# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATES OF NEW YORK,
CONNECTICUT, DELAWARE,
ILLINOIS, IOWA, MARYLAND,
MINNESOTA, NEW JERSEY, NEW
MEXICO, NORTH CAROLINA,
OREGON, RHODE ISLAND,
VERMONT, and WASHINGTON;
COMMONWEALTHS OF
MASSACHUSETTS,
PENNSYLVANIA, and VIRGINIA;
DISTRICT OF COLUMBIA; CITIES
OF CHICAGO, NEW YORK,
PHILADELPHIA, PROVIDENCE,
and SEATTLE; CITY and COUNTY
of SAN FRANCISCO; and the
UNITED STATES CONFERENCE
OF MAYORS,

          Plaintiffs,

    v.

UNITED STATES DEPARTMENT
OF COMMERCE; and WILBUR L.
ROSS, JR., in his official capacity as
Secretary of Commerce,

    and

BUREAU OF THE CENSUS, an
agency within the United States
Department of Commerce; and RON S.
JARMIN, in his capacity as performing
the non-exclusive functions and duties
of the Director of the U.S. Census
Bureau,

          Defendants.

CIVIL ACTION NO.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This case is brought to enforce the federal government's constitutional obligation to conduct an "actual Enumeration" of the national population every ten years, by determining the "whole number of persons" in the United States.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  Plaintiffs challenge Defendants' unconstitutional and arbitrary decision to add a citizenship demand to the 2020 Census questionnaire, which will fatally undermine the accuracy of the population count and cause tremendous harms to Plaintiffs and their residents.

2.      The "decennial enumeration of the population is one of the most critical constitutional functions our federal government performs."[1]  The decennial census directly determines the apportionment of Representatives to Congress among the states, the allocation of electors to the Electoral College, and the distribution of hundreds of billions of dollars in federal funds to states, local governments, and other grantees.

3.      On March 26, 2018, Defendants announced their decision to use the 2020 Census to demand information on the citizenship status of every resident in the country, despite acknowledging that "[t]he Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."[2]  As required by the Census Act, on March 29, 2018, Defendants transmitted the Secretary of Commerce's final determination of the "questions that will be asked on the 2020 Census" to Congress.[3]

---

[1] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

[2] Memorandum from Sec'y of Commerce Wilbur Ross to Under Sec'y of Commerce for Econ. Affairs Karen Dunn Kelley, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* 7 (Mar. 26, 2018), https://www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf (hereafter "Ross Memo").

[3] U.S. Census Bureau, *Questions Planned for the 2020 Census and American Community Survey* 1 (Mar. 2018); *see also* 13 U.S.C. § 141(f)(2) (hereafter "Final Questions Report").

4.      The U.S. Bureau of the Census ("Census Bureau") has not sought citizenship information on the decennial census form that goes to every household in the country since 1950. In departing from nearly seven decades of settled practice, Defendants also departed from their long-standing and well-established processes for revising the decennial census questionnaire. Decisions to change questions on the decennial census typically take several years to test, evaluate, and implement; but Defendants' decision here was compressed into a hasty and unprecedented period of less than four months.

5.      As Defendants' own research shows, this decision will "inevitably jeopardize the overall accuracy of the population count" by significantly deterring participation in immigrant communities, because of concerns about how the federal government will use citizenship information.  *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980) (three-judge court).  These concerns have been amplified by the anti-immigrant policies, actions, and rhetoric targeting immigrant communities from President Trump and this Administration.

6.      The resulting undercount will not only fatally undermine the accuracy of the 2020 Census, but will jeopardize critical federal funding needed by states and localities to provide services and support for millions of residents.  Further, it will deprive historically marginalized immigrant communities of critical public and private resources over the next ten years. Defendants' decision is inconsistent with their constitutional and statutory obligations; is unsupported by the stated justification; departs from decades of settled practice without reasoned explanation; and fails to consider the availability of alternative data that effectively serve the federal government's needs.

7.  Plaintiffs the States of New York, Connecticut, Delaware, Illinois, Iowa, Maryland, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; the District of Columbia; the Cities of Chicago, New York, Philadelphia, Providence, and Seattle; the City and County of San Francisco; and the United States Conference of Mayors ("USCM"), therefore bring this action to enjoin Defendants' decision because it violates the constitutional mandate to conduct an "actual Enumeration," U.S. Const. art. I, § 2, cl. 3; exceeds and is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C); and is arbitrary, capricious, and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

8.  The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

9.  Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2202.

10.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs State of New York and City of New York are residents of this judicial district, and the other Plaintiffs consent to adjudication of these issues in this district.

11.  Plaintiffs bring this action to redress harms to their proprietary and sovereign interests and Plaintiff States and the District of Columbia as to their interests as *parens patriae*.

3

## PARTIES

12.     Plaintiff the State of New York, represented by and through its Attorney General, Eric T. Schneiderman, is a sovereign state in the United States of America.  The Attorney General is New York State's chief law enforcement officer, and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

13.     Plaintiff the State of Connecticut, represented by and through its Attorney General, is a sovereign state in the United States of America.

14.     Plaintiff the State of Delaware, represented by and through its Attorney General, is a sovereign state in the United States of America.

15.     Plaintiff the State of Illinois, represented by and through its Attorney General, is a sovereign state in the United States of America.

16.     Plaintiff the State of Iowa, represented by and through its Attorney General, is a sovereign state in the United States of America.

17.     Plaintiff the State of Maryland, represented by and through its Attorney General, is a sovereign state in the United States of America.

18.     Plaintiff the State Minnesota, represented by and through its Attorney General, is a sovereign state in the United States of America.

19.     Plaintiff the State New Jersey, represented by and through its Attorney General, is a sovereign state in the United States of America.

20.     Plaintiff the State of New Mexico, represented by and through its Attorney General, is a sovereign state in the United States of America.

21.     Plaintiff the State of North Carolina, represented by and through its Attorney General, is a sovereign state in the United States of America.

22.     Plaintiff the State of Oregon, represented by and through its Attorney General, is a sovereign state in the United States of America.

23.     Plaintiff the State of Rhode Island, represented by and through its Attorney General, is a sovereign state in the United States of America.

24.     Plaintiff the State of Vermont, represented by and through its Attorney General, is a sovereign state in the United States of America.

25.     Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign state in the United States of America.  The Washington State Attorney General is the chief legal advisor to the State.  The Attorney General's powers and duties include acting in federal court on matters of public concern.

26.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state in the United States of America.

27.     Plaintiff the Commonwealth of Pennsylvania, represented by and through its Attorney General, is a sovereign state in the United States of America.

28.     Plaintiff the Commonwealth of Virginia, represented by and through its Attorney General, is a sovereign state in the United States of America.

29.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia.

30.     Plaintiff City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.  Chicago is the third largest city in the United States by population.

31.     Plaintiff New York City is a municipal corporation organized pursuant to the laws of the State of New York.  The City is a political subdivision of the State and derives its powers through the State Constitution, State laws, and the New York City Charter.  New York City is the largest city in the United States by population.

32.     Plaintiff City of Philadelphia is a municipal corporation organized pursuant to the laws of the Commonwealth of Pennsylvania.  The City is a political subdivision of the Commonwealth with powers derived from the Pennsylvania Constitution, Commonwealth law, and the City's Home Rule Charter.  Philadelphia is the fifth largest city in the United States by population.

33.     Plaintiff City of Providence is a municipal corporation organized pursuant to the laws of the State of Rhode Island.

34.     Plaintiff the City and County of San Francisco, represented by and through its City Attorney, is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

35.     Plaintiff the City of Seattle is a first-class charter city, incorporated under the laws of the State of Washington, empowered to sue and be sued, and represented by and through its elected City Attorney, Peter S. Holmes.  Seattle is the largest city in the State of Washington by population.

36.     Plaintiff United States Conference of Mayors is the official nonpartisan organization of cities with populations of 30,000 or more.  There are nearly 1,400 such cities in

the country today, and each member city is represented in the Conference by its chief elected official, the mayor.

37.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the decision to add a person-by-person demand for citizenship information to the 2020 Census has already damaged Plaintiffs' sovereign, quasi-sovereign, and proprietary interests and will continue to cause injury unless and until the decision is enjoined.

38.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  The Commerce Department is responsible for planning, designing, and implementing the 2020 Census.  13 U.S.C. § 4.

39.     Defendant Wilbur L. Ross, Jr. is the Secretary of Commerce.  He is responsible for conducting decennial censuses of the population, and oversees the Bureau of the Census ("Census Bureau").  He is sued in his official capacity.

40.     Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is the agency responsible for planning and administering the decennial census.

41.     Defendant Ron S. Jarmin is currently performing the non-exclusive functions and duties of the Director of the Census Bureau.  He is sued in his official capacity.

## ALLEGATIONS

**I.      Defendants have a constitutional obligation to conduct an accurate enumeration of the population.**

42.     The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, cl. 2, § 3; which requires "counting the whole number of persons in each State," *id.* amend. XIV, § 2.  To ensure

fair representation among the states, the Constitution requires that this count be an "actual Enumeration" conducted every ten years.

