**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>               Plaintiffs,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE, *et al.*,<br><br>             Defendants. | No. 1:18-cv-2921 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.    CONSTITUTIONAL AND STATUTORY AUTHORITY REGARDING
        THE CENSUS ...........................................................................................................2

    II.    HISTORY OF INCLUSION OF A CITIZENSHIP QUESTION .....................................3

    III.    REINSTATEMENT OF A CITIZENSHIP QUESTION IN THE 2020 CENSUS.........6

    IV.    2020 CENSUS PROCEDURES AND PLANNED EFFORTS TO
         MINIMIZE NON-RESPONSE .................................................................................10

LEGAL STANDARDS...........................................................................................................11

ARGUMENT ......................................................................................................................12

    I.    THIS CASE IS NOT JUSTICIABLE .......................................................................13

      A.    Plaintiffs Lack Standing to Maintain this Action..................................................13

         1.    Plaintiffs' allegations of injury are too speculative.............................................14

         2.    Plaintiffs' alleged injuries are not fairly traceable to the challenged action. ...................19

      B.    Plaintiffs' Suit is Barred by the Political Question Doctrine. ................................21

         1.    The content of the census questionnaire is textually committed to Congress..............23

         2.    The Court has no judicially manageable standards to make the necessarily policy-
            based determinations regarding the content of the census questionnaire.....................24

      C.    The Secretary's Decision Is Not Subject to Judicial Review Under the
         Administrative Procedure Act................................................................................26

    II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ENUMERATION
         CLAUSE.................................................................................................................30

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
    436 F.3d 82 (2d Cir. 2006) ........................................................................................11

*Armstrong v. Bush*,
    924 F.2d 282 (D.C. Cir. 1991) ................................................................................30

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................12

*Baker v. Carr*,
    369 U.S. 186 (1962) ...........................................................................................22, 23

*Bates v. Donley*,
    935 F. Supp. 2d 14 (D.D.C. 2013) ..........................................................................12

*Baur v. Veneman*,
    352 F.3d 625 (2d Cir. 2003) ....................................................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................12

*Carey v. Klutznick*,
    508 F. Supp. 416 (S.D.N.Y. 1980) ..........................................................................16

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980) ..................................................................16, 17, 26, 29

*Carey v. Klutznick*,
    653 F.2d 732 (2d Cir. 1981) ....................................................................................32

*Citizens to Preserve Overton Park, Inc., v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................27

*City of Detroit v. Franklin*,
    4 F.3d 1367 (6th Cir. 1993) ....................................................................................21

*City of Phila. v. Klutznick*,
    503 F. Supp. 663 (E.D. Pa. 1980) ..........................................................................29

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................14, 19, 20, 21

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ................................................................24, 26, 33, 34

*Dickerson v. Feldman,*
    426 F. Supp. 2d 130 (S.D.N.Y. 2006)............................................................................13

*Effie Film, LLC v. Pomerance,*
    909 F. Supp. 2d 273 (S.D.N.Y. 2012)..............................................................................4

*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016)....................................................................................................21

*Family Farm All. v. Salazar,*
    749 F. Supp. 2d 1083 (E.D. Cal. 2010) ..........................................................................35

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)...................................................................................................passim

*FW/PBS, Inc. v. Dallas,*
    493 U.S. 215 (1990)........................................................................................................14

*Gaffney v. Cummings,*
    412 U.S. 735 (1973)........................................................................................................33

*Haas v. Gutierrez,* No. 07 CV 3623 (GBD),
    2008 WL 2566634 (S.D.N.Y. June 26, 2008)................................................................35

*Habitat for Horses v. Salazar,* No. 10 Civ. 7684 (WHP)
    2011 WL 4343306 (S.D.N.Y. Sept. 7, 2011)..................................................................35

*Heckler v. Chaney,*
    470 U.S. 821 (1985)........................................................................................................27

*Heldman v. Sobol,*
    962 F.2d 148 (2d Cir. 1992) ...........................................................................................20

*Himber v. Intuit, Inc.,* 10-CV-2511 (JFB)(AKT),
    2012 WL 4442796 (E.D.N.Y. Sept. 25, 2012)...............................................................21

*ICC v. Bhd. of Locomotive Eng'rs,*
    482 U.S. 270 (1987)........................................................................................................27

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986)..........................................................................................22, 25, 26

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione,*
    937 F.2d 44 (2d Cir. 1991) .............................................................................................22

*Legal Tender Cases,*
    79 U.S. 457 (1870).........................................................................................................33

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ............................................................................................................27

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ....................................................................................... 11, 13, 14, 20

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ............................................................................................................18

*Lunney v. United States,*
  319 F.3d 550 (2d Cir. 2003) ............................................................................................27

*McConnell v. FEC,*
  540 U.S. 93 (2003) ............................................................................................................20

*MMA Consultants 1, Inc. v. Republic of Peru,*
  245 F. Supp. 3d 486 (S.D.N.Y. 2017) ..........................................................................12

*Montesa v. Schwartz,*
  836 F.3d 176 (2d Cir. 2016). ..........................................................................................18

*Morales v. Daley,*
  116 F. Supp. 2d 801 (S.D. Tex. 2000) ....................................................................32, 34

*Nat'l Labor Relations Board v. Noel Canning,*
  134 S. Ct. 2550 (2014) ......................................................................................................34

*Nat'l Law Ctr. on Homelessness & Poverty v. Kantor,*
  91 F.3d 178 (D.C. Cir. 1996) ..........................................................................................17

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012) ............................................................................................19

*Rempfer v. Sharfstein,*
  583 F.3d 860 (D.C. Cir. 2009) ........................................................................................12

*Renne v. Geary,*
  501 U.S. 312 (1991) ..........................................................................................................11

*Ridge v. Verity,*
  715 F. Supp. 1308 (W. D. Pa. 1989) ............................................................................19

*Rothstein v. UBS AG,*
  708 F.3d 82 (2d Cir. 2013) ..............................................................................................21

*Salt Inst. v. Leavitt,*
  440 F.3d 156 (4th Cir. 2006) ..........................................................................................35

*Schneider v. Feinberg*,
345 F.3d 135 (2d Cir. 2003) ..................................................................28

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005) ..............................................................23

*Senate of State of Cal. v. Mosbacher*,
968 F.2d 974 (9th Cir. 1992) ................................................................29

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ..............................................................................30

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................................14

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1996) ..............................................................................26

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................14

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ............................................................................34

*Tucker v. Dep't of Commerce*,
958 F.2d 1411 (7th Cir. 1992) ........................................................26, 29

*U.S. Dep't of Commerce v. Montana*,
503 U.S. 442 (1992) ........................................................................18, 26

*United States v. Little*,
321 F. Supp. 388 (D. Del. 1971) ..........................................................34

*United States v. Moriarity*,
106 F. 886 (S.D.N.Y. 1901) ................................................................34

*United States v. Munoz-Flores*,
495 U.S. 385 (1990) ............................................................................22

*United States v. Rickenbacker*,
309 F.2d 462 (2d Cir. 1962) ................................................................34

*Utah v. Evans*,
536 U.S. 452 (2002) ....................................................................25, 31, 34

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) ............................................................................23

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................................................. 13, 19

*Webster v. Doe,*
    486 U.S. 592 (1988) ............................................................................................. 27, 28

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ..................................................................................................... 26

*Whiteman v. Dorotheum GmbH & Co. KG,*
    431 F.3d 57 (2d Cir. 2005) ...................................................................................... 23

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ................................................................................................ 14

*Wisconsin v. City of N.Y.C.,*
    517 U.S. 1 (1996) ............................................................................................... passim

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ................................................................................................ 23

## **Statutes**

U.S. Const. art. I, § 2, cl. 3 .............................................................................. 2, 22, 23

U.S. Const. amend. XIV, § 2 ........................................................................... 4, 22, 32

2 U.S.C. § 2a ............................................................................................................. 18

5 U.S.C. § 701 .......................................................................................................... 27

13 U.S.C. § 2 .............................................................................................................. 3

13 U.S.C. § 4 .............................................................................................................. 3

13 U.S.C. § 5 .............................................................................................................. 3

13 U.S.C. § 9 ............................................................................................................ 11

13 U.S.C. § 141 ................................................................................................... passim

13 U.S.C. § 195 ........................................................................................................ 26

13 U.S.C. § 221 .................................................................................................... 3, 20

42 U.S.C. § 1301 ...................................................................................................... 17

52 U.S.C. § 10301 ...................................................................................................... 6

Census Act of 1790, 1 Stat. 101 (1790) .................................................................. 32

Census Act of 1820, 3 Stat. 548 (1820)....................................................................................33

Census Act of 1850, 9 Stat. 430 (1850)....................................................................................33

