UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                                           :

STATE OF NEW YORK, et al.,             :

                             :

                Plaintiffs,   :

                             :      18-CV-2921 (JMF)

        -v-                      :

                             :

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :

                             :

                Defendants.   :

                             :

------------------------------------------------------------------- :

                             :

NEW YORK IMMIGRATION COALITION, et al.,  :    18-CV-5025 (JMF)
                             :      (Consolidated)

                Plaintiffs,   :

                             :

        -v-                      :

                             :    <u>FINDINGS OF FACT AND</u>

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :   <u>CONCLUSIONS OF LAW</u>

                Defendants.   :

                             :

------------------------------------------------------------------------ X

## TABLE OF CONTENTS

BACKGROUND ................................................................................................ 11

    A.    History and Purposes of the Census................................................... 12

    B.    The Secretary's Authority Over the Census ....................................... 17

    C.    The History of a Citizenship Question on the Census ......................... 21

    D.    Testing and Adding New Questions to the Census............................... 24

    E.    Secretary Ross's Decision and This Litigation................................... 26

SECRETARY ROSS'S DECISION ................................................................ 31

    A.    The Initial Administrative Record Submission.................................... 31

1.      The December 12, 2017 DOJ Letter .........................................32

2.      The Census Bureau's Preliminary Analyses and Recommendations ........34

3.      Secretary Ross's February 12, 2018 Meeting with the Census Bureau .........................................................................41

4.      The Census Bureau's Analysis of Alternative D ......................................41

5.      Communications with Stakeholders ...........................................47

6.      Secretary Ross's March 26, 2018 Memorandum......................................52

7.      Secretary Ross's Testimony Before Congress...........................................58

B.      The Supplemental Administrative Record and the Trial Record ........................ 60

1.      Secretary Ross's Early Interest in Adding the Citizenship Question ........63

2.      Comstock's Search for a Rationale and an Agency to Request the Question ..................................................................................66

3.      Secretary Ross and His Aides Persist in Their Efforts .............................68

4.      Secretary Ross's Intervention with the Attorney General ........................72

5.      AAAG Gore Ghostwrites the DOJ Letter..................................................73

6.      The Attorney General Forbids DOJ to Meet with the Census Bureau .........................................................................77

7.      Efforts to Downplay Deviations from the Census Bureau's Standard Processes.........................................................................80

        a.      Secretary Ross's Claim that the Question Was Well Tested ........82

        b.      The Commerce Department Revises the Census Bureau's Description of the "Well-Established Process" for "Adding or Changing Content on the Census"..............................................86

        c.      Secretary Ross's Description of His Dealings with Nielsen..........88

        d.      Comstock's Testimony About the Census Bureau's Analyses ..................................................................................90

8.      The Genesis of the DOJ Letter Was Kept from the Census Bureau..........93

9.      Findings Regarding the Timing of, and Reasons for, Secretary Ross's Decision............................................................................94

STANDING ............................................................................................................ 102

    A.    General Legal Standards ......................................................... 103

    B.    Findings of Fact Related to Standing ................................................. 109

        1.    Background ............................................................... 109

        2.    The Citizenship Question Will Cause a Differential Decline in Self-Response Rates ................................................................ 111

        3.    NRFU Operations Will Not Cure the Differential Drop in Self-Response Rates ................................................................ 120

        4.    Effects of the Citizenship Question on Apportionment Among and Within States ................................................................ 138

        5.    Effects of the Citizenship Question on Funding to, and Within, States ................................................................ 142

        6.    Effects of the Citizenship Question on the Quality and Accuracy of Census Data ................................................................ 146

        7.    Secretary Ross's Decision Has Caused Plaintiffs to Divert Resources ................................................................ 148

    C.    Conclusions of Law Related to Standing ......................................... 155

        1.    Associational Standing ................................................... 156

        2.    Injury in Fact ........................................................... 159

            a.    Diminished Political Representation ............................ 160

            b.    Loss of Government Funds ......................................... 162

            c.    Harm to the Quality and Accuracy of Data ................. 165

            d.    Diversion of Resources ......................................... 173

            e.    Loss of Privacy ................................................. 177

        3.    Traceability and Redressability ......................................... 178

RIPENESS ............................................................................................................ 189

ADMINISTRATIVE PROCEDURE ACT CLAIMS ................................................ 194

    A.    General Legal Standards ...................................................................... 194

    B.    The Scope of Review .......................................................................... 197

    C.    Discussion ........................................................................................... 205

        1.    Secretary Ross's Decision Was Not in Accordance with Law ...............207

            a.    The Section 6 Violation ......................................................208

            b.    The Section 141(f) Violation ..............................................216

        2.    Secretary Ross's Decision Was Arbitrary and Capricious .....................225

            a.    Secretary Ross's Explanations Ran Counter to the Evidence Before the Agency ..............................................225

            b.    Secretary Ross Failed to Consider Several Important Aspects of the Problem ................................................231

            c.    Secretary Ross Failed to Justify Departures from the OMB Guidelines and the Census Bureau's Standards and Practices ...............................................236

        3.    Secretary Ross's Rationale Was Pretextual .............................................245

THE DUE PROCESS CLAUSE CLAIM .......................................................... 253

    A.    Applicable Legal Principles ................................................................ 253

    B.    The Scope of Review .......................................................................... 256

    C.    Discussion ........................................................................................... 260

REMEDIES .......................................................................................................... 263

    A.    General Legal Principles ..................................................................... 264

    B.    Discussion ........................................................................................... 266

        1.    Vacatur and Remand .................................................................266

        2.    Injunctive Relief ........................................................................270

        3.    Declaratory Relief .....................................................................275

CONCLUSION ..................................................................................................... 276

JESSE M. FURMAN, United States District Judge:

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  To that end, it mandates that an "actual Enumeration" be conducted "every . . . ten Years, in such Manner as [Congress] shall by Law direct," an effort commonly known as the census (or, more precisely, the decennial census).  *Id.* art. I, § 2, cl. 3. By its terms, therefore, the Constitution mandates that every ten years the federal government endeavor to count every single person residing in the United States, whether citizen or noncitizen, whether living here with legal status or without.  The population count derived from that effort is used not only to apportion Representatives among the states, but also to draw political districts and allocate power within them.  And it is used to allocate hundreds of billions of dollars in federal, state, and local funds.  Given the stakes, the interest in an accurate count is immense.  Even small deviations from an accurate count can have major implications for states, localities, and the people who live in them — indeed, for the country as a whole.

Since its inception in 1790, the decennial census also has been used for another purpose: to collect demographic data about the population of the United States, including information about respondents' race, sex, and age, and whether they own or rent their homes.  Most relevant here, the government collected data about people's citizenship status from all households in the country in every census between 1820 and 1950 (with the exception of 1840).  In 1960, however, the government stopped asking a citizenship question of every respondent, and for decades thereafter the official position of the Census Bureau was that reintroducing such a question was inadvisable because it would depress the count for already "hard-to-count" groups — particularly noncitizens and Hispanics — whose members would be less likely to participate in the census for

fear that the data could be used against them or their loved ones.  Every Secretary of Commerce

(to whom Congress has long delegated significant authority over the census) adhered to that

position — until early last year.  On March 26, 2018, Secretary of Commerce Wilbur L. Ross, Jr.

announced that he was reinstating the citizenship question on the 2020 census questionnaire,

purportedly in response to a request from the Department of Justice ("DOJ") for better

citizenship data to assist in its enforcement of Section 2 of the Voting Rights Act of 1965

("VRA").  *See* 52 U.S.C. § 10301.  He did so over the strenuous objections of the Census Bureau

itself, which warned that adding a citizenship question would harm the quality of census data and

increase costs significantly and that it would do so for no good reason because there was an

alternative way to satisfy DOJ's purported needs that would not cause those harms.

The question in these consolidated cases is whether Secretary Ross's decision to reinstate

the citizenship question, and the process leading to that decision, violated provisions of statutory

or constitutional law.  Two sets of Plaintiffs — one, a coalition of eighteen states and the District

of Columbia, fifteen cities and counties, and the United States Conference of Mayors (the

"Governmental Plaintiffs"), and the other, a coalition of non-governmental organizations (the

"NGO Plaintiffs") — challenge the decision on two principal grounds.  First, they contend that

the decision violated the Administrative Procedure Act ("APA"), which, among other things,

prohibits federal agencies from acting in a manner that is arbitrary and capricious or not in

accordance with law.  Second, they allege that the decision violated the Due Process Clause of

the Fifth Amendment because it was motivated in part by invidious discrimination against

immigrant communities of color.  Defendants — the United States Department of Commerce;

Secretary Ross (the "Secretary"); the Bureau of the Census (the "Census Bureau"); and the

Director of the Census, Dr. Steven Dillingham[1] — have tried mightily to avoid a ruling on the merits of these claims. They asserted a slew of unsuccessful jurisdictional arguments, raised multiple challenges to this Court's decisions authorizing discovery beyond the administrative record collected and filed in this litigation (one of which is still pending before the United States Supreme Court), and tried no fewer than fourteen times to halt the proceedings altogether. Between November 5 and 27, 2018, however, this Court held — and completed — an eight-day bench trial to resolve Plaintiffs' claims, taking direct testimony by affidavit from many witnesses and orally from others.

This Opinion contains the Court's findings of fact and conclusions of law following that trial. Broadly speaking, the Court reaches three legal conclusions. *First*, the Court holds that most, if not all, of Plaintiffs have standing to bring their claims. Specifically, they have proved by a preponderance of the evidence that they will be harmed in various ways as a result of the addition of a citizenship question on the census and that a favorable ruling here will redress those harms. Defendants' own documents and expert witness confirm that adding a citizenship question to the census will result in a significant reduction in self-response rates among noncitizen and Hispanic households. And expert testimony, based in large part on the Census Bureau's own analyses of past censuses, indicates that the Census Bureau's "Non-Response Follow Up" procedures, extensive though they will be, are unlikely to remedy that reduction in self-response rates, which means that hundreds of thousands — if not millions — of people will go uncounted in the census if the citizenship question is included. The result will not only be a decrease in the quality of census data — something Defendants concede — but likely also a net

---

[1]     Dr. Ron S. Jarmin served as Acting Director of the Census throughout the period relevant to this litigation and was originally named as a Defendant in his official capacity. *See* Docket No. 1. On January 2, 2019, however, Dr. Dillingham was confirmed as Director of the Census, and was substituted for Dr. Jarmin as a Defendant. *See* Docket No. 573.

differential undercount (that is, an undercount of certain sectors of the population, including people who live in households containing noncitizens and Hispanics, relative to others). That undercount, in turn, will translate into a loss of political power and funds, among other harms, for various Plaintiffs. In light of these and other factual findings, the Court holds that most, if not all, Plaintiffs have standing to bring their claims.

*Second*, the Court concludes on the merits that Secretary Ross violated the APA in multiple independent ways. Most blatantly, Secretary Ross ignored, and violated, a statute that requires him, in circumstances like those here, to collect data through the acquisition and use of "administrative records" *instead* of through "direct inquiries" on a survey such as the census. Additionally, Secretary Ross's decision to add a citizenship question was "arbitrary and capricious" on its own terms: He failed to consider several important aspects of the problem; alternately ignored, cherry-picked, or badly misconstrued the evidence in the record before him; acted irrationally both in light of that evidence and his own stated decisional criteria; and failed to justify significant departures from past policies and practices — a veritable smorgasbord of classic, clear-cut APA violations. On top of that, Secretary Ross acted without observing procedures required by law, including a statute requiring that he notify Congress of the subjects planned for any census at least three years in advance. And finally, the evidence establishes that Secretary Ross's stated rationale, to promote VRA enforcement, was pretextual — in other words, that he announced his decision in a manner that concealed its true basis rather than explaining it, as the APA required him to do. Notably, the Court reaches all of those conclusions based exclusively on the materials in the official "Administrative Record" — that is, the record of materials collected and submitted by Defendants that Secretary Ross allegedly considered, directly or indirectly, prior to making his decision. Looking beyond the Administrative Record merely confirms the Court's conclusions and illustrates how egregious the APA violations were.

*Third*, on the merits of the constitutional claim, the Court concludes that Plaintiffs did not carry their burden of proving that Secretary Ross was motivated by invidious discrimination and thus that he violated the equal protection component of the Due Process Clause.  In particular, although the Court finds that Secretary Ross's decision *was* pretextual, it is unable to find, on the record before it, that the decision was a pretext *for* impermissible discrimination.  To be fair to Plaintiffs, it is impossible to know if they could have carried their burden to prove such discriminatory intent had they been allowed to depose Secretary Ross, as the Court had authorized last September.  As defense counsel more or less conceded during closing arguments, a deposition of Secretary Ross would have been the best evidence of the question at the heart of the due process inquiry — namely, the true nature of Secretary Ross's intent in reinstating the citizenship question.  But this Court's order authorizing such a deposition was stayed by the Supreme Court pending its further review, *see In re Dep't of Commerce*, — S. Ct. —, 2018 WL 5458822 (Nov. 16, 2018); *In re Dep't of Commerce*, 139 S. Ct. 16 (2018) (mem.), and Plaintiffs made the understandable decision to proceed with trial despite that stay (because, with the clock ticking on census preparations, waiting for a final ruling from the Supreme Court could have cost Plaintiffs a meaningful chance to obtain *any* relief).  Be that as it may, it was — and remains — Plaintiffs' burden to prove discriminatory intent, and the evidence in the existing record does not support a conclusion that they carried that burden.

The Court's Opinion is, to put it mildly, long.  But that is for good reasons.  For one thing, the Court has taken care to thoroughly examine every issue because the integrity of the census is a matter of national importance.  As noted, the population count has massive and lasting consequences.  And it occurs only once a decade, with no possibility of a do-over if it turns out to be flawed.  *See* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, § 209(a)(8), Pub. L. No. 105-119, 111 Stat. 2440,

2480-81 (1997) ("1998 Appropriations Act") ("Congress finds that . . . the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.").  For another, time is of the essence because the Census Bureau needs to finalize the 2020 questionnaire by June of this year.  *See* Docket No. 540, at 3; *see also* Brief for Petitioners at 45, *Department of Commerce v. U.S. Dist. Ct. for S.D.N.Y.* (Dec. 17, 2018) (No. 18-557), 2018 WL 6650094, at *45 (noting "the need to finalize the census questionnaire by mid-2019").[2]  With time so short and the likelihood that one or both sides will seek appellate relief so high, it is critical to make a comprehensive record in order to facilitate higher court review and to minimize any potential need for a remand.  That means reaching most, if not all, issues raised by the parties — even if, in other circumstances, it would be unnecessary or even inadvisable.  *See, e.g.*, *Ashwander v. TVA,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").  And in light of Defendants' strenuous objections to consideration of any extra-record discovery — objections they are already pressing before the Supreme Court — it also means spelling out which facts are drawn exclusively from the Administrative Record rather than from other evidence, and which conclusions of law are based solely on the Administrative Record rather than on other evidence.[3]

---

[2]     Unless otherwise noted, all citations to the docket are to No. 18-CV-2921.

[3]     There is one more reason for the Opinion's length.  To paraphrase a line generally traced to Blaise Pascal: If the Court had more time, its Opinion would be shorter.

In short (or not, as the case may be), the Court concludes that Secretary Ross's decision to add the citizenship question to the 2020 census questionnaire, while not inconsistent with the Constitution, violated the APA in several respects. Those violations are no mere trifles. The fair and orderly administration of the census is one of the Secretary of Commerce's most important duties, as it is critical that the public have "confidence in the integrity of the process." *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring in part and concurring in the judgment). And although some may deride its requirements as "red tape," the APA exists to protect core constitutional and democratic values: It ensures that agencies exercise only the authority that Congress has given them, that they exercise that authority reasonably, and that they follow applicable procedures — in short, it ensures that agencies remain accountable to the public they serve. That is not to say — and the APA does not say — that an agency cannot adopt new policies or otherwise change course. But the APA does require that before an agency does so, it must consider all important aspects of a problem; study the relevant evidence and arrive at a decision rationally supported by that evidence; comply with all applicable procedures and substantive laws; and articulate the facts and reasons — the *real* reasons — for that decision. The Administrative Record in these cases makes plain that Secretary Ross's decision fell short on all these fronts. In arriving at his decision as he did, Secretary Ross violated the law. And in doing so with respect to the census — "one of the most critical constitutional functions our Federal Government performs," 1998 Appropriations Act, § 209(a)(5), 111 Stat. at 2480-81, and a "mainstay of our democracy," *Franklin*, 505 U.S. at 818 (Stevens, J., concurring) — Secretary Ross violated the public trust.

## BACKGROUND

The Court begins with relevant background concerning the history and purpose of the census, the Secretary's authority over the census, and the history of the citizenship question on

the census.  The relevant background is largely undisputed (for example, as reflected in

stipulations of the parties) or drawn from materials of which the Court can take judicial notice.

*See, e.g.*, Fed. R. Evid. 201(b)-(c); *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298-303

(S.D.N.Y. 2012) (noting that a court may take notice of undisputed historical facts).  To the

extent that the Court cites trial testimony or exhibits in what follows, it is only by way of

background and does not form a basis for any of the conclusions of law later in this Opinion.[4]

## A.  History and Purposes of the Census

Article I of the Constitution requires Congress to carry out an "actual Enumeration"

every ten years, "in such Manner as [Congress] shall by Law direct."  U.S. Const. art. I, § 2, cl.

3.  The original and fundamental purpose of this "Enumeration," known as the decennial census,

was to apportion congressional representatives (and, where necessary, direct taxes) among the

states "according to their respective Numbers."  *Id.*  For the first eighty years of the country's

history, the states' "respective Numbers" were calculated according to a formula mandated by

the same constitutional provision's infamous Three-Fifths Clause, which reformulated the

"actual Enumeration" established by the census by "adding to the whole Number of free Persons

. . . , and excluding Indians not taxed, three fifths of all other Persons" — "all other Persons"

---

[4]     Defendants filed the initial part of the Administrative Record on June 8, 2018.  *See*
Docket No. 173; *see also id.* Ex. 1.  They later filed additional materials, *see* Docket Nos. 189,
212, and stipulated that almost all of their contents, as well as several additional documents, are
also part of the Administrative Record.  *See* Docket Nos. 523, 524.  In general, throughout this
Opinion, "AR [Number]" refers to a page or pages in the Administrative Record; "Tr. [Number]"
refers to a page or pages of the trial transcript; "PX-[Number]" refers to a Plaintiffs' Exhibit; and
"[Name] Dep." refers to a deposition admitted into evidence in part.  (To the extent that the
Court cites to any deposition testimony to which a party objected, the objection is overruled.)
Where possible, citations to the Administrative Record include both "AR" and the relevant Bates
stamp number within the Administrative Record productions (e.g., AR 001).  Where Bates stamp
numbers are unavailable — for instance, for certain trial exhibits that were added to the
Administrative Record by stipulation — the Court cites to the source or exhibit directly and
includes "(AR)" to signify that it is part of the Administrative Record (e.g., PX-001 (AR)).

being the people then held as slaves. *Id.* (amended 1868). After the Civil War, that provision was superseded by the Fourteenth Amendment, which provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons* in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (emphasis added). The result is that the Constitution "requires the federal government to conduct a Decennial Census counting the total number of 'persons' — with no reference to citizenship status — residing in each state." Docket No. 480-1 ("Joint Stips."), ¶ 1.

 Significantly, although the "initial constitutional purpose" of the census was to "provide a basis for apportioning representatives among the states in the Congress," it has long "fulfill[ed] many important and valuable functions for the benefit of the country." *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982). In particular, it "now serves as a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country." *Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 341 (1999) (internal quotation marks omitted). *See generally* U.S. CENSUS BUREAU, MEASURING AMERICA: THE DECENNIAL CENSUSES FROM 1790 TO 2000 ("MEASURING AMERICA") (2002), http://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf. "Today, policy makers at all levels of government, as well as private businesses, households, researchers, and nonprofit organizations, rely on an accurate census in myriad ways that range far beyond the single fact of how many people live in each state." COUNCIL OF ECONOMIC ADVISERS, THE USE OF CENSUS DATA: AN ANALYTICAL REVIEW (2000), https://clintonwhitehouse4.archives.gov/media/pdf/censusreview.pdf. Among other things, the data are used "for such varied purposes as computing federal grant-in-aid benefits, drafting of legislation, urban and regional planning, business planning, and academic and social studies." *Baldrige*, 455 U.S. at 353 n.9.

Since 1790, the government has conducted the required "actual Enumeration" through questions — initially asked in person by U.S. Marshals and "specially appointed agents" and later by means of written questionnaire — about both the number and demographic backgrounds of those living in each American household.  *See* MEASURING AMERICA 125-40.  Congress provided for each of the first twelve censuses on an *ad hoc* basis; then, in 1902, Congress established the "Census Office" that it had organized for the twelfth census as a permanent office within the Department of the Interior, to be supervised by a "Director of the Census" appointed by the President and confirmed by the Senate.  *See* Act of Mar. 6, 1902 §§ 1-3, Pub. L. No. 57-27, 32 Stat. 51, 51.  Shortly thereafter, Congress moved the Census Office into the newly created Department of Commerce and Labor.  *See* Act of Feb. 14, 1903 § 4, Pub. L. No. 57-87, 32 Stat. 825, 826-27.  Ten years later, various parts of that combined department were transferred into the newly fashioned Department of Labor, and the Census Office was left behind at the slimmed-down (and renamed) Department of Commerce.  *See* Act of Mar. 4, 1913 §§ 1, 3, Pub. L. No. 62-426, 37 Stat. 736, 736-37.[5]  (Today the "Census Office" is known as the "Bureau of the Census," or the "Census Bureau.")  In 1954, Congress enacted the various census-related statutes codified in Title 13 into positive law, *see* Act of Aug. 31, 1954, Pub. L. No. 83-740, 68 Stat. 1012, and has enacted all subsequent revisions to the census statutes as amendments to Title 13, which, as a result, is known colloquially as the "Census Act."

The modern decennial census is administered exclusively through a "short-form" questionnaire — a short questionnaire containing only a handful of questions.  This is a relatively recent phenomenon.  Beginning in 1960, and until 2000, each census also included a "long-

---

[5]     Pursuant to the Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203, President Truman transferred "all functions of the Department of Commerce and all functions of all agencies and employees of such Department" to the Secretary of Commerce.  *See* Reorganization Plan No. 5 of 1950, 15 Fed. Reg. 3174 (May 25, 1950).

form" questionnaire, which contained many additional questions but was sent to only a sample fraction of the population.  *See* MEASURING AMERICA 72.  In 1960, twenty-five percent of households received the "long-form" questionnaire, while the remainder received the "short-form."  *Id.*  In the 1970 and subsequent censuses, approximately one-sixth of all households received the "long-form" questionnaire.  *See* Joint Stips. ¶ 31.  During that time, none of the short-form questionnaires included a question about citizenship or birthplace, although the long-form questionnaires each did.  *See* Joint Stips. ¶¶ 30, 35.  After the 2000 census, the Census Bureau introduced a new survey instrument, the American Community Survey ("ACS").  Joint Stips. ¶ 37.  Unlike the decennial census questionnaires, the ACS is conducted annually and not used to enumerate the population for apportionment purposes.  It is distributed to about 3.5 million households (approximately two percent of households in the country) each year, for the sole purpose of collecting demographic data about the population.  Since its inception, the ACS has included a question on citizenship.  Joint Stips. ¶¶ 38-41.  With the advent of the ACS, the Census Bureau phased out the "long-form" decennial census questionnaire.  Joint Stips. ¶ 37; *see* JENNIFER D. WILLIAMS, THE 2010 DECENNIAL CENSUS: BACKGROUND AND ISSUES 3 (2011), https://www.census.gov/history/pdf/2010-background-crs.pdf.  Thus, the 2010 decennial census included only a single "short-form" questionnaire, distributed primarily by mail.  *Id.*  So too, the 2020 census will be conducted with a single short-form questionnaire, which, for the first time, many respondents will complete online.  *See* Tr. 1091.

The modern decennial census begins with a Master Address File ("MAF"), a database containing every known housing unit in the country.  *See* 83 Fed. Reg. 26643, 26644 (June 8, 2018).  Every household is then given the opportunity to self-respond to the census questionnaire.  Joint Stips. ¶ 7.  A majority of households self-respond to that questionnaire.  To attempt to count the households that do not self-respond, the Census Bureau uses a set of

procedures known as "Non-Response Follow-Up" or "NRFU."  Joint Stips. ¶ 8.  The first step in NRFU is an in-person visit from a census enumerator.  Assuming that a household is listed in the MAF — a precondition for any NRFU efforts — a NRFU enumerator will visit any nonresponding household in person and, if possible, conduct the census survey face-to-face.  In the 2020 census, if the NRFU enumerator's first visit is unsuccessful, but the Census Bureau believes the housing unit to be occupied, the Census Bureau will then refer to "administrative records" — data collected from other federal or state entities — to enumerate that household, assuming administrative records of sufficient quality exist.  Joint Stips. ¶¶ 9-10; 83 Fed. Reg. at 26649.  If the household cannot be enumerated with high-quality administrative records, a NRFU enumerator will return to the household for at least two more in-person attempts.  Joint Stips. ¶¶ 10-11.  After three unsuccessful attempts to contact a member of the household in person, the NRFU enumerator will return and attempt to gather information from a "proxy," such as a neighbor or landlord, who can report what he or she knows about the household and its members.  Joint Stips. ¶¶ 11-13; 83 Fed. Reg. at 26649.  Finally, if enumeration-by-proxy fails, the Census Bureau will then "impute" either the number of household members or their characteristics (or both) based on already-existing data from the area.  *See* AR 1281-82, 1304.  In other words, the Census Bureau will use a formula to extrapolate what it does not know about the population from what it already knows.  *See* Tr. 1351.  Because NRFU data is less accurate than self-response data, *see* AR 1281, the Census Bureau places a high priority on obtaining self-responses from as many households as possible, *see* AR 163-65.  To that end, the Census Bureau partners with local organizations (which it refers to as "Trusted Partners") to encourage local households to self-respond.  Joint Stips. ¶¶ 26, 28.

**B.  The Secretary's Authority Over the Census**

Since Congress first delegated its census-related authority to an Executive Branch official, it has retained some control over the design and administration of the census.  The first permanent delegation, for example, provided that the decennial census "shall be restricted to inquiries relating to the population, to mortality, to the products of agriculture and of manufacturing and mechanical establishments" and that the tabulations of population "shall comprehend for each inhabitant the name, age, color, sex, conjugal condition, place of birth, and place of birth of parents, whether alien or naturalized, number of years in the United States, occupation, months unemployed, literacy, school attendance, and ownership of farms and homes."  Act of Mar. 3, 1899 § 7, 30 Stat. 1014, 1015.  Within those broad confines, however, Congress provided that "the Director of the Census may use his discretion as to the construction and form and number of inquiries necessary to secure information."  *Id.*

In 1976, Congress amended Title 13 substantially.  *See* Act. of Oct. 17, 1976 ("1976 Census Act"), Pub. L. No. 94-521, 90 Stat. 2459 (codified in scattered sections of 13 U.S.C.).  Among other things, the 1976 Census Act amended Section 141(a) of Title 13 to update and consolidate its delegation of authority over the census to the Secretary of Commerce.  *See id.* § 7(a), 90 Stat. at 2461 (codified at 13 U.S.C. § 141(a)).  Section 141(a) now provides:

> The Secretary shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the "decennial census date," in such form and content as he may determine, including the use of sampling procedures and special surveys.  In connection with any such census, the Secretary is authorized to obtain such other census information as necessary.

13 U.S.C. § 141(a).  That delegation now sits alongside Section 5 of Title 13, which authorizes the Secretary to "prepare questionnaires," including but not only for the decennial census, and to "determine the inquiries, and the number, form, and subdivisions thereof."  13 U.S.C. § 5.

Along with — and within — that broad delegation, however, the 1976 Census Act also constrained the Secretary's delegated authority over the decennial census and its questionnaires in several significant ways.  First, by its terms, Section 141(a) itself authorized the Secretary to collect information "other" than population information only "as necessary."  *Id.* § 141(a). Second, and significantly, Congress added a new subsection to Title 13's Section 6, which had previously merely authorized the Secretary to acquire and use "pertinent" information from other federal, state, and local authorities for the purpose of gathering census-related data.  *See* 13 U.S.C. § 6 (1970).  The new subsection — Section 6(c) — added that, "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary *shall* acquire and use information available from any source referred to in subsection (a) or (b) of this section *instead* of conducting direct inquiries."  1976 Census Act § 5(a), 90 Stat. at 2460 (codified at 13 U.S.C.  § 6(c)) (emphases added).

At the same time, Congress also cabined the Secretary's authority to collect data — other than for the straightforward purpose of counting whole persons for apportionment purposes — through nationwide inquiries of the whole population.  Whereas Section 195 of Title 13 had previously merely authorized data collection through statistical sampling, the 1976 Census Act amended that provision to state that, "[e]xcept for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary *shall*, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title."  1976 Census Act § 10, 90 Stat. at 2464 (codified at 13 U.S.C. § 195) (emphasis added); *see Department of Commerce*, 525 U.S. at 341 (noting that the new Section 195 "changed a provision that *permitted* the use of sampling for purposes other than apportionment into one that *required* that sampling be used for such purposes if 'feasible'").  Thus, the "broad grant of authority given in § 141(a) is informed . . .  by the narrower and more

specific § 195," *Department of Commerce*, 525 U.S. at 338, and is similarly limited by the narrower and more specific Section 6(c).  Thus, together, Sections 6(c) and Section 195 effectively established a new default rule for the collection of census data other than for apportionment purposes: first, the Secretary was to "acquire and use" administrative record data instead of conducting direct surveys "to the maximum extent possible," if consistent with the type of data required, 13 U.S.C. § 6(c); and, second, when conducting surveys, he was required to use statistical sampling "if . . . feasible," instead of asking a question of everyone, *id.* § 195.

That was not all.  The 1976 Congress also enacted a new reporting requirement, mandating that the Secretary report to the relevant congressional committees, at least three years before the "census date" for a given census, all "subjects proposed to be included, and the types of information to be compiled."  13 U.S.C. § 141(f)(1).  Further, no later than two years before the given census date, the Secretary must report to the same congressional committees all "*questions* proposed to be included in such census."  *Id.* § 141(f)(2) (emphasis added).  Congress authorized the Secretary to diverge from the proposals set forth in those reports, but only if he "finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified," and he submits another report "containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified."  *Id.* § 141(f)(3).

Finally, to the extent relevant here, the 1976 Census Act's new constraints on the Secretary's authority built on another important, longstanding constraint: a sharp restriction on the authority to *share* any information gathered in any given data collection effort.  With certain limited exceptions, Section 9 of Title 13 provides:

> Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, . . . may . . .

> (1) use the information furnished under the provisions of [Title 13] for any purpose other than the statistical purposes for which it is supplied; or
>
> (2) make any publication whereby the data furnished by any particular establishment or individual under [Title 13] can be identified; or
>
> (3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

13 U.S.C. § 9(a). Moreover, Section 9 categorically forbids *anyone*, "except the Secretary in carrying out the purposes of [Title 13]," from ordering the production of census reports that have been retained by the people who submitted them. *Id.* And it provides that copies of such census materials are both "immune from legal process" and unusable "for any purpose in any action, suit, or other judicial or administrative proceeding," without the person's consent. *Id.* Notably, the Secretary's authority to share data with other federal agencies, including DOJ, is "[s]ubject to the limitations contained in" Section 9 (*and* Section 6(c)). *Id.* § 8(b). More specifically, although the Secretary is authorized to "furnish copies of tabulations and other statistical materials" to other federal agencies, those materials may "not disclose the information reported by, or on behalf of, any particular respondent." *Id.*

In sum, as befits a subject over which the Constitution assigns *Congress* "virtually unlimited discretion," *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996), Congress has been judicious in its delegation of that authority to the Executive Branch, and it has retained an active role in policing the form, content, and methodology of the census through these and other provisions. That is, even as it has delegated broad authority over the census to the Secretary, Congress has taken care to limit that authority and, with respect to a few topics that it has deemed especially worthy of restraint — such as the use of survey questions instead of administrative records or the practice of asking survey questions of all respondents as opposed to

sampling — Congress has enacted clear instructions for the Secretary to follow in carrying out his statutory duties.  *Cf. Department of Commerce*, 525 U.S. at 337-39.

## C.  The History of a Citizenship Question on the Census

As the Court described at length in an earlier Opinion and Order, *see New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 776-79 (S.D.N.Y. 2018), the questions posed on the census have ebbed and flowed since the first census in 1790 asked each household about "the sexes and colours of free persons," as well the age of each resident, *see* Act of March 1, 1790 § 1, 1 Stat. 101, 101-02 (1790).  Most relevant for present purposes, a question regarding citizenship appeared for the first time on the fourth census in 1820, when Congress directed enumerators to tally the number of "Foreigners not naturalized."  Act of March 14, 1820 § 1, 3 Stat. 548, 550 (1820).  With one unexplained exception (the 1840 census), a question about citizenship status or birthplace appeared on every census thereafter through 1950.  *See New York*, 315 F. Supp. 3d at 776-79.  That changed in 1960 — the first census after Congress authorized the use of sampling.  *Id.* at 778.  That year, only five questions were posed to all respondents, concerning the respondent's relationship to the head of household, sex, color or race, marital status, and month and year of birth.[6]  In a review of the census several years later, the Census Bureau explained the decision not to ask all respondents about citizenship as follows:  "It was felt that general census information on citizenship had become of less importance compared with other possible questions to be included in the census, particularly in view of the recent statutory requirement for annual alien registration which could provide the Immigration and

---

[6]      In 1960, a longer questionnaire was sent to a sample of the population with questions regarding respondents' and their parents' birthplaces.  *See* MEASURING AMERICA 73-75.  Additionally, residents of New York and Puerto Rico were asked about citizenship — the former "at the expense of the State, to meet [now defunct] State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration."  1960 CENSUSES OF POPULATION AND HOUSING 10, 130.

Naturalization Service, the principal user of such data, with the information it needed."  U.S.
BUREAU OF THE CENSUS, 1960 CENSUSES OF POPULATION AND HOUSING: PROCEDURAL HISTORY
("1960 CENSUSES OF POPULATION AND HOUSING") 194 (1966), http://www2.census.gov/prod2/
decennial/documents/1960/proceduralHistory/1960proceduralhistory.zip.

      Between 1970 and 2000, the Census Bureau used both a short-form questionnaire
(containing only a handful of questions), which was distributed to the vast majority of the
population, and a long-form questionnaire (containing both the inquiries on the short-form
questionnaire as well as additional questions), which was distributed to only a sample of the
population.  During that time, the long-form questionnaires contained a citizenship question, but
the short-form questionnaires did not.  *See* MEASURING AMERICA 77-78, 84-85, 91-92, 100-101.
In 2010, after the advent of the ACS, the Census Bureau dropped the long-form questionnaire
entirely.  The 2010 census asked about such matters as "the age, sex, race, and ethnicity
(Hispanic or non-Hispanic) of each person in a household," but did not ask about citizenship.
WILLIAMS, THE 2010 DECENNIAL CENSUS 3.  Thus, the last time that the census asked *every*
respondent about citizenship was sixty-nine years ago, in 1950.  Notably, that is before the VRA
was enacted in 1965.  In other words, for all fifty-four years that the VRA has existed, the federal
government has *never* had a "hard-count" tally of the number of citizens in the country.  Instead,
consistent with the requirement to use statistical sampling techniques "if . . . feasible" for
everything other than the constitutionally mandated "actual Enumeration," *see* 13 U.S.C. § 195,
the federal government has extrapolated from citizenship data collected from a subset of the
population to model data for the population as a whole, *see* WILLIAMS, THE 2010 DECENNIAL
CENSUS 3.

      Since 1950, the Census Bureau and former Census Bureau officials have consistently
opposed periodic proposals to resume asking a citizenship question of every census respondent.

In 1980, for example, several plaintiffs (including the Federation for American Immigration Reform, which appears here as *amicus curiae* in support of Defendants, *see* Docket Nos. 75, 179) sued the Census Bureau, contending that the census was constitutionally required to count only citizens.  *See Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980) ("*FAIR*") (three-judge court).  In that litigation, the Census Bureau argued that reinstating a citizenship question for all respondents would "inevitably jeopardize the overall accuracy of the population count" because noncitizens would be reluctant to participate, for fear "of the information being used against them."  *Id*. at 568.  Likewise, in Congressional testimony prior to the 1990 census, Census Bureau officials opposed reinstating a citizenship question for all respondents, opining that it could cause legal residents to "misunderstand or mistrust the census and fail or refuse to respond."  *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing on H.R. 3639, H.R. 3814, and H.R. 4234 Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv*., 100th Cong. 47-51 (1988) (statement of John G. Keane, Director, Bureau of the Census); *see also Census Equity Act: Hearings on H.R. 2661 Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civ. Serv.*, 101st Cong. 42-44 (1989) (statement of C. Louis Kincannon, Deputy Director, Bureau of the Census).  Before the 2010 census, former Bureau Director Kenneth Prewitt testified before Congress to the same effect.  *See Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform*, 109th Cong. 72 (2005) (statement of Kenneth Prewitt).  Just two years ago, four former Census Bureau Directors wrote in an *amicus curiae* brief to the Supreme Court (in a case about the use of total population in intrastate redistricting) that a "citizenship inquiry would invariably lead to a lower response rate to the Census."  Brief of Former Directors of the U.S. Census Bureau as *Amici Curiae* in

Support of Appellees at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940), 2015 WL 5675832, at *25.[7]

## D.  Testing and Adding New Questions to the Census

The Census Bureau's longstanding opposition to a citizenship question on the census is consistent with a more general reluctance to tinker with the questionnaire unnecessarily.  That is, although early census questionnaires changed regularly, a more sophisticated understanding of statistics and survey design in the modern era has caused the Census Bureau to approach any changes to the questionnaire with great care.  For instance, after the 1990 census, the Census Bureau considered adding a question regarding respondents' Social Security Numbers ("SSNs") to the "short-form" questionnaire.  *See* Tr. 998-99.  Before deciding to add such a question, however, the Census Bureau conducted a randomized controlled trial comparing a version of the questionnaire that asked about SSNs to one that did not in order to assess the question's impact on self-response rates.  *See id.* at 999.  Overall, the Census Bureau observed a 3.4% decline in self-response rates attributable to the question, a decline that was not evenly distributed among subpopulations.  *See id.* at 999-1000.  In part due to these results, the Census Bureau did not — and does not to this day — ask a question about SSNs on the decennial census.  *See id.* at 999.

As the SSN example reflects, in recent decades, the Census Bureau has followed a fairly robust process in evaluating whether to add a new question to a survey such as the census.  AR 9865, 9867; AR 3560; AR 3890-91; Docket No. 516-1 ("Thompson Decl."), ¶¶ 45, 47-49.  The process usually begins with a request from Congress or an Executive Branch agency to add a

---

[7]  The four former Census Bureau Directors continue to oppose addition of a citizenship question.  As discussed below, they and two other former Directors wrote to Secretary Ross to express "deep[] concern[]" about the addition of a question without proper testing.  AR 8555-56.  In addition, five of the six former Directors have filed an amicus brief in support of Plaintiffs in these cases.  *See* Docket No. 423-1.  The sixth, John Thompson, testified as an expert witness on Plaintiffs' behalf.  *See* Tr. 563-79.

question.  AR 3890; *see* AR 2304.  After receiving such a request, the Census Bureau works with

the Office of Management and Budget ("OMB") to ensure that the proposed data collection

would comply with applicable legal and regulatory requirements.  AR 3890.  If the Census

Bureau determines that adding the new question is "warranted," the Secretary of Commerce

notifies Congress of his intent to add the question — first by including the subject of the question

in the Section 141(f)(1) report to Congress, at least three years before the census date and, later,

by reporting the question itself in the Section 141(f)(2) report, at least two years before the

census date.  *Id.*  The Census Bureau must then test the wording of the new question.  AR 3891.

Pre-testing requires approval from OMB and a process that includes notifying the public and

inviting comment through a notice in the Federal Register.  *Id.*  After the Census Bureau has

responded to comments, OMB can approve the test.  *Id.*  Once the question has been tested, the

Census Bureau must redesign the questionnaires (or internet collection systems), including

translation into non-English languages, and redevelop training procedures for enumerators.  *Id.*

Finally, the Census Bureau must submit the final questionnaire to OMB for approval.  *Id.*

This process is subject to several sets of guidelines and standards governing collection of

statistical data.  First, since 2006, the design and administration of governmental surveys —

including the census — have been subject to OMB's *Standards and Guidelines for Statistical

Surveys*.  PX-260, at ii; *see* 79 Fed. Reg. 71610 (Dec. 2, 2014); PX-359; *see also* Docket No.

498-11 ("Habermann Aff."), ¶ 20.  Several provisions of the OMB *Standards and Guidelines* are

relevant here.  First, Statistical Directive Number 1 requires that "a Federal statistical agency

must be independent from political and other undue external influence in developing, producing,

and disseminating statistics."  79 Fed. Reg. at 71612.  Second, Standard 2.3 states that

"[a]gencies must design and administer their data collection instruments and methods in a

manner that achieves the best balance between maximizing data quality and controlling

measurement error while minimizing respondent burden and cost."  PX-359, at ii.  Finally,

Guideline 2.3.1 states: "Design the data collection instrument in a manner that minimizes

respondent burden, while maximizing data quality."  *Id.* at 11.

      Additionally, in 2010, the Census Bureau adopted a comprehensive set of "Statistical

Quality Standards."  PX-260, at vii.  The Standards require pre-testing of any questions to be

added to data-collection products such as the census questionnaire.  *See id.* at 8.  Sub-

Requirement A2-3.3 of the Standards requires that "[d]ata collection instruments and supporting

materials *must* be pretested with respondents to identify problems (e.g., problems related to

content, order/context effects, skip instructions, formatting, navigation, and edits) and then

refined, prior to implementation, based on the pretesting results."  *Id.* at 8 (emphasis added).

Sub-Requirements A2-3.3-1c and A2-3.3-1d further provide that pretesting must be performed

when "[r]eview by cognitive experts reveals that adding pretested questions to an existing

instrument may cause potential context effects" and when "[a]n existing data collection

instrument has substantive modifications (e.g., existing questions are revised or new questions

added)."  *Id.*  The Standards note that, "[o]n rare occasions, cost or schedule constraints may

make it infeasible to perform complete pretesting.  In such cases, subject matter and cognitive

experts must discuss the need for and feasibility of pretesting.  The program manager must

document any decisions regarding such pretesting, including the reasons for the decision.  If no

acceptable options for pretesting can be identified, the program manager must apply for a

waiver."  *Id.*  The Standards provide for another exception to the pretesting requirement:

"Pretesting is not required for questions that performed adequately in another survey."  *Id.*

## E.  Secretary Ross's Decision and This Litigation

      As noted above, the Census Act requires the Secretary of Commerce to submit a report to

the relevant congressional committees at least three years before any given census listing the

"subjects proposed to be included, and the types of information to be compiled" on the census. 13 U.S.C. § 141(f)(1). Consistent with that requirement, in March 2017 — approximately one month after his confirmation by the Senate — Secretary Ross submitted a report to Congress titled "Subjects Planned for the 2020 Census and American Community Survey." *See* AR 194-270. The report listed as the planned subjects for the 2020 census questionnaire the very same subjects that had appeared on the 2010 census questionnaire: age, gender, race/ethnicity, relationship, and tenure (that is, whether the respondent's home in question is owned or rented). *See* AR 204-13. The list of subjects did not include citizenship status.

On March 26, 2018, however, Secretary Ross issued a memorandum directing the Census Bureau to reinstate a question about citizenship status on the 2020 census questionnaire. *See* AR 1313-20 ("Ross Memo"). In his memorandum, Secretary Ross asserted that his decision was prompted by a letter from DOJ, dated December 12, 2017, which requested reinstatement of the citizenship question to facilitate enforcement of Section 2 of the VRA. *See* Ross Memo 1, at AR 1313. A few days later, Secretary Ross submitted another report to Congress (of which the Court can and does take judicial notice) titled "Questions Planned for the 2020 Census and American Community Survey." *See* PX-489. The report included the following planned question about citizenship:

*Id.* at 7.  It stated that a question about citizenship had been "asked since 1820." *Id.*; *see id.* n.1 ("Citizenship asked 1820, 1830, 1870, and 1890 to present.").  And it asserted that the question is "USED TO CREATE STATISTICS ABOUT CITIZEN AND NONCITIZEN POPULATIONS," which "are essential for enforcing the Voting Rights Act" and "is of interest to researchers, advocacy groups, and policymakers." *Id.* (capitalization in original).

Eight days after Secretary Ross's March 26, 2018 memorandum announcing his decision, the first of these cases — brought by a coalition of states and local governmental entities (the "Governmental Plaintiffs") — was filed.  *See* Docket No. 1.  The Governmental Plaintiffs are comprised of eighteen states (New York, Colorado, Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington) and the District of Columbia, fifteen cities and counties (the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; the city and county of San Francisco; and the counties of Cameron, El Paso, Hidalgo, and Monterey), and the United States Conference of Mayors.  *See* Governmental Plaintiffs' Second Amended Complaint ("SAC"), Docket No. 214.  On June 6, 2018, the second case — brought by a coalition of nongovernmental organizations (the "NGO Plaintiffs") — was filed.  *See* NGO Plaintiffs' Complaint ("NGO Compl."), 18-CV-5025, Docket No. 1.  The NGO Plaintiffs are comprised of New York Immigration Coalition ("NYIC"), CASA de Maryland ("CASA"), American-Arab Anti-Discrimination Committee ("ADC"), ADC Research Institute ("ADCRI"), and Make the Road New York ("MRNY").  *See id.*  In each case, Plaintiffs alleged that Secretary Ross's decision to reinstate a citizenship question violated both the APA and the Enumeration Clause of the Constitution.  The NGO Plaintiffs argued as well that the decision violated the equal protection component of the Fifth Amendment's Due Process Clause.

The procedural history of these cases has been somewhat unusual because, among other things, Defendants filed multiple petitions for mandamus challenging discovery orders issued by the Court and corresponding applications — to this Court, the Second Circuit, and the Supreme Court — to stay proceedings pending adjudication of those petitions. *See New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 6060304, at *1 n.1 (S.D.N.Y. Nov. 20, 2018) (detailing this history). For present purposes, two pieces of that procedural history warrant mention. First, in May and June 2018, Defendants moved to dismiss all of Plaintiffs' claims. *See* Docket No. 154; 18-CV-5025, Docket No. 38. On July 26, 2018, the Court granted those motions in part and denied them in part. *See New York*, 315 F. Supp. 3d at 811-12. The Court denied the motions with respect to Plaintiffs' claims under the APA and the Due Process Clause, finding, among other things, that the NGO Plaintiffs had alleged a plausible claim of invidious discrimination in violation of the Fifth Amendment's Due Process Clause. *See id.* at 806-08. By contrast, the Court held that Plaintiffs failed to state a claim under the Enumeration Clause. "That conclusion," the Court reasoned, was "compelled not only by the text of the Clause, which vests Congress with virtually unlimited discretion in conducting the census, but also by historical practice," namely "that, since the very first census in 1790, the federal government has consistently used the decennial exercise not only to obtain a strict headcount . . . , but also to gather demographic data about the population on matters such as race, sex, occupation, and, even citizenship." *Id.* at 774.

Second, around the same time, Plaintiffs moved for relief related to the "Administrative Record" — the record, compiled and submitted by Defendants, of materials "upon which the Secretary of Commerce based his decision." Docket Nos. 173, 173-1; *see* Docket No. 193. To the extent relevant here, Plaintiffs moved for two forms of relief: first, an order compelling Defendants to "complete" the Administrative Record; and second, an order authorizing discovery

"outside" the Administrative Record. *See* Docket No. 193, at 1. In an oral ruling on July 3, 2018, the Court granted both requests. With respect to the former, the Court found that the Administrative Record did not constitute the "whole record" — namely, the "full scope of" materials that Secretary Ross had considered, whether directly, "indirectly," or "constructively." Docket No. 208 ("July 3rd Tr."), at 79-82. And with respect to the latter, the Court found that Plaintiffs had "made a strong preliminary showing or *prima facie* showing that they will find material beyond the Administrative Record indicative of bad faith" or pretext. *Id.* at 85. Notably, Defendants did not immediately challenge the Court's ruling authorizing discovery beyond the Administrative Record (and have never challenged its ruling with respect to completing the Administrative Record). Several months later, however, after the Court authorized depositions of Secretary Ross and a DOJ official, Defendants challenged those rulings by way of petitions for mandamus, tacking on a challenge to the Court's initial discovery Order. Eventually, the Supreme Court agreed to hear one such challenge (treating Defendants' mandamus petition as a petition for certiorari), *In re Dep't of Commerce*, — S. Ct. —, 2018 WL 5458822 (Nov. 16, 2018); and stayed the deposition of Secretary Ross pending its decision, but otherwise allowed these proceedings to continue, *see In re Dep't of Commerce*, 139 S. Ct. 16 (2018) (mem.).[8] The case proceeded to trial, without a jury, on November 5, 2018. After extensive post-trial briefing (Plaintiffs' briefs, alone, totaled 502 pages), the Court held closing arguments on November 27, 2018.[9]

---

[8]    The Supreme Court is scheduled to hear oral argument on February 19, 2019. *See In re Dep't of Commerce*, 2018 WL 5458822, at *1.

[9]    In addition to the parties' pre- and post-trial briefs, the Court received and considered nine *amicus curiae* briefs. *See* Brief of the American Statistical Association et al. as *Amici Curiae* in Support of Plaintiffs' Position at Trial, Docket No. 420-1; Brief of *Amici Curiae* Former Census Bureau Directors in Support of Plaintiffs' Trial Position, Docket No. 423-1; Brief *Amicus Curiae* of the Public Interest Legal Foundation in Support of Defendants' Position at Trial, Docket No. 426-1; Brief of Common Cause et al. as *Amici Curiae* in Support of Plaintiffs,

## SECRETARY ROSS'S DECISION

With that as background, the Court turns to the process and basis for Secretary Ross's March 26, 2018 decision. In light of the pending Supreme Court challenge to the Court's decision authorizing extra-record discovery and the limited time to resolve Plaintiffs' claims before the 2020 census questionnaires need to be printed, the Court begins with an account that is based exclusively on the initially filed Administrative Record and then turns to what the evidence beyond that portion of the Administrative Record reveals.[10]

### A.  The Initial Administrative Record Submission

1.      Defendants first filed what they characterized as the Administrative Record on June 8, 2018.  *See* Docket No. 173.  That submission was 1,320 pages and included the December 12, 2017 DOJ letter requesting addition of a citizenship question to the census questionnaire; various analyses of that request by the Census Bureau; and Secretary Ross's March 26, 2018 memorandum.  These pages reveal that the Census Bureau repeatedly and consistently recommended against addition of a citizenship question to the census questionnaire based on its assessment that adding the question would reduce self-response rates, thereby increasing costs and harming the overall data and integrity of the census, *and* that DOJ's stated interest in having more granular citizenship data could be satisfied in a less costly, more

---

Docket No. 427-1; Brief of the Electronic Privacy Information Center as *Amicus Curiae* in Support of Plaintiffs' Position at Trial, Docket No. 428-1; Brief of *Amici Curiae* Norman Y. Mineta et al. in Support of Plaintiffs at Trial, Docket No. 435-1; Brief of *Amici Curiae* Tech:NYC et al. in Support of Plaintiffs, Docket No. 439-1; Brief of the Leadership Conference on Civil and Human Rights as *Amicus Curiae*, Docket No. 443-1; Brief of the New York State Black, Puerto Rican, Hispanic and Asian Legislative Caucus, as *Amici Curiae*, in Support of Plaintiffs, Docket No. 449-1.

[10]     For ease of reference, the Court summarizes the relevant facts in sequentially numbered paragraphs, cited throughout this Opinion as "Recitation of Facts ¶ [Number]."  As noted below, a separately demarcated range of those paragraphs constitute the Court's findings of fact with respect to the issue of standing.

effective, and less harmful manner.  More importantly, for the purposes of this Court's review, the initial Administrative Record submission alone contains overwhelming evidence to that effect, and none that contradicts it.

### 1. The December 12, 2017 DOJ Letter

2.      Secretary Ross asserted in his March 26, 2018 memorandum that his decision to add the citizenship question to the census questionnaire was prompted by a December 12, 2017 letter from DOJ.  The letter came from Arthur E. Gary of the Justice Management Division; it was addressed to then-Acting Director Jarmin.  *See* AR 663-65 (the "Gary Letter"); AR 1525-27 (same).  In the letter, DOJ "formally request[ed] that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included on the so-called 'long form' census."  Gary Letter 1, at AR 663.  "This data," the Letter stated, "is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting.  To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected."  *Id.*

3.      More specifically, the Gary Letter noted that the Supreme Court had "held that Section 2 of the Voting Rights Act prohibits 'vote dilution' by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority."  Gary Letter 1, at AR 663 (citing *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)).  Further, "[m]ultiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population" — often referred to as "CVAP" — "is the proper metric for determining whether a racial group could constitute a majority in a single-member district."  *Id.* (citing cases).  "These cases," the Gary Letter reasoned, "make clear that, in order to assess and enforce compliance with Section

2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected."  Gary Letter 2, at AR 664.

4.     The Gary Letter noted that DOJ had previously relied on citizenship data acquired through either the "long form" census questionnaire or the ACS.  *See id.*  The Gary Letter asserted, however, that citizenship data acquired through the ACS is not "ideal . . . for such purposes" for four reasons.  Gary Letter at 2-3, at AR 664-65.  First, "[j]urisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement," such that "using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly."  *Id.* at 2, at AR 664.  Second, ACS surveys are conducted annually and produce data that are "aggregated into one-year, three-year, and five-year estimates," and thus "do not align in time with the decennial census data," whereas "[c]itizenship data from the decennial census . . . would align in time with the . . . data from the census that jurisdictions already use in redistricting."  *Id.* at 3, at AR 665.  Third, "ACS estimates are reported at a ninety percent confidence level" (that is, as a statistical sample with a margin of error that "increases as the sample size — and thus, the geographic area — decreases"), whereas "decennial census data is a full count of the population."  *Id.*  And finally, decennial "Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group," requiring DOJ in some instances to "perform further estimates" of CVAP at the census block level.  *Id.*

5.     "For all of these reasons," the Gary Letter concluded, DOJ "believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship

estimates." *Id.*  On that basis, the Gary Letter "formally request[ed]" that the Census Bureau "reinstate" a citizenship question on the 2020 census.  *Id.*  "At the same time," however, the Gary Letter "request[ed] that the [Census] Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia*, to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act."  *Id.*[11]

## 2. The Census Bureau's Preliminary Analyses and Recommendations

6.     Following receipt of the Gary Letter, experts at the Census Bureau — acting under the supervision of Dr. John M. Abowd, the Bureau's Chief Scientist and Associate Director for Research and Methodology — sought to determine the effects of adding a citizenship question to the census questionnaire and whether there were alternative means to satisfy DOJ's interest in more granular citizenship data.  The Census Bureau's initial analyses and recommendations were memorialized in memoranda dated December 22, 2017, *see* AR 11634-45 (the "December 22 Memo"); *see also* AR 5500-11 (copy of the same); January 3, 2018, *see* AR 5473-75  (the "January 3 Memo");[12] and January 19, 2018, *see* AR 1277-85 (the "January 19 Memo").[13]

---

[11]     Section 203 of the VRA requires that the Census Bureau use the ACS to acquire data, including citizenship data, related to language-minorities who might be adversely affected by state voting systems.  *See* 52 U.S.C. § 10503(b)(2)(A).

[12]     Neither the December 22, 2017 Memo nor the January 3, 2019 Memo appeared in Defendants' initial Administrative Record submission, *see* AR 1-1320, but it is undisputed that both are properly part of the Administrative Record, *see* Docket No. 523, at Joint Stip. ¶ 63, and given their close relation to the evidence and analyses reflected in the subsequent Memos, the Court discusses them where they fit best both logically and chronologically.

[13]     Defendants submitted a copy of the January 19 Memo in their initial Administrative Record submission with a watermark reading "DRAFT Pre-decisional (V2.6)."  AR 1277-1285. The January 19 Memo appears elsewhere in the complete Administrative Record in substantially identical form, but without that watermark.  *See* AR 12480-88; 12493-12501.

7.      The December 22 Memo included two significant conclusions.  First, the Memo opined that the Census Bureau could "potentially" obtain "a more accurate measure of citizenship" in a more "cost efficient" manner by using means other than a question on the census.  December 22 Memo, at AR 11644.  The Memo identified four existing surveys, including the ACS, through which the Census Bureau obtained "directly reported" citizenship data, as well as a slew of "administrative record[s]" (that is, records from other federal agencies or states) with similar information that the Census Bureau had or could acquire.  *Id.* at AR 11634-35.  The administrative records included Numident, a Social Security Administration ("SSA") dataset that represents "the most complete and reliable administrative record source of citizenship data currently available," and citizenship data maintained by the U.S. Customs and Immigration Service ("USCIS").  *Id.* at AR 11636, 11643-44.

8.      Second, the December 22 Memo concluded that including a citizenship question in the 2020 census questionnaire was likely to depress self-response rates, particularly among noncitizen households; increase costs; and produce lower quality citizenship data.  *Id.* at AR 11639-45.  The Memo explained that including a citizenship question could lower the rate of voluntary compliance, which would require expanded field operations that "require additional unnecessary costs and burden to the Bureau."  *Id.* at AR 11644-45.

9.      The December 22 Memo recommended that the best way to "support[]" redistricting in the manner requested by the Department of Justice is" not to add a citizenship question to the census, but "to make a citizenship variable available on the 2020 Census Edited File (CEF)."  *Id.* at AR 11644.  The CEF is "the internal, confidential data file" that underlies the census data set used by DOJ in redistricting, known as the "PL94 tabulations."  *Id*.  If citizenship were available on the CEF, the Memo explained, the PL94 tabulations could be restructured to include direct estimates of CVAP by race and ethnicity at the census block level.  *See id*.  "These

tabulations would have essentially the same accuracy as current PL94 and Summary File 1 (SF1) data." *Id*.

10.     On the afternoon of December 22, 2017, Dr. Jarmin emailed Arthur Gary at DOJ, stating that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses.  This would result in higher quality data produced at lower cost." AR 3289.

11.     The January 3 Memo from Dr. Abowd to Dr. Jarmin expanded on the December 22 Memo's analyses and recommendations.  *See* January 3 Memo, at AR 5473-75.  The January 3 Memo described "three alternatives for meeting the DoJ request."  *Id.* at AR 5473.

12.     Under Alternative A, the Census Bureau would "[m]aintain the status quo for data collection, preparation, and publication," but would prepare a "special product" for DOJ containing the Census Bureau's "best estimate of block-level citizen voting age population by race and ethnicity," similar to what the Census Bureau prepares for use in connection with Section 203 of the VRA.  *Id.*  Alternative A would cost an extra $200,000 and would produce similar-quality data to that produced for Section 203 purposes.  *Id.* at AR 5474.

13.     The January 3 Memo concluded that Alternative B — adding a citizenship question to the 2020 census questionnaire — would "most likely deliver higher quality block-level citizen voting age population by race and ethnicity data than Alternative A."  *Id.*  But it would cost an estimated additional $27.5 million and, based on an estimated minimum 5.1% decline in self-response among noncitizen households, would lead to an estimated minimum "154,000 *fewer* correct enumerations." *Id.*[14]

---

[14]     As discussed below in connection with the issue of standing (as to which the Court may review evidence outside the Administrative Record), the Census Bureau has since revised its

14.     Finally, the January 3 Memo addressed Alternative C, the option the December 22 Memo had recommended (although not by that name).  *See* December 22 Memo, at AR 11644. Under Alternative C, the Census Bureau would not add a citizenship question to the questionnaire, but would "[a]dd the capability to link an accurate, edited citizenship variable from administrative records to the final 2020 Census microdata files."  January 3 Memo, at AR 5473.  In that way, Alternative C would provide block-level tabulations of CVAP by race and ethnicity.  *Id.*  It would deliver "higher quality data than Alternative B for DoJ's stated uses" because the "primary data sources for the administrative record citizen variable require proof of citizenship" and, thus, are "very accurate."  *Id.* at AR 5475.

15.     Based on this analysis, the January 3 Memo opined that "Alternative A is not very costly and does not harm the quality of the census count"; that "Alternative B better addresses DoJ's stated uses," but "is very costly and does harm the quality of the census count"; and that "Alternative C even better meets DoJ's stated uses, is comparatively far less costly than Alternative B, and does not harm the quality of the census count."  *Id.*  "For these reasons," the Memo concluded, "we recommend Alternative C for meeting the Department of Justice data request."  *Id.*

16.     The January 19 Memo contained a "Technical Review" of the facts and the Census Bureau's analysis of Alternatives A, B, and C.  January 19 Memo, at AR 1277-85.

17.     The January 19 Memo described Alternative A in more detail, explaining that existing "redistricting and CVAP data are used by the Department of Justice to enforce the

---

conservative estimates of both the increased costs and the decline in self-response rates attributable to the citizenship question.  The Census Bureau currently estimates that adding the question will increase the costs of the census by at least \$82.5 million and that it will cause a differential decline in the self-response rate among noncitizen households of at least 5.8%.  *See* Recitation of Facts ¶ 160.

Voting Rights Act" and "by state redistricting offices to draw congressional and legislative districts that conform to constitutional equal-population and Voting Rights Act nondiscrimination requirements.  Because the block-group-level CVAP tables have associated margins of error, their use in combination with the much more precise block-level census counts in the redistricting data requires sophisticated modeling.  For these purposes, most analysts and the DoJ use statistical modeling methods to produce the block-level eligible voter data that become one of the inputs to their processes." *Id.* at AR 1279.  Without modifying any of its other procedures, the January 19 Memo explained, the Census Bureau could deploy "a small team of Census Bureau experts similar in size and capabilities to the teams used to provide the Voting Rights Act Section 203 language determinations" to assist DOJ in making those calculations.  *Id.*  The January 19 Memo updated the cost of Alternative A to $350,000, and estimated that it would "have no impact on the quality of the 2020 Census."  *Id.*

18.     The January 19 Memo also presented an updated analysis of Alternative B.  *Id.* at AR 1279-82.  It explained bluntly that adding a citizenship question to the census "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  *Id.* at AR 1277.  The Memo summarized "[t]hree distinct analyses" showing that the addition of a citizenship question would lead to "an adverse impact on self-response" to the census questionnaire and, consequently, "on the accuracy and quality of the 2020 Census."  *Id.* at AR 1280.  First, the Memo described evidence that a citizenship question would increase "item nonresponse rates" — that is, omitted answers to the question — and would do so disproportionately among Hispanics.  *Id.*  Second, the Memo described evidence that a citizenship question would decrease "self-response rates" — that is, the rate at which households voluntarily respond to the questionnaire — and would do so disproportionately among noncitizen households.  *Id.* at AR 1280-81.  Third, the Memo

described evidence that a citizenship question would increase "breakoff rates" — that is, the rate at which households stop answering the questionnaire when they come to a particular question — and would do so disproportionately among Hispanics.  *Id.* at AR 1281.

19.     The updated analysis of Alternative B included more detail on its high cost.  *Id.* at AR 1281-82.  The reduction in self-response rates caused by the citizenship question, the January 19 Memo explained, would lead to more people being counted through the Census Bureau's NRFU (that is, Non-Response Follow-Up) procedures.  *Id.* at AR 1280.  The greater use of NRFU procedures produces, in turn, lower-quality data because the NRFU procedures yield more "erroneous enumerations" and "whole-person imputations" than self-responses do.  *Id.* at AR 1281.[15]  Using the "conservative" estimate that addition of a citizenship question would cause a 5.1% decline in self-response among noncitizen households, the January 19 Memo explained that adding a citizenship question would produce 432,000 fewer correct enumerations and would cost at least $27.5 million more.  *Id.* at AR 1282.  The Memo stressed that its estimates of the decline in data quality and increase in cost associated with Alternative C were "conservative" and that the true numbers could be "much greater."  *Id.*

20.     The January 19 Memo also discussed Alternative C in more depth.  It summarized the Census Bureau's evidence that Alternative C — linking a citizenship variable from administrative records to the census microdata files — "is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count."  AR 1277.  The Memo noted that the Census Bureau had been testing its ability to link

---

[15]     An "erroneous enumeration" is the counting of a person who "should not have been counted for any of several reasons, such as, that the person is (1) a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation."  AR 1281.  A "whole-person census imputation is a census microdata record for a person for which all characteristics are imputed."  *Id.*

administrative data to census data in that manner since the 1990 census.  *Id.*  For the 2020 census, the Census Bureau had already begun "regularly ingesting and loading administrative data from the Social Security Administration, Internal Revenue Service and other federal and state sources into the 2020 Census data systems."  *Id.*

21.    Significantly, in its analysis of Alternative C, the January 19 Memo again noted that Alternative C was likely to yield more accurate citizenship data than Alternative B would yield.  *See id.* at AR 1277.  First, the Memo explained that comparisons of ACS data and federal administrative records revealed that somewhere between 23.8% and 30% of people whom administrative records indicate are noncitizens report that they are citizens on the ACS.  *See id.* at AR 1283.  This suggests that self-reported citizenship status is of dubious accuracy.  Second, the sampling techniques used for ACS data may not accurately predict the citizenship status of those who do not respond.  The sampling techniques assume that those who do not respond to any given question are statistically similar to those who do — an assumption contradicted by the data.  *See id.* at AR 1283-84.  As a result, the ACS imputes citizenship responses based on data that is not predictive of the missing set.  *See id*.

22.    The January 19 Memo acknowledged that the Numident database might be missing citizenship data for older citizens who obtained SSNs before the SSA required proof of citizenship, for naturalized citizens who have not communicated the fact of their naturalization to the SSA, and for noncitizens who do not have a SSN or other taxpayer identification number.  *Id.* at AR 1285.  "All three of these shortcomings," however, "are addressed by adding data from [USCIS]."  *Id.*  Accordingly, the Memo concluded, "the administrative records citizenship data would most likely have both more accurate citizen status *and* fewer missing individuals than would be the case for any survey-based collection method."  *Id.* (emphasis added).  The January

19 Memo estimated that the cost of using administrative records to obtain block-level CVAP data would be between $500,000 and $2 million.  *Id.*

### 3.  Secretary Ross's February 12, 2018 Meeting with the Census Bureau

23.     On February 12, 2018, Secretary Ross met with Dr. Abowd and others from the Census Bureau to discuss the various alternatives.  *See* AR 9450.  The Administrative Record contains only one document concerning what was discussed at the meeting: an email dated February 13, 2018, from an attendee at the meeting, "identif[ying]" action items and items for future consideration that were discussed at the meeting.  AR 9450.  The Administrative Record otherwise contains no record — contemporaneous or otherwise — of what was discussed during the meeting.  Nor is there is any indication in the Administrative Record of any other meeting between Secretary Ross and Census Bureau officials.

24.     The Administrative Record does reveal that sometime before March 1, 2018, Secretary Ross asked the Census Bureau to analyze a fourth option — "Alternative D" — that would combine Alternative B (adding a citizenship question to the 2020 census) and Alternative C (relying on administrative records to generate block-level CVAP data).  *See* AR 1308-12 ("March 1 Memo"), at AR 1309.

### 4.  The Census Bureau's Analysis of Alternative D

25.     Dr. Abowd transmitted a detailed analysis of Alternative D to Secretary Ross in a memorandum dated March 1, 2018.  The March 1 Memo explained at length that Alternative D (combining the addition of a citizenship question to the census with the use of administrative records) would entail "all the negative cost and quality implications of Alternative B" (that is, simply adding the citizenship question) and would still produce "poorer quality citizenship data than Alternative C" (that is, linking data from administrative records to data from the census). *See* March 1 Memo at AR 1312.

26.     The March 1 Memo described, first, how the various sources of administrative records interact to supplement and correct for one another's "gaps."  *See id.* at AR 1309-10.  It then identified seven "[r]emaining citizenship data gaps" in the administrative records: (1) "U.S. citizens from birth with no SSN or U.S. passport"; (2) U.S. citizens from birth born outside the United States without a passport who applied for an SSN before they were required to provide proof of their citizenship to do so; (3) U.S. citizens naturalized before 2001 who did not inform the SSA of their naturalization; (4) U.S. citizens who were automatically naturalized if they were under eighteen when their parents were naturalized after 1999, but did not inform USCIS or receive a U.S. passport; (5) lawful permanent residents ("LPRs") who obtained that status before 2001, but lack an SSN or received an SSN before the SSA asked about citizenship; (6) noncitizen, non-LPR residents who do not have an SSN (or other taxpayer identification number) and who have not applied for a visa extension; and (7) persons for whom citizenship does appear in administrative records, but for whom it is not possible to link those records with decennial census data.  *Id.* at AR 1310-11.

27.     The March 1 Memo explained that, perhaps counterintuitively, "survey data" (that is, data from a citizenship question) would not "help fill the . . . gaps" in the administrative records.  *Id.* at AR 1311.  This is because a "significant, but unknown, fraction" of people whose citizenship status is unknown fall into "Category Six": noncitizen, non-LPR residents without SSNs or taxpayer IDs.  These people have a "strong incentive to provide an incorrect answer" or no answer to a citizenship question.  *Id.*  And, because "there is no feasible method of independently verifying their non-citizen status," identifying false reports of citizenship on the census would be "an inexact science."  *Id.*  Instead of doing that inexact science, the "survey response[s] of 'citizen' would be accepted as valid" for large numbers of people who are not, in fact, citizens.  *See id.*  Making matters worse, if a household does not self-respond in order to

42

protect one household member in Category Six, this problem would apply to the entire household.  *See id.* at AR 1311-12.

28.     Second, the March 1 Memo explained that, like Alternative B, Alternative D would lower self-response rates and "push[] more households into . . . NRFU."  *Id.* at AR 1311. That would lower the quality of the data in two ways.  First, as explained above, NRFU procedures yield more "erroneous enumerations" and "whole-person imputations" than self-responses do.  January 19 Memo, at AR 1281.  Second, NRFU procedures produce more responses that cannot be linked to administrative records (due to lower-quality personal identifying information) and linking to administrative records helps improve the accuracy of the survey data.  *See* March 1 Memo, at AR 1311.  For responses gathered through NRFU procedures, only 81.6% can be linked to people recorded in administrative records, compared to 96.7% for self-responses in the 2010 census.  *Id*.

29.     Additionally, the March 1 Memo concluded that Alternative D would likely increase the number of proxy responses required, another less accurate type of enumeration.  *See id.*  This is because those who do not self-respond because of the presence of the citizenship question are especially likely not to respond in NRFU as well.  *See id.*  Proxy responses also lead to even lower rates of linkage to administrative data on citizenship: only 33.8%.  *See id.*

30.     The March 1 Memo concluded that Alternative D was plainly inferior to Alternative D:  It "would result in poorer quality citizenship data than Alternative C," *and* it "would still have all the negative cost and quality implications of Alternative B" summarized in the January 19 Memo.  *Id.* at AR 1312.  The March 1 Memo remarked that "[u]sing the 2020 Census data only to fill in gaps for persons without administrative data on citizenship would raise questions about why 100 percent of respondents are being burdened by a citizenship question to obtain information for the two percent of respondents where it is missing."  *Id*.

31.     In another memorandum, undated but obviously written in this same March 2018 timeframe, Dr. Abowd presented Secretary Ross with numerical estimates illustrating the differences between Alternative C and Alternative D.  *See* AR 1304-06 ("Key Differences Memo").  The Key Differences Memo illustrated that, under Alternative C, the Census Bureau expected to link 295 million people — 89.4% of the population — to high-quality citizenship data.  *Id.* at AR 1306.  It would be unable to identify the citizenship status of 35 million people through linking, leaving those to be modeled.  *Id.*  The Key Differences Memo illustrated these numbers for Alternative C in the following flowchart:



AR 1306.

32. The Key Difference Memo explained that, under Alternative D, the Census Bureau expected to receive responses to the citizenship question from 294.6 million people. *See id.* at AR 1307. Of those responses, 263 million could be confirmed through linkages to administrative records; 9.5 million responses could be linked to, *but would be inconsistent with*, citizenship data in administrative records; and 22.2 million responses would not be linked to administrative records at all. *See id.* On top of that, the Census Bureau expected that approximately 35.4 million people's citizenship would not be measured by the 2020 census, either due to non-response or NRFU failure. *See id.* Approximately 21.5 million non-respondents could be linked to administrative records containing citizenship data, while approximately 13.8 million would have to have their citizenship status modeled. *See id.* Once again, the Key Differences Memo illustrated the numbers for Alternative D with a flowchart:



AR 1307.

33.     These numbers reveal that Alternative D would produce *more* people who could not be linked to administrative records: 36 million people in Alternative D as compared to 35 million in Alternative C.  *See id.* at AR 1306-07.  Of the unlinked people in Alternative D, 13.8 million would have their citizenship modeled (or "imputed"), *see id.* at AR 1307, while 22.2 million would have their citizenship status evaluated through their census responses, despite the known likelihood that a high rate of noncitizens (just under 500,000, according to the Census Bureau's estimate) would be incorrectly enumerated as citizens through the survey process.  *See id.* at AR 1305-07; March 1 Memo, at AR 1311.  That would leave 9.5 million people whose census responses would conflict with administrative records.  *See* Key Differences Memo, at AR 1307.  For these people, the "[h]istoric Census Bureau practice is to use self-reported data in these situations," even though "the Census Bureau now knows from linking ACS responses on citizenship to administrative data that nearly one third of noncitizens in the administrative data respond to the questionnaire indicating they are citizens, indicating that this practice should be revisited in the case of measuring citizenship."  *Id.* at AR 1305.

34.     Put differently, Alternative D would provide no improvement to the citizenship data available under Alternative C for 90.4% of the population.  For 6.7% of the population, Alternative D would produce *lower* quality data than Alternative C because the Census Bureau would have to use survey responses that are, generally speaking, less accurate than the imputation methods the Census Bureau would deploy under Alternative C.  *See id.*  And finally, for 2.9% of the population, Alternative D would create a problem that would not exist under Alternative C: conflicts between the survey data and the administrative data, with no reliable method for discerning accurate data amidst the conflict.  *See id.*

35.     The Key Differences Memo summarized the implications of these comparative predictions.  He acknowledged that "all possible measurement methods will have errors" and that

46

the Census Bureau "cannot quantify the relative magnitude of the errors across the alternatives at this time." *Id.* at AR 1305.  Nevertheless, Alternative C would involve some risk of error in the administrative record data, but that would be "relatively limited" thanks to the procedures used by the SSA, USCIS, and the State Department.  *Id.*  Alternative C would also be subject to some prediction error in the 35 million cases that would have to be modeled, which would be a similar, but lesser issue in Alternative D.  *Id.*  By contrast, Alternative D would be subject to an error that is "only an issue in Alternative D": the "response error."  *Id.*  Dr. Abowd noted that while "[s]tatisticians often hope" that such response errors "are random and cancel out," the Census Bureau "know[s] from prior research" that they are "systematically biased for a subset of noncitizens."  *Id.*

### 5. Communications with Stakeholders

36.     While the Census Bureau was analyzing the citizenship question, the Commerce Department was communicating with stakeholders about the question.  At the February 12, 2018 meeting with Dr. Abowd and other representatives of the Census Bureau, Secretary Ross requested a list of stakeholders with whom to discuss the addition of the citizenship question to the census.  *See* AR 9450.  During the outreach to stakeholders after the meeting, however, Commerce Department officials struggled to find anyone willing to express support for adding the question.  *See* AR 3274-75 ("Email re AEI"); AR 4853-55 (same).

37.     For example, on February 13, 2018 — only one day after the meeting with Secretary Ross — Dr. Jarmin emailed someone at the American Enterprise Institute ("AEI"): "We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders.  *Most stakeholders will speak against the proposal.  We're looking to find someone thoughtful who can speak to the pros of adding such a question*."  Email re AEI, at AR 3275 (emphasis added).  Later the same day, Michael

Strain of the AEI responded: "None of my colleagues at AEI would speak favorably about the proposal. Is it important that the person actually be in favor of the proposal?" *Id.*

38.     Dr. Jarmin responded the same day, noting: "We are trying to find someone who can give a professional expression of support for the proposal in contrast to the many folks we can find to give professional statements against the proposal.  Interesting, but perhaps not so surprising, that no one at AEI is willing to do that."  AR 8325.  Less than two minutes later, Dr. Jarmin forwarded his email exchange with the AEI to then-Under Secretary for Economic Affairs, Karen Dunn Kelley, noting: "Appears no one at AEI willing to speak in favor of putting question on the 2020." *Id.* at AR 3274.[16]  The Administrative Record reflects that only two organizations supported the citizenship question: the Center for Immigration Studies and the Heritage Foundation.  *See* AR 1206; AR 8325.

39.     By contrast, between December 12, 2017 (the date of the Gary Letter) and March 26, 2018 (the date of Secretary Ross's decision), the Commerce Department received many communications opposing addition of a citizenship question to the census, from former directors of the Census Bureau, business groups, civil rights groups, social science groups, members of Congress, and state and local officials.  *See generally* Plaintiffs' Joint Proposed Post-Trial Findings of Fact, Docket No. 545 ("Pls.' Proposed Findings"), ¶¶ 674-724.

40.     For instance, on January 5, 2018, the American Sociological Association ("ASA") wrote to Secretary Ross to urge him to reject DOJ's proposal to add a citizenship question.  *See* AR 787.  The ASA letter predicted that if a citizenship question were added, "the integrity of the 2020 Census data will be fundamentally compromised." *Id.*  "Including a citizenship question,"

---

[16]     From August 3, 2017, through the date of trial, Kelley served as Under Secretary for Economic Affairs, overseeing the Census Bureau.  On November 28, 2018, Kelley was confirmed as Deputy Secretary of Commerce.  *See* 164 CONG. REC. S7147, S7195 (2018).

the ASA continued, "is likely to keep some people from responding to the questionnaire and others from responding truthfully, thereby undermining the accuracy of the data.  In addition . . . , [w]ith little time left before the 2020 launch, a new question could not be subject to standard rigorous testing, which would further undermine the quality of the data."  *Id.*

41.     Similarly, on January 9, 2018, members of the Census Scientific Advisory Committee ("CSAC") wrote to then-Attorney General Jeff Sessions, Secretary Ross, and others, calling inclusion of a citizenship question "a serious mistake which would result in a substantial lowering of the response rate."  AR 794.  The CSAC members noted that "[a]dding a citizenship question to the main Census questionnaire is almost certain to jeopardize the cooperation of at least some community partners and lead to a lower response rate, hurting the reputation of the Census Bureau."  *Id.* at AR 794-95.

42.     On January 10, 2018, the Leadership Conference on Civil and Human Rights (the "Leadership Conference") wrote to "urge" Secretary Ross "to reject the Department of Justice's untimely and unnecessary request for a new citizenship question on the 2020 Census, which would threaten a fair and accurate decennial census."  AR 798.  Adding a citizenship question "would destroy any chance for an accurate count, discard years of careful research, and increase costs significantly."  *Id.*  Moreover, the Leadership Conference continued, adding a citizenship question was "unnecessary."  *Id.* at AR 799.  "The Justice Department has never needed to add this new question to the decennial census to enforce the Voting Rights Act before, so there is no reason it would need to do so now."  *Id.*

43.     On January 26, 2018, Secretary Ross received a letter from six former Directors of the Census Bureau — John Thompson, Robert Groves, Steven Murdock, Kenneth Prewitt, Martha Farnsworth Riche, and Vincent Barabba — expressing concern about the possible addition of a citizenship question.  *See* AR 8555-56.  The former Directors said they were

"troubled to learn that the Department of Justice has recently asked the Bureau to add a new question on citizenship to the 2020 census." *Id.* at AR 8555. They were "deeply concerned about the consequence of this possible action and hope[d] that [their] objective observations provide a useful perspective before a final decision is made on this issue." *Id.*

44.     In particular, the former Directors expressed concern that the question had not been appropriately tested. They noted that "[t]here is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality, and truthfulness of response." *Id.* at AR 8556. That is why "[t]here is a well-proven multi-year process to suggest and test new questions." *Id.* at AR 8555. They wrote that they "strongly believe[d] that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk." *Id.*

45.     On March 19, 2018, Secretary Ross received a letter from the Latino Community Foundation, which "strongly urge[d Secretary Ross] to reject the inclusion of a citizenship question to the 2020 Census." AR 1222. The Foundation explained: "Including a citizenship question to the census will add to an extensive list of concerns that can and will suppress Latino participation. Increased immigration enforcement, anti-immigrant rhetoric in our political discourse, and privacy concerns have already meshed together to create a climate of fear and aversion of the federal government." *Id.*

46.     On March 22, 2018, Secretary Ross received a letter from Ready Nation, a council of "American business leaders," who wrote "to express [its] deep concern about the Department of Justice's request that the Census Bureau include an untested question about citizenship in the 2020 Census questionnaire." AR 3608. The business leaders were concerned because "[t]he decennial Census provides critical data that informs decisionmaking in both the

private and public sectors"; they expressed the worry that "[a]dding a new question this late in the decennial Census process could reduce the accuracy" of the census. *Id.*

47.    On March 23, 2018, Secretary Ross received a letter from members of the scientific community, including the Acting President of the Federation of American Scientists, the Director of 2020 Census Counts, and the President of the American Political Science Association. *See* AR 1269-71. The letter stated that the DOJ request "is ill-conceived for a number of reasons. We have more accurate methods for measuring and studying non-citizenship, for example through anonymous surveys. Imposing a citizenship question would lead to a lower participation rate and substantial undercount of certain geographic regions and demographic populations, undermining the scientific integrity of the entire project." *Id.* at AR 1269.

48.    That same day, Secretary Ross spoke with Christine Pierce, Senior Vice President of Data Science for Nielsen, a private survey company. *See* AR 1276. According to the Commerce Department notes of the conversation, Pierce expressed concern that the addition of the citizenship question "could lead to a lower response rate," which "is very important." *Id.* Pierce said that "including a question on citizenship could make people less likely to respond, but that there is no data to predict how much lower the response rate might be." *Id.* Pierce explained that at Nielsen, when the company was considering asking a sensitive question that was expected to depress response rates, the company "conducts a cost-benefit analysis to determine whether it is worth asking the question." *Id.* She "noted the importance of testing questions." *Id.* With regard to the federal government's questions, Pierce described that Nielsen once added the ACS questions about birthplace and date of arrival in the United States to one of its surveys. *Id.* She explained that although the company was "concerned about response rates declining, . . . Nielsen did not observe lower response rates to the survey." *Id.* But, Pierce noted,

Nielsen would have offered a cash reward to incentivize participation in that survey.  *See id.*

## 6. Secretary Ross's March 26, 2018 Memorandum

49.     As noted, on March 26, 2018, Secretary Ross issued his memorandum announcing the decision to adopt Alternative D (which he referred as "Option D"), which included adding the citizenship question to the 2020 census.  *See* Ross Memo 1, 4, at AR 1313, 1316.  Secretary Ross wrote that "[f]ollowing receipt" of the Gary Letter on December 12, 2017, he had "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond."  *Id.* at AR 1313.  "To that end," he wrote, the Department of Commerce "immediately initiated a comprehensive review process led by the Census Bureau."  *Id.*

50.     Secretary Ross said that his decision "prioritized the goal of obtaining *complete and accurate data*."  *Id.* (emphasis in original).  He wrote that "Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA."  *Id.* at AR 1314.  Secretary Ross did not cite any authority for the proposition that the DOJ's request expanded his discretion to determine the content of the decennial census questionnaire.  *See id.*  Nor did Secretary Ross address whether he was required to comply with DOJ's request in the first place.  *See id.*

51.     Secretary Ross noted that "collection of citizenship data by the Census [Bureau] has been a long-standing practice."  *Id.*  He gave as examples of this "long-standing practice" the fact that a citizenship question had appeared on decennial censuses up until 1950; that the 2000 "long form" survey "distributed to one in six people in the U.S.[] included a question on citizenship"; and that the ACS (which replaced the "long form sample") had "included a

citizenship question since 2005." *Id.* (internal quotation marks omitted). From this, he concluded that "the citizenship question has been well tested." *Id.* Secretary Ross did not, however, detail any such testing or address how the testing would apply to a question in 2020 on a census questionnaire distributed to the entire population.

52. Secretary Ross explained that DOJ had stated "that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA." *Id.* For that reason, DOJ sought "CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected." *Id.* Secretary Ross explained that the "Census Bureau ha[d] advised [him] that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which . . . does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA." *Id.*

53. Secretary Ross then discussed the four alternatives he had considered in reaching his decision: Alternatives A, B, C, and D (albeit referring to them as "Options" A, B, C, and D). *Id.* at AR 1314-17.

54. The Ross Memo described Alternative A as rejecting the DOJ request entirely and relying entirely on existing citizenship data. *See id.* at AR 1314; January 19 Memo, at AR 1279. Secretary Ross rejected this option because, "[u]nder Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data." Ross Memo 2, at AR 1314. The existing block-level CVAP data obtained through the ACS, he noted, "has associated margins of error because the ACS is extrapolated based on sample surveys." *Id.* Thus, Secretary Ross reasoned, "[p]roviding more precise block-level data would require sophisticated statistical modeling," requiring "the Census Bureau . . . to deploy a team of experts to develop model-based methods that attempt to better

facilitate DOJ's request for more specific data." *Id.* Secretary Ross's problem with this option was that "the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy," and, "[r]egardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and completeness," such that "[a]ny future modeling from these incomplete data would only compound that problem." *Id.* at AR 1314-15. In summary, Secretary Ross wrote that he rejected Alternative A because it "would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods." *Id.* at AR 1315.

55. Secretary Ross then turned to Alternative B, "which would add a citizenship question to the decennial census." *Id.* Secretary Ross acknowledged that "[t]he Census Bureau and many stakeholders expressed concern that Option B . . . would negatively impact the response rate for non-citizens," which "could reduce the accuracy of the decennial census and increase costs for non-response followup ('NRFU') operations." *Id.* (emphasis omitted). "However," he continued, "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially." *Id.* Secretary Ross cited three sources for this conclusion. First, he stated that he had "discuss[ed] the question with the national survey agency Nielsen" and that Nielsen had "stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates." *Id.* Second, "the former director of the Census Bureau during the last decennial census" said "that, while he wished there were data to answer the [citizenship] question, none existed to his knowledge." *Id.* Third, "Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating

Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses." *Id.*

56.     Secretary Ross noted that "the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses," as the Census Bureau had done in the January 19 Memo. *Id.*; *see* January 19 Memo, at AR 1279-80. Secretary Ross wrote that "such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys." Ross Memo 3, at AR 1315. For example, the Census Bureau attributed higher response rates on the decennial census to "greater outreach and follow-up associated with the . . . decennial census" and to the comparatively short length of the decennial census questionnaire compared to the ACS. *Id.*

57.     Secretary Ross also assessed the empirical data showing that Hispanics were disproportionately likely not to self-respond to citizenship questions. *See id.* at AR 1315-16. With regard to the ACS, he pointed out that many questions other than the citizenship question also have significant nonresponse rates. *Id.* at AR 1315. But in citing those other questions, he did not acknowledge any comparative response rates by race or ethnicity, citing only average nonresponse rates. *See id.* With regard to the decennial census, Secretary Ross acknowledged the Census Bureau's data showing that noncitizen households (compared to citizen households) were disproportionately less likely to self-respond to the 2000 long-form census questionnaire, which included a citizenship question, than to the short-form questionnaire, which did not. *See id.* at AR 1316. But, Secretary Ross wrote, the Census Bureau "was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey." *Id.* He concluded that "while there is widespread belief

among many parties that adding a citizenship question could reduce response rates, the Census

Bureau's analysis did not provide definitive, empirical support for that belief." *Id.*

58.    Secretary Ross next evaluated Alternative C, which would use administrative

records *instead* of adding a citizenship question to the decennial census. *Id.* He acknowledged

that the Census Bureau had used administrative record data "since the early 20th century" and

that administrative records often yield "more accurate" citizenship data than self-responses do.

*Id.* "However," he wrote, "the Census Bureau is still evolving its use of administrative records,

and the Bureau does not yet have a complete administrative records data set for the entire

population." *Id.* He also acknowledged that the Census Bureau was able to match 88.6% of the

population "with what the Bureau considers credible administrative record data" in the 2010

census. *Id.* But, he wrote, "[w]hile impressive, this means that more than 10 percent of the

American population — some 25 million voting age people — would need to have their

citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that

another option be developed to provide a greater level of accuracy than either self-response alone

or use of administrative records would presently provide." *Id.*

59.    Secretary Ross explained that he had "asked the Census Bureau to develop" an

Alternative D, which "would combine" Alternatives B and C. *See id.* His "judgment," the

Memo announced, was that Alternative D "will provide DOJ with the most complete and

accurate CVAP data in response to its request." *Id.* at AR 1317. Secretary Ross explained:

> Asking the citizenship question of 100 percent of the population gives each
> respondent the opportunity to provide an answer. This may eliminate the need for
> the Census Bureau to have to impute an answer for millions of people. For the
> approximately 90 percent of the population who are citizens, this question is no
> additional imposition. And for the approximately 70 percent of non-citizens who
> already answer this question accurately on the ACS, the question is no additional
> imposition since census responses by law may only be used anonymously and for
> statistical purposes. Finally, placing the question on the decennial census and
> directing the Census Bureau to determine the best means to compare the decennial

census responses with administrative records will permit the Census Bureau to
determine the inaccurate response rate for citizens and non-citizens alike using the
entire population.  This will enable the Census Bureau to establish, to the best of
its ability, the accurate ratio of citizen to non-citizen responses to impute for that
small percentage of cases where it is necessary to do so.

*Id.*

60.     Secretary Ross addressed the possible effect on self-response rates of the

citizenship question as set forth in Alternative D.  *See id.* at AR 1319.  He opined that "even if"

addition of a citizenship question had "some impact on responses, the value of more complete

and accurate data derived from surveying the entire population outweighs such concerns.

Completing and returning decennial census questionnaires is required by Federal law, those

responses are protected by law, and inclusion of a citizenship question on the 2020 decennial

census will provide more complete information for those who respond."  *Id.*  Secretary Ross then

stated, without reference to any evidence or to the Census Bureau's conclusion that adding a

citizen question would produce "substantially less accurate citizenship status data than are

available from administrative sources," January 19 Memo, at AR 1277, that "[t]he citizenship

data provided to DOJ will be more accurate with the question than without it," Ross Memo 7, at

AR 1319.  He wrote that this "accura[cy]" was "of greater importance than any adverse effect

that may result from people violating their legal duty to respond."  *Id.*

61.     Secretary Ross concluded: "I have determined that reinstatement of a citizenship

question on the 2020 decennial census is necessary to provide complete and accurate data in

response to the DOJ request."  *Id.* at AR 1320.  He also announced his decision to place the

question "last on the decennial census form" to "minimize any impact on decennial census

response rates."  *Id.*

**7.  Secretary Ross's Testimony Before Congress**

62.     As the foregoing makes clear, the chronology of events in the initial

Administrative Record produced on June 8, 2018, largely conformed to the chronology in the

Ross Memo.  According to the Ross Memo, the decision to add a citizenship question to the

2020 census began with the December 12, 2017 request from Arthur Gary, a career official at

DOJ.  *See* Ross Memo 1, at AR 1313.  "Following receipt" of the Gary Letter, Secretary Ross

claimed, he had "set out to take a hard look at the request."  *Id*.  The Memo did not mention any

earlier discussions and efforts to propose addition of a citizenship question or any role in those

discussions by White House personnel, political appointees at DOJ, or political appointees at the

Commerce Department.  *See id.* at AR 1313-14.

63.     In sworn testimony before Congress around the same time, Secretary Ross

repeated that the decision to add a citizenship question began with the Gary Letter and denied

White House involvement in the decision and discussions leading to the decision.

64.     Before the House Appropriations Committee on March 20, 2018, for example,

Representative José Serrano asked Secretary Ross whether "the President or anyone else in the

White House [had] directed [him] to add this or a similar question to the 2020 census."  *Hearings

Before Subcomm. on Commerce, Justice, Science, and Related Agencies of the H. Comm. on

Appropriations*, 115th Cong. 15 (2018) (admitted as an audio file at PX-491).  Secretary Ross

responded that the Department of Commerce was "responding *solely* to Department of Justice's

request."  *Id.* (emphasis added).  Later in the same hearing, Representative Grace Meng asked

Secretary Ross whether "the President or anyone in the White House discussed with you or

anyone on your team about adding this citizenship question."  *Id.* at 38 (admitted as an audio file

at PX-493).  Secretary Ross answered: "I am not aware of any such."  *Id.*

65.     Secretary Ross testified similarly before the House Ways and Means Committee

on March 22, 2018.  *See Hearing with Commerce Secretary Ross: Hearing Before the H. Comm. on Ways and Means*, 115th Cong. 1 (2018) (admitted as PX-480).  Most relevant here, Representative Judy Chu asked if Secretary Ross could tell her "whether the Department of Commerce plans to include the citizenship question in the 2020 Census."  *Id.* at 51.  Secretary Ross responded that the "Department of Justice, as you know, *initiated* the request for inclusion of the citizenship question" to the decennial census.  *Id.* (emphasis added).

66.     Finally, before the Senate Subcommittee on Commerce, Justice, Science, and Related Agencies on May 10, 2018, Secretary Ross testified again that DOJ had initiated the request.  *See Hearing on the F.Y. 2019 Funding Request for the Commerce Dep't Before the S. Appropriations Subcomm. on Commerce, Justice, and Science and Related Agencies*, 2018 WL 2179074 (May 10, 2018).  Senator Patrick Leahy questioned whether a citizenship question was actually "necessary to enforce the Voting Rights Act."  *Id.*  He asked Secretary Ross: "[W]hy this sudden interest in that when the department that's supposed to enforce violations doesn't see any problems?"  *Id.*  Secretary Ross responded: "Well, the Justice Department is the one who made the request of us."  *Id*.

67.     In a brief filed with the Supreme Court in December 2018, Defendants argue that "[v]iewed in context," these statements should not be understood to imply that the Department of Commerce had not previously considered the issue or spoken with others in the Administration about it.  Brief for the Petitioners at 27, *Dep't of Commerce v. U.S. Dist. Ct. for S.D.N.Y.* (Dec. 17, 2018) (No. 18-557), 2018 WL 6650094, at *27.  Instead, they argue that Secretary Ross's response to Representative Serrano should be understood to mean that "no outside political parties or campaigns had made a request to which the Department of Commerce was responding"; that his statement to Representative Meng was in reference to an email purportedly sent by the Trump Reelection Campaign and thus only about "whether any political actors in the

White House had made a formal request" about the citizenship question; that his response to Representative Chu pertained only to the "formal process" that began with the Gary Letter; and that his assertion to Senator Leahy was meant only to "rebut[]" Senator Leahy's suggestion that DOJ did not see a problem with current VRA enforcement. *Id.* at 27-31 (emphasis omitted).

68. Defendants' *post hoc* interpretations of Secretary Ross's sworn statements to Congress are unconvincing. Viewed individually, even in context, none of the statements are limited in the ways Defendants suggest. And viewed together, the statements afford only one conclusion: Secretary Ross intended to convey the impression that the Gary Letter — and the Gary Letter alone — prompted consideration of whether to add a citizenship question to the census; that neither he nor anyone else at the Commerce Department prompted DOJ's request; and that he had not discussed the matter with White House officials before 2018. Moreover, nothing in Secretary Ross's March 26, 2018 Memorandum, in the rest of the Administrative Record, or in the relevant statutes and regulations supports the purported distinction between an "informal" and "formal" process.[17]

**B. The Supplemental Administrative Record and the Trial Record**

69. Secretary Ross's first version of events, set forth in the initial Administrative Record, the Ross Memo, and his congressional testimony, was materially inaccurate.

70. The first concrete sign of the inaccuracy came on June 21, 2018, when — "to provide further background and context regarding" Secretary Ross's decision — Defendants added a one-page "Supplemental Memorandum" signed by Secretary Ross himself, to the

---

[17] In any event, as the next part of this Opinion makes clear, there was nothing "informal" about the process predating DOJ's December 12, 2017 letter, which involved briefing books, legal memoranda, formal meetings, and inter-agency communications at both the staff and Cabinet secretary levels.

Administrative Record.  *See* Docket No. 189.[18]  In the Supplemental Memorandum, Secretary

Ross admitted that "[s]oon after [his] appointment as Secretary of Commerce," he had begun

considering "whether to reinstate a citizenship question."  AR 1321 ("June 21 Supplemental

Memo").  He also acknowledged that "other senior Administration officials had previously

raised" the issue, but he did not identify the officials by name.  *Id*.  He continued: "My staff and I

thought reinstating a citizenship question could be warranted, and we had various discussions

with other governmental officials about reinstating a citizenship question to the Census."  *Id.*  He

then disclosed that, "[a]s part of that deliberative process," *he and his staff* had "inquired whether

the Department of Justice . . . would support, *and if so would request*, inclusion of a citizenship

question as consistent with and useful for enforcement of" the VRA.  *Id.* (emphasis added).

71.     After receiving Secretary Ross's Supplemental Memorandum, the Court ordered

Defendants to complete the Administrative Record and authorized discovery beyond the

Administrative Record.  *See* Docket No. 199; *see also* July 3rd Tr. 76-89.[19]

---

[18]     Ironically, in light of Defendants' own subsequent (and ongoing) efforts to limit the evidence this Court may consider, this "Supplemental Memorandum" presents a curious case for inclusion in the Administrative Record.  In particular, its inclusion is hard to square with Defendants' contention that the Administrative Record *cannot* include materials that "did not exist until after the agency decision had been made."  Docket No. 33, at 3 n.1 (internal quotation marks omitted); *see also* Brief for Petitioners at 21-22, *Department of Commerce v. United States Dist. Ct. for S.D.N.Y.*, 2018 WL 6650094, at *21-22 (arguing to the Supreme Court that review in this Court should focus on "the contemporaneous explanation of the agency decision that the agency rests upon," that courts must accordingly "confine review to a judgment upon the validity of the grounds upon which the agency itself based its action," and that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court" (citations, alterations, and internal quotation marks omitted)).  Ultimately, however, the Court need not decide whether the Supplemental Memorandum is properly part of the Administrative Record (or, if not, whether it can be considered under one of the exceptions to the "record rule" discussed below), as the parties stipulated that it is part of the Administrative Record for purposes of this litigation.  *See* Docket No. 517, at Joint Stip. ¶ 63; *see* Docket No. 523 (so-ordered version of the same).  But, given the history of this litigation, the Court cannot help but note that it was *Defendants* who first sought to introduce material "outside" the Administrative Record into this case.

[19]     The Court limited the scope of extra-record discovery, in the first instance, to DOJ and

72.     The evidence disclosed as a result reveals a very different set of events from the one described in the initial Administrative Record, the Ross Memo, and Secretary Ross's congressional testimony.  In particular, as outlined in depth below, the evidence shows that shortly after his confirmation as Secretary of Commerce, Secretary Ross discussed the addition of the citizenship question with then-White House advisor Steve Bannon, among others; that Secretary Ross wanted to add the question to the 2020 census prior to, and independent of, DOJ's December 12, 2017 request; that the Secretary and his aides pursued that goal vigorously for almost a year, with no apparent interest in promoting more robust enforcement of the VRA; that, believing they needed another agency to request and justify a need for the question, Secretary Ross and his aides worked hard to generate such a request for the citizenship question from DOJ; that these efforts included a direct intervention by Secretary Ross with Attorney General Sessions; and that these efforts ultimately succeeded, resulting in DOJ's request for a citizenship question.  The evidence also reveals that DOJ deliberately (and unusually) did not explore whether there was a way to obtain the data it purportedly needed that would not involve a citizenship question on the census.  The Court now turns to this more complete story of

---

the Department of Commerce.  *See* July 3rd Tr. 86.  More specifically, the Court precluded any discovery from the White House or White House officials, and ruled that any discovery beyond DOJ and the Department of Commerce required either consent of Defendants or leave of Court. *See id.* at 86-87.  In subsequent rulings, the Court strictly policed those limits.  *See, e.g.*, Docket No. 495, at 21-23, 30-39 (denying or effectively denying several of Plaintiffs' open discovery demands); Docket No. 403 (denying Plaintiffs' motion to take *de bene esse* depositions or reopen depositions to address newly disclosed documents); Docket No. 369 (partially denying, on deliberative-process-privilege grounds, Plaintiffs' motion to compel production of documents); Docket No. 361 (partially denying, on attorney-client-privilege grounds, Plaintiffs' motion to compel documents); Docket No. 366, at 17 (denying Plaintiffs' motions to compel interrogatory responses); Docket No. 323 (memorializing a ruling from the bench partially denying Plaintiffs' motion to compel production of documents and to respond to interrogatories); Docket No. 303 (denying Plaintiffs' motion for leave to seek third-party discovery from Kris Kobach); Docket No. 261, at 3 (denying Plaintiffs' motion to compel documents "erroneously withheld" from the administrative record); Docket No. 204 (denying Plaintiffs' motion to shorten Defendants' time to respond to discovery requests and for additional deposition time).

Secretary Ross's decision.

## 1. Secretary Ross's Early Interest in Adding the Citizenship Question

73.     The Senate confirmed Secretary Ross as Secretary of Commerce on February 27, 2017.  *See* 163 CONG. REC. S1421, S1455 (2017).  Two days later, on March 1, 2017, the Census Bureau briefed Secretary Ross on the census and the upcoming deadline to notify Congress about the proposed subjects for the census questionnaire.  *See* AR 1410, 3685-86; PX-193 ("Ross Calendar"), at 1; Docket Nos. 510-2, 510-3 (together, "Langdon Dep.") at 81, 93-98; *see also* 13 U.S.C. § 141(f)(3).

74.     At some point between February 27 and March 10, 2017, Secretary Ross asked his Deputy Chief of Staff and Director of Policy, Earl Comstock, why there was no citizenship question on the census.  *See* Docket No. 490-2 ("Comstock Dep.") at 55.  Comstock responded that he did not know, but would "check."  *Id.*  On March 10, 2017, Comstock sent Secretary Ross an email with the subject line: "Your Question on the Census."  AR 2521.  The email reported that the Census Bureau's webpage on apportionment was "explicit" that "all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts."  *Id.*  The email also included the text of a *Wall Street Journal* article titled "The Pitfalls of Counting Illegal Immigrants," which, Comstock noted, "confirms that neither the 2000 nor the 2010 Census asked about citizenship."  *Id.*

75.     Around this same time, Secretary Ross's interest in adding a citizenship question to the census first surfaced.  Comstock, for example, first heard "about the notion of adding a question about citizenship to the decennial census" from the Secretary himself, "shortly after the confirmation."  *Id.* at 54.  In fact, some evidence suggests that Secretary Ross went even further in these early weeks and had actually decided to add the citizenship question already.  According to Comstock, for example, Secretary Ross actually made a "request" to add the citizenship

question "sometime in the spring" — "[p]otentially" as early as March 10, 2017 (when

Comstock had emailed him the *Wall Street Journal* article).  *Id.* at 146.

76.     Although Secretary Ross acknowledges speaking with various "senior

Administration officials" and "other governmental officials" about adding a citizenship question

to the census around this time, AR 1321, the record is largely (and somewhat surprisingly) void

of details regarding when these conversations occurred and with whom.  But it does reflect that

Secretary Ross discussed the topic with at least three outside officials.  First, Secretary Ross

discussed the topic with Attorney General Sessions "in the Spring of 2017 and at subsequent

times."  *See* Docket No. 379-1 ("Defs.' Second Supp. Interrog."), at 2-3 (admitted as PX-302).

Second, on or about April 5, 2017, Secretary Ross spoke with White House advisor Steve

Bannon, who asked "if he would be willing to speak to Kansas Secretary of State Kris Kobach

about Secretary Kobach's ideas about a possible citizenship question on the decennial census."

*Id.* at 3; AR 763-64, 2561.  Third, complying with Bannon's request, Secretary Ross spoke with

Kobach (who also served as Vice Chair of the since aborted Presidential Commission on

Election Integrity).  *See* AR 763-64, 2561; Defs.' Second Supp. Interrog. at 2-3; Docket Nos.

509-2, 509-3 (together, "Teramoto Dep.") at 38–47.  During that discussion, Secretary Ross and

Kobach discussed the potential effect on "congressional apportionment" of adding "one simple

question" to the census.  AR 763-64.

77.     After these conversations, Secretary Ross and his staff began to take action on the

citizenship question, in part by contacting Mark Neuman, who was not then a government

official but had served as the point person on census-related issues for the Trump

Administration's transition team.  Teramoto Dep. 126-27.  On April 11, 2017, Neuman emailed

Comstock a link to the Supreme Court's decision in *League of United Latin Am. Citizens v.*

*Perry*, 548 U.S. 399 (2006) ("*LULAC*"), which considered CVAP data in assessing claims under

Section 2 of the VRA.  *See* PX-188 (AR); *see also* Comstock Dep. 155-56.  On April 13, 2017,

Comstock asked Neuman by email when the Census Bureau would need to "notify Congress"

regarding census questions.  AR 3709.  Neuman responded the next day, informing Comstock

that the notification deadline for census topics had already passed, but there would "be another

opportunity next year" when the report of specific questions was due to Congress.  AR 3709.

78.     Secretary Ross soon began to express frustration with his staff's lack of progress

on the citizenship question issue.  On April 20, 2017, for example, he emailed Comstock,

copying Wendy Teramoto, who was then his Senior Advisor and Chief of Staff.  *See* AR 3694;

Teramoto Dep. 78.[20]  In the email, he noted that then-Director of the Census Bureau John

Thompson was scheduled to meet with the Census National Advisory Committee on Racial,

Ethnic and Other Populations on April 29, 2017, and he noted: "We <u>must</u> get our issue resolved

before this!"  AR 3694 (emphasis in original); *see* Comstock Dep. 137-41.

79.     On May 2, 2017, Secretary Ross expressed even greater frustration.  He emailed

Comstock that he was "mystified why nothing ha[s] been done in response to [his] *months old*

*request* that we include the citizenship question."  AR 3710 (emphasis added).

80.     A few hours later, Comstock responded.  "On the citizenship question," he

declared, "we will get that in place."  *Id.*; PX-298(R), at RFA 63;[21] *see* Comstock Dep. 151-52.

He explained that the specific questions on the census questionnaire were not due to Congress

until March 2018.  *See* AR 3710.  In the meantime, Comstock wrote, "[w]e need to work with

---

[20]     The email was sent from the account of Secretary Ross's personal assistant, but she noted
in the subject line that she had tried unsuccessfully to send it from Secretary Ross's email and
that "it's from him."  AR 3694.

[21]     PX-298(R), which was admitted into evidence on November 9, 2018, *see* Docket No.
518; Docket No. 518-1 at 19; Tr. 559, is "Defendants' Objections and Responses to Plaintiffs'
Requests for Admission to Defendant United States Department of Commerce."  The Exhibit is
stamped with an (R) because it is a revised version of an earlier exhibit, not because of any
connection to the Administrative Record.  *See* Docket No. 518, at 1-2.

Justice to get them to request that citizenship be added back as a census question, and we have the court cases to illustrate that DoJ has a legitimate need for the question to be included." *Id.* Comstock promised to "arrange a meeting with DoJ staff this week to discuss." *Id.*

## 2. Comstock's Search for a Rationale and an Agency to Request the Question

81.     By May 2, 2017, Comstock had come to believe that the Commerce Department would need another agency to request addition of the citizenship question on the census because OMB and the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq.*, required the Commerce Department to "justify" why a citizenship question was "need[ed]."  Comstock Dep. 153-54. Comstock acknowledged that simply "say[ing] the Secretary wanted" the question added would not "clear [the] legal thresholds."  *Id.* at 154.

82.     With this understanding, Comstock set out to find a "legal rationale" to support the Secretary's request to add a citizenship question, *id.* at 266, and to "find an agency that would have as reason" to do so, *id.* at 181.  Comstock testified that he viewed it as his job to "help [the Secretary] find the best rationale" for adding the question, because "[t]hat's what a policy person does."  *Id.* at 267.  In his view, he did not "need to know what" the Secretary's actual "rationale might be, because it may or may not be one that is . . . legally-valid."  *Id.*

83.     On May 4, 2017, two days after promising Secretary Ross that he would "get [the citizenship question] in place," Comstock emailed Eric Branstad, the Senior White House Advisor at the Department of Commerce, asking him to identify the "best counterpart . . . at DOJ" to speak with "[r]egarding [the] Census."  AR 3701; *see also* AR 12755; AR 2458 (same as AR 12755 but with more redactions); AR 12756 (similar to AR 12755).  Branstad advised Comstock to contact Mary Blanche Hankey, who had previously served as legislative counsel to then-Senator Jeff Sessions and, at the time, was the White House liaison at DOJ.  *See* AR 3701, 12755.

84.     Later that day, Comstock emailed Hankey and asked to set up a meeting.  AR

2462; *see also* AR 12755; PX-298(R), at RFA 68.  At some point that month, Comstock and

Hankey spoke in person; "[a] few days later," Hankey "directed [Comstock] to James McHenry

in the Department of Justice."  AR 12755.  McHenry was the Director of DOJ's Executive Office

for Immigration Review; he had no responsibility for enforcement of the VRA.  *See* Attorney

General Sessions Announces Appointment of James McHenry As Director of the Executive

Office for Immigration Review, Department of Justice (Jan. 10, 2018), https://www.justice.gov/

opa/pr/attorney-general-sessions-announces-appointment-james-mchenry-director-executive-

office; PX-298(R), at RFA 71; Docket No. 491-2 ("Gore Dep."), at 65.

85.     Comstock and McHenry "spoke several times . . . by phone."  AR 12755.  After

these calls and "considering the matter further," McHenry told Comstock that "Justice staff did

not want to raise the [citizenship] question given the difficulties Justice was encountering in the

press at the time (the whole Comey matter)."  *Id.*[22]  McHenry referred Comstock instead to Gene

Hamilton at the Department of Homeland Security ("DHS").  *Id.*  Comstock and Hamilton held

"several phone calls to discuss the matter," but Hamilton "relayed that after discussion DHS

really felt that it was best handled by Department of Justice."  *Id.*  Faced with these rejections by

DOJ and DHS, Comstock turned to James Uthmeier, a lawyer at the Commerce Department.  *Id.*

He asked Uthmeier "to look into the legal issues and how Commerce could add the question to

the Census itself."  *Id.*

86.     On May 24, 2017, Secretary Ross met "all afternoon" with various aides,

including David Langdon, a Policy Advisor who reported to Comstock.  AR 12542; *see also* AR

---

[22]     The "whole Comey matter" was presumably a reference to the firing of James Comey as
Director of the Federal Bureau of Investigation, which occurred on May 9, 2017.  *See* Michael D.
Shear & Matt Apuzzo, *F.B.I. Director James Comey Is Fired by Trump*, N.Y. Times (May 9,
2017), https://www.nytimes.com/2017/05/09/us/politics/james-comey-fired-fbi.html.

3702-04 (same as AR 12541-43 but with more redactions).  During the meeting, Secretary Ross

"seemed . . . puzzled why citizenship is not included in [the] 2020" census.  AR 12541.  At about

11 p.m. that night, Langdon emailed Lisa Blumerman, Acting Associate Director of the 2020

Decennial Census, asking her to respond immediately — "[i]deally this evening" — to his

inquiry about a citizenship question.  *Id.*; *see also* Langdon Dep. 172-74.  Langdon reported to

Comstock that he made that request.  PX-543 (AR).

### 3. Secretary Ross and His Aides Persist in Their Efforts

87.     Throughout July and August 2017, Secretary Ross and his staff continued to work

internally, and with Kobach, to arrange for the addition of the citizenship question.

88.     On July 14, 2017, Kobach emailed Secretary Ross to follow up on their April

telephone conversation.  *See* AR 763-64.  Kobach wrote that the lack of a citizenship question on

the census "impairs the federal government's ability to do a number of things accurately," and

"also leads to the problem that aliens who do not actually 'reside' in the United States are still

counted for congressional apportionment purposes."  *Id.* at AR 764; PX-298(R), at RFA 81-82.

Kobach stated that it was "essential that one simple question be added to the upcoming 2020

census," urging, in particular, a "slight variant" of the citizenship question that appears on the

ACS.  AR 763-64, at AR 764.  Kobach did not mention the VRA or any rationale tied to VRA

enforcement.  *Id*.

89.     On July 21, 2017, Kobach called Teramoto.  *See id.* at AR 763.  He also

forwarded her his July 14, 2017 email to Secretary Ross.  *See id.*  In a note above the forwarded

email, Kobach wrote that he had "spoken" to Secretary Ross about the addition of citizenship

question to the census "at the direction of Steve Bannon."  *Id.*; *see also* PX-298(R), at RFA 83.

He asked "to schedule a short call."  AR 763.  In response to this email, Teramoto arranged a call

between Kobach and Secretary Ross.  *See id*.  Teramoto would later testify that she had "no

recollection of ever speaking" with Kobach.  Teramoto Dep. 40-45.  She also testified that she

had "no idea" who Kobach was, *id.*, even though the email he forwarded to her began with the

line: "Kansas Secretary of State Kris Kobach here."  AR 764.[23]  On or about July 25, 2017,

Secretary Ross spoke with Kobach about the addition of a citizenship question to the decennial

census.  *See id.*; Ross Calendar. at 8, 40; PX-298(R), at RFA 84.

90.     On August 8, 2017, Representative Mark Meadows and Secretary Ross spoke by

telephone.  Ross Calendar at 9.  Later that day, Secretary Ross emailed Comstock to ask "where"

DOJ was "in their analysis" of whether to request the addition of a citizenship question.  *See* AR

4004; PX-298(R), at RFA 91; *see also* Comstock Dep. 213.  Secretary Ross advised: "If [DOJ]

still have not come to a conclusion please let me know your contact person and I will call the

AG."  AR 4004; PX-298(R), at RFA 92; Comstock Dep. 214.  Comstock immediately responded

to Secretary Ross, writing that he would "be back shortly with an update."  AR 4004; PX-

298(R), at RFA 93.

91.     The next day, August 9, 2017, Comstock responded again by email to Secretary

Ross about their internal analysis of the citizenship question.  *See* AR 12476; *see also* AR 3984

(same as AR 12476 but with more redactions).  He wrote: "[W]e are preparing a memo and full

briefing for you on the citizenship question.  The memo will be ready by Friday."  AR 12476.

Critically, Comstock cautioned: "Since this issue will go to the Supreme Court we need to be

diligent in preparing the administrative record."  *Id.*  Secretary Ross responded that he "would

---

[23]     Throughout her deposition, Teramoto professed not to recall various events and people of
significance, including direct communications with the Attorney General and his close aides that
were memorialized in contemporaneous emails.  *See, e.g.*, Teramoto Dep. 74-78, 83-85.  This
lack of memory is noteworthy, but ultimately has only limited significance given the extent of
other evidence available on the topics at issue.

like to be briefed on Friday by phone" and added that "we should be very careful, about everything, whether or not it is likely to end up in the SC." *Id.*

92.    On August 11, 2017, Comstock and Uthmeier exchanged edits on briefing materials regarding the citizenship question for Secretary Ross.  In one email, Uthmeier shared "recommendations on execution."  PX-607 (AR), at 2; AR 11343-45 (redacted version). Uthmeier stated that "our hook" was "[u]ltimately, we do not make decisions on how the [citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide."  PX-607 (AR), at 2.  Later the same day, Comstock emailed Secretary Ross and Teramoto a memorandum prepared by Uthmeier regarding the addition of a citizenship question to the census.  *See* AR 2461; *see also* AR 11362.  (The Memorandum itself was withheld by Defendants — with the Court's blessing, *see* Docket No. 361 — on the basis of attorney-client privilege and, thus, is not part of the record.)

93.    On August 21, 2017, senior Commerce Department personnel met regarding the citizenship question.  *See* AR 2461.  Attendees included Teramoto; Comstock; Peter Davidson, the newly appointed Commerce Department General Counsel, *see* 163 CONG. REC. S4781, S4897 (2017); and Under Secretary Kelley, who oversaw the operations of the Census Bureau, *see id.  See* AR 2461; Docket No. 493-2 ("Kelley Dep."), at 25.  During their respective depositions, however, Comstock, Teramoto, and Under Secretary Kelley denied having any recollection of the August 21, 2017 meeting.  *See* Comstock Dep. 221; Teramoto Dep. 54-58; Kelley Dep. 91-92.

94.    On September 1, 2017, Secretary Ross complained to Comstock and Teramoto that he had "received no update" on "the issue of the census question."  AR 2424; *see also* AR 4002-03, at AR 4002.  Comstock responded: "Understood.  Wendy and I are working on it."  AR 4002-03, at AR 4002.

95.     On September 6, 2017, Secretary Ross met with various aides, including Under Secretary Kelley, Teramoto, Comstock, Davidson, and Uthmeier, to discuss addition of the citizenship question.  *See* AR 1411-12; AR 1996-97; AR 2426-28; Ross Calendar 11 ("Staff Briefing: Census Legal Question"); *see also* AR 1998-99 (same email chain as AR 1996-97); AR 2429-30 (same email chain as AR 2426-28).  Uthmeier prepared a briefing book for the meeting, which he gave to at least Under Secretary Kelley.  *See* AR 1996-97, at AR 1996; Docket No. 253 ("Uthmeier Decl."), ¶ 3.  The briefing book is not part of the record, however, apparently because none of the participants in the meeting retained a copy.  *See* Pls.' Proposed Findings ¶ 383.  At their depositions, Under Secretary Kelley, Comstock, and Teramoto denied having any recollection of the meeting.  *See* Comstock Dep.  221; Teramoto Dep. 58-61; Kelley Dep. 105-07.

96.     The day after the meeting with Secretary Ross, Comstock emailed Uthmeier and Davidson that Secretary Ross "would like an update on progress since the discussion yesterday regarding the citizenship question."  AR 2034; *see also* AR 2395-96; AR 2459-60.  Later that day, Davidson wrote to Comstock, Uthmeier, and Teramoto expressing "concern[] about" directly contacting Kobach — whom Secretary Ross had mentioned in the September 6, 2017 meeting.  PX-614 (AR).  Instead, Davidson recommended contacting a "trusted" advisor, such as Neuman, "before we do anything externally."  *Id.*

97.     Consistent with that recommendation, Uthmeier sent Neuman an email on September 8, 2017, with the subject line "Questions re Census," and asking if Neuman had a "few minutes" that morning "to discuss."  AR 2051.  That same day, Comstock sent Secretary Ross a memorandum reporting on his — as yet unsuccessful — efforts to find an agency that would request addition of a citizenship question to the 2020 census.  *See* AR 12755; PX-298(R) at RFA 96.  The memorandum summarized Comstock's prior discussions with Hankey and

71

McHenry of DOJ, and with Hamilton of DHS, and noted that none had expressed interest in requesting the addition of the citizenship question on the census.  *See* AR 12755.

### 4.  Secretary Ross's Intervention with the Attorney General

98.     By sometime in late summer 2017, Secretary Ross was plainly out of patience with Comstock's failed efforts to get DOJ to request the citizenship question and decided to take matters into his own hands by contacting Attorney General Sessions directly.  The precise date of his first communication on the census topic with the Attorney General during that period is unclear.  *See* AR 1321; Gore Dep. 83-84; *see also* Defs.' Second Supp. Interrog. 2-3.  But around Labor Day, the Attorney General spoke then-Acting Assistant Attorney General for Civil Rights John Gore ("AAAG Gore") about requesting the addition of a citizenship question.  Gore Dep. 83.  AAAG Gore learned that Secretary Ross had "initiated" an earlier discussion with Attorney General Sessions about a citizenship question.  *Id.* at 83-84.

99.     Until September 13, 2017, the conversations between the Commerce Department and DOJ about the citizenship question had been "initiated by the Department of Commerce."  Gore Dep. 67-68, 91-98.  But on that date, AAAG Gore initiated contact with Teramoto.  He sent Teramoto an email introducing himself and asking "to talk about a DOJ-DOC" issue, referring to the addition of a citizenship question to the 2020 census.  AR 2628-29, at AR 2629; AR 2634-35 (same email chain); Gore Dep. 95-97.  And for the next couple months, AAAG Gore served as the primary contact at DOJ about the citizenship question issue.  Gore Dep. 91-92, 94-95.

100.     A few days later, on or about September 16, 2017 (a Saturday), AAAG Gore and Teramoto spoke by telephone.  *See* AR 2628-29, at AR 2628; AR 2639.  Later that day, AAAG Gore put Teramoto in touch with Danielle Cutrona, an aide to Attorney General Sessions.  *See* AR 2639.  In his email introducing them, AAAG Gore explained that "Danielle is the person to

connect with about the issue we discussed earlier this afternoon," namely the citizenship question.  *Id.*; AR 2651-52; AR 2653-54; Gore Dep. 102-03.

101.    Teramoto asked Cutrona to "let [her] know when the AG is available to speak to Secretary Ross."  AR 2639.  In response, Cutrona sent Teramoto Attorney General Sessions' cellphone number and stated: "From what John [Gore] told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication.  The AG is eager to assist."  AR 2651; Gore Dep. 105-06.

102.    On September 18, 2017, Secretary Ross spoke again to Attorney General Sessions about adding a citizenship question to the census.  *See* AR 2528; AR 2636; Gore Dep. 111-12. The next day, on September 19, 2017, Secretary Ross sent an email with the subject "Census" to Davidson.  AR 2528.  The email said: "Wendy [Teramoto] and I spoke with the AG yesterday. Please follow up so we can resolve this issue today."  *Id.*

### 5.  AAAG Gore Ghostwrites the DOJ Letter

103.    Over the next three months, relying heavily on the VRA rationale first proposed by the Department of Commerce, political appointees in DOJ — led by AAAG Gore — drafted the letter requesting addition of the citizenship question on the decennial census.

104.    Notably, in drafting the letter, AAAG Gore relied not only on the Commerce Department's proposed rationale, but also on its work product and its advisors.  For example, he spoke with Uthmeier, the Commerce Department lawyer who had drafted the August 11, 2017 legal memorandum on the issue for Secretary Ross.  *See* Gore Dep. 117-19.  After they spoke, AAAG Gore received a copy of the memorandum and a handwritten note from Uthmeier.  *See id.*; *see also* AR 2461 (email referencing August 11 memo).  At his deposition, AAAG Gore stated that "[t]he note contained information regarding [the citizenship question] issue that was considered by the Department of Justice in drafting its request," that is, the December 12, 2017

Gary Letter.  *Id.* 123-24.  AAAG Gore acknowledged, however, that Uthmeier had no experience with, or responsibility for, enforcement of the VRA.  *See id.* at 117-18.

105.    AAAG Gore also communicated directly with Neuman, who was advising Secretary Ross and his aides on the issue and who appears to have been the first to float the VRA rationale for adding the question.  *See* Gore Dep. 437-38; *see also* PX-188 (AR); Comstock Dep. 155-56.  (Neuman, in turn, kept the Commerce Department abreast of his dealings with DOJ. For example, on Sunday, October 8, 2017, Secretary Ross emailed Davidson with the subject line "Letter from DoJ," asking "what is its status?"  AR 2482.  Davidson responded: "I'm on the phone with Mark Neuman right now . . . he is giving me a readout of his meeting last week." *Id.*)  AAAG Gore knew that Neuman "was advising the Department of Commerce and the Census Bureau with respect to this issue" as well.  Gore Dep. 437-38.

106.    By November 1, 2017, AAAG Gore had completed a draft of what would become the Gary Letter.  *See* Gore Dep. 126-27.  He solicited feedback on the draft from only a few people in DOJ.  AAAG Gore emailed the draft letter to Chris Herren, Chief of DOJ's Voting Section, asking for Herren's input.  Gore Dep. 126-27.  AAAG Gore knew that Herren was a career DOJ official.  *See* Gore Dep. 151-53.  AAAG Gore also copied Ben Aguiñaga on his email, and authorized Aguiñaga to forward it to Bethany Pickett.  *See* Gore Dep. 133.  AAAG Gore knew that Aguiñaga and Pickett were both political appointees.  *See id.*  AAAG Gore also knew that both Aguiñaga and Pickett had recently graduated from law school and that neither had any experience as counsel in VRA cases or in assessing the reliability of CVAP data used in VRA litigation.  *See id.* at 134-35.

107.    Herren, Aguiñaga, and Pickett provided substantive feedback on the initial draft of the letter.  *See id.* at 136-37.  AAAG Gore also received edits on a "near-final" version of the draft letter from Rachael Tucker, then counsel in the front office in the Office of the Attorney

General, and Robert Troester, then Associate Deputy Attorney General. *See id.* at 139-42. Like Aguiñaga and Pickett, neither Trucker nor Troester had any experience as counsel in VRA cases or in assessing the reliability of CVAP data used in VRA litigation. *See id.* at 140.

108.    Tucker's and Troester's edits were the last substantive edits made to the letter before it was sent. *See id.* at 142, 146. AAAG Gore did not recall receiving any input or edits from career DOJ Civil Rights Division staff other than the first round of edits from Herren. *See* Gore Dep. 152-53.

109.    On or about November 26, 2017, Secretary Ross spoke with President Trump. PX-298(R), at RFA 103. The next evening, Secretary Ross sent Davidson an email with the subject "Census Questions." AR 11193. The email said that the Census Bureau "is about to begin translating the questions into multiple languages and has let [sic] the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must have this resolved." *Id.*; PX-298(R), at RFA 105. AAAG Gore called Davidson that afternoon, but the record does not reflect whether they spoke. *See* AR 2496.

110.    Ultimately, Attorney General Sessions made the decision that DOJ would send the letter to request that the Census Bureau add a citizenship question to the census. *See* Gore Dep. 442. The final authorization to AAAG Gore to send the letter came from Tucker or Troester on behalf of the Attorney General. *See id.* at 158-60.

111.    Although AAAG Gore — a political appointee — was the principal drafter of the letter, he did not sign or send it; instead, those tasks fell to Arthur Gary, a career DOJ official. On December 8, 2017, AAAG Gore emailed Gary a copy of the letter "with leadership's final changes." *See id.* at 145. He wrote that "[w]ith these changes, we are authorized to send. Sending on Monday is fine." *Id.* at 146-47. On Tuesday, December 12, 2017, Gary sent the final version of the letter to Dr. Jarmin. AR 663-65; *see also* AR 5489-91; Gore Dep. 155.

112.    The Gary Letter was the first time that DOJ communicated to the Census Bureau that its existing CVAP data was not ideal for VRA enforcement purposes.  *See* Tr. 996.  Dr. Abowd testified at trial that "prior to December 2017 . . . , the Census Bureau had never heard from the Department of Justice that existing CVAP data . . . was not ideal for purpose of DOJ's VRA enforcement work."  *Id.*  AAAG Gore understood that before the Gary Letter was sent, DOJ had not reached out to the Department of Commerce to initiate a conversation "for the purposes of obtaining better data to enforce the Voting Rights Act."  Gore Dep. 67-68.  He was also aware that DOJ "staff did not want to raise the [citizenship] question" in the fall of 2017. *Id.* at 68-69.

113.    AAAG Gore, the primary drafter of the DOJ letter requesting improved data, admitted that he believes "that CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts."  *Id.* at 300.  AAAG Gore also testified that he had "no understanding of what the Census Bureau is going to do or what data it's going to provide [DOJ] in the future related to this request," *id.* at 215-16; that he did not "understand . . . any margin of error" associated with the data the Census Bureau will obtain through the citizenship question on the census, *id.* at 224-25; and that he did not "know whether or not CVAP data produced from responses to the citizenship question . . . will, in fact, be more precise than the CVAP data on which the DOJ is currently relying for purposes of VRA enforcement," *id.* at 232-33.  AAAG Gore testified that he is not aware of any communications between DOJ and the Census Bureau on these subjects.  *Id.* at 228, 233-34.

114.    In short, although the letter AAAG Gore drafted states that the "decennial census questionnaire is the most appropriate vehicle" for collecting "reliable" CVAP data for purposes of enforcing the VRA, Gary Letter at AR 663, AAAG Gore admitted that he did not know whether citizenship data obtained through the census would in fact be "more precise than the

CVAP data on which DOJ is currently relying for purposes of VRA enforcement," Gore Dep.

233.

### 6. The Attorney General Forbids DOJ to Meet with the Census Bureau

115.    Throughout December 2017 and January 2018, Census Bureau staff sought to

meet with DOJ officials to better understand their request and to discuss other ways to satisfy

DOJ's interest in more granular CVAP data.  *See* AR 3289; AR 8651; Docket No. 511-2

("Jarmin Dep.") at 64.  The DOJ rebuffed these attempts.

116.    On December 22, 2017, for example, Dr. Jarmin emailed Gary that "the best way

to provide PL94 block-level data with citizen voting population by race and ethnicity would be

through utilizing a linked file of administrative and survey data the Census Bureau already

possesses.  This would result in higher quality data produced at a lower cost."  AR 3289; *see also*

PX-297, at RFA 184; Tr. 961-62.  Dr. Jarmin suggested a "meeting of Census and DOJ technical

experts to discuss the details of this proposal."  AR 3289.

117.    Dr. Jarmin repeatedly followed up with Gary.  On January 2, 2018, Dr. Jarmin

sent Gary a follow-up email requesting a meeting the following week.  *See* AR 5490.  Gary, in

turn, informed AAAG Gore that Census Bureau officials were attempting to arrange a meeting

between the Census Bureau and DOJ.  *See* Gore Dep. 262-63.  AAAG Gore also learned from

Gary that the Census Bureau had an alternative means for providing the DOJ with block-level

CVAP data.  *See id.* at 265-66.  AAAG Gore told Gary that he "would think about the issue and

discuss it further with others."  *Id.* at 264.  AAAG Gore did not ask Gary to get more information

about the specifics of the Census Bureau's alternative proposal.  *See id.* at 268.

118.    AAAG Gore then discussed the matter with several DOJ officials, including

Attorney General Sessions at an in-person meeting.  *See id.* at 265, 268-69.  Attorney General

Sessions decided "not to pursue the Census Bureau's alternative proposal."  *Id.* at 271-72.  To

AAAG Gore's knowledge, the reasons for the Attorney General's decision not to pursue the alternatives were not memorialized anywhere. *Id.* at 272. To this date, Defendants have not identified any reason for DOJ's decision not to meet with the Census Bureau.

119. DOJ eventually "communicated that it did not want to meet with the Census Bureau to discuss alternative sources of block-level CVAP data other than a citizenship question on the decennial census questionnaire." PX-297, at RFA 200. On February 6, 2018, almost two months after first suggesting a technical meeting to DOJ, Dr. Jarmin reported to the Census Bureau and Commerce staff that DOJ did not want to meet. *See* AR 3460; AR 9074. He wrote that he had "spoken with DOJ leadership. They believe the letter requesting citizenship be added to the 2020 Census fully describes their request. They do not want to meet." AR 3460; AR 9074; Docket Nos. 502-2, 502-4 (together, "Census Bureau 30(b)(6) Dep."), at 98.[24]

120. Thus, no meeting between the Census Bureau's and DOJ's technical experts took place before Secretary Ross issued his March 26, 2018 Memorandum announcing his decision to add the citizenship question. *See* Census Bureau 30(b)(6) Dep. 96; Gore Dep. 259; PX-297, at RFA 170, 195, 196.

121. DOJ officials' refusal to meet with the Census Bureau to discuss their request for data was highly "unusual." Census Bureau 30(b)(6) Dep. 98-99. It is standard operating procedure for the Census Bureau to hold a technical meeting with the agency requesting additional data to discuss the best way to deliver usable data for a particular use. *See* Tr. 1248; *see also* Thompson Decl. ¶ 60. As Dr. Abowd testified, when "an agency has requested a statistical product that cannot be produced with current public estimates, we would normally

---

[24]    The Census Bureau's Rule 30(b)(6) deposition was conducted over two days — August 29 and October 5, 2018 — and appears on the docket in two volumes with consecutive pagination. *See* Docket No. 502-2 (Volume I, consisting of pages 1-339); Docket No. 502-4 (Volume II, consisting of pages 340-464).

expect to meet with that agency to determine . . . the use case, the application, what they wanted to do, and why they felt that our current products did not serve that need.  That would be normal." Tr. 1248.  And as former Census Bureau Director Thompson explained, input from subject matter experts — usually consisting of "staff from both the Census Bureau and the requesting agency" — is "essential to the development of a new question" for a survey. Thompson Decl. ¶ 60.  That is because "[t]hese experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome."  *Id.*; *see also* Habermann Aff. ¶ 29 ("[A meeting between the Census Bureau and the requesting agency] allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers. It also allows for a discussion of alternative ways of meeting a request.").

122.	Neither the Census Bureau nor AAAG Gore is aware of any instance, other than the request to add a citizenship question to the decennial census questionnaire, in which DOJ has requested data from the Census Bureau and then declined to meet to discuss that request.  PX-297, at RFA 201; Gore Dep. 282.

123.	The fact that the Attorney General himself made the decision not to allow DOJ officials to meet with the Census Bureau is also highly unusual.  Dr. Abowd, the Census Bureau's Chief Scientist and Defendants' own expert, testified that he was unaware of any other circumstance in which a Cabinet Secretary personally directed agency staff not to meet with the Census Bureau and that DOJ's refusal in this case was thus "unusual."  Tr. 962-65.  Dr. Abowd opined that Attorney General Sessions's decision constituted improper "political influence" on the decision-making process.  Tr. 1267-68.

### 7.  Efforts to Downplay Deviations from the Census Bureau's Standard Processes

124.    As noted above (by way of background only), in recent decades, the Census
Bureau has adhered to a fairly robust process in evaluating whether to add new questions to any
data-collection instrument, including the census.  AR 9865, 9867; AR 3560; AR 3890-91;
Thompson Decl. ¶¶ 45, 47-49.  That process includes rigorous pre-testing.  In fact, the Census
Bureau's "Statistical Quality Standards," issued in 2010, explicitly require pre-testing of any
question to be added to a survey such as the census, unless the Census Bureau obtains a waiver
or uses a question that has "performed adequately in another survey."  PX-260, at vii, 8; *see also*
PX-364 ("If there is insufficient evidence about how well a question performs, the question must
be subjected to some form of questionnaire pretest.").

125.    Initial plans for the 2020 census adhered to the Census Bureau's historical
practices and Statistical Quality Standards.  All questions on the 2010 census had been the
subject of extensive cognitive testing and field testing.  *See* Tr. 997.  And the Census Bureau
began testing potential improvements for the questions on race and ethnicity for the 2020 census
more than *ten years* before the census, in 2008.  *See* Thompson Decl. ¶ 49.  The Census Bureau
sought community feedback on the proposed changes in 2014 and 2015, and then conducted
additional testing in 2015.  *See id.* ¶¶ 50-53.  Despite that extensive testing, the Census Bureau
opted not to make the proposed changes to the questions on race and ethnicity because a final
decision had not been made as of December 31, 2017, leaving inadequate time to deliver the
final question wording to Congress two years prior to the census, as required by Section
141(f)(2).  *See id.* ¶ 54.

126.    Additionally, on April 29, 2016, Lisa Blumerman, Associate Director of
Decennial Census Programs, issued a memorandum "officially document[ing] the U.S. Census
Bureau's plan to develop and transmit to Congress" the questions planned for the 2020 decennial

census.  PX-271, at 1; *see also* Tr. 995.  To the extent relevant here, the Memorandum invited

"[f]ederal agencies with known uses of the 2020 Census or ACS content" to submit any requests

for data collection by July 1, 2016.  PX-271, at 3.  Blumerman explained that "[f]inal proposed

questions are based on the results of extensive cognitive testing, field testing, other ongoing

research, and input from advisory committees."  PX-271, at 4; Tr. 995-96.

127.     Despite these plans and the Census Bureau's Statistical Quality Standards, neither

the Census Bureau nor the Commerce Department conducted any pretesting of the citizenship

question before Secretary Ross made the decision to add it to the 2020 census questionnaire.

There was no cognitive testing, field testing, or randomized control testing of the question, nor

was there any testing of the question within the context of the entire questionnaire or

consultation with the Census Bureau's advisory committees or outside researchers with relevant

expertise.  *See* Tr. 156-57, 736-37, 925-26, 997-98, 1279-80; Thompson Decl. ¶¶ 60, 71, 77;

Census Bureau 30(b)(6) Dep. 142-43, 426-27; Habermann Aff. ¶¶ 56-58.  The one "end-to-end"

test — in essence, a form of dress rehearsal — conducted for the 2020 census did not include the

citizenship question.  Tr. 92, 155-56, 998, 1096; Census Bureau 30(b)(6) Dep. 225.

128.     Nor did the Census Bureau apply for, let alone receive, a waiver from the pre-

testing requirement for the citizenship question.  Tr. 1279.  And while Secretary Ross opted to

use a question that had previously appeared on the ACS, the record establishes that it has not

"performed adequately" within the meaning of the Census Bureau's Statistical Quality

Standards.  For example, 32.7% of all people identified as noncitizens by administrative records

reported themselves as citizens on the 2010 ACS.  *See* January 19 Memo, at AR 1280.  For the

2016 ACS, that figure was 34.7%.  *See id.*  Defendants' own expert witness, Dr. Abowd,

acknowledged that the Census Bureau views this "disagreement" between the ACS survey

responses and administrative records — which are generally viewed as more accurate — as a

"problem with the ACS citizenship question." Tr. 1282. In fact, he opined that, in light of the

disagreement rate, the citizenship question on the ACS has not "performed adequately." *Id.* at

1286-88; *see also* Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law

Regarding Plaintiffs' Claims, Docket No. 546 ("Defs.' Post-Trial Br."), at 62, ¶ 420 (conceding

that "the citizenship question does not appear to be performing adequately on the ACS").

129.    Thus, the failure to conduct any pretesting of the proposed citizenship question on

the decennial census questionnaire was a "significant deviation" from the Census Bureau's

historical practices, its own mandatory Statistical Quality Standards, and its previously

announced plans for the 2020 census. *See* Thompson Decl. ¶ 96; AR 3890-91; AR 2304; AR

9865, 9867; Tr. 1264. Yet, Secretary Ross and the Commerce Department tried to downplay, if

not conceal, the degree of that deviation. The Court will address four examples of these efforts.

### a.  Secretary Ross's Claim that the Question Was Well Tested

130.    First, Secretary Ross described the citizenship question as "well tested" in his

March 26, 2018 Memorandum. Ross Memo 2, at AR 1314. He did not, however, describe that

testing or even define what he meant by "well tested." *See id.* at AR 1313-20. Nor did Secretary

Ross make any effort to reconcile his characterization of the question as "well tested" with the

poor performance of the question on the ACS — that is, the high disagreement rate between

survey responses and administrative records. *See id.* at AR 1316. Ironically, Secretary Ross

himself noted this high disagreement rate when explaining his reasons for rejecting Alternative

C. *See id.*

131.    There is no basis in the record to dispute Dr. Abowd's assessment — which he

conveyed to Secretary Ross in advance of the March 26, 2018 Memorandum — that the

citizenship question was "well tested" for purposes of the ACS. *See* Tr. 1254-55, 1288; *see also*

Tr. 568 (testimony of Thompson, former Census Bureau Director, that testing of the citizenship

Case 1:18-cv-05025-JMF   Document 166   Filed 01/15/19   Page 83 of 277

question for use on the ACS was "complete and thorough").  But the fact that the question was "well tested" for purposes of the ACS does *not* mean that the question is well tested for purposes of the decennial census.  Nor does it mean that the testing was consistent with the Census Bureau's own standards and historical practices.

132.    To the contrary, the record supports the conclusion of experts in the field that the question was not well — or even adequately — tested for purposes of the decennial census questionnaire.  That view is shared by: (1) six former Census Bureau Directors, in both Republican and Democratic Administrations, including Dr. Thompson (whom Defendants' own expert described as "the expert in this trial who's most deserving of weight on his testimony), AR 8555-56; Tr. 1192; Thompson Decl. ¶¶ 93-96; (2) Plaintiffs' experts, Dr. Hillygus and Dr. Barreto, Tr. 157, 737-38; (3) the National Academies of Sciences, Engineering, and Medicine's Committee on National Statistics' Task Force on the 2020 Census, PX-539; and (4) the American Statistical Association, the American Sociological Association, and the Population Association of America, "three leading national associations of professional and academic statisticians, sociologists and demographers," Brief of the American Statistical Association et al. as *Amici Curiae* Supporting Plaintiffs, Docket No. 420-1, at 1, 4-9.

133.    Defendants did not present any evidence to dispute the conclusion that the citizenship question has not been "well tested" for purposes of the 2020 census questionnaire.  Instead, their own expert, Dr. Abowd, agreed that "[i]t would not be appropriate to describe it as well-tested in the context of the 2020 questionnaire.  That is simply not true. . . .  It hasn't ever been tested in that context."  Tr. 1330.

134.    There are several reasons that the testing conducted for the citizenship question on the ACS is not adequate for purposes of the decennial census questionnaire.  First, although superficially similar, there are salient differences between the ACS and the decennial census.

83

*See* Docket No. 456 ("Defs.' Pretrial Reply Br."), at 5 (conceding that the ACS is "a different instrument with different considerations and goals").  The primary purpose of the census is to obtain an "actual Enumeration" of the entire population of the country, *see* U.S. Const. art. I, § 2, cl. 3, while the ACS is "intended to provide information on the characteristics of the population, and the social and economic needs of communities," Thompson Decl. ¶ 32.  And while the census strives for an "actual Enumeration" through an actual count of every household in the country, ACS estimates are statistical estimates based on a sample of United States households.  Thompson Decl. ¶¶ 32-33; Tr. 805, 1027-28.  Additionally, the ACS is a much longer questionnaire than the decennial census questionnaire.  It includes dozens of questions — depending on household composition and housing status, a household might have to answer more than seventy questions — while the 2020 census questionnaire will contain either ten or eleven questions (depending on whether the citizenship question appears on it).  *See* Tr. 87, 889, 1146; Thompson Decl. ¶ 63.  A question concerning citizenship may take on added significance in the context of the much shorter decennial census questionnaire.  *See* Thompson Decl. ¶ 63; Tr. 87-88.  Thus, a test of the question in the context of the ACS questionnaire has only limited relevance to how the question will perform in the context of the census questionnaire.

135.    Second, and related, the question order and context for the question in the ACS (as well as on the 1950 census questionnaire and the long-form questionnaire, both of which were also referenced by Secretary Ross in his March 26, 2018 Memorandum) are different than they would be on the census questionnaire.  On the online ACS (and the prior census questionnaires), the question was preceded by a question about "nativity" — that is, place of birth — and only those who indicated that they were born outside of the United States were asked to disclose citizenship status.  Tr. 159-60, 1274-75.  By contrast, at present, the 2020 decennial census will ask about citizenship without a preceding nativity question — and it will

be asked of all respondents.  PX-489; Census Bureau 30(b)(6) Dep. 22-23; Thompson Decl.

¶ 66; Tr. 1275.  Such differences in "sequencing" and context can affect response rates.  Census

Bureau 30(b)(6) Dep. 14; Tr. 159-60; Thompson Decl. ¶¶ 63-66.[25]

136.    Finally, the ACS was last tested in 2006, and the macroenvironment has changed

in important ways since then.  *See* Tr. 737, 1252, 1258-59.  In particular, the undisputed evidence

— including the Census Bureau's own research — indicates that respondents are likely to react

differently to a citizenship question in 2020 than they would have reacted only three years ago,

let alone thirteen years ago.  *See id.* at 616, 619-20, 737, 1258-59.  Thus, testing conducted

thirteen years ago has only limited relevance to how the question will perform on the 2020

census.

137.    In short, while the citizenship question may have been "well tested" for the

purposes of the ACS (and earlier versions of the census questionnaire, including the "long-form"

questionnaire used until 2000), it is not "well," or even adequately, tested for purposes of the

2020 census questionnaire.  Thus, Secretary Ross's statement that the question is "well tested" is

misleading at best.

---

[25]    Secretary Ross asserted in his March 26, 2018 Memorandum that placing the citizenship question at the end of the questionnaire will "minimize any impact on decennial response rates." Ross Memo at AR 1320.  Notably, however, he cited no empirical support for that assertion. And there are reasons to believe that such placement would have less of an effect than Secretary Ross expects.  That is, census respondents are directed to answer all of the questions on the questionnaire sequentially for each member of their household.  That means that respondents will see the citizenship question when they answer the census questionnaire for the first member of the household, and before they answer any questions about other members of the household.  *See* Tr. 161.  Additionally, on a paper form, respondents can view all of the questions before completing any of it.  So it is impossible to determine whether Secretary Ross's proposed placement will "minimize any impact on decennial response rates" without proper testing.

**b.  The Commerce Department Revises the Census Bureau's Description of the "Well-Established Process" for "Adding or Changing Content on the Census"**

138.   The record contains evidence of another, more deliberate, effort to downplay the degree to which Secretary Ross's decision to add the citizenship question deviated from the Census Bureau's past practices and standards.  In late January 2018 — after the Census Bureau's initial, critical assessments of DOJ's request to add the question — senior aides to Secretary Ross, including Comstock and Uthmeier, developed a set of thirty-five questions for the Census Bureau to answer for the Secretary.  AR 1976-78; Tr. 1004-05.

139.   Dr. Abowd took the lead in coordinating the Census Bureau's responses to the questions.  *See* Tr. 1005.  In particular, he maintained the "control" or "master" copy of the responses to the questions, which represented the final and official position of the Census Bureau, as Dr. Abowd understood them.  *Id.* 1010-11.  After some back and forth with aides to Secretary Ross about some of the responses, *see* Tr. 1005, 1013-14; AR 9190, 13023; AR 2292; AR 2294-2305, Dr. Abowd provided a final set of responses on March 1, 2018 (with his memorandum comparing Alternatives C and D), *see* AR 9812-33.

140.   The thirty-first question on the list asked: "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?"  AR 1296; AR 2303-04; AR 9832-33; AR 10900-01.

141.   Victoria Velkoff, Chief of the American Community Survey Office at the U.S. Census Bureau, drafted the initial answer to this question on behalf of the Census Bureau.  It stated in relevant part as follows:

> The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress.  Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation.  This process ensures the change is necessary and will produce quality, useful information for the nation.

AR 2303; *see* AR 7644, 10950.  The draft answer then described the "formal process for making content changes" laid out by the Census Bureau and OMB.  AR 2304; AR 9832; AR 7644; AR 10901.  That description was consistent with other Census Bureau documents describing the process to add a question or change the content of the decennial census, which are discussed above.  AR 3560; AR 3890-91; PX-271, at 4.

142.    Michael Walsh, Deputy General Counsel of the Commerce Department, and Sahra Park-Su, then Senior Policy Advisor at the Commerce Department, removed all references to the "well-established process" for adding or changing content on the census, *see* Docket No. 494-2 ("Park-Su Dep.") at 142; Tr. 1006-14; AR 9190, 13023.  The answer to Question Thirty-One, as revised by Walsh and Park-Su, read as follows:

> No new questions were added to the 2010 Decennial Census, so there is no recent precedent for considering a request to add questions to a decennial census. Consistent with longstanding practice for adding new questions to the ACS survey, the Census Bureau is working with relevant stakeholders to ensure that legal and regulatory requirements are fulfilled and that the question would produce quality, useful information for the nation.  As you are aware, that process is ongoing.  Upon its conclusion, you will have all of the relevant data at your disposal to make an informed decision about the pending request from the Department of Justice.

AR 9190, 13023.

143.    The final version of the response to Question Thirty-One included in the original Administrative Record was further modified to read as follows:

> Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound by past precedent when considering the Department of Justices' request.  Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation.  As you are aware, that process is ongoing at your direction.

AR 1296 (errors in original).

144.    Dr. Abowd did not receive, review, or approve any of these revisions to the response to Question Thirty-One.  *See* Tr. 1010-11.  Nor were these revisions incorporated into

Dr. Abowd's "control" copy of the responses.  *See id.*  To Dr. Abowd's knowledge, the response to Question Thirty-One is the only response that was changed between his final "control" copy and the copy that was submitted with the original Administrative Record.  *See id.* at 1011.

### c. Secretary Ross's Description of His Dealings with Nielsen

145.    Third, Secretary Ross sought to bolster claims in his March 26, 2018 Memorandum by invoking his conversation with Christine Pierce, the Senior Vice President of Data Science for the Nielsen Company (US) LLC, *see* Ross Memo 3, 6, at AR 1315, 1318, but he materially mischaracterized the nature of that conversation.

146.    Pierce testified by affidavit that Nielsen was contacted in the spring of 2018 about speaking with Secretary Ross regarding the census.  *See* Docket No. 498-18 ("Pierce Aff."), ¶ 4. Despite multiple communications with Secretary Ross's staff, she was not advised in advance that the citizenship question was going to be a topic of the conversation.  *See id.* ¶¶ 6, 8. Accordingly, she believed that the conversation would be about "the importance of the Census generally, the need for Nielsen and its commercial clients to have as complete and accurate a count as possible, and to advocate for full funding for Census operations."  *Id.* ¶ 4.

147.    On the evening of March 23, 2018, Pierce spoke by telephone with Secretary Ross and Walsh, the Commerce Department lawyer.  *Id.* ¶ 7.  As she testified, "it immediately became apparent that the citizenship question was the only topic of conversation."  *Id.* ¶ 8.

148.    During the conversation, Pierce told Secretary Ross "unequivocally" that she "was concerned that a citizenship question would negatively impact self-response rates," and she "explained that people are less likely to respond to a survey that contains sensitive questions." *Id.* ¶ 9.  She "also added that increasing the length of a survey can reduce response rates" and "discussed the impact that lower response rates have on survey costs."  *Id.*  Finally, she "emphasized that Census non-response follow up operations are expensive because they require

a full count and non-response follow up operations for the Decennial Census include in-person data collection." *Id.*

149.    None of that appeared in the Ross Memo, which was issued only three days later. Instead, the Ross Memo stated, first, that Pierce had "confirmed that, to the best of [her] knowledge, no empirical data existed on the impact of a citizenship question on responses." Ross Memo 3, at AR 1315.

150.    Pierce, however, testified that she "did not say" that.  Pierce Aff. ¶ 10.  She "discuss[ed] the importance of testing questions to understand any impacts to response . . . [,] explained that a lack of testing could lead to poor survey results," and "confirmed that [she] was not aware of any such test of a citizenship question by the Census Bureau." *Id.*

151.    The Ross Memo also asserted that Nielsen had "stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates."  Ross Memo 3, at AR 1315; *see also id.* at 6, at AR 1318 ("Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen.  When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added.").

152.    Pierce, however, testified that she "did not state that Nielsen had added 'questions concerning immigration status to short survey forms without any appreciable decrease in response rates.'"  Pierce Aff. ¶ 12.  She did explain that Nielsen had asked "certain questions from the ACS in [its] surveys and of [its] panelists, including place of birth and year of entry to the United States" and that these questions "had not caused a significant decline in response rates." *Id.* ¶ 13.  But she "stressed the importance of specifically testing changes to

questionnaires and that Nielsen had done such testing" with respect to those sensitive questions. *Id.*  And she "did not suggest that Secretary Ross could draw parallels between the surveys conducted by Nielsen and the Decennial Census," as the two are "entirely different."  *Id.* ¶¶ 13-14.  Among other things, "Nielsen surveys are not conducted by a government agency and are not required by law"; their purpose is to "understand consumer purchases and media usage," not to count the population; they are "not required to count all people"; response rates "generally range" from only 5% to 40% and if someone does not participate Nielsen will simply "recruit" someone else to take his or her place; and, "unlike the Census, Nielsen provides incentives — usually cash — for filling out [its] surveys."  *Id.* ¶ 14.

153.    There is no indication in the Administrative Record (or elsewhere in the trial record) that Secretary Ross communicated with anyone at Nielsen other than Pierce.  Further, Pierce is not aware of any other relevant communications between Nielsen and the Department of Commerce regarding the citizenship question.  *Id.* ¶ 15.

154.    The Court credits Pierce's account of the March 23, 2018 conversation with Secretary Ross.  Indeed, Defendants chose not to even cross-examine her (and did not cite her testimony even once in their extensive post-trial briefing).

### d.  Comstock's Testimony About the Census Bureau's Analyses

155.    Finally, the Court finds that Comstock's testimony in this matter about his and Secretary Ross's dealings with the Census Bureau in the period leading up to the Ross Memo was materially misleading.  Notably, by his own account, Comstock was more "involved in the citizenship question" than anyone else at the Commerce Department between early 2017 and the issuance of the Ross Memo.  Comstock Dep. 340-41.  That characterization is borne out by the evidence in the Administrative Record and the trial record.

156.    During his videotaped deposition, Comstock was asked about the statement in Dr.

Abowd's January 19 Memo that adding a citizenship question to the census would be "very costly, harm[] the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  January 19 Memo, at AR 1277; *see* Comstock Dep. 309-12.  Comstock acknowledged the statement, but he testified that it "overstate[d] the case they made further in the document" and that it was "not an accurate representation of what's actually reflected in the document."  Comstock Dep. 312.

157.    Additionally, he testified that the statement was not "the final conclusion" or "the position" of the Census Bureau, *id.* at 312-13; that in a meeting with Dr. Abowd and others (presumably the February 12, 2018 meeting), "they stood by the entire analysis," but "not necessarily that statement," *id.* at 314; that it was not his "understanding" that "that particular statement represent[ed] the view of the Census Bureau," *id.*; and that it was "not representative of the data that was presented to us in the course of extensive discussions," but rather "an early statement that mischaracterize[d] the final conclusions that we understood," *id.* at 316-17.

158.    Based on an assessment of Comstock's demeanor and a review of the other evidence in the record, the Court declines to credit that testimony.  For one thing, the entirety of the January 19 Memo is consistent with, and supports, the statement that adding a citizenship question to the census would be "very costly, harm[] the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  January 19 Memo at AR 1277-85.

159.    For another, there is no indication anywhere else in the record that, in the February 12, 2018 meeting or otherwise, Dr. Abowd or his colleagues at the Census Bureau ever retreated from the statement.  To the contrary, Dr. Abowd testified at trial (credibly) that he adhered to the statement and conclusions in the January 19 Memo.  *See* Tr. 882-92, 922-23, 950-54, 958-59.

160.     In fact, if anything, the Census Bureau's assessment of the harms and costs of

adding a citizenship question only grew *more pessimistic* after the January 19 Memo.  While the

January 19 Memo conservatively estimated that adding the citizenship question would cause a

5.1% increase in the non-response rate of noncitizen households, AR 1280, the Census Bureau

has since updated its estimate of that figure to 5.8%.  *See* PX-162 ("Brown Memo"), at 38, 42.

And while the January 19 Memo conservatively estimated that adding the citizenship question

would increase the costs of the 2020 census by at least $27.5 million (a figure that did not even

include anticipated increases in communications costs), AR 1282, the Census Bureau's current

best estimate is that it would cost $82.5 million more.  *See* Tr. 952, 1249-50.[26]

161.     During his deposition, Comstock also acknowledged his awareness of the Census

Bureau's view (set forth in the March 1 Memo) that Alternative B (adding the citizenship

question) "would result in poorer quality citizenship data" than Alternative C (using

administrative records) "and still have all the cost and quality implications of Alternative B"

outlined in the January 19 Memo.  Comstock Dep. 320.  When asked about that view, Comstock

testified that "there was [an] iterative exchange in which the conclusions of the Census Bureau to

staff and some of their assertions did not hold up under cross-examination."  *Id.* at 321.

162.     Once again, based on an assessment of Comstock's demeanor and a review of the

other evidence in the record, the Court declines to credit that testimony.[27]  Among other things,

---

[26]     The trial transcript reads "$82.5 *billion*," not million, but that is obviously an error, as
reference to the corresponding demonstrative exhibit (Defendants' Demonstrative Exhibit 15)
makes clear.  *See Jones v. Nat'l Am. Univ.*, No. 06-CV-5075 (KES), 2009 WL 949189, at *2
(D.S.D. Apr. 4, 2009) (noting that Fed. R. Civ. P. 60(a) and Fed. R. App. P. 10(e)(1) authorize a
district court to correct a trial transcript where it is in error).

[27]     The Court also questions Comstock's testimony that there were "[t]wo or three" meetings
with representatives of the Census Bureau, the last of which was "somewhere in the vicinity of
March 20th."  Comstock Dep. 322-23.  There is no evidence in the record of any such meetings.
Further, Dr. Abowd testified that the February 12, 2018 meeting (which Comstock attended) was
his one and only meeting with Secretary Ross, and that he could not recall a meeting with

92

there is no indication anywhere in the record that the conclusions and assertions set forth in the March 1 Memo "did not hold up" or that, "under cross-examination" or otherwise, the Census Bureau retreated from them.  To the contrary, Dr. Abowd testified at trial (credibly) that he adhered to the conclusions in the March 1 Memo.  *See* Tr. 966-76.

### 8.  The Genesis of the DOJ Letter Was Kept from the Census Bureau

163.    The revisions to the Question Thirty-One response were not the only thing about which Dr. Abowd and his colleagues at the Census Bureau were left in the dark.  They were also never told that Secretary Ross had begun considering a citizenship question in early 2017.

164.    Indeed, it was not until Secretary Ross's June 21, 2018 Memo and the subsequent disclosures in this litigation (some of which are now part of the Administrative Record and some of which are not) that Dr. Abowd and others at the Census Bureau learned that Secretary Ross had begun considering a citizenship question in early 2017; that, as part of that consideration, Secretary Ross communicated with Bannon and Kobach; that, as early as May 2017, Secretary Ross had expressed frustration about nothing having been done about his "months old request" to "include the citizenship question"; that the Commerce Department had initiated conversations with DOJ about requesting the citizenship question rather than the other way around; and that the Attorney General himself directed the technical experts at DOJ not to meet with the Census Bureau to discuss alternative options.  *See* Tr. 964, 1016-21.

165.    Of course, Secretary Ross and his aides were not *required* to inform Dr. Abowd or others at the Census Bureau that they were considering whether to add a citizenship question to the census.  As a *de facto* matter, however, the degree to which the origins of the decision were kept from those who worked hard to promptly evaluate DOJ's request was unusual and

Comstock after March 1, 2018.  Tr. 884, 991-92.

noteworthy.  Moreover, had Secretary Ross and his aides involved the Census Bureau earlier, the experts there might have been able to conduct appropriate testing of the question in the context of the census itself.  Indeed, by not revealing his consideration of the citizenship question before December 2017, Secretary Ross prevented those experts from conducting a study to quantify whether and to what extent the question would result in a differential undercount even with NRFU operations.  *See* Tr. 1291, 1301.

166.    A poignant exchange between counsel and Dr. Abowd at trial highlights the unusual — and impactful — nature of Secretary Ross's failure to consult the Census Bureau earlier.  When asked whether he had been under the impression that all his work in the wake of DOJ's request "mattered as far as the Secretary's decision-making process," Dr. Abowd responded: "I was under the impression that it mattered in the conduct of the 2020 census, yes." Tr. 1021.  Counsel then asked: "And no one ever told you during that entire period of time that Commerce Department officials had initiated this entire process, correct?"  Dr. Abowd then answered: "No one told me that, but I am still under the impression it matters for the 2020 census."  *Id.* at 1022.  As he did so, Dr. Abowd choked up and visibly held back tears.

**9.  Findings Regarding the Timing of, and Reasons for, Secretary Ross's Decision**

167.    It is hard, if not impossible, to identify with precision when Secretary Ross first made the decision to add a citizenship question to the 2020 census — particularly in the absence of a deposition of Secretary Ross himself.  But based on the foregoing record, the Court finds — by well more than a preponderance of the evidence — that Secretary Ross had made the decision months *before* DOJ sent its letter on December 12, 2017.

168.    That conclusion is supported by evidence in the Administrative Record alone. First and most obviously, it is supported by Secretary Ross's May 2, 2017 email to Comstock expressing "mystif[ication]" as to why "nothing" had been done "in response to" his "*months old*

*request* that we include the citizenship question," AR 3710 (emphasis added), and Comstock's reply later the same day that "we will get that in place" and "[w]e need to work with Justice to get them to request that citizenship be added back as a census question," *id.*[28]  On its face, Secretary Ross's email supports the conclusion that he had made the decision to "include" the question before May 2, 2017 — and thus before receiving DOJ's request on December 12, 2017. After all, his reference was not to a "months old" request to *analyze* inclusion of the question, but to his request, from a supervisor to his staff, to "include" it.

169.    Second, the conclusion that Secretary Ross actually made the decision before DOJ sent its letter in December 2017 is further supported by Comstock's August 11, 2017 email to Secretary Ross emphasizing the "need to be diligent in preparing the administrative record" because the "issue will go to the Supreme Court."  AR 12476.  Plaintiffs characterize that email as evidence that "Secretary Ross and his senior staff agreed . . . to whitewash the administrative record."  Plaintiffs' Joint Proposed Post-Trial Conclusions of Law, Docket No. 545-1 ("Pls.' Proposed Conclusions"), ¶ 354.  The parsimonious nature of the initial Administrative Record in these cases, and the steps that Secretary Ross and his aides took to downplay, if not conceal, the significance of his decision, do provide some basis to draw such an uncharitable inference.  But there is no need to do so in light of a more obvious and significant inference to be drawn from Comstock's email.  That is, the email makes clear that, by August 11, 2017, Secretary Ross had already decided to add the citizenship question to the 2020 census.  After all, the only reason to believe that "the issue" would definitely "go to the Supreme Court" was if Secretary Ross had

---

[28]    Comstock's email also stated that he had "the court cases to illustrate that DoJ has a legitimate need for the question to be included."  *Id.*  But there is no indication in the Administrative Record that he had communicated with anyone at DOJ about the issue prior to that date.  *See also* Comstock Dep. 157 (confirming that he had not discussed the citizenship question with DOJ prior to May 2, 2017).  Thus, he had no basis to opine on DOJ's "need for the question," let alone on whether such a need would be "legitimate."

decided to add the question; if there was a chance that Secretary Ross, after considering the issue with an open mind, was going to preserve the status quo, Comstock would have had no reason to state with confidence that the issue "will" go to the Supreme Court.  Nor would there have been any reason to "prepar[e] the administrative record" to memorialize or justify a decision that might never even be made.

170.    Third, the same conclusion is supported by Uthmeier's August 11, 2017 email to Comstock, which attached his legal memorandum concerning the citizenship question that was later used by AAAG Gore in drafting the Gary Letter.  PX-607 (AR).  In that email, Uthmeier stated that he had "some new ideas/recommendations on *execution*" and that "our hook" was that "[u]ltimately, we do not make decisions on how the data should be used for apportionment, that is for Congress (or possibly the President) to decide."  PX-607 (AR) (emphasis added).  As with Comstock, Uthmeier's choice of words makes sense only if he understood that there was already a decision to "execut[e]."  Taken together, therefore, the record evidence reveals an agency staff in search of a rationale for a decision their boss had already made, before December 12, 2017.

171.    More broadly, the Court's conclusion is supported by the general chronology leading up to the decision, as revealed by evidence in the supplemented Administrative Record. That evidence makes clear that Secretary Ross and his staff did more than merely "inquire[] whether the [DOJ] would support, *and if so would request*, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act," AR 1321 (emphasis added) — although that alone would have been significant.  Instead, the evidence reveals that Secretary Ross was aggressively pressing to add a citizenship question to the census before the idea of justifying it on the basis of VRA enforcement was first floated, AR 3702, 3710; that, prompted by Neuman, Secretary Ross's own aides came up with the legal rationale DOJ could rely upon for addition of the question, PX-188 (AR), PX-565 (AR); that, believing they needed

another agency to justify adding the question, they actively lobbied other agencies to make the request and, when that initially proved unsuccessful, explored whether they could do it themselves, AR 12755-56; that, undeterred by the lack of any interest from DOJ staff, Secretary Ross intervened directly with Attorney General Sessions in order to secure the request they believed they needed, AR 1321, 2528, 2636, 4004; and that Secretary Ross's aides then fed DOJ with the rationale for the request rather than vice-versa, AR 2461; PX-607 (AR).

172.    Notably, all of this evidence is in the Administrative Record alone — not in Defendants' initial production, to be sure, but in the Administrative Record as stipulated by the parties. *See* Docket No. 523, at Joint Stip. ¶ 63.  What little evidence remains "outside" the Administrative Record after the parties' stipulations, however, only strengthens the conclusion that Secretary Ross had made his decision even before DOJ's request.  Most notably, Comstock — the aide more involved in Secretary Ross's early deliberations on the issue than any other — testified that the Secretary had made a "request" to add the citizenship question "sometime in the spring" — "[p]otentially" as early as March 10, 2017.  Comstock Dep. 146; *see also id.* at 337 (conceding that the "initial impetus for putting the citizenship question on the 2020 census" was Secretary Ross, not DOJ, and that, "shortly after he was confirmed," he "request[ed] the question be put on the census").[29]

---

[29]    At trial, Dr. Abowd testified that he did not believe that Secretary Ross had "already made up his mind" about adding a citizenship question to the census when the two met on February 12, 2018.  Tr. 1099-1100.  The Court declines to rely on that testimony for several reasons.  First, Dr. Abowd's testimony on this point is sheer speculation.  He was obviously not privy to what was actually going on in Secretary Ross's mind, and he based his opinion entirely on the fact that the Secretary "asked a lot of questions."  *See id.*  Second, Dr. Abowd was not privy to the voluminous evidence that has emerged in this litigation, and is described in this Opinion, demonstrating that Secretary Ross's mind was made up well before February 2018.  *See id.* at 1019-22.  Finally, Secretary Ross was well aware of the fact that his decision was likely to be challenged in court (if not in Congress), *see* AR 12476, and — as discussed below — he took various steps to paint his decision in the best possible light and to make it appear as if it was a good faith response to DOJ's request; thus, it would have been surprising had he revealed, in

173.     Secretary Ross's actual reasons for his decision are even foggier than the precise timing of his decision.  There is no writing of any kind — either in the Administrative Record or produced in discovery, either authored by Secretary Ross or by anyone else — that describes the reasons why Secretary Ross wanted to add a citizenship question within weeks of his confirmation as Secretary.  *See* AR 1-13024.  Moreover, Comstock testified that Secretary Ross never disclosed why he wanted to add a citizenship question to the census — *and* that Comstock never asked him, perhaps because Comstock believed that the reason might or might not be "legally valid."  Comstock Dep. 267; *see id.* at 112, 171-72, 251-55, 340-41.  Teramoto, Secretary Ross's own Chief of Staff, similarly testified that she had no knowledge of why Secretary Ross wanted to add a citizenship question.  Teramoto Dep. 32.

174.     While the Court is unable to determine — based on the existing record, at least — what Secretary Ross's real reasons for adding the citizenship question were, it does find, by a preponderance of the evidence, that promoting enforcement of the VRA was *not* his real reason for the decision.  Instead, the Court finds that the VRA was a *post hoc* rationale for a decision that Secretary had already made for other reasons.

175.     Once again, that conclusion finds support in the Administrative Record alone. For one thing, it finds support in the very same evidence that supported the conclusion that Secretary Ross committed to adding the citizenship question months before he even received the request from DOJ.  By definition, Secretary Ross's original and actual rationale could not have been promotion of better VRA enforcement because the record reveals that he had made up his mind well before DOJ even agreed to submit the request to him.

176.     Moreover, it finds support in the sheer number of Commerce Department

word or deed, that he had already made up his mind.

communications predating the DOJ letter — with staff, with Kobach, and with DOJ and DHS — none of which mention the VRA rationale, but all of which reflect Secretary Ross's anxious desire to add a citizenship question to the census.  *See, e.g.*, AR 763-64, 2424, 2458, 2521, 3710, 3984, 4004.  And it finds support in Comstock's aggressive — and initially unsuccessful — efforts to lobby DOJ and DHS officials with no responsibility for VRA enforcement.  *See* AR 2458, 2462; PX-298(R), at RFA 73, 91-95.  Those efforts make clear that the goal of Secretary Ross and his aides was to launder their request through another agency — that is, to obtain cover for a decision that they had already made — and that the reasons underlying any request from another agency were secondary, if not irrelevant.

177.    Once again as well, extra-record evidence merely strengthens the conclusion that Secretary Ross's actual rationale was something other than VRA enforcement — and that a belief that he needed another agency to request the question, rather than a belief that adding a citizenship question was necessary to enhance VRA enforcement, motivated his aggressive efforts to stimulate a request from DOJ.

178.    First, notwithstanding his otherwise self-serving testimony, Comstock conceded in his deposition testimony that he did not believe that Secretary Ross's unstated reasons to add a citizenship question in early 2017 would "clear [the] legal thresholds" set by OMB and federal law.  Comstock Dep. 153-54.  Indeed, he admitted that he viewed his job as finding a "legal rationale" to support the Secretary's request (and then finding an agency to make the ask) and that he did not "need to know what" the Secretary's actual "rationale might be, because it may or may not be one that is . . . legally-valid."  *Id.* at 181, 267.  That testimony constitutes a near-confession that the VRA rationale was a *post hoc* concoction to justify a decision made for other reasons — that is, that Comstock felt the need to launder the request through another agency.

179.    Second, there is reason to doubt that *DOJ itself* believed the VRA rationale in the

Gary Letter.  The VRA was enacted in 1965, fifteen years after a citizenship question last appeared on the decennial census questionnaire for all households.  Yet, until Secretary Ross and his senior aides planted the seed, DOJ had never before cited a VRA-related need for citizenship data from the decennial census; never before asserted that it had failed to bring or win a VRA case because of the absence of such data; and never before claimed that it had been hampered in any way by relying on citizenship estimates obtained from sample surveys.  After fifty-four years of VRA enforcement, it was the Department of Commerce that first proposed the idea.  In fact, DOJ did not even take the bait when Comstock first approached staff with the idea.  It was not until Secretary Ross intervened directly with Attorney General Sessions that DOJ agreed to carry the baton forward based on the rationale that Secretary Ross's aides had come up with.

180.    Additionally, AAAG Gore, the actual author of the Gary Letter, acknowledged that none of the DOJ components with principal responsibility for enforcing the VRA requested the addition of a citizenship question; instead, he drafted the letter solely in response to the Secretary's request. Gore Dep. 64-67, 94-95.  He also testified that he drafted the letter without knowing if citizenship data based on responses to a citizenship question on the census would have smaller or larger margins of error, or would be any more precise, than the existing citizenship data on which DOJ currently relies.  *See id.* at 225-28.

181.    Beyond that, the odd nature of DOJ's request and events thereafter suggest that the goal was not to obtain better CVAP data for purposes of VRA enforcement, but merely to provide cover for Secretary Ross's decision to add a citizenship question.  It would have been one thing for DOJ to ask the Commerce Department for better CVAP data and leave it to the Commerce Department, which is ultimately tasked with deciding how to obtain needed data, to figure out how best to meet that need.  But DOJ went further and, going beyond its role, explicitly asked the Commerce Department to add the citizenship question to the census.

182.    Of course, there is no mystery why DOJ did so.  By Secretary Ross's own admission, the Department of Commerce did not merely ask DOJ if existing data was adequate; instead, making clear that he had prejudged the solution to a problem that DOJ might or might not even have, he and his staff affirmatively asked DOJ if it "would support, and if so would request, *inclusion of a citizenship question*."  June 21 Supplemental Memo (emphasis added). And, despite the DOJ staff's own lack of interest, Attorney General Sessions was only happy to oblige.  As his aide put it to Teramoto: "[W]e can do whatever you all need us to do . . . .  The AG is eager to assist."  AR 2651.

183.    Further, when the Census Bureau sought to meet with representatives of DOJ to discuss other, less harmful ways of meeting its need for data, Attorney General Sessions vetoed any such meeting.  Had DOJ's interest genuinely been to get better CVAP data, rather than providing a *post hoc* rationale for Secretary Ross's resolve to add a citizenship question to the census, there is no explanation for that decision.

184.    Finally, the Court's conclusion is supported by the sheer number of ways in which Secretary Ross and his aides tried to avoid disclosure of, if not conceal, the real timing and the real reasons for the decision to add the citizenship question.  Those include:

- The curated and highly sanitized nature of the Administrative Record initially filed by Defendants in this matter, *see* Docket No. 193, at 1; July 3 Tr. 80-82, which (general background materials aside) omitted all materials relating to the deliberations and communications of Secretary Ross and his aides prior to the Gary Letter (despite Comstock's and Secretary Ross's acknowledgment as early as August 2017 of the need to be "diligent in preparing the administrative record," AR 12476);

- The lack of any record (even reconstructed) of various important steps along the way (despite, again, the stated intent to be diligent in preparing the administrative record), including but not limited to Secretary Ross's early discussions with other officials regarding addition of the citizenship question, *see* PX-302, at 2-3; Comstock Dep. 112; the September 6, 2017 meeting of Secretary Ross and his aides, *see* AR 1411-12, 1996-97; Comstock Dep. 221; Teramoto Dep. 58-61; Kelley Dep. 105-07; Secretary Ross's conversations with Attorney General Sessions that prompted DOJ to agree to request the question, Gore Dep. 83; and Secretary Ross's February 12, 2018 meeting with Dr.

Abowd and others from the Census Bureau — his one and only meeting with the technical experts at the Census Bureau, *see* AR 9450;

- The failure to disclose to subject matter experts at the Census Bureau that the issue was on the table prior to the Gary Letter, a failure that prevented those experts from conducting rigorous testing of the proposed question, Tr. 1018-22;

- The revisions to the Census Bureau's answer to Question Thirty-One, which were plainly intended to downplay the degree to which Secretary Ross departed from the process ordinarily used to consider new questions on the census, Tr. 965, 1010-11;

- The misleading, if not false, statements in the Ross Memo, including but not limited to its suggestion that Secretary Ross began considering the issue only after receiving the Gary Letter in December 2017, AR 1321, and the descriptions of the communications with Nielsen, *compare* Ross Memo 3, 6, at AR 1315, 1318, *with* Pierce Aff. ¶¶ 9, 10, 12-14;

- Secretary Ross's "admittedly imprecise," Petition for a Writ of Mandamus at 20, *In re U.S. Dep't of Commerce*, (Oct. 29, 2018) (No. 18-557), 2018 WL 5617904, at *24, if not false, testimony before Congress, including but not limited to his statements that he was "not aware of any" discussions with "anyone in the White House" (despite his own conversation with Bannon), that DOJ "initiated the request for inclusion of the citizenship question" (despite the fact that it was plainly initiated by the Commerce Department), and that he was responding "solely" to DOJ's request (despite the fact that it was he who had generated that request in the first place), *see* Recitation of Facts ¶¶ 70, 72, 98-102; and

- Comstock's misleading, if not false, testimony regarding the Census Bureau's analyses in this litigation, *see* Comstock Dep. 305-25.

Those acts and statements are not the transparent acts and statements one would expect from government officials who have decided, for *bona fide* and defensible reasons, to change policy. Nor are they the acts and statements of government officials who are merely trying to cut through red tape.  Instead, they are the acts and statements of officials with something to hide.

## STANDING

The Court begins its legal analysis, as it must, with the threshold question of whether any Plaintiff has standing to bring the claims asserted.  Defendants contend, as they have throughout this litigation, that the Court lacks subject-matter jurisdiction because Plaintiffs cannot prove — and, after trial, have not proved — that they have suffered, or will suffer, injury in fact that is fairly traceable to Secretary Ross's decision to add a citizenship question on the 2020 census.

*See* Defs.' Post-Trial Br. 8-44, 66-72.  Notably, although they filed over fourteen applications

seeking to avoid trial, Defendants now concede that trial was necessary to resolve the issue of

standing.  *See* Tr. 1421-22.[30]  Further, they concede that the Court may, and indeed should, look

at evidence beyond the Administrative Record to make findings of fact relevant to the standing

inquiry.  *See id.*  To avoid any confusion, the Court sets forth those findings separately in the

discussion that follows.  And for reasons the Court will explain, those findings compel the

conclusion that Plaintiffs do indeed have standing to assert their claims.

## A.  General Legal Standards

Article III of the United States Constitution extends the "judicial Power" of the United

States to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  This means that all suits filed in

federal court must be "cases and controversies of the sort traditionally amenable to, and resolved

by, the judicial process."  *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 102 (1998).  Courts

implement this limit on the judicial power by ensuring that at least one plaintiff in any federal

case has "standing."  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47,

53 n.2 (2006) (noting that, in a case with "numerous" plaintiffs, "the presence of one [plaintiff]

with standing is sufficient to satisfy Article III's case-or-controversy requirement"); *accord

Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).  Standing, in turn, is measured by a "familiar

three-part test," which requires a plaintiff to show (1) "an injury in fact, (2) that is fairly

---

[30]      In particular, Defendants conceded at oral argument that the Court could consider extra-record evidence in deciding whether Plaintiffs have Article III standing.  *See* Tr. 1502; *see also id.* at 1422.  Defendants continue to argue that Plaintiffs cannot show traceability as a matter of law — an argument the Court addresses in detail below — but they acknowledged at oral argument that the Court rejected that argument in its ruling on their motions to dismiss and that that ruling is law of the case.  *See id.* at 1501-04.  The net effect of these concessions is that trial was not only appropriate, but necessary on Defendants' own view of the case, making their repeated efforts to forestall trial particularly puzzling.  *See also New York*, 2018 WL 6060304, at *3.

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal quotation marks omitted); *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The plaintiff must make this showing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Ultimately, the facts "(if controverted) must be supported adequately by the evidence adduced at trial." *Id.* (internal quotation marks omitted).

Injury in fact is the "first and foremost of standing's three elements." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and alterations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (internal quotation marks omitted). An injury "need not be actualized" to satisfy Article III. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). A "future injury" can suffice, so long as it is "certainly impending, *or* there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 157 (2014) (emphasis added) (internal quotation marks omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (noting that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about").[31] Thus, for example, in a previous challenge to the conduct of the decennial census, the Supreme Court found that the plaintiffs had established standing "on the basis of the expected effects" of the challenged conduct "on intrastate redistricting" — in particular, based on a factual finding

---

[31]     Although earlier in this litigation Defendants contended that the "substantial risk" formulation applies only in food-and-drug cases, *see* Docket No. 190, at 4-5, they conceded at oral argument that the standard applies more broadly and is good law, *see* Tr. 1485.

that certain jurisdictions were "*substantially likely* . . . [to] suffer vote dilution in state and local elections." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332-33 (1999) (emphasis added) (internal quotation marks omitted). Ultimately, the injury-in-fact requirement is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List,* 573 U.S. at 158 (internal quotation marks omitted).

Standing's second element requires proof that the plaintiff's injury is "fairly traceable" to the defendant's challenged conduct. Put differently, "there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations and internal quotation marks omitted). Significantly, though, "[p]roximate causation is *not* a requirement of Article III standing, which requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (emphases added); *see also Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("[T]he 'fairly traceable' standard is lower than that of proximate cause."). That "requires no more than *de facto* causality." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.). Relatedly, for an injury to be "fairly traceable" to a defendant's conduct, that conduct need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). To be sure, traceability may be "substantially more difficult to establish" where it depends on a lengthier causal chain, including intervening actions by third parties, but it "is not precluded" in such circumstances. *Lujan*, 504 U.S. at 562. As the Supreme Court has explained, even where "standing depends on the unfettered choices made by independent actors not before the courts," choices that "the courts cannot presume either to control or to predict," the traceability requirement is nonetheless satisfied if the plaintiff "adduce[s] facts showing that those choices have been or will be made in

such manner as to produce causation and permit redressability of injury." *Id.*; *see also Bennett*, 520 U.S. at 169 (holding that where the defendant's conduct has a "determinative or coercive effect upon the action of someone else" the traceability requirement is satisfied).

Third and finally, a plaintiff's injury must be "redressable" by the relief sought — that is, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).  Although "the 'fairly traceable' and 'redressability' components of the constitutional standing inquiry were initially articulated" as "'two facets of a single causation requirement,'" there is a difference between them: "[T]he former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (quoting C. WRIGHT, LAW OF FEDERAL COURTS § 13, at 68 n.43 (4th ed. 1983)).  "[T]he very essence of the redressability requirement" is that a request for "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107.  But if there is "a likelihood that the requested relief will redress the [plaintiff's] injury," the requirement is satisfied.  *Id.* at 103; *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) ("[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

The Supreme Court's decision in *Davis* illustrates how these three requirements should be applied in cases that allege, at least in part, prospective risks of harm.  In *Davis*, a candidate for the House of Representatives challenged Section 319(a) of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, 109-11 (2002) (codified at 52 U.S.C. § 30117), which increased campaign contribution limits for any candidate whose opponent's

personal campaign expenditures exceeded her own by a certain amount. *See Davis*, 554 U.S. at 729.  The Federal Election Commission argued that Davis lacked standing to challenge the provision for two reasons: first, when he filed the lawsuit, his personal expenditures had not yet triggered the heightened contribution limits for his opponent; and second, once his expenditures did trigger the heightened limits (after the lawsuit was filed), Davis's opponent chose not to take advantage of them. *See id.* at 734.  The Court swiftly rejected those arguments in an opinion by Justice Alito that was joined in relevant part by every member of the Court. *See id.* at 752 n.4 (Stevens, J., dissenting).  The standing inquiry, Justice Alito explained, is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Id.* at 734.  At that time, Davis "had declared his candidacy and his intent to spend more" than the relevant threshold, and "there was no indication that his opponent would forego" the benefits of Davis' choice — namely, the heightened contribution limits. *Id.*  Moreover, the record "indicated that most candidates who had the opportunity to receive expanded contributions had done so." *Id.* at 735.  "In these circumstances," the Court concluded, "Davis faced the requisite injury from § 319(a) when he filed suit." *Id.*

*Davis* yields three insights relevant here.  First, it establishes that, in regulating the federal courts' power to dispense prospective relief, Article III is concerned with the *risk* of future injury, rather than its ultimate realization.  After all, the Court found that Davis had standing even though the harm he feared never materialized.  Second, the opinion makes plain that the risk of future injury may satisfy Article III's injury and causation requirements even if several steps on the causal chain still stand between a defendant's conduct and the plaintiff's injury when the case is filed.  Davis, for example, was at least three steps away from suffering any concrete harm: He had to spend a sufficient amount of his own money; his opponent had to refrain from a comparable level of self-funding, *see id.* at 729 & n.5 (explaining that the

heightened contribution limits were triggered when "a statistic that compares the expenditure of personal funds by competing candidates" reached a particular level); *and* his opponent had to then take advantage of the law by accepting heightened contributions.  Even so, the Court found that Davis faced "a real, immediate, and direct injury . . . when he filed suit."  *Id.* at 734.

Third, and related, *Davis* underscores that, under longstanding precedent, a party can establish standing to challenge government action even where its theory of injury depends on "choices made by independent actors not before the courts," so long as — through statistical analysis, common sense, or record evidence — the court can "predict" that those independent actors will respond to the government action in a way that causes the injury.  *Lujan*, 504 U.S. at 562 (internal quotation marks omitted).  In *Davis*, the plaintiff's theory of injury depended on the assumption that his opponent would be sufficiently incentivized to take advantage of the heightened contribution limits, once triggered.  The Court deemed that assumption valid based on little more than evidence that "*most* candidates who had the opportunity to receive expanded contributions had done so."  *Id.* at 735 (emphasis added).  Notably, the Court did not require proof that the government conduct had a coercive effect on the third party's action; evidence that allowed the Court to predict how the third party would likely act in response to the government action was sufficient.  *See id.*; *see also Lujan*, 504 U.S. at 562 (noting that, when injury depends on the conduct of third parties, it is sufficient to show "choices have been or *will be* made in such a manner as to produce causation and permit redressability" (emphasis added)); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104-05 (2d Cir. 2018) (finding "the agency's own pronouncements," as well as "[c]ommon sense and basic economics," supported a conclusion that an "increased penalty has the potential to affect [third parties'] business decisions and compliance approaches" in a manner that would result in harm to the petitioners (internal quotation marks omitted)); *Texas v. United States*, 809 F.3d 134, 156 (5th

Cir. 2015) (finding that Texas had established the necessary causal connection between the

Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program

and a future injury because DAPA would have "enabled" third parties "to apply for driver's

licenses" and there was "little doubt that many would do so"), *aff'd by an equally divided Court*,

136 S. Ct. 2271 (2016).

**B.  Findings of Fact Related to Standing**

As noted, the three elements of standing must be established "in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Accordingly, at this stage, standing must be supported by undisputed facts or by a preponderance

of "the evidence adduced at trial." *Id.* (internal quotation marks omitted); *see* Defs.' Post-Trial

Br. 67, ¶¶ 7, 9 (agreeing that the relevant standard is a preponderance of the evidence); Tr. 1477-

78 (same).  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and based on the

extensive record compiled at trial, the Court therefore makes the following findings of fact with

respect to Plaintiffs' standing.  Although, as noted, "the presence of one party with standing is

sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld*, 547 U.S. at 53 n.2,

in the interest of making a comprehensive record so as to facilitate appellate review and avoid

the need for remand, the Court makes findings of fact — and, below, arrives at conclusions of

law — with respect to most, if not all, Plaintiffs.[32]

**1.  Background**

185.    The goal of the census is to count everyone residing in the United States, but the

census has never achieved that goal.  *See* Census Bureau 30(b)(6) Dep. 254.  In each census,

---

[32]    To avoid confusion, the Court picks up the paragraph numbers from where the recitation
of facts set forth above left off.

some people are "counted twice" (referred to as "erroneous enumerations") and others are not counted at all (referred to as "omissions"). *Id.* When the number of omissions exceeds the number of erroneous enumerations, the final census tally undercounts the actual total population. This phenomenon is called a "net undercount." *See* Joint Stips. ¶ 25; *see also* Tr. 1366-67. Additionally, even when there is no net undercount of the total population, the census may still undercount certain groups of people relative to other groups. *See id.* This is called a "net *differential* undercount" of a particular group. *See* Joint Stips. ¶ 25.

186. The Census Bureau has identified certain "hard-to-count" groups that, historically, have proved especially difficult to count completely and accurately. Joint Stips. ¶ 21. Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been among the hardest groups to count. *See id.* ¶ 22.

187. The Census Bureau has developed a range of strategies to reach such hard-to-count populations. *Id.* ¶ 26. The strategies include targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and employment of staff with foreign language skills. *See id.* For example, in the 2000 and 2010 censuses, the Census Bureau used public advertising campaigns that included paid media in over a dozen languages to reach hard-to-count immigrant communities and to improve their responsiveness. *See id.* ¶ 27. The Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to improve the accuracy of the count. *Id.* ¶ 28.

188. Despite these efforts, net differential undercounts have persisted for certain hard-to-count groups. In the 1990 census, for example, Hispanics were undercounted by almost five percent. *Id.* ¶ 23. The 2010 census similarly undercounted Hispanic and other populations; in

total, it undercounted more than 1.5 million Hispanic and African-American people.  *Id.* ¶ 24.[33]

**2.  The Citizenship Question Will Cause a Differential Decline in Self-Response Rates**

189.     The central pillar of the Census Bureau's efforts to count everyone — and the means through which the majority of people are counted, AR 172 — is self-response to a questionnaire that the Census Bureau tries to send to every housing unit in the United States, *see* Joint Stips. ¶ 7.  If there is net differential decline in self-response rates among a particular group (in other words, if the rate of self-response to the census questionnaire declines by a certain amount among a particular group, but not other groups) then that decline will, if left uncured, translate into a net differential undercount of that group (in other words, an undercount of that group that does not affect other groups).[34]  Plaintiffs have proved that the addition of a citizenship question will cause precisely that outcome with respect to noncitizen and Hispanic households.  Moreover, with respect to the net differential decline in self-response rates among noncitizen households, Plaintiffs have also proved the likely *amount* of the decline.  With respect to Hispanic households, by contrast, Plaintiffs have managed to prove only that there will be such a decline; the evidence is not sufficient to quantify the decline.

---

[33]     The Census Bureau measures the accuracy of each census by conducting a post-enumeration survey in the summer of every decennial census year.  *See* Tr. 400-01.  The post-enumeration survey — known in 2010 as the "Census Coverage Measurement" — involves sending another group of enumerators to a subsample of about 180,000 American households to "conduct what amounts to another enumeration."  *Id.* at 401.  The survey produces a data set that allows the Census Bureau to measure the quality of the data produced by the decennial census enumeration.  *See id.* at 401-02.

[34]     When the Court says that the citizenship question will cause a "net differential decline" in self-response rates among noncitizen households, it is describing an incremental effect of the citizenship question that is unique to noncitizen households — that is, that the citizenship question will cause a decline in self-response rates among noncitizen households that will not occur among all other households.  Similarly, when the Court says that such a decline will translate into a "net differential undercount" of people who live in noncitizen households, it is describing an incremental effect of the citizenship question that is unique to those people — that is, that people who live in noncitizen households will suffer an undercount that will not occur among other people.

190.     The Court begins, as the census does, with self-response to the census questionnaire.  The evidence in the trial record overwhelmingly supports the conclusion that the addition of a citizenship question to the 2020 census will cause a significant net differential decline in self-response rates among noncitizen households (that is, households with at least one noncitizen).  Significantly, that is the Census Bureau's *own* considered view.  *See, e.g.*, Brown Memo at 39, 54.  Indeed, several persuasive Census Bureau analyses support this position, and no evidence in the record — from Defendants or otherwise — contradicts it.  Defendants do attack the Census Bureau's own analyses in one respect, discussed below, but the proposition that addition of the citizenship question will cause a net differential decline in self-response rates among noncitizen households is otherwise undisputed.

191.     The Census Bureau's conclusions are spelled out in three memoranda.  First, the Census Bureau's December 22 Memo summarized evidence that a citizenship question would cause a then-estimated 5.1% decline in self-response rates among noncitizens.  *See* December 22 Memo, at AR 11639-40.  It noted that "this evidence is consistent with citizenship questions being more sensitive for household with noncitizens," *id.* at AR 11640, a fact that is not in dispute, *see* PX-297 at RFA 70.

192.     Second, the Census Bureau's January 19 Memo similarly concluded that addition of a citizenship question would reduce self-response rates.  *See* January 19 Memo, at AR 1280.  The Memo summarized "[t]hree distinct analyses" that "support the conclusion of an adverse impact on self-response" caused by the addition of a citizenship question.  *Id*.  First, data show that, on the ACS survey, Hispanic households are disproportionately less likely to respond to the citizenship question, whether responding by mail or online.  *Id.*  Second, a comparison of self-response rates for the 2000 census's long-form census questionnaire (which included a citizenship question) and its short-form census questionnaire (which did not) revealed that

noncitizen households were 3.3% less likely than all-citizen households to respond to the long-form questionnaire. *Id.* A similar comparison of 2010 census self-response rates to 2010 ACS self-response rates (the latter of which included a citizenship question) produced a similar result: Noncitizen households were 5.1% less likely than all-citizen households to respond to the survey containing a citizenship question. *See id.* Based on these comparisons, the Memo noted, it was a "reasonable inference that a question on citizenship would lead to some decline in overall self-response" and "a larger decline in self-response for noncitizen households." *Id.* at AR 1281. Finally, the Memo analyzed the "breakoff rates" (the rate at which a respondent stops responding to the survey when he or she comes to a particular question) on the 2016 ACS internet survey. Those rates indicated that Hispanics were disproportionately likely to "breakoff" in their responses when they came to the citizenship question. *See id*.

193.    Third, a comprehensive study by Census Bureau staff published on August 6, 2018 and referred to at trial as the Brown Memo (so named for its lead author) consolidated the existing data on the impact of a citizenship question. The Brown Memo also concluded that a citizenship question would disproportionately reduce noncitizens' self-response rates. *See* Brown Memo at 1, 54. The Brown Memo presented data illustrating that Hispanics and noncitizens are disproportionately unlikely to respond to a citizenship question. *See id.* at 7-9. The data also showed that those subpopulations became even less likely to respond to a citizenship question during the middle of this decade. *See id.* at 9-10 ("[T]hat sensitivity has increased in recent years.").

194.    Whereas the January 19 Memo had predicted that addition of the citizenship question would cause a 5.1% differential decline in noncitizen household self-response rates, *see* January 19 Memo, at AR 1280, the Brown Memo updated that figure to 5.8% on the basis of more recent data, *see* Brown Memo at 39. Notably, it emphasized that the 5.8% estimate was

still "conservative." *Id.*; *see also* Tr. 900-01.  It was conservative, the Memo explained, because the analysis supporting the estimate relied on ACS data, and the effect of a citizenship question on the ACS may have been muted by its presence among the large number of questions.  *See* Brown Memo at 39; *see also* Tr. 87, 89, 901-02.  A citizenship question on the shorter 2020 census questionnaire "will be more visible" and thus likely to produce a more pronounced effect. Brown Memo at 39.  And changes in the macroenvironment since the ACS data was collected, including a higher "level of concern about using citizenship data for enforcement purposes," could also exacerbate the effects of adding a citizenship question.  *Id.*

195.    Separate and apart from its effects on self-response rates among noncitizen households, the Brown Memo supports the conclusion that adding a citizenship question to the 2020 census will disproportionately depress self-response rates among Hispanic households (some, but not all, of which are also noncitizen households).  The Brown Memo showed that Hispanics were more than twice as likely as non-Hispanic whites to skip the citizenship question on the ACS and that the differential in such item nonresponse rates increased between 2013 and 2016.  *Id.* at 8-10.  Other ACS questions did not produce the same differential effects.  *See id.* And the Memo found that the citizenship-question breakoff rate for Hispanics on the ACS was eight times higher than the breakoff rate for non-Hispanic whites.  *See id.* at 10; *accord* January 19 Memo, at AR 1281.

196.    As the Census Bureau has observed, this differential breakoff effect is growing. The breakoff rate among Hispanics for the 2017 ACS citizenship question (which was not available in time to be incorporated into the Brown Memo's analysis) was *twelve* times higher than the breakoff rate for non-Hispanic whites.  *See* AR 12757-62; Tr. 916.  Moreover, the breakoff rate for Hispanics, but not for non-Hispanic whites, increased between 2016 and 2017 — suggesting that the effects of a citizenship question on Hispanic self-responses have been

"increas[ing]."  AR 12757-62; Tr. 916-17.  The Census Bureau believes that "Hispanics are more sensitive to survey questions about citizenship than they were a few years ago"; non-Hispanic whites "are not."  Census Bureau 30(b)(6) Dep. 366-69.

197.    Defendants' expert, Dr. Abowd, credibly testified to the soundness of the Census Bureau's analyses and conclusion that adding a citizenship question to the 2020 census would result in a differential decline in self-response rates among noncitizen households.  With regard to methodology, Dr. Abowd testified not only that the Brown Memo was "methodologically appropriate," but also that it "constitutes the best analysis that the Census Bureau can do of the consequences of adding the citizenship question to the 2020 census" given the available data. Tr. 897.  With regard to conclusions, Dr. Abowd testified that both he and the Census Bureau agreed that adding a citizenship question to the 2020 census would lead to a lower self-response rate among noncitizen households.  *See id.* at 881-82.[35]  Finally, Dr. Abowd agreed that "[t]he bulk of the evidence suggests that the citizenship question is likely to be responsible for the decline in self-response," and that 5.8% was a "conservative estimate" of the likely differential decline in self-response rates among noncitizen households if a citizenship question were added to the 2020 census questionnaire.  *Id.* at 1352, 900-02.

198.    Dr. Abowd testified that considerations beyond those mentioned in the Brown Memo further supported the view that the 5.8% estimate was "conservative."  *See id.* at 944.  For instance, he referred to the Census Bureau's Census Barriers, Attitudes, and Motivators Survey ("CBAMS").  *See id.*; PX-662.  The CBAMS found that, in 2018, only 67% of people said they were likely to respond to the 2020 census, as compared to the 86% who had said in 2008 they

---

[35]    Dr. Abowd also agreed with the Census Bureau's conclusion, based on ACS data, that citizenship questions lead to greater breakoff rates among Hispanics than among non-Hispanic whites.  *See* Tr. 910, 914-17.

were likely to respond to the 2010 census.  *See* PX-662, at 12.  It noted that "[t]he citizenship question may be a major barrier" in part because people believed that the census's "purpose is to find undocumented immigrants."  *Id.* at 43.  Dr. Abowd testified that the increase in sensitivity to a citizenship question reflected in the CBAMS study "would not be captured in the 5.8 percentage point estimate that is based on data only up through 2016."  Tr. 944-45; *see also id.* at 902, 916-17.

199.    Testimony from at least three of Plaintiffs' expert witnesses bolsters the Census Bureau's and Dr. Abowd's conclusions about self-response rates.  First, Dr. D. Sunshine Hillygus credibly and reliably testified that "noncitizens and Hispanics are differentially concerned about the confidentiality of a citizenship question" and, thus, "would be less likely to participate" in a survey that includes such a question.  *See id.* at 50-51; *see also id.* at 57-58.  She noted that this concern has increased in the last few years.  *Id.* at 51-53.  Notably, Dr. Hillygus testified that a citizenship question would be likely to affect the response rates of all Hispanics, "regardless of their own immigration or citizenship status."  *Id.* at 51-52, 1404; *see also* PX-152; PX-662; PX-663.  That testimony is supported by evidence showing that Hispanics who are citizens are disproportionately hesitant to engage with the government by seeking food stamps or health care out of fear that a family member could be deported.  *See* Tr. 52-54, 57, 85-86.

200.    Second, Dr. Matthew Barreto, "an expert in survey methodology, public opinion polling, and racial and ethnic politics," credibly testified that "the addition of a citizenship question . . . in today's macro environment would result in reduced participation in Latino and immigrant communities in 2020."  *Id.* at 589, 620-21.  He based this conclusion on a review of existing social science literature and on the results of a public opinion survey that he designed and conducted.  *See id.* at 620, 643-44.  On the basis of that evidence, Dr. Barreto credibly concluded that Hispanic households would be substantially less willing to participate in the

census if there were a citizenship question, regardless of whether they were given assurances that their responses would be kept confidential.  Tr. 682-85; *see also* PX-670.[36]

201.    Third, Dr. Jennifer L. Van Hook's expert analysis of 2017 ACS data demonstrates that nonresponse to the ACS citizenship question has continued to increase among Hispanics relative to other subgroups since 2013.  *See* Docket No. 489-3 ("Van Hook Decl."), ¶¶ 69-71. By contrast, there has not been a significant increase in nonresponse rates for the citizenship question for other racial groups.  *See id.* ¶ 70.  On an absolute basis, nonresponse rates for the citizenship question for Hispanics have also increased since 2013.  *See id.* ¶¶ 72-73.[37]

202.    Amazingly, despite all of the foregoing evidence — much of it from Defendants' own expert witness and the Census Bureau itself — Defendants contend that Plaintiffs failed to prove that addition of a citizenship question will cause these differential declines in self-response rates.  *See* Defs.' Post-Trial Br. 8-16; *see, e.g.*, *id.* at 9-10, ¶¶ 94, 96.  But that contention is

---

[36]    The Court puts only limited weight on Dr. Barreto's study.  As Dr. Abowd pointed out, several considerations cast doubt on the results of the study.  First, the study asked only about respondents' intentions to self-respond — as opposed to measuring actual behavior in the field. Second, the survey's response rate was only twenty-nine percent.  And third, the resulting data set was not weighted to match population totals.  *See* Tr. 1162-64; *see also id.* at 742.  That said, as Dr. Abowd himself conceded, the study does provide some "additional evidence" to support the Census Bureau's own conclusion that "[t]he presence of a citizenship question on the 2020 census is likely to depress self-response rates, and the people who are not likely to self-respond are going to be more difficult to follow up."  *Id.* at 1164.  Moreover, as Dr. Abowd's testimony further confirmed, Defendants go too far when they maintain that Dr. Barreto's study could not provide "actionable information" because the only way to do so would be to run a true randomized controlled trial.  Defs.' Post-Trial Br. 14, at ¶ 115.  Indeed, the Census Bureau itself took a different view of what constituted "actionable information" for purposes of the 2020 census, declining to run a randomized controlled trial of its own and instead relying on its own internal, "natural experiment" analysis.  *See infra* ¶ 240.

[37]    The Court relies on this portion of Dr. Van Hook's testimony, which it finds to be credible and reliable.  But it declines to rely on any other portion of Dr. Van Hook's testimony because, as Defendants point out, other portions of that testimony included several significant errors that cast doubt on its reliability.  *See* Defs.' Post-Trial Br. 11-14, ¶¶ 104-112; *see, e.g.*, Tr. 219-38.  There is also reason to doubt the soundness of Dr. Van Hook's methodology because it involved extrapolating from Current Population Survey ("CPS") data and there are significant differences between the CPS and the decennial census.  *See* Tr. 206-09.

without merit.  First, it is based on a mischaracterization of the record evidence.  For example, Defendants urge the Court to adopt a factual finding that, "[w]hile the balance of available evidence suggests that including a citizenship question on the 2020 Census *could* lead to a lower self-response rate in households that potentially contain a noncitizen, the magnitude of any such decline is unknown."  *Id.* at 9, ¶ 93 (emphasis added and citation omitted).  It goes without saying that the magnitude of any decline in self-response to the 2020 census questionnaire is, today, "unknown" (since the census has not yet occurred).  But the weight of the evidence definitively shows the most that evidence about future events can ever show: a probable range of "magnitudes," all illustrating the overwhelming likelihood that the "magnitude" of the differential decline in self-responses among noncitizens and Hispanics will be quite high — in the case of noncitizen households, conservatively estimated to be 5.8% or higher.

203.    Second, Defendants' argument fails because it relies heavily on misguided criticism of the Census Bureau's own research.  For instance, Defendants argue that the Brown Memo "cannot assign causation to the citizenship question" because it is merely a "natural experiment," as opposed to "a randomized control trial," and because it "did not, and to a certain extent could not" control for every confounding variable.  Defs.' Post-Trial Br. 10, ¶ 96.  But the Brown Memo *did* conceive of, and control for, numerous potentially confounding variables in its analysis of the citizenship question's effect on self-response rates.  *See* Brown Memo at 74-77 (Tables A13-A14); Tr. 1151.  As Dr. Abowd explained, for example, the factors controlled for in that analysis were the "groups of questions that . . . might plausibly be related to other sensitive questions for some subpopulation."  Tr. 1150.  That is, although it is true that no "natural experiment" could ever control for *all possible* confounding factors, this experiment *did* control for all *plausible* confounding factors associated with other questions on the ACS.  *See id*; *see also id.* at 1150-55.  And, although Defendants argue that the Brown analysis did not control for

the sheer length of the ACS, *see* Defs.' Post-Trial Br. 10, ¶ 96, the Brown analysis largely did control for that factor by controlling for household size, "which has the biggest effect on the number of questions that you have to answer in the [ACS]."  Tr. 1152.

204.   Finally, Defendants suggest that the Brown Memo is incomplete because it "could not account for the changing macro environment" and that it could be that the macroenvironment, rather than the citizenship question, explained why noncitizen households responded to the ACS at lower rates than all-citizen households.  *See* Defs.' Post-Trial Br. 10, ¶ 96.  But, as Dr. Abowd explained, the macroenvironment is "constant" or "almost constant" across the groups.  Tr. 1153.  That means that even though the kind of natural experiments described in the Brown Memo "can't make . . . sophisticated controls for the macro environment," *id.*, any meaningful effects should be muted because the same macroenvironment affects all ACS respondents.

205.   In sum, the trial evidence clearly shows, and certainly shows by a preponderance of the evidence, that the citizenship question will cause a significant differential decline in self-response rates among noncitizen households.  Notably, even Defendants conceded at oral argument that there is "credible quantifiable evidence" that "the citizenship question could be expected to cause a decline in self-response."  Tr. 1453.

206.   More specifically, the Court finds that the addition of a citizenship question to the 2020 census will cause an incremental net differential decline in self-responses among noncitizen households of at least 5.8%.  The Court further finds that that estimate is conservative and that the net differential decline could be much higher.  Further, the evidence demonstrates, and the Court finds, that the citizenship question will also cause a significant decline in self-response rates among Hispanic households.  Although it is harder to quantify the likely magnitude of that decline (or to isolate the decline from the citizenship question's effects on self-response rates

among noncitizen households) based on the record here, the evidence of a decline in self-response rates among Hispanic households supports the overall conclusion that the 5.8% estimate captures only part of the citizenship question's differential effects.

### 3.   NRFU Operations Will Not Cure the Differential Drop in Self-Response Rates

207.    The Court turns next to the Census Bureau's procedures (referred to as Non-Response Follow-Up, or NRFU) for attempting to make up for the large number of households that do not self-respond to the census questionnaire.  If a known household fails to self-respond, it is shifted into the Census Bureau's NRFU workload.  *See* Joint Stips. ¶ 8.  NRFU includes a range of operations designed to obtain data about those households that do not volunteer the information themselves: in-person visits to households by "enumerators"; use of administrative records; collection of information from "proxies," such as neighbors or landlords; and "imputation," a process through which the Census Bureau extrapolates data about households from supposedly comparable household data.  *See id.* ¶¶ 9-12; Tr. 33-34; *see also* 83 Fed. Reg. 26643, 26648-49 (June 8, 2018) (admitted as PX-655).  NRFU efforts in prior censuses have involved all of these methods, with the exception of a new proposed use of administrative records at one step in the process.  *See* Census Bureau 30(b)(6) Dep. 400-01.  The evidence demonstrates that each of NRFU's steps will replicate or exacerbate the effects of the net differential decline in self-response rates among noncitizen households.

208.    Even before the addition of the citizenship question, the Census Bureau had been anticipating a somewhat larger NRFU workload for the 2020 Census.  Rates of self-response to Census Bureau surveys have been in general decline, "as people are overloaded with requests for information and [are] increasingly concerned about sharing information."  AR 162, 172.  With the addition of the citizenship question and the corresponding decline in self-response rates it will cause, however, the Census Bureau now expects a previously unanticipated increase in

NRFU cases.  *See* January 3 Memo, at AR 5474; Brown Memo at 43.  That is, the decline in self-response rates caused by the citizenship question will force the Census Bureau to "try to enumerate more people through nonresponse follow-up efforts."  Tr. 950-52; *see also* January 19 Memo, at AR 1279-82.  Moreover, because the decline in self-response rates will be disproportionately greater among noncitizens and Hispanics, the Census Bureau expects an increased use of NRFU operations in an effort to enumerate a disproportionate number of noncitizen and Hispanic households.  *See* Brown Memo at 42-43.

209.    The resulting increase in NRFU workload will be enormous.  The Census Bureau estimates that nearly ten percent of all households "potentially contain at least one noncitizen." Brown Memo at 42.  Based on this, it estimates that the addition of a citizenship question will cause approximately 2,090,000 additional households (approximately 6.5 million additional people) to go into its NRFU procedures, because of the citizenship question's effects on self-response among noncitizen households alone.  *See id.*

210.    The Census Bureau strives to maximize self-response rates — rather than relying on the collection of data through NRFU operations — for two reasons.  First, NRFU operations are more expensive than self-response, so maximizing self-response reduces the costs of administering the census.  *See* Tr. 33.  Second, the data collected through self-response is more accurate and complete than the data collected through NRFU operations.  *See id.* at 33-35, 292, 325.  Accordingly, the Census Bureau places a high priority on obtaining self-responses from as many households as possible.  *See* AR 163, 165.

211.    Significantly, NRFU has not remedied net undercounts in prior censuses.  For example, in prior censuses, the net undercounts of Hispanics were estimated at 1.54% (2010), 0.71% (2000), and 4.99% (1990) even after NRFU procedures.  *See* PX-267, at 18 (Table 7); *see also* Tr. 1364-65.  As Dr. Hillygus testified, these translated into differential undercounts of

Hispanics, as compared to non-Hispanic whites, of 2.38% (2010), 1.84% (2000), and 4.31%

(1990).  *See* Tr. 95-97.

212.    Moreover, historical data show that substantial post-NRFU undercounts can

manifest in specific locations, including at the neighborhood level.  *See* Tr. 407, 412-14, 416,

452-53.  The 2010 Census, for example, omitted approximately 65,000 people in minority

neighborhoods of Brooklyn and Queens, despite NRFU efforts.  *See id.* at 452-53.  That 2010

undercount involved an erroneous enumeration (that is, an overcount) of 8.4% in non-Hispanic

white neighborhoods and an omission (that is, undercount) of over 10% in high-minority

neighborhoods of Brooklyn.  *See id.* at 412-413, 414, 452-53.  Thus, although there was no net

undercount in Brooklyn as a whole, the offsetting enumeration errors and NRFU failures yielded

erroneous data at the neighborhood level.  *See id.* at 412, 414.

213.    The record shows that if a citizenship question is added to the 2020 census,

NRFU procedures will fail to cure the resulting differential decline in self-response rates among

noncitizen and Hispanic households.  As the Court lays out in more detail below, each step of the

NRFU process will fail to prevent such a decline from translating into a differential undercount

of people who live in such households, and will likely even exacerbate the problem.

214.    In the first place, the evidence shows that NRFU cannot — and does not even try

to — fix undercounts caused by households leaving certain individual members off their

questionnaire, a phenomenon that will be more common among noncitizen and Hispanic

households.  That is, when a household *does* self-respond, but omits one or more household

members from its response, the Census Bureau simply assumes it has counted everyone at that

address.  NRFU does not even attempt to fix this problem, meaning that the uncounted

household member will stay uncounted.  *See* Tr. 1309-10; Census Bureau 30(b)(6) Dep. 459.

This precise phenomenon has contributed to net undercounts of certain subpopulations in the

past — including Hispanics.  *Id.* at 1306; *see* Census Bureau 30(b)(6) Dep. 394.  And indeed, the evidence shows that noncitizens and Hispanics are both disproportionately likely to be omitted from self-responses in this way, particularly if the citizenship question is added to the census. *See* Tr. 124-26; *see also id.* at 1308-10.  Dr. Abowd testified that it is "fair" to say that NRFU "would not meaningfully address" any undercount caused by this type of omission.  *Id.* at 1326. In fact, because such households would count as having self-responded, they would never enter the NRFU workload, and, for that matter, would not even count toward the 5.8% decline in self-response.  That is, the phenomenon of household roster omissions helps explain both why the 5.8% figure is conservative and why NRFU will fall short.

215.   Second, even where NRFU does attempt to address the decline in self-responses among noncitizen households, it is at least as likely to fail at that task as the decline in self-response is likely to occur in the first place.  This is because many of the reasons that the citizenship question will cause a decline in self-response also apply to NRFU, and will also make NRFU less effective at remedying that decline.  For example, to the extent that the macroenvironment will magnify the effects of the citizenship question on self-response, it will also render NRFU operations less effective among the subpopulations that are less likely to self-respond.  *See* Census Bureau 30(b)(6) Dep. 314-15; Tr. 96, 100.  As Dr. Abowd testified, the Census Bureau has not tested the efficacy of NRFU operations in the presence of a citizenship question.  Tr. 1303.  Plaintiffs, on the other hand, introduced persuasive evidence that NRFU operations will not succeed in remedying the differential decline in self-response caused by the addition of the citizenship question because each successive step of the NRFU process will reinforce or exacerbate the differential undercount of noncitizens and Hispanics.  As the Court discusses below, this will happen in four primary ways: (1) noncitizens and Hispanics who do not self-respond to the census because of the presence of a citizenship question are similarly

unlikely to respond (or to give a complete response) to in-person NRFU enumerators; (2) in some cases, NRFU will enumerate non-self-responding households using administrative records that, while the most accurate source of citizenship information, still tend to undercount noncitizens; (3) to the extent NRFU relies on "proxy" responses from third parties, those proxies are disproportionately unlikely to give information about noncitizen and Hispanic households and likely to underestimate their size when they do; and (4) imputation will reinforce or exacerbate the net differential undercount because it will extrapolate data about uncounted households — including a disproportionate number of noncitizen and Hispanic households — from a data set in which noncitizens and Hispanics are disproportionately underrepresented.

216.    To begin, NRFU's first step — an in-person visit from a NRFU enumerator — is likely to disproportionately undercount noncitizens and Hispanics.  As the Census Bureau itself acknowledges, households that refuse to self-respond to the census questionnaire because of the presence of a citizenship question are "particularly likely to refuse to respond in NRFU as well." March 1 Memo, at AR 1311.  The Census Bureau's specific analysis of the effect of the citizenship question on the NRFU process bears this out: That analysis concluded that "[h]ouseholds deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door."  Brown Memo at 41; *see also id.* at 42 n.19; Census Bureau 30(b)(6) Dep. 425; Tr. 1336-37.  Defendants' own expert, Dr. Abowd, testified that the same considerations leading such households not to self-respond are likely to lead them not to respond to NRFU in-person enumerators.  Tr. 1312.  And as the authors of the Brown Memo concluded, given this resistance to in-person enumerators, the undercount attributable to a citizenship question "may not be avoidable . . . by spending more money on fieldwork.  Once a household decides not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on their door."  Brown

Memo at 43 n.60.  Based on the evidence, the Court finds that households that do not self-respond to the census questionnaire because of the citizenship question are similarly unlikely to respond to NRFU enumerators — or to give a complete and accurate accounting of the people who live in their households when they do.  This step in NRFU will therefore only replicate the citizenship question's differential effects on self-response, thereby failing to counteract a differential undercount of people who live in noncitizen and Hispanic households.

217.    The same will be true of what comes next for some households, after in-person NRFU attempts fail — the use of administrative records.  After a NRFU enumerator's first visit to an address, if high-quality administrative records about that address are available, *see* AR 67 & n.4, the enumerator may consult those records to determine whether the address is vacant or should be deleted from the Master Address File or MAF, or even to enumerate the people who live there.  *See* Tr. 1116, 1201-02, 1207-08; *see also* 83 Fed Reg. at 26649.[38]  But the use of administrative records in these ways will reinforce, rather than cure, the differential undercount of noncitizens and Hispanics.

218.    First, although the evidence does not strongly suggest that it will disproportionately affect noncitizen or Hispanic households, using administrative records to mark addresses as vacant or for deletion from the MAF will negatively affect the quality of data obtained through NRFU procedures.  When an address is marked as "vacant" or flagged for deletion from the MAF, it is "enumerated" as containing no people, and all further efforts to

---

[38]    An address is marked as "vacant" if NRFU procedures (including, in 2020, both in-person visits and administrative records, *see* Tr. 1117-18) indicate that the housing unit at that address is unoccupied.  An address is marked as "delete" if NRFU procedures determine that it should be removed from the MAF altogether because it has been demolished, is nonresidential, or is deemed uninhabitable.  *See* AR 67 & n.4.  Once an address is marked as "vacant" or "delete," the Census Bureau mails it one final postcard encouraging self-response and then removes it from the NRFU workload, ending its attempts to enumerate any people living there. *See* 83 Fed. Reg. at 26649; Tr. 312.

count people living there stop; no subsequent imputation is made to count people at that address. *See* Tr. 368.  Put differently, "[i]mputation," the next step in NRFU, "is not required because you have essentially said there aren't any people there."  *Id*. at 367.  But, according to the Census Bureau's own limited studies, roughly twenty percent of addresses that administrative records suggest should be deleted or marked as vacant are actually occupied.  *See id.* at 314; *see also id.* at 1199.  Nor do the Census Bureau's future plans to address this error rate — which include adding an additional direct visit by an enumerator before marking an address "vacant" or "delete," *id.* at 1199-1200 — solve the problem.  As a preliminary matter, it is not clear that the Court can even consider that possibility given that the parties' stipulations about NRFU procedures do not include such a step.  *See* Joint Stips. ¶¶ 8-11.  But it is not clear that the plans will reduce the error either.  The Census Bureau has performed no testing of how effective the new procedures will be.  *See* Tr. 1378-79.  And when it attempted something similar in 2010 — that is, sending an enumerator to independently verify the status of any housing unit identified as vacant — the process still remained error-prone.  *See id.* at 351-53.

219.    Thus, the Court finds that the process of marking as vacant or deleting addresses from the MAF will result in the misidentification of occupied addresses as vacant or "should be deleted."  This will undermine NRFU's ability to correct for any decline in the self-response rate on the 2020 census.  Additionally, the Court finds that these errors will be particularly large in the 2020 census because the addition of the citizenship question and consequent decline in the self-response rates among noncitizen and Hispanic households will push more of these households into the NRFU process, where the errors will manifest.  Although there is no evidence in the record to suggest that the errors introduced at this step will aggravate or ameliorate any net undercount of noncitizens or Hispanics, they will be one more mechanism through which the citizenship question will degrade the quality of resulting census data, by

causing more households to be enumerated through this process, rather than through more accurate self-responses.

220.    Whether and how administrative records will be used to *enumerate* non-self-responding households in NRFU is uncertain, as the procedure has not yet been approved by OMB, and the Census Bureau "hasn't made a decision yet about how it will process responses to the citizenship question alongside" those records.  Tr. 1030.  If administrative records are used for that purpose, however, they will reinforce the net undercount of people who live in noncitizen households and Hispanics.  The Census Bureau has no data to show that using administrative records would cure a differential drop in self-response rates, Tr. 1340, and when asked whether there was evidence that "populations that are likely to see an increase in nonresponse due to the citizenship question can be successfully enumerated on a wide scale using administrative records," Dr. Abowd answered that "the administrative record actually shows that [the Census Bureau] concluded the opposite," *id.*  Indeed, the evidence shows that, if the process is used, it will actually differentially undercount Hispanics and people who live in noncitizen households because the quality of administrative record data varies for different groups.  *Id.* at 104.  If such records are used, they will be used to enumerate only "a limited number of those households for which there is high quality administrative data about the household."  Joint Stips. ¶ 9.  Noncitizen and Hispanic households are less likely to be accurately represented in quality administrative records than other groups.  *Id.* at 1340-41; Census Bureau 30(b)(6) Dep. 252-23, 389-91; Tr. 104.  As a result, the Census Bureau expects that it will fail to link Hispanics to administrative records at a higher rate than non-Hispanic whites; that enumeration using administrative records will be less successful for noncitizens than for citizens; and that undocumented immigrants will be even harder to enumerate using administrative records because they are less likely to appear in such records at all.  *See* Tr. 1340-41; Census

Bureau 30(b)(6) Dep. 389-91. Thus, although in a simple one-to-one comparison, the administrative records available to the Census Bureau are a more reliable source of accurate answers to questions about a person's citizenship status than survey questions, *see* AR 1285, the administrative records proposed to be used for this purpose would still tend to undercount people who live in noncitizen households. In any event, the Court declines to place much weight at all on a step that, Defendants admit, remains a hypothetical possibility rather than part of a finalized plan to address the effects of the citizenship question.

221. Third, the use of proxies at the next step of the NRFU process is also unlikely to cure the decline in self-response among noncitizens and Hispanic households. Indeed, as with other NFRU procedures, households that fail to self-respond because of the citizenship question will be relatively unlikely to be successfully enumerated through proxies. *See* Tr. 1342. For one thing, proxy responses are more likely to result in errors and omissions of household members than self-responses are, further degrading the quality of the resulting census data. *See* Census Bureau 30(b)(6) Dep. 382-83. For example, the Census Bureau's analysis of the 2010 Census found that proxy responses resulted in a correct enumeration only 70.2% of the time, as compared to 97.3% of the time for self-responding households. *See* January 19 Memo, at AR 1282 (citing PX-267 at 33, Table 21). For another, the Census Bureau has found that proxies generally "supply poor quality individual demographic and socioeconomic characteristic information about the person on behalf of whom they are responding." Brown Memo at 41, 42 (Table 12).

222. In fact, the evidence suggests that the use of proxies will reinforce or exacerbate the net differential undercount of people who live in noncitizen and Hispanic households attributable to the citizenship question. The record contains no evidence suggesting that households that fail to respond to the census because of a citizenship question will be

enumerated through proxies as successfully as other non-responding households, Tr. 1342; to the contrary, the evidence suggests that households that fail to self-respond because of the citizenship question will be relatively unlikely to be successfully enumerated through proxies, even as compared to households that fail to self-respond for other reasons.

223.    For instance, the Census Bureau's evidence shows that people who in areas with higher percentages of noncitizen households are less likely to give proxy responses than people in other areas are. *See* Census Bureau 30(b)(6) Dep. 386. In other words, people who live in communities with high rates of noncitizens are disproportionately less likely to provide information about their neighbors to the government. Moreover, when proxies do answer, they are less likely to provide accurate information than self-responders are. *See* January 19 Memo, at AR 1282; Brown Memo at 41. Some proxies give incorrect information because they "have less information about the household than a member of the household [does]." Tr. 107. As Dr. Hillygus testified, proxy responders are especially likely to underestimate the size of noncitizen and Hispanic households because they do not know the true size of the household due to complexities in living arrangements. *Id.* at 110-11; *see also id.* at 1397-1400. And some proxies give incorrect information because they have an incentive to do so. For example, landlords concerned about violating the law might intentionally underreport the number of occupants in a household or fail to report residents lacking legal status. *See id.* at 107-08, 336. And other proxies may choose not to reveal information for fear that it will cause negative consequences like deportation for their neighbors. *See id.* at 110-11; *see also id.* at 1398-1400. A preponderance of the evidence thus shows — and the Court finds — that the use of proxies in NRFU will systematically underestimate the size of noncitizen and Hispanic households.

224.    Fourth, the final stage of the NRFU process — imputation — will also reinforce or exacerbate a differential undercount of people who live in noncitizen and Hispanic

households.  "Imputation" means, essentially, modeling or predicting information about the

uncounted households based on the information already gathered from counted households.  *See*

*id*. at 1232, 1350-51.  For the census, a household is "imputed" only if it remains uncounted after

all the other NRFU steps.  *See id.* at 1231, 1350.  At that point, the Census Bureau imputes the

number and characteristics of the people living in the household.  *See id.* at 113-14.  As practiced

by the Census Bureau in NRFU operations, imputation has two components: "count imputation,"

which imputes the *size* of a household; and "whole-person imputation," which includes "count

imputation" *and* imputation of all other characteristics to the people in the household.  *See id*. at

113-14, 1193-94; January 19 Memo, at AR 1281.  In each case, accurate imputation depends on

an accurate starting point; "if there are errors in the data collected, those errors are then carried

over into the imputation."  Thompson Decl. ¶ 117; *see e.g.*, January 19 Memo, at AR 1282.

225.    NRFU's imputation procedures will reinforce or exacerbate the net differential

undercount of people who live in noncitizen and Hispanic households because the Census

Bureau's imputation model incorrectly assumes that it is starting with accurate data.  As Dr.

Barreto credibly explained, when imputing characteristics from a group of counted (or "known")

people to a group of unknown (or "missing") people, it matters whether the "missing" group is a

random selection of the population or whether it is instead missing for a particular reason.  *See*

Tr. 702-03.  If the "missing-ness" of a group is correlated with a particular characteristic, that

will make it impossible to accurately impute characteristics from the known group to the missing

group.  *See id*.  For example, if the group of "missing" households still uncounted after NRFU's

first three steps is disproportionately composed of noncitizens and Hispanics compared to the

known (*i.e.*, counted) households, then imputing the missing household characteristics from the

known population (in which noncitizens and Hispanics are *under*represented) will not yield

accurate data about the "missing" households (in which noncitizens and Hispanics are

*over*represented).  *See also id.* at 702-03, 1236-37.

226.     That is precisely the problem here.  For all the reasons explained above, when the Census Bureau performs its imputation calculations, noncitizen and Hispanics households will be underrepresented in the "counted" or "known" population and overrepresented in the "unknown" or "missing" population.  *See id.* at 119, 1352-54, 1401; PX-400, at 3.  Because the Census Bureau "do[es] imputation based on those self-responding . . . , enumerated households," and because self-response to the Census is correlated with citizenship status (that is, citizens are more likely to self-respond to the census than noncitizens, as discussed above), the set of known households from which imputation proceeds will be disproportionately composed of all-citizen households.  Tr. 1351-52; *see* Brown Memo at 44.[39]  Noncitizen and Hispanic households are therefore more likely to be counted using imputation.  But because that imputation will extrapolate their numbers from an unrepresentative sample (which undercounts them), that imputation will lead to an erroneous under-enumeration of people who live in both noncitizen and Hispanic households.  The Census Bureau knows that its imputation model will be biased in this way.  *See* Tr. 114-19, 1353-54.

227.     Dr. Abowd acknowledged that imputation "disadvantages hard-to-count subpopulations" such as noncitizens and households containing noncitizens.  *Id.* at 1384-85.  And Census Bureau data suggest that, historically, increased rates of imputation lead to undercounts in the imputed population.  *See* PX-267, at 16-17 & Table 9.  Additionally, the Census Bureau has historically treated household size as an "ignorable" characteristic, one that can be safely assumed to occur randomly throughout both the known and unknown populations.

---

[39]     In technical terms, this means the Census Bureau will use an "ignorable missing data model" to impute numbers and characteristics to unknown households even though the "missing data" are actually "*non*ignorable."  Tr. 1236-40, 1351-52, 1401.  When the Census Bureau does so, it "end[s] up with bias."  *Id.* at 1401.

*See* Tr. 113-17; *see, e.g.*, PX-478 at 5-7.  But the available data show that household size is not an ignorable trait.  Because Hispanic and noncitizen households tend to be larger than other households, and because such households are underrepresented in the known sample (and overrepresented in the "missing" group), imputing household size from the known sample to the missing group leads to an undercount of the missing group.  *See* Tr. 115-21.  Imputing missing household figures from data that already undercount noncitizens and Hispanics, as the Census Bureau plans to do, will only extrapolate that undercount into the imputed data.

228.    The Census Bureau has not yet finalized its imputation algorithm for the 2020 Census.  *See id.* at. 1351.  Dr. Abowd testified that the Census Bureau has set up an "expert panel" empowered to modify the imputation algorithm "if they can figure out a way to do so successfully," but "no such modification has been proposed to date."  *Id.* at 1353.  And, speaking more generally, Dr. Abowd testified that the Census Bureau "[does not] plan to modify the NRFU operation to address the citizenship question."  *Id.* at 1357.

229.    For all of these reasons, NRFU operations will fail to prevent the net decline in self-response rates among noncitizen (and likely Hispanic) households from translating into a net differential undercount of people who live in such households — instead, it will reinforce or exacerbate that decline.

230.    In the face of Plaintiffs' considerable evidence that NRFU will fail to remedy the differential decline in self-response among Hispanic and noncitizen households — or, worse, even exacerbate the decline — Defendants offer no evidence to support their claim that NRFU will be adequate to the task.  And indeed, the available evidence supports exactly the opposite conclusion.  Where specific subpopulations have self-responded at relatively lower rates before, NRFU has failed to compensate for the difference, leading to net undercounts of those populations.  As Plaintiffs' expert Dr. William P. O'Hare demonstrated based on his study of the

last three censuses, for example, negative net differential self-response rates among demographic groups have reliably translated into net undercounts of those demographic groups *despite the Census Bureau's NRFU operations*. *See* Docket No. 507-1 ("Corr. O'Hare Aff."), ¶¶ 28-30, 38-39, 43-44. That is powerful evidence that NRFU is generally unable to prevent self-response declines from translating into net undercounts.

231. Dr. O'Hare opined further that declines in self-response rates *cause* net undercounts. *See id.* ¶¶ 47-55. In response, Defendants are quick to recite the old saw that correlation alone does not imply causation. *See* Defs.' Post-Trial Br. 16, ¶ 123. Dr. O'Hare recognized that, however, and was accordingly careful in his conclusions. And, as Dr. O'Hare correctly pointed out, a correlation of the strength and character that he described may be evidence of causation, even if it is incapable of establishing it beyond a reasonable doubt. *See* Corr. O'Hare Aff. ¶¶ 49-50.

232. The Court concludes just that: Dr. O'Hare's testimony provides affirmative evidence that self-response declines among specific subpopulations directly cause net undercounts of those subpopulations. For the purposes of this litigation, a preponderance of the evidence supports that conclusion. More importantly, however, Dr. O'Hare's testimony illustrates the historical inability of NRFU to *prevent* net undercounts of particular subpopulations in the presence of a decline in self-response rates.

233. Despite this evidence about the inadequacy of NRFU procedures, Defendants claim that NRFU efforts will be sufficient "to mitigate any decrease in the initial self-response rate." Defs.' Post-Trial Br. 16, ¶ 127. But Defendants offer no evidence to support their claim and, as noted above, the evidence strongly supports the opposite conclusion.

234. It is worth stepping back to view the evidence on this point as a whole. As is essentially undisputed, differential rates of self-response among different subpopulations are

common, and the Census Bureau struggles to cure the defects caused by those differentially low self-response rates with its NRFU operations.  For the 2020 census, the Census Bureau plans to add a question about citizenship that it knows will cause an additional, incremental differential decline in self-response rates in a defined subpopulation.  But, Defendants argue, this will not result in a net undercount of that subpopulation, because its NRFU operations — which *never* work perfectly — will somehow work perfectly this time.  Meanwhile, Plaintiffs have introduced overwhelming evidence (most of which is acknowledged, accepted, or generated by the Census Bureau itself) that, in this context, the Census Bureau's NRFU operations will instead work *less* well than ever — specifically with respect to the very people whose households will be differentially likely not to self-respond to the census questionnaire.  Indeed, the evidence demonstrates that NRFU operations will simply replicate the same problems as the original attempt to obtain self-responses from those households.

235.    Seen in that light, it is impossible to accept Defendants' interpretation of the facts. In the face of Plaintiffs' strong evidence that the citizenship question will cause a differential decline in self-response rates among noncitizen households, Defendants demand that Plaintiffs also rebut their unsupported assurances that the Census Bureau will figure out a way to fix the problem, even though it has never done so before.  To the extent that Plaintiffs must carry that additional burden, they have done so, as their evidence about NRFU's inadequacies in this context is far more persuasive than Defendants' conclusory assertions that NRFU will suddenly work exactly as hoped.  In any event, on the whole, a preponderance of the evidence establishes that the incremental net differential decline in self-response rates among noncitizen households caused by the citizenship question, and any similar decline among Hispanics, will remain uncured by NRFU, and will thus ripen into an incremental net differential undercount of the people who live in such households.

236.     In sum, the Court find that the addition of a citizenship question to the 2020 census will cause an incremental net decline in self-response rates of at least 5.8% among noncitizen households, and a significant but unquantified net decline in self-response rates among Hispanic households.  The Census Bureau's NRFU operations will not remedy those declines, which means that they will translate into an incremental net differential undercount of people who live in such households in the 2020 census.

237.     Admittedly, it is difficult to precisely quantify the exact size of the net differential undercounts attributable to the citizenship question.  Significantly, though, that is because of the difficulty of quantifying the exact effects of the *Census Bureau*'s efforts to fix the problem, a subject about which there is frustratingly little quantitative evidence in the record.  Starting with the conservative estimate of a 5.8% net decline in self-response rates among noncitizen households, the Court can find little justification in the record to depart from that estimate when arriving at a finding of the likely net undercount of people who live in noncitizen households.  Indeed, as already discussed at great length, the evidence overwhelmingly suggests that NRFU operations will simply replicate all of the same effects on noncitizen response that will cause the decline in self-response in the first place.  *See supra* ¶¶ 213-29.  On the other side of the ledger, Defendants have offered no quantifiable evidence of their own to support, much less quantify, their assertions of NRFU's hoped-for curative effects.

238.     The record does allow the Court to calculate a minimum likely net differential undercount of people who live in noncitizen households.  If household size were distributed evenly across all households, both counted and uncounted, it would be possible to predict that an uncorrected 5.8% decline in self-response rates among noncitizen households would translate directly into a 5.8% net undercount of the people who live in those households.  But the record evidence in these cases indicates that household size is *not* distributed equally among self-

responding and non-self-responding households: instead, households that do *not* self-respond are likely to be larger than those that do.  *See* Tr. 119-20, 733.  The Court therefore finds that the 5.8% decline in self-response rates will translate into a net undercount of people who live in such households of *at least* 5.8%, and likely more.  Providing further support for that conclusion is the disproportionate likelihood that noncitizen households that do self-respond will leave individuals off their questionnaires, contributing to a differential undercount of people who live in such households in a way not captured by the initial 5.8% estimate at all.  The Court therefore finds that the addition of a citizenship question will cause an incremental differential net undercount of people who live in noncitizen households of approximately 5.8%, and likely more.

239.    Quantifying the likely net undercount of Hispanics caused by the citizenship question is more difficult on the basis of the evidence in the record.  Nevertheless, the Court finds that a preponderance of the evidence indicates that the citizenship question will cause a nonzero net undercount of Hispanics.

240.    Defendants' objections to these factual findings rest primarily on Dr. Abowd's double-negative testimony that he has not seen any "credible quantitative data" that the Census Bureau's NRFU operations will not prevent net undercounts of noncitizen and Hispanic populations.  *See* Tr. 1214.  But Defendants' reliance on that testimony is ultimately unpersuasive, for two reasons.  First, Dr. Abowd did not opine (and no other record evidence suggests) that NRFU operations *will* remedy any undercounts caused by the addition of a citizenship question to the 2020 census.  Instead, he opined, "in a very careful way," only that he had not seen evidence sufficient to prove to his own standards that a net differential undercount would in fact result.  *See id.* at 925-26, 1165-66.[40]  Even so, Dr. Abowd testified that the Census

---

[40]     Additionally, Dr. Abowd testified that, although he would not adopt the same conclusion as Dr. John Thompson, he "respected" Dr. Thompson's opinion that the citizenship question

Bureau had not run the type of randomized controlled trial that would have met his own standard of "credible, quantitative evidence," but was nevertheless relying on the results of the "natural experiment" analyzed in the Brown Memo to plan for the 2020 census because, as he testified, the Census Bureau "believe[d] they are the best available data." *Id.* at 926; *see also id.* at 923-26.

241.    Second, although Dr. Abowd's credibility, expertise, and dedication to public service impressed the Court in almost every respect, his opinion on this point does not shake the Court's confidence in its finding, by a preponderance of the evidence, that the addition of a citizenship question will cause a net differential undercount of noncitizens and Hispanics.  For one thing, as Chief Scientist of the Census Bureau, his responsibilities are vastly different than those of a federal court, and his testimony and written analyses make clear that he and the Census Bureau insist (at least in the abstract) on a far greater degree of statistical confidence than that which applies in federal civil litigation.[41]  The Court's task is not to determine whether the evidence on the net differential undercounts caused by the citizenship question can satisfy the Census Bureau's high statistical standards.  It is, instead, to determine whether Plaintiffs have proved by a preponderance of the evidence that the addition of a citizenship question will cause

_____

would cause a net undercount of noncitizens and Hispanics. *See* Tr. 1221.

[41]    Notably, Dr. Abowd testified that a statistical analysis capable of achieving his preferred level of certainty would require non-public data in the Census Bureau's exclusive possession and control — and that it would have taken his team of experts up to a year to conduct.  Tr. 1216-18, 1290-92.  (For what it is worth, he testified that the Census Bureau did not bother to do that work largely because he did not need it to conclude that addition of a citizenship question was a mistake.  *See id.* at 1290-92.)  It would be perverse indeed to hold that Plaintiffs lack standing to argue that Secretary Ross's decision substantively violated the APA because the Census Bureau did not adequately test the precise effects of the citizenship question on the very ground that the Census Bureau, the sole entity in the country capable of conducting such a test, failed to do so.  Thankfully, the Court need not go there, as Plaintiffs have satisfied their burden of proving by the applicable standard here — namely, a preponderance of the evidence — that the citizenship question would result in a net differential undercount of people who live in noncitizen households of at least 5.8%.

such undercounts.  For the reasons stated above, the Court finds that Plaintiffs have done so.

**4.  Effects of the Citizenship Question on Apportionment Among and Within States**

242.    Next, Plaintiffs have also proved that the net differential undercount of people who live in noncitizen households will translate into several further concrete harms.  First, the Court finds by a preponderance of the evidence that the addition of a citizenship question will cause or is likely to cause several jurisdictions to lose seats in the next congressional apportionment and that it will cause another set of jurisdictions to lose political representation in the next round of intrastate redistricting.

243.    To begin, the Court finds that several states, including some that are Plaintiffs here and some in which NGO Plaintiffs' members reside, will lose at least one seat in the congressional reapportionment based on the 2020 census data.  Plaintiffs' expert Dr. Christopher Warshaw modeled the effects of a net differential undercount of people who live in noncitizen households on congressional apportionment.  *See* Docket No. 526-1 ("Warshaw Decl.").  (Dr. Warshaw also independently modeled the effects of various net differential undercounts of people who live in noncitizen households *and* Hispanics together.  *See id.*).  Using the Method of Equal Proportions, which Congress adopted as the apportionment method in 1941, Dr. Warshaw calculated that an incremental 5.8% net differential undercount of people who live in noncitizen households will make California "extremely likely" to lose a congressional seat that it would not lose otherwise.  *Id.* ¶ 46; *see id.* at 23 (Table 6) & ¶¶ 42-46.

244.    Dr. Warshaw's findings also support the conclusion that, in the event that the net differential undercount of people who live in noncitizen households reaches 10% — or if there is a mere 5.8% differential undercount both of people who live in noncitizen households *and* Hispanics — then Texas, Arizona, Florida, and Plaintiffs New York and Illinois will face a significant risk of an apportionment loss.  *See id.* ¶¶ 46-47.  As noted above, the Court cannot

quantify exactly how much higher than 5.8% the noncitizen net differential undercount is likely to be and how high the Hispanic net differential undercount will be.  *See supra* ¶¶ 238-39.  But, based on the risks discussed above, the Court can say, and does find, that Texas, Arizona, Florida, and Plaintiffs New York and Illinois face a substantial risk of losing a seat in the next congressional reapportionment because of the addition of a citizenship question to the 2020 census.

245.    The Court finds that Dr. Warshaw's calculations are credible and persuasive.  As they are the most credible quantitative evidence in the record about the apportionment consequences of adding a citizenship question to the census questionnaire, the Court finds by a preponderance of the evidence that California residents face a certainly impending loss of representation in the House of Representatives.  Similarly, Texas, Arizona, Florida, New York, and Illinois face a substantial risk of losing a seat.  In other words, based on the facts as proved here by a preponderance of the evidence, the Court finds that residents of those states face a substantial risk of a loss of representation in the House of Representatives.

246.    The Court finds further that the citizenship question will have similar effects on *intra*state apportionment.  States — including Plaintiffs here — rely on federal decennial census data to carry out their own *intra*state redistricting.  *See, e.g.*, Del. Const. art. 2, § 2A; Iowa Const. art. III, § 34; Md. Code Ann., Elec. Law § 8-701; Mass. Const. amend. art. CI, §§ 1-2; Minn. Const. art. 4, §§ 2-3; Minn. Stat. Ann. § 600.18; N.J. Const. art. 4, § 2 ¶¶ 1, 3; N.Y. Const. art. III, §§ 4-5 & 5-a[42]; Va. Code Ann. § 30-265; Wash. Rev. Code § 44.05.090; *see also Georgia v.*

---

[42]    On their face, Sections 4 and 5 of Article III of the New York Constitution appear to require that the state's Senate and Assembly districts be apportioned on the basis of "inhabitants, excluding aliens," but Section 5-a, ratified in 1969, amended those provisions — somewhat inartfully — by redefining the term "inhabitants, excluding aliens" to mean "the whole number of persons."  N.Y. Const. art. III, § 5-a ("For the purpose of apportioning senate and assembly districts pursuant to the foregoing provisions of this article, the term 'inhabitants, excluding

*Ashcroft*, 539 U.S. 461, 488 n.2 (2003) ("When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population."); *Department of Commerce*, 525 U.S. at 334 ("States use the population numbers generated by the federal decennial census for federal congressional redistricting.").  The addition of a citizenship question on the census will cause some jurisdictions and their residents to lose political power in that process as well.

247.    Dr. Warshaw analyzed the impact of the citizenship question on intrastate redistricting, and credibly found that a mere *two* percent differential undercount of people who live in noncitizen households will lower the population enumerations, and statewide population shares, of several jurisdictions that are home to a disproportionate share of their states' populations living in noncitizen households.  *See* Warshaw Decl. 28 (Table 8) & ¶¶ 53-55, 57-59.  New York City is a prime example.  New York City contains approximately forty-three percent of the total state population, but approximately seventy-one percent of the state's noncitizen population.  Docket No. 504-1 ("Breitbart Aff.") ¶ 12; *see also* Docket No. 504-2 ("Supp. Breitbart Aff.").  Dr. Warshaw calculated that if the citizenship question causes a mere two percent net differential undercount of people who live in noncitizen households, that will lower the statewide population shares of Phoenix, Arizona; Los Angeles County, California; Monterey County, California; Miami, Florida; Chicago, Illinois; Prince George's County, Maryland; New York City; Columbus, Ohio; Philadelphia, Pennsylvania; Pittsburgh, Pennsylvania; Central Falls, Rhode Island; Providence, Rhode Island; Cameron County, Texas; El Paso County, Texas; Hidalgo County, Texas; and Seattle, Washington.  Warshaw Decl. 28

---

aliens' shall mean the whole number of persons."); *see also* Docket No. 504-1 ("Breitbart Aff.") ¶ 4.  Accordingly, the New York Constitution now requires that the state's Senate and Assembly districts be apportioned on the basis of total population count data from the decennial census.

(Table 8) & ¶¶ 53-55, 57-59.  The effect will be particularly pronounced for Plaintiffs Central

Falls and Providence, Rhode Island; Cameron, Hidalgo, and El Paso Counties, Texas; Phoenix,

Arizona; Miami, Florida; and New York City.  *See id.* ¶¶ 54-55, 59.[43]

248.    Any net differential undercount of people who live in noncitizen households, and

especially a net differential undercount of 5.8%, will dilute the political power of such

jurisdictions.  Similarly, the people who *live* in those jurisdictions will suffer a corresponding

decrease in political power.

249.    The Court also finds, based on Dr. Warshaw's credible calculations, that Plaintiff

Colorado will suffer a net undercount of its total population of at least 0.7%, an estimate Dr.

Warshaw calculated using the conservative projection of an estimated 5.8% net differential

undercount of people who live in noncitizen households.  *See* Warshaw Decl. 19 (Table 5).

Furthermore, because Colorado is home to a significant population of people who live in

noncitizen households, *any* net differential undercount of that population greater than zero will

cause Colorado's enumerated population to be lower than it otherwise would be.  *See, e.g.*, PX-

324 (illustrating that if there is a 2% undercount of noncitizens in Colorado, the state's

population will be undercounted by 0.2%).  Similarly, because Colorado is home to a significant

population of Hispanics, any net differential undercount of that population greater than zero will

cause Colorado's enumerated population to be lower than it otherwise would be.

---

[43]     Dr. Warshaw made a similar calculation premised on a scenario in which there is a two percent net differential undercount of (1) people who live in noncitizen households and (2) people who live in noncitizen households *and* Hispanic citizens.  *See* Warshaw Decl. ¶¶ 24, 25, 53, 58.  In that scenario, the statewide population shares of the same jurisdictions described above would be reduced.  The effects would be particularly pronounced for Central Falls and Providence, Rhode Island; Cameron, Hidalgo, and El Paso Counties, Texas; Phoenix, Arizona; and New York City.  Warshaw Decl. ¶¶ 54, 55.

**5. Effects of the Citizenship Question on Funding to, and Within, States**

250.    A net undercount of people who live in noncitizen households will also cause

states (and their residents) to lose access to federal funding from domestic financial assistance

programs that allocate funding based on census-tied geographic formulas. *See* Docket No. 508-1

("Reamer Decl."), ¶¶ 15-17, 83.  A large number of federal domestic financial assistance

programs rely on census data to allocate money.  In fiscal year 2016, for example, at least 320

such programs allocated about $900 billion using census-derived data. *See id.* ¶ 9.  Plaintiffs'

expert witness Dr. Andrew Reamer calculated the effects of a net differential undercount of

people who live in noncitizen households on several such programs.  Of the programs Dr.

Reamer analyzed, eighteen are "state-share" programs, which rely in whole or part on the state's

share of the total U.S. population. *Id.* ¶¶ 10, 16-17.[44]  The rest are programs that use the Federal

Medical Assistance Percentage ("FMAP") reimbursement formula. *See id.*[45]  These programs —

and many others, including those that rely on decennial census data less directly, *see id.* ¶¶ 26-29

— are sensitive to changes in the decennial census count.  Dr. Reamer calculated that a net

differential undercount of people who live in noncitizen households[46] and Hispanic populations

---

[44]    These are: Federal Transit Formula Grants, Community Development Block
Grants/Entitlement Grants, Crime Victim Assistance, Title I Grants to Local Educational
Authorities ("LEAs"), Special Education Grants, State Children's Health Insurance Program
("CHIP"), Head Start, Supplemental Nutrition Program for Women, Infants, and Children
("WIC"), Child Care and Development Block Grant, Supporting Effective Instruction State
Grants, Workforce Innovation and Opportunity Act ("WIOA") Youth Activities, Rehabilitation
Services: Vocational Rehabilitation Grants to the States, Unemployment Insurance
administrative costs, Block Grants for Prevention and Treatment of Substance Abuse, Social
Services Block Grants, Career and Technical Education—Basic Grants to States, WIOA
Disclosed Worker Formula Grants, Special Programs for the Aging, Title III, Part C, Nutrition
Services. *See* PX-329.

[45]     These are: Medical Assistance Program (traditional Medicaid), CHIP, Foster Care, Child
Care, Adoption Assistance, and Medicare Part D Clawback. *See* PX-329.

[46]    To perform his calculations, Dr. Reamer assumed that the seven net undercount scenarios
projected by Dr. Warshaw would occur, and he then projected the effects that those scenarios

of as little as two percent — much lower than the net differential undercount would likely be —

will cause Plaintiffs New York and New Jersey, as well as California, Texas, Florida, Nevada,

and Hawaii, to lose funding under the state-share programs, and would cause Arizona, Texas,

Florida, Nevada, and Hawaii to lose funding under the FMAP programs.  *See id.* ¶¶ 16-17, 33, 35

& 16, 17, 20, 23, 27 (Tables).  Larger net undercounts would, naturally, lead to correspondingly

larger losses.  *Id.*; *see also id.* ¶ 19.

251.    The Court finds Dr. Reamer's testimony to be credible, and his analysis

persuasive.  Accordingly, the Court finds that even under an almost implausibly conservative

projection of the net differential undercount of people who live in noncitizen households,

Plaintiffs New York and New Jersey, along with Arizona, California, Texas, Florida, Nevada,

and Hawaii will lose some amount of federal funding as a result of the addition of the citizenship

question.  More specifically, the Court finds that Plaintiffs New York and New Jersey, along

with California, Texas, Florida, Nevada, and Hawaii, would lose funding under the WIC, Social

Services Block Grants, and Title I Grants to LEAs programs.  *See* Reamer Decl. ¶¶ 46-47, 51-52,

61-62.  Those are merely illustrative; as Dr. Reamer testified, those states would lose funding

from other state-share programs as well.  *See* Tr. 517-18.

252.    The Court further finds, based on Dr. Reamer's testimony, that a two percent net

differential undercount of people who live in noncitizen households will cause Plaintiffs Illinois,

Massachusetts, Maryland, Washington, and the District of Columbia to lose funding under the

Title I LEA Grant program and the Social Services Block Grant Program.  *See* Reamer Decl. 17

---

would have on program funding.  *See* Reamer Decl. ¶¶ 13-14.  (Dr. Reamer's declaration
somewhat inartfully refers to people who live in noncitizen households — the relevant group for
purposes of Dr. Warshaw's projected net undercount scenarios — as "noncitizens," but it is clear
that Dr. Reamer is referring to the same set of people that was the subject of Dr. Warshaw's
projections, namely those who live in households containing at least one noncitizen.  *See id.*).

(Table), 20 (Table) & ¶¶ 51-52, 61-62.  A net differential undercount of people who live in

noncitizen households of at least two percent will also cause Plaintiffs Illinois and Washington to

lose Medicaid funds, and Plaintiffs Oregon, New Mexico, and Washington to lose CHIP funds.

*Id.* at 23, 27 (Tables) & ¶¶ 70-71, 81-82.

253.    In addition to the state-share programs Dr. Reamer testified about, Plaintiffs have

proved that even a tiny net differential undercount of people who live in noncitizen households

will cause several Plaintiffs to lose funds from federal programs that distribute resources on the

basis of census-derived data, including Community-Based Child Abuse Prevention ("CBCAP")

Grants, Older Americans Act ("OAA") Grants for State and Community Programs on Aging,

Title II, Part A and Title IV, Part A funding under the Every Student Succeeds Act, Temporary

Assistance for Needy Families ("TANF") funding, Low-Income Home Energy Assistance,

Program ("LIHEAP") funding, and Community Services Block Grants ("CSBG").  Docket No.

498-12 ("Haney Aff."), ¶¶ 5-8; Docket No. 498-14 ("Harmon Aff."), ¶¶ 10-13, 17; Docket No.

498-5 ("Franklin Aff."), ¶¶ 6-10; Docket No. 501-1 ("Tiema-Massie Aff."), ¶ 11.  Some such

programs require states to use census-derived data to distribute funding to City and County

Plaintiffs, including the Victims of Crime Act program, TANF, LIHEAP, the WIOA program,

and CSBG.  Franklin Aff. ¶¶ 6-10; Tiema-Massie Aff. ¶ 11.  The City and County Plaintiffs

receive funds under these programs based on their relative share of the relevant population

within a state.  For instance, states are required to distribute TANF, LIHEAP, WIOA, and CSBG

funds to localities based in part on the number of low-income individuals who reside in the

jurisdiction.  *See* Franklin Aff. ¶¶ 7-8, 10; Tiema-Massie Aff. ¶ 11.

254.    Similarly, many federal funding programs provide direct funding to localities

based on census-derived information, including the Community Development Block Grant

("CDBG"), Emergency Solutions Grant ("ESG") program, and the HOME Investment

Partnerships Program.  *See* Docket No. 498-7 ("Freedman Aff."), ¶¶ 7, 10, 12.  These programs provide funding to cities and counties based at least in part on such jurisdictions' share of the overall population count relative to other metropolitan areas and share of the population in poverty.  *Id.*

255.    Dr. Warshaw's testimony shows that under any plausible net differential undercount scenario resulting from the addition of a citizenship question, nearly all Plaintiff Cities and Counties will lose population shares relative to their states.  *See* Warshaw Decl. 28 (Table 8) & ¶¶ 59-61.  Those cities and counties — specifically, Cameron, Hidalgo, and El Paso Counties, Texas; Monterey County in California; and Providence and Central Falls in Rhode Island, *id.* at 26 (Table 7) — will lose funds under these programs, whether the funds are routed through state governments or distributed from the federal government directly.

256.    The Court also finds — based on uncontradicted evidence in the record — that Plaintiff MRNY has identified several members by name who reside in New York City and who benefit from the federal funding programs that Plaintiffs have shown are tied specifically to federal census data.  *See* Docket No. 503-1 ("Altschuler Decl."), ¶¶ 24-30; *see also* Docket No. 503-2 ("Supp. Altschuler Decl."); Tr. 472.  MRNY members Julissa Bisono and Diana Zarumeno are both residents of Queens County, New York, whose children attend public schools that receive Title I funding.  Altschuler Decl. ¶¶ 25-26; Supp. Altschuler Decl. ¶¶ 15-16.  MRNY member Maria Hernandez is a resident of Kings County, New York, whose child attends a public school that receives Title I funding.  Altschuler Decl. ¶ 27; Supp. Altschuler Decl. ¶ 17.  MRNY member Lorena Mendez is a resident of Kings County whose child attends a Head Start program.  Altschuler Decl. ¶ 28; Supp. Altschuler Decl. ¶ 18.  MRNY member Perla Lopez and MRNY member Yatziri Tovar live in Queens County, New York, and Bronx County, New York, respectively.  Altschuler Decl. ¶¶ 29-30; Supp. Altschuler Decl. ¶¶ 19-20.  Altschuler also

identified an unnamed MRNY member who is a U.S. citizen and a resident of Long Island, New York.  Altschuler Decl. ¶ 16; Supp. Altschuler Decl. ¶ 11.

257.    The Court also finds, based on uncontradicted testimony and undisputed documentary evidence in the record, that ADC has members residing in all fifty states and in the District of Columbia, including 172 in Arizona; 1,441 in California; 1,296 in the District of Columbia; 551 in Florida; 437 in Illinois; 612 in Maryland; 819 in New York; 341 in Ohio; 1,341 in Pennsylvania; 30 in Rhode Island; 408 in Texas; and 186 in Washington State.  Docket No. 498-16  ("Khalaf Decl."), ¶¶ 34-35; *see also* Docket No. 498-17 ("Supp. Khalaf Decl."), ¶ 7; Tr. 286.  For example, ADC members Dr. Souhail Toubia, Dr. Diane Shammas, and George Majeed Khoury reside in California; Dr. Debbie AlMontaser resides in New York; Shatha Atiya resides in Florida; Dr. Safa Rifka and Dr. Doo'a Taha reside in the District of Columbia; and Abed Awad resides in New Jersey.  Khalaf Aff. ¶ 31.

258.    Finally, to the extent relevant here, the Court finds that Plaintiff NYIC has members who benefit from census-tied funding programs.  NYIC member Chhaya Community Development Corporation ("Chhaya") receives funding through the Community Development Block Grant program.  Docket No. 498-19 ("Plum Aff."), at ¶ 6; *see also* Docket No. 498-20 ("Supp. Plum Aff.").  NYIC members Family Health Centers at NYU Langone, Little Sisters of the Assumption Family Health Services ("LSA"), Korean Community Services of Metropolitan New York, and Planned Parenthood of New York City all receive funding through Medicaid to provide community health services.  *Id.* ¶ 7.  NYIC member Chinese-American Planning Council receives funding through the WIOA for education and training services for job-seekers.  *Id.* ¶ 8.

### 6.  Effects of the Citizenship Question on the Quality and Accuracy of Census Data

259.    Next, the Court finds that the addition of a citizenship question to the 2020 census will harm the quality of the resulting census data regardless of whether it also leads to a

146

net differential undercount of people who live in noncitizen and Hispanic households.  Much of that decline will be attributable to the fact that, because of the decline in self-response rates, more enumerations will be conducted through NRFU efforts.  March 1 Memo, at AR 1311.  As all agree, NRFU generates lower quality data than self-responses — in large part because it relies more heavily on proxies and imputation.  Tr. 33-35; January 19 Memo, at AR 1281.  There is essentially no dispute about this point.  Dr. Abowd — Defendants' expert — "consistently characterized data produced by lower self-response rates as being less accurate" in his testimony, Tr. 882; *see* March 1 Memo, at AR 1311, and described how that inaccuracy would hamper the work of demographers and policymakers at all levels of government, *see* Tr. 1222-23.

260.    Credible testimony confirms that the citizenship question and consequent decline in self-response rates are likely to harm the resulting data in several ways.  For instance, information about subgroups that comprise a jurisdiction — called local-level "characteristic data" — will decline in quality, even if the *total* population count within that jurisdiction is accurate.  Tr. 302-04.  This will be true regardless of whether NRFU is able to remedy the decline in self-response rates for the jurisdiction as a whole.  *See id.* at 1221-23.

261.    In fact, NRFU operations may actually make the problem worse.  The Census Bureau's own analysis concluded that enumeration errors are more common in NRFU because NRFU data "are much more likely to be collected from a proxy rather than a household member," and proxies have "less accurate information" about the household than self-responders.  January 19 Memo, at AR 1282.  In particular (and as discussed above), proxies result in correct enumerations only about seventy percent of the time, compared to ninety-seven percent for self-responses.  *Id.*  And proxies "supply poor quality individual demographic and socioeconomic characteristic information about the person on behalf of whom they are responding."  Brown Memo at 41.  As Dr. Jarmin put it, the accuracy of NRFU "is less than self-

response" and, within NRFU, "proxy response" is less accurate still.  Jarmin Dep. 308.

262.    Dr. Abowd testified that, whatever else happens as a result of the citizenship question, "gross omissions" — people left off self-response, responses to in-person NRFU enumerators, and proxy responses — will increase.  Tr. 1221.  In Dr. Abowd's view, this will harm the quality of the data, regardless of what happens to the overall count.  *Id.* at 1222. Indeed, even where a decline in self-response does not lead to an overall net undercount, it will create inaccuracies in subgroup data — particularly at the local level — that can be quite serious in and of themselves.  *See* Tr. 309, 351-54.

263.    Several Governmental Plaintiffs proved that they rely on accurate data to perform essential governmental functions.  New York City, for example, makes important decisions about how to allocate public services in reliance on demographic data derived from the census, as when its Department of Education redraws school zone boundary lines, Tr. 305-06; when its Department of Health deploys resources based on its best understanding of the age, race, and Hispanic origin characteristics within particular communities, *id.* at 307-08; and when the Mayor's Office of Immigrant Affairs distributes English-language services based on its understanding of where the highest concentration of limited-English-proficient ("LEP") populations live, *id.* at 307.  Dr. Salvo also testified that New York City is expecting a forty-six percent increase in its sixty-five-and-over population by 2040, and is currently attempting to project where and when that demographic change will be felt so that it can design and deploy appropriate infrastructure and physical accommodations.  *See id.* at 356-57.  A decline in the quality of decennial census data will degrade the City's ability to make and implement such policies.

**7.  Secretary Ross's Decision Has Caused Plaintiffs to Divert Resources**

264.    Secretary Ross's decision to add a citizenship question to the census will cause,

and has already has caused, another harm to Plaintiffs: the diversion of precious resources.  The

NGO Plaintiffs — NYIC, MRNY, ADC/ADCRI, and CASA — have already diverted significant

resources from their organizational missions and other priorities to address the effects of a

citizenship question.  Each of the NGO Plaintiffs is deeply committed to a laudable mission of

increasing political participation, promoting civic engagement, and advancing the interests of

immigrant communities, especially immigrant communities of color.

265.    Plaintiff NYIC is an "umbrella policy and advocacy organization for nearly 200

groups in New York State."  Docket No. 489-1 ("Choi Decl."), ¶ 2; *see also* Docket No. 489-2

("Supp. Choi Decl."); Tr. 21-22.  NYIC aims to "unite immigrants, members, and allies so that

all New Yorkers can thrive," is devoted to "advanc[ing] the interests of New York's diverse

immigrant communities," and "advocates for laws, policies, and programs that lead to justice and

opportunity for all immigrant groups."  Choi Decl. ¶ 3.  NYIC has a "fundamental interest in

ensuring as complete and accurate a Decennial Census as possible," *id.* ¶ 6, partly because its

member organizations receive funding through census-tied federal funding programs, *id.*, and

partly because the communities its member organizations serve will only receive the full political

representation to which they are entitled if the people in those communities are fully counted, *id.*

at 8.  For that reason, NYIC has committed itself to ensuring a complete and accurate census

count since at least 2010.  During the 2010 cycle, NYIC engaged in widespread efforts to

encourage participation, including by coordinating public service announcements in sixty-nine

newspapers (and in twenty-four languages), and by holding press briefings with elected officials.

*Id.* ¶ 9.

266.    NYIC has already started similar efforts with respect to the 2020 census.  In

March 2018, for instance, NYIC helped launch New York Counts 2020, a coalition of New York

stakeholders committed to a "fair and complete" census count.  *Id.* ¶ 10.  More broadly, NYIC

has been investing its organizational resources in outreach, education, and advocacy to increase participation in the 2020 census.  *Id.* ¶ 11.  Before the addition of the citizenship question was announced, NYIC planned to spend approximately $625,000 on such education and outreach efforts over a three-year period leading up to the 2020 census.  *Id.* ¶ 16.  NYIC testifies that it has increased that spending by approximately sixty percent "as a result of the decision to add a citizenship question," and will now spend approximately $1 million on its efforts.  *Id.* ¶¶ 16-17; *see* Docket No. 498-19 ("Plum Decl."), ¶ 14 (stating that the extra spending "represents an increase of approximately 60% over what the organization would have spent in the absence of a citizenship question"); *see also* Tr. 286.  Of that additional amount (roughly $375,000), NYIC has already spent about $93,000 in funds it would not have spent absent the addition of the citizenship question.  Choi Decl. ¶¶ 16-17.

267.    The Court also finds, based on the undisputed testimony of NYIC's Vice President of Policy Elizabeth Plum, that NYIC has diverted, and will continue to divert, resources from its organizational mission because of the citizenship question.  As Plum testified, NYIC "was undertaking a study and publication on adult English literacy and workforce development, which examines the critical role of English language acquisition in integrating immigrants into the workforce and preparing them to earn higher wages," but "that project has been postponed indefinitely because of the resources required to perform additional Census outreach and education work."  Plum Decl. ¶ 23.  Plum also testified that "NYIC and some of its member organizations will have to divert resources that would have been spent on education and outreach efforts to increase Census response rates among immigrant communities of color towards addressing the heightened fear generated by the citizenship question."  *Id.*

268.    Notably, Defendants dispute none of this.  They merely contend that the cause of NYIC's increased spending is not the citizenship question itself, but the macroenvironment of

fear and distrust of government.  Defs' Post-Trial Br. 39-42, ¶¶ 261, 272.  The Court is not

persuaded.  Plaintiffs' testimony credibly makes clear that NYIC increased its expenditures "as a

result" of the addition of the citizenship question — a statement made all the more credible and

persuasive given that the macroenvironment prevailing at the time NYIC made its initial funding

decisions was similar to the macroenvironment at the time it made the decision to *increase* those

expenditures.  Choi Decl. ¶ 17; *see* Tr. 616-17, 942-44.  The Court has no trouble concluding by

a preponderance of the evidence that NYIC has incurred (and will continue to incur) these extra

expenses, and has diverted resources away from its organizational mission, because of the

citizenship question and not because of Defendants' proposed alternative causes.

269.    Plaintiff MRNY is a nonprofit membership organization with offices and service

centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains, New York.  *See*

Altschuler Decl. ¶ 2.  MRNY's mission is to "build the power of immigrant and working-class

communities."  *Id.* ¶ 3.  MRNY has an "ongoing commitment to promoting engagement in the

Decennial Census among its members and constituents."  *Id.* ¶ 7.  During the 2010 cycle, MRNY

spent about $150,000 and more than one thousand personnel hours on its census education and

outreach efforts.  *Id.* ¶ 8.  MRNY is conducting similar outreach and education programs this

time around, and has already begun creating informational resources and training staff members

to conduct outreach and encourage census response, "particularly" among Spanish-speaking

communities.  *Id.* ¶ 20.

270.    Daniel Altschuler, MRNY's Director of Civic Engagement and Research, *id.* ¶ 1,

testified that the organization "will be forced to expend more resources than initially anticipated

to try to reduce the negative effect" of the citizenship question among "the immigrant

communities of color it serves."  *Id.* ¶ 19.  More precisely, MRNY "anticipates expending at

least double the amount on 2020 Census education and outreach" than it did for the 2010 census.

*Id.* Altschuler testified that "[b]ecause of the need to increase the time and money spent on Census outreach due to the addition of the citizenship question, MRNY will need to divert resources from other areas critical to its mission[,] including civic engagement and community organizing on other issues." *Id.* ¶ 21. Indeed, MRNY has already done so. *Id.* Separate and apart from the diversion of those resources, MRNY has diverted resources towards participating in this lawsuit. *Id.* ¶ 22.

271. Once again, Defendants contest very little of Altschuler's credible testimony about MRNY's activities, focusing only on the causal connection between the citizenship question and MRNY's additional expenditures and noting that MRNY "acknowledges that there is a general increased fear due to the Trump Administration." Defs.' Post-Trial Br. 39 (alterations and internal quotation marks omitted). But MRNY has submitted evidence of a causal connection between the citizenship question itself and the diversion of its resources in the form of Altschuler's credible testimony, and Defendants offer nothing at all in rebuttal. Once again, the Court has no trouble concluding by a preponderance of the evidence that MRNY has doubled its 2020 census expenditures because of the addition of the citizenship question.

272. Plaintiffs ADC and ADCRI were founded by Senator James G. Abourezk — the first Arab American to serve in the United States Senate — in 1980 and 1981, respectively. Khalaf Decl. ¶¶ 4-5. ADC is a "civil rights membership organization that is committed to defending and promoting the rights and liberties of Arab Americans and other persons of Arab heritage." *Id.* ¶ 6. ADC and ADCRI have long track records of census-related work. For example, ADC has served on Census Bureau advisory committees "in numerous capacities" since the 1980s, and has conducted census-related campaign and policy initiatives since the 2000 census cycle. *Id.* ¶ 13. ADC and ADCRI have increased their planned spending on 2020 census education and outreach by $150,000 compared to 2010, "largely" because of "the presence of the

citizenship question."  *Id.* ¶ 28.  As with MRNY, Defendants do not dispute any of these facts,

except to object that ADC has not "analyze[d] any incremental increase in expenditures due to

the citizenship question."  Defs.' Post-Trial Br. 39, ¶ 260.  Again, however, Defendants offer no

evidence to rebut Plaintiffs' credible testimony that precisely such an incremental increase is

occurring, and the Court finds that it is.

273.    Plaintiff CASA is a nonprofit membership organization headquartered in

Maryland, with additional offices in Virginia and Pennsylvania.  Docket No. 498-3 ("Escobar

Decl."), at ¶ 4.  CASA is the largest membership-based immigrants' rights organization in the

mid-Atlantic region.  *See id.*  CASA's mission is "to create a more just society by increasing the

power of and improving the quality of life of low-income immigrant communities."  *Id.* ¶ 5.

CASA offers social, health, education, job training, employment, and legal services to such

communities, serving "nearly 20,000" people each year through its physical offices alone.  *Id.*

Part of CASA's work in service of its mission is "promoting engagement in the Decennial

Census among its members, constituents, and communities."  *Id.* ¶ 7.  George Escobar, the

organization's Chief of Programs and Services, *id.* ¶ 1, testified that "[m]ember participation in

the Decennial Census advances CASA's mission by increasing the political power of low-

income immigrant communities and improving quality of life for those communities through

increased population-driven government funding," *id.* ¶ 7.

274.    Given its thirty-year history working with immigrant communities, CASA has

"consistently been a 'go-to' organizational partner" for outreach and education efforts

concerning the census.  *Id.* ¶ 8.  Because of the addition of a citizenship question, CASA is now

"diverting [its] limited resources in an effort to encourage participation in the Decennial

Census."  *Id.* ¶ 15.  Indeed, CASA is planning a "massive response" to mitigate the effects of the

citizenship question, *id.* ¶ 25, and "will have to reorganize its communication team and reassign

staff to Census outreach and education to a level not previously anticipated," *id.* ¶ 26.  Given the unanticipated nature of those expenses, CASA will have to fund these efforts through "other sources" — "perhaps including CASA reserves" — and additional volunteers.  *Id.*  CASA has already begun some of these efforts.  *Id.* ¶ 27.  Defendants, for their part, nowhere dispute (or even discuss) any of these facts.  Instead, Defendants level the same highly general objection to CASA's account as with the other NGO Plaintiffs, namely that Plaintiffs have not "shown any analysis to account for the incremental increase due to the citizenship question."  Defs.' Post-Trial Br. 39, ¶ 259.[47]  The Court is unpersuaded by Defendants' objection to CASA's lack of detail in accounting for the precise incremental increase in expenditures which, by definition, have not happened yet, and finds — by a preponderance of the evidence — that CASA will divert a significant portion of its organizational resources because of the addition of the citizenship question.

275.   The Court also finds, based on the undisputed record evidence, that Plaintiffs New York City and the City of Chicago have diverted or will divert resources in an attempt to mitigate the effects of the citizenship question.  New York City had originally allocated $4.3 million to its efforts to increase participation in the 2020 census, and then — after Secretary Ross announced his decision — increased that funding to $5.5 million.  Tr. 426-29.  Plaintiffs also introduced uncontroverted evidence that the City of Chicago will expend additional resources to

---

[47]   Or at least, the Court presumes that Defendants *meant* to level this criticism at CASA's testimony.  Defendants do not discuss Escobar's affidavit anywhere in the relevant section of their brief.  *Cf.* Defs.' Post-Trial Br. 41-42, ¶ 272 (briefly citing Escobar's affidavit elsewhere for the proposition that any harm may be attributable to the macroenvironment).  Instead, where they broadly criticize the "NGO Plaintiffs" for this purported failure of proof, they curiously cite to the affidavit of Evelyn Rodriguez.  *See id.* at 39, ¶ 259.  Rodriguez, however, is an advisor to the Mayor of the City of Chicago who testified about Chicago's census-related activities; she has nothing to do with CASA or the other NGO Plaintiffs.  *See* Rodriguez Aff. ¶ 1.  Small wonder, then, that Defendants did not find any discussion of the NGO Plaintiffs' expenditures in her affidavit.

combat the citizenship question's effects on self-response among immigrant communities in Chicago. *See* Docket No. 488-1 ("Rodriguez Aff."), at ¶ 12; *see also* Tr. 11-12, 21.

## C. Conclusions of Law Related to Standing

The Court turns, then, to its conclusions of law with respect to standing. Plaintiffs advance at least five distinct theories of how they have been, or will be, injured due to the addition of a citizenship question on the 2020 census, namely: (1) diminished political representation, both between *and* within states; (2) loss in government funds, again both between *and* within states; (3) harm to the sovereign interests of state and local governments caused by degradation of the census data upon which they rely; (4) diversion of resources; and (5) loss of privacy. The Court begins by addressing the question of certain NGO Plaintiffs' standing to pursue claims based on any of those theories on behalf of their individual members (in addition to any standing they may have to pursue such claims in their own right). The Court then explains its conclusions as to whether each of these forms of injury is legally cognizable and, if so, whether Plaintiffs proved by a preponderance of the evidence that they have been, or will be, injured in that manner. As the Court will explain, it concludes that all five forms of injury are legally cognizable and that, for all but one of the theories — namely, the loss of privacy — at least some Plaintiffs proved by a preponderance that they have suffered, or will suffer, injury in fact sufficient to support standing. The Court then turns to whether Plaintiffs proved that those forms of injury are fairly traceable to Secretary Ross's decision to add the citizenship question to the 2020 census and whether they are redressable by a favorable decision. Answering both questions in the affirmative, the Court concludes that most, if not all, Plaintiffs have Article III standing to bring the claims in these cases.

The Court notes that, aside from challenging each of Plaintiffs' theories of injury on "traceability" grounds, Defendants make only limited objections to each individual theory of

injury.  Specifically, Defendants challenge Plaintiffs' apportionment-loss and funding-loss theories only on the ground that they are insufficiently "imminent," Defs.' Post-Trial Br. 67-68, ¶¶ 11-14; the resource-expenditure theory only on the ground that Plaintiffs' expenditures do not qualify as legally cognizable injuries-in-fact, *id.* at 69-70, ¶¶ 15-19; and the data-degradation theory only on the ground that it is not a sufficiently "concrete" and "tangible" injury for purposes of Article III, *id.* at 70, ¶¶ 20-21.  Defendants do not explicitly address Plaintiffs' theory of harm to their privacy interests anywhere in their Proposed Conclusions of Law.  The Court cannot ignore the omitted objections given its independent obligation to assess its jurisdiction.  But it is worth noting that Defendants themselves do not appear to believe that any of Plaintiffs' injuries are not redressable or — apart from their ambitious objections to traceability, discussed below — fairly traceable to the citizenship question.

### 1.  Associational Standing

Before turning to Plaintiffs' theories of injury, however, the Court briefly addresses the issue of associational standing — namely, whether any of the NGO Plaintiffs have standing to bring claims on behalf of their individual members (in addition to any standing they may have to pursue such claims in their own right).  An organization has "associational" standing to bring claims on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Food and Commercial Workers v. Brown Grp.*, 517 U.S. 544, 553 (1996) (internal quotation marks omitted).  The third of those requirements is only a prudential one — that is, it is not an element of Article III's jurisdictional limitations on the power of the federal courts.  *See id.* at 554-57.

Applying those standards here, the Court concludes — subject to its broader conclusions regarding standing below — that three of the NGO Plaintiffs, NYIC, MRNY, and ADC, have proved that they have associational standing to seek relief on behalf of certain of their members. The second and third prongs of the analysis can be swiftly addressed.  Defendants make no argument with respect to the third, non-jurisdictional prong and, thus, have waived the issue.  *Cf. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010).  In any event, concerns of "administrative convenience and efficiency" favor associational standing, as neither the claims asserted nor the relief requested in this litigation call for significant participation by individual members; at most, the claims call for proof of their residence, but that can be readily established without direct participation.  *Food and Commercial Workers*, 517 U.S. at 556-57.  As for the second prong of the analysis, which Defendants also fail to contest, the Second Circuit has explained that an interest is "germane" to an organization's purpose if the lawsuit would "reasonably tend to further the general interests that individual members sought to vindicate in joining the association and . . . bears a reasonable connection to the association's knowledge and experience."  *Bldg. & Constr. Trades Council of Buffalo & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006).  Here, as discussed above, ADC's, MRNY's, and NYIC's missions involve obtaining government benefits for their communities, including — indeed, expressly *by means of* — ensuring a fair and accurate census count of those communities.  Thus, the second prong of the associational standing test is satisfied.

That leaves the first — and only disputed — prong of the analysis: whether the NGO Plaintiffs' members would otherwise have standing to sue in their own right.  Although proof of a mere "statistical probability that some of [an organization's] members are threatened with concrete injury" is not enough to satisfy the first prong of associational standing, an organization can meet the first prong by offering "specific allegations" (along, at this stage, with proof)

"establishing that at least one identified member had suffered or would suffer harm." *Summers*

*v. Earth Island Institute*, 555 U.S. 488, 497-98 (2009). Asserting that "a vague reference to

unidentified members does not confer associational standing on an organization," Defendants

contend that the NGO Plaintiffs have "failed to identify any member who has standing to sue in

his or her own right." Defs.' Post-Trial Br. 71, ¶¶ 25-26. While that is true of CASA, *see*

*generally* Escobar Decl., it is not true of NYIC, MRNY, or ADC. NYIC has identified specific

members who receive funds from federal programs that distribute those funds on the basis of

census data. *See* Recitation of Facts ¶ 258. Similarly, MRNY has identified specific members

who live in New York (and, more specifically, certain counties within the state) whose children

attend Head Start programs or public schools that receive Title I funding. *See* Recitation of Facts

¶ 256. And ADC has identified specific members who reside in California, Florida, New York,

the District of Columbia, and New Jersey. *See* Recitation of Facts ¶ 257. More generally, there

is evidence that ADC has members residing in all fifty states. *Id.* That is sufficient to establish

that those members, although unnamed, would have standing to the extent that standing depends

only on the facts of their existence and residence in a particular jurisdiction. As will be

discussed below, that is true with respect to some (albeit not all) of the theories of injury at issue

here.[48]

---

[48]        Defendants seem to argue that an organization must identify particular members by name
in order to have associational standing to pursue claims on their behalf. *See* Defs.' Post-Trial Br.
71, ¶ 25. But the cases they cite do not support that proposition. As discussed, an organization
can satisfy the first prong of the associational standing analysis by offering proof "establishing
that at least one identified member ha[s] suffered or would suffer harm." *Summers*, 555 U.S. at
498. It would overread the word "identified" in that context to require an organization to *name*
the member who might have standing in his or her own right. In the first place, such specific
identifying information is often unnecessary to determine whether a person would have Article
III standing. For example, as in this case, whether a person will suffer a loss of political
representation depends on the facts of his or her existence and residence within a particular
jurisdiction, but not on his or her name. Where those (or other relevant) facts are proved, a court
need look no further to conclude that the organization has members who would have standing to

In short, three of the NGO Plaintiffs have established — in addition to whatever standing they may have in their own right — that they have standing to the same extent that certain of their individual members would have standing.  More specifically, NYIC has standing to the extent that its members who receive funds from census-tied programs would have standing. MRNY has standing to the extent that its individual members residing in New York State generally, and Queens, Brooklyn, the Bronx, and Long Island specifically, would have standing and to the extent that its individual members whose children attend Head Start programs or public schools that receive Title I funding would have standing.  And ADC has standing to the extent that its individual members residing in all fifty states and the District of Columbia — and certainly those residing in California, New York, Pennsylvania, Texas, Florida, Rhode Island, Washington State, Arizona, Illinois, Maryland, New Jersey, and the District of Columbia — would have standing.

## 2.  Injury in Fact

With that, the Court turns to Plaintiffs' five theories of injury: (1) loss of political representation, both between states (in congressional reapportionment) and within states (in redistricting); (2) loss of federal funds, also both between and within states; (3) harm to important sovereign interests caused by degradation of the census data on which state and local governments rely; (4) injury to organizations and local governments through the diversion of,

---

pursue a particular claim in their own right.  Moreover, to hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine — namely, protecting individuals who might prefer to remain anonymous.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 458-60 (1958); *see also Food and Commercial Workers*, 517 U.S. at 551-52. Dicta about "unidentified members" aside, the most that Defendants' cases establish is that a plaintiff must prove "facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State Inc.*, 454 U.S. 464, 487 n.23 (1982).  For the reasons discussed above, ADC has done so, even as to those members whom it does not identify by name.

and strain inflicted upon, organizational resources; and (5) infringement of privacy interests in the information collected by the census.  As noted, the Court concludes that all five forms of injury are legally cognizable and that, as to four of the five — namely, all except the privacy-infringement theory — at least some Plaintiffs have proved by a preponderance of the evidence that they have suffered, or will suffer, injury in fact sufficient to support standing.

### a. Diminished Political Representation

First, Plaintiffs have proved that several states are likely to lose one or more seats in the next round of congressional redistricting if the citizenship question is added to the census.  *See* Recitation of Facts ¶ 243-45.  The Supreme Court has squarely held that the loss of a seat or seats in the House of Representatives "undoubtedly satisfies the injury-in-fact requirement of Article III standing" because of the dilution of political power that results from such an apportionment loss.  *Dep't of Commerce*, 525 U.S. at 331; *accord Carey v. Klutznick*, 637 F.2d 834, 836-38 (2d Cir. 1980); *cf. Utah v. Evans*, 536 U.S. 452, 458 (2002).  Further, although the census is still months away, such an injury is sufficiently "imminent" to invoke federal-court jurisdiction now.  *See Dep't of Commerce*, 525 U.S. at 327, 332 (finding threatened vote dilution because of census modifications sufficiently "imminent" in two lawsuits brought twenty-five months before the census date).

In particular, Plaintiffs have proved that California's prospective loss of a seat in the House of Representatives is "certainly impending."  *See* Recitation of Facts ¶¶ 243, 245.  And although California is not a Plaintiff here, ADC is and, as discussed, it has individual members who reside in California.  *See id.* ¶ 257.  Those individual members' "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement

of Article III standing." *Dep't of Commerce*, 525 U.S. at 331.[49]  Plaintiffs have also proved that

New York and Illinois face a "substantial risk" that they will lose at least one seat in the next

Congressional reapportionment because of the citizenship question's addition to the 2020

Census.  *See* Recitation of Facts ¶¶ 243, 245.  New York and Illinois *are* Plaintiffs here, and thus

have standing to seek a remedy for that injury in their own right.  *Cf. Evans*, 536 U.S. 452.

Additionally, that provides an independent basis for ADC and MRNY to seek relief, as ADC has

individual members who reside in New York and Illinois, *see* Recitation of Facts ¶ 257, and

MRNY has individual members who reside in New York, *see id.* ¶ 256.  ADC's individual

members who reside in Texas, Arizona, and Florida, *see id.* ¶ 257, likewise face a substantial risk

of lost representation in the U.S. House of Representatives.

     A closer question is whether Plaintiffs have also proved that any of the NGO Plaintiffs'

members will suffer an Article III injury in fact in the form of lost representation in *intra*state

---

[49]     Although Defendants do not raise the issue, the jurisdictional nature of the standing inquiry compels the Court to note that ADC's standing does not depend on proof that its members residing in California and elsewhere are U.S. citizens or voters — matters on which the record is silent.  While intrastate redistricting is governed by the Equal Protection Clause's "one person, one vote" principle, interstate congressional apportionment is governed by Section 2 of the Fourteenth Amendment, which provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons in each State*, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2 (emphasis added).  Thus, while a nonvoter might or might not have standing to challenge a *district* on a representational dilution theory under the Equal Protection Clause — an open question, however much common sense might suggest the answer is "yes," *see, e.g.*, *Calvin v. Jefferson Cty. Bd. of Comm'rs*, 172 F. Supp. 3d 1292, 1307 n.12 (N.D. Fla. 2016) — the "undoubted[]" Article III injury that a person suffers when his or her *state* loses a representative in congressional reapportionment, *Department of Commerce*, 525 U.S. at 331, ultimately traces to a legally protected interest that does not depend on that person's citizenship status or eligibility to vote.  *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-28 & n.9 (2016) (describing the original understanding of population-based apportionment, which James Madison called a "fundamental principle of the proposed constitution," as reflecting Alexander Hamilton's "principled argument for allocating seats to protect the representational rights of every individual of the community at large," and describing the understanding of the Fourteenth Amendment's framers that "non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot" (citations and internal quotation marks omitted)).

redistricting carried out on the basis of the federal decennial census. Intrastate vote dilution plainly qualifies as an injury in fact for purposes of Article III. *Dep't of Commerce*, 525 U.S. at 332-33; *Carey*, 637 F.2d at 838. In *Department of Commerce*, for example, the Supreme Court held — given the fact that certain counties "were substantially likely to lose population" under the Census Bureau's plan — that residents of those counties had satisfied Article III's injury-in-fact requirement. 525 U.S. at 334. In other words, all the Court required was proof that (1) certain states relied on federal decennial census data for intrastate redistricting, (2) voters in certain counties in those states were "substantially likely . . . to suffer vote dilution as a result of the [Census Bureau's] plan," and (3) plaintiffs were among the voters who lived in those counties in those states. *Id.* at 332-34 (internal quotation marks omitted). As that language suggests, however, the Supreme Court has tended to describe the injury in the *intra*state vote-dilution context as affecting only eligible voters. Here, Plaintiffs have proved that several of the NGO Plaintiffs' individual members *reside* in counties that will lose statewide population shares because of the citizenship question, but the record is silent as to whether those members are also eligible voters. In this instance, the Court concludes that the interests of avoiding an unnecessary holding on a delicate constitutional question outweigh even the powerful interests favoring resolution of all open legal issues in this Opinion. *See Ashwander*, 297 U.S at 347 (Brandeis, J., concurring). The Court therefore declines to address whether the facts proved by Plaintiffs are legally sufficient to establish that any of the NGO Plaintiffs' members will suffer an Article III injury when, at a minimum, they lose political representation in the next intrastate redistricting.

### b. Loss of Government Funds

Second, given the Court's factual findings, many Plaintiffs have proved that they will suffer a loss of funding from federal programs that distribute such funding on the basis of census data. Such a monetary loss is a classic form of Article III injury in fact. *See Carey*, 637 F.2d at

838 (holding that "citizens who challenge a census undercount on the basis . . . that improper enumeration will result in loss of funds to their city have established . . . an injury" for purposes of standing); *accord City of Detroit v. Franklin*, 4 F.3d 1367, 1374-75 (6th Cir. 1993); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 671 (E.D. Pa. 1980); *City of Camden v. Plotkin*, 466 F. Supp. 44, 47-51 (D.N.J. 1978).  More specifically, a state or locality that proves that it will lose funds under federal revenue-sharing programs satisfies Article III's injury-in-fact requirement.  *See Carey*, 637 F.2d at 838 ("New York City and New York State . . . have standing as recipients of federal funds under revenue sharing.").  So too, an individual who proves that he or she will suffer a loss of federal benefits has adequately proved an Article III injury.  *See id.*  ("The individual plaintiffs in this case have alleged concrete harm in the form of . . . decreased federal funds flowing to their city and state, thus establishing their standing.").

Applying those principles here, the Court concludes as follows:

- Plaintiffs Illinois, Massachusetts, Maryland, New Jersey, New Mexico, New York, Oregon, Washington State, and the District of Columbia have proved that if the net undercount of noncitizens attributable to the citizenship question is as low as two percent — far lower than the Court has found to be the best estimate — they will lose funds from several federal programs.  *See* Recitation of Facts ¶¶ 251-52.  On that basis, the Court concludes that those Plaintiffs face "certainly impending" injuries.

- Plaintiffs have also proved that (1) MRNY's individual members who reside in New York and (2) ADC's individual members who reside in California, Texas, Florida, Nevada, and Hawaii, and in Plaintiff States New York and New Jersey, face a "certainly impending" Article III injury for the same reasons.  *See* Recitation of Facts ¶¶ 256-67.

- Additionally, Plaintiffs have proved that MRNY's individual members who reside in New York and benefit from Title I and Head Start funds will suffer an individualized harm that is "certainly impending," in light of its propensity to occur in even the most implausibly low noncitizen net undercount scenarios.  *See* Recitation of Facts ¶ 256.

- Finally, Plaintiffs have proved that NYIC's members Chhaya, LSA, Korean Community Services of New York, Planned Parenthood of New York City, and Chinese-American Planning Council all receive funding through programs that allocate funds to states based on census data.  *See* Recitation of Facts ¶ 258.  Given the net undercount scenarios that the Court has found to be likely, those organizations have proved that they face a substantial risk of an Article III injury in the form of lost funding.

Defendants argue that, even if Plaintiffs have proved these losses are likely to occur, they do not count as Article III injuries because they may be "offset" by gains that turn up elsewhere in the federal funding scheme. *See* Tr. 506; Defs.' Post-Trial Br. 34-36, ¶¶ 220-38. But "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006); *see also Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (mem.); *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013) ("A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise . . . ."), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016).

Plaintiff Colorado will also suffer an injury for a related reason: It will lose the ability to spend funds because its own state constitution limits year-on-year increases in expenditures to a function of the state's population growth as determined by federal census data. The Colorado "Taxpayer's Bill of Rights," ratified into the Colorado Constitution, limits the "maximum annual percentage change in state fiscal year spending" to "inflation plus the percentage change in state population in the prior calendar year, adjusted for revenue changes approved by voters after 1991," and provides that "[p]opulation shall be determined" for that purpose "by annual federal census estimates and such number shall be adjusted every decade to match the federal census." Colo. Const. art. X, § 20(7)(a); *see* Colo. Rev. Stat. § 24-77-103(1)(c)(III) (providing for a formula to recalculate the percentage change each year on the basis of new federal census estimates). Whether characterized as a loss in funding, or a loss in the ability to spend for the general welfare of its residents (and, thus, an infringement on Colorado's sovereign interests), Colorado will suffer an Article III injury if its population is undercounted by even the smallest

amount. Given the Court's findings as to the likely net undercount of Colorado's population, *see* Recitation of Facts ¶ 249, the Court concludes that Colorado faces a "certainly impending" injury traceable to the addition of the citizenship question.

In sum, given the remarkably low net undercount of noncitizens that would prompt the foregoing losses of funding, Governmental Plaintiffs Colorado, Illinois, Massachusetts, Maryland, New Jersey, New Mexico, New York, Oregon, Washington State, and the District of Columbia; and NGO Plaintiffs ADC, MRNY, and NYIC have established an injury in fact that is "certainly impending." At a minimum, there is no doubt that these Plaintiffs have demonstrated a "substantial risk" that they will suffer such injuries. In either case, these Plaintiffs have satisfied Article III's injury-in-fact requirement.

### c. Harm to the Quality and Accuracy of Data

Next, the Governmental Plaintiffs proved that they will suffer injury in fact from the degradation in data quality that would occur if the citizenship question appears on the 2020 census. At the outset, there is no reasonable dispute that Plaintiffs proved by a preponderance of the evidence that addition of the citizenship question would result in that harm. Indeed, the evidence at trial was undisputed that, regardless of how successful NRFU operations are in remedying a net differential undercount due to a differential decline in self-response rates, the addition of the citizenship question *will* result in harm to the quality of census data. First, as noted above, that was the original position of the Census Bureau in connection with its review of DOJ's request. *See* Recitation of Facts ¶¶ 8, 19, 28-30, 34. Second, Defendants own expert, Dr. Abowd, agreed, testifying that the addition of a citizenship question would harm the overall quality of 2020 census data regardless of any net undercount scenario. *See* Tr. 882, 952-53, 1221-22, 1251. And third, Plaintiffs' experts testified credibly in the same manner. Tr. 302-04. Additionally, Dr. Salvo, the Director of the New York City Department of City Planning's

Population Division, explained credibly that the degradation in quality of the data would harm New York City's ability to allocate educational and public health resources efficiently and effectively.  *See* Recitation of Facts ¶ 263.[50]  Crucially, these harms will occur *whether or not there is a net undercount* — meaning that this theory of injury does not depend on the causal chain of events connecting the decline in self-response rates among noncitizen households to a net differential undercount of people who live in such households.

Understandably, then, Defendants raise no objections in their post-trial filings to the imminence, traceability, or redressability of this harm.  *See* Defs.' Post-Trial Br. 70, ¶¶ 20-21.  Instead, the principal dispute between the parties is whether a degradation in the quality of census data *is* a legally cognizable harm.  *Compare id.*, *with* Pls.' Proposed Conclusions ¶¶ 57-59.  The Court agrees with Plaintiffs that it is.  For starters, the Supreme Court has consistently held that the "inability to obtain information" is a cognizable Article III injury.  *FEC v. Akins*, 524 U.S. 11, 21 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) ("[R]efusal to permit appellants to scrutinize the ABA Committee's activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue."); *id.* ("Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records.").  If the inability to obtain information is a cognizable form of injury for Article III purposes, it follows *a fortiori* that the inability to obtain accurate

---

[50]     Defendants contend that Dr. Salvo's testimony about the citizenship question's effects on data quality was too "conclusory" and "lacked key specifics," including that he did not name the precise city services that might be affected by a decline in data quality.  Defs.' Post-Trial Br. 40, ¶ 264.  At best, Defendants' criticisms amount to little more than nitpicking.  Dr. Salvo testified credibly that the City's allocation of resources with respect to several important programs would be harmed by the degradation in data quality attributable to the citizenship question and, moreover, did name specific examples relating to the New York City Board of Education and Department of Health.  *See* Recitation of Facts ¶ 263.

information would be as well.  After all, there is no interest in obtaining false or faulty information.

To be sure, many of these cases involved statutory entitlements to certain information — the classic example of such an entitlement (although, interestingly, the example least discussed in the context of Article III standing) being the Freedom of Information Act.  That is no objection to the conclusion that the Supreme Court has recognized the denial of information as an Article III injury, however, because if such an injury were not already "concrete" enough for Article III purposes, Congress could not make it so.  As the Supreme Court recently clarified, "Congress' role in identifying and elevating intangible harms" does not allow it to grant standing on the basis of pure statutory violations — instead, "Article III standing requires a concrete injury even in the context of a statutory violation."  *Spokeo*, 136 S. Ct. at 1540.  Thus, if the claims of informational injury discussed in the cases amounted to nothing more than "bare procedural violation[s], divorced from any concrete harm," they would not "satisfy the injury-in-fact requirement of Article III," *id.*  — but they are more than that, so they do.

Similarly, a state that relies on the information provided by the federal government under an existing statutory arrangement suffers a sufficiently "concrete" and "particularized" injury for purposes of Article III when the federal government degrades the quality of that information.  States are sovereign entities with sovereign interests in the making and enforcement of their own laws.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *cf. Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (concluding that Maryland suffered an injury to its "law enforcement and public safety interests" from a lower-court order preventing the state from utilizing DNA samples for law enforcement purposes pursuant to a state statute).  But they frequently do so in collaboration with, or in reliance on, the federal government — such is the genius of the federal system, which has historically embraced

167

various creative models of "cooperative federalism." *See, e.g.*, *New York v. United States*, 505 U.S. 144, 167-69 (1992); *Hodel v. Va. Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 286-89 (1981). Most relevant here, states have long relied on federal decennial census data for countless sovereign purposes, and many of the State Plaintiffs here even *require* the use of such data by law; in some instances, it is written into their state constitutions.

The most noteworthy examples of this reliance are the State Plaintiffs that mandate the use of federal decennial census data to apportion state representatives. *See, e.g.*, Recitation of Facts ¶ 246; *see also Georgia*, 539 U.S. at 488 n.2; *Dep't of Commerce*, 525 U.S. at 333 n.4, 334. But state reliance on federal census data for sovereign purposes is goes well beyond that, as the following examples — ranging from the profound to the mundane — make plain:

- States often seek to apportion governmental expenses equitably among local governments, for example, by requiring each county to contribute in proportion to its share of population as calculated by the latest federal decennial census. *See, e.g.*, Colo. Rev. Stat. § 20-1-208 (requiring counties to contribute towards the salaries of employees in Colorado district attorneys' offices according to the counties' population share, as determined in the "last preceding decennial census" of the district in which each county sits); Conn. Gen. Stat. Ann. § 7-338 (requiring that the expenses of a charter commission for a new metropolitan fire, sewer, or water district be apportioned among "each town, city or borough" according to its proportion of the district's total population, "as determined by the last-preceding federal census").

- Other states provide for direct state aid to local governmental units on a per capita basis, relying on federal decennial census data to ensure a fair distribution of resources. *See, e.g.*, 30 Ill. Comp. Stat. 115/2(a) (requiring monthly allocations of the Illinois "Local Government Redistributive Fund" and "Income Tax Surcharge Local Government Distributive Fund" in proportion to cities' and counties' population as determined by federal decennial census data); Minn. Stat. Ann. § 260.821(1)(b) (requiring that support grants to Indian tribes be apportioned, in part, on the basis of "the ratio of the tribe's on-reservation population to the state's total on-reservation population," as determined by the "most recent federal census data"); R.I. Gen. Laws §§ 23-18.9-1, 23-18.9-3 (requiring that funds appropriated as grants in aid of local refuse disposal services be distributed according to a community's share of the statewide population, according to federal census data); N.Y. State Fin. Law § 54(2) (McKinney) (providing that each fiscal year, "there shall be apportioned and paid to the several counties, cities, towns and villages, from moneys appropriated by the state, for the support of local government" amounts in proportion to their "population"); *id.* § 54(1)(a)(1) (defining "population" to mean "the population as shown by the latest preceding decennial federal census" or a "special

population census").

- Some states also redistribute state tax receipts to cities on the basis of each city's
  population share.  *See, e.g.*, Iowa Code Ann. § 312.3(2)(a) (providing that the state
  treasurer shall, on the first day of each month, "[a]pportion among the cities of the state,
  in the ratio which the population of each city, as shown by the latest available federal
  census, bears to the total population of all such cities in the state, the percentage of the
  road use tax funds which is credited to the street construction fund of the cities"); N.M.
  Stat. Ann. § 7-1-6.26(C) (providing that counties shall receive a share of the "county
  government road fund" calculated in part based on the county's population "as shown by
  the most recent federal decennial census"); Or. Rev. Stat. § 221.770 (requiring that
  certain liquor revenues be apportioned among Oregon's cities in part based on their
  population as determined by federal census data).

- North Carolina apportions state support to community colleges in part based on a formula
  that takes into account ratios of county and area populations as determined by the "latest
  United States census."  N.C. Gen. Stat. § 115D-31(a)(3).

- Pennsylvania sets the maximum salary for the mayor of any city with a population greater
  than 15,000 at "$500 per every thousand residents per year as determined by the most
  recent census data provided by the United States Census Bureau."  11 Pa. Cons. Stat.
  § 11208(a), (b).  It also sets the maximum "tapping fee" that a sewer or water authority
  may charge a property owner who connects to the authority's sewer or water system as a
  function of the average household size "as established by the most recent census data
  provided by the United States Census Bureau."  53 Pa. Cons. Stat. § 5607(d)(24)
  (i)(C)(V)(e).

- Some states more generally define "population" for the purpose of their laws to mean
  population as calculated in the most recent federal decennial census.  *See, e.g.*, Iowa
  Code Ann. § 9F.6 ("Whenever the population of any county, township or city is referred
  to in any law of this state, it shall be determined by the last preceding certified federal
  census unless otherwise provided."); N.Y. Gen. Constr. Law § 37-b (McKinney) ("The
  term population when used in relation to this state . . . shall, unless otherwise provided in
  relation to such use, mean population as shown by the latest federal census published as a
  final population count by the United States bureau of the census."); Va. Code Ann. § 1-
  235 ("'Population' or 'inhabitants' means with reference to any county, city, town,
  political subdivision of the Commonwealth or any combination thereof, the natural
  persons in such county, city, town, political subdivision or combination as shown by the
  unadjusted United States decennial census . . . .").

Meanwhile, it is, of course, the federal government's job to collect and distribute accurate federal

decennial census data.  *See* U.S. Const. art. I, § 2, cl. 3; *see also Utah*, 536 U.S. at 478

(explaining that the Framers had a "strong constitutional interest in [the] accuracy" of the

census); *Wisconsin*, 517 U.S. at 20 (holding that the conduct of the census must bear a

"reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, obtaining an accurate count of the population in each state); Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481 ("Congress finds that . . . [i]t is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States."). When the federal government degrades the quality of that data, it therefore inflicts a cognizable injury on the sovereign interests of reliant states.[51]

An example may be helpful in illustrating the point. Suppose a state were to premise certain of its policies on a person's lawful presence in the United States — for example, suppose that it chose to deny certain benefits to undocumented immigrants or required its law-enforcement officials to inquire into the immigration status of any person detained in state custody for any reason. "The accepted way" for states "to perform [such] status checks" — and surely the most reliable — is to contact the DHS' Immigration and Customs Enforcement ("ICE"), the federal agency that accepts and responds to such inquiries from interested states. *Arizona v. United States*, 567 U.S. 387, 411 (2012). Now suppose that ICE were to degrade the quality of its data set, thereby undermining its usefulness to the state as a tool for implementing its policy priorities. If this hypothetical state were to challenge the decisions causing the degradation in immigration-status data, the federal agency could certainly defend its actions on the grounds that they were lawful. But could it seriously deny that the state had suffered a cognizable injury for purposes of standing? Surely not.

---

[51]     That does not mean that, in every case, a state will have a "right" to such data — or a right to data of a certain quality — sufficient to support a valid cause of action to obtain it. But it does mean that a state suffers a concrete and particularized injury when the federal government degrades important tools of sovereignty — or takes those tools away altogether.

Indeed, ample case law supports the proposition that a state has a strong sovereign interest in conducting its own policy, the burdening of which causes an injury in fact for Article III purposes.  One such sovereign interest is a state's "exercise of sovereign power over individuals and entities within [its] jurisdiction — this involves the power to create and enforce a legal code, both civil and criminal."  *Alfred L. Snapp & Son*, 458 U.S. at 601.  Another such sovereign interest — which, in light of the frequent prohibition on *parens patriae* suits against the federal government, *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), is "distinct from . . . the general well-being of its residents" — is a state's "interest in securing observance of the terms under which it participates in the federal system," *Alfred L. Snapp & Son*, 458 U.S. at 607-08; *cf. Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Diamond v. Charles*, 476 U.S. 54, 65 (1986) ("Because the State alone is entitled to create a legal code, only the State has the kind of 'direct stake' . . . in defending the standards embodied in that code.").

The Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016), is instructive on this front.  In that case, Texas led a coalition of states in a challenge to the Obama Administration's Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA").  The Court held that the states had suffered a cognizable injury for purposes of standing because DAPA would have entitled its recipients to obtain driver's licenses under existing state law and providing those licenses would have come at a financial cost to Texas.  *See id.* at 155-56.  In denying a stay of the district court's preliminary injunction pending appeal, the Fifth Circuit cited *Alfred L. Snapp & Son*, explained that Texas possessed a sovereign interest in the maintenance of its own legal code, and held that "Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal

law, and Texas did not enact them merely to create standing." 787 F.3d 733, 749 (5th Cir. 2015).

The court reasoned that "if pressure to change state law in some substantial way were not injury,

states would have no standing to challenge *bona fide* harms because they could offset most

financial losses by raising taxes or fees." *Id.* Several months later, the Fifth Circuit affirmed the

preliminary injunction on the merits, reiterating and confirming its conclusions as to standing.

The Circuit held that "states may have standing based on . . . federal interference with the

enforcement of state law, at least where the state statute at issue regulates behavior or provides

for the administration of a state program and does not simply purport to immunize state citizens

from federal law." 809 F.3d 134, 153 (alterations and internal quotation marks omitted). Such

"intrusions," the court explained, "are analogous to pressure to change state law." *Id.*

Like the state plaintiffs in *Texas v. United States*, the State Plaintiffs here have enacted

their reliance on federal census data into law — in some cases, as noted, even into their

constitutions. Moreover, as in *Texas v. United States*, "there is no allegation," let alone proof,

that those jurisdictions enacted their laws or ratified their constitutions "to manufacture standing"

in these cases. *Texas*, 809 F.3d at 159. If a citizenship question is added to the decennial census,

these Plaintiffs will be subjected to a forced choice: They can use the degraded data, resulting in

worse policy; they can spend money to compensate for the damage; or they can change their

laws to relieve themselves of the legal obligation to use federal census data in making and

enforcing their laws (which would presumably necessitate the expenditure of additional

resources to collect data of their own anyway). Such "pressure[] to change state law constitutes

an injury" within the meaning of Article III. *Texas*, 787 F.3d at 749; *see Texas*, 809 F.3d at 153.

Accordingly, several Governmental Plaintiffs — including State Plaintiffs New York,

Colorado, Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New

Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Virginia, and

Washington, and Plaintiff New York City — have proved an imminent injury to their sovereign interests through the degradation in quality of federal census data.

### d.  Diversion of Resources

Next, the Court finds that the NGO Plaintiffs have established that they have already suffered, and will continue to suffer, injury in fact due to a diversion of their resources.  In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organization can establish Article III injury in fact by proving "concrete and demonstrable injury to [its] activities — with the consequent drain on [its] resources."  *Id.* at 379; *see id.* at 379 n.21 (holding that an organization that proves it "has indeed suffered impairment" in its activities has proved an Article III injury); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (requiring a showing of "perceptible impairment"); *see also Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904-06 (2d Cir. 1993).  Although an organization may not inflict such an "impairment" on itself for purposes of creating standing — for example, by incurring litigation expenses in the very lawsuit at issue, *see, e.g.*, *Citizens for Responsibility and Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174, 189-93 (S.D.N.Y. 2017) ("*CREW*") — the *Havens Realty* theory of organizational standing squarely covers a claim of injury from "purportedly illegal action [that] increases the resources the group must devote to programs independent of its suit challenging the action." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (R.B. Ginsburg, J.); *see CREW*, 276 F. Supp. 3d at 190 (noting that *Havens Realty* applies where the "[d]efendant's actions have impeded" an organization's "ability to perform a particular mission-related activity, or [forced it] to expend resources to counteract and remedy the adverse consequences or harmful effects of [the] [d]efendant's conduct").  This is exactly the kind of injury that NGO Plaintiffs allege here.

Defendants suggest that *Havens Realty* recognizes Article III injuries arising from organizational expenditures, but only where those expenditures are made in response to injuries

that are *themselves* sufficiently imminent and impending to satisfy Article III.  *See* Defs.' Post-

Trial Br. 69, ¶ 15; Tr. 1486-89.  Of course, that argument is beside the point because Plaintiffs

have proved such injury, as discussed above.  But the argument also makes no sense on its own

terms.  It would be illogical to recognize that organizations may be injured by expenditures made

in response to future injuries, as the Supreme Court continues to do, *see Clapper*, 568 U.S. at 414

n.5, but to hold that that doctrine applies only in cases in which it would be superfluous.  Indeed,

that would render the category of plaintiffs that could establish standing under a *Havens Realty*

theory a null set.  Conspicuously, though, Defendants cite no Supreme Court case holding (or

even hinting) that *Havens Realty* has been so cabined, much less overruled.

Applying *Havens Realty* here, the Court finds that the NGO Plaintiffs plainly have

standing to challenge Secretary Ross's decision.  That is, all four NGO Plaintiffs have proved

that the citizenship question will cause them — indeed, already is causing them — to divert

organizational resources away from their core missions and towards combating the negative

effects of the citizenship question.  *See* Recitation of Facts ¶¶ 265-74.[52]  Defendants' arguments

to the contrary are somewhat ironic because the record makes clear that the Census Bureau itself

relies on organizations like the NGO Plaintiffs to ensure a successful census — and will rely on

them to counteract the indisputably negative effects of the citizenship question.  *See, e.g.*,

Recitation of Facts ¶¶ 187-88, 274.  In fact, Dr. Abowd, Defendants' own expert, explicitly

conceded that addition of the citizenship question on the census will make the "job[s]" of these

---

[52]     Some of the NGO Plaintiffs cite expenses related to this litigation among the resources
that they have expended because of the citizenship question.  *See, e.g.*, Altschuler Decl. ¶ 22.  A
claim of injury predicated on litigation expenses alone, however, would stand on shaky ground.
*See CREW*, 276 F. Supp. 3d at 189-93.  Given that the NGO Plaintiffs' injuries involve diversion
of resources *other* than mere litigation expense, *see, e.g.*, Altschuler Decl., ¶¶ 19-21, the Court
need not and does not rely on litigation expenses in reaching its conclusions that the NGO
Plaintiffs have proved injury in fact.

organizations "harder." Tr. 1303-05. In other words, Defendants' own arguments against the NGO Plaintiffs' injury depend on their prediction that any impending decline in self-response rates will be mitigated, in part by organizations such as the NGO Plaintiffs that will spend money and devote organizational resources to combat the citizenship question's negative effects. Defendants' own arguments against Plaintiffs' other theories of standing therefore serve to confirm this one.

In contending that the NGO Plaintiffs have not proved this theory of injury, Defendants also fault the NGO Plaintiffs for the lack of any testimony "that their expenditure of resources took into account the extent to which the Census Bureau's [NRFU] procedures would mitigate any differential net undercount attributable to the citizenship question." Defs.' Post-Trial Br. 40, ¶ 262. In other words, Defendants suggest that Plaintiffs should be denied standing to seek a remedy in federal court because they should have trusted the same parties who caused their injuries in the first place to fix them. That may be the kind of thing the fox would say to the henhouse, but it is not what one would expect the federal government to say to a coalition of civil rights organizations challenging what they believe to be unlawful governmental action. In any event, the argument is unpersuasive on its merits, too, as it has a circular quality: As noted above, Defendants' own efforts to mitigate a decline in self-response depend in part on organizations like the NGO Plaintiffs expending resources to counteract such a decline. That is, to the extent that Defendants' NRFU efforts are successful in any respect, it will be in part because the NGO Plaintiffs have expended resources in aid of those efforts. And in any event, the Court has already found, based on the evidence at trial, that Defendants' NRFU efforts will *not* succeed in eliminating a net differential undercount as a result of the citizenship question.

Defendants' only remaining objection to this theory of injury is without merit. They assert that the NGO Plaintiffs have "not met their burden of proving" a "direct conflict between

their missions and the reinstatement of a citizenship question on the census."  Defs.' Post-Trial

Br. 40, ¶ 263; *see id.* at 69-70, ¶ 18.  In support of that conclusion, however, they rely on a

misreading of the D.C. Circuit's decision in *National Law Center on Homelessness & Poverty v.*

*Kantor*, 91 F.3d 178 (D.C. Cir. 1996).  In that case, an organization dedicated to helping the

homeless asserted Article III standing to challenge an undercount of homeless individuals based

on an anticipated injury to the organization's "purpose of providing accurate information on

homelessness and poverty."  *Id.* at 182.  But the D.C. Circuit did not accept that characterization

of the organization's mission; pointing out that the National Law Center was not a "news

reporting agency," the Court observed instead that the "purpose of providing" such "accurate

information" was "ancillary to [its] general approach of gaining governmental responses to

improve the lot of the homeless."  *Id.*  Given that definition of the organization's mission, the

"indirectness" that the court found to be problematic in that case is easy to see.  It is equally easy

to see that it is *not* present here.

More significantly, the D.C. Circuit went on to hold that the connection between the

ability to disseminate accurate information about the homeless population and the probability of

achieving tangible benefits based on the public's reaction to that information was "at the far end

of speculation" on the factual record before it.  *Id.*  Observing that "conjectural" connection, the

Court held that it was "[f]or *this* reason" that the organization's reliance on *Havens Realty* was

"misplaced" — that is, that the group had simply failed to show, as a factual matter, that "a

homeless undercount . . . impose[d] any . . . barriers to either the homeless or their advocates."

*Id.* (emphasis added); *see Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*, 659

F.3d 13, 25 (D.C. Cir. 2011) (construing the "direct conflict" requirement to mean that "[i]f the

challenged conduct affects an organization's activities but is neutral with respect to its

substantive mission," it is "'entirely speculative' whether the challenged practice will actually

impair the organization's activities").  Here, of course, Plaintiffs have proved, as a factual matter, that Defendants' conduct will — absent an expenditure of resources — harm their core missions of advancing the interests, and enhancing the political power, of the communities they serve. There is thus a "direct conflict" between their missions and the conduct they challenge, and they have proved an Article III injury under *Havens Realty*.

Finally, Plaintiffs have also proved that New York City and Chicago have diverted limited resources towards counteracting the injurious effects of a citizenship question.  That forced resource-diversion also qualifies as an Article III injury.  It is long settled that a municipality that loses access to resources, thus "threatening its ability to bear the costs of local government and to provide services," suffers an Article III injury in fact.  *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979).  And it is of no import that New York City and Chicago could, theoretically, have foregone any efforts to remedy the harms caused by the citizenship question, as the "forced choice" between risking imminent harm and spending money to avoid it would constitute a cognizable Article III injury all by itself.  *Cf. Texas*, 787 F.3d at 749.

Accordingly, Plaintiffs ADC, MRNY, NYIC, CASA, New York City, and the City of Chicago have each proved that the addition of a citizenship question to the 2020 census questionnaire will cause, and in some instances has already caused, cognizable Article III injury in the form of a diversion of valuable resources.

**e.  Loss of Privacy**

Finally, the Court shares Plaintiffs' view that any "invasion of privacy" that would be inflicted by the unlawful disclosure of confidential census data regarding individuals' citizenship status would, it if were sufficiently imminent, constitute a cognizable Article III injury.  A contrary view would fly in the face of "both the common law and the literal understandings of

privacy," which "encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). That said, Plaintiffs did not prove that such an injury is sufficiently imminent to satisfy Article III in these cases. As Plaintiffs concede, it would be illegal for the Department of Commerce to "make any publication whereby the data furnished by any particular establishment or individual . . . can be identified." 13 U.S.C. § 9(a)(2); Pls.' Proposed Findings ¶ 1722. Consistent with that mandate, Dr. Abowd testified at trial that the Census Bureau will apply "disclosure avoidance techniques" to any data to ensure that information concerning particular respondents is not identifiable. Tr. 1033. To be sure, those techniques may reduce the fitness of the data for DOJ's purposes — an issue addressed below. And, in theory, the statutory prohibition could be changed by a future Congress. But it is pure speculation to suggest that the Census Bureau will not comply with its legal obligations to ensure the privacy of respondents' data or that those legal obligations will be amended. And given that, the fact that NGO Plaintiffs may be subjectively fearful that the government will misuse citizenship data obtained through the census, *see* Pls.' Proposed Conclusions ¶ 55, however understandable such fears may be, is "insufficient to create standing," *Clapper*, 566 U.S. at 417. Accordingly, the Court holds that Plaintiffs failed to prove that they have been, or will be, injured for Article III purposes through a loss of privacy.

### 3. Traceability and Redressability

In short, Plaintiffs proved that some have suffered, or will suffer, injury in fact in at least four ways: (1) diminished political representation, between and within states; (2) reductions in federal funding, again both between and within states; (3) harm to the accuracy and quality of census data; and (4) the diversion of resources. Thus, the Court turns to the second element of

standing, which requires that Plaintiffs prove a "causal connection" between their injuries and the conduct they challenge in this lawsuit.  *Lujan*, 504 U.S. at 560.

Plaintiffs have done so here.  First, the evidence at trial proved beyond any doubt, and certainly by a preponderance of the evidence, that the addition of a citizenship question will cause a disproportionate decline in self-response rates among households containing at least one noncitizen individual and that that, in turn, will force substantially more such households into the Census Bureau's NRFU process.  Right off the bat, that will cause a decline in the accuracy and quality of the data generated by the census, which will injure the Governmental Plaintiffs that rely on that data to make and enforce their laws.  On top of that, the Court found, by a preponderance of the evidence, that the decline in self-response will translate into a net differential undercount of people who live in noncitizen households of at least 5.8%.  That net differential undercount will, in turn, cause the harms set forth in the prior section of this Opinion. In arguing otherwise, Defendants attack the "traceability" of Plaintiffs' injuries to the citizenship question in startlingly cursory fashion.  After previewing these arguments with such fanfare, *see* Defs.' Pre-Trial Br. 6 n.2; *see generally id.* at 5-20, Defendants devote a scant two paragraphs of their Proposed Conclusions of Law to contesting "traceability" on various grounds, each of which amounts to little more than a conclusory citation to the record, and each of which — even lending it the most charitable interpretation, despite Defendants' near-abandonment of their supporting arguments — is ultimately unavailing.  *See* Defs.' Post-Trial Br. 70-71, ¶¶ 22-23.

The first such ground is the most familiar: Defendants argue that the connection between the citizenship question and Plaintiffs' injuries is simply too "speculat[ive]," relying on too many "inferences" to satisfy Article III.  Post-Trial Br. 67-68, ¶¶ 11-14.[53]  That argument, however,

---

[53]   Notably, Defendants raise this argument as an objection to the *imminence* — as opposed to the traceability — of only two types of injuries, namely lost political representation and lost

misunderstands both the law and the facts.  Courts often dismiss claims for prospective relief because the plaintiffs' claims that defendants will imminently cause them injury are too "speculative" to satisfy Article III.  *See, e.g.*, *Clapper*, 568 U.S. at 410-14.  But, as the term suggests, the bar on "speculative inferences" in the standing analysis refers to *speculation* and *inferences*, as opposed to evidence and proof.  To be sure, at the pleading stage, a plaintiff must plausibly allege facts connecting his or her injuries to the defendant's conduct, and cannot substitute "speculative inferences" for plausible factual allegations of causation.  *See, e.g.*, *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 42-46 (1976) (ordering dismissal of a complaint that failed to allege that plaintiffs' injuries "*in fact* result[ed] from" a challenged federal tax incentive through its effect on third parties, rendering it "purely speculative" whether those injuries were fairly traceable to the tax incentive "or instead result[ed] from decisions made" by the third parties "without regard" to the incentive (emphasis added)).  But here, with a full trial record, the Court need not speculate: Plaintiffs *proved* each factual step in the causal chain and that each step is fairly traceable, at least in part, to the addition of a citizenship question.  *See, e.g.*, *Mendia v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014) ("[W]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." (internal quotation marks omitted)).  So, while "highly attenuated chain[s] of *possibilities*" are not enough to survive a motion to dismiss, *Clapper*, 568 U.S. at 410 (emphasis added), here the Court deals with facts, not possibilities.  Because the facts show both that Plaintiffs' injuries are imminent and fairly traceable to Defendants' conduct, this is not a case in

---

federal funding.  Defs.' Post-Trial Br. 67-68, ¶¶ 11-14.  But for the Court's independent obligation to assure itself of its own subject-matter jurisdiction, the Court would deem the objection abandoned as it relates to traceability — and perhaps Defendants meant to do just that, given the ultimate weakness of the argument.  The Court addresses the "imminence" of Plaintiffs' injuries in more detail below.

which "[s]peculative inferences are necessary to connect [Plaintiffs'] injury to the challenged actions of [Defendants]." *Simon*, 426 U.S. at 45. Indeed, the facts underlying the chain of causation connecting Defendants' conduct to Plaintiffs' injuries here is far stronger than those the Supreme Court found sufficient in *Davis*.

In fact, to the extent that either side in these cases invites the Court to substitute "speculation" for proof, it is *Defendants*, not Plaintiffs, who do so. Defendants assert that NRFU operations will remedy any decline in the self-response rate attributable to the citizenship question, Defs.' Post-Trial Br. 16-20, ¶¶ 127-141, but, at the end of the day, they offer little more than a hope and prayer in support of that assertion. As discussed, NRFU operations have historically failed to remedy differential declines in self-response rates. *See* Recitation of Facts ¶¶ 211, 230. And Defendants offer no evidence in support of their claim that NRFU operations will do so this time; indeed, they have not even determined the imputation formulae that they will use in the 2020 census. *See* Tr. 1350-51. As a matter of fact, and as discussed at length above, there are several demonstrable reasons to believe that NRFU operations will do a *worse* job this time around than in past years in addressing any decline in response rate among Hispanic and noncitizen households. Considerable testimony supports the conclusion that NRFU will suffer from many of the same defects as the initial attempts to obtain answers through self-response. Dr. Hillygus testified that "all of the issues . . . with respect to confidentiality concerns associated with the citizenship question that the Census Bureau acknowledges and has shown to have an impact on the self-response, all matter for cooperation with a census enumerator" in NRFU, too. Tr. 97; *see id.* at 99-100 (discussing the likelihood that confidentiality concerns and the macroenvironment will hamper NRFU efforts more than in previous years). Dr. Barreto's testimony supports the same conclusion, *see* Tr. 643-44, and also suggests that attempts to reassure potential NRFU respondents with confidentiality concerns will be disproportionately

less effective for Hispanic and immigrant populations.  Tr. 688.  Notably, these opinions were

based in part on the Census Bureau's own conclusions and studies.  *See* Brown Memo at 43 n.60;

*see also* PX-152; PX-662; PX-663.  On top of that, it is undisputed that NRFU operations do

nothing to address an undercount attributable to households that do self-respond but omit

noncitizen members from those responses, Tr. 1309-10, a phenomenon that is substantially likely

to rise in direct response to a citizenship question appearing on the census questionnaire, *see*

Recitation of Facts ¶ 214.  In short, Plaintiffs proved that they will imminently suffer a variety of

harms that are fairly traceable to Secretary Ross's decision; Defendants' unsupported assertion

that they will cure or mitigate those injuries before they materialize, supported by nothing more

than a promise — and contradicted by both history and expert testimony about the conditions of

the 2020 census — is not enough to render Plaintiffs' injuries "speculative."  *Cf. Duke Power*

*Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978) (noting, in the context of

discussing traceability and redressability, that a plaintiff need not "negate . . . speculative and

hypothetical possibilities in order to demonstrate the likely effectiveness of judicial relief");

*Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) ("It would be

inequitable in the extreme for us to permit one party to create a significantly increased risk of

harm to another, and then avoid [sic] the aggrieved party from trying to prevent the potential

harm because the party that created the risk promises that it will ensure that the harm is

avoided[.]").

Defendants' second argument — and the one they come closest to abandoning (as it

appears only in their proposed findings of fact) — is that the decline in self-response rates among

Hispanic and noncitizen households is not "fairly traceable" to the addition of a citizenship

question alone because it may also be traceable to an alternate cause, namely the

"macroenvironment" of fear and distrust of government among the Hispanic and noncitizen

populations.  *See* Defs.' Post-Trial Br. 41-42, ¶¶ 272-76.  But this is not how the "traceability" requirement works.  A plaintiff must "demonstrate *a* causal nexus between the defendant's conduct and the injury" to satisfy Article III's traceability requirement — nothing more.  *Rothstein*, 708 F.3d at 91 (emphasis added).  And in these cases, overwhelming evidence (much of it from the Census Bureau itself and Defendants' own expert witness, Dr. Abowd) supports the Court's factual finding that Hispanic and noncitizen households will be less likely to respond to the 2020 census questionnaire if it includes such a question.  That means that the addition of a citizenship question will — obviously — be a "but for" cause of the decline in self-response rates among those communities.  It may well be true (and indeed, the trial evidence suggests) that adding a citizenship question in the current "macroenvironment" will lead to a *greater* decline than it would in another "macroenvironment."  But it would be perverse to suggest that merely because the background context for Secretary Ross's decision will *exacerbate* its negative effects, that the decision is somehow not itself a cause of those effects.  Even in a dry season, it is fair to trace the fire to the arsonist.

Defendants' contrary argument — that the decline in self-response will be traceable to the macroenvironment, not the citizenship question — implies that Article III permits only one legally responsible cause per injury.  But that is not even how the concept of "proximate" cause works, much less how the "fairly traceable" requirement works.  An event can have more than one proximate cause, *see, e.g.*, *Staub v. Proctor Hospital*, 562 U.S. 411, 420 (2011), and each proximate cause need not always even be a *sufficient* cause.[54]  And in any event, "proximate cause" is "not a requirement of Article III standing."  *Lexmark Int'l*, 572 U.S. at 134 n.6.  While

---

[54]     Thus, for example, "[s]trike one, strike two, [and] strike three" are "all proximate causes of the strikeout."  Oral Arg. Tr. 69, No. 16-980, *Husted v. A. Philip Randolph Institute* (U.S. Jan. 10, 2018) (Kagan, J.), *available at* 2018 WL 353954.

the fact that there is another cause "of the plaintiff's injury may foreclose a finding of proximate cause," it "is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." *Rothstein*, 708 F.3d at 92; *see also Block*, 793 F.2d at 1309.  Indeed, the Supreme Court's cases imply an even more expansive traceability bar than the one Plaintiffs have cleared here: that a defendant's conduct need *only* be a "but-for" cause of a plaintiff's injuries in the sense that its removal from the causal chain, through the relief sought in the action, will be likely to redress the injuries.  *See Watt v. Energy Action Ed. Foundation*, 454 U.S. 151, 161 (1981) (stating that a plaintiff must "show that there is a 'fairly traceable' causal connection between the injury it claims and the conduct it challenges, *so that if the relief sought is granted, the injury will be redressed*" (emphasis added) (citation omitted)); *Duke Power Co.*, 438 U.S. at 74-78 (concluding that an injury "fairly can be traced to the challenged action of the defendant" if it is a "but-for" cause of the injury and thus likely to be redressed by the relief sought (internal quotation marks omitted)).

Next, Defendants make much of the fact that some steps in the causal chains involve the actions of third parties — namely, those who choose not to self-respond to the census because of the citizenship question's presence on the questionnaire.  It is certainly true that traceability can be destroyed where the "*independent* actions of third parties" are responsible for a plaintiff's injuries.  *Lujan*, 504 U.S. at 562 (emphasis added).  But as Justice Alito's opinion in *Davis* makes clear, *see* 554 U.S. at 734-35, where record evidence, statistical analysis, or just plain common sense support a finding, as they do here, that third parties will respond to the challenged government conduct in a predictable way, "traceability" is *not* defeated.  In the words of then-Judge Scalia, "[i]t is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons." *Block*, 793 F.2d at 1309.  If Defendants' argument were true, he continued, it would be "difficult

to see how libel actions or suits for inducing breach of contract could be brought in federal court" or "how state threats and intimidation directed at the distributors of certain books could confer standing upon the publisher whose sales are affected." *Id.* Put simply, the "fairly traceable" standard rules out injuries produced by the "independent choices of third parties" only where those choices are truly "unfettered," *Lujan*, 504 U.S. at 562 — that is, *causally* independent from the challenged conduct. Article III "requires no more than *de facto* causality," *Block*, 793 F.2d at 1309, which the presence of third parties in the causal chain does not necessarily undermine, *see Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (three-judge court) (permanently and universally enjoining the Secretary of Commerce's decision to use statistical sampling in enumerating the population for apportionment purposes, despite the presence of third-parties' "intervening" actions in the chain of causation leading to the plaintiffs' injuries), *aff'd, Dep't of Commerce*, 525 U.S. 316. The only question is whether, as a matter of fact, Plaintiffs' injuries are "fairly traceable" up the causal chain to Defendants' conduct. Here, for the reasons explained above, they are.

Perhaps recognizing the weakness of their general arguments regarding the intervening acts of third parties, Defendants renew an argument that they first pressed in their motion to dismiss: that Plaintiffs cannot prove traceability here because the chain of causation depends on the intervening acts of third parties that are *unlawful*. *See* Docket No. 155, at 19-21; Defs.' Pre-Trial Br. 6 n.2; Tr. 1497, 1503. Defendants' argument — for which they cite no supporting authority, from the Supreme Court or otherwise — may deserve points for creativity, but it gives way under the strain of only a little thought. For one thing, the purpose of standing doctrine is to "ensure[] that courts exercise power that is judicial in nature" — that is, the power to adjudicate "cases" and "controversies" that Article III confers on the judicial branch (and keeps away from the other branches). *Gill*, 138 S. Ct. at 1930 (internal quotation marks omitted); *accord Spokeo*

136 S. Ct. at 1547; *see* U.S. Const. art. III, § 2.  Congress can instruct the courts *not* to exercise

judicial power over certain cases or classes of cases, *see, e.g.*, *Patchak v. Zinke*, 138 S. Ct. 897,

910 (2018), but it cannot change what the Constitution says the judicial power is.  Thus, while

declaring one of the intervening steps in a causal chain to be unlawful might affect the

underlying merits of a given claim, it would not, and could not, change whether adjudicating that

claim qualified as an exercise in the "judicial power" as defined by Article III.

Defendants' argument appears also to suffer from a common confusion between the

standing and merits inquiries, which — of course — are conceptually distinct.  *See, e.g.*,

*Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way

depends on the merits of [the plaintiff's] contention that particular conduct is illegal." (internal

quotation marks omitted)).  The question whether Plaintiffs' injuries are "fairly traceable" to

Defendants' conduct is not a merits inquiry, as for example the question of proximate causation

in tort liability would be; with respect to the latter, Defendants would surely have a colorable

argument that they should not be held *liable in damages* for the unlawful intervening actions of

another.  *See* Restatement (Second) of Torts § 448 (noting that, absent certain circumstances,

"[t]he act of a third person in committing an intentional tort or crime is a superseding cause of

harm to another resulting therefrom").  But nobody is suggesting that Defendants should share in

the criminal (or civil) liability that people who fail to respond to the census may incur.  *Cf.*

*Block*, 793 F.2d at 1309 ("That argument could be relevant to the merits of a tort action seeking

to hold the government liable for damages as the *legal cause* of [the plaintiff's] injury; but it is

irrelevant to the question of core, constitutional injury-in-fact, which requires no more than *de

facto* causality.").  The Article III standing inquiry is entirely different: It looks to the chain of

causation connecting Defendants' conduct to Plaintiffs' injuries, and it asks whether Plaintiffs

have shown that one is sufficiently traceable to the other so as to give Plaintiffs a sufficiently

"personal stake" in the outcome of their challenge to create the adverseness required by Article III.  Here, Plaintiffs have plainly made that showing.

Given the foregoing, it is not surprising that Defendants fail to cite any authority in support of their novel argument.  Perhaps more surprising is the ample authority that contradicts their argument that they simply ignore.  Thus, for instance, courts have found, in data breach cases, that customers have standing to bring claims against the companies that failed to safeguard their data — even though the hacker or "thief would be the most immediate cause of plaintiffs' injuries." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018); *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 390 (6th Cir. 2016) ("Although hackers are the direct cause of Plaintiffs' injuries, the hackers were able to access Plaintiffs' data only because Nationwide allegedly failed to secure the sensitive personal information entrusted to its custody."); *Lambert v. Hartman*, 517 F.3d 433, 437-38 (6th Cir. 2008) (rejecting the argument that the intervening "criminal act of a third party" defeated standing where the plaintiff "link[ed] the act of identity theft" to the personal information divulged by the defendant).  So too, in terrorist financing cases, courts have found standing — even though the most immediate cause of injury is the terrorist, not the bank or financier.  *See, e.g.*, *Rothstein*, 708 F.3d at 93 ("[W]e cannot conclude that the Complaint failed to allege sufficiently that plaintiffs' injuries in bombings and rocket attacks conducted by Hizbollah and Hamas were fairly traceable to UBS's provision of U.S. currency to Iran."); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 417 (E.D.N.Y. 2009) ("Here, while a number of independent third parties were involved in the attack on Bus 19, plaintiffs have alleged a coherent and plausible causal nexus linking UBS's alleged wire transfers for ASP to the bombing of Bus 19."); *accord Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 23 (D.D.C. 2010); *cf. Mendia*, 768 F.3d at 1013 (describing the plaintiff's theory of traceability, that "the government's unlawful conduct,

while not directly causing his injury, nonetheless led third parties to act in a way that injured him," as "perfectly viable").  Most relevant for present purposes, Defendants' argument is incompatible with the many decisions, most notably the Second Circuit's decision in *Carey*, holding that "citizens who challenge a census undercount on the basis, inter alia, that improper enumeration will result in a loss of funds to their city have established . . . an injury fairly traceable to the Census Bureau."  *Carey*, 637 F.2d at 838; *accord City of Detroit*, 4 F.3d at 1375; *City of Philadelphia*, 503 F. Supp. at 671; *City of Camden*, 466 F. Supp. at 50.

Those basic standing principles are enough to turn away Defendants' arguments against traceability here.  The touchstone of any Article III standing injury is whether the plaintiff has suffered, or is likely to suffer, an injury that is fairly traceable to the challenged conduct and redressable by the relief sought.  Although congressional action can obviously affect whether particular injuries are "redressable" by creating (or not creating) causes of action, the "injury in fact" and "traceability" inquiries are fundamentally practical inquiries, grounded in the real-world consequences of human interaction — the sorts of things that give rise to "concrete and particularized" injuries that give plaintiffs a "personal stake" in federal litigation.  In both cases, Article III demands something less than an ultimate merits inquiry might require: only that the defendant's conduct was a *de facto* cause of the plaintiff's injury, not that it was the "legal" or "proximate" cause.  *Block*, 793 F.2d at 1309.  Thus, while all three strikes are proximate causes of the strikeout, the last domino to fall is fairly traceable to the first.  On Defendants' theory of traceability, Congress could abrogate standing to sue for that last domino falling by declaring it unlawful for the intervening dominoes to fall.  But an injury's traceability for purposes of Article III — like Plaintiffs' injuries here — does not depend on whether the dominoes have congressional permission to fall; it depends only on whether, in fact, they *will*.  Taking a practical look at the facts of these cases, the Court would have no trouble concluding that the

apportionment losses, funding losses, and harms to data quality that Plaintiffs have proved were *proximately* caused by Secretary Ross's decision.  It is even easier to conclude, as the Court does, that Plaintiffs' injuries are fairly traceable to that decision.

That leaves only the element of redressability.  Conspicuously, Defendants make no argument whatsoever concerning redressability — a tell, if there ever was one, that their arguments about traceability are themselves ultimately lacking.  *See, e.g.*, *Watt*, 454 U.S. at 161 (stating that a plaintiff must "show that there is a 'fairly traceable' causal connection between the injury it claims and the conduct it challenges, *so that if the relief sought is granted, the injury will be redressed*" (emphasis added) (citation omitted)).  In any event, given the Court's findings of fact and conclusions of law, it follows that Plaintiffs have proved that their injuries are "likely" to "be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).  That is, if Secretary Ross's decision to add a citizenship question to the 2020 census is set aside or enjoined, as Plaintiffs request in these cases and as the Court concludes it must be, it is likely that its effects on the net differential undercount will be mitigated to the point of relieving Plaintiffs' injuries.  Notably, to satisfy Article III's redressability requirement, a plaintiff must show that the requested relief will remedy "*an* injury" to the plaintiff, not "*every* injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).  And here, although the data generated by the 2020 census may still be less than perfect (no census is perfect, after all), and the resulting political apportionment and funding allocations may not be accurate to the seat or dollar, Plaintiffs have proved that their injuries specifically caused by the citizenship question will be mitigated, if not wholly remedied, by its removal.

## RIPENESS

For the foregoing reasons, the Court concludes that most, if not all, Plaintiffs have standing to bring the claims pressed here — well more than the one Plaintiff with standing that

the Court would need for jurisdiction. Before turning to the merits, however, there is one more threshold issue to address: ripeness. On December 28, 2018 (after trial ended), Defendants submitted the proposed census questionnaire, with the citizenship question, to OMB for approval under the Paperwork Reduction Act. *See* 83 Fed. Reg. 62713 (Dec. 28, 2018). As of today, OMB has not acted on the submission, and indeed it need not affirmatively approve the questionnaire for Secretary Ross's decision to be effective. Moreover, in the forty-two years since the enactment of the Paperwork Reduction Act, OMB has apparently never rejected a proposed census questionnaire. Nevertheless, Defendants assert that "because the citizenship question has not . . . received clearance . . . and may be rejected by OMB," Plaintiffs' claims are "unripe for judicial resolution." Defs.' Post-Trial Br. 72-73, ¶¶ 32-33.

Notably, Defendants did not raise the issue of ripeness until their post-trial briefs — and then raised it only in response to a query from the Court. *See* Tr. 1482-84; Defs.' Post-Trial Br. 72, ¶¶ 32-33; Docket No. 551 ("Defs.' Post-Trial Reply Br."), at 7. Furthermore, they now concede that "prudential ripeness," rather than jurisdictional ripeness, is "the appropriate framework" for analyzing these cases. Defs.' Post-Trial Reply Br. 1; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) ("Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." (internal quotation marks omitted)). That concession alone is fatal to their argument because a prudential ripeness argument, unlike a jurisdictional ripeness argument, can be waived, *see, e.g.*, *Stolt-Nielsen*, 559 U.S. at 670 n.2, and by failing to make the argument in their motion to dismiss, in a motion for summary judgment, or in their pretrial briefing, Defendants did just that.

In any event, Defendants' belated ripeness argument would fail on the merits. As the Supreme Court has explained, the ripeness doctrine "is designed to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967) (internal quotation marks omitted)). To evaluate a claim's ripeness for judicial review, therefore, a court must consider three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* at 733. In these cases, as Defendants all but concede, all three factors weigh heavily in favor of judicial review now.

First, there is no question that delayed review would cause hardship to Plaintiffs. As discussed above, the NGO Plaintiffs are *already* suffering harm from the addition of the citizenship question due to the diversion of valuable resources. And more broadly, as the Court explained in denying Defendants' attempts to stay trial, time is of the essence. *See New York v. U.S. Dep't of Commerce*, — F. Supp. 3d —, No. 18-CV-2921 (JMF), 2018 WL 5791968, at *6- *7 (S.D.N.Y. Nov. 5, 2018). According to Defendants themselves, the Census Bureau "need[s] to begin printing the 2020 census questionnaire" in June 2019. Docket No. 540, at 3. In light of that deadline, Defendants concede that even with this Court issuing a ruling now, "it is extremely unlikely that full merits briefing and argument in the Second Circuit, let alone the Supreme Court, would be possible." *Id.* It follows that dismissing the case as unripe pending OMB clearance later this year would almost certainly preclude Plaintiffs from obtaining a final ruling on their claims. *See Dep't of Commerce*, 525 U.S. at 332 (noting that a "pause" in litigation "would result in extreme — possibly irremediable — hardship" to plaintiffs challenging how the

census was to be conducted).  Indeed, when pressed at oral argument on whether it would make sense for the Court to dismiss the case as unripe given the time sensitivities and the limited opportunity for review after OMB clearance, defense counsel answered, with admirable candor, that "it probably does not."  Tr. 1484.  He further noted that "the hardship to the parties waiting for judicial review is a significant factor here."  *Id.* at 1485.  In sum, there is little or no dispute that the first ripeness factor weighs heavily in favor of prompt review.

Defendants do not even argue about the second and third factors, and for good reason. With respect to the second factor, judicial review at this stage would not inappropriately interfere with further administrative action.  There is no dispute the Secretary Ross's decision constitutes "final agency action" reviewable under the APA.  *Id.* at 1482.  OMB could ultimately take the view that the decision to add a citizenship question fails even the most rudimentary cost-benefit analysis.  But in that event, a judicial decision implying or concluding the same thing would hardly "interfere" with administrative action.  To the contrary, both processes would act as complementary restraints on unlawful (the courts) or inefficient (OMB) governmental action. With respect to the third factor, Defendants can hardly maintain that the Court would benefit from further factual development of the issues presented.  For one thing, Defendants have spent months arguing — and are still arguing, before the Supreme Court — that these cases should proceed to final judgment with *less* of a factual record.  More importantly, the absence of Secretary Ross's deposition notwithstanding, the administrative and trial records in these cases are plainly sufficient to present the issues in a manner fit for judicial decisionmaking.

*CTIA – The Wireless Ass'n v. FCC*, 530 F.3d 984 (D.C. Cir. 2008), the principal case upon which Defendants rely, *see* Tr. 1482-83; *see also* Defs.' Post-Trial Reply Br. 7, is easily distinguished.  As Plaintiffs point out, that case involved an FCC rule that was still awaiting OMB clearance and *required* such clearance in order to take effect.  *CTIA*, 530 F.3d at 988.

Accordingly, the question whether the FCC's action was "final" (and thus reviewable under the APA) was contested and, in the D.C. Circuit's view, "entirely speculative."  *Id.* at 987-88 (internal quotation marks omitted).  Here, by contrast, Secretary Ross's decision was effective the day it was made — and, as noted, the finality of his decision is conceded.  *See* Tr. 1482.  The *CTIA* court also found "little hardship to the parties" in delaying decision, *CTIA*, 530 F.3d at 988, but, as noted above, that weighs in the opposite direction here.  Finally, the court in *CTIA* noted that it was "not concerned" that the FCC would use a pause in proceedings "to delay unnecessarily judicial review of its rules going forward."  *Id.* at 989.  Alas, the Court does not have the same confidence here.  Defendants submitted the questionnaire to OMB more than three months after they indicated they would, with no explanation.  *See* AR 1170; Tr. 1484.  And the submission was made months later than it was in either 2000 or 2010.  *See* 73 Fed. Reg. 52264, 52264 (Sept. 9, 2008); 63 Fed. Reg. 43369, 43370 (Aug. 13, 1998).  And, as the Court previously noted, much of Defendants' litigation strategy in these proceedings "makes so little sense, even on its own terms, that it is hard to understand as anything but an attempt to avoid a timely decision on the merits altogether."  *New York*, 2018 WL 6060304, at *3.  In short, *CTIA* undermines, rather than supports, Defendants' case.

Finally, although Defendants have now dropped their *jurisdictional* ripeness objection, the Court will address it anyway — if only because jurisdictional arguments cannot be waived and the Court has an independent obligation to confirm its own jurisdiction.  *See United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004).  The jurisdictional, or "constitutional," ripeness inquiry "essentially mirrors that governing Article III standing, and asks whether the question presents a 'genuine case or controversy.'"  *United States v. Santana*, 761 F. Supp. 2d 131, 138 (S.D.N.Y. 2011); *see Sultum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7 (1997) (distinguishing between cases that are unripe because they do not "properly present[] a genuine 'case or

controversy' sufficient to satisfy Article III" and those that merely "fail[] to satisfy [the] prudential ripeness requirements").  For the reasons discussed above, these cases do present a genuine "case or controversy" within the meaning of Article III.  In particular, Plaintiffs have proved that they face a substantial risk of injury or injuries that are "certainly impending." Accordingly, Plaintiffs' claims are jurisdictionally "ripe" for adjudication in federal court.  That conclusion is further confirmed by the Supreme Court's conclusion that a similar pre-census challenge — filed roughly two years before the relevant census date, as these cases were — did not present a ripeness issue.  *See Dep't of Commerce*, 525 U.S. at 329, 332.

## ADMINISTRATIVE PROCEDURE ACT CLAIMS

With that, the Court can finally turn to the merits of Plaintiffs' claims, beginning with their claims that Defendants violated the APA in multiple ways.  *See* SAC ¶¶ 183-197; NGO Compl. ¶¶ 208-212; *see also* Pls.' Proposed Conclusions ¶¶ 138-448.

### A.  General Legal Standards

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin*, 505 U.S. at 796.  The APA thus provides that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."  5 U.S.C. § 702.  In a challenge to agency action brought pursuant to the APA, the statute provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A)-(D); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Through those provisions, the APA "establishes a scheme of 'reasoned decisionmaking.'" *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 52 (1983) ("*State Farm*")). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Under the APA, therefore, courts must "hold unlawful and set aside" agency action that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Agency action can also fail arbitrary and capricious review if the agency fails to provide a "coherent explanation" of its decision, *Clark Cty. v. FAA*, 522 F.3d 437, 443 (D.C. Cir. 2008), or fails to justify departures from past practice (by, for example, failing to persuasively distinguish contrary precedent), *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012) (Kavanaugh, J.). In short, arbitrary-and-capricious review implements the APA's requirement "that an agency's exercise of its statutory authority be reasonable *and* reasonably explained." *Id.* (emphasis added); *accord Laccetti v. SEC*, 885 F.3d 724, 725 (D.C. Cir. 2018) (Kavanaugh, J.).

Separate and apart from the mandate to set aside agency action that is arbitrary and capricious, the APA requires courts to set aside agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or is carried out without following procedures prescribed by statute,

*see id.* § 706(2)(D).  Indeed, the APA requires courts to set aside agency action if it violates the Constitution or some *other* law — even if that law is not directed at the agency or within the agency's specific bailiwick.  *See FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A) — which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering.").  Significantly, all of these provisions are "separate standards" operating as independent constraints on agency action.  *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284 (1974).  Put another way, "[t]he 'scope of review' provisions of the APA are cumulative.  Thus, an agency action" that survives review under one provision of Section 706 "may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.) (citation omitted).

Finally, and crucially, it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015); *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (describing the "simple but fundamental rule of administrative law," announced in *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ("*Chenery I*"), "that a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency").  Thus, "the *post hoc* rationalizations of the agency or the parties to . . . litigation cannot serve as a sufficient predicate for agency action."  *American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 539 (1981). "Congress has delegated to the administrative official and not to [his or her] counsel the responsibility for elaborating and enforcing statutory commands."  *Investment Company Institute*

196

*v. Camp*, 401 U.S. 617, 628 (1971).  Accordingly, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *State Farm*, 463 U.S. at 50.

Of course, in subjecting Secretary Ross's decision to scrutiny under the APA, the Court "does not sit as a super-agency," and may not "substitute its . . . expertise" or evidence "presented to it de novo for the evidence received and considered by the agency."  *Suffolk Cty. v. Sec'y of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977).  Nevertheless, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  By definition, Congress has assigned agency decisionmaking to the agency, to be carried out within constitutional and statutory bounds.  But Congress has also provided for judicial review of agency decisions once they are final.  And while it is the agency's job to make the decisions Congress has assigned to the agency, it is the courts' job to apply the APA.  The APA "creates a basic presumption of judicial review for one suffering legal wrong because of agency action," *Weyerhaeuser Co. v. United States Fish & Wildlife Serv.*, 139 S. Ct. 361, 270 (2018) (alterations and internal quotation marks omitted), and, in the words of the Supreme Court, that review must be "thorough, probing, [and] in-depth," *Overton Park*, 401 U.S. at 415; *see id.* at 416 (mandating a "searching and careful" review).  "In *all* cases agency action *must* be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements."  *Id.* at 413-14 (emphases added).

## B.  The Scope of Review

Before turning to the substance of Plaintiffs' APA claims, the Court pauses to consider the question of what evidence it may consider in reviewing Plaintiffs' APA claims — an issue that has, at times, seemed central to these cases.  As it turns out, the issue is not quite as central as it once seemed, both because the Court can resolve Plaintiffs' APA claims without relying on

extra-record evidence and because Defendants ultimately stipulated that a wide swath of previously contested documentary material is properly part of the Administrative Record for purposes of this litigation. *See* Docket No. 523, at Joint Stip. ¶ 63.

It is well established that judicial review of administrative action is generally "based on the full administrative record that was before the Secretary at the time he made his decision." *Overton Park*, 401 U.S. at 420. Further, in evaluating agency action for compliance with the APA, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). "Ordinarily," therefore, courts reviewing agency action for compliance with Section 706(2)(A) "confine their review to the 'administrative record.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *accord Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 81-82 (2d Cir. 2006); *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) ("[J]udicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made."). As the Court will explain, however, those words ("normally" and "ordinarily") are key. And while in some ways, this is an ordinary APA case, in other ways, it is not.

In a case such as this one, the term "administrative record" is not particularly helpful in clarifying the proper object of judicial review. The Court's statutory obligation is to evaluate Secretary Ross's decision in light of the "whole record," 5 U.S.C. § 706, which must include all materials that were "before [him] . . . at the time he made his decision," *Overton Park*, 401 U.S. at 420. But this is not a case in which, because of the nature of the administrative proceedings below (such as agency adjudication or notice-and-comment rulemaking), either Secretary Ross or the Department of Commerce compiled an "administrative record" in the course of *making* his decision. Instead, as is often the case with "informal" agency actions, Secretary Ross amassed

some information, consulted it, and made his decision on that basis.  Then, only *after* these

lawsuits were filed, the Department of Commerce conducted a search for materials that were

"before" the Secretary at the time he made that decision, compiled those materials, and submitted

them to the Court as the "Administrative Record."  *See* Docket No. 173; *see also id.* Ex. 1

(certification of Sahra Park-Su, Senior Policy Advisor to the Secretary of Commerce, that

Defendants' designated record is "a true copy of the complete administrative record upon which

the Secretary of Commerce based his decision to reinstate a question concerning citizenship on

the 2020 Decennial Census," based on *her* "personal involvement with the . . . compilation and

review of the documents comprising the administrative record").  Since that time, Defendants

have added substantially to the "Administrative Record."  *See* Docket Nos. 189, 212, 523, 524.

As a general matter, the compilation and submission of the "Administrative Record" by

the agency that made the very decision under review is not unusual.  Indeed, it appears to be the

normal way of doing things where, as here, there is no preexisting administrative record

available for judicial review.  *See, e.g.*, *Preserve Endangered Areas of Cobb's History, Inc. v.*

*U.S. Army Corps of Engineers*, 87 F.3d 1242, 1247 n.2 (11th Cir. 1996) ("There is, of course,

nothing wrong with an agency compiling and organizing the complete administrative record after

litigation has begun from all the files of agency staff involved in the agency action, as long as

that record only contains documents considered by the staff prior to the agency action."); *see*

*also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the

reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the

agency decision based on the record the agency presents to the reviewing court.").  That said, the

"whole administrative record," within the meaning of the APA, "is not necessarily those

documents that the *agency* has compiled and submitted as 'the' administrative record."

*Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989).  Instead, the "whole

administrative record" mandated by the APA "consists of all documents and materials directly or

indirectly considered by agency decision-makers," including "evidence contrary to the agency's

position." *Id.* (emphasis omitted); *Schicke v. Romney*, 474 F.2d 309, 315 (2d Cir. 1973) (noting,

in reviewing agency action under the APA, that a court "must have before it the full

administrative record which was before the agency and on which the agency determination was

based"); *accord Overton Park*, 401 U.S. at 420; *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26,

32 (N.D. Tex. 1981).

In such cases, courts have held that the agency's designation of an administrative record,

"like any established administrative procedure, is entitled to a presumption of administrative

regularity." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *Comprehensive*

*Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012).  Critically, however,

that presumption is *only* a presumption.  Put another way, "[a]n agency may not unilaterally

determine what constitutes the Administrative Record." *Bar MK Ranches*, 994 F.2d at 739; *see*

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977) (noting that an agency's

unilateral decision to exclude material from the administrative record cannot "stand[] between [a

court] and fulfillment of [its] obligation" under the APA).  Ultimately, that question is one for

the Court.  *See, e.g.*, *Overton Park*, 401 U.S. at 420; *Occidental Petroleum Corp. v. SEC*, 873

F.2d 325, 340 (D.C. Cir. 1989); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982);

*Suffolk Cty.*, 562 F.2d at 1384 n.9 (2d Cir. 1977).  Moreover, the question of what constitutes the

administrative (or "whole") record is a question of fact, subject to the usual incidents of district

court factfinding and appellate review.  *See, e.g.*, *Occidental Petroleum*, 873 F.2d at 340;

*Dopico*, 687 F.2d at 654.

In light of the foregoing considerations, courts have recognized several limited

exceptions to the "record rule" — that is, circumstances in which the "presumption of regularity"

that ordinarily attaches to the administrative record compiled and submitted by the agency itself is rebutted and the reviewing court may consider material beyond that record.  *See generally* Richard McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and Additional Factfinding during Judicial Review of Informal Agency Action*, 1982 Duke L.J. 333 (enumerating exceptions to the record rule).  First, because "[t]he failure to include . . . information relied upon by the agency in the administrative record . . . is . . . inconsistent with the Administrative Procedure Act's requirement that review take place on 'the whole record,'" *U. S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 534 n.43 (D.C. Cir. 1978), where it appears that the administrative record designated by the agency is *not* the "whole record" that was before the agency decisionmakers at the time of decision, a court may order that the record be *completed.  See Home Box Office*, 567 F.2d at 54 ("Even the possibility that there is here one administrative record for the public and [the] court and another for the [agency] and those 'in the know' is intolerable.").  A court may do so where, as Plaintiffs did here, *see* July 3 Oral Arg. Tr. 79-82, a challenger shows that "materials exist that were actually considered by the agency decision-makers but are not in the record as filed," *Sebelius*, 890 F. Supp. 2d at 309, or has "made a prima facie showing that the agency excluded from the record evidence adverse to its position," *Kent Cty. Levy Court v. EPA*, 963 F.2d 391, 396 (D.C. Cir. 1992); *see also New York v. Shalala*, No. 93-CV-1330 (JFK), 1996 WL 87240, at *5 (S.D.N.Y. Feb. 29, 1996) ("The Court may also consider evidence that was considered by the agency but omitted from the formal administrative record.").  Properly understood, however, an order directing *completion* of an administrative record is not the same thing as ordering "discovery" of material *beyond* the

record.  Instead, it is an order that the agency provide the *real* — or "whole" — record for the court's consideration.[55]

Second, it is well established that a court may allow parties to *supplement* the record with additional material "to provide, for example, background information."  *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987).  Occasionally, such supplemental material will be "helpful in understanding the problem faced by the [a]gency and the methodology it used to resolve it," as in highly technical areas, and "[t]o a limited extent," it is "proper" for a court to consider such material as "a clarification or an explanation of the original information before the [a]gency."  *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811 (9th Cir. 1980) (Kennedy, J.).  Notably, it is not always (or, judging from the Court's review of the case law, even usually) the *plaintiffs* who seek to use such material in APA cases — the Government has been known to proffer "supplemental" extra-record material in defense of agency decisions as well.  *See, e.g.*, *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 83-84 (D.C. Cir. 2006); *AT&T Info. Sys.*, 810 F.2d at 1236.  But no matter who introduces it, this type of "supplemental" material *cannot* be used "as a new rationalization either for sustaining *or* attacking the [a]gency's decision."  *Ass'n of Pac. Fisheries*, 615 F.2d at 811-12 (emphasis added); *see, e.g.*, *Tripoli Rocketry*, 437 F.3d at 83-84 (noting that "new materials" produced in litigation to supplement the record may be considered

---

[55]      A review of the case law reveals that courts are not always careful to distinguish in their terminology among "completing" the administrative record, "supplementing" the administrative record, and authorizing "extra-record" discovery.  *See* Daniel J. Rohlf, *Avoiding the 'Bare Record': Safeguarding Meaningful Judicial Review of Federal Agency Action*, 35 Ohio N. L. Rev. 575, 615 (2009) ("[C]ase law on records issues is often somewhat muddled, at least apart from broad principles.").  The concepts are distinct, however, and the Court will endeavor to treat them as such, although it does occasionally cite a case that — for example — refers to itself as a "supplementation" case when it is properly understood (at least in the terminology used here) as a "completion" case.  *See, e.g.*, *Kent Cty.*, 963 F.2d at 395-96.

as "merely explanatory of the original record and should contain no new rationalizations");

*accord Sierra Club v. U.S. Army Corps of Engineers*, 772 F.2d 1043, 1052 (2d Cir. 1985).

Instead, a court may consider such materials only to illuminate a complex record and to help the

court better understand the issues involved.

Third, and somewhat related, a court may consider such "supplemental" materials to

evaluate whether an agency failed to consider all relevant factors, ignored an important aspect of

the problem, or deviated from established agency practices. *See, e.g.*, *AT&T Info. Sys.*, 810 F.2d

at 1236.  As noted above, a court must vacate and set aside an agency decision if it finds that the

agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416, ignored "an

important aspect of the problem," *State Farm*, 463 U.S. at 43-44, or made "an irrational

departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).  It goes

without saying that, to apply these standards, a court must have an adequate understanding of

what is "relevant," "important," or "settled" in the field where the agency decision was made.

And particularly where that field involves technical, complex, or specialized matters, as it does

here, that may require looking beyond the bare administrative record.  *See, e.g.*, *Asarco, Inc. v.*

*EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly

technical matters are involved, for the court to determine whether the agency took into

consideration all relevant factors unless it looks outside the record to determine what matters the

agency should have considered but did not.").  Indeed, without looking to evidence beyond the

administrative record to determine the relevant factors, a court may be unable to identify, let

alone redress, the most egregious APA violations: those in which the administrative record is

carefully cultivated to exclude contrary evidence.  *See also, e.g.*, *Nat'l Audubon Soc. v. Hoffman*,

132 F.3d 7, 15 (2d Cir. 1997) (noting that "[t]he omission of technical scientific information is

often not obvious from the record itself").

Finally, it is well established that courts reviewing the substantive validity of agency action may consider additional material beyond the administrative record — extra-record material going to the reasons for the agency's action — where there has been a "strong showing" that the agency has acted in "bad faith."  *Id.* at 14 ("[A]n extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers . . . ." (citing *Overton Park*, 401 U.S. at 420)); *Nat'l Nutritional Foods Ass'n v. FDA*, 491 F.2d 1141, 1145 (2d Cir. 1974) (Friendly, J.) (holding that "testimony with regard to [an agency's] reasons," or "with regard to internal agency deliberations" "can be taken" only on a "strong showing of bad faith or improper behavior"); *accord Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996); *James Madison Ltd.*, 82 F.3d at 1096; *Sierra Club v. Costle*, 657 F.2d 298, 389 n.450 (D.C. Cir. 1981).  Although courts have set a high bar for such additional evidence going to an agency decisionmaker's reasons for acting, that bar is *not* impossible to clear — courts have treated the possibility as a real one from *Overton Park* to this day.  *See, e.g.*, *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004)*; Hoffman*, 132 F.3d at 14; *Nat'l Nutritional Foods Ass'n*, 491 F.2d at 1145 & n.5; *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 185 (E.D.N.Y. 2013).

If a plaintiff's strong preliminary showing of bad faith or pretext later matures into a factual finding of bad faith or pretext, that "'fact' would be material to determining whether the [agency] acted arbitrarily" in violation of the APA.  *James Madison Ltd.*, 82 F.3d at 1096; *see also, e.g.*, *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994), *adhered to on reh'g*, 47 F.3d 1032 (10th Cir. 1995); *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1150-51 (Fed. Cir. 1994).  In *James Madison Ltd.*, the D.C. Circuit helpfully reframed this issue in terms of summary judgment procedure: Where a plaintiff asserts

a genuine dispute as to an agency's bad faith, that dispute is only "material," and thus appropriate for trial, if the plaintiff's proffered evidence amounts to the "strong showing" necessary for including that evidence in the summary-judgment record in the first place.  *Id.* at 1096-97.  In other words, while a preliminary showing of "bad faith" can entitle a plaintiff to discovery on the question, a plaintiff must then prove "actual" bad faith in order to prevail on an APA claim.  Similarly, if a plaintiff is able to prove that the agency's stated reasons for acting were not its "real" reasons, then the plaintiff has proved that the agency's decision was not "reasonably explained" as the APA requires it to be.  On that score, Defendants have wisely conceded that if Plaintiffs establish that Secretary Ross's "stated rationale [was] pretextual, that would be a basis for" relief under the APA.  Docket No. 150 ("May 9 Conf. Tr."), at 15; *see also* Docket No. 366 ("Sept. 14 Conf. Tr."), at 36-37 (defense counsel maintaining that if the Court "were to conclude . . . that the state[d] reason were not the real reason that that would be a factor for review under the arbitrary and capricious standard[,] that the decision would not be rational for the stated reason").

## C.  Discussion

With those principles in mind, the Court turns to the merits of Plaintiffs' APA claims. For reasons the Court will explain at length, the APA compels the Court to "hold unlawful and set aside," 5 U.S.C. § 706(2), Secretary Ross's decision to add a citizenship question to the 2020 census for four independent reasons.  First, the Court concludes that Secretary Ross ignored and violated a clear statutory duty to rely on administrative records (rather than direct inquiries) to the "maximum extent possible," 13 U.S.C. § 6(c), rendering his decision "not in accordance with law," 5 U.S.C. § 706(2)(A).  Second, even if that statute did not exist, Secretary Ross's decision to add a citizenship question rather than collect citizenship data through more effective and less costly means was "not supported by the reasons [he] adduce[d]," *Allentown Mack Sales &*

*Service*, 522 U.S. at 374, making it "arbitrary and capricious" in violation of Section 706(A). Third, although a closer question, the Court finds that Secretary Ross failed to satisfy the statutory requirement that he report any plan to address the subject of citizenship to Congress at least three years before the decennial census, in violation of Title 13, United States Code, Section 141(f)(1).  And fourth, the Court concludes that Secretary Ross's decision was pretextual — that the rationale he provided for his decision was not his real rationale.

In reaching these conclusions, the Court is mindful of the dispute between the parties, finally ripe for resolution, about whether and to what extent the Court may consider evidence beyond the Administrative Record.  Consistent with the standards discussed above, the answer differs depending on the nature of Plaintiffs' specific claims.  Specifically, the Court may not — and does not — consider or rely on material outside the Administrative Record in evaluating whether Secretary Ross's decision was "arbitrary and capricious," except to the limited extent that Secretary Ross is alleged to have "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, or that such material would further illuminate the issues before the Court (albeit, in that case, *without* substituting any such material proffered by Defendants for the reasons given by Secretary Ross), *Ass'n of Pac. Fisheries*, 615 F.2d at 811-12; *cf. Michigan*, 135 S. Ct. at 2710.  That is, in examining the question whether Secretary Ross's decision rested on a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43 (internal quotation marks omitted), "the focal point" of the Court's review is "the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp*, 411 U.S. at 142.  Similarly, the Court may not — and does not — consider any extra-record evidence (and materials of which the Court may take judicial notice) in evaluating Plaintiffs' arguments that Secretary Ross's decision was "not in accordance with law" or "without observance of procedure required by law," 5 U.S.C. §706(2)(A), (D), because he

failed to comply with Sections 6(c) and 141(f).  By contrast, the Court *may* consider material outside the administrative record in evaluating whether Secretary Ross's decision was made in bad faith or was pretextual.  Ultimately, however, the issue does not matter for purposes of Plaintiffs' APA claims because the Court would reach the same conclusions with respect to those claims whether it is limited to the Administrative Record or not.

### 1.  Secretary Ross's Decision Was Not in Accordance with Law

First and foremost, Secretary Ross's decision was unlawful because it was "not in accordance with law."  5 U.S.C. § 706(2)(A).  As discussed above, Congress has delegated to the Secretary broad discretion over the conduct of the census.  Critically, however, that discretion is not unlimited and, in opting to add the citizenship question to the 2020 census questionnaire in the manner that he did, Secretary Ross violated two of those limits.  First, and most blatantly, he violated the mandate in Section 6(c) of the Census Act to "acquire and use information" derived from administrative records "instead of conducting direct inquiries" to the "maximum extent possible."  And second, he did not include citizenship as a subject to be included on the 2020 census questionnaire in a report to Congress, as required by Section 141(f) of the Census Act.[56] The Court plainly has authority to set aside Secretary Ross's decision on the basis of the former violation — indeed, to do otherwise would be to sanction a blatant disregard of a critical substantive limitation on the Secretary's delegated powers.  Whether the Court has the same

---

[56]     *Amicus* Electronic Privacy Information Center contends that Defendants also violated the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, because they failed to conduct an adequate "privacy impact assessment" before proposing to collect citizenship data through the census.  *See* Docket No. 428-1, at 11.  The Court declines to address that contention, however, as Plaintiffs did not press it.  *See, e.g.*, *Citizens Against Casino Gambling in Erie Cty. v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007) ("Amicus participation goes beyond its proper role if the submission is used to present wholly new issues not raised by the parties."); *Russell v. Bd. of Plumbing Examiners*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) ("The *amicus* cannot raise or implicate new issues that have not been presented by the parties.").

authority with respect to Secretary Ross's violation of Section 141(f) is a closer question, but in the circumstances presented here, the Court concludes that it does.  The Court will address each defect in turn, limiting its discussion to evidence contained in the Administrative Record.

### a.  The Section 6 Violation

The Court begins with Section 6(c), a statutory provision  that Congress enacted seemingly — indeed, almost prophetically — for the very circumstances presented here.[57] Section 6 of the Census Act provides in full as follows:

> (a) The Secretary, whenever he considers it advisable, may call upon any other department, agency, or establishment of the Federal Government, or of the government of the District of Columbia, for information pertinent to the work provided for in this title.

> (b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies, such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title.

> (c) To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries.

13 U.S.C. § 6.  The origins of Section 6 can be traced back to 1929, when Congress first authorized the Secretary to collect administrative records from federal sources.  *See* Act of June 18, 1929, Pub. L. No. 71-13, 46 Stat. 21, 25.  In 1957, Congress expanded the Secretary's authority to include collection of state and local administrative records, and divided Section 6 into two subsections: today's Section 6(a), which authorizes the acquisition of federal records, and Section 6(b), which authorizes the acquisition of state and local records.  *See* Act of Aug. 28,

---

[57]     Defendants initially contended in their post-trial brief that Plaintiffs had forfeited any argument based on Section 6(c), *see* Defs.' Post-Trial Br. 77, ¶ 55, but they expressly abandoned any such contention at oral argument, *see* Tr. 1528-29.  In any event, the Court would conclude that Plaintiffs adequately raised the issue through their pleadings and witness examinations, substantially for the reasons they argued orally.  *See* Tr. 1517-20.

1957 ("1957 Census Act") § 3, Pub. L. No. 85-207, 71 Stat 481, 481 (codified at 13 U.S.C.

§ 6(b) (Supp. V 1958)).

As noted above, Congress enacted several significant new limits on the Secretary's

authority with respect to the census in 1976.  *See* 1976 Census Act, Pub. L. No. 94-521, 90 Stat.

2459.  As the United States House of Representatives explained in a Supreme Court brief filed

twenty years ago, the 1976 Census Act "constrained the Secretary's authority" in order to

"address[] concerns that the [Census] Bureau was requiring the citizenry to answer too many

questions in the decennial census."  Brief for Respondents at 37 n.50, 40, *U.S. Dep't of*

*Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (No. 98-404), 1998 WL

767637.  To that end, Congress enacted the current Section 195, which *requires* sampling (where

"feasible") for all purposes other than apportionment in the House of Representatives, rather than

merely *authorizing* it.  *See* 13 U.S.C. § 195.  And Congress enacted the current Section 6(c),

which generally mandates the use of administrative records "to the maximum extent possible," in

lieu "of conducting direct inquiries."  *Id.* § 6(c); *see* H.R. Rep. No. 94-1719, at 10 (1976) (Conf.

Rep.), *as reprinted in* 1976 U.S.C.C.A.N. 5476, 5477-78 (describing the "new subsection (c), the

provisions of which direct the Secretary of Commerce to acquire and use to the greatest extent

possible statistical data available from other sources in lieu of making direct inquiries.  While

existing law authorizes the Secretary to purchase or otherwise acquire such information, the

amendment made by the House bill is intended to emphasize the Congress' desire that such

authority be used whenever possible in the dual interests of economizing and reducing

respondent burden."); S. Rep. No. 94-1256, at 3 (1976), *as reprinted in* 1976 U.S.C.C.A.N.

5463, 5465-66 (similar); *see also* Brief for Petitioners at 12 n.9, *Baldrige v. Shapiro*, 455 U.S.

345 (1982) (No. 80-1436), 1981 WL 389922 (brief filed by the Acting Solicitor General on

behalf of the Secretary of Commerce and Acting Director of the Census Bureau, noting the requirements of 6(c) and its legislative history).

For present purposes, several features of Section 6(c) loom large.  First, by its terms, the statute is mandatory where it applies: The Secretary "*shall* acquire and use" data gleaned from administrative records.  13 U.S.C. § 6(c) (emphasis added).  Second, it imposes an affirmative duty not only to use such data, but also to *acquire* more of it when appropriate to fulfil the Secretary's other statutory responsibilities.  Third, the statute explicitly requires the acquisition and use of such administrative-record data *instead* of asking questions through "direct inquiries" on the decennial census or other surveys — a clear, direct command that the Secretary *not* add additional questions to the census or other survey questionnaires where administrative records would suffice.  Fourth, Section 6(c) requires the acquisition and use of administrative records instead of collecting data through direct inquiries "[t]o the maximum extent possible" — confining the Secretary's duty to the bounds of the possible, but requiring him to exhaust that limit.  And finally, the statute requires the "maximum . . . possible" use of administrative records "consistent with the kind, timeliness, quality and scope of the statistics required," authorizing departures from Section 6(c)'s obligation only where certain characteristics of "required" statistics justify them.  To the extent relevant here, the upshot is that, if the collection of data through the acquisition and use of administrative records would be as good or better than collection of data through the census, Section 6(c) leaves the Secretary no room to choose; he may not collect the data through a question on the census.

Considering these features here, the Court easily concludes that Secretary Ross's decision ran afoul of Section 6(c).  For one thing, Secretary Ross nowhere mentions, considers, or analyzes his statutory obligation to "acquire and use" administrative records "[t]o the maximum extent possible . . . instead of conducting direct inquiries."  Agency action taken in ignorance of

applicable law is arbitrary and capricious, and must be vacated.  *See, e.g.*, *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970-71 (10th Cir. 2016) (Gorsuch, J.); *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1195 (8th Cir. 2001) ("[A]n agency implementing a statute may not ignore . . . a standard articulated in the statute."); *cf. Porzecanski v. Azar*, 316 F. Supp. 3d 11, 19-20 (D.D.C. 2018) (holding that agency action that "relies on the wrong law" must be vacated).  In his decision memorandum, Secretary Ross treated the choice between Alternatives C and D as a matter of policy committed to his discretion.  In other words, he acted "as though the choice between them were a matter of complete indifference from the statutory point of view."  *Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 444 (D.C. Cir. 1989).  But it was not.  Congress had already made the policy decision to *require* the acquisition and use of administrative records "[t]o the maximum extent possible" *in lieu of* conducting "direct inquiries."  13 U.S.C. § 6(c).  The congressional preference set forth in Section 6(c) "precludes" a decision "which totally ignores that preference."  *Ohio*, 880 F.2d at 444; *see NRDC v. U.S. EPA*, 658 F.3d 200, 217 (2d Cir. 2011) (determining that "[t]he lack of . . . an explanation" as to how an agency action complies with applicable statutory standards "is arbitrary and capricious").

Given Secretary Ross's failure even to acknowledge Section 6(c), it is perhaps no surprise that he failed to articulate a rationale that would meet the statute's requirements for justifying the use of a direct inquiry about citizenship status.  Granted, he expressed a preference for data compiled entirely of survey self-responses and hypothesized that giving every person an opportunity to self-respond "may eliminate the need" for any imputation.  AR 1317.  And he expressed a "judgment that [Alternative] D will provide DOJ with the most complete and accurate CVAP data in response to its request."  *Id.*  But Secretary Ross nowhere explained whether or how adding a citizenship question to the census questionnaire was consistent with the mandate to avoid "direct inquiries" to the "maximum extent possible"; or, to the extent that he

suggested (albeit without explicit reference to the statute) that his decision was "consistent with the kind, timeliness, quality and scope of the statistics required," whether or how the "statistics" at issue are *required* — as opposed to merely desired. On the latter score, Secretary Ross is not excused from compliance with Section 6(c)'s dictates merely because another federal department asks him to add a "direct inquir[y]" to the census, as DOJ did here (at least formally). By its plain terms, Section 6(c) constrains the authority of "*the Secretary*." 13 U.S.C. § 6(c) (emphasis added); *cf. Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015) ("EPA seeks to excuse its inadequate responses by passing the entire issue onto a different agency. Administrative law does not permit such a dodge."). And if that were not clear enough, Congress explicitly provided that the Secretary of Commerce's authority to share "tabulations and other statistical materials" with other federal departments, such as DOJ, is "[s]ubject to the limitations contained in section[] 6(c)." 13 U.S.C. § 8(b).

In short, Secretary Ross violated Section 6(c) by adding a "direct inquiry" to the census questionnaire when the data gained from available administrative records would have been adequate — indeed, better. Notably, Defendants do not really even try to argue that Secretary Ross complied with the letter of Section 6(c) — a tacit admission that his decision was "not in accordance with law." 5 U.S.C. § 706(2)(A). Instead, they are left to argue that he complied with the statute in spirit — that, without saying so, he effectively made a finding that "the information that could be gained from administrative records alone was not of 'the kind, timeliness, quality and scope of the statistics required' for the Department of Justice's Voting Rights Act enforcement efforts." Defs.' Post-Trial Br. 77, ¶ 58. Defendants are certainly correct that, even as he acknowledged evidence that administrative records are more accurate than self-responses "in the case of non-citizens," Secretary Ross *tried* to justify his decision not to rely on administrative records in lieu of a direct inquiry. AR 1316. "[T]he Census Bureau," he claimed,

212

"is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  *Id.*  According to Secretary Ross, that meant that "using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture" — namely, that roughly ten percent of the American population "would need to have their citizenship [status] imputed by the Census Bureau."  *Id.* "Given the scale of [that] number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide."  *Id.*  The problem is that, even on its own terms, that explanation does not come close to meeting Section 6(c)'s requirements for collecting citizenship data through a direct inquiry, let alone a direct inquiry on the census, rather than through administrative records.[58]

For one thing, Secretary Ross appears to have misunderstood his own options. Alternative B (merely adding a citizenship question to the census) would not have relied on "self-response *alone*" to capture citizenship data — far from it, given that the addition of a citizenship question would cause a *decline* in self-response and lead to more households having citizenship data collected through in-person enumeration, administrative records, proxy response, *and* imputation.  *See* AR 1280-82.  And Alternative C would not have relied on "administrative records alone," given the necessity of imputing citizenship status to some number of households. AR 1305, 1311.  Instead, *both* alternatives would have involved some degree of imputation — i.e., "modeling" — of responses.  *Id.*  The difference, as the record overwhelmingly demonstrates, is that Alternative B — and, by extension, Alternative D, which Secretary Ross adopted — would have introduced errors into citizenship self-responses, corrupting both that

---

[58]    Secretary Ross's preference for a "hard count" of citizenship status is also hard to square with Congress's explicit mandate that, for all purposes *other* than congressional apportionment (that is, the "actual Enumeration" mandated by the Constitution), the Secretary gather data using sampling "if he considers it feasible."  13 U.S.C. § 195.

data and the data generated by extrapolating from self-responses through imputation.  AR 1278, 1280-82, 1305.  In other words, and as explained in more detail below in assessing the substantive reasonableness of Secretary Ross's decision, every relevant piece of evidence in the Administrative Record supports the conclusion that Alternative D would produce *less accurate citizenship data* than Alternative C — and *none* supports the conclusion that Alternative D would yield more accurate citizenship data given Secretary Ross's own criteria or the parameters discussed in the Gary Letter.  Given that, it cannot be said, even in spirit, that "the kind, timeliness, quality and scope of the statistics" allegedly "required" for DOJ's VRA enforcement efforts justified the use of a census question under Section 6(c).

Defendants' only other attempt to justify Secretary Ross's failure to heed Section 6(c) is to argue that "there is no apparent distinction between the citizenship question and a number of other questions on the decennial census for purposes of 13 U.S.C. § 6(c)," such as the questions about sex, race, and ethnicity.  Defs.' Post-Trial Br. 77, ¶ 57.  And because "no one would suggest that the statute prohibits the Census Bureau from including *those* questions," they continue, it cannot be read to prohibit the citizenship one either.  *Id.* (emphasis added).  But that argument falls short for three independent reasons.  First, as noted, it is a "foundational principle of administrative law that a court may uphold agency action *only* on the grounds that the agency invoked when it took the action," *Michigan*, 135 S. Ct. at 2710 (emphasis added), and, as discussed above, Secretary Ross's March 26, 2018 Memorandum contained no analysis whatsoever of his statutory obligations under Section 6(c) — let alone this specific argument, which Defendants present for the first time through their counsel in this litigation.  Second, collection of data about sex, race, and ethnicity through direct inquiries rather than administrative data may or may not be justified under the standards set forth in Section 6(c) — the Administrative Record in these cases obviously does not speak to that question and the

parties have not briefed it.  And third, even assuming *arguendo* that collection of such data *cannot* be reconciled with the statute's text, Defendants cite no authority for the proposition that *those* violations of Section 6(c) would justify *this* one.  Two statutory wrongs do not make a right.[59]

"[T]he Constitution vests *Congress*," not the Executive, "with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15 (emphasis added), and it is only because of Congress's statutory delegations that the Secretary of Commerce has any authority to design and conduct the decennial census at all.  It goes without saying that that authority extends only as far as Congress has provided, ends where Congress says it ends, and can only be exercised subject to the conditions and constraints that Congress has imposed.  Here, Congress has spoken clearly: To the maximum extent possible and given the kind, timeliness, quality and scope of the data required, Secretary Ross *must* gather data through the acquisition and use of administrative records, not by adding direct inquiries to the census or other surveys.  Because Secretary Ross ignored that requirement altogether — and, in the process, blatantly violated it as well —  his decision was "not in accordance with law."  5 U.S.C. § 706(2)(A).

---

[59]     Along similar lines, given that a citizenship question appeared on the long-form questionnaire in the 1980, 1990, and 2000 censuses, and has appeared on the ACS since 2005, one could conceivably argue that Congress has acquiesced in the practice and that asking the question on the 2020 census would thus not run afoul of Section 6(c).  Defendants do not make that argument, however, and have thus waived it.  Moreover, it may be that direct inquiries on those instruments *were* justified under Section 6(c) — for example, because the Census Bureau's ability to collect the relevant data through the use of administrative records was not as advanced as it is now or because the "statistics required" were somehow different.  (Among other things, the Census Bureau is statutorily *required* to collect CVAP data *on the ACS* in connection with Section 203 of the Voting Rights Act.  *See* 52 U.S.C. § 10503(b)(2)(A).)  Once again, neither the record nor the parties speak to those questions here.  The only question presented here is whether, given the Administrative Record in *this* case, Secretary Ross's decision to collect citizenship data through the *2020* census questionnaire rather than through administrative records was consistent with Section 6(c).  For the reasons stated above, it was not.

### b.  The Section 141(f) Violation

The 1976 Census Act added one more constraint on the Secretary's authority to conduct the census that is relevant here: a deadline to report the subjects and questions planned for the census to Congress.  *See* 1976 Census Act § 7(a), 90 Stat. 2462; 13 U.S.C. § 141(f).  Section 141(f) provides in relevant part:

> With respect to each decennial . . . census conducted under subsection (a) . . . of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census —
>
> > (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;
> >
> > (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and
> >
> > (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C. § 141(f).  The statute is plainly intended to facilitate Congress's oversight of the Secretary, thereby enabling the legislature to fulfil its "constitutional duty . . . to ensure that the decennial enumeration of the population is conducted in a manner consistent with the Constitution and laws of the United States."  1998 Appropriations Act, § 209(a)(1), 111 Stat. at 2480-81.

Secretary Ross submitted Section 141(f)(1) and (2) reports to the relevant congressional committees in March 2017 and March 2018, respectively.  AR 149; PX-489, at 1.[60]  The problem

---

[60]    As noted above, the Court can — and does — take judicial notice of the March 2018 Section 141(f)(2) report even though it is not contained in the Administrative Record.

is that the Section 141(f)(1) report, titled "Subjects Planned for the 2020 Census and American Community Survey," included only five planned "subjects" for the 2020 census: Age, Gender, Race/Ethnicity, Relationship, and Tenure (Owner/Renter).  AR 204-13.  It did not include "citizenship."[61]  By contrast, Secretary Ross did include the proposed citizenship question in the Section 141(f)(2) report, titled "Questions Planned for the 2020 Census and American Community Survey," which was filed within days of his March 26, 2018 Memorandum.  PX-489, at 7.  The report stated that "[a] question about a person's citizenship is used to create statistics about citizen and noncitizen populations" and that "[t]hese statistics are essential for enforcing the Voting Rights Act and its protections against voting discrimination."  *Id.* (capitalization altered).  Notably, it claimed that a question about citizenship had been asked in 1820, 1830, 1870, and from "1890 to present."  *Id.*  That claim, of course, is flat wrong in one respect (citizenship did not appear on the 2010 census at all) and materially misleading in another (the citizenship question was not asked of every household in 1960 or thereafter).

Defendants try to excuse Secretary Ross's conceded failure to include citizenship as a subject of the census in the Section 141(f)(1) report by contending that the Section 141(f)(2) report satisfied the requirements of Section 141(f)(3), which allows the Secretary to add subjects or questions to the census "after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date."  *See* Defs.' Post-Trial Br. 80, ¶ 65.[62]  But that

---

[61]    The Section 141(f)(3) report did include "Place of Birth, Citizenship, and Year of Entry" as one of the planned subjects for the ACS.  *See* AR 248.

[62]    Notably, Defendants did not make any argument with respect to Section 141(f) in their pretrial briefing, even though Plaintiffs explicitly contended in their initial pretrial brief that Secretary Ross had violated the statute and that the violation provided an independent basis for relief under the APA.  *Compare* Docket Nos. 413 and 456, *with* Docket No. 410, at 28-29, *and* Docket No. 455, at 7-8.  On that basis, the Court could conceivably find that Defendants waived any merits-based arguments in opposition to Plaintiffs' contention.  *See, e.g.*, *League of United Latin Am. Citizens v. Wheeler*, 899 F.3d 814, 829 (9th Cir. 2018) ("The EPA presents no arguments in defense of its decision.  Accordingly, the EPA has forfeited any merits-based

argument is unpersuasive for two reasons.  First, by its terms, Section 141(f)(3) conditions the belated addition of a new subject or question on a "find[ing]" by the Secretary that "new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified."  13 U.S.C. § 141(f)(3).  And, putting aside the question of whether any such findings would be subject to judicial review, there is no evidence — in the Section 141(f)(2) report, in Secretary Ross's March 26, 2018 Memorandum, or anywhere else in the Administrative Record for that matter — that Secretary Ross ever made such a finding.  Second, again by its own terms, Section 141(f)(3) requires the Secretary to submit a separate report to the relevant congressional committees if he finds, after having submitted the "subject" report, that new circumstances necessitate modifying the subjects to be asked on the census.  But if the Section 141(f)(2) report could satisfy Section 141(f)(3) when the Section 141(f)(1) report was to be modified, then there would have been no reason for Congress to mention Section 141(f)(1) in Section 141(f)(3).  The Secretary could always modify the "subject" report required by Section 141(f)(1) by simply submitting a "question" report with a new question, rendering Section 141(f)(3)'s reference to "paragraph (1) . . . of this subsection" superfluous.  Construing the statute in that manner would violate the canon that courts must give effect to all of a statute's provisions "so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (citations omitted).

Defendants are on slightly firmer ground in arguing that Secretary Ross's violation of Section 141(f) is a matter for Congress, not the courts, to address.  *See* Defs.' Post-Trial Br. 78-79, ¶¶ 61-64.  That argument finds some support in a line of out-of-Circuit cases, *see id.* at 79

---

argument.").  The Court declines to find such waiver, however, in part given the significance of the matter, in part because Defendants' arguments are to some extent jurisdictional, and in part because Defendants did at least cite Section 141(f) in their pretrial reply (albeit without any discussion whatsoever of the issues).  *See* Defs.' Pretrial Reply Br. 6.

(citing cases), the leading examples of which are *Guerrero v. Clinton*, 157 F.3d 1190 (9th Cir. 1998), and *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988).  In *Guerrero*, the plaintiffs — two federal territories and the State of Hawaii — challenged the adequacy of a report submitted by the Director of the Office of Insular Affairs to Congress pursuant to a statute mandating an annual report.  *See* 157 F.3d at 1191.  On appeal, the Ninth Circuit held "that the adequacy of the report" was not reviewable for two interrelated reasons.  *Id.*  First, because the required report was "purely informational" and no "legal consequences" flowed from it, the plaintiffs' injuries could not be redressed by "the relief requested (a better report)."  *Id.* at 1194-95.  Second, relying on *Hodel*, the Court concluded that the report was not final agency action subject to APA review — or, more precisely, "not agency action of the sort that is typically subject to judicial review." *Id.* at 1195.  "Because it triggers no legal consequences and determines no rights or obligations," the Court reasoned, "no check on the substance of the report is necessary.  Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Id.*  In sum, "the adequacy of the . . . reports is not reviewable, and the injury asserted by the governments is correspondingly not redressable, because the . . . report that Congress asked for is primarily a tool for its own use, without cognizable legal consequences." *Id.* at 1197.

The statute at issue in *Hodel*, Section 111 of Public Law No. 99-591, directed the Secretary of the Interior to "indicate in detail . . . to the President and Congress" his reasons for rejecting lease proposals under an Outer Continental Shelf oil and gas leasing program.  865 F.2d at 316 (quoting Pub. L. No. 99-591 § 111(b), 100 Stat. 3341, 3341-261 (1986)).  The petitioners sued under Section 111, contending that "adequate explanations were not provided for the Secretary's rejection of portions of three particular proposals." *Id.* at 316.  Like the *Guerrero* Court, the D.C. Circuit held that that claim was "not susceptible of judicial review" for two "closely related" reasons. *Id.* at 317, 319.  First, the Court concluded that "the nature of the

'agency action' at issue" was "quite distinct from the prototypical exercise of agency power" subject to the presumption in favor of judicial review.  *Id.* at 318.  As the Court explained:

> Executive responses to congressional reporting requirements of the kind presented here represent, we believe, an entirely different sort of agency action.  Under the reporting requirement before us, the designated Executive Branch officer is simply reporting back to the source of its delegated power in accordance with the Article I branch's instructions.  Lacking a provision for judicial review, the measure before us embodies a requirement that by its nature seems singularly committed to *congressional* discretion in measuring the fidelity of the Executive Branch actor to legislatively mandated requirements.

*Id.*  Significantly, however, the Court noted in an accompanying footnote that it was "decid[ing] only the issue" presented and that it therefore had "no occasion to pass on the broad, theoretical question whether an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review."  *Id.* at 318 n.33.  It then stressed that the petitioners' "contention" was "not that the Secretary failed entirely to report back to Congress (and the Governor), but that the Secretarial response lacked the requisite 'detail.'"  *Id.* at 318.  "If the Secretary's response has indeed been deemed inadequate (in the statutory sense of 'insufficiently detailed') by its recipient," the Court concluded, "then it is most logically for the recipient of the report to make that judgment and take what it deems to be the appropriate action."  *Id.* at 318-19.

The *Hodel* Court then cited a "second, and closely related, reservation about embracing the customary presumption of reviewability in this unusual setting."  *Id.* at 319.  "Under the specific circumstances of this reporting provision," the Court concluded, "we despair at formulating judicially manageable standards by which to gauge the fidelity of the Secretary's response to the strictures of section 111."  *Id.*  The Court reasoned that an inquiry into "[w]hether a report to Congress is sufficiently 'detailed' within the meaning of section 111" was "inherently elusive, especially in light of the statute's apparent purpose to inform and further the ongoing interbranch negotiation process."  *Id.*  "Generally," the Court concluded, "congressional reporting requirements are, and heretofore have been, a management tool employed by Congress

for its own purposes.  We decline to take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases, of reviewing petitioners' section 111 claim when Congress has not provided for judicial scrutiny of this aspect of the interbranch relationship."  *Id.*

Although they are non-binding, *Guerrero* and *Hodel* give the Court some pause about entertaining Plaintiffs' Section 141(f) arguments, if only because there is broad language in the two opinions suggesting that congressional reporting requirements are entirely a matter for Congress, not the courts.  But as the Ninth and D.C. Circuits themselves noted, the *holdings* of the two cases do not extend so far.  *See Hodel*, 865 F.3d at 318 n.33 ("We obviously decide only the issue before us; we have no occasion to pass on the broad, theoretical question whether an interbranch reporting requirement can ever be reviewable in the absence of an express provision for judicial review."); *accord Guerrero*, 157 F.3d at 1195 n.10.  And there are two critical distinctions between the situations in those cases (and in the other cases cited by Defendants, which follow *Guerrero* and *Hodel*) and the situation here.  First, the reports in those cases were not conditions precedent to some other agency action subject to judicial review.  In *Guerrero*, the statute at issue required the President (through his designee, the Director of the Office of Insular Affairs) to do no more than submit an annual report to Congress.  *See* 157 F.3d at 1191-92 & n.4. It did not require anything further from the Executive Branch, absent separate congressional action.  And in *Hodel*, the statute required the Secretary of Interior to submit the report at issue to the President and Congress at the same time that he submitted a proposed final Outer Continental Shelf leasing program.  *See* 865 F.2d at 316 n.27.  The statute required him to explain in the report "why" he had not "accepted" certain proposals for the leasing program, but it did not otherwise require him to take further action.  Thus, in both *Guerrero* and *Hodel*, the reports were

freestanding and "purely informational."  157 F.3d at 1194.  The question presented was whether

the reports themselves could be challenged, separate and apart from any other agency action.

        The reporting requirement here is very different.  Section 141(f) requires the Secretary to

file reports before he may take other action delegated to him by statute — namely, to the extent

relevant here, before he may add a new subject or question to the census questionnaire.  In other

words, "legal consequences" do "flow" from the Section 141(f) reports.  *Id.* at 1195.  Once he

files the "subjects" report mandated by Section 141(f)(1), he is statutorily required to adhere to

those subjects on the census questionnaire unless he finds "new circumstances . . . which

necessitate that the subjects" be modified and reports these modified subjects to Congress.  13

U.S.C. § 141(f)(3).  And it is the Secretary's ultimate decision — not, as in *Guerrero* and *Hodel*,

the mere failure to submit an adequate report in itself — that Plaintiffs challenge.  That makes all

the difference in the world.  Defendants concede that Secretary Ross's decision to add the

citizenship question qualifies as "final agency action" for purposes of the APA.  *See* Tr. 1482.

Thus, it is, in *Hodel*'s words, a "prototypical exercise of agency power" subject to "the general

presumption of reviewability of agency action" and the "congressional directive for judicial

review of claims by non-congressional parties" embodied in the APA.  *Hodel*, 865 F.2d at 318-

19.  That is, through the APA, which was in effect when Section 141(f) was enacted, Congress

has expressly authorized the court to "hold unlawful and set aside" that action if it was "not in

accordance with law," 5 U.S.C. § 706(2)(A), or taken "without observance of procedure required

by law," *id.* § 706(2)(D).  By the same token, the relief requested by Plaintiffs is not the filing of

"a better report," as it was in *Guerrero* and *Hodel*.  *Guerrero*, 157 F.3d at 1195.  Instead,

Plaintiffs ask the Court to set aside Secretary Ross's decision to add the question, which — as

discussed above — will indeed redress their injuries caused by that decision.

There is a second critical difference between the situations in *Guerrero* and *Hodel* and the one here.  In each of those cases, the challengers' contention was emphatically not that the relevant Executive Branch official had "failed entirely to report back to Congress," but rather that the statutorily mandated report had somehow been "inadequate."  *Hodel*, 865 F.2d at 318-19; *see Guerrero*, 157 F.3d at 1194 (noting that "the only controversy is whether the [challenged] report was adequate and what kind of information must be provided in future reports"); *id.* at 1195 n.10.[63]  Here, by contrast, the issue is not the adequacy of Secretary Ross's reports to Congress.  Instead, given the undisputed omission of citizenship from the March 2017 "subjects" report, it is the fact that he "failed entirely" to submit the report required by Section 141(f)(3).  *Hodel*, 865 F.2d at 318.  Congress may be in a better position than the courts to evaluate whether a given report is adequate and to "take what it deems to be the appropriate action" if the report is not.  *Id.* at 319.  But there is no reason to believe that Congress is in a better position than the courts to determine whether a given report has been submitted at all; at most, that determination requires, as it does here, a construction of the relevant statute and a straightforward finding of fact, both matters well within the competence of courts.  Relatedly, while evaluating "[w]hether a report to Congress is sufficiently 'detailed'" may well involve an "inherently elusive" inquiry, *id.*, there is nothing complicated or elusive about the inquiry required here.  Indeed, given the Court's construction of the statute (namely, that Secretary Ross's Section 141(f)(2) "questions" report does not, as a matter of law, qualify as a Section 141(f)(3) supplemental "subjects" report), it is undisputed that Secretary Ross failed entirely to

---

[63]     In *Guerrero*, the plaintiffs initially brought claims based on the allegation that the Director of the Office of Insular Affairs had failed to file reports for certain years.  *See* 157 F.3d at 1193.  While the case was pending, however, the Director remedied that failure, *see id.*, thereby mooting those claims, *id.* at 1195 n.10.  Thus, as in *Hodel*, the plaintiffs' challenge to the *adequacy* of the Director's reports was "the only remaining point in contention on appeal."  *Id.*

file the report required by Section 141(f)(3).  That, in turn, means that his decision to add a citizenship question to the census questionnaire was unlawful.  *See Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1125 (N.D. Cal. 2007) (holding, in similar circumstances, that "[n]either *Hodel* nor *Guerrero* offer relief for the defendants.  What was challenged in those cases was the adequacy or sufficiency of required reports; what is being challenged here is the *complete* failure to produce the Research Plan at all.").[64]

In short, although the question is a close one, the Court concludes that, under the circumstances presented here, Secretary Ross's violation of Section 141(f) is judicially reviewable and that it provides an independent basis to set aside his decision to add a citizenship question to the 2020 census questionnaire.  *See, e.g.*, *NRDC*, 894 F.3d at 108-13 (vacating an agency's order for failure to comply with a statutory deadline).  Indeed, those conclusions follow from a straightforward application of Congress's own dictates in the Census Act and the APA.  More fundamentally, they accord with "a basic element of our system of checks and balances": judicial review of final agency actions "affecting . . . the lives and liberties of the American people.  This is fully in keeping with fundamental notions in our policy that the exercise of governmental power, as a general matter, should not go unchecked."  *Hodel*, 865 F.2d at 318.

---

[64]     For similar reasons, the Court need not resolve the parties' disputes over (1) whether Secretary Ross would need to include in a Section 141(f)(3) report his statutorily mandated finding that "new circumstances exist which necessitate that the subjects" set forth in the Section 141(f)(1) report "be modified," 13 U.S.C. § 141(f)(3); and (2) whether Secretary Ross could make that finding given evidence in the record (albeit the trial record) that citizenship data acquired through the census is not "necessary" for enforcement of the VRA, *see* Gore Dep. 300 (Gore, the author of the Gary Letter, conceding that he does not believe that collection of CVAP data through the census is "necessary" for DOJ's VRA enforcement efforts).  *Compare* Defs.' Post-Trial Br. 79, ¶ 64, *with* Docket No. 550, at 11-12.  For purposes of this decision, all that matters is that Secretary Ross has not, to date, submitted a Section 141(f)(3) report.  Whether he can do so between now and the census date, and what would need to be included in any such report, are questions for another day — and, for the reasons set forth in *Hodel* and *Guerrero*, may be questions for Congress, rather than a court, to answer.

### 2. Secretary Ross's Decision Was Arbitrary and Capricious

Separate and apart from the fact that Secretary Ross's decision to add a citizenship question to the 2020 census was "not in accordance with" Sections 6(c) and 141, the decision would — and does — fail ordinary arbitrary-and-capricious review on its own terms, several times over.  As noted, agency action is "arbitrary and capricious," and must be set aside, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.  Agency action is also arbitrary and capricious if it is not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *id.* at 42-43 (citation and internal quotation marks omitted), or if the agency fails to adequately justify a departure from past practice, *see Mfrs. Ry. Co.*, 676 F.3d at 1096.  In short, to survive arbitrary-and-capricious review, agency action must be "logical and rational." *Allentown Mack Sales & Service, Inc.*, 522 U.S. at 374.  Secretary Ross's decision fails these standards for several independent reasons.[65]

### a. Secretary Ross's Explanations Ran Counter to the Evidence Before the Agency

First, in a startling number of ways, Secretary Ross's explanations for his decision were unsupported by, or even counter to, the evidence before the agency.  For instance, he sought to

---

[65]    In the discussion that follows, the Court relies heavily on the Census Bureau's analyses of the effects of adding a citizenship question on the census questionnaire.  It is important to note, however, that the Court's conclusions are not based on "the mere fact that the Secretary's decision overruled the views of some of his subordinates," which "is by itself of no moment in any judicial review of his decision."  *Wisconsin*, 517 U.S. at 23.  Instead, the Court's conclusions are based on the Court's determination that the Secretary's decision was irrational on its own terms and in light of the evidence before the Secretary at the time.

justify his decision on the ground that "no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates." AR 1317. But that assertion is simply untrue. The Administrative Record is rife with both quantitative and qualitative evidence, from the Census Bureau itself, demonstrating that the addition of a citizenship question to the census questionnaire would indeed materially reduce response rates among immigrant and Hispanic households. *See, e.g.*, AR 1277, 1278; AR 5500, 5505-06; AR 10386. Most notably, by examining differential declines in self-response rates on past surveys and measuring differential sensitivity to citizenship inquiries as shown in item non-response rates and breakoff rates, the Census Bureau calculated in January 2018 that adding a citizenship question to the 2020 census was likely to lead to a 5.1% differential decrease in self-response rates among noncitizen households. AR 5505-06. That analysis and others like it are the *only* quantitative evidence in the Administrative Record on the effect of the citizenship question on response rates. That is, despite Secretary Ross's claim to the contrary, *see* AR 1315, 1318, there is no evidence in the Administrative Record supporting a conclusion that addition of the citizenship question will *not* harm the response rate.

That is just the tip of the iceberg. For instance:

- Secretary Ross claimed that the citizenship question is "no additional imposition" for "the approximately 90 percent of the population who are citizens" and "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS." AR 1317. But that claim is manifestly contrary to both evidence in the Administrative Record, *see* AR 1277, 1281, and common sense. Adding a question to a survey that is sent to every household in the country "imposes" an additional burden — one question's worth, per person, per household — on every respondent. And that is true whether or not the respondent can answer the question by truthfully affirming that he or she is, in fact, a citizen of the United States and whether or not the respondent answered the question correctly on another survey.[66] *See* AR 1281 ("Survey methodologists consider

---

[66]     Secretary Ross's reference to "the approximately 70 percent of non-citizens who already answer this question accurately on the ACS" has its own share of problems. Ross Memo 5, at AR 1317. For one thing, nowhere near seventy percent of noncitizens answer the citizenship

burden to include . . . the direct time costs of responding . . . ."); 44 U.S.C. § 3502(2) (defining the term "burden," for purposes of the Paperwork Reduction Act, to mean "time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency, including the resources expended for . . . reviewing instructions; . . . completing and reviewing the collection of information; and transmitting, or otherwise disclosing the information.").[67]

- Secretary Ross asserted that placing the citizenship question last on the census form will somehow "minimize any impact on decennial census response rates." AR 1320. But the Administrative Record includes no evidence whatsoever to support that assertion. And the assertion is based on a fundamental misunderstanding of the way the census is conducted. After all, respondents are directed to answer all questions on the questionnaire sequentially for each member of their household, which means that — in a multi-member household — a respondent would see the citizenship question when he or she answers as to the first member of the household before answering any questions about others.

- Secretary Ross stated that it was "difficult to assess" whether "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs." AR 1319. But the Administrative Record reflects that, prior to the March 2018 decision, the Census Bureau estimated that the expected self-response decline from adding a citizenship question would result in an increased cost of at least $27.5 million. *See* AR 1282.

Any one of these errors or overstatements would arguably support a finding that Secretary Ross's decision was arbitrary and capricious within the meaning of the APA. Taken together, they plainly do. *See, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188,

---

question accurately on the ACS; only about one in fifty households even receives the ACS. *See* Joint Stips. ¶ 40. For another, although the Census Bureau generally considers citizenship data derived from administrative records to be more accurate than citizenship data derived from self-response (thus, the Section 6(c) problem with Secretary Ross's decision), one cannot say, without additional data, that the thirty percent of respondents for whom there is a discrepancy between self-response and administrative records answered the question inaccurately on the ACS; the most that can be said is that there is a disagreement between the two sets of data. Thus, it is inaccurate to say that "approximately 70 percent of non-citizens . . . answer this question accurately on the ACS." Based on the Administrative Record, all that can be said is that approximately seventy percent of noncitizens *who respond to the ACS* — quite a small fraction of the population of noncitizens overall — provide a citizenship status that matches their status in administrative records.

[67]    Having erroneously assumed that no additional burden existed, Secretary Ross naturally also failed to analyze whether it was justified — and thus "failed to consider an important aspect of the problem," another APA violation. *State Farm*, 463 U.S. at 43.

194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."); *see also, e.g.*, *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006) (stating that courts should not defer to agency action where the record evidence "directly contradicts the unsupported reasoning of the agency and the agency fails to support its pronouncements with data or evidence"); *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (stating that, to survive review under the APA, "the facts on which the agency purports to have relied" must "have some basis in the record" (internal quotation marks omitted)); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (reversing an agency decision that "ignore[d] critical context" and "cherry-pick[ed] . . . evidence").

And notably, the Court has not even gotten to the most significant way in which Secretary Ross's explanation for his decision ran counter to the evidence in the Administrative Record. Secretary Ross's own stated "priorit[y]" was to "obtain[] *complete and accurate data*." AR 1313; *see also id.* ("[I]t is . . . incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census."). And his decision was explicitly based on the "judgment" that adding the question to the census "will provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.* at 1317. He stated, for example, that "[t]he citizenship data provided to DOJ will be *more* accurate with the question than without it," *id.* at 1319 (emphasis added), and that adding a citizenship question was "*necessary* to provide complete and accurate data in response to the DOJ request," *id.* at 1320 (emphasis added). And he expressly found that the disadvantages of adding a question — most prominently, a reduction in the self-response rate — were "outweigh[ed]" by "the value of more complete and accurate data." *Id.* at 1319; *see id.* at 1317 ("I find that the need for accurate

citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.").  The problem is that all relevant evidence in the Administrative Record establishes that adding a citizenship question to the census will result in *less* accurate and *less* complete citizenship data.

First, as discussed above in reference to Section 6(c), all of the relevant evidence before Secretary Ross — *all* of it — demonstrated that using administrative records (Alternative C) would actually produce more accurate block-level CVAP data than adding a citizenship question to the census (Alternative D).  *See, e.g.*, AR 1277-78 (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources"); AR 1285 ("[T]he administrative records citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method."); AR 1293 ("Q: Is using sample data and administrative records sufficient for DOJ's request?  A: The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request.  We do not anticipate using any ACS data under Alternative C."); AR 1312 ("Alternative D would result in poorer quality citizenship data than Alternative C."); AR 5475 ("Alternative C delivers higher quality data than Alternative B for DoJ's stated uses.").  That is because, as Secretary Ross himself acknowledged, *see id.* at 1316, survey data regarding citizenship is highly suspect: People who are identified as noncitizens in administrative respond on surveys that they are citizens approximately thirty percent of the time.  *See* AR 1283; AR 1311.  And while it is true that Alternative C — using administrative records "alone" — would require the Census Bureau to "impute" the citizenship of a portion of the population, *see* Ross Memo 4, at AR 1316, Alternative D would rely on imputation (not to mention proxy response) as well, *see* AR 1305, 1307.  The difference is that,

in Alternative C, the missing citizenship data would be imputed from a more accurate source —
namely, administrative records — than in Alternative D. *Id.*

Nor would adding the question to the census result in "more complete" citizenship data,
whatever that may mean. It is certainly true that "[a]sking that citizenship question of 100
percent of the population gives each respondent the *opportunity* to provide an answer." Ross
Memo 5, at AR 1317 (emphasis added). But Secretary Ross identifies no independent value, let
alone one supported by a rational policy objective, in providing an "opportunity" to respond if
doing so does not yield more accurate and complete data. And the record is clear that many
respondents will not take advantage of the opportunity (or, as discussed, will take advantage of it
by providing inaccurate responses), forcing the Census Bureau to rely more heavily on NRFU
operations, including proxy response and imputation, to fill in the missing data. *See, e.g.*, AR
1311. That result also undermines Secretary Ross's assertion that Alternative D "would
maximize the Census Bureau's ability to match the decennial census responses with
administrative records." Ross Memo 4, at AR 1316. As the Census Bureau itself made clear,
adding a citizenship question will drive down the self-response rate and push more households
into NRFU operations, which, in turn, produces "lower quality" personal identifying
information. *See* AR 1311. That, in turn, will actually increase "the number of persons who
cannot be linked to . . . administrative data." *Id.*

In short, Secretary Ross's decision is neither logical nor rational on its own terms. That
is, "the reason" that he himself "gave for [his] action . . . makes no sense." *New England Coal.
on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984)
(Scalia J.). Having articulated that his own "priorit[y]" was "obtaining *complete and accurate
data*," Ross Memo 1, at AR 1313, and having made "completeness" and "accuracy" the
dispositive criteria for his decision, *see id.* at 1316-17, Secretary Ross acted arbitrarily and

230

capriciously by selecting an option that will produce *less* accurate and *less* complete citizenship data. That by itself renders his decision arbitrary and capricious. *See, e.g.*, *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003) (holding that the adoption of a standard that permitted "plainly inferior" outcomes was arbitrary and capricious absent "satisfactory explanation" in the record); *see also, e.g.*, *State Farm*, 463 U.S. at 43 (stating that a decision is arbitrary when it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise"); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 626 F.3d 84, 94 (D.C. Cir. 2010) (explaining that an agency has an "obligation to explain its reasoning for rejecting" expert evidence contrary to its decision); *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (stating that a court will "not defer to [an] agency's conclusory or unsupported suppositions").[68]

### b.  Secretary Ross Failed to Consider Several Important Aspects of the Problem

Secretary Ross's decision was arbitrary and capricious for another reason: He "failed to consider" several "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. For starters, Secretary Ross failed to consider, let alone coherently address, whether it was necessary to

---

[68]     To be clear, the foregoing analysis relies solely on evidence in the Administrative Record, as the relevant question is whether Secretary Ross's explanations for his decision ran counter to the evidence that was "before the agency." *State Farm*, 463 U.S. at 43. That said, considering the extra-record evidence presented at trial would only strengthen the conclusion that Secretary Ross's decision was unsupported by evidence. Among other things, the evidence from trial establishes that the impact of the question on the self-response rates of immigrant and Hispanic households is likely to be even higher than 5.1%, *see, e.g.*, Brown Memo at 35, 38-39; Tr. 30, 50-51, 78-80, 881-82, 897, 919-20; that adding any question to the census imposes an incremental burden on respondents, *see, e.g.*, Habermann Aff. ¶¶ 22-25, 33; Pierce Aff. ¶ 9; Trial Tr. 43; and that the costs of adding the question are likely to be even higher than the Census Bureau's initial estimates, *see* Brown Memo at 43. More broadly, the trial record includes the credible and persuasive explanation of Defendants' own expert, Dr. Abowd, of why, using Secretary Ross's own criteria, Alternative C was superior to Alternative D. *See* Tr. 966-91, 1374-75.

respond to DOJ's request at all.[69]  The March 26, 2018 Memorandum is premised on *DOJ*'s

request to add a citizenship question to the decennial census questionnaire so as to obtain more

granular CVAP data for use in the enforcement of the VRA.  Ross Memo 1, at AR 1313.  The

Census Act, however, delegates the authority to obtain "other census information" to the

Secretary of Commerce — not to DOJ — and authorizes the collection of such information

(subject to limits found elsewhere in the statute, including Section 6(c)) only "as necessary."  13

U.S.C § 141(a).  It does not permit the Secretary of Commerce to exercise that authority on an

unreasoned whim or to outsource the decision that certain data is "necessary" to the

unscrutinized discretion of another federal agency.  But notably, Secretary Ross gave no reason

at all — not even that it would be rude to refuse DOJ.  Instead, he treated DOJ's request as

conclusive with respect to whether he should exercise his authority to collect more granular

citizenship data.[70]  The Census Act and the APA required more than that.  *See, e.g.*, *City of*

*Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987) (noting that "an

agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned

explanation for its rejection of such alternatives," and observing "that the failure of an agency to

consider obvious alternatives has led uniformly to reversal" (citations and internal quotation

marks omitted)); *Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 16 (stating that

"[a]dministrative law does not permit" an agency to "dodge" its own responsibilities or "to

excuse its inadequate responses by passing the entire issue off onto a different agency").

---

[69]     Notably, Defendants conceded at oral argument that that there was no requirement — statutory, constitutional, or otherwise — that Secretary Ross respond to DOJ's request.  Tr. 1534.

[70]     To be sure, Secretary Ross did characterize Alternative A as a "rejection of the DOJ request" because it would not involve adding a citizenship question to the census.  Ross Memo 2, at AR 1314.  But that characterization is belied by Secretary Ross's own description of the option.  As he himself explained, Alternative A involved deploying statisticians to assist DOJ in achieving more precise results using existing ACS CVAP data.  *See id.* at 1314-15.

Making matters worse, there is no evidence in the Administrative Record that would support a finding that more granular CVAP data is "necessary" for enforcement of the VRA and plenty of evidence to the contrary.  Conspicuously, the Gary Letter itself does not state that such data is "necessary" to enforce the VRA; indeed, it studiously avoids using the word "necessary" to describe the request for the data.  *See* AR 663-65.  Nor does it identify a single VRA case that DOJ failed to bring or lost because of inadequate block-level CVAP data.  *See id.*[71]  That omission is hardly surprising.  After all, the VRA was enacted in 1965 — *fifteen years after* a citizenship question last appeared on a census questionnaire sent to every household in the country.  In other words, during the entire fifty-four-year existence of the VRA, DOJ has never

---

[71]      The Gary Letter cites a handful of cases for the proposition that "where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district."  AR 663.  But none of those cases even remotely suggest that it matters whether that CVAP data be derived from "hard count" survey responses.  To the contrary, those cases indicate that existing, sample-derived CVAP data (whether drawn from the ACS or from the long-form census) have generally been sufficient to enforce VRA claims.  *See LULAC*, 548 U.S. at 423-42 (discussing the district court's factual findings based on then-existing CVAP data, and ultimately ruling in favor of the plaintiffs on their vote dilution claim); *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (rejecting the plaintiffs' *district*-level CVAP data — derived from an independent estimate and the plaintiffs' own attempt to count, but not from the ACS — as inadequate); *Barnett v. City of Chicago*, 141 F.3d 699, 702-04 (7th Cir. 1998) (concluding that CVAP data is the proper basis for "determining equality of voting power" under the VRA while accepting the adequacy of the data in the record on that question and ruling in favor of one set of plaintiffs); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569-70 (11th Cir. 1997) (holding that CVAP data was the proper basis for considering the first *Gingles* factor, but accepting sample citizenship data as "reasonably accurate" even though it was only available at the census-block level); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (rejecting a VRA claim upon consideration of *total* population data, the plaintiffs having conceded that they would lose if CVAP data were considered instead).  Notably, none of those cases suggest that *block-level* CVAP data is necessary.  Indeed, the only one of those cases to even address block-level CVAP data concluded that block-*group*-level CVAP data was sufficient, and expressly rejected the argument that "citizenship information . . . based upon a sample population" could not be used alongside "census data . . . based upon the entire population."  *Negron*, 113 F.3d at 1569-70; *see id.* at 1570 ("The use of sample data is a long-standing statistical technique, whose limits are known and measurable.  We will not reject the citizenship statistics solely because they are based on sample data without some indication that the sample was tainted in some way.").

had "hard count" CVAP data from the decennial census.  It did not have such data in 1965, when the VRA was first enacted; it did not have such data in 1982, when the VRA was amended to clarify the vote-dilution standard, *see* Pub. L. No. 97-205, 96 Stat. 131; and it did not have such data in 1986, when the Supreme Court articulated the still-operative vote-dilution test in *Gingles*, a case cited in the Gary Letter.  AR 663.  And if that point was not obvious to Secretary Ross from the historical record alone, as it should have been, it was made to him explicitly in multiple submissions from voting rights experts and other stakeholders that appear in the Administrative Record.  *See, e.g.*, AR 798-800 (letter from the Leadership Conference on Civil and Human Rights); AR 1122-23 (letter from various Jewish organizations); AR 3605-06 (letter from the Constitutional Accountability Center on behalf of Asian Americans Advancing Justice, NAACP Legal Defense and Education Fund, and other organizations).

There is at least one more important aspect of the problem that Secretary Ross failed to consider: the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices on the fitness of decennial census citizenship data for DOJ's stated purposes.[72]  To

---

[72]    To some extent, that failure is arguably manifest in the Administrative Record alone. Evidence in the Administrative Record notes that disclosure avoidance protocols would impact any CVAP data produced for DOJ.  *See, e.g.*, AR 1292 (explaining that only data that has been "processed through the Bureau's disclosure avoidance procedures can be released for public use"); AR 2952 (acknowledging that the Census Bureau will need to ascertain "how disclosure avoidance will be handled"); AR 6415 (discussing application of disclosure avoidance to a Census Bureau proposal to obtain CVAP information).  Moreover, Dr. Abowd testified that he advised Secretary Ross about the issue in their February 12, 2018 meeting, *see* Tr. 1046-48, 1373, and, while no notes of that meeting exist (or at least have been disclosed), that advice should surely be deemed part of the "whole record" that was before the agency, 5 U.S.C. § 706; *see Portland Audubon Soc'y*, 984 F.2d at 1548 (stating that the "whole record" includes "everything that was before the agency pertaining to the merits of its decision"); *Sierra Club*, 657 F.2d at 402 (noting that excluding "oral communications of central relevance" to the EPA Administrator's decision from the record would improperly force the court to ignore "information central to the [Administrator's] justification" simply because it was "communicat[ed] . . . by voice rather than by pen").  In any event, for the reasons stated above, the Court may look to extra-record evidence in determining whether Secretary Ross failed to consider an important aspect of the problem before him.  *See Asarco*, 616 F.2d at 1160.

ensure that it complies with its statutory confidentiality obligations, the Census Bureau plans to apply disclosure avoidance protocols to every census block. *See* Tr. 1032-33, 1039-46; Census Bureau 30(b)(6) Dep. 50-51. That has two significant implications with respect to DOJ's purported desire for census-block CVAP data. First, it means that, even with a citizenship question on the census, there would not be a single census block (except for randomly) where citizenship data would actually reflect the responses of the block's inhabitants to the census questionnaire. *See* Census Bureau 30(b)(6) Dep. 67-68, 70-71; Tr. at 1033. Second, it means that block-level CVAP data based on responses to a citizenship question on the census would themselves be estimates, with associated margins of error, rather than a true or precise "hard count." *See* Tr. at 1043-44; Census Bureau 30(b)(6) Dep. 53-56, 69-71, 100-01. As a matter of fact, the Census Bureau has not yet even determined if, after disclosure avoidance, the error margins for block-level CVAP data based on the census would "still allow redistricting offices and the Department of Justice to use the data effectively." *See* Census Bureau 30(b)(6) Dep. 101. Nor does it even know if the CVAP data produced by a citizenship question on the census would have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies. *See id.*; Tr. 1044-46; *see also* Gore Dep. 225-28 (acknowledging that when he drafted the Gary Letter, AAAG Gore did know if citizenship data derived from the census would have smaller or larger margins of error, or would be any more precise, than citizenship data).

There is no indication that Secretary Ross considered any of this in deciding to add a citizenship question to the census; indeed, the words "disclosure avoidance" appear nowhere in his Memorandum. Ross Memo 5-8, at AR 1317-20.[73] On its own terms, that failure easily

---

[73]    Nor did Secretary Ross consider whether adding a citizenship question would enable the Census Bureau to meet DOJ's stated desire for a single data set containing both population and citizenship data. *See* AR 664. Even now, the Census Bureau has not yet decided whether to include population and CVAP data in the same data set. *See* Defs.' Post-Trial Br. 55, ¶ 374.

qualifies as arbitrary and capricious.  *See, e.g.*, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606

(D.C. Cir. 2017) ("Despite immense losses in the gray wolves' historical range . . . the Service

nowhere analyzed the impact of that loss on the survival of the gray wolves as a whole . . . .

Such a failure to address 'an important aspect of the problem' that is factually substantiated in

the record is unreasoned, arbitrary, and capricious decisionmaking." (quoting *State Farm*, 463

U.S. at 43)); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 420-21 (3d Cir. 2004)

(vacating an agency's repeal of a rule where the agency failed to consider or even acknowledge

"the effect of its decision on minority television station ownership"); *Connecticut v. U.S. Dep't

of Commerce*, No. 3:04-CV-1271, 2007 WL 2349894, at *12-13 (D. Conn. Aug. 15, 2007)

(vacating an agency decision as arbitrary because, among other things, "the Secretary failed to

address an important aspect of the problem because he effectively ignored the adverse effects on

oysters," where "the destruction of oysters . . . is significant in balancing the adverse effects of

the project against the national interest").  It is all the more arbitrary and capricious given that it

casts grave doubt on the central premise of Secretary Ross's explanation for his decision: that

adding a citizenship question to the census "will provide DOJ with the most complete and

accurate CVAP data in response to its request."  Ross Memo 5, at AR 1317.

### c.  Secretary Ross Failed to Justify Departures from the OMB Guidelines and the Census Bureau's Standards and Practices

As if that were not enough, Secretary Ross's decision was also arbitrary and capricious

because, in multiple ways, it represented a dramatic departure from the standards and practices

that have long governed administration of the census, and he failed to justify those departures.

*See, e.g.*, *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 207

(D.D.C. 2015) (holding that an agency's unsupported departure from prior practice was arbitrary

and capricious); *Tummino v. Torti*, 603 F. Supp. 2d 519, 523 (E.D.N.Y. 2009), *amended sub

nom. Tummino v. Hamburg*, No. 05-CV-366 (ERK), 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013)

(holding that agency action was arbitrary and capricious in part because it had "departed in significant ways from [its] normal procedures"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action . . . ordinarily demand[s] that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1029 (D.C. Cir. 2017) ("To provide a satisfactory explanation, an agency must acknowledge and explain any departure from its precedents."); *Hooper v. Nat'l Transp. Safety Bd*., 841 F.2d 1150, 1151 (D.C. Cir. 1988) (holding that the failure to enforce a procedural rule uniformly is arbitrary and capricious).  Making matters worse, not only did Secretary Ross fail to justify these departures, but he and his aides took active steps to downplay, if not conceal, them from scrutiny.

For starters, the Census Bureau's conduct of the census is governed by various federal standards that generally call for, among other things, burden-reduction, cost-minimization, and pretesting of statistical data collection instruments, including the decennial census.  First, the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq.*, tasks OMB with coordinating the federal statistical system and establishing government-wide guidelines and policies regarding statistical collection methods.  *See id.* §§ 3501(9), 3504(a)(1)(B)(iii), 3504(e).  The purposes of the Act are, among other things, to "minimize the paperwork burden . . . resulting from the collection of information by or for the Federal Government"; to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government"; and to "minimize the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information."  *Id.* § 3501(1), (2), (5); *see also id.* § 3502(2) (providing, in relevant part, that "the

term 'burden' means time, effort, or financial resources expended by persons to generate, maintain, or provide information to or for a Federal agency").

As discussed above by way of background, in line with these statutory obligations, OMB has published a number of "Statistical Policy Directives" that govern data collection by the Census Bureau and other federal statistical agencies. *See* Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71610 (Dec. 2, 2014); PX-359 (Statistical Policy Directive No. 2); PX-360 (Addendum to Statistical Policy Directive No. 2).  To the extent relevant here, Statistical Policy Directive ("SPD") No. 1, titled *Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, requires the Census Bureau to "[c]onduct objective statistical activities" by "produc[ing] data that are impartial, clear, and complete and are readily perceived as such by the public."  79 Fed. Reg. at 71615.  Meanwhile, SPD No. 2, titled *Standards and Guidelines for Statistical Surveys*, provides, among other things, that federal statistical agencies "must design and administer their data collection instruments and methods in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost."  PX-359, at 16, § 2.3; *accord id.* at 13, § 1.3 (requiring an agency to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs).  Another provision of SPD No. 2 requires agencies to "pretest" survey systems, and notes in particular that "[a] complete test of all components (sometimes referred to as a dress rehearsal) may be desirable for highly influential surveys."  *Id.* at 14, § 1.4.

As noted above as well, the Census Bureau has adopted its own set of "Statistical Quality Standards," which are binding on "[a]ll Census Bureau employees."  PX-260, at ii.  The express goals of the Standards are "to promote quality in [the Census Bureau's] information products and

the processes that generate them" and to "provide a means to ensure consistency in the processes of all the Census Bureau's program areas, from planning through dissemination." *Id.* at i.  To that end, Requirement A2-3 provides that "[d]ata collection instruments and supporting materials must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden." *Id.* at 7.  Sub-Requirement A2-3.3 further states that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." *Id.* at 8.  It provides for only two exceptions to that requirement.  First, "[o]n rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting," in which case "the program manager must apply for a waiver." *Id.*  Second, "[p]retesting is not required for questions that performed adequately in another survey." *Id.*

The Administrative Record alone reveals that Secretary Ross — without any, let alone adequate, justification — failed to comply with the foregoing Statistical Policy Directives and Quality Standards, not to mention the historical practices that have long conformed to them. Most glaringly, Secretary Ross's decision to add the question violates every component of OMB's SPD No. 2, which mandates that the Census Bureau "design and administer" the census "in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost." PX-359, at 16, § 2.3.  Since, as discussed above, Secretary Ross selected an option that is less accurate and less complete than an alternative that was presented to him, it goes without saying that his decision did not constitute "the *best* balance between maximizing data quality and controlling measurement error." *Id.* (emphasis added).  Nor can it be said that he "minimize[d] respondent burden and cost," since, as discussed above as well, adding a citizenship question to the census increases the

burden on every household in the country and, by the Census Bureau's own calculations, would increase the costs of administering the census by tens of millions of dollars.  In short, Secretary Ross's decision falls short on *all four* criteria set forth in SPD No. 2's Section 2.3 — maximizing data quality, controlling measurement error, minimizing respondent burden, and minimizing cost.  Secretary Ross's failure to justify that departure qualifies as arbitrary and capricious.

Secretary Ross's decision departed without adequate justification from the Census Bureau's own Statistical Quality Standards and practices as well.  As noted, the Standards require pretesting of new questions, except in two circumstances: first, where "cost or schedule constraints . . . make it infeasible," in which case a "waiver" is required; or second, where the question "performed adequately in another survey."  PX-260, at 8.  But there is no indication in the Administrative Record that the Census Bureau applied for, let alone received, a waiver.  (And even if it had, Secretary Ross could hardly contend that "cost or schedule constraints" made pretesting infeasible, as any such constraints were a product of his own making — the Census Bureau would have had ample time to conduct thorough pretesting had Secretary Ross shared in early 2017 that he was considering the issue.  *See, e.g.*, *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (rejecting an agency's attempt "to excuse its violation of the APA by pointing to the problems created by its own delay")).  And second, the Administrative Record — indeed, Secretary Ross's own Memorandum — establishes that the citizenship question has not "performed adequately" on the ACS.  After all, analyses indicate that noncitizens "inaccurately mark 'citizen' about 30 percent of the time" on the ACS.  Ross Memo 4, at AR 1316.  Notably, Secretary Ross nowhere stated in his Memorandum that the question has "performed adequately" on the ACS.  He did say the question had "been well tested."  *Id.* at AR 1314.  But "well tested" and "performed adequately" are not synonyms.  And in any event, given both the differences between the ACS and the decennial census, and the Census Bureau's

own Standards and practices calling for pretesting of any new question in the context of the

whole proposed questionnaire, there is no basis even to call the question "well tested."[74]

Conspicuously, Defendants barely even try to argue that Secretary Ross's decision was

made in compliance with OMB's Statistical Policy Directives and the Census Bureau's

Statistical Quality Standards.  Instead, they have made two arguments.[75]  First, in their pretrial

briefing, they argued that "[t]he process that Plaintiffs claim was not followed was developed for

the [ACS]."  Defs.' Pretrial Reply Br. 5.  Stating that the ACS is "a different instrument with

different considerations and goals," Defendants contended that they "reasonably determined that

---

[74]     Once again, the foregoing analysis relies solely on evidence in the Administrative
Record.  But once again, considering the extra-record evidence presented at trial would only
strengthen the conclusion that Secretary Ross deviated from Census Bureau standards and
practices without adequate justification.  Among other things, the evidence from trial establishes
that the Census Bureau has a rigorous pretesting protocol for any proposed changes to the census
and typically spends years — in some cases, *up to a decade* — testing any proposed changes to
the questionnaire, *see* Thompson Decl. ¶¶ 48-54; Habermann Aff. ¶¶ 44-46; Tr. 167; that the
Census Bureau had explicitly adopted a plan for the 2020 census that required rigorous pretesting
of any new questions, *see* PX-271, at 4; that the Census Bureau did not obtain a waiver from the
pretesting requirement, *see* Tr. 1278; and that Defendants' own expert, Dr. Abowd, agreed that
the citizenship question has not "performed adequately" on the ACS, *see* Tr. 1282, 1287-88.
Notably, the record includes testimonials from *dozens* of experts in relevant fields that the
citizenship question has not been adequately tested for inclusion in the decennial census
questionnaire.  *See, e.g.*, Tr. 157, 169-70, 737; Thompson Decl. ¶¶ 48-55, 92; Habermann Aff.
¶¶ 42, 59, 63; AR 8555 (letter from six former Directors of the Census Bureau); PX-539 (report
of the National Academics of Sciences, Engineering, and Medicine's Committee on National
Statistics Task Force on the 2020 Census); Brief of the American Statistical Association et al. as
*Amici Curiae* Supporting Plaintiffs, Docket No. 420-1.  In fact, Defendants' own expert, Dr.
Abowd, testified — in both an individual capacity and as the official representative of the Census
Bureau — that the citizenship question has not been adequately tested in the context of the
decennial census. *See* Census Bureau 30(b)(6) Dep. 142-43; Tr. 1330.  Defendants failed to
proffer a single expert willing to opine that the citizenship question has been adequately for
inclusion on the decennial census.

[75]     Defendants also contend that making changes to the census questionnaire without
extensive pretesting "is not unprecedented," citing a question regarding Hispanic origin on the
1970 census long-form questionnaire and a question regarding race on the 1990 census short-
form questionnaire. Defs.' Post-Trial Br. 61, ¶ 419.  But those situations are distinguishable on
multiple grounds.  *See* Pls.' Proposed Findings ¶¶ 275-91.  Most significantly, the Census
Bureau's Statistical Quality Standards were not in effect at the time.  *See* PX-260, at 4.

the ACS process did not apply to the decennial census here.  Accordingly, the Secretary did not act arbitrarily by following a more informal process." *Id.* at 5-6.  Putting aside whether Defendants have abandoned this argument as it does not appear in their extensive post-trial briefing, it is, of course, close to a concession that Secretary Ross acted in an arbitrary and capricious manner by relying on testing done for the purpose of the ACS (a conclusion for which there is plenty of evidence anyway).  But the argument fails on its own terms for at least three reasons.  First, the argument is a belated concoction of counsel; it appears nowhere in the Ross Memo or otherwise in the Administrative Record.  Second, the argument finds no basis in the Census Bureau's Statistical Quality Standards.  To the contrary, the Quality Standards explicitly apply "to all information products released by the Census Bureau and the activities that generate those products," which includes both the ACS *and* the decennial census.  PX-260, at 6; *accord id.* at ii.  And third, the argument does not pass the laugh test.  The constitutionally mandated, once-in-a-decade census, which is used for many purposes, including apportionment of Representatives in Congress, is plainly more consequential than the annual ACS.  Thus, if anything, the process used to vet any proposed changes to the decennial census questionnaire should be *more* rigorous than the process used to vet proposed changes to the ACS questionnaire.

In a last-ditch attempt to defend Secretary Ross's departures from the Census Bureau's well-established standards and practices, Defendants also contended at oral argument that the Statistical Quality Standards are not binding on the Secretary himself, citing *Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008).  *See* Tr. 1458-59.  But that argument is unavailing for four independent reasons.  First, Defendants did not make the argument in either their pre-trial or post-trial briefs and, thus, waived it.  *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . .").  Second, Defendants have never disputed that OMB's Statistical Policy Directives (or the Paperwork

Reduction Act itself), as distinct from the Census Bureau's standards, are binding on the

Secretary; to the contrary, Defendants acknowledge that "each" of the "OMB Statistical Policy

Directives . . . applies to the Census Bureau."  Defs.' Post-Trial Br. 60, ¶ 412; *see* 44 U.S.C.

§ 3518(a) ("Except as otherwise provided in this subchapter, the authority of an agency under

any other law to prescribe policies, rules, regulations, and procedures for Federal information

resources management activities is subject to the authority of the Director . . . ."); *United States*

*v. Nixon*, 418 U.S. 683, 696 (1974) ("So long as [a] regulation remains in force the Executive

Branch is bound by it . . . .").  Third, it is far from clear that *Comcast* even applies here.  The

issue there was whether the Federal Communications Commission was bound by decisions of its

Media Bureau that had not been appealed to, let alone adopted by, the Commission itself.  The

Court held that it was not, reaffirming "that an agency is not bound by the actions of its staff if

the agency has not endorsed those actions."  *Comcast*, 526 F.3d at 769 (internal quotation marks

omitted).  The Census Bureau's Statistical Quality Standards are very different from the Media

Bureau decisions at issue in *Comcast*.  They were the product of a formal rule-making-type

process, *see* 67 Fed. Reg. 38467 (June 4, 2002), and have been "endorsed" by the Commerce

Department — as demonstrated by the consistent adherence to them until Secretary Ross's

decision.  Finally, even if the Standards (or OMB's Directives, for that matter) were not

technically binding on Secretary Ross (or subject to judicial review), they are consistent with the

standards prevailing in the fields of survey design and administration and were before Secretary

Ross at the time he made his decision.  Thus, they are independently relevant to the analysis of

whether his decision was substantively reasonable as the APA requires.  *See, e.g.*, *Mobil Pipe*

*Line Co. v. FERC*, 676 F.3d 1098, 1103 n.2 (D.C. Cir. 2012) (Kavanaugh, J.) (relying on "the

economic and legal analysis of FERC's expert staff," even though it was not formally binding on the Commission, because the Court found it "so persuasive").[76]

One other departure from standard operating procedures warrants brief mention — although whether it would be enough on its own to render Secretary Ross's decision arbitrary and capricious is a close question, if only because the record is scant on whether he himself knew of the departure.  As detailed in the Administrative Record, when an agency requests data, it is standard operating procedure for the Census Bureau to meet with that agency to discuss the request, to drill down into the details of the data use, and to consider how best to meet the need presented.  *See* AR 3289, 5489-91, 8651; *see also* Recitation of Facts ¶¶ 121-23.  Consistent with that practice, the Census Bureau advised DOJ that it had a less burdensome proposal for meeting DOJ's purported need for CVAP data and reached out repeatedly to DOJ to set up a meeting between their respective experts.  *See* AR 3289, 8651.  But DOJ rebuffed those requests.  *See* AR 3460, 5489, 8651, 9074.  Thus, there is no evidence in the Administrative Record that DOJ was apprised of the high inaccuracy rate of citizenship survey responses or of the potential implications of disclosure avoidance protocols for block-level CVAP data.  That would be bad enough, but the trial record reveals that DOJ's refusal to meet with the Census Bureau was virtually unprecedented — particularly since it was done at the direction of the Attorney General

---

[76]      Arguably, Defendants would have been on firmer ground contending that the Court should not consider OMB's Statistical Policy Directives (as opposed to the Census Bureau's Standards), either on ripeness or reviewability grounds.  *See* 44 U.S.C. § 3507(d)(6) ("The decision by the [OMB] Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review."); *see also, e.g.*, *Tozzi v. EPA*, 148 F. Supp. 2d 35, 47 (D.D.C. 2001) (holding that the EPA's submission to OMB of an Information Collection Request under the Paperwork Reduction Act is not judicially reviewable because the OMB Director's eventual decision would not be reviewable).  But they conspicuously failed to make that argument.  And, in any event, the extent to which Secretary Ross departed without explanation from the Statistical Policy Directives is relevant to the Court's evaluation of the substantive reasonableness of Secretary Ross's decision, whether or not compliance with the Directives (or lack thereof) is independently reviewable by the Court as a technical matter.

himself.  Gore Dep. 274; Tr. 963-65.  Dr. Abowd testified at trial that he was not aware of a single other circumstance in which a Cabinet Secretary had personally directed agency staff not to meet with the Census Bureau.  Tr. 964-65.  And he opined — without doubt, correctly — that the Attorney General's involvement violated fundamental principles designed to ensure that federal statistical agencies conduct their work independent of political and other undue external influence.  *See* Tr. 1265-68; PX-355, at 3; *see also* 79 Fed. Reg. at 71612 ("A Federal statistical agency must be independent from political and other undue external influence in developing, producing, and disseminating statistics.").

### 3.  Secretary Ross's Rationale Was Pretextual

Finally, and perhaps most egregiously, the evidence is clear that Secretary Ross's rationale was pretextual — that is, that the real reason for his decision was something other than the sole reason he put forward in his Memorandum, namely enhancement of DOJ's VRA enforcement efforts.  As the Court noted above, judicial review of agency action "requires that the grounds upon which the . . . agency acted be clearly disclosed."  *Chenery I*, 318 U.S. at 94; *accord Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-68 (1962) (stating that an agency must "disclose the basis of its" action).  Absent compliance with this basic requirement, a reviewing court would be unable to measure agency action against the relevant governing standard.  *Cf., e.g.*, *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the final agency decision reflect[ed] the rational outcome of the agency's consideration of all relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact considered by the agency").

It follows that a court cannot sustain agency action founded on a pretextual or sham justification that conceals the true "basis" for the decision.  Indeed, any other rule would deprive the words "basis," "grounds," and "disclose" of any force or meaning.  Notably, Defendants do

not argue otherwise; in fact, they expressly conceded (and thus have waived any argument to the contrary) that if the Court were to find that Secretary's "stated rationale [was] pretextual," APA relief must follow.  May 9 Conf. Tr. 15.  That concession was prudent, as courts have not hesitated to find that reliance on a pretextual justification violates the APA.  *See, e.g.*, *Woods Petroleum Corp.*, 18 F.3d at 859 (setting aside agency action because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior motive"); *Home Box Office*, 567 F.2d at 54-55 ("[W]here . . . an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, but must treat the agency's justifications as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary." (internal citations omitted)); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544-46 (E.D.N.Y. 2009) (finding agency action to be arbitrary and capricious when its articulated basis was "fanciful and wholly unsubstantiated" and other, impermissible considerations were evident from the record).

In light of that well-established law, the Court's conclusion that Secretary Ross made the decision to add a citizenship question well before he received DOJ's request and for reasons unrelated to the VRA, *see* Recitation of Facts ¶¶ 167-84, provides yet one more independent basis for vacating and setting aside his decision.  As discussed above, that conclusion is supported by evidence in the Administrative Record alone, including evidence that Secretary Ross had made the decision to add the citizenship question well before DOJ requested its addition in December 2017, AR 3702, 3710, 12476; the absence of any mention, *at all*, of VRA enforcement in the discussions of adding the question that preceded the Gary Letter, *see* AR 763-64, 2424, 2458, 2521-23, 3710, 3984, 4004; unsuccessful attempts by Commerce Department staff to shop around for a request by another agency regarding citizenship data, AR 12755-56;

and Secretary Ross's personal outreach to Attorney General Sessions, followed by the Gary Letter, AR 2528, 2636, 4004; *see* AR 1321; not to mention the conspicuous procedural irregularities that accompanied the decision to add the question.  When one considers evidence outside the Administrative Record, as the Court may do for this purpose, *see, e.g.*, *Overton Park*, 401 U.S. at 420, the conclusion is inescapable.  That record includes the testimony from Comstock all but admitting that Secretary Ross had made up his mind to add the citizenship question in the spring of 2017, Comstock Dep. 146; testimony that senior aides to Secretary Ross had no idea why he decided to add the question, *see id.* at 112; Teramoto Dep. 32; a near-admission from Comstock that he went searching for a request from other agencies because the Commerce Department "would need to clear certain legal thresholds" to add the citizenship question that it otherwise would not be able to, and that it was his role to "find the best rationale" to support the addition of the question, Comstock Dep. 153-55, 266-67; and testimony from AAAG Gore that conversations between DOJ and the Commerce Department about adding a citizenship question were not initiated by DOJ, Gore Dep. 67.

Significantly, the record also includes evidence of the many ways in which Secretary Ross and his aides sought to conceal aspects of the process.  *See* Recitation of Facts ¶ 184.  In various contexts, courts frequently rely on evidence of false or misleading statements to draw inferences of pretext.  In the employment setting, for example, it is well established that a factfinder "can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up" an ulterior purpose.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may . . . suffice to show intentional discrimination."); *Stratton v. Dep't for the Aging for New York*, 132 F.3d 869, 880-81 (2d Cir. 1997) (holding that

evidence of an employer's false explanation for employment action supported the jury's finding of unlawful pretext); *see also, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). And in the criminal context, courts frequently refer to false exculpatory statements as evidence of consciousness of guilt. *See, e.g.*, *United States v. Reyes*, 302 F.3d 48, 56 (2d Cir. 2002) ("[I]t is reasonable to infer guilty knowledge from [the defendant's] false exculpatory statement."). These inferences are "consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Reeves*, 530 U.S. at 147 (internal quotation marks omitted). Applying that common-sense evidentiary principle here, the Court can — and, in light of all the evidence in the record, does — infer from the various ways in which Secretary Ross and his aides acted like people with something to hide that they *did* have something to hide.

The Court does not make the finding that Secretary Ross failed to disclose his true rationale lightly. As Defendants note, the decisions of Executive Branch officials are undoubtedly subject to a "presumption of regularity." *See* Defs.' Post-Trial Br. 65, ¶ 440; *accord id.* at 87-88, ¶ 447.[77] By definition, however, a "presumption" can be rebutted by

---

[77] Conspicuously, Defendants do not cite any case holding that the presumption of regularity applies to a court's substantive review under the APA. In their brief to this Court, Defendants cite a FOIA case, *see Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004), and a case noting (in a footnote) only that an agency is presumed, absent a "showing" to the contrary, to have considered all evidence in the record when making a determination, *see J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 394 n.7 (2d Cir. 2000). *See* Defs.' Post-Trial Br. 87-88, ¶ 447. Even more curiously, in their recent brief in the Supreme Court, Defendants cite cases addressing selective-prosecution claims, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996), and whether Executive branch officials are immune from suits for money damages brought against them in their individual capacities, *see Harlow v. Fitzgerald*, 457 U.S. 800, 807

evidence.  *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011)

(noting that a presumption is "just that," and may be "rebutted by appropriate evidence").  And

courts have long held that the presumption of regularity may be rebutted on a sufficiently strong

showing of "bad faith or improper behavior."  *Nat'l Nutritional Foods Ass'n*, 491 F.2d at 1145

(internal quotation marks omitted) (Friendly, J.).  Here, for the reasons discussed above, the

Court is compelled to conclude that the presumption of regularity has been rebutted.

    Aside from taking refuge in the presumption of regularity and minimizing the evidence of

pretext, Defendants make two principal arguments in response to Plaintiffs' claim of pretext.

First, they contend that Plaintiffs failed to prove that Secretary Ross "acted with an unalterably

closed mind."  Defs.' Post-Trial Br. 75, ¶ 49.  Although not clear from Defendants' briefing in

this Court, that purported standard appears to come from the D.C. Circuit's decision in

*Mississippi Comm'n on Envtl. Quality* v. *EPA*, 790 F.3d 138, 183-84 (D.C. Cir. 2015) (per

curiam).[78]  But that standard has heretofore been applied only to the question of whether a

---

(1982).  *See* Brief for the Petitioners at 22-23, *Dep't of Commerce v. U.S. Dist. Ct. for S.D.N.Y.*,
(Dec. 17, 2018) (No. 18-557), 2018 WL 6650094, at *22-23.  It is far from clear, however, that
these authorities call for any sort of heightened deference here, given both the APA and the
nature of, and limits on, the Secretary's authority with respect to the census.  *See also Tecom,
Inc. v. United States*, 66 Fed. Cl. 736, 757-68 (Fed. Cl. 2005) (exhaustively tracing the origins of
the presumption of regularity and questioning whether it is anything more than a reaffirmation of
the principle that the plaintiff bears the burden of proving that challenged conduct was unlawful).
In fact, one of the cases cited by Defendants themselves holds that the strength of the
presumption depends on context and that, in the case of some statutes, a "less stringent standard"
applies because it "is more faithful to the statutory scheme."  *Favish*, 541 U.S. at 174.  Be that as
it may, the Court assumes *arguendo* that a robust version of the presumption of regularity applies
to Secretary Ross's decision here.

[78]    Defendants cited *Mississippi Commission on Environmental Quality* in their Supreme
Court petition, *see* Petition for a Writ of Mandamus at 20, *Dep't of Commerce v. U.S. Dist. Ct.
for S.D.N.Y.* (Oct. 29, 2018) (No. 18-557), 2018 WL 5617904, at *20, and when pressed at oral
argument for authority supporting the standard — because none was cited in Defendants' post-
trial briefing — defense counsel invoked the petition.  *See* Tr. 1507 ("I believe the Supreme
Court petition cited a D.C. Circuit case . . . I'm sorry.  I don't have that case handy, but that was
one of the cases that the [S]olicitor [G]eneral has cited in that petition, arguing that standard.").
Defendants cite the case as well in their Supreme Court merits brief.  *See* Brief for the Petitioners

decision-maker should have been disqualified from the rulemaking process.  *See id.* at 183; *see also, e.g.*, *Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 486-88 (D.C. Cir. 2011); *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1002 (D.C. Cir. 1999). Defendants cite no case — to this Court or the Supreme Court — applying the standard to the question presented here: whether an agency head's decision should be vacated under the APA because his stated rationale was not his real rationale.  Nor could they because, as noted, Defendants have explicitly *conceded* throughout this litigation that if Secretary Ross's rationale was pretextual, then Plaintiffs are entitled to relief under the APA.  *See* May 9 Conf. Tr. 15.

In any event, the evidence summarized above amply supports the conclusion that Secretary Ross did act with an "unalterably closed mind" in that he was "unwilling or unable to rationally consider arguments."  *Mississippi Comm'n on Envtl. Quality*, 790 F.3d at 183 (internal quotation marks omitted).  It shows that Secretary Ross had decided to add the question for reasons entirely unrelated to VRA enforcement well before he persuaded DOJ to make its request.  And it *certainly* shows that he was either "unwilling or unable to rationally consider" arguments against the question after he received DOJ's request, when he was allegedly engaged in the "comprehensive review" that led to his final decision.  Ross Memo 1, at AR 1313.  For one thing, given the extraordinary lengths to which Secretary Ross and his aides went to generate a request for the question, it is hard to imagine he would have been open to putting the brakes on his quest once he had finally succeeded in getting the request he felt he needed.  For another, a decision-maker who was fairly and honestly considering the evidence before him would have been more likely to heed the legal obstacles in his path, including Sections 6(c) and 141(f), OMB's Statistical Policy Directives, and the Census Bureau's own pretesting requirements than

---

at 33, *Dep't of Commerce v. U.S. Dist. Ct. for S.D.N.Y.* (Dec. 17, 2018) (No. 18-557), 2018 WL 6650094, at *33.

Ross was; more likely to hesitate in the face of near uniform opposition to the request from stakeholders (notwithstanding an explicit effort to drum up support from outside groups); more likely to hit the pause button when experts at the Census Bureau warned that adding the question would increase the burden on respondents, harm the accuracy of the census count, and result in enormous extra costs, without providing as accurate and complete CVAP data as alternatives; and more likely to engage in, and encourage, dialogue with DOJ about whether there were other, less harmful ways to satisfy its purported needs.  Secretary Ross's insistence on adding the question despite all of these obstacles and objections is strong evidence that he was unwilling or unable to rationally consider counterarguments to his plan once he had secured the request he felt he needed.  *Cf., e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1112-13 (10th Cir. 2002) (granting relief on the ground that the agency had prejudged the decision at issue and conducted "an evidently *pro forma* public opportunity to comment"), *abrogated on other grounds by Dine Citizens Against Ruining our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016); *Tummino v. von Eschenbach*, 427 F. Supp. 2d 212, 233-34 (E.D.N.Y. 2006) ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing of bad faith . . . has been made.").

Defendants' second argument accepts that Secretary Ross had other, unstated reasons for his decision.  Relying on *Jagers v. Federal Crop Insurance Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014), they argue that, so long as Secretary Ross "actually believe[d] the rationale set forth in his decision memorandum," it does not matter if he "had *additional* reasons for reinstating a citizenship question."  Defs.' Post-Trial Br. 75-76, ¶ 49.  But *Jagers* is easily distinguished, as the agency's decision in that case, unlike the decision at issue here, was supported by "objective scientific evidence," and the challengers there, unlike Plaintiffs here, had provided "neither evidence nor argument to call the validity of this scientific evidence into question."  758 F.3d at

1185.  Moreover, in *Jagers*, unlike here, there was no evidence of improper "external political pressures."  *Id.*  In any event, the presumption of regularity aside, there is no basis in the record to conclude that Secretary Ross "actually believe[d]" the rationale he put forward, Defs.' Post-Trial Br. 75, ¶ 49, and a solid basis to conclude that he did not.  And while there may well be, as Defendants assert, "myriad" other "legitimate reasons more-precise citizenship data could prove useful to both the federal and state governments," Docket No. 412, at 30; *accord* Defs.' Post-Trial Br. 65, ¶ 441, the fact of the matter is that Secretary Ross did not articulate even one.  To the contrary, he cited one and only one rationale — DOJ's request for more granular CVAP data to enhance VRA enforcement — in his decision memorandum, and he affirmatively testified before Congress, under oath, that DOJ's request was the "sole[]" reason for his decision.  *See Hearings Before Subcomm. on Commerce, Justice, Science, and Related Agencies of the H. Comm. on Appropriations*, 115th Cong. 15 (2018) (admitted as an audio file at PX-491).

In sum, the evidence in the Administrative Record and the trial record, considered separately *or* together, establishes that the sole rationale Secretary Ross articulated for his decision — that a citizenship question is needed to enhance DOJ's VRA enforcement efforts — was pretextual.  Because Secretary Ross's stated rationale was not his actual rationale, he did not comply with the APA's requirement that he "disclose the basis of [his]" decision.  *Burlington Truck Lines, Inc.*, 371 U.S at 167-68 (internal quotation marks omitted).  As Defendants themselves have conceded, *see* May 9 Conf. Tr. 15, that by itself entitles Plaintiffs to relief under the APA.  *See, e.g., Woods Petroleum Corp.*, 18 F.3d at 859-60; *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994) (noting that "proof of subjective bad faith" by decisionmakers, including "predetermining" the awardee of a government contract, calls for relief under the APA); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 79

(D.D.C. 2015) (holding that the plaintiff had stated an APA claim based in part on allegations that the agency had proffered a pretextual reason for its decision).

## THE DUE PROCESS CLAUSE CLAIM

That leaves the claim — pressed only by the NGO Plaintiffs — that Defendants violated the equal protection component of the Fifth Amendment's Due Process Clause by "act[ing] with discriminatory intent toward Latinos, Asian-Americans, Arab-Americans, and immigrant communities of color generally in adding the citizenship question to the Decennial Census." NGO Compl. ¶¶ 193-200; *see* Pls.' Proposed Conclusions ¶¶ 487-613.  As the Court noted at the outset, having found that Plaintiffs are entitled to relief under the APA, it would not normally proceed to consider, as an alternative, their claim under the Constitution.  *See, e.g.*, *Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2001) ("Principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case.").  But the unusual circumstances here and the need to make a comprehensive record for appeal call for a different approach, so the Court will proceed.  For the reasons that follow, the Court concludes that the evidence in the existing record does not support Plaintiffs' claim.

### A.  Applicable Legal Principles

To prevail on their equal protection claim, Plaintiffs must prove both that Secretary Ross's decision was "motivated by discriminatory animus" and that "its application results in a discriminatory effect."  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) ("*Hayden I*").[79]

---

[79]     Although the Fourteenth Amendment's Equal Protection Clause applies only to the states, the "equal protection component" of the Fifth Amendment's Due Process Clause applies to the federal government.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214-17 (1995).  And the equal protection analysis required by the two Clauses is the same.  *See id.*; *see also, e.g.*, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.").  Accordingly, the Court refers to the Fifth Amendment analysis as an "equal protection" analysis, and relies on cases applying the

In this context, discriminatory animus — or "[d]iscriminatory purpose" — "implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  At the same time, "a plaintiff need not prove that the 'challenged action rested solely on racially discriminatory purposes.'"  *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) ("*Hayden II*") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).  Indeed, "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.  Thus, it is enough to show that an "invidious discriminatory purpose was *a* motivating factor" in the challenged decision.  *Id.* at 266 (emphasis added).

In *Arlington Heights*, the Supreme Court observed that, "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  *Hayden II*, 594 F.3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266); *see Feeney*, 442 U.S. at 283 ("[S]ince reliable evidence of subjective intentions is seldom obtainable, resort to inference based on objective factors is generally unavoidable.").  More specifically, the Supreme Court identified a set of non-exhaustive factors to guide courts in undertaking this "sensitive inquiry."  First, whether the impact of the action "'bears more heavily on one race than another' may provide an important starting point." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Unless a "clear pattern, unexplainable on grounds other than race, emerges,"

---

Fourteenth Amendment's equal protection guarantee.

however, "impact alone is not determinative, and the Court must look to other evidence."  *Id.*

(footnotes omitted).  The "other evidence" can include the following:

> (1) "[t]he historical background of the decision . . . particularly if it reveals a
> series of official actions taken for invidious purposes"; (2) "[t]he specific
> sequence of events leading up the challenged decision"; (3) "[d]epartures from the
> normal procedural sequence"; (4) "[s]ubstantive departures . . . , particularly if the
> factors usually considered important by the decisionmaker strongly favor a
> decision contrary to the one reached"; and (5) "[t]he legislative or administrative
> history . . . especially where there are contemporary statements by members of the
> decisionmaking body, minutes of its meetings, or reports."

*New York*, 315 F. Supp. 3d at 807-08 (quoting *Arlington Heights*, 429 U.S. at 266-68).  Finally,

"'[i]n some extraordinary instances,' evidence of discriminatory animus may also come from the

testimony of decisionmakers."  *Id.* at 808 (quoting *Arlington Heights*, 429 U.S. at 268).

Defendants acknowledge that the foregoing standards define the relevant inquiry, yet in

the very same breath they cite the Supreme Court's recent decision in *Trump v. Hawaii*, 138 S.

Ct. 2392 (2018), for the proposition "that facially neutral policies are subject to only limited,

deferential review and may not lightly be held unconstitutional."  Defs.' Post-Trial Br. 82, ¶ 72.

But, as the Court already explained, *see New York*, 315 F. Supp. 3d at 810, *Trump v. Hawaii*

involved review of a presidential order that "prevent[s] the entry of [certain] *foreign nationals*"

to the United States, 138 S. Ct. at 2405 (quoting Presidential Proclamation No. 9645, 82 Fed.

Reg. 45161 (Sept. 24, 2017)) (emphasis added).  It held that judicial "inquiry into *matters of*

*entry and national security* is highly constrained" because "[a]ny rule of constitutional law that

would inhibit the flexibility of the President to respond to changing world conditions should be

adopted only with the greatest caution."  *Id.* at 2439-40 (emphasis added).  That is, the Court

held only that, in *that* context, a facially neutral policy survives judicial scrutiny if "it can

reasonably be understood to result from a justification independent of unconstitutional grounds."

*Id.* at 2420.  Nothing in the opinion indicates that this "circumscribed inquiry" applies outside of

the "national security and foreign affairs context."  *Id.* at 2420 n.5.

Indeed, applying *Trump v. Hawaii*'s deferential review in this setting would do more than unsettle decades of equal protection jurisprudence; it would decimate that jurisprudence altogether.  It is one thing to uphold an Executive Branch decision that could "reasonably be understood to result from a justification independent of" an unconstitutional purpose in a context where the President exercises nearly "plenary" power.  *See Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972).  It is another thing entirely to suggest that that a deferential standard should apply, as Defendants suggest, to *all* "facially neutral" government action.  *See* Defs.' Post-Trial Br. 82, ¶ 72.  Under that approach, even ordinary government action motivated "in part" by an unconstitutional discriminatory purpose would survive judicial scrutiny so long as a court could divine some *other* purpose that may have contributed to the action.  That is emphatically not the law.  *See, e.g.*, *Feeney*, 442 U.S. at 279 (noting that equal protection prohibits government action that is motivated even "in part" by discrimination); *Arlington Heights*, 429 U.S. at 265 (noting that a plaintiff need not prove that the "challenged action rested solely on racially discriminatory purposes" to succeed in bringing an equal protection claim); *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) (stating that a plaintiff "need not show . . . that a government decisionmaker was motivated solely, primarily, or even predominantly by concerns that were racial").  Instead, as Defendants themselves recognize when arguing that the Court should ignore statements by people other than Secretary Ross, "[t]his Court is bound to examine the decisionmaker's purposes."  Defs.' Post-Trial Br. 83, ¶ 77 (internal quotation marks and emphasis omitted).  That is precisely what this Court must — and therefore will — do.

## B.  The Scope of Review

Before turning to that inquiry, however, the Court pauses once again to address the proper scope of its review.  As discussed above, Defendants have repeatedly contested the Court's authority to order discovery and consider evidence "beyond" the Administrative Record.

Although that dispute has largely centered on Plaintiffs' APA claims, Defendants previously maintained that the Court should limit its review to material in the Administrative Record when evaluating Plaintiffs' equal protection claim as well, on the ground that the APA provides a cause of action for agency action taken in violation of the Constitution. *See* Docket No. 333, at 3-4. It is not clear that Defendants still adhere to that view, as they suggest in their post-trial briefing only that the evidence in the Administrative Record does not support Plaintiffs' claim (and do so only briefly). *See* Defs.' Post-Trial Br. 83, ¶¶ 78-79. Nevertheless, because the issue has been so central to this litigation, the Court addresses it briefly here.

The Constitution forbids *all* purposeful official discrimination against protected groups, including discrimination that officials try to hide. That approach ensures that the prohibition does not become just a "test" of whether the officials taking discriminatory action have "stupid staff" who let their true purposes into the open. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1025 n.12 (1992) (Scalia, J.). Instead, the doctrine charges courts to "smoke out" unconstitutional governmental purposes that may be more hidden. *See, e.g.*, *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (noting that the "strict scrutiny" test is designed to "'smoke out' illegitimate uses of race"). That often requires courts to evaluate whether the government selected means that are "narrowly tailored" to achieving its goal, an inquiry that necessarily requires courts to evaluate what the government could have done, but did not. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 339-40 (2003) (holding that the Equal Protection Clause requires the government to engage in "serious, good faith consideration of workable . . . alternatives"); *J.A. Croson Co.*, 488 U.S. at 507 (faulting the government for the lack of "any consideration of the use of race-neutral means" to achieve its objectives); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 n.6 (1986) (opinion of Powell, J.) (noting that the "narrow tailored" test may "require consideration of whether lawful alternative and less

restrictive means could have been used"). In short, the very doctrine contemplates a wide-ranging and penetrating inquiry capable of uncovering hidden forms of discrimination.

It follows that the Court should be able to consider evidence outside the Administrative Record designated by the agency and submitted to the Court when evaluating Plaintiffs' equal protection claim. Indeed, it would be nearly impossible to "smoke out" discriminatory purpose if "litigants and courts evaluating whether government actors have engaged in invidious discrimination cannot look beyond the record that those very decisionmakers may have carefully curated to exclude evidence of their true 'intent' and 'purpose.'" *New York*, 2018 WL 5791968, at *5. Moreover, such a limited inquiry would prevent the Court from conducting the more expansive and searching inquiry into "circumstantial and direct evidence of intent" that *Arlington Heights* requires. *See Arlington Heights*, 429 U.S. at 266.[80] The cases that Defendants cite do not hold otherwise. *See* Docket No. 333, at 3-4. Most of those cases did not involve claims about a suspect class or prohibited animus and thus have little relevance to claims such as the one at issue here. *See Harkness v. Sec'y of Navy*, 858 F.3d 437, 442-44 (6th Cir. 2017) (non-APA Establishment Clause claims with no allegation of improper governmental motives or discriminatory animus); *Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172 (3d Cir. 2014) (in challenge to agency action, no claim of discriminatory animus); *Ursack,*

---

[80]    Notably, that is true even if Defendants are correct and the equal protection claim should be viewed as a species of APA claim subject to the "record rule" exceptions discussed above. The scope of the "whole record" for purposes of the APA must be defined in relation to whatever the substantive law makes relevant. Thus, for example, when evaluating a classic APA claim that an agency has acted unreasonably *in light of the record before the agency*, courts naturally limit their review to only those facts that were before the agency at the time of decision. For purposes of Plaintiffs' equal protection claim, the substantive law provides that Secretary Ross's motive or purpose are relevant — indeed, central — and Plaintiffs amply rebutted any presumption that the Administrative Record compiled by Defendants and submitted to the Court contained all available evidence regarding his motive or purpose. Accordingly, whether it is viewed as "completing" the record, "supplementing" the record, or going beyond the record (based on evidence of bad faith), the Court's review is not limited to the Administrative Record.

*Inc. v. Sierra Interagency Black Bear Group*, 639 F.3d 949, 958-59 (9th Cir. 2011) (same);

*Chang v. USCIS*, 254 F. Supp. 3d 160, 162 (D.D.C. 2017) (in equal protection claim, "[n]o

suspect class [wa]s alleged"); *Harvard Pilgrim Health Care of New England v. Thompson*, 318

F. Supp. 2d 1, 9-11 (D.R.I. 2004) (in procedural due process challenge to agency adjudication,

no claim about a suspect class or hidden animus).  And the few cited decisions involving

allegations of "illicit animus" acknowledge that discovery outside of the administrative record

may be appropriate for such claims.  *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest

Service*, 58 F. Supp. 3d 1191, 1238-41 (D.N.M. 2014) (noting that, although allowing extra-

record discovery could "incentivize every unsuccessful party to agency action to allege . . .

constitutional violations to trade in the APA's restrictive procedures for the more even-handed

ones of the Federal Rules of Civil Procedure," extra-record discovery could still be appropriate

where plaintiffs make a "compelling factual showing" of the need for an expansion of the

record); *Evans v. Salazar*, No. C08-0372 (JCC), 2010 WL 11565108, at *1 (W.D. Wash. July 7,

2010) (denying a request for extra-record discovery, but acknowledging that, in principle,

"discovery [was] appropriate for Plaintiffs' constitutional claims" (internal quotation marks

omitted)).  In short, there is no basis in law or logic to restrict judicial review of the due process

claim to Defendants' handpicked evidence.  The Court therefore must decide whether Plaintiffs

proved, on the full trial record, that Secretary Ross's decision was motivated by animus.[81]

---

[81]     The Court notes that the question of whether a particular official such as Secretary Ross
may be compelled to give testimony relevant to such a claim implicates separate concerns about
the burdens on high-ranking official's time.  *See New York*, 2018 WL 4539659, at *1 ("High-
ranking government officials . . . are generally shielded from depositions because they have
greater duties and time constraints than other witnesses.  If courts did not limit these depositions,
such officials would spend an inordinate amount of time tending to pending litigation." (internal
quotation marks omitted)).  Such concerns might warrant precluding an otherwise relevant
deposition, as in any civil case, but not because a court could not consider the deposition if it
existed and were relevant to a party's substantive claims.  *Cf. New York*, 2018 WL 5791968, at
*5 n.9 (noting that the relevance of extra-record discovery does not automatically open the doors

## C. Discussion

At the motion-to-dismiss stage, the Court found that Plaintiffs had plausibly alleged that Secretary Ross's decision was motivated by discriminatory animus. *See New York*, 315 F. Supp. 3d at 808-10. In making that finding, the Court relied on several of the NGO Plaintiffs' factual allegations, construed in a manner most favorable to them. *See id.* at 811. The Court cited, among other things, "departures from the normal procedural sequence," such as failing to test the citizenship question and ignoring the Census Bureau advisory committee's recommendations, *id.* at 808 (alterations and internal quotation marks omitted); oddities in the "specific sequence of events leading up to the challenged decision," such as Secretary Ross's shifting and inconsistent explanations of his motivation for reinstating the citizenship question; and the seemingly transparent pretext of the VRA-enforcement rationale, *id.* at 809 (internal quotation marks omitted). The Court cautioned, though, that without the benefit of inferences in their favor, such allegations might not be enough. Even if they established pretext, the Court explained, they "did not necessarily" establish "pretext for *discrimination*." *Id.* (emphasis added). The Court also considered the NGO Plaintiffs' allegations of statements made by President Trump around the time of Secretary Ross's decision that, "while not pertaining directly to that decision, could be construed to reveal a general animus toward immigrants of color." *Id.* at 810. The Court noted, however, that the President's statements were probative only if he was personally involved in Secretary Ross's decision. *See id.* The Court found a basis to infer that President Trump was directly involved: Plaintiffs' allegation that his reelection campaign had sent an email announcing that he had "'officially mandated'" Secretary Ross's decision. *Id.* All together, the Court held that "drawing all reasonable inferences in Plaintiffs' favor," these allegations,

_____

to such discovery, which still must be tailored to avoid undue burdens, including "intrusion on the governmental decisionmaking process").

combined with the President's statements, "nudge[d] [the] NGO Plaintiffs' claim of intentional discrimination across the line from conceivable to plausible." *Id.*

In many respects, the trial evidence was consistent with Plaintiffs' original allegations. As discussed at length above, it included ample evidence of procedural irregularities and substantive departures. That evidence, taken together, supports a finding that Secretary Ross's stated rationale was pretextual. But, for purposes of their equal protection claim, Plaintiffs must prove more than that. Specifically, they must prove what the rationale was a pretext for — and, more to the point, that it was a pretext *for discrimination* prohibited by the Due Process Clause. *See St. Mary's Honor Ctr.*, 509 U.S. at 515 (stating, in the Title VII context, that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason"); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83, 88 (2d Cir. 2015) (noting that, for purposes of defining discrimination and pretext, an "equal protection claim parallels [a] Title VII claim"); *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225-27 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination . . . in violation of . . . the Equal Protection Clause."); *see also, e.g.*, *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125 n.16 (2d Cir. 2004) (distinguishing between pretext that is "connected to an offensive stereotype" and thus "considerably more probative of discrimination than a pretextual answer that is unconnected to such a stereotype" (internal quotation marks omitted)). Plaintiffs have not carried that burden.

The extra-record discovery does not, as Plaintiffs' all but admit, reveal discriminatory animus on the part of Secretary Ross himself. *See, e.g.*, Pls.' Proposed Findings ¶ 292 ("None of the emails in which the Secretary expressed deepening concern that Commerce might not be able

to add the question explained *why* he cared so much about adding the question.").[82]  Instead,

Plaintiffs point primarily to the motivations of "those who influenced" Secretary Ross in the

decision-making process, including Kobach, Bannon, and Attorney General Sessions.  Pls.'

Proposed Conclusions ¶¶ 538, 541-42.  But whether or not the trial evidence would support a

finding that those advisors acted with a discriminatory purpose, the trial evidence does not

establish that they communicated such a purpose to Secretary Ross, as would be necessary to

impute their discriminatory purpose to him.  Similarly, Plaintiffs failed to prove a sufficient

nexus between President Trump and Secretary Ross's decision to make the President's

statements or policies relevant to the equal protection analysis.  In particular, Plaintiffs failed to

back up the primary allegation in their pleadings that had supported finding such a nexus: the

email from President Trump's reelection campaign announcing that he "officially mandated" the

decision.  The Court sustained Defendants objection to admission of the email on the ground that

it was hearsay, *see* Docket No. 539-1, at 35; *New York*, 315 F. Supp. 3d at 810; Tr. 1315, 1565-

66, and Plaintiffs offered no other evidence of a nexus between the President and Secretary

Ross's decision, *see* Tr. 1566-68.

     In short, the Court finds that Plaintiffs failed to prove, by a preponderance of the

evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the

citizenship question on the 2020 census questionnaire.[83]  To be fair, it is possible that Plaintiffs

---

[82]     Plaintiffs cite only one statement of Secretary Ross himself in support of their contention that he was "motivated at least in part by a desire to dilute the political power of immigrant communities of color": an October 9, 2017 statement in which he endorsed "a wide array of President Trump's immigration policies," including a proposal "to restrict what [the President] called 'chain migration,' . . . a program that primarily benefits immigrants of color."  Pls.' Proposed Conclusions ¶¶ 538-39; *see also* Pls.' Proposed Findings ¶¶ 450, 938.  By itself, however, that statement does not come close to establishing a constitutionally prohibited discriminatory purpose.  Nor did the statement have anything to do with the census or the challenged decision.

[83]     Plaintiffs' primary argument was that Secretary Ross's decision violated the Due Process

could have carried their burden on that score had they had access to sworn testimony from Secretary Ross himself.  As Defendants concede, Secretary Ross's intent — as the official decision-maker — was crucial to the equal protection claim.  *See* Tr. 1575.  Secretary Ross's testimony could have revealed the nature of his conversations with Kobach, Bannon, and Attorney General Sessions, and whether President Trump directed the addition of the citizenship question.  But Plaintiffs were denied the opportunity to depose Secretary Ross because the Supreme Court stayed this Court's Order authorizing such a deposition pending its resolution of Defendants' petition for a writ of certiorari.  *See In re Dep't of Commerce*, 139 S. Ct. at 17.  In light of the urgency of these proceedings, Plaintiffs decided to press ahead to trial rather than waiting to see if the Supreme Court eventually lifts the stay.  *See* Docket No. 399, at 2; *see also* Tr. 1576.  That decision was understandable, but means that the equal protection claim rises or falls on a record without Secretary Ross's deposition.  For the reasons the Court has explained, that record fails to support Plaintiffs' equal protection claim.

## REMEDIES

Given the Court's conclusion that Secretary Ross's decision violated the APA, the Court is required by the plain terms of the statute to "hold [the decision] unlawful" and to "set [it] aside."  5 U.S.C. § 706(2).  Nevertheless, the parties vigorously dispute precisely what that should mean in the context of these cases.  *Compare* Pls.' Proposed Conclusions ¶¶ 449-86, *with* Defs.' Post-Trial Br. 83-87, ¶¶ 80-97.  Accordingly, the Court turns to the question of remedies.

---

Clause because it was motivated by animus against immigrants of color, but in closing they argued in the alternative that it was unlawful because it was motivated by animus against noncitizens generally.  *See* Tr. 1428-29, 1568-69.  The Court need not decide whether proof of intentional discrimination against immigrants or noncitizens as a group would make out an equal protection violation because, on the existing record, the Court would reach the same conclusion even if it would.  Put simply, Plaintiffs did not prove by a preponderance of evidence that the decision was motivated by animus, against immigrants of color or immigrants generally.

## A.  General Legal Principles

Plaintiffs brought this challenge under the APA, which provides a "generic cause of action," *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010), for any "person suffering legal wrong because of agency action," 5 U.S.C. §§ 702, 704.  Significantly, the APA also prescribes a remedy: "[T]he reviewing court *shall* . . . hold unlawful *and set aside* agency action" found to violate its terms.  5 U.S.C. § 706(2) (emphases added).  By the statute's plain terms, therefore, the "normal remedy" in a successful APA challenge is to set aside — that is, vacate — the final agency action at issue.  *See, e.g.*, *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see also, e.g.*, *Federal Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case . . . ."); *Camp*, 411 U.S. at 143 (stating that, if agency action is not "sustainable on the administrative record made," it "must be vacated"); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("In the usual case, when an agency violates its obligations under the APA, we will vacate a judgment and remand to the agency . . . .").[84]  Moreover, because the statutory remedy is directed at the *entire* "final agency action" that the APA subjects to judicial review, the "normal remedy" is to set aside the agency action wholesale, not merely as it applies to the particular plaintiff or plaintiffs who brought the agency action before the court.  *See, e.g.*,

---

[84]     Ordinarily, vacatur is accompanied by a remand to the agency.  *See Akins*, 524 U.S. at 25; *accord Guertin*, 743 F.3d at 388; *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Thus, the default remedy for most APA violations is to vacate *and* remand.  *See Akins*, 524 U.S. at 25; *Camp*, 411 U.S. at 143.  Nevertheless, consistent with principles of equity, the Second Circuit has held that "there are occasions in which remand to the agency for further review is not appropriate."  *Guertin*, 743 F.3d at 388; *accord Ithaca Coll. v. NLRB*, 623 F.2d 224, 229 (2d Cir. 1980) ("Although we are empowered, we are not required to remand.").  Vacatur-without-remand may be appropriate, for example, where "compelling evidence in the record" conclusively establishes a plaintiff's right to relief and the "record . . . would not change" on remand, *Guertin*, 743 F.3d at 388-89, or where the agency "had the opportunity to address [an] issue . . . [and] improperly and arbitrarily refused" to do so, *Ithaca Coll.*, 623 F.2d at 229-30.

*Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency [action] [is] unlawful, the ordinary result is that the [action is] vacated — not that [its] application to the individual [plaintiffs] is proscribed."); *accord NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.13 (D.D.C. 2018).

That said, APA review of agency action is "vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939). Thus, some courts have held that equitable principles can justify a departure from the remedy seemingly mandated by the APA's text. For example, courts — especially in the D.C. Circuit — have occasionally ordered remand *without* vacatur. *See, e.g.*, *NRDC v. U.S. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Given the plain language of the statute, there is an understandable and substantial debate about whether such a remedy is in fact "within the bounds of the statute," *Ford Motor Co.*, 305 U.S. at 373; *compare Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757-58 (D.C. Cir. 2002) (Sentelle, J., dissenting) (arguing that remand-without-vacatur violates the APA's clear text mandating that the court "shall" set aside unlawful agency action), *and Checkosky v. SEC*, 23 F.3d 452, 490-91 (D.C. Cir. 1994) (opinion of Randolph, J.) (same), *with id.* at 462-65 (opinion of Silberman, J.) (defending the remedy); *see also, e.g.*, *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) ("[R]emand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule."). Be that as it may, courts have held that remand without vacatur may be appropriate "when an agency may be able readily to cure a defect in its explanation of a decision and the disruptive effect of vacatur is high" or when vacatur "would at least temporarily defeat"

the purpose of the party seeking relief.  *NACS v. Bd. of Governors of Fed. Reserve Sys.*, 746 F.3d

474, 493 (D.C. Cir. 2014) (internal quotation marks omitted); *see also, e.g.*, *EME Homer City

Generation*, 795 F.3d at 132; *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008).

Finally, to the extent relevant here, courts often enjoin future action by government

officials where the principles of equity support such relief.  *See, e.g.*, *Gonzales v. Oregon*, 546

U.S. 243 (2006) (affirming an injunction against the Attorney General in an APA action);

*Franklin*, 505 U.S. at 802 ("[I]njunctive relief against executive officials like the Secretary of

Commerce is within the courts' power . . . .").  Whether such additional relief is warranted turns

on the traditional four factors, namely whether the plaintiff proves "(1) that it [will suffer] an

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate

to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139,

156-57 (2010) (internal quotation marks omitted).  But because the government is a party, and

"the government's interest *is* the public interest," the last two factors merge.  *Pursuing Am.

Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Nken v. Holder*, 556 U.S. 418,

435 (2009).

**B.  Discussion**

**1.  Vacatur and Remand**

Applying the foregoing standards here, the Court concludes that there is no reason to

depart from the "usual" remedy for violations of the APA: vacatur and remand.  *Guertin*, 743

F.3d at 388.  Vacatur is consistent with both the plain language of the APA and the principle that

agency action taken in violation of the APA "cannot be afforded the force and effect of law."

*Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (internal quotation marks omitted).

Moreover, it has long been held to be the appropriate remedy when, as here, an agency acts contrary to law, *see, e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007), or agency action is found to be arbitrary and capricious, *see, e.g.*, *Camp*, 411 U.S. at 143. Remand, meanwhile, is appropriate as well, in recognition of the fact that Congress delegated its authority over administration of the census to the Secretary of Commerce, not to this Court. That is not to say that Defendants can or would be able to remedy the defects in Secretary Ross's decision that this Court has found in time for the 2020 census. But to the extent that a "remand" is even necessary to make clear that the Secretary of Commerce retains authority to make decisions about the census, so long as they are consistent with law and this Court's Opinion, a remand is appropriate.

The parties' respective arguments for an alternative remedy are unpersuasive. For their part, Defendants contend that remand *without* vacatur is "the only potentially appropriate remedy." Defs.' Post-Trial Br. 83-85, ¶¶ 80-85. Putting aside whether such a remedy is consistent with the plain language of the APA, it is inappropriate here. Courts authorizing remand without vacatur have done so where the agency shows "at least a serious possibility that [it] will be able to substantiate its decision on remand" and that "the consequences of vacating may be quite disruptive." *Allied-Signal, Inc.*, 988 F.2d at 151. Defendants have done neither here. The problem with Secretary Ross's decision was not that it was inadequately explained, but rather that it was substantively arbitrary and capricious and "not in accordance" with statutes that constrain his discretion. And as Plaintiffs correctly point out, "the Secretary has never suggested an alternative basis for his decision." Pls.' Proposed Conclusions ¶ 456. Notably, Defendants offer nothing more than a bare conclusory assertion that "there is a non-trivial likelihood that the agency will be able to state a valid legal basis for its decision" on remand. Defs.' Post-Trial Br. 84, ¶ 83 (internal quotation marks and alterations omitted). Nothing in either the Administrative Record or the trial record even remotely suggests such a "likelihood."

Second, Defendants' assertions about "the disruptive consequences of vacating the rule [sic]" are overblown.  Defs.' Post-Trial Br. 84-85, ¶ 84.[85]  The Court has no doubt that Defendants are "diligently at work preparing for the 2020 census, including working with its communication contractors and trusted partners concerning the reinstatement of a citizenship question."  *Id.*  But, unless this Court's decision is reversed by a higher court, vacating Secretary Ross's decision means only that the 2020 census questionnaire may not include a question about citizenship.  *See* AR200-213 (listing the subjects planned for the 2020 census before Secretary Ross's decision).  Significantly, it does not preclude Defendants from continuing to test the question or making whatever preparations they think appropriate in the event that the question is ultimately allowed to appear on the questionnaire.  Moreover, the whole point of the parties' and the Court's haste in this litigation is that the census questionnaires have not yet been printed and that ordering any remedy *after* they are printed would result in significantly greater disruption and expense.

Defendants' final objection to the normal APA remedy of vacatur is that APA relief should *never* extend more broadly than the particular injuries proved by the plaintiffs in a given case.  Defs.' Post-Trial Br. 85-87, ¶¶ 86-89, 95.  Article III standing principles, in their view, constrain the courts' power to enforce the statutory remedy that Congress has created for violations of the APA.  *Id.*  But that argument is too clever by half.  If Defendants are right that Article III constrains the Court's power to order relief beyond the parties who have demonstrated

---

[85]     The Court notes, in this regard, that the disruptions Defendants assert all involve Defendants' own internal processes.  The Court is not so sure that additional burdens on governmental resources are the type of disruption with which the remand-without-vacatur remedy is concerned, at least insofar as those burdens do not seriously harm the public interest.  More to the point, the Court fails to see how it would be equitable to leave unlawful governmental action standing simply because vacating it would involve more work for the very agency that violated the law in the first place.

injury in a particular case, what kind of "remand" would ever be possible in an APA case?  Do
Defendants imagine that the Court should "remand" with respect to only certain Plaintiffs?
Taken to its logical conclusion, Defendants' argument implies that the judicial review provision
of the APA is inconsistent with Article III.  But no court, least of all the Supreme Court, has
suggested as much.  Article III limits the federal courts' power to actual "cases" or
"controversies," which do not exist when there is no plaintiff who has a personal stake in the
outcome of litigation.  But once such a personal stake is present, the Court *does* have power to
adjudicate the controversy, and the question of what relief it may or must order is a "merits"
question of substantive law that is ultimately for the legislature to decide (so long, of course, as
any such relief has "direct consequences on the parties involved"), *United States v. Sanchez-
Gomez*, 138 S. Ct. 1532, 1537 (2018) (internal quotation marks omitted)) — hence the normal
rule that only one plaintiff need have standing in order to empower the court to decide a case.
Here, Congress has required that agency action be reasonable and has prescribed that courts must
set it aside where it is not — rather than, for example, awarding damages to compensate for the
specific injuries suffered by plaintiffs as a result of unreasonable agency action.  In short,
assuming that a court has Article III jurisdiction — as this Court does — and that the APA's
other statutory requirements are satisfied — as they are here — a court has both the power *and*
the duty to order the remedy Congress created.

Plaintiffs, meanwhile, seek the opposite remedy: vacatur *without* remand.  PCOL ¶¶ 453-
57.  On its face, that request has some merit, if only because Defendants have never suggested an
alternative basis for adding a citizenship question to the census, and it is doubtful that
Defendants could cure the problems identified above by June, when the census questionnaires
have to be printed.  *See, e.g.*, *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43 (D.C Cir.
1994) (holding that remand was unnecessary because the agency had "suggested no alternative

bases for upholding" its determination); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) (same).  At the same time, however, it is not entirely clear what it would mean to refrain from remand in the circumstances of these cases.  By analogy to appellate litigation, a remand is arguably necessary to restore an agency's "jurisdiction" where an adjudicatory decision or formal rulemaking was under review.  Here, by contrast, Secretary Ross's "jurisdiction" over the 2020 census has presumably continued unabated throughout this litigation, and his ongoing obligation to execute his statutory duties with respect to the census will survive whatever remedy the Court orders.  Put differently, it is hard to see how the Court's decision whether or not to "remand" in these cases could affect the Secretary's ongoing statutory authority over the form and content of the census questionnaire.  Having said all that, and if only to avoid confusion, the Court will "remand" the case to the extent that such an order is necessary to restore the Secretary's jurisdiction over the census questionnaire.  It goes without saying that such remand is limited to further action not inconsistent with the Court's Orders.

### 2.  Injunctive Relief

Thus, there is no basis to deviate from the standard remedy of vacatur and remand in these cases.  Whether the Court should also issue an injunction is a closer question.  Certainly, the four traditional factors governing the inquiry into whether to grant injunctive relief are satisfied.  As discussed (at great length) above, Plaintiffs proved at trial that, if the citizenship question is added to the 2020 census questionnaire, they will suffer serious harm in the form of lost political representation, lost federal funding, and degradation of information that is an important tool of state sovereignty.  And at least two of those injuries — the loss of political representation and the degradation of information — would be irreparable, without any adequate remedy at law.  *Cf., e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (noting that a state's inability to implement its laws constitutes irreparable harm); *Department of Commerce*, 525 U.S.

at 344 (holding that the prospective loss of representation in Congress warrants injunctive relief).

As for the final two factors, "[t]here is generally no public interest in the perpetuation of

unlawful agency action.  To the contrary, there is a substantial public interest in having

governmental agencies abide by the federal laws that govern their existence and operations."

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation

marks and citation omitted).  Moreover, both the Supreme Court's decision in *Department of

Commerce* — affirming the Eastern District of Virginia's permanent injunction against the use of

statistical sampling to enumerate the population in the 2000 census — and the Second Circuit's

holding in *Carey* — affirming the Southern District of New York's preliminary injunction

requiring the Census Bureau to process certain forms and to compare its list of New York City

residents against other government records — confirm that the public interest favors an

injunction in these cases.  *See Department of Commerce*, 525 U.S. at 344; *Carey v. Klutznick*,

637 F.2d 834, 839 (2d Cir. 1980). ("[T]he public interest . . . requires obedience . . . to the

requirement that Congress be fairly apportioned, based on accurate census figures.  Furthermore,

it is in the public interest that the federal government distribute its funds, when the grant statute

is keyed to population, on the basis of accurate census data.").

What makes the question a somewhat closer one is whether, in light of the vacatur of

Secretary Ross's decision, an injunction is necessary.  In *Monsanto*, the Supreme Court

admonished that a district court vacating agency action under the APA should not grant an

injunction if doing so would "not have any meaningful practical effect independent of its

vacatur."  *Monsanto Co.*, 561 U.S. at 165.  "An injunction," the Court reasoned, "is a drastic and

extraordinary remedy, which should not be granted as a matter of course."  *Id.* at 165-66.  Thus,

"[i]f a less drastic remedy (such as . . . vacatur . . .)" is "sufficient to redress" Plaintiffs' injuries,

"no recourse to the additional and extraordinary relief of an injunction" would be "warranted."

*Id.* Here, vacatur of Secretary Ross's decision undoubtedly goes a long way toward redressing Plaintiffs' injuries. Nevertheless, the Court concludes that granting an injunction would have two practical effects beyond mere vacatur of Secretary Ross's March 26, 2018 memorandum. First, in the absence of an injunction, Secretary Ross could theoretically reinstate his decision by simply re-issuing his memorandum under a new date or by changing the memorandum in some immaterial way. Secretary Ross retains the same statutory authority over the census that he had before the Court's decision today, provided (as always) that he exercises it consistent with the APA and applicable law (and the Court's order). *See New York*, 315 F. Supp. 3d at 804-06. In the circumstances of these cases, however, an injunction is necessary to make the Court's vacatur effective, as it prevents Secretary Ross from arriving at the same decision *without* curing the problems identified in this Opinion. Second, and related, an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion. The ability to seek immediate recourse is critical in these cases given the looming printing deadline.

Thus, in an exercise of its discretion, the Court does grant an injunction. In particular, the Court enjoins Defendants from adding a citizenship question to the 2020 census questionnaire based on Secretary Ross's March 26, 2018 memorandum or based on any reasoning that is substantially similar to the reasoning contained in that memorandum. More specifically, Defendants are enjoined from adding a citizenship question to the 2020 census questionnaire unless the Secretary: exhausts the maximum possible usefulness of administrative records to acquire adequate information "consistent with the kind, timeliness, quality and scope of the statistics *required*," 13 U.S.C. § 6(c) (emphasis added); submits a report to the relevant congressional committees "containing [his] determination of the . . . questions as proposed to be modified," 13 U.S.C. § 141(f)(3); considers all relevant evidence and aspects of the problem; and

272

provides, in support of the decision, his real rationale.  To be clear, the Court does *not* enjoin

Defendants from continuing to study whether and how to collect data on citizenship as part of the

census (or any other Census Bureau instrument).  Nor does the Court enjoin Defendants from

conducting tests with respect to the addition of a citizenship question or otherwise taking

appropriate steps to prepare for the 2020 census — recognizing that, if a higher court disagrees

with this Court's ruling, the citizenship question may well end up on the questionnaire and that

Defendants should not be precluded from preparing accordingly.[86]

One final note about the scope of the Court's injunction.  Defendants argue that any

injunctive relief in these cases should not "extend beyond the Plaintiffs to this litigation."  Defs.'

Post-Trial Br. 85, ¶ 86.[87]  More broadly, they try to fit these cases into the larger current debate

over so-called "nationwide" — really, universal — injunctions.  *See, e.g.*, *Trump v. Hawaii*, 138

S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring); Memorandum from the Attorney General,

*Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions* (Sept. 13,

2018), https://www.justice.gov/opa/press-release/file/1093881/download.  But it is an odd fit

indeed.  Because the Secretary's *decision* was universal, APA relief directed at that decision may

— indeed, arguably must — be too.  *See* 5 U.S.C. § 706(2); *cf., e.g.*, *Califano v. Yamasaki*, 442

---

[86]     For the same reasons, the Court's injunction does not preclude OMB from reviewing or acting on Defendants' submission pursuant to the Paperwork Reduction Act.

[87]     Somewhat surprisingly, Defendants expand this argument to cover the remedy of vacatur, arguing that "the APA's text does not permit, let alone[] require, universal *vacatur*."  Defs.' Post-Trial Br. 87, ¶ 95 (emphasis added).  That would come as a surprise to the Supreme Court, which routinely vacates or stays agency action "universally," without regard to any such limitation in the APA.  *See, e.g.*, *West Virginia v. EPA*, 136 S. Ct. 1000 (2016) (mem.) (staying an EPA rule pending APA review in the D.C. Circuit); *Judulang v. Holder*, 565 U.S. 42, 64 (2011) (rejecting as arbitrary and capricious a Board of Immigration Appeals policy regarding discretionary relief from removal); *Gonzales*, 546 U.S. at 274-75 (affirming a lower-court injunction of a directive by the Attorney General that exceeded his statutory authority under the Controlled Substances Act); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 486 (2001) (affirming in part the D.C. Circuit's vacatur of EPA air pollution standards).  In any event, the Court rejects this notion for the reasons explained above.

U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.").  That is, these cases do not involve the case-by-case enforcement of a particular policy or statute.  Instead, it concerns a single decision about a single questionnaire, to be used on a single census throughout the nation. Were the Court to hold that its injunction should apply only to Plaintiffs (whatever that would even mean given that Plaintiffs include NGOs with members in all fifty states and the District of Columbia, *see* Recitation of Facts ¶ 257), the Court would be "drawing a line which the agency itself has never drawn." *Harmon*, 878 F.2d at 495.  In fact, Defendants have never suggested — let alone presented any evidence to support — that a citizenship question could somehow be included only in some census questionnaires, but not in others. *Cf. Texas v. United States*, 809 F.3d at 187-88 (upholding a "nationwide" injunction against the federal government's DAPA policy because the Constitution and federal law contemplate, if not require, "uniform" immigration rules and because an injunction limited to one or more of the plaintiff states was likely to be "ineffective").  And indeed, the Supreme Court's own past practice supports census-wide relief. *See Department of Commerce*, 525 U.S. at 344 (affirming the Eastern District of Virginia's universal injunction against the use of statistical sampling for apportionment purposes on the 2000 census); *see also Glavin v. Clinton*, 19 F. Supp. 2d 543, 553 (E.D. Va. 1998) (three-judge court) (entering the universal injunction affirmed in *Department of Commerce*).

Moreover, granting nationwide relief does not meaningfully intrude on the discretion delegated to the Secretary of Commerce over the census.  Exercising that discretion by electing to use two forms of the census questionnaire — one without the citizenship question (in areas subject to a ruling by the Court) and one with the citizenship question (in other areas) — would almost certainly run afoul of the Census Act, if not provisions of the Constitution itself, *see* U.S. Const. art. I, § 2, cl. 3 (requiring an "actual Enumeration" for purposes of apportionment); *id.*

amend. XIV, § 2, cl. 1 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . . ."); *see also Shelby County v. Holder*, 570 U.S. 529, 544 (2013) (noting the "fundamental principle of equal sovereignty among the States") (internal quotation marks and emphasis omitted). And it would result in the very harms that this Court's decision is intended to redress — by causing net differential undercounts in *non*-plaintiff states, thereby potentially giving the Plaintiff States representational or funding windfalls. But equitable relief "issues to remedy a wrong, not to promote one." *Morrison v. Work*, 266 U.S. 481, 490 (1925) (Brandeis, J.). Granted, in the unlikely event that Secretary Ross proceeded with two different census questionnaires, those harmed could bring their own lawsuit. But it is near certain that the press of time would preclude "orderly judicial review of any disputed matters that might arise." *Bush v. Gore*, 531 U.S. 98, 110 (2000) (per curiam). Thus, an injunction barring Defendants from including a citizenship question on the 2020 census questionnaire altogether is appropriate.

### 3. Declaratory Relief

Finally, the Court denies Plaintiffs' request for declaratory relief as unecessary. *See* Pls.' Proposed Conclusions ¶ 615; SAC 57; NGO Compl. 67. The Declaratory Judgment Act vests federal courts with discretion, in a proper case, to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). In exercising that discretion, courts must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; . . . (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . [3] whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; [4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the

domain of a state or foreign court; and [5] whether there is a better or more effective remedy."
*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003) (citations and internal
quotation marks omitted).  Applying those standards here, the Court concludes that a declaratory
judgment would serve little "useful purpose" beyond what has already been said and ordered
here.  More to the point, there is a "better" remedy available to Plaintiffs in these cases — and
they now have it.  The relief awarded, combined with the preclusive effect (at least as between
these parties) of the Court's factual findings and legal conclusions, is as good and as "effective"
— and, for that matter, as "declaratory" — a remedy as Plaintiffs require.

## CONCLUSION

There is no dispute that the Constitution, the Census Act, and the APA allow the
Secretary of Commerce broad discretion over the design and administration of the decennial
census.  *See Wisconsin*, 517 U.S. at 18-20.  Generally speaking, they do not preclude the
Secretary from charting a new policy direction, even over the strenuous objections of career
staff, or from recruiting other government officials to support such a change.  Significantly,
however, the discretion that they allow the Secretary is not unlimited.  He must comply with the
policy decisions that Congress — to which the Constitution gives authority over the census —
has made and enshrined in statute, including but not limited to the preference for obtaining data
through administrative records rather than through direct inquiries.  He must follow the
procedures mandated by law.  And more broadly, the exercise of his statutory authority must "be
reasonable and reasonably explained."  *Mfrs. Ry. Co.*, 676 F.3d at 1096.

Measured against these standards, Secretary Ross's decision to add a citizenship question
to the 2020 census — even if it did not violate the Constitution itself — was unlawful for a
multitude of independent reasons and must be set aside.  To conclude otherwise and let Secretary
Ross's decision stand would undermine the proposition — central to the rule of law — that ours

is a "government of laws, and not of men." John Adams, *Novanglus Papers*, No. 7 (1775). And it would do so with respect to what Congress itself has described as "one of the most critical constitutional functions our Federal Government performs." 1998 Appropriations Act, § 209(a)(5), 111 Stat. at 2480-81.

Accordingly, and for the reasons stated at length above, the Court vacates Secretary Ross's decision to add a citizenship question to the 2020 census questionnaire, enjoins Defendants from implementing Secretary Ross's March, 26, 2018 decision or from adding a question to the 2020 census questionnaire without curing the legal defects identified in this Opinion, and remands the matter to the Secretary of Commerce (to the extent that such a "remand" is even necessary) for further proceedings not inconsistent with the Court's Order.[88]

One final housekeeping matter remains. At the end of trial, the Court indicated (without objection) that it would reopen the record for the limited purpose of taking Secretary Ross's testimony should the Supreme Court lift its stay of this Court's Order authorizing his deposition before the Court issued a final decision. *See* Tr. 1406-07; Docket No. 538, at 2. With this ruling, that possibility is now foreclosed. Accordingly, the Court's September 21, 2018 Order granting Plaintiffs' motion to compel the deposition of Secretary Ross, *see* Docket No. 345, is VACATED as moot.

SO ORDERED.

Dated: January 15, 2019
    New York, New York

_____
        JESSE M. FURMAN
    United States District Judge

---

[88] In their Complaints, Plaintiffs ask for attorney's fees and other, similar relief. *See* NGO Compl. 67; SAC 58. The parties have not briefed those issues, and the Court does not address them here. Moreover, given the pending litigation in the Supreme Court, and the high likelihood of appeals from this Court's judgment, it would make sense to defer any such litigation until such appeals run their course. Accordingly, unless and until the Court orders otherwise, Plaintiffs shall file any application for attorney's fees within thirty days of the judgment in this case becoming final and not appealable.