## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.    Plaintiffs have Article III standing to challenge the Secretary's demand for citizenship information on the 2020 Census. ............................................................... 4

    A. Plaintiffs plausibly allege that adding a citizenship question to the census will cause Plaintiffs multiple, non-speculative injuries. ........................................... 5

        1. Plaintiffs plausibly assert that adding a citizenship question will undermine the accuracy of the census by undercounting certain populations, as Defendants have acknowledged for decades. ......................... 6

        2. Plaintiffs have plausibly alleged that inaccuracies in the census count caused by a citizenship question will directly injure Plaintiffs...................... 10

            a. Plaintiffs have sufficiently pled a non-speculative risk of harm to their federal funding interests. .................................................................. 11

            b. Plaintiffs have sufficiently pled a non-speculative risk of harm to their representational and electoral interests............................................. 13

            c. Plaintiffs have sufficiently pled that they will expend funds to mitigate the undercount that will likely result from Defendants' action................................................................................................................ 15

    B. Plaintiffs' injuries are fairly traceable to Defendants' conduct because Plaintiffs would not be injured absent the addition of a citizenship demand to the census. ................................................................................................... 16

II.    The Secretary's decision to add a citizenship demand to the census is not exempt from judicial review. ..................................................................................... 19

    A. Plaintiffs' challenge does not pose a political question. ...................................... 19

    B. There are meaningful and judicially manageable standards that permit review of the Secretary's demand for citizenship information. ............................. 22

        1. The plain language of the Constitution and Census Act suggest that judicial review is appropriate........................................................................ 23

i

2. The statutory and constitutional objectives undergirding the Census Act provide a judicially manageable standard by which courts may review the Secretary's decision. ...................................................... 25

3. Changes to the census questionnaire are governed by a substantial body of statutory and administrative requirements that provide standards by which the courts may review Defendants' conduct. ................. 28

4. Courts routinely hold that there are judicially manageable standards to apply in reviewing challenges to the census. .................................................. 30

III.     Plaintiffs have stated a claim under the Enumeration Clause. .................................... 32

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. Bush,*
  924 F.2d 282 (D.C. Cir. 1991) ............................................................................................... 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................................. 2

*Baker v. Carr,*
  369 U.S. 186 (1962) ......................................................................................................... 19, 23

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ......................................................................................... 6, 7, 10

*Beazley Insurance Co. v. Ace Am. Insurance Co.,*
  150 F. Supp. 3d 345 ............................................................................................................... 15

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................................. 2

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................................... 16

*Borough of Bethel Park v. Stans,*
  319 F. Supp. 971 (W.D. Pa. 1970) ........................................................................................ 31

*Carey v. Klutznick,*
  508 F. Supp. 404 (S.D.N.Y. 1980) ............................................................................... 9, 20, 21

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) ................................................... 11, 12, 14, 21, 30, 31, 34

*Carver v. City of New York,*
  621 F.3d 221 (2d Cir. 2010) .................................................................................................. 16

*Cent. Delta Water Agency v. United States,*
  306 F.3d 938 (9th Cir. 2002) ................................................................................................. 10

*City of Camden v. Plotnick,*
  466 F. Supp. 44 (D.N.J. 1978) ........................................................................... 12, 13, 31, 34

*City of Detroit v. Franklin,*
  4 F.3d 1367 (6th Cir. 1993) ..................................................................................... 11, 12, 15

*City of New York v. United States Dep't of Commerce,*
  713 F. Supp. 48 (E.D.N.Y. 1989) ........................................................................... 7, 12, 31

*City of Perry v. Proctor & Gamble Co.*,
    188 F.Supp.3d 276 (S.D.N.Y. 2016) ................................................................. 18

*City of Philadelphia v. Klutznick*,
    503 F. Supp. 663 (E.D. Pa. 1978) ................................................... 9, 20, 21, 27, 31

*City of Willacoochee v. Baldridge*,
    556 F. Supp. 551 (S.D. Ga. 1983) ............................................................. 12, 25

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................... 5, 7, 16, 18

*Massachusetts v. Mosbacher*,
    785 F. Supp. 230 (D. Mass. 1992) ............................................................ 24, 31

*District of Columbia v. U.S. Dep't of Commerce*,
    789 F. Supp. 1179 (D.D.C. 1992) ............................................................ 31, 34

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ................................................................. 14, 15, 21, 35

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978) ........................................................................... 12, 17

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016) ...................................................................... 26, 27

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
    316 F.3d 357 (2d Cir. 2003) ..................................................................... 17

*Fed'n for Am. Immigration Reform v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ...................................................... 1, 6, 9, 17, 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................. 24, 25, 27, 34, 35

*Karcher v. Daggett*,
    462 U.S. 725 (1983) ............................................................................ 15

*Keiler v. Harlequin Enters.*,
    751 F.3d 64 (2d Cir. 2014) ................................................................ 2, 3, 10

*Khodara Envtl., Inc. v. Blakely*,
    376 F.3d 187 (3d Cir. 2004) ................................................................ 16, 17

*Legal Tender Cases*,
    79 U.S. 457 (1870) ............................................................................ 34

iv

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................ 2, 5, 9

*Mach Mining, LLC. v. EEOC,*
    135 S. Ct. 1645 (2015) .................................................................................... 24

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .................................................................................. 17, 18

*Matrixx Initiatives, Inc. v. Siracusano,*
    563 U.S. 27 (2011) ............................................................................................ 2

*NRDC v. Johnson,*
    461 F.3d 164 (2d Cir. 2006) ........................................................................... 23

*Robbins v. Reagan,*
    780 F.2d 37 (D.C. Cir. 1985) .......................................................................... 27

*Robinson v. Overseas Military Sales Corp.,*
    21 F.3d 502 (2d Cir. 1994) .......................................................................... 2, 12

*Ross v. AXA Equitable Life Ins. Co.,*
    115 F. Supp. 3d 424 (S.D.N.Y. 2015) .............................................................. 6

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) .......................................................................... 16, 18

*Salazar v. King,*
    822 F.3d 61 (2d Cir. 2016) ..................................................... 23, 24, 28, 32

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ...................................................................................... 5

*Texas v. Mosbacher,*
    783 F. Supp. 308 (S.D. Tex. 1992) ................................................................. 31

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014) ...................................................................................... 5

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) ........................................................................................ 34

*Tucker v. Dep't of Commerce,*
    958 F.2d 1411 (7th Cir. 1992) .................................................................. 11, 32

*U.S. Dep't of Commerce v. Montana,*
    503 U.S. 442 (1992) ........................................................................................ 19

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
   11 F. Supp. 2d 76 (D.D.C. 1998) ................................................................. 21

*Utah v. Evans*,
   536 U.S. 452 (2002) ........................................................ 14, 20, 25, 26, 35

*Walker v. Schult*,
   717 F.3d 119 (2d Cir. 2013) .......................................................................... 35

*Webster v. Doe*,
   486 U.S. 592 (1988) ...................................................................................... 24

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ................................................................................... 15, 21

*Westchester v. U.S. Dep't of Hous. & Urban Dev.*,
   778 F.3d 412 (2d Cir. 2015) .......................................................................... 23

*Wisconsin v. City of New York*,
   517 U.S. 1 (1996)............................... 4, 11, 12, 20, 26, 27, 32, 33, 34, 35

## STATUTES

13 U.S.C. § 141(a) .............................................................................. 24, 25

13 U.S.C. § 141(b) ............................................................................. 24, 25

13 U.S.C. § 141(f) ..................................................................................... 28

13 U.S.C. § 5 ..................................................................................... 24, 25

21 U.S.C. 365a(q)(3)................................................................................. 23

44 U.S.C. § 3504(e)(3)............................................................................. 29

44 U.S.C. § 3506(e)(4)............................................................................. 28

5 U.S.C. § 701(a)(2).................................................................... 23, 24, 31

5 U.S.C. § 706(2) ....................................................................................... 30

Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 515(a), 114 Stat.
   2763 (Dec. 21, 2000) .............................................................................. 28

Fed. R. Civ. P. 12(b)(1)............................................................................. 2, 3

Fed. R. Civ. P. Rule 12(b)(6) .................................................................... 2, 3

**OTHER AUTHORITIES**

OMB Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal
    Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610,
    71,611-12 (Dec. 2, 2014) ......................................................................................... 29

OMB Statistical Policy Directive No. 2: Standards and Guidelines for Statistical
    Surveys, § 1.3 (2006) ........................................................................................... 8, 29

U.S. Census Bureau, *Statistical Quality Standards* ("Quality Standards") ...................... 8, 29, 30

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 2, cl. 3 ........................................................................... 1, 4, 20, 25

U.S. Const., amend. XIV, § 2 .............................................................................. 1, 4, 25

## INTRODUCTION

As Defendants concede, the Enumeration Clause unambiguously mandates that the Census Bureau conduct a person-by-person headcount to determine "the whole number of persons in each State," without regard to citizenship status.  U.S. Const. amend. XIV, § 2; *id.* art. I, § 2, cl. 3.  Decades of federal legislation, judicial precedent, and settled agency practice have confirmed the Census Bureau's obligation to conduct this enumeration accurately, specifically by using reliable and carefully vetted procedures that are directed to counting every person.

Defendants' decision to use the decennial census to demand the citizenship status of every resident in the country is a stark repudiation of both their constitutional obligation and decades of established, repeatedly affirmed, policy.  For nearly forty years, the Census Bureau has taken the affirmative position that the citizenship question will deter participation and therefore undermine the accuracy of the person-by-person headcount compelled by the Constitution.  *See* Am. Compl. ¶¶ 38–44.  As the Census Bureau has publicly represented, any efforts to use the census "to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count." *Fed'n for Am. Immigration Reform ("FAIR") v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980) (three-judge court).  And as recently as April 18, 2018, during sworn congressional testimony, Defendant Ron S. Jarmin, the Director of the Census Bureau, acknowledged that asking for citizenship status will have a deterrent effect on response rates that "would largely be felt in various sub-groups, in immigrant populations, [and] Hispanic populations."  Am. Compl. at ¶ 79.

Defendants' motion to dismiss rests largely on their insistence that demanding citizenship information through the decennial census will not in fact result in any undercount at all; or that regardless of the consequences, this Court has no role in reviewing the Commerce Secretary's

exercise of his authority.  But that assertion begs the very factual question that further proceedings in this litigation will explore.  Properly taking Plaintiffs' factual allegations as true, the jurisdictional question presented by Defendants' motion to dismiss is a narrow one: whether a federal court may review the Census Bureau's deliberate decision to adopt a practice that will result in an undercount of the enumeration required by the Constitution.  The Court should answer this question in the affirmative and deny Defendants' motion to dismiss.

## LEGAL STANDARD

A complaint need only set forth "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, Plaintiffs bear the burden of demonstrating that the Court has subject-matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs may rely on the pleadings and any supporting affidavits, and the Court should "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations."  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) ("[T]he plaintiff need only make a *prima facie* showing of jurisdiction.").

To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court should accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *Keiler v. Harlequin Enters.*, 751 F.3d 64, 68 (2d Cir. 2014).

