**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>Defendants. | No. 1:18-cv-2921 (JMF) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I. THIS CASE IS NOT JUSTICIABLE ............................................................................................1

    A. Plaintiffs Lack Standing to Maintain this Action. .............................................................1

    B. Plaintiffs' Suit is Barred by the Political Question Doctrine. ..........................................7

    C. The Secretary's Decision Is Not Subject to Judicial Review under the
        Administrative Procedure Act. ........................................................................................10

II. PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM .......................13

# TABLE OF AUTHORITIES

## CASES

*Baur v. Veneman,*
  352 F.3d 625 (2d Cir. 2003) ....................................................................................... 4, 5

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..................................................................................................... 2

*Brito v. Mukasey,*
  521 F.3d 160 (2d Cir. 2008) .......................................................................................... 3

*Butler v. Obama,*
  814 F. Supp. 2d 230 (E.D.N.Y. 2011) ........................................................................... 3

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980) .......................................................................................... 8

*City of New York v. U.S. Dep't of Commerce,*
  713 F. Supp. 48 (E.D.N.Y. 1989) .................................................................................. 5

*City of Perry v. Procter & Gamble Co.,*
  188 F. Supp. 3d 276 (S.D.N.Y. 2016) ........................................................................... 2

*City of Phila. v. Klutznick,*
  503 F. Supp. 663 (E.D. Pa. 1980) ............................................................................ 8, 12

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .................................................................................................. 3, 4

*Duke Power Co. v. Carolina Envt'l Study Grp., Inc.,*
  438 U.S. 59 (1978) ....................................................................................................... 2

*Family Farm All. v. Salazar,*
  749 F. Supp. 2d 1083 (E.D. Cal. 2010) ........................................................................ 12

*Fed'n for Am. Immigration Reform v. Klutznick,*
  486 F. Supp. 564 (D.D.C. 1980) ................................................................................... 6

*Glavin v. Clinton,*
  19 F. Supp. 2d 543 (E.D. Va. 1998), *aff'd sub nom,*
  *Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316 (1999) ..................... 6

*Haas v. Gutierrez,*
  2008 WL 2566634 (S.D.N.Y. June 26, 2008) ............................................................... 13

*Habitat for Horses v. Salazar,*
  2011 WL 4343306 (S.D.N.Y. Sept. 7, 2011) ................................................................ 12

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1996) .............................................................................................................10

*Khodara Envt'l, Inc. v. Blakey*,
    376 F.3d 187 (3d Cir. 2004) ...................................................................................................2

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................................2

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................................................7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ................................................................................................................2

*McConnell v. Federal Election Comm'n*,
    540 U.S. 93 (2003) ..................................................................................................................1

*Ross v. AXA Equitable Life Ins. Co.*,
    115 F. Supp. 3d 424 (S.D.N.Y. 2015), *aff'd*, 680 F. App'x 41 (2d Cir. 2017) ......................5

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ......................................................................................................2

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) ....................................................................................................11

*Salt Inst. v. Leavitt*,
    440 F.3d 156 (4th Cir. 2006) .................................................................................................12

*Salt Inst. v. Thompson*,
    345 F. Supp. 2d 589 (E.D. Va. 2004), *aff'd*, 440 F.3d 156 (4th Cir. 2006) .........................13

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ....................................................................................................10

*Sharrow v. Brown*,
    447 F.2d 94 (2d Cir. 1971) ......................................................................................................6

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .............................................................................................................3

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ..................................................................................................................8

*Taylor v. Bernanke*,
    No. 13-CV-1013 (ARR), 2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013) .................................3

*U.S. Dep't of Commerce v. Montana*,
    503 U.S. 442 (1992) ............................................................................................5

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
    11 F. Supp. 2d 76 (D.D.C. 1998), *aff'd*, 525 U.S. 316 (1999) ...........................8

*Westchester v. U.S. Dep't of Hous. & Urban Dev.*,
    778 F.3d 412 (2d Cir. 2015) .............................................................................10

*Wisconsin v. City of NY*,
    517 U.S. 1 (1996) ...............................................................................................9

*Zeller v. United States*,
    467 F. Supp. 487 (E.D.N.Y. 1979)...................................................................13

## UNITED STATES CONSTITUTION

U.S. Const. art. I § 2 ...................................................................................................7

## STATUTES

5 U.S.C. § 701 ..................................................................................................... 10, 13

13 U.S.C. § 5 ............................................................................................................11

