I739stao

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STATE OF NEW YORK, et al.,

                Plaintiffs,

          v.                          18 Civ. 2921 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,
                                      Argument

                Defendants.


------------------------------x

NEW YORK IMMIGRATION
COALITION,et al.,

                Plaintiffs,

          v.                          18 Civ. 5025 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,
                                      Argument

                Defendants.


------------------------------x

                                      New York, N.Y.
                                      July 3, 2018
                                      9:30 a.m.
Before:

                HON. JESSE M. FURMAN,

                                      District Judge

I739stao

APPEARANCES

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
      Attorneys for Plaintiffs
BY:  MATTHEW COLANGELO
      AJAY P. SAINI
      ELENA S. GOLDSTEIN
      - and -
ARNOLD & PORTER KAYE SCHOLER
BY:  JOHN A. FREEDMAN
      - and -
LAW OFFICE OF ROLANDO L. RIOS
BY:  ROLANDO L. RIOS

United States Department of Justice
Civil Division, Federal Programs Branch
      Attorneys for Defendants
BY:  BRETT SHUMATE
      KATE BAILEY
      JEANNETTE VARGAS
      STEPHEN EHRLICH

I739stao

(Case called)

MR. COLANGELO:  Good morning, your Honor.

Matthew Colangelo from New York for the state and local government plaintiffs.

One housekeeping matter, your Honor, if I may.  The plaintiffs intended to have two lawyers oppose the Justice Department's motion to dismiss; Mr. Saini argue the standing argue and Ms. Goldstein argue the remaining 12(b)(1) and 12(b)(6) arguments; and then I will argue the discovery aspect of today's proceedings.  And I may ask my cocounsel from Hidalgo County, Texas, Mr. Rios, to weigh in briefly on one particular aspect of expert discovery that we intend to proffer.  So with the Court's indulgence, we may swap counsel in and out between those arguments.

THE COURT:  Understood.  Thank you.

MS. GOLDSTEIN:  Elena Goldstein also from New York for the plaintiffs.

MR. SAINI:  Ajay Saini also from New York for the plaintiffs.

MR. FREEDMAN:  Good morning, your Honor.

John Freedman from Arnold & Porter for the New York Immigration Coalition plaintiffs.

MR. RIOS:  Rolando Rios for the Cameron and Hidalgo County plaintiffs, your Honor.

MR. SHUMATE:  Good morning, your Honor.

I739stao

Brett Shumate from the Department of Justice on behalf of the United States.  I'll be handling the motion to dismiss augment today.  My colleague, Ms. Vargas, will be handling the discovery argument.

MS. VARGAS:  Good morning, your Honor.

Jeannette Vargas with the U.S. Attorney's Office for the Southern District of New York.

MS. BAILEY:  Kate Bailey with the Department of Justice on behalf of the United States.

MR. EHRLICH:  Stephen Ehrlich from the Department of Justice on behalf of defendants.

THE COURT:  Good morning to everybody.

Just a reminder and request that everybody should speak into the microphones.  First of all, the acoustics in this courtroom are a little bit subpar.  Second of all we're both on CourtCall so counsel who are not local can listen in and also, I don't know if there are folks in the overflow room, but in order for all of them to hear it's important that everybody speak loudly, clearly, into the microphone.

Before we get to the oral argument a couple housekeeping matters on my end.  First, I did talk to judge Seeborg following his conference I think it was last Thursday in the California case.  He mentioned that there is some new cases since the initial conference in this matter, perhaps in Maryland.  Does somebody want to update me about that and tell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I739stao

me what the status of those cases may be.

MS. BAILEY:  There is an additional case that's been filed in Maryland, Lupe v. Ross.

THE COURT:  What was the plaintiff's name?

MS. BAILEY:  Lupe.  L-U-P-E.  That case has just been filed and a schedule has not been set yet but it is before Judge Hazel, same as the case that was already filed in Maryland.

THE COURT:  And that raises a citizenship question challenge?

MS. BAILEY:  Yes, your Honor.

THE COURT:  Are there any other cases aside from that?

MS. BAILEY:  No, your Honor.

THE COURT:  All right.  Any objection to my potentially at some point reaching out to Judge Hazel?

MS. BAILEY:  No, your Honor.

THE COURT:  All right.

I have one minor disclosure, which is that there were a number of amicus briefs filed in this case, one of which was filed on behalf of several or a number of members of Congress, one of whom was Congresswoman Maloney.  My 14-year-old daughter happened to intern for her primary campaign for about a week and two days earlier this month.  I did consider whether I should either reject the amicus brief or if it would warrant anything beyond that, and I did not -- I decidedly did not;

I739stao

that disclosing it would suffice.

I should mention that my high school son is going to be starting as a Senate Page next week. I don't think that's affiliated with any particular senator but since several senators were on that brief as well I figured I'd mention it, but suffice it to say that their responsibilities are commensurate with their ages. Don't tell them I said that. They did not do anything in the census and will not.

All right. Finally, briefing in the New York Immigration Coalition case is obviously continuing. The government filed its brief last Friday. Plaintiffs will be filing their opposition by July 9. And reply is due July 13.

Per my order of the 27th, June 27th that is, and the plaintiffs' letter of June 29, I take it everybody's understanding is that that briefing is going to focus on arguments and issues specific to that case, and essentially the government has already incorporated by reference its arguments, to the extent they're applicable, from the states case and the plaintiffs will not be responding separately to that.

MR. FREEDMAN: That's correct, your Honor.

THE COURT: And suffice it to say that my ruling in the states case will apply to that case to the extent that there are common issues.

Any other preliminary matters? Otherwise, I'm prepared to jump into oral argument and we'll go from there.

I739stao

All right.  So let's do it then.  I think the best way to proceed is I'm inclined to start with standing, then go to -- folks should not be using that rear door but I'll let my deputy take care of that.

Start with standing and then I'll hear first from defendants as the moving parties and then plaintiffs can respond.  And then I want to take both the political question doctrine and the APA justiciability together.  I recognize that there are discrete issues and arguments but, nevertheless, there is some thematic overlap.  And then, finally, I want to take up the failure to state a claim under the enumeration clause.  Candidly, I want to focus primarily on that.  So in that regard I may move you a little quickly through the first preliminary arguments.

So Mr. Shumate, let me start with you and focus on standing in the first instance.

Use this microphone actually.

MR. SHUMATE:  Good morning, your Honor.  May it please the Court, Brett Shumate for the United States.

Congress directed the Secretary of Commerce to conduct the census in such form and content as he may determine.  For the 2020 census, Commerce decided to reinstate the question about citizenship on the census questionnaire.  That questionnaire already asks a number of demographic questions about race, Hispanic origin, and sex.  As far back as 1820 and

I739stao

as most recently as 2000 Commerce asked a question about citizenship on the census questionnaire.

THE COURT:  Let me just make you cut to the chase because I got the preliminaries, I've read the briefs, I'm certainly familiar with the history, I'm familiar with your overall argument.

On the question of standing, let me put it to you bluntly, why is your argument not foreclosed by the Second Circuit's decision in Carey v. Klutznick?

MR. SHUMATE:  It's not foreclosed by Carey, your Honor, because the injury in this case, the alleged injury is not fairly traceable to the government.  Instead, the injury that's alleged here is the result of the independent action of third parties to make a choice not to respond to the census in violation of a legal duty to do so.  That was not at issue in the Carey case.  The Carey case is also distinguishable on --

THE COURT:  So you make two distinct arguments with respect to standing.  The first is that there is no injury in fact; and the second is that there is no traceability.

Is the injury in fact argument foreclosed by Carey v. Klutznick?

MR. SHUMATE:  No, it's not, your Honor, for two reasons.  Carey was a post-census case.  So the injury there was far more concrete than it is here.  Here, we're two years out from the census and the injuries that are alleged here are

I739stao

quit speculative.  They depend on a number of speculative links in the chain of causation that he we didn't have in <u>Carey v. Klutznick</u>.

First we have to speculate first about why people might not respond to the census.  They might not respond for a number of reasons.  Paragraphs 47 to 53 of the plaintiffs' complaint point to a number of different reasons:  Distress to the government, political climate, a number of different things.  But even assuming there is an increase in the -- a decrease in the initial response rate, it's speculative whether the Census Bureau's extensive efforts to follow up, what they call nonresponse follow-up operations, will fail.

THE COURT:  Can I consider those efforts in deciding this question?  Are those in the complaint?  Am I not limited to the allegations in the complaint?

It seems to me that you're relying pretty heavily on records and issues outside of the complaint.  That may well be appropriate at summary judgment and, as many of the cases you've cited are, in fact, on summary judgment.  So why is that appropriate for me to look at and consider at this stage?

MR. SHUMATE:  Your Honor, on a 12(b)(1) motion to dismiss the Court can consider evidence outside the pleadings for purposes of establishing its jurisdiction.

Even if you limit the allegations to the complaint, paragraph 53 makes no allegation that the Census Bureau's

I739stao

extensive efforts that they intend to implement to follow up with individuals who may not respond to the census initially will fail.

And then, finally, the third element of that speculative chain of causation is that it's speculative whether any undercount that results will be material in a way that will ultimately affect the plaintiffs. As they acknowledge, there are very complex formulas to determine apportionment and federal funding. And we just don't know at this point whether any undercount will be sufficient to cause them to have an injury in 2020.

In Carey it was very different. It was in the census year. There were already preliminary estimates that the census figures were inaccurate because the Census Bureau was including or using inaccurate address lists in New York City. So it was -- there was a far stronger and tighter causal nexus between the alleged injury and the government's action in that case. And that case also didn't involve a question on the citizenship -- a question on the census form.

THE COURT: You seem to reject the substantial risk standard, citing the footnote in Clapper and suggest that it's limited to Food and Drug Administration type cases.

What's your authority for that proposition and don't the cases that are cited in the Clapper footnote stand for the proposition that it's not so limited?

MR. SHUMATE:  Your Honor, I think under either standard the plaintiffs' claims will fail.  I think the substantial risk test involves -- the cases that I have seen it will have involved cases involving risk of Food and Drug enforcement, or cases where there's a risk that the government may institute prosecution, something like that.

The far more accepted test is certainly impending injury.  Either test, the plaintiffs can't show that there's a substantial risk that their injuries will ultimately occur because of these speculative chain of inferences that they have to rely on to tie the addition of a question on a form to their ultimate injury here, which is a loss of federal funding.

THE COURT:  Are not they basing that inference on statements of the government itself and former and current government officials?

In other words, the government itself has said that adding a citizenship question will depress response rates.  They've alleged in the complaint that there are states and counties and cities that have a high incidence of immigrants and it, therefore, would seem to follow that it would be particularly depressed in those states.

At this stage in the proceedings, doesn't it demand too much to expect them to be able to prove concretely what the actual differential response rate is going to be and what the concrete implications of that are going to be?

I739stao

MR. SHUMATE:  Your Honor, they don't have to prove it concretely.  But those allegations that they're pointing to only go to the initial response rate.

There's always been an undercount in the census in terms of the initial response rate.  I think in the 2010 census it was 63 percent of the individuals responded to the initial census questioning.  So I think that's what the individuals -- the Census Bureau are referring to, that there may be a drop in the initial response rate.  But there are no allegations that the Census Bureau's follow-up operations, which are quite extensive, that those will fail.  The only allegation that they pointed to, I think it is paragraph 53 of the complaint that says because of the reduced initial response rate, the Census Bureau will have to hire additional enumerators to follow up with those individuals.  But it is entirely speculative whether those efforts will fail.  It's also speculative, even assuming those efforts fail, whether the undercount will be material in a way that ultimately affects the plaintiffs.  Because this is a pre-census case, it's not like Carey where there, like I said earlier, there were already preliminary figures suggesting that the Census Bureau had an inaccurate count in New York City.

THE COURT:  Let me ask you about traceability.  Why is that argument not foreclosed by the Circuit's decision last Friday in the NRDC v. NHTSA case.  I don't know if you've seen it, but the Court held that -- rejected an argument by the

I739stao

government that the connection between the potential industry compliance and the agency's imposition of coercive penalties intended to induce compliances too indirect to establish causation and proceeds to say:  As the case law recognizes, it is well settled that for standing purposes petitioners need not prove a cause-and-effect relationship with absolute certainty. Substantial likelihood of the alleged commonality meets the test.  This is true even in cases where the injury hinges on the reactions of the third parties to the agency's conduct.

MR. SHUMATE:  I think the key is the language that you read about coercive effect.  There is no coercive effect here by the government.  In fact, the government is attempting to coerce people to respond to the census.  There's a statute that requires individuals to respond to the census.

