# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATES OF NEW YORK, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, IOWA, MARYLAND, MINNESOTA, NEW JERSEY, NEW MEXICO, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, and WASHINGTON; COMMONWEALTHS OF MASSACHUSETTS, PENNSYLVANIA, and VIRGINIA; DISTRICT OF COLUMBIA; CITIES OF CENTRAL FALLS, CHICAGO, COLUMBUS, NEW YORK, PHILADELPHIA, PHOENIX, PITTSBURGH, PROVIDENCE, and SEATTLE; CITY and COUNTY of SAN FRANCISCO; COUNTIES OF CAMERON, EL PASO, HIDALGO, and MONTEREY; and the UNITED STATES CONFERENCE OF MAYORS,

           Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF COMMERCE; and WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce,

   and

BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and RON S. JARMIN, in his capacity as performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau,

          Defendants.

CIVIL ACTION NO. 1:18-cv-2921 (JMF)

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

## INTRODUCTION

1.      This case is brought to enforce the federal government's constitutional obligation

to conduct an "actual Enumeration" of the national population every ten years, by determining

the "whole number of persons" in the United States.  U.S. Const. art. I, § 2, cl. 3; *id.* amend.

XIV, § 2.  Plaintiffs challenge Defendants' unconstitutional and arbitrary decision to add a

citizenship demand to the 2020 Census questionnaire, which will fatally undermine the accuracy

of the population count and cause tremendous harms to Plaintiffs and their residents.

2.      The "decennial enumeration of the population is one of the most critical

constitutional functions our federal government performs."[1]  The decennial census directly

determines the apportionment of Representatives to Congress among the states, the allocation of

electors to the Electoral College, and the distribution of hundreds of billions of dollars in federal

funds to states, local governments, and other grantees.

3.      On March 26, 2018, the Secretary of the United States Department of Commerce,

Wilbur Ross, directed the United States Bureau of the Census ("Census Bureau") to use the 2020

Census to demand information on the citizenship status of every resident in the country, despite

acknowledging that "[t]he Department of Commerce is not able to determine definitively how

inclusion of a citizenship question on the decennial census will impact responsiveness."[2]

Secretary Ross disregarded recommendations from Census Bureau officials to pursue alternative

less invasive means for collecting citizenship information.  As required by the Census Act, on

---

[1] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

[2] Memorandum from Sec'y of Commerce Wilbur Ross to Under Sec'y of Commerce for Econ. Affairs Karen Dunn Kelley, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* 7 (Mar. 26, 2018), https://www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf (hereafter "Ross Memo").

March 29, 2018, Defendants transmitted the Secretary of Commerce's final determination of the "questions that will be asked on the 2020 Census" to Congress.[3]

4.      The Census Bureau has not sought citizenship information on the decennial census form that goes to every household in the country since 1950.  In departing from nearly seven decades of settled practice, Defendants also departed from their long-standing and well-established processes for revising the decennial census questionnaire.  Decisions to change questions on the decennial census typically take several years to test, evaluate, and implement; but Defendants' decision here was compressed into a hasty and unprecedented period of less than four months.

5.      As Defendants' own research shows, this decision will "inevitably jeopardize the overall accuracy of the population count" by significantly deterring participation in immigrant communities, because of concerns about how the federal government will use citizenship information.  *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980) (three-judge court).  These concerns have been amplified by the anti-immigrant policies, actions, and rhetoric targeting immigrant communities of President Trump and this Administration.

6.      By deterring participation in immigrant communities, Defendants will not only fatally undermine the accuracy of the 2020 Census, but will jeopardize critical federal funding needed by states and localities to provide services and support for millions of residents.  Further, it will deprive historically marginalized immigrant communities of critical public and private resources over the next ten years. Defendants' decision is inconsistent with their constitutional

---

[3] U.S. Census Bureau, *Questions Planned for the 2020 Census and American Community Survey* 1 (Mar. 2018); *see also* 13 U.S.C. § 141(f)(2) (hereafter "Final Questions Report").

and statutory obligations; is unsupported by the stated justification; departs from decades of settled practice without reasoned explanation; and fails to consider the availability of alternative data that effectively serve the federal government's needs.

7.       Plaintiffs the States of New York, Colorado, Connecticut, Delaware, Illinois, Iowa, Maryland, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington; the Commonwealths of Massachusetts, Pennsylvania, and Virginia; the District of Columbia; the Cities of Central Falls RI, Chicago IL, Columbus OH, New York City NY, Pittsburgh PA, Philadelphia PA, Phoenix AZ, Providence RI, and Seattle WA; the City and County of San Francisco CA; Counties of Cameron TX, El Paso TX, Hidalgo TX, and Monterey CA; and the United States Conference of Mayors, therefore bring this action to enjoin Defendants' decision because it violates the constitutional mandate to conduct an "actual Enumeration," U.S. Const. art. I, § 2, cl. 3; exceeds and is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C); is contrary to constitutional right, 5 U.S.C. § 706(2)(B); is without observance of procedure required by law, 5 U.S.C. § 706(2)(D); and is arbitrary, capricious, and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

8.       The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

9.       Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2202.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).
Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs State
of New York and City of New York are residents of this judicial district, and the other Plaintiffs
consent to adjudication of these issues in this district.

11.     Plaintiffs bring this action to redress harms to their proprietary and sovereign
interests, and Plaintiff States and the District of Columbia as to their interests as *parens patriae*.

### PARTIES

12.     Plaintiffs States of New York, Colorado, Connecticut, Delaware, Illinois, Iowa,
Maryland, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island,
Vermont, and Washington, Commonwealths of Massachusetts, Pennsylvania, and Virginia,
represented by and through their Attorneys General,[4] are sovereign states of the United States of
America.

13.     Plaintiff District of Columbia is a municipal corporation organized under the
Constitution of the United States.  It is empowered to sue and be sued, and it is the local
government for the territory constituting the permanent seat of the federal government.  The
District is represented by and through its chief legal officer, the Attorney General for the District
of Columbia.

14.     Plaintiff City of Chicago is a municipal corporation and home rule unit organized
and existing under the constitution and laws of the State of Illinois.

---

[4] Colorado is represented by and through Governor John W. Hickenlooper's Chief Legal Counsel, who has been
designated Special Assistant Attorney General for purposes of representing Colorado in this matter.

15.     Plaintiff City of Columbus is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Ohio and the City's Home Rule Charter.

16.     Plaintiff New York City is a municipal corporation organized pursuant to the laws of the State of New York.  The City is a political subdivision of the State and derives its powers through the State Constitution, State laws, and the New York City Charter.

17.     Plaintiffs Cities of Philadelphia and Pittsburgh are municipal corporations organized pursuant to the laws of the Commonwealth of Pennsylvania.  The Cities are political subdivisions of the Commonwealth with powers derived from the Pennsylvania Constitution, Commonwealth law, and the Cities' Home Rule Charters.

18.     Plaintiff City of Phoenix is a municipal corporation organized pursuant to the laws of the State of Arizona.

19.     Plaintiffs Cities of Providence and Central Falls are municipal corporations organized pursuant to the laws of the State of Rhode Island.

20.     Plaintiff City and County of San Francisco, represented by and through its City Attorney, is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

21.     Plaintiff City of Seattle is a first-class charter city, incorporated under the laws of the State of Washington, empowered to sue and be sued, and represented by and through its elected City Attorney, Peter S. Holmes.

22.     Plaintiffs Cameron County, El Paso County, and Hidalgo County, Texas are political subdivisions of the State of Texas.

23.     Plaintiff County of Monterey is a political subdivision of the State of California.

24.     Plaintiff United States Conference of Mayors ("USCM") is the official nonpartisan organization of cities with populations of 30,000 or more.  There are nearly 1,400 such cities in the country today, and each member city is represented in the Conference by its chief elected official, the mayor.

25.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the decision to add a person-by-person demand for citizenship information to the 2020 Census has already damaged Plaintiffs' sovereign, quasi-sovereign, and proprietary interests and will continue to cause injury unless and until the decision is enjoined.

26.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  The Commerce Department is responsible for planning, designing, and implementing the 2020 Census.  13 U.S.C. § 4.

27.     Defendant Wilbur L. Ross, Jr. is the Secretary of Commerce.  He is responsible for conducting decennial censuses of the population, and overseeing the Census Bureau.  He is sued in his official capacity.

28.     Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is the agency responsible for planning and administering the decennial census.

29.     Defendant Ron S. Jarmin is currently performing the non-exclusive functions and duties of the Director of the Census Bureau ("Defendant Jarmin").  He is sued in his official capacity.

## ALLEGATIONS

**I.     Defendants have a constitutional obligation to conduct an accurate enumeration of the population.**

30.     The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, cl. 2, § 3; which requires "counting the whole number of persons in each State," *id.* amend. XIV, § 2.  To ensure fair representation among the states, the Constitution requires that this count be an "actual Enumeration" conducted every ten years.

31.     Congress has assigned the responsibility of making this enumeration to the Secretary of Commerce, and the Secretary may delegate authority for establishing procedures to conduct the census to the Census Bureau.  13 U.S.C. §§ 2, 4, 141.  The central constitutional purpose of the Census Bureau in taking the decennial census is to conduct an accurate enumeration of the population.

32.     In addition, the population data tabulated as a result of the census are used for other governmental purposes, including to permit compliance with the Fourteenth Amendment's one-person, one-vote requirement when drawing district lines for state and local government elected bodies; and to allocate federal funds authorized by hundreds of critical Congressional programs.

33.     To enable a person-by-person count, the Census Bureau sends a questionnaire to every household in the United States.  The questionnaires are directed to every resident in the United States and, under 13 U.S.C. § 221, residents are legally required to respond.  The Census Bureau then counts responses from every household to determine the population count in the various states.

34.     Some demographic groups have proven more difficult to count than others. Minority and immigrant populations have historically been some of the hardest groups to count accurately in the decennial census, due to issues such as language barriers and distrust of government.  For example, the 2010 Census failed to count more than 1.5 million minorities. Indeed, Census Bureau analyses show the fast-growing Hispanic population was undercounted by 1.54% in 2010, by 0.71% in 2000, and by 4.99% in 1990.[5]

35.     Recognizing that these barriers undermine its constitutional mandate to pursue an accurate enumeration of the population, the Census Bureau has previously taken affirmative steps to reach these hard-to-count populations.  One such measure includes hiring census workers to serve as "enumerators," to conduct in-person follow-up with any person who fails to respond.[6]  In addition, during the 2000 and 2010 censuses, the Census Bureau designed and implemented a public advertising campaign to reach hard-to-count immigrant communities.  The Census Bureau used paid media in over a dozen different languages to improve responsiveness in immigrant communities.  For the 2010 Census, the Census Bureau adopted a plan to partner with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count.

36.     The Census Bureau's constitutional obligation to pursue an accurate enumeration requires that the Census Bureau avoid unnecessarily deterring participation in the decennial census.  U.S. Const. art. 1, § 2, cl. 3.  To that end, the Census Bureau must minimize the burden

---

[5] *See* Memorandum from Patrick J. Cantwell to David C. Whitford, *2010 Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States* 2 (May 22, 2012), https://www.census.gov/coverage_measurement/pdfs/g01.pdf.

[6] U.S. Census Bureau, *2010 Census Non-Response Followup Enumerator Manual* 1–6 (2009), https://www.census.gov/history/pdf/2010nrfu.pdf; U.S. Census Bureau, *Non-Response Followup Enumerator Manual* 1–2 (1999), https://www.census.gov/history/pdf/2000nrfu.pdf; U.S. Census Bureau, *Census Instructions-History*, https://www.census.gov/history/www/through_the_decades/census_instructions/.

questions may place on respondents.  According to the Census Bureau's own standards, it must also test its survey questions to ensure that they do not increase non-responsiveness by touching on sensitivities or anxieties respondents have about privacy and governmental overreach.

