UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED:  07/26/2018____
```

------------------------------------------------------------------------ X
                               :

STATE OF NEW YORK, et al.,               :

                Plaintiff,      :          18-CV-2921 (JMF)
                                 :

      -v-                      :

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :

                Defendants.    :

------------------------------------------------------------ :

NEW YORK IMMIGRATION COALITION, et al.,    :

                Plaintiff,      :          18-CV-5025 (JMF)

      -v-                      :

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :       <u>OPINION AND ORDER</u>

                Defendants.    :

------------------------------------------------------------------------ X

JESSE M. FURMAN, United States District Judge:

INTRODUCTION ......................................................................................................... 2

BACKGROUND ........................................................................................................... 6

LEGAL STANDARDS ................................................................................................. 14

DISCUSSION ............................................................................................................... 15

     A.    Standing ........................................................................................ 16

           1.    Injury-in-Fact ................................................................. 17

           2.    Traceability ................................................................... 23

           3.    NGO Plaintiffs' Standing............................................... 29

B.      The Political Question Doctrine.............................................................. 32

C.      The Administrative Procedure Act ........................................................ 38

D.      The Enumeration Clause......................................................................... 46

E.      The Equal Protection Claim.................................................................... 60

CONCLUSION................................................................................................................ 68

## INTRODUCTION

The Fourteenth Amendment to the Constitution provides that "Representatives shall be apportioned among the several States according to their respective Numbers, counting the whole number of persons in each State."  U.S. CONST. amend. XIV, § 2.  Article I of the Constitution provides, in turn, that the number of persons in each state is to be calculated by means of an "actual Enumeration" — known as the census — every ten years "in such Manner as [Congress] shall by Law direct."  *Id.* art. I, § 2, cl. 3.  Since 1790, the government has conducted that "actual Enumeration" through questions — initially asked in person and, later, by means of written questionnaire — about both the number and demographic backgrounds of those living in each American household.  Beginning in 1820, one such question concerned (in one form or another) citizenship status.  The government ceased asking that question of everyone nationwide in 1960.  Earlier this year, however, Secretary of Commerce Wilbur L. Ross, Jr., exercising authority delegated by Congress over the census, announced that he was reinstating the citizenship question on the 2020 census questionnaire.  Secretary Ross explained that reinstatement of the citizenship question is necessary for the Department of Justice to enforce, and courts to adjudicate, violations of Section 2 of the Voting Rights Act of 1965, codified at 52 U.S.C. § 10301.

Plaintiffs in these two related cases (which have been informally consolidated for purposes of scheduling and discovery) contend that Secretary Ross's decision to reinstate the citizenship question on the 2020 census questionnaire violates both the Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* In 18-CV-2921, Plaintiffs are eighteen states and the District of Columbia, as well as various cities, counties, and mayors; they challenge the Secretary's decision under both Article I's Enumeration Clause and the APA. (Docket No. 214 ("SAC"), ¶¶ 178-97.) In 18-CV-5025, Plaintiffs are five nongovernmental organizations, four suing on behalf of themselves and their members and one suing only on its own behalf; they challenge the Secretary's decision on the same grounds and also as a violation of equal protection, as embodied in the Due Process Clause of the Fifth Amendment. (18-CV-5025, Docket No. 1 ("NGO Compl."), ¶¶ 193-212).[1] On May 25, 2018, Defendants — the United States Department of Commerce; Secretary Ross (the "Secretary"); the Bureau of the Census (the "Census Bureau"); and Acting Director of the Census Bureau, Ron Jarmin — moved, pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, to dismiss the First Amended Complaint in 18-CV-2921. (Docket No. 154).[2] On June 29, 2018, Defendants moved to dismiss the Complaint in 18-CV-5025. (18-CV-5025, Docket No. 38.)

---

[1]     Unless otherwise noted, docket references are to 18-CV-2921. Additionally, "Plaintiffs" refers to the plaintiffs in both cases, "Government Plaintiffs" refers to the plaintiffs in 18-CV-2921, and "NGO Plaintiffs" refer to the plaintiffs in 18-CV-5025.

[2]     On July 23, 2018, Plaintiffs in 18-CV-2921 filed a Second Amended Complaint, which adds the City of Phoenix as a plaintiff and includes allegations relating to Phoenix, but "otherwise does not substantively alter" the First Amended Complaint that Defendants had originally moved to dismiss. (Docket No. 210-1; *see* Docket No. 214 (refiling the Second Amended Complaint due to a filing error)). By Order entered on July 24, 2018, the Court indicated that it would treat Defendants' previously filed motion to dismiss "as applying to the Second Amended Complaint." (Docket No. 213).

The Court held oral argument on the first motion on July 3, 2018.  (*See* July 3, 2018 Transcript, Docket No. 207 ("Oral Arg. Tr."))

Broadly speaking, in this Opinion, the Court reaches three conclusions with respect to Defendants' motions.  *First*, the Court categorically rejects Defendants' efforts to insulate Secretary Ross's decision to reinstate the citizenship question on the 2020 census from judicial review.  Contending that Plaintiffs cannot prove they have been or will be injured by the decision, and citing the degree of discretion afforded to Congress by the Enumeration Clause and to the Secretary by statute, Defendants insist that this Court lacks jurisdiction even to consider Plaintiffs' claims.  As the Court will explain, however, that contention flies in the face of decades of precedent from the Supreme Court, the Second Circuit, and other courts.  That precedent makes clear that, while deference is certainly owed to the Secretary's decisions, courts have a critical role to play in entertaining challenges like those raised by Plaintiffs here.

*Second*, the Court concludes that the citizenship question is a permissible — but by no means mandated — exercise of the broad power granted to Congress (and, in turn, to the Secretary) in the Enumeration Clause of the Constitution.  That conclusion is compelled not only by the text of the Clause, which vests Congress with virtually unlimited discretion in conducting the census, but also by historical practice.  The historical practice reveals that, since the very first census in 1790, the federal government has consistently used the decennial exercise not only to obtain a strict headcount in fulfillment of the constitutional mandate to conduct an "actual Enumeration," but also to gather demographic data about the population on matters such as race, sex, occupation, and, even citizenship.  Moreover, it reveals that all three branches of the government — including the Supreme Court and lower courts — have blessed this dual use of the census, if not a citizenship question itself.  In the face of that history and the broad

constitutional grant of power to Congress, the Court cannot conclude that the Secretary lacks power under the Enumeration Clause to ask a question about citizenship on the census.

*Third*, although the Secretary has *authority* under the Enumeration Clause to direct the inclusion of a citizenship question on the census, the Court concludes that the particular *exercise* of that authority by Secretary Ross may have violated NGO Plaintiffs' rights to equal protection of the laws under the Due Process Clause of the Fifth Amendment.  That is, assuming the truth of NGO Plaintiffs' allegations and drawing all reasonable inferences in their favor — as the Court must at this stage of the proceedings — they plausibly allege that Secretary Ross's decision to reinstate the citizenship question on the 2020 census was motivated by discriminatory animus and that its application will result in a discriminatory effect.  As discussed below, that conclusion is supported by indications that Defendants deviated from their standard procedures in hastily adding the citizenship question; by evidence suggesting that Secretary Ross's stated rationale for adding the question is pretextual; and by contemporary statements of decisionmakers, including statements by the President, whose reelection campaign credited him with "officially" mandating Secretary Ross's decision to add the question right after it was announced.

The net effect of these conclusions is that Defendants' motions to dismiss are granted in part and denied in part.  In particular, Plaintiffs' claims under the Enumeration Clause — which turn on Secretary Ross's power rather than his purposes — must be and are dismissed.  By contrast, their claims under the APA (which Defendants seek to dismiss solely on jurisdictional and justiciability grounds) and the Due Process Clause — which turn at least in part on Secretary Ross's purposes and not merely on his power — may proceed.

## BACKGROUND

As noted, the Constitution requires an "actual Enumeration" of "the whole number of persons in each State" every ten years, and grants to Congress authority to conduct that enumeration — commonly known as the census — "in such Manner as [Congress] shall by Law direct."  U.S. CONST. art. 1, § 2, cl. 3 & amend. XIV.  The modern census is governed by the Census Act, which was enacted in 1976.  *See* 13 U.S.C. §§ 1 *et seq.*  The Act delegates to the Secretary of Commerce the duty to "take a decennial census of population as of the first day of April of such year . . . in such form and content as he may determine."  13 U.S.C. § 141(a).  It further provides that "[t]he Secretary shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in [the Act]."  *Id.* § 5.  The Secretary is required to submit "a report containing [his] determination of the questions proposed to be included" in the census "not later than 2 years before the appropriate census date."  *Id.* § 141(f)(2).  After the census is taken, the President is tasked with transmitting to Congress "a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State" is "entitled."  2 U.S.C. § 2a(a).

Significantly, consistent with the constitutional text, the decennial census endeavors to count *all* residents of the United States, regardless of their legal status.  *See Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court) ("The language of the Constitution is not ambiguous.  It requires the counting of the 'whole number of persons' for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly 'persons.'").  The federal government, however, has long used the decennial census to do more than take a mere headcount

6

of the population for purposes of apportioning Representatives.  It has also used the census as a means to collect data — demographic and otherwise — on the population of the United States.  *See generally* U.S. CENSUS BUREAU, MEASURING AMERICA: THE DECENNIAL CENSUSES FROM 1790 TO 2000 ("MEASURING AMERICA") (2002), *available at* http://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf.  Notably, that practice began with the nation's very first census, taken in 1790, which was conducted by United States Marshals.  *See* Act of March 1, 1790 ("1790 Census Act"), 1 Stat. 101, 101-02 (1790).[3]  Congress directed the Marshals to ask each household, among other things, about "the sexes and colours of free persons" as well the age of residents, *id.* at 101, in order to "assess the countries [*sic*] industrial and military potential," MEASURING AMERICA 5.  As a history of the census prepared in 1900 for the Senate Committee on the Census described the first census: "Instead of providing simply for an enumeration of the population in 1790 . . . which would have answered all the requirements of the Constitution," Congress "called for [more information] . . . thus recognizing at the very outset the desirability of using the census as a means of securing data beyond the mere statement of population needed for apportionment purposes."  CARROLL D. WRIGHT, THE HISTORY AND GROWTH OF THE UNITED STATES CENSUS ("HISTORY AND GROWTH"), S. Doc. No. 194, at 89 (1st Sess., 1900).

　　　　The inquiries on the second and third censuses were largely the same as the first.  *See* MEASURING AMERICA 6; *see also* Act of Feb. 28, 1800 ("1800 Census Act"), 2 Stat. 11 (1800); Act of March 26, 1810, 2 Stat. 564 (1810).  Unlike the first census, however, the second census also included a question about the town or city in which persons resided.  *See* 1800 Census Act,

---

[3]　　　　The Court may and does take judicial notice of undisputed historical facts.  *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 298-300 (S.D.N.Y. 2012) (noting that courts may take judicial notice of historical facts contained in undisputed, authoritative writings).

2 Stat. at 11-12.  The third census, taken in 1810, also required the Marshals to give "an account of the several manufacturing establishments . . . within their several districts."  Act of May 1, 1810, 2 Stat. 605, 605 (1810).  Interestingly, civic groups — including the American Philosophical Society, led by Thomas Jefferson — encouraged Congress to add questions regarding citizenship (and other topics) as early as the second census, but those proposals were rejected at that point without debate.  *See* WRIGHT, HISTORY AND GROWTH 19-20.  For reasons that are not clear, however, Congress did add a question about citizenship to the fourth census in 1820, directing enumerators to tally the number of "Foreigners not naturalized."  Act of March 14, 1820 ("1820 Census Act"), 3 Stat. 548, 550 (1820).

The fifth census in 1830 — which was the first to rely on standardized, pre-printed forms — tallied all "white persons" who were "ALIENS – Foreigners not naturalized."  Act of March 23, 1830 ("1830 Census Act"), 4 Stat. 383, 389 (1830).  For unknown reasons, the sixth census in 1840 did not ask about citizenship or birthplace, although it did include nearly every other question that had been asked in the fifth census, including questions regarding occupation, mental illness, and military service.  *See* WRIGHT, HISTORY AND GROWTH 142-43 (reprinting the inquiries on the sixth census).  The scope of the census then expanded materially in 1850, when it was overseen, for the first time, by a "census board" composed of "the Secretary of State, the Attorney-General, and the Postmaster-General."  *Id.* at 40.  The census board prepared six "schedules" of inquiries, relating to "(1) free inhabitants, (2) slave inhabitants, (3) mortality, (4) productions of agriculture, (5) products of industry, and (6) social statistics."  *Id.* at 44-45. All "free inhabitants" were required to state their place of birth ("State, Territory, or country"), as well as the "[v]alue of real estate owned" and whether they were "deaf and dumb, blind, insane, idiotic, pauper, or convict."  *See* Act of May 15, 1850 ("1850 Census Act"), 9 Stat. 428,

433 (1850).  Although the 1850 census required inhabitants to state their place of birth, it did not explicitly ask about citizenship.

The questions in 1860 and 1870 were largely the same as those in 1850, although the 1870 census also included a question about whether the respondent's father or mother was "of foreign birth" and an explicit inquiry (no doubt prompted by the Civil War and ratification of the Fourteenth Amendment) as to "[m]ale [c]itizens of U.S. of 21 years of age and upwards, whose right to vote is denied or abridged on other grounds than rebellion or other crime."  *See* MEASURING AMERICA 13.  The 1880 census asked for the birthplaces of the respondent and of each respondent's parents ("naming the State or Territory of the United States, or the Country, if of foreign birth").  *See id.* at 17.  The 1880 census was also the first to be conducted by a newly established census office, led by the Superintendent of the Census and lodged in the Department of the Interior.  *See* WRIGHT, HISTORY AND GROWTH 58-59.  The census office prescribed similar questions for the 1890 census, asking for the respondent's and his or her parents' places of birth and, additionally, whether the respondent was naturalized and whether "naturalization papers have been taken out."  MEASURING AMERICA 22.

In the early 20th century, the federal government continued to use the census to gather data regarding citizenship and other topics.[4]  The 1900, 1910, 1920, and 1930 censuses, in keeping with their immediate predecessors, asked about birthplace and parental birthplace; they also asked immigrant residents their year of immigration and whether they were naturalized.  *Id.*

---

[4]      In between the 1900 and 1910 censuses, Congress created a permanent Census Office within the Department of Interior; the Census Office moved to the Department of Commerce and Labor the following year.  *See* U.S. CENSUS BUREAU, FACTFINDER FOR THE NATION: HISTORY AND ORGANIZATION 2 (2000), *available at* https://www.census.gov/history/pdf/cff4.pdf.  When the Department of Commerce and Labor split into two departments in 1913, the Census Office — renamed the Census Bureau — was placed in the Department of Commerce.  *Id.*

at 34, 45-46, 58, 59.  The 1940 census asked for residents' birthplace and for "[c]itizenship of the foreign born."  *Id.* at 62.  The 1940 census was also the first to include supplemental questions that went to only a sample fraction of the population; on the 1940 census, these supplemental inquiries included a question about parental birthplace.  *Id.* at 63.  The 1950 census also asked all respondents for their birthplace and whether foreign-born residents were naturalized, and asked a sample of the population supplemental questions about, among other things, parental birthplace. *Id.* at 66-68.

