# Exhibit 1

**548 U.S. 399 (2006)**

## LEAGUE OF UNITED LATIN AMERICAN CITIZENS et al.

### v.

### PERRY, GOVERNOR OF TEXAS, et al.

No. 05-204.

**Supreme Court of United States.**

Argued March 1, 2006.

Decided June 28, 2006.[*]

407    *407 *Paul M. Smith* argued the cause for appellants in No. 05-276. With him on the briefs for appellants were *Sam Hirsch* and *J. Gerald Hebert.*

*Nina Perales* argued the cause for appellants in No. 05-439. With her on the briefs was *David Herrera Urias.*

*R. Ted Cruz,* Solicitor General of Texas, argued the cause for the state appellees in all cases. With him on the brief were *Greg Abbott,* Attorney General, *Barry R. McBee,* First Assistant Attorney General, *Edward D. Burbach,* Deputy Attorney General, and *Don Cruse, Joel L. Thollander,* and *Adam W. Aston,* Assistant Solicitors General.

*Deputy Solicitor General Garre* argued the cause for the United States as *amicus curiae* urging affirmance in support of the state appellees. With him on the brief were *Solicitor General Clement, Assistant Attorney General Kim, James A. Feldman, David K. Flynn,* and *Lisa J. Stark.*

*Rolando L. Rios, George Korbel, Jose Garza,* and *Judith A. Sanders-Castro* filed briefs for the League of United Latin American Citizens et al., appellants in No. 05-204. *Renea Hicks* filed briefs for Travis County, Texas, et al., appellants in No. 05-254.

*Michael A. Carvin* and *Louis K. Fisher* filed a brief in all cases for appellees Tina Benkiser et al. *Robert M. Long* filed a brief in all cases for appellee Charles Soechting, in support of appellants. *John S. Ament III* and *Richard Gladden* filed briefs for Frenchie Henderson, appellee in support of appellant Travis County, Texas, et al. in No. 05-254. *Gary L. Bledsoe, David T. Goldberg, Sean H. Donahue,* and *Dennis Courtland Hayes* filed briefs for the Texas State-Area Conference of the National

408    Association for the Advancement *408 of Colored People in support of appellants in No. 05-276.[†]

409    JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court with respect to Parts II-A and III, an opinion with respect to Parts I and IV, in *409 which THE CHIEF JUSTICE and JUSTICE ALITO join, an opinion with respect to Parts II-B and II-C, and an opinion with respect to Part II-D, in which JUSTICE SOUTER and JUSTICE GINSBURG join.

These four consolidated cases are appeals from a judgment entered by the United States District Court for the Eastern District of Texas. Convened as a three-judge court under 28 U. S. C. § 2284, the court heard appellants' constitutional and statutory challenges to a 2003 enactment of the Texas State Legislature that drew new district lines for the 32 seats Texas holds in the United States House of Representatives. (Though appellants do not join each other as to all claims, for the sake of convenience we refer to appellants collectively.) In 2004 the court entered judgment for appellees and issued detailed findings of fact and conclusions of law. *Session* v. *Perry,* 298 F. Supp. 2d 451 *(per curiam).* This Court vacated that decision and remanded for consideration in light of *Vieth* v. *Jubelirer,* 541 U. S. 267 (2004). 543 U. S. 941 (2004). The District Court reexamined appellants' political gerrymandering claims and, in a second careful opinion, again held for the defendants. *Henderson* v. *Perry,* 399 F. Supp. 2d 756 (2005). These appeals followed, and we noted probable jurisdiction. 546 U. S. 1074 (2005).

Appellants contend the new plan is an unconstitutional partisan gerrymander and that the redistricting statewide violates § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973. Appellants also contend that the use of race and politics in drawing lines of specific districts violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The three-judge panel, consisting of Circuit Judge Higginbotham and District Judges Ward and Rosenthal, brought considerable experience and expertise to the instant action, based on their knowledge of the State's people, history,

and geography. Judges Higginbotham and Ward, moreover, had served on the three-judge court that drew the plan the Texas
410    Legislature *410 replaced in 2003, so they were intimately familiar with the history and intricacies of the cases.

We affirm the District Court's dispositions on the statewide political gerrymandering claims and the Voting Rights Act claim
against District 24. We reverse and remand on the Voting Rights Act claim with respect to District 23. Because we do not reach
appellants' race-based equal protection claim or the political gerrymandering claim as to District 23, we vacate the judgment of
the District Court on these claims.

I

To set out a proper framework for the cases, we first recount the history of the litigation and recent districting in Texas. An
appropriate starting point is not the reapportionment in 2000 but the one from the census in 1990.

The 1990 census resulted in a 30-seat congressional delegation for Texas, an increase of 3 seats over the 27 representatives
allotted to the State in the decade before. See _Bush_ v. _Vera_, 517 U. S. 952, 956-957 (1996). In 1991 the Texas Legislature
drew new district lines. At the time, the Democratic Party controlled both houses in the state legislature, the governorship, and
19 of the State's 27 seats in Congress. Yet change appeared to be on the horizon. In the previous 30 years the Democratic
Party's post-Reconstruction dominance over the Republican Party had eroded, and by 1990 the Republicans received 47% of
the statewide vote, while the Democrats received 51%. _Henderson, supra,_ at 763; Brief for Appellee Perry et al. in No. 05-204
etc., p. 2 (hereinafter Brief for State Appellees).

Faced with a Republican opposition that could be moving toward majority status, the state legislature drew a congressional
redistricting plan designed to favor Democratic candidates. Using then-emerging computer technology to draw district lines with
artful precision, the legislature enacted a plan later described as the "shrewdest gerrymander of the 1990s." M. Barone, R.
411    Cohen, & C. Cook, Almanac of American *411 Politics 2002, p. 1448 (2001). See _Henderson, supra,_ at 767, and n. 47.
Although the 1991 plan was enacted by the state legislature, Democratic Congressman Martin Frost was acknowledged as its
architect. _Session, supra,_ at 482. The 1991 plan "carefully constructs democratic districts `with incredibly convoluted lines' and
packs `heavily Republican' suburban areas into just a few districts." _Henderson, supra,_ at 767, n. 47 (quoting M. Barone & R.
Cohen, Almanac of American Politics 2004, p. 1510 (2003) (hereinafter 2004 Almanac)).

Voters who considered this unfair and unlawful treatment sought to invalidate the 1991 plan as an unconstitutional partisan
gerrymander, but to no avail. See _Terrazas_ v. _Slagle,_ 789 F. Supp. 828, 833 (WD Tex. 1992); _Terrazas_ v. _Slagle,_ 821 F. Supp.
1162, 1175 (WD Tex. 1993) _(per curiam)._ The 1991 plan realized the hopes of Democrats and the fears of Republicans with
respect to the composition of the Texas congressional delegation. The 1990's were years of continued growth for the Texas
Republican Party, and by the end of the decade it was sweeping elections for statewide office. Nevertheless, despite carrying
59% of the vote in statewide elections in 2000, the Republicans only won 13 congressional seats to the Democrats' 17.
_Henderson, supra,_ at 763.

These events likely were not forgotten by either party when it came time to draw congressional districts in conformance with the
2000 census and to incorporate two additional seats for the Texas delegation. The Republican Party controlled the
governorship and the State Senate; it did not yet control the State House of Representatives, however. As so constituted, the
legislature was unable to pass a redistricting scheme, resulting in litigation and the necessity of a court-ordered plan to comply
with the Constitution's one-person, one-vote requirement. See _Balderas_ v. _Texas,_ Civ. Action No. 6:01CV158 (ED Tex., Nov.
14, 2001) _(per curiam),_ summarily aff'd, 536 U. S. 919 (2002), App. E to Juris. Statement in No. 05-276, p. 202a (hereinafter
412    _Balderas,_ App. E to *412 Juris. Statement), The congressional districting map resulting from the _Balderas_ litigation is known as
Plan 1151C.

As we have said, two members of the three-judge court that drew Plan 1151C later served on the three-judge court that issued
the judgment now under review. Thus we have the benefit of their candid comments concerning the redistricting approach
taken in the _Balderas_ litigation. Conscious that the primary responsibility for drawing congressional districts is given to political
branches of government, and hesitant to "und[o] the work of one political party for the benefit of another," the three-judge
_Balderas_ court sought to apply "only `neutral' redistricting standards" when drawing Plan 1151C. _Henderson,_ 399 F. Supp. 2d,
at 768. Once the District Court applied these principles—such as placing the two new seats in high-growth areas, following
county and voting precinct lines, and avoiding the pairing of incumbents—"the drawing ceased, leaving the map free of further
change except to conform it to one-person, one-vote." _Ibid._ Under Plan 1151C, the 2002 congressional elections resulted in a
17-to-15 Democratic majority in the Texas delegation, compared to a 59% to 40% Republican majority in votes for statewide

office in 2000. *Id.,* at 763-764. Reflecting on the *Balderas* Plan, the District Court in *Henderson* was candid to acknowledge "[t] he practical effect of this effort was to leave the 1991 Democratic Party gerrymander largely in place as a `legal' plan." 399 F. Supp. 2d, at 768.

The continuing influence of a court-drawn map that "perpetuated much of [the 1991] gerrymander," *ibid.,* was not lost on Texas Republicans when, in 2003, they gained control of the State House of Representatives and, thus, both houses of the legislature. The Republicans in the legislature "set out to increase their representation in the congressional delegation." *Session,* 298 F. Supp. 2d, at 471. See also *id.,* at 470 ("There is little question but that the single-minded purpose of the Texas

413    Legislature in enacting [a new plan] was to gain partisan advantage"). After a protracted partisan *413 struggle, during which Democratic legislators left the State for a time to frustrate quorum requirements, the legislature enacted a new congressional districting map in October 2003. It is called Plan 1374C. The 2004 congressional elections did not disappoint the plan's drafters. Republicans won 21 seats to the Democrats' 11, while also obtaining 58% of the vote in statewide races against the Democrats' 41%. *Henderson, supra,* at 764.

Soon after Texas enacted Plan 1374C, appellants challenged it in court, alleging a host of constitutional and statutory violations. Initially, the District Court entered judgment against appellants on all their claims. See *Session,* 298 F. Supp. 2d, at 457; *id.,* at 515 (Ward, J., concurring in part and dissenting in part). Appellants sought relief here and, after their jurisdictional statements were filed, this Court issued *Vieth* v. *Jubelirer.* Our order vacating the District Court judgment and remanding for consideration in light of *Vieth* was issued just weeks before the 2004 elections. See 543 U. S. 941 (Oct. 18, 2004). On remand, the District Court, believing the scope of its mandate was limited to questions of political gerrymandering, again rejected appellants' claims. *Henderson,* 399 F. Supp. 2d, at 777-778. Judge Ward would have granted relief under the theory—presented to the court for the first time on remand—that mid-decennial redistricting violates the one-person, one-vote requirement, but he concluded such an argument was not within the scope of the remand mandate. *Id.,* at 779, 784-785 (specially concurring).

## II

## A

Based on two similar theories that address the mid-decade character of the 2003 redistricting, appellants now argue that Plan

414    1374C should be invalidated as an unconstitutional partisan gerrymander. In *Davis* v. *Bandemer,* 478 U. S. 109 (1986), the Court held that an equal protection challenge to a political gerrymander presents a justiciable case or controversy, *414 *id.,* at 118-127, but there was disagreement over what substantive standard to apply. Compare *id.,* at 127-137 (plurality opinion), with *id.,* at 161-162 (Powell, J., concurring in part and dissenting in part). That disagreement persists. A plurality of the Court in *Vieth* would have held such challenges to be nonjusticiable political questions, but a majority declined to do so. See 541 U. S., at 306 (KENNEDY, J., concurring in judgment); *id.,* at 317 (STEVENS, J., dissenting); *id.,* at 343 (SOUTER, J., dissenting); *id.,* at 355 (BREYER, J., dissenting). We do not revisit the justiciability holding but do proceed to examine whether appellants' claims offer the Court a manageable, reliable measure of fairness for determining whether a partisan gerrymander violates the Constitution.

## B

Before addressing appellants' arguments on mid-decade redistricting, it is appropriate to note some basic principles on the roles the States, Congress, and the courts play in determining how congressional districts are to be drawn. Article I of the Constitution provides:

"Section 2. The House of Representatives shall be composed of Members chosen every second Year by the
People of the several States . . . .

. . . . .

"Section 4. The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in
each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations.
. . ."

This text, we have explained, "leaves with the States primary responsibility for apportionment of their federal congressional. . . districts." *Growe* v. *Emison*, 507 U. S. 25, 34 (1993); see also *Chapman* v. *Meier*, 420 U. S. 1, 27 (1975) ("[R]eapportionment is

415    primarily the duty and responsibility of the State through its legislature or other body"); *Smiley* \*415 v. *Holm*, 285 U. S. 355, 366-367 (1932) (reapportionment implicated State's powers under Art. I, § 4). Congress, as the text of the Constitution also provides, may set further requirements, and with respect to districting it has generally required single-member districts. See U. S. Const., Art. I, § 4; Pub. L. 90-196, 81 Stat. 581, 2 U. S. C. § 2c; *Branch* v. *Smith*, 538 U. S. 254, 266-267 (2003). But see *id.,* at 275 (plurality opinion) (multimember districts permitted by 55 Stat. 762, 2 U. S. C. § 2a(c) in limited circumstances). With respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, the Constitution and Congress state no explicit prohibition.

Although the legislative branch plays the primary role in congressional redistricting, our precedents recognize an important role for the courts when a districting plan violates the Constitution. See, *e. g., Wesberry* v. *Sanders*, 376 U. S. 1 (1964). This litigation is an example, as we have discussed. When Texas did not enact a plan to comply with the one-person, one-vote requirement under the 2000 census, the District Court found it necessary to draw a redistricting map on its own. That the federal courts sometimes are required to order legislative redistricting, however, does not shift the primary locus of responsibility.

> "Legislative bodies should not leave their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the `unwelcome obligation' of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise* v. *Lipscomb*, 437 U. S. 535, 540 (1978) (principal opinion) (quoting *Connor* v. *Finch*, 431 U. S. 407, 415 (1977)).

Quite apart from the risk of acting without a legislature's expertise, and quite apart from the difficulties a court faces in drawing

416    a map that is fair and rational, see *id.,* at 414-415, \*416 the obligation placed upon the Federal Judiciary is unwelcome because drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance. That Congress is the federal body explicitly given constitutional power over elections is also a noteworthy statement of preference for the democratic process. As the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts.

It should follow, too, that if a legislature acts to replace a court-drawn plan with one of its own design, no presumption of impropriety should attach to the legislative decision to act. As the District Court noted here, *Session*, 298 F. Supp. 2d, at 460-461, our decisions have assumed that state legislatures are free to replace court-mandated remedial plans by enacting redistricting plans of their own. See, *e. g., Upham* v. *Seamon*, 456 U. S. 37, 44 (1982) *(per curiam)*; *Wise, supra,* at 540 (principal opinion) (quoting *Connor, supra,* at 415); *Burns* v. *Richardson*, 384 U. S. 73, 85 (1966); *Reynolds* v. *Sims*, 377 U. S. 533, 587 (1964). Underlying this principle is the assumption that to prefer a court-drawn plan to a legislature's replacement would be contrary to the ordinary and proper operation of the political process. Judicial respect for legislative plans, however, cannot justify legislative reliance on improper criteria for districting determinations. With these considerations in mind, I now turn to consider appellants' challenges to the new redistricting plan.

## C

Appellants claim that Plan 1374C, enacted by the Texas Legislature in 2003, is an unconstitutional political gerrymander. A decision, they claim, to effect mid-decennial redistricting, when solely motivated by partisan objectives, violates equal protection

417    and the First Amendment because it \*417 serves no legitimate public purpose and burdens one group because of its political opinions and affiliation. The mid-decennial nature of the redistricting, appellants say, reveals the legislature's sole motivation. Unlike *Vieth*, where the legislature acted in the context of a required decennial redistricting, the Texas Legislature voluntarily replaced a plan that itself was designed to comply with new census data. Because Texas had "no constitutional obligation to act at all" in 2003, Brief for Appellant Jackson et al. in No. 05-276, p. 26, it is hardly surprising, according to appellants, that the District Court found "[t]here is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage" for the Republican majority over the Democratic minority, *Session, supra,* at 470.

A rule, or perhaps a presumption, of invalidity when a mid-decade redistricting plan is adopted solely for partisan motivations is a salutary one, in appellants' view, for then courts need not inquire about, nor parties prove, the discriminatory effects of partisan gerrymandering—a matter that has proved elusive since *Bandemer*. See *Vieth*, 541 U. S., at 281 (plurality opinion);

*Bandemer,* 478 U. S., at 127 (plurality opinion). Adding to the test's simplicity is that it does not quibble with the drawing of individual district lines but challenges the decision to redistrict at all.

For a number of reasons, appellants' case for adopting their test is not convincing. To begin with, the state appellees dispute the assertion that partisan gain was the "sole" motivation for the decision to replace Plan 1151C. There is some merit to that criticism, for the pejorative label overlooks indications that partisan motives did not dictate the plan in its entirety. The legislature does seem to have decided to redistrict with the sole purpose of achieving a Republican congressional majority, but partisan aims did not guide every line it drew. As the District Court found, the contours of some contested district lines were

418    drawn based *418 on more mundane and local interests. *Session, supra,* at 472-473. The state appellees also contend, and appellants do not contest, that a number of line-drawing requests by Democratic state legislators were honored. Brief for State Appellees 34.

Evaluating the legality of acts arising out of mixed motives can be complex, and affixing a single label to those acts can be hazardous, even when the actor is an individual performing a discrete act. See, *e. g., Hartman* v. *Moore,* 547 U. S. 250, 259-260 (2006). When the actor is a legislature and the act is a composite of manifold choices, the task can be even more daunting. Appellants' attempt to separate the legislature's sole motive for discarding Plan 1151C from the complex of choices it made while drawing the lines of Plan 1374C seeks to avoid that difficulty. We should be skeptical, however, of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted.

Even setting this skepticism aside, a successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights. For this reason, a majority of the Court rejected a test proposed in *Vieth* that is markedly similar to the one appellants present today. Compare 541 U. S., at 336 (STEVENS, J., dissenting) ("Just as race can be a factor in, but cannot dictate the outcome of, the districting process, so too can partisanship be a permissible consideration in drawing district lines, so long as it does not predominate"), and *id.,* at 338 ("[A]n acceptable rational basis can be neither purely personal nor purely partisan"), with *id.,* at 292-295 (plurality opinion), and *id.,* at 307-308 (KENNEDY, J., concurring in judgment).

The sole-intent standard offered here is no more compelling when it is linked to the circumstance that Plan 1374C is mid-

419    decennial legislation. The text and structure of the *419 Constitution and our case law indicate there is nothing inherently suspect about a legislature's decision to replace middecade a court-ordered plan with one of its own. And even if there were, the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders. Under appellants' theory, a highly effective partisan gerrymander that coincided with decennial redistricting would receive less scrutiny than a bumbling, yet solely partisan, mid-decade redistricting. More concretely, the test would leave untouched the 1991 Texas redistricting, which entrenched a party on the verge of minority status, while striking down the 2003 redistricting plan, which resulted in the majority Republican Party capturing a larger share of the seats. A test that treats these two similarly effective power plays in such different ways does not have the reliability appellants ascribe to it.

Furthermore, compared to the map challenged in *Vieth,* which led to a Republican majority in the congressional delegation despite a Democratic majority in the statewide vote, Plan 1374C can be seen as making the party balance more congruent to statewide party power. To be sure, there is no constitutional requirement of proportional representation, and equating a party's statewide share of the vote with its portion of the congressional delegation is a rough measure at best. Nevertheless, a congressional plan that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority. See *Gaffney* v. *Cummings,* 412 U. S. 735, 754 (1973). By this measure, Plan 1374C can be seen as fairer than the plan that survived in *Vieth* and the two previous Texas plans—all three of which would pass the modified sole-intent test that Plan 1374C would fail.

A brief for one of the *amici* proposes a symmetry standard that would measure partisan bias by "compar[ing] how both parties

420    would fare hypothetically if they each (in turn) had received a given percentage of the vote." Brief for Gary *420 King et al. 5. Under that standard the measure of a map's bias is the extent to which a majority party would fare better than the minority party, should their respective shares of the vote reverse. *Amici*'s proposed standard does not compensate for appellants' failure to provide a reliable measure of fairness. The existence or degree of asymmetry may in large part depend on conjecture about where possible vote-switchers will reside. Even assuming a court could choose reliably among different models of shifting voter preferences, we are wary of adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs. Presumably such a challenge could be litigated if and when the feared inequity arose. Cf. *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 148 (1967). More fundamentally, the counterfactual plaintiff would face the

same problem as the present, actual appellants: providing a standard for deciding how much partisan dominance is too much. Without altogether discounting its utility in redistricting planning and litigation, I would conclude asymmetry alone is not a reliable measure of unconstitutional partisanship.

In the absence of any other workable test for judging partisan gerrymanders, one effect of appellants' focus on middecade redistricting could be to encourage partisan excess at the outset of the decade, when a legislature redistricts pursuant to its decennial constitutional duty and is then immune from the charge of sole motivation. If mid-decade redistricting were barred or at least subject to close judicial oversight, opposition legislators would also have every incentive to prevent passage of a legislative plan and try their luck with a court that might give them a better deal than negotiation with their political rivals. See _Henderson_, 399 F. Supp. 2d, at 776-777.

## D

421 Appellants' second political gerrymandering theory is that mid-decade redistricting for exclusively partisan purposes *421 violates the one-person, one-vote requirement. They observe that population variances in legislative districts are tolerated only if they "are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." _Karcher_ v. _Daggett_, 462 U. S. 725, 730 (1983) (quoting _Kirkpatrick_ v. _Preisler_, 394 U. S. 526, 531 (1969); internal quotation marks omitted). Working from this unchallenged premise, appellants contend that, because the population of Texas has shifted since the 2000 census, the 2003 redistricting, which relied on that census, created unlawful interdistrict population variances.

To distinguish the variances in Plan 1374C from those of ordinary, 3-year-old districting plans or belatedly drawn court-ordered plans, appellants again rely on the voluntary, mid-decade nature of the redistricting and its partisan motivation. Appellants do not contend that a decennial redistricting plan would violate equal representation three or five years into the decade if the State's population had shifted substantially. As they must, they concede that States operate under the legal fiction that their plans are constitutionally apportioned throughout the decade, a presumption that is necessary to avoid constant redistricting, with accompanying costs and instability. See _Georgia_ v. _Ashcroft_, 539 U. S. 461, 488, n. 2 (2003); _Reynolds_, 377 U. S., at 583. Appellants agree that a plan implemented by a court in 2001 using 2000 population data also enjoys the benefit of the so-called legal fiction, presumably because belated court-drawn plans promote other important interests, such as ensuring a plan complies with the Constitution and voting rights legislation.

In appellants' view, however, this fiction should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan overriding a legal court-drawn plan, thus "'unnecessarily'" creating population variance "when there was no legal compulsion" to do so. Brief for Appellant Travis County et al. in No. 05-254, p. 18. This is particularly so, appellants say, when a

422 legislature acts because of an *422 exclusively partisan motivation. Under appellants' theory this improper motive at the outset seems enough to condemn the map for violating the equal-population principle. For this reason, appellants believe that the State cannot justify under _Karcher_ v. _Daggett_ the population variances in Plan 1374C because they are the product of partisan bias and the desire to eliminate all competitive districts.

