# Exhibit 2

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEAGUE OF UNITED LATIN AMERICAN CITIZENS ET AL. *v.* PERRY, GOVERNOR OF TEXAS, ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

No. 05–204.  Argued March 1, 2006—Decided June 28, 2006*

The 1990 census resulted in a 3-seat increase over the 27 seats previously allotted the Texas congressional delegation.  Although the Democratic Party then controlled 19 of those 27 seats, as well as both state legislative houses and the governorship, change was in the air: The Republican Party had received 47% of the 1990 statewide vote, while the Democrats had received only 51%.  Faced with a possible Republican ascent to majority status, the legislature drew a congressional redistricting plan that favored Democratic candidates.  The Republicans challenged the 1991 Plan as an unconstitutional partisan gerrymander, but to no avail.

The 2000 census authorized two additional seats for the Texas delegation.  The Republicans then controlled the governorship and the State Senate, but did not yet control the State House of Representatives.  So constituted, the legislature was unable to pass a redistricting scheme, resulting in litigation and the necessity of a court-ordered plan to comply with the U. S. Constitution's one-person, one-vote requirement.  Conscious that the primary responsibility for drawing congressional districts lies with the political branches of government, and hesitant to undo the work of one political party for the benefit of another, the three-judge Federal District Court sought to apply only "neutral" redistricting standards when drawing Plan 1151C, including placing the two new seats in high-growth areas, fol-

--------

*Together with No. 05–254, *Travis County, Texas, et al.* v. *Perry, Governor of Texas, et al.,* No. 05–276, *Jackson et al.* v. *Perry, Governor of Texas, et al.,* and No. 05–439, *GI Forum of Texas et al.* v. *Perry, Governor of Texas, et al.,* also on appeal from the same court.

lowing county and voting precinct lines, and avoiding the pairing of
incumbents.  Under Plan 1151C, the 2002 congressional elections re-
sulted in a 17-to-15 Democratic majority in the Texas delegation,
compared to a 59% to 40% Republican majority in votes for statewide
office in 2000, thus leaving the 1991 Democratic gerrymander largely
in place.

In 2003, however, Texas Republicans gained control of both houses
of the legislature and set out to increase Republican representation
in the congressional delegation.  After a protracted partisan struggle,
the legislature enacted a new congressional districting map, Plan
1374C.  In the 2004 congressional elections, Republicans won 21
seats to the Democrats' 11, while also obtaining 58% of the vote in
statewide races against the Democrats' 41%.  Soon after Plan 1374C
was enacted, appellants challenged it in court, alleging a host of con-
stitutional and statutory violations.  In 2004 the District Court en-
tered judgment for appellees, but this Court vacated the decision and
remanded for consideration in light of *Vieth* v. *Jubelirer,* 541 U. S. 267.
On remand, the District Court, believing the scope of its mandate
was limited to questions of political gerrymandering, again rejected
appellants' claims.

*Held:* The judgment is affirmed in part, reversed in part, and vacated in
part, and the cases are remanded.

399 F. Supp. 2d 756, affirmed in part, reversed in part, vacated in part,
and remanded.

JUSTICE KENNEDY delivered the opinion of the Court with respect to
Parts II–A and III, concluding:

1. This Court held, in *Davis* v. *Bandemer,* 478 U. S. 109, 118–127,
that an equal protection challenge to a political gerrymander pre-
sents a justiciable case or controversy, although it could not agree on
what substantive standard to apply, compare *id.,* at 127–137, with
*id.,* at 161–162.  That disagreement persists.  The *Vieth* plurality
would have held such challenges nonjusticiable political questions,
but a majority declined to do so, see 541 U. S., at 306, 317, 343, 355.
Justiciability is not revisited here.  At issue is whether appellants of-
fer a manageable, reliable measure of fairness for determining
whether a partisan gerrymander is unconstitutional.  P. 7.

2. Texas' redrawing of District 23's lines amounts to vote dilution
violative of §2 of the Voting Rights Act of 1965.  Pp. 17–36.

