# EXHIBIT C

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------

NEW YORK IMMIGRATION COALITION, ET AL.,

4

              Plaintiffs,

5         vs.        Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7              Defendants.

---------------------------------------

8

9                   Washington, D.C.

10                  Thursday, August 30, 2018

11   Deposition of:

12              EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22

Page 111

1    mean to break your line of questioning.  Actually,

2    we've been going about an hour and a half.  Would

3    now be an appropriate time for a break?

4            MR. COLANGELO:  Yes.

5            MR. GARDNER:  Let's take a break.

6            VIDEOGRAPHER:  This concludes Media Unit

7    Number 1.  The time on the video is 10:32 a.m.  We

8    are now off the record.

9            (Off the record.)

10           VIDEOGRAPHER:  This begins Media Unit

11   Number 2.  The time on the video is 10:45 a.m.  We

12   are on the record.

13   BY MR. COLANGELO:

14       Q   Mr. Comstock, we were talking about the

15   Secretary's June 21, 2018 memo which we marked as

16   Exhibit 5.  Do you still have that in front of

17   you?

18       A   I do.

19       Q   Okay.  That memo says that other senior

20   administration officials had previously raised

21   this question.  Do you see that line?

22       A   Yes.

1      Q    Who are those other senior administration

2   officials?

3      A    You'd have to ask the Secretary.

4      Q    You don't know yourself?

5      A    I don't.

6      Q    You have no idea which other senior

7   administration officials raised this question,

8   other than the Secretary?

9      A    No.

10     Q    You never asked him where the idea came

11   from?

12     A    Nope.

13     Q    He never told you where the idea came

14   from?

15     A    Nope.

16     Q    You spent a lot of time on this issue?

17     A    Not relative to a lot of other things I

18   work on, no.

19     Q    How would you characterize the amount of

20   time you spent on this issue?

21     A    One one-hundredth of my time.

22     Q    You agree that it's an important issue?

Page 113

1      A    Correct.

2      Q    It was important to the Secretary?

3      A    Correct.

4      Q    He was motivated to get this done?

5      A    He was working on a lot of different

6    issues at the time.

7      Q    But this one was important to him?

8      A    Yes.  Absolutely.

9      Q    Okay.  And when you saw the draft of this

10   memo before June 21st and it refers to other

11   senior administration officials, you didn't

12   yourself have any view or understanding of who

13   those other administration officials were?

14     A    I did not, no.

15     Q    You didn't ask the secretary who those

16   other administration officials were?

17     A    No.

18     Q    Okay.  When recommending that he sign the

19   memo, he didn't say to you who are the other

20   senior -- who the other senior administration

21   officials were?

22     A    We did not discuss that, no.

Page 250

1      A    That's correct.

2      Q    Okay.

3           MR. GERSCH:  Let's take our short break

4    here.

5           MR. GARDNER:  How long?

6           MR. GERSCH:  Ten minutes or so.

7           VIDEOGRAPHER:  This is the end of Media

8    Unit Number 4.  The time on the video is 1:58 p.m.

9    We are off the record.

10          (Off the record.)

11          VIDEOGRAPHER:  This begins Media Unit 4.

12   The time on the video is 2:14 p.m.  We are on the

13   record.

14   BY MR. GERSCH:

15     Q    Mr. Comstock, we're back on the record.

16   Before the break, I was asking some questions

17   about 2018.  Now I want to go back to 2017.

18     A    Okay.

19     Q    You with me?

20     A    I'm with you.

21     Q    All right.  I want to go back to the

22   spring of 2017 when Secretary Ross requests the

Page 251

1   inclusion of a citizenship question on the census.

2   At that point in time, the Department of Justice

3   had made no request to Commerce for the addition

4   of a citizenship question, correct?

5       A   That's correct.

6       Q   And they certainly hadn't

7   asked -- withdrawn.

8           The Department of Justice certainly

9   hadn't asked Commerce to add a citizenship

10  question because of the VRA.  That's also correct;

11  isn't it?

12      A   Well, they didn't ask us to add a

13  citizenship question at that point.  So

14  speculating as to why they would ask is

15  irrelevant.

