Exhibit 5

Page 1

1             UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF NEW YORK

2

- - - - - - - - - - - - - -x

3     NEW YORK IMMIGRATION           :

      COALITION, et al.,             :

4                                    :

          Plaintiffs,                :

5                                    :   Case No.

          v.                         :

6                                    :   1:18-CF-05025-JMF

      UNITED STATES DEPARTMENT       :

7     OF COMMERCE, et al.,           :

                                     :

8         Defendants.                :

- - - - - - - - - - - - - - -x

9                         Friday, October 12,2018

                                Washington, D.C.

10

11

12   Videotaped Deposition of:

13               JOHN  M. ABOWD, Ph.D.,

14   called for oral examination by counsel for the

15   Plaintiffs, pursuant to notice, at the law offices of

16   Arnold & Porter Kaye Scholer, LLP, 601 Massachusetts

17   Avenue, Northwest, Washington, D.C. 20001-3743,

18   before Christina S. Hotsko, RPR, CRR, of Veritext

19   Legal Solutions, a Notary Public in and for the

20   District of Columbia, beginning at 9:06 a.m., when

21   were present on behalf of the respective parties:

22

Dr. John M. Abowd , Ph.D.

Page 2

```
 1                   A P P E A R A N C E S
 2    On behalf of New York Immigration Coalition, CASA de
      Maryland, American-Arab Anti-Discrimination
 3    Committee, ADC Research Institute and Make the Road
      New York:
 4       JOHN A. FREEDMAN, ESQUIRE
         DAVID GERSCH, ESQUIRE
 5       Arnold & Porter Kaye Scholer, LLP
         601 Massachusetts Avenue, Northwest
 6       Washington, D.C. 20001-3743
         (202) 942-5000
 7       john.freedman@arnoldporter.com
 8       SARAH BRANNON, ESQUIRE
         KELLY HERNANDEZ, ESQUIRE
 9       American Civil Liberties Union Foundation
         915 15th Street, Northwest
10       Washington, D.C. 20005
         (202) 675-2337
11       sbrannon@aclu.org
12
      On behalf of the State of New York:
13       ELENA GOLDSTEIN, ESQUIRE
         DANIELLE FIDLER, ESQUIRE
14       State of New York
         Office of the Attorney General
15       Civil Rights Bureau
         28 Liberty Street
16       New York, New York 10005
         (212) 416-6201
17       elena.goldstein@ag.ny.gov
18
      On behalf of the State of California:
19       R. MATTHEW WISE, ESQUIRE
         California Department of Justice
20       Office of the Attorney General
         1300 I Street
21       P.O. Box 944255
         Sacramento California 94244-2550
22       (916) 210-6046
         matthew.wise@doj.ca.gov
```

Dr. John M. Abowd , Ph.D.

```
                                                    Page 3
 1           A P P E A R A N C E S   C O N T I N U E D
 2    On behalf of Lupe Plaintiffs:
          NIYATI SHAH, ESQUIRE
 3        ERI ANDRIOLA, ESQUIRE
          Asian Americans Advancing Justice
 4        1620 L Street, Northwest, Suite 1050
          Washington, D.C. 20036
 5        (202) 296-2300
          nshah@advancingjustice-aajc.org
 6
 7    On behalf of City of San Jose and Black Alliance for
      Just Immigration:
 8        DORIAN L. SPENCE, ESQUIRE
          EZRA ROSENBERG, ESQUIRE (Via Telephone)
 9        Lawyers Committee for Civil Rights Under Law
          1401 New York Avenue, Northwest, Suite 400
10        Washington, D.C. 20005
          (202) 662-8324
11        dspence@lawyerscommittee.org
          erosenberg@lawyerscommittee.org
12
13    On behalf of Kravitz Plaintiffs:
          KARUN A. TILAK, ESQUIRE
14        Covington & Burling, LLP
          One City Center
15        850 Tenth Street, Northwest
          Washington, D.C. 20001-4956
16        (202) 662-5083
          ktilak@cov.com
17
18    On behalf of Los Angeles Unified School District:
          BRYAN J. PARK, ESQUIRE (Via Telephone)
19        Dannis Woliver Kelley
          115 Pine Avenue, Suite 500
20        Long Beach, California 90802
          (562) 366-8500
21        bpark@dwkesq.com
22
```

Dr. John M. Abowd , Ph.D.

