IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,

    Defendants.

No. 1:18-cv-2921 (JMF)

**DEFENDANTS' MOTION IN LIMINE**

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted); *see also Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 467 (S.D.N.Y. 2005); *see generally* Fed. R. Evid. 104. *In limine* motions serve the goal of "streamlin[ing] trials and settl[ing] evidentiary disputes in advance." *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002). Here, Defendants respectfully request the following pretrial rulings: (1) the admission of the Administrative Record into evidence; (2) the exclusion of all testimony and exhibits beyond the administrative record relating to the merits of this litigation as irrelevant under Federal Rule of Evidence 402; and (3) the disqualification of one of Plaintiffs' expert witnesses, Dr. Lisa Handley.

## I. The Court Should Admit Into Evidence the Administrative Record

Plaintiffs have challenged under the Administrative Procedure Act the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census. For the reasons stated in Defendants' pretrial memorandum, review of the Secretary's decision should be based solely upon the administrative record. *See* Defs. Pretrial Mem. Accordingly, Defendants maintain that trial in this case is inappropriate. Nevertheless, to the extent the Court proceeds to conduct a trial, judicial review should be confined to the administrative record. Notably, the administrative record appears on both parties' exhibit lists, and there can be no dispute that the administrative record is central to the resolution of Plaintiffs' claims.

Accordingly, Defendants respectfully seek the admission into evidence of the administrative record.

## II. The Court Should Exclude All Exhibits And Testimony Concerning the Merits of the Secretary's Decision Under Rule 402 as Irrelevant

Because the administrative record serves as the exclusive source for judicial review of a challenge to final agency action, it necessarily follows that evidence beyond the administrative record is irrelevant for purposes of resolving plaintiffs' claims. As discussed below, Plaintiffs improperly seek to introduce hundreds of exhibits, multiple expert witnesses, and thousands of lines of deposition designations from government employees in an attempt to support their claims on the merits. Because this evidence is irrelevant for review of a final agency decision under the APA, Defendants respectfully request that the Court exclude it from trial.

Under the Federal Rules, evidence must be relevant to be admissible. FRE 402. "Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . and the fact is of consequence in determining the action." *United States v. Scali*, No. 16-CR-466, 2018 WL 543584, *1 (S.D.N.Y. Jan. 23, 2018) (quoting FRE 401(a)-(b)). "The particular

facts of the case determine the relevancy of a piece of evidence." *United States v. Vallejo*, 237 F.3d 1008, 1015 (9th Cir. 2001). Plaintiffs have the burden of establishing by a preponderance of the evidence that each of their proposed exhibits is relevant. *See United States v. Arce*, No. 16-CR-643, 2018 WL 1662762, at *1 (S.D.N.Y. Mar. 12, 2018).

      Here, there can be little doubt that the extra-record evidence Plaintiffs seek to introduce at trial to challenge the Secretary's decision is irrelevant in this APA case. As discussed in Defendants' pretrial brief, under the APA's "arbitrary and capricious" standard, "judicial review of agency action is necessarily narrow." *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008). A reviewing court does not weigh the evidence or try to determine whether the course taken by the agency was the course the court would have taken; rather, the court's inquiry is limited to determining "whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005) (quoting *Motor Vehicle Mfts. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That requirement is satisfied "when the agency's explanation is clear enough that its path may reasonably be discerned." *Encino Motorcars, LLC v. Navarro*, 136 S. C. 2117, 2125 (2016) (citation omitted). In an action challenging an agency decision as arbitrary and capricious, "the question whether an agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record." *Greene v. Carson*, 256 F. Supp. 3d 411, 424 (S.D.N.Y. 2017) (quoting *Glara Fashion, Inc. v. Holder*, No. 11-cv-889, 2012 WL 352309, at *5 (S.D.N.Y. Feb. 3, 2012)) (alterations omitted). Materials that were not before the agency decisionmaker at the time of the decision, such as expert testimony, *see e.g.*, *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 549 (1978), or materials produced in discovery, *see, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*), are not part of the agency record and should not be considered.

