## Expert Report of Dr. Hermann Habermann

September 7, 2018

### I.  Professional experience and qualifications.

I have over thirty-five years of experience as a statistician, earning much of that experience at statistical agencies of the United States government.  Among other federal government positions, I have served as Chief Statistician of the United States (from 1988 to 1992), and as Deputy Director and Chief Operating Officer of the U.S. Census Bureau (from 2002 to 2007).  I also served for eight years as Director of the United Nations Statistics Division (from 1994 to 2002).

I earned my Ph.D. in Statistics from the University of Wisconsin – Madison in 1975.  My curriculum vitae is attached to this report and includes a list of all publications I have authored in the past ten years.  I have not previously testified as an expert at trial or by deposition.  I am being compensated at the rate of $250 per hour for my work in this case, including any testimony.

### II.  Summary of Findings.

I was retained by the plaintiffs in *State of New York v. U.S. Department of Commerce* to provide my expert opinion on the policies and procedures federal statistical agencies follow when designing, modifying, and implementing statistical instruments, and on the extent to which the Commerce Department and Census Bureau complied with or deviated from these policies and procedures in deciding to add a question on citizenship status to the 2020 decennial census.  I was also asked to evaluate the Commerce Secretary's reference, in his March 26, 2018 decision memo, to the recommendations of the United Nations regarding population censuses.

In forming my conclusions, I considered the Administrative Record and other materials produced by the Commerce Department and Census Bureau in this lawsuit; the authorities cited in this report; the deposition testimony of Dr. John Abowd on August 15 and August 29, 2018; and the deposition testimony of Dr. Ron Jarmin on August 20, 2018.  I worked on this project with Katherine Wallman, the former Chief Statistician of the United States (from 1992 to 2017), who helped me review the Administrative Record and other materials produced in this lawsuit.  I discussed aspects of my analysis and the Administrative Record with Amy O'Hara, Senior Research Scholar at Stanford Institute for Economic Policy Research; Constance Citro, Senior Scholar at the Committee on National Statistics; Joe Salvo, Population Director, New York City Department of City Planning; and Annette Jacoby, Demographer, New York City Department of City Planning.

Based on my analysis, I have formed the following opinions:

1.  There is insufficient justification of the need for citizenship data at the block level.

2.  The Census Bureau's interactions with the Department of Justice do not reflect sufficient coordination with the requesting agency to determine their actual data needs.

1

3. Even if one accepts the need for block level data there is a less-costly and better-quality alternative which was proposed by the Census Bureau.

4. There is a need for pretesting of the citizenship question, including the impact on response and quality.

5. Creating and maintaining a current database on citizens is likely to damage the credibility of the 2020 census and the Census Bureau.

6. The United Nations recommendations on population censuses do not independently support the Commerce Secretary's decision to add a citizenship question to the census.

## III.    Overview.

Federal statistics touch every part of the country at all levels of government and affect every resident. Federal economic statistics, such as gross national product and unemployment are used by government and corporate decision makers as well as individual investors. Demographic statistics, including income and wealth data, track poverty trends and the state of inequality and are used in allocation formulas for federal funds. Crime data provide information on the safety of our neighborhoods. Federal statistics not only illuminate the health of the nation but are used in developing policies on improving health at national, state and local levels. Federal statistics are used to determine if a new business comes to a neighborhood or where a new road or hospital goes. The decennial census[1] holds a special place in federal statistics. It is enshrined in the Constitution and is used for apportioning the House of Representatives. The decennial corresponds to a national ceremony. It becomes a series of photographs of where we have been, where we are, and where we are likely to be as a nation.

The use and value of federal statistics – including the decennial census – depends on their being seen as accurate and unbiased. If statistics are seen to be biased and inaccurate, they will not be used and therefore they will be of little or no value. Statistics are trusted when the agencies that produce the data are seen as making decisions based on professional not political considerations. For their data to be credible, the Census Bureau must gain and hold the trust of the nation. Professional independence is a foundation for building this trust. Decisions about statistical matters should be free of any real or perceived political interference.[2] Professional independence is important not only for the credibility of the statistics agency but also for the credibility of the

---

[1] The 2000 decennial census was the last census with a long form and a short form. The long form was a large sample which asked questions about the characteristics of the sample population. The short form asked basic demographic questions. After 2000 the decennial census was only the short form and in 2005 the American Community Survey was established to essentially provide the information that was on the long form.

[2] The Office of Management and Budget, which coordinates the federal statistical system, has identified several fundamental responsibilities of federal statistical agencies, including that they maintain both impartiality and the perception of impartiality. Office of Management & Budget, *Statistical Policy Directive No. 1: Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, Federal Register Vol. 79, No. 231, pp. 71610-71616 (December 2, 2014). The Committee on National Statistics of the National Academy of Sciences has also identified independence from political and other undue external influence as a core principle for federal statistical agencies. National Academies of Sciences, Engineering, and Medicine. (2017). *Principles and Practices for a Federal Statistical Agency, Sixth Edition*, Washington, DC: The National Academies Press. https://doi.org/10.17226/24810

decisions made by political appointees.  The reason for professional independence is to ensure that decisions based on statistical outputs are not tainted by real or perceived political interference.

In addition, federal statistics cannot be produced without the voluntary cooperation of people and the business community to provide data. This holds even for those data collections that are labeled "mandatory" and are required by law.  Respondents provide data with the belief that their data will be confidential and not used against them.

While statistical information is critical to the nation, it is also true that any question that is asked about a person's characteristics is by its very nature intrusive and a burden.  It is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public.

There is not a single federal statistics agency that collects and disseminates statistical information.[3] The United States has a decentralized statistical system with over 100 agencies that conduct statistical activities, of which 13 are designated "principal statistical agencies" by the Office of Management and Budget.  These agencies are located in their respective Departments (e.g. Bureau of Labor Statistics in the Labor Department, Census Bureau in the Commerce Department) with an oversight and coordinating agency in the Office of Management and Budget (OMB). The head of each statistical agency may be a career official (e.g. National Center for Health Statistics) or a Presidential Appointee with Senate Confirmation (e.g. Census Bureau) who reports to senior officials in the Department in which the statistical agency is located. While OMB does not have line management authority over individual statistical agencies, OMB approval is needed for any data collection that is promulgated to ten or more respondents. Moreover, OMB develops system-wide standards to ensure federal statistics are of high quality and that the burden on the public is minimized.  Like all agencies that collect information for statistical purposes, the Department of Commerce and the Census Bureau are accountable for following the OMB standards when they propose to add a question to any of their data collections, including the decennial census.

