**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

NEW YORK IMMIGRATION
COALITION, *et al*.,

  Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
COMMERCE; and WILBUR L. ROSS,
JR., in his official capacity as Secretary
of Commerce, *et al*.

  Defendants.

Civil Action No. 1:18-cv-05025

RULE 26(A)(2)(B)
EXPERT REPORT AND
DECLARATION OF
JOHN THOMPSON

# Expert Report of Mr. John Thompson
## in *New York Immigration Coalition et al. v. Department of Commerce et al.*

### I.    Introduction

On March 26, 2018 Secretary of Commerce Wilbur Ross announced that he had decided to include a citizenship question on the 2020 Decennial Census Questionnaire.  The 2020 Decennial Census results will be of great importance to our nation.  The Constitution requires that the Decennial Census be used for reapportioning the Congress of the United States and the Electoral College.  The 2020 Decennial Census will also be used for numerous other functions to support good policymaking and economic growth including:  redrawing Congressional and local voting districts; allocating over $650 billion of federal funds annually; informing sound policy development; providing critical information for state, local and tribal government planning; and supplying critical information to large and small businesses to generate growth and job creation.  Inaccuracies or errors in the 2020 Decennial Census will have grave consequences on these uses for the subsequent 10-year period.

I have served as both the Director of the U.S. Census Bureau and as the career senior executive in charge of management of all aspects of the 2000 Decennial Census.  I am also a distinguished professional in the area of statistics and survey design.   I have a deep understanding of the processes that are necessary to achieve a complete and highly accurate Decennial Census. I am being paid $150 an hour for my work as an expert in this case.

I have carefully reviewed the publicly available administrative record upon which the Secretary of Commerce based his decision to add a question concerning citizenship on the 2020 Decennial Census, the depositions of Dr. Ron Jarmin and Dr. John Abowd and materials produced in discovery in this case.  I have also reviewed the March 26, 2018 memorandum prepared by Secretary of Commerce Wilbur Ross documenting his decision to include a question on citizenship on the 2020 Decennial Census questionnaire.  I have concluded that there is no evidence in these documents that the Census Bureau conducted any of the proper testing that should be done in order to determine the effects of including a citizenship question on a Decennial Census before the decision was made to add such a question to the 2020 Census.  Nor has the Census Bureau conducted any of the proper testing that would allow one to conclude that non-response follow up ("NRFU") procedures will effectively address the increase in non-response that may be caused by the addition of the citizenship question.  Furthermore, based on my review of these materials, it is my opinion that the rationale provided by Secretary Ross for his decision is not supported by the administrative record.

In this report, I first describe my credentials as an expert on the design and conduct of all phases of the Decennial Census including the development of the questionnaire.  I then discuss the proper processes for testing a proposed question prior to its inclusion on the Decennial Census questionnaire.  I also describe how these processes have been used in previous Decennial Censuses to consider and test proposed changes to questions on the questionnaire sent to all

2

households, and how these standard Census Bureau practices differ from the process that was conducted to consider the inclusion of the citizenship question on the 2020 Decennial Census questionnaire.  I also describe how deviations from these well-established procedures can have serious consequences on accuracy and response rates.  Finally, I discuss my review of the publicly available administrative record upon which the Secretary of Commerce based his decision to add a citizenship question to the 2020 Census questionnaire, including his March 29, 2018 decision memorandum.  This discussion provides the basis for my conclusion the citizenship question was not properly tested before Secretary Ross decided to add it to the Decennial Census questionnaire and that the rationale for his decision is not supported by the administrative record.

## II.    Qualifications

Below I briefly describe specific aspects of my qualifications and work experience that establish my credentials as an accomplished statistician and an expert on the Census Bureau and Decennial Census.  I have also attached a copy of my CV to this report.

In addition to the work experience described below, I am an elected Fellow of the American Statistical Association, and was selected to serve on the National Academies of Science, Engineering, and Medicine Committee on National Statistics.

1.   **U.S. Census Bureau** (Director August 2013 – June 2017; Career Census Bureau Employee 1975-2002)

The Census Bureau is the largest Statistical Agency and produces a wide range of demographic and economic statistics including the Decennial Census, the American Community Survey, the Current Population Survey, the National Crime Victimization Survey, the National Health Interview Survey, the Economic Census, the release of 13 principle key economic indicators on a monthly or quarterly basis, and conducts about 100 additional surveys. The Director of the Census Bureau is appointed by the President and confirmed by the Senate.

My responsibilities as Director of the Census Bureau included overseeing the research and testing program for improving the 2020 Decennial Census questions on Race and Ethnicity.  This testing program began with the 2010 Decennial Census and culminated with the 2015 National Content Test on Race and Ethnicity questions for the 2020 Decennial Census.  The final report was published in February 2017 and provides a documentation of the extensive testing required to adequately determine if a new or revised question to collect race and ethnicity data should be included on the 2020 Decennial Census.  The report also provides analysis of the test results and recommendations for the optimal design of questions on Race and Ethnicity for the 2020 Census.

Prior to becoming Director, I worked at the Census Bureau for 27 years. I started my career as a mathematical statistician in 1975.  I spent the majority of my employment at the Census Bureau focused on the Decennial Census and ultimately served as the Associate Director for the 2000

Decennial Census, with management responsibility for all phases of the 2000 Decennial Census. My work included collaboration with the Office of Management and Budget on the extensive research and testing program that lead to the inclusion of a new race question on the 2000 Census questionnaire.

2. **NORC at the University of Chicago** (President 2008 – 2013, Executive Vice President 2002 – 2008)

NORC at the University of Chicago is an objective, non-partisan independent research institution that delivers reliable data and rigorous analysis to guide critical programmatic, business, and policy decisions.  Clients include government, corporate, and nonprofit organizations around the world who partner with NORC to transform increasingly complex information into useful knowledge.  NORC conducts research in five main areas: Economics, Markets, and the Workforce; Education, Training, and Learning; Global Development; Health and Well-Being; and Society, Media, and Public Affairs.  NORC services include designing and conducting surveys (telephone, Internet, and in-person) as well as analytical studies.

At NORC, my responsibilities encompassed the management of all survey operations including the design and testing of survey questionnaires.

3. **Council of Professional Associations on Federal Statistics** (Executive Director July 2017 – August 2018)

The Council of Professional Associations on Federal Statistics (COPAFS) is an organization with a membership consisting of professional associations and research organizations that depend on and support high quality federal statistics.  The Executive Director of COPAFS must have a deep understanding of the Federal Statistical System and the wide range of data products that are produced.  Serving as the Executive Director of COPAFS reinforced my appreciation of the importance of high quality Decennial Census data to the entire Federal Statistical System.

III.    **Protocols for Proper Research and Testing of a Question Proposed for Inclusion on the Decennial Census**

The uses of the data generated by the Decennial Census are extremely important for all components of our democracy and economy, including: the constitutionally required reapportionment of the Congress; redrawing Congressional and local voting districts; allocating over $650 billion in federal funds annually; supporting evidence based policy making by state, local and tribal governments; and allowing informed decisions by large and small business to generate economic growth and job creation.  Inaccuracies or undercounts in Decennial Census data will result in under-representation of the affected population groups not just in the immediate term, but for ten subsequent years until the next Decennial Census results are available.

