<u>DECLARATION OF TIMOTHY F. MELLETT</u>

TIMOTHY F. MELLETT, pursuant to the provisions of 28 U.S.C. § 1746, declares as follows:

1.      I am a Deputy Chief in the Voting Section of the Civil Rights Division of the United

States Department of Justice.  I have worked as an attorney in the Voting Section since 1996,

and I have been a Deputy Chief since 2008.  I have been involved in numerous lawsuits

brought by the Department of Justice under Section 2 of the Voting Rights Act, 52 U.S.C. §

10301, which prohibits voting practices and procedures that discriminate on the basis of race,

color, or membership in a language minority group.  I also have been involved in a number

of cases previously litigated by the Department of Justice under Section 5 of the Voting

Rights Act, 52 U.S.C. § 10304.

2.      To help meet its burden of proving vote dilution claims under Section 2 in court, the

Department typically hires external experts to prepare reports for the litigation analyzing the

preconditions to establishing a Section 2 vote dilution claim, as set forth in *Thornburg v.*

*Gingles*, 478 U.S. 30 (1986).  The first *Gingles* precondition is whether the racial or language

minority group is sufficiently numerous and compact to form a majority in a single-member

district (which typically involves creating an illustrative districting map).  The remaining

preconditions involve whether there is racially polarized voting in elections in the jurisdiction

(the second precondition is whether the minority group is politically cohesive and the third

precondition is whether the majority votes sufficiently as a bloc to enable it usually to defeat

the minority's preferred candidate).  The Department also typically hired external experts to

prepare reports when it litigated declaratory judgment cases under Section 5 of the Voting

Rights Act.

3.      The purpose of this declaration is to provide background regarding Dr. Lisa Handley's

work with the United States, including the confidential information provided to Dr. Handley

1

and the confidential communications with her in her capacity as an expert for the United States.  In six different cases under the Voting Rights Act in the last dozen years, the Department has hired Dr. Lisa Handley as its external expert.  Five of these cases were litigated by the United States under Section 2 of the Voting Rights Act, and one was litigated under Section 5 of the Voting Rights Act:  *United States v. City of Eastpointe*, No. 2:17-cv-10079 (E.D. Mich.) (Section 2); *Texas v. United States*, No. 1:11-cv-1303 (D.D.C.) (Section 5); *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex.) (Section 2); *United States v. Village of Port Chester*, No. 1:06-cv-15173 (S.D.N.Y.) (Section 2); *United States v. Euclid City School District Board of Education*, No. 1:08-cv-2832 (N.D. Ohio) (Section 2); and, *United States v. City of Euclid*, No. 1:06-cv-1652 (N.D. Ohio) (Section 2).  I have worked with Dr. Handley as the United States' expert in five of these cases:  *Eastpointe*, *Perez*, *Texas*, *Port Chester* and *Euclid City School District*.  In the sixth case, *City of Euclid*, I am familiar with Dr. Handley's work with the United States, though I did not work on that case.

### *City of Eastpointe*

4.      In early 2017, the United States, through the Voting Section of the Civil Rights Division of the United States Department of Justice, brought a lawsuit under Section 2 of the Voting Rights Act against the City of Eastpointe and city officials in *United States v. City of Eastpointe*.  The United States' complaint alleges that the at-large method of election used by the City of Eastpointe for electing members of its city council results in vote dilution in violation of Section 2.  The litigation remains pending, and the parties are currently awaiting the district court's decision on the City of Eastpointe's motion for summary judgment.  If summary judgment is denied, the case may be set for trial.  I am the supervising attorney for the United States on *City of Eastpointe*.

5.      The Department of Justice has retained Dr. Lisa Handley as one of the United States'

experts in *United States v. City of Eastpointe*.  Dr. Handley signed a Confidentiality

Agreement and Security Certification with the United States that prohibits her from

"reveal[ing], divulg[ing], or publiciz[ing]" any matters dealt with" in her capacity as an

expert retained by the Department of Justice in this case.  Confidentiality Agreement for

*United States v. City of Eastpointe,* ¶ I.A (executed April 4, 2017) (Ex. 1); *see also id.* ¶ IV.B

(disclosure of public record materials permissible but excluding "work product of the

Division" from permissible disclosures).

6.      Dr. Handley has prepared three expert reports (an initial report and two rebuttal reports)

for the Department of Justice in *City of Eastpointe*.  Dr. Handley's initial expert report

discusses the three *Gingles* preconditions to establishing a Section 2 vote dilution claim.  Dr.

Handley crafted an illustrative redistricting plan for the city council for Eastpointe to satisfy

the first *Gingles* precondition, and she conducted an analysis of the racial bloc voting in

Eastpointe, to satisfy the second and third *Gingles* preconditions.

