# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, by and through Attorney General Xavier Becerra,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. Census Bureau; DOES 1-100,<br><br>　　　　　Defendants. | Case No.  3:18-cv-01865 |
| CITY OF SAN JOSE, a municipal corporation; and BLACK ALLIANCE FOR JUST IMMIGRATION, a California Non-Profit Corporation,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of the U.S. Department of Commerce; U.S. DEPARTMENT OF COMMERCE; RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau; U.S. CENSUS BUREAU,<br><br>Defendants. | Case No.  5:18-cv-02279 |

## RULE 26(A)(2)(B) EXPERT REPORT AND DECLARATION OF PAMELA S. KARLAN, PhD

Pursuant to 28 U.S.C. § 1746, I make the following statement.

INTRODUCTION AND BACKGROUND

I am the Kenneth and Harle Montgomery Professor of Public Interest Law at Stanford Law School. My scholarly specialty is constitutional law and litigation, with a special emphasis on legal regulation of the political process. I am the co-author of the leading casebook in the field, *The Law of Democracy: Legal Structure of the Political Process*, now in its fifth edition, as well as dozens of scholarly articles about voting rights. From 1986 to 1988, I served as an assistant counsel at the NAACP Legal Defense and Educational Fund, Inc., where I spent the majority of my time working on cases under section 2 of the Voting Rights Act of 1965 (now codified at 52 U.S.C. § 10301 et seq.). I continued to participate in litigating cases under the Voting Rights Act throughout the decades after I entered teaching. During 2014 and 2015, I served as a Deputy Assistant Attorney General in the Civil Rights Division of the U.S. Department of Justice, where one of my responsibilities was to review the work of the Voting Section and to assist in reviewing the voting rights-related work of the Appellate Section. A full copy of my curriculum vitae is attached to this Report as Appendix A.

On December 12, 2017, Arthur Gary, General Counsel in the Justice Management Division of the U.S. Department of Justice, sent a letter to Ron Jarmin at the Census Bureau of the U.S. Department of Commerce. The full text of that letter ("the Gary letter"), which I obtained from ProPublica's website, is attached to this Report as Appendix B. In the letter, Gary requests that the Bureau "reinstate" on the 2020 census form sent to each household a question regarding citizenship. The Gary letter asserts that citizenship data "is critical to the [Justice] Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting." It further asserts that "the decennial census questionnaire is the most appropriate vehicle for collecting that data."

I have been retained by plaintiffs' counsel to serve as an expert in the above-captioned cases. Although I am being reimbursed for my costs, I am not receiving compensation for my services. However, my standard hourly rate for expert witness services is $650 per hour.

Plaintiffs' counsel asked me to offer my opinion, based on my experience litigating and studying section 2 cases, on whether a citizenship question on the decennial census would assist the Department of Justice's section 2 enforcement, as outlined in the Gary letter. In my opinion, it would not. The remainder of this report sets out the basis for my opinion, which is provided to a reasonable degree of certainty.

BACKGROUND ASSUMPTIONS

When I refer to case law in this report, I do so for two reasons:  (1) to describe the standards that I have assumed apply to cases litigated under section 2 and (2) to provide real-world illustrations of why the Gary letter is wrong to argue that citizenship data provided from decennial census questionnaires are critical to section 2 enforcement.

I have made the following assumptions about the state of the law. Section 2 of the Voting Rights Act provides, in pertinent part, that no State or political subdivision can use a voting practice that gives members of minority groups "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Election schemes that violate this prohibition are said to "dilute" minority voting strength. The Department of Justice has litigating authority to bring section 2 vote-dilution claims. *See* https://www.justice.gov/crt/section-2-voting-rights-act.

The Supreme Court has articulated three "necessary preconditions" for plaintiffs to succeed on a section 2 vote-dilution claim. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51. "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id.* In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court explained that to satisfy the first *Gingles* precondition, plaintiffs must show that it is possible to draw a district with a "numerical majority of minority voters," *id.* at 14, which the Court equated with the "voting-age population," *id.* at 20. The Gary letter is correct that numerous lower courts, both before and after *Bartlett*, have required that section 2 plaintiffs satisfy the first *Gingles* precondition by drawing an illustrative district in which the minority group constitutes a majority of the citizens of voting age within the relevant population ("CVAP"). So I assume throughout this report that plaintiffs can prevail in a section 2 lawsuit only if they can provide the court with such a district.

Data regarding total population and voting-age population comes directly from answers to questions on the existing decennial census form. The census is an actual enumeration.  Data regarding citizenship currently comes from the American Community Survey (ACS).  The ACS provides estimates of citizenship and CVAP. *See* U.S. Census Bureau, Voting Age Population by Citizenship and Race (CVAP), CVAP Documentation (2017), available at https://tinyurl.com/y9anvycl.

<u>CONCLUSIONS</u>

The existing data sources, including most recently the ACS-derived citizenship and CVAP estimates, are entirely sufficient to enable plaintiffs, including the Department of Justice, to successfully litigate section 2 cases.

During more than thirty years spent as a staff attorney at the NAACP Legal Defense and Educational Fund, as a pro bono attorney litigating section 2 cases, as a scholar studying voting rights, or as a presidential appointee at the Department of Justice, I have never heard either any counsel representing section 2 plaintiffs or any social scientific expert ever suggest that adding a citizenship question to the decennial census questionnaire would be helpful, let alone necessary, to effective enforcement of section 2.

This is not because discussions about data and data-related issues were rare. To the contrary: I have been present during many meetings, and have read voluminous scholarship, involving discussion of methodological issues that arise in section 2 cases. These have included, for example, discussions regarding how to determine polarized voting or how to determine the race of citizens who lack government-issued identification. And they have involved census-related issues: for example, the implications of the Census Bureau's decision prior to the 2000 census to allow individuals to report themselves as being bi- or multiracial. If the adequacy of existing data sources regarding citizenship had been a concern of the section 2 plaintiffs' bar, the issue certainly would have been discussed.

In particular, during my time at the Department of Justice, I had conversations both with other attorneys in the office of the Assistant Attorney General and with attorneys in the Voting Section on data-related matters. I was also aware of ongoing discussions between career staff and their counterparts at the Census Bureau over preparation for the 2020 enumeration. But there was, to my knowledge, no discussion whatsoever of the need, or desirability, of adding a citizenship question to the decennial census form.

The complete decades-long silence on the need for additional citizenship-related questions is not surprising given the realities of section 2 litigation.

Census data are used in analyzing all three *Gingles* preconditions, but information about citizenship is most important to the first *Gingles* precondition. The other two preconditions, which together indicate the level of racial bloc voting (or racial polarization) within the relevant jurisdiction, can be proven without the need for citizenship data.  Leaving aside the very few jurisdictions in which non-

citizens are eligible to vote for specific local offices, everyone who votes in an election must be a citizen.[1]

While section 2 protects <u>all</u> citizens against racial vote dilution, virtually all section 2 cases involve claims by voters who are African American, Latino, American Indian, or Alaska Natives. (There are very few vote-dilution claims brought by Asian Americans alone because there are relatively few places with sufficient levels of racially polarized voting where Asian American communities are sufficiently geographically concentrated to create predominantly Asian American districts.)

Citizenship data is almost never important in cases involving African American, American Indian, or Alaska Native plaintiffs. The reason for this is straightforward: citizenship rates among these communities are so high (over 99 percent among American Indians and Alaska Natives of voting age, and over 95 percent among African Americans of voting age) that if one of these groups constitutes a majority of the voting age population, it almost surely constitutes a majority of CVAP as well.[2]

The situation is, of course, different with respect to section 2 cases involving alleged dilution of Latino voting strength. Nationwide, roughly one-third of Latinos of voting age are non-citizens. So citizenship data can be crucial to determining whether it makes sense to bring a section 2 case. But it is important to understand that the problem from the perspective of vindicating minority voting rights is rarely one of inadequate data (as opposed to insufficient numbers of geographically concentrated minority citizens of voting age within the jurisdiction at issue). This "numbers" problem thus has nothing to do with the accuracy of census or ACS data regarding CVAP. To the contrary, plaintiffs have routinely and successfully used ACS-derived data to satisfy the first *Gingles* precondition and to establish other relevant factors in section 2 vote-dilution cases.[3]

Neither the Department of Justice nor private counsel litigating section 2 cases has any practical need for the data the Gary letter requests (that is, for data

---

[1] For a detailed discussion of how census data and citizenship information are used in section 2 cases, see Justin Levitt, *Citizenship and the Census*, 119 Colum. L. Rev. ___ (forthcoming 2019) (manuscript at 24-29), draft available at https://tinyurl.com/yd5gly2h.

[2] I obtained the relevant percentages from the CSV file for the Nation contained in U.S. Census Bureau, Voting Age Population by Citizenship and Race (CVAP) (2017), available at https://tinyurl.com/lbldpo7.

[3] For example, in *Fabela v. City of Farmers Branch*, 2012 WL 3135545, at *4-*8 (N.D. Tex. Aug. 2, 2012), the court found that the plaintiff had satisfied the first *Gingles* precondition based on illustrative districts that relied on ACS-derived data.

on citizenship derived directly from the decennial census questionnaires.) The situations where the absence of data might deter plaintiffs from filing are ones that are very close to the line: jurisdictions where it is unclear whether, using existing estimation techniques, it is possible to create a district that will perform for the minority community. Before bringing suit in such a marginal district, a competent attorney will certainly have an expert analyze election data (which by definition involves citizen-voters) to see whether it is possible to craft a performing district.

The object of a section 2 vote-dilution lawsuit is to obtain a districting plan in which the minority community can elect some representatives of its choice. There is no point to bringing suit if it is impossible to create a district that will perform for the minority community. Few organizations that operate voting rights projects have the resources to bring cases where there is only a marginal prospect of creating a performing district. And while the Department of Justice has tremendous financial resources, the Voting Section is sufficiently small and has a sufficiently broad range of responsibilities that it has no incentive to bring marginal cases. In my observation, for reasons unrelated to the availability of census data regarding citizenship, the Voting Section is also quite cautious about the cases it brings. Perhaps that is why the Gary letter does not identify, or even allude to, a single situation in which the Voting Section found itself unable to bring a case its attorneys considered meritorious because of insufficient data.

<u>Section 2 lawsuits have been successful using existing data sources.</u>

The history of section 2 shows that plaintiffs have consistently succeeded using the existing data sources. At all times since the Act's passage in 1965 and its amendment in 1982 (which introduced the "results" test for racial vote dilution claims), plaintiffs have relied on estimated citizenship figures, either from the "long form" or from the ACS, each of which is survey-based.

According to the most comprehensive studies of the Act's consequences, there were 117 "reported Section 2 cases leading to favorable results for minority voters" in the "23-year period following the 1982 reauthorization." National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005*, at 88 (2006) ["*Protecting Minority Voters*"].[4] *See also* Ellen Katz et. al., *Documenting Discrimination in Voting: Judicial Findings Under Section 2 of the Voting Rights Act Since 1982 Final Report of the Voting Rights Initiative, University of Michigan Law School*, 39 U. Mich. J.L. Reform 643, 656-57(2006).

---

[4] The report is available online at *Voting Rights Act: Evidence of Continuing Need: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary*, 109th Cong (2006), https://tinyurl.com/yd2kbbyh. The report begins at page 104 of the Committee print. I have used the report's internal pagination.

But that number understates the magnitude of plaintiffs' success. For example, I worked for many years on the "*Dillard* litigation," a lawsuit challenging at-large elections for county commissions, city councils, and school boards in Alabama that produced a series of reported decisions. Ultimately, more than 170 election systems were changed, either through adjudication or remedial settlements.

Once unreported decisions and remedial settlements are factored in, the number of successful section 2 cases skyrockets. The National Commission undertook a comprehensive inquiry into voting rights cases in nine states with a particularly significant history of voting-related discrimination (eight of the states fully covered by the preclearance provisions of section five, plus the partially-covered state of North Carolina). It found "approximately ten times the number of" unreported cases as reported ones. *Protecting Minority Voters* at 88. Looking at the more granular county-by-county level, the Commission found that there were at least 825 counties in those nine states affected by successful section 2 lawsuits. *See id.* tbl. 5.

Thus, section 2 plaintiffs were able to win or successfully settle significant numbers of cases using the existing data sources, which provided citizenship estimates rather than an actual enumeration of citizens.

<u>Unsuccessful section 2 suits are not due to problems with existing data.</u>

If one looks at the section 2 cases plaintiffs have lost for failure to satisfy the first *Gingles* precondition, there is no reason to believe that those defeats were in any way attributable to the lack of a citizenship question on the decennial census questionnaire.  I am aware of twenty-four reported cases in which courts have held that plaintiffs' section 2 claims failed to satisfy the first *Gingles* precondition. (I have listed these cases in Appendix C.) In none of these cases was there even a hint that some inadequacy in ACS data prevented plaintiffs from meeting their burden.

