# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, *et al.* | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| U.S. DEPARTMENT OF COMMERCE, *et al.* | |
| *Defendants*. | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants*. | |

## RULE 26(A)(2)(B) EXPERT REPORT AND DECLARATION OF DAVID ELY

## EXPERT WITNESS REPORT AND DECLARATION OF DAVID ELY

### I.      Professional Background

1.  I am the founder of Compass Demographics, a consulting and database management firm specializing in projects involving Census and Elections Data. I have extensive expertise and experience in the management of redistricting projects, the analysis of voting behavior, and demographic analysis.

2.  Prior to founding Compass Demographics, from 1986 to 2007, I was the Director of Research for the Redistricting and Reapportionment practice of Pactech Data and Research, where in addition to litigation expert and consulting work, I provided database construction and redistricting consultation to numerous jurisdictions.

3.  Since 1986, I have served as an expert witness in over 30 federal and state voting rights cases in 12 states. I have been retained as an expert by the Department of Justice and have testified on behalf of the United States in numerous cases involving enforcement of the federal Voting Rights Act, in which I performed analysis similar to the types of analysis discussed in this report.

4.  I have also served as a consultant and expert on behalf of private plaintiffs in state and federal voting rights litigation challenging electoral systems in multiple jurisdictions.

5.  I have also served as a consultant and expert on behalf of defendant jurisdictions, in voting rights litigation challenging election systems or districts.

6.  I have served as an expert witness in numerous cases brought under Section 2 of the federal Voting Rights Act, including with respect to plaintiffs' satisfaction of the first threshold condition under the test of *Thornburg v. Gingles,* 478 U.S. 50 (1986)—namely, whether a minority group is sufficiently large and compact to constitute a majority of the voting age citizen population in a single-member district. Among the cases in which I have provided expert testimony concerning prong one of the *Gingles* test are *Luna v. Kern County Board of Supervisors*, 291 F. Supp.3d 1088 (E.D. Ca. 2018) (Plaintiffs prevailed, my prong one evidence adopted with approval by the court); *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 674 (S.D.Tex. 2017) (same), *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545, (N.D.Tex, 2012) (same); *Benavidez v. City of Irving, Tex.,* 638 F.Supp.2d 709, 720 (N.D.Tex. 2009) (same).

7.  In addition to my expert witness work in cases under the federal Voting Rights Act, I have also testified as an expert in cases under the California Voting Rights Act, including *Pico Neighborhood Association v. City of Santa Monica*, Los Angeles Superior Court Case No. BC616804 (judgement pending); *Jauregui v. City of Palmdale*, Los Angeles Superior Court Case, No. BC 482039 (court relied on my testimony to find racially polarized voting and to enter a remedial plan); *Garrett v. City of Highland*, San Bernardino Superior Court, Case No. CIV-DS-1410696 (court approved my remedial plan); *Yumore Kaku v. City of Santa Clara,* Santa Clara Superior Court Case No. 17CV31982 (remedial plan pending).

8. Following the 1990, 2000, and 2010 Censuses, I have also served as a consultant to construct databases, draw district lines, or prepare presentation maps and reports for redistricting authorities in many jurisdictions in conducting their normal decennial redistricting. These jurisdictions include statewide congressional and legislative redistricting authorities, as well as a variety of County Boards, City Councils, School Boards, Water Districts, Regional Transit Boards and others.

9. I participated in the construction of the California Statewide Redistricting Database for the California State Legislature for the last three redistricting cycles. That publicly available database includes voting, registration, and geographic data sets for the State of California for statewide elections beginning in 1992.

10. A copy of my CV is attached as Appendix A. It contains a listing of selected cases in which I testified as an expert witness and a list of selected jurisdictions in which I performed database construction, demographic and voter analysis, and technical assistance; developed districting plans; participated in public hearings and presentation of plans; and analyzed alternative redistricting plans.

11. I am being compensated at a rate of $250 per hour for my work in this case.


## II.   Summary of Opinions

12. I have been retained by the Plaintiffs in *Kravitz v. U.S. Department of Commerce* and in *La Unión del Pubelo Entero v. Ross* to provide my expert opinion concerning the use of data that are currently available from the U.S. Census Bureau in developing the statistical evidentiary proof necessary to establish a claim under Section 2 of the Voting Rights Act ("VRA"), particularly in cases where evidence of the citizen voting age population ("CVAP") of a minority group is needed to prevail on a Section 2 claim.

