# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | |
| v. | 18-CV-5025 (JMF) (Consolidated Case) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

## PLAINTIFFS' PRETRIAL MEMORANDUM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE CASE .................................................................................. 2

ARGUMENT ......................................................................................................... 5

    I.      Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the decennial census. .......................................... 5

        A.     The evidence will show that Plaintiffs have suffered and will suffer concrete injuries-in-fact ................................................................... 5

              1.     Plaintiffs will be injured through the expenditure of resources necessary to mitigate a substantial risk of harm ............................. 6

              2.     Plaintiffs will be injured by the loss of federal funds and through harms to their representational and electoral interests ..................... 7

                      a.     Diminished political representation ..................................... 8

                      b.     Diminished federal funding ................................................ 10

                      c.     Loss of privacy .................................................................. 11

        B.     Traceability and redressability ................................................. 13

    II.     Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act ................................. 14

        A.     The decision is not supported by the administrative record ..................... 15

        B.     Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA ....................................... 16

              1.     The evidence will show Defendants' decision to add a citizenship question ran counter to the evidence before the agency and failed to consider important aspects of the problem...16

                      a.     The citizenship question will lead to lower quality citizenship data.................................................................. 17

i

|  | b. | Defendants refused to consider alternatives that would better satisfy the Department of Justice's stated data need. | 19 |

|  | c. | Block-level CVAP data are not necessary to enforce the Voting Rights Act. | 20 |

| 2. | Defendants' Decision Memo is replete with factual errors and manifestly erroneous conclusions. | 22 |

| 3. | Defendants' failure to adequately test the citizenship question is arbitrary and capricious. | 23 |

| 4. | The evidence will show that Defendants' stated rationale was pretextual. | 25 |

C.  Defendants' decision to demand citizenship information is not in accordance with law. ..................................................28

III.  Intentional discrimination was a motivating factor in the citizenship question decision.. ...................................................................................29

A.  Disparate impact. ......................................................................30

B.  Historical background of the decision. ....................................30

C.  Irregular procedural sequence. ................................................31

D.  Substantial departures from past practice. ..............................32

E.  Contemporary statements by decisionmakers and those influencing them. ..............................................................................................33

F.  The pretextual nature of the justification. ................................34

CONCLUSION ...........................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Action on Smoking & Health v. CAB*,
     699 F.2d 1209 (D.C. Cir. 1983) ............................................................................... 20

*Am. Wild Horse Pres. Campaign v. Perdue*,
     873 F.3d 914 (D.C. Cir. 2017) ................................................................................. 23

*Batalla Vidal v. Duke*,
     295 F. Supp. 3d 127 (E.D.N.Y. 2017) ..................................................................... 14

*Batalla Vidal v. Nielsen*,
     291 F. Supp. 3d 260 (E.D.N.Y. 2018) ..................................................................... 33

*Bauer v. DeVos*,
     325 F. Supp. 3d 74 (D.D.C. 2018) ............................................................................. 5

*Bennett v. Spear*,
     520 U.S. 154 (1997) ............................................................................................ 13, 14

*Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
     448 F.3d 138 (2d Cir. 2006) ....................................................................................... 6

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
     290 F.R.D. 409 (S.D.N.Y. 2012) ............................................................................... 7

*Butte Cty. v. Hogen*,
     613 F.3d 190 (D.C. Cir. 2010) ................................................................................. 18

*Carey v. Klutznick*,
     653 F.2d 732 (2d Cir. 1981) ..................................................................................... 12

*Carey v. Klutznick*,
     637 F.2d 834 (2d Cir. 1980) ................................................................................. 8, 10

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
     868 F.3d 104 (2d Cir. 2017) ............................................................................. 5, 7, 13

*Chevron Corp. v. Donziger*,
     833 F.3d 74 (2d Cir. 2016) ....................................................................................... 13

*Citizens to Pres. Overton Park v. Volpe*,
     401 U.S. 402 (1971) ................................................................................................. 15

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,
     923 F.2d 188 (D.C. Cir. 1991) ................................................................................. 17

**Cases**                                                                      **Page(s)**

*City of New York v. U.S. Dep't of Commerce*,
    713 F. Supp. 48 (E.D.N.Y. 1989) ...................................................................8

*City of New York v. U.S. Dep't of Commerce*,
    822 F. Supp. 906 (E.D.N.Y. 1993) ...............................................................15

*City of Philadelphia v. Klutznick*,
    503 F. Supp. 663 (E.D. Pa. 1980) ................................................................10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..................................................................................7, 11

*Crawford v. Bd. of Educ.*,
    458 U.S. 527 (1982)......................................................................................30

*Cuomo v. Baldrige*,
    674 F. Supp. 1089 (S.D.N.Y. 1987).............................................................19

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)....................................................................20, 21

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006).........................................................................11

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016)...................................................................................3

*Fed'n for Am. Immigration Reform v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ...........................................................1, 2, 32

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)......................................................................................35

*Friedman v. U.S. Postal Serv.*,
    No. 08-cv-00913, 2011 WL 3267713 (D. Conn. July 28, 2011) ...............11, 13

*Glavin v. Clinton*,
    19 F. Supp. 2d 543 (E.D. Va. 1998) .........................................................8, 10

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)....................................................................................5, 7

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................................................5

*Inforeliance Corp. v. United States*,
    118 Fed. Cl. 744 (2014)...............................................................................27

**Cases**                                                                           **Page(s)**

*Innovative Health Sys., Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997)................................................................................33

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010)...........................................................................18

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*,
    482 F.3d 79 (2d Cir. 2006)........................................................................19, 21

*Karcher v. Daggett*,
    462 U.S. 725 (1983)............................................................................................9

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*,
    19 F.3d 1342 (D.C. Cir. 1994).....................................................................25, 27

*Leibovitz v. N.Y. City Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001).............................................................................11

*Luciano v. Olsten Corp.*,
    110 F.3d 210 (2d Cir. 1997).............................................................................34

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004)........................................................................19

*McNabola v. Chicago Transit Auth.*,
    10 F.3d 501 (7th Cir. 1993) .............................................................................34

*Mhany Mgmt., Inc. v. Cty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016).............................................................................29

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)......................................................................15, 16, 17, 25

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2011).............................................................................13

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) ................................................................................15

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006)..........................................................................22

*Nat. Res. Def. Council v. EPA*,
    658 F.3d 200 (2d Cir. 2011).............................................................................15

**Cases**                                                                      **Page(s)**

*New York v. Salazar*,
   701 F. Supp. 2d 224 (N.D.N.Y. 2010) ........................................................................26

*New York v. U.S. Dep't of Commerce*,
   No. 18-cv-2921, 2018 WL 4539659 (S.D.N.Y. Sept. 21, 2018) ...........................25

*New York v. U.S. Dep't of Commerce*,
   315 F. Supp. 3d 766 (S.D.N.Y. 2018)....................................................................32, 33

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011).........................................................................................7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000).....................................................................................................26

*Reyes v. City of Farmers Branch*,
   586 F.3d 1019 (5th Cir. 2009) ....................................................................................21

*Rioux v. City of Atlanta, Ga.*,
   520 F.3d 1269 (11th Cir. 2008) ..................................................................................34

*Rosen v. Thornburgh*,
   928 F.2d 528 (2d Cir. 1991)...................................................................................29, 30

*Ross v. AXA Equitable Life Ins. Co.*,
   115 F. Supp. 3d 424 (S.D.N.Y. 2015).........................................................................11

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)...........................................................................................13

*Sackin v. TransPerfect Glob., Inc.*,
   278 F. Supp. 3d 739 (S.D.N.Y. 2017)...........................................................................7

*Sokaogon Chippewa Cmty. v. Babbitt*,
   961 F. Supp. 1276 (W.D. Wis. 1997) ........................................................................27

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)...................................................................................................5

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993).....................................................................................................34

*State of Tex. v. Mosbacher*,
   783 F. Supp. 308 (S.D. Tex. 1992) ..............................................................................8

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014)...................................................................................................5

| **Cases** | **Page(s)** |
|---|---|

*Thornburg v. Gingles,*
478 U.S. 30 (1986) ................................................................................................21

*Tummino v. Torti,*
603 F. Supp. 2d 519 (E.D.N.Y. 2009) ...................................................................27

