UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>          Plaintiff,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>          Defendant. | Civil Action No. 18-CV-2921 |

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, *et al.*,<br><br>          Plaintiff,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>          Defendant. | Civil Action No. 18-5025 (Consolidated Case)<br><br>Hon. Jesse M. Furman<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS *IN LIMINE*** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT.......................................................................................................................1

   MIL 1:    The Court Should Preclude Defendants from Offering Post-Hoc Justifications of
Secretary Ross's March 26, 2018 Memorandum......................................................................1

   MIL 2:    Defendants Should Be Precluded From Using Deliberative Process Privilege as a
Sword And A Shield ................................................................................................................3

   MIL 3:    Defendants Should Be Precluded From Arguing That There Is No Evidence That
Census Response Rates Will Decline.......................................................................................6

   MIL 4:    Defendants Should Be Precluded from Proferring Testimony From Any Fact
Witnesses at Trial....................................................................................................................9

CONCLUSION....................................................................................................................10

US:163845991v8

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bowen v. Georgetown Univ. Hosp.*,
     488 U.S. 204 (1988) .................................................................................................2

*Bradberry v. Dir., Office of Workers' Comp. Programs*,
     117 F.3d 1361 (11th Cir. 1997)............................................................... 2-3

*Burka v. N.Y.C. Transit Auth.*,
     110 F.R.D. 660 (S.D.N.Y. 1986) ........................................................................5

*Chevron Corp. v. Donziger*,
     No. 11-Civ.-0691, 2013 WL 4045326 (S.D.N.Y. Aug. 9, 2013)............................3

*In re City of New York*,
     607 F.3d 923 (2d Cir. 2010) ........................................................................3, 6

*Favors v. Cuomo*,
     285 F.R.D. 187 (E.D.N.Y. 2012) ........................................................................3

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
     No. 3:06-cv-1352 (JBA), 2009 WL 5873112 (D. Conn. 2009)............................10

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*,
     898 F. Supp. 2d 603 (S.D.N.Y. 2012)........................................................3, 5, 6

*In re Nielsen*,
     No. 17-Civ.-3345, 2017 U.S. App. LEXIS 27681 (2d Cir. Dec. 27, 2017) ............5

*In re Sims*,
     534 F.3d 117 (2d Cir. 2008) ........................................................................3

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
     145 F.3d 1422 (D.C. Cir. 1998) ........................................................................5

*U.S. Steel Mining Co., LLC v. Dir., OWCP*,
     386 F.3d 977 (11th Cir. 2004) ........................................................................2

*U.S. v. Bilzerian*,
     926 F.2d 1285 (2d Cir. 1991)..................................................................4, 5, 6, 9

US:163845991v8

*U.S. v. Ghailani*,
    751 F. Supp. 2d 498 (S.D.N.Y. 2010) ...............................................................................3, 6

*U.S. v. Wells Fargo Bank, N.A.*,
    No. 12-CV-7527 (JMF), 2015 WL 6935917 (S.D.N.Y. Oct. 22, 2015) ..................................3

*William Bros. v. Pate*,
    833 F.2d 261 (11th Cir. 1987) ...........................................................................................2

**Other Authorities**

Federal Rule of Civil Procedure 26....................................................................................8, 9, 10

Federal Rule of Civil Procedure 37...........................................................................................10

US:163845991v8

## INTRODUCTION

Pursuant to this Court's Individual Rules and Practices 5(B).i, Plaintiffs, the State of New York and New York Immigration Coalition *et al.*, submit these motions *in limine* to bar defendants from introducing certain testimony or other evidence at trial. Plaintiffs seek to exclude the following specific categories of testimony and other evidence: (1) post hoc justifications for Secretary Ross's March 26, 2018 memorandum; (2) testimony or argument based on deliberative processes that were not disclosed in discovery by defendants; (3) testimony or argument from Defendants that census response rates will not decline or that there will not be an undercount; (4) testimony or argument that plaintiffs and their experts did not adequately prove that a decline in response rates will occur or that there will be an undercount; and (5) testimony from any non-disclosed fact witness.

## ARGUMENT

**MIL 1:**   **THE COURT SHOULD PRECLUDE DEFENDANTS FROM OFFERING POST-HOC JUSTIFICATIONS OF SECRETARY ROSS'S MARCH 26, 2018 MEMORANDUM**

Defendants should not be allowed to offer post-hoc rationalizations or support for Secretary Ross's March 26, 2018 memorandum. (March 26, 2018 Mem. of Secretary Wilbur Ross, AR0001313). In response to the DOJ's request that the Census Bureau add a citizen question to the decennial census, Secretary Ross determined that adding the citizenship question to the 2020 decennial census was "necessary to provide complete and accurate data" to aid DOJ in enforcement of the Voting Rights Act. *Id.* at AR0001313, AR0001320. Secretary Ross explained in the March 26 memo that he took a "hard look at the request" and "considered all facts and data relevant" in order to make his decision. *Id.* Secretary Ross further explained the four options he was considering, two of which included adding the citizenship question per

1

DOJ's request; and stated that he consulted with "Census Bureau leadership and interested stakeholders" to conduct a "thorough review of the legal, program and policy considerations," that included an evaluation of the impact of adding a citizenship question. *Id.*

Defendants have since sought to buttress Secretary Ross's memorandum with additional, after-the-fact rationalizations. For example, during their testimony, senior Commerce officials testified about new rationales and justifications for asking the citizenship question, unrelated to the Voting Rights Act (*see* Ex. A; Comstock Tr. 107-110, 261-262). These rationales and evidence were not considered by Secretary Ross when he wrote the March 26 memorandum, and should not be admitted for the purpose of supporting Secretary Ross's March 26 memorandum.

Deference traditionally afforded an agency is not appropriate when the agency's position "appears to be nothing more than an agency's convenient litigating position." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988); *U.S. Steel Mining Co., LLC v. Dir., OWCP*, 386 F.3d 977, 986 (11th Cir. 2004) ("we do not afford deference to ad hoc positions of agencies adopted in reaction to the exigencies of litigation; rather, deference is due when an agency has taken a constant and unchanging—and reasonable—position . . . ."). Here, Secretary Ross, and Defendants, have insisted that the Voting Rights Act rationale was the only basis for the decision to add the citizenship question to the Decennial Census. They have insisted that the evidence available and presented in the March 26 memo justified the addition of the question. Defendants should therefore now be prohibited from offering any post hoc rationale or evidence justifying the decision for the simple reason that it would not be the stated reason for Secretary Ross's decision. *See William Bros. v. Pate*, 833 F.2d 261, 265 (11th Cir. 1987) (Court was not "inclined to defer to an inconsistent position" where a "Director has seen fit to adopt a contradictory position on related issues when to do so furthers the chances of success in litigation); *Bradberry*

*v. Dir., Office of Workers' Comp. Programs*, 117 F.3d 1361, 1366 (11th Cir. 1997)("we need not defer to a mere litigating position").

**MIL 2:      DEFENDANTS SHOULD BE PRECLUDED FROM USING DELIBERATIVE PROCESS PRIVILEGE AS A SWORD AND A SHIELD**

Defendants have invoked deliberative process privilege as a shield to withhold discovery about their intent in including the citizenship question in the census.  Defendants should therefore be precluded from introducing evidence or argument at trial as a sword to challenge Plaintiffs' evidence and arguments about Defendants' discriminatory intent.

It is well established that "a party cannot use materials as a 'sword' in its defense 'while using privileges attaching to [materials relied upon for that defense] as a "shield."'"  *In re City of New York*, 607 F.3d 923, 946-47 (2d Cir. 2010) (quoting *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003)).  In other words, "a party may not affirmatively rely on privileged communications to support a claim or defense and then shield those communications from discovery by its adversary."  *U.S. v. Ghailani*, 751 F. Supp. 2d 498, 501 (S.D.N.Y. 2010).  This doctrine applies in the context of various privileges.  *See, e.g.*, *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008); *Chevron Corp. v. Donziger*, No. 11-Civ.-0691, 2013 WL 4045326, at *4 (S.D.N.Y. Aug. 9, 2013); *Favors v. Cuomo*, 285 F.R.D. 187, 212 (E.D.N.Y. 2012); *Ghailani*, 751 F. Supp. 2d at 501.  That includes deliberative process privilege.  *See, e.g.*, *U.S. v. Wells Fargo Bank, N.A.*, No. 12-CV-7527 (JMF), 2015 WL 6935917, at *2 (S.D.N.Y. Oct. 22, 2015); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 898 F. Supp. 2d 603, 607 (S.D.N.Y. 2012).

This is important because the Defendants have repeatedly insisted that their intent and questions of pretext are irrelevant because they are entitled to a so-called "presumption of regularity," while continuing to shield hundreds of otherwise relevant Department of Commerce and Justice documents on the basis of deliberative privilege.  While Plaintiffs have been selective

3

in challenging the invocation of this privilege, the Court has granted a number of Plaintiffs' motions requiring disclosure.[1]  And the compelled documents show anything but "regularity" – including an email between Secretary Ross and a top aide about the need to censor the Administrative Record in light of judicial review, AR 12476, and a second document disclosing that "Justice Department staff did not want to raise the question. . . " and Commerce appointees would look into "how Commerce could add the question to the Census itself."  AR 12755.

Defendants here have repeatedly invoked the deliberative process privilege as a basis to withhold otherwise relevant documents or information.  Notwithstanding successful motions to compel, the Defendants have refused to independently evaluate those assertions and continue to assert deliberative privilege over hundreds of Commerce and Justice Department documents.

Parties may not assert a defense, including a purported lack of "intent," that "in fairness requires examination of protected communications."  *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).  In *United States v. Bilzerian*, a defendant charged with securities fraud sought to testify at trial that he had acted in good faith, *i.e.*, that his intent was to comply with the securities laws, without disclosing the content or even the existence of any privileged communications and without asserting a reliance on counsel defense.  *Id.* at 1291.  Because good faith necessarily called into question the defendant's communications with his attorney, the Second Circuit held that such testimony implicitly waived the attorney-client privilege.  *See id.* at 1291–94.  As the

---

[1] ECF No. 323, 369.  For example, in response to plaintiffs' September 20, 2018 motion to compel challenging DOJ's invocation of deliberative 2018, Plaintiffs sought disclosure of 27 Department of Justice ("DOJ") documents Defendants withheld on the basis of deliberative process privilege.  ECF 343.  Plaintiffs argued these documents would "likely shed light on whether DOJ's purported rationale for requesting the citizenship question was legitimate or pretextual." *Id.* at 3.  Defendants agreed to disclose one document and determined the material redacted from another was non-responsive. Docket No. 343 at 1.  Defendants asserted deliberative process privilege over the remaining 25 documents. *See id.*  These documents received *in camera* treatment after which the Court ruled 19 documents must be disclosed to Plaintiffs.  ECF No. 369 at 6.

US:163845991v8

court explained, a party "may not use [a] privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." *Id.* at 1292.

The integrity of decision-making by the Commerce Department is central to this litigation, and the withheld documents may shed light on that process.  That is why Plaintiffs sought their production.  The sword/shield doctrine squarely prevents Defendants from offering evidence or argument suggesting that the inclusion of the citizenship question is not pretextual, while withholding discovery into whether Defendants in fact developed a pretext.  Nor can Defendants claim Plaintiffs' evidence of discriminatory intent is lacking, while withholding discovery into whether Defendants in fact acted with discriminatory intent.  Defendants fought for, and won, the opportunity to shield these deliberations from disclosure.  They cannot now turn around and weaponize these same withheld deliberations as evidence or argument at trial that they acted without discriminatory intent.  *See Bilzerian*, 926 F.2d at 1291-92; *Burka v. N.Y.C. Transit Auth.*, 110 F.R.D. 660, 667 (S.D.N.Y. 1986) ("Where the decision-making process itself is the subject of the litigation, the deliverative [sic] privilege may not be raised as a bar against disclosure of critical information.").  Nor can they strategically introduce portions of these communications about the citizenship question when they withheld others.  *See Bilzerian*, 926 F.2d at 1292.

Any assertion by Defendants of a lack of intent to discriminate, absence of pretextual justification, or presumptions of regularity puts their own deliberations in these documents at issue.  *See In re Nielsen*, No. 17-Civ.-3345, 2017 U.S. App. LEXIS 27681, at *11 n.2 (2d Cir. Dec. 27, 2017); *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 898 F. Supp. 2d 603, 609-10 (S.D.N.Y. 2012).  In the *MTBE Product Liability Litigation*,

the New Jersey Department of Environmental Protection ("NJDEP") claimed various manufacturers of the gasoline additive MTBE had contaminated New Jersey's groundwater. 898 F. Supp. 2d at 606. NJDEP raised, among other claims, a failure to warn claim that requires establishing the product's lack of "adequate warning or instruction" of its dangers and safe uses. *Id.* at 608. This claim put at issue NJDEP's internal decision-making process, and therefore, "the deliberative process must give way." *Id.* at 610. The same would be true of any lack of intent defense Defendants raise based on the withheld information. Defendants cannot assert a lack of intent defense or lack of pretext defense without also asserting the withheld documents do not contain evidence of their discriminatory intent or pretextual justification. By raising this defense, Defendants would put at issue their lack of intent by seeking to rebut Plaintiffs' claims with evidence to which Plaintiffs do not have access. *See Ghailani*, 751 F. Supp. 2d at 501. They would be offering evidence or arguments that could only be proved or disproved with the materials over which they have asserted privilege. In so doing, Defendants would prejudice Plaintiffs. *See Bilzerian*, 926 F.2d at 1292. This is prohibited by the sword/shield doctrine.

For the foregoing reasons, Defendants should be barred from offering evidence or argument regarding lack of intent (including presumption of regularity), lack of pretext, or other topics about which they withheld discovery on the grounds of deliberative process privileged.

**MIL 3:**     **DEFENDANTS SHOULD BE PRECLUDED FROM ARGUING THAT THERE IS NO EVIDENCE THAT CENSUS RESPONSE RATES WILL DECLINE.**

Likewise, defendants should be precluded from using Section 9 of Title 13 ("Title 13") as a sword and a shield. *In re City of New York*, 607 F.3d at 946-47 (quoting *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003)); *Ghailani*, 751 F. Supp. 2d at 501.

Throughout discovery, Plaintiffs have sought data, including Numident citizenship data and data from the American Community Survey ("ACS"), an annual survey conducted by the Census Bureau that includes a question concerning citizenship status, in order better quantify the impact of the citizenship question on the Census.  But Defendants claim this data constitutes "proprietary information[.]"  Citing Title 13, Defendants repeatedly refused to release this data. By withholding this data, *inter alia*, Defendants have prevented Plaintiffs from obtaining, through the normal course of discovery, evidence that would have allowed Plaintiffs' experts to buttress their testimony regarding the expected decline in participation in the 2020 Census should the citizenship question be added, and the resultant undercount.

Because Defendants have withheld data relevant to the question of decline in response rates and undercounts for certain communities, Plaintiffs now move to prevent Defendants from offering any argument, testimony or other evidence at trial that (a) there is no evidence that adding the citizenship question to the 2020 Census would lead to a decrease in the response rate for certain communities, (b) there is no evidence that adding the citizenship question to the 2020 Census would lead to an undercount for certain communities, or that (c) Plaintiffs' experts have failed to quantify sufficiently the decline in those response rates or undercounts.  While Defendants had a right to raise their objections, they cannot both deprive Plaintiffs of data that would assist their analysis by asserting Title 13 and then argue that Plaintiffs' proof regarding these topics is insufficient.

There is no question that the withheld data would allow Plaintiffs to further support their analyses.  Plaintiffs' experts have already produced substantial evidence that the addition of the citizenship question will reduce response rates of noncitizen, immigrant, and Hispanics, particularly in light of the current political climate.  They have supplemented their analysis as

more data becomes available.  For example, the 2017 PUMS ACS data was publicly released on October 18, 2018, and Plaintiffs have now been able to analyze some of that data.  In fact, Plaintiffs' expert quickly analyzed the data about non-response and demonstrated that, since 2016, trends indicative of a decline in self-response have significantly increased.  Plaintiffs presented this analysis in an October 23 supplemental disclosure.  However, none of the public ACS data contains information like Numident citizenship data, so this recent analysis cannot be as robust as the analysis done by the Census Bureau.  *See* Ex. B, ACS Breakoff Analysis, AR0010382.   As Plaintiffs' experts have made clear, access to the information that Defendants have withheld would have allowed Plaintiffs to further bolster their analysis.  *Id.*  For example, when asked at her deposition whether she had "attempted to quantify the potential impact of a citizenship question on the self-response rate of Hispanic citizens," Dr. Hillygus testified that "[t]he Census Bureau has not produced the data that would make that possible."  (Ex. C, Deposition of Dionne Sunshine Hillygus at 25:21-25).  By withholding this data, Defendants have deprived Plaintiffs of the means by which their experts could bolster their analysis.

Plaintiffs expect that Defendants will try to contend at trial, as they have in the past, that the expected decrease in response rates of minorities and hard-to-count populations is "speculative" by arguing that Plaintiffs and Plaintiffs' experts lack empirical data to show the decline.  Further, Plaintiffs expect that Defendants will argue, as their expert Dr. John Abowd has, that:

> no expert has produced credible quantitative evidence that the addition of a citizenship question to the 2020 Census would increase the net undercount or increase differential net undercounts for identifiable sub-populations. Therefore, there is no credible quantitative evidence that the addition of the citizenship question would affect the accuracy of the count.  (Defendants' Disclosures Pursuant to Rule 26(A)(2)(C) at 3.)

Dr. Abowd repeatedly criticized Plaintiffs' experts for failing to adequately quantify the undercount that would result from adding the citizenship question to the Census.  *See also*  ECF No. 387-5 (Abowd 10/12 Tr. at 72:17-73:3 (stating that Dr. Matthew Barreto lacked "credible evidence that the citizenship question will have a bearing on the net undercount"); *id.* at 216:3-12 (claiming that Plaintiffs' experts "should have been able to" provide a quantification of the difference caused by adding the citizenship question).

At the same time, Defendants have failed to conduct the analysis themselves, all while invoking Title 13 to deprive Plaintiffs of the data to independently conduct such analysis. Indeed, Dr. Abowd conceded that the Census Bureau could have used this information to study this question  and that  Dr. Abowd, himself had proposed studying this question to Census Bureau leadership – but did not do so.  *Id.* at 288-289.  As a result, Defendants complain about insufficiency of proof as to the decline in self-response or undercount when they had exclusive possession of the data necessary to measure and refused Plaintiffs the opportunity to do so.

For these reasons, Defendants should not be allowed to argue that Plaintiffs have failed to present such evidence.  Having refused to give Plaintiffs that information, Defendants should not be able to argue at trial (or put on testimony) about the adequacy of Plaintiffs proof or any purported failure by Plaintiffs to prove undercount that would result if the citizenship question were included.  *United States v. Bilzerian*, 928 F.2d 1285, 1292 (2d Cir. 1991) (a party "may not use . . . privilege to prejudice his opponent's case).

**MIL 4:       DEFENDANTS SHOULD BE PRECLUDED FROM PROFERRING TESTIMONY FROM ANY FACT WITNESSES AT TRIAL.**

Defendants failed to identify any fact witnesses in their initial disclosures, but have reserved their right to call anyone who is on Plaintiffs' initial disclosure list, or who has appeared in a deposition.  The Court should not permit testimony by additional witnesses to be put forth at

trial.  Rule 26(a)(3) requires parties, in an initial disclosure, to "provide to the other parties . . . information about the evidence that it may present at trial other than solely for impeachment," including "the name . . . of each witness."  Fed R. Civ. P. 26(a)(3)(A).  Federal Rule of Civil Procedure 37(c)(1), in turn, provides that if a party fails to disclose information required by Rule 26(a) or (e), "the party is not allowed to use that information" at trial "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

Defendants' initial disclosure of July 23, 2018 (attached as Ex. D) stated that "there are no fact witnesses Defendants intend to use to support their claims or defenses, other than for impeachment," and Defendants have never supplemented this disclosure.  (Ex. D, Defs.' Initial Disclosure at 2).  Defendants have made no indication that they intend to call further witnesses – instead reiterating that the agency action should be reviewed only "on the basis of the administrative record produced by the agency," and the Court should not permit Defendants to change course now.  At this stage of the proceedings, Defendants can make no reasonable argument that the failure to disclose any fact witnesses was substantially justified; and on the other side of the ledger, Plaintiffs would be significantly prejudiced by such a late addition of a witness.  Accordingly, the Court should not allow Defendants to present any factual witnesses at trial.  *E.g.*, *Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06-cv-1352 (JBA), 2009 WL 5873112, *3 (D. Conn. 2009) ("Rule 37(c)(1)'s preclusionary sanction is automatic absent a determination of either substantial justification or harmlessness.") (citation omitted).

US:163845991v8

## CONCLUSION

For the foregoing reasons, plaintiffs request that the Court grant the relief requested in

motions *in limine* 1 through 4.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Matthew Colangelo
  *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*


Dale Ho
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

US:163845991v8

*Not admitted in the District of Columbia;
practice limited pursuant to D.C. App. R.
49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs

12

Page 1

 1          UNITED STATES DISTRICT COURT

 2          SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

 4

                     Plaintiffs,

 5        vs.        Case No.  1:18-CF-05025-JMF

 6   UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 7                   Defendants.

     ----------------------------------------

 8

 9                   Washington, D.C.

10                   Thursday, August 30, 2018

11   Deposition of:

12                   EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22

Page 2

1                    C O N T E N T

                                               PAGE
2
     EARL COMSTOCK                              9
3    Examination by Mr. Colangelo              9
     Examination by Mr. Gersch                 241
4    Examination by Mr. Rosenberg              336
     Examination by Ms. Senteno                381
5    Examination by Ms. Boutin                 419
6
7         COMSTOCK DEPOSITION EXHIBITS
8    EXHIBIT                                   PAGE
     NUMBER
9    Plaintiffs' Exhibit 1    Email            56
     Plaintiffs' Exhibit 2    Email            62
10   Plaintiffs' Exhibit 3    Email            82
     Plaintiffs' Exhibit 4    Email            87
11   Plaintiffs' Exhibit 5    Memo             93
     Plaintiffs' Exhibit 6    Email            114
12   Plaintiffs' Exhibit 7    Email            120
     Plaintiffs' Exhibit 8    Email            123
13   Plaintiffs' Exhibit 9    Email            137
     Plaintiffs' Exhibit 10   Email            145
14   Plaintiffs' Exhibit 11   Email            147
     Plaintiffs' Exhibit 12   Email            158
15   Plaintiffs' Exhibit 13   Email            164
     Plaintiffs' Exhibit 14   Email            167
16   Plaintiffs' Exhibit 15   Memo             182
     Plaintiffs' Exhibit 16   Memo             189
17   Plaintiffs' Exhibit 17   Meeting          194
                              notification
18   Plaintiffs' Exhibit 18   Email            199
     Plaintiffs' Exhibit 19   Email            212
19   Plaintiffs' Exhibit 20   Email            215
     Plaintiffs' Exhibit 21   Email            218
20   Plaintiffs' Exhibit 22   Email            219
     Plaintiffs' Exhibit 23   Email            221
21   Plaintiffs' Exhibit 24   Email            224
     Plaintiffs' Exhibit 25   Email            226
22   Plaintiffs' Exhibit 26   Email            234
     Plaintiffs' Exhibit 27   Testimony from   293

Page 3

1                                  Committee on
                                   Oversight and
2                                  Government
                                   Reform
3    Plaintiffs' Exhibit 28   Memo                 309
     Plaintiffs' Exhibit 29   Memo                 317
4    Plaintiffs' Exhibit 30   Decisional           326
                              memorandum
5    Plaintiffs' Exhibit 31   Questions on         372
                              draft Census
6                             memo
     Plaintiffs' Exhibit 32   Memo                 374
7    Plaintiffs' Exhibit 33   Questions on         376
                              draft Census
8                             memo
     Plaintiffs' Exhibit 34   Email                378
9    Plaintiffs' Exhibit 35   Trump campaign       383
                              email

10

11        (Exhibits attached to transcript.)

12

13

14

15

16

17

18              Veritext Legal Solutions
                 Mid-Atlantic Region
              1250 Eye Street NW - Suite 350
19            Washington, D.C.  20005

20

21

22

Page 4

```
 1              A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
             David Gersch, Esquire
 4           ARNOLD & PORTER
             601 Massachusettes Avenue, NW
 5           Washington, D.C. 20001
             (202) 942-5316
 6           david.gersch@arnoldporter.com
 7           Perry Grossman, Esquire
             New York Civil Liberties Union
 8           125 Broad Street
             New York, New York 1004
 9           (212) 607-3300
             pgrossman@nyclu.org
10
    On behalf of Kravitz Plaintiffs:
11           Daniel Grant, Esquire
             COVINGTON & BURLINGTON
12           850 Tenth Street, NW
             Washington, D.C. 20001
13           (202) 662-5458
             dgrant@cov.com
14
    On behalf of Los Angeles Unified School District:
15           Brian Park, Esquire (Telephonically)
             DANIELS WOLIVER KELLEY
16           115 Pine Avenue
             Suite 500
17           Long Beach, California 90802
             (562) 366-8500
18           bpark@dwkesq.com
19  On behalf of County of Los Angeles:
             David I. Holtzman, Esquire
20           HOLLAND & KNIGHT
             50 California Street, Suite 2800
21           San Francisco, California 94111
             (415) 743-6909
22           david.holtzman@hklaw.com
```

Page 5

```
 1   On behalf of LUPE Plaintiffs:
           Andrea Senteno, Esquire
 2         MALDEF
           1016 16th Street, NW
 3         Suite 100
           Washington, D.C. 20036
 4         (202) 293-2828
           asenteno@maldef.org
 5
           Niyati Shah, Esquire
 6         John C. Yang, Esquire
           ASIAN AMERICANS ADVANCING Justice
 7         1620 L Street, NW
           Suite 1050
 8         Washington, D.C. 20036
           (202) 296-2300
 9         nshah@advancingjustice-aajc.org
           jyang@advancingjustice-aajc.org
10
           Ezra Rosenberg, Esquire
11         Dorian Spence, Esquire
           LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
12         1401 New York Avenue, NW
           Suite 400
13         Washington, D.C. 20005
           (202) 662-8345
14         erosenberg@lawyerscommittee.org
           dspence@lawyerscommittee.org
15
     On behalf of State of California:
16         Gabrielle Boutin, Esquire
           R. Matthew Wise, Esquire (Telephonically)
17         DEPARTMENT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
18         1300 I Street
           P.O. Box 944255
19         Sacramento, California 94244
           (916) 210-6053
20         gabrielle.boutin@doj.ca.gov
           matthew.wise@doj.ca.gov
21
22
```

Page 6

```
 1    On behalf of State of New York:
             Danielle Fidler, Esquire
 2           Elena Goldstein, Esquire
             Matthew Colangelo, Esquire
 3           Alex Finkelstein, Esquire
             ASSISTANT ATTORNEY GENERAL
 4           ENVIRONMENTAL PROTECTION BUREAU
             28 Liberty Street
 5           New York, New York 10005
             (212) 416-8441
 6           danielle.fidler@ag.ny.gov
             elena.goldstein@ag.ny.gov
 7           matthew.colangelo@ag.ny.gov
             alexfinkelstein@ag.ny.gov
 8
      On behalf of Defendants:
 9           Kate Bailey, Esquire
             Joshua Gardner, Esquire
10           U.S. DEPARTMENT OF JUSTICE
             20 Massachusetts Avenue
11           Washington, D.C. 20530
             (202) 305-9802
12           kate.bailey@usdoj.gov
             joshua.gardner@usdoj.gov
13
             Michael Cannon, Esquire
14           David M.S. Dewhirst,Esquire
             U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
15           ASSISTANT GENERAL COUNSEL FOR FINANCE &
             LITIGATION
16           1401 Constitution Avenue, NW
             Room 5890
17           Washington, D.C. 20230
             (202) 482-5395
18           mcannon@doc.gov
             ddewhirst@doc.gov
19
             Michael Walsh, Jr., Esquire
20           DEPUTY GENERAL COUNSEL
             1401 Constitution Avenue, NW
21           Washington, D.C. 20230
             (202) 482-4772
22           mwalsh@doc.gov
```

Page 7

1    VIDEOGRAPHER:   Dan Reidy

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 8

1                P R O C E E D I N G S

2    WHEREUPON,

3            VIDEOGRAPHER:  Good morning.  We are

4    going on the record at 9:01 a.m. on Thursday,

5    August 30, 2018.  Please note that the microphones

6    are sensitive and may pick up whispering, private

7    conversations and cellular interference.  Please

8    turn off all cell phones or place them away from

9    the microphones, as that can interfere with the

10   deposition audio.  Audio and video recording will

11   continue to take place unless all parties agree to

12   going off the record.

13           This is Media Unit 1 of the video

14   recorded deposition of Earl Comstock to be taken

15   by counsel for the plaintiff in the matter of the

16   New York Immigration Coalition, et al., v. The

17   United States Department of Commerce, et al.  This

18   case is filed in the United States District Court

19   for the Southern District of New York.  This

20   deposition is being held at the law office of

21   Arnold & Porter located a 601 Massachusetts Avenue

22   Northwest, Washington, D.C. 20001.

```
                                       Page 9
 1          My name is Dan Reidy from the firm
 2   Veritext Legal Solutions, and I am the
 3   videographer.  The court reporter is Karen
 4   Jorgenson from Veritext Legal Solutions.
 5          I am not authorized to administer an
 6   oath.  I am not related to any party in this
 7   action, nor am I financially interested in the
 8   outcome.
 9          Also, counsel appearances will be noted
10   on the stenographic report rather than orally at
11   this time.
12          Will the court reporter please swear in
13   the witness?
14                     EARL COMSTOCK,
15   called as a witness, and having been first duly
16   sworn, was examined and testified as follows:
17          THE WITNESS:  I do.
18          EXAMINATION BY MR. COLANGELO:
19      Q   Please state your name and work address.
20      A   Earl Comstock, U.S. Department of
21   Commerce.
22      Q   And we met a minute ago, but for the
```

Page 10

1    record, I'm Matthew Colangelo.  I work for the

2    New York Attorney General, and I represent

3    plaintiffs in one of the actions challenging the

4    inclusion of a citizenship question on the

5    decennial census.  I'll be taking your deposition

6    today.

7         Have you been deposed before?

8    A    Nope.

9    Q    Okay.  So I will ask questions.  I just

10   ask that you answer honestly and completely.  If

11   at any point you don't understand a question I've

12   asked, please just let me know that it was unclear

13   and I can see if I can rephrase it.

14   A    Okay.

15   Q    Does that work?

16   A    Sure.

17   Q    Karen introduced herself.  She's

18   transcribing this deposition.  She'll be taking

19   down my questions and your answers.  In order to

20   make sure that we have a clear transcript, please

21   wait until I'm done asking a question before you

22   answer it, and I will try to make sure I don't

```
                                          Page 11

 1   interrupt your answers either.

 2          Sound good?

 3      A   Sounds perfect.

 4      Q   Great.

 5          Can you tell me how you prepared for your

 6   deposition today?

 7      A   Met with counsel yesterday.

 8      Q   And did you review any documents during

 9   that meeting?

10      A   A few documents that are in the record,

11   yes.

12      Q   Great.

13          And did you review any of those documents

14   for the purpose of refreshing your recollection

15   about any of the events involved in this lawsuit?

16      A   No.

17      Q   Tell me about your educational background

18   after high school.

19      A   After high school, I went to the

20   University of California Santa Barbara, and then

21   worked in Alaska for a couple years.  Started

22   working for Senator Ted Stevens from Alaska and
```

Page 12

1    the Senate Committee, Science and Transportation.

2    Did that for ten years.

3            Left the Hill, and became a partner at a

4    law firm.  Did that for six years, and then was

5    CEO of a trade organization for two years.  Ran my

6    own consulting firm for about seven years.  Went

7    back to a law firm for about a year and a half,

8    and then became counsel for a start-up.

9        Q   Okay.  So I got your UCSB degree.  That

10   was a bachelor's degree?

11       A   Correct.

12       Q   And I may have missed it in your answer.

13   But I take it at some point you earned a law

14   degree.

15       A   I did.

16       Q   Okay.

17       A   I went to night law school while working

18   for the Senate.

19       Q   Got it.

20           And what year did you earn your J.D.?

21       A   1992.

22       Q   1992.  Okay.

Page 13

1        And are you currently admitted to the

2   practice?

3        A    In the District, yes.

4        Q    In D.C.

5        Is your registration active or inactive?

6        A    I believe it's active.  I'd have to go

7   double-check.

8        Q    Okay.  And are you admitted in any other

9   states?

10       A    I was admitted in Alaska and that's

11   inactive.

12            (Thereupon, the court reporter

13   clarified.)

14   BY MR. COLANGELO:

15       Q    And tell me what your college degree

16   field of study was?

17       A    Political science.

18       Q    Do you have any education training or

19   experience in statistics?

20       A    Did -- well, George Mason University does

21   accounting, statistics and economics for lawyers,

22   which is a required part of the course.  So I had

Page 14

1   two years of that, and also had an environmental

2   science minor at UCSB, so did a number of

3   statistics and chemistry and biology courses in

4   relation to that.

5       Q   And by in relation to that, you mean in

6   relation to the environmental science degree?

7       A   Correct.

8       Q   Okay.  Do you have any education,

9   training or experience in survey methodology?

10      A   No.

11      Q   Do you have any education, training or

12  experience in demography?

13      A   Other than basic introduction to

14  demography, no.

15      Q   What do you mean by introduction?

16      A   Well, what you take in an undergraduate

17  course that covers demography.

18      Q   Okay.  Do you have any education,

19  training or experience in voting rights law?

20      A   No.

21      Q   Do you have any education training or

22  experience in redistricting?

Page 15

1      A    No.

2      Q    Do you have any education, training or

3   experience in election law?

4      A    Again, other than as an attorney and the

5   ability to read laws, no.

6      Q    Okay.  By as an attorney and the ability

7   to read laws, you mean if you needed to read a

8   law, you could?

9      A    Meaning if I had read a statute related

10   to those, then I would be able to understand it,

11   yes.

12      Q    But you've never studied election law?

13      A    I've never studied election law.

14      Q    You've never practiced election law?

15      A    No.

16      Q    Okay.  Were -- between November 2016 and

17   February 2017, you were a member of the

18   presidential transition team?

19      A    From November -- yeah, just after

20   Thanksgiving until I began working for the

21   Department of Commerce, yes.

22      Q    Okay.  And when did you begin working at

Page 16

1   Department of Commerce?

2        A    January 31st, I believe.

3        Q    31st, okay.

4             When did you join the presidential

5   transition team?

6        A    This would have been around

7   November 28th.

8        Q    And what were your responsibilities on

9   the transition?

10       A    I was Sherpa for getting people through

11  the confirmation in the Senate Commerce Committee.

12       Q    Sherpa for getting people through

13  confirmation in the Senate Commerce meeting.

14            Can you tell me what Sherpa means as you

15  use that term?

16       A    Yeah.  It's a colloquial term.  It's

17  basically a person that helps the nominee, and in

18  my case, I had two nominees that were

19  being -- would be considered by the

20  Senate Commerce Committee.  So you advise them on,

21  you know, what the different members are going to

22  care about, what the general subject matter issues

1    are.  As former staff for the committee, I was

2    familiar with the issues that would be of

3    importance to the members of the committee, so

4    that's why I was asked to do the job.

5         Q    You mentioned that you were the Sherpa

6    for nominees through the Senate Commerce

7    Committee.  I take it one of those was

8    Secretary Ross?

9         A    Secretary Ross and Deputy Secretary

10   Todd Riggins.

11        Q    And did your responsibilities on the

12   transition team include anything other than the

13   Sherpa role you've just described?

14        A    No.

15        Q    Did you work on the campaign, at all --

16   the presidential campaign for the 2016

17   presidential --

18        A    I did not.

19        Q    What -- tell me a little bit more about

20   your role as Sherpa for the Secretary.

21        A    Well, it involved setting up meetings

22   with members of the committee, advising the

Page 18

1    Secretary on subject matter that

2    Department of Commerce handles and that the

3    committee cares about.  My particular areas of

4    expertise are fisheries and telecommunications,

5    and so those are two rather arcane but rather

6    important areas of the Senate Commerce Committees

7    jurisdiction.

8            I've also, as former legislative director

9    for Senator Stevens, basically covered all of the

10   issues in front of the committee, so aviation,

11   space, science issues, climate change, all of

12   those.

13       Q   And what were the specific issues that

14   you briefed Secretary -- or then nominee Ross on?

15       A   Essentially, everything that the

16   department covers across the board, including the

17   census, to the extent I had background.

18       Q   Okay.  And tell me -- I want to ask you a

19   couple questions about that.  But before we do, in

20   addition to preparing the Secretary -- or the

21   nominee, I should say --

22       A   Right.

Page 19

1      Q   -- for his meetings and his hearing, did

2   you have any role in developing policy positions

3   for the incoming administration?

4      A   Not in that sense, no.

5      Q   Not in what sense?

6      A   Not in -- no.  I was not involved in the

7   policy discussions.  There were different teams

8   handling that.

9      Q   Okay.  You were not -- you're not

10  involved in developing policy?

11     A   Correct.

12     Q   And did you participate in any policy

13  meetings, at all?

14     A   No.

15     Q   Okay.  You mentioned that among others,

16  you briefed the Secretary on Census Bureau

17  matters; is that right?

18     A   Right.  For example, doing the census in

19  Alaska is handled differently than the rest of the

20  census.

21     Q   How so?

22     A   Well, they start it in January so that

Page 20

1   you don't -- in a lot of the remote villages, if

2   you tried to do the census on census day, the

3   rivers would be impassable.  So people would be

4   able -- unable to get in and out to get to the

5   census.

6          So that is an area that Senator Stevens

7   spent a lot of time on, that, and postal service

8   and some other issues unique to Alaska, so --

9      Q   And what other census-related issue did

10   you prepare the nominee -- and when I say the

11   nominee, I mean the nominee Secretary Ross.  I'm

12   not talking now about the deputy secretary

13   nominee.

14      A   Right.  Mostly --

15      Q   What are -- I'm sorry.  Let me just

16   finish the question for the clarity of the record.

17          What other census-related issues did you

18   prepare future Secretary Ross on in advance of his

19   confirmation hearing?

20      A   Largely, the size of the budget, the fact

21   that it had to be conducted based on a certain

22   schedule, and that it would require a large ramp

Page 21

1    up of personnel.

2         Q    And this was because the -- when you say

3    it would require a large ramp up, what would

4    require a large ramp up?

5         A    Conducting the census.

6         Q    Okay.

7         A    You, basically, have to hire about half a

8    million part-time workers.

9         Q    Got it.

10        Did you have any discussion with

11   Secretary Ross when he was nominee regarding the

12   citizenship question?

13        A    No.

14        Q    Okay.  And when I say the citizenship

15   question, you understand that I mean the inclusion

16   of a citizenship question on the 2020 census?

17        A    I took that to be your meaning, yes.

18        Q    Thank you.

19        You mentioned you also were involved as

20   the Sherpa for the deputy secretary nominee?

21        A    Correct.

22        Q    And tell us about any briefings that you

Page 22

1    gave the deputy -- the then deputy secretary

2    nominee regarding any Commerce Department matters?

3         A    Again, basically, the same subject

4    matter.  The Secretary -- the only difference

5    being that the Secretary typically asked more

6    questions than the deputy secretary nominee did.

7         Q    Did you brief them -- at the same time or

8    did you brief them in separate meetings?

9         A    No.  They were on separate tracks.

10        Q    And then -- I take it -- you testified

11   you took them up for meetings on the hill.

12        A    Correct.

13        Q    And did you take the Secretary and the

14   deputy secretary up together or separately?

15        A    Separately.

16        Q    How many -- how many Hill meetings do you

17   recall going to with the Secretary when he was the

18   nominee?

19        A    Well, we met with every member of the

20   committee, so I think that's about -- I don't

21   know -- somewhere in the vicinity of 30.  I'd have

22   to go pull the list of the committee -- we met

Page 23

1   with every member of the committee.  We may have

2   met with a couple of them twice if they had

3   follow-up questions.

4        Q    And then did you --

5        A    And then there were a few members who

6   were -- who had either just rolled off the

7   committee or, obviously, the leader -- you know,

8   leadership, so Leader McConnell and Mr. Schumer

9   are not on the committee, but we, obviously, met

10  with them, as well.

11       Q    Okay.

12       A    So I don't know, 35 meetings in all.

13       Q    Okay.  And did you meet with any staff

14  members on the committee outside of staff who

15  would have attended meetings with the senators?

16       A    In one case, with Senator Nelson, we met

17  with the staff prior to meeting with the Senator.

18  But, otherwise, yes, the staff was always there

19  with the member.

20       Q    Okay.  And in any of the meetings that

21  you had with senators or staff during the

22  confirmation process --

Page 24

1      A    Yeah.

2      Q    -- did anyone ask you about the

3  citizenship question?

4      A    Not that I recall.

5      Q    Okay.  And did you raise the citizenship

6  question in any of those conversations?

7      A    Not that I recall.

8      Q    And did the Secretary raise the

9  citizenship question in any of those

10  conversations?

11      A    Not that I recall.

12      Q    Okay.  In any of the meetings that you

13  had with members and the deputy secretary nominee,

14  did any of the members ask you about the

15  citizenship question?

16      A    Not that I recall.

17      Q    And did you raise the citizenship

18  question with any of the members?

19      A    Not that I recall.

20      Q    And did the deputy secretary nominee

21  raise the citizenship question with any of the

22  members?

Page 25

 1      A    Not that I recall.

 2      Q    The -- let me go back one second to when

 3  you joined the transition team.  How did you come

 4  to join the transition team?

 5      A    I was contacted by a former colleague who

 6  was tasked with setting up the Sherpa teams.

 7      Q    Who was that?

 8      A    Christine Ciccone.

 9      Q    Can you spell that for the record?

10      A    Well, Christine, C-H-R-I-S-T-I-N-E.  And

11  then Ciccone, I think is C-I-C-C-O-N-E.

12      Q    And you mentioned Christine Ciccone was a

13  former colleague?

14      A    Correct.

15      Q    Where had you worked together?

16      A    She worked as staff on the governmental

17  affairs committee when Senator Stevens was

18  chairman.

19      Q    And what was her role on the transition

20  team?

21      A    Setting up the Sherpa meetings.

22      Q    Okay.  So between -- shortly after

Page 26

1    Thanksgiving and inauguration, your only role on
2    the transition team was as the Sherpa to the
3    Commerce committee?
4        A    Right.
5        Q    And your only functions as Sherpa to the
6    Commerce committee included the functions that
7    we've just discussed with regard to the
8    Commerce Secretary nominee and the deputy
9    secretary nominee; is that correct?
10       A    Right.  We were responsible for prepping
11   them for the meetings and assisting with the
12   questions for the record --
13            (Thereupon, the court reporter
14   clarified.)
15            THE WITNESS:  Questions for the record
16   that came out.
17   BY MR. COLANGELO
18       Q    And --
19       A    And hearing prep.
20       Q    Great.  So let's take those separately.
21            Did you receive any questions for the
22   record -- well, let's do the hearing first.

Page 27

1        Do you remember when the Secretary's

2   nomination was?

3        A    Well, when his nom- -- he was nominated

4   before I came on board, so --

5        Q    Okay.  If I told you he was nominated on

6   November 30, 2016, would that sound about right?

7        A    Yeah.  It sounds right.

8        Q    And your recollection is you came on

9   board shortly after he was nominated?

10       A    It was at the end of November, so he may

11   have been -- they may have brought me on without

12   knowing who it was, but it was right about that

13   time frame.

14       Q    Okay.  And when was the Secretary

15   confirmation hearing?

16       A    It was in early January, I believe.

17       Q    Okay.  Would January 18, 2017 sound about

18   right?

19       A    Yeah.  When's the -- the inaugural [sic]

20   is on the 20th --

21       Q    Inauguration was on the --

22       A    Yeah.  Sounds about right.  Shortly

Page 28

1   before the inauguration.

2      Q    So you mentioned that you assisted with

3   questions for the record?

4      A    Yes.

5      Q    Can you describe what questions for the

6   record, are?

7      A    Well, in the course off the nomination

8   hearing, many members then send follow-up

9   questions, particularly, Democratic members send

10  follow-up questions.  So those -- the typical

11  process for a nominee is in order to get

12  confirmed, you have to complete answering all the

13  information that the committee requests.

14     Q    And those questions for the record, I

15  take it those were all submitted after the

16  confirmation hearing?

17     A    If I remember right -- and thank you for

18  the reminder that it was on the 18th -- the

19  committee gave the members until, I think it was

20  midnight that night to submit questions for the

21  record, and then we -- the objective was to try to

22  get the questions answered in time that they could

Page 29

1   be confirmed shortly after the President's

2   confirmation.

3        Q    Got it.  Okay.

4        A    So --

5        Q    But you didn't get any questions for the

6   record before his hearing on the 18th, did you?

7        A    No.

8        Q    And your recollection is that all of the

9   questions for the record, would have come in on

10  the 18th after the hearing?

11       A    I think that's correct, yes.

12       Q    And you assisted in preparing responses

13  to those --

14       A    Correct.

15       Q    -- QFRs?

16       A    Yes.

17       Q    If I say QFRs, will you understand --

18       A    I --

19       Q    -- I mean questions for the record?

20       A    I will.  Yes.

21       Q    And how did you prepare responses to

22  those QFRs?

Page 30

1        A    Typically, the Secretary would take a

2    first pass at them, and then I would follow in.

3    And if it was a question he really didn't -- was

4    unfamiliar with, then I would try to provide

5    information, run that by him.  And if he concurred

6    in the response, we would send that.

7        Q    Did you work with any other members of

8    the transition team on the responses to the QFRs?

9        A    No.

10       Q    Did you work with any members of the

11   Commerce Department -- any employees of the

12   Commerce Department on the responses of the QFRs?

13       A    No.  Because he was not part -- we

14   were -- I mean, we were in that awkward period

15   where you're transitioned but you're not part --

16   we could ask -- we could send questions, but given

17   the timing, it was highly unlikely that we were

18   going to get a quick response.  There were people

19   standing by to try to assist, but we -- there

20   wasn't a very well-defined process for getting

21   that information back and forth.

22       Q    Okay.  Did you have any interaction with

Page 31

1    employees at the Commerce Department from the time

2    that you joined the transition team until

3    Inauguration Day?

4        A    No.   There was pretty large firewalls

5    between the two.

6        Q    Okay.

7        A    There were a couple members of the

8    transition who were allowed to go in.   They were

9    sort of -- I forget when they call them beach head

10   team --

11       Q    Uh-huh.

12       A    -- but none of them were the same people

13   doing the Sherpa process, so it was a little bit

14   awkward.

15       Q    And did any of those QFRs that the

16   Secretary received after his confirmation hearing

17   relate to the citizenship question?

18       A    No.

19       Q    In the period after his confirmation

20   hearing on January 18th, did you have any

21   discussions with the Secretary about any

22   Commerce Department matters, other than the

Page 32

1    responses to the QFR?

2         A    Other than -- no.  I mean, other than

3    basic personnel as he was trying to figure out,

4    you know, who he was bringing on board.

5         Q    Okay.

6         A    That was all the discussion.

7         Q    Okay.  So in that period after his

8    confirmation hearing and before he was confirmed,

9    did you have any discussions about policy matters?

10        A    No.

11        Q    Okay.  Did you -- after the confirmation

12   hearing, was there a meeting with the Secretary

13   and the transition team?

14        A    I imagine there was, but I don't recall

15   one.

16        Q    Okay.  So you don't remember

17   leaving the -- leaving the Hill and going to a

18   meeting anywhere in Washington with

19   Commerce Department transition team members?

20        A    Not that I recall, no.

21        Q    And do you remember, was Wendy Teramoto

22   at that confirmation hearing?

Page 33

1      A    Yes.

2      Q    Do you remember a meeting that you and

3  Wendy and the Secretary attended on the 18th after

4  the confirmation hearing?

5      A    Not with any particularity, no.

6      Q    Okay.  Mr. Comstock, tell me what your

7  current position is?

8      A    I'm the deputy chief of staff and

9  director of policy.

10      Q    Deputy chief of staff and director of

11  policy.

12          When did you become the director of

13  policy?

14      A    On January 31st --

15      Q    January 31st.

16      A    -- 2017.

17      Q    The -- was January 31, 2017 your first

18  day in the office at the Commerce Department?

19      A    Yes.  If I'm recalling correctly, that

20  that was Monday, yes.  It was the 30th or 31st.

21  It was whatever the Monday was at the end of

22  January.

Page 34

1      Q    Would it help if I told you that Monday

2   was the 30th?

3      A    I'll take your word for it.

4      Q    Okay.  So your recollection is, then,

5   that --

6      A    They start you at the beginning of a pay

7   period is the way it works --

8      Q    Okay.

9      A    -- in the federal.

10      Q    So your first day was January 30, 2017?

11      A    Correct.

12      Q    So between Inauguration Day on the 20th

13   and the 30th, you weren't physically present at

14   the Commerce Department?

15      A    I was not.

16      Q    Did you have any conversations with any

17   Commerce Department staff during that time period?

18      A    Well -- no.  Well, other than the

19   gentleman who was helping with processing my

20   paperwork.

21      Q    Personnel onboarding?

22      A    Right.

Page 35

1    Q    Other than the personnel onboarding, did
2  you have conversations --
3    A    No.
4    Q    -- with anyone at the Commerce Department
5  between January 20th and January 30th of 2017?
6    A    No.
7    Q    Did you have any conversations with
8  Secretary Ross between January 20th and
9  January 30th of 2017?
10    A    Nothing particularly that I recall, but
11  I'm sure I talked to him, yes.
12    Q    Okay.  You mentioned that your title is
13  deputy chief of staff and director of policy.
14         When did you became deputy chief of
15  staff?
16    A    In April of this year.
17    Q    So from January 30, 2017 until
18  April 2018, you were director of policy?
19    A    Correct.
20    Q    Is director of policy a position within
21  the Office of the Secretary?
22    A    Yes.

Page 36

1      Q    And is that the same as director of

2    policy and strategic planning?

3      A    Correct.

4      Q    Who do you report to?

5      A    The Secretary.

6      Q    Directly to the Secretary?

7      A    Well, and to the chief of staff and to

8    the deputy secretary.

9      Q    Okay.  Was there a chief of staff on

10   January 30, 2017?

11     A    There was not.

12     Q    Okay.  So until there was a chief of

13   staff, who would you say you reported to?

14     A    Well, until the Secretary came on board,

15   sort of no one.

16     Q    Okay.

17     A    No.  The -- the acting deputy secretary,

18   obviously, was the career official who was in

19   charge of making any final decisions for the

20   department, so --

21     Q    And can you identify her for the record?

22     A    Ellen Herbst.

Page 37

1    Q   When did the Secretary come on board as
2  Secretary?
3    A   Again, I think his confirmation, if I
4  remember right, was the 28th of February.  And,
5  again, you'd have to confirm that with records.
6    Q   Okay.  So between January 30th and
7  February 28th of 2017, you were director of the
8  Office of Policy and Strategic Planning?
9    A   Right.
10   Q   Notionally, you reported to the chief of
11  staff and the Secretary, but neither of those --
12   A   Weren't there.
13   Q   -- roles had been filled?
14   A   Correct.
15   Q   And so you reported to nobody?
16   A   Well, no.  Again, to the extent that any
17  decisions needed to be made, they were made by the
18  career officials who were there.  I would advise
19  those career officials as to what my best guess of
20  administration's policy on a particular matter
21  would be.
22   Q   In your position as director of the

Page 38

1    policy office, how are you assigned work?

2        A    Whatever the Secretary decides he wants

3    me to work on.

4        Q    Do you have a job description?

5        A    Yes.  I'm sure there is a job deception.

6        Q    Have you seen a job description for that

7    position?

8        A    Not that I recall.

9        Q    Do you have any regular or standing

10   meetings with the Secretary?

11       A    No standing meetings.  I meet with him on

12   a daily basis.

13       Q    Do you -- is it a scheduled daily

14   meeting?

15       A    No.

16       Q    So you don't see him at the same time

17   every morning or afternoon?

18       A    I do not.

19       Q    And the Secretary doesn't have a daily

20   senior staff meeting?

21       A    No.

22       Q    Are your daily meetings with him

Page 39

1    scheduled or are they ad hoc?

2        A    They're both.  I mean, if there's -- if

3    there's a meeting on his schedule for which I have

4    relevant expertise or they would like my advice

5    and counsel, I'm added to that meeting.  If

6    there's a meeting we need to have with him because

7    something has come up, then we just -- when he's

8    available, we go meet with him.

9        Q    You said if they would like your advice

10   or counsel, who is they?

11       A    They meaning the Secretary and chief of

12   staff.

13       Q    And can you identify the chief of staff

14   for the record?

15       A    The chief of staff currently is

16   Wendy Teramoto.

17       Q    And there was no chief of staff in

18   January of 2017?

19       A    Correct.

20       Q    When did she become chief of staff?

21       A    I think she officially became chief of

22   staff in August 2018.

Page 40

1      Q    2018?

2      A    Sorry.  2017.

3      Q    So you mentioned you work on whatever the

4  Secretary wants you to work on?

5      A    Correct.

6      Q    How does he identify matters that he

7  wants you to work on?

8      A    He says, Earl, can you get this done?  Or

9  we attend this meeting, and he says, can you

10  follow up on that?

11      Q    And how do you keep the Secretary

12  informed about what you are doing on important

13  matters or on assignments that he's given you?

14      A    By email, by oral briefing, and sometimes

15  by memos.

16      Q    How do you decide whether you're going to

17  update Secretary Ross by email, by briefing or by

18  memo?

19      A    Just depends on the time frame, the speed

20  of which I need to get something to him, how

21  extensive it is.  You know, if there's a lot of

22  information that it would be helpful for him to

Page 41

1    have and review in advance, then I typically would

2    try to do a memo.

3        Q    How big is the policy office?

4        A    We currently have six people.

5        Q    Six people.

6             And what are those individuals'

7    functions?

8        A    Well, the policy office existed prior to

9    my arrival, and it's staffed, essentially, by

10   career -- largely by career staff.  So their

11   primary function is to assist me and the Secretary

12   in identifying who can get something done within

13   the department.  They also review memorandums and

14   correspondence that comes in from the different

15   bureaus to try to identify if they're -- you know,

16   flag policy issues, flag things they think might

17   be concerning to the Secretary.  So they're really

18   an interface to help us figure how to manage the

19   leviathan.

20       Q    Manage the leviathan?

21       A    Yeah.

22       Q    And by leviathan, can you explain what

Page 42

1   you mean?

2        A    The Department of Commerce.   It's 47,000

3   people who all report to work every day, and they

4   all do a great job.   And when you're trying to

5   figure out what everybody's doing and make sure

6   that what they're doing is consistent with the

7   administration's policy, that's a large task.

8        Q    Can you tell me what the professional

9   background is of the six people on your staff in

10   the policy office?

11       A    Most of them are detailed from the

12   different departments, so they have some

13   experience or expertise in that particular

14   department.

15       Q    Do you have anybody in the policy office

16   detailed from the Census Bureau?

17       A    We have somebody from the economics and

18   statistics administration which oversees the

19   Census Bureau.

20       Q    You don't have anybody detailed to the

21   policy from the Census Bureau; is that correct?

22       A    Not that I'm aware of.

Page 43

1       Q    And is the individual from ESA an

2    economist?

3       A    Good question.  I don't know.

4       Q    Okay.  Have you seen the resumes of the

5    people who work in your office and report to you?

6       A    No.

7       Q    Were all of them there when you became

8    the director of the policy office?

9       A    Well, not all the current ones, but, yes,

10   everybody was there that was working for me when I

11   started, yeah.

12      Q    I'm not sure I understand that answer.

13      A    In other words, they switch.  So, for

14   example, the person from NIST has left.  I have an

15   Army -- a detailee from the Army logistics command

16   who comes in every year.  I'm now on my third

17   person for that job.

18      Q    So would it be fair to say that you have

19   six people in the policy office, and those people

20   are details from different bureaus or agencies

21   within the Department of Commerce, and they're on

22   a fixed term and when one person leaves, another

Page 44

1    person from that bureau comes in?

2        A    Essentially, yes.  I mean, the fixed term

3    is somewhat flexible.  But, for example, the

4    person doing the National Oceanic and Atmospheric

5    Administration has now moved on to be one of the

6    budget directors for them.

7            So it's a position that's seen by the

8    bureaus as something that could be good for

9    leadership development.  So they'll send somebody

10   up and they'll work there for a year.  The person

11   who did the National Institutes of Standards

12   Technology, NTIA, et cetera, has now moved back to

13   NIST to take a more senior position there.

14       Q    And do you have any regular -- strike

15   that.

16           Does the policy office have any regular

17   functions, other than whatever the Secretary wants

18   us to work on?

19       A    Well, yeah.  Each one of the policy

20   office people is responsible for managing their

21   area, alerting me and the Secretary to issues that

22   are coming up in those particular bureaus.  So

Page 45

1   it's a monitoring function in some ways.  And so

2   they're not necessarily developing policy for

3   those bureaus as much as they are keeping track of

4   what the bureaus are doing.

5       Q   Okay.  Is it unusual for the policy

6   office to develop policy for a bureau?

7       A   Not if we're developing for the

8   Secretary, no.

9       Q   You just said, I believe, your testimony

10  was --

11      A   What I'm saying is the staff that works

12  that --

13      Q   I'm sorry.  Hang on.  Just let me finish

14  my question.

15          Your testimony was, so they're not

16  necessarily developing policy for those bureaus,

17  as much as they are keeping track of what the

18  bureaus are doing?

19      A   Correct.

20      Q   So is it usual for the policy office to

21  develop policy as opposed to keeping track of

22  policy?

Page 46

1       A    No.

2       Q    Please explain.

3       A    Well, again, it depends on who you're
4  talking about at the policy office.  If you're
5  talking about my staff at the policy office, they
6  do not, as a general rule, develop the policy.
7  The policy is generally developed by the Secretary
8  with input from me and with input from them when
9  needed.

10      Q    And not with input from the bureaus?

11      A    Well, absolutely.  We go back and forth
12  with the bureaus all the time.

13      Q    You mentioned that the individuals in the
14  policy office monitor specific areas; is that
15  right?

16      A    Correct.

17      Q    Do you have somebody assigned to monitor
18  the Census Bureau?

19      A    Yes.

20      Q    Who is that?

21      A    David Langdon.

22      Q    And what is David Langdon's background?

Page 47

1      A   He is in the Economic & Statistics
2   Administration and knows -- knows the people down
3   there, knows how to get stuff done, so --
4      Q   Okay.  And did you hire Mr. Langdon?
5      A   I did not.
6      Q   Was he in the policy office when you got
7   there?
8      A   He was.
9      Q   How often do you interact with the
10  Census Bureau?
11     A   Directly?  Depends on the issue.  Like
12  when we were doing the lifecycle cost estimate,
13  quite a bit.  When we were doing the census -- the
14  citizenship question, interacted with the staff
15  there -- the senior staff on a fairly frequent
16  basis.
17     Q   Do you have any standing meetings with
18  the Census Bureau?
19     A   No.  Well, other than when they come and
20  brief the Secretary sort of on a monthly basis,
21  I'll attend those meetings.
22     Q   Okay.  I'll come back to the monthly

Page 48

1   briefings in a minute.

2          In your job as director of policy, do you

3   a -- have any role with regard to interacting with

4   the White House?

5      A   Sure.  I'm the primary person that gets

6   contacted when they've got a document they're

7   trying to circulate and clear.

8      Q   When the White House has a document

9   they're trying to circulate and clear?

10     A   Correct.

11     Q   Okay.  And so who would contact you in

12  the course of circulating and clearing a document?

13     A   Staff Secretary.

14     Q   And what kind of documents would be

15  circulated and cleared through the Commerce

16  Department from White House?

17     A   Op eds, presidential memorandums,

18  executive orders.

19     Q   And how often does the White House ask

20  you to clear a document?

21     A   Sometimes I get to clear multiple

22  documents in a day.

Page 49

1      Q   So daily?

2      A   Yes.

3      Q   Okay.  And when you get a document from

4  the White House to clear, what do you do?

5      A   I usually send it off to the affected

6  bureaus and ask for their input.

7      Q   And how much turnaround time do you

8  typically have if you get a document from the

9  White House to clear?

10     A   It ranges from less than two hours to a

11 week and a half.

12     Q   And --

13     A   Typically, in that ballpark.

14     Q   And when you get a document from the

15 White House to clear, how is it transmitted to

16 you?

17     A   By email.

18     Q   From the Office of the Staff Secretary?

19     A   Yeah.

20     Q   Is it ever transmitted to you directly

21 from a policy office within the White House?

22     A   I'm not sure what you mean.

Page 50

1     Q    Would you get a document from the

2   Domestic Policy Council directly or from the

3   National Economic Council directly, or would you

4   always get a document from --

5     A    If we were working on something and

6   there's something relevant that they would need to

7   send it, sure.

8     Q    So you get documents to clear from the

9   White House and they can come from either the

10  Staff Secretary or from another office within the

11  White House?

12    A    Sure.  I mean, to give you an example,

13  working on the steel proclamation, having to do

14  with Section 232 tariffs, there's all kinds of

15  interaction back and forth with the White House,

16  White House -- Office of White House Counsel, NEC,

17  CEA.  I mean, it just depends on who's working on

18  an issue.

19    Q    And for the record, can you say what CEA?

20    A    Counsel of Economic Advisors.

21    Q    And, for the record, can you say what

22  NEC?

Page 51

1      A    National Economic Council.

2      Q    Great.

3           Did you have any interaction with the

4   White House on the census citizenship question?

5      A    No.

6      Q    Did you have any interaction with the

7   White House on the Census Bureau, at all?

8      A    Not that I recall.

9      Q    What is your typical -- do you have any

10  typical role with regard to interacting with other

11  cabinet agencies?

12     A    Again, if there's an issue that the

13  Secretary is working on and we're trying to

14  communicate with the other departments, I'll often

15  be asked to track down somebody in the other

16  department to whom we can have a conversation.

17     Q    So, yes, you do typically have a role

18  interacting with other cabinet agencies?

19     A    Yes.

20     Q    On -- is that role on policy matters --

21     A    Yes.

22     Q    -- exclusively?

Page 52

```
 1      A    I'm not sure what you mean by
 2  exclusively.
 3      Q    Budget, legal --
 4      A    Yeah.
 5      Q    -- any other --
 6      A    I mean, we talk all the time with OMB,
 7  for example, on our budget.  I'm involved in that.
 8  Involved in strategic planning for the department.
 9  You know, we were working on a revision to a sugar
10  agreement which involved a lot of interaction with
11  the Department of Agriculture, so dealt heavily
12  with Secretary Perdue and his senior staff on that
13  matter.  Just depends on the issue.
14      Q    And do you have -- in your role as
15  director of the policy office, do you have typical
16  interaction with Congressional staff?
17      A    On occasion, yes.
18      Q    How much would you say you interact with
19  Congressional staff?
20      A    Well, depending on the issue, sometimes
21  quite frequently.  Sometimes -- usually, it's
22  often when either their office -- like, for
```

Page 53

1   example, on steel tariffs, we've had quite a bit

2   of interaction with Chairman Brady and his staff,

3   senior staff on the Ways and Means Committee would

4   call frequently.  On a red snapper issue, the

5   staff of Mr. Scalise called.  So it just depends

6   on the issue.

7        Q    Did you have any interaction with

8   Congressional staff on the citizenship question?

9        A    I did not.

10       Q    Are you aware of anyone in the

11  Commerce Department who did have interaction with

12  Congressional staff on the citizenship question?

13       A    Not that I recall.

14       Q    Do you interact, at all, with members of

15  Congress in your role as the director of policy?

16       A    I do on occasion, yes.

17       Q    Did you interact with any members of

18  Congress on the citizenship question?

19       A    I did not.

20       Q    Is it typical in your function as

21  director of the policy office to interact with

22  outside stakeholders and nongovernmental

Page 54

1   stakeholders?

2        A    I take meetings when the Secretary can't,

3   yes.

4        Q    Do you ever take meetings independent of

5   filling in for the Secretary?

6        A    Yeah, on major policy issues I'm working

7   on.

8        Q    Did you meet with outside stakeholders on

9   the citizenship question?

10       A    No.

11       Q    You didn't attend any meetings, including

12  with the Secretary, on the citizenship question --

13       A    I --

14       Q    -- with outside stakeholders?

15       A    With the outside stakeholders groups, no.

16       Q    When did you first hear about the notion

17  of adding a question about citizenship to the

18  decennial census?

19       A    Sometime in -- shortly after the

20  confirmation.

21       Q    And who did you hear it from?

22       A    The Secretary.

Page 55

1    Q   And the Secretary was confirmed on

2    February 28, 2017; is that right?

3    A   I -- like I said, you'd have to confirm

4    that date, but I think that was the date, yes.

5    Q   And what did the Secretary tell you about

6    the idea of adding a question on citizenship to

7    the census during that first conversation shortly

8    after his confirmation?

9    A   Again, the exact time frame of the

10   conversation, I can't tell you.  It was sometime

11   in that spring period.  I don't recall the

12   details.  I think he simply inquired as to why

13   don't we have a citizenship question on the

14   census.

15   Q   Okay.  And what did you say to him when

16   he inquired?

17   A   Short answer, I don't know.  I'll check.

18   Q   Okay.  And would that interaction be

19   reflected in any documents?

20   A   I don't -- I don't believe so, but it's

21   possible it's in an email exchange.

22        MR. COLANGELO:  Can we mark as Exhibit 1,

Page 56

1   Comstock Exhibit 1?

2            (Plaintiffs' Exhibit 1, Email, was

3   marked.)

4            MR. COLANGELO:  I'm handing counsel

5   Document Bates-stamped 1410.

6   BY MR. COLANGELO:

7       Q   And I'll hand the document to the

8   witness.

9       A   Thank you.

10      Q   Mr. Comstock, let me take that back and

11  I'll give you the marked copy.

12           Mr. Comstock, have you seen this email

13  before?

14      A   Let's see it.  It doesn't appear I was

15  copied on it, so, no.

16      Q   And you weren't shown this email in

17  preparation for your deposition?

18      A   No.

19      Q   Okay.  And this is an email from

20  David Langdon to Ellen Herbst dated

21  February 22, 2017; is that right?

22      A   Correct.

Page 57

1      Q    And you testified that David Langdon
2  works for you in the policy office; is that right?
3      A    Correct.
4      Q    And Ellen Herbst at the time was the
5  acting deputy secretary; is that right?
6      A    Right.
7      Q    Do you see in this email where
8  Mr. Langdon asks Ms. Herbst who is organizing the
9  Census Bureau briefing for Earl and team?
10     A    Yeah.
11     Q    Okay.  And take a look at the subject
12 line, "Census Bureau briefing for OS politicals."
13          Does OS stand for Office of the
14 Secretary?
15     A    Yes.
16     Q    Now, in the second paragraph of this
17 email, you see the line where Mr. Langdon says,
18 "Jim S. reminded me about the upcoming
19 Congressional notification of decennial census and
20 ACS topics and the need to gauge Earl's interest
21 it."  I believe he meant Earl's interest in it.
22          Do you see that line?

Page 58

1      A    I see it, yes.

2      Q    And I take it that you would assume that

3   Earl refers to you?

4      A    I'm not aware of another Earl that works

5   at the department at the moment, so --

6      Q    Okay.  Certainly, not another Earl that

7   works at the Office of Secretary who's a political

8   appointee?

9      A    Correct.

10     Q    And then Mr. Langdon then says, "Earl is

11  very" -- underlined very -- "interested and thinks

12  the Secretary will be, as well."

13          Do you see that?

14     A    Yes.

15     Q    On February 2nd of 2017 would have been

16  your fourth day on the job; is that right?

17     A    Yep.

18     Q    Okay.  And do you recall telling

19  Mr. Langdon that you were very interested in

20  Congressional notification of decennial ACS

21  topics?

22     A    I recall telling him that we were very

Page 59

1    interested in the census and getting a briefing on
2    it.
3         Q    Okay.
4         A    I don't specifically recall that, but --
5         Q    Were you very interested in the decennial
6    topics on February 2, 2017?
7         A    What probably would have caught my
8    attention is if we had to notify Congress about
9    something, I would want to make sure we were up to
10   speed on what we needed to notify them about.
11        Q    As of this date, February 2, 2017, do you
12   recall if you had already had discussions
13   regarding adding a citizenship question to the
14   census?
15        A    I don't recall having a discussion before
16   that.
17        Q    Mr. Langdon's email says, quote, it would
18   make sense for John Thompson to touch on this
19   topic in his overview briefing and then to have a
20   follow-up briefing very soon.
21             Was Mr. Thompson the Census Bureau
22   director at the time?

Page 60

```
 1        A    Yes.
 2        Q    And did that overview briefing take place
 3    that's referred to in this email?
 4        A    I imagine it did.
 5        Q    Do you remember when that happened?
 6        A    I couldn't tell you.
 7        Q    Do you keep a calendar?
 8        A    Yeah.  There's an electronic calendar
 9    somewhere.
10        Q    And your calendar records the meetings
11    that you attend?
12        A    Generally, yes.
13        Q    Would it typically record a meeting with
14    the Census director?
15        A    It would depend if somebody sent me a
16    calendar invite.
17        Q    Would somebody typically send you a
18    calendar invite for a meeting with the Census
19    director?
20        A    At that point in time, possibly.  Yeah, I
21    don't know.
22        Q    The email refers, also, to a follow-up
```

Page 61

1    briefing very soon.  Do you remember that

2    follow-up briefing?

3        A   I don't have any specific recollection of

4    that, no.

5        Q   If there was a follow-up briefing on the

6    question of Congressional notification of

7    decennial topics, would that be reflected in your

8    calendar?

9        A   Again, possibly.  But unless I entered it

10   myself, which I may or may not have done, I don't

11   know.

12       Q   Do you have an assistant who adds

13   meetings to your calendar?

14       A   I do now, but I didn't then.

15       Q   When did your assistant start?

16       A   I think I finally got an assistant in

17   May, maybe.

18       Q   Okay.  And before May, is it your

19   testimony that meetings didn't appear on your

20   calendar unless you put them there or somebody

21   sent a calendar invite to you?

22       A   Correct.

Page 62

1      Q   We'll mark this exhibit Comstock

2   Exhibit 2.

3          (Plaintiffs' Exhibit 2, Email, was

4   marked.)

5   BY MR. COLANGELO:

6      Q   We are marking as Comstock 2 Document

7   Bates numbered 2521.

8          Mr. Comstock, take a look at this email.

9   You've seen this email before, right?

10     A   I sent it.

11     Q   So that's a yes?

12     A   Yes.

13     Q   Were you shown this email in preparation

14   for your deposition today?

15         MR. GARDNER:  I'm going to object and

16   instruct the witness not to answer on the grounds

17   of attorney work product.

18         I'm happy to let you answer when was the

19   last time you saw the document.

20         But you're asking about documents counsel

21   may have shown that would be protected.

22   BY MR. COLANGELO:

Page 63

1      Q    When's the last time you saw this
2   document, Mr. Comstock?
3      A    Yesterday.
4      Q    And do you see the subject line of this
5   email is your question on the census?
6      A    Yep.
7      Q    Okay.  And Secretary Ross was confirmed
8   on February 28th, I think we agreed; is that
9   right?
10      A    Like I said, if that's the date, yes.
11      Q    Okay.  So this would have been
12   Secretary Ross's eleventh day on the job as
13   Commerce Secretary, give or take?
14      A    Approximately, yes.
15      Q    And the subject line of this email is
16   your question on the census?
17      A    Right.
18      Q    What was the Secretary's question on the
19   census?
20      A    He appeared to have asked whether
21   undocumented people were counted in the census.
22      Q    Okay.  And how did he ask you that

Page 64

1    question?

2        A    I don't recall.   Probably at a meeting,

3    possibly following up on a census briefing.   I

4    don't know.

5        Q    Have you checked your calendar for

6    March 10, 2017 recently?

7        A    I was going to say I probably haven't

8    checked it from March 10, 2017 for that particular

9    date.

10        Q    Okay.

11        A    By the way, I wanted to add one point.

12    On the prior document, you need to understand that

13    at that time, there were a number of questions

14    that the prior administration had requested be

15    placed, potentially, on the census that would have

16    been involved in that notification.   So that would

17    have been a reason of why I would have been

18    interested in that, on sexual orientation and

19    gender identity.   So that was an issue that was

20    very at the forefront at the time of what to do

21    about those requests.

22        Q    So let's go back to Exhibit 2, your email

Page 65

1    to Secretary Ross on Friday, March 10th.  Do you

2    know why the Secretary asked you whether

3    undocumented people were counted?

4         A    I have no idea.

5         Q    Okay.  Did he ask you whether noncitizen

6    people were counted for apportionment purposes?

7         A    Well, based on the answer, it appears he

8    might have.

9         Q    Appears he might have or appears he did?

10        A    I couldn't tell you the answer on that.

11        Q    Okay.

12        A    I don't recall the question, so --

13        Q    Okay.  But you sent this email to the

14   Secretary in response to a question?

15        A    Yes.

16        Q    And you would have presumably tried to

17   make your answer responsive to his question?

18        A    I generally do that, yes.

19        Q    So you think it's likely that his

20   question was about whether undocumented immigrants

21   were counted for apportionment purposes?

22        A    That's entirely possible, but he might

Page 66

1    have also just asked do we count undocumented

2    persons, and this is what I found on the Census

3    website.

4       Q   How do you think you found it on the

5    Census website?

6       A   By typing in census and going to their

7    website and seeing what their FAQs say.

8       Q   So you think you would have gone directly

9    to the frequently asked questions page?

10      A   That would not be unusual for me to do,

11   yes.

12      Q   This link you've identified at

13   www.census.gov, that's the Census Bureau's

14   frequently asked web page for Congressional

15   apportionment; is that right?

16      A   Again, without pulling it up, I couldn't

17   tell you specifically what it says.

18      Q   Okay.  If I represent to you that if you

19   pulled up that website, it would say frequently

20   asked questions for Congressional apportionment,

21   would that assist you?

22      A   I'd be happy to take your word for it.

Page 67

1     Q    So does that assist you in recalling that

2   the Secretary asked whether noncitizens were

3   counted for apportionment purposes?

4     A    And I have no recollection of the

5   question, so I can only go by the answer.

6     Q    Okay.  The email also includes a blog

7   post from the Wall Street Journal; is that right?

8     A    Uh-huh.

9     Q    Okay.  And your email to the Secretary

10  says that this blog post, quote, confirms that

11  neither the 2000s, nor the 2010 census asked about

12  citizenship?

13    A    Correct.

14    Q    So does that lead you to conclude that

15  the Secretary asked about whether the decennial

16  census asks about citizenship?

17    A    That would be a reasonable supposition,

18  based on the response.

19    Q    And this blog post is called the pitfalls

20  of counting illegal immigrants; is that right?

21    A    Yep.

22    Q    And were you concerned on March 10, 2017

Page 68

1   about counting illegal immigrants?

2       A   I -- no, not personally.

3       Q   Was the Secretary concerned on

4   March 10, 2017 about counting illegal immigrants?

5       A   Again, I have no recollection of the

6   question, so I couldn't speculate as to what his

7   concern was.

8       Q   But you testified that a significant part

9   of your job function involves answering questions

10  from the Secretary on issues that matter to him,

11  right?

12      A   Correct.

13      Q   And if he asked you a question, you would

14  try to be responsive?

15      A   Generally, yes.

16      Q   You wouldn't ordinarily send him

17  information that wasn't responsive to a question

18  he asked, would you?

19      A   Not -- not characterized this way, no.

20      Q   So you testified a minute ago that the

21  Secretary -- that you first heard about the notion

22  of adding a question about citizenship to the

Page 69

1    census when the Secretary raised it with you

2    shortly after his confirmation.  Does this email

3    indicate to you that it was by March 10th that the

4    Secretary first raised it with you?

5        A   I wouldn't necessarily draw that

6    conclusion from this email.

7        Q   Would you draw the conclusion that it was

8    later than March 10?

9        A   No, I wouldn't.  Again, this -- this

10   question does not directly address -- it's a

11   question about how -- who do we count, not whether

12   or not -- and whether there's a citizenship

13   question.  So I don't know at this point whether

14   he indicated he was interested in such a question,

15   other than getting the factual information.

16       Q   Okay.  Who would know when the Secretary

17   was interested in adding a citizenship question?

18           MR. GARDNER:  Objection.  Calls for

19   speculation.

20   BY MR. COLANGELO:

21       Q   You can answer.

22       A   My counsel just objected, so why can --

Page 70

1    would I answer?

2       Q    So let me -- an additional ground rule

3    that I -- let's cover one additional ground rule.

4    I will ask questions and your job is to answer

5    them fully and truthfully.

6       A    Okay.

7       Q    Your counsel may state objections if he

8    finds my questions objectionable for a range of

9    reasons.  If he states an objection, you can,

10   nonetheless, answer the question unless he

11   instructs you not to answer.

12          Do you understand?

13      A    Well, you used the word "can," which

14   means that I have the discretion.

15          Am I instructed to answer the question

16   notwithstanding his objection or is it -- should I

17   follow my counsel's objection?

18          MR. GARDNER:  You should do your best to

19   answer the question posed to the extent you

20   understand.

21          THE WITNESS:  Thank you for the

22   clarification.

Page 71

1          Again, you'd have to ask the Secretary.

2     BY MR. COLANGELO:

3          Q   The -- the -- let's go back to Exhibit 2,

4     subject line, your question on the census, and

5     tell me how the Secretary's question was

6     communicated to you?

7          A   It appears orally.

8          Q   Okay.  Why do you say it appears orally?

9          A   Well, we did a very extensive email

10    search, including the Secretary's email, and so if

11    you don't have an email from him to me asking

12    about this, and normally I would reply back if he

13    had sent me an email asking me about this.  So,

14    therefore, I would conclude that it was oral.

15         Q   Okay.  And you don't recall -- strike

16    that.

17             Was that oral question in a meeting, on

18    the telephone?  How do you remember receiving that

19    question?

20         A   I have no recollection.

21         Q   Okay.  Your email says -- let me direct

22    you to the first line of your message to the

Page 72

1    Secretary.  Quote, I was not able to catch anyone

2    at their desk when I called the numbers I have for

3    the Census Bureau from their briefing.

4           Do you see that?

5       A   Yep.

6       Q   Which briefing are you referring to?

7       A   Apparently a briefing that we had with

8    Census.

9       Q   A briefing that you and the Secretary

10   both had with the Census?

11      A   Right.

12      Q   Were you given any materials at that

13   meeting?

14      A   Quite possibly.

15      Q   And was that briefing on March 10th?

16      A   I have no idea.

17      Q   Okay.  If you -- if you -- would that

18   briefing be reflected on your calendar?

19      A   Again, it's possible.  I -- I don't know.

20      Q   Okay.  Would it be reflected on the

21   Secretary's calendar?

22      A   Most likely, yes.

Page 73

1       Q    He does keep a calendar, correct?

2       A    Well, he has somebody that keeps a

3    calendar for him, yes.

4       Q    And he had an assistant as of the day he

5    started as Commerce Secretary, I assume?

6       A    Correct.

7       Q    Mr. Comstock, you sent your email to the

8    Secretary on a Friday night after 8:30 p.m.; is

9    that right?

10       A    That appears to be the date stamp on

11    here, yes.

12       Q    Okay.  And you sent it after you couldn't

13    reach Census Bureau staff at their desks; is that

14    right?

15       A    Shocking at 8:30 that I could not reach

16    them at their desk, yes.

17       Q    So you got a question from the Secretary

18    at the end of the work day; is that right?

19       A    Quite possibly.

20       Q    Was his question urgent?

21       A    Again, I don't know.  I don't recall when

22    he asked me, and so this could have been something

Page 74

1    I was catching up on at the end of the day.  It

2    could have been something that he had just called

3    me on the phone about.

4         Q    Okay.  Who is Eric Branstad?

5         A    Eric was the senior White House advisor

6    at the time.

7         Q    Tell me what senior White House advisor

8    is.

9         A    It's a position that basically helps

10   with -- largely, with personnel coming over and

11   also, ideally, was keeping us informed on what was

12   going on at the White House side of things.

13        Q    Is that the political appointee position?

14        A    Yes, it is.

15        Q    You said Mr. Branstad was the --

16        A    Right.

17        Q    -- senior White House advisor at the

18   time?

19        A    Correct.

20        Q    Is he no longer in that role?

21        A    That's correct.

22        Q    Does he work at the Commerce Department

Page 75

1    anymore?

2         A    No.  He does not.

3         Q    Do you know when he left the

4    Commerce Department?

5         A    I think it was last spring.  I think he

6    worked there about a year.

7         Q    Why did you copy Mr. Branstad on this

8    email to the Secretary at 8:30 at night on a

9    Friday about the census and citizenship?

10        A    Because Eric was the, quote, senior

11   political in the department at the time.

12        Q    He was the senior political in the

13   department at the time, okay.

14             Had Wendy Teramoto started in the office

15   at that point?

16        A    She had not.

17        Q    Was Mr. Branstad in the Census Bureau

18   briefing with you?

19        A    I have no idea.

20        Q    Did he -- tell me a little bit more about

21   what you mean by he was the senior political in

22   the Commerce Department at the time?

Page 76

1      A   He was somebody who had worked on the
2  campaign and the transition and had been brought
3  over as part of that.  And so he was one of
4  the -- there's a small group of folks that had
5  been -- you know, the new politicals that had come
6  in, and he was one of them and was -- not only the
7  senior person in the group.
8      Q   And did you generally keep him updated on
9  anything that you would have been working with the
10 Secretary on?
11     A   Most likely, yes.
12     Q   Do you recall whether he was present when
13 the Secretary asked you the question that you were
14 responding to?
15     A   I have no idea.
16     Q   Okay.  Did he assist with the Secretary's
17 confirmation?
18     A   No.
19     Q   Okay.  Was anyone else on the transition
20 team -- strike that.
21         Did anyone else on the transition team
22 assist you in your function as confirmation

Page 77

1    Sherpa?

2         A    Yes, Israel Hernandez.

3         Q    Anyone else?

4         A    Nope.

5              Well, I mean, we had a press person, as

6    well.

7         Q    Who is the press person?

8         A    You're going to tax my memory here.

9    Really nice fellow, but he didn't come over

10   so -- unfortunately, I can't recall his name, but

11   we'd be happy to provide it.

12        Q    Okay.

13        A    If you -- there's a -- there's a -- I

14   think it's a Washington Post picture that has the

15   group, and he's sitting there, but we'll get you

16   the name.

17        Q    Thanks.

18             Was Mr. Branstad working on Census Bureau

19   issues in March of 2017?

20        A    Not that I recall, no.

21        Q    Did you discuss the census citizenship

22   question with him outside of this email in

Page 78

1    March of 2017?

2         A    Again, not that I recall.

3         Q    Let me direct you to the highlighted line

4    about three-quarters of the way down on the page

5    that is stamped 2521 -- and we apologize for the

6    copy quality.

7         A    I was going to say --

8         Q    This is how the document --

9         A    Think you highlighted it so nobody could

10   read it.

11        Q    -- was produced to us.

12        A    So this is not a redaction is what you're

13   telling me?

14        Q    Correct.  This is not a redaction.

15        A    If you can tell me what it says, I'd be

16   happy to --

17        Q    Sure.  The highlighted line says, "No

18   major government survey, including the decennial

19   census now underway, asks Americans about their

20   citizenship status."

21             And you see that this blog post is dated

22   May of 2010, correct?

Page 79

1      A    Uh-huh.

2      Q    So the decennial census now underway, do

3   you understand we refer to --

4      A    Would have been the 2010, yeah.

5      Q    Remember to please wait for me to finish

6   my question before you answer.

7      A    Sure.

8      Q    Did you highlight this line?

9      A    Well, unless you did, then I'm assuming I

10   did.

11     Q    I can represent to you we did not

12   highlight this line.

13     A    Okay.  Then I will assume that it was

14   highlighted in the email.

15     Q    And why did you highlight this line of

16   the blog post before sending it to the Secretary?

17     A    Well, it appears that the question was

18   whether or not the citizenship question had been

19   asked, at least on the 2010 census, and so I'm

20   highlighting for him where in this article, so he

21   doesn't have to read the whole thing that I found

22   the information responsive to his question, which

Page 80

1   is a statement by somebody in Wall Street Journal,

2   which is, you know, in some circles considered a

3   reasonably accurate paper.  Stating that it was

4   not collected in the 2010 census.

5        Q   Okay.  And take a look -- let's do that

6   again.  We had some interference from the

7   conference line.

8            Take a look at the second page of

9   Comstock Exhibit 2.  This is the page marked 2522.

10       A   Yep.

11       Q   And, again, about two-thirds of the way

12  down the page, there's another highlighted line.

13           Do you see that?

14       A   I -- yep.

15       Q   I'll represent to you this line was

16  highlighted as the documents were produced to the

17  plaintiffs in this lawsuits.  We did not

18  highlight.

19       A   Okay.

20       Q   That line reads --

21       A   I can't read what it says.

22       Q   -- "Many more foreign-born residents were

Page 81

1    counted in 2000 than was expected based on annual
2    estimates produced by the Bureau."
3            Do you see that line?
4        A    Yep.  I'm -- I see the highlighted line,
5    but I'm taking it at your word that that's what it
6    says.
7        Q    Okay.  The -- do you know why you
8    highlighted that line when you sent this blog post
9    to the Secretary?
10       A    Again, it would appear to indicate that
11   the census may have underestimated the number of
12   undocumented folks.
13       Q    Okay.  So you told me that the Secretary
14   first raised the idea of adding a citizenship
15   question to the census shortly after he was
16   confirmed.  You've testified that on March 10th,
17   you emailed him information showing that
18   undocumented residents are included in the
19   apportionment counts.  You've testified on
20   March 10th, you emailed him a blog post from the
21   Wall Street Journal highlighting a line that no
22   major government survey asks American's about

Page 82

1    their citizenship status.

2            Does that help you remember when the

3    Secretary first expressed interest in adding a

4    citizenship question to the decennial census?

5        A    No.

6        Q    And does that help you remember that it

7    was no later than March 10th that the Secretary

8    first asked you that question?

9        A    Again, you're speculating as to when he

10   asked.  But he appeared to have inquired about

11   some relevant aspects of it --

12       Q    Okay.

13       A    -- on March 10th.

14       Q    We'll mark this Comstock Exhibit 3.  And,

15   Mr. Comstock, is being handed Document Bates stamp

16   3685.

17           (Plaintiffs' Exhibit 3, Email, was

18   marked.)

19   BY MR. COLANGELO:

20       Q    Mr. Comstock, do you have Exhibit 3 in

21   front of you?

22       A    I do.

Page 83

1      Q    And this is an email from David Langdon
2    to you on March 10, 2017; is that right?
3      A    That's correct.
4      Q    Looks like this email was sent at
5    7:50 p.m. on March 10th; is that right?
6      A    That appears to be correct, yes.
7      Q    And this was the same night you emailed
8    the Secretary in response to, quote, your question
9    on the census, unquote; is that right?
10     A    Yeah.  Yes.
11     Q    Have you seen this email before?
12     A    I would assume, since it was sent to me.
13     Q    When's the last time you saw this email?
14     A    Probably at 7:51 p.m. on March 10th.
15     Q    Okay.  Why did Mr. Langdon send you this
16   email on the evening of March 10?
17          MR. GARDNER:  Objection.  Calls for
18   speculation.
19   BY MR. COLANGELO:
20     Q    You can answer the question.
21     A    Well, again, as I mentioned earlier,
22   there was -- we'd been told there was a

Page 84

1  notification process that needs to go to Congress.
2  And when you're not familiar with the details of
3  this, one of the first things you do in my kind of
4  position is try to get your arms around, okay,
5  what are the things that have to happen?
6  Particularly, what are the things that might
7  prevent you from being able to make a policy
8  change?  And so when you're told we have to notify
9  Congress about something at a certain time, that
10  then becomes a deadline we have to decide if we
11  need to take any action prior to.  And in this
12  case, there were a lot of other things potentially
13  being added to the census that it was not clear
14  that the administration was aligned with the prior
15  administration on, including a question having to
16  do with breaking out Middle Eastern North Africa
17  [sic] people the so-called MENA question.  There
18  was the sexual orientation/gender identity
19  questions.  So there was an ongoing process to try
20  to decide what, if anything, to do about these
21  sort of pending things that were basically held
22  over from the prior administration.

Page 85

1      Q    Okay.  So --

2      A    So I expect that's probably what Dave was

3   emailing me about.

4      Q    And was David in the conversation that

5   you had with Secretary -- with Secretary Ross

6   earlier that day about the census?

7      A    I have no idea, because I don't recall

8   the conversation.

9      Q    And you don't recall telling him about

10   that conversation?

11      A    I don't, no.

12      Q    Do you recall asking him to set up a

13   briefing on that day?

14      A    I -- it's entirely possible I did.  I

15   have no idea.

16      Q    Okay.  Do you think it's likely that it

17   was a coincidence that on the same day you were

18   emailing the Secretary about his question on

19   whether noncitizens were included for

20   apportionment purposes, that your employee was

21   scheduling a briefing for you on the 2020 census

22   topics?

Page 86

1      A    I think there's not, necessarily, linkage

2   between the two.  As I mentioned before, there

3   were other things happening with respect to the

4   census.  We were also trying to get our arms

5   around the budget of the census, all of which

6   would be entirely plausible reasons why we would

7   schedule a briefing.

8      Q    And you mentioned one of the reasons you

9   wanted, in general, to be briefed on Congressional

10  notifications of the 2020 census topics was so

11  that you had time to make policy decisions that

12  the administration might support; is that right?

13     A    No.  To make sure we were -- had time to

14  make any changes that needed to be made, based on

15  prior administration recommendations that we knew

16  were still pending.

17     Q    Okay.  And those prior recommendations

18  were the sexual orientation and gender identity

19  question and Middle Eastern North African issue;

20  is that right?

21     A    Those were two that I recall, yes.

22     Q    Do you recall also being concerned at

Page 87

1  this time about having enough time to add

2  citizenship as a topic on the Congressional

3  notification?

4      A   I don't recall that being a concern at

5  the time.

6      Q   Let's have this marked as Comstock

7  Exhibit 4.

8          (Plaintiffs' Exhibit 4, Email, was

9  marked.)

10  BY MR. COLANGELO:

11      Q   Handed the witness a document stamped

12  3686.  And we've marked this as --

13          MR. COLANGELO:  Is that Exhibit 4?

14  BY MR. COLANGELO:

15      Q   Do you have Exhibit 4 in front of you,

16  Mr. Comstock?

17      A   I do.

18      Q   And this is an email from David Langdon

19  to you, Ellen Herbst and Dennis Alvord, is that

20  how you pronounce his name?

21      A   Yeah, Dennis Alvord.

22      Q   Dennis Alvord.

Page 88

1          Dated March 15th; is that right?

2      A    Yes.

3      Q    Of 2017?

4      A    Yeah.  We did a lot late at night.

5      Q    So it seems.

6          Have you seen this email before?

7      A    Again, apparently, if it was to me, yes,

8  I probably saw it sometime around the 15th of

9  March, 2017.

10     Q    Do you recall seeing this email since the

11 15th of March, 2017?

12     A    Absolutely not.

13     Q    And this is an email from Mr. Langdon to

14 you and Ms. Herbst that says, quote, I'd like to

15 schedule a Census Bureau briefing on the 2020

16 census and ACS topics before the Census Bureau

17 does its Hill notifications on March 31st.

18          Do you see that?

19     A    Yeah.

20     Q    And then he goes on to say the goal is

21 for all to be on the same page for the

22 notification process for the topics this year and

Page 89

1    questions next year.

2         Do you see that?

3    A    Yeah.

4    Q    So Mr. Langdon is trying to schedule a

5    briefing before the Census Bureau notifications to

6    the Hill, correct?

7    A    Yes.

8    Q    And was this in follow-up to the

9    March 10th email we just discussed?

10   A    Again, I have no recollection of this

11   exchange, but it appears to be likely, yes.

12   Q    Okay.  Did the briefing that Mr. Langdon

13   was trying to schedule for you take place?

14   A    No idea.

15   Q    Would that be reflected on your calendar

16   if it did?

17   A    It's possible.

18   Q    The Census Bureau is not in the same

19   building that you work in; is that right?

20   A    That's correct.

21   Q    Okay.  In fact, are they in the

22   District of Columbia or are they in Maryland?

Page 90

1      A    I think they're actually just across the

2   line in Maryland.

3      Q    Okay.  And when you are briefed by

4   Census Bureau officials, are you typically briefed

5   in person or by telephone or in some other way?

6      A    Typically, they come over en masse and we

7   have a briefing in the Secretary's conference

8   room.

9      Q    Okay.

10     A    Or another conference room.

11     Q    Does the Secretary's conference room have

12  its own calendar?

13     A    Good question.  I don't know.

14     Q    In order to make sure that meetings

15  aren't double booked?

16     A    I'm -- somebody may well maintain a

17  calendar.  I have no idea.

18     Q    But, typically, when you meet with

19  Census Bureau officials, you meet with them in

20  person, right?

21     A    Typically, yes.

22     Q    And they aren't in the same building as

Page 91

1    you, they're coming from somewhere else, right?

2        A    Correct.

3        Q    They come over en masse.  By that, do you

4    mean there's more than one of them?

5        A    Typically, yes.

6        Q    How many people typically come over from

7    the Census Bureau?

8        A    Well, a lot of the briefings have 15 or

9    20 people in them.

10       Q    Okay.  So would you typically invite 15

11   or 20 people to come over en masse from Maryland

12   to meet with you in person and not include it on

13   your calendar?

14       A    I wouldn't have normally scheduled the

15   meeting, so -- again, I would -- I might have it

16   on my calendar if there's an invite, but I'm

17   not -- I do a lot of meetings that I'm just pulled

18   into, so I don't worry about putting them on a

19   calendar.

20       Q    But if people are coming from outside the

21   building to meet with you on an important issue,

22   you'd want to make sure you were available, right?

Page 92

1     A    Depends.  I mean, if the Secretary's

2  schedule interrupts that, then I'm not available,

3  so --

4     Q    Okay.  So you don't remember if this

5  briefing happened?

6     A    I don't recall a particular briefing, no.

7     Q    Okay.  When the Census Bureau comes over

8  en masse to meet with you in person, do they

9  typically bring or send you materials?

10    A    Sometimes they email things, yeah.

11    Q    Not always?

12    A    No.  I mean, as you notice, Ellen, who is

13 the deputy secretary, would be the person they'd

14 be coming to brief.  I would simply be an attendee

15 at the meeting.  So if I didn't show because

16 something else conflicted on my schedule, then the

17 meeting would occur any way, and that would be

18 that.

19    Q    Okay.  Take a look -- do you still have

20 Exhibit 3 in front of you?

21    A    Yes.

22    Q    Okay.  Let's go back to Exhibit 3.  This

Page 93

1    is David Langdon asking you what your schedule --

2        A    Right.

3        Q    -- looks like to receive a briefing on

4    the 2020 census --

5        A    Right.

6        Q    -- and ACS topics; is that right?

7        A    Correct.

8        Q    So is it your understanding that he was

9    briefing the acting deputy secretary or that he

10   was arranging everything for you?

11       A    Again, I have no recollection of this

12   exchange.  So it's entirely possible that this

13   briefing in the 3/10 email and briefing in the

14   3/15 email are one in the same or they could be

15   different.  I don't know.

16       Q    Okay.  Let's mark this Comstock 5.  This

17   is document Bates -- the witness has been handed

18   Comstock Exhibit 5 stamped 1321.

19           (Plaintiffs' Exhibit 5, Memo, was

20   marked.)

21   BY MR. COLANGELO:

22       Q    Mr. Comstock, do you have Exhibit 5 in

Page 94

1    front of you?

2         A    I do.

3         Q    Have you seen this document before?

4         A    I have.

5         Q    When's the first time you saw this

6    document?

7         A    Probably when we reviewed a draft in the

8    Justice Department.

9         Q    Okay.  When was that?

10        A    I couldn't tell you the date.

11        Q    Was it near in time to the date below

12   Secretary Ross's signature, which is June 21,

13   2018?

14        A    I'd say that's likely, yes.

15        Q    When's the last time you saw this

16   document?

17        A    Right now.

18        Q    When's the last time before right now

19   that you saw this document?

20        A    I think maybe yesterday.  I can't recall.

21        Q    Okay.  Did you draft this memo?

22        A    I did not draft this memo, no.

Page 95

1      Q    Did you assist in drafting this memo?

2      A    I provided some edits to this memo.

3      Q    Okay.  Who else assisted in providing

4  edits to the memo?

5      A    The Office of General Counsel.

6      Q    Who in the Office of General Counsel?

7      A    I believe Mike Walsh.

8      Q    Anyone else?

9      A    There may have been other counsel.  I

10  don't know.

11      Q    Did Peter Davidson provide edits to this

12  memo?

13      A    It's entirely possible he did.

14      Q    Did James Uthmeier provide edits to this

15  memo?

16      A    It's possible, yes.

17      Q    The second sentence of this memo says,

18  "Soon after my appointment as Secretary of

19  Commerce, I began considering various fundamental

20  issues regarding the upcoming 2020 census,

21  including funding and content.  Part of these

22  considerations included whether to reinstate a

Page 96

```
 1   citizenship question, which other senior
 2   administration officials had previously raised."
 3        A    Yes.
 4        Q    Do you see that?
 5        A    I do.
 6        Q    Do you recall when -- strike that.
 7             Do you know what time period the
 8   Secretary is referring to in this memo when he
 9   says, "Soon after my appointment, I began
10   considering various fundamental issues"?
11        A    Well, it appears that he would be talking
12   about spring of 2017.
13        Q    And the Secretary says in this memo, "My
14   staff and I thought reinstating a citizenship
15   question could be warranted."
16             Do you see that line?
17        A    Yep.
18        Q    Okay.  Who is the Secretary referring to
19   when he says my staff and I?
20        A    That probably includes me and could
21   include other staff.
22        Q    Which other staff?
```

Page 97

1     A   Other staff involved in this process

2  would include James Uthmeier, Mike Walsh,

3  Wendy Teramoto, the Census staff.  You know,

4  again, the entire department that works for him,

5  so --

6     Q   Okay.  He refers in that line to, "My

7  staff and I thought reinstating a citizenship

8  question could be warranted."

9          Is that right?

10    A   Right.  So he's likely talking about me.

11 And, again, whether he discussed this with

12 Eric Branstad, I have no idea.  Izzy Hernandez was

13 working on this for a while, so he might have

14 talked to him about it.  And then, obviously,

15 James Uthmeier was working on this.  Ellen Herbst,

16 whether he discussed it with her, I don't know.

17    Q   Let me ask you another question about

18 your review of this memo.  You mentioned that

19 before today, the last time you saw it was

20 yesterday; is that right?

21    A   Right.  Counsel showed it to me.

22    Q   And who was present at that meeting?

Page 98

1      A    At the meeting yesterday?

2      Q    Yes.

3      A    Counsel sitting right here.

4      Q    Can you identify them for the record,

5    please?

6      A    Josh, Kate, Mike Walsh, David.

7      Q    Those four counsel?

8      A    Yeah.

9      Q    Okay.  And when you saw this memo before

10   June 21st, why were you shown this memo?

11         MR. GARDNER:  Objection.  Calls for

12   speculation.

13   BY MR. COLANGELO:

14     Q    You can answer.

15     A    Well, I would be shown this memo because

16   it involves an issue I worked on, so -- as one of

17   the senior counsels for the Secretary, they would

18   typically run something like this by me.

19     Q    And did you meet to discuss it or were

20   you shown the memo by email?

21     A    Email.  And I'm sure I discussed it with

22   them, as well.

Page 99

1      Q    And who did you discuss it with when you

2    were shown this -- the draft of this memo before

3    June 21st?

4      A    I would have discussed it with counsel.

5      Q    The same counsel you just identified?

6      A    No.   Because I wasn't working with the

7    Justice Department folks at the time.   So this

8    would have been internal at Commerce.

9      Q    Okay.   I thought you said it came over

10   from the Justice Department.

11     A    It did, the first draft.

12     Q    Okay.   What do you mean by I wasn't

13   working with Justice Department folks at the time?

14     A    I was not involved with direct

15   interaction with the Justice Department --

16     Q    Okay.

17     A    -- I was seeing them through the Office

18   of General Counsel.

19     Q    So you discussed with your colleagues in

20   OGC?

21     A    Correct.

22     Q    The same colleagues who are here today?

Page 100

1      A    Michael Walsh, I know I did.  I don't
2  recall if I discussed with David or not.
3      Q    Anyone else?
4      A    I likely talked to James Uthmeier.
5      Q    Anyone else outside --
6      A    Peter Davidson.
7      Q    I'm sorry.  Please answer.
8      A    No.  Peter Davidson.  But those would
9  have been the likely candidates.  Again, I don't
10  recall the exact discussions.
11     Q    This was two months ago, correct?
12     A    Correct.
13     Q    Did you discuss the draft of this memo
14  with anybody outside the Office of the General
15  Counsel at Commerce?
16     A    Other than when the Secretary signed it,
17  no.
18     Q    Okay.  Tell me who you discussed it with
19  when the Secretary signed it?
20     A    The Secretary.
21     Q    And what did you discuss with him when he
22  signed it?

Page 101

1      A    Mr. Secretary, the Justice Department

2    recommends that we file this supplemental memo,

3    and so we recommend you sign it.

4      Q    And did he read it when you showed it to

5    him?

6      A    I believe he did, yes.

7      Q    Had you shown it to him before that

8    conversation?

9      A    I -- I don't know.

10     Q    Do you know if OGC had shown it to him

11   before that conversation?

12     A    It's entirely possible, yes.

13     Q    Do you know if the Justice Department

14   showed it to him before that conversation?

15     A    I don't believe the Justice Department

16   came over to meet with them.

17     Q    Did you talk with anyone other than the

18   Secretary or your colleagues from the Office of

19   General Counsel about this memo before June 21st?

20     A    Not that I recall.

21     Q    Did you discuss with it

22   Karen Dunn Kelley?

Page 102

1      A    That's entirely possible, yeah.

2      Q    Okay.  Anyone else?

3      A    Again, don't recall specific meetings on

4    this.  I think it was done largely in back and

5    forth as people were available.

6      Q    Did you discuss it with Wendy Teramoto?

7      A    No.  I don't believe I discussed it with

8    Wendy.

9      Q    Wendy is the chief of staff?

10     A    Yes.

11     Q    And you report to her?

12     A    Yes.

13     Q    Do you know why you wouldn't have

14   discussed it with Wendy?

15     A    Wendy doesn't get very involved in the

16   policy matters, typically.

17     Q    Why not?

18     A    Because she's chief of staff.  That's her

19   call.

20     Q    Got it.

21          You mentioned that you were likely one of

22   the people the Secretary's referring to when he

Page 103

1   says my staff and I thought reinstating a

2   citizenship question could be warranted.

3        A   Uh-huh.

4        Q   Why did you think in the spring of 2017

5   that reinstating a citizenship question could be

6   warranted?

7        A   Because a citizenship question had

8   previously been asked.  It's asked by every other

9   major democracy in the world, so why wouldn't we

10  ask?

11       Q   And why did you want a citizenship

12  question?

13       A   Again, I think it provides important

14  information that's used for all kind of programs.

15  And if you want a complete and accurate census,

16  you would provide it.

17       Q   What caused you to form a view on whether

18  the citizenship question should or should not be

19  added?

20       A   When I was -- and I didn't really know

21  that it wasn't included in the census, but once I

22  became informed of that, it struck me as odd that

Page 104

1  we don't ask the question.

2      Q    And you testified earlier that the

3  Secretary is the first person who raised it to

4  you?

5      A    In my employment at the Department of

6  Commerce, yes.

7      Q    Do you recall discussing it before you

8  worked at the Commerce Department?

9      A    Probably sometime in the last 30-odd

10 years, I'm in -- you know, in political science

11 and politics, so I'm sure I discussed at.

12     Q    But the first time in 2017 that you

13 recall considering this issue is when the

14 Secretary raised it with you?

15     A    Correct.

16     Q    And this memo says the Secretary began

17 considering it soon after his appointment?

18     A    Correct.

19     Q    And his appointment was February 28th

20 we've established --

21     A    That's correct.

22     Q    -- of 2017?

Page 105

1      A    Again, assuming that's the correct date,

2   yes.

3      Q    I'm sure your counsel will advise us at

4   the break if that's not the correct date.

5      A    I could look it up if you need me to.

6      Q    Okay.  So you came to the view at some

7   point in the spring of 2017 that a citizenship

8   question ought to be included.  What materials did

9   you review in coming to that view?

10     A    The fact that it's not on the census.

11     Q    That's it?

12     A    That's sufficient, from my point of view,

13   yes.

14     Q    You weren't concerned about any of

15   the -- strike that.

16          Are you aware that in developing surveys

17   and statistical instruments, the Census Bureau and

18   other statistical agencies consider the impact of

19   asking a question on a range of factors, including

20   response rates?

21     A    Absolutely.  Yes.

22     Q    And were you concerned about the

Page 106

1    Census Bureau's processes for changing statistical

2    instruments when you formed a view that the

3    citizenship question should be added?

4            MR. GARDNER:  Objection.  Form.

5    BY MR. COLANGELO:

6        Q   You can answer.

7        A   Okay.  Well, again, I think you need to

8    separate this out.  My decision or my belief that

9    a -- a citizenship question should be included

10   does not in any way change the process by which it

11   might get included.  So they're two separate

12   things.  I can hold the belief that a certain

13   action might be warranted or should be taken

14   independent of any analysis of whether or not that

15   should be done.  That's two separate things.  So I

16   think you're conflating the two.

17           The fact that I may think that as an

18   objective, hypothetical question should one be

19   added, I can form that belief quite quickly and

20   hold that.  That's, then, separate from is that

21   the right decision to make for a variety of

22   reasons, including some of the issues that you

Page 107

1    just outlined.

2        Q   And so in forming your view that a

3    citizenship question should be added --

4        A   Again, you're characterizing it in a way

5    that I'm not.  In forming my view that a

6    citizenship question would be appropriate to

7    include in a census, that's one thing.

8        Q   Okay.

9        A   Should be added is a separate --

10       Q   Hang on a second.  I haven't added a

11   question yet.

12           The Secretary's memo says my staff and I

13   thought reinstating a citizenship question could

14   be warranted, right?  And you've testified that

15   you were among the people he was referring to when

16   he says my staff and I.

17       A   Right.

18       Q   So you were of the view that the

19   citizenship -- adding a citizenship question could

20   be warranted?

21       A   Yes.

22       Q   And I'm asking in forming the view that

Page 108

1    adding a citizenship question could be warranted,

2    you relied only on common sense; is that what you

3    testified?

4           MR. GARDNER:   Objection.

5    Mischaracterizes the witness's prior testimony.

6    BY MR. COLANGELO:

7       Q   What did you rely on in forming that

8    view?

9       A   So, again, the key word is could.  Could

10   be warranted, meaning it is worthy of

11   investigating further.  That is what the document

12   says.

13      Q   What did you rely on in forming that

14   view?

15      A   The fact that other countries ask this

16   information; the fact that we ask it on the ACS of

17   a percentage of the population every year; the

18   fact that as a citizen, most people wouldn't be

19   concerned with answering that question.  All of

20   those things are relevant.

21      Q   Did you research the statistical

22   practices of other countries in the spring of

1  2017?

2       A    No.

3       Q    When did you -- did there come a time

4  when you researched the statistical practices of

5  other countries?

6       A    Why would that be relevant?

7       Q    Mr. Comstock, you just testified that in

8  forming the view that adding a citizenship

9  question could be warranted, among the things you

10  considered was that other countries do.  So I'm

11  asking you --

12       A    Okay.

13       Q    -- did you research the practices of

14  other countries?

15       A    By that, you mean did I -- did I

16  determine that other countries ask the question?

17  Yes.

18       Q    In the spring of 2017?

19       A    Yeah.  I think we did a quick Google

20  search, you know.

21       Q    So you Googled the census practices of

22  other countries in order to determine that adding

Page 110

1    a citizenship question could be warranted?

2         A    Again, my formulation of a -- of a

3    decision that it could be warranted is largely

4    based on common sense.

5         Q    Okay.  I just want to make sure that I

6    understand.  That as to the part of your answer

7    that related to the practices of other countries,

8    in the spring of 2017, you formed that view by

9    Googling it?

10        A    I may have asked if other countries did

11   it or I may have gotten online and looked.  I

12   don't recall.

13        Q    Who would you have asked if you asked?

14        A    I likely would have asked somebody from

15   Census or I might have asked David Langdon.

16        Q    And if you asked, would that be reflected

17   in your -- in your email or your memo somewhere?

18        A    If it was, you could have found the

19   email.  So I, obviously, did not send an email if

20   I asked that question.

21        Q    Okay.  The --

22             MR. GARDNER:  Matt, I'm sorry.  I didn't

Page 111

1    mean to break your line of questioning.  Actually,

2    we've been going about an hour and a half.  Would

3    now be an appropriate time for a break?

4            MR. COLANGELO:  Yes.

5            MR. GARDNER:  Let's take a break.

6            VIDEOGRAPHER:  This concludes Media Unit

7    Number 1.  The time on the video is 10:32 a.m.  We

8    are now off the record.

9            (Off the record.)

10           VIDEOGRAPHER:  This begins Media Unit

11   Number 2.  The time on the video is 10:45 a.m.  We

12   are on the record.

13   BY MR. COLANGELO:

14       Q    Mr. Comstock, we were talking about the

15   Secretary's June 21, 2018 memo which we marked as

16   Exhibit 5.  Do you still have that in front of

17   you?

18       A    I do.

19       Q    Okay.  That memo says that other senior

20   administration officials had previously raised

21   this question.  Do you see that line?

22       A    Yes.

Page 112

1    Q    Who are those other senior administration

2  officials?

3    A    You'd have to ask the Secretary.

4    Q    You don't know yourself?

5    A    I don't.

6    Q    You have no idea which other senior

7  administration officials raised this question,

8  other than the Secretary?

9    A    No.

10    Q    You never asked him where the idea came

11  from?

12    A    Nope.

13    Q    He never told you where the idea came

14  from?

15    A    Nope.

16    Q    You spent a lot of time on this issue?

17    A    Not relative to a lot of other things I

18  work on, no.

19    Q    How would you characterize the amount of

20  time you spent on this issue?

21    A    One one-hundredth of my time.

22    Q    You agree that it's an important issue?

Page 113

1      A    Correct.

2      Q    It was important to the Secretary?

3      A    Correct.

4      Q    He was motivated to get this done?

5      A    He was working on a lot of different

6  issues at the time.

7      Q    But this one was important to him?

8      A    Yes.  Absolutely.

9      Q    Okay.  And when you saw the draft of this

10  memo before June 21st and it refers to other

11  senior administration officials, you didn't

12  yourself have any view or understanding of who

13  those other administration officials were?

14      A    I did not, no.

15      Q    You didn't ask the secretary who those

16  other administration officials were?

17      A    No.

18      Q    Okay.  When recommending that he sign the

19  memo, he didn't say to you who are the other

20  senior -- who the other senior administration

21  officials were?

22      A    We did not discuss that, no.

Page 114

1      Q    And you said this came over from the
2  Justice Department?

3      A    Correct.

4      Q    Who sent it over, do you remember?

5      A    I don't know.

6      Q    Let's mark Exhibit 6.

7           (Plaintiffs' Exhibit 6, Email, was
8  marked.)

9           MR. COLANGELO:   The witness has been
10  handed document stamped 2561.   This has been
11  marked Exhibit 6.

12  BY MR. COLANGELO:

13      Q    Do you have Exhibit 6 in front of you?

14      A    I do.

15      Q    Have you seen this email before?

16      A    I'm not on the email, so, no.

17      Q    So this is the first time you've seen
18  this message?

19      A    Yeah.   I -- I don't recall seeing this
20  when it was sent.

21      Q    Is today the first time you've seen this
22  email?

Page 115

1      A    I think so, yes.

2      Q    And you see this is an email from

3  Brooke Alexander to Hillary Geary?

4      A    Yes.

5      Q    Who is Brooke Alexander?

6      A    She is the Secretary's confidential

7  assistant -- or at the time, she was.  She's no

8  longer.

9      Q    And do you understand the recipient of

10  this email to be the Secretary's wife?

11      A    That appears to be who it's directed to,

12  yes.

13      Q    And this email is dated March 5th of

14  2017, correct -- I'm sorry.  Strike that.

15          This email is dated April 5th of 2017; is

16  that correct?

17      A    That's what's on there, yes.

18      Q    And you see that Ms. Alexander is

19  emailing Ms. Ross and says, quote, do you have

20  plans following Newseum?  I'm asking because

21  Steven Bannon has asked that the Secretary talk to

22  someone about the census, and around 7:00 to

Page 116

1    7:30 p.m. is the available time.

2          Do you see that?

3      A    Yeah.

4      Q    Okay.  You know who Steven Bannon is?

5      A    I do.

6      Q    Who is Steve Bannon?

7      A    He was an advisor to the President.

8      Q    And he had that position at the time of

9    this email, correct?

10     A    I do not know.

11     Q    And who did Mr. Bannon want the Secretary

12   to talk to?

13         MR. GARDNER:  Objection.  Calls for

14   speculation.  Lack of foundation.

15         THE WITNESS:  I have no idea.

16   BY MR. COLANGELO:

17     Q    Do you understand that the

18   second -- that -- strike that.

19         Do you understand that Mr. Bannon wanted

20   the Secretary to talk to Kris Kobach?

21     A    I wasn't part of this email or this

22   conversation, so I don't know who he wanted him to

Page 117

1    talk to.

2         Q    Did the Secretary speak with Mr. Bannon

3    that night?

4         A    I don't know.

5              MR. GARDNER:  Objection.  Calls for

6    speculation.  Lack of foundation.

7              THE WITNESS:  I do not know.

8    BY MR. COLANGELO:

9         Q    Did the Secretary speak with Kris Kobach

10   on April 7, 2017?

11        A    No idea.

12        Q    Did you join a call with the Secretary

13   regarding the census on April 5th of 2017?

14        A    I have no idea.

15        Q    You don't know if you joined the call

16   with the Secretary on April 5th of 2017?

17        A    I don't know what I was doing on

18   April 5, 2017 without looking at a calendar or

19   something else that would remind me.  I'd have to

20   go through my emails that day.  I could not tell

21   you what I was doing on that day.

22        Q    Do you know who Kris Kobach is?

Page 118

1      A    I believe he's somebody with State of

2    Kansas maybe.

3      Q    And have you spoken to Mr. Kobach before?

4      A    I've never spoken to Mr. Kobach.

5      Q    Have you emailed with Mr. Kobach?

6      A    I've never emailed with Mr. Kobach.

7      Q    And after the call that's referred to in

8    this email, did the Secretary tell you what he

9    discussed?

10     A    No.

11          MR. GARDNER:  Objection.  Lack of

12   foundation.

13          THE WITNESS:  No.

14   BY MR. COLANGELO:

15     Q    Who would know what was discussed on this

16   phone call?

17          MR. GARDNER:  Objection.  Calls for

18   speculation.  Also, lack of foundation.

19   BY MR. COLANGELO:

20     Q    You can answer.

21     A    The parties to the call.

22     Q    You were working on the census in the

Page 119

1    spring of 2017, correct?

2         A    Yes.

3         Q    And the Secretary frequently asked you

4    for updates on the census-related matters in the

5    spring of 2017, right?

6         A    I wouldn't characterize it as frequently.

7         Q    Did the Secretary ever ask you for

8    updates on census matters in the spring of 2017?

9         A    Yes, he did.

10        Q    Did he ever update you on developments

11   that he was aware of regarding the census in the

12   spring of 2017?

13        A    It's unusual for the Secretary to update

14   me on anything.

15        Q    Would the Secretary have told you if he

16   had a conversation with Steven Bannon about the

17   census?

18        A    Not necessarily.

19        Q    Would he have told you if he had a

20   conversation about the census with Kris Kobach?

21        A    Not necessarily.

22        Q    Why not?

Page 120

1              MR. GARDNER:  Objection.  Form.

2              THE WITNESS:  I wouldn't speculate, but

3     he's the Secretary.  He makes his own decisions.

4     BY MR. COLANGELO:

5         Q    So has the Secretary ever told you about

6     a conversation he had with someone else?

7              MR. GARDNER:  Objection.  Form.

8              THE WITNESS:  Yes.  He reports to me

9     sometimes if he feels that it's essential that I

10    know the substance of conversation.

11    BY MR. COLANGELO:

12        Q    Okay.

13             MR. COLANGELO:  Can we mark this

14    Exhibit 7?

15             (Plaintiffs' Exhibit 7, Email, was

16    marked.)

17             THE WITNESS:  Thank you very much.

18    BY MR. COLANGELO:

19        Q    Handed the witness a document stamped 763

20    and marked Exhibit 7.

21             Mr. Comstock, do you have Exhibit 7 in

22    front of you?

Page 121

1       A    I do.

2       Q    Have you seen this email before?

3       A    No, I haven't.

4       Q    This is the first you've ever seen this

5    email?

6       A    Yes.

7       Q    Okay.  If you turn to the second page --

8       A    I'm sorry.  I'm just reading the

9    document.

10           Okay.

11      Q    Do you see at the bottom of page -- of

12   the first page of this exhibit, Mr. Comstock,

13   there's an email from Kris Kobach to

14   Wendy Teramoto --

15      A    Right.

16      Q    -- on July 21, 2017; is that right?

17      A    That's what it says.

18      Q    And the email says, "Wendy, nice meeting

19   you on the phone this afternoon.  Below is the

20   email that I sent to Secretary Ross.  He and I had

21   spoken briefly on the phone about this issue at

22   the direction of Steven Bannon a few months

Page 122

1   earlier."

2          Do you see that?

3      A   I see that.

4      Q   Okay.  That was the call on April 5th

5   that we were just talking about, right?

6          MR. GARDNER:  Objection.  Lack of

7   foundation.  Calls for speculation.

8          THE WITNESS:  Doesn't specify when the

9   phone call took place.

10  BY MR. COLANGELO:

11     Q   And did Wendy tell you she got this email

12  from Kris Kobach in July of 2017?

13     A   No.

14     Q   You've never spoken to Wendy about

15  Kris Kobach, at all?

16     A   Not that I recall.

17     Q   Is there anyone else that you're aware of

18  that Steven Bannon directed the Secretary to talk

19  to about the census, other than Kris Kobach?

20         MR. GARDNER:  Objection.  Lack of

21  foundation.

22         THE WITNESS:  I have no knowledge of any

Page 123

1   conversations with Steven Bannon, so I wouldn't

2   know who he might have suggested the Secretary

3   talk to.

4   BY MR. COLANGELO:

5       Q   Have you ever spoken to Steven Bannon

6   yourself?

7       A   I have never spoken to Steven Bannon

8   myself.

9           MR. COLANGELO:  Can we have this marked

10  Exhibit 8?

11          (Plaintiffs' Exhibit 8, Email, was

12  marked.)

13  BY MR. COLANGELO:

14      Q   This is document stamped 3709.

15      A   Uh-huh.

16      Q   Do you have Exhibit 8 in front of you?

17      A   Uh-huh.

18      Q   Who's Mark Neuman?

19      A   Mark Neuman is a former -- I think he was

20  formally chair of a census advisory committee, and

21  he was a member of the transition -- I don't know

22  which aspect of transition but, basically,

Page 124

1    advising on census.

2         Q    How long have you known Mark Neuman?

3         A    I think I met Mark Neuman probably in

4    December or January of either December 2016 or

5    January 2017.  I don't recall which.

6         Q    And did you meet him in your capacity as

7    the confirmation Sherpa?

8         A    Yes.

9         Q    Did you discuss any Commerce Department

10   policy matters with him during the transition?

11        A    Not that I recall.

12        Q    Did you discuss any Census Bureau policy

13   matters with him during the transition?

14        A    We discussed -- I mean, he basically

15   briefed the Secretary on the Census operation,

16   some of the challenges they face, the whole issue

17   of hard-to-count populations, the challenges you

18   face hiring temporary workers, concerns about the

19   budget, whether they're properly funded.  Those

20   were the primary discussion points.

21        Q    Where does Mr. Newman work right now?

22        A    He is a senior VP at -- I don't know the

Page 125

1   name of the organization, but I know they own

2   Victoria's Secret.

3       Q    He's not a government employee right now?

4       A    No.

5       Q    Okay.  How often do you speak with him?

6       A    I last saw him several months ago when we

7   ran into each other at a party.

8       Q    And over the course of your time at the

9   Commerce Department, how often have you spoken

10  with him?

11      A    Maybe a dozen times.

12      Q    By telephone?

13      A    Yep.

14      Q    Have you ever met with him in person?

15      A    I have met with him in person.

16      Q    How many times?

17      A    I think he briefed the Secretary maybe

18  two times, three times that I can recall, and he

19  had me over for dinner one time at his house to

20  meet a potential chief of staff of the

21  Census Bureau.

22      Q    What did he brief the Secretary on?

Page 126

1     A   Again, the whole operation of the Census,

2   background on it.  It's an area I was not familiar

3   with, and he was one of the folks on the

4   transition who was familiar with the Census.

5     Q   Have you been present for briefings he

6   gave the Secretary on the citizenship question?

7     A   I've been present -- did we cover

8   citizenship?  He covered citizenship at one of the

9   briefings.

10    Q   When was that?

11    A   I couldn't tell you the date.

12    Q   What did he say about citizenship in the

13  briefing that you attended with him?

14    A   We talked about how citizenship could

15  be -- what would it be useful for and in terms of

16  a government agency.  So the Voting Rights Act

17  enforcement, that's what the ACS data has provided

18  to the Justice Department.

19    Q   When was that briefing?

20    A   Again, sometime -- sometime in the

21  spring.  I can't -- couldn't tell you exactly

22  when.

Page 127

1      Q    Is Mr. Neuman a lawyer?

2      A    Good question.  I don't know.

3      Q    Does Mr. Neuman have a voting rights

4    background?

5      A    I couldn't tell you.

6      Q    Take a look at Exhibit 8, which is an

7    email from you to Mr. Neuman at the bottom of the

8    page dated April 13, 2017.  Do you see that?

9      A    Uh-huh.

10     Q    And the email says, "Hi, Mark.  Quick

11   question.  When does Census need to notify

12   Congress regarding the questions that will be on,

13   A, the ACS and, B, the decennial census?"

14     A    Correct.

15     Q    Why were you asking Mark this question?

16     A    Likely because Mark would know the

17   answer.

18     Q    Why didn't you ask the Office of General

19   Counsel?

20     A    Because at the time, there was nobody in

21   the Office of General Counsel that I

22   would -- would have been familiar with.

Page 128

1      Q    I'm not sure I understand what you mean
2   by nobody in the Office of General Counsel that
3   you would have been familiar with.
4      A    Well, there was nobody in the Office of
5   General Counsel that I was -- had easy access to
6   that works on census issues.
7      Q    You're the director of the office policy
8   in the Office of the Secretary?
9      A    Correct.
10     Q    Okay.  But you didn't think you could ask
11  the General Counsel's office this question at the
12  time?
13     A    Well, if you note the date, the time of
14  this email, it's 9:58 p.m.
15     Q    Uh-huh.
16     A    I'm trying to get an answer.  And I'm
17  pretty certain there's going to be nobody in the
18  Office of General Counsel at 9:58 p.m.
19     Q    Did you need an answer that night?
20     A    I usually try to get answers as quickly
21  as I can, yes.
22     Q    Why were you asking this question?

Page 129

1     A   Probably because it was on my list of

2  things to do, and I was working, trying to get

3  those things done.

4     Q   And how did it come to be on your list of

5  things to do?

6     A   Well, I may have been -- again, the

7  Secretary might have asked me about when do we

8  need to get questions, when do we need to notify

9  the Congress?

10    Q   Okay.  So you asked Mr. Neuman this

11 question in order to respond to a question from

12 the Secretary?

13    A   I don't know the genesis because I didn't

14 say in the email why I need the information.

15    Q   Why didn't you ask the Census Bureau this

16 question?

17    A   Because in April, I probably had no

18 contracts over at the Census Bureau.

19    Q   By April 13th of 2017, had you already

20 discussed the citizenship question with

21 Mr. Neuman?

22    A   I have no idea.

Page 130

1     Q    Take a look at Mr. Neuman's reply to your

2    email.  This is at the top of Exhibit 8.  He says,

3    "I believe that the annual notification to the

4    Congressional committee relating to the

5    questionnaire content additions for 2020 census

6    just take place."

7         And then do you see in the second

8    paragraph he says, "There will be another

9    opportunity next year"?

10    A    Right.

11    Q    What does Mr. Neuman mean by opportunity?

12         MR. GARDNER:  Objection.  Calls for

13    speculation.

14         THE WITNESS:  Again, if you notice the

15    rest of his statement that you didn't read, plenty

16    of questions relating to sexual orientation.  So

17    we were focused on the issue of what was going to

18    be included in the questions.  More precisely,

19    what was not going to be added.

20         The prior administration had wanted to

21    add, I might note, to the decennial census a

22    question on sexual orientation and gender

Page 131

1   identity.  So for all the people that are raising

2   an uproar right now about the addition of this

3   question, apparently there was no concern about

4   adding such a question on another sensitive topic

5   last year.

6         So leaving that aside, I think he is

7   simply pointing out to the extent there's -- we

8   have some questions we'd like to see added, there

9   will be an opportunity next year.

10  BY MR. COLANGELO:

11      Q   So had you talked to Mr. Neuman about a

12  question you'd like to see added?

13      A   I don't recall.

14      Q   Okay.  But the sexual orientation and

15  gender identity question was not included as a

16  topic, right?

17      A   Correct.

18      Q   And that was because you came to the

19  policy position you did not want to ask that

20  question, correct?

21      A   That was the administration's conclusion,

22  yes.

Page 132

1    Q   So Mr. Neuman can't have been talking

2    about the opportunity to put that question back on

3    that you had just decided not to have included,

4    right?

5    A   That would be speculation.  I don't know

6    what he's referring to.

7    Q   Okay.  But you did testify he was

8    referring to the opportunity to put a question on?

9    A   He was noting that there would be another

10   opportunity to place a question, should somebody

11   decide to do that next year.

12   Q   And then the next paragraph of his email

13   says, "I recommend that you ask the Bureau to

14   provide a list of their response rates on all

15   demographic questions currently asked on the ACS.

16   You will see whether certain demographic questions

17   have lower response rates than others, especially

18   among certain demographic groups.  That is

19   something that can be provided off the shelf."

20   A   Yes.

21   Q   Why is he recommending that you ask that

22   information from the Bureau?

Page 133

1           MR. GARDNER:  Objection.  Calls for

2     speculation.

3           THE WITNESS:  Again, to the extent we

4     were discussing the possibility of adding the

5     citizenship question, that would be a logical

6     question to ask.

7     BY MR. COLANGELO:

8        Q   When did you first discuss the

9     possibility of adding a citizenship question with

10    Mr. Newman?

11       A   Again, for the umpteenth time, I don't

12    recall the exact date.

13       Q   But you agree that based on this email

14    exchange, that you had already had that

15    conversation before April 14th of 2017?

16       A   Again, I have -- I don't recall when we

17    first discussed it.  It's entirely possible.

18       Q   Not just possible, but likely, right?

19    Why else would Mr. Newman be talking about the

20    opportunity to add a question?

21          MR. GARDNER:  Objection.  Calls for

22    speculation.

Page 134

1        THE WITNESS:  Again, if we were

2   considering changing the questions, it would be

3   important to know.

4   BY MR. COLANGELO:

5        Q   And if you're considering adding a

6   citizenship question, it would also be important

7   to know the response rates on all demographic

8   questions; is that right?

9        A   That would be one of the questions you

10  would ask, yes.

11       Q   Okay.  Did the Secretary discuss the

12  citizenship question with Mr. Newman in the spring

13  of 2017?

14       A   You'd have to ask the Secretary.

15       MR. GARDNER:  Objection.  Lack of

16  foundation.

17  BY MR. COLANGELO:

18       Q   I'm sorry.  You were both speaking at the

19  same time.

20       MR. GARDNER:  Objection.  Lack of

21  foundation.

22  BY MR. COLANGELO:

Page 135

1    Q   And now please answer.

2    A   I would say you'd have to ask the

3  Secretary.

4    Q   Did he ever tell you that he spoke with

5  Mr. Newman about the citizenship question?

6    A   I'm fairly certain he was -- he did talk

7  to him at some point.

8    Q   Okay.  When was that?

9    A   I couldn't tell you.

10    Q   Did Mr. Newman ever say to you that he

11  had spoken to the Secretary about adding a

12  citizenship question?

13    A   It's possible, yeah.

14    Q   Okay.  When did he tell you?

15    A   Again, I don't recall the exact date.

16    Q   Try to place it, roughly.

17    A   To your question, was there discussion of

18  the possibility of adding a citizenship question

19  in the spring?  Yes.  That does not mean any firm

20  decision had been made.  We were exploring the

21  opportunity.

22    Q   I'm not asking you about decisions.  I'm

Page 136

1    just asking when the Secretary spoke to

2    Mr. Newman.

3        A    Again, I keep telling you I don't know

4    the exact dates he spoke to him.

5        Q    Okay.

6        A    I know he did speak to Mr. Newman.  I

7    don't know the exact dates.

8        Q    And I'm not sure I got an answer, but

9    forgive me if I did.

10            When did Mr. Newman tell you that he had

11   spoken to the Secretary about this citizenship

12   question?

13       A    Again, I do not recall the exact dates of

14   conversations.

15       Q    Okay.

16       A    If you don't have an email that specifies

17   it, I can't tell you the date.

18       Q    All right.  Did you ask the Census Bureau

19   to give you the information that Mr. Newman

20   suggested in this email?

21       A    Possibly.  I don't recall.

22            In the decision memo we have such

Page 137

1    information, so, clearly, at some point, it was

2    asked.  I cannot tell you.

3        Q   Can you tell me what you mean by decision

4    memo?

5        A   The memo that the Secretary produced

6    documenting his decision.  There was a reference

7    to other response rates and demographic.  So,

8    clearly, at some point, the information became

9    available.

10       Q   And you're referring to the

11   March 26, 2018 from the Secretary to Karen

12   Dunn Kelley?

13       A   Yes.

14       Q   But you don't recall seeing that

15   information -- strike that.

16           MR. COLANGELO:  Let's mark Exhibit 9.

17           (Plaintiffs' Exhibit 9, Email, was

18   marked.)

19   BY MR. COLANGELO:

20       Q   We have marked a document stamped 3694 as

21   Exhibit 9.  Do you have this email in front of

22   you?

Page 138

1    A    I do.

2    Q    Have you seen this email before?

3    A    Yes.

4    Q    Before today, when is the last time you

5  saw this email?

6    A    Yesterday.

7    Q    And this is an email from

8  Brooke Alexander to you with a copy to

9  Wendy Teramoto; is that right?

10   A    Correct.

11   Q    Dated April 20, 2017?

12   A    Yep.

13   Q    And did you understand this to be a

14  message from the Secretary?

15   A    That's what Brooke's message says.

16   Q    Brooke has access to the Secretary's

17  email?

18   A    Yes.

19   Q    And is it -- okay.  Withdrawn.

20        Are you familiar with the National

21  Advisory Committee on Racial, Ethnic and Other

22  Populations?

Page 139

1        A    No.

2        Q    You have no idea what the National

3   Advisory Committee is?

4        A    I mean, I know it's an advisory committee

5   to Census, but outside of that, I -- I couldn't

6   tell you what they do, other than what their title

7   suggests that they do.

8        Q    So you're aware that there's a National

9   Advisory Committee on Racial, Ethnic and Other

10   Populations that advises the Census Bureau?

11        A    I take that from this email that's

12   correct, yes.

13        Q    And what do you understand the role of

14   the advisory committee to be?

15        A    To provide advice to the Census Bureau.

16        Q    Okay.  The message from Brooke speaking

17   for the Secretary to you says, "Earl, Census

18   director has on April 29th a meeting of the

19   National Advisory Committee.  We must get our

20   issue resolved before this" -- exclamation point,

21   and the must is underlined.

22            Do you see that?

Page 140

1      A    I see that.

2      Q    What is our issue?

3      A    I couldn't tell you.

4      Q    Our issue is the citizenship question,

5   right?

6           MR. GARDNER:  Objection.  Calls for

7   speculation.  Lack of foundation.

8           THE WITNESS:  I would say likely not,

9   actually, given there's no reason to believe the

10  National Advisory Committee on Racial, Ethnic and

11  Other Populations would be advising on a

12  citizenship question.

13  BY MR. COLANGELO:

14     Q    Were there other issues that you'd been

15  talking about with the Secretary involving the

16  census in the spring of 2017 that would relate to

17  the National Advisory's mandate?

18     A    Certainly the SOGI question would, and

19  the MENA question would.

20     Q    But the notification date for the SOGI

21  question was at the end of March in 2017 -- for

22  the SOGI topics, I should say, correct?

Page 141

1       A    Correct.

2       Q    So that was already resolved by April,

3   right?

4       A    I'm not certain of the timing, but MENA,

5   I think, was not resolved until sometime in the

6   spring or summer.

7       Q    And sticking with the SOGI question --

8   and for the record, that' S-O-G-I.  SOGI stands

9   for sex orientation and gender identity.

10      A    Correct.

11      Q    Would you conclude if the Secretary

12  referred to a National Advisory Committee on

13  Racial and Ethnic, Populations that the SOGI

14  question would be what he had in mind?

15      A    I would guess.  Again, this is

16  speculation, but my best guess, based on this

17  reference, is probably more like the MENA issue is

18  what was in front of us.

19      Q    Okay.  And describe the MENA issue?

20      A    The Middle Eastern North African

21  question.  There's a question as to whether you

22  ask two questions or you ask one question.  And

1  it's not a topic I spent a tremendous amount of

2  time on, but it was something that the Census was

3  very much discussing at the time.

4      Q   And had you discussed that issue with the

5  Secretary?

6      A   We had a conversation or two about it.

7  And, again, it was largely in the context of which

8  way to go on that question.

9      Q   And why would the Secretary have said

10 that that issue must be resolved by April 29th?

11         MR. GARDNER:  Objection.  Calls for

12 speculation.  Lack of foundation.

13 BY MR. COLANGELO:

14     Q   You can answer.

15     A   You know, again, at that point -- this is

16 shortly before a -- if I recall correctly, a

17 Congressional hearing that was going to go into

18 the census and probably wanted to have a position

19 to recommend to Director Thompson as to what he

20 should say to the advisory group.  Again, I don't

21 recall this reference or precisely what he was

22 speaking to.

Page 143

```
 1      Q   Okay.  This isn't a topic you'd spent a
 2  lot of time on, right, the Middle Eastern
 3  North African question?
 4      A   Correct.
 5      Q   There's no reason the Secretary would
 6  have referred to it as our issue, is there?
 7          MR. GARDNER:  Objection.  Calls for
 8  speculation.  Lack of foundation.
 9          THE WITNESS:  Again, depending on if his
10  perception was that there was an administration
11  policy call to make on it, he would refer to it as
12  our issue.
13  BY MR. COLANGELO:
14      Q   He could also have referred to the
15  citizenship issue as your issue, right?
16          MR. GARDNER:  Objection.  Calls for
17  speculation.  Lack of foundation.
18          THE WITNESS:  Again, I would say looking
19  at the context of the email, I would say that's an
20  unlikely connection.
21  BY MR. COLANGELO:
22      Q   And by April 20th of 2017, how many times
```

Page 144

1  had you discussed the citizenship question with

2  Secretary Ross?

3      A   I have no idea.

4      Q   More than a handful?

5      A   Possibly.

6      Q   Okay.  Would you say he was extremely

7  interested in the issue?

8      A   Certainly, when he raised it, he was

9  interested in it.

10      Q   Okay.  You wouldn't say he was extremely

11  interested in the MENA question, right?

12      A   When we discussed it, he was equally

13  interested in that.

14      Q   He didn't raise it with you with the same

15  frequency he raised the citizenship question,

16  right?

17      A   That's correct.

18      Q   Why was Wendy Teramoto copied on this

19  email?

20          MR. GARDNER:  Objection.  Calls for

21  speculation.

22          THE WITNESS:  Couldn't tell you.

Page 145

1    BY MR. COLANGELO:

2        Q    Did you speak with her about this issue

3    after you got this message?

4        A    It's possible.  I don't recall.

5            MR. COLANGELO:  Can we mark this

6    Exhibit 10?

7            (Plaintiffs' Exhibit 10, Email, was

8    marked.)

9    BY MR. COLANGELO:

10       Q    Handed the witness a document stamped

11   3710 and we've marked it as Exhibit 10.

12       A    Okay.

13       Q    Have you read this email?

14       A    Yep.

15       Q    Okay.  You've seen this email before?

16       A    I have.

17       Q    When's the last time you saw this email?

18       A    Yesterday.

19       Q    When you saw this email yesterday, was it

20   redacted as it is in the form I've shown it to you

21   now or was it unredacted?

22       A    It was redacted.

Page 146

1      Q    Okay.  And you see that the Secretary has

2    written you an email on May 2, 2017 that says,

3    quote, worst of all, they emphasize they have

4    settled with Congress on the questions to be

5    asked.  I am mystified why nothing has been done

6    in response to my months' old request that we

7    include the citizenship question.  Why not?

8            Do you see that?

9      A    I see that.

10     Q    When did the Secretary make his months'

11   old request to include the citizenship question?

12     A    Again, sometime in the spring.

13     Q    Probably on March 10th when you emailed

14   him the Wall Street Journal blog post?

15     A    Potentially.  I don't recall.

16     Q    Who does the "they" refer to in the line

17   I just read you from the Secretary's email?

18          MR. GARDNER:  Objection.  Calls for

19   speculation.

20          THE WITNESS:  I don't know.

21   BY MR. COLANGELO:

22     Q    You mentioned a minute ago the Census

Page 147

1    director in the -- this time period, had an

2    upcoming House appropriation hearing; is that

3    right?

4        A    I believe I said the Secretary had an

5    upcoming House appropriation hearing.

6        Q    Do you remember the date of that hearing?

7        A    I don't.

8             MR. COLANGELO:  Can we mark this Exhibit

9    Number 11?

10            (Plaintiffs' Exhibit 11, Email, was

11   marked.)

12   BY MR. COLANGELO:

13       Q    Okay.  This is -- have you had a chance

14   to look at this email?

15       A    Lot of black spots on it.  Okay.

16       Q    Have you seen this email before?

17       A    Apparently I must have seen it when I

18   wrote it.

19       Q    When's the last time before today you saw

20   this email?

21       A    Probably May 1, 2017.

22       Q    Okay.  And does this email reflect that

Page 148

1    you sent the Secretary, Director Thompson's House

2    appropriation subcommittee written testimony?

3        A    Yes.

4        Q    And his testimony was for, quote, this

5    Wednesday?

6        A    Right.  That's what it appears.

7        Q    And if I told you that -- oh, if you look

8    at the subject line it says, Wednesday, May 3rd;

9    is that right?

10       A    That's correct.

11       Q    Okay.  So let's refer back to Exhibit 10.

12       A    Yep.

13       Q    Now that you see the day before you had

14   sent the Secretary Mr. Thompson's written

15   testimony for the House appropriation subcommittee

16   hearing --

17       A    Right.

18       Q    -- what do you understand, worst of all

19   they emphasize they have settled with Congress to

20   mean?

21            MR. GARDNER:  Same objection.  Calls for

22   speculation.

Page 149

1          THE WITNESS:  Again, I'm not sure without

2    further context who they is.  He could be

3    referring to that advisory committee that you had

4    had in a previous email.  He could be referring to

5    Census.

6    BY MR. COLANGELO:

7         Q    Does the advisory committee establish the

8    content for the census?

9         A    Again, the context of this email is that

10   somebody appears to be emphasizing that they've

11   settled with Congress on the questions.  That

12   clearly is not the case, because questions aren't

13   due until March of 2018.  So they couldn't have

14   settled on the questions.

15        Q    And you see that at the top of

16   Exhibit 10, you email the Secretary saying, "On

17   the citizenship question, we will get that in

18   place"?

19        A    Uh-huh.

20        Q    Do you see that?

21        A    Yep.

22        Q    What did you mean by that?

Page 150

1        A    Well, it means that we're, as instructed,

2    going to continue to work on developing a

3    citizenship question, and that process -- again,

4    it's probably helpful at this point to explain on

5    the policy side, right, you formulate -- you

6    formulate something that you think you would like

7    to do, and then you go explore that.  That's my

8    job, is to go.  Secretary says, I think this might

9    be a good idea, you run it down, and you track

10   down the issues, and you say -- you know, first

11   question I usually ask is, okay, is this something

12   that Department of Commerce does?  Do we have

13   legal authority to do this?  Once you clear those

14   two thresholds, now you get to work.

15           But I don't spend a lot of time chasing

16   down things that people are not planning on doing.

17       Q    So you --

18       A    So there has to be some initial threshold

19   decision that this is worth pursuing.

20       Q    Now, let me stop you there, because you

21   said a minute ago, as instructed.  And you're

22   referring to instructions from the Secretary,

Page 151

1   correct?

2       A   To pursue, exploring the question.

3       Q   This was instructions to add the question

4   in response to my months' old request that we

5   include the citizenship question, correct?

6       A   This would be instructions to review and

7   consider and present to him information that would

8   allow him to make a decision on whether or not to

9   take final action.

10      Q   Mr. Comstock, I'm just asking you what

11  you understood on May 2nd --

12      A   And that's what I'm telling you I

13  understood on May 2nd.

14      Q   Hold on one second.  Let me finish the

15  question.

16      A   Uh-huh.

17      Q   The Secretary wrote, "I am mystified why

18  nothing has been done in response to my months'

19  old request that we include the citizenship

20  question."

21          And you responded, "On the citizenship

22  question, we will get that in place"?

1      A    Correct.

2      Q    Okay.  So my question is:  By we will get

3  that in place, what did you mean?

4      A    I meant that I will present to you the

5  information and the process necessary for you to

6  decide if you would like to pursue this question.

7      Q    Your email says we will get that in

8  place, correct?

9      A    I mean, we will get in front of you the

10  necessary information for you to make a decision.

11  Part of my role in this process is explaining to

12  people who have never worked in government before

13  that there are processes that you have to follow

14  in order to make an action happen.  You're dealing

15  with people who are used to being able to make a

16  decision and it simply goes into effect.

17      Q    Okay.

18      A    That's not the way the U.S. government

19  works.

20      Q    So the process that you then go on to

21  tell the Secretary he has to follow is later in

22  your message; is that right?

Page 153

1      A    That part of the process, yes.

2      Q    And that email says we need to work with

3   Justice to get them to request that citizenship be

4   added back as a census question; is that right?

5      A    That's right.

6      Q    Why would you say you needed to work with

7   the Justice Department to get them to request that

8   citizenship be added back?

9      A    Because based on a very preliminary

10  review, they appeared to be the most likely

11  government body that would have a specific need

12  for the information that would support adding a

13  citizenship question to the decennial census.

14     Q    Who conducted that preliminary review?

15     A    We were told by the Census Bureau that

16  the Justice Department was the person that had

17  requested the citizenship question on the ACS and

18  that they utilized the ACS data for Voting Rights

19  Act information.

20     Q    Who in the Census Bureau told you that?

21     A    I couldn't tell you.

22     Q    And why did you need a request from

1    Justice?

2        A    Again, based on the preliminary review,

3    the understanding we had was questions are added,

4    based on requests from a government agency.  There

5    is such a thing as the Paperwork Reduction Act

6    where you have to justify to OMB why do I need

7    this information?  That has to get cleared.  So

8    there are certain hurdles you have to get through.

9    So if at the end of the day the Secretary decided

10   to pursue this question, we would need to clear

11   certain legal thresholds.

12       Q    Why not just tell the Census Bureau to

13   add the citizenship question and say the Secretary

14   wanted it?

15       A    Because I'm not sure that that would be

16   the process they would necessarily agree to

17   follow.

18       Q    So you had to have it come from DOJ in

19   order for the Census Bureau to agree to follow it?

20       A    Again, that was a preliminary conclusion

21   based on a cursory analysis.

22       Q    Your email then says, "We have the court

Page 155

1   cases to illustrate that DOJ has a legitimate need
2   for the question to be included."
3           What court cases were your referring?
4       A   I don't recall the exact court cases.
5       Q   Did you research those court cases?
6       A   I did research a court case where there
7   was a scenario in which you would need -- it would
8   be important to have Citizen Voting Age Population
9   data in order to make a Voting Rights Act claim.
10      Q   How did you identify that case?
11      A   By a legal research.
12      Q   What do you mean by legal research?
13      A   Well, I think I talked to -- I'm trying
14  to think -- I think Mark Neuman may have provided
15  a case name.  I talked to James Uthmeier, who
16  looked at some cases.  Basically said, okay, if
17  this is the question -- I mean, it's what you do
18  as an attorney all day long, is to go find cases
19  to support what you're looking for.
20      Q   So Mark Neuman identified for you a case
21  that would support DOJ's need for this
22  information?

Page 156

1      A    Yeah.  I said I may have spoken to

2    Mark Neuman on that.  I think he may have provided

3    it.  I don't recall.  I know James Uthmeier looked

4    at some cases.

5      Q    Would he have provided that case for you

6    on a phone call or by email?

7      A    James?

8      Q    Pardon me?

9           I'm sorry.  Withdraw that question.

10          Would Mr. Newman have provided that case

11   to you by email or on the phone?

12     A    Well, if he provided it by email, you'd

13   have it.  I don't have the emails in front of me,

14   so I can't tell you.

15     Q    So by May of 2017, you'd come to the view

16   that you needed another agency to request a

17   citizenship question on the census?

18     A    That was based on the preliminary

19   analysis, yes.

20     Q    You then say in your email, "I will

21   arrange a meeting with DOJ staff this week to

22   discuss."

Page 157

1          Do you see that?

2     A    Yes.

3     Q    Okay.  So before May 2, 2017, you had not

4    had any discussions with the Department of Justice

5    about the citizenship question, right?

6     A    Not to my knowledge.

7     Q    What did you do to arrange a meeting with

8    DOJ staff to discuss?

9     A    I asked Eric Branstad for a name over at

10   DOJ, and he provided me the name of

11   Mary -- Mary Jane [sic] Hankey I think it was,

12   whom I then contacted.

13    Q    Okay.  Your email refers to the court

14   cases to illustrate that DOJ has a legitimate need

15   for the question to be included.

16    A    That's what it says, yes.

17    Q    What were the other needs that you had

18   talked about for including the citizenship

19   question?

20    A    I don't recall.

21    Q    Okay.  And by legitimate need, were you

22   concerned that other needs that didn't come from

Page 158

1   DOJ would not be legitimate needs?

2       A   No.  I think that's just an

3   imprecise -- the use of the term legitimate,

4   something to say that it would be a need that

5   would be considered a government need for the

6   information.

7           MR. COLANGELO:  Counsel, five-minute

8   break.  Let's go off the record.

9           VIDEOGRAPHER:  Going off the record.  The

10  time on the video is 11:31 a.m.

11          (Off the record.)

12          VIDEOGRAPHER:  This begins Media Unit

13  Number 3.  The time on the video is 11:45 a.m.  We

14  are on the record.

15  BY MR. COLANGELO:

16      Q   Okay.  Let's mark as Exhibit 11 --

17          MR. GARDNER:  No.  I think 12.

18          MR. COLANGELO:  12.  Sorry.  Thank you.

19          (Plaintiffs' Exhibit 12, Email, was

20  marked.)

21  BY MR. COLANGELO:

22      Q   This is document stamped 3699.

Page 159

1          Mr. Comstock, do you have Exhibit 12 in

2     front of you?

3          A    Uh-huh.

4          Q    Have you seen this email before?

5          A    No.  I mean, part of it I clearly did,

6     because it's to me, but -- oh, that's the previous

7     email.  So I haven't seen the upper part of this

8     document.

9          Q    Okay.  So this is an -- an email chain

10    from Brooke Alexander forwarding to Wendy Teramoto

11    the May 2nd email that the Secretary wrote to you

12    where he says I'm mystified why nothing has been

13    done in response to my months' old request; is

14    that right?

15         A    Yeah.  Appears to be, yeah.

16         Q    So it looks like Brooke forwarded the

17    Secretary's email to Wendy?

18         A    Correct.

19         Q    Is that her regular practice?

20              MR. GARDNER:  Objection.  Calls for

21    speculation.

22              THE WITNESS:  Yeah.  I couldn't tell you.

Page 160

1    BY MR. ADAMS:

2        Q    Do you know why she did in this case?

3        A    I don't know.

4        Q    It's because the Secretary was expressing

5    frustration and one concern was that one of his

6    priorities had not yet been accomplished and she

7    wanted the chief of staff to know?

8        A    I don't know.

9        Q    Would that be your surmise?

10            MR. GARDNER:  Objection.  Form.

11            THE WITNESS:  It's certainly a

12   possibility.

13   BY MR. COLANGELO:

14       Q    And then the -- strike that.

15            Wendy, from this chain, it appears, sends

16   an email to the Secretary and says, "I continue to

17   talk frequently with Mark Neuman, and we often

18   have dinner together.  He will not leave L-E-S" or

19   "LES, but is in love with the census and talks

20   about it nonstop."

21            Do you see that?

22       A    Yes.

Page 161

1      Q   Why would the Secretary's concern about

2  the citizenship question prompt Wendy to bring up

3  Mark Neuman?

4          MR. GARDNER:  Objection.  Lack of

5  foundation.  Calls for speculation.

6          THE WITNESS:  Again, he was the primary

7  transition team person advising us on Census.

8  BY MR. COLANGELO:

9      Q   Okay.  And the email also says, "Do you

10  want me to set up another meeting?"

11          Do you see that?

12      A   I see that.

13      Q   What's the earlier meeting that she's

14  referring to?

15          MR. GARDNER:  Objection.  Calls for

16  speculation.

17          THE WITNESS:  I don't know.

18  BY MR. COLANGELO:

19      Q   Had you attended the meetings with the

20  Secretary and Mr. Neuman on the citizenship

21  question before May 2, 2017?

22      A   I don't know.  I had attended meetings

Page 162

1    with the Secretary and Mr. Newman on the census.

2        Q    Before May 2017?

3        A    Yes.

4        Q    How many times?

5        A    I don't know.  Two times, three times.

6    I'd -- you'd have to check his count.

7        Q    Okay.  And the citizenship question was

8    discussed in those earlier meetings?

9        A    I don't recall.

10       Q    And you see the Secretary writes back and

11   says, "Let's try to stick him in there for a few

12   days to fact find."

13       A    Yes.

14       Q    Do you see that?

15            Were you aware of that request?

16       A    I was aware that the Secretary was

17   distressed with Director Thompson who had just

18   told us that he had massively overrun the CEDCaP

19   budget and failed to warn us that that was coming.

20   So the Secretary was not happy with the Census

21   leadership at the time and was trying to find

22   someone who could be -- provide us better

Page 163

1  information about what was going on at Census.

2      Q   Okay.  This email refers to the

3  citizenship question; is that right?

4          MR. GARDNER:  Objection.  Calls for

5  speculation.  Lack of foundation.

6          THE WITNESS:  I know the forwarded email

7  refers to the citizenship question.  There's

8  nothing in Ms. Teramoto's email that refers to

9  citizenship.

10 BY MR. COLANGELO:

11     Q   But she's not forwarding any other

12 information there, correct?

13     A   Well, I can't see what's blacked out, so

14 I have no idea what else is discussed there.  But

15 I know that there is a large amount of black out,

16 so presumably quite a number of other things were

17 discussed.

18     Q   And was Mark Neuman placed in

19 Census Bureau to fact find?

20     A   No.

21     Q   Why not?

22     A   I imagine because he had a much better

Page 164

1    paying job where he's at.

2        Q    Okay.   And did Wendy or the Secretary

3    convey this request to you at the time?

4        A    Wendy and the Secretary discussed with me

5    the possibility of putting Mark Newman in Census

6    so that we could get a handful of what's going on

7    with the budget, yes.

8        Q    And did you discuss putting Mark Neuman

9    in Census so he could help facilitate the

10   inclusion of a citizenship question?

11       A    That was never discussed -- or not to my

12   knowledge.

13           MR. COLANGELO:   Let's mark as Exhibit 13.

14           (Plaintiffs' Exhibit 13, Email, was

15   marked.)

16   BY MR. COLANGELO:

17       Q    Do you have the document that has been

18   marked Exhibit 13?

19       A    Yes.

20       Q    For the record, this is Bates stamp 3071

21   and this email from Eric Branstad to Matthew

22   Flynn, Subject Line DOJ contact, "Who is the best

Page 165

1    counterpart to reach out to at DOJ regarding

2    census and legislative issues?"

3            Have you seen this before?

4        A    Yes.

5        Q    When was the last time you saw it before

6    today?

7        A    Yesterday.

8        Q    Do you know who Matthew Flynn is?

9        A    I have no idea who Matthew Flynn is.

10       Q    You testified before our last break that

11   you asked Eric to get you a point of contact at

12   the Justice Department, right?

13       A    Correct.

14       Q    So does this email exchange reflect Eric

15   followed up on that request?

16       A    Yes.

17       Q    And he forwards it to you on May 3; is

18   that right?

19       A    It looks like he forwarded it to me --

20            (Conference call interruption.)

21            THE WITNESS:  It looks like he sent it to

22   me on May 4th and I -- May 3rd and I replied

Page 166

1    May 4th early in the morning.

2    BY MR. COLANGELO:

3        Q    Saying, "Thanks, Eric.  Earl."

4        Correct?

5        A    Yes.

6        Q    So on May 2nd, the Secretary asked you

7    why nothing had been done in response to his

8    months' old request.  You told him you needed to

9    get the Justice Department to request the

10   question.  You also told him that you would set up

11   meetings with the Justice Department to discuss.

12   And then after that, you asked Eric Branstad to

13   get you a point of contact at the Justice

14   Department and he did, right?

15            MR. GARDNER:  Objection.  Form.

16            THE WITNESS:  That appears to be the

17   sequence.

18   BY MR. COLANGELO:

19       Q    Okay.  And you testified earlier that you

20   hadn't ever spoken to the Justice Department

21   before that on the citizenship issue?

22       A    That's correct.

Page 167

1         MR. COLANGELO:  Let's mark Exhibit 14.

2         (Plaintiffs' Exhibit 14, Email, was

3   marked.)

4   BY MR. COLANGELO:

5     Q   Exhibit 14 is document stamped 2462.  You

6   have Exhibit 14 in front of you?

7     A   I do.

8     Q   And why were you contacting Mary Blanche?

9   Her surname is redacted on this email, I assume

10  for personal privacy reasons.  But this is Mary

11  Blanche Hankey, correct?

12    A   Yes.

13    Q   Why were you contacting Mary Blanche

14  Hankey?

15    A   That was the name that Eric Branstad said

16  he'd provide me.

17    Q   Okay.  And do you know where in the

18  White House -- strike that.

19        Do you know where in the

20  Justice Department she worked?

21    A   She was advisor for -- to

22  Attorney General Sessions.

Page 168

1    Q    So she worked for the Attorney General?

2    A    Correct.

3    Q    And you reached out to her to talk about

4    the citizenship question, right?

5    A    Amongst other things, yes.

6    Q    And you reached out to her and asked her

7    for times for a call that day, right?

8    A    That's what I'm asking for, yes.

9    Q    Okay.  Is that because this was an urgent

10   priority for the Secretary?

11   A    I think you can divine from his prior

12   email that he was hoping I might take a quick

13   action on this, so I was trying to be responsive.

14   Q    So the answer is yes?

15   A    I'm not going to speculate as to whether

16   he thought it was urgent or not, but he was

17   conveying he would like me to get moving.

18   Q    You were treating it as an urgent matter?

19   A    Correct.

20   Q    And then you -- did you speak to

21   Ms. Hankey?

22   A    I did speak to Ms. Hankey.

Page 169

1        Q    How many times?

2        A    I met with her -- I think I spoke with

3    her by phone and then met with her in her office.

4        Q    When did you speak with her by phone?

5        A    I couldn't tell you.

6        Q    Was it on May 4th?

7        A    It's possible.

8        Q    And then you met with her in her office,

9    you said?

10       A    Yes.

11       Q    When was that meeting?

12       A    I don't know the exact date.

13       Q    When you spoke to her on the phone, was

14   anyone else on the call with you?

15       A    No.

16       Q    Was anyone else on the call on her end?

17       A    Not that I was aware of, no.

18       Q    When you met with her in person, did

19   anyone from the Commerce Department go with you?

20       A    No.

21       Q    Did anyone from the Census Bureau go with

22   you?

1      A    No.

2      Q    Was there anyone else in the meeting that

3    she brought?

4      A    No.

5      Q    What did you say to her when you spoke to

6    her on the phone?

7      A    That I'd like to come over and discuss

8    what issues the Justice Department might have with

9    Commerce that I could be helpful on and talk to

10   her about an issue that we were interested in.

11     Q    And that issue was the citizenship

12   question?

13     A    Correct.

14     Q    And what did she say about that?

15     A    Let's get together and meet.

16     Q    So then you went over to meet with her.

17   Did she have any issues that she wanted to raise

18   with you?

19     A    I don't recall that Justice had any

20   particular Commerce issues, no.

21     Q    So this was a meeting about the

22   citizenship question?

Page 171

1      A    I'd say that was the primary topic.

2      Q    Okay.  And what did you say to her when

3  you met with her in person?

4      A    That we -- the Secretary had asked us to

5  look into the possibility of adding a citizenship

6  question, and that since the Justice Department

7  was the agency that had sponsored the question for

8  the ACS, it seemed that that was a logical place

9  to start, and was there someone in the

10  Justice Department with whom I should speak about

11  that.

12     Q    And what did she say?

13     A    Let me look into it.

14     Q    How long was the meeting?

15     A    Well, we met for about 20 minutes.

16     Q    Did you explain why the Secretary wanted

17  the citizenship question?

18     A    No.

19     Q    Did you have an understanding at that

20  point as to why the Secretary wanted the

21  citizenship question?

22     A    I've never asked the Secretary why he

Page 172

1    wanted a citizenship question.

2        Q    Did she ask you why it was important to

3    Commerce Department to add a citizenship question?

4    She being Ms. Hankey.

5        A    No.

6        Q    You mentioned earlier that you did some

7    legal research or that Mark Neuman or others may

8    have identified cases for you.  Did you identify

9    those cases to Ms. Hankey in that conversations?

10       A    I don't recall.

11       Q    Did you bring any paper with you to that

12   meeting?

13       A    Not that I recall.

14       Q    Did you take notes?

15       A    No.

16       Q    After the meeting, did you update anyone

17   at the Commerce Department and your discussion?

18       A    I don't recall.

19       Q    Did you speak to the Secretary to tell

20   him that -- on an issue that you understand to be

21   a priority, you'd gone over to the

22   Justice Department to make some progress on his

Page 173

1    request?

2        A    I might have mentioned I had a meeting

3    over there.

4        Q    Did you mention it to Wendy?

5        A    I might have.

6        Q    Did you talk about it with anyone else in

7    the Office of Policy?

8        A    I might have told Eric that I met with

9    the person he recommended.

10       Q    Eric Branstad?

11       A    Yes.

12       Q    Is the senior White House advisor

13   position in Office of Policy?

14       A    No.

15       Q    My question was:  Did you talk to anyone

16   in the Office of Policy about the meeting?

17       A    Not that I recall.

18       Q    Other than the Secretary, Wendy and Eric,

19   did you talk to anyone else at the

20   Commerce Department about that meeting?

21       A    Not that I recall.

22       Q    Did you talk to Mark Neuman about it?

Page 174

1       A    Not that I recall.

2       Q    And after you met with Ms. Hankey and she

3    said she'd look into it, what was the next that

4    you heard from the Justice Department on this

5    issue?

6       A    I think when she contacted me, provided a

7    name.

8       Q    How long after your meeting did she

9    contact you and provide a name?

10      A    There's an email that documents it, you

11   could tell from that, but otherwise, I have no

12   idea.

13      Q    Okay.

14      A    I mean, it was sometime in the next

15   couple weeks, but --

16      Q    And what name did she give you?

17      A    I -- I know I put it in a memo to the

18   Secretary later on, so you'd have to look at that

19   memo.

20      Q    Is it James McHenry?

21      A    That sounds like the right name.

22      Q    When she spoke to you to pass along

Page 175

1   James McHenry's name, what did she say about why

2   she was directing you to him?

3       A   She didn't say much.  Just said this

4   would be the best guy to talk to.

5       Q   Okay.  Had you spoken to James McHenry

6   before?

7       A   Never talked to him before.

8       Q   Did she tell you what his position was in

9   the Department of Justice?

10      A   She might have.

11      Q   What was his position?

12      A   I don't know, actually.

13      Q   After she gave you Mr. McHenry's name,

14  what did you do next to contact him?

15      A   I called him on the phone.

16      Q   And when you spoke to him on the phone

17  what did you say?

18      A   I outlined that we were interested in

19  seeing what kind of level of interest the

20  Justice Department would have in requesting the

21  citizenship question be asked -- added to the

22  decennial census.

Page 176

1      Q    And did you tell him why the

2    Commerce Department wanted the Justice Department

3    to make that request?

4      A    Because that was our understanding of the

5    process.  They were the people that needed it for

6    ACS, and our understanding was that it might be

7    useful for them to have it at a more granule

8    level, which would be needed -- you'd need to put

9    it on the decennial census to do that.

10     Q    So you were -- you told him that the

11   Commerce Secretary wanted the question and wanted

12   to know if DOJ would ask for the Census Bureau to

13   add the question; is that right?

14     A    Those are your words.

15     Q    Well, I'm asking you to tell me yes or

16   no.

17     A    Well, if the question is yes or no, then

18   the answer is no.

19     Q    Okay.  How would you put it in your

20   words?

21     A    In my words, what I told him was that we

22   were exploring the possibility and wanting to know

Page 177

1   the level of interest at the Justice Department in

2   making such a request, would this be information

3   they could use?

4       Q   So this is the shortly -- this is shortly

5   after the Secretary of Commerce emailed you and

6   said I am mystified why nothing had been done in

7   response to my months' old request?

8       A   Right.

9       Q   But your testimony is that you conveyed

10  to the Justice Department that you were exploring

11  the issue?

12      A   As I explained before, when -- when the

13  Secretary says he would like to do something,

14  there's a presumption that we will attempt to do

15  that.  That's subject to revision as more

16  information is made available.  So I'm exploring

17  what is necessary to follow through on the

18  Secretary's request.  That request may be modified

19  or changed, based on the information that I

20  provide.

21      Q   Okay.  How many times did you speak to

22  Mr. McHenry?

Page 178

1      A   I think three or four times.

2      Q   And what was the next time you spoke to

3   him after the initial phone call?

4      A   Maybe a week later.

5      Q   Okay.  And what did he say when he -- did

6   he call you or did you call him?

7      A   I don't recall.

8      Q   And what did you discuss on that

9   conversation?

10      A   That he was still exploring the question.

11      Q   How long was that conversation?

12      A   Five minutes.

13      Q   Okay.  So he didn't have anything new to

14   report?

15      A   Right.

16      Q   Okay.  And you said you spoke to him at

17   least a couple more times; is that right?

18      A   Again, I don't recall the exact number of

19   times, but somewhere in the vicinity of three or

20   four times.

21      Q   So after the second call where he said he

22   was still exploring it, tell me about the next

Page 179

1    conversation?

2        A    Memory serves, I think the next

3    conversation was a similar one.  He was still

4    looking into the matter and then -- and then the

5    last conversation he and I had, he directed me to

6    somebody at the Department of Homeland Security.

7        Q    Okay.  And over what period of time were

8    you talking to Mr. McHenry on the phone?

9        A    Probably over the course of a month.

10       Q    So this was primarily in May of 2017?

11       A    I honestly don't recall, but sometime in

12   May, early June.

13       Q    And who did he direct you to at the

14   Department of Homeland Security?

15       A    I don't remember the person's name.

16       Q    Was it Gene Hamilton?

17       A    Again, I know I prepared a memo for the

18   Secretary that had the name.  So if that's the

19   name that was on the memo, then, yes, that would

20   be the person I spoke with.

21       Q    How many times did you speak to your

22   point of contact at the Department of

Page 180

1   Homeland Security?

2       A   Again, I think it was -- I think this was

3   like two or three times.

4       Q   And what did you say when you first spoke

5   to Mr. Hamilton?

6       A   Same -- same basic message, we're looking

7   into the -- exploring the possibility of putting a

8   census question on -- a citizenship question on

9   the decennial census, would this be information

10  that the Department of Homeland Security would

11  need or use, and could he answer that, and his

12  response was, let me look into it.

13      Q   Now, the Department of Homeland Security

14  wasn't the original requester for the ACS

15  citizenship question, to your understanding,

16  correct?

17      A   Correct.

18      Q   Was it your view that the Department of

19  Homeland Security would also be a legitimate

20  requester of this information?

21      A   Legitimate is not the right word, but

22  the -- I think my view was, let me see if

Page 181

1   there's -- what their explanation would be, but

2   they were obviously not our first choice.

3       Q   So you were looking for an agency to make

4   this ask?

5       A   Again, my understanding of the process,

6   based on the research I've been able to do, and

7   consequently was advising the Secretary was an

8   agency needed to make the request; therefore, you

9   have to find an agency that would have a reason to

10  be using this information.  And Justice,

11  obviously, was the primary recipient of the CVAP

12  data from the ACS, so they were the logical place

13  to start.  Justice then says go to

14  Homeland Security, and I say, okay, maybe there's

15  something about Homeland Security that I don't

16  know about that might justify this data.  So you

17  follow up on a call, get more information, informs

18  your decision, you might change it.

19      Q   And so my question was:  So you were

20  looking for an agency to make this ask and --

21      A   Correct.  In order to implement the

22  process that had been outlined to us, you needed

Page 182

1    an agency.  So that was my task at the time.

2         Q    Thank you.

3              MR. COLANGELO:  Let's mark this

4    Exhibit --

5              MR. GARDNER:  15.

6              MR. COLANGELO:  -- 15.

7              (Plaintiffs' Exhibit 15, Memo, was

8    marked.)

9              THE WITNESS:  The very memo I was

10   speaking of.

11   BY MR. COLANGELO:

12        Q    Exhibit 15 is document stamped 9834.

13             Mr. Comstock, do you have Exhibit 15 if

14   front of you?

15        A    I do.

16        Q    Is this the very memo you were just

17   speaking about?

18        A    It's the very memo I was just speaking

19   about.

20        Q    And what's the date on this memo?

21        A    September 8th.

22        Q    And you see in the second paragraph of

Page 183

1    this memo, the sentence that says, "James directed

2    me to Gene Hamilton at the Department of

3    Homeland Security."

4         A    Correct.

5         Q    So the person you were speaking to at DHS

6    was Gene Hamilton, right?

7         A    Apparently so, yes.

8         Q    The -- in that paragraph -- strike that.

9              This is a memo from you to the Secretary

10   dated September 8th of 2017, correct?

11        A    Correct.

12        Q    Why did you prepare this memo?

13        A    Because the Secretary was asking about

14   the lack of progress and said he was prepared to

15   call the Attorney General, and so he needed the

16   timeline of who I had spoken to.

17        Q    Okay.  What do you mean by lack of

18   progress?

19        A    Well, obviously, we're now September 8th,

20   and he inquired on May -- May whatever the date

21   was, 2nd, 5th, whatever it was, saying how come we

22   haven't made more progress?  Three months later we

Page 184

1  don't have any response from the

2  Justice Department, so --

3     Q   In his May 2nd email it said, why has

4  nothing been done in response to my months' old

5  request?

6     A   That is what it says, yes.

7     Q   So the Secretary had been asking about

8  this since the early spring of 2017?

9     A   Yes.

10    Q   And you testified and this memo says you

11 met in person with Mary Blanche and she said what?

12    A   Well, as I said, she directed me to

13 James McHenry.

14    Q   And then after speaking with Mr. McHenry,

15 he told you what?

16    A   He directed me to Gene Hamilton.

17    Q   Okay.  And then after several phone calls

18 with Gene Hamilton, according to this memo, he

19 relayed that, "After discussion, DHS really felt

20 it was best handled by the Justice Department."

21        Do you see that?

22    A   I see that.

1    Q   Why did Mr. Hamilton feel this was best

2    handled by the Justice Department?

3    A   As relayed to me, DHS felt the agency

4    that would most utilize this data was

5    Department of Justice, which was our

6    original conclusion.

7    Q   So DHS said they were not going to make

8    this request, right?

9    A   Well, Gene never made a commitment, one

10   way or the other, for the department.  He simply

11   directed me back to the other department.  It's

12   not an uncommon experience in the federal

13   government.

14   Q   Tell me what's not uncommon in the

15   federal government.

16   A   Being directed to somebody.

17   Q   Your memo then says at that point the

18   conversation ceased.

19   A   Correct.

20   Q   What do you mean by that?

21   A   Means that I did not talk to

22   Mary Blanche, James McHenry or Gene Hamilton after

Page 186

1  that point in time.

2      Q   You didn't, at this point, have a request

3  from the Justice Department, right?

4      A   That's correct.

5      Q   Okay.  And what did you ask

6  James Uthmeier after that point?

7          MR. GARDNER:  Objection.  Calls for

8  information --

9          (Thereupon, the court reporter

10 clarified.)

11         MR. GARDNER:  Sorry.  I have a cold.

12         Objection.  Calls for information that's

13 subject to privilege.  I'll instruct the witness

14 not to answer.

15         MR. GERSCH:  What privilege?

16         MR. GARDNER:  Attorney -- thank you.  I

17 thought we were doing one at a time.

18         Attorney-client privilege.

19         MR. GERSCH:  Sorry.

20 BY MR. COLANGELO:

21     Q   Did you identify any facts for

22 Mr. Uthmeier?

```
 1          MR. GARDNER:  Objection.  Form.
 2          THE WITNESS:  Can you restate the
 3   question?
 4   BY MR. COLANGELO:
 5      Q   Sure.  When you -- was this your first
 6   contact with Mr. Uthmeier on the topic of the
 7   citizenship question?
 8      A   Well, you mean this memo or this
 9   reference?
10      Q   This reference.
11      A   Well, it says -- at this -- at that
12   point, the conversation ceased, and I asked
13   James Uthmeier, who had by then joined -- this is
14   referring back in time.  I don't know exactly when
15   James joined OGC, but it was before September, so
16   I think he joined -- I don't know -- in June
17   maybe.  I don't know.
18      Q   I understand this memo to be a reference
19   to discussions you had with the Justice Department
20   in May; is that right?
21      A   It doesn't exactly specify the time
22   frame, but, yes, from early May when I met with
```

Page 188

1    Mary Blanche, through when my conversations with

2    Gene Hamilton ceased, I don't know exactly what

3    that time frame was.  It was four or six weeks.

4        Q    So I'm asking before May of 2017, had you

5    ever discussed the citizenship question with

6    James Uthmeier?

7        A    And I cannot answer that directly,

8    because I don't recall when James Uthmeier joined

9    the department.

10       Q    Okay.  So you do recall discussing the

11   citizenship question with him, but you don't

12   remember when it was?

13       A    Yes.

14       Q    And you don't remember if it was before

15   May or June of 2017?

16       A    Well, it couldn't have been before he

17   joined the department, so whenever that was.

18       Q    Is it your understanding that

19   Mr. Uthmeier had a position in the Department of

20   Commerce that was not within the Office of

21   General Counsel and he was then moved into a

22   position in the Office of General Counsel?

Page 189

1           MR. GARDNER:  Objection to form.

2           THE WITNESS:  To my knowledge, the first

3      time I interacted with James, he was in the

4      Office of General Counsel.

5           MR. COLANGELO:  Okay.  Okay.  Let's mark

6      Exhibit 16.

7           (Plaintiffs' Exhibit 16, Memo, was

8      marked.)

9      BY MR. COLANGELO:

10          Q    Exhibit 16 is document stamped 2458.

11               Do you have Exhibit 16 in front of you,

12     Mr. Comstock?

13          A    I do.

14          Q    Have you seen this email before?

15          A    Not since I've sent it to Wendy on

16     Saturday the 16th of September.

17          Q    Why did you send Ms. Teramoto your

18     September 8th memo on September 16, 2017?

19          A    I don't recall exactly, but, likely,

20     because she may have been setting up the call with

21     the Attorney General.

22          Q    And which call with the Attorney General

1    was that?

2        A    A call from the Secretary to talk to the

3    Attorney General about whether or not Justice

4    would be interested in a citizenship question.

5        Q    And why was the Secretary talking to the

6    Attorney General about whether or not Justice

7    would be interested in the citizenship question?

8        A    Again, if -- if the -- if the

9    Justice Department was not going to request the

10   question, had no use for the information, then

11   that would probably put an end to the citizenship

12   question.

13       Q    And the Secretary wanted the citizenship

14   question?

15       A    I think he felt -- well, I don't know

16   what he felt.  Yes.  He was continuing to explore

17   that possibility.

18           MS. BOUTIN:  I'm sorry.  Can you speak

19   up?

20           THE WITNESS:  I don't know what he felt,

21   but he was continuing to explore the possibility.

22   BY MR. COLANGELO:

```
                                        Page 191

 1      Q    And when did the Secretary speak with the

 2   Attorney General?

 3      A    I don't know that.

 4      Q    Were you on that call?

 5      A    I don't recall being on the call.

 6      Q    Who else was on the call?

 7      A    I don't know.

 8      Q    Okay.  Did -- did Wendy ask to see this

 9   memo, or did you send it to her without her

10   asking?

11      A    Again, I don't recall the context, but

12   based on what the memo says, it appears she might

13   have asked --

14           (Thereupon, the court reporter

15   clarified.)

16           THE WITNESS:  For it.

17   BY MR. COLANGELO:

18      Q    Okay.  I want to go back for a second

19   here, May 2nd email --

20           MR. GARDNER:  Which exhibit number?

21           MR. COLANGELO:  This is Exhibit --

22           MR. GARDNER:  Oh, the 12 --
```

Page 192

1          MR. COLANGELO:  This is Exhibit -- no.  I
2     was thinking of Exhibit 10.
3     BY MR. COLANGELO:
4          Q   How did you come to the view before ever
5     talking to DOJ that DOJ should request this
6     information?
7          A   Again, if DOJ was the governmental
8     organization that had questioned the information
9     on the ACS, then it would stand to reason that
10    they would be the people that would also be
11    interested in the information on the decennial,
12    and they're also the party responsible for
13    enforcing the voting rights.
14         Q   And how did you come to the view before
15    ever talking to DOJ that DOJ had a legitimate need
16    for the question to be included?
17         A   If they enforced the Voting Rights Act --
18    if you're going to make a Voting Rights Act case,
19    then they would be the people that would
20    have -- need the information.
21         Q   And you researched those Voting Rights
22    Act cases or that Voting Rights case on your own?

Page 193

1      A    Again, I think in doing some basic

2  research on it, it was pointed out there was a

3  case where the Court had said you could -- you

4  would need more granule information to answer this

5  question, which would then support a citizenship

6  question.

7      Q    And you told me before that you're not a

8  voting rights lawyer, right?

9      A    Again, what do you mean by a voting

10  rights lawyer?

11      Q    Have you ever practiced voting rights

12  law?

13      A    No.

14      Q    Have you ever tried a voting rights case?

15      A    No.

16      Q    Have you ever advised a client on a

17  voting rights matter?

18      A    No.

19      Q    Have you ever practiced redistricting

20  law, tried a redistricting case --

21      A    No.

22      Q    -- or advised a client on a redistricting

```
                                    Page 194
 1   matter?

 2       A    No.

 3            MR. GARDNER:   Make sure he finishes his

 4   question before you answer.

 5            THE WITNESS:   No.

 6   BY MR. COLANGELO:

 7       Q    Have you ever litigated a case under the

 8   Voting Rights Act?

 9       A    No.

10       Q    Have you ever litigated a redistricting

11   case?

12       A    No.

13            MR. COLANGELO:   Let's mark as Exhibit 17

14   a document Bates-stamped 3705.

15            (Plaintiffs' Exhibit 17, Meeting

16   notification, was marked.)

17   BY MR. COLANGELO:

18       Q    Mr. Comstock, do you have 3705 in front

19   of you?

20       A    I do.

21       Q    And what is this?

22       A    It appears to be some kind of meeting
```

Page 195

1   notification.

2       Q    Okay.  Does this help you date your

3   interactions with Mr. Uthmeier regarding the

4   citizenship question?

5       A    Well, it appears that we might have had a

6   meeting on the 28th of June, 2017.

7       Q    And does this help you answer my earlier

8   question regarding whether this was your earliest

9   discussion with Mr. Uthmeier on the citizenship

10  question or whether you, in fact, spoke to him

11  before that?

12          MR. GARDNER:  Objection.  Form.

13          THE WITNESS:  Again, I don't recall when

14  James started working for the department.  I don't

15  recall when we had our first conversation on the

16  citizenship question.

17  BY MR. COLANGELO:

18      Q    And what did you tell Mr. Uthmeier in

19  that conversation?

20          MR. GARDNER:  Objection to the extent it

21  calls for disclosure of information subject to the

22  attorney-client privilege.  To the extent it does,

Page 196

1    I would instruct the witness not to answer.

2          Can you answer the question without

3    disclosing confidential communications?

4          THE WITNESS:  I have no recollection of

5    this meeting, so I couldn't tell you what we

6    discussed.

7          MR. GARDNER:  Problem solved.

8    BY MR. COLANGELO:

9      Q   Easy enough.

10         Was this your first interaction with the

11   Office of General Counsel on this issue?

12     A   Again, I have no idea.

13     Q   As you were talking to Ms. Hankey at the

14   Justice Department, Mr. McHenry at the

15   Justice Department and Mr. Hamilton at DHS --

16     A   Yeah.

17     Q   -- in the spring of 2017, were you

18   keeping the Secretary informed of those

19   conversations?

20     A   I might have mentioned them.

21     Q   In what context would you have mentioned

22   them?

Page 197

1       A    Mr. Secretary, I contacted the

2   Justice Department today.  I would not have

3   given -- I mean, there was nothing to report.  So

4   I hadn't made any progress.

5       Q    Well, he was frustrated there was no

6   request yet?

7       A    Right.

8       Q    So one of the things to report might have

9   been --

10      A    That I contacted them, yes.

11      Q    Okay.  And did you keep Ms. Teramoto

12  informed during that time period?

13      A    Again, I might have.  At that time

14  period, we operated in bullpens, so we were

15  all -- there were five people in the same room.

16  So it's entirely possible I might have mentioned I

17  was going to the Justice Department or I had

18  spoken with the Justice Department, yes.

19      Q    I'm sorry.  If you were not finished.

20      A    Nope.

21      Q    Who was sitting in the bullpen with you?

22      A    Wendy Teramoto, Eric Branstad,

Page 198

1   James Rockas, me, and occasionally Izzy Hernandez.

2        Q    Who is James Rockas?

3        A    He was acting press secretary at the

4   time.

5        Q    And who is Izzy Hernandez?

6        A    Israel Hernandez, he was the acting -- or

7   I'm not sure what his formal title was.  I think

8   he was deputy chief of staff.

9        Q    And where was the bullpen you referred

10  to?

11       A    It was the -- what is now the chief of

12  staff.

13       Q    And there were five of you working in the

14  office?

15       A    Correct.

16       Q    How long were the five of you working in

17  that office together?

18       A    Maybe nine months.

19       Q    So from January of 2018 through the

20  end -- strike that.

21            From January 2017 through the end of

22  the --

Page 199

1        A    No.

2        Q    -- summer --

3        A    No.  The bullpen was set up, I think, in

4   March through the end of the year.

5        Q    Why did you work in a bullpen?

6        A    Because that was the form that the

7   Secretary and Ms. Teramoto felt was most

8   effective.

9        Q    And was it near the Secretary's office?

10       A    It's located -- there's the Secretary's

11   office, there's the anteroom to the Secretary's

12   office, and it's located right next to that.

13       Q    And at some point, you stopped working in

14   a bullpen?

15       A    Yes.

16       Q    Did it become less effective?

17       A    I think that was the chief of staff's

18   determination, yes.

19            MR. COLANGELO:  Let's mark Document 3702

20   as Exhibit 18.

21            (Plaintiffs' Exhibit 18, Email, was

22   marked.)

Page 200

1    BY MR. COLANGELO:

2        Q    Mr. Comstock, do you have Exhibit 18 in

3    front of you?

4        A    I do.

5        Q    Have you seen this document before?

6        A    No.

7        Q    Okay.  And you testified before that

8    Mr. Langdon works for you in the Office of Policy

9    and Strategic Planning, correct?

10       A    Yes.

11       Q    His -- if you go to the second page of

12   this exhibit, the page stamped 3703, Mr. Langdon

13   says, "I apologize for not answering sooner, but I

14   honestly have been in meetings with SWR all

15   afternoon."

16            Do you see that?

17       A    Yes.

18       Q    And do you understand SWR to refer to

19   Secretary Wilbur Ross?

20       A    Yes.

21       Q    What meetings was he referring to?

22            MR. GARDNER:  Objection.  Calls for

Page 201

1    speculation.  Lack of foundation.

2          THE WITNESS:  I don't know.

3    BY MR. COLANGELO:

4       Q    Were you in meetings with the Secretary

5    and David Langdon on May 24th of 2017?

6       A    It's entirely possible.

7       Q    Is it common for staff in the Office of

8    Policy to attend meetings with the Secretary that

9    you wouldn't be in?

10      A    Not common, but it would -- at that time

11   frame, it would depend on what else I was working

12   on.  I might have been off working on sugar

13   negotiations, saw-fit lumber --

14          (Thereupon, the court reporter

15   clarified.)

16          THE WITNESS:  I said I might have been

17   working on sugar negotiations, which were going on

18   at the time.  We have a saw-fit lumber case.  We

19   were beginning work on steel 232 investigation.

20   We had fisheries issues.  So any number of things

21   could have kept me from the meeting.

22   BY MR. COLANGELO:

Page 202

1    Q   Okay.  And if you weren't in the meeting,

2  would it be typical for Ms. Teramoto to be there?

3    A   Again, it would depend on what her

4  schedule was.

5    Q   Okay.  You'll see from this email at the

6  top of Page 3702, that David Langdon is reporting

7  to several people, quote, the Secretary seemed

8  interested on subjects and puzzled why citizenship

9  is not included in 2020.

10       Do you see that?

11   A   Yes.

12   Q   Okay.  Do you remember a meeting where

13  the Secretary was puzzled why citizenship was not

14  included?

15   A   I don't recall such a meeting, but --

16   Q   And why does Mr. Langdon say the

17  Secretary seemed puzzled why citizenship is not

18  included?

19       MR. GARDNER:  Objection.  Calls for

20  speculation.

21       THE WITNESS:  Again, the Secretary was

22  clear.  He did not understand why a citizenship

Page 203

1  question was not included, so he asked us to look

2  into the matter.

3  BY MR. COLANGELO:

4      Q   Okay.  And then you see that Mr. Langdon

5  sent the email to Lisa Blummerman.  Am I saying

6  that right?

7      A   I think it's pronounced Blummerman.

8      Q   Okay.  Mr. Langdon sent the email to

9  Lisa Blummerman at 10:51 p.m. on May 24.

10         Can you tell me who Ms. Blummerman is?

11     A   She was -- I believe at the time, in some

12  kind of acting capacity.  I don't know if she was

13  the acting deputy director or whether she was the

14  person in charge of budget.  If you notice further

15  down in the conversation, Lisa and I are happy to

16  discuss the lifecycle stuff, which was beginning

17  to become an issue.  So Lisa, to my recollection,

18  is largely budget side.

19     Q   Is it your understanding that at the

20  time, Ms. Blummerman was the associate director

21  for decennial programs?

22     A   That's entirely possible.

Page 204

1      Q   And is the associate director for

2  decennial programs effectively the head of 2020

3  census?

4      A   I believe that's correct, yes.

5      Q   And you see that Mr. Langdon has asked

6  Ms. Blummerman for an answer on the citizenship

7  question ideally this evening?

8      A   That's what his mail says.

9      Q   Okay.  It's fair to say that this was a

10  matter of some urgency?

11         MR. GARDNER:  Objection.  Form.

12         THE WITNESS:  Again, one of the biggest

13  roles that I play is expediting things along.

14  Because you have people from the private sector

15  who are used to a much faster speed than the

16  government usually operates at.  So we spend a lot

17  of time expediting things to get things back in

18  place.  So this is not uncommon for us to say

19  everything the Secretary is requesting is urgent.

20  BY MR. COLANGELO:

21      Q   Let's go back to Exhibit 7.  Do you have

22  that in front of you?

Page 205

1      A    Just a minute.

2           Yes.

3      Q    Okay.  And Exhibit 7 is the email

4   exchange with Kris Kobach; is that right?

5      A    It's an email exchange between

6   Kris Kobach and Wendy Teramoto.

7      Q    And the Secretary, correct, on the second

8   page?

9      A    Yes.  Appears to be one to the Secretary

10  on the second page.

11     Q    Okay.

12     A    Though it's blanked out as to who it goes

13  to.

14     Q    If I represent to you that the government

15  has represented to us that this was an email to

16  the Secretary and that they've blanked out his

17  name for personal privacy reasons, can we agree

18  that it's an email to the Secretary on July 14th?

19     A    I'll stipulate to that, yes.

20     Q    And Mr. Gardner will tell me after lunch

21  if that's wrong.

22          The -- so you see that the -- that

Page 206

1    Mr. Kobach, who identifies himself as the Kansas

2    Secretary of State, emailed the Secretary on

3    July 14, 2017, correct?

4        A    Correct.

5            MR. GARDNER:  Objection.  Lack of

6    foundation.

7    BY MR. COLANGELO:

8        Q    And you'll see that it says I'm following

9    up on our telephone discussion from a few months

10   ago, correct?

11           MR. GARDNER:  Objection.  Lack of

12   foundation.

13           THE WITNESS:  And you're reading from the

14   email.  So I have no idea if the email is correct

15   or not.

16   BY MR. COLANGELO:

17       Q    Did the Secretary ever tell you that he

18   spoke to Kris Kobach?

19           MR. GARDNER:  Objection.  Asked and

20   answered.

21   BY MR. COLANGELO:

22       Q    You can still answer.

Page 207

1        A    No.

2        Q    Sorry.  We were speaking at the same

3   time.

4        A    I don't recall him ever telling me that

5   he spoke to Kris Kobach.

6        Q    This email reads, "As you may recall, we

7   talked about the fact that the U.S. Census does

8   not currently ask respondents their citizenship."

9             Do you see that?

10       A    I see that.

11       Q    The email also reads, "It also leads to

12   the problem that aliens who do not actually reside

13   in the United States are still counted for

14   Congressional apportionment purposes."

15            Do you see that?

16       A    I see that.

17       Q    Did the Secretary ever tell you he was

18   concerned about the problem that aliens who do not

19   reside in the United States are still counted for

20   Congressional apportionment purposes?

21       A    He never expressed an opinion on that.

22       Q    And when the Secretary asked you on

Page 208

1   March 10, 2017 about the census and the

2   citizenship question, did he ask you in the

3   context of whether noncitizens should be included

4   for Congressional apportionment purposes?

5        A   He discussed Congressional apportionment

6   purposes.  If asked were the noncitizens counted,

7   and we answered the question, which is they are

8   counted.

9        Q   Well, you testified the link you sent him

10  was the link to the Census Bureau's web page on

11  whether noncitizens are counted for apportionment?

12       A   That's correct.  Well, I don't believe

13  you can find a web page on the Census that doesn't

14  speak to it in that context, whether noncitizens

15  are counted other than for apportionment.  That's

16  the question that we asked.  Do we count

17  noncitizens?  The answer is yes.  What is the

18  Census used for?  It's used for apportionment.

19  That's its primary function.

20       Q   And you'll see that -- going back to the

21  first page of Exhibit 7, Ms. Teramoto has written

22  to Mr. Kobach, "Kris, can you do a call with the

Page 209

1    Secretary and Izzy tomorrow at 11:00 a.m.?"

2         A    Correct.

3         Q    And that's Izzy Hernandez, correct?

4         A    I would believe that's the reference

5    she's making, yes.

6         Q    And he's copied at the top of this page,

7    correct?

8         A    Yes, he is.

9         Q    Did you ever discuss with Izzy Hernandez

10   a call with Mr. Kobach and the Secretary?

11        A    I did not.

12        Q    Did you ever discuss the citizenship

13   question with Mr. Hernandez, at all?

14        A    I think we discussed it once or twice.

15        Q    And when were those conversations?

16        A    I don't recall exactly.

17        Q    Was it in the summer of 2017?

18        A    It was sometime in the spring/summer of

19   2017.

20        Q    Okay.  So you had been working on the

21   citizenship question for some number of months by

22   late July of 2017; is that right?

Page 210

1       A    Correct.

2       Q    Okay.  But your testimony is that the

3   Secretary had a phone call with Kris Kobach on

4   that issue and nobody told you about it?

5           MR. GARDNER:  Objection.

6   Mischaracterizes the witness's testimony.

7           THE WITNESS:  My testimony is he did not

8   discuss it with me.

9   BY MR. COLANGELO:

10      Q    Did anyone tell you that the Secretary

11  spoke to Kris Kobach about this issue?

12      A    Wendy might have mentioned it.

13      Q    And what do you remember Wendy said about

14  it?

15      A    That the Secretary had a conversation

16  with Kris Kobach.

17      Q    What did she describe about that phone

18  call?

19      A    She didn't.

20      Q    And did you ask for any other information

21  on it?

22      A    I didn't.

Page 211

1       Q   On an issue that you'd been working on
2   for five months?
3       A   It's not really relevant to the process I
4   was working on.
5           MR. COLANGELO:  Mr. Gardner, is now a
6   good time for a lunch break?  I have another --
7           THE WITNESS:  Or you can keep going.
8           MR. COLANGELO:  -- feeling this might be
9   a good time to stop.
10          MR. GARDNER:  How much -- how much more
11  time do you think you have, because I think the
12  witness is fine to keep going if you-all are?
13          MR. COLANGELO:  Well, we have a lot of
14  people here, and a court reporter and a
15  videographer.  So I'd rather take a short break
16  and then -- I probably have -- why don't you let
17  me look at my notes, I'll tell you once we're off
18  the record --
19          MR. GARDNER:  Sure.
20          MR. COLANGELO:  -- how much time we left.
21          MR. GARDNER:  Sure.
22          VIDEOGRAPHER:  This concludes Media

Page 212

1   Unit 3.  The time is 12:32 p.m.  We are off the
2   record.
3            (Off the record.)
4            VIDEOGRAPHER:  This begins Media Unit
5   Number 4.  The time on the video is 1:19 p.m.  We
6   are on the record.
7   BY MR. COLANGELO:
8       Q   Welcome back.
9       A   Good to be back.
10           MR. COLANGELO:  Let's mark Document 4004
11  as Exhibit 18.
12           MR. GARDNER:  I think 19.
13           MR. COLANGELO:  19.  Thank you.
14           (Plaintiffs' Exhibit 19, Email, was
15  marked.)
16  BY MR. COLANGELO:
17      Q   Mr. Comstock, do you have Exhibit 19 in
18  front of you?
19      A   I do.
20      Q   And do you recognize this email?
21      A   I sent it, so --
22      Q   Have you seen it before today?

Page 213

1        A    Well, obviously, when I wrote it.

2        Q    Okay.  This is an email from the

3   Secretary to you on August 8, 2017, and the

4   Secretary asks were you on the call this morning

5   about census?

6             Do you see that?

7        A    Uh-huh.

8        Q    What call is he referring to?

9        A    I don't know.  I'm not sure I was on it.

10       Q    Okay.  Did you hear from anybody about a

11   call on the census on August 8th?

12       A    I have no idea.

13       Q    And you'll see that later in the email,

14   the Secretary says, "Where is the DOJ in their

15   analysis?  If they still have not come to a

16   conclusion, please let me know your contact person

17   and I will call the AG.  Wilbur Ross."

18             Do you see that?

19       A    I see that.

20       Q    And what analysis is the Secretary

21   referring to?

22       A    Again, this pre-dates the memo I wrote

Page 214

1   outlining my contacts with the DOJ.  So this is a

2   question about where are we with the DOJ?

3       Q   Okay.  And you wrote back that evening

4   saying, "We'll be back shortly with an update on

5   the census question."

6       A   Yes.

7       Q   I have two attorneys in the DOC's general

8   counsel's office working on it?

9       A   Yes.

10      Q   And you testified one of those two

11  attorneys was James Uthmeier; is that right?

12      A   That's correct.

13      Q   And who was the other?

14      A   I don't recall.

15      Q   Okay.  Going back to the Secretary's

16  email where he says, "If they still have not come

17  to a conclusion, please let me know your contact

18  person and I will call the AG."

19      A   Yes.

20      Q   Did you understand that to mean that the

21  Secretary was concerned this was not done yet?

22      A   He was concerned that we had not made

Page 215

1    more progress.

2        Q    Okay.  How did he communicate that

3    concern to you?

4        A    By saying let me know who your contact

5    person is and I will call the AG.

6        Q    This email that you sent in your response

7    doesn't identify your contact person; is that

8    right?

9        A    That -- well, at least not in the part

10   that's not blacked out.

11       Q    Okay.  Do you recall identifying for the

12   Secretary before the September 8, 2017 memo who

13   your contact person was at DOJ?

14       A    I might have.  I probably would have had

15   to go back and look and see who I spoke to.

16       Q    Okay.

17            MR. COLANGELO:  Let's mark Document 3984

18   as Exhibit 20.

19            (Plaintiffs' Exhibit 20, email, was

20   marked.)

21            THE WITNESS:  Thank you.

22   BY MR. COLANGELO:

Page 216

1      Q    Mr. Comstock, have you seen this email

2   before?

3      A    It's to me, so, yes.

4      Q    Okay.  And this is in further response to

5   the Secretary's August 8th question; is that

6   right?

7      A    Would appear to be, yes.

8      Q    Okay.  And it says, "Mr. Secretary, we

9   are preparing a memo and full briefing for you on

10  the citizenship question.  The memo will be ready

11  by Friday, and we can do the briefing whenever you

12  are back in the office."

13          Do you see that?

14     A    Yes.

15     Q    And at this point, you had not received

16  any information from the Justice Department; is

17  that right?

18     A    That's correct.

19     Q    Okay.  So the memo that you're referring

20  to is a memo on the citizenship question that

21  includes no input from DOJ; is that right?

22     A    I -- I don't know.  I had not spoken to

Page 217

1    DOJ, no.

2        Q    You're not aware that anyone else had

3    spoken to DOJ on it?

4        A    Actually, I believe counsel might have

5    been talking to DOJ, but I don't know who they

6    were talking to.

7        Q    And which counsel is that?

8        A    James Uthmeier.

9        Q    And did he tell you he was talking to

10   DOJ?

11       A    I don't recall.

12       Q    So you're not aware that anybody had been

13   in touch with DOJ in order to get information for

14   this memo going to the Secretary?

15       A    I -- I'm not sure exactly the contents of

16   the memo to which you're referring, so I don't

17   know if it contained information from DOJ or not.

18       Q    And the Secretary responded by saying, "I

19   would like to be briefed on Friday by phone."

20       A    Yes.

21       Q    So it's fair to say that this reflects

22   the Secretary's continued impatience about getting

Page 218

1    an answer to his question?

2        A    I would say he clearly wanted to keep

3    moving forward.

4            MR. COLANGELO:   Let's mark as 21

5    Document 3983.

6            (Plaintiffs' Exhibit 21, email, was

7    marked.)

8            THE WITNESS:   Thank you very much.

9    BY MR. COLANGELO:

10       Q    Do you have Exhibit 21 in front of you?

11       A    Yes.

12       Q    Okay.  And this is an email from you to

13   the Secretary passing along the draft memo on the

14   citizenship question?

15       A    Correct.

16       Q    Okay.  And you'll see that Wendy Teramoto

17   responded a few days later saying, "Peter Davidson

18   and Karen Dunn Kelley will both be here Monday.

19   Let's spend 15 minutes together and sort this

20   out."

21       A    Right.

22       Q    And who is Peter Davidson?

Page 219

1      A    He is the Department of Commerce general

2    counsel who was arriving about that time, so --

3      Q    Who is Karen Dunn Kelley?

4      A    She is -- well, she would have been

5    coming in as the Under Secretary for economic and

6    statistics or whatever the name of the bureau is.

7    So she would have been arriving about that time,

8    as well.  She -- I think they got confirmed around

9    the same time.

10     Q    And this is the transmittal of the memo

11   that you described in the earlier emails we talked

12   about that you and OGC were preparing on the

13   citizenship question for the Secretary?

14     A    That's [sic] appears to be what it is

15   referencing, but I don't have the draft memo so I

16   can't tell you for sure.

17          MR. COLANGELO:  Okay.  Let's mark as

18   Exhibit 22 Document 1411.

19          (Plaintiffs' Exhibit 22, Email, was

20   marked.)

21   BY MR. COLANGELO:

22     Q    Do you have Exhibit 22 in front of you?

Page 220

1       A    I do.  I'm reading it.

2       Q    Do you need a moment to look it over?

3       A    Yeah.

4            Okay.

5       Q    Okay.  And have you seen this document

6   before?

7       A    Again, I sent the email, so yes.

8       Q    And can you tell me what this document

9   reflects?

10      A    It reflects an email exchange about

11  setting up a meeting.

12      Q    Okay.  And this was a meeting on the

13  citizenship question, right?

14      A    This was a meeting on key legal

15  questions.

16      Q    Regarding the census?

17      A    It actually -- well, the subject matter

18  is census, so presumably.

19      Q    And it involves you, Ms. Teramoto,

20  Mr. Hernandez, Mr. Uthmeier, Ms. Davidson,

21  Ms. Kelley, correct?

22      A    That's the list, yes.

Page 221

1    Q   And we just saw an email from a few weeks

2   earlier where Ms. Teramoto says let's keep

3   Mr. Davidson and Ms. Kelley involved in a

4   conversation about this, right?

5    A   I wouldn't say keep, but --

6    Q   Introduce them to this conversation?

7    A   Introduce, yes.

8    Q   So to your understanding, this was a

9   meeting to discuss the citizenship question?

10    A   Again, my understanding of this was to

11   discuss key legal issues regarding the census.

12    Q   Do you remember this meeting?

13    A   Not specifically, no.

14    Q   Do you remember any meetings with the

15   Secretary and with this group on the census?

16    A   Again, not specifically, no.

17        MR. COLANGELO:  Okay.  Let's have this

18   marked as Exhibit 23.  It's Document 2424.

19        (Plaintiffs' Exhibit 23, Email, was

20   marked.)

21   BY MR. COLANGELO:

22    Q   Do you have Exhibit 23 in front of you,

Page 222

1    Mr. Comstock?

2         A    I do.

3         Q    And do you recognize this document?

4         A    Again, it's an email from the Secretary

5    to me, so presumably I saw it then.  There's a lot

6    blanked out.

7         Q    And you understand that the

8    Justice Department has applied those redactions,

9    correct?

10        A    I do.

11        Q    And in this email dated September 1,

12   2017, the Secretary says, "I have received no

13   update, nor has there been an updated," -- blocked

14   out -- "nor the issue of the census question, nor

15   whether KDB thinks we have our arms around the

16   census cost data."

17              Do you see that?

18        A    Yes.

19        Q    And by KDB, do you think he meant KDK?

20        A    I believe that would be who he would be

21   referring to, yes.

22        Q    Referring to Karen Dunn Kelley?

Page 223

1     A    Yes.

2     Q    And did you understand this to be a

3  request for information on the status of the

4  citizenship question?

5     A    Well, I understood this to be a request

6  for information on a whole series of information

7  that were presented in the census.

8     Q    Including the citizenship question?

9     A    Including the citizenship.  He mentions

10 that.

11    Q    And the Secretary is frustrated, right?

12    A    That would appear so, yes.

13    Q    He's frustrated because he's asked for it

14 repeatedly and hasn't seen anything yet telling

15 him that it's done; is that right?

16    A    Well, I would not agree with your

17 characterization.  I think what this memo -- this

18 email shows is that there were a tremendous number

19 of issues connected to Census.  At this time, we

20 were working a tremendous amount on the lifecycle

21 cost estimate.

22         So we -- I mean, we had a huge issue.

Page 224

1  They were $3 billion -- basically, 25 percent of

2  their budget off, which is a shocking figure --

3      Q   Does the Secretary --

4          MR. GARDNER:  Let him finish his answer.

5          THE WITNESS:  -- that does not inspire

6  confidence in the Census Bureau or its current

7  leadership at the time.  So we were dealing with

8  quite a few issues connected with Census,

9  primarily related to the budget, trying to find

10  people to run the Census that we could count on.

11          So, yes, citizenship was one small piece

12  of this, but it was by no means the driving piece.

13      Q   Thank you.

14          MR. COLANGELO:  Let's mark Document 2034

15  as Exhibit 24.

16          (Plaintiffs' Exhibit 24, Email, was

17  marked.)

18  BY MR. COLANGELO:

19      Q   Mr. Comstock, do you have Exhibit 24 with

20  you?

21      A   I do.

22      Q   Have you seen this email before?

1        A    Again, it's an email from me to Peter

2   and -- Davidson and James Uthmeier, it looks like,

3   yes.

4        Q    And when's the last time you saw this

5   email before today?

6        A    Probably when I sent it on September 7,

7   2017.

8        Q    And you are advising Peter and James,

9   quote, as I discussed with James a little while

10  ago, the Secretary would like an update on

11  progress since the discussion yesterday regarding

12  the citizenship question.

13       A    That's what it says.

14       Q    And do you recall the discussion the day

15  before with the Secretary regarding the

16  citizenship question?

17       A    I don't recall the specifics of that

18  discussion, no.

19       Q    There was a discussion on September 6th

20  regarding the citizenship question?

21            MR. GARDNER:  Objection.  Form.

22            THE WITNESS:  Again, based on the email,

Page 226

1   it appears there might have been.

2   BY MR. COLANGELO:

3       Q   And why would the Secretary have asked

4   for an update by the next day?

5           MR. GARDNER:  Objection.  Calls for

6   speculation.

7           THE WITNESS:  As I've mentioned before,

8   we like to get things done.  We're not here to do

9   this all year long.  So I was asked similar

10  questions on numerous other issues I was working

11  on.

12  BY MR. COLANGELO:

13      Q   But it's fair to say the Secretary wanted

14  an answer quickly?

15      A   He always wants an answer quickly.

16          MR. COLANGELO:  Let's mark Document 2395

17  as Exhibit 25.

18          (Plaintiffs' Exhibit 25, Email, was

19  marked.)

20  BY MR. COLANGELO:

21      Q   Mr. Comstock, do you have Exhibit 25?

22      A   I do.

Page 227

1      Q    Okay.  Have you seen this document
2   before?
3      A    Yes.
4      Q    When's the last time you saw it before
5   today?
6      A    Yesterday counsel pointed it out to me.
7      Q    And did you review a version yesterday
8   that was redacted like this or unredacted?
9      A    I did.
10      Q    Pardon me?
11      A    It was redacted.
12      Q    Okay.  Like this?
13      A    Exactly like this.
14      Q    And this is an email from Mr. Uthmeier to
15   you on the evening of September 7th saying, "Earl,
16   I touched base with Peter," redacted, "He spoke
17   with Kassinger this evening."
18          Do you see that?
19      A    Yes.
20      Q    Who is Kassinger?
21      A    That would be Ted Kassinger, former
22   general counsel for the Department of Commerce.

Page 228

1       Q    And where does Mr. Kassinger work now?

2       A    He works at O'Melveny & Myers.

3       Q    A law firm?

4       A    Correct.

5       Q    In Washington?

6       A    Yes.

7       Q    And what did Mr. Davidson and

8   Mr. Kassinger discuss?

9            MR. GARDNER:  Objection -- sorry.

10  Restate that one more time.

11  BY MR. COLANGELO:

12      Q    What did Mr. Davidson and Mr. Kassinger

13  discuss?

14      A    I don't know.

15      Q    Did Mr. Davidson tell you what he and

16  Mr. Kassinger discussed?

17      A    Not to my knowledge.

18      Q    Did Mr. Uthmeier tell you what he and

19  Mr. Kass- -- what Mr. Davidson and Mr. Kassinger

20  discussed?

21      A    Well, it appears he might have, but it's

22  blanked out.

Page 229

1      Q    And Mr. Kassinger doesn't work for the

2    government, correct?

3      A    Correct.

4      Q    And did not at the time, correct?

5      A    Correct.

6           I would just observe, based on the all

7    blanked out here, we really have no idea what this

8    email is referring to.  It says a Census matter,

9    but it could have been any number of things,

10   including the numerous budget issues we were

11   talking about.  So let's make clear I don't know

12   what this email was in reference to.

13     Q    Okay.  Let's take a look at Exhibit 24.

14     A    Uh-huh.

15     Q    So this appears to be an unredacted

16   version --

17     A    Of the last part.

18     Q    -- of the last part --

19     A    Right.

20     Q    -- which appears to be redacted on 2396;

21   is that correct?

22     A    That certainly seems to be the case, yes.

Page 230

1      Q    They're both dated the same date,

2  correct?

3      A    Same date, same time.

4      Q    So --

5      A    Just to be precise.

6      Q    Thank you.  Same date and same time, to

7  be precise.

8           So on an email chain that you commenced

9  by saying the Secretary would like an update on

10  progress since the discussion yesterday regarding

11  the citizenship question.  Is it your

12  understanding that the reference to the Census

13  matter in the subject line, in fact, refers to the

14  citizenship question?

15      A    That would appear to be the case.

16      Q    Okay.  So it would also be your

17  conclusion that Mr. Davidson and Mr. Kassinger

18  were talking about the citizenship question; is

19  that right?

20      A    No.  It would not.

21      Q    Why not?

22      A    Because I get lots of email that start on

Page 231

1    one chain that go to another matter.  So it's
2    possible, but it's also possible it was discussing
3    something else.
4         Q    And did the general counsel talk to
5    Mr. Kassinger about a lot of issues you were
6    updated on?
7         A    I have no idea what Mr. Davidson and
8    Mr. Kassinger discussed.
9         Q    Do you see the email below the Kassinger
10   reference?
11        A    Uh-huh.
12        Q    There's a message from you to
13   Mr. Davidson, Mr. Uthmeier and Ms. Teramoto that
14   says, "I suggest setting up a call for tomorrow.
15   The Secretary is asking for progress on this."
16        A    Correct.
17        Q    And that's a reference to the citizenship
18   question, correct?
19        A    Without seeing the blanked out matter
20   below that from Peter Davidson, I don't know if
21   the email chain switched subjects or not.
22        Q    Okay.  So your -- your testimony is that

Page 232

1    even though you emailed Mr. Davidson and

2    Mr. Uthmeier about the citizenship question, and

3    they email you within an hour, and then you said

4    the Secretary is asking for progress on this,

5    you're not prepared to say it was about

6    citizenship question?

7        A    Without seeing the redacted material, I

8    can't confirm whether it's about the citizenship

9    question or whether we switched gears to another

10   topic.  That happens frequently.

11       Q    Were there a lot of -- strike that.

12            And the next day is the day that you sent

13   the Secretary your memo on DOJ contacts; is that

14   correct?

15            It's Exhibit 15, if that helps.

16       A    Yes.  The next day I sent him on my

17   discussions DOJ.

18       Q    And so the Secretary was asking for

19   updates on the citizenship question, you prepared

20   a memo on your contacts with DOJ, and you asked

21   the general counsel's office to prepare their own

22   data; is that right?

1    A   Again, I think -- I would agree that I

2  sent an email on the 7th asking for an update on

3  progress regarding the citizenship question, and I

4  would agree that I sent a memo to the Secretary

5  updating him on who I had spoken to at Justice.

6  But that's all I would know about what the

7  substance of the conversations were.

8    Q   And then after that exchange, did there

9  come a time when the Secretary and Attorney

10  General spoke about this issue?

11    A   Correct.

12    Q   And about how long after was that?

13    A   I don't recall.

14    Q   Was it about a week after?

15    A   Possibly.  I would imagine it was on the

16  Secretary's calendar.

17    Q   And after the Secretary spoke with the

18  Attorney General, was the substance of that

19  conversation relayed to you?

20    A   Beyond -- beyond the fact that they had

21  spoken and that the Attorney General was going to

22  look into the matter, no.

Page 234

1       Q    Beyond that they had spoken and the

2  Attorney General would look into it --

3       A    Correct.

4       Q    -- nothing else was conveyed to you?

5       A    Right.

6       Q    This was an issue you had been working on

7  for eight, nine months at this point?

8       A    Along with about 60 other issues.

9       Q    But this was one issue that you'd been

10  working on for eight or nine months, correct?

11      A    Let's see, September -- no.  I had not

12  been working on it for eight or nine months.

13  That's an overcharacterization.  I'd been working

14  on it for no more than seven months.

15      Q    Since very shortly after the Secretary

16  was confirmed, correct?

17      A    Correct.

18           MR. COLANGELO:  And let's mark as

19  Exhibit 26 document stamped 2651.

20           (Plaintiffs' Exhibit 26, Email, was

21  marked.)

22  BY MR. COLANGELO:

Page 235

1      Q    You have 2651 in front of you?

2      A    I do.  I'm reading it.

3           Okay.

4      Q    Have you seen this email before?

5      A    No.

6      Q    Do you see on the first page the email

7   from Danielle Cutrona, Wendy Teramoto dated

8   September 17, 2017 at 12:10 p.m.?

9      A    Yes.

10     Q    Do you know who Danielle Cutrona is?

11     A    I don't.

12     Q    Do you know what OAG stands for?

13     A    Office of the Attorney General.

14     Q    Okay.  So is your understanding that

15  Danielle Cutrona, as of September 17, 2017, worked

16  in the Office of Attorney General?

17          MR. GARDNER:  Objection.  Lack of

18  foundation.

19          THE WITNESS:  Again, based on the email,

20  that would appear to be the case.

21  BY MR. COLANGELO:

22     Q    Okay.  And Ms. Cutrona says to

Page 236

1    Ms. Teramoto, quote, from what John told me, it

2    sounds like we can do whatever you-all need us to

3    do, and the delay was due to a miscommunication.

4         Do you see that?

5    A    I see that.

6    Q    And then Ms. Teramoto writes back, "They

7    connected.  Thanks for the help.  Wendy."

8         Do you see that?

9    A    I see that.

10   Q    And you mentioned that you got an update

11   after this call.  Who did you get that update

12   from?

13   A    I said I think the Secretary mentioned

14   they had a discussion and the Attorney General was

15   looking into it.

16   Q    Well, this email doesn't say the Attorney

17   General was looking into it.  It says, "We can do

18   whatever you-all need us to do and the delay was

19   due to a miscommunication.  The AG is eager to

20   assist."

21   A    That is what the email says.  That is not

22   what was communicated to me, so --

Page 237

1    Q    So the Secretary said to you the AG will

2    look into it?

3    A    I don't recall the exact words, but the

4    AG is looking into the matter.

5    Q    When did the Secretary describe to you

6    the conversation with the Attorney General?

7    A    I have no idea.  Some time in this time

8    frame.

9    Q    And what did he say when conveying the

10   substance of the call to you?

11   A    I already relayed that.  He said

12   something to the effect of the AG is working on

13   it.

14   Q    Okay.  So this was in September of 2017.

15   At some subsequent point, did the acting director

16   of the Census Bureau receive a memo from the

17   Justice Department requesting inclusion of a

18   citizenship question?

19   A    Acting director receive a memo?  I'm not

20   aware of a memo.  I think -- I think there was a

21   letter that was sent.

22   Q    Okay.  And do you remember the date of

Page 238

1  that letter?

2      A    I don't.

3      Q    Have you seen that letter?

4      A    I believe I saw a letter from the

5  Justice Department.

6      Q    It came in around December of 2017, does

7  that sound right?

8      A    That sounds like the right ballpark.

9      Q    Did you see that letter before it was

10  transmitted to Mr. Jarmin -- to Dr. Jarmin?

11  Sorry.

12      A    I had not, no.

13      Q    And did you know the date that that

14  letter was going to be transmitted before it was

15  transmitted?

16      A    I did not, no.

17      Q    And did you read the letter when it came

18  in?

19      A    I imagine I did.

20      Q    And did you discuss that letter with the

21  Secretary when it came in?

22      A    I -- I might well have.  I don't know.

Page 239

1      Q    Okay.  What did you say to the Secretary

2  about the December 2017 letter when it came in?

3      A    Justice Department has requested this, so

4  now we can start the formal process.

5      Q    And what formal process are you referring

6  to?

7      A    Well, as I've outlined before, in order

8  for the government to take an action, you have to,

9  basically, create a record and make your decision

10  on the basis of that record.  So without a request

11  from an agency to ask for the inclusion of

12  citizenship, you were -- this was, basically, a

13  hypothetical question.

14      Q    Okay.  But you had told the Secretary in

15  May, we will get the Justice Department to request

16  the question?

17      A    I am going to do everything I can to

18  carry out the Secretary's wishes, if they are

19  legal, and so I will do my best.  I can't promise

20  things.

21      Q    You mentioned in reference to your

22  May 2nd email that you'd identified a case or

Page 240

1    cases supporting the --

2         A    Right.

3         Q    -- need for a citizenship question?

4         A    Correct.

5         Q    Is that case the Evanwell decision?

6         A    I have no idea.

7              MR. COLANGELO:  Give me one second,

8    Counsel.

9              MR. GARDNER:  Sure.

10             MR. COLANGELO:  I think I'm done, so we

11   will hand over to other counsel.

12             Do you want a short break, David, to do

13   that?

14             MR. GERSCH:  I could do some questioning

15   before we break and then we can break.

16             MR. COLANGELO:  Sure.

17             Let's go off the record.

18             VIDEOGRAPHER:  Going off the record.  The

19   time on the video is 1:49 p.m.

20             (Off the record.)

21             VIDEOGRAPHER:  We're back on the record.

22   The time on the video is 1:50 p.m.

Page 241

1           EXAMINATION BY MR. GERSCH:

2      Q   Good afternoon, Mr. Comstock.  My name is

3  David Gersch, and I represent the New York

4  Immigration Coalition plaintiffs.

5      A   Okay.

6      Q   And I'm going to ask you some questions.

7      A   Sounds fine.

8      Q   All right.  At some point in March, the

9  Secretary -- and when I secretary, you'll

10 understand I mean Secretary Ross?

11     A   Yes.

12     Q   At some point in March, the Secretary

13 issues what's called a decisional memorandum

14 explaining his decision to add a question

15 regarding citizenship to the census?

16     A   You're referring to March 2018?

17     Q   I'm sorry?

18     A   You're referring to March 2018, not 2017?

19     Q   I'm referring to March 26th.

20     A   Right.  In the year 2018 --

21     Q   Correct.

22     A   -- not the year 2017.

Page 242

1      Q   Ah.  If I said --

2      A   The prior questions were very focused on

3  March 2017, so I want to be clear we're now

4  talking about the following year.

5      Q   Absolutely.  Sorry.  Yes.  These

6  questions -- the question I'm going to ask you now

7  is about 2018.

8          You recall there was a time,

9  March 26, 2018, when the Secretary issued a

10 decisional memorandum regarding his decision to

11 add a citizenship question?

12     A   Yes.

13     Q   You worked on that memorandum?

14     A   Yes.

15     Q   Okay.  Were you the principal drafter?

16     A   I was one of the principal drafters.

17     Q   Who were the other principal drafters?

18     A   James Uthmeier was the primary other

19 drafter.

20     Q   Did you have a division of responsibility

21 between the two of you?

22     A   No.  I believe he did the first draft.

1      Q    He did the first draft?

2      A    Well, the Secretary actually probably

3    made -- indicated what he wanted in a draft and

4    then James would have put it together.

5      Q    And then you would have worked on it

6    after James?

7      A    Correct.

8      Q    All right.  Was that a typical way in

9    which the two of you worked?

10      A    Sure.  I edit lots of documents.

11      Q    I mean --

12           (Thereupon, the court reporter

13    clarified.)

14           THE WITNESS:  I edit lot of documents.

15    BY MR. COLANGELO:

16      Q    I meant with you and Mr. Uthmeier?

17      A    Yeah.  It would be unusual for me to

18    prepare the first draft and him to edit it, yes.

19      Q    That's what I'm getting at.  All right.

20    Thank you.

21           And did anyone else work on the draft

22    besides you, the Secretary and Mr. Uthmeier?

Page 244

1      A    Yes.  I think numerous other people

2   reviewed the draft, and --

3      Q    How about people who contributed to the

4   language?

5      A    Again, without seeing various drafts, it

6   would be hard to say who contributed to which

7   language.

8      Q    Okay.  Okay.  Couple more questions

9   before we take our break.

10          You were shown earlier today a supplement

11   to the decisional memorandum --

12      A    Yes.

13      Q    -- issued by Secretary Ross in June of

14   this year.

15          You recall that?

16      A    Right.  You're referring to Exhibit 5?

17      Q    Yes.  And there's language in

18   Exhibit 5 -- get the exact language -- there's

19   language in Exhibit 5 that says referring to

20   fundamental issues regarding the upcoming 2020

21   census, "part of these considerations included

22   whether to reinstate a citizenship question which

Page 245

1   other senior administration officials had

2   previously raised."

3           Was that language in the original memo

4   you received -- original versions of this memo you

5   received from the Department of Justice?

6       A   I have no idea.

7       Q   Did you add that language?

8       A   No.

9       Q   Do you have any idea who put that

10  language in there?

11      A   I don't.

12      Q   Who at the Department of Justice

13  recommended that the Secretary sign this memo

14  memorandum?

15      A   I don't know exactly.  I mean, I was

16  told --

17      Q   Who were you dealing with at the

18  Department of Justice?

19      A   Well, I wasn't dealing directly with

20  them.  It was the Office of General Counsel at

21  Department of Commerce that was dealing with them.

22      Q   All right.  If I understood your

Page 246

1   testimony this morning -- and correct me if I'm

2   wrong -- you received a draft from

3   Department of Justice and you made edits to it; is

4   that right?

5       A   Well, Department of Commerce received the

6   draft, which I made some edits to.

7       Q   Who did you receive the document from?

8       A   I would have either gotten it from James

9   Uthmeier or Mike Walsh.

10      Q   And is it your testimony you don't know

11  who at Department of Justice were -- well,

12  withdrawn.

13          You made recommendation to the Secretary

14  that he sign the memorandum, correct?

15      A   Based on the advice I'd been given by the

16  Office of General Counsel, yes.

17      Q   This morning I understood you to testify

18  that it was based on the advice from the

19  Department of Justice.  Do --

20          MR. GARDNER:  Objection.

21  BY MR. GERSCH:

22      Q   -- you recall that testimony?

Page 247

1          MR. GARDNER:  Objection.

2   Mischaracterizes the witness's previous testimony.

3          THE WITNESS:  My previous testimony was

4    the Department of Justice sent to the

5    Department of Commerce, from the Justice

6    Department to the Office of General Counsel, a

7    draft document suggesting that the Secretary

8    needed to sign this.  That document was reviewed

9    by the Office of General Counsel and myself, edits

10   were made, the document produced, and the

11   Secretary then signed it.

12   BY MR. GERSCH:

13      Q   Yeah.  My question was a little

14   different.

15          My understanding of your testimony this

16   morning was you recommended that the Secretary

17   sign this supplemental memorandum based on advice

18   you received from the Department of Justice; is

19   that correct?

20          MR. GARDNER:  Objection.

21   Mischaracterizes the witness's previous testimony.

22          THE WITNESS:  Once again, the

Page 248

1    Department of Justice, who are our counsel,

2    suggested that a supplemental memorandum was

3    needed.  This was not something Department of

4    Commerce generated.  This was something the

5    Department of Justice, as our counsel, recommended

6    be provided.  Following up on that advice, we

7    worked on the document and then had the Secretary

8    sign it.  We were following advice of counsel.

9    BY MR. GERSCH:

10       Q   Well, again, I'm not sure I've got an

11   answer to my question.

12           My understanding -- well, I'll put it --

13   without respect to what you testified to this

14   morning, is it correct that you advised the

15   Secretary to sign the supplemental memorandum

16   based, in part, on advice from the

17   Department of Justice?

18       A   Again, I'm not sure I'm following the

19   logic of your question.  But, once again, this

20   document was produced initially by the

21   Department of Justice, who sent it to the

22   Department of Commerce with the recommendation

Page 249

1    that the Secretary, for purposes of this

2    litigation, needed to submit this supplemental

3    memorandum.

4             So we reviewed it, made a few edits, and

5    then we had the Secretary sign it.  We were

6    following the advice of our counsel.  I'm not sure

7    which part of that answer you're not following.

8        Q   I just asked whether part of the basis

9    for your advice to the Secretary to sign it was

10   the advice you got from the Department of Justice?

11       A   Obviously.

12       Q   Thank you.

13            Did you talk to the Department of Justice

14   about why it was a good idea for the Secretary to

15   sign this memorandum?

16       A   No.

17       Q   Did anyone?

18       A   You'd have to ask our Office of General

19   Counsel.

20       Q   And it's your testimony that you had no

21   dealings with the Department of Justice about this

22   memorandum?

Page 250

1      A    That's correct.

2      Q    Okay.

3           MR. GERSCH:  Let's take our short break

4   here.

5           MR. GARDNER:  How long?

6           MR. GERSCH:  Ten minutes or so.

7           VIDEOGRAPHER:  This is the end of Media

8   Unit Number 4.  The time on the video is 1:58 p.m.

9   We are off the record.

10          (Off the record.)

11          VIDEOGRAPHER:  This begins Media Unit 4.

12  The time on the video is 2:14 p.m.  We are on the

13  record.

14  BY MR. GERSCH:

15     Q    Mr. Comstock, we're back on the record.

16  Before the break, I was asking some questions

17  about 2018.  Now I want to go back to 2017.

18     A    Okay.

19     Q    You with me?

20     A    I'm with you.

21     Q    All right.  I want to go back to the

22  spring of 2017 when Secretary Ross requests the

Page 251

1    inclusion of a citizenship question on the census.

2    At that point in time, the Department of Justice

3    had made no request to Commerce for the addition

4    of a citizenship question, correct?

5        A   That's correct.

6        Q   And they certainly hadn't

7    asked -- withdrawn.

8            The Department of Justice certainly

9    hadn't asked Commerce to add a citizenship

10   question because of the VRA.  That's also correct;

11   isn't it?

12       A   Well, they didn't ask us to add a

13   citizenship question at that point.  So

14   speculating as to why they would ask is

15   irrelevant.

16       Q   I'm not asking you to speculate.  The one

17   thing we can be sure of is they didn't ask about

18   the VRA is because they didn't ask at all?

19       A   Correct.

20       Q   All right.  And when Secretary Ross says

21   to you in the spring, in whatever words he used,

22   that he wants a citizenship question added to the

Page 252

1   census, wouldn't you have had a discussion with

2   him at the time about why he wants that?

3          MR. GARDNER:  Objection.  Asked and

4   answered.

5          THE WITNESS:  Again, the answer is no, I

6   would not have a discussion.  My boss, if he asked

7   me to investigate something, I investigate it and

8   report back the results.

9   BY MR. GERSCH:

10     Q    Is your testimony you did not have a

11   discussion?

12     A    I did not.

13     Q    And you're not saying -- well, withdrawn.

14          Wouldn't it be helpful to you in your job

15   to assist the Secretary to have an understanding

16   of why he wanted the citizenship question?

17          MR. GARDNER:  Objection.  Form.

18   BY MR. GERSCH:

19     Q    You can answer.

20     A    Again, I didn't have any particular

21   doubts about why a citizenship question would be

22   useful, so, no, it would not have hurt me to ask.

Page 253

1        Q   I'm not asking whether you had doubts.

2   My question to you is a little bit --

3        A   I understand your question.

4        Q   My question, sir, is:  Wouldn't it be

5   helpful to you in your job of assisting the

6   Secretary to have a complete understanding of why

7   the Secretary wants to add a citizenship question?

8           MR. GARDNER:  Objection.  Form.

9           THE WITNESS:  Again, it's not relevant to

10  the question of whether or not he needs -- of

11  whether or not a question should be added, so, no.

12  BY MR. GERSCH:

13       Q   Is it your testimony that why he wants a

14  citizenship question to be added is not relevant

15  to whether it should be added?  Did I -- did I

16  hear that right?

17          MR. GARDNER:  Objection.

18  Mischaracterizes the witness's prior testimony.

19          THE WITNESS:  My test- --

20          MR. COLANGELO:  That's exactly what he

21  said, Counsel.

22          THE WITNESS:  No.  My testimony is:  The

Page 254

1    rationale for why he would want it added is not

2    relevant to my initial inquiry as to whether or

3    not a question can be added.

4    BY MR. GERSCH:

5         Q    Yeah.  My question was a little

6    different.  The question I am trying to get you to

7    focus on is:  In your work for the Secretary,

8    wouldn't it be helpful to you to understand as

9    fully as possible why he thinks it's a good idea

10   to add a citizenship question?

11        A    And let --

12             MR. GARDNER:  Objection.  Asked and

13   answered.

14             THE WITNESS:  And let me get you to

15   understand my answer, which is, no, it would not

16   make a difference, because I don't need that

17   information to investigate the question.

18   BY MR. GERSCH:

19        Q    Anyone ever say anything to you about why

20   the Secretary thought it was a good

21   idea -- withdrawn.

22             Am I right that your testimony is that

Page 255

1   you've never had a discussion with the Secretary

2   about why he thought it was a good idea to have a

3   citizenship question added?

4       A   That's correct.  I have not had a

5   conversation with him, no.

6       Q   Okay.  And did anyone else say anything

7   to you about why the Secretary thought it was a

8   good idea to have a citizenship question added?

9           MR. GARDNER:  Objection.  Form.

10          THE WITNESS:  Again, no.

11  BY MR. GERSCH:

12      Q   All right.  If I remember correctly, you

13  testified you worked in a bullpen area?

14      A   Correct.

15      Q   Outside the Secretary's office?

16      A   Yes.

17      Q   I'm not sure I've got all the people who

18  were there, but Wendy Teramoto was there, right?

19      A   Correct.

20      Q   James Uthmeier was there?

21      A   No.

22      Q   I'm sorry.

Page 256

1          You were there?

2     A    Yes.

3     Q    Eric Branstad, was he there?

4     A    Yes.

5     Q    That's three.

6          Izzy Hernandez, that's four.  Was he

7     there?

8     A    Yes.

9     Q    Who was the fifth?

10    A    James Rockas.

11    Q    And I'm right that there were five?

12    A    Correct.

13    Q    Okay.

14    A    At times.

15    Q    So you're all sitting there -- and are --

16    do you work in cubicles, open desks, how does it

17    work?

18    A    Wendy Teramoto had a seated desk.  I had

19    a standing desk.  Izzy had a standing desk with a

20    stool.  James had a standing desk with a stool.

21    Eric Branstad had a standing desk with a stool.

22    Q    Are there walls?  Are there partitions?

Page 257

1    Are you all in an open space?

2        A    I'm facing -- I was facing Wendy.  Izzy,

3    who was rarely there, but his desk was next to

4    mine, facing Eric, and then James was on the end.

5        Q    And there are no walls, correct?

6        A    No walls.

7        Q    No partitions?

8        A    No partitions.

9        Q    Okay.  In all the time that you're

10   sitting there and you're all working together, no

11   one says, why does the Secretary want to add a

12   citizenship question -- citizenship question?

13       A    That's correct.  Because, again, this was

14   one of well over 100 different items we were

15   working on.  All of us were working on different

16   things.  I'm primarily tasked with policy.  James

17   is primarily tasked with press.  And so you're

18   dealing with all of these other issues.  There's

19   no reason to discuss it.

20       Q    I'm not even talking about discussing it.

21   No one mentioned?  Did anyone mention it?

22       A    Not that I recall.

Page 258

1      Q   No one says the reason the Secretary

2  wants to add a citizenship question is whatever

3  the reason is, no one ever said anything like

4  that?

5      A   No.

6          MR. GARDNER:  Objection to form.

7          THE WITNESS:  Not to my recollection.

8  BY MR. GERSCH:

9      Q   Okay.  Did you ever have a discussion

10 with people from the Office of General Counsel at

11 Commerce about why the Secretary wanted to add a

12 citizenship question?

13     A   No.

14     Q   And in your time there, did you never see

15 a document analyzing why it was a good idea for

16 Census to add a citizenship question?

17     A   Again, you're -- we have a fundamental

18 disagreement on the premises of your question.

19 Your premise is that somehow a reason needs to be

20 provided.  The question before us is the Secretary

21 has the legal authority to add questions to the

22 census.  Is there a governmental need?  And if

Page 259

1   there is, then you're off to the races.

2        Q    My question was a little different.  My

3   question was --

4        A    I understand your question.

5        Q    Sir, I'll repeat it for you.

6             My question is:  In all the time you're

7   there, did you never see a document spelling out

8   the reasons why it would be a good idea to add a

9   citizenship question?  Why it would be good from

10  Commerce's perspective?

11            MR. GARDNER:  Objection.  Form.

12            THE WITNESS:  Again, that's not the

13  question.  Commerce --

14  BY MR. GERSCH:

15       Q    Excuse me, sir.  That is my question.

16  Could you answer my question?

17       A    Okay.  No.

18       Q    Not even a scrap of paper, right?

19       A    Nope.

20       Q    No memoranda, right?

21       A    No.

22       Q    No emails?

Page 260

1      A    Not that I recall.

2      Q    And I just want to be straight on my

3  understanding.  I think I got you correctly, but I

4  just want to make sure and test that I'm right.

5           It couldn't possibly assist you in your

6  work, in any way, to know why the Secretary wanted

7  to add a citizenship question?  Do I understand

8  that correctly?

9      A    It's not relevant to my analysis.

10     Q    And so it couldn't possibly help you in

11 any way in your work?

12     A    I'm not going to agree with your

13 statement that way, no.

14     Q    Well, that's my question -- withdrawn.

15          Well, is there any way in which knowing

16 what the Secretary's reason was for wanting to add

17 a citizenship question, is there any way that

18 could assist you in your work at

19 Department of Commerce?

20     A    Assist me on my work at the Department of

21 Commerce, no.

22     Q    Is there any way that it could help you

Page 261

1  help the Secretary add a citizenship question?

2      A   If I had found it difficult or

3  challenging, yes.  Knowing more about why he

4  wanted it would have been helpful, but I didn't

5  say that there was an issue.  It had been asked

6  for hundreds of years, and it had been asked on

7  the ACS.  So, clearly, there's a need for it.  And

8  so, no, that was not a particularly troublesome

9  aspect of the question I was being asked to look

10  into.

11      Q   When you said if I had found it difficult

12  or challenging, what did you mean?  What's the it?

13      A   If -- if what I had been requested to do

14  seemed to have significant legal obstacles to the

15  ability to do that question or take that action,

16  then I would probably inquire more fully to see if

17  there's an alternative way to address what the

18  Secretary is trying to get to.  In this particular

19  case, you have something that has been on the

20  decennial census before that is currently being

21  asked on the ACS.  There's clear legal authority

22  for him to add the question.  So, frankly, the

Page 262

1    reasons that he wants to add it doesn't add

2    anything to the analysis.  There is a governmental

3    need for this information.  That's a question

4    that's already established, so I don't need to

5    inquire further as to what his personal beliefs

6    regarding this question might be.

7        Q   What's the governmental need for the

8    question?

9        A   Enforcement to the Voting Rights Act,

10   determining how many undocumented citizens there

11   are.  You name it, there's a whole bunch of

12   reasons.  That's why every government in the world

13   collects this information.

14       Q   Well, correct me if I'm wrong, we're

15   talking about at a period in the spring of 2017

16   when the Voting Rights Act hadn't come up, the

17   Department of Justice hadn't made a request for

18   it.  What does the Voting Rights Act got to do

19   with it in the spring of 2017?

20       A   When you inquire as to what does the

21   Department of Justice use the citizenship data

22   on --

Page 263

```
 1        Q    That wasn't my question.  My question
 2    is --
 3        A    I'm answering your --
 4        Q    -- why is it a good idea, why does the
 5    government need it back in the spring of 2017?
 6        A    Finished with your question?
 7        Q    That's my question.
 8        A    The answer is for the same reason they've
 9    been collecting it for the last 200-plus years.
10        Q    What's the government need in the spring
11    of 2017?
12        A    I already answered that question.  If
13    they collect the data under the ACS for Voting
14    Rights Act enforcement, that is one of the primary
15    reasons they collect the data.
16        Q    Okay.  It's on the ACS.  What's the
17    need -- governmental need for it to be on the
18    census?
19             MR. GARDNER:  Objection.  Asked and
20    answered.
21             THE WITNESS:  The governmental need is,
22    again, if you're going to get more detailed
```

Page 264

1    information, then you need that information.

2    BY MR. GERSCH:

3        Q   Who said in the spring of 2017 that the

4    government needed more detailed information?

5        A   Again, I'm presented with a request by

6    the Secretary to say, can we add this question to

7    the census?  I inquire about that, and I looked at

8    it.  One of the reasons you would need it is

9    voting rights.  If you're going to do voting

10   allocations on the basis of census allocations,

11   that's the reason it's perfectly sufficient.

12       Q   Who said that in the spring of 2017?

13       A   That was -- that was determined after

14   taking a quick look at the issue.  I don't need

15   more than that to continue to pursue the question.

16       Q   Who told you that the government needed,

17   in the spring of 2017, more detailed information

18   about citizenship than was contained in the ACS?

19       A   Nobody.

20       Q   You came to that decision on your own; is

21   that right?

22       A   Correct.

Page 265

1    Q   But you're not a voting rights lawyer,

2  right?

3    A   Irrelevant to the question.

4    Q   That's not my question.  You're not a

5  voting rights lawyer, right?

6    A   I've already said that.

7    Q   So you decided on your own in the spring

8  of 2017 that it would be a good idea for the

9  government to have more information than was

10  available from the ACS about citizenship to

11  enforce the Voting Rights Act, even though you're

12  not a voting rights lawyer?

13    A   I don't agree with that characterization,

14  at all.  I decided that there was sufficient

15  information for me to pursue the Secretary's

16  request to consider placing a citizenship question

17  on the decennial census and that there was

18  sufficient potential reason to collect that

19  information to warrant moving forward.  If I'd

20  come to an opposite conclusion that there was not

21  sufficient potential reason or that there was some

22  insurmountable legal bar, then I would have

1  reported back to the Secretary, I'm sorry,

2  Mr. Secretary, it does not appear we can

3  accomplish this objective.

4      Q   Why did you need to come up with a reason

5  for asking the question, separate and apart from

6  whatever reason the Secretary had in his own head?

7      A   Again, my job is to figure out how to

8  carry out what my boss asks me to do.  So you go

9  forward and you find a legal rationale.  Doesn't

10 matter what his particular personal perspective is

11 on it.  It's not -- it's not going to be the basis

12 on which a decision is made.

13     Q   That's your understanding, that the way

14 you should do it, is come up with a rationale that

15 has nothing to do with what's in the Secretary's

16 mind as to why he wants it; is that your

17 understanding of how it's supposed to work?

18     A   No.  Again, you continue to characterize

19 things in a way that you believe may be correct,

20 but not the way I believe to be correct.  My job,

21 as a person who has been doing this for 30-plus

22 years for clients and people in the government, is

Page 267

1    if they would like to accomplish an objective, I
2    see if there's a way to do that.  And, again, if
3    it's not legal, you tell them that.  If it can't
4    be done, you tell them that.  If there's a way to
5    do it, then you help them find the best rationale
6    to do it.  That's what a policy person does.
7           And so, again, if I came up with a
8    rationale that the Secretary didn't agree with or
9    didn't support, then he was going to tell me that.
10   I have no doubt about that.  But in the meantime,
11   he doesn't -- I don't need to know what his
12   rationale might be, because it may or may not be
13   one that is -- that is something that's going to a
14   legally-valid basis.
15          So, again, he's got -- he's asked, can we
16   put -- can we put a question on?  The job of a
17   policy person is go out and find out how you do
18   that.  Whether that decision is going to be made
19   ultimately to do it or not, that's up to the
20   decision-maker.
21   Q   Are you saying you're better off not
22   knowing what the Secretary's own rationale is for

Page 268

1    wanting the citizenship question?

2        A    The Secretary, as you would point out, is

3    not a voting rights lawyer, so I would not expect

4    him to necessarily come up with a rationale.

5    That's the job of the staff at work.

6        Q    You certainly wouldn't expect the

7    Secretary to have come up with the idea that the

8    reason he should want the citizenship question is

9    the Voting Rights Act; you wouldn't expect him to

10   come up that on his own?

11       A    I -- he might well.  I don't know.

12       Q    You have no reason to believe that he

13   did, right?

14           MR. GARDNER:  Objection.  Calls for

15   speculation.

16           THE WITNESS:  I'm not going to speculate

17   about what his rationale was.  You'd have to --

18   BY MR. GERSCH:

19       Q    Because --

20       A    -- ask him.

21       Q    -- because you have no idea what his

22   rationale is?

Page 269

1      A    That's correct.

2      Q    Counsel asked you about contact you made

3  with the Department of Justice --

4      A    Correct.

5      Q    -- starting with a Ms. Haney [sic], I

6  believe.

7           Do you recall that?

8      A    Yes.  I believe her name is Hankey,

9  but --

10     Q    Hankey.  I apologize.

11          What was the full name?  I can get it out

12  if you don't know it offhand.

13     A    Mary Blanche, but --

14     Q    I'll find it in here.

15     A    It's in one of these exhibits, the memo

16  that I wrote.  Here.

17     Q    Mary Blanche --

18     A    Yep.

19     Q    -- Hankey; is that right?

20     A    Yeah.

21     Q    All right.  So you went -- you called

22  Mary Blanche Hankey --

Page 270

1      A   Correct.

2      Q   -- with regard to adding a citizenship

3  question to the census, right?

4      A   Correct.

5      Q   And you wanted to see if the

6  Department of Justice would sponsor the question?

7      A   Correct.

8      Q   And you had a phone call with her, and

9  you had at least a meeting with her, right?

10     A   Right.

11     Q   So at least two contacts?

12     A   Three, when she called me back with

13  somebody else's name.

14     Q   Fair enough.

15         Didn't -- didn't Ms. Hankey say, why do

16  you want to have a citizenship question?

17     A   No, she didn't.

18     Q   Didn't come up, at all?

19     A   Nope.

20     Q   She referred you to a Mr. McHenry; is

21  that right?

22     A   Correct.

Page 271

1      Q    And he's not a voting rights guy, right?

2      A    I don't actually know what his background

3  is.

4      Q    Well, you went ahead, back and forth with

5  him over about a month; is that right?

6      A    I mean, we spoke on the phone probably

7  three or four times, yeah.

8      Q    Going from, I think, the period you

9  mentioned was --

10      A    Yeah.  It was --

11      Q    -- early May to early June, roughly?

12      A    Approximately a month, yeah.

13      Q    And didn't you learn in that time that

14  he's not a voting rights guy?

15      A    No.

16      Q    Never came up?

17      A    We didn't get into great detail on the

18  rationale.

19      Q    You did ask him would you sponsor a

20  census question for -- I'm sorry.  Withdrawn.

21           You did ask Mr. McHenry if he would be

22  willing to sponsor a request for the addition of a

Page 272

1  citizenship question on the census, right?

2       A    I didn't ask Mr. McHenry if he would.   I

3  asked if the Department of Justice would be

4  inclined to send a letter asking us to add the

5  citizenship question.

6       Q    Fair enough.

7            And when you did that, you didn't explain

8  to Mr. McHenry why the Secretary wanted a

9  citizenship question?

10      A    I would have no reason to.

11      Q    And Mr. McHenry never asked, hey, you

12  want me to do this?  Why do you need it?  He never

13  asked you that?

14      A    I think I explained at the outset that

15  the department currently got a report from the ACS

16  on citizenship level -- I mean, on

17  census -- certain census size, Citizen Voting Age

18  Population, and if they were to get it from the

19  decennial, that would allow them a greater

20  granularity and would that be useful to them, and

21  he said he would inquire.

22      Q    You asked Mr. McHenry if the

Page 273

1    Department of Justice would find it useful to have

2    more granularity about citizenship?

3         A    Correct.

4         Q    But at no point did Mr. McHenry say,

5    look, if we want it, we'll ask for it, but how

6    come you want it?  Didn't he ask you something

7    like that?

8         A    No.

9         Q    When people call you and say, hey, will

10   the Department of Commerce do this or do that,

11   don't you say, why do you want that, why do you

12   need that?

13        A    I usually say is there a reason that you

14   think the Department of Commerce would need

15   that -- and if they have a reason, then I'll look

16   into it.  I don't say, hey, why does your boss

17   want this?  That's not part of lexicon.

18        Q    No.  No.  If another agency calls and

19   says --

20        A    I don't --

21        Q    Let me finish the question and you can

22   answer any way you want.

Page 274

1           If another agency calls and says, will

2      the Department of Commerce do such and such,

3      whatever it is --

4           A    Right.

5           Q    -- don't you say to them in some form or

6      another, why do you want this?

7                MR. GARDNER:  Objection.  Hypothetical.

8      BY MR. GERSCH:

9           Q    Why does your agency need this?

10               MR. GARDNER:  Objection.  Hypothetical.

11               THE WITNESS:  Again, I don't question why

12     their boss might want it.  I might say, what is it

13     you think we can provide or why do you think the

14     Department of Commerce is the right agency for

15     this?  But if they say we need this data because

16     we're negotiating a trade agreement, whatever,

17     that's fine.  I don't question their basis.

18     BY MR. GERSCH:

19          Q    Okay.  But if I understood your last

20     answer, you added something important, you said,

21     if they call and say we need this for the trade

22     ag- -- trade agreement, you say I don't question

Page 275

1    them.  But if they don't give a reason, sir, don't

2    you say to them, why do you want it?

3           MR. GARDNER:  Objection.  Calls for a

4    hypothetical.

5           THE WITNESS:  Again, I already provided

6    the reason for Department of Justice.  I said,

7    would it be useful for you to have more granular

8    voting data at the census lock level?  He said he

9    would inquire.  That answers your question.  I'd

10   already provided the answer.

11   BY MR. GERSCH:

12      Q   Mr. McHenry comes back at some point and

13   he says he's not interested, right, in words or

14   substance?

15      A   He suggested that I contact the

16   Department of Homeland Security.

17      Q   But I take it he makes it clear to you in

18   some fashion -- withdrawn.

19           Let's start with this.  What did he say

20   to you?

21      A   He suggested I talk to the Department of

22   Homeland Security.

Page 276

1      Q   Did he also say, listen, I don't really
2   need that information, or my guys don't need that
3   information, or my department doesn't need that
4   information or something like that?
5          MR. GARDNER:  Objection to form.
6          THE WITNESS:  Again, no, he did not
7   indicate that they did not need the information.
8   He simply suggested that they were rather busy and
9   why don't I talk to the Department of
10  Homeland Security.
11  BY MR. GERSCH:
12     Q   It's your testimony that he said they
13  were too busy to do it?
14     A   Unfortunately, that's not an uncommon
15  response from other agencies.  They don't
16  necessarily look for extra work.
17     Q   Okay.  So they were too busy to ask for
18  it, that's what you understood them to say?
19     A   Yeah.  Their inclination was they weren't
20  inclined to do the work, to ask for it, yeah.
21     Q   Okay.  Okay.  So Mr. McHenry let's you
22  know he's not inclined or the department is not

Page 277

1    inclined to do the work, to ask for it, and he

2    refers you to Homeland Security, correct?

3        A    Correct.

4        Q    And you speak to a Mr. Hamilton, right?

5        A    Right.

6        Q    And Mr. Hamilton, he's not a VRA guy,

7    right?

8        A    I have no idea what his background is.

9        Q    Certainly, it's your understanding that

10   the Department of Homeland Security has nothing to

11   do with enforcing the Voting Rights Act?

12       A    It would not normally be something I

13   would think they would do, no.

14       Q    And you talked to Mr. Hamilton how many

15   times?

16       A    I don't know, three or four times.

17       Q    Over what period?

18       A    Again, two weeks.  I don't know.

19       Q    And don't you say to Mr. Hamilton, here's

20   why we want the information, here's why we want

21   you to ask for the citizenship question?

22       A    Again, it was the same explanation as I

Page 278

1    gave the Department of Justice.  And as you

2    pointed out, DHS doesn't really do that.  So I was

3    simply following up on the suggestion that

4    Mr. McHenry had made, and perhaps there was

5    something that DHS did that I was unaware of that

6    would have them -- have the need for this

7    information.  Turns out they didn't, so back to

8    Square 1.

9        Q   Yeah.  My question is -- and maybe I

10   didn't phrase it exactly right.

11           Did you explain to Mr. McHenry [sic] in

12   any of these several calls, here's why it's

13   important to the Department of Commerce, or your

14   boss or whomever, here's why it's important

15   that -- to get a citizenship question added?

16           MR. GARDNER:  I think you mean

17   Mr. Hamilton.  You said Mr. McHenry.

18           MR. GERSCH:  Withdrawn.  Let me rephrase.

19   Thank you, Counsel.

20   BY MR. GERSCH:

21       Q   In any of these several calls, you say to

22   Mr. Hamilton, here's why it's important to

Page 279

1   Department of Commerce to have you folks request

2   the addition of a citizenship question.

3       A    No.  I never explained that to him.

4       Q    And is it your testimony that in your

5   several conversations with Mr. Hamilton, he never

6   says, hey, why do you want this?

7       A    That's correct.

8       Q    He never says, why do you want a

9   citizenship question added?

10      A    Again, when somebody calls up and says --

11  my boss, you know, Secretary Ross, AG Sessions,

12  whomever has asked us to pursue this, I don't

13  typically question back and say, well, why do you

14  think -- does your boss think this is needed?  I

15  just don't do that.  It's kind of discourteous to

16  other staff.  So no, he took me at face value.

17  I'm calling to inquire, would they find this

18  useful?  He gets back to me, no.

19      Q    I just want to make sure I caught part of

20  what you're saying correctly.

21           Are you saying it would have been

22  discourteous for Mr. Hamilton at Homeland Security

Page 280

```
 1    to say, hey, why do you guys at Commerce want us

 2    to ask for a citizenship question?

 3        A    For him to challenge why my boss might

 4    ask for it.

 5        Q    I didn't say challenge.

 6             Is it your testimony it would be

 7    discourteous for him to say, hey, you're asking me

 8    to do something --

 9        A    Uh-huh.

10        Q    -- something which involves some work --

11        A    Uh-huh.

12        Q    -- would you just explain to me why it's

13    important for you to have me ask for a citizenship

14    question?

15             MR. GARDNER:  Objection.  Form.

16             THE WITNESS:  No such conversation

17    occurred.

18    BY MR. GERSCH:

19        Q    Yeah.  My question is:  Would that have

20    been discourteous for him to say that to you?

21        A    Depends on how he phrased it.

22        Q    He could have phrased it in a way that
```

Page 281

1    was properly respectful, right?

2         A    Theoretically, yes.

3         Q    In the time that you were dealing with

4    Mr. McHenry or getting ready to deal with

5    Mr. McHenry -- this is back at the Justice

6    Department now -- did you ever learn that he was

7    director of the Executive Office of Immigration

8    Review?

9         A    I never learned that, no.

10        Q    How about Ms. Hankey, did she say why she

11   was going to refer you to Mr. McHenry?

12        A    No, she didn't.

13        Q    Is it common for you to call people like

14   Mr. McHenry without knowing what their position

15   is?

16        A    Certainly at that time, yes.

17        Q    What was it about that time?

18        A    Well, it was shortly into the

19   administration, and titles are not necessarily

20   informative of what people do, so --

21        Q    Did you have an understanding of what

22   Mr. McHenry's portfolio was, independent of his

Page 282

1    title?

2         A    No.

3         Q    About what his expertise was independent

4    of his title?

5         A    No.

6         Q    You didn't know -- withdrawn.

7              You're trying to accomplish something for

8    your boss, right?

9         A    Correct.

10        Q    And you're calling another agency and

11   you're going to ask them to do some work, right?

12        A    Right.

13        Q    And you know from your vast experience

14   that sometimes people just say no because they

15   just don't want to do the work, right?

16        A    Correct.

17        Q    That's not uncommon, right?

18        A    It's been my experience.

19        Q    So in order to have the best possible

20   chance of persuading a person like Mr. McHenry,

21   don't you want to do a little research beforehand?

22        A    Again, I was dealing with, literally,

Page 283

1   hundreds of issue, as well as clearing

2   correspondence, clearing Federal Register notices,

3   no.  I did not have time to research this guy's

4   background.  That's why I went through

5   Eric Branstad to say, hey, get me somebody over at

6   DOJ who I can talk to.  I want to Hankey -- and I

7   don't know her from Adam, but relying on the fact

8   that she was recommended by folks over at the

9   White House as somebody who was connected with

10  AG Sessions, I'm assuming she's going to steer me

11  in the right direction.  So I take on faith who

12  she suggested I talked to.  Turned out they

13  weren't the right person, so we didn't get

14  anywhere.

15      Q   Did you have an assistant during this

16  period?

17      A   No.

18      Q   Any staff?

19      A   I had my OPSP staff.

20      Q   Who's that?

21      A   Office of Policy and Strategic Planning.

22  They were the detailees I discussed earlier.

Page 284

1        Q    Got it.

2             You couldn't ask one of them, hey, I'm

3    supposed to have a call with Mr. McHenry, can one

4    of you figure out what he is and why --

5        A    No.

6        Q    Excuse me.  I got to -- just a second.

7    I've got to finish the question.  You can answer

8    it any way you want.

9             Didn't you want to call -- talk to one of

10   your staff people and say, listen, I got a call

11   with Mr. McHenry, I got to persuade him to do some

12   work he's not going to want to do, to help out our

13   boss, Mr. Ross, Secretary Ross, and can one of

14   your look up and tell me who he is and what levers

15   we might be able to pull to persuade him to do

16   this work for us?

17             MR. GARDNER:  Objection.

18   BY MR. GERSCH:

19       Q    You didn't want to ask someone on your

20   staff to do some work like that for you?

21             MR. GARDNER:  Objection.  Form.

22             THE WITNESS:  Again, that's a view of

Page 285

1    both the workload I was under and the workload

2    that they're under that I think is misinformed.

3             In fact, several of my calls with

4    Mr. McHenry were made while I was driving into

5    work, so there was no opportunity to call somebody

6    and do that research.

7             And, besides, this wasn't about getting

8    leverage on Mr. McHenry.  This was simply to

9    ask -- following up on the person I'd been

10   directed to, who, based on the fact that it was

11   recommended by an assistant to the AG, I'm

12   assuming is going to at least be somewhat

13   receptive.  Probably an error on my part, but

14   that's -- I've got a dozen other things I'm

15   dealing with at the same time.  So, no, I'm not

16   going to spend a lot of time researching this guy.

17   BY MR. GERSCH:

18        Q   You didn't spend any time researching

19   this guy?

20        A   Correct.  I didn't.

21        Q   Secretary Ross certainly knows why he

22   wanted a citizenship question back in the spring

Page 286

1    of 2017, right?

2         A    You'd have to ask him.

3         Q    Is there anyone besides Secretary Ross

4    who we could go to who would have that

5    information?

6              MR. GARDNER:  Objection.  Lack of

7    foundation.  Calls for speculation.

8              THE WITNESS:  I'm not aware of anybody.

9    BY MR. GERSCH:

10        Q    Do you have any reason to believe that

11   Secretary Ross's rationale for wanting to add a

12   citizenship question is some kind of supersecret?

13        A    No.

14        Q    Doesn't involve national security, right?

15             MR. GARDNER:  Objection.  Lack of

16   foundation.  Calls for speculation.

17             THE WITNESS:  I don't know what the

18   Secretary's rationale is.  You'd have to ask him.

19   BY MR. GERSCH:

20        Q    But you don't think it involves national

21   security?

22             MR. GARDNER:  Same objections.

Page 287

```
 1          THE WITNESS:  I'm not going to speculate
 2   on that.
 3   BY MR. GERSCH:
 4      Q    You heard about this suit back when it
 5   was filed, right, this lawsuit?
 6      A    Yeah.
 7      Q    Okay.  And there's several lawsuits,
 8   right?
 9      A    Lost count, but yes.
10      Q    And you've known that you were going to
11   sit for a deposition for a while, also?
12      A    Maybe for two weeks or so.
13      Q    Okay.  Well, at any time since these
14   lawsuits started to get filed, did you have a
15   discussion with anyone about why it is the
16   Secretary wanted a citizenship question added?
17      A    No.
18      Q    Secretary Ross gave Congressional
19   testimony in March of 2018 in advance of his
20   decisional memorandum.  Do you remember that?
21      A    I'll take your word for it.
22      Q    Testified before committees of both --
```

Page 288

1    both House, right?

2        A    Again, I'd have to look at a calendar to

3    refresh my memory as to when he testified.  But,

4    yes, he testified to Congress during the course of

5    the year.

6        Q    Fair enough.

7             And he was asked questions about a

8    citizenship question?

9        A    I believe that's correct.

10       Q    Who prepared him to testify on that

11   subject?

12       A    He -- he does a lot of his own hearing

13   prep, but we would have -- I would have been

14   involved, as well as James Uthmeier,

15   Peter Davidson, of course, Karen Dunn Kelley.  I

16   mean, this was not a hearing specifically on the

17   citizenship question, so we mostly would have been

18   preparing for the broad range of questions on

19   whatever the topic was.  We were going up and

20   testifying on the steel tariffs.  We were going up

21   and testifying on the lifecycle cost estimate, a

22   whole series of things, so --

Page 289

1      Q    Sure.  You want to get him prepped on

2   everything, though, right?

3      A    Yeah.

4      Q    And one of the things that you

5   anticipated would come up was the question about

6   the citizenship question, right?

7      A    Seems reasonable if that was the time

8   frame, yes.

9      Q    And were you the one who worked with

10  Secretary Ross on how he was going to answer those

11  questions?

12     A    I would have been one of the people, yes.

13     Q    Was there a division of responsibility

14  between the folks you mentioned just a minute ago,

15  the people who helped prepare him?

16     A    Not per se.  I think he's fairly open to

17  suggestions from staff of what to consider.  So if

18  somebody had an idea, he would consider it.

19     Q    Did you tell the Secretary, listen, you

20  can expect that someone is going to ask

21  whether -- whether you're going to add a

22  citizenship question?  Did you have that

Page 290

 1    discussion with him?  That would have been normal,
 2    right?
 3        A   Well, again, if this is in the time
 4    period after we received the DOJ letter and while
 5    he was considering making his decision, then, yes,
 6    we might have anticipated.  But the answer would
 7    have been fairly straightforward, which is we have
 8    that matter under review, and I'm considering
 9    all -- all information.  So there would have been
10    very little we're prepping for on that.
11        Q   Didn't you discuss with the
12    Secretary -- withdrawn.
13            First of all, I'll represent that he
14    did -- the Secretary did, in fact, testify before
15    multiple committees after the
16    Department of Justice request came in in December
17    of 2017 and before the issuance of the March
18    decisional memorandum.
19        A   Okay.
20        Q   And my question to you is:  In those
21    discussions that you had with the Secretary to
22    prepare him, wasn't it discussed whether the

Page 291

1    Secretary was going to reveal the reasons he had

2    wanted to the addition of a citizenship question?

3        A    No.

4        Q    Subject never came up?

5        A    Never came up.

6        Q    Didn't it come up whether the Secretary

7    would reveal that the reason that Commerce had

8    received a request from DOJ to add a citizenship

9    question is because Commerce had gone to DOJ and

10   asked DOJ to make that request?

11       A    No.

12       Q    Never came up?

13       A    Never came up.

14           (Conference call interruption.)

15           THE WITNESS:  In case we were falling

16   asleep.

17   BY MR. GERSCH:

18       Q    You testified with respect to the

19   citizenship question; isn't that right?

20       A    That's correct.

21       Q    You gave testimony before the House

22   Committee on Oversight and Government Reform?

Page 292

1      A    Correct.

2      Q    After the decisional memorandum was

3    issued?

4      A    Uh-huh.

5      Q    May 8th of this year?

6      A    Okay.

7      Q    Sound right?

8      A    Somewhere in that ballpark, yeah.

9      Q    Yeah?

10     A    I'll take your word for it on the date.

11     Q    You were asked questions by

12   Representative Eleanor Holmes Norton about

13   citizenship questions.  Do you remember?

14     A    I recall the exchange, yes.

15     Q    She asked why did this question, which

16   was dropped for 70 years, suddenly appear on the

17   decennial census, what was the point, didn't she?

18     A    I -- I would have to refer to her

19   testimony.  I don't have it in front of me.

20          MR. GERSCH:  What are we up to?

21          MR. GARDNER:  27.

22          MR. GERSCH:  Let's mark this 27.

Page 293

1          (Plaintiffs' Exhibit 27, Testimony from

2     Committee on Oversight and Government Reform, was

3     marked.)

4     BY MR. GERSCH:

5          Q    I'm showing you a transcript of your

6     testimony before the Committee on Oversight and

7     Government Reform on May 2018.

8               Mr. Comstock, I want to be clear.  This

9     is not a transcript made by the committee.  Do you

10    understand me?

11         A    I understand what you're saying.

12         Q    Okay.

13         A    I'm not sure why it's not a transcript

14    made by the committee, but that's all right.

15         Q    We had this transcript --

16         A    Okay.

17         Q    -- made by a reporter who watched your

18    testimony.

19         A    Okay.

20         Q    So let me direct you to Page 37, Line 12.

21    See where it says, Ms. Norton?

22         A    Uh-huh.

Page 294

1      Q   All right.  And this is where she asks

2   you -- withdraw this.  Isn't what I want --

3           Let me direct your attention to Lines 2

4   through 5, okay.

5      A   All right.  Let me read the context of

6   which Lines 2 through 5 appear.

7      Q   Let me ask your question and then you can

8   read whatever you need.

9      A   All right.  Very good.

10     Q   On Lines 2 through 5, Ms. Norton asked

11   you, "My question to the two of you" -- and you

12   were there with Mr. Jarmin; is that right?

13     A   Correct.

14     Q   She says, "My question to the two of you

15   is:  Why did this question, which was dropped for

16   70 years, suddenly appear on the decennial census?

17   What was the point?"

18          And then you answered, "Thank you very

19   much, Congresswoman, for the question.  We

20   received a request from the Department of Justice

21   for this, and their rationale was that the level

22   of the information that they needed to enforce the

Page 295

1    Voting Rights Act was not available."

2           That's the testimony you gave, correct?

3      A    Again, this is not the official

4    transcript, but presuming your person transcribed

5    this correctly, that appears to be what I said.

6      Q    And this squares with your memory of what

7    you said, right?

8      A    Correct.

9      Q    And when she says, why did this question

10   get added, and you say, we received a request from

11   the Department of Justice, that's not the whole

12   truth; is it?

13     A    That's a -- that's a factual statement.

14     Q    It's a factual statement that you

15   received a request from Department of Justice,

16   right?

17     A    Correct.

18     Q    But the reason the Department of Justice

19   made the request is because you guys at the

20   Department of Commerce put them up to it; isn't

21   that right?

22     A    I don't agree with that characterization.

Page 296

1    But, again, the Department of Justice decided that

2    this was information they could use and they made

3    the request.  That starts the formal process for

4    us to review the question.  Had they decided they

5    did not need that information and not made the

6    request, then the Commerce Department would have

7    had to decide if there was some rationale that the

8    Commerce Department needed this information.

9        Q    Sure.  But the reason the

10   Department of Justice made this request of the

11   Department of Commerce was that the Department of

12   Commerce went to the Justice Department and said,

13   will you please make this request of us, right?

14       A    We asked them if they could use this

15   information.  That was an independent decision on

16   their part.

17       Q    You asked them if they could use

18   information from a citizenship question, right?

19       A    At the block level, which is not

20   currently available.

21       Q    And you asked them if they would be

22   willing to request that from the

Page 297

1    Department of Justice [sic]?

2        A    If that was information that they found

3    useful, then they could request it, yes.

4        Q    You asked them to request it from the

5    Department of Justice, correct?

6        A    Again, what we asked them was if they

7    could use this information, and if so, then they

8    would need to request it.

9        Q    Do you deny that you personally went to

10   representatives in the Department of Justice and

11   asked them if they would request the addition of a

12   citizenship question?

13            MR. GARDNER:  Objection.  Asked and

14   answered.

15            THE WITNESS:  To answer, once again, I

16   went to representatives of the

17   Department of Justice and asked them if this would

18   be information that they would find useful, and if

19   so, they could request it.

20   BY MR. GERSCH:

21       Q    Yeah.  I got that part, and I'm asking a

22   slightly different question now.

Page 298

```
 1      A    Okay.

 2      Q    Didn't you say to the

 3  Department of Justice when you were talking to

 4  them, in words or substance, we would appreciate

 5  it if you would ask us to include a citizenship

 6  question?

 7      A    I never made such a request.

 8      Q    And I take it, based on your prior

 9  testimony, you don't know what conversation

10  occurred between the Secretary and the Attorney

11  General?

12      A    That's correct.

13      Q    Did you understand that Ms. Teramoto was

14  on that call between the Secretary and the

15  Attorney General?

16      A    I don't know who was on the call.

17      Q    In any case, however we word it, you

18  didn't tell Representative Norton when she asked

19  why is this question being added, that you had

20  gone to the Department of Justice and suggested

21  that this might be something they'd be interested

22  in?
```

Page 299

1      A    That's correct.

2      Q    Why is that?

3      A    Again, because until the department makes

4    its independent decision to request this

5    information, that was the -- there was no question

6    that was going to be added.

7      Q    When Representative Norton says, why is

8    the question being added?  Don't you think it's

9    relevant that the Secretary of Commerce wanted

10   this question added independent of the

11   Department of Justice's request?

12           MR. GARDNER:  Objection.  Form.

13           THE WITNESS:  Again, now --

14           MR. GARDNER:  What's your -- withdrawn.

15           MR. GERSCH:  What's your objection?

16           MR. GARDNER:  I didn't understand that

17   question.  Is it relevant to Secretary -- or I'm

18   sorry -- Representatives Norton Holmes question

19   that the Secretary had requested DOJ to ask?  I

20   didn't even --

21           MR. GERSCH:  I got it.

22   BY MR. GERSCH:

Page 300

1    Q    Let me put a different question to you.

2    A    Sure.

3    Q    When Representative Norton asks you the

4    why question, don't you think it's responsive to

5    the why question that the Secretary of Commerce

6    wanted to add a citizenship question independent

7    of the Department of Justice's request?

8    A    No.  I don't think it's relevant.  His

9    decisional memo laid out very clearly the

10   rationale that was the basis of his decision.

11   Whatever his personal feelings may have been are

12   irrelevant to that decision.

13   Q    It laid out a rationale.  We can agree on

14   that, right?

15   A    That's what he's required to do under the

16   law, is lay out a rationale.  That is the

17   rationale for his decision and that's what he's

18   standing on.

19   Q    Okay.  He laid out a rationale.  Is it

20   your understanding, under the law, that if the

21   rationale is not his real reason for doing it, we

22   should ignore the real reason, and we should only

Page 301

1  focus on the pretextual reasons that he offers up?

2          MR. GARDNER:  Objection.  Calls for a

3  legal conclusion.

4          THE WITNESS:  The Secretary's decision

5  memo lays out a valid reason that's consigned to

6  his discretion under the law, and that is the

7  rationale he provided to staff, and that is the

8  rationale that we placed in the record.  So that

9  is his reason for having the question.

10 BY MR. GERSCH:

11     Q   My question is a little different.  If

12 the Secretary's real rationale is something

13 different than the rationale he lays out in his

14 decisional memo, is it your understanding, under

15 the law, that we're to ignore the real reason and

16 only focus on what's in the decisional memorandum?

17         MR. GARDNER:  Objection.  Calls for a

18 legal decision.

19         THE WITNESS:  Your hypothetical is

20 premised on the false conclusion that there is

21 some illegal rationale that would be provided and

22 be exposed and be referenced.  There is none.

Page 302

1   It's committed to his discretion to add a

2   question, as long as you make it through the other

3   things, Paperwork Production Act, et cetera.  So

4   it's -- I don't understand the basis for your

5   question.  But there's -- at the base of your

6   question is this hypothetical that there's some

7   supposed illegal reason that would be -- that

8   would nullify a perfectly valid decision.  I don't

9   agree with that assessment.

10  BY MR. GERSCH:

11      Q   Mr. Comstock, I want you to listen to my

12  question carefully, because there was no reference

13  to any illegal rationale, and I'm going to put it

14  to you again and there will be no reference to an

15  illegal rationale.  And my only question -- and,

16  by the way, I'm happy if you want to take this as

17  a hypothetical.

18          My only question is:  If the Secretary

19  lays out a rationale in his decisional memorandum

20  which is different than his real rationale, is it

21  your understanding that we're supposed to ignore

22  the real rationale and only focus on what's in the

Page 303

1  decision memo?

2         MR. GARDNER:  Given your introductory

3  clause, objection.  Calls for a hypothetical.

4  Objection.  Calls for a legal conclusion.

5         THE WITNESS:  Again, a decision is valid

6  if a valid reason has been spelled out, and that

7  is what we did.

8  BY MR. GERSCH:

9    Q   Could you answer my question?

10   A   Again, I don't accept the premise of your

11 question, which is that there's some other reason

12 besides what was provided in the memo.

13   Q   It's a hypothetical question, sir.  The

14 question is --

15   A   I'm not going to answer a hypothetical on

16 that basis.

17   Q   I'm asking you to answer it, and you're

18 here to answer questions, and I think I'm fairly

19 following up on your testimony.

20        My question to you is real simple:  If

21 the Secretary lays out a rationale in his

22 decisional memorandum and it's not his real

Page 304

1    rationale, is it your understanding that what

2    we're supposed to focus on is what's in the

3    decisional memorandum and we're not supposed to

4    look at the rationale?

5         MR. GARDNER:  Objection.  Calls for

6    hypothetical.  Objection.  Calls for legal

7    conclusion.

8         THE WITNESS:  Again, we're at loggerheads

9    here because you keep spelling out something that

10   is -- that presupposes there is some other

11   rationale that would be sufficient to outweigh a

12   legitimate rationale and, therefore, must be

13   noticed and taken care of.  I mean, the government

14   makes decisions all the time and spells out a

15   rationale.  Do some of decision-makers have,

16   perhaps, other reasons, maybe, but it's not

17   relevant to the legal analysis.

18     Q    We shouldn't know what Secretary --

19   withdrawn.

20        We shouldn't know what the real rationale

21   is; is that testimony?

22     A    I --

Page 305

1          MR. GARDNER:  Objection.  Calls for a

2     legal conclusion.

3          THE WITNESS:  Again, I have no reason to

4     believe that the rationale is anything other than

5     what's in the memo.

6     BY MR. GERSCH:

7          Q    Well, sir, actually, you testified

8     previously that the Secretary had a rationale for

9     asking this question, which he didn't reveal to

10    you and had nothing to do with the

11    Department of Justice's request.

12         A    I disagree with that statement.

13         Q    Let's try this one other way.  You don't

14    disagree with the proposition that a

15    decision-maker could have a rationale that is

16    different than what he chooses to spell out in his

17    decisional memorandum, right?

18         MR. GARDNER:  Objection.  Calls for

19    hypothetical.

20         THE WITNESS:  Again, I don't know -- I

21    don't -- it's impossible to answer that question,

22    because you -- I'm not sure where you're going

Page 306

1    with it.

2    BY MR. GERSCH:

3        Q   I'm not asking you to know where I'm

4    going with it.  I'm asking you to answer the

5    question.  I'll put it to you again.

6            You don't disagree with the proposition

7    that it's possible for the decision-maker to have

8    one rationale which he puts in the decisional

9    memorandum and a completely different rationale

10   which is the real reason he wants the decision

11   done?

12           MR. GARDNER:  Objection.  Calls for a

13   hypothetical.

14           THE WITNESS:  Again, in the context we're

15   dealing with, I don't agree with that statement.

16   BY MR. GERSCH:

17       Q   It's not possible for that to happen,

18   it's not possible for the decision-maker to put

19   one rationale in the decisional memo and have a

20   completely different rationale for why he wants

21   the decision?

22           MR. GARDNER:  Objection.  Calls for a

Page 307

1    hypothetical.

2           THE WITNESS:  In my experience with the

3    federal government service across 30 years, both

4    Democrat and Republican, I'm not aware of

5    decision-makers who would do such a thing.

6    BY MR. GERSCH:

7       Q    This would never happen, in your view,

8    right?

9       A    I'm not going to use the word never.

10   Clearly, in the course of human history, things

11   like that do happen.  That's not been my

12   experience that it generally is the case.

13      Q    That's fine.  Put aside your experience.

14   I'm just asking you conceptually, you don't have

15   difficulty understanding that a decision-maker

16   could say I'm doing this for one reason without

17   revealing that he is actually doing it for a

18   different reason.  You understand that concept,

19   right?

20          MR. GARDNER:  Objection.  Calls for a

21   hypothetical.

22          THE WITNESS:  Yeah.  It's a hypothetical

Page 308

1    to which the answer is always going to be yes.  So

2    to the extent that makes you happy, sure.

3    BY MR. GERSCH:

4       Q   Okay.  So you do understand that concept.

5    So when that occurs, when it is the case that the

6    decision-maker puts forth a stated rationale,

7    which is, in fact, not his real rationale, is it

8    your understanding that we should pay no attention

9    to his real rationale and focus only on his stated

10   rationale?

11         MR. GARDNER:  Objection.  Calls for

12   hypothetical objection.  Calls for a legal

13   conclusion.

14         THE WITNESS:  I'm not going to answer

15   that question.

16         MR. GARDNER:  Would now be a good time

17   for a break?  We've been going about an hour.

18         VIDEOGRAPHER:  This concludes Media Unit

19   Number 5.  The time on the video is 3:11 p.m.  We

20   are off to record.

21         (Off the record.)

22         VIDEOGRAPHER:  This begins Media Unit

Page 309

1    Number 6.  The time on the video is 3:37 p.m.  We

2    are on the record.

3            (Plaintiffs' Exhibit 28, Memo, was

4    marked.)

5    BY MR. GERSCH:

6        Q    Mr. Comstock, we're back on the record.

7            After the Department of Justice made

8    their formal request for the addition of a

9    citizenship question in December of 2017, you

10   understand that the Census Bureau did some

11   analysis with respect to that request, right?

12       A    Correct.

13       Q    All right.  And one of the things that

14   the Census Bureau produced is a document that's

15   been marked Exhibit 28.

16       A    Okay.

17       Q    Is that fair to say?

18       A    It appears to be a memo from John Abowd

19   to the Secretary, so will -- oh, it's marked

20   draft, so --

21       Q    Dated January 19, 2018, as you say, from

22   John Abowd, Chief Scientist at the Census Bureau,

Page 310

1   to Secretary Ross through Karen Dunn Kelley.

2           You've seen this before, haven't you?

3       A   I don't know that I've seen this

4   particular draft.  It's marked draft, so I don't

5   know that this document ever made it up to the

6   Secretary's office.

7       Q   Did you see a form of this document,

8   whether it was this one or not?

9       A   I saw some form of this document, yes.

10      Q   I want to direct your attention to the

11  one, two, three -- third full paragraph, last

12  sentence, and in it Mr. Abowd addresses

13  Alternative B -- and, by the way, you understand

14  Alternative B is adding a citizenship question to

15  the census, right?

16      A   That appears to be what the memo says,

17  yeah.

18      Q   So what Mr. Abowd reports is

19  Alternative B -- that is adding a citizenship

20  question -- is, quote, very costly, harms the

21  quality of the census count, and would use

22  substantially-less active citizenship status data

Page 311

1   that are available from administrative sources.

2            You knew that that is what the

3   Census Bureau had concluded, right?

4       A   Well, again, that's a -- this is a draft

5   pre-decisional memo.  So I'm not sure if this was

6   the final document that was sent to us or not.

7       Q   I'll represent to you that this

8   is -- that the record made in this case so far is

9   that this is the last draft produced.  Does that

10  help you --

11      A   Is that -- okay.

12      Q   I'm happy if you want to consult with

13  your counsel.

14           MR. GARDNER:  If you -- you can answer

15  the question, yes.

16           THE WITNESS:  Sure.  Assuming this is the

17  final version, then that's what the document says,

18  yes.

19  BY MR. GERSCH:

20      Q   That's not my question.  You came to

21  understand, isn't that right, that the view of the

22  Census Bureau was that asking the citizenship

Page 312

1   question is very costly, harms the quality of the

2   census count and would use substantially-less

3   citizenship status than are available from

4   administrative sources?

5       A   I would agree that that's the summary

6   statement here.  That it overstates the case they

7   made further in the document.  But that is not an

8   accurate representation of what's actually

9   reflected in the document.

10      Q   I want to make sure I understand your

11  testimony.  You're saying you disagree with their

12  conclusion?

13      A   I disagree with that characterization as

14  being the final conclusion of the Census Bureau,

15  yes.

16      Q   Ah.  Okay.  So you think that what I just

17  read to you doesn't fairly reflect the view of the

18  Census Bureau; is that right?

19      A   I think that reflects the view of

20  Dr. Abowd and that it's very imprecisely stated.

21  If you read the rest of the memo, it provides more

22  detail, and so I would not agree with the

Page 313

1   statement, because it's not backed up in the

2   document that it would be very costly.  That's a

3   relative term.  And that it would use

4   substantially-less accurate, I disagree with those

5   statements.

6        Q   Yeah.  I understand, and I stipulate that

7   you disagree with them.  My question is a little

8   different.  I'm asking if you understand this is

9   the position of the Census Bureau, whether you

10  agree with it or not, and I stipulate that you

11  don't.

12       A   And just, again, I'm being very clear

13  that this sentence taken out of context, I would

14  say is not the position of the Census Bureau.  The

15  position of the Census Bureau is reflected in this

16  full memo, which provides greater detail, which is

17  not, I would say, accurately characterized in this

18  summary statement at the front.

19       Q   Did you ever meet with the folks at the

20  Census Bureau about this analysis?

21       A   Yes, we did.

22       Q   Okay.  When did you do that?

Page 314

1      A    I couldn't tell you the exact date.

2      Q    Who did you meet with?

3      A    Dr. Abowd, Dr. Jarmin.  It was a large

4  meeting.

5      Q    And Dr. Abowd and Dr. Jarmin, they stood

6  by this analysis, right, the analysis in

7  Exhibit 28?

8      A    I'd say that, yeah, they stood by the

9  entire analysis, not necessarily that statement.

10     Q    And the entire analysis includes the

11  statement that I read to you, right?

12     A    Again, you're -- I think you're taking a

13  single statement out of context.

14     Q    My question is a little different.  I'm

15  saying when you said, they stood by the entire

16  analysis, that includes the statement that I read

17  you?

18     A    And, again, I will say that I think

19  you're trying to get me to say that particular

20  statement represents the view of the

21  Census Bureau, and that is not my understanding.

22     Q    Okay.  When you say it's not your

Page 315

1    understanding, at no point did Dr. Jarmin or

2    Dr. Abowd say, no, we don't believe that

3    Alternative B is very costly, harms the quality of

4    the census count and would use substantially-less

5    accurate citizenship status data that are

6    available from administration sources; isn't that

7    right?  They never took it back?

8         A    We never asked them to take it back.

9         Q    And they never did?

10        A    I don't know if they took it back or not.

11        Q    In your presence, sir.

12        A    Again, they were never asked, to my

13   knowledge, to take that statement back, so there

14   would be no reason for them to take it back.

15        Q    And they didn't take it back, did they?

16        A    I don't know whether they took it back.

17        Q    In your presence, they didn't take it

18   back?

19        A    Again, I look at their entire memo, not

20   that statement.

21        Q    I'm not asking that question.  They

22   didn't take this statement back that I just read

Page 316

1    to you three times?

2        A    Again, my point is, they were never asked

3    to take it back, so there would be no reason for

4    them to take it back.

5        Q    I just want there to be no

6    misunderstanding, Mr. Abowd [sic], if at trial

7    you're going to say they took it back, I want to

8    hear that right now.

9            MR. GARDNER:  He's not Mr. Abowd.

10   BY MR. GERSCH:

11       Q    I'm sorry, Mr. Comstock.  It's late in

12   the day.

13           Mr. Comstock, if you're going to say at

14   trial that Dr. Abowd or Dr. Jarmin took this

15   statement back, I want to hear that right now.

16   Can we agree on that, that you'll tell me right

17   now?

18       A    I will agree -- I will agree that I would

19   say that is not representative of the data that

20   was presented to us in the course of extensive

21   discussions.  That that statement is an early

22   statement that mischaracterizes the final

Page 317

1   conclusions that we understood.

2       Q   When you say earlier, it's the statement

3   as of the January 19th memo, you don't disagree

4   with that?

5       A   Again, I'm not contesting they provided

6   this investigation.

7       Q   Focus on timing.  You said this was an

8   early statement and you don't think it was

9   reflective of their final conclusions.

10          My question is:  You're not saying it

11  doesn't reflect their position as of January 19th,

12  are you?

13      A   I am saying, again, that I think you're

14  taking a single statement out of context and

15  trying to represent it has the position of the

16  Bureau as conclusive, and I'm saying I disagree

17  with that statement.

18      Q   Let me show you -- let's mark this as

19  Exhibit 29.

20          (Plaintiffs' Exhibit 29, Memo, was

21  marked.)

22  BY MR. GERSCH:

Page 318

1    Q   You see what's been marked as Comstock

2    Exhibit 29, it is a March 1, 2018 memo from

3    Dr. Abowd for Secretary Ross, Bates stamp first

4    Page 001308.

5        Do you have that in front of you?

6    A   I do.

7    Q   Have you seen this document before?

8    A   I believe I've seen this document.

9    Q   Okay.  And this document relates to an

10   Alternative D, right?

11   A   Correct.  But I'll note, again, it's

12   marked draft, and I'm just mystified as to why we

13   keep getting draft documents as opposed to finals.

14   Certainly draft documents don't normally come to

15   us.

16       MR. WALSH:  Counsel, would it be possible

17   to hand out --

18       MR. GERSCH:  Oh, I'm sorry.

19       MR. WALSH:  Thanks.

20   BY MR. GERSCH:

21   Q   This is about Alternative D; is that

22   right?

Page 319

1      A    That's correct.  But I'm still asking a

2   question, why am I getting a draft version of this

3   instead of a final?

4      Q    I don't get to testify.  All I can do is

5   ask the questions.

6           And Alternative D was the idea of

7   Secretary Ross, that perhaps you could combine

8   Alternative B, which is asking the citizenship

9   question of every household in the decennial

10  census, and Alternative C, which was don't ask the

11  question but use administration data to figure out

12  citizenship status, correct?

13     A    Correct.

14     Q    And at the back of this memo, the last

15  sentence says, "In sum, Alternative D would result

16  in poorer quality citizenship data than

17  Alternative C.  It would still have all the

18  negative cost and quality implications of

19  Alternative B outlined in the draft January 19th

20  memo to the Department of Commerce."

21          You saw this at the time, right?

22     A    Again, I can't say that this was the

Page 320

```
1   document I saw, because I did not see something
2   marked draft pre-decisional V10.
3       Q   You think you saw a version of it that
4   didn't have draft on it?
5       A   I have no idea.  But we don't typically
6   see documents that say draft.
7       Q   I'll represent that we've never seen a
8   version of either of these documents that aren't
9   marked draft.  If there is one -- if there are
10  versions, I would like them right now.
11          MR. GARDNER:  I represent we've produced
12  what we have.
13  BY MR. GERSCH:
14      Q   Regardless of the format, you became
15  acquainted with the views of Census that
16  Alternative B would result in poorer quality
17  citizenship data than Alternative C and still have
18  all the cost and quality implications of
19  Alternative B outlined in the draft January 19th
20  memo to the Department of Commerce; you became
21  acquainted with that conclusion of theirs, right?
22      A   I did.
```

Page 321

1      Q   Okay.  By the way, you'll notice it

2   says -- this refers to the January 19th memo as

3   being a draft.

4      A   Okay.  Like I said --

5      Q   Do you see that?

6      A   I see it.  That it says that, yes.

7   Perhaps that is what they provided to us.  I don't

8   know.  We produced whatever is in the record, so

9   if this is what's in the record -- as long as I'm

10  being given the final version, then okay.

11     Q   All right.  You're not saying that the

12  Census Bureau took back the conclusion reflected

13  in this last paragraph that I've read you from

14  Exhibit 29, are you?

15     A   Again, I think there was iterative

16  exchange in which the conclusions of the

17  Census Bureau to staff and some of their

18  assertions did not hold up under

19  cross-examination.

20     Q   Whether you think they held up or not, my

21  question to you is:  Did the Census Bureau ever

22  take back the conclusion that's in the last

Page 322

1    paragraph of this March 1 memo?

2         A    You'd have to ask them.

3         Q    In your presence, did they say any such

4    thing?

5         A    I didn't ask them to take it back.

6         Q    I'm not asking whether you asked them.

7    I'm asking -- withdrawn.

8              There were other people in the meeting

9    besides you, right?

10        A    There were a series of meetings, so --

11        Q    How many meetings did you have about this

12   memo, this March 1 memo?

13        A    I couldn't tell you.

14        Q    About?

15        A    Might have met once or twice.  I really

16   couldn't tell you.

17        Q    And who did you remember being there

18   besides Dr. Abowd and Dr. Jarmin?

19        A    Again, I don't know if it was

20   specifically on this memo or this presentation or

21   whether they sent it to us.  There were multiple

22   meetings on the question.  Who was at each

Page 323

1    meeting, I couldn't tell you.

2        Q    I think it would be fair to say there

3    were multiple meetings about Census Bureau's

4    analysis of the citizenship question, right?

5        A    Yes.

6        Q    Okay.  And what's your best recollection

7    of how many meetings there were?

8        A    I don't know.  Two or three.

9        Q    And if this memo is dated March 1 and the

10   decisional memo is dated March 26th.  What's your

11   best recollection about when the last -- the last

12   meeting was, the last of these two or three

13   meetings?

14       A    Probably somewhere in the vicinity of

15   March 20th.

16       Q    Okay.  And my question simply to you is,

17   sir:  Did the Census Bureau people ever say we're

18   taking it back, you've convinced us, we don't

19   agree with the conclusion we put forth in the last

20   paragraph?

21       A    No.

22       Q    And did you ever have -- withdrawn.

Page 324

1          Did you have a meeting about the wording
2    of the March 26th memo with the Census Bureau?
3          A    I don't believe so.
4          Q    You didn't have a meeting with Dr. Abowd
5    with Secretary Ross there on the morning of the
6    26th or thereabouts?
7          A    No, not to my recollection.  But it's
8    entirely possible.
9          Q    So it's your -- and all I can ask for is
10   your best recollection.
11         It's your best recollection that you
12   never had a meeting with the Census Bureau about
13   the wording of the March 26 decisional memo?
14         A    Not that I recall, no.
15         Q    Did you ever have any analysis of the
16   citizenship question prepared by experts other
17   than the folks at the Census Bureau?
18         A    Not that I know of, no.
19         Q    Did you ever get any input from somebody
20   with technical expertise with respect to the
21   Census Bureau's analysis of the citizenship
22   question who was not from the Census Bureau?

Page 325

1      A    No.

2      Q    Did anyone review the Census Bureau's

3  analysis of what was wrong with the citizenship

4  question who was not a lawyer?

5      A    The Secretary.

6      Q    Other than the Secretary?

7      A    Karen Dunn Kelley.

8      Q    Other than the Secretary and Karen Dunn

9  Kelley?

10     A    Obviously, Dr. Jarmin, Dr. Abowd.

11     Q    I'm talking about people outside the

12 Census Bureau.

13     A    Census Bureau.

14          Well, let's see -- well, Wendy Teramoto

15 might have.  But, no, primarily would have been

16 Office of General Counsel doing the review.

17     Q    And you?

18     A    And me.

19     Q    And you're a lawyer?

20     A    Yes, I am a lawyer.

21     Q    All right.  Let's mark the decisional

22 memorandum as Exhibit 30.

Page 326

1          (Plaintiffs' Exhibit 30, Decisional

2     memorandum, was marked.)

3     BY MR. GERSCH:

4          Q    Mr. Comstock, I show you what's been

5     marked as Exhibit 30.  This is Secretary Ross's

6     March 26, 2018 decisional memorandum with his

7     signature affixed to it, correct?

8          A    Yes.

9          Q    I just have a few questions on that.

10              I may have fewer than I thought.

11              Let me just drop back to Exhibits 28 and

12    29.  The Census Bureau analysis for a second --

13         A    Uh-huh.

14         Q    -- and then we'll get to Exhibit 30.

15              With respect to the Census Bureau

16    analysis, you understood that they researched the

17    question about the citizenship question, they

18    researched that by looking at information from the

19    decennial -- past decennial censuses, right?

20         A    Mostly the long form, yes.

21         Q    And past ACS --

22         A    Correct.

Page 327

```
 1      Q    -- surveys, right?

 2      A    Yes.

 3      Q    You said mostly the long form, but also

 4    the short form, right?  They did a comparison

 5    between response rates from the short form and

 6    response rates on the long form, right?

 7      A    Right.

 8      Q    And the long form, we're talking about

 9    something that's filled out by on the order of 300

10    million people or something -- withdrawn.

11           It reflects data on 300 million people?

12      A    Well, the long form is --

13      Q    I should have said the short form.

14    You're right.  Let me put it to you again.

15           The short form reflects data on

16    approximately 300 million people?

17      A    That would be about right, yeah.

18      Q    And it's filled out by over 100 million

19    people, right?

20      A    I couldn't answer that question.  I don't

21    know.

22      Q    It's a larger number.
```

Page 328

1      A    I think it's 169 million households or

2    something.

3      Q    And the ACS, roughly, how many people

4    fill out the ACS in rough terms?

5      A    My recollection is it's about two to

6    three -- two and half to three percent per year.

7      Q    Two and half to three percent of the

8    total population?

9      A    Total number of households.

10      Q    And the number of households you think

11    are 160 million?

12      A    You'd have to look at the data.

13      Q    But that's --

14      A    In the ballpark, yeah.

15      Q    So the 2 or 3 percent that fill out the

16    ACS, those are millions of people, right?

17      A    Oh, yeah.  Right.

18      Q    Okay.  And you'd call -- withdrawn.

19            When the Census Bureau does analyses

20    based on their findings from the decennial census

21    and the ACS --

22      A    Uh-huh.

Page 329

```
 1      Q    -- those are empirical analyses, right,
 2  they count?
 3           MR. GARDNER:  Objection.  Form.
 4           THE WITNESS:  You'd have to ask the
 5  Census Bureau how they do their analysis.
 6  BY MR. GERSCH:
 7      Q    Right.  But you understand what empirical
 8  means, right?
 9      A    I understand the use of the term, but I
10  don't know if all of their analyses are based on
11  empirical or some other method.
12      Q    Certainly, some of their analyses are
13  empirical, right?
14      A    Sure.  And some are sampling and some of
15  them are imputation.  They use a variety of
16  statistical methods.
17      Q    Just a few more questions.  Now, turn to
18  Exhibit 30 if you would and turn to Page 7.
19      A    Yeah.
20      Q    Last paragraph, first sentence reads,
21  "The Department of Commerce is not able to
22  determine definitively how inclusion of a
```

Page 330

1    citizenship question on the decennial census will

2    impact responsiveness."

3            You saw that, right?

4        A    Yep.

5        Q    It says the Department of Commerce is not

6    able to determine definitively.  What does that

7    mean, determine definitively?

8        A    What it says.  In other words, the

9    evidence presented to us was not determinative,

10   and it was not definitive that there would be a

11   drop in response rate.  There was a widely-held

12   belief that there would be a drop in response, but

13   many of those same people that they were not

14   answering the citizenship question, were already

15   not answering the census because of distrust of

16   government, because of whatever the other reasons

17   may be.

18           So they could not identify with any

19   specificity that the addition of a citizenship

20   question would, in fact, cause a decrease in

21   response rate.  They estimated there could be a

22   decrease of a certain number of households, which

Page 331

```
 1   was less than half a percent.  And based on the

 2   size and volume of the exercise we were

 3   undertaking, that is not sufficient to say it's an

 4   insurmountable obstacle.

 5        MR. GERSCH:  I'll move to strike it as

 6   nonresponsive.

 7   BY MR. GERSCH:

 8        Q   My question --

 9        A   It was responsive.

10        Q   What do you mean by definitively?

11        MR. GARDNER:  Objection.  Asked and

12   answered.

13        THE WITNESS:  What I mean by definitive

14   is they did not provide evidence that you could

15   draw a straight line and say if you do this, this

16   will happen.  They speculated it, and they drew

17   some conclusions based on other information, but

18   logical people can look at that information and

19   say, yes, but that's not a necessary conclusion

20   that, in fact, as was pointed out, the same

21   hard-to-count populations who were already not

22   responding to the census were likely the very same
```

Page 332

```
 1   ones that might not answer the census.
 2          And just to your point, just to
 3   illustrate this, we do know from the ACS that
 4   70 percent of the people who are presented with
 5   the citizenship question answer it correctly, who
 6   are, in fact, noncitizens and 30 percent don't.
 7   So it doesn't necessarily mean that you add a
 8   citizenship question and people refuse to answer.
 9   We have a population that does answer.
10          I know that's not the answer you wanted.
11   BY MR. GERSCH:
12      Q   Mr. Comstock, we're missing each other,
13   so let me try it a little differently.
14          I'm not asking you whether you didn't
15   think the Census Bureau's answer was definitive.
16   I'm asking what is -- what would be -- let's try
17   it this way, what would you consider to be
18   definitive evidence?
19      A   If they had evidence that showed that the
20   addition of a citizenship question would cause a
21   number of people that otherwise would have
22   responded to the census to not respond.
```

Page 333

1    Q    And what would they need to show you

2    that?

3    A    They would problem have to put the

4    question on the decennial census and compare it to

5    prior decennial censuses and eliminate for the

6    errors.  And, unfortunately, they don't have that

7    data from when they were asking that question, so

8    they couldn't make the comparisons.

9    Q    Well, they could have done it on a test

10   basis for the 2020 census, right?

11   A    They already asked the ACS to 43 million

12   households.  So we'd asked and answered that

13   question already.

14   Q    My question --

15   A    It's been well tested.

16   Q    My question is:  They could do it on the

17   2020 census on a trial basis, right?

18   A    And that's, basically, what the Secretary

19   has determined to do.

20   Q    No.  The Secretary has not decided to do

21   it on a trial basis.  He wants everyone asked,

22   right?

Page 334

1        A    Well, that would be a trial basis.

2        Q    Let me do it differently.  You could do

3   it on the 2020 census as a test where it's being

4   asked as a sample of the people, right?

5        A    That would not give you -- actually, that

6   would give you no more information than you get

7   from the ACS, so we already have that information.

8        Q    You think asking the question on the

9   decennial census is the same thing as asking on

10  the ACS?

11       A    No, I don't.

12       Q    Okay.  How about a randomized control

13  study of some kind, randomized controlled testing?

14       A    We already have that.

15       Q    You think you already have that?

16       A    Sure, through the ACS.

17       Q    Okay.  Was a proposal to do a randomized

18  controlled test in May of this year from the

19  Census Bureau?

20            MR. GARDNER:  Objection.  Lacks

21  foundation.

22            THE WITNESS:  Not that I'm aware of.

Page 335

1   BY MR. GERSCH:

2        Q    You never heard that Victoria Velkoff

3   proposed conducting a randomized controlled test

4   in May of this year?

5        A    No.

6        Q    This is the first time you're hearing

7   this?

8        A    Yes.

9             MR. GERSCH:   Okay.   We can go off for a

10  second.

11            VIDEOGRAPHER:   We're going off the

12  record.   The time on the video is 4:02 p.m.

13            (Off the record.)

14            VIDEOGRAPHER:   We're back on the record.

15  The time on the video is 4:04 p.m.

16            MR. GERSCH:   Mr. Comstock, thank you very

17  much.   Those are all the questions I have at this

18  time.

19            Our view is there is certain information

20  we haven't received from the government, and to

21  that extent, we are keeping the deposition open,

22  but this concludes my questions for today.

Page 336

1        MR. GARDNER:  And our position is the

2    deposition is concluded after today.

3        THE WITNESS:  Thank you for your

4    questions.

5             EXAMINATION BY MR. ROSENBERG:

6    Q    And good afternoon, Mr. Comstock.  My

7    name is Ezra Rosenberg.  I think I introduced

8    myself to you.  Although I might have used your

9    wrong name when I first introduced myself.

10   A    That's okay.

11   Q    I represent the City of San Jose and

12   Black Alliance for Just Immigration in the case

13   that's been venued in the North District of

14   California.

15   A    Okay.

16        MR. ROSENBERG:  And can everyone hear me

17   down -- can you hear me?

18        MS. BOUTIN:  Little louder, please.

19   BY MR. ROSENBERG:

20   Q    And I'll try to be short and sweet.  Let

21   me just back up a bit.

22   A    Okay.

Page 337

1      Q    The initial impetus for putting the
2   citizenship question on the 2020 census was not
3   DOJ's idea; is that correct?
4      A    That's correct.
5      Q    It was Secretary Ross's idea, I think
6   you've testified to that, correct?
7      A    He was the one who asked me to
8   investigate it, yes.
9      Q    He told you sometime shortly after he was
10  confirmed that he wanted the question on the 2020
11  census, correct?
12     A    He asked me to explore putting it on,
13  yes.
14     Q    Well, he actually said he requests the
15  question be put on the census, correct?
16     A    That was the way he phrased it, yes.
17     Q    You said you would make that happen,
18  correct?
19     A    I said I would do my best.
20     Q    And you would get the citizenship
21  question in place, I think was -- were your words?
22     A    I said I would work to get that in place.

Page 338

1      Q   And he asked you several times during the

2   year what progress you were making on this; is

3   that correct?

4      A   That's correct.

5      Q   And you met with Mary Blanche Hankey at

6   DOJ as a result of that, correct?

7      A   Correct.

8      Q   And you wouldn't have met with her if

9   Secretary Ross hadn't ask you to do what you can

10   to put this citizenship question on the census,

11   correct?

12      A   That's correct.

13      Q   And the only subject that you talked to

14   Ms. Hankey about at that meeting was the

15   citizenship question, correct?

16      A   No.  I'm not sure that's the case.

17      Q   What else did you talk to her about?

18      A   I think we talked generally about what

19   the Department of Commerce and Department of

20   Justice overlap on, what we work on.  So it was

21   just broader conversation, but the primary focus

22   was on the citizenship question.

Page 339

1      Q    And then you memorialized or at least you

2    summarized your discussion with her in the memo

3    that you sent to Secretary Ross on September 8th,

4    correct?

5      A    That's correct.

6      Q    And take a look at what's been marked as

7    C15, please.  That's it.  Yep.

8           The first paragraph you see that there's

9    a sentence -- well, it reads, starting with the

10   third sentence, "We" -- meaning you and

11   Ms. Hankey --

12     A    Uh-huh.

13     Q    -- met in person to discuss the

14   citizenship question."

15     A    Right.

16     Q    "She said she," and then it's blocked

17   out, right?

18     A    Yes.

19     Q    Now, this is something that you wrote

20   that's been blocked out, correct?

21     A    Correct.

22     Q    Do you know why it's been blocked out?

Page 340

1      A   You'd have to ask the Justice Department

2   redactors.

3      Q   Do you -- without saying what is said

4   there, do you know what you wrote there that's

5   been blocked out?

6      A   I don't recall.

7      Q   You did not ask her for legal advice, did

8   you?

9      A   No.

10     Q   Do you have any reason to believe there

11  is some privileged information in what's been

12  blocked out?

13         MR. GARDNER:  Objection.  Calls for a

14  legal conclusion.

15         MR. ROSENBERG:  He's always the client,

16  and the client holds the privilege.

17         THE WITNESS:  I don't know what it says,

18  so I trust the folks who redacted it believe

19  there's a conclusion of some kind that is relevant

20  to the investigation.

21  BY MR. ROSENBERG:

22     Q   Anyone at Commerce who was more involved

                                        Page 341

1    in the citizenship question other than you during

2    the period from the time you came to Commerce

3    until the citizenship question issue was resolved?

4        A    Probably not, no.

5        Q    Let me -- take a look at C5 that's been

6    marked, which is the supplemental memorandum.

7        A    Uh-huh.  I've got it somewhere.  It's a

8    supplemental memorandum.

9        Q    It's dated June 21 --

10           MR. GARDNER:  You want to look at my

11   copy?

12           THE WITNESS:  Okay.  All right.  Go

13   ahead.

14   BY MR. ROSENBERG:

15       Q    When did you first hear that this

16   document was going to be created?

17       A    Sometime shortly before June 21st.

18       Q    Do you recall approximately how many days

19   before June 21st?

20       A    I don't.

21       Q    But before you got a copy of the

22   document; is that correct?

Page 342

1      A    No.  I think, actually, the first time I

2  knew about it was when I was handed a copy of the

3  document.

4      Q    So all of a sudden, it popped up on your

5  desk one morning, our your computer?

6      A    Right.  Again, as I think I stated

7  before, this was Office of General Counsel with

8  Commerce was handling the litigation in

9  conjunction with Department of Justice who

10  represents us.  So they were having conversations

11  on this matter.  I would have been called in

12  simply to the point of saying, okay, this is being

13  requested, do you have any thoughts or edits on

14  it?

15      Q    So just so it's clear, you did not know

16  that it was being prepared until you saw the first

17  draft?

18      A    That's correct.

19      Q    Were you surprised to see it?

20      A    I didn't think it was necessary, but if

21  that's the advice of counsel, we follow it.

22      Q    You understood that this was a supplement

Page 343

1    to the March 26th determination by Secretary Ross?

2        A    I understand that it's a supplement to

3    the administration record.

4        Q    And you --

5        A    I don't think it supplements the decision

6    by Secretary Ross.

7        Q    You understood it supplements the

8    administrative record and you understood this was

9    a pretty important document, did you not?

10       A    Not being experienced in this litigation,

11   I couldn't say exactly how important this was or

12   not.

13       Q    Do you have an understanding as to the

14   reason that this document was created?

15       A    My understanding was the reason this

16   document was created was the Department of Justice

17   felt it would be advisable in this litigation.

18       Q    Was there anything in the supplemental

19   memorandum that was not known at the time that the

20   Secretary issued his March 26th determination?

21            MR. GARDNER:  Objection.  Form.

22            THE WITNESS:  No.  I don't think there's

Page 344

1   anything in this memorandum that was not done at

2   the time of the decision.

3   BY MR. GERSCH:

4       Q   After you received the draft of the

5   memorandum, did you discuss it with anyone within

6   Commerce, other than attorneys?

7       A   Just the attorneys.

8       Q   You did not discuss, at all, with

9   Secretary Ross?

10      A   Other than advising him that we -- this

11  has been recommended to sign and that we've

12  reviewed it and made a few edits, no.

13      Q   Did he ask you why it was being

14  recommended?

15      A   I'd already provided that explanation.

16  DOJ was suggesting that we needed it for

17  litigation.  He's not a litigator, so he's not

18  going to question that.

19      Q   Was he surprised when he saw this?  Did

20  he express surprise to you?

21      A   Not particularly.  I mean, he just said,

22  if that's what they recommend, fine.

Page 345

1    Q   Now, I think you testified that you were

2  one of the two persons who were principally

3  involved in the drafting of the March 26th

4  determination; is that correct?

5    A   I was one of the two principal staff.

6  There were a number -- quite a number of other

7  people who reviewed it.

8    Q   Right.  But you were one of the principal

9  draft persons; is that correct?

10    A   I was principal -- James Uthmeier, I

11  think, did the bulk of the drafting, and I did a

12  lot of the editing.

13    Q   During the course of your preparation of

14  the March 26th determination, did you consider

15  including in the March 26th determination any of

16  the information that's in the supplemental

17  memorandum that's identified as C5?

18        MR. GARDNER:  I'm going to object on the

19  grounds that calls for disclosure of information

20  subject to deliberative process by which I

21  instruct the witness not to answer.

22  BY MR. ROSENBERG:

Page 346

1    Q    Are you going to follow counsel's advice?

2    A    I'll follow my counsel's advice, yes.

3    Q    By the way -- by the way, I think you

4    testified that you made some edits to C5, the June

5    21st supplemental memorandum; is that correct?

6    A    I think I may have suggested a wording

7    change or two.

8    Q    Do you know what wording change or two

9    you made?

10   A    I have no recollection of that.

11   Q    Did you maintain the original draft of

12   the June 21st memorandum?

13   A    I imagine I made it -- my edits in

14   electronic form, but that would be, probably,

15   privileged, under the administrative record.

16   Q    Let's turn to C30, which is the

17   March 26th memo.  Now, is it stated anywhere in

18   this memorandum that the Secretary had begun,

19   considering the question of adding the citizenship

20   question to the census almost a year prior or more

21   than a year prior to the March 26th memorandum?

22   A    It wouldn't be relevant to the

Page 347

1   memorandum.

2       Q    So you don't think that's important

3   information?

4       A    The government has lots of processes

5   where -- and I've been involved in lots of

6   processes throughout the government where things

7   have been under consideration for months, years,

8   decades, even, prior to an administrative record,

9   and that's not usually included in the decision.

10          The question is once you began the formal

11  action of considering this decision and in which

12  you're presented with a situation where you need

13  to make a decision, you document at how you arrive

14  at your conclusion.

15      Q    It's your testimony that the formal

16  action is when?

17      A    When we received the letter from the

18  Department of Justice.  Because prior to that,

19  this was all speculation.

20      Q    Well, but prior to that, you had been

21  directed by the Secretary of the Commerce to put

22  the citizenship question on the census --

Page 348

1        A    I'd --

2        Q    -- isn't that correct?

3        A    I'd been directed to explore putting a

4   citizenship question on the census.

5        Q    He said he wanted it on the census,

6   correct?

7        A    That was certainly his expressed

8   interest.

9        Q    It was an expressed statement, was it

10  not?

11       A    That's the way he phrased it.  But,

12  again, he can't put something on the census

13  without having the legal authority or process in

14  place to do so.

15       Q    You agree it would have been more

16  accurate if the first sentence of C30 said, as you

17  know, pursuant to my request on December 12, 2017,

18  the Department of Justice requested that the

19  Census Bureau reinstate a citizenship question;

20  isn't that more accurate?

21       A    I wouldn't agree that's more accurate.

22       Q    Isn't that what happened?

Page 349

1      A    Again, the Department of Justice decision

2    to ask -- send a letter requesting this is a

3    decision they made independently.  We cannot

4    compel them to make that request.

5      Q    By the way, what does Section 2 of the

6    Voting Act provide?

7      A    Well, my understanding of it -- and,

8    again, it's been established that I'm not a Voting

9    Rights Act expert -- is that there are cases in

10   which you might have a population where as they

11   set up a district, you have two minority

12   populations.  If one of those minority

13   populations, for example, Hispanics population,

14   has a large under of undocumented people, they

15   might appear on paper to have a majority.  When,

16   in fact, they can never actually execute that

17   majority because they don't have enough Citizen

18   Voting Age Population people to carry that out.

19         Now, under the census, we already ask

20   about age and we ask about race, so we can

21   determine those two questions.  What you can't

22   determine is how many people of that population

Page 350

1    are, in fact, eligible to vote.

2          Now, using the ACS data, the census

3    provides estimates that the Justice Department

4    uses for that very purpose.  We know, in fact, as

5    a result of this analysis, in the Census Bureau's

6    efforts to promote Alternative C, they, in fact,

7    did an analysis of that ACS data, and lo and

8    behold, it came back that the data that we've been

9    providing to the Justice Department is, in fact,

10   at a fairly significant error.  It's off by a

11   factor of about a third.  And so in light of that

12   information, you'd absolutely want to go forward

13   with this.

14      Q   But the Census Bureau, nevertheless,

15   recommended from a standpoint of accurate and

16   completeness and quality of the census that there

17   should not be a citizenship question added to the

18   census, as opposed to continuing to rely on ACS

19   data supplemented by the administrative records?

20      A   No.  In the process of this memorandum,

21   back and forth, they could not articulate a

22   rationale to support their belief that there would

Page 351

1    be this decline in this response rate.  Their

2    entire analysis relied on the assumption that

3    there would be this decline in response rate of a

4    certain percentage and that that would, therefore,

5    make the data less reliable.

6            What they couldn't refute was the fact

7    that under their proposed approach, they would

8    have had to impute -- again, based on statistical

9    models -- the citizenship of 25 million voting age

10   citizens.  That was not a complete and accurate

11   picture as far as the Secretary was concerned.  So

12   the Secretary said this is why we need to look at

13   combining the two approaches, B and C, to come up

14   with Alternative D.  Because in the absence of

15   that, we don't have good enough data on which to

16   build the formula to impute those people that we

17   would have to because we don't have answers on

18   what their citizenship is.  So that's the

19   rationale that's laid out in this memo, and as far

20   as I know, that's been the rationale that's been

21   the Secretary's all along.

22       Q   But not the rationale that was accepted

Page 352

1  by the Census Bureau, which nevertheless, rejected

2  as -- from a technical perspective, the

3  Secretary's rationale; isn't that correct?

4       A    I disagree that they rejected it from a

5  technical perspective.  They made some assumptions

6  in making their recommendation -- and that's

7  exactly what it is, it's a recommendation -- that

8  this would be the case.

9       Q    Let me turn your attention to C30,

10 Page 001314, which is Page 2 of the March 26th

11 memo.  And turning your attention to the Option A,

12 the third line in the sentence that says,

13 "Additionally, the block group levels CVAP data

14 currently obtained through the ACS has associated

15 margins of error" --

16      A    Correct.

17      Q    -- "because the ACS is extrapolated based

18 on the sample servers of the population."

19      A    That's correct.

20      Q    Do you know what the margins of errors

21 are that are referred to in this sentence?

22      A    I think you go on and see, you'll see it

Page 353

1    described later in the same memo, which is that

2    they have an error of approximately 30 percent, 28

3    to 34, I believe, is the range.

4            Yeah.  If you look on Page 4,

5    "Census Bureau analysis showed that between 28 and

6    34 percent of citizenship self-responses for

7    persons with administrative records show are

8    noncitizen were inaccurate.  In other words, when

9    noncitizens respond to long form or ACS questions

10   on citizenship, they inaccurately mark citizen

11   about 30 percent of the time.  However, the

12   Census Bureau is still evolving its use of

13   administrative records.  The Bureau does not have"

14   --

15           (Thereupon, the court reporter

16   clarified.)

17           THE WITNESS:  This is in the -- under

18   Option C of Page 4.

19           MR. GARDNER:  You're going to have to

20   slow down for the court reporter.

21           THE WITNESS:  "So they inaccurately mark

22   noncitizen about 30 percent of the time.  However,

Page 354

1    the Census Bureau is still evolving its use of

2    administrative records, and the Bureau does not

3    yet have a complete administrative record set for

4    the entire population.  Thus, using administrative

5    records alone would provide DOJ data with CVAP

6    data that was not a" -- "that would provide an

7    incomplete picture."

8    BY MR. ROSENBERG:

9        Q    And that's your understanding of what

10   margins of error means as used on Page 01314?

11       A    Well, yes.  They're referring to that --

12   that margin of error they're referring to is the

13   28 to 34 percent they were off.

14       Q    Do you know whether the data that would

15   be provided to DOJ if a citizenship question were

16   added to the 2020 census would also have margins

17   of error associated with that data?

18       A    It would almost certainly have some small

19   margin of error, yes.

20       Q    When you say a small margin of error, can

21   you quantify that?

22       A    Well, yeah.  I think if you look at the

Page 355

1    decision memo, it spells out that by providing the

2    question on the census, you'll give 100 percent of

3    the population to answer that question.  For

4    90 percent of the people that are citizens, that

5    is not a problem.  For the remaining 10 percent,

6    approximately, again, based on -- again, on the

7    ACS error rate, you can expect that approximately

8    70 percent of those people will also answer that

9    data correctly.  So you're looking at, basically,

10   what is the situation with the remaining

11   30 percent?  And based of the data we get from the

12   actual responses, comparing that with the

13   administrative records, which we're also working

14   to improve, so that that 88.6 from the 2010 census

15   is expected to go up, should be closer to 90 to

16   95, we'll be able to narrow to down to about a 5

17   percent of the population that we'll have to

18   impute.  It's a much smaller number than the

19   number that's being --

20        Q    And that's your understanding of how the

21   phrase margins of error is used in the Secretary's

22   memo?

Page 356

1      A    Well, I'm not sure -- you're focused on

2    the words margins of error.

3      Q    Right.  All of my questions had to do

4    with the phrase margins of error.

5      A    And you're saying --

6      Q    I'm just trying to get your understanding

7    of the phrase.

8      A    No.  I was focusing on the ACS.  I mean,

9    you're isolating the term margins of error.

10     Q    Yes.

11     A    When you do sampling or other things,

12   there is a margin of error associated with that,

13   and that margin of error can be larger or it can

14   be smaller.  And so they would provide, typically,

15   a confidence interval connected with their data,

16   and, again, depending on how the survey is

17   conducted, it could be large or small.

18     Q    Well, that sounds a little bit different

19   than what you testified to earlier, when I asked

20   you about the phrase margins of error as used in

21   the sentence I read to you from C003134.

22     A    You'll have to remind me what the

Page 357

1    sentence is again --

2         Q    Sure.  "The Census was additionally" --

3         A    -- because I focused on the ACS.

4         Q    -- "block group level CVAP data currently

5    obtained through the ACS has associated margins of

6    error because the ACS is extrapolated, based on

7    sample surveys of the population."

8         A    And I believe that reference in the

9    context of this memo may be scientifically

10   incorrect, but it's referring to the fact that

11   there's this error in the data of roughly

12   30 percent.  So this was not drafted by, quote,

13   scientists.  So we may have inaccurately used the

14   term margin of error.  But what the Secretary was

15   referring to was the fact that we had now learned

16   that the ACS data was fairly significantly

17   inaccurate.

18        Q    Do you know whether the Census Bureau's

19   use of margins of error, quote, end quote, is the

20   same as you have just described?

21        A    I have no idea.  I mean, I would guess

22   that in other context, that the Census Bureau uses

Page 358

```
 1    the term margin of error differently.  I'm saying

 2    in the context of this memo, I think the reference

 3    of margin of error is referring to that margin of

 4    inaccurate information in the ACS.  That is what

 5    the Secretary was focused on in making his

 6    decision.

 7        Q   I'd like to turn your attention to

 8    001315, Page 3, the second full paragraph that

 9    begins "the Census Bureau."

10        A   Uh-huh.

11        Q   And the Census -- I'm sorry -- the

12    sentence that reads, "However, neither the

13    Census Bureau, nor the concerned stakeholders

14    could document that the response rate would, in

15    fact, decline materially."

16            Do you see that?

17        A   I see that.

18        Q   Can you tell me what you understand the

19    word materially to mean?

20        A   Yes.  In that context, it's, basically,

21    saying they could not, as I explained earlier,

22    demonstrate that the decline because of the
```

Page 359

1    addition of a citizenship question would be any

2    greater than the decline that we already

3    anticipated we would face because of the current

4    political climate and people's concerns about

5    government.

6         And, frankly, the folks bringing this

7    lawsuit are contributing to that.  We already

8    anticipated this was going to be -- this census

9    was going to be more difficult than other

10   censuses, and that was a lot of the reasons behind

11   some of the changes that were made in the

12   lifecycle cost estimate.  So we anticipated there

13   were going to be hard-to-count populations, and

14   many -- many of the same hard-to-count populations

15   would have been disinclined to answer the census

16   with or without a citizenship question.

17       Q   When you say that the -- when you talk

18   about the material decline, are you talking about

19   the decline overall or are you talking about a

20   differential decline depending on what demographic

21   group is being discussed?

22       A   If the data had shown conclusively that

Page 360

1    the addition of a citizenship question would cause

2    a material -- in other words, significant and

3    major decline in any particular group, I'm sure

4    the Secretary would have considered that quite

5    carefully.

6        Q    When the Secretary used the word material

7    or phrase material decline, was he referring to

8    any decline of any demographic group or was he

9    referring to a decline across the board?

10       A    Again, based on the subject of the

11   discussion here, would there be a significant

12   increase in the number of nonresponse follow-ups

13   that we had to go do because people failed to

14   respond?  The data that was being presented did

15   not isolate the citizenship question as being a

16   material source of potential decline.  There were

17   a lot -- there was a lot of speculation that

18   would, there was a lot of assertions it would.

19   And upon review and analysis, it appears that many

20   of the same populations that were already going to

21   be difficult to count for lots of other reasons

22   would be the same people who might be disinclined

Page 361

```
 1   because of citizenship.  So you cannot say that
 2   adding citizen is going to materially increase the
 3   nonresponse follow-up rate.
 4        Q   Can you quantify what you mean by a
 5   material decline?
 6        A   Well, I mean, the Census Bureau,
 7   basically, under their best analysis, was saying
 8   that there might be a decline that would cause an
 9   increase of $27 and a half million.  In a
10   $15.6 billion budget, that is -- I mean, that's so
11   far within the margin of error it's not even a
12   fact.
13        Q   Well --
14        A   We could have a bad snow day that would
15   cause bigger damage than that.
16        Q   Was -- do you consider an undercount
17   resulting from the addition of any question to the
18   census of a quarter of a percentage point in a
19   specific population to be material?
20        A   I have no reason to believe the addition
21   of a citizenship question would cause such a
22   thing.
```

Page 362

1      Q    Whether it does or not, I'm trying to
2    quantify what you mean by material decline.
3    How --
4      A    And, again, you're postulating a
5    hypothetical.  And my point is that in the absence
6    of the context, would a quarter percent decline in
7    response because we added a question that, for
8    example, asked somebody their ethnicity, again,
9    that's a weighing thing that the decision-maker
10   has to make and say there may be a quarter percent
11   decline, but it's important that we get ethnicity
12   data.
13     Q    But I'm --
14     A    Same thing with gender, same thing with
15   race, same.  You know, lots of questions are added
16   that may, in fact, result in a few people not
17   answering the census.
18     Q    Well, now you're using the word a few
19   people not answering the census.  I'm looking at
20   your language of material decline.
21     A    Uh-huh.
22     Q    Is a quarter percent decline in a

Page 363

1    response of a demographic group a material decline
2    in your estimation?
3        A    Again, without context, I can't give you
4    an answer.  If that demographic group is composed
5    of 100 people, it may not be --
6        Q    What if the demographic is Hispanics?
7        A    I don't know that -- well, again, no.
8    That's a weighing question that the decision-maker
9    is free to make.
10       Q    Again, you're going back to weighing.
11   I'm talking about the phrase declining material --
12   materially.  I'm not weighing it yet.  You can
13   weigh it later if you want.  I'm just talking
14   about one side of the balance that I think you're
15   suggesting is being applied.
16            Is a quarter decline in response to the
17   census among Hispanics a material decline in your
18   estimation?
19       A    The -- the -- I think the short answer
20   is, the decline identified by -- the potential
21   decline identified by the Census Bureau was not
22   material enough to outweigh the benefits the

Page 364

1    Secretary saw in adding the question.

2         Q    It still doesn't answer my question.

3         A    You're asking me to answer in a

4    hypothetical, which I'm not going to do because I

5    don't have the number of Hispanic voters.  I don't

6    know what 4 percent decline would represent.  I --

7    it's impossible for me to evaluate.  I've never

8    looked at the population numbers of Hispanics

9    versus any other.

10        Q    Well, you know that the number of

11   Hispanics in American is in the tens of millions;

12   is that correct?

13        A    I honestly haven't really given it much

14   thought.

15        Q    Do you know if it's more than a million?

16        A    I think it safe to say it's more than a

17   million.

18        Q    More than five million?

19        A    I think so.

20        Q    More than ten million?

21        A    Let's see.  If the population of the

22   United States is 360 million, and I believe

Page 365

1   Hispanic are somewhere in the 10, 12, 15 percent

2   range, they're, obviously, well above that.

3   They're like -- I don't know, like -- 79 million.

4       Q   Of how many did you say?

5       A   70 -- I can't do the math that quickly,

6   so let's say, whatever, 70 million.  I don't know.

7       Q   Let's use 70 million.  So if there

8   were -- let's make it easier, for my head.  Let's

9   say there was a 1 percent decline in response rate

10  among Hispanics due to the inclusion of a question

11  on the census, would you consider that a material

12  decline?

13      A   I would consider that a factor that you

14  need to take into account.

15      Q   And if it were a 3 percent decline, would

16  you consider that even more of a factor?

17      A   Three percent is greater than 1 percent,

18  so, presumably, it would be greater.  But, again,

19  it depends on, again, what I'm deciding against.

20      Q   Would you consider that material?

21      A   That depends on the context.

22      Q   The context of adding a question to the

                                            Page 366

1    census resulting in a 3 percent decline in

2    responsiveness among Hispanics?

3        A    All of the factors outlined in this memo

4    are material.  It's a question for the

5    decision-maker to decide which are -- which to

6    give greater or lesser weight to.

7        Q    But the phrase here was material

8    decline --

9        A    And, again --

10       Q    -- correct?

11       A    -- in the context of conducting a

12   nationwide census, the half percent change in

13   response rates for NRFU was not something we

14   considered material because there were lots of

15   other factors that would cause an even greater

16   decline.

17       Q    And if the response rate was shown to be

18   greater than a half percent decline, if it was

19   shown to be a 3 percent decline?

20           MR. GARDNER:  Objection.  Calls for

21   hypothetical.

22           THE WITNESS:  I understand you're trying

Page 367

1    to get a certain answer, but I'm just telling you

2    in the context of this, in the context of this

3    memo, the half percent increase in NRFU response

4    rate was not material.

5    BY MR. ROSENBERG:

6        Q    By the way, earlier you said that 30

7    percent of noncitizen citizens answering the ACS

8    citizenship question responded accurately.  Do you

9    recall that?

10       A    That was data provided by the Census

11   Bureau.

12       Q    Okay.  What, if any, evidence is there

13   that noncitizens would respond to a citizenship

14   question on the 2020 census questionnaire at a

15   more accurate rate than they currently do on the

16   ACS?

17       A    That's -- I think we assumed in doing

18   this that they would continue at that potential

19   rate.

20       Q    At a 30 percent inaccurate rate?

21       A    Which is why you have to do both

22   administrative records and put the question on.

Page 368

1    You can't do just one or the other.

2        Q    But the administrative records could be

3    used with ACS; isn't that correct?

4        A    No, they couldn't.

5        Q    They could not be used --

6        A    Because you can't extrapolate from the

7    ACS to the whole population.

8        Q    No.  That wasn't my question.

9             The administrative records could be used

10   in conjunction with the information from ACS?

11       A    Again, you don't get an accurate sampling

12   because you're extrapolating from the ACS to the

13   larger population, so you can't apply your

14   administrative records across in the same way.

15   That's why the census was proposing to just use

16   administrative records and they were prepared,

17   apparently, to have to impute 25 million voting

18   age citizen citizenship records.  Now, on what

19   basis, they would do that, we weren't sure.

20       Q    But both Options C and D require some

21   imputation; isn't that correct?

22       A    Potentially, to get a complete and

Page 369

1   accurate count, because we don't have 100 percent

2   matching between the administrative records and

3   the respondents.  Yes.  That's correct.

4       Q    Let me draw your attention to the period

5   around January 2018.  Do you recall taking part in

6   the signing of the list of 35 questions to the

7   Census Bureau to answer?

8       A    Yes.  I helped prepare that list.

9       Q    Do you -- who else helped prepare that

10  list?

11      A    The Secretary, Karen Dunn Kelley,

12  James Uthmeier, myself.  There may have been

13  others.

14      Q    Were you the prime drafter?

15      A    Of that particular list, I may have been

16  the prime assembler.  I was not necessarily the

17  prime drafter of all the questions.

18      Q    And what was your purpose -- what was the

19  purpose in proposing those questions?

20      A    Basically, it has -- I think it was

21  pointed out earlier we got an analysis from the

22  Census Bureau that seemed to have a particular

Page 370

1    viewpoint, and it wasn't well supported in some

2    cases.  So those are the questions that arose

3    after reviewing their memo.

4        Q    And when you -- after the questions were

5    formulated, whom did you send them to?

6        A    I believe they were sent to the

7    Census Bureau.

8        Q    And the idea was the Census Bureau would

9    answer the questions; is that correct?

10       A    They would provide that input, yes.

11       Q    And you gave them a deadline, did you

12   not?

13       A    I imagine we did, yeah.

14       Q    Four days; is that correct?

15       A    I don't recall.

16       Q    Was it your understanding that the

17   answers were going to be provided solely by the

18   Census Bureau to those questions?

19       A    I believe all the questions were directed

20   to the Census Bureau, but if they were directed to

21   somebody else, then, obviously, they would provide

22   them.

Page 371

1     Q   But it was your understanding that the

2   Census Bureau would answer them; is that correct?

3     A   Again, without going back and looking at

4   the documents and the accompanying emails, I can't

5   tell you exactly who it was.  But my understanding

6   was, yes, they were drafted for the Census Bureau.

7     Q   Did there come a time when you reviewed

8   the answers for the questions?

9     A   I imagine there was.

10    Q   Well, was there?

11    A   Again, I know all of you are focused on

12  this case and everything else.  This was one small

13  fraction of the work I was doing at that time.  So

14  I'm quite certain I reviewed the answers.  Exactly

15  when, I can't tell you.  But, clearly, they

16  went -- the responses to those questions were

17  considered in the decision memo.  So I, obviously,

18  reviewed them at some point.

19    Q   Do you recall whether you reviewed those

20  responses all at once or some kind of rolling

21  basis?

22    A   If memory serves, I believe the Census

Page 372

1   responded back to some, and then provided

2   follow-up answers to others that took more time.

3       Q   Do you recall whether in connection with

4   any of the questions the Census Bureau was asked

5   to change their answers to any questions?

6       A   I believe -- well, I believe in one case,

7   they provided a response that indicated that there

8   was a very set format for putting questions on the

9   census.  And we went back to them and said, how

10  can that be?  You haven't -- there hasn't been a

11  question added to the long form?  They went back

12  and reviewed and said, yes, that's correct.  This

13  was the process we used for the ACS.

14      Q   Let me -- let's have this marked as 31.

15          (Plaintiffs' Exhibit 31, Questions on

16  draft Census memo, was marked.)

17  BY MR. ROSENBERG:

18      Q   Showing you what's been marked as --

19          MR. GARDNER:  Ezra, we need a --

20          MR. ROSENBERG:  Can you give me one more

21  copy?

22          I just need one.  Thank you.

Page 373

1    BY MR. ROSENBERG:

2        Q    Showing you what's been marked as

3    Exhibit 31, have you ever seen this document

4    before?

5        A    Again, I'd have to go back and check

6    emails.  It appears to be an incomplete response

7    to the 35 questions.

8        Q    And when you say it's an incomplete

9    response to the 35 questions, why do you say that?

10       A    Well, Question 4 is not answered.

11   Question 9 is not answered.  Question 11 is not

12   answered.  Question 15 is not answered.

13   Question 20 is not answered.  Question 27 is not

14   answered.  It appears to be -- I'm not sure that's

15   the entire list, but some of that -- some of

16   these -- obviously, it's not a final, because at

17   least five questions are unanswered, so --

18       Q    Let's have this marked as -- one question

19   on that.  Turning our attention to Question 31 --

20       A    Okay.

21       Q    -- is that the question you were

22   referring to before as a question whose answer was

Page 374

1   changed at some point?

2       A    Yeah.  Because this was -- as I said,

3   when we explored the question further, it became

4   evident that this was not, in fact, an accurate

5   representation for the process for the decennial.

6       Q    Do you know when that answer was changed?

7       A    I don't.

8            Is there a date on this?

9       Q    We just give you them as we got them.

10      A    No.  Well, no, unfortunately nobody dated

11  this.  So I don't know -- is there a -- do you

12  have a final --

13      Q    Well --

14      A    -- with all the questions answered?

15      Q    You're going to have to tell me.

16      A    I believe there was one where they

17  managed to answer all the questions.

18      Q    Okay.  Let's have this marked as the next

19  exhibit.

20           (Plaintiffs' Exhibit 32, Memo, was

21  marked.)

22  BY MR. ROSENBERG:

Page 375

1      Q   Can you identify -- first of all, have

2  you ever seen what's been marked as Exhibit 32?

3      A   I'm flipping through it here.  I believe

4  I've seen -- I can't recall for certain whether

5  this was the document, but I've seen, certainly,

6  something similar to the document, yes.

7      Q   And the last part of this document, I

8  know it's a multi-document document --

9      A   Right.

10     Q   -- does have the 35 questions, all of

11 which are answered; is that correct?

12     A   On a quick review, it looks like you're

13 correct, that they're all answered.

14     Q   And the answer to Question 31 is the same

15 answer as was in Comstock Exhibit 31; is that

16 correct?

17     A   Correct.  But I note this is also marked

18 draft and predecision, so --

19     Q   So -- well, let's deal with that, also.

20 We can represent to you that this is the only

21 version of the March -- of a document dated

22 March 1, 2018 that is -- and it's -- and they're

Page 376

1    all marked draft for decisional -- I can't read

2    the whole watermark.

3         A    Right.

4         Q    Are you aware whether there was a

5    document that does not contain that stamp or

6    watermark?

7         A    I don't recall.

8         Q    And that is dated March 1, 2018; is that

9    correct?

10        A    Correct.

11        Q    Now, let me show you -- let me get this

12   marked as Exhibit 33.

13             (Plaintiffs' Exhibit 33, Questions on

14   draft Census memo, was marked.)

15   BY MR. ROSENBERG:

16        Q    Have you seen that document before?

17        A    Again, possible.  I can't tell from

18   the -- without the accompanying emails to show the

19   traffic back and forth.  I honestly can't tell you

20   when I would have seen which of these documents.

21        Q    Now, do you know whether what's been

22   marked as Document 33 is the final iteration of

Page 377

1    the answers to the questions?

2         A    I don't honestly know that.

3         Q    Now, turning your attention to the answer

4    to 31 --

5         A    Uh-huh.

6         Q    -- does that answer reflect a change in

7    the answer from the previous documents I've shown

8    you?

9         A    Yes.  It reflects a more accurate

10   statement of the response to the question.

11        Q    Who drafted that answer?

12        A    I don't know.

13        Q    Do you know if the Census Bureau drafted

14   that answer?

15        A    It would appear to be since it's a Census

16   document.

17        Q    Who is Christa Jones?

18        A    She's is the chief of staff for the

19   Census Bureau.

20        Q    Who is Sahra Park-Su?

21        A    Sahra Park-Su works in the Office of

22   Policy and Strategic Planning -- or actually did.

```
                                           Page 378
 1    She is now at Bureau of Industry and Security.
 2        Q    Did she work for you, report to you, I
 3    should say?
 4        A    Yes.
 5        Q    What was her title?
 6        A    She doesn't really have a title.  She's
 7    one of the staff that covers an area in the Office
 8    of Policy Planning.
 9        Q    Was she involved in review of the answers
10    to 35 -- to the 35 questions?
11        A    I don't know.
12        Q    Did you task her with that?
13        A    I did not, no.
14        Q    Do you know if anyone did task her with
15    that?
16        A    I don't know.
17        Q    Let's have this exhibit marked as 34.
18             (Plaintiffs' Exhibit 34, Email, was
19    marked.)
20    BY MR. ROSENBERG:
21        Q    Looking at what's been marked as
22    Exhibit 34, have you ever seen this document
```

Page 379

1   before?

2        A    No.  I haven't.

3        Q    And does it appear to be an email from

4   Sahra that contains the Question 31, "What was the

5   process that was used in the past to get questions

6   added to the decennial census or do we have

7   something similar where precedent was

8   established"?

9             Do you see that?

10       A    That appears to be Question 31.

11            She pronounces her name Sahra, by the

12  way.

13       Q    I'm sorry?

14       A    She pronounces her name Sahra.

15       Q    Sahra?

16       A    Yes.

17       Q    Okay.  Do you see what has been blocked

18  out below that question?

19       A    I see that there is a block of black

20  below the question, yes.

21       Q    And do you see that that block, if you

22  compare it to the Exhibit C33, the answer, that

Page 380

1   that block seems to be about the same size as the

2   amended answer in C -- in C34?

3        A    You're comparing -- I don't know.  It

4   depends on the font size being used.

5        Q    Do you doubt that Sahra Park-Su may have

6   been the one who wrote the answer to Question 31?

7             MR. GARDNER:  Objection.  Calls for

8   speculation.  Lack of foundation.

9             THE WITNESS:  I was -- as you'll note,

10  I'm not on this email chain, so I don't know who

11  was involved in the drafting change.

12  BY MR. ROSENBERG:

13       Q    Can you deny the possibility that she

14  wrote the answer to 31?

15       A    I -- that's certainly possible.

16            MR. ROSENBERG:  We'll go off the record.

17            VIDEOGRAPHER:  This concludes Media Unit

18  Number 6.  The time on the video is 4:48 p.m.  We

19  are off the record.

20            (Off the record.)

21            VIDEOGRAPHER:  This begins Media Unit

22  Number 7.  The time on the video is 5:05 p.m.  We

Page 381

1    are on the record.

2              EXAMINATION BY MS. SENTENO:

3        Q   Good afternoon, Mr. Comstock.  My name is

4    Andrea Senteno and I'm counsel for the plaintiffs

5    in the LUPE v. Ross.  That's in the Federal

6    District court in Maryland 8:18-CV-01570.  And

7    LUPE stands for La Unión Del Pueblo Entero.

8              So I know we've talked a bit today about

9    your interactions with Mary Blanche Hankey and

10   with James McHenry, so I just have a couple

11   questions on that.

12             Do you understand correctly that it was

13   based on your description of -- of the

14   Department of Commerce's request to add the

15   citizenship question that Ms. Hankey told you that

16   it would be best appropriate to speak to

17   Mr. McHenry?

18             MR. GARDNER:  Objection.  Form.

19             THE WITNESS:  Yes.  I don't know that I

20   went into great detail with her as to the nature

21   of the citizenship question, but as to who in the

22   department would handle Voting Rights Act and

Page 382

1   citizenship questions.

2   BY MS. SENTENO:

3       Q   So you did specifically ask who would

4   best be the appropriate -- who would be the most

5   appropriate person if you wanted to talk about the

6   Voting Rights Act and citizenship data?

7       A   The use of the citizenship data by the

8   Justice Department, yes.

9       Q   And based on that interaction, she

10  referred you to Mr. McHenry?

11      A   Correct.

12      Q   Okay.  And do you understand correctly

13  that it was based upon that conversation or that

14  explanation with respect to the Department of

15  Commerce's request with Mr. McHenry that he then

16  referred you to the Department of Homeland

17  Security?

18      A   I don't know why he referred me to the

19  Department of Homeland Security.  He simply -- I

20  think, as I indicated before, indicated that the

21  Justice Department was a little busy on other

22  issues right now, and so this was not something

Page 383

1    that high on their priority list.

2       Q    And I know we've talked about this

3    before, but when you spoke with Mr. McHenry, did

4    you relay the same information that you'd relayed

5    to Ms. Hankey about wanting to talk about the

6    voting rights after voting rights enforcement and

7    citizenship -- and the use of citizenship data?

8       A    In both cases, I spoke to them about

9    adding a citizenship question to the decennial

10   census.  I don't recall whether we went into any

11   great detail about the rationale.

12      Q    Did you ever have a conversation with

13   Donald Trump regarding the addition of the

14   citizenship question to the decennial census form?

15      A    No.

16      Q    And that includes during any transition

17   period?

18      A    Correct.

19      Q    I want to introduce Exhibit -- I believe

20   we said 35, Plaintiff's Exhibit 35 for the record.

21          (Plaintiffs' Exhibit 35, Trump campaign

22   email, was marked.)

Page 384

1   BY MS. SENTENO:

2       Q    This is Bates number 2643.  And this is

3   an email that contains a Trump campaign email from

4   March 2008.

5           Have you been shown this email prior to

6   today?

7       A    No.  I'm not on this email.

8       Q    Okay.  Can I refer you to Page 2644?

9   It's the second page of this document.

10      A    Okay.

11      Q    Okay.  And do you see what it has

12  included in the original email chain.  This is an

13  image of a campaign email from the Trump campaign,

14  correct?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.

17          THE WITNESS:  It's rather small print,

18  but it appears to be something from the campaign,

19  yes.

20  BY MS. SENTENO:

21      Q    Okay.  And I'm going to recognize it's

22  small print, but I'm going to draw your attention

Page 385

1   to the first sentence here of the campaign email,

2   quote, the President wants the 2020 United States

3   census to ask people whether or not they are

4   citizens.

5          In continues, in another era this would

6   be common sense.  And common sense is in all

7   capital letters.

8          Do you see that?

9   A    I do see that.

10  Q    And you said you were never made aware of

11  this campaign email; is that correct?

12  A    No.  I said I had not seen this email.

13  Q    You had not seen this particular chain?

14  A    I had not seen this chain or the

15  substance of this -- whatever it is.

16  Q    Prior to today?

17         Okay.  So no one -- so this was looking

18  at 2643 --

19  A    Okay.

20  Q    -- this image, this stamp of the campaign

21  email was sent to Kevin Manning.  Who is

22  Kevin Manning?

Page 386

1      A    Kevin Manning works in our office of --
2  Office of Public Affairs.
3      Q    Okay.  And Kevin Manning has forwarded
4  this email to James Rockas; is that correct?
5      A    Correct.  Well, yes.  Based on the email
6  chain, correct.
7      Q    And I believe we've already established
8  who James Rockas is, but perhaps, again, just
9  remind us.
10     A    Well, as his title at the bottom says,
11  press secretary, deputy director public affairs.
12     Q    Okay.  So were you ever made aware of
13  this email by either Mr. Manning or Mr. Rockas?
14     A    Mr. Rockas mentioned to me there had been
15  a campaign email, yes.
16     Q    Okay.  And did you ever -- did anyone
17  else make you aware of this email?
18     A    I think James Uthmeier or Peter Davidson
19  may have mentioned it.  We were all surprised to
20  see this email.
21     Q    Okay.  When were you made aware of the
22  email?

Page 387

1      A    Shortly after Mr. Rockas received a copy.

2      Q    Okay.  And why were you made aware of

3    this particular email?

4      A    Well, as you notice, the email is from

5    somebody at Federal Computer Week who apparently

6    got a copy of this and sent it to us to ask for

7    comment, does Commerce have any response to this,

8    and this was, to my knowledge, the first we'd ever

9    seen it.

10     Q    You said you were surprised or everyone

11   was surprised to have seen or made aware of this

12   campaign email.  Can you describe for me why you

13   were surprised?

14     A    Because we've never spoken to the

15   campaign about the Secretary's thinking or

16   decision, so -- I'm not sure what the date of this

17   is, but, 3/19.

18     Q    After you all were made aware of this

19   email, did you discuss the campaign email with

20   anyone else inside the Department of Commerce?

21     A    No.

22     Q    Did you discuss this email with anyone at

Page 388

1    the White House?

2         A    No.

3         Q    Did you discuss this email with anyone at

4    Trump campaign?

5         A    No.

6         Q    Did you discuss this email with anyone at

7    the Department of Justice?

8         A    No.

9         Q    Did you discuss this email with anyone at

10   the Census Bureau?

11        A    No.

12        Q    The flyer also refers to -- and this is

13   on 2644 -- "19 attorney generals who said they

14   will fight Trump if the President dares to ask

15   people if they are citizens."

16             Do you know who those 19 attorney

17   generals are?

18        A    I have no idea.

19        Q    And do you know what, quote, unquote, era

20   this campaign email is referring to when he says

21   in another era?

22        A    I have no knowledge, other than reading

Page 389

1    this email now what the campaign was thinking

2    about.

3        Q   Okay.  Do you agree with the sentiments

4    in this campaign email?

5        A   Do I agree that asking citizenship -- a

6    citizenship question makes sense?  Is that your

7    question?

8        Q   If that's what you understand the

9    sentiment of this email to be?  What do you

10   understand the sentiment of this email to be?

11       A   I said I worked on the Secretary's

12   decision to do this, and I am comfortable with the

13   Secretary's decision.

14       Q   So this was a request for media comment,

15   and you stated earlier that after you all were

16   made aware of this email and you all expressed

17   your surprise that the email existed, you didn't

18   discuss it any further?

19       A   I mean, I'm not sure what our final

20   response to press was, but I think we had no

21   comment.

22       Q   Who would know what the final response to

Page 390

1   the press was?

2           MR. GARDNER:  Objection.  Lack of

3   foundation.

4           THE WITNESS:  Well, I'd say if it's

5   not on -- if it's not published on our website and

6   it's not quoted in media paper anywhere, then it

7   appears we did not respond.

8   BY MS. SENTENO:

9       Q   Would this be something that would be

10  raised to Secretary Ross directly?

11          MR GARDNER:  Objection.  Lack of

12  foundation.  Calls for speculation.

13          THE WITNESS:  Certainly the answer would

14  be that the Secretary would probably be made aware

15  that the press were inquiring on this, yes.

16  BY MS. SENTENO:

17      Q   Would he be made aware of the fact that

18  this email existed?

19      A   Sure.  I mean, he would be made aware of

20  the fact we had received an inquiry from the press

21  with the following email on it.

22      Q   Do you know if Secretary Ross saw this

Page 391

1   campaign email?

2       A    I can't say for certain.

3       Q    Do you know of anyone else at

4   Department of Commerce or the Census Bureau that

5   discussed this campaign email?

6       A    Well, James Rockas, I image, would have

7   presented to it the Secretary and asked him if he

8   had a response or further we'd make no response.

9       Q    So would the best person to ask about the

10  Secretary's knowledge about this particular email

11  be the Secretary?

12      A    That would be the person that could

13  probably best answer your question, yes.

14      Q    Do you know if anyone in Department of

15  Commerce or the Census Bureau discussed this email

16  with the White House?

17      A    Again, I don't know.  You'd have to ask

18  James Rockas.  But absent something else in the

19  administrative record that shows that there was

20  correspondence with the White House, I think we'd

21  probably just ignored this.

22      Q    And so do you know of anyone at the

Page 392

1    Department of Commerce or the Census Bureau who

2    discussed this with the Trump campaign?

3        A    I don't, no.

4        Q    And what was your understanding when you

5    were made aware of this email of the President's

6    rationale for needing a citizenship question on

7    the decennial census?

8            MR. GARDNER:  Objection.  Calls for

9    speculation.  Lack of foundation.

10           THE WITNESS:  I have no knowledge of the

11   President's interest or rationale on this

12   question.

13   BY MS. SENTENO:

14       Q    What was your understanding of President

15   Trump's directive to the Department of Commerce

16   based on this email?

17           MR. GARDNER:  Objection.  Calls for

18   speculation.  Lack of foundation.

19           THE WITNESS:  And to my knowledge,

20   President Trump never gave any directive to the

21   Department of Commerce.

22   BY MS. SENTENO:

1    Q   And what was your understanding, sorry,
2  of the President's role in the determination of
3  whether or not to add a citizenship question to
4  the decennial census form?
5    A   My understanding was the President had no
6  role.
7    Q   Did you ever discuss -- did you ever
8  discuss with anyone in the White House other
9  topics outside of the census, such as immigration
10  enforcement?
11    A   I did not, no.
12    Q   Have you ever discussed immigration
13  enforcement with President Trump, the issue of
14  voter fraud?
15    A   No.
16    Q   Have you ever discussed with him the
17  issue of an undercount as a result of the
18  citizenship question?
19    A   No.
20    Q   How about Congress apportionment?
21    A   No.
22    Q   How about redistricting?

Page 394

```
 1      A    No.

 2      Q    Section 2 of the VRA?

 3      A    No.

 4      Q    Okay.  Did you ever have a conversation

 5 with Reince Priebus?

 6      A    No.

 7      Q    Are you aware of anyone in the Department

 8 of Commerce or the Census Bureau that had a

 9 conversation with Mr. Priebus?

10      A    Regarding?

11      Q    Regarding the census.

12      A    I'm not aware of any specific

13 conversation regarding the census, no.

14      Q    Are you aware of anyone at the

15 Department of Commerce or the Census Bureau that

16 had a conversation with Mr. Priebus about

17 immigration enforcement?

18      A    Not that I'm aware of.

19      Q    About voter fraud?

20      A    Not that I'm aware of.

21      Q    About an undercount as a result of a

22 citizenship question?
```

Page 395

1      A    Not that I'm aware of.

2      Q    About Congress apportionment?

3      A    Not that I'm aware of.

4      Q    About redistricting?

5      A    Not that I'm aware of.

6      Q    About Section 2 of the VRA?

7      A    Not that I'm aware of.

8      Q    Did you ever have a conversation with

9   White House Chief of Staff John Kelly about the

10  census?

11     A    No.

12     Q    Are you aware of anyone else at the

13  Department of Commerce or the Census Bureau that

14  had a conversation with Chief of Staff John Kelly

15  about the census?

16     A    No.

17     Q    About immigration enforcement?

18     A    No.

19     Q    About voter fraud?

20     A    No.

21     Q    About an undercount as a result of a

22  potential citizenship question?

Page 396

1      A    No.

2      Q    About Congressional apportionment?

3      A    No.

4      Q    Redistricting?

5      A    No.

6      Q    Or about Section 2 of the VRA?

7      A    No.

8      Q    Did you ever have a conversation with

9  Arthur Gary regarding the addition of the

10 citizenship question to the decennial census form?

11     A    No.

12     Q    Are you aware of anyone else at the

13 Department of Commerce or the Census Bureau that

14 had conversations with Mr. Gary?

15     A    I believe Peter Davidson may have.

16     Q    And are you familiar with who Mr. Gary

17 is?

18     A    I believe he's the person that wrote the

19 letter.

20     Q    When did you learn about your -- about

21 the conversations between Mr. Davidson and

22 Mr. Gary?

Page 397

1        A    I believe I would have heard -- to the

2   extent they occurred, I likely would have heard

3   about it when he was telling -- informing the

4   Secretary he spoke with Mr. Gary.

5        Q    A general time frame?

6        A    I couldn't tell you.

7        Q    Would it have been before the

8   December 2017 letter?

9        A    I don't -- I don't recall.

10       Q    Would it have been after the

11  December 2017 letter?

12       A    Possibly.  Because I know there were

13  discussions about trying to get a meeting between

14  the Census Bureau and the DOJ, and DOJ was not

15  interested in that letter.

16       Q    So you're not aware of anyone other than,

17  potentially, Mr. Davidson that had a conversation

18  with Mr. Gary prior to his letter to the

19  Census Bureau?

20       A    No.

21       Q    Do you know if the conversations between

22  Mr. Davidson and Mr. Gary took place in person or

Page 398

1    by phone?

2        A    Again, I -- there may have been

3    conversations between Mr. Davidson and Mr. Gary.

4    I'm not certain that there were.

5        Q    Who would know that there were?

6        A    Mr. Gary.

7        Q    And what was your understanding of what

8    the conversations between Mr. Davidson and

9    Mr. Gary were about?

10       A    Again, I'm not certain that conversations

11   occurred.  If they occurred, as I said, my

12   recollection would be it came up in the context of

13   trying to get the meeting that Census Bureau was

14   asking.

15       Q    And did those meetings ever occur?

16       A    Not to my knowledge.

17       Q    Do you know why?

18       A    I don't know why.  The Justice Department

19   did not want to do the meetings.

20       Q    When you say the department -- I'm sorry

21   could you repeat?

22       A    I said I do not know why the

Page 399

```
 1   Justice Department was unavailable for those
 2   meetings.
 3        Q    Was there ever any follow-up to inquire
 4   why Department of Justice was not available for
 5   meetings with the Census Bureau?
 6        A    As I said, that's why I believe
 7   Peter Davidson may have spoken with Mr. Gary.
 8        Q    Have ever you discussed with Mr. Gary the
 9   issue of immigration enforcement?
10        A    No.
11        Q    Have you ever -- has -- have you or
12   anyone else in the Department of Commerce
13   discussed with Mr. Gary the issue of voter fraud?
14        A    No.
15        Q    The issue of an undercount as a result of
16   the citizenship question?
17        A    Again, not to my knowledge.
18        Q    The issue of Congressional apportionment?
19        A    Again, not to my knowledge.
20        Q    Issue of redistricting?
21        A    Not to my knowledge.
22        Q    Section 2 of the VAR?
```

Page 400

1    A   Again, that's the section that they would

2   need the information for, so I think any

3   conversation with the Justice Department -- to the

4   extent it reached the Voting Rights Act, would

5   have been referring to Section 2.

6    Q   Forgive me if you answered this question

7   earlier, but did you -- did you yourself ever have

8   a conversation with the Attorney General -- with

9   Attorney General Jeff Sessions -- sorry --

10   regarding the addition of a citizenship question

11   to the decennial census?

12    A   I personally did not speak to him

13   directly about that matter.

14    Q   Did you speak to him through other

15   individuals?

16    A   No.

17    Q   Have you -- did you say that you -- is it

18   my understanding from your testimony that you

19   didn't speak directly to the Attorney General

20   about the citizenship question?

21    A   I've never spoken directly to the

22   Attorney General about the citizenship question.

Page 401

1       Q    Okay.  Have you ever spoken with the

2   Attorney General about immigration enforcement?

3       A    No.

4       Q    About voter fraud?

5       A    No.

6       Q    About an undercount as a result of the

7   citizenship question?

8       A    No.

9       Q    About Congressional apportionment?

10      A    No.

11      Q    About redistricting?

12      A    No.

13      Q    About Section 2 of the VRA?

14      A    No.

15      Q    Okay.  Are you aware of anyone in the

16  Department of Commerce who has had direct

17  conversation with the Attorney General,

18  notwithstanding Secretary Ross?

19      A    Other than Secretary Ross, I'm not sure

20  that anybody has spoken directly with the Attorney

21  General.

22      Q    Okay.  Are you aware of the

Page 402

1    Attorney General's views on asking a citizenship

2    question on the decennial census?

3        A   I'm not aware of the Attorney General's

4    view -- Attorney General's views.

5        Q   On?

6        A   On a citizenship question on the census.

7        Q   Are you aware of his views on immigration

8    enforcement?

9        A   Other than what you read in the press,

10   no.

11       Q   Are you aware of his views on the program

12   called Deferred Action For Childhood Arrivals?

13       A   Again, other than what's in the press, I

14   don't know anything about what his views are.

15       Q   So the views that you do know of the

16   Attorney General, you learned through the media?

17       A   Media reports, yes.

18       Q   And approximately when are you learning

19   those?  When did you begin reading media reports

20   about the Attorney General's specific viewpoints?

21       A   I stay abreast in most papers, so the

22   Washington Post, the Wall Street Journal.  I have

Page 403

1   a general knowledge of the issue, but no specific

2   interests.  The Department of Commerce doesn't do

3   immigration enforcement, so --

4       Q   Did you believe at the time of the DOJ

5   letter to the Census Bureau that the

6   Attorney General was committed to the enforcement

7   of the Voting Rights Act but that his hindrance or

8   the hindrance of the DOJ was the availability of

9   data?

10          MR. GARDNER:  I'm sorry.  Can you repeat

11  that question?

12          MS. SENTENO:  Yeah.

13  BY MS. SENTENO:

14      Q   Did you believe at the time of the DOJ

15  letter, that the Attorney General was committed to

16  the enforcement of the Voting Rights Act but that

17  what was holding them up was -- were data issues?

18      A   Their letter communicated that they could

19  use census block-level data, which they currently

20  don't get for that, and if, therefore, we would

21  add a question to the decennial census that would

22  provide that data.

Page 404

1    Q   Have you ever had a conversation with
2  Stephen Miller regarding the addition of the
3  citizenship question to decennial census?
4    A   No.
5    Q   Do you know who Stephen Miller is?
6    A   I do know who Stephen Miller is.
7    Q   Could you tell us who that is?
8    A   He's a policy advisor to the President.
9    Q   And have you ever asked -- have you ever
10 had a discussion with Mr. Miller about immigration
11 enforcement, voter fraud, and undercount as a
12 result of the citizenship question, Congressional
13 apportionment, redistricting or Section 2 of the
14 VRA?
15       MR. GARDNER:  Objection.  Form.
16       THE WITNESS:  No. I have not.
17 BY MS. SENTENO:
18    Q   Are you aware of anyone at the
19 Department of Commerce who has had conversations
20 with Mr. Miller about those topics?
21    A   No.
22    Q   Are you aware of Mr. Miller's views on

Page 405

1    immigration?

2         A    Not specifically, no.

3         Q    The census?

4         A    Not specifically, no.

5         Q    On apportionment?

6         A    Not specifically, no.

7         Q    On Deferred Action for Childhood

8    Arrivals?

9         A    Not specifically, no.

10        Q    Have you ever had a conversation with

11   Alabama Attorney General Steve Marshall regarding

12   the addition of a citizenship question to the

13   decennial census form or about the census

14   generally?

15        A    No.

16        Q    Do you know of anyone at the

17   Department of Commerce or the Census Bureau who

18   has had a conversation with Attorney General

19   Steve Marshall?

20        A    Are they --

21        Q    Alabama.  Sorry.

22        A    Are they the ones bringing the lawsuit

Page 406

1   against us?

2        Q    Yes.

3        A    No.  I don't think so.

4        Q    And you've never -- have you ever had a

5   conversation with Mr. Marshal about voter fraud,

6   undercount as a result of the citizenship

7   question, Congressional apportionment,

8   redistricting or Section 2 of the VRA?

9        A    I've never spoken to Mr. Marshall.

10       Q    Are you aware of anyone at the Department

11   of Commerce who has?

12       A    Not that I know of.

13       Q    Have you ever had a conversation with

14   Alabama Congress member Mo Brooks?

15       A    No.

16            Well, I take that back.  Unless he's been

17   on some panel that's -- that I testified in front

18   of.  It's entirely possible, in that case, I would

19   have had a conversation with him.

20       Q    Okay.  So you've never had a conversation

21   with him outside of a potential panel about

22   anything generally or just about the census or the

Page 407

1    citizenship question?

2        A    I feel fairly confident I have not spoken

3    with Mr. Brooks about any subject matter.

4        Q    Are you aware of anyone at the

5    Department of Commerce or Census Bureau who has --

6        A    Again, no.

7        Q    -- had a conversation?

8        A    No.

9        Q    Okay.  Outside of the Department of

10   Commerce and the Census Bureau and individuals

11   that I just ran through, have you or anyone else

12   at the Department of Commerce spoken to anyone

13   outside of your agency prior to the DOJ letter

14   about the citizenship question?

15            MR. GARDNER:  Objection.  Lack of

16   foundation.

17            THE WITNESS:  Again, I can only answer

18   for myself.  So I wouldn't know what other people

19   might or might not have spoken to people outside

20   the department on.

21   BY MS. SENTENO:

22       Q    Did you ever speak to anyone from the

Page 408

1   Heritage Foundation?

2       A    No.

3       Q    You never spoke to anyone at the

4   Heritage Foundation about the census?

5       A    Not that I recall.

6       Q    And you never spoke to anyone at the

7   Heritage Foundation about the potential -- about

8   apportionment?

9       A    Not that I recall, no.

10      Q    How about voter fraud?

11      A    No.

12      Q    Congressional apportionment -- sorry.  I

13  just said that.

14           Section 2 of the VRA?

15      A    No.

16      Q    Okay.  Are you aware of anyone else at

17  the Department of Commerce or the Census Bureau

18  that at any point, either before or after the DOJ

19  letter -- the DOJ letter, who had a conversation

20  with someone we had not already discussed about

21  the purpose of adding a citizenship question for

22  immigration enforcement?

Page 409

1          MR. GARDNER:  Objection.  Form.

2          THE WITNESS:  I'm not aware of any

3    conversations regarding adding a citizenship

4    question for immigration enforcement.

5    BY MS. SENTENO:

6        Q    How about voter fraud?

7        A    No.

8        Q    Congressional apportionment?

9        A    No.

10       Q    Redistricting?

11       A    No.

12            I mean, I will note there was an earlier

13   conversation about that Wall Street Journal

14   article that mentioned -- that referenced

15   apportionment.  So outside of that response with

16   the Secretary, there's never been a discussion of

17   it.

18       Q    Have you spoken to anyone at

19   Department of Justice's voting rights section?

20       A    Not to my knowledge.

21       Q    So you were never referred to anyone or

22   you never inquired from anyone, a contact within

Page 410

1   the voting rights section, to discuss this

2   request --

3          MR. GARDNER:  Objection.  Form.

4   BY MS. SENTENO:

5      Q   -- for a citizenship question?

6          MR. GARDNER:  Sorry.  Objection to form.

7          THE WITNESS:  No.  Again, as I think we

8   established in the earlier testimony, I was

9   referred to Mary Blanche Hankey by someone in the

10  Department of Commerce, by Eric Branstad, who I

11  think got her name from a contract of his at the

12  White House.  She referred me to -- I'm already

13  blanking on his name -- John McHenry.  I did not

14  investigate John McHenry's position in the

15  department.  I just took it on face value he would

16  be the right person to talk to and those are the

17  two people I spoke to at Department of Justice,

18  so -- outside of litigation counsel, obviously.

19  BY MS. SENTENO:

20     Q   You testified earlier in the memo that

21  you drafted for the Secretary that stated that

22  once you had been told by DHS that your request

Page 411

1   would be more appropriately handled by the

2   Department of Justice, you said that the

3   interaction ceased; is that correct?

4        A    Well --

5        Q    From you?

6        A    My efforts at that point to track down

7   somebody ceased because they had run into a dead

8   end.  I mean, our initial conclusion was that

9   Department of Justice was the right place to go.

10  They seemed occupied on other matters, so they

11  referred us to DHS.  DHS referred us back, so now

12  I'm back to where I started.

13       Q    So once you were referred back to DOJ,

14  you didn't ask another follow-up as to who in the

15  voting section would be more appropriate to talk

16  about this particular issue?

17       A    Again, I was working on literally dozens

18  of issues that consumed a lot of time.  And so I

19  had put the time into it that I could afford to

20  put into it and had come up empty.  So I reported

21  that to my boss, and basically, said if absent

22  some instruction from higher up, it appears that

Page 412

1    the DOJ staff is not particularly interested in

2    expending resources on this right now.

3        Q    Did you or Secretary Ross consider having

4    anyone else, any other governmental department or

5    any other jurisdiction make a request to the

6    Census Bureau to add a citizenship question --

7            MR. GARDNER:  Objection.

8    BY MS. SENTENO:

9        Q    -- other than the DOJ and DHS?

10           MR. GARDNER:  Objection.  Form.  And

11   objection.  Foundation.

12           THE WITNESS:  Again, nobody would make a

13   request to the Census Bureau to add it because the

14   statute commits that discretion to the Secretary,

15   not the Census Bureau.  So it's not their decision

16   to make.  It's the Secretary's decision to make.

17   So we would not seek someone else to contact the

18   Census Bureau about the question, no.

19   BY MS. SENTENO:

20       Q    But the DOJ letter was directed to the

21   Census Bureau requesting an addition of the

22   question?

Page 413

1      A   I did not draft that letter, so I -- but

2   their choice of who to send the request to was

3   dictated by the Department of Justice, not by us.

4      Q   Did you or Secretary Ross consider having

5   anyone else make -- anyone else, other than the

6   DOJ to DHS, to make that request to Commerce?

7           MR. GARDNER:  Objection.  Lack of

8   foundation.

9           THE WITNESS:  No.  I think upon further

10  analysis, we determined that the Secretary

11  probably could determine that Commerce had a need

12  for it, but that was not before us at the time,

13  so --

14  BY MS. SENTENO:

15     Q   Can you explain your subsequent research?

16     A   Well, as I mentioned, the United Nations

17  recommends that all countries ask, frankly, rather

18  detailed questions about citizenship,

19  naturalization, et cetera.  So it's considered

20  good practice, good demographic information to

21  have.  It was asked for 150-plus years without any

22  problem.  So -- and every other major democracy

Page 414

1    inquires of all their citizens on a regular basis

2    of it.  So it's -- I think there's a perception

3    out there -- where it came from, I don't know --

4    that somehow asking a citizenship question is a

5    problem.

6             And I would, again, refer you back to the

7    fact that 70 percent of the noncitizens in the ACS

8    actually answer the question correctly.  So,

9    apparently, those people don't consider it a

10   problem.  So it appears to be a rather small

11   demographic that is concerned about this.  And

12   again, I would point out that when you understand

13   that the data that is being protected by law,

14   cannot be used for any enforcement purpose, cannot

15   be used to identify an individual, there's

16   absolutely no reason I can think of why someone

17   would not answer the census honestly on that,

18   citizen or noncitizen.  It's demographic

19   information.

20       Q   So based on that, was it your

21   understanding that if the DOJ did not make this

22   request to the Department of Commerce or the

Page 415

1    Census Bureau, whoever was the most appropriate

2    point of contact for that request, was it your

3    understanding that the Department of Commerce

4    might move forward with a plan to add the

5    citizenship question based on --

6            MR. GARDNER:  Objection.

7    BY MS. SENTENO:

8        Q   -- that rationale?

9            MR. GARDNER:  Sorry.  Objection.

10   Hypothetical.

11           THE WITNESS:  Right.  It's a hypothetical

12   question that was not before us.

13   BY MS. SENTENO:

14       Q   Okay.  Did Secretary Ross tell you or

15   anyone else whether he would have pursued other

16   justifications for adding the citizenship

17   question?

18           MR. GARDNER:  Objection.

19           THE WITNESS:  We had a request --

20           MR. GARDNER:  Lack of foundation.

21           THE WITNESS:  -- from the

22   Justice Department, so there was no need to

1    speculate on that.

2    BY MS. SENTENO:

3        Q   Okay.  Are you aware of any VRA cases

4    that the Department of Justice declined to bring,

5    only because they needed block-level citizenship

6    data?

7        A   I'm not aware of that, but I didn't

8    research that either.

9        Q   So no -- neither yourself or anyone else

10   at the Department of Commerce asked DOJ for this

11   information?

12       A   I did not.  I can't say whether anybody

13   else did.

14       Q   So -- just a couple more questions.

15           The ACS is not a head count, correct?

16       A   That's right.  It's a sample.

17       Q   But the decennial census is a head count,

18   correct?

19       A   That's correct.  Counts all persons.

20       Q   And a decrease in the response rate in

21   the citizen question on the 2016 ACS caused an

22   underestimate of the percent of noncitizens; is

Page 417

1    that correct?

2        A    No.  That's not correct.

3        Q    Can you explain?

4        A    Well, you're asserting that it's because

5    of the citizenship question, and I'm not sure that

6    the data supports that statement.

7        Q    What are you -- what do you believe the

8    data supports?

9        A    Again, without the data sitting in front

10   of me, it would be hard to make an analysis.  But

11   basically, the Census Bureau has reported that

12   certain number of people may drop off at certain

13   questions.  It's not dissimilar for citizenship

14   versus other questions.  There was not a major

15   statistical variation.  So, yes, a certain percent

16   of people do not complete the 45, 48 or 70

17   questions that are on the ACS or the long form,

18   and they have various break-off rates under the

19   Internet thing to tell where they stopped.

20            But, again, whether citizenship was a

21   determinative factor in any of those cases, it's

22   hard to determine.

Page 418

1          Q    But the data suggests -- the data that

2     the Census Bureau provided suggests that the

3     break-off rate for noncitizens was higher with

4     respect to a citizen question; is that correct?

5          A    Higher than noncitizen?

6          Q    Yes.

7          A    Yes.  That's true.

8          Q    Okay.  So if the same people who did not

9     respond to the citizen question on the ACS also

10     didn't respond to the short form of the decennial

11     census, that would cause a drop in the total head

12     count, correct?

13          A    No.  It would not.

14          Q    Could you explain?

15          A    Secretary Ross placed the question at the

16     end of the census so they would be able to not

17     answer that and still complete the census.  We

18     also have administrative records and

19     Secretary Ross directed we use administrative

20     records, which we're actively doing for a variety

21     of reasons, not just citizenship.

22               So we have every confidence between the

Page 419

1   increased outreach that's planned, the additional

2   money and resources that are to be put into the

3   advertising and other things, that we will more

4   than compensate -- in fact, our objection is to

5   have a complete and accurate count above and

6   beyond the count that was done in 2010.

7        Q   But every individual is required to

8   answer the census fully and completely, including

9   all questions; is that not right?

10       A   That's correct.  Yes.

11           Though I would note, we've never

12   prosecuted anybody for failure to do so.

13           MS. SENTENO:  Okay.  Go off the record.

14           VIDEOGRAPHER:  We're going off the

15   record.  The time on the record is 5:46 p.m.

16           (Off the record.)

17           VIDEOGRAPHER:  We're back on the record.

18   The time on the video is 5:43 p.m.

19               EXAMINATION BY MS. BOUTIN:

20       Q   Sir, I'd like to talk about the time

21   period between the December 12th DOJ letter

22   requesting the citizenship question and before

Page 420

1    Secretary Ross issued the March 26 memo --

2    decision memo.

3         A    I'm sorry.  Could you tell me who you're

4    with?

5         Q    Sure.  My name is Gabrielle Boutin.  I'm

6    with the Attorney General's of the State of

7    California, and I represent plaintiffs, the

8    State of California -- excuse me -- State of

9    California v. Ross in the Northern District of

10   California.

11        A    Okay.  Thank you.

12        Q    So during the time period between the

13   December 12th DOJ letter and the issuance of

14   Secretary Ross's March 26th memorandum, that's

15   what we're talking about.

16        A    I understand.

17        Q    Do you understand?

18        A    So far so good.

19        Q    Good.

20             During that time period, did the

21   Department of Commerce ever inform the

22   Department of Justice that the Census Bureau

Page 421

1    recommended using administrative records alone to

2    meet Justice's December 12th request rather than

3    adding the citizenship question to the census?

4        A    I believe that was part of the purposes

5    of the meeting they were seeking with the -- the

6    Census Bureau was seeking with the

7    Justice Department.

8        Q    Okay.  My question is:  Did the

9    Commerce Department ever inform DOJ that the

10   Census Bureau recommended using administrative

11   records alone to meet their requests, rather than

12   adding a citizenship question to the census?

13       A    Again, I'm not privy to all the

14   conversations with the Justice Department, so --

15       Q    Do you --

16       A    -- I was not --

17       Q    -- know --

18       A    I was not involved in such a discussion,

19   no.

20       Q    Okay.  But you were one of the primary

21   people working on this at Commerce; isn't that

22   right?

Page 422

1      A    Yes.

2      Q    Do you think you would have known if

3   someone from Commerce conveyed that information to

4   the Department of Justice?

5           MR. GARDNER:  Objection.  Calls for

6   speculation.

7   BY MS. BOUTIN:

8      Q    Do you think it's likely you would have

9   known?

10     A    It's possible, yes.

11     Q    Did the Department of Commerce ever

12  transmit to the Department of Justice any of the

13  Census Bureau memos analyzing options for

14  providing block-level -- excuse me -- block-level

15  citizenship data to the Department of Justice?

16          MR. GARDNER:  Objection.  Lack of

17  foundation.

18  BY MS. BOUTIN:

19     Q    That was repetitive.  Let me rephrase.

20     A    All right.

21     Q    Did Commerce ever transmit to

22  Department of Justice any of the Census Bureau's

Page 423

1    memos that analyzed the options for providing to
2    DOJ block-level citizenship data?
3            MR. GARDNER:  Objection.  Lack of
4    foundation.
5            THE WITNESS:  I would just note it's the
6    Secretary of Commerce's decision as to whether
7    this goes forward.  His focus is on a complete and
8    accurate count.
9            And as explained earlier, the Option C
10   alternative, which was to use the administrative
11   records only, would have inquired us to impute --
12   so, in other words, fill in the blanks -- for 25
13   million voting age citizens.  That was not
14   something Secretary Ross was prepared to have the
15   department do.
16   BY MS. BOUTIN:
17     Q   Mr. Comstock, I understand that.  Your
18   counsel is -- wants us to limit the amount or time
19   that we're here today, and the best way to do that
20   is if you would answer my questions directly.  So
21   I'll ask you again.
22           Did the Department of Justice ever --

Page 424

1      A    Not to my knowledge.

2      Q    Okay.  Thank you.

3           And again, we're talking about between

4      December 12th and the March 26th.

5      A    Right.

6      Q    Did the Department of Commerce ever

7      inform DOJ that the Census Bureau believed that

8      administrative records alone would be more

9      complete -- would create more complete and

10     accurate citizenship data than asking a

11     citizenship question on the census and then

12     combining the data from that question with

13     administrative records?

14          MR. GARDNER:  Objection.  Form.

15     Objection.  Lack of foundation.

16     BY MS. BOUTIN:

17     Q    Do you want me to re-ask that question?

18     A    Sure.

19     Q    Did the Department of Commerce ever

20     inform Justice that the Census Bureau believes

21     that admin -- using administrative records alone

22     would provide more complete and accurate data than

```
                                           Page 425

 1    instead of doing that asking the citizenship

 2    question on the census and then combining that

 3    with the use of administrative records?

 4          MR. GARDNER:  Same objection.

 5          THE WITNESS:  Again, I think you

 6    mischaracterize the Census Department's -- Census

 7    Bureau's analysis.  But, again, it's the

 8    Secretary of Commerce's decision as to what to

 9    make, and so he would only transmit to the

10    Justice Department what he considered that would

11    provide complete and accurate data.

12    BY MS. BOUTIN:

13      Q   But the Commerce Department did inform

14    the Department of Justice about that belief by the

15    Census Bureau?

16          MR. GARDNER:  Same objections.

17          THE WITNESS:  Again, not to my knowledge.

18    BY MS. BOUTIN:

19      Q   Okay.  But did the Commerce Department

20    ever inform Justice that the Census Bureau

21    believed that 30 percent of responses by

22    noncitizens as to citizen status are incorrect?
```

Page 426

1          MR. GARDNER:  Objection.  Lacks

2    foundation.

3          THE WITNESS:  Again, I believe we have

4    told the Justice Department that is now the case

5    with the ACS data, yes.

6    BY MS. BOUTIN:

7       Q    And was that conveyed between

8    December 12th and March 26?

9       A    I don't know.

10      Q    Did Commerce ever communicate to Justice

11   any of the substance of the Census Bureau's

12   technical review of the -- of the

13   Justice Department's request for a citizen

14   question?

15          MR. GARDNER:  Same objection.

16          THE WITNESS:  Again, the Justice

17   Department asked us to provide block-level --

18   block-level census data.  How we do that is a

19   decision of Department of Commerce, not the

20   Department of Justice.

21   BY MS. BOUTIN:

22      Q    But is the answer to that question yes or

Page 427

1  no?

2       A    I forget the question.

3       Q    Okay.  I have to, so I'll say it again.

4            Did Commerce ever communicate to DOJ any

5  of the substance of the Census Bureau's technical

6  review to have DOJ's request for a citizenship

7  question?

8            MR. GARDNER:  Same objection.

9            THE WITNESS:  Again, it's -- the

10 technical review was how do we provide data that

11 would respond to this, and that would not be

12 relevant -- why would we communicate that to the

13 Justice Department is not --

14 BY MS. BOUTIN:

15      Q    Well, isn't -- didn't the

16 Justice Department, isn't that ultimately the

17 goal, according to that letter, getting

18 block-level data for Voting Rights Act

19 enforcement?

20      A    Correct.  But they --

21      Q    Hold on.  Hold on.  And isn't -- don't

22 you think they would want the most accurate data

Page 428

1  of which to do that?

2      A    And that's a determination of the

3  Secretary, not the Justice Department, so --

4      Q    But you don't think the

5  Justice Department would want to know the

6  Census Bureau's opinion on what would be best way

7  to do that?

8           MR. GARDNER:  Objection.  Calls for

9  speculation.

10          THE WITNESS:  I don't think it would be

11  relevant if I'm the Justice Department, at all.

12  BY MS. SENTENO:

13      Q    Okay.  I'd like to turn to the March 26th

14  memo.

15          Was that Exhibit 30?

16          MR. GARDNER:  No.  I think --

17          THE WITNESS:  I think it is.  Yes.

18  BY MS. BOUTIN:

19      Q    Okay.  So I'd like to turn to Page 5,

20  which is Bates number 1317.

21      A    Okay.

22      Q    And I'd like to avoid having to read a

                                              Page 429

1    full paragraph, but I also want you to understand

2    the context, so let's start at the top of the

3    first paragraph.

4        A   Okay.

5        Q   It says, "In my judgment that Option D

6    will product DOJ with the most complete and

7    accurate CVAP" -- excuse me.  Let me start again.

8           "It is my judgment that Option D will

9    provide DOJ with the most complete and accurate

10   CVAP data in response to its request."

11          The paragraph then goes on to give a few

12   reasons why Option D would be the best option in

13   his opinion and then about in the middle of the

14   paragraph, it gives one final reason starting with

15   the word "finally," so I'm going to read that

16   portion.

17       A   Okay.

18       Q   It says, "Finally placing the question on

19   the decennial census and directing the

20   Census Bureau to determine the best means to

21   compare the decennial census responses with

22   administrative records will permit the

Page 430

1   Census Bureau to determine the inaccurate response
2   rate for citizens and noncitizens alike using the
3   entire population.  This will enable the
4   Census Bureau to establish, to the best of its
5   ability, the accurate ratio of citizen to
6   noncitizen responses to impute for that small
7   percentage of cases where it is necessary to do
8   so."
9        A    Yes.
10       Q    So with respect to those two sentences
11   starting with the word finally, who wrote that
12   language?
13       A    I couldn't say for certain, but I likely
14   had a hand in drafting that.
15       Q    Okay.  Can you explain, how does adding a
16   citizenship question to the census and determining
17   the incorrect response rate for citizens and
18   noncitizens help the Census Bureau impute with
19   respect to people who did not respond at all and
20   did not have administrative records?
21       A    I mean, you could ask the Census Bureau
22   for a fuller explanation of imputation, but

1   basically, they do a formula that looks at data

2   that they have.  And so if they know for the

3   people -- let's say 95 percent of the population

4   that they have accurate records for and which they

5   have responses for, if they discover that -- pick

6   a number -- it's now 10 percent of the people who

7   aren't citizens, are, in fact, noncitizens, then

8   they would probably apply that to 5 percent

9   remaining.  So they would take whatever number of

10  people who are citizens, multiply that by that 5

11  percent, and then they would take the noncitizens

12  and say, okay, we now know the accurate count,

13  based on the entire population of what we have,

14  there's a 10 percent error rate, 10 percent of the

15  people that might say they're citizens are

16  noncitizens, so we're going to multiply that

17  number out.  That's going to give you the most

18  accurate count that you can get.

19      Q   So what's your source of that

20  explanation?

21      A   Based on the briefings.

22      Q   So you're saying that the Census Bureau

Page 432

1    supports this statement here?

2        A    This is the Secretary's statement.

3    Whether the --

4        Q    But did the Census Bureau explain,

5    say -- explanation you just offered me -- did

6    they -- did they explain it that way to you?

7        A    More or less, yeah.

8        Q    And do you believe they support this

9    statement in this memo?

10       A    I'm going to make no representations

11   about what the Census Bureau would or would not

12   support.

13       Q    Would it surprise you if you learned that

14   they did not support that statement, that they did

15   not ever represent to you or the Secretary that

16   establishing that ratio would help impute for

17   nonresponders?

18       A    I would not be surprised if that was the

19   opinion of Dr. Abowd, no.

20       Q    Do you believe that Dr. Abowd wrote this

21   memos on his own?

22       A    I believe he had the help of lots of

Page 433

1    staff.  I have no --

2       Q    Do you believe he acted against the

3    opinions of his staff when he wrote the memos?

4       A    I have no idea.

5       Q    So -- but you believe that it was his

6    opinion alone that contributed to -- that was

7    reflected in those memos?

8       A    No.  Dr. Abowd is the head of the

9    division that does that, so at the end of the day,

10   he gets the final call, so --

11            And, again, just to be clear, do I think

12   that there may be other opinions in the

13   Census Bureau?  Absolutely.

14      Q    So do you have any source, other than the

15   Census Bureau, for believing in the scientific

16   empirical accuracy of these last two sentences of

17   this paragraph?

18            MR. GARDNER:  Objection.  Form.

19            THE WITNESS:  Yes.  My experience, my

20   knowledge and other people who also, including the

21   Secretary, who is a very smart man, who also came

22   to a similar conclusion.

Page 434

1    BY MS. BOUTIN:

2        Q   Do you believe you have more expertise in

3    the science of imputation than the experts at the

4    Census Bureau?

5        A   I'm not going to get caught in making

6    such a statement, but I'm perfectly capable of

7    looking at the analysis they provided and deciding

8    whether or not I agreed with that analysis.

9        Q   What's your background in statistical

10   imputation?

11       A   I --

12           (Conference call interruption.)

13   BY MS. BOUTIN:

14       Q   What is your background in statistical

15   imputation?

16       A   I don't have one.

17       Q   Okay.  Switching gears.  Did you ever ask

18   anyone at the Census Bureau whether placing the

19   citizenship question on the census could affect

20   the apportionment of the Congressional

21   representatives to the state?

22       A   I never asked that question.

Page 435

1       Q    Are you aware of whether anyone else at

2    Commerce ever asked that question to the

3    Census Bureau?

4       A    Not to my knowledge.

5       Q    Okay.

6            MS. BOUTIN:  I believe that's all I have.

7            MS. GOLDSTEIN:  Let's go off the record.

8            MS. BOUTIN:  Yeah.  Let's go off the

9    record.

10           VIDEOGRAPHER:  We're going off the

11   record.  The time on the video is 5:56 p.m.

12           (Off the record.)

13           VIDEOGRAPHER:  We're back on the record.

14   The time on the video is 6:02 p.m.

15           MS. BOUTIN:  We have completed our

16   questions for today.  However, based on the fact

17   that there are still outstanding discovery

18   responses and discovery documents, we are keeping

19   the deposition open at this time.

20           MR. GARDNER:  We oppose that, of course.

21   You had the option to put this off, if you wanted

22   to, knowing there were outstanding issues and

Page 436

1  chose to go forward anyway, but we don't have to

2  resolve this here and now.

3          The witness will read and sign.

4          VIDEOGRAPHER:  This concludes today's

5  video deposition.  The time on the video is

6  6:02 p.m.  We are off the record.

7          (Whereupon, at 6:04 p.m., the deposition

8  of EARL COMSTOCK was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 437

1                    * * * * *

2              CERTIFICATE OF REPORTER

3         I, KAREN LYNN JORGENSON, RPR, CSR, CCR the

4    officer before whom the foregoing deposition was

5    taken, do hereby certify that the witness whose

6    testimony appears in the foregoing deposition was

7    duly sworn by me; that the testimony of said

8    witness was taken by me in stenotype and

9    thereafter reduced to typewriting under my

10   direction; that the said deposition is a true

11   record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in

14   which this deposition was taken; and further, that

15   I am not a relative or employee of any counsel or

16   attorney employed by the parties hereto, nor

17   financially or otherwise interested in the outcome

18   of this action.

19   _____

20            KAREN LYNN JORGENSON, RPR, CCR, CSR

21   Dated this 3rd   day

22   of    September  , 2018.

Page 438

1          ACKNOWLEDGEMENT OF DEPONENT

2        I, EARL COMSTOCK, do hereby acknowledge I

3    have read and examined the foregoing pages of

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any changes or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10

11

12

13    _____     _____

14    Date                 EARL COMSTOCK

15

      Joshua E. Gardner, Esquire

16    U.S. DEPARTMENT OF JUSTICE

      20 Massachusetts Avenue

17    Washington, D.C. 20530

18    IN RE:  New York Immigration Coalition, et al., v.

      United States Department of Commerce, et al.

19

20

21

22

Page 439

1   Dear Mr. Gardner:

2        Enclosed please find your copy of the

3   deposition of EARL COMSTOCK, along with the

4   original signature page.  As agreed, you will be

5   responsible for contacting the witness regarding

6   signature.

7        Within 21 days of receipt of transcript,

8   please forward errata sheet and original signed

9   signature page to counsel for, John Freedman and

10  all counsel  of record.

11       If you have any questions, please do not

12  hesitate to call.  Thank you.

13  Yours,

14  Karen Lynn Jorgenson, RPR, CCR, CSR

    Capital Reporting Company

15  1821 Jefferson Place, Northwest

    3rd Floor

16  Washington, D.C. 20006

    (202) 857-3376

17

    cc:  All counsel of record

18

19

20

21

22

Page 440

1                E R R A T A   S H E E T

2  Case Name:  New York Immigration Coalition, et

3  al., v. United States Department of Commerce, et

4  al.,

5  Witness Name:  EARL COMSTOCK

6  Deposition Date:  Thursday, August 30, 2018

7  Page No.   Line No.      Change/Reason for Change

8

9

10

11

12

13

14

15

16

17

18  _____          _____

19  Signature                         Date

20

21

22

[& - 2017]                                                                 Page 1

| & |
| --- |
| **&**   1:15 4:4,11,20<br>6:15 8:21 47:1<br>228:2 |

| 0 |
| --- |
| **001308**   318:4<br>**001314**   352:10<br>**001315**   358:8<br>**01314**   354:10<br>**01570**   381:6<br>**05025**   1:5 |

| 1 |
| --- |
| **1**   2:9 8:13 55:22<br>56:1,2 111:7<br>147:21 222:11<br>278:8 318:2 322:1<br>322:12 323:9<br>365:9,17 375:22<br>376:8<br>**10**   2:13 64:6,8<br>67:22 68:4 69:8<br>83:2,16 145:6,7,11<br>148:11 149:16<br>192:2 208:1 355:5<br>365:1 431:6,14,14<br>**100**   5:3 257:14<br>327:18 355:2<br>363:5 369:1<br>**10005**   6:5<br>**1004**   4:8<br>**1016**   5:2<br>**1050**   5:7<br>**10:32**   111:7<br>**10:45**   111:11<br>**10:51**   203:9<br>**10th**   65:1 69:3<br>72:15 81:16,20<br>82:7,13 83:5,14<br>89:9 146:13 |

**11**   2:14 147:9,10
158:16 373:11
**114**   2:11
**115**   4:16
**11:00**   209:1
**11:31**   158:10
**11:45**   158:13
**12**   2:14 158:17,18
158:19 159:1
191:22 293:20
348:17 365:1
**120**   2:12
**123**   2:12
**125**   4:8
**1250**   3:18
**12:10**   235:8
**12:32**   212:1
**12th**   419:21
420:13 421:2
424:4 426:8
**13**   2:15 127:8
164:13,14,18
**1300**   5:18
**1317**   428:20
**1321**   93:18
**137**   2:13
**13th**   129:19
**14**   2:15 167:1,2,5,6
206:3
**1401**   5:12 6:16,20
**1410**   56:5
**1411**   219:18
**145**   2:13
**147**   2:14
**14th**   133:15
205:18
**15**   2:16 91:8,10
182:5,6,7,12,13
218:19 232:15
365:1 373:12

**15.6**   361:10
**150**   413:21
**158**   2:14
**15th**   88:1,8,11
**16**   2:16 189:6,7,10
189:11,18
**160**   328:11
**1620**   5:7
**164**   2:15
**167**   2:15
**169**   328:1
**16th**   5:2 189:16
**17**   2:17 194:13,15
235:8,15
**17388**   437:18
439:13
**18**   2:18 27:17
199:20,21 200:2
212:11
**182**   2:16
**1821**   439:15
**189**   2:16
**18th**   28:18 29:6,10
31:20 33:3
**19**   2:18 212:12,13
212:14,17 309:21
388:13,16
**194**   2:17
**199**   2:18
**1992**   12:21,22
**19th**   317:3,11
319:19 320:19
321:2
**1:18**   1:5
**1:19**   212:5
**1:49**   240:19
**1:50**   240:22
**1:58**   250:8

| 2 |
| --- |
| **2**   2:9 59:6,11 62:2<br>62:3,6 64:22 71:3<br>80:9 111:11 146:2<br>157:3 161:21<br>294:3,6,10 328:15<br>349:5 352:10<br>394:2 395:6 396:6<br>399:22 400:5<br>401:13 404:13<br>406:8 408:14<br>**20**   2:19 6:10 91:9<br>91:11 138:11<br>171:15 215:18,19<br>373:13 438:16<br>**200**   263:9<br>**2000**   81:1<br>**20001**   4:5,12 8:22<br>**20005**   3:19 5:13<br>**20006**   439:16<br>**2000s**   67:11<br>**20036**   5:3,8<br>**2008**   384:4<br>**2010**   67:11 78:22<br>79:4,19 80:4<br>355:14 419:6<br>**2016**   15:16 17:16<br>27:6 124:4 416:21<br>**2017**   15:17 27:17<br>33:16,17 34:10<br>35:5,9,17 36:10<br>37:7 39:18 40:2<br>55:2 56:21 58:15<br>59:6,11 64:6,8<br>67:22 68:4 77:19<br>78:1 83:2 88:3,9<br>88:11 96:12 103:4<br>104:12,22 105:7<br>109:1,18 110:8<br>115:14,15 117:10<br>117:13,16,18 |

119:1,5,8,12
121:16 122:12
124:5 127:8
129:19 133:15
134:13 138:11
140:16,21 143:22
146:2 147:21
156:15 157:3
161:21 162:2
179:10 183:10
184:8 188:4,15
189:18 195:6
196:17 198:21
201:5 206:3 208:1
209:17,19,22
213:3 215:12
222:12 225:7
235:8,15 237:14
238:6 239:2
241:18,22 242:3
250:17,22 262:15
262:19 263:5,11
264:3,12,17 265:8
286:1 290:17
309:9 348:17
397:8,11
**2018**   1:10 8:5
35:18 39:22 40:1
94:13 111:15
137:11 149:13
198:19 241:16,18
241:20 242:7,9
250:17 287:19
293:7 309:21
318:2 326:6 369:5
375:22 376:8
437:22 440:6
**202**   4:5,13 5:4,8,13
6:11,17,21 439:16
**2020**   21:16 85:21
86:10 88:15 93:4

95:20 130:5 202:9
204:2 244:20
333:10,17 334:3
337:2,10 354:16
367:14 385:2
**20230**   6:17,21
**2034**   224:14
**20530**   6:11 438:17
**20th**   27:20 34:12
35:5,8 143:22
323:15
**21**   2:19 94:12
111:15 121:16
218:4,6,10 341:9
439:7
**210-6053**   5:19
**212**   2:18 4:9 6:5
**215**   2:19
**218**   2:19
**219**   2:20
**21st**   98:10 99:3
101:19 113:10
341:17,19 346:5
346:12
**22**   2:20 56:21
219:18,19,22
**221**   2:20
**224**   2:21
**226**   2:21
**23**   2:20 221:18,19
221:22
**232**   50:14 201:19
**234**   2:22
**2395**   226:16
**2396**   229:20
**24**   2:21 203:9
224:15,16,19
229:13
**241**   2:3
**2424**   221:18

**2458**   189:10
**2462**   167:5
**24th**   201:5
**25**   2:21 224:1
226:17,18,21
351:9 368:17
423:12
**2521**   62:7 78:5
**2522**   80:9
**2561**   114:10
**26**   2:22 137:11
234:19,20 242:9
324:13 326:6
420:1 426:8
**2643**   384:2 385:18
**2644**   384:8 388:13
**2651**   234:19 235:1
**26th**   241:19
323:10 324:2,6
343:1,20 345:3,14
345:15 346:17,21
352:10 420:14
424:4 428:13
**27**   2:22 292:21,22
293:1 361:9
373:13
**28**   3:3 6:4 55:2
309:3,15 314:7
326:11 353:2,5
354:13
**2800**   4:20
**28th**   16:7 37:4,7
63:8 104:19 195:6
**29**   3:3 317:19,20
318:2 321:14
326:12
**293**   2:22
**293-2828**   5:4
**296-2300**   5:8
**29th**   139:18
142:10

**2:14**   250:12
**2nd**   58:15 151:11
151:13 159:11
166:6 183:21
184:3 191:19
239:22

**3**

**3**   2:10 82:14,17,20
92:20,22 158:13
165:17 212:1
224:1 328:15
358:8 365:15
366:1,19
**3/10**   93:13
**3/15**   93:14
**3/19**   387:17
**30**   1:10 3:4 8:5
22:21 27:6 34:10
35:17 36:10 104:9
266:21 307:3
325:22 326:1,5,14
329:18 332:6
353:2,11,22
355:11 357:12
367:6,20 425:21
428:15 440:6
**300**   327:9,11,16
**305-9802**   6:11
**3071**   164:20
**309**   3:3
**30th**   33:20 34:2,13
35:5,9 37:6
**31**   3:5 33:17
372:14,15 373:3
373:19 375:14,15
377:4 379:4,10
380:6,14
**317**   3:3
**31st**   16:2,3 33:14
33:15,20 88:17

**[32 - abowd]**

| | | | |
|---|---|---|---|
| **32**   3:6 374:20<br>375:2<br>**326**   3:4<br>**33**   3:7 376:12,13<br>376:22<br>**336**   2:4<br>**34**   3:8 353:3,6<br>354:13 378:17,18<br>378:22<br>**35**   3:9 23:12 369:6<br>373:7,9 375:10<br>378:10,10 383:20<br>383:20,21<br>**350**   3:18<br>**360**   364:22<br>**366-8500**   4:17<br>**3685**   82:16<br>**3686**   87:12<br>**3694**   137:20<br>**3699**   158:22<br>**37**   293:20<br>**3702**   199:19 202:6<br>**3703**   200:12<br>**3705**   194:14,18<br>**3709**   123:14<br>**3710**   145:11<br>**372**   3:5<br>**374**   3:6<br>**376**   3:7<br>**378**   3:8<br>**381**   2:4<br>**383**   3:9<br>**3983**   218:5<br>**3984**   215:17<br>**3:11**   308:19<br>**3:37**   309:1<br>**3rd**   148:8 165:22<br>437:21 439:15 | **4**<br><br>**4**   2:10 87:7,8,13,15<br>212:5 250:8,11<br>353:4,18 364:6<br>373:10<br>**400**   5:12<br>**4004**   212:10<br>**415**   4:21<br>**416-8441**   6:5<br>**419**   2:5<br>**43**   333:11<br>**45**   417:16<br>**47,000**   42:2<br>**48**   417:16<br>**482-4772**   6:21<br>**482-5395**   6:17<br>**4:02**   335:12<br>**4:04**   335:15<br>**4:48**   380:18<br>**4th**   165:22 166:1<br>169:6<br><br>**5**<br><br>**5**   2:11 93:16,18,19<br>93:22 111:16<br>117:18 244:16,18<br>244:19 294:4,6,10<br>308:19 355:16<br>428:19 431:8,10<br>**50**   4:20<br>**500**   4:16<br>**56**   2:9<br>**562**   4:17<br>**5890**   6:16<br>**5:05**   380:22<br>**5:43**   419:18<br>**5:46**   419:15<br>**5:56**   435:11<br>**5th**   115:13,15<br>117:13,16 122:4<br>183:21 | **6**<br><br>**6**   2:11 114:6,7,11<br>114:13 309:1<br>380:18<br>**60**   234:8<br>**601**   1:15 4:4 8:21<br>**607-3300**   4:9<br>**62**   2:9<br>**662-5458**   4:13<br>**662-8345**   5:13<br>**6:02**   435:14 436:6<br>**6:04**   436:7<br>**6th**   225:19<br><br>**7**<br><br>**7**   2:12 117:10<br>120:14,15,20,21<br>204:21 205:3<br>208:21 225:6<br>329:18 380:22<br>**70**   292:16 294:16<br>332:4 355:8 365:5<br>365:6,7 414:7<br>417:16<br>**743-6909**   4:21<br>**763**   120:19<br>**79**   365:3<br>**7:00**   115:22<br>**7:30**   116:1<br>**7:50**   83:5<br>**7:51**   83:14<br>**7th**   227:15 233:2<br><br>**8**<br><br>**8**   2:12 123:10,11<br>123:16 127:6<br>130:2 213:3<br>215:12<br>**82**   2:10<br>**850**   4:12<br>**857-3376**   439:16 | **87**   2:10<br>**88.6**   355:14<br>**8:18**   381:6<br>**8:30**   73:8,15 75:8<br>**8th**   182:21 183:10<br>183:19 189:18<br>213:11 216:5<br>292:5 339:3<br><br>**9**<br><br>**9**   2:2,3,13 137:16<br>137:17,21 373:11<br>**90**   355:4,15<br>**90802**   4:17<br>**916**   5:19<br>**93**   2:11<br>**94111**   4:21<br>**942-5316**   4:5<br>**94244**   5:19<br>**944255**   5:18<br>**95**   355:16 431:3<br>**9834**   182:12<br>**9:01**   8:4<br>**9:08**   1:18<br>**9:58**   128:14,18<br><br>**a**<br><br>**a.m.**   1:18 8:4<br>111:7,11 158:10<br>158:13 209:1<br>**aajc.org**   5:9,9<br>**ability**   15:5,6<br>261:15 430:5<br>**able**   15:10 20:4<br>72:1 84:7 152:15<br>181:6 284:15<br>329:21 330:6<br>355:16 418:16<br>**abowd**   309:18,22<br>310:12,18 312:20<br>314:3,5 315:2<br>316:6,9,14 318:3 |

322:18 324:4 325:10 432:19,20 433:8

**abreast** 402:21

**absence** 351:14 362:5

**absent** 391:18 411:21

**absolutely** 46:11 88:12 105:21 113:8 242:5 350:12 414:16 433:13

**accept** 303:10

**accepted** 351:22

**access** 128:5 138:16

**accompanying** 371:4 376:18

**accomplish** 266:3 267:1 282:7

**accomplished** 160:6

**account** 365:14

**accounting** 13:21

**accuracy** 433:16

**accurate** 80:3 103:15 312:8 313:4 315:5 348:16,20,21 350:15 351:10 367:15 368:11 369:1 374:4 377:9 419:5 423:8 424:10,22 425:11 427:22 429:7,9 430:5 431:4,12,18

**accurately** 313:17 367:8

**acknowledge** 438:2

**acknowledgement** 438:1

**acquainted** 320:15 320:21

**acs** 57:20 58:20 88:16 93:6 108:16 126:17 127:13 132:15 153:17,18 171:8 176:6 180:14 181:12 192:9 261:7,21 263:13,16 264:18 265:10 272:15 326:21 328:3,4,16 328:21 332:3 333:11 334:7,10 334:16 350:2,7,18 352:14,17 353:9 355:7 356:8 357:3 357:5,6,16 358:4 367:7,16 368:3,7 368:10,12 372:13 414:7 416:15,21 417:17 418:9 426:5

**act** 126:16 153:19 154:5 155:9 192:17,18,22 194:8 262:9,16,18 263:14 265:11 268:9 277:11 295:1 302:3 349:6 349:9 381:22 382:6 400:4 403:7 403:16 427:18

**acted** 433:2

**acting** 36:17 57:5 93:9 198:3,6 203:12,13 237:15 237:19

**action** 9:7 84:11 106:13 151:9 152:14 168:13 239:8 261:15 347:11,16 402:12 405:7 437:13,18

**actions** 10:3

**active** 13:5,6 310:22

**actively** 418:20

**actual** 355:12

**ad** 39:1

**adam** 283:7

**adams** 160:1

**adc** 4:2

**add** 64:11 87:1 130:21 133:20 151:3 154:13 172:3 176:13 241:14 242:11 245:7 251:9,12 253:7 254:10 257:11 258:2,11 258:16,21 259:8 260:7,16 261:1,22 262:1,1 264:6 272:4 286:11 289:21 291:8 300:6 302:1 332:7 381:14 393:3 403:21 412:6,13 415:4

**added** 39:5 84:13 103:19 106:3,19 107:3,9,10 130:19 131:8,12 153:4,8 154:3 175:21 251:22 253:11,14 253:15 254:1,3 255:3,8 274:20 278:15 279:9

287:16 295:10 298:19 299:6,8,10 350:17 354:16 362:7,15 372:11 379:6

**adding** 54:17 55:6 59:13 68:22 69:17 81:14 82:3 107:19 108:1 109:8,22 131:4 133:4,9 134:5 135:11,18 153:12 171:5 270:2 310:14,19 346:19 361:2 364:1 365:22 383:9 408:21 409:3 415:16 421:3,12 430:15

**addition** 18:20 131:2 251:3 271:22 279:2 291:2 297:11 309:8 330:19 332:20 359:1 360:1 361:17,20 383:13 396:9 400:10 404:2 405:12 412:21

**additional** 70:2,3 419:1

**additionally** 352:13 357:2

**additions** 130:5

**address** 9:19 69:10 261:17

**addresses** 310:12

**adds** 61:12

**admin** 424:21

**administer** 9:5

**administration** 19:3 42:18 44:5

47:2 64:14 84:14
84:15,22 86:12,15
96:2 111:20 112:1
112:7 113:11,13
113:16,20 130:20
143:10 245:1
281:19 315:6
319:11 343:3
**administration's**
37:20 42:7 131:21
**administrative**
311:1 312:4 343:8
346:15 347:8
350:19 353:7,13
354:2,3,4 355:13
367:22 368:2,9,14
368:16 369:2
391:19 418:18,19
421:1,10 423:10
424:8,13,21 425:3
429:22 430:20
**admitted** 13:1,8
13:10
**advance** 20:18
41:1 287:19
**advancing** 5:6
**advancingjustice**
5:9,9
**advertising** 419:3
**advice** 39:4,9
139:15 246:15,18
247:17 248:6,8,16
249:6,9,10 340:7
342:21 346:1,2
**advisable** 343:17
**advise** 16:20 37:18
105:3
**advised** 193:16,22
248:14
**advises** 139:10

**advising** 17:22
124:1 140:11
161:7 181:7 225:8
344:10
**advisor** 74:5,7,17
116:7 167:21
173:12 404:8
**advisors** 50:20
**advisory** 123:20
138:21 139:3,4,9
139:14,19 140:10
141:12 142:20
149:3,7
**advisory's** 140:17
**affairs** 25:17
386:2,11
**affect** 434:19
**affixed** 326:7
**afford** 411:19
**africa** 84:16
**african** 86:19
141:20 143:3
**afternoon** 38:17
121:19 200:15
241:2 336:6 381:3
**ag** 213:17 214:18
215:5 236:19
237:1,4,12 274:22
279:11 283:10
285:11
**ag.ny.gov** 6:6,6,7
6:7
**age** 155:8 272:17
349:18,20 351:9
368:18 423:13
**agencies** 43:20
51:11,18 105:18
276:15
**agency** 126:16
154:4 156:16
171:7 181:3,8,9,20

182:1 185:3
239:11 273:18
274:1,9,14 282:10
407:13
**ago** 9:22 68:20
100:11 125:6
146:22 150:21
206:10 225:10
289:14
**agree** 8:11 112:22
133:13 154:16,19
205:17 223:16
233:1,4 260:12
265:13 267:8
295:22 300:13
302:9 306:15
312:5,22 313:10
316:16,18,18
323:19 348:15,21
389:3,5
**agreed** 63:8 434:8
439:4
**agreement** 52:10
274:16,22
**agriculture** 52:11
**ah** 242:1 312:16
**ahead** 271:4
341:13
**al** 1:3,6 8:16,17
438:18,18 440:3,4
**alabama** 405:11
405:21 406:14
**alaska** 11:21,22
13:10 19:19 20:8
**alerting** 44:21
**alex** 6:3
**alexander** 115:3,5
115:18 138:8
159:10
**alexfinkelstein** 6:7

**aliens** 207:12,18
**aligned** 84:14
**alike** 430:2
**alliance** 336:12
**allocations** 264:10
264:10
**allow** 151:8
272:19
**allowed** 31:8
**alternative** 261:17
310:13,14,19
315:3 318:10,21
319:6,8,10,15,17
319:19 320:16,17
320:19 350:6
351:14 423:10
**alvord** 87:19,21,22
**amended** 380:2
**american** 4:2
364:11
**american's** 81:22
**americans** 5:6
78:19
**amount** 112:19
142:1 163:15
223:20 423:18
**analyses** 328:19
329:1,10,12
**analysis** 106:14
154:21 156:19
213:15,20 260:9
262:2 304:17
309:11 313:20
314:6,6,9,10,16
323:4 324:15,21
325:3 326:12,16
329:5 350:5,7
351:2 353:5
360:19 361:7
369:21 413:10
417:10 425:7

434:7,8
**analyzed** 423:1
**analyzing** 258:15
422:13
**andrea** 5:1 381:4
**angeles** 4:14,19
**annual** 81:1 130:3
**answer** 10:10,22
12:12 43:12 55:17
62:16,18 65:7,10
65:17 67:5 69:21
70:1,4,10,11,15,19
79:6 83:20 98:14
100:7 106:6 110:6
118:20 127:17
128:16,19 135:1
136:8 142:14
168:14 176:18
180:11 186:14
188:7 193:4 194:4
195:7 196:1,2
204:6 206:22
208:17 218:1
224:4 226:14,15
248:11 249:7
252:5,19 254:15
259:16 263:8
273:22 274:20
275:10 284:7
289:10 290:6
297:15 303:9,15
303:17,18 305:21
306:4 308:1,14
311:14 327:20
332:1,5,8,9,10,15
345:21 355:3,8
359:15 363:4,19
364:2,3 367:1
369:7 370:9 371:2
373:22 374:6,17
375:14,15 377:3,6

377:7,11,14
379:22 380:2,6,14
390:13 391:13
407:17 414:8,17
418:17 419:8
423:20 426:22
**answered** 28:22
206:20 208:7
252:4 254:13
263:12,20 294:18
297:14 331:12
333:12 373:10,11
373:12,12,13,14
374:14 375:11,13
400:6
**answering** 28:12
68:9 108:19
200:13 263:3
330:14,15 362:17
362:19 367:7
**answers** 10:19
11:1 128:20 275:9
351:17 370:17
371:8,14 372:2,5
377:1 378:9
**anteroom** 199:11
**anti** 4:2
**anticipated** 289:5
290:6 359:3,8,12
**anybody** 42:15,20
100:14 213:10
217:12 286:8
401:20 416:12
419:12
**anymore** 75:1
**anyway** 436:1
**apart** 266:5
**apologize** 78:5
200:13 269:10
**apparently** 72:7
88:7 131:3 147:17

183:7 368:17
387:5 414:9
**appear** 56:14
61:19 81:10 216:7
223:12 230:15
235:20 266:2
292:16 294:6,16
349:15 377:15
379:3 438:6
**appearances** 9:9
**appeared** 63:20
82:10 153:10
**appears** 65:7,9,9
71:7,8 73:10
79:17 83:6 89:11
96:11 115:11
148:6 149:10
159:15 160:15
166:16 191:12
194:22 195:5
205:9 219:14
226:1 228:21
229:15,20 295:5
309:18 310:16
360:19 373:6,14
379:10 384:18
390:7 411:22
414:10 437:6
**applied** 222:8
363:15
**apply** 368:13
431:8
**appointee** 58:8
74:13
**appointment**
95:18 96:9 104:17
104:19
**apportionment**
65:6,21 66:15,20
67:3 81:19 85:20
207:14,20 208:4,5

208:11,15,18
393:20 395:2
396:2 399:18
401:9 404:13
405:5 406:7 408:8
408:12 409:8,15
434:20
**appreciate** 298:4
**approach** 351:7
**approaches**
351:13
**appropriate** 107:6
111:3 381:16
382:4,5 411:15
415:1
**appropriately**
411:1
**appropriation**
147:2,5 148:2,15
**approximately**
63:14 271:12
327:16 341:18
353:2 355:6,7
402:18
**april** 35:16,18
115:15 117:10,13
117:16,18 122:4
127:8 129:17,19
133:15 138:11
139:18 141:2
142:10 143:22
**arab** 4:2
**arcane** 18:5
**area** 20:6 44:21
126:2 255:13
378:7
**areas** 18:3,6 46:14
**arms** 84:4 86:4
222:15
**army** 43:15,15

**arnold** 1:15 4:4
8:21
**arnoldporter.com**
4:6
**arose** 370:2
**arrange** 156:21
157:7
**arranging** 93:10
**arrival** 41:9
**arrivals** 402:12
405:8
**arrive** 347:13
**arriving** 219:2,7
**arthur** 396:9
**article** 79:20
409:14
**articulate** 350:21
**asenteno** 5:4
**asian** 5:6
**aside** 131:6 307:13
**asked** 10:12 17:4
22:5 51:15 63:20
65:2 66:1,9,14,20
67:2,11,15 68:13
68:18 73:22 76:13
79:19 82:8,10
103:8,8 110:10,13
110:13,14,15,16
110:20 112:10
115:21 119:3
129:7,10 132:15
137:2 146:5 157:9
165:11 166:6,12
168:6 171:4,22
175:21 187:12
191:13 203:1
204:5 206:19
207:22 208:6,16
223:13 226:3,9
232:20 249:8
251:7,9 252:3,6

254:12 261:5,6,9
261:21 263:19
267:15 269:2
272:3,11,13,22
279:12 288:7
291:10 292:11,15
294:10 296:14,17
296:21 297:4,6,11
297:13,17 298:18
315:8,12 316:2
322:6 331:11
333:11,12,21
334:4 337:7,12
338:1 356:19
362:8 372:4 391:7
404:9 413:21
416:10 426:17
434:22 435:2
**asking** 10:21
62:20 71:11,13
85:12 93:1 105:19
107:22 109:11
115:20 127:15
128:22 135:22
136:1 151:10
168:8 176:15
183:13 184:7
188:4 191:10
231:15 232:4,18
233:2 250:16
251:16 253:1
266:5 272:4 280:7
297:21 303:17
305:9 306:3,4
307:14 311:22
313:8 315:21
319:1,8 322:6,7
332:14,16 333:7
334:8,9 364:3
389:5 398:14
402:1 414:4

424:10 425:1
**asks** 57:8 67:16
78:19 81:22 213:4
266:8 294:1 300:3
**asleep** 291:16
**aspect** 123:22
261:9
**aspects** 82:11
**assembler** 369:16
**asserting** 417:4
**assertions** 321:18
360:18
**assessment** 302:9
**assigned** 38:1
46:17
**assignments** 40:13
**assist** 30:19 41:11
66:21 67:1 76:16
76:22 95:1 236:20
252:15 260:5,18
260:20
**assistant** 6:3,15
61:12,15,16 73:4
115:7 283:15
285:11
**assisted** 28:2
29:12 95:3
**assisting** 26:11
253:5
**associate** 203:20
204:1
**associated** 352:14
354:17 356:12
357:5
**assume** 58:2 73:5
79:13 83:12 167:9
**assumed** 367:17
**assuming** 79:9
105:1 283:10
285:12 311:16

**assumption** 351:2
**assumptions** 352:5
**atlantic** 3:18
**atmospheric** 44:4
**attached** 3:11
438:7
**attempt** 177:14
**attend** 40:9 47:21
54:11 60:11 201:8
**attended** 23:15
33:3 126:13
161:19,22
**attendee** 92:14
**attention** 59:8
294:3 308:8
310:10 352:9,11
358:7 369:4
373:19 377:3
384:22
**attorney** 5:17 6:3
10:2 15:4,6 62:17
155:18 167:22
168:1 183:15
186:16,18 189:21
189:22 190:3,6
191:2 195:22
233:9,18,21 234:2
235:13,16 236:14
236:16 237:6
298:10,15 388:13
388:16 400:8,9,19
400:22 401:2,17
401:20 402:1,3,4
402:16,20 403:6
403:15 405:11,18
420:6 437:16
**attorneys** 214:7,11
344:6,7
**audio** 8:10,10
**august** 1:10 8:5
39:22 213:3,11

216:5 440:6
**authority**  150:13
258:21 261:21
348:13
**authorized**  9:5
**availability**  403:8
**available**  39:8
91:22 92:2 102:5
116:1 137:9
177:16 265:10
295:1 296:20
311:1 312:3 315:6
399:4
**avenue**  1:15 4:4,16
5:12 6:10,16,20
8:21 438:16
**aviation**  18:10
**avoid**  428:22
**aware**  42:22 53:10
58:4 105:16
119:11 122:17
139:8 162:15,16
169:17 217:2,12
237:20 286:8
307:4 334:22
376:4 385:10
386:12,17,21
387:2,11,18
389:16 390:14,17
390:19 392:5
394:7,12,14,18,20
395:1,3,5,7,12
396:12 397:16
401:15,22 402:3,7
402:11 404:18,22
406:10 407:4
408:16 409:2
416:3,7 435:1
**awkward**  30:14
31:14

**b**

**b**  127:13 310:13
310:14,19 315:3
319:8,19 320:16
320:19 351:13
**bachelor's**  12:10
**back**  12:7 25:2
30:21 44:12 46:11
47:22 50:15 56:10
64:22 71:3,12
92:22 102:4 132:2
148:11 153:4,8
162:10 185:11
187:14 191:18
204:17,21 208:20
212:8,9 214:3,4,15
215:15 216:12
236:6 240:21
250:15,17,21
252:8 263:5 266:1
270:12 271:4
275:12 278:7
279:13,18 281:5
285:22 287:4
309:6 315:7,8,10
315:13,14,15,16
315:18,22 316:3,4
316:7,15 319:14
321:12,22 322:5
323:18 326:11
335:14 336:21
350:8,21 363:10
371:3 372:1,9,11
373:5 376:19
406:16 411:11,12
411:13 414:6
419:17 435:13
**backed**  313:1
**background**  11:17
18:17 42:9 46:22
126:2 127:4 271:2

277:8 283:4 434:9
434:14
**bad**  361:14
**bailey**  6:9
**balance**  363:14
**ballpark**  49:13
238:8 292:8
328:14
**bannon**  115:21
116:4,6,11,19
117:2 119:16
121:22 122:18
123:1,5,7
**bar**  265:22
**barbara**  11:20
**base**  227:16 302:5
**based**  20:21 65:7
67:18 81:1 86:14
110:4 133:13
141:16 153:9
154:2,4,21 156:18
177:19 181:6
191:12 225:22
229:6 235:19
246:15,18 247:17
248:16 285:10
298:8 328:20
329:10 331:1,17
351:8 352:17
355:6,11 357:6
360:10 381:13
382:9,13 386:5
392:16 414:20
415:5 431:13,21
435:16
**basic**  14:13 32:3
180:6 193:1
**basically**  16:17
18:9 21:7 22:3
74:9 84:21 123:22
124:14 155:16

224:1 239:9,12
333:18 355:9
358:20 361:7
369:20 411:21
417:11 431:1
**basis**  38:12 47:16
47:20 239:10
249:8 264:10
266:11 267:14
274:17 300:10
302:4 303:16
333:10,17,21
334:1 368:19
371:21 414:1
**bates**  56:5 62:7
82:15 93:17
164:20 194:14
318:3 384:2
428:20
**beach**  4:17 31:9
**began**  15:20 95:19
96:9 104:16
347:10
**beginning**  1:18
34:6 201:19
203:16
**begins**  111:10
158:12 212:4
250:11 308:22
358:9 380:21
**begun**  346:18
**behalf**  1:19 4:1,10
4:14,19 5:1,15 6:1
6:8
**behold**  350:8
**belief**  106:8,12,19
330:12 350:22
425:14
**beliefs**  262:5
**believe**  13:6 16:2
27:16 45:9 55:20

[believe - budget]                                                              Page 9

57:21 95:7 101:6
101:15 102:7
118:1 130:3 140:9
147:4 203:11
204:4 208:12
209:4 217:4
222:20 238:4
242:22 266:19,20
268:12 269:6,8
286:10 288:9
305:4 315:2 318:8
324:3 340:10,18
353:3 357:8
361:20 364:22
370:6,19 371:22
372:6,6 374:16
375:3 383:19
386:7 396:15,18
397:1 399:6 403:4
403:14 417:7
421:4 426:3 432:8
432:20,22 433:2,5
434:2 435:6
**believed**  424:7
425:21
**believes**  424:20
**believing**  433:15
**benefits**  363:22
**best**  37:19 70:18
141:16 164:22
175:4 184:20
185:1 239:19
267:5 282:19
323:6,11 324:10
324:11 337:19
361:7 381:16
382:4 391:9,13
423:19 428:6
429:12,20 430:4
**better**  162:22
163:22 267:21

**beyond**  233:20,20
234:1 419:6
**big**  41:3
**bigger**  361:15
**biggest**  204:12
**billion**  224:1
361:10
**biology**  14:3
**bit**  17:19 31:13
47:13 53:1 75:20
253:2 336:21
356:18 381:8
**black**  147:15
163:15 336:12
379:19
**blacked**  163:13
215:10
**blanche**  167:8,11
167:13 184:11
185:22 188:1
269:13,17,22
338:5 381:9 410:9
**blanked**  205:12,16
222:6 228:22
229:7 231:19
**blanking**  410:13
**blanks**  423:12
**block**  296:19
352:13 357:4
379:19,21 380:1
403:19 416:5
422:14,14 423:2
426:17,18 427:18
**blocked**  222:13
339:16,20,22
340:5,12 379:17
**blog**  67:6,10,19
78:21 79:16 81:8
81:20 146:14
**blummerman**
203:5,7,9,10,20

204:6
**board**  18:16 27:4
27:9 32:4 36:14
37:1 360:9
**body**  153:11
**booked**  90:15
**born**  80:22
**boss**  252:6 266:8
273:16 274:12
278:14 279:11,14
280:3 282:8
284:13 411:21
**bottom**  121:11
127:7 386:10
**boutin**  2:5 5:16
190:18 336:18
419:19 420:5
422:7,18 423:16
424:16 425:12,18
426:6,21 427:14
428:18 434:1,13
435:6,8,15
**box**  5:18
**bpark**  4:18
**brady**  53:2
**branstad**  74:4,15
75:7,17 77:18
97:12 157:9
164:21 166:12
167:15 173:10
197:22 256:3,21
283:5 410:10
**break**  105:4 111:1
111:3,5 158:8
165:10 211:6,15
240:12,15,15
244:9 250:3,16
308:17 417:18
418:3
**breaking**  84:16

**brian**  4:15
**brief**  22:7,8 47:20
92:14 125:22
**briefed**  18:14
19:16 86:9 90:3,4
124:15 125:17
217:19
**briefing**  40:14,17
57:9,12 59:1,19,20
60:2 61:1,2,5 64:3
72:3,6,7,9,15,18
75:18 85:13,21
86:7 88:15 89:5
89:12 90:7 92:5,6
93:3,9,13,13
126:13,19 216:9
216:11
**briefings**  21:22
48:1 91:8 126:5,9
431:21
**briefly**  121:21
**bring**  92:9 161:2
172:11 416:4
**bringing**  32:4
359:6 405:22
**broad**  4:8 288:18
**broader**  338:21
**brooke**  115:3,5
138:8,16 139:16
159:10,16
**brooke's**  138:15
**brooks**  406:14
407:3
**brought**  27:11
76:2 170:3
**budget**  20:20 44:6
52:3,7 86:5
124:19 162:19
164:7 203:14,18
224:2,9 229:10
361:10

**build** 351:16
**building** 89:19
  90:22 91:21
**bulk** 345:11
**bullpen** 197:21
  198:9 199:3,5,14
  255:13
**bullpens** 197:14
**bunch** 262:11
**bureau** 6:4 19:16
  42:16,19,21 44:1
  45:6 46:18 47:10
  47:18 51:7 57:9
  57:12 59:21 72:3
  73:13 75:17 77:18
  81:2 88:15,16
  89:5,18 90:4,19
  91:7 92:7 105:17
  124:12 125:21
  129:15,18 132:13
  132:22 136:18
  139:10,15 153:15
  153:20 154:12,19
  163:19 169:21
  176:12 219:6
  224:6 237:16
  309:10,14,22
  311:3,22 312:14
  312:18 313:9,14
  313:15,20 314:21
  317:16 321:12,17
  321:21 323:17
  324:2,12,17,22
  325:12,13 326:12
  326:15 328:19
  329:5 334:19
  348:19 350:14
  352:1 353:5,12,13
  354:1,2 357:22
  358:9,13 361:6
  363:21 367:11

369:7,22 370:7,8
370:18,20 371:2,6
372:4 377:13,19
378:1 388:10
391:4,15 392:1
394:8,15 395:13
396:13 397:14,19
398:13 399:5
403:5 405:17
407:5,10 408:17
412:6,13,15,18,21
415:1 417:11
418:2 420:22
421:6,10 422:13
424:7,20 425:15
425:20 429:20
430:1,4,18,21
431:22 432:4,11
433:13,15 434:4
434:18 435:3
**bureau's** 66:13
  106:1 208:10
  323:3 324:21
  325:2 332:15
  350:5 357:18
  422:22 425:7
  426:11 427:5
  428:6
**bureaus** 41:15
  43:20 44:8,22
  45:3,4,16,18 46:10
  46:12 49:6
**burlington** 4:11
**busy** 276:8,13,17
  382:21

**c**

**c** 4:1 5:6 8:1 25:10
  25:11,11,11
  319:10,17 320:17
  350:6 351:13
  353:18 368:20

380:2 423:9
**c003134** 356:21
**c15** 339:7
**c30** 346:16 348:16
  352:9
**c33** 379:22
**c34** 380:2
**c5** 341:5 345:17
  346:4
**cabinet** 51:11,18
**calendar** 60:7,8,10
  60:16,18 61:8,13
  61:20,21 64:5
  72:18,21 73:1,3
  89:15 90:12,17
  91:13,16,19
  117:18 233:16
  288:2
**california** 4:17,20
  4:21 5:15,19
  11:20 336:14
  420:7,8,9,10
**call** 31:9 53:4
  102:19 117:12,15
  118:7,16,21 122:4
  122:9 143:11
  156:6 165:20
  168:7 169:14,16
  178:3,6,6,21
  181:17 183:15
  189:20,22 190:2
  191:4,5,6 208:22
  209:10 210:3,18
  213:4,8,11,17
  214:18 215:5
  231:14 236:11
  237:10 270:8
  273:9 274:21
  281:13 284:3,9,10
  285:5 291:14
  298:14,16 328:18

433:10 434:12
439:12
**called** 1:13 9:15
  53:5 67:19 72:2
  74:2 84:17 175:15
  241:13 269:21
  270:12 342:11
  402:12
**calling** 279:17
  282:10
**calls** 69:18 83:17
  98:11 116:13
  117:5 118:17
  122:7 130:12
  133:1,21 140:6
  142:11 143:7,16
  144:20 146:18
  148:21 159:20
  161:5,15 163:4
  184:17 186:7,12
  195:21 200:22
  202:19 226:5
  268:14 273:18
  274:1 275:3
  278:12,21 279:10
  285:3 286:7,16
  301:2,17 303:3,4
  304:5,6 305:1,18
  306:12,22 307:20
  308:11,12 340:13
  345:19 366:20
  380:7 390:12
  392:8,17 422:5
  428:8
**campaign** 3:9
  17:15,16 76:2
  383:21 384:3,13
  384:13,18 385:1
  385:11,20 386:15
  387:12,15,19
  388:4,20 389:1,4

[campaign - census]

391:1,5 392:2
**candidates** 100:9
**cannon** 6:13
**capable** 434:6
**capacity** 124:6
203:12
**capital** 1:17 385:7
439:14
**care** 16:22 304:13
**career** 36:18 37:18
37:19 41:10,10
**carefully** 302:12
360:5
**cares** 18:3
**carry** 239:18
266:8 349:18
**casa** 4:2
**case** 1:5 8:18
16:18 23:16 84:12
149:12 155:6,10
155:15,20 156:5
156:10 160:2
192:18,22 193:3
193:14,20 194:7
194:11 201:18
229:22 230:15
235:20 239:22
240:5 261:19
291:15 298:17
307:12 308:5
311:8 312:6
336:12 338:16
352:8 371:12
372:6 406:18
426:4 440:2
**cases** 155:1,3,4,5
155:16,18 156:4
157:14 172:8,9
192:22 240:1
349:9 370:2 383:8
416:3 417:21

430:7
**catch** 72:1
**catching** 74:1
**caught** 59:7
279:19 434:5
**cause** 330:20
332:20 360:1
361:8,15,21
366:15 418:11
**caused** 103:17
416:21
**cc** 439:17
**ccr** 1:17 437:3,20
439:14
**cea** 50:17,19
**ceased** 185:18
187:12 188:2
411:3,7
**cedcap** 162:18
**cell** 8:8
**cellular** 8:7
**census** 3:5,7 10:5
18:17 19:16,18,20
20:2,2,5,9,17 21:5
21:16 42:16,19,21
46:18 47:10,13,18
51:4,7 54:18 55:7
55:14 57:9,12,19
59:1,14,21 60:14
60:18 63:5,16,19
63:21 64:3,15
66:2,5,6,13 67:11
67:16 69:1 71:4
72:3,8,10 73:13
75:9,17 77:18,21
78:19 79:2,19
80:4 81:11,15
82:4 83:9 84:13
85:6,21 86:4,5,10
88:15,16,16 89:5
89:18 90:4,19

91:7 92:7 93:4
95:20 97:3 103:15
103:21 105:10,17
106:1 107:7
109:21 110:15
115:22 117:13
118:22 119:4,8,11
119:17,20 122:19
123:20 124:1,12
124:15 125:21
126:1,4 127:11,13
128:6 129:15,18
130:5,21 136:18
139:5,10,15,17
140:16 142:2,18
146:22 149:5,8
153:4,13,15,20
154:12,19 156:17
160:19 161:7
162:1,20 163:1,19
164:5,9 165:2
169:21 175:22
176:9,12 180:8,9
204:3 207:7 208:1
208:10,13,18
213:5,11 214:5
220:16,18 221:11
221:15 222:14,16
223:7,19 224:6,8
224:10 229:8
230:12 237:16
241:15 244:21
251:1 252:1
258:16,22 261:20
263:18 264:7,10
265:17 270:3
271:20 272:1,17
272:17 275:8
292:17 294:16
309:10,14,22
310:15,21 311:3

311:22 312:2,14
312:18 313:9,14
313:15,20 314:21
315:4 319:10
320:15 321:12,17
321:21 323:3,17
324:2,12,17,21,22
325:2,12,13
326:12,15 328:19
328:20 329:5
330:1,15 331:22
332:1,15,22 333:4
333:10,17 334:3,9
334:19 337:2,11
337:15 338:10
346:20 347:22
348:4,5,12,19
349:19 350:2,5,14
350:16,18 352:1
353:5,12 354:1,16
355:2,14 357:2,18
357:22 358:9,11
358:13 359:8,15
361:6,18 362:17
362:19 363:17,21
365:11 366:1,12
367:10,14 368:15
369:7,22 370:7,8
370:18,20 371:2,6
371:22 372:4,9,16
376:14 377:13,15
377:19 379:6
383:10,14 385:3
388:10 391:4,15
392:1,7 393:4,9
394:8,11,13,15
395:10,13,15
396:10,13 397:14
397:19 398:13
399:5 400:11
402:2,6 403:5,19

403:21 404:3
405:3,13,13,17
406:22 407:5,10
408:4,17 412:6,13
412:15,18,21
414:17 415:1
416:17 417:11
418:2,11,16,17
419:8 420:22
421:3,6,10,12
422:13,22 424:7
424:11,20 425:2,6
425:6,15,20
426:11,18 427:5
428:6 429:19,20
429:21 430:1,4,16
430:18,21 431:22
432:4,11 433:13
433:15 434:4,18
434:19 435:3
**censuses** 326:19
333:5 359:10
**ceo** 12:5
**certain** 20:21 84:9
106:12 128:17
132:16,18 135:6
141:4 154:8,11
272:17 330:22
335:19 351:4
367:1 371:14
375:4 391:2 398:4
398:10 417:12,12
417:15 430:13
**certainly** 58:6
140:18 144:8
160:11 229:22
251:6,8 268:6
277:9 281:16
285:21 318:14
329:12 348:7
354:18 375:5

**certificate** 437:2
**certify** 437:5
**cetera** 44:12 302:3
413:19
**cf** 1:5
**chain** 159:9
160:15 230:8
231:1,21 380:10
384:12 385:13,14
386:6
**chair** 123:20
**chairman** 25:18
53:2
**challenge** 280:3,5
**challenges** 124:16
124:17
**challenging** 10:3
261:3,12
**chance** 147:13
282:20
**change** 18:11 84:8
106:10 181:18
346:7,8 366:12
372:5 377:6
380:11 440:7,7
**changed** 177:19
374:1,6
**changes** 86:14
359:11 438:6
**changing** 106:1
134:2
**characterization**
223:17 265:13
295:22 312:13
**characterize**
112:19 119:6
266:18
**characterized**
68:19 313:17

**characterizing**
107:4
**charge** 36:19
203:14
**chasing** 150:15
**check** 13:7 55:17
162:6 373:5
**checked** 64:5,8
**chemistry** 14:3
**chief** 33:8,10
35:13,14 36:7,9,12
37:10 39:11,13,15
39:17,20,21 102:9
102:18 125:20
160:7 198:8,11
199:17 309:22
377:18 395:9,14
**childhood** 402:12
405:7
**choice** 181:2 413:2
**chooses** 305:16
**chose** 436:1
**christa** 377:17
**christine** 25:8,10
25:12
**ciccone** 25:8,11,12
**circles** 80:2
**circulate** 48:7,9
**circulated** 48:15
**circulating** 48:12
**citizen** 108:18
155:8 272:17
349:17 353:10
361:2 368:18
414:18 416:21
418:4,9 425:22
426:13 430:5
**citizens** 262:10
351:10 355:4
367:7 385:4
388:15 414:1

423:13 430:2,17
431:7,10,15
**citizenship** 10:4
21:12,14,16 24:3,5
24:9,15,17,21
31:17 47:14 51:4
53:8,12,18 54:9,12
54:17 55:6,13
59:13 67:12,16
68:22 69:12,17
75:9 77:21 78:20
79:18 81:14 82:1
82:4 87:2 96:1,14
97:7 103:2,5,7,11
103:18 105:7
106:3,9 107:3,6,13
107:19,19 108:1
109:8 110:1 126:6
126:8,8,12,14
129:20 133:5,9
134:6,12 135:5,12
135:18 136:11
140:4,12 143:15
144:1,15 146:7,11
149:17 150:3
151:5,19,21 153:3
153:8,13,17
154:13 156:17
157:5,18 161:2,20
162:7 163:3,7,9
164:10 166:21
168:4 170:11,22
171:5,17,21 172:1
172:3 175:21
180:8,15 187:7
188:5,11 190:4,7
190:11,13 193:5
195:4,9,16 202:8
202:13,17,22
204:6 207:8 208:2
209:12,21 216:10

216:20 218:14
219:13 220:13
221:9 223:4,8,9
224:11 225:12,16
225:20 230:11,14
230:18 231:17
232:2,6,8,19 233:3
237:18 239:12
240:3 241:15
242:11 244:22
251:1,4,9,13,22
252:16,21 253:7
253:14 254:10
255:3,8 257:12,12
258:2,12,16 259:9
260:7,17 261:1
262:21 264:18
265:10,16 268:1,8
270:2,16 272:1,5,9
272:16 273:2
277:21 278:15
279:2,9 280:2,13
285:22 286:12
287:16 288:8,17
289:6,22 291:2,8
291:19 292:13
296:18 297:12
298:5 300:6 309:9
310:14,19,22
311:22 312:3
315:5 319:8,12,16
320:17 323:4
324:16,21 325:3
326:17 330:1,14
330:19 332:5,8,20
337:2,20 338:10
338:15,22 339:14
341:1,3 346:19
347:22 348:4,19
350:17 351:9,18
353:6,10 354:15

359:1,16 360:1,15
361:1,21 367:8,13
368:18 381:15,21
382:1,6,7 383:7,7
383:9,14 389:5,6
392:6 393:3,18
394:22 395:22
396:10 399:16
400:10,20,22
401:7 402:1,6
404:3,12 405:12
406:6 407:1,14
408:21 409:3
410:5 412:6
413:18 414:4
415:5,16 416:5
417:5,13,20
418:21 419:22
421:3,12 422:15
423:2 424:10,11
425:1 427:6
430:16 434:19
**city**   336:11
**civil**   4:7 5:11
**claim**   155:9
**clarification**   70:22
**clarified**   13:13
  26:14 186:10
  191:15 201:15
  243:13 353:16
**clarity**   20:16
**clause**   303:3
**clear**   10:20 48:7,9
  48:20,21 49:4,9,15
  50:8 84:13 150:13
  154:10 202:22
  229:11 242:3
  261:21 275:17
  293:8 313:12
  342:15 433:11

**cleared**   48:15
  154:7
**clearing**   48:12
  283:1,2
**clearly**   137:1,8
  149:12 159:5
  218:2 261:7 300:9
  307:10 371:15
**client**   186:18
  193:16,22 195:22
  340:15,16
**clients**   266:22
**climate**   18:11
  359:4
**closer**   355:15
**coalition**   1:3 4:2
  8:16 241:4 438:18
  440:2
**coincidence**   85:17
**colangelo**   2:3 6:2
  9:18 10:1 13:14
  26:17 55:22 56:4
  56:6 62:5,22
  69:20 71:2 82:19
  83:19 87:10,13,14
  93:21 98:13 106:5
  108:6 111:4,13
  114:9,12 116:16
  117:8 118:14,19
  120:4,11,13,18
  122:10 123:4,9,13
  131:10 133:7
  134:4,17,22
  137:16,19 140:13
  142:13 143:13,21
  145:1,5,9 146:21
  147:8,12 149:6
  158:7,15,18,21
  160:13 161:8,18
  163:10 164:13,16
  166:2,18 167:1,4

182:3,6,11 186:20
187:4 189:5,9
190:22 191:17,21
192:1,3 194:6,13
194:17 195:17
196:8 199:19
200:1 201:3,22
203:3 204:20
206:7,16,21 210:9
211:5,8,13,20
212:7,10,13,16
215:17,22 218:4,9
219:17,21 221:17
221:21 224:14,18
226:2,12,16,20
228:11 234:18,22
235:21 240:7,10
240:16 243:15
253:20
**cold**   186:11
**colleague**   25:5,13
**colleagues**   99:19
  99:22 101:18
**collect**   263:13,15
  265:18
**collected**   80:4
**collecting**   263:9
**collects**   262:13
**college**   13:15
**colloquial**   16:16
**columbia**   89:22
**combine**   319:7
**combining**   351:13
  424:12 425:2
**come**   25:3 29:9
  37:1 39:7 47:19
  47:22 50:9 76:5
  77:9 90:6 91:3,6
  91:11 109:3 129:4
  154:18 156:15
  157:22 170:7

183:21 192:4,14
213:15 214:16
233:9 262:16
265:20 266:4,14
268:4,7,10 270:18
273:6 289:5 291:6
318:14 351:13
371:7 411:20
**comes** 41:14 43:16
44:1 92:7 275:12
**comfortable**
389:12
**coming** 44:22
74:10 91:1,20
92:14 105:9
162:19 219:5
**command** 43:15
**commenced** 230:8
**comment** 387:7
389:14,21
**commerce** 1:6
6:14 8:17 9:21
15:21 16:1,11,13
16:20 17:6 18:2,6
22:2 26:3,6,8
30:11,12 31:1,22
32:19 33:18 34:14
34:17 35:4 42:2
43:21 48:15 53:11
63:13 73:5 74:22
75:4,22 95:19
99:8 100:15 104:6
104:8 124:9 125:9
150:12 169:19
170:9,20 172:3,17
173:20 176:2,11
177:5 188:20
219:1 227:22
245:21 246:5
247:5 248:4,22
251:3,9 258:11

259:13 260:19,21
273:10,14 274:2
274:14 278:13
279:1 280:1 291:7
291:9 295:20
296:6,8,11,12
299:9 300:5
319:20 320:20
329:21 330:5
338:19 340:22
341:2 342:8 344:6
347:21 387:7,20
391:4,15 392:1,15
392:21 394:8,15
395:13 396:13
399:12 401:16
403:2 404:19
405:17 406:11
407:5,10,12
408:17 410:10
413:6,11 414:22
415:3 416:10
420:21 421:9,21
422:3,11,21 424:6
424:19 425:13,19
426:10,19 427:4
435:2 438:18
440:3
**commerce's**
259:10 381:14
382:15 423:6
425:8
**commitment**
185:9
**commits** 412:14
**committed** 302:1
403:6,15
**committee** 3:1 4:2
5:11 12:1 16:11
16:20 17:1,3,7,22
18:3,10 22:20,22

23:1,7,9,14 25:17
26:3,6 28:13,19
53:3 123:20 130:4
138:21 139:3,4,9
139:14,19 140:10
141:12 149:3,7
291:22 293:2,6,9
293:14
**committees** 18:6
287:22 290:15
**common** 108:2
110:4 201:7,10
281:13 385:6,6
**communicate**
51:14 215:2
426:10 427:4,12
**communicated**
71:6 236:22
403:18
**communications**
196:3
**company** 1:17
439:14
**compare** 333:4
379:22 429:21
**comparing** 355:12
380:3
**comparison** 327:4
**comparisons**
333:8
**compel** 349:4
**compensate** 419:4
**complete** 28:12
103:15 253:6
351:10 354:3
368:22 417:16
418:17 419:5
423:7 424:9,9,22
425:11 429:6,9
438:5

**completed** 435:15
**completely** 10:10
306:9,20 419:8
**completeness**
350:16
**composed** 363:4
**computer** 342:5
387:5
**comstock** 1:12 2:2
2:7 8:14 9:14,20
33:6 56:1,10,12
62:1,6,8 63:2 73:7
80:9 82:14,15,20
87:6,16 93:16,18
93:22 109:7
111:14 120:21
121:12 151:10
159:1 182:13
189:12 194:18
200:2 212:17
216:1 222:1
224:19 226:21
241:2 250:15
293:8 302:11
309:6 316:11,13
318:1 326:4
332:12 335:16
336:6 375:15
381:3 423:17
436:8 438:2,14
439:3 440:5
**concept** 307:18
308:4
**conceptually**
307:14
**concern** 68:7 87:4
131:3 160:5 161:1
215:3
**concerned** 67:22
68:3 86:22 105:14
105:22 108:19

157:22 207:18
214:21,22 351:11
358:13 414:11
**concerning** 41:17
**concerns** 124:18
359:4
**conclude** 67:14
71:14 141:11
**concluded** 311:3
336:2 436:8
**concludes** 111:6
211:22 308:18
335:22 380:17
436:4
**conclusion** 69:6,7
131:21 154:20
185:6 213:16
214:17 230:17
265:20 301:3,20
303:4 304:7 305:2
308:13 312:12,14
320:21 321:12,22
323:19 331:19
340:14,19 347:14
411:8 433:22
**conclusions** 317:1
317:9 321:16
331:17
**conclusive** 317:16
**conclusively**
359:22
**concurred** 30:5
**conducted** 20:21
153:14 356:17
**conducting** 21:5
335:3 366:11
**conference** 80:7
90:7,10,11 165:20
291:14 434:12
**confidence** 224:6
356:15 418:22

**confident** 407:2
**confidential** 115:6
196:3
**confirm** 37:5 55:3
232:8
**confirmation**
16:11,13 20:19
23:22 27:15 28:16
29:2 31:16,19
32:8,11,22 33:4
37:3 54:20 55:8
69:2 76:17,22
124:7
**confirmed** 28:12
29:1 32:8 55:1
63:7 81:16 219:8
234:16 337:10
**confirms** 67:10
**conflating** 106:16
**conflicted** 92:16
**congress** 53:15,18
59:8 84:1,9
127:12 129:9
146:4 148:19
149:11 288:4
393:20 395:2
406:14
**congressional**
52:16,19 53:8,12
57:19 58:20 61:6
66:14,20 86:9
87:2 130:4 142:17
207:14,20 208:4,5
287:18 396:2
399:18 401:9
404:12 406:7
408:12 409:8
434:20
**congresswoman**
294:19

**conjunction** 342:9
368:10
**connected** 223:19
224:8 236:7 283:9
356:15
**connection** 143:20
372:3
**consequently**
181:7
**consider** 105:18
151:7 265:16
289:17,18 332:17
345:14 361:16
365:11,13,16,20
412:3 413:4 414:9
**consideration**
347:7
**considerations**
95:22 244:21
**considered** 16:19
80:2 109:10 158:5
360:4 366:14
371:17 413:19
425:10
**considering** 95:19
96:10 104:13,17
134:2,5 290:5,8
346:19 347:11
**consigned** 301:5
**consistent** 42:6
**constitution** 6:16
6:20
**consult** 311:12
**consulting** 12:6
**consumed** 411:18
**contact** 48:11
164:22 165:11
166:13 174:9
175:14 179:22
187:6 213:16
214:17 215:4,7,13

269:2 275:15
409:22 412:17
415:2
**contacted** 25:5
48:6 157:12 174:6
197:1,10
**contacting** 167:8
167:13 439:5
**contacts** 214:1
232:13,20 270:11
**contain** 376:5
**contained** 217:17
264:18
**contains** 379:4
384:3
**content** 2:1 95:21
130:5 149:8
**contents** 217:15
**contesting** 317:5
**context** 142:7
143:19 149:2,9
191:11 196:21
208:3,14 294:5
306:14 313:13
314:13 317:14
357:9,22 358:2,20
362:6 363:3
365:21,22 366:11
367:2,2 398:12
429:2
**continue** 8:11
150:2 160:16
264:15 266:18
367:18
**continued** 217:22
**continues** 385:5
**continuing** 190:16
190:21 350:18
**contract** 410:11
**contracts** 129:18

contributed   244:3
   244:6 433:6
contributing
   359:7
control   334:12
controlled   334:13
   334:18 335:3
conversation
   51:16 55:7,10
   85:4,8,10 101:8,11
   101:14 116:22
   119:16,20 120:6
   120:10 133:15
   142:6 178:9,11
   179:1,3,5 185:18
   187:12 195:15,19
   203:15 210:15
   221:4,6 233:19
   237:6 255:5
   280:16 298:9
   338:21 382:13
   383:12 394:4,9,13
   394:16 395:8,14
   396:8 397:17
   400:3,8 401:17
   404:1 405:10,18
   406:5,13,19,20
   407:7 408:19
   409:13
conversations   8:7
   24:6,10 34:16
   35:2,7 123:1
   136:14 172:9
   188:1 196:19
   209:15 233:7
   279:5 342:10
   396:14,21 397:21
   398:3,8,10 404:19
   409:3 421:14
convey   164:3

conveyed   177:9
   234:4 422:3 426:7
conveying   168:17
   237:9
convinced   323:18
copied   56:15
   144:18 209:6
copy   56:11 75:7
   78:6 138:8 341:11
   341:21 342:2
   372:21 387:1,6
   439:2
correct   12:11 14:7
   19:11 21:21 22:12
   25:14 26:9 29:11
   29:14 34:11 35:19
   36:3 37:14 39:19
   40:5 42:21 45:19
   46:16 48:10 56:22
   57:3 58:9 61:22
   67:13 68:12 73:1
   73:6 74:19,21
   78:14,22 83:3,6
   89:6,20 91:2 93:7
   99:21 100:11,12
   104:15,18,21
   105:1,4 113:1,3
   114:3 115:14,16
   116:9 119:1
   127:14 128:9
   131:17,20 138:10
   139:12 140:22
   141:1,10 143:4
   144:17 148:10
   151:1,5 152:1,8
   159:18 163:12
   165:13 166:4,22
   167:11 168:2,19
   170:13 180:16,17
   181:21 183:4,10
   183:11 185:19

186:4 198:15
   200:9 204:4 205:7
   206:3,4,10,14
   208:12 209:2,3,7
   210:1 214:12
   216:18 218:15
   220:21 222:9
   228:4 229:2,3,4,5
   229:21 230:2
   231:16,18 232:14
   233:11 234:3,10
   234:16,17 240:4
   241:21 243:7
   246:1,14 247:19
   248:14 250:1
   251:4,5,10,19
   255:4,14,19
   256:12 257:5,13
   262:14 264:22
   266:19,20 269:1,4
   270:1,4,7,22 273:3
   277:2,3 279:7
   282:9,16 285:20
   288:9 291:20
   292:1 294:13
   295:2,8,17 297:5
   298:12 299:1
   309:12 318:11
   319:1,12,13 326:7
   326:22 337:3,4,6
   337:11,15,18
   338:3,4,6,7,11,12
   338:15 339:4,5,20
   339:21 341:22
   342:18 345:4,9
   346:5 348:2,6
   352:3,16,19
   364:12 366:10
   368:3,21 369:3
   370:9,14 371:2
   372:12 375:11,13

375:16,17 376:9
   376:10 382:11
   383:18 384:14
   385:11 386:4,5,6
   411:3 416:15,18
   416:19 417:1,2
   418:4,12 419:10
   427:20 438:4
corrections   438:6
correctly   33:19
   142:16 255:12
   260:3,8 279:20
   295:5 332:5 355:9
   381:12 382:12
   414:8
correspondence
   41:14 283:2
   391:20
cost   47:12 222:16
   223:21 288:21
   319:18 320:18
   359:12
costly   310:20
   312:1 313:2 315:3
council   50:2,3
   51:1
counsel   1:13 6:15
   6:20 8:15 9:9 11:7
   12:8 39:5,10
   50:16,20 56:4
   62:20 69:22 70:7
   95:5,6,9 97:21
   98:3,7 99:4,5,18
   100:15 101:19
   105:3 127:19,21
   128:2,5,18 158:7
   188:21,22 189:4
   196:11 217:4,7
   219:2 227:6,22
   231:4 240:8,11
   245:20 246:16

[counsel - david]                                                                                      Page 17

247:6,9 248:1,5,8
249:6,19 253:21
258:10 269:2
278:19 311:13
318:16 325:16
342:7,21 381:4
410:18 423:18
437:12,15 439:9
439:10,17
**counsel's** 70:17
128:11 214:8
232:21 346:1,2
**counsels** 98:17
**count** 66:1 69:11
124:17 162:6
208:16 224:10
287:9 310:21
312:2 315:4 329:2
331:21 359:13,14
360:21 369:1
416:15,17 418:12
419:5,6 423:8
431:12,18
**counted** 63:21
65:3,6,21 67:3
81:1 207:13,19
208:6,8,11,15
**counterpart** 165:1
**counting** 67:20
68:1,4
**countries** 108:15
108:22 109:5,10
109:14,16,22
110:7,10 413:17
**counts** 81:19
416:19
**county** 4:19
**couple** 11:21
18:19 23:2 31:7
174:15 178:17
244:8 381:10

416:14
**course** 13:22
14:17 28:7 48:12
125:8 179:9 288:4
288:15 307:10
316:20 345:13
435:20
**courses** 14:3
**court** 1:1 8:18 9:3
9:12 13:12 26:13
154:22 155:3,4,5,6
157:13 186:9
191:14 193:3
201:14 211:14
243:12 353:15,20
381:6
**cov.com** 4:13
**cover** 70:3 126:7
**covered** 18:9
126:8
**covers** 14:17 18:16
378:7
**covington** 4:11
**create** 239:9 424:9
**created** 341:16
343:14,16
**cross** 321:19
**csr** 1:17 437:3,20
439:14
**cubicles** 256:16
**current** 33:7 43:9
224:6 359:3
**currently** 13:1
39:15 41:4 132:15
207:8 261:20
272:15 296:20
352:14 357:4
367:15 403:19
**cursory** 154:21
**cutrona** 235:7,10
235:15,22

**cv** 381:6
**cvap** 181:11
352:13 354:5
357:4 429:7,10

**d**

**d** 8:1 318:10,21
319:6,15 351:14
368:20 429:5,8,12
**d.c.** 1:9,16 3:19
4:5,12 5:3,8,13
6:11,17,21 8:22
13:4 438:17
439:16
**daily** 38:12,13,19
38:22 49:1
**damage** 361:15
**dan** 7:1 9:1
**daniel** 4:11
**danielle** 6:1 235:7
235:10,15
**danielle.fidler** 6:6
**daniels** 4:15
**dares** 388:14
**data** 126:17
153:18 155:9
181:12,16 185:4
222:16 232:22
262:21 263:13,15
274:15 275:8
310:22 315:5
316:19 319:11,16
320:17 327:11,15
328:12 333:7
350:2,7,8,19 351:5
351:15 352:13
354:5,6,14,17
355:9,11 356:15
357:4,11,16
359:22 360:14
362:12 367:10
382:6,7 383:7

403:9,17,19,22
414:13 416:6
417:6,8,9 418:1,1
422:15 423:2
424:10,12,22
425:11 426:5,18
427:10,18,22
429:10 431:1
**date** 55:4,4 59:11
63:10 64:9 73:10
94:10,11 105:1,4
126:11 128:13
133:12 135:15
136:17 140:20
147:6 169:12
182:20 183:20
195:2 230:1,3,6
237:22 238:13
292:10 314:1
374:8 387:16
438:14 440:6,19
**dated** 56:20 78:21
88:1 115:13,15
127:8 138:11
183:10 222:11
230:1 235:7
309:21 323:9,10
341:9 374:10
375:21 376:8
437:21
**dates** 136:4,7,13
213:22
**dave** 85:2
**david** 4:3,19 6:14
46:21,22 56:20
57:1 83:1 85:4
87:18 93:1 98:6
100:2 110:15
201:5 202:6
240:12 241:3

| | | | |
|---|---|---|---|
| **david.gersch** 4:6 | **dealt** 52:11 | **decision** 106:8,21 | 359:18,19,20 |
| **david.holtzman** 4:22 | **dear** 439:1 | 110:3 135:20 | 360:3,7,8,9,16 |
| **davidson** 95:11 | **decades** 347:8 | 136:22 137:3,6 | 361:5,8 362:2,6,11 |
| 100:6,8 218:17,22 | **december** 124:4,4 | 150:19 151:8 | 362:20,22 363:1 |
| 220:20 221:3 | 238:6 239:2 | 152:10,16 181:18 | 363:16,17,20,21 |
| 225:2 228:7,12,15 | 290:16 309:9 | 239:9 240:5 | 364:6 365:9,12,15 |
| 228:19 230:17 | 348:17 397:8,11 | 241:14 242:10 | 366:1,8,16,18,19 |
| 231:7,13,20 232:1 | 419:21 420:13 | 264:20 266:12 | **declined** 416:4 |
| 288:15 386:18 | 421:2 424:4 426:8 | 267:18,20 290:5 | **declining** 363:11 |
| 396:15,21 397:17 | **decennial** 10:5 | 296:15 299:4 | **decrease** 330:20 |
| 397:22 398:3,8 | 54:18 57:19 58:20 | 300:10,12,17 | 330:22 416:20 |
| 399:7 | 59:5 61:7 67:15 | 301:4,18 302:8 | **defendants** 1:7 6:8 |
| **day** 20:2 31:3 | 78:18 79:2 82:4 | 303:1,5 304:15 | **deferred** 402:12 |
| 33:18 34:10,12 | 127:13 130:21 | 305:15 306:7,10 | 405:7 |
| 42:3 48:22 58:16 | 153:13 175:22 | 306:18,21 307:5 | **defined** 30:20 |
| 63:12 73:4,18 | 176:9 180:9 | 307:15 308:6 | **definitive** 330:10 |
| 74:1 85:6,13,17 | 192:11 203:21 | 343:5 344:2 347:9 | 331:13 332:15,18 |
| 117:20,21 148:13 | 204:2 261:20 | 347:11,13 349:1,3 | **definitively** |
| 154:9 155:18 | 265:17 272:19 | 355:1 358:6 362:9 | 329:22 330:6,7 |
| 168:7 225:14 | 292:17 294:16 | 363:8 366:5 | 331:10 |
| 226:4 232:12,12 | 319:9 326:19,19 | 371:17 387:16 | **degree** 12:9,10,14 |
| 232:16 316:12 | 328:20 330:1 | 389:12,13 412:15 | 13:15 14:6 |
| 361:14 433:9 | 333:4,5 334:9 | 412:16 420:2 | **del** 381:7 |
| 437:21 | 374:5 379:6 383:9 | 423:6 425:8 | **delay** 236:3,18 |
| **days** 162:12 | 383:14 392:7 | 426:19 | **deliberative** |
| 218:17 341:18 | 393:4 396:10 | **decisional** 3:4 | 345:20 |
| 370:14 439:7 | 400:11 402:2 | 241:13 242:10 | **democracy** 103:9 |
| **ddewhirst** 6:18 | 403:21 404:3 | 244:11 287:20 | 413:22 |
| **de** 4:2 | 405:13 416:17 | 290:18 292:2 | **democrat** 307:4 |
| **dead** 411:7 | 418:10 429:19,21 | 300:9 301:14,16 | **democratic** 28:9 |
| **deadline** 84:10 | **deception** 38:5 | 302:19 303:22 | **demographic** |
| 370:11 | **decide** 40:16 84:10 | 304:3 305:17 | 132:15,16,18 |
| **deal** 281:4 375:19 | 84:20 132:11 | 306:8,19 311:5 | 134:7 137:7 |
| **dealing** 152:14 | 152:6 296:7 366:5 | 320:2 323:10 | 359:20 360:8 |
| 224:7 245:17,19 | **decided** 132:3 | 324:13 325:21 | 363:1,4,6 413:20 |
| 245:21 257:18 | 154:9 265:7,14 | 326:1,6 376:1 | 414:11,18 |
| 281:3 282:22 | 296:1,4 333:20 | **decisions** 36:19 | **demography** |
| 285:15 306:15 | **decides** 38:2 | 37:17 86:11 120:3 | 14:12,14,17 |
| **dealings** 249:21 | **deciding** 365:19 | 135:22 304:14 | **demonstrate** |
| | 434:7 | **decline** 351:1,3 | 358:22 |
| | | 358:15,22 359:2 | |

| | | | |
|---|---|---|---|
| **dennis**  87:19,21,22 | 247:6,18 248:1,3,5 | 420:22 421:7,9,14 | 386:11 |
| **deny**  297:9 380:13 | 248:17,21,22 | 422:4,11,12,15,22 | **describe**  28:5 |
| **department**  1:6 | 249:10,13,21 | 423:15,22 424:6 | 141:19 210:17 |
| 5:17 6:10,14 8:17 | 251:2,8 260:19,20 | 424:19 425:10,13 | 237:5 387:12 |
| 9:20 15:21 16:1 | 262:17,21 269:3 | 425:14,19 426:4 | **described**  17:13 |
| 18:2,16 22:2 | 270:6 272:3,15 | 426:17,19,20 | 219:11 353:1 |
| 30:11,12 31:1,22 | 273:1,10,14 274:2 | 427:13,16 428:3,5 | 357:20 |
| 32:19 33:18 34:14 | 274:14 275:6,16 | 428:11 438:16,18 | **description**  38:4,6 |
| 34:17 35:4 36:20 | 275:21 276:3,9,22 | 440:3 | 381:13 |
| 41:13 42:2,14 | 277:10 278:1,13 | **department's** | **desk**  72:2 73:16 |
| 43:21 48:16 51:16 | 279:1 281:6 | 425:6 426:13 | 256:18,19,19,20 |
| 52:8,11 53:11 | 290:16 294:20 | **departments** | 256:21 257:3 |
| 58:5 74:22 75:4 | 295:11,15,18,20 | 42:12 51:14 | 342:5 |
| 75:11,13,22 94:8 | 296:1,6,8,10,11,11 | **depend**  60:15 | **desks**  73:13 |
| 97:4 99:7,10,13,15 | 296:12 297:1,5,10 | 201:11 202:3 | 256:16 |
| 101:1,13,15 104:5 | 297:17 298:3,20 | **depending**  52:20 | **detail**  271:17 |
| 104:8 114:2 124:9 | 299:3,11 300:7 | 143:9 356:16 | 312:22 313:16 |
| 125:9 126:18 | 305:11 309:7 | 359:20 | 381:20 383:11 |
| 150:12 153:7,16 | 319:20 320:20 | **depends**  40:19 | **detailed**  42:11,16 |
| 157:4 165:12 | 329:21 330:5 | 46:3 47:11 50:17 | 42:20 263:22 |
| 166:9,11,14,20 | 338:19,19 340:1 | 52:13 53:5 92:1 | 264:4,17 413:18 |
| 167:20 169:19 | 342:9 343:16 | 280:21 365:19,21 | **detailee**  43:15 |
| 170:8 171:6,10 | 347:18 348:18 | 380:4 | **detailees**  283:22 |
| 172:3,17,22 | 349:1 350:3,9 | **deponent**  438:1 | **details**  43:20 |
| 173:20 174:4 | 381:14,22 382:8 | **deposed**  10:7 | 55:12 84:2 |
| 175:9,20 176:2,2 | 382:14,16,19,21 | **deposition**  1:11 | **determination** |
| 177:1,10 179:6,14 | 387:20 388:7 | 2:7 8:10,14,20 | 199:18 343:1,20 |
| 179:22 180:10,13 | 391:4,14 392:1,15 | 10:5,18 11:6 | 345:4,14,15 393:2 |
| 180:18 183:2 | 392:21 394:7,15 | 56:17 62:14 | 428:2 |
| 184:2,20 185:2,5 | 395:13 396:13 | 287:11 335:21 | **determinative** |
| 185:10,11 186:3 | 398:18,20 399:1,4 | 336:2 435:19 | 330:9 417:21 |
| 187:19 188:9,17 | 399:12 400:3 | 436:5,7 437:4,6,10 | **determine**  109:16 |
| 188:19 190:9 | 401:16 403:2 | 437:14 439:3 | 109:22 329:22 |
| 195:14 196:14,15 | 404:19 405:17 | 440:6 | 330:6,7 349:21,22 |
| 197:2,17,18 | 406:10 407:5,9,12 | **deputy**  6:20 17:9 | 413:11 417:22 |
| 216:16 219:1 | 407:20 408:17 | 20:12 21:20 22:1 | 429:20 430:1 |
| 222:8 227:22 | 409:19 410:10,15 | 22:1,6,14 24:13,20 | **determined** |
| 237:17 238:5 | 410:17 411:2,9 | 26:8 33:8,10 | 264:13 333:19 |
| 239:3,15 245:5,12 | 412:4 413:3 | 35:13,14 36:8,17 | 413:10 |
| 245:18,21 246:3,5 | 414:22 415:3,22 | 57:5 92:13 93:9 | **determining** |
| 246:11,19 247:4,5 | 416:4,10 420:21 | 198:8 203:13 | 262:10 430:16 |

**develop**  45:6,21
46:6
**developed**  46:7
**developing**  19:2
19:10 45:2,7,16
105:16 150:2
**development**  44:9
**developments**
119:10
**dewhirst**  6:14
**dgrant**  4:13
**dhs**  183:5 184:19
185:3,7 196:15
278:2,5 410:22
411:11,11 412:9
413:6
**dictated**  413:3
**difference**  22:4
254:16
**different**  16:21
19:7 41:14 42:12
43:20 93:15 113:5
247:14 254:6
257:14,15 259:2
297:22 300:1
301:11,13 302:20
305:16 306:9,20
307:18 313:8
314:14 356:18
**differential**  359:20
**differently**  19:19
332:13 334:2
358:1
**difficult**  261:2,11
359:9 360:21
**difficulty**  307:15
**dinner**  125:19
160:18
**direct**  71:21 78:3
99:14 179:13
293:20 294:3

310:10 401:16
**directed**  115:11
122:18 179:5
183:1 184:12,16
185:11,16 285:10
347:21 348:3
370:19,20 412:20
418:19
**directing**  175:2
429:19
**direction**  121:22
283:11 437:10
**directive**  392:15
392:20
**directly**  36:6
47:11 49:20 50:2
50:3 66:8 69:10
188:7 245:19
390:10 400:13,19
400:21 401:20
423:20
**director**  18:8 33:9
33:10,12 35:13,18
35:20 36:1 37:7
37:22 43:8 48:2
52:15 53:15,21
59:22 60:14,19
128:7 139:18
142:19 147:1
148:1 162:17
203:13,20 204:1
237:15,19 281:7
386:11
**directors**  44:6
**disagree**  305:12
305:14 306:6
312:11,13 313:4,7
317:3,16 352:4
**disagreement**
258:18

**disclosing**  196:3
**disclosure**  195:21
345:19
**discourteous**
279:15,22 280:7
280:20
**discover**  431:5
**discovery**  435:17
435:18
**discretion**  70:14
301:6 302:1
412:14
**discrimination**  4:2
**discuss**  77:21
98:19 99:1 100:13
100:21 101:21
102:6 113:22
124:9,12 133:8
134:11 156:22
157:8 164:8
166:11 170:7
178:8 203:16
209:9,12 210:8
221:9,11 228:8,13
238:20 257:19
290:11 339:13
344:5,8 387:19,22
388:3,6,9 389:18
393:7,8 410:1
**discussed**  26:7
89:9 97:11,16
98:21 99:4,19
100:2,18 102:7,14
104:11 118:9,15
124:14 129:20
133:17 142:4
144:1,12 162:8
163:14,17 164:4
164:11 188:5
196:6 208:5
209:14 225:9

228:16,20 231:8
283:22 290:22
359:21 391:5,15
392:2 393:12,16
399:8,13 408:20
**discussing**  104:7
133:4 142:3
188:10 231:2
257:20
**discussion**  21:10
32:6 59:15 124:20
135:17 172:17
184:19 195:9
206:9 225:11,14
225:18,19 230:10
236:14 252:1,6,11
255:1 258:9
287:15 290:1
339:2 360:11
404:10 409:16
421:18
**discussions**  19:7
31:21 32:9 59:12
100:10 157:4
187:19 232:17
290:21 316:21
397:13
**disinclined**  359:15
360:22
**dissimilar**  417:13
**distressed**  162:17
**district**  1:1,2 4:14
8:18,19 13:3
89:22 336:13
349:11 381:6
420:9
**distrust**  330:15
**divine**  168:11
**division**  242:20
289:13 433:9

**doc's** 214:7
**doc.gov** 6:18,18,22
**document** 48:6,8
  48:12,20 49:3,8,14
  50:1,4 56:5,7 62:6
  62:19 63:2 64:12
  78:8 82:15 87:11
  93:17 94:3,6,16,19
  108:11 114:10
  120:19 121:9
  123:14 137:20
  145:10 158:22
  159:8 164:17
  167:5 182:12
  189:10 194:14
  199:19 200:5
  212:10 215:17
  218:5 219:18
  220:5,8 221:18
  222:3 224:14
  226:16 227:1
  234:19 246:7
  247:7,8,10 248:7
  248:20 258:15
  259:7 309:14
  310:5,7,9 311:6,17
  312:7,9 313:2
  318:7,8,9 320:1
  341:16,22 342:3
  343:9,14,16
  347:13 358:14
  373:3 375:5,6,7,8
  375:8,21 376:5,16
  376:22 377:16
  378:22 384:9
**documenting**
  137:6
**documents** 11:8
  11:10,13 48:14,22
  50:8 55:19 62:20
  80:16 174:10

243:10,14 318:13
318:14 320:6,8
371:4 376:20
377:7 435:18
**doing** 19:18 31:13
  40:12 42:5,6 44:4
  45:4,18 47:12,13
  117:17,21 150:16
  186:17 193:1
  266:21 300:21
  307:16,17 325:16
  367:17 371:13
  418:20 425:1
**doj** 154:18 155:1
  156:21 157:8,10
  157:14 158:1
  164:22 165:1
  176:12 192:5,5,7
  192:15,15 213:14
  214:1,2 215:13
  216:21 217:1,3,5
  217:10,13,17
  232:13,17,20
  283:6 290:4 291:8
  291:9,10 299:19
  338:6 344:16
  354:5,15 397:14
  397:14 403:4,8,14
  407:13 408:18,19
  411:13 412:1,9,20
  413:6 414:21
  416:10 419:21
  420:13 421:9
  423:2 424:7 427:4
  429:6,9
**doj's** 155:21 337:3
  427:6
**doj.ca.gov** 5:20,20
**domestic** 50:2
**donald** 383:13

**dorian** 5:11
**double** 13:7 90:15
**doubt** 267:10
  380:5
**doubts** 252:21
  253:1
**dozen** 125:11
  285:14
**dozens** 411:17
**dr** 238:10 312:20
  314:3,3,5,5 315:1
  315:2 316:14,14
  318:3 322:18,18
  324:4 325:10,10
  432:19,20 433:8
**draft** 3:5,7 94:7,21
  94:22 99:2,11
  100:13 113:9
  218:13 219:15
  242:22 243:1,3,18
  243:21 244:2
  246:2,6 247:7
  309:20 310:4,4
  311:4,9 318:12,13
  318:14 319:2,19
  320:2,4,6,9,19
  321:3 342:17
  344:4 345:9
  346:11 372:16
  375:18 376:1,14
  413:1
**drafted** 357:12
  371:6 377:11,13
  410:21
**drafter** 242:15,19
  369:14,17
**drafters** 242:16,17
**drafting** 95:1
  345:3,11 380:11
  430:14

**drafts** 244:5
**draw** 69:5,7
  331:15 369:4
  384:22
**drew** 331:16
**driving** 224:12
  285:4
**drop** 326:11
  330:11,12 417:12
  418:11
**dropped** 292:16
  294:15
**dspence** 5:14
**due** 149:13 236:3
  236:19 365:10
**duly** 9:15 437:7
**dunn** 101:22
  137:12 218:18
  219:3 222:22
  288:15 310:1
  325:7,8 369:11
**dwkesq.com** 4:18

**e**

**e** 4:1,1 8:1,1 25:10
  25:11 160:18
  438:15 440:1,1,1
**eager** 236:19
**earl** 1:12 2:2 8:14
  9:14,20 40:8 57:9
  58:3,4,6,10 139:17
  166:3 227:15
  436:8 438:2,14
  439:3 440:5
**earl's** 57:20,21
**earlier** 83:21 85:6
  104:2 122:1
  161:13 162:8
  166:19 172:6
  195:7 219:11
  221:2 244:10
  283:22 317:2

356:19 358:21
367:6 369:21
389:15 400:7
409:12 410:8,20
423:9
**earliest** 195:8
**early** 27:16 166:1
179:12 184:8
187:22 271:11,11
316:21 317:8
**earn** 12:20
**earned** 12:13
**easier** 365:8
**eastern** 84:16
86:19 141:20
143:2
**easy** 128:5 196:9
**economic** 47:1
50:3,20 51:1
219:5
**economics** 13:21
42:17
**economist** 43:2
**edit** 243:10,14,18
**editing** 345:12
**edits** 95:2,4,11,14
246:3,6 247:9
249:4 342:13
344:12 346:4,13
**eds** 48:17
**education** 13:18
14:8,11,18,21 15:2
**educational** 11:17
**effect** 152:16
237:12
**effective** 199:8,16
**effectively** 204:2
**efforts** 350:6
411:6
**eight** 234:7,10,12

**either** 11:1 23:6
50:9 52:22 124:4
246:8 320:8
386:13 408:18
416:8
**eleanor** 292:12
**election** 15:3,12,13
15:14
**electronic** 60:8
346:14
**elena** 6:2
**elena.goldstein**
6:6
**eleventh** 63:12
**eligible** 350:1
**eliminate** 333:5
**ellen** 36:22 56:20
57:4 87:19 92:12
97:15
**else's** 270:13
**email** 2:9,9,10,10
2:11,12,12,13,13
2:14,14,15,15,18
2:18,19,19,20,20
2:21,21,22 3:8,9
40:14,17 49:17
55:21 56:2,12,16
56:19 57:7,17
59:17 60:3,22
62:3,8,9,13 63:5
63:15 64:22 65:13
67:6,9 69:2,6 71:9
71:10,11,13,21
73:7 75:8 77:22
79:14 82:17 83:1
83:4,11,13,16 87:8
87:18 88:6,10,13
89:9 92:10 93:13
93:14 98:20,21
110:17,19,19
114:7,15,16,22

115:2,10,13,15
116:9,21 118:8
120:15 121:2,5,13
121:18,20 122:11
123:11 127:7,10
128:14 129:14
130:2 132:12
133:13 136:16,20
137:17,21 138:2,5
138:7,17 139:11
143:19 144:19
145:7,13,15,17,19
146:2,17 147:10
147:14,16,20,22
149:4,9,16 152:7
153:2 154:22
156:6,11,12,20
157:13 158:19
159:4,7,9,11,17
160:16 161:9
163:2,6,8 164:14
164:21 165:14
167:2,9 168:12
174:10 184:3
189:14 191:19
199:21 202:5
203:5,8 205:3,5,5
205:18 206:14,14
207:6,11 212:14
212:20 213:2,13
214:16 215:6,19
216:1 218:6,12
219:19 220:7,10
221:1,19 222:4,11
223:18 224:16,22
225:1,5,22 226:18
227:14 229:8,12
230:8,22 231:9,21
232:3 233:2
234:20 235:4,6,19
236:16,21 239:22

378:18 379:3
380:10 383:22
384:3,3,5,7,12,13
385:1,11,12,21
386:4,5,13,15,17
386:20,22 387:3,4
387:12,19,19,22
388:3,6,9,20 389:1
389:4,9,10,16,17
390:18,21 391:1,5
391:10,15 392:5
392:16
**emailed** 81:17,20
83:7 118:5,6
146:13 177:5
206:2 232:1
**emailing** 85:3,18
115:19
**emails** 117:20
156:13 219:11
259:22 371:4
373:6 376:18
**emphasize** 146:3
148:19
**emphasizing**
149:10
**empirical** 329:1,7
329:11,13 433:16
**employed** 437:13
437:16
**employee** 85:20
125:3 437:15
**employees** 30:11
31:1
**employment** 104:5
**empty** 411:20
**en** 90:6 91:3,11
92:8
**enable** 430:3
**enclosed** 439:2

enforce 265:11
294:22
enforced 192:17
enforcement
126:17 262:9
263:14 383:6
393:10,13 394:17
395:17 399:9
401:2 402:8 403:3
403:6,16 404:11
408:22 409:4
414:14 427:19
enforcing 192:13
277:11
entered 61:9
entero 381:7
entire 97:4 314:9
314:10,15 315:19
351:2 354:4
373:15 430:3
431:13
entirely 65:22
85:14 86:6 93:12
95:13 101:12
102:1 133:17
197:16 201:6
203:22 324:8
406:18
environmental 6:4
14:1,6
equally 144:12
era 385:5 388:19
388:21
eric 74:4,5 75:10
97:12 157:9
164:21 165:11,14
166:3,12 167:15
173:8,10,18
197:22 256:3,21
257:4 283:5
410:10

erosenberg 5:14
errata 438:7 439:8
error 285:13
350:10 352:15
353:2 354:10,12
354:17,19,20
355:7,21 356:2,4,9
356:12,13,20
357:6,11,14,19
358:1,3 361:11
431:14
errors 333:6
352:20
esa 43:1
especially 132:17
esquire 4:3,7,11
4:15,19 5:1,5,6,10
5:11,16,16 6:1,2,2
6:3,9,9,13,14,19
438:15
essential 120:9
essentially 18:15
41:9 44:2
establish 149:7
430:4
established 104:20
262:4 349:8 379:8
386:7 410:8
establishing
432:16
estimate 47:12
223:21 288:21
359:12
estimated 330:21
estimates 81:2
350:3
estimation 363:2
363:18
et 1:3,6 8:16,17
44:12 302:3
413:19 438:18,18

440:2,3
ethnic 138:21
139:9 140:10
141:13
ethnicity 362:8,11
evaluate 364:7
evanwell 240:5
evening 83:16
204:7 214:3
227:15,17
events 11:15
everybody 43:10
everybody's 42:5
evidence 330:9
331:14 332:18,19
367:12
evident 374:4
evolving 353:12
354:1
exact 55:9 100:10
133:12 135:15
136:4,7,13 155:4
169:12 178:18
237:3 244:18
314:1
exactly 126:21
187:14,21 188:2
189:19 209:16
217:15 227:13
245:15 253:20
278:10 343:11
352:7 371:5,14
examination 1:13
2:3,3,4,4,5 9:18
241:1 321:19
336:5 381:2
419:19
examined 9:16
438:3
example 19:18
43:14 44:3 50:12

52:7 53:1 349:13
362:8
exchange 55:21
89:11 93:12
133:14 165:14
205:4,5 220:10
233:8 292:14
321:16
exclamation
139:20
exclusively 51:22
52:2
excuse 259:15
284:6 420:8
422:14 429:7
execute 349:16
executive 48:18
281:7
exercise 331:2
exhibit 2:8,9,9,10
2:10,11,11,12,12
2:13,13,14,14,15
2:15,16,16,17,18
2:18,19,19,20,20
2:21,21,22,22 3:3
3:3,4,5,6,7,8,9
55:22 56:1,2 62:1
62:2,3 64:22 71:3
80:9 82:11,17,20
87:7,8,13,15 92:20
92:22 93:18,19,22
111:16 114:6,7,11
114:13 120:14,15
120:20,21 121:12
123:10,11,16
127:6 130:2
137:16,17,21
145:6,7,11 147:8
147:10 148:11
149:16 158:16,19
159:1 164:13,14

164:18 167:1,2,5,6
182:4,7,12,13
189:6,7,10,11
191:20,21 192:1,2
194:13,15 199:20
199:21 200:2,12
204:21 205:3
208:21 212:11,14
212:17 215:18,19
218:6,10 219:18
219:19,22 221:18
221:19,22 224:15
224:16,19 226:17
226:18,21 229:13
232:15 234:19,20
244:16,18,19
293:1 309:3,15
314:7 317:19,20
318:2 321:14
325:22 326:1,5,14
329:18 372:15
373:3 374:19,20
375:2,15 376:12
376:13 378:17,18
378:22 379:22
383:19,20,21
428:15
**exhibits** 2:7 3:11
269:15 326:11
**existed** 41:8
389:17 390:18
**expect** 85:2 268:3
268:6,9 289:20
355:7
**expected** 81:1
355:15
**expediting** 204:13
204:17
**expending** 412:2
**experience** 13:19
14:9,12,19,22 15:3

42:13 185:12
282:13,18 307:2
307:12,13 433:19
**experienced**
343:10
**expert** 349:9
**expertise** 18:4
39:4 42:13 282:3
324:20 434:2
**experts** 324:16
434:3
**explain** 41:22 46:2
150:4 171:16
272:7 278:11
280:12 413:15
417:3 418:14
430:15 432:4,6
**explained** 177:12
272:14 279:3
358:21 423:9
**explaining** 152:11
241:14
**explanation** 181:1
277:22 344:15
382:14 430:22
431:20 432:5
**explore** 150:7
190:16,21 337:12
348:3
**explored** 374:3
**exploring** 135:20
151:2 176:22
177:10,16 178:10
178:22 180:7
**exposed** 301:22
**express** 344:20
**expressed** 82:3
207:21 348:7,9
389:16
**expressing** 160:4

**extensive** 40:21
71:9 316:20
**extent** 18:17 37:16
70:19 131:7 133:3
195:20,22 308:2
335:21 397:2
400:4
**extra** 276:16
**extrapolate** 368:6
**extrapolated**
352:17 357:6
**extrapolating**
368:12
**extremely** 144:6
144:10
**eye** 3:18
**ezra** 5:10 336:7
372:19

**f**

**face** 124:16,18
279:16 359:3
410:15
**facilitate** 164:9
**facing** 257:2,2,4
**fact** 20:20 89:21
105:10 106:17
108:15,16,18
162:12 163:19
195:10 207:7
230:13 233:20
283:7 285:3,10
290:14 308:7
330:20 331:20
332:6 349:16
350:1,4,6,9 351:6
357:10,15 358:15
361:12 362:16
374:4 390:17,20
414:7 419:4 431:7
435:16

**factor** 350:11
365:13,16 417:21
**factors** 105:19
366:3,15
**facts** 186:21
**factual** 69:15
295:13,14
**failed** 162:19
360:13
**failure** 419:12
**fair** 43:18 204:9
217:21 226:13
270:14 272:6
288:6 309:17
323:2
**fairly** 47:15 135:6
289:16 290:7
303:18 312:17
350:10 357:16
407:2
**faith** 283:11
**falling** 291:15
**false** 301:20
**familiar** 17:2 84:2
126:2,4 127:22
128:3 138:20
396:16
**faqs** 66:7
**far** 311:8 351:11
351:19 361:11
420:18
**fashion** 275:18
**faster** 204:15
**february** 15:17
37:4,7 55:2 56:21
58:15 59:6,11
63:8 104:19
**federal** 34:9
185:12,15 283:2
307:3 381:5 387:5

feel 185:1 407:2
feeling 211:8
feelings 300:11
feels 120:9
fellow 77:9
felt 184:19 185:3
  190:15,16,20
  199:7 343:17
fewer 326:10
fidler 6:1
field 13:16
fifth 256:9
fight 388:14
figure 32:3 41:18
  42:5 224:2 266:7
  284:4 319:11
file 101:2
filed 8:18 287:5,14
fill 328:4,15
  423:12
filled 37:13 327:9
  327:18
filling 54:5
final 36:19 151:9
  311:6,17 312:14
  316:22 317:9
  319:3 321:10
  373:16 374:12
  376:22 389:19,22
  429:14 433:10
finally 61:16
  429:15,18 430:11
finals 318:13
finance 6:15
financially 9:7
  437:17
find 155:18 162:12
  162:21 163:19
  181:9 208:13
  224:9 266:9 267:5
  267:17 269:14

273:1 279:17
  297:18 439:2
findings 328:20
finds 70:8
fine 211:12 241:7
  274:17 307:13
  344:22
finish 20:16 45:13
  79:5 151:14 224:4
  273:21 284:7
finished 197:19
  263:6
finishes 194:3
finkelstein 6:3
firewalls 31:4
firm 9:1 12:4,6,7
  135:19 228:3
first 9:15 26:22
  30:2 33:17 34:10
  54:16 55:7 68:21
  69:4 71:22 81:14
  82:3,8 84:3 94:5
  99:11 104:3,12
  114:17,21 121:4
  121:12 133:8,17
  150:10 180:4
  181:2 187:5 189:2
  195:15 196:10
  208:21 235:6
  242:22 243:1,18
  290:13 318:3
  329:20 335:6
  336:9 339:8
  341:15 342:1,16
  348:16 375:1
  385:1 387:8 429:3
fisheries 18:4
  201:20
fit 201:13,18
five 158:7 178:12
  197:15 198:13,16

211:2 256:11
  364:18 373:17
fixed 43:22 44:2
flag 41:16,16
flexible 44:3
flipping 375:3
floor 439:15
flyer 388:12
flynn 164:22 165:8
  165:9
focus 254:7 301:1
  301:16 302:22
  304:2 308:9 317:7
  338:21 423:7
focused 130:17
  242:2 356:1 357:3
  358:5 371:11
focusing 356:8
folks 76:4 81:12
  99:7,13 126:3
  279:1 283:8
  289:14 313:19
  324:17 340:18
  359:6
follow 23:3 28:8
  28:10 30:2 40:10
  59:20 60:22 61:2
  61:5 70:17 89:8
  152:13,21 154:17
  154:19 177:17
  181:17 342:21
  346:1,2 360:12
  361:3 372:2 399:3
  411:14
followed 165:15
following 64:3
  115:20 206:8
  242:4 248:6,8,18
  249:6,7 278:3
  285:9 303:19
  390:21

follows 9:16
font 380:4
forefront 64:20
foregoing 437:4,6
  438:3
foreign 80:22
forget 31:9 427:2
forgive 136:9
  400:6
form 103:17 106:4
  106:19 120:1,7
  145:20 160:10
  166:15 187:1
  189:1 195:12
  199:6 204:11
  225:21 252:17
  253:8 255:9 258:6
  259:11 274:5
  276:5 280:15
  284:21 299:12
  310:7,9 326:20
  327:3,4,5,6,8,12
  327:13,15 329:3
  343:21 346:14
  353:9 372:11
  381:18 383:14
  393:4 396:10
  404:15 405:13
  409:1 410:3,6
  412:10 417:17
  418:10 424:14
  433:18
formal 198:7
  239:4,5 296:3
  309:8 347:10,15
formally 123:20
format 320:14
  372:8
formed 106:2
  110:8

**former** 17:1 18:8
25:5,13 123:19
227:21
**forming** 107:2,5
107:22 108:7,13
109:8
**formula** 351:16
431:1
**formulate** 150:5,6
**formulated** 370:5
**formulation** 110:2
**forth** 30:21 46:11
50:15 102:5 271:4
308:6 323:19
350:21 376:19
**forward** 218:3
265:19 266:9
350:12 415:4
423:7 436:1 439:8
**forwarded** 159:16
163:6 165:19
386:3
**forwarding**
159:10 163:11
**forwards** 165:17
**found** 66:2,4 79:21
110:18 261:2,11
297:2
**foundation** 116:14
117:6 118:12,18
122:7,21 134:16
134:21 140:7
142:12 143:8,17
161:5 163:5 201:1
206:6,12 235:18
286:7,16 334:21
380:8 384:16
390:3,12 392:9,18
407:16 408:1,4,7
412:11 413:8
415:20 422:17

423:4 424:15
426:2
**four** 98:7 178:1,20
188:3 256:6 271:7
277:16 370:14
**fourth** 58:16
**fraction** 371:13
**frame** 27:13 40:19
55:9 187:22 188:3
201:11 237:8
289:8 397:5
**francisco** 4:21
**frankly** 261:22
359:6 413:17
**fraud** 393:14
394:19 395:19
399:13 401:4
404:11 406:5
408:10 409:6
**free** 363:9
**freedman** 439:9
**frequency** 144:15
**frequent** 47:15
**frequently** 52:21
53:4 66:9,14,19
119:3,6 160:17
232:10
**friday** 65:1 73:8
75:9 216:11
217:19
**front** 18:10 82:21
87:15 92:20 94:1
111:16 114:13
120:22 123:16
137:21 141:18
152:9 156:13
159:2 167:6
182:14 189:11
194:18 200:3
204:22 212:18
218:10 219:22

221:22 235:1
292:19 313:18
318:5 406:17
417:9
**frustrated** 197:5
223:11,13
**frustration** 160:5
**full** 216:9 269:11
310:11 313:16
358:8 429:1
**fuller** 430:22
**fully** 70:5 254:9
261:16 419:8
**function** 41:11
45:1 53:20 68:9
76:22 208:19
**functions** 26:5,6
41:7 44:17
**fundamental**
95:19 96:10
244:20 258:17
**funded** 124:19
**funding** 95:21
**further** 108:11
149:2 203:14
216:4 262:5 312:7
374:3 389:18
391:8 413:9
437:14
**future** 20:18

| g |
|---|

**g** 8:1 141:8
**gabrielle** 5:16
420:5
**gabrielle.boutin**
5:20
**gardner** 6:9 62:15
69:18 70:18 83:17
98:11 106:4 108:4
110:22 111:5
116:13 117:5

118:11,17 120:1,7
122:6,20 130:12
133:1,21 134:15
134:20 140:6
142:11 143:7,16
144:20 146:18
148:21 158:17
159:20 160:10
161:4,15 163:4
166:15 182:5
186:7,11,16 187:1
189:1 191:20,22
194:3 195:12,20
196:7 200:22
202:19 204:11
205:20 206:5,11
206:19 210:5
211:5,10,19,21
212:12 224:4
225:21 226:5
228:9 235:17
240:9 246:20
247:1,20 250:5
252:3,17 253:8,17
254:12 255:9
258:6 259:11
263:19 268:14
274:7,10 275:3
276:5 278:16
280:15 284:17,21
286:6,15,22
292:21 297:13
299:12,14,16
301:2,17 303:2
304:5 305:1,18
306:12,22 307:20
308:11,16 311:14
316:9 320:11
329:3 331:11
334:20 336:1
340:13 341:10

343:21 345:18
353:19 366:20
372:19 380:7
381:18 384:15
390:2,11 392:8,17
403:10 404:15
407:15 409:1
410:3,6 412:7,10
413:7 415:6,9,18
415:20 422:5,16
423:3 424:14
425:4,16 426:1,15
427:8 428:8,16
433:18 435:20
438:15 439:1
**gary** 396:9,14,16
396:22 397:4,18
397:22 398:3,6,9
399:7,8,13
**gauge** 57:20
**gears** 232:9
434:17
**geary** 115:3
**gender** 64:19
84:18 86:18
130:22 131:15
141:9 362:14
**gene** 179:16 183:2
183:6 184:16,18
185:9,22 188:2
**general** 5:17 6:3
6:15,20 10:2
16:22 46:6 86:9
95:5,6 99:18
100:14 101:19
127:18,21 128:2,5
128:11,18 167:22
168:1 183:15
188:21,22 189:4
189:21,22 190:3,6
191:2 196:11

214:7 219:1
227:22 231:4
232:21 233:10,18
233:21 234:2
235:13,16 236:14
236:17 237:6
245:20 246:16
247:6,9 249:18
258:10 298:11,15
325:16 342:7
397:5 400:8,9,19
400:22 401:2,17
401:21 402:16
403:1,6,15 405:11
405:18
**general's** 402:1,3
402:4,20 420:6
**generally** 46:7
60:12 65:18 68:15
76:8 307:12
338:18 405:14
406:22
**generals** 388:13
388:17
**generated** 248:4
**genesis** 129:13
**gentleman** 34:19
**george** 13:20
**gersch** 2:3 4:3
186:15,19 240:14
241:1,3 246:21
247:12 248:9
250:3,6,14 252:9
252:18 253:12
254:4,18 255:11
258:8 259:14
264:2 268:18
274:8,18 275:11
276:11 278:18,20
280:18 284:18
285:17 286:9,19

287:3 291:17
292:20,22 293:4
297:20 299:15,21
299:22 301:10
302:10 303:8
305:6 306:2,16
307:6 308:3 309:5
311:19 316:10
317:22 318:18,20
320:13 326:3
329:6 331:5,7
332:11 335:1,9,16
344:3
**getting** 16:10,12
30:20 59:1 69:15
217:22 243:19
281:4 285:7
318:13 319:2
427:17
**give** 50:12 56:11
63:13 136:19
174:16 240:7
275:1 334:5,6
355:2 363:3 366:6
372:20 374:9
429:11 431:17
**given** 30:16 40:13
72:12 140:9 197:3
246:15 303:2
321:10 364:13
437:11 438:5
**gives** 429:14
**go** 13:6 22:22 25:2
31:8 39:8 46:11
64:22 67:5 71:3
84:1 92:22 117:20
142:8,17 150:7,8
152:20 155:18
158:8 169:19,21
181:13 191:18
200:11 204:21

215:15 231:1
240:17 250:17,21
266:8 267:17
286:4 335:9
341:12 350:12
352:22 355:15
360:13 373:5
380:16 411:9
419:13 435:7,8
436:1
**goal** 88:20 427:17
**goes** 88:20 152:16
205:12 423:7
429:11
**going** 8:4,12 16:21
22:17 30:18 32:17
40:16 62:15 64:7
66:6 74:12 77:8
78:7 111:2 128:17
130:17,19 142:17
150:2 158:9 163:1
164:6 168:15
185:7 190:9
192:18 197:17
201:17 208:20
211:7,12 214:15
217:14 233:21
238:14 239:17
240:18 241:6
242:6 260:12
263:22 264:9
266:11 267:9,13
267:18 268:16
271:8 281:11
282:11 283:10
284:12 285:12,16
287:1,10 288:19
288:20 289:10,20
289:21 291:1
299:6 302:13
303:15 305:22

306:4 307:9 308:1
308:14,17 316:7
316:13 335:11
341:16 344:18
345:18 346:1
353:19 359:8,9,13
360:20 361:2
363:10 364:4
370:17 371:3
374:15 384:21,22
419:14 429:15
431:16,17 432:10
434:5 435:10
**goldstein** 6:2
435:7
**good** 8:3 11:2 43:3
44:8 90:13 127:2
150:9 211:6,9
212:9 241:2
249:14 254:9,20
255:2,8 258:15
259:8,9 263:4
265:8 294:9
308:16 336:6
351:15 381:3
413:20,20 420:18
420:19
**google** 109:19
**googled** 109:21
**googling** 110:9
**gotten** 110:11
246:8
**government** 3:2
78:18 81:22 125:3
126:16 152:12,18
153:11 154:4
158:5 185:13,15
204:16 205:14
229:2 239:8
262:12 263:5,10
264:4,16 265:9

266:22 291:22
293:2,7 304:13
307:3 330:16
335:20 347:4,6
359:5
**governmental**
25:16 192:7
258:22 262:2,7
263:17,21 412:4
**grant** 4:11
**granular** 275:7
**granularity**
272:20 273:2
**granule** 176:7
193:4
**great** 11:4,12
26:20 42:4 51:2
271:17 381:20
383:11
**greater** 272:19
313:16 359:2
365:17,18 366:6
366:15,18
**grossman** 4:7
**ground** 70:2,3
**grounds** 62:16
345:19
**group** 76:4,7
77:15 142:20
221:15 352:13
357:4 359:21
360:3,8 363:1,4
**groups** 54:15
132:18
**guess** 37:19
141:15,16 357:21
**guy** 175:4 271:1
271:14 277:6
285:16,19
**guy's** 283:3

**guys** 276:2 280:1
295:19

## h

**h** 25:10 440:1
**half** 12:7 21:7
49:11 111:2 328:6
328:7 331:1 361:9
366:12,18 367:3
**hamilton** 179:16
180:5 183:2,6
184:16,18 185:1
185:22 188:2
196:15 277:4,6,14
277:19 278:17,22
279:5,22
**hand** 56:7 240:11
318:17 430:14
**handed** 82:15
87:11 93:17
114:10 120:19
145:10 342:2
**handful** 144:4
164:6
**handing** 56:4
**handle** 381:22
**handled** 19:19
184:20 185:2
411:1
**handles** 18:2
**handling** 19:8
342:8
**haney** 269:5
**hang** 45:13 107:10
**hankey** 157:11
167:11,14 168:21
168:22 172:4,9
174:2 196:13
269:8,10,19,22
270:15 281:10
283:6 338:5,14
339:11 381:9,15

383:5 410:9
**happen** 84:5
152:14 306:17
307:7,11 331:16
337:17
**happened** 60:5
92:5 348:22
**happening** 86:3
**happens** 232:10
**happy** 62:18 66:22
77:11 78:16
162:20 203:15
302:16 308:2
311:12
**hard** 124:17 244:6
331:21 359:13,14
417:10,22
**harms** 310:20
312:1 315:3
**head** 31:9 204:2
266:6 365:8
416:15,17 418:11
433:8
**hear** 54:16,21
213:10 253:16
316:8,15 336:16
336:17 341:15
**heard** 68:21 174:4
287:4 335:2 397:1
397:2
**hearing** 19:1
20:19 26:19,22
27:15 28:8,16
29:6,10 31:16,20
32:8,12,22 33:4
142:17 147:2,5,6
148:16 288:12,16
335:6
**heavily** 52:11
**held** 8:20 84:21
321:20 330:11

**help** 34:1 41:18
82:2,6 164:9
195:2,7 236:7
260:10,22 261:1
267:5 284:12
311:10 430:18
432:16,22
**helped** 289:15
369:8,9
**helpful** 40:22
150:4 170:9
252:14 253:5
254:8 261:4
**helping** 34:19
**helps** 16:17 74:9
232:15
**herbst** 36:22 56:20
57:4,8 87:19
88:14 97:15
**hereto** 437:16
**heritage** 408:1,4,7
**hernandez** 77:2
97:12 198:1,5,6
209:3,9,13 220:20
256:6
**hesitate** 439:12
**hey** 272:11 273:9
273:16 279:6
280:1,7 283:5
284:2
**hi** 127:10
**high** 11:18,19
383:1
**higher** 411:22
418:3,5
**highlight** 79:8,12
79:15 80:18
**highlighted** 78:3,9
78:17 79:14 80:12
80:16 81:4,8

**highlighting** 79:20
81:21
**highly** 30:17
**hill** 12:3 22:11,16
32:17 88:17 89:6
**hillary** 115:3
**hindrance** 403:7,8
**hire** 21:7 47:4
**hiring** 124:18
**hispanic** 364:5
365:1
**hispanics** 349:13
363:6,17 364:8,11
365:10 366:2
**history** 307:10
**hklaw.com** 4:22
**hoc** 39:1
**hold** 106:12,20
151:14 321:18
427:21,21
**holding** 403:17
**holds** 340:16
**holland** 4:20
**holmes** 292:12
299:18
**holtzman** 4:19
**homeland** 179:6
179:14 180:1,10
180:13,19 181:14
181:15 183:3
275:16,22 276:10
277:2,10 279:22
382:16,19
**honestly** 10:10
179:11 200:14
364:13 376:19
377:2 414:17
**hoping** 168:12
**hour** 111:2 232:3
308:17

**hours** 49:10
**house** 48:4,8,16,19
49:4,9,15,21 50:9
50:11,15,16,16
51:4,7 74:5,7,12
74:17 125:19
147:2,5 148:1,15
167:18 173:12
283:9 288:1
291:21 388:1
391:16,20 393:8
395:9 410:12
**household** 319:9
**households** 328:1
328:9,10 330:22
333:12
**huge** 223:22
**huh** 31:11 67:8
79:1 103:3 123:15
123:17 127:9
128:15 149:19
151:16 159:3
213:7 229:14
231:11 280:9,11
292:4 293:22
326:13 328:22
339:12 341:7
358:10 362:21
377:5
**human** 307:10
**hundreds** 261:6
283:1
**hundredth** 112:21
**hurdles** 154:8
**hurt** 252:22
**hypothetical**
106:18 239:13
274:7,10 275:4
301:19 302:6,17
303:3,13,15 304:6
305:19 306:13

307:1,21,22
308:12 362:5
364:4 366:21
415:10,11

## i

**idea** 55:6 65:4
72:16 75:19 76:15
81:14 85:7,15
89:14 90:17 97:12
112:6,10,13
116:15 117:11,14
129:22 139:2
144:3 150:9
163:14 165:9
174:12 196:12
206:14 213:12
229:7 231:7 237:7
240:6 245:6,9
249:14 254:9,21
255:2,8 258:15
259:8 263:4 265:8
268:7,21 277:8
289:18 319:6
320:5 337:3,5
357:21 370:8
388:18 433:4
**ideally** 74:11
204:7
**identified** 66:12
99:5 155:20 172:8
239:22 345:17
363:20,21
**identifies** 206:1
**identify** 36:21
39:13 40:6 41:15
98:4 155:10 172:8
186:21 215:7
330:18 375:1
414:15
**identifying** 41:12
215:11

**identity** 64:19
84:18 86:18 131:1
131:15 141:9
**ignore** 300:22
301:15 302:21
**ignored** 391:21
**illegal** 67:20 68:1
68:4 301:21 302:7
302:13,15
**illustrate** 155:1
157:14 332:3
**image** 384:13
385:20 391:6
**imagine** 32:14
60:4 163:2
233:15 238:19
346:13 370:13
371:9
**immigrants** 65:20
67:20 68:1,4
**immigration** 1:3
4:1 8:16 241:4
281:7 336:12
393:9,12 394:17
395:17 399:9
401:2 402:7 403:3
404:10 405:1
408:22 409:4
438:18 440:2
**impact** 105:18
330:2
**impassable** 20:3
**impatience** 217:22
**impetus** 337:1
**implement** 181:21
**implications**
319:18 320:18
**importance** 17:3
**important** 18:6
40:12 91:21
103:13 112:22

113:2,7 134:3,6
155:8 172:2
274:20 278:13,14
278:22 280:13
343:9,11 347:2
362:11
**impossible** 305:21
364:7
**imprecise** 158:3
**imprecisely**
312:20
**improve** 355:14
**imputation** 329:15
368:21 430:22
434:3,10,15
**impute** 351:8,16
355:18 368:17
423:11 430:6,18
432:16
**inaccurate** 353:8
357:17 358:4
367:20 430:1
**inaccurately**
353:10,21 357:13
**inactive** 13:5,11
**inaugural** 27:19
**inauguration** 26:1
27:21 28:1 31:3
34:12
**inclination** 276:19
**inclined** 272:4
276:20,22 277:1
**include** 17:12
91:12 96:21 97:2
107:7 146:7,11
151:5,19 298:5
**included** 26:6
81:18 85:19 95:22
103:21 105:8
106:9,11 130:18
131:15 132:3

155:2 157:15
192:16 202:9,14
202:18 203:1
208:3 244:21
347:9 384:12
**includes** 67:6
96:20 216:21
314:10,16 383:16
**including** 18:16
54:11 71:10 78:18
84:15 95:21
105:19 106:22
157:18 223:8,9
229:10 345:15
419:8 433:20
**inclusion** 10:4
21:15 164:10
237:17 239:11
251:1 329:22
365:10
**incoming** 19:3
**incomplete** 354:7
373:6,8
**incorrect** 357:10
425:22 430:17
**increase** 360:12
361:2,9 367:3
**increased** 419:1
**independent** 54:4
106:14 281:22
282:3 296:15
299:4,10 300:6
**independently**
349:3
**indicate** 69:3
81:10 276:7
**indicated** 69:14
243:3 372:7
382:20,20
**individual** 43:1
414:15 419:7

**individuals** 41:6
46:13 400:15
407:10
**industry** 378:1
**inform** 420:21
421:9 424:7,20
425:13,20
**information** 28:13
30:5,21 40:22
68:17 69:15 79:22
81:17 103:14
108:16 129:14
132:22 136:19
137:1,8,15 151:7
152:5,10 153:12
153:19 154:7
155:22 158:6
163:1,12 177:2,16
177:19 180:9,20
181:10,17 186:8
186:12 190:10
192:6,8,11,20
193:4 195:21
210:20 216:16
217:13,17 223:3,6
223:6 254:17
262:3,13 264:1,1,4
264:17 265:9,15
265:19 276:2,3,4,7
277:20 278:7
286:5 290:9
294:22 296:2,5,8
296:15,18 297:2,7
297:18 299:5
326:18 331:17,18
334:6,7 335:19
340:11 345:16,19
347:3 350:12
358:4 368:10
383:4 400:2
413:20 414:19

416:11 422:3
**informative**
   281:20
**informed**  40:12
   74:11 103:22
   196:18 197:12
**informing**  397:3
**informs**  181:17
**initial**  150:18
   178:3 254:2 337:1
   411:8
**initially**  248:20
**input**  46:8,8,10
   49:6 216:21
   324:19 370:10
**inquire**  261:16
   262:5,20 264:7
   272:21 275:9
   279:17 399:3
**inquired**  55:12,16
   82:10 183:20
   409:22 423:11
**inquires**  414:1
**inquiring**  390:15
**inquiry**  254:2
   390:20
**inside**  387:20
**inspire**  224:5
**institute**  4:3
**institutes**  44:11
**instruct**  62:16
   186:13 196:1
   345:21
**instructed**  70:15
   150:1,21
**instruction**  411:22
**instructions**
   150:22 151:3,6
**instructs**  70:11
**instruments**
   105:17 106:2

**insurmountable**
   265:22 331:4
**interact**  47:9
   52:18 53:14,17,21
**interacted**  47:14
   189:3
**interacting**  48:3
   51:10,18
**interaction**  30:22
   50:15 51:3,6
   52:10,16 53:2,7,11
   55:18 99:15
   196:10 382:9
   411:3
**interactions**  195:3
   381:9
**interest**  57:20,21
   82:3 175:19 177:1
   348:8 392:11
**interested**  9:7
   58:11,19 59:1,5
   64:18 69:14,17
   144:7,9,11,13
   170:10 175:18
   190:4,7 192:11
   202:8 275:13
   298:21 397:15
   412:1 437:17
**interests**  403:2
**interface**  41:18
**interfere**  8:9
**interference**  8:7
   80:6
**internal**  99:8
**internet**  417:19
**interrupt**  11:1
**interruption**
   165:20 291:14
   434:12
**interrupts**  92:2

**interval**  356:15
**introduce**  221:6,7
   383:19
**introduced**  10:17
   336:7,9
**introduction**
   14:13,15
**introductory**
   303:2
**investigate**  252:7
   252:7 254:17
   337:8 410:14
**investigating**
   108:11
**investigation**
   201:19 317:6
   340:20
**invite**  60:16,18
   61:21 91:10,16
**involve**  286:14
**involved**  11:15
   17:21 19:6,10
   21:19 52:7,8,10
   64:16 97:1 99:14
   102:15 221:3
   288:14 340:22
   345:3 347:5 378:9
   380:11 421:18
**involves**  68:9
   98:16 220:19
   280:10 286:20
**involving**  140:15
**irrelevant**  251:15
   265:3 300:12
**isolate**  360:15
**isolating**  356:9
**israel**  77:2 198:6
**issuance**  290:17
   420:13
**issue**  20:9 47:11
   50:18 51:12 52:13

52:20 53:4,6
   64:19 86:19 91:21
   98:16 104:13
   112:16,20,22
   121:21 124:16
   130:17 139:20
   140:2,4 141:17,19
   142:4,10 143:6,12
   143:15,15 144:7
   145:2 166:21
   170:10,11 172:20
   174:5 177:11
   196:11 203:17
   210:4,11 211:1
   222:14 223:22
   233:10 234:6,9
   261:5 264:14
   283:1 341:3
   393:13,17 399:9
   399:13,15,18,20
   403:1 411:16
**issued**  242:9
   244:13 292:3
   343:20 420:1
**issues**  16:22 17:2
   18:10,11,13 20:8
   20:17 41:16 44:21
   54:6 68:10 77:19
   95:20 96:10
   106:22 113:6
   128:6 140:14
   150:10 165:2
   170:8,17,20
   201:20 221:11
   223:19 224:8
   226:10 229:10
   231:5 234:8
   241:13 244:20
   257:18 382:22
   403:17 411:18
   435:22

**items** 257:14
**iteration** 376:22
**iterative** 321:15
**izzy** 97:12 198:1,5
  209:1,3,9 256:6,19
  257:2

**j**

**j.d.** 12:20
**james** 95:14 97:2
  97:15 100:4
  155:15 156:3,7
  174:20 175:1,5
  183:1 184:13
  185:22 186:6
  187:13,15 188:6,8
  189:3 195:14
  198:1,2 214:11
  217:8 225:2,8,9
  242:18 243:4,6
  246:8 255:20
  256:10,20 257:4
  257:16 288:14
  345:10 369:12
  381:10 386:4,8,18
  391:6,18
**jane** 157:11
**january** 16:2
  19:22 27:16,17
  31:20 33:14,15,17
  33:22 34:10 35:5
  35:5,8,9,17 36:10
  37:6 39:18 124:4
  124:5 198:19,21
  309:21 317:3,11
  319:19 320:19
  321:2 369:5
**jarmin** 238:10,10
  294:12 314:3,5
  315:1 316:14
  322:18 325:10

**jeff** 400:9
**jefferson** 439:15
**jim** 57:18
**jmf** 1:5
**job** 17:4 38:4,5,6
  42:4 43:17 48:2
  58:16 63:12 68:9
  70:4 150:8 164:1
  252:14 253:5
  266:7,20 267:16
  268:5
**john** 5:6 59:18
  236:1 309:18,22
  395:9,14 410:13
  410:14 439:9
**join** 16:4 25:4
  117:12
**joined** 25:3 31:2
  117:15 187:13,15
  187:16 188:8,17
**jones** 377:17
**jorgenson** 1:16 9:4
  437:3,20 439:14
**jose** 336:11
**josh** 98:6
**joshua** 6:9 438:15
**joshua.gardner**
  6:12
**journal** 67:7 80:1
  81:21 146:14
  402:22 409:13
**jr** 6:19
**judgment** 429:5,8
**july** 121:16 122:12
  205:18 206:3
  209:22
**june** 94:12 98:10
  99:3 101:19
  111:15 113:10
  179:12 187:16
  188:15 195:6

244:13 271:11
  341:9,17,19 346:4
  346:12
**jurisdiction** 18:7
  412:5
**justice** 5:6,17 6:10
  94:8 99:7,10,13,15
  101:1,13,15 114:2
  126:18 153:3,7,16
  154:1 157:4
  165:12 166:9,11
  166:13,20 167:20
  170:8,19 171:6,10
  172:22 174:4
  175:9,20 176:2
  177:1,10 181:10
  181:13 184:2,20
  185:2,5 186:3
  187:19 190:3,6,9
  196:14,15 197:2
  197:17,18 216:16
  222:8 233:5
  237:17 238:5
  239:3,15 245:5,12
  245:18 246:3,11
  246:19 247:4,5,18
  248:1,5,17,21
  249:10,13,21
  251:2,8 262:17,21
  269:3 270:6 272:3
  273:1 275:6 278:1
  281:5 290:16
  294:20 295:11,15
  295:18 296:1,10
  296:12 297:1,5,10
  297:17 298:3,20
  309:7 338:20
  340:1 342:9
  343:16 347:18
  348:18 349:1
  350:3,9 382:8,21

388:7 398:18
  399:1,4 400:3
  410:17 411:2,9
  413:3 415:22
  416:4 420:22
  421:7,14 422:4,12
  422:15,22 423:22
  424:20 425:10,14
  425:20 426:4,10
  426:13,16,20
  427:13,16 428:3,5
  428:11 438:16
**justice's** 299:11
  300:7 305:11
  409:19 421:2
**justifications**
  415:16
**justify** 154:6
  181:16
**jyang** 5:9

**k**

**kansas** 118:2
  206:1
**karen** 1:16 9:3
  10:17 101:22
  137:11 218:18
  219:3 222:22
  288:15 310:1
  325:7,8 369:11
  437:3,20 439:14
**kass** 228:19
**kassinger** 227:17
  227:20,21 228:1,8
  228:12,16,19
  229:1 230:17
  231:5,8,9
**kate** 6:9 98:6
**kate.bailey** 6:12
**kdb** 222:15,19
**kdk** 222:19

**keep** 40:11 60:7
73:1 76:8 136:3
197:11 211:7,12
218:2 221:2,5
304:9 318:13
**keeping** 45:3,17
45:21 74:11
196:18 335:21
435:18
**keeps** 73:2
**kelley** 4:15 101:22
137:12 218:18
219:3 220:21
221:3 222:22
288:15 310:1
325:7,9 369:11
**kelly** 395:9,14
**kept** 201:21
**kevin** 385:21,22
386:1,3
**key** 108:9 220:14
221:11
**kind** 48:14 84:3
103:14 175:19
194:22 203:12
279:15 286:12
334:13 340:19
371:20
**kinds** 50:14
**knew** 86:15 311:2
342:2
**knight** 4:20
**know** 10:12 16:21
22:21 23:7,12
32:4 40:21 41:15
43:3 52:9 55:17
60:21 61:11 64:4
65:2 69:13,16
72:19 73:21 75:3
76:5 80:2 81:7
90:13 93:15 95:10

96:7 97:3,16
100:1 101:9,10,13
102:13 103:20
104:10 109:20
112:4 114:5 116:4
116:10,22 117:4,7
117:15,17,22
118:15 120:10
123:2,21 124:22
125:1 127:2,16
129:13 132:5
134:3,7 136:3,6,7
139:4 142:15
146:20 150:10
156:3 160:2,3,7,8
161:17,22 162:5
163:6,15 165:8
167:17,19 169:12
174:17 175:12
176:12,22 179:17
181:16 187:14,16
187:17 188:2
190:15,20 191:3,7
201:2 203:12
213:9,16 214:17
215:4 216:22
217:5,17 228:14
229:11 231:20
233:6 235:10,12
238:13,22 245:15
246:10 260:6
267:11 268:11
269:12 271:2
276:22 277:16,18
279:11 282:6,13
283:7 286:11
298:9,16 304:18
304:20 305:20
306:3 310:3,5
315:10,16 321:8
322:19 323:8

324:18 327:21
329:10 332:3,10
339:22 340:4,17
342:15 346:8
348:17 350:4
351:20 352:20
354:14 357:18
362:15 363:7
364:6,10,15 365:3
365:6 371:11
374:6,11 375:8
376:21 377:2,12
377:13 378:11,14
378:16 380:3,10
381:8,19 382:18
383:2 388:16,19
389:22 390:22
391:3,14,17,22
397:12,21 398:5
398:17,18,22
402:14,15 404:5,6
405:16 406:12
407:18 414:3
421:17 426:9
428:5 431:2,12
**knowing** 27:12
260:15 261:3
267:22 281:14
435:22
**knowledge** 122:22
157:6 164:12
189:2 228:17
315:13 387:8
388:22 391:10
392:10,19 398:16
399:17,19,21
403:1 409:20
424:1 425:17
433:20 435:4
**known** 124:2
287:10 343:19

422:2,9
**knows** 47:2,2,3
285:21
**kobach** 116:20
117:9,22 118:3,4,5
118:6 119:20
121:13 122:12,15
122:19 205:4,6
206:1,18 207:5
208:22 209:10
210:3,11,16
**kravitz** 4:10
**kris** 116:20 117:9
117:22 119:20
121:13 122:12,15
122:19 205:4,6
206:18 207:5
208:22 210:3,11
210:16

| l |
|---|

**l** 5:7 160:18
**la** 381:7
**lack** 116:14 117:6
118:11,18 122:6
122:20 134:15,20
140:7 142:12
143:8,17 161:4
163:5 183:14,17
201:1 206:5,11
235:17 286:6,15
380:8 384:15
390:2,11 392:9,18
407:15 413:7
415:20 422:16
423:3 424:15
**lacks** 334:20 426:1
**laid** 300:9,13,19
351:19
**langdon** 46:21
47:4 56:20 57:1,8
57:17 58:10,19

83:1,15 87:18
88:13 89:4,12
93:1 110:15 200:8
200:12 201:5
202:6,16 203:4,8
204:5
**langdon's** 46:22
59:17
**language** 244:4,7
244:17,18,19
245:3,7,10 362:20
430:12
**large** 20:22 21:3,4
31:4 42:7 163:15
314:3 349:14
356:17
**largely** 20:20
41:10 74:10 102:4
110:3 142:7
203:18
**larger** 327:22
356:13 368:13
**late** 88:4 209:22
316:11
**law** 5:11 8:20 12:4
12:7,13,17 14:19
15:3,8,12,13,14
193:12,20 228:3
300:16,20 301:6
301:15 414:13
**laws** 15:5,7
**lawsuit** 11:15
287:5 359:7
405:22
**lawsuits** 80:17
287:7,14
**lawyer** 127:1
193:8,10 265:1,5
265:12 268:3
325:4,19,20

**lawyers** 5:11
13:21
**lawyerscommitt...**
5:14,14
**lay** 300:16
**lays** 301:5,13
302:19 303:21
**lead** 67:14
**leader** 23:7,8
**leadership** 23:8
44:9 162:21 224:7
**leads** 207:11
**learn** 271:13 281:6
396:20
**learned** 281:9
357:15 402:16
432:13
**learning** 402:18
**leave** 160:18
**leaves** 43:22
**leaving** 32:17,17
131:6
**left** 12:3 43:14
75:3 211:20
**legal** 3:18 9:2,4
52:3 150:13
154:11 155:11,12
172:7 220:14
221:11 239:19
258:21 261:14,21
265:22 266:9
267:3 301:3,18
303:4 304:6,17
305:2 308:12
340:7,14 348:13
**legally** 267:14
**legislative** 18:8
165:2
**legitimate** 155:1
157:14,21 158:1,3
180:19,21 192:15

304:12
**les** 160:19
**lesser** 366:6
**letter** 237:21
238:1,3,4,9,14,17
238:20 239:2
272:4 290:4
347:17 349:2
396:19 397:8,11
397:15,18 403:5
403:15,18 407:13
408:19,19 412:20
413:1 419:21
420:13 427:17
**letters** 385:7
**level** 175:19 176:8
177:1 272:16
275:8 294:21
296:19 357:4
403:19 416:5
422:14,14 423:2
426:17,18 427:18
**levels** 352:13
**leverage** 285:8
**levers** 284:14
**leviathan** 41:19,20
41:22
**lexicon** 273:17
**liberties** 4:7
**liberty** 6:4
**lifecycle** 47:12
203:16 223:20
288:21 359:12
**light** 350:11
**limit** 423:18
**line** 57:12,17,22
63:4,15 71:4,22
78:3,17 79:8,12,15
80:7,12,15,20 81:3
81:4,8,21 90:2
96:16 97:6 111:1

111:21 146:16
148:8 164:22
230:13 293:20
331:15 352:12
440:7
**lines** 294:3,6,10
**link** 66:12 208:9
208:10
**linkage** 86:1
**lisa** 203:5,9,15,17
**list** 22:22 129:1,4
132:14 220:22
369:6,8,10,15
373:15 383:1
**listen** 276:1
284:10 289:19
302:11
**literally** 282:22
411:17
**litigated** 194:7,10
**litigation** 6:15
249:2 342:8
343:10,17 344:17
410:18
**litigator** 344:17
**little** 17:19 31:13
75:20 225:9
247:13 253:2
254:5 259:2
282:21 290:10
301:11 313:7
314:14 332:13
336:18 356:18
382:21
**lo** 350:7
**located** 8:21
199:10,12
**lock** 275:8
**loggerheads** 304:8
**logic** 248:19

[logical - marked]

**logical**  133:5
171:8 181:12
331:18
**logistics**  43:15
**long**  4:17 124:2
155:18 171:14
174:8 178:11
198:16 226:9
233:12 250:5
302:2 321:9
326:20 327:3,6,8
327:12 353:9
372:11 417:17
**longer**  74:20 115:8
**look**  57:11 62:8
80:5,8 92:19
105:5 127:6 130:1
147:14 148:7
171:5,13 174:3,18
180:12 203:1
211:17 215:15
220:2 229:13
233:22 234:2
237:2 261:9
264:14 273:5,15
276:16 284:14
288:2 304:4
315:19 328:12
331:18 339:6
341:5,10 351:12
353:4 354:22
**looked**  110:11
155:16 156:3
264:7 364:8
**looking**  117:18
143:18 155:19
179:4 180:6 181:3
181:20 236:15,17
237:4 326:18
355:9 362:19
371:3 378:21

385:17 434:7
**looks**  83:4 93:3
159:16 165:19,21
225:2 375:12
431:1
**los**  4:14,19
**lost**  287:9
**lot**  20:1,7 40:21
52:10 84:12 88:4
91:8,17 112:16,17
113:5 143:2
147:15 150:15
204:16 211:13
222:5 231:5
232:11 243:14
285:16 288:12
345:12 359:10
360:17,17,18
411:18
**lots**  230:22 243:10
347:4,5 360:21
362:15 366:14
432:22
**louder**  336:18
**love**  160:19
**lower**  132:17
**lumber**  201:13,18
**lunch**  205:20
211:6
**lupe**  5:1 381:5,7
**lynn**  1:16 437:3,20
439:14

---

**m**

**m.s.**  6:14
**mail**  204:8
**maintain**  90:16
346:11
**major**  54:6 78:18
81:22 103:9 360:3
413:22 417:14

**majority**  349:15
349:17
**maker**  267:20
305:15 306:7,18
307:15 308:6
362:9 363:8 366:5
**makers**  304:15
307:5
**making**  36:19
177:2 209:5 290:5
338:2 352:6 358:5
434:5
**maldef**  5:2
**maldef.org**  5:4
**man**  433:21
**manage**  41:18,20
**managed**  374:17
**managing**  44:20
**mandate**  140:17
**manning**  385:21
385:22 386:1,3,13
**march**  64:6,8 65:1
67:22 68:4 69:3,8
72:15 77:19 78:1
81:16,20 82:7,13
83:2,5,14,16 88:1
88:9,11,17 89:9
115:13 137:11
140:21 146:13
149:13 199:4
208:1 241:8,12,16
241:18,19 242:3,9
287:19 290:17
318:2 322:1,12
323:9,10,15 324:2
324:13 326:6
343:1,20 345:3,14
345:15 346:17,21
352:10 375:21,22
376:8 384:4 420:1
420:14 424:4

426:8 428:13
**margin**  354:12,19
354:20 356:12,13
357:14 358:1,3,3
361:11
**margins**  352:15,20
354:10,16 355:21
356:2,4,9,20 357:5
357:19
**mark**  55:22 62:1
82:14 93:16 114:6
120:13 123:18,19
124:2,3 127:10,15
127:16 137:16
145:5 147:8
155:14,20 156:2
158:16 160:17
161:3 163:18
164:5,8,13 167:1
172:7 173:22
182:3 189:5
194:13 199:19
212:10 215:17
218:4 219:17
224:14 226:16
234:18 292:22
317:18 325:21
353:10,21
**marked**  56:3,11
62:4 80:9 82:18
87:6,9,12 93:20
111:15 114:8,11
120:16,20 123:9
123:12 137:18,20
145:8,11 147:11
158:20 164:15,18
167:3 182:8 189:8
194:16 199:22
212:15 215:20
218:7 219:20
221:18,20 224:17

226:19 234:21
293:3 309:4,15,19
310:4 317:21
318:1,12 320:2,9
326:2,5 339:6
341:6 372:14,16
372:18 373:2,18
374:18,21 375:2
375:17 376:1,12
376:14,22 378:17
378:19,21 383:22
**marking**   62:6
**marshal**   406:5
**marshall**   405:11
405:19 406:9
**mary**   157:11,11
167:8,10,13
184:11 185:22
188:1 269:13,17
269:22 338:5
381:9 410:9
**maryland**   4:2
89:22 90:2 91:11
381:6
**mason**   13:20
**massachusettes**
4:4
**massachusetts**
1:15 6:10 8:21
438:16
**masse**   90:6 91:3
91:11 92:8
**massively**   162:18
**matching**   369:2
**material**   232:7
359:18 360:2,6,7
360:16 361:5,19
362:2,20 363:1,11
363:17,22 365:11
365:20 366:4,7,14
367:4

**materially**   358:15
358:19 361:2
363:12
**materials**   72:12
92:9 105:8
**math**   365:5
**matt**   110:22
**matter**   8:15 16:22
18:1 22:4 37:20
52:13 68:10
168:18 179:4
193:17 194:1
203:2 204:10
220:17 229:8
230:13 231:1,19
233:22 237:4
266:10 290:8
342:11 400:13
407:3
**matters**   19:17
22:2 31:22 32:9
40:6,13 51:20
102:16 119:4,8
124:10,13 411:10
**matthew**   5:16 6:2
10:1 164:21 165:8
165:9
**matthew.colang...**
6:7
**matthew.wise**
5:20
**mcannon**   6:18
**mcconnell**   23:8
**mchenry**   174:20
175:5 177:22
179:8 184:13,14
185:22 196:14
270:20 271:21
272:2,8,11,22
273:4 275:12
276:21 278:4,11

278:17 281:4,5,11
281:14 282:20
284:3,11 285:4,8
381:10,17 382:10
382:15 383:3
410:13
**mchenry's**   175:1
175:13 281:22
410:14
**mean**   14:5,15 15:7
20:11 21:15 29:19
30:14 32:2 39:2
42:1 44:2 49:22
50:12,17 52:1,6
75:21 77:5 91:4
92:1,12 99:12
109:15 111:1
124:14 128:1
130:11 135:19
137:3 139:4
148:20 149:22
152:3,9 155:12,17
159:5 174:14
183:17 185:20
187:8 193:9 197:3
214:20 223:22
241:10 243:11
245:15 261:12
271:6 272:16
278:16 288:16
304:13 330:7
331:10,13 332:7
344:21 356:8
357:21 358:19
361:4,6,10 362:2
389:19 390:19
409:12 411:8
430:21
**meaning**   15:9
21:17 39:11
108:10 339:10

**means**   16:14 53:3
70:14 150:1
185:21 224:12
329:8 354:10
429:20
**meant**   57:21 152:4
222:19 243:16
**media**   8:13 111:6
111:10 158:12
211:22 212:4
250:7,11 308:18
308:22 380:17,21
389:14 390:6
402:16,17,19
**meet**   23:13 38:11
39:8 54:8 90:18
90:19 91:12,21
92:8 98:19 101:16
124:6 125:20
170:15,16 313:19
314:2 421:2,11
**meeting**   2:17 11:9
16:13 23:17 32:12
32:18 33:2 38:14
38:20 39:3,5,6
40:9 60:13,18
64:2 71:17 72:13
91:15 92:15,17
97:22 98:1 121:18
139:18 156:21
157:7 161:10,13
169:11 170:2,21
171:14 172:12,16
173:2,16,20 174:8
194:15,22 195:6
196:5 201:21
202:1,12,15
220:11,12,14
221:9,12 270:9
314:4 322:8 323:1
323:12 324:1,4,12

| | | | |
|---|---|---|---|
| 338:14 397:13 | 187:8,18 189:7,18 | 341:6,8 343:19 | 124:3 125:14,15 |
| 398:13 421:5 | 191:9,12 213:22 | 344:1,5 345:17 | 169:2,3,8,18 171:3 |
| **meetings**  17:21 | 215:12 216:9,10 | 346:5,12,18,21 | 171:15 173:8 |
| 19:1,13 22:8,11,16 | 216:19,20 217:14 | 347:1 350:20 | 174:2 184:11 |
| 23:12,15,20 24:12 | 217:16 218:13 | 420:14 | 187:22 322:15 |
| 25:21 26:11 38:10 | 219:10,15 223:17 | **memorandums** | 338:5,8 339:13 |
| 38:11,22 47:17,21 | 232:13,20 233:4 | 41:13 48:17 | **method**  329:11 |
| 54:2,4,11 60:10 | 237:16,19,20 | **memorialized** | **methodology**  14:9 |
| 61:13,19 90:14 | 245:3,4,13 269:15 | 339:1 | **methods**  329:16 |
| 91:17 102:3 | 300:9 301:5,14 | **memory**  77:8 | **michael**  6:13,19 |
| 161:19,22 162:8 | 303:1,12 305:5 | 179:2 288:3 295:6 | 100:1 |
| 166:11 200:14,21 | 306:19 309:3,18 | 371:22 | **microphones**  8:5,9 |
| 201:4,8 221:14 | 310:16 311:5 | **memos**  40:15 | **mid**  3:18 |
| 322:10,11,22 | 312:21 313:16 | 422:13 423:1 | **middle**  84:16 |
| 323:3,7,13 398:15 | 315:19 317:3,20 | 432:21 433:3,7 | 86:19 141:20 |
| 398:19 399:2,5 | 318:2 319:14,20 | **mena**  84:17 | 143:2 429:13 |
| **member**  15:17 | 320:20 321:2 | 140:19 141:4,17 | **midnight**  28:20 |
| 22:19 23:1,19 | 322:1,12,12,20 | 141:19 144:11 | **mike**  95:7 97:2 |
| 123:21 406:14 | 323:9,10 324:2,13 | **mention**  173:4 | 98:6 246:9 |
| **members**  16:21 | 339:2 346:17 | 257:21 | **miller**  404:2,5,6 |
| 17:3,22 23:5,14 | 351:19 352:11 | **mentioned**  17:5 | 404:10,20 |
| 24:13,14,18,22 | 353:1 355:1,22 | 19:15 21:19 25:12 | **miller's**  404:22 |
| 28:8,9,19 30:7,10 | 357:9 358:2 366:3 | 28:2 35:12 40:3 | **million**  21:8 |
| 31:7 32:19 53:14 | 367:3 370:3 | 46:13 83:21 86:2 | 327:10,11,16,18 |
| 53:17 | 371:17 372:16 | 86:8 97:18 102:21 | 328:1,11 333:11 |
| **memo**  2:11,16,16 | 374:20 376:14 | 146:22 172:6 | 351:9 361:9 |
| 3:3,3,6,6,8 40:18 | 410:20 420:1,2 | 173:2 196:20,21 | 364:15,17,18,20 |
| 41:2 93:19 94:21 | 428:14 432:9 | 197:16 210:12 | 364:22 365:3,6,7 |
| 94:22 95:1,2,4,12 | **memoranda** | 226:7 236:10,13 | 368:17 423:13 |
| 95:15,17 96:8,13 | 259:20 | 239:21 257:21 | **millions**  328:16 |
| 97:18 98:9,10,15 | **memorandum**  3:4 | 271:9 289:14 | 364:11 |
| 98:20 99:2 100:13 | 241:13 242:10,13 | 386:14,19 409:14 | **mind**  141:14 |
| 101:2,19 104:16 | 244:11 245:14 | 413:16 | 266:16 |
| 107:12 110:17 | 246:14 247:17 | **mentions**  223:9 | **mine**  257:4 |
| 111:15,19 113:10 | 248:2,15 249:3,15 | **message**  71:22 | **minor**  14:2 |
| 113:19 136:22 | 249:22 287:20 | 114:18 138:14,15 | **minority**  349:11 |
| 137:4,5 174:17,19 | 290:18 292:2 | 139:16 145:3 | 349:12 |
| 179:17,19 182:7,9 | 301:16 302:19 | 152:22 180:6 | **minute**  9:22 48:1 |
| 182:16,18,20 | 303:22 304:3 | 231:12 | 68:20 146:22 |
| 183:1,9,12 184:10 | 305:17 306:9 | **met**  9:22 11:7 | 150:21 158:7 |
| 184:18 185:17 | 325:22 326:2,6 | 22:19,22 23:2,9,16 | 205:1 289:14 |

**minutes** 171:15
  178:12 218:19
  250:6
**mischaracterize**
  425:6
**mischaracterizes**
  108:5 210:6 247:2
  247:21 253:18
  316:22
**miscommunicati...**
  236:3,19
**misinformed**
  285:2
**missed** 12:12
**missing** 332:12
**misunderstanding**
  316:6
**mo** 406:14
**models** 351:9
**modified** 177:18
**moment** 58:5
  220:2
**monday** 33:20,21
  34:1 218:18
**money** 419:2
**monitor** 46:14,17
**monitoring** 45:1
**month** 179:9
  271:5,12
**monthly** 47:20,22
**months** 100:11
  121:22 125:6
  146:6,10 151:4,18
  159:13 166:8
  177:7 183:22
  184:4 198:18
  206:9 209:21
  211:2 234:7,10,12
  234:14 347:7
**morning** 8:3 38:17
  166:1 213:4 246:1

246:17 247:16
  248:14 324:5
  342:5
**motivated** 113:4
**move** 331:5 415:4
**moved** 44:5,12
  188:21
**moving** 168:17
  218:3 265:19
**multi** 375:8
**multiple** 48:21
  290:15 322:21
  323:3
**multiply** 431:10
  431:16
**mwalsh** 6:22
**myers** 228:2
**mystified** 146:5
  151:17 159:12
  177:6 318:12

**n**

**n** 4:1 8:1 25:10,11
**name** 9:1,19 77:10
  77:16 87:20 125:1
  155:15 157:9,10
  167:15 174:7,9,16
  174:21 175:1,13
  179:15,18,19
  205:17 219:6
  241:2 262:11
  269:8,11 270:13
  336:7,9 379:11,14
  381:3 410:11,13
  420:5 440:2,5
**narrow** 355:16
**national** 44:4,11
  50:3 51:1 138:20
  139:2,8,19 140:10
  140:17 141:12
  286:14,20

**nations** 413:16
**nationwide** 366:12
**naturalization**
  413:19
**nature** 381:20
**near** 94:11 199:9
**nec** 50:16,22
**necessarily** 45:2
  45:16 69:5 86:1
  119:18,21 154:16
  268:4 276:16
  281:19 314:9
  332:7 369:16
**necessary** 152:5
  152:10 177:17
  331:19 342:20
  430:7
**need** 39:6 40:20
  50:6 57:20 64:12
  84:11 105:5 106:7
  127:11 128:19
  129:8,8,14 153:2
  153:11,22 154:6
  154:10 155:1,7,21
  157:14,21 158:4,5
  176:8 180:11
  192:15,20 193:4
  220:2 236:2,18
  240:3 254:16
  258:22 261:7
  262:3,4,7 263:5,10
  263:17,17,21
  264:1,8,14 266:4
  267:11 272:12
  273:12,14 274:9
  274:15,21 276:2,2
  276:3,7 278:6
  294:8 296:5 297:8
  333:1 347:12
  351:12 365:14
  372:19,22 400:2

413:11 415:22
**needed** 15:7 37:17
  46:9 59:10 86:14
  153:6 156:16
  166:8 176:5,8
  181:8,22 183:15
  247:8 248:3 249:2
  264:4,16 279:14
  294:22 296:8
  344:16 416:5
**needing** 392:6
**needs** 84:1 157:17
  157:22 158:1
  253:10 258:19
**negative** 319:18
**negotiating** 274:16
**negotiations**
  201:13,17
**neither** 37:11
  67:11 358:12
  416:9 437:12
**nelson** 23:16
**neuman** 123:18,19
  124:2,3 127:1,3,7
  129:10,21 130:11
  131:11 132:1
  155:14,20 156:2
  160:17 161:3,20
  163:18 164:8
  172:7 173:22
**neuman's** 130:1
**never** 15:12,13,14
  112:10,13 118:4,6
  122:14 123:7
  152:12 164:11
  171:22 175:7
  185:9 207:21
  255:1 258:14
  259:7 271:16
  272:11,12 279:3,5
  279:8 281:9 291:4

291:5,12,13 298:7
307:7,9 315:7,8,9
315:12 316:2
320:7 324:12
335:2 349:16
364:7 385:10
387:14 392:20
400:21 406:4,9,20
408:3,6 409:16,21
409:22 419:11
434:22
**nevertheless**
350:14 352:1
**new**   1:2,3 4:1,3,7,8
4:8 5:12 6:1,5,5
8:16,19 10:2 76:5
178:13 241:3
438:18 440:2
**newman**   124:21
133:10,19 134:12
135:5,10 136:2,6
136:10,19 156:10
162:1 164:5
**newseum**   115:20
**nice**   77:9 121:18
**night**   12:17 28:20
73:8 75:8 83:7
88:4 117:3 128:19
**nine**   198:18 234:7
234:10,12
**nist**   43:14 44:13
**niyati**   5:5
**nom**   27:3
**nominated**   27:3,5
27:9
**nomination**   27:2
28:7
**nominee**   16:17
18:14,21 20:10,11
20:11,13 21:11,20
22:2,6,18 24:13,20

26:8,9 28:11
**nominees**   16:18
17:6
**noncitizen**   65:5
353:8,22 367:7
414:18 418:5
430:6
**noncitizens**   67:2
85:19 208:3,6,11
208:14,17 332:6
353:9 367:13
414:7 416:22
418:3 425:22
430:2,18 431:7,11
431:16
**nongovernmental**
53:22
**nonresponders**
432:17
**nonresponse**
360:12 361:3
**nonresponsive**
331:6
**nonstop**   160:20
**nope**   10:8 77:4
112:12,15 197:20
259:19 270:19
**normal**   290:1
**normally**   71:12
91:14 277:12
318:14
**north**   84:16 86:19
141:20 143:3
336:13
**northern**   420:9
**northwest**   8:22
439:15
**norton**   292:12
293:21 294:10
298:18 299:7,18
300:3

**note**   8:5 128:13
130:21 318:11
375:17 380:9
409:12 419:11
423:5
**noted**   9:9
**notes**   172:14
211:17
**notice**   1:14 92:12
130:14 203:14
321:1 387:4
**noticed**   304:13
**notices**   283:2
**notification**   2:17
57:19 58:20 61:6
64:16 84:1 87:3
88:22 130:3
140:20 194:16
195:1
**notifications**   86:10
88:17 89:5
**notify**   59:8,10
84:8 127:11 129:8
**noting**   132:9
**notion**   54:16 68:21
**notionally**   37:10
**notwithstanding**
70:16 401:18
**november**   15:16
15:19 16:7 27:6
27:10
**nrfu**   366:13 367:3
**nshah**   5:9
**ntia**   44:12
**nullify**   302:8
**number**   2:8 14:2
64:13 81:11 111:7
111:11 147:9
158:13 163:16
178:18 191:20
201:20 209:21

212:5 223:18
229:9 250:8
308:19 309:1
327:22 328:9,10
330:22 332:21
345:6,6 355:18,19
360:12 364:5,10
380:18,22 384:2
417:12 428:20
431:6,9,17
**numbered**   62:7
**numbers**   72:2
364:8
**numerous**   226:10
229:10 244:1
**nw**   1:15 3:18 4:4
4:12 5:2,7,12 6:16
6:20
**nyclu.org**   4:9

## o

**o**   8:1 25:11 141:8
**o'melveny**   228:2
**oag**   235:12
**oath**   9:6
**object**   62:15
345:18
**objected**   69:22
**objection**   69:18
70:9,16,17 83:17
98:11 106:4 108:4
116:13 117:5
118:11,17 120:1,7
122:6,20 130:12
133:1,21 134:15
134:20 140:6
142:11 143:7,16
144:20 146:18
148:21 159:20
160:10 161:4,15
163:4 166:15
186:7,12 187:1

| | | | |
|---|---|---|---|
| 189:1 195:12,20 | obstacle 331:4 | 173:16 188:20,22 | 48:11 49:3 55:15 |
| 200:22 202:19 | obstacles 261:14 | 189:4 196:11 | 55:18 56:19 57:11 |
| 204:11 206:5,11 | obtained 352:14 | 198:14,17 199:9 | 58:6,18 59:3 |
| 206:19 210:5 | 357:5 | 199:11,12 200:8 | 61:18 63:7,11,22 |
| 225:21 226:5 | obviously 23:7,9 | 201:7 214:8 | 64:10 65:5,11,13 |
| 228:9 235:17 | 36:18 97:14 | 216:12 232:21 | 66:18 67:6,9 |
| 246:20 247:1,20 | 110:19 181:2,11 | 235:13,16 245:20 | 69:16 70:6 71:8 |
| 252:3,17 253:8,17 | 183:19 213:1 | 246:16 247:6,9 | 71:15,21 72:17,20 |
| 254:12 255:9 | 249:11 325:10 | 249:18 255:15 | 73:12 74:4 75:13 |
| 258:6 259:11 | 365:2 370:21 | 258:10 281:7 | 76:16,19 77:12 |
| 263:19 268:14 | 371:17 373:16 | 283:21 310:6 | 79:13 80:5,19 |
| 274:7,10 275:3 | 410:18 | 325:16 342:7 | 81:7,13 82:12 |
| 276:5 280:15 | occasion 52:17 | 377:21 378:7 | 83:15 84:4 85:1 |
| 284:17,21 286:6 | 53:16 | 386:1,2 | 85:16 86:17 89:12 |
| 286:15 297:13 | occasionally 198:1 | officer 437:4 | 89:21 90:3,9 |
| 299:12,15 301:2 | occupied 411:10 | official 36:18 | 91:10 92:4,7,19,22 |
| 301:17 303:3,4 | occur 92:17 | 295:3 | 93:16 94:9,21 |
| 304:5,6 305:1,18 | 398:15 | officially 39:21 | 95:3 96:18 97:6 |
| 306:12,22 307:20 | occurred 280:17 | officials 37:18,19 | 98:9 99:9,12,16 |
| 308:11,12 329:3 | 298:10 397:2 | 90:4,19 96:2 | 100:18 102:2 |
| 331:11 334:20 | 398:11,11 | 111:20 112:2,7 | 105:6 106:7 107:8 |
| 340:13 343:21 | occurs 308:5 | 113:11,13,16,21 | 109:12 110:5,21 |
| 366:20 380:7 | oceanic 44:4 | 245:1 | 111:19 113:9,18 |
| 381:18 384:15 | odd 103:22 104:9 | ogc 99:20 101:10 | 116:4 120:12 |
| 390:2,11 392:8,17 | offered 432:5 | 187:15 219:12 | 121:7,10 122:4 |
| 404:15 407:15 | offers 301:1 | oh 148:7 159:6 | 125:5 128:10 |
| 409:1 410:3,6 | offhand 269:12 | 191:22 309:19 | 129:10 131:14 |
| 412:7,10,11 413:7 | office 1:14 5:17 | 318:18 328:17 | 132:7 134:11 |
| 415:6,9,18 419:4 | 6:14 8:20 33:18 | okay 10:9,14 12:9 | 135:8,14 136:5,15 |
| 422:5,16 423:3 | 35:21 37:8 38:1 | 12:16,22 13:8 | 138:19 139:16 |
| 424:14,15 425:4 | 41:3,8 42:10,15 | 14:8,18 15:6,16,22 | 141:19 143:1 |
| 426:1,15 427:8 | 43:5,8,19 44:16,20 | 16:3 18:18 19:9 | 144:6,10 145:12 |
| 428:8 433:18 | 45:6,20 46:4,5,14 | 19:15 21:6,14 | 145:15 146:1 |
| objectionable 70:8 | 47:6 49:18,21 | 23:11,13,20 24:5 | 147:13,15,22 |
| objections 70:7 | 50:10,16 52:15,22 | 24:12 25:22 27:5 | 148:11 150:11 |
| 286:22 425:16 | 53:21 57:2,13 | 27:14,17 29:3 | 152:2,17 155:16 |
| objective 28:21 | 58:7 75:14 95:5,6 | 30:22 31:6 32:5,7 | 157:3,13,21 |
| 106:18 266:3 | 99:17 100:14 | 32:11,16 33:6 | 158:16 159:9 |
| 267:1 | 101:18 127:18,21 | 34:4,8 35:12 36:9 | 161:9 162:7 163:2 |
| observe 229:6 | 128:2,4,7,8,11,18 | 36:12,16 37:6 | 164:2 166:19 |
| | 169:3,8 173:7,13 | 43:4 45:5 47:4,22 | 167:17 168:9 |

171:2 174:13
175:5 176:19
177:21 178:5,13
178:16 179:7
181:14 183:17
184:17 186:5
188:10 189:5,5
191:8,18 195:2
197:11 200:7
202:1,5,12 203:4,8
204:9 205:3,11
209:20 210:2
213:2,10 214:3,15
215:2,11,16 216:4
216:8,19 218:12
218:16 219:17
220:4,5,12 221:17
227:1,12 229:13
230:16 231:22
235:3,14,22
237:14,22 239:1
239:14 241:5
242:15 244:8,8
250:2,18 255:6
256:13 257:9
258:9 259:17
263:16 274:19
276:17,21,21
287:7,13 290:19
292:6 293:12,16
293:19 294:4
298:1 300:19
308:4 309:16
311:11 312:16
313:22 314:22
318:9 321:1,4,10
323:6,16 328:18
334:12,17 335:9
336:10,15,22
341:12 342:12
367:12 373:20

374:18 379:17
382:12 384:8,10
384:11,21 385:17
385:19 386:3,12
386:16,21 387:2
389:3 394:4 401:1
401:15,22 406:20
407:9 408:16
415:14 416:3
418:8 419:13
420:11 421:8,20
424:2 425:19
427:3 428:13,19
428:21 429:4,17
430:15 431:12
434:17 435:5
**old** 146:6,11 151:4
151:19 159:13
166:8 177:7 184:4
**omb** 52:6 154:6
**onboarding** 34:21
35:1
**once** 103:21
150:13 209:14
211:17 247:22
248:19 297:15
322:15 347:10
371:20 410:22
411:13
**ones** 43:9 332:1
405:22
**ongoing** 84:19
**online** 110:11
**op** 48:17
**open** 256:16 257:1
289:16 335:21
435:19
**operated** 197:14
**operates** 204:16
**operation** 124:15
126:1

**opinion** 207:21
428:6 429:13
432:19 433:6
**opinions** 433:3,12
**opportunity** 130:9
130:11 131:9
132:2,8,10 133:20
135:21 285:5
**oppose** 435:20
**opposed** 45:21
318:13 350:18
**opposite** 265:20
**opsp** 283:19
**option** 352:11
353:18 423:9
429:5,8,12,12
435:21
**options** 368:20
422:13 423:1
**oral** 1:13 40:14
71:14,17
**orally** 9:10 71:7,8
**order** 10:19 28:11
90:14 109:22
129:11 152:14
154:19 155:9
181:21 217:13
239:7 282:19
327:9
**orders** 48:18
**ordinarily** 68:16
**organization** 12:5
125:1 192:8
**organizing** 57:8
**orientation** 64:18
84:18 86:18
130:16,22 131:14
141:9
**original** 180:14
185:6 245:3,4
346:11 384:12

439:4,8
**os** 57:12,13
**ought** 105:8
**outcome** 9:8
437:17
**outlined** 107:1
175:18 181:22
239:7 319:19
320:19 366:3
**outlining** 214:1
**outreach** 419:1
**outset** 272:14
**outside** 23:14
53:22 54:8,14,15
77:22 91:20 100:5
100:14 139:5
255:15 325:11
393:9 406:21
407:9,13,19
409:15 410:18
**outstanding**
435:17,22
**outweigh** 304:11
363:22
**overall** 359:19
**overcharacteriza...**
234:13
**overlap** 338:20
**overrun** 162:18
**oversees** 42:18
**oversight** 3:1
291:22 293:2,6
**overstates** 312:6
**overview** 59:19
60:2

---

**p**

**p** 4:1,1 8:1
**p.m.** 73:8 83:5,14
116:1 128:14,18
203:9 212:1,5
235:8 240:19,22

250:8,12 308:19
309:1 335:12,15
380:18,22 419:15
419:18 435:11,14
436:6,7
**p.o.** 5:18
**page** 2:1,8 66:9,14
78:4 80:8,9,12
88:21 121:7,11,12
127:8 200:11,12
202:6 205:8,10
208:10,13,21
209:6 235:6
293:20 318:4
329:18 352:10,10
353:4,18 354:10
358:8 384:8,9
428:19 439:4,9
440:7
**pages** 438:3
**panel** 406:17,21
**paper** 80:3 172:11
259:18 349:15
390:6
**papers** 402:21
**paperwork** 34:20
154:5 302:3
**paragraph** 57:16
130:8 132:12
182:22 183:8
310:11 321:13
322:1 323:20
329:20 339:8
358:8 429:1,3,11
429:14 433:17
**pardon** 156:8
227:10
**park** 4:15 377:20
377:21 380:5
**part** 13:22 21:8
30:13,15 68:8

76:3 95:21 110:6
116:21 152:11
153:1 159:5,7
215:9 229:17,18
244:21 248:16
249:7,8 273:17
279:19 285:13
296:16 297:21
369:5 375:7 421:4
**participate** 19:12
**particular** 18:3
37:20 42:13 44:22
64:8 92:6 170:20
252:20 261:18
266:10 310:4
314:19 360:3
369:15,22 385:13
387:3 391:10
411:16
**particularity** 33:5
**particularly** 28:9
35:10 84:6 261:8
344:21 412:1
**parties** 1:19 8:11
118:21 437:13,16
**partitions** 256:22
257:7,8
**partner** 12:3
**party** 9:6 125:7
192:12
**pass** 30:2 174:22
**passing** 218:13
**pay** 34:6 308:8
**paying** 164:1
**pending** 84:21
86:16
**people** 16:10,12
20:3 30:18 31:12
41:4,5 42:3,9 43:5
43:19,19 44:20
47:2 63:21 65:3,6

84:17 91:6,9,11,20
102:5,22 107:15
108:18 131:1
150:16 152:12,15
176:5 192:10,19
197:15 202:7
204:14 211:14
224:10 244:1,3
255:17 258:10
266:22 273:9
281:13,20 282:14
284:10 289:12,15
322:8 323:17
325:11 327:10,11
327:16,19 328:3
328:16 330:13
331:18 332:4,8,21
334:4 345:7
349:14,18,22
351:16 355:4,8
360:13,22 362:16
362:19 363:5
385:3 388:15
407:18,19 410:17
414:9 417:12,16
418:8 421:21
430:19 431:3,6,10
431:15 433:20
**people's** 359:4
**percent** 224:1
328:6,7,15 331:1
332:4,6 353:2,6,11
353:22 354:13
355:2,4,5,8,11,17
357:12 362:6,10
362:22 364:6
365:1,9,15,17,17
366:1,12,18,19
367:3,7,20 369:1
414:7 416:22
417:15 425:21

431:3,6,8,11,14,14
**percentage** 108:17
351:4 361:18
430:7
**perception** 143:10
414:2
**perdue** 52:12
**perfect** 11:3
**perfectly** 264:11
302:8 434:6
**period** 30:14
31:19 32:7 34:7
34:17 55:11 96:7
147:1 179:7
197:12,14 262:15
271:8 277:17
283:16 290:4
341:2 369:4
383:17 419:21
420:12,20
**permit** 429:22
**perry** 4:7
**person** 16:17
43:14,17,22 44:1,4
44:10 48:5 76:7
77:5,7 90:5,20
91:12 92:8,13
104:3 125:14,15
153:16 161:7
169:18 171:3
173:9 179:20
183:5 184:11
203:14 213:16
214:18 215:5,7,13
266:21 267:6,17
282:20 283:13
285:9 295:4
339:13 382:5
391:9,12 396:18
397:22 410:16

person's  179:15
personal  167:10
  205:17 262:5
  266:10 300:11
personally  68:2
  297:9 400:12
personnel  21:1
  32:3 34:21 35:1
  74:10
persons  66:2
  345:2,9 353:7
  416:19
perspective
  259:10 266:10
  352:2,5
persuade  284:11
  284:15
persuading  282:20
peter  95:11 100:6
  100:8 218:17,22
  225:1,8 227:16
  231:20 288:15
  386:18 396:15
  399:7
pgrossman  4:9
phone  74:3 118:16
  121:19,21 122:9
  156:6,11 169:3,4
  169:13 170:6
  175:15,16 178:3
  179:8 184:17
  210:3,17 217:19
  270:8 271:6 398:1
phones  8:8
phrase  278:10
  355:21 356:4,7,20
  360:7 363:11
  366:7
phrased  280:21,22
  337:16 348:11

physically  34:13
pick  8:6 431:5
picture  77:14
  351:11 354:7
piece  224:11,12
pine  4:16
pitfalls  67:19
place  8:8,11 60:2
  89:13 122:9 130:6
  132:10 135:16
  149:18 151:22
  152:3,8 171:8
  181:12 204:18
  337:21,22 348:14
  397:22 411:9
  439:15
placed  64:15
  163:18 301:8
  418:15
placing  265:16
  429:18 434:18
plaintiff  8:15
plaintiff's  383:20
plaintiffs  1:4,14
  2:9,9,10,10,11,11
  2:12,12,13,13,14
  2:14,15,15,16,16
  2:17,18,18,19,19
  2:20,20,21,21,22
  2:22 3:3,3,4,5,6,7
  3:8,9 4:10 5:1
  10:3 56:2 62:3
  80:17 82:17 87:8
  93:19 114:7
  120:15 123:11
  137:17 145:17
  147:10 158:19
  164:14 167:2
  182:7 189:7
  194:15 199:21
  212:14 215:19

218:6 219:19
  221:19 224:16
  226:18 234:20
  241:4 293:1 309:3
  317:20 326:1
  372:15 374:20
  376:13 378:18
  381:4 383:21
  420:7
plan  415:4
planned  419:1
planning  36:2
  37:8 52:8 150:16
  200:9 283:21
  377:22 378:8
plans  115:20
plausible  86:6
play  204:13
please  8:5,7 9:12
  9:19 10:12,20
  46:2 79:5 98:5
  100:7 135:1
  213:16 214:17
  296:13 336:18
  339:7 439:2,8,11
plenty  130:15
plus  263:9 266:21
  413:21
point  10:11 12:13
  60:20 64:11 69:13
  75:15 105:7,12
  135:7 137:1,8
  139:20 142:15
  150:4 165:11
  166:13 171:20
  179:22 185:17
  186:1,2,6 187:12
  199:13 216:15
  234:7 237:15
  241:8,12 251:2,13
  268:2 273:4

275:12 292:17
  294:17 315:1
  316:2 332:2
  342:12 361:18
  362:5 371:18
  374:1 408:18
  411:6 414:12
  415:2
pointed  193:2
  227:6 278:2
  331:20 369:21
pointing  131:7
points  124:20
policy  19:2,7,10
  19:12 32:9 33:9
  33:11,13 35:13,18
  35:20 36:2 37:8
  37:20 38:1 41:3,8
  41:16 42:7,10,15
  42:21 43:8,19
  44:16,19 45:2,5,6
  45:16,20,21,22
  46:4,5,6,7,14 47:6
  48:2 49:21 50:2
  51:20 52:15 53:15
  53:21 54:6 57:2
  84:7 86:11 102:16
  124:10,12 128:7
  131:19 143:11
  150:5 173:7,13,16
  200:8 201:8
  257:16 267:6,17
  283:21 377:22
  378:8 404:8
political  13:17
  58:7 74:13 75:11
  75:12,21 104:10
  359:4
politicals  57:12
  76:5

politics  104:11
poorer  319:16
  320:16
popped  342:4
population  108:17
  155:8 272:18
  328:8 332:9
  349:10,13,18,22
  352:18 354:4
  355:3,17 357:7
  361:19 364:8,21
  368:7,13 430:3
  431:3,13
populations
  124:17 138:22
  139:10 140:11
  141:13 331:21
  349:12,13 359:13
  359:14 360:20
porter  1:15 4:4
  8:21
portfolio  281:22
portion  429:16
posed  70:19
position  33:7
  35:20 37:22 38:7
  44:7,13 74:9,13
  84:4 116:8 131:19
  142:18 173:13
  175:8,11 188:19
  188:22 281:14
  313:9,14,15
  317:11,15 336:1
  410:14
positions  19:2
possibility  133:4,9
  135:18 160:12
  164:5 171:5
  176:22 180:7
  190:17,21 380:13

possible  55:21
  65:22 72:19 85:14
  89:17 93:12 95:13
  95:16 101:12
  102:1 133:17,18
  135:13 145:4
  169:7 197:16
  201:6 203:22
  231:2,2 254:9
  282:19 306:7,17
  306:18 318:16
  324:8 376:17
  380:15 406:18
  422:10
possibly  60:20
  61:9 64:3 72:14
  73:19 136:21
  144:5 233:15
  260:5,10 397:12
post  67:7,10,19
  77:14 78:21 79:16
  81:8,20 146:14
  402:22
postal  20:7
postulating  362:4
potential  125:20
  265:18,21 360:16
  363:20 367:18
  395:22 406:21
  408:7
potentially  64:15
  84:12 146:15
  368:22 397:17
practice  13:2
  159:19 413:20
practiced  15:14
  193:11,19
practices  108:22
  109:4,13,21 110:7
pre  213:22 311:5
  320:2

precedent  379:7
precise  230:5,7
precisely  130:18
  142:21
predecision
  375:18
preliminary  153:9
  153:14 154:2,20
  156:18
premise  258:19
  303:10
premised  301:20
premises  258:18
prep  26:19 288:13
preparation  56:17
  62:13 345:13
prepare  20:10,18
  29:21 183:12
  232:21 243:18
  289:15 290:22
  369:8,9
prepared  11:5
  179:17 183:14
  232:5,19 288:10
  324:16 342:16
  368:16 423:14
preparing  18:20
  29:12 216:9
  219:12 288:18
prepped  289:1
prepping  26:10
  290:10
presence  315:11
  315:17 322:3
present  1:18 34:13
  76:12 97:22 126:5
  126:7 151:7 152:4
presentation
  322:20
presented  223:7
  264:5 316:20

330:9 332:4
  347:12 360:14
  391:7
president  116:7
  385:2 388:14
  392:14,20 393:5
  393:13 404:8
president's  29:1
  392:5,11 393:2
presidential  15:18
  16:4 17:16,17
  48:17
press  77:5,7 198:3
  257:17 386:11
  389:20 390:1,15
  390:20 402:9,13
presumably  65:16
  163:16 220:18
  222:5 365:18
presuming  295:4
presumption
  177:14
presupposes
  304:10
pretextual  301:1
pretty  31:4 128:17
  343:9
prevent  84:7
previous  149:4
  159:6 247:2,3,21
  377:7
previously  96:2
  103:8 111:20
  245:2 305:8
priebus  394:5,9,16
primarily  179:10
  224:9 257:16,17
  325:15
primary  41:11
  48:5 124:20 161:6
  171:1 181:11

| | | | |
|---|---|---|---|
| 208:19 242:18<br>263:14 338:21<br>421:20<br>**prime** 369:14,16<br>369:17<br>**principal** 242:15<br>242:16,17 345:5,8<br>345:10<br>**principally** 345:2<br>**print** 384:17,22<br>**prior** 23:17 41:8<br>64:12,14 84:11,14<br>84:22 86:15,17<br>108:5 130:20<br>168:11 242:2<br>253:18 298:8<br>333:5 346:20,21<br>347:8,18,20 384:5<br>385:16 397:18<br>407:13<br>**priorities** 160:6<br>**priority** 168:10<br>172:21 383:1<br>**privacy** 167:10<br>205:17<br>**private** 8:6 204:14<br>**privilege** 186:13<br>186:15,18 195:22<br>340:16<br>**privileged** 340:11<br>346:15<br>**privy** 421:13<br>**probably** 59:7<br>64:2,7 83:14 85:2<br>88:8 94:7 96:20<br>104:9 124:3 129:1<br>129:17 141:17<br>142:18 146:13<br>147:21 150:4<br>179:9 190:11<br>211:16 215:14 | 225:6 243:2<br>261:16 271:6<br>285:13 323:14<br>341:4 346:14<br>390:14 391:13,21<br>413:11 431:8<br>**problem** 196:7<br>207:12,18 333:3<br>355:5 413:22<br>414:5,10<br>**process** 23:22<br>28:11 30:20 31:13<br>84:1,19 88:22<br>97:1 106:10 150:3<br>152:5,11,20 153:1<br>154:16 176:5<br>181:5,22 211:3<br>239:4,5 296:3<br>345:20 348:13<br>350:20 372:13<br>374:5 379:5<br>**processes** 106:1<br>152:13 347:4,6<br>**processing** 34:19<br>**proclamation**<br>50:13<br>**produced** 78:11<br>80:16 81:2 137:5<br>247:10 248:20<br>309:14 311:9<br>320:11 321:8<br>**product** 62:17<br>429:6<br>**production** 302:3<br>**professional** 42:8<br>**program** 402:11<br>**programs** 103:14<br>203:21 204:2<br>**progress** 172:22<br>183:14,18,22<br>197:4 215:1 | 225:11 230:10<br>231:15 232:4<br>233:3 338:2<br>**promise** 239:19<br>**promote** 350:6<br>**prompt** 161:2<br>**pronounce** 87:20<br>**pronounced** 203:7<br>**pronounces**<br>379:11,14<br>**properly** 124:19<br>281:1<br>**proposal** 334:17<br>**proposed** 335:3<br>351:7<br>**proposing** 368:15<br>369:19<br>**proposition**<br>305:14 306:6<br>**prosecuted** 419:12<br>**protected** 62:21<br>414:13<br>**protection** 6:4<br>**provide** 30:4<br>77:11 95:11,14<br>103:16 132:14<br>139:15 162:22<br>167:16 174:9<br>177:20 274:13<br>331:14 349:6<br>354:5,6 356:14<br>370:10,21 403:22<br>424:22 425:11<br>426:17 427:10<br>429:9<br>**provided** 95:2<br>126:17 132:19<br>155:14 156:2,5,10<br>156:12 157:10<br>174:6 248:6<br>258:20 275:5,10 | 301:7,21 303:12<br>317:5 321:7<br>344:15 354:15<br>367:10 370:17<br>372:1,7 418:2<br>434:7<br>**provides** 103:13<br>312:21 313:16<br>350:3<br>**providing** 95:3<br>350:9 355:1<br>422:14 423:1<br>**public** 386:2,11<br>**published** 390:5<br>**pueblo** 381:7<br>**pull** 22:22 284:15<br>**pulled** 66:19 91:17<br>**pulling** 66:16<br>**purpose** 11:14<br>350:4 369:18,19<br>408:21 414:14<br>**purposes** 65:6,21<br>67:3 85:20 207:14<br>207:20 208:4,6<br>249:1 421:4<br>**pursuant** 1:14<br>348:17<br>**pursue** 151:2<br>152:6 154:10<br>264:15 265:15<br>279:12<br>**pursued** 415:15<br>**pursuing** 150:19<br>**put** 61:20 132:2,8<br>174:17 176:8,19<br>190:11 243:4<br>245:9 248:12<br>267:16,16 295:20<br>300:1 302:13<br>306:5,18 307:13<br>323:19 327:14 |

333:3 337:15
338:10 347:21
348:12 367:22
411:19,20 419:2
435:21
**puts**   306:8 308:6
**putting**   91:18
164:5,8 180:7
337:1,12 348:3
372:8
**puzzled**   202:8,13
202:17

**q**

**qfr**   32:1
**qfrs**   29:15,17,22
30:8,12 31:15
**quality**   78:6
310:21 312:1
315:3 319:16,18
320:16,18 350:16
**quantify**   354:21
361:4 362:2
**quarter**   361:18
362:6,10,22
363:16
**quarters**   78:4
**question**   10:4,11
10:21 20:16 21:12
21:15,16 24:3,6,9
24:15,18,21 30:3
31:17 43:3 45:14
47:14 51:4 53:8
53:12,18 54:9,12
54:17 55:6,13
59:13 61:6 63:5
63:16,18 64:1
65:12,14,17,20
67:5 68:6,13,17,22
69:10,11,13,14,17
70:10,15,19 71:4,5
71:17,19 73:17,20

76:13 77:22 79:6
79:17,18,22 81:15
82:4,8 83:8,20
84:15,17 85:18
86:19 90:13 96:1
96:15 97:8,17
103:2,5,7,12,18
104:1 105:8,19
106:3,9,18 107:3,6
107:11,13,19
108:1,19 109:9,16
110:1,20 111:21
112:7 126:6 127:2
127:11,15 128:11
128:22 129:11,11
129:16,20 130:22
131:3,4,12,15,20
132:2,8,10 133:5,6
133:9,20 134:6,12
135:5,12,17,18
136:12 140:4,12
140:18,19,21
141:7,14,21,21,22
142:8 143:3 144:1
144:11,15 146:7
146:11 149:17
150:3,11 151:2,3,5
151:15,20,22
152:2,6 153:4,13
153:17 154:10,13
155:2,17 156:9,17
157:5,15,19 161:2
161:21 162:7
163:3,7 164:10
166:10 168:4
170:12,22 171:6,7
171:17,21 172:1,3
173:15 175:21
176:11,13,17
178:10 180:8,8,15
181:19 187:3,7

188:5,11 190:4,7
190:10,12,14
192:16 193:5,6
194:4 195:4,8,10
195:16 196:2
203:1 204:7 208:2
208:7,16 209:13
209:21 214:2,5
216:5,10,20 218:1
218:14 219:13
220:13 221:9
222:14 223:4,8
225:12,16,20
230:11,14,18
231:18 232:2,6,9
232:19 233:3
237:18 239:13,16
240:3 241:14
242:6,11 244:22
247:13 248:11,19
251:1,4,10,13,22
252:16,21 253:2,3
253:4,7,10,11,14
254:3,5,6,10,17
255:3,8 257:12,12
258:2,12,16,18,20
259:2,3,4,6,9,13
259:15,16 260:7
260:14,17 261:1,9
261:15,22 262:3,6
262:8 263:1,1,6,7
263:12 264:6,15
265:3,4,16 266:5
267:16 268:1,8
270:3,6,16 271:20
272:1,5,9 273:21
274:11,17,22
275:9 277:21
278:9,15 279:2,9
279:13 280:2,14
280:19 284:7

285:22 286:12
287:16 288:8,17
289:5,6,22 290:20
291:2,9,19 292:15
294:7,11,14,15,19
295:9 296:4,18
297:12,22 298:6
298:19 299:5,8,10
299:17,18 300:1,4
300:5,6 301:9,11
302:2,5,6,12,15,18
303:9,11,13,14,20
305:9,21 306:5
308:15 309:9
310:14,20 311:15
311:20 312:1
313:7 314:14
315:21 317:10
319:2,9,11 321:21
322:22 323:4,16
324:16,22 325:4
326:17,17 327:20
330:1,14,20 331:8
332:5,8,20 333:4,7
333:13,14,16
334:8 337:2,10,15
337:21 338:10,15
338:22 339:14
341:1,3 344:18
346:19,20 347:10
347:22 348:4,19
350:17 354:15
355:2,3 359:1,16
360:1,15 361:17
361:21 362:7
363:8 364:1,2
365:10,22 366:4
367:8,14,22 368:8
372:11 373:10,11
373:11,12,13,13
373:18,19,21,22

[question - reading]                                                      Page 47

374:3 375:14
377:10 379:4,10
379:18,20 380:6
381:15,21 383:9
383:14 389:6,7
391:13 392:6,12
393:3,18 394:22
395:22 396:10
399:16 400:6,10
400:20,22 401:7
402:2,6 403:11,21
404:3,12 405:12
406:7 407:1,14
408:21 409:4
410:5 412:6,18,22
414:4,8 415:5,12
415:17 416:21
417:5 418:4,9,15
419:22 421:3,8,12
424:11,12,17
425:2 426:14,22
427:2,7 429:18
430:16 434:19,22
435:2
**questioned** 192:8
**questioning** 111:1
240:14
**questionnaire**
130:5 367:14
**questions** 3:5,7
10:9,19 18:19
22:6 23:3 26:12
26:15,21 28:3,5,9
28:10,14,20,22
29:5,9,19 30:16
64:13 66:9,20
68:9 70:4,8 84:19
89:1 127:12 129:8
130:16,18 131:8
132:15,16 134:2,8
134:9 141:22

146:4 149:11,12
149:14 154:3
220:15 226:10
241:6 242:2,6
244:8 250:16
258:21 288:7,18
289:11 292:11,13
303:18 319:5
326:9 329:17
335:17,22 336:4
349:21 353:9
356:3 362:15
369:6,17,19 370:2
370:4,9,18,19
371:8,16 372:4,5,8
372:15 373:7,9,17
374:14,17 375:10
376:13 377:1
378:10 379:5
381:11 382:1
413:18 416:14
417:13,14,17
419:9 423:20
435:16 439:11
**quick** 30:18
109:19 127:10
168:12 264:14
375:12
**quickly** 106:19
128:20 226:14,15
365:5
**quite** 47:13 52:21
53:1 72:14 73:19
106:19 163:16
224:8 345:6 360:4
371:14
**quote** 59:17 67:10
72:1 75:10 83:8
88:14 115:19
146:3 148:4 202:7
225:9 236:1

310:20 357:12,19
357:19 385:2
388:19
**quoted** 390:6

**r**

**r** 4:1 5:16 8:1
25:10 440:1,1
**race** 349:20
362:15
**races** 259:1
**racial** 138:21
139:9 140:10
141:13
**raise** 24:5,8,17,21
144:14 170:17
**raised** 69:1,4
81:14 96:2 104:3
104:14 111:20
112:7 144:8,15
245:2 390:10
**raising** 131:1
**ramp** 20:22 21:3,4
**ran** 12:5 125:7
407:11
**randomized**
334:12,13,17
335:3
**range** 70:8 105:19
288:18 353:3
365:2
**ranges** 49:10
**rarely** 257:3
**rate** 330:11,21
351:1,3 355:7
358:14 361:3
365:9 366:17
367:4,15,19,20
416:20 418:3
430:2,17 431:14
**rates** 105:20
132:14,17 134:7

137:7 327:5,6
366:13 417:18
**ratio** 430:5 432:16
**rationale** 254:1
266:9,14 267:5,8
267:12,22 268:4
268:17,22 271:18
286:11,18 294:21
296:7 300:10,13
300:16,17,19,21
301:7,8,12,13,21
302:13,15,19,20
302:22 303:21
304:1,4,11,12,15
304:20 305:4,8,15
306:8,9,19,20
308:6,7,9,10
350:22 351:19,20
351:22 352:3
383:11 392:6,11
415:8
**reach** 73:13,15
165:1
**reached** 168:3,6
400:4
**read** 15:5,7,7,9
78:10 79:21 80:21
101:4 130:15
145:13 146:17
238:17 294:5,8
312:17,21 314:11
314:16 315:22
321:13 356:21
376:1 402:9
428:22 429:15
436:3 438:3
**reading** 121:8
206:13 220:1
235:2 388:22
402:19

**reads** 80:20 207:6
  207:11 329:20
  339:9 358:12
**ready** 216:10
  281:4
**real** 300:21,22
  301:12,15 302:20
  302:22 303:20,22
  304:20 306:10
  308:7,9
**really** 30:3 41:17
  77:9 103:20
  184:19 211:3
  229:7 276:1 278:2
  322:15 364:13
  378:6
**reason** 64:17
  140:9 143:5 181:9
  192:9 257:19
  258:1,3,19 260:16
  263:8 264:11
  265:18,21 266:4,6
  268:8,12 272:10
  273:13,15 275:1,6
  286:10 291:7
  295:18 296:9
  300:21,22 301:5,9
  301:15 302:7
  303:6,11 305:3
  306:10 307:16,18
  315:14 316:3
  340:10 343:14,15
  361:20 414:16
  429:14 440:7
**reasonable** 67:17
  289:7
**reasonably** 80:3
**reasons** 70:9 86:6
  86:8 106:22
  167:10 205:17
  259:8 262:1,12

263:15 264:8
  291:1 301:1
  304:16 330:16
  359:10 360:21
  418:21 429:12
**recall** 22:17 24:4,7
  24:11,16,19 25:1
  32:14,20 35:10
  38:8 51:8 53:13
  55:11 58:18,22
  59:4,12,15 64:2
  65:12 71:15 73:21
  76:12 77:10,20
  78:2 85:7,9,12
  86:21,22 87:4
  88:10 92:6 94:20
  96:6 100:2,10
  101:20 102:3
  104:7,13 110:12
  114:19 122:16
  124:5,11 125:18
  131:13 133:12,16
  135:15 136:13,21
  137:14 142:16,21
  145:4 146:15
  155:4 156:3
  157:20 162:9
  170:19 172:10,13
  172:18 173:17,21
  174:1 178:7,18
  179:11 188:8,10
  189:19 191:5,11
  195:13,15 202:15
  207:4,6 209:16
  214:14 215:11
  217:11 225:14,17
  233:13 237:3
  242:8 244:15
  246:22 257:22
  260:1 269:7
  292:14 324:14

340:6 341:18
  367:9 369:5
  370:15 371:19
  372:3 375:4 376:7
  383:10 397:9
  408:5,9
**recalling** 33:19
  67:1
**receipt** 439:7
**receive** 26:21 93:3
  237:16,19 246:7
**received** 31:16
  216:15 222:12
  245:4,5 246:2,5
  247:18 290:4
  291:8 294:20
  295:10,15 335:20
  344:4 347:17
  387:1 390:20
**receiving** 71:18
**receptive** 285:13
**recipient** 115:9
  181:11
**recognize** 212:20
  222:3 384:21
**recollection** 11:14
  27:8 29:8 34:4
  61:3 67:4 68:5
  71:20 89:10 93:11
  196:4 203:17
  258:7 323:6,11
  324:7,10,11 328:5
  346:10 398:12
**recommend** 101:3
  132:13 142:19
  344:22
**recommendation**
  246:13 248:22
  352:6,7
**recommendations**
  86:15,17

**recommended**
  173:9 245:13
  247:16 248:5
  283:8 285:11
  344:11,14 350:15
  421:1,10
**recommending**
  113:18 132:21
**recommends**
  101:2 413:17
**record** 8:4,12 10:1
  11:10 20:16 25:9
  26:12,15,22 28:3,6
  28:14,21 29:6,9,19
  36:21 39:14 50:19
  50:21 60:13 98:4
  111:8,9,12 141:8
  158:8,9,11,14
  164:20 211:18
  212:2,3,6 239:9,10
  240:17,18,20,21
  250:9,10,13,15
  301:8 308:20,21
  309:2,6 311:8
  321:8,9 335:12,13
  335:14 343:3,8
  346:15 347:8
  354:3 380:16,19
  380:20 381:1
  383:20 391:19
  419:13,15,15,16
  419:17 435:7,9,11
  435:12,13 436:6
  437:11 439:10,17
**recorded** 8:14
**recording** 8:10
**records** 37:5 60:10
  350:19 353:7,13
  354:2,5 355:13
  367:22 368:2,9,14
  368:16,18 369:2

418:18,20 421:1
421:11 423:11
424:8,13,21 425:3
429:22 430:20
431:4
**red** 53:4
**redacted** 145:20
145:22 167:9
227:8,11,16
229:20 232:7
340:18
**redaction** 78:12
78:14
**redactions** 222:8
**redactors** 340:2
**redistricting** 14:22
193:19,20,22
194:10 393:22
395:4 396:4
399:20 401:11
404:13 406:8
409:10
**reduced** 437:9
**reduction** 154:5
**refer** 79:3 143:11
146:16 148:11
200:18 281:11
292:18 384:8
414:6
**reference** 137:6
141:17 142:21
187:9,10,18 209:4
229:12 230:12
231:10,17 239:21
302:12,14 357:8
358:2
**referenced** 301:22
409:14
**referencing**
219:15

**referred** 60:3
118:7 141:12
143:6,14 198:9
270:20 352:21
382:10,16,18
409:21 410:9,12
411:11,11,13
**referring** 72:6
96:8,18 102:22
107:15 132:6,8
137:10 149:3,4
150:22 155:3
161:14 187:14
200:21 213:8,21
216:19 217:16
222:21,22 229:8
239:5 241:16,18
241:19 244:16,19
354:11,12 357:10
357:15 358:3
360:7,9 373:22
388:20 400:5
**refers** 58:3 60:22
97:6 113:10
157:13 163:2,7,8
230:13 277:2
321:2 388:12
**reflect** 147:22
165:14 312:17
317:11 377:6
**reflected** 55:19
61:7 72:18,20
89:15 110:16
312:9 313:15
321:12 433:7
**reflective** 317:9
**reflects** 217:21
220:9,10 312:19
327:11,15 377:9
**reform** 3:2 291:22
293:2,7

**refresh** 288:3
**refreshing** 11:14
**refuse** 332:8
**refute** 351:6
**regard** 26:7 48:3
51:10 270:2
**regarding** 21:11
22:2 59:13 95:20
117:13 119:11
127:12 165:1
195:3,8 220:16
221:11 225:11,15
225:20 230:10
233:3 241:15
242:10 244:20
262:6 383:13
394:10,11,13
396:9 400:10
404:2 405:11
409:3 439:5
**regardless** 320:14
**region** 3:18
**register** 283:2
**registration** 13:5
**regular** 38:9 44:14
44:16 159:19
414:1
**reidy** 7:1 9:1
**reince** 394:5
**reinstate** 95:22
244:22 348:19
**reinstating** 96:14
97:7 103:1,5
107:13
**rejected** 352:1,4
**relate** 31:17
140:16
**related** 9:6 15:9
20:9,17 110:7
119:4 224:9
437:12

**relates** 318:9
**relating** 130:4,16
**relation** 14:4,5,6
**relative** 112:17
313:3 437:15
**relay** 383:4
**relayed** 184:19
185:3 233:19
237:11 383:4
**relevant** 39:4 50:6
82:11 108:20
109:6 211:3 253:9
253:14 254:2
260:9 299:9,17
300:8 304:17
340:19 346:22
427:12 428:11
**reliable** 351:5
**relied** 108:2 351:2
**rely** 108:7,13
350:18
**relying** 283:7
**remaining** 355:5
355:10 431:9
**remember** 27:1
28:17 32:16,21
33:2 37:4 60:5
61:1 71:18 79:5
82:2,6 92:4 114:4
147:6 179:15
188:12,14 202:12
210:13 221:12,14
237:22 255:12
287:20 292:13
322:17
**remind** 117:19
356:22 386:9
**reminded** 57:18
**reminder** 28:18
**remote** 20:1

repeat  259:5
398:21 403:10
repeatedly  223:14
repetitive  422:19
rephrase  10:13
278:18 422:19
replied  165:22
reply  71:12 130:1
report  9:10 36:4
42:3 43:5 102:11
178:14 197:3,8
252:8 272:15
378:2
reported  36:13
37:10,15 266:1
411:20 417:11
reporter  9:3,12
13:12 26:13 186:9
191:14 201:14
211:14 243:12
293:17 353:15,20
437:2
reporting  1:17
202:6 439:14
reports  120:8
310:18 402:17,19
represent  10:2
66:18 79:11 80:15
205:14 241:3
290:13 311:7
317:15 320:7,11
336:11 364:6
375:20 420:7
432:15
representation
312:8 374:5
representations
432:10
representative
292:12 298:18
299:7 300:3

316:19
representatives
297:10,16 299:18
434:21
represented
205:15
represents  314:20
342:10
republican  307:4
request  146:6,11
151:4,19 153:3,7
153:22 156:16
159:13 162:15
164:3 165:15
166:8,9 173:1
176:3 177:2,7,18
177:18 181:8
184:5 185:8 186:2
190:9 192:5 197:6
223:3,5 239:10,15
251:3 262:17
264:5 265:16
271:22 279:1
290:16 291:8,10
294:20 295:10,15
295:19 296:3,6,10
296:13,22 297:3,4
297:8,11,19 298:7
299:4,11 300:7
305:11 309:8,11
348:17 349:4
381:14 382:15
389:14 410:2,22
412:5,13 413:2,6
414:22 415:2,19
421:2 426:13
427:6 429:10
requested  64:14
153:17 239:3
261:13 299:19
342:13 348:18

requester  180:14
180:20
requesting  175:20
204:19 237:17
349:2 412:21
419:22
requests  28:13
64:21 154:4
250:22 337:14
421:11
require  20:22 21:3
21:4 368:20
required  13:22
300:15 419:7
research  4:2
108:21 109:13
155:5,6,11,12
172:7 181:6 193:2
282:21 283:3
285:6 413:15
416:8
researched  109:4
192:21 326:16,18
researching
285:16,18
reside  207:12,19
residents  80:22
81:18
resolve  436:2
resolved  139:20
141:2,5 142:10
341:3
resources  412:2
419:2
respect  86:3
248:13 291:18
309:11 324:20
326:15 382:14
418:4 430:10,19
respectful  281:1

respective  1:19
respond  129:11
332:22 353:9
360:14 367:13
390:7 418:9,10
427:11 430:19
responded  151:21
217:18 218:17
332:22 367:8
372:1
respondents  207:8
369:3
responding  76:14
331:22
response  30:6,18
65:14 67:18 83:8
105:20 132:14,17
134:7 137:7 146:6
151:4,18 159:13
166:7 177:7
180:12 184:1,4
215:6 216:4
276:15 327:5,6
330:11,12,21
351:1,3 358:14
362:7 363:1,16
365:9 366:13,17
367:3 372:7 373:6
373:9 377:10
387:7 389:20,22
391:8,8 409:15
416:20 429:10
430:1,17
responses  29:12
29:21 30:8,12
32:1 353:6 355:12
371:16,20 425:21
429:21 430:6
431:5 435:18
responsibilities
16:8 17:11

**responsibility**
242:20 289:13
**responsible** 26:10
44:20 192:12
439:5
**responsive** 65:17
68:14,17 79:22
168:13 300:4
331:9
**responsiveness**
330:2 366:2
**rest** 19:19 130:15
312:21
**restate** 187:2
228:10
**result** 319:15
320:16 338:6
350:5 362:16
393:17 394:21
395:21 399:15
401:6 404:12
406:6
**resulting** 361:17
366:1
**results** 252:8
**resumes** 43:4
**reveal** 291:1,7
305:9
**revealing** 307:17
**review** 11:8,13
41:1,13 97:18
105:9 151:6
153:10,14 154:2
227:7 281:8 290:8
296:4 325:2,16
360:19 375:12
378:9 426:12
427:6,10
**reviewed** 94:7
244:2 247:8 249:4
344:12 345:7

371:7,14,18,19
372:12
**reviewing** 370:3
**revision** 52:9
177:15
**riggins** 17:10
**right** 18:22 19:17
19:18 20:14 26:4
26:10 27:6,7,12,18
27:22 28:17 34:22
37:4,9 46:15 55:2
56:21 57:2,5,6
58:16 62:9 63:9
63:17 66:15 67:7
67:20 68:11 72:11
73:9,14,18 74:16
83:2,5,9 86:12,20
88:1 89:19 90:20
91:1,22 93:2,5,6
94:17,18 97:9,10
97:20,21 98:3
106:21 107:14,17
119:5 121:15,16
122:5 124:21
125:3 130:10
131:2,16 132:4
133:18 134:8
136:18 138:9
140:5 141:3 143:2
143:15 144:11,16
147:3 148:6,9,17
150:5 152:22
153:4,5 157:5
159:14 163:3
165:12,18 166:14
168:4,7 174:21
176:13 177:8
178:15,17 180:21
183:6 185:8 186:3
187:20 193:8
197:7 199:12

203:6 205:4
209:22 214:11
215:8 216:6,17,21
218:21 220:13
221:4 223:11,15
229:19 230:19
232:22 234:5
238:7,8 240:2
241:8,20 243:8,19
244:16 245:22
246:4 250:21
251:20 253:16
254:22 255:12,18
256:11 259:18,20
260:4 264:21
265:2,5 268:13
269:19,21 270:3,9
270:10,21 271:1,5
272:1 274:4,14
275:13 277:4,5,7
278:10 281:1
282:8,11,12,15,17
283:11,13 286:1
286:14 287:5,8
288:1 289:2,6
290:2 291:19
292:7 293:14
294:1,5,9,12 295:7
295:16,21 296:13
296:18 300:14
305:17 307:8,19
309:11,13 310:15
311:3,21 312:18
314:6,11 315:7
316:8,15,16
318:10,22 319:21
320:10,21 321:11
322:9 323:4
325:21 326:19
327:1,4,6,7,14,17
327:19 328:16,17

329:1,7,8,13 330:3
333:10,17,22
334:4 339:15,17
341:12 342:6
345:8 356:3 375:9
376:3 382:22
410:16 411:9
412:2 415:11
416:16 419:9
421:22 422:20
424:5
**rights** 5:11 14:19
126:16 127:3
153:18 155:9
192:13,17,18,21
192:22 193:8,10
193:11,14,17
194:8 262:9,16,18
263:14 264:9
265:1,5,11,12
268:3,9 271:1,14
277:11 295:1
349:9 381:22
382:6 383:6,6
400:4 403:7,16
409:19 410:1
427:18
**rivers** 20:3
**road** 4:3
**rockas** 198:1,2
256:10 386:4,8,13
386:14 387:1
391:6,18
**role** 17:13,20 19:2
25:19 26:1 48:3
51:10,17,20 52:14
53:15 74:20
139:13 152:11
393:2,6
**roles** 37:13 204:13

[rolled - secret]                                                                              Page 52

rolled   23:6
rolling   371:20
room   6:16 90:8,10
   90:11 197:15
rosenberg   2:4
   5:10 336:5,7,16,19
   340:15,21 341:14
   345:22 354:8
   367:5 372:17,20
   373:1 374:22
   376:15 378:20
   380:12,16
ross   17:8,9 18:14
   20:11,18 21:11
   35:8 40:17 63:7
   65:1 85:5 115:19
   121:20 144:2
   200:19 213:17
   241:10 244:13
   250:22 251:20
   279:11 284:13,13
   285:21 286:3
   287:18 289:10
   310:1 318:3 319:7
   324:5 338:9 339:3
   343:1,6 344:9
   381:5 390:10,22
   401:18,19 412:3
   413:4 415:14
   418:15,19 420:1,9
   423:14
ross's   63:12 94:12
   286:11 326:5
   337:5 420:14
rough   328:4
roughly   135:16
   271:11 328:3
   357:11
rpr   1:17 437:3,20
   439:14

rule   46:6 70:2,3
run   30:5 98:18
   150:9 224:10
   411:7

s

s   4:1 8:1 25:10
   57:18 141:8
   160:18 440:1
sacramento   5:19
safe   364:16
sahra   377:20,21
   379:4,11,14,15
   380:5
sample   334:4
   352:18 357:7
   416:16
sampling   329:14
   356:11 368:11
san   4:21 336:11
santa   11:20
saturday   189:16
saw   62:19 63:1
   83:13 88:8 94:5
   94:15,19 97:19
   98:9 113:9 125:6
   138:5 145:17,19
   147:19 165:5
   201:13,18 221:1
   222:5 225:4 227:4
   238:4 310:9
   319:21 320:1,3
   330:3 342:16
   344:19 364:1
   390:22
saying   45:11
   149:16 166:3
   183:21 203:5
   214:4 215:4
   217:18 218:17
   227:15 230:9
   252:13 267:21

279:20,21 293:11
312:11 314:15
317:10,13,16
321:11 340:3
342:12 356:5
358:1,21 361:7
431:22
says   40:8,9 57:17
   58:10 59:17 66:17
   67:10 71:21 78:15
   78:17 80:21 81:6
   88:14 95:17 96:9
   96:13,19 103:1
   104:16 107:12,16
   108:12 111:19
   115:19 121:17,18
   127:10 130:2,8
   132:13 138:15
   139:17 146:2
   148:8 150:8 152:7
   153:2 154:22
   157:16 159:12
   160:16 161:9
   162:11 177:13
   181:13 183:1
   184:6,10 185:17
   187:11 191:12
   200:13 204:8
   206:8 213:14
   214:16 216:8
   221:2 222:12
   225:13 229:8
   231:14 235:22
   236:17,21 244:19
   251:20 257:11
   258:1 273:19
   274:1 275:13
   279:6,8,10 293:21
   294:14 295:9
   299:7 310:16
   311:17 319:15

321:2,6 330:5,8
340:17 352:12
386:10 388:20
429:5,18
scalise   53:5
scenario   155:7
schedule   20:22
   39:3 86:7 88:15
   89:4,13 92:2,16
   93:1 202:4
scheduled   38:13
   39:1 91:14
scheduling   85:21
school   4:14 11:18
   11:19 12:17
schumer   23:8
science   12:1 13:17
   14:2,6 18:11
   104:10 434:3
scientific   433:15
scientifically
   357:9
scientist   309:22
scientists   357:13
scrap   259:18
se   289:16
search   71:10
   109:20
seated   256:18
second   25:2 57:16
   80:8 95:17 107:10
   116:18 121:7
   130:7 151:14
   178:21 182:22
   191:18 200:11
   205:7,10 240:7
   284:6 326:12
   335:10 358:8
   384:9
secret   125:2

**secretary**   17:8,9,9
17:20 18:1,14,20
19:16 20:11,12,18
21:11,20 22:1,4,5
22:6,13,14,17 24:8
24:13,20 26:8,9
27:14 30:1 31:16
31:21 32:12 33:3
35:8,21 36:5,6,8
36:14,17 37:1,2,11
38:2,10,19 39:11
40:4,11,17 41:11
41:17 44:17,21
45:8 46:7 47:20
48:13 49:18 50:10
51:13 52:12 54:2
54:5,12,22 55:1,5
57:5,14 58:7,12
63:7,12,13 65:1,2
65:14 67:2,9,15
68:3,10,21 69:1,4
69:16 71:1 72:1,9
73:5,8,17 75:8
76:10,13 79:16
81:9,13 82:3,7
83:8 85:5,5,18
92:13 93:9 94:12
95:18 96:8,13,18
98:17 100:16,19
100:20 101:1,18
104:3,14,16 112:3
112:8 113:2,15
115:21 116:11,20
117:2,9,12,16
118:8 119:3,7,13
119:15 120:3,5
121:20 122:18
123:2 124:15
125:17,22 126:6
128:8 129:7,12
134:11,14 135:3

135:11 136:1,11
137:5,11 138:14
139:17 140:15
141:11 142:5,9
143:5 144:2 146:1
146:10 147:4
148:1,14 149:16
150:8,22 151:17
152:21 154:9,13
159:11 160:4,16
161:20 162:1,10
162:16,20 164:2,4
166:6 168:10
171:4,16,20,22
172:19 173:18
174:18 176:11
177:5,13 179:18
181:7 183:9,13
184:7 190:2,5,13
191:1 196:18
197:1 198:3 199:7
200:19 201:4,8
202:7,13,17,21
204:19 205:7,9,16
205:18 206:2,2,17
207:17,22 209:1
209:10 210:3,10
210:15 213:3,4,14
213:20 214:21
215:12 216:8
217:14,18 218:13
219:5,13 221:15
222:4,12 223:11
224:3 225:10,15
226:3,13 230:9
231:15 232:4,13
232:18 233:4,9,17
234:15 236:13
237:1,5 238:21
239:1,14 241:9,9
241:10,12 242:9

243:2,22 244:13
245:13 246:13
247:7,11,16 248:7
248:15 249:1,5,9
249:14 250:22
251:20 252:15
253:6,7 254:7,20
255:1,7 257:11
258:1,11,20 260:6
261:1,18 264:6
266:1,2,6 267:8
268:2,7 272:8
279:11 284:13
285:21 286:3,11
287:16,18 289:10
289:19 290:12,14
290:21 291:1,6
298:10,14 299:9
299:17,19 300:5
302:18 303:21
304:18 305:8
309:19 310:1
318:3 319:7 324:5
325:5,6,8 326:5
333:18,20 337:5
338:9 339:3 343:1
343:6,20 344:9
346:18 347:21
351:11,12 357:14
358:5 360:4,6
364:1 369:11
386:11 390:10,14
390:22 391:7,11
397:4 401:18,19
409:16 410:21
412:3,14 413:4,10
415:14 418:15,19
420:1,14 423:6,14
425:8 428:3
432:15 433:21

**secretary's**   27:1
63:18 71:5,10
72:21 76:16 90:7
90:11 92:1 102:22
107:12 111:15
115:6,10 138:16
146:17 159:17
161:1 177:18
199:9,10,11
214:15 216:5
217:22 233:16
239:18 255:15
260:16 265:15
266:15 267:22
286:18 301:4,12
310:6 351:21
352:3 355:21
387:15 389:11,13
391:10 412:16
432:2

**section**   50:14
349:5 394:2 395:6
396:6 399:22
400:1,5 401:13
404:13 406:8
408:14 409:19
410:1 411:15

**sector**   204:14

**security**   179:6,14
180:1,10,13,19
181:14,15 183:3
275:16,22 276:10
277:2,10 279:22
286:14,21 378:1
382:17,19

**see**   10:13 38:16
56:14 57:7,17,22
58:1,13 63:4 72:4
78:21 80:13 81:3
81:4 88:18 89:2
96:4,16 111:21

115:2,18 116:2
121:11 122:2,3
127:8 130:7 131:8
131:12 132:16
139:22 140:1
146:1,8,9 148:13
149:15,20 157:1
160:21 161:11,12
162:10,14 163:13
180:22 182:22
184:21,22 191:8
200:16 202:5,10
203:4 204:5
205:22 206:8
207:9,10,15,16
208:20 213:6,13
213:18,19 215:15
216:13 218:16
222:17 227:18
231:9 234:11
235:6 236:4,5,8,9
238:9 258:14
259:7 261:16
267:2 270:5
293:21 310:7
318:1 320:1,6
321:5,6 325:14
339:8 342:19
352:22,22 358:16
358:17 364:21
379:9,17,19,21
384:11 385:8,9
386:20
**seeing** 66:7 88:10
99:17 114:19
137:14 175:19
231:19 232:7
244:5
**seek** 412:17
**seeking** 421:5,6

**seen** 38:6 43:4
44:7 56:12 62:9
83:11 88:6 94:3
114:15,17,21
121:2,4 138:2
145:15 147:16,17
159:4,7 165:3
189:14 200:5
212:22 216:1
220:5 223:14
224:22 227:1
235:4 238:3 310:2
310:3 318:7,8
320:7 373:3 375:2
375:4,5 376:16,20
378:22 385:12,13
385:14 387:9,11
**self** 353:6
**senate** 12:1,18
16:11,13,20 17:6
18:6
**senator** 11:22 18:9
20:6 23:16,17
25:17
**senators** 23:15,21
**send** 28:8,9 30:6
30:16 44:9 49:5
50:7 60:17 68:16
83:15 92:9 110:19
189:17 191:9
272:4 349:2 370:5
413:2
**sending** 79:16
**sends** 160:15
**senior** 38:20 44:13
47:15 52:12 53:3
74:5,7,17 75:10,12
75:21 76:7 96:1
98:17 111:19
112:1,6 113:11,20
113:20 124:22

173:12 245:1
**sense** 19:4,5 59:18
108:2 110:4 385:6
385:6 389:6
**sensitive** 8:6 131:4
**sent** 60:15 61:21
62:10 65:13 71:13
73:7,12 81:8 83:4
83:12 114:4,20
121:20 148:1,14
165:21 189:15
203:5,8 208:9
212:21 215:6
220:7 225:6
232:12,16 233:2,4
237:21 247:4
248:21 311:6
322:21 339:3
370:6 385:21
387:6
**sentence** 95:17
183:1 310:12
313:13 319:15
329:20 339:9,10
348:16 352:12,21
356:21 357:1
358:12 385:1
**sentences** 430:10
433:16
**senteno** 2:4 5:1
381:2,4 382:2
384:1,20 390:8,16
392:13,22 403:12
403:13 404:17
407:21 409:5
410:4,19 412:8,19
413:14 415:7,13
416:2 419:13
428:12
**sentiment** 389:9
389:10

**sentiments** 389:3
**separate** 22:8,9
106:8,11,15,20
107:9 266:5
**separately** 22:14
22:15 26:20
**september** 182:21
183:10,19 187:15
189:16,18,18
215:12 222:11
225:6,19 227:15
234:11 235:8,15
237:14 339:3
437:22
**sequence** 166:17
**series** 223:6
288:22 322:10
**servers** 352:18
**serves** 179:2
371:22
**service** 20:7 307:3
**sessions** 167:22
279:11 283:10
400:9
**set** 85:12 161:10
166:10 199:3
349:11 354:3
372:8
**setting** 17:21 25:6
25:21 189:20
220:11 231:14
**settled** 146:4
148:19 149:11,14
**seven** 12:6 234:14
**sex** 141:9
**sexual** 64:18 84:18
86:18 130:16,22
131:14
**shah** 5:5
**she'd** 174:3

she'll 10:18
sheet 438:7 439:8
shelf 132:19
sherpa 16:10,12
  16:14 17:5,13,20
  21:20 25:6,21
  26:2,5,7 31:13 77:1
  124:7
shocking 73:15
  224:2
short 55:17 211:15
  240:12 250:3
  327:4,5,13,15
  336:20 363:19
  418:10
shortly 25:22 27:9
  27:22 29:1 54:19
  55:7 69:2 81:15
  142:16 177:4,4
  214:4 234:15
  281:18 337:9
  341:17 387:1
show 92:15 317:18
  326:4 333:1 353:7
  376:11,18
showed 97:21
  101:4,14 332:19
  353:5
showing 81:17
  293:5 372:18
  373:2
shown 56:16 62:13
  62:21 98:10,15,20
  99:2 101:7,10
  145:20 244:10
  359:22 366:17,19
  377:7 384:5
shows 223:18
  391:19
sic 27:19 84:17
  157:11 219:14

269:5 278:11
  297:1 316:6
side 74:12 150:5
  203:18 363:14
sign 101:3 113:18
  245:13 246:14
  247:8,17 248:8,15
  249:5,9,15 344:11
  436:3
signature 94:12
  326:7 437:18
  439:4,6,9,13
  440:19
signed 100:16,19
  100:22 247:11
  438:7 439:8
significant 68:8
  261:14 350:10
  360:2,11
significantly
  357:16
signing 369:6
similar 179:3
  226:9 375:6 379:7
  433:22
simple 303:20
simply 55:12
  92:14 131:7
  152:16 185:10
  276:8 278:3 285:8
  323:16 342:12
  382:19
single 314:13
  317:14
sir 253:4 259:5,15
  275:1 303:13
  305:7 315:11
  323:17 419:20
sit 287:11
sitting 77:15 98:3
  197:21 256:15

257:10 417:9
situation 347:12
  355:10
six 12:4 41:4,5
  42:9 43:19 188:3
  331:2 380:1,4
size 20:20 272:17
slightly 297:22
slow 353:20
small 76:4 224:11
  354:18,20 356:17
  371:12 384:17,22
  414:10 430:6
smaller 355:18
  356:14
smart 433:21
snapper 53:4
snow 361:14
sogi 140:18,20,22
  141:7,8,13
solely 370:17
solutions 3:18 9:2
  9:4
solved 196:7
somebody 42:17
  44:9 46:17 51:15
  60:15,17 61:20
  73:2 76:1 80:1
  90:16 110:14
  118:1 132:10
  149:10 179:6
  185:16 270:13
  279:10 283:5,9
  285:5 289:18
  324:19 362:8
  370:21 387:5
  411:7
somewhat 44:3
  285:12
soon 59:20 61:1
  95:18 96:9 104:17

sooner 200:13
sorry 20:15 40:2
  45:13 100:7
  110:22 115:14
  121:8 134:18
  156:9 158:18
  186:11,19 190:18
  197:19 207:2
  228:9 238:11
  241:17 242:5
  255:22 266:1
  271:20 299:18
  316:11 318:18
  358:11 379:13
  393:1 398:20
  400:9 403:10
  405:21 408:12
  410:6 415:9 420:3
sort 31:9 36:15
  47:20 84:21
  218:19
sound 11:2 27:6
  27:17 238:7 292:7
sounds 11:3 27:7
  27:22 174:21
  236:2 238:8 241:7
  356:18
source 360:16
  431:19 433:14
sources 311:1
  312:4 315:6
southern 1:2 8:19
space 18:11 257:1
speak 117:2,9
  125:5 136:6 145:2
  168:20,22 169:4
  171:10 172:19
  177:21 179:21
  190:18 191:1
  208:14 277:4
  381:16 400:12,14

400:19 407:22
**speaking**  134:18
  139:16 142:22
  182:10,17,18
  183:5 184:14
  207:2
**specific**  18:13
  46:14 61:3 102:3
  153:11 361:19
  394:12 402:20
  403:1
**specifically**  59:4
  66:17 221:13,16
  288:16 322:20
  382:3 405:2,4,6,9
**specificity**  330:19
**specifics**  225:17
**specifies**  136:16
**specify**  122:8
  187:21
**speculate**  68:6
  120:2 168:15
  251:16 268:16
  287:1 416:1
**speculated**  331:16
**speculating**  82:9
  251:14
**speculation**  69:19
  83:18 98:12
  116:14 117:6
  118:18 122:7
  130:13 132:5
  133:2,22 140:7
  141:16 142:12
  143:8,17 144:21
  146:19 148:22
  159:21 161:5,16
  163:5 201:1
  202:20 226:6
  268:15 286:7,16
  347:19 360:17

380:8 390:12
  392:9,18 422:6
  428:9
**speed**  40:19 59:10
  204:15
**spell**  25:9 305:16
**spelled**  303:6
**spelling**  259:7
  304:9
**spells**  304:14
  355:1
**spence**  5:11
**spend**  150:15
  204:16 218:19
  285:16,18
**spent**  20:7 112:16
  112:20 142:1
  143:1
**spoke**  135:4 136:1
  136:4 169:2,13
  170:5 174:22
  175:16 178:2,16
  179:20 180:4
  195:10 206:18
  207:5 210:11
  215:15 227:16
  233:10,17 271:6
  383:3,8 397:4
  408:3,6 410:17
**spoken**  118:3,4
  121:21 122:14
  123:5,7 125:9
  135:11 136:11
  156:1 166:20
  175:5 183:16
  197:18 216:22
  217:3 233:5,21
  234:1 387:14
  399:7 400:21
  401:1,20 406:9
  407:2,12,19

409:18
**sponsor**  270:6
  271:19,22
**sponsored**  171:7
**spots**  147:15
**spring**  55:11 75:5
  96:12 103:4 105:7
  108:22 109:18
  110:8 119:1,5,8,12
  126:21 134:12
  135:19 140:16
  141:6 146:12
  184:8 196:17
  209:18 250:22
  251:21 262:15,19
  263:5,10 264:3,12
  264:17 265:7
  285:22
**square**  278:8
**squares**  295:6
**staff**  17:1 23:13,14
  23:17,18,21 25:16
  33:8,10 34:17
  35:13,15 36:7,9,13
  37:11 38:20 39:12
  39:13,15,17,20,22
  41:10 42:9 45:11
  46:5 47:14,15
  48:13 49:18 50:10
  52:12,16,19 53:2,3
  53:5,8,12 73:13
  96:14,19,21,22
  97:1,3,7 102:9,18
  103:1 107:12,16
  125:20 156:21
  157:8 160:7 198:8
  198:12 201:7
  268:5 279:16
  283:18,19 284:10
  284:20 289:17
  301:7 321:17

345:5 377:18
  378:7 395:9,14
  412:1 433:1,3
**staff's**  199:17
**staffed**  41:9
**stakeholders**
  53:22 54:1,8,14,15
  358:13
**stamp**  73:10 82:15
  164:20 318:3
  376:5 385:20
**stamped**  56:5 78:5
  87:11 93:18
  114:10 120:19
  123:14 137:20
  145:10 158:22
  167:5 182:12
  189:10 194:14
  200:12 234:19
**stand**  57:13 192:9
**standards**  44:11
**standing**  30:19
  38:9,11 47:17
  256:19,19,20,21
  300:18
**standpoint**  350:15
**stands**  141:8
  235:12 381:7
**start**  12:8 19:22
  34:6 61:15 171:9
  181:13 230:22
  239:4 275:19
  429:2,7
**started**  11:21
  43:11 73:5 75:14
  195:14 287:14
  411:12
**starting**  269:5
  339:9 429:14
  430:11

starts 296:3
state 5:15 6:1 9:19
  70:7 118:1 206:2
  420:6,8,8 434:21
stated 308:6,9
  312:20 342:6
  346:17 389:15
  410:21
statement 80:1
  130:15 260:13
  295:13,14 305:12
  306:15 312:6
  313:1,18 314:9,11
  314:13,16,20
  315:13,20,22
  316:15,21,22
  317:2,8,14,17
  348:9 377:10
  417:6 432:1,2,9,14
  434:6
statements 313:5
states 1:1,6 8:17
  8:18 13:9 70:9
  207:13,19 364:22
  385:2 438:18
  440:3
stating 80:3
statistical 105:17
  105:18 106:1
  108:21 109:4
  329:16 351:8
  417:15 434:9,14
statistics 13:19,21
  14:3 42:18 47:1
  219:6
status 78:20 82:1
  223:3 310:22
  312:3 315:5
  319:12 425:22
statute 15:9
  412:14

stay 402:21
steel 50:13 53:1
  201:19 288:20
steer 283:10
stenographic 9:10
stenotype 437:8
stephen 404:2,5,6
steve 116:6 405:11
  405:19
steven 115:21
  116:4 119:16
  121:22 122:18
  123:1,5,7
stevens 11:22 18:9
  20:6 25:17
stick 162:11
sticking 141:7
stipulate 205:19
  313:6,10
stood 314:5,8,15
stool 256:20,20,21
stop 150:20 211:9
stopped 199:13
  417:19
straight 260:2
  331:15
straightforward
  290:7
strategic 36:2 37:8
  52:8 200:9 283:21
  377:22
street 3:18 4:8,12
  4:20 5:2,7,18 6:4
  67:7 80:1 81:21
  146:14 402:22
  409:13
strike 44:14 71:15
  76:20 96:6 105:15
  115:14 116:18
  137:15 160:14
  167:18 183:8

198:20 232:11
  331:5
struck 103:22
studied 15:12,13
study 13:16
  334:13
stuff 47:3 203:16
su 377:20,21 380:5
subcommittee
  148:2,15
subject 16:22 18:1
  22:3 57:11 63:4
  63:15 71:4 148:8
  164:22 177:15
  186:13 195:21
  220:17 230:13
  288:11 291:4
  338:13 345:20
  360:10 407:3
subjects 202:8
  231:21
submit 28:20
  249:2
submitted 28:15
subsequent 237:15
  413:15
substance 120:10
  233:7,18 237:10
  275:14 298:4
  385:15 426:11
  427:5
substantially
  310:22 312:2
  313:4 315:4
sudden 342:4
suddenly 292:16
  294:16
sufficient 105:12
  264:11 265:14,18
  265:21 304:11
  331:3

sugar 52:9 201:12
  201:17
suggest 231:14
suggested 123:2
  136:20 248:2
  275:15,21 276:8
  283:12 298:20
  346:6
suggesting 247:7
  344:16 363:15
suggestion 278:3
suggestions
  289:17
suggests 139:7
  418:1,2
suit 287:4
suite 3:18 4:16,20
  5:3,7,12
sum 319:15
summarized 339:2
summary 312:5
  313:18
summer 141:6
  199:2 209:17,18
supersecret
  286:12
supplement
  244:10 342:22
  343:2
supplemental
  101:2 247:17
  248:2,15 249:2
  341:6,8 343:18
  345:16 346:5
supplemented
  350:19
supplements
  343:5,7
support 86:12
  153:12 155:19,21
  193:5 267:9

350:22 432:8,12
432:14
**supported** 370:1
**supporting** 240:1
**supports** 417:6,8
432:1
**supposed** 266:17
284:3 302:7,21
304:2,3
**supposition** 67:17
**sure** 10:16,20,22
35:11 38:5 42:5
43:12 48:5 49:22
50:7,12 52:1 59:9
78:17 79:7 86:13
90:14 91:22 98:21
104:11 105:3
110:5 128:1 136:8
149:1 154:15
187:5 194:3 198:7
211:19,21 213:9
217:15 219:16
240:9,16 243:10
248:10,18 249:6
251:17 255:17
260:4 279:19
289:1 293:13
296:9 300:2
305:22 308:2
311:5,16 312:10
329:14 334:16
338:16 356:1
357:2 360:3
368:19 373:14
387:16 389:19
390:19 401:19
417:5 420:5
424:18
**surmise** 160:9
**surname** 167:9

**surprise** 344:20
389:17 432:13
**surprised** 342:19
344:19 386:19
387:10,11,13
432:18
**survey** 14:9 78:18
81:22 356:16
**surveys** 105:16
327:1 357:7
**swear** 9:12
**sweet** 336:20
**switch** 43:13
**switched** 231:21
232:9
**switching** 434:17
**sworn** 9:16 437:7
**swr** 200:14,18

**t**

**t** 25:10 440:1,1
**take** 8:11 12:13
14:16 17:7 22:10
22:13 26:20 28:15
30:1 34:3 44:13
54:2,4 56:10
57:11 58:2 60:2
62:8 63:13 66:22
80:5,8 84:11
89:13 92:19 111:5
127:6 130:1,6
139:11 151:9
168:12 172:14
211:15 229:13
239:8 244:9 250:3
261:15 275:17
283:11 287:21
292:10 298:8
302:16 315:8,13
315:14,15,17,22
316:3,4 321:22
322:5 339:6 341:5

365:14 406:16
431:9,11
**taken** 8:14 106:13
304:13 313:13
437:5,8,14
**talk** 52:6 101:17
115:21 116:12,20
117:1 122:18
123:3 135:6
160:17 168:3
170:9 173:6,15,19
173:22 175:4
185:21 190:2
231:4 249:13
275:21 276:9
283:6 284:9
338:17 359:17
382:5 383:5
410:16 411:15
419:20
**talked** 35:11 97:14
100:4 126:14
131:11 155:13,15
157:18 175:7
207:7 219:11
277:14 283:12
338:13,18 381:8
383:2
**talking** 20:12 46:4
46:5 96:11 97:10
111:14 122:5
132:1 133:19
140:15 179:8
190:5 192:5,15
196:13 217:5,6,9
229:11 230:18
242:4 257:20
262:15 298:3
325:11 327:8
359:18,19 363:11
363:13 420:15

424:3
**talks** 160:19
**tariffs** 50:14 53:1
288:20
**task** 42:7 182:1
378:12,14
**tasked** 25:6
257:16,17
**tax** 77:8
**team** 15:18 16:5
17:12 25:3,4,20
26:2 30:8 31:2,10
32:13,19 57:9
76:20,21 161:7
**teams** 19:7 25:6
**technical** 324:20
352:2,5 426:12
427:5,10
**technology** 44:12
**ted** 11:22 227:21
**telecommunicati...**
18:4
**telephone** 71:18
90:5 125:12 206:9
**telephonically**
4:15 5:16
**tell** 11:5,17 13:15
16:14 17:19 18:18
21:22 33:6 42:8
55:5,10 60:6
65:10 66:17 71:5
74:7 75:20 78:15
94:10 100:18
117:20 118:8
122:11 126:11,21
127:5 135:4,9,14
136:10,17 137:2,3
139:6 140:3
144:22 152:21
153:21 154:12
156:14 159:22

169:5 172:19
174:11 175:8
176:1,15 178:22
185:14 195:18
196:5 203:10
205:20 206:17
207:17 210:10
211:17 217:9
219:16 220:8
228:15,18 267:3,4
267:9 284:14
289:19 298:18
314:1 316:16
322:13,16 323:1
358:18 371:5,15
374:15 376:17,19
397:6 404:7
415:14 417:19
420:3
**telling** 58:18,22
78:13 85:9 136:3
151:12 207:4
223:14 367:1
397:3
**temporary** 124:18
**ten** 12:2 250:6
364:20
**tens** 364:11
**tenth** 4:12
**teramoto** 32:21
39:16 75:14 97:3
102:6 121:14
138:9 144:18
159:10 189:17
197:11,22 199:7
202:2 205:6
208:21 218:16
220:19 221:2
231:13 235:7
236:1,6 255:18
256:18 298:13

325:14
**teramoto's** 163:8
**term** 16:15,16
43:22 44:2 158:3
313:3 329:9 356:9
357:14 358:1
**terms** 126:15
328:4
**test** 253:19 260:4
333:9 334:3,18
335:3
**tested** 333:15
**testified** 9:16
22:10 57:1 68:8
68:20 81:16,19
104:2 107:14
108:3 109:7
165:10 166:19
184:10 200:7
208:9 214:10
248:13 255:13
287:22 288:3,4
291:18 305:7
337:6 345:1 346:4
356:19 406:17
410:20
**testify** 132:7
246:17 288:10
290:14 319:4
**testifying** 288:20
288:21
**testimony** 2:22
45:9,15 61:19
108:5 148:2,4,15
177:9 210:2,6,7
231:22 246:1,10
246:22 247:2,3,15
247:21 249:20
252:10 253:13,18
253:22 254:22
276:12 279:4

280:6 287:19
291:21 292:19
293:1,6,18 295:2
298:9 303:19
304:21 312:11
347:15 400:18
410:8 437:6,7,11
438:4,5
**testing** 334:13
**thank** 21:18 28:17
56:9 70:21 120:17
158:18 182:2
186:16 212:13
215:21 218:8
224:13 230:6
243:20 249:12
278:19 294:18
335:16 336:3
372:22 420:11
424:2 439:12
**thanks** 77:17
166:3 236:7
318:19
**thanksgiving**
15:20 26:1
**theirs** 320:21
**theoretically**
281:2
**thereabouts** 324:6
**thing** 79:21 107:7
154:5 251:17
307:5 322:4 334:9
361:22 362:9,14
362:14 417:19
**things** 41:16 74:12
84:3,5,6,12,21
86:3 92:10 106:12
106:15 108:20
109:9 112:17
129:2,3,5 150:16
163:16 168:5

197:8 201:20
204:13,17,17
226:8 229:9
239:20 257:16
266:19 285:14
288:22 289:4
302:3 307:10
309:13 347:6
356:11 419:3
**think** 22:20 25:11
28:19 29:11 37:3
39:21 41:16 55:4
55:12 61:16 63:8
65:19 66:4,8 75:5
75:5 77:14 78:9
85:16 86:1 90:1
94:20 102:4 103:4
103:13 106:7,16
106:17 109:19
115:1 123:19
124:3 125:17
128:10 131:6
141:5 150:6,8
155:13,14,14
156:2 157:11
158:2,17 168:11
169:2 174:6 178:1
179:2 180:2,2,22
187:16 190:15
193:1 198:7 199:3
199:17 203:7
209:14 211:11,11
212:12 219:8
222:19 223:17
233:1 236:13
237:20,20 240:10
244:1 260:3 271:8
272:14 273:14
274:13,13 277:13
278:16 279:14,14
285:2 286:20

289:16 299:8
300:4,8 303:18
312:16,19 314:12
314:18 317:8,13
320:3 321:15,20
323:2 328:1,10
332:15 334:8,15
336:7 337:5,21
338:18 342:1,6,20
343:5,22 345:1,11
346:3,6 347:2
352:22 354:22
358:2 363:14,19
364:16,19 367:17
369:20 382:20
386:18 389:20
391:20 400:2
406:3 410:7,11
413:9 414:2,16
422:2,8 425:5
427:22 428:4,10
428:16,17 433:11
**thinking** 192:2
387:15 389:1
**thinks** 58:11
222:15 254:9
**third** 43:16 310:11
339:10 350:11
352:12
**thirds** 80:11
**thompson** 59:18
59:21 142:19
162:17
**thompson's** 148:1
148:14
**thought** 96:14
97:7 99:9 103:1
107:13 168:16
186:17 254:20
255:2,7 326:10
364:14

**thoughts** 342:13
**three** 78:4 125:18
162:5 178:1,19
180:3 183:22
256:5 270:12
271:7 277:16
310:11 316:1
323:8,12 328:6,6,7
365:17
**threshold** 150:18
**thresholds** 150:14
154:11
**thursday** 1:10 8:4
440:6
**time** 9:11 20:7
21:8 22:7 27:13
28:22 31:1 34:17
38:16 40:19 46:12
49:7 52:6 55:9
57:4 59:22 60:20
62:19 63:1 64:13
64:20 74:6,18
75:11,13,22 83:13
84:9 86:11,13
87:1,1,5 94:5,11
94:15,18 96:7
97:19 99:7,13
104:12 109:3
111:3,7,11 112:16
112:20,21 113:6
114:17,21 115:7
116:1,8 125:8,19
127:20 128:12,13
133:11 134:19
138:4 142:2,3
143:2 145:17
147:1,19 150:15
158:10,13 162:21
164:3 165:5 178:2
179:7 182:1 186:1
186:17 187:14,21

188:3 189:3
197:12,13 198:4
201:10,18 203:11
203:20 204:17
207:3 211:6,9,11
211:20 212:1,5
219:2,7,9 223:19
224:7 225:4 227:4
228:10 229:4
230:3,6 233:9
237:7,7 240:19,22
242:8 250:8,12
251:2 252:2 257:9
258:14 259:6
271:13 281:3,16
281:17 283:3
285:15,16,18
287:13 289:7
290:3 304:14
308:16,19 309:1
319:21 335:6,12
335:15,18 341:2
342:1 343:19
344:2 353:11,22
371:7,13 372:2
380:18,22 397:5
403:4,14 411:18
411:19 413:12
419:15,18,20
420:12,20 423:18
435:11,14,19
436:5
**timeline** 183:16
**times** 125:11,16,18
125:18 143:22
162:4,5,5 168:7
169:1 177:21
178:1,17,19,20
179:21 180:3
256:14 271:7
277:15,16 316:1

338:1
**timing** 30:17
141:4 317:7
**title** 35:12 139:6
198:7 282:1,4
378:5,6 386:10
**titles** 281:19
**today** 10:6 11:6
62:14 97:19 99:22
114:21 138:4
147:19 165:6
197:2 212:22
225:5 227:5
244:10 335:22
336:2 381:8 384:6
385:16 423:19
435:16
**today's** 436:4
**todd** 17:10
**told** 27:5 34:1
81:13 83:22 84:8
112:13 119:15,19
120:5 148:7
153:15,20 162:18
166:8,10 173:8
176:10,21 184:15
193:7 210:4 236:1
239:14 245:16
264:16 337:9
381:15 410:22
426:4
**tomorrow** 209:1
231:14
**top** 130:2 149:15
202:6 209:6 429:2
**topic** 59:19 87:2
131:4,16 142:1
143:1 171:1 187:6
232:10 288:19
**topics** 57:20 58:21
59:6 61:7 85:22

86:10 88:16,22
93:6 140:22 393:9
404:20
**total**  328:8,9
418:11
**touch**  59:18
217:13
**touched**  227:16
**track**  45:3,17,21
51:15 150:9 411:6
**tracks**  22:9
**trade**  12:5 274:16
274:21,22
**traffic**  376:19
**training**  13:18
14:9,11,19,21 15:2
**transcribed**  295:4
**transcribing**  10:18
**transcript**  3:11
10:20 293:5,9,13
293:15 295:4
439:7
**transcription**
438:5
**transition**  15:18
16:5,9 17:12 25:3
25:4,19 26:2 30:8
31:2,8 32:13,19
76:2,19,21 123:21
123:22 124:10,13
126:4 161:7
383:16
**transitioned**  30:15
**transmit**  422:12
422:21 425:9
**transmittal**  219:10
**transmitted**  49:15
49:20 238:10,14
238:15
**transportation**
12:1

**treating**  168:18
**tremendous**  142:1
223:18,20
**trial**  316:6,14
333:17,21 334:1
**tried**  20:2 65:16
193:14,20
**troublesome**  261:8
**true**  418:7 437:10
438:4
**trump**  3:9 383:13
383:21 384:3,13
388:4,14 392:2,20
393:13
**trump's**  392:15
**trust**  340:18
**truth**  295:12
**truthfully**  70:5
**try**  10:22 28:21
30:4,19 41:2,15
68:14 84:4,19
128:20 135:16
162:11 305:13
332:13,16 336:20
**trying**  32:3 42:4
48:7,9 51:13 86:4
89:4,13 128:16
129:2 155:13
162:21 168:13
224:9 254:6
261:18 282:7
314:19 317:15
356:6 362:1
366:22 397:13
398:13
**turn**  8:8 121:7
329:17,18 346:16
352:9 358:7
428:13,19
**turnaround**  49:7

**turned**  283:12
**turning**  352:11
373:19 377:3
**turns**  278:7
**twice**  23:2 209:14
322:15
**two**  12:5 14:1
16:18 18:5 31:5
49:10 80:11 86:2
86:21 100:11
106:11,15,16
125:18 141:22
142:6 150:14
162:5 180:3 214:7
214:10 242:21
243:9 270:11
277:18 287:12
294:11,14 310:11
323:8,12 328:5,6,7
345:2,5 346:7,8
349:11,21 351:13
410:17 430:10
433:16
**typewriting**  437:9
**typical**  28:10 51:9
51:10 52:15 53:20
202:2 243:8
**typically**  22:5 30:1
41:1 49:8,13
51:17 60:13,17
90:4,6,18,21 91:5
91:6,10 92:9
98:18 102:16
279:13 320:5
356:14
**typing**  66:6

**u**

**u.s.**  6:10,14 9:20
152:18 207:7
438:16

**ucsb**  12:9 14:2
**uh**  31:11 67:8 79:1
103:3 123:15,17
127:9 128:15
149:19 151:16
159:3 213:7
229:14 231:11
280:9,11 292:4
293:22 326:13
328:22 339:12
341:7 358:10
362:21 377:5
**ultimately**  267:19
427:16
**umpteenth**  133:11
**unable**  20:4
**unanswered**
373:17
**unavailable**  399:1
**unaware**  278:5
**unclear**  10:12
**uncommon**  185:12
185:14 204:18
276:14 282:17
**undercount**
361:16 393:17
394:21 395:21
399:15 401:6
404:11 406:6
**underestimate**
416:22
**underestimated**
81:11
**undergraduate**
14:16
**underlined**  58:11
139:21
**understand**  10:11
15:10 21:15 29:17
43:12 64:12 70:12
70:20 79:3 110:6

115:9 116:17,19
128:1 138:13
139:13 148:18
172:20 187:18
200:18 202:22
214:20 222:7
223:2 241:10
253:3 254:8,15
259:4 260:7
293:10,11 298:13
299:16 302:4
307:18 308:4
309:10 310:13
311:21 312:10
313:6,8 329:7,9
343:2 358:18
366:22 381:12
382:12 389:8,10
414:12 420:16,17
423:17 429:1
**understanding**
93:8 113:12 154:3
171:19 176:4,6
180:15 181:5
188:18 203:19
221:8,10 230:12
235:14 247:15
248:12 252:15
253:6 260:3
266:13,17 277:9
281:21 300:20
301:14 302:21
304:1 307:15
308:8 314:21
315:1 343:13,15
349:7 354:9
355:20 356:6
370:16 371:1,5
392:4,14 393:1,5
398:7 400:18
414:21 415:3

**understood**
151:11,13 223:5
245:22 246:17
274:19 276:18
317:1 326:16
342:22 343:7,8
**undertaking** 331:3
**underway** 78:19
79:2
**undocumented**
63:21 65:3,20
66:1 81:12,18
262:10 349:14
**unfamiliar** 30:4
**unfortunately**
77:10 276:14
333:6 374:10
**unified** 4:14
**union** 4:7
**unique** 20:8
**unit** 8:13 111:6,10
158:12 212:1,4
250:8,11 308:18
308:22 380:17,21
**united** 1:1,6 8:17
8:18 207:13,19
364:22 385:2
413:16 438:18
440:3
**university** 11:20
13:20
**unión** 381:7
**unquote** 83:9
388:19
**unredacted**
145:21 227:8
229:15
**unusual** 45:5
66:10 119:13
243:17

**upcoming** 57:18
95:20 147:2,5
244:20
**update** 40:17
119:10,13 172:16
214:4 222:13
225:10 226:4
230:9 233:2
236:10,11
**updated** 76:8
222:13 231:6
**updates** 119:4,8
232:19
**updating** 233:5
**upper** 159:7
**uproar** 131:2
**ups** 360:12
**urgency** 204:10
**urgent** 73:20
168:9,16,18
204:19
**usdoj.gov** 6:12,12
**use** 16:15 158:3
177:3 180:11
190:10 262:21
296:2,14,17 297:7
307:9 310:21
312:2 313:3 315:4
319:11 329:9,15
353:12 354:1
357:19 365:7
368:15 382:7
383:7 403:19
418:19 423:10
425:3
**useful** 126:15
176:7 252:22
272:20 273:1
275:7 279:18
297:3,18

**uses** 350:4 357:22
**usual** 45:20
**usually** 49:5 52:21
128:20 150:11
204:16 273:13
347:9
**uthmeier** 95:14
97:2,15 100:4
155:15 156:3
186:6,22 187:6,13
188:6,8,19 195:3,9
195:18 214:11
217:8 220:20
225:2 227:14
228:18 231:13
232:2 242:18
243:16,22 246:9
255:20 288:14
345:10 369:12
386:18
**utilize** 185:4
**utilized** 153:18

---
**v**
---

**v** 8:16 381:5 420:9
438:18 440:3
**v10** 320:2
**valid** 267:14 301:5
302:8 303:5,6
**value** 279:16
410:15
**var** 399:22
**variation** 417:15
**variety** 106:21
329:15 418:20
**various** 95:19
96:10 244:5
417:18
**vast** 282:13
**velkoff** 335:2
**venued** 336:13

| veritext 3:18 9:2,4 | viewpoint 370:1 | **w** | 252:16 258:11 |
|---|---|---|---|
| version 227:7 | viewpoints 402:20 | | 260:6 261:4 270:5 |
| 229:16 311:17 | views 320:15 | wait 10:21 79:5 | 272:8 285:22 |
| 319:2 320:3,8 | 402:1,4,7,11,14,15 | wall 67:7 80:1 | 287:16 291:2 |
| 321:10 375:21 | 404:22 | 81:21 146:14 | 299:9 300:6 |
| versions 245:4 | villages 20:1 | 402:22 409:13 | 332:10 337:10 |
| 320:10 | volume 331:2 | walls 256:22 257:5 | 348:5 382:5 |
| versus 364:9 | vote 350:1 | 257:6 | 435:21 |
| 417:14 | voter 393:14 | walsh 6:19 95:7 | wanting 176:22 |
| vicinity 22:21 | 394:19 395:19 | 97:2 98:6 100:1 | 260:16 268:1 |
| 178:19 323:14 | 399:13 401:4 | 246:9 318:16,19 | 286:11 383:5 |
| victoria 335:2 | 404:11 406:5 | want 18:18 59:9 | wants 38:2 40:4,7 |
| victoria's 125:2 | 408:10 409:6 | 91:22 103:11,15 | 44:17 226:15 |
| video 8:10,13 | voters 364:5 | 110:5 116:11 | 251:22 252:2 |
| 111:7,11 158:10 | voting 14:19 | 131:19 161:10 | 253:7,13 258:2 |
| 158:13 212:5 | 126:16 127:3 | 191:18 240:12 | 262:1 266:16 |
| 240:19,22 250:8 | 153:18 155:8,9 | 242:3 250:17,21 | 306:10,20 333:21 |
| 250:12 308:19 | 192:13,17,18,21 | 254:1 257:11 | 385:2 423:18 |
| 309:1 335:12,15 | 192:22 193:8,9,11 | 260:2,4 268:8 | warn 162:19 |
| 380:18,22 419:18 | 193:14,17 194:8 | 270:16 272:12 | warrant 265:19 |
| 435:11,14 436:5,5 | 262:9,16,18 | 273:5,6,11,17,22 | warranted 96:15 |
| videographer 7:1 | 263:13 264:9,9 | 274:6,12 275:2 | 97:8 103:2,6 |
| 8:3 9:3 111:6,10 | 265:1,5,11,12 | 277:20,20 279:6,8 | 106:13 107:14,20 |
| 158:9,12 211:15 | 268:3,9 271:1,14 | 279:19 280:1 | 108:1,10 109:9 |
| 211:22 212:4 | 272:17 275:8 | 282:15,21 283:6 | 110:1,3 |
| 240:18,21 250:7 | 277:11 295:1 | 284:8,9,12,19 | washington 1:9,16 |
| 250:11 308:18,22 | 349:6,8,18 351:9 | 289:1 293:8 294:2 | 3:19 4:5,12 5:3,8 |
| 335:11,14 380:17 | 368:17 381:22 | 302:11,16 310:10 | 5:13 6:11,17,21 |
| 380:21 419:14,17 | 382:6 383:6,6 | 311:12 312:10 | 8:22 32:18 77:14 |
| 435:10,13 436:4 | 400:4 403:7,16 | 316:5,7,15 341:10 | 228:5 402:22 |
| view 103:17 105:6 | 409:19 410:1 | 350:12 363:13 | 438:17 439:16 |
| 105:9,12 106:2 | 411:15 423:13 | 383:19 398:19 | watched 293:17 |
| 107:2,5,18,22 | 427:18 | 424:17 427:22 | watermark 376:2 |
| 108:8,14 109:8 | vp 124:22 | 428:5 429:1 | 376:6 |
| 110:8 113:12 | vra 251:10,18 | wanted 64:11 86:9 | way 34:7 64:11 |
| 156:15 180:18,22 | 277:6 394:2 395:6 | 116:19,22 130:20 | 68:19 78:4 80:11 |
| 192:4,14 284:22 | 396:6 401:13 | 142:18 154:14 | 90:5 92:17 106:10 |
| 307:7 311:21 | 404:14 406:8 | 160:7 170:17 | 107:4 142:8 |
| 312:17,19 314:20 | 408:14 416:3 | 171:16,20 172:1 | 152:18 185:10 |
| 335:19 402:4 | vs 1:5 | 176:2,11,11 | 243:8 260:6,11,13 |
| | | 190:13 218:2 | 260:15,17,22 |
| | | 226:13 243:3 | |

261:17 266:13,19
266:20 267:2,4
273:22 280:22
284:8 302:16
305:13 310:13
321:1 332:17
337:16 346:3,3
348:11 349:5
367:6 368:14
379:12 423:19
428:6 432:6
**ways** 45:1 53:3
**we've** 26:7 53:1
87:12 104:20
111:2 145:11
308:17 320:7,11
344:11 350:8
381:8 383:2 386:7
387:14 419:11
**web** 66:14 208:10
208:13
**website** 66:3,5,7
66:19 390:5
**wednesday** 148:5
148:8
**week** 49:11 156:21
178:4 233:14
387:5
**weeks** 174:15
188:3 221:1
277:18 287:12
**weigh** 363:13
**weighing** 362:9
363:8,10,12
**weight** 366:6
**welcome** 212:8
**wendy** 32:21 33:3
39:16 75:14 97:3
102:6,8,9,14,15
121:14,18 122:11
122:14 138:9

144:18 159:10,17
160:15 161:2
164:2,4 173:4,18
189:15 191:8
197:22 205:6
210:12,13 218:16
235:7 236:7
255:18 256:18
257:2 325:14
**went** 11:19 12:6
12:17 170:16
269:21 271:4
283:4 296:12
297:9,16 371:16
372:9,11 381:20
383:10
**when's** 27:19 63:1
83:13 94:5,15,18
145:17 147:19
225:4 227:4
**whispering** 8:6
**white** 48:4,8,16,19
49:4,9,15,21 50:9
50:11,15,16,16
51:4,7 74:5,7,12
74:17 167:18
173:12 283:9
388:1 391:16,20
393:8 395:9
410:12
**widely** 330:11
**wife** 115:10
**wilbur** 200:19
213:17
**willing** 271:22
296:22
**wise** 5:16
**wishes** 239:18
**withdraw** 156:9
294:2

**withdrawn** 138:19
246:12 251:7
252:13 254:21
260:14 271:20
275:18 278:18
282:6 290:12
299:14 304:19
322:7 323:22
327:10 328:18
**witness** 9:13,15,17
26:15 56:8 62:16
70:21 87:11 93:17
114:9 116:15
117:7 118:13
120:2,8,17,19
122:8,22 130:14
133:3 134:1 140:8
143:9,18 144:22
145:10 146:20
149:1 159:22
160:11 161:6,17
163:6 165:21
166:16 182:9
186:13 187:2
189:2 190:20
191:16 194:5
195:13 196:1,4
201:2,16 202:21
204:12 206:13
210:7 211:7,12
215:21 218:8
224:5 225:22
226:7 235:19
243:14 247:3,22
252:5 253:9,19,22
254:14 255:10
258:7 259:12
263:21 268:16
274:11 275:5
276:6 280:16
284:22 286:8,17

287:1 291:15
297:15 299:13
301:4,19 303:5
304:8 305:3,20
306:14 307:2,22
308:14 311:16
329:4 331:13
334:22 336:3
340:17 341:12
343:22 345:21
353:17,21 366:22
380:9 381:19
384:17 390:4,13
392:10,19 404:16
407:17 409:2
410:7 412:12
413:9 415:11,19
415:21 423:5
425:5,17 426:3,16
427:9 428:10,17
433:19 436:3
437:5,8,11 439:5
440:5
**witness's** 108:5
210:6 247:2,21
253:18
**woliver** 4:15
**word** 34:3 66:22
70:13 81:5 108:9
180:21 287:21
292:10 298:17
307:9 358:19
360:6 362:18
429:15 430:11
**wording** 324:1,13
346:6,8
**words** 43:13
176:14,20,21
237:3 251:21
275:13 298:4
330:8 337:21

353:8 356:2 360:2
423:12
**work**   9:19 10:1,15
17:15 30:7,10
38:1,3 40:3,4,7
42:3 43:5 44:10
44:18 62:17 73:18
74:22 89:19
112:18 124:21
150:2,14 153:2,6
199:5 201:19
228:1 229:1
243:21 254:7
256:16,17 260:6
260:11,18,20
266:17 268:5
276:16,20 277:1
280:10 282:11,15
284:12,16,20
285:5 337:22
338:20 371:13
378:2
**worked**   11:21
25:15,16 75:6
76:1 98:16 104:8
152:12 167:20
168:1 235:15
242:13 243:5,9
248:7 255:13
289:9 389:11
**workers**   21:8
124:18
**working**   11:22
12:17 15:20,22
43:10 50:5,13,17
51:13 52:9 54:6
76:9 77:18 97:13
97:15 99:6,13
113:5 118:22
129:2 195:14
198:13,16 199:13

201:11,12,17
209:20 211:1,4
214:8 223:20
226:10 234:6,10
234:12,13 237:12
257:10,15,15
355:13 411:17
421:21
**workload**   285:1,1
**works**   34:7 45:11
57:2 58:4,7 97:4
128:6 152:19
200:8 228:2
377:21 386:1
**world**   103:9
262:12
**worry**   91:18
**worst**   146:3
148:18
**worth**   150:19
**worthy**   108:10
**writes**   162:10
236:6
**written**   146:2
148:2,14 208:21
**wrong**   205:21
246:2 262:14
325:3 336:9
**wrote**   147:18
151:17 159:11
213:1,22 214:3
269:16 339:19
340:4 380:6,14
396:18 430:11
432:20 433:3
**www.census.gov**
66:13

**y**

**yang**   5:6
**yeah**   15:19 16:16
24:1 27:7,19,22

41:21 43:11 44:19
49:19 52:4 54:6
57:10 60:8,20
79:4 83:10 87:21
88:4,19 89:3
92:10 98:8 102:1
109:19 114:19
116:3 135:13
156:1 159:15,15
159:22 196:16
220:3 243:17
247:13 254:5
269:20 271:7,10
271:12 276:19,20
278:9 280:19
287:6 289:3 292:8
292:9 297:21
307:22 310:17
313:6 314:8
327:17 328:14,17
329:19 353:4
354:22 370:13
374:2 403:12
432:7 435:8
**year**   12:7,20 35:16
43:16 44:10 75:6
88:22 89:1 108:17
130:9 131:5,9
132:11 199:4
226:9 241:20,22
242:4 244:14
288:5 292:5 328:6
334:18 335:4
338:2 346:20,21
**years**   11:21 12:2,4
12:5,6 14:1
104:10 261:6
263:9 266:22
292:16 294:16
307:3 347:7
413:21

**yep**   58:17 63:6
67:21 72:5 80:10
80:14 81:4 96:17
125:13 138:12
145:14 148:12
149:21 269:18
330:4 339:7
**yesterday**   11:7
63:3 94:20 97:20
98:1 138:6 145:18
145:19 165:7
225:11 227:6,7
230:10
**york**   1:2,3 4:1,3,7
4:8,8 5:12 6:1,5,5
8:16,19 10:2
241:3 438:18
440:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



0010382



0010383

The results are embargoed, but you could make qualitative conclusions about them. They are for January-November 2017. They are unweighted.

The place of birth and citizenship questions come after the basic person demographics and housing unit questions, so the people who get to this place in the form are already pretty cooperative. Dave Raglin suggests considering the place of birth and citizenship questions jointly, and he thinks ███ breakoff rate for the two questions together for Hispanics is notable.

0010384

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                  *
IN THE MATTER OF:                 *
                                  *
NEW YORK IMMIGRATION              *
COALITION, et al.,                *
                                  *
          Plaintiffs,             *
                                  *
     v.                           *
                                  *  Civil Action No.
UNITED STATES DEPARTMENT          *  1:18-cv-05025
COMMERCE, and WILBUR L.           *
ROSS, JR., in his capacity        *
As Secretary of Commerce,         *
et al.,                           *
                                  *
          Defendants.             *
_____ *


          Deposition of DIONE SUNSHINE HILLYGUS, was taken on

Tuesday, October 9, 2018, commencing at 9:24 a.m., at 1100

L Street, NW, Washington, DC, before Timothy J. Atkinson,

Jr., a Notary Public.

A P P E A R A N C E S

On behalf of Department of Justice:

STEPHEN EHRLICH
CAROTTA P. WELLS
Trial Attorney
Federal Programs Branch
US Dept of Justice
20 Massachusetts Ave
Washington D.C. 20530
202-395-9802 (Ehrlich)
202-514-4522 (Wells)
stephen.erhlich@usdoj.gov

On behalf of ACLU:

SARAH BRANNON
Senior Staff Attorney
915 15th St. NW
Washington, D.C. 20005
202-675-2337
sbrannon@aclu.org

On behalf of Department of Commerce:

MICHAEL CANNON
US Dept of Commerce
Chief, General Litigation Division
1401 Constitution Ave NW
Washington, D.C.
202-482-1328
mcannon@doc.gov


On behalf of Plaintiffs:

JOHN FREEDMAN
BARBARA H. WOOTEN
Arnold & Porter
601 Massachusetts Ave, NW
Washington, DC 20001
john.freedman@arnoldporter.com
barbara.wooten@arnoldporter.com
202-942-5316 (Freedman)
202-942-6545 (Wooten)

On behalf of the State of New York:

DANIELLE FIDLER
Assistant Attorney General
Environmental Protection Bureau
28 Liberty St.
New York, NY 10005
212-416-8441
danielle.fidler@ag.ny.gov

4

I N D E X

| Deponent | Examination By | | Page |
|----------|----------------|---|------|
| Dione S. Hillygus | Mr. Ehrlich | – Direct | 5 |

E X H I B I T S

Exhibit No.   Description                                      Marked

DOJ:

| 1 | DSSD 2010 Census Coverage Measurement<br>Memorandum Series 2010-G-1 | 12 |
| 2 | 2016 Internet Break-Off Rates,<br>Bates 9692 | 27 |
| 3 | January 19, 2018, memorandum for<br>Wilbur Ross, Bates 1277 | 30 |
| 4 | Understanding the Quality of Alternative<br>Citizenship Data Sources for 2020 Census,<br>by David Brown, et al | |
| 5 | Expert Report and Declaration of<br>Ms. Hillygus | 73 |
| 6 | Press Release | 136 |
| 7 | January 1999, GAO High Risk Series<br>an Update | 137 |
| 8 | Expert Rebuttal Report of<br>Ms. Hillygus | 157 |
| 9 | Discussion Comments, 2020 update by<br>Ms. Hillygus | 170 |
| 10 | Curriculum Vitae of Ms. Hillygus | 178 |

```
 1                   P R O C E E D I N G S

 2                                        (9:24 a.m.)

 3   (Whereupon,

 4                   DIONE SUNSHINE HILLYGUS

 5   the Deponent, called for examination by Counsel for

 6   Department of Justice, being first duly sworn to tell the

 7   truth, the whole truth, and nothing but the truth,

 8   testified as follows:)

 9                   DIRECT EXAMINATION

10          BY MR. EHRLICH:

11      Q.   Dr. Hillygus, thank you for coming in.

12      A.   Yeah.

13      Q.   Can you state your full name for the record?

14      A.   Dione Sunshine Hillygus.

15      Q.   And you understand that you're under oath to tell

16   the truth today?

17      A.   I do.

18      Q.   Are you represented by counsel?

19      A.   Um-hmm.

20      Q.   Have you ever had your deposition taken before?

21      A.   Once.

22      Q.   When was that?

23      A.   It was in a voting rights act case in North

24   Carolina.

25      Q.   Okay.  So you're familiar with the process a
```

6

1   little bit.  Just want to go through a few things, will

2   refresh your recollection so that --

3        A.   Right.

4        Q.   -- will make this a smooth process.  So I'm going

5   to be asking some questions today of course.  Your counsel

6   is here.  From time-to-time he may object.  I'm going to

7   ask you to go ahead and answer the question anyway unless

8   he directs you not to.  All answers should be verbal.  So,

9   for example, no nodding.  Does that make sense?

10       A.   Yes.

11       Q.   So they need that for the transcript.  Let's try

12  not to interrupt each other.  So I'll try to wait until

13  you're done talking before I talk and vice-versa.  Does

14  that make sense?

15       A.   Yes.

16       Q.   I'm going to try and phrase my questions clearly.

17  I'm not trying to trick or confuse you.  So if something is

18  not clear, just ask me to clarify or explain, and I'll try

19  to do that as well.  Okay?

20       A.   Okay.

21       Q.   Is there any medical reason you can't testify

22  truthfully today?

23       A.   As long as my voice holds out.

24       Q.   Any other reason you can't testify truthfully

25  today?

1        A.    No.

2        Q.    Okay.  If you need to take a short break, I

3   understand you're a little bit under the weather.  Just let

4   me know.  The only thing I'll say is if I had asked a

5   question, if you could answer that question before we go to

6   a break.  We'll try to do that, and then we can take a

7   break after that.  Does that make sense?

8        A.    Sounds good.

9        Q.    Okay.  At a high level, can you just explain the

10  opinions and conclusions you're offering in this case?

11       A.    Sure.  And I'm happy to read from the report if

12  helpful and entirely summarizing.  But I think that based

13  on the available evidence that external to the Census

14  Bureau as well as internal Census Bureau that there's going

15  to be a differential self-response rate.  It is also the

16  case that I see no evidence to suggest, and plenty of

17  evidence to indicate that it will not be corrected by NRFU

18  operations, and the communications campaign.  And, finally,

19  I would say that based on the available evidence and

20  standard scientific -- methodology practices and Census

21  Bureau practices, that the addition of the citizenship

22  question was not adequately tested to evaluate the impact

23  on data quality.

24       Q.    Got it.  So now, first of all when you're talking

25  about a differential self-response rate, can you explain

1   what differential self-response rate is?

2        A.   Sure.  So the best quality data on the census

3   comes from people self-responding.  That is, is they fill

4   out information about their household.  This round that

5   will happen online predominantly, although it will also be

6   available for some people with a paper form.  The

7   differential self-response rate simply refers to the fact

8   that some groups are going to be more likely to self-

9   respond than others, and that the addition of a citizenship

10  question on the census form will make it more likely that

11  some subgroups will be unlikely to respond.

12       Q.   Okay.  And what are those subgroups?

13       A.   So the level at which I've focused attention, the

14  Census Bureau has focused attention, but I'm happy to talk

15  about others, is non-citizen households.  And that is --

16  includes households that have mixed status.  Hispanics as a

17  population category.

18       Q.   Okay.  And so is it your opinion in this case

19  that the differential self-response rate will result in a

20  differential net undercount?

21       A.   Correct.

22       Q.   Okay.  So I just want to make sure we're on the

23  same page with a few things before we get into the -- sort

24  of the meat of your analysis.  Does that make sense?

25       A.   Um-hmm.

1          Q.   So when we're talking about a differential net

2    undercount, we're saying that with regard to race and

3    ethnicity, correct?

4               MR. FREEDMAN:  Object to form.

5               BY MR. EHRLICH:

6          Q.   Would you agree that there's been a differential

7    net undercount in pretty much ever census since that

8    started being measured?

9          A.   Correct.

10         Q.   Okay.  And so your analysis in this case is not

11   focused on that, you know, persistent net undercount in the

12   census, but on the additional net undercount differential?

13   Strike that.  Sorry.  Your opinion in this case is based on

14   a differential net undercount attributable to the

15   citizenship question, correct?

16         A.   Yes.

17         Q.   And not just persistent one that's been in every

18   census, correct?

19         A.   Yes.  Although I certainly make reference to

20   history and the importance of history or understanding the

21   current census.

22         Q.   Of course.  Of course.  Thank you.  Would you

23   agree that net undercount is the net undercount is the best

24   measure we have for accuracy of the census count?

25              MR. FREEDMAN:  Object to form.

1            THE DEPONENT:  So I think it's very important

2   following the Census Bureau quality standards to think

3   about the objectivity, the integrity and the utility of the

4   data.  In terms of objectivity, that includes accuracy, but

5   also unbiasness.  And so that means that we need accuracy

6   not only of the overall count but also accuracy of

7   subgroups.  So that the census is fair and complete.

8            BY MR. EHRLICH:

9       Q.   So then would you say differential net undercount

10  is the best standard we have for judging the accuracy of

11  the census count?

12           MR. FREEDMAN:  Object to form.

13           THE DEPONENT:  I'm not sure what you mean by

14  best.  I mean, it is one of the, you know, key things that

15  we look at in terms of evaluating the fairness and

16  completeness of the census count.

17           BY MR. EHRLICH:

18      Q.   And what are better forms of judging the accuracy

19  of the census count?

20      A.   I'm not sure.

21      Q.   Okay.  In terms of quantitative analysis, is

22  there another way to measure after the census how

23  accurately we counted the population?

24           MR. FREEDMAN:  Object to form.

25           THE DEPONENT:  If I'm interpreting your question

1  correctly, the way that the accuracy is evaluated is with a

2  post-enumeration survey and demographic analysis.

3      Q.   And those analyses are using net undercount, is

4  that right?

5           MR. FREEDMAN:  Object to form.

6           THE DEPONENT:  So, I guess, I'm not sure exactly

7  your question.

8           BY MR. EHRLICH:

9      Q.   Sure.  So we do the census in the year ending in

10 zero, correct?  After that we do an analysis as best we can

11 of whether got certain counts correct.  Is that right?

12     A.   Um-hmm.

13     Q.   And so when we do that analysis how do we judge

14 whether we got the count correct or incorrect?

15     A.   So the post-enumeration survey is one piece of

16 that coverage analysis.  A demographic analysis is another.

17 I'm not sure if you're asking me which is better or

18 there -- these are both separate from and independent of

19 the census, and both have identified the differential

20 undercount for Hispanics.

21     Q.   Got it.  And so both of those analyses, both the

22 post-enumeration survey and the demographic analyses focus

23 on that undercount, is that right?

24           MR. FREEDMAN:  Object to form.

25           THE DEPONENT:  Differential undercount and net

1  undercount are both --

2       Q.   Got it.  Okay, got it.  Thank you.

3            MR. EHRLICH:  So I'm going to mark this as

4  Exhibit 1.

5  (DOJ Exhibit 1 marked for identification.)

6            BY MR. EHRLICH:

7       Q.   I've handed you what's been marked as Exhibit 1.

8            MR. FREEDMAN:  Counsel, this doesn't have Bates

9  numbers already.  Do you know if it's been produced in this

10 litigation?

11           MR. EHRLICH:  This is publicly available online.

12           MR. FREEDMAN:  I'm aware of that.  Has it been

13 produced in litigation?

14           MR. EHRLICH:  I believe so, but I'm not entirely

15 sure.

16           MR. FREEDMAN:  Okay.  We'll be following up on

17 that.

18           MR. EHRLICH:  Okay.

19           BY MR. EHRLICH:

20      Q.   So I've handed you what's been marked as

21 Exhibit 1.  It says DSSD 2010 Census Coverage Measurement

22 Memorandum Series 2010-G-1.  Is that right?

23      A.   Yes.

24      Q.   Do you recognize this document?

25      A.   I believe I have reviewed it, yes.

1        Q.    Okay.  I just want to walk through this so we're

2   on the same page.  Because obviously this goes to a lot of

3   things in your analysis, correct?

4              MR. FREEDMAN:  Object to the form.

5              BY MR. EHRLICH:

6        Q.    So can we turn to page 12, please?  So looking at

7   Table 3, I just want to get a handle on what we're

8   measuring here.  So that's -- the census count at the top,

9   that equals the sum of the correct enumerations, the

10  erroneous enumerations and the whole person census

11  imputations, is that right?

12             MR. FREEDMAN:  Object to form and foundation.

13             THE DEPONENT:  So, I mean I, I didn't produce

14  this.  I think I've looked at it at some point.  I'd hate

15  to --

16             BY MR. EHRLICH:

17       Q.    Well --

18       A.    -- issue an interpretation of somebody else's

19  work in terms of the components or misstate without careful

20  review.

21       Q.    Sure.  Well, go ahead and take a quick review of

22  it, if you like, just so we're on the same page.

23       A.    I mean, I can, but I mean in terms of what is it

24  that I should be --

25       Q.    So I'm just, I'm wondering how each of these

1  things are calculated is where I was going to go with this.

2         MR. FREEDMAN:  Same objection, form and

3  foundation.

4         THE DEPONENT:  I would be very hesitant to try

5  and explain Dr. Mule's work.  I'm certainly happy to talk

6  at a very high level, but just don't know that I feel

7  comfortable interpreting in great detail without review.

8         MR. FREEDMAN:  And for the record, we learned

9  last Friday it's pronounced Mule.

10         THE DEPONENT:  Oh.

11         BY MR. EHRLICH:

12     Q.  Okay.  So is it fair to say that you don't know

13  how these numbers are calculated here in Table 3?

14     A.  Well, it's just without review I'm not exactly

15  sure what it's referencing.

16     Q.  So I think the -- if you want to turn to the

17  first several pages of the document, I think it explains.

18  You want to turn to page 6?  It says correct enumerations

19  for components, right?

20         (Pause.)

21     A.  So I think I have a general sense of this.

22     Q.  Okay.

23     A.  It wasn't, you know, kind of central to my

24  opinion.

25     Q.  I understand.

1        A.    Right.  Yeah.

2        Q.    Okay.  Thank you.  So in Table 3 when we're

3   looking at the -- it says the census count.

4        A.    Um-hmm.

5        Q.    And if we add up the numbers for correct

6   enumerations, erroneous enumerations and whole person

7   census imputations, that equals the census count.  Does

8   that make sense?

9              MR. FREEDMAN:  Object to form and foundation.

10             BY MR. EHRLICH:

11       Q.    I'm sorry.  I didn't catch your answer.

12       A.    Okay.

13       Q.    Okay.  Do you agree with that?

14             MR. FREEDMAN:  The same objection.  Go ahead.

15             THE DEPONENT:  Looks like, yeah.

16             BY MR. EHRLICH:

17       Q.    Okay.  And so the category correct enumerations

18   that's going to be the census count minus the erroneous

19   enumerations and minus the whole person imputations,

20   correct?

21             MR. FREEDMAN:  Same objection.

22             THE DEPONENT:  Sounds correct.

23             BY MR. EHRLICH:

24       Q.    Does that look right from you -- for you?

25       A.    Uh-huh.

1        Q.   Okay.  And then the category omissions near the

2    bottom there, it's calculated with the difference between

3    the dual system estimate of the total population and the

4    category correct enumerations.

5        A.   Right.

6             MR. FREEDMAN:  Same objection.  Just let me

7    object before you --

8             THE DEPONENT:  Okay.

9             BY MR. EHRLICH:

10       Q.   And so the net undercount then, if I get this

11   right, is equal to the omissions minus the erroneous

12   enumerations, minus the whole person census imputations,

13   correct?

14       A.   We're on the same page.

15       Q.   Okay.

16       A.   So to make clear though this is the net

17   undercount, which is for the nation as a whole.  The issue

18   here is not about the net undercount.  You can have,

19   because you have over counted whites and under counted

20   other subgroups you can have across the population as a

21   whole a undercount that looks quite good, but can

22   nonetheless have a differential undercount of subgroups

23   that has implications for the distribution of funding and

24   representation.  And my focus has been on the implications

25   of adding a citizenship question for the differential self-

1  response and undercount.

2      Q.   Got it.  Is it possible to calculate a

3  differential net undercount without an overall net

4  undercount?

5          MR. FREEDMAN:  Object to form.

6          THE DEPONENT:  Technically I don't know the

7  answer to that.  I mean, I know as part of the coverage

8  analysis that we get the net undercount.  That's a very

9  important metric for the census full -- at the same time

10  for the census to be unbiased and fair and complete, we

11  also have to have accuracy at subgroups that are

12  distributed geographically in concentrated ways.

13         BY MR. EHRLICH:

14     Q.   Got it.  Understood.  So going back to the table

15  for a moment in the calculations that we talked through, is

16  it possible for omissions to increase without increasing

17  the net undercount?

18         MR. FREEDMAN:  Object to form and foundation.

19         THE DEPONENT:  Sure.  If you overcount a bunch of

20  college students, you can miss more people, and overall

21  your count is still going to have an okay net undercount.

22         BY MR. EHRLICH:

23     Q.   So could we turn to page 16 for a moment?

24  Actually, I'm sorry.  Can we go back to 12?

25     A.   Okay.  So we were just talking about omissions,

1   and we said that omissions it subtracts erroneous

2   enumerations and whole person census imputations, right?

3           MR. FREEDMAN:  Object to form and foundation.

4           THE DEPONENT:  I think so, if I got that

5   correctly.

6           BY MR. EHRLICH:

7   Q.   Yeah.  And so the whole person census imputations

8   are not accounted for by omissions, right?

9           MR. FREEDMAN:  Object to form and foundation.

10          THE DEPONENT:  So as noted in the table,

11  omissions are people who should have been enumerated but

12  were not.  And it says many of these people may have been

13  accounted for in the whole person census imputations.

14          BY MR. EHRLICH:

15  Q.   Got it.  Okay.  Page 16, please.  Table 8, which

16  is titled Estimates of Percent Net Undercount by Race and

17  Hispanic Origin.  Did I read that right?

18  A.   Correct.

19  Q.   So according to this table the net undercount for

20  Hispanics in the 2010 census was 1.54 percent, correct?

21  A.   Correct.

22          MR. FREEDMAN:  Object to foundation.

23          THE DEPONENT:  Correct.

24          BY MR. EHRLICH:

25  Q.   Is it fair to say that Hispanics in 2010 were not

1   evenly distributed across the country?

2        A.   Yes.

3        Q.   And so this would be an example of the

4   differential net undercount, correct?

5        A.   Well, I'm not sure the -- both of those things

6   are separately true.  Yes, the 1.54 is how much Hispanics

7   are undercounted.  The differential undercount would be

8   whites minutes Hispanics.  And so you add the whites and

9   Hispanics together.  It is also true that Hispanics are not

10  geographically distributed equally across the population.

11       Q.   Okay.  I think I understand.  But just to go back

12  for a moment.  The white population it says was

13  undercounted by .54, is that right?

14            MR. FREEDMAN:   Object to foundation.

15            THE DEPONENT:   So this is reported as an

16  undercount.  And so it's a negative number, which means

17  that whites were actually overcounted.  And so when

18  calculating the differential undercount then whites were

19  overcounted; Hispanics were undercounted.  And so the

20  difference between them is the differential undercount that

21  I referenced in my report.

22            BY MR. EHRLICH:

23       Q.   Got it.  So is the net undercount judged against

24  whites or judged against what the Hispanic population

25  should have been counted at?

1          MR. FREEDMAN:  Object to form and foundation.

2          THE DEPONENT:  I mean, when we talk about the net

3     undercount for the population as a whole, that's everyone.

4     But when we talk about the differential undercount, we're

5     talking about the subgroups relative to the count of

6     whites.  In some censuses whites have also been

7     undercounted.  And so we would say the differential

8     undercount, right, is still the difference between the

9     undercount of whites compared to the undercount of this

10    other group.  In the last couple censuses, we've

11    overcounted whites.  And so you end up with a differential

12    undercount that is actually wider than the subgroup

13    undercount.  And, again, in terms of distribution of

14    funding and resources, what matters is that fairness,

15    right, that differential.

16          BY MR. EHRLICH:

17    Q.   Got it.  And so you were saying that the

18    Hispanics were not evenly spread across the country in

19    2010, right?

20    A.   This particular table does not speak to that, but

21    it is the case that Hispanics are not evenly distributed

22    across the country in 2010 or today, yeah.

23    Q.   And how in 2020?  We'd expect that to be the case

24    again, right?

25    A.   I would assume so.  Yes.

 1       Q.   Okay.  And just for clarity this analysis in this

 2   document we're looking at is for the 2010 census, right?

 3            MR. FREEDMAN:  Object to form and foundation.

 4            THE DEPONENT:  Correct.

 5            BY MR. EHRLICH:

 6       Q.   And there was no citizenship question on the 2010

 7   census?

 8       A.   Correct.

 9       Q.   And so that's why this report does not calculate

10   an undercount for non-citizens, right?

11            MR. FREEDMAN:  Object to form and foundation.

12            THE DEPONENT:  I can't speak to their logic.

13   But, yes, they would not be able to because they didn't

14   have citizenship on the census.

15            BY MR. EHRLICH:

16       Q.   Got it.  So this document in front of you doesn't

17   calculate a net undercount for non-citizens?

18       A.   Correct.

19            MR. FREEDMAN:  Object to --

20            BY MR. EHRLICH:

21       Q.   Okay.  Could we go to page 21, please?  This is

22   titled Percent Net Undercount for Persons by State,

23   correct?

24       A.   Yes.

25       Q.   And it's showing the net undercount for each

1   state, is that right?

2          MR. FREEDMAN:  Object to foundation.

3          THE DEPONENT:  I, you know, I looked at this at

4   one point but, again, it was not central to my opinion.

5   I'm happy to review it, if you want me to look into it.

6          MR. EHRLICH:  Yeah, just briefly, just so you

7   know what this chart is saying or figure, I should say.

8          (Pause.)

9          THE DEPONENT:  Okay.  I think I --

10          BY MR. EHRLICH:

11     Q.   So the note below says for each state and the

12   District of Columbia the estimated percent net undercount

13   is not significantly different from zero.  Did I read that

14   right?

15          MR. FREEDMAN:  Object to form.

16          THE DEPONENT:  Correct.

17          BY MR. EHRLICH:

18     Q.   And we just looked at the percent net undercount

19   for Hispanics that said it was 1.54 percent, correct?

20          MR. FREEDMAN:  Object to form.

21          MR. FREEDMAN:  Object to form and foundation.

22          THE DEPONENT:  Correct.  But this is a different

23   quantity.  This is now looking at the overall net

24   undercount by geography, not within subgroup.

25          BY MR. EHRLICH:

1          Q.   Got it.  But you said that Hispanics are not

2     evenly distributed across the country in 2010, right?

3          A.   Correct.

4          Q.   And the note for this figure says that each of

5     these net undercount per state were not significantly

6     different than zero, correct?

7               MR. FREEDMAN:  Object to form and foundation.

8               THE DEPONENT:  It does.  But that is not testing

9     whether for those subgroups that those differential

10    undercount might not vary by geography.  They're separate

11    questions.

12              BY MR. EHRLICH:

13         Q.   I got it.  I'm just trying to see -- let me ask

14    it this way.  Based on these percent net undercount and the

15    note below Figure 1, it doesn't seem that congressional

16    appointment would have been effective, correct.

17              MR. FIDLER:  Objection to foundation and form.

18              THE DEPONENT:  So number one, this is 2010,

19    without the citizenship.

20              BY MR. EHRLICH:

21         Q.   Yes.

22         A.   Number two, I was not retained to look at impacts

23    on apportionment.  So I can't say that I feel comfortable

24    making that judgment.  And, three, I would just say that

25    this in terms of where I was retained to talk about the

1    impact of adding a citizenship question on the 2020 census

2    and the likely impact on self-response and the differential

3    undercount that this graphic doesn't actually speak to that

4    because it's lot looking by subgroup.

5        Q.   Got it.  But it is looking by state, correct?

6        A.   It is.

7             MR. FREEDMAN:  Object.

8             BY MR. EHRLICH:

9        Q.   And the Table 3 we just looked at was talking

10   about population by subgroup?

11            MR. FREEDMAN:  Object to foundation.

12            THE DEPONENT:  Yes.

13            BY MR. EHRLICH:

14       Q.   Okay.  And just for clarity, this says that the

15   net undercount for each state here is not significantly

16   different from zero?

17            MR. FIDLER:  Objection to form and foundation.

18            THE DEPONENT:  For the overall population in that

19   state in 2010, correct.

20            BY MR. EHRLICH:

21       Q.   Got it.  So you can put that to the side for now.

22   Thank you.  So we are talking about the differential self-

23   response rate, correct?

24       A.   Correct.

25       Q.   And your analysis focuses on Hispanics and non-

1   citizens, is that right?

2       A.   Correct.

3       Q.   Can you explain the basis for your conclusion

4   that a citizenship question will depress the response rate

5   among Hispanic citizens?

6       A.   Sure.   So there's two different reasons to look

7   at Hispanics and not just non-citizens.   Sometimes it's the

8   case that the data are not available separating non-

9   citizens from Hispanics.   We know that there's an overlap

10  between the two.   And so that seemed to the rationale in

11  some of the Census Bureau analyses.   But I outlined and

12  reviewed and showed that there is considerable evidence

13  that in fact Hispanic citizens are also showing increased

14  sensitivity, are likely to have increased sensitivity to

15  the citizenship question as evidenced by public opinion,

16  polling data, by other kind of civic and government

17  interactions that have had spillover effects on Hispanics

18  citizens.   Leading me to the conclusion that it is likely

19  to have an impact not only on non-citizens but also on

20  Hispanic citizens.

21      Q.   Got it.   Did you attempt to quantify the

22  potential impact of a citizenship question on the self-

23  response rate of Hispanic citizens?

24      A.   The Census Bureau has not produced the data that

25  would make that possible.

1          Q.   Got it.  And so the studies you were talking

2     about, were those qualitative studies?

3               MR. FREEDMAN:  Object to form.

4               THE DEPONENT:  No.  It was a variety of different

5     research projects, quantitative and qualitative.  So for

6     instance public opinion polling data that has looked at,

7     you know, fears about deportation.  That's quantitative

8     data now.  It's not directly linked to the citizenship

9     question.  Likewise, there is considerable quantitative

10    evidence regarding Hispanic citizens declining to take food

11    stamps and healthcare benefits under the Trump

12    administration when there's fears about deportation and

13    fears about confidentiality.  These all point to the

14    likelihood that Hispanic citizens will also be -- also

15    consider citizenship question to be sensitive.

16              BY MR. EHRLICH:

17         Q.   Got it.  Were those studies performed in the

18    context of a decennial census?

19              MR. FREEDMAN:  Object to form.  Do you want her

20    to look at -- I mean, she talks about the 12 of them in the

21    report or so.  Do you want her to walk through, and she can

22    tell you what's quantitative, what's qualitative?

23              MR. EHRLICH:  No.  Just talking generally right

24    now.

25              THE DEPONENT:  So -- I'm sorry.  Will you repeat

1    the question.  Sorry.

2              BY MR. EHRLICH:

3         Q.   Sure.  I was wondering if those studies that you

4    were referencing were in the context of the decennial

5    census?

6              MR. FREEDMAN:  Object to form.

7              THE DEPONENT:  So in terms of some of the

8    evidence that I relied on in reaching my conclusions some

9    of that was specific to the Census Bureau.  For instance,

10   some of the spontaneous -- the qualitative research that

11   showed spontaneous concerns about confidentiality of the

12   census, mentioning DACA and other things.  Some of it was

13   external quantitative research that was not specific to the

14   census.

15             MR. EHRLICH:  Got it.  Exhibit 2.

16   (DOJ Exhibit 2 marked for identification.)

17             BY MR. EHRLICH:

18        Q.   So I've handed you what's been marked as Exhibit

19   2.  The title says 2016 Internet Break-off Rates from

20   Internet -- Data Weighted with Base Weight.  And it's Bates

21   stamped 9692.  Can you describe what a break-off is?

22        A.   Sure.  It's when in the course of taking a survey

23   that someone exits from the survey.  So in the Internet

24   case that could come about because somebody lost Internet

25   connection or they could come about because somebody

1  decides they don't want to continue the survey.

2      Q.   Got it.  So this is a household group again

3  answering, and then stopped answering at a particular

4  point?

5      A.   Correct.

6      Q.   Okay.  And this chart breaks it down by

7  non-Hispanic white, non-Hispanic non-white and Hispanic,

8  right?

9          MR. FREEDMAN:  Object to form and foundation.

10          THE DEPONENT:  Correct.

11          BY MR. EHRLICH:

12      Q.   Does it differentiate between Hispanic citizens

13  and Hispanic non-citizens?

14          MR. FREEDMAN:  Object to form and foundation.

15          THE DEPONENT:  It does not.

16          BY MR. EHRLICH:

17      Q.   Okay.  Given the current planning for the 2020

18  census do you know where the citizenship question is going

19  to be placed on that?

20          MR. FREEDMAN:  Object to foundation.

21          THE DEPONENT:  So according to Secretary Ross's

22  memo, the citizenship question will be added at the end.

23  But that's a little bit unclear because what the end is

24  depends on the nature of the household.  And so if you have

25  multiple individuals in a household, the end in answering

1   about one member of the household is not in fact the end of

2   the survey.  I don't know how the Census Bureau has

3   resolved Ross's direction to put it at the end of the

4   survey given that it is an individual household member.

5   That's not something I have an answer to.

6       Q.   Got it.  So if somebody was filling out the

7   questionnaire for the household and they got to the

8   citizenship question, decided not to answer, the remainder

9   of that information would have been filled out, is that

10  right?

11          MR. FREEDMAN:  Object to form and foundation.

12          THE DEPONENT:  So yes.  So if a member of the

13  household answers the household level of questions, and

14  then they start answering the questions about them as the

15  head of household, and they get to the citizenship

16  question, and decide that because of that question they no

17  longer want to participate, they will -- they would break

18  off.  Maybe they want to answer that question for

19  themselves and not for, say a spouse, who might be a non-

20  citizen.  Then they might answer for themselves, continue

21  on in answering about the other member of the household and

22  break off the citizenship question at a different point.

23  The point I would just make is that it's -- there's not a

24  clear it's the end of survey at least as I understand it.

25          BY MR. EHRLICH:

1       Q.   Got it.  Before they got to that point on the

2   census they would have filled out how many members in the

3   household, right?

4            MR. FREEDMAN:  Object to form.

5            THE DEPONENT:  Correct.

6            MR. EHRLICH:  Okay.  We're done with two.  So

7   I've handed you what's been marked as Exhibit 3.

8   (DOJ Exhibit 3 marked for identification.)

9            BY MR. EHRLICH:

10      Q.   It's a January 19, 2018, memorandum for Wilbur

11  Ross, Secretary of Commerce, Bates stamped 1277.  Can we go

12  to page that's labeled 1280?

13      A.   Okay.

14      Q.   Are you familiar with this memo?

15      A.   I am.

16      Q.   And you've reviewed this memo before?

17      A.   I have.

18      Q.   So in the section that's labeled quality of

19  citizenship responses, the second paragraph in that

20  section, this is talking about item non-response rates for

21  non-Hispanic whites, non-Hispanic blacks and Hispanics, is

22  that right?

23            MR. FREEDMAN:  Object to form and foundation.

24            (Pause.)

25            THE DEPONENT:  Okay, sorry.  Will you repeat your

 1   question?

 2           BY MR. EHRLICH:

 3       Q.   Sure.  So this paragraph is discussing item non-

 4   response rates for non-Hispanic whites, non-Hispanic blacks

 5   and Hispanics, correct?

 6           MR. FREEDMAN:  Object to form and foundation.

 7           THE DEPONENT:  Correct.

 8           BY MR. EHRLICH:

 9       Q.   And this on the 2013 and 2016 American Community

10   Survey?

11           MR. FREEDMAN:  Object to form and foundation.

12           THE DEPONENT:  Correct.

13           BY MR. EHRLICH:

14       Q.   If I say ACS, you know that means American

15   Community Survey?

16       A.   Yes.

17       Q.   Okay.  Can you explain what an item non-response

18   is?

19       A.   Yes.  Item non-response refers to someone not

20   providing an answer for an individual question.

21       Q.   So if somebody skips that question, for example,

22   that would be an item non-response?

23       A.   Correct.

24       Q.   And so as we were discussing for the 2020 census

25   questionnaire, if somebody skipped the citizenship

1   question -- assuming they answered the other questions, we

2   would have the remaining information for that household?

3           MR. FREEDMAN:  Object to form.

4           THE DEPONENT:  Correct.  So the Census Bureau

5   would impute, and would end up with lower quality data

6   because of that imputation.  But, yes, you would still

7   enumeration of the entire household.

8           BY MR. EHRLICH:

9       Q.  Got it.  Did you rely on this memo when you were

10  talking about decline in self-response rates for Hispanic

11  citizens?

12      A.  No, I don't recall that I did.  I mean, in terms

13  of a decline in self-response rate of Hispanic citizens --

14          MR. FREEDMAN:  Do you need to see your report?

15          THE DEPONENT:  Yeah.  I could look at my report

16  to look specifically.  This to me was evidence that this is

17  a sensitive question for Hispanics.  The fact that you have

18  higher levels of item non-response as with the break-offs.

19  Again, indication that the citizenship question is a

20  sensitive question for Hispanics.  Of course, we don't have

21  this broken by citizenship status.

22          BY MR. EHRLICH:

23      Q.  Got it.  So we looked at the break-off rates --

24  strike that.  So we've looked at the ACS break-off rates

25  and ACS item non-response rate, correct?

1    A.   Correct.

2    Q.   And neither of these studies provided

3  quantitative evidence regarding unit non-response rates of

4  Hispanic citizens, is that right?

5         MR. FREEDMAN:  Object to form.

6         THE DEPONENT:  Correct.

7         BY MR. EHRLICH:

8    Q.   Okay.  So focusing on the non-citizen piece of

9  the differential self-response rate we were talking about,

10  can you describe the basis for your conclusion that the

11  citizenship question will depress response rates among

12  non-citizens?

13    A.   Sure.  I'm happy to review my report.  It helps

14  to be more precise.  But generally I think some of the most

15  compelling evidence comes from the Census Bureau analysis

16  regarding the -- it's the Brown white memo.

17    Q.   Got it.  And this Exhibit 3 memo also does sort

18  of a preliminary analysis that ends up in that White paper,

19  is that right?

20    A.   My understanding is, is that it summarizes some

21  initial analyses that Brown et al, were working on related

22  to that.

23    Q.   Got it.  So looking at Exhibit 3, staying on the

24  same page, 1280, the section titled Self-Response Rate

25  Analysis.  Can you describe what this analysis is doing?

```
 1                MR. FREEDMAN:  Object to form and foundation.

 2                THE DEPONENT:  So the -- this is summarizing what

 3      was later in the Brown, et al, White memo that matches the

 4      administrative records to be able to identify households as

 5      citizen or non-citizen to be able to speak about the impact

 6      of the addition of the citizenship question on

 7      self-response.

 8                BY MR. EHRLICH:

 9           Q.   And this is comparing the 2010 census and the

10      2010 ACS, right?

11                MR. FREEDMAN:  Object to form and foundation.

12                THE DEPONENT:  Correct.

13                BY MR. EHRLICH:

14           Q.   Separately for citizen and non-citizen

15      households?

16           A.   Yes.

17           Q.   And the bottom of this paragraph, the last

18      sentence, it says once again --

19                MR. FREEDMAN:  Which paragraph are you --

20                MR. EHRLICH:   I'm sorry.  The second paragraph

21      under the heading of Self-Response Rate Analysis.

22                MR. FREEDMAN:  So the very bottom of the page?

23                MR. EHRLICH:  correct.  It says once again the

24      self-response rates were lower in the ACS than in 2010

25      census for both citizen and non-citizen households in this
```

1   2010 comparison.  Moreover, the decline in self-response

2   was 5.1 percentage points greater for non-citizen

3   households than for citizen households.

4           BY MR. EHRLICH:

5       Q.  Did I read that correctly?

6       A.  Yes.

7       Q.  Okay.  And so this is concluding that the

8   difference in self-response rate between all citizen

9   households and households with at least one non-citizen as

10  noted by administrative records is 5.1 percentage-wise,

11  right?

12          MR. FREEDMAN:  Object to form and foundation.

13          THE DEPONENT:  Among the sample that was able to

14  be matched of these datasets, yes.  And the analysis later

15  revised that particular estimate, and based on various

16  modeling functions had a wider range of -- sizes.

17          BY MR. EHRLICH:

18      Q.  Got it.

19      A.  Yes.

20      Q.  I'm handing you what's been marked as Exhibit 4.

21  (DOJ Exhibit 4 marked for identification.)

22          BY MR. EHRLICH:

23      Q.  Titled Understanding the Quality of Alternative

24  Citizenship Data Sources for the 2020 Census, by David

25  Brown, et al.  Bates stamped COM underscore DIS 00009833.

1  Can we turn to page 11.  Table 1 says 2016 ACS Internet

2  Self-Response Break-off Rates Percent by Screen, is that

3  right?

4      A.   Yes.

5      Q.   So this is showing the break-off rates for the

6  2016 ACS broken down by non-Hispanic whites, non-Hispanic

7  other and Hispanics, correct?

8          MR. FREEDMAN:  Object to foundation.

9          THE DEPONENT:  Yes.

10         BY MR. EHRLICH:

11     Q.   Okay.  Can you look at the break-off rate for

12  work location for Hispanics?  What is that rate?

13         MR. FREEDMAN:  Object to form and foundation.

14         THE DEPONENT:  1.246.

15         BY MR. EHRLICH:

16     Q.   And that's about double the break-off rate for

17  non-Hispanic whites, correct?

18     A.   Correct.

19     Q.   And the break-off rate for wage amount for

20  Hispanic, what is that?

21         MR. FREEDMAN:  Object to form and foundation.

22         THE DEPONENT:  .751.

23         BY MR. EHRLICH:

24     Q.   And that's higher than the break-off rate for

25  non-Hispanic whites, correct?

1            MR. FREEDMAN:  Object to form and foundation.

2            THE DEPONENT:  Yes.  That looks, yeah.

3            BY MR. EHRLICH:

4       Q.   And what is the break-off rate for work for wages

5   for Hispanics?

6            MR. FREEDMAN:  Object to form and foundation.

7            THE DEPONENT:  .590.

8            BY MR. EHRLICH:

9       Q.   And that's again higher than non-Hispanic white,

10   correct?

11            MR. FREEDMAN:  Same objection.

12            THE DEPONENT:  Correct.

13            BY MR. EHRLICH:

14       Q.   And the break-off rate for type of employee for

15   Hispanics?

16            MR. FREEDMAN:  Same objection.

17            THE DEPONENT:  .399.

18            BY MR. EHRLICH:

19       Q.   And again that's higher than the break-off rate

20   for non-Hispanic whites, correct?

21            MR. FREEDMAN:  Same objection.

22            THE DEPONENT:  Yes.

23            BY MR. EHRLICH:

24       Q.   And the break-off rate for health insurance for

25   Hispanics on the 2016 census or 2016 ACS, excuse me, what

1   is that?

2          MR. FREEDMAN:  Same objection.

3          THE DEPONENT:  .336.

4          BY MR. EHRLICH:

5     Q.   And that's again higher than non-Hispanic white

6   break-off rate on the 2016 ACS?

7          MR. FREEDMAN:  Same objection.

8          THE DEPONENT:  Yes.

9          BY MR. EHRLICH:

10    Q.   And the break-off rate for work duties for

11  Hispanics?

12         MR. FREEDMAN:  Do you have a question?

13         BY MR. EHRLICH:

14    Q.   What is that?

15         MR. FREEDMAN:  Same objection.

16         THE DEPONENT:  .266.

17         BY MR. EHRLICH:

18    Q.   And again that's higher than the break-off rate

19  for non-Hispanic whites on the 2016 ACS?

20    A.   Correct.

21    Q.   Okay.  And for the taxes question on the 2016

22  ACS, what was the break-off rate for Hispanics?

23         MR. FREEDMAN:  Same objection.

24         THE DEPONENT:  .259.

25         BY MR. EHRLICH:

1      Q.   And that's again higher than non-Hispanic whites,

2    correct?

3              MR. FREEDMAN:   Same objection.

4              THE DEPONENT:   Correct.

5              BY MR. EHRLICH:

6      Q.   And residence last year, what is the break-off

7    rate for Hispanics on the 2016 ACS?

8              MR. FREEDMAN:   Same objection.

9              THE DEPONENT:   .232.

10             BY MR. EHRLICH:

11     Q.   And that's higher than the break-off rate for

12   non-Hispanic white on the 2016 ACS, is that right?

13             MR. FREEDMAN:   Same objection.

14             THE DEPONENT:   Correct.

15             BY MR. EHRLICH:

16     Q.   So is it fair to say that each of these questions

17   we looked at on the 2016 ACS have break-off rates that

18   differentially impact Hispanics when compared to non-

19   Hispanic whites?

20             MR. FREEDMAN:   Same objection.

21             THE DEPONENT:   They are larger for Hispanics than

22   non-Hispanic whites, but none of them come close to the

23   differential that we see on the citizenship question.

24             BY MR. EHRLICH:

25     Q.   And the citizenship question on the 2016 ACS has

1   a break-off rate for Hispanics of .363, is that right?

2          MR. FREEDMAN:  Same objection.

3          THE DEPONENT:  Correct.

4          BY MR. EHRLICH:

5      Q.   And for non-Hispanic whites the break-off rate on

6   the 2016 ACS for the citizenship question is .035, is that

7   right?

8      A.   Correct.

9      Q.   Can we go to page 36?  Looking at Table 7.  Feel

10  free to review the -- text.

11         (Pause.)

12         BY MR. EHRLICH:

13     Q.   Have you reviewed this before?

14     A.   I have seen it before, although it was given to

15  me very late in the process in terms of my writing expert

16  report.  So I wasn't able to give it as much, nearly as

17  much attention as I would have preferred.

18     Q.   Yes.  Time is short in these cases.  Looking at

19  the top panel in Table 7.

20     A.   Um-hmm.

21     Q.   This mirrors the analysis we looked at for

22  Exhibit 3, right, Dr. Abowd's January 19th memo?

23         MR. FREEDMAN:  Object to form and foundation.

24         THE DEPONENT:  I mean, he was referencing a

25  different table in here, my understanding.

1               BY MR. EHRLICH:

2          Q.   So the top panel here, this looks at households

3     with at least one -- one AR non-citizen, right?

4          A.   Correct.

5          Q.   And compares it with households with AR all

6     citizen households?

7          A.   Correct.

8          Q.   Was that the same analysis that was done in

9     Exhibit 3?

10         A.   Well, so he was referencing Table 6.

11         Q.   Yes.

12         A.   Where you get the 5.1 difference in the --

13         Q.   Yes.

14         A.   Whereas this is the 11.9 difference in

15    difference, which was just one of the points I made was

16    that depending on the modeling assumptions that you make,

17    you can get -- you get a different effect.

18         Q.   Right.  So but the -- you're talking about the

19    bottom panel for the 11.9, right?

20         A.   Yes.

21         Q.   Okay.

22         A.   But I believe Dr. Abowd when he was referencing

23    the 5.1 that that was the difference in difference result

24    from Table 6.

25         Q.   Right.  And those same two groups, AR all citizen

1  households and households with at least one AR non-citizen

2  are analyzed at the top panel of Table 7, right?

3       A.   Yes.

4            MR. FREEDMAN:  Object to form and foundation.

5            THE DEPONENT:  Yes.

6            BY MR. EHRLICH:

7       Q.   And the bottom panel is analyzing two different

8  groups, right?

9            MR. FREEDMAN:  Object to foundation.

10           THE DEPONENT:  Yes.

11           BY MR. EHRLICH:

12      Q.   And what are those two groups?

13           MR. FREEDMAN:  Object to form and foundation.

14           THE DEPONENT:  So it looks like AR refers to

15  administrative record, and ACS, and then it's all citizen

16  households.

17           BY MR. EHRLICH:

18      Q.   And that's compared with another group?

19      A.   Well, it's comparing self-response rates for the

20  2010 ACS compared to the 2010 census, and what you see is

21  for all citizen households that you have a higher self-

22  response rate in the 2010 census compared to the 2010 ACS,

23  and that difference is 8.9 percentage points.

24      Q.   Got it.  And above that it says all other

25  households, right?

1    A.   Correct.

2    Q.   And what group is that?

3         MR. FREEDMAN:   Object to form and foundation.

4         THE DEPONENT:   I assume that refers to any

5    households that are not all citizen households.

6         BY MR. EHRLICH:

7    Q.   And then the drop in response rate from the --

8    between the 2010 census and the 2010 ACS is 20.7, right?

9    A.   Correct.

10   Q.   And so the difference in difference analysis here

11   in Table 7 the bottom panel appears to be that AR and ACS

12   all citizen households have a self-response rate that's

13   11.9 percentage points higher than all other households,

14   right?

15        MR. FREEDMAN:   Object to form and foundation.

16        THE DEPONENT:   Correct.

17        MR. FREEDMAN:   We've been going a little over an

18   hour.  Can we take a break?

19        MR. EHRLICH:   Yes.  Let me just ask one more

20   question, then we can take a break.

21        BY MR. EHRLICH:

22   Q.   So the paragraph below the table, the second

23   sentence says, other characteristics besides citizenship

24   status could be associated with the lower ACS self-response

25   and AR non-citizen household and all other household groups

1   could have a higher propensity to have such

2   characteristics.  Is that right?

3           MR. FREEDMAN:  I'm sorry.  You're talking about

4   the text paragraph, not the long footnote or the --

5           MR. EHRLICH:  Correct.

6           MR. FREEDMAN:  Okay.

7           THE DEPONENT:  And correct, yes, that was my --

8           MR. EHRLICH:  Okay, we can take a break.

9           MR. FREEDMAN:  Thank you.

10          (Off the record at 10:30 a.m.)

11          (On the record at 10:47 a.m.)

12          BY MR. EHRLICH:

13      Q.   Dr. Hillygus, we were looking at page 36 here of

14   the Brown white paper.

15      A.   Um-hmm.

16      Q.   You said you've reviewed this before, correct?

17      A.   Correct.

18      Q.   Okay.  And the text paragraph below Table 7, the

19   second sentence was the sentence I just read.  Can you read

20   the last sentence of that paragraph?

21      A.   To explore this possibility, we performed

22   Blinder-Oaxaca decompositions.

23      Q.   Do you know what Blinder-Oaxaca decompositions

24   are?

25      A.   Vaguely.  They're not something that I have done

1    before.  They're kind of discipline specific.  Much more

2    common in economics than other social science disciplines.

3         Q.   Got it.  So you don't perform Blinder-Oaxaca

4    decompositions in your work?

5         A.   No.  But even when I'm doing causal inference

6    type of modeling, I mean, it's, you know, it's just a

7    particular modeling assumption.

8         Q.   Okay.  And do you know what the modeling

9    assumption is for a Blinder-Oaxaca decomposition?

10        A.   So I don't want to misspeak on exactly, but

11   essentially what is going on here is they're attempting to

12   account for a set of -- for variants that you can see in

13   Table A-14, I believe is the one, as an attempt to account

14   for these other characteristics that might also be

15   associated with self-response rates.  But, you know, one of

16   the things that was a little bit frustrating about this to

17   the write-up is that the justification for that model

18   specification was not given.  And I would argue that some

19   of the items were not exactly ones that -- I mean, I think

20   an argument can be made as to ones that you might not want

21   to include.

22        Q.   Okay.  So let's go to Table A-14 then since

23   you're talking about it.  So these are the factors they're

24   attempting to rule out for the purposes of the Blinder-

25   Oaxaca decomposition analysis?

1          A.    Well, think about it just in terms of what

2     they're trying to do is remove from the prediction of the

3     effect of these particular variables.  Yeah.

4          Q.    Got it.

5          A.    It is standard practice for statistical analyses

6     to explain why you include particular variables in your

7     model, and that's not done here.  So I can certainly

8     speculation about their decision making but, of course this

9     is just reviewing their analyses.

10          Q.    So the first factor listed here is log household

11     size, is that right?

12          A.    Correct.

13          Q.    And so this means that the Blinder-Oaxaca

14     decompositions are taking into account log household size

15     in attempting to explain the difference in self-response

16     rates between the 2010 ACS and the 2010 census for these

17     groups at the tops of the columns, right?

18               MR. FREEDMAN:  Object to form and foundation.

19               THE DEPONENT:  That's my understanding of their

20     analysis.

21               BY MR. EHRLICH:

22          Q.    Okay.  And the second two groups of columns what

23     are those?

24               MR. FREEDMAN:  Same objection.

25               THE DEPONENT:  So it is the administrative record

1   and ACS all citizen versus all other households.

2          BY MR. EHRLICH:

3      Q.   Got it.

4      A.   And to be clear, I mean, this is basically just

5   talking about different comparisons.  That's one of the

6   points I made in my report was that you can make an

7   argument that given the differential undercount is relative

8   to whites that looking at just all citizen households as

9   kind of the baseline or all other house lines as a base

10  line is maybe not even the right benchmark comparison.

11     Q.   Okay.  We'll get there in a little bit.  So

12  looking at the left side, these are the factors that

13  they're attempting to account for with their Blinder-Oaxaca

14  decompositions?  Is that right?

15     A.   That's my interpretation of their analysis, yes.

16     Q.   Okay.  Do you see work location as one of the

17  factors?

18          MR. FREEDMAN:  Object to form and foundation.

19          THE DEPONENT:  No.  I see last week search for a

20  job.

21          BY MR. EHRLICH:

22     Q.   Do you see wage amount?

23          MR. FREEDMAN:  Same objection.

24          THE DEPONENT:  I don't.

25          BY MR. EHRLICH:

1        Q.   Do you see work for wages?

2             MR. FREEDMAN:  Same objection.

3             THE DEPONENT:  I don't.  I don't know how the

4    household income is computed relative to some of those

5    variables that you're mentioning.  So I'm not exactly sure

6    of the --

7             BY MR. EHRLICH:

8        Q.   Fair enough.  Do you see type of employee on the

9    left side of Table A-14?

10            MR. FREEDMAN:  Object to form.

11            THE DEPONENT:  No.

12            BY MR. EHRLICH:

13       Q.   Do you see health insurance as one of these

14   factors in Table A-14?

15            MR. FREEDMAN:  Same objection.

16            THE DEPONENT:  I do not.

17            BY MR. EHRLICH:

18       Q.   Do you see work duties?

19            MR. FREEDMAN:  Same objection.

20            THE DEPONENT:  I do not.

21            BY MR. EHRLICH:

22       Q.   Do you see taxes?

23            MR. FREEDMAN:  Same objection.

24            THE DEPONENT:  I do not.

25            BY MR. EHRLICH:

1      Q.    Do you see residence last year?

2            MR. FREEDMAN:  Same objection.

3            THE DEPONENT:  I do not.

4            BY MR. EHRLICH:

5      Q.    So we can go back to page 37.  The paragraph in

6  the middle of the page that starts the first term, can you

7  read the last sentence of that paragraph?

8            MR. FREEDMAN:  I'm sorry.  Where?

9            MR. EHRLICH:  The middle paragraph on page 37

10 that starts with the first term.

11           THE DEPONENT:  The --

12           MR. FREEDMAN:  Objection.  Asked and answered.

13           Go ahead.

14           THE DEPONENT:  The White paper says the

15 interpretation of the unexplained variation represents the

16 citizenship question effect is dependent on the assumption

17 that there are no unobserved variables relevant to the

18 difference in differences in self-response across the two

19 surveys.

20           BY MR. EHRLICH:

21     Q.    What does that mean?

22           MR. FREEDMAN:  Object to form and foundation.

23           THE DEPONENT:  It means that an RCTU would have

24 been better at the end of the day.  That when you're trying

25 to do observational work and draw a causal inference that

1   you have to deal with both observed and unobserved

2   confounders.  And they presumably are very limited in the

3   things that are observed that they can account for.  So,

4   for instance, as I explained in my report the reason that

5   we expect to see this impact of the citizenship question is

6   because citizenship is a sensitive question on which some

7   groups in the population are concerned about

8   confidentiality.  If we had that directly measured, right,

9   that would allow us to explicitly kind of test for that.

10  We don't have that directly measured.  And so, you know,

11  they are attempting to account for some of -- the variety

12  of factors that account for differences in self-response

13  rates.  They have to do it imperfectly.  All social

14  scientists who try to do causal inference work recognize

15  this.  They also say that their conclusions are

16  conservative for a variety of reasons.  I think that the

17  model specification is potentially however one of them.  In

18  part because they account for some -- treatment variables,

19  I think.  They don't explain or justify why they have the

20  particular model specification that they do, which is

21  standard practice.

22          BY MR. EHRLICH:

23      Q.  Got it.  So turning to page 38.  Table 8 is

24  showing the analysis of some factors we just looked at in

25  Table A-14 of this White paper, right?

```
 1              MR. FREEDMAN:  Object to form and foundation.
 2              THE DEPONENT:  Yes.  That's my understanding of
 3   their analysis.
 4              BY MR. EHRLICH:
 5      Q.   And so looking at the bottom panel, what is the
 6   difference in differences for AR and ACS all citizen
 7   households versus all other citizen households?
 8              MR. FREEDMAN:  Same objection.
 9              THE DEPONENT:  Which one?
10              BY MR. EHRLICH:
11      Q.   The difference in differences.
12      A.   So the 11.9?
13      Q.   Yeah.  And that's the same 11.9 from Table 7,
14   right?
15      A.   Yes.
16      Q.   And so Table 8 is trying to apply the
17   Blinder-Oaxaca decompositions to that in order to explain
18   certain factors that they tried to account for, right?
19      A.   Yes.
20              MR. FREEDMAN:  Objection.
21              BY MR. EHRLICH:
22      Q.   And that -- the part that's explained by the
23   factors that they attempted to control for is the row that
24   says explained on the bottom of Table 8?
25              MR. FREEDMAN:  Same objection.
```

1          BY MR. EHRLICH:

2    Q.   Is that right?

3    A.   Correct.

4    Q.   And, I guess, then the part that says unexplained

5  would be other factors, right?

6          MR. FREEDMAN:  Same objection.

7          THE DEPONENT:  Yeah.

8          BY MR. EHRLICH:

9    Q.   So and the number for -- what is the number for

10  unexplained in this Blinder-Oaxaca decomposition

11  comparison?

12          MR. FREEDMAN:  Same objection.

13          THE DEPONENT:  The negative 6.1.

14          BY MR. EHRLICH:

15    Q.   And so if there were no other factors to consider

16  other than the ones they ruled out and the citizenship

17  question then this entire 6.1 would be due to the

18  citizenship question, correct?

19          MR. FREEDMAN:  Same objection.

20          THE DEPONENT:  I don't feel entirely comfortable

21  with that interpretation of the model given the set of

22  assumptions and controls.  So --

23          BY MR. EHRLICH:

24    Q.   So this is taking into account the factors that

25  they controlled for, correct, that we looked at in Table A-

1   14?

2           MR. FREEDMAN:  Same objection.

3           THE DEPONENT:  And as I explained in my report

4   very briefly, you know, I think that they may have over

5   controlled for some things.

6           BY MR. EHRLICH:

7       Q.   Got it.

8       A.   So but generally, I think your general sense of

9   the interpretation I believe is also my interpretation of

10  their analysis.

11      Q.   Okay.  And so is it fair to say that that 6.1

12  unexplained difference according to the Blinder-Oaxaca

13  decomposition comparison incorporates a number of other

14  unobserved factors?

15          MR. FREEDMAN:  Object to form and foundation.

16          THE DEPONENT:  No.

17          BY MR. EHRLICH:

18      Q.   Can you explain?

19      A.   It accounts for some observed factors.

20      Q.   Isn't it right that the observed factors are the

21  explained part?

22          MR. FREEDMAN:  Same objection.

23          THE DEPONENT:  So the -- oh, so they explained

24  accounts for the observed, yeah.

25          BY MR. EHRLICH:

1      Q.    And the non-explained is the unobserved factors,

2   right?

3            MR. FREEDMAN:   Same objection.

4            THE DEPONENT:   Assuming, you know, with those

5   modeling assumptions, yes.

6            BY MR. EHRLICH:

7      Q.    And the observed factors includes the citizenship

8   question, right?

9            MR. FREEDMAN:   Same objection.

10            THE DEPONENT:   So the explained are -- there are

11   variables in A-14.

12            BY MR. EHRLICH:

13      Q.    And the citizenship is not in A-14, right?

14      A.    Correct.

15      Q.    And so that would fall into the unexplained

16   column in Table 8?

17            MR. FREEDMAN:   Same objection.

18            BY MR. EHRLICH:

19      Q.    Or row.   Sorry.   Is that right?

20      A.    I think.   I feel like I'm getting a little bit

21   muddled in the conversation, but yeah.

22      Q.    Sure.   So I'm just trying to, I'm just trying to

23   clarify what the 6.1 is in the Blinder-Oaxaca

24   decomposition.   And so when you account for the factors

25   that's in the explained row of Table 8 explaining the

1   Blinder-Oaxaca decomposition, is that right?

2              MR. FREEDMAN:  Object to form and foundation.

3              THE DEPONENT:  Again, you know, I think my

4   interpretation of their analysis is consistent with that,

5   yes.

6              BY MR. EHRLICH:

7       Q.   Okay.

8       A.   But I also don't want to --

9       Q.   I understand.  But the -- so the unexplained row

10  includes other factors that weren't listed in Table A-14,

11  one of which is the citizenship question, is that right?

12             MR. FREEDMAN:  Object to form and foundation.

13             THE DEPONENT:  I think if I interpret that

14  correctly, yes.

15             BY MR. EHRLICH:

16      Q.   Okay.  And there are other factors along with the

17  citizenship question that also are not considered in that

18  6.1?

19             MR. FREEDMAN:  Same objection.

20             THE DEPONENT:  Correct.

21             BY MR. EHRLICH:

22      Q.   Okay.  There's a lot of math.  And then just

23  turning briefly to Table 9, and feel free to review as much

24  as you need to, to understand the table.

25             (Pause.)

1       A.    Okay.

2       Q.    So the bottom panel of Table 9 -- strike that.

3  The Table 9 uses the 2016 ACS, right?

4       A.    Correct.

5       Q.    Whereas Table 8 had used the 2010 ACS?

6       A.    That is my interpretation of their analysis, yes.

7       Q.    So the -- is it fair to say that this is -- that

8  Table 9 is essentially updating Table 8 using the 2016 ACS

9  numbers?

10          MR. FREEDMAN:   Object to form and foundation.

11          THE DEPONENT:   That is my interpretation of their

12  analysis, yes.

13          BY MR. EHRLICH:

14      Q.    Okay.  So that looking at the bottom panel of

15  Table 9, this difference in differences what -- strike

16  that.  The bottom panel of Table 9, what is the difference

17  in differences between the AR and ACS all citizen

18  households and all other households?

19          MR. FREEDMAN:   Object to form and foundation.

20          THE DEPONENT:   Negative 5.8.

21          BY MR. EHRLICH:

22      Q.    Okay.  And that's essentially the same as the

23  negative 6.8 in Table 8 except it's using the 2016 ACS data

24  instead?

25          MR. FREEDMAN:   Object to form and foundation.

1          BY MR. EHRLICH:

2     Q.   Is that right?

3     A.   I think that's my interpretation of -- I mean, I

4  think that's correct based on my review of their analysis.

5     Q.   Okay.  Can we turn to page 54?  That's Bates

6  stamp 9886.  So the bottom paragraph, last sentence.  Can

7  you read what that says?

8     A.   The implication is that adding a citizenship

9  question to the 2020 census would lead to lower

10 self-response rates in households potentially containing

11 non-citizens resulting in more non-response follow-up field

12 work, more proxy responses, and a lower quality population

13 count.

14    Q.   The authors don't use the 5.8 number we just

15 looked at, right?

16         MR. FREEDMAN:  Object to form and foundation.

17         BY MR. EHRLICH:

18    Q.   In that paragraph about conclusions.

19         MR. FREEDMAN:  Object to form.

20         THE DEPONENT:  They don't specifically reference

21 5.8, no.

22         BY MR. EHRLICH:

23    Q.   Do they cite any projection of how much

24 self-response would be reduced for households potentially

25 containing non-citizens?

1           MR. FREEDMAN:  Object to form.  You talking about

2    in the report or in that specific sentence?

3           MR. EHRLICH:  In this conclusion paragraph.

4           THE DEPONENT:  No, they don't specifically

5    reference any of their precise estimates in the conclusion

6    paragraph.

7           BY MR. EHRLICH:

8       Q.   And their conclusions only relate to households

9    containing non-citizens, right?

10          MR. FREEDMAN:  Object to form.

11          THE DEPONENT:  That is correct.

12          BY MR. EHRLICH:

13      Q.   Okay.  I want to turn to one of the other

14   conclusions we were discussing at the beginning about how

15   the self-response, the differential self-response rate will

16   not be corrected by outreach and NRFU.  Is that one of the

17   conclusions that you reached?

18          MR. FREEDMAN:  Object to form.

19          THE DEPONENT:  Yes.

20          BY MR. EHRLICH:

21      Q.   Okay.  Can you describe the basis for your

22   conclusion that increased outreach through the integrated

23   partnership and communications campaign will not fully

24   address the differential self-response rate?

25          MR. FREEDMAN:  Object to form.

1            THE DEPONENT:  Sure.  As I outlined in my

2   report --

3            BY MR. EHRLICH:

4       Q.   I'm sorry.  Can you set aside the report?

5       A.   Oh, sure.

6            MR. FREEDMAN:  You want her to do it from memory?

7   I mean is that --

8            MR. EHRLICH:  Yeah.  I'm talking generally about

9   her conclusions right now.

10           MR. FREEDMAN:  I mean, she -- I mean there's like

11  pages of analysis.

12           MR. EHRLICH:  I understand.

13           THE DEPONENT:  So in terms of --

14           MR. FREEDMAN:  Hold on.  Hold on.  Object to

15  form.  Go ahead.

16           THE DEPONENT:  So in terms of the outreach

17  campaign, the concern about its ability to correct the

18  differential self-response is partly just based on the fact

19  that they haven't done the research that the Census Bureau

20  deems necessary to do, but ultimately was cancelled because

21  of budgetary concerns.  Second, to the extent that they

22  have started doing research for the communications

23  campaign, it points to all the issues that I talk about in

24  my report, and that we know is this climate that makes the

25  census count more challenging.  And so, you know, there is

 1   no evidence that the communications campaign is going to

 2   somehow be able to fix the differential self-response that

 3   is attributable to the addition of the citizenship

 4   question.  And some of the internal research suggests that

 5   confidentiality concerns in particular can be especially

 6   difficult to influence.  My own research, the book that I

 7   wrote on the 2000 census was focused on the ability to have

 8   an effect on self-response with a communication campaign.

 9   There are a number of challenges that I haven't seen the

10   Census Bureau be able to address, in part because they

11   haven't been able to do the research.  We also face a more

12   fragmented communication environment than we did in 2010.

13   That complicates how you actually get your message to the

14   people that you intend to reach.  Some of the, you know,

15   critical players for the communication campaign are the

16   trusted voices.  There has been concern that the trusted

17   voices are not going to be able to -- be able to make a

18   compelling case in their committees to increase

19   self-response.  I have a, I hope, a far more coherent

20   explanation in my report that I'm happy to reference if it

21   would be useful.

22          BY MR. EHRLICH:

23     Q.   Sure.  We'll get to your report in a little bit.

24   So when you were talking about the -- you were talking

25   about the internal research the census has done on this, is

1    that right?

2        A.    Um-hmm.

3        Q.    Can you describe what that research was?

4              MR. FREEDMAN:  Object to form.

5              THE DEPONENT:  So I know they have CBAMS and I

6    didn't get the updated CBAMS for this time around.  But

7    looking at CBAMS for 2010 points to concerns about

8    confidentiality among Hispanics.  And so that was, again,

9    one of the indications of this hard to count group.  There

10   was a CSM research project on administrative records that I

11   recall.  I can't remember who the authors were in the

12   Census Bureau who were looking specifically at attitudes

13   about administrative records.  And that was the one that

14   said that privacy attitudes could be moved, but

15   confidentiality concerns couldn't.

16             BY MR. EHRLICH:

17       Q.    Was the 2010 CBAMS that you reviewed was that a

18   qualitative assessment of people's attitudes?

19       A.    No.  There was -- these are survey -- I mean,

20   I've seen both qualitative and also survey-based estimates.

21       Q.    Okay.  And in what context was the 2010 CBAMS

22   conducted?

23             MR. FREEDMAN:  Object to form and foundation.

24             THE DEPONENT:  I believe that it was conducted in

25   2008 to, again, inform the communications campaign going

1   into 2010.

2            BY MR. EHRLICH:

3       Q.   Okay.  And can you describe the CSM research that

4   you were just referencing?

5       A.   Not beyond the description I gave about

6   reviewing.

7       Q.   Without reviewing your report?

8       A.   Yeah.  I'm happy to find the citation, if it's

9   useful.

10      Q.   Are there any other sources that you reviewed in

11  reaching your conclusion that the differential

12  self-response rate will not be -- will not be fully

13  addressed by the outreach campaign?

14           MR. FREEDMAN:  Do you want her to consult her

15  report?

16           MR. EHRLICH:  No.

17           MR. FREEDMAN:  You just want a memory test of

18  like how much -- whether she remembers anything else?

19           MR. EHRLICH:  No.  I would just like her to

20  answer the questions I'm asking.

21           MR. FREEDMAN:  You've been promising for almost

22  two hours that she would be allowed to consult her report.

23  So at some point, I think you should ask her questions

24  about what's actually in her report rather than conducting

25  a memory test.  She can answer if she remembers --

1          MR. EHRLICH:  I would just like her to answer the

2     questions that I'm asking.  We'll look at the report when

3     we look at the report.

4          THE DEPONENT:  I don't remember anything

5     specifically else.

6          BY MR. EHRLICH:

7     Q.   Okay.

8     A.   I'm happy to take a look at my report, if you

9     want me to.

10    Q.   Do you know if the 2010 CBAMS included -- that

11    you reviewed included research on reactions to a

12    citizenship question?

13    A.   Did not.

14    Q.   How about the CSM research that you reviewed?

15    A.   It did not.  This is one of the big gaps in

16    knowledge is that the research hasn't been conducted

17    specifically about the citizenship question and the

18    attitudes about it.  I don't know what research is going on

19    right now but --

20    Q.   Understood.  You mentioned your book on the 2000

21    census.  Can you describe your conclusions in the book?

22         MR. FREEDMAN:  Object to form.

23         THE DEPONENT:  Dust those off, those cobwebs.

24    It's been awhile.  But what we find is that concerns about

25    privacy at the time depressed cooperation among those who

1    have privacy concerns because of the salience of that

2    issue.  So in that sense it was really highlighting the

3    importance of the macro environment in terms of people's

4    willingness to complete.  We also looked at the impact of

5    the communication campaign, and found an increase

6    particularly in awareness of the census over the course of

7    that communications campaign.  And so my take away would be

8    that communications can have an effect on cooperation at

9    the same time that this macro environment really matters

10   particularly for subgroups who might consider questions to

11   be particularly sensitive.  It's a different set of issues

12   in 2000.  But in terms of that underlying model of survey

13   response that it's essentially the same.

14           BY MR. EHRLICH:

15       Q.   Did the 2000 census have a citizenship question?

16       A.   It did not.

17       Q.   It did not on the short form, right?

18       A.   Correct.

19       Q.   On the long form did it have one, a citizenship

20   question?

21       A.   I don't think it did actually.  Did it?  I'm --

22       Q.   It was a long time ago.

23       A.   It was long -- yeah, sorry.

24       Q.   That's okay.

25       A.   I should know that, and my mind is fuzzy with

1    cough medicine.

2              MR. FREEDMAN:  I'll interpose an objection that

3    there's better evidence than asking you --

4              THE DEPONENT:  Right.

5              MR. FREEDMAN:  Go ahead.

6              BY MR. EHRLICH:

7         Q.   And so you mentioned the internal research from

8    the Census Bureau including the 2010 CBAMS and the CSM

9    research, and you mentioned your book on the 2000 census in

10   terms of materials you consulted for supporting your

11   conclusion that the outreach campaign will not fully

12   mitigate the issues with differential self-response.  Is

13   that right?

14             MR. FREEDMAN:  Object to form.  Mischaracterizes

15   her testimony.

16             THE DEPONENT:  I can't remember if one of the

17   things that I also relied on was some of the qualitative

18   evidence the Census Bureau.  Certainly the qualitative

19   evidence from the Census Bureau was relevant to my overall

20   opinion.  And so I'm happy to talk about it.

21             BY MR. EHRLICH:

22        Q.   But what qualitative evidence was that?

23        A.   So there was the focus groups.  Most recently

24   there's the focus groups from the CBAMS that I've just now

25   seen that wasn't incorporated into my report.  There was

1   the report from a couple of members of the CSM about

2   spontaneous concerns about confidentiality that came about

3   not in a focus group dedicated to understanding what the

4   impact of the citizenship question, which in some way is

5   actually even more compelling about the importance because

6   these were things that were volunteered in discussions

7   about, I think, it was language testing for instance.  And

8   so that -- those AAPOR presentations were something that I

9   did rely on.

10        Q.   What is AAPOR?

11        A.   American Association of Public Opinion

12   Researchers.  It's a national organization that is a big

13   organization for survey methodologists.

14        Q.   Got it.  And you said that was qualitative

15   research from focus groups?

16        A.   Qualitative in -- I mean, I can review if you'd

17   like, but my recollection is, is that there was qualitative

18   research from focus groups not specific to the citizenship

19   question in which people spontaneously brought up issues of

20   confidentiality.

21        Q.   Got it.  Can you think of any other sources right

22   now that you consulted in reaching your conclusion that the

23   differential self-response rate will not be fully mitigated

24   by the outreach campaign?

25             MR. FREEDMAN:  Again, you want her to do that

1    from memory, not consult what's actually in her report?

2              MR. EHRLICH:  I just asked her if she can think

3    of any other ones that she consulted right now.

4              THE DEPONENT:  Not off the top of my head.  I'm

5    certain I have 176 footnotes, as people have mentioned.  So

6    I am certain that I might have others that I'm happy to

7    talk about.

8              BY MR. EHRLICH:

9        Q.    Okay.  But without the report in front of you

10   that's --

11       A.    Yeah.

12       Q.    Okay.  Those are all the sources you recall right

13   now?  Right?

14       A.    True.

15       Q.    Okay.  Can you turn back to Exhibit 4, which is

16   the Census Bureau authors and their white paper?

17       A.    Uh-huh.

18       Q.    Page 42, please.  The second paragraph here, can

19   you read the first sentence of that paragraph?

20       A.    Using these estimates as well as the data in

21   Table 12, we can develop cautious estimates of the data

22   quality and cost consequences of adding the citizenship

23   question to the enumeration form.

24       Q.    And when that sentence says these estimates, do

25   you know what that is referring to?

1          MR. FREEDMAN:  Object to form and foundation.

2          THE DEPONENT:  I don't without review.  But I

3    presume they're referencing in part the 5.8 difference in

4    difference.

5          BY MR. EHRLICH:

6     Q.   We've already talked about where that comes from

7    extensively.

8     A.   Um-hmm.

9     Q.   But that number is an attempt to figure out the

10   possible drop in self-response rate for households

11   potentially containing non-citizens, right?

12         MR. FREEDMAN:  Object to form and foundation.

13         THE DEPONENT:  Can you state that again?

14         BY MR. EHRLICH:

15    Q.   Sure.  That 5.8 difference in differences was an

16   attempt to estimate the potential drop in differential

17   self-response for households potentially containing non-

18   citizens.

19         MR. FREEDMAN:  Object to form and foundation.

20         THE DEPONENT:  Not potentially containing.  The

21   ones that have been identified, I believe, as not being all

22   citizens.  And, of course, with the assumptions made in

23   calculating the estimate.  But, yes, it is an estimate of

24   the impact on self-response.

25         BY MR. EHRLICH:

1      Q.   So if the households did not contain all

2   citizens, then it was included in the latter group of every

3   other household, right?

4           MR. FREEDMAN:  Object to foundation.

5           THE DEPONENT:  I --

6           BY MR. EHRLICH:

7      Q.   You can feel free to review if you'd like.

8      A.   So I believe the 5.8, and this is from my memory,

9   but this is their analysis.  So, you know, I'm happy to be

10   corrected.  I believe that the difference between the 5.1

11   and the 5.8 is the assumption made about individuals who --

12   for whom citizenship is missing in the administrative

13   record.  And that the 5.1 assumes that those individuals

14   are citizens, and so it puts them in that part of the

15   comparison, and the 5.8 does not.  But that's just my

16   recollection of, you know, of their analysis.

17      Q.   Got it.

18      A.   And then I -- my understanding of this sentence

19   is to say we take the self-response estimate that we have

20   as long as we buy all the assumptions that go into that

21   estimate, and that we can then look at what that means in

22   terms of cost consequences and some data quality.

23      Q.   Got it.  And that sentence also says that the

24   data from Table 12.  Can you describe what the data in

25   Table 12 is?

1          MR. FREEDMAN:  Object to the foundation.

2          THE DEPONENT:  Sure.  My interpretation of their

3     analysis here is that they are comparing the quality of

4     proxy respondents in the NRFU operation compared to those

5     who are self-responding.  Which in 2010 self-responding was

6     a mail-back, whereas in 2010 for most people that would be

7     an Internet completion.

8          BY MR. EHRLICH:

9     Q.   So looking at this bottom paragraph of page 42,

10    seems to go into page 43.  Can you describe what that

11    analysis is doing?

12         MR. FREEDMAN:  Object to form and foundation.

13         THE DEPONENT:  I'm happy to review the paragraph.

14         BY MR. EHRLICH:

15    Q.   Sure.

16    A.   If you want me to interpret their analysis.

17         (Pause.)

18    A.   So to summarize their analysis what they're doing

19    is with some additional assumptions which, by the way, one

20    of the assumptions it's a pretty big stretch is to say that

21    anyone who is a citizen household will not be affected by

22    the citizenship question.  But that's in my report.  So

23    they're saying, okay, if we take that 5.8 percent, we can

24    then look at what the projected increase is in NRFU, and we

25    could look to see how likely we are to get, you know, the

1    increase in proxy responses instead of self-responses.  And

2    then the subsequent -- what that means in terms of the

3    projected whole person imputations and erroneous

4    enumerations.  And then ultimately what that means in terms

5    of being linkable to administrative records.  And the key

6    takeaway of these numbers, again, these numbers are resting

7    on some assumptions that I call into question in my report

8    in rebuttal.  But still the takeaway is not one that I

9    disagree with.  And that is, is that you're going to see

10   lower data quality because proxy respondents don't give as

11   good data as a self-response.

12        Q.   When you say data quality, what do you mean by

13   that?

14        A.   So that has a very specific meaning.  Data

15   quality has defined in terms of utility integrity and

16   objectivity.  In common usage you think of data quality as

17   kind of accuracy.  And so that's how I was using it right

18   there.  But in terms of data quality there, you know, is a,

19   is kind of this broader definition.  And actually but it

20   does apply here, right?  Because if you're using -- if you

21   have a high percentage of imputations and proxy

22   respondents, then the utility of the resulting data is

23   potentially lower because it's lower, less accurate.  And

24   so these things are all linked together.

25        Q.   And when you're talking about accuracy, you're

1  talking about the quality of the data you're receiving, is

2  that right?

3       A.   Getting the right answer.

4       Q.   For the questions on the form, right?

5       A.   Correct.

6       Q.   But you're not referring to the actual count of

7  people?

8       A.   Correct.

9       Q.   Does this Census Bureau analysis that you just

10  reviewed, does that say anything about possible net

11  undercounts?

12       A.   It does not.  Except actually, well, no, it does

13  not.

14       Q.   Can we go back to Exhibit 3 for a moment?  This

15  is the January 19th memo to Secretary Ross again.  And

16  you've reviewed this before today, right?

17       A.   Correct.

18       Q.   Does this analysis contain the same type of

19  analysis that we've just looked at for Exhibit 4 in terms

20  of possible increases in cost for NRFU?

21            MR. FREEDMAN:  Object to form and foundation --

22            THE DEPONENT:  Section B-4 is a cost analysis.  I

23  don't know if that's what you're --

24            BY MR. EHRLICH:

25       Q.   And so turning to page 1282, the second paragraph

```
1   from the bottom.  This is talking about an increase in NRFU

2   workload, right?  And the associated cost?

3            MR. FREEDMAN:  Object to form.

4            THE DEPONENT:  Correct.

5            BY MR. EHRLICH:

6       Q.   I'm sorry.  And when I say NRFU you know I mean

7   non-response follow-up?

8       A.   Correct.

9       Q.   Okay.  Does this analysis have any discussion of

10  net undercount?

11           MR. FREEDMAN:  Object to form.

12           THE DEPONENT:  It does not.

13           MR. EHRLICH:  Can we take a quick break?

14           MR. FREEDMAN:  Sure.

15           (Off the record at 11:34 a.m.)

16           (On the record at 11:50 a.m.)

17           MR. EHRLICH:  I'm handing you Exhibit 5.

18  (DOJ Exhibit marked for identification.)

19           BY MR. EHRLICH:

20      Q.   It's the expert report and declaration of D.

21  Sunshine Hillygus, PhD.  Do you recognize this?

22      A.   I do.

23      Q.   I'd just like to walk through this report a

24  little bit.  Can you turn to page 4, please?  And the

25  bottom paragraph that says the undercount.  Can you read
```

1  that first sentence?

2       A.   Although the U.S. Census Bureau has the goal to

3  count everyone once, only once and in the right place,

4  scientific measurements of census accuracies since 1940

5  have shown a persistent and disproportionate undercount of

6  some population subgroups, including racial and ethnic

7  minorities -- and children immigrants.

8       Q.   Can you describe the basis for your opinion that

9  the -- that census accuracies since 1940 have shown

10 persistent and disproportionate undercounts of immigrants?

11          MR. FREEDMAN:  Object to form.

12          THE DEPONENT:  So there's a considerable basis of

13 research, like, De la Puente, the ethnography researches

14 are some of the ones that have looked at the differential

15 undercount in particular.  And I talk a little bit more

16 about that later in the report.

17          BY MR. EHRLICH:

18      Q.   And what does that research show?

19      A.   Just that the hard to count population, the

20 Census Bureau recognizes these groups as hard to count

21 populations, are less likely to be counted.

22      Q.   Fair enough.  And there's a specific -- is there

23 a Census Bureau analysis on the disproportionate

24 undercounts of immigrants?

25          MR. FREEDMAN:  Object to form.

1                THE DEPONENT:  So in terms of the Post

2     Enumeration Survey and the demographic analyses that are

3     the specific coverage measurement of the Census Bureau,

4     that that -- I don't believe immigrants have been included

5     as a subgroup.  However, there is Census Bureau research,

6     ethnographies and other research that certainly has looked

7     at the undercount of immigrants.

8          Q.   And what -- are those?

9          A.   The one that comes to mind immediately is De la

10    Puente.  But, you know, I can look through it.

11         Q.   Sure.  Do you cite that in here?

12         A.   Yeah.  So in looking at the differential

13    undercount, my recollection of some of the citations that

14    are particularly valuable for this particular point might

15    be Kissam (ph.) from 2017, the differential undercount of

16    Mexican immigrant families in the U.S. census.  I don't

17    believe that's a Census Bureau person, but and then De la

18    Puente, 1993, why are people missed or erroneously

19    enumerated in the census, a summary of findings from

20    ethnographic research would be another.  In my rebuttal the

21    Fine and West, the exploratory assessment of the 1986 Los

22    Angeles test census.

23         Q.   I'm sorry.  You're looking at your rebuttal?

24         A.   So that I think that's not cited in my main

25    report.

1      Q.   Okay.  Let's just focus on the main report now.

2  Turn to page 5, the first full paragraph.  It says, at the

3  same time as the decennial census count -- decennial count

4  undercount some segments of the population decennial has

5  also overcounted whites in 2000 and 2010 censuses largely

6  as a result of double counting those with second homes or

7  those with college students away from home.  Can you

8  describe your basis for the basis that whites have been

9  overcounted in 2000 and 2010 due to double counting of

10  those with second homes or college students?

11      A.   Yeah.  That's just one, one explanation for how

12  you can end up with overcounting.

13      Q.   Okay.

14      A.   Yeah.

15      Q.   Did that come from somewhere?

16      A.   I mean, we talk about it my 2006 book, and I

17  mean, you know, I think that in terms of attributing

18  explicitly duplications that is my, you know, general

19  understanding as opposed to that I can give you a specific

20  citation to those particular factors.  Those are model

21  factors that explain the overcounting.

22      Q.   Okay.  So you're just saying that these are a

23  couple of factors that contribute  --

24      A.   Yeah.

25      Q.   -- to that?

1        A.    For sure.

2        Q.    Okay.  Can we go to page 7, please?  Can you read

3    the second sentence of Footnote 21?

4        A.    Incentives are obviously not a relevant factor

5    for the decennial census, but this example highlights the

6    way the survey design decisions can shape the respondent

7    participation.

8        Q.    Okay.  When you say incentives there, what do you

9    mean?

10       A.    So what I was referencing was the fact that when

11   we think about the survey participation decision that

12   people might have characteristics that make them more or

13   less likely to participate in a survey.  But their decision

14   to actually participate or not depends not only on their

15   characteristics but also the design of the survey and the

16   external environment.  The design of the survey includes a

17   wide variety of different factors, and that can include the

18   questionnaire, the question order.  It can include the mode

19   of the survey.  And incentives refers to if you give

20   somebody money or sometimes the incentives are not actually

21   money.  They might be points if it's some type of survey.

22   But those incentives can affect somebody's decision about

23   whether to participate or not.  We don't give people

24   incentives, you know, for the -- for a census survey.

25   However, there was reference in Secretary Ross's memo about

1   a Nielson study, and so it was pointed out that was one of

2   the ways in which it's different, and all of those design

3   decisions matter.

4        Q.   Got it.  So for the census there's no financial

5   incentive, right?

6        A.   So what we term in survey methodology as an

7   incentive is the -- in exchange for your completion you

8   will receive a gift card or a check or points.

9        Q.   And that doesn't happen in the census?

10       A.   That does not happen in the census.

11       Q.   Okay.  If only.

12       A.   Yeah.

13       Q.   But there -- is there such a thing as negative

14   incentives?  So let me ask a different question.  Is

15   responding to the census required by law?

16       A.   It is.

17       Q.   And do you know if there's criminal penalties for

18   not answering the census?

19            MR. FREEDMAN:  Object to form.

20            THE DEPONENT:  My understanding is that there has

21   not been a prosecution in a very long time.

22            BY MR. EHRLICH:

23       Q.   But they exist?

24       A.   It is my understanding that the Department of

25   Justice, I believe, could, yes.

1       Q.   And so are these criminal penalties some sort of

2    incentive for people to answer the census?

3            MR. FREEDMAN:  Object to form.

4            THE DEPONENT:  It is not the way that survey

5    methodologists would think about it.  We refer to an

6    incentive as a very explicit part of the survey design.

7    Certainly the mandatory nature of the census is one feature

8    of the design that matters, and it matters a lot.  There is

9    no doubt about that.  I'm not sure I would label it

10   incentive or not.

11           BY MR. EHRLICH:

12       Q.   Got it.

13       A.   Yeah.

14       Q.   So it's not an incentive in the terminology

15   you're using?

16       A.   Yeah, right.

17       Q.   Okay.  How did you take into account in your

18   analysis that the census is mandatory?

19           MR. FREEDMAN:  Object to form.

20           THE DEPONENT:  So one of the ways is that where

21   possible I tried to look at research that was explicit to

22   census, census surveys that were mandatory.  It's certainly

23   a case that -- certainly the case that the mandatory nature

24   of the census is a factor that does not come into play in

25   all of the surveys that have been cited here though.

1          BY MR. EHRLICH:

2      Q.   What other census surveys that you relied on also

3   have that mandatory nature?

4      A.   The ACS.

5      Q.   Okay.  Any other ones?

6      A.   Not to my knowledge.

7      Q.   Looking at the third full paragraph on page 7.

8   I'd like to talk about this first sentence.  Can you just

9   read that for me?

10     A.   For the 2020 decennial census scientific

11  framework for thinking about survey participation would

12  best predict that the subgroups in the population

13  disproportionately concerned about the confidentiality of

14  the citizenship question will be less likely to respond;

15  more likely to skip the individual question, and more

16  likely to give an inaccurate response.

17     Q.   Okay.  So when you say that subgroups in the

18  population disproportionately concerned about

19  confidentiality of the citizenship question will be less

20  likely to respond, can you explain what you mean by less

21  likely?

22     A.   Yes.  So as I explained it, the framework for

23  understanding the survey participation decision depends on,

24  again, both the characteristics of the individual, the

25  characteristics of the survey, and the broader survey

1    environment.  And so at issue here is that there is going

2    to be some individuals who consider the citizenship

3    question to be sensitive because of concerns about

4    confidentiality.  And so they will respond in a way that is

5    different.  And that could include not responding at all.

6    It could include skipping the individual question.  It

7    might include breaking off, as we've talked about before.

8    Or it could include providing an inaccurate response.  And

9    all of those are ways that we have seen within the survey

10   methodology literature that people respond to sensitive

11   items.

12       Q.   Okay.  Do you know -- so for the subgroups in the

13   population that you're referring to here, do you know how

14   much less likely they are to respond with the addition of a

15   citizenship question?

16       A.   Precisely no.  But the internal Census Bureau

17   research has their estimates.   The thing that I do is I

18   review all of the literature and the analyses, and conclude

19   that all of the evidence cumulative to all points in the

20   same direction, that it will be a negative effect.  There

21   is nothing that suggest to me that we would find a positive

22   factor for instance.

23       Q.   Okay.

24       A.   The size of that negative effect, the Census

25   Bureau analysis is the closest thing we have because we

1   don't have an RCT that gave a precise estimate.

2          Q.   Yeah.  And so when you say subgroups in the

3   population disproportionately concerned about

4   confidentiality would be more likely to skip the individual

5   question, you also don't have a quantitative estimate of

6   how much more likely they are to skip an individual

7   question?

8          MR. FREEDMAN:  Object to form.

9          THE DEPONENT:  Again, all the evidence points to

10  a impact on skipping.  But I can't speak to a precise

11  estimate of the size of that because the Census Bureau

12  didn't do the pre-testing that would allow us to calculate

13  that.

14         BY MR. EHRLICH:

15         Q.   And would you have the same answer for some

16  populations in terms of their likelihood to give an

17  accurate response?

18         A.   Correct.

19         Q.   Okay.  If you'd turn the page to page 8.  Can you

20  read the -- at the very top the census that begins as

21  explained?  Can you read that sentence?

22         A.   As explained in a classic survey methodology

23  textbook there are some ubiquitous correlates of the

24  tendency to refuse the survey request.  When the key

25  variables of the survey are related to these attributes, we

1    can anticipate non-response biases on the respondent-based

2    estimates.

3        Q.   Can you explain what that means?

4        A.   Sure.  It basically says that we can rely on our

5    existing body of scientific knowledge about survey response

6    to be able to predict likely biases in our estimates.  Or

7    put in terms that are directly relevant here is that we can

8    predict who is likely to be affected by the survey design

9    that we're trying to evaluate.  So the basic point I'm

10   trying to make here I -- even though the Census Bureau

11   didn't have the exact empirical test that would allow us

12   to -- the RCT that I would have loved to have seen, that we

13   can nonetheless make predictions on the basis of what we do

14   know from survey methodology and from previous surveys.

15       Q.   So what is non-response biases in

16   respondent-based estimates?

17       A.   So when we are trying to get an estimate of the

18   population that that can be biased.  It can be wrong,

19   right, it can be inaccurate because of even non-response.

20   It can be inaccurate because of item non-response, and it

21   can be inaccurate because of measurement error.  And so

22   those three things that we talked about, right, that people

23   will fail to respond, that can create biases in the

24   estimates, and that people skip individual questions, that

25   can create population biases in estimate.  And then if some

1   people provide an inaccurate response, that can also

2   provide biases in the estimate.

3        Q.   So the respondent-based estimates part is just

4   referring to the self-response, is that right, in

5   determining how people will respond to a survey?

6        A.   In terms of like a survey.  Right.  That people

7   are providing responses.

8        Q.   Okay.  But so is the type of enumeration that

9   occurs in non-response follow-up such as an in-person

10  interview, is that a respondent-based estimate?

11            MR. FREEDMAN:  Object to form.

12            THE DEPONENT:  Yes.  As I conceptualize it, yes.

13  I guess I'm not entirely sure what the question is but --

14            BY MR. EHRLICH:

15       Q.   Yeah.  So I guess I'm trying to determine what

16  step of the process this statement is referring to when

17  it's talking about non-response biases in the

18  respondent-based estimates.

19       A.   So you can have non-response -- so when you think

20  about non-response bias in the census, right, very clearly

21  we recognize that the estimates that we get just from self-

22  response, right, that that's a biased estimate of the

23  population.  There's a whole bunch of people who didn't

24  respond.  And so the non-response follow-up is intended to

25  reduce that non-response bias.  The point of this agreement

1   between Dr. Apav (ph.) and myself if the extent to which

2   that non-response follow-up is going to be able to correct

3   for that non-response bias.

4       Q.   Got it.  But and then at the end of the process,

5   imputation, that's not a respondent-based estimate, right?

6           MR. FREEDMAN:  Object to form.

7           THE DEPONENT:  I guess it's -- that is a -- not

8   entirely how to put those two things together.  But an

9   imputation would be an attempt to correct for non-response

10  biases.  It requires some assumptions as the Brown paper

11  makes clear.  Imputation, it's really tricky, when you're

12  talking about the citizenship question because it's the

13  non-ignorable missing data.  So but imputation is an

14  attempt to correct for non-response bias.

15          BY MR. EHRLICH:

16      Q.   Turn to page 9, in the second full paragraph.

17  You say extensive empirical research shows that sensitive

18  questions can result in increased burden, which can impact

19  data quality in a number of ways, including -- and then you

20  list a few of the ways here.

21      A.   Um-hmm.

22      Q.   We've already talked about some of these, but can

23  you describe again what these bullet points are?

24      A.   Sure.  So it's unit non-response or unit response

25  rate.  That's where we're spending a lot of time in this

1    case.  There's item non-response.  So that's skipping an

2    individual question.  There's break-offs.  That's people

3    leaving the survey.  There's response accuracy or

4    measurement error.  That's people giving the truthful

5    answer.  And then the additional thing that I mention in

6    terms of data quality is a little bit more meta, and that

7    is the spillover effect on attitudes about surveys, about

8    the survey sponsor and so on.

9         Q.   Yeah.  Could you just describe negative

10   evaluations of surveys generally, and just describe that

11   more for me?

12        A.   Sure.  If people take -- if they have a bad

13   survey experience, then they are less likely to participate

14   in surveys generally.

15        Q.   Got it.

16        A.   Specifically from the same.  So where I -- my own

17   research has focused on this that the most is with

18   longitudinal surveys where you're trying to interview

19   someone more than once.  If somebody has a bad survey

20   experience, they think that the questions are too sensitive

21   or it's burdensome in terms of length or complexity, that

22   it reduces their willingness to participate in the study in

23   the future, and from that sponsor in the future.  And so in

24   terms of implications here, you know, I don't have the

25   empirical study to be able to provide any explicit

1    evidence, but the concern that this raises is how does a

2    negative experience with the census have an impact on the

3    other census surveys and people's willingness to cooperate

4    with the Census Bureau generally.

5         Q.   And this is due to a sensitive question on the

6    survey?

7              MR. FREEDMAN:  Object to form.

8              THE DEPONENT:  Explicitly it's about burden.

9    And, yes, sensitivity is related to burden.  Burden

10   captures a variety of things.

11             BY MR. EHRLICH:

12        Q.   Okay.

13        A.   And there's variation across the population in

14   terms of what people consider burdensome.  And so sometimes

15   it's, you know, this has been a lot of focus within the

16   Census Bureau to understand burden.  Burden both in terms

17   of how difficult it s for somebody to figure out how much

18   they pay in property taxes, as well as how sensitive an

19   item is.  And so those are just two elements of burden.

20        Q.   Got it.  So it's the burden that causes possible

21   increase in negative evaluations of surveys generally?

22        A.   Correct.

23        Q.   And the sensitive question is one component of

24   that burden?

25        A.   Correct.

 1        Q.   Okay.  Got it.  So talking about decreasing unit
 2   non-response rates here, that same analysis would apply
 3   then, we're talking about burden?
 4             MR. FREEDMAN:  Object to form.
 5             THE DEPONENT:  Um-hmm.
 6             BY MR. EHRLICH:
 7        Q.   Okay.  And a sensitive question is one aspect of
 8   that burden?
 9        A.   Correct.
10        Q.   That could decrease non-response rates, correct?
11        A.   Correct.
12        Q.   And just to go down the list.  So increased
13   burden could increase item non-response, right?
14        A.   Correct.
15        Q.   And a sensitive question is one aspect of that
16   burden?
17        A.   Correct.
18        Q.   And increased seeing break-offs is one possible
19   impact of increased burden and one -- I'm sorry.
20        A.   Yes.
21        Q.   And sensitive questions are one aspect of that
22   burden, right?
23        A.   Yes.
24        Q.   Decreasing response accuracy in terms of somebody
25   answering untruthfully is an aspect of burden, correct?

1       A.   Yes.

2       Q.   And a sensitive question is one aspect of that?

3       A.   Correct.

4       Q.   Okay.  When you're talking about -- I'll just

5   focus on decreasing unit response rates.  How are you

6   quantifying decreasing there?  Or --

7            MR. FREEDMAN:  Objection.

8            MR. EHRLICH:  Let me rephrase.

9            BY MR. EHRLICH:

10      Q.   Can you quantify the amount of decreasing unit

11  non-response rates due to increased burden?

12           MR. FREEDMAN:  Object to form.

13           THE DEPONENT:  It depends on a lot of other

14  factors.  And so what I can say is that there is rich

15  scientific literature that looks at the relationship

16  between survey burden and response rates and the other

17  metrics of data quality that point to a negative effect.

18  The precise amount depends on a lot of factors.

19           BY MR. EHRLICH:

20      Q.   So what are some of the other aspects of burden?

21      A.   So of burden, complexity is one, and survey

22  length is the one that Secretary Ross seems to focus on.

23  But those are the other aspects.

24      Q.   When you say complexity is one aspect of burden,

25  do you mean of a particular question or of the survey as a

1    whole?

2         A.    Both.  So one of, you know, within my field one

3    of the things that we find is viewed as particularly

4    burdensome is if we ask a whole bunch of political

5    knowledge questions.  People hate it, right.  Because they

6    don't know the answers, and so they get frustrated, and

7    they don't want to participate anymore.  So that is an

8    example where it's not easy to say that it's just about

9    length.  Yes.  A long survey is more burdensome.  But it is

10   so much more than just length.  There's a number of very,

11   very long surveys that people are still willing to

12   participate in.  So you have to take into account a lot of

13   factors.

14        Q.    And the length of the form is one of those other

15   factors you said?

16        A.    Yes.

17        Q.    And then from this paragraph also the sensitivity

18   of the question is another one of those factors?

19        A.    Yes.

20        Q.    Can you think of other factors that go into

21   burden?

22        A.    Well, how hard it is.  How hard a question is.

23        Q.    Okay.  The complexity?

24        A.    Right.

25        Q.    Or is it --

1      A.   And remember, remember that it's not, you know,

2   that might be that the question itself is hard or it might

3   mean that it's asking for people to remember something that

4   might be difficult to remember.  So --

5      Q.   Um-hmm.  Is there any way based on the increased

6   burden, is there a way to determine whether a particular

7   person would -- which action a particular person would

8   take?  So, for example, not respond entirely, skip the

9   question or break off?

10     A.   Sure.  We can do studies.

11     Q.   Okay.  Is there -- do you know how much of an

12  increased burden it would take to undertake one of those

13  actions?

14          MR. FREEDMAN:  Object to form.

15          THE DEPONENT:  Again, it depends.  So in -- with

16  respect to the census and the sensitive AFS citizenship

17  question, it -- all this literature points to this negative

18  effect.  In terms of a precise estimate, that's where I

19  would say that we need empirical research to give us a more

20  precise estimate.

21          BY MR. EHRLICH:

22     Q.   Got it.  Could we turn to page 11?

23          MR. EHRLICH:  Actually, can we go off the record?

24          (Off the record at 12:22 p.m.)

25          (On the record at 1:18 p.m.)

1          BY MR. EHRLICH:

2          Q.    Okay.  Can we turn to page 11 of your expert

3    report?  Footnote 44 says there are two reasons to

4    separately consider the categories of non-citizens and

5    Hispanics.  First, citizenship cannot always be fully

6    determined because a significant percentage of non-citizens

7    are Hispanic.  The Hispanic category captures non-citizens

8    who would not -- who would otherwise be missed or allows

9    for analysis that could not otherwise be conducted.  Can

10   you describe that?

11         A.    Sure.  It's just there are times when there are

12   datasets that don't have citizenship status that have been

13   used in forming an opinion here, and that's both my

14   opinion, but also within the Census Bureau research.  And

15   at times you don't have citizenship status because there is

16   an overlap between non-citizens and Hispanics that both the

17   Census Bureau and I have used that as one reason to look at

18   Hispanic as a subgroup.

19         Q.    Got it.  Can you turn back to Exhibit 4, which is

20   the white paper?

21         A.    Um-hmm.

22         Q.    Is this one of the Census Bureau analyses that

23   you were just referring to?

24         A.    Yes.  I think they do include in here some

25   analyses just by Hispanic that they don't have citizenship

1   status for.  Although a lot of it -- this is one of the few

2   examples where you do have the overlap of the two.

3        Q.   Can you explain what you mean it's one of the

4   examples that has overlap of Hispanic and non-citizens?

5        A.   The Brown paper is one of the very few examples

6   of analyses in which we can actually look at data quality

7   issues related to citizenship status specifically.  Whereas

8   other analyses were restricted to looking at Hispanic.  But

9   we don't have citizenship status within that.

10       Q.   Got it.  And that's because they used every other

11  household as their benchmark in their analysis rather than

12  AR non-citizen households, is that right?

13            MR. FREEDMAN:  Object to form.

14            THE DEPONENT:  No.  This is just one of the few

15  examples in which they are able to make use of data in

16  which citizenship status is available.  And they are able

17  to do that through the matching of administrative records.

18  A lot of the data quality analyses that I've looked at like

19  with the break-offs, for instance, and the item non-

20  response that some of that is -- it's -- we don't have it

21  linked to data that identifies citizenship status.  So

22  we're only to -- I'm only able to look at the Hispanics

23  generally.

24            BY MR. EHRLICH:

25       Q.   Understood.  So this analysis in Exhibit 4, the

1   Brown paper, in terms of their quantitative analysis in

2   attempting to ascertain a self-response rate due to the

3   citizenship question did they take into account Hispanics

4   that would have an uncertain citizenship status?

5           MR. FREEDMAN:  Object to form.

6           THE DEPONENT:  Their primary analysis is

7   comparing only upon citizenship.  But in some of the

8   earlier, like Figure 1 and Figure 2, they use Hispanic

9   there.

10          BY MR. EHRLICH:

11      Q.   Got it.  But their later analyses about the drop-

12  off and self-response they used all citizen versus all

13  other, right?

14      A.   Right.

15      Q.   Okay.  And so your language in Footnote 44 is

16  just talking about generally the problem with evaluating

17  surveys like -- generally evaluating research in this area?

18      A.   Well, then my next sentence says offers a

19  substantive rationale, not simply -- so the first point is

20  to say there are some times that we use Hispanic

21  essentially as a proxy even though we might be interested

22  in a particular subset.  And that seems to be sometimes the

23  rationale Census Bureau analyses.  The second point is to

24  say there's actually a -- reason that we want to look

25  explicitly at Hispanics, and that's because as evidence I

1    show that even Hispanic citizens might be impacted by the

2    addition of the citizenship question.

3        Q.   Got it.  Okay.  Turning to the next page.  Can

4    you read that very first paragraph for me?

5        A.   Census Bureau data stewardship policies

6    identifies citizenship as a sensitive topic.  In fact, of

7    the questions planned for the decennial short form only the

8    citizenship question has a sensitive designation.

9        Q.   And there was no other topics in there that had

10   a -- strike that.  There were no other topics that would

11   appear on the 2020 census that had a sensitive designation

12   in that?

13       A.   So age, race and relationship to householder not

14   in my understanding designated as sensitive items.

15       Q.   Did that stewardship policy also have a category

16   of very sensitive topics?

17       A.   It did.

18       Q.   Were any of the topics on the 2020 census

19   included in that category?

20       A.   I don't recall, but it seems like that was not

21   the case.

22       Q.   Okay.  I'd like to talk about some of the

23   research that you're summarizing here, if that's okay.

24       A.   Um-hmm.

25       Q.   Looking at page 13, the first bullet point.  I

1   think this is the CSM survey you referred to earlier, is

2   that right?

3        A.   It's not a survey, but it's a memo from the CSM

4   researchers in which they had found spontaneously within

5   the field and in focus groups these fears among immigrant

6   respondents.

7        Q.   Got it.  And in what context was this -- were

8   these fears reported?

9        A.   My recollection, although I'm happy to review to

10  clarify if needed, was that it was a variety of different

11  contexts.  And that is part of what makes it somewhat

12  striking is that these were, again, even in like focus

13  groups in which the point wasn't to ask about

14  confidentiality concerns, the point was to do, say language

15  testing.  And yet these issues were being raised.  And from

16  my standpoint that makes it all the more reason that that

17  is a striking piece of qualitative evidence.

18       Q.   Got it.  And was this memo about Hispanic

19  citizens in particular?

20       A.   I don't know if there was any reference to

21  Hispanic citizens in the memo.  I don't remember that.

22       Q.   But it says -- the quote you have here is a new

23  phenomena the field -- oh, sorry, in the field, and

24  reported that respondents fears particularly among

25  immigrant respondents have increased markedly this year.

1    Is that right?

2        A.    Correct.  I don't know if there was any

3    distinction between Hispanics who are citizens, Hispanics

4    generally or just --

5        Q.    Got it --

6        A.    -- immigrants.

7        Q.    Okay.  Got it.   The next bullet point, a

8    research presentation.  Says that in a research

9    presentation at the American Association of Public Opinion

10   Research census researchers Mikelyn Meyers and Patricia

11   Gorman explained that respondents were spontaneously

12   expressing concerns about confidentiality during multi-

13   lingual pre-testing projects conducted in 2017.

14   Respondents referenced legal residency status, immigration

15   and certain current events like changes to the DACA

16   program.  Do you know if this presentation differentiated

17   Hispanic citizens from non-citizens?

18       A.    I don't know that.

19       Q.    And this -- they were talking about fears that

20   were raised during multi-lingual pre-testing projects,

21   right?

22       A.    Correct.

23       Q.    And so this was not some sort of research on the

24   census specifically?

25            MR. FREEDMAN:  Object to form.

1          THE DEPONENT:  On the census, yes.  But not on

2    the citizenship question.

3          MR. EHRLICH:  I'm not sure I follow that.  Sorry.

4          MR. FREEDMAN:  Question was about the census --

5          THE DEPONENT:  Right.  So these are Census Bureau

6    researchers referencing research about the census, but it

7    wasn't research was explicit to the addition of a

8    citizenship question.

9          BY MR. EHRLICH:

10     Q.   Got it.  Got it.  And was this a -- would you

11   define this as a quantitative analysis or a qualitative

12   analysis?

13     A.   Qualitative.

14     Q.   And I don't think I asked this for the first one,

15   but the Center for Survey Management memorandum qualitative

16   or quantitative?

17     A.   Qualitative.

18     Q.   Okay.

19     A.   And, in fact, I'm not sure that I would call the

20   first one an explicit research design.  It was an

21   observation of researchers.  So in some ways it's far

22   broader than a single research question.

23     Q.   And neither of those were gauging reactions to a

24   citizenship question in particular, right?

25     A.   Correct.

1        Q.   The third bullet here, in a study of qualitative

2   interviews to do language testing, census researchers have

3   said immigrants they interviewed spontaneously raised

4   topics like the travel ban and dissolution of the deferred

5   action for childhood arrivals, program that has protected

6   from deportation young immigrants brought to the country as

7   children without legal status.  What study of qualitative

8   interviews are you referencing there?

9        A.   I'm guessing it's probably the same, the same

10  one.

11       Q.   From the prior bullet?

12       A.   Yeah, yeah.

13       Q.   Okay.  The next bullet going on to 14.  This is

14  talking about a presentation to the National Advisory

15  Committee by Mikelyn Meyers.  Is that right?

16       A.   Um-hmm.

17       Q.   And there she discussed unprecedented ground

18  swell and confidentiality in data sharing concerns

19  particularly among immigrants or those who live with

20  immigrants may present a barrier to participation in the

21  2020 census.  And this was also referring to immigrants,

22  right?

23       A.   Correct.

24       Q.   Did it differentiate between citizens and non-

25  citizens?

1        A.    I don't recall that it did.

2        Q.    Okay.  And the presentation weren't talking about

3   reactions to a citizenship question in particular, right?

4        A.    Correct.

5        Q.    And this is another, you would say qualitative

6   way of trying to determine?

7        A.    Yes.  I think it's -- I suspect referencing some

8   of the same research, qualitative research.

9        Q.    In the next paragraph you're talking about the

10  2011 CBAMS.  And CBAMS is the Census Barriers Attitudes and

11  Motivators Survey, is that right?

12       A.    I believe that's correct.

13       Q.    Okay.  So we know what each other is talking

14  about for that.  Says a cluster analysis identified -- I'm

15  sorry.  In the second sentence.  A cluster analysis

16  identified five distinct attitudinal segments or mindsets

17  within the population, including 14 percent labeled

18  suspicious, which is described as a segment, which has the

19  lowest self-reported intent to respond to the census, and

20  are mostly likely to believe that the census can harm them.

21  And then the next sentence goes on talking about Hispanics

22  making up a disproportionate share of this mindset, right?

23       A.    Um-hmm.

24       Q.    Did this differentiate between Hispanic citizens

25  and Hispanic non-citizens?

1      A.    No.   CBAMS did not ask for the citizenship

2   status.

3      Q.    Got it.   And this CBAMS is in testing for the

4   census, but it's not -- can you describe CBAMS, please?

5      A.    To the best of my knowledge, yes.   CBAMS is

6   intended to measure the attitudes and motivators and help

7   to inform the challenges that the Census Bureau has in

8   increasing self-response.   And this particular analysis, I

9   have no idea if they've done a similar type of analysis of

10   the survey data.   I've seen the survey questionnaire is all

11   for the 2020.   But I think the earlier CBAMS is telling in

12   that this concern about confidentiality seems

13   disproportionately to affect Hispanics.

14      Q.    Yeah.   And we didn't -- I think you mentioned

15   this, but that CBAMS did not talk about citizenship status,

16   right?

17      A.    Correct.   And it's actually quite striking to me

18   that the CBAMS does not include a citizenship question, and

19   they ask about foreign born status but not citizenship, and

20   it's -- I wonder why.

21      Q.    And this was the 2011 CBAMS, right?

22      A.    Um-hmm.

23      Q.    Okay.   And moving down the page, it says these

24   findings are also apparent in public opinion polling data.

25   Can you describe what public opinion polling data is?

1      A.    Sure.   I'm just referencing here survey data that

2   has been conducted outside of the Census Bureau for the

3   purposes of generalizing about some population of interest

4   about attitudes and behaviors.

5      Q.    So how would a public opinion poll be conducted?

6   Would it be by phone?

7            MR. FREEDMAN:  Object to form.

8            THE DEPONENT:  There's a variety of different

9   ways to do that.  You can do telephone.  You can do mail.

10  You can do Internet.

11           BY MR. EHRLICH:

12     Q.    Okay.  So going to the first one, for example,

13  UCLA Luskin Institution Survey of Los Angeles County in

14  2017 found that 56 percent of Latinos report being worried

15  about the deportation of themselves or a friend or a family

16  member compared to only 19 percent for whites.  Is that

17  right?

18     A.    Correct.

19     Q.    This seems to reference Latinos.  Is that

20  basically a synonym for Hispanics?

21     A.    Correct.

22     Q.    Okay.  And did this study differentiate between

23  Hispanic citizens and Hispanic non-citizens?

24     A.    I'm trying to recall if the study did or not.  It

25  might have.  I don't remember.

1       Q.    Okay.

2       A.    I'm embarrassed I didn't include the citation

3    here specifically to the study.  But the full report is

4    available.

5       Q.    Um-hmm.

6       A.    Online Googling.

7       Q.    And this study was not specifically talking about

8    the census, right, confidentiality of the census?

9       A.    Correct.

10      Q.    Okay.  Or the confidentiality of asking a

11   citizenship question on the census, for example?

12      A.    Correct.

13      Q.    Okay.  The next one, next bullet down, in

14   national poll of Hispanics following the 2016 election, Pew

15   Research Center found that 47 percent of all Hispanics have

16   a lot or some worry that they, a family member or a close

17   friend would be deported.  It says the numbers were even

18   higher for foreign born Hispanics or foreign born U.S.

19   citizens and 66 percent for non-citizens.  Is that right?

20      A.    Correct.  That would be 66 percent of non-citizen

21   Hispanics.

22      Q.    Got it.  That's higher than the 47 percent for

23   all Hispanics, right?

24      A.    Correct.

25      Q.    And higher than the foreign born U.S. citizen

1    Hispanics?

2        A.    Correct.

3        Q.    Okay.  And this was, again, general fears of

4    deportation, right?

5        A.    Right.

6        Q.    And this was not related to the census?

7        A.    Correct.  These are all indicators of the broader

8    macro environment, which is -- I outlined in the beginning

9    part of the calculation for somebody's decision to

10   participate in a survey or not.

11       Q.    Okay.  Got it.  And just to cut to the chase the

12   remaining one cited in the section in the bullet points on

13   15, for example, are also your analysis of broader themes

14   in the macro environment?

15       A.    No.  I mean, these are all indications.  So these

16   are indicating this macro environment, but they're also

17   indicating that Hispanics including Hispanics citizens have

18   these confidentiality -- are more likely to consider the

19   citizenship question to be sensitive.  And that's evident

20   both in this public opinion data, but also in these

21   estimates of civic behavior such as use of food stamps and

22   healthcare and so on.  Where economic analyses have found

23   that the impact applies not only to those who would

24   directly be deported, but also even to Hispanic citizens.

25       Q.    And when you say the impact, you're talking about

1    the impact of confidentiality concerns, right?

2         A.    Yes.   The operationalization in these particular

3    cases are -- there's different treatments that have been

4    evaluated, but they are all kind of tapping into

5    confidentiality concerns.

6         Q.    Okay.   Did any of them relate specifically to the

7    context of the decennial census?

8         A.    No.

9         Q.    Did any of them relation specifically to a

10   citizenship question?

11             MR. FREEDMAN:   Object to form.

12             THE DEPONENT:   No.   Well, I mean, I -- people

13   have made the argument that the first case actually is

14   pretty explicitly parallel about citizenship question

15   because it's the case in Alabama where the requirement was

16   for citizenship status to be reported.   And upon that

17   policy decision there was this impact of Hispanic students

18   not showing up for class.   And so some have made the

19   parallels that that is in fact about a citizenship

20   question, but clearly not within the context of the Census

21   Bureau.

22             BY MR. EHRLICH:

23        Q.    Got it.   Were they -- did the Alabama Department

24   of Education estimate whether it was Hispanic citizens that

25   did not show up for class?

1        A.    That was not specified.

2        Q.    Okay.  Can we turn to page 17?  So this is your

3   explanation of why the Census Bureau's differential

4   self-response rate analysis is conservative, right?

5        A.    Correct.

6        Q.    And these were the analyses we looked at before,

7   which were Exhibit 3, the January 19th memo, and Exhibit 4,

8   the Brown technical paper?

9        A.    Correct.

10       Q.    Okay.  The second paragraph starts, first the

11   analysis was based on a dataset that individually linked

12   ACS responses with administrative records, but each of

13   these files are more likely to be missing non-citizens and

14   Hispanic households exacerbating potential coverage bias in

15   the resulting estimates.  Can you explain what coverage

16   bias is?

17       A.    Sure.  So we know that administrative records

18   don't cover 100 percent of the population.  As the Brown

19   white paper acknowledges, non-citizens are more likely to

20   be missing from that sample of administrative records.  We

21   also know that the ACS also doesn't cover 100 percent of

22   the population or it does with weighting, but those

23   weighting -- those particular weights make some assumptions

24   that again you have non-citizens who are more likely to be

25   excluded.  So when you put those two things together, and

1   you only find that pool of people who are in each of those

2   two samples, you are missing non-citizens at a higher rate,

3   and within certain methodology we reference kind of the

4   extent to which that's adequately covering the population

5   of interest.  That's coverage error.  And all of what the

6   Bureau had put out suggests that there is coverage bias.

7   That is, is that we're disproportionately missing non-

8   citizens in that resulting match sample.

9        Q.   The match sample you're referring to was that

10  administrative record matching?

11       A.   It's the analysis that the Brown et al., white

12  paper was based on.

13       Q.   So but didn't the Brown analysis compare all

14  citizen households based on administrative data versus all

15  other households such that if there was no administrative

16  record linkage that would be included in the second group?

17       A.   Maybe that's possible in some of the analyses,

18  but that's not my understanding of all of the analyses.

19  That my understanding of the analyses is that they used it

20  for some of their -- for the bulk of their analyses that

21  they were relying on that match.  But perhaps there's

22  something I missed.  Like I said, I got that white paper in

23  detail quite late in my report writing.

24       Q.   And so if that was the way they did do it in

25  terms of putting one group of only citizens that was both

1   by ACS data and administrative data, and the second group

2   all other citizens, would that change your opinion about

3   the coverage bias?

4            MR. FREEDMAN:  Object to form.

5            THE DEPONENT:  No.  Because still what you're

6   dealing with is you're defining on the basis of a set of

7   data that are incomplete.

8            BY MR. EHRLICH:

9       Q.   And the set of data that are incomplete, are they

10  ACS responses?

11      A.   No, both.  Each of them are incomplete.

12      Q.   So if a household doesn't have administrative

13  record data, they would be put in the second group though,

14  right?

15           MR. FREEDMAN:  Object to form.

16           THE DEPONENT:  So the only way that you -- I

17  mean, the way that they have defined citizen and non-

18  citizen households, my understanding was it was the

19  combination of the administrative records where the

20  administrative records were as they acknowledged more

21  likely to miss non-citizens.  And they are looking at

22  estimates.  They're looking at ACS again as they

23  acknowledge the ACS is also missing -- more likely to miss

24  non-citizens.

25           BY MR. EHRLICH:

1      Q.   And so if your understanding of their grouping

2  was incorrect would that change your opinion of the

3  coverage bias then?

4           MR. FREEDMAN:  Object to form.

5           THE DEPONENT:  I guess I would need to have more

6  clarity on where I've misinterpreted something.

7           BY MR. EHRLICH:

8      Q.   Okay.  Why don't we just turn to Exhibit 4 for a

9  second.  I think page 33.  Can you just look at pages 33 to

10  34 for a second?  And I'll do the same.

11          (Pause.)

12      Q.   I'm sorry.  The second part of 34 is, I think,

13  the relevant part.

14          (Pause.)

15      Q.   Does this describe the process they used?

16          MR. FREEDMAN:  Object to form.

17          THE DEPONENT:  I mean, I'm happy to have you

18  point out where I may have misinterpreted their method in

19  some way.  And that is entirely possible.  But, I guess, I

20  don't see what would point me to that.

21          BY MR. EHRLICH:

22      Q.   So looking at Table 7, for example, the top is an

23  analysis, and it compares AR, all citizen household

24  response rates versus households with at least one AR

25  non-citizen, right?

1              MR. FREEDMAN:  Object to form and foundation.

2              THE DEPONENT:  So if your interpretation is that

3    the match dataset is used for one of -- the AR and ACS that

4    the all other households is on the basis of just the ACS

5    and just the census, that doesn't fully address the

6    concern --

7              BY MR. EHRLICH:

8        Q.   Got it.

9        A.   -- about coverage bias.

10       Q.   Okay.  Can you explain that?

11       A.   And that's because the ACS is also missing

12   non-citizens at a higher rate as Brown, et al., acknowledge

13   in their discussion of the weights.

14       Q.   Okay.  Got it.  Page 17, looking at Footnote

15   72 --

16             MR. FREEDMAN:  Same objection.

17             THE DEPONENT:  Just so the record's clear, going

18   back to the report?

19             MR. EHRLICH:  Oh, I apologize.  Yes.

20             BY MR. EHRLICH:

21       Q.   Exhibit 5, your expert report.  Says other

22   modeling decisions are also likely to bias the downward

23   estimate.  And then you list a few things.  The first one

24   is the assumption that foreign born individuals with

25   missing citizenship data in administrative records are all

1   U.S. citizens.

2        A.    That's in some of the analyses, not all of them.

3        Q.    Got it.  Is it fair to say if you look at Exhibit

4   4, that that's in, you know, page 36 for example that would

5   be the case in the top panel but not the bottom panel?

6        A.    I think that's correct.

7        Q.    Okay.  Fair enough.

8        A.    I believe that's a distinction between the 5.8

9   and the 5.1, if I'm not mistaken.

10        Q.    Okay.  And it says, sorry.  Going back to Exhibit

11   5, in Footnote 72.  The inclusion of the English language

12   ability in the Blinder-Oaxaca decomposition.  Can you

13   explain why that bias is downward --

14        A.    Yeah.  So what the attempt here to do is to try,

15   and with observational data make for a clean estimate of

16   the causal effect of the citizenship question.  Any time

17   you're trying to estimate a causal effect, you want to not

18   account for post-treatment variables.  And you have -- in

19   observational data, it's very difficult to know what are

20   potential confounders and how variables that you include in

21   the model might impact the estimated results.  I would say

22   that I was surprised by the inclusion of the English

23   language ability.  In some ways when we're thinking about

24   the non-citizen versus the citizen comparison, you know, we

25   don't necessarily, you know, we think that a mechanism

1    there by which the addition of the citizenship question is

2    going to have an effect I expect is the confidentiality

3    concerns.  And so it seemed like the inclusion of the

4    English language ability might be over correcting for the

5    estimate.  Now it's entirely possible that these are the

6    best variables to include in the model.  My biggest

7    complaint was that there was no explanation of why we saw

8    the model justification, you know, why there was no

9    justification of the particular model specification that we

10   saw.  I think others might pick apart the particular

11   modeling assumption, and say that we should have then

12   said -- used some type of non-parametric matching to do the

13   estimation instead.  All I wanted, the point I was trying

14   to make was that there are a variety of different

15   assumptions that were built into these estimates, and I was

16   pointing out some of the assumptions that might have led to

17   a smaller estimate than we might otherwise have gotten.

18        Q.   Okay.  I think I understand that.  The point of

19   the Blinder Oaxaca decomposition that we discussed is to

20   try and rule out factors that could be contributing to the

21   thing that you're trying to study.  Is that right?

22        A.   Um-hmm.

23        Q.   And so your position is that excluding that from

24   the factors that you're trying to control for would give

25   you a better estimate of the effect of the citizenship

1    question?

2         A.   My fundamental position is that we need to have a

3    theoretical reason that some variables are accounted for in

4    the model.  I haven't been presented with that

5    justification for why some things were accounted for and

6    some things weren't.  And so my basic point is just to say

7    that you're going to get different results depending on

8    what is included in your model.  And this is entirely, you

9    know, potentially a entirely reasonable model

10   specification.  And the reality is, is that different

11   researchers will, you know, have different views about what

12   is the correct model specification.  I would have just

13   liked to have seen the model without this particular

14   variable accountable.

15        Q.   Got it.  So I'm just trying to gauge what effect

16   excluding the English language ability from the Blinder-

17   Oaxaca decomposition would have.

18        A.   I want to be careful not to answer that in a way

19   that steps beyond what I'm able to say because I don't have

20   access to the data.

21        Q.   Yeah.

22        A.   All I have access to is their results.  And so

23   that's where, you know, I want to just be clear about what

24   I can and can't say.

25        Q.   Yeah.  Okay.

1      A.   And, you know, one possibility is that this

2 particular variable in particular would have an impact.

3 Might not.  I don't -- without being able to run the data

4 myself, I can't say.

5      Q.   Sorry.  When you say this particular impact

6 you're talking about English language ability on -- may

7 have an impact on --

8      A.   The estimates that we get as to the causal

9 effect.  And I say that with some quotes around causal

10 effect.

11      Q.   Yeah.

12      A.   Because it is still observational data that is

13 not in our CT.  And as Brown, the researcher said, like,

14 this is imperfect.  It is entirely imperfect.  We would

15 prefer to have an RCT.  Modeling decisions had to be made.

16 Those modeling decisions have consequences for the

17 estimates that we get as a result.

18      Q.   Got it.  So if you -- strike that.  So is it your

19 opinion that households containing only citizens that speak

20 a foreign language at home would be negatively affected by

21 the citizenship question?

22           MR. FREEDMAN:  Object to form.

23           THE DEPONENT:  No.  My expectation is that

24 households who view the citizenship question sensitive and

25 are concerned about confidentiality associated with that

1  citizenship question will be less likely to respond.  We

2  don't directly have a measure of that in the population.

3  And so what we do is we look for potential proxies in

4  subgroups that we think might disproportionately be --

5  consider the citizenship question to be sensitive.

6  Non-citizens would be one subgroup.  Hispanics would be

7  another subgroup.  But we would also expect heterogeneity

8  within those groups as well.  And that's what my concern

9  about this particular control is, is that it might be

10 downward biasing because if you're wanting to recognize

11 that there's going to be variation across the non-citizen

12 population in terms of the likely effect.

13      Q.   Okay.  I don't want to belabor this point, but I

14 do want to understand the point.  So the Blinder-Oaxaca

15 decomposition, the factors that you're analyzing there are

16 the ones that you're ruling out, correct?

17      A.   So, I guess, the thing that I would say again is

18 that there's a particular model that was estimated that

19 ended up with the results.  That model isn't the perfect

20 model, and we don't know how the results would exactly

21 change with a different model, and I would have liked to

22 have seen the results without English language ability in

23 there.

24      Q.   Okay.  Later on in the footnote it goes on to

25 page 18.

1          MR. FREEDMAN:  Same objection.

2          THE DEPONENT:  Again you're back to Exhibit 5?

3          MR. EHRLICH:  Yeah, sorry, Exhibit 5, Footnote

4    72.

5          BY MR. EHRLICH:

6     Q.   Going over on to page 18.  So the failure to

7    account for attrition bias in the SIPP analysis, can you

8    explain what that means?

9     A.   Yeah.  There was some analysis presented at some

10   time, and I don't even remember exactly what it is at this

11   point, where SIPP was used.  SIPP is another census survey

12   that includes citizenship.  And there as, if I'm recalling

13   correctly, an analysis that looked at multiple waves.  And

14   SIPP has attrition.  That attrition is not random.  And so,

15   you know, you have to account for that in your modeling.

16    Q.   Okay.  And then the last part of that footnote

17   says another thing that downward biased the estimate was

18   the use of all citizen households rather than white citizen

19   households.  Can you explain that?

20    A.   Sure.  So, you know, I think a case could be made

21   that because when -- if we're particularly interested in at

22   the end of the day the differential undercount, that is the

23   undercount of Hispanics relative to whites, that it would

24   have been a relevant benchmark to compare to white

25   households, not to just citizen households or not just to

1    all households in some of the analysis.  So it -- there's

2    always the question of what's the counterfactual.  And, you

3    know, that's what ultimately the question is.

4         Q.   Yeah.  Understood.  I guess I'm a little bit

5    confused because the analysis was attempting to using a

6    natural experiment rather than RCT to determine what the

7    decline in self-response would be due to the citizenship

8    question, correct?

9         A.   Yes.

10        Q.   And so using whites as one group rather than all

11   citizens would add non-citizen whites to the control group,

12   right?

13        A.   No.  So what the issue is, is if we think that

14   the impact of the citizenship question could affect

15   citizens, say Hispanics citizens, then what you actually do

16   is you have some treated people in your control group at

17   that point.  So, you know, one possibility to say is that

18   the counterfactual of interest is actually a group that we

19   think absolutely is not going to be impacted by the

20   addition of a citizenship question, and that would be white

21   citizen households.  So, you know, we might think that

22   non-citizen Asians could be impacted.  We might think --

23   right -- there are other subgroups where we -- given that

24   kind of the causal mechanism that is suggested by the

25   survey methodology research is this sensitivity of the

1    survey -- citizenship question.  Then remember that all of

2    the analyses that we're doing are imperfectly, you know,

3    looking at the impact of increased sensitivity of the

4    citizenship question.  And so that counterfactual includes

5    some individuals who are presumably treated.  I think a

6    case can be made either way, but the point is, is that

7    because it's also the case that there's probably some

8    non-citizens who will not be impacted.  Right?  I have a

9    lot of colleagues who are non-citizens that they probably

10   are not terribly fearful about the addition of a

11   citizenship question.  But the point is just that the

12   choice of the counterfactual is meaningful here, and an

13   argument can be made for a different counterfactual.

14        Q.   But the counterfactual of all citizens isn't

15   necessarily unreasonable?

16        A.   No.  I'm saying that an argument can be made for

17   a different counterfactual that would have probably

18   resulted in a larger estimate.  So it's a reasonable --

19   it's fine, it's fine.  But I think a case could be made for

20   that it's a conservative estimate because there are people

21   within that control group, right, that are -- that have

22   been treated, if that makes sense.

23        Q.   Such as non-white citizens?

24        A.   Correct.

25        Q.   Okay.  Turning to the next page 18, last

1    paragraph.  You're talking about the change in survey

2    climate in terms of -- sorry, strike that.  You're talking

3    about the -- in the last paragraph on 18, you're talking

4    about a change in survey climate, right?

5         A.    Um-hmm.

6         Q.    Can you describe that?

7         A.    Sure.  As I talk about in the beginning of the

8    report that the kind of scientific framework of survey

9    participation takes into account the individual

10   characteristics of the respondent, the characteristics of

11   the survey, and the broader environment.  And those three

12   things kind of interact together.  And the broader

13   environment matters here because it's likely to make

14   salient the concerns about the citizenship question and,

15   yeah.

16        Q.    Okay.  So turning to the next page on 19.  Just

17   going to your concluding paragraph at the bottom.  You say

18   there is ample empirical support as well as well-grounded

19   science of survey methodology, which all consistently

20   points to the same conclusion.  The addition  of a

21   citizenship question is highly likely to reduce rates and

22   data quality among non-citizens and Hispanic households.

23   Right?

24        A.    Yes.

25        Q.    What's the empirical support you're specifically

1   referencing with that sentence?

2        A.   There's several different pieces.   There is both

3   the internal Census Bureau analyses, the Brown memo.

4   There's the break-off data.   There's the item non-response

5   data.   There's the aggregate relationship that's reference

6   in this report.   There's empirical data that is from

7   previous censuses that's been published in survey

8   methodology literature.   There's empirical data that has

9   been published in other white papers within the Census

10  Bureau.   And then there is all of the citations that I

11  gave.   Just generally a -- survey methodology that

12  sometimes is not specific to the census.

13       Q.   Okay.   So here you're talking about empirical

14  support for what exact proposition?

15       A.   For that entire conclusion.

16       Q.   Okay.   But the empirical support you're

17  referencing was possibly outside the context of the census

18  and outside the context of a citizenship question?

19            MR. FREEDMAN:   Object.

20            THE DEPONENT:   Some yes, some no.

21            BY MR. EHRLICH:

22       Q.   Okay.   And the next part of the sentence, well

23  grounded signs of survey methodology.   What did you mean by

24  that?

25       A.   Meaning that there is large scientific

1   literature, for instance, about the impact of response

2   burden on data quality and non-response.  And that we can

3   make predictions on the basis of that research about the

4   likely impact in the context of the census, combined with

5   the explicit census analyses that that offers a pretty

6   compelling body of evidence about the impact on

7   self-response --

8        Q.   Got it.

9        A.   -- data quality.

10       Q.   And so going on to page 20, the end of the

11  sentence, you say that addition of a citizenship question

12  is highly likely to reduce response rates and data quality

13  among non-citizens and Hispanic households.  What do you

14  mean by highly likely there?

15       A.   Meaning that every piece of evidence,

16  qualitative, quantitative, about the census, about other

17  surveys, all points in the same direction of expecting

18  there to be a lower response rate.

19       Q.   Is there a quantifiable way to say that?

20       A.   I agree with you that I would love to have a

21  precise point estimate, and think that the Census Bureau

22  should have done more to get a precise point estimate.  But

23  that doesn't eliminate the fact that there is a large body

24  of other evidence from the census, from external to the

25  census that point all to the same direction of a negative

1    impact.

2         Q.    And that's due to a lot of the studies we

3    discussed in terms of confidentiality concerns and things

4    like that?

5         A.    Yes.

6         Q.    And when you say highly likely, you mean even

7    more than just likely?  You're expressing some certainty

8    there, is that right?

9         A.    Yes.  It means that in my professional opinion

10   that I am confident that the evidence points towards a

11   negative impact on response rates and data quality.

12        Q.    Okay.

13        A.    As Census Bureau research also suggests.

14        Q.    Okay.  So turning to 21 we're in the section

15   discussing pre-testing of the census question here, right?

16        A.    Um-hmm.

17        Q.    And in the first full paragraph, second sentence,

18   you say research has shown for instance that respondents

19   are more likely to give socially desirable answers in

20   interviewer-administered surveys compared to

21   self-administered questionnaires.  What do you mean by

22   socially desirable answers?

23        A.    Sure.  In the context specific to what we're

24   talking about, socially desirable means wanting to give a

25   response that the society, right, thinks is the right

1    response.  And so here the people might say that they're

2    citizens.  So imagine a neighbor who is having to report on

3    the citizenship status of, you know, the apartment next to

4    them, that the social desirable response there might be to

5    say they're citizens even if they might not know.  In

6    survey methodology literature, socially desirable is just a

7    category of sensitive questions where we recognize that it

8    is difficult to get people to respond to a sensitive

9    question.

10        Q.   Got it.  And in that situation that you were just

11   discussing where family next door would want to say that

12   their neighbors are all citizens, that would result in

13   inaccurate citizenship data for that enumerated next door

14   neighbor, right?

15        A.   Correct.

16        Q.   Okay.

17        A.   Yeah.  And so sensitive question -- as I talk

18   about before, sensitive questions can lead to, you know,

19   problems with unit non-response, item non-response and

20   inaccuracy.  And, you know, when we're talking about social

21   desirability, that's all wrapped up in these kind of

22   sensitive questions.  And so people might give an

23   inaccurate response because of the socially desirable

24   response.

25        Q.   And before, I think you said sensitive questions

1    are one aspect of burden, right?

2         A.    Right.

3         Q.    Along with various other aspects.  Is the macro

4    climate part of the burden?  Is that associated with that

5    too?

6         A.    I would consider that a separate.

7         Q.    Separate.

8         A.    So perceived burden of a survey is, you know,

9    related to the design of the survey.  It's also because

10   there's going to be some groups who consider citizenship to

11   be sensitive and some that aren't.  It's also related to

12   the characteristics of the individual.  The external

13   environment can prime or make salient some aspects of like

14   the confidentiality concerns.  In 2000, it was privacy

15   concerns that were made salient.

16        Q.    Okay.  Page 22, near the bottom of the page going

17   into 23.  You're talking about the 2018 -- a 2018 press

18   release.  Talking about the end-to-end census test.

19        A.    Um-hmm.

20        Q.    And you say the -- well, the press release says

21   the 2018 census test will help the Census Bureau validate

22   its readiness for the 2020 census operations, procedures,

23   systems and field infrastructure for a once in a decade

24   census.  Right?

25        A.    Um-hmm.

1      Q.   That description of the end-to-end test doesn't

2   talk about testing new content, right?

3      A.   It does not.

4      Q.   Was the -- was one of the purposes of the 2010

5   end-to-end test to test new content?

6           MR. FREEDMAN:  Object to form and foundation.

7           THE DEPONENT:  The citizenship question was not

8   on the end-to-end test.

9           BY MR. EHRLICH:

10     Q.   Right.  But what is the purpose of the end-to-end

11  test?

12     A.   It is --

13          MR. FREEDMAN:  Same objection.

14          THE DEPONENT:  It's a field test.  It's supposed

15  to be everything.  It's supposed to be exactly what's going

16  to happen, right, when it comes to the decennial census.

17  That was not what happened in 2018, right?  Because this

18  citizenship question was added so late the end-to-end test

19  cannot be considered helpful field test.  They also didn't

20  do the communications campaign associated with 2018.  they

21  also didn't do the testing in West Virginia where the, you

22  know, there was the worst self-coverage.  Anyway, but the

23  point is that the end-to-end test is intended to be the dry

24  run for the real thing.

25          BY MR. EHRLICH:

1      Q.   Did the end-to-end test, test the operations of

2  the census?

3           MR. FREEDMAN:  Object to form and foundation.

4           THE DEPONENT:  I would conclude that it was

5  incomplete.  It was incomplete in part because the limited

6  geographic nature, cutting the West Virginia side.  But

7  also incomplete because the content is different.  And you

8  would very much learn about how operations -- some of the

9  operations, right, might be related to the inclusion of a

10 citizenship question.  Now, I think generally, you know,

11 the -- our systems in place and procedures and, you know,

12 those, did the phones work as intended and things like

13 that, that those things all happened.

14          BY MR. EHRLICH:

15     Q.   So from an operational perspective you would say

16 that 2018 end-to-end test was a success?

17          MR. FREEDMAN:  Object to form.

18          THE DEPONENT:  I'm not able to -- I mean I have,

19 I have not seen any reports about calling it a success or

20 not beyond Dr. Abowd's characterization.

21          BY MR. EHRLICH:

22     Q.   Got it.  If a citizenship question were on the

23 2018 end-to-end test what extra data would that have given

24 you?

25          MR. FREEDMAN:  Object to form.

1          THE DEPONENT:  So actually there's several things

2     that I think would be valuable to know.  You would have

3     seen for that particular test what it looked like in terms

4     of the increased NRFU workload.  You would be able to see

5     how enumerators were able to handle NRFU in light of having

6     the citizenship question.  Had there been a full-on

7     engagement with trusted voices for instance, there could

8     have been some on the ground understanding of how people

9     were reacting to the citizenship question.  That certainly

10    would have informed 2020.  So --

11         BY MR. EHRLICH:

12    Q.    Would it -- if you're looking for the effect of a

13    citizenship question would an RCT be better than that or

14    not as good as that?

15    A.    That's a little bit of interesting question.  I

16    would want to see an RCT.  On the other hand, I would want

17    an RCT and a field test would be ideal.  I mean, you know,

18    the standard census process is that the end-to-end test is,

19    you know, a dry run of everything.   And so the ideal would

20    be to do the RCT type of testing in the run-up so that your

21    end-to-end test is in fact end-to-end.

22    Q.    Given the timing of adding the citizenship

23    question, is it your opinion that it was reasonable to

24    undertake that process that you're talking about before the

25    end-to-end test?

1          MR. FREEDMAN:  Object to form.

2          THE DEPONENT:  I think the decision to add the

3    citizenship question at such a late date precluded probably

4    doing the testing within the end-to-end.  However, it did

5    not precluded doing adequate pre-testing.

6          BY MR. EHRLICH:

7     Q.    And that pre-testing you're talking about is what

8    exactly?

9     A.    Like an RCT.

10    Q.    Okay.  And that could still occur, right?

11    A.    That is a question for the Census Bureau.

12    Q.    Well, let me ask this.  If that did occur, would

13   that assuage your concerns?

14         MR. FREEDMAN:  Object to form.

15         THE DEPONENT:  I do think that -- I'm not

16   fundamentally opposed to asking sensitive questions on

17   census surveys.  So to be clear, the concern here is about

18   the process, number one, the lack of pre-testing, and what

19   the likely impact is going to be.  I think had the Census

20   Bureau done a thorough job of evaluating the impact of

21   adding the citizenship question on the objectivity,

22   integrity and utility of the census that a reasonable

23   decision could be made to ultimately include it.  But it's

24   my opinion that they have not adequately evaluated the

25   impact of adding the citizenship question on those

1    dimensions of data quality.

2          MR. FREEDMAN:  Counsel, we've been going about an

3    hour and 15 minutes.  Whenever you get to a convenient

4    point, take a break.

5          MR. EHRLICH:  Okay.

6          BY MR. EHRLICH:

7      Q.   And so if we -- if the Census Bureau had or does

8    conduct an RCT, and has a better handle on the effect of a

9    citizenship question, it's your opinion that the addition

10   of a citizenship question could be better handled in the

11   census and, therefore, less of an issue for the concerns

12   you raise in your report?  Is that right?

13         MR. FREEDMAN:  Object to form.

14         THE DEPONENT:  So if I, if I'm interpreting your

15   question correctly, I do think that there is a process that

16   could be followed that would allow the decision makers to

17   be able to determine if the citizenship question could be

18   added without impacting the objectivity, utility and

19   integrity of the data, and if it was determined that it

20   could be added without having significant impacts on those

21   -- data quality, then that would be a reasonable decision.

22         BY MR. EHRLICH:

23     Q.   Could that testing still be done today?

24         MR. FREEDMAN:  Object to form.

25         THE DEPONENT:  I think that's a question for the

1    Census Bureau.

2              BY MR. EHRLICH:

3         Q.   Let me ask the question this way.  Given infinite

4    time from this point forward, is there testing that could

5    be done that would assuage your concerns about a

6    citizenship question on the 2020 census?

7              MR. FREEDMAN:  Object to form.

8              THE DEPONENT:  But there's not infinite time

9    before 2020 is the problem.

10             BY MR. EHRLICH:

11        Q.   Fair enough.  Fair enough.

12        A.   So if I'm interpreting you correctly, would it be

13   possible to separate from 2020 but to add a citizenship

14   question to a census, and to do so in a way that I wouldn't

15   have concerns, the answer is yes.  If all of the

16   conditions, you know, all of the processes were in place

17   that allowed us to evaluate impacts on data quality.  Now,

18   when I look at the reality of the timeframe between now and

19   2020, I look at the reality of the macro environment.  I

20   think that there is nothing that suggest to me that it

21   would be possible to add a citizenship question on 2020 and

22   not have a negative impact of self-response of non-citizens

23   and Hispanics absent some type of really massive policy

24   change in this country.

25        Q.   Okay.  So even if we did an RCT tomorrow, do you

1   think -- and understood the results, and understood the

2   effects of a citizenship question there's no way that the

3   citizenship question could be added to the 2020 census

4   without -- let me start again.  If we did an RCT tomorrow,

5   and understood the full results and impacts of a

6   citizenship question, is it your view that even

7   understanding those results we could not put a citizenship

8   question on the 2020 census?

9          MR. FREEDMAN:  Object to form.

10         THE DEPONENT:  Is your hypothetical that with

11   this RCT we find that there's no effect or a positive

12   effect on response rate?

13         BY MR. EHRLICH:

14     Q.   So you would want to know the results of the RCT

15   is what you're saying?

16     A.   Yeah.  I mean, so in your -- so I think with the

17   hypothetical the reason to do the RCT is to understand the

18   impact of adding a citizenship question on data quality.

19   And so the outcome of that RCT matters in terms of decision

20   making.  I mean, if the outcome didn't matter, then I would

21   be concerned about evidence based policy making.

22     Q.   Yeah.  And when you say -- when you're talking

23   about data quality, what exactly do you mean?

24     A.   The objectivity, integrity and utility of the

25   data.

1       Q.   Okay.   The data being the responses you get

2   from -- the information you get from the 2020 census?

3       A.   The census --

4            MR. FREEDMAN:  Object to form.

5            THE DEPONENT:  I'm sorry.

6            MR. FREEDMAN:  Go ahead.

7            THE DEPONENT:  The census count.  By objectivity,

8   I mean the accuracy and -- again going back to as we talked

9   about earlier in the day that it's both about getting an

10  overall accurate count, but also getting accurate counts of

11  subgroups so that there's not differential inaccuracies

12  that have implications for resources and representation.

13  Integrity refers to the, you know, the confidentiality of

14  the data.  And the utility means the usefulness.  And in

15  this case, that's, you know, evaluated with respect to what

16  has been requested of the Census Bureau.  But as I made the

17  case in my report, is also in question.  Would this be a

18  good time for a bathroom break?

19           MR. EHRLICH:  Yeah.  Let's take a break.

20           (Off the record at 2:36 p.m.)

21           (On the record at 2:50 p.m.)

22           BY MR. EHRLICH:

23      Q.   We were just talking about testing of the

24  citizenship question.  We're on page 23 of your report,

25  which is Exhibit 5.  And we're talking about -- just to

1    close the loop on this.  We were talking about the

2    advantage of an RCT.  And you were saying that even with an

3    RCT you felt that it would not be advisable to add the

4    citizenship question in 2020, is that right?

5         A.   No.  I said I would want to see the results of

6    the RCT before making a judgment about --

7         Q.   Got it.  Given the macro environment, do you

8    think it's possible that the RCT would show that there

9    would be no effect of a citizenship question on 2020?

10        A.   That is hard to imagine.

11        Q.   Okay.  Do you think the macro environment is

12   going to cause difficulties for 2020 in non-citizens for

13   example even absent a citizenship question?

14             MR. FREEDMAN:  Object to form.

15             THE DEPONENT:  Yes.  And I think the addition of

16   a citizenship question exacerbates that.

17             BY MR. EHRLICH:

18        Q.   Okay.  Due to the burden and confidentiality

19   concerns that we talked about earlier?

20        A.   Yes.

21        Q.   Okay.  On page 23 you say there -- the middle of

22   the page, you say there are two well-known examples of

23   recent content evaluations, which highlight the role of

24   testing.  One is the evaluation of a combined race and

25   ethnicity question, which was not adopted, and revisions to

1    the decennial relationship question to capture same sex

2    relationships, which was adopted.  Right?

3         A.   Yes.

4         Q.   And both underwent multi-year testing evaluation

5    in cooperation with experts and stakeholders.  Is that

6    right?

7         A.   Yes.

8         Q.   Both of those had to do with changing the format

9    and wording of two particular questions, right?

10        A.   Yes.

11        Q.   At the bottom of the page, it says even before

12   addition of a citizenship question the Government

13   Accountability Office -- if I say GAO you would know what

14   that means?

15        A.   Um-hmm.

16        Q.   Had designated the 2020 census as high risk, and

17   had emphasized the importance of testing evaluation to

18   mitigate risk to census accuracy and cost.  Do you know why

19   the GAO classified the 2020 census as high risk?

20        A.    They had a full report that I believe they cite

21   here.  They gave a -- my recollection is, is that they gave

22   a number of different issues.  Some have been tests that

23   were not conducted, budgetary constraints, you know,

24   decisions still to be made.  At the end of the day, if I'm

25   correctly summarizing that document, there are a lot of

1    changes for 2020, and making those changes requires a lot

2    of testing, and creates a lot of uncertainty.  And my

3    understanding is that the -- that GAO report was pointing

4    to risks associated with a number of those changes.

5         Q.   Would you say information technology shortcomings

6    is one concern?

7         A.   Yeah.  I mean, so of those -- of the major

8    changes that were meant to try and keep accuracy the same

9    while holding cost study, the Internet self-completion of

10   course is one of them.  The use of administrative records

11   is another.  And both of those are ones that there have

12   been bumps along the way and fits and starts and

13   uncertainties about where things will end up.

14        Q.   Is it fair to say that these are fairly common

15   challenges for a decennial census?

16             MR. FREEDMAN:  Object to form.

17             THE DEPONENT:  I don't know how to answer that

18   question.  This is the first time that the Census Bureau

19   will be conducting online.  The first time to use

20   administrative records in such an extensive fashion.  And

21   so I would not consider those kind of commonplace in that

22   respect.

23             BY MR. EHRLICH:

24        Q.   Fair enough.  More broadly speaking, do you think

25   technology issues, cost issues, elimination of tests, do

1   you think those are common things for the decennial census

2   to face?

3            MR. FREEDMAN:  Object to form.

4            THE DEPONENT:  I probably shouldn't speak to

5   common versus not common.

6            BY MR. EHRLICH:

7       Q.   Okay.

8       A.   In terms of those issues.

9       Q.   Okay.

10           MR. FREEDMAN:  What exhibit?

11           MR. EHRLICH:  Six.

12           MR. FREEDMAN:  Okay.

13  (DOJ Exhibit 6 marked for identification.)

14           BY MR. EHRLICH:

15      Q.   So I've handed you what's been marked as

16  Exhibit 6.  This is a press release titled the GAO Adds the

17  2010 Census to the High Risk List.  Have you seen this

18  before?

19      A.   Um.

20      Q.   The third paragraph down starting with GAO added,

21  can you read that?

22           MR. FREEDMAN:  Object to form and foundation.  Go

23  ahead.

24           THE DEPONENT:  GAO added the upcoming census to

25  the high risk list due to a combination of longstanding

1   deficiencies and emerging challenges including shortcomings

2   in the Census Bureau's management of information

3   technology, weak performances by technology that the Bureau

4   plans to use for data collection, uncertainty of cost

5   estimates, and the elimination of several dress rehearsal

6   activities.

7           BY MR. EHRLICH:

8       Q.   So looking at this, is it fair to say that the

9   2010 census was also classified as high risk?

10          MR. FREEDMAN:  Object to form and foundation.

11          THE DEPONENT:  Yes, it was also -- high risk.

12  And my recollection is, is, right, there was the last-

13  minute device disaster with 2010.  So, yeah, they also had

14  issues.

15          BY MR. EHRLICH:

16      Q.   They also had issues.  Handed you Exhibit 7.

17  (DOJ Exhibit 7 marked for identification.)

18          MR. FREEDMAN:  Do you have copies for --

19          MR. EHRLICH:  Oh, sorry about that.  Yeah.

20          BY MR. EHRLICH:

21      Q.   This is -- I've handed you what's been marked

22  Exhibit 7, GAO High Risk Series an Update is the title,

23  dated January 1999.  Publicly available.  Have you seen

24  this document before?

25      A.   I have not, no.

1          Q.   Can you turn to page 143?  Paragraph at the

2    bottom, very bottom of the page on 143.  The last sentence

3    says as we reported in our earlier work -- excuse me.  Let

4    me back up.  It says in that regard our work has shown that

5    the Bureau faces a number of formidable challenges to cost

6    effective, accurate and complete census no matter which

7    design is chosen.  As we reported in our earlier work, they

8    include the following:  Mail response rates remain

9    problematic.  Scanning equipment used to electronically

10   record responses from census questionnaires experience

11   system crashes due to software flaws, and local

12   partnerships, et cetera, et cetera, et cetera.  Further

13   down the page it says, these major challenges and

14   uncertainties have led us to conclude that there is a high

15   risk that the 20 -- 2000 census will be less accurately and

16   more costly than previous censuses.  Did I read that right?

17          MR. FREEDMAN:  Object to form and foundation.

18          THE DEPONENT:  Yes.

19          BY MR. EHRLICH:

20          Q.   So the 2000 census was also classified as high

21   risk, is that right?

22          MR. FREEDMAN:  Object to foundation.

23          THE DEPONENT:  Yes.

24          BY MR. EHRLICH:

25          Q.   And both the 2000 and 2010 censuses, the GAO

1  raised similar concerns to 2020 regarding technology and

2  cost shortcomings and things like that?

3          MR. FREEDMAN:  Object to form.

4          THE DEPONENT:  I mean, I don't want to say that

5  they're exactly similar.  Did they raise issues about the

6  fragile nature of the census in these censuses?

7  Absolutely.  And it's one of the reasons that we -- I think

8  the Census Bureau as such important standards and

9  guidelines about making changes to the census, and the

10  process by which that testing happens.

11          BY MR. EHRLICH:

12      Q.  But the concerns that the GAO raised for 2020

13  broadly speaking are not uncommon as it relates to

14  decennial censuses?

15          MR. FREEDMAN:  Object to form.

16          THE DEPONENT:  Correct.  And those concerns

17  raised were ones raised prior to the addition of the

18  citizenship question.

19          BY MR. EHRLICH:

20      Q.  Right.  So going back to Exhibit 5, which is your

21  report, if we go to page 27, the top of 27, the first full

22  sentence says pre-testing should have been used to

23  determine if the placement and prominence of a citizenship

24  question on the decennial census questionnaire influences

25  the way in which the respondent interprets and evaluates

1  the survey, right?  What did you mean by that?

2       A.   So survey methodologists, internal and external

3  to the Census Bureau recognize that what matters is not

4  just the wording of a question, but also where it is within

5  the survey.  So the question order.  And then the context

6  as well.  And all of those things are different with a

7  citizenship question on the short form compared to a

8  citizenship question on the ACS.  And so the question is,

9  is how does that impact how people interpret the survey?

10  Do they, for instance, think that the rationale for adding

11  the citizenship question is different in the census

12  compared to the ACS?  If so, then their likelihood of

13  responding or breaking off or lying could be different in

14  those two different surveys.

15       Q.   And so here you're talking about the placement

16  and prominence of a citizenship question on the census,

17  right?

18       A.   Um-hmm.

19       Q.   And --

20       A.   And I mean I would say context generally.  So the

21  absence of having the nativity question before is another

22  way in which the context is different.

23       Q.   Got it.  In terms of placement and prominence

24  though the citizenship question is, as currently planned,

25  is going to be last on the form, right?

1          MR. FREEDMAN:  Object to form.

2          THE DEPONENT:  So what I have seen in Secretary

3    Ross's statement is a directive to put it at the end of the

4    form.  How that actually happens we talked about before, is

5    entirely unclear given that that is a household member

6    level question, and so what that means for it to be on the

7    end of the form is a little bit unclear.

8          BY MR. EHRLICH:

9     Q.   Got it.  Isn't there -- is there a less prominent

10   place for a citizenship question to be on the 2020

11   decennial census questionnaire?

12         MR. FREEDMAN:  Object to form.

13         THE DEPONENT:  My point about prominence was

14   about the fact that it was one of, I guess, 11 questions,

15   as opposed to one of 75.  So just the prominence is about

16   how much that question sticks out relative to can somebody

17   dress or bathe themselves, for instance.  In the short form

18   it really stands out.

19         BY MR. EHRLICH:

20    Q.   So in the second full paragraph -- oh, excuse me.

21   Yeah, the second full paragraph, the last sentence says in

22   the ACS and on the 1950 census the placement of a

23   citizenship question after a place of birth question might

24   signal the government's interest in patterns of migration,

25   which might not trigger the same sensitivities as a

1    freestanding question about citizenship status.  Right?

2         A.    Um-hmm.

3         Q.    Do you have -- strike that.  What's the basis for

4    this opinion?

5         A.    That's simply my basis as a survey methodologist

6    as how somebody might interpret.  I don't know if that is

7    backed up by anything.  It's simply to say that it is a

8    plausible interpretation that would to me signal the need

9    to actually do some testing.

10        Q.    Um-hmm.  Have there been studies done in terms of

11   the ACS and people viewing the place of birth and

12   citizenship question as related to patterns of migration?

13              MR. FREEDMAN:  Object to form.

14              THE DEPONENT:  I have no, I have no idea if

15   that's true.

16              BY MR. EHRLICH:

17        Q.    You haven't reviewed any --

18        A.    No.

19        Q.    -- like that?

20        A.    No.

21        Q.    How often do census respondents understand the

22   rationale for every question on the census questionnaire?

23              MR. FREEDMAN:  Object to form.

24              THE DEPONENT:  Not enough.  And it's related to

25   whether or not they are likely to respond.  Certainly

1    there's been recognition by the Census Bureau and testing

2    by the Census Bureau of the need to provide a rational for

3    individual questions.  And so it's one of the things that

4    we've seen over the last decade in terms of explaining with

5    the ACS why individual questions are asked.  Going back to

6    the research I did in 2000, and the privacy concerns that

7    were associated with individual questions, people are like,

8    why are you asking me if I have, you know, plumbing in the

9    house, right?  And part of the thinking was is that if we

10   can explain to people why we need to ask this question,

11   then it makes them more likely to respond.  And so my point

12   here is, yes, it's entirely speculation as to how people

13   might be interpreting why this question is asked.  My point

14   is to say is that how they interpret the question matters

15   in terms of if and how they respond, and how they interpret

16   the question is related to, according to survey methodology

17   research not only the wording of the question, but also the

18   placement of the question, and the context in which it's

19   asked.

20          BY MR. EHRLICH:

21     Q.   Got it.  So your sentence here about how the

22   placement of a citizenship question after a branched

23   question on place of birth might signal the government's

24   interest in patterns of migration is just your speculation

25   in terms of highlighting the larger importance of context

1   and people understanding the rationale for questions?

2       A.   No.  It's my -- based on my background as a

3   survey methodologist, recognizing what it is that we need

4   to further scrutinize, and this would be one of those

5   things.

6       Q.   Do you know if the citizenship question on the

7   ACS was preceded by a question on place of birth in order

8   to evaluate patterns of migration?

9           MR. FREEDMAN:  Object to form.

10          THE DEPONENT:  I can't speak specifically to the

11  rationale for that.

12          BY MR. EHRLICH:

13      Q.   Okay.

14      A.   Good question though.

15      Q.   If we could go to 29.  I'm sorry, 30.  This is

16  talking about, the top of the page is talking about

17  consultation with experts and advisors, and it's talking

18  about two advisory committees.  Can you describe that

19  process?

20      A.   So I make a couple different points here.  One is

21  that in the 2010 decennial there was a Census Advisory

22  Committee that was set up to make recommendations

23  specifically about the decennial.  There was a Federal

24  Register seeking nominations, but then I never heard

25  anything else about it, and heard that it was -- advice was

1   going to be heard instead through the two Advisory

2   Committees, the National Advisory Committee and then the

3   Census Scientific Advisory Committee.

4        Q.   How often does the -- if I say NAC, you'll

5   understand that's National Advisory Committee?

6        A.   Um-hmm.

7        Q.   How often does that Committee meet?

8        A.   I can't speak to NAC, but CSAC would meet twice a

9   year.

10       Q.   Twice a year.

11       A.   Um-hmm.  And then working groups would do work in

12  between meetings.

13       Q.   Got it.  So when was the last CSAC meeting?

14       A.   I don't know if there's been one this -- there

15  hasn't been one.  So, I guess, the last one was in the

16  spring.

17       Q.   In March 2018?

18       A.   That sounds right.

19       Q.   And so when would the CSAC meeting before that

20  have been?

21       A.   In the fall.

22       Q.   The fall of 2017?

23       A.   Um-hmm.

24       Q.   So there would not have been a CSAC meeting

25  between when the Department of Justice asked for a

```
 1   citizenship question and Secretary Ross decided to add the
 2   citizenship question, is that right?
 3              MR. FREEDMAN:  Object to form.
 4              THE DEPONENT:  So CSAC, I was a member of CSAC
 5   until -- ended at the March meeting.  But we submitted a
 6   letter to Secretary Ross when it was announced that he was
 7   considering it not officially as CSAC but members of CSAC.
 8   And then right before the March meeting, we heard about the
 9   decision.
10              BY MR. EHRLICH:
11       Q.   So the March meeting was after the decision was
12   made?
13       A.   Um-hmm.
14       Q.   But in that intervening time between the request
15   from DOJ and the decision to add it, there was no CSAC
16   meeting?
17              MR. FREEDMAN:  Object to form.
18              THE DEPONENT:  No.
19              BY MR. EHRLICH:
20       Q.   Okay.  Do you know if that's true for NAC as
21   well?
22              MR. FREEDMAN:  Same objection.
23              THE DEPONENT:  I don't know, but I would say that
24   we oftentimes receive -- when I was on CSAC, we would
25   receive updates in between meetings.  So the timing of a
```

1    meeting doesn't necessarily correspond to engagement of the

2    committee.

3         BY MR. EHRLICH:

4    Q.   And what does an update entail?

5    A.   It varies.  Sometimes it is a sharing of

6    information.  Sometimes it would be a presentation where we

7    all call in.  Sometimes it was a working group meeting

8    virtually.  So certainly there was activity going on in

9    between meetings.

10        Q.   Got it.  You mentioned that you were on CSAC,

11   correct?

12   A.   Correct.

13        Q.   And CSAC, did CSAC talk about the citizenship

14   question after the decision was made in the March meeting?

15   A.   I did.

16        Q.   And is it fair to say that CSAC had concerns

17   about the citizenship question?

18   A.   That is fair to say, yes.

19        Q.   Okay.  And if CSAC had been consulted while the

20   citizenship question was under active consideration by the

21   Secretary, what would CSAC's advice have been?

22        MR. FREEDMAN:  Object to form.

23        THE DEPONENT:  I think we were pretty explicit

24   about our advice and our recommendations, and I think I

25   quoted them in my report.  But one of the main things we

1    said was the importance of testing.  We also raised

2    concerns about the impact on data quality, specifically on

3    response rates, and the overall impact on the opinions of

4    the Census Bureau.  That included, you know, just the

5    political -- this just makes the Census Bureau's job so

6    much more difficult.

7                 BY MR. EHRLICH:

8         Q.   Got it.  Do you know if the Census Bureau itself

9    supported the addition of a citizenship question?

10               MR. FREEDMAN:  Object to form.

11               THE DEPONENT:  So I -- based on the things that

12   I've read, the explicit recommendation was that it was

13   going to be harmful to the count.

14               BY MR. EHRLICH:

15        Q.   Harmful to data quality?

16        A.   Yeah.

17        Q.   And CSAC would have been of that same opinion,

18   right?

19               MR. FREEDMAN:  Object to form.

20               THE DEPONENT:  I don't want to say that those are

21   parallel decisions.  They're, you know, my understanding of

22   the official Census Bureau position comes from analyses of

23   administrative records, and analyses of these series of

24   different options.  Those were not discussed by CSAC.  The

25   CSAC concerns were explicitly focused on not the set of

1   alternatives, but what was the likely impact going to be

2   based on our expert opinions, and what was the information

3   that we would like to see the Census Bureau pull together

4   in responding.

5           BY MR. EHRLICH:

6   Q.   Okay.  But CSAC did not support the addition of a

7   citizenship question is that right?

8           MR. FREEDMAN:  Object to form.

9           THE DEPONENT:  CSAC made an official

10  recommendation stating opposition to the addition of a

11  citizenship question.

12          BY MR. EHRLICH:

13  Q.   Okay.  And the --

14  A.   Because of concerns of -- a number of concerns

15  about the likely impact, the process and so on.

16  Q.   Did CSAC feel that those concerns were echoed by

17  the Census Bureau in its memos to the Secretary?

18          MR. FREEDMAN:  Object to form.

19          THE DEPONENT:  We never had that explicit

20  discussion.  At the CSAC meeting concerns were raised.  The

21  Census Bureau response was exactly what, you know, it

22  should have been, which is to say we are going to try and

23  do the very best job we can do as we're told, you know,

24  depending on what we're told to do.  It was very clear that

25  particularly given the freshness of the decision that there

1    was a lot of uncertainty.  Uncertain, like, inability to be

2    able to say what the consequences of this would be in

3    response to questions that CSAC raised.

4              BY MR. EHRLICH:

5         Q.    So as of the March meeting neither CSAC nor the

6    Census Bureau supported the addition of the citizenship

7    question at that point?

8              MR. FREEDMAN:  Object to form.

9              THE DEPONENT:  I don't know.  I mean, certainly

10   at that point I didn't know the -- I had not seen Abowd's

11   memo.  I don't know the date of when those two things

12   corresponded, but I don't think I had seen Abowd's memo.

13   So I at that point I didn't know the official Census Bureau

14   position, if that's what we're --  Abowd's position.

15             BY MR. EHRLICH:

16        Q.    Yeah.  So given your knowledge today --

17        A.    Yeah.

18        Q.    -- the Census Bureau did not advocate for the

19   addition of the citizenship question on the 2020 census,

20   right?

21        A.    The Census Bureau recommended against adding a

22   citizenship question.

23        Q.    And CSAC --

24        A.    Also recommended against adding the citizenship

25   question.

1      Q.   Okay.  Can we turn to 34?  At the bottom -- the

2  bottom paragraph on this page, the middle sentence.

3  Empirical research finds that respondents are less likely

4  to answer sensitive questions in an interview-administered

5  survey compared to a self-administered survey, right?

6      A.   Um-hmm.

7      Q.   This is -- and what's your basis for that

8  opinion?

9      A.   Just previous research, and again the point of

10  this paragraph of which this is one piece, is to say that

11  the addition of a citizenship question in the NRFU

12  operation where you have an interviewer creates an

13  additional layer of complication to be studied.  And

14  certainly we recognize in the survey methodology research

15  that different modes of survey completion matter in terms

16  of sensitive questions in particular.

17      Q.   So here we're just talking about answering

18  sensitive questions.

19      A.   Generally.

20      Q.   Generally.

21      A.   Not citizenship questions specifically.

22      Q.   And do this in the terminology we discussed

23  earlier, this would be concerns about item non-response?

24      A.   Not necessarily.  I mean, you could also have

25  break-offs.  And if you have a breaking off early enough

1   then it becomes essentially unit non-response.  So, yeah.

2   I mean, typically with the sensitive -- with a sensitive

3   question oftentimes people don't encounter it until they

4   have already agreed to participate in the survey.  And, you

5   know, this is one of the things that's kind of different

6   about something as big as the census is that people know

7   about a question before they actually encounter it on the

8   actual survey.

9       Q.   But if an enumerator visited someone's house

10  during NRFU, and they interviewed with the enumerator but

11  broke off at the citizenship question, they would have

12  already supplied the household information before that,

13  right?

14      A.   With that, yeah, particular example, yeah.

15      Q.   Yeah.  And if an enumerator comes to the door,

16  and the person skips the citizenship question in the

17  enumerator interview, all the information about the

18  household would still have been collected at that point,

19  right?

20      A.   If they just give it, yeah.

21      Q.   Okay.  So this is along the same lines, but going

22  on the top of 35.  You know what -- scratch that.  Further

23  down on 35, you're talking about the background of

24  enumerators hired for the non-response follow-up process,

25  right?  And the last sentence of that paragraph, can you

1   read that?

2        A.   Moreover, the staffing challenges noted by a

3   recent GAO report --

4        Q.   I'm sorry.  The -- I'm sorry.  The first full

5   paragraph on 35, the sentence that begins for example.

6        A.   Oh.  For example, the Census Bureau has announced

7   it will hire only U.S. citizens as enumerators for the 2020

8   census, a decision that could deprive the Bureau of a pool

9   of potential enumerators likely to have the very language

10  skills and cultural backgrounds critical to reaching the

11  very populations -- well, deterred from census

12  participation because of the sensitive question.

13       Q.   And what's your basis for that opinion?

14       A.   That non-citizens might be able to better reach

15  non-citizens.  Is that a part of the question or about the

16  decision that they will only hire U.S. citizens?

17       Q.   The former is what I was going for.

18       A.   Okay.

19       Q.   So --

20       A.   So we know that interviewer characteristics

21  matter in terms of people's willingness to respond, and

22  willingness to respond to the questionnaire.  Let me give

23  just an extreme example.  So suppose an enumerator shows up

24  in a high density Hispanic household with a Make America

25  Great Again hat on, that they would likely be less willing

1   to open the door, and less willing to respond, and respond

2   accurately.  Interviewer -- I mean, obviously that's not

3   going to happen, but interviewer characteristics matter.

4   And so it's one of the reasons that there has been an

5   attempt to match neighborhood enumerators in the

6   neighborhoods that need to be counted.  When you have, you

7   know, areas that have a high density of non-citizens we

8   have removed from the potential pool of potentially

9   effective enumerators if we're limiting ourselves to

10   citizens.

11       Q.   And so here you're highlighting language skills

12   and cultural backgrounds that would be helpful when you're

13   in a particular community, right?

14       A.   Yeah.

15       Q.   And so is it possible that U.S. citizens would

16   have the same language and cultural skills in order to

17   enumerate those same communities?

18            MR. FREEDMAN:  Object to form.

19            THE DEPONENT:  I think that's a reasonable

20   question.  The question is, is will there be sufficient

21   numbers of citizen enumerators who are also viewed as, you

22   know, like me in those neighborhoods.  You've taken out a

23   potential pool of enumerators by with this restriction.

24            BY MR. EHRLICH:

25       Q.   But you have no quantitative evidence that there

1    won't be enough people with language and cultural

2    backgrounds to enumerate?

3            MR. FREEDMAN:  Object to form.

4            THE DEPONENT:  I do not.

5            BY MR. EHRLICH:

6       Q.    Okay.  Could we go to 41?  So your concluding

7    paragraph at the end you say based on a review of the

8    quantitative and qualitative research and evidence the

9    preponderance of the evidence suggests that it's highly

10   likely that the addition of a citizenship question will

11   exacerbate the disproportionate undercount of non-citizen

12   households and Hispanics.  Is that right?

13      A.    Um-hmm.

14      Q.    What level of certainty do you have in that

15   conclusion?

16      A.    As I say, I think that every piece of evidence

17   that I have seen all points in the same direction.  All

18   points to a negative impact.  So, you know, have a high

19   degree of certainty about the direction of that effect.

20      Q.    Um-hmm.  When you're saying a preponderance of

21   evidence here, what do you mean by that?

22      A.    Just meaning that study after study after

23   study -- every piece that I looked at.  Like I never

24   encountered any piece of evidence that was counter to their

25   being a negative impact.  There was nothing that suggests,

1   oh, maybe we'll get some people that will be more likely to

2   respond.  Maybe they'll be -- there was nothing that

3   pointed to any other direction over the fact.

4        Q.   Any you say -- when you say highly likely, do

5   you -- did you attempt to quantify how likely this would

6   be?

7        A.   No.

8        Q.   Would it be able -- would you be able to do that?

9        A.   The Census Bureau could.

10       Q.   How would the Census Bureau do that?

11       A.   They might do a coverage analysis after an end-

12  to-end test in which there was a citizenship question that

13  had been adequately tested over the course of many years.

14       Q.   But absent that, there's no quantitative way to

15  figure out the answer to this question?

16            MR. FREEDMAN:  Object to form.

17            THE DEPONENT:  I think the question is if you're

18  looking for the likely effect and the direction of that

19  effect versus a point estimate about the size of that

20  effect, and that's where I feel very confident in

21  concluding that all of the evidence -- there is

22  considerable evidence that suggests a negative impact.  I

23  understand the desire to try and get the size of that

24  negative effect, and that's a far more difficult empirical

25  challenge, and it's one that absent additional testing and

1   research by the Census Bureau that we just aren't going to

2   have any confidence.

3          BY MR. EHRLICH:

4          Q.   Got it.  So your -- in your professional opinion

5   there's going to be some negative effect of the citizenship

6   question, but you don't know how much?

7          A.   Correct.

8          MR. EHRLICH:  Okay.  Handed you Exhibit 8.

9   (DOJ Exhibit 8 marked for identification.)

10          BY MR. EHRLICH:

11          Q.   This is the expert rebuttal report of D.

12   Sunshine Hillygus, Ph.D.  Does this look familiar?

13          A.   It does.  I'm sure I'll identify some more typos.

14          Q.   Page 2.  At the bottom paragraph, middle of the

15   paragraph, you say it is well established that proxy

16   respondents provide less accurate data.  Is that right?

17          A.   Yes.

18          Q.   And what's your support for that?

19          A.   There I'm referencing the Mule coverage analysis.

20   I think that might be the same one that is entered into

21   evidence.  But I also reference there Restacki (ph.) and

22   O'Hara.  And pretty much any time we see any analysis of

23   proxy respondents by, you know, every measure we see lower

24   quality data.

25          Q.   So this is -- sorry.  If we look at Footnote 8,

1   it looks like you're citing Dr. Abowd's January 19th memo,

2   is that right?

3       A.   Oh, yeah, sorry.  Looking at the wrong one.  But

4   in the next sentence is an example of how proxy respondents

5   provide lower quality data, and that was the Mule citation.

6       Q.   Got it.  And that's what that says, the 2010

7   census coverage measurement analysis found the correct

8   enumeration was 27.1 percent lower for proxy responses

9   compared to self-responses, right?

10      A.   Um-hmm.

11      Q.   And we looked at how those calculations were done

12  earlier today in terms of what correct enumerations are,

13  right?

14      A.   Yes.

15      Q.   Okay.  Can we turn back to Exhibit 3 again,

16  please?  And this is again Dr. Abowd's January 19th memo,

17  is that right?

18      A.   Um-hmm.

19      Q.   Turning to page 1282, the first full paragraph.

20  Can you read the first sentence?

21      A.   Sure.  One reason that the erroneous enumeration

22  in the whole person imputation rates are so much greater

23  during NRFU is that the data are much more likely to be

24  collected from a proxy rather than a household member.  And

25  when they do come from a household member, that person has

1   less accurate information than self-responders.

2         Q.   Right.  And then the further down in the

3   paragraph he writes, the information for 21 percent of

4   persons whose data were collected during NRFU is based on

5   proxy responses.  For these 16 million persons the correct

6   enumeration rate is only 70.1 percent.  Among proxy

7   respondents erroneous enumerations are 6.7 percent, and

8   whole person census imputations are 23.1 percent.  Is that

9   right?

10        A.   Um-hmm.

11        Q.   So when Dr. Abowd is talking about accuracy here,

12  he's measuring it in terms of enumerations, erroneous

13  enumerations, whole person imputations, right?

14              MR. FREEDMAN:  Object to form.

15              THE DEPONENT:  Correct.  That is my

16  understanding.

17              BY MR. EHRLICH:

18        Q.   If we go back to your rebuttal report, which is

19  Exhibit 8.  Actually, I'm sorry.  Can we turn to the Mule

20  report.

21              MR. FREEDMAN:  That's Exhibit 1.

22              MR. EHRLICH:  Exhibit 1.  Thank you.

23              BY MR. EHRLICH:

24        Q.   Actually you know what, I apologize.  Let's go

25  back to your report.  Rebuttal Report Exhibit 8, please,

1    page 4.  So the bottom paragraph of this you're referencing

2    the Census Bureau analysis that we've looked at today in

3    terms of the drop in self-response rate for non-citizens,

4    right?

5         A.   Yes.

6         Q.   The end of that paragraph into the next page says

7    in addition the translation of the estimate into a

8    predicted increase in NRFU workload rests on the assumption

9    that average household size for non-citizens is the same as

10   the general population.  Can you describe the basis for

11   that opinion?  Or strike that.  Can you describe why

12   household size matters in terms of increased NRFU workload

13   and cost?

14        A.   Sure.  Actually, the household size is actually

15   really critical, I think, throughout because if you assume

16   that the non-citizen and Hispanic households are less

17   likely to self-respond, and you're making a projection

18   about your NRFU households on the basis of general

19   household size, then you're underestimating the number of

20   people who are going to ultimately be put into -- and

21   counted through NRFU.  Household size matters again when it

22   comes to proxy responding, and why I expect that proxy

23   respondings is more likely to lead to under estimates of

24   Hispanic and non-citizen households.  And so --

25        Q.   So is it your understanding of the NRFU process

1  that when an enumerator is attempting to follow-up on a

2  household that has not self-responded they would attempt to

3  contact every person in that house?

4       A.   No, no, no.  It's more just in terms of, yeah.

5  So I mean it's certainly the households don't -- number of

6  households don't change, but when you trace out the

7  implication from self-response to NRFU to ultimately

8  undercount that's where that ultimately matter.

9       Q.   But looking at the sentence in terms of NRFU

10  workload and costs, is it fair to say that household size

11  does not matter for purposes of NRFU workload and cost?

12      A.   I don't -- I mean, so as I reference on picking

13  up on the Brown assumption about equivalents.  And so if

14  that's an assumption that's not necessary because it

15  doesn't matter, then it doesn't matter.  But that was what

16  I was trying to do was trying to identify within the

17  Brown estimates.

18      Q.   So Brown is Exhibit 4, page 42, Bates stamp

19  ending in 9874.

20      A.   So maybe this reference here means that this

21  assumption here doesn't necessarily apply to the NRFU.

22  Only it applies to the implications of a NRFU for the next

23  stage.

24      Q.   Got it.

25      A.   Yeah.

1      Q.   But an increase in household size is not going

2  to -- that factor alone will not increase NRFU costs and

3  workload, right?

4      A.   I should -- that's probably something I don't

5  know the answer to exactly.  But I think it's a fair point

6  to say that NRFU workload is in terms of households, not

7  individuals.

8      Q.   Okay.  And so --

9      A.   I don't know if the assumptions that Abowd made

10  about like field staff, if that comes in or not, but it is

11  correct to -- I think it is correct to say that NRFU

12  workload is a function of households, not individuals

13  within the household.

14      Q.   Got it.  Can we go to page 6?  In the bottom

15  paragraph, the second sentence you're talking about testing

16  again, and you write simply because Census Bureau standard

17  A2-3 indicates that the pre-testing exception is allowed in

18  some circumstances does not mean that conclusion is the

19  appropriate decision here.  So the Census Bureau standards

20  do allow an exception for pre-testing of a question when it

21  was included on another survey, right?

22           MR. FREEDMAN:  Object to form.

23           THE DEPONENT:  So what I can speak to is both my

24  understanding of Census Bureau standards and survey

25  methodology --

1          MR. EHRLICH:  Sure.

2          THE DEPONENT:  -- standards.  And the standard

3   practices in terms of pre-testing.  Is there potential to

4   waive an exception for pre-testing?  It does appear that

5   that is the case of the pre-testing of a question.  One of

6   the things that, as I explained in my report, is the

7   importance of not just testing a question but a

8   questionnaire, and that the extent to which the inclusion

9   of a citizenship question on the ACS is fundamentally

10  different from inclusion on the census short form, that's

11  in terms of, you know, placement, prominence, the lead-in

12  to the context.  That all of those things are different,

13  and different in a way that I would say makes it not

14  previously extensively tested, similar to including on

15  census long form.  I mean census short form.

16          BY MR. EHRLICH:

17  Q.   So in your opinion the question has been

18  adequately tested, but has not been adequately tested in

19  the context of the short form questionnaire for the 2020

20  census?

21          MR. FREEDMAN:  Object to form.

22          THE DEPONENT:  Yes.  And I should say the ACS

23  question has been tested.  A question on the short form is

24  different from the ACS question in several respects, and so

25  has not been adequately tested.

1          BY MR. EHRLICH:

2      Q.   But context of the question on the short form,

3   correct?

4      A.   Right.  And in particular the connection to the

5   where you were born.

6      Q.   But the citizenship question on the 2020 census

7   will be identical to the ACS, right?

8          MR. FREEDMAN:  Object to form.

9          THE DEPONENT:  I have made the case that it is

10  not identical.  It's not identical because you don't have

11  first ask where you were born, and then the other parts of

12  the questionnaire that are different.

13         BY MR. EHRLICH:

14     Q.   So in terms of the questionnaire and how you get

15  to the question, that's different, right?

16     A.   Yeah.

17     Q.   But the question itself asking about citizenship?

18     A.   The response options and stuff, yes.

19     Q.   That's all the same for the 2020 census?

20     A.   Um-hmm, yeah.

21     Q.   For both -- we've looked at your initial expert

22  report, which is Exhibit --

23         MR. FREEDMAN:  Five.

24         MR. EHRLICH:  Five.  Thank you.

25         BY MR. EHRLICH:

1      Q.   And your rebuttal expert report, which is
2  Exhibit 8, correct?
3      A.   Um-hmm.
4      Q.   Are there any other grounds supporting your
5  opinions that you have not disclosed on the record?
6      A.   No.
7      Q.   Okay.  Backing out of the reports.  When did you
8  first learn that a citizenship question was being
9  considered for the 2020 census?
10     A.   It was when I was a member of CSAC and a little
11 bit of -- I'm not entirely sure of the timing, but I
12 believe I was probably contacted by Barbara Anderson about
13 it being considered.
14     Q.   Who is Barbara Anderson?
15     A.   She was Chair of CSAC.  And there was a question
16 if members of CSAC not representing CSAC, but as members of
17 CSAC if we wanted to write an opinion, we sent a letter to
18 Secretary Ross.
19     Q.   And about when was that?
20     A.   Whenever.  I don't know.
21     Q.   Okay.
22     A.   Like whenever he said he was considering it we
23 sent in a letter, and I really thought there was just no
24 chance that it would actually happen.  And then got a
25 letter from him, and then heard the announcement shortly

1    thereafter right before the March CSAC.

2         Q.    And from him you mean Secretary Ross?

3         A.    Yes.

4         Q.    So I think you sort of suggested the answer to

5    this next question, but what was your initial reaction upon

6    learning that the citizenship question was being considered

7    for the 2020 census?

8         A.    Upon that initial -- that wasn't that big of a

9    surprise.  To consider the addition of a citizenship

10   question is not out of the realm of possibility.  To

11   consider doing some extensive testing to see if it would be

12   feasible to add, I also wasn't terribly surprised by.  What

13   I was surprised by was by the decision to actually add it

14   in this round as opposed to putting it in a queue for

15   testing and evaluation.

16        Q.    Did you have an opinion around the time you sent

17   the letter to Secretary Ross whether adding the citizenship

18   question would be a good idea or a bad idea?

19        A.    We recommended at a pretty high level against

20   doing it.  But --

21        Q.    And why was that?

22        A.    On expectation that it could have a negative

23   impact based on just our, you know, collective expert

24   opinion about the questionnaire.

25        Q.    But you had not done any testing at that point to

1    determine the impact, right?

2         A.   Well, I mean, no testing.  I didn't do any

3    original data analysis from my report.  And I would say

4    that in terms of a good chunk of the survey methodology

5    literature that I brought to bear here was stuff that I

6    carry around in my head, right?  So, you know, I can't

7    remove my opinion on the basis of my background in survey

8    methodology then from -- I mean, certainly my opinion here

9    has been better researched and have been able to bring to

10   bear more empirical evidence.  But I wouldn't say it was an

11   uninformed opinion then.

12        Q.   At the time you formed that opinion, you had not

13   seen, for example, Dr. Abowd's analysis of drop-off in

14   self-response rates, right?

15        A.   No.  My opinion at that point was based on my

16   knowledge of the survey methodology literature, my

17   experiences as a member of CSAC, as a researcher, NCRN,

18   having at that point written, you know, had already written

19   a book on census participation.  So, you know, I hadn't

20   seen any new specific analyses regarding the addition of a

21   citizenship question that we'd seen, but a lot of the same

22   things that I brought to bear and document I discuss in my

23   report.

24        Q.   And when you're talking about the knowledge that

25   you brought to bear, you're talking about the studies

1  concerning, for example, non-citizen concerns with

2  confidentiality and things of that nature?

3      A.   No.   More I was thinking about just my knowledge

4  of the survey response decision, and the likely impact of

5  sensitive questions generally.   That that is where a lot of

6  the scientific literature has focused.   Yes, I'm a public

7  opinion scholar.   So I'm certainly, you know, vaguely aware

8  of what public opinion is right now in various domains.

9  But I, at that point, I wasn't aware specifically of say,

10  you know, what specific numbers were regarding Hispanics

11  fear of deportation for instance.

12      Q.   So just to clarify.   So your initial reaction

13  when around the time when CSAC sent the letter to the

14  Secretary that adding the citizenship question to the 2020

15  census would be a bad idea, it was based on just your

16  general knowledge in the field, is that right?

17      A.   In multiple fields, yeah.   So with respect to

18  census cooperation specifically with survey methodology as

19  well.   And familiarity with, you know, the census -- the

20  challenge -- I mean, the 20 -- there was certainly

21  recognition that the 2020 census was already fragile, had a

22  lot of challenges on its, you know, without adding one more

23  piece to make it more complicated.   And so that background

24  knowledge was what led into that collective letter.

25      Q.   Okay.

1      A.   And I don't actually remember the content of that

2  letter.  I think it was pretty short and sweet to say we

3  just want to get down on the record that this seems like a

4  bad decision.  And, again, we were really surprised.  I

5  should speak for myself.  I was really surprised.

6      Q.   At the time you sent that letter, did you know

7  that there was not going to be testing done?

8      A.   No.  But I also was familiar with the lengthy

9  process of testing that we go through with the ACS for

10 instance.  And it was hard to imagine how you squeeze that

11 much thoroughness into a short timeframe.

12     Q.   So beyond -- strike that.  And at this point you

13 didn't know if a citizenship question was added to the

14 census what form that question would take, correct?

15     A.   I did not know, no.

16     Q.   Okay.

17     A.   I probably would have assumed that it would have

18 been a, are you a citizen?  Yes, no.  As opposed to one

19 that had distinctions between Guam and, you know, foreign

20 born or U.S. citizens abroad, parents, and so on.

21     Q.   Would a yes, no citizenship question have been

22 better?

23          MR. FREEDMAN:  Object to form.

24          THE DEPONENT:  I think that's a good question

25 that we could have answered with the RCT that was designed.

1          MR. EHRLICH:  I'm handing you what's been marked

2     as Exhibit 9.

3     (DOJ Exhibit 9 marked for identification.)

4          BY MR. EHRLICH:

5     Q.    And it's a presentation called Discussion

6     Comments, 2020 Update by D. Sunshine Hillygus, Duke

7     University, publicly available.  Do you recognize this

8     document?

9     A.    I do.

10    Q.    Did you write this presentation?

11    A.    I did.

12    Q.    And can you explain what this presentation is

13    for?

14    A.    Sure.  The CSAC Chair asked CSAC members to

15    discuss various presentations over the course of the CSAC

16    meeting, and she had asked me to do the discuss and

17    comments.  I can't remember the exact timing of her request

18    and the announcement of, but again as you can see in here,

19    I focused quite a bit of attention on the announcement of

20    the citizenship question.

21    Q.    And so what was the purpose for giving the

22    presentation?

23    A.    To provide feedback to the Census Bureau, to ask

24    questions of the Census Bureau, to be able to get -- I

25    mean, our role is to be able to offer advice, also serve as

1   kind of liaison census and the user community.

2        Q.   So you talked about how you first formed your

3   opinion around the time that CSAC sent the letter to the

4   Secretary, right?

5        A.   Yeah.

6        Q.   And so this presentation to CSAC could have been

7   two months later or so?

8        A.   Yeah, yeah.

9        Q.   Had you done any additional research between the

10  first point in time and the second point in time?

11       A.   I mean, only probably the 45 minutes or two hours

12  or whatever put into to articulating my responses.

13       Q.   Got it.  So turning to the second page.

14       A.   Um-hmm.

15       Q.   Which I think is the first slide.  The slide just

16  says WTH, right?

17       A.   Right.

18       Q.   What does that stand for?

19       A.   I was censoring myself.

20       Q.   Please uncensor yourself for the purposes here.

21       A.   Well, I would have said WTF, but I thought there

22  could be people watching.  So what the hell.  So, like I

23  said, I was really surprised, and that about the decision

24  to add a citizenship question.  I don't know the internal

25  dynamics of how much the Census Bureau is kind of forced to

1   do what the Commerce Secretary says even if it violates

2   their standards and guidelines and procedures.  And so I

3   had just assumed that because an addition of the

4   citizenship question just so clearly seemed like a danger

5   to the quality of the census that 2020 would be protected.

6   And I had also hoped that Secretary Ross was committed to

7   an accurate and fair census.  And so, again, I was just

8   really surprised by the decision.

9        MR. FREEDMAN:  Counsel, we've been going about an

10  hour and 15 minutes again, and there's a court order that I

11  want a chance to look at.  So if we could go off, I

12  appreciate.

13       MR. EHRLICH:  Yeah, sure.

14       (Off the record at 4:05 p.m.)

15       (On the record at 4:19 p.m.)

16       BY MR. EHRLICH:

17  Q.   So we were talking about your presentation at

18  CSAC at the end of March 2018.  And you were describing

19  your opinion at the time of the Secretary's decision.  Do

20  you recall saying during the presentation that it was an

21  absolutely awful decision?

22  A.   That sounds right.

23  Q.   Okay.  Is that for substantially the reasons that

24  you've already talked about?

25  A.   Well, and, I mean, I think at the time I laid out

1    exactly the specific things that were coming to mind at

2    that point.  I think there have probably been a few things

3    that have changed since I have done more research.

4         Q.   What has changed since the time of this

5    presentation in terms of the research you've done?

6         A.   I've been able to look at the research that was

7    more explicitly about citizenship question specifically.

8    Like I said, the things that I was able to bring to bear on

9    more were informed based on my background knowledge about

10   surveys generally in the census, and in previous cycles.

11   And so, you know, at this point having seen the Brown

12   analysis and break-offs and so on it just gives, again, I

13   guess a way to put it is to say every piece of evidence is

14   still pointing to a negative effect.  Some of the research

15   that has been done since I had already expected a negative

16   effect confirms the likelihood of a negative effect, and

17   that was all things that were new.

18        Q.   Do you recall saying during the presentation that

19   the controversy caused by the addition of a citizenship

20   question could possibly increase response rates?

21        A.   So I may have talked about the phenomenon that

22   sometimes what you see is essentially what's called a

23   backlash effect.  And so you can see a backlash effect in

24   some phenomena, you know, like there's been speculation

25   that you put in place an electoral rule that makes it

1  harder for a particular group to participate and they're

2  feeling more mobilized as a result.  And so I suspected

3  like in context of talking about this that I may have been

4  emphasizing the importance of all this what's going to

5  happen.

6      Q.  Do you recall in the presentation saying anything

7  along the lines of you would like to resign and rail

8  against the decision?

9      A.  I don't remember that explicitly.  It was my last

10  CSAC meeting.  So there was no need to resign.  But

11  certainly rail against the decision.  Yes, I think that I

12  did that.

13      Q.  Fair enough.  When were you first contacted by

14  counsel about testifying in this case?

15      A.  I don't -- I can't remember exactly when it was.

16  It was definitely after, after this.  I just got a little

17  bit of attention.  I didn't, I really didn't realize -- I

18  always say that with my 2000 census book, that, you know,

19  like three people read it, my mom included.  Nobody ever

20  seems to care about census stuff.  So I was surprised by

21  how much attention this got.  I -- it was sometime in late

22  spring, I think.

23      Q.  So about April?

24      A.  Could be, yeah.

25      Q.  Okay.  And how soon after that were you retained?

1        A.    I think in May.

2        Q.    Okay.  And what analysis were you asked to do?

3        A.    So, you know, initially we had a lot of

4   conversations about, you know, overall assessing the impact

5   of a citizenship question.  And then my foot in this is in

6   many different spots, both as a survey methodologist, as

7   somebody who has been on CSAC's.  I've been -- talked about

8   processes.  And so from the very beginning there was a

9   little bit of like, you know, we want to ask you questions,

10  and get your feedback, and ultimately they decided to

11  retain me even though I think at the time we weren't

12  exactly clear how I would be used.

13       Q.    Got it.  So about when was it decided that you

14  would actually provide expert testimony?

15       A.    I guess probably in May or so.  I didn't really

16  get started just because of other commitments.  I'm working

17  on a book.  And so I had a book manuscript.  And so the

18  plan was is, you know, in July once I had the draft of that

19  manuscript done, I could commit to focusing on my expert

20  report.

21       Q.    And what did you do to prepare the -- both

22  reports?

23       A.    Reviewed a lot of documents, and looked at

24  essentially everything that I could get my hands on about

25  census participation, about citizenship questions,

1   sensitive questions.  And so I was reviewing both my

2   personal collection of survey methodology books, the

3   literature, academic journals out there.  I mean, one of

4   the things that has been so, so helpful is the fact that

5   the Census Bureau is so much more transparent now.  And so,

6   you know, when counsel asked about what I referenced, I

7   said, just can I put the Census Bureau website?  Because so

8   much of the material is on the Census Bureau website.

9        Q.   In preparing your reports, did you do all the

10   work yourself?

11        A.   I did.

12        Q.   And so about how much time have you spent reading

13   materials in order to prepare your reports?

14        A.   Just on reading materials, I'm not entirely sure

15   of the numbers.  But, I mean, I've worked over 100 hours on

16   reviewing material and writing and revising and so on.

17        Q.   How much time have you spent discussing this case

18   with others?

19        A.   It's a little hard to say because, I mean, from

20   the get-to I've been talking about it.   And I have now

21   tried to, you know, not talk to journalists and stuff as

22   much.  But, yeah, certainly I've talked to others.

23        Q.   In preparing your report, did you talk to any

24   other experts that were retained by Plaintiffs?

25        A.   So I have talked -- like some of the other

1    experts are ones that I've encountered at conferences and

2    interact with.  I saw Chris Warsha (ph.) at American

3    Political Science Association Conference.  And we both

4    said, I have no time these days.  I mean, that was the

5    extent of that conversation.  So, you know, I have had some

6    interactions.

7         Q.   You sure it wasn't a Stanford alumni event?

8         A.   No.

9         Q.   Have you talked to other experts retained in this

10   case about your report?

11        A.   Not about my report, no.

12        Q.   Have you reviewed other experts' reports in this

13   case?

14        A.   I reviewed one of the reports.

15        Q.   Which one?

16        A.   Salvo (ph.).

17        Q.   Okay.  Did you talk with Mr. Salvo?

18        A.   No.

19        Q.   Okay.

20             MR. FREEDMAN:  And, obviously, you reviewed

21   Dr. Abowd's report as well.

22             THE DEPONENT:  Oh, of course, yeah.

23             MR. FREEDMAN:  That goes without saying.

24             BY MR. EHRLICH:

25        Q.   Does the report, both the initial report and the

1    rebuttal report represent your independent views?

2         A.   Yes.

3         Q.   How much time did you spend preparing for this

4    deposition?

5         A.   A few hours.  So met with them yesterday.  Met

6    once before for a couple hours, and spent some time reading

7    and rereading materials last night.

8              MR. EHRLICH:  Got it.  Handing you Exhibit 10.

9    (DOJ Exhibit 10 marked for identification.)

10             BY MR. EHRLICH:

11        Q.   Do you recognize this document?

12        A.   I do.

13        Q.   And what is it?

14        A.   My CV.

15        Q.   Can you describe your education?

16        A.   Sure.  I have a BA in political science and

17   Spanish from the University of Arkansas, a Master's in

18   political science from the University of Arkansas, a

19   Master's in political science from Stanford, and a PhD from

20   Stanford.

21        Q.   And during the time pursuing these degrees, did

22   you receive any training in statistics?

23        A.   Yes.

24        Q.   And what type of training was that?

25        A.   Statistical training both within political

1    science and the Statistics Department.

2        Q.    For which degree?

3        A.    For my MA and PhD at Stanford.  Some at Master's

4    at Arkansas, but pretty minor.

5        Q.    Um-hmm.

6        A.    I also teach, taught statistics at Duke.

7        Q.    Did you have any training in demography?

8        A.    No.

9        Q.    Any training in psychology?

10       A.    Political psychology, yes.

11       Q.    Can you describe what political psychology is?

12       A.    Applied to political decision making.  So, you

13   know, how it is people make up their mind about political

14   decisions.  And I would say civic decisions as well.  I

15   mean, so my current book, and then the book about census

16   participation draws on that psychology of decision making.

17       Q.    And did you receive any training in survey

18   methodology?

19       A.    Um-hmm.

20       Q.    Have you -- what classes have you taught in

21   statistics?

22       A.    So I teach, I currently teach a survey

23   methodology introduction to statistics, a research design

24   class, a survey practicum.  I think those are the main ones

25   I teach.

1     Q.    And just to back up.  So after you received your

2     PhD, you taught at Harvard, is that right?

3     A.    Correct.

4     Q.    And that was in the Political Science Department?

5     A.    Well, it's the Department of Government, but yes.

6     Q.    Okay.  And in 2010 you transitioned to Duke?

7     A.    2009.

8     Q.    2009.  And at Duke you joined the Political

9     Science Department, right?

10    A.    Correct.

11    Q.    And you're still in the Political Science

12    Department?

13    A.    Yes.  I have a courtesy appointment in public

14    policy.

15    Q.    What is a courtesy appointment?

16    A.    Basically they make me do work, and list me on

17    their website, but don't pay me.

18    Q.    Fair enough.  What responsibilities do you have

19    as a professor at Duke currently?

20    A.    So in addition to teaching, I'm teaching a class

21    on public opinion.  This semester I'll teach my graduate

22    level survey methodology class.  In the spring I advise

23    students.  I sit on dissertation committees in political

24    science and statistics and other fields.  I direct the

25    initiative on survey methodology, which is part of the

1  Social Science Research Institute.  And the DISM as we're

2  called, we provide research and training support for

3  researchers at all levels at the university in survey

4  methods.

5          Q.   Have you ever worked in the Census Bureau?

6          A.   Not paid, just a member of CSAC.  So I think it's

7  a special some type of appointment.

8          Q.   And CSAC is an advisory committee to the Census

9  Bureau?

10         A.   Correct.

11         Q.   How long were you on CSAC?

12         A.   The full length.  I think that's six years.

13         Q.   And why did that end this year?

14         A.   Just timing.  Bob Robes (ph.) is the one who

15  invited me to join initially, and I just rotated out.  So

16  didn't have to, you know, resign and rail.

17         Q.   Fair enough.  And as part of CSAC, what were your

18  responsibilities?

19         A.   It depended on the particular meeting, whether I

20  would provide feedback on particular areas of the census.

21  I was also part of working group that I actually worked

22  with Tom Beuley (ph.), I was mispronouncing his name the

23  whole time, on the use of administrative records and

24  adaptive design.  And anyway over six years -- and learned

25  so much about the census.  I'm also -- or was a senior

 1   investigator on one of the research nodes.  Duke has had

 2   one of those, and so was my other involvement in census.

 3        Q.   Got it.  So I'm not going to go through each one

 4   individually, but as I count it, you have about two books,

 5   34 journal articles and 21 other publications?  Does that

 6   sound about right?

 7        A.   Sounds right.

 8        Q.   Okay.  How many of those related to the conduct

 9   of the decennial census?

10        A.   Only the book.

11        Q.   And that's --

12        A.   Well, except, I mean, the survey methodology

13   stuff is certainly related.  A lot of the work that I have

14   done has been on non 19:26:07 missing data, and

15   fundamentally a lot of the stuff that we are talking about

16   is about the fact that it's not random who is going to

17   respond and who is not.  And so although it's not directly

18   within application of the census, it's the fundamental

19   issues ultimately.

20        Q.   You would agree that the census is sort of its

21   own beast though, right?

22             MR. FREEDMAN:  Object to form.

23             THE DEPONENT:  Yes.  I would agree that the

24   census is its own beast.

25             BY MR. EHRLICH:

1      Q.   And so, for example, in your other political

2   surveys, for example, there's no non-response follow-up, is

3   that right?

4           MR. FREEDMAN:  Object to form.

5           THE DEPONENT:  True.  Well, actually not exactly

6   true.  The American National Election Study, for instance,

7   had a non-response follow-up.  But, yes.  I mean, certainly

8   there are some surveys on which there are differences.

9   Some of my methodological work though was -- particularly

10  that with Jerry Ryer (ph.), who also does work with the

11  Census Bureau, was very much motivated from the standpoint

12  of thinking about census applications, even if we

13  sometimes, you know, is purely methodological as opposed to

14  using census data.

15          BY MR. EHRLICH:

16     Q.   Got it.  In the other areas that you studied,

17  primarily political science, right?

18     A.   Um-hmm.

19     Q.   Strike that.  Have you ever conducted your own

20  survey?

21     A.   Many, many times.

22     Q.   And in what areas?

23     A.   Many, many different areas.

24     Q.   Okay.  Just broad strokes?

25     A.   Yeah.  So in terms of because as a survey

1    methodologist both in terms of where I've worked,

2    collaborated on projects, but also where I've been

3    interested in the substantive question myself, I mean, I --

4    have a publication about how you measure sleep

5    satisfaction.  So like that has nothing to do with

6    politics.  Although I guess there are some potential links.

7    But my involvement in projects is sometimes based purely as

8    a survey methodologist, not because I'm a substantive

9    expert in the project.  My substantive expertise is looking

10   at civic and political decision making.  And so that's

11   where the decision to participate in the census, the

12   decision to vote or not, the decision to get involved in

13   your community, those are the type of outcomes that I

14   primarily -- and how people decide in a campaign.  The

15   other aspect of my research is focused on communication

16   effects.  So can the campaign, whether that's an

17   information campaign from the census or campaign efforts

18   from a particular candidate, can that have an influence on

19   people's decision making?

20        Q.   And of your extensive publication list have any

21   of your publications been refuted?

22        A.   Yeah.  I had -- well, not refuted.  I did an

23   errata on one of them.

24        Q.   Which one was that?

25        A.   American Journal Political of Science article on

1   the impact of pre-registration on youth turnout.  We just

2   had a mistake in our model.  Doesn't change the conclusions

3   but --

4        Q.   Have --

5        A.   -- for transparency.

6        Q.   Any of your publications have your views changed

7   since you've public published those papers?

8        A.   Oh, for sure, yeah.

9        Q.   Can you give an example?

10       A.   Not so much my views changed, but just the

11  standards of what is considered convincing empirical

12  political behavior research has changed since 2005.  And

13  so, yeah, I mean, so some of the conclusions that I

14  reached, you know, it's kind of difference between

15  correlation and causation.  We know a lot more now about

16  how to identify causal effects than we did 15 years ago.

17       Q.   Would you consider your reports in this case of

18  the same quality as the papers that you've published?

19       A.   That's a difficult question actually because the

20  report wasn't peer reviewed, and these are peer reviewed.

21  And I think highly of the peer review process in terms of

22  having people catch errors.  And so in terms of do I stand

23  behind the things that I wrote, yes, absolutely.  But it's

24  -- and most of my research is entirely different.  Most of

25  my research is where I'm doing the data collection and

1   doing the data analysis myself.

2        Q.   And you didn't do that here?

3        A.   There is no original data analysis in my expert

4   report or rebuttal.

5        Q.   Got it.  Have you ever served as an expert

6   before?

7        A.   Just once.

8        Q.   Can you describe the circumstances?

9        A.   Yeah.  So it was for the Voting Rights Act case

10  in North Carolina, and I came on very late, and basically

11  my expert report was co-authored with my co-author.  It was

12  looking at the impact of pre-registration on youth turnout.

13       Q.   Was your expert testimony in that case limited or

14  excluded at all?

15       A.   No.

16            MR. EHRLICH:  Can we go off the record?

17            (Off the record at 4:43 p.m.)

18            (On the record at 4:46 p.m.)

19            MR. EHRLICH:  Dr. Hillygus, thank you for coming

20  in today.  That's all the questions we have for you at this

21  time.

22            MR. FREEDMAN:  We'll read and sign.

23            (Whereupon, signature not having been waived, the

24  deposition was concluded at 4:46 p.m., on October 9, 2018.)

25

C E R T I F I C A T E

     I, TIMOTHY J. ATKINSON, JR., a Court Reporter and a Notary Public, do hereby certify that the foregoing deponent, DIONE SUNSHINE HILLYGUS, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my notes and electronic recording and is a true record of the testimony given by the foregoing witness.

     I FURTHER CERTIFY that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

     In witness whereof, I have hereunto set my hand this 9th day of October, 2018.


_____
Timothy J. Atkinson, Jr.
Notary Public


My commission expires:  May 14, 2021

INSTRUCTIONS TO THE DEPONENT

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

E R R A T A

PAGE    LINE    CHANGE

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Reason:_____

_ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

ACKNOWLEDGMENT OF DEPONENT

I, DIONE SUNSHINE HILLYGUS, do hereby certify

that I have read the foregoing pages and that the same is a

correct transcription of the answers given by me to the

questions therein propounded, except for the corrections or

changes in form or substance, if any, noted in the attached

Errata Sheet.


_____          _____

DATE                 SIGNATURE

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> Defendants. | No. 1:18-cv-2921 (JMF) |
| NEW YORK IMMIGRATION COALITION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> Defendants. | No. 1:18-cv-5025 (JMF) |

**DEFENDANTS' INITIAL DISCLOSURES**

In accordance with the Court's order on the record on July 3, 2018, and entered on the

docket on July 5, 2018, Defendants United States Department of Commerce, Bureau of the Census,

Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce, and Ron S. Jarmin, in his

official capacity as performing the non-exclusive functions and duties of the Director of the U.S.

Census, disclose under Federal Rule of Civil Procedure 26(a)(1):

## I.      Witnesses

Defendants maintain their position that this challenge to a final agency action is properly reviewed, if at all, on the basis of the administrative record produced by the agency. Accordingly, at this time there are no fact witnesses Defendants intend to use to support their claims or defenses, other than for impeachment.   If this case proceeds to trial, Defendants reserve the right to call any individuals identified in Plaintiffs' initial disclosures or discovery responses or any individuals deposed by any party.  Also, should the Court or the plaintiffs question the authenticity of the administrative record, Defendants reserve the right to call a witness to authenticate the administrative record.

## II.     Documents

Defendants may use the following documents in their possession, custody, or control to support their claims or defenses, but not solely for impeachment:

- Complete administrative record upon which the Secretary of Commerce based his decision to reinstate a question concerning citizenship on the 2020 Decennial Census, filed on June 8, 2018, *see* ECF No. 173, *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (JMF)

- Supplement to administrative record, filed on June 21, 2018, *see* ECF No. 189, *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (JMF)

## III.    Damages

Not applicable. Defendants are not claiming damages in these cases.

## IV.     Insurance

There is no insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in these actions or to indemnify or reimburse for payments made to satisfy the judgment.

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers St., 3rd Floor
New York, NY 10007

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch

/s/    *Kate Bailey*
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-9239
Email:  kate.bailey@usdoj.gov

*Counsel for Defendants*

3