# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| Plaintiffs, | |
| v. | No. 1:18-cv-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | |
| Defendants. | |

## DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

FACTUAL BACKGROUND...................................................................................................3

ARGUMENT.........................................................................................................................5

I.     Plaintiffs lack standing because they cannot meet their burden of proving that their injuries are certainly impending................................................................................5

        A.     Legal standards for Article III standing. ..........................................................7

        B.     Plaintiffs cannot prove the magnitude of any decline in self-response rate attributable to the citizenship question. ..........................................................8

                1.     The Census Bureau's analysis in the Technical Paper does not demonstrate the amount of any decline in self-response rate attributable to the citizenship question.................................................9

                2.     Plaintiffs' other estimates cannot establish a decline in self-response rate attributable to the citizenship question, let alone the magnitude of any such decline....................................................................11

        C.     Plaintiffs cannot prove that Defendants' NRFU efforts, in conjunction with imputation, will not counteract any alleged decline in self-response rates.................12

                1.     Plaintiffs cannot prove that the Census Bureau's NRFU efforts will be unable to enumerate all those who would be enumerated absent a citizenship question. ..............................................................12

                2.     The Census Bureau is fully prepared and funded to counteract any projected decline in self-response rate due to the citizenship question..........14

        D.     Plaintiffs cannot prove that any differential net undercount will materially impact apportionment or federal funding........................................................16

        E.     NGO Plaintiffs do not have standing because they cannot show that any of their members have standing. ........................................................................18

II.    The Secretary's decision to reinstate a citizenship question was eminently reasonable based on the record before him and must be upheld under the APA. ....................................20

        A.     Legal standards for review under the Administrative Procedure Act...........................21

                1.     Agency actions are reviewed only for reasonableness. .....................................21

                2.     The agency's decision is judged against the record before it. ...........................22

i

B.    The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census. ...................................................................23

1.    The Secretary reasonably concluded that reinstating a citizenship question would provide the most appropriate citizenship data. .....................23

2.    The Secretary engaged in an appropriate process, including the consideration of alternatives, and explained his rationale...............................26

C.    Plaintiffs' Claims of "Pretext" Do Not Provide a Basis for Vacating the Secretary's Decision...................................................................................29

III.   The Secretary's decision did not deny Plaintiffs equal protection. ............................32

CONCLUSION........................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**

*Am. Biosci., Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) ........................................................................................22

*Ass'n of Proprietary Colls. v. Duncan,*
   107 F. Supp. 3d 332 (S.D.N.Y. 2015) ................................................................................23

*Bechtel v. Admin. Review Bd.,*
   710 F.3d 443 (2d Cir. 2013) ........................................................................................ 22, 26

*Camp v. Pitts,*
   411 U.S. 138 (1973) .................................................................................................... 23, 29

*Carey v. Klutznick,*
   653 F.2d 732 (2d Cir. 1981) ................................................................................................8

*Cent. Hudson Gas & Elec. Corp. v. FERC,*
   783 F.3d 92 (2d Cir. 2015) ...............................................................................................26

*Chafin v. Chafin,*
   568 U.S. 165 (2013) .............................................................................................................8

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ...........................................................................................................21

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................................................................7

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ......................................................................................................22

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ...........................................................................................................26

*Fed. Energy Regulation Comm'n v. Elec. Power Supply Ass'n,*
   136 S. Ct. 760 (2016) .................................................................................................. 21, 27

*Fla. Light & Power Co. v. Lorion,*
   470 U.S. 729 (1985) ...........................................................................................................29

*Glara Fashion, Inc. v. Holder,*
   No. 11-cv-889, 2012 WL 352309 (S.D.N.Y. Feb. 3, 2012) .............................................23

*Greene v. Carson,*
   256 F. Supp. 3d 411 (S.D.N.Y. 2017) ..............................................................................23

*Guertin v. United States*,
    743 F.3d 382 (2d Cir. 2014) ...........................................................................21

*Hayden v. Cty. of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ..............................................................................32

*In re Dep't of Commerce*,
    ___ S. Ct.___, 2018 WL 5259090 (U.S. Oct. 22, 2018) .............................31, 34, 35

*Islander E. Pipeline Co. v. McCarthy*,
    525 F.3d 141 (2d Cir. 2008) ............................................................................21

*Jagers v. Fed. Crop Ins. Corp.*,
    758 F.3d 1179 (10th Cir. 2014) .......................................................................30

*James Madison Ltd. ex rel. Hecht v. Ludwig*,
    82 F.3d 1085 (D.C. Cir. 1996) .........................................................................23

*Koopmann v. U.S. Dep't of Transp.*,
    No. 18-cv-3460 (JMF), 2018 WL 3946450 (S.D.N.Y. Aug. 16, 2018) ................22

*Lujan v. Def. of Wildlife.*,
    504 U.S. 555 (1992) ..........................................................................................7

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ..............................................................................8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................................28

*Mingo Logan Coal Co. v. EPA*,
    829 F.3d 710 (D.C. Cir. 2016) .........................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................*passim*

*New York v. U.S. Dep't of Commerce*,
    315 F. Supp. 3d 766 (S.D.N.Y. 2018) ..............................................................22

*Personal Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ........................................................................................35

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..........................................................................................30

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    772 F.2d 1043 (2d Cir. 1985) ..........................................................................23

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ..........................................................................................................7

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ....................................................................................................7

*St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.,*
  610 F.3d 75 (D.C. Cir. 2010) ........................................................................................27

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ........................................................................................................7

*United States v. City of Yonkers,*
  96 F.3d 600 (2d Cir. 1996) ............................................................................................32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ................................................................................................passim

*Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.,*
  435 U.S. 519 (1978) ......................................................................................................23

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
  749 F.2d 788 (D.C. Cir. 1984) ......................................................................................23

*Warth v. Seldin,*
  422 U.S. 490 (1975) ........................................................................................................7

*Waterkeeper All., Inc. v. EPA,*
  399 F.3d 486 (2d Cir. 2005) ....................................................................................22, 23

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ........................................................................................................7

*Wisconsin v. City of New York,*
  517 U.S. 1 (1996) ....................................................................................................passim

## **STATUTES**

5 U.S.C. § 706 .........................................................................................................passim

13 U.S.C. § 1 *et seq.* ....................................................................................................3

13 U.S.C. § 2 ....................................................................................................................3

13 U.S.C. § 4 ....................................................................................................................3

13 U.S.C. § 5 ....................................................................................................................3

13 U.S.C. § 141 .............................................................................................................22

13 U.S.C. § 221 ................................................................................................................... 6, 27

**RULES**

Fed. R. Civ. P. 56 ......................................................................................................................1

**U.S. CONSTITUTION**

U.S. Const. art. I, § 2 ..............................................................................................................22

**OTHER AUTHORITIES**

Hr'g on FY 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. On Commerce,
    Justice, Sci. & Related Agencies of the H. Comm. on Appropriations,
    115th Cont. 9 (2018), 2018 WLNR 8815056 ........................................................................32

Hr'g on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum,
    Hr'g Before the H. Ways & Means Comm.,
    115th Cong. 24 (2018), 2018 WLNR 8951469 .....................................................................32

## PRELIMINARY STATEMENT

Plaintiffs in these consolidated cases challenge the Secretary of Commerce's eminently reasonable decision to reinstate a question about citizenship on the decennial census, consistent with historical practice dating back to 1820 and the Secretary's nearly unfettered discretion over the format and content of the census.  If included, the citizenship question will be one of several demographic questions (including ones inquiring about race, gender, and relationship status) on the census form sent to every household.  In challenging the Secretary's decision about which questions to ask on the census form, Plaintiffs invite this Court to second guess a policy judgment that the Constitution reserves for the political branches of government.  But the Court lacks jurisdiction to disrupt the Secretary's judgment because Plaintiffs lack standing to bring their claims.[1]

The evidence at trial will establish that Plaintiffs lack Article III standing and this Court therefore lacks subject matter jurisdiction over their claims.  Despite extensive discovery, Plaintiffs have failed to produce material evidence that the reinstatement of a citizenship question will result in an actual and concrete injury that is certainly impending and fairly traceable to the government, as required to establish a justiciable case or controversy.  Plaintiffs' claims of Article III injury rest entirely on the unproven assertion that the reinstatement of a citizenship question will result in a differential undercount of the population because of a decline in self-response, leading to putative detrimental effects on apportionment and federal funding.  But Plaintiffs cannot establish the magnitude of any alleged decline in the self-response rate, nor can Plaintiffs refute that the Census Bureau has adequate

---

[1] Defendants previously understood that the Court did not want to consider motions for summary judgment in advance of trial. *See* ECF No. 363 ("[T]he Court remains firmly convinced that a trial will be necessary to resolve the claims in this case….  Defendants would be far better off devoting their time and resources to preparing their pre-trial materials than to preparing summary judgment papers.").  Defendants submit that if the Court is willing to entertain a motion for summary judgment, it may construe this pre-trial brief as such a motion and rule, as it should, on the administrative record compiled by the agency.  *See* Fed. R. Civ. P. 56(f).

means of addressing any such decline through non-response follow-up operations and imputation. Nor can Plaintiffs establish any material effect on apportionment or federal funding. Plaintiffs' claims of injury are impermissibly speculative and remote, and their claims are not fit for resolution by an Article III court.