43.     Congress has assigned the responsibility of making this enumeration to the Secretary of Commerce, and the Secretary may delegate authority for establishing procedures to conduct the census to the Census Bureau.  13 U.S.C. §§ 2, 4, 141.  The central constitutional purpose of the Census Bureau in taking the decennial census is to conduct an accurate enumeration of the population.

44.     In addition, the population data tabulated as a result of the census are used for other governmental purposes, including to permit compliance with the Fourteenth Amendment's one-person one-vote requirement when drawing district lines for state and local government elected bodies; and to allocate federal funds authorized by hundreds of critical Congressional programs.

45.     To enable a person-by-person count, the Census Bureau sends a questionnaire to every household in the United States.  The questionnaires are directed to every resident in the United States and, under 13 U.S.C. § 221, residents are legally required to respond.  The Census Bureau then counts responses from every household to determine the population count in the various states.

46.     Some demographic groups have proven more difficult to count than others. Minority and immigrant populations have historically been some of the hardest groups to count accurately in the decennial census, due to issues such as language barriers and distrust of government.  For example, the 2010 Census failed to count more than 1.5 million minorities.

Indeed, Census Bureau analyses show the fast-growing Hispanic population was undercounted by 1.54% in 2010, by 0.71% in 2000, and by 4.99% in 1990.[4]

47.     Recognizing that these barriers undermine its constitutional mandate to pursue an accurate enumeration of the population, the Census Bureau has previously taken affirmative steps to reach these hard-to-count populations.  One such measure includes hiring census workers to serve as "enumerators," to conduct in-person follow-up with any person who fails to respond.[5]  In addition, during the 2000 and 2010 censuses, the Census Bureau designed and implemented a public advertising campaign to reach hard-to-count immigrant communities.  The Census Bureau used paid media in over a dozen different languages to improve responsiveness in immigrant communities.  For the 2010 Census, the Census Bureau adopted a plan to partner with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count.

48.     The Census Bureau's constitutional obligation to pursue an accurate enumeration requires that the Census Bureau avoid unnecessarily deterring participation in the decennial census.  U.S. Const. art. 1, § 2, cl. 3.  To that end, the Census Bureau must minimize the burden questions may place on respondents.  According to the Census Bureau's own standards, it must also test its survey questions to ensure that they do not increase non-responsiveness by touching on sensitivities or anxieties respondents have about privacy and governmental overreach.

---

[4] See Memorandum from Patrick J. Cantwell to David C. Whitford, *2010 Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States* 2 (May 22, 2012), https://www.census.gov/coverage_measurement/pdfs/g01.pdf.

[5] U.S. Census Bureau, *2010 Census Non-Response Followup Enumerator Manual* 1–6 (2009), https://www.census.gov/history/pdf/2010nrfu.pdf; U.S. Census Bureau, *Non-Response Followup Enumerator Manual* 1–2 (1999), https://www.census.gov/history/pdf/2000nrfu.pdf; U.S. Census Bureau, *Census Instructions-History*, https://www.census.gov/history/www/through_the_decades/census_instructions/.

**II.    Defendants' decision to include a citizenship demand on the 2020 Census will deter participation.**

49.    Federal law requires the Secretary of Commerce to advise Congress by no later than March 31, 2018, of the Secretary's determination of the questions to be included on the 2020 Census.  13 U.S.C. § 141(f)(2).  Consistent with this obligation, the Defendants transmitted a report to Congress on March 29, 2018, advising Congress of the questions to be included on the 2020 Census.  This report included the Secretary's determination that the decennial census will include, for the first time since 1950, a demand for information regarding the citizenship status of every person in the country.

50.    In the March 26, 2018, memo announcing the Defendants' decision to demand citizenship status for every resident in the country, Secretary Ross stated that "the Department [of Commerce]'s review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially."[6]  However, almost forty years of Census Bureau statements and data reflect the opposite to be true.

**A.    Defendants have acknowledged for decades that a citizenship demand would deter census participation and undermine the decennial population count.**

51.    Since at least 1980, the Census Bureau has expressed the public position that inquiries regarding citizenship are particularly sensitive in immigrant communities, and that demanding citizenship or immigration status on the decennial census would drive down response rates and seriously impair the accuracy of the decennial population count.

52.    In 1980, in response to a lawsuit seeking to compel the Census Bureau to demand all Americans disclose their immigration status, the Bureau argued in litigation that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count."

---

[6] Ross Memo at 5.

*Fed'n for Am. Immigration Reform*, 486 F. Supp. at 568.  The Bureau explained that "[o]btaining the cooperation of a suspicious and fearful population would be impossible if the group being counted perceived any possibility of the information being used against them.  Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Id.*

53.     The Census Bureau repeated these concerns in 1988 and 1989, in congressional testimony opposing proposed legislation that would have directed the Census Bureau to exclude from its count any immigrant who was not a lawful permanent resident.

54.     The Bureau testified that inquiring into immigration status "could seriously jeopardize the accuracy of the census," because "[p]eople who are undocumented immigrants may either avoid the census altogether or deliberately misreport themselves as legal residents," and legal residents "may misunderstand or mistrust the census and fail or refuse to respond."[7] The Bureau concluded that a citizenship demand would suffer from "the same problems."[8]

55.     The Census Bureau also declined to include a person-by-person demand regarding citizenship status on the 2000 Census.  The former Director of the Census Bureau who oversaw the 2000 Census later testified that a citizenship demand "will lead to a less complete and less accurate census," explaining that the "question will be treated with suspicion" and "[a] significant number of noncitizens will not respond," because "it is foolish to expect that census-

---

[7] *See Census Equity Act: Hearings Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civ. Serv.*, 101st Cong. 43–45 (1989) (statement of C. Louis Kincannon, Deputy Director, Census Bureau); *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 100th Cong. 50–51 (1988) (testimony of John Keane, Director, Census Bureau).

[8] *Id.*

taking is immune from anxieties that surround such issues as undocumented aliens, immigration enforcement, and so forth."[9]

56.     In 2009, all eight former Census Bureau directors dating back to 1979, and appointed by presidents of both political parties, objected to an ultimately failed congressional proposal to add demands for information regarding citizenship and immigration status to the 2010 Census.  They argued that the Census Bureau would not have enough time to determine "[t]he effect on data quality" and "the consequences for participation among all immigrants, regardless of their legal status," including the concern that enumerators might encounter "problems during door-to-door visits to unresponsive households, when a legalized 'head of household' would avoid enumerators because one or more other household members are present unlawfully."[10]

57.     In 2010, the Census Bureau again declined to include a person-by-person citizenship demand on the census questionnaire.  Then-Director of the Census Bureau, Robert Groves, explained that "we don't ask citizenship or documentation status, all of the things that may make people uncomfortable are gone from [the census] form."[11]

58.     Subsequently, in 2016, four former Directors of the Census Bureau, also appointed by presidents of both political parties, argued in a brief filed with the U.S. Supreme Court that "a [person-by-person] citizenship inquiry would invariably lead to a lower response

---

[9] *Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform*, 109th Cong. 73 (2005) (statement of Kenneth Prewitt).

[10] *Statement of Former Census Directors on Adding a New Question to the 2010 Census* (Oct. 16, 2009), http://reformimmigrationforamerica.org/wp-content/uploads/2009/10/thecensusproject.org_letters_cp-formerdirs-16oct2009.pdf.

[11] *Video of Robert Groves*, C-SPAN (Mar. 26, 2010), https://www.c-span.org/video/?292743-6/2010-us-census&start=1902.

rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states."  Brief of Former Directors of the U.S. Census Bureau as Amici Curiae Supporting Appellees at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940).

59.     The former Directors also noted that "[r]ecent experience demonstrates lowered participation in the Census and increased suspicion of government collection of information in general," and that "[p]articular anxiety exists among non-citizens."  *Id*. at 5.  In this context, the former Directors concluded, "[t]here would be little incentive for non-citizens to offer to the government their actual status," and the "result would be a reduced rate of response overall and an increase in inaccurate responses."  *Id.*

**B.      The Trump Administration's anti-immigrant policies, actions, and rhetoric will amplify the negative impacts on census participation rates of Defendants' demand for citizenship status.**

60.     These well-documented risks of adding a person-by-person citizenship demand to the decennial census are heightened in the current political climate because of President Trump's anti-immigrant rhetoric and this Administration's pattern of policies and actions that target immigrant communities.  These actions and policies include the rescission of the Deferred Action for Childhood Arrivals program; the ban on travel from several majority-Muslim countries; the suspension on refugee admissions to the United States; the termination of special protections from removal for migrants from nations experiencing war and natural disasters; increased roundups of undocumented migrants; efforts to suspend or terminate federal funding to localities that elect to limit their participation in federal immigration enforcement efforts; and efforts to build a physical wall along the Mexico-U.S. border, among other actions.

61.     The Trump Administration has also made a number of threatening statements about deporting undocumented immigrants.  On June 13, 2017, the Acting Director of U.S. Immigration and Customs Enforcement, Thomas Homan, testified before Congress that "every immigrant in the country without papers . . . should be uncomfortable.  You should look over your shoulder.  And you need to be worried."[12]

62.     This anti-immigrant climate has led to significant public distrust and fear of providing information to the federal government.  During recent pretests in preparation for the 2020 Census, Census Bureau researchers found that immigrant respondents are already increasingly concerned about confidentiality and data sharing in light of the current anti-immigrant rhetoric.