**Other Authorities**

Election Data Services, Some Changes in Apportionment Allocations With New
    2017 Census Estimates; But Greater Change Likely by 2020 (Dec. 26, 2017),
    https://www.electiondataservices.com/wp-content/uploads/2017/12/NR_Appor17c3wTables
    MapsC2.pdf ...........................................................................................................................19

Federal Rule of Civil Procedure 12(b)(1)..................................................................................11
Federal Rule of Civil Procedure 12(b)(6)..................................................................................12

*Form*, Sheridan's Complete Dictionary of the English Language (6th ed. 1796)....................24

https://www.census.gov/geo/reference/webatlas/blocks.html ....................................................6

https://www.census.gov/newsroom/blogs/random-samplings/2011/07/what-are-census-
    blocks.html .............................................................................................................................6

https://www.census.gov/popclock/...........................................................................................32

https://www.census.gov/population/apportionment/about/computing.html..................................19

https://www.census.gov/programs-surveys/acs/about/acs-and-census.html ...............................6

National Research Council, Counting People in the Information Age (D. Steffey & N. Bradburn
    eds. 1994)..............................................................................................................................33

Testimony,
    https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239..........................16

United Nations, Department of Economic and Social Affairs, Principles
    and Recommendations for Population and Housing Censuses,
    https://unstats.un.org/unsd/publication/seriesM/Series_M67rev3en.pdf .....................................33

U.S. Census Bureau, 2020 Census Operational Plan: A New Design for the 21st Century
    (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/decennial/2020/
    program-management/planning-docs/2020-oper-plan3.pdf .............................................8, 10, 11, 31

U.S. Census Bureau, Archive of American Community Survey Questions,
    https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.htm .... 5, 34

U.S. Census Bureau, Census Topic Report No. 11, Response Rates and Behavior Analysis,
    https://www.census.gov/pred/www/rpts/TR11.pdf.........................................................................35

U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000,
    https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf .............................. 3, 4, 5

U.S. Census Bureau, Questionnaires,
    https://www.census.gov/history/www/through_the_decades/questionnaires/ .............................5

U.S. Census Bureau, Questions Planned for the 2020 Census and American Community
    Survey (Mar. 2018),
    https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-
    2020-acs.pdf ................................................................................................................................... 3, 10

## INTRODUCTION

The relief sought in this suit—an order barring the Secretary of Commerce from collecting demographic information through the decennial census—is as extraordinary as it is unprecedented. The Constitution vests in the political branches of government discretion to decide the manner in which the census is conducted. In the exercise of that discretion, the Secretary decided to reinstate a question about U.S. citizenship on the 2020 decennial census. Not only has citizenship information historically been collected as far back as 1820, but citizenship information also forms an important component of enforcing the Voting Rights Act of 1965. Plaintiffs' claim that the Constitution precludes the Secretary from simply asking a question fails for at least four reasons.

First, Plaintiffs lack standing to challenge the Secretary's decision to add a citizenship question to the decennial census. Plaintiffs' claimed injuries of lost representation in Congress and decreased federal funding, based on their allegation that adding the citizenship question will reduce response rates, are too speculative to confer Article III standing. And even if Plaintiffs could allege injuries that are concrete and non-speculative, those injuries would be not be fairly traceable to the Secretary's decision, as they would be attributable instead to the independent decisions of individuals who disregard their legal duty to respond to the census.

Second, Plaintiffs' challenge is unreviewable under the political question doctrine. The Constitution textually commits the "[m]anner" of conducting the census to Congress, and it contains no judicially discoverable or manageable standards for determining which demographic questions may be included on the census form. That question involves policy determinations that are ill-suited for judicial resolution and that the Constitution expressly commits to the political branches. Plaintiffs' challenge elides the serious separation-of-powers concerns that would be implicated by a court order dictating the form and content of the decennial census questionnaire.

Third, Plaintiffs are similarly barred from proceeding under the Administrative Procedure Act because the form and content of the census is committed to the Secretary's discretion by law. "Congress has delegated its broad authority over the census to the Secretary [of Commerce]," *Wisconsin v. City of NY*, 517 U.S. 1, 19 (1996), and it has done so in broad terms: Congress authorized the Secretary to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. § 141(a), and to obtain other demographic information through that device, *id.* These broad delegations leave a court with no meaningful standard to apply and accordingly preclude judicial review of which demographic questions the Secretary decides to include on the decennial census form.

Fourth, Plaintiffs cannot state a claim for relief under the Constitution's Enumeration Clause. U.S. Const. art. I, § 2, cl. 3. The Secretary has developed comprehensive plans to conduct a person-by-person headcount of the population, and there is no allegation that he has failed to put in place procedures to count the population, all of whom are under a legal obligation to answer. The Secretary's decision to reinstate a citizenship question is consistent with the longstanding historical practice of asking about citizenship and other demographic information, whereas Plaintiffs' theory would call into question the constitutionality of asking *any* demographic questions—*e.g.*, about sex, Hispanic origin, race, or relationship status—that are unnecessary to count the population and that could cause at least some individuals not to respond for any of various reasons, such as discomfort with the question or increased time needed to answer.

For all of these reasons, this action should be dismissed.

## BACKGROUND

## I.   CONSTITUTIONAL AND STATUTORY AUTHORITY FOR THE CENSUS

The U.S. Constitution requires that an "actual enumeration" of the population be conducted every 10 years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I § 2, cl. 3. Through the Census Act, Congress has delegated to

the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," 13 U.S.C. § 141(a), and has "authorized [him] to obtain such other census information as necessary," *id.* The Bureau of the Census assists the Secretary in the performance of this responsibility. *See id.* §§ 2, 4. As required by the Constitution, a national census of the U.S. population has been conducted every 10 years since 1790. U.S. Census Bureau, Questions Planned for the 2020 Census and American Community Survey, at 1 (Mar. 2018), https://www2. census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf ("Questions Planned").

The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title." 13 U.S.C. § 5. Nothing in the Act, however, directs the precise content of the questions that are to be included on the decennial census questionnaire. The Act imposes a legal duty on all persons to respond to the census. *See id.* § 221.

## II.   HISTORY OF INCLUSION OF A CITIZENSHIP QUESTION

Throughout our history, the United States has used the census to collect additional information beyond the population count "in response to the challenges facing the nation and a national desire to understand ourselves." Questions Planned, *supra*, at 1. This has included, for many decennial censuses, information about foreign birth, naturalization, and citizenship.

Beginning in 1820, the Census was used to tabulate citizenship by inquiring of each household the number of "foreigners not naturalized." *See* U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6, https://www2.census.gov/library/publications

/2002/dec/pol_02-ma.pdf ("Measuring America").[1] With the exception of 1840, censuses from 1820 to 1880 asked for citizenship or birthplace in some form.[2] Decennial censuses from 1890 through 1950 specifically requested citizenship information more consistently. The 1890 Census asked for the place of birth of the respondent and his or her parents and, for adult males of foreign birth 21 years or older, the number of years the individual had resided in the United States, whether he had naturalized, or, if not, whether naturalization papers had been taken out. Measuring America, at 22, 28. The 1900, 1910, 1920, and 1930 Censuses asked, with some variations, for the birthplaces of the individual and his or her parents, the year of immigration for all foreign-born individuals, and, for any adult male of foreign birth 21 years or older, whether he had naturalized or was an alien. *Id.* at 34, 37; *id* at 45, 49; *id.* at 58; *id.* at 59. The next two enumerations asked for the individual's place of birth and either (in 1940) for the citizenship of all foreign-born individuals or (in 1950) whether a foreign-born individual had naturalized. *Id.* at 62; *id.* at 66. The 1940 census also began the practice of sampling a portion of the population to collect some information, though the answers for all individuals were entered on the same form. Thus, the 1940 and 1950 Censuses asked only some of the population for the birthplaces of their parents. *Id.* at 62-63 (1940, 5%); *id.* at 66, 68 (1950, 20%).

The 1950 Census is the last one to have asked *all* respondents for citizenship status. In 1960,

---

[1] The Court may take judicial notice of the undisputed historical facts concerning the census and other related surveys presented herein. *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298 (S.D.N.Y. 2012).