**ARGUMENT**

Defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure cannot be sustained.  As a preliminary matter, Defendants' application, while nominally styled as motion to dismiss, is replete with factual assertions and appeals to the underlying merits.  For example, Defendants dispute the likely effect of adding a citizenship question to the decennial census, *see* Defs.' Mem. at 8–9, 15–6 (Docket No. 155); the relevant historical context,[1] *id.* at 2–11; the adequacy of the testing conducted (or not) on the citizenship question, *id.* at 7; the quality of the Secretary's purported "hard look" at this issue, *id.* at 6; and the efficacy of Defendants' "extensive publicity and outreach campaigns," *id.* at 11.  But these matters raise disputed factual issues that are inapposite on a motion to dismiss, where the Court takes facts alleged in the complaint as true and draws all reasonable inferences in Plaintiffs' favor.  *Keiler*, 751 F.3d at 68.

Defendants challenge Plaintiffs' standing by asking the Court to ignore the well-founded allegations—citing, *inter alia*, the Census Bureau's own findings—that person-by-person citizenship inquiries increase nonresponse and lead to disproportionate undercounting in immigrant communities, and that Defendants themselves recognize the substantial risks associated with their decision.  Defendants' blatant disregard of these risks threatens Plaintiffs with losses of crucial federal funds and representation, and poses significant, legally cognizable

---

[1] The fact that since 1970, the Census Bureau has requested some citizenship information from a limited portion of the population does not support Defendants' contention that adding the citizenship question to the decennial census is an uncontroversial, "[h]istorical practice."  Defs.' Mem. at 32.  As the Census Bureau acknowledges, data collection through more limited surveys cannot be compared to the full decennial census.  *See infra* note 23**.** Moreover, this Administration has engaged in, and continues to engage in, well-publicized and extensive efforts to separate immigrant families and deport immigrants.  *See, e.g.*, Am. Compl. ¶¶ 47–48 (detailing the Administration's admonition that every immigrant "should look over [their] shoulder" and "be worried").  In this environment, sending federal employees to "personally visit," Defs.' Mem. at 10, the doors of immigrant households to demand citizenship information cannot be equated to the mere mailing of an American Community Survey questionnaire to 2% of the population.

threats to the economies and democracies of Plaintiff States, Cities, and Counties.

Defendants' other challenges are, at base, an effort to place constitutional issues implicating fundamental voting and representational rights entirely outside the purview of the courts.  Defendants argue that their decision to add a citizenship question is entirely outside the scope of judicial review—in effect conferring on the Secretary unfettered and unlimited discretion to add or change census questions, regardless of how those changes impact the Census Bureau's ability to fulfill its constitutional obligation to enumerate all persons.  There is no merit to this extreme position, which would effectively insulate from judicial review conduct that could openly and knowingly undercount the population of the states.

In contrast, Plaintiffs take the unremarkable position that the Secretary's discretion, while substantial, is constrained by the unambiguous constitutional command that the census must count "the whole number of persons in each state."  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  Accordingly, as the Supreme Court has held, the Secretary's actions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, obtaining an accurate count. *See Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996).  At minimum, then, the Constitution forbids the Secretary from adopting a course of action that will compromise the accuracy of the census by predictably deterring certain populations from responding.  Because the complaint here adequately alleges that Defendants failed to satisfy this straightforward and judicially administrable standard, Defendants' motion to dismiss should be denied.

## I.   Plaintiffs have Article III standing to challenge the Secretary's demand for citizenship information on the 2020 Census.

To establish standing, Plaintiffs must allege facts demonstrating that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61).  Defendants challenge only the first and second elements.  Defs.' Mem. at 13–21.  But Defendants improperly ignore Plaintiffs' well-pled allegations cataloguing the concrete injuries that Plaintiffs will suffer from the Secretary's decision to add a citizenship question to the census.  Those allegations include Defendants' repeated, long-standing acknowledgment that adding a citizenship inquiry to the census will inevitably impede the Bureau's ability to conduct an accurate enumeration of all persons—an acknowledgment reiterated by the acting Census Director just weeks ago in Congressional testimony he provided *after* this case was filed.  Am. Compl. ¶¶ 4–5, 36–46, 79, 88.  And the Amended Complaint plausibly asserts that undercounting Plaintiffs' populations will harm Plaintiffs in multiple ways, such as by decreasing their share of federal funds and their allocation of representation in federal or state government.  Controlling Supreme Court and Second Circuit precedent dictate that such alleged financial and representational harms provide Plaintiffs with standing to challenge the conduct of the decennial census.

### A.    Plaintiffs plausibly allege that adding a citizenship question to the census will cause Plaintiffs multiple, non-speculative injuries.

To establish injury in fact, Plaintiffs must allege facts demonstrating an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).  Allegations of a "future injury" are sufficiently imminent "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).  "Ultimately, the purpose of the imminence requirement is 'to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur.'" *Ross v. AXA*

5

*Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting *Baur v. Veneman*,

352 F.3d 625, 632 (2d Cir. 2003)).  The Amended Complaint easily satisfies these standards.

> **1.  Plaintiffs plausibly assert that adding a citizenship question will undermine the accuracy of the census by undercounting certain populations, as Defendants have acknowledged for decades.**

Defendants argue that Plaintiffs' alleged injuries are not sufficiently imminent because

Plaintiffs only speculate that the addition of a citizenship question will undermine the accuracy

of the census.  *See* Defs.' Mem. at 14–19.  However, Plaintiffs' allegations are based not on

speculation but rather on Defendants' long-standing determination that demanding citizenship

information will depress response rates in immigrant communities, thus severely impeding the

Bureau's ability to conduct an accurate enumeration.  Defendants' arguments to the contrary

merely raise factual disputes that should not be resolved at the motion-to-dismiss stage.

The Census Bureau repeatedly has determined that demanding citizenship information

through the decennial census will "inevitably jeopardize the accuracy" of the constitutionally

required actual enumeration.  *FAIR*, 486 F. Supp. at 568; Am. Compl. ¶ 39.  Indeed, for nearly

forty years, Census Bureau officials have acknowledged that adding a citizenship question would

undermine the census's accuracy by suppressing the response rates of certain groups, including

noncitizens and individuals who live in the same residence as noncitizens.  *See* Am. Compl. ¶¶

38–46, 88.  For instance, numerous Census Bureau officials have testified to Congress that

adding a citizenship demand "will lead to a less complete and less accurate census" because a

"significant number of noncitizens will not respond" to a census that includes such a question.

*Id*. at ¶ 42; *see also id.* at ¶¶ 40–41 (describing testimony from Census Bureau officials that

census inquiries regarding citizenship or immigration status "could seriously jeopardize the

accuracy of the census" because immigrant populations may "refuse to respond" to the census).

Current and former Census Bureau leadership confirm that a citizenship inquiry will

impede the Bureau's ability to conduct an accurate actual enumeration during the 2020 Census.

For example, the Director of the Census Bureau from 2013 to 2017 has warned that Defendants'

sudden decision to add a citizenship inquiry poses "great risks" to the 2020 Census—particularly

because such a question "will result in an undercount not just of non-citizen populations but [also

of] other populations that are concerned with what could happen to them."  *Id*. at ¶ 88; *see also*

*id*. at ¶ 45.  Moreover, the current Census Director acknowledged in sworn testimony to

Congress that adding a citizenship demand to the census would likely have a significant and

negative impact on the response rates of immigrant populations and Hispanic populations.[2]  *Id*. at

¶ 79.  And just a few weeks ago, the Secretary confirmed that he expected the citizenship

demand to cause response rates to "go down" an estimated one percent.[3]  Thus the Census

Bureau has confirmed that there is a "substantial risk" that a citizenship demand will harm the

accuracy of the enumeration.[4]  *See Clapper*, 568 U.S. at 414–15 n.5; *see also Baur*, 352 F.3d at

637–40 (plaintiff sufficiently alleged threat of exposure to disease based, in part, on government

agency's reports confirming alleged risks); *City of New York v. United States Dep't of*

*Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989) (plaintiff states and cities sufficiently alleged

standing to challenge census methodology based on statements by former Census Bureau

---

[2] Defendants mischaracterize the Director's concession of harm by arguing that Dr. Jarmin suggested only that the non-response effect of the citizenship demand "*might* be important."  Defs.' Mem. at 16 n.7 (emphasis in original). But when read in context, Dr. Jarmin's testimony plainly acknowledged the substantial negative effects of a citizenship question.  In response to a question about whether the effects "would be minimal," Dr. Jarmin replied "I wouldn't say minimal, I would say it could be in some communities, it might be important . . . ."  *House Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on Bureau of the Census*, 115th Cong. 20 (Apr. 18, 2018); *see* Am. Compl. ¶ 79.

[3] *Senate Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on the F.Y. 2019 Funding Request for the Commerce Department*, 115th Cong. 25 (May 10, 2018).

[4] Plaintiffs' allegations are confirmed by the January 2018 analysis of the Census Bureau's own Chief Scientist, who concluded, among other detriments that adding a citizenship question "harms the quality of the census count" and "would lead to a larger decline in self-response for noncitizen households."  See Administrative Record, Bates Nos. 001277, 001281, available at http://www.osec.doc.gov/opog/FOIA/Documents/AR%20-%20FINAL%20FILED%20-%20ALL%20DOCS%20%5bCERTIFICATION-INDEX-DOCUMENTS%5d%206.8.18.pdf#page=1289.

officials that census would undercount certain minority groups that had a disproportionately large presence in plaintiffs' jurisdictions).

The strong likelihood that a citizenship inquiry will erode the accuracy of the census is further confirmed by Defendants' failure to provide any plausible reason for reversing the Census Bureau's prior determination that a citizenship question will impede the actual enumeration. The Secretary acknowledged that he decided to demand citizenship information despite the lack of any "empirical" evidence to suggest that the Census Bureau would be able to maintain the enumeration's accuracy in light of the question. Am. Compl. ¶ 37. Indeed, Defendants suddenly added the citizenship question without conducting the analyses that are needed to ensure that *any* change to the census—let alone a change of this magnitude—will not harm the census's accuracy, reliability, or objectivity. *Id*. at ¶¶ 55–57, 62–79.[5] Contrary to Defendants' contention, Defs.' Mem. at 9, any purported lack of "empirical" evidence about the effects of a citizenship question thus further supports Plaintiffs' allegation that the question is likely to depress response rates materially and undermine the enumeration. In any event, Plaintiffs are not required at this early stage of the litigation to provide "empirical" evidence to support their well-pled allegations.[6]

And even if any further support were needed (which it is not), Plaintiffs have plausibly alleged that the risk that a citizenship question will depress response rates is especially acute given the current Administration's anti-immigrant rhetoric and actions. Am. Compl. ¶¶ 47–49.

---

[5] *See* OMB Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys, §§ 1.3, 1.4, 2.3.1 (2006), https://goo.gl/83gdr4 (2006); U.S. Census Bureau, Statistical Quality Standards ("Quality Standards") (2013), https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/ quality/statistical-quality-standards/Quality_Standards.pdf, A2–3 & A2–3.3 (July 2013); *see also infra* Section II.B.3.