13 U.S.C. § 141 ................................................................................................. 11, 12

13 U.S.C. § 221 ..........................................................................................................2

20 U.S.C. § 1087 .....................................................................................................11

## OTHER AUTHORITIES

2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.3.0),
    https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-
    docs/2020-oper-plan3.pdf5 U.S.C. § 701 ..........................................................4

Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected
    Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm.
    on Gov't Reform, 109th Cong. 128 (2005), 20 U.S.C. § 1087(c)(1) .....................3

Election Data Services, Some Changes in Apportionment Allocations With New 2017 Census
    Estimates; But Greater Change Likely by 2020 (Dec. 26, 2017),
    https://www.electiondataservices.com/wp-content/uploads/2017/12/
    NR_Appor17c3wTablesMapsC2.pdf.20 U.S.C. § 1087(c)(1) ...............................5

In opposing Plaintiffs' attempt to invalidate the Secretary's reinstatement of a citizenship question on the decennial census questionnaire, Defendants set forth the multiple reasons this case is not justiciable, and explained why the Court should not second-guess the Secretary's judgment regarding his exercise of authority that was delegated to him by the Constitution through Congress. Plaintiffs' opposition does nothing to dispel these justiciability concerns.  In particular, Plaintiffs fail to show why third parties' illegal choices in failing to respond to the census should be fairly attributed to Defendants. Their arguments with regard to injury also do nothing more than underscore the speculative and uncertain nature of the claimed increase in the undercount and alleged consequences. As for their remaining arguments concerning the Court's power to review and the existence of an Enumeration Clause claim, Plaintiffs suggest that any decision about the manner of implementing the census that does not "pursue accuracy" and will likely lead to an undercount is illegal. But neither the Constitution nor the Census Act says any such thing; the census need not pursue maximum accuracy at the expense of other important goals, and there are no workable standards that restrict the Defendants' discretion to achieve other legitimate ends at the same time, even if that incidentally impairs accuracy. For these reasons, and those set forth in Defendants' previous memorandum, this case should be dismissed.

## I.     THIS CASE IS NOT JUSTICIABLE

### A.     Plaintiffs Lack Standing to Maintain this Action.

Plaintiffs fundamentally err in contending that their alleged injuries are "fairly traceable" to Defendants' decision to simply reinstate a question on the census questionnaire. *See* Pls.' Opp'n at 16-19 [Dkt. No. 182]. Rather, their alleged injuries are properly attributable to third parties who violate their legal duty to respond to the census. Such *unlawful* action cannot "fairly" be attributable to the government's otherwise-lawful decision merely to ask a question. *Cf. McConnell v. Federal Election Comm'n*, 540 U.S. 93, 228 (2003) (holding that a plaintiff's self-inflicted injury based on their own "personal choice" was not fairly traceable to the defendant). In other words, the unlawful acts of third

1

parties should not disable the government from obtaining valuable information. The Second Circuit's decision in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), on which plaintiffs rely, is distinguishable because the chain of causation in that case involved illegal acts *both* by third parties (Iran/Hezbollah/Hamas) and also *by the defendant*, which had admitted its illegal conduct. *See id.* at 93 (complaint alleged that defendant bank "in violation of United States laws, . . . provided Iran with hundreds of millions of dollars in cash—transactions that UBS has publicly acknowledged"). Moreover, the very purpose of the laws violated by the bank was to prevent the acts of terrorism that ultimately ensued.[1] Here, in contrast, there is nothing illegal or even inherently wrongful about asking a question on the census form, so third parties' illegal choices not to respond are simply that, individual choices, and not consequences fairly attributable to the government.

"When … a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). In such cases, the inquiry is whether the government's actions created a "determinative or coercive effect upon the action of" those third parties. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Here, Defendants' actions do not impose a "determinative or coercive" effect causing persons *not* to respond to the census; quite the contrary—the statute attempts to "coerce" persons *to respond to* the census, by imposing a legal obligation to do so.[2] 13 U.S.C. § 221. Given the statutory scheme *requiring* persons to respond to the

---

[1] The other cases cited by Plaintiffs are also inapt. This case does not involve lawful responses by third parties to regulatory action (or inaction), *see Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (EPA decision not to regulate emissions from new motor vehicles); *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 76-78 (1978) (limitation on liability for nuclear accidents), or the responses of third parties to deliberate marketing (that wipes are "flushable") conducted by defendants, *see City of Perry v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 285 (S.D.N.Y. 2016). Nor do Plaintiffs allege that there are two separate causes of their injury, *see Khodara Envt'l, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) (sufficient causation because "Article III allows Eagle to challenge each obstacle separately").