At the most what the plaintiffs have alleged is that the government's addition of the citizenship question will encouraged people not to respond to the census, even though there may be a small segment of the population who would otherwise respond not for -- putting aside the citizenship question.  This is a lot more like the Simon case from 1976, which involved hospitals -- the IRS revenue ruling that granted favorable tax treatment to hospitals.  The allegation in that case was that the government's decision was encouraging the hospitals to deny access to indigents to hospital services. And the Court said no, the injury in that case is not fairly

I739stao

traceable to the government's action, even though it may have encouraged the hospitals to deny access, because it was fairly traceable to the independent decisions of third parties, the hospitals themselves.

That's exactly what we have here.  We have an independent decision by individuals not to respond to the census.  Moreover, that independent decision is unlawful because there's a statute that makes individuals -- it requires individuals to respond to the census.

THE COURT:  Why does that matter?  I think you made an effort to distinguish Rothstein on that ground, or at least the ground that the defendant's conduct in that case was allegedly unlawful and it's not here.  I would think for standing purposes that that's more a merits consideration than a standing question.  For standing purposes, it's really just a question of whether plaintiffs can establish injury that resulted from some conduct of the defendants, in other words, injury and causation.  What does it matter if conduct is unlawful, unlawful, or not?

MR. SHUMATE:  It matters, your Honor, because the test is that the injury must be fairly traceable to the government's conduct; not the independent actions of third parties.  And it is not fair to attribute to the government the unlawful decisions of third parties not to respond to a lawful question.

You mentioned the Rothstein case.  That case was

I739stao

fundamentally different.  That involved funding terror.  That is fundamentally different than adding a question to the census questionnaire.  And it's fair to assume that there would be a causal relationship between giving money to terrorists and the terrorists' acts themselves.

THE COURT:  But the question is simply whether the independent acts of third parties intervening break the chain of causation such that it's no longer fairly traceable.  I think in that -- just looking at it from that perspective, what does it matter whether the conduct on either side is legal or not legal?  It's just a simple question of whether it causes injury and whether it's fairly traceable.

I mean, in other words where -- can you point me to any Supreme Court case or Second Circuit case that says that whether -- that the standing inquiry turns on whether the acts of either the defendant or the intervening third parties are lawful or unlawful?

MR. SHUMATE:  There are cases.  I believe it's the O'Shea case from the Supreme Court that says in the context of mootness, which is another related judicial review doctrine, that we assume that parties follow the law.  And so here we should assume that individuals would respond to the census consistent with their legal duty.

Let me put it this way.  If everybody in America responded to the census consistent with their legal duty, would

I739stao

the plaintiffs have any reason to complain about the citizenship question?  Of course not because there would be no undercount at all.  Every person in America would be counted. They would have no reason to complain about the citizenship question or any fear of an undercount or loss of federal funding or apportionment.

Put it another way, as the Court did in Simon.  If the Court were to strike the citizenship question from the census questionnaire, would that address or redress all the plaintiffs' fear of an injury?  Probably not because, as they acknowledge, there's always an undercount in a census and individuals will not respond to the census questionnaire for a variety of reasons.

THE COURT:  Well it would redress the injury to the extent that it is fairly traceable to the citizenship question.

MR. SHUMATE:  But it is not fairly traceable to the citizen question.  And the Simon Court talked about the chain, the speculative chain of inferences that you had to reach in that case to trace the injury from the government's action to the ultimate injury.  And here there are at least three steps in the chain of causation.  I've talked about them already.  I don't need to repeat them.

THE COURT:  Let me ask you one final question on that front and then I'll hear from the plaintiffs on standing.

You rely pretty heavily on the Supreme Court's

I739stao

decision in _Clapper_ and the chain of causation or the chain of inferences that the Court found inadequate there.  Isn't there a fundamental difference between that setting and this in the sense that the plaintiffs there were individuals and essentially needed to prove that they themselves had been subjected to surveillance and it was that inquiry that required the multiple levels of inferences that the Court found inadequate?

Here, particularly in the states case where the plaintiffs are states and cities and counties and the like, we're talking about an aggregate plaintiff.  So there is no need to prove that a particular person didn't respond or is not likely to respond to the census in light of question.  The question is just, on an aggregate level, will it depress the rates and on that presumably one can look at the Census Bureau's own history and studies and the like.  Why is that not fundamentally different and make it a different inquiry than the one that was made in _Clapper_?

MR. SHUMATE:  Certainly the injuries alleged in _Clapper_ and this case are different but the standing principles are not.  They still have to allege an injury that is not speculative, that is concrete certainly, or at least substantial risk that that injury will occur.  Now this arises in a different context, to be sure, but still they have alleged an injury that is speculative at this point, and it is not

I739stao

fairly traceable to the government because of the independent action of the third parties that are necessary for that action to occur.  As I said earlier, it's not fair to attribute to the government actions of third parties that violate a statute that the government is attempting to coerce people to respond to the census.  So it is not fair to attribute to the government their failure to respond when the government is merely adding a question to the form itself.

THE COURT:  Let me hear from the plaintiffs on the standing, please.  If you could just for the record make sure your repeat your names.

MR. SAINI:  Your Honor, Ajay Saini from the State of New York for the plaintiffs.

THE COURT:  Proceed.

MR. SAINI:  Your Honor, the plaintiffs intend to make two points here today.  First, that the injuries that they have alleged are not speculative and, in fact, the plaintiffs' action here, the inclusion of citizenship question on the 2020 census, creates a substantial risk of an undercount and poses a serious threat to plaintiffs' funding levels as well as apportionment and representational interests; and our second point that the plaintiffs' injuries are in fact fairly traceable to the defendants' actions.

THE COURT:  Does your argument depend on my accepting that the substantial risk standard is still alive and not

I739stao

inconsistent with certainly impending.

MR. SAINI:  No, your Honor.  We believe that there are immediate injuries that have occurred here.  We have alleged that at paragraph 53 and -- 52 and 53 in which we state that the announcement of the citizenship question has an immediate deterrent effect and is already causing individuals to choose not to, in anticipation of the census, not cooperate.  But that said, the substantial risk standard was affirmed just two years ago in Susan B. Anthony List v. Driehaus and as a result -- by the Supreme Court, and as a result the substantial risk standard is available here.

Your Honor the plaintiffs' injuries here are not speculative.  First and foremost, the plaintiffs have shown that there is a substantial risk that an undercount will occur and the statements by the defendants over the last 40 years, the repeated determination by the Census Bureau that a citizenship question will, in fact, increase nonresponse, and not only increase nonresponse, but those determinations also include in the statements that a citizenship question would deter cooperation with enumerators going door to door seeking to count nonresponsive households is sufficient to find that there is a substantial risk of undercounting here.

The defendants have mischaracterized paragraph 53 of our complaint.  We have, in fact, alleged that typical forms of nonresponse follow-up will be ineffective at capturing

I739stao

individuals who are intimidated by the citizenship question. And the typical form of nonresponse follow-up there is the use of enumerators going door to door. And, again, Census Bureau's longstanding determinations on this serve as sufficient proof to show that, in fact, the nonresponse follow-up operations -- that there is a substantial risk that they will be effective. In addition, your Honor this is -- we are still at the beginning stage of this litigation and to the extent that we need to determine whether or not some unspecified nonresponse follow-up operations will somehow reduce potential undercount, that would require further factual development at later stages of the litigation.

THE COURT: Your view is that, therefore, I cannot or should not consider the government's announced procedures and plans on that front?

MR. SAINI: You need not consider it, your Honor, but even if you were to consider it these unspecified allegations regarding nonresponse follow-up would not be enough to defeat the plaintiffs' claim that there is, in fact, a substantial risk of an undercount here.

THE COURT: What's your answer to the argument that there are multiple other steps in the chain of inferences that are required for you to intervene including, for example, that it will affect the counts in your geographic jurisdiction disproportionately given the complex formulas at issue here for

I739stao

apportionment, for funding, etc., essentially it's too speculative to know whether and to what extent it will have an effect and that ultimately you also need to prove that it has a material effect on those?

MR. SAINI:  Your Honor, first we would note that we are at the pleading stage here so we do not need to determine with certainty the exact level of injury that we expect to suffer, if we do intend to provide further factual development in the form of expert and fact discovery to help further elucidate the injuries that we expect to result.

But more importantly, your Honor, there is plenty of case law relating to -- from here in the Second Circuit relating to the viability of funding harms from undercounts such as in Carey v. Klutznick, for instance, the Court recognized that funding harms were sufficient to establish Article III standing on the basis of plaintiffs' State and City of New York's claims that an undercount would affect their federal formula grants.  And, similarly, the Sixth Circuit found in the City of Detroit v. Franklin that undercounting would affect potential funding under the Community Development Block Grant Program which we also have alleged in our complaint.

The last thing to note here --

THE COURT:  Can I ask you a question.  Mr. Shumate's argument is that Carey is different because it's a post-census

I739stao

case and not a pre-census case and in that regard it didn't involve the same degree of speculation with respect to there being an undercount.  What's your answer to that?

MR. SAINI:  Our answer to that, your Honor, is, again, plaintiffs here -- the defendants here have repeatedly recognized that a citizenship question will impair the accuracy of the census both by driving down response rates but also by deterring cooperation with enumerators.  That specific fact of government acknowledgment that this causal connection exists and that there's a substantial likelihood that a citizenship question will result in undercounts is significant here.

In addition, we have also pointed to, in the complaint at paragraphs 50 and 51, the results of pretesting conducted by the Census Bureau which shows unprecedented levels of immigrant anxiety.  That pretesting also reveals that immigrant households, noncitizen households are increasingly breaking off interviews with Census Bureau officials.  The results of that pretesting show that not only is there a substantial likelihood of an undercount here but there's a substantial likelihood of a serious undercount here.  That's more than enough for plaintiffs to meet their burden.

THE COURT:  And presumably those allegations are relevant to the question of whether the in-person enumerator follow-up would suffice to address any disparity; is that correct?

I739stao

MR. SAINI:  Yes, your Honor.

THE COURT:  Can you turn to the question of traceability and address that.  The language in the cases suggest that the intervening acts of third parties don't necessarily break the chain of causation if there is a coercive or determinative effect.  I think the government's argument here is that there is no coercive effect.  In fact, to the extent that the government coerces anything, it coerces people to respond to the census because it's their lawful obligation to do so.

So why is that not compelling argument?

MR. SAINI:  Your Honor, the courts have repeatedly acknowledged, including the Second Circuit just last week in NRDC v. NHTSA that the government's acknowledgment of a causal connection between their action and the plaintiffs' injury is sufficient to find that the defendants' injury -- the plaintiffs' injury is fairly traceable to the defendants' conduct and that case law is sufficient to address this particular point.

With respect to the illegality point that the defendants have brought up here, we would point first to Rothstein which shows that the illegal intervening actions of a third party do not break the line of causation.

In addition, your Honor, while we haven't cited this in our papers because this point was first brought up and

I739stao

explored in a reply brief, there are a line of cases relating to data breaches, including in the D.C. Circuit, Attias v. CareFirst, in which plaintiffs' injuries related to identity theft, were fairly traceable to a company's lack of consumer information data security policies in spite of the intervening illegal action of the third parties, namely the hackers stealing that confidential information.

THE COURT:  Can you give me that citation?

MR. SAINI:  I can give that to you -- it's in my bag, so I will give that to you shortly.  Apologize about that.

THE COURT:  All right.  Very good.  Why don't you wrap up on standing and we'll turn to the political question and APA question.

MR. SAINI:  One last note on standing, your Honor. The plaintiff need only show that one city, state, or county within their coalition has Article III standing to satisfy the Article III requirement for the entire coalition.  As a result, it's more than plausible to include that at least one of the cities, states and counties that we have alleged harms for related to funding and apportionment are likely and substantial -- at a substantial risk of harm here.

THE COURT:  All right.  Thank you.

MR. SAINI:  Thank you, your Honor.

THE COURT:  Mr. Shumate, back to you.  Mr. Saini can look for that cite in the meantime.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I739stao

Talk to me about political question and the APA and, once again, my question to you is why are those arguments not foreclosed by Carey v. Klutznick?

MR. SHUMATE:  Your Honor, even assuming the plaintiffs have standing the case is not reviewable for two reasons:  One, the political question doctrine, the second --

THE COURT:  You have to slow down a little bit.

MR. SHUMATE:  The APA is not reviewable because this matter is committed to the agency's discretion.

With respect to Carey, again, that case did not involve the addition of the question on the census questionnaire.  There was very little analysis of the political question doctrine in that case.  So it's hard to view that case as foreclosing the arguments we're making here.