## II.    Defendants' decision to include a citizenship demand on the 2020 Census will deter participation.

37.    Federal law required the Secretary of Commerce to advise Congress by no later than March 31, 2018, of the Secretary's determination of the questions to be included on the 2020 Census.  13 U.S.C. § 141(f)(2).  Consistent with this obligation, Defendants transmitted a report to Congress on March 29, 2018, advising Congress of the questions to be included on the 2020 Census.  This report included the Secretary's determination that the decennial census will include, for the first time since 1950, a demand for information regarding the citizenship status of every person in the country.

38.    In the March 26, 2018, memo announcing Defendants' decision to demand citizenship status for every resident in the country, Secretary Ross stated that "the Department [of Commerce]'s review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially."[7]  However, almost forty years of Census Bureau statements and data reflect the opposite to be true.

### A.    Defendants have acknowledged for decades that a citizenship demand would deter census participation and undermine the decennial population count.

39.    Since at least 1980, the Census Bureau has expressed the public position that inquiries regarding citizenship are particularly sensitive in immigrant communities, and that demanding citizenship or immigration status on the decennial census would drive down response rates and seriously impair the accuracy of the decennial population count.

---

[7] Ross Memo at 5.

40.     In 1980, in response to a lawsuit seeking to compel the Census Bureau to demand all Americans disclose their immigration status, the Bureau argued in litigation that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count." *Fed'n for Am. Immigration Reform*, 486 F. Supp. at 568.  The Bureau explained that "[o]btaining the cooperation of a suspicious and fearful population would be impossible if the group being counted perceived any possibility of the information being used against them.  Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Id.*

41.     The Census Bureau repeated these concerns in 1988 and 1989, in congressional testimony opposing proposed legislation that would have directed the Census Bureau to exclude from its count any immigrant who was not a lawful permanent resident.

42.     The Bureau testified that inquiring into immigration status "could seriously jeopardize the accuracy of the census," because "[p]eople who are undocumented immigrants may either avoid the census altogether or deliberately misreport themselves as legal residents," and legal residents "may misunderstand or mistrust the census and fail or refuse to respond."[8] The Bureau concluded that a citizenship demand would suffer from "the same problems."[9]

43.     The Census Bureau also declined to include a person-by-person demand regarding citizenship status on the 2000 Census.  The former Director of the Census Bureau who oversaw the 2000 Census later testified that a citizenship demand "will lead to a less complete and less

---

[8] *See Census Equity Act: Hearings Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civ. Serv.*, 101st Cong. 43–45 (1989) (statement of C. Louis Kincannon, Deputy Director, Census Bureau); *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 100th Cong. 50–51 (1988) (testimony of John Keane, Director, Census Bureau).

[9] *Id.*

accurate census," explaining that the "question will be treated with suspicion" and "[a] significant number of noncitizens will not respond," because "it is foolish to expect that census-taking is immune from anxieties that surround such issues as undocumented aliens, immigration enforcement, and so forth."[10]

44.      In 2009, all eight former Census Bureau directors dating back to 1979, and appointed by presidents of both political parties, objected to an ultimately failed congressional proposal to add demands for information regarding citizenship and immigration status to the 2010 Census.  They argued that the Census Bureau would not have enough time to determine "[t]he effect on data quality" and "the consequences for participation among all immigrants, regardless of their legal status," including the concern that enumerators might encounter "problems during door-to-door visits to unresponsive households, when a legalized 'head of household' would avoid enumerators because one or more other household members are present unlawfully."[11]

45.      In 2010, the Census Bureau again declined to include a person-by-person citizenship demand on the census questionnaire.  Then-Director of the Census Bureau, Robert Groves, explained that "we don't ask citizenship or documentation status, all of the things that may make people uncomfortable are gone from [the census] form."[12]

46.      Subsequently, in 2016, four former Directors of the Census Bureau, also appointed by presidents of both political parties, argued in a brief filed with the U.S. Supreme

---

[10] *Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform*, 109th Cong. 73 (2005) (statement of Kenneth Prewitt).

[11] *Statement of Former Census Directors on Adding a New Question to the 2010 Census* (Oct. 16, 2009), http://reformimmigrationforamerica.org/wp-content/uploads/2009/10/thecensusproject.org_letters_cp-formerdirs-16oct2009.pdf.

[12] *Video of Robert Groves*, C-SPAN (Mar. 26, 2010), https://www.c-span.org/video/?292743-6/2010-us-census&start=1902.

Court that "a [person-by-person] citizenship inquiry would invariably lead to a lower response

rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to

conduct the only count the Constitution expressly requires: determining the whole number of

persons in each state in order to apportion House seats among the states."  Brief of Former

Directors of the U.S. Census Bureau as Amici Curiae Supporting Appellees at 25, *Evenwel v.*

*Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940).

47.    The former Directors also noted that "[r]ecent experience demonstrates lowered

participation in the Census and increased suspicion of government collection of information in

general," and that "[p]articular anxiety exists among non-citizens."  *Id*. at 5.  In this context, the

former Directors concluded, "[t]here would be little incentive for non-citizens to offer to the

government their actual status," and the "result would be a reduced rate of response overall and

an increase in inaccurate responses."  *Id.*

**B.**     **The Trump Administration's anti-immigrant policies, actions, and rhetoric**
         **will amplify the negative impact on census participation rates of Defendants'**
         **demand for citizenship status.**

48.    The well-documented risks of adding a person-by-person citizenship demand to

the decennial census are heightened in the current political climate because of President Trump's

anti-immigrant rhetoric and this Administration's pattern of policies and actions that target

immigrant communities.  These actions and policies include the rescission of the Deferred

Action for Childhood Arrivals program; the ban on travel from several majority-Muslim

countries; the suspension on refugee admissions to the United States; the termination of special

protections from removal for migrants from nations experiencing war and natural disasters;

increased roundups of undocumented migrants; efforts to suspend or terminate federal funding to

localities that elect to limit their participation in federal immigration enforcement efforts; and

efforts to build a physical wall along the Mexico-U.S. border, among other actions.

49.     The Trump Administration has also made a number of threatening statements about deporting undocumented immigrants.  On June 13, 2017, the Acting Director of U.S. Immigration and Customs Enforcement, Thomas Homan, testified before Congress that "every immigrant in the country without papers . . . should be uncomfortable.  You should look over your shoulder.  And you need to be worried."[13]

50.     This anti-immigrant climate has led to significant public distrust and fear of providing information to the federal government.  During recent pretests in preparation for the 2020 Census, Census Bureau researchers found that immigrant respondents are already increasingly concerned about confidentiality and data sharing in light of the current anti-immigrant rhetoric.

51.     Census Bureau officials have noted that in routine pretests conducted from February 2017 to September 2017, "fears, particularly among immigrant respondents, have increased markedly this year."[14]  The Census Bureau's researchers recounted repeated instances of respondents spontaneously raising concerns about data confidentiality and the government's negative attitudes toward immigrants.  The researchers also noted that some respondents, acting on these same concerns, intentionally provided incomplete or inaccurate information, or sought to break off interviews.

52.     The Census Bureau has recognized that these anxieties are already likely to present a barrier to participation in the 2020 Census, and that "[t]hese findings are particularly

---

[13] *Immigration and Customs Enforcement and Customs and Border Patrol Fiscal Year 2018 Budget Request: Hearing Before the Subcomm. on Homeland Sec. of the H. Comm. on Appropriations*, 115th Cong. (2017) (statement of Thomas D. Homan, Acting Director, Immigration and Customs Enforcement).

[14] Memorandum from the U.S. Census Bureau, Ctr. for Survey Measurement to Assoc. Directorate for Research and Methodology, *Respondent Confidentiality Concerns* 1 (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."[15]

53.     Defendants' decision to add a citizenship demand to the 2020 Census questionnaire will add to this unprecedented level of anxiety in immigrant communities.  It will lead to nonresponse and lower participation by many immigrants who are citizens and legal residents and live in mixed immigration status households, as well as by undocumented immigrants, all of whom may seek to protect their own privacy or the privacy of their household. This exacerbated deterrent effect began on March 26, 2018, when immigrant communities learned that Secretary Ross directed the Census Bureau to add a citizenship demand to the 2020 Census.

54.     Further, the Census Bureau will have to expend significant additional resources due to the lowered participation of immigrant communities, including hiring more census enumerators for in-person follow-up.  However, enumerators are unlikely to succeed in meaningfully addressing nonresponses to the census where individuals decline to participate due to fear or mistrust of the federal government.

55.     While Defendants recognize the detrimental impact that the addition of a citizenship demand will cause to the accuracy of the 2020 Census, they nevertheless decided to demand citizenship status from every individual resident in the country through the 2020 Census questionnaire.

---

[15] *Id.* at 7.

**C.    Defendants ignored their own standards for ensuring the accuracy of the decennial census.**

56.     In adding a citizenship demand to the 2020 Census, Defendants departed from statistical standards that promote the accuracy of information collected and disseminated by Defendants.

57.     For each decennial census, the Census Bureau meticulously develops and tests the content, specific language, order, and layout of the questionnaire to improve the accuracy of the enumeration.  In addition to fulfilling the Census Bureau's constitutional duty, this development process involves multiple steps that ensure the accuracy, reliability, and objectivity of the final data, as consistent with prior Census Bureau practice and as required by the Information Quality Act ("IQA").  Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, § 515, 114 Stat. 2763 (Dec. 21, 2000).

58.     Government-wide statistical standards adopted under the IQA require the Commerce Department and the Census Bureau to carefully design the census questionnaire to "minimize respondent burden while maximizing data quality" and to "achieve the highest rates of response."[16]  The standards also require testing each component of the questionnaire to ensure that it operates as intended.

59.     The questionnaire development process and the evaluation of changes to individual inquiries take several years to complete.

60.     Indeed, the Census Bureau has spent almost ten years developing and testing the content, specific language, and layout of just one proposed change to the question regarding race and ethnicity on the 2020 questionnaire.  From 2008 through 2012, the Census Bureau conducted

---

[16] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys,* Sections 1.3, 1.4, 2.3.1 (2006).

comprehensive research into the possibility of combining race and ethnicity into one question on the 2020 Census.  The research focused on whether this proposed change would improve respondent understanding of the question, as well as improve the accuracy of the race and ethnicity data collected.

61.     The Census Bureau then spent several years designing and conducting tests on the proposed change to explore different alternatives for the language, layout, and instructions regarding a revised question.  The testing was designed to assess the accuracy and reliability of alternative forms of asking the proposed question.  In 2016, the Census Bureau conducted outreach to federal agencies and to the public to obtain feedback on the proposed change.

62.     The Bureau concluded its process at the end of 2017, after nine years of evaluation and testing, because it "needed to make a decision on the design of the race and ethnicity questions by December 31, 2017 in order to prepare for the 2020 Census systems, and deliver the final 2020 Census question wording to Congress by March 31, 2018."[17]

63.     In contrast, Defendants added a demand for citizenship information to the 2020 questionnaire after less than four months of consideration, conducted almost entirely after the Bureau's internal December 31, 2017 deadline for adding questions to the 2020 Census. Defendants did not conduct any research into the potential performance of the citizenship demand or test the impact of adding a citizenship demand on data accuracy.  Nevertheless, Secretary Ross directed the Census Bureau to add a citizenship demand to the 2020 Census questionnaire, overruling Census Bureau officials and the Bureau's own expert advisory committee.

---

[17] Memorandum, U.S. Census Bureau, *2020 Census Program Memorandum Series: 2018.02, Using Two Separate Questions for Race and Ethnicity in 2018 End-to-End Census Test and 2020 Census* (Jan. 26, 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_02.pdf.