The 1960 census marked a departure from previous censuses in several respects.  *See generally* MARGO J. ANDERSON, THE AMERICAN CENSUS: A SOCIAL HISTORY 201-06 (1988).  For one, it was the first census to rely principally on the mail to distribute and collect questionnaires. U.S. BUREAU OF THE CENSUS, 1960 CENSUSES OF POPULATION AND HOUSING: PROCEDURAL HISTORY ("1960 CENSUSES OF POPULATION AND HOUSING") 1 (1966), *available at* http://www2. census.gov/prod2/decennial/documents/1960/proceduralHistory/1960proceduralhistory.zip.  It was also the first census to pose the majority of questions to only a fraction of the population: The census posed only five questions to all respondents, with more detailed questions going to twenty-five percent of the population.  MEASURING AMERICA 72.  The five universal questions included the respondent's relationship to the head of household, sex, color or race, marital status, and month and year of birth.  *See* 1960 CENSUSES OF POPULATION AND HOUSING 364.  The lengthier questionnaire that went to a sample of the population included questions regarding respondents' and parental birthplace, highest level of education attained, salary earned, and how many working television sets a household had.  *Id.* at 73-75.

Notably, the 1960 census was the first since 1840 not to include a question about citizenship (or birthplace) for all residents.  It did, however, ask all residents of New York and

Puerto Rico about citizenship — the former "at the expense of the State, to meet State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration."  1960 CENSUSES OF POPULATION AND HOUSING 10, 130.  In a review of the census, the Census Bureau explained the decision not to ask all respondents about citizenship as follows: "It was felt that general census information on citizenship had become of less importance compared with other possible questions to be included in the census, particularly in view of the recent statutory requirement for annual alien registration which could provide the Immigration and Naturalization Service, the principal user of such data, with the information it needed."  *Id.* at 194.

Between 1970 and 2000, the census continued to feature a short questionnaire distributed to the vast majority of the population (known as the "short-form census") and a longer questionnaire, which included both the inquiries on the shorter questionnaire as well as additional questions, distributed to a sample of the population (known as the "long-form census").  During that time, none of the short-form questionnaires included a question about citizenship or birthplace.  *See* MEASURING AMERICA 77 (1970), 84 (1980), 91 (1990), 100 (2000).  But each long-form census, which went to approximately one sixth of households, did. *See id.* at 78 (1970), 85 (1980), 92 (1990), 101 (2000).  In 2010, the Census Bureau dropped the long-form questionnaire altogether, a change that was precipitated by the introduction, in 2005, of the American Community Survey ("ACS").  *See* JENNIFER D. WILLIAMS, THE 2010 DECENNIAL CENSUS: BACKGROUND AND ISSUES 3 (2011), *available at* https://www.census.gov/ history/pdf/2010-background-crs.pdf.  Unlike the decennial census, the ACS is conducted annually and is not used to obtain an "actual Enumeration" of the population for purposes of apportionment; instead, it is given each year to only about 3.5 million households — roughly one

in every thirty-eight households in the country — for the sole purpose of collecting demographic data on the population.  (SAC ¶¶ 74, 98 n.43).  The ACS "requires citizens to disclose whether they were born in 'United States territories,' whether they were born 'abroad' to U.S. parents, or if and when they were 'naturalized.'" (*Id.* ¶ 76).[5]  The 2010 census asked about "the age, sex, race, and ethnicity (Hispanic or non-Hispanic) of each person in a household," as well as "whether the housing unit was rented or owned by a member of the household."  WILLIAMS, THE 2010 DECENNIAL CENSUS: BACKGROUND AND ISSUES 3.  It did not ask about citizenship.

Thus, the last time that the census asked *every* respondent about citizenship was sixty-eight years ago, in 1950.  Notably, since then, the Census Bureau and former Bureau officials have opposed periodic efforts to reinstate a citizenship question on a universal basis.  In 1980, for example, several plaintiffs (including the Federation for American Immigration Reform, which appears here as *amicus curiae* in support of Defendants) sued the Census Bureau, contending that the census was constitutionally required to count only citizens.  *Fed'n for Am. Immigration Reform*, 486 F. Supp. at 565.  In that litigation, the Census Bureau argued that reinstating a citizenship question for all respondents would "inevitably jeopardize the overall accuracy of the population count" because noncitizens would be reluctant to participate, for fear "of the information being used against them."  *Id.* at 568.  Likewise, in Congressional testimony prior to the 1990 census, Census Bureau officials opposed reinstating a citizenship question for all respondents, opining that it could cause people to "misunderstand or mistrust the census and fail or refuse to respond."  *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing on H.R. 3639, H.R. 3814, and H.R. 4234 Before the Subcomm. on*

---

[5]     A recipient of the ACS is required, under threat of fine, to respond — just as recipients of the census are.  *See* 13 U.S.C. § 221(a).

*Census & Population of the H. Comm. on Post Office & Civil Serv.*, 100th Cong. 50-51 (1988) (statement of John G. Keane, Director, Bureau of the Census); *see also Census Equity Act: Hearings on H.R. 2661 Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civ. Serv.*, 101st Cong. 42-44 (1989) (statement of C. Louis Kincannon, Deputy Director, Bureau of the Census).  Before the 2010 census, former Bureau Director Kenneth Prewitt testified before Congress to the same effect.  *See Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?: Hearing Before the Subcomm. on Federalism & the Census of the H. Comm. on Gov't Reform*, 109th Cong. 73 (2005) (statement of Kenneth Prewitt).  And finally, just two years ago, several former Bureau Directors wrote in an *amicus curiae* brief to the Supreme Court (in a case about the use of total population in intrastate redistricting) that a "citizenship inquiry would invariably lead to a lower response rate to the Census."  Brief of Former Directors of the U.S. Census Bureau as *Amici Curiae* in Support of Appellees at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).

Earlier this year, however, the Census Bureau reversed course.  Specifically, on March 26, 2018, Secretary Ross issued a memorandum directing the Census Bureau to reinstate the citizenship question on the 2020 decennial census.  (SAC ¶ 3; *see also* Docket No. 173 ("Admin. Record"), at 1313-20 ("Ross Mem.")).[6]  Secretary Ross asserted that he included the citizenship question in response to a letter from the Department of Justice ("DOJ") dated December 12, 2017.  (SAC ¶ 94).  The DOJ letter, in turn, requested the question's reinstatement on the grounds that more granular citizenship data was necessary to enforce Section 2 of the Voting

---

[6]     Given the volume of the Administrative Record, Defendants did not file it directly on the docket.  Instead, they made it publicly available at http://www.osec.doc.gov/opog/FOIA/ Documents/AR%20-%20FINAL%20FILED%20-%20ALL%20DOCS%20%5b CERTIFICATION-INDEX-DOCUMENTS%5d%206.8.18.pdf.

Rights Act, which prohibits discriminatory voting laws.  (*Id.* ¶ 95).  After considering several options — including maintaining the *status quo* and using "administrative records to calculate citizenship data," (*id.* ¶ 81 (internal quotation marks omitted)) — the Secretary concluded that the "value of more complete citizenship data outweighed concerns regarding non-response."  (*Id.* ¶ 82).  Two days later, President Trump's campaign sent an e-mail to supporters stating that "President Trump has officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens."  (NGO Compl. ¶ 178).

These lawsuits (and others, elsewhere) followed.

## LEGAL STANDARDS

Defendants move to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  A Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction to hear the case.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).  Additionally, a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits."  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  Ultimately, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). When ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 570 (noting that a claim must be dismissed if the plaintiffs "have not nudged their claims across the line from conceivable to plausible").

## DISCUSSION

Defendants make four arguments with respect to the operative complaints in both cases, and one argument unique to NGO Plaintiffs' Complaint in 18-CV-5025. First, they contend that Plaintiffs in both cases lack Article III standing because Plaintiffs do not allege an injury-in-fact that is fairly traceable to Defendants' conduct. (*See* Docket No. 155 ("Defs.' Br."), at 13-21). Second, they assert that all of the claims pressed by Plaintiffs are barred by the political question doctrine. (*See id.* at 21-26). Third, they insist that the decision as to what questions should be included in the census questionnaire is committed by law to agency discretion and, thus, that Secretary Ross's decision is not subject to judicial review under the APA. (*See id.* at 26-30). Fourth, they aver that Plaintiffs fail to state a claim under the Enumeration Clause. (*See id.* at 30-35). And finally, they argue that NGO Plaintiffs fail to state an equal protection claim under

the Due Process Clause.  (*See* 18-CV-5025, Docket No. 39 ("Defs.' NGO Br."), at 16-19).  The

Court will address each of those arguments in turn.

### A.        Standing

Article III of the Constitution restricts the "judicial Power" of the United States to

"Cases" and "Controversies."  U.S. CONST. art. III, § 2.  In light of that restriction, a party

invoking the court's jurisdiction — the plaintiff — must have "standing" to sue.  *See, e.g.*,

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  To have standing, a plaintiff must

establish three elements.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Specifically, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-

61).  Significantly, each element "must be supported . . . with the manner and degree of evidence

required at the successive stages of the litigation."  *Lujan*, 504 U.S. at 561.  At the pleading

stage, a plaintiff need only "clearly . . . allege facts demonstrating" each element.  *Warth v.*

*Seldin*, 422 U.S. 490, 518 (1975); *see also John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732,

736 (2d Cir. 2017) ("[B]ecause [the defendant] mounts only a 'facial' challenge to [the

plaintiff's] allegations of standing, [the plaintiff] bears no evidentiary burden at the pleading

stage."); *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("When the Rule

12(b)(1) motion is facial, . . . [t]he task of the district court is to determine whether the Pleading

allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue."

(second and third alterations in original) (internal quotation marks omitted)).  Further, where

there are multiple plaintiffs, as here, only one must establish the elements of standing for the case

to proceed.  *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017).

In this case, Defendants contend that Plaintiffs fail to establish that they have been injured in fact and that any injury is traceable to the challenged conduct.  (*See* Defs.' Br. 13-14). Additionally, they make a handful of arguments specific to whether NGO Plaintiffs have standing.  (*See* Defs.' NGO Br. 4-15).  The Court will address the common arguments first.

## 1.    Injury-in-Fact

The injury-in-fact requirement is meant to "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth*, 422 U.S. at 498).  To establish injury-in-fact, a plaintiff must demonstrate an injury that is "concrete, particularized, and actual or imminent."  *Clapper*, 568 U.S. at 409.  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative . . . ."  *Id.*  Nevertheless, a plaintiff may allege a "future injury" if he or she shows that "the threatened injury is 'certainly impending,' *or* there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List*, 134 S. Ct. at 2341 (emphasis added) (quoting *Clapper*, 568 U.S. at 409, 414 n.5 (2013)).[7]  Plaintiffs easily meet their burden at this stage of the proceedings.

Plaintiffs' theory of injury proceeds in two steps, each of which is amply supported by allegations in their operative complaints — allegations that the Court must assume are true in

---

[7]    Defendants suggest that the "substantial risk" formulation applies only in food and drug cases (*see* Docket No. 190 ("Defs.' Reply Br."), at 4-5), but that suggestion is supported by neither logic nor law.  Indeed, it is belied by both *Clapper*, in which the Supreme Court cited to non-food and drug cases, *see* 568 U.S. at 414 n.5 (citing *Blum v. Yaretsky*, 457 U.S. 991 (1982)), and *Susan B. Anthony List*, another non-food and drug case in which the Supreme Court expressly reaffirmed the "substantial risk" formulation.  *See* 134 S. Ct. at 2341; *accord Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016).

deciding this motion.  First, Plaintiffs contend that Defendants' inclusion of a citizenship question on the census will "drive down response rates and seriously impair the accuracy of the decennial population count."  (SAC ¶ 39; *accord* NGO Compl. ¶ 4).  In support of that assertion, Plaintiffs proffer an array of evidence — much of it from Defendants themselves.  For instance, Plaintiffs cite the Census Bureau's own argument in 1980 that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count" because "[q]uestions as to citizenship are particularly sensitive in minority communities and would inevitable trigger . . . refusal to cooperate."  (SAC ¶ 40 (quoting *Fed'n for Am. Immigration Reform*, 486 F. Supp. at 568); *accord* NGO Compl. ¶ 84).  Plaintiffs also cite testimony, interviews, and an *amicus* brief filed by former Directors of the Census Bureau, arguing in sum and substance that the "citizenship inquiry would invariably lead to a lower response rate to the Census in general."  (SAC ¶¶ 39-47; *accord* NGO Compl. ¶¶ 81-90).  Moreover, Plaintiffs plausibly allege that this risk is "heightened in the current political climate because of President Trump's anti-immigrant rhetoric."  (SAC ¶ 48; *accord* NGO Compl. ¶¶ 113-26, 140-46).  Accordingly, Plaintiffs claim, Defendants' actions "will add to this unprecedented level of anxiety in immigrant communities," leading to "nonresponse and lower participation by many immigrants."  (SAC ¶ 53; *accord* NGO Compl. ¶¶ 141-46).

The second step in Plaintiffs' argument is that this "undercounting" will result in various concrete harms to them and their constituents or members.  (*See, e.g.*, SAC ¶ 105 ("[I]n 2014, New York State had the fourth largest population of undocumented residents in the nation."); *see id.* ¶¶ 104-38; *see also, e.g.*, NGO Compl. ¶ 52 ("Make the Road New York members . . . will be deprived of political influence and funding . . . .")).  For example, Plaintiffs identify various federal programs, including "the Highway Trust Fund program, the Urbanized Area Formula

Funding program, the Metropolitan Planning program, and the Community Highway Safety Grant program," which "distribute funds based, at least in part, on population figures collected through the decennial census."  (SAC ¶ 140 (citing 23 U.S.C. § 104(d)(3); 49 U.S.C. §§ 5305, 5307, 5340; 23 U.S.C. § 402); *see id.* ¶ 145 ("Plaintiffs will lose millions of dollars in [Medicaid] reimbursement as a result of even a 1% undercount."); *see also* NGO Compl. ¶ 197 (identifying the Federal Medical Assistance Percentage, the Highway Trust Fund program, and other programs that rely on population figures from the census)).  Additionally, they note that the Department of Education relies on census data to determine certain funding for schools in their jurisdictions.  (*See, e.g.*, SAC ¶ 143(a)-(v)).  Citing these programs, they plausibly allege that an undercount in their jurisdictions will "depriv[e] them of their statutory fair share of federal funding, and remov[e] crucial resources for important government services."  (*Id.* ¶ 139; *accord* NGO Compl. ¶ 52).  That alone is sufficient to confer standing.  *See, e.g.*, *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (*per curiam*) (holding that New York City, New York State, and several individual voters had standing to challenge "a census undercount" by alleging harm "in the form of dilution of [the individual plaintiffs'] votes," and, for the government plaintiffs, "as recipients of federal funds").  But on top of that, Government Plaintiffs also plausibly allege that an undercount "will lead to loss of representation in Rhode Island" — which is apparently teetering on the edge of losing one of its two Representatives already — and will the "harm representational interests" of local government Plaintiffs "within their states."  (SAC ¶¶ 160-63).  That, too, is sufficient.  *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999) (observing that the "expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement" of standing).