As the District Court noted, this is a test that turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place. _Henderson, supra_, at 776. In that respect appellants' approach merely restates the question whether it was permissible for the Texas Legislature to redraw the districting map. Appellants' answer, which mirrors their attack on mid-decennial redistricting solely motivated by partisan considerations, is unsatisfactory for reasons we have already discussed.

Appellants also contend that the legislature intentionally sought to manipulate population variances when it enacted Plan 1374C. There is, however, no District Court finding to that effect, and appellants present no specific evidence to support this serious allegation of bad faith. Because appellants have not demonstrated that the legislature's decision to enact Plan 1374C constitutes a violation of the equal-population requirement, we find unavailing their subsidiary reliance on _Larios_ v. _Cox_, 300 F. Supp. 2d 1320 (ND Ga.) _(per curiam)_, summarily aff'd, 542 U. S. 947 (2004). In _Larios_, the District Court reviewed the Georgia Legislature's decennial redistricting of its State Senate and House of Representatives districts and found deviations from the equal-population requirement. The District Court then held the objectives of the drafters, which included partisan interests along with regionalist bias and inconsistent incumbent protection, did not justify those deviations. 300 F. Supp. 2d, at 1351-1352. The

423 _Larios_ holding and its examination of the legislature's motivations were relevant only in response to an *423 equal-population violation, something appellants have not established here. Even in addressing political motivation as a justification for an equal-population violation, moreover, _Larios_ does not give clear guidance. The panel explained it "need not resolve the issue of

whether or when partisan advantage alone may justify deviations in population" because the plans "plainly unlawful" and any partisan motivations were "bound up inextricably" with other clearly rejected objectives. *Id.,* at 1352.

In sum, we disagree with appellants' view that a legislature's decision to override a valid, court-drawn plan mid-decade is sufficiently suspect to give shape to a reliable standard for identifying unconstitutional political gerrymanders. We conclude that appellants have established no legally impermissible use of political classifications. For this reason, they state no claim on which relief may be granted for their statewide challenge.

## III

Plan 1374C made changes to district lines in south and west Texas that appellants challenge as violations of § 2 of the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment. The most significant changes occurred to District 23, which—both before and after the redistricting—covers a large land area in west Texas, and to District 25, which earlier included Houston but now includes a different area, a north-south strip from Austin to the Rio Grande Valley.

After the 2002 election, it became apparent that District 23 as then drawn had an increasingly powerful Latino population that threatened to oust the incumbent Republican, Henry Bonilla. Before the 2003 redistricting, the Latino share of the citizen voting-age population was 57.5%, and Bonilla's support among Latinos had dropped with each successive election since 1996.
424    *Session,* 298 F. Supp. 2d, at 488–489. In 2002, Bonilla captured only 8% of the Latino vote, *424 ibid.,* and 51.5% of the overall vote. Faced with this loss of voter support, the legislature acted to protect Bonilla's incumbency by changing the lines—and hence the population mix—of the district. To begin with, the new plan divided Webb County and the city of Laredo, on the Mexican border, that formed the county's population base. Webb County, which is 94% Latino, had previously rested entirely within District 23; under the new plan, nearly 100,000 people were shifted into neighboring District 28. *Id.,* at 489. The rest of the county, approximately 93,000 people, remained in District 23. To replace the numbers District 23 lost, the State added voters in counties comprising a largely Anglo, Republican area in central Texas. *Id.,* at 488. In the newly drawn district, the Latino share of the citizen voting-age population dropped to 46%, though the Latino share of the total votingage population remained just over 50%. *Id.,* at 489.

These changes required adjustments elsewhere, of course, so the State inserted a third district between the two districts to the east of District 23, and extended all three of them farther north. New District 25 is a long, narrow strip that winds its way from McAllen and the Mexican-border towns in the south to Austin, in the center of the State and 300 miles away. *Id.,* at 502. In between it includes seven full counties, but 77% of its population resides in split counties at the northern and southern ends. Of this 77%, roughly half reside in Hidalgo County, which includes McAllen, and half are in Travis County, which includes parts of Austin. *Ibid.* The Latinos in District 25, comprising 55% of the district's citizen voting-age population, are also mostly divided between the two distant areas, north and south. *Id.,* at 499. The Latino communities at the opposite ends of District 25 have divergent "needs and interests," *id.,* at 502, owing to "differences in socio-economic status, education, employment, health, and other characteristics," *id.,* at 512.

425    The District Court summed up the purposes underlying the redistricting in south and west Texas: "The change to *425 Congressional District 23 served the dual goal of increasing Republican seats in general and protecting Bonilla's incumbency in particular, with the additional political nuance that Bonilla would be reelected in a district that had a majority of Latino voting age population—although clearly not a majority of citizen voting age population and certainly not an effective voting majority." *Id.,* at 497. The goal in creating District 25 was just as clear: "[t]o avoid retrogression under § 5" of the Voting Rights Act given the reduced Latino voting strength in District 23. *Id.,* at 489.

## A

The question we address is whether Plan 1374C violates § 2 of the Voting Rights Act. A State violates § 2

"if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

The Court has identified three threshold conditions for establishing a § 2 violation: (1) the racial group is " '"sufficiently large and geographically compact to constitute a majority in a single-member district"'"; (2) the racial group is " '"politically cohesive"'"; and

(3) the majority "'vot[es] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.'"" _Johnson v. De Grandy,_ 512 U. S. 997, 1006-1007 (1994) (quoting _Growe,_ 507 U. S., at 40 (in turn quoting _Thornburg v. Gingles,_ 478 U. S. 30, 50-51 (1986))). These are the so-called _Gingles_ requirements.

426 If all three _Gingles_ requirements are established, the statutory text directs us to consider the "totality of circumstances" to determine whether members of a racial group *426 have less opportunity than do other members of the electorate. _De Grandy, supra,_ at 1011-1012; see also _Abrams v. Johnson,_ 521 U. S. 74, 91 (1997). The general terms of the statutory standard "totality of circumstances" require judicial interpretation. For this purpose, the Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies factors typically relevant to a § 2 claim, including:

> "the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . .; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." _Gingles, supra,_ at 44-45 (citing S. Rep. No. 97-417 (1982) (hereinafter Senate Report); pinpoint citations omitted).

Another relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area. _De Grandy, supra,_ at 1000.

427 *427 The District Court's determination whether the § 2 requirements are satisfied must be upheld unless clearly erroneous. See _Gingles, supra,_ at 78-79. Where "the ultimate finding of dilution" is based on "a misreading of the governing law," however, there is reversible error. _De Grandy, supra,_ at 1022.

## B

Appellants argue that the changes to District 23 diluted the voting rights of Latinos who remain in the district. Specifically, the redrawing of lines in District 23 caused the Latino share of the citizen voting-age population to drop from 57.5% to 46%. The District Court recognized that "Latino voting strength in Congressional District 23 is, unquestionably, weakened under Plan 1374C." _Session,_ 298 F. Supp. 2d, at 497. The question is whether this weakening amounts to vote dilution.

To begin the _Gingles_ analysis, it is evident that the second and third _Gingles_ preconditions—cohesion among the minority group and bloc voting among the majority population—are present in District 23. The District Court found "racially polarized voting" in south and west Texas, and indeed "throughout the State." _Session, supra,_ at 492-493. The polarization in District 23 was especially severe: 92% of Latinos voted against Bonilla in 2002, while 88% of non-Latinos voted for him. App. 134, Table 20 (expert Report of Allan J. Lichtman on Voting-Rights Issues in Texas Congressional Redistricting (Nov. 14, 2003) (hereinafter Lichtman Report)). Furthermore, the projected results in new District 23 show that the Anglo citizen voting-age majority will often, if not always, prevent Latinos from electing the candidate of their choice in the district. _Session, supra,_ at 496-497. For all these reasons, appellants demonstrated sufficient minority cohesion and majority bloc voting to meet the second and third _Gingles_ requirements.

428 The first _Gingles_ factor requires that a group be "sufficiently large and geographically compact to constitute a majority *428 in a single-member district." 478 U. S., at 50. Latinos in District 23 could have constituted a majority of the citizen voting-age population in the district, and in fact did so under Plan 1151C. Though it may be possible for a citizen votingage majority to lack real electoral opportunity, the Latino majority in old District 23 did possess electoral opportunity protected by § 2.

While the District Court stated that District 23 had not been an effective opportunity district under Plan 1151C, it recognized the district was "moving in that direction." _Session,_ 298 F. Supp. 2d, at 489. Indeed, by 2002 the Latino candidate of choice in District 23 won the majority of the district's votes in 13 out of 15 elections for statewide officeholders. _Id.,_ at 518 (Ward, J., concurring in part and dissenting in part). And in the congressional race, Bonilla could not have prevailed without some Latino support, limited though it was. State legislators changed District 23 specifically because they worried that Latinos would vote Bonilla out of office. _Id.,_ at 488.

Furthermore, to the extent the District Court suggested that District 23 was not a Latino opportunity district in 2002 simply because Bonilla prevailed, see *id.,* at 488, 495, it was incorrect. The circumstance that a group does not win elections does not resolve the issue of vote dilution. We have said that "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *De Grandy,* 512 U. S., at 1014, n. 11. In old District 23 the increase in Latino voter registration and overall population, *Session,* 298 F. Supp. 2d, at 523 (Ward, J., concurring in part and dissenting in part), the concomitant rise in Latino voting power in each successive election, the near-victory of the Latino candidate of choice in 2002, and the resulting threat to the Bonilla incumbency, were the very reasons that led the State to

429    redraw the district lines. Since the redistricting prevented the immediate success of the emergent Latino majority in District *429 23, there was a denial of opportunity in the real sense of that term.

Plan 1374C's version of District 23, by contrast, "is unquestionably not a Latino opportunity district." *Id.,* at 496. Latinos, to be sure, are a bare majority of the voting-age population in new District 23, but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship. This approach fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates. In sum, appellants have established that Latinos could have had an opportunity district in District 23 had its lines not been altered and that they do not have one now.

Considering the district in isolation, the three *Gingles* requirements are satisfied. The State argues, nonetheless, that it met its § 2 obligations by creating new District 25 as an offsetting opportunity district. It is true, of course, that "States retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw* v. *Hunt,* 517 U. S. 899, 917, n. 9 (1996) *(Shaw II)*. This principle has limits, though. The Court has rejected the premise that a State can always make up for the less-than-equal opportunity of some individuals by providing greater opportunity to others. See *id.,* at 917 ("The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State"). As set out below, these conflicting concerns are resolved by allowing the State to use one majority-minority district to compensate for the absence of another only when the racial group in each area had a § 2 right and both could not be accommodated.

As to the first *Gingles* requirement, it is not enough that appellants show the possibility of creating a majority-minority district that would include the Latinos in District 23. See *Shaw II, supra,* at 917, n. 9 (rejecting the idea that "a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown"). If the inclusion of the plaintiffs would

430    necessitate the exclusion *430 of others, then the State cannot be faulted for its choice. That is why, in the context of a challenge to the drawing of district lines, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy, supra,* at 1008.

The District Court found that the current plan contains six Latino opportunity districts and that seven reasonably compact districts could not be drawn. Appellant GI Forum presented a plan with seven majority-Latino districts, but the District Court found these districts were not reasonably compact, in part because they took in "disparate and distant communities." *Session, supra,* at 491-492, and n. 125. While there was some evidence to the contrary, the court's resolution of the conflicting evidence was not clearly erroneous.

A problem remains, though, for the District Court failed to perform a comparable compactness inquiry for Plan 1374C as drawn. *De Grandy* requires a comparison between a challenger's proposal and the "existing number of reasonably compact districts." 512 U. S., at 1008. To be sure, § 2 does not forbid the creation of a noncompact majority-minority district. *Bush* v. *Vera,* 517 U. S., at 999 (KENNEDY, J., concurring). The noncompact district cannot, however, remedy a violation elsewhere in the State. See *Shaw II, supra,* at 916 (unless "the district contains a `geographically compact' population" of the racial group, "where that district sits, `there neither has been a wrong nor can be a remedy'" (quoting *Growe,* 507 U. S., at 41)). Simply put, the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right. And since there is no § 2 right to a district that is not reasonably compact, see *Abrams,* 521 U. S., at 91-

431    92, the creation of a noncompact *431 district does not compensate for the dismantling of a compact opportunity district.

THE CHIEF JUSTICE claims compactness should be only a factor in the analysis, see *post,* at 507 (opinion concurring in part, concurring in judgment in part, and dissenting in part), but his approach comports neither with our precedents nor with the nature of the right established by § 2. *De Grandy* expressly stated that the first *Gingles* prong looks only to the number of "reasonably compact districts." 512 U. S., at 1008. *Shaw II,* moreover, refused to consider a noncompact district as a possible remedy for a § 2 violation. 517 U. S., at 916. It is true *Shaw II* applied this analysis in the context of a State's using compliance with § 2 as a defense to an equal protection challenge, but the holding was clear: A State cannot remedy a § 2 violation through the creation of a noncompact district. *Ibid. Shaw II* also cannot be distinguished based on the relative location of the remedial district as compared to the district of the alleged violation. The remedial district in *Shaw II* had a 20% overlap with the

district the plaintiffs sought, but the Court stated "[w]e do not think this degree of incorporation could mean [the remedial district] substantially addresses the § 2 violation." *Id.*, at 918; see also *De Grandy, supra*, at 1019 (expressing doubt about the idea that even within the same county, vote dilution in half the county could be compensated for in the other half). The overlap here is not substantially different, as the majority of Latinos who were in the old District 23 are still in the new District 23, but no longer have the opportunity to elect their candidate of choice.

Apart from its conflict with *De Grandy* and *Shaw II*, THE CHIEF JUSTICE's approach has the deficiency of creating a one-way rule whereby plaintiffs must show compactness but States need not (except, it seems, when using § 2 as a defense to an equal
432 protection challenge). THE CHIEF JUSTICE appears to accept that a plaintiff, to make out a § 2 violation, *432 must show he or she is part of a racial group that could form a majority in a reasonably compact district. *Post*, at 505. If, however, a noncompact district cannot make up for the lack of a compact district, then this is equally true whether the plaintiff or the State proposes the noncompact district.

The District Court stated that Plan 1374C created "six *Gingles* Latino" districts, *Session*, 298 F. Supp. 2d, at 498, but it failed to decide whether District 25 was reasonably compact for § 2 purposes. It recognized there was a 300-mile gap between the Latino communities in District 25, and a similarly large gap between the needs and interests of the two groups. *Id.*, at 502. After making these observations, however, it did not make any finding about compactness. *Id.*, at 502-504. It ruled instead that, despite these concerns, District 25 would be an effective Latino opportunity district because the combined voting strength of both Latino groups would allow a Latino-preferred candidate to prevail in elections. *Ibid.* The District Court's general finding of effectiveness cannot substitute for the lack of a finding on compactness, particularly because the District Court measured effectiveness simply by aggregating the voting strength of the two groups of Latinos. *Id.*, at 503-504. Under the District Court's approach, a district would satisfy § 2 no matter how noncompact it was, so long as all the members of a racial group, added together, could control election outcomes.

The District Court did evaluate compactness for the purpose of deciding whether race predominated in the drawing of district lines. The Latinos in the Rio Grande Valley and those in Central Texas, it found, are "disparate communities of interest," with "differences in socio-economic status, education, employment, health, and other characteristics." *Id.*, at 512. The court's conclusion that the relative smoothness of the district lines made the district compact, despite this combining of discrete
433 communities of interest, is inapposite *433 because the court analyzed the issue only for equal protection purposes. In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller* v. *Johnson*, 515 U. S. 900, 916-917 (1995). Under § 2, by contrast, the injury is vote dilution, so the compactness inquiry embraces different considerations. "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *Vera*, 517 U. S., at 997 (KENNEDY, J., concurring); see also *Abrams*, 521 U. S., at 111 (BREYER, J., dissenting) (compactness to show a violation of equal protection, "which concerns the shape or boundaries of a district, differs from § 2 compactness, which concerns a minority group's compactness"); *Shaw II, supra*, at 916 (the inquiry under § 2 is whether "the minority group is geographically compact" (internal quotation marks omitted)).

While no precise rule has emerged governing § 2 compactness, the "inquiry should take into account `traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams, supra*, at 92 (quoting *Vera*, 517 U. S., at 977 (plurality opinion)); see also *id.*, at 979 (A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact). The recognition of noncompact communities of interest reflects the principle that a State may not "assum[e] from a group of voters' race that they `think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller, supra*, at 920 (quoting *Shaw* v. *Reno*, 509 U. S. 630, 647 (1993)). In the absence of this prohibited assumption, there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates. "The purpose of
434 the Voting Rights Act is to prevent discrimination in *434 the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia* v. *Ashcroft*, 539 U. S., at 490; cf. *post*, at 511 (opinion of ROBERTS, C. J.). We do a disservice to these important goals by failing to account for the differences between people of the same race.

While the District Court recognized the relevant differences, by not performing the compactness inquiry, it failed to account for the significance of these differences under § 2. In these cases the District Court's findings regarding the different characteristics, needs, and interests of the Latino community near the Mexican border and the one in and around Austin are well supported and uncontested. Legitimate yet differing communities of interest should not be disregarded in the interest of race. The practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals. Compactness is, therefore, about more than "style points," *post*, at 494 (opinion of ROBERTS, C. J.); it is critical to advancing the ultimate purposes of § 2, ensuring minority groups equal "opportunity . . . to

participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b). (And if it were just about style points, it is difficult to understand why a plaintiff would have to propose a compact district to make out a § 2 claim.) As witnesses who know the south and west Texas culture and politics testified, the districting in Plan 1374C "could make it more difficult for thinly financed Latino-preferred candidates to achieve electoral success and to provide adequate and responsive representation once elected." _Session_, 298 F. Supp. 2d, at 502; see also _id.,_ at 503 (Elected officials from the region "testified that the size and diversity of the newly-configured districts could make it more difficult for the constituents in the Rio Grande Valley to control election outcomes"). We do not question the District Court's finding that the groups' combined voting strength would enable *435 them to elect a candidate each prefers to the Anglos' candidate of choice. We also accept that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity. See _Abrams, supra,_ at 111-112 (BREYER, J., dissenting). When, however, the only common index is race and the result will be to cause internal friction, the State cannot make this a remedy for a § 2 violation elsewhere. We emphasize it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for § 2 purposes. The mathematical possibility of a racial bloc does not make a district compact.

Since District 25 is not reasonably compact, Plan 1374C contains only five reasonably compact Latino opportunity districts. Plan 1151C, by contrast, created six such districts. The District Court did not find, and the State does not contend, that any of the Latino opportunity districts in Plan 1151C are noncompact. Contrary to THE CHIEF JUSTICE's suggestion, _post,_ at 501, moreover, the Latino population in old District 23 is, for the most part, in closer geographic proximity than is the Latino population in new District 25. More importantly, there has been no contention that different pockets of the Latino population in old District 23 have divergent needs and interests, and it is clear that, as set out below, the Latino population of District 23 was split apart particularly because it was becoming so cohesive. The Latinos in District 23 had found an efficacious political identity, while this would be an entirely new and difficult undertaking for the Latinos in District 25, given their geographic and other differences.

Appellants have thus satisfied all three _Gingles_ requirements as to District 23, and the creation of new District 25 does not remedy the problem.

*436 **C**

We proceed now to the totality of the circumstances, and first to the proportionality inquiry, comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population. As explained in _De Grandy,_ proportionality is "a relevant fact in the totality of circumstances." 512 U. S., at 1000. It does not, however, act as a "safe harbor" for States in complying with § 2. _Id.,_ at 1017-1018; see also _id.,_ at 1025 (O'Connor, J., concurring) (proportionality "is _always_ relevant evidence in determining vote dilution, but is _never_ itself dispositive"); _id.,_ at 1027-1028 (KENNEDY, J., concurring in part and concurring in judgment) (proportionality has "some relevance," though "placing undue emphasis upon proportionality risks defeating the goals underlying the Voting Rights Act"). If proportionality could act as a safe harbor, it would ratify "an unexplored premise of highly suspect validity: that in any given voting jurisdiction . . ., the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class." _Id.,_ at 1019; see also _Shaw II,_ 517 U. S., at 916-918.

The State contends that proportionality should be decided on a regional basis, while appellants say their claim requires the Court to conduct a statewide analysis. In _De Grandy,_ the plaintiffs "passed up the opportunity to frame their dilution claim in statewide terms." 512 U. S., at 1022. Based on the parties' apparent agreement that the proper frame of reference was the Dade County area, the Court used that area to decide proportionality. _Id.,_ at 1022-1023. In these cases, on the other hand, appellants allege an "injury to African American and Hispanic voters throughout the State." Complaint in Civ. Action No. 03C-356 (ED Tex.), pp. 1-2; see also First Amended Complaint in Civ. Action No. 2:03-354 (ED Tex.), pp. 1, 5, 7; Plaintiff's First Amended Complaint in Civ. Action No. 2:03cv354 etc. (ED Tex.), pp. 4-5. The District Court, moreover, expressly considered the statewide *437 proportionality argument. As a result, the question of the proper geographic scope for assessing proportionality now presents itself.

We conclude the answer in these cases is to look at proportionality statewide. The State contends that the seven districts in south and west Texas correctly delimit the boundaries for proportionality because that is the only area of the State where reasonably compact Latino opportunity districts can be drawn. This argument, however, misunderstands the role of proportionality. We have already determined, under the first _Gingles_ factor, that another reasonably compact Latino district can

be drawn. The question now is whether the absence of that additional district constitutes impermissible vote dilution. This inquiry requires an "'intensely local appraisal'" of the challenged district. *Gingles, supra,* at 79 (quoting *Rogers* v. *Lodge,* 458 U. S. 613, 622 (1982)); see also *Gingles, supra,* at 101 (O'Connor, J., concurring in judgment). A local appraisal is necessary because the right to an undiluted vote does not belong to the "minority as a group," but rather to "its individual members." *Shaw II, supra,* at 917. And a State may not trade off the rights of some members of a racial group against the rights of other members of that group. See *De Grandy, supra,* at 1019; *Shaw II, supra,* at 916-918. The question is therefore not "whether line-drawing in the challenged area as a whole dilutes minority voting strength," *post,* at 504 (opinion of ROBERTS, C. J.), but whether line-drawing dilutes the voting strength of the Latinos in District 23.

438    The role of proportionality is not to displace this local appraisal or to allow the State to trade off the rights of some against the rights of others. Instead, it provides some evidence of whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation." 42 U. S. C. § 1973(b). For this purpose, the State's seven-district area is arbitrary. It just as easily could have included six or eight districts. Appellants *438 have alleged statewide vote dilution based on a statewide plan, so the electoral opportunities of Latinos across the State can bear on whether the lack of electoral opportunity for Latinos in District 23 is a consequence of Plan 1374C's redrawing of lines or simply a consequence of the inevitable "win some, lose some" in a State with racial bloc voting. Indeed, several of the other factors in the totality of circumstances have been characterized with reference to the State as a whole. *Gingles, supra,* at 44-45 (listing Senate Report factors). Particularly given the presence of racially polarized voting—and the possible submergence of minority votes—throughout Texas, it makes sense to use the entire State in assessing proportionality.

Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total, while Latinos make up 22% of Texas' citizen voting-age population. (Appellant GI Forum claims, based on data from the 2004 American Community Survey of the U. S. Census Bureau, that Latinos constitute 24.5% of the statewide citizen voting-age population, but as this figure was neither available at the time of the redistricting, nor presented to the District Court, we accept the District Court's finding of 22%.) Latinos are, therefore, two districts shy of proportional representation. There is, of course, no "magic parameter," *De Grandy,* 512 U. S., at 1017, n. 14, and "rough proportionality," *id.,* at 1023, must allow for some deviations. We need not decide whether the two-district deficit in these cases weighs in favor of a § 2 violation. Even if Plan 1374C's disproportionality were deemed insubstantial, that consideration would not overcome the other evidence of vote dilution for Latinos in District 23. "[T]he degree of probative value assigned to proportionality may vary with other facts," *id.,* at 1020, and the other facts in these cases convince us that there is a § 2 violation.

439    District 23's Latino voters were poised to elect their candidate of choice. They were becoming more politically active, *439 with a marked and continuous rise in Spanish-surnamed voter registration. See Lichtman Report, App. 142-143. In successive elections Latinos were voting against Bonilla in greater numbers, and in 2002 they almost ousted him. Webb County in particular, with a 94% Latino population, spurred the incumbent's near defeat with dramatically increased turnout in 2002. See 2004 Almanac 1579. In response to the growing participation that threatened Bonilla's incumbency, the State divided the cohesive Latino community in Webb County, moving about 100,000 Latinos to District 28, which was already a Latino opportunity district, and leaving the rest in a district where they now have little hope of electing their candidate of choice.

The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. Cf. *De Grandy, supra,* at 1014 (finding no § 2 violation where "the State's scheme would thwart the historical tendency to exclude Hispanics, not encourage or perpetuate it"); *White* v. *Regester,* 412 U. S. 755, 769 (1973) (looking in the totality of the circumstances to whether the proposed districting would "remedy the effects of past and present discrimination against Mexican-Americans, and to bring the community into the full stream of political life of the county and State by encouraging their further registration, voting, and other political activities" (citation and internal quotation marks omitted)). The District Court recognized "the long history of discrimination against Latinos and Blacks in Texas," *Session,* 298 F. Supp. 2d, at 473, and other courts have elaborated on this history with respect to electoral processes:

440    "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and *440 restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions." *Vera* v. *Richards,* 861 F. Supp. 1304, 1317 (SD Tex. 1994) (citations omitted).

See also *Vera*, 517 U. S., at 981-982 (plurality opinion); *Regester, supra*, at 767-769. In addition, the "political, social, and economic legacy of past discrimination" for Latinos in Texas, *Session, supra*, at 492, may well "hinder their ability to participate effectively in the political process," *Gingles*, 478 U. S., at 45 (citing Senate Report factors).

Against this background, the Latinos' diminishing electoral support for Bonilla indicates their belief he was "unresponsive to the particularized needs of the members of the minority group." *Ibid.* (same). In essence the State took away the Latinos' opportunity because Latinos were about to exercise it. This bears the mark of intentional discrimination that could give rise to an equal protection violation. Even if we accept the District Court's finding that the State's action was taken primarily for political, not racial, reasons, *Session, supra*, at 508, the redrawing of the district lines was damaging to the Latinos in District 23. The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active, dividing them with a district line through the middle of Laredo.

Furthermore, the reason for taking Latinos out of District 23, according to the District Court, was to protect Congressman Bonilla from a constituency that was increasingly voting against him. The Court has noted that incumbency protection *441 can be a legitimate factor in districting, see *Karcher* v. *Daggett*, 462 U. S., at 740, but experience teaches that incumbency protection can take various forms, not all of them in the interests of the constituents. If the justification for incumbency protection is to keep the constituency intact so the officeholder is accountable for promises made or broken, then the protection seems to accord with concern for the voters. If, on the other hand, incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. By purposely redrawing lines around those who opposed Bonilla, the state legislature took the latter course. This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters. See *Gingles, supra*, at 45 (citing Senate Report factor of whether "the policy underlying" the State's action "is tenuous"). The policy becomes even more suspect when considered in light of evidence suggesting that the State intentionally drew District 23 to have a nominal Latino voting-age majority (without a citizen voting-age majority) for political reasons. *Session, supra*, at 497. This use of race to create the facade of a Latino district also weighs in favor of appellants' claim.

Contrary to THE CHIEF JUSTICE's suggestion that we are reducing the State's needed flexibility in complying with § 2, see *post*, at 506, the problem here is entirely of the State's own making. The State chose to break apart a Latino opportunity district to protect the incumbent congressman from the growing dissatisfaction of the cohesive and politically active Latino community in the district. The State then purported to compensate for this harm by creating an entirely new district that combined two groups of Latinos, hundreds of miles apart, that represent different communities of interest. Under § 2, the State must be held accountable for the effect of these choices in denying equal opportunity *442 to Latino voters. Notwithstanding these facts, THE CHIEF JUSTICE places great emphasis on the District Court's statement that "new District 25 is `a more effective Latino opportunity district than Congressional District 23 had been.'" *Post*, at 493 (quoting *Session*, 298 F. Supp. 2d, at 503). Even assuming this statement, expressed in the context of summarizing witnesses' testimony, qualifies as a finding of the District Court, two points make it of minimal relevance. First, as previously noted, the District Court measured the effectiveness of District 25 without accounting for the detrimental consequences of its compactness problems. Second, the District Court referred only to how effective District 23 "had been," not to how it would operate today, a significant distinction given the growing Latino political power in the district.

Based on the foregoing, the totality of the circumstances demonstrates a § 2 violation. Even assuming Plan 1374C provides something close to proportional representation for Latinos, its troubling blend of politics and race—and the resulting vote dilution of a group that was beginning to achieve § 2's goal of overcoming prior electoral discrimination—cannot be sustained.

## D

Because we hold Plan 1374C violates § 2 in its redrawing of District 23, we do not address appellants' claims that the use of race and politics in drawing that district violates the First Amendment and equal protection. We also need not confront appellants' claim of an equal protection violation in the drawing of District 25. The districts in south and west Texas will have to be redrawn to remedy the violation in District 23, and we have no cause to pass on the legitimacy of a district that must be changed. See *Session*, 298 F. Supp. 2d, at 528 (Ward, J., concurring in part and dissenting in part). District 25, in particular, was formed to compensate for the loss of District 23 as a Latino opportunity district, and there is no reason to believe District 25 will remain *443 in its current form once District 23 is brought into compliance with § 2. We therefore vacate the District Court's judgment as to these claims.

**IV**

Appellants also challenge the changes to district lines in the Dallas area, alleging they dilute African-American voting strength in violation of § 2 of the Voting Rights Act. Specifically, appellants contend that an African-American minority effectively controlled District 24 under Plan 1151C, and that § 2 entitles them to this district.

Before Plan 1374C was enacted, District 24 had elected Anglo Democrat Martin Frost to Congress in every election since 1978. *Id.,* at 481-482. Anglos were the largest racial group in the district, with 49.8% of the citizen voting-age population, and third largest were Latinos, with 20.8%. State's Exh. 57, App. 339. African-Americans were the second-largest group, with 25.7% of the citizen voting-age population, *ibid.,* and they voted consistently for Frost. The new plan broke apart this racially diverse district, assigning its pieces into several other districts.

Accepting that African-Americans would not be a majority of the single-member district they seek, and that African-Americans do not vote cohesively with Hispanics, *Session, supra,* at 484, appellants nonetheless contend African-Americans had effective control of District 24. As the Court has done several times before, we assume for purposes of this litigation that it is possible to state a § 2 claim for a racial group that makes up less than 50% of the population. See *De Grandy,* 512 U. S., at 1009; *Voinovich* v. *Quilter,* 507 U. S. 146, 154 (1993); *Gingles,* 478 U. S., at 46-47, n. 12. Even on the assumption that the first *Gingles* prong can accommodate this claim, however, appellants must show they constitute "a sufficiently large minority to elect their candidate of choice with the assistance of cross-over votes." *Voinovich, supra,* at 158 (emphasis deleted).

444  *444 The relatively small African-American population can meet this standard, according to appellants, because its members constituted 64% of the voters in the Democratic primary. Since a significant number of Anglos and Latinos voted for the Democrat in the general election, the argument goes, African-American control of the primary translated into effective control of the entire election.

The District Court found, however, that African-Americans could not elect their candidate of choice in the primary. In support of this finding, it relied on testimony that the district was drawn for an Anglo Democrat, the fact that Frost had no opposition in any of his primary elections since his incumbency began, and District 24's demographic similarity to another district where an African-American candidate failed when he ran against an Anglo. *Session,* 298 F. Supp. 2d, at 483-484. "In short, that Anglo Democrats control this district is," according to the District Court, "the most rational conclusion." *Id.,* at 484.

Appellants fail to demonstrate clear error in this finding. In the absence of any contested Democratic primary in District 24 over the last 20 years, no obvious benchmark exists for deciding whether African-Americans could elect their candidate of choice. The fact that African-Americans voted for Frost—in the primary and general elections—could signify he is their candidate of choice. Without a contested primary, however, it could also be interpreted to show (assuming racial bloc voting) that Anglos and Latinos would vote in the Democratic primary in greater numbers if an African-American candidate of choice were to run, especially given Texas' open primary system. The District Court heard trial testimony that would support both explanations, and we cannot say that it erred in crediting the testimony that endorsed the latter interpretation. Compare App. 242-243 (testimony of Tarrant County Precinct Administrator that Frost is the "favored candidate of the African-American community" and that he has gone unopposed in primary challenges *445 because he "serves [the African-American community's] interests") with *id.,* at 262-264 (testimony of Congresswoman Eddie Bernice Johnson that District 24 was drawn for an Anglo Democrat (Martin Frost, in particular) in 1991 by splitting a minority community), and *id.,* at 277-280 (testimony of State Representative Ron Wilson that African-Americans did not have the ability to elect their preferred candidate, particularly an African-American candidate, in District 24 and that Anglo Democrats in such "influence [d]istricts" were not fully responsive to the needs of the African-American community).

445

The analysis submitted by appellants' own expert was also inconsistent. Of the three elections for statewide office he examined, in District 24 the African-American candidate of choice would have won one, lost one, and in the third the African-American vote was split. See Lichtman Report, *id.,* at 75-76, 92-96; State's Exh. 20 in Civ. Action No. 2:03-CV-354 (ED Tex.), p. 138; State's Exh. 21 in Civ. Action No. 2:03-CV-354 (ED Tex.). The District Court committed no clear error in rejecting this questionable showing that African-Americans have the ability to elect their candidate of choice in favor of other evidence that an African-American candidate of choice would not prevail. See *Anderson* v. *Bessemer City,* 470 U. S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

That African-Americans had influence in the district, *Session, supra,* at 485, does not suffice to state a § 2 claim in these cases. The opportunity "to elect representatives of their choice," 42 U. S. C. § 1973(b), requires more than the ability to influence the outcome between some candidates, none of whom is their candidate of choice. There is no doubt African-Americans preferred

Martin Frost to the Republicans who opposed him. The fact that African-Americans preferred Frost to some others does not, however, make him *446 their candidate of choice. Accordingly, the ability to aid in Frost's election does not make the old District 24 an African-American opportunity district for purposes of § 2. If § 2 were interpreted to protect this kind of influence, it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions. See _Georgia_ v. _Ashcroft_, 539 U. S., at 491 (KENNEDY, J., concurring).

446

Appellants respond by pointing to _Georgia_ v. _Ashcroft_, where the Court held that the presence of influence districts is a relevant consideration under § 5 of the Voting Rights Act. The inquiry under § 2, however, concerns the opportunity "to elect representatives of their choice," 42 U. S. C. § 1973(b), not whether a change has the purpose or effect of "denying or abridging the right to vote," § 1973c. _Ashcroft_ recognized the differences between these tests, 539 U. S., at 478, and concluded that the ability of racial groups to elect candidates of their choice is only one factor under § 5, _id.,_ at 480. So while the presence of districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process" is relevant to the § 5 analysis, _id.,_ at 482, the lack of such districts cannot establish a § 2 violation. The failure to create an influence district in these cases thus does not run afoul of § 2 of the Voting Rights Act.

Appellants do not raise a district-specific political gerrymandering claim against District 24. Even if the claim were cognizable as part of appellants' statewide challenge, it would be unpersuasive. Just as for the statewide claim, appellants would lack any reliable measure of partisan fairness. JUSTICE STEVENS suggests the burden on representational rights can be measured by comparing the success of Democrats in old District 24 with their success in the new districts they now occupy. _Post,_ at 475-476 (opinion concurring in part and dissenting in part). There is no reason, however, why the old district has any special claim to fairness. In fact, old District 24, no less than the old redistricting plan *447 a whole, was formed for partisan reasons. See _Session,_ 298 F. Supp. 2d, at 484; see also _Balderas,_ App. E to Juris. Statement 208a. Furthermore, JUSTICE STEVENS' conclusion that the State has not complied with § 5 of the Voting Rights Act, _post,_ at 478-481—effectively overruling the Attorney General without briefing, argument, or a lower court opinion on the issue—does not solve the problem of determining a reliable measure of impermissible partisan effect.

447

* * *

We reject the statewide challenge to Texas' redistricting as an unconstitutional political gerrymander and the challenge to the redistricting in the Dallas area as a violation of § 2 of the Voting Rights Act. We do hold that the redrawing of lines in District 23 violates § 2 of the Voting Rights Act. The judgment of the District Court is affirmed in part, reversed in part, and vacated in part, and the cases are remanded for further proceedings.

It is so ordered.

JUSTICE STEVENS, with whom JUSTICE BREYER joins as to Parts I and II, concurring in part and dissenting in part.

This is a suit in which it is perfectly clear that judicially manageable standards enable us to decide the merits of a statewide challenge to a political gerrymander. Applying such standards, I shall explain why the wholly unnecessary replacement of the neutral plan fashioned by the three-judge court in _Balderas_ v. _Texas,_ Civ. Action No. 6:01CV158 (ED Tex., Nov. 14, 2001) _(per curiam)_ (Plan 1151C or _Balderas_ Plan) with Plan 1374C, which creates districts with less compact shapes, violates the Voting Rights Act of 1965, and fragments communities of interest—all for purely partisan purposes—violated the State's constitutional duty to govern impartially. Prior misconduct by the Texas Legislature neither excuses nor justifies that violation. Accordingly, while I join the Court's decision to invalidate District 23, I *448 would hold that Plan 1374C is entirely invalid and direct the District Court to reinstate Plan 1151C. Moreover, as I shall explain, even if the remainder of the plan were valid, the cracking of _Balderas_ District 24 would still be unconstitutional.

448

I

The maintenance of existing district boundaries is advantageous to both voters and candidates. Changes, of course, must be made after every census to equalize the population of each district or to accommodate changes in the size of a State's congressional delegation. Similarly, changes must be made in response to a finding that a districting plan violates § 2 or § 5 of the Voting Rights Act, 42 U. S. C. §§ 1973, 1973c. But the interests in orderly campaigning and voting, as well as in maintaining communication between representatives and their constituents, underscore the importance of requiring that any decision to redraw district boundaries—like any other state action that affects the electoral process—must, at the very least, serve some legitimate governmental purpose. See, _e. g., Burdick_ v. _Takushi,_ 504 U. S. 428, 434, 440 (1992); _id.,_ at 448-450 (KENNEDY, J.,

joined by Blackmun and STEVENS, JJ., dissenting). A purely partisan desire "to minimize or cancel out the voting strength of racial or political elements of the voting population," _Fortson_ v. _Dorsey_, 379 U. S. 433, 439 (1965), is not such a purpose. Because a desire to minimize the strength of Texas Democrats was the sole motivation for the adoption of Plan 1374C, see _Session_ v. _Perry_, 298 F. Supp. 2d 451, 470, 472 (ED Tex. 2004) _(per curiam)_, the plan cannot withstand constitutional scrutiny.

449    The districting map that Plan 1374C replaced, Plan 1151C, was not only manifestly fair and neutral, it may legitimately be described as a milestone in Texas' political history because it put an end to a long history of Democratic misuse of power in that State. For decades after the Civil War, the political party associated with the former Commander in *449 Chief of the Union Army attracted the support of former slaves and a handful of "carpetbaggers," but had no significant political influence in Texas. The Democrats maintained their political power by excluding black voters from participating in primary elections, see, _e. g._, _Smith_ v. _Allwright_, 321 U. S. 649, 656-661 (1944), by the artful management of multimember electoral schemes, see, _e. g._, _White_ v. _Regester_, 412 U. S. 755, 765-770 (1973), and, most recently, by outrageously partisan gerrymandering, see _ante_, at 410-411 (opinion of KENNEDY, J.); _Bush_ v. _Vera_, 517 U. S. 952, 987-990 (1996) (appendices in plurality opinion), _id._, at 1005-1007, 1042-1045 (STEVENS, J., dissenting). Unfortunately, some of these tactics are not unique to Texas Democrats; the apportionment scheme they devised in the 1990's is only one example of the excessively gerrymandered districting plans that parties with control of their States' governing bodies have implemented in recent years. See, _e. g._, _Cox_ v. _Larios_, 542 U. S. 947, 947-950 (2004) (STEVENS, J., joined by BREYER, J., concurring) (Democratic gerrymander in Georgia); _Vieth_ v. _Jubelirer_, 541 U. S. 267, 272 (2004) (plurality opinion); _id._, at 342 (STEVENS, J., dissenting) (Republican gerrymander in Pennsylvania); _Karcher_ v. _Daggett_, 462 U. S. 725, 744 (1983) (Democratic gerrymander in New Jersey); _Badham_ v. _Eu_, 694 F. Supp. 664, 666 (ND Cal. 1988), summarily aff'd, 488 U. S. 1024 (1989) (Democratic gerrymander in California).

Despite the Texas Democratic Party's sordid history of manipulating the electoral process to perpetuate its stranglehold on political power, the Texas Republican Party managed to become the State's majority party by 2002. If, after finally achieving political strength in Texas, the Republicans had adopted a new plan in order to remove the excessively partisan Democratic gerrymander of the 1990's, the decision to do so would unquestionably have been supported by a neutral justification. But that

450    is not what happened. Instead, as the following discussion of the relevant events that *450 transpired in Texas following the release of the 2000 census data demonstrates, Texas Republicans abandoned a neutral apportionment map for the sole purpose of manipulating district boundaries to maximize their electoral advantage and thus create their own impermissible stranglehold on political power.

By 2001, Texas Republicans had overcome many of the aforementioned tactics designed to freeze the Democrats' status as the State's dominant party, and Republicans controlled the governorship and the State Senate. Democrats, however, continued to constitute a majority of the State House of Representatives. In March of that year, the results of the 2000 decennial census revealed that, as a result of its population growth, Texas was entitled to two additional seats in the United States House of Representatives, bringing the State's Texas congressional delegation to 32. Texas, therefore, was required to draw 32 equipopulous districts to account for its additional representation and to comply with the one-person, one-vote mandate of Article I, § 2, see, _e. g._, _Karcher_, 462 U. S. 725. Under Texas law, the Texas Legislature was required to draw these new districts. See _Session_, 298 F. Supp. 2d, at 457-458.

The Texas Legislature, divided between a Republican Senate and a Democratic House, did not reach agreement on a new congressional map in the regular legislative session, and Governor Rick Perry declined to call a special session. Litigation in the Texas state courts also failed to result in a plan, as the Texas Supreme Court vacated the map created by a state judge. See _Perry_ v. _Del Rio_, 67 S. W. 3d 85 (2001). This left a three-judge Federal District Court in the Eastern District of Texas with "'the unwelcome obligation of performing in the legislature's stead.'" _Balderas_ v. _Texas_, Civ. Action No. 6:01CV158 (Nov. 14, 2001) _(per curiam)_, App. E to Juris. Statement in No. 05-276, p. 202a (hereinafter App. to Juris. Statement) (quoting _Connor_ v. _Finch_, 431 U. S. 407, 415 (1977)).

451    *451 After protracted proceedings, which included the testimony of an impartial expert as well as representatives of interested groups supporting different plans, the court prepared its own plan. "Conscious that the primary responsibility for drawing congressional districts is given to political branches of government, and hesitant to 'und[o] the work of one political party for the benefit of another,' the three-judge _Balderas_ court sought to apply 'only "neutral" redistricting standards' when drawing Plan 1151C." _Ante_, at 412 (opinion of KENNEDY, J.) (quoting _Henderson_ v. _Perry_, 399 F. Supp. 2d 756, 768 (ED Tex. 2005)). As the court explained, it started with a blank map of Texas, drew in the existing districts protected by the Voting Rights Act, located the new Districts 31 and 32 where the population growth that produced them had occurred, and then applied the neutral criteria of "compactness, contiguity, and respecting county and municipal boundaries." App. to Juris. Statement 205a. See _id._, at 206a-209a. The District Court purposely "eschewed an effort to treat old lines as an independent locator," and concluded that its plan had done much "to end most of the below-the-surface 'ripples' of the 1991 plan and the myriad of

submissions before us. For example, the patently irrational shapes of Districts 5 and 6 under the 1991 plan, widely cited as the most extreme but successful gerrymandering in the country, are no more." *Id.,* at 207a-208a.

At the conclusion of this process, the court believed that it had fashioned a map that was "likely to produce a congressional delegation roughly proportional to the party voting breakdown across the state." *Id.,* at 209a. Indeed, reflecting the growing strength of the Republican Party, the District Court's plan, Plan 1151C, offered that party an advantage in 20 of the 32 congressional seats. See *Session,* <u>298 F. Supp. 2d, at 471</u> (describing Plan 1151C). The State's expert in this litigation testified that the *Balderas* Plan was not biased in favor of Democrats and that it was "[m]aybe slightly" biased in favor of Republicans.

452     App. 224 (deposition *452 of Ronald Keith Gaddie, Ph.D.). Although groups of Latino voters challenged Plan 1151C on appeal, neither major political party did so, and the State of Texas filed a motion asking this Court to affirm the District Court's judgment, which we did, <u>*Balderas* v. *Texas,* 536 U. S. 919 (2002).</u>

In the 2002 congressional elections, however, Republicans were not able to capitalize on the advantage that the *Balderas* Plan had provided them. A number of Democratic incumbents were able to attract the votes of ticket-splitters (individuals who voted for candidates from one party in statewide elections and for a candidate from a different party in congressional elections), and thus won elections in some districts that favored Republicans. As a result, Republicans carried only 15 of the districts drawn by the *Balderas* court.[1]

While the Republicans did not do as well as they had hoped in elections for the United States House of Representatives, they made gains in the Texas House of Representatives and won a majority of seats in that body. This gave Texas Republicans control over both bodies of the state legislature, as well as the Governor's mansion, for the first time since Reconstruction.

453     With full control of the State's legislative and executive branches, the Republicans "decided to redraw the state's *453 congressional districts solely for the purpose of seizing between five and seven seats from Democratic incumbents." *Session,* <u>298 F. Supp. 2d, at 472</u> (internal quotation marks omitted). According to former Lieutenant Governor Bill Ratliff, a highly regarded Republican member of the State Senate, "political gain for the Republicans was 110% of the motivation for the Plan, . . . it was `the entire motivation.'" *Id.,* at 473 (quoting trial transcript). Or, as the District Court stated in the first of its two decisions in this litigation, "[t]here is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage." *Id.,* at 470. See also *ante,* at 412 (opinion of KENNEDY, J.) (quoting District Court's conclusion). Indeed, as the State itself argued before the District Court: "The overwhelming evidence demonstrated that partisan gain was the motivating force behind the decision to redistrict in 2003." State Defendants' Post-Trial Brief in No. 2:03-CV-354 (ED Tex.), p. 51 (hereinafter State Post-Trial Brief).