(a) Plan 1374C's changes to District 23 served the dual goals of
increasing Republican seats and protecting the incumbent Republi-
can against an increasingly powerful Latino population that threat-
ened to oust him, with the additional political nuance that he would
be reelected in a district that had a Latino majority as to voting age
population, though not a Latino majority as to citizen voting age

Syllabus

population or an effective Latino voting majority.  The District 23
changes required adjustments elsewhere, so the State created new
District 25 to avoid retrogression under §5 of the Act.  Pp. 17–18.

(b) A State violates §2 "if, based on the totality of circumstances,
it is shown that the political processes leading to nomination or elec-
tion . . . are not [as] equally open to . . . members of [a racial group as
they are to] other members of the electorate."  42 U. S. C. §1973(b).
*Thornburg* v. *Gingles,* 478 U. S. 30, 50–51, identified three threshold
conditions for establishing a §2 violation: (1) the racial group must be
"sufficiently large and geographically compact to constitute a major-
ity in a single-member district"; (2) the group must be "politically co-
hesive"; and (3) the white majority must "vot[e] sufficiently as a bloc
to enable it . . . usually to defeat the minority's preferred candidate."
The legislative history identifies factors that courts can use, once all
three threshold requirements are met, in interpreting §2's "totality of
circumstances" standard, including the State's history of voting-
related discrimination, the extent to which voting is racially polar-
ized, and the extent to which the State has used voting practices or
procedures that tend to enhance the opportunity for discrimination
against the minority group.  See *id.,* at 44–45.  Another relevant con-
sideration is whether the number of districts in which the minority
group forms an effective majority is roughly proportional to its share
of the population in the relevant area.  *Johnson* v. *De Grandy,* 512
U. S. 997, 1000.  The district court's determination whether the §2
requirements are satisfied must be upheld unless clearly erroneous.
See *Gingles, supra,* at 78–79.  Where "the ultimate finding of dilu-
tion" is based on "a misreading of the governing law," however, there
is reversible error.  *De Grandy, supra,* at 1022.  Pp. 18–20.

(c) Appellants have satisfied all three *Gingles* requirements as to
District 23, and the creation of new District 25 does not remedy the
problem.

The second and third *Gingles* factors—Latino cohesion, majority
bloc voting—are present, given the District Court's finding of racially
polarized voting in the District 23 and throughout the State.  As to
the first *Gingles* precondition—that the minority group be large and
compact enough to constitute a majority in a single-member district,
478 U. S., at 50—appellants have established that Latinos could have
had an opportunity district in District 23 had its lines not been al-
tered and that they do not have one now.  They constituted a major-
ity of the citizen voting age population in District 23 under Plan
1151C.  The District Court suggested incorrectly that the district was
not a Latino opportunity district in 2002 simply because the incum-
bent prevailed.  The fact that a group does not win elections does not
resolve the vote dilution issue.  *De Grandy,* 512 U. S., at 1014, n. 11.

In old District 23 the increase in Latino voter registration and overall population, the concomitant rise in Latino voting power in each successive election, the near victory of the Latino candidate of choice in 2002, and the resulting threat to the incumbent's continued election were the very reasons the State redrew the district lines. Since the redistricting prevented the immediate success of the emergent Latino majority in District 23, there was a denial of opportunity in the real sense of that term. Plan 1374C's version of District 23, by contrast, is unquestionably not a Latino opportunity district. That Latinos are now a bare majority of the district's voting-age population is not dispositive, since the relevant numbers must account for citizenship in order to determine the group's opportunity to elect candidates, and Latinos do not now have a citizen voting-age majority in the district.