16      Q   I'm not asking you to speculate.  The one

17  thing we can be sure of is they didn't ask about

18  the VRA is because they didn't ask at all?

19      A   Correct.

20      Q   All right.  And when Secretary Ross says

21  to you in the spring, in whatever words he used,

22  that he wants a citizenship question added to the

Page 252

1    census, wouldn't you have had a discussion with

2    him at the time about why he wants that?

3         MR. GARDNER:  Objection.  Asked and

4    answered.

5         THE WITNESS:  Again, the answer is no, I

6    would not have a discussion.  My boss, if he asked

7    me to investigate something, I investigate it and

8    report back the results.

9    BY MR. GERSCH:

10        Q    Is your testimony you did not have a

11   discussion?

12        A    I did not.

13        Q    And you're not saying -- well, withdrawn.

14             Wouldn't it be helpful to you in your job

15   to assist the Secretary to have an understanding

16   of why he wanted the citizenship question?

17        MR. GARDNER:  Objection.  Form.

18   BY MR. GERSCH:

19        Q    You can answer.

20        A    Again, I didn't have any particular

21   doubts about why a citizenship question would be

22   useful, so, no, it would not have hurt me to ask.

Page 253

1       Q   I'm not asking whether you had doubts.

2   My question to you is a little bit --

3       A   I understand your question.

4       Q   My question, sir, is:  Wouldn't it be

5   helpful to you in your job of assisting the

6   Secretary to have a complete understanding of why

7   the Secretary wants to add a citizenship question?

8           MR. GARDNER:  Objection.  Form.

9           THE WITNESS:  Again, it's not relevant to

10  the question of whether or not he needs -- of

11  whether or not a question should be added, so, no.

12  BY MR. GERSCH:

13      Q   Is it your testimony that why he wants a

14  citizenship question to be added is not relevant

15  to whether it should be added?  Did I -- did I

16  hear that right?

17          MR. GARDNER:  Objection.

18  Mischaracterizes the witness's prior testimony.

19          THE WITNESS:  My test- --

20          MR. COLANGELO:  That's exactly what he

21  said, Counsel.

22          THE WITNESS:  No.  My testimony is:  The

Page 254

1   rationale for why he would want it added is not

2   relevant to my initial inquiry as to whether or

3   not a question can be added.

4   BY MR. GERSCH:

5       Q   Yeah.  My question was a little

6   different.  The question I am trying to get you to

7   focus on is:  In your work for the Secretary,

8   wouldn't it be helpful to you to understand as

9   fully as possible why he thinks it's a good idea

10  to add a citizenship question?

11      A   And let --

12          MR. GARDNER:  Objection.  Asked and

13  answered.

14          THE WITNESS:  And let me get you to

15  understand my answer, which is, no, it would not

16  make a difference, because I don't need that

17  information to investigate the question.

18  BY MR. GERSCH:

19      Q   Anyone ever say anything to you about why

20  the Secretary thought it was a good

21  idea -- withdrawn.

22          Am I right that your testimony is that

Page 255

1   you've never had a discussion with the Secretary

2   about why he thought it was a good idea to have a

3   citizenship question added?

4        A    That's correct.  I have not had a

5   conversation with him, no.

6        Q    Okay.  And did anyone else say anything

7   to you about why the Secretary thought it was a

8   good idea to have a citizenship question added?

9             MR. GARDNER:  Objection.  Form.

10            THE WITNESS:  Again, no.

11  BY MR. GERSCH:

12       Q    All right.  If I remember correctly, you

13  testified you worked in a bullpen area?

14       A    Correct.

15       Q    Outside the Secretary's office?

16       A    Yes.

17       Q    I'm not sure I've got all the people who

18  were there, but Wendy Teramoto was there, right?

19       A    Correct.

20       Q    James Uthmeier was there?

21       A    No.

22       Q    I'm sorry.

Page 256

1          You were there?

2     A    Yes.

3     Q    Eric Branstad, was he there?

4     A    Yes.

5     Q    That's three.

6          Izzy Hernandez, that's four.  Was he

7     there?