Page 4

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2   On behalf of Defendants:
         CARLOTTA P. WELLS, ESQUIRE
 3       U.S. Department of Justice, Civil Division
         20 Massachusetts Avenue, Northwest
 4       Washington, D.C. 20530
         (202) 514-4522
 5       carlotta.wells@usdoj.gov
 6       MILES RYAN, ESQUIRE
         U.S. Department of Commerce
 7       U.S. Census Bureau
         Office of the Chief Counsel for Economic
 8       Affairs
         Office of the General Counsel
 9       4600 Silver Hill Road
         Suitland, Maryland 20746
10       (301) 763-9844
         miles.f.ryan.iii@census.gov
11
12   Also Present:
         Dan Reidy, Video Technician
13
14
15
16
17
18
19
20
21
22
```

Dr. John M. Abowd , Ph.D.

Page 68

1   28 percent, that matters.

2        Q.  Do you know whether Dr. Barreto provided

3   the backup to that calculation?

4        A.  If he did, it wasn't provided to me.

5        Q.  Okay.  Thank you.

6        A.  So paragraph 60 says that this was a

7   national survey of 6,309 respondents.  And

8   paragraph 67 shows the composition of the phone

9   design.  And paragraph 75 reports response rate of

10  28 percent.

11           So I think that the survey was

12  administered to 63,000 -- 6,309 sample units, of

13  whom 28 percent responded.  If it was administered

14  to 6,309 respondents, then the sample plan in

15  paragraph 67 is not a sample plan.

16           I'm marking paragraph 60 as number 16 and

17  the table in paragraph 67 as number 17.

18           At this point, I'd just like to say I

19  don't know enough about the survey design to

20  continue.  It doesn't seem to make sense to

21  speculate.  But it's hard -- it's hard to go from

22  that description of the survey to having

Dr. John M. Abowd , Ph.D.

Page 69

1  confidence in the analysis of it.

2          I had other general analysis criticisms.

3  Some of the numbers reported in the report are not

4  accompanied with margins of error.  Whether those

5  margins of error are properly calculated or not

6  depends upon exactly how the survey design handled

7  non-response.  It had non-response if it had only

8  28 percent respondents.  And I accept that a

9  28 percent response rate is within the range of

10  acceptability for this kind of poll.

11          So I'm not saying that you can't learn

12  anything from a poll this size.  But I am saying

13  that you have to document the methods that you

14  used to generalize to the populations that he

15  tried to generalize to, and the sample plan

16  documentation is inadequate.

17      Q.  Okay.  And I should ask you, were you

18  given any of Dr. Barreto's backup to his survey,

19  either in the plan or backup to these tables?

20      A.  The only things that I have seen are his

21  reports.

22      Q.  Okay.

Page 77

1    studies that I've put on the record and that in

2    the public record of the Census Bureau show that

3    those operations have succeeded in reducing the

4    net undercount and in reducing differential net

5    undercounts, and that the intercensal research

6    that's done focuses on the deficiencies that are

7    identified in the previous census or the previous

8    several censuses.

9              So it's simply not conjecture.  I'm --

10   I'll leave it at that.

11        Q.   Thank you.  If you could continue.

12        A.   I additionally take issue with the final

13   analysis in the -- in paragraph 10 about the

14   self-response rate in the end-to-end test.  The

15   end-to-end test was not conducted under full

16   census protocol; in particular, it didn't have a

17   communication campaign.  And it was conducted to

18   ensure that the systems were properly integrated

19   and worked properly with each other.  It didn't

20   have a target completed response rate that's

21   comparable to the targeted completed response rate

22   in the 2020 census, so it wasn't extended.  In

Dr. John M. Abowd , Ph.D.

Page 78

1    order to meet the 2020 targets, it was kept in the

2    field long enough to meet its own targets, which

3    were below the 2020 targets.

4         Q.  And just for clarification, when you --

5    we're talking about the communications plan.  You

6    said not under a full communications -- you meant

7    not under a full communications plan under not --

8    under a false communications plan?  I think

9    that's --

10        A.  Did I say false?

11        Q.  It sounded like you said false.

12        A.  I did not intend to say the word "false."

13   I intended to say that the 2018 end-to-end census

14   test was conducted without a full communication

15   campaign.  In fact, it was conducted without the

16   use of the integrated partnership and