### A. The Vast Majority of Plaintiffs' Proposed Exhibits Should Be Excluded As Irrelevant in this APA Case Under Rule 402

Plaintiffs cannot meet their burden of establishing the relevancy of most of their proposed exhibits in their APA challenge to the Secretary's decision to reinstate a citizenship question on the 2020 decennial census. Plaintiffs have identified over 500 exhibits they may seek to admit at trial. The overwhelming majority of these exhibits are in support of Plaintiffs' APA challenge to the Secretary of Commerce's decision to reinstate a citizenship question on the decennial census. Indeed, it is apparent that Plaintiffs intend to use these exhibits to second-guess the wisdom of the Secretary's decision using information that was not considered by the Secretary in his decisionmaking process. As discussed in Defendants' pretrial memorandum, Pretrial Mem. at 26-27, Plaintiffs intended use of exhibits for this purpose is wholly inappropriate in resolving Plaintiffs' APA challenges. *Resolute Forest Prods., Inc. v. U.S. Dep't of Agriculture*, 130 F. Supp. 3d 81, 93–94 (D.D.C. 2015) ("Nor is it the Court's job to second-guess an agency's determination: We do not weigh the evidence; we merely examine the record to see if there is evidence . . . support[ing] the determinations of the agency.").

### B. Plaintiffs' Deposition Designations Should Be Excluded as Irrelevant Under Rule 402

Plaintiffs seek to designate thousands of lines of deposition testimony from various Commerce and Census employees, including from Wendy Teramoto, who they are also attempting to subpoena for live testimony at trial. As with many of Plaintiffs' proposed exhibits, Plaintiffs plainly are seeking to rely upon their deposition designations to support the merits of their claim. Plaintiffs have designated hundreds of pages of deposition transcripts from Karen Dunn Kelley, the Under Secretary of Economic Affairs for the Department of Commerce; Wendy Teramoto, the former Commerce Chief of Staff; Earl Comstock, the Commerce deputy chief of staff; Dr. Ron Jarmin, the Acting Director of the Census Bureau, and Dr. John Abowd, the Chief Scientist of the

Census Bureau. These designations focus almost exclusively on the decision-making process undertaken by the Commerce Secretary concerning the reinstatement of a citizenship question on the census. The Secretary detailed his decisionmaking process at length in his Decision Memo, AR 1313–1320, and introduction of further testimony from the Secretary's advisors on this matter is unnecessarily cumulative and wasteful of the Court's time. For this reason alone, even if this Court determines that it would be relevant, such testimony should be excluded pursuant to FRE 403.[1]

### C. Certain of Plaintiffs' Proposed Experts Seek to Offer Testimony That Should Be Excluded as Irrelevant Under Rule 402

Similarly, Plaintiffs intend to introduce certain expert testimony for the sole purpose of second-guessing the Secretary's decision to reinstate a citizenship question on the decennial census by providing information that was not before the Secretary in making his decision.

Plaintiffs have identified Dr. Hermann Habermann, the former Deputy Director and Chief Operating Officer of the U.S. Census Bureau from 2002 to 2007, to second-guess the Secretary's decision by offering the opinion that the need for citizenship data at the block level is unnecessary and that the proper procedure for reinstating a question on the Decennial Census was not followed. *See* Ex. 1, Expert Report of Dr. Hermann Habermann, at 1–2. Plaintiffs also seek to introduce the testimony of the former Director of the Census Bureau, John Thompson, to offer, based on his review, his "opinion that the rationale provided by Secretary Ross for his decision is not supported by the administrative record." *See* Ex. 2, Expert Report of John Thompson, at 2. In addition, Plaintiffs seek to introduce the testimony of Dr. D. Sunshine Hillygus, a political science professor, who intends to opine that she was "asked to assess various assertions in a March 26, 2018

---

[1] In addition, if Ms. Teramoto were subpoenaed for live trial testimony, Plaintiffs' deposition designations for her would be cumulative, and therefore appropriately excluded under Rule 403. Likewise, because the Court has already ruled that Dr. Abowd will present testimony live, Plaintiffs' extensive deposition designations from Dr. Abowd are cumulative and should be excluded under Rule 403.

5

memorandum signed by U.S. Secretary Wilbur Ross regarding: (i) existing evidence concerning the effect of adding a citizenship question to the 2020 census on response rates to the census and the undercounting of subpopulations such as Hispanics and noncitizens; and (ii) the adequacy of testing the 2020 census questionnaire featuring the proposed citizenship question." *See* Ex. 3, Expert Report of D. Sunshine Hillygus, at 2. Finally, Plaintiffs seek to introduce expert testimony from Dr. Lisa Handley. Dr. Handley purports to analyze the Department of Justice's December 12, 2017 request to the Census Bureau to reinstate a citizenship question, and concludes that "currently available census data, including the citizenship data derived from the Census Bureau's ACS, has proven to be perfectly sufficient to ascertain whether an electoral system or redistricting plan dilutes minority votes." *See* Ex. 4, Expert Report of Lisa Handley, at 4.[2]