On March 26, 2018 the Secretary of Commerce concluded that a citizenship question should be added to the 2020 Decennial Census (short form, asked of 100 percent of households).  This proposal is intended to produce information on citizenship at the census block level. A census block is the smallest geographic unit used by the Census Bureau for tabulation of 100-percent data (data collected from all houses, rather than a sample of houses).  Currently, citizenship information is available from the American Community Survey at the census block group level. A census block group is a geographical unit used by the Census Bureau which is the next largest geographic area than a block.  It is the smallest geographic unit for which the bureau publishes sample data, i.e. data which is only collected from a fraction of all households.  The Census

---

[3] Statistical information is that which can only be used for aggregate or summary purposes and which protects the confidentiality of individual information.

Bureau can provide estimates of block data from block group data by using statistical modeling techniques.[4]

## IV.   Evaluation of the decision to add a citizenship question.

### 1.   Justification for the citizenship question.

*Applicable Standards.*

The Congress and the Executive Branch have developed laws and procedures to reduce the burden of federal information collection on respondents and to ensure that questions proposed for a survey instrument (including the decennial census) have a practical utility.  These laws and procedures generally require statistical agencies to demonstrate that a particular data collection is necessary to properly perform a given agency function.  The record of the Commerce Secretary's decision to add a citizenship question to the decennial census fails to demonstrate sufficient justification of the need for citizenship data at the block level.

The Paperwork Reduction Act[5] (PRA) of 1995, the most recent legislative update of laws that commenced with the Federal Reports Act of 1942, was enacted to ensure that agencies minimize burden resulting from the collection of information and maximize the utility of information created, collected, maintained, used, shared, and disseminated by or for the Federal Government[6].  At the heart of the PRA is a requirement that the agency proposing to collect information from the public evaluates the tradeoff between the burden imposed upon the public and the "practical utility" of the collection to the government. Practical utility is defined in Section 3502(11) of the PRA as "the ability of an agency to use information, particularly the capability to process such information in a timely and useful fashion." Furthermore, section 3506(c)(3)(a) of the PRA requires that before seeking final OMB approval of a collection of information, the agency certify (and provide a record supporting such certification, including public comments received by the agency) that the information "is necessary for the proper performance of the functions of the agency, including that the information has practical utility."

The implementing rule for the PRA[7] outlines agency collection of information responsibilities (prior to seeking OMB approval) that include, among others, an evaluation of the need for the collection of information, a test of the collection of information through a pilot program, the reasons for which the information is being collected, and the way such information is to be used to further the proper performance of the functions of the agency. The proposer of the question is required to justify the reason for the information collection.  The implementing rule for the PRA notes that the justification must include a citation and brief description of any statute or Executive Order that requires the collection. (Copies of statutes mandating or authorizing a collection must be included with all submissions.)  Agencies must provide background information on the program and describe how the collection supports it, and detail any specific

---

[4] A block-group generally contains between 600 and 3000 people.

[5] P.L. 104-13.

[6] 44 U.S. Code Section 3501(1), (2).

[7] 5 C.F.R. Part 1320, "Controlling Paperwork Burdens on the Public," Federal Register Vol. 60, No. 167, pp. 44978-44996 (August 29, 1995).

program problems to be resolved.  Further, the agency must furnish justification for the proposed granularity of data including most importantly how the agency would use information at the requested level of detail in fulfilling its responsibilities.  For sensitive questions[8] the agency is expected to indicate why the question is necessary, the specific uses to be made of the information, the explanation to be given to people from whom the information is requested, and any steps to be taken to obtain their consent must also be provided.

*Department of Commerce / Census Bureau Adherence to these Standards.*

Given the many potential uses of decennial census data, and its highly desired geographic detail, great care must be taken in determining whether to use this vehicle to meet a particular information need.  The Census Act[9] requires that the subjects to be included in the next census be submitted to the Congress no later than three years before the census date (in the case of the 2020 Census, no later than March 31, 2017).  This requirement is in addition to the mandates of the PRA.  At the three year deadline to identify subjects for the 2020 census, the Census Bureau notified the Congress of a citizenship subject on the ACS but not on the short form.[10]

With respect to the addition of a citizenship question, on November 4, 2016[11] the Department of Justice sent a letter to the Census Bureau that "…supplements my letter of July 1, 2016[12] in which I advised that, at this time, the Department of Justice had no needs to amend the current content and uses or to request new content in the American Community Survey (ACS) for the 2020 Census."  The letter goes on to request the Census Bureau to consider a new topic in the ACS relating to LGBT populations.  Approximately 13 months later, on December 12, 2017 the Department of Justice sent a letter to the Census Bureau again outlining its needs and requesting to add a citizenship question to assist with Voting Rights Act enforcement[13].  The Department of Justice did not request block-level citizenship data for purposes of enforcement for any of the decades beginning with 1970, the first decennial census after the Voting Rights Act was enacted in 1965.

On December 22, 2017 John Abowd, the Census Bureau's Chief Scientist, sent a memorandum[14] to Acting Director Ron Jarmin in which he stated: "Based on balanced consideration of multiple factors of quality, cost and feasibility, we recommend that the citizenship data for Department of Justice Voting Rights Act enforcement be obtained through the use of administrative records and not through the addition of a question to the decennial census instrument."

---

[8] OMB considers topics such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private to be of a "sensitive" nature.  Paperwork Reduction Act Submission OMB 83-I INST, 10/95 Page 3, Specific Instructions A, Item 11.

[9] 13 U.S. Code Section 141(f).

[10] https://www.census.gov/library/publications/2017/dec/planned-subjects-2020-acs.html.

[11] AR 311.

[12] No record of this letter in the AR.

[13] AR 4012.

[14] December 22, 2017 memorandum from John Abowd to Ron Jarmin, AR 10443.

Also on December 22, 2017 Ron Jarmin sent an email to Arthur Gary at DOJ[15].  In that email Jarmin stated that the findings of the Census Bureau professional staff "suggest that the best way to provide block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses. This would result in higher quality data produced at lower cost."  Jarmin goes on to suggest a meeting with technical experts to discuss the details of the DOJ proposal.  This suggestion for a meeting is normal Census Bureau procedure.  It allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers.  It also allows for a discussion of alternative ways of meeting a request. In this case the Census Bureau suggested that modeling of the American Community Survey data would meet the DOJ needs at less cost than adding a question to the decennial census.  Without such a meeting it would not be possible to know if the modeling approach would in fact meet the DOJ needs.