It is a widely accepted principle among statisticians and survey methodologists that even minor changes in question wording or placement on a questionnaire can have unanticipated effects on both response rates and the accuracy of the data respondents provide.  Given the importance of the Decennial Census, the Census Bureau has established extensive testing processes in order to properly assess proposed changes to the content of the questionnaire and avoid the risk of introducing undercounts or other inaccuracies into the census data.  The current proposal to add a question on citizenship to the 2020 Decennial Census questionnaire is a deviation from these well-established principles for developing a Decennial Census questionnaire.

### a. Examples of Prior Extensive Research and Testing Conducted When Considering Adding a New Question

Two examples of the extensive research and testing that is standard practice when the Census Bureau considers making changes to the Decennial Census questionnaire took place during my tenure overseeing the 2000 and 2020 Decennial Censuses.

#### i. Race and Ethnicity on the 2000 Decennial Census

For the 2000 Decennial Census there was a proposal to revise the questionnaire to allow respondents to indicate that they identified with multiple races. In 1977, the Office of Management and Budget (OMB) issued Statistical Directive No. 15 to establish the standards for the classification of Federal data on race and ethnicity. Following the 1990 Decennial Census, the standards in Directive No. 15 came under increasing criticism from those who believed that the minimum race categories set forth in Directive No. 15 did not reflect the increasing diversity of our Nation's population that resulted primarily from growth in immigration and in interracial marriages.[1] Many of these respondents did not identify with a single race category and wanted the OMB standards to allow them to report more than one race.[2]  In response to the criticisms, OMB announced in July 1993 that it would undertake a comprehensive review of the current categories for data on race and ethnicity.  The review was conducted over four years and included extensive cognitive and field testing components conducted by the Census Bureau. This program of research is documented in a Federal Register Notice issued on October 30, 1997[3] in which OMB announced that it intended to revise the standards to allow reporting of multiple races in all Federal data collections including the 2000 Decennial Census.  The testing conducted by the Census Bureau that supported OMB's decision to make these revisions also

---

[1] Federal Register Notice, Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, (October 30, 1997), https://obamawhitehouse.archives.gov/omb/fedreg_1997standards.
[2] Roderick Harrison et al., *Findings on Questions on Race and Hispanic Origin Tested in the 1996 National Content Survey,* Census Bureau Special Populations Statistics Population Division Working Paper Number POP-WP016, (December 1996), https://www.census.gov/population/www/documentation/twps0016/report.html.
[3] Federal Register Notice, Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity, (October 30, 1997), https://obamawhitehouse.archives.gov/omb/fedreg_1997standards.

included the development and extensive testing of a question to be included on the 2000 Decennial Census questionnaire.[4]

### ii.   Race and Ethnicity on the 2020 Decennial Census

Similarly, planning for the 2020 Decennial Census also included an extensive research and testing program to determine how the questions on race and ethnicity could be improved beyond those announced in 1997.  This research started more than ten years prior to the 2020 Decennial Census as part of the 2010 Decennial Census as the Alternate Questionnaire Experiment.[5]  The design of the Alternate Questionnaire Experiment began in 2008.[6] This testing involved three components: 1) a questionnaire sent by mail that respondents received in lieu of the standard 2010 Decennial Census questionnaire; 2) a telephone re-interview of the mail respondents to assess the accuracy and the reliability of both the control and the alternative race and Hispanic origin questions; and 3) a series of focus groups conducted to complement the quantitative analyses.[7]

The results of the Alternate Questionnaire Experiment were promising but not conclusive and thus testing continued following the 2010 Decennial Census.  Throughout 2014 and 2015, the Census Bureau research team "shared and discussed plans for testing different question designs, and participated in numerous public dialogues about their research plans in order to obtain community feedback."[8]  In 2015 the proposed changes were extensively tested through the National Content Test (NCT).  This comprehensive research program is documented by the Census Bureau in the *2015 National Content Test Race and Ethnicity Analysis* Report.[9]

---

[4] *See, e.g.,* Roderick Harrison et al., *Findings on Questions on Race and Hispanic Origin Tested in the 1996 National Content Survey,* Census Bureau Special Populations Statistics Population Division Working Paper Number POP-WP016,(December 1996), https://www.census.gov/population/www/documentation/twps0016/report.html#background-rho. *See also* Claudette Bennett et al., *Results of the 1996 Race and Ethnic Targeted Test,* Census Bureau Population Division Working Paper No. 18, (May 1997), https://www.census.gov/population/www/documentation/twps0018/twps0018.html.

[5] 2010 Census Planning Memorandum Series No. 211 *2010 Census Race and Hispanic Origin Alternative Questionnaire Experiment,* (2013), https://www.census.gov/2010census/pdf/2010_Census_Race_HO_AQE.pdf.

[6] Research to Improve Data on Race and Ethnicity, U.S. Census Bureau, (2017), https://www.census.gov/about/our-research/race-ethnicity.html.

[7] Karen Humes, *2010 Census Alternative Questionnaire Experiment: Race and Hispanic Origin Treatments,* U.S. Census Bureau Population Division, (2009), http://www.nilpnetwork.org/Census_-_Alt_Exper_Ques_Plan_-_Summer_2010.pdf.

[8] Research to Improve Data on Race and Ethnicity, U.S. Census Bureau, (2017), https://www.census.gov/about/our-research/race-ethnicity.html.

[9] Mathews, Kelly, Jessica Phelan, Nicholas A. Jones, Sarah Konya, Rachel Marks, Beverly M. Pratt, Julia Coombs, Michael Bentley, *2015 National Content Test Race and Ethnicity Analysis Report*, Census Bureau Report, (February 28, 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/final-analysis-reports/2015nct-race-ethnicity-analysis.pdf.