7.      An illustrative plan for the City of Eastpointe was drawn by an employee of the

Department of Justice on the Department's internal Geographic Information System (GIS)

mapping program at Dr. Handley's direction.  In devising the illustrative redistricting plan

for Eastpointe, citizen voting-age population ("CVAP") data from the multi-year American

Community Survey ("ACS") was used as well as total population and voting-age population

("VAP") data from the decennial Census.  This illustrative plan shows that the black

population in Eastpointe is sufficiently large and geographically compact to constitute a

majority in a single-member district, which satisfies the first *Gingles* precondition to a

Section 2 claim.  In Dr. Handley's August 4, 2017 report for the Eastpointe case, she explains

that the smallest level for which the ACS releases CVAP data by race is the census block group and that the data must be allocated down to the block level for mapping purposes. The United States engaged in confidential communications with Dr. Handley about the disaggregation methods used to allocate ACS CVAP data to the census block level.

8. Regarding the second and third *Gingles* preconditions, Dr. Handley analyzed voting patterns in Eastpointe to determine whether racial bloc voting exists in the city. While the total votes cast for each candidate in elections are available for each voting precinct in a jurisdiction like Eastpointe, experts must choose how to determine or estimate the racial characteristics of the voters who cast those ballots, in order to estimate levels of racial bloc voting. The most accurate way to estimate voters' preferences is to look at the voters who cast a ballot in the election. While Michigan maintains records of the voters who participated in each election, Michigan does not gather or maintain data regarding the race of voters, unlike some states.

9. Where voter turnout data by race cannot be used to help estimate racial bloc voting, experts have relied on other estimates of racial data, such as the racial share of the CVAP or VAP residing in each voting precinct in a jurisdiction.

10. CVAP data from the ACS is a survey estimate available only for larger areas, such as census block groups and tracts, whereas VAP data from the decennial census is available as an enumeration in each census block. On the other hand, CVAP data from the ACS is available on an updated basis across the decade and incorporates citizenship data, whereas VAP data from the decennial census does not take into account demographic changes across a decade or potentially disparate rates of citizenship between racial groups. The United

States engaged in confidential communications with Dr. Handley about the various strengths and limitations of these data.

11.     Given the limitations involved in using demographic data for voting precincts as an estimate for the set of voters who participated in a particular election, in *City of Eastpointe*, Dr. Handley used Bayesian Improved Surname Geocoding ("BISG") as the method to estimate the racial composition of the group of individuals who cast ballots in each precinct. BISG relies on two data points about each individual: surname and residential address.  Both surname and residential address provide some information about the likelihood of each individual's race, and BISG uses Bayes' rule (a statistical principle) to provide a more likely estimate of the cumulative racial composition of the group.  Dr. Handley and the United States engaged in numerous confidential communications about the use of this method.

12.     Regarding the estimation of the surname data point in BISG, the 2010 Census has tabulated the race and ethnicity of all individuals with each particular surname, and the Census Bureau has determined the probability that an individual with a given surname is a member of certain racial or ethnic groups.  *See* U.S. Census Bureau, *Frequently Occurring Surnames from the 2010 Census*, *at*

https://www.census.gov/topics/population/genealogy/data/2010_surnames.html

13.     Regarding the residential address data point in BISG, each voter's address is assigned to a census block group or tract.  Then, ACS data is used to determine the racial and ethnic characteristics of the residents of this block group or tract.  In using this process, the United States again engaged in confidential communications with Dr. Handley about this method, including in discussion of drafts of her report.

14.     On September 7, 2018, the Department of Justice received an expert report by Dr. Handley on behalf of plaintiffs in *New York Immigration Coalition v. U.S. Department of Commerce* (S.D.N.Y.), a case in which the defendants are officers and agencies of the United States.  Dr. Handley did not inform me or others in the Voting Section that she intended to offer an opinion in the *New York Immigration Coalition* case, or that she intended to use her work for the United States in the *City of Eastpointe* and other Voting Rights Act cases discussed in this declaration in a report in the *New York Immigration Coalition* case.

15.     Upon review of that report, it appears that Dr. Handley has used her work as an expert on behalf of the United States in the *City of Eastpointe*, as well as other cases discussed below, to testify against the United States in *New York Immigration Coalition.*  In particular, Dr. Handley's report cited the estimation of "CVAP by race and ethnicity by precinct based on the [American Community Survey] to conduct a racial bloc voting analysis on behalf of the U.S. Department of Justice in voting rights litigation currently underway" in *City of Eastpointe*.  N.Y. Immigration Coal. Rep. 15-16, n. 18 compared to Eastpointe Rep. 7 ("substituting 2010 VAP by race with black and white CVAP based on the ACS . . . [b]ut it does not solve the problem of differential turnout rates across racial groups").

16.     Dr. Handley has received numerous confidential communications and voluminous confidential information from Department of Justice attorneys and staff regarding CVAP data related to her work in the *City of Eastpointe* case.  Cross-examination in the *New York Immigration Coalition* case regarding the various methods of allocating CVAP data to the block level, and their strengths and limitations, almost certainly would require divulging confidential communications with the United States in *City of Eastpointe*.  Likewise, cross-examination on the decisions made regarding her racial bloc voting analysis in her work on

*City of Eastpointe* would also almost certainly require divulging privileged information and confidential communications with the United States.