It is striking that the Gary letter fails to identify even a single case where inadequate citizenship data caused plaintiffs to lose. And although the Gary letter cites three cases that are in my set of twenty-four cases available on Westlaw— *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997); *Reyes v. City of Farmers Branch*, 586 F.3d 1019 (5th Cir. 2009); and *Romero v. City of Pomona*, 665 F. Supp. 853 (C.D. Cal. 1987), *aff'd*, 883 F.2d 1418 (9th Cir. 1989)—it never attempts to explain why those cases provide support for the letter's request. In my opinion, they provide no support.

It is important to understand the limited universe of cases in which a lack of citizenship information from the decennial questionnaires even <u>could</u> cause a plaintiff to lose a case that he would otherwise win. The problem the Gary letter purports to identify – that the Department of Justice lacks sufficient data to bring

section 2 cases – would arise only where an _actual_ enumeration would show the possibility of a majority minority CVAP district, but survey-provided estimates cannot show such a possibility. This condition is implausible. Among other things, it presupposes that the actual enumeration, with its well-known undercount, would capture and thereby report a higher number of minority citizens of voting age than the more statistically sophisticated survey techniques estimate there to be. The Gary letter offers no suggestion that estimates of minority CVAP are likely to be lower than numbers produced by an actual enumeration. And it ignores the significance of intra-decade demographic changes that are captured by the ACS but not by the decennial census.

None of the actual cases where section 2 claims failed the first _Gingles_ precondition suggest the problem I have just described. In some cases, the plaintiffs lost because:

1. The plaintiffs failed to provide any illustrative district at all.[5]

2. The plaintiffs' illustrative district was not "geographically compact.[6]

3. The plaintiffs acknowledged that they could not create an illustrative district that satisfied the numerosity requirement—that is, a district in which they constituted a majority of the total population, a majority of the voting-age

---

[5] _See Wright v. Sumter County Bd. of Elections & Registration,_ 2014 WL 1347427, at *2 (M.D. Ga. Apr. 3, 2014); _In re 2012 Legislative Districting_, 80 A.3d 1073, 1115–16 (Md. 2013); _Fairley v. Hattiesburg_, 584 F.3d 660, 669 (5th Cir. 2009) (the only illustrative district plaintiffs provided simply excluded students living in the city from the plan).

[6] _See Sensley v. Albritton_, 385 F.3d 591, 596 (5th Cir. 2004); _Gause v. Brunswick County_, 1996 WL 453466, at *2 (4th Cir. 1996); _Al-Hakim v. Florida_, 892 F. Supp. 1464, 1474 (M.D. Fla. 1995) (finding "no evidence . . . that the precincts [where black voters live] are geographically contiguous"),_aff'd_, 99 F.3d 1154 (11th Cir. 1996).

In _Stabler v. Cty. of Thurston_, 129 F.3d 1015, 1024, 1025 (8th Cir. 1997), the court held that the plaintiffs could not prove "that Native Americans are sufficiently large and geographically compact to constitute a majority in a single-member district which is regularly drawn and non-bizarrely shaped"; the Native American majority in the illustrative districts was so "fragile" that "if 4 or 5 Native Americans moved from the proposed majority-minority districts . . . and they were replaced by non-Native Americans, the majority-minority composition would be destroyed."

population, or a majority of the CVAP.[7] I recognize that these proportions differ from one another and that it is conceptually possible that a minority community's share of CVAP could be higher than its share of the total population or its share of the voting-age population. But I am unaware of any case in which plaintiffs have

---

[7] *Romero v. City of Pomona*, 665 F. Supp. 853 (C.D. Cal. 1987) *aff'd*, 883 F.2d 1418 (9th Cir. 1989), and *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997), both cited in the Gary letter, fall into this category.

In *Romero*, the plaintiffs' expert "testified that when the eligible voting age population is considered, none of the districts in plaintiffs' proposed district plans have a majority hispanic or black population." 665 F. Supp. 2d at 857 n.2.

In *Negron*, the plaintiffs' expert proffered an illustrative plan that created three districts that were majority Latino with respect to voting-age population. *See* 113 F.3d at 1567. The district court adjusted those figures downward by "synthesizing" them with data regarding the "Hispanic citizenship rate," which produced districts that were between 41 and 48 percent Latino. *Id.* The court of appeals rejected the plaintiffs' various methodological challenges to the district court's reliance on survey data to impose an across-the-board reduction. *See id.* at 1569-70. But the plaintiffs in *Negron* never attempted to proffer illustrative districts that were majority Latino with respect to CVAP; their claim was only that voting-age population was the relevant measure.

The other cases where the plaintiffs' proposed districts concededly did not contain majority minority CVAPs are: *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (seeking a district that was 39.36 black in VAP); *Dillard v. Baldwin County Comm'rs*, 376 F.3d 1260, 1269 (11th Cir. 2004) (black VAP was too small to create a majority-black district); *Hall v. Virginia*, 385 F.3d 421, 430 (4th Cir. 2004) ("The plaintiffs concede that black voters cannot form a majority in the Fourth District, and thereby elect a candidate"); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 944 (7th Cir. 1988) (blacks "would not comprise a majority of the voting age population" in the illustrative districts); *Metts v. Almond*, 217 F. Supp. 2d 252, 261 (D.R.I. 2002) (pointing to "plaintiffs' failure to allege that African–American voters could constitute a majority in a reconfigured [d]istrict"), *rev'd*, 363 F.3d 8 (1st Cir. 2004) (en banc) (holding, prior to the Supreme Court's decision in *Bartlett*, that plaintiffs were entitled to proceed on a crossover district theory); *Rios-Andino v. Orange County*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014) (at trial, plaintiffs' expert "stated that he was uncertain as to whether Latino citizens of voting age were actually a majority in District 3 of his illustrative Map"); *Skorepa v. City of Chula Vista*, 723 F. Supp. 1384, 1390 (S.D. Cal. 1989) (illustrative district was only 45.9% Latino in total population); *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) (plaintiffs did not allege that "minority voters could be a majority in either" of their proposed illustrative districts); *Turner v. Arkansas*, 784 F. Supp. 553, 570 (E.D. Ark. 1991) (plaintiffs sought the creation of a 38 percent black district), *summarily aff'd*, 504 U.S. 952 (1992).

made such a claim or of any secondary literature that suggests such a reality in the jurisdictions where vote-dilution claims are likely to be brought. Plaintiffs who concede that they cannot create an illustrative district in which the minority group constitutes a majority of the total population or the voting-age population—both figures entirely derivable from existing census data—thus realistically have conceded *a fortiori* that they cannot satisfy a requirement to show a district that is majority minority with respect to CVAP.[8]

    4. The plaintiffs did not make sufficient use of ACS data.[9]

    5. Given its proportion of the jurisdiction's population and CVAP, the minority community was already electing sufficient representatives of its choice.[10]

    In none of these five circumstances did a court conclude that the CVAP available from the ACS was inadequate to enable plaintiffs to provide an illustrative district.

    Nor would a citizenship question on the decennial form do anything to help section 2 plaintiffs whose claim rests on assertions of population shifts that occurred during the decade (that is, after statistics from the decennial census were reported). So, for example, the Gary proposal would have done nothing to help the plaintiffs in *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010), given their expert's concession that "none of the illustrative districts" he had drawn "ha[d] greater than a 50% Hispanic share of CVAP according to 2000 Census data." *Id.* at 457. Moreover, the court's rejection of the plaintiffs' attempt to use ACS data to show that in the interim the share of Latino CVAP had risen to the point where the potential districts "<u>now</u> have [majority] Hispanic CVAP shares," *id.* at 458 (emphasis added), came from the plaintiffs' reliance on a single year's worth of

---

[8] And plaintiffs who cannot show the possibility of creating districts that are majority minority with respect to either total population or voting age population would almost certainly gain nothing from the inclusion of a citizenship question on the decennial census form.

[9] *See Reyes v. City of Farmers Branch*, 586 F.3d 1019 (5th Cir. 2009) (court of appeals left open whether plaintiffs could have succeeded in satisfying the first *Gingles* precondition had their expert properly used his alternative methods, none of which relied on the ACS); *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) (plaintiffs relied on a single year's worth of ACS data instead of the more accurate five-year ACS data).

[10] *See Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997) ("Houston's current electoral scheme," which had nine single-member districts and five at-large seats and which had produced four Latino council members, was already "enabl[ing] its Hispanic community to elect city council members in greater than proportional numbers, based on its citizen voting-age population.")

ACS data in the face of the Bureau's explanation that for small jurisdictions the five year data is needed for reliability.[11]

In short, I have been wholly unable to find a single case where the availability of citizenship data from the decennial census would have changed the outcome.

<u>Other problems with the Gary letter.</u>

There are problems with the Gary letter beyond its claim regarding the need for additional citizenship information. The Gary letter asserts that it is problematic to use different data sets to "determine compliance with the Constitution's one-person, one vote requirement" and to analyze section 2 claims. Not so. Although "one-person, one-vote" is the common way of referring to the requirement that jurisdictions draw equipopulous districts, that requirement does not focus at all on election results, or the ability of groups of citizens to elect representatives of their choice. So there is nothing anomalous about using an actual enumeration to

---

[11] *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999), provides another example of a case where census data would not have changed the outcome. The parties apparently agreed that the exemplary districts were not majority Latino in CVAP as of the 1990 census. *See id.* at 1209. The disagreement centered on whether the plaintiffs' proposed <u>adjustments</u> to take account of population growth and census undercount would make it possible to create such districts, *id.* at 1210.

The flip side of cases like *Benavidez* and *Perez* is cases where plaintiffs offer illustrative districts that are majority minority with respect to census-derived data but courts nonetheless held that they failed to satisfy the first *Gingles* precondition because the defendant provided evidence of post-census demographic change within the jurisdiction. In *Johnson v. DeSoto County. Bd. of Comm'rs*, 204 F.3d 1335 (11th Cir. 2000), the plaintiffs, using 1990 census figures proffered illustrative districts that were 54 to 57 percent black with respect to voting-age population. *Id.* at 1342. (There was no suggestion that the black population contained a disproportionate number of non-citizens). Nonetheless, relatively higher white population growth during the decade led the court to conclude that the plaintiffs' illustrative districts no longer satisfied the first precondition. *Id.* at 1343. Similarly, in *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848 (5th Cir. 1999), the defendant conceded that according to the 1990 census, the plaintiffs' illustrative district was majority Latino with respect to CVAP, but provided evidence that persuaded the court "that demographic changes between the 1990 census and the 1997 trial had eliminated that majority." *Id.* at 850. Even if there were citizenship data derived from decennial census forms, nothing about the existence of that data would preclude defendants from making arguments about intra-decade demographic changes. So nothing about the Gary proposal would help these plaintiffs either.

determine whether jurisdictions have satisfied the equipopulous districting requirement and using sophisticated estimation techniques to determine whether it is possible to create districts where a minority group can be electorally successful. (The other two *Gingles* preconditions by necessity use estimation techniques.)  Nor is it problematic that ACS estimates are "rolling" and aggregated while the Census offers a static number. The Gary letter offers no reason why the numbers need to be derived simultaneously. Here, too, in a section 2 lawsuit, to prove racial bloc voting, the plaintiff must offer analysis of election results, often from intra-decade elections. So there will always be some degree of dynamism.

* * * * *

My conclusion from my experience and from rereading the existing cases in light of the Gary letter is that a citizenship question on the decennial census would not assist the Department of Justice (or private parties) in enforcing section 2 of the Voting Rights Act.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2018.