13. I have reviewed the letter (the "DOJ Letter") dated December 12, 2017, from Arthur Gary, General Counsel for the Justice Management Division of the U.S. Department of Justice, to Dr. Ron Jarmin, acting Director of the U.S. Census Bureau, requesting that the Census Bureau "reinstate" a question regarding citizenship on the 2020 Census. The letter asserts that, to "fully enforce" the requirements of Section 2 of the Voting Rights Act, the Department of Justice ("DOJ") needs "a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected," and that the decennial census questionnaire is "the most appropriate vehicle for collecting that data."

14. The DOJ Letter notes that, prior to the 2010 Census, a question regarding citizenship was included on the "long form" questionnaire sent to a fraction of U.S. households as part of the decennial census. Following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey ("ACS"). The 2010 redistricting cycle was the first such cycle in which the ACS provided the only CVAP data available from the Census Bureau.

15. The DOJ Letter makes the following four assertions concerning alleged features of the ACS data that are not "ideal" for purposes of enforcing Section 2 of the Voting Rights Act:

- "Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly."

- ACS data do not "align in time" with decennial census data used in redistricting, because ACS data "are rolling and aggregated into one-year, three-year, and five year estimates."

- ACS data "are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and thus, the geographic area—decreases," whereas decennial census data represent "a full count of the population."

- Decennial census data are reported down to the census block level, but ACS citizenship estimates are reported only to the census block group. Redistricting requires "further estimates and . . . interject[s] further uncertainty in order to approximate citizen voting-age population at the level of a census block."

16. Based upon my decades of experience as an expert in Section 2 cases and the redistricting process generally, it is my opinion that there is no valid basis for the above assertions as set forth in the DOJ Letter. In particular:

- Reliance upon two or more different data sets is a routine statistical practice in Section 2 work and does not impede development of the proof required for the redistricting process or Section 2 enforcement. Moreover, the availability of decennial census citizenship data would not avoid the need to rely upon more than one data set in that context.

- For purposes of redistricting and Section 2 enforcement, citizenship population data do not need to align exactly in time with decennial census data on the total and voting-age population. Further, for Section 2 cases brought mid-to-late decade, ACS citizenship data would provide an advantage over decennial census data, because aggregated five-year ACS citizenship data would be more current.

- The confidence level and margin of error associated with ACS estimates do not present an obstacle to demonstrating that the minority group at issue constitutes a majority of CVAP in a proposed district. Moreover, census data reported at the block level must be edited for confidentiality purposes and therefore involve error and uncertainty that would not be avoided by adding a citizenship question to the decennial census questionnaire.

- Block-level citizenship data from the Census Bureau have never been available in the past, and their absence has not hindered my work drawing reliable district maps that are in compliance with Section 2, nor prevented courts from finding that the requirements of Section 2 have been met. ACS citizenship data reported at the block group level are sufficient for these purposes.

## III.   The Use of Citizenship Data in Redistricting and Section 2 Enforcement

17. Redistricting is the process of drawing congressional, state legislative, and local electoral district boundaries. Regular redistricting occurs once a decade. Districts must be drawn with equal populations "as nearly as is practicable" to comply with the U.S. Constitution's requirement that districts be drawn to comprise substantially equal populations.[1] (The equal population requirement is sometimes referred to as the "one-person, one-vote" requirement.) Total population data from the decennial census are used to draw districts with equal population. Even when remedial districts are drawn mid-decade, these are the only data needed for the purpose of drawing districts that have equal population.

18. Section 2 of the VRA prohibits the adoption of electoral districts that dilute the voting power of a politically cohesive minority population.[2] In *Gingles*, the U.S. Supreme Court held that, to sustain a "vote dilution" claim under Section 2, plaintiffs must establish three "threshold preconditions."[3] *First*, a "minority group" must be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Second*, the minority group must be "politically cohesive." *Third*, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."

19. The first *Gingles* precondition is satisfied by presenting the court with an illustrative districting plan that includes at least one majority-minority district based on CVAP data. Thus, Section 2 of the VRA often requires demographers such as myself to conduct analyses to determine whether a minority group can constitute a majority (i.e., more than 50 percent) of the citizen voting age population in a single-member district.