*Tummino v. von Eschenbach,*
427 F. Supp. 2d 212 (E.D.N.Y. 2006) ..............................................................26, 27

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973) ..............................................................................................35

*U.S. Dep't of Commerce v. U.S. House of Representatives,*
525 U.S. 316 (1999) ............................................................................................8, 9

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
517 U.S. 544 (1996) ................................................................................................5

*United States v. Yonkers Bd. of Educ.,*
837 F.2d 1181 (2d Cir. 1987) ................................................................................29

*Veasey v. Abbott,*
830 F.3d 216 (5th Cir. 2016) .................................................................................31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) .........................................................................................29, 30

*Water Quality Ins. Syndicate v. United States,*
225 F. Supp. 3d 41 (D.D.C. 2016) ........................................................................22

*Wesberry v. Sanders,*
376 U.S. 1 (1964) ....................................................................................................9

*Wisconsin v. City of New York,*
517 U.S. 1 (1996) ..............................................................................................3, 19

*Woods Petroleum Corp. v. United States Dep't of Interior,*
18 F.3d 854 (10th Cir. 1994) .................................................................................27

**Constitutional Provisions**

U.S. Const.
amend. XIV, § 2 .......................................................................................................2
art. I, § 2 ...............................................................................................................2, 3

**Laws**                                                                                           **Page(s)**

Pub. L. No. 105-119, 111 Stat. 2440 (1997)...................................................................3

5 U.S.C. § 706...........................................................................................14, 15, 28

13 U.S.C.
    § 4......................................................................................................................3
    § 9...............................................................................................12, 17, 18
    § 141..............................................................................................................28

44 U.S.C. § 3501........................................................................................29

**Legislative Hearings**

*Hearing on the F.Y. 2019 Funding Request for the Commerce Department:*
    *Hearing Before the Subcomm. on Commerce, Justice, Sci., & Related*
    *Agencies of the S. Comm. on Appropriations*, 115th Cong. (May 10, 2018),
    2018 WL 2179074 ..........................................................................................25

*Hearing on F.Y. 2019 Dep't of Commerce Budget: Hearing Before the Subcomm.*
    *on Commerce, Justice, Sci., & Related Agencies of the H. Comm. on*
    *Appropriations*, 115th Cong. (Mar. 20, 2018), 2018 WLNR 8815056 ...................................25

*Hearing on Recent Trade Actions, Including Section 232 Determinations on Steel*
    *& Aluminum: Hearing Before the H. Ways & Means Comm.*, 115th Cong.
    (Mar. 22, 2018), 2018 WLNR 8951469 .................................................................25

**Miscellaneous Authorities**

Brief of Former Directors of the U.S. Census Bureau as Amici Curiae Supporting
    Appellees, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016)............................................33

*ICE Out of Courts*, Immigrant Defense Project, *at*
    https://www.immigrantdefenseproject.org/ice-courts/ .............................................13

John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious*
    *Operation*, NPR (Sept. 20, 2017), *at* https://www.npr.org/2017/09/20/
    552339976/border-patrol-arrests-parentswhile-infant-awaits-serious-operation ...................13

Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and*
    *Guidelines for Statistical Surveys* (2006). .......................................................3

Ray Sanchez, *ICE arrests undocumented father taking daughter to California*
    *school*, CNN (Mar. 3, 2017), *at* https://www.cnn.com/2017/03/03/us/
    california-father-ice-arrest-trnd/index.html;..........................................................13

**Miscellaneous Authorities**                                                    **Page(s)**

U.S. Census Bureau, *Statistical Quality Standards* (July 2013)..............................................24, 29

## INTRODUCTION

For nearly seventy years, a citizenship question has not been asked on the decennial census that is sent to every household in the country.  For nearly as long, the Census Bureau – across administrations of both political parties – has vigorously opposed adding a citizenship question to the census because doing so would depress response rates, including those of noncitizens and immigrants, and thereby "inevitably jeopardize the overall accuracy of the population count."  *Fed'n for Am. Immigration Reform v. Klutznick* ("*FAIR*"), 486 F. Supp. 564, 568 (D.D.C. 1980) (three-judge court).

On March 26, 2018, Commerce Secretary Wilbur L. Ross, Jr. changed course, directing the Census Bureau to use the decennial census to demand information on the citizenship status of every resident in the country.  This directive overruled, without any empirical evidence, the judgment of the Bureau's professional experts who opposed adding the question because it would lead to *lower* quality citizenship data at higher cost and increased burden.  And this directive required the Census Bureau to violate its internal procedures and federal law.

At the time, the Secretary wrote in his decisional memorandum and repeatedly testified before Congress that he simply made this change in response to a request from the Department of Justice (DOJ) for more granular citizenship data so that it could better enforce the Voting Rights Act (VRA).   This explanation was untrue in every important respect.  The citizenship question was neither initiated nor necessitated by the DOJ request; in fact, it was the Secretary who wanted the citizenship question and lobbied DOJ to request it, not the other way around.  The reason to add the citizenship question was not to better enforce the VRA; that justification was merely a pretext.  Asking the question will not give DOJ any better information than can be obtained from less burdensome sources; and data confidentiality laws prohibit the disclosure of the granular citizenship data that DOJ supposedly needs.  Indeed, when the Census Bureau asked

1

to meet with DOJ to discuss less burdensome alternatives that would produce higher-quality data, DOJ – in a possibly unprecedented move – refused even to meet with the Bureau.  The head of DOJ's Civil Rights Division, John Gore, testified at deposition today that it was Attorney General Sessions who personally made the decision to direct DOJ not to even meet with the Census Bureau to discuss alternative approaches.

Unless enjoined, Defendants' decision will impair the Census Bureau's obligation under the Constitution to determine "the whole number of persons in each State," U.S. Const. amend. XIV, § 2, depriving Plaintiff states, counties, cities, and members of the non-governmental organizations of fair electoral representation, and reducing Plaintiffs' share of the hundreds of billions of dollars in federal funds that are allocated in part on decennial census data.

The governmental plaintiffs (18 states, the District of Columbia, 15 cities and counties, and the United States Conference of Mayors) and NGO plaintiffs (five organizations serving immigrant communities likely to be impacted by a census undercount of those communities) brought these suits to challenge Defendants' decision.  The evidence at trial will show that Defendants' decision is arbitrary, capricious, and contrary to law, in violation of the Administrative Procedure Act; and violates the Due Process Clause of the Fifth Amendment because it was intended to disadvantage immigrant communities of color.  Plaintiffs respectfully request that following a trial on the merits of Plaintiffs' claims, the Court grant the requested relief by vacating Defendants' decision and enjoining Defendants from adding a citizenship question to the 2020 decennial census.

## STATEMENT OF THE CASE

The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State."  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  All residents must be counted, regardless of citizenship status.  *See FAIR*, 486 F. Supp. at 576.

2

The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs."  Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).  The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts.  *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).  The federal government uses the census's population count to distribute hundreds of billions of dollars each year to states and localities.

Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau.  13 U.S.C. § 4.  Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law.  Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

The Census Bureau conducts the decennial enumeration principally by sending a short questionnaire to every household in the country.  To ensure the accuracy of the total-population count, the Bureau uses well-established statutory, regulatory, and statistical standards to govern the development and testing of the questionnaire and each census question.  For example, statistical standards require the Bureau to "achieve the highest practical rates of response" and "minimize[] respondent burden, while maximizing data quality."  Office of Mgmt. & Budget, *Statistical Policy Directive No. 2: Standards and Guidelines for Statistical Surveys* §§ 1.3, 2.3 (2006).  Census standards and long-established practices dictate a rigorous, years-long testing process to ensure changes will not undermine the enumeration.

The decennial census questionnaire sent to every household has not included any

question related to citizenship status since 1950.[1]  For decades, the Bureau has opposed adding

any such question based on its concern that including a citizenship question would drive down

response rates by certain groups, such as noncitizens and immigrants, undermining the accuracy

of the person-by-person headcount.

In March 2018, Secretary Ross announced that he had decided to add a citizenship

question to the 2020 census questionnaire sent to every household, in contravention of the

Bureau's long-held view that such a question would undermine the accuracy of the enumeration.