In addition, the Secretary's decision is not arbitrary and capricious or otherwise in violation of the Administrative Procedure Act (APA). An agency need only articulate a reasonable explanation grounded in the record that was before the agency decisionmaker to surmount the low bar of arbitrary-and-capricious review, and the Court's evaluation of the decision in this case must be guided further by the enormous deference owed to the Secretary's oversight of the decennial census. Here, the Secretary set forth the rationale for his decision to reinstate a citizenship question in a detailed memorandum, and the government has provided an extensive administrative record in support of that determination. The validity of the Secretary's decision must be judged on that objective record, without inquiry into the Secretary's mental state. But even if the Court were to examine Plaintiffs' assertion that the Secretary's decision was "pretextual," there is no evidence to demonstrate that the Secretary acted in bad faith and did not actually believe the rationale set forth in his decision memorandum. And even if the Court were to conclude that the Secretary had *additional* motivations for reinstating the citizenship question, that would not be grounds for invalidating the Secretary's reasoned policy decision that obtaining more precise citizenship data via the decennial census will be useful to the Department of Justice in enforcing the Voting Rights Act. On any theory, Plaintiffs will be unable to show at trial that the Secretary's decision was unreasonable based on the record before him.

Plaintiffs' second remaining claim arises under the equal protection clause. NYIC Plaintiffs allege that the Secretary's decision was motivated by discriminatory animus, but this claim is plainly belied by the extensive record before the Court. Finding no help in any of the facts surfaced during

2

discovery, Plaintiffs can only resort to unrelated innuendos, suggesting that the Secretary's conversations with third parties necessitate a finding of animus or that the Secretary's process for reaching his decision can only be explained by discriminatory intent. Plaintiffs have utterly failed to make out an equal protection violation based on the paltry circumstantial evidence assembled, and Defendants thus will be entitled to judgment after trial.

## FACTUAL BACKGROUND

The Constitution requires that an "actual Enumeration" of the population be conducted every ten years in order to allocate representatives in Congress among the States, and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." U.S. Const. art. I, § 2, cl. 3. The Census Act, 13 U.S.C. § 1 *et seq.*, delegates to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," and "authorize[s] [him] to obtain such other census information as necessary." *Id.* § 141(a). The Census Bureau assists the Secretary in performing this duty. *See id.* §§ 2, 4. The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title." 13 U.S.C. § 5. Nothing in the Act directs the content of the questions included on the decennial census.

With the exception of 1840, decennial censuses from 1820 to 1880 asked for citizenship or birthplace in some form, and decennial censuses from 1890 through 1950 specifically requested citizenship information. *See* Opinion & Order at 8-10, ECF No. 215 ("MTD Order"). Citizenship-related questions continued to be asked of some respondents after the 1950 Census. In 1960, the Census Bureau asked 25% of the population for the respondent's birthplace and that of his or her parents. MTD Order 10-11. Between 1970 and 2000, the Census Bureau distributed a detailed questionnaire, known as the "long-form questionnaire," to a sample of the population (one in five households in 1970, one in six thereafter) in lieu of the "short-form questionnaire" sent to the majority

3

of households.  *Id.* at 11-12.  The long-form questionnaire included questions about the respondent's citizenship or birthplace, while the short form did not.  *Id.*

Beginning in 2005, the Census Bureau began collecting the more extensive long-form data—including citizenship—through the American Community Survey (ACS), which is sent yearly to about one in 38 households.  MTD Order 11-12.  The replacement of the long-form questionnaire with the yearly ACS enabled the 2010 census to be a "short-form-only" census.  The 2020 census will also be a "short-form-only" census.  The ACS will continue to collect additional data each year, including information on the citizenship status of respondents.  Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tracts" and "census-block groups."  The decennial census is designed to undertake a full count of the people in each state and produces, in addition to the population count, other, limited information down to the smallest geographic level, known as the "census block."   As in past years, the 2020 census questionnaire will pose a number of questions beyond the total number of individuals residing at a location, including questions regarding sex, Hispanic origin, race, and relationship status.

On March 26, 2018, the Secretary of Commerce issued a memorandum reinstating a citizenship question on the 2020 census questionnaire.  Administrative Record ("AR") 1313-20.  The Secretary's reasoning and the procedural background are set out in that memorandum and in a supplemental memorandum issued on June 21, 2018.  *Id.* 1321.  The Secretary explained that, "[s]oon after [his] appointment," he "began considering various fundamental issues" regarding the 2020 Census, including whether to reinstate a citizenship question.  *Id.*  As part of his deliberative process, he and his staff "consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for the enforcement of the Voting Rights Act."  *Id.*

In a December 12, 2017 letter, DOJ responded that citizenship data is important to its enforcement of Section 2 of the VRA for several reasons, and that the decennial census would provide more-granular citizenship voting age population (CVAP) data than that provided by the annual ACS survey. AR 663-665 [hereinafter Gary Letter]. In the letter DOJ "formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship." *Id.* 665.

After receiving DOJ's formal request, the Secretary "initiated a comprehensive review process led by the Census Bureau," AR 1313, and asked the Bureau to evaluate the best means of providing the data identified in the letter. The Census Bureau initially presented three alternatives. *Id.* 1277-85. After reviewing those alternatives, the Secretary asked the Census Bureau to consider a fourth option, which would combine two of the options the Bureau had presented. *Id.* 1316. Ultimately, the Secretary concluded that this fourth option—reinstating a citizenship question on the census while simultaneously linking available administrative-record data to Census Bureau files—would "provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.* at 1317.

## ARGUMENT

### I.  Plaintiffs lack standing because they cannot meet their burden of proving that their injuries are certainly impending.

For Plaintiffs to demonstrate standing, they must prove, by a preponderance of the evidence, that (1) there will be a decrease in the self-response rate *specifically attributable* to a citizenship question on the 2020 Census, (2) the Census Bureau's extensive Nonresponse Followup ("NRFU") efforts will not counteract such a decline, (3) the Census Bureau's use of imputation for any remaining uncounted households after NRFU will also not counteract such a decline, (4) if there is a net undercount after these comprehensive operations, Plaintiffs' particular states and localities will be undercounted more than others (*i.e.*, there will be a differential net undercount), and (5) if there is a differential net undercount at the end of the months-long 2020 Census, it will actually impact the apportionment or funding of Plaintiffs' specific states and localities in light of both the magnitude of the differential net

undercount and the distribution of the differential net undercount.  Plaintiffs cannot prove any of these steps, let alone all of these steps consecutively.

And in attempting to prove standing, Plaintiffs will conflate concepts that in fact are distinct. For example, Plaintiffs will attempt to cast noncitizens' confidentiality concerns in the current political climate as probative of a decline in self-response rates to the census.  But if a given household is concerned about the government's use of their information, they may well decide not to respond to the census with or without a citizenship question.  And if a particular household is specifically concerned about providing citizenship information such that they simply skip the citizenship question (i.e., item nonresponse)they will nonetheless be fully counted.  Similarly, if a given household is concerned about providing citizenship information such that they stop filling out the census questionnaire once they reach the citizenship question—a so-called breakoff—they also will be fully counted.  While these scenarios may impact the *quality* of the demographic data received, they do not support Plaintiffs' standing.