63.     Census Bureau officials have noted that in routine pretests conducted from February 2017 to September 2017, "fears, particularly among immigrant respondents, have increased markedly this year."[13]  The Census Bureau's researchers recounted repeated instances of respondents spontaneously raising concerns about data confidentiality and the government's negative attitudes toward immigrants.  The researchers also noted that some respondents, acting on these same concerns, intentionally provided incomplete or inaccurate information, or sought to break off interviews.

64.     The Census Bureau has recognized that these anxieties are already likely to present a barrier to participation in the 2020 Census, and that "[t]hese findings are particularly

---

[12] *Immigration and Customs Enforcement and Customs and Border Patrol Fiscal Year 2018 Budget Request: Hearing Before the Subcomm. on Homeland Sec. of the H. Comm. on Appropriations*, 115th Cong. (2017) (statement of Thomas D. Homan, Acting Director, Immigration and Customs Enforcement).

[13] Memorandum from the U.S. Census Bureau, Ctr. for Survey Measurement to Assoc. Directorate for Research and Methodology, *Respondent Confidentiality Concerns* 1 (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."[14]

65.    The Defendants' decision to add a citizenship demand to the 2020 Census questionnaire will add to this unprecedented level of anxiety in immigrant communities.  It will lead to nonresponse and lower participation by many immigrants who are citizens and legal residents and live in mixed immigration status households, as well as by undocumented immigrants, all of whom may seek to protect their own privacy or the privacy of their household. This exacerbated deterrent effect began on March 26, 2018, when immigrant communities learned that Secretary Ross directed the Census Bureau to add a citizenship demand to the 2020 Census.

66.    Further, the Census Bureau will have to expend significant additional resources due to the lowered participation of immigrant communities, including hiring more census enumerators for in-person follow-up.  However, enumerators are unlikely to succeed in meaningfully addressing nonresponses to the census where individuals decline to participate due to fear or mistrust of the federal government.

67.    While Defendants recognize the detrimental impact that the addition of a citizenship demand will cause to the accuracy of the 2020 Census, they nevertheless decided to demand citizenship status from every individual resident in the country through the 2020 Census questionnaire.

---

[14] *Id.* at 7.

C.     **Defendants ignored their own standards for ensuring the accuracy of the decennial census.**

68.     In adding a citizenship demand to the 2020 Census, Defendants departed from statistical standards that promote the accuracy of information collected and disseminated by the Defendants.

69.     For each decennial census, the Census Bureau meticulously develops and tests the content, specific language, order, and layout of the questionnaire to improve the accuracy of the enumeration.  In addition to fulfilling the Census Bureau's constitutional duty, this development process involves multiple steps that ensure the accuracy, reliability, and objectivity of the final data, as consistent with prior Census Bureau practice and as required by the Information Quality Act ("IQA").  Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 515, 114 Stat. 2763 (Dec. 21, 2000).

70.     Government-wide statistical standards adopted under the IQA require the Commerce Department and the Census Bureau to carefully design the census questionnaire to "minimize respondent burden while maximizing data quality" and to "achieve the highest rates of response."[15]  The standards also require testing each component of the questionnaire to ensure that it operates as intended.

71.     The questionnaire development process and the evaluation of changes to individual inquiries take several years to complete.

72.     Indeed, the Census Bureau has spent almost ten years developing and testing the content, specific language, and layout of just one proposed change to the question regarding race and ethnicity on the 2020 questionnaire.  From 2008 through 2012, the Census Bureau conducted

---

[15] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys* Sections 1.3, 1.4, 2.3.1 (2006).

16

comprehensive research into the possibility of combining race and ethnicity into one question on the 2020 Census.  The research focused on whether this proposed change would improve respondent understanding of the question, and improve the accuracy of race and ethnicity data collected.

73.     The Census Bureau then spent several years designing and conducting tests on the proposed change to explore different alternatives for the language, layout, and instructions regarding a revised question.  The testing was designed to assess the accuracy and reliability of alternative forms of asking the proposed question.  In 2016, the Census Bureau conducted outreach to federal agencies and to the public to obtain feedback on the proposed change.

74.     The Bureau concluded its process at the end of 2017, after nine years of evaluation and testing, because it "needed to make a decision on the design of the race and ethnicity questions by December 31, 2017 in order to prepare for the 2020 Census systems, and deliver the final 2020 Census question wording to Congress by March 31, 2018."[16]

75.     In contrast, Defendants added a demand for citizenship information to the 2020 questionnaire after less than four months of consideration, conducted almost entirely after the Bureau's internal deadline of December 31, 2017, for adding questions to the 2020 Census. Defendants did not conduct any research into the potential performance of the citizenship demand, and did not test the impact of adding a citizenship demand on data accuracy. Nevertheless, Secretary Ross directed the Census Bureau to add a citizenship demand to the 2020 Census questionnaire, overruling Census Bureau officials and the Bureau's own expert advisory committee.

---

[16] Memorandum, U.S. Census Bureau, *2020 Census Program Memorandum Series: 2018.02, Using Two Separate Questions for Race and Ethnicity in 2018 End-to-End Census Test and 2020 Census* (Jan. 26, 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_02.pdf.

### (1)    The Defendants failed to adequately test the inclusion of a citizenship demand on the 2020 Census.

76.    The Defendants added a citizenship demand to the 2020 Census without following required standards for testing the content, specific language, and layout of new inquiries.  Specifically, Defendants ignored IQA standards that require testing of each inquiry to "ensure that all components of a survey function as intended," and require incorporation of testing results into the final design of the questionnaire.[17]  These testing standards promote the accuracy of the decennial census, which is the Defendants' primary constitutional obligation.

77.    Major testing of proposed changes to the 2020 Census questionnaire began with the 2014 Census Test.  At that time, the Census Bureau assessed wording changes to the race and Hispanic origin question, as well as new potential response categories for married and unmarried relationships.  The 2014 test did not assess the content, wording, or layout of a demand for citizenship information.

78.     For the 2020 Census, the 2015 National Content Test was the opportunity for the U.S. Census Bureau to "compare different versions of questions prior to making final decisions."[18]

79.    The Census Bureau designed and conducted the National Content Test in 2015.  While the Census Bureau tested the changes to questions related to race and ethnicity, the Bureau did not design tests of language, layout, or instructions for a potential citizenship demand.  The Census Bureau announced the results of this test in early March 2017, none of which related to citizenship.

---

[17] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys* Section 1.4 (2006).

[18] U.S. Census Bureau, *Information Collection Request: 2015 National Content Test*, 80 Fed. Reg. 29,609, 29,610 (May 22, 2015).

80.    The Census Bureau had other opportunities during the major tests in 2016 and April 2017 to test its questionnaire for the 2020 Census.  However, the questionnaires assessed in these tests did not include a question regarding citizenship.  In fact, the Census Bureau did not begin considering whether to add a demand for citizenship information to the 2020 Census until approximately eight months after it began conducting major testing in 2017.

81.    The last major test before the 2020 Census, the 2018 end-to-end test, began on April 1, 2018.  The end-to-end test is a dress rehearsal for the upcoming census, in which the Bureau tests and validates all major components, including operations, procedures, systems, and infrastructure.  The 2018 end-to-end test does not include any request for citizenship information on the questionnaire sent to households.  As a result, none of the major tests for the 2020 Census will have assessed the content, language, layout, or order of the citizenship demand on the questionnaire, or the impact that the demand for person-by-person citizenship status would have on response rates and accuracy.

82.    Defendants acknowledge that they are unable "to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness,"[19] but they added a citizenship question without conducting the necessary testing to determine the impact of this decision on the 2020 Census.

83.    To date, the Census Bureau has not tested the language or layout of the newly added demand for person-by-person citizenship information.  Indeed, the purpose of testing is to promote accuracy by ensuring that the components of the census function as intended.  Yet, the Bureau has failed to conduct any testing to assess the accuracy and reliability of "different ways

---

[19] Ross Memo at 7.

to ask the question" before adding it to the questionnaire.[20]  The Census Bureau also failed to test the content and order of the citizenship demand on the proposed census questionnaire with actual respondents as required by its own standards.  Such testing could have allowed the Bureau to identify potential problems, including adverse impact of the citizenship demand on response rates and accuracy.

84.     The Census Bureau's failure to test its demand for citizenship information before deciding to include it on the 2020 Census questionnaire is unprecedented in the modern administration of the decennial census.  For each decennial census since 1970, "the Census Bureau has conducted content tests to research and improve the design and function of different questions."[21]  The Census Bureau spent three to four years thoroughly testing proposed changes to topics and question wording "to ensure census questionnaires are easily understood and reflect the population accurately."[22]  This thorough vetting process included testing of the language of specific questions in decennial National Content Tests in 1976, 1986, 1996, 2005, and 2015, as well as testing the performance of proposed topics and specific questions in the field with actual respondents.