[2] In 1830, the Census asked whether individuals were "foreigners not nationalized." Measuring America at 7. No question regarding birthplace or citizenship status was included in the 1840 Census. *Id.* at 8. In the 1850, 1860, and 1880 enumerations, the questionnaires asked for place of birth (though not citizenship per se). *Id.* at 9, 11, 13. The Census included an express question regarding citizenship in 1870, along with questions about the individual's place of birth, whether either parent was of foreign birth, and whether the individual was a "Male citizen of U.S. 21 years of age and upwards." *Id.* at 13, 15. (If the answer to the latter question was yes, the questionnaire then asked whether that person's voting rights had been abridged, to enforce the requirement of section 2 of the recently ratified Fourteenth Amendment, providing for the basis of a state's apportionment to be reduced proportional to the numbers of males whose voting rights had been denied or abridged. *Id.* at 13; *see* U.S. Const. amend. XIV, § 2.)

the Census Bureau asked 25% of the population for the birthplace of the respondent and his or her parents, though naturalization status was not requested. Measuring America at 72-73. In 1970, the first year respondents were asked to mail back the questionnaire, 20% of the population were asked for their birthplace, 15% were asked for parents' birthplace, and 5% were asked whether the individual, if foreign born, had naturalized. *Id.* at 78. The questionnaires asking for more detailed information from a sample of the population were called, in this and subsequent enumerations, the "long-form questionnaire." *See* U.S. Census Bureau, Questionnaires, https://www.census.gov/history/ www/through_the_decades/questionnaires/. In 1980, 1990, and 2000, the long form, which approximately 1 in 6 households received instead of the short form, asked for the individual's birthplace, and foreign-born persons were asked either whether they had naturalized (1980) or whether they were citizens (1990, 2000). *See id.*; Measuring America, at 91-92. The corresponding "short-form questionnaire," sent to the majority of households, did not ask for birthplace or citizenship status in those years.

Beginning in 2005, in order to provide communities, businesses, and the public with more-timely statistical information, the Census Bureau began collecting monthly (and releasing annually) the more extensive long-form data through the American Community Survey ("ACS"), which is sent yearly to a sample of the population—about one in 38 households. Information regarding national origin and citizenship has been collected through the ACS every year since 2005. *See* U.S. Census Bureau, Archive of American Community Survey Questions, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html ("ACS Questionnaire Archive") (noting citizenship questions on every ACS questionnaire). The replacement of the long-form questionnaire with the yearly ACS enabled the 2010 census to be a "short-form-only" census. The 2020 census will also be a "short-form-only" census. The ACS will continue to be distributed each year, as usual, to collect additional data. https://www.census.gov/programs-surveys/acs/about/acs-and-census.html.

In recent decades, the Census Bureau has obtained citizenship data consistently through the long-form questionnaire and, since 2005, the yearly American Community Survey.[3] Because the ACS collects information from only a sample of the population, it produces annual estimates only for census tracts and census block groups. *See* https://www.census.gov/newsroom/blogs/random-samplings/2011/07/what-are-census-blocks.html. The decennial census attempts a full count of the population and produces population counts as well as counts of other, limited information (such as race) down to the smallest level, known as the "census block." *See* https://www.census.gov/geo/reference/webatlas/blocks.html. The Census Bureau currently provides the Department of Justice ("DOJ") with estimated citizenship data at the "census block group" level, which is a collection of census blocks.

## III.    REINSTATEMENT OF A CITIZENSHIP QUESTION IN THE 2020 CENSUS

On March 26, 2018, after taking a hard look and considering input from a variety of sources, the Secretary of Commerce issued a memorandum reinstating a citizenship question on the 2020 Census questionnaire.[4] Memorandum to Karen Dunn Kelley, Under Secretary for Economic Affairs, from the Sec'y of Commerce on Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire at 1 (Mar. 26, 2018) ("Ross Memo"), *cited in* FAC ¶ 3. The Secretary determined that the census should collect such information in order to provide DOJ with census-block-level data to assist in enforcing section 2 of the Voting Rights Act ("VRA"), now codified at 52 U.S.C. § 10301. *Id.* at 1. In December 2017, DOJ had "formally request[ed] that the Census Bureau reinstate on the 2020 census questionnaire a question regarding citizenship." Letter from Arthur Gary, General Counsel, DOJ, to Ron Jarmin, performing the nonexclusive duties of the Director, U.S. Census

---

[3] Citizenship information has also been obtained through the Survey of Income and Program Participation and the Annual Social and Economic Supplement of the Current Population Survey.

[4] As the First Amended Complaint ("FAC") makes clear, the Census Bureau has periodically assessed whether reinstatement of such a question is appropriate. FAC ¶¶ 40-44.

Bureau, at 3 (Dec. 12, 2017) ("Gary Letter"), *cited in* FAC ¶ 94. DOJ had explained that citizenship "data is critical to the Department's enforcement of Section 2 of the Voting Rights Act" and that "the decennial census questionnaire is the most appropriate vehicle for collecting that data" because it would provide census-block-level citizenship voting age population ("CVAP") data that are not currently available from the ACS surveys (which provide data only at the larger census block group level). *Id.* DOJ explained that having citizenship data at the census block level will permit more effective enforcement of the Act. *Id.* at 1-2.

The Secretary first emphasized the goal of conducting a complete and accurate decennial census. Ross Memo, at 1. The Secretary also observed that, as detailed above, collection of citizenship data in the decennial census has a long history and that the ACS has included a citizenship question since 2005. *Id.* at 2. The Secretary therefore found that "the citizenship question has been well tested." *Id.* He also confirmed with the Census Bureau that census-block-level citizenship data are not available using the annual ACS. *Id.*

The Secretary asked the Census Bureau to evaluate the best means of providing the data requested by DOJ, and the Census Bureau initially presented three alternatives: Option A would have continued the status quo and provided DOJ with ACS citizenship data at the census-block-group level, rather than the block level requested in the Gary letter; Option B would have placed the ACS citizenship question on the decennial census, which goes to every American household; and Option C instead would have provided block-level citizenship data for the entire population using existing federal administrative-record data.[5] Ross Memo, at 2-4. In his decision memo, the Secretary found

---

[5] Administrative records include data from the Internal Revenue Service, the Social Security Administration, the Centers for Medicare and Medicaid Services, the Department of Housing and Urban Development, the Indian Health Service, the Selective Service, and the U.S. Postal Service. 2020 Census Operational Plan, at 22-26. Administrative records will be utilized only if the data is corroborated by at least two sets of records.

that Option A would not provide DOJ with improved CVAP data, as there was no guarantee that the accuracy or level of detail of the ACS data could be enhanced to meet DOJ's requirements even using sophisticated modeling methods. *Id.* at 2-3. After discussing Options B and C, *id.* at 3-4, the Secretary indicated that he had asked the Census Bureau to develop and implement a fourth alternative, Option D, which would effectively combine Options B and C. *Id.* at 4. Under this fourth option, a citizenship question would be reinstated on the decennial census in the same form as it appears on the ACS, imposing on each of the country's inhabitants the legal obligation to self-respond. *Id.* at 4-5. The Secretary directed the Census Bureau to work to further enhance its administrative-record data sets, protocols, and statistical models to maximize its ability to match the decennial census responses with administrative records. *Id.* at 4. The combination of responses to the question and more-developed practices for comparing those responses with administrative records would then permit the Census Bureau to determine the inaccurate response rate (whether for non-response, conflicting responses, or other reasons) for the entire population. *Id.* at 5. The Secretary concluded that this combined option would provide DOJ with the most complete and accurate CVAP data. *Id.*

In addition to discussing the operational aspect of DOJ's request with the Census Bureau, the Secretary closely considered stakeholder views. He reviewed letters from local, state, and federal officials and advocacy groups, monitored stakeholder commentary in the press, and spoke personally to interested parties on both sides of the issue. Ross Memo, at 1-2. In particular, the Secretary considered but rejected concerns raised by a number of parties that reinstating a citizenship question on the decennial census would negatively impact the response rate for noncitizens. *Id.* at 3-4, 5-6. While the Secretary agreed that a "significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up operations," *id.* at 3, he concluded that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially" as a result of reinstatement of the citizenship

question. *Id.* Based on his discussions with outside parties, Census Bureau leadership and others within the Department of Commerce, the Secretary determined that, to the best of everyone's knowledge, limited empirical data exists on how reinstatement of a citizenship question might impact response rates on the 2020 census. *Id.* at 3, 5. Thus, "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief." *Id.* at 4; *see also id.* at 5-6.

Certain stakeholders informed the Secretary that reinstating a citizenship question could negatively impact response rates because of heightened, general distrust of the government. But the Secretary concluded that those commenters referred to individuals who may decline to participate regardless of whether the census includes a citizenship question and noted that "no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did." Ross Memo, at 5. The Secretary further observed that, based on past experience, "certain interest groups consistently attack the census and discourage participation." *Id.* at 6. The Secretary explained that the Census Bureau intends to take steps to conduct respondent and stakeholder-group outreach in an effort to mitigate the impact of the foregoing issues on the 2020 decennial census. *Id.*

Finally, the Secretary explained his decision not to implement Option C, which would have relied solely on administrative records without reinstating a citizenship question. Ross Memo, at 4. The Secretary noted that the use of administrative records is still evolving, and that the Census Bureau does not yet have a complete data set for the entire population; in fact, based on the credible administrative record data identified by the Census Bureau in the 2010 Census, some 25 million voting-age people would need to have their citizenship status imputed by the Census Bureau if not given the opportunity to self-respond. *Id.* Reliance on administrative records alone thus would not provide DOJ with the complete and accurate block-level CVAP data it requested. *Id.*

The citizenship question is not the only question beyond the total number of persons residing at a location that the 2020 census questionnaire will pose. For example, the questionnaire also will ask questions regarding sex, Hispanic origin, race, and relationship status. *See* Questions Planned, at 13. Plaintiffs do not challenge the Secretary's decision to include any of those questions.