[6] Although expert testimony about the negative effects of the citizen question is unnecessary to defeat Defendants' motion to dismiss, Plaintiffs intend to introduce further evidence, including expert testimony, at the appropriate stage of litigation. *See* Tr. of Initial Pretrial Conf. at 28:12–22 (May 9, 2018) (Docket No. 150).

As the Census Bureau's preliminary tests and reports for the 2020 Census reflect, immigrant populations are already reporting an "unprecedented level" of fear and anxiety surrounding the census. *Id*. at ¶ 52. These reports show, *inter alia*, that respondents are providing incomplete and inaccurate information, or breaking off interviews, in response to questions regarding citizenship status. *Id*. at 50.[7] Statistical experts and former Census Bureau officials have concluded that, given this atmosphere of fear and anxiety, the addition of a citizenship question is particularly likely to decrease response rates in immigrant populations. *Id*. at ¶¶ 84, 88. These factual allegations provide a more than plausible basis to conclude that many immigrants, anxious about interacting with the government, will refuse to respond to the census if asked to provide information regarding their citizenship status. *See Carey v. Klutznick*, 508 F. Supp. 404, 410 (S.D.N.Y. 1980) (plaintiffs had standing to challenge census where they relied on preliminary figures and reports to allege that census would result in an undercount); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 671 (E.D. Pa. 1978) (plaintiff had standing to challenge census based on conduct allegedly resulting in biased population counts).[8]

Defendants aver that the Census Bureau will take steps to mitigate any possible harms caused by the demand for citizenship status. *See* Defs.' Mem. at 11, 15–16. But unspecified

---

[7] Memorandum from the U.S. Census Bureau, Ctr. for Survey Measurement to Assoc. Directorate for Research and Methodology, *Respondent Confidentiality Concerns* 1 (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

[8] This case is distinguishable from *FAIR*, which granted summary judgment to the defendants for lack of standing. 486 F. Supp. at 578. Because the court in *FAIR* was ruling on summary judgment, the plaintiffs bore a heavier burden of proof than Plaintiffs do here at the pleading stage. *Id*. at 566; *see Lujan*, 504 U.S. at 561 (each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation"). Moreover, the court in *FAIR* concluded that the plaintiffs had failed to raise an issue of fact as to whether they lived in jurisdictions that would be negatively affected by a census undercount because plaintiffs' own summary judgment evidence showed that their jurisdictions were unlikely to be negatively affected. *FAIR*, 486 F. Supp. at 571–72. Here, by contrast, Plaintiffs have plausibly alleged that they will lose federal funding and suffer other harms from the addition of a citizenship question because a disproportionate number of affected individuals live in Plaintiffs' jurisdictions. *See* Am. Compl. ¶¶ 103–136.

claims about Defendants' purported future mitigation efforts do not defeat Plaintiffs' standing.[9]

*See Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) ("It would be

inequitable in the extreme for us to permit one party to create a significantly increased risk of

harm to another, and then avoid the aggrieved party from trying to prevent the potential harm

because the party that created the risk promises that it will ensure that the harm is avoided[.]").

To the contrary, Defendants' assertion that they will take "preemptive steps" to mitigate the very

harms that Plaintiffs allege will occur "strongly suggests" that Defendants view the harms as

"both serious and imminent." *Baur*, 352 F.3d at 637–40.  In any event, Defendants' purported

mitigation plans at most raise factual disputes about the extent to which a citizenship demand

will erode the accuracy of the census.  Because such disputes may only be resolved on summary

judgment or after trial, the Court should deny Defendants' motion to dismiss.  *See Keiler*, 751

F.3d at 68.

### 2. Plaintiffs have plausibly alleged that inaccuracies in the census count caused by a citizenship question will directly injure Plaintiffs.

Plaintiffs have also plausibly alleged that depressed response rates from a citizenship

demand will imminently injure Plaintiffs in multiple ways, including by decreasing their share of

federal funding; decreasing their allocation of representation in federal or state government;

interfering with their ability to conduct intrastate redistricting; and requiring them to expend

additional resources.  Defendants' arguments to the contrary, Defs.' Mem. at 16–19, are

unpersuasive and raise issues of fact that cannot be resolved on a motion to dismiss.

---

[9] The only source Defendants cite in support of their claim of future mitigation is the 2020 Census Operational Plan, Defs.' Mem. 10–11, which was published five months *prior* to the decision to add a citizenship question, and therefore cannot have been designed to remedy an undercount caused by the demand for citizenship status.

### a. Plaintiffs have sufficiently pled a non-speculative risk of harm to their federal funding interests.

Defendants argue that Plaintiffs have not sufficiently pled that the citizenship question will injure Plaintiffs' interests in federal funds that are distributed based on the decennial enumeration. Defs.' Mem. at 16. But the Second Circuit has squarely held that state and local governments have standing to challenge the census based on their potential loss of federal funds. In *Carey v. Klutznick*, the Second Circuit concluded that New York City and New York State had standing to challenge the census based on their allegations that the census would result in an undercount that would "generally cost the city and the state vast sums of money distributed under federal revenue sharing and other programs with statutory formulas tied to the census." 637 F.2d 834, 836, 838 (2d Cir. 1980); *see also City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993) (concluding that the city had standing based on "claim that the census undercount will result in a loss of federal funds" to the city).

Here, as in *Carey*, Plaintiffs have plausibly alleged a substantial risk that they will lose federal funds because of the undercount arising from the citizenship question. Plaintiffs have identified numerous federal programs that by statute or regulation tie funding allocations, at least in part, to the decennial census's population count. Am. Compl. ¶¶ 138–139, 143–145; *see Wisconsin*, 517 U.S. at 5–6 ("The Federal Government considers census data in dispensing funds through federal programs to the States . . . ."). These programs are sensitive to inaccuracies in the decennial enumeration because they are directly dependent on the census's population count. *Tucker v. Dep't of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) ("[T]here is no doubt that, as a matter of fact, the allocation of state and federal funds is heavily influenced by census figures."). Plaintiffs have further alleged that they are likely to lose federal funds if a citizenship question is added to the census because Plaintiffs' jurisdictions are home to large numbers of

immigrants and other individuals whose census response rates will be suppressed by a citizenship question.  Am. Compl. ¶¶ 138–139, 141–147.  These allegations sufficiently allege harms caused by a loss of federal funds resulting from inaccuracies in the census.  *See Carey*, 637 F.2d at 838; *see also City of Detroit*, 4 F.3d at 1374.

Defendants argue that the citizenship question may not cause particular Plaintiffs to lose federal funding because many federal programs allocate funds based on multiple factors, including the census's population count. Defs.' Mem. at 16–17.  But at the pleading stage, Plaintiffs are not required to establish with mathematical certainty the extent to which they may lose federal funds.  Rather, as numerous courts adjudicating challenges to the census have concluded, Plaintiffs plausibly plead their standing by alleging that they receive federal funds that are allocated based in part on the census enumeration, and that their share of such funds will likely decrease due to inaccuracies in the census count.  *See City of Willacoochee v. Baldridge*, 556 F. Supp. 551, 554 (S.D. Ga. 1983); *City of Camden v. Plotnick*, 466 F. Supp. 44, 47–50 (D.N.J. 1978) (plaintiffs alleged injury in fact based on potential loss of federal funding for City of Camden).  Plaintiffs' allegations, which should be accepted as true, satisfy this minimal pleading burden.  *See generally Robinson*, 21 F.3d at 507.

To the extent Defendants' arguments about the magnitude of funding losses "require testing by affidavit or testimony," they are "not an appropriate basis on which to deny standing" on a motion to dismiss.[10]  *City of Camden*, 466 F. Supp. at 49 (rejecting contention that

---

[10] Defendants' argument that Plaintiffs' loss-of-funding injuries fall outside the "zone of interests" of the Enumeration Clause is incorrect.  *See* Defs.' Mem. at 17.  The Supreme Court has recognized the critical importance of the constitutionally required enumeration to many federal funding decisions.  *Wisconsin*, 517 U.S. at 5–6.  And the Second Circuit has concluded that this inextricable tie between the enumeration and funding allows plaintiffs to bring Enumeration Clause claims on the basis of funding harms.  *Carey*, 637 F.2d at 838; *see also City of Detroit*, 4 F.3d at 1374; *City of New York*, 713 F. Supp. at 50.  Moreover, Plaintiffs have satisfied the "basic practical and prudential concerns underlying the standing doctrine" by sufficiently alleging that relief under the Enumeration Clause will redress Plaintiffs' funding losses.  *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59,

plaintiffs' loss-of-funding injury was uncertain because that argument raised factual disputes inappropriate on a motion to dismiss).

> **b.  Plaintiffs have sufficiently pled a non-speculative risk of harm to their representational and electoral interests.**

Contrary to Defendants' contentions (Defs.' Mem. at 17–19), Plaintiffs have also adequately pled that they will be harmed by a citizenship question because there is a substantial risk that depressed census response rates will decrease Plaintiffs' allocation of representation in federal or state government, as well as impede Plaintiffs' ability to conduct redistricting within their own jurisdictions.

First, Plaintiffs have plausibly alleged that several Plaintiff States, including New York, Illinois, and Rhode Island, face a substantial risk of losing at least one seat in the House of Representatives if a citizenship question is added to the census.  Recent population projections show that these states are already on the cusp of losing a House seat.  Am. Compl. ¶¶ 158, 160.[11] Plaintiffs have further alleged that these states are home to large communities of noncitizens and immigrants—the groups whose census response rates will most likely be suppressed by the inclusion of a citizenship question, as Defendants have acknowledged.  *Id.* at ¶¶ 104, 109, 119; *see supra* at Section I.A.1.  And contrary to Defendants' contentions, Defs.' Mem. at 18, Plaintiffs have specifically alleged that they will suffer disproportionately lower population counts than other states if a citizenship question is added because the Plaintiff States, including

---

80-81 (1978) (rejecting argument that there must be a connection between injuries claimed and constitutional rights asserted so long as "injury alleged is a concrete and particularized one which will be *prevented* or redressed by the relief requested").  In any event, Plaintiffs have separately alleged that the citizenship question places at least three Plaintiff States at substantial risk of losing a seat in the House of Representatives—an injury that Defendants concede falls squarely within the Enumeration Clause's zone of interests (Defs.' Mem. at 18).

[11] Election Data Services, *Some Change in Apportionment Allocations With New 2017 Census Estimates; But Greater Change Likely by 2020* (Dec. 26, 2017), https://www.electiondataservices.com/wp-content/uploads/2017/12/NR_Appor17c3wTablesMapsC2.pdf.

New York, Illinois, and Rhode Island, are home to disproportionately larger groups of noncitizens and immigrants compared to other states.  Am. Compl. ¶¶ 103–104, 109, 119, 136.  The Amended Complaint thus plausibly alleges that depressed response rates from a citizenship question are likely to push the enumeration counts for New York, Illinois, Rhode Island and other similarly situated states under the threshold required to lose a House seat.  *Id.* at ¶¶ 158–160.  Such an "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement" for Article III standing.  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999); *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (concluding that Utah had standing to challenge census methodology based on loss of House seat); *Carey*, 637 F.2d at 838.