[2] That legal duty is not affected by government statements that respondents can choose not to answer the citizenship question. *See* Pls.' Opp'n at 18 n.14. To be sure, the legal duty to respond applies to each individual question; however, no one has implied that households can refuse to answer the basic enumeration questions (regarding numbers of persons) on the census.

census, actions by individuals in violation thereof cannot be "fairly" attributable to the government.

Plaintiffs' opposition also fails to show that they have met their burden to plead an injury that is "both concrete *and* particularized," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), and "*certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs' attempt to cast the likelihood of their potential injury as a "strong" (Pls.' Opp'n at 8) is unavailing—their claimed injuries of future lost funding or representation, occurring more than two years in the future after an unknown number of people in unknown jurisdictions fail to be enumerated, do not rise above the speculative level.  Plaintiffs have not alleged concrete grounds for concluding that there will be a differential increase in the undercount, after *all* operations for the 2020 census are completed, and that this putative increase will *actually* affect their representation or funding. Their chain of speculation is thus insufficient to establish an injury that satisfies Article III. *See Brito v. Mukasey*, 521 F.3d 160, 168 (2d Cir. 2008) ("Because [the plaintiff] alleges only a potential for [injury] that has not yet occurred and because that potential is born of nothing more than hypothesis and conjecture, [the plaintiff] lacks standing …."); *Taylor v. Bernanke*, 2013 WL 4811222, at *7 (E.D.N.Y. Sept. 9, 2013) (plaintiffs' allegations that they faced "increasing risk of loss of their bank deposits" "is too speculative to confer standing"); *Butler v. Obama*, 814 F. Supp. 2d 230, 238 (E.D.N.Y. 2011) (plaintiff "has failed to demonstrate a concrete injury based on the possibility that, in 2014, he may have to purchase insurance under the individual mandate or pay a fine").

Plaintiffs contend that it is not too speculative whether there will be a decreased response from reinstatement of a citizenship question sufficient to create an injury-in-fact, citing numerous statements made by government or former government officials over the years. Pls.' Opp'n at 6-7. But these statements are generally unsupported by any hard data, *see, e.g.,* Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform, 109th Cong. 128 (2005), and the repetition and audience for such statements do not make them any less speculative.

3

Moreover, Plaintiffs fail to understand the distinction between "self-response," which occurs when a household responds online or returns the paper questionnaire, and "response," which includes both self-response *and* response obtained through follow-up methods known as "non-response followup" undertaken by the Census Bureau to obtain "responses" when self-response does not occur. The estimated decrease mentioned by the Secretary in his decision memo (Pls.' Opp. at 7 n.3) refers to an estimated decrease in the initial *self*-response rate, not in the total "final" response. *See* A.R. 1319 (stating that one-half percent represents the increase *in non-response followup*). That the "self-response" rate may decrease after reinstatement of a citizenship question does not necessarily mean that the *final* response rate may decrease. As always, the Census Bureau is committed to a comprehensive non-response followup strategy to obtain responses from households that do not self-respond, involving attempts to contact households in person, additional mailings, use of proxies, or use of administrative data. *See generally* 2020 Census Operational Plan: A New Design for the 21st Century (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf. These plans are not some vague "promises" that harm will not occur, made only after the onset of litigation, as alleged by Plaintiffs. Pls.' Opp'n at 10. To the contrary, the Census Bureau has decades of experience in non-response follow-up operations, has developed detailed plans for such operations in the 2020 Census, and continues to test, add to, and refine its plans. Any potential decrease in self-response rate attributable to a citizenship question is also well within the Census Bureau's cost projections. Plaintiffs have not shown, or even alleged, that these efforts will not be successful in offsetting any possible decrease in the initial self-response.