THE COURT:  But I don't understand you to be arguing that the decision with respect to the questions on the questionnaire is a political question and other aspects of the census are not political questions, or is that your argument? And to the extent that is your argument, where do you find support for that in the text of the enumeration clause?

MR. SHUMATE:  So our argument is that the manner of conducting the census is committed to Congress, and Congress has committed that to the Secretary of Commerce.  So to be sure there have been cases reviewing census decisions but those have been decisions involving how to count, who to count, things

I739stao

like that, should we use imputation --

THE COURT:  Isn't that the manner in which the census is conducted?

MR. SHUMATE:  No.  Those go squarely to the question of whether there's going to be a person-by-person headcount of every individual in America.  That is the actual enumeration. So in those cases there was law to apply.  There was a meaningful standard.  Is there going to be an actual enumeration?

This case is fundamentally different.  This doesn't implicate those issues how to count, who to count.  It implicates the Secretary's information gathering functions that are pre-census itself.  And there is simply no case that addresses that question or decides -- or says that it's not a political question.

THE COURT:  Can you cite any case that has projected challenges to the census on the political question grounds?

MR. SHUMATE:  No, there haven't been any cases like this one where a plaintiff is challenging the addition of a question to the census questionnaire itself.  There have been cases --

THE COURT:  You're telling me in the two hundred plus years of the census and the pretty much every ten-year cycle of litigation arising over it there has never been a challenge to the manner in which the census has been conducted; this is the

I739stao

first one?

MR. SHUMATE:  There has never been a challenge like this one to the addition of a question on the census questionnaire.

THE COURT:  So it is specific to the addition of a question then.

MR. SHUMATE:  Right.  Right.  So there have been cases --

THE COURT:  In other words, that's the level on which I should look at whether it's a political question and the question -- literally adding the question is itself a political question.  That's your argument?

MR. SHUMATE:  Right.  You don't need to go any further than that.  Because our argument is that the Secretary's choice, or Congress's choice of which questions to ask on the census questionnaire is a political question.  It is a value judgment and a policy judgment about what statistical information the government should collect.  And there are no judicially manageable standards that the court can apply to decide whether that's a reasonable choice or not.

THE COURT:  Why isn't the standard, and this becomes relevant to the issues we'll discuss later, why isn't the standard the one from the Supreme Court's decision in Wisconsin v. City of New York that it has to be reasonably related to the accomplishment of an actual enumeration?  Why is that not the

I739stao

standard and why is that not judicially manageable?

MR. SHUMATE:  Because that case implicated the actual enumeration question.  So there is a standard as to decide whether the Secretary's actions are intended to count every person in America.  But that's not this case.

THE COURT:  Isn't that the ultimate purpose of the census?

MR. SHUMATE:  That is the ultimate purpose of the census, but the manner of conducting the census itself, the information-gathering function in particular is a political question.  There is simply no law that the Court can find in the Constitution to decide whether the government should collect this type of information or that type of information.

THE COURT:  So is it your argument that if the Secretary decided to add a question to the questionnaire that asks who you voted for in the last presidential election, that that would be unreviewable by a court?

MR. SHUMATE:  It would be reviewable by Congress but not a court.  That demonstrates why this is a political question, because Congress has reserved for itself the right to review the questions.

Two years before the census the Secretary has to submit the questions to Congress.  If Congress doesn't like the questions, the Congress can call the Secretary to the Hill and berate him over that; or they can pass a statute and say no,

I739stao

we're going to ask these questions.  That's how the census used to be conducted.  It used to be that statutory decision about which questions to ask on the census.  But Congress has now delegated that discretion to the Secretary.  But ultimately it is still a political question about the manner of conducting the census that is committed to the political branches.

THE COURT:  What if the Secretary added a question that was specifically designed to depress the count in states that -- we live in a world of red states and blue states.  Let's assume for the sake of argument that the White House and Congress are both controlled by the same party.  Let's call it blue for now.  And let's assume that the Secretary adds a question that is intended to and will have the predictable effect of depressing the count in red states and red states only.  Again, don't resist the hypothetical.  Your argument is that that's reviewable only by Congress and even if Congress, even if there's a political breakdown and basically Congress is not prepared to do anything about that question, that question is not reviewable by a court?

MR. SHUMATE:  Correct.  Because it is a decision about which question to ask.  It wouldn't matter what the intent was behind the addition of the question.  It's fundamentally different than a question, like the courts have reviewed in other cases, about who to count, how to count, things like that, should we count overseas federal employees.  That's a

I739stao

judicially manageable question.  We can decide whether those individuals should be counted or not.  It's different than whether sampling procedures should be allowed because it implicates the count itself.  This is the pre-count information-gathering function that is committed to the political branches.

THE COURT:  A lot of your argument turns on accepting that the plaintiffs' challenges to the manner in which the census is conducted as opposed to the enumeration component of the clause.  Isn't the gravamen of the plaintiffs' claim here that by virtue of adding the question it will depress the count and therefore interfere with the actual enumeration required by the clause?

MR. SHUMATE:  They're trying to make an actual enumeration claim, but their factual allegations don't implicate that clause of the Constitution at all because what they're challenge is the manner in which the Secretary conducts the information-gathering function delegated to him by Congress.

So there is no allegation in the complaint, for example, that the Secretary had not put in place procedures to count every person in America.  I think they would have to concede that the Secretary has those procedures in place and intends to count every person in America.

Now they argue that -- I will get to this later --

they argue that the question will depress the count itself. But that would lead down a road where they can -- plaintiffs could challenge the font of the form itself, the size of the form, whether it should be put on the internet, or the other questions on the form itself:  Race, sex, Hispanic origin. These are matters that are committed to the Secretary's discretion for himself.

THE COURT:  That may be committed to his discretion but that's a different question than whether they're completely unreviewable by a court, correct?

In other words, it may well be that there's a place for courts to review the decisions of the Secretary but giving appropriate deference to those decisions?  Isn't that a fundamental distinction?

MR. SHUMATE:  That is correct, your Honor.  Even if you assume that it is not a political question, the court would still -- should grant significant deference to the Secretary if the court gets to the enumeration clause claim.

THE COURT:  Let's talk about the APA argument and whether it's committed to the discretion of the agency by law.

Can you cite any authority for the proposition that a census decision is so committed or is your point that this case has never -- this is an issue of first impression effectively?

MR. SHUMATE:  The later point, your Honor.  This is a question of first impression.  However, Webster v. Doe, a

I739stao

Supreme Court case, involved similar statutory language.  I'll read that language.  It said --

THE COURT:  How do you square that with Justice Stevens' concurring opinion in Franklin where he essentially distinguished Webster on several grounds?

MR. SHUMATE:  He did not get a majority of the Court, your Honor, so it wouldn't be controlling.

THE COURT:  I understand that.  I'm not controlled by it.  But on the merits, tell me why he is not right.

In other words, the language in Webster was deemed advisable.  That's not the language here.  The structure of the Act at issue in Webster and the purpose of the Act, namely national security, implicated fairly significant considerations that are absent here.  Here, there's an interest in transparency and the like that was absent or the exact opposite in Webster.

MR. SHUMATE:  I respectfully disagree.  To be sure, Webster involved national security where the courts have historically deferred significantly to the political branches. But so have courts also deferred to political branches when it comes to the census.  The Wisconsin case from the Supreme Court makes that quite clear.

THE COURT:  But holds that it's reviewable.

MR. SHUMATE:  A case involving the actual enumeration question, not a case involving the Secretary's

I739stao

information-gathering function.

And I think we need to focus on the specific language of the statute itself, which was not involved -- not at issue in Franklin, did not involve a question about what questions to ask on the form.

The statute here says:  Congress has delegated to the Commerce the responsibility to conduct a census, quote, in such form and content as he may determine.

THE COURT:  Slow down.

MR. SHUMATE:  Such form and content as he may determine.  As he may determine.  That is very similar to the language in Webster, that he deems advisable.

So there is simply nothing in the statute itself that a court can point to, to decide whether it's reasonable to ask one question or another because the statute says he has -- the Secretary himself has the discretion to decide the form and content of the census questionnaire itself.

THE COURT:  I take it that language was added to the statute in 1976; is that right?

MR. SHUMATE:  I'm sorry.  I don't understand.

THE COURT:  That language was added to the statute in 1976?

MR. SHUMATE:  I think the statute I'm pointing to is a 1980 statute, Section 141 of the census, because it says the Secretary shall conduct the census in 1980 and years -- so

I739stao

perhaps --

THE COURT:  Probably passed before 1980.

MR. SHUMATE:  Right.  Right.

THE COURT:  Is there anything in the legislative history that you're aware of that suggests that Congress intended to render the Secretary's decisions on that score totally unreviewable?

MR. SHUMATE:  I'm not aware of any legislative history, your Honor, on this question about whether courts should be permitted to review the Secretary's choice of which questions to ask on the census.

THE COURT:  All right.  Very good.  Anything else on these two points?  Otherwise I'll hear from plaintiffs.

MR. SHUMATE:  I don't think so, your Honor.

THE COURT:  All right.  Thank you.

Good morning.

MS. GOLDSTEIN:  Good morning, your Honor.

Elena Goldstein for the plaintiffs.  Before I begin, your Honor, I do have that citation that my colleague referenced.  Attias v. CareFirst, Inc.  That is 865 F.3d 620.

THE COURT:  Thank you.

MS. GOLDSTEIN:  That was from 2017.

THE COURT:  You may proceed.

MS. GOLDSTEIN:  Thank you, your Honor.

Before I get to the heart of defendants' arguments, I

want to address this decision that they've made to get very granular with respect to the question, with respect to the exact conduct of the Secretary here.

The defendants contend repeatedly that this is a case of first impression and that no case has ever challenged a question on the census.  That fact highlights the extreme and outlandish nature of defendants' conduct here.

If you look at the wide number of census cases that are out there, that I know we've all been looking at, there's a common theme.  And the common theme is that the Census Bureau and the Secretary aim for accuracy.

If you look at the Wisconsin case, there the Secretary determined not to adjust the census using a post-enumeration survey had some science on his side.  The Court says the Secretary is trying to be more accurate, has some science, we will defer.  Utah v. Evans is similar.  The determination to use a type of statistic known as hot-deck imputation, the Secretary says we're trying to be more accurate, we will defer.

This case turns that factual predicate on its head and in a most unusual way.  Instead of the Secretary aiming for accuracy, the Secretary here has acknowledged that he's actually moving in the opposite direction.

THE COURT:  So let's say I agree with you.  Why under the language of the clause and the language of the statute is that not a matter for Congress to deal with?

I739stao

Congress has required the Secretary to report to Congress the questions that he intends to ask sufficiently in advance of the census that Congress could act, that the democratic process could run its course.  Why is that not the answer instead of having a court intervene?

MS. GOLDSTEIN:  Your Honor, defendants confuse the grant of authority to Congress for a grant of sole and unreviewable authority.  They draw this -- there's a vast number of cases out there that are holding, as the Court has noted, that these census cases are not, in fact, political questions.  So in order to distinguish between all of those cases and this one case that defendants argue is not justiciable defendants proffer this novel distinction between the manner of the headcount and the headcount itself.  But that distinction is a false dichotomy that collapses on further review.  In many cases, including this one, the manner of the headcount absolutely impacts the obligation to count to begin with.  In this case plaintiffs have specifically alleged that defendants' decision to demand citizenship information from all persons will reduce the accuracy of the enumeration.  That is, in defendant's effective parlance, a counting violating.  And it's easy to think of many other examples in which the manner of the headcount is absolutely bound up in the headcount obligation itself.  For example, the decision, as defendants point out, between Times New Roman and Garamond font, likely

within the government's discretion.  But the decision to put the questionnaire in size two Garamond font that's unreadable, for example, on the questionnaire, that would be certainly a decision that would impact the accuracy of the enumeration. The decision to send out all the questionnaires in French would impact the accuracy of the enumeration.

THE COURT:  Right.  But not every problem warrants or even allows for a judicial solution, right.  Indeed the Supreme Court said as much last week in some cases, like why is the remedy there not Congress stepping in and taking care of that problem, mandating that it be distributed in 17 languages instead of one, mandating that it be in twelve-point font, etc.

Why is a court to supervise, at that level of granularity, the Secretary's conduct that is committed to him by statute?

MS. GOLDSTEIN:  Your Honor, defendants' political question argument depends on this manner versus headcount distinction.  They acknowledge that everything else courts can review, not review on that granular level but review under Wisconsin to affirm that the Secretary's decision bears a reasonable relationship to the accomplishment of an enumeration.