**(1) Defendants failed to adequately test the inclusion of a citizenship demand on the 2020 Census.**

64.     Defendants added a citizenship demand to the 2020 Census without following required standards for testing the content, specific language, and layout of new inquiries. Specifically, Defendants ignored IQA standards that require testing of each inquiry to "ensure that all components of a survey function as intended," and require incorporation of testing results into the final design of the questionnaire.[18]   These testing standards promote the accuracy of the decennial census, which is Defendants' primary constitutional obligation.

65.     Major testing of proposed changes to the 2020 Census questionnaire began with the 2014 Census Test.  At that time, the Census Bureau assessed wording changes to the race and Hispanic origin question, as well as new potential response categories for married and unmarried relationships.  The 2014 test did not assess the content, wording, or layout of a demand for citizenship information.

66.      For the 2020 Census, the 2015 National Content Test was the opportunity for the U.S. Census Bureau to "compare different versions of questions prior to making final decisions."[19]

67.     The Census Bureau designed and conducted the National Content Test in 2015. While the Census Bureau tested the changes to questions related to race and ethnicity, the Bureau did not design tests of language, layout, or instructions for a potential citizenship demand.  The Census Bureau announced the results of this test in early March 2017, none of which related to citizenship.

---

[18] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys* Section 1.4 (2006).

[19] U.S. Census Bureau, *Information Collection Request: 2015 National Content Test*, 80 Fed. Reg. 29,609, 29,610 (May 22, 2015).

68.     The Census Bureau had other opportunities during the major tests in 2016 and April 2017 to test its questionnaire for the 2020 Census.  However, the questionnaires assessed in these tests did not include a question regarding citizenship.  In fact, the Census Bureau did not begin considering whether to add a demand for citizenship information to the 2020 Census until approximately eight months after it began conducting major testing in 2017.

69.     The last major test before the 2020 Census—the 2018 end-to-end test—began on April 1, 2018. The end-to-end test is a dress rehearsal for the upcoming census, in which the Bureau tests and validates all major components, including operations, procedures, systems, and infrastructure.  The 2018 end-to-end test does not include any request for citizenship information on the questionnaire provided to households.  As a result, none of the major tests for the 2020 Census will have assessed the content, language, layout, or order of the citizenship demand on the questionnaire or the impact that the demand for person-by-person citizenship status would have on response rates and accuracy.

70.     Defendants acknowledge that they are unable "to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness,"[20] but they added a citizenship question without conducting the necessary testing to determine the impact of this decision on the 2020 Census.

71.     To date, the Census Bureau has not tested the language or layout of the newly added demand for person-by-person citizenship information.  Indeed, the purpose of testing is to promote accuracy by ensuring that the components of the census function as intended.  Yet, the Bureau has failed to conduct any testing to assess the accuracy and reliability of "different ways

---

[20] Ross Memo at 7.

to ask the question" before adding it to the questionnaire.[21]   The Census Bureau also failed to test the content and order of the citizenship demand on the proposed census questionnaire with actual respondents as required by its own standards.   Such testing could have allowed the Bureau to identify potential problems, including adverse impact of the citizenship demand on response rates and accuracy.

72.   The Census Bureau's failure to test its demand for citizenship information before deciding to include it on the 2020 Census questionnaire is unprecedented in the modern administration of the decennial census.   For each decennial census since 1970, "the Census Bureau has conducted content tests to research and improve the design and function of different questions."[22]   The Census Bureau spent three to four years thoroughly testing proposed changes to topics and question wording "to ensure census questionnaires are easily understood and reflect the population accurately."[23]   This thorough vetting process included testing of the language of specific questions in decennial National Content Tests in 1976, 1986, 1996, 2005, and 2015, as well as testing the performance of proposed topics and specific questions in the field with actual respondents.

73.   In sharp contrast to these extensive testing practices, the Bureau failed to conduct any tests to determine the performance of its new demand for citizenship status on the 2020 questionnaire.   Instead the Census Bureau simply transferred the citizenship demand from the existing American Community Survey ("ACS") to the 2020 Census questionnaire.

---

[21] U.S. Census Bureau, *How a Question Becomes a Part of the American Communities Survey* (2017) https://www.census.gov/content/dam/Census/library/visualizations/2017/comm/acs-questions.pdf.

[22] U.S. Census Bureau, *Content Research* (Jan. 11, 2017), https://www.census.gov/programs-surveys/decennial-census/2020-census/research-testing/content-research.html.

[23] *Id.*

74.     While the Census Bureau currently inquires into citizenship status on the annual

ACS, it cannot simply transfer the demand from the ACS to the decennial census without testing.

The ACS is a sample survey sent to 3.5 million households annually, rather than a complete

enumeration of every household in the United States.

75.     Moreover, the testing the Census Bureau has conducted on the citizenship demand

in the ACS was done to refine the question in the context of the ACS questionnaire.  The

citizenship demand's specific language, layout, order, and instructions remain untested in the

context of the decennial census questionnaire.

76.     For instance, the Census Bureau developed the language of the citizenship

demand on the ACS to fulfill various purposes, including the "evaluation of immigration

policies."[24] As a result, the citizenship demand on the ACS requires citizens to disclose whether

they were born in "United States territories," whether they were born "abroad" to U.S. parents,

or if and when they were "naturalized."[25]  This information is entirely irrelevant to the sole stated

purpose for adding the citizenship demand to the 2020 Census questionnaire: to provide the

Department of Justice with data it claims to need to enforce Section 2 of the Voting Rights Act.[26]

The Census Bureau has not tested either how these components of the citizenship demand will

perform on a person-by-person questionnaire or whether the language can be refined to minimize

respondent burden.

77.     Finally, the demand for information regarding the citizenship status of every

individual in the United States has not been tested in the contemporary environment of high

immigrant anxiety and concerns over privacy.  Secretary Ross ignored these requirements when

---

[24] Final Questions Report at 59.

[25] *Id.* at 7.

[26] Ross Memo at 1, 8.

he asserted that the demand for citizenship status had been adequately tested by virtue of its inclusion on the so-called "long-form census" that was sent to a random sample of households from 1960 to 2000 and on the ACS since 2005.  As the Census Bureau's Scientific Advisory Committee publicly asserted on March 30, 2018, Secretary Ross's reliance on these prior surveys is based on "data collected in a different data collection context, in a different political climate, before anti-immigrant attitudes were as salient and consequential" as they are at present.[27]

78.    Indeed, during general testing from February through September 2017, the Census Bureau found that unprecedented anxiety in immigrant communities—even without the inclusion of a demand for citizenship status—could increase non-response rates and adversely affect data quality for the 2020 Census.  Defendants did not incorporate these findings into the final design of the 2020 Census questionnaire.  Instead, Defendants incorporated a demand for citizenship status that will exacerbate anxiety in immigrant communities and further diminish the accuracy of the 2020 Census.

**(2) Defendants disregarded respondent burden on potential response rates.**

79.    The IQA standards require Defendants to design questionnaires "in a manner that achieves the best balance between maximizing data quality . . . while minimizing respondent burden and cost," and "achieves the highest practical rates of response."[28]  Further, under agency-specific IQA standards adopted by the Census Bureau, the Bureau committed to verify that questions are not "unduly sensitive" and "do not cause undue burden."[29]

---

[27] Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*,  New York Times (Mar. 30, 2018).

[28] Office of Mgmt. & Budget, *Statistical Policy Directive No. 2*, § 2.3 at 11.

[29]  U.S. Census Bureau, *Statistical Quality Standards* ii, 7–8 reqs. A2-3 & A2-3.3 (Jul. 2013).

80.     Defendants failed to follow these directives, despite acknowledging that the citizenship question will have a negative impact on response rates.  During sworn congressional testimony on April 18, 2018, Defendant Jarmin acknowledged that the Census Bureau provided Secretary Ross with an estimate of potential non-response resulting from inclusion of a citizenship demand on the 2020 Census.  Defendant Jarmin noted that the impact "might be important" in some communities,[30] and that he expected the negative impact of the citizenship demand on response rates "would be largely felt in various sub-groups, in immigrant populations, [and] Hispanic populations."[31]

81.     Rather than adding a person-by-person citizenship demand on the 2020 Census questionnaire, Defendant Jarmin and the Census Bureau recommended that the best approach "would be to use administrative records" to calculate citizenship data.[32]

82.     Secretary Ross disregarded the Census Bureau's recommendation and directed the Census Bureau to include a citizenship demand on the 2020 Census questionnaire.  While Secretary Ross recognized the potential for higher rates of non-response, he concluded that the value of more complete citizenship data outweighed concerns regarding non-response.[33]

83.     Abandoning the goal of higher response rates and overall accuracy runs contrary to Defendants' constitutional mandate to pursue an accurate enumeration of the population, and violates the IQA standards that the Census Bureau must follow.

---

[30] *House Appropriations Committee, Commerce, Justice, Science and Related Agencies Subcommittee Hearing on Bureau of the Census*, 115th Cong. 20 (April 18, 2018).

[31] *Id.* at 23.

[32] *Id.* at 13.

[33] Ross Memo at 7.

**(3) Defendants disregarded stakeholder concerns.**

84.     A number of affected stakeholders have expressed concern to Defendants regarding the inclusion of a demand for citizenship status on the 2020 Census.

85.     On January 8, 2018, the American Statistical Association ("ASA") urged the Census Bureau not to collect citizenship information because of the "very strong potential the quality of the census will be undermined."[34]  In addition, the ASA raised concerns that the addition of a citizenship demand this late in the preparation process "would likely increase distrust or suspicion of the government among immigrants, many of whom are already anxious about government inquiries and activities."[35]  Moreover, the timing of the Census Bureau's consideration "[did] not allow time for adequate testing to incorporate new questions, particularly if the testing reveals substantial problems."[36]

86.     The National League of Cities also flagged concerns that the addition of a citizenship demand at such a late stage in the census planning process was "reckless and disruptive," and would "spike fears about data confidentiality."[37]

87.     Plaintiff USCM also sent Secretary Ross a letter signed by 161 Republican and Democratic mayors, expressing concerns about the addition of a citizenship demand to the 2020 Census questionnaire.  The USCM noted that adding a demand for citizenship status late in the 2020 Census development process would nullify years of careful planning by the Census Bureau,

---

[34] Letter from Lisa LaVange to Sec'y of Commerce Wilbur Ross (Jan. 8, 2018), http://www.amstat.org/asa/files/pdfs/POL-CitizenshipQuestion.pdf.

[35] *Id.*

[36] *Id.*

[37] Letter from Clarence Anthony to Sec'y of Commerce Wilbur Ross (Feb. 8, 2018), http://www.nlc.org/sites/default/files/users/user125/Ross%20Letter%20on%20Citizenship%20Question.pdf.

and would require staffing beyond currently planned levels to address higher rates of non-response in light of the anticipated chilling effect.

88.     On February 12, 2018, nineteen state Attorneys General and the Governor of Colorado urged Secretary Ross not to collect citizenship information on the 2020 Census.  In addition to the issues highlighted above, the states explained in detail that the collection of citizenship data is "unnecessary to enforce the vote-dilution prohibition in Section 2 of the Voting Rights Act," and that "[c]ollecting citizenship data would undermine the goal of fair and effective representation for all communities, which the Voting Rights Act was enacted to protect."[38]

89.     Several former directors of the Census Bureau voiced similar concerns after Defendants began considering this change.  The Census Bureau Director from 2013 to 2017 explained, "[t]here are great risks that including that question, particularly in the atmosphere that we're in today, will result in an undercount, not just of non-citizen populations but other populations that are concerned with what could happen to them."[39]  While Secretary Ross acknowledged receipt of some of these letters in his March 26, 2018 memorandum, he disregarded the serious concerns raised in these letters and directed the Census Bureau to demand the citizenship status of all respondents to the 2020 Census.