In response, Defendants contend that Plaintiffs' allegations are "too speculative" because they rely on a highly attenuated chain of inferences.  (Defs.' Br. 14).  That may ultimately prove to be the case, but Defendants' contentions are misplaced at this stage in the litigation, when Plaintiffs "bear[] no evidentiary burden."  *John*, 858 F.3d at 736.  Citing a memorandum authored by Secretary Ross, for example, Defendants claim that "there is little 'definitive, empirical' evidence regarding the effect of adding a citizenship question."  (Defs.' Br. 15).  But Plaintiffs allege otherwise, citing ample evidence — spanning decades and much of it from the Census Bureau itself — in support of the proposition that including a citizenship question will cause an undercount.  (*See* SAC ¶¶ 39-47; *accord* NGO Compl. ¶¶ 81-90).  Moreover, Plaintiffs cite testing that the Census Bureau conducted in 2017 that tended to show that "fears, particularly among immigrant respondents, have increased markedly this year."  (SAC ¶ 51; *accord* NGO Compl. ¶¶ 113-26).  These findings, the Census Bureau explained, "have implications for data quality and nonresponse."  (SAC ¶ 52; *accord* NGO Compl. ¶ 127).  For the time being, those allegations are sufficient to establish Plaintiffs' point.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 168 (1997) ("[W]hile a plaintiff must set forth by affidavit or other evidence specific facts to survive a motion for summary judgment, and must ultimately support any contested facts with evidence adduced at trial, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (internal quotation marks, brackets, and citation omitted)).  Defendants' reliance on contrary evidence merely raises disputes of fact that the Court may not resolve on a motion to dismiss.  *See, e.g.*, *Lujan*, 504 U.S. at 561.

Next, Defendants claim that the Census Bureau "has extensive procedures in place to address non-response and to obtain accurate data for those households that decline to respond." (Defs.' Br. 15). Defendants repackaged this argument slightly in their reply brief, (Defs.' Reply Br. 4), and at oral argument, (Oral Arg. Tr. 12), claiming that Plaintiffs fail to distinguish between the *initial* "self-response" to the written census form, and the "non-response followup" employed by the Census Bureau to reach initial non-responders. As Defendants see it, Plaintiffs allege only that the initial self-response rate will decrease; they fail to consider that the non-response followup could cure any diminished self-response. (Defs.' Reply Br. 4). However packaged, though, those arguments are also factual and thus premature. Moreover, they ignore well-pleaded allegations in Plaintiffs' complaints. Plaintiffs allege broadly that adding the citizenship question will "significantly deter[] *participation*" in the census. (SAC ¶ 5 (emphasis added); *accord* NGO Compl. ¶ 141 (alleging that "adding the citizenship question" will "reduc[e] participation by Latinos and Immigrants of color")). And Plaintiffs support that assertion with concrete allegations, citing, for example, reports from the Census Bureau that census respondents "sought to break off interviews" because of "concerns about data confidentiality and the government's negative attitudes toward immigrants." (SAC ¶ 51; *accord* NGO Compl. ¶¶ 133-37). In other words, Plaintiffs plausibly allege that the addition of the citizenship question will affect not only the initial response rate to the questionnaire itself, but also cooperation with the in-person followup.

Finally, Defendants claim that Plaintiffs' allegations regarding loss of representation and federal funding are "too speculative" because apportionment and the allocation of funds are both "complex" and could be affected by, among other things, "potential undercounting in other

states." (Defs.' Br. 16-18).[8] But that argument is squarely foreclosed by *Carey*, in which the Second Circuit held that New York City and New York State had standing to challenge the Census Bureau's conduct during the 1980 census because they had "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in loss of representation" and "decreased federal funds . . . under revenue sharing." 637 F.2d at 838; *see also, e.g.*, *City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993) ("Plaintiffs . . . have standing to challenge the [Secretary's] actions based upon their claim that the census undercount will result in a loss of federal funds to the City of Detroit.").[9] Defendants try to distinguish *Carey* on the ground that it "did not involve allegations of injuries from the mere inclusion of a question," (Defs.' Br. 17 n.8), but that consideration is irrelevant to the standing inquiry. Equally irrelevant is the fact that the Second Circuit "cited New York City's 'present financial condition' in finding that the city and the state had standing as recipients of federal funds." (*Id.*). The loss of federal funds constitutes injury whether or not a jurisdiction is in sound fiscal shape, and nothing in *Carey* suggests that the Court's passing reference to the financial condition of New York City (not the State) was essential to its holding. Finally, the

---

[8]      Defendants also complain that Government Plaintiffs "do not explain" how the states at issue might lose representation in Congress. (Defs.' Br. 18). At this stage, however, the Court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. Government Plaintiffs allege that if Rhode Island's population count drops by a mere 157 people, it will result in the loss of a Representative, and they explicitly allege that "an undercount resulting from Defendants' decision to add a citizenship demand will lead to loss of representation" in the state. (SAC ¶ 160; *see also id.* ¶ 162 ("An undercount of immigrant communities in [New York and Illinois] will result in losses of these seats . . . .")).

[9]      Defendants seize on the *Carey* Court's use of the word "showing," (Defs.' Br. 16), but it merely reflects the procedural posture of the case — namely, an appeal from the grant of a preliminary injunction. Plaintiffs here have made the requisite "showing" by way of the allegations in their Second Amended Complaint, which the Court must assume to be true.

fact that *Carey* analyzed standing after preliminary results from the census had been tabulated —
a point that Defendants pressed at oral argument, (*see* Oral Arg. Tr. 8-9) — is merely a
difference in degree.  Put simply, the Circuit did not demand the kind of rigorous proof that an
undercount would result in the loss of representation and federal funds that Defendants here
demand.  *See also U.S. House of Representatives*, 525 U.S. at 332 (finding standing to bring a
challenge in advance of the census based on "the threat of vote dilution" and noting that "it is
certainly not necessary . . . to wait until the census has been conducted to consider the issues
presented here, because such a pause would result in extreme — possibly irremediable —
hardship").

In short, taking Plaintiffs' allegations as true, the Court concludes that they establish a
"substantial risk" of harm and thus satisfy the injury-in-fact requirement.

### 2.     Traceability

As noted, to establish Article III standing, a plaintiff must also demonstrate that his or her
injury is "fairly traceable" to the challenged actions of the defendant.  *Lujan*, 504 U.S. at 561
(ellipsis and brackets omitted).  In other words, a plaintiff "must demonstrate a causal nexus
between the defendant's conduct and the injury."  *Chevron Corp.*, 833 F.3d at 121.  On a motion
to dismiss, plaintiffs have only a "relatively modest" burden to allege that "their injury is 'fairly
traceable'" to the defendant's conduct.  *Bennett*, 520 U.S. at 171.  But that burden is harder to
carry where, as here, traceability "depends on the unfettered choices made by independent actors
not before the courts and whose exercise of broad and legitimate discretion the courts cannot
presume either to control or to predict."  *Lujan*, 504 U.S. at 562.  In such a case, "it becomes the
burden of the plaintiff to adduce facts showing that" the choices of these independent actors
"have been or will be made in such manner as to produce causation and permit redressability of

injury." *Id.*; *see also, e.g.*, *Bennett*, 520 U.S. at 169 (holding that a plaintiff may meet the traceability requirement by alleging that a defendant's conduct has a "determinative or coercive effect upon the action of someone else").  At the same time, "it is well-settled that for standing purposes, [plaintiffs] need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test.  This is true even in cases where the injury hinges on the reactions of the third parties . . . to the agency's conduct." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.* ("*NRDC*"), 894 F.3d 95, 104 (2d Cir. 2018). Thus, the "fact that the defendant's conduct may be only an 'indirect[]' cause is 'not necessarily fatal to standing.'" *Chevron Corp.*, 833 F.3d at 121 (alteration in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976)).

The Second Circuit's recent decision in *NRDC* is instructive.  In that case, the petitioners — five states and three nonprofit organizations — claimed that the National Highway Traffic Safety Administration ("NHTSA") violated the APA when it indefinitely delayed the effective date of a rule that would have increased penalties for violations of certain vehicle environmental standards.  *NRDC*, 894 F.3d at 100.  The petitioners claimed environmental injuries stemming from the indefinite delay of the rule.  *Id.* at 103-04.  NHTSA argued, *inter alia*, that the petitioners' injuries were "too indirect to establish causation and redressability" because they relied on the uncertain reactions of third parties — namely, vehicle manufacturers — to the increased penalties.  *Id.* at 104.  The Second Circuit rejected NHTSA's argument, finding that the petitioners had demonstrated "the required nexus between inappropriately low penalties and harm to Petitioners."  *Id.*  Citing "the agency's own pronouncements," as well as "[c]ommon sense and basic economics," the Court concluded that "the increased penalty has the potential to affect automakers' business decisions and compliance approaches" in a manner that would harm

the petitioners.  *Id.* at 105 (alteration in original).  Specifically, the Court noted that "NHTSA itself has concluded that emissions reductions from compliance with higher fuel economy standards would result in significant declines in the adverse health effects that result from population exposure to these pollutants."  *Id.* (internal quotation marks and citation omitted).

Applying those standards to Defendants' motions to dismiss, Plaintiffs meet their traceability burden.  Plaintiffs allege that reinstating the citizenship question "will lead to nonresponse and lower participation" in the census, which will, in turn, cause financial and representational injuries to Plaintiffs.  (SAC ¶ 53; *see id.* ¶ 159 (alleging that adding a citizenship question will "depress[] participation in the decennial census within Plaintiffs' diverse naturalized, documented, and undocumented immigrant populations"); *see also* NGO Compl. ¶¶ 4-5).  Plaintiffs further allege that "immigrant respondents are . . . increasingly concerned about confidentiality and data sharing in light of the current anti-immigrant rhetoric," and "may seek to protect their own privacy or the privacy of their household" by not responding to the census.  (SAC ¶¶ 50, 53; *accord* NGO Compl. ¶ 127).  Moreover, like the petitioners in *NRDC*, Plaintiffs support these allegations with evidence from Defendants themselves.  (*See, e.g.*, SAC ¶ 51 ("Census Bureau officials have noted that in routine pretests conducted from February 2017 to September 2017, 'fears, particularly among immigrant respondents, have increased markedly this year.'"); *id.* ¶ 52 (quoting the Census Bureau's conclusion that their findings after a census pretest were "particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse"); NGO Compl. ¶¶ 81-90).  Plaintiffs thus plead a "substantial likelihood of the alleged causality."  *NRDC*, 894 F.3d at 104.

Relying heavily on the Supreme Court's decisions in *Clapper* and *Simon*, Defendants contend that "the intervening acts of third parties" — namely, those who refuse to comply with their legal duty to respond to the census questionnaire — break the chain of causation in these cases for purposes of standing.  (Defs.' Br. 19-20).  But that argument "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation."  *Bennett*, 520 U.S. at 168-69.  Moreover, *Clapper* and *Simon* are distinguishable.  For one, both of those cases were decided on summary judgment, at which point the plaintiffs could "no longer rest on . . . mere allegations, but" had to "set forth by affidavit or other evidence specific facts."  *Clapper*, 568 U.S. at 412 (alteration in original) (internal quotation marks omitted); *see Simon*, 426 U.S. at 35.[10]  Further, the chains of causation in *Clapper* and *Simon* were significantly more attenuated than the one here.  In *Clapper*, the plaintiffs' theory of injury depended on a chain of causation with five discrete links, each of which "rest[ed] on [the plaintiffs'] highly speculative fear that" governmental actors or courts would exercise their nearly unfettered discretion in a particular way.  568 U.S. at 410-14.  And in *Simon*, the Court found that it was "purely speculative" to attribute the choice of hospitals to deny the indigent plaintiffs services to decisions of the Treasury Department, as opposed to "decisions made by the hospitals without regard to the tax implications."  426 U.S. at 41-43.  The chain of causation here — that Defendants' actions will increase non-response rates of certain populations and that the resulting undercount, in turn, will cause harm — is neither as long nor as speculative as the chains in *Clapper* and *Simon*.[11]

---

[10]     Additionally, the standing inquiry in *Clapper* was "especially rigorous" because it involved the "review [of] actions of the political branches in the fields of intelligence gathering and foreign affairs."  568 U.S. at 408-09.

[11]     With respect to the local government Plaintiffs who allege injury stemming from intra-state redistricting based on census data, Defendants note that "states are not required to use

The injuries alleged in *Clapper* and *Simon* also differ in an important respect from the injuries alleged in the instant cases. In those two cases, the plaintiffs' standing turned on their ability to prove that the defendants' conduct would cause injury to *particular* individuals. That is, in *Clapper*, each plaintiff had to show that his or her own communications would likely be intercepted by surveillance conducted pursuant to the provisions at issue. *See* 568 U.S. at 410-12. And in *Simon*, the plaintiffs had to show that particular indigent individuals were denied service at a hospital on account of the defendants' conduct. *See* 426 U.S. at 40. The plaintiffs in those cases could not make a showing at that level of specificity. In these cases, by contrast, the alleged injuries are aggregate or communal in nature. That is, Plaintiffs do not need to show that a particular person will be deterred by Defendant's conduct from responding to the census; instead, their ability to prove injury that is fairly traceable to Defendants' actions turns on whether they can show that Defendants' conduct is likely to result in an undercount at the aggregate level, something that can presumably be done through surveys or other statistical proof. Plaintiffs may or may not be able to make that showing when the time comes, but that is a question for another day. Given the allegations in Plaintiffs' operative complaints, including those based on Defendants' own evidence, they have done enough to survive the present motions.[12]

_____

unadjusted census figures in such actions." (Defs.' Br. 21). The contention that this breaks the chain of causation for traceability purposes is foreclosed by *U.S. House of Representatives*, in which the Supreme Court held that the plaintiffs "established standing on the basis of the expected effects of the use of sampling in the 2000 census on intrastate redistricting." 525 U.S. at 332. There, as here, (*see* SAC ¶ 164), the plaintiffs alleged that "several of the States in which these counties [in which the plaintiffs resided] are located require use of federal decennial census population numbers for their state legislative redistricting." *Id.* at 333.