This desire for political gain led to a series of dramatic confrontations between Republicans and Democrats, and ultimately resulted in the adoption of a plan that violated the Voting Rights Act. The legislature did not pass a new map in the regular 2003 session, in part because Democratic House members absented themselves and thus denied the body a quorum. Governor Perry then called a special session to take up congressional redistricting—the same step he had declined to take in 2001 after the release of the decennial census figures, when Republicans lacked a majority in the House. During the first special session, the House approved a new congressional map, but the Senate's longstanding tradition requiring two-thirds of that body to support a measure before the full Senate will consider it allowed Democrats to block the plan.

454     Lieutenant Governor Dewhurst then announced that he would suspend operation of the two-thirds rule in any future *454 special session considering congressional redistricting. Nonetheless, in a second special session, Senate Democrats again prevented the passage of a new districting map by leaving the State and depriving the Senate of a quorum. When a lone Senate Democrat returned to Texas, Governor Perry called a third special session to consider congressional redistricting.

During that third special session, the State Senate and the State House passed maps that would have apparently avoided any violation of the Voting Rights Act because they would have, *inter alia,* essentially preserved *Balderas* District 23, a majority-Latino district in southwest Texas, and *Balderas* District 24, a majority-minority district in the Dallas-Fort Worth area, where black voters constituted a significant majority of voters in the Democratic primary and usually elected their candidate of choice in the general election. Representative Phil King, the redistricting legislation's chief sponsor in the Texas House, had previously proposed fragmenting District 24, but, after lawyers reviewed the map, King expressed concern that redrawing District 24 might violate the Voting Rights Act, and he drafted a new map that left District 24 largely unchanged.

Nonetheless, the conferees seeking to reconcile the House and Senate plans produced a map that, as part of its goal of maximizing Republican political advantage, significantly altered both Districts 23 and 24 as they had existed in the *Balderas* Plan. *Balderas* District 23 was extended north to take in roughly 100,000 new people who were predominately Anglo and

Republican, were also moved west, thus splitting Webb County and the city of Laredo, and pushing roughly 100,000 people who were predominantly Latino and Democratic into an adjacent district. *Session,* 298 F. Supp. 2d, at 488–489. Black voters who previously resided in *Balderas* District 24 were fragmented into five new districts, each of which is predominately Anglo and Republican. See App. 104-106. Representative King testified at trial that *455 District 24 was cracked even though cracking the district was not "'the path of least resistance'" in terms of avoiding Voting Rights Act liability because leaving *Balderas* District 24 intact would not "accomplish our political objectives." State Post-Trial Brief 51-52 (quoting transcript). This map was ultimately enacted into law as Plan 1374C.

The overall effect of Plan 1374C was to shift more than *eight million* Texans into new districts, and to split more counties into more pieces than the *Balderas* Plan. Moreover, the 32 districts in Plan 1374C are, on average, much less compact under either of two standard measures than their counterparts had been under the *Balderas* Plan. See App. 177-178 (expert report of Professor Gaddie).[2]

Numerous parties filed suit in federal court challenging Plan 1374C on the grounds that it violated § 2 of the Voting Rights Act and that it constituted an unconstitutional partisan gerrymander. A three-judge panel—two of whom also were members of the *Balderas* court—rejected these challenges, over Judge Ward's partial dissent on the § 2 claims. See *Session,* 298 F. Supp. 2d 451. Responding to plaintiffs' appeals, we remanded for reconsideration in light of *Vieth,* 541 U. S. 267. See 543 U. S. 941 (2004).

In a characteristically thoughtful opinion written by Judge Higginbotham, the District Court again rejected all challenges to the constitutionality of Plan 1374C. See *Henderson,* 399 F. Supp. 2d 756. It correctly found that the Constitution does not prohibit a state legislature from redrawing congressional districts in the middle of a census cycle, see *id.,* at 766, and it also correctly recognized that this Court has not yet endorsed clear standards for judging the validity of partisan gerrymanders, see *id.,* at 760-762. Because the *456 District Court's original decision, and its reconsideration of the case in the light of the several opinions in *Vieth,* are successive chapters in the saga that began with *Balderas,* it is appropriate to quote this final comment from that opinion before addressing the principal question that is now presented. The *Balderas* court concluded:

> "Finally, to state directly what is implicit in all that we have said: political gerrymandering, a purely partisan exercise, is inappropriate for a federal court drawing a congressional redistricting map. Even at the hands of a legislative body, political gerrymandering is much a bloodfeud, in which revenge is exacted by the majority against its rival. We have left it to the political arena, as we must and wisely should. We do so because our role is limited and not because we see gerrymandering as other than what it is: an abuse of power that, at its core, evinces a fundamental distrust of voters, serving the self-interest of the political parties at the expense of the public good." App. to Juris. Statement 209a-210a (footnote omitted).

## II

The unique question of law that is raised in this appeal is one that the Court has not previously addressed. That narrow question is whether it was unconstitutional for Texas to replace a lawful districting plan "in the middle of a decade, for the sole purpose of maximizing partisan advantage." Juris. Statement in No. 05-276, p. i. This question is both different from, and simpler than, the principal question presented in *Vieth,* in which the "'lack of judicially discoverable and manageable standards'" prevented the plurality from deciding the merits of a statewide challenge to a political gerrymander. 541 U. S., at 277-278.

As the State points out, "in every political-gerrymandering claim the Court has considered, the focus has been on the *map* *457 itself, not on the decision to create the map in the first* place." Brief for State Appellees 33. In defense of the map itself, rather than the basic decision whether to draw the map in the first place, the State notes that Plan 1374C's district borders frequently follow county lines and other neutral criteria. At what the State describes as the relevant "level of granularity," the State correctly points out that appellants have not even attempted to argue that every district line was motivated solely for partisan gain. *Ibid.* See also *ante,* at 417 (opinion of KENNEDY, J.) (noting that "partisan aims did not guide every line" in Plan 1374C). Indeed, the multitude of "granular" decisions that are made during redistricting was part of why the *Vieth* plurality concluded, in the context of a statewide challenge to a redistricting plan promulgated in response to a legal obligation to redistrict, that there are no manageable standards to govern whether the predominant motivation underlying the entire redistricting map was partisan. See 541 U. S., at 285. But see *id.,* at 355 (BREYER, J., dissenting) (arguing that there are judicially manageable standards to assess statewide districting challenges even when a plan is enacted in response to a legal obligation to redistrict).

Unlike *Vieth*, the narrow question presented by the statewide challenge in this litigation is whether the State's decision to draw the map in the first place, when it was under no legal obligation to do so, was permissible. It is undeniable that identifying the motive for making that basic decision is a readily manageable judicial task. See *Gomillion* v. *Lightfoot*, 364 U. S. 339, 341 (1960) (noting that plaintiffs' allegations, if true, would establish by circumstantial evidence "tantamount for all practical purposes to a mathematical demonstration," that redistricting legislation had been enacted "solely" to segregate voters along racial lines); cf. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 276-280 (1979) (analyzing whether the purpose of a law was to discriminate against women). Indeed, although the Constitution places no *per se* ban on midcycle redistricting,

458    \*458 a legislature's decision to redistrict in the middle of the census cycle, when the legislature is under no legal obligation to do so, makes the judicial task of identifying the legislature's motive simpler than it would otherwise be. As JUSTICE BREYER has pointed out, "the presence of midcycle redistricting, for any reason, raises a fair inference that partisan machinations played a major role in the map-drawing process." *Vieth*, 541 U. S., at 367 (dissenting opinion).

The conclusion that courts can easily identify the motive for redistricting when the legislature is under no legal obligation to act is reinforced by the record in this very case. The District Court unambiguously identified the sole purpose behind the decision to promulgate Plan 1374C: a desire to maximize partisan advantage. See *Session*, 298 F. Supp. 2d, at 472 ("It was clear from the evidence" that Republicans "'decided to redraw the state's congressional districts solely for the purpose of seizing between five and seven seats from Democratic incumbents'" (quoting *amicus* brief filed in *Vieth*)); 298 F. Supp. 2d, at 470 ("There is little question but that the single-minded purpose of the Texas Legislature in enacting Plan 1374C was to gain partisan advantage"). It does not matter whether the District Court's description of that purpose qualifies as a specific finding of fact because it is perfectly clear that there is more than ample evidence in the record to support such a finding. This evidence includes: (1) testimony from state legislators; (2) the procedural irregularities described above that accompanied the adoption of Plan 1374C, including the targeted abolition of the longstanding two-thirds rule, designed to protect the rights of the minority party, in the Texas Senate; (3) Plan 1374C's significant departures from the neutral districting criteria of compactness and respect for county lines; (4) the plan's excessive deviations from prior districts, which interfere with the development of strong relationships between Members of Congress and their constituents; and (5) the plan's failure to comply with the Voting Rights Act. Indeed,

459    \*459 the State itself conceded that "[t]he overwhelming evidence demonstrated that partisan gain was the motivating force behind the decision to redistrict in 2003." State Post-Trial Brief 51. In my judgment, there is not even a colorable basis for contending that the relevant intent—in this case a purely partisan intent[3]—cannot be identified on the basis of admissible evidence in the record.[4]

Of course, the conclusions that courts are fully capable of analyzing the intent behind a decision to redistrict, and that desire for partisan gain was the sole factor motivating the decision to redistrict at issue here, do not resolve the question whether proof of a single-minded partisan intent is sufficient to establish a constitutional violation.

On the merits of that question, the State seems to assume that our decision in *Upham* v. *Seamon*, 456 U. S. 37 (1982) *(per curiam)*, has already established the legislature's right to replace a court-ordered plan with a plan drawn for purely \*460 partisan purposes. JUSTICE KENNEDY ultimately indulges in a similar assumption, relying on *Upham* for the proposition that "our decisions have assumed that state legislatures are free to replace court-mandated remedial plans by enacting redistricting plans of their own." *Ante*, at 416. JUSTICE KENNEDY recognizes that "[j]udicial respect for legislative plans, however, cannot justify legislative reliance on improper criteria for districting determinations." *Ibid*. But JUSTICE KENNEDY then incorrectly concludes that the singular intent to maximize partisan advantage is not, in itself, such an improper criterion. *Ante*, at 417-418.

This reliance on *Upham* overlooks critical distinctions between the redistricting plan the District Court drew in *Upham* and the redistricting plan the District Court drew in *Balderas*. The judicial plan in *Upham* was created to provide an interim response to an objection by the Attorney General that two contiguous districts in a plan originally drafted by the Texas Legislature violated § 5 of the Voting Rights Act. We concluded that, in fashioning this interim remedy, the District Court had erroneously "substituted its own reapportionment preferences for those of the state legislature." 456 U. S., at 40. We held that when judicial relief was necessary because a state legislature had failed "'to reapportion according to federal constitutional [or statutory] requisites in a timely fashion after having had an adequate opportunity to do so,'" the federal court should, as much as possible "'follow the policies and preferences of the State,'" in creating a new map. *Id.*, at 41 (quoting *White* v. *Weiser*, 412 U. S. 783, 794-795 (1973)). We did not suggest that federal courts should honor partisan concerns, but rather identified the relevant state policies as those "'expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution.'" *Upham*,

461    456 U. S., at 41 (quoting *White*, 412 U. S., at 794-795). Because the District Court in \*461 *Upham* had exceeded its authority in drawing a new districting map, we made clear that the legislature was authorized to remedy the § 5 violation with a map of its own choosing. See 456 U. S., at 44. *Upham*, then, stands only for the proposition that a state legislature is authorized to redraw

a court-drawn congressional districting map when a district court has exceeded its remedial authority. *Upham* does not stand for the proposition that, after a State embraces a valid, neutral court-drawn plan by asking this Court to affirm the opinion creating that plan, the State may then redistrict for the sole purpose of disadvantaging a minority political party.

Indeed, to conclude otherwise would reflect a fundamental misunderstanding of the reason why we have held that state legislatures, rather than federal courts, should have the primary task of creating apportionment plans that comport with federal law. We have so held because "a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies" with the requirements of federal law, *Finch*, 431 U. S., at 414-415, not because we wish to supply a dominant party with an opportunity to disadvantage its political opponents. Indeed, a straightforward application of settled constitutional law leads to the inescapable conclusion that the State may not decide to redistrict if its sole motivation is "to minimize or cancel out the voting strength of racial *or political* elements of the voting population," *Fortson*, 379 U. S., at 439 (emphasis added).

The requirements of the Federal Constitution that limit the State's power to rely exclusively on partisan preferences in drawing district lines are the Fourteenth Amendment's prohibition against invidious discrimination, and the First Amendment's protection of citizens from official retaliation based on their political affiliation. The equal protection component of the Fourteenth Amendment requires actions taken by the sovereign to be supported by some legitimate interest, and further establishes that a

462 bare desire to harm *462 a politically disfavored group is not a legitimate interest. See, *e. g.*, *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 447 (1985). Similarly, the freedom of political belief and association guaranteed by the First Amendment prevents the State, absent a compelling interest, from "penalizing citizens because of their participation in the electoral process,. . . their association with a political party, or their expression of political views." *Vieth*, 541 U. S., at 314 (KENNEDY, J., concurring in judgment) (citing *Elrod* v. *Burns*, 427 U. S. 347 (1976) (plurality opinion)). These protections embodied in the First and Fourteenth Amendments reflect the fundamental duty of the sovereign to govern impartially. *E. g.*, *Lehr* v. *Robertson*, 463 U. S. 248, 265 (1983); *New York City Transit Authority* v. *Beazer*, 440 U. S. 568 (1979).

The legislature's decision to redistrict at issue in this litigation was entirely inconsistent with these principles. By taking an action for the sole purpose of advantaging Republicans and disadvantaging Democrats, the State of Texas violated its constitutional obligation to govern impartially. "If a State passed an enactment that declared `All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated." *Vieth*, 541 U. S., at 312 (KENNEDY, J., concurring in judgment).

## III

Relying solely on *Vieth*, JUSTICE KENNEDY maintains that even if legislation is enacted based solely on a desire to harm a politically unpopular minority, this fact is insufficient to establish unconstitutional partisan gerrymandering absent proof that the legislation did in fact burden "the complainants' representative rights." *Ante*, at 418. This conclusion—which clearly goes to the merits, rather than the manageability, of a partisan gerrymandering claim—is not only inconsistent with the constitutional

463 requirement that *463 state action must be supported by a legitimate interest, but also provides an insufficient response to appellants' claim on the merits.

JUSTICE KENNEDY argues that adopting "the modified sole-intent test" could "encourage partisan excess at the outset of the decade, when a legislature redistricts pursuant to its decennial constitutional duty and is then immune from the charge of sole motivation." *Ante*, at 419, 420. But this would be a problem of the Court's own making. As the decision in *Cox* v. *Larios*, 542 U. S. 947, demonstrates, there are, in fact, readily manageable judicial standards that would allow injured parties to challenge excessive (and unconstitutional) partisan gerrymandering undertaken in response to the release of the decennial census data. [5] See also *Vieth*, 541 U. S., at 328-339 (STEVENS, J., dissenting); *id.*, at 347-353 (SOUTER, J., joined by GINSBURG, J., dissenting); *id.*, at 365-367 (BREYER, J., dissenting). Justice KENNEDY's concern about a heightened incentive to engage in such excessive partisan gerrymandering would be avoided if the Court were willing to enforce those standards.

464 *464 In any event, JUSTICE KENNEDY's additional requirement that there be proof that the gerrymander did in fact burden the complainants' representative rights is clearly satisfied by the record in this litigation. Indeed, the Court's accurate exposition of the reasons why the changes to District 23 diluted the voting rights of Latinos who remain in that district simultaneously explains why those changes also disadvantaged Democratic voters and thus demonstrates that the effects of a political gerrymander can be evaluated pursuant to judicially manageable standards.

In my judgment the record amply supports the conclusion that Plan 1374C not only burdens the minority party in District 23, but also imposes a severe statewide burden on the ability of Democratic voters and politicians to influence the political process.[6]

In arguing that Plan 1374C does not impose an unconstitutional burden on Democratic voters and candidates, the State takes the position that the plan has resulted in an equitable distribution of political power between the State's two principal political parties. The State emphasizes that in the 2004 elections—held pursuant to Plan 1374C—Republicans won 21 of 32, or 66%, of the congressional seats. That same year, Republicans carried 58% of the vote in statewide elections. Admittedly, these numbers do suggest that the State's congressional delegation was "roughly proportional" to the parties' share of the statewide vote, Brief for State Appellees 44, particularly in light of the fact that our electoral system tends to produce a "seat bonus" in which a party that wins a majority of the vote generally wins an even larger majority of the seats, see Brief for Alan Heslop et al.

465    as *Amici Curiae* (describing the seat bonus phenomenon). *465 Cf. *ante*, at 419 (opinion of KENNEDY, J.) (arguing that, compared to the redistricting plan challenged in *Vieth*, "Plan 1374C can be seen as making the party balance more congruent to statewide party power").

That Plan 1374C produced a "roughly proportional" congressional delegation in 2004 does not, however, answer the question whether the plan has a discriminatory effect against Democrats. As appellants point out, whether a districting map is biased against a political party depends upon the bias in the map itself—in other words, it depends upon the opportunities that the map offers each party, regardless of how candidates perform in a given year. And, as the State's expert found in this litigation, Plan 1374C clearly has a discriminatory effect in terms of the opportunities it offers the two principal political parties in Texas. Indeed, that discriminatory effect is severe.

According to Professor Gaddie, the State's expert, Plan 1374C gives Republicans an advantage in 22 of 32 congressional seats. The plaintiffs' expert, Professor Alford, who had been cited favorably by the *Balderas* Court as having applied a "neutral approach" to redistricting in that litigation, App. to Juris. Statement 207a, agreed. He added that, in his view, the only surprise from the 2004 elections was "how far things moved" toward achieving a 22-to-10 pro-Republican split "in a single election

466    year," *id.*, at 226a (declaration of John R. Alford, Ph.D.).[7] But this 22-to-10 advantage does not depend on Republicans winning the 58% share of the statewide vote that they received in 2004. Instead, *466 according to Professor Gaddie, Republicans would be likely to carry 22 of 32 congressional seats if they won only 52% of the statewide vote. App. 216, 229. Put differently, Plan 1374C ensures that, even if the Democratic Party succeeds in convincing 10% of the people who voted for Republicans in the last statewide elections to vote for Democratic congressional candidates,[8] which would constitute a major electoral shift, there is unlikely to be *any* change in the number of congressional seats that Democrats win. Moreover, Republicans would still have an overwhelming advantage if Democrats achieved full electoral parity. According to Professor Gaddie's analysis, Republicans would be likely to carry 20 of the 32 congressional seats even if they only won 50% (or, for that matter, 49%) of the statewide vote. *Id.*, at 216, 229-230. This demonstrates that Plan 1374C is inconsistent with the symmetry standard, a measure social scientists use to assess partisan bias, which is undoubtedly "a reliable standard" for measuring a "burden . . . on the complainants' representative rights," *ante*, at 418 (opinion of KENNEDY, J.).

The symmetry standard "requires that the electoral system treat similarly-situated parties equally, so that each receives the same fraction of legislative seats for a particular vote percentage as the other party would receive if it had received the same percentage." Brief for Gary King et al. as *Amici Curiae* 4-5. This standard is widely accepted by scholars as providing a measure of partisan fairness in electoral systems. See, *e. g.*, Tufte, The Relationship Between Seats and Votes in Two-Party Systems, 67 Am. Pol. Sci. Rev. 540, 542-543 (1973); Gelman & King, Enhancing Democracy Through Legislative Redistricting, 88 Am. Pol. Sci. Rev. 541, 545 (1994); Thompson, Election Time: Normative Implications of Temporal Properties of the

467    Electoral Process in the *467 United States, 98 Am. Pol. Sci. Rev. 51, 53, and n. 7 (2004); Engstrom & Kernell, Manufactured Responsiveness: The Impact of State Electoral Laws on Unified Party Control of the Presidency and House of Representatives, 1840-1940, 49 Am. J. Pol. Sci. 531, 541 (2005). Like other models that experts use in analyzing vote dilution claims, compliance with the symmetry standard is measured by extrapolating from a sample of known data, see, *e. g.*, *Thornburg* v. *Gingles*, 478 U. S. 30, 53, and n. 20 (1986) (discussing extreme case analysis and bivariate ecological regression analysis). In this litigation, the symmetry standard was not simply proposed by an *amicus* to this Court, it was also used by the expert for plaintiffs and the expert for the State in assessing the degree of partisan bias in Plans 1151C and 1374C. See App. 34-42 (report of Professor Alford); *id.*, at 189-193, 216 (report of Professor Gaddie).

Because, as noted above, Republicans would have an advantage in a significant majority of seats even if the statewide vote were equally distributed between Republicans and Democrats, Plan 1374C constitutes a significant departure from the symmetry standard. By contrast, based on Professor Gaddie's evaluation, the *Balderas* Plan, though slightly biased in favor of Republicans, provided markedly more equitable opportunities to Republicans and Democrats. For example, consistent with the

symmetry standard; under Plan 1151C the parties were likely to each take 16 congressional seats if they won 50% of the statewide vote. See App. 216.

Plan 1374C then, clearly has a discriminatory impact on the opportunities that Democratic citizens have to elect candidates of their choice. Moreover, this discriminatory effect cannot be dismissed as *de minimis*. According to the State's expert, if each party receives half the statewide vote, under Plan 1374C the Republicans would carry 62.5% (20) of the congressional seats, whereas the Democrats would win 37.5% (12) of those seats. In other words, at the vote distribution point where a politically neutral map would result in zero *468 differential in the percentage of seats captured by each party, Plan 1374C is structured to create a 25% differential. When a redistricting map imposes such a significant disadvantage on a politically salient group of voters, the State should shoulder the burden of defending the map. Cf. *Brown* v. *Thomson,* 462 U. S. 835, 842-843 (1983) (holding that the implementation of a redistricting plan for state legislative districts with population deviations over 10% creates a prima facie case of discrimination under the Equal Protection Clause, thus shifting the burden to the State to defend the plan); *Larios* v. *Cox,* 300 F. Supp. 2d 1320, 1339-1340 (ND Ga.) *(per curiam),* summarily aff'd, 542 U. S. 947 (2004) (same, but further pointing out that the "'ten percent rule'" is not a safe harbor, and concluding that, under the circumstances of the case before it, a state legislative districting plan was unconstitutional even though population deviations were under 10%). At the very least, once plaintiffs have established that the legislature's sole purpose in adopting a plan was partisan—as plaintiffs have established in this action, see Part II, *supra*—such a severe discriminatory effect should be sufficient to meet any additional burden they have to demonstrate that the redistricting map accomplishes its discriminatory purpose.[9]

468

469    *469 The bias in Plan 1374C is most striking with regard to its effect on the ability of Democratic voters to elect candidates of their choice, but its discriminatory effect does not end there. Plan 1374C also lessens the influence Democratic voters are likely to be able to exert over Republican lawmakers, thus further minimizing Democrats' capacity to play a meaningful role in the political process.