The State's argument that it met its §2 obligations by creating new District 25 as an offsetting opportunity district is rejected. In a district line-drawing challenge, "the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Id.,* at 1008. The District Court's finding that the current plan contains six Latino opportunity districts and that seven reasonably compact districts, as proposed by appellant GI Forum, could not be drawn was not clearly erroneous. However, the court failed to perform the required compactness inquiry between the number of Latino opportunity districts under the challenger's proposal of reinstating Plan 1151C and the "existing number of reasonably compact districts." *Ibid.* Section 2 does not forbid the creation of a noncompact majority-minority district, *Bush* v. *Vera,* 517 U. S. 952, 999, but such a district cannot remedy a violation elsewhere in the State, see *Shaw* v. *Hunt,* 517 U. S. 899, 916. The lower court recognized there was a 300-mile gap between the two Latino communities in District 25, and a similarly large gap between the needs and interests of the two groups. The court's conclusion that the relative smoothness of the district lines made the district compact, despite this combining of discrete communities of interest, is inapposite because the court analyzed the issue only in the equal protection context, where compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller* v. *Johnson,* 515 U. S. 900, 916–917. Under §2, by contrast, the injury is vote dilution, so the compactness inquiry considers "the compactness of the minority population, not . . . the compactness of the contested district." *Vera,* 517 U. S., at 997. A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *Id.,* at 979. The lower court's findings regarding the different characteristics, needs, and interests

Syllabus

of the two widely scattered Latino communities in District 23 are well supported and uncontested. The enormous geographical distances separating the two communities, coupled with the disparate needs and interests of these populations—not either factor alone—renders District 25 noncompact for §2 purposes. Therefore, Plan 1374C contains only five reasonably compact Latino opportunity districts, one fewer than Plan 1151C. Pp. 20–29.

(d) The totality of the circumstances demonstrates a §2 violation. The relevant proportionality inquiry, see *De Grandy,* 512 U. S., at 1000, compares the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population. The State's contention that proportionality should be decided on a regional basis is rejected in favor of appellants' assertion that their claim requires a statewide analysis because they have alleged statewide vote dilution based on a statewide plan. Looking statewide, there are 32 congressional districts. The five reasonably compact Latino opportunity districts amount to roughly 16% of the total, while Latinos make up 22% of Texas' citizen voting-age population. Latinos are, therefore, two districts shy of proportional representation. Even deeming this disproportionality insubstantial would not overcome the other evidence of vote dilution for Latinos in District 23. The changes there undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive. Cf., *e.g., id.,* at 1014. Against this background, the Latinos' diminishing electoral support for the incumbent indicates their belief he was unresponsive to their particularized needs. In essence, the State took away their opportunity because they were about to exercise it. Even accepting the District Court's finding that the State's action was taken primarily for political, not racial, reasons, the redrawing of District 23's lines was damaging to its Latino voters. The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active. Although incumbency protection can be a legitimate factor in districting, see *Karcher* v. *Daggett,* 462 U. S. 725, 740, not all of its forms are in the interests of the constituents. If, as here, such protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters. This policy, whatever its validity in the political realm, cannot justify the effect on Latino voters. See *Gingles, supra,* at 45. Pp. 29–36.

(e) Because Plan 1374C violates §2 in its redrawing of District 23, appellants' First Amendment and equal protection claims with respect to that district need not be addressed. Their equal protection

claim as to the drawing of District 25 need not be confronted because
that district will have to be redrawn to remedy the District 23 viola-
tion.  Pp. 36–37.

   Justice Kennedy concluded in Part II that because appellants
have established no legally impermissible use of political classifica-
tions, they state no claim on which relief may be granted as to their
contention that Texas' statewide redistricting is an unconstitutional
political gerrymander.  Justice Souter and Justice Ginsburg joined
Part II–D.  Pp. 7–15.