8     A    Yes.

9     Q    Who was the fifth?

10    A    James Rockas.

11    Q    And I'm right that there were five?

12    A    Correct.

13    Q    Okay.

14    A    At times.

15    Q    So you're all sitting there -- and are --

16    do you work in cubicles, open desks, how does it

17    work?

18    A    Wendy Teramoto had a seated desk.  I had

19    a standing desk.  Izzy had a standing desk with a

20    stool.  James had a standing desk with a stool.

21    Eric Branstad had a standing desk with a stool.

22    Q    Are there walls?  Are there partitions?

Page 257

1    Are you all in an open space?

2        A   I'm facing -- I was facing Wendy.  Izzy,

3    who was rarely there, but his desk was next to

4    mine, facing Eric, and then James was on the end.

5        Q   And there are no walls, correct?

6        A   No walls.

7        Q   No partitions?

8        A   No partitions.

9        Q   Okay.  In all the time that you're

10   sitting there and you're all working together, no

11   one says, why does the Secretary want to add a

12   citizenship question -- citizenship question?

13       A   That's correct.  Because, again, this was

14   one of well over 100 different items we were

15   working on.  All of us were working on different

16   things.  I'm primarily tasked with policy.  James

17   is primarily tasked with press.  And so you're

18   dealing with all of these other issues.  There's

19   no reason to discuss it.

20       Q   I'm not even talking about discussing it.

21   No one mentioned?  Did anyone mention it?

22       A   Not that I recall.

1      Q   No one says the reason the Secretary

2  wants to add a citizenship question is whatever

3  the reason is, no one ever said anything like

4  that?

5      A   No.

6          MR. GARDNER:  Objection to form.

7          THE WITNESS:  Not to my recollection.

8  BY MR. GERSCH:

9      Q   Okay.  Did you ever have a discussion

10 with people from the Office of General Counsel at

11 Commerce about why the Secretary wanted to add a

12 citizenship question?

13     A   No.

14     Q   And in your time there, did you never see

15 a document analyzing why it was a good idea for

16 Census to add a citizenship question?

17     A   Again, you're -- we have a fundamental

18 disagreement on the premises of your question.

19 Your premise is that somehow a reason needs to be

20 provided.  The question before us is the Secretary

21 has the legal authority to add questions to the

22 census.  Is there a governmental need?  And if

Page 259

1    there is, then you're off to the races.

2        Q   My question was a little different.  My

3    question was --

4        A   I understand your question.

5        Q   Sir, I'll repeat it for you.

6            My question is:  In all the time you're

7    there, did you never see a document spelling out

8    the reasons why it would be a good idea to add a

9    citizenship question?  Why it would be good from

10   Commerce's perspective?

11           MR. GARDNER:  Objection.  Form.

12           THE WITNESS:  Again, that's not the

13   question.  Commerce --

14   BY MR. GERSCH:

15       Q   Excuse me, sir.  That is my question.

16   Could you answer my question?

17       A   Okay.  No.

18       Q   Not even a scrap of paper, right?

19       A   Nope.

20       Q   No memoranda, right?

21       A   No.

22       Q   No emails?

Page 260

1      A    Not that I recall.

2      Q    And I just want to be straight on my

3   understanding.  I think I got you correctly, but I

4   just want to make sure and test that I'm right.

5          It couldn't possibly assist you in your

6   work, in any way, to know why the Secretary wanted

7   to add a citizenship question?  Do I understand

8   that correctly?

9      A    It's not relevant to my analysis.

10     Q    And so it couldn't possibly help you in

11  any way in your work?

12     A    I'm not going to agree with your

13  statement that way, no.

14     Q    Well, that's my question -- withdrawn.

15          Well, is there any way in which knowing

16  what the Secretary's reason was for wanting to add

17  a citizenship question, is there any way that

18  could assist you in your work at

19  Department of Commerce?

20     A    Assist me on my work at the Department of

21  Commerce, no.

22     Q    Is there any way that it could help you

Page 261

1  help the Secretary add a citizenship question?

2      A   If I had found it difficult or

3  challenging, yes.  Knowing more about why he

4  wanted it would have been helpful, but I didn't

5  say that there was an issue.  It had been asked

6  for hundreds of years, and it had been asked on

7  the ACS.  So, clearly, there's a need for it.  And

8  so, no, that was not a particularly troublesome

9  aspect of the question I was being asked to look

10 into.