17   communication program.

18        Q.  Okay.  Thank you.

19        A.  I disagree with the conclusions in

20   paragraph 11.  I'm marking it number 7.  I believe

21   that Dr. Barreto was unfamiliar with the

22   appropriate use of subnational net undercount

Dr. John M. Abowd , Ph.D.

Page 89

1    visit form from the end-to-end.

2         Q.  I see.  If you could continue.

3         A.  I disagree with paragraph 31.  That's

4    number 17.  The end-to-end test was conducted just

5    as the presence of a citizenship question was

6    being announced.  And we are examining the data

7    entered by the field enumerators regarding

8    people's reactions to the question.  I don't have

9    any conclusions to report from that, but I think

10   it's not correct to conclude that just because it

11   didn't have a citizenship question on it, it

12   couldn't have been affected by the presence of --

13   the discussion about a presence of a citizenship

14   question on the subsequent -- on the actual

15   2020 census.

16        Q.  I'm sorry, I didn't follow that.  You

17   said the enumerator responses to the question, but

18   the question --

19        A.  So there --

20        Q.  - wasn't asked --

21        A.  So there's -- in the follow-up -- so the

22   enumerators don't use the same instrument that you

Dr. John M. Abowd , Ph.D.

Page 90

1   get.  They use an instrument that's customized for

2   the field enumeration and non-response follow-up.

3   And it has a space for them to insert comments

4   regarding things that they think their supervisor

5   would want to know or things that they think the

6   next interviewer who goes there would want to

7   know.  The classic example is the dog, but the --

8   other things like household expressed strong

9   reluctance to answer, household objected to the

10  citizenship -- they would record that.

11      Q.  Even -- so you're not suggesting that the

12  enumerators actually went out and in the field

13  surveys --

14      A.  No, no, no.  There's no design study.

15  I'm not suggesting there was a design study.  What

16  I'm suggesting is that the enumerators have

17  recorded the sensitivity that was already present

18  in Providence, and the news reports recorded it

19  too, so, it's right, there wasn't a citizenship

20  question, and you can't do the kinds of controlled

21  studies that we all prefer, or even the kinds

22  of -- different studies that you can sometimes

Dr. John M. Abowd , Ph.D.

Page 91

1    construct.  But I don't think it's a correct

2    conclusion that inferences from the Providence

3    study, which did not include the citizenship

4    question, will likely be inapposite.

5         Q.  I see.

6         A.  It probably says inapposite.

7              I'm now in section C.  Can I just put my

8    objection to the whole of section C?

9         Q.  That's -- that's fine.  If you want to

10   summarize what's your --

11        A.  Yes.  So I'm putting number 18 there.

12             Section C acknowledges that the

13   citizenship question used on the census was not

14   further tested before it was put on the census.

15   It documents that that is consistent with the

16   Census Bureau's stated quality standards because

17   of an explicit exception that predates this census

18   question arising -- i.e., that was already in

19   there -- allowing the use of a question that has

20   been previously tested on another survey without

21   further testing.

22             That exception doesn't require a waiver.

Dr. John M. Abowd , Ph.D.

Page 96

1        A.   It is not.

2        Q.   Putting aside your central criticism,

3    which I take is the misinterpret -- and if you

4    don't like my language, you can use your own

5    language -- but the misinterpretation of a decline

6    in self-response as signifying anything with

7    regard to an undercount, are the other criticisms

8    you have of Dr. Barreto's report discussed in your

9    report?

10       A.   So let's make this easier.  I didn't

11   specifically discuss anything about Dr. Barreto's

12   report when I wrote -- especially the version

13   that's in front of me, September 21st, I hadn't

14   even read it.  I had read it when I wrote the

15   revised one, but I didn't feel that I needed to

16   comment specifically on his report, that I just

17   needed to document where the estimates that I used

18   in my report came from.

19            And I am relying on the analysis I did.

20   And I am not relying on the analysis that

21   Dr. Barreto did.

22            You asked me what I disagreed with, so I

Dr. John M. Abowd , Ph.D.

Page 143

1       Q.  Your 1970 and your 1990 examples.