These opinions simply have no relevance in an APA case, where the question before the Court is whether the Secretary's decision is supported by the administrative record. There is no dispute that the Secretary did not have before him these expert opinions in reaching his decision, nor is there any dispute that the purpose of these expert opinions is to disagree with the Secretary's decision-making process (or, in the case of Dr. Handley, the Department of Justice's request). Indeed, these opinions seek to usurp the role of the Court as the ultimate decision-maker by offering the opinion that they do not believe the Secretary's decision is supported by the administrative record. Accordingly, the opinions of Dr. Habermann, Dr. Hillygus, Dr. Handley, and Mr. Thompson are irrelevant to any issue in this APA case and, as such, should be excluded under Rule 401.[3]

---

[2] As discussed below, beyond being irrelevant to any issue in this case, Dr. Handley should be disqualified from testifying based upon her conflict of interest based on her current work for the Department of Justice.

[3] For similar reasons, if Ms. Teramoto were subpoenaed for live trial testimony, this Court should exclude any attempt by Plaintiffs to elicit testimony from Ms. Teramoto on whether the Secretary's decision to reinstate a citizenship question was "correct" or otherwise to second guess the substance

Because Plaintiffs' APA claims present only legal questions, there are no "facts of consequence" in this action and the proposed exhibits, expert testimony, and deposition designations they intend to offer into evidence in support of their APA claims are irrelevant under FRE 402 as a matter of law. Accordingly, the Court should grant Defendants' motion *in limine*. *See Bromberg v. United States*, 389 F.2d 618, 618 (9th Cir. 1968) (affirming exclusion of irrelevant exhibits).

### III. The Court Should Disqualify Dr. Lisa Handley From Serving As An Expert Witness In These Cases

As discussed above, Plaintiffs seek to introduce the expert testimony of Dr. Lisa Handley to opine on whether the citizenship data derived from the Census Bureau's ACS is "sufficient to ascertain whether an electoral system or redistricting plan dilutes minority votes." *See* Ex. 4, Handley Report, at 4. In reaching this conclusion, Dr. Handley takes issue with the Department of Justice's December 12, 2017 letter requesting the reinstatement of a citizenship question on the 2020 decennial census, which she characterizes as "argu[ing] that the [block-level citizenship data] information was needed to accurately determine whether the citizen voting age population of a particular minority group was sufficiently large to constitute a majority in a single-member district – contending the current citizenship data available from the [ACS] is inadequate for this task."[4] *Id.*

Dr. Handley bases her opinions on her "over thirty years of experience," which includes, among other things, her work for the Department of Justice. *Id.* at 2. Indeed, Dr. Handley explains

---

of the Secretary's decision. Instead, her testimony should be limited to "whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005) (internal quotation omitted).[4] The December 12, 2017 letter from the Department of Justice does not actually claim that such data was "needed," *see* AR 663-65 (stating that block level data gathered from the Decennial Census "would greatly assist the redistricting process"), and Dr. Handley's misinterpretation of that letter is itself grounds for concluding that her opinions are irrelevant under Rule 402.

[4] The December 12, 2017 letter from the Department of Justice does not actually claim that such data was "needed," *see* AR 663-65 (stating that block level data gathered from the Decennial Census "would greatly assist the redistricting process"), and Dr. Handley's misinterpretation of that letter is itself grounds for concluding that her opinions are irrelevant under Rule 402.

7

in her report that she has served as an expert witness in more than 25 voting rights cases, "including six cases on behalf of the U.S. Department of Justice." *Id.* Dr. Handley further states that she "served as an expert in four cases that involved Voting Rights Act challenges in which Hispanic voting strength was of concern, three as an expert on behalf of the U.S. Department of Justice; *Perry v. Perez*, a Section 2 case challenging Texas congressional and state house districts; *State of Texas v. U.S.*, a Section 5 case regarding proposed congressional and state legislative districts in Texas before the U.S. District Court of the District of Columbia; and *U.S. v. Village of Port Chester*, a Section 2 challenge brought by the U.S. Department of Justice on behalf of Hispanic voters in the Village of Port Chester, New York." *Id.* at 2-3. Dr. Handley then explains at length the work she performed for the Department of Justice concerning the *Village of Port Chester* case as support for her opinion. *Id.* at 12-13. Dr. Handley further discusses the "district-specific, functional approach" she employed on behalf of the Department of Justice in *Texas v. United States*. *See* Rep. at 16-17, as well as the work she performed on behalf of the Department of Justice in the *Eastpointe* matter.