A meeting was scheduled but the Department of Justice subsequently cancelled the meeting and declined to further justify or elaborate its requirements.  In an email from Jarmin to Acting Deputy Secretary Karen Dunn Kelley on February 6, 2018[16], Jarmin wrote that he spoke with Arthur Gary who reported that DOJ believed its requirements were fully described and did not want to meet.

One of the reasons given by the Secretary in his March 26 memo on the citizenship question for rejecting the approach of the Census Bureau to model the citizenship data was because the Census Bureau could not confirm that such modeling would have a sufficient degree of accuracy. However, without greater degree of specificity from the DOJ on what the DOJ actually intended to use the block-level data for, it is not possible to know whether modeling would satisfy the requirements of the Department of Justice.  As noted above, the Census Bureau attempted to meet with the DOJ to obtain more information but DOJ declined to meet.

The Secretary rejected the option of not adding a citizenship question and using modeling techniques on ACS data on the grounds that it does not provide actual, complete number counts and that there is no guarantee that data could be improved using small-area modeling methods. With respect to the insistence on "actual" data, Section C of the March 19, 2018 memorandum from John Abowd to Secretary Ross notes that responses from non-citizens who assert they are citizens are incorrect on the ACS about 30% of the time[17].  The record identifies no reason to conclude that responses to a citizenship question would be *more* accurate on the decennial census than on the ACS.  With respect to completeness, even with an added question on citizenship some degree of imputation will be required to provide a "complete" set of responses.  The problem with statistical modeling of ACS data remains that DOJ has failed to provide sufficient information on its needs – despite efforts of the Census Bureau to obtain this information – which would allow the Census Bureau to determine if modeling was an effective solution.

The PRA final rule says (in part) "the agency . . . shall certify . . . that the proposed collection of information … (b) is not unnecessarily duplicative of information otherwise reasonably

---

[15] AR 5656.

[16] AR 9074.

[17] January 19, 2018 Memorandum for Secretary Ross from John Abowd, AR 1277 also found in AR 1313, March 26, 2018 letter from Secretary Ross.

accessible to the agency".[18]   It further requires that the agency "Describe efforts to identify duplication.  Show specifically why any similar information already available cannot be used or modified for use . . ."[19]  Because the Department of Justice did not provide sufficient information to enable the Census Bureau to determine that its data request was non-duplicative and could not be met through existing data sources, the request for a citizenship question does not meet the standards a federal statistical agency would ordinarily apply to justify collecting block-level citizenship data.

>    2.    **The Census Bureau's interactions with the Department of Justice do not reflect sufficient coordination with the requesting agency to determine their actual data needs.**

*Applicable Standards.*

The decennial census has long served as the fundamental source of data for agencies across federal, state, and local governments; needs it has addressed range from the enumeration used in congressional reapportionment nationally and redistricting at the state level to allocation of federal, state, and local resources, to ascertaining compliance with statues and regulations, to providing the denominators for an array of more focused surveys.  To ensure that information collected through the decennial census program is required by federal programs, regular content reviews have been carried out for at least the past 50 years.  The content review process is intended to confirm that questions on the decennial census are required by federal programs, that only the information needed is requested, and that the information collection is as minimally burdensome as possible.

A critical component of the content review process is interagency communication to determine the data needs of any agency that believes census content is needed for the federal programs it administers.  Over the years OMB and the Census Bureau have collaborated on interagency consideration of forthcoming Decennial Census content and question wording.  Along with the relevant agencies they participated in assessments of the agencies' needs for specific questions, with particular attention to the justification for granularity of data (whether data needs had to be met on the short form, the long form, or in fact could be met by the Current Population Survey or some other household survey).  In addition to ensuring that requests passed the "granularity[20] litmus test," the interested agencies worked to review, test, and evaluate alternative wording of many questions on items such as educational achievement, employment status, race and ethnicity.

More recently, for example, OMB hosted an ongoing technical group to exchange views and recommendations with respect to the Decennial Census content and questions, including the nascent ACS that ultimately replaced the long (sample) decennial census questionnaire.  In addition to the ongoing technical group, on August 2012, OMB and the Census Bureau chartered the Interagency Council on Statistical Policy (ICSP) Subcommittee for the ACS (ICSP-SACS) to "provide advice to the Director of the Census Bureau and the Chief Statistician at OMB on how

---

[18] 5 CFR 1320.9 instructions page 2, right column.

[19] 5 CFR 1320.9 page 3 Specific Instructions A.  Justification para. 4.

[20] Granularity refers to the lowest census geographic area that is required.

the ACS can best fulfill its role in the portfolio of Federal household surveys and provide the most useful information with the least amount of burden." The Subcommittee charter also states that the Subcommittee would be expected to "conduct regular, periodic reviews of the ACS content…designed to ensure that there is clear and specific authority and justification for each question to be on the ACS, the ACS is the appropriate vehicle for collecting the information, respondent burden is being minimized, and the quality of the data from ACS is appropriate for its intended use." The deliberations of the ICSP-SACS were informed in part by the work of the ongoing technical group.  The formation of the ICSP Subcommittee on the ACS also embraced the 2020 OMB-Census Bureau process to examine and confirm the value of each question on the decennial census program that began in 2014, and to confirm and update the statutory and regulatory authorities for the questions.

*Department of Commerce / Census Bureau Adherence to these Standards.*

In 2014, OMB and the Census Bureau began the inter-departmental review to examine and confirm the value of each question on the ACS, and to confirm and update the statutory and regulatory authorities for the questions.  In response to this request, Arthur E. Gary, General Counsel of DOJ's Justice Management Division, wrote, "Accordingly, please accept this letter[21] as DOJ's affirmation that it continues to need relevant information as described above and in the attachment, and that the legal authorities for the use of such information are accurate, current, and complete."  The attachment details statutory requirements, uses, lowest geography (census block group), ACS characteristics, and frequency (annual) for citizenship data required through the ACS.