The 2015 NCT was conducted with a nationally representative sample of 1.2 million housing units in the United States, including Puerto Rico.[10] This sample was designed to ensure that the results accurately reflected the nation as a whole, across a variety of demographic characteristics. The NCT oversampled census tracts that contained relatively high percentages of race and ethnicity groups who were susceptible to undercounts or were likely to have low self-response rates.[11]

The NCT examined several key dimensions for improving the data on race and ethnicity. This included question format (e.g. whether to ask separate questions on race and ethnicity or to combine them), response categories (e.g. whether to include a "Middle Eastern or North African" category), instruction wording (e.g. comparing two sets of instructions: "Mark [X] one or more boxes" vs. "Mark all that apply" in paper data collections; and "Select one or more boxes" vs. "Select all that apply" in Internet data collections) and question terminology (e.g. whether to include "race," "origin," "ethnicity," or no terms).[12]

Following the initial NCT sampling a re-interview was conducted with approximately 75,000 respondents. This re-interview asked three questions about how respondents self-identify, as well as collecting more detailed information about respondents' racial and ethnic background and was designed to confirm how effective the initial questionnaire had been.[13]

After the release of the 2015 NCT results the Census Bureau had extensive dialogue about the NCT results with other agencies and received additional feedback from the public through the Federal Register Notice process in order to develop the final recommendation to OMB. Despite all of these extensive testing and research, in January 2018 Albert Fontenot, the Associate Director for Decennial Census Programs announced that the Census Bureau would continue to use two separate questions for collecting data on race and ethnicity and would not add a separate Middle Eastern or North African category on the 2020 Census.[14] The stated justification for this decision was that although extensive testing had been conducted for over a decade, a final decision had to be made by December 31, 2017 in order to allow the Census Bureau adequate time to deliver the final question wording for the 2020 Decennial Census to Congress by March 31, 2018.[15]

---

[10] *Id.*

[11] Kelly Mathews, Jessica Phelan, Nicholas A. Jones, Sarah Konya, Rachel Marks, Beverly M. Pratt, Julia Coombs, Michael Bentley, *2015 National Content Test Race and Ethnicity Analysis Report*, Census Bureau Report, (2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/final-analysis-reports/2015nct-race-ethnicity-analysis.pdf.

[12] *Id.*

[13] *Id.*

[14] 2020 Census Program Memorandum Series: 2018.02 *Using Two Separate Questions for Race and Ethnicity in 2018 End-to-End Census Test and 2020 Census,* Census Bureau, (2018)*,* https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_02.pdf.

[15] *Id.*

These two extensive multi-year testing programs are reflective of the great care which the Census Bureau determined was necessary to ensure that both the 2000 and 2020 Census results would not be influenced by unanticipated biases or undercounts due to changes in the questionnaires relating to race and ethnicity. As I will discuss in more detail below, there is no evidence in the administrative record that any similar testing supported the decision to include the citizenship question on the 2020 Census.

I will now describe the components of a research and testing program that should be carried out to determine whether a new question should be included on a Decennial Census.

### b. Determination of a Potential Need for a New Question on the Decennial Census Questionnaire

The determination of a need for a new question on the Decennial Census questionnaire begins when a federal agency identifies a need for new information that is only possible to be collected from the Decennial Census and makes a formal request to the Census Bureau to consider adding a new question.  The request can come in response to a formal solicitation from the Census Bureau or when circumstances arise that cause an agency to identify a new program need.  Upon receiving the request, the Census Bureau typically works with the Office of Management and Budget and with the Department of Commerce Office of General Counsel to determine whether this information should be collected from the Decennial Census questionnaire.  The three key components of this review are: (1) validating the legislative basis for the information need; (2) validating that the information is needed from every person in the United States such that it cannot be obtained from some other survey such as the American Community Survey; and (3) that there is no other source for the information.  If the review indicates that the information should be collected from the Decennial Census a rigorous testing program will then begin as described below.

In my experience, the process that took place to determine the need for a citizenship question to be included on the 2020 Decennial Census is unprecedented.  The administrative record makes clear that the Secretary of Commerce solicited the Department of Justice to request that a citizenship question be added to the 2020 Census questionnaire.[16]  This latter action by Secretary Ross is very unusual – during my tenure at the Census Bureau as both a long-time senior career executive and as a political appointee, I never observed a political official at the Department of Commerce solicit another federal agency to request that a specific question be added to the Decennial Census questionnaire.

---

[16] On page 1 of his decision memorandum Ross makes the statement "Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond."  However, the administrative record makes it very clear that Secretary Ross actually approached DOJ and requested that they initiate the request much earlier than December 12, 2017 therefore this is an inaccurate statement.  *See also* Supplemental Memorandum by Secretary of Commerce Wilbur Ross Regarding the Administrative Record in Census Litigation, (June 21, 2018), AR 1308-1321.

### c. Initial Question Design

The first step in designing a new question to be added to a Decennial Census questionnaire is for experts in both subject matter and cognitive design to develop several reasonable alternatives for the question wording.  The subject matter experts usually consist of staff from both the Census Bureau and the requesting agency.

The Commerce Department has asserted that since a citizenship question was included on previous Decennial Census long form questionnaires that were sent to a sampling of households and on the American Community Survey such a question has been adequately tested.[17] However, there are a number of design issues that must first be considered before reaching such a conclusion.  Based on my review of the administrative record, these issues were not addressed before the decision was made to include a citizenship question on the 2020 Decennial Census questionnaire.

### i. Consultation With Subject Matter Experts

Input from subject matter experts is essential to the development of a new question.  There must be a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome.  However, the administrative record and the depositions of Acting Census Bureau Director Dr. Ron Jarmin and Census Bureau Chief Scientist Dr. John Abowd make it clear that the Department of Justice refused to meet with the Census Bureau to discuss their request that a citizenship question be included on the 2020 Census.  Without these discussions, there is a significant risk that the resulting citizenship data will not meet their needs. For example, Dr. Abowd stated that the Census Bureau still doesn't know how the responses from the citizenship question will be combined with administrative records to form the tabulation of block-level citizenship data, the details of how the citizenship data will be altered to prevent disclosure of respondent's citizenship status, whether the citizenship data produced after the 2020 Decennial Census will have larger or smaller margins of error than the citizenship data currently relied on by the Department of Justice, whether the error margins associated with the data will allow the Department of Justice to use the data effectively, or even whether the block-level data will be included in the standard redistricting data file produced by the Census at all (the "P 94-171 Data File").[18]

### ii. Design of Questionnaire

Good test design requires considering not just an individual question, but the effect of the question in the context of the entire questionnaire.  For example, the testing that was done relating to potential changes to the race and ethnicity questions for the 2000 and 2020 Decennial

---

[17] Secretary Wilbur Ross, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire*, (March 26, 2018), AR 1314. (the ACS "has included a citizenship question since 2005.  Therefore the question has been well tested.")

[18] 30(b)(6) Dep. of J. Abowd, dated Aug. 29, 2018 at 55-62, 70.  J. Abowd Dep. dated Aug. 15 2018, at 174-178.

Census questionnaires that I described above considered this issue extensively.  Assessment of the potential design should also take into account the order in which the questions will appear.

The ACS is a much longer questionnaire than the Decennial Census questionnaire.  The ACS questionnaire includes over 70 questions while the 2020 Decennial Census will contain 11 questions if the citizenship question is included.  A question concerning citizenship may take on added significance to a respondent in the context of a shorter questionnaire where it is only one of 11 questions.  The administrative record does not document any design considerations related to putting the citizenship question that appears on the ACS on the much shorter 2020 Decennial Census questionnaire.