**Texas Redistricting Cases**

17.     Dr. Handley also references her work in *Texas v. United States* and *Perez v. Perry*, which are cases regarding statewide redistricting in the State of Texas after the 2010 Census.  In *Texas v. United States*, Texas sought preclearance under Section 5 of the Voting Rights Act for the 2011 redistricting plans for Congress, State House and State Senate.  In *Perez v. Perry*, the United States and private plaintiffs challenged Texas's 2011 congressional and state house redistricting plans under Section 2 of the Voting Rights Act, among other claims. The United States initially participated as amicus in *Perez* and later intervened as a plaintiff. *Perez* remains pending in the district court, on remand from the Supreme Court.  I have been the supervising attorney for the United States in both matters.

18.     Dr. Handley has served as an expert for the United States in both cases.  Dr. Handley signed confidentiality agreements related to her work in both matters, which are the same in substance as the one she signed in relation to *City of Eastpointe*.  *See* Confidentiality Agreement for *Texas v. United States* (executed August 10, 2011) (Ex. 2) and Confidentiality Agreement for *Perez v. Perry* (executed April 23, 2014) (Ex. 3).

19.     In Dr. Handley's report in *New York Immigration Coalition*, she discusses a district-specific, functional approach to election analysis and represents that in her analysis in *Texas v. United States*, citizenship rates are taken into account only indirectly.  She explains that her analysis there follows the functional approach suggested by the United States and that looking at citizenship rates is therefore unnecessary.  N.Y. Immigration Coal. Rep. 16-17.

20.     The development of the functional approach in the Texas redistricting cases in fact begins by looking at population.  In her expert reports in *Texas v. United States*, Dr. Handley acknowledges that her analysis in that Section 5 case starts with the demographic composition of the districts under the State's prior plans, known as benchmark districts.

21.     Dr. Handley's district-specific, functional analysis in *Texas v. United States* used indices to evaluate the ability of minority voters to elect their candidate of choice.  The endogenous index addressed whether minority voters were able to elect a preferred candidate for the office at issue (e.g., congressional representative), and the exogenous index concerned whether minority voters in statewide and other elections were able to elect their candidates of choice.  Dr. Handley then looked at reconstituted elections in the proposed redistricting plan to gauge whether the ability to elect increased, decreased, or stayed the same.  Dr. Handley developed the indices in confidential consultation with the Department to evaluate the benchmark and proposed redistricting plans under Section 5.  Cross-examination regarding these points would almost certainly require divulging confidential communications.

22.     Dr. Handley also used a district-specific functional analysis in the Section 2 litigation in *Perez*, although her role involved examining only one congressional district (CD 23) in a rebuttal report to an expert for the State of Texas.  Dr. Handley looked at whether the district would be able to elect a candidate of choice of Hispanic voters in the proposed redistricting plan compared to the benchmark plan.  Dr. Handley also looked at voter turnout in areas removed from the benchmark plan and turnout in the proposed redistricting plan.  Cross-examination regarding these points would almost certainly require divulging confidential communications.

23.     When the United States was an amicus in *Perez*, the United States also provided the court with one of Dr. Handley's expert reports from *Texas v. United States* as well as illustrative plans designed by Dr. Handley to show a viable remedy in CD 23.  The development of illustrative maps for CD 23 also involved confidential communications with the United States.

### *Village of Port Chester*

24.     In the expert report in *New York Immigration Coalition*, Dr. Handley also references her expert work in *United States v. Village of Port Chester*, where the Department challenged the method of election for the village board under Section 2 of the Voting Rights Act.  N.Y. Immigration Coal. Rep. at 11-12.  I was a trial attorney for the United States on *Village of Port Chester*.

25.     Dr. Handley conducted a racial bloc voting analysis in *Village of Port Chester*.  Dr. Handley notes in her expert report in that case that she was unable to derive reliable estimates for Hispanic voters in Port Chester using voting age and citizen voting age population data.  Therefore, Dr. Handley had to look at a smaller subset of elections for which Port Chester had available voter registration data.  Dr. Handley also did not perform an analysis of the first *Gingles* precondition for the United States in that matter; nor did she prepare an illustrative districting plan for the United States in that case.

26.     The United States filed its complaint in *Village of Port Chester* in 2006, and Dr. Handley's work for the United States in that case was performed prior to the availability of ACS data.

**Euclid Cases**

27.     Dr. Handley has been an expert for the United States in two additional cases—*United States v. City of Euclid* and *United States v. Euclid City School District*.  In both cases, the United States challenged at-large methods of election as diluting the opportunity for black voters to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act.  I was the supervising attorney in *Euclid City School District*, and I am generally familiar with the United States' work on the *City of Euclid*, although I did not work on that case.