Pamela S. Karlan

# Appendix A
# CurriculumVita of
# Pamela S. Karlan

Stanford Law School                                  karlan@stanford.edu
559 Nathan Abbott Way                                    (650) 725-4851
Stanford, CA 94305-8610

## ACADEMIC APPOINTMENTS

Stanford Law School
Kenneth and Harle Montgomery Professor of Public Interest Law (since 1999); Co-Director,
Supreme Court Litigation Clinic (since 2004); Associate Dean (1999-2000, 2005-06);
Professor of Law (1998-99)

University of Virginia School of Law
Roy L. and Rosamond Woodruff Morgan Research Professor (1994-98); Professor of Law
(1993-98); Associate Professor of Law (1988-93)

Visiting Professor, Harvard Law School (1994-95); N.Y.U. School of Law (Spring 1993);
Stanford Law School (Fall 1996); Stanford University Breyer Center for Overseas Studies
in Florence (Winter 2016, Winter 2019); Tel Aviv University Buchmann Faculty of Law
(Spring 2011); University of Virginia School of Law (Fall 2002); Yale Law School (Fall 1992,
Fall 2006, Fall 2011)

> Recent Law School Courses: Civil Procedure; Conflicts, Ethics, and the Academy;
> Constitutional Law; Constitutional Litigation; Regulation of the Political Process; Supreme
> Court Litigation Clinic; Torts

> Recent Undergraduate Courses: Constituting a Republic: Machiavelli, Madison, and Modern
> Issues; Justice and the University

> Policy Fellow, Rockefeller Foundation Bellagio Center (2017); Phi Beta Kappa Visiting
> Scholar (2011-12); Coif Distinguished Visiting Professor (2006); John Bingham Hurlbut
> Award for Excellence in Teaching, Stanford (2002, 2009); State Council of Higher Education
> in Virginia Outstanding Faculty Award (1997); University of Virginia All-University
> Outstanding Teaching Award (1995-96); Elected Graduation Speaker, Yale Law School
> (2007), University of Virginia School of Law (1991)

## OTHER PROFESSIONAL EXPERIENCE

United States Department of Justice
Deputy Assistant Attorney General, Civil Rights Division (2014-15)

> Reviewer for the Employment Litigation Section, the Voting Section, and the Office of
> Special Counsel for Immigration-Related Unfair Employment Practices

Appendix A-1

Received the Attorney General's John Marshall Award for Providing Legal Advice – the Department's highest award to attorneys for contributions and excellence in specialized areas of legal performance – as part of the team responsible for guiding the department to its new position regarding Title VII and gender identity (2015)

Received the Attorney General's Award for Exceptional Service – the Department's highest award for employee performance – for work on the *Windsor* Implementation Team (2014)

California Fair Political Practices Commission
Commissioner (2003-05)

Appointed by Controller Steve Westley to the state commission responsible for implementing and enforcing California's campaign finance, lobbying, and conflict of interest laws

NAACP Legal Defense and Educational Fund, Inc.
Cooperating Attorney (1988-2013); Assistant Counsel (1986-88)

Focused on trials and appeals of cases involving Title VII of the Civil Rights Act of 1964 and Section 2 of the Voting Rights Act of 1965 (individual cases are listed under Litigation Experience)

Supreme Court of the United States
Law Clerk to Justice Harry A. Blackmun, October Term 1985

United States District Court for the Southern District of New York
Law Clerk to Judge Abraham D. Sofaer (1984-85)

Lecturer, Judicial Education Programs (since 1993), including, among others, the Federal Judicial Center and the ABA Appellate Judges' Conference; the NYU Institute of Judicial Administration New Judges' Seminar and the University of Virginia School of Law Master of Laws in the Judicial Process Program; and state programs in California, Delaware, Pennsylvania, and Washington

Guest Lecturer, Federal Bureau of Investigation National Academy (1990-2001)

*Pro bono* representation of individuals, groups, and elected officials before courts and in the legislative process (individual cases are listed under Litigation Experience) (since 1988)

Named one of the *Politico 50* – a group of "thinkers, doers, and visionaries transforming American politics" (2016)

Alumni Achievement Award, Yale Law School OutLaws (2014)

National Public Service Award, Stanford Law School (2013)

Named one of the *American Lawyer Public Sector 45* – a group of lawyers "actively using their law degrees to change lives" (1997)

Appendix A-2

Elected Member: American Law Institute; American Academy of Arts and Sciences; American Academy of Appellate Lawyers

**PUBLICATIONS**

*Books*

Civil Rights Actions: Enforcing the Constitution (2000; 2nd ed. 2007; 3rd ed. 2013; 4th ed. 2018) (with John C. Jeffries, Jr., Peter W. Low and George A. Rutherglen) (with supplements)

A Constitution for all Times (2013)

Constitutional Law (5th ed. 2005; 6th ed. 2009; 7th ed. 2013; 8th ed. 2018) (with Geoffrey R. Stone, Louis Michael Seidman, Cass R. Sunstein, and Mark V. Tushnet) (with supplements)

The First Amendment (2nd ed. 2003; 3rd ed. 2008; 4th ed. 2012) (with Geoffrey R. Stone, Louis M. Seidman, Cass R. Sunstein, and Mark V. Tushnet) (with supplements)

Keeping Faith with the Constitution (2009; rev. ed. 2010) (with Goodwin Liu and Christopher Schroeder) (honored by the Green Bag as one of its examples of "Exemplary Legal Writing 2011")

The Law of Democracy: Legal Structure of the Political Process (1998; 2nd ed. 2001; rev. 2nd ed. 2002; 3rd ed. 2007; 4th ed. 2012; 5th ed. 2016) (with Samuel Issacharoff, Nathaniel Persily, and Richard H. Pildes) (with supplements)

Race, Incarceration, and American Values (2008) (with Glenn C. Loury, Tommie Shelton, and Loïc Wacquant) (Tanner Lecture and commentaries)

When Elections Go Bad: The Law of Democracy and the Presidential Election of 2000 (with Samuel Issacharoff and Richard H. Pildes) (2001; rev. ed. 2001)

*Articles and Book Chapters*

2018

Reapportionment, Nonapportionment, and Recovering Some Lost History of One-Person, One Vote, 59 Wm. & Mary L. Rev. 1921 (2018)

Undue Burdens and Potential Opportunities in Voting Rights and Abortion Law, 93 Ind. L.J. 139 (2018)

2016

Turnout, Tenuousness, and Getting Results in Section 2 Vote Denial Cases, 77 Ohio St. L.J. 763 (2016)

2015

The Alabama Foundations of the Law of Democracy, 67 Ala. L. Rev. 415 (2015)

2014

Citizens Deflected: Electoral Integrity and Political Reform *in* Citizens Divided: A Constitutional Theory of Campaign Finance Reform (2014) (Tanner Lectures and commentaries)

Out of Alignment, Boston Rev., Jan./Feb. 2014, at 10

2013

Answering Questions, Questioning Answers, and the Role of Empiricism in the Law of Democracy, 65 Stan. L. Rev. 1269 (2013)

The Constitution Without the Court, Boston Rev., July/Aug. 2013, at 10

Founding Firearms: Originalism and the Second Amendment, Boston Rev., May/June 2013, at 10

*Gideon* at Fifty, Boston Rev., Mar./Apr. 2013, at 8

A Moveable Court, Boston Rev., Sept./Oct. 2013, at 10

The Supreme Court's Docket Addresses the Washington Gridlock, Boston Rev., Nov./Dec. 2013, at 10

Votes Behind Bars, Boston Rev., Jan./Feb. 2013, at 14

2012

The "Ambiguous Giving Out": The Complicated Roles of Disclosure and Anonymity in Political Activity, 27 Va. J.L. & Pol. 655 (2012)

Big Brother Buys a GPS, Boston Rev., Jan./Feb. 2012, at 10

Contempt of Court, Boston Rev., Nov./Dec. 2012, at 10

Empty Benches, Boston Rev., Sept./Oct. 2012, at 12

Forty Years After Watergate, Boston Rev., July/Aug. 2012, at 10

The Supreme Court, 2011 Term, Foreword: Democracy and Disdain, 126 Harv. L. Rev. 1 (2012)

The Transformation of Judicial Self-Restraint, 100 Cal. L. Rev. 607 (2012) (Jorde Symposium)

What's a Right Without a Remedy?, Boston Rev., Mar./Apr. 2012, at 10

When the Umpire Throws the Pitches, Boston Rev., May/June 2012, at 10

2011

The Cost of Death, Boston Rev., Nov./Dec. 2011, at 10

The Gay and the Angry: The Supreme Court and the Battles Surrounding Same-Sex Marriage, 2011 Sup. Ct. Rev. 159

The Health Care Challenge Threatens All Regulation, Boston Rev., Mar./Apr. 2011, at 10

In Memoriam: William J. Stuntz, 124 Harv. L. Rev. 1841 (2011)

It Takes Two, Boston Rev., May/June 2011, at 10

Lightning in the Hand: Indians and Voting Rights, 120 Yale L.J. 1420 (2011)

Me, Inc., Boston Rev., July/Aug. 2011, at 10

Old Reasons, New Reasons, and No Reasons in Equal Protection Law, 27 Ga. St. L. Rev. 873 (2011) (Miller Lecture)

The Reconstruction of Voting Rights *in* Race, Reform, and the Regulation of the Political Process: Recurring Puzzles in American Democracy (Heather Gerken, Guy-Uriel Charles and Michael Kang ed. 2011)

Sometimes an Amendment Is Just an Amendment, Boston Rev., Sept./Oct. 2011, at 12

Ten Years After Bush v. Gore, Boston Rev., Jan./Feb. 2011, at 10

2010

Appendix A-5

Acting Out, Boston Rev., Nov./Dec. 2010, at 10

In the Beginning, Boston Rev., Sept./Oct. 2010, at 7

Let's Call the Whole Thing Off, 98 Cal. L. Rev. 697 (2010) (Jorde Symposium)

Shoe-Horning, Shell Games, and Enforcing Constitutional Rights in the Twenty-First Century, 78 U.M.K.C. L. Rev. 875 (2010) (Edward A. Smith/Bryan Cave Lecture)

2009

Ballots, Bullets, and Battles on the Roberts Court, 35 Ohio N.U.L. Rev. 435 (2009) (Kormendy Lecture)

Constitutional Law as Trademark, 43 U.C. Davis L. Rev. 385 (2009) (Barrett Lecture)

Electing Judges, Judging Elections and the Lessons of *Caperton*, 123 Harv. L. Rev. 80 (2009)

Lessons Learned: Voting Rights and the Bush Administration, 4 Duke J. Con. Law & Pub. Pol'y 17 (2009)

Reflecting on the Election and Its Consequences, Am. Acad. Arts & Sciences Bull., Spring 2009, at 15 (with David Brady)

Some Thoughts on Autonomy and Equality in Relation to Ruth Bader Ginsburg, 70 Ohio St. L.J. 1085 (2009)

Voting Rights and the Third Reconstruction *in* The Constitution in 2020 (Jack Balkin & Reva Siegel eds. 2009) (honored by the Green Bag as one of its examples of "Exemplary Legal Writing 2009")

What Can *Brown*® Do For You?: Neutral Principles and the Struggle for Ownership of the Equal Protection Clause, 58 Duke L.J. 1059 (2009) (Currie Lecture)

2008

Identifying the Barriers and Challenges to Voting by Residents in Nursing Homes and Assisted Living Settings: A Study of the 2003 Philadelphia Mayor's Race, 20(1) J. Aging & Social Pol'y 65 (2008) (with Jason H.T. Karlawish, Richard Bonnie, Paul S. Appelbaum, Constantin Lyketsos, Brian D. James, Charles Sabatino, T. Lawrence, David Knopman, and R..M. Kane)

The Law of Small Numbers: *Parents Involved, Gonzales v. Carhart* and Some Emerging Themes of the Roberts Court, 86 N.C.L. Rev. 1369 (2008)

Pluralists and Republicans, Rules and Standards: Conflicts of Interest and the California Experience *in* Conflict of Interest and Public Life: Cross-National Perspectives (Christine Trost & Alison L. Gash eds. 2008) (with Karen Getman)

Taking Politics Religiously: How Free Exercise and Establishment Clause Cases Illuminate the Law of Democracy, 83 Ind. L.J. 1 (2008) (Harris Lecture)

2007

Compelling Interests/Compelling Institutions: Law Schools as Constitutional Litigants 54 UCLA L. Rev. 1613 (2007)

Framing the Voting Rights Claims of Cognitively Impaired Individuals, 38 McGeorge L. Rev. 917 (2007)

How Voting Rights Arose in Southern Courts, Legal Times, June 25, 2007, at 43 (reviewing Brian K. Landsberg, Free At Last To Vote: The Alabama Origins of the 1965 Voting Rights Act)

Judicial Independences, 95 Geo. L.J. 1041 (2007)

New Beginnings and Dead Ends in the Law of Democracy, 68 Ohio St. L.J. 743 (2007)

The Paradoxical Structure of Constitutional Litigation, 75 Fordham L. Rev. 1913 (2007) (Levine Lecture)

Section 5 Squared: Congressional Power to Extend and Amend the Voting Rights Act, 44 Houston L. Rev. 1 (2007) (Frankel Lecture)

2006

Batson v. Kentucky: The Constitutional Challenges of Peremptory Challenges, *in* Criminal Procedure Stories 381 (Carol S. Steiker ed. 2006)

The Partisan of Nonpartisanship: Justice Stevens and the Law of Democracy, 74 Fordham L. Rev. 2187 (2006)

2005

Contracting the Thirteenth Amendment: Hodges v. United States, 85 B.U.L. Rev. 783 (2005) (symposium issue)

Go East, Young Lawyers: The Stanford Law School Supreme Court Litigation Clinic, 7 J. App. Prac. & Proc. 207 (2005) (with Thomas C. Goldstein and Amy Howe)

John Hart Ely and the Problem of Gerrymandering: The Lion in Winter, 114 Yale L.J. 1329 (2005)

Same-Sex Marriage as a Moving Story, 16 Stan. L. & Pol'y Rev. 1 (2005)

2004

Addressing the Ethical, Legal and Social Issues Raised By Voting By Persons with Dementia, 292 J.A.M.A 1345 (2004) (with Jason H. Karlawish, Richard J. Bonnie, Paul S. Appelbaum, Constantine Lyketsos, Bryan James, David Knopman, Christopher Patusky, and Rosalie A. Kane)