20. To determine whether a minority population is sufficiently compact to constitute a majority of the citizen voting age population in a district, however, it is not necessary to determine the exact number of citizens in each census block. There is also no requirement regarding the precise geographic distribution of voting-age citizens within a proposed district. The relevant question is whether it is "more likely than not" that the minority group comprises more than 50 percent of the voting-age citizens overall within a properly

---

[1] *Wesberry v. Sanders*, 376 U.S. 1, 8 (1964); *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016).

[2] 52 U.S.C. § 10301(a); *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993).

[3] *Thornburg v. Gingles*, 478 U.S. 50-51 (1986).

configured district.[4] As discussed in detail below, Section 2 plaintiffs use sample survey data collected and reported by the Census Bureau to make this determination.

21. The second and third *Gingles* preconditions require experts to analyze voting patterns by race and ethnicity to show that the minority group is politically cohesive (the second *Gingles* precondition) and that the white majority consistently votes against minority-preferred candidates and usually defeats these candidates (the third *Gingles* precondition). In addition, because the ballot is secret, a voter's race and ethnicity are not available from voting records or election results. Therefore, polarization experts must conduct a statistical analysis comparing data on election results for each candidate by precinct with data on the racial/ethnic composition of the voters in each precinct. The statistical analysis determines the extent to which the number of votes cast for a particular candidate is correlated with the race of the voters supporting that candidate.

22. As a demographer, I have frequently been called upon to conduct the analyses required to demonstrate that a particular minority group within a given jurisdiction (state, county, etc.) meets the first *Gingles* precondition. I also construct databases that include voting, registration, and geographic data, which other experts use to conduct the analyses required to determine if a minority group meets the second and third *Gingles* preconditions.

23. The DOJ Letter asked the Census Bureau to "reinstate into the 2020 Census a question regarding citizenship" to help enforce Section 2 of the VRA. In fact, the decennial census short-form questionnaire has not included a citizenship question since before the VRA was enacted in 1965. Section 2 enforcement has always used citizenship data from sample surveys. From 1970 to 2000, the Census Bureau collected citizenship data from a sample of households through the long-form questionnaire it sent to approximately one in every six households during each decennial census. The citizenship data collected through the long-form questionnaire was reported only down to the census block-group level.

24. In 2005, the Census Bureau began using the ACS to gather population information, including citizenship data, previously collected through the long-form questionnaire. The ACS is administered on an ongoing monthly basis to approximately 3.5 million households nationwide each year. The Census Bureau aggregates ACS data into 1-year and 5-year estimates.[5] Cumulating ACS data to 5-year estimates yields a sample of

---

[4] *Reyes v. City of Farmers Branch, Texas*, No. 3:07-CV-900-O, 2008 WL 4791498, at *7 (N.D. Tex. Nov. 4, 2008), *aff'd sub nom. Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019 (5th Cir. 2009).

[5] The DOJ Letter fails to note that the Census Bureau stopped producing ACS 3-year estimates in 2014. Census Bureau, American Community Survey: When to Use 1-Year, 3-Year, or 5-Year Estimates, https://www.census.gov/programs-surveys/acs/guidance/estimates.html; Census Bureau, Understanding and Using ACS Single-Year and Multiyear Estimates, https://www.census.gov/content/dam/Census/library/publications/2018/acs/acs_general_handbook_2018_ch03.pdf.

approximately one in every eight households. While ACS 1-year estimates are only available for geographic areas with a population of 65,000 or greater, ACS 5-year estimates are available for all geographic areas. Like the census long-form questionnaire, the ACS 5-year estimates report citizenship data for all geographic areas down to the census block-group level.

25. In my experience, the process of constructing district-level CVAP estimates, and the reliability of such estimates, are effectively the same regardless of whether the source of the citizenship data is the ACS 5-year estimates or the census long-form questionnaire. Further, the ACS provides important advantages over the census long-form questionnaire, because the ACS collects citizenship and other data throughout the decade, while the census long-form questionnaire provided static data of the population at the beginning of the decade. The ACS thus provides more reliable estimates of the composition of the current population later in the decade.