The Secretary made the decision to add the citizenship question even though experts, including

the Bureau's Chief Scientist, recommended against it and informed the Secretary that doing so

would "harm[] the quality of the census count."  AR 1277.  And the Secretary made this decision

even though the Bureau did not conduct any testing on the effects that a citizenship question

would have on the accuracy of the census.  Rather, this reversal of a decades-long policy was

made notwithstanding the near-consensus opinion of experts (inside and outside the Bureau) that

adding the question will deter certain groups' responses to the census and undermine the

accuracy of the count.

As the evidence will show, Defendants' decision is arbitrary, capricious, and contrary to

law, and should therefore be set aside under the Administrative Procedure Act.  The decision to

add a citizenship question is unsupported by the stated rationale; was grounded on factual errors

and erroneous conclusions; and was reached through unjustified departures from well-established

protocols for testing changes to the decennial census.  The decision also is arbitrary and

capricious because its stated rationale – improving enforcement of the Voting Rights Act – was

---

[1] Since 1960, the Bureau has requested citizenship information through sampling the population.  Until 2005, the Bureau requested such information through a "long-form" questionnaire, i.e., a list of questions sent to one of every six households each decade.  In 2005, the Bureau instituted the American Community Survey (ACS), which contains more than forty-five questions and is sent annually to one of every thirty-six households.

4

pretextual, as demonstrated by evidence of political pressure, shifting and untrue explanations for agency action, and departures from typical agency practice.

The evidence will also show that Defendants' decision violates the Due Process Clause of the Fifth Amendment because it was intended to disadvantage immigrant communities of color.

## ARGUMENT

I.     **Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the decennial census.**

To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Allegations of a "future injury" qualify "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). The standing inquiry is satisfied so long as a single plaintiff establishes standing, including in a consolidated case. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 90-91 (D.D.C. 2018) (consolidated case). Organizations can establish standing on their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), or "associational standing" on behalf of their members.[2]

A.     **The evidence will show that Plaintiffs have suffered and will suffer concrete injuries-in-fact.**

The evidence will establish that Plaintiffs have standing on several independent grounds.

---

[2] An organization has associational standing to sue if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The third prong is a prudential requirement only. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). Where, as here, a plaintiff "seeks civil penalties and injunctive relief only, not money damages, its claims do not require

First, Plaintiffs – recognizing that the citizenship demand will deter census participation – will devote additional resources to counteract the deterrent effect of the citizenship question.  Second, the reduction in responses to the 2020 census will translate into an undercount of certain populations (including immigrants, noncitizens, and Hispanics), resulting in a loss of federal resources and political representation in states, counties, and cities with higher proportions of such persons – including some of the governmental plaintiffs – and in places where members of the NGO plaintiffs reside.  Third, NGO members and residents of the governmental plaintiffs face injury based on loss of privacy, including psychological and emotional injury from the collection and publication of their citizenship status and the increased risk of targeted immigration enforcement.

> **1.     Plaintiffs will be injured through the expenditure of resources necessary to mitigate a substantial risk of harm.**

Plaintiffs will present evidence that the addition of the citizenship question will cause Plaintiffs – both governmental plaintiffs and NGO plaintiffs – to expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.  The addition of a citizenship question will promote fear among noncitizens, Latinos, Arab-Americans, and immigrants of color.  The Census Bureau conservatively estimates that the citizenship question will cause response rates to the 2020 census to decline among households with a noncitizen or person of unknown citizenship status by at least 5.8 percentage points relative to households that consist only of U.S. citizens.  Testimony from Plaintiffs, Plaintiffs' experts, and Defendants' only expert will show that the actual decline in response rates is likely to be significantly higher.

---

'individualized proof.'" *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006).

To counteract the anticipated decline in self-response rates caused by the addition of the citizenship question, Plaintiffs have expended and plan to expend additional resources on census outreach.  These expenditures constitute a direct injury to the budgets and resources of both the governmental plaintiffs and the NGO plaintiffs.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (standing may be based on "reasonably incur[red] costs to avoid" a substantial risk of harm); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 746-47 (S.D.N.Y. 2017) ("expenses in taking reasonable measures to prevent" harm are sufficient to establish injury in fact).

The evidence will also establish that the NGO plaintiffs have standing because they have diverted "resources that could be spent on other activities" and the addition of the question harms their organizational missions.  *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (citing *Havens Realty*, 455 U.S. at 379); *see also Comunidad Hispana*, 868 F.3d at 111 (organizational standing is established when resources are diverted); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012) (Second Circuit requires only "'scant' evidence of 'only a perceptible impairment of an organization's activities'").

## 2.      Plaintiffs will be injured by the loss of federal funds and through harms to their representational and electoral interests.

Plaintiffs will present evidence that the reduction in census response rates caused by the inclusion of the citizenship question will result in a disproportionate undercount of the population in certain areas, which will, in turn, cause a loss of political representation and federal funding for affected areas.  These harms will directly injure the governmental plaintiffs and the NGO plaintiffs' members who reside in those jurisdictions, on whose behalf the NGO plaintiffs may assert associational standing.  *See Bloomberg*, 290 F.R.D. at 415.

Plaintiffs will also show that these injuries are actual and imminent, not conjectural and

speculative.  As the Supreme Court held in *U.S. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ("*D.O.C.*"), because Defendants have set the policy that will harm Plaintiffs, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme – possibly irremediable – hardship."  525 U.S. at 332.

Although Defendants contend that the Census Bureau's non-response follow up (NRFU) efforts may mitigate the undercount of certain impacted populations (immigrants, noncitizens, and Hispanics) arising from the citizenship question, Defendants' position is speculative because NRFU has never prevented an undercount of hard-to-count populations in the past, and NRFU will be even less effective in 2020 due to the citizenship question and the current political environment.  Plaintiffs' experts will testify that the Census Bureau's procedures for remedying the decline in self-response rates will be insufficient to prevent an undercount of the impacted populations.

### a.   Diminished political representation.

The likely loss of political power as a result of a plaintiff's community being undercounted in the decennial census constitutes a "concrete," "actual or imminent" injury that is "not 'conjectural' or 'hypothetical.'"  *D.O.C.*, 525 U.S. at 332.  This is true for effects on interstate apportionment (the allocation of Congressional seats among the states) and intrastate districting (the drawing of lines for election districts for state and local legislative bodies).  *See id.*[3]

In *D.O.C.*, the Supreme Court evaluated whether individual plaintiffs would be injured if

---

[3] *See also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 549 (E.D. Va. 1998) (three-judge court), *aff'd sub nom. D.O.C.*, 525 U.S. 316 (1999); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313 (S.D. Tex. 1992); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989).

the Census Bureau adopted sampling rather than person-by-person enumeration for the decennial

census; the Court concluded, based on expert testimony, that Indiana would likely lose a seat,

and the Indiana resident plaintiff was injured because with "one fewer Representative, Indiana

residents' votes will be diluted." *Id.* at 330-32.  The *D.O.C.* Court held, based on an expert

analysis of the sampling effects on particular counties, that for plaintiffs who resided in those

counties, their residence alone was enough to establish "standing on the basis of the expected

effects of the use of sampling in the 2000 census on *intrastate* redistricting." *Id.* at 332

(emphasis added).

Here, the evidence at trial will show that several governmental plaintiff jurisdictions, and

as in *D.O.C.*, various states and localities in which the NGO plaintiffs' members reside, will lose

political power as a result of the inclusion of the citizenship question on the 2020 census.  As

Plaintiffs' experts will establish, this includes states like New York, California, and Texas, and a

number of cities and counties including New York City, Prince George's County, Maryland, Los

Angeles, Miami, Phoenix, and others.  The governmental plaintiffs include several of these

jurisdictions, including New York State, New York City, and Phoenix.

And several of the governmental plaintiffs are required to rely on decennial census counts

as the population base for periodically redrawing their state and local districts to be "as nearly of

equal population as is practicable," such that the addition of a citizenship question will force

these states to redistrict using population counts that will be fundamentally inaccurate, harming

their sovereign interests in ensuring that their representative governments fairly and accurately

reflect the number of people who live in each district. *Karcher v. Daggett*, 462 U.S. 725, 782

n.14 (1983); *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).  The NGOs similarly have

associational standing because they have members in affected jurisdictions (such as New York

City; Prince George's County, Maryland; Los Angeles; Miami; and Phoenix), and their missions to foster civic engagement and empower their communities will be impaired by an undercount resulting from the inclusion of the citizenship question.