Plaintiffs will also attempt to characterize a differential net undercount as a *fait accompli* if there is a decline in self-response rate.  Not so.  The evidence at trial will show that the Census Bureau has extensive NRFU operations to reach households that do not initially self-respond to the 2020 Census, and it has ample funding to deal with even the gravest of self-response scenarios.

Even if Plaintiffs could prove any of the foregoing, they would not be able to prove that any differential net undercount would impact the apportionment or funding of Plaintiffs' specific states and localities.  They have proffered no evidence or calculations based on the actual manner in which the 2020 Census will be conducted.[2]

---

[2] Even if Plaintiffs were able to demonstrate injury-in-fact at trial, such an injury would not be fairly traceable to the Secretary's decision to reinstate the citizenship question on the census; rather, such an injury would be the result of the unlawful decision by third parties not to respond to the census questionnaire in violation of a legal duty.  13 U.S.C. § 221.  Because the Court has already addressed

**A.   Legal standards for Article III standing.**

The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citation omitted).   At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

The standing requirement of "injury in fact" requires an allegation that the plaintiff "'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).   The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560).   Thus, an alleged future injury must be "*certainly impending*"; "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky.*

---

this purely legal argument, MTD Order at 28, Defendants do not reiterate it here.   At trial, however, Plaintiffs will also fail to prove that their speculative injuries are *specifically attributable* to a citizenship question, thus also failing the fairly-traceable prong of standing as a factual matter.

*Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  In the census context, merely a showing of differential net undercount is not enough; there has never been a perfect census count.  *See Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981.  Plaintiffs instead must prove by a preponderance of the evidence that any differential net undercount is specifically attributable to the citizenship question.

As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing these elements of standing "with the manner and degree of evidence required at the successive stages of the litigation."  *Defs. of Wildlife*, 504 U.S. at 561.  If Plaintiffs cannot prove standing by a preponderance of the evidence, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), the Court must refrain from addressing the merits of Plaintiffs' APA and equal protection claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

**B. Plaintiffs cannot prove the magnitude of any decline in self-response rate attributable to the citizenship question.**

Defendants expect that Plaintiffs will attempt to quantify the potential decline in self-response rates for certain subpopulations.  But any attempt to do so is pure speculation.  In particular, Plaintiffs will rely heavily on the Census Bureau's August 6, 2018 technical paper that attempted to examine the impact of a citizenship question on self-response rates.[3]  Defs.' Ex. DX-002 ("Technical Paper").  But while Plaintiffs may attempt to make much of the few salient conclusions, they will not prove either the magnitude of any decline in self-response rates or any impact on the Census Bureau's ability to count those who would be counted absent a citizenship question sufficient to establish a certainly

---

[3] The Technical Paper post-dated the Secretary's March 26, 2018 decision and therefore it cannot bear on the merits of Plaintiffs' APA claim because it was not part of the "whole record" before the agency.  *See infra.*

impending injury.  Plaintiffs' other attempts to quantify declines in self-response rates will similarly fail, as they are based only on a deeply flawed telephone survey or otherwise pulled from thin air.

### 1. The analysis in the Technical Paper does not demonstrate the amount of any decline in self-response rate.

The Technical Paper's analysis concludes that there may be a 5.8% decrease in self-response rates for households potentially containing noncitizens.  Ex. DX-002 at 42.  But the 5.8% is far less significant than Plaintiffs will claim.

The Technical Paper determines this number in four steps.  First, it subtracts the response rates to the 2010 Census short-form questionnaire (without a citizenship question) from the response rates for the lengthy 2010 ACS questionnaire (with a citizenship question) for two groups: an all-citizen-household group and an every-other-household group.  Ex. DX-002 at 35 tbl. 6.  The latter group—every other household—includes both confirmed noncitizen households and households with uncertain citizenship status.  *Id.* at 33-36.  Second, the Technical Paper subtracts the all-citizen-household difference in response rate (–8.9) from the every-other-household difference in response rate (-20.7), which results in a "difference-in-differences" of –11.9.  *Id.* at 36 tbl. 7.  Third, because there are many questions that may cause a household to forego answering the ACS, the Technical Paper performs a "Blinder-Oaxaca Decomposition" control for certain other questions on the ACS. *Id.* at 36.  The decline in response rates attributable to the controlled-for ACS questions is considered "explained" (–5.8) and the decline in response rates attributable to other questions—including the ACS citizenship question—is considered "unexplained."  *Id.* at 38 tbl. 8.  Fourth, the Technical Paper uses updated 2016 ACS data to model the "unexplained" portion of the foregoing analysis, resulting in a 5.8% response-rate decline for households potentially containing noncitizens.  *Id.* at 39 tbl. 9.

As the Census Bureau's Chief Scientist Dr. John Abowd has testified on multiple occasions, the Technical Paper's analysis was far from ideal.  Because this analysis was based on a "natural experiment"—an observational study conducted from real-world data—rather than a "randomized

controlled trial"—an assignment of subjects to control and treatment groups to minimize bias—the Technical Paper's quantitative numbers are of limited value. Specifically, the Technical Paper suffers from three deficiencies. First, in performing the Blinder-Oaxaca Decomposition at Step Three, above, the Technical Paper controlled for only certain ACS questions. However, other ACS questions could have contributed to lower ACS response rates for the every-other-household group, including wages earned, taxes paid, and health insurance. Second and similarly, the Blinder-Oaxaca Decomposition at Step Three could not take into account the cumulative impact of asking 73 questions, many of which are invasive, to potential noncitizen households. While any one question may cause such households not to respond to the ACS, it is quite possible that the cumulative impact of the lengthy ACS questionnaire contributed to the lower self-response rates for potential noncitizen households. Third, the Technical Paper does not, and cannot, account for the changing macro environment. Potential noncitizen households that may have responded to the census in 2010 may be unlikely to do so in 2020 with or without a citizenship question. In other words, the Technical Paper's analysis (based on census and ACS response rates from 2010) cannot be easily transposed into the 2020 environment.

The conclusion of a 5.8% decline in the response rate for potential noncitizen households is thus flawed. In addition, the scope of the Technical Paper is limited: it analyzed only the initial decline in self-response rate for *potential noncitizen households* and is silent as to any decline in self-response rate for Hispanic households containing *all citizens*. Consequently, any attempt by Plaintiffs to apply the Technical Paper's analysis to Hispanics in general is unsupported by relevant empirical evidence. Moreover, although the Technical Paper acknowledged that any decline in *self-response rate* for potential noncitizen households would lead to disruptions in the quality of data received, it did not include any analysis of the ultimate net undercount after NRFU and imputation. Thus the Technical Paper cannot cast any doubt on the Census Bureau's ability to enumerate all those who would be enumerated absent a citizenship question.

While the Census Bureau performed the best possible analysis with the data at hand, at bottom, the Technical Paper is probative only of a decline in the self-response rate for potential noncitizen households.  The Technical Paper does not provide (a) persuasive evidence for the *amount* of any decline in self-response rates, (b) any evidence for a decline in self-response rates for Hispanic *citizens*, or (c) any evidence of a differential net undercount *after* NRFU and imputation.

### 2. Plaintiffs' other estimates cannot establish a decline in self-response rate attributable to the citizenship question, let alone the magnitude of any such decline.

Plaintiffs rely, for example, on a telephone survey conducted by Dr. Matthew Barreto, the design of which was fundamentally defective.  Dr. Barreto used an opinion poll methodology that involved calling individuals to ask whether they plan to participate in the census.  But neither Dr. Barreto's report nor  deposition testimony provide reliable evidence that an opinion poll conducted two years in advance of the census  accurately predicts likely self-response rates, particularly given the high visibility of the actual census, the stakeholder outreach that will accompany it, and the reliable indication of the final count after NRFU efforts.  Even if individuals' responses to hypothetical questions posed on a telephone survey reliably predict behavior in the context of the census, Dr. Barreto's survey was demonstrably biased, designed both to increase respondents' skepticism of the decision to collect citizenship data and to encourage respondents to report an intention not to participate.  For example, the survey asked individuals whether they planned to participate in the census survey, but then *immediately* asked whether they still would participate in a census survey in which the federal government *added* a question about citizenship.  That juxtaposition highlighted the distinction between a census with and without this question.  The framing of the question, which discusses the federal government, not the Census Bureau, inaccurately informed respondents that citizenship is a new question *added* to the form, likely causing individuals for whom citizenship is not particularly sensitive to respond negatively due to the perceived implications of the federal government

11

requiring new information.  This design also fails to account for the fact that 2020 Census respondents may not recall whether or not the 2010 form contained a citizenship question.