85.     In sharp contrast to these extensive testing practices, the Bureau failed to conduct any tests to determine the performance of its new demand for citizenship status on the 2020 questionnaire.  Instead the Census Bureau simply transferred the citizenship demand from the existing American Community Survey ("ACS") to the 2020 Census questionnaire.

---

[20] U.S. Census Bureau, *How a Question Becomes a Part of the American Communities Survey* (2017) https://www.census.gov/content/dam/Census/library/visualizations/2017/comm/acs-questions.pdf.

[21] U.S. Census Bureau, *Content Research* (Jan. 11, 2017), https://www.census.gov/programs-surveys/decennial-census/2020-census/research-testing/content-research.html.

[22] *Id.*

86.     While the Census Bureau currently inquires into citizenship status on the annual ACS, it cannot simply transfer the demand from the ACS to the decennial census without testing. The ACS is a sample survey sent to 3.5 million households annually, rather than a complete enumeration of every household in the United States.

87.     Moreover, the testing the Census Bureau has conducted on the citizenship demand occurred to refine the question in the context of the ACS questionnaire.  The citizenship demand's specific language, layout, order, and instructions remain untested in the context of the decennial census questionnaire.

88.     For instance, the Census Bureau developed the language of the citizenship demand on the ACS to fulfill various purposes, including the "evaluation of immigration policies."[23] As a result, the citizenship demand on the ACS requires citizens to disclose whether they were born in "United States territories," whether they were born "abroad" to U.S. parents, or if and when they were "naturalized."[24]  This information is entirely irrelevant to the sole stated purpose for adding the citizenship demand to the 2020 Census questionnaire: to provide the Department of Justice with data it claims to need to enforce Section 2 of the Voting Rights Act.[25]  The Census Bureau has not tested how these components of the citizenship demand will perform on a person-by-person questionnaire, and whether the language can be refined to minimize respondent burden.

89.     Finally, the demand for information regarding the citizenship status of every individual in the United States has not been tested in the contemporary environment of high immigrant anxiety and concerns over privacy.  Secretary Ross ignored these requirements when

---

[23] Final Questions Report at 59.

[24] *Id.* at 7.

[25] Ross Memo at 1, 8.

he asserted that the demand for citizenship status had been adequately tested by virtue of its inclusion on the so-called "long-form census" that was sent to a random sample of households from 1960 to 2000, and on the ACS since 2005.  As the Census Bureau's Scientific Advisory Committee publicly asserted on March 30, 2018, Secretary Ross's reliance on these prior surveys is based on "data collected in a different data collection context, in a different political climate, before anti-immigrant attitudes were as salient and consequential" as they are at present.[26]

90.     Indeed, during general testing from February through September 2017, the Census Bureau found that unprecedented anxiety in immigrant communities – even without the inclusion of a demand for citizenship status – could increase non-response rates and adversely affect data quality for the 2020 Census.  Defendants did not incorporate these findings into the final design of the 2020 Census questionnaire.  Instead, Defendants incorporated a demand for citizenship status that will exacerbate anxiety in immigrant communities and further diminish the accuracy of the 2020 Census.

### (2)     The Defendants have not considered respondent burden or potential response rates.

91.     The IQA standards require Defendants to design questionnaires "in a manner that achieves the best balance between maximizing data quality . . . while minimizing respondent burden and cost," and "achieves the highest practical rates of response."[27]  Further, under agency-specific IQA standards adopted by the Census Bureau, the Bureau committed to verify that questions are not "unduly sensitive" and "do not cause undue burden."[28]

---

[26] Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question* (Mar. 30, 2018).

[27] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2*, § 2.3 at 11.

[28]  U.S. Census Bureau, *Statistical Quality Standards* ii, 7–8 reqs. A2-3 & A2-3.3 (Jul. 2013).

92.     The Defendants failed to follow these directives.  To the contrary, despite accumulating significant evidence showing that inquiries into citizenship are especially burdensome for immigrant populations, and that a demand for citizenship status would lead to higher rates of non-response, Defendants nonetheless decided to include such a demand on the 2020 Census questionnaire that will be sent to every household.

### (3)     The Defendants failed to respond to stakeholder concerns.

93.     A number of affected stakeholders have expressed concern to the Defendants regarding the inclusion of a demand for citizenship status on the 2020 Census.

94.     On January 8, 2018, the American Statistical Association ("ASA") urged the Census Bureau not to collect citizenship information because of the "very strong potential the quality of the census will be undermined."[29]  In addition, the ASA raised concerns that the addition of a citizenship demand this late in the preparation process "would likely increase distrust or suspicion of the government among immigrants, many of whom are already anxious about government inquiries and activities."[30]  Moreover, the timing of the Census Bureau's consideration "[did] not allow time for adequate testing to incorporate new questions, particularly if the testing reveals substantial problems."[31]

95.     The National League of Cities also flagged concerns that the addition of a citizenship demand at such a late stage in the census planning process was "reckless and disruptive," and would "spike fears about data confidentiality."[32]

---

[29] Letter from Lisa LaVange to Sec'y of Commerce Wilbur Ross (Jan. 8, 2018), http://www.amstat.org/asa/files/pdfs/POL-CitizenshipQuestion.pdf.

[30] *Id.*

[31] *Id.*

[32] Letter from Clarence Anthony to Sec'y of Commerce Wilbur Ross (Feb. 8, 2018), http://www.nlc.org/sites/default/files/users/user125/Ross%20Letter%20on%20Citizenship%20Question.pdf.

96.     Plaintiff USCM also sent Secretary Ross a letter signed by 161 Republican and Democratic mayors, expressing concerns about the addition of a citizenship demand to the 2020 Census questionnaire.  The USCM noted that adding a demand for citizenship status late in the 2020 Census development process would nullify years of careful planning by the Census Bureau, and would require staffing beyond currently planned levels to address higher rates of non-response in light of the anticipated chilling effect.

97.     On February 12, 2018, nineteen state Attorneys General and the Governor of Colorado urged Secretary Ross not to collect citizenship information on the 2020 Census.  In addition to the issues highlighted above, the states explained in detail that the collection of citizenship data is "unnecessary to enforce the vote-dilution prohibition in Section 2 of the Voting Rights Act," and that "[c]ollecting citizenship data would undermine the goal of fair and effective representation for all communities, which the Voting Rights Act was enacted to protect."[33]

98.     Several former directors of the Census Bureau voiced similar concerns after Defendants began considering this change.  The Census Bureau Director from 2013 to 2017 explained, "[t]here are great risks that including that question, particularly in the atmosphere that we're in today, will result in an undercount, not just of non-citizen populations but other populations that are concerned with what could happen to them."[34]  While Secretary Ross acknowledged receipt of some of these letters in his March 26, 2018, memorandum, he

---

[33] Letter from Eric Schneiderman *et al.* to Sec'y of Commerce Wilbur Ross (Feb. 12, 2018), https://ag.ny.gov/sites/default/files/multi-state_letter_2020_census.pdf.

[34] Kriston Capps, *Ex-Census Director: Citizenship Question is 'a Tremendous Risk'*, CityLab (Feb. 27, 2018), https://www.citylab.com/equity/2018/02/former-census-director-citizenship-question-is-a-tremendous-risk/554372/.

disregarded the serious concerns raised in these letters and directed the Census Bureau to demand the citizenship status of all respondents to the 2020 Census.

> **(4)    The Defendants failed to justify their changes to the subjects to be included on the 2020 Census.**

99.     Finally, the Defendants failed to comply with their statutory obligations to advise Congress of the subjects to be included on the decennial census, and of any changes to those subjects.  The Census Act required the Commerce Secretary, not later than three years before the decennial census date (that is, before April 1, 2017), to transmit to Congress "a report containing the Secretary's determination of the subjects proposed to be included" in the census.  13 U.S.C. § 141(f)(1).  The report of subjects that Defendants submitted in March 2017 included the same subjects as the 2010 Census, and did not indicate any change to include citizenship information.

100.     In reversing course just a year later, Defendants failed to identify and explain any "new circumstances" that "necessitated" this modification to the subjects it submitted in 2017, as required by statute.  13 U.S.C. § 141(f)(3).

## III.    Defendants' decision to include a citizenship demand on the 2020 Census is not supported by the stated justification.

101.     Defendants assert that they included a citizenship demand on the 2020 Census in response to a request from the United States Department of Justice ("DOJ") dated December 12, 2017 (the "DOJ Letter").

102.     The DOJ Letter asserted that person-by-person information on the citizenship status of every individual in the country was necessary to enforce Section 2 of the Voting Rights Act.  Specifically, DOJ claimed that it needs a "reliable calculation of citizen voting-age

population" in order to determine whether a minority group can constitute a majority in a single-member district, the first element in a vote dilution case.[35]

103.    Collecting citizenship information from every person in the United States is not necessary to achieve the goal of effective Section 2 enforcement.  The Supreme Court has never held that citizen voting-age population ("CVAP") is the proper measure for examining whether a minority group can constitute a majority in a single-member district.

104.    Congress could not have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data has never been available at any point since Section 2 was enacted in 1965.  Data collected through the decennial census would not provide a "reliable calculation" of CVAP in any event, because citizenship information collected decennially will quickly become outdated and less reliable over the course of the subsequent decade.