## IV.     2020 CENSUS PROCEDURES AND PLANNED EFFORTS TO MINIMIZE NON-RESPONSE

The Department of Commerce and the Census Bureau have extensive plans in place to maximize self-response and thereby minimize the amount of non-response follow up. The 2020 census will be the first to rely extensively on digital methods and automation. It will be the first census where individuals are encouraged to respond online. 2020 Census Operational Plan: A New Design for the 21st Century, at 15, 18-19, 26, 88 (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf ("2020 Census Operational Plan"). Most housing units will receive several short mailings instructing them to complete the census either online or by telephone. *Id.* at 18, 21. Individuals will be able to respond online and online forms will be provided in multiple languages. *Id.* at 19, 98. If households do not respond by the fourth mailing, the full paper questionnaire will be sent.[6] *Id.* at 99. Housing units that are less likely to have Internet access will receive a full paper questionnaire in the first mailing, to allow them to respond immediately via mail. *Id.* at 91, 95.

Each household will receive up to six mailings, if necessary. 2020 Census Operational Plan, at 99. If no response has been received after the fifth mailing, a census enumerator will be assigned to that address. *Id.* at 114. The enumerator will personally visit all units to which he or she is assigned to verify that the address is occupied and to attempt to contact a household member to complete the questionnaire. *Id.* If the enumerator is not able to complete the questionnaire, administrative records

---

[6] In particularly hard-to-reach areas, census questionnaires will be hand delivered. 2020 Census Operational Plan, at 102-05.

will be used to identify vacant housing units and determine response data for occupied households where the Census Bureau has high-quality administrative records. *Id.* at 22, 114, 117. If such records do not exist, a final postcard encouraging self-response will be mailed, and all addresses still non-responsive will be subject to up to six contact attempts, with eligibility to have the data obtained from a proxy (such as a neighbor or landlord) after the third unsuccessful attempt. *Id.*

The Census Bureau also plans to mount extensive publicity and outreach campaigns, in which it will work with units of local government, the media, and community-based organizations to encourage people to respond to the census. 2020 Census Operational Plan, at 92-95. Through that outreach the Census Bureau also regularly reiterates its commitment to preserving the confidentiality of the data it collects as required by statute. *Id.* at 19; *see* 13 U.S.C. § 9.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of establishing the court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted). In deciding a Rule 12(b)(1) motion, the district court may refer to evidence outside the pleadings, such as documents or affidavits, without converting the motion to one for summary judgment. *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.8 (2d Cir. 2006).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, . . . documents incorporated by reference in the complaint[,]" "document[s]

'integral' to the complaint," and "matters of which judicial notice may be taken." *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 498 (S.D.N.Y. 2017) (citations omitted). Further, "when faced with a motion to dismiss in the APA context, a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment," *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citing *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).

## ARGUMENT

In seeking to invalidate the Secretary's decision to reinstate a question about citizenship on the decennial census form, Plaintiffs ask the Court to second-guess the Secretary's judgment about how to exercise authority that has been delegated to him by the Constitution through Congress—a particularly troublesome request because the relief requested would intrude deeply into matters textually committed to the discretion of the political branches of government.

Plaintiffs' request is not justiciable for multiple reasons. As an initial matter, Plaintiffs' claimed injuries are insufficient to confer standing because they are highly speculative and because any injury would not be fairly traceable to the challenged decision, but instead would be attributable to the independent, unlawful actions of third parties. But even if Plaintiffs could clear the standing hurdle, the Constitution commits the "[m]anner" of conducting the census to Congress, and Congress has delegated that authority to the Secretary in such broad terms that there is no judicially discernible standard against which to measure the Secretary's exercise of his discretion. Plaintiffs' challenge to the Secretary's decision thus presents a nonjusticiable political question, and the decision at issue is committed to agency discretion by law and unreviewable under the APA. And lastly, Plaintiffs fail to state a claim under the Enumeration Clause of the Constitution because the Secretary has wide discretion to control the content of the Census, and to determine the method to count every person. This case should be dismissed.

## I.      THIS CASE IS NOT JUSTICIABLE

### A.      Plaintiffs Lack Standing to Maintain this Action.

The doctrine of constitutional standing, an essential aspect of the Article III case-or-controversy requirement, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Defs. of Wildlife*, 504 U.S. at 560. The "elements are conjunctive, so that a failure of any of the three elements deprives a plaintiff of standing to maintain an action in federal court." *Dickerson v. Feldman*, 426 F. Supp. 2d 130, 134 (S.D.N.Y. 2006).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing the required elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, but "a plaintiff cannot rely solely on conclusory allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003); *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' . . . 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" (citation omitted)).

Plaintiffs have not met their burden here. Plaintiffs' allegations of injury are too speculative to satisfy the injury-in-fact requirement. In addition, Plaintiffs fail the causation prong of the standing

inquiry because they have not established that their alleged injuries fairly can be traced to government action rather than the independent actions of third parties.

## 1. Plaintiffs' allegations of injury are too speculative.

The standing requirement of "injury in fact" requires an allegation that "the plaintiff 'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted). The injury or threat of injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560). Thus, an alleged future injury must be "*certainly impending*"; "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

Plaintiffs' claimed injuries here, stemming from predictions about non-responses to census questions, are not "certainly impending" and are too speculative to demonstrate the necessary injury-in-fact. Plaintiffs claim that the reinstatement of the citizenship question on the decennial census could increase non-response rates, particularly in hard-to-count populations, and, as a result, "increases the risk of undercounting both citizens and noncitizens" disproportionately in their communities. FAC ¶¶ 103, 136. This undercount, they aver, will deprive them of their fair share of federal funding stemming from a variety of federal programs, and also will deprive them of healthcare funding and programs and of access to private funding. *Id.* ¶¶ 137-149, 167-175. Plaintiffs also contend that the alleged undercount will create errors in redistricting, thereby impairing the right to equal representation for residents of under-counted districts, and will threaten Plaintiff states with loss of representation in the U.S. House of Representatives. *Id.* ¶¶ 150-162. Finally, they assert that they will have to expend

significant resources to combat the anticipated undercount by encouraging residents to respond to the census despite the addition of the new question. *Id.* ¶¶ 163-166.

At the outset, Plaintiffs' claims of injury are premised on their belief that the addition of the citizenship question will ultimately cause a net *decrease* in the response rate for the 2020 census. *See, e.g.,* FAC ¶¶ 103, 136, 137, 148. This assertion is entirely speculative, however. As Secretary Ross points out, there is little "definitive, empirical" evidence regarding the effect of adding a citizenship question to the decennial census. Ross Memo, at 3; *see also id.* at 4-6. Indeed, as the Secretary confirmed with the Census Bureau, non-response rates for the citizenship question on the 2013-2016 ACS surveys were comparable to non-response rates for other questions on those same surveys. *Id.* at 3. As Plaintiffs themselves recognize, households historically have failed to respond in fairly high numbers for a variety of reasons, even when no citizenship question was included. *See* FAC ¶ 33 (citing undercount numbers for the 1990, 2000, and 2010 Censuses). Plaintiffs do not provide any reason to conclude that households who otherwise would respond in 2020 would now choose not to do so because of the citizenship question and even admit that there already are anxieties in the population "likely to present a barrier to participation in the 2020 Census." FAC ¶ 51. As the Secretary noted, there are many individuals who would decline to participate regardless of whether the census included a citizenship question, and "no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did." Ross Memo, at 5.

Thus, Plaintiffs merely speculate that the reinstatement of a citizenship question alone will reduce self-response rates. Moreover, Plaintiffs ignore that the Census Bureau has extensive procedures in place to address non-response and to obtain accurate data for those households that decline to respond. Indeed, the Census Bureau plans to increase outreach to address the potential for non-responses (whatever the reason), and is investing in extensive procedures to meet any non-

response challenge. It is entirely unknown (and unknowable) at present whether any initial decrease in self-response rates will result in an undercount at the close of the 2020 census, after the Census Bureau has completed all its processes for enumerating.[7] In sum, Plaintiffs' allegations that the reinstatement of the citizenship question will lower response rates is nothing more than speculation. *Cf. Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (finding standing where plaintiffs "*have made a showing,*" through a survey conducted by an independent research organization, *see Carey v. Klutznick*, 508 F. Supp. 416, 418 (S.D.N.Y. 1980), "that Census Bureau actions in New York State *have caused* a disproportionate undercount which will result in loss of representation in Congress") (emphasis added).