Second, Plaintiffs have plausibly alleged that several cities and counties are at substantial risk of losing electoral power in their respective state governments if a citizenship question is included on the census.  These Cities and Counties are located in states that are required to use the census enumeration as the population base for intrastate redistricting.[12]  And as the Amended Complaint alleges, these Plaintiff Cities and Counties are home to disproportionately larger immigrant populations than other cities and counties within their respective states.  Am. Compl. ¶¶ 104, 125, 161.  Plaintiffs have thus plausibly alleged that the citizenship question's suppression of census responses from these populations will likely disproportionately affect these Cities and Counties and decrease their share of state and local representation vis-à-vis other localities.  *See House of Representatives*, 525 U.S. at 332–34 (sufficient injury-in-fact where votes of residents in states required to base districts on census enumeration would be diluted vis-

---

[12] *See, e.g.,* N.Y. Const. art. III, § 4; Pa. Const. art. II, § 17(c); Tex. Const. art. 3, § 26; R.I. Gen. Laws § 17–4–2, §22–1–2, § 22–2–2; Wash. Const. art. 2, § 43; Wash. Rev. Code Ann. § 29A.76.010; Ohio Const. art. XI, § 3; Cal. Elec. Code § 22000.

à-vis residents of other counties).

Finally, Plaintiffs have also plausibly alleged that Defendants' action will likely harm Plaintiffs' ability to conduct fair and accurate redistricting within their own borders because a citizenship question will undermine the decennial census counts that Plaintiffs must rely on to redraw district boundaries. Several Plaintiffs are required to rely on decennial census counts as the population base for periodically redrawing their state and local districts to be "as nearly of equal population as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 782 n.14 (1983); *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964); *see* Am. Compl. ¶¶ 151–54. The addition of a citizenship question will thus force these Plaintiffs to redistrict based on population counts that the Census Bureau has acknowledged will be fundamentally inaccurate, thereby harming Plaintiffs' sovereign interests in ensuring that their representative governments fairly and accurately reflect the number of people who live in each district. *See* Am. Compl. ¶ 155.[13]

### c. Plaintiffs have sufficiently pled that they will expend funds to mitigate the undercount that will likely result from Defendants' action.

Plaintiffs have plausibly alleged that they will be forced to spend significant resources to avoid and mitigate the substantial harms that will result from the addition of a citizenship demand to the census. Am. Compl. ¶¶ 163–66, 175. Defendants miss the mark in arguing that Plaintiffs may not base standing on such expenditures. Defs.' Mem. at 19. As the Supreme Court made clear in *Clapper*, Plaintiffs may base their standing on "reasonably incur[red] costs

---

[13] Defendants are incorrect in arguing that Plaintiffs lack standing on the ground that States might conduct intrastate redistricting based on data other than the census enumeration. Defs.' Mem. at 21. This theoretical possibility does not defeat Plaintiffs' standing when all fifty states currently use the census's total population figures for intrastate redistricting. *Beazley Insurance Co. v. Ace Am. Insurance Co.*, 150 F. Supp. 3d 345, 355 (S.D.N.Y. 2015) ("a plaintiff's standing to sue is assessed based on facts existing at the time of filing suit") (internal quotation marks omitted). Indeed, the Supreme Court has recognized that injuries resulting from state mandated use of inaccurate census counts are sufficient for standing—a ruling that effectively overruled *City of Detroit v. Franklin*, 4 F.3d 1367 (6th Cir. 1993), the case on which Defendants rely. *See House of Representatives*, 525 U.S. at 330 (plaintiffs had standing based on potential impact on state and local redistricting where state was mandated to use decennial census figures).

to avoid" a substantial risk of harm.  *Clapper*, 568 U.S. at 398 n.5.  Here, Plaintiffs have

described their current and former efforts to increase census response rates, particularly among

difficult-to-count immigrant populations.  Am. Compl. ¶¶ 163–165.  And Plaintiffs have alleged

that they will need to increase those efforts, at substantial additional cost, in response to the

expected decrease in those populations' census participation due to Defendants' decision.  Am.

Compl. ¶¶ 166, 175.  Given that the Census Bureau has repeatedly confirmed the substantial risk

that a citizenship demand will depress response rates from immigrant communities, Plaintiffs'

efforts to mitigate that harm are reasonable and thus sufficient to support their standing.

> **B.    Plaintiffs' injuries are fairly traceable to Defendants' conduct because Plaintiffs would not be injured absent the addition of a citizenship demand to the census.**

To satisfy the causation requirement for Article III standing, Plaintiffs must allege

injuries that are "fairly traceable to the actions of the defendant."  *Bennett v. Spear*, 520 U.S.

154, 162 (1997).  "[T]he 'fairly traceable standard is lower than that of proximate cause,'"

*Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013), and does not require that the challenged

conduct was the but-for cause of the alleged injury, *Khodara Envtl., Inc. v. Blakely*, 376 F.3d

187, 194–95 (3d Cir. 2004).  Nor does traceability require a showing that the Defendants'

conduct directly injured the Plaintiffs.  Rather, an injury is fairly traceable to challenged conduct

so long as the conduct has a "determinative or coercive effect upon the action of" the actor who

directly causes the plaintiff's injury.  *Bennett*, 520 U.S. at 169; *see Carver v. City of New York*,

621 F.3d 221, 226 (2d Cir. 2010) ("[C]ausation turns on the degree to which the defendant's

actions constrained or influenced the decision of the final actor in the chain of causation.").

Here, Plaintiffs have satisfied the "relatively modest" burden of alleging traceability at

the pleading stage.  *Rothstein*, 708 F.3d at 92–93 (quoting *Bennett*, 520 U.S. at 171).  Plaintiffs

have alleged that Defendants' addition of the citizenship demand to the 2020 Census will

strongly influence noncitizens and immigrants to avoid or refuse to respond to the census,

thereby causing numerous harms to Plaintiffs.  Indeed, as explained *supra* in Section I.A.1.,

Defendants have affirmatively recognized this strong causal connection by consistently

acknowledging during the past forty years that a person-by-person citizenship question will

"inevitably" impede the Census Bureau's ability to count noncitizen and immigrant populations.

*FAIR*, 486 F. Supp. at 568.  Moreover, statistical experts and Defendants' own reports have

confirmed that the citizenship question will have a particularly strong influence on noncitizens'

and immigrant populations' nonresponse rates in light of unprecedented levels of anxiety among

such groups.  Am. Compl. ¶¶ 50–52, 79, 84, 88.  These allegations amply support Plaintiffs'

showing of causation.  *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74–78

(1978) (finding causal influence of challenged conduct on industry third party based on

testimony from industry officials confirming connection).

Defendants claim that Plaintiffs have not "provide[d] any reason to conclude" that

individuals will choose not to participate in the census based on the citizenship question, as

opposed to other factors.  *See* Defs.' Mem. at 15.  But Plaintiffs specifically alleged that the

citizenship question in particular will exacerbate nonresponse rates, Am. Compl. ¶ 52, and

Defendants' argument that other factors may also influence nonresponse rates raises factual

disputes that cannot properly be resolved on a motion to dismiss.  *See Fair Hous. in Huntington

Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 363 (2d. Cir. 2003).

In any event, even if other factors may influence nonresponse rates, Plaintiffs are not

required to allege that the citizenship question is the proximate or but-for cause of their alleged

injuries.  *Khodara Envtl.*, 376 F.3d at 195.  Rather, it is sufficient for Plaintiffs to plead that

Defendants' conduct will contribute to the alleged harms.  *Massachusetts v. EPA*, 549 U.S. 497,

523–25 (2007) (finding standing where challenged conduct was one of several causes of plaintiffs' injuries); *Rothstein*, 708 F.3d at 93 (finding standing where challenged conduct was one of many sources of funding supporting terrorist activity); *City of Perry v. Proctor & Gamble Co.*, 188 F.Supp.3d 276, 284–85 (S.D.N.Y. 2016).

Relying on *Clapper*, Defendants also assert that Plaintiffs have not adequately alleged causation because the alleged harms are attributable "to the independent decisions of third parties who disregard their legal duty to respond to the census" rather than the citizenship question. Defs.' Mem. at 1, 19–20, 20 n.10.[14]  But Defendants' argument is unavailing for multiple reasons.  First, *Clapper* was decided on a motion for summary judgment and thus demanded a higher evidentiary showing than the showing required of Plaintiffs at the pleading stage. *Clapper*, 568 U.S. at 411–412.  Second, the causal chain at issue in *Clapper* is far more attenuated than the causal chain alleged here.  In *Clapper*, the plaintiffs' allegations of harm from surveillance rested on speculation about multiple events in a long causal chain, including decisions by courts over which the defendants had no influence.  *Id.* at 411–14.  No such long and speculative causal chain exists here, where Defendants have consistently emphasized that a citizenship demand will suppress census response rates from immigrants.

Indeed, Defendants' own policies and procedures further confirm that the harm Plaintiffs identified here—reduced response rates—is fairly traceable to Defendants' conduct. Specifically, the Census Bureau's policies and procedures recognize that simply phrasing a

---

[14] Defendants have made contradictory statements regarding the obligation to answer questions on the decennial census.  Specifically, Attorney General Jefferson Sessions publicly stated that those who are afraid "don't have to answer" the question.  *Senate Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on the F.Y. 2019 Funding Request for the Justice Department*, 115th Cong. 21 (Apr. 25, 2018). These public statements by the head of the agency tasked with enforcing the legal requirement to respond to the census undermine Defendants' argument that any increase in census nonresponse is "attributable" to the independent decisions of third parties who disregard their legal duty to respond.

census question in a certain way, let alone adding an entirely new question, may significantly lower response rates. And to prevent such harms, the Census Bureau is required to follow federally promulgated quality-control procedures, including extensive testing and analysis of changes to the census questions. *See infra* Section II.B.3. Yet Defendants did not comply with these testing and evaluation requirements before adding a citizenship question to the census. Plaintiffs have thus plausibly alleged causation when Defendants failed to follow their own procedures designed to defend against the precise harm that Plaintiffs allege a citizenship question will cause.

## II.    The Secretary's decision to add a citizenship demand to the census is not exempt from judicial review.

### A.    Plaintiffs' challenge does not pose a political question.

Defendants argue (Defs.' Mem. at 21–26) that the Court lacks authority to review the constitutionality of the Secretary's decision to add a citizenship demand because this decision raises a political question outside the purview of judicial review. Defendants' argument is meritless. Plaintiffs' challenge to the citizenship question does not present one of the rare and extraordinary cases in which the judicial branch is precluded by the political question doctrine from fulfilling its role in our constitutional system of checks and balances. *See U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458 (1992).

Under the political question doctrine, courts lack authority to resolve questions where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political branch," or where there is "a lack of judicially discoverable and manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217 (1962). With respect to the latter, Section II.B., *infra*, details the many "judicially discoverable and manageable standards" governing this action.