Plaintiffs' reliance on footnote 5 in *Clapper*, 568 U.S. at 414 n.5, and on *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003), to argue that they need only show a "substantial risk" that harm will occur (Pls.' Opp'n at 5, 7), is erroneous in this context. In *Baur*, the Second Circuit declined to hold that "enhanced risk generally qualifies as sufficient injury to confer standing." 352 F.3d at 634. Rather, the *Baur* court held only that "in the specific context of food and drug safety suits, . . . such injuries

are cognizable for standing purposes, where the plaintiff alleges exposure to potentially harmful products." 352 F.3d at 634. Because this is not a food and drug safety case, *Baur* and the "substantial risk" theory of injury do not apply here.[3] *See also Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 437 (S.D.N.Y. 2015) (Furman, J.) (holding that "absent any real or impending injury arising from [Defendant's] practices and nondisclosures, Plaintiffs' conclusory allegations of current risk do not suffice to confer Article III standing"), *aff'd* 680 F. App'x 41 (2d Cir. 2017).

Plaintiffs also fail to respond to Defendants' arguments that their claims of lost representation and funding (attributable to the putative increased undercount) are too vague because they have failed to address the *nationwide* effects of the feared undercount and provide a specific statement of how representation or funding would be altered by such effects. Specifically, Plaintiffs state only that New York, Illinois, and Rhode Island are on the "cusp" of losing a House seat, continue to provide no explanation or calculation of how the putative undercount will be so disproportionate as to skew the complex apportionment calculation. *See* Pls.' Opp'n at 13; see generally *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 461 (1992) (discussing method of equal proportions). In fact, as Defendants pointed out in their opening memorandum, Rhode Island is virtually certain to lose a seat, as are New York and Illinois. *See* Election Data Services, Some Changes in Apportionment Allocations With New 2017 Census Estimates; But Greater Change Likely by 2020, at 4 (Dec. 26, 2017), at 1, 3, https://www.electiondataservices.com/wp-content/uploads/2017/12/NR_Appor17c3wTablesMa psC2.pdf. The cited report does not support the proposition that the loss only becomes certain if there is a differential increase in the undercount, as Plaintiffs seem to imply. It is not sufficient for Plaintiffs to show there will be *some* undercount; they need to show that the *level* of the undercount will be *material* to their claimed injury.

---

[3] *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989), Pls' Opp'n at 7-8, is also inapposite because the federal defendants there "concede[d] that plaintiffs' allegation of loss of federal funds satisfies the injury requirement of standing for the State and municipal plaintiffs."

Nor do Plaintiffs address Defendants' point that the interdependence of funding determinations under the cited funding programs makes it difficult, if not impossible to conclude, years before the census even begins, that one state or jurisdiction would stand to lose more than any another state or jurisdiction. Plaintiffs only state that their "minimal" allegations that their "share of such funds will likely decrease" are sufficient to satisfy their burden. Pls.' Opp'n. at 12. But they do not seem to deny Defendants' point that it is also possible *some* level of undercount will not have a material effect on funding. In view of this uncertainty, more should be required than Plaintiffs' bare allegations that they will be injured. Indeed, other courts have recognized the difficulty of concluding ahead of time that one particular state or other jurisdiction stands to lose funding or representation from the census. *See* Defs.' Mem. at 16-17, 19 [Dkt. No. 155]*; see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York *but for every other State as well*" (emphasis added)); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, *inter alia,* on "the interplay of all the other population factors which affect apportionment"); *cf. Glavin v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998) (finding that plaintiffs had alleged a sufficient injury related to appointment and redistricting resulting from the Commerce Department's plan regarding statistical adjustment where "they are able to calculate its effects by reference to the results of the Post-Enumeration Survey completed in 1992, which closely mirrors the methodology the Department will utilize as part of its plan for Census 2000"), *aff'd sub nom, Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).[4]

---

[4] Moreover, regardless of whether federal funding statutes rely on the census enumeration, Pls.' Opp'n at 12, the Enumeration Clause is not even arguably intended to protect the interests of

Accordingly, Plaintiffs fail to meet their burden of demonstrating Article III standing, and this case should be dismissed for lack of jurisdiction.

**B.      Plaintiffs' Suit is Barred by the Political Question Doctrine.**

Plaintiffs' contention that this case is not barred by the political question doctrine boils down to a single point: that the reinstatement of a citizenship question on the 2020 Census will cause a differential undercount. *See* Pls.' Opp'n at 19-21. But that contention is irrelevant to whether the Constitution's text commits the content of the census questionnaire to Congress and whether there are judicially manageable standards for judging the propriety of reinstating a citizenship question. Especially where, as here, there is no allegation that the Secretary failed to establish procedures for counting every person, a case ceases to implicate "actual Enumeration" and instead targets only the "[m]anner" of conducting the census. That inquiry presents a nonjusticiable political question.