Courts do not analyze cases in this fashion.  The starting point, as the Court has recognized, is Carey.  This is a case that is, I think by any fair reading, a manner case.  It

I739stao

involved the adequacy of address registers.  It involved the adequacy of enumerators going out.  The Court there holds squarely that this is not a political question.

And looking at even Wisconsin, your Honor, the Court there recognized that the Secretary's discretion to not adjust the census in that case arises out of the manner language of the statute.

Virtually every court to consider this issue has held the fact that Congress has authority over the census does not mean that that is sole or unreviewable authority.

THE COURT:  What is the judicially manageable standard to use?

The defendants throw out some hypotheticals as to whether it would constitute a violation of the -- let me put it differently.

Is the standard the pursuing accuracy standard that you articulate in your brief and to some extent you've articulated here?

MS. GOLDSTEIN:  Yes, your Honor.

I think that the baseline standard is the standard in Wisconsin, that defendants are obligated to take decisions that bear a reasonable relationship to the accomplishment of an actual enumeration, and accomplishing an actual enumeration means trying to get that count done, which means pursuing accuracy.  Whatever the outer limits of that decision may be,

I739stao

your Honor, it is not taking decisions that affirmatively undermine that enumeration.

THE COURT:  So defendants cite a number of hypotheticals in their reply brief, for example, the question of whether to hire 550 as opposed to 600,000 in-person enumerators; the question of whether to put it in 12 languages versus 13 languages.

Is it your position that those aren't reviewable but presumably acceptable on the merits or -- I mean what's your position on those?

MS. GOLDSTEIN:  Yes, your Honor.

The vast majority of those kinds of decisions made by the Secretary are well within the bound of the discretion that's laid out in Wisconsin.  But as you push those examples further, the decision to send 500 enumerators versus 450, clearly within the Secretary's discretion.  Both accomplish an actual enumeration and are calculated to do so.

But the decision to send no enumerators or no enumerators to a particular state, that begins to look more questionable as to whether or not that decision would bear a reasonable relationship to accomplish an enumeration and, under defendants', theory would be entirely unreviewable.

THE COURT:  Turning to the APA question, I think you rely in part on the mandatory language in some places in the census act.  There is no question that the Act mandates that

I739stao

the Secretary do X, Y, and Z but the relevant clause here would seem to be the permissive one, namely, in such form and content as he may determine.

So why are the mandatory aspects of the Act even relevant to the question of whether it's committed to agency discretion?

MS. GOLDSTEIN:  Your Honor, with respect to the plain language of the Census Act, I would argue that Section 5 which directs the Secretary to determine the question -- the mandatory language directs the Secretary to determine the questions and inquiries on the census is more specific than the form and content language that even arguably is permissive in Section 141.

In addition, as plaintiffs have noted in that their papers, there are multiple sources for law to apply in this case, both from those mandatory requirements of the Census Act from the constitutional purposes undergirding the census, the Constitution and the Census Act, and the wide array of administrative guidance out there dictating specifically how the Census Bureau has and does add questions to the decennial questionnaire.  In light of that mosaic of law, there is no question that the vast majority of courts to consider this question have concluded that challenges to the census are reviewable, that there is law to apply.

THE COURT:  And to the extent that you rely on the

I739stao

Census Bureau's own guidance, don't those policy statements have to be binding in order to provide law to apply?

MS. GOLDSTEIN:  No, your Honor.  The starting point here -- so defendants are arguing that there is no law to apply at all.  And the Second Circuit in the Salazar case makes very clear that the Court can look to informal agency guidance to determine whether or not there is law to apply.

In Salazar the Court was looking to dear-colleague letters that no one alleged gave rise to a finding of a private right of action.  But at the same time those dear-colleague letters, in conjunction with other law out there, formed the basis for agency practices and procedures that departures therefrom could be judged to be arbitrary or capricious.

So, too, in this case.  Plaintiffs have identified a wide arrange of policies and practices and procedural guidance dictating the many testing requirements that questions are typically held to and required to go through prior to being added to the decennial census the defendants have entirely ignored here.  I'm happy to distinguish the cases that defendants have cited if the Court would like me to continue on this.

THE COURT:  No.  I think I'd like to turn to the enumeration clause issue at this point.

Mr. Shumate, you're back up.

MR. SHUMATE:  Thank you, your Honor.

I739stao

THE COURT:  Do you agree that the relevant standard comes from Wisconsin is the reasonably related or reasonable relationship to the accomplishment of an actual enumeration that that is the guiding standard here?

MR. SHUMATE:  I think that would be the guiding standard in a case involving a question over whether the Secretary has procedures in place to conduct an actual enumeration, but that is not this case.  This is a case involving the information-gathering function that takes place during the census.  And there is no standard to apply.

THE COURT:  What is the authority -- Ms. Goldstein just argued that it's a false dichotomy and a false distinction that you're trying to draw between the manner and the enumeration.  I mean it seems to me that there is some -- it's hard to draw that -- a clear distinction in the sense that clearly the manner in which the Secretary conducts the census will determine, in many instances, whether it actually is an accurate actual enumeration.

So are there cases that you can point to that draw that distinction and indicate that it is as bright line as you're suggesting?

MR. SHUMATE:  I can't, your Honor, because frankly there hasn't been a case like this one involving the facial challenge to the addition of a question itself.  But even assuming that is the standard, there's nothing in the

I739stao

Constitution that forecloses the Secretary from asking this questions on the census questionnaire.  There is no allegation that the Secretary doesn't have procedures in place to conduct person-by-person headcount in the United States.  And as the Secretary said in his memo at pages one and eight, he intends, again, procedures in place to make every effort to conduct a complete and accurate census.  So they're not challenging the procedures themselves.  They're not challenging the follow-up operations.  They're just challenging the addition of a question itself.

THE COURT:  What about the hypothetical that the Secretary decides to send in-person enumerators only to states in certain regions of the country.  Why would that not be a violation of the enumeration clause?

MR. SHUMATE:  I think that would be, first of all, a very different case, but there may be a valid claim there if the Secretary had not put in place procedures to count every person in the United States.

THE COURT:  Procedures sounds an awful lot like manner, no?  In other words, why is that not a manner case as well that ultimately goes to the enumeration?

MR. SHUMATE:  Because it implicates the count itself. It's not the questions on the form itself that are used to collect the information to count itself.  So it's a fundamentally different situation.

I739stao

But, again, they don't have those allegations in the complaint here that the number of enumerators are insufficient. The only challenge here is to the addition of a question itself.

We can't ignore the fact that this question has been asked repeatedly throughout our history, as early as 1820 and as most recently as the 2000 census. And as the Wisconsin Court made clear, history is fundamentally important in a census case because the government has been doing this since 1790.

THE COURT:  I take it your view is I can consider that history on a 12(b)(6) motion because there are undisputed facts, essentially historical facts.

MR. SHUMATE:  Historical facts that take judicial notice of the fact that the question has been asked repeatedly throughout history.

THE COURT:  Why does history not cut in both directions in the sense that the question was abandoned from the short-form census since 1950; in other words, for the last 68 years it has not been a part of the census.

MR. SHUMATE:  It has been part of the long-form census which went to one in six households, and those households didn't get the short form.  So under their view it was unconstitutional for the government to send the long-form census to one in six houses, it was unconstitutional for the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I739stao

government to ask this question in 1950 and in 1820, and that cannot possibly be right.

Let me address their point about the standard is accuracy, the Secretary has to do everything to pursue accuracy.  That can't possibly be the standard.  It's a made-up standard.  It doesn't come from the cases.  And it's simply unworkable.

On this question of the font on the form itself. There's nothing for the court to evaluate to decide whether that would be a permissible choice or not.  It would give rise to courts second guessing everything that the Secretary does to collect the information for the census.  And that's -- it's simply not a case where the allegations implicate the procedures that are in place to count every person in America; instead this is case implicating the information-gathering function.

THE COURT:  Now in United States v. Rickenbacker, Justice Marshall, for whom this courthouse is named, wrote that, "The authority to gather reliable statistical data reasonably related to governmental purposes and functions is a necessity if modern government is to legislate intelligently and effectively.  The questions contained in the household questionnaire related to important federal concerns such as housing, labor and health and were not unduly broad or sweeping in their scope."

Now admittedly that was in the context of a Fourth Amendment challenge to a criminal prosecution of someone who refused to respond to the census.  But why is that not the relevant standard here?

It seems to me that the census's dual purpose, I think, has always been about getting an accurate count for purposes of allocating seats in the House of Representatives, but from time immemorial it seems that it also was used to collect data on those living in this country and that that has been deemed an acceptable, indeed, important function of it.

So why is that not a sensible standard to apply here?

MR. SHUMATE:  Your Honor, it may be.  But if that's the standard, there is no reason that the addition of a citizenship question would run afoul of that standard.

Again, the question has been asked repeatedly.

THE COURT:  First of all, two questions.  One is doesn't that provide a judicially manageable standard?  Again, recognizing the deference of it to the Secretary on his judgments with respect to it, but at least it is a standard against which the Secretary's judgments can be measured, no?

MR. SHUMATE:  I don't know where that standard comes from, your Honor.  It certainly doesn't come from --

THE COURT:  Thurgood Marshall.

MR. SHUMATE:  That doesn't come from the Constitution, because the Constitution simply says the manner of conducting

the census.  The plaintiffs are right.  That's not the standard that the plaintiffs are pressing.  They're pressing the standard that the Secretary has to do everything to pursue accuracy.  And if that's right, then the plaintiff can claim that the questions about race and sex and Hispanic origin are also unconstitutional.

THE COURT:  But you don't make the argument that that's the relevant standard to apply in your brief?

MR. SHUMATE:  No, your Honor.  The standard to apply, if there is one, is actual enumeration.  And the plaintiffs haven't made any allegations that the Secretary does not have procedures in place to conduct an actual enumeration.

THE COURT:  And the purposes for which the question was added, obviously in the Administrative Record the stated purpose was to enforce -- help enforce the Voting Rights Act.  Are there additional purposes that would justify addition of the question and, relatedly, are those purposes somewhere in the record?

MR. SHUMATE:  Your Honor, the standard rationale was the one provided by the Secretary in his memorandum.  If we ever get to the APA claim, that would be the basis on which the Court would review the reasonableness of his decision.

But in terms of the constitutional claim, plaintiffs have to show, notwithstanding all the significant deference that the Secretary is entitled to, that the addition of this

I739stao

question violates the Constitution.  But, again, there is no suggestion here that the Secretary does not have procedures in place to count every person in America, and it can't be the standard that anything that might cause an undercount would be somehow unconstitutional, because that would call into question many other questions on the form, and it would ignore the long history that this question has been asked on the census.

THE COURT:  And I guess -- what if the political climate in our country was such that the administration was thought to be very anti gun, let's say, and there were perceived threats to gun ownership, thoughts that the administration and the federal government would seize people's guns, and that administration proposed adding a question to the census about whether and how many guns people owned.  Do you think that would not violate the enumeration clause?

MR. SHUMATE:  It would not violate the clause, and Congress could provide a remedy and pass a statute and say this is not a question that should be asked on the census.  It wouldn't be for a court to decide this question is bad, this one is good.  That is something that is squarely committed to the political branches to decide.

THE COURT:  Who is handling this for the plaintiffs?

Ms. Goldstein again.  All right.

Tell me why the Thurgood Marshall standard shouldn't apply here.

I739stao

MS. GOLDSTEIN:  Your Honor, even if the Thurgood Marshall standard would apply, as I can address in a moment, this question would still violate it.  But the Supreme Court in Wisconsin, a more recent case, has made clear the standards that the Court uses to assess the Secretary's decisionmaking authority with respect to the census and that is whether or not the Secretary's decisions bear a reasonable relationship to the accomplishment of an actual immigration keeping in mind the constitutional purposes of the census.

THE COURT:  Tell me, measured against that standard, why asking any demographic questions on the census would pass muster, in other words, presumably asking about race, about sex, about all sorts of questions that have long been on the census, I mean they certainly don't -- they're not reasonably related to getting an accurate count because they don't do anything to advance that purpose and they presumably, to the extent they have any effect, it is to depress the count if only because people view filling out the form as more of a pain.

So how would any of those questions pass muster under that test?

MS. GOLDSTEIN:  Your Honor, this is not an ordinary demographic question.

THE COURT:  That's not my question though.  In other words, based on the test that you are articulating wouldn't any demographic question on the questionnaire fail?