90.     In his memorandum, Secretary Ross supported his decision by citing to several conversations with interested parties.  One interested party, the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush, subsequently

---

[38] Letter from Eric Schneiderman *et al.* to Sec'y of Commerce Wilbur Ross (Feb. 12, 2018), https://ag.ny.gov/sites/default/files/multi-state_letter_2020_census.pdf.

[39] Kriston Capps, *Ex-Census Director: Citizenship Question is 'a Tremendous Risk'*, CityLab (Feb. 27, 2018), https://www.citylab.com/equity/2018/02/former-census-director-citizenship-question-is-a-tremendous-risk/554372/.

stated "there's a high burden of proof that must be met about its value . . . and I told [Secretary Ross] that I don't think the case has been made that [the citizenship question] is so important that it's worth endangering this fragile instrument."[40]

91.     Secretary Ross also cited discussions with a representative from Nielsen, a private survey company, as support for his conclusion that sensitive questions from the ACS caused no appreciable decrease in response rates.  Nielsen took issue with this characterization of their representative's discussion with the Secretary, and subsequently, issued a statement clarifying that it did not support Defendants' inclusion of a citizenship question on the 2020 Census because it would lead to "inaccuracies in the underlying data."[41]

**(4) Defendants failed to justify their changes to the subjects to be included on the 2020 Census.**

92.     Finally, Defendants failed to comply with their statutory obligations to advise Congress of the subjects to be included on the decennial census, and of any "new circumstances" that "necessitate" changes to those subjects.  The Census Act required the Commerce Secretary, not later than three years before the decennial census date (that is, before April 1, 2017), to transmit to Congress "a report containing the Secretary's determination of the subjects proposed to be included" in the census.  13 U.S.C. § 141(f)(1).  The report of subjects that Defendants submitted in March 2017 included the same subjects as the 2010 Census, and did not indicate any change to include citizenship information.

---

[40] Jeffrey Mervis, *Trump officials claim they can avoid 2020 census problems caused by controversial citizenship question. Experts are very skeptical.* Science (April 13, 2018), http://www.sciencemag.org/news/2018/04/trump-officials-claim-they-can-avoid-2020-census-problems-caused-controversial?utm_campaign=news_daily_2018-04-16&et_rid=272854805&et_cid=1976256best.

[41] *Id.*

93.     In reversing course just a year later, Defendants failed to identify and explain any "new circumstances" that "necessitate" this modification to the subjects they submitted in 2017, as required by statute.  13 U.S.C. § 141(f)(3).

**III.    Defendants' decision to include a citizenship demand on the 2020 Census is not supported by the stated justification.**

94.     Defendants assert that they included a citizenship demand on the 2020 Census in response to a request from the United States Department of Justice ("DOJ") dated December 12, 2017 (the "DOJ Letter").

95.     The DOJ Letter asserted that person-by-person information on the citizenship status of every individual in the country was necessary to enforce Section 2 of the Voting Rights Act.  Specifically, DOJ claimed that it needs a "reliable calculation of citizen voting-age population" in order to determine whether a minority group can constitute a majority in a single-member district, the first element in a vote dilution case.[42]

96.     Collecting citizenship information from every person in the United States is not necessary to achieve the goal of effective Section 2 enforcement.  The Supreme Court has never held that citizen voting-age population ("CVAP") is the proper measure for examining whether a minority group can constitute a majority in a single-member district.

97.     Congress could not have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data has never been available at any point since Section 2 was enacted in 1965.  Data collected through the decennial census would not provide a "reliable calculation" of CVAP in any event, because citizenship

---

[42] Letter from Arthur E. Gary, General Counsel, Justice Management Division, U.S. Dep't of Justice, to Ron Jarmin, Performing the Non-Exclusive Functions and Duties of the Director, U.S. Bureau of the Census, U.S. Dep't of Commerce (Dec. 12, 2017).

information collected decennially will quickly become outdated and less reliable over the course of the subsequent decade.

98.     Further, the ACS already provides a reliable calculation of annually updated citizenship information that is collected through less invasive methods.  In fact, DOJ and voting rights advocates have long used data from the ACS or a functionally equivalent survey to effectively enforce the law, and have never relied on the decennial census for this purpose.[43]

99.     Even if demanding citizenship status from every person residing in the United States were necessary to enforce Section 2 of the Voting Rights Act — which it is not — Defendants' decision would impermissibly sacrifice the accuracy of the constitutionally-mandated census for non-constitutional purposes.

100.     Defendants added a citizenship demand to the 2020 Census questionnaire knowing that it would likely lead to increased non-response and decreased accuracy in the 2020 Census.  Nevertheless, Secretary Ross concluded that the accuracy of the citizenship data requested by the DOJ was "of greater importance" than the adverse effect resulting from higher levels of non-response.[44]  In making this conclusion, Secretary Ross weighed a purported statutory purpose as having greater importance than the only constitutional requirement for the census: pursuing an accurate enumeration of the whole number of persons in the United States.

101.     Demanding citizenship status on the 2020 Census will undermine, not advance, the goals of the Voting Rights Act.  A person-by-person citizenship demand that leads to a

---

[43] Section 2 of the VRA was enacted in 1965, and no citizenship question has been included on the decennial census since 1950.  From 1970 to 2000, a citizenship question was included only on the "long form" questionnaire, which was distributed to a sample of about one in six households in lieu of the decennial census questionnaire. Following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey, which is now sent to about one in every 38 households each year.

[44] Ross Memo at 7.

systematic undercount of minority populations across the United States will impair fair representation of those groups and the states in which they live.

102.     It is clear that DOJ's stated rationale for demanding information on the citizenship status of every resident in the country is contrary to the evidence, and was not, in fact, the true reason DOJ sought this change in practice from the Census Bureau.  On March 19, 2018, President Trump's reelection campaign sent a fundraising email stating, "The President wants the 2020 United States Census to ask people whether or not they are citizens . . . The President wants to know if you're on his side."[45]  There was no assertion that the President sought this information to strengthen enforcement of the Voting Rights Act.[46]  On March 28, 2018 — the day before the Census Bureau sent a report to Congress indicating that the 2020 Census would include a citizenship demand — President Trump's reelection campaign sent another fundraising email declaring that the President "officially mandated" that a citizenship demand be included on the 2020 Census. Again, the email had no mention of Voting Rights Act enforcement.[47]

103.     Further, the assertion that President Trump compelled the addition of a demand for citizenship information undermines Secretary Ross's claims that Defendants made an informed decision to add this question based on a comprehensive review process.  Therefore, Defendants' unfounded and conflicting rationales indicate that the stated reason for demanding citizenship information is pretext.

---

[45] Tara Bahrampour, *Trump's Reelection Campaign Calls For Adding Citizenship Question To 2020 Census Amid Criticism That He Is Politicizing The Count*, Washington Post (Mar. 20, 2018), https://www.washingtonpost.com/local/social-issues/trump-campaign-calls-for-adding-citizenship-question-to-2020-census-amid-accusations-that-the-president-is-politicizing-the-annual-count/2018/03/20/dd5929fe-2c62-11e8-b0b0-f706877db618_story.html.

[46] Ross Memo at 1, 8.

[47] Tal Kopan, *Trump Campaign Rallies Supporters on Census Citizenship Question*, CNN (Mar. 28, 2018), https://www.cnn.com/2018/03/28/politics/trump-census-citizenship/index.html.

**IV.    Plaintiffs will be injured by Defendants' actions.**

    **A.    Plaintiffs are vulnerable to an undercount of their hard-to-count immigrant communities.**

104.    Plaintiffs are home to some of the hardest-to-count communities in the nation, including significant populations of authorized and undocumented immigrants.  Many of these immigrants live in mixed-status families, with U.S. citizen children, siblings, or spouses.  As a result, Defendants' decision increases the risk of undercounting both the citizens and noncitizens in these populations.

105.    For instance, in New York State, 24.2% of households are "hard-to-count," meaning they did not mail back their 2010 Census questionnaire, which required the Census Bureau to conduct in-person follow-up.  Approximately 36% of New York State's overall population and over one-half of its Hispanic population live in hard-to-count neighborhoods.  Among these hard-to-count communities are New York's large immigrant population.  Over one in five residents of New York State is foreign-born, the second highest proportion of foreign-born residents in the United States.  In addition, in 2014, New York State had the fourth largest population of undocumented residents in the nation.  New York's immigrants often reside in mixed-status households.  Approximately 1.2 million New Yorkers, including 410,525 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

106.    In Colorado, 20.9% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 9.8% of Colorado's population, and in 2014 about 200,000 immigrants in Colorado were undocumented.  Over 275,000 Colorado residents, including 127,582 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

107.     In Connecticut, 20.9% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 22% of the population currently lives in hard-to-count neighborhoods. Immigrants account for 14.4% of Connecticut's population, and in 2014, nearly one in every four immigrants in Connecticut was undocumented.  Nearly 144,000 Connecticut residents, including 47,220 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

108.     In Delaware, 20% of households did not mail back their 2010 census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 9.4% of Delaware's population, and in 2014, approximately 31% of Delaware's immigrant population was undocumented.  Nearly 30,000 Delaware residents, including 12,939 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

109.     In the District of Columbia, 21.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.3% of D.C.'s population, and in 2014, over one in four immigrants in D.C. was undocumented.  Nearly 24,000 D.C. residents, including 8,912 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

110.     In Illinois, 19.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.9% of Illinois's population, and in 2014, approximately 24% of Illinois's immigrant population was undocumented. Between 2010 and 2014, approximately 344,000 U.S.-born Illinoisans lived with at least one undocumented family member.

111.    In Iowa, 16.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 5.1% of Iowa's population, and in 2014, over one in four immigrants in Iowa was undocumented. Nearly 58,959 Iowa residents, including 23,639 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

112.    In Maryland, 19.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Moreover, Hispanic children in Maryland between the ages of 0 and 4 were undercounted by an estimated 9%. Immigrants account for 15.2% of Maryland's population, and in 2014, over one in four immigrants in Maryland was undocumented.  Nearly 300,000 Maryland residents, including 99,846 born in the United States, lived with at least one undocumented family member between 2010 and 2014

113.    In Massachusetts, 21.1% of households did not mail back their 2010 Census questionnaire, which required the Census Bureau to conduct in-person follow-up, and approximately 23% of the population currently lives in hard-to-count neighborhoods. Immigrants account for 16.5% of Massachusetts's total population, and in 2014, nearly one in five immigrants in Massachusetts was undocumented. In Massachusetts, 28.5% of all child residents have at least one immigrant parent, and 80% of the children of immigrants under 18 are U.S. born.

114.    In Minnesota, 14.4% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 8.2% of Minnesota's population, and in 2014, nearly one in four immigrants in Minnesota was undocumented. Nearly 140,000 Minnesota residents, including

54,857 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

115.    In New Jersey, 21.9% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 22% of the population currently lives in hard-to-count neighborhoods. Immigrants account for 22.5% of New Jersey's population, and in 2014, nearly one in four immigrants in New Jersey was undocumented.  Over 600,000 New Jersey residents, including 204,946 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

116.    In New Mexico, 26.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Approximately 43% of the overall population and over 50% of New Mexico's Hispanic population lives in hard-to-count neighborhoods.  Immigrants account for 9.5% of New Mexico's population, and in 2014, approximately 37% of immigrants in New Mexico were undocumented.  Over 115,000 New Mexico residents, including 54,068 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

117.    In North Carolina, 19.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 7.8% of North Carolina's population, and in 2014, approximately 43% of immigrants in North Carolina were undocumented.  Nearly 430,000 North Carolina residents, including 186,930 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

118.    In Oregon, 20.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for nearly 10% of Oregon's population.  Additionally, in 2016, over 12% of Oregon's population were native born Americans who had at least one immigrant parent.  In 2014, approximately 32% of immigrants in Oregon were undocumented, and children of undocumented immigrants accounted for 8.6% of Oregon's K-12 population.