[12]     For similar reasons, there is no merit to Defendants' contention that "it likely would be impossible to isolate and quantify the number of individuals who would have responded but for addition of the citizenship question." (Defs.' Br. 20). Given that Plaintiffs allege injuries

Finally, Defendants make much of the fact that the actions of the intervening third parties — namely, residents who fail to respond to the census — would be illegal.  (Defs.' Br. 20; 18-CV-5025, Docket No. 58 ("Defs.' NGO Reply Br."), at 2-3).[13]  That is true, *see* 13 U.S.C. § 221(a) (establishing a fine for persons who do not respond to the census), but irrelevant to the question of standing, which turns only on whether the actions of the defendant can fairly be said to cause injury to the plaintiff.  The D.C. Circuit's decision in *Attias v. CareFirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), is on point.  In that case, the plaintiffs brought breach of contract, negligence, and consumer-protection law claims against CareFirst following a breach of CareFirst's computer systems, including a database containing its customers' personal information.  *Id.* at 623.  The plaintiffs alleged that they faced an increased risk of identity theft as a result of the defendant's negligence.  The Court recognized standing in spite of the fact that the plaintiffs' ability to prove injury depended upon a showing that intervening third parties — data hackers — would break the law.  *Id.* at 629.  The Court explained that, while "the thief would be the most immediate cause of plaintiffs' injuries, . . . Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant."  *Id.*  So too here: Plaintiffs plausibly allege that adding the citizenship question will result in a

---

stemming from the aggregate effect of adding the citizenship question, they do not need to identify who would have answered the census but for the inclusion of the citizenship question.

[13]      In support of that argument, Defendants cite *United States v. Sanchez-Gomez*, 138 S. Ct. 1532 (2018), for the proposition that "courts 'have consistently refused to conclude that the case-or-controversy requirement is satisfied by the possibility that a party will . . . violat[e] valid criminal laws.'"  (Defs.' NGO Reply Br. 2 (quoting *Sanchez-Gomez*, 138 S. Ct. at 1541).  But *Sanchez-Gomez* concerned mootness and whether a plaintiff could invoke the capable-of-repetition-but-evading-review exception based on the possibility that he or she would violate the law in the future; the case has nothing to do with the traceability requirement for standing purposes.

disproportionate number of people not responding to the census in their jurisdictions and that this non-response, in turn, will cause them injury.  That is a sufficient showing of traceability at this stage of the proceedings and, thus, sufficient to show standing.[14]

### 3.      NGO Plaintiffs' Standing

As noted, Defendants make a handful of additional arguments with respect to the standing of NGO Plaintiffs — namely, that they lack standing to sue on their own behalf, that they lack standing to sue on behalf of their members, and that they lack "third-party" standing to assert the constitutional rights of their members.  (*See* Defs.' NGO Br. 4-15).  For an organization to establish standing to bring suit on behalf of its members — known as "associational standing" — the organization must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Here, at least one NGO Plaintiff — namely, Make the Road New York ("Make the Road") — plainly satisfies those requirements.  Make the Road "has more than 22,000 members

---

[14]        In addition to arguing that Plaintiffs lack Article III standing, Defendants contend that Plaintiffs lack "prudential standing" because their alleged injuries are not "within the zone of interests protected by the Constitution's Enumeration Clause."  (Defs.' Br. 17).  Whether a "plaintiff [comes] within the zone of interests for which [a] cause of action [is] available . . . . has nothing to do with whether there is a case or controversy under Article III."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case.").  Given that, and the Court's conclusion that Plaintiffs fail to state a claim under the Enumeration Clause, the Court need not and does not address Defendants' zone-of-interests argument.

who reside in New York City, Long Island and Westchester County."  (NGO Compl. ¶ 50).  Its

"mission is to build the power of immigrant and working class communities to achieve dignity

and justice."  (*Id.* ¶ 49).  The Complaint alleges that the organization's members reside in

communities where "Latino immigrant populations . . . exceed the national and state averages."

(*Id.* ¶ 51).  It further alleges that New York State and its subdivisions use census data to draw

congressional, state legislative, and municipal legislative districts.  (*Id.* ¶¶ 72-73).  Consequently,

the Complaint alleges, the undercount likely caused by including the citizenship question "will

reduce" both "the amount of federal funds" distributed to the communities in which Make the

Road members live and their "political power."  (*Id.* ¶ 52; *see also id.* ¶ 73 ("[W]hen a local

community in any of these [jurisdictions] is disproportionately undercounted in the Decennial

Census, the community will be placed in a malapportioned legislative district that has greater

population that other legislative districts in the same state.")).  Notably, the Complaint

specifically identifies one such member, Perla Lopez of Queens County, which has a large

population of Latino and immigrant residents.  (*Id.* ¶ 53).  Affidavits — which the Court may

consider, *see Thompson v. Cty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) — identify others,

including a resident of Nassau County, where the "number of Latino and immigrant residents . . .

far exceed[s] the New York state average."  (18-CV-5025, Docket No. 49 ("NGO Pls.' Br."), Ex.

3, ¶ 21).

    These allegations suffice to establish that Make the Road has associational standing.  As

discussed above, the Second Circuit and Supreme Court have made clear that both fiscal and

representational injuries resulting from an alleged undercount are sufficient to support standing.

*See Carey*, 637 F.2d at 838 ("[C]itizens who challenge a census undercount on the basis, *inter*

*alia*, that improper enumeration will result in loss of funds to their city have established both an

injury fairly traceable to the Census Bureau and a substantial probability that court intervention will remedy the plaintiffs' injury."); *U.S. House of Representatives*, 525 U.S. at 332 ("[T]he threat of vote dilution . . . is concrete and actual or imminent, not conjectural or hypothetical." (internal quotation marks omitted)).  Further, these cases stand for the proposition that individuals, like Ms. Lopez, have standing to raise fiscal and representational injuries.  *See Carey*, 637 F.2d at 838 ("The individual plaintiffs in this case have alleged concrete harm in the form of dilution of their votes and decreased federal funds flowing to their city and state, thus establishing their standing."); *see also City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (holding that residents of Philadelphia had standing to challenge alleged undercount because "[e]ven if none of the named plaintiffs personally receives a dollar of state or federal aid, all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money").  Nothing more is required at this stage of the proceedings.

Defendants also contend that NGO Plaintiffs lack standing to bring their equal protection claim because they fail to "satisfy the third-party standing exception to the general rule against asserting the rights of others."  (Defs.' NGO Br. 13-15).  Defendants' invocation of the third-party standing doctrine is inapt, however, as Make the Road plainly has associational standing to bring an equal protection claim, and thus need not rely on the third-party standing doctrine.  That NGO Plaintiffs' claim sounds in equal protection is of no moment for the associational standing inquiry.  *See, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of N.Y.*, 487 U.S. 1, 9 (1988) (holding that an association had standing to bring a constitutional claim on behalf of its members because the members "would have standing to bring this same suit"); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 669 n.6 (1993) (holding that, on "the current state of the record," an association of contractors had standing to bring an Equal

Protection Clause challenge on behalf of its members); *Thomas v. City of N.Y.*, 143 F.3d 31, 36 n.9 (2d Cir. 1998) (finding that associations of livery car drivers had standing to bring an Equal Protection Clause challenge on behalf of their members).  Notably, the Second Circuit has held that in cases such as this one, where plaintiffs seek declaratory and injunctive relief only, the third prong of the associational standing inquiry — whether the relief requested requires the participation of individual members in the lawsuit — is likely to be satisfied.  *See, e.g.*, *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006) ("[W]here the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied." (quoting *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004)).

In sum, the Court concludes that Make the Road has associational standing.  Accordingly, it need not and does not address the standing of the other NGO Plaintiffs or Defendants' other arguments.  *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 109 ("It is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" (quoting *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006))).

**B.    The Political Question Doctrine**

Next, Defendants contend that all of Plaintiffs' claims should be dismissed on the basis of the political question doctrine.  (Defs.' Br. 21-26).  Although a court generally has "a responsibility to decide cases properly before it," there is a well-established but "narrow exception to that rule, known as the political question doctrine."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (internal quotation marks omitted).  That doctrine "excludes from judicial review those controversies which revolve around policy choices and

value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.  The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (internal quotation marks omitted).  More specifically, a case "involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky*, 566 U.S. at 195 (ellipsis in original) (internal quotation marks omitted).  Citing the language in the Enumeration Clause providing that the "actual Enumeration shall be made . . . *in such Manner as* [*Congress*] *shall by Law direct*," U.S. CONST., art. I, § 2, cl. 3 (emphasis added), Defendants contend that this is such a case.  (Defs.' Br. 23).  It follows, they argue, that courts have no role whatsoever to play in reviewing decisions of the Secretary, to whom Congress has delegated its authority over the census.

Defendants have a tough sell because courts, including the Supreme Court and the Second Circuit, have entertained challenges to the conduct of the census for decades and, more to the point, have consistently rejected application of the political question doctrine in such cases.  *See, e.g.*, *U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 459 (1992); *Utah v. Evans*, 536 U.S. 452 (2002); *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Wisconsin v. City of N.Y.*, 517 U.S. 1 (1996); *Carey*, 637 F.2d at 838; *Young v. Klutznick*, 497 F. Supp. 1318, 1326 (E.D. Mich. 1980)*, rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981); *City of Philadelphia*, 503 F. Supp. at 674; *Texas v. Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992); *District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1185 (D.D.C. 1992); *City of N.Y. v. U.S. Dep't of Commerce*, 739 F. Supp. 761, 764 (E.D.N.Y. 1990); *U.S. House of Representatives v. U.S. Dep't*

*of Commerce*, 11 F. Supp. 2d 76, 95 (D.D.C. 1998) (three-judge court), *aff'd*, 525 U.S. 316;

*Prieto v. Stans*, 321 F. Supp. 420 (N.D. Cal. 1970); *see also Morales v. Daley*, 116 F. Supp. 2d

801 (S.D. Tex. 2000), *aff'd sub nom. Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001)

(unpublished).  *But cf. Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1417 (7th Cir. 1992)

("So nondirective are the relevant statutes that it is arguable that there is no law for a court to

apply in a case like this . . . .").  Those courts have acknowledged that "[t]he text of the

Constitution vests Congress with virtually unlimited discretion in conducting the decennial

'actual Enumeration.'"  *Wisconsin*, 517 U.S. at 19 (quoting U.S. CONST., art. I, § 2, cl. 3).  Yet,

time and again, they have recognized that the judiciary has at least some role to play in reviewing

the conduct of the political branches with respect to the decennial census.[15]

Defendants contend that those cases are all distinguishable because they challenged

whether the government had conducted an "actual Enumeration," while the instant case

challenges the "manner" in which the census was conducted.  (Defs.' Reply Br. 7-8).  But that is

not true.  In fact, at least two of the cases involved challenges to the census questionnaire itself

— precisely the kind of challenge brought here.  *See Morales*, 116 F. Supp. 2d at 809; *Prieto*,

321 F. Supp. at 421-22.  And in *Carey* — which is binding on this Court — the Second Circuit

explicitly described the plaintiffs' suit as a challenge to "the *manner* in which the Census Bureau

conducted the 1980 census in the State of New York," 637 F.2d at 836 (emphasis added); *see*

*also id.* ("[Plaintiffs'] basic complaint is that the census was conducted in a *manner* that will

---

[15]     Admittedly, the Supreme Court did not explicitly address the political question doctrine
in either *Evans* or *Wisconsin*.  Nevertheless, there is authority for the proposition that the
political question doctrine is a "jurisdictional limitation," *Hourani v. Mirtchev*, 796 F.3d 1, 12
(D.C. Cir. 2015); *see also Franklin*, 505 U.S. at 801 n.2 (plurality opinion) (citing *Montana* in
dismissing the argument "that the courts have no subject-matter jurisdiction over this case
because it involves a 'political question'") — in which case, the Court would have had an
obligation to raise it "*sua sponte*," *Steel Co.*, 523 U.S. at 93.

inevitably result in an undercount . . . ." (emphasis added)), yet rejected the defendants' invocation of the political question doctrine, *see id.* at 838.

Relying on *Steel Company*, Defendants try to dismiss the analysis in *Carey* on the ground that it was so "scant . . . as to constitute the type of 'drive-by jurisdictional ruling[]' that 'ha[s] no precedential effect.'" (Defs.' Br. 26 n.14 (alterations in original) (quoting *Steel Co.*, 523 U.S. at 91)). But Defendants' reliance on *Steel Company* is badly misplaced, as that decision (and the quoted passage in particular) was concerned with courts' "mischaracteriz[ing] claim-processing rules or elements of a cause of action as jurisdictional limitations." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (describing *Steel Co.*'s reference to "drive-by jurisdictional rulings" as concerning opinions where the court states that it "is dismissing 'for lack of jurisdiction' when some threshold fact has not been established"). The Second Circuit did no such thing in *Carey*: Rather than dismissing a case on non-jurisdictional grounds while calling them jurisdictional, the Court *rejected* the defendants' argument for dismissal on a ground that plainly is jurisdictional in nature. *See* 637 F.2d at 838. Defendants also contend that *Carey* is distinguishable because it concerned "*procedures* put in place to conduct the actual count — not the form of the questionnaire itself." (Defs.' Br. 26 n.14). But the political question doctrine does not operate at that level of specificity. *Carey* stands for the proposition that the "manner" in which the political branches conduct the census is not immune from judicial review. That alone compels rejection of Defendants' political-question arguments.

More broadly, the distinction upon which Defendants' argument rests — between "enumeration" cases and "manner" cases — is ultimately a false one. Defendants try to explain away the Supreme Court's repeated review of how the Secretary has conducted the census on the

ground that its cases "[a]ll have concerned calculation methodologies, not pre-count information-gathering functions or content determinations."  (Defs.' Br. 25 (citing cases)).  But — Defendants' *ipse dixit* aside — challenges to "calculation methodologies," whether they be to "hot-deck imputation" (a process whereby the Census Bureau fills in certain missing information about an address by relying on other information in the Bureau's possession), *Evans*, 536 U.S. at 457-58; statistical sampling, *see U.S. House of Representatives*, 525 U.S. at 322-27; the use of post-enumeration surveys, *see Wisconsin*, 517 U.S. at 8-11; or the methods used to count federal employees serving overseas, *see Franklin*, 505 U.S. at 792-95, are no less challenges to the "manner" in which the "enumeration" is conducted than are the challenges in the present cases. In fact, *every* challenge to the conduct of the census is, in some sense, a challenge to the "manner" in which the government conducts the "actual Enumeration."  And these cases are no different.  At bottom, Plaintiffs' claim under the Enumeration Clause is that Defendants plan to conduct the census in a manner that does not satisfy the constitutional command to conduct an "actual Enumeration."  (*See* SAC ¶¶ 178-82 (claiming that adding the citizenship question will "cause an undercount that impedes the 'actual Enumeration' required by the Constitution"); NGO Compl. ¶ 206 (alleging that adding the "citizenship question will in fact harm the accomplishment of an actual enumeration of the population")).  That may or may not be the case, but "the political question doctrine does not place" the matter "outside the proper domain of the Judiciary."  *Montana*, 503 U.S. at 459.