Even though it "defies political reality to suppose that members of a losing party have as much political influence over . . . government as do members of the victorious party," *Davis* v. *Bandemer,* 478 U. S. 109, 170 (1986) (Powell, J., concurring in part and dissenting in part), the Court has recognized that "the power to influence the political process is not limited to winning elections," *id.,* at 132 (plurality opinion); see also *Georgia* v. *Ashcroft,* 539 U. S. 461, 482 (2003). In assessing whether members of a group whose candidate is defeated at the polls can nonetheless influence the elected representative, it is "important to consider `the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account.'" *Ibid.* (quoting *Gingles,* 478 U. S., at 100 (O'Connor, J., concurring in judgment)). One justification for majority rule is that elected officials *will* generally "take the minority's interests into account," in part because the majority recognizes that preferences shift and today's minority could be tomorrow's majority. See, *e. g.,* L. Guinier, Tyranny of the Majority 77 (1994); J. Ely, Democracy and Distrust 84 (1980); cf. Letter from James Madison to Thomas Jefferson (Oct. 24, 1787), reprinted in 1 Republic of Letters 502 (J. Smith ed. 1995) (arguing that "[t]he great desideratum in Government is . . . to modify the sovereignty as that it may be sufficiently neutral between different parts of the Society" and thus prevent a fixed majority from oppressing the minority). Indeed, this Court has concluded that our *470 system of representative democracy is premised on the assumption that elected officials will seek to represent their constituency as a whole, rather than any dominant faction within that constituency. See *Shaw* v. *Reno,* 509 U. S. 630, 648 (1993).

470

Plan 1374C undermines this crucial assumption that congressional representatives from the majority party (in this case Republicans) will seek to represent their entire constituency. "When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole." *Ibid. Shaw'*s analysis of representational harms in the racial gerrymandering context applies with at least as much force in the partisan gerrymandering context because, in addition to the possibility that a representative may believe her job is only to represent the interests of a dominant constituency, a representative may feel more beholden to the cartographers who drew her district than to the constituents who live there. See *Vieth,* 541 U. S., at 329-331 (STEVENS, J., dissenting). In short, Plan 1374C reduces the likelihood that Republican representatives elected from gerrymandered districts will act as vigorous advocates for the needs and interests of Democrats who reside within their districts.

In addition, Plan 1374C further weakens the incentives for members of the majority party to take the interests of the minority party into account because it locks in a Republican congressional majority of 20-22 seats, so long as Republicans achieve at least 49% of the vote. The result of this lock-in is that, according to the State's expert, between 19 and 22 of these Republican seats are safe seats, meaning seats where one party has at least a 10% advantage over the other. See App. 227-228 (expert

471    report of Professor Gaddie). Members of Congress elected from such safe districts need not worry *471 much about the
possibility of shifting majorities, so they have little reason to be responsive to political minorities within their district.[10]

In sum, I think it is clear that Plan 1374C has a severe burden on the capacity of Texas Democrats to influence the political
process. Far from representing an example of "one of the most significant acts a State can perform to ensure citizen

472    participation in republican self-governance," *ante,* at 416 (opinion of KENNEDY, J.), the plan guarantees that the *472
Republican-dominated membership of the Texas congressional delegation will remain constant notwithstanding significant pro-
Democratic shifts in public opinion. Moreover, the harms Plan 1374C imposes on Democrats are not "hypothetical" or
"counterfactual," *ante,* at 420, simply because, in the 2004 elections, Republicans won a share of seats roughly proportional to
their statewide voting strength. By creating 19-22 safe Republican seats, Plan 1374C has already harmed Democrats because,
as explained above, it significantly undermines the likelihood that Republican lawmakers from those districts will be responsive
to the interests of their Democratic constituents. In addition, Democrats will surely have a more difficult time recruiting strong
candidates, and mobilizing voters and resources, in these safe Republican districts. Thus, appellants have satisfied any
requisite obligation to demonstrate that they have been harmed by the adoption of Plan 1374C.

Furthermore, as discussed in Part II, *supra,* the sole intent motivating the Texas Legislature's decision to replace Plan 1151C
with Plan 1374C was to benefit Republicans and burden Democrats. Accordingly, in terms of both its intent and effect, Plan
1374C violates the sovereign's duty to govern impartially.

> "When a State adopts rules governing its election machinery or defining electoral boundaries, those rules must
> serve the interests of the entire community. If they serve no purpose other than to favor one segment —whether
> racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular point in
> time, or to disadvantage a politically weak segment of the community, they violate the constitutional guarantee
> of equal protection." *Karcher,* 462 U. S., at 748 (STEVENS, J., concurring) (citation omitted).

473    Accordingly, even accepting the Court's view that a gerrymander is tolerable unless it in fact burdens the minority's *473
representative rights, I would hold that Plan 1374C is unconstitutional.[11]

## IV

Even if I thought that Plan 1374C were not unconstitutional in its entirety, I would hold that the cracking of District 24—which,
under the *Balderas* Plan, was a majority-minority district that consistently elected Democratic Congressman Martin Frost—was
unconstitutional. Readily manageable standards enable us to analyze both the purpose and the effect of the "granular"
decisions that produced the replacements for District 24. Applying these standards, which I set forth below, I believe it is clear
that the manipulation of this district for purely partisan gain violated the First and Fourteenth Amendments.

474    The same constitutional principles discussed above concerning the sovereign's duty to govern impartially inform the proper
analysis for claims that a particular district is an unconstitutional partisan gerrymander. We have on several occasions
recognized that a multimember district is subject to challenge under the Fourteenth Amendment if it operates "'to minimize or
cancel out the voting strength of racial *or *474 political* elements of the voting population.'" *E. g., Gaffney* v. *Cummings,* 412 U.
S. 735, 751 (1973) (emphasis added); *Burns* v. *Richardson,* 384 U. S. 73, 88 (1966). There is no constitutionally relevant
distinction between the harms inflicted by single-member district gerrymanders that minimize or cancel out the voting strength
of a political element of the population and the same harms inflicted by multimember districts. In both situations, the State has
interfered with the voter's constitutional right to "engage in association for the advancement of beliefs and ideas," *NAACP* v.
*Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958).

I recognize that legislatures will always be aware of politics and that we must tolerate some consideration of political goals in
the redistricting process. See *Cousins* v. *City Council of Chicago,* 466 F. 2d 830, 847 (CA7 1972) (Stevens, J., dissenting).
However, I think it is equally clear that, when a plaintiff can prove that a legislature's predominant motive in drawing a particular
district was to disadvantage a politically salient group, and that the decision has the intended effect, the plaintiff's constitutional
rights have been violated. See *id.,* at 859-860. Indeed, in *Vieth,* five Members of this Court explicitly recognized that extreme
partisan gerrymandering violates the Constitution. See 541 U. S., at 307, 312-316 (KENNEDY, J., concurring in judgment); *id.,*
at 317-318 (STEVENS, J., dissenting); *id.,* at 343, 347-352 (SOUTER, J., joined by GINSBURG, J., dissenting); *id.,* at 356-357,
366-367 (BREYER, J., dissenting). The other four Justices in *Vieth* stated that they did not disagree with that conclusion. See
*id.,* at 292 (plurality opinion). The *Vieth* plurality nonetheless determined that there were no judicially manageable standards to
assess partisan gerrymandering claims. *Id.,* at 305-306. However, the following test, which shares some features of the burden-

475    shifting standard for assessing unconstitutional partisan gerrymandering proposed by Justice SOUTER's opinion in *Vieth*, see *id.*, at 348-351, would provide a remedy for at least the most blatant *475 unconstitutional partisan gerrymanders and would also be eminently manageable.

First, to have standing to challenge a district as an unconstitutional partisan gerrymander, a plaintiff would have to prove that he is either a candidate or a voter who resided in a district that was changed by a new districting plan. See *id.*, at 327-328 (STEVENS, J., dissenting) (discussing *United States* v. *Hays*, 515 U. S. 737 (1995)). See also 541 U. S., at 347-348 (SOUTER, J., joined by GINSBURG, J., dissenting) (citing *Hays*). A plaintiff with standing would then be required to prove both improper purpose and effect.

With respect to the "purpose" portion of the inquiry, I would apply the standard fashioned by the Court in its racial gerrymandering cases. Under the Court's racial gerrymandering jurisprudence, judges must analyze whether plaintiffs have proved that race was the predominant factor motivating a districting decision such that other, race-neutral districting principles were subordinated to racial considerations. If so, strict scrutiny applies, see, *e. g.*, *Vera*, 517 U. S., at 958-959 (plurality opinion), and the State must justify its districting decision by establishing that it was narrowly tailored to serve a compelling state interest, such as compliance with § 2 of the Voting Rights Act, see *King* v. *Illinois Bd. of Elections*, 979 F. Supp. 619 (ND Ill. 1997), summarily aff'd, 522 U. S. 1087 (1998); *Vera*, 517 U. S., at 994 (O'Connor, J., concurring).[12] However, strict scrutiny does not apply merely because race was one motivating factor behind the drawing of a majority-minority district. *Id.*, at 958-959 (plurality opinion); see also *Easley* v. *Cromartie*, 532 U. S. 234, 241 (2001). Applying these standards to the political

476    gerrymandering context, I would hold that, if a plaintiff carried *476 her burden of demonstrating that redistricters subordinated neutral districting principles to political considerations and that their predominant motive was to maximize one party's power, she would satisfy the intent prong of the constitutional inquiry.[13] Cf. *Vieth*, 541 U. S., at 349-350 (SOUTER, J., joined by GINSBURG, J., dissenting) (discussing the importance of a district's departures from traditional districting principles in determining whether the district is an unconstitutional gerrymander).

With respect to the effects inquiry, a plaintiff would be required to demonstrate the following three facts: (1) her candidate of choice won election under the old plan; (2) her residence is now in a district that is a safe seat for the opposite party; and (3) her new district is less compact than the old district. The first two prongs of this effects inquiry would be designed to measure whether or not the plaintiff has been harmed, whereas the third prong would be relevant because the shape of the gerrymander has always provided crucial evidence of its character, see *Karcher*, 462 U. S., at 754-758, 762-763 (STEVENS, J., concurring); see also *Vieth*, 541 U. S., at 348 (SOUTER, J., joined by GINSBURG, J., dissenting) (noting that compactness is a traditional districting principle, which "can be measured quantitatively"). Moreover, a safe harbor for more compact districts would allow a newly elected majority to eliminate a prior partisan gerrymander without fear of liability or even the need to devote resources to litigating whether or not the legislature had acted with an impermissible intent.

477    *477 If a plaintiff with standing could meet the intent and effects prong of the test outlined above, that plaintiff would clearly have demonstrated a violation of her constitutional rights. Moreover, I do not think there can be any colorable claim that this test would not be judicially manageable.

Applying this test to the facts of these cases, I think plaintiffs in new Districts 6, 24, 26, and 32—four of the districts in Plan 1374C that replaced parts of *Balderas* District 24—can demonstrate that their constitutional rights were violated by the cracking of *Balderas* District 24. First, I assume that there are plaintiffs who reside in Districts 6, 24, 26, and 32, and whose homes were previously located in *Balderas* District 24.[14] Accordingly, I assume that there are plaintiffs who have standing to challenge the creation of these districts.

Second, plaintiffs could easily satisfy their burden of proving predominant partisan purpose. Indeed, in this litigation, the State has acknowledged that its predominant motivation for cracking District 24 was to achieve partisan gain. See State Post-Trial Brief 51-52 (noting that, in spite of concerns that the cracking of District 24 could lead to Voting Rights Act liability, "[t]he Legislature . . . chose to pursue a political goal of unseating Congressman Frost instead of following a course that might have lowered risks [of such liability]").

478    The District Court agreed with the State's analysis on this issue. In the District Court, plaintiffs claimed that the creation of District 26 violated the Equal Protection Clause because the decision to create District 26 was motivated by unconstitutional racial discrimination against black voters. *478 The District Court rejected this argument, concluding that the State's decision to crack *Balderas* District 24 was driven not by racial prejudice, but rather by the political desire to maximize Republican advantage and to "remove Congressman Frost," which required that Frost "lose a large portion of his Democratic constituency, many of whom lived in a predominately Black area of Tarrant County." *Session*, 298 F. Supp. 2d, at 471.

That an impermissible, predominantly partisan, purpose motivated the cracking of former District 24 is further demonstrated by the fact that, in my judgment, this cracking caused Plan 1374C to violate § 5 of the Voting Rights Act, 42 U. S. C. § 1973c. The State's willingness to adopt a plan that violated its legal obligations under the Voting Rights Act, combined with the other indicia of partisan intent in this litigation, is compelling evidence that politics was not simply one factor in the cracking of District 24, but rather that it was an impermissible, predominant factor.

Section 5 of the Voting Rights Act "was intended `to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques.'" _Beer_ v. _United States,_ 425 U. S. 130, 140-141 (1976) (quoting S. Rep. No. 94-295, p. 19 (1975); alteration in _Beer_). To effectuate this goal, § 5 prevents covered jurisdictions, such as Texas, from making changes to their voting procedures "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." _Georgia,_ 539 U. S., at 477 (internal quotation marks omitted). In other words, during the redistricting process, covered jurisdictions may not "leave minority voters with less chance to be effective in electing preferred candidates than they were" under the prior districting plan. See _id.,_ at 494 (SOUTER, J., dissenting). By cracking _Balderas_ District 24, and by not offsetting the loss in black voters' ability to elect preferred *479 candidates elsewhere, Plan 1374C resulted in impermissible retrogression.

479

Under the _Balderas_ Plan, black Americans constituted a majority of Democratic primary voters in District 24. According to the unanimous report authored by staff attorneys in the Voting Section of the Department of Justice, black voters in District 24 generally voted cohesively, and thus had the ability to elect their candidate of choice in the Democratic primary. Section 5 Recommendation Memorandum 33 (Dec. 12, 2003), available at http://www.washingtonpost.com/wp-srv/nation/documents/texasDOJmemo.pdf (as visited June 21, 2006, and available in Clerk of Court's case file). Moreover, the black community's candidates of choice could consistently attract sufficient crossover voting from nonblacks to win the general election, even though blacks did not constitute a majority of voters in the general election. _Id.,_ at 33-34. Representative Frost, who is white, was clearly the candidate of choice of the black community in District 24, based on election returns, testimony of community leaders, and "`scorecards'" he received from groups dedicated to advancing the interests of African-Americans. See _id.,_ at 35.

As noted above, in Plan 1374C, "the minority community in [_Balderas_ District] 24 [was] splintered and submerged into majority Anglo districts in the Dallas-Fort Worth area." _Id.,_ at 67. By dismantling one district where blacks had the ability to elect candidates of their choice,[15] and by not offsetting *480 this loss of a district with another district where black voters had a similar opportunity, Plan 1374C was retrogressive, in violation of § 5 of the Voting Rights Act. See _id.,_ at 31, 67-69.

480

Notwithstanding the unanimous opinion of the staff attorneys in the Voting Section of the Justice Department that Plan 1374C was retrogressive and that the Attorney General should have interposed an objection, the Attorney General elected to preclear the map, thus allowing it to take effect. We have held that, under the statutory scheme, voters may not directly challenge the Attorney General's decision to preclear a redistricting plan, see _Morris_ v. _Gressette,_ 432 U. S. 491 (1977), which means that the Attorney General's vigilant enforcement of the Act is critical, and which also means that plaintiffs could not bring a § 5 challenge as part of this litigation.[16] However, judges are frequently called upon to consider whether a redistricting plan violates § 5, because a covered jurisdiction has the option of seeking to achieve preclearance by either submitting its plan to the Attorney General or filing a declaratory judgment action in the District Court for the District of Columbia, whose judgment is *481 subject to review by this Court, see, e. g., _Georgia,_ 539 U. S. 461. Accordingly, we have the tools to analyze whether a redistricting plan is retrogressive.

481

Even though the § 5 issue is not directly before this Court, for the reasons stated above, I believe that the cracking of District 24 caused Plan 1374C to be retrogressive. And the fact that the legislature promulgated a retrogressive plan is relevant because it provides additional evidence that the legislature acted with a predominantly partisan purpose. Complying with § 5 is a neutral districting principle, and the legislature's promulgation of a retrogressive redistricting plan buttresses my conclusion that the "legislature subordinated traditional [politically] neutral districting principles. . . to [political] considerations." _Miller_ v. _Johnson,_ 515 U. S. 900, 916 (1995). This evidence is particularly compelling in light of the State's acknowledgment that "[t]he Legislature. . . chose to pursue a political goal of unseating Congressman Frost instead of following a course that might have lowered risks in the preclearance process." State Post-Trial Brief 52 (citing, _inter alia,_ trial testimony of state legislators).

In sum, the record in this litigation makes clear that the predominant motive underlying the fragmentation of _Balderas_ District 24 was to maximize Republicans' electoral opportunities and ensure that Congressman Frost was defeated.

Turning now to the effects test I have proposed, plaintiffs in new Districts 6, 24, 26, and 32 could easily meet the three parts of that test because: (1) under the _Balderas_ Plan, they lived in District 24 and their candidate of choice (Frost) was the winning

candidate; (2) under Plan 1374C, they have been placed in districts that are safe seats for the Republican party, see App. 106 (showing that the Democratic share of the two-party vote in statewide elections from 1996 to 2002 was 40% or less in Districts

482    6, 24, 26, and 32); and (3) their *482 new districts are less compact than *Balderas* District 24, see App. 319-320 (compactness scores for districts under the *Balderas* Plan and Plan 1374C).[17]

JUSTICE KENNEDY rejects my proposed effects test, as applied in these cases, because in his view *Balderas* District 24 lacks "any special claim to fairness," *ante*, at 446. But my analysis in no way depends on the proposition that *Balderas* District 24 was fair. The district *was* more compact than four of the districts that replaced it, and, as explained above, compactness serves important values in the districting process. This is why, in my view, a State that creates more compact districts should enjoy a safe harbor from partisan gerrymandering claims. However, the mere fact that a prior district was unfair should surely not provide a safe harbor for the creation of an even more unfair district. Conversely, a State may of course create less compact districts without violating the Constitution so long as its purpose is not to disadvantage a politically disfavored group. See *supra*, at 477-478, and n. 14. The reason I focus on *Balderas* District 24 is not because the district was fair, but because the prior district provides a clear benchmark in analyzing whether plaintiffs have been harmed.

In sum, applying the judicially manageable test set forth in this Part of my opinion reveals that the cracking of *Balderas* District 24 created several unconstitutional partisan gerrymanders. Even if I believed that Plan 1374C were not invalid in its entirety, I would reverse the judgment below with regard to Districts 6, 24, 26, and 32.

\* \* \*

483    *483 For the foregoing reasons, although I concur with the majority's decision to invalidate District 23 under § 2 of the Voting Rights Act, I respectfully dissent from the Court's decision to affirm the judgment below with respect to plaintiffs' partisan gerrymandering claim. I would reverse with respect to the plan as a whole, and also, more specifically, with respect to Districts 6, 24, 26, and 32.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

I join Part II-D of the principal opinion, rejecting the one-person, one-vote challenge to Plan 1374C based simply on its mid-decade timing, and I also join Part II-A, in which the Court preserves the principle that partisan gerrymandering can be recognized as a violation of equal protection, see *Vieth* v. *Jubelirer*, 541 U. S. 267, 306 (2004) (KENNEDY, J., concurring in judgment); *id.*, at 317 (STEVENS, J., dissenting); *id.*, at 346 (SOUTER, J., dissenting); *id.*, at 355 (BREYER, J., dissenting). I see nothing to be gained by working through these cases on the standard I would have applied in *Vieth, supra*, at 346-355 (dissenting opinion), because here as in *Vieth* we have no majority for any single criterion of impermissible gerrymander (and none for a conclusion that Plan 1374C is unconstitutional across the board). I therefore treat the broad issue of gerrymander much as the subject of an improvident grant of certiorari, and add only two thoughts for the future: that I do not share JUSTICE KENNEDY's seemingly flat rejection of any test of gerrymander turning on the process followed in redistricting, see *ante*, at 416-420 (principal opinion), nor do I rule out the utility of a criterion of symmetry as a test, see, *e. g.*, King & Browning, Democratic Representation and Partisan Bias in Congressional Elections, 81 Am. Pol. Sci. Rev. 1251 (1987). Interest in

484    exploring this notion is evident, see *ante*, at 419-420 *484 (principal opinion); *ante*, at 465-468 (STEVENS, J., concurring in part and dissenting in part); *post*, at 491-492 (BREYER, J., concurring in part and dissenting in part). Perhaps further attention could be devoted to the administrability of such a criterion at all levels of redistricting and its review.

I join Part III of the principal opinion, in which the Court holds that Plan 1374C's District 23 violates § 2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973, in diluting minority voting strength. But I respectfully dissent from Part IV, in which a plurality upholds the District Court's rejection of the claim that Plan 1374C violated § 2 in cracking the black population in the prior District 24 and submerging its fragments in new Districts 6, 12, 24, 26, and 32. On the contrary, I would vacate the judgment and remand for further consideration.

The District Court made a threshold determination resting reasonably on precedent of this Court and on a clear rule laid down by the Fifth Circuit, see *Valdespino* v. *Alamo Heights Independent School Dist.*, 168 F. 3d 848, 852-853 (1999), cert. denied, 528 U. S. 1114 (2000): the first condition for making out a § 2 violation, as set out in *Thornburg* v. *Gingles*, 478 U. S. 30 (1986), requires "the minority group . . . to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," *id.*, at 50, (here, the old District 24) before a dilution claim can be recognized under § 2.[1] Although both the plurality today and our own prior cases have sidestepped the question whether a statutory dilution claim can prevail without the possibility of a district percentage of minority voters above 50%, see *ante*, at 443; *Johnson* v. *De Grandy*, 512 U. S.

485  *485 997, 1008-1009 (1994); *Voinovich* v. *Quilter*, 507 U. S. 146, 154 (1993); *Growe* v. *Emison*, 507 U. S. 25, 41, n. 5 (1993); *Gingles, supra,* at 46, n. 12, the day has come to answer it.

Chief among the reasons that the time has come is the holding in *Georgia* v. *Ashcroft*, 539 U. S. 461 (2003), that replacement of a majority-minority district by a coalition district with minority voters making up fewer than half can survive the prohibition of retrogression under § 5 of the Voting Rights Act, 42 U. S. C. § 1973c, enforced through the preclearance requirement, *Georgia*, 539 U. S., at 482-483. At least under § 5, a coalition district can take on the significance previously accorded to one with a majority-minority voting population. Thus, despite the independence of §§ 2 and 5, *id.,* at 477-479, there is reason to think that the integrity of the minority voting population in a coalition district should be protected much as a majority-minority bloc would be. While protection should begin through the preclearance process,[2] in jurisdictions where that is required, if that process fails a minority voter has no remedy under § 5 because the State and the Attorney General (or the District Court for the District of Columbia) are the only participants in preclearance, see 42 U. S. C. § 1973c. And, of course, vast areas of the country are not covered by § 5. Unless a minority voter is to be left with no recourse whatsoever, then, relief under § 2 must be possible, as by definition it would not be if a numerical majority of minority voters in a reconstituted or putative district is a necessary condition. I would therefore hold that a minority of 50% or less of the voting population might suffice at the *Gingles* gatekeeping stage. To have a clear-edged rule, I would hold it sufficient satisfaction of the first gatekeeping condition to show that minority voters in a

486  reconstituted or putative district constitute a majority *486 of those voting in the primary of the dominant party, that is, the party tending to win in the general election.[3]

This rule makes sense in light of the explanation we gave in *Gingles* for the first condition for entertaining a claim for breach of the § 2 guarantee of racially equal opportunity "to elect representatives of . . . choice," 42 U. S. C. § 1973: "The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large . . . is this: Unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." 478 U. S., at 50, n. 17 (emphasis deleted); see also *id.,* at 90, n. 1 (O'Connor, J., concurring in judgment) ("[I]f a minority group that is not large enough to constitute a voting majority in a single-member district can show that white support would probably be forthcoming in some such district to an extent that would enable the election of the candidates its members prefer, that minority group would appear to have demonstrated that, at least under this measure of its voting strength, it would be able to elect some candidates of its choice"). Hence, we emphasized that an analysis under § 2 of the political process should be "'functional.'" *Id.,* at 48, n. 15 (majority opinion); see also *Voinovich, supra,* at 158 ("[T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim"). So it is not surprising that we have looked to political-primary data in considering the second and third *Gingles* conditions, to see whether

487  there is racial bloc voting. *487 See, e. g., Abrams* v. *Johnson*, 521 U. S. 74, 91-92 (1997); *Gingles, supra,* at 52-54, 59-60.