   (a) Article I of the Constitution, §§2 and 4, gives "the States pri-
mary responsibility for apportionment of their . . . congressional . . .
districts," *Growe* v. *Emison,* 507 U. S. 25, 34, but §4 also permits Con-
gress to set further requirements.  Neither the Constitution nor Con-
gress has stated any explicit prohibition of mid-decade redistricting to
change districts drawn earlier in conformance with a decennial census.
Although the legislative branch plays the primary role in congres-
sional redistricting, courts have an important role when a districting
plan violates the Constitution.  See, *e.g., Wesberry* v. *Sanders,* 376
U. S. 1.  That the federal courts sometimes must order legislative redis-
tricting, however, does not shift the primary responsibility away from
legislative bodies, see, *e.g., Wise* v. *Lipscomb,* 437 U. S. 535, 540, who
are free to replace court-mandated remedial plans by enacting redis-
tricting plans of their own, see, *e.g., Upham* v. *Seamon,* 456 U. S. 37,
44.  Judicial respect for legislative plans, however, cannot justify leg-
islative reliance on improper criteria for districting determinations.
Pp. 7–10.

   (b) Appellants claim unpersuasively that a decision to effect mid-
decennial redistricting, when solely motivated by partisan objectives,
presumptively violates equal protection and the First Amendment
because it serves no legitimate public purpose and burdens one group
because of its political opinions and affiliation.  For a number of rea-
sons, that test is unconvincing.  There is some merit to the State's as-
sertion that partisan gain was not the sole motivation for replacing
Plan 1151C: The contours of some contested district lines seem to
have been drawn based on more mundane and local interests, and a
number of line-drawing requests by Democratic state legislators were
honored.  Moreover, a successful test for identifying unconstitutional
partisan gerrymandering must do what appellants' sole-motivation
theory explicitly disavows: show a burden, as measured by a reliable
standard, on the complainants' representational rights.  See *Vieth,
supra,* at 292–295, 307–308.  Appellants' sole-intent standard is no
more compelling when it is linked to the circumstance that Plan
1374C is mid-decennial legislation.  The Constitution's text and
structure and this Court's cases indicate there is nothing inherently

Syllabus

suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own.  Even if there were, the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders.  Appellants' test would leave untouched the 1991 Texas redistricting, which entrenched a party on the verge of minority status, while striking down the 2003 redistricting plan, which resulted in the majority Republican Party capturing a larger share of the seats.  A test that treats these two similarly effective power plays in such different ways does not have the reliability appellants ascribe to it.  Pp. 10–14.

(c) Appellants' political gerrymandering theory that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement is rejected.  Although conceding that States operate under the legal fiction that their plans are constitutionally apportioned throughout a decade, see, *e.g., Georgia* v. *Ashcroft,* 539 U. S. 461, 488, n. 2, appellants contend that this fiction should not provide a safe harbor for a legislature that enacts a voluntary, mid-decade plan overriding a legal court-drawn plan.  This argument mirrors appellants' attack on mid-decennial redistricting solely motivated by partisan considerations and is unsatisfactory for the same reasons.  Their further contention that the legislature intentionally sought to manipulate population variances when it enacted Plan 1374C is unconvincing because there is no District Court finding to that effect, and they present no specific evidence to support this serious allegation of bad faith.  Because they have not demonstrated that the legislature's decision to enact Plan 1374C constitutes a violation of the equal-population requirement, their subsidiary reliance on *Larios* v. *Cox,* 300 F. Supp. 2d 1320, summarily aff'd, 542 U. S. 947, is unavailing.  Pp. 14–16.

JUSTICE KENNEDY, joined by THE CHIEF JUSTICE and JUSTICE ALITO, concluded in Part IV that the Dallas area redistricting does not violate §2 of the Voting Rights Act.  Appellants allege that the Dallas changes dilute African-American voting strength because an African-American minority effectively controlled District 24 under Plan 1151C.  However, before Plan 1374C, District 24 had elected an Anglo Democrat to Congress in every election since 1978.  Since then, moreover, the incumbent has had no opposition in any of his primary elections, and African-Americans have consistently voted for him.  African-Americans were the second-largest racial group in the district after Anglos, but had only 25.7% of the citizen voting age population.  Even assuming that the first *Gingles* prong can accommodate appellants' assertion that a §2 claim may be stated for a racial group that makes up less than 50% of the population, see, *e.g., De Grandy, supra,* at 1009, they must show they constitute "a sufficiently large