11     Q   When you said if I had found it difficult

12 or challenging, what did you mean?  What's the it?

13     A   If -- if what I had been requested to do

14 seemed to have significant legal obstacles to the

15 ability to do that question or take that action,

16 then I would probably inquire more fully to see if

17 there's an alternative way to address what the

18 Secretary is trying to get to.  In this particular

19 case, you have something that has been on the

20 decennial census before that is currently being

21 asked on the ACS.  There's clear legal authority

22 for him to add the question.  So, frankly, the

Page 262

1   reasons that he wants to add it doesn't add

2   anything to the analysis.  There is a governmental

3   need for this information.  That's a question

4   that's already established, so I don't need to

5   inquire further as to what his personal beliefs

6   regarding this question might be.

7        Q   What's the governmental need for the

8   question?

9        A   Enforcement to the Voting Rights Act,

10  determining how many undocumented citizens there

11  are.  You name it, there's a whole bunch of

12  reasons.  That's why every government in the world

13  collects this information.

14       Q   Well, correct me if I'm wrong, we're

15  talking about at a period in the spring of 2017

16  when the Voting Rights Act hadn't come up, the

17  Department of Justice hadn't made a request for

18  it.  What does the Voting Rights Act got to do

19  with it in the spring of 2017?

20       A   When you inquire as to what does the

21  Department of Justice use the citizenship data

22  on --

Page 263

1      Q    That wasn't my question.  My question

2  is --

3      A    I'm answering your --

4      Q    -- why is it a good idea, why does the

5  government need it back in the spring of 2017?

6      A    Finished with your question?

7      Q    That's my question.

8      A    The answer is for the same reason they've

9  been collecting it for the last 200-plus years.

10      Q    What's the government need in the spring

11  of 2017?

12      A    I already answered that question.  If

13  they collect the data under the ACS for Voting

14  Rights Act enforcement, that is one of the primary

15  reasons they collect the data.

16      Q    Okay.  It's on the ACS.  What's the

17  need -- governmental need for it to be on the

18  census?

19            MR. GARDNER:  Objection.  Asked and

20  answered.

21            THE WITNESS:  The governmental need is,

22  again, if you're going to get more detailed

Page 264

1   information, then you need that information.

2   BY MR. GERSCH:

3       Q   Who said in the spring of 2017 that the

4   government needed more detailed information?

5       A   Again, I'm presented with a request by

6   the Secretary to say, can we add this question to

7   the census?  I inquire about that, and I looked at

8   it.  One of the reasons you would need it is

9   voting rights.  If you're going to do voting

10  allocations on the basis of census allocations,

11  that's the reason it's perfectly sufficient.

12      Q   Who said that in the spring of 2017?

13      A   That was -- that was determined after

14  taking a quick look at the issue.  I don't need

15  more than that to continue to pursue the question.

16      Q   Who told you that the government needed,

17  in the spring of 2017, more detailed information

18  about citizenship than was contained in the ACS?

19      A   Nobody.

20      Q   You came to that decision on your own; is

21  that right?

22      A   Correct.

Page 265

1     Q   But you're not a voting rights lawyer,
2  right?
3     A   Irrelevant to the question.
4     Q   That's not my question.  You're not a
5  voting rights lawyer, right?
6     A   I've already said that.
7     Q   So you decided on your own in the spring
8  of 2017 that it would be a good idea for the
9  government to have more information than was
10 available from the ACS about citizenship to
11 enforce the Voting Rights Act, even though you're
12 not a voting rights lawyer?
13    A   I don't agree with that characterization,
14 at all.  I decided that there was sufficient
15 information for me to pursue the Secretary's
16 request to consider placing a citizenship question
17 on the decennial census and that there was
18 sufficient potential reason to collect that
19 information to warrant moving forward.  If I'd
20 come to an opposite conclusion that there was not
21 sufficient potential reason or that there was some
22 insurmountable legal bar, then I would have

1   reported back to the Secretary, I'm sorry,

2   Mr. Secretary, it does not appear we can

3   accomplish this objective.