2           Were the Census Bureau's statistical

3   quality standards that govern the Census Bureau

4   today in effect in either 1970 or in 1990?

5       A.  No.

6       Q.  With regard to your 1970 example, which

7   is discussed on page 24 of your report, what is

8   your source of information for this analysis?  And

9   it's fine -- if you want to consult Exhibit 2,

10  that's fine.  We just should make clear on the

11  record that you're doing it.

12      A.  I'm consulting Exhibit 2.

13          Oh, okay.  It's in the footnote in both

14  places.  It's that 1990 census content reinterview

15  survey study cited in footnote 39.  Oh, sorry, no.

16      Q.  Right.  For the 1970 --

17      A.  I think the problem here is you had a

18  summary paragraph, and I actually discuss the 1970

19  example.  I know that I marked the sources, and

20  they're public, unlike the '92 experiment.

21          I can't figure out what happened to the

22  citation for that.  I apologize for having to --

Dr. John M. Abowd , Ph.D.

Page 144

1      Q.   It's quite all right.  We're just --

2      A.   -- dig through my own report.

3           Okay.  The report did make the

4   references, and I apologize for the fact that I

5   didn't cite it properly in text.

6           In the report, I cite a paper by Jacob

7   Siegel and Jeffrey Passel in 1979, Coverage of the

8   Hispanic population of the United States in the

9   1970 census:  A methodological analysis, current

10  population reports:  Special studies P-23, and a

11  URL where you can find it is below.

12          There's a description in there of how

13  that particular question was imported from the

14  current population survey into the 1970 census.

15     Q.   Okay.  Was that the only source you

16  consulted regarding this example?

17     A.   Yes.

18     Q.   Do you know whether that study -- I see

19  that it's -- there's a website here for a 1979 --

20     A.   So I can help you more.  The P series are

21  public reports from the current population survey.

22  And the Library of Congress will have a copy, too.

Dr. John M. Abowd , Ph.D.

Page 145

1    It's just that, where I was sitting, the only copy

2    I could get is the one that happened to have been

3    curated on that particular site.

4         Q.   I see.

5         A.   But that's an official publication of the

6    Census Bureau.

7         Q.   What do the other series of studies

8    issued by the Census Bureau -- what do the

9    prefixes mean, like the G or the J?

10        A.   I'll do the best I can.

11        Q.   Okay.

12        A.   The document curation for most of our

13   information products is not covered by the quality

14   standards.  And most of our practices date from

15   when a paper copy was produced and a copy was

16   automatically deposed with the Library of Congress

17   and other curation libraries that held all

18   government printing documents -- all official

19   publications of the U.S. government.

20             So the P series for the current

21   population survey is demographic reports,

22   population reports.  In the -- in the production

Dr. John M. Abowd , Ph.D.

Page 146

1    of documents related to decennial censuses, the

2    memo series are generally labeled A, B, C, D, E,

3    sequentially in a form that the associate director

4    for the decennial census dictates at the start of

5    the recordkeeping operation, and then the memos

6    are numbered A-1 and B-1.  I don't know all the

7    series.  I don't know even what letter we've

8    gotten up to for 2020 or what letters we got up to

9    for 2010.

10          When they're released to the public, our

11   current practice is also to release a paper copy,

12   if one exists.  But since official government

13   documents had to be in electronic format, we now

14   have a curated electronic copy, and we depose with

15   the Minnesota Population Center and the

16   Inter-University Consortium on Political and

17   Social Research, which are two academic

18   consortia -- we depose copies there, too.

19     Q.  The series label wouldn't necessarily be

20   consistent from census to census?

21     A.  As far as I know, it's not.

22     Q.  Okay.  Do you know whether a copy of the

Dr. John M. Abowd , Ph.D.

Page 147

1   Siegel paper was produced in discovery in this

2   matter?

3        A.   I believe it was.  Yes.

4        Q.   Without having considered the Siegel

5   paper, could you have made the statements in your

6   report about the 1970 example?

7        A.   I believe that one of the population

8   experts at the Census Bureau recalled that this

9   might have happened, but couldn't provide any

10  documentation.  And it took some searching to find