"A federal court has the inherent power to disqualify an expert witness." *See Grioli v. Delta Int'l Mach. Corp.*, 395 F. Supp. 2d 11, 13 (E.D.N.Y. 2005) (citing *Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996)). As one court has recognized, "[t]his power derives from the court's judicial duty to protect the integrity of the legal process.'" *Id.* (quotation omitted). The integrity of the judicial process is protected by disqualification "by ensuring that experts do not use, even unwittingly, confidential information that they learned from a party in the course of an earlier engagement against that party in a later lawsuit." *See Gordon v. Kaleida Health*, No. 08-CV-3785, 2013 WL 2250506, at *5 (W.D.N.Y. May 21, 2013) (quotation omitted). Courts in the Second Circuit have employed the following test to determine whether an expert should be disqualified: "(1) was it objectively reasonable for the first party who retained the expert to conclude that a confidential relationship existed; (2) was any confidential or privileged information disclosed by the first party to

8

the expert; and (3) does the public have an interest in allowing or not allowing the expert to testify." *Id.* at 13–14; *see also In re Namedna Direct Purchaser Antitrust Litig.*, No. 1:15-cv-7488, 2017 WL 3613663, at *3 (S.D.N.Y. Aug. 21, 2017). Here, each of these factors are easily satisfied, and disqualification of Dr. Handley is warranted.

First, there can be little dispute that it was objectively reasonable for the Department of Justice to conclude that a confidential relationship existed with Dr. Handley. The contract signed by Dr. Handley engaging her to work on *City of Eastpointe*, *Texas*, and *Perez*, among other cases, each required her to sign confidentiality agreements in which she agreed not to "reveal, divulge, or publicize any matters dealt with" while working as a retained expert. *See* Ex. 5, Declaration of Timothy F. Mellett (hereinafter "Mellett Declaration") at ¶¶ 5, 18 & Exs. 1–3, and both *City of Eastpointe* and *Perez* are currently pending in their respective district courts. *See* Mellett Decl. at ¶¶ 4, 17. Accordingly, this first factor tilts sharply in favor of disqualification. *See Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 591 (D. Minn. 1986) (disqualifying expert when "a longstanding series of interactions . . . have more likely than not coalesced to create a basic understanding of [a party's] modus operandi, patterns of operations, decision-making process and the like.").

Second, as reflected in the Mellett Declaration, Dr. Handley unquestionably received confidential information in her role as an expert witness for the Department of Justice that could be used against the United States in this litigation. The Department of Justice provided confidential feedback concerning the soundness of Dr. Handley's analysis and underlying methodologies, based on the Department of Justice's internal resources and analyses, including from its litigators, social scientists, and systems, and engaged in numerous and substantial confidential communications about Dr. Handley's analysis, including (1) her use of citizen voting-age population (CVAP) from the American Community Survey (ACS) in the *City of Eastpointe* case; (2) her use of the Bayesian Improved Surname Geocoding to estimate racial composition of voting groups in the *City of*

9

*Eastpointe* case; (3) her development of indices to address the ability of minority voters to elect representatives in *Texas v. United States*; and (4) her development of illustrative maps for Texas' 23rd Congressional district in the *Perez* case. Mellett Decl. ¶¶ 7, 10-11, 13, 16, 21, 23. These opinions and analyses are not subject to disclosure. *See* Fed. R. Civ. P. 26(b)(4)(C). These confidential communications with Dr. Handley are "specific[ally] and unambiguous[ly]" relevant to her expert report in the Census cases, *see, e.g., Auto-Kaps, LLC v. Clorox Co.*, No. 1:15-cv-1737, 2016 WL 1122037, at *2 (E.D.N.Y. Mar. 22, 2016), and the tacit argument that the United States has endorsed Dr. Handley's analysis rests heavily on those confidential conversations.

Some district courts in this Circuit have expanded upon this second factor by requiring a "direct connection" between the previous work using confidential information performed by the expert and the case at issue. *See Hinterberger v. Catholic Health Syst., Inc.*, No. 08-cv-380, 2013 WL 225091, at *11 (W.D.N.Y. May 21, 2015). This "direct connection" requirement prevents a party seeking disqualification from satisfying its burden through "mere conclusory or *ipse dixit* assertions" and instead requires "specific and unambiguous disclosures that if revealed would prejudice the party." *Eastman Kodak Co. v. Kyocera Corp.*, No. 10-cv-6334, 2012 WL 4103811, at *8 (W.D.N.Y. Sept. 17, 2012); *see Gioli*, 395 F. Supp. 2d at 12-14 (disqualifying plaintiff's expert in product liability case because the expert had served as defense counsel for defendant's company, represented defendant in cases that involved the same product at issue in the instant litigation, and therefore knew confidential information and defenses that were "particularly relevant to the instant case."); *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2017 WL 3613663, at *8 (S.D.N.Y. Aug. 21, 2017) (disqualifying plaintiffs' proposed expert, a former executive for defendant, who had testified on behalf of defendant 85-95 times, and a search of her emails "uncovered over approximately 1,000 privileged or confidential messages and attachments" concerning the issues in the case).