In 2016, the Census Bureau asked Federal agencies to provide updates, if any, to their documentation.  In response to this request, DOJ's Gary wrote[22], "This letter updates my letter of July 1, 2016, in which I advised that, at that time, the Department of Justice had no needs to amend the current content and uses or to request new content in the American Community Survey (ACS) for the 2020 Census."  It does not further discuss the citizenship question.  But on December 12, 2017, after the subjects for the 2020 Decennial Census and the American Community Survey had been submitted to the Congress, DOJ's Gary wrote[23] to Acting Census Bureau Director Ron Jarmin regarding a request to reinstate a citizenship question on the 2020 census questionnaire.

Although the Census Bureau undertook all phases of the Interagency Question Revision Process -- including extensive discussions with other federal agencies and outside stakeholders, substantial research and cognitive testing of alternatives, and robust testing in the 2015 National Content Test -- with respect to possible changes in the race/ethnicity questions for the 2020 Census, none of those processes were followed with respect to adding the citizenship question to the 2020 Decennial Census short form.

Despite repeated references in the Administrative Record to steps involving "robust processes" for working with OMB and the ICSP-SACS [see for example AR 3890, AR 5567, AR 5512], the

---

[21] June 25, 2014,  AR 278

[22] AR 311.

[23] AR 4012.

addition of the citizenship question just prior to the submission of planned questions to the Congress appears to have taken place without any apparent consultation with OMB or the ICSP-SACS.  In fact, as of March 6, 2018, a Census Bureau briefing for the Department of Commerce indicated that there would be no changes to the 2020 Census subjects, that an OMB briefing had taken place on February 22, and that the ICSP-SACS briefing would take place March 14.[24]

In addition, as noted above, the Census Bureau requested a meeting with the Department of Justice in order to give the technical experts an opportunity to discuss the details of the proposal to add a citizenship question, but the Department of Justice declined to meet.[25]  As Dr. Abowd testified on behalf of the Census Bureau, it is unusual to receive a data request from an agency and then for the agency to refuse to meet to discuss the technical aspects of that data request.[26]

The content review process for the Department of Justice's request for a citizenship question did not follow the basic protocols for interacting with OMB and the Census Bureau to assure that questions on the decennial census are required by federal programs and that the information collection is as minimally burdensome as possible.

*Example of An Interagency Collaboration Process.*

Revisions to survey questions in the federal statistical system usually involve an extensive, multi-faceted process.  This is particularly true when a question may be employed, or its data used, by multiple agencies.  While there are many examples that could be elaborated, a salient case is the question employed across the government when asking about race and ethnicity.  Prior to the mid-1970's there was no standard approach to asking this question on federal information collections -- whether for general demographic information, for evaluation of federal program initiatives, or for enforcement of government policies.  At the request of several agencies, OMB undertook the development of a standard approach to collecting this information and in 1977 issued a standard for use by agencies that intended to collect race/ethnicity data.  For the first time, the "denominators" from the decennial census could be used with "numerators" from various surveys (e.g., education, labor, health) as well as administrative reports (school enrollment, employee characteristics, patient records) to better understand access to learning, labor force participation, and use of services.  The 1977 standard, based largely on the question then used by the Office of Education in the Department of Health, Education, and Welfare, was adopted following an OMB-led consultation with several federal agencies.

In the early 1990's, Congress highlighted the need for a review and possible revision of the OMB standards for data on race and ethnicity.  OMB agreed to undertake this review, outlining a three-pronged process.  This included:

- Establishing an interagency committee comprising the producers and users of data on race and ethnicity (30-plus agencies)

---

[24] AR 435, AR 438, AR 441.

[25] Abowd 8/30/2018 deposition transcript at pages 96-99.

[26] Abowd 8/30/2018 deposition transcript at pages 98-99.

- Conducting a research and testing program to examine and assess alternatives that were under consideration

- Providing multiple opportunities for public input and comment on options (via public hearings as well as multiple Federal Register notices)

The process ultimately spanned four years from inception to announcement of revisions (October 1997).  During that time, both affected federal agencies and stakeholders outside government had multiple, continuing opportunities to contribute to the research agenda and to comment on the potential changes.  The incremental research and testing program (which included substantial cognitive work) allowed for full consideration of alternatives, some of which came into view as the process unfolded.

The standards that ultimately were adopted -- though not necessarily the first choice of some constituencies -- were well-received as a consequence of the robust process that had been employed.  A four year process is not always necessary – but the critical components of the process need to be carried out: interagency involvement, research and testing, and timely public comment.

### 3.   The Commerce Secretary rejected a less-costly and better-quality alternative that the Census Bureau proposed for producing block level citizenship data.

Part IV.1 of this report discussed the standards that apply to an agency's request for a particular data collection, including the requirement that the request be supported by sufficient justification to demonstrate the practical utility of a collection and the necessity of that collection to properly perform a given agency function.  That section of this report further discussed that insufficient information was provided to reject the Census Bureau's opinion that the information needed by the Department of Justice could be obtained through modeling of existing ACS data.

However, assume for the moment that such evidence had been supplied by the Department of Justice.  In that event the Census Bureau did develop a solution which would provide block-level data on citizenship but would not require adding a question on citizenship.  Moreover, this option would, in the judgment of the Census Bureau, be less costly and provide better quality data than adding a citizenship question to the decennial census to obtain "actual" data[27].  The solution proposed by the Census Bureau was to link decennial census responses to administrative records to determine the citizenship characteristics of the respondent and to model the remaining estimated 10% for whom a linkage was not possible.  This is the Option C described in the March 19, 2018 Abowd memo to the Secretary.  The Census Bureau option is based on its extensive administrative records research and its confidence that it could successfully model the citizenship of the approximately 10% of the decennial census responses through a model it would develop.

---

[27] One issue with "actual" data on citizenship is that, as the Secretary notes in his March 26, 2018 memo (AR 1313), a non-citizen is likely to give an erroneous response approximately 30% of the time to the question of whether they are a citizen.

The Secretary rejected this approach by asserting that: "However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."[28]

The Census Bureau will always be evolving in its use of administrative records. The Census Bureau has always looked at the use of administrative records as a way to reduce the burden on respondents and there is no evidence that it is the Bureau's intention (nor its mandate) to have a complete administrative records data set for the entire population. The position of the Bureau, in its analysis of the options, is that the Bureau was confident that Option C could be accomplished through a combination of the Bureau's existing record linkage program, augmentation of existing agreements with those agencies possessing administrative records on citizenship, and development of an estimation model.