The effects of the interactions between questions included on a questionnaire must also be considered.  For example, the ACS includes the following question on place of birth that is asked just before the question on citizenship[19]:

**Where was this person born?**
___In the United States – *Print name of the state.* _____
___Outside the United States – *Print name of foreign country, or Puerto Rico, Guam,*
*etc.*_____

The potential effects on the subsequent responses to the ACS citizenship question given that respondents have been influenced by the place of birth question need to be carefully studied.  For example, it is possible that the place of birth question may cause ACS respondents to be more comfortable with the citizenship question. As such, the absence of the place of birth question before the citizenship question on the 2020 Decennial Census may generate respondent concerns that the citizenship question is intrusive.  However, the actual outcome is unknown without testing.

Whether the wording and length of the question to be added is consistent with the instrument on which it is to be included is another important design consideration.  Yet, my review of the administrative record did not reveal any evidence that such concerns were considered before the decision was made to include a citizenship question on the 2020 Decennial Census.  The language of the citizenship question that Secretary Ross has indicated will be added is as follows:

**Is this person a citizen of the United States?**

___ Yes, born in the United States
___ Yes, born in Puerto Rice, Guam, the U.S. Virgin Islands, or Northern Marianas
___ Yes, born abroad of U.S. parent or parents
___ Yes, by naturalization – print year of naturalization –  __ __ __ __

---

[19] The American Community Survey, U.S. Census Bureau, (2018), https://www2.census.gov/programs-surveys/acs/methodology/questionnaires/2018/quest18.pdf.

___ No, not a U.S. citizen

There are potential concerns with the five response categories that are included in the ACS question. For example, concerns have been publicly expressed by members of Congress and other stakeholders about the response category "Yes born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas" because respondents in Puerto Rico may be offended by the perception that their citizenship is different from that of citizens in the mainland United States.[20] To my knowledge no testing has been done to confirm whether this may affect response rates if asked on the 2020 Decennial Census.

A reasonable alternative for the 2020 Decennial Census question on citizenship could be a very short question such as:

> Is this person a citizen of the United States?
> ___ Yes
> ___ No

However, there is no evidence in the administrative record that such an alternative—or any alternatives at all—were considered or tested.

### iii.    Iterative Cognitive Testing to Refine Alternatives

Once the reasonable alternative question designs have been developed, the next step in considering a new question is for cognitive survey methodology experts to conduct a number of facilitated focus group studies to examine how potential respondents react to each of the alternative questions.  It is very important that the focus group testing focus on the entire questionnaire and the sequence that questions will be asked.  Often these focus groups are conducted in a cognitive laboratory in which a group of 10 to 12 respondents are administered questions by a facilitator.  While this administration is being conducted, other cognitive survey methodologists unobtrusively observe how the respondents react to the questions.  An important objective of these studies is to determine whether respondents understand the questions and are providing accurate answers. The focus groups will also give an indication if questions are posed in such a fashion that they will lead to non-response that could result in an undercount.  The focus groups must be conducted with a representative sample of the population of the United States.  For example, the 2010 Census Alternative Questionnaire Experiment included 67 focus groups with about 800 total respondents.  During this process it is common for the initial alternative question designs to be revised based on the reactions of the focus group respondents and then for the revised designs to be subjected to additional focus group testing.  At the end of this iterative process, a set of alternative questions are then ready for field testing.

---

[20] *See e.g., Bureau of the Census FY 2019 Budget: Hearing Before the Committee on Appropriations 115th Cong.* (April 18, 2018) (Statement of Representative Serrano at 2:15:10-2:16:50), https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=395239.

The administrative record provides no evidence of any cognitive testing of the Decennial Census questionnaire with the ACS citizenship question included.  One critical objective of focus group testing of the inclusion of the ACS citizenship question would be whether doing so would increase the propensity for certain historically hard-to-count population groups to resist responding to the entire 2020 Decennial Census questionnaire.  The Census Bureau has produced research that indicates growing concerns that respondents have with privacy, confidentiality and government surveys,[21] underscoring the importance of such testing.  However, the administrative record indicates that there has been no evaluation of the effect of these concerns on how respondents may view the citizenship question on the 2020 Decennial Census questionnaire.  As Dr. Abowd testified, Census Bureau staff concluded that, with respect to "cognitive testing," the 2020 census questionnaire was "not adequately tested with the citizenship question."[22]

### iv.    Field Testing of Alternative Questionnaires

While cognitive focus group testing of alternative questionnaires is very important, it is not sufficient to conclude that a question is ready to be included in a data collection activity.  This is particularly the case for the Decennial Census where field testing of alternative questions and questionnaires is of critical importance to understand how respondents will react in an unsupervised environment.

The field testing must also be based on a well-designed national sample of households that simulates to the greatest extent possible a Decennial Census environment.  Importantly, the sample must be representative of the population of the United States and include sufficient observations to assess the effects on the hard-to-count populations.  Some other important aspects of a proper field test design are as follows:

(1) A stratified sample must be designed to allow for analysis of the effectiveness of alternative questions on producing data for both population and geographic subgroups (e.g., Racial and Hispanic populations, urban and rural areas, American Indian Reservations, etc.).

(2) The alternative questionnaires are administered to the sample households in a manner that replicates to the greatest extent possible the way in which the Decennial Census will be conducted.  For example, since the 2020 Census will allow both internet and paper questionnaire response options, the test design must allow for an analysis of these different response modes.

(3) A re-interview of either all or at least a subsample of the respondents who completed the initial questionnaires should be conducted.  This is an extremely critical component of the testing of a new question.  The purpose of the re-interview is to determine whether the respondents are providing accurate answers that the alternate questionnaires were designed to

---

[21] AAPOR Panel on *Changes in Respondent Privacy, Confidentiality, and Data Sharing Concerns*, Meyers, Goerman, Harris-Kojetin, Terry, and Fobia, Denver, Colorado, May 18, 2018.
[22] Abowd 30(b)(6) Dep. Tr. at 142:18-43:4.

collect.  In addition, if misreporting is detected, the re-interview will identify the factors that are causing the response error.  This would be of critical importance to designing a question on citizenship because it is well known that over 30 percent of non-citizens report themselves as citizens when responding to the citizenship question included on the ACS questionnaire,[23] and it is essential to understand the factors that are generating such errors.

Despite the importance of field testing a new question before inclusion on the Decennial Census—especially for a question that is already known to have a high incorrect response rate on the ACS—the administrative record contains no evidence that any field testing of the citizenship question to be included on the 2020 Decennial Census was conducted.

In his decision memorandum Ross states that "the citizenship question has been well tested."[24] However, the administrative record does contain any documentation of a research testing program that would be appropriate for supporting the inclusion of the citizenship question on the 2020 Decennial Census questionnaire.  In fact, the administrative record demonstrates that little is known about the effects of a citizenship question.  Thus, I conclude that Secretary Ross's statement is not supported by the administrative record.

> **v.    Analysis of Field Test Results**

At the conclusion of the field test the results are analyzed to determine which of the alternative questions, if any, is producing the desired outcome or if more testing is needed.  In the case of the Decennial Census, the analysis of the results would typically be discussed with the Census Bureau advisory committees, the Office of Management and Budget, and outside researchers with expertise in questionnaire design and in the subject matter area related to the new questionnaire.