28.     In *City of Euclid*, Dr. Handley reviewed an illustrative map drawn by GIS specialist at the Department of Justice in determining that the map established the first *Gingles* precondition. In *Euclid City School District*, Dr. Handley designed illustrative maps for a remedy using the GIS system on a computer at the Department of Justice and with the help of a GIS specialist at the Department.  Dr. Handley used VAP data to draw the districts because citizenship rates were not an issue in that case.

29.     The United States filed *City of Euclid* in 2006 and *Euclid City School District* in 2008. Dr. Handley did not use ACS data, which was not yet available, in her work for the United States in *City of Euclid* or *Euclid City School District*.

30.     In *City of Euclid*, Dr. Handley also did a racial bloc voting analysis relying on VAP data allocated to precincts by a GIS specialist at the Department of Justice for elections occurring from 1995-2000.  For elections occurring after 2000, Dr. Handley used the VAP allocation by NODIS, a source of redistricting data for the State of Ohio.  Although Dr. Handley primarily relied in *Euclid City School District* case on the racial bloc voting report she had

prepared for the *City of Euclid*, she also did a similar racial bloc voting analysis for two school board contests.

## Conclusion

31.     Given Dr. Handley's reliance upon the work she performed for the United States in the voting rights cases described above in the course of rendering her opinions in *New York Immigration Coalition*, it is hard to envision how the Department could effectively cross-examine Dr. Handley about the bases for her opinions regarding that work without risking of disclosure of confidential information.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        October 26, 2018
              Washington, District of Columbia


                              TIMOTHY F. MELLETT

# Exhibit 1

# Exhibit 1

**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**

**CONFIDENTIALITY AGREEMENT AND SECURITY CERTIFICATION**
**FOR CONSULTANT OR EXPERT WITNESS**

I, Lisa R. Handley,                          solemnly swear (or affirm) that I understand the high standards of trustworthiness and integrity required of me with regard to materials and information which may come to my attention in connection with Department of Justice case/matter Eastpointe, MI, Section 2 case DJ 166-37-13, while I am employed as a contractor with the Civil Rights Division.

This contract has been designated to include the following information:

☐  Sensitive and/or Personally Identifiable Information (PII) and therefore contractor must meet all the requirements identified below.

☒  Non-sensitive and Non-PII data, and therefore is not subject to Section II, Security of Systems and Data. Section I, Non-Disclosure of Confidential Information and Section IV, Amendment is applicable.

**I.    Non-Disclosure of Confidential Information**

A.    Except, as necessary, to the performance of my duties under this contract, I will not:

1.    Reveal, divulge or publicize any matters dealt with under this contract.

2.    Disseminate any oral or written information or electronic data obtained as a result of execution of this contract, except those disclosures specifically authorized in writing by the Civil Rights Division Attorney.

3.    Remove any document, whether in paper or electronic format, from the place of contract performance, except as approved, in advance by the Civil Rights Division Attorney whose name appears below.

B.    I understand that should I make any unauthorized disclosure(s) of confidential information, the terms of the Default Clause contained in FAR 52.249-8 (48 C.F.R.), incorporated herein by reference, may be invoked and that I will be considered to be in breach of this contract.

**II.   Security of Systems and Data, Including PII**

A.    I understand that the work to be performed under this contract requires the handling of data that originated within the Civil Right Division, data that the contractor manages or acquires for the Division, and/or data that is acquired in order to perform the contract and concerns Division programs or personnel.

For all systems handling such data, other than DOJ provided computers or other electronic devices, I shall comply with all security requirements applicable to Department of Justice systems, including but not limited to all Executive Branch system security requirements (*e.g.,* requirements imposed by Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), DOJ IT Security Standards, and DOJ Order 2640.2F.  In addition, upon

---

The term "personally identifiable information," as defined by OMB, means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

request, I shall provide Civil Rights Division access to and information regarding my policies and procedures for deleting all electronic data provided to me by the Civil Rights Division from my computer systems at the end of the contract period.

To the extent that I process or use confidential Division-provided data on a non-government laptop or other media storage device, I hereby certify that I have complied with the following requirements:

1)      Laptop(s) employ encryption using a NIST Federal Information Processing Standard (FIPS) Pub 140-2, Security Requirements for Cryptographic Modules, approved product;

2)      The contract has developed and implemented a process to ensure that security and other applications software is kept up-to-date;

3)      Mobile computing devices will utilize anti-viral software and a host-based firewall mechanism.

4)      Log all computer-readable data extracts from databases holding sensitive information and verify to the Department that each extract including sensitive data has been erased within 90 days or its use is still required.  All DOJ information is sensitive information unless designated as non-sensitive by the Department;

5)      Contractor-owned removable media, such as removable hard drives, flash drives, CDs, and floppy disks, containing DOJ data, shall not be removed from DOJ facilities unless encrypted using a NIST FIPS 140-2 approved product;

6)      When data is no longer needed, all removable media and laptop hard drives shall be processed (sanitized, degaussed, or destroyed) in accordance with security requirements applicable to DOJ;

7)      Contracting firms shall keep an accurate inventory of devices used on DOJ contracts;

8)      Rules of behavior must be signed by users. These rules shall address at a minimum: authorized and official use; prohibition against unauthorized users; and protection of sensitive data ad personally identifiable information;

9)      All DOJ data will be removed from contractor-owned laptops upon termination of contractor work. This removal must be accomplished in accordance with DOJ IT Security Standard requirements. Certification of data removal will be performed by the contractor's project manager and a letter confirming certification will be delivered to the Contracting Officer (CO) within 15 days or termination of contractor work.