Convictions and Doubts: Retribution, Representation, and the Debate Over Felon Disenfranchisement, 56 Stan. L. Rev. 1147 (2004)

Critics of Gay Unions Can Look at the Stats, New Orleans Times-Picayune, April 1, 2004 (op-ed)

The Elysian Fields of the Law, 56 Stan. L. Rev. 695 (2004) (with Kathleen M. Sullivan)

Loving Lawrence, 102 Mich. L. Rev. 1447 (2004)

*Georgia v. Ashcroft* and the Retrogression of Retrogression, 3 Election L.J. 21 (2004)

"Pricking the Lines": The Due Process Clause, Punitive Damages, and Criminal Punishment, 88 Minn. L. Rev. 880 (2004) (Lockhart Lecture)

Where To Draw the Line?: Judicial Review of Political Gerrymandering, 153 U. Pa. L. Rev. 541 (2004) (with Samuel Issacharoff)

2003

Ballots and Bullets: The Exceptional History of the Right to Vote, 71 U. Cin. L. Rev. 1345 (2003) (William Howard Taft Lecture)

Groups, Politics, and the Equal Protection Clause, 58 Miami L. Rev. 35 (2003) (with Samuel Issacharoff) (Fiss Symposium)

Disarming the Private Attorney General, 2003 U. Ill. L. Rev. 183 (David C. Baum Lecture)

Elections and Change under "Voting With Dollars," 91 Cal. L. Rev. 705 (2003) (Jorde Symposium)

When Freedom Isn't Free: The Costs of Judicial Independence in *Bush v. Gore*, 64 Ohio St. L.J. 265 (2003)

2002

Easing the Spring: Strict Scrutiny and Affirmative Action After the Redistricting Cases, 43 Wm. & Mary L. Rev. 1569 (2002) (Cutler Lecture)
Equal Protection, Due Process, and the Stereoscopic Fourteenth Amendment, 33 McGeorge L. Rev. 473 (2002) (Distinguished Speaker Series)

Exit Strategies in Constitutional Law: Lessons for Getting the Least Dangerous Branch Out of the Political Thicket, 82 B.U.L. Rev. 669 (2002) (Moffett Lecture)

Foreword: Litigation, War, and Politics by Other Means, 13 Stan. L. & Pol'y Rev.5 (2002)

2001

The Court Finds Room for Racial Candor, New York Times, April 23, 2001, at A15

Equal Protection: *Bush v. Gore* and The Making of a Precedent *in* The Unfinished Election of 2000 (Jack N. Rakove ed. 2001)

The Irony of Immunity: The Eleventh Amendment, Irreparable Injury, and Section 1983, 53 Stan. L. Rev. 1311 (2001)

The Newest Equal Protection: Regressive Doctrine on a Changeable Court *in* The Vote: Bush, Gore and the Supreme Court (Cass R. Sunstein & Richard A. Epstein eds. 2001)

Nothing Personal: The Evolution of the Newest Equal Protection from *Shaw v. Reno* to *Bush v. Gore*, 79 N.C.L. Rev. 1346 (2001)

The Right to Counsel *in* Encyclopedia of Crime and Justice (Joshua Dressler ed. 2d ed. 2001)

The Soul of a New Political Machine: The Online, the Color Line, and Electronic Democracy, 34 Loy. L.A.L. Rev. 1089 (2001) (with Eben Moglen)

Unduly Partial: The Supreme Court and the Fourteenth Amendment in *Bush v. Gore*, 29 Fla. St. U.L. Rev. 589 (2001)

The Triumph of Expedience: How America Lost the Election to the Courts, Harper's, May

9

2001, at 31 (with Richard Posner)

2000

Redistricting for Inclusive Democracy: A Survey of the Voting Rights Landscape and Strategies for Post-2000 Redistricting (2000) (with Penda D. Hair) (Ford Foundation-sponsored report from the Advancement Project)

The Court Casts Its Vote, New York Times, Dec. 11, 2000, at A31

The Future of Voting Rights Litigation, *in* Census 2000: Considerations and Strategies for State and Local Government (Benjamin E. Griffith ed. 2000)

How Should the U.S. Supreme Court Rule?: Court Right to Side with Gore, USA Today, Nov. 30, 2000, at A30

Outracing the Past, Am. Law., Oct. 2000, at 73 (reviewing Scott L. Malcomson, One Drop of Blood: The American Misadventure of Race (2000))

1999

A Bigger Picture, *in* Reflecting All of Us: The Case for Proportional Representation (Robert Richie & Steven Hill eds. 1999) (reprinted from Boston Rev., Feb./March 1998, at 19)

Constitutional Law, The Political Process, and the Bondage of Discipline, 32 Loyola L.A.L. Rev. 1185 (1999)

The Hydraulics of Campaign Finance Reform, 77 Tex. L. Rev. 1704 (1999) (with Samuel Issacharoff)

It's Not Black and White Any More: Contemporary Controversies in Voting Rights, 43 N.Y.L. School L. Rev. 137 (1999)

Justice and Mercy, Religion & Values in Public Life, Vol. 7, No. 2/3 at 5 (1999)

Politics by Other Means, 85 Va. L. Rev. 1697 (1999)

Two Concepts of Judicial Independence, 72 So. Cal. L. Rev. 535 (1999)

A Tribute to Justice Harry A. Blackmun, 113 Harv. L. Rev. 5 (1999)

1998

Constitutional Elitism?: Some Skepticism About Dogmatic Assertions, 30 McGeorge L. Rev. 117 (1998) (with Daniel R. Ortiz)

Constitutional Farce, *in* Constitutional Stupidities, Constitutional Tragedies (William N. Eskridge, Jr. & Sanford Levison eds. 1998) (with Daniel R. Ortiz)

The Fire Next Time: Reapportionment after the 2000 Census, 50 Stan. L. Rev. 731 (1998)

The Geography of Race in Elections: Color Blindness and Redistricting, 14 J.L. & Pol. 109 (1998) (American Bar Association Presidential Showcase Program roundtable discussion)

The Impact of the Voting Rights Act on African Americans: Second and Third Generation Issues *in* Voting Rights and Redistricting in the United States (Mark Rush ed. 1998)

The Path of the Law Firm: A Comment on Ribstein's "Ethical Rules, Agency Costs and Law Firm Structure," 84 Va. L. Rev. 1761 (1998)

Race, Rights, and Remedies in Criminal Adjudication, 96 Mich. L. Rev. 2001 (1998)

Some Thoughts on Autonomy and Equality in Relation to Justice Blackmun, 26 Hastings Const. L.Q. 59 (1998)

Standing and Misunderstanding in Voting Rights Law, 111 Harv. L. Rev. 2276 (1998) (with Samuel Issacharoff)

Two Section Twos and Two Section Fives: Voting Rights and Remedies after *Boerne*, 39 Wm. & Mary L. Rev. 725 (1998)

1997

Just Politics?: Five Not So Easy Pieces of the 1995 Term, 34 Houston L. Rev. 289 (1997) (Frankel Lecture)

Loss and Redemption: Voting Rights at the Turn of a Century, 50 Vand. L. Rev. 291 (1997)

The Majoritarian Difficulty: One Person, One-Vote, *in* Reason and Passion: Justice Brennan's Enduring Influence (E. Joshua Rosenkranz & Bernard Schwartz eds. 1997) (with Lani Guinier)

The Supreme Court and Voting Rights: Deja Vu All Over Again?, Voting Rights Review, Summer 1997, at 1

The Voting Rights Act and Judicial Elections: Horse of a Different Color or Canary in the Coal Mine?, in Race and Representation, 6 Nat'l Pol. Sci. Rev. 110 (1997)

1996

*Cousins'* Kin: Justice Stevens and Voting Rights, 27 Rutgers L.J. 521 (1996)

Disabilities, Discrimination, and Reasonable Accommodation, 46 Duke L.J. 1 (1996) (with George Rutherglen)

Still Hazy After All These Years: Voting Rights in the Post-*Shaw* Era, 26 Cumb. L. Rev. 287 (1996)

Why Voting Is Different, 84 Cal. L. Rev. 1201 (1996) (with Daryl J. Levinson)

1995

Après *Shaw* Le Déluge?, PS: Political Science and Politics, March 1995, at 50

Book Review, Voting Rights Review, Spring 1995, at 24 (reviewing Chandler Davidson & Bernard Grofman, eds., Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990 (1994)), reprinted in a slightly different form as Not So Quiet Anymore, Southern Changes, Summer 1995, at 18.

Court Still Ambivalent on Redistricting, Nat'l L.J., July 24, 1995, at A19 (with Thomas C. Goldstein)

Cumulative Voting as a Remedy in Voting Rights Cases, Nat'l Civic Rev., Fall/Winter 1995 at 337 (with Edward Still)

Democracy and Dis-Appointment, 93 Mich. L. Rev. 1273 (1995) (reviewing Lani Guinier, The Tyranny of the Majority: Fundamental Fairness in Representative Democracy (1994))

Fee Shifting and Criminal Defendants, 71 Chi.-Kent L. Rev. 583 (1995)

Negative Political Theory, 68 S. Cal. L. Rev. 1691 (1995) (with Daniel R. Ortiz)

On a Collision Course: The Ambiguity of Shaw v. Reno Pits the Voting Rights Act Against the Constitution, Legal Times, April 17, 1995, at 24 (with Thomas C. Goldstein)

Our Separatism? Voting Rights as an American Nationalities Policy, 1995 U. Chi. Legal For. 83

The Supreme Court and Voting Rights: "Bizarre" Districts or Bizarre Decisions?, Southern Changes, Fall/Winter 1995, at 8

Voting Rights Act Enforcement: An Agenda for Equal Electoral Opportunity *in* New Challenges: The Civil Rights Record of the Clinton Administration Mid-Term (Corinne M. Yu & William L. Taylor eds. 1995) (with Arthur A. Baer)

1994

From Logic to Experience, 83 Geo. L.J. 1 (1994)

My Seder with Blackmun: Court Gossip & Matzoh Balls, Los Angeles Times, Apr. 10, 1994, at M2 (Opinion Section)

Not By Money But By Virtue Won? Vote Trafficking and the Voting Rights System, 80 Va. L. Rev. 1455 (1994)

A Tribute to Justice Harry A. Blackmun, 108 Harv. L. Rev. 13 (1994)

The Supreme Court, Racial Politics, and the Right to Vote: Shaw v. Reno and the Future of the Voting Rights Act, 44 Am. U.L. Rev. 1 (1994) (roundtable)

Voting Rights and the Court: End of the Second Reconstruction?, The Nation, May 23, 1994, at 698

1993

About Redistricting: A Ballot Box for Diversity, New York Newsday, Mar. 25, 1993, at 94

All Over the Map: The Supreme Court's Voting Rights Trilogy, 1993 Sup. Ct. Rev. 245, reprinted in 10 Civil Rights and Attorney Fees Annual Handbook (Steven Saltzman & Barbara M. Wolvovitz eds. 1995)
Bringing Compassion into the Province of Judging: Justice Blackmun and Outsiders, 97 Dick. L. Rev. 527 (1993), reprinted in a slightly edited form, 71 N. Dak. L. Rev. 173 (1995)

Contingent Fees and Criminal Cases, 93 Colum. L. Rev. 595 (1993)

In a Diffident Voice: Relational Feminism, Abortion Rights, and the Feminist Legal Agenda (with Daniel R. Ortiz), 87 Nw. U.L. Rev. 858 (1993)

The Rights To Vote: Some Pessimism About Formalism, 71 Tex. L. Rev. 1705 (1993)

1992

Book Review, J. Southern Hist., Feb. 1992, at 175 (reviewing Frank Parker, Black Votes Count: Political Empowerment in Mississippi after 1965 (1990))

Discrete and Relational Criminal Representation: The Changing Vision of the Right to Counsel, 105 Harv. L. Rev. 670 (1992)

Individual Rights Upheld, Nat'l L.J., Aug. 31, 1992, at S12

Minority Reps, The Nation, Mar. 8, 1993, at 292

Richard Posner's Just So-Stories: The Phallacies of Sex and Reason, 1 Va. J. Soc. Pol'y & L. 229 (1993) (reviewing Richard A. Posner, Sex and Reason (1992))

13

1991

"Law and ...," Va. L. School Rep., Summer 1991, at 41

Throwing Out the First Pitch, Va. L. School Rep., Winter 1991, at 12

Undoing the Right Thing: Single-Member Offices and the Voting Rights Act, 77 Va. L. Rev. 1 (1991)

Use It and Lose It: Forfeiture and Section 881, Charlottesville Bus. J., April 1991, at 20

1990

Going Beyond District Boundaries in Voting Rights Law, Va. L. School Rep., Spring 1990, at 25

1989

Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation, 24 Harv. C.R.-C.L. L. Rev. 173 (1989)