## IV.  Reliance on Two Data Sets Is Commonplace and Does Not Impede Redistricting Analysis.

26. The DOJ Letter alleged: "Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census" to determine compliance with the Constitution's equal population requirement, and thus "using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly."

27. I built redistricting datasets and assisted in the redistricting process for a number of jurisdictions following the decennial census in 1990, 2000, and 2010. Most of these jurisdictions needed to assess compliance with Section 2 of the VRA, and some were required to have plans precleared by the DOJ under Section 5 of the VRA. In my experience, relying on two different data sets does not impede the redistricting process or Section 2 enforcement.

28. Total population data from the decennial census and citizenship data from the ACS serve distinct purposes in redistricting and Section 2 cases. Total population data from the decennial census are used to determine the size of the district, in order to draw districts with equal populations "as nearly as is practicable," as required by the Constitution's equal population requirement. These are the only data needed to determine compliance with that requirement.

29. Once the size of the district has been determined, Section 2 experts use data from the ACS and other data sets to determine the demographic composition of a proposed district, including the percentage of the citizen voting age population of the district who are, for example, Hispanic. Currently available survey data are well-suited to this purpose. In practice, it does not matter that their "scope and level of detail . . . vary quite significantly" from a person-by-person enumeration, which is not needed to reliably determine the demographic composition of a district.

30. In serving as an expert demographer in Section 2 cases, sometimes I also use survey data to provide socioeconomic characteristics of the communities captured by the districts I have drawn, to aid the court and the parties in determining whether the minority population comprises a "community of interest" in the Section 2 district.[6] Such data may include characteristics such as income, education, and language spoken at home, all of which are derived from 5-year ACS data, and none of which are available from the decennial census. For instance, in *Luna v. County of Kern*, a Section 2 case challenging a supervisorial plan in Kern County, California, I used ACS data to demonstrate that plaintiffs' illustrative maps were more effective than Kern County's adopted map in "grouping into districts populations with similar socioeconomic characteristics, including educational attainment, income, homeownership, immigration status, and Spanish language ability."[7] The maps with these analyses are attached as Attachment 1.

31. In *Kern*, I also used ACS data to draw two illustrative maps demonstrating that Hispanics could constitute a majority of the citizen voting age population in two of the map's five districts. To draw the maps, I used data from the 2010 decennial census for total population and voting age population by race and ethnicity, and data from the 2005-2009 ACS for citizen voting age population. Using these data, I drew one illustrative map demonstrating that Hispanics could constitute 53.2% of the CVAP in one district and 54.5% of the CVAP in a second district. I drew a second illustrative map demonstrating that Hispanics could constitute 51.6% of the CVAP in one district and 52.0% of the CVAP in a second district. The court found that both illustrative maps established that Hispanics could constitute the majority of the CVAP in a properly configured district.[8] These illustrative maps are attached as Attachment 2.

32. In addition, experts use other databases that include voting, registration, and geographic data to assess whether (1) the minority group is politically cohesive and (2) the white majority consistently votes against minority-preferred candidates and usually defeats these candidates. These data come from multiple sources, including state, county, and local election authorities. Even if a citizenship question were added to the 2020 Census, experts would still have to work with multiple data sets to perform the analysis necessary to satisfy the *Gingles* preconditions.

33. In sum, experts often use multiple data sets to conduct their analyses. This is not unusual or difficult, nor does it present an obstacle to producing reliable estimates of the composition of a district's population to meet VRA standards.

---

[6] *LULAC v. Perry*, 548 U.S. 399, 433 (2006).

[7] *Luna v. County of Kern*, 291 F.Supp.3d 1108-09, 1111, 1115-16 (E.D. Cal. 2018).

[8] *Id.* at 1107-08, 1114-15.

**V.    The Temporal "Alignment" of ACS Citizenship and Decennial Census Data Does Not Raise an Obstacle to Proof of Section 2 Claims, and Rolling Data Provide Important Advantages.**

34.    For purposes of redistricting and proving Section 2 claims, citizenship data do not need to align exactly in time with decennial census data on the total and voting-age population. As stated above, VRA experts use ACS citizenship data to determine the demographic composition of a district, not to count the number of eligible voters in a district as of a particular date. ACS data provide ample basis for reliable estimates of the demographic composition of a district even though the data are not all collected at the same time as the decennial census.