### b. Diminished federal funding.

Plaintiffs will also establish injury based on the citizenship question's negative effect on federal funds that they (or the jurisdictions in which their members reside) receive. In *Carey*, the Second Circuit held that New York State and New York City had standing to challenge the conduct of the 1980 census because they "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in . . . decreased federal funds flowing to their city and state." 637 F.2d at 838. Other courts have followed suit.[4]

Plaintiffs will present evidence that even a small undercount of noncitizen households or Hispanics will cause the governmental plaintiffs with a greater than average share of those residents to lose funding under several dozen federal financial assistance programs that rely on geographic distribution criteria. For example, for nineteen state-share programs (including Title I educational funds, and the Special Supplemental Nutrition Program for Women, Infants, and Children), New York, New Jersey, California, Texas, Florida, Nevada, and Hawaii will lose funds. Some of these states are among the governmental plaintiffs in this litigation, and the NGO plaintiffs have members in all of them. Finally, although the Second Circuit has held that it is unnecessary for standing purposes, the NGO plaintiffs will also introduce evidence that a number of their members do directly use, rely on, or interact with some of the programs that would lose money. *See Carey*, 637 F.2d at 838 (holding that individuals could establish harm by

---

[4] *See Glavin*, 19 F. Supp. 2d at 550; *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (finding standing even if "none of the named plaintiffs personally receives a dollar of state or federal aid, [because] all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money").

showing "decreased federal funds flowing to their city and state," without showing that they themselves relied on the particular programs at issue).

> ### c.    Loss of privacy.

Defendants' sole justification for adding the citizenship question – to provide DOJ with census block data about citizenship of residents – also injures NGO plaintiffs' members by invading their right to privacy.  The Census Bureau publishes its citizenship voting age population (CVAP) data; census blocks are sufficiently small, sometimes consisting of a single household, that providing such information will sacrifice respondents' statutory right to confidentiality.  The door-to-door collection of this information will result in increased fear and emotional stress among members of immigrant communities, and raises the specter that the release of such granular data could be used for immigration enforcement.

"[A]esthetic, emotional or psychological harms also suffice for standing purposes." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006); *see also Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 184-85 (2d Cir. 2001).  In order to satisfy the standing requirements, plaintiffs must establish that the emotional or psychological harm is significant enough to constitute injury and more than some mere "personal embarrassment."  *Friedman v. U.S. Postal Serv.*, No. 08-cv-00913, 2011 WL 3267713, at *5 (D. Conn. July 28, 2011).  The threatened harm must be "sufficiently real and immediate to show an existing controversy," *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), though Plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about," *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting *Clapper*, 568 U.S. at 414 n.5).

The evidence will establish that for members of the NGO plaintiffs, being compelled to answer questions as to the citizenship status of every member of their household – deeply personal information – is extremely invasive when combined with Defendants' goal of providing

this information to DOJ at the census block level.  Federal law requires Defendants to maintain the confidentiality of responses to the Census questionnaire.  *See* 13 U.S.C. § 9(a)(2). ("Neither the [Commerce] Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof" may "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified.").  "Both the history of the Census Act and the broad language of the confidentiality provisions of § 9 make abundantly clear that Congress intended both a rigid immunity from publication or discovery and a liberal construction of that immunity that would assure confidentiality."  *Carey v. Klutznick*, 653 F.2d 732, 739 (2d Cir. 1981) (quoting *McNichols v. Klutznick*, 644 F.2d 844, 845 (10th Cir. 1981)).

The federal government's intention to publish CVAP data on a census block basis will result in the disclosure of at least some individuals' responses to the citizenship question, and presents a high risk of disclosure for many others.  Census blocks often consist of only a few households, and some contain only a single individual.  Publication of granular CVAP data will necessarily disclose the citizenship status of some individuals, violating the confidentiality of their census responses.  The Census Bureau admits that it has not yet developed any methodology or plan for how such granular data can be published without disclosure, and as such its assertion that it does not intend to publish actual individual responses does not mitigate the risk of violating the confidentiality requirement.  *See id.* at 738-39 (holding that it was error to compel discovery of address registers, even though individual names would be redacted, because the § 9(a)(2) requirement is that no identifying information be made public).

This violation of privacy causes a second injury: for members of NGO plaintiffs who are undocumented immigrants and noncitizens with legal status, the publication of CVAP data presents a grave threat – that such publicly-available information could be used for immigration

enforcement against known noncitizens or targeting areas with high levels of noncitizens.  That

fear is warranted because this federal Administration has used other publicly available

information to target noncitizens.  Using public data, U.S. Immigration and Customs

Enforcement (ICE) has targeted noncitizen communities for enforcement action, which has

resulted in both a 1,200% increase in ICE arrests and attempted arrests in New York State

generally and at courthouses in New York between 2016 and 2017, as well as swaths of

enforcement actions at sensitive public locations such as schools, hospitals, and churches.[5]  The

fear that immigration enforcement will use all available information to target noncitizens is real,

and is more than sufficient to establish standing.  *See, e.g.*, *Friedman*, 2011 WL 3267713, at *5.

### B.      Traceability and redressability.

To establish causation, a plaintiff must show that the injury in fact is "fairly traceable to

the challenged action of the defendant."  *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,

684 F.3d 286, 294 (2d Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493

(2009)).  This standard is "lower than that of proximate cause," and "indirectness is 'not

necessarily fatal.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).[6]  For redressability, a

plaintiff merely must show "that a favorable decision would redress its injuries."  *Comunidad

Hispana*, 868 F.3d at 109.

With regard to plaintiffs' census outreach efforts, Defendants' decision to add a

citizenship question has caused or will directly cause Plaintiffs to increase their expenditures,

---

[5] *See, e.g.*, *ICE Out of Courts*, Immigrant Defense Project; Ray Sanchez, *ICE arrests undocumented father taking daughter to California school*, CNN (Mar. 3, 2017); John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious Operation*, NPR (Sept. 20, 2017).

[6] Defendant's actions need not be "the very last step in the chain of causation," and independent action by a third party "does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017) ("A defendant's conduct that injures a plaintiff but does so only after intervening conduct by another person, may suffice for Article III standing").

and has caused the NGO plaintiffs to divert resources away from other core organizational priorities.  A favorable decision would redress this injury by ensuring all of these additional resources need not be expended or diverted.

As to electoral and funding injuries arising from an undercount, the evidence will establish that the citizenship question will cause an undercount among certain communities, directly injuring various governmental plaintiffs as well as NGO plaintiffs' members.  The Census Bureau's analysis conservatively estimates that 5.8 percent of households with a noncitizen will not respond to the census because of the citizenship question.  Plaintiffs will be injured by the question's "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 168-69.  A favorable decision would redress injury by removing the cause for this undercount.

Finally, the Census Bureau's collection of citizenship data and publication of citizenship data at the granular block level is directly related to both loss of privacy rights guaranteed by statute and heightened risk of immigration enforcement.  *See, e.g., Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 156 (E.D.N.Y. 2017) (holding that the plaintiffs had standing because "[i]t is not difficult to infer that this information would facilitate [the Government's] ability to remove these individuals from the country.").  A favorable decision would eliminate the risk of personal disclosure and targeted immigration enforcement.

## II.     Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act.

The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A); or that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).  Judicial review of agency action under the APA is

based on the rationale the agency provided in making its decision; a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Defendants' stated reason for adding the citizenship question to the census is that it is "necessary" for DOJ to enforce Section 2 of the Voting Rights Act. AR 1320. The evidence will show that this reason is arbitrary and capricious; and that Defendants' decision should therefore be set aside under the APA. The evidence will also show that Secretary Ross and the Department of Commerce engaged in a concerted effort to bowdlerize the administrative record to frustrate judicial review upon the "whole record" in violation of 5 U.S.C. § 706. AR 12476; *see Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419-20 (1971).

## A.     The decision is not supported by the administrative record.

The APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." *Overton Park*, 401 U.S. at 420; *see also* 5 U.S.C. § 706. The evidence will show that Defendants' decision is invalid under the APA even if the Court's review is limited to the complete (albeit censored) administrative record.