Testimony at trial will reveal numerous other flaws in Dr. Barreto's survey.  At bottom, however, this survey was demonstrably different in many ways from the census.  It cannot, and does not,  provide a reliable indication of any potential impact on self-response given  the reinstatement of the citizenship question, much less—as Dr. Barreto also will testify—on the potential efficacy of the Bureau's NRFU operations.  Dr. Barreto's survey was poorly designed and should not be credited.

### C. Plaintiffs cannot prove that Defendants' NRFU efforts, in conjunction with imputation, will not counteract any alleged decline in self-response rates.

The Census Bureau will utilize one of the largest peacetime mobilizations in our Nation's history as well as high-quality administrative records from other federal agencies to enumerate all those who would be enumerated absent a citizenship question.  After the months-long, multi-step NRFU process, the Bureau will use imputation for any remaining uncounted households.  Plaintiffs will layer speculation on top of conjecture in an attempt to demonstrate that these processes will not ameliorate any decline in self-response rate due to the citizenship question.  But a preponderance of the evidence will not show that these operations will be ineffective.

#### 1. The NRFU efforts will enumerate all those who would be enumerated absent a citizenship question.

The Census Bureau has comprehensive plans in place to maximize self-response and thereby minimize the amount of NRFU.  For example, the 2020 census will be the first to rely extensively on digital methods and automation, and it will be the first census where individuals are encouraged to respond online, and in a manner that eliminates the possibility of follow-up by a human enumerator. 2020 Census Operational Plan: A New Design for the 21st Century, at 15, 18-19, 26, 88 (Sept. 2017, v.3.0), ("2020 Census Operational Plan").  Most housing units will receive mailings instructing them to complete the census online or by telephone.  *Id.* at 18, 21.  If households do not respond by the fourth

mailing, the full paper questionnaire will be sent.  *Id.* at 99.  Households that are less likely to have

internet access will receive a full paper questionnaire in the first mailing, allowing them to respond

immediately via mail.  *Id.* at 91, 95.  Each household will receive up to six mailings.  *Id.* at 99.  Plaintiffs

do not challenge the efficacy of these outreach efforts.

> If no response has been received after the fifth mailing, a census enumerator will be assigned.

2020 Census Operational Plan, at 114.  Utilizing a state-of-the-art optimizer that efficiently assigns

cases to enumerators and provides routes for their field work, the enumerators will personally visit all

units in their set(s) of cases to verify that the address is occupied and to attempt to contact a household

member to complete the questionnaire.[4]   *Id.*   If the enumerator is not able to complete the

questionnaire after such a visit, administrative records will be used to identify vacant housing units

and determine response data for occupied households where the Census Bureau has high-quality

administrative records.  *Id.* at 22, 114, 117.  If such records do not exist, a final postcard encouraging

self-response will be mailed, and all addresses still non-responsive after this mailing will be subject to

up to six contact attempts, with eligibility to have the data obtained from a proxy (such as a neighbor

or landlord) after the third unsuccessful attempt.  *Id.*  Any uncounted households remaining thereafter

will have their occupancy information imputed by the Census Bureau.

> Plaintiffs will focus much of their attention on the enumeration effort, contending (1) that

households who do not self-respond because of the citizenship question are unlikely to respond to an

enumerator, and (2) that proxies will not provide an accurate count.  Plaintiffs will not be able to prove

either contention.

> To support their claim that households which do not self-respond because of the citizenship

question are unlikely to respond to an enumerator, Plaintiffs will rely on social science research from

---

[4] The increased efficiency from these technological advances will enable the Census Bureau to target advertising and NRFU resources toward areas with low response rates

areas and contexts unrelated and dissimilar to the Decennial Census.  None of this research will relate (a) to the specific effect of a citizenship question, (b) on a mandatory survey, (c) with an accompanying communications campaign utilizing units of local government, the media, and community-based organizations to encourage self-responses and cooperation, and (d) with follow-up, in-person interviews (by someone from the community) for individuals who do not respond.  Put simply, Plaintiffs' social science research will have little relevance to the decennial census and to Plaintiffs' standing.  For these and other reasons, Plaintiffs' continued reliance on a deeply flawed telephone survey by Dr. Barreto will also have little relevance to NRFU and the Court's inquiry.

With respect to Plaintiffs' assertion that proxies will not provide an accurate count, Plaintiffs will provide little to no evidence.  While Plaintiffs (and the Census Bureau) could empirically show that proxies provide lower *quality* demographic information—for example, age, ethnicity, and race data—there is no evidence suggesting that use of proxies leads to a greater net undercount or differential net undercount in comparison to self-response or in-person interviews.  Similarly, there is a lack of evidence that imputation will be insufficient, as even Plaintiffs' experts will admit imputation is an accepted and reliable statistical method for supplying missing data.

### 2. The Census Bureau is fully prepared and funded to counteract any projected decline in self-response rate due to the citizenship question.

Under any of Plaintiffs' hypothetical and speculative self-response scenarios, the Census Bureau has the resources and planning to enumerate all those who would be enumerated absent a citizenship question.

The 2020 Census Life Cycle Cost Estimate ("LCCE") includes an estimated fiscal year 2020 cost for NRFU of approximately $1.5 billion.  Internal Document: September 29, 2017 version of the 2020 Census Lifecycle Cost Assumptions Table 3, NRFU Operation Costs Sub-Table, Ex. DX-005.  This estimate is based on numerous factors, including the self-response rate at the start of the operation; self-responses received after the start of the operation; occupied, vacant and non-existent

cases in the workload that are removed using administrative information; late additions to the workload; the number of days worked by enumerators; the average hours the enumerators work per day; the number of contact attempts to conduct the interview; training hours for enumerators; mileage travelled by enumerators; and other miscellaneous expenses. *Id.* In fiscal year 2020, there will also be an additional $1.7 billion in contingency funding that may be spent on NRFU. Internal email: September 11, 2018.

The self-response rate built into the LCCE is in the range of 55.5% to 65.5%. And although the Census Bureau expects a self-response rate of 60.5%, all NRFU planning—including hiring of field staff and enumerators—is based on the lower bound of this estimate, 55.5%. For each percentage point increase or decrease in the overall self-response rate, the LCCE estimates $55 million will be saved or spent. This estimate includes, for example, the cost of additional or lowered field supervisors and enumerators, hours in the field, mileage, training costs, provisioning and usage of handheld devices, and impacts on printing, postage, and paper data capture operations.[5]

Under any conceivable scenario in which self-response rates decline due to the citizenship question, the Census Bureau is fully equipped and  funded to enumerate all those who would be enumerated absent a citizenship question. For example, if there is a 10% decline in self-response among potential noncitizen households—far beyond the Technical Paper's 5.8% calculation—and using the largest estimate that 28.6% of households in the country match that description, then the predicted increase in the NRFU workload would be approximately 3.6 million addresses. The potential decrease in the *overall* self-response rate would be 2.5%. Assuming $55 million per percentage

---

[5] The estimate assumes that the increased or decreased percentage of housing unit addresses self-responding is not easier or harder to count than a representative percentage of those not responding to the census.

point decrease in self-response rate, this scenario would increase NRFU costs by $137.5 million, far below the $1.7 billion in fiscal year 2020 contingency funding.

### D. Plaintiffs cannot prove that any differential net undercount will materially impact apportionment or federal funding.

Plaintiffs raise two theories as to how they would be harmed by a differential undercount: (1) a differential undercount will cause Plaintiffs to cause a dilution of their legislative representation, *see, e.g.*, Second Am. Compl. ¶ 155, ECF No. 214 ("SAC"); and (2) a differential undercount will cause harm in the form of a loss of federal funding under certain federal programs that use census data in part to determine funding amounts, *see, e.g.*, SAC ¶ 138. However, they will be unable to prove, as they must, that there is an imminent, concrete risk of either harm.

Plaintiffs' assertion of harm is expected to rely almost entirely upon the anticipated testimony of Dr. Warshaw, who  is expected to testify that  a differential undercount will affect apportionment of representation at both the state and local levels, as well as cause a loss of federal funding.  However, Dr. Warshaw's opinion is based upon a series of methodological flaws and faulty assumptions.