105.    Further, the American Community Survey already provides a reliable calculation of annually updated citizenship information that is collected through less invasive methods.  In fact, DOJ and voting rights advocates have long used data from the ACS or a functionally equivalent survey to effectively enforce the law, and have never relied on the decennial census for this purpose.[36]

106.    Even if demanding citizenship status from every person residing in the United States were necessary to enforce Section 2 of the Voting Rights Act – which it is not –

---

[35] Letter from Arthur E. Gary, General Counsel, Justice Management Division, U.S. Dep't of Justice, to Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Bureau of the Census, U.S. Dep't of Commerce (Dec. 12, 2017).

[36] Section 2 of the VRA was enacted in 1965, and no citizenship question has been included on the decennial census since 1950.  From 1970 to 2000, a citizenship question was included only on the "long form" questionnaire, which was distributed to a sample of about one in six households in lieu of the decennial census questionnaire. Following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey, which is now sent to about one in every 38 households each year.

Defendants' decision would impermissibly sacrifice the accuracy of the constitutionally-mandated census for non-constitutional purposes.

107.     Demanding citizenship status on the 2020 Census will undermine, not advance, the goals of the Voting Right Act.  A person-by-person citizenship demand that leads to a systematic undercount of minority populations across the United States will impair fair representation of those groups and the states in which they live.

108.     It is clear that DOJ's stated rationale for demanding information on the citizenship status of every resident in the country is contrary to the evidence, and was not, in fact, the true reason DOJ sought this change in practice from the Census Bureau.  A March 29, 2018, fundraising email from President Trump's reelection campaign indicates that the President "officially mandated" that a citizenship demand be included on the 2020 Census,[37] with no assertion that the President sought this information to strengthen enforcement of the Voting Rights Act.[38]  Further, the assertion that President Trump compelled the addition of a demand for citizenship information undermines Secretary Ross's claims that Defendants made an informed decision to add this question based on a comprehensive review process.  Therefore, Defendants' unfounded and conflicting rationales indicate that the stated reason for demanding citizenship information is pretext.

**IV.     Plaintiffs are harmed by Defendants' actions.**

109.     Defendants' decision to add a demand for person-by-person citizenship information to the 2020 Census will lead to significant undercount of Plaintiffs' citizen and

---

[37] Tal Kopan, *Trump Campaign Rallies Supporters on Census Citizenship Question*, CNN (Mar. 28, 2018), https://www.cnn.com/2018/03/28/politics/trump-census-citizenship/index.html.

[38] Ross Memo at 1, 8.

noncitizen residents.  Indeed, Plaintiffs are home to some of the hardest-to-count communities in the nation, including significant authorized and undocumented immigrants.

110.    For instance, in New York State, 24.2% of households did not mail back their 2010 Census questionnaire, which required the Census Bureau to conduct in-person follow-up. Approximately 36% of New York State's population lives in hard-to-count neighborhoods. Among those hard-to-count communities is New York State's large population of immigrants. One in five residents of New York State is foreign-born, the second highest proportion of foreign-born residents in the United States.  In addition, in 2014, New York State had the fourth largest population of undocumented residents in the nation.

111.    In Massachusetts, 21.1% of households did not mail back their 2010 Census questionnaire, which required the Census Bureau to conduct in-person follow-up. Approximately 23% of the population currently lives in hard-to-count neighborhoods. Immigrants account for 16.5% of Massachusetts's total population, and, in 2014, nearly one in five immigrants in Massachusetts was undocumented.

112.    In Connecticut, 20.9% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 22% of the population currently lives in hard-to-count neighborhoods. Immigrants account for 14.4% of Connecticut's population, and in 2014, nearly one in every four immigrants in Connecticut was undocumented.

113.    In Delaware, 20% of households did not mail back their 2010 census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 9.4% of Delaware's population, and in 2014, approximately 31% of Delaware's immigrant population was undocumented.

114.     In the District of Columbia, 21.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.3% of D.C.'s population, and in 2014, over one in four immigrants in D.C. was undocumented.

115.     In Illinois, 19.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.9% of Illinois's population, and in 2014, nearly one in four immigrants in Illinois was undocumented

116.     In Iowa, 16.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 5.1% of Iowa's population, and in 2014, over one in four immigrants in Iowa was undocumented.

117.     In Maryland, 19.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 15.3% of Maryland's population, and in 2014, over one in four immigrants in Maryland was undocumented.

118.     In Minnesota, 14.4% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 8.2% of Minnesota's population, and in 2014, nearly one in four immigrants in Minnesota was undocumented.

119.     In New Jersey, 21.9% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 22% of the population currently lives in hard-to-count neighborhoods.

Immigrants account for 22.5% of New Jersey's population, and in 2014, nearly one in four immigrants in New Jersey was undocumented.

120.    In New Mexico, 26.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 43% of the population currently lives in hard-to-count neighborhoods.  During the 2000 Census, New Mexico had the fourth highest undercount of any state.  Immigrants account for 9.5% of New Mexico's population, and in 2014, approximately 37% of immigrants in New Mexico were undocumented.

121.    In North Carolina, 19.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  North Carolina is home to one of the fastest growing immigrant communities in the nation, increasing by over 83% between 2000 and 2016.  Immigrants account for 7.8% of North Carolina's population, and in 2014, approximately 43% of immigrants in North Carolina were undocumented.

122.    In Oregon, 20.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 9.6% of Oregon's population, and in 2014, approximately 32% of immigrants in Oregon were undocumented.

123.    In Pennsylvania, 17.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 6.8% of Pennsylvania's population, and in 2014, over one in five immigrants in Pennsylvania was undocumented.

124.     In Rhode Island, 22.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.5% of Rhode Island's population, and in 2014, nearly one in five immigrants in Rhode Island was undocumented.

125.     In Vermont, 20.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 4.5% of Vermont's population, and in 2014, approximately 8% of Vermont's immigrant population was undocumented.

126.     In Virginia, 19.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 12.3% of Virginia's population, and in 2014, approximately 28% of Virginia's immigrant population was undocumented.

127.     In Washington, more than 20% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Roughly one in seven Washington residents is an immigrant, and one in eight native-born U.S. citizens lives with at least one immigrant parent.  In 2014, over one in four immigrants in Washington was undocumented, and over 170,000 U.S. citizens lived with an undocumented family member.

128.     In Chicago, 34% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Approximately 48% of Chicago's population lives in hard-to-count neighborhoods. Immigrants account for 20.8% of Chicago's population, and in 2014, an estimated 425,000 undocumented immigrants lived in the Chicago metro area.

129.     In New York City, 29% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  New York City is home to 3.4 million foreign-born residents, and approximately 46% of foreign-born residents are non-citizens.  Immigrants and the children of immigrants account for 60% of New York City's population.  The New York metropolitan area is also home to an estimated 1.15 million undocumented immigrants.

130.     In Philadelphia, 26.9% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.1% of Philadelphia's population, and in 2014, an estimated 50,000 undocumented immigrants lived in the City of Philadelphia.

131.     In Providence County, Rhode Island, where Providence is located, 24.8% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for nearly 30% of Providence's population.

132.     In the City and County of San Francisco, 22.3% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 35% of San Francisco's population, and the San Francisco metro area is home to an estimated 240,000 undocumented immigrants.

133.     In King County, Washington, where Seattle is located, 20.7% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 18% of Seattle's population, and the immigrant population in Seattle grew by 20% from 2000 through 2014.  Over one in five

residents in Seattle speak a language other than English at home.  In 2014, approximately 150,000 undocumented immigrants lived in the Seattle metro area.

134.    The members of the USCM are home to the majority of immigrants in the United States.  In 2014, 104 metro areas, including many USCM members, accounted for over 86% of the immigrant population of the United States.  Moreover, 61% of the nation's undocumented population live in the 20 largest metro areas in the United States, all of which contain cities that are USCM members.

135.    Given the prevalence of Plaintiffs' hard-to-count populations, Plaintiffs are particularly susceptible to an undercount.  The Defendants' decision to add a person-by-person citizenship demand to the 2020 Census questionnaire will disproportionately impact Plaintiffs' hard-to-count immigrant populations.  The resulting undercounts in these communities will harm Plaintiffs' interests in full federal funding, accurate redistricting, and fair representation.

**A.    Defendants' conduct harms Plaintiffs' funding interests.**

136.    Many federal programs rely on the population figures collected in the decennial census to allocate federal funds among states and local governments.  A total of approximately $700 billion is distributed annually to nearly 300 different census-guided federal grant and funding programs.  Inaccurate population counts as a result of Defendants' decision to add a citizenship demand to the 2020 Census will harm Plaintiffs by depriving them of their statutory fair share of federal funding.