Second, even to the extent that there may be a chance of a greater undercount because of the citizenship question, Plaintiffs' allegations that they face a substantial risk of losing funding or voting power as a consequence of any such additional hypothetical undercount also are too speculative to satisfy Article III. Plaintiffs allege generally that an increased undercount (assuming one occurs) "will deprive Plaintiffs of crucial federal funds" under a variety of federal programs. FAC ¶ 139; *see also id.* ¶¶ 138-149. However, Plaintiffs' allegations do not acknowledge that the allocation of funds under the cited programs is not generally directly proportional to population but is a function of multiple factors including, often, the populations of *other* states. *See, e.g.,* 42 U.S.C. § 1301(a)(8)(A) (Medicaid formula measuring a state's per capita income against the national average per capita income); 49 U.S.C. § 5305(d)(1) (apportioning public transportation planning funds to states in the relation that the population of urbanized areas in each state bears to the total population of urbanized areas in all

---

[7] This conclusion is confirmed by recent testimony by Dr. Ron Jarmin, performing the nonexclusive duties of the Director of the Census Bureau, who stated that there is no "definitive answer" as to whether a citizenship question could produce a differential increase in the non-response rate and could offer only that the impact in some communities "*might* be important." *See* Testimony, https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239, at 1:41:36, 1:44:20.

states).  Given the complexity of these calculations and the interrelationships among all the states'

funding, these allegations regarding anticipated effect are too speculative to satisfy Article III's

requirements. *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996)

(finding lack of standing where court could not determine "what effect any methodology for counting

the homeless would have on the federal funding of any particular appellant," noting that "if a more

accurate count would have enlarged some communities' shares, it likely would have reduced the shares

of other communities").[8]

Even if Plaintiffs had adequately pled a non-speculative injury regarding loss of funding and

therefore had met their pleading burden for Article III standing, that injury alone would not bring

them within the zone of interests protected by the Constitution's Enumeration Clause, which has no

relation, and was not intended, to provide *funding* to states. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S.

871, 883 (1990) ("[A] plaintiff must establish that the injury he complains of … falls within the 'zone

of interests' sought to be protected by the statutory provision whose violation forms the legal basis

for his complaint."); *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016). In order for prudential

standing to exist to assert a claim under the Enumeration Clause, Plaintiffs would have to adequately

plead an injury relating to *apportionment*. They have not. Indeed, the same difficult-to-predict multistate

---

[8] Defendants acknowledge that the court in *National Law Center on Homelessness and Poverty* was ruling on a motion for summary judgment and that a number of courts have found allegations of loss of funding to be sufficient to survive motions to dismiss. *See* 91 F.3d at 185 (citing cases). But most of those cases involved post-census challenges to counting methodologies, and none of them involved a challenge to the mere inclusion of a *question* on the census form. Defendants also recognize that the Second Circuit in *Carey*, in upholding a preliminary injunction requiring the Census Bureau to take certain actions while the census was ongoing, held that allegations of loss of funding were sufficient to establish standing. 637 F.2d at 838. *Carey* did not involve allegations of injuries from the mere inclusion of a question.  Moreover, the court cited New York City's "present financial condition" in finding that the city and the state had standing as recipients of federal funds. Defendants respectfully contend that the layers of speculation required here to conclude that Plaintiffs will be injured by the addition of one question on the census form distinguishes this case from these prior decisions.

impact of an undercount, combined with Plaintiffs' failure to explain the basis for their calculation, also clouds Plaintiffs' allegations regarding apportionment.

Plaintiffs assert that New York and Illinois "risk[] losing additional representation in Congress" because of an "undercount of immigrant communities in these states" but do not explain how these conclusions are reached or whether these conclusions take into account potential undercounting in other states. FAC ¶ 160. Apportionment is a complex process that is determined by ranking states in order of priority for seats, based on their populations (multiplied by a multiplier). *See* 2 U.S.C. § 2a(a) (apportionment of existing number of Representatives to occur "by the method known as the method of equal proportions"); https://www.census.gov/population/apportionment/about/computing.html; *see generally U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992). Thus, each state's likelihood of getting seats is affected by its own total population as well as the population of *other* states, which may also be moving up or down in the priority listing. Plaintiffs do not allege that New York and Illinois will remain at risk of losing seats *even if potential undercounts in other states are taken into account. See Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress").

In addition, Plaintiffs err in asserting that an undercount of only 157 people will cause Rhode Island to lose a seat in the House of Representatives. FAC ¶ 158. This allegation is based on the estimated *2017* population of the states. *See* Election Data Services, Some Changes in Apportionment Allocations With New 2017 Census Estimates; But Greater Change Likely by 2020, at 4 (Dec. 26, 2017), https://www.electiondataservices.com/wp-content/uploads/2017/12/NR_Appor17c3w TablesMapsC2.pdf. The foregoing report indicates that, under all projections for *2020* population

counts based on the 2017 population estimates, Rhode Island is virtually certain to lose a seat, rendering any potential undercount immaterial in this respect.[9] *Id.*

Finally, Plaintiffs' allegations that, at a minimum, they will be required to expend additional funds in order to counteract the (alleged) effects of the additional question (FAC ¶ 166) are also insufficient to establish standing. Plaintiffs allege merely that they "will have to expend additional funding … such as expending resources on greater public outreach … ." *Id.*; s*ee N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (organization must allege "a concrete injury as a result of the policy"). And these contentions suffer from an even more fundamental flaw, given that Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at 416.

In sum, Plaintiffs' allegations do not make out a claim which satisfies the Article III requirement that a plaintiff's threatened injury must be "certainly impending" and must not rely on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S at 410.

### 2. Plaintiffs' alleged injuries are not fairly traceable to the challenged action.

To ensure that a plaintiff's allegations of harm are fairly attributable to the challenged action, it is necessary to allege "a causal nexus between the defendant[s'] conduct and the injury," such that the alleged injury is "fairly traceable to the government conduct claimed as illegal." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). Indeed, the Supreme Court repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414; *see also Defs. of Wildlife*, 504 U.S. at 561-62. At bottom, "a federal court [must] act only to redress injury that fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action *of some third party not before the*

---

[9] Plaintiffs' allegations regarding redistricting are similarly overly conclusory and do not identify concretely how they believe the feared increase in undercount will affect state-level districting. FAC ¶¶ 150-156.

court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (emphasis added); *see also Warth v. Seldin*, 422 U.S. at 504 (finding standing lacking where alleged injury resulted from outside forces, "rather than … respondents' assertedly illegal acts").

Even if Plaintiffs' allegations here were not inherently speculative, and even accepting all well-pleaded facts as true, Plaintiffs' own allegations rely upon the intervening acts of third parties violating a clear legal duty to participate in the decennial census. *See* 13 U.S.C. § 221. Specifically, Plaintiffs do not claim that their threatened injuries—the loss of representation and federal funding—will result directly from the Secretary's decision to reinstate a citizenship question on the decennial form. Rather, Plaintiffs posit that individuals who otherwise would comply with their legal obligation to respond to the census will be deterred by the reinstatement of a single question from participating in the entire survey. But that unlawful failure to respond to a legitimate question simply is not "*fairly* traceable" to the Secretary.[10]

Moreover, it likely would be impossible to isolate and quantify the number of individuals who would have responded but for addition of the citizenship question, both because every census undercounts the population to some degree, *see Wisconsin*, 517 U.S. at 6, and because there will be no reliable method to exclude from the total undercount individuals who would refuse to respond regardless of the citizenship question because of any number of other factors, such as a general

---

[10] In *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013), the Second Circuit explained that "the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." *Rothstein* is inapposite because that opinion concluded only that families of terrorism victims could fairly trace their injuries to a bank's decision to provide funds to Iran, a designated state sponsor of terrorism, in violation of U.S. sanctions—a scenario not remotely analogous to the Secretary's decision to collect information from the U.S. populace. Moreover, *Rothstein* was decided roughly two weeks before the Supreme Court's decision in *Clapper*, which reversed and criticized the Second Circuit's formulation of the traceability requirement. As *Clapper* made clear, "Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court." 568 U.S. at 414 n.5 (internal quotation omitted). *Clapper*, therefore, supersedes *Rothstein*'s explication of the traceability requirement.

reluctance to provide information to the government or the current political climate. *See Himber v. Intuit, Inc.*, 10-CV-2511 (JFB)(AKT), 2012 WL 4442796, at *9 (E.D.N.Y. Sept. 25, 2012) ("No standing exists for … hypothetical, speculative harm that [i]s preventable only by the discretionary decisions of third parties.").

Plaintiffs also cannot premise standing on injuries allegedly produced by state-level redistricting actions following the census, as states are not required to use unadjusted census figures in such actions. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 & n.3 (2016). Accordingly, a state's decision to use such figures is another independent action by a third party that breaks the chain of causation. *See City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993).