With respect to the former, controlling precedent demonstrates that the Clause does not

bar the courts from reviewing the Secretary's decision to add a citizenship question to the census—a decision that the Census Bureau has long acknowledged will undermine the accuracy of the enumeration.  Rather, courts have the authority and responsibility to ensure that census-related decisions, at minimum, bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, obtaining an accurate count of the population in each state.  *Wisconsin*, 517 U.S. at 20; *see Utah*, 536 U.S. at 478 (explaining Framers' "strong constitutional interest in accuracy" for the enumeration); *FAIR*, 486 F. Supp. at 567 (noting that enumeration is "straightforward head count, as accurate as is reasonably possible").  That standard is plainly violated when the Census Bureau pursues a course of action that, as alleged here, will lead to an undercount by deterring particular populations from responding.  This Court may thus determine whether the Secretary exceeded his discretion by adding a question that the Census Bureau has determined would undermine the accuracy of the enumeration.

To be sure, the Enumeration Clause gives Congress considerable discretion over the census by providing that the enumeration shall be conducted "in such Manner as [Congress] shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  But the text and history of this provision provide "no indication . . . why, within the federal government, it should be the exclusive responsibility of Congress" to conduct the census to the extent that its discretion would be limitless "and not subject to judicial review."  *City of Philadelphia*, 503 F. Supp. at 674.  Indeed, although the Framers provided Congress with discretion over the census, they "also intended to extend the authority of the judicial branch . . . to those controversies which concern the execution of the provisions expressly contained in the articles of the Union"—including the Enumeration Clause.  *Carey*, 508 F. Supp. at 411.  Courts have thus routinely adjudicated census-related matters and

rejected arguments that the conduct of the census is textually committed solely to Congress.  *See, e.g.*, *Carey*, 637 F.2d at 838 (political question doctrine did not bar plaintiffs' challenge to manner of conducting the census); *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 95 (D.D.C. 1998) (three-judge court) (confirming that census is not textually committed to Congress and recognizing that "[c]ourts routinely adjudicate these matters"), *aff'd* 525 U.S. 316 (1999); *City of Philadelphia*, 503 F. Supp. at 674 (Enumeration Clause does not reflect a textually demonstrable commitment to Congress); *see also Wesberry*, 376 U.S. at 6–7 (rejecting argument that similar language in the Elections Clause creates a nonjusticiable political question).[15]

Defendants argue that the Enumeration Clause distinguishes between the "manner" of conducting the census and the "person-by-person headcount of the population," with only the former being justiciable.  Defs.' Mem. at 21.  But Defendants' attempt to characterize Plaintiffs' claims as merely challenging the "manner" of conducting the enumeration cannot be squared with the complaint's allegations.  Plaintiffs' constitutional claim here is not some technocratic dispute over whether some method is better than another at enumerating the population; it is instead that Defendants acted precisely contrary to their duty to conduct a person-by-person count of whole persons in every state.  Defendants' characterization of this choice as affecting only the "manner" of conducting the census thus ignores the fact that Defendants' demand for citizenship information represents an abdication of their core responsibility to pursue an accurate enumeration—rather than a disagreement over the best way to accomplish that responsibility.

In any event, Defendants' argument presents a false dichotomy.  The two phrases within

---

[15] Although challenges to the conduct of the census differ from challenges to redistricting decisions, courts considering census challenges have found that the census "provides the foundation for apportionment and redistricting and, therefore, the precedents sustaining challenges to congressional redistricting should afford a predicate for finding [challenges to the census] justiciable."  *Carey*, 508 F. Supp. at 411.

the Enumeration Clause are inextricably intertwined because many changes to the "manner" of the census would impede the "person-by-person headcount."  Indeed, Defendants concede that challenges to "calculation methodologies" and the "method[s] used to count" respondents are justiciable (Defs.' Mem. at 25), but such challenges also address the "manner" of the census under Defendants' own dictionary definitions of that term, *see* Defs.' Mem. at 23 n.11.  There is thus no textual or doctrinal support for Defendants' novel theory that only some Enumeration Clause challenges to the census (i.e., all challenges except this one) are justiciable.

Moreover, Defendants' contention that challenges to the "manner" of the census are entirely committed to Congress's discretion is at odds with the history and purpose of the Enumeration Clause.  As explained in Section II.B.2., *infra*, the Framers were principally concerned with ensuring an accurate enumeration to protect against political manipulation of apportionment and taxation decisions.  Distinguishing between the actual enumeration and the manner by which this actual enumeration is conducted, as Defendants urge, would open the door to precisely the type of political manipulation that the Framers sought to prevent.

**B.   There are meaningful and judicially manageable standards that permit review of the Secretary's demand for citizenship information.**

Defendants cannot establish that the Secretary's decision, taken in direct contravention of statutory and administrative procedures, is outside the scope of judicial review.  Defendants incorrectly contend that there are no judicially manageable standards by which to assess the Secretary's decision-making and therefore judicial review is barred under both the political question doctrine and the Administrative Procedure Act ("APA").  *See* Defs.' Mem. at 26–30.  However, the plain statutory language, overarching statutory and constitutional objectives, detailed guidelines for changing the census questionnaire, and decades of settled precedent all confirm that there is ample law with which to judge Defendants' exercise of discretion.

22

Accordingly, Defendants cannot meet their "heavy burden" of overcoming the "strong

presumption favoring judicial review of administrative action" under the APA, nor can they

demonstrate an absence of "judicially manageable standards" pursuant to the political question

doctrine.[16]  *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016).

Section 701(a)(2) of the APA exempts a narrow class of agency actions from judicial

review only where those actions are "committed to agency discretion by law."  5 U.S.C.

§ 701(a)(2).  Agency actions are insulated from review under section 701(a)(2) only in those

"rare instances" in which a statute is drawn so broadly that "there is no law to apply."

*Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015) (internal

citation omitted).  Similarly, the political question doctrine precludes judicial review where there

is "a lack of judicially discoverable and manageable standards" for assessing an agency's action.

*Baker*, 369 U.S. at 217.  In assessing whether there is "law to apply" such that a court may

review an agency's exercise of discretion, courts look to the statutory text, the structure and

objectives of the statutory scheme, and informal agency guidance that governs the challenged

action.  *See Salazar*, 822 F.3d at 76; *NRDC v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

### 1.  The plain language of the Constitution and Census Act suggest that judicial review is appropriate.

The plain language of the Census Act weighs heavily in favor of judicial review.  The

Act does not expressly state that the Secretary's census-question decisions are beyond judicial

review, even though Congress knows how to exempt an agency's actions from review when it

intends that result.  *See, e.g.*, 21 U.S.C. § 365a(q)(3) (Federal Food, Drug, and Cosmetic Act)

("The determination of priorities for the review of tolerances and exemptions pursuant to this

---

[16] To the extent that there is "law to apply" pursuant to the APA, there are also "judicially manageable standards" pursuant to this prong of the political question doctrine.  Accordingly, Plaintiffs' discussion in this Section will focus primarily on the APA standard.

subsection is not a rulemaking and shall not be subject to judicial review.").  Nor does the

Census Act implicitly suggest that the Secretary has limitless discretion over the census.  To the

contrary, the Act uses mandatory language that reflects that the census is not entirely committed

to agency discretion, providing that the Secretary "*shall* . . . take a decennial census . . . in such

form and content as he may determine," 13 U.S.C. § 141(a), and "*shall* determine the inquiries"

for the census," *id.* at § 5; *see also id.* at § 141(b) ("tabulation of total population by States . . .

shall be completed within 9 months after the census date").  The mandatory nature of the

Secretary's obligations vis-à-vis the census counsels in favor of judicial review.  *Mach Mining,*

*LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (Title VII's directive that the EEOC "shall" conduct

informal conciliation to resolve complaints used mandatory language and was reviewable);

*Salazar*, 822 F.3d at 77 (student loan law mandating that Secretary "shall" take certain actions

was subject to judicial review because "mandatory, non-discretionary language creates

boundaries and requirements for agency action and shows that Congress has not left the decision

. . . to the discretion of the agency").[17]

Defendants ignore this mandatory language and rely on the Census Act's statement that

the Secretary shall conduct the census "in such form and content as he *may* determine."  Defs.'

Mem. at 27 (quoting 13 U.S.C. § 141(a)) (emphasis added).  But the Act's use of the term "may"

simply provides the Secretary with discretion over the form and content of the census.  It does

---

[17] Contrary to Defendants' contention (Defs.' Mem. at 27–28), the Census Act's routine use of the term "may" does not provide the Secretary with discretion as broad as that allowed to the Director of Central Intelligence in *Webster v. Doe*, 486 U.S. 592 (1988).  In *Webster*, the Court determined that § 701(a)(2) barred APA review of the CIA's decision to terminate an employee where the applicable statute provided that the Director "may, in his discretion" terminate an employee whenever he "deem[s] such termination necessary."  486 U.S. at 594.  But the Census Act contains "[n]o language equivalent to 'deem . . . advisable'" and thus provides "no indication" that Congress intended to vest the Secretary with total discretion over the census. *Franklin v. Massachusetts*, 505 U.S. 788, 817 (1992) (Stevens, J., concurring in part); s*ee Massachusetts v. Mosbacher*, 785 F. Supp. 230, 262 (D. Mass. 1992), *rev'd on other grounds sub nom. Franklin v. Massachusetts*, 505 U.S. 788 (1992) (distinguishing *Webster*).

not remotely suggest that Congress provided the Secretary with limitless and unreviewable discretion over the census's form and content.  Indeed, the Census Act separately frames the Secretary's specific obligations vis-à-vis the questionnaire in mandatory terms.  *Id.* at § 5 ("The Secretary *shall* prepare questionnaires, and *shall* determine the inquiries, and the number, form, and subdivisions thereof, for the . . . censuses provided for in this title.").[18]  The mandatory nature of the Secretary's obligations with respect to the census and the inquiries contained therein counsel in favor of judicial review.

### 2. The statutory and constitutional objectives undergirding the Census Act provide a judicially manageable standard by which courts may review the Secretary's decision.

Underpinning the Census Act and the Enumeration Clause of the Constitution is a guiding principle that cabins agency discretion—namely, that agency actions in service of enumeration must pursue accuracy.  The Census Act and the Constitution require the Secretary to perform a "tabulation of the total population" and an "actual enumeration" of "the whole number of persons in each state."  13 U.S.C. § 141(b); U.S Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  "Necessarily implicit in the Census Act is the command that the census be accurate." *City of Willacoochee*, 556 F. Supp. at 555; *see also Utah*, 536 U.S. at 478 (the Enumeration Clause and the Framers' intent behind it, "suggest a strong constitutional interest in accuracy"); *Franklin v. Massachusetts*, 505 U.S. 788, 819–20 (1992) (Stevens, J. concurring) ("[T]he Secretary's discretion is constrained by the requirement that she produce a tabulation of the 'whole number of persons in each State. . . .  This statutory command also embodies a duty to

---

[18] The legislative history of § 141(a) of the Census Act confirms this interpretation.  *See Franklin*, 505 U.S. at 816 n.16 (Stevens, J., concurring in part) ("It was not until 1976 that Congress added the language, 'in such form and content as [s]he may determine.'  To the extent that the argument for unreviewability depends on this phrase, it requires the conclusion that when Congress amended the statute in 1976, it intended to effect a new, unreviewable commitment to agency discretion.  There is no support for this position whatsoever.").

conduct a census that is accurate[.]").