This case has nothing to do with the only judicially-enforceable line drawn by the Enumeration Clause: impermissible estimation versus lawful enumeration. It has nothing to do with whom to count, how to count them, or where to count them. And it has nothing to do with the Secretary's procedures for counting every person. Instead, Plaintiffs challenge the Secretary's information-gathering decision to include a question on the census questionnaire that will be used to enumerate inhabitants almost two years from now. This is a challenge to the "[m]anner" of the census, which the Constitution expressly commits to Congress (and that Congress has expressly delegated to the Secretary).[5]

---

federal funding recipients.  Therefore, Plaintiffs' alleged funding injuries fall outside the zone of interests of that provision. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("[A] plaintiff must establish that the injury he complains of … falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.").

[5] Contrary to Plaintiffs' contention, Pls.' Opp'n at 22, the Constitution's text does not indicate that calculation methodologies are also part of the "[m]anner" by which the census is conducted. The Enumeration Clause is split into two distinct phrases, with "in such Manner" modifying "[t]he actual Enumeration shall be made." U.S. Cons. art. I, § 2, cl. 3. If the Framers considered calculation methodologies part of the "[m]anner" of the census, presumably the Clause would have been written differently; not only did they separate "actual Enumeration" and "such Manner" but they specifically directed the latter phrase to Congress.

None of the cases cited by Plaintiffs confronted the question of whether pre-census information-gathering decisions—as opposed to calculation methodologies—present a nonjusticiable political question. In *U.S. House of Representatives v. U.S. Dep't of Commerce*, for example, a three-judge court specifically noted that the plaintiff had Article III standing and that "a jurisdictional statute permits this plaintiff to bring the case" before holding that the calculation methodology of statistical sampling does not present a political question. 11 F. Supp. 2d 76, 94-95 (D.D.C. 1998), *aff'd* 525 U.S. 316 (1999); *see Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (finding justiciable a post-census challenge to the counting accuracy of a specific city);[6] *City of Phila. v. Klutznick*, 503 F. Supp. 663, 674 (E.D. Pa. 1980) (same). Plaintiffs point to no court that has reviewed a pre-census challenge to the census questionnaire's content—a purely information-gathering decision—and held that such a challenge is justiciable.

Plaintiffs' attempt to characterize their challenge as extending beyond the "[m]anner" of the census is also unavailing. Plaintiffs claim that their "constitutional claim here is not some technocratic dispute over whether some method is better than another at enumerating the population." Pls.' Opp'n at 21. Including the citizenship question, they say, "represents an abdication of [Defendants'] core responsibility to pursue an accurate enumeration—rather than a disagreement over the best way to accomplish that responsibility." *Id.* But that is *exactly* the dispute at issue here: Plaintiffs disagree with the Secretary's policy choice in which he balanced the need for citizenship information with the cost and effectiveness of efforts to mitigate non-responses, the possibility of lower response rates, the cost of increased non-response follow-up procedures, and the completeness and cost of administrative records. As with every pre-count information-gathering procedure, there are no judicially manageable standards for balancing those factors and a myriad of others.

---

[6] This Second Circuit opinion also contains such scant analysis as to constitute the type of "drive-by jurisdictional ruling[]" that "ha[s] no precedential effect," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).

Plaintiffs try to avoid this conclusion by arguing that "the pursuit of accuracy provides the Court with a judicially manageable standard." Pls.' Opp'n at 27, 32. This argument fails for two reasons.[7] First, Plaintiffs derive their purported standard from *Wisconsin v. City of NY*, 517 U.S. 1 (1996), a case concerning whether the Secretary's refusal to correct a census undercount with data from a post-enumeration survey (*i.e.*, a calculation methodology) violated the Enumeration Clause's requirement of an "actual Enumeration". But the Supreme Court's decision in *Wisconsin* says nothing about standards applicable to the "[m]anner" prong of the Enumeration Clause. There is a good reason for this: the Secretary's decision to correct (or not correct) a census undercount implicates an affirmative constitutional command to count, rather than estimate, the population. Once a court ventures beyond that affirmative constitutional command into the "[m]anner" of conducting the census, there is simply no law to apply.