I739stao

MS. GOLDSTEIN:  Absolutely not, your Honor.  Ordinary questions which are subject to extensive testing procedures that are precisely designed in order to assess and minimize and deal with any impacts to accuracy likely do, when they emerge from the end point of that testing, bear a reasonable relationship to the accomplishment of an actual enumeration. The Secretary is permitted under Wisconsin to privileged distributional accuracy over numerical accuracy.  So if adding a gender question or a race question brings down the count a certain percent, there is no suggestion that that is disproportionately impacting certain groups as defendant Jarmin has acknowledged with respect to this situation.

THE COURT:  What about sexuality?  Could the Secretary ask about sexuality in the interests of getting public health information, perhaps?

MS. GOLDSTEIN:  Your Honor, I think to answer that question we would need to wait and see the procedures that the Census Bureau puts that question to, for example, with respect to the race and ethnicity question that the Secretary looked at for nearly a decade subjecting it to focus group testing cognitive testing, all sorts of testing to assess the impact on accuracy.

Now to the extent that a sexuality question had a disproportionate impact that the Secretary acknowledged and recognized and decided to take an action to reduce the accuracy

I739stao

of the census nonetheless, that may well state a claim.  But the vast majority of decisions that the Secretary may make will not.

Now in this case -- there may be hard cases out there, your Honor, but this case is an easy case.

THE COURT:  And is the standard an objective one, I assume?  If one doesn't like at the intent of the Secretary or the government in adding the question, presumably it's an objective test of whether it's reasonably related to the goal of an actual enumeration.

MS. GOLDSTEIN:  That is correct, your Honor.

However, defendants acknowledged recognition of the deterrent effect of this question certainly is good evidence that this will, in fact, undermine the enumeration and does not reasonably relate it to accomplishing enumeration.

THE COURT:  But because it's objective evidence.  In other words, let's assume for the sake of argument that the question was added by the Secretary to suppress the count in certain jurisdictions -- I'm not suggesting that that is the case but let's assume -- is that relevant to whether it states a claim under the enumeration clause.

MS. GOLDSTEIN:  No, your Honor, but it may be well relevant to the claim under the APA.

THE COURT:  Go back to the Thurgood Marshall standard and tell me why that should not be the relevant standard here.

I739stao

It seems to me, as I mentioned to Mr. Shumate, that the census has long had essentially a dual purpose.  On the one hand, it is intended to get an actual enumeration and count the number of people in our country for purposes of representation.  On the other hand, it has long been accepted that it's a means by which the government can collect data on residents of the country.  So why is -- it seems to me that the questions on the questionnaire are more tethered to that later purpose and if that's the case there is a little bit of a mismatch in measuring the acceptability of a question against whether it's reasonably related to the first goal.

MS. GOLDSTEIN:  Your Honor, plaintiffs are to some extent hampered on this because defendants have not proffered the standard or argued it.

THE COURT:  They say there is no standard which is why it's a political question.

MS. GOLDSTEIN:  But the end of that sentence that you read by Justice Marshall made clear that even on that standard of gathering additional demographic data that there are questions that are unduly broad in scope.

Now here what we are alleging, that the Secretary of Commerce has made a decision that reverses decades of settled position that the Census Bureau recognizes that this specific question will reduce the accuracy of the enumeration; in their words from 1980, will inevitably jeopardize the accuracy of the

I739stao

count, where defendants themselves have recognized that this may have, as defendant Jarmin indicated, important impacts in immigrant and Hispanic communities against this particular historical and cultural moment where this administration's anti immigration policy --

THE COURT:  Let me ask you a question about that and try and get at what role that plays in the argument.  Let's assume for the sake of that argument that the prior administration had added the citizenship question in a different climate.  New administration comes in, whether it's this one or some other one, that is perceived to be very anti immigrant.  Does the existence of the question suddenly become unconstitutional because the political climate has changed?

MS. GOLDSTEIN:  I think that the starting point in this case is significant.  The starting point is a reversal of decades of the settled position.  The starting point is without a single test or even explanation as to why that position is being changed.  The starting point is a recognition that it will impair accuracy.  I think if this is a long-standing question, this has been on the census, that might be a different situation.

Just to address defendants' contention that the historical practice weighs in favor of them, I think setting aside that I do think that this is a merits question, this gets

I739stao

the merits wrong.  This question has not been asked of all respondents since 1950.  It, instead, has been relegated to the longer form instrument where the citizenship demand is one of many questions.  On the ACS it can be statistically adjusted.  Failure to answer does not bring a federal employee to your door, knocking on it, demanding to know if you are a citizen.

THE COURT:  How can it be constitutional to include it on a long-form questionnaire and not on a short-form questionnaire?  In other words, how can the constitutionality of whether the question is proffered or asked turn on the length of the questionnaire?

MS. GOLDSTEIN:  The question before the Court is whether or not the decision that was made several months ago to add this question to the long-form questionnaire that goes to all households, whether or not that question is constitutional.  The question of whether or not it was constitutional in 1970 I believe when it was -- when the world was different, when it was originally on the long form is not before the court.  The question has not been -- has been asked on the ACS since 2005.

Now defendants' allegations that the ACS is effectively the same thing as the census I think really belie or ignore the allegations in plaintiffs' complaint.  The Census Bureau has for decades repeatedly resisted calls to move the question from the ACS to the census precisely because while the question may perform on the ACS it does not perform on the

I739stao

census because it undermines the accuracy of that instrument.

THE COURT:  Why, measured against the reasonable relation standard that you're pressing, would the mere use of the long-form questionnaire, why wouldn't that be unconstitutional?

In other words, I think that the response rate of those who receive the long-form questionnaire is significantly lower than the response rate of those who receive the short-form questionnaire.  On your argument wouldn't that be unconstitutional under the enumeration clause?

MS. GOLDSTEIN:  Your Honor, I think that just the lack of testing and the conduct with respect to this decision alone makes this decision distinguishable.  With respect to the change in the long-form questionnaire, with respect to the ACS, with respect to those other demographic questions, they went through considered detailed procedures designed to assess and to minimize impacts on accuracy.  Those tests, those procedures were entirely ignored here.  And that alone distinguishes the Secretary's conduct.

THE COURT:  All right.  Thank you very much.

That concludes the argument on the motion to dismiss. Let me check with the court reporter whether we need a break or not.

She is willing to proceed so I am as well.

Why don't we hear from plaintiffs on discovery since

I739stao

they're the moving parties on that front.  I think the papers are fairly adequate for me to address most of the issues on this front.  In that regard I don't intend to have a lengthy oral argument but I don't want to deprive you of your moment in the sun, Mr. Colangelo.

MR. COLANGELO:  Thank you, your Honor.

Good morning.  Matthew Colangelo from New York for the state and local government plaintiffs.  I'll make two key points regarding the record.  First is that the record the United States has prepared here is deficient on its face and should be completed.  It deprives the Court of the opportunity to review the whole record as it's obligated to do under Section 706 of the APA.  And the second broad argument I'll make is that the plaintiffs have, even once the record is completed, we anticipate the need for extra record discovery in light of the evidence of bad faith, the complicated issues involved in this case and, of course, the constitutional claim.

So turning to the first argument, as I've mentioned, the APA requires the Court to review the whole record.  In Dopico v. Goldschmidt the Second Circuit --

THE COURT:  Can I ask you a threshold question, which is why I shouldn't hold off until I've decided the motion to dismiss in light of the Supreme Court's decision in the DACA litigation arising out of California.

MR. COLANGELO:  The circumstances in the DACA

I739stao

litigation, your Honor, were extremely different and distinguishable from the circumstances here.  The Court in that case pointed out that the United States had made an extremely strong showing of the overbroad nature of the discovery request.  I believe the solicitor general's reply on cert to the Supreme Court mentioned that they would be obligated to review and produce 1.6 million records.  So it was against the backdrop of that extremely broad production request that the Court said that it might make -- the Court directed the district court to stay its discovery order until it resolved the threshold questions.  Nobody is requesting 1.6 million records here, your Honor.

THE COURT:  How do I know that since the question of what you're requesting is not yet before me.

MR. COLANGELO:  I think, among other reasons, your Honor, you know that because the United States hasn't made any contention at all that there's anything near the size of that record that's being withheld in this case as they did in the DACA litigation.

There are, to use the language from Dopico, there are a number of conspicuous absences from the record presented here and we would draw your attention to four in particular.

The first is that with the exception of background materials, there is essentially nothing in the record that predates the December 2017 request from the Justice Department.

There is no record at all of communications with other federal government components.  The new supplemental memo that the Secretary added to the record just twelve days ago now discloses for the first time that over the course of 2017 the Secretary and his senior staff had a series of conversations with other federal government components.  None of those records are anywhere in the Administrative Record that the United States produced.

Second, again with the exception of the December 2017 memo, the United States hasn't produced anything at all reflecting the Justice Department's decision where, as here, the heart of the Secretary's rationale for asking about citizenship, according to his March decision memo, was the supposed need to better enforce sections of the Voting Rights Act.  It's just not reasonable to believe that there are no other records that he directly or indirectly considered in the course of reaching his decision.  In fact, the Secretary testified to Congress under oath that we had a lot of conversations with the Justice Department.  If that's the case, those conversations ought to be included in the record.

The third key category of materials that are conspicuously omitted include records of the stakeholder outreach that the Secretary did conduct over the course of -- earlier this year.  The Secretary's decision memo says he reached out to about two dozen stakeholders.  Other than what

I739stao

appear to be undated, after-the-fact post hoc summaries that somebody somewhere prepared of those calls, there is no information at all about how those 24 stakeholders were selected; why, for example, was the National Association of Home Builders one of the stakeholders that the Secretary elected to reach out to here.  The government has omitted the Secretary's briefing materials.  All of these records are records that are necessary to help understand the government's decision.

And then the final category of materials conspicuously omitted are the materials that support Dr. Abowd's conclusion that adding this question would be costly and undermine the accuracy of the count.  Dr. Abowd is the Census Bureau's chief scientist.  Obviously materials that he relied on in reaching that adverse conclusion are materials that the Secretary indirectly considered and that body of evidence should be included in the record as well.

THE COURT:  Why don't you briefly speak to the bad faith argument and then I want to address the question of scope and what should and shouldn't be permitted if I allow discovery.  I don't know if that's you or Mr. Rios who is planning to address that.

MR. COLANGELO:  I can address scope and then I will turn to Mr. Rios to address one aspect of our anticipated expert discovery, your Honor.

I739stao

On bad faith, your Honor, we think there are at least five indicia of bad faith here, more than enough -- more than enough certainly singularly to justify expanding the record but in collection we think they make an overwhelming case.

THE COURT:  List them quickly if you don't mind.

MR. COLANGELO:  Why don't I focus on two.  First is the tremendous political pressure that was brought to bear on the Commerce Department and the Census Bureau.  The record that the Justice Department presented discloses what appear to be four telephone calls between Kris Kobach and the Commerce Secretary or his senior staff on this question at a time that the Commerce Secretary now admits he was considering how to proceed on this question.  The Justice Department's only response in the paper they filed with the Court is that that appears to be isolated or unsolicited and quite frankly, your Honor, that's just not credible.  The Commerce Secretary and the senior staff had four telephone calls with an adviser to the President and Vice-President on election law issues on the exact question that the Secretary now acknowledges he was then considering.  Mr. Kobach presented to the Secretary proposed language to this question that matches nearly verbatim the language that the Secretary ultimately decided to add to the census questionnaire and yet the only conclusion one can draw is that it was isolated, incidental and immaterial contact. That's just not a reasonable position to take without exploring

I739stao

more of the record.

The second argument that I'll mention briefly, that the shifting chronology here that the Commerce Department has presented we think also presents a strong case of bad faith. The March decision memo explicitly describes the Commerce Department's consideration of this question as being in response to the requests they received from the Justice Department. The Secretary's more or less contemporaneous sworn testimony to Congress repeats that point several times. In at least three different congressional hearings he uses language like we are responding only to the Justice Department; as you know, Congressperson, the Justice Department initiated this request; and then just twelve days ago the Commerce Secretary supplemented the record and disclosed that, in fact, the Commerce Department recruited the Justice Department to request this question, which certainly suggests that the Commerce Department knew where it wanted to go and was trying to build a record to support it. The rest of the arguments are set out in our papers, your Honor.

THE COURT: So talk to me about what the scope of discovery that you're seeking is and why I shouldn't, if I authorize it at all, severely constrain it.

MR. COLANGELO: Well, your Honor, I think we're actually looking for quite tailored discovery here and I think we can stagger it, I think as an initial --

I739stao

THE COURT:  It's grown from three or four depositions at the initial conference to twenty.