119.    In Pennsylvania, 17.7% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 6.8% of Pennsylvania's population, and in 2014, over one in five immigrants in Pennsylvania was undocumented.  Nearly 195,000 Pennsylvania residents, including 66,576 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

120.    In Rhode Island, 22.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.5% of Rhode Island's population, and in 2014, nearly one in five immigrants in Rhode Island was undocumented.  Nearly 38,000 Rhode Island residents, including 14,507 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

121.    In Vermont, 20.3% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 4.5% of Vermont's population, and in 2014, approximately 8% of Vermont's immigrant population was undocumented.

122.     In Virginia, 19.2% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 12.3% of Virginia's population, and in 2014, approximately 28% of Virginia's immigrant population was undocumented. Over 325,000 Virginia residents, including 113,072 born in the United States, lived with at least one undocumented family member between 2010 and 2014.

123.     In Washington, more than 20% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Roughly one in seven Washington residents is an immigrant, and one in eight native-born U.S. citizens in Washington lives with at least one immigrant parent.  Over 170,000 U.S. citizens in Washington live with at least one family member who is undocumented.  Between 2010 and 2014, over 351,000 people in Washington, including 151,209 born in the United States, lived with at least one undocumented family member.

124.     In Chicago, 34% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Approximately 48% of Chicago's population lives in hard-to-count neighborhoods. Immigrants account for 20.8% of Chicago's population, and in 2014, an estimated 425,000 undocumented immigrants lived in the Chicago metro area.

125.     In Columbus, 29% of households did not mail back their 2010 census questionnaire, requiring the Census Bureau to conduct in-person follow-up interviews.  Over 60% of Columbus's Hispanic population live in hard-to-count neighborhoods. Immigrants account for 11.6% of the City's population and in 2014, approximately 22% of Columbus's immigrant population was undocumented.

126.    In New York City, 29% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  New York City is home to 3.4 million foreign-born residents, and approximately 46% of foreign-born residents are non-citizens.  Immigrants and the children of immigrants account for 60% of New York City's population.  The New York metropolitan area is also home to an estimated 1.15 million undocumented immigrants.

127.    In Philadelphia, 26.9% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 13.1% of Philadelphia's population, and in 2014, an estimated 50,000 undocumented immigrants lived in the City of Philadelphia.

128.    In Maricopa County, where the City of Phoenix is located, 22.4% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 19.8% of Phoenix's population, and in 2014, an estimated 250,000 undocumented immigrants lived in the Phoenix metro area.

129.    In Allegheny County, where the City of Pittsburgh is located, 17.5% of households did not mail back their 2010 census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for approximately 8.5% of Pittsburgh's population, and in 2014, approximately 18% of Pittsburgh's immigrant population was undocumented.

130.    In Providence County, Rhode Island, where Providence and Central Falls are located, 24.8% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Approximately 37% of Providence County's current population lives in hard-to-count neighborhoods.  Immigrants account for

nearly 30% of Providence's population, and over 38% of the population in Central Falls. Providence and Central Falls are both taking part in the 2018 Census End-to-End Test.

131.     In the City and County of San Francisco, 22.6% of households did not mail back the 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Immigrants account for 34.9% of San Francisco's population, and an estimated 44,000 immigrant residents are undocumented.  San Francisco is also home to thousands of mixed-status families, and over 8,000 undocumented residents reside with at least one United States citizen.

132.     In Seattle, Washington, 20.7% of households did not mail back their 2010 census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up. Immigrants account for 16.9% of Seattle's population. Between 2000 and 2014, Seattle's immigrant population grew 20% compared to 14% for the overall population, and in 2014, approximately 4% of Seattle's immigrant population was undocumented.

133.     In Cameron County, Texas, located on the border with Mexico, 26.5% of households did not mail back their 2010 Census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Approximately 47% of Cameron County's overall population, and over 80% of its Hispanic population lives in hard-to-count neighborhoods. Nearly one-fourth of Cameron County's population is foreign born, and, in 2014, approximately 9% of the county's residents were undocumented.

134.     In El Paso County, Texas, located on the border with Mexico, 22.9% of households did not mail back their 2010 census questionnaire, and therefore required the Census Bureau to conduct in-person follow-up.  Approximately 26% of El Paso County's overall

population lives in hard-to-count neighborhoods.  Over 25% of El Paso's population is foreign

born, and in 2014, 50,000 undocumented immigrants lived in El Paso.

135.    In Hidalgo County, Texas, located on the border with Mexico, 29.3% of

households did not mail back their 2010 census questionnaire, and therefore required the Census

Bureau to conduct in-person follow-up.  Approximately 58% of Hidalgo County's overall

population, and over 90% of the County's Hispanic population, lives in hard-to-count census

tracts.  Nearly 28% of Hidalgo County's population is foreign born, and in 2014, over 10% of

residents were undocumented.

136.    In Monterey County, California, 24.2% of households did not mail back their

2010 census questionnaire, and therefore required the Census Bureau to conduct in-person

follow-up.  Approximately 35% of Monterey's population lives in hard-to-count neighborhoods.

Also, 30% of Monterey County's population is foreign born.  In 2014, approximately 10.2% of

the immigrant population in Salinas, by far the largest city in Monterey County, was

undocumented, and 50,000 undocumented immigrants lived in the Salinas metro area.

137.    The members of the USCM are home to the majority of immigrants in the United

States.  In 2014, 104 metro areas, including many USCM members, accounted for over 86% of

the immigrant population of the United States.  Moreover, 61% of the nation's undocumented

population live in the 20 largest metro areas in the United States, all of which contain cities that

are USCM members.

138.    Given the prevalence of Plaintiffs' hard-to-count populations, Plaintiffs are

particularly susceptible to an undercount.  Defendants' decision to add a person-by-person

citizenship demand to the 2020 Census questionnaire will disproportionately impact Plaintiffs'

hard-to-count immigrant populations.  The resulting undercounts in these communities will harm Plaintiffs' interests in full federal funding, accurate redistricting, and fair representation.

**B.     Defendants' conduct harms Plaintiffs' funding interests.**

139.     Many federal programs rely on the population figures collected in the decennial census to distribute federal funds among states and local governments.  A total of approximately $700 billion is distributed annually to nearly 300 different census-guided federal grant and funding programs.  These programs support essential services for Plaintiffs, including healthcare, public education, social services, and infrastructure development.  Inaccurate population counts resulting from Defendants' decision to add a citizenship demand to the 2020 Census will harm Plaintiffs by depriving them of their statutory fair share of federal funding, and removing crucial resources for important government services.

**(1)     Defendants' decision will deprive Plaintiffs of necessary infrastructure funding.**

140.     Many federal funding programs provide crucial support for the planning, construction, maintenance, and operation of essential infrastructure projects.  Several of these federal programs, including the Highway Trust Fund program, the Urbanized Area Formula Funding program, the Metropolitan Planning program, and the Community Highway Safety Grant program distribute funds based, at least in part, on population figures collected through the decennial census.  23 U.S.C. § 104(d)(3); 49 U.S.C. §§ 5305, 5307, 5340; 23 U.S.C. § 402. Plaintiffs rely on these programs to meet their infrastructure needs.  For instance:

a.     In fiscal year 2015, New York received $1.66 billion from the Highway Trust Fund, and over $645 million in Urbanized Area Formula grants.

b.     In fiscal year 2015, Colorado received over $520 million from the Highway Trust Fund, and over $72 million in Urbanized Area Formula grants.

38

c.  In fiscal year 2015, Connecticut received over $470 million from the Highway Trust Fund, and nearly $94 million in Urbanized Area Formula grants.

d.  In fiscal year 2015, Delaware received nearly $182 million from the Highway Trust Fund, and over $19 million in Urbanized Area Formula grants.

e.  In fiscal year 2015, the District of Columbia received over $185 million from the Highway Trust Fund, and over $20 million in Urbanized Area Formula grants.

f.  In fiscal year 2015, Iowa received over $506 million from the Highway Trust Fund, and over $20 million in Urbanized Area Formula grants.

g.  In fiscal year 2015, Maryland received about $597 million from the Highway Trust Fund, and over $154 million in Urbanized Area Formula grants.

h.  In fiscal year 2015, Massachusetts received nearly $614 million from the Highway Trust Fund, and over $194 million in Urbanized Area Formula grants.

i.  In fiscal year 2015, Minnesota received over $673 million from the Highway Trust Fund, and over $59 million in Urbanized Area Formula grants.

j.  In fiscal year 2015, New Jersey received over $839 million from the Highway Trust Fund, and over $390 million in Urbanized Area Formula grants.

k.  In fiscal year 2015, New Mexico received nearly $361 million from the Highway Trust Fund, and over $23 million in Urbanized Area Formula grants.

l.  In fiscal year 2015, North Carolina received over $237 million from the Highway Trust Fund, and over $66 million in Urbanized Area Formula grants.

m.  In fiscal year 2015, Oregon received nearly $431 million from the Highway Trust Fund, and over $51 million in Urbanized Area Formula grants.

n.  In fiscal year 2015, Pennsylvania received over $1.67 billion from the Highway Trust Fund, and over $177 million in Urbanized Area Formula grants.

o.  In fiscal year 2015, Rhode Island received nearly $217 million from the Highway Trust Fund, and over $27 million in Urbanized Area Formula grants.

p.  In fiscal year 2015, Vermont received over $206 million from the Highway Trust Fund, and over $2 million in Urbanized Area Formula grants.

q.  In fiscal year 2015, Virginia received over $953 million from the Highway Trust Fund, and over $123 million in Urbanized Area Formula grants.

r.  In fiscal year 2015, Washington received over $663 million from the Highway Trust Fund, and over $140 million in Urbanized Area Formula grants.

s.  In fiscal year 2015, New York City received $34 million in Urbanized Area Formula grants.

t.  During Philadelphia's fiscal year 2016, Philadelphia received over $41 million from the Highway Trust Fund.

u.  In fiscal year 2017, Illinois received over $1.46 billion from the Highway Trust Fund, and over $235 million in Urbanized Area Formula grants.

v.  In fiscal year 2017, Columbus received $11 million from the Highway Trust Fund, and over $11 million in Community Highway Safety grants.

w.  In fiscal year 2017, San Francisco received over $73 million in Urbanized Area Formula grants.

x.  In fiscal year 2017, Monterey County received $2.6 million in pass through funds from the Highway Trust Fund.

40

141.    Defendants' decision will lead to an undercount in the decennial census that will deprive Plaintiffs of crucial federal funds for infrastructure provided under these and other programs.

> **(2)    Defendants' decision will deprive Plaintiffs of funding necessary to support public education.**

142.    Federal funding programs are also essential for supporting public education, especially for low-income children and families.  Undercounts in the decennial census can impact allocations under many of these programs, including Special Education grants, and the Title I funding program.  For instance, the United States Department of Education allocates Title I funding based on the number and percentage of children living in families with incomes below the poverty line, which it obtains through the Census Bureau's Small Area Income and Poverty Estimates (SAIPE) program. 20 U.S.C. §§ 6333-6335.  The SAIPE program incorporates ACS estimates, which are calculated using the results of the decennial census count.  As a result, any undercount in the decennial census will carry over into ACS estimates and the SAIPE, and will ultimately decrease funding under Title I.

143.    Plaintiffs rely on federal funding programs to meet their public education needs. In fiscal year 2017, the United States Department of Education appropriated:

    a.    Approximately $1.2 billion in Title I funds to school districts in New York, including $779 million for New York City.  In addition, New York received $781 million in Special Education grants.

    b.    Over $152 million in Title I funds to school districts in Colorado, and nearly $164 million to Colorado in Special Education grants.

    c.    Nearly $130 million in Title I funds to school districts in Connecticut, and nearly $137 million to Connecticut in Special Education grants.