Defendants are on even shakier ground to the extent that they invoke the political question doctrine to seek dismissal of NGO Plaintiffs' equal protection claim.  (Defs.' NGO Br. 15).  Defendants do not specifically argue that the political question doctrine should bar that claim; instead, they merely incorporate the arguments they make in connection with Government

Plaintiffs' claims by reference.  Regardless, any such arguments would be fruitless, as the Supreme Court made plain in *Baker v. Carr*, 369 U.S. 186 (1962), that "[j]udicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action."  *Id.* at 226.  Additionally, courts in this Circuit have noted more broadly that "[i]f a litigant claims that an individual right has been invaded, the lawsuit by definition does not involve a political question."  *Stokes v. City of Mount Vernon*, No. 11-CV-7675 (VB), 2015 WL 4710259, at *5 (S.D.N.Y. Aug. 4, 2015) (citing authorities); *In re "Agent Orange" Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 67 (E.D.N.Y. 2005) (same), *aff'd sub nom. Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104 (2d Cir. 2008).  Finally, courts have entertained equal protection challenges to the census before, with no suggestion that doing so would run afoul of the political question doctrine.  *See Morales*, 116 F. Supp. 2d 801; *Prieto*, 321 F. Supp. 420.

        In short, Defendants' sweeping argument that the federal courts have no role to play in adjudicating the parties' disputes in these cases is squarely foreclosed by precedent.  To be sure, the Constitution "vests Congress with wide discretion over . . . the conduct of the census."  *Wisconsin*, 517 U.S. at 15.  And Congress has, in turn, delegated broad authority to the Secretary.  *See id.* at 19 (citing 13 U.S.C. § 141(a)).  As discussed below, that undoubtedly mandates substantial "deference" to the decisions of the political branches in the conduct of the census.  *See id.* at 23.  But it does not follow that the Constitution commits the issue solely to the political branches or (as the discussion of the Enumeration Clause below makes clear) that the textual command for an "actual Enumeration," combined with the historical practice, does not yield "judicially discoverable and manageable standards for resolving" the parties' dispute.

*Zivotofsky*, 566 U.S. at 195; *see Evans*, 536 U.S. at 474-79 (looking to history in assessing an

Enumeration Clause claim); *Wisconsin*, 517 U.S. at 21 (same); *Franklin*, 505 U.S. at 803-06

(same); *see also, e.g.*, *Nixon v. United States*, 506 U.S. 224, 233-36 (1993) (looking to the

history of the Impeachment Trial Clause in deciding whether the political question doctrine

applied); *Powell v. McCormack*, 395 U.S. 486, 520-48 (1969) (similar).  The need for judicial

deference does not justify judicial abdication.

## C.     The Administrative Procedure Act

Defendants' third argument is specific to Plaintiffs' APA claims.  (Defs.' Br. 26-30).  The

"generous review provisions" of the APA provide for judicial review of "'final agency action for

which there is no other adequate remedy in a court.'"  *Abbott Labs. v. Gardner*, 387 U.S. 136,

140-41 (1967) (quoting 5 U.S.C. § 704).  More specifically, the APA authorizes a reviewing

court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . .

arbitrary [or] capricious," "contrary to constitutional right," "in excess of statutory jurisdiction,"

or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).  The

"presumption favoring judicial review of administrative action" under these provisions is

"strong," but it is "not absolute."  *Salazar v. King*, 822 F.3d 61, 75-76 (2d Cir. 2016); *accord*

*Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015).  As relevant here, it is subject to a

"very narrow exception," codified in Section 701(a)(2) of the APA, for "agency action" that "is

committed to agency discretion by law."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S.

402, 410 (1971).

Pursuant to Section 701(a)(2), "'review is not to be had' in those rare circumstances

where the relevant statute 'is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)

(quoting *Heckler v. Chaney,* 470 U.S. 821, 830 (1985)); *accord Webster v. Doe,* 486 U.S. 592, 599-600 (1988).  The bar is even higher when, as here, a plaintiff brings a constitutional challenge to final agency action: In such a case, a defendant must produce clear and convincing evidence that Congress intended not only to bar judicial review generally, but that Congress also intended to bar judicial review of constitutional challenges specifically.  *See Webster*, 486 U.S. at 603 ("We require this heightened showing in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."); *see also Weinberger v. Salfi*, 422 U.S. 749, 762 (1975).  To determine if a statute falls within Section 701(a)(2)'s narrow exception to judicial review, a court must analyze "the specific statutory provisions involved."  *Briscoe v. Bell*, 432 U.S. 404, 413-14 (1977).  More broadly, "courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action."  *Salazar*, 822 F.3d at 76.  As the Second Circuit has explained, "[a]gency regulations and guidance can provide a court with law to apply because . . . where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so even where the internal procedures are possibly more rigorous than otherwise would be required."  *Id.* (internal quotation marks omitted).

Defendants contend that this is one of the rare circumstances in which Congress clearly intended to preclude judicial review of agency action.  (Defs.' Br. 26-30).  They base that contention primarily on the language of the Census Act, which — as amended in 1976 — provides that the Secretary "shall . . . every 10 years . . . take a decennial census of population . . . *in such form and content as he may determine*, including the use of sampling procedures and special surveys."  13 U.S.C. § 141(a) (emphasis added).  Further, the Act "authorize[s]" the Secretary when conducting the decennial census "to obtain such other census information *as*

*necessary*." *Id.* (emphasis added).  "This plain language," Defendants contend, "confers

discretion as broad as that granted by the statute at issue in *Webster*, which allowed the CIA

Director to terminate an employee whenever he 'shall deem such termination necessary or

advisable in the interests of the United States.'"  (Defs.' Br. 27 (citation omitted)).  "The

language of § 141(a)," they continue, "contains similar 'deeming' language — the census is to be

conducted as the Secretary 'may determine.'  And, just as the CIA Director's decision that

terminating an employee is 'necessary or advisable' is immune from judicial review, so too is the

Secretary's decision to collect information through the decennial census 'as necessary' and 'in

such form and content as he may determine.'"  (*Id.* at 27-28).

  This argument falls short for at least four independent reasons.  First, as with Defendants'

standing and political question doctrine arguments, it is foreclosed by *Carey*, in which the

"Second Circuit explicitly rejected the contention that a federal court is precluded by operation

of § 701(a)(2) from reviewing the Secretary's action."  *City of N.Y. v. U.S. Dep't of Commerce*,

713 F. Supp. 48, 53 (E.D.N.Y. 1989) (citing *Carey*, 637 F.2d at 838-39).  The *Carey* Court held

that "allegations as to mismanagement of the census . . . . [are] not one of those 'rare instances'

where [the committed-to-agency-discretion-by-law] exception may be invoked."  637 F.2d at

838 (quoting *Overton Park*, 401 U.S. at 410).  The Court noted that the plaintiffs in that case

"allege[d] an impairment of their right to vote free of arbitrary impairment, a matter which

cannot, of course, be foreclosed by operation of the [APA]."  *Id.* (internal quotation marks

omitted).  Here, too, Plaintiffs claim that the Secretary's decision to include a citizenship

question "may systemically dilute the voting power of persons living in communities with

immigrant populations, and impair their right to equal representation in congressional, state, and

local legislative districts."  (SAC ¶ 157; *see also id.* ¶ 101 ("A person-by-person citizenship

demand that leads to a systematic undercount of minority populations across the United States will impair fair representation of those groups and the states in which they live."); NGO Compl. ¶ 5 ("[R]educed census participation by members of immigrant communities of color will result in these communities losing government funding as well as political power and representation in the United States Congress, the Electoral College, and state legislatures.")).[16]  By itself, *Carey* compels the rejection of Defendants' argument.

Second, Defendants' argument is flawed because, in contrast to the statute at issue in *Webster*, the language of the Census Act as a whole does not "fairly exude[] deference" to the agency.  486 U.S. at 600.  Defendants' argument focuses myopically on the phrase "in such form and content as he may determine" in Section 141(a), but that phrase is nestled in a clause that uses the word "shall" to curtail the Secretary's discretion: "The Secretary *shall* . . . take a decennial census of population . . . in such form and content as he may determine . . . ."  13 U.S.C. § 141(a) (emphasis added).  As the Seventh Circuit explained in a like case, where a statute begins with a mandatory clause ("[t]he Secretary *shall provide*…") and contains a discretionary clause ("as the Secretary *deems appropriate*"), the statute is "unfortunately ambiguous," and a court should look to the structure of the act as a whole to determine whether Congress intended to preclude review.  *Bd. of Trs. of Knox Cty. (Ind.) Hosp. v. Sullivan*, 965 F.2d 558, 562 (7th Cir. 1992).  In that case, the Seventh Circuit examined the Medicare Act as a

---

[16]  The plaintiffs in *Carey* included several individual voters who alleged that that their votes would be diluted "vis-a-vis those of other residents of the state."  637 F.2d at 836.  Here, Government Plaintiffs do not include individual voters, but rather various states, cities, and counties alleging that a census undercount "will impair the right to equal representation."  (SAC ¶ 155).  But this is no basis upon which to distinguish *Carey*, because that decision also held that "the State of New York has standing in its capacity as *parens patriae*."  637 F.2d at 838 (citing *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)).  Moreover, NGO Plaintiffs include groups representing individual voters, and the Complaint alleges that they will suffer "reduce[d] . . . political representation" in Congress and state legislatures.  (NGO Compl. ¶ 146).

whole, concluding that it "imposes a number of mandatory duties upon the [agency]." *Id.* at 563; *see also Bennett*, 520 U.S. at 175 (examining "the statutory scheme" to determine whether Congress intended to commit action to agency discretion by law).

So too here, the Census Act imposes any number of mandatory duties upon the Secretary. *See, e.g.*, 13 U.S.C. § 5 ("The Secretary shall prepare questionnaires, and shall determine the inquiries . . . provided for in this title."); *id.* § 141(a) ("The secretary shall . . . take a decennial census . . . ."); *id.* § 141(b) ( "The tabulation . . . shall be completed within 9 months . . . ."); *id.* § 141(c) ("[The Secretary] shall furnish [the census plan] to such officers or public bodies not later than April 1 of the fourth year preceding the decennial census date."). That is strong evidence that Congress did not intend to preclude judicial review of the Secretary's actions. *See Salazar*, 822 F.3d at 77 ("This mandatory, non-discretionary language creates boundaries and requirements for agency action and shows that Congress has not left the decision [at issue] to the discretion of the agency."). At a minimum, it demands even clearer evidence that Congress intended to shield the Secretary's actions from judicial review. The single use of the word "may" is not enough. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) ("When a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency, and that courts should accordingly show *deference* to the agency's determination. However, such language does not mean the matter is *committed* exclusively to agency discretion.").

Third, and relatedly, Defendants' argument fails substantially for the reasons set forth in Justice Stevens's persuasive concurring opinion in *Franklin*, which was joined by three other Justices. *See* 505 U.S. at 816-20 (Stevens, J., concurring in part and concurring in the

judgment).[17]  As he explained, Defendants' assertion that the discretion afforded by the Census

Act "is at least as broad as that allowed the Director of Central Intelligence" in the statute at

issue in *Webster* "cannot withstand scrutiny" for several reasons.  *Id.* at 817.  First and foremost,

"[n]o language equivalent to 'deem . . . advisable' exists in the census statute.  There is no

indication that Congress intended the Secretary's own mental processes, rather than other more

objective factors, to provide the standard for gauging the Secretary's exercise of discretion."  *Id.*

(ellipsis in original).  Second, "it is difficult to imagine two statutory schemes more dissimilar

than the National Security Act and the Census Act."  *Id.* at 817-18.  The former governs "the

operations of a secret intelligence agency" and involves national security, where the mandate for

judicial deference is at its strongest.  *See id.* at 818 & n.17.  By contrast, "[t]he reviewability of

decisions relating to the conduct of the census bolsters public confidence in the integrity of the

process and helps strengthen this mainstay of our democracy."  *Id.* at 818 & n.18.  Third, and

"[m]ore generally," the Supreme Court "has limited the exception" set forth in Section 701(a)(2)

to "areas in which courts have long been hesitant to intrude," such as "cases involving national

security" or "those seeking review of refusal to pursue enforcement actions."  *Id.* at 818 (citing

*Webster*, 486 U.S. 592, and *Heckler*, 470 U.S. 821); *see also Lincoln*, 508 U.S. at 191-92

(identifying "categories of administrative decisions that courts traditionally have regarded as

'committed to agency discretion'").  "The taking of the census is not such an area of traditional

---

[17]     The other five Justices in *Franklin* concluded that the action at issue did not constitute
"final agency action."  *See* 505 U.S. at 796-801.  Accordingly, they held that it was not
reviewable under the APA for *that* reason and did not reach the question of whether the conduct
of the census is "committed to agency discretion by law."

deference." *Franklin*, 505 U.S. at 819 (Stevens, J., concurring in part and concurring in the judgment).[18]

Finally, as Justice Stevens and many other courts have made clear, there are in fact judicially manageable standards with which courts can review the Secretary's decisions. *See id.* at 819-20 & n.19 (citing cases); *City of Philadelphia*, 503 F. Supp. at 677-79; *Utah v. Evans*, 182 F. Supp. 2d 1165, 1178-80 (D. Utah 2001) (three-judge court), *aff'd*, 536 U.S. 452; *Willacoochee v. Baldrige*, 556 F. Supp. 551, 555 (S.D. Ga. 1983); *Texas*, 783 F. Supp. at 311-12. *But see Tucker*, 958 F.2d at 1417-18 ("So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this — that you might as well turn it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness." (citations omitted)). That is, "the overall statutory scheme and the Census Bureau's consistently followed policy provide[] law to apply in

---

[18]    The Court departs from Justice Stevens's concurrence in one narrow respect, although it ultimately does not matter for purposes of this case. Assessing the legislative history of the 1976 statute amending the Census Act to include the language "in such form and content as he may determine," Justice Stevens concluded that "[t]he legislative history [of that statute] evidences no intention to expand the scope of the Secretary's discretion." *Franklin*, 505 U.S. at 816 n.16 (Stevens, J., concurring in part and concurring in the judgment). But the 1976 statute replaced a version of Section 141(a) requiring the Secretary to "take a census of population, *unemployment, and housing (including utilities and equipment)*." *See* H.R. Rep. No. 92-1288, at 23 (emphasis added) (comparing the old statutory language and the proposed amended language). Moreover, the House Committee on Post Office and Civil Service explained that the purpose of replacing "unemployment, and housing (including utilities and equipment)" with the present language — "in such form and content as he may determine" — was "not intended to deny to the Secretary the authority to ask questions on [unemployment and housing] in the decennial censuses. Rather it is directed towards permitting the Secretary *greater discretion* in the determination of the extent to which questions on unemployment and housing are to be included." *Id.* at 12 (emphasis added). Thus, the legislative history could be read to suggest that Congress sought to expand the scope of the Secretary's discretion. That said, the legislative history cannot be read to mean that Congress "intended to effect a new, unreviewable commitment to agency discretion," particularly given the language and structure of the Act itself. *Franklin*, 505 U.S. at 816 n.16 (Stevens, J., concurring in part and concurring in the judgment).