The pertinence of minority voters' role in a primary is obvious: a dominant party's primary can determine the representative ultimately elected, as we recognized years ago in evaluating the constitutional importance of primary elections. See *United States* v. *Classic*, 313 U. S. 299, 318-319 (1941) ("Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary is likewise included in the right protected by Article I, § 2. . . . Here, . . . the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative"); *id.,* at 320 ("[A] primary election which involves a necessary step in the choice of candidates for election as representatives in Congress, and which in the circumstances of this case controls that choice, is an election within the meaning of the constitutional provision"); *Smith* v. *Allwright*, 321 U. S. 649, 660 (1944) (noting "[t]he fusing by the *Classic* case of the primary and general elections into a single instrumentality for choice of officers"); *id.,* at 661-662 ("It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution. . . . Under our Constitution the great privilege of the ballot may not be denied a man by the State because of his color").[4] These conclusions

488  of our predecessors *488 fit with recent scholarship showing that electoral success by minorities is adequately predictable by taking account of primaries as well as elections, among other things. See Grofman, Handley, & Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N. C. L. Rev. 1383 (2000-2001).[5]

I would accordingly not reject this § 2 claim at step one of *Gingles*, nor on this record would I dismiss it by jumping to the ultimate § 2 issue to be decided on a totality of the circumstances, see *De Grandy, supra,* at 1009-1022, and determine that the black plaintiffs cannot show that submerging them in the five new districts violated their right to equal opportunity to participate in the political process and elect candidates of their choice. The plurality, on the contrary, is willing to accept the conclusion that the minority voters lost nothing cognizable under § 2 because they could not show the degree of control that guaranteed a candidate of their choice in the old District 24. See *ante,* at 443-446. The plurality accepts this conclusion by

placing great weight on the fact that Martin Frost, the perennially successful congressional candidate in District 24, was white. See, e. g., ante, at 444-445 (no clear error in District Court's findings that "no Black candidate has ever filed in a Democratic primary against Frost," Session v. Perry, 298 F. Supp. 2d 451, 484 (ED Tex. 2004) (per curiam), and "[w]e have no measure of what Anglo turnout would be in a Democratic primary if Frost were opposed by a Black candidate," ibid.); ante, at 445 (no clear

489   error in District Court's reliance on testimony of Congresswoman Eddie Bernice Johnson that "District 24 *489 was drawn for an Anglo Democrat (Martin Frost, in particular) in 1991").

There are at least two responses. First, "[u]nder § 2, it is the status of the candidate as the chosen representative of a particular racial group, not the race of the candidate, that is important." Gingles, supra, at 68 (emphasis deleted). Second, Frost was convincingly shown to have been the "chosen representative" of black voters in old District 24. In the absence of a black-white primary contest, the unchallenged evidence is that black voters dominated a primary that consistently nominated the same and ultimately successful candidate; it takes more than speculation to rebut the demonstration that Frost was the candidate of choice of the black voters.[6] There is no indication that party rules or any other device rigged the primary ballot so as to bar any aspirants the minority voters would have preferred, see n. 5, supra, and the uncontroverted and overwhelming evidence is that Frost was strongly supported by minority voters after more than two decades of sedulously considering minority interests, App. 107 (Frost's rating of 94% on his voting record from the National Association for the Advancement of Colored People exceeded the scores of all other members of the Texas congressional delegation, including black and Hispanic members of both major parties); id., at 218-219 (testimony by State's political-science expert that Frost is the African-Americans' candidate of choice); id., at 239 (testimony by Ron Kirk, an African-American former mayor of Dallas and U. S. Senate candidate, that Frost "has gained a very strong base of support among African-American . . . voters because of his strong voting records [in numerous areas]" and has "an incredible following and amount of respect among the African-American community"); id., at 240-241

490   (Kirk's testimony *490 that Frost has never had a contested primary because he is beloved by the African-American community, and that a black candidate, possibly including himself, could not better Frost in a primary because of his strong rapport with the black community); id., at 242-243 (testimony by county precinct administrator that Frost has been the favored candidate of the African-American community and there have been no primary challenges to him because he "serves [African-American] interests").[7]

It is not that I would or could decide at this point whether the elimination of the prior district and composition of the new one violates § 2. The other Gingles gatekeeping rules have to be considered, with particular attention to the third, majority bloc voting, see 478 U. S., at 51, since a claim to a coalition district is involved.[8] And after that would come the ultimate analysis of the totality of circumstances. See De Grandy, supra, at 1009-1022.

491   I would go no further here than to hold that the enquiry should not be truncated by or conducted in light of the Fifth *491 Circuit's 50% rule,[9] or by the candidate-of-choice analysis just rejected. I would return the § 2 claim on old District 24 to the District Court, which has already labored so mightily on these cases. All the members of the three-judge court would be free to look again untethered by the 50% barrier, and Judge Ward, in particular, would have the opportunity to develop his reasons unconstrained by the Circuit's 50% rule, which he rightly took to limit his consideration of the claim, see Session, 298 F. Supp. 2d, at 528-531 (opinion concurring in part and dissenting in part).

JUSTICE BREYER, concurring in part and dissenting in part.

I join Parts II-A and III of the Court's opinion. I also join Parts I and II of JUSTICE STEVENS' opinion concurring in part and dissenting in part.

For one thing, the timing of the redistricting (between census periods), the radical departure from traditional boundary-drawing criteria, and the other evidence to which JUSTICE STEVENS refers in Parts I and II of his opinion make clear that a "desire to maximize partisan advantage" was the "sole purpose behind the decision to promulgate Plan 1374C." Ante, at 458. Compare, e. g., App. 176-178; ante, at 452-455, 458-459 (opinion of STEVENS, J.), with Vieth v. Jubelirer, 541 U. S. 267, 366-367 (2004) (BREYER, J., dissenting).

492   For another thing, the evidence to which JUSTICE STEVENS refers in Part III of his opinion demonstrates that the *492 plan's effort "to maximize partisan advantage," ante, at 458, encompasses an effort not only to exaggerate the favored party's electoral majority but also to produce a majority of congressional representatives even if the favored party receives only a minority of popular votes. Compare ante, at 465-468 (opinion of STEVENS, J.), App. 55 (plaintiffs' expert), and id., at 216 (State's expert), with Vieth, supra, at 360 (BREYER, J., dissenting).

Finally, because the plan entrenches the Republican Party, the State cannot successfully defend it as an effort simply to *neutralize* the Democratic Party's previous political gerrymander. Nor has the State tried to justify the plan on nonpartisan grounds, either as an effort to achieve legislative stability by avoiding legislative exaggeration of small shifts in party preferences, see *Vieth*, 541 U.S., at 359 (same), or in any other way.

In sum, "the risk of entrenchment is demonstrated," "partisan considerations [have] render[ed] the traditional district-drawing compromises irrelevant," and "no justification other than party advantage can be found." *Id.*, at 367 (same). The record reveals a plan that overwhelmingly relies upon the unjustified use of purely partisan line-drawing considerations and which will likely have seriously harmful electoral consequences. *Ibid.* For these reasons, I believe the plan in its entirety violates the Equal Protection Clause.

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, concurring in part, concurring in the judgment in part, and dissenting in part.

I join Parts I and IV of the plurality opinion. With regard to Part II, I agree with the determination that appellants have not provided "a reliable standard for identifying unconstitutional political gerrymanders." *Ante*, at 423. The question whether any such standard exists—that is, whether a challenge to a political gerrymander presents a justiciable case or controversy—has
493   not been argued in these cases. I therefore take no position on that question, which *493 has divided the Court, see *Vieth* v. *Jubelirer*, 541 U. S. 267 (2004), and I join the Court's disposition in Part II without specifying whether appellants have failed to state a claim on which relief can be granted, or have failed to present a justiciable controversy.

I must, however, dissent from Part III of the Court's opinion. According to the District Court's factual findings, the State's drawing of district lines in south and west Texas caused the area to move from five out of seven effective Latino opportunity congressional districts, with an additional district "moving" in that direction, to *six* out of seven effective Latino opportunity districts. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 489, 503-504 (ED Tex. 2004) *(per curiam)*. The end result is that while Latinos make up 58% of the citizen voting-age population in the area, they control 85% (six of seven) of the districts under the State's plan.

In the face of these findings, the majority nonetheless concludes that the State's plan somehow dilutes the voting strength of Latinos in violation of § 2 of the Voting Rights Act of 1965. The majority reaches its surprising result because it finds that Latino voters in one of the State's Latino opportunity districts—District 25—are insufficiently compact, in that they consist of two different groups, one from around the Rio Grande and another from around Austin. According to the majority, this may make it more difficult for certain Latino-preferred candidates to be elected from that district—*even though Latino voters make up 55% of the citizen voting-age population in the district and vote as a bloc. Id.*, at 492, n. 126, 503. The majority prefers old District 23, despite the District Court determination that new District 25 is "a more effective Latino opportunity district than Congressional District 23 had been." *Id.*, at 503; see *id.*, at 489, 498-499. The District Court based that determination on a careful examination of regression analysis showing that "the Hispanic-preferred candidate [would win] *every* primary and general election examined
494   in District 25," *id.*, at 503 (emphasis added), compared to the only partial success *494 such candidates enjoyed in former District 23, *id.*, at 488, 489, 496.

The majority dismisses the District Court's careful factfinding on the ground that the experienced judges did not properly consider whether District 25 was "compact" for purposes of § 2. *Ante*, at 430-431. But the District Court opinion itself clearly demonstrates that the court carefully considered the compactness of the minority group in District 25, just as the majority says it should have. The District Court recognized the very features of District 25 highlighted by the majority and unambiguously concluded, under the totality of the circumstances, that the district was an effective Latino opportunity district, and that no violation of § 2 in the area had been shown.

Unable to escape the District Court's factfinding, the majority is left in the awkward position of maintaining that its *theory* about compactness is more important under § 2 than the actual prospects of electoral success for Latino-preferred candidates under a State's apportionment plan. And that theory is a novel one to boot. Never before has this or any other court struck down a State's redistricting plan under § 2, on the ground that the plan achieves the maximum number of possible majority-minority districts, but loses on style points, in that the minority voters in one of those districts are not as "compact" as the minority voters would be in another district were the lines drawn differently. Such a basis for liability pushes voting rights litigation into a whole new area—an area far removed from the concern of the Voting Rights Act to ensure minority voters an equal opportunity "to elect representatives of their choice." 42 U. S. C. § 1973(b).

I

Under § 2, a plaintiff alleging "a denial or abridgement of the right of [a] citizen of the United States to vote on account of race or color," § 1973(a), must show, "based on the totality of circumstances,"

*495 "that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." § 1973(b).

In _Thornburg_ v. _Gingles,_ 478 U. S. 30 (1986), we found that a plaintiff challenging the State's use of multimember districts could meet this standard by showing that replacement of the multimember district with several single-member districts would likely provide minority voters in at least some of those single-member districts "the ability . . . to elect representatives of their choice." _Id.,_ at 48. The basis for this requirement was simple: If no districts were possible in which minority voters had prospects of electoral success, then the use of multimember districts could hardly be said to thwart minority voting power under § 2. See _ibid._ ("Minority voters who contend that the multimember form of districting violates § 2 must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates").

The next generation of voting rights litigation confirmed that "manipulation of [single-member] district lines" could also dilute minority voting power if it packed minority voters in a few districts when they might control more, or dispersed them among districts when they might control some. _Voinovich_ v. _Quilter,_ 507 U. S. 146, 153-154 (1993). Again the basis for this application of _Gingles_ was clear: A configuration of district lines could only dilute minority voting strength if under another configuration minority voters had better electoral prospects. Thus in cases involving single-member districts, the question was whether an _additional_ majority-minority district should be created, see _Abrams_ v. _Johnson,_ 521 U. S. 74, 91-92 (1997); _Growe_ v. _Emison,_ 507 U. S. 25, 38 (1993), or whether _additional_ influence districts *496 should be created to supplement existing majority-minority districts, see _Voinovich, supra,_ at 154.

We have thus emphasized, since _Gingles_ itself, that a § 2 plaintiff must at least show an apportionment that is likely to perform _better_ for minority voters, compared to the existing one. See 478 U. S., at 99 (O'Connor, J., concurring in judgment) ("[T]he relative lack of minority electoral success under a challenged plan, when compared with the success that would be predicted under the measure of undiluted minority voting strength the court is employing, can constitute powerful evidence of vote dilution"). And unsurprisingly, in the context of single-member districting schemes, we have invariably understood this to require the possibility of _additional_ single-member districts that minority voters might control.

_Johnson_ v. _De Grandy,_ 512 U. S. 997 (1994), reaffirmed this understanding. The plaintiffs in _De Grandy_ claimed that, by reducing the size of the Hispanic majority in some districts, _additional_ Hispanic-majority districts could be created. _Id.,_ at 1008. The State defended a plan that did not do so on the ground that the proposed additional districts, while containing nominal Hispanic majorities, would "lack enough Hispanic voters to elect candidates of their choice without cross-over votes from other ethnic groups," and thus could not bolster Hispanic voting strength under § 2. _Ibid._

In keeping with the requirement that a § 2 plaintiff must show that an alternative apportionment would present _better_ prospects for minority-preferred candidates, the Court set out the condition that a challenge to an existing set of single-member districts must show the possibility of "creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." _Ibid. De Grandy_ confirmed that simply proposing a set of districts that divides up a minority population in a different manner than the State has chosen, *497 without a gain in minority opportunity districts, does not show vote dilution, but "only that lines could have been drawn elsewhere." _Id.,_ at 1015.

Here the District Court found that six Latino-majority districts were all that south and west Texas could support. Plan 1374C provides six such districts, just as its predecessor did. This fact, combined with our precedent making clear that § 2 plaintiffs must show an alternative with _better_ prospects for minority success, should have resulted in affirmance of the District Court decision on vote dilution in south and west Texas. See _Gingles, supra,_ at 79 ("[T]he clearly-erroneous test of [Federal Rule of Civil Procedure] 52(a) is the appropriate standard for appellate review of a finding of vote dilution. . . . [W]hether the political process is equally open to minority voters . . . is peculiarly dependent upon the facts" (internal quotation marks omitted)); _Rogers_ v. _Lodge,_ 458 U. S. 613, 622, 627 (1982).

The majority avoids this result by finding fault with the District Court's analysis of one of the Latino-majority districts in the State's plan. That district—District 25—is like other districts in the State's plan, like districts in the predecessor plan, and like

districts in the *plaintiffs*' proposed seven-district plan, in that it joins population concentrations around the border area with others closer to the center of the State. The District Court explained that such "'bacon-strip'" districts are inevitable, given the geography and demography of that area of the State. *Session*, 298 F. Supp. 2d, at 486-487, 490, 491, n. 125, 502.

The majority, however, criticizes the District Court because its consideration of the compactness of District 25 under § 2 was deficient. According to the majority,

"the court analyzed the issue only for equal protection purposes. In the equal protection context, compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. Under § 2, by contrast, the injury is vote dilution, so the compactness inquiry embraces different considerations." *Ante,* at 433 (citation omitted).

This is simply an inaccurate description of the District Court's opinion. The District Court expressly considered compactness in the § 2 context. That is clear enough from the fact that the majority *quotes* the District Court's opinion in elaborating on the standard of compactness it believes the District Court *should* have applied. See *ante,* at 424 (quoting *Session, supra,* at 502); *ante,* at 434 (quoting *Session, supra,* at 502). The very passage quoted by the majority about the different "'needs and interests'" of the communities in District 25, *ante,* at 424, appeared in the District Court opinion precisely because the District Court recognized that those concerns "bear on the extent to which the new districts"—including District 25—"are functionally effective Latino opportunity districts, important to understanding whether *dilution* results from Plan 1374C," *Session,* 298 F. Supp. 2d, at 502 (emphasis added); see also *ibid.* (noting different "needs and interests of Latino communities" in the "'bacon-strip'" districts and concluding that "[t]he issue is whether these features mean that the newly-configured districts *dilute the voting strength* of Latinos" (emphasis added)).

Indeed, the District Court addressed compactness in two different sections of its opinion: in Part VI-C with respect to vote dilution under § 2, and in Part VI-D with respect to whether race predominated in drawing district lines, for purposes of equal protection analysis. The District Court even explained, in considering in Part VI-C the differences between the Latino communities in the bacon-strip districts (including District 25) for purposes of vote dilution under § 2, how the same concerns bear on the plaintiffs' equal protection claim, discussed in Part VI-D. *Id.,* at 502, n. 168. The majority faults the District Court for discussing "the relative smoothness of the district lines," because that is only pertinent *499 in the equal protection context, *ante,* at 432, but it was only in the equal protection context that the District Court mentioned the relative smoothness of district lines. See 298 F. Supp. 2d, at 506-508. In discussing compactness in Part VI-C, with respect to vote dilution under § 2, the District Court considered precisely what the majority says it should have: the diverse needs and interests of the different Latino communities in the district. Unlike the majority, however, the District Court properly recognized that the question under § 2 was "whether these features mean that the newly-configured districts dilute the voting strength of Latinos." *Id.,* at 502.

The District Court's answer to that question was unambiguous:

"Witnesses testified that Congressional Districts 15 and 25 would span *colonias* in Hidalgo County and suburban areas in Central Texas, but the witnesses testified, and the regression data show, that both districts are effective Latino opportunity districts, with the Hispanic-preferred candidate winning every primary and general election examined in District 25." *Id.,* at 503.

The District Court emphasized this point again later on:

"The newly-configured Districts 15, 25, 27, and 28 cover more territory and travel farther north than did the corresponding districts in Plan 1151C. The districts combine more voters from the central part of the State with voters from the border cities than was the case in Plan 1151C. The population data, regression analyses, and the testimony of both expert witnesses and witnesses knowledgeable about how politics actually works in the area lead to the finding that in Congressional Districts 25 and 28, Latino voters will likely control every primary and general election outcome." *Id.,* at 503-504.

I find it inexplicable how the majority can read these passages and state that the District Court reached its finding *500 on the effectiveness of District 25 "without accounting for the attenuated consequences of its compactness problems." *Ante,* at 442. The majority does "not question" the District Court's parsing of the statistical evidence to reach the finding that District 25 was an effective Latino opportunity district. *Ante,* at 434. But the majority nonetheless rejects that finding, based on its own theory that "[t]he practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals," *ibid.,* and because the finding rests on the "prohibited assumption" that voters of the same race will "think alike, share the same political interests, and will prefer the same candidates at the polls," *ante,* at 433

(internal quotation marks omitted). It is important to be perfectly clear about the following, out of fairness to the District Court if for no other reason: No one has made any "assumptions" about how voters in District 25 will vote based on their ethnic background. Not the District Court; not this dissent. There was a trial. At trials, assumptions and assertions give way to facts. In voting rights cases, that is typically done through regression analyses of past voting records. Here, those analyses showed that the Latino candidate of choice prevailed in every primary and general election examined for District 25. See *Session,* 298 F. Supp. 2d, at 499-500. Indeed, a plaintiffs' expert conceded that Latino voters in District 25 "have an effective opportunity to control outcomes in both primary and general elections." *Id.,* at 500. The District Court, far from "assum[ing]" that Latino voters in District 25 would "prefer the same candidate at the polls," concluded that they were likely to do so based on statistical evidence of historic voting patterns.

Contrary to the erroneous statements in the majority opinion, the District Court judges did *not* simply "aggregat[e]" minority voters to measure effectiveness. *Ante,* at 432. They did *not* simply rely on the "mathematical possibility" of minority voters
501  voting for the same preferred *501 candidate, *ante,* at 435, and it is a disservice to them to state otherwise. It is the majority that is indulging in unwarranted "assumption[s]" about voting, contrary to the facts found at trial based on carefully considered evidence.

What is blushingly ironic is that the district preferred by the majority—former District 23—suffers from the same "flaw" the majority ascribes to District 25, except to a greater degree. While the majority decries District 25 because the Latino communities there are separated by "enormous geographical distance," *ibid.,* and are "hundreds of miles apart," *ante,* at 441, Latino communities joined to form the voting majority in old District 23 are nearly twice as far apart. Old District 23 runs "from El Paso, over 500 miles, into San Antonio and down into Laredo. It covers a much longer distance than . . . the 300 miles from Travis to McAllen [in District 25]." App. 292 (testimony of T. Giberson); see *id.,* at 314 (expert report of T. Giberson) ("[D]istrict 23 in any recent Congressional plan extends from the outskirts of El Paso down to Laredo, dipping into San Antonio and spanning 540 miles"). So much for the significance of "enormous geographical distance." Or perhaps the majority is willing to "assume" that Latinos around San Antonio have common interests with those on the Rio Grande rather than those around Austin, even though San Antonio and Austin are a good bit closer to each other (less than 80 miles apart) than either is to the Rio Grande.[ ]

502  *502 The District Court considered expert evidence on projected election returns and concluded that District 25 would likely perform impeccably for Latino voters, better indeed than former District 23. See *Session,* 298 F. Supp. 2d, at 503-504, 488, 489, 496. The District Court also concluded that the other districts in Plan 1374C would give Latino voters a favorable opportunity to elect their preferred candidates. See *id.,* at 499 (observing the parties' agreement that Districts 16 and 20 in Plan 1374C "do clearly provide effective Latino citizen voting age population majorities"); *id.,* at 504 ("Latino voters will likely control every primary and general election outcome" in District 28, and "every primary outcome and almost every general election outcome" in Districts 15 and 27, under Plan 1374C). In light of these findings, the District Court concluded that "compared to Plan 1151C . . . Plaintiffs have not shown an impermissible reduction in effective opportunities for Latino electoral control or in opportunities for Latino participation in the political process." *Ibid.*

Viewed against this backdrop, the majority's holding that Plan 1374C violates § 2 amounts to this: A State has denied minority voters equal opportunity to "participate in the political process and to elect representatives of their choice," 42 U. S. C. § 1973
503  (b), when the districts in the plan a State has created have *better* prospects for the success of *503 minority-preferred candidates than an alternative plan, simply because one of the State's districts combines different minority communities, which, in any event, are likely to vote as a controlling bloc. It baffles me how this could be vote dilution, let alone how the District Court's contrary conclusion could be clearly erroneous.

## II

The majority arrives at the wrong resolution because it begins its analysis in the wrong place. The majority declares that a *Gingles* violation is made out "[c]onsidering" former District 23 "in isolation," and chides the State for suggesting that it can remedy this violation "by creating new District 25 as an offsetting opportunity district." *Ante,* at 429. According to the majority, "§ 2 does not forbid the creation of a noncompact majority-minority district," but "[t]he noncompact district cannot . . . remedy a violation elsewhere in the State." *Ante,* at 430.