8          LEAGUE OF UNITED LATIN AMERICAN CITIZENS *v.*
PERRY

Syllabus

minority to elect their candidate of choice with the assistance of
cross-over votes," *Voinovich* v. *Quilter,* 507 U. S. 146, 158. The District
Court committed no clear error in rejecting questionable evidence
that African-Americans have the ability to elect their candidate of
choice in favor of other evidence that an African-American candidate
of choice would not prevail. See *Anderson* v. *Bessemer City,* 470 U. S.
564, 574. That African-Americans had influence in the district does
not suffice to state a §2 claim. If it did, it would unnecessarily infuse
race into virtually every redistricting, raising serious constitutional
questions. See *Georgia* v. *Ashcroft,* 539 U. S. 461, 491. *Id.,* at 480, 482,
distinguished. Appellants do not raise a district-specific political ger-
rymandering claim against District 24. Pp. 37–41.

THE CHIEF JUSTICE, joined by JUSTICE ALITO, agreed that appellants
have not provided a reliable standard for identifying unconstitutional
political gerrymanders, but noted that the question whether any such
standard exists—*i.e.,* whether a challenge to such a gerrymander
presents a justiciable case or controversy—has not been argued in
these cases. THE CHIEF JUSTICE and JUSTICE ALITO therefore take no
position on that question, which has divided the Court, see *Vieth* v.
*Jubelirer,* 541 U. S. 267, and join the plurality's Part II disposition
without specifying whether appellants have failed to state a claim on
which relief can be granted or failed to present a justiciable contro-
versy. Pp. 1–2.

JUSTICE SCALIA, joined by JUSTICE THOMAS, concluded that appel-
lants' claims of unconstitutional political gerrymandering do not pre-
sent a justiciable case or controversy, see *Vieth* v. *Jubelirer,* 541 U. S.
267, 271–306 (plurality opinion), and that their vote-dilution claims
premised on §2 of the Voting Rights Act of 1965 lack merit for the
reasons set forth in JUSTICE THOMAS's opinion concurring in the
judgment in *Holder* v. *Hall,* 512 U. S. 874, 891–946. Reviewing ap-
pellants' race-based equal protection claims, JUSTICE SCALIA, joined
by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded
that the District Court did not commit clear error in rejecting appel-
lant GI Forum's assertion that the removal of Latino residents from
District 23 constituted intentional vote dilution. JUSTICE SCALIA,
joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO,
subjected the intentional creation of District 25 as a majority-
minority district to strict scrutiny and held that standard satisfied
because appellants conceded that the creation of this district was
reasonably necessary to comply with §5 of the Voting Rights Act of
1965, which is a compelling state interest, and did not argue that
Texas did more than that provision required it to do. Pp. 2–11.

KENNEDY, J., announced the judgment of the Court and delivered the

Syllabus

opinion of the Court with respect to Parts II–A and III, in which STE-
VENS, SOUTER, GINSBURG, AND BREYER, JJ., joined, an opinion with re-
spect to Parts I and IV, in which ROBERTS, C. J., and ALITO, J., joined,
an opinion with respect to Parts II–B and II–C, and an opinion with
respect to Part II–D, in which SOUTER and GINSBURG, JJ., joined.  STE-
VENS, J., filed an opinion concurring in part and dissenting in part, in
which BREYER, J., joined as to Parts I and II.  SOUTER, J., filed an opin-
ion concurring in part and dissenting in part, in which GINSBURG, J.,
joined.  BREYER, J., filed an opinion concurring in part and dissenting in
part.  ROBERTS, C. J., filed an opinion concurring in part, concurring in
the judgment in part, and dissenting in part, in which ALITO, J., joined.
SCALIA, J., filed an opinion concurring in the judgment in part and dis-
senting in part, in which THOMAS, J., joined, and in which ROBERTS,
C. J., and ALITO, J., joined as to Part III.