4       Q   Why did you need to come up with a reason

5   for asking the question, separate and apart from

6   whatever reason the Secretary had in his own head?

7       A   Again, my job is to figure out how to

8   carry out what my boss asks me to do.  So you go

9   forward and you find a legal rationale.  Doesn't

10  matter what his particular personal perspective is

11  on it.  It's not -- it's not going to be the basis

12  on which a decision is made.

13      Q   That's your understanding, that the way

14  you should do it, is come up with a rationale that

15  has nothing to do with what's in the Secretary's

16  mind as to why he wants it; is that your

17  understanding of how it's supposed to work?

18      A   No.  Again, you continue to characterize

19  things in a way that you believe may be correct,

20  but not the way I believe to be correct.  My job,

21  as a person who has been doing this for 30-plus

22  years for clients and people in the government, is

Page 267

1   if they would like to accomplish an objective, I

2   see if there's a way to do that.  And, again, if

3   it's not legal, you tell them that.  If it can't

4   be done, you tell them that.  If there's a way to

5   do it, then you help them find the best rationale

6   to do it.  That's what a policy person does.

7          And so, again, if I came up with a

8   rationale that the Secretary didn't agree with or

9   didn't support, then he was going to tell me that.

10  I have no doubt about that.  But in the meantime,

11  he doesn't -- I don't need to know what his

12  rationale might be, because it may or may not be

13  one that is -- that is something that's going to a

14  legally-valid basis.

15         So, again, he's got -- he's asked, can we

16  put -- can we put a question on?  The job of a

17  policy person is go out and find out how you do

18  that.  Whether that decision is going to be made

19  ultimately to do it or not, that's up to the

20  decision-maker.

21    Q   Are you saying you're better off not

22  knowing what the Secretary's own rationale is for

Page 268

1   wanting the citizenship question?

2       A    The Secretary, as you would point out, is

3   not a voting rights lawyer, so I would not expect

4   him to necessarily come up with a rationale.

5   That's the job of the staff at work.

6       Q    You certainly wouldn't expect the

7   Secretary to have come up with the idea that the

8   reason he should want the citizenship question is

9   the Voting Rights Act; you wouldn't expect him to

10  come up that on his own?

11      A    I -- he might well.  I don't know.

12      Q    You have no reason to believe that he

13  did, right?

14          MR. GARDNER:  Objection.  Calls for

15  speculation.

16          THE WITNESS:  I'm not going to speculate

17  about what his rationale was.  You'd have to --

18  BY MR. GERSCH:

19      Q    Because --

20      A    -- ask him.

21      Q    -- because you have no idea what his

22  rationale is?

Page 269

1      A    That's correct.

2      Q    Counsel asked you about contact you made

3    with the Department of Justice --

4      A    Correct.

5      Q    -- starting with a Ms. Haney [sic], I

6    believe.

7           Do you recall that?

8      A    Yes.  I believe her name is Hankey,

9    but --

10     Q    Hankey.  I apologize.

11          What was the full name?  I can get it out

12   if you don't know it offhand.

13     A    Mary Blanche, but --

14     Q    I'll find it in here.

15     A    It's in one of these exhibits, the memo

16   that I wrote.  Here.

17     Q    Mary Blanche --

18     A    Yep.

19     Q    -- Hankey; is that right?

20     A    Yeah.

21     Q    All right.  So you went -- you called

22   Mary Blanche Hankey --

Page 270

1     A    Correct.

2     Q    -- with regard to adding a citizenship

3  question to the census, right?

4     A    Correct.

5     Q    And you wanted to see if the

6  Department of Justice would sponsor the question?

7     A    Correct.

8     Q    And you had a phone call with her, and

9  you had at least a meeting with her, right?

10    A    Right.

11    Q    So at least two contacts?

12    A    Three, when she called me back with

13 somebody else's name.

14    Q    Fair enough.

15         Didn't -- didn't Ms. Hankey say, why do

16 you want to have a citizenship question?

17    A    No, she didn't.

18    Q    Didn't come up, at all?

19    A    Nope.

20    Q    She referred you to a Mr. McHenry; is

21 that right?