11  a copy of a report that documented it.  So I

12  probably would have known that it was a

13  possibility but had a difficult time tracking down

14  a source for it.

15       Q.   You certainly couldn't have provided the

16  level of detail here without consulting this

17  Siegel --

18       A.   That's correct.

19       Q.   So for the 1970 Hispanic origin question,

20  do you know what the gap of time was between when

21  the question was tested for the CPS and when it

22  was included on the long form?

Dr. John M. Abowd , Ph.D.

Page 269

1          So in order to produce the tables that I

2    actually used, I asked the DRB not to consider

3    those tables, since they didn't have the

4    information.  So they had to redact them because

5    they didn't have the information they would need

6    to begin considering clearing them.

7          I didn't use any of the redacted tables.

8          Q.  But you've seen the document in

9    unredacted form, correct?

10         A.  Yes, I have.

11         Q.  Without considering this document, could

12   you have reached all the conclusions in your

13   report?

14         A.  I'm pretty sure the answer to that is no.

15   I didn't search for alternative sources for

16   these -- for these documents -- for the -- numbers

17   drawn from this document I did not search for

18   alternative sources for.  So if there are any that

19   are not in the public document -- there might have

20   been a summary memo someplace that didn't have the

21   detailed tables that I could have used instead of

22   the memo with the detailed tables, but this is the

Dr. John M. Abowd , Ph.D.

Page 270

1   memo that I had.

2        Q.   Now, this memo describes the 2010

3   imputation process, correct?

4        A.   The count imputation process.

5        Q.   The count imputation process.  It doesn't

6   discuss any kind of post-imputation survey or

7   analysis that is done whether the count

8   imputations were accurate, does it?

9        A.   The entire whole census -- whole-person

10  census imputations are out of the universe for

11  coverage evaluation.  They're not in the

12  data-defined record universe.

13       Q.   So the G series memos that Dr. Mule and

14  his team worked on wouldn't speak to coverage of

15  people in the imputation universe, correct?

16       A.   No, that's not correct.  Net undercount

17  does depend on whole person census imputation, so

18  you can't leave it out of a full coverage

19  analysis.  You can declare the coverage universe

20  to be the data-defined census records, but you're

21  still in the end going to have to make an

22  estimation of how to inflate those up to account

Dr. John M. Abowd , Ph.D.

Page 274

1       Q.   One would hope.

2       A.   I think that's a safe hypothesis.

3       Q.   So the J-12 memo doesn't provide

4   stratification, demographic stratification, does

5   it?

6       A.   I -- I don't remember.  I was waiting for

7   you to direct my attention to the table where it

8   did.  I'm just going to look.

9       Q.   Well, I don't know if it's been

10  redacted --

11      A.   I'm guessing that it doesn't because we

12  know that on the imputations themselves, that we

13  copied all those characteristics from somebody

14  else.  So it doesn't make much sense to talk about

15  whether they're correct or not.  Why we think we

16  can include them in the overall statistics is that

17  a general property of -- I guess we'll call it

18  ignorable -- ignorable missing data models is that

19  they produce reliable statistics when you do the

20  imputation.

21           But whether the ignorability assumption

22  holds or not is another one of those fundamentally

Dr. John M. Abowd , Ph.D.

Page 275

1    untestable things, unless you bring in additional

2    independent information.  And we've already

3    discussed why the post-enumeration survey doesn't

4    do that.

5         Q.  Could the Census Bureau have looked at

6    the demographic characteristics of the source of

7    the imputation to model the demographics of the

8    imputation population?

9         A.  So -- yes is the answer to that question.

10   And what you would want is you would want a much

11   more diverse team in terms of their

12   specializations than coverage measurement teams,

13   which are extremely well versed in doing the dual

14   system estimation and the associated statistics

15   and not as well versed in combining alternative

16   sources of data to make an independent or an

17   approximately independent estimate of the

18   demographic characteristics of the people that you

19   left out.

20         I've done some of that in other research,

21   but not with respect to census counts.