10

Here, there is a direct connection between Dr. Handley's work in the Census cases and the confidential information she has obtained based on her work as a current expert on behalf of the Department of Justice. In *City of Eastpointe*, for example, Dr. Handley conducted a racial bloc voting analysis to determine whether black residents were politically cohesive and whether whites consistently voted as a bloc to defeat black-preferred candidates, and she also directed a Department of Justice employee in crafting an illustrative redistricting plan on the Department's Geographic Information System, and each of these analyses was based in part on citizenship and demographic data from the American Community Survey. *See* Mellett Decl. ¶¶ 10-13. In the instant cases, Dr. Handley opines about "the effectiveness of current U.S. Census Bureau data resources;" specifically, citizenship data in the current American Community Survey. *See* Handley Rep. at 3-4. The analysis and underlying methodologies Dr. Handley uses in her report in this case so relate to the analysis and underlying methodologies she uses (after extensive confidential communications with the Department of Justice) in *City of Eastpointe* that any testimony Dr. Handley provides at trial would necessarily require divulging those confidential communications. *See* Mellett Decl. ¶ 15 (noting the similarity of the language in Dr. Handley's expert report in the current litigation, which cites the estimation of "CVAP by race and ethnicity by precinct based on the [American Community Survey] to conduct a racial bloc voting analysis on behalf of the U.S. Department of Justice in voting rights litigation currently underway" in *City of Eastpointe* with Dr. Handley's expert report in *City of Eastpointe*, which notes that she is "substituting 2010 VAP by race with black and white CVAP based on the ACS…").

Finally, public policy favors disqualifying Dr. Handley from testifying as an expert in these cases. "Plaintiffs can easily retain a new expert in the field, one who did not work for a company that is a key witness in this case (and a defendant in the related action) for two decades." *See In re Namenda*, 2017 WL 3613663, at *8. Indeed, in the Census cases pending in Maryland and California,

11

the plaintiffs have retained experts offering opinions similar to Dr. Handley who do not pose the same risk of disclosure of confidential information.[5] *See, e.g.*, Ex. 6, Expert Report of Pamela S. Karlan in N.D. Cal. Nos. 18-cv-01865 and 18-cv-02279; Ex. 7, Expert Report of David Ely in D. Md. Nos. 18-cv-01041-GJH and 18-cv-01570-GJH. Nor would Dr. Handley's livelihood as a "voting rights and redistricting expert," *see* Rep. at 2, be compromised; rather, it simply would mean that Dr. Handley could not offer opinions that rely upon confidential communications with the Department of Justice while she was retained as an expert witness for the United States. And absent disqualification, the Defendants will be substantially prejudiced, as the ability to cross-examine Dr. Handley will be greatly compromised by the fear of "opening the door" to the disclosure of confidential information that she has relied upon as the basis for her opinions. Indeed, it is difficult to see how the Department of Justice could effectively cross-examine Dr. Handley without risking the disclosure of such confidential information. *See* Mellett Decl. ¶¶ 16, 21, 31. Dr. Handley prominently and repeatedly discusses her work for the Department of Justice as a basis for her opinions. *See* Rep.at 2-3; 12-13; 15 at n.15; 16-17.

Accordingly, Defendants respectfully request that the Court disqualify Dr. Handley as an expert for the Plaintiffs in these cases.

## CONCLUSION

For the foregoing reasons, the administrative record should be admitted into evidence; the majority of Plaintiffs' proposed exhibits, Plaintiff's cumulative deposition designations, and the testimony of experts who are merely second-guessing the agency's decision should be excluded; and Dr. Handley should be disqualified.

---

[5] As discussed above, because Dr. Handley's testimony is legally irrelevant, Plaintiffs would not be prejudiced by her disqualification.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
JOSHUA E. GARDNER
Assistant Branch Directors

/s/     *Kate Bailey*
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
MARTIN M. TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel.:  (202) 514-79239
Fax:  (202) 616-8470
Email:  kate.bailey@usdoj.gov

*Counsel for Defendants*