After reviewing the options identified in Dr. Abowd's January 19, 2018 memorandum,[29] the Secretary directed the Census Bureau to develop an Option D that would be a combination of the administrative records approach (Option C), and the option proposed by the Secretary to add a citizenship question to the decennial census (designated as Option B). As described in the March 1, 2018 memo from Dr. Abowd to the Secretary[30], the Census Bureau understands that Option D can be described as follows:

> "Administrative data from the Social Security Administration (SSA), Internal Revenue Service (IRS), U.S. Citizenship and Immigration Services (USCIS), and the State Department would be used to create a comprehensive statistical reference list of current U.S. citizens. Nevertheless, there will be some persons for whom no administrative data are available. To obtain citizenship information for this sub-population, a citizenship question would be added to the 2020 Census questionnaire. The combined administrative record and 2020 Census data would be used to produce baseline citizenship statistics by 2021. Any U.S. citizens appearing in administrative data after the version created for the 2020 Census would be added to the comprehensive statistical reference list. There would be no plan to include a citizenship question on future Decennial Censuses or American Community Surveys. The comprehensive statistical reference list, built from administrative records and augmented by the 2020 Census answers would be used instead. The comprehensive statistical reference list would be kept current, gradually replacing almost all respondent-provided data with verified citizenship status data."

In its analysis of Option D the Census Bureau notes that[31]: "In sum, Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce."

---

[28] AR 1316.

[29] AR 1277.

[30] Memo to Secretary Wilbur L. Ross, Jr. from Dr. John M. Abowd, March 1, 2018 (AR 1308).

[31] Ibid. (last paragraph AR 1312).

As discussed in Part IV.1 above, the applicable standards require federal statistical agencies to minimize respondent burden, demonstrate practical utility, minimize cost and utilize existing information when conducting a collection of information from the public.[32]  Even if the Department of Justice's need for block-level data on citizenship had been adequately justified, the Secretary's decision to reject the Census Bureau's less-costly and better-quality alternative failed to meet these standards.

### 4.      Statistical Standards for developing questions.

*Applicable Standards.*

Standards and Guidelines for Statistical Surveys (including censuses) are government-wide methods and practices issued to ensure the maximum usefulness of the statistics produced.  Under the PRA, OMB is responsible for developing and overseeing the implementation of government-wide policies, principles, standards and guidelines concerning statistical collection procedures and methods[33].   With expertise from its Federal Committee on Statistical Methodology[34] (FCSM), OMB most recently updated and issued these standards in 2006[35], and supplemented the standards with an addendum on Standards and Guidelines for Cognitive Interviews in 2016[36].

There are 20 core standards issued by OMB that apply to federal censuses and surveys: they set forth the professional principles and practices to which federal agencies are required to adhere and the level of quality and effort expected in all statistical activities.  Among these are several that contribute directly to the utility of information, including survey planning, survey design, survey response rates, and pretesting of survey systems.  For example, the survey planning standard requires agencies to provide a justification that includes, in part, the decisions the survey is designed to inform, the precision required of estimates (e.g., the size of differences that need to be detected), when and how frequently users need the data, and the tabulations and analytic results that will inform decisions and other uses.  The pretesting survey systems standard requires agencies to ensure that all components of a survey function as intended when implemented in the full-scale survey and that measurement error is controlled by conducting a pretest of the survey components.

Standards and guidelines for *cognitive interviews* issued by OMB similarly apply to federal censuses and surveys.  Cognitive interviewing is a key method used to pretest survey questions and questionnaires that can indicate whether a survey question captures the intended construct

---

[32] PRA Section 3501; OMB Statistical Policy Directive No. 1, Federal Register, Vol. 79, No. 231, pp. 71614-71615.

[33] PRA Section 3504(e)(3)(A).

[34] As previously described the United States has a decentralized statistical system.  The overwhelming preponderance of statistical expertise resides in the agencies, not in OMB.  OMB then relies on agency workgroups and committees to develop technical standards and guidelines for the entire statistical system under OMB sponsorship and direction. The Census Bureau has traditionally played a prominent role in these committees, including the FCSM.

[35] Federal Register, Vol. 71, No. 184, pp. 55522-55523.

[36] Federal Register, Vol. 81, No. 197, pp. 70586-70587.

and identify difficulties that respondents experience in understanding and accurately answering proposed questions.

*Department of Commerce / Census Bureau Adherence to these Standards.*

In adding a question to a survey, the normal practice is to test the question. This testing is done to understand, inter alia, how the question will be received by different respondents (including response rates and quality of response); what wording of the question performs best, and the question's impact on other questions; and the correct placement of the question. These practices are part of the OMB standards; with respect to these OMB standards on development of questions the Census Bureau stated it needed to undertake a rigorous process[37] to evaluate proposed content additions to the decennial census. This process includes several steps related to testing, including:

- "The Census Bureau must test the wording of the new question. It is too late to add a question to the 2018 End-to-End Census Test, so additional testing on a smaller scale would need to be developed and implemented as soon as possible. This test would also require approval from OMB, which includes notifying the public and inviting comments through a Federal Register Notice (FRN)."

- "The Census Bureau must make additional operational adjustments, beyond testing, to include new content. This includes re-designing the paper questionnaires and adjusting the paper data capture system. For all automated data collection instruments (including Internet self-response, Census Questionnaire Assistance, and Nonresponse Followup), the additional question will require system redevelopment, for English and all supported non-English languages. In addition, the training for the enumerators and Census Questionnaire Assistance agents will need redevelopment."

- "Based on the result of the testing, the Census Bureau must finalize the actual 2020 Census questionnaires (paper and automated). The Census Bureau then must submit for OMB approval of the 2020 Census information collection. This submission also requires notifying the public and inviting comments through a Federal Register Notice."

This rigorous and "well-established process" is referenced repeatedly in the Administrative Record and is consistent with OMB standards.[38]

In his March 26 memo, the Secretary, while acknowledging the principle of testing, concludes:

"The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions."

---

[37] Census Bureau talking points dated December 12, 2017, AR 3890.

[38] AR 4773, AR 4874, AR 5512, AR 5565, AR 5567.

John Abowd took this same position, that testing of the citizenship question was not required because it had been included on the ACS, in his January 19, 2018 memo to the Secretary.[39] However; at least some in the Census Bureau have stated a different opinion of the need for pretesting of the citizenship question.  In a September 20, 2017 memo the Center for Survey Management (CSM) of the Census Bureau[40] noted that they had noticed recent increases in respondents expressing concerns about confidentiality in some of the pretesting studies in 2017. In particular, interviewers reported that respondent's fears have increased markedly in the past year.  For example, respondents reported "being told by community leaders not to open the door without a warrant signed by a judge…"  To address these concerns, the memo recommended:

> "…designing and pretesting wording that could address these concerns in mailing materials, the Decennial Internet Self Response instrument, FAQs provided to enumerators, etc."