A good example of such analysis is the work that the Census Bureau carried out as part of the 2015 National Content Test.  Census Bureau staff made numerous presentations of each stage of analysis to their federal advisory committees, and other stakeholders including OMB.  The Census Bureau published the final research report and then met with numerous stakeholder groups to discuss the findings and answer questions.  A primary objective of this outreach was to ensure that the research adhered to the established principles of openness and objectivity.

In the case of the decision to include a citizenship question on the 2020 Decennial Census questionnaire, the administrative record documents that in deviation from standard practice Secretary Ross made his decision in the absence of any field test results or other research on the potential effects of including the question on the 2020 Decennial Census questionnaire and

---

[23] John Abowd, *Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census*, Memorandum to Wilbur Ross (January 19, 2018), AR 1277-1285.
[24] Secretary Wilbur Ross, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire*, (March 26, 2018), AR 1314.

without the input of the Census Bureau's own advisory committees or other important stakeholders.

## vi.    Census Bureau Recommendations

Based on the analysis, and input of the external review, the Census Bureau would then make a recommendation regarding whether to move forward with proposing that a new questionnaire should be added to the 2020 Census questionnaire.  The recommendations would be discussed with officials at the Department of Commerce with oversight responsibilities including the Secretary of Commerce.

The administrative record documents that the Census Bureau conducted timely and well-thought-out research on how to best produce data on citizenship to meet the Department of Justice's request.  This research clearly indicated that there were more cost effective and more accurate methods to produce these data by using administrative records instead of asking the question directly on the 2020 Census questionnaire. [25] [26]  In addition, Dr. Abowd testified that, speaking for the Census Bureau, he does not agree with the concluding passage of Secretary Ross's decision memorandum that the addition of the citizenship question "is necessary to provide complete and accurate data in response to the DOJ request." [27]  The Census Bureau provided these recommendations to Secretary Ross, but they were not adopted and the administrative record does not include a rationale for Ross ignoring them.  In my experience, it is unprecedented for a senior Department of Commerce official to dismiss a Census Bureau technical recommendation based on extensive research without documenting a rationale for such an action.

## IV.    Review of the Administrative Record Upon Which the Secretary of Commerce Based his Decision to Add a Citizenship Question to the 2020 Decennial Census

I have carefully reviewed the administrative record that has been produced in this case and upon which the Secretary of Commerce based his decision to add a question concerning citizenship on the 2020 Decennial Census, as well as the March 26, 2018 Memorandum from Secretary Ross to Karen Dunne Kelley in which he announced his decision to reinstate a citizenship question on the 2020 Decennial Census questionnaire.  I have found that serious inconsistencies exist between the materials in the administrative record and the rationale Secretary Ross provides in support of his decision.  I have also found that Secretary Ross has made certain assumptions that are contrary to his stated goal of prioritizing "complete and accurate data." [28]  These problematic areas in Secretary Ross's decision memorandum are as follows:

---

[25] John Abowd, *Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census*, Memorandum to Wilbur Ross (January 19, 2018), AR 1277-1285.
[26] John Abowd, *Preliminary analysis of Alternative D (Combined Alternatives B and C)*, Memorandum to Wilbur Ross (March 1, 2018), AR 1308-1312.
[27] 30(b)(6) Dep. of J. Abowd, dated Aug. 29, 2018, at 331:8-17.
[28] Secretary Wilbur Ross, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire*, (March 26, 2018), AR 1313.

14

**a. Ross Failed to Consider the Likelihood of Increased Undercount**

The most problematic issue with Ross's decision memorandum is that it contains no consideration of whether the addition of the citizenship question to the 2020 Decennial Census questionnaire will result in increased undercounts of those population groups that have been traditionally hard-to-count.

The Census Bureau has made good progress since the 1990 Decennial Census, and had great success during both the 2000 and 2010 Decennial Censuses, in reducing undercounts. A key component of this success has been the deployment of a combined national and local advertising and local partnership program to deliver a message to hard-to-count populations that the census is important to their community, and that the data collected through the census is completely confidential. No individual's information is shared with any other organization or law enforcement entities. This messaging program was responsible for dramatic gains in the accuracy and coverage of the 2000 and 2010 Decennial Census relative to the 1990 Census, which did not include such a program. For example, the undercount of Black or African Americans dropped from 4.6 percent in 1990 to 2.1 percent in 2010.[29] For the Hispanic population the undercount dropped from 5.0 percent to 1.5 percent.[30]

There is no research cited in Ross's decision memo or in the administrative record that supports the conclusion that including the citizenship question on the 2020 Decennial Census questionnaire will not significantly reduce the effectiveness of this messaging, therefore resulting in increased undercounts relative to previous Decennial Censuses.

In his decision memo Ross claims that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially." The reason that neither the Census Bureau nor other stakeholders could provide such documentation is that including a citizenship question on a Decennial Census short form has not been tested. Obtaining such documentation would involve a multi-year testing and research program following the steps I outlined above. Instead, Secretary Ross simply assumed that there will be no adverse effects on response rates without any supporting evidence.

In fact, in their depositions, Dr. Ron Jarmin and Dr. John Abowd both stated that the inclusion of the citizenship question may result in reducing self-response rates. And it is reasonable to conclude that this drop in self-response rates will result in increased undercounts. The Census Bureau identifies hard-to-count areas as those with a low response score or low self-response rate.[31] Lower self-response rates indicate that an area should receive a higher rating as hard-to-count than those areas with higher self-response. Decennial Census undercounts would be

---

[29] P. Cantwell, *DSSD 2010 Census Coverage Measurement Memorandum Series* # 2010-G-01, (May 22, 2012), https://www.census.gov/coverage_measurement/pdfs/g01.pdf.
[30] *Id.*
[31] Response Area Outreach Mapper, Census.gov, www.census,gov/roam, (July 2018).

expected to occur in those areas that are hard-to-count.  Given that the Census Bureau has provided research indicating that it is very likely that the 2020 Census self-response rates will be lowered by the addition of a citizenship question,[32] it follows that the number of hard-to-count areas will increase, and it is therefore likely that undercounts will also increase.

Both Dr. Jarmin and Dr, Abowd, however, testified that the in-person operations to collect information from non-respondents (referred to as "Non Response Follow Up" or "NRFU") will still be able to obtain complete information for the populations whose self-response is lowered by the citizenship question.  That is, despite having a lower self-response rate, the final results for these populations will not show an increased undercount.  However, there is no research cited in the administrative record—and I know of no research outside of the administrative record—to support this conclusion.  Instead, an internal Census Bureau analysis produced in this case and provided to me by counsel raises questions about the accuracy of NRFU procedures for addressing an increase in non-response resulting from the citizenship question.[33]  The same Census Bureau staff that analyzed the possible effect of the citizenship question on response rates also acknowledged that "[h]ouseholds deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door in NRFU.[34]  That is, Bureau staff concluded that it is likely that households that refuse to respond to the Decennial Census questionnaire because of the citizenship question are also likely to respond to enumerators.  Dr. Abowd also testified that there is no empirical evidence that someone who chooses not to respond to the 2020 Decennial Census because of the citizenship question would respond in a face-to-face interaction with the census enumerator.[35]  There is also data in the administrative record indicating that NRFU efforts for the ACS have been less successful in census tracts with the largest percentages of non-citizen households, and that ACS NRFU success rates have been declining.[36]  These facts all strongly suggest that NRFU efforts may be unsuccessful with respect to households that decline to answer the Decennial Census questionnaire because of the citizenship question, particularly noncitizen households.