B.      By acceptance of, or performance on, this contract, I agree that, with respect to the data identified in paragraph IIa, in the event of any actual or suspected breach of such data (*i.e.*, loss of control, compromise, unauthorized disclosure, access for an unauthorized purpose, or other unauthorized access, whether physical or electronic), I shall immediately (and in no event later than within one hour of discovery) report the breach to the Division's Contracting Officer (CO) at 202-514-2222 and the contracting officer's technical representative (COTR) listed in the Statement of Work.

If the data breach occurs outside of regular business hours and neither the CO nor COTR can be reached, I will call the DOJ Computer Emergency Readiness Team (DOJCERT) at 1-866-US4-CERT (1-866-874-2378) within one hour of discovery of the breach.  I will also notify the CO as soon as possible during regular business hours.

I further certify that I have a security policy in place that contains procedures to promptly notify any individual whose personally identifiable information (as defined by OMB) was, or is reasonably believed to have been, breached.  Any notification shall be coordinated with the CO and COTR, and shall not proceed until the Division has made a determination that notification would not impede a law enforcement investigation or jeopardize national security.  The method and content of any notification shall be coordinated with, and be subject to the approval of, the Division.  I assume full responsibility for taking corrective action consistent with the

Department's, Incident Response Procedures for Data Breaches Involving Personally Identifiable Information (v1.6, August 7, 2008), which may include offering credit monitoring when appropriate.

The security requirements set forth in this Section II, apply to all subcontractors who perform work in connection with this contract. For each subcontractor, I will certify that I have required the subcontractor to adhere to all such requirements. I understand that I will be responsible for any breach by a subcontractor of any of the provisions set forth in this clause.

## III. Return of Division Equipment/Materials

In an effort to assist contractors in meeting the IT security requirements outlined in this agreement, the Civil Rights Division may, on a loaner basis, provide either of the following piece of equipment: laptop, hard drive, flash drive. Request for loaner equipment should be made in writing to the CO or COTR listed in the Statement of Work or on the order.

☐   Place a check in the box if you will be using DOJ issued equipment to comply with security guidelines.

I understand that all materials provided by the Civil Rights Division, including any copies, notes or working papers derived or produced there from, are the property of the United States Government. In addition, I understand that all electronic data, whether saved on a Division-provided or non-government laptop or any other media storage device, is the property of the United States Government. If required to do so, by the Division's Contracting Officer or Trial Attorney, I will promptly surrender such materials and derived copies, notes and/or working papers which are in my custody or control.

I understand that my failure to surrender such materials promptly, or my conversion of such materials to a use not called for by the contract (*e.g.* delivery or emailing a document, or a copy thereof, or notes contain information taken from the document to someone not working on this contract), may be a violation of 18 U.S.C.-§641 (theft of Government property) and may subject me to fines (up to $10,000) and imprisonment (up to 10 years). Following my return of all Division property and deletion of electronic data on my computer systems, I will certify to the Division my compliance with this paragraph.

## IV. Amendment; application of contract provisions

A.   In accordance with contract provision, this Agreement may be formally modified or changed by the Division in those instances in which the courts (*e.g.* civil investigative demands), or specific circumstances dictate such a modification change.

B.   The above clauses are not meant to apply to materials which are matters of public record or available to interested parties upon request from the Division; but are intended to apply to privileged documents and internal memoranda and other work product of the Division.

C.   This Agreement does not preclude me from quoting my research, work product and trial testimony occasioned by my status in Departmental litigation in subsequent academic research and teaching activities, as long as that research, etc. is not based on confidential information.

4/4/17
Date

*Signature*
Signature of Contractor

4/4/17
Date

*Signature*
Signature of Division Attorney

# Exhibit 2

# Exhibit 2

**U.S. DEPARTMENT OF JUSTICE**
**CIVIL RIGHTS DIVISION**

## CONFIDENTIALITY AGREEMENT AND SECURITY CERTIFICATION
## FOR CONSULTANT OR EXPERT WITNESS

I, Lisa Handley _____ solemnly swear (or affirm) that I understand the high standards of trustworthiness and integrity required of me with regard to materials and information which may come to my attention in connection with Department of Justice case/matter State of Texas v. United States, C.A. No. 1:11-cv-01303 while I am employed as a contractor with the Civil Rights Division.

This contract has been designated to include the following information:

☐ Sensitive and/or Personally Identifiable Information (PII) and therefore contractor must meet all the requirements identified below.