1988

Book Review, Human Rights, Fall 1988, at 10 (reviewing Seth Cagin & Philip Dray, We Are Not Afraid: The Story of Goodman, Schwerner and Chaney and the Civil Rights Campaign for Mississippi (1988))

Book Review, A.B.A.J., Feb. 1988, at 117 (reviewing Abigail Thernstrom, Whose Vote Counts?: Affirmative Action and Minority Voting Rights (1987))

Nonmajority Rules and the Supreme Court, 136 U. Pa. L. Rev. 1067 (1988) (with Richard Revesz)

Without Fear and Without Research: Abigail Thernstrom on the Voting Rights Act, 4 J.L. & Pol. 751 (1988) (with Peyton McCrary) (reviewing Abigail Thernstrom, Whose Vote Counts?: Affirmative Action and Minority Voting Rights (1987))

1983

Discriminatory Purpose and Mens Rea: The Tortured Argument of Invidious Intent, 93 Yale L.J. 111 (1983)

## LITIGATION EXPERIENCE

*U.S. Supreme Court Merits Stage Cases*

†Gundy v. United States, ___ S. Ct. ___ (counsel for petitioner)

†Jam v. International Finance Corp., ___ S. Ct. ___ (counsel for petitioners)

†Mount Lemmon Fire District v. Guido, ___ S. Ct. ___ (counsel for respondent)

†Nieves v. Bartlett, ___ S. Ct. ___ (counsel for respondent)

†United States v. Sims, ___ S. Ct. ___ (counsel for respondent)

†Weyerhaeuser Company v. U.S. Fish and Wildlife Service, ___ S. Ct. ___ (counsel for respondent-intervenors)

†Janus v. American Federation of State, County, and Municipal Employees, Council 31, 138 S. Ct. 2448 (2018) (counsel for amici curiae Peace Officers Research Association of California, National Association of Police Organizations, Police Benevolent & Protective Association of Illinois, New York State Association of Police Benevolent Associations, California Correctional Peace Officers' Association, California Statewide Law Enforcement Association, Detectives' Endowment Association of the New York City Police Department, Los Angeles Police Protective League, San Francisco Police Officers Association, San Jose Police Officers Association, Fresno Deputy Sheriff's Association, Deputy Sheriffs' Association of Santa Clara County, Deputy Sheriffs' Association of Santa Clara, San Francisco Deputy Probation Officers Association, Roseville Firefighters, Local 1592, and Davis Professional Firefighters Association in support of respondents

†Abbott v. Perez, 138 S. Ct. 2305 (2018) (counsel for appellee Mexican American Legislative Caucus)

†Currier v. Virginia, 138 S. Ct. 2144 (2018) (counsel for petitioner)

†Lozner v. City of Riviera Beach, 138 S. Ct. 1945 (2018) (counsel for petitioner) (arguing counsel)

†Gill v. Whitford, 138 S. Ct. 1916 (2018) (counsel for amici curiae law professors Samuel R. Bagenstos, Richard Briffault, Erwin Chemerinsky, Henry L. Chambers, Jr., Joshua A. Douglas, Joseph Fishkin, Rebecca Green, Michael Halberstam, Michael S. Kang, Pamela S. Karlan, and Franita Tolson in support of appellees)

†Koons v. United States, 138 S. Ct. 1783 (2018) (counsel for petitioners)

†Jesner v. Arab Bank, 138 S. Ct. 1386 (2018) (counsel for petitioners)

15

†Packingham v. North Carolina, 137 S. Ct. 1730 (2017) (counsel for petitioner)

†Esquival-Quintana v. Lynch, 137 S. Ct. 1562 (2017) (counsel for petitioner)

†Endrew F. v. Douglas County School District RE-1, 137 S.Ct. 988 (2017) (counsel for petitioner)

†Manuel v. City of Joliet, 137 S.Ct. 911 (2017) (counsel for petitioner)

†Peña Rodriguez v. Colorado, 137 S.Ct. 855 (2017) (counsel for petitioner)

†Ivy v. Morath, 137 S. Ct. 414 (2016) (counsel for petitioners)

†Fisher v. University of Texas at Austin, 136 S. Ct. 2198 (2016) (counsel for amicus curiae Association of American Law Schools in support of respondents)

*Evenwel v. Abbott, 136 S. Ct. 1120 (2016) (counsel for amicus curiae United States supporting respondent)

†Friedrichs v. California Teachers Association, 136 S. Ct. 1083 (2016) (per curiam) (counsel for amici curiae Peace Officers Research Association of California, Peace Officers Research Association of California Legal Defense Fund, National Association of Police Organizations, CAL FIRE Local 288, New York State Association Of Police Benevolent Associations, Detectives' Endowment Association Of The New York City Police Department, California Statewide Law Enforcement Association, Davis Professional Firefighters Association Local 3494, Fresno Deputy Sheriff's Association, San Francisco Police Officers Association, Deputy Sheriffs' Association Of Santa Clara County, And Engineers & Architects Association in support of respondents)

*Arizona State Legislature v. Arizona Independent Redistricting Commission, 135 S. Ct. 2652 (2015) (counsel for amicus curiae United States supporting appellees)

*Obergefell v. Hodges, 135 S. Ct. 2584 (2015) (counsel for amicus curiae United States supporting petitioners)

†Harris v. Quinn, 134 S. Ct. 2618 (2014) (counsel for amicus curiae Paraprofessional Health Institute in support of respondents)

†Schuette v. Coalition to Defend Affirmative Action, 134 S. Ct. 1623 (2014) (counsel for amici curiae constitutional and local government law scholars Michelle Wilde Anderson, Richard Briffault, Richard Thompson Ford, Sheila Foster, Gerald E. Frug, Daniel B. Rodriguez, Richard C. Schragger, and Rick Su in support of the Cantrell Respondents)

†Fernandez v. California, 134 S. Ct. 1126 (2014) (counsel for petitioner)

16

†Air Wisconsin Airlines Corp. v. Hoeper, 134 S. Ct. 852 (2014) (counsel for respondent)

†Daimler-Chrysler AG v. Bauman, 134 S. Ct. 746 (2014) (counsel for respondent)

†United States v. Windsor, 570 U.S. 744 (2013) (counsel for respondent)

†Shelby County v. Holder, 570 U.S. 529 (2013) (counsel for amici curiae Representatives F. James Sensenbrenner, Jr., John Conyers, Jr., Steve Chabot, Jerrold Nadler, Melvin L. Watt, and Robert C. Scott in support of respondents)

†Fisher v. University of Texas, 570 U.S. 297 (2013) (counsel for amicus curiae American Association of Law Schools in support of respondents)

†Descamps v. United States, 570 U.S. 254 (2013) (counsel for amici curiae National Association of Criminal Defense Lawyers and National Association of Federal Defenders in support of petitioner)

†Salinas v. Texas, 570 U.S. 178 (2013) (counsel for petitioner)

†Arizona v. Intertribal Council, 570 U.S. 1 (2013) (counsel for amici curiae Overseas Vote Foundation, Federation of American Women's Clubs Overseas, American Citizens Abroad, Military Spouses of Michigan, and Arizona Students' Association in support of respondents)

†Moncrieffe v. Holder, 569 U.S. 184 (2013) (counsel for petitioner)

†Kiobel v. Royal Dutch Shell Co., 569 U.S. 108 (2013) (counsel for amici curiae Abukar Hassan Ahmed, Daniel Alvarado, Dr. Juan Romagoza Arce, Aldo Cabello, Zita Cabello, Aziz Mohamed Deria, Dolly Filartiga, Neris Gonzales, Gloria Reyes, Oscar Reyes, Cecilia Santos Moran, Zenaida Velasquez, Bashe Abdi Yousuf, and the Center for Justice and Accountability in support of petitioners)

†Decker v. Northwest Environmental Defense Center, 568 U.S. 597 (2013) (counsel for respondent)

†Chaidez v. United States, 568 U.S. 342 (2013) (counsel for petitioner)

†Lozman v. City of Riviera Beach, 568 U.S. 115 (2013) (counsel for petitioner)

†Freeman v. Quicken Loans, Inc., 566 U.S. 624 (2012) (counsel for petitioners)

†Mohamad v. Palestinian Authority, 566 U.S. 449 (2012) (counsel for petitioners)

†Florence v. Board of Freeholders, 566 U.S. 318 (2012) (counsel for petitioner)

Perry v. Perez, 565 U.S. 388 (2012) (counsel for appellee Mexican American Legislative Caucus)

†Golan v. Holder, 565 U.S. 302 (2012) (counsel for petitioners)

†Greene v. Fisher, 565 U.S. 34 (2011) (counsel for petitioner)

†Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011) (counsel for petitioner)

Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc., 563 U.S. 776 (2011) (counsel for petitioner)

†United States v. Tinklenberg, 563 U.S. 647 (2011) (counsel for respondent)

Chamber of Commerce v. Whiting, 563 U.S. 582 (2011) (counsel for amici curiae Asian American Institute, Asian Law Caucus and AsianPacific American Legal Center of Southern California in support of petitioners)

†Brown v. Plata, 563 U.S. 493 (2011) (counsel for appellee California Correctional and Peace Officers Association)

†Sossamon v. Texas, 563 U.S. 277 (2011) (counsel for petitioner)

Connick v. Thompson, 563 U.S. 51 (2011) (counsel for amici curiae Former Federal Civil Rights Officials and Prosecutors Wan J. Kim, Bill Lann Lee, Grace Chung Becker, William Yeomans, John R. Dunne, Stephen J. Pollak, J. Stanley Pottinger, James P. Turner, Edward S.G. Dennis, Jr., David W. Marston, Matthew D. Orwig, John Ratcliffe, and Uttam Dhillon in support of respondent)

†Magwood v. Patterson, 561 U.S. 320 (2010) (counsel for petitioner)

†Dolan v. United States, 560 U.S. 605 (2010) (counsel for petitioner) (arguing counsel)

†Abbott v. Abbott, 130 S. Ct. 1983 (2010) (counsel for petitioner)

†Samantar v. Yousuf, 560 U.S. 305 (2010) (counsel for respondent)

†United States v. O'Brien, 560 U.S. 218 (2010) (counsel for respondent)

†Jerman v. Carlisle, McNellie, Rini, Kramer & Ullrich, LPA, 559 U.S. 573 (2010) (counsel for petitioner)

†Reed-Elsevier v. Muchnick, 559 U.S. 154 (2010) (counsel for the Muchnick respondents)

†Ricci v. DeStefano, 557 U.S. 557 (2009) (counsel for amici curiae ACLU, Mexican American Legal Defense and Education Fund, and LatinoJustice PRLDF)

†Cuomo v. The Clearing House Association, LLC, 557 U.S. 519 (2009) (counsel for amici

18

curiae Central New York Citizens in Action, Inc., Empire Justice Center, Lawyers' Committee for Civil Rights Under Law, Long Island Housing Services, Inc., National Community Reinvestment Coalition, National Fair Housing Alliance, Neighborhood Economic Development Advocacy Project, Progressive Research & Action Center, Inc., Public Citizen, Inc., South Brooklyn Legal Services, U.S. PIRGs: Federation of State PIRGs, and Washington Lawyers' Committee for Civil Rights and Urban Affairs at the certiorari stage and amici curiae NAACP Legal Defense and Educational Fund, Inc., and Lawyers' Committee for Civil Rights Under Law at the merits stage)

†Melendez-Diaz v. Massachusetts 557 U.S. 305 (2009) (counsel for petitioner)

†Northwest Austin Municipal Utility District No. 1 v. Holder, 557 U.S. 193 (2009) (counsel for amici curiae Reps. John Conyers, Jr.., F. James Sensenbrenner, Jr., Jerrold Nadler, and Melvin Watt and former Rep. Steve Chabot)

†AT&T v. Hulteen, 556 U.S. 701 (2009) (counsel for respondents)

†Flores-Figueroa v. United States, 556 U.S. 646 (2009) (counsel for petitioner)

†Kansas v. Ventris, 556 U.S. 586 (2009) (counsel for amicus curiae National Association of Criminal Defense Lawyers)

†Cone v. Bell, 556 U.S. 149 (2009) (counsel for petitioner)

†Bartlett v. Strickland, 556 U.S. 1 (2009) (counsel for amici curiae NAACP, ACLU, Cindy Moore, Milford Farrior, and Mary Jordan)

†Herring v. United States, 555 U.S. 135 (2009) (counsel for petitioner) (arguing counsel)

†Jimenez v. Quarterman, 555 U.S. 113 (2009) (counsel for petitioner)

†Kennedy v. Louisiana, 554 U.S. 407 and 554 U.S. 945 (2008) (counsel for petitioner)

†Greenlaw v. United States, 554 U.S. 237 (2008) (counsel for petitioner)

†Chamber of Commerce v. Brown, 554 U.S. 60 (2008) (counsel for amici curiae AARP, Association for Gerontology and Human Development in Historically Black Colleges and Universities, California Alliance for Retired Americans, Center for Medicare Advocacy, Inc., the Gray Panthers Project Fund, National Citizens' Coalition for Nursing Home Reform, Older Women's League, and Paraprofessional Healthcare Institute)

†Meacham v. Knolls Atomic Power Laboratory, 554 U.S. 84 (2008) (counsel for petitioners)

†Richlin Security Services Corp. v. Chertoff, 553 U.S. 571(2008) (counsel for amici curiae National Association of Legal Assistants and Paralyzed Veterans of America)

19

†Riley v. Kennedy, 553 U.S. 406 (2008) (counsel for appellees) (arguing counsel)

†Crawford v. Marion County Election Board, 553 U.S. 181 (2008) (counsel for petitioners)

†Virginia v. Moore, 553 U.S. 164 (2008) (counsel for respondent)

†Burgess v. United States, 553 U.S. 124 (2008) (counsel for petitioner)

†Tennessee Secondary School Athletics Association v. Brentwood Academy, 551 U.S. 291 (2007) (counsel for amicus curiae National School Boards Association)

†Wilkie v. Robbins, 551 U.S. 537 (2007) (counsel for respondent)

†Gonzales v. Carhart, 550 U.S. 124 (2007) (counsel for amicus curiae California Medical Association)

†Cunningham v. California, 549 U.S. 270 (2007) (counsel for amicus curiae National Association of Criminal Defense Lawyers)

†Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) (counsel for petitioner)

†Hamdan v. Rumsfeld, 548 U.S. 557 (2006) (counsel for amici curiae historians)

†United States v. Gonzalez-Lopez, 548 U.S. 140 (2006) (counsel for respondent)

†Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) (counsel for amici curiae National Women's Law Center et al.)