35.    The ACS is not the only data source used in Section 2 enforcement that does not align perfectly in time with the decennial census count of the total population. Indeed, the election data that are needed to assess whether the minority group satisfies the second and third *Gingles* preconditions reflect past election results, and the racial composition of voters in past elections, therefore, cannot align in time with the once-a-decade total population count obtained through the census.

36.    Further, although regular redistricting is done at the beginning of each decade, districts can be challenged in Section 2 litigation throughout the decade, and district boundaries may be redrawn to comply with Section 2. During the course of a decade, changing demographic conditions can result in changes to the vote-diluting effects of district boundaries and, thus, to changes in potential Section 2 liability.

37.    For example, if at the time redistricting occurs, the minority group is not sufficiently large to constitute the majority of a properly configured district, Section 2 would not require the redistricting plan to include a majority-minority district. But if the minority population grows and, later in the decade, Section 2 plaintiffs are able to show that the minority group constitutes more than 50 percent of the CVAP of a properly configured district (and the plaintiffs satisfy the other *Gingles* conditions), a court may order a remedial district to be drawn mid-decade. Thus, it is important to have citizenship data that are updated throughout the decade.

38.    For Section 2 cases brought mid-to-late decade, using demographic data from the ACS provides a better estimation of the demographic composition of the district than static decennial census data, particularly if the minority population in a particular geographic area is rapidly increasing. The decennial census reports population data only as of the census date. If the decennial census collected citizenship information, it would only provide information on the citizenship status of the population at a single point in time. Because the decennial census provides static data, federal courts have noted that "Census data are less probative the further away from the Census cycle one gets."[9] The ACS, by

---

[9] *Reyes*, 2008 WL 4791498, at *9; *see also Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1212 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999).

contrast, collects citizenship and other data throughout the decade, and thus provides more reliable estimates of the composition of the current population later in the decade.

39. Before ACS 5-year citizenship estimates became available, the lack of current citizenship data created an obstacle to Section 2 enforcement. I have served as an expert witness in cases where Section 2 plaintiffs were able to satisfy the first *Gingles* precondition only after ACS 5-year citizenship estimates became available. For example, in *Reyes v. City of Farmers Branch, Texas* ("*Farmers Branch I*"),[10] Hispanic residents of Farmers Branch, a city in Texas, filed a Section 2 claim challenging the at-large election of council members for the city of Farmers Branch. I did not serve as the expert in the initial case, which was unsuccessful, but served as the Section 2 expert in *Fabela v. City of Farmers Branch, Texas* ("*Farmers Branch II*"),[11] the subsequent suit in which the plaintiffs prevailed in their Section 2 challenge to the at-large system of electing council members for the city of Farmers Branch.

40. As the court's 2008 decision notes, *Farmers Branch I* "was filed in 2007, many years after the 2000 Census data were collected."[12] The lack of current estimates of the citizenship population (such as ACS 5-year estimates) created an obstacle to plaintiffs satisfying the first *Gingles* precondition in that case. Specifically, the citizenship data collected through the 2000 Census long-form questionnaire indicated that Hispanics constituted less than 50 percent of the CVAP in the proposed district.[13] Five-year ACS citizenship estimates were not available for the City of Farmers Branch at the time the plaintiffs' earlier Section 2 expert conducted his analysis. The court found that plaintiffs' expert failed to demonstrate that it was more likely than not that the Hispanic population constituted more than 50 percent of the CVAP within a proposed district.[14] Plaintiffs' Section 2 claim therefore failed.

41. In 2010, the Census Bureau began publishing ACS 5-year estimates for all geographic areas down to the block group level.[15] In *Farmers Branch II*, I used citizenship data from the ACS 5-year estimates (2005-2009), in combination with population data from the 2010 Census, to draw four illustrative minority-majority districts.[16] The court accepted these illustrative districts as evidence that plaintiffs met the first prong of *Gingles*, finding

---

[10] No. 3:07-CV-900-O, 2008 WL 4791498 (N.D. Tex. Nov. 4, 2008), *aff'd sub nom. Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019 (5th Cir. 2009).

[11] No. 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012).

[12] *Reyes*, 2008 WL 4791498, at *9.

[13] *Id.* at *8.

[14] *Id.* at *8-19.