In addition, this case presents circumstances that warrant consideration of evidence beyond the administrative record.[7] *See Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see also Overton Park*, 401 U.S. at 420; *City of New York v. U.S. Dep't of Commerce*, 822 F. Supp. 906, 917 (E.D.N.Y. 1993) (describing expert testimony of statisticians and

---

[7] Plaintiffs' post-trial memorandum of law and proposed findings of fact will set out in detail the grounds for invalidating Defendants' decision based on the complete administrative record standing alone, and will further demonstrate that the extra-record evidence presented at trial bolsters that conclusion.

demographers in census challenge).

**B.    Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA.**

Agency action is arbitrary and capricious if not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 42-43.  Agency action is also arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *Id.* at 43.

The evidence will show that the Secretary's decision is arbitrary and capricious.  The Secretary's decision runs counter to the evidence before the agency, fails to consider several important considerations, failed to abide by the agency's well-established procedures and testing protocols for changing the census, and is based on factual errors, erroneous conclusions, and an inversion of the burden of proof.  The evidence will also show that Defendants' decision undermines rather than supports enforcement of laws that protect minority voting rights.  The trial record will further establish that Defendants' decision is arbitrary and capricious because its stated rationale – enforcement of the Voting Rights Act – is pretextual, as demonstrated by evidence of undue political pressure, a misleading explanation of the genesis and purpose for the decision, departures from typical agency practice, unsupported disregard for the views of Census Bureau experts, and providing a false rationale for the decision.

**1.    The evidence will show Defendants' decision to add a citizenship question ran counter to the evidence before the agency and failed to consider important aspects of the problem.**

The evidence at trial will establish that Defendants' decision should be set aside as

16

arbitrary because it runs counter to the evidence and failed to consider important factors. *State Farm*, 463 U.S. at 43.

The stated rationale for the addition of the citizenship question is that collecting this information is "necessary to provide complete and accurate data" to be used by DOJ to enforce Section 2 of the VRA. AR 1320. But to the contrary, the evidence will show that adding a citizenship question will compromise the accuracy of the census data, and that the Secretary failed to select – or even seriously consider – a less burdensome and more accurate alternative to meet DOJ's purported need for this information. AR 1277-85, AR 1304-12. And the evidence will show that block-level data are unnecessary to enforce Section 2 of the VRA, and that the Census Bureau cannot disclose CVAP data at the block level consistent with the privacy restrictions of 13 U.S.C. § 9(a)(2), AR 8911-12 – an issue which the Secretary entirely failed to consider.

Defendants have thus both "offered an explanation for [the] decision that runs counter to the evidence before the agency" and "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *see also, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decision-making and cannot survive review under the arbitrary and capricious standard.").

### a.      The citizenship question will lead to lower quality citizenship data.

Secretary Ross's decision depends on the premise that adding the citizenship question to the census will result in higher quality citizenship data. *See* AR 1313 ("prioritiz[ing] the goal of obtaining *complete and accurate data*") (emphasis in original); AR 1316 ("it was imperative" to choose an option to "provide a greater level of accuracy"); AR 1317 ("It is my judgment that option D will provide DOJ with the most complete and accurate CVAP data in response to its

request.").  But the evidence will show that adding the citizenship question will result in *less* complete and *less* accurate data that cannot be used for DOJ's purposes for two reasons.

First, responses to inquiries about citizenship status are inherently inaccurate; as the Census Bureau's own analysis confirms, non-citizens respond to inquiries into their citizenship status by responding that they are citizens approximately 30% of the time.  AR 1284.  This unreliability belies Secretary Ross's contention that collection of citizenship data through the census will enhance the scope and accuracy of the data collected.  And the citizenship question will further reduce data quality by reducing response rates, ultimately resulting in poorer quality data.  AR 1280-81.  *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 93 (D.C. Cir. 2010) (finding rule arbitrary and capricious where "it defie[d] the expert record evidence and is unexplained"); *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action").  The Secretary's stated desire for accuracy cannot be squared with a decision that moves the census in the opposite direction.

Second, as Defendants' expert recognizes, there is no evidence even suggesting that census responses will result in better block-level data for VRA enforcement.  Even setting aside data quality issues, the Census Bureau cannot disclose CVAP data at the block level consistent with the privacy restrictions of 13 U.S.C. § 9(a)(2).  This consideration is nowhere mentioned in Secretary Ross's memo.  AR 1313.  Although the Census Bureau anticipates using "disclosure avoidance protocols" to obscure individually-identifiable data (AR 8912), Defendants cannot show that such obscured data will even be usable for the purposes of enforcing the Voting Rights Act  – another consideration nowhere mentioned in Secretary Ross's memo.  The lack of any fit between the citizenship question and the stated rationale of VRA enforcement underscores the

fundamental irrationality of Defendants' decision.

In response to the concerns proffered by the Census Bureau experts, Defendants' unsupported assertions to the contrary cannot sustain their decision.  For example, the Secretary's decision memo contends that the citizenship question will provide the "most complete and accurate" data.  AR 1317.  But as detailed above, this contention is contrary to the evidence.  Courts will "not defer to the agency's conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *see also, e.g.*, *Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.,* 482 F.3d 79, 99 (2d Cir. 2006) (reversing where agency offered "no explanation for dismissing record evidence that runs counter to its findings").  Unlike prior litigation concerning the census, where both sides identified scientific evidence in their favor, there is *no* contrary scientific evidence in the record with respect to deleterious effect on accuracy of the citizenship question.[8]

### b. Defendants refused to consider alternatives that would better satisfy the Department of Justice's stated data need.

The evidence will demonstrate that Defendants refused to explore or consider alternatives that would better support VRA enforcement.  As Defendants' sole expert and Plaintiffs' experts agree, when an agency requests information through the census, the standard process is for the Census Bureau to meet with the agency to discuss the data request, drill down into the details of the data use, and consider how best to meet the need presented.  But in what the Bureau conceded was unusual (perhaps unprecedented), the Census Bureau never met with DOJ to

---

[8] *See, e.g.*, *Wisconsin*, 517 U.S. at 22-23; *Cuomo v. Baldrige*, 674 F. Supp. 1089, 1106 (S.D.N.Y. 1987).  Although the Secretary's decision memo references contrary survey data gathered by Nielsen, AR 1318, these materials are nowhere in the administrative record.  Indeed, the evidence at trial will reflect that Defendants never reviewed survey data or other materials from Nielsen.  The Defendants refuse to credit the Census Bureau's empirical evidence regarding the impact of the citizenship question – but purport to rely on privately-collected survey data that was never actually before the agency – is additional grounds to conclude that the decision is arbitrary and capricious.

discuss the request for a citizenship question; DOJ refused even to meet with the Census Bureau

to explain the data request or discuss how best to meet the data need.  AR 3460.  This refusal

came after the Census Bureau advised DOJ that using administrative data to generate CVAP data

at the block level would better meet their VRA-related needs than adding a citizenship question.

AR 5489.  Under these circumstances, Defendants cannot show that there is a fit between the

purported data need presented by the Department of Justice – block-level CVAP data – and the

method identified to satisfy that need – the addition of a citizenship question.

And the record reflects that Defendants refused to adopt the less burdensome and more

accurate alternative proposed by the Census Bureau of using administrative records to produce

block-level CVAP tables.  *See, e.g.*, AR 1277, AR 1283.  The only scientific analyses in the

record describe how this alternative "best meets DoJ's stated uses, is comparatively far less

costly" than adding a citizenship question, "does not increase response burden, and does not

harm the quality of the census count."  *Id.*

In short, the evidence will confirm that adding a citizenship question is not necessary to

satisfy DOJ's data needs.  Defendants' refusal to choose an option that actually aligns with their

stated rationale is arbitrary and capricious.  *See, e.g.*, *Delaware Dep't of Nat. Res. & Envtl.*

*Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015), *as amended* (July 21, 2015) (reversing where,

*inter alia*, agency did not fully consider alternatives); *Action on Smoking & Health v. CAB*, 699

F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision failed to give sufficient consideration

to narrower alternatives).

      **c.**    **Block-level CVAP data are not necessary to enforce the Voting Rights Act.**

The Secretary's decision is arbitrary and capricious because block-level CVAP data are

not necessary to enforce the VRA.[9]  As Plaintiffs' expert Dr. Lisa Handley will explain, the long

history of successful VRA and Section 2 enforcement belies Defendants' contention that a new

source of data is necessary.  To perform the analysis required by *Thornburg v. Gingles*, 478 U.S.