Most notably, the premise for Dr. Warshaw's opinion is fundamentally flawed because the estimates he uses for the extent of the hypothetical differential undercount are based entirely upon estimates of the *initial,* not the final, non-self-response rate.  Dr. Warshaw simply assumes that any impact the citizenship question has on the initial non-self-response rate will lead to an impact in the same proportion on the final non-response rate.  In doing so, Dr. Warshaw presumes without any basis that the Census Bureau's NRFU efforts will not have any impact on the initial non-self-response rates.  Dr. Warshaw even stated during his deposition testimony that he failed to take NRFU into account because, despite the availability of historical NRFU success rates, it was impossible to predict how successful NRFU would be because it was in the future and he could not predict what NRFU measures Census Bureau would take.  Dr. Warshaw thus implicitly recognizes the entirely speculative basis for Plaintiffs' claims about a differential undercount.  Dr. Warshaw also has acknowledged that

his predictions ignore imputation.  Simply put, Dr. Warshaw's opinion that there will be a differential undercount is based upon ignoring the two (historically significant and successful) methods the Census Bureau has in place for making sure an undercount does not happen.  Because governments use  the *final* census numbers, not the initial self-response rates,  to calculate representational apportionment and to plug into funding formulas for programs, any analysis of response rates that wholly ignores NRFU or imputation  cannot form the basis of concrete, imminent injury here.

In addition,  Dr. Warshaw is not expected to offer any testimony that it is more likely than not that any specific governmental Plaintiff will be harmed in the form of a loss of representation as a result of the estimated differential undercount.  While Dr. Warshaw performed calculations as to which states may lose a Congressional representative due to a differential undercount, under his own calculations he estimates that the only States that are more likely than not to lose a Congressional representative are California and Texas, *neither of which are State Plaintiffs in this action*.  Because each State Plaintiff must demonstrate standing on its own, and Plaintiffs' own expert concludes that none of State Plaintiffs here is likely to lose Congressional representation, this should defeat any standing claim based upon the loss of Congressional representation.

As to representation at the state and local levels, Dr. Warshaw admitted in his deposition that he had not performed any calculations or estimates as to the likelihood a differential undercount would cause a loss of representation as to any specific City or County Plaintiff, and therefore could provide only a generalized opinion that a differential undercount would have some impact on state and local apportionment.  However, such a generalized opinion, without any attempt by Plaintiffs to produce evidence of impact on a specific entity, falls short of each Plaintiff's burden of proving standing to bring its claims.

Plaintiffs also assert that they will be harmed by a differential undercount in the form of a loss of federal funding.  Plaintiffs primarily rely upon the opinion and anticipated testimony of Dr. Andrew

Reamer for their claim that State governments may lose funding.[6]  However, Dr. Reamer's analysis is based entirely upon the undercount scenarios devised by Dr. Warshaw.  This is true even though Dr. Reamer concedes that all of the funding formulas for Government programs he used in his calculations rely upon the *final*, post-NRFU and imputation numbers, not the initial non-response rates upon which Dr. Warshaw based his estimates.  Dr. Reamer also conceded in deposition testimony that Census NRFU efforts can reduce the initial nonresponse rates.  Accordingly, because Dr. Reamer's calculations are based entirely upon the deeply flawed differential undercount scenario estimates calculated by Dr. Warshaw, the relevance and helpfulness of Dr. Reamer's calculations are undermined to the same extent as Dr. Warshaw's.

### E.  NGO Plaintiffs do not have standing because they cannot show that any of their members have standing.

Finally, even if Plaintiffs were able to prove that (a) there was a decline in self-response attributable solely to the reinstatement of a citizenship question; (b) that the Census Bureau's NRFU and imputation efforts were insufficient to counteract that decline; and (c) that the undercount had a differential impact on certain populations; and (d) the undercount had a harmful effect, in the form of either a loss of legislative representation or the loss of federal funding, of state governments, the non-governmental organizational (NGO) Plaintiffs will still be unable to establish standing to pursue their claims because they will be unable to demonstrate any harm to them or their members.

The NGO Plaintiffs' allegations of injuries are generally premised on the allegation that a differential undercount will lead to a reduction in federal funding that will harm either the organizations or the individual members of such organizations.  *See, e.g.*, SAC ¶¶ 26, 38, 52, 55.

---

[6]  To the extent Plaintiffs may rely upon Dr. Warshaw's testimony that a differential undercount will cause Plaintiffs to lose funding, such testimony should not be considered because he has not performed any analysis of any such potential loss and acknowledged in deposition testimony not only that his opinion on this issue  is based entirely on a generalized conclusion but also that he is unable to quantify the likelihood of a loss of funding.

However, Plaintiffs will not be able to produce evidence at trial that proves that any individual member or any organization will be directly harmed by a theoretical reduction in federal funding. Plaintiffs' proposed expert on Government funding formula expert, Dr. Reamer, did not analyze a single program in which funding was directly provided from the federal government to nonprofit organizations: all five programs he analyzed involved funding to state governments, *not* nonprofit organizations or individuals. NGO Plaintiffs will also not be able to show any evidence at trial that any individual group member is likely to be individually injured as a result of any theoretical reduction in funding to the state in which he or she resides.

No individual member of an NGO Plaintiff will be able to prove any harm as a result of any predicted reduction in state funding for Medicaid. This is because Medicaid uses a formula based on the Federal Medical Assistance Percentages (FMAP) to determine the amount of funding that will be used to *reimburse* states for certain expenditures under the two programs. Medicaid is administered by the states, including the beneficiary eligibility criteria. Because states set the Medicaid eligibility criteria and also partially fund the program, the most likely result of a reduction in funding is that states will contribute slightly more and Medicaid services will continue uninterrupted for most if not all beneficiaries, who cannot claim to have been harmed as a result of a slight shift in funding.[7]

Several NGO Plaintiffs allege that their individual members may be harmed as result of a reduction in federal Title I funding. *See, e.g.*, SAC ¶¶ 26, 38, 52. However, none of NGO Plaintiff's members will be able to prove any personal harm as a result of a possible reduction in Title I funding. Like Medicaid, Title I grants are given by the federal government to state and tribal governments. The

---

[7] This analysis is equally true of Children's Health Insurance Program (CHIP), which, like Medicaid, is a program in which the amount of federal reimbursement funding to the states uses a formula based on FMAP and for which states are responsible for defining eligibility criteria and administering the program.

state and tribal governments then have some discretion about the best way to allocate the use of such funds to qualifying local educational agencies (LEAs).  If there were a reduction in funding as a result of a differential undercount that led to a reduction in Title I funding for certain states[8], it would be up to those state governments to determine funding amounts for LEAs.  Therefore, for any individual member of a NGO Plaintiff to prove an imminent risk of injury, in addition to proving that there will be a differential undercount attributable solely to the citizenship question which causes a reduction in federal Title I funding, he or she also must demonstrate at a minimum that his or her state would allocate the Title I funds the reduced amount of funds in such a way as to lead a reduction in a particular LEA.  NGO Plaintiffs will be unable to do so at trial.

Finally, some NGO Plaintiffs allege that their members use federal highways and thus may be impacted by a differential undercount from a reduction in federal highway funding.  *See, e.g.*, SAC ¶¶ 26, 38, 52.  However, Plaintiffs have not offered any proposed expert opinions or testimony about what the impact of any differential undercount would be on federal highway funding, so this is merely unsupported speculation.  Accordingly, NGO Plaintiffs will be unable to produce evidence at trial to prove that either they as organizations or their individual members are likely to suffer a direct harm as a result of a reduction of federal funding.

## II.   The Secretary's decision to reinstate a citizenship question was eminently reasonable based on the record before him and must be upheld under the APA.

Plaintiffs challenge the Secretary's decision to reinstate a citizenship question under the Administrative Procedure Act (APA), 5 U.S.C. § 706.  *See, e.g.*, SAC ¶¶ 189-96.  The question for the Court is whether Plaintiffs can demonstrate that the Secretary's decision was "arbitrary, capricious, an

---

[8]   Defendants note that under Dr. Reamer's own calculations, 13 out of the 19 state governments (including the District of Columbia) that are Plaintiffs in this action would actually see an *increase* in federal Title I under most of the scenarios he used, and only two states—New York and New Jersey—would see a reduction in funding under all seven scenarios he used in his calculations.

abuse of discretion, or otherwise not in accordance with law" based on the record that was before him at the time of his decision.  5 U.S.C. § 706(2).  Plaintiffs will not be able to show that the Secretary failed to clear this low bar, and the Court should enter judgment for Defendants.