137.    For instance, the Highway Trust Fund provides grants to states and municipalities for road construction and other surface transportation programs, which are allocated on the basis of local population estimates collected through the decennial census.  23 U.S.C. § 104(d)(3).  In fiscal year 2015:

      a.  New York received $1.66 billion in Highway Trust Fund grants.

b.  Massachusetts received nearly $614 million in Highway Trust Fund grants.

c.  Connecticut received over $470 million in Highway Trust Fund grants.

d.  Delaware received nearly $182 million in Highway Trust Fund grants.

e.  The District of Columbia received over $185 million in Highway Trust Fund grants.

f.  Illinois received over $1.44 billion in Highway Trust Fund grants.

g.  Iowa received over $506 million in Highway Trust Fund grants.

h.  Maryland received about $597 million in Highway Trust Fund grants.

i.  Minnesota received over $673 million in Highway Trust Fund grants.

j.  New Jersey received over $839 million in Highway Trust Fund grants.

k.  New Mexico received nearly $361 million in Highway Trust Fund grants.

l.  North Carolina received over $237 million in Highway Trust Fund grants.

m.  Oregon received nearly $431 million in Highway Trust Fund grants.

n.  Pennsylvania received over $1.67 billion in Highway Trust Fund grants.

o.  Rhode Island received nearly $217 million in Highway Trust Fund grants.

p.  Vermont received over $206 million in Highway Trust Fund grants.

q.  Virginia received over $953 million in Highway Trust Fund grants.

r.  Washington received over $663 million in Highway Trust Fund grants.

138.   Under the Urbanized Area Formula Funding program, the Department of Transportation utilizes population figures from the most recent decennial census to calculate the federal resources allocated to cities and states for planning, operating, and improving transportation.  49 U.S.C. §§ 5307, 5340.  In fiscal year 2017:

a.  New York received nearly $657 million in Urbanized Area Formula grants.

b.   Massachusetts received over $205 million in Urbanized Area Formula grants.

c.   Connecticut received nearly $98 million in Urbanized Area Formula grants.

d.   Delaware received over $20 million in Urbanized Area Formula grants.

e.   The District of Columbia received over $22 million in Urbanized Area Formula grants.

f.   Illinois received over $273 million in Urbanized Area Formula grants.

g.   Iowa received over $21 million in Urbanized Area Formula grants.

h.   Maryland received over $165 million in Urbanized Area Formula grants.

i.   Minnesota received over $63 million in Urbanized Area Formula grants.

j.   New Jersey received over $401 million in Urbanized Area Formula grants.

k.   New Mexico received over $24 million in Urbanized Area Formula grants.

l.   North Carolina received nearly $71 million in Urbanized Area Formula grants.

m.   Oregon received nearly $57 million in Urbanized Area Formula grants.

n.   Pennsylvania received nearly $183 million in Urbanized Area Formula grants.

o.   Rhode Island received over $28 million in Urbanized Area Formula grants.

p.   Vermont received nearly 2.5 million in Urbanized Area Formula grants.

q.   Virginia received over 131 million in Urbanized Area Formula grants.

r.   Washington received over $145 million in Urbanized Area Formula grants.

139.   The Child Care and Development Fund allocates funding based on census information of the number of children below the age of thirteen.  45 C.F.R. § 98.63.  In Fiscal Year 2015:

a.   New York received over $198 million in Child Care Development grants.

b.   Massachusetts received over $76 million in Child Care Development grants.

    c.   Connecticut received over $36 million in Child Care Development grants.

    d.   Delaware received nearly $9.9 million in Child Care Development grants.

    e.   The District of Columbia received over $7.2 million in Child Care Development grants.

    f.   Illinois received over $126 million in Child Care Development grants.

    g.   Iowa received over $25 million in Child Care Development grants.

    h.   Maryland received nearly $54 million in Child Care Development grants.

    i.   Minnesota received over $52 million in Child Care Development grants.

    j.   New Jersey received nearly $72 million in Child Care Development grants.

    k.   New Mexico received over $20 million in Child Care Development grants.

    l.   North Carolina received over $122 million in Child Care Development grants.

    m.   Oregon received nearly $39 million in Child Care Development grants.

    n.   Pennsylvania received over $116 million in Child Care Development grants.

    o.   Rhode Island received over $11 million in Child Care Development grants.

    p.   Vermont received nearly $6.7 million in Child Care Development grants.

    q.   Virginia received nearly $64 million in Child Care Development grants.

    r.   Washington received nearly $78 million in Child Care Development grants.

140.    The Medicaid Program relies on "per-capita income" information calculated with decennial census data to determine the amount to reimburse each state for medical assistance payments on behalf of low-income individuals.  42 U.S.C. §§ 1301, 1396d.  Several Plaintiff States will lose millions of dollars in reimbursement as a result of even a 1% undercount.  In fiscal year 2015:

a.  Delaware received $771 million under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $14 million in federal funding.

b.  Illinois received $7.19 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $122 million in federal funding.

c.  Iowa received $2.14 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $38 million in federal funding.

d.  New Mexico received $2.49 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $23 million in federal funding.

e.  North Carolina received $8.43 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $94 million in federal funding.

f.  Oregon received $3.64 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $44 million in federal funding.

g.  Pennsylvania received $11.2 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of nearly $222 million in federal funding.

    h.   Vermont received $774 million under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $14 million in federal funding.

    i.   Washington received 3.92 billion under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $2 million in federal funding.

141.    In addition, Plaintiff Cities of Chicago, New York, Philadelphia, Providence, and Seattle, the City and County of San Francisco, and the members of the USCM also receive funding through these and other programs that determine allocations on the basis of population data collected during the decennial census.

142.    An undercount of Plaintiffs' populations as a result of the demand for person-by-person citizenship status of every resident in the country will lead to losses of funding for Plaintiffs in each of these programs, as well as losses in other federally-funded programs that tie allocations to data collected during the decennial census.  Losses of funding for these programs will significantly harm Plaintiffs, who will either need to procure additional resources to meet these shortfalls in funding, or their resource needs will be unmet.

**B.    Defendants' conduct harms Plaintiffs' interests in accurate redistricting and compliance with the Constitution's one-person, one-vote mandate.**

143.    Defendants' decision to demand person-by-person citizenship information on the 2020 Census questionnaire also harms Plaintiffs' interests in obtaining accurate population figures for redistricting purposes.

144.    Each Plaintiff State relies on tabulations of the population produced by the Census Bureau from the decennial census to draw statewide redistricting plans for their Congressional and state legislative districts.  When drawing these districts, Plaintiff States must adhere to the

U.S. Constitution's one-person, one-vote requirement, which requires that legislative districts must be "as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 559, 577 (1964); *see Brown v. Thomson*, 462 U.S. 835, 842-43 (1983).  Moreover, at least for congressional districts, the Constitution requires apportionment "based on total population," not citizen voting age population.  *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128-29 (2015).

145.    Plaintiff the District of Columbia relies on tabulations of the population produced by the Census Bureau to redistrict for local elections within the District, setting boundaries for wards that elect members to the local legislative body, the Council of the District of Columbia, as well as boundaries for Advisory Neighborhood Commissions, Single Member Districts, and voting precincts.  Similarly, Plaintiff Cities, including the Cities of Chicago, New York, and San Francisco, also rely on population tabulations produced by the Census Bureau in order to reapportion their legislative districts.  65 ILCS 20/21-36; N.Y.C. Charter § 51; S.F. Charter art. XIII, § 13.110(d).  Like all U.S. States, the District of Columbia, and the Cities of Chicago, New York, Philadelphia, Providence, and Seattle, the City and County of San Francisco, and the members of the USCM are also bound by the U.S. Constitution's one-person, one-vote requirement.

146.    By causing disproportionate undercounts of citizens and noncitizens in communities with immigrant populations, the addition of a citizenship demand to the 2020 Census will jeopardize the ability of Plaintiffs to comply with the one-person, one-vote requirement.  Undercounts of citizens and noncitizens in these communities will create distributional inaccuracies in the data Plaintiffs rely on to draw district lines.  Districts drawn on the basis of inaccurate data may systemically dilute the voting power of persons living in communities with immigrant populations.

147.    As a result, Defendants' decision will harm Plaintiffs' interest in complying with the constitutional equal population principle in redistricting.

### C.    Defendants' conduct harms Plaintiffs' representational interests.

148.    Defendants' decision to demand person-by-person citizenship information on the 2020 Census questionnaire will harm Plaintiffs' interest in fair representation in Congress by depressing participation in the decennial census within Plaintiffs' diverse immigrant and undocumented populations, leading to inaccurate responses and a significant undercount of Plaintiffs' residents.

149.    For instance, an undercount resulting from Defendants' decision to add a citizenship demand will lead to loss of representation in Rhode Island.  As a result of the 2010 Census, Rhode Island was allocated two seats to the United States House of Representatives in accordance with U.S. Const. art. I, § 2.  Rhode Island has maintained two seats to the United States House of Representatives for over 200 years.  According to the Census Bureau estimates for 2017, the population of Rhode Island is 1,059,639.  Based on these 2017 estimates of its population, if 157 persons that reside in Rhode Island are not counted in the 2020 Census, Rhode Island will lose one of its two seats in the United States House of Representatives.

150.    In addition, the undercount resulting from Defendants' decision will threaten additional Plaintiffs with losses in representation.

151.    For example, New York is projected to lose one representative as a result of the 2020 Census, and is on the cusp of losing a second.  Illinois also risks losing additional representation in Congress.  An undercount of immigrant communities in these states will result in losses of these seats, and harm these states' interest in fair representation in Congress, and in the Electoral College.