### B.      Plaintiffs' Suit is Barred by the Political Question Doctrine.

Even if Plaintiffs had standing, their claims still must be dismissed because they are barred by the political question doctrine. The Constitution provides that Representatives "shall be apportioned among the Several States … according to their respective Numbers," which requires "counting the whole number of persons in each State." U.S. Const. amend. XIV, § 2. To calculate the "number of persons in each State," the Enumeration Clause requires an "actual Enumeration" every 10 years "in such Manner as [Congress] shall by Law direct." *Id.* art. I, § 2, cl. 3. This Clause says only two things about the census: (1) there must be a decennial, person-by-person headcount of the population, and (2) the manner of conducting the census is up to Congress. The former command presents a judicially cognizable question that courts have routinely answered; the latter presents a nonjusticiable political question reserved for Congress and, through Congress's delegation, for the Secretary.

This case implicates only the latter question because it does not involve whom to count, how to count them, or where to count them. Indeed, Plaintiffs themselves admit that the Secretary will conduct a person-by-person headcount of population. *See* FAC ¶¶ 24, 32, 47, 54, 70, 75, 76. Thus, only the Enumeration Clause's "[m]anner" prong is at issue here, as this case concerns simply the

"[m]anner" by which the Secretary performs the information-gathering function of the census. Judicial

review of that question is barred by the political question doctrine.

The political question doctrine is "primarily a function of the separation of powers," *Baker v.*

*Carr*, 369 U.S. 186, 210 (1962), and "is designed to restrain the Judiciary from inappropriate

interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495

U.S. 385, 394 (1990). The doctrine "excludes from judicial review those controversies which revolve

around policy choices and value determinations constitutionally committed for resolution to the halls

of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478

U.S. 221, 230 (1986). The functional nature of this doctrine requires a case-by-case inquiry into "the

precise facts and posture of the particular case." *Baker*, 369 U.S. at 217; *see Klinghoffer v. S.N.C. Achille*

*Lauro Ed Altri-Gestione*, 937 F.2d 44, 49 (2d Cir. 1991) ("[T]he doctrine is one of political questions,

not one of political cases." (internal quotation marks omitted)).

Six factors inform whether a case presents a nonjusticiable political question:

> [1] a textually demonstrable constitutional commitment of the issue to
> a coordinate political department; or [2] a lack of judicially discoverable
> and manageable standards for resolving it; or [3] the impossibility of
> deciding without an initial policy determination of a kind clearly for
> nonjudicial discretion; or [4] the impossibility of a court's undertaking
> independent resolution without expressing lack of the respect due
> coordinate branches of government; or [5] an unusual need for
> unquestioning adherence to a political decision already made; or [6] the
> potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

*Baker*, 369 U.S. at 217; *see also Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 70 (2d Cir. 2005).

While the first two factors are most important, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189,

195 (2012) (examining only the first two factors); *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (observing

that the factors are "probably listed in descending order of both importance and certainty"), the

presence of any one of these factors can render a case nonjusticiable. *See Whiteman*, 431 F.3d at 70

(referencing the six factors as six "independent tests"); *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C.

Cir. 2005) ("To find a political question, we need only conclude that one factor is present, not all."). This case presents not one, but at least three factors that render this controversy nonjusticiable.

### 1. The content of the census questionnaire is textually committed to Congress.

While the Enumeration Clause requires an "actual Enumeration" every 10 years, it also states that the census will be conducted "in such Manner as [Congress] shall by Law direct." U.S. Cons. art. I, § 2, cl. 3. The plain text of this Clause commits the "[m]anner" of conducting the Census to the sound discretion of Congress, thus satisfying the first and most important political question factor.

By using the phrase "in such Manner" to modify the phrase "[t]he actual Enumeration shall be made," the Constitution makes clear that Congress fully controls the manner in which the decennial census is conducted. Dictionaries roughly contemporaneous with the ratification of the Constitution demonstrate that the "[m]anner" of conducting the Census necessarily includes control over the census questionnaire.[11] The census questionnaire is quite literally the "form" of the census,[12] and it is the "method" by which an "actual Enumeration" is conducted—*i.e.*, the census is completed by inhabitants filling out the census questionnaire. Plaintiffs' challenge to the content of census questions thus goes directly to the "way of performing or executing" the census itself, a determination that is constitutionally entrusted to Congress.

Accordingly, the remedy for an unwise census question lies not in the courts, but in Congress. It is Congress to whom the Constitution entrusts the "[m]anner" of conducting the census, and only Congress can overturn the Secretary's decision to reinstate the citizenship question. The Census Act even requires the Secretary to report census questions to Congress two years prior to the Census for

---

[11] Noah Webster's 1828 American Dictionary of the English Language defines "manner" as "form; method; way of performing or executing," and Thomas Sheridan's 1796 Complete Dictionary of the English Language (6th ed.) defines "manner" as "form, method" or "habit, fashion." *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346-47 (1999) (Scalia, J., concurring in part) (examining the text of the Enumeration Clause by referencing these dictionaries).

[12] *See Form*, Sheridan's Complete Dictionary of the English Language (6th ed. 1796) (defining "form" as "[t]he external appearance of any thing, shape; particular model or modification").

this exact reason: to allow the Legislative Branch adequate time to consider the propriety of these questions. 13 U.S.C. § 141(f)(2). That congressionally established process further underscores what the Constitution's text makes clear: that Congress, note the courts, determines the form of the census. This case should therefore be dismissed as a nonjusticiable political question.

**2.   The Court has no judicially manageable standards to make the necessarily policy-based determinations regarding the content of the census questionnaire.**

The second and third political question factors also preclude the Court's intervention because there are no judicially manageable standards for making policy decisions regarding census procedures, such as the content of the census questionnaire.

The text and history of the Enumeration Clause unequivocally demonstrate that decisions regarding the information-gathering procedures of the census are fully committed to Congress's discretion. The reason for this constitutional delegation is axiomatic: each census procedure—from the types of advertising and the use of different languages to promote the census, to the number of regional census offices and the particular systems used to tabulate responses, to the number of enumerators to hire and the process for in-person enumeration visits—requires a careful balancing of considerations such as cost, testing, training, effectiveness, timing, informational need, and accuracy.[13]

These considerations are quintessentially policy choices outside the province of the judiciary. In this case, for example, the Secretary balanced the need for citizenship information with the cost and effectiveness of efforts to mitigate non-responses, the possibility of lower response rates, the cost of increased non-response follow-up procedures, and the completeness and cost of administrative records. There are no judicially manageable standards for determining how to weigh these factors, which do not implicate the affirmative constitutional command to count, rather than estimate, the

---

[13] These considerations are present to some degree when the Secretary decides who, where, and how to count inhabitants of the United States, which is why the Supreme Court defers to the Secretary's judgment in calculation-methodology cases. See *Wisconsin*, 517 U.S. at 19.

population. Once a court ventures beyond that affirmative constitutional command, there is simply no law to apply; it is in the realm of cost/benefit analyses and value judgments constitutionally entrusted to representatives of the people and executive officials confirmed by the same. *Japan Whaling*, 478 U.S. at 230.

The census-related cases decided by the Supreme Court are distinguishable. All have concerned calculation methodologies, not pre-count information-gathering functions or content determinations. *See, e.g., Utah v. Evans*, 536 U.S. 452, 452 (2002) ("hot-deck imputation"—a non-sampling process which infers characteristics of individuals based upon the characteristics of neighbors, resulting in inclusion of individuals who otherwise would be excluded—did not violate the Enumeration Clause); *Dep't of Commerce*, 525 U.S. at 316 (holding that statistical sampling violates the Census Act, 13 U.S.C. § 195, and declining to reach Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1 (holding that Secretary did not violate Enumeration Clause by failing to correct census undercount with data from a post-enumeration survey); *Franklin*, 505 U.S. at 788 (confirming that method used to count federal employees serving overseas did not violate Enumeration Clause). The Constitution supplies a simple judicial standard for determining the constitutionality of such practices—the Secretary must perform a person-by-person headcount, rather than an estimate of population. There is nothing incomprehensible about the standard itself.