Accordingly, as the Supreme Court has explained, the basic inquiry is whether the Secretary has violated his constitutional obligations by taking an action that bears no "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind" the census's core constitutional purpose of obtaining as accurate a population count as possible. *See Wisconsin*, 517 U.S. at 20.  While the Secretary has significant latitude to decide which census methods and questions are more likely to achieve accuracy, the courts are perfectly capable of determining when the Secretary exceeds the bounds of this discretion by taking an action that will affirmatively *undermine* rather than support the accuracy of the enumeration. *See Wisconsin*, 517 U.S. at 20.  This mandate to pursue accuracy rather than undermine it provides a court with sufficient "law to apply" for the purposes of judicial review.  *See* Defs.' Mem. at 24, 28–29.

Indeed, the history and underlying purpose of the census confirm that courts play a critical and manageable role in determining whether the Secretary has abdicated his responsibility to pursue an accurate headcount.  The Enumeration Clause, with its focus on total population, was promulgated to avoid the census being used as a tool for political manipulation. *See Utah*, 536 U.S. at 478; *see also id.* at 503 (Thomas, J., concurring and dissenting in part) (explaining that the Framers' "principle concern was that the Constitution establish a standard resistant to manipulation"); *cf. Evenwel v. Abbott*, 136 S. Ct. 1120, 1142 (2016) (recognizing that the decennial census "tallies total population," which is a statistic "more reliable and less subject to manipulation and dispute than statistics concerning eligible voters").[19]  This anti-manipulation

---

[19] There is no merit to the argument of Defendants' amici that the Plaintiffs' claims here are inconsistent with the arguments made in an amicus brief filed by New York and other Plaintiff States in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).  *See* Br. of Oklahoma, et al., at 17–18 (Docket No. 162); Br. of Project on Fair Representation, at 8–11

purpose would be severely undermined if Defendants are allowed to take an action that they have concluded would affirmatively undermine the enumeration's accuracy and then insulate that action from any judicial review.  Indeed, such a result would permit Defendants to alter the census questions in any way, "regardless of bias, manipulation, fraud or similarly grave abuse"— i.e., "exactly the type of conduct and temptation the Framers wished to avoid."  *City of Philadelphia*, 503 F. Supp. at 675.  This Court should not countenance such a result, particularly when the "reviewability of decisions relating to the conduct of the census bolsters public confidence in the integrity of the process and helps strengthen this mainstay of our democracy." *Franklin*, 505 U.S. at 818 (Stevens, J., concurring).

As Defendants note, precise numerical accuracy in the census is likely impossible; however, absent the *pursuit* of accuracy, the statutory and constitutional directive to conduct an actual enumeration rings hollow.  *Cf. Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("Even when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal.").  The pursuit of accuracy provides the Court with a judicially manageable standard that acknowledges the substantial discretion accorded to the Secretary, but likewise recognizes that it is subject to limits.  *See Wisconsin*, 517 U.S. at 20.

---

(Docket No. 167).  *Evenwel* did not involve any census-related decision by the Secretary but rather addressed whether states are permitted to draw state legislative districts based on total population rather than eligible-voter population.  *See Evenwel*, 136 S. Ct. at 1123.  The States' amicus brief in *Evenwel* argued, in part, that drawing districts based on eligible-voter population was not feasible because the decennial census did not collect such information.  Br. for New York, et al., at 11–21.  But the States did not remotely suggest that it would be constitutional or lawful for the Secretary to attempt to obtain such information by adding a citizenship question to the decennial census. To the contrary, the States advocated for (and the Supreme Court ultimately upheld) their practice of using total population to draw state legislative uniform districts.

3.   **Changes to the census questionnaire are governed by a substantial body of statutory and administrative requirements that provide standards by which the courts may review Defendants' conduct.**

Curiously, Defendants entirely fail to mention the substantial body of statutory and administrative guidance that set clear limits on, and procedures for, changing the census questionnaire.  The Census Act itself sets mandatory timelines that govern changes to the questionnaire.  The Act requires that the Secretary "shall submit" to Congress "a report containing the Secretary's determination of the subjects proposed to be included" in the census three years before the decennial census (that is, before April 1, 2017).[20]  13 U.S.C. § 141(f)(1).  Absent "new circumstances" that "necessitate" a change in subjects of inquiry, this requirement limits the Secretary's discretion to add new topics to the questionnaire.  *Id.* at § 141(f)(3).

Moreover, federal statutory and administrative requirements expressly circumscribe the Secretary's discretion in adding questions to the decennial census.  *See Salazar*, 822 F.3d at 76 (recognizing that agency guidance "can provide a court with law to apply").  The Information Quality Act, for example, mandates that agencies adopt procedures for maximizing the "quality, objectivity, utility, and integrity" of data gathered by the federal government.[21]  *See* Consolidated Appropriations Act, 2001, Pub. L. No. 106–554, § 515(a), 114 Stat. 2763 (Dec. 21, 2000); *see also* 44 U.S.C. § 3506(e)(4) (obligating agencies, including the Census Bureau, to "observe Federal standards and practices for data collection, analysis, documentation, sharing, and

---

[20] Defendants' contention that these statutorily required reports imply that Congress foreclosed the courts from "second-guessing [the Secretary's] judgment as to the contents of the census questionnaire," *see* Defs.' Mem. at 30, is unsupportable.  "Congress exercises oversight over all agencies, gets reports from many, and is often consulted by the executive branch before specific actions are taken," but these facts are "insufficient evidence to overcome the presumption in favor of judicial review."  *Armstrong v. Bush*, 924 F.2d 282, 292 (D.C. Cir. 1991).

[21] The amicus brief filed by the Federation for American Immigration Reform ("FAIR") (Docket No. 175) contends that there is no private right of action to enforce the IQA, and that therefore, Plaintiffs cannot complain of Defendants' failure to seek accuracy.  However, unlike each of the cases cited by FAIR, Plaintiffs do not allege a free-standing right of action arising out of the IQA.

dissemination of information").  And both the Office of Management and Budget ("OMB") and the Census Bureau have promulgated detailed protocols setting quality standards and directing how changes to instruments like the census must be analyzed and tested.

OMB guidance sets specific standards for federal statistical agencies such as the Census Bureau.[22]  This guidance mandates that the Census Bureau "be independent from political and other undue external influence" and provide "objective" and "accurate" information.  *See* OMB Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610, 71,611–12 (Dec. 2, 2014).  OMB specifically calls for agencies to design surveys, including the census, "to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs,"  OMB Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys, § 1.3 (2006), *available at* https://goo.gl/83gdr4 (2006), and to pretest survey components to ensure accuracy and reliability.  *See id.* at §§ 1.4, 2.3.1.

Likewise, the Census Bureau's own administrative guidance sets forth a detailed process for vetting census questions to ensure that they maintain the accuracy of the actual enumeration. *See* U.S. Census Bureau, *Statistical Quality Standards* (2013), *available at* https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf (July 2013).  The Bureau's Quality Standards require that changes to the census, including new questions, be pretested with the public in order to avoid "confusion," "misinterpretation," and "a loss of information."  *Id.* at A2. In addition to testing the content of questions, the Quality Standards direct the Census Bureau to

---

[22] The Director of the Office of Management Budget sets "policies, standards, and guidelines" that govern statistical methods across the federal government.  *See* 44 U.S.C. § 3504(e)(3).

pretest "order/context effects, skip instructions, formatting, [and] navigation." *Id.* at A2–3.3. These standards expressly obligate the Bureau to ascertain if questions are "unduly sensitive" or cause "undue burden"—factors that could depress response rates. *Id.* at A2–3.3(1)(d), (2)(c).[23]

These requirements provide ample "law to apply" in assessing whether the Secretary abused his discretion. Plaintiffs allege that the Secretary's decision to demand citizenship information was done without any testing at all, in clear contravention of the Census Bureau's governing policies and longstanding practice. *See* Am. Compl. ¶¶ 58–62, 63–77; *see also* Defs.' Mem. at 29 (acknowledging that "historical practice" may provide a standard by which to assess the Secretary's conduct). Accordingly, as Defendants have failed to comply with statutory and administrative procedures governing changes to the census questionnaire, their conduct may properly be reviewed. *See* 5 U.S.C. § 706(2).

### 4. Courts routinely hold that there are judicially manageable standards to apply in reviewing challenges to the census.

Given the clear statutory language, the purposes undergirding the Census Act and Enumeration Clause, and detailed directives governing changes to the census questionnaire, it is no surprise that courts have consistently rejected the federal government's efforts to insulate the census from judicial review. The vast majority of courts to consider the question have held that the rights implicated by the census process "cannot . . . be foreclosed from judicial review by operation of the Administrative Procedure Act." *Carey v. Klutznick*, 637 F.2d 834, 838–39 (2d

---

[23] Defendants' reference to the Secretary's conclusion that the citizenship question is "well tested," Defs.' Mem. at 7, ignores the Census Bureau's own recognition that "most survey results cannot be directly applied to a decennial census environment" and "thorough and separate research and integrated testing must be conducted to ensure that new methods and operations will work" in the context of the decennial census. U.S. Census Bureau, Supporting Statement For 2018 End-To-End Census Test – Peak Operations 22 (Jan. 23, 2018), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201801-0607-002 (listed as 2018 E2E Census Test Supporting Statement_A_RHOupdates.docx) (last visited June 13, 2018). Moreover, any prior testing of the citizenship demand was based on "data collected . . . in a different political climate, before anti-immigrant attitudes were as salient and consequential.'" Am. Compl. ¶ 76.

Cir. 1980).[24]

The Second Circuit's decision in *Carey* controls.  In *Carey*, plaintiffs alleged that the defendants' decisions in conducting the census—there, the Census Bureau's reliance on flawed "master address registers" and inadequate follow-up by the postal service and census workers— would cause a substantial undercount of minority voters.  *Id.* at 838.  The court held that the Bureau's procedures were reviewable under the APA, recognizing that the plaintiffs were "not merely quibbling over office procedures utilized by the Census Bureau."  *Id.*  Plaintiffs here are likewise not challenging a minor ministerial choice, but rather the Secretary's decision to add a census question that the Census Bureau has determined would harm the enumeration's accuracy, and Defendants' failure to conduct the evaluations designed to ensure that such a harm does not result.[25]

The statutory language, overarching objectives undergirding the census, substantial body of administrative guidance, and overwhelming weight of the case law all establish that there are judicially manageable standards that routinely permit courts to review challenges brought pursuant to the Census Act and the Enumeration Clause.  Under these circumstances, Defendants have not met their "heavy burden" of overcoming the "strong presumption" in favor of review,

---

[24] *See, e.g.*, *City of New York*, 713 F. Supp. at 53 ("[T]he overwhelming majority of cases considering this issue[] have concluded that § 701(a)(2) of the APA is inapplicable to the census statute") (citing cases); *District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 & n.16 (D.D.C. 1992) (noting that "almost every court that has considered the issue" has concluded that the APA does not bar judicial review of census-related decision-making); *Texas v. Mosbacher*, 783 F. Supp. 308, 315 (S.D. Tex. 1992); *Mosbacher*, 785 at 262; *City of Philadelphia*, 503 F. Supp. at 675; *City of Camden*, 466 F. Supp. at 52–53; *Borough of Bethel Park v. Stans,* 319 F. Supp. 971, 977 (W.D. Pa. 1970).