Second, Plaintiffs' proposed standard—whether the Secretary is pursuing accuracy—is unworkable. What does it mean that the Secretary is "pursuing" accuracy? Has the Secretary violated the Constitution if he employs 550,000 enumerators for in-person visits instead of 551,000 enumerators because he is valuing cost, training, testing, and timing over accuracy? How about when the census questionnaire is distributed in 12 non-English languages instead of 13? Or when the Secretary opens six regional census centers instead of seven? Just as with the content of the census questionnaire, each of these determinations are pieces of a much larger puzzle, all of which involve a careful consideration of factors such as cost, testing, training, effectiveness, timing, informational need, and accuracy. The courts have no standards by which to judge the consideration of those factors, and therefore Plaintiffs' suggested pursuit-of-accuracy standard is unworkable. As explained below, Plaintiffs' attempt to formulate a bright-line rule in this regard is also plainly wrong.

---

[7] Additionally, even under Plaintiffs' own standard, their claim fails as a matter of law. Plaintiffs hypothesize that a citizenship question may cause an inaccurate population count, but advance no allegation that the Secretary is doing anything other than pursuing a complete and accurate count using the census questionnaire he submitted to Congress.

Despite admitting that "precise numerical accuracy in the census is likely impossible," Pls.' Opp'n at 27, Plaintiffs seek to constitutionalize for judicial review every logistical decision in the 10-year lead up to the census that does not prioritize accuracy over all else. But the Constitution envisions a much more nuanced process by an institution capable of weighing the numerous factors that must be considered in such policy choices—Congress. The Secretary's decision to reinstate the citizenship question on the 2020 Census is therefore a "policy choice[] and value determination[] constitutionally committed for resolution to the halls of Congress [and] the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1996), and this case is barred by the political question doctrine.

## C. The Secretary's Decision Is Not Subject to Judicial Review under the Administrative Procedure Act.

Acknowledging that agency actions are insulated from judicial review under the APA "where statutes are drawn in such broad terms that . . . there is no law to apply," *Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d 412, 419 (2d Cir. 2015) (quoting *Sharkey v. Quarantillo*, 541 F.3d 75, 91 (2d Cir. 2008)), Plaintiffs searched for law governing the Secretary's decision to reinstate a citizenship question on the 2020 Census. Their search was in vain. Contrary to Plaintiffs' assertions, no standards exist in the relevant statutes or regulations that a court may apply to the Secretary's decision, and therefore Plaintiffs' APA claim is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[8]

Plaintiffs first point to the Census Act as a source of applicable law in this area, arguing that it "uses mandatory language that reflects that the census is not entirely committed to agency discretion." Pls.' Opp'n at 24. It is true that the mandatory word "shall" appears in the Census Act.

---

[8] Plaintiffs improperly conflate the political question doctrine's inquiry into "judicially discoverable and manageable standards" with the APA's "committed to agency discretion by law" inquiry. These are distinct questions. The first concerns whether *the Constitution* supplies a principled and workable judicial standard for assessing whether the inclusion of a particular question on the census questionnaire is unconstitutional. The second concerns whether *the Census Act* vests the content of the census questionnaire in the Secretary's discretion so as to preclude judicial review under the APA. Defendants therefore analyze these questions separately.

*See* 13 U.S.C. §§ 5, 141(a). It is also true that mandatory language such as "shall" may sometimes provide standards by which a court can review an agency's actions. *See Salazar v. King*, 822 F.3d 61, 77 (2d Cir. 2016). But Plaintiffs cannot provide a link between the mandatory "shall" and a congressional direction that enables judicial review. Indeed, the "shall" language cited by Plaintiffs creates only broad requirements that the Secretary undertake some action without any direction as to how he should do so. For example, the Census Act directs that the Secretary "shall . . . take a decennial census of population . . . in such form and content as he may determine," 13 U.S.C. § 141(a), and the Secretary "shall determine the inquiries, and the number, form, and subdivisions thereof, for . . . censuses," 13 U.S.C. § 5. But nowhere does the Census Act explain *how* the Secretary is to "take a decennial census of population" or *how* he should "determine the inquiries . . . thereof." *Compare* 13 U.S.C. §§ 5, 141(a) *with Salazar*, 822 F.3d at 77 (finding law to apply where the statute at issue provided that, if certain conditions are met by a student-loan borrower, "then the Secretary *shall* discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan." (quoting 20 U.S.C. § 1087(c)(1))). Quite the contrary, these provisions allow "such form and content as [the Secretary] may determine" and authorize him to "obtain such other census information as necessary." 13 U.S.C. § 141(a). Put another way, the Census Act simply orders the Secretary to take a decennial census and leaves the details of conducting that census to his discretion.[9] Such statutory language provides no law for courts to apply.