MR. COLANGELO:  Fair enough, your Honor.  But at the initial conference we didn't have the Administrative Record that disclosed the role of Mr. Kobach at the instruction of Steve Bannon.  We didn't known that Wendy Teramoto, the Secretary's chief of staff, had a series of e-mails and several phonecalls with Mr. Kobach at the exact same time they were now considering this question.

So, respectfully, our blindfolded assessment of what we might need has expanded slightly, but I still think it's a reasonable and reasonably tailored request.  And so I would say a couple of things.

First, I think the Justice Department ought to complete the record by including the materials that are conspicuously omitted and that they acknowledge exist and they ought to do that in short order and at the same time ought to present a privilege log so that we can assess, without guessing, what their claims of privilege are and why those claims are or are not defensible.

I think once we have completed the administrative record, I think there is additional discovery, particularly in the nature of testimonial evidence, some third-party discovery, of course, Mr. Kobach, the campaign, Mr. Bannon, potentially some others.  I think it's critical that we get evidence from

I739stao

the Department of Justice because the Department of Justice ostensibly was the basis for the Secretary's decision, and then expert testimony, which we can turn to in a moment.

THE COURT:  And then talk to me about Mr. Kobach, Mr. Bannon.  First of all, wouldn't it suffice, if I authorize discovery, to allow you to seek that discovery from the Commerce Department and/or the Justice Department alone?  In other words, the relevance of whatever input they gave is what impact it had on the decision-makers at Commerce and that can be answered by discovery through Commerce alone.  I'm not sure it warrants or necessitates expanding to third parties and then, second to that, Mr. Bannon is a former White House adviser and that implicates a whole set of separate and rather more significant issues, namely separation of powers issues, and executive privilege issues, and so forth.  Why should I allow you to go there?

MR. COLANGELO:  A couple of reasons, your Honor. First of all I do think we can table the question.  I'm not prepared to concede that he we don't need third-party discovery.  It may well be the only way that we can understand the basis for the Secretary's decision.  But I do think we can table it to see, especially if we can do it quickly, what the actual completed record looks like and what other documents and potentially other testimonial evidence may disclose.  And we certainly wouldn't be seeking to take third-party depositions

I739stao

next week.

And I appreciate the concerns, obviously, about executive privilege. But we do have the separate -- two separate issues here. One is that the Secretary has testified to Congress that he was not aware at all of any communications from anyone in the White House to anyone on his team. So if it now turns out that that congressional testimony may have omitted input from Mr. Bannon, I think we would want to discuss the opportunity to seek further explication of what exactly happened.

And then the final reason why I'm not prepared to concede that this additional evidence may not be necessary is the involvement of political access here is problematic for the Commerce Department's decision in a way that might not arise in an ordinary policy judgment case for two reasons. First, it's not consistent with the Secretary's presentation of his decision in his decision memo; but second, the Census Bureau is a statistical agency that is governed by the White House's own procedures that govern how statistical agencies ought to operate and among the core tenets of those procedures is independence and autonomy from political actors. So to the extent that there was undue political involvement in the decision here, we think that it probably does bear somewhat heavily on the Court's ability to assess the record.

But I don't disagree that we can stagger it. I'm just

I739stao

not prepared to concede now that we won't need it.

THE COURT:  Let me hear from Mr. Rios briefly and then I'll here from Mr. Shumate -- excuse me, not Mr. Shumate.

Go ahead.

MR. RIOS:  May it please the Court, your Honor, Rolando Rios on behalf of the plaintiffs.  My brief comments, your Honor, are addressed to the need for discovery on an Article I claim.  My clients, Hidalgo and Cameron Counties, are on the southernmost Texas border between Mexico and the United States.  It is the epicenter of the hysterical anti immigrant rhetoric from the federal government.  McAllen and Brownsville are the county seats.  It is a microcosm, your Honor, of what is going on across the country in the Latino community.  Quite frankly, the minority community across the country is traumatized by the federal government's actions.

THE COURT:  Mr. Rios, I don't mean to cut you off but if you could get to the expert discovery point that you want to make.

MR. RIOS:  Yes, your Honor.  The general comments that I have is that based on their own expert's testimony that the citizenship question will increase the nonresponsiveness I feel it's important that expert testimony to update that data based on the present environment is essential.  Your Honor, the importance of census data is lost sometimes here.  I've been practicing voting rights law for 30 years.  And, quite frankly,

I739stao

census data is the gold standard that the federal courts use to adjudicate the allocation of judicial power -- I mean electoral power and political power and federal resources.  So this citizenship question is designed to tarnish that gold standard and basically deny our clients the political power that they're entitled to and also federal funds.

THE COURT:  Thank you very much.  Let me hear from Ms. Vargas I think it is.

MR. FREEDMAN:  Your Honor, do you want to hear from us before the defendants or --

THE COURT:  I didn't realize that you wished to have a word.

MR. FREEDMAN:  Sorry, your Honor.

THE COURT:  Sure.  That makes more sense, that order.  Go ahead.

MR. FREEDMAN:  Your Honor, John Freedman for the NYIC plaintiffs.  I could add additional points to what the state did on why the record needs to be supplemented.  I could point to additional gaps.  A lot of those are covered in our letter.  I could point to additional evidence why expansion of the record is appropriate and layout bad faith.  But I think, again, I think that's covered in the letter.

THE COURT:  OK.

MR. FREEDMAN:  I do think it is worth emphasizing that we have an additional constitutional claim, equal protection

I739stao

claim, that we believe entitles us to discovery. The basis for that is Rule 26 to start with, which says that we have the right to conduct discovery to any issue that's relevant. Certainly, the equal protection claim has elements that are not and do not overlap with the APA claim, including intent and impact and the history into the decision. We think that under the Supreme Court precedence, Webster v. Doe, we are entitled to conduct discovery and that there is a parallel APA claim.

THE COURT: It strikes me that the Supreme Court's decision In re United States, the DACA litigation, counsel is cautioned in allowing discovery before a court has considered threshold issues. I think the state's case is a little different in the sense that I have heard oral argument and have already gotten full briefing on those issues and in that regard can weigh that in the balance. But obviously the motion in your case is not yet fully submitted.

MR. FREEDMAN: It will be soon.

THE COURT: It will be soon. That is true.

MR. FREEDMAN: I think with respect to our case we can argue it now, you can take it under advisement until there is a ruling. I also think there's an important distinction in the way the DACA case was handled in terms of supplementing the administrative record and that can be going on while the government has already put forward a record that is manifestly deficient. Their work you can provide guidance to them to how

I739stao

they supplement it while the motion is under consideration.  I think that that's permitted under how the Supreme Court ruled in the DACA case.

THE COURT:  Anything else?

MR. FREEDMAN:  I do want -- just on scope.  Obviously, you were asking questions about scope and how to control it.  I think that the constitutional precedence we would cite Webster v. Doe on intent of decision-makers.  All counsel have active involvement of the court in making sure discovery is tailored.  We do have tailored discovery in mind.  We weren't here at the May 4 conference obviously.  We've always been approaching this as, because we have additional elements on our intentional discrimination claim, that we have additional things that we'd like to be able to prove, that under Arlington Heights we are entitled to prove.  That's part of the reason why the deposition list is a little bit longer.

I also do think it would be helpful to get guidance from the Court on the question of the supplementation of Administrative Record.  In particular, we cited cases in our letter spelling out that it's the obligation of the Agency, not just merely the Secretary, to produce records that are under consideration.  We think that the Court should provide guidance that the whole record should include materials prior to December 12 and the pre-decisional determination to reach out to other agencies and have them sponsor the question.  In many

I739stao

ways looking at that prehistory, there's a parallel between this case and what happened in Overton Park which is the seminal Supreme Court case here where the Court was hamstrung by its ability to review the case because all that the Department of Transportation had produced was effectively a post-litigation record.  And I think you could look at what the Department has done here as a similar or analogous circumstance that they made a decision that they wanted to have this question.  They had a response, then they said we're now on the clock, it's now time to start building our record, and that's what we're going to produce, and we don't have the real record before us.

THE COURT:  Thank you.

Let me hear from Ms. Vargas and then we'll proceed.

Ms. Vargas, tell me why the supplemental memo or addition to the Administrative Record alone doesn't give rise to the need for discovery here.  It seems that the ground has shifted quite dramatically; that initially in both the Administrative Record and in testimony the Secretary's position was that this was requested by the Department of Justice and lo and behold in a supplemental memo of half a page without explanation it turns out that that's not entirely the case.  So doesn't that point to the need for discovery?

MS. VARGAS:  Your Honor, there is nothing inconsistent between the supplemental memo and the original memo.  The

I739stao

original memo addresses a particular point in time.  There is a receipt of the DOJ letter.  It's uncontested that it was received on a particular date.  At that point, as the Secretary said in his original memo, we gave a hard look, after we received the formal request from the Department of Justice, and then he details the procedures and the analysis that he started at that point in time.

THE COURT:  First of all, isn't it material to know that that letter was generated by a request from the Secretary himself as opposed to at least the misleading suggestion that it was from the Department of Justice without invitation?

MS. VARGAS:  Your Honor, I resist the suggestion that it was misleading as an initial matter.

THE COURT:  That's my question.  Isn't it misleading or at least isn't there a basis to conclude that it's misleading and therefore an entitlement for the plaintiffs to probe that?

MS. VARGAS:  No, your Honor.  It's not misleading.  It simply starts at a particular point in time and it goes forward.  It doesn't speak whatsoever to the process that preceded the receipt of the DOJ memo and that's because the Administrative Record does not include internal deliberations, the consultative process, or the internal discussions that happen inter-agency or intra-agency.  That's very settled law. It's black letter administrative law that what is put on the

I739stao

administrative record is the decisional document and the informational basis for that decision but not the discussions that precede that or that go along with it.  That has been the decisions of the Second Circuit, the D.C. Circuit en banc in San Luis Obispo.  All of those courts speak to the fact that the internal conversations, the process documents, are not part of the administrative record and so, therefore, they wouldn't normally be disclosed.  All the things that precede a decision internally, the processes, the discussions, none of that would normally be part of an administrative record and it wouldn't normally be part of a decisional document.  Normally when an agency issues a decision it doesn't go through:  And then we had this discussion, and then there was this discussion and they arrive at --

THE COURT:  But it does include the underlying data that the decision-maker considered or that those advising the decision-maker considered and how can it possibly be that the Secretary began conversations about this shortly after he was confirmed and there is literally virtually nothing in the record between that date and December 12 or whatever the date is that the letter arrives from the Department of Justice?  It just -- doesn't that --

MS. VARGAS:  Data is a different matter, your Honor. The underlying information and data we believe is included and there is -- there is some allegation that the data that the

I739stao

Census Bureau relied upon in generating analyses of the DOJ request was not included in the Administrative Record.

Now the summary of that analysis, in fact, is included in the Administrative Record.  It is in the Abowd -- two different Abowd memos that are part of the Administrative Record.

Raw data itself, the raw census data from which that analysis is generated is protected by law.  It's confidential --

THE COURT:  I don't mean the data but the analyses of those who are advising the Secretary on whether this is a good idea or bad idea.

MS. VARGAS:  Well to the extent they are discussing pros and cons, analysis, recommendations, all of that would fall within the deliberative process privilege.

THE COURT:  Why should that not be on a privilege log?

MS. VARGAS:  Because, your Honor, courts have routinely held that privilege logs are not required in APA cases precisely because these documents are not part --

THE COURT:  Didn't the Second Circuit say exactly the opposite in the DACA litigation out of the Eastern District?

MS. VARGAS:  Respectfully no, your Honor, it did not. I believe you're talking about the Nielsen slip order in which they denied a writ of mandamus.  So, first of all, we're talking about a denial of a writ of mandamus which, of course,

I739stao

is reviewing the district court decision under an exceedingly high standard, whether or not there are extreme circumstances warranting overturning the district court's decision. Obviously, of course, it's also not a published opinion but an order of the court, it's nonbinding. But on the merits I do not believe that the Second Circuit stated that privilege logs are required. If you look at the district court order that's being reviewed in that case, the District Court had decided that on the facts of that case a privilege log was required because it had found that the government had acted in bad faith. So there was -- it wasn't binding that in every APA case privilege logs are required. The District Court had said that in constructing the administrative record the agency had not included all of the documents that were directly or indirectly before the decision-maker. And in that specific circumstance where there had been that history, it said that we are not affording the normal presumption of regularity to the government and it was going to require a privilege log. And the Second Circuit did not grant writ of mandamus to overturn that decision.

But it doesn't stand for a broader proposition that in all APA cases privilege logs are required. The vast weight of authority is, in fact, to the contrary. Because these documents are not part of an administrative record in the first place, you don't log them; just as in civil discovery, if a

I739stao

document is not responsive to a document request, you don't put it on a privilege log.  The same principle applies in this case.