41

d.  Nearly $51 million in Title I funds to school districts in Delaware, and nearly $37 million to Delaware in Special Education grants.

e.  Over $47 million in Title I funds to school districts in the District of Columbia, and nearly $19 million to the District of Columbia in Special Education grants.

f.  Over $678 million in Title I funds to school districts in Illinois, including over $283 million for Chicago.  In addition, Illinois received nearly $518 million in Special Education grants.

g.  Over $97 million in Title I funds to school districts in Iowa, and nearly $126 million to Iowa in Special Education grants.

h.  Over $230 million in Title I funds to school districts in Maryland, and nearly $206 million to Maryland in Special Education grants.

i.  Over $226 million in Title I funds to school districts in Massachusetts, and over $292 million to Massachusetts in Special Education grants.

j.  Over $163 million in Title I funds to school districts in Minnesota, and over $195 million to Minnesota in Special Education grants.

k.  Nearly $365 million in Title I funds to school districts in New Jersey, and over $372 million to New Jersey in Special Education grants.

l.  Nearly $120 million in Title I funds to school districts in New Mexico, and nearly $94 million to New Mexico in Special Education grants.

m.  Nearly $451 million in Title I funds to school districts in North Carolina, and over $346 million to North Carolina in Special Education grants.

n.  Over $152 million in Title I funds to school districts in Oregon and over $132 million to Oregon in Special Education grants.

o. Over $621 million in Title I funds to school districts in Pennsylvania, including nearly $220 million for Philadelphia and $18 million for Pittsburgh.  In addition, Pennsylvania received over $438 million in Special Education grants.

p. Over $53 million in Title I funds to school districts in Rhode Island, including $21 million for Providence, and $3 million for Central Falls.  In addition, Rhode Island received over $45 million in Special Education grants.

q. Over $35 million in Title I funds to school districts in Vermont, and $29 million to Vermont in Special Education grants.

r. Over $265 million in Title I funds to school districts in Virginia, and nearly $300 million to Virginia in Special Education grants.

s. Over $228 million in Title I funds to school districts in Washington, including $10 million for Seattle.  In addition, Washington received $227 million in Special Education grants.

t. Over $30 million in Title I funds to the Brownsville Independent School District in Cameron County.

u. Over $23 million in Title I funds to the El Paso Independent School District in El Paso County.

v. Over $11 million in Title I funds to the McAllen Independent School District and over $17 million in Title 1 funds to the Edinburg Consolidated Independent School District, both in Hidalgo County.

144.    Defendants' decision will lead to an undercount in the decennial census that will deprive Plaintiffs and their residents of crucial federal funds for public education provided under these and other programs.

**(3)  Defendants' decision will deprive Plaintiffs of funding necessary for critical social services.**

145.    Federal funding programs also provide increased access to healthcare, child care, affordable housing, and nutrition.  For instance, the Medical Assistance Program ("Medicaid") provides financial assistance for payment of medical expenses on behalf of certain eligible groups, including low-income families, children, and pregnant women.  Medicaid relies on "per-capita income" information calculated with decennial census data to determine the amount to reimburse each state for medical assistance payments on behalf of low-income individuals.  42 U.S.C. §§ 1301, 1396d.  Several Plaintiffs will lose millions of dollars in reimbursement as a result of even a 1% undercount.  In fiscal year 2015:

a.  Colorado received $3.4 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $63 million in federal funding.

b.  Delaware received $771 million in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $14 million in federal funding.

c.  Illinois received $7.19 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $122 million in federal funding.

d.  Iowa received $2.14 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $38 million in federal funding.

e.  New Mexico received $2.49 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $23 million in federal funding.

f.  North Carolina received $8.43 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $94 million in federal funding.

g.  Oregon received $3.64 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $44 million in federal funding.

h.  Pennsylvania received $11.2 billion in reimbursement under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of nearly $222 million in federal funding.

i.  Vermont received $774 million under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $14 million in federal funding.

j.  Washington received $3.92 billion under the Medicaid program, and an additional 1% undercount on the 2010 Census would have resulted in losses of over $2 million in federal funding.

146.    In addition, in fiscal year 2017, the City of Columbus received $69.7 million under the Medicaid program and an undercount of its population would lead to a loss of crucial Medicaid funds.

147.    The Child Care and Development Fund ("CCDF"), a program that helps low-income families obtain child care so that family members can work, also allocates funds on the

basis of population data collected through the decennial census.  45 C.F.R. § 98.63.  In fiscal

year 2015:

     a.   New York received over $198 million in CCDF grants.

     b.   Colorado received over $38 million in CCDF grants.

     c.   Connecticut received over $36 million in CCDF grants.

     d.   Delaware received nearly $9.9 million in CCDF grants.

     e.   The District of Columbia received over $7.2 million in CCDF grants.

     f.   Illinois received over $126 million in CCDF grants.

     g.   Iowa received over $25 million in CCDF grants.

     h.   Maryland received nearly $54 million in CCDF grants.

     i.   Massachusetts received over $76 million in CCDF grants.

     j.   Minnesota received over $52 million in CCDF grants.

     k.   New Jersey received nearly $72 million in CCDF grants.

     l.   New Mexico received over $20 million in CCDF grants.

     m.   North Carolina received over $122 million in CCDF grants.

     n.   Oregon received nearly $39 million in CCDF grants.

     o.   Pennsylvania received over $116 million in CCDF grants.

     p.   Rhode Island received over $11 million in CCDF grants.

     q.   Vermont received nearly $6.7 million in CCDF grants.

     r.   Virginia received nearly $64 million in CCDF grants.

     s.   Washington received nearly $78 million in CCDF grants.

148.   The Community Development Block Grant ("CDBG") program provides annual

grants to qualifying jurisdictions for the purpose of undertaking development activities directed

toward housing and housing-related facilities and services, such as neighborhood revitalization, economic development, and community facilities.  Grantees must spend at least 70% of CDBG funds on activities that benefit low- and moderate-income persons. Funding allocation under the CDBG program is determined on the basis, at least in part, of information collected by the Census Bureau.  42 U.S.C. §§ 5302, 5306; 24 C.F.R §§ 570.3-4.  Plaintiffs receive annual CDBG funds.  For example, Chicago received over $80 million under the CDBG program in fiscal year 2018, Phoenix was allocated over $16 million in fiscal year 2018, Columbus received nearly $7.7 million in fiscal year 2017, Pittsburgh received approximately $10.3 million in fiscal year 2016, and Philadelphia received nearly $46 million during the city's 2016 fiscal year.

149.    Several federal programs improve nutrition for low-income families, including the School Breakfast and National School Lunch programs, as well as the Supplemental Nutrition Assistance Program ("SNAP").  Funding allocations for these programs are often determined on the basis of information collected by the Census Bureau.  Plaintiffs receive annual funds under the School Breakfast and National School Lunch Program.  For example, in fiscal year 2017, Virginia received nearly $90 million under the School Breakfast program, and over $250 million under the National School Lunch Program.  Plaintiffs also receive significant annual funding under SNAP.  For instance, in fiscal year 2015, Delaware received $228 million under SNAP, New Mexico received $685 million, and Oregon received $1.15 billion, and in fiscal year 2017 Monterey County received $12.8 million.

150.    Defendants' decision will lead to an undercount in the decennial census that will deprive Plaintiffs of crucial federal funds that provide increased access to social services under these and other programs.

151.    An undercount of Plaintiffs' populations as a result of the demand for person-by-person citizenship status of every resident in the country will also lead to losses of funding for Plaintiffs in many other federally-funded programs that tie allocations to data collected during the decennial census.  Losses of funding for these programs will significantly harm Plaintiffs, who will either need to procure additional resources to meet these shortfalls in funding, or their resource needs will be unmet.

**C.     Defendants' conduct harms Plaintiffs' interests in accurate redistricting and compliance with the Constitution's one-person, one-vote mandate.**

152.    Defendants' decision to demand person-by-person citizenship information on the 2020 Census questionnaire also harms Plaintiffs' interests in obtaining accurate population figures for redistricting purposes.

153.    Plaintiff States rely on tabulations of the population produced by the Census Bureau from the decennial census to draw statewide redistricting plans for their congressional and state legislative districts.

154.    When drawing these districts, Plaintiff States must adhere to the U.S. Constitution's one-person, one-vote requirement, which requires that congressional and state legislative districts must be "as nearly of equal population as is practicable."  *Reynolds v. Sims*, 377 U.S. 533, 559, 577 (1964); *see Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964); *Karcher v. Daggett*, 462 U.S. 725, 734 (1983); *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983).  The drawing of congressional districts is subject to a strict constitutional standard, and even small population deviations, if avoidable, are unconstitutional.  Moreover, at least for congressional districts, the Constitution requires apportionment "based on total population," not citizen voting age population.  *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128-29 (2015).

155.     Defendants' decision will create avoidable errors in the data provided to Plaintiff States for congressional redistricting, and districts drawn on that data will impair the right to equal representation for residents of over-populated districts.

156.     Plaintiff the District of Columbia relies on tabulations of the population produced by the Census Bureau to redistrict for local elections within the District, setting boundaries for wards that elect members to the local legislative body, the Council of the District of Columbia, as well as boundaries for Advisory Neighborhood Commissions, Single Member Districts, and voting precincts.  Similarly, most Plaintiff Cities and Counties also rely on population tabulations produced by the Census Bureau in order to reapportion their legislative districts. Like all U.S. States, the District of Columbia, and the Cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Providence, and Seattle, the City and County of San Francisco, the Counties of Cameron, El Paso, Hidalgo and Monterey, and the members of the USCM are also bound by the U.S. Constitution's one-person, one-vote requirement.

157.     By causing disproportionate undercounts of citizens and noncitizens in communities with immigrant populations, the addition of a citizenship demand to the 2020 Census will jeopardize the ability of Plaintiffs to comply with the one-person, one-vote requirement.  Undercounts of citizens and noncitizens in these communities will create avoidable distributional inaccuracies in the data on which Plaintiffs rely to draw district lines.  Districts drawn on the basis of inaccurate data may systemically dilute the voting power of persons living in communities with immigrant populations, and impair their right to equal representation in congressional, state, and local legislative districts.

158.     As a result, Defendants' decision will harm Plaintiffs' interest in complying with the constitutional equal population principle in redistricting.

**D.    Defendants' conduct harms Plaintiffs' representational interests.**

159.    Defendants' decision to demand person-by-person citizenship information on the 2020 Census questionnaire will harm Plaintiffs' interest in fair representation in Congress by depressing participation in the decennial census within Plaintiffs' diverse naturalized, documented, and undocumented immigrant populations, leading to inaccurate responses and a significant undercount of Plaintiffs' residents.

160.    For instance, an undercount resulting from Defendants' decision to add a citizenship demand will lead to loss of representation in Rhode Island.  As a result of the 2010 Census, Rhode Island was allocated two seats to the United States House of Representatives in accordance with U.S. Const. art. I, § 2.  Rhode Island has maintained two seats to the United States House of Representatives for over 200 years.  According to the Census Bureau estimates for 2017, the population of Rhode Island is 1,059,639.  Based on these 2017 estimates of its population, if 157 persons that reside in Rhode Island are not counted in the 2020 Census, Rhode Island will lose one of its two seats in the United States House of Representatives.

161.    In addition, the undercount resulting from Defendants' decision will threaten additional Plaintiffs with losses in representation.

162.    For example, New York is projected to lose one representative as a result of the 2020 Census, and is on the cusp of losing a second.  Illinois also risks losing additional representation in Congress.  An undercount of immigrant communities in these states will result in losses of these seats, and harm these states' interest in fair representation in Congress and in the Electoral College.