reviewing the Secretary's exercise of discretion."  *Franklin*, 505 U.S. at 819 (Stevens, J.,

concurring in part and concurring in the judgment).  For instance, "the relationship of the census

provision contained in 13 U.S.C. § 141 and the apportionment provision contained in 2 U.S.C.

§ 2a demonstrates that the Secretary's discretion is constrained by the requirement that she

produce a tabulation of the 'whole number of persons in each State.'"  *Id.* (quoting 2 U.S.C.

§ 2a(a)).

Additionally, the "statutory command . . . embodies a duty to conduct a census that is

accurate and that fairly accounts for the crucial representational rights that depend on the census

and the apportionment."  *Id.* at 819-20; *see also Willacoochee*, 556 F. Supp. at 555 ("Necessarily

implicit in the Census Act is the command that the census be accurate. . . .  At the very least, the

Census Act requires that the defendants' decisions not be arbitrary or capricious.").  The Census

Bureau's own regulations may also provide law to apply.  *See* 15 C.F.R. § 90.2 ("It is the policy

of the Census Bureau to provide the most accurate population estimates possible given the

constraints of time, money, and available statistical techniques . . . [and] to provide governmental

units the opportunity to seek a review and provide additional data to these estimates and to

present evidence relating to the accuracy of the estimates.").[19]  And, of course, the Secretary is

---

[19]     As Government Plaintiffs note, (Docket No. 182 ("Pls.' Br."), at 29), "the Census
Bureau's own administrative guidance" may also provide a judicially manageable standard
against which to measure the Secretary's actions.  *See Salazar*, 822 F.3d at 76 (noting that a
court may look to "informal agency guidance" to determine if there is law to be applied).
Whether the particular administrative guidance identified by Government Plaintiffs can be
considered "law to apply," however, is a close call.  Internal agency policy statements or
guidance create "judicially manageable standards" when they provide "meaningful standards [to]
constrain[]" agency discretion.  *Id.* at 80; *see also Pearl River Union Free Sch. Dist. v. King*, 214
F. Supp. 3d 241, 257 (S.D.N.Y. 2016) (finding that agency guidance was "law to apply" where it
"look[ed] to have create[d] binding norms" (second alteration in original) (internal quotation
marks omitted)).  The Information Quality Act and Office of Management and Budget protocols,
cited by Government Plaintiffs, (Pls.' Br. 28-29), do not "'provide judicially manageable
standards' because they vest agencies with *unfettered discretion* to determine 'when correction

plainly constrained by other provisions of the Constitution — including the Due Process Clause

of the Fifth Amendment, which is invoked by NGO Plaintiffs here — in exercising his wide

discretion under the Act.

In short, "the statutory framework and the long-held administrative tradition provide a

judicially administrable standard of review." *Franklin*, 505 U.S. at 820 (Stevens, J., concurring

in part and concurring in the judgment); *cf., e.g.*, *Nat'l Treasury Emps. Union v. Horner*, 854

F.2d 490, 495-98 (D.C. Cir. 1988) (finding judicially manageable standards in a statutory scheme

allowing the Office of Personnel Management to depart from competitive civil service only

when "necessary" for "conditions of good administration").  Accordingly, the Court concludes

that it has jurisdiction to entertain Plaintiffs' APA claims.

**D.     The Enumeration Clause**

Although all of Plaintiffs' claims are justiciable, that does not mean that they are valid.

Defendants do not make other arguments to dismiss Plaintiffs' APA claims at this stage, but they

do contend that Plaintiffs failure to state claims under the Constitution.  (*See* Defs.' Br. 30-35;

Defs.' NGO Br. 16-19).  The Court turns, then, to Plaintiffs' claims under the Enumeration

---

of information contained in informal agency statements is warranted.'"  *Styrene Info. &
Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 82 (D.D.C. 2013) (emphasis added) (quoting
*Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 602-03 (E.D. Va. 2004), *aff'd sub nom. on other
grounds*, *Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006)).  But the Census Bureau's "Statistical
Quality Standards," also cited by Government Plaintiffs, (Pls.' Br. 29-30), may count as "law to
apply."  For one, the preface to those Standards provides that "[a]ll Census Bureau employees . .
. *must comply*" with them.  U.S. Census Bureau, *Statistical Quality Standards* ii (July 2013)
(emphasis added), https://www.census.gov/content/dam/Census/about/about-the-
bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf; *see also
Salazar*, 822 F.3d at 77 (concluding that internal agency guidance, under which the agency "*must*
consider" certain factors, provided sufficient law to apply (emphasis added)).  They also provide
standards that meaningfully constrain Census Bureau discretion.  *See, e.g.*, *Statistical Quality
Standards* 4 (listing factors to be included in a preliminary survey design for "sample survey and
census programs" that the Census Bureau "must . . . develop[]").

Clause, which provides in relevant part that an "actual Enumeration shall be made" every ten

years "in such Manner as [Congress] shall by Law direct."  U.S. CONST. art. 1, § 2, cl. 3.

Plaintiffs' claims fail, Defendants argue, because "[t]here is no allegation that the Secretary is

estimating rather than counting the population, nor any allegation that he has failed to establish

procedures for counting every resident of the United States. . . .  Moreover, the Secretary's

decision to reinstate a citizenship question is consistent with historical practice dating back to the

founding era."  (Defs.' Br. 30).  Plaintiffs counter that the "substantial discretion" of Congress

and the Secretary in conducting the census "is not unlimited; it does not include a decision to

altogether abandon the pursuit of accuracy or to privilege other, non-constitutional values above

it."  (Pls.' Br. 32).  Relying on language from the Supreme Court's decision in *Wisconsin*, they

contend that reinstating the citizenship question violates the Enumeration Clause because it

"does not bear 'a reasonable relationship to the accomplishment of an actual enumeration of the

population, keeping in mind the constitutional purpose of the census'" to aid in the

apportionment of Representatives.  (*Id.* (quoting *Wisconsin*, 517 U.S. at 19-20)).

The Court's analysis of Plaintiffs' claims under the Enumeration Clause is guided by

three background considerations.  First, the "text" of the Clause itself "vests Congress with

virtually unlimited discretion in conducting the decennial 'actual Enumeration.'"  *Wisconsin*, 517

U.S. at 19; *see also id.* at 17 (noting that the Clause grants to Congress "broad authority over the

census"); *Evans*, 536 U.S. at 474 (stating that the Clause, in providing "that the 'actual

Enumeration' shall take place 'in such Manner as' Congress itself 'shall by Law direct,'

. . . suggest[s] the breadth of congressional methodological authority, rather than its limitation");

*Baldrige v. Shapiro*, 455 U.S. 345, 361 (1982) (finding that Congress properly exercised its

discretion to preclude disclosure of census data because "Congress is vested by the Constitution

with authority to conduct the census 'as they shall by Law direct'").  Indeed, the Supreme Court has noted that "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides."  *Wisconsin*, 517 U.S. at 19.  And Congress has fully delegated its "broad authority over the census to the Secretary" through the Census Act.  *Id.* (citing 13 U.S.C. § 141(a)).  "[T]he wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary" demands a high degree of "judicial deference" to the Secretary's decisions concerning the conduct of the census.  *Id.* at 22-23.

Second, as Plaintiffs conceded at oral argument, the inquiry with respect to the Enumeration Clause is an "objective" one.  (*See* Oral Arg. Tr. 51).  That is, there is nothing in either the text of the Enumeration Clause itself or judicial precedent construing the Clause to suggest that the relevant analysis turns on the subjective intent of either Congress or the Secretary.  The Clause calls for an "actual Enumeration," and the census either satisfies that standard or it does not; whether Congress or the Secretary intended to satisfy it is of no moment.  Thus, as in other areas where Congress is permitted wide latitude to legislate, if there "are plausible reasons" for the actions of Congress or the Secretary, judicial inquiry under the Enumeration Clause "is at an end.  It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision' . . . ."  *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)).  In that regard, Plaintiffs' claims under the Enumeration Clause are critically different from their APA and equal protection claims.  The Secretary's intent in reinstating the citizenship question is highly relevant to the question of whether Defendants' conduct violated the APA and the Due Process Clause.  *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 276 (1979) (Equal Protection Clause);

48

*Nat'l Audubon Soc'y. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (APA). It is not a relevant consideration under the Enumeration Clause itself.

Third, in interpreting the Enumeration Clause, the Court "put[s] significant weight upon historical practice." *N.L.R.B. v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (emphasis omitted). As a general matter, the Supreme Court and lower courts have long looked to historical practice to "guide [their] interpretation of an ambiguous constitutional provision." *Id.* at 2594 (Scalia, J., concurring in the judgment) (citing cases); *see generally* Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers*, 126 HARV. L. REV. 411 (2012). Notably, they have done so not only when adjudicating disputes between the political branches, *see Noel Canning*, 134 S. Ct. at 2559; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring), but also when probing the limits of Congressional authority under Article I, *see, e.g.*, *Golan v. Holder*, 565 U.S. 302, 322-23 (2012) (examining the "unchallenged" actions by Congress in the nineteenth and twentieth centuries to interpret Congress's authority under the Copyright Clause), and the limits of executive authority under Article II, *see, e.g.*, *Schick v. Reed*, 419 U.S. 256, 266 (1974) (relying on the long and "unchallenged" history of presidential pardons in interpreting the Pardon Clause). More to the point for present purposes, the Supreme Court has stressed "the importance of historical practice" in determining the metes and bounds of the Enumeration Clause itself. *Wisconsin*, 517 U.S. at 21; *see also Franklin*, 505 U.S. at 803-06 (noting the importance of historical experience in conducting the census); *Montana*, 503 U.S. at 447-56 (considering the history of apportionment under Article I, Section 2). It follows that "the longstanding 'practice of the government'" in conducting the census "can inform our determination of 'what the law is'" for purposes of the Enumeration Clause. *Noel Canning*, 134 S. Ct. at 2560 (quoting *McCulloch v.*

*Maryland*, 4 Wheat. 316, 401 (1819), and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)); *see, e.g.*, *Schick*, 419 U.S. at 266 ("[A]s observed by Mr. Justice Holmes: 'If a thing has been practiced for two hundred years by common consent, it will need a strong case' to overturn it." (quoting *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922)); *The Pocket Veto Case*, 279 U.S. 655, 690 (1929) ("[A] practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department . . . is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning.'" (citation omitted)).

In light of those considerations, the Court is compelled to conclude that the citizenship question is a permissible — but by no means mandated — exercise of the broad power granted to Congress and, in turn, the Secretary pursuant to the Enumeration Clause of the Constitution.  The Court is particularly compelled to reach that conclusion by historical practice, which demonstrates that the census has been consistently used — since the Founding era — for an end unrelated to the "actual Enumeration" textually contemplated by the Enumeration Clause: to collect data on residents of the United States.  For example, the nation's first census, taken in 1790, included information about age and sex, in order to "assess the countries [*sic*] industrial and military potential."  MEASURING AMERICA 5; *see* 1790 Census Act § 1, 1 Stat. 101.  Over the course of the nineteenth century, the demographic questions on the census expanded to include all manner of questions unrelated to the goal of a simple headcount, from questions about the number of persons "engaged in agriculture, commerce, and manufactures," 1820 Census Act, 3 Stat. at 549; to whether members of a household were "deaf," "dumb," or "blind," 1830 Census Act, 4 Stat. at 383; to the "[p]rofession, occupation, or trade of each male person over 15 years of age," the "value of real estate owned," and whether persons over age twenty could read and

write, 1850 Census Act, 9 Stat. at 433; to respondents' marital status, *see Morales*, 116 F. Supp. 2d at 805 ("A question on marital status has been asked in the census since 1880.").  Of course, "the mere fact that these inquiries were not challenged at the time does not prove" that they were consistent with the Enumeration Clause, *id.*, but it does confirm that Congress has held the view since the very first census in 1790 that it was proper to use the census for more than a mere headcount.

In fact, the longstanding practice of asking questions about the populace of the United States without a direct relationship to the constitutional goal of an "actual Enumeration" has been blessed by all three branches of the federal government.  Until the 1930 census, Congress itself "specified minutely" the "details of the questions" on the census.  U.S. GENERAL ACCOUNTING OFFICE, DECENNIAL CENSUS: OVERVIEW OF HISTORICAL CENSUS ISSUES 22 (1998), *available at* https://www.gao.gov/pdfs/GGD-98-103; *see also, e.g.*, 1820 Census Act, 3 Stat. at 550 (listing inquiries required on the fourth decennial census); 1830 Census Act, 4 Stat. at 389 (listing inquiries required on the fifth decennial census).  Since 1930, Congress has delegated more authority to the executive branch, but has continued to play a role in determining what questions must be asked.  *See, e.g.*, Act of June 18, 1929, 46 Stat. 21, 22 (1929) (providing that "the fifteenth and subsequent censuses shall be restricted to inquiries relating to population, to agriculture, to irrigation, [etc.]").  The modern Census Act, enacted in 1976, for example, expressly "authorize[s]" the Secretary to obtain information beyond that necessary for a mere headcount, 13 U.S.C. § 141(a), and provides that he "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title," *id.* § 5.  But even now, Congress retains both oversight and the ultimate word: The Secretary must submit a report to Congress at least two

years prior to the census "containing the Secretary's determination of the questions proposed to

be included." *Id.* § 141(f)(2); *see also* H.R. Rep. No. 92-1288, 92d Cong., at 3-4 (1972)

(explaining that the provisions of the Census Act requiring the Secretary to submit proposed

questions to Congress in advance of the census were meant to strengthen Congress's "oversight

capacity" by enacting "a more formal review of the questions proposed" and to preserve

Congress's traditional role in "reviewing the operational aspects of census and survey[]

procedures and tabulations"). Thus, *both* political branches have long endorsed the

understanding that the census may be used to gather data unrelated to the constitutionally

mandated "actual Enumeration."

The Supreme Court and lower courts have long and consistently blessed the practice as

well. As far back as 1871, for example, the Supreme Court took as a given that Congress could

use the census to gather statistical information beyond that required for an "actual Enumeration":

> Congress has often exercised, without question, powers that are not expressly
> given nor ancillary to any single enumerated power. . . . An[] illustration of this
> may be found in connection with the provisions respecting a census. The
> Constitution orders an enumeration of free persons in the different States every
> ten years. The direction extends no further. Yet Congress has repeatedly directed
> an enumeration not only of free persons in the States but of free persons in the
> Territories, and not only an enumeration of persons but the collection of statistics
> respecting age, sex, and production. Who questions the power to do this?