The issue, however, is not whether a § 2 violation in District 23, viewed "in isolation," can be remedied by the creation of a Latino opportunity district in District 25. When the question is where a fixed number of majority-minority districts should be located, the analysis should never begin by asking whether a *Gingles* violation can be made out in any one district "in isolation."

In these circumstances, it is always possible to look at one area of minority population "in isolation" and see a "violation" of § 2 under *Gingles.* For example, if a State drew three districts in a group, with 60% minority voting-age population in the first two, and 40% in the third, the 40% can readily claim that their opportunities are being thwarted because *they* were not grouped with an additional 20% of minority voters from one of the other districts. But the remaining minority voters in the other districts would have precisely the same claim if minority voters were shifted from their districts to join the 40%. See *De Grandy,* 512 U. S., at

504    1015-1016 ("[S]ome dividing by district *504 lines and combining within them is virtually inevitable and befalls any population group of substantial size"). That is why the Court has explained that no individual minority voter has a right to be included in a majority-minority district. See *Shaw* v. *Hunt,* 517 U. S. 899, 917, and n. 9 (1996) *(Shaw II); id.,* at 947 (STEVENS, J., dissenting). Any other approach would leave the State caught between incompatible claims by different groups of minority voters. See *Session, supra,* at 499 ("[T]here is neither sufficiently dense and compact population in general nor Hispanic population in particular to support" retaining former District 23 *and* adding District 25).

The correct inquiry under § 2 is not whether a *Gingles* violation can be made out with respect to one district "in isolation," but instead whether line-drawing in the challenged area as a whole dilutes minority voting strength. A proper focus on the district lines in the area as a whole also demonstrates why the majority's reliance on *Bush* v. *Vera,* 517 U. S. 952 (1996), and *Shaw II* is misplaced.

In those cases, we rejected on the basis of lack of compactness districts that a State defended against equal protection strict scrutiny on the grounds that they were necessary to avoid a § 2 violation. See *Vera, supra,* at 977-981 (plurality opinion); *Shaw II, supra,* at 911, 916-918. But those cases never suggested that a plaintiff proceeding under § 2 could rely on lack of compactness to prove liability. And the districts in those cases were nothing like District 25 here. To begin with, they incorporated multiple, small, farflung pockets of minority population, and did so by ignoring the boundaries of political subdivisions. *Vera, supra,* at 987-989 (Appendices A-C to plurality opinion) (depicting districts); *Shaw II, supra,* at 902-903 (describing districts). Here the District Court found that the long and narrow but more normal shape of District 25 was shared by other districts both in the state plan and the predecessor plan—not to mention the plaintiffs' own proposed plan—and resulted

505    from the demography *505 and geography of south and west Texas. See *Session,* 298 F. Supp. 2d, at 487-488, 491, and n. 125. And *none* of the minority voters in the *Vera* and *Shaw II* districts could have formed part of a *Gingles*-compliant district, see *Vera, supra,* at 979 (plurality opinion) (remarking of one of the districts at issue that it "reaches out to grab small and apparently isolated minority communities which, based on the evidence presented, could not possibly form part of a compact majority-minority district"); *Shaw II,* 517 U. S., at 916-917 (describing the challenged district as "in no way coincident with the compact *Gingles* district"); while here no one disputes that at least the Latino voters in the border area of District 25—the larger concentration—*must* be part of a Latino-majority district if six are to be placed in south and west Texas.

This is not, therefore, a case of the State drawing a majority-minority district "anywhere," once a § 2 violation has been established elsewhere in the State. *Id.,* at 917. The question is instead whether the State has some latitude in deciding where to place the maximum possible number of majority-minority districts, when one of those districts contains a substantial proportion of minority voters who *must* be in a majority-minority district if the maximum number is to be created at all.

Until today, no court has ever suggested that lack of compactness under § 2 might invalidate a district that a State has chosen to create in the first instance. The "geographica[l] compact[ness]" of a minority population has previously been only an element of the *plaintiff's* case. See *Gingles,* 478 U. S., at 49-50. That is to say, the § 2 plaintiff bears the burden of demonstrating that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.,* at 50. Thus compactness, when it has been invoked by lower courts to defeat § 2 claims, has been applied to a remedial district

506    a *plaintiff* proposes. See, *e. g., Sensley* v. *Albritton,* 385 F. 3d *506 591, 596-597 (CA5 2004); *Mallory* v. *Ohio,* 173 F. 3d 377, 382-383 (CA6 1999); *Stabler* v. *County of Thurston,* 129 F. 3d 1015, 1025 (CA8 1997). Indeed, the most we have had to say about the compactness aspect of the *Gingles* inquiry is to profess doubt whether it was met when the district a § 2 plaintiff proposed was "oddly shaped." *Growe* v. *Emison,* 507 U. S., at 38, 41. And even then, we rejected § 2 liability not because of the odd shape, but because no evidence of majority bloc voting had been submitted. *Id.,* at 41-42.

Far from imposing a freestanding compactness obligation on the States, we have repeatedly emphasized that "States retain broad discretion in drawing districts to comply with the mandate of § 2," *Shaw II, supra,* at 917, n. 9, and that § 2 itself imposes "no *per se* prohibitions against particular types of districts," *Voinovich* v. *Quilter,* 507 U. S., at 155. We have said that the States retain "flexibility" in complying with voting rights obligations that "federal courts enforcing § 2 lack." *Vera, supra,* at 978. The majority's intrusion into line-drawing, under the authority of § 2, when the lines already achieve the maximum possible number of majorityminority opportunity districts, suggests that all this is just so much hollow rhetoric.

The majority finds fault in a "one-way rule whereby plaintiffs must show compactness but States need not," *ante,* at 431, without bothering to explain how its contrary rule of equivalence between plaintiffs litigating and the elected representatives of the people legislating comports with our repeated assurances concerning the discretion and flexibility left to the States. Section 2 is, after all, part of the Voting Rights Act, not the Compactness Rights Act. The word "compactness" appears nowhere in § 2, nor even in the agreed-upon legislative history. See *Gingles, supra,* at 36-37. To bestow on compactness such precedence in the § 2 inquiry is the antithesis of the totality test that the statute contemplates. *De Grandy,* 512 U. S., at 1011 ("[T]he ultimate

507 conclusions about equality or inequality of opportunity *507 were intended by Congress to be guideposts resting on comprehensive, not limited, canvassing of relevant facts"). Suggesting that determinative weight should have been given this one factor contravenes our understanding of how § 2 analysis proceeds, see *Gingles,* 478 U. S., at 45 (quoting statement from the legislative history of § 2 that "'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other'"), particularly when the proper standard of review for the District Court's ultimate judgment under § 2 is clear error, see *id.,* at 78-79.

A § 2 plaintiff has no legally protected interest in compactness, apart from how deviations from it dilute the equal opportunity of minority voters "to elect representatives of their choice." § 1973(b). And the District Court found that any effect on this opportunity caused by the different "needs and interests" of the Latino voters within District 25 was at least offset by the fact that, despite these differences, they were likely to prefer the same candidates at the polls. This finding was based on the evidence, not assumptions.

Whatever the competing merits of old District 23 and new District 25 at the margins, judging between those two majority-minority districts is surely the responsibility of the legislature, not the courts. See *Georgia* v. *Ashcroft,* 539 U. S. 461, 480 (2003). The majority's squeamishness about the supposed challenge facing a Latino-preferred candidate in District 25—having to appeal to Latino voters near the Rio Grande and those near Austin—is not unlike challenges candidates face around the country all the time, as part of a healthy political process. It is in particular not unlike the challenge faced by a Latino-preferred candidate in the district favored by the majority, former District 23, who must appeal to Latino voters both in San Antonio and in El Paso, 540 miles away. "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying *508 a statute meant to hasten the waning of racism in American

508 politics." *De Grandy,* 512 U. S., at 1020. As the Court has explained, "the ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Id.,* at 1014, n. 11. Holding that such *opportunity* is denied because a State draws a district with 55% minority citizen voting-age population, rather than keeping one with a similar percentage (but lower turnout) that did not in any event consistently elect minority-preferred candidates, gives an unfamiliar meaning to the word "opportunity."

## III

Even if a plaintiff satisfies the *Gingles* factors, a finding of vote dilution under § 2 does not automatically follow. In *De Grandy,* we identified another important aspect of the totality inquiry under § 2: whether "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population." 512 U. S., at 1000. A finding of proportionality under this standard can defeat § 2 liability even if a clear *Gingles* violation has been made out. In *De Grandy* itself, we found that "substantial proportionality" defeated a claim that the district lines at issue "diluted the votes cast by Hispanic voters," 512 U. S., at 1014-1015, even assuming that the plaintiffs had shown "the possibility of creating *more* than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice," *id.,* at 1008-1009 (emphasis added).

The District Court determined that south and west Texas was the appropriate geographic frame of reference for analyzing proportionality: "If South and West Texas is the only area in which *Gingles* is applied and can be met, as Plaintiffs argue, it is

509 also the relevant area for measuring proportionality." *Session,* 298 F. Supp. 2d, at 494. As the court explained, *509 "[l]ower courts that have analyzed `proportionality' in the *De Grandy* sense have been consistent in using the same frame of reference for that factor and for the factors set forth in *Gingles*." *Id.,* at 493-494, and n. 131 (citing cases).

In south and west Texas, Latinos constitute 58% of the relevant population and control 85% (six out of seven) of the congressional seats in that region. That includes District 25, because the District Court found, without clear error, that Latino voters in that district "will likely control every primary and general election outcome." *Id.,* at 504. But even not counting that district as a Latino opportunity district, because of the majority's misplaced compactness concerns, Latinos in south and west Texas still control congressional seats in a markedly greater proportion—71% (five out of seven)—than their share of the population there. In other words, in the only area in which the *Gingles* factors can be satisfied, Latino voters enjoy effective

political power 46% above their numerical strength, or, even disregarding District 25 as an opportunity district, 24% above their numerical strength. See *De Grandy*, 512 U. S., at 1017, n. 13. Surely these figures do not suggest a denial of equal *opportunity* to *participate* in the political process.

The majority's only answer is to shift the focus to statewide proportionality. In *De Grandy* itself, the Court rejected an argument that proportionality should be analyzed on a statewide basis as "flaw[ed]," because "the argument would recast these cases as they come to us, in order to bar consideration of proportionality except on statewide scope, whereas up until now the dilution claims have been litigated on a smaller geographical scale." *Id.*, at 1021-1022. The same is true here: The plaintiffs' § 2 claims concern "the impact of the legislative plan on Latino voting strength *in South and West Texas*," *Session, supra*, at 486 (emphasis added), and that is the only area of the State in which they can satisfy the *Gingles* factors. That is accordingly the proper frame of reference in analyzing proportionality.

510     *510 In any event, at a statewide level, 6 Latino opportunity districts out of 32, or 19% of the seats, would certainly seem to be "roughly proportional" to the Latino 22% share of the population. See *De Grandy, supra*, at 1000. The District Court accordingly determined that proportionality suggested the lack of vote dilution, even considered on a statewide basis. *Session, supra*, at 494. The majority avoids that suggestion by disregarding the District Court's factual finding that District 25 is an effective Latino opportunity district. That is not only improper, for the reasons given, but the majority's rejection of District 25 as a Latino opportunity district is also flatly inconsistent with its statewide approach to analyzing proportionality. Under the majority's view, the Latino voters in the northern end of District 25 cannot "count" along with the Latino voters at the southern end to form an effective majority, because they belong to different communities. But Latino voters from everywhere around the State of Texas—even those from areas where the *Gingles* factors are not satisfied—can "count" for purposes of calculating the proportion against which effective Latino electoral power should be measured. Heads the plaintiffs win; tails the State loses.

* * *

The State has drawn a redistricting plan that provides six of seven congressional districts with an effective majority of Latino voting-age citizens in south and west Texas, and it is not possible to provide more. The majority nonetheless faults the state plan because of the *particular mix* of Latino voters forming the majority in one of the six districts—a combination of voters from around the Rio Grande and from around Austin, as opposed to what the majority uncritically views as the more monolithic majority assembled (from more farflung communities) in old District 23. This despite the express factual findings, from judges

511     far more familiar with Texas than we are, that the State's new district would be a *511 more effective Latino-majority district than old District 23 ever was, and despite the fact that *any* plan would necessarily leave *some* Latino voters outside a Latino-majority district.

Whatever the majority believes it is fighting with its holding, it is not vote dilution on the basis of race or ethnicity. I do not believe it is our role to make judgments about which *mixes* of minority voters should count for purposes of forming a majority in an electoral district, in the face of factual findings that the district is an effective majority-minority district. It is a sordid business, this divvying us up by race. When a State's plan already provides the maximum possible number of majority-minority effective opportunity districts, and the minority enjoys effective political power in the area well in *excess* of its proportion of the population, I would conclude that the courts have no further role to play in rejiggering the district lines under § 2.

I respectfully dissent from Part III of the Court's opinion.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, and with whom THE CHIEF JUSTICE and JUSTICE ALITO join as to Part III, concurring in the judgment in part and dissenting in part.

# I

As I have previously expressed, claims of unconstitutional partisan gerrymandering do not present a justiciable case or controversy. See *Vieth* v. *Jubelirer*, 541 U. S. 267, 271-306 (2004) (plurality opinion). JUSTICE KENNEDY's discussion of appellants' political-gerrymandering claims ably demonstrates that, yet again, no party or judge has put forth a judicially discernible standard by which to evaluate them. See *ante*, at 413-423. Unfortunately, the opinion then concludes that appellants have failed to state a claim as to political gerrymandering, without ever articulating what the elements of such a

512     claim consist of. That is not an available disposition of this appeal. We must either conclude *512 that the claim is nonjusticiable and dismiss it, or else set forth a standard and measure appellants' claim against it. *Vieth, supra*, at 301. Instead, we again

dispose of this claim in a way that provides no guidance to lower court judges and perpetuates a cause of action with no discernible content. We should simply dismiss appellants' claims as nonjusticiable.

## II

I would dismiss appellants' vote-dilution claims premised on §2 of the Voting Rights Act of 1965 for failure to state a claim, for the reasons set forth in JUSTICE THOMAS's opinion, which I joined, in _Holder_ v. _Hall_, 512 U. S. 874, 891-946 (1994) (opinion concurring in judgment). As THE CHIEF JUSTICE makes clear, see _ante_, p. 492 (opinion concurring in part, concurring in judgment in part, and dissenting in part), the Court's § 2 jurisprudence continues to drift ever further from the Act's purpose of ensuring minority voters equal electoral opportunities.

## III

Because I find no merit in either of the claims addressed by the Court, I must consider appellants' race-based equal protection claims. The GI Forum appellants focus on the removal of 100,000 residents, most of whom are Latino, from District 23. They assert that this action constituted intentional vote dilution in violation of the Equal Protection Clause. The Jackson appellants contend that the intentional creation of District 25 as a majority-minority district was an impermissible racial gerrymander. The District Court rejected the equal protection challenges to both districts.

## A

The GI Forum appellants contend that the Texas Legislature removed a large number of Latino voters living in Webb County from District 23 with the purpose of diminishing Latino electoral power in that district. Congressional redistricting is primarily a

513   responsibility of state legislatures, and legislative motives are often difficult to discern. We presume, \*513 moreover, that legislatures fulfill this responsibility in a constitutional manner. Although a State will almost always be aware of racial demographics when it redistricts, it does not follow from this awareness that the State redistricted on the basis of race. See _Miller_ v. _Johnson_, 515 U. S. 900, 915-916 (1995). Thus, courts must "exercise extraordinary caution" in concluding that a State has intentionally used race when redistricting. _Id._, at 916. Nevertheless, when considerations of race predominate, we do not hesitate to apply the strict scrutiny that the Equal Protection Clause requires. See, e. g., _Shaw_ v. _Hunt_, 517 U. S. 899, 908 (1996) _(Shaw II); Miller, supra_, at 920.

At the time the legislature redrew Texas's congressional districts, District 23 was represented by Congressman Henry Bonilla, whose margin of victory and support among Latinos had been steadily eroding. See _Session_ v. _Perry_, 298 F. Supp. 2d 451, 488-489 (ED Tex. 2004) _(per curiam)._ In the 2002 election, he won with less than 52 percent of the vote, _ante_, at 423-424 (opinion of the Court), and received only 8 percent of the Latino vote, _Session_, 298 F. Supp. 2d, at 488. The District Court found that the goal of the map drawers was to adjust the lines of that district to protect the imperiled incumbent: "The record presents undisputed evidence that the Legislature desired to increase the number of Republican votes cast in Congressional District 23 to shore up Bonilla's base and assist in his reelection." _Ibid._ To achieve this goal, the legislature extended the district north to include counties in the central part of the State with residents who voted Republican, adding 100,000 people to the district. Then, to comply with the one-person, one-vote requirement, the legislature took one-half of heavily Democratic Webb County, in the southern part of the district, and included it in the neighboring district. _Id._, at 488-489.

Appellants acknowledge that the State redrew District 23 at least in part to protect Bonilla. They argue, however, that they
514   assert an intentional vote-dilution claim that is analytically distinct from the racial-gerrymandering claim of \*514 the sort at issue in _Shaw_ v. _Reno_, 509 U. S. 630, 642-649 (1993) _(Shaw I)._ A vote-dilution claim focuses on the majority's intent to harm a minority's voting power; a _Shaw I_ claim focuses instead on the State's purposeful classification of individuals by their race, regardless of whether they are helped or hurt. _Id._, at 651-652 (distinguishing the vote-dilution claim in _United Jewish Organizations of Williamsburgh, Inc._ v. _Carey_, 430 U. S. 144 (1977)). In contrast to a _Shaw I_ claim, appellants contend, in a vote-dilution claim the plaintiff need not show that the racially discriminatory motivation _predominated_, but only that the invidious purpose was _a_ motivating factor. Appellants contrast _Easley_ v. _Cromartie_, 532 U. S. 234, 241 (2001) (in a racial-gerrymandering claim, "[r]ace must not simply have been _a_ motivation for the drawing of a majority-minority district, but the _predominant_ factor motivating the legislature's districting decision" (citation and internal quotation marks omitted)), with _Arlington Heights_ v. _Metropolitan Housing Development Corp._, 429 U. S. 252, 265-266 (1977), and _Rogers_ v. _Lodge_, 458 U. S. 613, 617 (1982). Whatever the validity of this distinction, on the facts of these cases it is irrelevant. The District Court's

conclusion that the legislature was not racially motivated when it drew the plan as a whole, _Session,_ 298 F. Supp. 2d, at 473, and when it split Webb County, _id.,_ at 509, dooms appellants' intentional-vote-dilution claim.

We review a district court's factual finding of a legislature's motivation for clear error. See _Easley, supra,_ at 242. We will not overturn that conclusion unless we are "`left with the definite and firm conviction that a mistake has been committed.'" _Anderson_ v. _Bessemer City,_ 470 U. S. 564, 573 (1985) (quoting _United States_ v. _United States Gypsum Co.,_ 333 U. S. 364, 395 (1948)). I cannot say that the District Court clearly erred when it found that "[t]he legislative motivation for the division of Webb County between Congressional District 23 and Congressional District 28 in Plan 1374C was political." _Session, supra,_ at 509.

515    *515 Appellants contend that the District Court had evidence of the State's intent to minimize Latino voting power. They note, for instance, that the percentage of Latinos in District 23's citizen voting-age population decreased significantly as a result of redistricting and that only 8 percent of Latinos had voted for Bonilla in the last election. They also point to testimony indicating that the legislature was conscious that protecting Bonilla would result in the removal of Latinos from the district and was pleased that, even after redistricting, he would represent a district in which a slight majority of voting-age residents was Latino. Of the individuals removed from District 23, 90 percent of those of voting age were Latinos, and 87 percent voted for Democrats in 2002. _Id.,_ at 489. The District Court concluded that these individuals were removed because they voted for Democrats and against Bonilla, not because they were Latino. _Id.,_ at 473, 508-510. This finding is entirely in accord with our case law, which has recognized that "a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were _conscious_ of that fact." _Hunt_ v. _Cromartie,_ 526 U. S. 541, 551 (1999). See also _Bush_ v. _Vera,_ 517 U. S. 952, 968 (1996) (plurality opinion) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no

516    racial classification to justify").[11] Appellants argue that in evaluating the State's stated motivation, the District *516 Court improperly conflated race and political affiliation by failing to recognize that the individuals moved were not Democrats, they just voted against Bonilla. But the District Court found that the State's purpose was to protect Bonilla, and not just to create a safe Republican district. The fact that the redistricted residents voted against Bonilla (regardless of how they voted in other races) is entirely consistent with the legislature's political and nonracial objective.

I cannot find, under the clear error standard, that the District Court was required to reach a different conclusion. See _Hunt, supra,_ at 551. "Discriminatory purpose. . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker. . . selected or reaffirmed a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group." _Personnel Administrator of Mass._ v. _Feeney,_ 442 U. S. 256, 279 (1979) (citation, some internal quotation marks, and footnote omitted). The District Court cited ample evidence supporting its finding that the State did not remove Latinos from the district because they were Latinos: The new District 23 is more compact than it was under the old plan, see _Session,_ 298 F. Supp. 2d, at 506, the division of Webb County simply followed the interstate highway, _id.,_ at 509-510, and the district's "lines did not make twists, turns, or jumps that can be explained only as efforts to include Hispanics or exclude Anglos, or vice-versa," _id.,_ at 511. Although appellants put forth alternative redistricting scenarios that would have protected Bonilla, the District Court noted that these alternatives would not have furthered the legislature's goal of increasing the number of Republicans elected statewide. _Id.,_ at 497. See _Miller,_ 515 U. S., at 915 ("Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to

517    balance competing interests"). Nor is the District Court's finding at all impugned by the fact that certain legislators *517 were pleased that Bonilla would continue to represent a nominally Latino-majority district.

The ultimate inquiry, as in all cases under the Equal Protection Clause, goes to the State's purpose, not simply to the effect of state action. See _Washington_ v. _Davis,_ 426 U. S. 229, 238-241 (1976). Although it is true that the effect of an action can support an inference of intent, see _id.,_ at 242, there is ample evidence here to overcome any such inference and to support the State's political explanation. The District Court did not commit clear error by accepting it.

**B**

The District Court's finding with respect to District 25 is another matter. There, too, the District Court applied the approach set forth in _Easley,_ in which the Court held that race may be a motivation in redistricting as long as it is not the predominant one. 532 U. S., at 241. See also _Bush,_ 517 U. S., at 993 (O'Connor, J., concurring) ("[S]o long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny"). In my view, however, when a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation and strict scrutiny is therefore

triggered. See *id.*, at 999-1003 (THOMAS, J., joined by SCALIA, J., concurring in judgment). As in *Bush, id.*, at 1002, the State's concession here sufficiently establishes that the legislature classified individuals on the basis of their race when it drew District 25: "[T]o avoid retrogression and achieve compliance with § 5 of the Voting Rights Act . . ., the Legislature chose to create a new Hispanic-opportunity district—new CD 25—which would allow Hispanics to actually elect its candidate of choice." Brief for State Appellees 106. The District Court similarly found that "the Legislature clearly intended to create a majority Latino citizen voting *518* age population district in Congressional District 25." *Session, supra*, at 511. Unquestionably, in my view, the drawing of District 25 triggers strict scrutiny.