22    A    Correct.

Page 271

1    Q   And he's not a voting rights guy, right?

2    A   I don't actually know what his background

3  is.

4    Q   Well, you went ahead, back and forth with

5  him over about a month; is that right?

6    A   I mean, we spoke on the phone probably

7  three or four times, yeah.

8    Q   Going from, I think, the period you

9  mentioned was --

10   A   Yeah.  It was --

11   Q   -- early May to early June, roughly?

12   A   Approximately a month, yeah.

13   Q   And didn't you learn in that time that

14  he's not a voting rights guy?

15   A   No.

16   Q   Never came up?

17   A   We didn't get into great detail on the

18  rationale.

19   Q   You did ask him would you sponsor a

20  census question for -- I'm sorry.  Withdrawn.

21       You did ask Mr. McHenry if he would be

22  willing to sponsor a request for the addition of a

Page 272

1  citizenship question on the census, right?

2      A   I didn't ask Mr. McHenry if he would.  I

3  asked if the Department of Justice would be

4  inclined to send a letter asking us to add the

5  citizenship question.

6      Q   Fair enough.

7          And when you did that, you didn't explain

8  to Mr. McHenry why the Secretary wanted a

9  citizenship question?

10     A   I would have no reason to.

11     Q   And Mr. McHenry never asked, hey, you

12  want me to do this?  Why do you need it?  He never

13  asked you that?

14     A   I think I explained at the outset that

15  the department currently got a report from the ACS

16  on citizenship level -- I mean, on

17  census -- certain census size, Citizen Voting Age

18  Population, and if they were to get it from the

19  decennial, that would allow them a greater

20  granularity and would that be useful to them, and

21  he said he would inquire.

22     Q   You asked Mr. McHenry if the

Page 273

1  Department of Justice would find it useful to have

2  more granularity about citizenship?

3      A   Correct.

4      Q   But at no point did Mr. McHenry say,

5  look, if we want it, we'll ask for it, but how

6  come you want it?  Didn't he ask you something

7  like that?

8      A   No.

9      Q   When people call you and say, hey, will

10  the Department of Commerce do this or do that,

11  don't you say, why do you want that, why do you

12  need that?

13      A   I usually say is there a reason that you

14  think the Department of Commerce would need

15  that -- and if they have a reason, then I'll look

16  into it.  I don't say, hey, why does your boss

17  want this?  That's not part of lexicon.

18      Q   No.  No.  If another agency calls and

19  says --

20      A   I don't --

21      Q   Let me finish the question and you can

22  answer any way you want.

Page 285

1   both the workload I was under and the workload

2   that they're under that I think is misinformed.

3        In fact, several of my calls with

4   Mr. McHenry were made while I was driving into

5   work, so there was no opportunity to call somebody

6   and do that research.

7        And, besides, this wasn't about getting

8   leverage on Mr. McHenry.  This was simply to

9   ask -- following up on the person I'd been

10  directed to, who, based on the fact that it was

11  recommended by an assistant to the AG, I'm

12  assuming is going to at least be somewhat

13  receptive.  Probably an error on my part, but

14  that's -- I've got a dozen other things I'm

15  dealing with at the same time.  So, no, I'm not

16  going to spend a lot of time researching this guy.

17  BY MR. GERSCH:

18       Q   You didn't spend any time researching

19  this guy?

20       A   Correct.  I didn't.

21       Q   Secretary Ross certainly knows why he

22  wanted a citizenship question back in the spring

Page 286

1   of 2017, right?

2      A   You'd have to ask him.

3      Q   Is there anyone besides Secretary Ross

4   who we could go to who would have that

5   information?

6         MR. GARDNER:  Objection.  Lack of

7   foundation.  Calls for speculation.

8         THE WITNESS:  I'm not aware of anybody.

9   BY MR. GERSCH:

10     Q   Do you have any reason to believe that

11  Secretary Ross's rationale for wanting to add a

12  citizenship question is some kind of supersecret?

13     A   No.

14     Q   Doesn't involve national security, right?

15        MR. GARDNER:  Objection.  Lack of

16  foundation.  Calls for speculation.