22         Q.  Are the candidate records that are used

Dr. John M. Abowd , Ph.D.

Page 277

 1   Hispanics are imputed at a greater or lower rate
 2   than non-Hispanic whites, does it?
 3        A.   It doesn't seem to, no.  And I don't
 4   see -- if you're just looking at the count-imputed
 5   households, I don't see how it could.
 6        Q.   Is that reflected in Dr. Mule's memo?
 7        A.   So the overall coverage assessment was
 8   designed to be able to isolate Hispanics as a
 9   subpopulation of interest and to produce reliable
10   national statistics related to answering the
11   Hispanic origin question yes on the census.
12        Q.   The -- J-12 also doesn't provide
13   geographical breakdowns.  It doesn't tell you the
14   number of imputations for particular states or
15   jurisdictions, does it?
16        A.   I believe they were in the suppressed
17   cells.
18        Q.   In the redacted information?
19        A.   Yes.  If the title of the -- let me see
20   if the title of the redacted tables is there.
21             I can't tell from the redacted titles --
22   from the titles of the redacted tables exactly

Dr. John M. Abowd , Ph.D.

Page 278

1   what geographic detail might have been in them.

2   It doesn't look like there was any.  And I don't

3   remember.  I didn't look at them, I just had -- I

4   had access to them.

5         Q.  Is the rest of the J series of memos the

6   Census Bureau's analysis of imputation during the

7   2010 census?

8         A.  It's not exclusively imputation.  It's

9   internal technical memos related to the

10  statistical operations in the census.

11        Q.  If you look at page 13 of the memo, the

12  references section --

13        A.  Got it.

14        Q.  -- that cites three other J series memos?

15            Do you see that?

16        A.  Yes.

17        Q.  None of -- none of those memos have been

18  publicly released, correct?

19        A.  As far as I know, that's correct.  Yes.

20        Q.  And to your knowledge, none of them has

21  been produced in this litigation, correct?

22        A.  To the best of my knowledge, that's

Dr. John M. Abowd , Ph.D.

Page 279

1    correct.

2          Q.   You have access to all of these memos,

3    correct?

4          A.   In principle, yes.

5          Q.   You have considered them at some point in

6    your tenure at the Census Bureau, correct?

7          A.   So if you're not working in a particular

8    division of the Census Bureau, you don't

9    automatically have access to its internal document

10   file.  So I had to learn of the existence of the

11   J series in writing my expert report, and only

12   very recently have I learned -- have I acquired

13   copies of the rest of them.

14             There's not a central document

15   repository.  And there's a good reason for that,

16   because the -- your business-related need to know,

17   the confidential information in the redacted

18   tables here, is directly related to whether you're

19   working on the decennial census or not.  And we

20   don't automatically grant even the chief scientist

21   access to all of the confidential memos.

22             I -- there's that.  And then they're not

Dr. John M. Abowd , Ph.D.

Page 280

1  curated in a central repository.  The latter

2  problem we're actually trying to take care of.

3  The former problem of, since I didn't have a

4  business-related need to know until that was

5  established, I wouldn't have been automatically

6  given access to these memos.  I had to ask

7  somebody, where's the writeups, and then they

8  properly pointed me to the public ones.  And I was

9  able to analyze a lot of the public data, and I'm

10  properly allowed to analyze the microdata from the

11  2010 census, including the coverage measurement

12  data.

13      But until I asked, where are the other

14  studies that you did on imputation, I didn't know

15  about the J series.  Maybe somebody who had been

16  in decennial for a lot longer, like Mr. Thompson,

17  would have automatically known.  I don't know if

18  he would have known about the 2010 series, but I'm

19  sure he can still tell you every memo series

20  letter from 2000 and from 1990.

21      Q.  Did you consider the J series memos on

22  imputation in -- in writing your report?

Dr. John M. Abowd , Ph.D.

Page 281

1      A.   The only J series memo that I considered
2   was this one (indicating).
3      Q.   Okay.  I'm wondering, if you had not
4   considered them, how you can say, at page 13 of
5   your report, that "The Census Bureau is not aware
6   of any credible quantitative data suggesting that
7   imputation in the census leads to a greater net
8   undercount or differential net undercount in