It should be noted that this material was anecdotal and not based on any randomized control study.  Moreover, by itself the CSM position might not be determinative.  However, this was not the only voice calling for pretesting of the citizenship question.  With respect to the importance of testing a proposed citizenship question, on January 26, 2018 six former Directors of the Census Bureau wrote a letter[41] to Secretary Ross.  In that letter they state that:

> "We strongly believe that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk."

They further state:

> "Adding a citizenship question without a testing opportunity in a contemporary, census-like environment will invalidate the results and lessons learned from the End-to-End test."

The subject of testing was also addressed by the Committee on National Statistics.  In their letter report of August 7, 2018 the Committee points out[42] the 2020 census is not the same as the American Community Survey and is much more than a single, simple questionnaire.  They note that both paper and electronic questionnaires would need to add a citizenship question and that it should not be assumed that respondents would react the same way to any question on paper or as an electronic form.  They point out that:

---

[39] AR 1277.

[40] Memo for Associate Directorate for Research and Methodology on Respondent Confidentiality Concerns, September 20, 2017, AR 10386.

[41] Letter from Barabba, Farnsworth Riche, Prewitt, Murdock, Groves and Thompson to Honorable Wilbur L. Ross January 26, 2018, AR 1057.

[42] FR Doc. 2018-12365, proposed Information Collection: Comment Request: 2020 Census.  Docket number USBC-2018-005, letter report from National Academies of Sciences, Committee on National Statistics, Task Force on the 2020 Census to U.S. Department of Commerce, Departmental Paperwork Clearance Officer, Aug. 7, 2018, p. 4-5

"Because many households will not respond to the 2020 Census, either via the Internet or by mail (and the extent of nonresponse could be increased due to publicity about the citizenship item), the citizenship question would also have to be included on the Enumerator Questionnaire used in nonresponse follow-up (NRFU) operations. … Though an objective of the 2020 census is to reduce the NRFU field workload through recourse to administrative records data from other federal government sources, the quality of citizenship information in those administrative data is known (and acknowledged, explicitly, in the Secretary's decision memorandum) to have issues.  And even with the use of administrative records, enumerators will be making millions of NRFU field visits throughout the country.  It is not known the extent to which publicity about the citizenship question would induce households to not provide this information or avoid the interview entirely."

The operating conditions of an annual survey like the American Community Survey and the decennial census are vastly different.  The publicity and national effort involved in a decennial census cannot be compared to any survey, even one as large as the American Community Survey.  Moreover, comparing the state of the country now and even ten years ago ignores the added complexities that are now involved in conducting a decennial census.  The country is more polarized now and the ability of individual groups to disseminate their views and possibly provoke dissent is much greater.  It would seem more than prudent, even necessary then, to understand how different groups and segments of society will react to such a question and the best way to prepare for the additional question.  Even though response to the decennial census is required by law, a successful census depends on the voluntary cooperation of respondents.  Without this voluntary cooperation costs will go up and quality will go down.  Testing to determine improved methods for outreach to these groups would seem to be mandatory.  Without testing the Census Bureau will be forced into conducting the 2020 decennial census with limited awareness of the impact of adding a citizenship question.

## 5.     Credibility and Public Trust.

*Applicable Standards.*

In addition to the utility of proposed questions and adherence to good practice is the importance of ensuring that new questions and surveys do no harm to the credibility of the statistical agency and do not have a deleterious effect on public trust.

The recognition of the importance of agency credibility for public trust is found globally.  The "Fundamental Principles of Official Statistics" were first adopted by the United Nations Statistical Commission in April 1994 and later were adopted by the General Assembly of the United Nations[43] in January 2014.  This document states, inter alia:

"To retain trust in official statistics, the statistical agencies need to decide according to strictly professional considerations, including scientific principles and professional ethics,

---

[43] Fundamental Principles of Official Statistics (A/RES/68/261 from 29 January 2014), p. 2-2.  The sixty-eighth session of the General Assembly, in its resolution 68/261 of 29 January 2014, endorsed the Fundamental Principles of Official Statistics.

on the methods and procedures for the collection, processing, storage and presentation of statistical data."

The Office of Management and Budget also recognized the importance of trust, and the part that professional independence and professional judgment plays in generating that trust, in OMB Statistical Policy Directive No. 1[44]. The Directive states that the four "Fundamental Responsibilities" of a federal statistical agency are: (1) "produce and disseminate relevant and timely information," (2) "conduct credible and accurate statistical activities," (3) "conduct objective statistical activities," and (4) "protect the trust of information providers by ensuring the confidentiality and exclusive statistical use of their responses."[45]

Since 1992 the Committee on National Statistics of the National Academy of Sciences has issued a report on Principles and Practices for a Federal Statistical Agency[46]. They echo the importance of the OMB principles and they note:

> "To be credible and unhindered in its mission, a statistical agency must maintain a widely acknowledged position of independence from undue external influences. It must avoid even the appearance that its collection, analysis, or reporting processes might be manipulated for political purposes or that individually identifiable data collected under a pledge of confidentiality might be turned over for administrative, regulatory, or law enforcement uses."

*Department of Commerce / Census Bureau Adherence to these Standards.*

What do these principles say about the statistical decision making process that was employed with respect to adding a question on citizenship? The Census Bureau developed lower cost and higher quality alternatives than proposed by the Commerce Department and the public may well believe that political judgments were substituted for what should have been professional ones. As a result, the credibility of the 2020 census and the Census Bureau itself are likely to be damaged by the addition of a citizenship question.

Moreover, as noted in Part IV.3 above, one outcome of the Secretary's decision is the planned creation of a current, comprehensive statistical reference list on citizens.[47] This comprehensive statistical reference list could be, and has already been perceived by experts as, the beginning of a population register of characteristics which would be maintained by the Census Bureau.[48] The Census Bureau rests its credibility as a statistical agency on the foundation that it collects data

---

[44] Federal Register, Vol. 79, No. 231, p.71612 (December 2, 2014).

[45] Ibid. at pp.71614-71615.