The 2020 Decennial Census is too important to not have an assessment of the potential for increased undercounts that could result from the inclusion of a citizenship question. A decision criteria should **not** be *there is no evidence that the inclusion of a citizenship question will increase undercounts*.  Instead, the correct decision criteria under governing professional standards **must** be that *there is strong evidence that the inclusion of a citizenship question will not increase undercounts*.  In the absence of this latter criterion, the risk of serious undercounts in the 2020 Decennial Census is very high.

---

[32] J. David Brown, Misty L. Heggeness, Suzanne M. Dorinski, Lawrence Warren, and Moises Yi, *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census*, (August 6, 2018), COM_DIS00009873-74.
[33] *Id.*
[34] *Id.*
[35] Abowd 30(b)(6) Dep. at 251:15-22.
[36] Chart of Response Rates, AR 10408-10413; Abowd 30(b)(6) Dep. at 128:1-11.

As Census Bureau staff concluded, when such households do not respond to the questionnaire or to NRFU enumerators because of the citizenship question, it "result[s] in the use of neighbors as proxy respondents on their behalf."[37]   That is, when households refuse to respond to an enumerator, the enumerator seeks a proxy response from someone outside the household.[38]   But as noted by Census Bureau staff, proxy enumeration generally produces a lower correct enumeration rate, and poorer quality individual demographic information, than a self-response. Finally, if a proxy response is unavailable for a household, the Census Bureau may attempt to enumerate that household using administrative records; but as Dr. Abowd testified, such records are more likely to exist for citizens than for noncitizen households.[39]

### b.  Ross Ignored the Recommendation of the Census Bureau

On page 4 of his decision memorandum, while discussing Option C, which involved the use of administrative records rather than adding a citizenship question, Ross makes the statement:

> While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau.  Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would provide.

The other option that Secretary Ross refers to was Option D, which he ultimately selected. However, the Census Bureau conducted a thorough assessment of Option D and clearly demonstrated that Option D would increase the level of inaccuracy in citizenship data.  The administrative record shows that the Census Bureau sent Secretary Ross a memorandum on March 1, 2018 with the subject *Preliminary analysis of Alternative D (Combined Alternatives B and C).*  This memorandum documented a well-designed analysis of Alternative D and concluded "In sum, Alternative D would result in poorer quality than Alternative C.  It would still have all of the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce." [40]   In other words, the administrative record makes clear through the research conducted by Dr. Abowd, that the citizenship data would best be met by using other means than including a question on citizenship on the 2020 Decennial Census questionnaire. Secretary Ross stated on page one of his decision memorandum "The Department and Census Bureau's review of the DOJ request – as with all significant Census assessments – prioritized the goal of obtaining *complete and accurate data.*"  Despite this claim, the administrative record indicates that he actually rejected the recommendation of the Census Bureau and decided on a less accurate one.

---

[37] *Id.*
[38] *Id.*
[39] Abowd 30(b)(6) Dep. at 233:3-11.
[40] John Abowd, *Preliminary analysis of Alternative D (Combined Alternatives B and C)*, Memorandum to Wilbur Ross (March 1, 2018), AR 1308-1312.

On page 6 of the decision memorandum Ross states that:

> [O]ther stakeholders who opposed reinstatement did so on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate thereby obviating the need to ask the question on the decennial census.  But as discussed above, the Census Bureau estimates that between 28 and 34 percent of the citizenship self-responses on the persons that administrative records show are non-citizens were inaccurate.  Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

This statement seems to imply that including a citizenship question on the 2020 Decennial Census will solve the potential problem of respondents misreporting their citizenship status as identified by Census Bureau researchers.  However, this is no evidence in the administrative record that would indicate that a different result would occur if the ACS citizenship question were included on the 2020 Decennial Census questionnaire.  That is, there is no evidence to suggest that the same misreporting for the ACS would not be present in the 2020 Decennial Census results.  Instead, the Census Bureau research documented in the administrative record clearly indicates that the only viable means of eliminating the misreporting identified by Secretary Ross would be to use administrative records to meet the DOJ request for citizenship data.

## V.    Conclusion

I have carefully studied the administrative record upon which the Secretary of Commerce based his decision to add a question on citizenship to the 2020 Decennial Census.  Based on my review, I have found no evidence of any support for certain key conclusions set forth in Secretary Ross's decision memorandum.  The importance of the Decennial Census requires careful testing and evaluation before making changes that could have far lasting consequences of underrepresentation for many population groups and areas.  No such research and testing was conducted to support Secretary Ross's decision.  More troubling, I did not find any evidence in the administrative record, nor do I know of any research, that would indicate that inclusion of the citizenship question **will not** result in serious undercounts for the 2020 Census.  Therefore, there is a high risk that we will see such undercounts if a citizenship question is included on the 2020 Census questionnaire.

I reserve the right to amend or supplement my opinions if additional information or materials become available. I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.

DATED this 7th Day of September, 2018

John Thompson

# JOHN H. THOMPSON

## BRIEF CAREER HISTORY

Extensive Senior Executive leadership in the non-profit and federal sectors, with experience in social science research and statistics, congressional advocacy, building coalitions, operational management, business development, stakeholder relations, innovation, and strategic vision.

### Executive Director, Council of Professional Associations on Federal Statistics – July 2017 to August 2018

The Council of Professional Associations on Federal Statistics (COPAFS) was founded in 1981 to coordinate activities of a number of Associations, Organizations, and Businesses that rely on federal statistics to support good governance and economic growth.  COPAFS now represents a growing body of stakeholders that support the production and use of high quality statistics.  The Executive Director represents these stakeholders in realizing their mission to *Advance Excellence in Federal Statistics*.  Activities include:

- Advocated on behalf of federal agencies. For example, COPAFS is a co-chair of the Friends of the Bureau of Labor Statistics, and the Friends of the National Center for Health Statistics;
- Worked with stakeholder coalitions to support proper funding for the 2020 Census and the American Community Survey;
- Ensured members of Congress, COPAFS members, and other stakeholders were informed of critical issues facing agencies that produce federal statistics;
- Alerted members and stakeholders of breaking issues that needed immediate support and attention;
- Organized and supported ongoing educational efforts for members of Congress and their staff on the value and importance of federal statistics both nationally and in their own states and districts;
- Created and joined in powerful coalitions of organizations and businesses to advocate on behalf of federal agencies that produce statistics, building broad support across a wide spectrum of data users;
- Built partnerships with foundations that help fund critical research in the statistical agencies and academia to ensure the on-going modernization of how statistical data are created and made available to the public and researchers, and to fund educational efforts;
- Worked closely with the Chief Statistician of the United States and the statistical agencies to help inform and promote modernization efforts underway and assist agencies in keeping abreast of new stakeholder data needs; and
- Hosted events to demonstrate the importance of federal statistics such as the 2018 Federal Committee on Statistical Methodology Research and Policy Conference.