☒ Non-sensitive and Non-PII data, and therefore is not subject to Section II, Security of Systems and Data. Section I, Non-Disclosure of Confidential Information and Section IV, Amendment is applicable.

**I.      Non-Disclosure of Confidential Information**

A.      Except, as necessary, to the performance of my duties under this contract, I will not:
1.      Reveal, divulge or publicize any matters dealt with under this contract.

2.      Disseminate any oral or written information or electronic data obtained as a result of execution of this contract, except those disclosures specifically authorized in writing by the Civil Rights Division Attorney.

3.      Remove any document, whether in paper or electronic format, from the place of contract performance, except as approved, in advance by the Civil Rights Division Attorney whose name appears below.

B.      I understand that should I make any unauthorized disclosure(s) of confidential information, the terms of the Default Clause contained in FAR 52.249-8 (48 C.F.R.), incorporated herein by reference, may be invoked and that I will be considered to be in breach of this contract.

**II.      Security of Systems and Data, Including PII**

A.      I understand that the work to be performed under this contract requires the handling of data that originated within the Civil Right Division, data that the contractor manages or acquires for the Division, and/or data that is acquired in order to perform the contract and concerns Division programs or personnel.

For all systems handling such data, other than DOJ provided computers or other electronic devices, I shall comply with all security requirements applicable to Department of Justice systems, including but not limited to all Executive Branch system security requirements (*e.g.,* requirements imposed by Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), DOJ IT Security Standards, and DOJ Order 2640.2F.  In addition, upon

---

The term "personally identifiable information," as defined by OMB, means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

request, I shall provide Civil Rights Division access to and information regarding my policies and procedures for deleting all electronic data provided to me by the Civil Rights Division from my computer systems at the end of the contract period.

To the extent that I process or use confidential Division-provided data on a non-government laptop or other media storage device, I hereby certify that I have complied with the following requirements:

1) Laptop(s) employ encryption using a NIST Federal Information Processing Standard (FIPS) Pub 140-2, Security Requirements for Cryptographic Modules, approved product;

2) The contract has developed and implemented a process to ensure that security and other applications software is kept up-to-date;

3) Mobile computing devices will utilize anti-viral software and a host-based firewall mechanism.

4) Log all computer-readable data extracts from databases holding sensitive information and verify to the Department that each extract including sensitive data has been erased within 90 days or its use is still required. All DOJ information is sensitive information unless designated as non-sensitive by the Department;

5) Contractor-owned removable media, such as removable hard drives, flash drives, CDs, and floppy disks, containing DOJ data, shall not be removed from DOJ facilities unless encrypted using a NIST FIPS 140-2 approved product;

6) When data is no longer needed, all removable media and laptop hard drives shall be processed (sanitized, degaussed, or destroyed) in accordance with security requirements applicable to DOJ;

7) Contracting firms shall keep an accurate inventory of devices used on DOJ contracts;

8) Rules of behavior must be signed by users. These rules shall address at a minimum: authorized and official use; prohibition against unauthorized users; and protection of sensitive data ad personally identifiable information;

9) All DOJ data will be removed from contractor-owned laptops upon termination of contractor work. This removal must be accomplished in accordance with DOJ IT Security Standard requirements. Certification of data removal will be performed by the contractor's project manager and a letter confirming certification will be delivered to the Contracting Officer (CO) within 15 days or termination of contractor work.

B. By acceptance of, or performance on, this contract, I agree that, with respect to the data identified in paragraph IIa, in the event of any actual or suspected breach of such data (*i.e.,* loss of control, compromise, unauthorized disclosure, access for an unauthorized purpose, or other unauthorized access, whether physical or electronic), I shall immediately (and in no event later than within one hour of discovery) report the breach to the Division's Contracting Officer (CO) at 202-514-2222 and the contracting officer's technical representative (COTR) listed in the Statement of Work.

If the data breach occurs outside of regular business hours and neither the CO nor COTR can be reached, I will call the DOJ Computer Emergency Readiness Team (DOJCERT) at 1-866-US4-CERT (1-866-874-2378) within one hour of discovery of the breach. I will also notify the CO as soon as possible during regular business hours.

I further certify that I have a security policy in place that contains procedures to promptly notify any individual whose personally identifiable information (as defined by OMB) was, or is reasonably believed to have been, breached. Any notification shall be coordinated with the CO and COTR, and shall not proceed until the Division has made a determination that notification would not impede a law enforcement investigation or jeopardize national security. The method and content of any notification shall be coordinated with, and be subject to the approval of, the Division. I assume full responsibility for taking corrective action consistent with the

Department's, Incident Response Procedures for Data Breaches Involving Personally Identifiable Information (v1.6, August 7, 2008), which may include offering credit monitoring when appropriate.

The security requirements set forth in this Section II, apply to all subcontractors who perform work in connection with this contract. For each subcontractor, I will certify that I have required the subcontractor to adhere to all such requirements. I understand that I will be responsible for any breach by a subcontractor of any of the provisions set forth in this clause.