†Hill v. McDonough, 547 U.S. 573 (2006) (counsel for amici Bradley A. MacLean and William P. Redick)

†Whitman v. U.S. Department of Transportation, 547 U.S. 512 (2006) (counsel for petitioner) (arguing counsel)

†Georgia v. Randolph, 547 U.S. 103 (2006) (counsel for respondent)

†Bank of China v. NBM, LLC, 546 U.S. 1026 (2005) (counsel for respondents)

†Domino's Pizza v. McDonald, 546 U.S. 470 (2006) (counsel for respondent)

†Tum v. Barber Foods, 546 U.S. 21 (2005) (counsel for petitioners)

†Gonzalez v. Crosby, 545 U.S. 524 (2005) (counsel for amicus curiae Abu Ali Abdur'Rahman)

†Spector v. Norwegian Cruise Line Limited, 545 U.S. 119 (2005) (counsel for petitioners)

†Rousey v. Jacoway, 544 U.S. 320 (2005) (counsel for petitioners) (arguing counsel)

†Smith v. City of Jackson, 544 U.S.228 (2005) (counsel for petitioners)

†Whitfield v. United States, 543 U.S. 209 (2005) (counsel for petitioners)

†U.S. Dept. of Transportation v. Public Citizen 541 U.S. 752 (2004) (counsel for amici curiae Defenders of Wildlife, Environmental Defense, and Sierra Club)

Vieth v. Jubelirer, 541 U.S. 267 (2004) (counsel for amici curiae Texas House Democratic Caucus and Representatives Chris Bell, Martin Frost, Sheila Jackson Lee, and John Lewis)

Lawrence v. Texas, 539 U.S. 558 (2003) (counsel for amici curiae constitutional law professors)

Grutter v. Bollinger, 539 U.S.306 (2003) (counsel for amicus curiae American Association of Law Schools)

Branch v. Smith, 538 U.S. 254 (2003) (counsel for appellants)

Sinkfield v. Kelley, 531 U.S. 28 (2000) (counsel for the Sinkfield appellants)

State of Texas v. United States, 523 U.S. 296 (1998) (counsel for amici curiae American Civil Liberties Union and NAACP Legal Defense and Educational Fund)

Clinton v. Jones, 520 U.S. 681 (1997) (counsel for amici curiae group of law professors)

Shaw v. Hunt, 517 U.S. 899 (1996) (counsel for amici curiae North Carolina Legislative Black Caucus and North Carolina Association of Black Lawyers)

Romer v. Evans, 517 U.S. 620 (1996) (counsel for amici curiae Asian American Legal Defense and Education Fund, Japanese American Citizens League, National Council of La Raza, and Puerto Rican Legal Defense and Education Fund)

Morse v. Republican Party of Virginia, 517 U.S. 186 (1996) (counsel for appellants) (arguing counsel)

Lotus Development Corp. v. Borland, International, Inc., 516 U.S. 233 (1996) (counsel for amicus curiae League for Programming Freedom)

Miller v. Johnson, 515 U.S. 900 (1995) (counsel for amicus curiae Georgia Association of Black Elected Officials)

United States v. Hays, 515 U.S. 734 (1995) (counsel for amicus curiae Congressional Black Caucus)

Voinovich v. Quilter, 507 U.S. 146 (1993) (counsel for amici curiae NAACP Legal Defense and Educational Fund, Mexican American Legal Defense and Educational Fund, National Asian Pacific American Legal Consortium, Lawyers Committee for Civil Rights Under Law, and Puerto Rican Legal Defense and Education Fund)

Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992) (counsel for an ad hoc group of 178 amici curiae)

Presley v. Etowah County Commission, 502 U.S. 491 (1992) (counsel for appellants)

Chisom v. Roemer, 501 U.S. 380 (1991) (counsel for petitioners) (arguing counsel)

Equal Employment Opportunity Commission v. Arabian American Oil Co., 499 U.S. 244 (1991) (counsel for amici curiae NAACP Legal Defense and Educational Fund, American Jewish Committee, American Jewish Congress, Anti-Defamation League of B'nai B'rith, and Women's Legal Defense Fund)

Lytle v. Household Manufacturing, Inc., 494 U.S. 545 (1990) (counsel for petitioners)


*U.S. Supreme Court Certiorari, Jurisdictional Statement, and Stay Stage Cases*

(Note: Cases in which I participated in which the Supreme Court granted plenary review or issued a written opinion are listed above if I participated at the merits stage; cases in which I participated in the courts of appeals where review was sought but denied are listed in the section concerning litigation in those courts.)

†Campos v. United States. ___ S.Ct. ___ (counsel for petitioner)

†J.B.R. v. United States, ___ S. Ct. ___ (counsel for petitioner)
'
†Turner v. United States, ___ S. Ct. ___ (counsel for *amici curiae* former judges and prosecutors U.W. Clemon, W.J. Michael Cody, Nancy Gertner, John Gleeson, Alex Little, Wendy J. Olson, Kevin Sharp, Joyce Vance, and Edward M. Yarbrough in support of petitioner)

†Licci v. Lebanese Canadian Bank, ___ S. Ct. ___ (counsel for petitioners)

†Planned Parenthood v. Jegley, 138 S. Ct. 2473 (2018) (counsel for petitioner)

†D.T. v. W.G., 138 S. Ct. 1441 (2018) (counsel for petitioner)

†Davenport v. City of Sandy Springs, 138 S. Ct. 1326 (2018) (counsel for petitioners)

†Massachusetts v. Wampanoag Tribe of Gay Head (Aquinnah), 138 S. Ct. 639 (2018)

22

(counsel for respondents)

†Evans v. Georgia Regional Hospital, 138 S. Ct. 557 (2017) (counsel for petitioner)

†Robinson v. United States, 138 S. Ct. 379 (2017) (counsel for petitioner)

†Glisson v. D.O., 138 S. Ct. 316 (2017) (counsel for respondents)

†Blackorby v. BNSF Railway Co., 138 S. Ct. 264 (2017) (counsel for petitioner)

†Loomis v. Wisconsin, 137 S. Ct. 2290 (2017) (counsel for petitioner)

†Northeast Ohio Coalition for the Homeless v. Husted, 137 S. Ct. 2265 (2017) (counsel for petitioners Northeast Ohio Coalition for the Homeless and Columbus Coalition for the Homeless)

†Connecticut v. Dickson, 137 S. Ct. 2263 (2017) (counsel for respondent)

United States ex rel. Advocates for Basic Legal Equality, Inc. v. U.S. Bank, N.A., 137 S. Ct. 2180 (2017) (counsel for petitioner)

†Garner v. Colorado, 137 S. Ct. 1813 (2017) (counsel for petitioners)

†Walker v. Texas, 137 S. Ct. 1813 (2017) (counsel for petitioner)

†FTS USA, LLC v. Monroe 137 S. Ct. 590 (2016) (counsel for petitioners)

†West Virginia Department of Health and Human Resources v. E.H., 137 S. Ct. 328 (2016) (counsel for respondents)

†Hylind v. Xerox Corp., 137 S. Ct. 84 (2016) (counsel for petitioner)

†GEICO General Insurance Co. v. Calderon, 137 S. Ct. 53 (2016) (counsel for respondents)

†Territory of Guam v. Paeste, 136 S. Ct. 2508 (2016) (counsel for respondents)

†Haberstroh v. Nevada, 136 S. Ct. 1660 (2016) (counsel for petitioner)

†Schumacher Homes of Circleville v. Spencer, 136 S. Ct. 1157 (2016) (counsel for respondents)

†Town of Mocksville v. Hunter, 136 S. Ct. 897 (2016) (counsel for respondents)

*Kobach v. United States Electoral Assistance Commission, 135 S. Ct. 2891 (2015) (counsel for respondents)

*Veasey v. Perry, 135 S. Ct. 9 (2014) (counsel for applicant United States)

†Brewington v. North Carolina, 134 S. Ct. 2660 (2014) (counsel for petitioner)

†Heien v. North Carolina, 134 S. Ct. 1872 (2014) (counsel for petitioner at the certiorari stage only)

†Hoagland v. Ada County, 134 S. Ct. 1024 (2014) (counsel for petitioner)

†Riley v. California, 134 S. Ct. 999 (2014) (counsel for petitioner at the certiorari stage only)

†Loughrin v. United States, 134 S. Ct. 822 (2013) (counsel for petitioner at the certiorari stage only)

†Alabama Black Legislative Caucus v. State of Alabama, 134 S. Ct. 694 (2013) (counsel for appellants)

†New Mexico v. Navarette, 134 S. Ct. 64 (2013) (counsel for respondent)

†Windsor v. United States, 133 S. Ct. 2884 (2013) (counsel for petitioner)

†Bipartisan Legislative Advisory Group of the United States House of Representatives v. Windsor, 133 S. Ct. 2885 (2013) (counsel for respondent)

†Donaldson v. Dep't of Homeland Security, 133 S. Ct. 2854 (2013) (counsel for petitioner)

†Allshouse v. Pennsylvania, 569 U.S. 972 (2013) (counsel for petitioner)

†Miller v. Louisiana, 568 U.S. 1157 (2013) (counsel for petitioner)

†City of New York v. Southerland, 568 U.S. 1150 (2013) (counsel for respondents)

†Pleau v. United States, 568 U.S. 1122 (2013) (counsel for petitioner)

†Delling v. Idaho, 568 U.S. 1038 (2012) (counsel for petitioner)

†Rivas-Lopez v. United States, 568 U.S. 817 (2012) (counsel for petitioner)

†Pickering v. Colorado, 566 U.S. 1009 (2012) (counsel for petitioner)

†Heydt-Benjamin v. Heydt-Benjamin, 564 U.S. 1047 (2011) (counsel for petitioner)

†Zuress v. Donley, 564 U.S. 1037 (2011) (counsel for petitioner)

†Cardinal v. Metrish, 563 U.S. 969 (2011) (counsel for petitioner)

†South Carolina, 563 U.S. 963 (2011) (counsel for petitioner)

†Edwards v. A.H. Cornell and Son, Inc., 562 U.S. 1280 (2011) (counsel for the petitioner)

†Allshouse v. Pennsylvania, 562 U.S. 1267 (2011) (counsel for petitioner)

†Barbour v. Louisiana, 562 U.S. 1217 (2011) (counsel for petitioner)

†Castro v. United States, 562 U.S. 1168 (2011) (counsel for petitioner)

†Experian Information Solutions v. Pintos, 562 U.S. 1134 (2011) (counsel for respondent)

†Gao v. Holder, 562 U.S. 1134 (2011) (counsel for petitioner)

†Lafler v. Cooper, 562 U.S. 1127 (2011) (counsel for respondent at the certiorari stage only)

†Bannister v. Illinois, 562 U.S. 1061 (2010) (counsel for petitioner)

†Meacham v. Knolls Atomic Power Laboratory, 562 U.S. 992 (2010) (counsel for petitioners)

†Pendergrass v. Indiana, 560 U.S. 965 (2010) (counsel for petitioner)

†Ferguson v. Holder, 559 U.S. 991 (2010) (counsel for petitioner)

†United States v. Bowden, 558 U.S. 1091 (2009) (counsel for respondent)

†Virginia v. Rudolph, 558 U.S. 1048 (2009) (counsel for respondent)

†Burkey v. Marberry, 558 U.S. 969 (2009) (counsel for petitioner)