[15] Census Bureau, Understanding and Using ACS Single-Year and Multiyear Estimates, https://www.census.gov/content/dam/Census/library/publications/2018/acs/acs_general_handboo k_2018_ch03.pdf.

[16] *Fabela*, 2012 WL 3135545, at *4.

that plaintiffs "have proved that, using the most accurate, readily-available data, a geographically compact demonstration district can be drawn in Farmers Branch in which Hispanics constitute more than 50% of the CVAP."[17] In addition, the court explained that it was reaching a different outcome than *Farmers Branch I* in large part because the "differences in the proof that the plaintiffs offered in the two trials."[18]

## VI.   The Confidence Level and Margin of Error Associated With ACS Estimates Do Not Present an Obstacle in Section 2 Cases.

42.   The DOJ Letter asserts that "ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and thus, the geographic area—decreases," whereas "decennial census data is a full count of the population."

43.   The statement that margin of error increases as the geographic area under review gets smaller is irrelevant in this context. The relevant inquiry in Section 2 cases is whether it is more likely than not that the minority group comprises a majority of CVAP at a district level.[19] As the court noted in *Farmers Branch II*, the "pertinent margin of error" is "the margin of error for the Hispanic CVAP," for example, "for a given illustrative district."[20] Districts typically comprise multiple census block groups—which the ACS data reports—and the statistical margin of error *decreases* as block groups are aggregated into an illustrative district.[21] The relevant margin of error—*i.e.* margin of error at the district level—is generally small enough that I can estimate the Hispanic CVAP and the CVAP figures needed for Section 2 purposes with a high degree of statistical certainty.

44.   Courts have recognized that the relevant margin of error of ACS data for Section 2 purposes is the margin of error at the district level, and have found CVAP calculations based on ACS data to be reliable.[22] Courts do not require any level of certainty about the estimate in each and every small block of the district. What is material to a court's determination of prong one is how certain I can be that the minority population is sufficiently compact to constitute a majority in a district—how certain can I be about the CVAP estimate in the entire district. Even taking into consideration the margin of error of ACS estimates, a point estimate of above 50 percent CVAP still establishes that the Hispanic CVAP is above the 50 percent threshold required to satisfy the first *Gingles* precondition. Point estimates (such as for the Hispanic CVAP) established to a 90 percent confidence level likewise are broadly recognized as sufficient to meet this standard.

---

[17] *Id.* at *8.

[18] *Id.* at *8 n.21.

[19] *Reyes*, 2008 WL 4791498, at *7.

[20] *Fabela*, 2012 WL 3135545, at *7 n.15.

[21] *Id.*

[22] *Id.* at *6-7, n.15.

45. Moreover, the DOJ Letter's suggestion that citizenship data generated by the 2020 Census would not be subject to error or uncertainty is simply incorrect. In fact, as Dr. John Abowd, Chief Scientist at the Census Bureau, acknowledged in his deposition testimony, the decennial census data used for redistricting (P.L. 94-171 data) are affected by error or uncertainty "because of the statistical methods that intervene in converting the responses to tabular data, including [the] disclosure avoidance" protocols the Census Bureau implements to comply with federal law.[23] The impact of these protocols would increase as the geographic areas under scrutiny get smaller.

46. Further, Dr. Abowd testified that the Census Bureau has not yet determined whether the error and uncertainty associated with block-level CVAP data based on the 2020 Census (if the citizenship question is allowed) would be any less significant than the error and uncertainty associated with the ACS citizenship data currently used for Section 2 enforcement purposes.[24] Dr. Abowd also indicated that the Census Bureau does not yet know if the error and uncertainty associated with block-level CVAP data based on the 2020 Census will "still allow redistricting offices and the Department of Justice to use the data effectively."[25]

47. Based on my experience, and especially in light of the above testimony of Dr. Abowd, it is my opinion that this purported reason for the DOJ's request to include a citizenship question on the 2020 Census questionnaire has no foundation.

## VII.   Block-Level Citizenship Data from the Decennial Census Are Not Needed for Section 2 Enforcement.

48. The DOJ Letter's final stated reason for requesting the addition of a citizenship question is also illusory. Block-level citizenship data are not directly relevant to Section 2 enforcement or redistricting. When courts, jurisdictions, or demographers examine a district intended to be a majority-minority district, it is not necessary to determine the exact number of citizens in the district. There is also no requirement regarding the precise geographic distribution of voting-age citizens within a district. What matters is the minority share of CVAP of the entire district, not the CVAP of any particular block within that district.