30 (1986), in some VRA cases involving states and larger jurisdictions, there is no need to split

census blocks.  For instances in which splitting census blocks is necessary, DOJ has always

relied on citizenship data not published at the block level and used those data to estimate CVAP

at the block level using one of several reliable methods.

The evidence will show that no DOJ Section 2 case has ever failed because of a lack of

citizenship data collected through the decennial census; a fact that reinforces the conclusion that

Secretary Ross's decision was arbitrary.[10]  *See, e.g., Islander E. Pipeline Co.*, 482 F.3d at 101

(decision was arbitrary and capricious where agency failed to identify specific examples to

support its rationale).

Defendants offer no explanation as to how all of the specific data collected by the

proposed citizenship question will aid VRA enforcement.  Although Defendants may contend

that they simply relied on the Department of Justice's representation that this data was necessary,

Defendants may not simply hide behind the Department of Justice's stated rationale.  *See*

*Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 16 ("EPA seeks to excuse its

inadequate responses by passing the entire issue off onto a different agency.  Administrative law

does not permit such a dodge.").  This principle carries particular weight in this case, where

---

[9] Plaintiffs will rely on likely extra-record evidence to demonstrate this particular point – that Defendants' decision is arbitrary because block-level CVAP data are unnecessary to enforce the VRA.  Perhaps unsurprisingly, for the reasons stated in this memorandum, the administrative record includes no evidence relating to the need for block-level CVAP data.  The very absence of this evidence from the record – particularly given the stakes of the decision at issue – itself demonstrates arbitrary and capricious conduct.

[10] *See, e.g., Reyes v. City of Farmers Branch*, 586 F.3d 1019 (5th Cir. 2009) (court of appeals left open whether plaintiffs could have succeeded in satisfying the first *Gingles* precondition had their expert properly used his alternative, non-ACS methods).

Commerce – not DOJ – supplied that rationale in the first instance.

>    **2.    Defendants' Decision Memo is replete with factual errors and manifestly erroneous conclusions.**

Courts "ha[ve] not hesitated" to vacate agency decisions "when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (vacating agency decision that "ignore[d] critical context" and "cherry-pick[ed] evidence"). As the evidence will show, the Secretary's decision memo is replete with factual errors and erroneous conclusions. For example, the Secretary contends that the Census Bureau "did not provide definitive, empirical support" for the conclusion that the addition of the citizenship question would result in a differential decline in self-response rates. *See* AR 1313, 1316-17. But this assertion ignores, *inter alia*, the numerous detailed and uncontroverted empirical analyses provided by the Census Bureau. *See* AR 1277, AR 1308, AR 8614, AR 11634. Likewise, the Secretary contends that "no one has identified any mechanism" for identifying respondents who would self-respond to the census but for the addition of a citizenship question. *See* AR 1313, AR 1317. This too ignores the Census Bureau's empirical analyses that go to this question.[11] *See* AR 1277, AR 1308, AR 8614, AR 11634. And the Secretary asserts – with no support whatsoever – that placing the citizenship question last on the census will somehow "minimize any impact on decennial census response rates." AR 1320. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (holding a rule arbitrary and capricious where agency lacked evidence to support key factual conclusion).

Indeed, the Secretary's decision inverts the standard of proof for adding new questions to

---

[11] The Secretary's failure to recognize that controlled testing would allow the Census Bureau to further assess differential response rates is plainly erroneous.

the census.  As Plaintiffs' experts will explain, the Census Bureau bears the burden to

demonstrate the need for the question, and to confirm that the change will not cause harm.  But

the Secretary's decision makes clear that Defendants made no affirmative finding whatsoever

that the citizenship demand would *not* harm the decennial census; instead, the Secretary based

his decision on the purported absence of evidence of harm.  *See* AR 1313, AR 1316, AR 1317.

As noted, this finding was contrary to the Census Bureau's analysis that adding the question

would "increase response burden" and "harm the quality of the census count."  AR 1277.  In

light of the irreparable impact of adding a citizenship question – dilution of political power,

reductions in funding streams for the next decade, impaired demographic data and statistics –

Secretary Ross's failure to consider and apply the appropriate standard is arbitrary and

capricious.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017)

(agencies must "adequately analyze . . . the consequences" of their actions).

> **3.    Defendants' failure to adequately test the citizenship question is arbitrary and capricious.**

The decision memo makes clear that Defendants failed to consider the inadequacies of

prior testing of the citizenship question and entirely disregarded the need to test the full

questionnaire.  Defendants' last-minute addition of the citizenship question failed to comply with

federal standards and long-standing Census Bureau processes.

Secretary Ross concluded that the citizenship question need not be tested because the

question had been included on the American Community Survey (ACS) since 2005.  *See* AR

1314.  But the evidence will show that the ACS is no precedent for adding the citizenship

question.  As the Census Bureau's Chief Scientist and sole expert concedes, the citizenship

question in fact performs poorly on the ACS.  AR 1284.  Plaintiffs' experts will demonstrate that

the ACS is a fundamentally different survey; for example, the ACS contains dozens of questions

to the decennial census's few, and its citizenship question is preceded by a nativity inquiry that impacts the question's context.  Changing sociopolitical environments also affect the sensitivity of the citizenship question, requiring testing.  And although the Secretary notes that the question was asked of every household prior to 1950, there is no evidence in the record that the citizenship question performed well in those earlier contexts.  At a minimum, it is improper to add the citizenship question without comprehensive testing, which was not done.

Moreover, even assuming that the question was adequately tested in the ACS context, Defendants entirely failed to consider the need for testing the full census questionnaire.  The evidence will show that good survey design testing requires considering not just an individual question, but the effect of the question in the context of the entire questionnaire.  Accordingly, OMB and the Census Bureau's own quality standards dictate that the full census instrument be pre-tested when changes are made, as even minor variations in the design of a questionnaire can lead to unanticipated differences in response patterns.  *See* U.S. Census Bureau, *Statistical Quality Standards* 7-8 reqs. A2-3 & A2-3.3 (July 2013).  The Census Bureau typically spends *years* testing survey instruments prior to deciding whether or not to change the decennial census.  As Plaintiffs' experts will explain, testing is particularly important where, as here, the change implicates sensitive subjects.

The Secretary's decision memo makes no reference to the substantial body of scientific evidence or the Census Bureau's own Quality Standards that require the testing of the entire census questionnaire.  *See* AR 1313, 1314, 1319 (referencing only testing of the question for the ACS).  Defendants' failure to test the entire proposed questionnaire – or even consider the need for that testing – is contrary to Defendants' own guidance and protocols and in contravention of well-established norms.  AR 9687, AR 3890.  Defendants' failure to even consider how this

change to the census questionnaire impacts performance as a whole is arbitrary and capricious.

### 4. The evidence will show that Defendants' stated rationale was pretextual.

Agency action is invalid under the APA where the agency has "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. As this Court previously recognized, agency action will be arbitrary and capricious if it is based on a pretext – that is, if "the stated rationale for Secretary Ross's decision was not his *actual* rationale." *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921, 2018 WL 4539659, at *2 (S.D.N.Y. Sept. 21, 2018); *see also Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994). The evidence will establish that Defendants' stated rationale for their decision was pretextual.