### A.  Legal standards for review under the Administrative Procedure Act.

#### 1.  Agency actions are reviewed only for reasonableness.

The APA provides only for limited judicial review of agency actions.  *Guertin v. United States*, 743 F.3d 382, 385 (2d Cir. 2014).  A court is authorized to set aside an agency action if it is arbitrary and capricious.  In deciding an arbitrary-and-capricious claim, the question for the Court ultimately is whether the agency's decision "was the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983).  Consequently, "[u]nder the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow." *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008).  "A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency."  *Id.*  A court does not determine whether the decision "is the best one possible or even whether it is better than the alternatives."  *Fed. Energy Regulation Comm'n v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  Indeed, "[w]hether [the Court] would have done what the agency did is immaterial," so long as the agency engages in an appropriate decisionmaking process.  *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718 (D.C. Cir. 2016). The Court asks only whether the decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

"An agency decision will thus only be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise."  *Bechtel v.*

*Admin. Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013) (citation omitted). The Court's role is limited to determining "whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005) (quoting *State Farm*, 463 U.S. at 43). And "[t]hat requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).

The Court's review in this case must be particularly deferential because Plaintiffs challenge the Secretary's broad discretion over the census. "The text of the Constitution vests Congress with *virtually unlimited discretion* in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting art. 1, § 2, cl. 3) (emphasis added). Congress, in turn, "has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19(citing 13 U.S.C. § 141(a)). Thus, as this Court has recognized, "'[t]he wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary' demands a high degree of 'judicial deference' to the Secretary's decisions concerning the conduct of the census." *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 799 (S.D.N.Y. 2018) (quoting *Wisconsin*, 517 U.S. at 22-23).

## 2. The agency's decision is judged against the record before it.

Plaintiffs' arbitrary-and-capricious claim should be resolved as a matter of law based on an evaluation of the record before the agency decisionmaker. "Where, as here, 'a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" *Koopmann v. U.S. Dep't of Transp.*, __ F. Supp. 3d __, 2018 WL 3946450, at *3 (S.D.N.Y. Aug. 16, 2018) (quoting *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "Indeed, 'district courts reviewing agency action under the APA's arbitrary and capricious

standard do not resolve factual issues'" as a matter of course.  *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp.3d 332, 344 (S.D.N.Y. 2015) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996)).  That is because "the question whether an agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record."  *Greene v. Carson*, 256 F. Supp.3d 411, 423 (S.D.N.Y. 2017) (quoting *Clara Fashion, Inc. v. Holder*, No. 11-cv-889, 2012 WL 352309, at *5 (S.D.N.Y. Feb. 3, 2012)) (alterations omitted).

To the extent Plaintiffs seek to introduce expert testimony going to the merits of the APA claim, that testimony is not properly the subject of APA review because it was not before the Secretary and irrelevant to his decision.  Considering expert testimony after the fact is inconsistent with the APA standard of review and the required deference to the agency's factfinding.  *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984.  Materials produced in discovery (which Defendants contend was improper here) likewise are not properly considered in a review of agency action under the APA unless Plaintiffs establish that those materials should be considered part of the "whole record" before the agency.  5 U.S.C. § 706; *see e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*); *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051-52 (2d Cir. 1985).

**B. The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census.**

Plaintiffs will not be able to establish that the Secretary's decision to reinstate a citizenship question on the decennial census, based on the record before him, was arbitrary and capricious.

**1. The Secretary reasonably concluded that reinstating a citizenship question would provide the most appropriate citizenship data.**

The record establishes that the Secretary "articulate[d] a satisfactory explanation for [his] action including a rational connection between the facts found and the choice made.'"  *Waterkeeper All., Inc.*, 399 F.3d at 498 (quoting *State Farm*, 463 U.S. at 43).  Plaintiffs cannot show that the basis

for the Secretary's decision to act upon DOJ's request and reinstate a question with long historical precedent was arbitrary and capricious.  SAC ¶¶ 191-92.

The Secretary explained in his decision memorandum that the inclusion of a citizenship question on the census is an accepted method of collecting citizenship data.  AR 1313-20.  The Commerce Department's review of the issue showed "that collection of citizenship data by the Census has been a long-standing historical practice," including through regular inclusion in the decennial census through 1950, in the long-form census through 2000, and in the ACS since 2005.  *Id.* at 1314. As the Secretary observed, "the decision to collect citizenship information from Americans through the decennial census was first made centuries ago." *Id.* at 1319.  Further, the inclusion of a citizenship question is far from unusual in comparative perspective; the United Nations recommends that nations inquire about citizenship and a number of democracies include such a question on their census.  *Id.* at 1319.  Given the ubiquity of citizenship questions, the reinstatement of a citizenship question on the 2020 decennial census was a subject under consideration by various stakeholders and government officials.  *E.g.*, *id.* at 763, 1319.  As a result, the Secretary's consideration of issues related to the 2020 decennial census included reinstatement of a citizenship question.  *Id.* at 1321.

Against this backdrop, the Secretary solicited the DOJ's views on the subject and, in December 2017, received DOJ's formal request in December 2017 "that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship."  AR 663.  The Gary Letter explains that DOJ "needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected" and opines that the decennial census is "the most appropriate vehicle for collecting that data."  *Id.*  The Gary Letter observes that DOJ "needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations," that DOJ previously used citizenship data collected from the long-form census for that purpose, and that decennial census questionnaire data, "if available, would be more appropriate" than

ACS data for VRA purposes because it would provide block-level CVAP data. *Id.* at 664-65.

The Secretary "set out to take a hard look at the request" and ensure that he "considered all facts and data relevant to the question." AR 1313. The Commerce Department and the Census Bureau "began a thorough assessment that included legal, program, and policy considerations." *Id.* This review included, for example, the preparation by the Census Bureau of a technical review of the request, *id.* at 1277-85; a detailed exchange between the Commerce Department and the Census Bureau about the technical review, *id.* at 1286-97; multiple meetings between the Secretary and Census Bureau leadership to discuss the Census Bureau's "process for reviewing the DOJ request, their data analysis, [the Secretary's] questions about accuracy and response rates, and their recommendations," *id.* at 1313; and extensive engagement with stakeholders, *id.* at 763-1276. At the conclusion of this process, the Secretary reasonably determined that the "census-block-level citizenship data requested by DOJ [was] not available" from existing surveys conducted by the Census Bureau. *Id.* at 1314. The Secretary also reasonably accepted DOJ's determination that, because "DOJ and the courts use CVAP data for determining violations of Section 2" of the VRA, "having these data at the census block level will permit more effective enforcement." *Id.* at 1313; *see also id.* at 664-65.[9]

The Secretary thus proceeded to evaluate the available options. AR 1317. Through extensive consultation with the Census Bureau, the Secretary identified four options: making no change in data collection but assisting DOJ with statistical modeling ("Option A"); reinstating a citizenship question on the decennial census ("Option B"); obtaining citizenship data from administrative records for the whole census population ("Option C"); and, at the request of the Secretary after receiving the Census Bureau's analysis, a combination of reinstating the question on the census and utilizing administrative-

---

[9] As *amicus curiae* the Project on Fair Representation has previously explained at length, the relative difficulties in using ACS CVAP data, as compared to an actual enumeration of citizens, are well documented; a number of the Plaintiffs previously made this case in the Supreme Court. Br. in Supp. of Defs.' Mot. to Dismiss at 8-11, ECF 167-1; *see also, e.g.*, AR 532-36.

record data ("Option D").  *Id.* at 1314-17.  With the goal of "obtaining *complete and accurate data*" on citizenship, *id.* at 1313, the Secretary concluded that Option D—"placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records"—would "provide DOJ with the most complete and accurate CVAP data in response to its request."  *Id.* at 1317.