152.     Moreover, Defendants' decision will also harm the interest of Plaintiff Cities and the members of Plaintiff USCM in fair electoral representation within their states.  Plaintiff Cities and the members of Plaintiff USCM are home to larger immigrant populations than other jurisdictions within their states.  For instance, the foreign-born population of Chicago is approximately 20.8% of the total population, compared to 13.9% for the State of Illinois. Similarly, approximately 34.9% of San Francisco's population is foreign-born, while only 27% of the State of California's population is foreign-born, and approximately 13.1% of Philadelphia's population is foreign-born, while 6.5% of Pennsylvania's population is foreign-born.

153.     Defendants' decision to include a citizenship demand on the 2020 Census questionnaire will lead to undercounts in immigrant communities, and, as a result, will disproportionately affect jurisdictions within states with larger immigrant communities. Redistricting on the basis of these inaccurate numbers will harm Plaintiff Cities and the members of Plaintiff USCM, including Chicago and San Francisco, vis-a-vis other jurisdictions within their states with smaller immigrant communities.

D.     **Plaintiffs will expend significant resources to mitigate the harm from Defendants' decision.**

154.     Plaintiffs already devote considerable resources every ten years to ensuring that they receive an accurate count of their populations on the census.  Plaintiffs will have to expend additional funding to combat the undercount that the addition of a citizenship demand will cause, such as expending resources on greater public outreach to encourage residents, particularly in immigrant communities, to respond to the 2020 Census.  For example, New York City implemented an early outreach initiative, which consists of deploying employees to canvass in

hard-to-count neighborhoods and identifying potentially problematic blocks, among other measures, to ensure these residents are counted.

**E.      Defendants' conduct harms the health of Plaintiffs' residents.**

155.    Many federal health agencies and public health organizations rely on the decennial census for accurate demographic statistics of the population of the United States.

156.    These statistics help healthcare providers and policymakers contain and prevent the spread of disease by efficiently allocating funding and limited resources for targeted interventions.  For example, census statistics help reduce the incidence of asthma and other preventative diseases by using demographic data to model neighborhoods before initiating preventative programs.

157.    An inaccurate census would not just result in worse health outcomes for undercounted communities, but for the nation as a whole.  An undercount in the 2020 Census would undermine efforts to prevent disease and cost millions of dollars in long-term treatment.

**F.      Defendants' conduct harms Plaintiffs' economies and residents who are beneficiaries of private funding.**

158.    An accurate census is essential for both public and private actors to identify and help meet community and business needs.

159.    The Department of Commerce estimates that census data guide trillions of dollars in private sector investment and create $221 billion in private sector revenue.

160.    Non-profit organizations use census data to decide where to provide critical aid such as health care and natural disaster relief and where to conduct fundraising and advocacy drives.

161.    Academics and researchers from Plaintiffs' universities rely on census data to conduct research on a wide variety of issues relating to race and ethnicity, population mobility, and other areas.

162.    An undercount on the 2020 Census, caused by Defendants' demand for citizenship information from every respondent, will ultimately deprive historically marginalized communities of vital private resources over the next decade.

163.    Plaintiffs will need to expend additional funds to compensate for the loss of vital aid from private actors to their residents.

### FIRST CLAIM FOR RELIEF
(U.S. Constitution article I, section 2, clause 3;
U.S. Constitution amend. XIV, sec. 2)

164.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

165.    The Constitution requires that Defendants conduct an "actual Enumeration" of the "whole number of persons" in the United States, so that Members of the U.S. House of Representatives may be "apportioned among the several States . . . according to their respective Numbers."  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2; *see* 13 U.S.C. §§ 4, 141.

166.    Defendants' decision to add a citizenship demand to the 2020 Census questionnaire will deter participation in the decennial census and cause an undercount that impedes the "actual Enumeration" required by the Constitution.

167.    Defendants' conduct poses a significant risk that Plaintiffs' number of U.S. Representatives and representation in the Electoral College will not reflect their actual population.

168.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SECOND CLAIM FOR RELIEF
### (Administrative Procedure Act – not in accordance with law,
### contrary to constitutional right, and beyond statutory authority)

169.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

170.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "not in accordance with law," "contrary to constitutional right," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

171.    Defendants' decision to add a citizenship demand to the 2020 Census questionnaire is inconsistent with and contrary to the constitutional mandate to conduct an "actual Enumeration" of "the whole number of persons" in the United States. U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.

172.    Defendants' decision is also inconsistent with the data quality requirements of the Information Quality Act and the guidelines implementing the IQA adopted by the Census Bureau. Pub. L. No. 106-554, § 515. The data quality requirements and testing standards developed pursuant to law and practice are designed to ensure accuracy, reliability, and objectivity in the final data, to minimize respondent burden and maximize data quality, and to achieve the highest rates of response. Defendants have failed to act in a manner consistent with these requirements and standards by failing to adequately test the citizenship demand, minimize the burden that that demand imposes on respondents, maximize data quality, or ensure the highest rates of response.

173.    Defendants' decision to add a citizenship demand to the 2020 Census is therefore not in accordance with law and beyond statutory authority, in violation of the APA. 5 U.S.C. § 706(2).

174.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## THIRD CLAIM FOR RELIEF
### (Administrative Procedure Act – arbitrary and capricious)

175.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

176.     The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

177.     Defendants' decision to add a citizenship demand to the 2020 Census is arbitrary and capricious and an abuse of discretion for multiple reasons.  First, there is no support for the Department of Justice's claim that effective enforcement of Section 2 of the Voting Rights Act requires person-by-person citizenship data; to the contrary, requesting citizenship data would undermine the purposes of the Voting Rights Act and weaken voting rights enforcement; and sufficient data for Voting Rights Act purposes is already available to the Department of Justice.

178.     Second, Defendants' decision to add a citizenship demand is arbitrary and capricious because it reverses nearly seven decades of settled and well-considered practice without reasoned explanation, in contradiction to factual findings that underlay the Census Bureau's previous practice.

179.     Third, Defendants' decision is arbitrary and capricious because Defendants entirely failed to consider important aspects of the problem, including the risk of inaccurate results and the availability of alternative data that serves the federal government's needs no less well.

180.     Fourth, Defendants' decision is arbitrary and capricious because it was reached without complying with Defendants' own data quality requirements and testing standards.

181.     Fifth, Defendants' unfounded and conflicting rationales indicate that the stated reason for adding the question is pretext.  Defendants' decision to add a citizenship demand to the 2020 Census is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

182.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.     Declare that the Defendants' decision to add a citizenship demand to the questionnaire for the 2020 Census is unauthorized by and contrary to the Constitution and laws of the United States;

2.     Declare that the Defendants' decision to add a citizenship demand to the 2020 Census is not in accordance with law, is beyond statutory authority, and is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

3.     Enjoin Defendants and all those acting on their behalf from adding a citizenship demand to the 2020 Census;

4.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

5.     Award such additional relief as the interests of justice may require.

DATED: April 3, 2018

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:  /s Lourdes M. Rosado
          Lourdes M. Rosado,[†] Bureau Chief
          Matthew Colangelo,[†] Executive Deputy
          Attorney General
          Laura Wood,[†] Special Counsel
          Ajay Saini,** Assistant Attorney General
          Diane Lucas,[†] Assistant Attorney General
          Alex Finkelstein,*** Volunteer Assistant
          Attorney General
          Civil Rights Bureau
          Office of the New York State Attorney
          General
          28 Liberty, 20th Floor
          New York, NY 10005
          Lourdes.Rosado@ag.ny.gov
          Diane.Lucas@ag.ny.gov
          Ajay.Saini@ag.ny.gov
          Tel. (212) 416-6348
          Fax (212) 416-8074

          [†] Admitted in the S.D.N.Y.
          **Admission pending
          ***NYS bar admission application pending

GEORGE JEPSEN
Attorney General of the State of Connecticut

By:    /s Mark F. Kohler
          Mark F. Kohler,*
          Assistant Attorney General
          Connecticut Office of the Attorney
          General
          55 Elm Street, P.O. Box 120
          Hartford, CT 06106
          Mark.Kohler@ct.gov
          Tel. (860) 808-5020

MATTHEW DENN
Attorney General of the State of Delaware

By:    /s Ilona Kirshon
          Ilona Kirshon,[†] Deputy State Solicitor
          David Lyons, Deputy Attorney General
          Department of Justice
          Carvel State Building, 6th Floor
          820 North French Street
          Wilmington, Delaware  19801
          Ilona.Kirshon@state.de.us
          Tel.  (302)  577-8372
          Fax  (302) 577-6630

47

**KARL A. RACINE**
Attorney General for the District of Columbia

By:  */s Robyn R. Bender*
Robyn R. Bender, * Deputy Attorney
General
Valerie M. Nannery,* Assistant
Attorney General
Public Advocacy Division
441 4th Street, NW
Suite 650 North
Washington, DC 20001
Robyn.Bender@dc.gov
Tel. (202) 724-6610
Fax (202) 730-0650