In stark contrast, there is no judicially discernible standard for determining whether the Secretary's decision to reinstate the citizenship question on the 2020 decennial census is unconstitutional. This is a "policy choice[] and value determination[] constitutionally committed for

resolution to the halls of Congress [and] the confines of the Executive Branch." *Japan Whaling*, 478

U.S. at 230.[14] Thus, this case is barred from judicial consideration by the political question doctrine. [15]

### C. The Secretary's Decision Is Not Subject to Judicial Review Under the Administrative Procedure Act.

The APA bars judicial review of certain categories of decisions that "courts traditionally have

regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5

U.S.C. § 701(a)(2)). Agency action is committed to agency discretion by law where "'statutes are drawn

in such broad terms that in a given case there is no law to apply,'" *Citizens to Preserve Overton Park, Inc.,*

*v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation omitted). These decisions are not amenable to

judicial review because there exists "no meaningful standard against which to judge the agency's

exercise of discretion" in these areas. *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see also Lunney v. United*

*States*, 319 F.3d 550, 558 (2d Cir. 2003) (§ 701(a)(2)'s "limitation on the APA's waiver of immunity

means that there is no jurisdiction if the statute or regulation said to govern the challenged agency

action 'is drawn so that a court would have *no meaningful standard* against which to judge the agency's

---

[14] Although the Second Circuit once rejected an argument that a challenge to census procedures constituted a political question, *see Carey v. Klutznick*, 637 F.2d at 838, that opinion contains such scant analysis as to constitute the type of "drive-by jurisdictional ruling[]" that "ha[s] no precedential effect," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 91 (1998). Moreover, that case challenged only the *procedures* put in place to conduct the actual count—not the form of the questionnaire itself. The analysis in *Carey* therefore does not control this Court's resolution of the argument presented here.

[15] The Court's apportionment cases are also inapposite. The Supreme Court has routinely decided cases involving congressional districting by States on the theory that the Constitution requires "equal representation for equal numbers of people." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964). And the Court similarly has decided that challenges to the way in which Congress allocates congressional seats are justiciable. *See U.S. Dep't of Commerce v. Montana*, 503 U.S. at 459 (noting that Congress is granted more deference than states in apportionment). But the nature of those controversies provided easily administrable standards for courts to apply: the number of people in each congressional district. *See Wesberry*, 376 U.S. at 2 (observing that one of Georgia's congressional districts contained more than twice as many residents as its other 10 districts); *Tucker v. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (noting that the Supreme Court's reapportionment cases "authorize the courts to intervene in the process of apportioning representatives," because "[e]quality of voting power is an administrable standard").

exercise of discretion'"). This bar applies, moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* ("*BLE*"), 482 U.S. 270, 283 (1987).

As the Supreme Court repeatedly has emphasized, application of § 701(a)(2)'s bar on judicial review "requires careful examination of the statute on which the claim of agency illegality is based," *Webster*, 486 U.S. at 600, along with whether the matter traditionally has been viewed as committed to agency discretion, *BLE*, 482 U.S. at 282, or whether the challenged action manifests a "general unsuitability" for judicial review because it involves a "complicated balancing of a number of factors," difficult judgments concerning the proper allocation of agency resources, or matters uniquely committed to another branch of government, *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). These factors compel the conclusion here that the Secretary's decision to reinstate on the decennial census a request for citizenship data is—just like the conduct of the census generally—a classic example of a discretionary determination that is committed to the discretion of the Secretary of Commerce and thus not subject to judicial review.

In the first place, the applicable section of the Census Act, 13 U.S.C. § 141(a), contains *no* standards against which to assess the Secretary's exercise of discretion (particularly with regard to a matter as fundamental as the form and content of the questionnaire itself). Far from confining the Secretary's discretion, the statute delegates it in the broadest terms: "The Secretary shall … take a decennial census of population … *in such form and content as he may determine*," and, "[i]n connection with any such census, the Secretary is authorized to obtain such other census information *as necessary*." 13 U.S.C. § 141(a) (emphases added). This plain language confers discretion as broad as that granted by the statute at issue in *Webster*, 486 U.S. at 600, which allowed the CIA Director to terminate an employee whenever he "shall deem such termination necessary or advisable in the interests of the United States." The language of § 141(a) contains similar "deeming" language—the census is to be conducted as the Secretary "may determine." And, just as the CIA Director's decision that terminating

an employee is "necessary or advisable" is immune from judicial review, so too is the Secretary's decision to collect information through the decennial census "as necessary" and "in such form and content as he may determine." As in *Webster*, this statutory scheme embodies deference to the Secretary, and forecloses the application of any meaningful judicial review. *See Schneider v. Feinberg*, 345 F.3d 135, 148-49 (2d Cir. 2003) (explaining that jurisdiction will not lie where "no standard of review—other than the APA's 'arbitrary and capricious' standard itself—governs").

It is thus unsurprising that, even in cases challenging calculation methodologies under the Enumeration Clause, courts have construed the "conduct" of the census as generally unfit for judicial interference. As the Supreme Court has explained:

> The text of the Constitution vests *Congress* with virtually unlimited discretion in conducting the decennial "actual Enumeration," *see* Art. I, § 2, cl. 3, and notwithstanding the plethora of lawsuits that inevitably accompany each decennial census, there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides. … Through the Census Act, Congress has delegated its broad authority over the census to the Secretary.

*Wisconsin*, 517 U.S. at 19 (emphasis added). The Supreme Court's explication of the political branches' virtually unlimited discretion is highly probative of whether the Secretary's decisions exercising that discretion are subject to judicial review.[16]

Similar concerns led the Seventh Circuit to conclude that the absence of "guidelines for an accurate decennial census" from the Constitution, the Census Act, and the APA itself creates "the inference . . . that these enactments do not create justiciable rights." *Tucker*, 958 F.2d at 1417 ("So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this, that you might as well turn it over to a panel of statisticians and political scientists and

---

[16] Although Justice Stevens's concurrence in *Franklin v. Massachusetts*, 505 U.S. at 816-20, concluded that the conduct of the census is not committed to agency discretion by law, this opinion failed to garner a majority of the Court and therefore lacks precedential value. It also predated *Wisconsin* and cannot be squared with the language in that unanimous opinion to the effect that Congress has delegated its virtually unlimited discretion to the Secretary.

let them make the decision, for all that a court could do to add its rationality or fairness.") (internal

citations omitted); *see also id.* at 1419 (Ripple, J., concurring) ("[T]he plain language of the governing

statute makes it clear that the matter is committed to agency discretion."); *Senate of State of Cal. v.*

*Mosbacher*, 968 F.2d 974, 977-79 (9th Cir. 1992) (finding "no law to apply" under the Constitution and

Census Act); *City of Phila. v. Klutznick*, 503 F. Supp. 663, 677 (E.D. Pa. 1980) (recognizing danger of

permitting local governments to manipulate conduct of census through judicial review).[17]

Nor can Plaintiffs identify any meaningful standards derived from any other statute, regulation,

or historical practice against which to judge the Secretary's choice of content for the census

questionnaire, further demonstrating that there is no law to apply in this case. To the contrary, the

long history of decennial censuses since ratification of the Constitution establishes a tradition of

commitment of the *general* conduct of the census to the Secretary's discretion, subject to oversight

only by Congress. Furthermore, the longstanding historical practice of including citizenship, dating

back to 1820, *see supra*, Background § II, coupled with the fact that no challenge to the subject matter

of the census questions has ever been successfully maintained (much less attempted), strongly

countenances the conclusion that this matter traditionally has been viewed as discretionary.

Tellingly, Congress has reserved to itself the responsibility for oversight of the Secretary's

performance and correction of any perceived defects in the census without the intrusive and

fragmenting involvement of numerous—and often competing—lawsuits. Section 141(f) of the Census

---

[17] The Second Circuit's determination that a Census Act challenge could be reviewed under the APA in *Carey*, 637 F.2d at 838, should be rejected for much the same reasons as its conclusion regarding the political question doctrine, *see supra* Note 14. Not only did the court engage in little analysis of the question, but its reasoning belies its application here. The court concluded that "appellees allege an impairment of their 'right to a vote free of arbitrary impairment,' a matter which cannot, of course, be foreclosed from judicial review by operation of the Administrative Procedure Act." *Id.* (internal citation omitted). By contrast, Plaintiffs here do not allege an impairment of their right to an unimpeded vote. Furthermore, as noted above, *Carey* dealt with census procedures, not the information collected through the questionnaire.

Act requires the Secretary to submit to Congress "not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census." Plaintiffs' challenge here arises from the Secretary's decision to include in that report a planned question regarding citizenship. FAC ¶ 1.

But the fact that the final agency action challenged here takes the form of a statutorily mandated report to Congress only underscores that Congress intended that *it* would address any defects in those questions, not *courts* in suits brought against Executive Branch officers after the report has been transmitted. By expressly reserving to itself the power to review the Secretary's exercise of his discretion, Congress foreclosed the courts from second-guessing his judgment as to the content of the census questionnaire. *Cf. Armstrong v. Bush*, 924 F.2d 282, 290-91 (D.C. Cir. 1991) (holding that Presidential Records Act impliedly precludes judicial review because it "would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns"). In the end it is for Congress, not this Court, to review the Secretary's exercise of his delegated discretion to determine which demographic questions to ask in the census.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ENUMERATION CLAUSE

Even if this case were justiciable, Plaintiffs' Enumeration Clause claim should be dismissed. The Constitution does not forbid the census from asking whether a person is a U.S. citizen. The Constitution's reference to "actual Enumeration" is simple: population is to be determined through a person-by-person headcount, rather than through estimates or conjecture. There is no allegation that the Secretary is estimating rather than counting the population, nor any allegation that he has failed to establish procedures for counting every resident of the United States. The Enumeration Clause is therefore satisfied. Moreover, the Secretary's decision to reinstate a citizenship question is consistent with historical practice dating back to the founding era. The census has collected demographic information since its first iteration in 1790, and it asked citizenship-related questions as early as 1820,

and in many enumerations since then. The Secretary has complied fully with the Constitution, and Plaintiffs' Enumeration Clause claim should be dismissed.