[25] Defendants' suggestion that *Carey* is distinguishable because it involved an alleged impairment of plaintiffs' right to vote, *see* Defs.' Mem. at 29, is unavailing.  In *Carey*, as here, plaintiffs alleged that a substantial and disproportionate undercount would result in a loss of congressional representation and would dilute the votes of undercounted groups.  *Carey*, 637 F.2d at 836.  Likewise, Plaintiffs here allege a loss of congressional representation, as well as an undercount of, *inter alia,* "immigrants who are citizens . . . and live in mixed immigration status households."  Am. Compl. ¶ 52; *see also* Am. Compl. ¶ 103.

and the Court should reject their efforts to shield their conduct entirely from judicial review. *Salazar*, 822 F.3d at 75. [26]

### III.   Plaintiffs have stated a claim under the Enumeration Clause.

For largely the same reasons already discussed, the Enumeration Clause permits Plaintiffs to seek review of the federal government's abdication of its constitutional obligation to pursue an accurate enumeration.  While the Secretary is vested with substantial discretion, this discretion is not unlimited; it does not include a decision to altogether abandon the pursuit of accuracy or to privilege other, non-constitutional values above it.  Defendants, in a stark and unprecedented reversal of decades of settled policy, have chosen a course of conduct that will—as Defendants have themselves acknowledged—likely compromise the accuracy of the census.  The question of whether this decision exceeds the constitutional limits of the Secretary's discretion is plainly cognizable under the Enumeration Clause.

The Supreme Court has been clear that the Secretary's discretion in conducting the decennial census is subject to constitutional limits, specifically, the requirement that the census at least aim for accuracy.  *See supra* at Section II.B.2.  Plaintiffs' challenge to the citizenship question falls well within this constitutional framework.  Plaintiffs allege that the citizenship question does not bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Wisconsin*, 517 U.S. at 19–20.  Rather, Defendants' addition of the citizenship question expressly

---

[26] Defendants misplace their reliance on *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411 (7th Cir. 1992).  *See* Defs.' Mem. at 28–29.  Unlike here, there was no suggestion in *Tucker* that the Census Bureau had not pursued accuracy.  The parties simply disagreed as to what approach would yield the most accurate results.  *Id.* at 1413.  The Seventh Circuit acknowledged that a challenge not to "statistical methodology" but to a census decision "argued to be in violation of history, logic and common sense" could provide "adequate materials for a lawlike judgment."  *Id.* Unlike *Tucker*, Plaintiffs here do not request that the court choose between reasonable statistical models; Plaintiffs seek only to hold Defendants to their statutory and constitutional mandate.

privileges a non-constitutional purpose, the purported enforcement of the vote dilution

prohibition in Section 2 of the Voting Rights Act, at the expense of the constitutional mandate to

seek accuracy.[27]  Accordingly, this case squarely presents the issue raised in *Wisconsin*, namely,

whether Defendants' action bears a reasonable relationship to accomplishing an actual

enumeration, keeping in mind the constitutional purpose of the census.  *See Wisconsin*, 517 U.S.

at 19–20.

Defendants' unprecedented conduct belies their contention that judicial review of the

citizenship question will somehow call into question centuries of demographic data gathering.

*See* Defs.' Mem. at 2, 33.  Plaintiffs contend, *inter alia*, that under present circumstances—the

stark and sudden change in policy, the long-acknowledged deterrent effect on participation rates,

the heightened fears of immigrants during this particular cultural moment, and the total failure of

the Census Bureau to follow their own testing protocols for new questions—adding the

citizenship question runs counter to the constitutional purposes underlying the enumeration.

Indeed, Defendants' total failure to test the citizenship question alone distinguishes this case

from the Census Bureau's normal practice of seeking demographic information.  *Compare* Am.

Compl. ¶¶ 58–61 (describing the nearly ten years spent testing a proposal for race/ethnicity

question on the 2020 Census).  Plaintiffs' analysis does not negate the legitimacy of collecting

standard demographic data, using typical testing protocols, in the ordinary course.  To the

contrary, it highlights the highly unusual and unprecedented nature of Defendants' decision to

---

[27] Plaintiffs have alleged that Defendants' stated rationale for demanding citizenship information is pretextual, as (1) person-by-person citizenship data have *never* been available—much less used—to enforce Section 2 of the Voting Rights Act, and (2) electronic communications sent by President Trump's reelection campaign suggest that the citizenship question was adopted for political reasons entirely unrelated to the Voting Rights Act.  *See* Am. Compl. ¶¶ 93–102.

add the citizenship question to the 2020 Census.[28]

Defendants' efforts to distinguish between this case and the many cases in which courts have considered the merits of constitutional Enumeration Clause claims are unavailing. *See* Defs.' Mem. at 25, 34. Numerous courts have considered a wide range of challenges to many aspects of the census process, from the adequacy of address registers used by the Census Bureau, *see Carey*, 637 F.2d at 836, to how to assign certain segments of the population, *see District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1180 (D.D.C. 1992), to "the manner in which" the Census Bureau conducted a pretest in a particular New Jersey city, *City of Camden*, 466 F. Supp. at 46. These cases—like the one currently before the Court—consider the overarching question of whether the Secretary has exercised his discretion in accordance with the constitutional framework. *See also, e.g.*, *Wisconsin*, 517 U.S. at 19–20; *Franklin*, 505 U.S. at 806 (dismissing APA claims on other grounds, and reviewing constitutional claims relating to counting of overseas employees to ascertain whether the "Secretary's judgment" "hamper[s] the underlying goal of equal representation").

Defendants' contention that there are no constitutional limits on the Secretary's discretion with respect to the conduct of the census or the contents of the census questionnaire is defies common sense. *See* Defs.' Mem. at 31. Under Defendants' theory, the Secretary could send out all census questionnaires only in Spanish or hire enumerators only in states that start with the letter "N." Defendants' contention would permit the Secretary to ask respondents if they had ever committed adultery or had an abortion, or to inquire as to who respondents voted for in the

---

[28] Defendants' reliance on dicta from the nearly 150-year old *Legal Tender Cases* does not alter this analysis. *See* Defs.' Mem. at 33. The *Legal Tender Cases* do not suggest that the collection of "age, sex, and production" statistics in any way impaired the accuracy of the underlying enumeration, or that the Census Bureau had failed to follow its own policies with respect to seeking those data. *Legal Tender Cases*, 79 U.S. 457, 536 (1870), *abrogated on other grounds*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302 (2002).

last Presidential election.  Such decisions would plainly violate the *Wisconsin* Court's admonition that the Secretary's decisions bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, accuracy in the count. 517 U.S. at 19–20.

While Defendants allege that the Secretary's decision is within constitutional bounds, that argument merely goes to the merits of the constitutional claim.  Defendants' repeated contention that their procedures are "comprehensive" and "wide-ranging," Defs.' Mem. at 31, within a long-standing historic tradition, *id.* at 21, and "well within [the Secretary's] discretion," *id.* at 34, are simply inappropriate to present on a motion to dismiss.  *See, e.g., Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) ("The issue is not whether a plaintiff will ultimately prevail, but whether [they are] entitled to offer evidence to support the claims.").  Indeed, the census cases relied upon by Defendants were uniformly decided on summary judgment or after trial, not on a motion to dismiss.  *See Wisconsin*, 517 U.S. 1 (decision after bench trial); *Franklin*, 505 U.S. 788 (summary judgment); *House of Representatives*, 525 U.S. 316 (summary judgment); *Utah*, 536 U.S. 452 (summary judgment).  Plaintiffs' challenge presents the unremarkable and well-established proposition that there are limits on the Secretary's discretion; whether or not the Secretary's decision to demand citizenship information falls outside of those limits should be decided on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated: June 13, 2018

Respectfully submitted,

**BARBARA D. UNDERWOOD**
**Attorney General of the State of New York**

By: */s/ Elena Goldstein*
Elena Goldstein (EG-8586)
  *Senior Trial Counsel*

Matthew Colangelo (MC-1746)
  *Executive Deputy Attorney General*
Lourdes M. Rosado (LR-8143), *Bureau Chief*
Ajay Saini (AS-7014), *Assistant Attorney*
*General*
Office of the New York State Attorney
General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6201
Elena.Goldstein@ag.ny.gov

**JOHN W. HICKENLOOPER**
**Governor of the State of Colorado**

By:   */s Jacqueline Cooper Melmed*
      Jacqueline Cooper Melmed,*
      Chief Legal Counsel
      Governor John Hickenlooper
      136 State Capitol Building
      Denver, Colorado 80203
      Jackic.melmed@state.co.us
      Tel: (303) 866-3788

**GEORGE JEPSEN**
**Attorney General of the State of**
**Connecticut**

By:   */s Mark F. Kohler*
      Mark F. Kohler,*
      Assistant Attorney General
      Connecticut Office of the Attorney
      General
      55 Elm Street, P.O. Box 120
      Hartford, CT 06106
      Mark.Kohler@ct.gov
      Tel. (860) 808-5020

**MATTHEW DENN**
**Attorney General of the State of Delaware**

By:    */s Ilona Kirshon*
Ilona Kirshon,[†]
Deputy State Solicitor
David Lyons, Deputy Attorney
General
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, Delaware  19801
Ilona.Kirshon@state.de.us
Tel.  (302)  577-8372
Fax  (302) 577-6630

**KARL A. RACINE**
**Attorney General for the District of Columbia**

By:    */s Robyn R. Bender*
Robyn R. Bender, *
Deputy Attorney General
Valerie M. Nannery,* Assistant
Attorney General
Public Advocacy Division
441 4th Street, NW
Suite 650 North
Washington, DC 20001
Robyn.Bender@dc.gov
Tel. (202) 724-6610
Fax (202) 730-0650

**LISA MADIGAN**
**Attorney General of the State of Illinois**

By:    */s Cara A. Hendrickson*
Cara A. Hendrickson,*
Chief, Public Interest Division
Karyn L. Bass Ehler,*
Chief, Civil Rights Bureau
Jeffrey VanDam,*
Assistant Attorney General
Matthew J. Martin,*
Assistant Attorney General
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
JVanDam@atg.state.il.us
Tel. (312) 814-3400
Fax (312) 814-3212

**THOMAS J. MILLER**
**Attorney General of the State of Iowa**

By:    */s Nathan Blake*
Nathan Blake,*
Deputy Attorney General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
nathan.blake@ag.iowa.gov
Tel. (515) 281-4325

**BRIAN E. FROSH**
**Attorney General of the State of Maryland**

By:    /s *John R. Grimm*
          John R. Grimm,* Assistant Attorney
          General
          Civil Litigation Division
          Maryland Office of the Attorney
          General
          200 St. Paul Place, 20th Floor
          Baltimore, Maryland 21202
          jgrimm@oag.state.md.us
          Tel. (410) 576-76339
          Fax (410) 576-6955