Plaintiffs next turn to the "guiding principle" purportedly underpinning the Enumeration Clause and the Census Act: "that agency actions in the service of enumeration must pursue accuracy."

---

[9] As Defendants previously noted, Defs.' Mem. at 30, Congress reserved responsibility for oversight of the Secretary's performance, requiring the Secretary to submit to Congress "not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census." 13 U.S.C. 141(f)(2). This direction simply underscores that it is for Congress, not the courts, to review the Secretary's content determinations.

Pls.' Opp'n at 25. But as discussed above, Section I.B., and below, Section II., that argument fails for multiple reasons.[10]

Finally, Plaintiffs turn to abstract administrative guidance as a source of applicable law. Pls.' Opp'n at 28-30. None of this "guidance", however, provides any guide for courts. For example, Plaintiffs cite the Information Quality Act ("IQA"), which "mandates that agencies adopt procedures for maximizing the 'quality, objectivity, utility, and integrity' of data gathered by the federal government." Pls.' Opp'n at 28. But Plaintiffs cannot cite to anything in the IQA that would inform the Secretary's exercise of discretion over the census questionnaire's content, which is understandable given that the IQA provides neither a private right of action nor a suitable basis for APA review. *See, e.g.*, *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); *Habitat for Horses v. Salazar*, 2011 WL 4343306, at *7 (S.D.N.Y. Sept. 7, 2011) ("[T]he [IQA] creates no legal rights in any third parties. . . . Nor has this Court located any authority supporting Plaintiffs' contention that they may bring such a claim under the APA." (internal citation omitted)); *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1092 (E.D. Cal. 2010) ("[T]he IQA itself contains *absolutely no substantive standards,* let alone any standards relevant to the claims brought in this case."); *Haas v. Gutierrez*, 2008 WL 2566634, at *6 (S.D.N.Y. June 26, 2008) ("Neither the Information Quality Act, nor the Administrative Procedure Act, create a private right of action upon which plaintiff may independently pursue this litigation."). Plaintiffs' citation to OMB guidelines suffers from the same fatal flaw. *See Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 602 (E.D. Va. 2004), *aff'd,* 440 F.3d 156 (4th Cir. 2006) ("Neither the IQA nor the OMB

---

[10] Plaintiffs suggest that foreclosing judicial review here would allow political manipulation and "would permit Defendants to alter the census question in any way." Pls.' Opp'n at 25. But as Plaintiffs' own cited cases demonstrate, the Framers were concerned with political manipulation of the census at the state and local level, not the federal level. *See City of Phila.*, 503 F. Supp. at 676-77 ("As the Framers in their wisdom clearly foresaw, the unique yet necessary and favored advantage of a federal census is the uniformity nationwide of its method; which, by avoiding the possibility of local bias, prevents the result from suffering the Nation's distrust."). Moreover, any alleged manipulation of the census by the Secretary is subject to oversight by Congress, and Congress is subject to its own checks on manipulation—elections.

Guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion."); *cf. Zeller v. United States*, 467 F. Supp. 487, 497 (E.D.N.Y. 1979) (noting that OMB Guidelines "are designed merely to assist federal agencies and not to bind them in their interpretation and application of the [Privacy] Act"). In short, none of the administrative guidance referenced by Plaintiffs provides any law by which courts could judge the Secretary's exercise of discretion over the census questionnaire's content.[11]

Although Plaintiffs canvass the Constitution, the Census Act, and administrative guidance, they can point to no source of law that provides a suitable basis for judicial review of the precise issue here: the Secretary's decision to reinstate a citizenship question on the 2020 Census. Accordingly, Plaintiffs' APA claim is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

## II.   PLAINTIFFS FAIL TO STATE AN ENUMERATION CLAUSE CLAIM

Even if this case were justiciable, Plaintiffs' Enumeration Clause claim should be dismissed. Plaintiffs seem to confuse the justiciability of their Enumeration Clause claim with their failure to plausibly allege such a claim. *See, e.g.*, Pls.' Opp'n at 32 (characterizing their challenge as "plainly cognizable under the Enumeration Clause"), *id.* at 34 (noting that "[n]umerous courts have considered a wide range of challenges to many aspects of the census process," and interpreting Defendants' arguments as presenting "no constitutional limits on the Secretary's discretion with respect to the conduct of the census"). But no amount of confusion can obscure the three straightforward reasons that Plaintiffs' constitutional claim should be dismissed: (1) the Enumeration Clause mandates only a person-by-person headcount, and there is no allegation that the Secretary is estimating rather than counting the population, nor any allegation that he has failed to establish procedures for counting