THE COURT:  All right.  Anything else you want to say?

MS. VARGAS:  Yes, your Honor.  I did want to address a couple of points on the scope of discovery, particularly expert discovery.  They are trying to take advantage of an exception that doesn't really apply to have broad expert discovery in a case when the Second Circuit in Sierra Club has specifically said it is error for a district court in an APA case to allow experts to opine and to challenge the propriety of an agency decision.

THE COURT:  Well, the way I read Sierra Club it doesn't speak to whether expert discovery should be authorized in the first instance.  It speaks to the deference owed to the agency and whether a court can rely on an expert -- expert evidence in order to supplant or disregard the agency's opinion.  But that's a merits question.  It's not a question pertaining to discovery.

MS. VARGAS:  I disagree, your Honor.  I think what the Second Circuit said is that expert discovery -- extra record, expert discovery for the purposes of challenging the agency's expert analysis is absolutely error and should not be allowed because of the fact that record review in an APA case under Supreme Court precedent, Camp v. Pitts, it must be confined to

I739stao

the record.

THE COURT:  What if the bad faith exception applies?

MS. VARGAS:  Well the bad faith exception, of course, is a separate exception.  Specific to the expert point.

THE COURT:  But my question is that if I find that the presumption of regularity has been rebutted and the bad faith exception applies, does that not open the door to expert discovery, putting aside the ultimate question of whether and to what extent I could rely on that expert discovery or evidence in terms of evaluating the Secretary's decision?

MS. VARGAS:  No, your Honor.  Because the exceptions for the record review rule are to be narrowly construed.  So to the extent that your Honor found that there was bad faith, which we obviously contest and don't believe extra record discovery is appropriate here, but if the Court were to find that, then the discovery had to be narrowly tailored to the points on which you found that there was some allegation of bad faith.  So, for example, if there was a very specific issue that your Honor thought needed to be developed that perhaps could be ordered but it wouldn't open the door up to make this just a regular civil litigation under Rule 26 with broad discovery allowed on all claims on all issues and any expert discovery they wanted.  It doesn't open the door that wide.  It just has to be narrowed to the specific point on which you find.  But, of course, the government does not concede, it does

I739stao

not believe that discovery would be appropriate in this case.

THE COURT:  I understand.

MS. VARGAS:  Thank you, your Honor.

THE COURT:  All right.  I was largely prepared to rule on the discovery question based on the papers and nothing I've heard from counsel has altered my view so I am prepared to give you my ruling on that front.

In doing so, I am of course mindful of the Supreme Court's decision In re United States, 138 S. Ct. 443 (2017) (per curiam), holding in connection with lawsuits challenging the rescission of DACA that the district court should have resolved the government's threshold arguments before deciding whether to authorize discovery -- on the theory that the threshold arguments, "if accepted, likely would eliminate the need for the district court to examine a complete Administrative Record."  That is from page 445 of that decision.  I do not read that decision, however, to deprive me of the broad discretion that district courts usually have in deciding whether and when to authorize discovery despite a pending motion to dismiss; indeed, the Supreme Court's decision was expressly limited to "the specific facts" of the case before it.  That's from the same page.  More to the point, several considerations warrant a different approach here. First, unlike the DACA litigation, this case does not arise in the immigration and national security context, where the

I739stao

Executive Branch enjoys broad, indeed arguably broadest authority.  Second, time is of the essence here given that the clock is running on census preparations.  If this case is to be resolved with enough time to seek appellate review, whether interlocutory or otherwise, it is essential to proceed on parallel tracks.  Third, and most substantially, unlike the DACA litigation, defendants' threshold argument here are fully briefed, at least in the states' case.  See Regents of University of California v. U.S. Department of Homeland Security, 279 F.Supp. 3d 1011, at 1028 (N.D. Cal. 2018) discussing the procedural history of the DACA litigation and making clear that the motion to dismiss was not filed at the time that discovery was authorized.  Although I reserve judgment on those threshold arguments, and I should make clear that I am reserving judgment on the motion to dismiss at this time, I am sufficiently confident, having read the parties' briefs and heard the oral argument today that the state and city plaintiffs' claims will survive, at least in part, to warrant proceeding on the discovery front.  Moreover, I hope to issue a decision on the threshold issues in short order.  So in the unlikely event that I do end up dismissing plaintiffs' case in its entirety, it is unlikely that defendants will have been heavily burdened in the interim.

With that, let me turn to the three broad categories of additional discovery that plaintiffs in the two cases have

I739stao

sought in their letters of June 26, namely, a privilege log for all materials withheld from the record on the basis of privilege; completion of the previously filed Administrative Record; and extra record discovery.  See docket no. 193 in the states' case, that is plaintiffs' letter in that case.  For reasons I will explain, I find that plaintiffs have the better of the argument on all three fronts.  I will address each in turn and then turn to the scope and timing of discovery that I will allow.

The first issue whether defendants need to produce a privilege log is easily resolved.  Put simply, defendants' arguments are, in my view, squarely foreclosed by the Second Circuit's December 17, 2017 rejection of similar arguments In re Nielsen.  That is docket no. 17-3345 (2d Cir. December 27 or 17, I think, 2017).  That is the DACA litigation pending in the Eastern District of New York.  I recognize, of course, that that was -- it arises in a mandamus petition and it is unpublished, but I think the reasons articulated by the Court of Appeals counsel for the production of a privilege log here. If anything, the justifications for requiring production of a privilege log are stronger here as the underlying documents do not implicate matters of immigration or national security and the burdens would appear to be substantially less significant or at least defendants have not articulated a particularly onerous burden.  Moreover, whereas the defendants in Nielsen

I739stao

had at least identified some basis for asserting privilege, namely the deliberative process privilege, defendants here, at least until the argument a moment ago, did not provide any such basis.  See the states' letter at page two, note three.  Accordingly, defendants must produce a privilege log identifying with specificity the documents that have been withheld from the Administrative Record and, for each document, the asserted privilege or privileges.

Second, plaintiffs seek an order directing the government to complete the Administrative Record.  Although an agency's designation of the Administrative Record is generally afforded a presumption of regularity, that presumption can be rebutted where the seeking party shows that "materials exist that were actually considered by the agency decision-makers but are not in the record as filed."  Comprehensive Community Development Corp. v. Sebelius, 890 F.Supp. 2d 305, 309 (S.D.N.Y. 2012).  Plaintiffs have done precisely that here.

In his March 2018 decision memorandum produced in the Administrative Record at page 1313, Secretary Ross stated that he "set out to take a hard look" at adding the citizenship question "following receipt" of a request from the Department of Justice on December 12, 2017.  Additionally, in sworn testimony before the House Ways and Means Committee, of which I can take judicial notice, see, for example, Ault v. J. M. Smucker Company, 2014 WL 1998235 at page 2 (S.D.N.Y. May 15,

I739stao

2014), Secretary Ross testified under oath that the Department of Justice had "initiated the request for inclusion of the citizenship question." See the states' letter at page four. It now appears that those statements were potentially untrue. On June 21, this year, without explanation, defendants filed a supplement to the Administrative Record, namely a half-page memorandum from Secretary Ross, also dated June 21, 2018. That appears at docket no. 189 in the states' case. In this memorandum, Secretary Ross stated that "soon after" his appointment as Secretary, which occurred in February of 2017, almost ten months before the request from the Department of Justice, he "began considering" whether to add the citizenship question and that "as part of that deliberative process," he and his staff "inquired whether the department of justice would support, and if so would request, inclusion of a citizenship question." In other words, it now appears that the idea of adding the citizenship question originated with Secretary Ross, not the Department of Justice and that its origins long predated the December 2017 letter from the Justice Department. Even without that significant change in the timeline, the absence of virtually any documents predating DOJ's December 2017 letter was hard to fathom. But with it, it is inconceivable to me that there aren't additional documents from earlier in 2017 that should be made part of the Administrative Record.

I739stao

That alone would warrant an order to complete the Administrative Record. But, compounding matters, the current record expressly references documents that Secretary Ross claims to have considered but which are not themselves a part of the Administrative Record. For example, Secretary Ross claims that "additional empirical evidence about the impact of sensitive questions on the survey response rates came from the Senior Vice-President of Data Science at Nielsen." That's page 1318 of the record. But the record contains no empirical evidence from Nielsen. Additionally, the record does not include documents relied upon by subordinates, upon whose advice Secretary Ross plainly relied in turn. For example, Secretary Ross's memo references "the department's review" of inclusion of the citizenship question, and advice of "Census Bureau staff." That's pages 1314, 1317, and 1319. Yet the record is nearly devoid of materials from key personnel at the Census Bureau or Department of Commerce -- apart from two memoranda from the Census Bureau's chief scientist which strongly recommend that the Secretary not add a citizenship question. Pages 1277 and 1308. The Administrative Record is supposed to include "materials that the agency decision-maker indirectly or constructively considered." Batalla Vidal v. Duke, 2017 WL 4737280 at page 5 (E.D.N.Y. October 19, 2017).

Here, for the reasons that I've stated, I conclude that the current Administrative Record does not include the

I739stao

full scope of such materials.  Accordingly, plaintiffs' request for an order directing defendants to complete the Administrative Record is well founded.

Finally, I agree with the plaintiffs that there is a solid basis to permit discovery of extra-record evidence in this case.  To the extent relevant here, a court may allow discovery beyond the record where "there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decision-makers."  National Audubon Society v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997).  Without intimating any view on the ultimate issues in this case, I conclude that plaintiffs have made such a showing here for several reasons.

First, Secretary Ross's supplemental memorandum of June 21, which I've already discussed, could be read to suggest that the Secretary had already decided to add the citizenship question before he reached out to the Justice Department; that is, that the decision preceded the stated rationale.  See, for example, Tummino v. von Eschenbach, 427 F.Supp. 2d 212, 233 (E.D.N.Y. 2006) authorizing extra-record discovery where there was evidence that the agency decision-makers had made a decision and, only thereafter took steps "to find acceptable rationales for the decision."  Second, the Administrative Record reveals that Secretary Ross overruled senior Census Bureau career staff, who had concluded -- and this is at page

I739stao

1277 of the record -- that reinstating the citizenship question would be "very costly" and "harm the quality of the census count." Once again, see Tummino, 427 F.Supp. 2d at 231-32, holding that the plaintiffs had made a sufficient showing of bad faith where "senior level personnel overruled the professional staff." Third, plaintiffs' allegations suggest that defendants deviated significantly from standard operating procedures in adding the citizenship question. Specifically, plaintiffs allege that, before adopting changes to the questionnaire, the Census Bureau typically spends considerable resources and time -- in some instances up to ten years -- testing the proposed changes. See the amended complaint which is docket no. 85 in the states' case at paragraph 59. Here, by defendants' own admission -- see the amended complaint at paragraph 62 and page 1313 of the Administrative Record -- defendants added an entirely new question after substantially less consideration and without any testing at all. Yet again Tummino is instructive. See 427 F.Supp. 2d at 233, citing an "unusual" decision-making process as a basis for extra-record discovery.

Finally, plaintiffs have made at least a prima facie showing that Secretary Ross's stated justification for reinstating the citizenship question -- namely, that it is necessary to enforce Section 2 of the Voting Rights Act -- was pretextual. To my knowledge, the Department of Justice and

I739stao

civil rights groups have never, in 53 years of enforcing Section 2, suggested that citizenship data collected as part of the decennial census, data that is by definition quickly out of date, would be helpful let alone necessary to litigating such claims.  See the states case docket no. 187-1 at 14; see also paragraph 97 of the amended complaint.  On top of that, plaintiffs' allegations that the current Department of Justice has shown little interest in enforcing the Voting Rights Act casts further doubt on the stated rationale.  See paragraph 184 of the complaint which is docket no. 1 in the Immigration Coalition case.  Defendants may well be right that those allegations are "meaningless absent a comparison of the frequency with which past actions have been brought or data on the number of investigations currently being undertaken," and that plaintiffs may fail "to recognize the possibility that the DOJ's voting-rights investigations might be hindered by a lack of citizenship data."  That is page 5 of the government's letter which is docket no. 194 in the states case.  But those arguments merely point to and underscore the need to look beyond the Administrative Record.