163.    Moreover, Defendants' decision will also harm representational interests within their states.  Plaintiff Cities, Counties, and the members of Plaintiff USCM are home to larger immigrant populations than other areas within their states.  For instance:

50

a.  The foreign-born population of Central Falls is 38%, and Providence is 30%, compared to 13.5% for the State of Rhode Island.

b.  The foreign-born population of Chicago is approximately 20.8% of the total population, compared to 13.9% for the State of Illinois.

c.  The foreign-born population of Columbus is 11.6%, compared to 4.4% for the State of Ohio.

d.  The foreign-born population of San Francisco is 34.9%, and Monterey County is 30%, compared to 27% for the State of California.

e.  The foreign-born population of Philadelphia is 13.1% and Pittsburgh is 8.5%, compared to 6.5% for the State of Pennsylvania.

f.  The foreign-born population of Phoenix is 19.8%, compared to 13.4% for the State of Arizona.

g.  The foreign-born population of Cameron County is 24%, El Paso County is 25%, and Hidalgo County is 28%, compared to 17% for the State of Texas.

164.  Defendants' decision to include a citizenship demand on the 2020 Census questionnaire will lead to undercounts in immigrant communities, and, as a result, will disproportionately affect areas with larger immigrant communities.  Redistricting on the basis of these inaccurate numbers will harm these areas, including Plaintiff Cities, Counties, and the members of Plaintiff USCM, vis-a-vis other areas within their states with smaller immigrant communities.

**E.   Plaintiffs will expend significant resources to mitigate the harm from Defendants' decision.**

165.  Plaintiffs already devote considerable resources every ten years to ensuring that they receive an accurate count of their populations on the census.  For instance, Colorado

51

devoted resources to train and educate local partners and update address lists.  Massachusetts funded community outreach grants in 2000 and 2010 focused on increasing immigrant participation in the decennial census.  Minnesota expended resources during the 2010 Census on efforts to coordinate with local governments, promote the Census at community events, and engage community leaders and organizations.  Similarly, San Francisco expended resources in connection with the 2010 Census, creating a Complete Count Committee, conducting a citywide campaign, and supporting multilingual outreach to immigrant and historically undercounted populations.

166.    Plaintiffs also devoted significant employee time to outreach efforts.  For the 2010 Census, the District of Columbia devoted an employee to reach out to the District's Hispanic community, hosted a training of Hispanic Census workers, and educated parents, English as a Second Language teachers, and counselors on the importance of a complete count.  Chicago and its sister agencies devoted over 1600 staff hours to programs encouraging residents to participate, including door-to-door distribution of flyers and information, sending Census messages on student report cards, and installing posters at bus shelters.  Oregon similarly devoted significant employee time to community outreach efforts.

167.    Several Plaintiffs have started making efforts encourage participation for the 2020 Census.  For instance, Illinois has enacted a Complete Count Commission to develop a census outreach strategy.  20 Ill. Comp. Stat. 5100/15.  New Mexico has spent $300,000 to identify housing units for the Census Bureau's address list, and expects to spend additional funds on a proposed Complete Count Committee and other efforts to encourage participation.  Maryland allocated $5 million to assist local governments and nonprofits in obtaining an accurate count.  New York City has budgeted $4 million to hire staff and develop programs to address the

unprecedented challenges New York City anticipates.  Many of these efforts did not, however, account for additional levels of non-response resulting from Defendants' decision to add a person-by-person citizenship demand to the 2020 Census questionnaire.

168.    Plaintiffs will have to expend additional funding to combat the undercount that the addition of a citizenship demand will cause, such as expending resources on greater public outreach to encourage anxious residents, particularly in immigrant communities, to respond to the 2020 Census.

**F.    Defendants' conduct harms the health of Plaintiffs' residents.**

169.    Many federal health agencies and public health organizations rely on the decennial census for accurate demographic statistics of the population of the United States.

170.    These statistics help healthcare providers and policymakers contain and prevent the spread of disease by efficiently allocating funding and limited resources for targeted interventions.  For example, census statistics help reduce the incidence of asthma and other preventative diseases by using demographic data to model neighborhoods before initiating preventative programs.

171.    An inaccurate census would not just result in worse health outcomes for undercounted communities, but for the nation as a whole.  An undercount in the 2020 Census would undermine efforts to prevent disease and cost millions of dollars in long-term treatment.

**G.    Defendants' conduct harms Plaintiffs' economies and residents who are beneficiaries of private funding.**

172.    An accurate census is essential for both public and private actors to identify and help meet community and business needs.

173.    The Department of Commerce estimates that census data guide trillions of dollars in private sector investment and create $221 billion in private sector revenue.

174.    Non-profit organizations use census data to decide where to provide critical aid such as health care and natural disaster relief and where to conduct fundraising and advocacy drives.

175.    Academics and researchers from Plaintiffs' universities rely on census data to conduct research on a wide variety of issues relating to race and ethnicity, population mobility, and other areas.

176.    An undercount on the 2020 Census, caused by Defendants' demand for citizenship information from every respondent, will ultimately deprive historically marginalized communities of vital private resources over the next decade.

177.    Plaintiffs will need to expend additional funds to compensate for the loss of vital aid from private actors to their residents.

### FIRST CLAIM FOR RELIEF
#### (U.S. Constitution article I, section 2, clause 3; U.S. Constitution amend. XIV, sec. 2)

178.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

179.    The Constitution requires that Defendants conduct an "actual Enumeration" of the "whole number of persons" in the United States, so that Members of the U.S. House of Representatives may be "apportioned among the several States . . . according to their respective Numbers." U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2; *see* 13 U.S.C. §§ 4, 141.

180.    Defendants' decision to add a citizenship demand to the 2020 Census questionnaire will deter participation in the decennial census and cause an undercount that impedes the "actual Enumeration" required by the Constitution.

181.    Defendants' conduct poses a significant risk that Plaintiffs' number of U.S. Representatives and representation in the Electoral College will not reflect their actual population.

182.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### SECOND CLAIM FOR RELIEF
**(Administrative Procedure Act – not in accordance with law,
contrary to constitutional right, beyond statutory authority, and without observance of
procedure required by law)**

183.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

184.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "not in accordance with law," "contrary to constitutional right," in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

185.    Defendants' decision to add a citizenship demand to the 2020 Census questionnaire is inconsistent with and contrary to the constitutional mandate to conduct an "actual Enumeration" of "the whole number of persons" in the United States.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.

186.    Defendants' decision is also inconsistent with the data quality requirements of the Information Quality Act and the guidelines implementing the IQA adopted by the Census Bureau.  Pub. L. No. 106-554, § 515.  The data quality requirements and testing standards developed pursuant to law and practice are designed to ensure accuracy, reliability, and objectivity in the final data, to minimize respondent burden and maximize data quality, and to achieve the highest rates of response.  Defendants have failed to act in a manner consistent with these requirements and mandated procedures by failing to adequately test the citizenship

demand, minimize the burden that such a demand imposes on respondents, maximize data quality, or ensure the highest rates of response.

187.   Defendants' decision to add a citizenship demand to the 2020 Census is therefore not in accordance with law; beyond statutory authority; and without observance of procedure required by law, in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2).

188.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### THIRD CLAIM FOR RELIEF
**(Administrative Procedure Act – arbitrary and capricious)**

189.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

190.   The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

191.   Defendants' decision to add a citizenship demand to the 2020 Census is arbitrary and capricious and an abuse of discretion for multiple reasons.  First, there is no support for the Department of Justice's claim that effective enforcement of Section 2 of the Voting Rights Act requires person-by-person citizenship data; to the contrary, requesting citizenship data would undermine the purposes of the Voting Rights Act and weaken voting rights enforcement; and sufficient data for Voting Rights Act purposes is already available to the Department of Justice.

192.   Second, Defendants' decision to add a citizenship demand is arbitrary and capricious because it reverses nearly seven decades of settled and well-considered practice without reasoned explanation, in contradiction to factual findings that underlay the Census Bureau's previous practice.

193.     Third, Defendants' decision is arbitrary and capricious because Defendants entirely failed to consider important aspects of the problem, including the risk of inaccurate results and the availability of alternative data that serves the federal government's needs no less well.

194.     Fourth, Defendants' decision is arbitrary and capricious because it was reached without complying with Defendants' own data quality requirements and testing standards.

195.     Fifth, Defendants' unfounded and conflicting rationales indicate that the stated reason for adding the question is pretext.

196.     Defendants' decision to add a citizenship demand to the 2020 Census is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the Administrative Procedure Act.  5 U.S.C. § 706(2)(A).

197.     Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.     Declare that Defendants' decision to add a citizenship demand to the questionnaire for the 2020 Census is unauthorized by and contrary to the Constitution and laws of the United States;

2.     Declare that Defendants' decision to add a citizenship demand to the 2020 Census is not in accordance with law, is beyond statutory authority, and is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

3.     Enjoin Defendants and all those acting on their behalf from adding a citizenship demand to the 2020 Census;

4.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

5.      Award such additional relief as the interests of justice may require.

DATED: April 30, 2018

**ERIC T. SCHNEIDERMAN**
**Attorney General of the State of New York**

By:     */s Lourdes M. Rosado*
        Lourdes M. Rosado,[†] Bureau Chief
        Matthew Colangelo,[†] Executive Deputy
        Attorney General
        Laura Wood,[†] Special Counsel
        Elena Goldstein, [†] Senior Trial Counsel
        Ajay Saini, [†] Assistant Attorney General
        Diane Lucas,[†] Assistant Attorney General
        Sania Khan,[†] Assistant Attorney General
        Alex Finkelstein, Volunteer Assistant
        Attorney General
        Civil Rights Bureau
        Office of the New York State Attorney
        General
        28 Liberty, 20th Floor
        New York, NY 10005
        Lourdes.Rosado@ag.ny.gov
        Diane.Lucas@ag.ny.gov
        Ajay.Saini@ag.ny.gov
        Tel. (212) 416-6348
        Fax (212) 416-8074

        [†] Admitted in the S.D.N.Y.

**JOHN W. HICKENLOOPER**          **GEORGE JEPSEN**
**Governor of the State of Colorado**   **Attorney General of the State of Connecticut**

By:  */s Jacqueline Cooper Melmed*
Jacqueline Cooper Melmed,* Chief Legal
Counsel
Governor John Hickenlooper
136 State Capitol Building
Denver, Colorado 80203
Jacki.melmed@state.co.us
Tel: (303) 866-3788

By:  */s Mark F. Kohler*
Mark F. Kohler,*
Assistant Attorney General
Connecticut Office of the Attorney
General
55 Elm Street, P.O. Box 120
Hartford, CT 06106
Mark.Kohler@ct.gov
Tel. (860) 808-5020

**MATTHEW DENN**
**Attorney General of the State of Delaware**

By:  */s Ilona Kirshon*
Ilona Kirshon,† Deputy State Solicitor
David Lyons, Deputy Attorney General
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, Delaware  19801
Ilona.Kirshon@state.de.us
Tel.  (302)  577-8372
Fax  (302) 577-6630

**KARL A. RACINE**
**Attorney General for the District of Columbia**

By:  */s Robyn R. Bender*
Robyn R. Bender, * Deputy Attorney
General
Valerie M. Nannery,* Assistant
Attorney General
Public Advocacy Division
441 4th Street, NW
Suite 650 North
Washington, DC 20001
Robyn.Bender@dc.gov
Tel. (202) 724-6610
Fax (202) 730-0650

**LISA MADIGAN**
**Attorney General of the State of Illinois**

By:  */s Cara A. Hendrickson*
Cara A. Hendrickson,* Chief, Public
Interest Division
Karyn L. Bass Ehler,* Chief, Civil Rights
Bureau
Jeffrey VanDam,* Assistant Attorney
General
Matthew J. Martin,* Assistant Attorney
General
Civil Rights Bureau
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601

**THOMAS J. MILLER**
**Attorney General of the State of Iowa**

By:  */s Nathan Blake*
Nathan Blake,* Deputy Attorney
General
Office of the Iowa Attorney General
1305 E. Walnut St.
Des Moines, IA 50319
nathan.blake@ag.iowa.gov
Tel. (515) 281-4325