*Legal Tender Cases*, 79 U.S. (12 Wall) 457, 535-36 (1870), *abrogated on other grounds by*

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002). And the

Supreme Court has reaffirmed the dual role of the census in more recent cases. In *Baldrige*, for

example, the Court acknowledged that while the "initial constitutional purpose" of the census

had been to "provide a basis for apportioning representatives among the states in the Congress,"

it has long "fulfill[ed] many important and valuable functions for the benefit of the country,"

including "in the allocation of federal grants to states" and in "provid[ing] important data for

Congress and ultimately for the private sector."  455 U.S. at 353 & n.9; *see also Dep't of Commerce*, 525 U.S. at 341 (noting that "the decennial census is not *only used* for apportionment purposes" and that it "now serves as a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country" (internal quotation marks omitted)).

Admittedly, the Supreme Court has never confronted a direct challenge to the questions posed on the census.  But a handful of lower courts, including the Second Circuit and this Court, have — and have universally rejected such challenges as meritless.  *See United States v. Rickenbacker*, 309 F.2d 462, 463 (2d Cir. 1962) (Thurgood Marshall, J.); *Morales*, 116 F. Supp. 2d at 803-20; *United States v. Little*, 321 F. Supp. 388, 392 (D. Del. 1971); *United States v. Moriarity*, 106 F. 886, 891 (C.C.S.D.N.Y. 1901); *see also Prieto*, 321 F. Supp. at 421-23 (denying a preliminary injunction based in part on the claim that, because "the standard 'short form' census" did not allow a respondent to identify as "Mexican-American," it would "result in a serious underestimation of what is America's second-largest minority group"); *United States v. Mitchell*, 58 F. 993, 999 (N.D. Ohio 1893) (stating, in *dicta*, that "[c]ertain kinds of information valuable to the public, and useful to the legislative branches of the government as the basis for proper laws, . . . may properly be required from the citizen" on the decennial census).  As a judge on this Court put it more than a century ago, the fact that Article I mandates only "a census of the population . . . does not prohibit the gathering of other statistics, if 'necessary and proper,' for the intelligent exercise of other powers enumerated in the constitution, and in such case there could be no objection to acquiring this information through the same machinery by which the population is enumerated."  *Moriarity*, 106 F. at 891 (citing *McCulloch*, 4 Wheat. at 416); *accord*

*Morales*, 116 F. Supp. 2d at 809 (citing *Moriarity*, *McCulloch*, and the *Legal Tender Cases* in affirming that the census may be used to conduct more than "a mere headcount").

By itself, the foregoing history makes it difficult to maintain that asking about citizenship on the census would constitute a violation of the Enumeration Clause.  Taking that position becomes untenable altogether in light of the undeniable fact that citizenship status has been a subject of the census for most of the last two hundred years.  Congress itself first included a question about citizenship on the fourth census, in 1820.  *See* Measuring America 6 (noting that the 1820 census included questions "to ascertain the number of foreigners not naturalized"); *see* 1820 Census Act, 3 Stat. at 550.  And with one exception (in 1840), *every* decennial census thereafter until 1950 asked a question related to citizenship or birthplace in one form or another. *See id.* at 34-71.  In 1960, the Secretary ceased asking *all* respondents about citizenship.  *See id.* at 73.  Notably, however, the 1960 census *did* include a citizenship question for residents of New York and Puerto Rico, and it *did* ask a sample of respondents to provide where they were born, the language they spoke before coming to the United States, and their parents' birthplaces.  *See id.* at 72-76; *see also id.* at 124 n.4 (confirming that these questions were asked on a "sample basis generally" and that "[c]itizenship was asked only in New York and Puerto Rico, where it was a 100-percent item").  From 1970, the first year in which a longer census questionnaire was sent to a segment of the population, to 2000, the last year in which such a long-form questionnaire was used, the subject of citizenship remained on the census, albeit only for some respondents — namely, the one-sixth or so of households that received the "long-form" questionnaire.  *See id.* at 78, 91-92.  In 2010, when the long-form questionnaire was deemed unnecessary in light of the annual ACS, the census did not ask about citizenship at all.  But there is no indication that the decision to drop the question from the 2010 census was made because

Congress or the Secretary had come to believe that asking about citizenship was beyond the broad authority granted to Congress and, in turn, the Secretary by the Enumeration Clause.

Thus, for two centuries, there has been a nearly unbroken practice of Congress either expressly including a question concerning citizenship on the census or authorizing (through delegation of its power and its non-intervention) the executive branch to do so. This history is significant for two reasons. First, as noted, the Supreme Court has made clear that "[l]ong settled and established practice" can be given "great weight" in construing constitutional provisions that define the scope of the political branches' powers. *Noel Canning*, 134 S. Ct. at 2559 (internal quotation marks omitted). For nearly two hundred years, all three branches have agreed that the census may be used to collect demographic information unrelated to the goal of an "actual Enumeration," and two of the three branches have explicitly approved the inclusion of questions about citizenship status. That is plainly "long enough to entitle a practice to 'great weight in a proper interpretation' of the constitutional provision." *Id.* at 2564 (quoting *The Pocket Veto Case*, 279 U.S. at 689). Second, in assessing the meaning of the Enumeration Clause's broad grant of power, there is independent significance to the fact that demographic questions appeared on the very first census and that citizenship appeared on the census as early as 1820, little more than three decades after the Founding. As the Supreme Court explained nearly 150 years ago, "[t]he construction placed upon the constitution by the [earliest acts of Congress], by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884); *see also J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 412 (1928) ("This

Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our government and framers of our Constitution were actively participating in public affairs long acquiesced in fixes the construction to be given its provisions.").

In short, the "virtually unlimited discretion" granted to Congress by the text of the Constitution, *Wisconsin*, 517 U.S. at 19, and the longstanding historical practice of asking demographic questions generally and asking questions about citizenship specifically, compel the conclusion that asking about citizenship status on the census is not an impermissible exercise of the powers granted by the Enumeration Clause to Congress (and delegated by Congress to the Secretary). In arguing otherwise, Plaintiffs make two principal arguments. First, they rely heavily on *Wisconsin*, in which the Supreme Court rejected a challenge to the Secretary's decision not to apply a post-census statistical adjustment. (Pls.' Br. 32-35). In doing so, the Court stated that, "[i]n light of the Constitution's broad grant of authority to Congress, the Secretary's decision not to adjust [the census] need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." 517 U.S. at 19. Arguing that the sole constitutional purpose of the census is "accuracy in the count," Plaintiffs contend that that standard should be applied here and that reintroduction of a citizenship question is impermissible because it does not bear a "reasonable relationship" to the accomplishment of an actual enumeration. (Pls.' Br. 35). Second, relying on history themselves, Plaintiffs place great weight on the fact that the Census Bureau has not included citizenship on the universal census form since 1950 and, in the years since, has repeatedly reaffirmed that doing so would harm the accuracy of the count. (*Id.* at 32).

Neither argument is persuasive.  First, *Wisconsin* cannot be read to suggest, let alone hold, that each and every question on the census must bear a "reasonable relationship" to the goal of an actual enumeration.  Doing so would contravene the Supreme Court's own acknowledgement that the census "fulfills many important and valuable functions," including "in the allocation of federal grants to states based on population" and in "provid[ing] important data for Congress and ultimately for the private sector."  *Baldrige*, 455 U.S. at 353.  And doing so would also fly in the face of the history discussed above, which makes clear that all three branches have long blessed, and certainly tolerated, the practice of asking sensitive demographic questions on the census.  Indeed, taken to its logical conclusion, application of the *Wisconsin* "reasonable relationship" standard to every decision concerning the census would lead to the conclusion that it is unconstitutional to ask *any* demographic question on the census.  After all, asking such questions bears no relationship whatsoever to the goal of an accurate headcount.  Far from it: Common sense and basic human psychology dictate that including *any* additional questions on the census — particularly questions on sensitive topics such as race, sex, employment, or health — can serve only to reduce response rates, as both the transaction costs of compliance and the likely concerns about intrusiveness increase.  *See, e.g.*, *Rickenbacker*, 309 F.2d at 463 (noting that the defendant had refused to answer census questions based on the view that they were an "unnecessary invasion" into his privacy); *Morales*, 116 F. Supp. 2d at 809-12 (similar); *Mitchell*, 58 F. at 999-1000 (similar).[20]  Yet, as noted, the census takers have, with the

---

[20]    Data support this common-sense conclusion.  In 2000, for instance, the mail-back response rate for the long-form questionnaire was 9.6% lower than the response rate for the short-form.  *See* U.S. CENSUS BUREAU, CENSUS 2000 TOPIC REPORT NO. 11: RESPONSE RATES AND BEHAVIOR ANALYSIS 9 (2004), *available at* https://www.census.gov/pred/www/rpts/TR11.pdf.

blessing of all three branches, asked such questions of respondents since the very first census in 1790.

To read *Wisconsin* as Plaintiffs suggest would, therefore, lead ineluctably to the conclusion that each and every census — from the Founding through the present — has been conducted in violation of the Enumeration Clause.  That would, of course, be absurd, and leads the Court to conclude instead that the *Wisconsin* standard applies only to decisions that bear directly on the actual population count.  Notably, the Supreme Court's own language supports that limitation, as it held only that "the Secretary's decision *not to adjust*" the census count "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population."  517 U.S. at 20 (emphasis added).  That is, the Court did not purport to announce a standard that would apply to a case such as this one.  *Cf. Rickenbacker*, 309 F.2d at 463 (holding, in a criminal prosecution for failure to respond to the census, that the questionnaire did not violate the Fourth Amendment because "[t]he authority to gather reliable statistical data reasonably related to governmental purposes and functions is a necessity if modern government is to legislate intelligently and effectively" and the questions at issue "related to important federal concerns . . . and were not unduly broad or sweeping in their scope").

Plaintiffs' second argument — based on the conduct of the Census Bureau since 1960 — is also unpersuasive.  That history may support the contention that reintroducing the citizenship question is a bad decision — and that, in turn, may be relevant to whether Plaintiffs can establish a violation of the APA or the Due Process Clause, both of which invite examination into the Secretary's bases for making that decision.  But nothing in the history of the census, recent or otherwise, plausibly suggests that asking a citizenship question is beyond the scope of Congress's broad *power* under the Enumeration Clause — which is the sole relevant question for

purposes of Plaintiffs' Enumeration Clause claims.  Moreover, Plaintiffs' argument from recent

history ignores the fact that citizenship *did* appear on all but one of the censuses since 1960.  To

be sure, it did so for only a portion of the population, but that fact alone has no constitutional

significance.  If Congress and the Secretary lack authority under the Enumeration Clause to ask

about citizenship on the census, they could not ask about it of anyone, whatever the length of the

questionnaire.  Conversely, if the Enumeration Clause permits Congress and the Secretary to ask

some respondents about citizenship, it follows that the Clause permits them to ask all

respondents.  It makes no sense to say that Congress's power (and, by extension, the Secretary's)

is dependent on the length of the questionnaire or on whether the entire population or only a

portion of the population receives a particular questionnaire.  Put simply, if the Enumeration

Clause allows the Secretary to ask anyone about citizenship status — and historical practice

makes clear that it does — then the Clause permits the Secretary to ask everyone about it.

 For the foregoing reasons, the Court holds that Plaintiffs do not — and cannot — state a

plausible claim that addition of the citizenship question on the 2020 census constitutes a

violation of the Enumeration Clause.  That does not mean — as Defendants have audaciously

argued (*see* Oral Arg. Tr. 48) — that there are no constitutional limits on Congress's and the

Secretary's discretion to add questions to the census questionnaire.  First, there is "a strong

constitutional interest in accuracy," *Evans*, 536 U.S. at 478, and a decision to add questions to

the census without the historical pedigree of the citizenship question could conceivably

undermine that interest to a degree that would be constitutionally offensive.  The Court need not

define the outer limits of Congress's powers under the Enumeration Clause to decide this case, as

it suffices to say that the Secretary's decision *here* is "consonant with, though not dictated by, the

text and history of the Constitution."  *Franklin*, 505 U.S. at 806; *see also Evans*, 536 U.S. at 479

("[W]e need not decide here the precise methodological limits foreseen by the Census Clause."). But there may well be questions or practices that would be so extreme and unprecedented that they would not be permissible even under the Enumeration Clause.

Second, to say that the Secretary has authority *under the Enumeration Clause* to ask about citizenship on the census is not to say that the particular exercise of that authority here was constitutional or lawful.  The Secretary cannot exercise his authority in a manner that would violate individual constitutional rights, such as the right to equal protection of the laws. *Compare, e.g.*, *Richardson v. Ramirez*, 418 U.S. 24, 54-55 (1974) (holding that states may disenfranchise felons under Section 2 of the Fourteenth Amendment), *with Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985) (striking down Alabama's felon disenfranchisement law as a violation of the Equal Protection Clause).  Nor, under the APA, may he exercise his authority in a manner that would be "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A); *see, e.g.*, *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 42 (2d Cir. 2003).  Plaintiffs here make both kinds of claims, and the Court's holding that the Secretary's decision was consonant with the Enumeration Clause does not resolve *those* claims.

**E.     The Equal Protection Claim**

Plaintiffs' final claim — pressed only by NGO Plaintiffs — is that Defendants violated the Fifth Amendment by "act[ing] with discriminatory intent toward Latinos, Asian-Americans, Arab-Americans, and immigrant communities of color generally in adding the citizenship question to the Decennial Census."  (NGO Compl. ¶ 195).  To state a claim under the Fifth Amendment in the circumstances presented here, NGO Plaintiffs have to plausibly allege that Defendants' decision "was motivated by discriminatory animus and its application results in a

discriminatory effect." *Hayden v. Cty. of Nassau* ("*Hayden I*"), 180 F.3d 42, 48 (2d Cir. 1999).[21]

Their allegations of discriminatory effect — that inclusion of the citizenship question for all

respondents will bear, in the form of diminished political representation and reduced federal

funding, more heavily on "Latinos, Asian-Americans, Arab-Americans, and other immigrant

communities of color" because the non-response rate is likely to be higher in such communities

— are sufficient.  (NGO Compl. ¶¶ 196-97).  Defendants contend that those claims are

"speculative," (Defs.' NGO Br. 18), but — assuming the truth of the allegations, as the Court

must — Defendants' contention is no more persuasive here than it was in the standing context.

Thus, whether Plaintiffs state an equal protection claim turns on whether they plausibly

allege a "racially discriminatory intent or purpose."  *Vill. of Arlington Heights v. Metro. Hous.*

*Dev. Corp.* ("*Arlington Heights*"), 429 U.S. 252, 265 (1977); *accord Red Earth LLC v. United*

*States*, 657 F.3d 138, 146 (2d Cir. 2011).  Discriminatory intent or purpose "implies more than

intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . .

selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in

spite of,' its adverse effects upon an identifiable group."  *Feeney*, 442 U.S. at 279 (citation and

footnote omitted).  At the same time, "a plaintiff need not prove that the 'challenged action

rested solely on racially discriminatory purposes.'"  *Hayden v. Paterson* ("*Hayden II*"), 594 F.3d

150, 163 (2d Cir. 2010) (quoting *Arlington Heights*, 429 U.S. at 265); *see also, e.g.*, *United*

*States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996) (stating that a plaintiff "need not show

. . . that a government decisionmaker was motivated solely, primarily, or even predominantly by

---

[21]     Although the Equal Protection Clause of the Fourteenth Amendment applies only to the
states, the Due Process Clause of the Fifth Amendment prohibits racial discrimination by the
federal government as well.  *See, e.g.*, *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)
("This Court's approach to Fifth Amendment equal protection claims has always been precisely
the same as to equal protection claims under the Fourteenth Amendment.").

concerns that were racial").  Indeed, "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."  *Arlington Heights*, 429 U.S. at 265.  Thus, it is enough to show that an "invidious discriminatory purpose was *a* motivating factor" in the challenged decision.  *Id.* at 266 (emphasis added).  Further, "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  *Hayden II*, 594 F.3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266).

In *Arlington Heights*, the Supreme Court identified a set of non-exhaustive factors for courts to consider in undertaking this "sensitive inquiry" into discriminatory intent.  First, whether the impact of the action "'bears more heavily on one race than another' may provide an important starting point."  *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Unless a "clear pattern, unexplainable on grounds other than race, emerges," however, "impact alone is not determinative, and the Court must look to other evidence."  *Id.* (footnote omitted).  That "other evidence" includes: (1) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (2) "[t]he specific sequence of events leading up the challenged decision"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (5) "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at 267-68.  "In some extraordinary instances," evidence of discriminatory animus may also come from the testimony of decisionmakers.  *Id.* at 268.

Considering those factors here, the Court concludes that NGO Plaintiffs' allegations are sufficient to survive Defendants' motion to dismiss.  First, the Complaint pleads facts that show "[d]epartures from the normal procedural sequence."  *Arlington Heights*, 429 U.S. at 267.  These departures include overruling career staff who strongly objected to including the citizenship question, failing to extensively test reintroduction of the question, and ignoring the recommendation of the Census Bureau's advisory committee.  (NGO Compl. ¶¶ 7, 191).  The Administrative Record — of which the Court may take judicial notice, *see Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) — lends support to these allegations.  It shows, for example, that Secretary Ross overruled Census Bureau career staff, who had concluded that reinstating the citizenship question would be "very costly" and "harm[] the quality of the census count."  (*See* Admin. Record 1277).  It also confirms that Defendants made the decision to add the question without the lengthy consideration and testing that usually precede even minor changes to the census questionnaire; in fact, it was added without any testing at all.  (*See* Ross Mem. 2, 7).  Notably, Defendants challenge only one of these alleged aberrations — the failure to test the question, which they attribute to the fact that it had previously been included on the ACS.  (Defs.' NGO Br. 19).  Whatever its merits, however, that challenge is premature, as all inferences must be drawn in Plaintiffs' favor at this stage of the litigation.  *See, e.g.*, *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  And, in any event, Defendants do not address, let alone dispute, the other procedural irregularities.

Second, various considerations — including the "specific sequence of events leading up to the challenged decision," *Arlington Heights*, 429 U.S. at 267 — suggest that Secretary Ross's sole proffered rationale for the decision, that the citizenship question is necessary for litigation of Voting Rights Act claims, may have been pretextual.  For one thing, there is no indication in the

record that the Department of Justice and civil rights groups have ever, in the fifty-three years

since the Voting Rights Act was enacted, suggested that citizenship data collected as part of the

decennial census would be helpful, let alone necessary, to litigate such claims.  (*See* Docket No.

187-1, at 14; *see also* NGO Compl. ¶¶ 183, 186).  For another, while Secretary Ross initially

(and repeatedly) suggested that the Department of Justice's request triggered his consideration of

the issue, it now appears that the sequence of events was exactly opposite.  In his memorandum,

Secretary Ross stated that he "*set out* to take a hard look" at adding the citizenship question

"[*f*]*ollowing receipt*" of a request from the Department of Justice on December 12, 2017.  (*See*

Ross Mem. 1 (emphases added)).[22]  Yet in a June 21, 2018 supplement to the Administrative

Record, Secretary Ross admitted that *he* "began considering" whether to add the citizenship

question "[s]oon after" his appointment as Secretary in February 2017 — almost ten months

before the "request" from DOJ — and that, "[a]s part of that deliberative process," *he and his*

*staff* asked the Department of Justice if it "would support, *and if so would request*, inclusion of a

citizenship question."  (Docket No. 189-1 (emphasis added)).  Along similar lines, in a May 2,

2017 e-mail to Secretary Ross, the director of the Commerce Department's office of policy and

strategic planning stated that "[w]e need to work with Justice *to get them to request* that

citizenship be added back as a census question."  (Docket No. 212, at 3710 (emphasis added);

*see also id.* at 3699 (e-mail from Secretary Ross, earlier the same day, stating that he was

---

[22]     In sworn testimony shortly after his March 26, 2018 memorandum — of which the Court
can also take judicial notice, *see, e.g.*, *Ault v. J.M. Smucker Co.*, No. 13-CV-3409 (PAC), 2014
WL 1998235, at *2 (S.D.N.Y. May 15, 2014) — Secretary Ross was even more explicit, stating
that it was the Department of Justice that had "*initiated* the request for inclusion of the
citizenship question."  *Hearing on Recent Trade Actions, Including Section 232 Determinations*
*on Steel & Aluminum: Hearing Before the H. Ways & Means Comm.*, 115th Cong. 24 (Mar. 22,
2018) (testimony of Secretary Ross) (emphasis added), *available at* 2018 WLNR 8951469.

"mystified why nothing have [sic] been done in response to my months old request that we

include the citizenship question")).[23]

> To prove a violation of the Fifth Amendment, of course, NGO Plaintiffs need to prove

that Defendants acted with a discriminatory purpose, and evidence that Secretary Ross's

rationale was pretextual does not necessarily mean that it was a pretext for discrimination.[24]

Nevertheless, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form

of circumstantial evidence that is probative of intentional discrimination, and it may be quite

persuasive." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (discussing

Title VII of the Civil Rights Act of 1964); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

517 (1993) (stating, in reference to a Title VII claim, that "proving the [defendant's] reason false

becomes part of (and often considerably assists) the greater enterprise of proving that the real

reason was intentional discrimination").  Thus, "[i]n appropriate circumstances, the trier of fact

can reasonably infer from the falsity of the explanation that the [defendant] is dissembling to

cover up a discriminatory purpose.  Such an inference is consistent with the general principle of

evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact

as 'affirmative evidence of guilt.'"  *Reeves*, 530 U.S. at 147.  At a minimum, there is certainly

---

[23]     Docket No. 212 is Defendants' notice of the filing of supplemental materials.  Given the volume of those materials, Defendants did not file them directly on the docket, but made them available at http://www.osec.doc.gov/opog/FOIA/Documents/CensusProd001.zip.

[24]     While evidence of pretext alone does not suffice to prove a violation of the Fifth Amendment, it may well suffice to prove a violation of the APA — as Defendants themselves conceded at the initial conference in 18-CV-2921.  (*See* Docket No. 150, at 15).

much "about the sequence of events leading up to the decision" at issue in these cases "that would spark suspicion." *Arlington Heights*, 429 U.S. at 269.[25]

Finally, NGO Plaintiffs identify "contemporary statements" by alleged decisionmakers that lend further support to their claim that Defendants' decision was motivated at least in part by intentional discrimination against immigrant communities of color. *Arlington Heights*, 429 U.S. at 268. Most notably, NGO Plaintiffs identify several statements made by President Trump himself in the months before and after Secretary Ross announced his decision that, while not pertaining directly to that decision, could be construed to reveal a general animus toward immigrants of color. Those statements include (1) his alleged complaint on January 11, 2018, about "these people from shithole countries" coming to the United States, (NGO Compl. ¶ 109); (2) his assertion in February 2018 that certain immigrants "turn out to be horrendous. . . . They're not giving us their best people, folks," (*id.*); and (3) his comment on May 16, 2018, that "[w]e have people coming into the country, or trying to come in. . . . You wouldn't believe how bad these people are. These aren't people, these are animals . . . ," (*id.*).

It is true, as Defendants note, that none of those statements relate specifically to the decision to reinstate the citizenship question on the 2020 census. (Defs.' NGO Br. 18). But the law is clear that the mere "use of racial slurs, epithets, or other racially charged language . . . *can* be evidence that official action was motivated by unlawful discriminatory purposes." *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018) (emphasis added) (citing cases). It is also true, as Defendants intimate, that the decisionmaker here was Secretary Ross — not President Trump himself. (Defs.' NGO Br. 18). But NGO Plaintiffs plausibly claim that

---

[25]   Citing much of the foregoing evidence of pretext, the Court previously ruled, in an oral opinion, that Plaintiffs were entitled to discovery on their claims under the APA. (*See* Oral Arg. Tr. at 76-89).

President Trump was personally involved in the decision, citing his own reelection campaign's assertion that he "officially mandated" it.  (NGO Compl. ¶ 178).  Treating those allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, the Court is therefore compelled to conclude that the statements help to nudge NGO Plaintiffs' claim of intentional discrimination across the line from conceivable to plausible.  *See Batalla Vidal*, 291 F. Supp. 3d at 279 (relying on "racially charged" statements by the President where he was alleged to have directed the decision at issue in concluding that the plaintiffs' allegations of discriminatory intent were sufficient to survive a motion to dismiss); *cf. Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter.").

Finally, Defendants' invocation of the Supreme Court's recent decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), falls somewhere between facile and frivolous.  Defendants claim that the decision, which rejected a challenge to President Trump's so-called Travel Ban, "reaffirmed that facially neutral policies are subject to only limited, deferential review and may not lightly be held unconstitutional."  (Defs.' NGO Br. 17).  In support of that contention, they quote the Court's opinion for the proposition that "deferential review may apply 'across different contexts and constitutional claims.'"  (*Id.* at 18 (quoting *Hawaii*, 138 S. Ct. at 2419)).  Conspicuously, however, Defendants omit the first part of the quoted sentence, which reveals that the deferential review referenced by the Court in *Hawaii* is that established by *Kleindienst v. Mandel*, 408 U.S. 753 (1972), for challenges to the exclusion of foreign nationals from the country.  *See* 138 S. Ct. at 2419.  And they fail to acknowledge that every case cited by the Court in which deferential review was applied involved either immigration or the admission of

noncitizens.  *See id.* at 2419-20; *see also id.* at 2420 n.5 ("[A]s the numerous precedents cited in this section make clear, such a circumscribed inquiry applies to any constitutional claim concerning the entry of foreign nationals.").  There is nothing in the Court's opinion to indicate that its deferential review applies outside of the "national security and foreign affairs context," *id.* at 2420 n.5, let alone that the Court meant to unsettle decades of equal protection jurisprudence regarding the types of evidence a court may look to in determining a government actor's intent.  In fact, even with its "circumscribed judicial inquiry," the *Hawaii* Court itself considered "extrinsic evidence" — namely, President Trump's own statements.  *See id.* at 2420. If anything, therefore, *Hawaii* cuts against Defendants' arguments rather than in their favor.

In sum, accepting NGO Plaintiffs' allegations as true and drawing all reasonable inferences in their favor — as is required at this stage of the litigation — the Court is compelled to conclude that they state a plausible claim that Defendants' decision to reintroduce the citizenship question on the 2020 census "was motivated by discriminatory animus and its application results in a discriminatory effect."  *Hayden I*, 180 F.3d at 48.[26]  It follows that Defendants' motion to dismiss NGO Plaintiffs' Fifth Amendment equal protection claim must be and is denied.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED in part and DENIED in part.  *First*, the Court rejects Defendants' attempts to insulate Secretary Ross's decision to reinstate a question about citizenship on the 2020 census from judicial review.

---

[26]     In light of that conclusion, the Court need not consider NGO Plaintiffs' alternative argument that the inclusion of the citizenship question "was motivated by a 'bare . . . desire to harm a politically unpopular group,' and thus a violation of the equal protection clause even applying rational basis review."  (NGO Pls.' Br. 25 (quoting *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973))).

Granted, courts must give proper deference to the Secretary, but that does not mean that they lack authority to entertain claims like those pressed here.  To the contrary, courts have a critical role to play in reviewing the conduct of the political branches to ensure that the census is conducted in a manner consistent with the Constitution and applicable law.  *Second*, the Court concludes that Plaintiffs' claims under the Enumeration Clause — which turn on whether Secretary Ross had the *power* to add a question about citizenship to the census and not on whether he *exercised* that power for impermissible reasons — must be dismissed.  *Third*, assuming the truth of their allegations and drawing all reasonable inferences in their favor, the Court finds that NGO Plaintiffs plausibly allege that Secretary Ross's decision to reinstate the citizenship question was motivated at least in part by discriminatory animus and will result in a discriminatory effect.  Accordingly, their equal protection claim under the Due Process Clause (and Plaintiffs' APA claims, which Defendants did not substantively challenge) may proceed.

None of that is to say that Plaintiffs will ultimately prevail in their challenge to Secretary Ross's decision to reinstate the citizenship question on the 2020 census.  As noted, the Enumeration Clause and the Census Act grant him broad authority over the census, and Plaintiffs may not ultimately be able to prove that he exercised that authority in an unlawful manner.  Put another way, the question at this stage of the proceedings is not whether the evidence supports Plaintiffs' claims, but rather whether Plaintiffs may proceed with discovery and, ultimately, to summary judgment or trial on their claims.  The Court concludes that they may as to their claims under the APA and the Due Process Clause and, to that extent, Defendants' motions are denied.

Per the Court's Order entered on July 5, 2018 (Docket No. 199), the deadline for the completion of fact and expert discovery in these cases is October 12, 2018, and the parties shall appear for a pretrial conference on September 14, 2018.  The parties are reminded that, no later

than the Thursday prior to the pretrial conference, they are to file on ECF a joint letter addressing

certain issues.  (*See id.* at 2-3).  In that letter, the parties should also give their views with respect

to whether the case should resolved by way of summary judgment or trial and whether the two

cases should be consolidated for either of those purposes.

      The Clerk of Court is directed to terminate 18-CV-2921, Docket No. 154; and 18-CV-

5025, Docket No. 38.


      SO ORDERED.

Date:  July 26, 2018
       New York, New York

                                               _____
                                              JESSE M. FURMAN
                                  United States District Judge