518

Texas must therefore show that its use of race was narrowly tailored to further a compelling state interest. See *Shaw II*, 517 U. S., at 908. Texas asserts that it created District 25 to comply with its obligations under § 5 of the Voting Rights Act. Brief for State Appellees 105-106. That provision forbids a covered jurisdiction to promulgate any "standard, practice, or procedure" unless it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race." 42 U. S. C. § 1973c. The purpose of § 5 is to prevent "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). Since its changes to District 23 had reduced Latino voting power in that district, Texas asserts that it needed to create District 25 as a Latino-opportunity district in order to avoid § 5 liability.

We have in the past left undecided whether compliance with federal antidiscrimination laws can be a compelling state interest. See *Miller, supra*, at 921; *Shaw II, supra*, at 911. I would hold that compliance with § 5 of the Voting Rights Act can be such an interest. We long ago upheld the constitutionality of § 5 as a proper exercise of Congress's authority under § 2 of the Fifteenth Amendment to enforce that Amendment's prohibition on the denial or abridgment of the right to vote. See *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966). If compliance with § 5 were not a compelling state interest, then a State could be placed in the impossible position of having to choose between compliance with § 5 and compliance with the Equal Protection Clause. Moreover, the compelling nature of the State's interest in § 5 compliance is supported by our recognition in previous cases that race may be used where necessary to remedy identified past discrimination. See, e. g., *Shaw II, supra*, at 909 (citing *519 Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 498-506 (1989)). Congress enacted § 5 for just that purpose, see *Katzenbach, supra*, at 309; *Beer, supra*, at 140-141, and that provision applies only to jurisdictions with a history of official discrimination, see 42 U. S. C. §§ 1973b(b), 1973c; *Vera* v. *Richards*, 861 F. Supp. 1304, 1317 (SD Tex. 1994) (recounting that, because of its history of racial discrimination, Texas became a jurisdiction covered by § 5 in 1975). In the proper case, therefore, a covered jurisdiction may have a compelling interest in complying with § 5.

519

To support its use of § 5 compliance as a compelling interest with respect to a particular redistricting decision, the State must demonstrate that such compliance was its "'actual purpose'" and that it had "'a strong basis in evidence' for believing," *Shaw II, supra*, at 908-909, n. 4 (citations omitted), that the redistricting decision at issue was "reasonably necessary under a constitutional reading and application of" the Act, *Miller*, 515 U. S., at 921.[2] Moreover, in order to tailor the use of race narrowly to its purpose of complying with the Act, a State cannot use racial considerations to achieve results beyond those that are required to comply with the statute. See *id.*, at 926 (rejecting the Department of Justice's policy that maximization of minority districts was required by § 5 and thus that this policy could serve as a compelling state interest). Section 5 forbids a State to take action that would worsen minorities' electoral opportunities; it does not require action that would improve them.

In determining whether a redistricting decision was reasonably necessary, a court must bear in mind that a State is permitted great flexibility in deciding how to comply with § 5's mandate. See *Georgia* v. *Ashcroft*, 539 U. S. 461, 479-483 (2003). For instance, we have recognized that § 5 does not constrain a State's choice between creating majority-minority districts or minority-influence districts. *Id.*, at *520* 480-483. And we have emphasized that, in determining whether a State has impaired a minority's "effective exercise of the electoral franchise," a court should look to the totality of the circumstances statewide. These circumstances include the ability of a minority group "to elect a candidate of its choice" or "to participate in the political process," the positions of legislative leadership held by individuals representing minority districts, and support for the new plan by the representatives previously elected from these districts. *Id.*, at 479-485.

520

In light of these many factors bearing upon the question whether the State had a strong evidentiary basis for believing that the creation of District 25 was reasonably necessary to comply with § 5, I would normally remand for the District Court to undertake that "fact-intensive" inquiry. See *id.*, at 484, 490. Appellants concede, however, that the changes made to District 23 "necessitated creating an additional effective Latino district elsewhere, in an attempt to avoid Voting Rights Act liability." Brief for Appellant Jackson et al. in No. 05-276, p. 44. This is, of course, precisely the State's position. Brief for State Appellees 105-106. Nor do appellants charge that in creating District 25 the State did more than what was required by § 5.[3] In light of these concessions, I do not believe a remand is necessary, and I would affirm the judgment of the District Court.

[*] Together with No. 05-254, *Travis County, Texas, et al.* v. *Perry, Governor of Texas, et al.,* No. 05-276, *Jackson et al.* v. *Perry, Governor of Texas, et al.,* and No. 05-439, *GI Forum of Texas et al.* v. *Perry, Governor of Texas, et al.,* also on appeal from the same court.

[†] Briefs of *amici curiae* urging reversal in all cases were filed for the Brennan Center for Justice by *Deborah Goldberg* and *Michael Waldman;* for the Center for American Progress by *Walter Dellinger, Jonathan D. Hacker, Matthew S. Mors,* and *Jeffrey W. Mice;* for the Reform Institute et al. by *Daniel R. Ortiz;* for University Professors et al. by *Lucas A. Powe, Jr.;* and for Samuel Issacharoff et al. by *Richard H. Pildes, pro se,* and *Mr. Issacharoff, pro se.*

*David W. Ogden, Jonathan E. Nuechterlein, Leonard M. Shambon,* and *Jonathan H. Siegelbaum* filed a brief of *amici curiae* for the League of Women Voters of the United States et al. urging reversal in Nos. 05-204, 05-254, and 05-276.

*Harold D. Hammett* filed a brief for the Fort Worth-Tarrant County Branch NAACP as *amicus curiae* urging reversal in No. 05-276.

Briefs of *amici curiae* urging affirmance in all cases were filed for the State of Utah et al. by *Mark Shurtleff,* Attorney General of Utah, *Gene C. Schaerr, Steffen N. Johnson, James R. Thompson, George J. Chanos,* Attorney General of Nevada, and *Jim Petro,* Attorney General of Ohio; for the American Legislative Exchange Council et al. by *Marguerite Mary Leoni;* for the Republican National Committee by *Thomas J. Josefiak;* for Senator Robert C. Jubelirer by *John P. Krill, Jr.,* and *Linda J. Shorey;* for the Speaker of the Georgia House of Representatives Glenn Richardson et al. by *Anne W. Lewis* and *Frank B. Strickland;* and for Ron Wilson by *S. Shawn Stephens* and *Mr. Wilson, pro se.*

*Maureen E. Mahoney* filed a brief for Congressman Henry Bonilla as *amicus curiae* urging affirmance in No. 05-439.

Briefs of *amici curiae* were filed in all cases for the NAACP Legal Defense and Educational Fund, Inc., by *Theodore M. Shaw, Jacqueline A. Berrien, Norman J. Chachkin,* and *Debo P. Adegbile;* for Edward Blum et al. by *Frank M. Reilly* and *Marc A. Levin;* for Alan Heslop et al. by *E. Marshall Braden, Robert M. Doherty,* and *Clark E. Bensen;* and for Gary King et al. by *Justin J. Nelson* and *H. Lee Godfrey.*

Briefs of *amici curiae* were filed in No. 05-276 for the North Carolina State Conference of the National Association for the Advancement of Colored People by *Anita S. Earls, Julius L. Chambers,* and *John Charles Boger;* and for Neil H. Cogan by *Mr. Cogan, pro se.*

[1] It was apparently these electoral results that later caused the District Court to state that "the practical effect" of Plan 1151C "was to leave the 1991 Democratic Party gerrymander largely in place as a `legal' plan." *Henderson* v. *Perry,* 399 F. Supp. 2d 756, 768 (ED Tex. 2005); see *id.,* at 768, n. 52. But the existence of ticket-splitting voters hardly demonstrates that Plan 1151C was biased in favor of Democrats. Instead, as noted above, even the State's expert in this litigation concluded that Plan 1151C was, if anything, biased in favor of Republicans. Nor do the circumstances surrounding the replacement of Plan 1151C suggest that the legislature was motivated by a misimpression that Plan 1151C was unfair to Republicans, and accordingly should be replaced with a more equitable map. Rather, as discussed in detail below, it is clear that the sole motivation for enacting a new districting map was to maximize Republican advantage.

[2] These two standard measures of compactness are the perimeter-to-area score, which compares the relative length of the perimeter of a district to its area, and the smallest circle score, which compares the ratio of space in the district to the space in the smallest circle that could encompass the district. App. 178.

[3] The State suggests that in the process of drawing districts the architects of Plan 1374C frequently followed county lines, made an effort to keep certain entire communities within a given district, and otherwise followed certain neutral principles. But these facts are not relevant to the narrow question presented by these cases: Neutral motivations in the implementation of particular features of the redistricting do not qualify the solely partisan motivation behind the basic decision to adopt an entirely unnecessary plan in the first place.

[4] As noted above, rather than identifying any arguably neutral reasons for adopting Plan 1374C, the record establishes a purely partisan single-minded motivation with unmistakable clarity. Therefore, there is no need at this point to discuss standards that would guide judges in enforcing a rule allowing legislatures to be motivated in part by partisan considerations, but which would impose an "obligation not to apply *too much* partisanship in districting." *Vieth* v. *Jubelirer,* 541 U. S. 267, 286 (2004) (plurality opinion). Deciding that 100% is "too much" is not only a manageable decision, but, as explained below, it is also an obviously correct one. Nonetheless, it is worth emphasizing that courts do, in fact, possess the tools to employ standards that permit legislatures to consider partisanship in the redistricting process, but which do not allow legislatures to use partisanship as the predominant motivation for their actions. See Part IV, *infra.*

[5] See *Larios* v. *Cox,* 300 F. Supp. 2d 1320, 1342-1353 (ND Ga. 2004) *(per curiam).* In *Cox,* the three-judge District Court undertook a searching review of the entire record in concluding that the population deviations in the state legislative districts created for the Georgia House and Senate after the release of the 2000 census data were not driven by any traditional redistricting criteria, such as compactness or preserving county lines, but were instead driven by the impermissible factors of regional favoritism and the discriminatory protection of Democratic incumbents. If there were no judicially manageable standards to assess whether a State's adoption of a redistricting map was based on valid governmental objectives, we would not have summarily affirmed the decision in *Cox* over the dissent of only one Justice. See 542 U. S. 947; *id.,* at 951 (SCALIA, J., dissenting). In addition, as Part III of the Court's opinion and this Part of my opinion demonstrate, assessing whether a redistricting map has a discriminatory impact on the opportunities for voters and candidates of a particular party to influence the political process is a manageable judicial task.

[6] Although the burdened group at issue in this litigation consists of Democratic voters and candidates, the partisan gerrymandering analysis throughout this opinion would be equally applicable to any "politically coherent group whose members engaged in bloc voting." *Vieth,* 541 U. S., at 347 (SOUTER, J., joined by GINSBURG, J., dissenting).

[7] In the 2004 congressional elections, Republicans won 21 of the 22 seats that had been designed to favor Republicans in Plan 1374C. One Democratic incumbent, Representative Chet Edwards, narrowly defeated (with 51% of the vote) his noncumbent Republican challenger in a Republican-leaning district; Edwards outspent his challenger, who lacked strong ties to the principal communities in the district. Republicans are likely to spend more money and find a stronger challenger in 2006, which will create a "very significant chance" of a Republican defeating Edwards. App. to Juris. Statement 224a, 226a.

[8] If 10% of Republican voters decided to vote for Democratic candidates, and if there were no other changes in voter turnout or preferences, the Republicans' share of the statewide vote would be reduced from 58% to 52%.

[9] JUSTICE KENNEDY faults proponents of the symmetry standard for not "providing a standard for deciding how much partisan dominance is too much," *ante*, at 420. But it is this Court, not proponents of the symmetry standard, that has the judicial obligation to answer the question of how much unfairness is too much. It would, of course, be an eminently manageable standard for the Court to conclude that deviations of over 10% from symmetry create a prima facie case of an unconstitutional gerrymander, just as population deviations among districts of more than 10% create such a prima facie case. Or, the Court could conclude that a significant departure from symmetry is one relevant factor in analyzing whether, under the totality of the circumstances, a districting plan is an unconstitutional partisan gerrymander. See n. 11, *infra*. At any rate, proponents of the symmetry standard have provided a helpful (though certainly not talismanic) tool in this type of litigation. While I appreciate JUSTICE KENNEDY's leaving the door open to the use of the standard in future cases, see *ante*, at 419-420, I believe it is the role of this Court, not social scientists, to determine how much partisan dominance is too much.

[10] Safe seats may harm the democratic process in other ways as well. According to one recent article coauthored by a former Chairman of the Federal Election Commission, electoral competition "plainly has a positive effect on the interest and participation of voters in the electoral process." Potter & Viray, Election Reform: Barriers to Participation, 36 U. Mich. J. L. Reform 547, 575 (2003) (hereinafter Potter & Viray); see also L. Guinier, Tyranny of the Majority 85 (1994). The impact of noncompetitive elections in depressing voter turnout is especially troubling in light of the fact that voter participation in the United States lags behind, often well behind, participation rates in other democratic nations. Potter & Viray 575-576, and n. 200. In addition, the creation of safe seats tends to polarize decisionmaking bodies. See, *e. g., Clingman* v. *Beaver,* 544 U. S. 581, 620 (2005) (STEVENS, J., joined by GINSBURG, J., dissenting) (noting that safe districts can "increase the bitter partisanship that has already poisoned some of those [legislative] bodies that once provided inspiring examples of courteous adversary debate and deliberation"); Cox, Partisan Gerrymandering and Disaggregated Redistricting, 2004 S. Ct. Rev. 409, 430 (arguing that "safe seats produce more polarized representatives because, by definition, the median voter in a district that is closely divided between the two major parties is more centrist than the median voter in a district dominated by one party"); Raviv, Unsafe Harbors: One Person, One Vote and Partisan Redistricting, 7 U. Pa. J. Const. L. 1001, 1068 (2005) (arguing that safe districts encourage polarization in decisionmaking bodies because representatives from those districts have to cater only to voters from one party). See generally Issacharoff & Karlan, Where to Draw the Line?: Judicial Review of Political Gerrymanders, 153 U. Pa. L. Rev. 541, 574 (2004) (providing data about the large percentage of safe seats in recent congressional and state legislative elections, and concluding that "[n]on-competitive elections threaten both the legitimacy and the vitality of democratic governance").

[11] In this litigation expert testimony provided the principal evidence about the effects of the plan that satisfy the test JUSTICE KENNEDY would impose. In my judgment, however, most statewide challenges to an alleged gerrymander should be evaluated primarily by examining these objective factors: (1) the number of people who have been moved from one district to another, (2) the number of districts that are less compact than their predecessors, (3) the degree to which the new plan departs from other neutral districting criteria, including respect for communities of interest and compliance with the Voting Rights Act, (4) the number of districts that have been cracked in a manner that weakens an opposition party incumbent, (5) the number of districts that include two incumbents from the opposite party, (6) whether the adoption of the plan gave the opposition party, and other groups, a fair opportunity to have input in the redistricting process, (7) the number of seats that are likely to be safe seats for the dominant party, and (8) the size of the departure in the new plan from the symmetry standard.

[12] Justice BREYER has authorized me to state that he agrees with JUSTICE SCALIA that compliance with § 5 of the Voting Rights Act is also a compelling state interest. See *post*, at 518 (opinion concurring in judgment in part and dissenting in part). I, too, agree with JUSTICE SCALIA on this point.

[13] If, on the other hand, the State could demonstrate, for example, that the new district was part of a statewide scheme designed to apportion power fairly among politically salient groups, or to enhance the political power of an underrepresented community of interest (such as residents of an economically distressed region), the State would avoid liability even if the results of such statewide districting had predictably partisan effects. See generally *Vieth*, 541 U. S., at 351-352 (SOUTER, J., joined by GINSBURG, J., dissenting) (discussing legitimate interests that a State could posit as a defense to a prima facie case of partisan gerrymandering).

[14] This assumption is justified based on counsel's undisputed representations at oral argument. See Tr. of Oral Arg. 35. However, if there were any genuine dispute about whether there are plaintiffs whose residences were previously located in *Balderas* District 24, but which are now incorporated into Districts 6, 24, 26, and 32, a remand would be appropriate to allow the District Court to address this issue.

[15] In the decision below, the District Court concluded that black voters did not in fact "control" electoral outcomes in District 24. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 498 (2004). Even assuming, as JUSTICE KENNEDY concludes, see *ante*, at 444-446, that the District Court did not commit reversible error in its analysis of this issue, the lack of "control" might be relevant in analyzing plaintiffs' vote dilution claim under § 2, but it is not relevant in evaluating whether Plan 1374C is retrogressive under § 5. It is indisputable that, at the very least, *Balderas* District 24 was a strong influence district for black voters, that is, a district where voters of color can "play a substantial, if not decisive, role in the electoral process." *Georgia* v. *Ashcroft*, 539 U. S. 461, 482 (2003). Accordingly, by dismantling *Balderas* District 24, and by failing to create a strong

influence district elsewhere, Plan 1374C was retrogressive. See 539 U. S., at 482 (explaining that, in deciding whether a plan is retrogressive, "a court must examine whether a new plan adds or subtracts `influence districts'").

[16] As Justice KENNEDY explains, see *ante*, at 443-447, plaintiffs did, however, challenge District 24 under § 2. I am in substantial agreement with Justice SOUTER's discussion of this issue. See *post*, at 485-490 (opinion concurring in part and dissenting in part). Specifically, I agree with Justice SOUTER that the "50% rule," which finds no support in the text, history, or purposes of § 2, is not a proper part of the statutory vote dilution inquiry. For the reasons stated in my analysis of the "unique question of law . . . raised in this appeal," *supra*, at 456, and in this part of my opinion, however, it is so clear that the cracking of District 24 created an unconstitutional gerrymander that I find it unnecessary to address the statutory issue separately.

[17] Because new District 12, another district that covers portions of former District 24, is more compact than *Balderas* District 24, voters in new District 12 who previously resided in *Balderas* District 24 would not be able to bring a successful partisan gerrymandering claim under my proposed test, even though new District 12 is also a safe Republican district. See App. 106, 319-320.

[1] In a subsequent case, however, we did not state the first *Gingles* condition in terms of an absolute majority. See *Johnson* v. *De Grandy*, 512 U.S. 997, 1008 (1994) ("[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice").

[2] Like JUSTICE STEVENS, I agree with JUSTICE SCALIA that compliance with § 5 is a compelling state interest. See *ante*, at 475, n. 12 (STEVENS, J., concurring in part and dissenting in part); *post*, at 518-519 (SCALIA, J., concurring in judgment in part and dissenting in part).

[3] I recognize that a minority group might satisfy the § 2 "ability to elect" requirement in other ways, and I do not mean to rule out other circumstances in which a coalition district might be required by § 2. A minority group slightly less than 50% of the electorate in nonpartisan elections for a local school board might, for example, show that it can elect its preferred candidates owing to consistent crossover support from members of other groups. Cf. *Valdespino* v. *Alamo Heights Independent School Dist.*, 168 F.3d 848, 850-851 (CA5 1999), cert. denied, 528 U.S. 1114 (2000).

[4] Cf. *California Democratic Party* v. *Jones*, 530 U.S. 567, 575 (2000) ("In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views").

[5] One must be careful about what such electoral success ostensibly shows; if the primary choices are constrained, say, by party rules, the minority voters' choice in the primary may not be truly their candidate of choice, see Note, *Gingles* In Limbo: Coalitional Districts, Party Primaries and Manageable Vote Dilution Claims, 80 N. Y. U. L. Rev. 312 (2005).

[6] Judge Ward properly noted that the fact that Frost has gone unchallenged may "reflect favorably on his record" of responding to the concerns of minorities in the district. See *Session* v. *Perry*, 298 F. Supp. 2d 451, 530 (ED Tex. 2004) (opinion concurring in part and dissenting in part).

[7] In any event, although a history or prophecy of success in electing candidates of choice is a powerful touchstone of § 2 liability when minority populations are cracked or packed, electoral success is not the only manifestation of equal opportunity to participate in the political process, see *De Grandy*, 512 U.S., at 1014, n. 11. The diminution of that opportunity by taking minority voters who previously dominated the dominant party's primary and submerging them in a new district is not readily discounted by speculating on the effects of a black-white primary contest in the old district.

[8] The way this third condition is understood when a claim of a putative coalition district is made will have implications for the identification of candidate of choice under the first *Gingles* condition. Suffice it to say here that the criteria may not be the same when dealing with coalition districts as in cases of districts with majority-minority populations. All aspects of our established analysis for majority-minority districts in *Gingles* and its progeny may have to be rethought in analyzing ostensible coalition districts.

[9] Notably, under the Texas Legislature's Plan 1374C, there are three undisputed districts where African-Americans tend to elect their candidates of choice. African-Americans compose at most a citizen voting-age majority (50.6%) in one of the three, District 30, see *Session*, *supra*, at 515; even there, the State's expert pegged the percentage at 48.6%, App. 185-186. In any event, the others, Districts 9 and 18, are coalition districts, with African-American citizen voting-age populations of 46.9% and 48.6% respectively. *Id.*, at 184-185.

[*] The majority's fig leaf after stressing the distances involved in District 25—while ignoring the greater ones in former District 23—is to note that "it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 noncompact for § 2 purposes." *Ante*, at 435. Of course no single factor is determinative because the ultimate question is whether the district is an effective majority-minority opportunity district. There was a trial on that; the District Court found that District 25 was, while former District 23 "did not perform as an effective opportunity district." *Session* v. *Perry*, 298 F. Supp. 2d 451, 496 (ED Tex. 2004) *(per curiam)*. The majority notes that there was no challenge to or finding on the compactness of old District 23, *ante*, at 435—certainly not compared to District 25—but presumably that was because, as the majority does not dispute, "[u]ntil today, no court has ever suggested that lack of compactness under § 2 might invalidate a district that a State has chosen to create in the first instance," *infra*, at 505. The majority asserts that Latino voters in old District 23 had found an "efficacious political identity," while doing so would be a challenge for such voters in District 25, *ante*, at 435, but the latter group has a distinct advantage over the former in

this regard: They actually *vote* to a significantly greater extent. See App. 187 (expert report of R. Gaddie) (for Governor and Senate races in 2002, estimated Latino turnout for District 25 was 46% to 51%, compared to 41.3% and 44% for District 23).

[1] The District Court did not find that the legislature had two motivations in dividing Webb County, one invidious and the other political, and that the political one predominated. Rather, it accepted the State's explanation that although the individuals moved were largely Latino, they were moved because they voted for Democrats and against Bonilla. For this reason, appellants' argument that incumbent protection cannot be a compelling state interest is off the mark. The District Court found that incumbent protection, not race, lay behind the redistricting of District 23. Strict scrutiny therefore does not apply, and the existence *vel non* of a compelling state interest is irrelevant.

[2] No party here raises a constitutional challenge to § 5 as applied in these cases, and I assume its application is consistent with the Constitution.

[3] Appellants argue that in *Bush* v. *Vera*, 517 U. S. 952 (1996), we did not allow the purpose of incumbency protection in one district to justify the use of race in a neighboring district. That is not so. What we held in *Bush* was that the District Court had not clearly erred in concluding that, although the State had political incumbent-protection purposes as well, its use of race predominated. See *id.,* at 969 (plurality opinion). We then applied strict scrutiny, as I do here. But we said nothing more about incumbency protection as part of that analysis. Rather, we rejected the State's argument that compliance with § 5 was a compelling interest because the State had gone beyond mere nonretrogression. *Id.,* at 983; *id.,* at 1003 (THOMAS, J., joined by SCALIA, J., concurring in judgment).

Save trees - read court opinions online on Google Scholar.