17        THE WITNESS:  I don't know what the

18  Secretary's rationale is.  You'd have to ask him.

19  BY MR. GERSCH:

20     Q   But you don't think it involves national

21  security?

22        MR. GARDNER:  Same objections.

Page 300

1       Q    Let me put a different question to you.

2       A    Sure.

3       Q    When Representative Norton asks you the

4  why question, don't you think it's responsive to

5  the why question that the Secretary of Commerce

6  wanted to add a citizenship question independent

7  of the Department of Justice's request?

8       A    No.  I don't think it's relevant.  His

9  decisional memo laid out very clearly the

10  rationale that was the basis of his decision.

11  Whatever his personal feelings may have been are

12  irrelevant to that decision.

13      Q    It laid out a rationale.  We can agree on

14  that, right?

15      A    That's what he's required to do under the

16  law, is lay out a rationale.  That is the

17  rationale for his decision and that's what he's

18  standing on.

19      Q    Okay.  He laid out a rationale.  Is it

20  your understanding, under the law, that if the

21  rationale is not his real reason for doing it, we

22  should ignore the real reason, and we should only

Page 301

1  focus on the pretextual reasons that he offers up?

2       MR. GARDNER:  Objection.  Calls for a

3  legal conclusion.

4       THE WITNESS:  The Secretary's decision

5  memo lays out a valid reason that's consigned to

6  his discretion under the law, and that is the

7  rationale he provided to staff, and that is the

8  rationale that we placed in the record.  So that

9  is his reason for having the question.

10 BY MR. GERSCH:

11    Q  My question is a little different.  If

12 the Secretary's real rationale is something

13 different than the rationale he lays out in his

14 decisional memo, is it your understanding, under

15 the law, that we're to ignore the real reason and

16 only focus on what's in the decisional memorandum?

17      MR. GARDNER:  Objection.  Calls for a

18 legal decision.

19      THE WITNESS:  Your hypothetical is

20 premised on the false conclusion that there is

21 some illegal rationale that would be provided and

22 be exposed and be referenced.  There is none.

Page 302

1    It's committed to his discretion to add a

2    question, as long as you make it through the other

3    things, Paperwork Production Act, et cetera.  So

4    it's -- I don't understand the basis for your

5    question.  But there's -- at the base of your

6    question is this hypothetical that there's some

7    supposed illegal reason that would be -- that

8    would nullify a perfectly valid decision.  I don't

9    agree with that assessment.

10   BY MR. GERSCH:

11       Q   Mr. Comstock, I want you to listen to my

12   question carefully, because there was no reference

13   to any illegal rationale, and I'm going to put it

14   to you again and there will be no reference to an

15   illegal rationale.  And my only question -- and,

16   by the way, I'm happy if you want to take this as

17   a hypothetical.

18          My only question is:  If the Secretary

19   lays out a rationale in his decisional memorandum

20   which is different than his real rationale, is it

21   your understanding that we're supposed to ignore

22   the real rationale and only focus on what's in the

Page 303

1   decision memo?

2          MR. GARDNER:  Given your introductory

3   clause, objection.  Calls for a hypothetical.

4   Objection.  Calls for a legal conclusion.

5          THE WITNESS:  Again, a decision is valid

6   if a valid reason has been spelled out, and that

7   is what we did.

8   BY MR. GERSCH:

9      Q   Could you answer my question?

10     A   Again, I don't accept the premise of your

11  question, which is that there's some other reason

12  besides what was provided in the memo.

13     Q   It's a hypothetical question, sir.  The

14  question is --

15     A   I'm not going to answer a hypothetical on

16  that basis.

17     Q   I'm asking you to answer it, and you're

18  here to answer questions, and I think I'm fairly

19  following up on your testimony.

20         My question to you is real simple:  If

21  the Secretary lays out a rationale in his

22  decisional memorandum and it's not his real

Page 304

1    rationale, is it your understanding that what

2    we're supposed to focus on is what's in the

3    decisional memorandum and we're not supposed to

4    look at the rationale?

5           MR. GARDNER:  Objection.  Calls for

6    hypothetical.  Objection.  Calls for legal

7    conclusion.