9   comparison to self-response or in-person
10  interviews."
11     A.   Because I grilled the author team of
12  these memos and their supervisor with very
13  specific questions in very long sessions to
14  discuss the procedures that were used.
15          And since the metadata database is the
16  memories of those people, I was obligated to rely
17  on their representations, and I'm still relying on
18  it.  I believe when they tell me that there
19  wasn't, there wasn't.
20     Q.   But you haven't gone back to actually
21  check the J series yourself --
22     A.   Now I have the J series because other

Dr. John M. Abowd , Ph.D.

Page 282

1    issues unrelated to the litigation led me to the

2    J series.  And Patrick Cantwell, the chief of the

3    DSSD now, has had access to the J series all

4    along.  He hasn't been trying to hide the J series

5    from me.  He knows there's a limit to what can be

6    read.  He produces the documents that he thinks

7    are most relevant.  And for litigation purposes,

8    those should be public documents so we all share

9    the same information.

10          So I have tried, to the maximum extent

11   possible, to rely on public documents.  Sometimes

12   I just can't.

13      Q.  Do any of the other J series memos

14   concern stratification or breakdowns that are of

15   issue in this case, either by demography or

16   geographic basis?

17      A.  One of the J series memos is the sampling

18   plan for the post-enumeration survey.  So I think

19   the answer to your question is necessarily yes.

20   But I'm just beginning to get familiar with them,

21   so I don't know their contents.

22      Q.  Okay.  I'm also wondering about the J-9

Dr. John M. Abowd , Ph.D.

Page 283

1   memo that's referenced in the redacted document,

2   which is titled, Census count imputation:  Summary

3   of results of the U.S. and the states, whether

4   that might provide a geographic breakdown

5   concerning numbers of imputation -- numbers of

6   count imputation.

7        A.  From the title, that's a fair

8   presumption.

9        Q.  And that breakdown might tell us, for

10  example, what the New York -- number of

11  imputations in New York is relative to Utah?

12       A.  So the public documents for the census

13  tabulate substituted persons.  That's a superset

14  of count imputations because it includes the ones

15  that are substituted in partial household

16  imputation.

17           But these confidential ones -- it's -- I

18  don't want to speculate.

19           From the title, I'd draw the same

20  conclusion you drew.

21       Q.  Okay.

22           MR. FREEDMAN:  I'm going to shift gears,

Dr. John M. Abowd , Ph.D.

1    were just speaking about.

2            And in the last full paragraph, the last

3    sentence of that, you state that, "In the 2018

4    end-to-end census, about 9 percent of the NRFU

5    households were resolved when a self-response was

6    received during the NRFU operation."

7            Where does that number come from?

8        A.  I am looking for Exhibit 2.  And I need

9    to find the same paragraph.  And I should have

10   documented it there.  I think I know, but let

11   me --

12       Q.  Thank you.

13       A.  And the page numbers don't agree because

14   there are longer footnotes in this version.

15           I did not document that number.  The

16   source should be the 2020 program management

17   review that -- so the next one is next Friday, so

18   it would have been about three months ago,

19   approximately.  I was there, so it wasn't in

20   Alaska.  So I think it was in August.

21       Q.  And --

22       A.  I can look.  And all of the 2020 --

Dr. John M. Abowd , Ph.D.

Page 308

1   they're quarterly.  They're all in a single

2   website.  And there's a complete set of slides,

3   and one of them should have that number on it.

4       Q.  And so it's a slide presentation that you

5   believe is the source of that 9 percent number?

6       A.  Yes.

7       Q.  Did you consider any other documents

8   relating to the end-to-end test in writing your

9   report?

10      A.  I don't think so.  In writing my

11  report -- and I'm sorry I didn't footnote it -- I

12  relied on my memory.  I've seen the presentation

13  of the preliminary results from the end-to-end

14  test twice, so -- once when it was reviewed by the

15  executive steering committee and once when it was

16  presented publicly.  And I knew them to be public,

17  but I should have gone and found the slide.

18      Q.  And other than those slides, you don't

19  recall relying on any other information relating

20  to the 2018 end-to-end test in writing your

21  report?

22      A.  That's right.