[46] National Academies of Sciences, Engineering, and Medicine. (2017). *Principles and Practices for a Federal Statistical Agency, Sixth Edition*, Washington, DC: The National Academies Press. https://doi.org/10.17226/24810.

[47] AR 1309.

[48] FR Doc. 2018-12365, proposed Information Collection: Comment Request: 2020 Census. Docket number USBC-2018-005, letter report from National Academies of Sciences, Committee on National Statistics, Task Force on the 2020 Census to U.S. Department of Commerce, Departmental Paperwork Clearance Officer, Aug. 7, 2018, p. 9, at https://www.nap.edu/read/25215/chapter/1.

solely for statistical purposes and that the information provided by individuals will not be used against them by law enforcement or administrative agencies.  The existence of such a comprehensive statistical reference list is unprecedented and will raise doubts about the credibility of the Census Bureau and the 2020 Decennial census.  For example, in its August 2018 letter report on the citizenship question[49], the Committee on National Statistics of the National Academy of Sciences notes:

> "Because there is no apparent statistical justification for the Census Bureau to create this citizenship registry, legitimate concerns arise that this information could somehow be used for law enforcement, adjudicatory, or other non-statistical purposes in some manner, which would undermine the mission of the Census Bureau (as well as violate title 13, Section 9)."

The Secretary's decision to add a citizenship question against the advice of Census Bureau professionals, and his decision to further create a current, comprehensive statistical reference list on citizenship, risks undermining the credibility of the Census Bureau and the 2020 Decennial census as well as the professional staff of the Census Bureau.

**6.      The United Nations recommendations on population censuses do not support the Commerce Secretary's decision to add a citizenship question to the census.**

In the Secretary's March 26, 2018 decision memorandum,[50] the Secretary stated that the United Nations recommends "that its member countries ask census questions identifying both an individual's country of birth and country of citizenship."[51]  This reference to the United Nations Principles and Recommendations for Population and Housing Censuses (the UN Principles) omits important context and fails to capture the full scope of the UN's recommendations on population censuses.

The United Nations develops statistical standards and recommendations for a broad range of statistical systems and for countries with greatly varying needs. It is not intended that all the recommendations would apply equally to all countries.  The specific needs and state of development of each country must be considered.  Some countries will decide that only relatively few of the recommendations apply to them while others will adopt most of the recommendations.  The United Nations recognizes this, and notes in the UN Principles that "[e]ach country's decision with regard to the topics to be covered should depend upon a balanced

---

[49] FR Doc. 2018-12365, proposed Information Collection: Comment Request: 2020 Census.  Docket number USBC-2018-005, letter report from National Academies of Sciences, Committee on National Statistics, Task Force on the 2020 Census to U.S. Department of Commerce, Departmental Paperwork Clearance Officer, Aug. 7, 2018, p. 9.

[50] AR 1313.

[51] AR 1319, citing Principles and Recommendations for Population and Housing Censuses (Revision 3), United Nations 121 (2017).

appraisal of how urgently the data are needed and whether the information could be equally well or better obtained from other sources."[52]

Among the country-specific considerations that the UN Principles identify as central to determining census content is the sensitivity of a particular topic or question (and the accompanying respondent burden) in light of local conditions: "It is advisable to avoid topics that could increase the burden on respondents and those that are likely to arouse fear, local prejudice or superstition or that might be used to deliberately promote political or sectarian causes as these are likely to have a detrimental effect on response rates and support for the census."[53]

The UN Principles also state: "It should be stressed that no country should attempt to cover all the topics included in the list of population topics (see Table 3)."[54]

In fact, there are 49 total topics in the list of United Nations recommendations and 26 of these are considered "core" recommendations. However, of these 26 core recommendations, the United States has decided that only five are to be directly included in the short form:  age, sex, marital status, ethnicity, and place of residence.  The United States also includes race but it is not a separate category in the list of recommended topics by the United Nations.   Citizenship is one of the core recommendations in the UN Principles, and the United States does collect this information, through the American Community Survey which is the replacement of the long form on the decennial census.

Apart from census topics, the UN Principles also identify core considerations for every country to follow in planning to conduct a population census.  Among these is the recommendation that in developing census content, countries "ensure that the topics are appropriate for meeting the demonstrated requirements of users," including "suitable consultation with existing and potential users at all stages," and "adequate testing of new topics to ensure successful collection and production of reliable results."[55]  As I stated earlier in this report, the Secretary's decision to add a citizenship question did not follow suitable consultation with the requesting agency (the Department of Justice), and did not involve adequate testing of the new question.

The list of population census topics in the UN Principles thus means only that a global consensus has been reached that the topic warrants consideration – along with the list of other topics - by the country, bearing in mind local conditions, and consistent with the foundational obligations to justify and test all census content.

The Secretary states in his decision memo that it is important to note that other major democracies inquire about citizenship on their census.  He supplied a disparate list with respect to cultural and political norms as well as the development of their statistical systems.  Two of the countries on his list which seem most comparable to the United States are Australia and Canada.

---

[52] UN Principles ¶ 4.6, at 172.  See https://unstats.un.org/unsd/demographic-social/Standards-and-Methods/files/Principles_and_Recommendations/Population-and-Housing-Censuses/Series_M67rev3-E.pdf.

[53] UN Principles ¶¶ 4.2(c), 4.10, at 171, 173.

[54] UN Principles ¶ 4.14, at 174.

[55] UN Principles ¶ 2.8, at 33.

Australia has only a long form census which can be responded to either online or by paper and asks 51 questions, including one on citizenship, relating to individuals. Canada conducts its census in much the same manner as did the United States. During the census there is both a short and a long form. The long form goes to approximately one in four households and it is on this long form that questions about citizenship are asked. Questions on citizenship are not asked on the short form. The United States has moved away from simultaneously conducting a short and long form census. It now conducts a short form census every ten years which is intended to reach every household. The successor to the long form is the ACS, a yearly survey of 3.5 million households, and it is on the ACS that questions on nativity and citizenship are already currently asked.

## V.      Conclusion.

The proposal of the Department of Commerce to add a citizenship question fails to demonstrate need, does not allow for required preliminary testing and provides inadequate justification for rejection of a lower cost and higher quality Census Bureau proposal. Additionally, if implemented, the option proposed by the Department would damage the Census Bureau's position of trust with the public.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: September 7, 2018

Hermann Habermann, Ph.D.