**Director, United States Census Bureau – August 2013 to June 2017**

Appointed by the President as Director of the largest federal statistical agency, with a staff of over 5,000 headquarters employees and approximately 10,000 to 15,000 staff spread across the United States in six regional offices and a major production facility in Indiana, with an annual budget exceeding $1 billion.  Key accomplishments include:

- Worked successfully with the executive and legislative branches of the federal government, including the White House, the Office of Management and Budget, Cabinet officials, and members of Congress and congressional staff, to accomplish a major transformation of the Census Bureau into a forward-looking 21st century statistical agency.  Testified at 6 congressional hearings on the Census Bureau;
- Provided a conceptual vision and lead a redesign of the 2020 decennial census that is estimated to save $5 billion through effective use of operations research-driven reengineering of field operations, innovative use of technology, and partnership with key stakeholders;
- Lead outreach to key stakeholders including representatives of state local and tribal governments; advocacy organizations; professional associations, business groups, various media; and academic researchers;
- Put in place a robust research program to support mission critical activities, such as linking administrative records, disclosure avoidance methods, economic studies, statistical research, survey methodology, big data, and data dissemination;
- Lead efforts to maintain congressional support and funding for the American Community Survey, a critical data asset of the federal government, including mobilizing a diverse group of key stakeholders to effectively advocate in support of the survey, personally visiting almost all of the House of Representatives and Senate members of the Census Bureau appropriations and oversight committees, and establishing a program of research directly related to the concerns that had been raised;
- Improved economic statistics through research on using alternatives to direct survey data collection to produce statistics that are timelier and have increased granularity, and carrying out three initiatives to advance the release of principal economic indicators on trade, retail sales and services, which allowed the Bureau of Economic Analysis to significantly reduce revisions to Gross Domestic Product (GDP) estimates;
- Recruited outstanding research staff including new senior leadership for Research and Methodology, the Director of a newly established big data center, and seven former Presidential Innovation Fellows; and
- Improved data dissemination to the public, including development of a platform to deliver data in ways that will meet the rapidly evolving demands of a growing body of users. In addition, in order to meet immediate targeted demands two new tools were released: City SDK (Software Development Kit) to allow easy developer access; and Census Business Builder a tool that combines small area demographic and economic data in a way that is easily accessible for entrepreneurs and small business owners.

**President and Executive Vice President, NORC at the University of Chicago – July 2002 to August 2013**

NORC is a national non-profit organization that conducts high quality social science research in the public interest.  As President, I had responsibility for all NORC corporate activities and for the quality of all NORC research efforts. I provided vision for NORC to establish the organization as a leader in the social science research industry. My accomplishments included:

- Strengthened the organization's high-quality, diverse staff;
- Broadened the scope of the collaborations between NORC and the University of Chicago;
- Realized nearly 50 percent growth in revenue and greatly expanding NORC's portfolio of business and research programs; and
- Provided leadership in the social science research community - selected to be a Fellow of the American Statistical Association (ASA), elected to serve a term as Chair of the Social Statistics Section of the ASA, and chaired the 2009 ASA Committee on Fellows.  Also elected as a member of the Committee on National Statistics, serving on two National Academy of Sciences panels addressing 2010 and 2020 Census concerns.

As Executive Vice President of Survey Operations (2002 – 2008), I provided oversight and direction to the Economics, Labor Force, and Demography Research Department, the Statistics and Methodology Department, and Survey Operations for field and telephone data collection. My major accomplishments included:

- Provided leadership and guidance for a major corporate initiative, the National Immunization Survey, which is conducted on behalf of the Centers for Disease Control and Prevention, and is the largest telephone survey in the United States conducted via random digit dialing for scientific purposes.
- Significantly increased the productivity and cost effectiveness of NORC's overall data collection activities;
- Successfully utilized skills in directing large project start-ups, and in managing large complex operations, directing the project through the completion of the first contract phase, which included the first year of data collection and the delivery of the first data set; and
- All survey operations were completed on schedule, and within budget including the delivery of an extremely complex data set, and a public use file.

**Principal Associate Director and Associate Director for Decennial Census Programs, United States Census Bureau – 1998 to July 2002**

Served as the senior career executive responsible for all aspects of the 2000 Decennial Census. This was the largest peacetime mobilization undertaken by the U.S. government, with a budget of $6.5 billion, establishment of over 500 field offices, a temporary workforce that peaked at over 500,000, and establishment of telephone capacity to receive over 5 million calls over a period of one month. I was also chairman and director of the Executive Steering Committee for Accuracy & Coverage Evaluation Policy for the 2000 Census. This Committee was charged with making a recommendation as to whether or not to adjust the 2000 Census redistricting data for coverage errors, an issue fraught with political disagreement and controversy. This work was widely recognized as superb – with the Committee's recommendation supported by numerous reviews, including the National Academy of Sciences Panel on evaluating Census 2000.

## EDUCATION

| | |
|---|---|
| M.S. | Virginia Polytechnic Institute and State University, 1975 Mathematics Graduate course work in statistics - George Washington University 1977-1981 |
| B.S. | Virginia Polytechnic Institute and State University, 1973 Mathematics |

## PROFESSIONAL SERVICE AND ASSOCIATIONS

American Statistical Association, 1975 to Present

Chair, Social Statistics Section – 2011

Chair, ASA Committee on Fellows - 2009

National Academy of Sciences,

Member of the Committee on National Statistics – 2011 - 2013

Member of the Panel on the Design of the 2010 Census Program of Evaluations and Experiments

Member of the Panel to Review the 2010 Census

## HONORS AND AWARDS

Virginia Tech College of Science Hall of Distinction inaugural class, 2013

Presidential Rank Award of Meritorious Executive, 2001

Department of Commerce, Gold Medal, U.S. Bureau of the Census, 2000

Elected Fellow of the American Statistical Association, 2000

Department of Commerce, Silver Medal, U.S. Bureau of the Census, 1998

Department of Commerce, Bronze Medal, U.S. Bureau of the Census, 1988

## PAPERS AND PUBLICATIONS

2012     Thompson, John H. (Panel Member). "Panel Discussion: Considering Changing Sectors in the Research Industry?: Advice From Those Who Have Done It!" AAPOR 67th Annual Conference, Orlando, Florida, May 19, 2012

2012     Thompson, John H. (Discussant). "Future is Now: Realignment of Current Survey Management and Operations at the Census Bureau". Population Association of America 2012 Annual Meeting, San Francisco, California, May 4, 2012.