## III. Return of Division Equipment/Materials

In an effort to assist contractors in meeting the IT security requirements outlined in this agreement, the Civil Rights Division may, on a loaner basis, provide either of the following piece of equipment: laptop, hard drive, flash drive. Request for loaner equipment should be made in writing to the CO or COTR listed in the Statement of Work or on the order.

☐   Place a check in the box if you will using DOJ issued equipment to comply with security guidelines.

I understand that all materials provided by the Civil Rights Division, including any copies, notes or working papers derived or produced there from, are the property of the United States Government. In addition, I understand that all electronic data, whether saved on a Division-provided or non-government laptop or any other media storage device, is the property of the United States Government. If required to do so, by the Division's Contracting Officer or Trial Attorney, I will promptly surrender such materials and derived copies, notes and/or working papers which are in my custody or control.

I understand that my failure to surrender such materials promptly, or my conversion of such materials to a use not called for by the contract (*e.g.* delivery or emailing a document, or a copy thereof, or notes contain information taken from the document to someone not working on this contract), may be a violation of 18 U.S.C.-§641 (theft of Government property) and may subject me to fines (up to $10,000) and imprisonment (up to 10 years). Following my return of all Division property and deletion of electronic data on my computer systems, I will certify to the Division my compliance with this paragraph.

## IV. Amendment; application of contract provisions

A.   In accordance with contract provision, this Agreement may be formally modified or changed by the Division in those instances in which the courts (*e.g.* civil investigative demands), or specific circumstances dictate such a modification change.

B.   The above clauses are not meant to apply to materials which are matters of public record or available to interested parties upon request from the Division; but are intended to apply to privileged documents and internal memoranda and other work product of the Division.

C.   This Agreement does not preclude me from quoting my research, work product and trial testimony occasioned by my status in Departmental litigation in subsequent academic research and teaching activities, as long as that research, etc. is not based on confidential information.

Date  8/ 10/ 2011

Signature of Contractor

Date  8/ 11/ 2011

Signature of Division Attorney

# Exhibit 3

# Exhibit 3

## U.S. DEPARTMENT OF JUSTICE
## CIVIL RIGHTS DIVISION

## CONFIDENTIALITY AGREEMENT AND SECURITY CERTIFICATION
## FOR CONSULTANT OR EXPERT WITNESS

I, Lisa R. Handley,                                solemnly swear (or affirm) that I understand the high standards of trustworthiness and integrity required of me with regard to materials and information which may come to my attention in connection with Department of Justice case/matter Perez v. Perry, 11-CA-360 (W.D. Texas), DJ 166-76-140, while I am employed as a contractor with the Civil Rights Division.

This contract has been designated to include the following information:

☐    Sensitive and/or Personally Identifiable Information (PII) and therefore contractor must meet all the requirements identified below.

☒    Non-sensitive and Non-PII data, and therefore is not subject to Section II, Security of Systems and Data. Section I, Non-Disclosure of Confidential Information and Section IV, Amendment is applicable.

**I.**    **Non-Disclosure of Confidential Information**

    A.    Except, as necessary, to the performance of my duties under this contract, I will not:

        1.    Reveal, divulge or publicize any matters dealt with under this contract.

        2.    Disseminate any oral or written information or electronic data obtained as a result of execution of this contract, except those disclosures specifically authorized in writing by the Civil Rights Division Attorney.

        3.    Remove any document, whether in paper or electronic format, from the place of contract performance, except as approved, in advance by the Civil Rights Division Attorney whose name appears below.

    B.    I understand that should I make any unauthorized disclosure(s) of confidential information, the terms of the Default Clause contained in FAR 52.249-8 (48 C.F.R.), incorporated herein by reference, may be invoked and that I will be considered to be in breach of this contract.

**II.**    **Security of Systems and Data, Including PII**

    A.    I understand that the work to be performed under this contract requires the handling of data that originated within the Civil Right Division, data that the contractor manages or acquires for the Division, and/or data that is acquired in order to perform the contract and concerns Division programs or personnel.

        For all systems handling such data, other than DOJ provided computers or other electronic devices, I shall comply with all security requirements applicable to Department of Justice systems, including but not limited to all Executive Branch system security requirements (*e.g.,* requirements imposed by Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), DOJ IT Security Standards, and DOJ Order 2640.2F. In addition, upon

---

The term "personally identifiable information," as defined by OMB, means any information about an individual maintained by an agency, including, but not limited to, education, financial transactions, medical history, and criminal or employment history and information which can be used to distinguish or trace an individual's identity, such as their name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

request, I shall provide Civil Rights Division access to and information regarding my policies and procedures for deleting all electronic data provided to me by the Civil Rights Division from my computer systems at the end of the contract period.

To the extent that I process or use confidential Division-provided data on a non-government laptop or other media storage device, I hereby certify that I have complied with the following requirements:

1) Laptop(s) employ encryption using a NIST Federal Information Processing Standard (FIPS) Pub 140-2, Security Requirements for Cryptographic Modules, approved product;

2) The contract has developed and implemented a process to ensure that security and other applications software is kept up-to-date;

3) Mobile computing devices will utilize anti-viral software and a host-based firewall mechanism.