†Daniels v. Washington, 558 U.S. 819 (2009) (counsel for petitioner)

†Bowen v. Oregon, 558 U.S. 815 (2009) (counsel for petitioner)

†Durall v. Quinn, 557 U.S. 904 (2009) (counsel for petitioner)

†Navajo Nation v. United States Forest Service, 556 U.S. 1281 (2009) (counsel for petitioners)

†Dunphy v. United States, 556 U.S. 1257 (2009) (counsel for petitioner)

†Mitchell v. Rees, 555 U.S. 1212 (2009) (counsel for petitioner)

†Polar Tankers, Inc. v. City of Valdez, 555 U.S. 1083 (2008) (counsel for respondent at the certiorari stage only)

†Smith v. United States, 555 U.S. 993 (2008) (counsel for petitioner)

†Lee v. Louisiana, 555 U.S. 823 (2008) (counsel for petitioner)

†Kay v. United States, 555 U.S. 813 (2008) (counsel for petitioners)

†Lewis v. United States, 555 U.S. 813 (2008) (counsel for petitioners)

†Riley v. Plump, 555 U.S. 801 (2008) (counsel for appellee)

†Green v. Chilton County Commission, 554 U.S. 918 (2008) (counsel for Dillard respondents)

†Baker v. Chisom, 554 U.S. 902 (2008) (counsel for petitioner)

†Anderson v. Cagle's, Inc., 553 U.S. 1093 (2008) (counsel for petitioners)

†Lawler v. Nara, 552 U.S. 1309 (2008) (counsel for respondent)

†Beasley v. United States, 552 U.S. 1242 (2008) (counsel for petitioner)

†Dickinson v. Collier, 552 U.S. 1096 (2008) (counsel for respondents)

†NCAA v. Cohane, 552 U.S. 1022 (2007) (counsel for respondent)

†Sasouvong v. Washington, 552 U.S. 816 (2007) (counsel for petitioner)

†McKenzie v. Carolina Care Plan, Inc., 551 U.S. 1176 (2007) (counsel for petitioner)

†Carolina Care Plan, Inc. v. McKenzie, 551 U.S. 1176 (2007) (counsel for respondent)

†Hrasky v. United States, 550 U.S. 903 (2007) (counsel for petitioner)

†Lively v. Wild Oats Market, 549 U.S. 1207 (2007) (counsel for petitioner)

†Goodin v. U.S. Postal Service, 549 U.S. 1111 (2006) (counsel for petitioner)

†Davis v. United States, 549 U.S. 1030 (2006) (counsel for petitioner)

†Medeiros v. Sullivan, 548 U.S. 904 (2006) (counsel for petitioner)

†Mouelle v. Gonzalez, 548 U.S. 901 (2006) (counsel for petitioners)

†Pierce v. Jeter, 547 U.S. 1127(2006) (counsel for petitioner)

†Cox v. United States, 547 U.S. 1127 (2006) (counsel for petitioner)

26

†City of Columbus v. Golden, 546 U.S. 1032 (2005) (counsel for petitioner)

†Johnson v. Bush, 546 U.S. 1015 (2005) (counsel for amicus curiae League of Women Voters of Florida)

†Hadfield v. McDonough, 546 U.S. 961 (2005) (counsel for petitioner)

†Illinois v. Bartels, 546 U.S. 801 (2005) (counsel for respondent)

†Bell v. Abdur'Rahman, 545 U.S. 1151 (2005) (counsel for respondent)

†Stavropolous v. Firestone, 544 U.S. 976 (2005) (counsel for petitioner)

†City of Evanston v. Franklin, 544 U.S. 956 (2005) (counsel for respondent)

†Arkansas v. Jolly, 544 U.S. 948 (2005) (counsel for respondent)

†Donaldson v. Lott, 543 U.S. 1050 (2005) (counsel for petitioners)

Meadows v. Moon, 521 U.S. 1113 (1997) (counsel for private appellants)

Harris v. City of Birmingham, 505 U.S. 1201 (1992) (counsel for appellant)

### United States Courts of Appeals

Lewis v. Alabama, 896 F.3d 1282 (11th Cir. 2018) (counsel for amici curiae historians Susan Ashmore, Wayne Flynt, Hasan Jeffries, J. Morgan Kousser, Peyton McCrary, and Patricia Sullivan in support of appellants seeking reversal)

*North Carolina Conf. of the State NAACP v. McCrory, 831 F.3d 204 (4th Cir. 2016) (counsel for appellant United States)

*Veasey v. Abbott, 830 F.3d 216 (5th Cir. 2016) (en banc) (counsel for appellee United States)

*Lopez v. City of Lawrence, 823 F.3d 102 (1st Cir. 2016) (counsel for amicus curiae United States)

*United States v. State of Georgia, 778 F.3d 1202 (11th Cir. 2015) (counsel for appellee United States)

*United States v. State of Alabama, 778 F.3d 926 (11th Cir. 2015) (counsel for appellee United States)

*Kobach v. United States Electoral Assistance Commission, 772 F.3d 1183 (10th Cir. 2014)

(counsel for appellants Electoral Assistance Commission and Alice Miller)

*Veasey v. Perry, 769 F.3d 890 (5th Cir. 2014) (counsel for appellee United States)

*Frank v. Walker, 769 F.3d 494 (7th Cir. 2014) (counsel for amicus curiae United States)

*League of Women Voters v. North Carolina, 769 F.3d 224 (4th Cir. 2014) (counsel for amicus curiae United States)

†Farrakhan v. Gregoire, 623 F.3d 990 (9th Cir. 2010) (en banc) (counsel for amici curiae law professors)

Simpson v. Colorado University, 500 F.3d 1170 (10th Cir. 2007) (counsel for appellant)

Dillard v. Baldwin County Commission, 376 F.3d 1260 (11th Cir. 2004) (counsel for appellants)

United States v. Smith and Tyree, 231 F.3d 800 (11th Cir. 2000), *cert. denied*, 532 U.S. 1019 (2001) (counsel for appellants) (arguing counsel)

Hoffman v. Hunt, 126 F.3d 525 (4th Cir. 1997), *cert. denied*, 526 U.S. 1135 (1998) (counsel for amicus curiae Planned Parenthood Federation of America)

Coalition for Economic Equity v. Wilson, 122 F.3d 692 (9th Cir.), *cert. denied*, 522 U.S. 963 (1997) (counsel for *amici curiae* law professors)

Cane v. Worcester County, 35 F.3d 921 (4th Cir1994), *cert. denied*, 513 U.S. 1148 (1995), and 59 F.3d 165 (4th Cir. 1995) (counsel for amicus curiae Center for Voting and Democracy)

Boureslan v. Arabian American Oil Co., 892 F.2d 1291 (5th Cir. 1990), *aff'd*, 499 U.S. 244 (1991) (counsel for amicus curiae NAACP Legal Defense and Educational Fund)

City of Scottsboro v. Battle, No. 88-7674 (11th Cir. 1989) (counsel for interlocutory appellants) (arguing counsel)

Westwego Citizens for Better Government v. City of Westwego, 872 F.2d 1201 (5th Cir. 1989) (counsel for amicus curiae NAACP Legal Defense and Educational Fund)

Montero v. Meyer, 861 F.2d 603 (10th Cir. 1988) (counsel for amici curiae NAACP Legal Defense and Educational Fund and American Civil Liberties Foundation of Colorado)

Larkin v. Pullman-Standard, 854 F.2d 1549 (11th Cir. 1988), *vacated and remanded*, 493 U.S. 929 (1989) (counsel for appellants)

Chisom v. Edwards, 853 F.2d 1156 (5th Cir. 1988) (counsel for appellees) (arguing counsel)

28

Gomez v. City of Watsonville, 852 F.2d 1186 (9th Cir. 1988) (counsel for amicus curiae NAACP Legal Defense and Educational Fund)

Chisom v. Edwards, 839 F.2d 1056 (5th Cir. 1988) (counsel for appellants) (arguing counsel)

Mallory v. Eyrich, 839 F.2d 275 (6th Cir. 1988) (counsel for amici curiae NAACP Legal Defense and Educational Fund and Lawyers' Committee for Civil Rights under Law)

United States v. Gordon, 836 F.2d 1312 (11th Cir. 1988) (per curiam) (counsel on petition for rehearing for defendant)

### United States District Courts

*United States v. Alabama, (M.D. Ala) (counsel for plaintiff)

*Brown v. Con-Way Freight, 2016 WL 861210 (N.D. Ill. 2016) (counsel for plaintiff)

*Jamal v. Saks & Co., Civ. Act. No. 14-2782 (S.D. Tex.) (settled 2015) (counsel for United States (statement of interest))

*Poor Bear v. County of Jackson, 2015 WL 1969760 (D.S.D. 2015) (counsel for United States (statement of interest))

*Toyukak v. Treadwell, Case No. 3:13-cv-137-SLG (D. Alaska 2014) (counsel for United States (statement of interest))

*Wandering Medicine v. McCulloch, Case No. 1:12-CV-135-DWM (D. Mont.) (counsel for United States (statement of interest))

*United States v. City of Austin, Civ. Act. No. 1:14cv533-L (W.D. Tex.) (counsel for plaintiff)

*United States v. Chicago Board of Education, Case No. 14-CIV-10285 (N.D. Ill.) (counsel for plaintiff)

*United States v. State of Louisiana, Civ. Act. No. 3:11-CV-470-JWD-RLB (M.D. La.) (counsel for plaintiff)

*United States v. School District of Philadelphia, Civ. Act. No. 2:14-cv-01334 (E.D. Pa.) (settled 2014) (counsel for plaintiff)

*United States v. West Virginia, 2014 WL 7338867 (S.D.W. Va. 2014) (counsel for plaintiff)

*United States v. Southeastern Oklahoma State University, Case No. CIV-15-324-C (W.D. Okla.) (counsel for plaintiff)

*Veasey v. Perry, 29 F. Supp. 3d 386 (S.D. Tex. 2014) (counsel for plaintiff United States)

*Ohio State Conference, NAACP v. Husted, 2014 WL 4377869 (S.D. Ohio 2014) (counsel for United States (statement of interest))

*Kobach v. United States Electoral Assistance Commission, 6 F. Supp. 3d 1252 (D. Kans.), *rev'd*, 772 F.3d 1183 (10th Cir. 2014) (counsel for defendants Electoral Assistance Commission and Alice Miller)

*North Carolina State Conference of NAACP v. McCrory, 997 F. Supp. 2d 322 (M.D.N.C. 2014) *aff'd in part, rev'd in part and remanded sub nom.* League of Women Voters v. North Carolina, 769 F.3d 224 (4th Cir. 2014) (counsel for plaintiff United States)
*Burnett v. City of Philadelphia-Free Library, Civ. Act. No. 09-4348 (E.D. Pa.) (settled 2014) (counsel for United States (statement of interest))

Voting Integrity Project v. Fleischer, Case No. Civ. 00 0109 PHX (PGR) (D. Ariz. Feb. 29, 2000) (counsel for amici curiae Center for Governmental Studies, Benjamin E. Mays National Educational Resource Center and Professor Charles E. Nesson)

Dillard v. Baldwin County Commission, 53 F. Supp.2d 1256 (M.D. Ala. 1999), *rev'd*, 275 F.3d 1271 (11th Cir. 2000) (counsel for plaintiffs)

Dillard v. City of Greensboro, 956 F. Supp. 1576 (M.D. Ala. 1997) (counsel for plaintiffs)

Moon v. Meadows, 952 F. Supp. 1141 (E.D. Va.) (three-judge court), *aff'd*, 521 U.S. 1113 (1997) (counsel for defendant-intervenors)

Mack v. Russell County Commission, 869 F. Supp. 1555 (M.D. Ala. 1994) (counsel for plaintiffs)

Morse v. Oliver North for U.S. Senate Committee, 853 F. Supp. 212 (W.D. Va. 1994) (three-judge court), *rev'd sub nom.* Morse v. Republican Party of Virginia, 517 U.S. 186 (1996) (counsel for plaintiffs) (arguing counsel)

Guy v. Hickel, No. A92-494 CIV (JWS) (D. Alaska 1994) (counsel for plaintiffs)

Texas Rural Legal Assistance v. Legal Services Corporation, 740 F. Supp. 880 (D.D.C. 1990), *rev'd and remanded,* 940 F.2d 685 (D.C. Cir. 1991) (counsel for amicus curiae National Legal Aid and Defender Association)

Jeffers v. Clinton, 730 F. Supp. 196 (E.D. Ark. 1989) (three-judge court), and 740 F. Supp. 585 (E.D. Ark. 1990) (three-judge court), *aff'd*, 498 U.S. 1019 (1991) (counsel for plaintiffs)

McDaniels v. Mehfoud, 708 F. Supp. 754 (E.D. Va. 1989), *appeal dism'd,* 1991 U.S. App. LEXIS 2896 (4th Cir. 1989) (counsel to the Special Master)

Chisom v. Edwards, 690 F. Supp. 1524 (E.D. La. 1988), *vacated*, 853 F.2d 1186 (5th Cir.