49. Block-level citizenship data are needed only when an illustrative district cannot be constructed by aggregating census block groups. When that happens, I use a process that I developed decades ago when citizenship data were obtained from the decennial census long-form questionnaire, which also provided block-group level CVAP estimates. The same process can be applied using the block-group level CVAP estimates provided by the ACS. I have been able to apply a basic methodological system that has been perfectly reliable for those purposes.

---

[23] Deposition of Dr. John Abowd, Chief Scientist, U.S. Census Bureau, August 29, 2018, at 49.

[24] *Id.* at 100-101.

[25] *Id.* at 101.

50. Specifically, in those instances in which one or more block-level estimates are necessary to construct an illustrative district meeting the first *Gingles* condition, this can be done through a standard method of disaggregating data, using what is known as a raking factor. This method is more complicated to describe than it is to perform—accurately and reliably.

51. A raking factor is a related data element that is available at both the level of geography at which the aggregate data are available (*e.g.*, the block-group level), and at the level of geography at which disaggregated data are desired (*e.g.*, the block level). The relationship between the aggregate data and the raking data is treated as being the same for both levels of geography. Voting Age Population from P.L. 94-171 data files provide an almost ideal raking factor for Citizen Voting Age Population from the ACS tabulation.

52. In order to compute a block-level estimate of an ethnic group's CVAP, all I have to do is (1) divide the block group CVAP estimate by the block group VAP for the same ethnic group, and then (2) multiply the census block VAP by the result for each block in a block group. This duplicates at the census block level the relationship that exists between CVAP and VAP at the block group level.

53. Once the raking files are created for a state, it is a simple matter to create census block-level estimates from each new CVAP tabulation. These procedures have been set up and used in some form since the 2003 release of CVAP data from the 2000 Census long-form questionnaire. The margins of error associated with these results are well-controlled and have been recognized by courts as reliable in the Section 2 context.

54. Finally, while decennial census data are reported to the census block level, adding a citizenship question to the decennial census will not actually provide the DOJ with citizenship information about the individuals who reside within a particular census block. Dr. Abowd testified that, because of federal confidentiality requirements, the Census Bureau implements disclosure avoidance protocols to hide the actual characteristics associated with the individuals who reside on a particular census block, through disclosure avoidance systems such as data swapping and synthetic data noise infusion.[26] Thus, according to Dr. Abowd's testimony, even if the 2020 Census asks about citizenship, "[t]here won't be a single block in which the citizenship variables or the race and ethnicity variables are the values reported by the people who live there."[27]

---

[26] *Id.* at 50-53, 67-68. I understand from Dr. Abowd's testimony that the Census Bureau does data swapping by selecting a sample of households, matching those households on a set of key variables with households in neighboring geographic areas that have similar characteristics, and swapping the information for each household according to an undisclosed algorithm. *Id.* at 51-53. Synthetic data noise infusion uses statistical modeling to generate contrived household characteristics for purposes of avoiding the disclosure of confidential information.

[27] *Id.* at 68.

## VIII.   Conclusion

In my decades of experience as a voting rights expert, the lack of citizenship data from the decennial census has not hindered my work, including my work for DOJ in Section 2 cases. Based on my experience serving as a Section 2 expert, including for the DOJ, it is my opinion that, for purposes of demonstrating that the minority group citizen population is sufficiently large and compact to constitute a majority of the CVAP in an illustrative single-member district, (1) block-level citizenship data from the decennial census are not needed; and (2) the citizenship estimates currently available from the ACS are sufficient. Finally, the Census Bureau has said that adding a citizenship question to the decennial census will not result in the availability of citizenship information about the individuals who actually reside within a particular census block, and that it is unclear whether the error and uncertainty associated with citizenship data from the decennial census will allow redistricting offices and the DOJ to use the available data effectively. In short, all of the reasons suggested in the DOJ Letter for requesting the addition of a citizenship question to the 2020 Census questionnaire evaporate upon close examination.

*      *      *

I reserve the right to supplement this declaration if I become aware of additional information or documentation that would require further analysis and any modification or addition to my opinions as stated herein.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 5, 2018.

_____
David Ely