First, the evidence will show that the Secretary's decision memo and sworn Congressional testimony presented a completely different explanation of the genesis and purpose for his determination than he now offers to the Court. The Secretary initially stated that he began considering a citizenship question *after* receiving the Department of Justice's December 2017 request letter. AR 1313. This was repeated in subsequent Congressional testimony.[12] These representations were false, AR 1321, as was the Secretary's testimony regarding the lack of White House involvement in his decisionmaking process. AR 763, AR 2561. It was the Secretary, not DOJ, who initiated the decision-making process to add a citizenship question; and the Secretary in fact personally and repeatedly lobbied the Attorney General to submit the

---

[12] *Hearing on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum: Hearing Before the H. Ways & Means Comm.*, 115th Cong. 24 (Mar. 22, 2018), 2018 WLNR 8951469 ("The Department of Justice . . . initiated the request for inclusion of the citizenship question."); *Hearing on F.Y. 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. on Commerce, Justice, Sci., & Related Agencies of the H. Comm. on Appropriations*, 115th Cong. 9 (Mar. 20, 2018), 2018 WLNR 8815056 ("We are responding solely to the Department of Justice's request."); *id.* at 21 ("Q: Has the President or anyone in the White House discussed with you or anyone on your team about adding this citizenship question?  A: I'm not aware of any such."); *Hearing on the F.Y. 2019 Funding Request for the Commerce Department: Hearing Before the Subcomm. on Commerce, Justice, Sci., & Related Agencies of the S. Comm. on Appropriations*, 115th Cong. 27 (May 10, 2018), 2018 WL 2179074 ("[T]he Justice Department is the one who made the request.").

request that the Secretary then later relied on to justify his decision, *after* DOJ (and the Department of Homeland Security) had already concluded they did not want to raise the question. *See* AR 4004, AR 2458, AR 2653, AR 2636, AR 12755. Manufacturing a post hoc explanation for a decision that the Secretary already made is evidence of pretext. *See Tummino v. von Eschenbach*, 427 F. Supp. 2d 212, 231-33 (E.D.N.Y. 2006) (officials "needed to find acceptable rationales").

Second, the evidence will show that Defendants concealed the fact that Secretary Ross prejudged the issue. Far from engaging in a "hard look" or "comprehensive review process," Secretary Ross began working to add the citizenship question shortly after his confirmation with a small number of senior aides. AR 3699, 3710. This included soliciting other agencies, including the Departments of Justice and Homeland Security, to request addition of the question. Ultimately the Secretary worked with DOJ to concoct a letter that would make it appear – falsely – as though DOJ had independently initiated the request. AR 12756. *See New York v. Salazar*, 701 F. Supp. 2d 224, 242 (N.D.N.Y. 2010) (agency took steps to conceal that official "prejudged and controlled" decision), *aff'd*, 2011 WL 1938232 (N.D.N.Y. 2011). And Secretary Ross and his senior staff agreed in August 2017 to whitewash the administrative record. AR 12476. The Secretary's effort to cover up his prejudgment of the issue are further proof of pretext and arbitrary action. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Third, the evidence will show political pressure on the Commerce Department from White House staff and Presidential advisers, including Stephen K. Bannon and Kris Kobach, to add the citizenship question. AR 763-764, AR 2561, Defs.' Supp. Response to Interrogatories

26

(Docket No. 379-1).  This evidence of political interference independently supports setting aside Defendants' decision on arbitrary and capricious grounds.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 544-45 (E.D.N.Y. 2009) (citing *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49 (D.C. Cir. 1971)); *see also Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997).

Fourth, the evidence at trial will show dramatic departures from the typical decisionmaking process for changing the census questionnaire.  The Census Bureau typically takes years to test the census design and validate new questions, but here Defendants decided to add the citizenship demand in less than four months, with no testing or validation, and with no consultation with DOJ to determine how its data needs could be met.  AR 3460.  *See Tummino*, 427 F. Supp. 2d at 233-34 ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing of bad faith . . . has been made."); *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747-48 (2014).  And the Secretary overruled the consensus view of the Census professional experts and advisory committees, which further supports a conclusion of pretext and arbitrary decisionmaking.  *Latecoere*, 19 F.3d at 1365; *Tummino*, 427 F. Supp. 2d at 231-33.

Finally, the evidence will demonstrate that the stated reason – to better enforce Section 2 of the Voting Rights Act ("VRA") – is pretext.  Block-level citizenship data from the decennial census has never been available since the 1965 enactment of the VRA, yet DOJ has been able to enforce the VRA since its passage without such information.  Acting AAG Gore testified that he does not even know if citizenship data based on responses to a citizenship question on the census will have smaller or larger margins of error, or will be any more precise, than the existing citizenship data on which DOJ currently relies.  And the evidence will show that any citizenship

data collected through the 2020 census would not be usable at the block level in any event, because of the Census Bureau's statutorily-mandated disclosure avoidance protocols and confidentiality protections.  AR 8912.  *See Woods Petroleum Corp. v. United States Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994) (setting aside agency action because "sole reason" for that action was "to provide a pretext" for the agency's "ulterior motive"), *adhered to on reh'g en banc*, 47 F.3d 1032 (10th Cir. 1995).

C.   **Defendants' decision to demand citizenship information is not in accordance with law.**

The evidence will show that Defendants' decision should also be set aside under the APA because it is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

Section 141(f) of the Census Act sets a strict timeline for changing the content of the decennial census and cabins the Secretary's discretion to add new questions to the instrument. The Act requires the Secretary to submit a report to Congress "not later than 3 years before the appropriate census date," identifying the "subjects proposed to be included, and the types of information to be compiled, in such a census."  13 U.S.C. § 141(f)(1).[13]  The Secretary submitted that report in March 2017, and did not identify citizenship as a subject to be included on the decennial census.  Although the Census Act allows the Secretary to amend the subjects on the census after the report is submitted, the Act limits such changes to where "*new* circumstances exist which *necessitate* that the subjects, types of information, or questions contained in reports so submitted be modified."  *Id.* § 141(f)(3) (emphasis added).[14]

---

[13] To meet this deadline, the Census Bureau required agencies to submit any requests for new data by July 1, 2016. Abowd 8/15 dep., Ex. 21.  DOJ's response did not request collection of citizenship data.  AR 311.

[14] The Act requires the Secretary to submit a report to Congress documenting such "new circumstances."  There is no suggestion in the record or elsewhere that the Secretary ever submitted such a report.

As the evidence will show, there are no "new circumstances . . . which necessitate" the inclusion of the citizenship question on the census.  There is nothing in the administrative record identifying any new circumstances arising after the March 2017 report suggesting that existing data for VRA enforcement were suddenly problematic or ineffective; nor are such new circumstances identified in Secretary Ross's decision memorandum; nor do such new circumstances exist.  And the evidence will reflect that the Department of Justice acknowledges that adding a citizenship demand to the census is not "necessary" to enforce the VRA, but may merely "assist" enforcement efforts.  Accordingly, Defendants' failure to include citizenship on the list of decennial subjects in the March 2017 report to Congress, and the concomitant absence of changed circumstances that necessitate the addition, is plainly contrary to law.

Defendants' failure to comply with testing protocols is likewise not in accordance with law, including federal rules and regulations mandating that the Census Bureau, *inter alia*, minimize respondent burden, pretest its data collection instruments to identify problems, and verify that questions are not unduly sensitive.  *See, e.g.*, 44 U.S.C. § 3501; U.S. Census Bureau, *Statistical Quality Standards* ii, 7-8 reqs. A2-3 & A2-3.3 (July 2013).

## III.  Intentional discrimination was a motivating factor in the citizenship question decision.

The evidence will show that Secretary Ross's decision to add a citizenship question to the census was motivated in part by a desire to harm Latinos and immigrants of color, and thus violates the Fifth Amendment's prohibitions on intentional discrimination on the basis of race and national origin.  To succeed on this claim, NGO plaintiffs need not show that intentional discrimination was the sole reason for Secretary Ross's decision, but merely a motivating factor. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216-17 (2d Cir. 1987).  Because "discriminatory intent is rarely susceptible to direct proof," *Mhany Mgmt., Inc. v. Cty. of Nassau*,

29

819 F.3d 581, 606 (2d Cir. 2016), the Court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).  Under the Supreme Court's decision in *Arlington Heights*, 429 U.S. at 266-68, the relevant factors include: (1) disparate impact; (2) the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures" from past practice; and (5) "contemporary statements" by those deciding the issue.  Additionally, the evidence will show that the proffered rationale for adding the question was pretextual.

### A.     Disparate impact.

The "racially disproportionate effect of official action provides an important starting point" in the intentional discrimination inquiry.  *Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982).  Plaintiffs intend to provide evidence that the addition of the question will have a disparate impact on Latinos, noncitizens, and the foreign-born.

Evidence, including the Census Bureau's own quantitative analysis and focus group research, shows that the citizenship question will have a disparate effect on response rates among non-citizens, immigrants, and Hispanics.  This evidence, as well as evidence from Plaintiffs regarding fear among immigrant and Hispanic communities about responding to the census due to the addition of the citizenship question, all point to the same conclusion: addition of the question will reduce response rates. Notwithstanding the Census Bureau's NRFU efforts, the decline in response rates will translate into an undercount, with a concomitant loss of resources and political representation for communities with larger percentages of these groups.