Thus, the Secretary traced the steps from the facts found during the agency's extensive review of DOJ's request to his ultimate decision.  AR 1313-20.  This reasonable explanation of the Secretary's decision process is all that is required to survive arbitrary-and-capricious review.  Even if the Court doubts that the Secretary's conclusions necessarily follow from the facts found, the Court "should 'uphold a decision of less than ideal clarity if the [Secretary's] path may reasonably be discerned.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).  And here, the Secretary's path is readily understood from his memorandum, such that the Secretary "articulate[d] a satisfactory explanation for [his] action including a 'rational connection between the facts found and the choices made." *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 108 (2d Cir. 2015) (quoting *State Farm*, 463 U.S. at 43).

## 2. The Secretary engaged in an appropriate process, including the consideration of alternatives, and explained his rationale.

To the extent Plaintiffs suggest that the Secretary's decision was arbitrary and capricious because he "failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency," *Bechtel*, 710 F.3d at 446, that claim is belied by the record.  The Secretary engaged in a process that identified various issues related to the inclusion of a citizenship question, considered alternative proposals, and explained his rationale for rejecting or accepting the different options presented based on the evidence before him.  What matters for APA review is that the Secretary engaged in this process and deliberately considered the options— not whether his decision was "the best one possible or even whether it [was] better than the

alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782.  Under this deferential standard, Plaintiffs

cannot show that the Secretary engaged in an arbitrary and capricious review.

First, Plaintiffs cannot show that the Secretary failed to consider alternatives.  *See* SAC ¶ 192.

The Secretary considered four proposals and reasonably concluded that Option D would provide

DOJ with the most complete and accurate CVAP data.  AR 1314-17.  That the Census Bureau

recommended Options A or C, *id.* at 1277, and expressed reservations about Option D, *id.* at 1312,

does not render the Secretary's decision unreasonable.  Given the broad deference afforded the

Secretary by virtue of the congressional delegation of broad discretion over the census, "the mere fact

that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment

in any judicial review of his decision." *Wisconsin*, 517 U.S. at 23.  The Secretary, "like all agency heads,

usually makes decisions after consulting subordinates, and those subordinates often have different

views." *St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 83 (D.C. Cir. 2010).

All that is required is that the Secretary consider the important issues—including those highlighted by

his subordinates—and provide a rational explanation for his decision.  *State Farm*, 463 U.S. at 43.

Next, Plaintiffs cannot show that the Secretary failed to consider effects on the response rate.

SAC ¶ 193.  This issue was brought to the Secretary's attention both by the Census Bureau, AR 1315-

16, and by stakeholders, *see, e.g., id.* at 1090-1101.  The Secretary reviewed the available materials and

concluded that "no one provided evidence that reinstating a citizenship question on the decennial

census would materially decrease response rates." *Id.* at 1315, 1317.  The Secretary explained that the

Census Bureau could address any nonresponse through NRFU and, in any event, "the value of more

complete and accurate data derived from surveying the entire population outweighs such concerns."

*Id.* at 1319.  That judgment was further informed by the fact that there is a legal duty to respond to

the census, 13 U.S.C. § 221, and the Secretary concluded that the value of providing accurate data to

DOJ was "of greater importance than any adverse effect that may result from people violating their

legal duty to respond." AR 1319. Regardless, to help minimize any effect on response rates, the Secretary decided that the citizenship question should be the last question on the form. *Id.* at 1320.

Plaintiffs also cannot show that the Secretary failed to consider cost implications. SAC ¶ 193. Indeed, the Secretary's decision memorandum states that he "considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise." AR 1319. The Secretary concluded that the costs of preparing and adding the question to the census would be *de minimis*. *Id.*; *see also, e.g.*, *id.* at 1279 (Census Bureau conclusion that "the cost of preparing the new question would be minimal"). The Secretary also addressed concerns about increased non-response follow-up. As previously explained, the Secretary concluded that there was no empirical evidence that inclusion of a citizenship question would have a material effect on response rates. *Id.* at 1319. But in any event, the Secretary evaluated the Census Bureau's rough estimate that 630,000 additional households could go into NRFU and concluded that the additional costs from this increase of approximately 0.5% in NRFU operations—at least $27.5 million, according to the Bureau—fell within the margin of error for the Bureau's cost estimates provided to Congress. *Id.*; *see also id.* at 1281-82 (Census Bureau cost analysis for Option B). The Secretary must be afforded deference in making budgetary decisions. *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("As we have repeated time and again, an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.").

Lastly, Plaintiffs cannot show that the Secretary failed to consider the issue of testing for the reinstatement of a citizenship question. SAC ¶ 194. When the Census Bureau receives a request from other agencies for a new question on the ACS, the Bureau typically "work[s] with the other agencies to test the question (cognitive testing and field testing)." AR 1296. In reviewing DOJ's request to reinstate a question on the census, the Census Bureau concluded that, "[s]ince the question is already asked on the American Community Survey, [it] would accept the cognitive research and questionnaire

testing from the ACS instead of independently retesting the citizenship question." *Id.* at 1279.  In his memorandum, the Secretary thus reasonably concluded that "the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions." *Id.* at 1319.

In sum, the Secretary conducted a comprehensive review before arriving at the decision to reinstate a citizenship question on the 2020 decennial census.  The Secretary responded to objections and concerns from the Census Bureau and concluded that Option D nonetheless was the appropriate choice given the evidence before him.  It is entirely rational for the Secretary to conclude that, where there is a lawful and historical practice of including a citizenship question, unsubstantiated concerns over an undercount resulting from an unlawful refusal to respond to the census—which could be addressed through increased NRFU—are outweighed by the need to provide DOJ with more complete block-level CVAP data.  And it is entirely consistent with the Secretary's broad, congressionally delegated authority to rest these complicated policy determinations over the administration of the census with the Secretary.

### C. Plaintiffs' Claims of "Pretext" Do Not Provide a Basis for Vacating the Secretary's Decision.

As a last-ditch effort to prevail on their APA claim, Plaintiffs likely will argue that the decision should be set aside because the rationale was pretextual, relying on a mischaracterization of the Secretary's testimony before Congress and statements made by officials other than the actual decisionmaker.  Plaintiffs' theory is flawed from start to finish.

To begin, as the Supreme Court repeatedly has explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp*, 411 U.S. at 143.  Because the court should be applying "the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 743-44 (1985) (internal citation omitted), Plaintiffs should not be able to rely on material outside the properly designated administrative record to argue that an

29

agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Plaintiffs' attempt to impugn the Secretary's credibility based on extra-record material—including the utterances of others—and statements which post-date the decision should be rejected at the outset.

Further, Plaintiffs cannot demonstrate that the Secretary did not believe the rationale set forth in his decision memorandum or that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious. Even if the Secretary had *additional* reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged. *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). Indeed, there are myriad legitimate reasons more-precise citizenship data could prove useful to both the federal and state governments, including policy formation and resource allocation. This is why Plaintiffs' attempt to rip from context Mr. Comstock's statement that "[his] job is to figure out how to carry out what [his] boss asks [him] to do . . . and . . . find a legal rationale," Comstock Dep. Tr. at 266:7-8, ECF No. 314-8, is misguided. It is utterly unremarkable for an agency head to enter office with predispositions toward certain policy choices and, as Mr. Comstock explained, "what a policy person does" is to "help them find the best rationale to do it," or, "if it's not legal, you tell them that." *Id.* That the Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, and asked his staff to explore such an action, is neither unexpected nor evidence of improper decisionmaking. As Justice Gorsuch has explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape." *In re Dep't of Commerce*, ___ S. Ct. ___, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring

in part and dissenting in part).

Plaintiffs' anticipated reliance on statements by officials other than the Secretary himself is even further afield. That other officials might have supported the reinstatement of a citizenship question for different reasons does not indicate that the reasons given by the actual decisionmaker—the Secretary—were pretextual. And most of the statements on which Plaintiffs rely, including general expressions about immigration, *see, e.g.*, NYIC Compl. ¶¶ 105-09, do not even concern the census or the citizenship question whatsoever.

Moreover, even if relevant, no statements of other officials plausibly give rise to a cognizable inference of pretext here. Plaintiffs likely will insist, for example, that the Secretary's reliance on VRA enforcement was pretextual because, early in his tenure at the Department of Commerce, the Secretary spoke with Kris Kobach about the potential inclusion of a census question on both citizenship and lawful status. But as explained more fully below, *infra* Section III, Plaintiffs have unearthed no evidence that the Secretary shared or was influenced by Kobach's outreach—indeed, the Secretary rejected the latter's proposed question. Plaintiffs' reliance on this isolated, unsolicited communication as evidence of pretext is misplaced.

Finally, Plaintiffs' expected attempt to demonstrate pretext through the Secretary's congressional testimony is both inappropriate and unpersuasive. The statements at issue cannot shed light on any proper inquiry under the APA. Further, there is no legitimate basis to conclude that, in context, the Secretary's statements were misleading. For example, the Secretary in his March 2018 memorandum did not say he "'set out to take a hard look" at adding the citizenship question following receipt of the Gary Letter; the Secretary actually said he "set out to take a hard look *at the request*" to "ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond. AR 1313 (emphasis added). That statement does not necessarily imply that he had not previously considered whether to reinstate a citizenship question, or

31

that he had not had discussions with other agencies or government officials before he received DOJ's formal request. Nor would it have made sense for the Secretary to take a "hard look" at DOJ's request before receiving it.

Similarly, the Secretary's March 20 statement to Congress that he was "'responding solely to the Department of Justice's request,'" Hr'g on FY 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. On Commerce, Justice, Sci. & Related Agencies of the H. Comm. on Appropriations, 115th Cong. 9 (2018), at 2018 WLNR 8815056, was actually in answer to a question asking whether he was also responding to requests from third parties, *see id.* And the Secretary's March 22 statement that DOJ "'initiated the request for inclusion of the citizenship question,'" Hr'g on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum, Hr'g Before the H. Ways & Means Comm., 115th Cong. 24 (2018), at 2018 WLNR 8951469, was in response to a question about whether Commerce planned to include a citizenship question on the 2020 census, not a question about the Secretary's decision-making process. The statement was immediately followed by an acknowledgment that he had been communicating with "quite a lot of parties on both sides of [the] question" and that he "ha[d] not made a final decision, as yet" on this "very important and very complicated question," *id.* Only by ignoring the context of these statements and eliding the presumption of regularity do Plaintiffs claim they are indicative of pretext.

### III.    The Secretary's decision did not deny Plaintiffs equal protection.

Despite wide-ranging and intrusive discovery, Plaintiffs have uncovered no evidence to substantiate their speculation that discriminatory animus motivated the Secretary's decision. Plaintiffs cannot carry their burden to demonstrate that the decision "was motivated by discriminatory animus and its application results in a discriminatory effect." *Hayden v. Cty. of Nassau* ("*Hayden I*"), 180 F.3d 42, 48 (2d Cir. 1999). Although Plaintiffs need not show that discrimination was the sole or primary factor motivating the Secretary, *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996), to

establish a due-process violation, they must put forth evidence that an "invidious discriminatory purpose was a motivating factor" in the challenged decision. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* ("*Arlington Heights*"), 429 U.S. 252, 266 (1977).  Plaintiffs have exposed no such evidence.

Plaintiffs will be unable to offer any clear evidence of discriminatory intent.  First, Plaintiffs rely heavily on a purported disproportionate impact on certain minority groups comprised of relatively large proportions of immigrants.  But "a racially disproportionate impact" alone is virtually never sufficient to establish discriminatory intent, *Arlington Heights*, 429 U.S. at 264-65, and especially not here because  Plaintiffs' theory of harm *relies upon* intentional choices to ignore a legal duty by the very individuals Plaintiffs claim will suffer a disproportionate impact.  (The decision itself, of course, is facially neutral in its applicability).  And in any event, Plaintiffs' ignores the fact that DOJ requested block-level CVAP data in order to *protect* the voting rights of minority citizens.  Even if large numbers of individuals will avoid the 2020 census, it is entirely predictable that an undercount of *any* community would have a disparate impact on members of that group—that is a function of the uses to which the census is put, not evidence of discrimination.  Regardless, it would defy logic to allow individuals who fail to comply with their legal duty to participate in the decennial population count to thwart the government's ability to collect common-sense information that has been gathered throughout this country's history.

Second, Plaintiffs insist that statements by *other people* both within and outside the current administration—most of which have nothing to do with the census or the challenged decision— evidence discriminatory motive *by the Secretary*.  *See, e.g.*, ECF No. 70 ("NYIC MTD Order")  at 66 (citing NYIC Compl. ¶ 109).  But those arguments are utterly meritless.  Statements by officials who did not participate in the decision to reinstate a citizenship question on unrelated topics cannot shed light on "the decisionmaker's purposes."  *Arlington Heights*, 429 U.S. at 267.  Plaintiffs' attempt to impute the purported motives of others to the Secretary should be rejected because, despite the

production of thousands of documents, Plaintiffs have unearthed nothing to suggest that the Secretary harbored any discriminatory animus.

In particular, Plaintiffs likely will accentuate the fact that the Secretary had a single conversation with Steven Bannon. *See* Defs.' Second Supp. Resp. to Pls.' First Inter., at 3. But the record shows that Bannon "called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of State Kris Kobach about *Secretary Kobach's* ideas about a possible citizenship question." *Id.* The record does not support Plaintiffs' conjecture that this single conversation evidences that Bannon had a discriminatory motive for connecting the Secretary to Kobach. Moreover, the administrative record shows that Kobach urged the Secretary to add an entirely new question to the census—one that would ask respondents about their *legal status*— a request the Secretary flatly rejected. *See* AR 763-64. And none of the documents produced in discovery provide any evidence that the Secretary was motivated by Kobach's belief that a lack of census citizenship data "leads to the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." *Id.* at 764. None of the materials Plaintiffs are expected to rely upon provide any evidence of a secret discriminatory motive for the reinstatement of a citizenship question.

Third, Plaintiffs likely will attempt to show that the Secretary's stated reasons for reinstating a citizenship question are designed to mask the true motive: invidious discrimination. But such an "extraordinary claim of bad faith . . . requires an extraordinary justification," and Plaintiffs come nowhere close to meeting that burden. *In re Dep't of Commerce*, 2018 WL 5259090, at *1 (Gorsuch, J., concurring in part and dissenting in part). Indeed, Plaintiffs will be unable to offer any reliable support for a finding that the Secretary's rationale is anything other than what is set forth in his decision, as the government explained above, *see supra* Section II. Plaintiffs' trial submissions will be utterly devoid of proof that "the decisionmaker … selected or reaffirmed" his decision "at least in part

34

'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation and footnote omitted).

Fourth, Plaintiffs are expected to continue to rely on purported "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267. Although this Court credited alleged "procedural irregularities" in denying the motion to dismiss, NYIC MTD Order at 63, the procedures employed by the Secretary in reaching his decision neither shed light on his motives nor provide any creditable evidence of discriminatory purpose. *See In re Dep't of Commerce*, 2018 WL 5259090, at *1 (Gorsuch, J., concurring in part and dissenting in part). Plaintiffs will likely offer evidence to support their allegation that the Secretary "ignored the advice of the Census Bureau's professional staff, its scientific advisory committee, and six previous Census directors." NYIC Compl. ¶ 7. But this cannot tip the scales in any analysis of purported discrimination because, as the Supreme Court has made clear, "the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision." *Wisconsin*, 517 U.S. at 23; *see also In re Dep't of Commerce*, 2018 WL 5259090, at *1 (Gorsuch, J., concurring in part and dissenting in part). And the government already has explained that Plaintiffs' continued framing of the question as "untested," NYIC Compl. ¶ 151, is inaccurate because, as the Secretary explained, the citizenship question "has already undergone the … testing required for new questions" because the question "is already included on the ACS," meaning that it "has been well tested." AR 1314, 1319. Although circumstantial evidence may be considered in evaluating a claimed violation of equal protection, *Arlington Heights*, 429 U.S. at 266, Plaintiffs still must prove that the official action was "taken for invidious purposes," *id.* at 267. Plaintiffs will be unable to carry their burden.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Defendants after trial.

35

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CAROLTTA P. WELLS
Assistant Branch Director

*/s/   Kate Bailey*
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St, N.W.
Washington, DC  20005
Tel.:  (202) 514-9239
Fax:  (202) 616-8470
Email:  kate.bailey@usdoj.gov

*Counsel for Defendants*