**LISA MADIGAN**
Attorney General of the State of Illinois

By:  */s Cara A. Hendrickson*
Cara A. Hendrickson,* Chief, Public
Interest Division
Karyn L. Bass Ehler,* Chief, Civil Rights
Bureau
Jeffrey VanDam,* Assistant Attorney
General
Matthew J. Martin,* Assistant Attorney
General
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
JVanDam@atg.state.il.us
Tel. (312) 814-3400
Fax (312) 814-3212

**THOMAS J. MILLER**
Attorney General of the State of Iowa

By:  */s Nathan Blake*
Nathan Blake,* Deputy Attorney
General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
nathan.blake@ag.iowa.gov
Tel. (515) 281-4325

**BRIAN E. FROSH**
Attorney General of the State of Maryland

By:  /s *John R. Grimm*
John R. Grimm,* Assistant Attorney
General
Civil Litigation Division
Maryland Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
jgrimm@oag.state.md.us
Tel. (410) 576-76339
Fax (410) 576-6955

48

**MAURA HEALEY**
Attorney General for the Commonwealth of
Massachusetts

By:    */s Jonathan Miller*
     Jonathan Miller,[†] Assistant Attorney
     General
     Miranda Cover,* Assistant Attorney
     General
     Ann E. Lynch,* Assistant Attorney
     General
     Public Protection & Advocacy Bureau
     Massachusetts Attorney General's Office
     One Ashburton Place
     Boston, MA 02108
     Jonathan.Miller@state.ma.us
     Mercy.Cover@state.ma.us
     Ann.Lynch@state.ma.us
     Tel. (617) 727-2200
     Fax (617) 727-5762

**LORI SWANSON**
Attorney General of the State of Minnesota

By:    *s/ Jacob Campion*
     Jacob Campion,* Assistant Attorney
     General
     Office of the Minnesota Attorney General
     445 Minnesota Street, Suite 1100
     St. Paul, Minnesota 55101-2128
     jacob.campion@ag.state.mn.us
     (651) 757-1459 (Voice)
     (651) 282-5832 (Fax)

**GURBIR S. GREWAL**
Attorney General of the State of New Jersey

By:    */s Rachel Wainer Apter*
     Rachel Wainer Apter*
     Assistant Attorney General
     Office of the Attorney General
     Richard J. Hughes Justice Complex
     25 Market Street, 8th Floor, West Wing
     Trenton, New Jersey 08625-0080
     Rachel.Apter@njoag.gov
     Tel: (609) 376-2702

**HECTOR H. BALDERAS**
Attorney General of the State of New Mexico

By:    */s Tania Maestas*
     Tania Maestas,* Deputy Attorney General
     New Mexico Office of the Attorney
     General
     408 Galisteo St.
     Santa Fe, NM 87501
     tmaestas@nmag.gov
     Tel. (505) 490-4060
     Fax (505) 490-4883

**JOSHUA H. STEIN**
Attorney General of the State of North Carolina

By:   */s Ryan Y. Park*
      Ryan Y. Park,*
      Deputy Solicitor General
      North Carolina Department of Justice
      114 W. Edenton Street
      Raleigh, NC 27603
      RPark@ncdoj.gov
      Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
Attorney General of the State of Oregon

By:   */s Brian De Haan*[†]
      Brian De Haan,[†]
      Assistant Attorney General
      Trial Attorney
      Brian.A.DeHaan@doj.state.or.us
      Tel. (971) 673-1880
      Fax (971) 673-5000

**JOSH SHAPIRO**
Attorney General of the Commonwealth of Pennsylvania

By:   */s Jonathan Scott Goldman*
      Jonathan Scott Goldman,*
      Executive Deputy Attorney General,
      Civil Law Division
      Michael J. Fischer,*
      Chief Deputy Attorney General,
      Impact Litigation Section
      Office of Attorney General
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      MFischer@attorneygeneral.gov
      Tel. (215) 560-2171

**PETER KILMARTIN**
Attorney General of the State of Rhode Island

By:   */s Adam D. Roach*
      Adam D. Roach,* Special Assistant
      Attorney General
      RI Office of the Attorney General
      150 South Main Street
      Providence, RI 02903
      aroach@riag.ri.gov
      Tel: (401) 274-4400 ext. 2490
      Fax: (401) 222-2995

**MARK R. HERRING**
Attorney General of the Commonwealth of Virginia

By:   */s Matthew R. McGuire*
      Matthew R. McGuire,*
      Deputy Solicitor General
      202 North Ninth Street
      Richmond, VA 23219
      MMcguire@oag.state.va.us
      Tel. (804) 786-7240
      Fax (804) 371-0200

**THOMAS J. DONOVAN, JR.**
Attorney General of the State of Vermont

By:   */s Benjamin D. Battles*
      Benjamin D. Battles,* Solicitor General
      Julio A. Thompson,* Assistant Attorney
      General, Civil Rights Unit
      Office of the Vermont Attorney General
      109 State Street
      Montpelier, VT 05609
      Benjamin.Battles@vermont.gov
      Tel. (802) 828-5500
      Fax (802) 828-3187

**ROBERT W. FERGUSON**
Attorney General of the State of Washington

By:   */s/ Laura K. Clinton*
      Laura K. Clinton,*
      Assistant Attorney General
      Complex Litigation Division
      800 Fifth Avenue, Suite 2000
      Seattle, WA 98104
      LauraC5@atg.wa.gov
      (206) 233-3383
      Peter Gonick,
      Deputy Solicitor General
      Office of the Attorney General
      PO Box 40100
      Olympia, WA  98504-0100
      peterg@atg.wa.gov
      Tel. (360) 753-6245

**EDWARD N. SISKEL**
Corporation Counsel of the City of Chicago

By:   */s John Hendricks*
      John Hendricks,* Deputy Corporation
      Counsel
      Andrew W. Worseck,* Chief Assistant
      Corporation Counsel
      Andrew S. Mine, Senior Counsel
      Maggie Sobota,* Assistant Corporation
      Counsel
      Christie Starzec, Assistant Corporation
      Counsel
      City of Chicago Law Department
      30 N. LaSalle Street, Suite 1230
      Chicago, IL 60602
      John.Hendricks@cityofchicago.org
      Andrew.Worseck@cityofchicago.org
      Andrew.Mine@cityofchicago.org
      Maggie.Sobota@cityofchicago.org
      Christie.Starzec@cityofchicago.org
      Tel. (312) 744-6975
      Fax (312) 742-3925

**ZACHARY W. CARTER**
Corporation Counsel of the City of New York

By:  */s Sabita Krishnan*
     Gail Rubin[†]
     Sabita Krishnan[†]
     100 Church Street
     New York, NY 10007
     grubin@law.nyc.gov
     skrishna@law.nyc.gov
     Tel. (212) 356-2030
     Fax (212) 356-2038


**MARCEL S. PRATT**
Acting Solicitor of the City Of Philadelphia

By: */s Marcel S. Pratt*
    Marcel S. Pratt,* Acting City Solicitor
    Eleanor N. Ewing,* Chief Deputy
    Solicitor
    Benjamin H. Field,* Deputy City
    Solicitor
    Michael W. Pfautz, Assistant City
    Solicitor
    City of Philadelphia Law Department
    1515 Arch Street, 17th Floor
    Philadelphia, PA 19102
    marcel.pratt@phila.gov
    eleanor.ewing@phila.gov
    benjamin.field@phila.gov
    Tel.  (215)683-5000
    Fax  (215)683-5299


**JEFFREY DANA**
City Solicitor for the City of Providence

By:  /s Jeffrey Dana
     Jeffrey Dana,*
     City Solicitor
     City of Providence
      444 Westminster Street
     Providence, RI 02903
     JDana@providenceri.gov
     401-680-5333


**DENNIS J. HERRERA**
City Attorney for the City and County of San Francisco

By:  */s Dennis J. Herrera*
     Dennis J. Herrera,* City Attorney
     Jesse C. Smith, Chief Assistant City
     Attorney
     Ronald P. Flynn, Chief Deputy City
     Attorney
     Yvonne R. Meré, Chief of Complex and
     Affirmative Litigation
     Mollie Lee,* Deputy City Attorney
     Erin Kuka, Deputy City Attorney
     Neha Gupta, Deputy City Attorney
     San Francisco City Attorney's Office
     City Hall, Room 234
     1 Dr. Carlton B. Goodlett Place
     San Francisco, CA 94102
     Mollie.Lee@sfcityatty.org
     Tel. (415) 554-4748
     Fax (415) 554-4715

**UNITED STATES CONFERENCE OF MAYORS**

By:   /s John Daniel Reaves
        John Daniel Reaves*
        General Counsel
        United Conference of Mayor
        1200 New Hampshire Avenue, NW
        Third Floor
        Washington, D.C. 20036
        jdreavesoffice@gmail.com
        Tel. (202) 974-5931


**CITY OF SEATTLE**
City of Seattle City Attorney

By:   /s Peter S. Holmes
        Peter S. Holmes,*
        City Attorney
        701 Fifth Avenue, Suite 2050
        Seattle, WA 98104-7097


† Admitted in the S.D.N.Y.
*_Pro hac vice_ motions will be forthcoming.