Plaintiffs themselves recognize that the Secretary will conduct a headcount of population. *See* FAC ¶¶ 24, 32, 47, 54, 70, 75, 76. As described above at Background § IV, the Census Bureau has comprehensive procedures in place for non-response follow up and will attempt to contact nearly every person in the country, utilizing up to six mailings and an in-person visit by an enumerator. 2020 Census Operational Plan*,* at 88-92, 112-21. These operations in place for 2020 are more wide-ranging and more advanced than the operations performed in any previous decennial census. Indeed, the FAC contains no allegations that the Secretary has failed to establish procedures for counting every resident of the United States; as the extensive 2020 census operations make clear, a complete and accurate person-by-person enumeration of the population is fully contemplated.

Furthermore, while in every census the possibility of an undercount exists, the Constitution does not require perfection. *See Utah*, 536 U.S. at 504 (Thomas, J., concurring in part and dissenting in part) (canvassing the history of census undercounts, including the first Census in 1790); *Wisconsin*, 517 U.S. at 6 ("Although each [of the 20 past censuses] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal."); *Gaffney v. Cummings,* 412 U.S. 735, 745 (1973) (census data "are inherently less than absolutely accurate"); *Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981) ("Although the mechanics of the counting process have been improved in each of the nineteen ensuing censuses, there has never been a perfect count."). As long as the Secretary has established procedures for counting every resident of the United States—and there is no allegation he has not—any undercount is the constitutionally permissible result of attempting to enumerate upwards of 325 million people across 3.8 million square miles. *See* https://www.census.gov/popclock/.

Historical practice confirms that the Secretary's decision to reinstate a citizenship question on the 2020 census cannot convert an otherwise constitutional headcount into a violation of the Enumeration Clause. *See Wisconsin*, 517 U.S. at 21 (noting the importance of historical practice when examining Enumeration Clause issues); *Franklin*, 505 U.S. at 803-06 (same). Despite the Constitution's reference only to "the whole number of persons in each State," *see* U.S. Const. amend. XIV, § 2, every census since 1790 has collected demographic information beyond the number and location of inhabitants. *Morales v. Daley*, 116 F. Supp. 2d 801, 809 (S.D. Tex. 2000), *aff'd*, 275 F.3d 45 (5th Cir. 2001). In fact, the First Census in 1790 asked about age, race, and sex. Census Act of 1790, § 1, 1 Stat. 101 (1790). Further, a wide range of demographic questions were asked in subsequent decennial censuses and will be asked in 2020.[18] As detailed above, Background § II, these broad demographic questions included citizenship-related questions as early as 1820 and continuing (on the long-form questionnaire) through the 2000 census. Although the long-form questionnaire was discontinued after the 2000 Census, citizenship questions have been asked on the American Community Survey to a sample of the population—about one in 38 households—every year since 2005. *See* ACS Questionnaire Archive, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html (noting citizenship questions on every ACS questionnaire). Thus, citizenship questions have a long and established history in the census. [19]

---

[18] Throughout the Nineteenth Century, demographic information on the Census expanded to include questions such as the number of persons "engaged in agriculture, commerce, and manufactures," Census Act of 1820, 3 Stat. 548 (1820), the "[p]rofession, occupation, or trade of each person over 15 years of age," the "value of real estate owned," and whether persons over age 20 could read and write, Census Act of 1850, 9 Stat. 430 (1850).

[19] There is nothing inherently suspect about a country asking its residents for citizenship information. Indeed, the United Nations recommends that its member countries ask their residents for such information during censuses. United Nations, Department of Economic and Social Affairs, Principles and Recommendations for Population and Housing Censuses, § 4.110, https://unstats.un.org/unsd/publication/seriesM/Series_M67rev3en.pdf.

Plaintiffs' theory, taken to its logical conclusion, would mean that the Enumeration Clause prohibits any demographic questions on the census questionnaire that may theoretically reduce response rates and cause some entirely speculative undercount. Under that standard, the long-form questionnaire would have been unconstitutional, given that the long-form questionnaire *replaced* the short form for a subset of population in previous censuses and elicited a substantially lower response rate. *See* Census Topic Report No. 11, Response Rates and Behavior Analysis, at 9 https://www.census.gov/pred/www/rpts/TR11.pdf (concluding that mail-back response rate for 2010 long form was 9.6% lower than short form). And many of the questions on the current and prior short forms—such as questions about sex, Hispanic origin, race, and relationship status—would also be called into question, as some people might prefer not to answer those questions as well.

But courts have universally approved the historical practice of gathering demographic information. *See, e.g., Legal Tender Cases*, 79 U.S. 457, 536 (1870)("Congress has repeatedly directed . . . not only an enumeration of persons but the collection of statistics respecting age, sex, and production. Who questions the power to do this?"); *abrogated on other grounds, Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002); *Dep't of Commerce*, 525 U.S. at 341 (such questions, the Court has recognized, serve as "a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country.") (quoting National Research Council, Counting People in the Information Age 1 (D. Steffey & N. Bradburn eds. 1994)).[20] Indeed, the Supreme Court has consistently held that such longstanding historical practice is powerful evidence of constitutionality. *See Nat'l Labor Relations Board v. Noel Canning*, 134 S.

---

[20] On the rare occasions that census questions have been challenged as unconstitutional—usually on Fourth and Fifth Amendment grounds—lower courts have dismissed such contentions out of hand. *United States v. Rickenbacker*, 309 F.2d 462, 463 (2d Cir. 1962) (Marshall, J.), *cert. denied*, 371 U.S. 962 (1963); *Morales v. Daley*, 116 F. Supp. 2d at 814-15; *United States v. Little*, 321 F. Supp. 388, 392 (D. Del. 1971); *United States v. Moriarity*, 106 F. 886, 891 (S.D.N.Y. 1901).

Ct. 2550, 2559 (2014). As noted above, all decennial censuses have included demographic inquiries, and the 2020 questionnaire is no different. In fact, the 2020 questionnaire will include questions about race, sex, and relationship status, which might also cause a theoretical undercount and could then be called into question under Plaintiffs' own theory.

Plaintiffs do not challenge any aspect of the 2020 census that might infringe the Enumeration Clause's command to conduct a person-by-person headcount of the population. Instead, Plaintiffs' challenge focuses entirely on the Secretary's information-gathering decision to reinstate a citizenship question on the 2020 Census. This is as meritless as it is unprecedented. Even when the Supreme Court struggled to distinguish between unconstitutional estimates and acceptable enumeration in calculation-methodology cases,[21] it has recognized that the Clause "vests Congress with virtually unlimited discretion in conducting the decennial" census. *Wisconsin*, 517 U.S. at 19; *see Utah*, 536 U.S. at 474 (explaining that the Clause's language indicates "the breadth of congressional methodological authority, rather than its limitation"). And in light of this discretion, the Supreme Court has never invalidated the Secretary's population count on Enumeration Clause grounds. *See Utah*, 536 U.S. at 474 (holding "hot-deck imputation" permissible under the Enumeration Clause); *Dep't of Commerce*, 525 U.S. at 344 (holding that statistical sampling violates the Census Act and declining to reach Enumeration Clause claim); *Wisconsin*, 517 U.S. at 1; *Franklin*, 505 U.S. at 788. This case presents no reason to break from those precedents.

The Secretary's decision to reinstate a citizenship question was well within his discretion and is fully consistent with the Constitution's text, longstanding historical practice, and judicial precedent. Plaintiffs' theory, by contrast, would deem virtually every census questionnaire in the Nation's history

---

[21] *See, e.g.*, *Utah*, 536 U.S. at 452 (four separate opinions regarding "hot-deck imputation"); *Dep't of Commerce*, 525 U.S. at 316 (five separate opinions regarding statistical sampling); *Franklin*, 505 U.S. at 788 (three separate opinions regarding how to count federal employees serving overseas).

unconstitutional.  The choice between those options is clear: Plaintiffs' Enumeration Clause claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and dismiss this case.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers St., 3rd Floor
New York, NY 10007

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Kate Bailey*
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-9239
Fax:  (202) 616-8470
Email:  kate.bailey@usdoj.gov

*Counsel for Defendants*