**MAURA HEALEY**
**Attorney General for the Commonwealth**
**of Massachusetts**

By:    /s *Jonathan Miller*
          Jonathan Miller,[†]
          Assistant Attorney General
          Miranda Cover,*
          Assistant Attorney General
          Ann E. Lynch,*
          Assistant Attorney General
          Public Protection & Advocacy Bureau
          Massachusetts Attorney General's
          Office
          One Ashburton Place
          Boston, MA 02108
          Jonathan.Miller@state.ma.us
          Mercy.Cover@state.ma.us
          Ann.Lynch@state.ma.us
          Tel. (617) 727-2200
          Fax (617) 727-5762

**LORI SWANSON**
**Attorney General of the State of Minnesota**

By:    s/ *Jacob Campion*
          Jacob Campion,*
          Assistant Attorney General
          Office of the Minnesota Attorney
          General
          445 Minnesota Street, Suite 1100
          St. Paul, Minnesota 55101-2128
          jacob.campion@ag.state.mn.us
          (651) 757-1459 (Voice)
          (651) 282-5832 (Fax)

**GURBIR S. GREWAL**
**Attorney General of the State of New**
**Jersey**

By:    /s *Rachel Wainer Apter*
          Rachel Wainer Apter*
          Assistant Attorney General
          Office of the Attorney General
          Richard J. Hughes Justice Complex
          25 Market Street, 8th Floor, West
          Wing
          Trenton, New Jersey 08625-0080
          Rachel.Apter@njoag.gov
          Tel: (609) 376-2702

**HECTOR H. BALDERAS**
**Attorney General of the State of New Mexico**

By:     */s Tania Maestas*
Tania Maestas,*
Deputy Attorney General
New Mexico Office of the Attorney
General
408 Galisteo St.
Santa Fe, NM 87501
tmaestas@nmag.gov
Tel. (505) 490-4060
Fax (505) 490-4883

**ELLEN F. ROSENBLUM**
**Attorney General of the State of Oregon**

By:     */s Brian De Haan*
Brian De Haan,†
Assistant Attorney General
Trial Attorney
Brian.A.DeHaan@doj.state.or.us
Tel. (971) 673-1880
Fax (971) 673-5000

**PETER KILMARTIN**
**Attorney General of the State of Rhode Island**

By:     */s Adam D. Roach*
Adam D. Roach,* Special Assistant
Attorney General
RI Office of the Attorney General
150 South Main Street
Providence, RI 02903
aroach@riag.ri.gov
Tel. (401) 274-4400 ext. 2490
Fax: (401) 222-2995

**JOSHUA H. STEIN**
**Attorney General of the State of North Carolina**

By:     */s Ryan Y. Park*
Ryan Y. Park,†
Deputy Solicitor General
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
RPark@ncdoj.gov
Tel. (919) 716-6400

**JOSH SHAPIRO**
**Attorney General of the Commonwealth of Pennsylvania**

By:     */s Jonathan Scott Goldman*
Jonathan Scott Goldman,*
Executive Deputy Attorney General,
Civil Law Division
Michael J. Fischer,*
Chief Deputy Attorney General,
Impact Litigation Section
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
MFischer@attorneygeneral.gov
Tel. (215) 560-2171

**MARK R. HERRING**
**Attorney General of the Commonwealth of Virginia**

By:     */s Matthew R. McGuire*
Matthew R. McGuire,*
Deputy Solicitor General
202 North Ninth Street
Richmond, VA 23219
MMcguire@oag.state.va.us
Tel. (804) 786-7240
Fax (804) 371-0200

**THOMAS J. DONOVAN, JR.**
**Attorney General of the State of Vermont**

By:     */s Benjamin D. Battles*
      Benjamin D. Battles,[†]
      Solicitor General
      Julio A. Thompson,*
      Assistant Attorney General,
      Civil Rights Unit
      Office of the Vermont Attorney
      General
      109 State Street
      Montpelier, VT 05609
      Benjamin.Battles@vermont.gov
      Tel. (802) 828-5500
      Fax (802) 828-3187

**ROBERT W. FERGUSON**
**Attorney General of the State of Washington**

By:     /s/ *Laura K. Clinton*
      Laura K. Clinton,*
      Assistant Attorney General
      Complex Litigation Division
      800 Fifth Avenue, Suite 2000
      Seattle, WA 98104
      LauraC5@atg.wa.gov
      (206) 233-3383
      Peter Gonick,
      Deputy Solicitor General
      Office of the Attorney General
      PO Box 40100
      Olympia, WA  98504-0100
      peterg@atg.wa.gov
      Tel. (360) 753-6245

**MATTHEW JERZYK**
**City Solicitor for the City of Central Falls**

By:     */s Matthew Jerzyk*
      Matthew Jerzyk,*
      City Solicitor
      City of Central Falls
      580 Broad Street
      Central Falls, RI 02863
      MJerzyk@CentralFallsRI.us
      Tel. (401) 727-7422

**EDWARD N. SISKEL**
**Corporation Counsel of the City of Chicago**

By:     */s John Hendricks*
      John Hendricks,* Deputy Corporation
      Counsel
      Andrew W. Worseck,* Chief Assistant
      Corporation Counsel
      Andrew S. Mine, Senior Counsel
      Maggie Sobota,* Senior Counsel
      Christie Starzec,* Assistant Corporation
      Counsel
      City of Chicago Law Department
      30 N. LaSalle Street, Suite 1230
      Chicago, IL 60602
      John.Hendricks@cityofchicago.org
      Andrew.Worseck@cityofchicago.org
      Andrew.Mine@cityofchicago.org
      Maggie.Sobota@cityofchicago.org
      Christie.Starzec@cityofchicago.org
      Tel. (312) 744-6975
      Fax (312) 742-3925

40

**ZACHARY M. KLEIN**
**Columbus City Attorney**

By:    */s Zachary Klein*
      Zachary M. Klein,*
      Columbus City Attorney
      Richard N. Coglianese,*
      Assistant City Attorney
      Lara N. Baker-Morrish,*
      Assistant City Attorney
      Alexandra N. Pickerill,*
      Assistant City Attorney
      77 North Front Street, 4th Floor
      zmklein@columbus.gov
      rncoglianese@columbus.gov
      lnbaker@columbus.gov
      anpickerill@columbus.gov
      Tel. (614) 645-7385
      Fax: (614) 645-6949

**ZACHARY W. CARTER**
**Corporation Counsel of the City of New York**

By:    */s Sabita Krishnan*
      Gail Rubin[†]
      Sabita Krishnan[†]
      100 Church Street
      New York, NY 10007
      grubin@law.nyc.gov
      skrishna@law.nyc.gov
      Tel. (212) 356-2030
      Fax (212) 356-2038

**MARCEL S. PRATT**
**Solicitor of the City Of Philadelphia**

By:    */s Marcel S. Pratt*
      Marcel S. Pratt,* Acting City Solicitor
      Eleanor N. Ewing,* Chief Deputy Solicitor
      Benjamin H. Field,* Deputy City Solicitor
      Michael W. Pfautz, Assistant City Solicitor
      City of Philadelphia Law Department
      1515 Arch Street, 17th Floor
      Philadelphia, PA 19102
      marcel.pratt@phila.gov
      eleanor.ewing@phila.gov
      benjamin.field@phila.gov
      Tel.  (215)683-5000
      Fax  (215)683-5299

**YVONNE S. HILTON**
**Acting City Solicitor of the City of Pittsburgh**

By:    */s Matthew S. McHale*
      Matthew S. McHale,* Associate City Solicitor
      City of Pittsburgh Department of Law
      414 Grant Street, Room 323
      Pittsburgh, PA 15219
      yvonne.hilton@pittsburghpa.gov
      Matthew.mchole@pittsburghpa.gov
      Tel. (412) 255-2015

**JEFFREY DANA**
**City Solicitor for the City of Providence**

By:     /s Jeffrey Dana
        Jeffrey Dana,*
        City Solicitor
        City of Providence
         444 Westminster Street
        Providence, RI 02903
        JDana@provosenceri.gov
        401-680-5333

**CITY OF SEATTLE**
**City of Seattle City Attorney**

By:     /s Peter S. Holmes
        Peter S. Holmes,*
        City Attorney
        Gary T. Smith, Assistant City Attorney
        701 Fifth Avenue, Suite 2050
        Seattle, WA 98104-7097
        Peter.Holmes@seattle.gov
        Gary.Smith@seattle.gov
        Tel. (206) 684-8200
        Fax (206) 684-4648

**DENNIS J. HERRERA**
**City Attorney for the City and County of San Francisco**

By:     */s Dennis J. Herrera*
        Dennis J. Herrera,* City Attorney
        Jesse C. Smith, Chief Assistant City
        Attorney
        Ronald P. Flynn, Chief Deputy City
        Attorney
        Yvonne R. Meré, Chief of Complex and
        Affirmative Litigation
        Mollie Lee,* Deputy City Attorney
        Erin Kuka, Deputy City Attorney
        Neha Gupta, Deputy City Attorney
        San Francisco City Attorney's Office
        City Hall, Room 234
        1 Dr. Carlton B. Goodlett Place
        San Francisco, CA 94102
        Mollie.Lee@sfcityatty.org
        Tel. (415) 554-4748
        Fax (415) 554-4715

**ROLANDO L. RIOS**
**Special Counsel for Hidalgo and Cameron Counties**

By:     */s Rolando Rios*
        Rolando Rios,* Special Counsel for
        Hidalgo and Cameron Counties
        115 E. Travis, Suite 1645
        San Antonio, TX 78205
        rrios@rolandorioslaw.com
        (210) 222-2102

**JO ANNE BERNAL**
**El Paso County Attorney**

By: */s Jo Anne Bernal*
   Jo Anne Bernal,* County Attorney
   Ian Kaplan,[†] Assistant County
   Attorney
   El Paso County Attorney's Office
   500 E. San Antonio, Room 503
   El Paso, TX 79901
   Joanne.bernal@epcounty.com
   Ian.kaplan@epcounty.com
   Tel. (915) 546-2050

**CHARLES J. McKEE**
**Monterey County Counsel**

By: */s Charles J. Mckee*
   Charles J. Mckee, County Counsel
   William M Litt., Deputy County
   Counsel
   Office of the County Counsel
   County of Monterey
   168 West Alisal St., 3rd Fl.
   Salinas, CA 93901
   McKeeCJ@co.monterey.ca.us
   LittWM@co.monterey.ca.us
   Tel. (831) 755-5045
   Fax (831) 755-5283

**UNITED STATES CONFERENCE OF MAYORS**

By: /s John Daniel Reaves
   John Daniel Reaves*
   General Counsel
   United Conference of Mayor
   1200 New Hampshire Avenue, NW
   Third Floor
   Washington, D.C. 20036
   jdreavesoffice@gmail.com
   Tel. (202) 974-5931

[†] Admitted in the S.D.N.Y.
*Seeking or obtained *Pro hac vice* admission