---

[11] Oddly, Plaintiffs simultaneously argue that Defendants should have been testing the citizenship question for years, Pls.' Opp'n at 33 (favorably citing the nearly ten years spent testing a race/ethnicity question), and that "any prior testing of the citizenship demand was based on 'data collected . . . in a different political climate, before anti-immigrant attitudes were as salient and consequential,'" Pls.' Opp'n at 30 n.23 (quoting First Am. Compl. ¶ 76). It is unclear how Defendants could satisfy Plaintiffs' conflicting demands.

every person; (2) the Secretary is granted "virtually unlimited" discretion in conducting the census, and he exercised that discretion to reinstate a citizenship question with historical pedigree dating back to the founding era; and (3) Plaintiffs' theory, if accepted, would invalidate demographic questions on nearly every decennial census since 1790. *See* Defs.' Mem. at 30-35. Plaintiffs fail to substantively counter the first two of these points, instead focusing on the third.

Plaintiffs claim that their constitutional theory "does not negate the legitimacy of collecting standard demographic data, using typical testing protocols, in the ordinary course," and they attempt to cabin their allegations to only the "present circumstances". Pls.' Opp'n at 33. Setting aside that the citizenship question at issue underwent extensive testing for inclusion on the American Community Survey ("ACS"), it is unclear what Plaintiffs envision as "typical testing protocols" when the first demographic questions were asked in 1790 and when citizenship information was first collected in 1820. *See* Defs.' Mem. at 3-4. Regardless, even accepting Plaintiffs' allegations of an undercount, the logical conclusion of Plaintiffs' theory is that the Enumeration Clause prohibits any demographic questions on the census questionnaire, tested or untested, because such questions do not "pursue accuracy" and are likely to reduce response rates at least somewhat, if not substantially.[12] *See id.* at 33. But it is simply not true that the Secretary must "pursue accuracy" to the exclusion of all other legitimate considerations.  Indeed, the long-form questionnaire, which likewise sought demographic information unrelated to the person-by-person enumeration, indisputably resulted in a lower response rate, *see id.* (noting the lower response rate for the long-form questionnaire), and the same is quite likely true to some degree for questions like sex, Hispanic origin, race, and relationship status. So,

---

[12] The extensive history of citizenship questions on the census, and the lack of any allegations concerning the Secretary's procedures for counting every person in the States, set this case apart from Plaintiffs' extreme hypotheticals. *See* Defs. Mem. at 3-6 (describing the history of collecting citizenship information in the census). For example, hiring enumerators only in states that start with the letter "N", Pls.' Opp'n at 34, not only lacks any historical precedent, but also presents a straightforward allegation that the Secretary does not have procedures in place for counting everyone.  In contrast, Plaintiffs here challenge a historically-grounded practice without any allegation that the Secretary has failed to establish procedures for counting every resident.

Plaintiffs' bright-line theory either invalidates all decennial census questionnaires in our Nation's history, or, as discussed above, it propounds an unworkable and arbitrary test that does not account for the numerous policy considerations in conducting the census.

Plaintiffs also claim that the question whether "the Secretary's decision is within constitutional bounds" merely "goes to the merits of the constitutional claim" and is therefore inappropriate for a motion to dismiss. While Enumeration Clause challenges that implicate the Secretary's procedures for conducting a headcount of the population may be ill-suited for a Rule 12(b)(6) motion to dismiss, Plaintiffs present the Court with no such case here. Indeed, Plaintiffs' Enumeration Clause claim is particularly weak because it relies on an undercount that results, not from Defendants' maladministration, but from third parties' unlawful failure to answer a lawful question. Thus, given the lack of any allegation regarding the adequacy of the Secretary's procedures for counting every person, the Secretary's extraordinarily broad discretion in this area, and the centuries-old history of collecting citizenship information through the census, Plaintiffs' Enumeration Clause fails as a matter of law, even accepting all their allegations as true. Plaintiffs Enumeration Clause claim should therefore be dismissed.

Dated: June 22, 2018

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers St., 3rd Floor
New York, NY 10007

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-9803
Fax:  (202) 616-8470
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*