To be clear, I am not today making a finding that Secretary Ross's stated rationale was pretextual -- whether it was or wasn't is a question that I may have to answer if or when I reach the ultimate merits of the issues in these cases. Instead, the question at this stage is merely whether --

I739stao

assuming the truth of the allegations in their complaints -- plaintiffs have made a strong preliminary or prima facie showing that they will find material beyond the Administrative Record indicative of bad faith.  See, for example, Ali v. Pompeo, 2018 WL 2058152 at page 4 (E.D.N.Y. May 2, 2018).  For the reasons I've just summarized, I conclude that the plaintiffs have done so.

That brings me to the question of scope.  On that score, I am mindful that discovery in an APA action, when permitted, "should not transform the litigation into one involving all the liberal discovery available under the federal rules.  Rather, the Court must permit only that discovery necessary to effectuate the Court's judicial review; i.e., review the decision of the agency under Section 706."  That is from Ali v. Pompeo at page 4, citing cases.  I recognize, of course, that plaintiffs argue that they are independently entitled to discovery in connection with their constitutional claims.  I'm inclined to disagree given that the APA itself provides for judicial review of agency action that is "contrary to" the Constitution.  See, for example, Chang v. USCIS, 254 F.Supp. 3d 160 at 161-62 (D.D.C. 2017).  But, even if plaintiffs are correct on that score, it is well within my authority under Rule 26 to limit the scope of discovery.

Mindful of those admonitions, not to mention the separation of powers principles at stake here, I am not

I739stao

inclined to allows as much or as broad discovery as the plaintiffs seek, at least in the first instance. First, absent agreement of defendants or leave of Court, of me, I will limit plaintiffs to ten fact depositions. To the extent that plaintiffs seek to take more than that, they will have to make a detailed showing in the form of a letter motion, after conferring with defendants, that the additional deposition or depositions are necessary. Second, again absent agreement of the defendants or leave of Court, I will limit discovery to the Departments of Commerce and Justice. As defendants' own arguments make clear, materials from the Department of Justice are likely to shed light on the motivations for Secretary Ross's decision -- and were arguably constructively considered by him insofar as he has cited the December 2017 letter as the basis for his decision. At this stage, however, I am not persuaded that discovery from other third parties would be necessary or appropriate; to the extent that third parties may have influenced Secretary Ross's decision, one would assume that that influence would be evidenced in Commerce Department materials and witnesses themselves. Further, to the extent that plaintiffs would seek discovery from the White House, including from current and former White House officials, it would create "possible separation of powers issues." That is from page 4 of the slip opinion in the Nielsen order. Third, although I suspect there will be a strong case for allowing a

I739stao

deposition of Secretary Ross himself, I will defer that question to another day. For one thing, I think it should be the subject of briefing in and of itself. It raises a number of thorny issues. For another, I'm inclined to think that plaintiffs should take other depositions before deciding whether they need or want to go down that road and bite off that issue recognizing, among other things, that defendants have raised the specter of appellate review in the event that I did allow it. At the same time, I want to make sure that I have enough time to decide the issue and to allow for the possibility of appellate review without interfering with an expeditious schedule. So on that issue I'd like you to meet and confer with one another and discuss a timeline and a way of raising the issue, that is to say, when it is both ripe but also timely and would allow for an orderly resolution.

So with those limitations, I will allow plaintiffs to engage in discovery beyond the record. Further, I will allow for expert discovery. Expert testimony would seem to be commonplace in cases of this sort. See, for example, Cuomo v. Baldrige, 674 F.Supp. 1089 (S.D.N.Y. 1987). And as I indicated in my colloquy with Ms. Vargas, I do not read Sierra v. United States Army Corps of Engineers, 772 F.2d 1043 (2d Cir. 1985), to "prohibit" expert discovery as defendants suggestion. That case, in my view, speaks the deference that a court ultimately owes the agency's own expert analyses, but it does not speak to

I739stao

the propriety of expert discovery, let alone clearly prohibit such discovery, let alone do so in a case where, as I have just done so, a finding of bad faith and a rebuttal of the presumption of regularity are at issue.

That leaves only the question of timing. I recognize that you proposed schedules without knowing the scope of discovery that I would permit. I would like to set a schedule today. In that regard, would briefly hear from both sides with respect to the schedule. Alternatively, I could allow you to meet and confer and propose a schedule in writing if you think that that would be more helpful. Let me facilitate the discussion by throwing out a proposed schedule which is based in part on your letters and modifications that I've made to the scope of discovery.

First, by July 16, I think defendants should produce the complete record as well as a privilege log and initial disclosures. I recognize that Rule 26(a)(1)(B)(i) exempts from initial disclosure "an action for review on an administrative record" but in light of my decision allowing extra-record discovery I do not read that exception to apply.

Then I would propose that by September 7, plaintiffs will disclose their expert reports.

By September 21, defendants will disclose their expert reports, if any.

By October 1, plaintiffs will disclose any rebuttal

I739stao

expert reports.

And fact an expert discovery would close by October 12, 2018.

Plaintiffs also propose that the parties would then be ready for trial on October 31.  My view is it's premature to talk about having a trial.  For one thing, it may well end up making sense to proceed by way of summary judgment rather than trial.  For another thing, I don't know if we need to build in time for Daubert motions or other pretrial motions that would require more than 19 days to brief and for me to decide.  I would be inclined, instead, to schedule a status conference for sometime in September to check in on where things stand, making sure that things are proceeding apace and get a sense of what is coming down the pike and decide how best to proceed.  Having said that, I think it would make sense for you guys to block time in late October and November in the event that I do decide a trial is warranted.  Again, I am mindful that my word is not likely to be the final one here and I want to make sure that all sides have an adequate opportunity to seek whatever review they would need to seek after a final decision.

So that's my ruling.  You can respond to my proposed schedule.  I'd be inclined to set it today but if you think you need additional time.

MR. FREEDMAN:  Your Honor, John Freedman.  Just one clarification.  I think it was clear from what you said but in

I739stao

terms of the number of depositions you meant ten collectively between the two cases, not ten per case?

THE COURT:  Correct.  And they would be cross-designated or cross-referenced in both cases.  Correct.

MR. FREEDMAN:  Understood, your Honor.

THE COURT:  And, again, I don't mean to suggest that you will get more, but that's not -- I did invite you to make a showing with specificity for why additional depositions would be needed.  If it turns out that it is warranted, I'm prepared to allow it but, mindful of the various principles at stake and the limited scope of review under the APA, I think that it makes sense to rein discovery in in a way that it wouldn't be a standard civil action.

So, thoughts?

MR. COLANGELO:  Your Honor, for the state and local government plaintiffs, we have no concerns at all.

THE COURT:  Microphone, please.

MR. COLANGELO:  For the state and local government plaintiffs, we have no concerns at all with the various deadlines that the Court has set out.  Thank you.

MR. FREEDMAN:  Your Honor, for the NYIC plaintiffs we concur.  We think that it sets an appropriately expedited schedule that will resolve the issues in time and we appreciate the expedited consideration.

THE COURT:  All right.  Defendants.

I739stao

MS. BAILEY:  Your Honor, I have a couple clarifying questions.  As far as the proposed July 16 deadline, you say completing the record would that be the same deadline you envision for the privilege log?

THE COURT:  Yes.

MS. BAILEY:  We would ask that the schedule we have already set in other actions, that we have a little bit more time for that initial deadline.  We have a number of briefs and an argument coming up that same week.  Could we push that back until a bit later in July?

THE COURT:  And when you say "that," meaning the deadline for initial disclosures, completing the record, and the log or only a part of those?

MS. BAILEY:  Yes, your Honor.  All -- it would make sense I think to do them all together.  But it would -- we'd like to move that a little later in July.

THE COURT:  Well I don't want to move it too much later in July because it will backup everything else.  Why don't I give you until July 23.  I would imagine that that would not materially affect the remainder of the schedule and would give you an extra week.  Next.

MS. BAILEY:  Thank you, your Honor.

One other point.  In the conference before Judge Seeborg, Judge Seeborg, as your Honor is aware, he reserved the issue of deciding whether discovery was warranted.  But as I

understand it, he strongly indicated that he thought that -- if discovery is warranted in different actions, that the plaintiffs should coordinate between those actions and asked for the views of the parties on how that coordination should take place.  So he didn't ultimately rule on that but we agree that coordinate between parties, if discovery is ordered in the other cases, is warranted.

THE COURT:  I agree wholeheartedly.  And Judge Seeborg knows as well, I did talk to him, as I mentioned.  He indicated that he had reserved judgment but indicated that he, I think, would probably be ruling on or before August 10, I think; and that it was his view that if discovery were to go forward, it should be coordinated with discovery here if I were to allow it.

I agree.  Ultimately I don't see why any of the folks who would be subjected to a deposition should be deposed twice in multiple actions.  How to accomplish that, I don't have a settled idea on at the moment, but I would think that either you all should go back to Judge Seeborg and say in light of Judge Furman's decision we're prepared to proceed here or at least enter some sort of stipulation in that action that would allow for participation of counsel in the depositions -- I'm open to suggestions.  I mean I think that counsel in all of these cases having a conversation and figuring out an orderly way to proceed is probably sensible.  I will call Judge Hazel

I739stao

but I imagine that all of the judges involved will be of the view that depositions should only be taken once and certainly if they are depositions of upper level officials those are definitely only going to happen once.  So I think coordination is going to be necessary.

Another component of that is that I imagine there may be discovery disputes in this case, and I don't have a brilliant idea for how those get resolved, whether they get resolved by me, by Judge Seeborg, or by Judge Hazel if discovery is allowed there.  I think for now they should come to me because I'm the one and only judge who has ruled on the issue.  But in the event that the other judges do authorize discovery, we probably need an orderly system to resolve those issues.  I don't want it to be like a child who goes to mom and doesn't get the answer that he wants and then goes to dad for reconsideration.  So I think you all should give some thought to that.  Again, I don't think it needs to be resolved right now because Judge Seeborg has reserved judgment on it, but I will give it some thought, as I imagine he will, and we'll talk about it.

Anything you all want to say on that score?

MR. COLANGELO:  Your Honor, for the state and local government plaintiffs, I would just add that we have no objection to coordinating with plaintiffs in other cases on the timing of depositions or on their participation, if warranted.

I739stao

Our key concern was in not having the latest decided case be the right limiting step.  We think the appropriate course is the one you've taken.  So assuming it's on the schedule that your Honor has proposed, we have no objection to other -- to coordinating with other plaintiffs on deposition schedules in particular.

THE COURT:  I don't intend to wait for the other courts.  I'm sure that they will be proceeding expeditiously in their own cases, but I am trying to get this case resolved in a timely fashion and in that regard don't plan to wait.  So it behooves all of you to get on the phone with one another and figure out some sort of means of coordinating.  You can look -- I have a coordination order in the GM MDL that might provide a model and that allows for counsel in different cases to participation in depositions.  This is not an MDL but there are some similarities.  You may want to consider that.  I'm sure there are other contexts in which these issues have arisen and you may want to look at models.

What I propose is why don't you submit a joint letter to me from all counsel in these cases, let's say within two weeks after you've had an opportunity to both confer with one another and confer with counsel in the other cases, and submit a joint letter to me with some sort of proposal.  And if you can agree upon an order that would apply and ensure smooth coordination, all the better; and if not, you can tell me what

I739stao

your counterproposals are and I'll consider it at that time. All right.

MS. BAILEY:  Thank you, your Honor.

THE COURT:  Very good.  Anything else?

MR. COLANGELO:  Nothing for us, your Honor.

THE COURT:  I wanted to just give you one heads-up.  I noted from the states and local governments' letter there is an attachment which is a letter with respect to the Touhy issues in the case.  As it happens, I have another case where that or some of the issues raised in that letter are actually fully submitted before me in an APA action case called Koopman v. U.S. Department of Transportation, 18 CV 3460.  That matter is fully submitted.  I can't and won't make any promises to you with respect to when I will issue a decision in it but it may speak to some of the issues raised in the states and local governments' letter.  So you may want to keep an eye out for it.

With that --

MS. VARGAS:  Your Honor, I do believe that we have -- we are not going to be resting on a former employee issue which I believe is the issue in the Koopman litigation.  So I don't believe that will implicate the issues that are at play in that case.

THE COURT:  Good.  Good to know.  Thank you for letting me know.  Then you don't need to look for it unless you

I739stao

have some strange desire to read Judge Furman decisions.

On that score let me say I will try to issue a decision on the motion to dismiss in short order.  I don't want to give myself a deadline.  That's one prerogative of being in my job.  But I do hope that I'll get it out in the next couple weeks.  And it's been very helpful, the argument this morning was very helpful, and counsel did an excellent job and your briefing is quite good as well as the amicus briefing.  So I appreciate that.  I will reserve judgment.  I wish everybody a very happy Fourth of July.  We are adjourned.

(Adjourned)