JVanDam@atg.state.il.us
Tel. (312) 814-3400
Fax (312) 814-3212

**BRIAN E. FROSH**
**Attorney General of the State of Maryland**

  By:    /s *John R. Grimm*
        John R. Grimm,* Assistant Attorney
        General
        Civil Litigation Division
        Maryland Office of the Attorney General
        200 St. Paul Place, 20th Floor
        Baltimore, Maryland 21202
        jgrimm@oag.state.md.us
        Tel. (410) 576-76339
        Fax (410) 576-6955

**MAURA HEALEY**
**Attorney General for the Commonwealth of Massachusetts**

  By:    /s *Jonathan Miller*
        Jonathan Miller,[†] Assistant Attorney
        General
        Miranda Cover,* Assistant Attorney
        General
        Ann E. Lynch,* Assistant Attorney
        General
        Public Protection & Advocacy Bureau
        Massachusetts Attorney General's Office
        One Ashburton Place
        Boston, MA 02108
        Jonathan.Miller@state.ma.us
        Mercy.Cover@state.ma.us
        Ann.Lynch@state.ma.us
        Tel. (617) 727-2200
        Fax (617) 727-5762

**LORI SWANSON**
**Attorney General of the State of Minnesota**

**GURBIR S. GREWAL**
**Attorney General of the State of New Jersey**

  By:    /s *Rachel Wainer Apter*
        Rachel Wainer Apter*
        Assistant Attorney General
        Office of the Attorney General
        Richard J. Hughes Justice Complex
        25 Market Street, 8th Floor, West Wing
        Trenton, New Jersey 08625-0080
        Rachel.Apter@njoag.gov
        Tel: (609) 376-2702

By:     *s/ Jacob Campion*
        Jacob Campion,* Assistant Attorney
        General
        Office of the Minnesota Attorney General
        445 Minnesota Street, Suite 1100
        St. Paul, Minnesota 55101-2128
        jacob.campion@ag.state.mn.us
        (651) 757-1459 (Voice)
        (651) 282-5832 (Fax)

**HECTOR H. BALDERAS**
**Attorney General of the State of New Mexico**

By:     */s Tania Maestas*
        Tania Maestas,* Deputy Attorney General
        New Mexico Office of the Attorney
        General
        408 Galisteo St.
        Santa Fe, NM 87501
        tmaestas@nmag.gov
        Tel. (505) 490-4060
        Fax (505) 490-4883

**JOSHUA H. STEIN**
**Attorney General of the State of North Carolina**

By:     */s Ryan Y. Park*
        Ryan Y. Park,[†]
        Deputy Solicitor General
        North Carolina Department of Justice
        114 W. Edenton Street
        Raleigh, NC 27603
        RPark@ncdoj.gov
        Tel. (919) 716-6400

**ELLEN F. ROSENBLUM**
**Attorney General of the State of Oregon**

By:     */s Brian De Haan*
        Brian De Haan,[†]
        Assistant Attorney General
        Trial Attorney
        Brian.A.DeHaan@doj.state.or.us

**JOSH SHAPIRO**
**Attorney General of the Commonwealth of Pennsylvania**

By:     */s Jonathan Scott Goldman*
        Jonathan Scott Goldman,*
        Executive Deputy Attorney General,
        Civil Law Division
        Michael J. Fischer,*

Tel. (971) 673-1880
Fax (971) 673-5000

Chief Deputy Attorney General,
Impact Litigation Section
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
MFischer@attorneygeneral.gov
Tel. (215) 560-2171

**PETER KILMARTIN**
**Attorney General of the State of Rhode Island**

By:    */s* Adam D. Roach
          Adam D. Roach,* Special Assistant
          Attorney General
          RI Office of the Attorney General
          150 South Main Street
          Providence, RI 02903
          aroach@riag.ri.gov
          Tel: (401) 274-4400 ext. 2490
          Fax: (401) 222-2995

**MARK R. HERRING**
**Attorney General of the Commonwealth of Virginia**

By:    */s Matthew R. McGuire*
          Matthew R. McGuire,*
          Deputy Solicitor General
          202 North Ninth Street
          Richmond, VA 23219
          MMcguire@oag.state.va.us
          Tel. (804) 786-7240
          Fax (804) 371-0200

**THOMAS J. DONOVAN, JR.**
**Attorney General of the State of Vermont**

By:    */s Benjamin D. Battles*
          Benjamin D. Battles,† Solicitor General
          Julio A. Thompson,* Assistant Attorney
          General, Civil Rights Unit
          Office of the Vermont Attorney General
          109 State Street
          Montpelier, VT 05609
          Benjamin.Battles@vermont.gov
          Tel. (802) 828-5500
          Fax (802) 828-3187

**ROBERT W. FERGUSON**
**Attorney General of the State of Washington**

By:    /s/ *Laura K. Clinton*
          Laura K. Clinton,*
          Assistant Attorney General
          Complex Litigation Division
          800 Fifth Avenue, Suite 2000
          Seattle, WA 98104
          LauraC5@atg.wa.gov
          (206) 233-3383
          Peter Gonick,
          Deputy Solicitor General
          Office of the Attorney General
          PO Box 40100
          Olympia, WA  98504-0100
          peterg@atg.wa.gov
          Tel. (360) 753-6245

**MATTHEW JERZYK**
**City Solicitor for the City of Central Falls**

**EDWARD N. SISKEL**
**Corporation Counsel of the City of Chicago**

By:   */s Matthew Jerzyk*
     Matthew Jerzyk,*
     City Solicitor
     City of Central Falls
     580 Broad Street
     Central Falls, RI 02863
     MJerzyk@CentralFallsRI.us
     Tel. (401) 727-7422

By:   */s John Hendricks*
     John Hendricks,* Deputy Corporation
     Counsel
     Andrew W. Worseck,* Chief Assistant
     Corporation Counsel
     Andrew S. Mine, Senior Counsel
     Maggie Sobota,* Senior Counsel
     Christie Starzec,* Assistant Corporation
     Counsel
     City of Chicago Law Department
     30 N. LaSalle Street, Suite 1230
     Chicago, IL 60602
     John.Hendricks@cityofchicago.org
     Andrew.Worseck@cityofchicago.org
     Andrew.Mine@cityofchicago.org
     Maggie.Sobota@cityofchicago.org
     Christie.Starzec@cityofchicago.org
     Tel. (312) 744-6975
     Fax (312) 742-3925

**ZACHARY M. KLEIN**
**Columbus City Attorney**

By:   */s Zachary Klein*
     Zachary M. Klein,* Columbus City
     Attorney
     Richard N. Coglianese,* Assistant City
     Attorney
     Lara N. Baker-Morrish,* Assistant City
     Attorney
     Alexandra N. Pickerill,* Assistant City
     Attorney
     77 North Front Street, 4th Floor
     zmklein@columbus.gov
     rncoglianese@columbus.gov
     lnbaker@columbus.gov
     anpickerill@columbus.gov
     Tel. (614) 645-7385
     Fax: (614) 645-6949

**ZACHARY W. CARTER**
**Corporation Counsel of the City of New York**

By:   */s Sabita Krishnan*
     Gail Rubin[†]
     Sabita Krishnan[†]
     100 Church Street
     New York, NY 10007
     grubin@law.nyc.gov
     skrishna@law.nyc.gov
     Tel. (212) 356-2030
     Fax (212) 356-2038

**MARCEL S. PRATT**

**YVONNE S. HILTON**

**Solicitor of the City Of Philadelphia**

By: */s Marcel S. Pratt*
    Marcel S. Pratt,* Acting City Solicitor
    Eleanor N. Ewing,* Chief Deputy
    Solicitor
    Benjamin H. Field,* Deputy City
    Solicitor
    Michael W. Pfautz, Assistant City
    Solicitor
    City of Philadelphia Law Department
    1515 Arch Street, 17th Floor
    Philadelphia, PA 19102
    marcel.pratt@phila.gov
    eleanor.ewing@phila.gov
    benjamin.field@phila.gov
    Tel.  (215)683-5000
    Fax  (215)683-5299

**Acting City Solicitor of the City of Pittsburgh**

By: */s Matthew S. McHale*
    Matthew S. McHale,* Associate City
    Solicitor
    City of Pittsburgh Department of Law
    414 Grant Street, Room 323
    Pittsburgh, PA 15219
    yvonne.hilton@pittsburghpa.gov
    Matthew.mchole@pittsburghpa.gov
    Tel. (412) 255-2015

**JEFFREY DANA**
**City Solicitor for the City of Providence**

By:   /s Jeffrey Dana
    Jeffrey Dana,*
    City Solicitor
    City of Providence
    444 Westminster Street
    Providence, RI 02903
    JDana@providenceri.gov
    401-680-5333

**CITY OF SEATTLE**
**City of Seattle City Attorney**

By:   /s Peter S. Holmes
    Peter S. Holmes,*
    City Attorney
    Gary T. Smith, Assistant City Attorney
    701 Fifth Avenue, Suite 2050
    Seattle, WA 98104-7097
    Peter.Holmes@seattle.gov
    Gary.Smith@seattle.gov
    Tel. (206) 684-8200
    Fax (206) 684-4648

**DENNIS J. HERRERA**
**City Attorney for the City and County of San Francisco**

**ROLANDO L. RIOS**
**Special Counsel for Hidalgo and Cameron Counties**

By: */s Dennis J. Herrera*
Dennis J. Herrera,* City Attorney
Jesse C. Smith, Chief Assistant City Attorney
Ronald P. Flynn, Chief Deputy City Attorney
Yvonne R. Meré, Chief of Complex and Affirmative Litigation
Mollie Lee,* Deputy City Attorney
Erin Kuka, Deputy City Attorney
Neha Gupta, Deputy City Attorney
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Mollie.Lee@sfcityatty.org
Tel. (415) 554-4748
Fax (415) 554-4715

By: */s Rolando Rios*
Rolando Rios,* Special Counsel for Hidalgo and Cameron Counties
115 E. Travis, Suite 1645
San Antonio, TX 78205
rrios@rolandorioslaw.com
(210) 222-2102

**JO ANNE BERNAL**
**El Paso County Attorney**

By: */s Joe Anne Bernal*
Jo Anne Bernal,* County Attorney
Ian Kaplan,[†] Assistant County Attorney
El Paso County Attorney's Office
500 E. San Antonio, Room 503
El Paso, TX 79901
Joanne.bernal@epcounty.com
Ian.kaplan@epcounty.com
Tel. (915) 546-2050

**CHARLES J. McKEE**
**Monterey County Counsel**

By: */s Charles J. Mckee*
Charles J. Mckee, County Counsel
William M Litt., Deputy County Counsel
Office of the County Counsel
County of Monterey
168 West Alisal St., 3rd Fl.
Salinas, CA 93901
McKeeCJ@co.monterey.ca.us
LittWM@co.monterey.ca.us
Tel. (831) 755-5045
Fax (831) 755-5283

**UNITED STATES CONFERENCE OF MAYORS**

By:   /s John Daniel Reaves
      John Daniel Reaves*
      General Counsel
      United Conference of Mayor
      1200 New Hampshire Avenue, NW
      Third Floor
      Washington, D.C. 20036
      jdreavesoffice@gmail.com
      Tel. (202) 974-5931

**Office of the Phoenix City Attorney**
Brad Holm, City Attorney

By:   /s Patricia J. Boland
      Patricia J. Boland*
      Assistant Chief Counsel
      City of Phoenix Law Department
      200 West Washington, Suite 130
      Phoenix, Arizona 85003-1611
      Patricia.boland@phoenix.gov
      Tel. (602) 262-6761

[†] Admitted in the S.D.N.Y.
*Seeking or obtained *Pro hac vice* admission