8           THE WITNESS:  Again, we're at loggerheads

9    here because you keep spelling out something that

10   is -- that presupposes there is some other

11   rationale that would be sufficient to outweigh a

12   legitimate rationale and, therefore, must be

13   noticed and taken care of.  I mean, the government

14   makes decisions all the time and spells out a

15   rationale.  Do some of decision-makers have,

16   perhaps, other reasons, maybe, but it's not

17   relevant to the legal analysis.

18      Q   We shouldn't know what Secretary --

19   withdrawn.

20          We shouldn't know what the real rationale

21   is; is that testimony?

22      A   I --

Page 305

1          MR. GARDNER:  Objection.  Calls for a

2    legal conclusion.

3          THE WITNESS:  Again, I have no reason to

4    believe that the rationale is anything other than

5    what's in the memo.

6    BY MR. GERSCH:

7       Q   Well, sir, actually, you testified

8    previously that the Secretary had a rationale for

9    asking this question, which he didn't reveal to

10   you and had nothing to do with the

11   Department of Justice's request.

12      A   I disagree with that statement.

13      Q   Let's try this one other way.  You don't

14   disagree with the proposition that a

15   decision-maker could have a rationale that is

16   different than what he chooses to spell out in his

17   decisional memorandum, right?

18          MR. GARDNER:  Objection.  Calls for

19   hypothetical.

20          THE WITNESS:  Again, I don't know -- I

21   don't -- it's impossible to answer that question,

22   because you -- I'm not sure where you're going

Page 306

1   with it.

2   BY MR. GERSCH:

3        Q   I'm not asking you to know where I'm

4   going with it.  I'm asking you to answer the

5   question.  I'll put it to you again.

6            You don't disagree with the proposition

7   that it's possible for the decision-maker to have

8   one rationale which he puts in the decisional

9   memorandum and a completely different rationale

10  which is the real reason he wants the decision

11  done?

12           MR. GARDNER:  Objection.  Calls for a

13  hypothetical.

14           THE WITNESS:  Again, in the context we're

15  dealing with, I don't agree with that statement.

16  BY MR. GERSCH:

17       Q   It's not possible for that to happen,

18  it's not possible for the decision-maker to put

19  one rationale in the decisional memo and have a

20  completely different rationale for why he wants

21  the decision?

22           MR. GARDNER:  Objection.  Calls for a

Page 307

1   hypothetical.

2         THE WITNESS:  In my experience with the

3   federal government service across 30 years, both

4   Democrat and Republican, I'm not aware of

5   decision-makers who would do such a thing.

6   BY MR. GERSCH:

7      Q   This would never happen, in your view,

8   right?

9      A   I'm not going to use the word never.

10  Clearly, in the course of human history, things

11  like that do happen.  That's not been my

12  experience that it generally is the case.

13     Q   That's fine.  Put aside your experience.

14  I'm just asking you conceptually, you don't have

15  difficulty understanding that a decision-maker

16  could say I'm doing this for one reason without

17  revealing that he is actually doing it for a

18  different reason.  You understand that concept,

19  right?

20        MR. GARDNER:  Objection.  Calls for a

21  hypothetical.

22        THE WITNESS:  Yeah.  It's a hypothetical

Page 308

1  to which the answer is always going to be yes.  So

2  to the extent that makes you happy, sure.

3  BY MR. GERSCH:

4      Q   Okay.  So you do understand that concept.

5  So when that occurs, when it is the case that the

6  decision-maker puts forth a stated rationale,

7  which is, in fact, not his real rationale, is it

8  your understanding that we should pay no attention

9  to his real rationale and focus only on his stated

10  rationale?

11          MR. GARDNER:  Objection.  Calls for

12  hypothetical objection.  Calls for a legal

13  conclusion.

14          THE WITNESS:  I'm not going to answer

15  that question.

16          MR. GARDNER:  Would now be a good time

17  for a break?  We've been going about an hour.

18          VIDEOGRAPHER:  This concludes Media Unit

19  Number 5.  The time on the video is 3:11 p.m.  We

20  are off to record.

21          (Off the record.)

22          VIDEOGRAPHER:  This begins Media Unit