19

Hermann Habermann
1555 N Colonial Terrace Apt. 700
Arlington, VA 22209
703 459 3242 or 703 312 0429
hermannhabermann@aol.com

## Employment History

2007-present    Independent Consultant

           Projects for, among others, the United Nations, World Bank, International Monetary Fund.
Projects in Georgia, Kenya, South Africa, Indonesia, Lesotho, CARICOM.
Examples include: Report for UN Statistical Commission on the future of City Groups; Lectures to National Research University, Higher School of Economics, Moscow; Modernizing the statistical system of the Republic of Georgia.
Participated in Panel on Approach for Criteria for High Level Decisions for National Center for Education Statistics, US Department of Education and similar statistical agency advisory meetings

2009 – 2018    National Academies of Sciences, Washington DC, <u>Senior Associate</u>
Example activities include: Director of Future of Innovation Workshop, Director of The Forum on Open Science, Chair of Expert Meeting for the Office of Management and Budget on Improving the Relevance of Federal Statistics

2011 – 2016    Oxford Policy Management, Oxford, England, <u>Associate Consultant</u>
Example activities include: Team leader for the project to modernize the Statistical System of Barbados, project quality control for Indonesia statistical transformation and quality improvement, and evaluating efforts to improve the measurement of Millennium Development Goals at the United Nations.

2002 – 2007    U.S. Department of Commerce, U.S. Census Bureau, <u>Deputy Director and Chief Operating Officer</u>

1994 - 2002    United Nations, <u>Director, United Nations Statistics Division</u>

1992 -1994    Executive Office of the President of the United States, Office of Management and Budget, <u>Deputy Associate Director for Budget</u>

1988 -1992    Executive Office of the President, Office of Management and Budget, <u>Chief Statistician</u>

1984 -1988    Executive Office of the President, Office of Management and Budget, <u>Chief, Information Technology Management</u>

1979 –1984    Forest Service, U.S. Department of Agriculture, <u>Director of Computer Sciences and Telecommunications</u>

1977 –1979    Forest Service, U.S. Department of Agriculture, <u>Assistant to Deputy Chief for Research</u>

1976 -1977    University of Wisconsin, <u>Adjunct Faculty Member</u>

1970 – 1977    Forest Products Laboratory, Forest Service, U.S. Department of Agriculture, <u>Station Statistician</u>

**Education**      1975    Ph.D.  Statistics, University of Wisconsin – Madison, Wisconsin
Thesis:"Estimation of Transition Matrices with Application to Empirical Bayes
Methodology", 1975

1966    MS        Mathematics, Adelphi University, Garden City, New York
1964    BS        Mathematics, Pratt Institute, Brooklyn, New York

**Professional Organizations**

International Statistical Institute (Elected Member)
Committee on National Statistics (Past Member), National Academies of Science
American Statistical Association (Fellow)
National Academy of Public Administration (Fellow)

**Board Memberships/ Advisory Groups**

Centers for Disease Control and Prevention, National Center for Health Statistics, Board of
Scientific Counselors, 2011 - 2015
US Department of Transportation, Advisory Council on Transportation Statistics, 2012 - 2015
National Center for Education Statistics Expert Group, 2015 – 2017
Member, National Academy of Sciences Panel on "The Transportation Data Needs of the
United States", 2010
Center for Internet Security, Board of Directors, 2007 – 2010

**Publications and Reports**

K. Hartman, H. Habermann, B. Harris-Kojetin, C. Jones, T.A. Louis, "The Shifting Role of
Official Statistics: Preparing for New Ethical Challenges", Significance, October 2014, Volume
11, Issue 4, pp. 44-46.

Prewitt, K., Mackie, C., Habermann, H. Editors, "Civic Engagement and Social Cohesion,
National Academies Press, 2014.

Hermann Habermann, Rapporteur, "Facilitating Innovation in the Federal Statistical System",
National Academies Press, 2011.

Habermann, Hermann, "Future of  Innovation in the Federal Statistical System, Annuals of the
American Academy of Political and Social Science,  Volume 631, No. 1, September, 2010,
pp.194-203.

Habermann, Hermann, "On Planning for the 2020 Census ", AMStat News, February 2009,
Issue # 380, pp.25-28.

Habermann, Hermann, "The Role of National Statistical Offices in Global Statistical Systems",
Statistical Journal of the IAOS, Volume 25, No. 1, 2, 2008, pp. 69-71.

Habermann, Hermann, Panel Chair, "A Green Compass: Institutional Options for developing a
National System of Environmental Indicators", National Academy of Public Administration,
December 1, 2007.

Habermann, Hermann, "Ethics, Confidentiality and Data Dissemination", Journal of Official
Statistics, Volume 22, No. 4, 2006, pp. 599-614.

Evaluation of the UNSD-DFID project: Improving the collation, availability and dissemination of
national development indicators, including MDGs, Final Report by OPM, M. Powell, J. Compton,
H. Habermann, January 2016.

## Presentations

Introduction to the Federal Statistical System – A short course sponsored by the Joint Program in Survey Methodology, 15  March 2017 and various other dates beginning in 2012, with Brian Harris-Kojetin

Forum on Open Science presented to the National Intelligence Science and Technology Committee, 19 November 2015

"Future of the National Statistic Office" presented to the Inter-American Development Bank, 20 October 2015

New Directions in Data Collection and Analysis presented to the Inter-American Development Bank, 16 September 2015

Keynote Speaker at 2014 IAOS Conference, Danang, Vietnam, " New Directions in Data Collection, The Role of Official Statistics", October 2014

Shifting Role of Official Statistics presented to the National Research Council, 8 April 2014

Chair, High Level Forum on Fundamental Principles of Official Statistics, UN Statistical Commission, 2014

"Future of the BLS", invited presentation for the Bureau of Labor Statistics, 18 September 2013

The Nation Statistical Office in 2030, Assuring Trust in Official Statistics, National and International Statistics, and U.S. Statistical Community presentations to Higher School of Economics, Moscow, December 2013

United Nations Committee for the Coordination of Statistical Activities, 1995-1997 (as Director of UN Statistics Division)

Chair, National Academy of Public Administration Panel on "A Program Review of Diversity Strategic Initiatives", June 1, 2009

"The Future of Innovation in the Federal Statistical System", presented at a joint symposium of the Committee on National Statistics and the American Academy of Political and Social Science on  "The Federal Statistical System: Recognizing Its Contributions, Moving It Forward", 8 May 2009, Washington, D.C.