2012     Thompson, John H. (Discussant). "Use of Administrative Records in the 2020 Census." Federal Committee on Statistical Methodology, Washington, DC., January 10, 2012

2011     Weinberg, Daniel H. and Thompson, John H., "Organization and Administration of the 2010 U.S. Census." In Margo J. Anderson, Constance F. Citro, and Joseph J. Salvo (eds.) *Encyclopedia of the U.S. Census,* Second Edition, CQ Press., July 2011

2010     Thompson, John H., "Challenges, Innovation and Quality for the 21st Century" Keynote Speech at the 2010 FCSM Statistical Policy Seminar, Washington, DC, December 14, 2010.

2010     Thompson, John H., "The Future of Survey Research:  Opportunities and Challenges" Paper presented at the Applied Demography Conference, San Antonio, Texas., January 11, 2010 and at the Population Association of America 2010 Annual meeting, Dallas, Texas, April 15, 2010.

2008     Thompson, John H. (Panel Member). "Panel Discussion: The American Community Survey: Promise, Products and Perspectives." Population Association of America Annual Meeting, New Orleans, Louisiana, April 17, 2008.

2006     Thompson, John H. (Discussant). "Census 2010: A New Census for the 21st Century." Population Association of America Annual Meeting, Los Angeles, California, March 30, 2006.

2004     Thompson, John H., "Interviewer Falsification of Survey Data." Paper presented at the Joint Meetings of the American Statistical Association, Toronto, Canada, August 11, 2004.

2003     Thompson, John H., "Is Interviewer Falsification Scientific Misconduct?" Roundtable paper presented at the American Association for Public Opinion Research 58th Annual Conference, Nashville, Tennessee, May 16, 2003.

2002     Thompson, John H. (Discussant). "Eliminating the 2010 Census Long Form? – Current Status of the American Community Survey." Population Association of America Annual Meeting, Atlanta, Georgia, May 9, 2002.

2001     Thompson, John H., "Decision on Release of Statistically Corrected Redistricting Data." Invited paper presented at the Joint Meetings of the American Statistical Association, Atlanta Georgia, August 6, 2001.

1999    Thompson, John H., "Census 2000 – Innovations and New Technology." Paper presented at the Economic Commission for Europe's Conference of European Statisticians Meeting, Geneva, Switzerland, February 15-17, 1999.

1998    Thompson, John H. and Robert E. Fay, "Census 2000: The Statistical Issues." Paper presented at the Joint Meetings of the American Statistical Association, Dallas, Texas, August 9-13, 1998.

1996    Thompson, John H. and Karen Mills, "Census 2000 Content: Tradeoffs on Cost, Quality, and Quantity." Paper presented at the Annual Meeting of the Population Association of America, New Orleans, Louisiana, May 9-11, 1996.

1995    Thompson, John H., Mary H. Mulry, Susan M. Miskura, "Census 2000: Statistical Issues in Reengineering the Decennial Census." Paper presented at the Annual Meeting of the American Statistical Association, Orlando, Florida, August 13-17, 1995.

1992    Fay, Robert E. and John H. Thompson, "The 1990 Post-Enumeration Survey: Statistical Lessons in, Hindsight." Paper presented at the Annual Research Conference, March 22-25, 1992, Arlington, Virginia.

1989    Edson, Robert G. and John H. Thompson, "1990 Decennial Census Coverage Improvement Program." Paper presented at the Annual Winter Meetings of the American Statistical Association, San Diego, California, January, 1989.

1988    Navarro, Alfredo, John H. Thompson, and Linda Flores-Baez, "Results of Data Switching Simulation." Paper presented to the Census Advisory Committees at the Joint Advisory Committee Meetings, Oxon Hill, Maryland, April, 1988.

1987    Griffin, Richard A. and John H. Thompson, "Confidentiality Techniques for the 1990 Census." Paper presented to the Census Advisory Committees at the Joint Advisory Committee Meetings, Oxon Hill, Maryland, October, 1987.

        U.S. Bureau of the Census, "Programs to Improve Coverage in the 1980 Census," by John H. Thompson. Evaluation and Research Reports, PHC80-E3.

1986    Thompson, John H. and David Franklin, 'Test Census Results and Applications for the 1990 Planning." Paper presented at the Census Bureau Second Annual Research Conference, Reston, Virginia, March, 1986.

1984    Miskura, Susan M., John H. Thompson, Henry F. Woltman, "Uses of Sampling for the Census Count." Paper presented at the Annual Meeting of the American Statistical Association, Philadelphia, Pennsylvania, August, 1984.

        Fan, Milton C., Martha L. Sutt, and John H. Thompson, "Evaluation of the 1980 Census Precanvass Coverage Improvement Program." Paper presented at the Annual Meeting of the American Statistical Association, Philadelphia, Pennsylvania, August, 1984.

        Keeley, Catherine and John H. Thompson, "The 1980 Census Nonhousehold Sources Program." Paper presented at the Annual Meeting of the American Statistical Association, Philadelphia, Pennsylvania, August, 1984.

1983    Miskura, Susan M. and John H. Thompson, "1980 Census Findings and Their Implications for 1990 Census Planning." Presented at the Joint Statistical Meetings, Toronto, Canada, August, 1983.

|      | Taeuber, Cynthia and John H. Thompson, "1980 Census Data: The Quality of the Data and Some Anomalies."  Paper presented at the Annual Meeting of the Population Association of America, April, 1983. |
|------|---|
| 1982 | Fan, Milton C., John H. Thompson, Jay Kim, and Henry F. Woltman, "Sample Design, Estimation and Presentation of Sampling Errors for the 1980 Census Early Publications National Sample." Paper presented at the Annual Meetings of the American Statistical Association, Chicago, Illinois, August, 1982. |
| 1981 | Woltman, Henry F., Susan M. Miskura, John H. Thompson, and Peter A. Bounpane, "1980 Census Weighting and Variance Estimation Studies, Design and Methodology."  Paper presented at the Annual Meetings of the American Statistical Association, Detroit, Michigan, August, 1981. |
|      | Kim, Jay, John H. Thompson, Henry F. Woltman, and Stephen M. Vajs, "Empirical Results from the 1980 Census Sample Estimation Study."  Paper presented at the Annual Meetings of the American Statistical Association, Detroit, Michigan, August, 1981. |
|      | Fan, Milton, C., John H. Thompson, and Susan M. Miskura, "1980 Census Variance Estimation Procedure."  Paper presented at the Annual Meetings of the American Statistical Association, Detroit, Michigan, August, 1981. |
|      | Thompson, John H., "Convergence Properties of the Iterative 1980 Census Estimator."  Paper presented at the Annual Meetings of the American Statistical Association, Detroit, Michigan, August, 1981. |
| 1978 | Thompson, John H., "The Nonhousehold Sources Program." Paper presented at the Annual Meetings of the American Statistical Association, San Diego, California, August, 1978. |

**PRIOR EXPERT TESTIMONY**

I have not testified as an expert at trial or by deposition in any case during the last four years.