4) Log all computer-readable data extracts from databases holding sensitive information and verify to the Department that each extract including sensitive data has been erased within 90 days or its use is still required.  All DOJ information is sensitive information unless designated as non-sensitive by the Department;

5) Contractor-owned removable media, such as removable hard drives, flash drives, CDs, and floppy disks, containing DOJ data, shall not be removed from DOJ facilities unless encrypted using a NIST FIPS 140-2 approved product;

6) When data is no longer needed, all removable media and laptop hard drives shall be processed (sanitized, degaussed, or destroyed) in accordance with security requirements applicable to DOJ;

7) Contracting firms shall keep an accurate inventory of devices used on DOJ contracts;

8) Rules of behavior must be signed by users. These rules shall address at a minimum: authorized and official use; prohibition against unauthorized users; and protection of sensitive data ad personally identifiable information;

9) All DOJ data will be removed from contractor-owned laptops upon termination of contractor work. This removal must be accomplished in accordance with DOJ IT Security Standard requirements. Certification of data removal will be performed by the contractor's project manager and a letter confirming certification will be delivered to the Contracting Officer (CO) within 15 days or termination of contractor work.

B. By acceptance of, or performance on, this contract, I agree that, with respect to the data identified in paragraph IIa, in the event of any actual or suspected breach of such data (*i.e.,* loss of control, compromise, unauthorized disclosure, access for an unauthorized purpose, or other unauthorized access, whether physical or electronic), I shall immediately (and in no event later than within one hour of discovery) report the breach to the Division's Contracting Officer (CO) at 202-514-2222 and the contracting officer's technical representative (COTR) listed in the Statement of Work.

If the data breach occurs outside of regular business hours and neither the CO nor COTR can be reached, I will call the DOJ Computer Emergency Readiness Team (DOJCERT) at 1-866-US4-CERT (1-866-874-2378) within one hour of discovery of the breach.  I will also notify the CO as soon as possible during regular business hours.

I further certify that I have a security policy in place that contains procedures to promptly notify any individual whose personally identifiable information (as defined by OMB) was, or is reasonably believed to have been, breached.  Any notification shall be coordinated with the CO and COTR, and shall not proceed until the Division has made a determination that notification would not impede a law enforcement investigation or jeopardize national security.  The method and content of any notification shall be coordinated with, and be subject to the approval of, the Division.  I assume full responsibility for taking corrective action consistent with the

Department's, Incident Response Procedures for Data Breaches Involving Personally Identifiable Information (v1.6, August 7, 2008), which may include offering credit monitoring when appropriate.

The security requirements set forth in this Section II, apply to all subcontractors who perform work in connection with this contract. For each subcontractor, I will certify that I have required the subcontractor to adhere to all such requirements. I understand that I will be responsible for any breach by a subcontractor of any of the provisions set forth in this clause.

## III. Return of Division Equipment/Materials

In an effort to assist contractors in meeting the IT security requirements outlined in this agreement, the Civil Rights Division may, on a loaner basis, provide either of the following piece of equipment: laptop, hard drive, flash drive. Request for loaner equipment should be made in writing to the CO or COTR listed in the Statement of Work or on the order.

☐   Place a check in the box if you will using DOJ issued equipment to comply with security guidelines.

I understand that all materials provided by the Civil Rights Division, including any copies, notes or working papers derived or produced there from, are the property of the United States Government. In addition, I understand that all electronic data, whether saved on a Division-provided or non-government laptop or any other media storage device, is the property of the United States Government. If required to do so, by the Division's Contracting Officer or Trial Attorney, I will promptly surrender such materials and derived copies, notes and/or working papers which are in my custody or control.

I understand that my failure to surrender such materials promptly, or my conversion of such materials to a use not called for by the contract (*e.g.* delivery or emailing a document, or a copy thereof, or notes contain information taken from the document to someone not working on this contract), may be a violation of 18 U.S.C.-§641 (theft of Government property) and may subject me to fines (up to $10,000) and imprisonment (up to 10 years). Following my return of all Division property and deletion of electronic data on my computer systems, I will certify to the Division my compliance with this paragraph.

## IV. Amendment; application of contract provisions

A.   In accordance with contract provision, this Agreement may be formally modified or changed by the Division in those instances in which the courts (*e.g.* civil investigative demands), or specific circumstances dictate such a modification change.

B.   The above clauses are not meant to apply to materials which are matters of public record or available to interested parties upon request from the Division; but are intended to apply to privileged documents and internal memoranda and other work product of the Division.

C.   This Agreement does not preclude me from quoting my research, work product and trial testimony occasioned by my status in Departmental litigation in subsequent academic research and teaching activities, as long as that research, etc. is not based on confidential information.

4/23/14
Date

_Signature of Contractor_

4/23/14
Date

_Signature of Division Attorney_