1988) (counsel for plaintiffs)

Dillard v. Crenshaw County, 679 F. Supp. 1546 (M.D. Ala. 1988) (*on remand from* 831 F.2d 246 (11th Cir. 1987)); Dillard v. Chilton County Board of Education and Chilton County Commission, 699 F. Supp. 870 (M.D. Ala. 1988) and 1988 U.S. Dist. LEXIS 18248 (M.D. Ala. 1988); Dillard v. Baldwin County Commission, 694 F. Supp. 836 (M.D. Ala. 1988), and 701 F. Supp. 808 (M.D. Ala. 1988); Dillard v. Baldwin County Board of Education, 686 F. Supp. 1459 (M.D. Ala. 1988) (counsel for plaintiffs)

Whitfield v. Democratic Party of Arkansas, 686 F. Supp. 1365 (E.D. Ark. 1988), *aff'd by an equally divided court,* 902 F.2d 15 (8th Cir. 1990) (per curiam), *cert. denied,* 498 U.S. 1126 (1991) (counsel for plaintiffs)

Jones v. Edwards, 674 F. Supp. 1225 (E.D. La. 1987) (three-judge court) (counsel for plaintiffs)

Chisom v. Edwards, 659 F. Supp. 183 (E.D. La. 1987), *rev'd,* 839 F.2d 1056 (5th Cir.), *cert. denied,* 488 U.S. 955 (1988) (counsel for plaintiffs)

Martin v. Allain, 658 F. Supp. 1183 (S.D. Miss. 1987), and Martin v. Mabus, 700 F. Supp. 327 (S.D. Miss. 1988) (counsel for plaintiffs)

Patterson v. NMDU, No. 73 Civ. 3058 (WCC) (S.D.N.Y.) (counsel for plaintiffs)

**State Courts**

*Joseph v. Legislature of the Virgin Islands, Civil No. ST-11-CV-419 (V.I. Superior Ct.) (counsel for United States (statement of interest))

Wilkins v. West, 571 S.E.2d 100 (Va. 2002) (counsel to Governor Mark Warner) (arguing counsel)

Hi-Voltage Wire Works, Inc. v. City of San Jose, 12 P.3d 1068 (Cal. Sup. Ct. 2000) (of counsel to *amicus curiae* NAACP Legal Defense and Educational Fund, Inc.)

Gamboa v. Chandler, Civil No. 92-1846 (Hawaii Circuit Ct.) (of counsel to attorneys for plaintiffs)

Hicks v. Kemp, No. 87-V-1122 (Butts County Superior Ct., Dec. 30, 1988), *certificate of probable cause denied,* No. 4180 (Ga. Sup. Ct. Oct. 5, 1990), *cert. denied,* 494 U.S. 1074 (1991); *later proceeding*, No. 91-V-3647 (Butts County Superior Ct. 1994), *certificate of probable cause denied,* No. S94H1032 (Ga. Sup. Ct. Sept. 30, 1994), *cert. denied sub nom.* Hicks v. Thomas, 514 U.S. 1020 (1995) (counsel for petitioner)

†      Cases litigated as co-director of the Stanford Supreme Court Litigation Clinic

\*      Cases in which I had significant involvement while serving as Deputy Assistant
Attorney General in the Civil Rights Division of the United States Department of Justice
(Note: It is a convention of the Appellate, Employment Litigation, and Voting Sections of
the Civil Rights Division generally not to include the names of Deputy Assistant Attorneys
General on court filings)

### INVITED LECTURES, WORKSHOPS, PAPERS, AND SYMPOSIUM PRESENTATIONS

AFL-CIO Lawyers Conference; University of Alabama Law School; American Association of
Law Schools Annual Meeting; American Bar Association Annual Meeting Presidential
Showcases; American Bar Association Annual Meeting; American Civil Liberties Union
Biennial Plenary Session; American Constitution Society Annual Convention; American
Political Science Association Annual Meeting; American Sociological Association Annual
Meeting; American University, Washington College of Law; Appellate Judges Educational
Institute Annual Meeting; Association of Business Trial Lawyers San Francisco Chapter
Annual Meeting; Aspen Institute Justice & Society Program; Augustana College; Boston
University Law School; Brown University; California Judicial Council; University of
California at Berkeley Institute of Governmental Studies; University of California at
Berkeley, Boalt Hall; University of California at Davis School of Law; University of
California, Hastings College of the Law; University of California at Los Angeles School of
Law; University of California at Santa Cruz; Benjamin N. Cardozo School of Law; Case
Western Reserve University School of Law; Chautauqua Institution; Chicago Humanities
Festival; University of Chicago Law School; University of Cincinnati College of Law;
University of Colorado Law School; Cornell Law School; Cumberland Law School; Defense
Research Institute Appellate Lawyers Conference; Delaware Courts Annual Meeting;
University of Denver, Sturm College of Law; DePaul University College of Law; Dickinson
Law School; Drake Law School; Duke Law School; Eighth Circuit Judicial Conference;
Emory Law School; Federal Judicial Center; Federalist Society National Student
Convention; Fifth Circuit Judicial Conference; Florida State University School of Law;
University of Florida College of Law; Fordham University School of Law; Fourth Circuit
Judicial Conference; George Washington University Law School; Georgetown University
Law Center; Georgia State University College of Law; University of Georgia Law School;
Harvard University Civil Rights Project; Harvard Law School; University of Houston Law
Center; Human Rights Campaign Right to THRIVE Conference; University of Illinois
College of Law; Iowa Federal Bar Association Annual Meeting; Indiana University Law
School; Johns Hopkins University; Kansas Bar Association Annual Meeting; University of
Kansas Law School; Lavender Law; Law and Society Association Annual Meeting; Law
School Admissions Council; Lewis and Clark Law School; Linfield College; Institute of
Advanced Legal Studies, University of London; Louisiana State Bar Association/Louisiana
Judicial College Annual Meeting; Loyola University Law School; Luther College; McGeorge
School of Law; University of Miami Law School; University of Michigan Law School;
Minnesota Judicial Branch Annual Conference of Judges; University of Minnesota Law
School; University of Montana; NAACP Legal Defense and Educational Fund, Inc., Annual
Civil Rights Training Institute; National Association of Attorneys General; National
Association of College and University Attorneys; National Association of Criminal Defense

Lawyers West Coast White Collar Conference; National Civil Rights Museum; National Legal Aid and Defender Association Annual Litigation Directors' Conference; National Association of Women Judges; University of Nebraska; Nebraska Supreme Court and Court of Appeals Annual Meeting; University of New Mexico School of Law; N.Y.U. School of Law; Ninth Circuit Judicial Conference; University of North Carolina School of Law; Northern District of California Historical Society; Northern District of California Judicial Conference; Nova Southeastern University; Oberlin College; Ohio Northern University Pettit College of Law; Ohio State University College of Law; Oklahoma City University Law School; Oregon Bar Association; Oregon Women Lawyers Society; Pacific Northwest Judicial Conference; Pennsylvania State Appellate Courts Annual Conference; University of Pennsylvania School of Law; Princeton University; Seventh Circuit Judicial Conference; Sixth Circuit Judicial Conference; University of Southern California Law School; Southern Oregon Federal Bar Association; Southwestern Law School; Stanford Law School; Tel Aviv University Buchmann Faculty of Law; Tenth Circuit Judicial Conference; Texas A & M University; University of Texas Law School; Tribunal Electoral del Poder Judicial de la Federación (Mexico); Tulane Law School; United Nations Development Program International Congress on Elections; Vanderbilt Law School; University of Virginia School of Law; Washington State Courts Appellate Conference; Washington and Lee School of Law; Western New England College School of Law; Washington University School of Law; William & Mary College of Law; William & Mary Bill of Rights Institute; University of Wisconsin Law School; Yale Law School

### EDUCATION

Yale Law School, J.D./M.A. (History), 1984

> Article & Book Review Editor, Yale Law Journal
> Director, Yale Moot Court of Appeals
> Supervising Student, Jerome N. Frank Legal Services Organization
> Head Coach, Yale Debate Association
> Research Assistant, Professor Paul Gewirtz
> Freshman Counselor, Jonathan Edwards College

Yale College, B.A. *magna cum laude* with distinction in history, 1980

> Robert D. French Scholar (intellectual leadership; ranking prize of Jonathan Edwards College)
> Ellsworth Prize (senior essay)
> DeForest, Thacher, TenEyck, and Buck-Jackson Prizes (debate and public speaking)

### BAR ADMISSIONS

Supreme Court of the United States
United States Courts of Appeals for the Fourth, Eighth, Ninth, and Eleventh Circuits
United States District Court for the Southern District of New York
Supreme Court, Appellate Division, First Department of the State of New York

Dec. 12 2017

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans. In furtherance of that commitment. I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called "long form" census. This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting. To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected. As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority. See *Thornburg* v. *Gingles,* 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district See, e.g., *Reyes* v. *City of Farmers Branch,* 586 F.3d 1019, 1023–24 (5th Cir. 2009); Barnett v. City of Chicago, 141 F.3d 699, 704 (7th Cir. 1998); Negrn v. City of Miami Beach, 113 F.3d 1563,1567-69 (11th Cir. 1997); Romero v. City of Pomona, 883 F.2d 1418, 1426 (9th Cir. 1989), overruled in part on other grounds by Townsend v. Holman Consulting Corp., 914 F.2d 1136, 1141 (9th Cir. 1990); see also LULAC v. Perry, 548 U.S. 399, 423–442 (2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation ... in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos* v. *City of Houston,* 113 F.3d 544, 548 (5th

Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos,* 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide at* 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22,2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

- Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel* v. *Abbott,* 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

- Because the ACS estimates are rolling and aggregated into one-year, three-year, and five- year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

- The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gOv/glossary/#term_ConfidenceintervalAmericanCommunitySurvey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

- Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia*, to yield information for the periodic

determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

Appendix C-1

APPENDIX C

Cases where section 2 plaintiffs lost because of a failure to satisfy
the first *Gingles* precondition

1.    In re 2012 Legislative Districting, 80 A.3d 1073 (Md. 2013)

2.    Al-Hakim v. Florida, 892 F. Supp. 1464 (M.D. Fla. 1995), aff'd, 99 F.3d 1154
(11th Cir. 1996)

3.    Bartlett v. Strickland, 556 U.S. 1 (2009)

4.    Benavidez v. Irving Indep. Sch. Dist., 690 F. Supp. 2d 451 (N.D. Tex. 2010)

5.    Campos v. City of Houston, 113 F.3d 544 (5th Cir. 1997)

6.    Dillard v. Baldwin County Comm'rs, 376 F.3d 1260 (11th Cir. 2004)

7.    Fairley v. Hattiesburg, 584 F.3d 660 (5th Cir. 2009)

8.    Gause v. Brunswick Cty., N.C., 1996 WL 453466 (4th Cir. 1996)

9.    Hall v. Virginia, 385 F.3d 421(4th Cir. 2004)

10.   Johnson v. DeSoto County Bd. of Comm'rs, 204 F.3d 1335 (11th Cir. 2000)

11.   McNeil v. Springfield Park Dist., 851 F.2d 937 (7th Cir. 1988)

12.   Metts v. Almond, 217 F. Supp. 2d 252 (D.R.I. 2002), rev'd, 363 F.3d 8 (1st Cir.
2004) (en banc)

13.   Negron v. City of Miami Beach, 113 F.3d 1563 (11th Cir. 1997)

14.   Perez v. Pasadena Indep. Sch. Dist., 165 F.3d 368 (5th Cir. 1999)

15.   Reyes v. City of Farmers Branch, 586 F.3d 1019 (5th Cir. 2009)

16.   Rios-Andino v. Orange County, 51 F. Supp. 3d 1215 (M.D. Fla. 2014)

17.   Romero v. City of Pomona, 665 F. Supp. 853 (C.D. Cal. 1987), aff'd, 883 F.2d
1418 (9th Cir. 1989)

18.   Sensley v. Albritton, 385 F.3d 591 (5th Cir. 2004)

Appendix C-2

19.     Skorepa v. City of Chula Vista, 723 F. Supp. 1384 (S.D. Cal. 1989)

20.     Stabler v. Thurston County, 129 F.3d 1015 (8th Cir. 1997), cert. denied, 523 U.S. 1118 (1998)

21.     Thompson v. Kemp, 309 F. Supp. 3d 1360 (N.D. Ga. 2018)

22.     Turner v. Arkansas, 784 F. Supp. 553 (E.D. Ark. 1991) (three-judge court), aff'd, 504 U.S. 952 (1992)

23.     Valdespino v. Alamo Heights Indep. Sch. Dist., 168 F.3d 848 (5th Cir. 1999)

24.     Wright v. Sumter County Bd. of Elections & Registration, 2014 WL 1347427 (M.D. Ga. Apr. 3, 2014)