### B.     Historical background of the decision.

In terms of the historical background of the citizenship question decision, Plaintiffs will

present evidence that will allow an inference of discriminatory intent.  The evidence will show Secretary Ross' earliest consideration of the issue was from proponents of the citizenship question who were explicit in their desire to limit the political representation of immigrants and noncitizens, the majority of whom are people of color; none of these efforts have sought to promote VRA enforcement.  AR 2510.  Immediately after assuming office, Secretary Ross began considering adding the citizenship question, which "senior administration officials had previously raised."  AR 1321.  The Administration's first attempt to add a citizenship question came in late January 2017 in the form of a draft Executive Order that included anti-immigrant provisions targeting illegal entries, visa overstays, and unlawful employment, and made no mention of the VRA.  PX-269, PX-270.  And during early 2017 (months before the VRA-rationale first emerged), Secretary Ross had conversations with several individuals who sought to target immigrants of color.  The individuals who first encouraged Secretary Ross to add a citizenship question – Steve Bannon and Kris Kobach – were expressly motivated by a desire to stem the political power of immigrant communities of color.  *E.g.*, AR 763-74.

> ### C.    Irregular procedural sequence.

Plaintiffs will present evidence that the adoption of the citizenship question involved major departures from the "well-established" procedures to add or change a Census Bureau questionnaire, including disregarding the views of Census Bureau experts.  In addition to these irregularities, the administrative record and other evidence will demonstrate that Secretary Ross offered shifting rationales for when and why he decided to add the citizenship question.  *See infra* Part II.B.4; *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 240-41 (5th Cir. 2016) (shifting rationales for a voter identification law was probative of discriminatory intent).  Specifically, only after this litigation was filed and the administrative record was lodged, Secretary Ross filed a supplemental memorandum stating that, in fact, he "'began considering' whether to add the

citizenship question '[s]oon after' his appointment as Secretary in February 2017 – almost ten months before the 'request' from DOJ – and that, '[a]s part of that deliberative process,' *he and his staff* asked the Department of Justice if it 'would support, *and if so would request*, inclusion of a citizenship question.'" *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 809 (S.D.N.Y. 2018) (quoting AR 1321) (emphasis in original).  At Secretary Ross's direction, Commerce officials pushed both DOJ and DHS to request the citizenship question, discussing the issue with individuals involved in immigration policy, not voting rights.  AR 12756.

As discussed, the evidence will also show that the process for adding the citizenship question departed from "well-established" procedures to change the census, including interagency consultation, consideration of less burdensome alternatives, and cognitive or field testing.  AR 9687, AR 3890.  These departures from established practice were not accidental; as just one example, Acting AAG for Civil Rights John Gore testified at deposition that Attorney General Sessions personally directed DOJ to refuse to meet with the Census Bureau to discuss alternative approaches – the standard first step when an agency seeks data from a Census Bureau instrument.  Independent experts, including former Census Directors, the National Academies of Sciences, and the Census Bureau Scientific Advisory Committee, have uniformly expressed the view that the process to add the citizenship question was inconsistent with accepted standards for survey methods, and thereby threatens the accuracy of the count.  *E.g.*, AR 794, AR 1057.

### D.    Substantive departures from past practice.

The evidence will also show the decision to add a citizenship question departs from past practice.  The Census Bureau has consistently rejected attempts to add a citizenship question.  Prior to the 1980 and 1990 censuses, the Census Bureau opposed adding a citizenship question, stating in the former case that such questions "are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *FAIR*, 486 F. Supp.

at 568.  Similarly, the evidence will show that prior to the 2010 census, eight former Directors of

the Census Bureau (appointed by Presidents from both political parties) opposed a congressional

attempt to add a question on citizenship and immigration status to the 2010 census because of the

potential impact on participation of both legal and undocumented immigrants.  And in 2016, four

former Census Bureau Directors filed a Supreme Court amicus brief in which they explained that

a person-by-person citizenship inquiry would reduce the response rate.  Br. of Former Directors

of the U.S. Census Bureau as Amici Curiae Supporting Appellees, *Evenwel v. Abbott*, 136 S. Ct.

1120 (2016).

E.     **Contemporary statements by decisionmakers and those influencing them.**

Plaintiffs intend to introduce statements by Secretary Ross and those who influenced him

to add the citizenship question that support a discriminatory motive.  As the Second Circuit has

explained, when multiple officials influence a final decision, the relevant inquiry is whether the

decision was "tainted with discriminatory intent even if the decisionmakers personally have no

strong views on the matter."  *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49

(2d Cir. 1997); *see also Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018)

(holding that there is still liability for intentional discrimination when a "biased individual

manipulates a non-biased decision-maker into taking discriminatory action").

To begin, Plaintiffs will present evidence that Secretary Ross was motivated at least in

part by a desire to dilute the political power of immigrant communities of color. For example, in

October 9, 2017, Ross announced his support for a wide-range of the Administration's anti-

immigrant policies.  PX-479.  And in March 2017, Secretary Ross asked another Commerce

official whether noncitizens were included in the census, and received in response an article

entitled "The Pitfalls of Counting Illegal Immigrants."  AR 2521.

Additionally, the evidence will show that the individuals who played a major role in

convincing Secretary Ross to add the citizenship question did so with discriminatory motives. Secretary Ross has admitted that in early 2017, he discussed adding the citizenship question with Kris Kobach, Steve Bannon, Attorney General Sessions, and several of Sessions' key immigration aides.  Additionally, President Trump's campaign claimed President Trump "officially mandated" that the citizenship question be added.  *New York,* 315 F. Supp. 3d at 780. The evidence will show that these individuals made statements that either demean or target immigrant communities of color, and that Mr. Kobach pushed for the citizenship question as a way to neutralize the growing political power of these communities.

## F.    The pretextual nature of the justification.

As the Supreme Court has held, "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 216 (2d Cir. 1997) (holding that a "showing of pretext was probative of intentional discrimination"); *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282-83 (11th Cir. 2008) (holding that if "the trier of fact believed [the plaintiff's] showing of pretext, and disbelieved [defendant's] proffered legitimate reason, then a violation of the Equal Protection Clause would be shown" where additional evidence permitted the inference); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513-14 (7th Cir. 1993) (adopting principle of inference from pretext for equal protection claim).

The evidence at trial will show that the stated purpose of VRA enforcement was pretextual.  The genesis of the citizenship question originated in early 2017 with "senior administration officials," including Steve Bannon, Kris Kobach, and others with no VRA-enforcement experience.  Indeed, the evidence will show a complete lack of interest by the Trump Administration in enforcing the VRA.

When DOJ finally did agree to make the request in late 2017, it was not prompted by

unmet VRA-related needs or a request from DOJ's voting rights enforcement attorneys.  DOJ

has never needed and does not need citizenship data collected through the "full count" decennial

census questionnaire to properly enforce Section 2 of the VRA, and no DOJ case has ever failed

for this reason.  Indeed, citizenship data based on responses to a question on the decennial census

questionnaire will likely be less accurate than currently available citizenship data.  And due to

the Census Bureau's privacy restrictions and disclosure-avoidance practices, data may be entirely

unusable for VRA enforcement purposes.

In sum, the evidence will rebut Defendants' asserted motive for adding the citizenship

question and provide affirmative evidence on all *Arlington Heights* factors, allowing the Court to

infer intentional discrimination.  In the end, this evidence will show that the decision was

motivated by a "bare . . . desire to harm a politically unpopular group," and thus violates the

Fifth Amendment.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

## CONCLUSION

More than 25 years ago, Justice Stevens, recognizing the fundamental relationship

between the decennial census and our democratic institutions, wrote that the "open nature of the

census enterprise and public dissemination of the information collected are closely connected

with our commitment to a democratic form of government."  *Franklin v. Massachusetts*, 505

U.S. 788, 818 (1992) (Stevens, J., concurring).  The evidence at trial will demonstrate that

Defendants' decision to add a citizenship question to the census substituted impermissible

considerations for reasoned, scientific processes, and will undermine the integrity of the census

unless set aside by the Court.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo
  *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*


Dale Ho
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*\* Not admitted in the District of Columbia;
practice limited pursuant to D.C. App. R.
49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs