1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------

NEW YORK IMMIGRATION COALITION, ET AL.,

4

Plaintiffs,

5          vs.        Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                    Defendants.

---------------------------------------

8

9                    Washington, D.C.

10                   Thursday, August 30, 2018

11   Deposition of:

12                   EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22

Page 2

<pre>
1                    CONTENT
                                          PAGE
2
   EARL COMSTOCK                            9
3  Examination by Mr. Colangelo            9
   Examination by Mr. Gersch               241
4  Examination by Mr. Rosenberg            336
   Examination by Ms. Senteno              381
5  Examination by Ms. Boutin               419
6
7           COMSTOCK DEPOSITION EXHIBITS
8  EXHIBIT                                  PAGE
   NUMBER
9  Plaintiffs' Exhibit 1    Email           56
   Plaintiffs' Exhibit 2    Email           62
10 Plaintiffs' Exhibit 3    Email           82
   Plaintiffs' Exhibit 4    Email           87
11 Plaintiffs' Exhibit 5    Memo            93
   Plaintiffs' Exhibit 6    Email          114
12 Plaintiffs' Exhibit 7    Email          120
   Plaintiffs' Exhibit 8    Email          123
13 Plaintiffs' Exhibit 9    Email          137
   Plaintiffs' Exhibit 10   Email          145
14 Plaintiffs' Exhibit 11   Email          147
   Plaintiffs' Exhibit 12   Email          158
15 Plaintiffs' Exhibit 13   Email          164
   Plaintiffs' Exhibit 14   Email          167
16 Plaintiffs' Exhibit 15   Memo           182
   Plaintiffs' Exhibit 16   Memo           189
17 Plaintiffs' Exhibit 17   Meeting        194
                            notification
18 Plaintiffs' Exhibit 18   Email          199
   Plaintiffs' Exhibit 19   Email          212
19 Plaintiffs' Exhibit 20   Email          215
   Plaintiffs' Exhibit 21   Email          218
20 Plaintiffs' Exhibit 22   Email          219
   Plaintiffs' Exhibit 23   Email          221
21 Plaintiffs' Exhibit 24   Email          224
   Plaintiffs' Exhibit 25   Email          226
22 Plaintiffs' Exhibit 26   Email          234
   Plaintiffs' Exhibit 27   Testimony from 293
</pre>

Page 3

1                                    Committee on
                                     Oversight and
2                                    Government
                                     Reform
3    Plaintiffs' Exhibit 28    Memo                309
     Plaintiffs' Exhibit 29    Memo                317
4    Plaintiffs' Exhibit 30    Decisional          326
                               memorandum
5    Plaintiffs' Exhibit 31    Questions on        372
                               draft Census
6                              memo
     Plaintiffs' Exhibit 32    Memo                374
7    Plaintiffs' Exhibit 33    Questions on        376
                               draft Census
8                              memo
     Plaintiffs' Exhibit 34    Email               378
9    Plaintiffs' Exhibit 35    Trump campaign      383
                               email

10

11        (Exhibits attached to transcript.)

12

13

14

15

16

17

18               Veritext Legal Solutions
                  Mid-Atlantic Region
               1250 Eye Street NW - Suite 350
19             Washington, D.C.  20005

20

21

22

```
 1              A P P E A R A N C E S
   On behalf of New York Immigration
 2 Coalition, CASA De Maryland, American-Arab
   Anti-Discrimination Committee, ADC Research
 3 Institute and Make the Road New York:
           David Gersch, Esquire
 4         ARNOLD & PORTER
           601 Massachusettes Avenue, NW
 5         Washington, D.C. 20001
           (202) 942-5316
 6         david.gersch@arnoldporter.com
 7         Perry Grossman, Esquire
           New York Civil Liberties Union
 8         125 Broad Street
           New York, New York 1004
 9         (212) 607-3300
           pgrossman@nyclu.org
10
   On behalf of Kravitz Plaintiffs:
11         Daniel Grant, Esquire
           COVINGTON & BURLINGTON
12         850 Tenth Street, NW
           Washington, D.C. 20001
13         (202) 662-5458
           dgrant@cov.com
14
   On behalf of Los Angeles Unified School District:
15         Brian Park, Esquire (Telephonically)
           DANIELS WOLIVER KELLEY
16         115 Pine Avenue
           Suite 500
17         Long Beach, California 90802
           (562) 366-8500
18         bpark@dwkesq.com
19 On behalf of County of Los Angeles:
           David I. Holtzman, Esquire
20         HOLLAND & KNIGHT
           50 California Street, Suite 2800
21         San Francisco, California 94111
           (415) 743-6909
22         david.holtzman@hklaw.com
```

Page 5

```
 1    On behalf of LUPE Plaintiffs:
           Andrea Senteno, Esquire
 2         MALDEF
           1016 16th Street, NW
 3         Suite 100
           Washington, D.C. 20036
 4         (202) 293-2828
           asenteno@maldef.org
 5
           Niyati Shah, Esquire
 6         John C. Yang, Esquire
           ASIAN AMERICANS ADVANCING Justice
 7         1620 L Street, NW
           Suite 1050
 8         Washington, D.C. 20036
           (202) 296-2300
 9         nshah@advancingjustice-aajc.org
           jyang@advancingjustice-aajc.org
10
           Ezra Rosenberg, Esquire
11         Dorian Spence, Esquire
           LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
12         1401 New York Avenue, NW
           Suite 400
13         Washington, D.C. 20005
           (202) 662-8345
14         erosenberg@lawyerscommittee.org
           dspence@lawyerscommittee.org
15
      On behalf of State of California:
16         Gabrielle Boutin, Esquire
           R. Matthew Wise, Esquire (Telephonically)
17         DEPARTMENT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
18         1300 I Street
           P.O. Box 944255
19         Sacramento, California 94244
           (916) 210-6053
20         gabrielle.boutin@doj.ca.gov
           matthew.wise@doj.ca.gov
21
22
```

```
 1    On behalf of State of New York:
            Danielle Fidler, Esquire
 2          Elena Goldstein, Esquire
            Matthew Colangelo, Esquire
 3          Alex Finkelstein, Esquire
            ASSISTANT ATTORNEY GENERAL
 4          ENVIRONMENTAL PROTECTION BUREAU
            28 Liberty Street
 5          New York, New York 10005
            (212) 416-8441
 6          danielle.fidler@ag.ny.gov
            elena.goldstein@ag.ny.gov
 7          matthew.colangelo@ag.ny.gov
            alexfinkelstein@ag.ny.gov
 8
      On behalf of Defendants:
 9          Kate Bailey, Esquire
            Joshua Gardner, Esquire
10          U.S. DEPARTMENT OF JUSTICE
            20 Massachusetts Avenue
11          Washington, D.C. 20530
            (202) 305-9802
12          kate.bailey@usdoj.gov
            joshua.gardner@usdoj.gov
13
            Michael Cannon, Esquire
14          David M.S. Dewhirst,Esquire
            U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
15          ASSISTANT GENERAL COUNSEL FOR FINANCE &
            LITIGATION
16          1401 Constitution Avenue, NW
            Room 5890
17          Washington, D.C. 20230
            (202) 482-5395
18          mcannon@doc.gov
            ddewhirst@doc.gov
19
            Michael Walsh, Jr., Esquire
20          DEPUTY GENERAL COUNSEL
            1401 Constitution Avenue, NW
21          Washington, D.C. 20230
            (202) 482-4772
22          mwalsh@doc.gov
```

Page 7

1   VIDEOGRAPHER:  Dan Reidy

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 8

1              P R O C E E D I N G S

2     WHEREUPON,

3              VIDEOGRAPHER:  Good morning.  We are

4     going on the record at 9:01 a.m. on Thursday,

5     August 30, 2018.  Please note that the microphones

6     are sensitive and may pick up whispering, private

7     conversations and cellular interference.  Please

8     turn off all cell phones or place them away from

9     the microphones, as that can interfere with the

10    deposition audio.  Audio and video recording will

11    continue to take place unless all parties agree to

12    going off the record.

13             This is Media Unit 1 of the video

14    recorded deposition of Earl Comstock to be taken

15    by counsel for the plaintiff in the matter of the

16    New York Immigration Coalition, et al., v. The

17    United States Department of Commerce, et al.  This

18    case is filed in the United States District Court

19    for the Southern District of New York.  This

20    deposition is being held at the law office of

21    Arnold & Porter located a 601 Massachusetts Avenue

22    Northwest, Washington, D.C. 20001.

Page 9

1         My name is Dan Reidy from the firm

2    Veritext Legal Solutions, and I am the

3    videographer.  The court reporter is Karen

4    Jorgenson from Veritext Legal Solutions.

5         I am not authorized to administer an

6    oath.  I am not related to any party in this

7    action, nor am I financially interested in the

8    outcome.

9         Also, counsel appearances will be noted

10   on the stenographic report rather than orally at

11   this time.

12        Will the court reporter please swear in

13   the witness?

14                    EARL COMSTOCK,

15   called as a witness, and having been first duly

16   sworn, was examined and testified as follows:

17             THE WITNESS:  I do.

18             EXAMINATION BY MR. COLANGELO:

19        Q    Please state your name and work address.

20        A    Earl Comstock, U.S. Department of

21   Commerce.

22        Q    And we met a minute ago, but for the

Page 10

1   record, I'm Matthew Colangelo.  I work for the

2   New York Attorney General, and I represent

3   plaintiffs in one of the actions challenging the

4   inclusion of a citizenship question on the

5   decennial census.  I'll be taking your deposition

6   today.

7          Have you been deposed before?

8      A   Nope.

9      Q   Okay.  So I will ask questions.  I just

10  ask that you answer honestly and completely.  If

11  at any point you don't understand a question I've

12  asked, please just let me know that it was unclear

13  and I can see if I can rephrase it.

14     A   Okay.

15     Q   Does that work?

16     A   Sure.

17     Q   Karen introduced herself.  She's

18  transcribing this deposition.  She'll be taking

19  down my questions and your answers.  In order to

20  make sure that we have a clear transcript, please

21  wait until I'm done asking a question before you

22  answer it, and I will try to make sure I don't

Page 11

1    interrupt your answers either.

2         Sound good?

3    A    Sounds perfect.

4    Q    Great.

5         Can you tell me how you prepared for your

6    deposition today?

7    A    Met with counsel yesterday.

8    Q    And did you review any documents during

9    that meeting?

10   A    A few documents that are in the record,

11   yes.

12   Q    Great.

13        And did you review any of those documents

14   for the purpose of refreshing your recollection

15   about any of the events involved in this lawsuit?

16   A    No.

17   Q    Tell me about your educational background

18   after high school.

19   A    After high school, I went to the

20   University of California Santa Barbara, and then

21   worked in Alaska for a couple years.  Started

22   working for Senator Ted Stevens from Alaska and

Page 12

1   the Senate Committee, Science and Transportation.

2   Did that for ten years.

3           Left the Hill, and became a partner at a

4   law firm.  Did that for six years, and then was

5   CEO of a trade organization for two years.  Ran my

6   own consulting firm for about seven years.  Went

7   back to a law firm for about a year and a half,

8   and then became counsel for a start-up.

9        Q   Okay.  So I got your UCSB degree.  That

10  was a bachelor's degree?

11       A   Correct.

12       Q   And I may have missed it in your answer.

13  But I take it at some point you earned a law

14  degree.

15       A   I did.

16       Q   Okay.

17       A   I went to night law school while working

18  for the Senate.

19       Q   Got it.

20           And what year did you earn your J.D.?

21       A   1992.

22       Q   1992.  Okay.

Page 13

1      And are you currently admitted to the

2  practice?

3      A    In the District, yes.

4      Q    In D.C.

5           Is your registration active or inactive?

6      A    I believe it's active.  I'd have to go

7  double-check.

8      Q    Okay.  And are you admitted in any other

9  states?

10     A    I was admitted in Alaska and that's

11 inactive.

12          (Thereupon, the court reporter

13 clarified.)

14 BY MR. COLANGELO:

15     Q    And tell me what your college degree

16 field of study was?

17     A    Political science.

18     Q    Do you have any education training or

19 experience in statistics?

20     A    Did -- well, George Mason University does

21 accounting, statistics and economics for lawyers,

22 which is a required part of the course.  So I had

1    two years of that, and also had an environmental

2    science minor at UCSB, so did a number of

3    statistics and chemistry and biology courses in

4    relation to that.

5         Q    And by in relation to that, you mean in

6    relation to the environmental science degree?

7         A    Correct.

8         Q    Okay.  Do you have any education,

9    training or experience in survey methodology?

10        A    No.

11        Q    Do you have any education, training or

12   experience in demography?

13        A    Other than basic introduction to

14   demography, no.

15        Q    What do you mean by introduction?

16        A    Well, what you take in an undergraduate

17   course that covers demography.

18        Q    Okay.  Do you have any education,

19   training or experience in voting rights law?

20        A    No.

21        Q    Do you have any education training or

22   experience in redistricting?

Page 15

1      A    No.

2      Q    Do you have any education, training or

3   experience in election law?

4      A    Again, other than as an attorney and the

5   ability to read laws, no.

6      Q    Okay.  By as an attorney and the ability

7   to read laws, you mean if you needed to read a

8   law, you could?

9      A    Meaning if I had read a statute related

10  to those, then I would be able to understand it,

11  yes.

12     Q    But you've never studied election law?

13     A    I've never studied election law.

14     Q    You've never practiced election law?

15     A    No.

16     Q    Okay.  Were -- between November 2016 and

17  February 2017, you were a member of the

18  presidential transition team?

19     A    From November -- yeah, just after

20  Thanksgiving until I began working for the

21  Department of Commerce, yes.

22     Q    Okay.  And when did you begin working at

Page 16

1    Department of Commerce?

2        A    January 31st, I believe.

3        Q    31st, okay.

4             When did you join the presidential

5    transition team?

6        A    This would have been around

7    November 28th.

8        Q    And what were your responsibilities on

9    the transition?

10       A    I was Sherpa for getting people through

11   the confirmation in the Senate Commerce Committee.

12       Q    Sherpa for getting people through

13   confirmation in the Senate Commerce meeting.

14            Can you tell me what Sherpa means as you

15   use that term?

16       A    Yeah.  It's a colloquial term.  It's

17   basically a person that helps the nominee, and in

18   my case, I had two nominees that were

19   being -- would be considered by the

20   Senate Commerce Committee.  So you advise them on,

21   you know, what the different members are going to

22   care about, what the general subject matter issues

1   are.  As former staff for the committee, I was

2   familiar with the issues that would be of

3   importance to the members of the committee, so

4   that's why I was asked to do the job.

5        Q   You mentioned that you were the Sherpa

6   for nominees through the Senate Commerce

7   Committee.  I take it one of those was

8   Secretary Ross?

9        A   Secretary Ross and Deputy Secretary

10  Todd Riggins.

11       Q   And did your responsibilities on the

12  transition team include anything other than the

13  Sherpa role you've just described?

14       A   No.

15       Q   Did you work on the campaign, at all --

16  the presidential campaign for the 2016

17  presidential --

18       A   I did not.

19       Q   What -- tell me a little bit more about

20  your role as Sherpa for the Secretary.

21       A   Well, it involved setting up meetings

22  with members of the committee, advising the

Page 18

1   Secretary on subject matter that

2   Department of Commerce handles and that the

3   committee cares about.  My particular areas of

4   expertise are fisheries and telecommunications,

5   and so those are two rather arcane but rather

6   important areas of the Senate Commerce Committees

7   jurisdiction.

8           I've also, as former legislative director

9   for Senator Stevens, basically covered all of the

10  issues in front of the committee, so aviation,

11  space, science issues, climate change, all of

12  those.

13      Q   And what were the specific issues that

14  you briefed Secretary -- or then nominee Ross on?

15      A   Essentially, everything that the

16  department covers across the board, including the

17  census, to the extent I had background.

18      Q   Okay.  And tell me -- I want to ask you a

19  couple questions about that.  But before we do, in

20  addition to preparing the Secretary -- or the

21  nominee, I should say --

22      A   Right.

1     Q   -- for his meetings and his hearing, did

2   you have any role in developing policy positions

3   for the incoming administration?

4     A   Not in that sense, no.

5     Q   Not in what sense?

6     A   Not in -- no.  I was not involved in the

7   policy discussions.  There were different teams

8   handling that.

9     Q   Okay.  You were not -- you're not

10  involved in developing policy?

11    A   Correct.

12    Q   And did you participate in any policy

13  meetings, at all?

14    A   No.

15    Q   Okay.  You mentioned that among others,

16  you briefed the Secretary on Census Bureau

17  matters; is that right?

18    A   Right.  For example, doing the census in

19  Alaska is handled differently than the rest of the

20  census.

21    Q   How so?

22    A   Well, they start it in January so that

1   you don't -- in a lot of the remote villages, if

2   you tried to do the census on census day, the

3   rivers would be impassable.  So people would be

4   able -- unable to get in and out to get to the

5   census.

6          So that is an area that Senator Stevens

7   spent a lot of time on, that, and postal service

8   and some other issues unique to Alaska, so --

9      Q   And what other census-related issue did

10  you prepare the nominee -- and when I say the

11  nominee, I mean the nominee Secretary Ross.  I'm

12  not talking now about the deputy secretary

13  nominee.

14     A   Right.  Mostly --

15     Q   What are -- I'm sorry.  Let me just

16  finish the question for the clarity of the record.

17         What other census-related issues did you

18  prepare future Secretary Ross on in advance of his

19  confirmation hearing?

20     A   Largely, the size of the budget, the fact

21  that it had to be conducted based on a certain

22  schedule, and that it would require a large ramp

Page 21

1    up of personnel.

2        Q    And this was because the -- when you say

3    it would require a large ramp up, what would

4    require a large ramp up?

5        A    Conducting the census.

6        Q    Okay.

7        A    You, basically, have to hire about half a

8    million part-time workers.

9        Q    Got it.

10       Did you have any discussion with

11   Secretary Ross when he was nominee regarding the

12   citizenship question?

13       A    No.

14       Q    Okay.  And when I say the citizenship

15   question, you understand that I mean the inclusion

16   of a citizenship question on the 2020 census?

17       A    I took that to be your meaning, yes.

18       Q    Thank you.

19       You mentioned you also were involved as

20   the Sherpa for the deputy secretary nominee?

21       A    Correct.

22       Q    And tell us about any briefings that you

Page 22

1  gave the deputy -- the then deputy secretary

2  nominee regarding any Commerce Department matters?

3       A   Again, basically, the same subject

4  matter.  The Secretary -- the only difference

5  being that the Secretary typically asked more

6  questions than the deputy secretary nominee did.

7       Q   Did you brief them -- at the same time or

8  did you brief them in separate meetings?

9       A   No.  They were on separate tracks.

10      Q   And then -- I take it -- you testified

11  you took them up for meetings on the hill.

12      A   Correct.

13      Q   And did you take the Secretary and the

14  deputy secretary up together or separately?

15      A   Separately.

16      Q   How many -- how many Hill meetings do you

17  recall going to with the Secretary when he was the

18  nominee?

19      A   Well, we met with every member of the

20  committee, so I think that's about -- I don't

21  know -- somewhere in the vicinity of 30.  I'd have

22  to go pull the list of the committee -- we met

Page 23

1    with every member of the committee.  We may have

2    met with a couple of them twice if they had

3    follow-up questions.

4         Q    And then did you --

5         A    And then there were a few members who

6    were -- who had either just rolled off the

7    committee or, obviously, the leader -- you know,

8    leadership, so Leader McConnell and Mr. Schumer

9    are not on the committee, but we, obviously, met

10   with them, as well.

11        Q    Okay.

12        A    So I don't know, 35 meetings in all.

13        Q    Okay.  And did you meet with any staff

14   members on the committee outside of staff who

15   would have attended meetings with the senators?

16        A    In one case, with Senator Nelson, we met

17   with the staff prior to meeting with the Senator.

18   But, otherwise, yes, the staff was always there

19   with the member.

20        Q    Okay.  And in any of the meetings that

21   you had with senators or staff during the

22   confirmation process --

Page 24

1      A    Yeah.

2      Q    -- did anyone ask you about the

3    citizenship question?

4      A    Not that I recall.

5      Q    Okay.  And did you raise the citizenship

6    question in any of those conversations?

7      A    Not that I recall.

8      Q    And did the Secretary raise the

9    citizenship question in any of those

10   conversations?

11     A    Not that I recall.

12     Q    Okay.  In any of the meetings that you

13   had with members and the deputy secretary nominee,

14   did any of the members ask you about the

15   citizenship question?

16     A    Not that I recall.

17     Q    And did you raise the citizenship

18   question with any of the members?

19     A    Not that I recall.

20     Q    And did the deputy secretary nominee

21   raise the citizenship question with any of the

22   members?

Page 25

1      A    Not that I recall.

2      Q    The -- let me go back one second to when

3  you joined the transition team.  How did you come

4  to join the transition team?

5      A    I was contacted by a former colleague who

6  was tasked with setting up the Sherpa teams.

7      Q    Who was that?

8      A    Christine Ciccone.

9      Q    Can you spell that for the record?

10     A    Well, Christine, C-H-R-I-S-T-I-N-E.  And

11 then Ciccone, I think is C-I-C-C-O-N-E.

12     Q    And you mentioned Christine Ciccone was a

13 former colleague?

14     A    Correct.

15     Q    Where had you worked together?

16     A    She worked as staff on the governmental

17 affairs committee when Senator Stevens was

18 chairman.

19     Q    And what was her role on the transition

20 team?

21     A    Setting up the Sherpa meetings.

22     Q    Okay.  So between -- shortly after

1   Thanksgiving and inauguration, your only role on

2   the transition team was as the Sherpa to the

3   Commerce committee?

4        A    Right.

5        Q    And your only functions as Sherpa to the

6   Commerce committee included the functions that

7   we've just discussed with regard to the

8   Commerce Secretary nominee and the deputy

9   secretary nominee; is that correct?

10       A    Right.  We were responsible for prepping

11  them for the meetings and assisting with the

12  questions for the record --

13            (Thereupon, the court reporter

14  clarified.)

15            THE WITNESS:  Questions for the record

16  that came out.

17  BY MR. COLANGELO

18       Q    And --

19       A    And hearing prep.

20       Q    Great.  So let's take those separately.

21            Did you receive any questions for the

22  record -- well, let's do the hearing first.

1      Do you remember when the Secretary's

2  nomination was?

3      A   Well, when his nom- -- he was nominated

4  before I came on board, so --

5      Q   Okay.  If I told you he was nominated on

6  November 30, 2016, would that sound about right?

7      A   Yeah.  It sounds right.

8      Q   And your recollection is you came on

9  board shortly after he was nominated?

10     A   It was at the end of November, so he may

11 have been -- they may have brought me on without

12 knowing who it was, but it was right about that

13 time frame.

14     Q   Okay.  And when was the Secretary

15 confirmation hearing?

16     A   It was in early January, I believe.

17     Q   Okay.  Would January 18, 2017 sound about

18 right?

19     A   Yeah.  When's the -- the inaugural [sic]

20 is on the 20th --

21     Q   Inauguration was on the --

22     A   Yeah.  Sounds about right.  Shortly

Page 28

1   before the inauguration.

2       Q   So you mentioned that you assisted with

3   questions for the record?

4       A   Yes.

5       Q   Can you describe what questions for the

6   record, are?

7       A   Well, in the course off the nomination

8   hearing, many members then send follow-up

9   questions, particularly, Democratic members send

10  follow-up questions.  So those -- the typical

11  process for a nominee is in order to get

12  confirmed, you have to complete answering all the

13  information that the committee requests.

14      Q   And those questions for the record, I

15  take it those were all submitted after the

16  confirmation hearing?

17      A   If I remember right -- and thank you for

18  the reminder that it was on the 18th -- the

19  committee gave the members until, I think it was

20  midnight that night to submit questions for the

21  record, and then we -- the objective was to try to

22  get the questions answered in time that they could

Page 29

1    be confirmed shortly after the President's

2    confirmation.

3         Q   Got it.  Okay.

4         A   So --

5         Q   But you didn't get any questions for the

6    record before his hearing on the 18th, did you?

7         A   No.

8         Q   And your recollection is that all of the

9    questions for the record, would have come in on

10   the 18th after the hearing?

11        A   I think that's correct, yes.

12        Q   And you assisted in preparing responses

13   to those --

14        A   Correct.

15        Q   -- QFRs?

16        A   Yes.

17        Q   If I say QFRs, will you understand --

18        A   I --

19        Q   -- I mean questions for the record?

20        A   I will.  Yes.

21        Q   And how did you prepare responses to

22   those QFRs?

Page 30

1      A    Typically, the Secretary would take a

2    first pass at them, and then I would follow in.

3    And if it was a question he really didn't -- was

4    unfamiliar with, then I would try to provide

5    information, run that by him.  And if he concurred

6    in the response, we would send that.

7      Q    Did you work with any other members of

8    the transition team on the responses to the QFRs?

9      A    No.

10     Q    Did you work with any members of the

11   Commerce Department -- any employees of the

12   Commerce Department on the responses of the QFRs?

13     A    No.  Because he was not part -- we

14   were -- I mean, we were in that awkward period

15   where you're transitioned but you're not part --

16   we could ask -- we could send questions, but given

17   the timing, it was highly unlikely that we were

18   going to get a quick response.  There were people

19   standing by to try to assist, but we -- there

20   wasn't a very well-defined process for getting

21   that information back and forth.

22     Q    Okay.  Did you have any interaction with

Page 31

1    employees at the Commerce Department from the time

2    that you joined the transition team until

3    Inauguration Day?

4        A    No.  There was pretty large firewalls

5    between the two.

6        Q    Okay.

7        A    There were a couple members of the

8    transition who were allowed to go in.  They were

9    sort of -- I forget when they call them beach head

10   team --

11       Q    Uh-huh.

12       A    -- but none of them were the same people

13   doing the Sherpa process, so it was a little bit

14   awkward.

15       Q    And did any of those QFRs that the

16   Secretary received after his confirmation hearing

17   relate to the citizenship question?

18       A    No.

19       Q    In the period after his confirmation

20   hearing on January 18th, did you have any

21   discussions with the Secretary about any

22   Commerce Department matters, other than the

1    responses to the QFR?

2         A    Other than -- no.  I mean, other than

3    basic personnel as he was trying to figure out,

4    you know, who he was bringing on board.

5         Q    Okay.

6         A    That was all the discussion.

7         Q    Okay.  So in that period after his

8    confirmation hearing and before he was confirmed,

9    did you have any discussions about policy matters?

10        A    No.

11        Q    Okay.  Did you -- after the confirmation

12   hearing, was there a meeting with the Secretary

13   and the transition team?

14        A    I imagine there was, but I don't recall

15   one.

16        Q    Okay.  So you don't remember

17   leaving the -- leaving the Hill and going to a

18   meeting anywhere in Washington with

19   Commerce Department transition team members?

20        A    Not that I recall, no.

21        Q    And do you remember, was Wendy Teramoto

22   at that confirmation hearing?

1      A    Yes.

2      Q    Do you remember a meeting that you and

3  Wendy and the Secretary attended on the 18th after

4  the confirmation hearing?

5      A    Not with any particularity, no.

6      Q    Okay.  Mr. Comstock, tell me what your

7  current position is?

8      A    I'm the deputy chief of staff and

9  director of policy.

10     Q    Deputy chief of staff and director of

11  policy.

12          When did you become the director of

13  policy?

14     A    On January 31st --

15     Q    January 31st.

16     A    -- 2017.

17     Q    The -- was January 31, 2017 your first

18  day in the office at the Commerce Department?

19     A    Yes.  If I'm recalling correctly, that

20  that was Monday, yes.  It was the 30th or 31st.

21  It was whatever the Monday was at the end of

22  January.

Page 34

1     Q    Would it help if I told you that Monday

2    was the 30th?

3     A    I'll take your word for it.

4     Q    Okay.  So your recollection is, then,

5    that --

6     A    They start you at the beginning of a pay

7    period is the way it works --

8     Q    Okay.

9     A    -- in the federal.

10     Q    So your first day was January 30, 2017?

11     A    Correct.

12     Q    So between Inauguration Day on the 20th

13    and the 30th, you weren't physically present at

14    the Commerce Department?

15     A    I was not.

16     Q    Did you have any conversations with any

17    Commerce Department staff during that time period?

18     A    Well -- no.  Well, other than the

19    gentleman who was helping with processing my

20    paperwork.

21     Q    Personnel onboarding?

22     A    Right.

Page 35

1    Q   Other than the personnel onboarding, did

2  you have conversations --

3    A   No.

4    Q   -- with anyone at the Commerce Department

5  between January 20th and January 30th of 2017?

6    A   No.

7    Q   Did you have any conversations with

8  Secretary Ross between January 20th and

9  January 30th of 2017?

10   A   Nothing particularly that I recall, but

11  I'm sure I talked to him, yes.

12   Q   Okay.  You mentioned that your title is

13  deputy chief of staff and director of policy.

14       When did you became deputy chief of

15  staff?

16   A   In April of this year.

17   Q   So from January 30, 2017 until

18  April 2018, you were director of policy?

19   A   Correct.

20   Q   Is director of policy a position within

21  the Office of the Secretary?

22   A   Yes.

Page 36

1      Q    And is that the same as director of

2   policy and strategic planning?

3      A    Correct.

4      Q    Who do you report to?

5      A    The Secretary.

6      Q    Directly to the Secretary?

7      A    Well, and to the chief of staff and to

8   the deputy secretary.

9      Q    Okay.  Was there a chief of staff on

10  January 30, 2017?

11     A    There was not.

12     Q    Okay.  So until there was a chief of

13  staff, who would you say you reported to?

14     A    Well, until the Secretary came on board,

15  sort of no one.

16     Q    Okay.

17     A    No.  The -- the acting deputy secretary,

18  obviously, was the career official who was in

19  charge of making any final decisions for the

20  department, so --

21     Q    And can you identify her for the record?

22     A    Ellen Herbst.

Page 37

1       Q    When did the Secretary come on board as

2   Secretary?

3       A    Again, I think his confirmation, if I

4   remember right, was the 28th of February.  And,

5   again, you'd have to confirm that with records.

6       Q    Okay.  So between January 30th and

7   February 28th of 2017, you were director of the

8   Office of Policy and Strategic Planning?

9       A    Right.

10      Q    Notionally, you reported to the chief of

11  staff and the Secretary, but neither of those --

12      A    Weren't there.

13      Q    -- roles had been filled?

14      A    Correct.

15      Q    And so you reported to nobody?

16      A    Well, no.  Again, to the extent that any

17  decisions needed to be made, they were made by the

18  career officials who were there.  I would advise

19  those career officials as to what my best guess of

20  administration's policy on a particular matter

21  would be.

22      Q    In your position as director of the

Page 38

1   policy office, how are you assigned work?

2       A    Whatever the Secretary decides he wants

3   me to work on.

4       Q    Do you have a job description?

5       A    Yes.  I'm sure there is a job deception.

6       Q    Have you seen a job description for that

7   position?

8       A    Not that I recall.

9       Q    Do you have any regular or standing

10  meetings with the Secretary?

11      A    No standing meetings.  I meet with him on

12  a daily basis.

13      Q    Do you -- is it a scheduled daily

14  meeting?

15      A    No.

16      Q    So you don't see him at the same time

17  every morning or afternoon?

18      A    I do not.

19      Q    And the Secretary doesn't have a daily

20  senior staff meeting?

21      A    No.

22      Q    Are your daily meetings with him

Page 39

1    scheduled or are they ad hoc?

2         A    They're both.  I mean, if there's -- if

3    there's a meeting on his schedule for which I have

4    relevant expertise or they would like my advice

5    and counsel, I'm added to that meeting.  If

6    there's a meeting we need to have with him because

7    something has come up, then we just -- when he's

8    available, we go meet with him.

9         Q    You said if they would like your advice

10   or counsel, who is they?

11        A    They meaning the Secretary and chief of

12   staff.

13        Q    And can you identify the chief of staff

14   for the record?

15        A    The chief of staff currently is

16   Wendy Teramoto.

17        Q    And there was no chief of staff in

18   January of 2017?

19        A    Correct.

20        Q    When did she become chief of staff?

21        A    I think she officially became chief of

22   staff in August 2018.

Page 40

1      Q    2018?

2      A    Sorry.  2017.

3      Q    So you mentioned you work on whatever the

4  Secretary wants you to work on?

5      A    Correct.

6      Q    How does he identify matters that he

7  wants you to work on?

8      A    He says, Earl, can you get this done?  Or

9  we attend this meeting, and he says, can you

10  follow up on that?

11      Q    And how do you keep the Secretary

12  informed about what you are doing on important

13  matters or on assignments that he's given you?

14      A    By email, by oral briefing, and sometimes

15  by memos.

16      Q    How do you decide whether you're going to

17  update Secretary Ross by email, by briefing or by

18  memo?

19      A    Just depends on the time frame, the speed

20  of which I need to get something to him, how

21  extensive it is.  You know, if there's a lot of

22  information that it would be helpful for him to

Page 41

1    have and review in advance, then I typically would

2    try to do a memo.

3         Q    How big is the policy office?

4         A    We currently have six people.

5         Q    Six people.

6              And what are those individuals'

7    functions?

8         A    Well, the policy office existed prior to

9    my arrival, and it's staffed, essentially, by

10   career -- largely by career staff.  So their

11   primary function is to assist me and the Secretary

12   in identifying who can get something done within

13   the department.  They also review memorandums and

14   correspondence that comes in from the different

15   bureaus to try to identify if they're -- you know,

16   flag policy issues, flag things they think might

17   be concerning to the Secretary.  So they're really

18   an interface to help us figure how to manage the

19   leviathan.

20        Q    Manage the leviathan?

21        A    Yeah.

22        Q    And by leviathan, can you explain what

Page 42

1    you mean?

2        A    The Department of Commerce.  It's 47,000

3    people who all report to work every day, and they

4    all do a great job.  And when you're trying to

5    figure out what everybody's doing and make sure

6    that what they're doing is consistent with the

7    administration's policy, that's a large task.

8        Q    Can you tell me what the professional

9    background is of the six people on your staff in

10   the policy office?

11       A    Most of them are detailed from the

12   different departments, so they have some

13   experience or expertise in that particular

14   department.

15       Q    Do you have anybody in the policy office

16   detailed from the Census Bureau?

17       A    We have somebody from the economics and

18   statistics administration which oversees the

19   Census Bureau.

20       Q    You don't have anybody detailed to the

21   policy from the Census Bureau; is that correct?

22       A    Not that I'm aware of.

Page 43

1     Q   And is the individual from ESA an

2   economist?

3     A   Good question.  I don't know.

4     Q   Okay.  Have you seen the resumes of the

5   people who work in your office and report to you?

6     A   No.

7     Q   Were all of them there when you became

8   the director of the policy office?

9     A   Well, not all the current ones, but, yes,

10  everybody was there that was working for me when I

11  started, yeah.

12    Q   I'm not sure I understand that answer.

13    A   In other words, they switch.  So, for

14  example, the person from NIST has left.  I have an

15  Army -- a detailee from the Army logistics command

16  who comes in every year.  I'm now on my third

17  person for that job.

18    Q   So would it be fair to say that you have

19  six people in the policy office, and those people

20  are details from different bureaus or agencies

21  within the Department of Commerce, and they're on

22  a fixed term and when one person leaves, another

Page 44

1    person from that bureau comes in?

2        A    Essentially, yes.  I mean, the fixed term

3    is somewhat flexible.  But, for example, the

4    person doing the National Oceanic and Atmospheric

5    Administration has now moved on to be one of the

6    budget directors for them.

7             So it's a position that's seen by the

8    bureaus as something that could be good for

9    leadership development.  So they'll send somebody

10   up and they'll work there for a year.  The person

11   who did the National Institutes of Standards

12   Technology, NTIA, et cetera, has now moved back to

13   NIST to take a more senior position there.

14       Q    And do you have any regular -- strike

15   that.

16            Does the policy office have any regular

17   functions, other than whatever the Secretary wants

18   us to work on?

19       A    Well, yeah.  Each one of the policy

20   office people is responsible for managing their

21   area, alerting me and the Secretary to issues that

22   are coming up in those particular bureaus.  So

Page 45

1   it's a monitoring function in some ways.  And so

2   they're not necessarily developing policy for

3   those bureaus as much as they are keeping track of

4   what the bureaus are doing.

5       Q   Okay.  Is it unusual for the policy

6   office to develop policy for a bureau?

7       A   Not if we're developing for the

8   Secretary, no.

9       Q   You just said, I believe, your testimony

10  was --

11      A   What I'm saying is the staff that works

12  that --

13      Q   I'm sorry.  Hang on.  Just let me finish

14  my question.

15          Your testimony was, so they're not

16  necessarily developing policy for those bureaus,

17  as much as they are keeping track of what the

18  bureaus are doing?

19      A   Correct.

20      Q   So is it usual for the policy office to

21  develop policy as opposed to keeping track of

22  policy?

Page 46

```
 1      A    No.

 2      Q    Please explain.

 3      A    Well, again, it depends on who you're

 4  talking about at the policy office.  If you're

 5  talking about my staff at the policy office, they

 6  do not, as a general rule, develop the policy.

 7  The policy is generally developed by the Secretary

 8  with input from me and with input from them when

 9  needed.

10      Q    And not with input from the bureaus?

11      A    Well, absolutely.  We go back and forth

12  with the bureaus all the time.

13      Q    You mentioned that the individuals in the

14  policy office monitor specific areas; is that

15  right?

16      A    Correct.

17      Q    Do you have somebody assigned to monitor

18  the Census Bureau?

19      A    Yes.

20      Q    Who is that?

21      A    David Langdon.

22      Q    And what is David Langdon's background?
```

1       A    He is in the Economic & Statistics

2    Administration and knows -- knows the people down

3    there, knows how to get stuff done, so --

4       Q    Okay.  And did you hire Mr. Langdon?

5       A    I did not.

6       Q    Was he in the policy office when you got

7    there?

8       A    He was.

9       Q    How often do you interact with the

10   Census Bureau?

11      A    Directly?  Depends on the issue.  Like

12   when we were doing the lifecycle cost estimate,

13   quite a bit.  When we were doing the census -- the

14   citizenship question, interacted with the staff

15   there -- the senior staff on a fairly frequent

16   basis.

17      Q    Do you have any standing meetings with

18   the Census Bureau?

19      A    No.  Well, other than when they come and

20   brief the Secretary sort of on a monthly basis,

21   I'll attend those meetings.

22      Q    Okay.  I'll come back to the monthly

1  briefings in a minute.

2      In your job as director of policy, do you

3  a -- have any role with regard to interacting with

4  the White House?

5      A   Sure.  I'm the primary person that gets

6  contacted when they've got a document they're

7  trying to circulate and clear.

8      Q   When the White House has a document

9  they're trying to circulate and clear?

10     A   Correct.

11     Q   Okay.  And so who would contact you in

12  the course of circulating and clearing a document?

13     A   Staff Secretary.

14     Q   And what kind of documents would be

15  circulated and cleared through the Commerce

16  Department from White House?

17     A   Op eds, presidential memorandums,

18  executive orders.

19     Q   And how often does the White House ask

20  you to clear a document?

21     A   Sometimes I get to clear multiple

22  documents in a day.

Page 49

1      Q    So daily?

2      A    Yes.

3      Q    Okay.  And when you get a document from

4    the White House to clear, what do you do?

5      A    I usually send it off to the affected

6    bureaus and ask for their input.

7      Q    And how much turnaround time do you

8    typically have if you get a document from the

9    White House to clear?

10     A    It ranges from less than two hours to a

11   week and a half.

12     Q    And --

13     A    Typically, in that ballpark.

14     Q    And when you get a document from the

15   White House to clear, how is it transmitted to

16   you?

17     A    By email.

18     Q    From the Office of the Staff Secretary?

19     A    Yeah.

20     Q    Is it ever transmitted to you directly

21   from a policy office within the White House?

22     A    I'm not sure what you mean.

Page 50

1      Q   Would you get a document from the

2   Domestic Policy Council directly or from the

3   National Economic Council directly, or would you

4   always get a document from --

5      A   If we were working on something and

6   there's something relevant that they would need to

7   send it, sure.

8      Q   So you get documents to clear from the

9   White House and they can come from either the

10  Staff Secretary or from another office within the

11  White House?

12     A   Sure.  I mean, to give you an example,

13  working on the steel proclamation, having to do

14  with Section 232 tariffs, there's all kinds of

15  interaction back and forth with the White House,

16  White House -- Office of White House Counsel, NEC,

17  CEA.  I mean, it just depends on who's working on

18  an issue.

19     Q   And for the record, can you say what CEA?

20     A   Counsel of Economic Advisors.

21     Q   And, for the record, can you say what

22  NEC?

Page 51

1       A    National Economic Council.

2       Q    Great.

3            Did you have any interaction with the

4    White House on the census citizenship question?

5       A    No.

6       Q    Did you have any interaction with the

7    White House on the Census Bureau, at all?

8       A    Not that I recall.

9       Q    What is your typical -- do you have any

10   typical role with regard to interacting with other

11   cabinet agencies?

12      A    Again, if there's an issue that the

13   Secretary is working on and we're trying to

14   communicate with the other departments, I'll often

15   be asked to track down somebody in the other

16   department to whom we can have a conversation.

17      Q    So, yes, you do typically have a role

18   interacting with other cabinet agencies?

19      A    Yes.

20      Q    On -- is that role on policy matters --

21      A    Yes.

22      Q    -- exclusively?

1      A    I'm not sure what you mean by

2    exclusively.

3      Q    Budget, legal --

4      A    Yeah.

5      Q    -- any other --

6      A    I mean, we talk all the time with OMB,

7    for example, on our budget.  I'm involved in that.

8    Involved in strategic planning for the department.

9    You know, we were working on a revision to a sugar

10   agreement which involved a lot of interaction with

11   the Department of Agriculture, so dealt heavily

12   with Secretary Perdue and his senior staff on that

13   matter.  Just depends on the issue.

14     Q    And do you have -- in your role as

15   director of the policy office, do you have typical

16   interaction with Congressional staff?

17     A    On occasion, yes.

18     Q    How much would you say you interact with

19   Congressional staff?

20     A    Well, depending on the issue, sometimes

21   quite frequently.  Sometimes -- usually, it's

22   often when either their office -- like, for

1    example, on steel tariffs, we've had quite a bit

2    of interaction with Chairman Brady and his staff,

3    senior staff on the Ways and Means Committee would

4    call frequently.  On a red snapper issue, the

5    staff of Mr. Scalise called.  So it just depends

6    on the issue.

7        Q    Did you have any interaction with

8    Congressional staff on the citizenship question?

9        A    I did not.

10       Q    Are you aware of anyone in the

11   Commerce Department who did have interaction with

12   Congressional staff on the citizenship question?

13       A    Not that I recall.

14       Q    Do you interact, at all, with members of

15   Congress in your role as the director of policy?

16       A    I do on occasion, yes.

17       Q    Did you interact with any members of

18   Congress on the citizenship question?

19       A    I did not.

20       Q    Is it typical in your function as

21   director of the policy office to interact with

22   outside stakeholders and nongovernmental

Page 54

1  stakeholders?

2     A   I take meetings when the Secretary can't,

3  yes.

4     Q   Do you ever take meetings independent of

5  filling in for the Secretary?

6     A   Yeah, on major policy issues I'm working

7  on.

8     Q   Did you meet with outside stakeholders on

9  the citizenship question?

10    A   No.

11    Q   You didn't attend any meetings, including

12 with the Secretary, on the citizenship question --

13    A   I --

14    Q   -- with outside stakeholders?

15    A   With the outside stakeholders groups, no.

16    Q   When did you first hear about the notion

17 of adding a question about citizenship to the

18 decennial census?

19    A   Sometime in -- shortly after the

20 confirmation.

21    Q   And who did you hear it from?

22    A   The Secretary.

Page 55

1      Q   And the Secretary was confirmed on

2   February 28, 2017; is that right?

3      A   I -- like I said, you'd have to confirm

4   that date, but I think that was the date, yes.

5      Q   And what did the Secretary tell you about

6   the idea of adding a question on citizenship to

7   the census during that first conversation shortly

8   after his confirmation?

9      A   Again, the exact time frame of the

10  conversation, I can't tell you.  It was sometime

11  in that spring period.  I don't recall the

12  details.  I think he simply inquired as to why

13  don't we have a citizenship question on the

14  census.

15     Q   Okay.  And what did you say to him when

16  he inquired?

17     A   Short answer, I don't know.  I'll check.

18     Q   Okay.  And would that interaction be

19  reflected in any documents?

20     A   I don't -- I don't believe so, but it's

21  possible it's in an email exchange.

22          MR. COLANGELO:  Can we mark as Exhibit 1,

Page 56

1    Comstock Exhibit 1?

2           (Plaintiffs' Exhibit 1, Email, was

3    marked.)

4           MR. COLANGELO:  I'm handing counsel

5    Document Bates-stamped 1410.

6    BY MR. COLANGELO:

7       Q   And I'll hand the document to the

8    witness.

9       A   Thank you.

10      Q   Mr. Comstock, let me take that back and

11   I'll give you the marked copy.

12          Mr. Comstock, have you seen this email

13   before?

14      A   Let's see it.  It doesn't appear I was

15   copied on it, so, no.

16      Q   And you weren't shown this email in

17   preparation for your deposition?

18      A   No.

19      Q   Okay.  And this is an email from

20   David Langdon to Ellen Herbst dated

21   February 22, 2017; is that right?

22      A   Correct.

Page 57

1      Q    And you testified that David Langdon

2  works for you in the policy office; is that right?

3      A    Correct.

4      Q    And Ellen Herbst at the time was the

5  acting deputy secretary; is that right?

6      A    Right.

7      Q    Do you see in this email where

8  Mr. Langdon asks Ms. Herbst who is organizing the

9  Census Bureau briefing for Earl and team?

10     A    Yeah.

11     Q    Okay.  And take a look at the subject

12 line, "Census Bureau briefing for OS politicals."

13          Does OS stand for Office of the

14 Secretary?

15     A    Yes.

16     Q    Now, in the second paragraph of this

17 email, you see the line where Mr. Langdon says,

18 "Jim S. reminded me about the upcoming

19 Congressional notification of decennial census and

20 ACS topics and the need to gauge Earl's interest

21 it."  I believe he meant Earl's interest in it.

22          Do you see that line?

1      A    I see it, yes.

2      Q    And I take it that you would assume that

3  Earl refers to you?

4      A    I'm not aware of another Earl that works

5  at the department at the moment, so --

6      Q    Okay.  Certainly, not another Earl that

7  works at the Office of Secretary who's a political

8  appointee?

9      A    Correct.

10     Q    And then Mr. Langdon then says, "Earl is

11 very" -- underlined very -- "interested and thinks

12 the Secretary will be, as well."

13          Do you see that?

14     A    Yes.

15     Q    On February 2nd of 2017 would have been

16 your fourth day on the job; is that right?

17     A    Yep.

18     Q    Okay.  And do you recall telling

19 Mr. Langdon that you were very interested in

20 Congressional notification of decennial ACS

21 topics?

22     A    I recall telling him that we were very

Page 59

1   interested in the census and getting a briefing on

2   it.

3       Q    Okay.

4       A    I don't specifically recall that, but --

5       Q    Were you very interested in the decennial

6   topics on February 2, 2017?

7       A    What probably would have caught my

8   attention is if we had to notify Congress about

9   something, I would want to make sure we were up to

10  speed on what we needed to notify them about.

11      Q    As of this date, February 2, 2017, do you

12  recall if you had already had discussions

13  regarding adding a citizenship question to the

14  census?

15      A    I don't recall having a discussion before

16  that.

17      Q    Mr. Langdon's email says, quote, it would

18  make sense for John Thompson to touch on this

19  topic in his overview briefing and then to have a

20  follow-up briefing very soon.

21          Was Mr. Thompson the Census Bureau

22  director at the time?

Page 60

1      A    Yes.

2      Q    And did that overview briefing take place

3   that's referred to in this email?

4      A    I imagine it did.

5      Q    Do you remember when that happened?

6      A    I couldn't tell you.

7      Q    Do you keep a calendar?

8      A    Yeah.  There's an electronic calendar

9   somewhere.

10     Q    And your calendar records the meetings

11  that you attend?

12     A    Generally, yes.

13     Q    Would it typically record a meeting with

14  the Census director?

15     A    It would depend if somebody sent me a

16  calendar invite.

17     Q    Would somebody typically send you a

18  calendar invite for a meeting with the Census

19  director?

20     A    At that point in time, possibly.  Yeah, I

21  don't know.

22     Q    The email refers, also, to a follow-up

Page 61

1   briefing very soon.  Do you remember that

2   follow-up briefing?

3        A   I don't have any specific recollection of

4   that, no.

5        Q   If there was a follow-up briefing on the

6   question of Congressional notification of

7   decennial topics, would that be reflected in your

8   calendar?

9        A   Again, possibly.  But unless I entered it

10  myself, which I may or may not have done, I don't

11  know.

12       Q   Do you have an assistant who adds

13  meetings to your calendar?

14       A   I do now, but I didn't then.

15       Q   When did your assistant start?

16       A   I think I finally got an assistant in

17  May, maybe.

18       Q   Okay.  And before May, is it your

19  testimony that meetings didn't appear on your

20  calendar unless you put them there or somebody

21  sent a calendar invite to you?

22       A   Correct.

Page 62

1      Q    We'll mark this exhibit Comstock

2    Exhibit 2.

3           (Plaintiffs' Exhibit 2, Email, was

4    marked.)

5    BY MR. COLANGELO:

6      Q    We are marking as Comstock 2 Document

7    Bates numbered 2521.

8           Mr. Comstock, take a look at this email.

9    You've seen this email before, right?

10     A    I sent it.

11     Q    So that's a yes?

12     A    Yes.

13     Q    Were you shown this email in preparation

14   for your deposition today?

15          MR. GARDNER:  I'm going to object and

16   instruct the witness not to answer on the grounds

17   of attorney work product.

18          I'm happy to let you answer when was the

19   last time you saw the document.

20          But you're asking about documents counsel

21   may have shown that would be protected.

22   BY MR. COLANGELO:

Page 63

1    Q   When's the last time you saw this

2  document, Mr. Comstock?

3    A   Yesterday.

4    Q   And do you see the subject line of this

5  email is your question on the census?

6    A   Yep.

7    Q   Okay.  And Secretary Ross was confirmed

8  on February 28th, I think we agreed; is that

9  right?

10    A   Like I said, if that's the date, yes.

11    Q   Okay.  So this would have been

12  Secretary Ross's eleventh day on the job as

13  Commerce Secretary, give or take?

14    A   Approximately, yes.

15    Q   And the subject line of this email is

16  your question on the census?

17    A   Right.

18    Q   What was the Secretary's question on the

19  census?

20    A   He appeared to have asked whether

21  undocumented people were counted in the census.

22    Q   Okay.  And how did he ask you that

Page 64

1    question?

2        A    I don't recall.  Probably at a meeting,

3    possibly following up on a census briefing.  I

4    don't know.

5        Q    Have you checked your calendar for

6    March 10, 2017 recently?

7        A    I was going to say I probably haven't

8    checked it from March 10, 2017 for that particular

9    date.

10        Q    Okay.

11        A    By the way, I wanted to add one point.

12   On the prior document, you need to understand that

13   at that time, there were a number of questions

14   that the prior administration had requested be

15   placed, potentially, on the census that would have

16   been involved in that notification.  So that would

17   have been a reason of why I would have been

18   interested in that, on sexual orientation and

19   gender identity.  So that was an issue that was

20   very at the forefront at the time of what to do

21   about those requests.

22        Q    So let's go back to Exhibit 2, your email

Page 65

1    to Secretary Ross on Friday, March 10th.  Do you

2    know why the Secretary asked you whether

3    undocumented people were counted?

4         A    I have no idea.

5         Q    Okay.  Did he ask you whether noncitizen

6    people were counted for apportionment purposes?

7         A    Well, based on the answer, it appears he

8    might have.

9         Q    Appears he might have or appears he did?

10        A    I couldn't tell you the answer on that.

11        Q    Okay.

12        A    I don't recall the question, so --

13        Q    Okay.  But you sent this email to the

14   Secretary in response to a question?

15        A    Yes.

16        Q    And you would have presumably tried to

17   make your answer responsive to his question?

18        A    I generally do that, yes.

19        Q    So you think it's likely that his

20   question was about whether undocumented immigrants

21   were counted for apportionment purposes?

22        A    That's entirely possible, but he might

Page 66

1    have also just asked do we count undocumented

2    persons, and this is what I found on the Census

3    website.

4        Q    How do you think you found it on the

5    Census website?

6        A    By typing in census and going to their

7    website and seeing what their FAQs say.

8        Q    So you think you would have gone directly

9    to the frequently asked questions page?

10       A    That would not be unusual for me to do,

11   yes.

12       Q    This link you've identified at

13   www.census.gov, that's the Census Bureau's

14   frequently asked web page for Congressional

15   apportionment; is that right?

16       A    Again, without pulling it up, I couldn't

17   tell you specifically what it says.

18       Q    Okay.  If I represent to you that if you

19   pulled up that website, it would say frequently

20   asked questions for Congressional apportionment,

21   would that assist you?

22       A    I'd be happy to take your word for it.

Page 67

1    Q    So does that assist you in recalling that

2    the Secretary asked whether noncitizens were

3    counted for apportionment purposes?

4    A    And I have no recollection of the

5    question, so I can only go by the answer.

6    Q    Okay.  The email also includes a blog

7    post from the Wall Street Journal; is that right?

8    A    Uh-huh.

9    Q    Okay.  And your email to the Secretary

10   says that this blog post, quote, confirms that

11   neither the 2000s, nor the 2010 census asked about

12   citizenship?

13   A    Correct.

14   Q    So does that lead you to conclude that

15   the Secretary asked about whether the decennial

16   census asks about citizenship?

17   A    That would be a reasonable supposition,

18   based on the response.

19   Q    And this blog post is called the pitfalls

20   of counting illegal immigrants; is that right?

21   A    Yep.

22   Q    And were you concerned on March 10, 2017

Page 68

1    about counting illegal immigrants?

2        A    I -- no, not personally.

3        Q    Was the Secretary concerned on

4    March 10, 2017 about counting illegal immigrants?

5        A    Again, I have no recollection of the

6    question, so I couldn't speculate as to what his

7    concern was.

8        Q    But you testified that a significant part

9    of your job function involves answering questions

10   from the Secretary on issues that matter to him,

11   right?

12       A    Correct.

13       Q    And if he asked you a question, you would

14   try to be responsive?

15       A    Generally, yes.

16       Q    You wouldn't ordinarily send him

17   information that wasn't responsive to a question

18   he asked, would you?

19       A    Not -- not characterized this way, no.

20       Q    So you testified a minute ago that the

21   Secretary -- that you first heard about the notion

22   of adding a question about citizenship to the

```
 1  census when the Secretary raised it with you
 2  shortly after his confirmation.  Does this email
 3  indicate to you that it was by March 10th that the
 4  Secretary first raised it with you?
 5      A   I wouldn't necessarily draw that
 6  conclusion from this email.
 7      Q   Would you draw the conclusion that it was
 8  later than March 10?
 9      A   No, I wouldn't.  Again, this -- this
10  question does not directly address -- it's a
11  question about how -- who do we count, not whether
12  or not -- and whether there's a citizenship
13  question.  So I don't know at this point whether
14  he indicated he was interested in such a question,
15  other than getting the factual information.
16      Q   Okay.  Who would know when the Secretary
17  was interested in adding a citizenship question?
18          MR. GARDNER:  Objection.  Calls for
19  speculation.
20  BY MR. COLANGELO:
21      Q   You can answer.
22      A   My counsel just objected, so why can --
```

Page 70

1    would I answer?

2        Q    So let me -- an additional ground rule

3    that I -- let's cover one additional ground rule.

4    I will ask questions and your job is to answer

5    them fully and truthfully.

6        A    Okay.

7        Q    Your counsel may state objections if he

8    finds my questions objectionable for a range of

9    reasons.  If he states an objection, you can,

10   nonetheless, answer the question unless he

11   instructs you not to answer.

12           Do you understand?

13       A    Well, you used the word "can," which

14   means that I have the discretion.

15           Am I instructed to answer the question

16   notwithstanding his objection or is it -- should I

17   follow my counsel's objection?

18           MR. GARDNER:  You should do your best to

19   answer the question posed to the extent you

20   understand.

21           THE WITNESS:  Thank you for the

22   clarification.

Page 71

1           Again, you'd have to ask the Secretary.

2    BY MR. COLANGELO:

3       Q    The -- the -- let's go back to Exhibit 2,

4    subject line, your question on the census, and

5    tell me how the Secretary's question was

6    communicated to you?

7       A    It appears orally.

8       Q    Okay.  Why do you say it appears orally?

9       A    Well, we did a very extensive email

10   search, including the Secretary's email, and so if

11   you don't have an email from him to me asking

12   about this, and normally I would reply back if he

13   had sent me an email asking me about this.  So,

14   therefore, I would conclude that it was oral.

15      Q    Okay.  And you don't recall -- strike

16   that.

17           Was that oral question in a meeting, on

18   the telephone?  How do you remember receiving that

19   question?

20      A    I have no recollection.

21      Q    Okay.  Your email says -- let me direct

22   you to the first line of your message to the

```
                                        Page 72
 1   Secretary.  Quote, I was not able to catch anyone
 2   at their desk when I called the numbers I have for
 3   the Census Bureau from their briefing.
 4         Do you see that?
 5   A   Yep.
 6   Q   Which briefing are you referring to?
 7   A   Apparently a briefing that we had with
 8   Census.
 9   Q   A briefing that you and the Secretary
10   both had with the Census?
11   A   Right.
12   Q   Were you given any materials at that
13   meeting?
14   A   Quite possibly.
15   Q   And was that briefing on March 10th?
16   A   I have no idea.
17   Q   Okay.  If you -- if you -- would that
18   briefing be reflected on your calendar?
19   A   Again, it's possible.  I -- I don't know.
20   Q   Okay.  Would it be reflected on the
21   Secretary's calendar?
22   A   Most likely, yes.
```

1      Q    He does keep a calendar, correct?

2      A    Well, he has somebody that keeps a

3  calendar for him, yes.

4      Q    And he had an assistant as of the day he

5  started as Commerce Secretary, I assume?

6      A    Correct.

7      Q    Mr. Comstock, you sent your email to the

8  Secretary on a Friday night after 8:30 p.m.; is

9  that right?

10     A    That appears to be the date stamp on

11  here, yes.

12     Q    Okay.  And you sent it after you couldn't

13  reach Census Bureau staff at their desks; is that

14  right?

15     A    Shocking at 8:30 that I could not reach

16  them at their desk, yes.

17     Q    So you got a question from the Secretary

18  at the end of the work day; is that right?

19     A    Quite possibly.

20     Q    Was his question urgent?

21     A    Again, I don't know.  I don't recall when

22  he asked me, and so this could have been something

Page 74

1    I was catching up on at the end of the day.  It

2    could have been something that he had just called

3    me on the phone about.

4         Q    Okay.  Who is Eric Branstad?

5         A    Eric was the senior White House advisor

6    at the time.

7         Q    Tell me what senior White House advisor

8    is.

9         A    It's a position that basically helps

10   with -- largely, with personnel coming over and

11   also, ideally, was keeping us informed on what was

12   going on at the White House side of things.

13        Q    Is that the political appointee position?

14        A    Yes, it is.

15        Q    You said Mr. Branstad was the --

16        A    Right.

17        Q    -- senior White House advisor at the

18   time?

19        A    Correct.

20        Q    Is he no longer in that role?

21        A    That's correct.

22        Q    Does he work at the Commerce Department

Page 75

1   anymore?

2       A    No.  He does not.

3       Q    Do you know when he left the

4   Commerce Department?

5       A    I think it was last spring.  I think he

6   worked there about a year.

7       Q    Why did you copy Mr. Branstad on this

8   email to the Secretary at 8:30 at night on a

9   Friday about the census and citizenship?

10      A    Because Eric was the, quote, senior

11  political in the department at the time.

12      Q    He was the senior political in the

13  department at the time, okay.

14           Had Wendy Teramoto started in the office

15  at that point?

16      A    She had not.

17      Q    Was Mr. Branstad in the Census Bureau

18  briefing with you?

19      A    I have no idea.

20      Q    Did he -- tell me a little bit more about

21  what you mean by he was the senior political in

22  the Commerce Department at the time?

Page 76

1     A   He was somebody who had worked on the

2   campaign and the transition and had been brought

3   over as part of that.  And so he was one of

4   the -- there's a small group of folks that had

5   been -- you know, the new politicals that had come

6   in, and he was one of them and was -- not only the

7   senior person in the group.

8     Q   And did you generally keep him updated on

9   anything that you would have been working with the

10  Secretary on?

11    A   Most likely, yes.

12    Q   Do you recall whether he was present when

13  the Secretary asked you the question that you were

14  responding to?

15    A   I have no idea.

16    Q   Okay.  Did he assist with the Secretary's

17  confirmation?

18    A   No.

19    Q   Okay.  Was anyone else on the transition

20  team -- strike that.

21        Did anyone else on the transition team

22  assist you in your function as confirmation

Page 77

1   Sherpa?

2       A    Yes, Israel Hernandez.

3       Q    Anyone else?

4       A    Nope.

5            Well, I mean, we had a press person, as

6   well.

7       Q    Who is the press person?

8       A    You're going to tax my memory here.

9   Really nice fellow, but he didn't come over

10  so -- unfortunately, I can't recall his name, but

11  we'd be happy to provide it.

12      Q    Okay.

13      A    If you -- there's a -- there's a -- I

14  think it's a Washington Post picture that has the

15  group, and he's sitting there, but we'll get you

16  the name.

17      Q    Thanks.

18           Was Mr. Branstad working on Census Bureau

19  issues in March of 2017?

20      A    Not that I recall, no.

21      Q    Did you discuss the census citizenship

22  question with him outside of this email in

Page 78

1    March of 2017?

2         A    Again, not that I recall.

3         Q    Let me direct you to the highlighted line

4    about three-quarters of the way down on the page

5    that is stamped 2521 -- and we apologize for the

6    copy quality.

7         A    I was going to say --

8         Q    This is how the document --

9         A    Think you highlighted it so nobody could

10   read it.

11        Q    -- was produced to us.

12        A    So this is not a redaction is what you're

13   telling me?

14        Q    Correct.  This is not a redaction.

15        A    If you can tell me what it says, I'd be

16   happy to --

17        Q    Sure.  The highlighted line says, "No

18   major government survey, including the decennial

19   census now underway, asks Americans about their

20   citizenship status."

21             And you see that this blog post is dated

22   May of 2010, correct?

Page 79

1        A     Uh-huh.

2        Q     So the decennial census now underway, do

3    you understand we refer to --

4        A     Would have been the 2010, yeah.

5        Q     Remember to please wait for me to finish

6    my question before you answer.

7        A     Sure.

8        Q     Did you highlight this line?

9        A     Well, unless you did, then I'm assuming I

10    did.

11        Q     I can represent to you we did not

12    highlight this line.

13        A     Okay.  Then I will assume that it was

14    highlighted in the email.

15        Q     And why did you highlight this line of

16    the blog post before sending it to the Secretary?

17        A     Well, it appears that the question was

18    whether or not the citizenship question had been

19    asked, at least on the 2010 census, and so I'm

20    highlighting for him where in this article, so he

21    doesn't have to read the whole thing that I found

22    the information responsive to his question, which

Page 80

1   is a statement by somebody in Wall Street Journal,

2   which is, you know, in some circles considered a

3   reasonably accurate paper.  Stating that it was

4   not collected in the 2010 census.

5        Q   Okay.  And take a look -- let's do that

6   again.  We had some interference from the

7   conference line.

8            Take a look at the second page of

9   Comstock Exhibit 2.  This is the page marked 2522.

10       A   Yep.

11       Q   And, again, about two-thirds of the way

12  down the page, there's another highlighted line.

13           Do you see that?

14       A   I -- yep.

15       Q   I'll represent to you this line was

16  highlighted as the documents were produced to the

17  plaintiffs in this lawsuits.  We did not

18  highlight.

19       A   Okay.

20       Q   That line reads --

21       A   I can't read what it says.

22       Q   -- "Many more foreign-born residents were

Page 81

1   counted in 2000 than was expected based on annual

2   estimates produced by the Bureau."

3          Do you see that line?

4      A   Yep.  I'm -- I see the highlighted line,

5   but I'm taking it at your word that that's what it

6   says.

7      Q   Okay.  The -- do you know why you

8   highlighted that line when you sent this blog post

9   to the Secretary?

10     A   Again, it would appear to indicate that

11  the census may have underestimated the number of

12  undocumented folks.

13     Q   Okay.  So you told me that the Secretary

14  first raised the idea of adding a citizenship

15  question to the census shortly after he was

16  confirmed.  You've testified that on March 10th,

17  you emailed him information showing that

18  undocumented residents are included in the

19  apportionment counts.  You've testified on

20  March 10th, you emailed him a blog post from the

21  Wall Street Journal highlighting a line that no

22  major government survey asks American's about

Page 82

1    their citizenship status.

2         Does that help you remember when the

3    Secretary first expressed interest in adding a

4    citizenship question to the decennial census?

5         A    No.

6         Q    And does that help you remember that it

7    was no later than March 10th that the Secretary

8    first asked you that question?

9         A    Again, you're speculating as to when he

10   asked.  But he appeared to have inquired about

11   some relevant aspects of it --

12        Q    Okay.

13        A    -- on March 10th.

14        Q    We'll mark this Comstock Exhibit 3.  And,

15   Mr. Comstock, is being handed Document Bates stamp

16   3685.

17        (Plaintiffs' Exhibit 3, Email, was

18   marked.)

19   BY MR. COLANGELO:

20        Q    Mr. Comstock, do you have Exhibit 3 in

21   front of you?

22        A    I do.

Page 83

1      Q    And this is an email from David Langdon

2   to you on March 10, 2017; is that right?

3      A    That's correct.

4      Q    Looks like this email was sent at

5   7:50 p.m. on March 10th; is that right?

6      A    That appears to be correct, yes.

7      Q    And this was the same night you emailed

8   the Secretary in response to, quote, your question

9   on the census, unquote; is that right?

10     A    Yeah.  Yes.

11     Q    Have you seen this email before?

12     A    I would assume, since it was sent to me.

13     Q    When's the last time you saw this email?

14     A    Probably at 7:51 p.m. on March 10th.

15     Q    Okay.  Why did Mr. Langdon send you this

16  email on the evening of March 10?

17          MR. GARDNER:  Objection.  Calls for

18  speculation.

19  BY MR. COLANGELO:

20     Q    You can answer the question.

21     A    Well, again, as I mentioned earlier,

22  there was -- we'd been told there was a

1   notification process that needs to go to Congress.

2   And when you're not familiar with the details of

3   this, one of the first things you do in my kind of

4   position is try to get your arms around, okay,

5   what are the things that have to happen?

6   Particularly, what are the things that might

7   prevent you from being able to make a policy

8   change?  And so when you're told we have to notify

9   Congress about something at a certain time, that

10   then becomes a deadline we have to decide if we

11   need to take any action prior to.  And in this

12   case, there were a lot of other things potentially

13   being added to the census that it was not clear

14   that the administration was aligned with the prior

15   administration on, including a question having to

16   do with breaking out Middle Eastern North Africa

17   [sic] people the so-called MENA question.  There

18   was the sexual orientation/gender identity

19   questions.  So there was an ongoing process to try

20   to decide what, if anything, to do about these

21   sort of pending things that were basically held

22   over from the prior administration.

Page 85

1      Q    Okay.  So --

2      A    So I expect that's probably what Dave was

3    emailing me about.

4      Q    And was David in the conversation that

5    you had with Secretary -- with Secretary Ross

6    earlier that day about the census?

7      A    I have no idea, because I don't recall

8    the conversation.

9      Q    And you don't recall telling him about

10    that conversation?

11      A    I don't, no.

12      Q    Do you recall asking him to set up a

13    briefing on that day?

14      A    I -- it's entirely possible I did.  I

15    have no idea.

16      Q    Okay.  Do you think it's likely that it

17    was a coincidence that on the same day you were

18    emailing the Secretary about his question on

19    whether noncitizens were included for

20    apportionment purposes, that your employee was

21    scheduling a briefing for you on the 2020 census

22    topics?

Page 86

1      A    I think there's not, necessarily, linkage

2    between the two.  As I mentioned before, there

3    were other things happening with respect to the

4    census.  We were also trying to get our arms

5    around the budget of the census, all of which

6    would be entirely plausible reasons why we would

7    schedule a briefing.

8      Q    And you mentioned one of the reasons you

9    wanted, in general, to be briefed on Congressional

10   notifications of the 2020 census topics was so

11   that you had time to make policy decisions that

12   the administration might support; is that right?

13     A    No.  To make sure we were -- had time to

14   make any changes that needed to be made, based on

15   prior administration recommendations that we knew

16   were still pending.

17     Q    Okay.  And those prior recommendations

18   were the sexual orientation and gender identity

19   question and Middle Eastern North African issue;

20   is that right?

21     A    Those were two that I recall, yes.

22     Q    Do you recall also being concerned at

1  this time about having enough time to add

2  citizenship as a topic on the Congressional

3  notification?

4      A   I don't recall that being a concern at

5  the time.

6      Q   Let's have this marked as Comstock

7  Exhibit 4.

8          (Plaintiffs' Exhibit 4, Email, was

9  marked.)

10 BY MR. COLANGELO:

11     Q   Handed the witness a document stamped

12 3686.  And we've marked this as --

13         MR. COLANGELO:  Is that Exhibit 4?

14 BY MR. COLANGELO:

15     Q   Do you have Exhibit 4 in front of you,

16 Mr. Comstock?

17     A   I do.

18     Q   And this is an email from David Langdon

19 to you, Ellen Herbst and Dennis Alvord, is that

20 how you pronounce his name?

21     A   Yeah, Dennis Alvord.

22     Q   Dennis Alvord.

Page 88

1          Dated March 15th; is that right?

2     A    Yes.

3     Q    Of 2017?

4     A    Yeah.  We did a lot late at night.

5     Q    So it seems.

6          Have you seen this email before?

7     A    Again, apparently, if it was to me, yes,

8  I probably saw it sometime around the 15th of

9  March, 2017.

10     Q    Do you recall seeing this email since the

11  15th of March, 2017?

12     A    Absolutely not.

13     Q    And this is an email from Mr. Langdon to

14  you and Ms. Herbst that says, quote, I'd like to

15  schedule a Census Bureau briefing on the 2020

16  census and ACS topics before the Census Bureau

17  does its Hill notifications on March 31st.

18          Do you see that?

19     A    Yeah.

20     Q    And then he goes on to say the goal is

21  for all to be on the same page for the

22  notification process for the topics this year and

Page 89

1    questions next year.

2          Do you see that?

3      A   Yeah.

4      Q   So Mr. Langdon is trying to schedule a

5    briefing before the Census Bureau notifications to

6    the Hill, correct?

7      A   Yes.

8      Q   And was this in follow-up to the

9    March 10th email we just discussed?

10     A   Again, I have no recollection of this

11   exchange, but it appears to be likely, yes.

12     Q   Okay.  Did the briefing that Mr. Langdon

13   was trying to schedule for you take place?

14     A   No idea.

15     Q   Would that be reflected on your calendar

16   if it did?

17     A   It's possible.

18     Q   The Census Bureau is not in the same

19   building that you work in; is that right?

20     A   That's correct.

21     Q   Okay.  In fact, are they in the

22   District of Columbia or are they in Maryland?

Page 90

1      A    I think they're actually just across the
2  line in Maryland.
3      Q    Okay.  And when you are briefed by
4  Census Bureau officials, are you typically briefed
5  in person or by telephone or in some other way?
6      A    Typically, they come over en masse and we
7  have a briefing in the Secretary's conference
8  room.
9      Q    Okay.
10      A    Or another conference room.
11      Q    Does the Secretary's conference room have
12  its own calendar?
13      A    Good question.  I don't know.
14      Q    In order to make sure that meetings
15  aren't double booked?
16      A    I'm -- somebody may well maintain a
17  calendar.  I have no idea.
18      Q    But, typically, when you meet with
19  Census Bureau officials, you meet with them in
20  person, right?
21      A    Typically, yes.
22      Q    And they aren't in the same building as

1   you, they're coming from somewhere else, right?

2       A    Correct.

3       Q    They come over en masse.  By that, do you

4   mean there's more than one of them?

5       A    Typically, yes.

6       Q    How many people typically come over from

7   the Census Bureau?

8       A    Well, a lot of the briefings have 15 or

9   20 people in them.

10      Q    Okay.  So would you typically invite 15

11  or 20 people to come over en masse from Maryland

12  to meet with you in person and not include it on

13  your calendar?

14      A    I wouldn't have normally scheduled the

15  meeting, so -- again, I would -- I might have it

16  on my calendar if there's an invite, but I'm

17  not -- I do a lot of meetings that I'm just pulled

18  into, so I don't worry about putting them on a

19  calendar.

20      Q    But if people are coming from outside the

21  building to meet with you on an important issue,

22  you'd want to make sure you were available, right?

1     A    Depends.  I mean, if the Secretary's

2    schedule interrupts that, then I'm not available,

3    so --

4     Q    Okay.  So you don't remember if this

5    briefing happened?

6     A    I don't recall a particular briefing, no.

7     Q    Okay.  When the Census Bureau comes over

8    en masse to meet with you in person, do they

9    typically bring or send you materials?

10    A    Sometimes they email things, yeah.

11    Q    Not always?

12    A    No.  I mean, as you notice, Ellen, who is

13   the deputy secretary, would be the person they'd

14   be coming to brief.  I would simply be an attendee

15   at the meeting.  So if I didn't show because

16   something else conflicted on my schedule, then the

17   meeting would occur any way, and that would be

18   that.

19    Q    Okay.  Take a look -- do you still have

20   Exhibit 3 in front of you?

21    A    Yes.

22    Q    Okay.  Let's go back to Exhibit 3.  This

Page 93

1    is David Langdon asking you what your schedule --

2         A    Right.

3         Q    -- looks like to receive a briefing on

4    the 2020 census --

5         A    Right.

6         Q    -- and ACS topics; is that right?

7         A    Correct.

8         Q    So is it your understanding that he was

9    briefing the acting deputy secretary or that he

10   was arranging everything for you?

11        A    Again, I have no recollection of this

12   exchange.  So it's entirely possible that this

13   briefing in the 3/10 email and briefing in the

14   3/15 email are one in the same or they could be

15   different.  I don't know.

16        Q    Okay.  Let's mark this Comstock 5.  This

17   is document Bates -- the witness has been handed

18   Comstock Exhibit 5 stamped 1321.

19             (Plaintiffs' Exhibit 5, Memo, was

20   marked.)

21   BY MR. COLANGELO:

22        Q    Mr. Comstock, do you have Exhibit 5 in

Page 94

1    front of you?

2        A    I do.

3        Q    Have you seen this document before?

4        A    I have.

5        Q    When's the first time you saw this

6    document?

7        A    Probably when we reviewed a draft in the

8    Justice Department.

9        Q    Okay.  When was that?

10       A    I couldn't tell you the date.

11       Q    Was it near in time to the date below

12   Secretary Ross's signature, which is June 21,

13   2018?

14       A    I'd say that's likely, yes.

15       Q    When's the last time you saw this

16   document?

17       A    Right now.

18       Q    When's the last time before right now

19   that you saw this document?

20       A    I think maybe yesterday.  I can't recall.

21       Q    Okay.  Did you draft this memo?

22       A    I did not draft this memo, no.

Page 95

1      Q    Did you assist in drafting this memo?

2      A    I provided some edits to this memo.

3      Q    Okay.  Who else assisted in providing

4   edits to the memo?

5      A    The Office of General Counsel.

6      Q    Who in the Office of General Counsel?

7      A    I believe Mike Walsh.

8      Q    Anyone else?

9      A    There may have been other counsel.  I

10   don't know.

11      Q    Did Peter Davidson provide edits to this

12   memo?

13      A    It's entirely possible he did.

14      Q    Did James Uthmeier provide edits to this

15   memo?

16      A    It's possible, yes.

17      Q    The second sentence of this memo says,

18   "Soon after my appointment as Secretary of

19   Commerce, I began considering various fundamental

20   issues regarding the upcoming 2020 census,

21   including funding and content.  Part of these

22   considerations included whether to reinstate a

1  citizenship question, which other senior

2  administration officials had previously raised."

3      A   Yes.

4      Q   Do you see that?

5      A   I do.

6      Q   Do you recall when -- strike that.

7          Do you know what time period the

8  Secretary is referring to in this memo when he

9  says, "Soon after my appointment, I began

10  considering various fundamental issues"?

11      A   Well, it appears that he would be talking

12  about spring of 2017.

13      Q   And the Secretary says in this memo, "My

14  staff and I thought reinstating a citizenship

15  question could be warranted."

16          Do you see that line?

17      A   Yep.

18      Q   Okay.  Who is the Secretary referring to

19  when he says my staff and I?

20      A   That probably includes me and could

21  include other staff.

22      Q   Which other staff?

1      A    Other staff involved in this process

2    would include James Uthmeier, Mike Walsh,

3    Wendy Teramoto, the Census staff.  You know,

4    again, the entire department that works for him,

5    so --

6      Q    Okay.  He refers in that line to, "My

7    staff and I thought reinstating a citizenship

8    question could be warranted."

9           Is that right?

10     A    Right.  So he's likely talking about me.

11   And, again, whether he discussed this with

12   Eric Branstad, I have no idea.  Izzy Hernandez was

13   working on this for a while, so he might have

14   talked to him about it.  And then, obviously,

15   James Uthmeier was working on this.  Ellen Herbst,

16   whether he discussed it with her, I don't know.

17     Q    Let me ask you another question about

18   your review of this memo.  You mentioned that

19   before today, the last time you saw it was

20   yesterday; is that right?

21     A    Right.  Counsel showed it to me.

22     Q    And who was present at that meeting?

1      A    At the meeting yesterday?

2      Q    Yes.

3      A    Counsel sitting right here.

4      Q    Can you identify them for the record,

5  please?

6      A    Josh, Kate, Mike Walsh, David.

7      Q    Those four counsel?

8      A    Yeah.

9      Q    Okay.  And when you saw this memo before

10  June 21st, why were you shown this memo?

11          MR. GARDNER:  Objection.  Calls for

12  speculation.

13  BY MR. COLANGELO:

14      Q    You can answer.

15      A    Well, I would be shown this memo because

16  it involves an issue I worked on, so -- as one of

17  the senior counsels for the Secretary, they would

18  typically run something like this by me.

19      Q    And did you meet to discuss it or were

20  you shown the memo by email?

21      A    Email.  And I'm sure I discussed it with

22  them, as well.

1    Q   And who did you discuss it with when you

2   were shown this -- the draft of this memo before

3   June 21st?

4    A   I would have discussed it with counsel.

5    Q   The same counsel you just identified?

6    A   No.  Because I wasn't working with the

7   Justice Department folks at the time.  So this

8   would have been internal at Commerce.

9    Q   Okay.  I thought you said it came over

10   from the Justice Department.

11    A   It did, the first draft.

12    Q   Okay.  What do you mean by I wasn't

13   working with Justice Department folks at the time?

14    A   I was not involved with direct

15   interaction with the Justice Department --

16    Q   Okay.

17    A   -- I was seeing them through the Office

18   of General Counsel.

19    Q   So you discussed with your colleagues in

20   OGC?

21    A   Correct.

22    Q   The same colleagues who are here today?

1    A    Michael Walsh, I know I did.  I don't

2  recall if I discussed with David or not.

3    Q    Anyone else?

4    A    I likely talked to James Uthmeier.

5    Q    Anyone else outside --

6    A    Peter Davidson.

7    Q    I'm sorry.  Please answer.

8    A    No.  Peter Davidson.  But those would

9  have been the likely candidates.  Again, I don't

10 recall the exact discussions.

11   Q    This was two months ago, correct?

12   A    Correct.

13   Q    Did you discuss the draft of this memo

14 with anybody outside the Office of the General

15 Counsel at Commerce?

16   A    Other than when the Secretary signed it,

17 no.

18   Q    Okay.  Tell me who you discussed it with

19 when the Secretary signed it?

20   A    The Secretary.

21   Q    And what did you discuss with him when he

22 signed it?

1    A   Mr. Secretary, the Justice Department

2  recommends that we file this supplemental memo,

3  and so we recommend you sign it.

4    Q   And did he read it when you showed it to

5  him?

6    A   I believe he did, yes.

7    Q   Had you shown it to him before that

8  conversation?

9    A   I -- I don't know.

10    Q   Do you know if OGC had shown it to him

11  before that conversation?

12    A   It's entirely possible, yes.

13    Q   Do you know if the Justice Department

14  showed it to him before that conversation?

15    A   I don't believe the Justice Department

16  came over to meet with them.

17    Q   Did you talk with anyone other than the

18  Secretary or your colleagues from the Office of

19  General Counsel about this memo before June 21st?

20    A   Not that I recall.

21    Q   Did you discuss with it

22  Karen Dunn Kelley?

1      A    That's entirely possible, yeah.

2      Q    Okay.  Anyone else?

3      A    Again, don't recall specific meetings on

4   this.  I think it was done largely in back and

5   forth as people were available.

6      Q    Did you discuss it with Wendy Teramoto?

7      A    No.  I don't believe I discussed it with

8   Wendy.

9      Q    Wendy is the chief of staff?

10     A    Yes.

11     Q    And you report to her?

12     A    Yes.

13     Q    Do you know why you wouldn't have

14  discussed it with Wendy?

15     A    Wendy doesn't get very involved in the

16  policy matters, typically.

17     Q    Why not?

18     A    Because she's chief of staff.  That's her

19  call.

20     Q    Got it.

21          You mentioned that you were likely one of

22  the people the Secretary's referring to when he

1    says my staff and I thought reinstating a

2    citizenship question could be warranted.

3        A    Uh-huh.

4        Q    Why did you think in the spring of 2017

5    that reinstating a citizenship question could be

6    warranted?

7        A    Because a citizenship question had

8    previously been asked.  It's asked by every other

9    major democracy in the world, so why wouldn't we

10   ask?

11       Q    And why did you want a citizenship

12   question?

13       A    Again, I think it provides important

14   information that's used for all kind of programs.

15   And if you want a complete and accurate census,

16   you would provide it.

17       Q    What caused you to form a view on whether

18   the citizenship question should or should not be

19   added?

20       A    When I was -- and I didn't really know

21   that it wasn't included in the census, but once I

22   became informed of that, it struck me as odd that

1  we don't ask the question.

2      Q    And you testified earlier that the

3  Secretary is the first person who raised it to

4  you?

5      A    In my employment at the Department of

6  Commerce, yes.

7      Q    Do you recall discussing it before you

8  worked at the Commerce Department?

9      A    Probably sometime in the last 30-odd

10 years, I'm in -- you know, in political science

11 and politics, so I'm sure I discussed at.

12     Q    But the first time in 2017 that you

13 recall considering this issue is when the

14 Secretary raised it with you?

15     A    Correct.

16     Q    And this memo says the Secretary began

17 considering it soon after his appointment?

18     A    Correct.

19     Q    And his appointment was February 28th

20 we've established --

21     A    That's correct.

22     Q    -- of 2017?

1     A    Again, assuming that's the correct date,

2   yes.

3     Q    I'm sure your counsel will advise us at

4   the break if that's not the correct date.

5     A    I could look it up if you need me to.

6     Q    Okay.  So you came to the view at some

7   point in the spring of 2017 that a citizenship

8   question ought to be included.  What materials did

9   you review in coming to that view?

10    A    The fact that it's not on the census.

11    Q    That's it?

12    A    That's sufficient, from my point of view,

13  yes.

14    Q    You weren't concerned about any of

15  the -- strike that.

16         Are you aware that in developing surveys

17  and statistical instruments, the Census Bureau and

18  other statistical agencies consider the impact of

19  asking a question on a range of factors, including

20  response rates?

21    A    Absolutely.  Yes.

22    Q    And were you concerned about the

1    Census Bureau's processes for changing statistical

2    instruments when you formed a view that the

3    citizenship question should be added?

4              MR. GARDNER:  Objection.  Form.

5    BY MR. COLANGELO:

6         Q    You can answer.

7         A    Okay.  Well, again, I think you need to

8    separate this out.  My decision or my belief that

9    a -- a citizenship question should be included

10   does not in any way change the process by which it

11   might get included.  So they're two separate

12   things.  I can hold the belief that a certain

13   action might be warranted or should be taken

14   independent of any analysis of whether or not that

15   should be done.  That's two separate things.  So I

16   think you're conflating the two.

17             The fact that I may think that as an

18   objective, hypothetical question should one be

19   added, I can form that belief quite quickly and

20   hold that.  That's, then, separate from is that

21   the right decision to make for a variety of

22   reasons, including some of the issues that you

Page 107

1  just outlined.

2      Q   And so in forming your view that a

3  citizenship question should be added --

4      A   Again, you're characterizing it in a way

5  that I'm not.  In forming my view that a

6  citizenship question would be appropriate to

7  include in a census, that's one thing.

8      Q   Okay.

9      A   Should be added is a separate --

10     Q   Hang on a second.  I haven't added a

11  question yet.

12         The Secretary's memo says my staff and I

13  thought reinstating a citizenship question could

14  be warranted, right?  And you've testified that

15  you were among the people he was referring to when

16  he says my staff and I.

17     A   Right.

18     Q   So you were of the view that the

19  citizenship -- adding a citizenship question could

20  be warranted?

21     A   Yes.

22     Q   And I'm asking in forming the view that

1  adding a citizenship question could be warranted,

2  you relied only on common sense; is that what you

3  testified?

4          MR. GARDNER:  Objection.

5  Mischaracterizes the witness's prior testimony.

6  BY MR. COLANGELO:

7     Q   What did you rely on in forming that

8  view?

9     A   So, again, the key word is could.  Could

10 be warranted, meaning it is worthy of

11 investigating further.  That is what the document

12 says.

13    Q   What did you rely on in forming that

14 view?

15    A   The fact that other countries ask this

16 information; the fact that we ask it on the ACS of

17 a percentage of the population every year; the

18 fact that as a citizen, most people wouldn't be

19 concerned with answering that question.  All of

20 those things are relevant.

21    Q   Did you research the statistical

22 practices of other countries in the spring of

1    2017?

2         A    No.

3         Q    When did you -- did there come a time

4    when you researched the statistical practices of

5    other countries?

6         A    Why would that be relevant?

7         Q    Mr. Comstock, you just testified that in

8    forming the view that adding a citizenship

9    question could be warranted, among the things you

10   considered was that other countries do.  So I'm

11   asking you --

12        A    Okay.

13        Q    -- did you research the practices of

14   other countries?

15        A    By that, you mean did I -- did I

16   determine that other countries ask the question?

17   Yes.

18        Q    In the spring of 2017?

19        A    Yeah.  I think we did a quick Google

20   search, you know.

21        Q    So you Googled the census practices of

22   other countries in order to determine that adding

Page 110

1    a citizenship question could be warranted?

2        A    Again, my formulation of a -- of a

3    decision that it could be warranted is largely

4    based on common sense.

5        Q    Okay.  I just want to make sure that I

6    understand.  That as to the part of your answer

7    that related to the practices of other countries,

8    in the spring of 2017, you formed that view by

9    Googling it?

10       A    I may have asked if other countries did

11   it or I may have gotten online and looked.  I

12   don't recall.

13       Q    Who would you have asked if you asked?

14       A    I likely would have asked somebody from

15   Census or I might have asked David Langdon.

16       Q    And if you asked, would that be reflected

17   in your -- in your email or your memo somewhere?

18       A    If it was, you could have found the

19   email.  So I, obviously, did not send an email if

20   I asked that question.

21       Q    Okay.  The --

22            MR. GARDNER:  Matt, I'm sorry.  I didn't

Page 111

1   mean to break your line of questioning.  Actually,

2   we've been going about an hour and a half.  Would

3   now be an appropriate time for a break?

4           MR. COLANGELO:  Yes.

5           MR. GARDNER:  Let's take a break.

6           VIDEOGRAPHER:  This concludes Media Unit

7   Number 1.  The time on the video is 10:32 a.m.  We

8   are now off the record.

9           (Off the record.)

10          VIDEOGRAPHER:  This begins Media Unit

11  Number 2.  The time on the video is 10:45 a.m.  We

12  are on the record.

13  BY MR. COLANGELO:

14      Q   Mr. Comstock, we were talking about the

15  Secretary's June 21, 2018 memo which we marked as

16  Exhibit 5.  Do you still have that in front of

17  you?

18      A   I do.

19      Q   Okay.  That memo says that other senior

20  administration officials had previously raised

21  this question.  Do you see that line?

22      A   Yes.

Page 112

1    Q    Who are those other senior administration

2  officials?

3    A    You'd have to ask the Secretary.

4    Q    You don't know yourself?

5    A    I don't.

6    Q    You have no idea which other senior

7  administration officials raised this question,

8  other than the Secretary?

9    A    No.

10    Q    You never asked him where the idea came

11  from?

12    A    Nope.

13    Q    He never told you where the idea came

14  from?

15    A    Nope.

16    Q    You spent a lot of time on this issue?

17    A    Not relative to a lot of other things I

18  work on, no.

19    Q    How would you characterize the amount of

20  time you spent on this issue?

21    A    One one-hundredth of my time.

22    Q    You agree that it's an important issue?

1      A    Correct.

2      Q    It was important to the Secretary?

3      A    Correct.

4      Q    He was motivated to get this done?

5      A    He was working on a lot of different

6  issues at the time.

7      Q    But this one was important to him?

8      A    Yes.  Absolutely.

9      Q    Okay.  And when you saw the draft of this

10  memo before June 21st and it refers to other

11  senior administration officials, you didn't

12  yourself have any view or understanding of who

13  those other administration officials were?

14      A    I did not, no.

15      Q    You didn't ask the secretary who those

16  other administration officials were?

17      A    No.

18      Q    Okay.  When recommending that he sign the

19  memo, he didn't say to you who are the other

20  senior -- who the other senior administration

21  officials were?

22      A    We did not discuss that, no.

Page 114

1      Q    And you said this came over from the

2    Justice Department?

3      A    Correct.

4      Q    Who sent it over, do you remember?

5      A    I don't know.

6      Q    Let's mark Exhibit 6.

7           (Plaintiffs' Exhibit 6, Email, was

8    marked.)

9           MR. COLANGELO:   The witness has been

10   handed document stamped 2561.   This has been

11   marked Exhibit 6.

12   BY MR. COLANGELO:

13     Q    Do you have Exhibit 6 in front of you?

14     A    I do.

15     Q    Have you seen this email before?

16     A    I'm not on the email, so, no.

17     Q    So this is the first time you've seen

18   this message?

19     A    Yeah.   I -- I don't recall seeing this

20   when it was sent.

21     Q    Is today the first time you've seen this

22   email?

Page 115

1        A    I think so, yes.

2        Q    And you see this is an email from

3    Brooke Alexander to Hillary Geary?

4        A    Yes.

5        Q    Who is Brooke Alexander?

6        A    She is the Secretary's confidential

7    assistant -- or at the time, she was.  She's no

8    longer.

9        Q    And do you understand the recipient of

10   this email to be the Secretary's wife?

11       A    That appears to be who it's directed to,

12   yes.

13       Q    And this email is dated March 5th of

14   2017, correct -- I'm sorry.  Strike that.

15            This email is dated April 5th of 2017; is

16   that correct?

17       A    That's what's on there, yes.

18       Q    And you see that Ms. Alexander is

19   emailing Ms. Ross and says, quote, do you have

20   plans following Newseum?  I'm asking because

21   Steven Bannon has asked that the Secretary talk to

22   someone about the census, and around 7:00 to

1    7:30 p.m. is the available time.

2         Do you see that?

3    A    Yeah.

4    Q    Okay.  You know who Steven Bannon is?

5    A    I do.

6    Q    Who is Steve Bannon?

7    A    He was an advisor to the President.

8    Q    And he had that position at the time of

9    this email, correct?

10   A    I do not know.

11   Q    And who did Mr. Bannon want the Secretary

12   to talk to?

13        MR. GARDNER:  Objection.  Calls for

14   speculation.  Lack of foundation.

15        THE WITNESS:  I have no idea.

16   BY MR. COLANGELO:

17   Q    Do you understand that the

18   second -- that -- strike that.

19        Do you understand that Mr. Bannon wanted

20   the Secretary to talk to Kris Kobach?

21   A    I wasn't part of this email or this

22   conversation, so I don't know who he wanted him to

Page 117

1    talk to.

2         Q    Did the Secretary speak with Mr. Bannon

3    that night?

4         A    I don't know.

5              MR. GARDNER:  Objection.  Calls for

6    speculation.  Lack of foundation.

7              THE WITNESS:  I do not know.

8    BY MR. COLANGELO:

9         Q    Did the Secretary speak with Kris Kobach

10   on April 7, 2017?

11        A    No idea.

12        Q    Did you join a call with the Secretary

13   regarding the census on April 5th of 2017?

14        A    I have no idea.

15        Q    You don't know if you joined the call

16   with the Secretary on April 5th of 2017?

17        A    I don't know what I was doing on

18   April 5, 2017 without looking at a calendar or

19   something else that would remind me.  I'd have to

20   go through my emails that day.  I could not tell

21   you what I was doing on that day.

22        Q    Do you know who Kris Kobach is?

Page 118

1      A    I believe he's somebody with State of

2    Kansas maybe.

3      Q    And have you spoken to Mr. Kobach before?

4      A    I've never spoken to Mr. Kobach.

5      Q    Have you emailed with Mr. Kobach?

6      A    I've never emailed with Mr. Kobach.

7      Q    And after the call that's referred to in

8    this email, did the Secretary tell you what he

9    discussed?

10     A    No.

11          MR. GARDNER:  Objection.  Lack of

12   foundation.

13          THE WITNESS:  No.

14   BY MR. COLANGELO:

15     Q    Who would know what was discussed on this

16   phone call?

17          MR. GARDNER:  Objection.  Calls for

18   speculation.  Also, lack of foundation.

19   BY MR. COLANGELO:

20     Q    You can answer.

21     A    The parties to the call.

22     Q    You were working on the census in the

Page 119

1    spring of 2017, correct?

2        A    Yes.

3        Q    And the Secretary frequently asked you

4    for updates on the census-related matters in the

5    spring of 2017, right?

6        A    I wouldn't characterize it as frequently.

7        Q    Did the Secretary ever ask you for

8    updates on census matters in the spring of 2017?

9        A    Yes, he did.

10       Q    Did he ever update you on developments

11   that he was aware of regarding the census in the

12   spring of 2017?

13       A    It's unusual for the Secretary to update

14   me on anything.

15       Q    Would the Secretary have told you if he

16   had a conversation with Steven Bannon about the

17   census?

18       A    Not necessarily.

19       Q    Would he have told you if he had a

20   conversation about the census with Kris Kobach?

21       A    Not necessarily.

22       Q    Why not?

Page 120

1          MR. GARDNER:  Objection.  Form.

2          THE WITNESS:  I wouldn't speculate, but

3    he's the Secretary.  He makes his own decisions.

4    BY MR. COLANGELO:

5      Q   So has the Secretary ever told you about

6    a conversation he had with someone else?

7          MR. GARDNER:  Objection.  Form.

8          THE WITNESS:  Yes.  He reports to me

9    sometimes if he feels that it's essential that I

10   know the substance of conversation.

11   BY MR. COLANGELO:

12     Q   Okay.

13         MR. COLANGELO:  Can we mark this

14   Exhibit 7?

15         (Plaintiffs' Exhibit 7, Email, was

16   marked.)

17         THE WITNESS:  Thank you very much.

18   BY MR. COLANGELO:

19     Q   Handed the witness a document stamped 763

20   and marked Exhibit 7.

21         Mr. Comstock, do you have Exhibit 7 in

22   front of you?

Page 121

1      A    I do.

2      Q    Have you seen this email before?

3      A    No, I haven't.

4      Q    This is the first you've ever seen this

5    email?

6      A    Yes.

7      Q    Okay.  If you turn to the second page --

8      A    I'm sorry.  I'm just reading the

9    document.

10          Okay.

11     Q    Do you see at the bottom of page -- of

12   the first page of this exhibit, Mr. Comstock,

13   there's an email from Kris Kobach to

14   Wendy Teramoto --

15     A    Right.

16     Q    -- on July 21, 2017; is that right?

17     A    That's what it says.

18     Q    And the email says, "Wendy, nice meeting

19   you on the phone this afternoon.  Below is the

20   email that I sent to Secretary Ross.  He and I had

21   spoken briefly on the phone about this issue at

22   the direction of Steven Bannon a few months

Page 122

1    earlier."

2            Do you see that?

3       A   I see that.

4       Q   Okay.  That was the call on April 5th

5    that we were just talking about, right?

6            MR. GARDNER:  Objection.  Lack of

7    foundation.  Calls for speculation.

8            THE WITNESS:  Doesn't specify when the

9    phone call took place.

10   BY MR. COLANGELO:

11      Q   And did Wendy tell you she got this email

12   from Kris Kobach in July of 2017?

13      A   No.

14      Q   You've never spoken to Wendy about

15   Kris Kobach, at all?

16      A   Not that I recall.

17      Q   Is there anyone else that you're aware of

18   that Steven Bannon directed the Secretary to talk

19   to about the census, other than Kris Kobach?

20           MR. GARDNER:  Objection.  Lack of

21   foundation.

22           THE WITNESS:  I have no knowledge of any

Page 123

1  conversations with Steven Bannon, so I wouldn't

2  know who he might have suggested the Secretary

3  talk to.

4  BY MR. COLANGELO:

5      Q   Have you ever spoken to Steven Bannon

6  yourself?

7      A   I have never spoken to Steven Bannon

8  myself.

9          MR. COLANGELO:  Can we have this marked

10 Exhibit 8?

11          (Plaintiffs' Exhibit 8, Email, was

12 marked.)

13 BY MR. COLANGELO:

14     Q   This is document stamped 3709.

15     A   Uh-huh.

16     Q   Do you have Exhibit 8 in front of you?

17     A   Uh-huh.

18     Q   Who's Mark Neuman?

19     A   Mark Neuman is a former -- I think he was

20 formally chair of a census advisory committee, and

21 he was a member of the transition -- I don't know

22 which aspect of transition but, basically,

Page 124

1    advising on census.

2        Q    How long have you known Mark Neuman?

3        A    I think I met Mark Neuman probably in

4    December or January of either December 2016 or

5    January 2017.  I don't recall which.

6        Q    And did you meet him in your capacity as

7    the confirmation Sherpa?

8        A    Yes.

9        Q    Did you discuss any Commerce Department

10   policy matters with him during the transition?

11       A    Not that I recall.

12       Q    Did you discuss any Census Bureau policy

13   matters with him during the transition?

14       A    We discussed -- I mean, he basically

15   briefed the Secretary on the Census operation,

16   some of the challenges they face, the whole issue

17   of hard-to-count populations, the challenges you

18   face hiring temporary workers, concerns about the

19   budget, whether they're properly funded.  Those

20   were the primary discussion points.

21       Q    Where does Mr. Newman work right now?

22       A    He is a senior VP at -- I don't know the

1   name of the organization, but I know they own

2   Victoria's Secret.

3       Q   He's not a government employee right now?

4       A   No.

5       Q   Okay.  How often do you speak with him?

6       A   I last saw him several months ago when we

7   ran into each other at a party.

8       Q   And over the course of your time at the

9   Commerce Department, how often have you spoken

10  with him?

11      A   Maybe a dozen times.

12      Q   By telephone?

13      A   Yep.

14      Q   Have you ever met with him in person?

15      A   I have met with him in person.

16      Q   How many times?

17      A   I think he briefed the Secretary maybe

18  two times, three times that I can recall, and he

19  had me over for dinner one time at his house to

20  meet a potential chief of staff of the

21  Census Bureau.

22      Q   What did he brief the Secretary on?

1     A    Again, the whole operation of the Census,

2     background on it.  It's an area I was not familiar

3     with, and he was one of the folks on the

4     transition who was familiar with the Census.

5     Q    Have you been present for briefings he

6     gave the Secretary on the citizenship question?

7     A    I've been present -- did we cover

8     citizenship?  He covered citizenship at one of the

9     briefings.

10    Q    When was that?

11    A    I couldn't tell you the date.

12    Q    What did he say about citizenship in the

13    briefing that you attended with him?

14    A    We talked about how citizenship could

15    be -- what would it be useful for and in terms of

16    a government agency.  So the Voting Rights Act

17    enforcement, that's what the ACS data has provided

18    to the Justice Department.

19    Q    When was that briefing?

20    A    Again, sometime -- sometime in the

21    spring.  I can't -- couldn't tell you exactly

22    when.

Page 127

1    Q    Is Mr. Neuman a lawyer?

2    A    Good question.  I don't know.

3    Q    Does Mr. Neuman have a voting rights

4    background?

5    A    I couldn't tell you.

6    Q    Take a look at Exhibit 8, which is an

7    email from you to Mr. Neuman at the bottom of the

8    page dated April 13, 2017.  Do you see that?

9    A    Uh-huh.

10   Q    And the email says, "Hi, Mark.  Quick

11   question.  When does Census need to notify

12   Congress regarding the questions that will be on,

13   A, the ACS and, B, the decennial census?"

14   A    Correct.

15   Q    Why were you asking Mark this question?

16   A    Likely because Mark would know the

17   answer.

18   Q    Why didn't you ask the Office of General

19   Counsel?

20   A    Because at the time, there was nobody in

21   the Office of General Counsel that I

22   would -- would have been familiar with.

Page 128

1      Q    I'm not sure I understand what you mean

2  by nobody in the Office of General Counsel that

3  you would have been familiar with.

4      A    Well, there was nobody in the Office of

5  General Counsel that I was -- had easy access to

6  that works on census issues.

7      Q    You're the director of the office policy

8  in the Office of the Secretary?

9      A    Correct.

10     Q    Okay.  But you didn't think you could ask

11 the General Counsel's office this question at the

12 time?

13     A    Well, if you note the date, the time of

14 this email, it's 9:58 p.m.

15     Q    Uh-huh.

16     A    I'm trying to get an answer.  And I'm

17 pretty certain there's going to be nobody in the

18 Office of General Counsel at 9:58 p.m.

19     Q    Did you need an answer that night?

20     A    I usually try to get answers as quickly

21 as I can, yes.

22     Q    Why were you asking this question?

Page 129

1      A    Probably because it was on my list of

2   things to do, and I was working, trying to get

3   those things done.

4      Q    And how did it come to be on your list of

5   things to do?

6      A    Well, I may have been -- again, the

7   Secretary might have asked me about when do we

8   need to get questions, when do we need to notify

9   the Congress?

10      Q    Okay.  So you asked Mr. Neuman this

11   question in order to respond to a question from

12   the Secretary?

13      A    I don't know the genesis because I didn't

14   say in the email why I need the information.

15      Q    Why didn't you ask the Census Bureau this

16   question?

17      A    Because in April, I probably had no

18   contracts over at the Census Bureau.

19      Q    By April 13th of 2017, had you already

20   discussed the citizenship question with

21   Mr. Neuman?

22      A    I have no idea.

1      Q    Take a look at Mr. Neuman's reply to your

2   email.  This is at the top of Exhibit 8.  He says,

3   "I believe that the annual notification to the

4   Congressional committee relating to the

5   questionnaire content additions for 2020 census

6   just take place."

7           And then do you see in the second

8   paragraph he says, "There will be another

9   opportunity next year"?

10     A    Right.

11     Q    What does Mr. Neuman mean by opportunity?

12          MR. GARDNER:  Objection.  Calls for

13   speculation.

14          THE WITNESS:  Again, if you notice the

15   rest of his statement that you didn't read, plenty

16   of questions relating to sexual orientation.  So

17   we were focused on the issue of what was going to

18   be included in the questions.  More precisely,

19   what was not going to be added.

20          The prior administration had wanted to

21   add, I might note, to the decennial census a

22   question on sexual orientation and gender

1    identity.  So for all the people that are raising

2    an uproar right now about the addition of this

3    question, apparently there was no concern about

4    adding such a question on another sensitive topic

5    last year.

6          So leaving that aside, I think he is

7    simply pointing out to the extent there's -- we

8    have some questions we'd like to see added, there

9    will be an opportunity next year.

10   BY MR. COLANGELO:

11      Q   So had you talked to Mr. Neuman about a

12   question you'd like to see added?

13      A   I don't recall.

14      Q   Okay.  But the sexual orientation and

15   gender identity question was not included as a

16   topic, right?

17      A   Correct.

18      Q   And that was because you came to the

19   policy position you did not want to ask that

20   question, correct?

21      A   That was the administration's conclusion,

22   yes.

1     Q   So Mr. Neuman can't have been talking

2   about the opportunity to put that question back on

3   that you had just decided not to have included,

4   right?

5     A   That would be speculation.  I don't know

6   what he's referring to.

7     Q   Okay.  But you did testify he was

8   referring to the opportunity to put a question on?

9     A   He was noting that there would be another

10   opportunity to place a question, should somebody

11   decide to do that next year.

12     Q   And then the next paragraph of his email

13   says, "I recommend that you ask the Bureau to

14   provide a list of their response rates on all

15   demographic questions currently asked on the ACS.

16   You will see whether certain demographic questions

17   have lower response rates than others, especially

18   among certain demographic groups.  That is

19   something that can be provided off the shelf."

20     A   Yes.

21     Q   Why is he recommending that you ask that

22   information from the Bureau?

1          MR. GARDNER:  Objection.  Calls for

2    speculation.

3          THE WITNESS:  Again, to the extent we

4    were discussing the possibility of adding the

5    citizenship question, that would be a logical

6    question to ask.

7    BY MR. COLANGELO:

8       Q   When did you first discuss the

9    possibility of adding a citizenship question with

10   Mr. Newman?

11      A   Again, for the umpteenth time, I don't

12   recall the exact date.

13      Q   But you agree that based on this email

14   exchange, that you had already had that

15   conversation before April 14th of 2017?

16      A   Again, I have -- I don't recall when we

17   first discussed it.  It's entirely possible.

18      Q   Not just possible, but likely, right?

19   Why else would Mr. Newman be talking about the

20   opportunity to add a question?

21          MR. GARDNER:  Objection.  Calls for

22   speculation.

1        THE WITNESS:  Again, if we were

2   considering changing the questions, it would be

3   important to know.

4   BY MR. COLANGELO:

5       Q   And if you're considering adding a

6   citizenship question, it would also be important

7   to know the response rates on all demographic

8   questions; is that right?

9       A   That would be one of the questions you

10  would ask, yes.

11      Q   Okay.  Did the Secretary discuss the

12  citizenship question with Mr. Newman in the spring

13  of 2017?

14      A   You'd have to ask the Secretary.

15       MR. GARDNER:  Objection.  Lack of

16  foundation.

17  BY MR. COLANGELO:

18      Q   I'm sorry.  You were both speaking at the

19  same time.

20       MR. GARDNER:  Objection.  Lack of

21  foundation.

22  BY MR. COLANGELO:

1       Q    And now please answer.

2       A    I would say you'd have to ask the

3    Secretary.

4       Q    Did he ever tell you that he spoke with

5    Mr. Newman about the citizenship question?

6       A    I'm fairly certain he was -- he did talk

7    to him at some point.

8       Q    Okay.  When was that?

9       A    I couldn't tell you.

10      Q    Did Mr. Newman ever say to you that he

11   had spoken to the Secretary about adding a

12   citizenship question?

13      A    It's possible, yeah.

14      Q    Okay.  When did he tell you?

15      A    Again, I don't recall the exact date.

16      Q    Try to place it, roughly.

17      A    To your question, was there discussion of

18   the possibility of adding a citizenship question

19   in the spring?  Yes.  That does not mean any firm

20   decision had been made.  We were exploring the

21   opportunity.

22      Q    I'm not asking you about decisions.  I'm

1      just asking when the Secretary spoke to

2      Mr. Newman.

3           A    Again, I keep telling you I don't know

4      the exact dates he spoke to him.

5           Q    Okay.

6           A    I know he did speak to Mr. Newman.  I

7      don't know the exact dates.

8           Q    And I'm not sure I got an answer, but

9      forgive me if I did.

10               When did Mr. Newman tell you that he had

11     spoken to the Secretary about this citizenship

12     question?

13          A    Again, I do not recall the exact dates of

14     conversations.

15          Q    Okay.

16          A    If you don't have an email that specifies

17     it, I can't tell you the date.

18          Q    All right.  Did you ask the Census Bureau

19     to give you the information that Mr. Newman

20     suggested in this email?

21          A    Possibly.  I don't recall.

22               In the decision memo we have such

Page 137

1   information, so, clearly, at some point, it was

2   asked.  I cannot tell you.

3       Q   Can you tell me what you mean by decision

4   memo?

5       A   The memo that the Secretary produced

6   documenting his decision.  There was a reference

7   to other response rates and demographic.  So,

8   clearly, at some point, the information became

9   available.

10      Q   And you're referring to the

11  March 26, 2018 from the Secretary to Karen

12  Dunn Kelley?

13      A   Yes.

14      Q   But you don't recall seeing that

15  information -- strike that.

16          MR. COLANGELO:  Let's mark Exhibit 9.

17          (Plaintiffs' Exhibit 9, Email, was

18  marked.)

19  BY MR. COLANGELO:

20      Q   We have marked a document stamped 3694 as

21  Exhibit 9.  Do you have this email in front of

22  you?

1      A    I do.

2      Q    Have you seen this email before?

3      A    Yes.

4      Q    Before today, when is the last time you

5   saw this email?

6      A    Yesterday.

7      Q    And this is an email from

8   Brooke Alexander to you with a copy to

9   Wendy Teramoto; is that right?

10     A    Correct.

11     Q    Dated April 20, 2017?

12     A    Yep.

13     Q    And did you understand this to be a

14  message from the Secretary?

15     A    That's what Brooke's message says.

16     Q    Brooke has access to the Secretary's

17  email?

18     A    Yes.

19     Q    And is it -- okay.  Withdrawn.

20          Are you familiar with the National

21  Advisory Committee on Racial, Ethnic and Other

22  Populations?

1      A    No.

2      Q    You have no idea what the National

3  Advisory Committee is?

4      A    I mean, I know it's an advisory committee

5  to Census, but outside of that, I -- I couldn't

6  tell you what they do, other than what their title

7  suggests that they do.

8      Q    So you're aware that there's a National

9  Advisory Committee on Racial, Ethnic and Other

10 Populations that advises the Census Bureau?

11     A    I take that from this email that's

12 correct, yes.

13     Q    And what do you understand the role of

14 the advisory committee to be?

15     A    To provide advice to the Census Bureau.

16     Q    Okay.  The message from Brooke speaking

17 for the Secretary to you says, "Earl, Census

18 director has on April 29th a meeting of the

19 National Advisory Committee.  We must get our

20 issue resolved before this" -- exclamation point,

21 and the must is underlined.

22          Do you see that?

1      A    I see that.

2      Q    What is our issue?

3      A    I couldn't tell you.

4      Q    Our issue is the citizenship question,

5  right?

6           MR. GARDNER:  Objection.  Calls for

7  speculation.  Lack of foundation.

8           THE WITNESS:  I would say likely not,

9  actually, given there's no reason to believe the

10  National Advisory Committee on Racial, Ethnic and

11  Other Populations would be advising on a

12  citizenship question.

13  BY MR. COLANGELO:

14      Q    Were there other issues that you'd been

15  talking about with the Secretary involving the

16  census in the spring of 2017 that would relate to

17  the National Advisory's mandate?

18      A    Certainly the SOGI question would, and

19  the MENA question would.

20      Q    But the notification date for the SOGI

21  question was at the end of March in 2017 -- for

22  the SOGI topics, I should say, correct?

1      A    Correct.

2      Q    So that was already resolved by April,

3  right?

4      A    I'm not certain of the timing, but MENA,

5  I think, was not resolved until sometime in the

6  spring or summer.

7      Q    And sticking with the SOGI question --

8  and for the record, that' S-O-G-I.  SOGI stands

9  for sex orientation and gender identity.

10     A    Correct.

11     Q    Would you conclude if the Secretary

12  referred to a National Advisory Committee on

13  Racial and Ethnic, Populations that the SOGI

14  question would be what he had in mind?

15     A    I would guess.  Again, this is

16  speculation, but my best guess, based on this

17  reference, is probably more like the MENA issue is

18  what was in front of us.

19     Q    Okay.  And describe the MENA issue?

20     A    The Middle Eastern North African

21  question.  There's a question as to whether you

22  ask two questions or you ask one question.  And

Page 142

1   it's not a topic I spent a tremendous amount of

2   time on, but it was something that the Census was

3   very much discussing at the time.

4       Q   And had you discussed that issue with the

5   Secretary?

6       A   We had a conversation or two about it.

7   And, again, it was largely in the context of which

8   way to go on that question.

9       Q   And why would the Secretary have said

10  that that issue must be resolved by April 29th?

11          MR. GARDNER:  Objection.  Calls for

12  speculation.  Lack of foundation.

13  BY MR. COLANGELO:

14      Q   You can answer.

15      A   You know, again, at that point -- this is

16  shortly before a -- if I recall correctly, a

17  Congressional hearing that was going to go into

18  the census and probably wanted to have a position

19  to recommend to Director Thompson as to what he

20  should say to the advisory group.  Again, I don't

21  recall this reference or precisely what he was

22  speaking to.

Page 143

1      Q   Okay.  This isn't a topic you'd spent a

2   lot of time on, right, the Middle Eastern

3   North African question?

4      A   Correct.

5      Q   There's no reason the Secretary would

6   have referred to it as our issue, is there?

7          MR. GARDNER:  Objection.  Calls for

8   speculation.  Lack of foundation.

9          THE WITNESS:  Again, depending on if his

10  perception was that there was an administration

11  policy call to make on it, he would refer to it as

12  our issue.

13  BY MR. COLANGELO:

14     Q   He could also have referred to the

15  citizenship issue as your issue, right?

16         MR. GARDNER:  Objection.  Calls for

17  speculation.  Lack of foundation.

18         THE WITNESS:  Again, I would say looking

19  at the context of the email, I would say that's an

20  unlikely connection.

21  BY MR. COLANGELO:

22     Q   And by April 20th of 2017, how many times

1   had you discussed the citizenship question with

2   Secretary Ross?

3        A    I have no idea.

4        Q    More than a handful?

5        A    Possibly.

6        Q    Okay.  Would you say he was extremely

7   interested in the issue?

8        A    Certainly, when he raised it, he was

9   interested in it.

10       Q    Okay.  You wouldn't say he was extremely

11  interested in the MENA question, right?

12       A    When we discussed it, he was equally

13  interested in that.

14       Q    He didn't raise it with you with the same

15  frequency he raised the citizenship question,

16  right?

17       A    That's correct.

18       Q    Why was Wendy Teramoto copied on this

19  email?

20            MR. GARDNER:  Objection.  Calls for

21  speculation.

22            THE WITNESS:  Couldn't tell you.

Page 145

1    BY MR. COLANGELO:

2         Q    Did you speak with her about this issue

3    after you got this message?

4         A    It's possible.  I don't recall.

5              MR. COLANGELO:  Can we mark this

6    Exhibit 10?

7              (Plaintiffs' Exhibit 10, Email, was

8    marked.)

9    BY MR. COLANGELO:

10        Q    Handed the witness a document stamped

11   3710 and we've marked it as Exhibit 10.

12        A    Okay.

13        Q    Have you read this email?

14        A    Yep.

15        Q    Okay.  You've seen this email before?

16        A    I have.

17        Q    When's the last time you saw this email?

18        A    Yesterday.

19        Q    When you saw this email yesterday, was it

20   redacted as it is in the form I've shown it to you

21   now or was it unredacted?

22        A    It was redacted.

Page 146

1    Q    Okay.  And you see that the Secretary has

2  written you an email on May 2, 2017 that says,

3  quote, worst of all, they emphasize they have

4  settled with Congress on the questions to be

5  asked.  I am mystified why nothing has been done

6  in response to my months' old request that we

7  include the citizenship question.  Why not?

8         Do you see that?

9    A    I see that.

10    Q    When did the Secretary make his months'

11  old request to include the citizenship question?

12    A    Again, sometime in the spring.

13    Q    Probably on March 10th when you emailed

14  him the Wall Street Journal blog post?

15    A    Potentially.  I don't recall.

16    Q    Who does the "they" refer to in the line

17  I just read you from the Secretary's email?

18         MR. GARDNER:  Objection.  Calls for

19  speculation.

20         THE WITNESS:  I don't know.

21  BY MR. COLANGELO:

22    Q    You mentioned a minute ago the Census

Page 147

1    director in the -- this time period, had an

2    upcoming House appropriation hearing; is that

3    right?

4        A    I believe I said the Secretary had an

5    upcoming House appropriation hearing.

6        Q    Do you remember the date of that hearing?

7        A    I don't.

8            MR. COLANGELO:  Can we mark this Exhibit

9    Number 11?

10           (Plaintiffs' Exhibit 11, Email, was

11   marked.)

12   BY MR. COLANGELO:

13       Q    Okay.  This is -- have you had a chance

14   to look at this email?

15       A    Lot of black spots on it.  Okay.

16       Q    Have you seen this email before?

17       A    Apparently I must have seen it when I

18   wrote it.

19       Q    When's the last time before today you saw

20   this email?

21       A    Probably May 1, 2017.

22       Q    Okay.  And does this email reflect that

1    you sent the Secretary, Director Thompson's House

2    appropriation subcommittee written testimony?

3        A    Yes.

4        Q    And his testimony was for, quote, this

5    Wednesday?

6        A    Right.  That's what it appears.

7        Q    And if I told you that -- oh, if you look

8    at the subject line it says, Wednesday, May 3rd;

9    is that right?

10       A    That's correct.

11       Q    Okay.  So let's refer back to Exhibit 10.

12       A    Yep.

13       Q    Now that you see the day before you had

14   sent the Secretary Mr. Thompson's written

15   testimony for the House appropriation subcommittee

16   hearing --

17       A    Right.

18       Q    -- what do you understand, worst of all

19   they emphasize they have settled with Congress to

20   mean?

21            MR. GARDNER:  Same objection.  Calls for

22   speculation.

Page 149

1          THE WITNESS:  Again, I'm not sure without

2     further context who they is.  He could be

3     referring to that advisory committee that you had

4     had in a previous email.  He could be referring to

5     Census.

6     BY MR. COLANGELO:

7          Q    Does the advisory committee establish the

8     content for the census?

9          A    Again, the context of this email is that

10    somebody appears to be emphasizing that they've

11    settled with Congress on the questions.  That

12    clearly is not the case, because questions aren't

13    due until March of 2018.  So they couldn't have

14    settled on the questions.

15         Q    And you see that at the top of

16    Exhibit 10, you email the Secretary saying, "On

17    the citizenship question, we will get that in

18    place"?

19         A    Uh-huh.

20         Q    Do you see that?

21         A    Yep.

22         Q    What did you mean by that?

1     A   Well, it means that we're, as instructed,

2  going to continue to work on developing a

3  citizenship question, and that process -- again,

4  it's probably helpful at this point to explain on

5  the policy side, right, you formulate -- you

6  formulate something that you think you would like

7  to do, and then you go explore that.  That's my

8  job, is to go.  Secretary says, I think this might

9  be a good idea, you run it down, and you track

10 down the issues, and you say -- you know, first

11 question I usually ask is, okay, is this something

12 that Department of Commerce does?  Do we have

13 legal authority to do this?  Once you clear those

14 two thresholds, now you get to work.

15        But I don't spend a lot of time chasing

16 down things that people are not planning on doing.

17     Q   So you --

18     A   So there has to be some initial threshold

19 decision that this is worth pursuing.

20     Q   Now, let me stop you there, because you

21 said a minute ago, as instructed.  And you're

22 referring to instructions from the Secretary,

1   correct?

2        A    To pursue, exploring the question.

3        Q    This was instructions to add the question

4   in response to my months' old request that we

5   include the citizenship question, correct?

6        A    This would be instructions to review and

7   consider and present to him information that would

8   allow him to make a decision on whether or not to

9   take final action.

10       Q    Mr. Comstock, I'm just asking you what

11  you understood on May 2nd --

12       A    And that's what I'm telling you I

13  understood on May 2nd.

14       Q    Hold on one second.  Let me finish the

15  question.

16       A    Uh-huh.

17       Q    The Secretary wrote, "I am mystified why

18  nothing has been done in response to my months'

19  old request that we include the citizenship

20  question."

21            And you responded, "On the citizenship

22  question, we will get that in place"?

1      A    Correct.

2      Q    Okay.  So my question is:  By we will get

3  that in place, what did you mean?

4      A    I meant that I will present to you the

5  information and the process necessary for you to

6  decide if you would like to pursue this question.

7      Q    Your email says we will get that in

8  place, correct?

9      A    I mean, we will get in front of you the

10  necessary information for you to make a decision.

11  Part of my role in this process is explaining to

12  people who have never worked in government before

13  that there are processes that you have to follow

14  in order to make an action happen.  You're dealing

15  with people who are used to being able to make a

16  decision and it simply goes into effect.

17      Q    Okay.

18      A    That's not the way the U.S. government

19  works.

20      Q    So the process that you then go on to

21  tell the Secretary he has to follow is later in

22  your message; is that right?

1       A    That part of the process, yes.

2       Q    And that email says we need to work with

3    Justice to get them to request that citizenship be

4    added back as a census question; is that right?

5       A    That's right.

6       Q    Why would you say you needed to work with

7    the Justice Department to get them to request that

8    citizenship be added back?

9       A    Because based on a very preliminary

10   review, they appeared to be the most likely

11   government body that would have a specific need

12   for the information that would support adding a

13   citizenship question to the decennial census.

14      Q    Who conducted that preliminary review?

15      A    We were told by the Census Bureau that

16   the Justice Department was the person that had

17   requested the citizenship question on the ACS and

18   that they utilized the ACS data for Voting Rights

19   Act information.

20      Q    Who in the Census Bureau told you that?

21      A    I couldn't tell you.

22      Q    And why did you need a request from

1    Justice?

2        A    Again, based on the preliminary review,

3    the understanding we had was questions are added,

4    based on requests from a government agency.  There

5    is such a thing as the Paperwork Reduction Act

6    where you have to justify to OMB why do I need

7    this information?  That has to get cleared.  So

8    there are certain hurdles you have to get through.

9    So if at the end of the day the Secretary decided

10   to pursue this question, we would need to clear

11   certain legal thresholds.

12       Q    Why not just tell the Census Bureau to

13   add the citizenship question and say the Secretary

14   wanted it?

15       A    Because I'm not sure that that would be

16   the process they would necessarily agree to

17   follow.

18       Q    So you had to have it come from DOJ in

19   order for the Census Bureau to agree to follow it?

20       A    Again, that was a preliminary conclusion

21   based on a cursory analysis.

22       Q    Your email then says, "We have the court

Page 155

1    cases to illustrate that DOJ has a legitimate need

2    for the question to be included."

3           What court cases were your referring?

4       A   I don't recall the exact court cases.

5       Q   Did you research those court cases?

6       A   I did research a court case where there

7    was a scenario in which you would need -- it would

8    be important to have Citizen Voting Age Population

9    data in order to make a Voting Rights Act claim.

10      Q   How did you identify that case?

11      A   By a legal research.

12      Q   What do you mean by legal research?

13      A   Well, I think I talked to -- I'm trying

14   to think -- I think Mark Neuman may have provided

15   a case name.  I talked to James Uthmeier, who

16   looked at some cases.  Basically said, okay, if

17   this is the question -- I mean, it's what you do

18   as an attorney all day long, is to go find cases

19   to support what you're looking for.

20      Q   So Mark Neuman identified for you a case

21   that would support DOJ's need for this

22   information?

1     A    Yeah.  I said I may have spoken to

2  Mark Neuman on that.  I think he may have provided

3  it.  I don't recall.  I know James Uthmeier looked

4  at some cases.

5     Q    Would he have provided that case for you

6  on a phone call or by email?

7     A    James?

8     Q    Pardon me?

9          I'm sorry.  Withdraw that question.

10          Would Mr. Newman have provided that case

11  to you by email or on the phone?

12     A    Well, if he provided it by email, you'd

13  have it.  I don't have the emails in front of me,

14  so I can't tell you.

15     Q    So by May of 2017, you'd come to the view

16  that you needed another agency to request a

17  citizenship question on the census?

18     A    That was based on the preliminary

19  analysis, yes.

20     Q    You then say in your email, "I will

21  arrange a meeting with DOJ staff this week to

22  discuss."

Page 157

```
 1          Do you see that?

 2     A    Yes.

 3     Q    Okay.  So before May 2, 2017, you had not

 4  had any discussions with the Department of Justice

 5  about the citizenship question, right?

 6     A    Not to my knowledge.

 7     Q    What did you do to arrange a meeting with

 8  DOJ staff to discuss?

 9     A    I asked Eric Branstad for a name over at

10  DOJ, and he provided me the name of

11  Mary -- Mary Jane [sic] Hankey I think it was,

12  whom I then contacted.

13     Q    Okay.  Your email refers to the court

14  cases to illustrate that DOJ has a legitimate need

15  for the question to be included.

16     A    That's what it says, yes.

17     Q    What were the other needs that you had

18  talked about for including the citizenship

19  question?

20     A    I don't recall.

21     Q    Okay.  And by legitimate need, were you

22  concerned that other needs that didn't come from
```

Page 158

1  DOJ would not be legitimate needs?

2      A   No.  I think that's just an

3  imprecise -- the use of the term legitimate,

4  something to say that it would be a need that

5  would be considered a government need for the

6  information.

7           MR. COLANGELO:  Counsel, five-minute

8  break.  Let's go off the record.

9           VIDEOGRAPHER:  Going off the record.  The

10  time on the video is 11:31 a.m.

11           (Off the record.)

12           VIDEOGRAPHER:  This begins Media Unit

13  Number 3.  The time on the video is 11:45 a.m.  We

14  are on the record.

15  BY MR. COLANGELO:

16      Q   Okay.  Let's mark as Exhibit 11 --

17           MR. GARDNER:  No.  I think 12.

18           MR. COLANGELO:  12.  Sorry.  Thank you.

19           (Plaintiffs' Exhibit 12, Email, was

20  marked.)

21  BY MR. COLANGELO:

22      Q   This is document stamped 3699.

Page 159

1          Mr. Comstock, do you have Exhibit 12 in

2    front of you?

3      A    Uh-huh.

4      Q    Have you seen this email before?

5      A    No.  I mean, part of it I clearly did,

6    because it's to me, but -- oh, that's the previous

7    email.  So I haven't seen the upper part of this

8    document.

9      Q    Okay.  So this is an -- an email chain

10   from Brooke Alexander forwarding to Wendy Teramoto

11   the May 2nd email that the Secretary wrote to you

12   where he says I'm mystified why nothing has been

13   done in response to my months' old request; is

14   that right?

15     A    Yeah.  Appears to be, yeah.

16     Q    So it looks like Brooke forwarded the

17   Secretary's email to Wendy?

18     A    Correct.

19     Q    Is that her regular practice?

20          MR. GARDNER:  Objection.  Calls for

21   speculation.

22          THE WITNESS:  Yeah.  I couldn't tell you.

Page 160

1    BY MR. ADAMS:

2        Q    Do you know why she did in this case?

3        A    I don't know.

4        Q    It's because the Secretary was expressing

5    frustration and one concern was that one of his

6    priorities had not yet been accomplished and she

7    wanted the chief of staff to know?

8        A    I don't know.

9        Q    Would that be your surmise?

10           MR. GARDNER:  Objection.  Form.

11           THE WITNESS:  It's certainly a

12   possibility.

13   BY MR. COLANGELO:

14       Q    And then the -- strike that.

15           Wendy, from this chain, it appears, sends

16   an email to the Secretary and says, "I continue to

17   talk frequently with Mark Neuman, and we often

18   have dinner together.  He will not leave L-E-S" or

19   "LES, but is in love with the census and talks

20   about it nonstop."

21           Do you see that?

22       A    Yes.

1      Q   Why would the Secretary's concern about

2   the citizenship question prompt Wendy to bring up

3   Mark Neuman?

4           MR. GARDNER:  Objection.  Lack of

5   foundation.  Calls for speculation.

6           THE WITNESS:  Again, he was the primary

7   transition team person advising us on Census.

8   BY MR. COLANGELO:

9      Q   Okay.  And the email also says, "Do you

10   want me to set up another meeting?"

11          Do you see that?

12     A   I see that.

13     Q   What's the earlier meeting that she's

14   referring to?

15          MR. GARDNER:  Objection.  Calls for

16   speculation.

17          THE WITNESS:  I don't know.

18   BY MR. COLANGELO:

19     Q   Had you attended the meetings with the

20   Secretary and Mr. Neuman on the citizenship

21   question before May 2, 2017?

22     A   I don't know.  I had attended meetings

1    with the Secretary and Mr. Newman on the census.

2        Q    Before May 2017?

3        A    Yes.

4        Q    How many times?

5        A    I don't know.  Two times, three times.

6    I'd -- you'd have to check his count.

7        Q    Okay.  And the citizenship question was

8    discussed in those earlier meetings?

9        A    I don't recall.

10       Q    And you see the Secretary writes back and

11   says, "Let's try to stick him in there for a few

12   days to fact find."

13       A    Yes.

14       Q    Do you see that?

15            Were you aware of that request?

16       A    I was aware that the Secretary was

17   distressed with Director Thompson who had just

18   told us that he had massively overrun the CEDCaP

19   budget and failed to warn us that that was coming.

20   So the Secretary was not happy with the Census

21   leadership at the time and was trying to find

22   someone who could be -- provide us better

1   information about what was going on at Census.

2       Q   Okay.  This email refers to the

3   citizenship question; is that right?

4           MR. GARDNER:  Objection.  Calls for

5   speculation.  Lack of foundation.

6           THE WITNESS:  I know the forwarded email

7   refers to the citizenship question.  There's

8   nothing in Ms. Teramoto's email that refers to

9   citizenship.

10  BY MR. COLANGELO:

11      Q   But she's not forwarding any other

12  information there, correct?

13      A   Well, I can't see what's blacked out, so

14  I have no idea what else is discussed there.  But

15  I know that there is a large amount of black out,

16  so presumably quite a number of other things were

17  discussed.

18      Q   And was Mark Neuman placed in

19  Census Bureau to fact find?

20      A   No.

21      Q   Why not?

22      A   I imagine because he had a much better

Page 164

1    paying job where he's at.

2         Q    Okay.  And did Wendy or the Secretary

3    convey this request to you at the time?

4         A    Wendy and the Secretary discussed with me

5    the possibility of putting Mark Newman in Census

6    so that we could get a handful of what's going on

7    with the budget, yes.

8         Q    And did you discuss putting Mark Neuman

9    in Census so he could help facilitate the

10   inclusion of a citizenship question?

11        A    That was never discussed -- or not to my

12   knowledge.

13             MR. COLANGELO:  Let's mark as Exhibit 13.

14             (Plaintiffs' Exhibit 13, Email, was

15   marked.)

16   BY MR. COLANGELO:

17        Q    Do you have the document that has been

18   marked Exhibit 13?

19        A    Yes.

20        Q    For the record, this is Bates stamp 3071

21   and this email from Eric Branstad to Matthew

22   Flynn, Subject Line DOJ contact, "Who is the best

1    counterpart to reach out to at DOJ regarding

2    census and legislative issues?"

3            Have you seen this before?

4        A    Yes.

5        Q    When was the last time you saw it before

6    today?

7        A    Yesterday.

8        Q    Do you know who Matthew Flynn is?

9        A    I have no idea who Matthew Flynn is.

10        Q    You testified before our last break that

11    you asked Eric to get you a point of contact at

12    the Justice Department, right?

13        A    Correct.

14        Q    So does this email exchange reflect Eric

15    followed up on that request?

16        A    Yes.

17        Q    And he forwards it to you on May 3; is

18    that right?

19        A    It looks like he forwarded it to me --

20            (Conference call interruption.)

21            THE WITNESS:  It looks like he sent it to

22    me on May 4th and I -- May 3rd and I replied

1    May 4th early in the morning.

2    BY MR. COLANGELO:

3        Q    Saying, "Thanks, Eric.  Earl."

4        Correct?

5        A    Yes.

6        Q    So on May 2nd, the Secretary asked you

7    why nothing had been done in response to his

8    months' old request.  You told him you needed to

9    get the Justice Department to request the

10   question.  You also told him that you would set up

11   meetings with the Justice Department to discuss.

12   And then after that, you asked Eric Branstad to

13   get you a point of contact at the Justice

14   Department and he did, right?

15           MR. GARDNER:  Objection.  Form.

16           THE WITNESS:  That appears to be the

17   sequence.

18   BY MR. COLANGELO:

19       Q    Okay.  And you testified earlier that you

20   hadn't ever spoken to the Justice Department

21   before that on the citizenship issue?

22       A    That's correct.

1        MR. COLANGELO:  Let's mark Exhibit 14.

2        (Plaintiffs' Exhibit 14, Email, was

3   marked.)

4   BY MR. COLANGELO:

5        Q    Exhibit 14 is document stamped 2462.  You

6   have Exhibit 14 in front of you?

7        A    I do.

8        Q    And why were you contacting Mary Blanche?

9   Her surname is redacted on this email, I assume

10  for personal privacy reasons.  But this is Mary

11  Blanche Hankey, correct?

12       A    Yes.

13       Q    Why were you contacting Mary Blanche

14  Hankey?

15       A    That was the name that Eric Branstad said

16  he'd provide me.

17       Q    Okay.  And do you know where in the

18  White House -- strike that.

19            Do you know where in the

20  Justice Department she worked?

21       A    She was advisor for -- to

22  Attorney General Sessions.

Page 168

1    Q    So she worked for the Attorney General?

2    A    Correct.

3    Q    And you reached out to her to talk about

4  the citizenship question, right?

5    A    Amongst other things, yes.

6    Q    And you reached out to her and asked her

7  for times for a call that day, right?

8    A    That's what I'm asking for, yes.

9    Q    Okay.  Is that because this was an urgent

10  priority for the Secretary?

11    A    I think you can divine from his prior

12  email that he was hoping I might take a quick

13  action on this, so I was trying to be responsive.

14    Q    So the answer is yes?

15    A    I'm not going to speculate as to whether

16  he thought it was urgent or not, but he was

17  conveying he would like me to get moving.

18    Q    You were treating it as an urgent matter?

19    A    Correct.

20    Q    And then you -- did you speak to

21  Ms. Hankey?

22    A    I did speak to Ms. Hankey.

Page 169

1      Q    How many times?

2      A    I met with her -- I think I spoke with

3  her by phone and then met with her in her office.

4      Q    When did you speak with her by phone?

5      A    I couldn't tell you.

6      Q    Was it on May 4th?

7      A    It's possible.

8      Q    And then you met with her in her office,

9  you said?

10     A    Yes.

11     Q    When was that meeting?

12     A    I don't know the exact date.

13     Q    When you spoke to her on the phone, was

14  anyone else on the call with you?

15     A    No.

16     Q    Was anyone else on the call on her end?

17     A    Not that I was aware of, no.

18     Q    When you met with her in person, did

19  anyone from the Commerce Department go with you?

20     A    No.

21     Q    Did anyone from the Census Bureau go with

22  you?

1      A    No.

2      Q    Was there anyone else in the meeting that

3   she brought?

4      A    No.

5      Q    What did you say to her when you spoke to

6   her on the phone?

7      A    That I'd like to come over and discuss

8   what issues the Justice Department might have with

9   Commerce that I could be helpful on and talk to

10   her about an issue that we were interested in.

11      Q    And that issue was the citizenship

12   question?

13      A    Correct.

14      Q    And what did she say about that?

15      A    Let's get together and meet.

16      Q    So then you went over to meet with her.

17   Did she have any issues that she wanted to raise

18   with you?

19      A    I don't recall that Justice had any

20   particular Commerce issues, no.

21      Q    So this was a meeting about the

22   citizenship question?

1      A    I'd say that was the primary topic.

2      Q    Okay.  And what did you say to her when

3    you met with her in person?

4      A    That we -- the Secretary had asked us to

5    look into the possibility of adding a citizenship

6    question, and that since the Justice Department

7    was the agency that had sponsored the question for

8    the ACS, it seemed that that was a logical place

9    to start, and was there someone in the

10   Justice Department with whom I should speak about

11   that.

12     Q    And what did she say?

13     A    Let me look into it.

14     Q    How long was the meeting?

15     A    Well, we met for about 20 minutes.

16     Q    Did you explain why the Secretary wanted

17   the citizenship question?

18     A    No.

19     Q    Did you have an understanding at that

20   point as to why the Secretary wanted the

21   citizenship question?

22     A    I've never asked the Secretary why he

Page 172

1    wanted a citizenship question.

2        Q    Did she ask you why it was important to

3    Commerce Department to add a citizenship question?

4    She being Ms. Hankey.

5        A    No.

6        Q    You mentioned earlier that you did some

7    legal research or that Mark Neuman or others may

8    have identified cases for you.  Did you identify

9    those cases to Ms. Hankey in that conversations?

10       A    I don't recall.

11       Q    Did you bring any paper with you to that

12   meeting?

13       A    Not that I recall.

14       Q    Did you take notes?

15       A    No.

16       Q    After the meeting, did you update anyone

17   at the Commerce Department and your discussion?

18       A    I don't recall.

19       Q    Did you speak to the Secretary to tell

20   him that -- on an issue that you understand to be

21   a priority, you'd gone over to the

22   Justice Department to make some progress on his

Page 173

1   request?

2       A   I might have mentioned I had a meeting

3   over there.

4       Q   Did you mention it to Wendy?

5       A   I might have.

6       Q   Did you talk about it with anyone else in

7   the Office of Policy?

8       A   I might have told Eric that I met with

9   the person he recommended.

10      Q   Eric Branstad?

11      A   Yes.

12      Q   Is the senior White House advisor

13  position in Office of Policy?

14      A   No.

15      Q   My question was:  Did you talk to anyone

16  in the Office of Policy about the meeting?

17      A   Not that I recall.

18      Q   Other than the Secretary, Wendy and Eric,

19  did you talk to anyone else at the

20  Commerce Department about that meeting?

21      A   Not that I recall.

22      Q   Did you talk to Mark Neuman about it?

Page 174

1      A    Not that I recall.

2      Q    And after you met with Ms. Hankey and she

3   said she'd look into it, what was the next that

4   you heard from the Justice Department on this

5   issue?

6      A    I think when she contacted me, provided a

7   name.

8      Q    How long after your meeting did she

9   contact you and provide a name?

10     A    There's an email that documents it, you

11  could tell from that, but otherwise, I have no

12  idea.

13     Q    Okay.

14     A    I mean, it was sometime in the next

15  couple weeks, but --

16     Q    And what name did she give you?

17     A    I -- I know I put it in a memo to the

18  Secretary later on, so you'd have to look at that

19  memo.

20     Q    Is it James McHenry?

21     A    That sounds like the right name.

22     Q    When she spoke to you to pass along

Page 175

1   James McHenry's name, what did she say about why

2   she was directing you to him?

3       A   She didn't say much.  Just said this

4   would be the best guy to talk to.

5       Q   Okay.  Had you spoken to James McHenry

6   before?

7       A   Never talked to him before.

8       Q   Did she tell you what his position was in

9   the Department of Justice?

10      A   She might have.

11      Q   What was his position?

12      A   I don't know, actually.

13      Q   After she gave you Mr. McHenry's name,

14  what did you do next to contact him?

15      A   I called him on the phone.

16      Q   And when you spoke to him on the phone

17  what did you say?

18      A   I outlined that we were interested in

19  seeing what kind of level of interest the

20  Justice Department would have in requesting the

21  citizenship question be asked -- added to the

22  decennial census.

1      Q    And did you tell him why the

2    Commerce Department wanted the Justice Department

3    to make that request?

4      A    Because that was our understanding of the

5    process.  They were the people that needed it for

6    ACS, and our understanding was that it might be

7    useful for them to have it at a more granule

8    level, which would be needed -- you'd need to put

9    it on the decennial census to do that.

10     Q    So you were -- you told him that the

11   Commerce Secretary wanted the question and wanted

12   to know if DOJ would ask for the Census Bureau to

13   add the question; is that right?

14     A    Those are your words.

15     Q    Well, I'm asking you to tell me yes or

16   no.

17     A    Well, if the question is yes or no, then

18   the answer is no.

19     Q    Okay.  How would you put it in your

20   words?

21     A    In my words, what I told him was that we

22   were exploring the possibility and wanting to know

Page 177

1    the level of interest at the Justice Department in

2    making such a request, would this be information

3    they could use?

4        Q    So this is the shortly -- this is shortly

5    after the Secretary of Commerce emailed you and

6    said I am mystified why nothing had been done in

7    response to my months' old request?

8        A    Right.

9        Q    But your testimony is that you conveyed

10   to the Justice Department that you were exploring

11   the issue?

12       A    As I explained before, when -- when the

13   Secretary says he would like to do something,

14   there's a presumption that we will attempt to do

15   that.  That's subject to revision as more

16   information is made available.  So I'm exploring

17   what is necessary to follow through on the

18   Secretary's request.  That request may be modified

19   or changed, based on the information that I

20   provide.

21       Q    Okay.  How many times did you speak to

22   Mr. McHenry?

1      A    I think three or four times.

2      Q    And what was the next time you spoke to

3  him after the initial phone call?

4      A    Maybe a week later.

5      Q    Okay.  And what did he say when he -- did

6  he call you or did you call him?

7      A    I don't recall.

8      Q    And what did you discuss on that

9  conversation?

10      A    That he was still exploring the question.

11      Q    How long was that conversation?

12      A    Five minutes.

13      Q    Okay.  So he didn't have anything new to

14  report?

15      A    Right.

16      Q    Okay.  And you said you spoke to him at

17  least a couple more times; is that right?

18      A    Again, I don't recall the exact number of

19  times, but somewhere in the vicinity of three or

20  four times.

21      Q    So after the second call where he said he

22  was still exploring it, tell me about the next

Page 179

1   conversation?

2       A    Memory serves, I think the next

3   conversation was a similar one.  He was still

4   looking into the matter and then -- and then the

5   last conversation he and I had, he directed me to

6   somebody at the Department of Homeland Security.

7       Q    Okay.  And over what period of time were

8   you talking to Mr. McHenry on the phone?

9       A    Probably over the course of a month.

10      Q    So this was primarily in May of 2017?

11      A    I honestly don't recall, but sometime in

12  May, early June.

13      Q    And who did he direct you to at the

14  Department of Homeland Security?

15      A    I don't remember the person's name.

16      Q    Was it Gene Hamilton?

17      A    Again, I know I prepared a memo for the

18  Secretary that had the name.  So if that's the

19  name that was on the memo, then, yes, that would

20  be the person I spoke with.

21      Q    How many times did you speak to your

22  point of contact at the Department of

Page 180

1    Homeland Security?

2       A    Again, I think it was -- I think this was

3    like two or three times.

4       Q    And what did you say when you first spoke

5    to Mr. Hamilton?

6       A    Same -- same basic message, we're looking

7    into the -- exploring the possibility of putting a

8    census question on -- a citizenship question on

9    the decennial census, would this be information

10   that the Department of Homeland Security would

11   need or use, and could he answer that, and his

12   response was, let me look into it.

13      Q    Now, the Department of Homeland Security

14   wasn't the original requester for the ACS

15   citizenship question, to your understanding,

16   correct?

17      A    Correct.

18      Q    Was it your view that the Department of

19   Homeland Security would also be a legitimate

20   requester of this information?

21      A    Legitimate is not the right word, but

22   the -- I think my view was, let me see if

Page 181

1    there's -- what their explanation would be, but

2    they were obviously not our first choice.

3        Q   So you were looking for an agency to make

4    this ask?

5        A   Again, my understanding of the process,

6    based on the research I've been able to do, and

7    consequently was advising the Secretary was an

8    agency needed to make the request; therefore, you

9    have to find an agency that would have a reason to

10   be using this information.  And Justice,

11   obviously, was the primary recipient of the CVAP

12   data from the ACS, so they were the logical place

13   to start.  Justice then says go to

14   Homeland Security, and I say, okay, maybe there's

15   something about Homeland Security that I don't

16   know about that might justify this data.  So you

17   follow up on a call, get more information, informs

18   your decision, you might change it.

19       Q   And so my question was:  So you were

20   looking for an agency to make this ask and --

21       A   Correct.  In order to implement the

22   process that had been outlined to us, you needed

Page 182

1   an agency.  So that was my task at the time.

2       Q    Thank you.

3            MR. COLANGELO:  Let's mark this

4   Exhibit --

5            MR. GARDNER:  15.

6            MR. COLANGELO:  -- 15.

7            (Plaintiffs' Exhibit 15, Memo, was

8   marked.)

9            THE WITNESS:  The very memo I was

10  speaking of.

11  BY MR. COLANGELO:

12      Q    Exhibit 15 is document stamped 9834.

13           Mr. Comstock, do you have Exhibit 15 if

14  front of you?

15      A    I do.

16      Q    Is this the very memo you were just

17  speaking about?

18      A    It's the very memo I was just speaking

19  about.

20      Q    And what's the date on this memo?

21      A    September 8th.

22      Q    And you see in the second paragraph of

Page 183

1  this memo, the sentence that says, "James directed

2  me to Gene Hamilton at the Department of

3  Homeland Security."

4      A   Correct.

5      Q   So the person you were speaking to at DHS

6  was Gene Hamilton, right?

7      A   Apparently so, yes.

8      Q   The -- in that paragraph -- strike that.

9          This is a memo from you to the Secretary

10 dated September 8th of 2017, correct?

11     A   Correct.

12     Q   Why did you prepare this memo?

13     A   Because the Secretary was asking about

14 the lack of progress and said he was prepared to

15 call the Attorney General, and so he needed the

16 timeline of who I had spoken to.

17     Q   Okay.  What do you mean by lack of

18 progress?

19     A   Well, obviously, we're now September 8th,

20 and he inquired on May -- May whatever the date

21 was, 2nd, 5th, whatever it was, saying how come we

22 haven't made more progress?  Three months later we

1  don't have any response from the

2  Justice Department, so --

3      Q   In his May 2nd email it said, why has

4  nothing been done in response to my months' old

5  request?

6      A   That is what it says, yes.

7      Q   So the Secretary had been asking about

8  this since the early spring of 2017?

9      A   Yes.

10     Q   And you testified and this memo says you

11 met in person with Mary Blanche and she said what?

12     A   Well, as I said, she directed me to

13 James McHenry.

14     Q   And then after speaking with Mr. McHenry,

15 he told you what?

16     A   He directed me to Gene Hamilton.

17     Q   Okay.  And then after several phone calls

18 with Gene Hamilton, according to this memo, he

19 relayed that, "After discussion, DHS really felt

20 it was best handled by the Justice Department."

21         Do you see that?

22     A   I see that.

1    Q   Why did Mr. Hamilton feel this was best

2   handled by the Justice Department?

3    A   As relayed to me, DHS felt the agency

4   that would most utilize this data was

5   Department of Justice, which was our

6   original conclusion.

7    Q   So DHS said they were not going to make

8   this request, right?

9    A   Well, Gene never made a commitment, one

10   way or the other, for the department.  He simply

11   directed me back to the other department.  It's

12   not an uncommon experience in the federal

13   government.

14    Q   Tell me what's not uncommon in the

15   federal government.

16    A   Being directed to somebody.

17    Q   Your memo then says at that point the

18   conversation ceased.

19    A   Correct.

20    Q   What do you mean by that?

21    A   Means that I did not talk to

22   Mary Blanche, James McHenry or Gene Hamilton after

Page 186

1    that point in time.

2        Q   You didn't, at this point, have a request

3    from the Justice Department, right?

4        A   That's correct.

5        Q   Okay.  And what did you ask

6    James Uthmeier after that point?

7            MR. GARDNER:  Objection.  Calls for

8    information --

9            (Thereupon, the court reporter

10   clarified.)

11           MR. GARDNER:  Sorry.  I have a cold.

12           Objection.  Calls for information that's

13   subject to privilege.  I'll instruct the witness

14   not to answer.

15           MR. GERSCH:  What privilege?

16           MR. GARDNER:  Attorney -- thank you.  I

17   thought we were doing one at a time.

18           Attorney-client privilege.

19           MR. GERSCH:  Sorry.

20   BY MR. COLANGELO:

21       Q   Did you identify any facts for

22   Mr. Uthmeier?

1        MR. GARDNER:  Objection.  Form.

2        THE WITNESS:  Can you restate the

3   question?

4   BY MR. COLANGELO:

5        Q    Sure.  When you -- was this your first

6   contact with Mr. Uthmeier on the topic of the

7   citizenship question?

8        A    Well, you mean this memo or this

9   reference?

10       Q    This reference.

11       A    Well, it says -- at this -- at that

12   point, the conversation ceased, and I asked

13   James Uthmeier, who had by then joined -- this is

14   referring back in time.  I don't know exactly when

15   James joined OGC, but it was before September, so

16   I think he joined -- I don't know -- in June

17   maybe.  I don't know.

18       Q    I understand this memo to be a reference

19   to discussions you had with the Justice Department

20   in May; is that right?

21       A    It doesn't exactly specify the time

22   frame, but, yes, from early May when I met with

Page 188

1  Mary Blanche, through when my conversations with

2  Gene Hamilton ceased, I don't know exactly what

3  that time frame was.  It was four or six weeks.

4      Q   So I'm asking before May of 2017, had you

5  ever discussed the citizenship question with

6  James Uthmeier?

7      A   And I cannot answer that directly,

8  because I don't recall when James Uthmeier joined

9  the department.

10     Q   Okay.  So you do recall discussing the

11 citizenship question with him, but you don't

12 remember when it was?

13     A   Yes.

14     Q   And you don't remember if it was before

15 May or June of 2017?

16     A   Well, it couldn't have been before he

17 joined the department, so whenever that was.

18     Q   Is it your understanding that

19 Mr. Uthmeier had a position in the Department of

20 Commerce that was not within the Office of

21 General Counsel and he was then moved into a

22 position in the Office of General Counsel?

Page 189

1           MR. GARDNER:  Objection to form.

2           THE WITNESS:  To my knowledge, the first

3    time I interacted with James, he was in the

4    Office of General Counsel.

5           MR. COLANGELO:  Okay.  Okay.  Let's mark

6    Exhibit 16.

7           (Plaintiffs' Exhibit 16, Memo, was

8    marked.)

9    BY MR. COLANGELO:

10       Q   Exhibit 16 is document stamped 2458.

11           Do you have Exhibit 16 in front of you,

12   Mr. Comstock?

13       A   I do.

14       Q   Have you seen this email before?

15       A   Not since I've sent it to Wendy on

16   Saturday the 16th of September.

17       Q   Why did you send Ms. Teramoto your

18   September 8th memo on September 16, 2017?

19       A   I don't recall exactly, but, likely,

20   because she may have been setting up the call with

21   the Attorney General.

22       Q   And which call with the Attorney General

1  was that?

2     A    A call from the Secretary to talk to the

3  Attorney General about whether or not Justice

4  would be interested in a citizenship question.

5     Q    And why was the Secretary talking to the

6  Attorney General about whether or not Justice

7  would be interested in the citizenship question?

8     A    Again, if -- if the -- if the

9  Justice Department was not going to request the

10  question, had no use for the information, then

11  that would probably put an end to the citizenship

12  question.

13     Q    And the Secretary wanted the citizenship

14  question?

15     A    I think he felt -- well, I don't know

16  what he felt.  Yes.  He was continuing to explore

17  that possibility.

18          MS. BOUTIN:  I'm sorry.  Can you speak

19  up?

20          THE WITNESS:  I don't know what he felt,

21  but he was continuing to explore the possibility.

22  BY MR. COLANGELO:

 1     Q    And when did the Secretary speak with the
 2 Attorney General?
 3     A    I don't know that.
 4     Q    Were you on that call?
 5     A    I don't recall being on the call.
 6     Q    Who else was on the call?
 7     A    I don't know.
 8     Q    Okay.  Did -- did Wendy ask to see this
 9 memo, or did you send it to her without her
10 asking?
11     A    Again, I don't recall the context, but
12 based on what the memo says, it appears she might
13 have asked --
14          (Thereupon, the court reporter
15 clarified.)
16          THE WITNESS:  For it.
17 BY MR. COLANGELO:
18     Q    Okay.  I want to go back for a second
19 here, May 2nd email --
20          MR. GARDNER:  Which exhibit number?
21          MR. COLANGELO:  This is Exhibit --
22          MR. GARDNER:  Oh, the 12 --

Page 192

1          MR. COLANGELO:  This is Exhibit -- no.  I

2    was thinking of Exhibit 10.

3    BY MR. COLANGELO:

4      Q   How did you come to the view before ever

5    talking to DOJ that DOJ should request this

6    information?

7      A   Again, if DOJ was the governmental

8    organization that had questioned the information

9    on the ACS, then it would stand to reason that

10   they would be the people that would also be

11   interested in the information on the decennial,

12   and they're also the party responsible for

13   enforcing the voting rights.

14     Q   And how did you come to the view before

15   ever talking to DOJ that DOJ had a legitimate need

16   for the question to be included?

17     A   If they enforced the Voting Rights Act --

18   if you're going to make a Voting Rights Act case,

19   then they would be the people that would

20   have -- need the information.

21     Q   And you researched those Voting Rights

22   Act cases or that Voting Rights case on your own?

Page 193

1      A    Again, I think in doing some basic
2  research on it, it was pointed out there was a
3  case where the Court had said you could -- you
4  would need more granule information to answer this
5  question, which would then support a citizenship
6  question.
7      Q    And you told me before that you're not a
8  voting rights lawyer, right?
9      A    Again, what do you mean by a voting
10 rights lawyer?
11     Q    Have you ever practiced voting rights
12 law?
13     A    No.
14     Q    Have you ever tried a voting rights case?
15     A    No.
16     Q    Have you ever advised a client on a
17 voting rights matter?
18     A    No.
19     Q    Have you ever practiced redistricting
20 law, tried a redistricting case --
21     A    No.
22     Q    -- or advised a client on a redistricting

Page 194

1   matter?

2       A   No.

3           MR. GARDNER:   Make sure he finishes his

4   question before you answer.

5           THE WITNESS:   No.

6   BY MR. COLANGELO:

7       Q   Have you ever litigated a case under the

8   Voting Rights Act?

9       A   No.

10      Q   Have you ever litigated a redistricting

11  case?

12      A   No.

13          MR. COLANGELO:   Let's mark as Exhibit 17

14  a document Bates-stamped 3705.

15          (Plaintiffs' Exhibit 17, Meeting

16  notification, was marked.)

17  BY MR. COLANGELO:

18      Q   Mr. Comstock, do you have 3705 in front

19  of you?

20      A   I do.

21      Q   And what is this?

22      A   It appears to be some kind of meeting

Page 195

1   notification.

2      Q    Okay.  Does this help you date your

3   interactions with Mr. Uthmeier regarding the

4   citizenship question?

5      A    Well, it appears that we might have had a

6   meeting on the 28th of June, 2017.

7      Q    And does this help you answer my earlier

8   question regarding whether this was your earliest

9   discussion with Mr. Uthmeier on the citizenship

10  question or whether you, in fact, spoke to him

11  before that?

12          MR. GARDNER:  Objection.  Form.

13          THE WITNESS:  Again, I don't recall when

14  James started working for the department.  I don't

15  recall when we had our first conversation on the

16  citizenship question.

17  BY MR. COLANGELO:

18     Q    And what did you tell Mr. Uthmeier in

19  that conversation?

20          MR. GARDNER:  Objection to the extent it

21  calls for disclosure of information subject to the

22  attorney-client privilege.  To the extent it does,

1    I would instruct the witness not to answer.

2           Can you answer the question without

3    disclosing confidential communications?

4           THE WITNESS:  I have no recollection of

5    this meeting, so I couldn't tell you what we

6    discussed.

7           MR. GARDNER:  Problem solved.

8    BY MR. COLANGELO:

9       Q   Easy enough.

10          Was this your first interaction with the

11   Office of General Counsel on this issue?

12      A   Again, I have no idea.

13      Q   As you were talking to Ms. Hankey at the

14   Justice Department, Mr. McHenry at the

15   Justice Department and Mr. Hamilton at DHS --

16      A   Yeah.

17      Q   -- in the spring of 2017, were you

18   keeping the Secretary informed of those

19   conversations?

20      A   I might have mentioned them.

21      Q   In what context would you have mentioned

22   them?

1     A    Mr. Secretary, I contacted the

2    Justice Department today.  I would not have

3    given -- I mean, there was nothing to report.  So

4    I hadn't made any progress.

5     Q    Well, he was frustrated there was no

6    request yet?

7     A    Right.

8     Q    So one of the things to report might have

9    been --

10     A    That I contacted them, yes.

11     Q    Okay.  And did you keep Ms. Teramoto

12    informed during that time period?

13     A    Again, I might have.  At that time

14    period, we operated in bullpens, so we were

15    all -- there were five people in the same room.

16    So it's entirely possible I might have mentioned I

17    was going to the Justice Department or I had

18    spoken with the Justice Department, yes.

19     Q    I'm sorry.  If you were not finished.

20     A    Nope.

21     Q    Who was sitting in the bullpen with you?

22     A    Wendy Teramoto, Eric Branstad,

1    James Rockas, me, and occasionally Izzy Hernandez.

2         Q    Who is James Rockas?

3         A    He was acting press secretary at the

4    time.

5         Q    And who is Izzy Hernandez?

6         A    Israel Hernandez, he was the acting -- or

7    I'm not sure what his formal title was.  I think

8    he was deputy chief of staff.

9         Q    And where was the bullpen you referred

10   to?

11        A    It was the -- what is now the chief of

12   staff.

13        Q    And there were five of you working in the

14   office?

15        A    Correct.

16        Q    How long were the five of you working in

17   that office together?

18        A    Maybe nine months.

19        Q    So from January of 2018 through the

20   end -- strike that.

21             From January 2017 through the end of

22   the --

Page 199

1      A    No.

2      Q    -- summer --

3      A    No.  The bullpen was set up, I think, in

4    March through the end of the year.

5      Q    Why did you work in a bullpen?

6      A    Because that was the form that the

7    Secretary and Ms. Teramoto felt was most

8    effective.

9      Q    And was it near the Secretary's office?

10     A    It's located -- there's the Secretary's

11   office, there's the anteroom to the Secretary's

12   office, and it's located right next to that.

13     Q    And at some point, you stopped working in

14   a bullpen?

15     A    Yes.

16     Q    Did it become less effective?

17     A    I think that was the chief of staff's

18   determination, yes.

19          MR. COLANGELO:  Let's mark Document 3702

20   as Exhibit 18.

21          (Plaintiffs' Exhibit 18, Email, was

22   marked.)

1  BY MR. COLANGELO:

2      Q    Mr. Comstock, do you have Exhibit 18 in

3  front of you?

4      A    I do.

5      Q    Have you seen this document before?

6      A    No.

7      Q    Okay.  And you testified before that

8  Mr. Langdon works for you in the Office of Policy

9  and Strategic Planning, correct?

10     A    Yes.

11     Q    His -- if you go to the second page of

12  this exhibit, the page stamped 3703, Mr. Langdon

13  says, "I apologize for not answering sooner, but I

14  honestly have been in meetings with SWR all

15  afternoon."

16          Do you see that?

17     A    Yes.

18     Q    And do you understand SWR to refer to

19  Secretary Wilbur Ross?

20     A    Yes.

21     Q    What meetings was he referring to?

22          MR. GARDNER:  Objection.  Calls for

1   speculation.  Lack of foundation.

2          THE WITNESS:  I don't know.

3   BY MR. COLANGELO:

4      Q   Were you in meetings with the Secretary

5   and David Langdon on May 24th of 2017?

6      A   It's entirely possible.

7      Q   Is it common for staff in the Office of

8   Policy to attend meetings with the Secretary that

9   you wouldn't be in?

10     A   Not common, but it would -- at that time

11  frame, it would depend on what else I was working

12  on.  I might have been off working on sugar

13  negotiations, saw-fit lumber --

14          (Thereupon, the court reporter

15  clarified.)

16          THE WITNESS:  I said I might have been

17  working on sugar negotiations, which were going on

18  at the time.  We have a saw-fit lumber case.  We

19  were beginning work on steel 232 investigation.

20  We had fisheries issues.  So any number of things

21  could have kept me from the meeting.

22  BY MR. COLANGELO:

Page 202

1      Q   Okay.  And if you weren't in the meeting,

2   would it be typical for Ms. Teramoto to be there?

3      A   Again, it would depend on what her

4   schedule was.

5      Q   Okay.  You'll see from this email at the

6   top of Page 3702, that David Langdon is reporting

7   to several people, quote, the Secretary seemed

8   interested on subjects and puzzled why citizenship

9   is not included in 2020.

10          Do you see that?

11     A   Yes.

12     Q   Okay.  Do you remember a meeting where

13  the Secretary was puzzled why citizenship was not

14  included?

15     A   I don't recall such a meeting, but --

16     Q   And why does Mr. Langdon say the

17  Secretary seemed puzzled why citizenship is not

18  included?

19          MR. GARDNER:  Objection.  Calls for

20  speculation.

21          THE WITNESS:  Again, the Secretary was

22  clear.  He did not understand why a citizenship

Page 203

1   question was not included, so he asked us to look

2   into the matter.

3   BY MR. COLANGELO:

4       Q   Okay.  And then you see that Mr. Langdon

5   sent the email to Lisa Blummerman.  Am I saying

6   that right?

7       A   I think it's pronounced Blummerman.

8       Q   Okay.  Mr. Langdon sent the email to

9   Lisa Blummerman at 10:51 p.m. on May 24.

10          Can you tell me who Ms. Blummerman is?

11      A   She was -- I believe at the time, in some

12  kind of acting capacity.  I don't know if she was

13  the acting deputy director or whether she was the

14  person in charge of budget.  If you notice further

15  down in the conversation, Lisa and I are happy to

16  discuss the lifecycle stuff, which was beginning

17  to become an issue.  So Lisa, to my recollection,

18  is largely budget side.

19      Q   Is it your understanding that at the

20  time, Ms. Blummerman was the associate director

21  for decennial programs?

22      A   That's entirely possible.

1     Q   And is the associate director for

2   decennial programs effectively the head of 2020

3   census?

4     A   I believe that's correct, yes.

5     Q   And you see that Mr. Langdon has asked

6   Ms. Blummerman for an answer on the citizenship

7   question ideally this evening?

8     A   That's what his mail says.

9     Q   Okay.  It's fair to say that this was a

10   matter of some urgency?

11          MR. GARDNER:  Objection.  Form.

12          THE WITNESS:  Again, one of the biggest

13   roles that I play is expediting things along.

14   Because you have people from the private sector

15   who are used to a much faster speed than the

16   government usually operates at.  So we spend a lot

17   of time expediting things to get things back in

18   place.  So this is not uncommon for us to say

19   everything the Secretary is requesting is urgent.

20   BY MR. COLANGELO:

21     Q   Let's go back to Exhibit 7.  Do you have

22   that in front of you?

1     A    Just a minute.

2          Yes.

3     Q    Okay.  And Exhibit 7 is the email

4  exchange with Kris Kobach; is that right?

5     A    It's an email exchange between

6  Kris Kobach and Wendy Teramoto.

7     Q    And the Secretary, correct, on the second

8  page?

9     A    Yes.  Appears to be one to the Secretary

10  on the second page.

11     Q    Okay.

12     A    Though it's blanked out as to who it goes

13  to.

14     Q    If I represent to you that the government

15  has represented to us that this was an email to

16  the Secretary and that they've blanked out his

17  name for personal privacy reasons, can we agree

18  that it's an email to the Secretary on July 14th?

19     A    I'll stipulate to that, yes.

20     Q    And Mr. Gardner will tell me after lunch

21  if that's wrong.

22          The -- so you see that the -- that

```
 1   Mr. Kobach, who identifies himself as the Kansas
 2   Secretary of State, emailed the Secretary on
 3   July 14, 2017, correct?
 4        A    Correct.
 5             MR. GARDNER:  Objection.  Lack of
 6   foundation.
 7   BY MR. COLANGELO:
 8        Q    And you'll see that it says I'm following
 9   up on our telephone discussion from a few months
10   ago, correct?
11             MR. GARDNER:  Objection.  Lack of
12   foundation.
13             THE WITNESS:  And you're reading from the
14   email.  So I have no idea if the email is correct
15   or not.
16   BY MR. COLANGELO:
17        Q    Did the Secretary ever tell you that he
18   spoke to Kris Kobach?
19             MR. GARDNER:  Objection.  Asked and
20   answered.
21   BY MR. COLANGELO:
22        Q    You can still answer.
```

1      A    No.

2      Q    Sorry.  We were speaking at the same

3  time.

4      A    I don't recall him ever telling me that

5  he spoke to Kris Kobach.

6      Q    This email reads, "As you may recall, we

7  talked about the fact that the U.S. Census does

8  not currently ask respondents their citizenship."

9          Do you see that?

10     A    I see that.

11     Q    The email also reads, "It also leads to

12  the problem that aliens who do not actually reside

13  in the United States are still counted for

14  Congressional apportionment purposes."

15         Do you see that?

16     A    I see that.

17     Q    Did the Secretary ever tell you he was

18  concerned about the problem that aliens who do not

19  reside in the United States are still counted for

20  Congressional apportionment purposes?

21     A    He never expressed an opinion on that.

22     Q    And when the Secretary asked you on

1   March 10, 2017 about the census and the

2   citizenship question, did he ask you in the

3   context of whether noncitizens should be included

4   for Congressional apportionment purposes?

5       A   He discussed Congressional apportionment

6   purposes.  If asked were the noncitizens counted,

7   and we answered the question, which is they are

8   counted.

9       Q   Well, you testified the link you sent him

10  was the link to the Census Bureau's web page on

11  whether noncitizens are counted for apportionment?

12      A   That's correct.  Well, I don't believe

13  you can find a web page on the Census that doesn't

14  speak to it in that context, whether noncitizens

15  are counted other than for apportionment.  That's

16  the question that we asked.  Do we count

17  noncitizens?  The answer is yes.  What is the

18  Census used for?  It's used for apportionment.

19  That's its primary function.

20      Q   And you'll see that -- going back to the

21  first page of Exhibit 7, Ms. Teramoto has written

22  to Mr. Kobach, "Kris, can you do a call with the

Page 209

1    Secretary and Izzy tomorrow at 11:00 a.m.?"

2        A    Correct.

3        Q    And that's Izzy Hernandez, correct?

4        A    I would believe that's the reference

5    she's making, yes.

6        Q    And he's copied at the top of this page,

7    correct?

8        A    Yes, he is.

9        Q    Did you ever discuss with Izzy Hernandez

10   a call with Mr. Kobach and the Secretary?

11       A    I did not.

12       Q    Did you ever discuss the citizenship

13   question with Mr. Hernandez, at all?

14       A    I think we discussed it once or twice.

15       Q    And when were those conversations?

16       A    I don't recall exactly.

17       Q    Was it in the summer of 2017?

18       A    It was sometime in the spring/summer of

19   2017.

20       Q    Okay.  So you had been working on the

21   citizenship question for some number of months by

22   late July of 2017; is that right?

1      A   Correct.

2      Q   Okay.  But your testimony is that the

3   Secretary had a phone call with Kris Kobach on

4   that issue and nobody told you about it?

5          MR. GARDNER:  Objection.

6   Mischaracterizes the witness's testimony.

7          THE WITNESS:  My testimony is he did not

8   discuss it with me.

9   BY MR. COLANGELO:

10     Q   Did anyone tell you that the Secretary

11   spoke to Kris Kobach about this issue?

12     A   Wendy might have mentioned it.

13     Q   And what do you remember Wendy said about

14   it?

15     A   That the Secretary had a conversation

16   with Kris Kobach.

17     Q   What did she describe about that phone

18   call?

19     A   She didn't.

20     Q   And did you ask for any other information

21   on it?

22     A   I didn't.

Page 211

```
1        Q    On an issue that you'd been working on

2    for five months?

3        A    It's not really relevant to the process I

4    was working on.

5            MR. COLANGELO:  Mr. Gardner, is now a

6    good time for a lunch break?  I have another --

7            THE WITNESS:  Or you can keep going.

8            MR. COLANGELO:  -- feeling this might be

9    a good time to stop.

10           MR. GARDNER:  How much -- how much more

11   time do you think you have, because I think the

12   witness is fine to keep going if you-all are?

13           MR. COLANGELO:  Well, we have a lot of

14   people here, and a court reporter and a

15   videographer.  So I'd rather take a short break

16   and then -- I probably have -- why don't you let

17   me look at my notes, I'll tell you once we're off

18   the record --

19           MR. GARDNER:  Sure.

20           MR. COLANGELO:  -- how much time we left.

21           MR. GARDNER:  Sure.

22           VIDEOGRAPHER:  This concludes Media
```

Page 212

1    Unit 3.  The time is 12:32 p.m.  We are off the

2    record.

3           (Off the record.)

4           VIDEOGRAPHER:  This begins Media Unit

5    Number 4.  The time on the video is 1:19 p.m.  We

6    are on the record.

7    BY MR. COLANGELO:

8       Q   Welcome back.

9       A   Good to be back.

10          MR. COLANGELO:  Let's mark Document 4004

11   as Exhibit 18.

12          MR. GARDNER:  I think 19.

13          MR. COLANGELO:  19.  Thank you.

14          (Plaintiffs' Exhibit 19, Email, was

15   marked.)

16   BY MR. COLANGELO:

17      Q   Mr. Comstock, do you have Exhibit 19 in

18   front of you?

19      A   I do.

20      Q   And do you recognize this email?

21      A   I sent it, so --

22      Q   Have you seen it before today?

Page 213

1      A    Well, obviously, when I wrote it.

2      Q    Okay.  This is an email from the

3  Secretary to you on August 8, 2017, and the

4  Secretary asks were you on the call this morning

5  about census?

6           Do you see that?

7      A    Uh-huh.

8      Q    What call is he referring to?

9      A    I don't know.  I'm not sure I was on it.

10     Q    Okay.  Did you hear from anybody about a

11 call on the census on August 8th?

12     A    I have no idea.

13     Q    And you'll see that later in the email,

14 the Secretary says, "Where is the DOJ in their

15 analysis?  If they still have not come to a

16 conclusion, please let me know your contact person

17 and I will call the AG.  Wilbur Ross."

18          Do you see that?

19     A    I see that.

20     Q    And what analysis is the Secretary

21 referring to?

22     A    Again, this pre-dates the memo I wrote

Page 214

1    outlining my contacts with the DOJ.  So this is a

2    question about where are we with the DOJ?

3        Q   Okay.  And you wrote back that evening

4    saying, "We'll be back shortly with an update on

5    the census question."

6        A   Yes.

7        Q   I have two attorneys in the DOC's general

8    counsel's office working on it?

9        A   Yes.

10       Q   And you testified one of those two

11   attorneys was James Uthmeier; is that right?

12       A   That's correct.

13       Q   And who was the other?

14       A   I don't recall.

15       Q   Okay.  Going back to the Secretary's

16   email where he says, "If they still have not come

17   to a conclusion, please let me know your contact

18   person and I will call the AG."

19       A   Yes.

20       Q   Did you understand that to mean that the

21   Secretary was concerned this was not done yet?

22       A   He was concerned that we had not made

Page 215

1    more progress.

2        Q    Okay.  How did he communicate that

3    concern to you?

4        A    By saying let me know who your contact

5    person is and I will call the AG.

6        Q    This email that you sent in your response

7    doesn't identify your contact person; is that

8    right?

9        A    That -- well, at least not in the part

10   that's not blacked out.

11       Q    Okay.  Do you recall identifying for the

12   Secretary before the September 8, 2017 memo who

13   your contact person was at DOJ?

14       A    I might have.  I probably would have had

15   to go back and look and see who I spoke to.

16       Q    Okay.

17            MR. COLANGELO:  Let's mark Document 3984

18   as Exhibit 20.

19            (Plaintiffs' Exhibit 20, email, was

20   marked.)

21            THE WITNESS:  Thank you.

22   BY MR. COLANGELO:

1      Q    Mr. Comstock, have you seen this email

2   before?

3      A    It's to me, so, yes.

4      Q    Okay.  And this is in further response to

5   the Secretary's August 8th question; is that

6   right?

7      A    Would appear to be, yes.

8      Q    Okay.  And it says, "Mr. Secretary, we

9   are preparing a memo and full briefing for you on

10   the citizenship question.  The memo will be ready

11   by Friday, and we can do the briefing whenever you

12   are back in the office."

13          Do you see that?

14      A    Yes.

15      Q    And at this point, you had not received

16   any information from the Justice Department; is

17   that right?

18      A    That's correct.

19      Q    Okay.  So the memo that you're referring

20   to is a memo on the citizenship question that

21   includes no input from DOJ; is that right?

22      A    I -- I don't know.  I had not spoken to

1  DOJ, no.

2      Q   You're not aware that anyone else had

3  spoken to DOJ on it?

4      A   Actually, I believe counsel might have

5  been talking to DOJ, but I don't know who they

6  were talking to.

7      Q   And which counsel is that?

8      A   James Uthmeier.

9      Q   And did he tell you he was talking to

10 DOJ?

11     A   I don't recall.

12     Q   So you're not aware that anybody had been

13 in touch with DOJ in order to get information for

14 this memo going to the Secretary?

15     A   I -- I'm not sure exactly the contents of

16 the memo to which you're referring, so I don't

17 know if it contained information from DOJ or not.

18     Q   And the Secretary responded by saying, "I

19 would like to be briefed on Friday by phone."

20     A   Yes.

21     Q   So it's fair to say that this reflects

22 the Secretary's continued impatience about getting

Page 218

1    an answer to his question?

2         A    I would say he clearly wanted to keep

3    moving forward.

4              MR. COLANGELO:  Let's mark as 21

5    Document 3983.

6              (Plaintiffs' Exhibit 21, email, was

7    marked.)

8              THE WITNESS:  Thank you very much.

9    BY MR. COLANGELO:

10        Q    Do you have Exhibit 21 in front of you?

11        A    Yes.

12        Q    Okay.  And this is an email from you to

13   the Secretary passing along the draft memo on the

14   citizenship question?

15        A    Correct.

16        Q    Okay.  And you'll see that Wendy Teramoto

17   responded a few days later saying, "Peter Davidson

18   and Karen Dunn Kelley will both be here Monday.

19   Let's spend 15 minutes together and sort this

20   out."

21        A    Right.

22        Q    And who is Peter Davidson?

1     A    He is the Department of Commerce general

2   counsel who was arriving about that time, so --

3     Q    Who is Karen Dunn Kelley?

4     A    She is -- well, she would have been

5   coming in as the Under Secretary for economic and

6   statistics or whatever the name of the bureau is.

7   So she would have been arriving about that time,

8   as well.  She -- I think they got confirmed around

9   the same time.

10    Q    And this is the transmittal of the memo

11  that you described in the earlier emails we talked

12  about that you and OGC were preparing on the

13  citizenship question for the Secretary?

14    A    That's [sic] appears to be what it is

15  referencing, but I don't have the draft memo so I

16  can't tell you for sure.

17        MR. COLANGELO:  Okay.  Let's mark as

18  Exhibit 22 Document 1411.

19        (Plaintiffs' Exhibit 22, Email, was

20  marked.)

21  BY MR. COLANGELO:

22    Q    Do you have Exhibit 22 in front of you?

1      A    I do.  I'm reading it.

2      Q    Do you need a moment to look it over?

3      A    Yeah.

4           Okay.

5      Q    Okay.  And have you seen this document

6  before?

7      A    Again, I sent the email, so yes.

8      Q    And can you tell me what this document

9  reflects?

10     A    It reflects an email exchange about

11  setting up a meeting.

12     Q    Okay.  And this was a meeting on the

13  citizenship question, right?

14     A    This was a meeting on key legal

15  questions.

16     Q    Regarding the census?

17     A    It actually -- well, the subject matter

18  is census, so presumably.

19     Q    And it involves you, Ms. Teramoto,

20  Mr. Hernandez, Mr. Uthmeier, Ms. Davidson,

21  Ms. Kelley, correct?

22     A    That's the list, yes.

1     Q    And we just saw an email from a few weeks

2    earlier where Ms. Teramoto says let's keep

3    Mr. Davidson and Ms. Kelley involved in a

4    conversation about this, right?

5     A    I wouldn't say keep, but --

6     Q    Introduce them to this conversation?

7     A    Introduce, yes.

8     Q    So to your understanding, this was a

9    meeting to discuss the citizenship question?

10    A    Again, my understanding of this was to

11   discuss key legal issues regarding the census.

12    Q    Do you remember this meeting?

13    A    Not specifically, no.

14    Q    Do you remember any meetings with the

15   Secretary and with this group on the census?

16    A    Again, not specifically, no.

17         MR. COLANGELO:  Okay.  Let's have this

18   marked as Exhibit 23.  It's Document 2424.

19         (Plaintiffs' Exhibit 23, Email, was

20   marked.)

21   BY MR. COLANGELO:

22    Q    Do you have Exhibit 23 in front of you,

1    Mr. Comstock?

2         A    I do.

3         Q    And do you recognize this document?

4         A    Again, it's an email from the Secretary

5    to me, so presumably I saw it then.  There's a lot

6    blanked out.

7         Q    And you understand that the

8    Justice Department has applied those redactions,

9    correct?

10        A    I do.

11        Q    And in this email dated September 1,

12   2017, the Secretary says, "I have received no

13   update, nor has there been an updated," -- blocked

14   out -- "nor the issue of the census question, nor

15   whether KDB thinks we have our arms around the

16   census cost data."

17             Do you see that?

18        A    Yes.

19        Q    And by KDB, do you think he meant KDK?

20        A    I believe that would be who he would be

21   referring to, yes.

22        Q    Referring to Karen Dunn Kelley?

1       A    Yes.

2       Q    And did you understand this to be a

3  request for information on the status of the

4  citizenship question?

5       A    Well, I understood this to be a request

6  for information on a whole series of information

7  that were presented in the census.

8       Q    Including the citizenship question?

9       A    Including the citizenship.  He mentions

10 that.

11      Q    And the Secretary is frustrated, right?

12      A    That would appear so, yes.

13      Q    He's frustrated because he's asked for it

14 repeatedly and hasn't seen anything yet telling

15 him that it's done; is that right?

16      A    Well, I would not agree with your

17 characterization.  I think what this memo -- this

18 email shows is that there were a tremendous number

19 of issues connected to Census.  At this time, we

20 were working a tremendous amount on the lifecycle

21 cost estimate.

22           So we -- I mean, we had a huge issue.

Page 224

1   They were $3 billion -- basically, 25 percent of

2   their budget off, which is a shocking figure --

3        Q    Does the Secretary --

4        MR. GARDNER:  Let him finish his answer.

5        THE WITNESS:  -- that does not inspire

6   confidence in the Census Bureau or its current

7   leadership at the time.  So we were dealing with

8   quite a few issues connected with Census,

9   primarily related to the budget, trying to find

10  people to run the Census that we could count on.

11       So, yes, citizenship was one small piece

12  of this, but it was by no means the driving piece.

13       Q    Thank you.

14       MR. COLANGELO:  Let's mark Document 2034

15  as Exhibit 24.

16       (Plaintiffs' Exhibit 24, Email, was

17  marked.)

18  BY MR. COLANGELO:

19       Q    Mr. Comstock, do you have Exhibit 24 with

20  you?

21       A    I do.

22       Q    Have you seen this email before?

Page 225

1      A    Again, it's an email from me to Peter

2  and -- Davidson and James Uthmeier, it looks like,

3  yes.

4      Q    And when's the last time you saw this

5  email before today?

6      A    Probably when I sent it on September 7,

7  2017.

8      Q    And you are advising Peter and James,

9  quote, as I discussed with James a little while

10  ago, the Secretary would like an update on

11  progress since the discussion yesterday regarding

12  the citizenship question.

13      A    That's what it says.

14      Q    And do you recall the discussion the day

15  before with the Secretary regarding the

16  citizenship question?

17      A    I don't recall the specifics of that

18  discussion, no.

19      Q    There was a discussion on September 6th

20  regarding the citizenship question?

21          MR. GARDNER:  Objection.  Form.

22          THE WITNESS:  Again, based on the email,

Page 226

1    it appears there might have been.

2    BY MR. COLANGELO:

3        Q   And why would the Secretary have asked

4    for an update by the next day?

5            MR. GARDNER:  Objection.  Calls for

6    speculation.

7            THE WITNESS:  As I've mentioned before,

8    we like to get things done.  We're not here to do

9    this all year long.  So I was asked similar

10   questions on numerous other issues I was working

11   on.

12   BY MR. COLANGELO:

13       Q   But it's fair to say the Secretary wanted

14   an answer quickly?

15       A   He always wants an answer quickly.

16           MR. COLANGELO:  Let's mark Document 2395

17   as Exhibit 25.

18           (Plaintiffs' Exhibit 25, Email, was

19   marked.)

20   BY MR. COLANGELO:

21       Q   Mr. Comstock, do you have Exhibit 25?

22       A   I do.

Page 227

1      Q    Okay.  Have you seen this document

2  before?

3      A    Yes.

4      Q    When's the last time you saw it before

5  today?

6      A    Yesterday counsel pointed it out to me.

7      Q    And did you review a version yesterday

8  that was redacted like this or unredacted?

9      A    I did.

10      Q    Pardon me?

11      A    It was redacted.

12      Q    Okay.  Like this?

13      A    Exactly like this.

14      Q    And this is an email from Mr. Uthmeier to

15  you on the evening of September 7th saying, "Earl,

16  I touched base with Peter," redacted, "He spoke

17  with Kassinger this evening."

18          Do you see that?

19      A    Yes.

20      Q    Who is Kassinger?

21      A    That would be Ted Kassinger, former

22  general counsel for the Department of Commerce.

1    Q   And where does Mr. Kassinger work now?

2    A   He works at O'Melveny & Myers.

3    Q   A law firm?

4    A   Correct.

5    Q   In Washington?

6    A   Yes.

7    Q   And what did Mr. Davidson and

8  Mr. Kassinger discuss?

9        MR. GARDNER:  Objection -- sorry.

10  Restate that one more time.

11  BY MR. COLANGELO:

12    Q   What did Mr. Davidson and Mr. Kassinger

13  discuss?

14    A   I don't know.

15    Q   Did Mr. Davidson tell you what he and

16  Mr. Kassinger discussed?

17    A   Not to my knowledge.

18    Q   Did Mr. Uthmeier tell you what he and

19  Mr. Kass- -- what Mr. Davidson and Mr. Kassinger

20  discussed?

21    A   Well, it appears he might have, but it's

22  blanked out.

1      Q    And Mr. Kassinger doesn't work for the

2   government, correct?

3      A    Correct.

4      Q    And did not at the time, correct?

5      A    Correct.

6           I would just observe, based on the all

7   blanked out here, we really have no idea what this

8   email is referring to.  It says a Census matter,

9   but it could have been any number of things,

10  including the numerous budget issues we were

11  talking about.  So let's make clear I don't know

12  what this email was in reference to.

13     Q    Okay.  Let's take a look at Exhibit 24.

14     A    Uh-huh.

15     Q    So this appears to be an unredacted

16  version --

17     A    Of the last part.

18     Q    -- of the last part --

19     A    Right.

20     Q    -- which appears to be redacted on 2396;

21  is that correct?

22     A    That certainly seems to be the case, yes.

1      Q    They're both dated the same date,

2   correct?

3      A    Same date, same time.

4      Q    So --

5      A    Just to be precise.

6      Q    Thank you.  Same date and same time, to

7   be precise.

8           So on an email chain that you commenced

9   by saying the Secretary would like an update on

10  progress since the discussion yesterday regarding

11  the citizenship question.  Is it your

12  understanding that the reference to the Census

13  matter in the subject line, in fact, refers to the

14  citizenship question?

15     A    That would appear to be the case.

16     Q    Okay.  So it would also be your

17  conclusion that Mr. Davidson and Mr. Kassinger

18  were talking about the citizenship question; is

19  that right?

20     A    No.  It would not.

21     Q    Why not?

22     A    Because I get lots of email that start on

Page 231

1    one chain that go to another matter.  So it's

2    possible, but it's also possible it was discussing

3    something else.

4         Q    And did the general counsel talk to

5    Mr. Kassinger about a lot of issues you were

6    updated on?

7         A    I have no idea what Mr. Davidson and

8    Mr. Kassinger discussed.

9         Q    Do you see the email below the Kassinger

10   reference?

11        A    Uh-huh.

12        Q    There's a message from you to

13   Mr. Davidson, Mr. Uthmeier and Ms. Teramoto that

14   says, "I suggest setting up a call for tomorrow.

15   The Secretary is asking for progress on this."

16        A    Correct.

17        Q    And that's a reference to the citizenship

18   question, correct?

19        A    Without seeing the blanked out matter

20   below that from Peter Davidson, I don't know if

21   the email chain switched subjects or not.

22        Q    Okay.  So your -- your testimony is that

Page 232

1  even though you emailed Mr. Davidson and

2  Mr. Uthmeier about the citizenship question, and

3  they email you within an hour, and then you said

4  the Secretary is asking for progress on this,

5  you're not prepared to say it was about

6  citizenship question?

7      A   Without seeing the redacted material, I

8  can't confirm whether it's about the citizenship

9  question or whether we switched gears to another

10  topic.  That happens frequently.

11      Q   Were there a lot of -- strike that.

12          And the next day is the day that you sent

13  the Secretary your memo on DOJ contacts; is that

14  correct?

15          It's Exhibit 15, if that helps.

16      A   Yes.  The next day I sent him on my

17  discussions DOJ.

18      Q   And so the Secretary was asking for

19  updates on the citizenship question, you prepared

20  a memo on your contacts with DOJ, and you asked

21  the general counsel's office to prepare their own

22  data; is that right?

1    A    Again, I think -- I would agree that I

2  sent an email on the 7th asking for an update on

3  progress regarding the citizenship question, and I

4  would agree that I sent a memo to the Secretary

5  updating him on who I had spoken to at Justice.

6  But that's all I would know about what the

7  substance of the conversations were.

8    Q    And then after that exchange, did there

9  come a time when the Secretary and Attorney

10  General spoke about this issue?

11    A    Correct.

12    Q    And about how long after was that?

13    A    I don't recall.

14    Q    Was it about a week after?

15    A    Possibly.  I would imagine it was on the

16  Secretary's calendar.

17    Q    And after the Secretary spoke with the

18  Attorney General, was the substance of that

19  conversation relayed to you?

20    A    Beyond -- beyond the fact that they had

21  spoken and that the Attorney General was going to

22  look into the matter, no.

Page 234

1      Q    Beyond that they had spoken and the

2   Attorney General would look into it --

3      A    Correct.

4      Q    -- nothing else was conveyed to you?

5      A    Right.

6      Q    This was an issue you had been working on

7   for eight, nine months at this point?

8      A    Along with about 60 other issues.

9      Q    But this was one issue that you'd been

10  working on for eight or nine months, correct?

11     A    Let's see, September -- no.  I had not

12  been working on it for eight or nine months.

13  That's an overcharacterization.  I'd been working

14  on it for no more than seven months.

15     Q    Since very shortly after the Secretary

16  was confirmed, correct?

17     A    Correct.

18          MR. COLANGELO:  And let's mark as

19  Exhibit 26 document stamped 2651.

20          (Plaintiffs' Exhibit 26, Email, was

21  marked.)

22  BY MR. COLANGELO:

Page 235

1       Q    You have 2651 in front of you?

2       A    I do.  I'm reading it.

3            Okay.

4       Q    Have you seen this email before?

5       A    No.

6       Q    Do you see on the first page the email

7    from Danielle Cutrona, Wendy Teramoto dated

8    September 17, 2017 at 12:10 p.m.?

9       A    Yes.

10      Q    Do you know who Danielle Cutrona is?

11      A    I don't.

12      Q    Do you know what OAG stands for?

13      A    Office of the Attorney General.

14      Q    Okay.  So is your understanding that

15   Danielle Cutrona, as of September 17, 2017, worked

16   in the Office of Attorney General?

17           MR. GARDNER:  Objection.  Lack of

18   foundation.

19           THE WITNESS:  Again, based on the email,

20   that would appear to be the case.

21   BY MR. COLANGELO:

22      Q    Okay.  And Ms. Cutrona says to

Page 236

1    Ms. Teramoto, quote, from what John told me, it

2    sounds like we can do whatever you-all need us to

3    do, and the delay was due to a miscommunication.

4            Do you see that?

5       A    I see that.

6       Q    And then Ms. Teramoto writes back, "They

7    connected.  Thanks for the help.  Wendy."

8            Do you see that?

9       A    I see that.

10      Q    And you mentioned that you got an update

11   after this call.  Who did you get that update

12   from?

13      A    I said I think the Secretary mentioned

14   they had a discussion and the Attorney General was

15   looking into it.

16      Q    Well, this email doesn't say the Attorney

17   General was looking into it.  It says, "We can do

18   whatever you-all need us to do and the delay was

19   due to a miscommunication.  The AG is eager to

20   assist."

21      A    That is what the email says.  That is not

22   what was communicated to me, so --

Page 237

1     Q    So the Secretary said to you the AG will

2   look into it?

3     A    I don't recall the exact words, but the

4   AG is looking into the matter.

5     Q    When did the Secretary describe to you

6   the conversation with the Attorney General?

7     A    I have no idea.  Some time in this time

8   frame.

9     Q    And what did he say when conveying the

10  substance of the call to you?

11    A    I already relayed that.  He said

12  something to the effect of the AG is working on

13  it.

14    Q    Okay.  So this was in September of 2017.

15  At some subsequent point, did the acting director

16  of the Census Bureau receive a memo from the

17  Justice Department requesting inclusion of a

18  citizenship question?

19    A    Acting director receive a memo?  I'm not

20  aware of a memo.  I think -- I think there was a

21  letter that was sent.

22    Q    Okay.  And do you remember the date of

1    that letter?

2        A    I don't.

3        Q    Have you seen that letter?

4        A    I believe I saw a letter from the

5    Justice Department.

6        Q    It came in around December of 2017, does

7    that sound right?

8        A    That sounds like the right ballpark.

9        Q    Did you see that letter before it was

10   transmitted to Mr. Jarmin -- to Dr. Jarmin?

11   Sorry.

12       A    I had not, no.

13       Q    And did you know the date that that

14   letter was going to be transmitted before it was

15   transmitted?

16       A    I did not, no.

17       Q    And did you read the letter when it came

18   in?

19       A    I imagine I did.

20       Q    And did you discuss that letter with the

21   Secretary when it came in?

22       A    I -- I might well have.  I don't know.

1    Q    Okay.  What did you say to the Secretary

2  about the December 2017 letter when it came in?

3    A    Justice Department has requested this, so

4  now we can start the formal process.

5    Q    And what formal process are you referring

6  to?

7    A    Well, as I've outlined before, in order

8  for the government to take an action, you have to,

9  basically, create a record and make your decision

10  on the basis of that record.  So without a request

11  from an agency to ask for the inclusion of

12  citizenship, you were -- this was, basically, a

13  hypothetical question.

14    Q    Okay.  But you had told the Secretary in

15  May, we will get the Justice Department to request

16  the question?

17    A    I am going to do everything I can to

18  carry out the Secretary's wishes, if they are

19  legal, and so I will do my best.  I can't promise

20  things.

21    Q    You mentioned in reference to your

22  May 2nd email that you'd identified a case or

1   cases supporting the --

2       A   Right.

3       Q   -- need for a citizenship question?

4       A   Correct.

5       Q   Is that case the Evanwell decision?

6       A   I have no idea.

7           MR. COLANGELO:  Give me one second,

8   Counsel.

9           MR. GARDNER:  Sure.

10          MR. COLANGELO:  I think I'm done, so we

11  will hand over to other counsel.

12          Do you want a short break, David, to do

13  that?

14          MR. GERSCH:  I could do some questioning

15  before we break and then we can break.

16          MR. COLANGELO:  Sure.

17          Let's go off the record.

18          VIDEOGRAPHER:  Going off the record.  The

19  time on the video is 1:49 p.m.

20          (Off the record.)

21          VIDEOGRAPHER:  We're back on the record.

22  The time on the video is 1:50 p.m.

Page 241

1        EXAMINATION BY MR. GERSCH:

2     Q    Good afternoon, Mr. Comstock.  My name is

3   David Gersch, and I represent the New York

4   Immigration Coalition plaintiffs.

5     A    Okay.

6     Q    And I'm going to ask you some questions.

7     A    Sounds fine.

8     Q    All right.  At some point in March, the

9   Secretary -- and when I secretary, you'll

10  understand I mean Secretary Ross?

11    A    Yes.

12    Q    At some point in March, the Secretary

13  issues what's called a decisional memorandum

14  explaining his decision to add a question

15  regarding citizenship to the census?

16    A    You're referring to March 2018?

17    Q    I'm sorry?

18    A    You're referring to March 2018, not 2017?

19    Q    I'm referring to March 26th.

20    A    Right.  In the year 2018 --

21    Q    Correct.

22    A    -- not the year 2017.

Page 242

1      Q    Ah.  If I said --

2      A    The prior questions were very focused on

3  March 2017, so I want to be clear we're now

4  talking about the following year.

5      Q    Absolutely.  Sorry.  Yes.  These

6  questions -- the question I'm going to ask you now

7  is about 2018.

8           You recall there was a time,

9  March 26, 2018, when the Secretary issued a

10  decisional memorandum regarding his decision to

11  add a citizenship question?

12      A    Yes.

13      Q    You worked on that memorandum?

14      A    Yes.

15      Q    Okay.  Were you the principal drafter?

16      A    I was one of the principal drafters.

17      Q    Who were the other principal drafters?

18      A    James Uthmeier was the primary other

19  drafter.

20      Q    Did you have a division of responsibility

21  between the two of you?

22      A    No.  I believe he did the first draft.

Page 243

1      Q    He did the first draft?

2      A    Well, the Secretary actually probably

3  made -- indicated what he wanted in a draft and

4  then James would have put it together.

5      Q    And then you would have worked on it

6  after James?

7      A    Correct.

8      Q    All right.  Was that a typical way in

9  which the two of you worked?

10     A    Sure.  I edit lots of documents.

11     Q    I mean --

12          (Thereupon, the court reporter

13  clarified.)

14          THE WITNESS:  I edit lot of documents.

15  BY MR. COLANGELO:

16     Q    I meant with you and Mr. Uthmeier?

17     A    Yeah.  It would be unusual for me to

18  prepare the first draft and him to edit it, yes.

19     Q    That's what I'm getting at.  All right.

20  Thank you.

21          And did anyone else work on the draft

22  besides you, the Secretary and Mr. Uthmeier?

Page 244

1      A    Yes.   I think numerous other people

2    reviewed the draft, and --

3      Q    How about people who contributed to the

4    language?

5      A    Again, without seeing various drafts, it

6    would be hard to say who contributed to which

7    language.

8      Q    Okay.   Okay.   Couple more questions

9    before we take our break.

10          You were shown earlier today a supplement

11   to the decisional memorandum --

12     A    Yes.

13     Q    -- issued by Secretary Ross in June of

14   this year.

15          You recall that?

16     A    Right.   You're referring to Exhibit 5?

17     Q    Yes.   And there's language in

18   Exhibit 5 -- get the exact language -- there's

19   language in Exhibit 5 that says referring to

20   fundamental issues regarding the upcoming 2020

21   census, "part of these considerations included

22   whether to reinstate a citizenship question which

Page 245

1   other senior administration officials had

2   previously raised."

3           Was that language in the original memo

4   you received -- original versions of this memo you

5   received from the Department of Justice?

6       A   I have no idea.

7       Q   Did you add that language?

8       A   No.

9       Q   Do you have any idea who put that

10  language in there?

11      A   I don't.

12      Q   Who at the Department of Justice

13  recommended that the Secretary sign this memo

14  memorandum?

15      A   I don't know exactly.  I mean, I was

16  told --

17      Q   Who were you dealing with at the

18  Department of Justice?

19      A   Well, I wasn't dealing directly with

20  them.  It was the Office of General Counsel at

21  Department of Commerce that was dealing with them.

22      Q   All right.  If I understood your

Page 246

1   testimony this morning -- and correct me if I'm

2   wrong -- you received a draft from

3   Department of Justice and you made edits to it; is

4   that right?

5       A   Well, Department of Commerce received the

6   draft, which I made some edits to.

7       Q   Who did you receive the document from?

8       A   I would have either gotten it from James

9   Uthmeier or Mike Walsh.

10      Q   And is it your testimony you don't know

11  who at Department of Justice were -- well,

12  withdrawn.

13          You made recommendation to the Secretary

14  that he sign the memorandum, correct?

15      A   Based on the advice I'd been given by the

16  Office of General Counsel, yes.

17      Q   This morning I understood you to testify

18  that it was based on the advice from the

19  Department of Justice.  Do --

20          MR. GARDNER:  Objection.

21  BY MR. GERSCH:

22      Q   -- you recall that testimony?

Page 247

1           MR. GARDNER:  Objection.

2    Mischaracterizes the witness's previous testimony.

3           THE WITNESS:  My previous testimony was

4    the Department of Justice sent to the

5    Department of Commerce, from the Justice

6    Department to the Office of General Counsel, a

7    draft document suggesting that the Secretary

8    needed to sign this.  That document was reviewed

9    by the Office of General Counsel and myself, edits

10   were made, the document produced, and the

11   Secretary then signed it.

12   BY MR. GERSCH:

13      Q   Yeah.  My question was a little

14   different.

15           My understanding of your testimony this

16   morning was you recommended that the Secretary

17   sign this supplemental memorandum based on advice

18   you received from the Department of Justice; is

19   that correct?

20           MR. GARDNER:  Objection.

21   Mischaracterizes the witness's previous testimony.

22           THE WITNESS:  Once again, the

Page 248

1    Department of Justice, who are our counsel,

2    suggested that a supplemental memorandum was

3    needed.  This was not something Department of

4    Commerce generated.  This was something the

5    Department of Justice, as our counsel, recommended

6    be provided.  Following up on that advice, we

7    worked on the document and then had the Secretary

8    sign it.  We were following advice of counsel.

9    BY MR. GERSCH:

10        Q   Well, again, I'm not sure I've got an

11   answer to my question.

12            My understanding -- well, I'll put it --

13   without respect to what you testified to this

14   morning, is it correct that you advised the

15   Secretary to sign the supplemental memorandum

16   based, in part, on advice from the

17   Department of Justice?

18        A   Again, I'm not sure I'm following the

19   logic of your question.  But, once again, this

20   document was produced initially by the

21   Department of Justice, who sent it to the

22   Department of Commerce with the recommendation

Page 249

1    that the Secretary, for purposes of this

2    litigation, needed to submit this supplemental

3    memorandum.

4         So we reviewed it, made a few edits, and

5    then we had the Secretary sign it.  We were

6    following the advice of our counsel.  I'm not sure

7    which part of that answer you're not following.

8         Q   I just asked whether part of the basis

9    for your advice to the Secretary to sign it was

10   the advice you got from the Department of Justice?

11        A   Obviously.

12        Q   Thank you.

13             Did you talk to the Department of Justice

14   about why it was a good idea for the Secretary to

15   sign this memorandum?

16        A   No.

17        Q   Did anyone?

18        A   You'd have to ask our Office of General

19   Counsel.

20        Q   And it's your testimony that you had no

21   dealings with the Department of Justice about this

22   memorandum?

1      A    That's correct.

2      Q    Okay.

3           MR. GERSCH:  Let's take our short break

4   here.

5           MR. GARDNER:  How long?

6           MR. GERSCH:  Ten minutes or so.

7           VIDEOGRAPHER:  This is the end of Media

8   Unit Number 4.  The time on the video is 1:58 p.m.

9   We are off the record.

10          (Off the record.)

11          VIDEOGRAPHER:  This begins Media Unit 4.

12   The time on the video is 2:14 p.m.  We are on the

13   record.

14   BY MR. GERSCH:

15      Q    Mr. Comstock, we're back on the record.

16   Before the break, I was asking some questions

17   about 2018.  Now I want to go back to 2017.

18      A    Okay.

19      Q    You with me?

20      A    I'm with you.

21      Q    All right.  I want to go back to the

22   spring of 2017 when Secretary Ross requests the

1  inclusion of a citizenship question on the census.

2  At that point in time, the Department of Justice

3  had made no request to Commerce for the addition

4  of a citizenship question, correct?

5      A   That's correct.

6      Q   And they certainly hadn't

7  asked -- withdrawn.

8          The Department of Justice certainly

9  hadn't asked Commerce to add a citizenship

10  question because of the VRA.  That's also correct;

11  isn't it?

12      A   Well, they didn't ask us to add a

13  citizenship question at that point.  So

14  speculating as to why they would ask is

15  irrelevant.

16      Q   I'm not asking you to speculate.  The one

17  thing we can be sure of is they didn't ask about

18  the VRA is because they didn't ask at all?

19      A   Correct.

20      Q   All right.  And when Secretary Ross says

21  to you in the spring, in whatever words he used,

22  that he wants a citizenship question added to the

Page 252

1   census, wouldn't you have had a discussion with

2   him at the time about why he wants that?

3           MR. GARDNER:  Objection.  Asked and

4   answered.

5           THE WITNESS:  Again, the answer is no, I

6   would not have a discussion.  My boss, if he asked

7   me to investigate something, I investigate it and

8   report back the results.

9   BY MR. GERSCH:

10      Q    Is your testimony you did not have a

11   discussion?

12      A    I did not.

13      Q    And you're not saying -- well, withdrawn.

14           Wouldn't it be helpful to you in your job

15   to assist the Secretary to have an understanding

16   of why he wanted the citizenship question?

17           MR. GARDNER:  Objection.  Form.

18   BY MR. GERSCH:

19      Q    You can answer.

20      A    Again, I didn't have any particular

21   doubts about why a citizenship question would be

22   useful, so, no, it would not have hurt me to ask.

Page 253

1      Q   I'm not asking whether you had doubts.

2  My question to you is a little bit --

3      A   I understand your question.

4      Q   My question, sir, is:  Wouldn't it be

5  helpful to you in your job of assisting the

6  Secretary to have a complete understanding of why

7  the Secretary wants to add a citizenship question?

8          MR. GARDNER:  Objection.  Form.

9          THE WITNESS:  Again, it's not relevant to

10  the question of whether or not he needs -- of

11  whether or not a question should be added, so, no.

12  BY MR. GERSCH:

13      Q   Is it your testimony that why he wants a

14  citizenship question to be added is not relevant

15  to whether it should be added?  Did I -- did I

16  hear that right?

17          MR. GARDNER:  Objection.

18  Mischaracterizes the witness's prior testimony.

19          THE WITNESS:  My test- --

20          MR. COLANGELO:  That's exactly what he

21  said, Counsel.

22          THE WITNESS:  No.  My testimony is:  The

Page 254

1  rationale for why he would want it added is not

2  relevant to my initial inquiry as to whether or

3  not a question can be added.

4  BY MR. GERSCH:

5      Q   Yeah.  My question was a little

6  different.  The question I am trying to get you to

7  focus on is:  In your work for the Secretary,

8  wouldn't it be helpful to you to understand as

9  fully as possible why he thinks it's a good idea

10  to add a citizenship question?

11      A   And let --

12          MR. GARDNER:  Objection.  Asked and

13  answered.

14          THE WITNESS:  And let me get you to

15  understand my answer, which is, no, it would not

16  make a difference, because I don't need that

17  information to investigate the question.

18  BY MR. GERSCH:

19      Q   Anyone ever say anything to you about why

20  the Secretary thought it was a good

21  idea -- withdrawn.

22          Am I right that your testimony is that

1    you've never had a discussion with the Secretary

2    about why he thought it was a good idea to have a

3    citizenship question added?

4        A    That's correct.  I have not had a

5    conversation with him, no.

6        Q    Okay.  And did anyone else say anything

7    to you about why the Secretary thought it was a

8    good idea to have a citizenship question added?

9            MR. GARDNER:  Objection.  Form.

10           THE WITNESS:  Again, no.

11   BY MR. GERSCH:

12       Q    All right.  If I remember correctly, you

13   testified you worked in a bullpen area?

14       A    Correct.

15       Q    Outside the Secretary's office?

16       A    Yes.

17       Q    I'm not sure I've got all the people who

18   were there, but Wendy Teramoto was there, right?

19       A    Correct.

20       Q    James Uthmeier was there?

21       A    No.

22       Q    I'm sorry.

Page 256

```
1           You were there?
2      A    Yes.
3      Q    Eric Branstad, was he there?
4      A    Yes.
5      Q    That's three.
6           Izzy Hernandez, that's four.  Was he
7  there?
8      A    Yes.
9      Q    Who was the fifth?
10     A    James Rockas.
11     Q    And I'm right that there were five?
12     A    Correct.
13     Q    Okay.
14     A    At times.
15     Q    So you're all sitting there -- and are --
16  do you work in cubicles, open desks, how does it
17  work?
18     A    Wendy Teramoto had a seated desk.  I had
19  a standing desk.  Izzy had a standing desk with a
20  stool.  James had a standing desk with a stool.
21  Eric Branstad had a standing desk with a stool.
22     Q    Are there walls?  Are there partitions?
```

Page 257

1    Are you all in an open space?

2        A    I'm facing -- I was facing Wendy.  Izzy,

3    who was rarely there, but his desk was next to

4    mine, facing Eric, and then James was on the end.

5        Q    And there are no walls, correct?

6        A    No walls.

7        Q    No partitions?

8        A    No partitions.

9        Q    Okay.  In all the time that you're

10   sitting there and you're all working together, no

11   one says, why does the Secretary want to add a

12   citizenship question -- citizenship question?

13       A    That's correct.  Because, again, this was

14   one of well over 100 different items we were

15   working on.  All of us were working on different

16   things.  I'm primarily tasked with policy.  James

17   is primarily tasked with press.  And so you're

18   dealing with all of these other issues.  There's

19   no reason to discuss it.

20       Q    I'm not even talking about discussing it.

21   No one mentioned?  Did anyone mention it?

22       A    Not that I recall.

1     Q   No one says the reason the Secretary

2   wants to add a citizenship question is whatever

3   the reason is, no one ever said anything like

4   that?

5        A   No.

6            MR. GARDNER:  Objection to form.

7            THE WITNESS:  Not to my recollection.

8   BY MR. GERSCH:

9        Q   Okay.  Did you ever have a discussion

10   with people from the Office of General Counsel at

11   Commerce about why the Secretary wanted to add a

12   citizenship question?

13        A   No.

14        Q   And in your time there, did you never see

15   a document analyzing why it was a good idea for

16   Census to add a citizenship question?

17        A   Again, you're -- we have a fundamental

18   disagreement on the premises of your question.

19   Your premise is that somehow a reason needs to be

20   provided.  The question before us is the Secretary

21   has the legal authority to add questions to the

22   census.  Is there a governmental need?  And if

Page 259

1    there is, then you're off to the races.

2        Q   My question was a little different.  My

3    question was --

4        A   I understand your question.

5        Q   Sir, I'll repeat it for you.

6            My question is:  In all the time you're

7    there, did you never see a document spelling out

8    the reasons why it would be a good idea to add a

9    citizenship question?  Why it would be good from

10   Commerce's perspective?

11           MR. GARDNER:  Objection.  Form.

12           THE WITNESS:  Again, that's not the

13   question.  Commerce --

14   BY MR. GERSCH:

15       Q   Excuse me, sir.  That is my question.

16   Could you answer my question?

17       A   Okay.  No.

18       Q   Not even a scrap of paper, right?

19       A   Nope.

20       Q   No memoranda, right?

21       A   No.

22       Q   No emails?

Page 260

1     A    Not that I recall.

2     Q    And I just want to be straight on my

3  understanding.  I think I got you correctly, but I

4  just want to make sure and test that I'm right.

5         It couldn't possibly assist you in your

6  work, in any way, to know why the Secretary wanted

7  to add a citizenship question?  Do I understand

8  that correctly?

9     A    It's not relevant to my analysis.

10    Q    And so it couldn't possibly help you in

11 any way in your work?

12    A    I'm not going to agree with your

13 statement that way, no.

14    Q    Well, that's my question -- withdrawn.

15        Well, is there any way in which knowing

16 what the Secretary's reason was for wanting to add

17 a citizenship question, is there any way that

18 could assist you in your work at

19 Department of Commerce?

20    A    Assist me on my work at the Department of

21 Commerce, no.

22    Q    Is there any way that it could help you

Page 261

1    help the Secretary add a citizenship question?

2        A    If I had found it difficult or

3    challenging, yes.  Knowing more about why he

4    wanted it would have been helpful, but I didn't

5    say that there was an issue.  It had been asked

6    for hundreds of years, and it had been asked on

7    the ACS.  So, clearly, there's a need for it.  And

8    so, no, that was not a particularly troublesome

9    aspect of the question I was being asked to look

10   into.

11       Q    When you said if I had found it difficult

12   or challenging, what did you mean?  What's the it?

13       A    If -- if what I had been requested to do

14   seemed to have significant legal obstacles to the

15   ability to do that question or take that action,

16   then I would probably inquire more fully to see if

17   there's an alternative way to address what the

18   Secretary is trying to get to.  In this particular

19   case, you have something that has been on the

20   decennial census before that is currently being

21   asked on the ACS.  There's clear legal authority

22   for him to add the question.  So, frankly, the

Page 262

1  reasons that he wants to add it doesn't add

2  anything to the analysis.  There is a governmental

3  need for this information.  That's a question

4  that's already established, so I don't need to

5  inquire further as to what his personal beliefs

6  regarding this question might be.

7      Q   What's the governmental need for the

8  question?

9      A   Enforcement to the Voting Rights Act,

10 determining how many undocumented citizens there

11 are.  You name it, there's a whole bunch of

12 reasons.  That's why every government in the world

13 collects this information.

14     Q   Well, correct me if I'm wrong, we're

15 talking about at a period in the spring of 2017

16 when the Voting Rights Act hadn't come up, the

17 Department of Justice hadn't made a request for

18 it.  What does the Voting Rights Act got to do

19 with it in the spring of 2017?

20     A   When you inquire as to what does the

21 Department of Justice use the citizenship data

22 on --

Page 263

1      Q    That wasn't my question.  My question

2    is --

3      A    I'm answering your --

4      Q    -- why is it a good idea, why does the

5    government need it back in the spring of 2017?

6      A    Finished with your question?

7      Q    That's my question.

8      A    The answer is for the same reason they've

9    been collecting it for the last 200-plus years.

10     Q    What's the government need in the spring

11   of 2017?

12     A    I already answered that question.  If

13   they collect the data under the ACS for Voting

14   Rights Act enforcement, that is one of the primary

15   reasons they collect the data.

16     Q    Okay.  It's on the ACS.  What's the

17   need -- governmental need for it to be on the

18   census?

19          MR. GARDNER:  Objection.  Asked and

20   answered.

21          THE WITNESS:  The governmental need is,

22   again, if you're going to get more detailed

Page 264

1    information, then you need that information.

2    BY MR. GERSCH:

3        Q   Who said in the spring of 2017 that the

4    government needed more detailed information?

5        A   Again, I'm presented with a request by

6    the Secretary to say, can we add this question to

7    the census?  I inquire about that, and I looked at

8    it.  One of the reasons you would need it is

9    voting rights.  If you're going to do voting

10   allocations on the basis of census allocations,

11   that's the reason it's perfectly sufficient.

12       Q   Who said that in the spring of 2017?

13       A   That was -- that was determined after

14   taking a quick look at the issue.  I don't need

15   more than that to continue to pursue the question.

16       Q   Who told you that the government needed,

17   in the spring of 2017, more detailed information

18   about citizenship than was contained in the ACS?

19       A   Nobody.

20       Q   You came to that decision on your own; is

21   that right?

22       A   Correct.

Page 265

1      Q    But you're not a voting rights lawyer,

2   right?

3      A    Irrelevant to the question.

4      Q    That's not my question.  You're not a

5   voting rights lawyer, right?

6      A    I've already said that.

7      Q    So you decided on your own in the spring

8   of 2017 that it would be a good idea for the

9   government to have more information than was

10   available from the ACS about citizenship to

11   enforce the Voting Rights Act, even though you're

12   not a voting rights lawyer?

13      A    I don't agree with that characterization,

14   at all.  I decided that there was sufficient

15   information for me to pursue the Secretary's

16   request to consider placing a citizenship question

17   on the decennial census and that there was

18   sufficient potential reason to collect that

19   information to warrant moving forward.  If I'd

20   come to an opposite conclusion that there was not

21   sufficient potential reason or that there was some

22   insurmountable legal bar, then I would have

Page 266

1    reported back to the Secretary, I'm sorry,

2    Mr. Secretary, it does not appear we can

3    accomplish this objective.

4        Q   Why did you need to come up with a reason

5    for asking the question, separate and apart from

6    whatever reason the Secretary had in his own head?

7        A   Again, my job is to figure out how to

8    carry out what my boss asks me to do.  So you go

9    forward and you find a legal rationale.  Doesn't

10   matter what his particular personal perspective is

11   on it.  It's not -- it's not going to be the basis

12   on which a decision is made.

13       Q   That's your understanding, that the way

14   you should do it, is come up with a rationale that

15   has nothing to do with what's in the Secretary's

16   mind as to why he wants it; is that your

17   understanding of how it's supposed to work?

18       A   No.  Again, you continue to characterize

19   things in a way that you believe may be correct,

20   but not the way I believe to be correct.  My job,

21   as a person who has been doing this for 30-plus

22   years for clients and people in the government, is

Page 267

1   if they would like to accomplish an objective, I

2   see if there's a way to do that.  And, again, if

3   it's not legal, you tell them that.  If it can't

4   be done, you tell them that.  If there's a way to

5   do it, then you help them find the best rationale

6   to do it.  That's what a policy person does.

7          And so, again, if I came up with a

8   rationale that the Secretary didn't agree with or

9   didn't support, then he was going to tell me that.

10  I have no doubt about that.  But in the meantime,

11  he doesn't -- I don't need to know what his

12  rationale might be, because it may or may not be

13  one that is -- that is something that's going to a

14  legally-valid basis.

15         So, again, he's got -- he's asked, can we

16  put -- can we put a question on?  The job of a

17  policy person is go out and find out how you do

18  that.  Whether that decision is going to be made

19  ultimately to do it or not, that's up to the

20  decision-maker.

21   Q   Are you saying you're better off not

22  knowing what the Secretary's own rationale is for

Page 268

1   wanting the citizenship question?

2       A    The Secretary, as you would point out, is

3   not a voting rights lawyer, so I would not expect

4   him to necessarily come up with a rationale.

5   That's the job of the staff at work.

6       Q    You certainly wouldn't expect the

7   Secretary to have come up with the idea that the

8   reason he should want the citizenship question is

9   the Voting Rights Act; you wouldn't expect him to

10  come up that on his own?

11      A    I -- he might well.  I don't know.

12      Q    You have no reason to believe that he

13  did, right?

14          MR. GARDNER:  Objection.  Calls for

15  speculation.

16          THE WITNESS:  I'm not going to speculate

17  about what his rationale was.  You'd have to --

18  BY MR. GERSCH:

19      Q    Because --

20      A    -- ask him.

21      Q    -- because you have no idea what his

22  rationale is?

Page 269

1      A    That's correct.

2      Q    Counsel asked you about contact you made

3  with the Department of Justice --

4      A    Correct.

5      Q    -- starting with a Ms. Haney [sic], I

6  believe.

7           Do you recall that?

8      A    Yes.  I believe her name is Hankey,

9  but --

10     Q    Hankey.  I apologize.

11          What was the full name?  I can get it out

12  if you don't know it offhand.

13     A    Mary Blanche, but --

14     Q    I'll find it in here.

15     A    It's in one of these exhibits, the memo

16  that I wrote.  Here.

17     Q    Mary Blanche --

18     A    Yep.

19     Q    -- Hankey; is that right?

20     A    Yeah.

21     Q    All right.  So you went -- you called

22  Mary Blanche Hankey --

1      A    Correct.

2      Q    -- with regard to adding a citizenship

3  question to the census, right?

4      A    Correct.

5      Q    And you wanted to see if the

6  Department of Justice would sponsor the question?

7      A    Correct.

8      Q    And you had a phone call with her, and

9  you had at least a meeting with her, right?

10      A    Right.

11      Q    So at least two contacts?

12      A    Three, when she called me back with

13  somebody else's name.

14      Q    Fair enough.

15           Didn't -- didn't Ms. Hankey say, why do

16  you want to have a citizenship question?

17      A    No, she didn't.

18      Q    Didn't come up, at all?

19      A    Nope.

20      Q    She referred you to a Mr. McHenry; is

21  that right?

22      A    Correct.

1    Q   And he's not a voting rights guy, right?

2    A   I don't actually know what his background

3 is.

4    Q   Well, you went ahead, back and forth with

5 him over about a month; is that right?

6    A   I mean, we spoke on the phone probably

7 three or four times, yeah.

8    Q   Going from, I think, the period you

9 mentioned was --

10    A   Yeah.  It was --

11    Q   -- early May to early June, roughly?

12    A   Approximately a month, yeah.

13    Q   And didn't you learn in that time that

14 he's not a voting rights guy?

15    A   No.

16    Q   Never came up?

17    A   We didn't get into great detail on the

18 rationale.

19    Q   You did ask him would you sponsor a

20 census question for -- I'm sorry.  Withdrawn.

21        You did ask Mr. McHenry if he would be

22 willing to sponsor a request for the addition of a

Page 272

1    citizenship question on the census, right?

2        A    I didn't ask Mr. McHenry if he would.   I

3    asked if the Department of Justice would be

4    inclined to send a letter asking us to add the

5    citizenship question.

6        Q    Fair enough.

7             And when you did that, you didn't explain

8    to Mr. McHenry why the Secretary wanted a

9    citizenship question?

10       A    I would have no reason to.

11       Q    And Mr. McHenry never asked, hey, you

12   want me to do this?  Why do you need it?  He never

13   asked you that?

14       A    I think I explained at the outset that

15   the department currently got a report from the ACS

16   on citizenship level -- I mean, on

17   census -- certain census size, Citizen Voting Age

18   Population, and if they were to get it from the

19   decennial, that would allow them a greater

20   granularity and would that be useful to them, and

21   he said he would inquire.

22       Q    You asked Mr. McHenry if the

Page 273

1   Department of Justice would find it useful to have

2   more granularity about citizenship?

3       A    Correct.

4       Q    But at no point did Mr. McHenry say,

5   look, if we want it, we'll ask for it, but how

6   come you want it?  Didn't he ask you something

7   like that?

8       A    No.

9       Q    When people call you and say, hey, will

10  the Department of Commerce do this or do that,

11  don't you say, why do you want that, why do you

12  need that?

13      A    I usually say is there a reason that you

14  think the Department of Commerce would need

15  that -- and if they have a reason, then I'll look

16  into it.  I don't say, hey, why does your boss

17  want this?  That's not part of lexicon.

18      Q    No.  No.  If another agency calls and

19  says --

20      A    I don't --

21      Q    Let me finish the question and you can

22  answer any way you want.

1          If another agency calls and says, will

2     the Department of Commerce do such and such,

3     whatever it is --

4          A    Right.

5          Q    -- don't you say to them in some form or

6     another, why do you want this?

7              MR. GARDNER:  Objection.  Hypothetical.

8     BY MR. GERSCH:

9          Q    Why does your agency need this?

10             MR. GARDNER:  Objection.  Hypothetical.

11             THE WITNESS:  Again, I don't question why

12    their boss might want it.  I might say, what is it

13    you think we can provide or why do you think the

14    Department of Commerce is the right agency for

15    this?  But if they say we need this data because

16    we're negotiating a trade agreement, whatever,

17    that's fine.  I don't question their basis.

18    BY MR. GERSCH:

19         Q    Okay.  But if I understood your last

20    answer, you added something important, you said,

21    if they call and say we need this for the trade

22    ag- -- trade agreement, you say I don't question

Page 275

1    them.  But if they don't give a reason, sir, don't

2    you say to them, why do you want it?

3           MR. GARDNER:  Objection.  Calls for a

4    hypothetical.

5           THE WITNESS:  Again, I already provided

6    the reason for Department of Justice.  I said,

7    would it be useful for you to have more granular

8    voting data at the census lock level?  He said he

9    would inquire.  That answers your question.  I'd

10   already provided the answer.

11   BY MR. GERSCH:

12      Q   Mr. McHenry comes back at some point and

13   he says he's not interested, right, in words or

14   substance?

15      A   He suggested that I contact the

16   Department of Homeland Security.

17      Q   But I take it he makes it clear to you in

18   some fashion -- withdrawn.

19           Let's start with this.  What did he say

20   to you?

21      A   He suggested I talk to the Department of

22   Homeland Security.

1      Q   Did he also say, listen, I don't really

2  need that information, or my guys don't need that

3  information, or my department doesn't need that

4  information or something like that?

5          MR. GARDNER:  Objection to form.

6          THE WITNESS:  Again, no, he did not

7  indicate that they did not need the information.

8  He simply suggested that they were rather busy and

9  why don't I talk to the Department of

10  Homeland Security.

11  BY MR. GERSCH:

12      Q   It's your testimony that he said they

13  were too busy to do it?

14      A   Unfortunately, that's not an uncommon

15  response from other agencies.  They don't

16  necessarily look for extra work.

17      Q   Okay.  So they were too busy to ask for

18  it, that's what you understood them to say?

19      A   Yeah.  Their inclination was they weren't

20  inclined to do the work, to ask for it, yeah.

21      Q   Okay.  Okay.  So Mr. McHenry let's you

22  know he's not inclined or the department is not

Page 277

1  inclined to do the work, to ask for it, and he

2  refers you to Homeland Security, correct?

3      A    Correct.

4      Q    And you speak to a Mr. Hamilton, right?

5      A    Right.

6      Q    And Mr. Hamilton, he's not a VRA guy,

7  right?

8      A    I have no idea what his background is.

9      Q    Certainly, it's your understanding that

10  the Department of Homeland Security has nothing to

11  do with enforcing the Voting Rights Act?

12      A    It would not normally be something I

13  would think they would do, no.

14      Q    And you talked to Mr. Hamilton how many

15  times?

16      A    I don't know, three or four times.

17      Q    Over what period?

18      A    Again, two weeks.  I don't know.

19      Q    And don't you say to Mr. Hamilton, here's

20  why we want the information, here's why we want

21  you to ask for the citizenship question?

22      A    Again, it was the same explanation as I

Page 278

1  gave the Department of Justice.  And as you

2  pointed out, DHS doesn't really do that.  So I was

3  simply following up on the suggestion that

4  Mr. McHenry had made, and perhaps there was

5  something that DHS did that I was unaware of that

6  would have them -- have the need for this

7  information.  Turns out they didn't, so back to

8  Square 1.

9      Q   Yeah.  My question is -- and maybe I

10  didn't phrase it exactly right.

11          Did you explain to Mr. McHenry [sic] in

12  any of these several calls, here's why it's

13  important to the Department of Commerce, or your

14  boss or whomever, here's why it's important

15  that -- to get a citizenship question added?

16          MR. GARDNER:  I think you mean

17  Mr. Hamilton.  You said Mr. McHenry.

18          MR. GERSCH:  Withdrawn.  Let me rephrase.

19  Thank you, Counsel.

20  BY MR. GERSCH:

21      Q   In any of these several calls, you say to

22  Mr. Hamilton, here's why it's important to

Page 279

1    Department of Commerce to have you folks request

2    the addition of a citizenship question.

3        A    No.  I never explained that to him.

4        Q    And is it your testimony that in your

5    several conversations with Mr. Hamilton, he never

6    says, hey, why do you want this?

7        A    That's correct.

8        Q    He never says, why do you want a

9    citizenship question added?

10        A    Again, when somebody calls up and says --

11    my boss, you know, Secretary Ross, AG Sessions,

12    whomever has asked us to pursue this, I don't

13    typically question back and say, well, why do you

14    think -- does your boss think this is needed?  I

15    just don't do that.  It's kind of discourteous to

16    other staff.  So no, he took me at face value.

17    I'm calling to inquire, would they find this

18    useful?  He gets back to me, no.

19        Q    I just want to make sure I caught part of

20    what you're saying correctly.

21            Are you saying it would have been

22    discourteous for Mr. Hamilton at Homeland Security

1    to say, hey, why do you guys at Commerce want us

2    to ask for a citizenship question?

3         A    For him to challenge why my boss might

4    ask for it.

5         Q    I didn't say challenge.

6              Is it your testimony it would be

7    discourteous for him to say, hey, you're asking me

8    to do something --

9         A    Uh-huh.

10        Q    -- something which involves some work --

11        A    Uh-huh.

12        Q    -- would you just explain to me why it's

13   important for you to have me ask for a citizenship

14   question?

15             MR. GARDNER:  Objection.  Form.

16             THE WITNESS:  No such conversation

17   occurred.

18   BY MR. GERSCH:

19        Q    Yeah.  My question is:  Would that have

20   been discourteous for him to say that to you?

21        A    Depends on how he phrased it.

22        Q    He could have phrased it in a way that

Page 281

1    was properly respectful, right?

2         A    Theoretically, yes.

3         Q    In the time that you were dealing with

4    Mr. McHenry or getting ready to deal with

5    Mr. McHenry -- this is back at the Justice

6    Department now -- did you ever learn that he was

7    director of the Executive Office of Immigration

8    Review?

9         A    I never learned that, no.

10        Q    How about Ms. Hankey, did she say why she

11   was going to refer you to Mr. McHenry?

12        A    No, she didn't.

13        Q    Is it common for you to call people like

14   Mr. McHenry without knowing what their position

15   is?

16        A    Certainly at that time, yes.

17        Q    What was it about that time?

18        A    Well, it was shortly into the

19   administration, and titles are not necessarily

20   informative of what people do, so --

21        Q    Did you have an understanding of what

22   Mr. McHenry's portfolio was, independent of his

Page 282

1  title?

2       A    No.

3       Q    About what his expertise was independent

4  of his title?

5       A    No.

6       Q    You didn't know -- withdrawn.

7            You're trying to accomplish something for

8  your boss, right?

9       A    Correct.

10      Q    And you're calling another agency and

11  you're going to ask them to do some work, right?

12      A    Right.

13      Q    And you know from your vast experience

14  that sometimes people just say no because they

15  just don't want to do the work, right?

16      A    Correct.

17      Q    That's not uncommon, right?

18      A    It's been my experience.

19      Q    So in order to have the best possible

20  chance of persuading a person like Mr. McHenry,

21  don't you want to do a little research beforehand?

22      A    Again, I was dealing with, literally,

Page 283

1  hundreds of issue, as well as clearing

2  correspondence, clearing Federal Register notices,

3  no.  I did not have time to research this guy's

4  background.  That's why I went through

5  Eric Branstad to say, hey, get me somebody over at

6  DOJ who I can talk to.  I want to Hankey -- and I

7  don't know her from Adam, but relying on the fact

8  that she was recommended by folks over at the

9  White House as somebody who was connected with

10  AG Sessions, I'm assuming she's going to steer me

11  in the right direction.  So I take on faith who

12  she suggested I talked to.  Turned out they

13  weren't the right person, so we didn't get

14  anywhere.

15      Q   Did you have an assistant during this

16  period?

17      A   No.

18      Q   Any staff?

19      A   I had my OPSP staff.

20      Q   Who's that?

21      A   Office of Policy and Strategic Planning.

22  They were the detailees I discussed earlier.

Page 284

1     Q   Got it.

2         You couldn't ask one of them, hey, I'm

3     supposed to have a call with Mr. McHenry, can one

4     of you figure out what he is and why --

5     A   No.

6     Q   Excuse me.  I got to -- just a second.

7     I've got to finish the question.  You can answer

8     it any way you want.

9         Didn't you want to call -- talk to one of

10    your staff people and say, listen, I got a call

11    with Mr. McHenry, I got to persuade him to do some

12    work he's not going to want to do, to help out our

13    boss, Mr. Ross, Secretary Ross, and can one of

14    your look up and tell me who he is and what levers

15    we might be able to pull to persuade him to do

16    this work for us?

17        MR. GARDNER:  Objection.

18    BY MR. GERSCH:

19    Q   You didn't want to ask someone on your

20    staff to do some work like that for you?

21        MR. GARDNER:  Objection.  Form.

22        THE WITNESS:  Again, that's a view of

Page 285

1   both the workload I was under and the workload

2   that they're under that I think is misinformed.

3            In fact, several of my calls with

4   Mr. McHenry were made while I was driving into

5   work, so there was no opportunity to call somebody

6   and do that research.

7            And, besides, this wasn't about getting

8   leverage on Mr. McHenry.  This was simply to

9   ask -- following up on the person I'd been

10  directed to, who, based on the fact that it was

11  recommended by an assistant to the AG, I'm

12  assuming is going to at least be somewhat

13  receptive.  Probably an error on my part, but

14  that's -- I've got a dozen other things I'm

15  dealing with at the same time.  So, no, I'm not

16  going to spend a lot of time researching this guy.

17  BY MR. GERSCH:

18       Q   You didn't spend any time researching

19  this guy?

20       A   Correct.  I didn't.

21       Q   Secretary Ross certainly knows why he

22  wanted a citizenship question back in the spring

Page 286

1   of 2017, right?

2       A    You'd have to ask him.

3       Q    Is there anyone besides Secretary Ross

4   who we could go to who would have that

5   information?

6           MR. GARDNER:  Objection.  Lack of

7   foundation.  Calls for speculation.

8           THE WITNESS:  I'm not aware of anybody.

9   BY MR. GERSCH:

10      Q    Do you have any reason to believe that

11  Secretary Ross's rationale for wanting to add a

12  citizenship question is some kind of supersecret?

13      A    No.

14      Q    Doesn't involve national security, right?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.  Calls for speculation.

17          THE WITNESS:  I don't know what the

18  Secretary's rationale is.  You'd have to ask him.

19  BY MR. GERSCH:

20      Q    But you don't think it involves national

21  security?

22          MR. GARDNER:  Same objections.

Page 287

```
 1          THE WITNESS:  I'm not going to speculate
 2     on that.
 3     BY MR. GERSCH:
 4          Q    You heard about this suit back when it
 5     was filed, right, this lawsuit?
 6          A    Yeah.
 7          Q    Okay.  And there's several lawsuits,
 8     right?
 9          A    Lost count, but yes.
10          Q    And you've known that you were going to
11     sit for a deposition for a while, also?
12          A    Maybe for two weeks or so.
13          Q    Okay.  Well, at any time since these
14     lawsuits started to get filed, did you have a
15     discussion with anyone about why it is the
16     Secretary wanted a citizenship question added?
17          A    No.
18          Q    Secretary Ross gave Congressional
19     testimony in March of 2018 in advance of his
20     decisional memorandum.  Do you remember that?
21          A    I'll take your word for it.
22          Q    Testified before committees of both --
```

1    both House, right?

2        A    Again, I'd have to look at a calendar to

3    refresh my memory as to when he testified.  But,

4    yes, he testified to Congress during the course of

5    the year.

6        Q    Fair enough.

7             And he was asked questions about a

8    citizenship question?

9        A    I believe that's correct.

10       Q    Who prepared him to testify on that

11   subject?

12       A    He -- he does a lot of his own hearing

13   prep, but we would have -- I would have been

14   involved, as well as James Uthmeier,

15   Peter Davidson, of course, Karen Dunn Kelley.  I

16   mean, this was not a hearing specifically on the

17   citizenship question, so we mostly would have been

18   preparing for the broad range of questions on

19   whatever the topic was.  We were going up and

20   testifying on the steel tariffs.  We were going up

21   and testifying on the lifecycle cost estimate, a

22   whole series of things, so --

1     Q    Sure.  You want to get him prepped on

2  everything, though, right?

3     A    Yeah.

4     Q    And one of the things that you

5  anticipated would come up was the question about

6  the citizenship question, right?

7     A    Seems reasonable if that was the time

8  frame, yes.

9     Q    And were you the one who worked with

10  Secretary Ross on how he was going to answer those

11  questions?

12     A    I would have been one of the people, yes.

13     Q    Was there a division of responsibility

14  between the folks you mentioned just a minute ago,

15  the people who helped prepare him?

16     A    Not per se.  I think he's fairly open to

17  suggestions from staff of what to consider.  So if

18  somebody had an idea, he would consider it.

19     Q    Did you tell the Secretary, listen, you

20  can expect that someone is going to ask

21  whether -- whether you're going to add a

22  citizenship question?  Did you have that

Page 290

1  discussion with him?  That would have been normal,

2  right?

3      A   Well, again, if this is in the time

4  period after we received the DOJ letter and while

5  he was considering making his decision, then, yes,

6  we might have anticipated.  But the answer would

7  have been fairly straightforward, which is we have

8  that matter under review, and I'm considering

9  all -- all information.  So there would have been

10  very little we're prepping for on that.

11      Q   Didn't you discuss with the

12  Secretary -- withdrawn.

13          First of all, I'll represent that he

14  did -- the Secretary did, in fact, testify before

15  multiple committees after the

16  Department of Justice request came in in December

17  of 2017 and before the issuance of the March

18  decisional memorandum.

19      A   Okay.

20      Q   And my question to you is:  In those

21  discussions that you had with the Secretary to

22  prepare him, wasn't it discussed whether the

Page 291

1  Secretary was going to reveal the reasons he had

2  wanted to the addition of a citizenship question?

3       A    No.

4       Q    Subject never came up?

5       A    Never came up.

6       Q    Didn't it come up whether the Secretary

7  would reveal that the reason that Commerce had

8  received a request from DOJ to add a citizenship

9  question is because Commerce had gone to DOJ and

10 asked DOJ to make that request?

11      A    No.

12      Q    Never came up?

13      A    Never came up.

14           (Conference call interruption.)

15           THE WITNESS:  In case we were falling

16 asleep.

17 BY MR. GERSCH:

18      Q    You testified with respect to the

19 citizenship question; isn't that right?

20      A    That's correct.

21      Q    You gave testimony before the House

22 Committee on Oversight and Government Reform?

Page 292

1      A    Correct.

2      Q    After the decisional memorandum was

3  issued?

4      A    Uh-huh.

5      Q    May 8th of this year?

6      A    Okay.

7      Q    Sound right?

8      A    Somewhere in that ballpark, yeah.

9      Q    Yeah?

10     A    I'll take your word for it on the date.

11     Q    You were asked questions by

12  Representative Eleanor Holmes Norton about

13  citizenship questions.  Do you remember?

14     A    I recall the exchange, yes.

15     Q    She asked why did this question, which

16  was dropped for 70 years, suddenly appear on the

17  decennial census, what was the point, didn't she?

18     A    I -- I would have to refer to her

19  testimony.  I don't have it in front of me.

20          MR. GERSCH:  What are we up to?

21          MR. GARDNER:  27.

22          MR. GERSCH:  Let's mark this 27.

Page 293

1          (Plaintiffs' Exhibit 27, Testimony from

2     Committee on Oversight and Government Reform, was

3     marked.)

4     BY MR. GERSCH:

5          Q    I'm showing you a transcript of your

6     testimony before the Committee on Oversight and

7     Government Reform on May 2018.

8          Mr. Comstock, I want to be clear.  This

9     is not a transcript made by the committee.  Do you

10    understand me?

11         A    I understand what you're saying.

12         Q    Okay.

13         A    I'm not sure why it's not a transcript

14    made by the committee, but that's all right.

15         Q    We had this transcript --

16         A    Okay.

17         Q    -- made by a reporter who watched your

18    testimony.

19         A    Okay.

20         Q    So let me direct you to Page 37, Line 12.

21    See where it says, Ms. Norton?

22         A    Uh-huh.

Page 294

1      Q    All right.  And this is where she asks

2   you -- withdraw this.  Isn't what I want --

3           Let me direct your attention to Lines 2

4   through 5, okay.

5      A    All right.  Let me read the context of

6   which Lines 2 through 5 appear.

7      Q    Let me ask your question and then you can

8   read whatever you need.

9      A    All right.  Very good.

10     Q    On Lines 2 through 5, Ms. Norton asked

11  you, "My question to the two of you" -- and you

12  were there with Mr. Jarmin; is that right?

13     A    Correct.

14     Q    She says, "My question to the two of you

15  is:  Why did this question, which was dropped for

16  70 years, suddenly appear on the decennial census?

17  What was the point?"

18          And then you answered, "Thank you very

19  much, Congresswoman, for the question.  We

20  received a request from the Department of Justice

21  for this, and their rationale was that the level

22  of the information that they needed to enforce the

1    Voting Rights Act was not available."

2         That's the testimony you gave, correct?

3    A    Again, this is not the official

4    transcript, but presuming your person transcribed

5    this correctly, that appears to be what I said.

6    Q    And this squares with your memory of what

7    you said, right?

8    A    Correct.

9    Q    And when she says, why did this question

10   get added, and you say, we received a request from

11   the Department of Justice, that's not the whole

12   truth; is it?

13   A    That's a -- that's a factual statement.

14   Q    It's a factual statement that you

15   received a request from Department of Justice,

16   right?

17   A    Correct.

18   Q    But the reason the Department of Justice

19   made the request is because you guys at the

20   Department of Commerce put them up to it; isn't

21   that right?

22   A    I don't agree with that characterization.

Page 296

1    But, again, the Department of Justice decided that

2    this was information they could use and they made

3    the request.  That starts the formal process for

4    us to review the question.  Had they decided they

5    did not need that information and not made the

6    request, then the Commerce Department would have

7    had to decide if there was some rationale that the

8    Commerce Department needed this information.

9        Q    Sure.  But the reason the

10   Department of Justice made this request of the

11   Department of Commerce was that the Department of

12   Commerce went to the Justice Department and said,

13   will you please make this request of us, right?

14       A    We asked them if they could use this

15   information.  That was an independent decision on

16   their part.

17       Q    You asked them if they could use

18   information from a citizenship question, right?

19       A    At the block level, which is not

20   currently available.

21       Q    And you asked them if they would be

22   willing to request that from the

Page 297

1    Department of Justice [sic]?

2        A    If that was information that they found

3    useful, then they could request it, yes.

4        Q    You asked them to request it from the

5    Department of Justice, correct?

6        A    Again, what we asked them was if they

7    could use this information, and if so, then they

8    would need to request it.

9        Q    Do you deny that you personally went to

10   representatives in the Department of Justice and

11   asked them if they would request the addition of a

12   citizenship question?

13           MR. GARDNER:  Objection.  Asked and

14   answered.

15           THE WITNESS:  To answer, once again, I

16   went to representatives of the

17   Department of Justice and asked them if this would

18   be information that they would find useful, and if

19   so, they could request it.

20   BY MR. GERSCH:

21       Q    Yeah.  I got that part, and I'm asking a

22   slightly different question now.

1      A   Okay.

2      Q   Didn't you say to the

3   Department of Justice when you were talking to

4   them, in words or substance, we would appreciate

5   it if you would ask us to include a citizenship

6   question?

7      A   I never made such a request.

8      Q   And I take it, based on your prior

9   testimony, you don't know what conversation

10  occurred between the Secretary and the Attorney

11  General?

12     A   That's correct.

13     Q   Did you understand that Ms. Teramoto was

14  on that call between the Secretary and the

15  Attorney General?

16     A   I don't know who was on the call.

17     Q   In any case, however we word it, you

18  didn't tell Representative Norton when she asked

19  why is this question being added, that you had

20  gone to the Department of Justice and suggested

21  that this might be something they'd be interested

22  in?

Page 299

1     A    That's correct.

2     Q    Why is that?

3     A    Again, because until the department makes

4  its independent decision to request this

5  information, that was the -- there was no question

6  that was going to be added.

7     Q    When Representative Norton says, why is

8  the question being added?  Don't you think it's

9  relevant that the Secretary of Commerce wanted

10  this question added independent of the

11  Department of Justice's request?

12          MR. GARDNER:  Objection.  Form.

13          THE WITNESS:  Again, now --

14          MR. GARDNER:  What's your -- withdrawn.

15          MR. GERSCH:  What's your objection?

16          MR. GARDNER:  I didn't understand that

17  question.  Is it relevant to Secretary -- or I'm

18  sorry -- Representatives Norton Holmes question

19  that the Secretary had requested DOJ to ask?  I

20  didn't even --

21          MR. GERSCH:  I got it.

22  BY MR. GERSCH:

Page 300

1    Q   Let me put a different question to you.

2    A   Sure.

3    Q   When Representative Norton asks you the

4    why question, don't you think it's responsive to

5    the why question that the Secretary of Commerce

6    wanted to add a citizenship question independent

7    of the Department of Justice's request?

8    A   No.  I don't think it's relevant.  His

9    decisional memo laid out very clearly the

10   rationale that was the basis of his decision.

11   Whatever his personal feelings may have been are

12   irrelevant to that decision.

13   Q   It laid out a rationale.  We can agree on

14   that, right?

15   A   That's what he's required to do under the

16   law, is lay out a rationale.  That is the

17   rationale for his decision and that's what he's

18   standing on.

19   Q   Okay.  He laid out a rationale.  Is it

20   your understanding, under the law, that if the

21   rationale is not his real reason for doing it, we

22   should ignore the real reason, and we should only

1   focus on the pretextual reasons that he offers up?

2          MR. GARDNER:  Objection.  Calls for a

3   legal conclusion.

4          THE WITNESS:  The Secretary's decision

5   memo lays out a valid reason that's consigned to

6   his discretion under the law, and that is the

7   rationale he provided to staff, and that is the

8   rationale that we placed in the record.  So that

9   is his reason for having the question.

10  BY MR. GERSCH:

11      Q   My question is a little different.  If

12  the Secretary's real rationale is something

13  different than the rationale he lays out in his

14  decisional memo, is it your understanding, under

15  the law, that we're to ignore the real reason and

16  only focus on what's in the decisional memorandum?

17         MR. GARDNER:  Objection.  Calls for a

18  legal decision.

19         THE WITNESS:  Your hypothetical is

20  premised on the false conclusion that there is

21  some illegal rationale that would be provided and

22  be exposed and be referenced.  There is none.

1  It's committed to his discretion to add a

2  question, as long as you make it through the other

3  things, Paperwork Production Act, et cetera.  So

4  it's -- I don't understand the basis for your

5  question.  But there's -- at the base of your

6  question is this hypothetical that there's some

7  supposed illegal reason that would be -- that

8  would nullify a perfectly valid decision.  I don't

9  agree with that assessment.

10  BY MR. GERSCH:

11      Q   Mr. Comstock, I want you to listen to my

12  question carefully, because there was no reference

13  to any illegal rationale, and I'm going to put it

14  to you again and there will be no reference to an

15  illegal rationale.  And my only question -- and,

16  by the way, I'm happy if you want to take this as

17  a hypothetical.

18          My only question is:  If the Secretary

19  lays out a rationale in his decisional memorandum

20  which is different than his real rationale, is it

21  your understanding that we're supposed to ignore

22  the real rationale and only focus on what's in the

Page 303

1   decision memo?

2          MR. GARDNER:  Given your introductory

3   clause, objection.  Calls for a hypothetical.

4   Objection.  Calls for a legal conclusion.

5          THE WITNESS:  Again, a decision is valid

6   if a valid reason has been spelled out, and that

7   is what we did.

8   BY MR. GERSCH:

9      Q   Could you answer my question?

10     A   Again, I don't accept the premise of your

11  question, which is that there's some other reason

12  besides what was provided in the memo.

13     Q   It's a hypothetical question, sir.  The

14  question is --

15     A   I'm not going to answer a hypothetical on

16  that basis.

17     Q   I'm asking you to answer it, and you're

18  here to answer questions, and I think I'm fairly

19  following up on your testimony.

20          My question to you is real simple:  If

21  the Secretary lays out a rationale in his

22  decisional memorandum and it's not his real

Page 304

1   rationale, is it your understanding that what

2   we're supposed to focus on is what's in the

3   decisional memorandum and we're not supposed to

4   look at the rationale?

5        MR. GARDNER:  Objection.  Calls for

6   hypothetical.  Objection.  Calls for legal

7   conclusion.

8        THE WITNESS:  Again, we're at loggerheads

9   here because you keep spelling out something that

10  is -- that presupposes there is some other

11  rationale that would be sufficient to outweigh a

12  legitimate rationale and, therefore, must be

13  noticed and taken care of.  I mean, the government

14  makes decisions all the time and spells out a

15  rationale.  Do some of decision-makers have,

16  perhaps, other reasons, maybe, but it's not

17  relevant to the legal analysis.

18    Q   We shouldn't know what Secretary --

19  withdrawn.

20        We shouldn't know what the real rationale

21  is; is that testimony?

22    A   I --

1          MR. GARDNER:  Objection.  Calls for a

2    legal conclusion.

3          THE WITNESS:  Again, I have no reason to

4    believe that the rationale is anything other than

5    what's in the memo.

6    BY MR. GERSCH:

7      Q   Well, sir, actually, you testified

8    previously that the Secretary had a rationale for

9    asking this question, which he didn't reveal to

10   you and had nothing to do with the

11   Department of Justice's request.

12     A   I disagree with that statement.

13     Q   Let's try this one other way.  You don't

14   disagree with the proposition that a

15   decision-maker could have a rationale that is

16   different than what he chooses to spell out in his

17   decisional memorandum, right?

18         MR. GARDNER:  Objection.  Calls for

19   hypothetical.

20         THE WITNESS:  Again, I don't know -- I

21   don't -- it's impossible to answer that question,

22   because you -- I'm not sure where you're going

1   with it.

2   BY MR. GERSCH:

3       Q   I'm not asking you to know where I'm

4   going with it.  I'm asking you to answer the

5   question.  I'll put it to you again.

6           You don't disagree with the proposition

7   that it's possible for the decision-maker to have

8   one rationale which he puts in the decisional

9   memorandum and a completely different rationale

10  which is the real reason he wants the decision

11  done?

12          MR. GARDNER:  Objection.  Calls for a

13  hypothetical.

14          THE WITNESS:  Again, in the context we're

15  dealing with, I don't agree with that statement.

16  BY MR. GERSCH:

17      Q   It's not possible for that to happen,

18  it's not possible for the decision-maker to put

19  one rationale in the decisional memo and have a

20  completely different rationale for why he wants

21  the decision?

22          MR. GARDNER:  Objection.  Calls for a

1    hypothetical.

2         THE WITNESS:  In my experience with the

3    federal government service across 30 years, both

4    Democrat and Republican, I'm not aware of

5    decision-makers who would do such a thing.

6    BY MR. GERSCH:

7         Q   This would never happen, in your view,

8    right?

9         A   I'm not going to use the word never.

10   Clearly, in the course of human history, things

11   like that do happen.  That's not been my

12   experience that it generally is the case.

13        Q   That's fine.  Put aside your experience.

14   I'm just asking you conceptually, you don't have

15   difficulty understanding that a decision-maker

16   could say I'm doing this for one reason without

17   revealing that he is actually doing it for a

18   different reason.  You understand that concept,

19   right?

20        MR. GARDNER:  Objection.  Calls for a

21   hypothetical.

22        THE WITNESS:  Yeah.  It's a hypothetical

Page 308

1   to which the answer is always going to be yes.  So

2   to the extent that makes you happy, sure.

3   BY MR. GERSCH:

4      Q   Okay.  So you do understand that concept.

5   So when that occurs, when it is the case that the

6   decision-maker puts forth a stated rationale,

7   which is, in fact, not his real rationale, is it

8   your understanding that we should pay no attention

9   to his real rationale and focus only on his stated

10  rationale?

11          MR. GARDNER:  Objection.  Calls for

12  hypothetical objection.  Calls for a legal

13  conclusion.

14          THE WITNESS:  I'm not going to answer

15  that question.

16          MR. GARDNER:  Would now be a good time

17  for a break?  We've been going about an hour.

18          VIDEOGRAPHER:  This concludes Media Unit

19  Number 5.  The time on the video is 3:11 p.m.  We

20  are off to record.

21          (Off the record.)

22          VIDEOGRAPHER:  This begins Media Unit

Page 309

1    Number 6.  The time on the video is 3:37 p.m.  We

2    are on the record.

3            (Plaintiffs' Exhibit 28, Memo, was

4    marked.)

5    BY MR. GERSCH:

6        Q    Mr. Comstock, we're back on the record.

7            After the Department of Justice made

8    their formal request for the addition of a

9    citizenship question in December of 2017, you

10   understand that the Census Bureau did some

11   analysis with respect to that request, right?

12       A    Correct.

13       Q    All right.  And one of the things that

14   the Census Bureau produced is a document that's

15   been marked Exhibit 28.

16       A    Okay.

17       Q    Is that fair to say?

18       A    It appears to be a memo from John Abowd

19   to the Secretary, so will -- oh, it's marked

20   draft, so --

21       Q    Dated January 19, 2018, as you say, from

22   John Abowd, Chief Scientist at the Census Bureau,

1    to Secretary Ross through Karen Dunn Kelley.

2          You've seen this before, haven't you?

3      A   I don't know that I've seen this

4    particular draft.  It's marked draft, so I don't

5    know that this document ever made it up to the

6    Secretary's office.

7      Q   Did you see a form of this document,

8    whether it was this one or not?

9      A   I saw some form of this document, yes.

10     Q   I want to direct your attention to the

11   one, two, three -- third full paragraph, last

12   sentence, and in it Mr. Abowd addresses

13   Alternative B -- and, by the way, you understand

14   Alternative B is adding a citizenship question to

15   the census, right?

16     A   That appears to be what the memo says,

17   yeah.

18     Q   So what Mr. Abowd reports is

19   Alternative B -- that is adding a citizenship

20   question -- is, quote, very costly, harms the

21   quality of the census count, and would use

22   substantially-less active citizenship status data

Page 311

1   that are available from administrative sources.

2          You knew that that is what the

3   Census Bureau had concluded, right?

4      A   Well, again, that's a -- this is a draft

5   pre-decisional memo.  So I'm not sure if this was

6   the final document that was sent to us or not.

7      Q   I'll represent to you that this

8   is -- that the record made in this case so far is

9   that this is the last draft produced.  Does that

10  help you --

11     A   Is that -- okay.

12     Q   I'm happy if you want to consult with

13  your counsel.

14         MR. GARDNER:  If you -- you can answer

15  the question, yes.

16         THE WITNESS:  Sure.  Assuming this is the

17  final version, then that's what the document says,

18  yes.

19  BY MR. GERSCH:

20     Q   That's not my question.  You came to

21  understand, isn't that right, that the view of the

22  Census Bureau was that asking the citizenship

Page 312

1    question is very costly, harms the quality of the

2    census count and would use substantially-less

3    citizenship status than are available from

4    administrative sources?

5        A   I would agree that that's the summary

6    statement here.  That it overstates the case they

7    made further in the document.  But that is not an

8    accurate representation of what's actually

9    reflected in the document.

10       Q   I want to make sure I understand your

11   testimony.  You're saying you disagree with their

12   conclusion?

13       A   I disagree with that characterization as

14   being the final conclusion of the Census Bureau,

15   yes.

16       Q   Ah.  Okay.  So you think that what I just

17   read to you doesn't fairly reflect the view of the

18   Census Bureau; is that right?

19       A   I think that reflects the view of

20   Dr. Abowd and that it's very imprecisely stated.

21   If you read the rest of the memo, it provides more

22   detail, and so I would not agree with the

Page 313

1   statement, because it's not backed up in the

2   document that it would be very costly.  That's a

3   relative term.  And that it would use

4   substantially-less accurate, I disagree with those

5   statements.

6       Q   Yeah.  I understand, and I stipulate that

7   you disagree with them.  My question is a little

8   different.  I'm asking if you understand this is

9   the position of the Census Bureau, whether you

10  agree with it or not, and I stipulate that you

11  don't.

12      A   And just, again, I'm being very clear

13  that this sentence taken out of context, I would

14  say is not the position of the Census Bureau.  The

15  position of the Census Bureau is reflected in this

16  full memo, which provides greater detail, which is

17  not, I would say, accurately characterized in this

18  summary statement at the front.

19      Q   Did you ever meet with the folks at the

20  Census Bureau about this analysis?

21      A   Yes, we did.

22      Q   Okay.  When did you do that?

1      A    I couldn't tell you the exact date.

2      Q    Who did you meet with?

3      A    Dr. Abowd, Dr. Jarmin.  It was a large

4  meeting.

5      Q    And Dr. Abowd and Dr. Jarmin, they stood

6  by this analysis, right, the analysis in

7  Exhibit 28?

8      A    I'd say that, yeah, they stood by the

9  entire analysis, not necessarily that statement.

10      Q    And the entire analysis includes the

11  statement that I read to you, right?

12      A    Again, you're -- I think you're taking a

13  single statement out of context.

14      Q    My question is a little different.  I'm

15  saying when you said, they stood by the entire

16  analysis, that includes the statement that I read

17  you?

18      A    And, again, I will say that I think

19  you're trying to get me to say that particular

20  statement represents the view of the

21  Census Bureau, and that is not my understanding.

22      Q    Okay.  When you say it's not your

Page 315

1   understanding, at no point did Dr. Jarmin or

2   Dr. Abowd say, no, we don't believe that

3   Alternative B is very costly, harms the quality of

4   the census count and would use substantially-less

5   accurate citizenship status data that are

6   available from administration sources; isn't that

7   right?  They never took it back?

8       A   We never asked them to take it back.

9       Q   And they never did?

10      A   I don't know if they took it back or not.

11      Q   In your presence, sir.

12      A   Again, they were never asked, to my

13  knowledge, to take that statement back, so there

14  would be no reason for them to take it back.

15      Q   And they didn't take it back, did they?

16      A   I don't know whether they took it back.

17      Q   In your presence, they didn't take it

18  back?

19      A   Again, I look at their entire memo, not

20  that statement.

21      Q   I'm not asking that question.  They

22  didn't take this statement back that I just read

1    to you three times?

2        A    Again, my point is, they were never asked

3    to take it back, so there would be no reason for

4    them to take it back.

5        Q    I just want there to be no

6    misunderstanding, Mr. Abowd [sic], if at trial

7    you're going to say they took it back, I want to

8    hear that right now.

9            MR. GARDNER:  He's not Mr. Abowd.

10   BY MR. GERSCH:

11       Q    I'm sorry, Mr. Comstock.  It's late in

12   the day.

13           Mr. Comstock, if you're going to say at

14   trial that Dr. Abowd or Dr. Jarmin took this

15   statement back, I want to hear that right now.

16   Can we agree on that, that you'll tell me right

17   now?

18       A    I will agree -- I will agree that I would

19   say that is not representative of the data that

20   was presented to us in the course of extensive

21   discussions.  That that statement is an early

22   statement that mischaracterizes the final

Page 317

1  conclusions that we understood.

2      Q   When you say earlier, it's the statement

3  as of the January 19th memo, you don't disagree

4  with that?

5      A   Again, I'm not contesting they provided

6  this investigation.

7      Q   Focus on timing.  You said this was an

8  early statement and you don't think it was

9  reflective of their final conclusions.

10         My question is:  You're not saying it

11  doesn't reflect their position as of January 19th,

12  are you?

13     A   I am saying, again, that I think you're

14  taking a single statement out of context and

15  trying to represent it has the position of the

16  Bureau as conclusive, and I'm saying I disagree

17  with that statement.

18     Q   Let me show you -- let's mark this as

19  Exhibit 29.

20         (Plaintiffs' Exhibit 29, Memo, was

21  marked.)

22  BY MR. GERSCH:

Page 318

1      Q    You see what's been marked as Comstock

2    Exhibit 29, it is a March 1, 2018 memo from

3    Dr. Abowd for Secretary Ross, Bates stamp first

4    Page 001308.

5          Do you have that in front of you?

6      A    I do.

7      Q    Have you seen this document before?

8      A    I believe I've seen this document.

9      Q    Okay.  And this document relates to an

10   Alternative D, right?

11     A    Correct.  But I'll note, again, it's

12   marked draft, and I'm just mystified as to why we

13   keep getting draft documents as opposed to finals.

14   Certainly draft documents don't normally come to

15   us.

16          MR. WALSH:  Counsel, would it be possible

17   to hand out --

18          MR. GERSCH:  Oh, I'm sorry.

19          MR. WALSH:  Thanks.

20   BY MR. GERSCH:

21     Q    This is about Alternative D; is that

22   right?

Page 319

1    A   That's correct.  But I'm still asking a

2   question, why am I getting a draft version of this

3   instead of a final?

4    Q   I don't get to testify.  All I can do is

5   ask the questions.

6         And Alternative D was the idea of

7   Secretary Ross, that perhaps you could combine

8   Alternative B, which is asking the citizenship

9   question of every household in the decennial

10  census, and Alternative C, which was don't ask the

11  question but use administration data to figure out

12  citizenship status, correct?

13   A   Correct.

14   Q   And at the back of this memo, the last

15  sentence says, "In sum, Alternative D would result

16  in poorer quality citizenship data than

17  Alternative C.  It would still have all the

18  negative cost and quality implications of

19  Alternative B outlined in the draft January 19th

20  memo to the Department of Commerce."

21        You saw this at the time, right?

22   A   Again, I can't say that this was the

Page 320

1    document I saw, because I did not see something

2    marked draft pre-decisional V10.

3        Q   You think you saw a version of it that

4    didn't have draft on it?

5        A   I have no idea.  But we don't typically

6    see documents that say draft.

7        Q   I'll represent that we've never seen a

8    version of either of these documents that aren't

9    marked draft.  If there is one -- if there are

10   versions, I would like them right now.

11          MR. GARDNER:  I represent we've produced

12   what we have.

13   BY MR. GERSCH:

14       Q   Regardless of the format, you became

15   acquainted with the views of Census that

16   Alternative B would result in poorer quality

17   citizenship data than Alternative C and still have

18   all the cost and quality implications of

19   Alternative B outlined in the draft January 19th

20   memo to the Department of Commerce; you became

21   acquainted with that conclusion of theirs, right?

22       A   I did.

Page 321

1    Q   Okay.  By the way, you'll notice it

2   says -- this refers to the January 19th memo as

3   being a draft.

4    A   Okay.  Like I said --

5    Q   Do you see that?

6    A   I see it.  That it says that, yes.

7   Perhaps that is what they provided to us.  I don't

8   know.  We produced whatever is in the record, so

9   if this is what's in the record -- as long as I'm

10   being given the final version, then okay.

11    Q   All right.  You're not saying that the

12   Census Bureau took back the conclusion reflected

13   in this last paragraph that I've read you from

14   Exhibit 29, are you?

15    A   Again, I think there was iterative

16   exchange in which the conclusions of the

17   Census Bureau to staff and some of their

18   assertions did not hold up under

19   cross-examination.

20    Q   Whether you think they held up or not, my

21   question to you is:  Did the Census Bureau ever

22   take back the conclusion that's in the last

Page 322

1    paragraph of this March 1 memo?

2        A    You'd have to ask them.

3        Q    In your presence, did they say any such

4    thing?

5        A    I didn't ask them to take it back.

6        Q    I'm not asking whether you asked them.

7    I'm asking -- withdrawn.

8             There were other people in the meeting

9    besides you, right?

10       A    There were a series of meetings, so --

11       Q    How many meetings did you have about this

12   memo, this March 1 memo?

13       A    I couldn't tell you.

14       Q    About?

15       A    Might have met once or twice.  I really

16   couldn't tell you.

17       Q    And who did you remember being there

18   besides Dr. Abowd and Dr. Jarmin?

19       A    Again, I don't know if it was

20   specifically on this memo or this presentation or

21   whether they sent it to us.  There were multiple

22   meetings on the question.  Who was at each

Page 323

1    meeting, I couldn't tell you.

2        Q   I think it would be fair to say there

3    were multiple meetings about Census Bureau's

4    analysis of the citizenship question, right?

5        A   Yes.

6        Q   Okay.  And what's your best recollection

7    of how many meetings there were?

8        A   I don't know.  Two or three.

9        Q   And if this memo is dated March 1 and the

10   decisional memo is dated March 26th.  What's your

11   best recollection about when the last -- the last

12   meeting was, the last of these two or three

13   meetings?

14       A   Probably somewhere in the vicinity of

15   March 20th.

16       Q   Okay.  And my question simply to you is,

17   sir:  Did the Census Bureau people ever say we're

18   taking it back, you've convinced us, we don't

19   agree with the conclusion we put forth in the last

20   paragraph?

21       A   No.

22       Q   And did you ever have -- withdrawn.

Page 324

1      Did you have a meeting about the wording

2  of the March 26th memo with the Census Bureau?

3      A    I don't believe so.

4      Q    You didn't have a meeting with Dr. Abowd

5  with Secretary Ross there on the morning of the

6  26th or thereabouts?

7      A    No, not to my recollection.  But it's

8  entirely possible.

9      Q    So it's your -- and all I can ask for is

10  your best recollection.

11      It's your best recollection that you

12  never had a meeting with the Census Bureau about

13  the wording of the March 26 decisional memo?

14      A    Not that I recall, no.

15      Q    Did you ever have any analysis of the

16  citizenship question prepared by experts other

17  than the folks at the Census Bureau?

18      A    Not that I know of, no.

19      Q    Did you ever get any input from somebody

20  with technical expertise with respect to the

21  Census Bureau's analysis of the citizenship

22  question who was not from the Census Bureau?

Page 325

```
 1        A    No.
 2        Q    Did anyone review the Census Bureau's
 3   analysis of what was wrong with the citizenship
 4   question who was not a lawyer?
 5        A    The Secretary.
 6        Q    Other than the Secretary?
 7        A    Karen Dunn Kelley.
 8        Q    Other than the Secretary and Karen Dunn
 9   Kelley?
10        A    Obviously, Dr. Jarmin, Dr. Abowd.
11        Q    I'm talking about people outside the
12   Census Bureau.
13        A    Census Bureau.
14             Well, let's see -- well, Wendy Teramoto
15   might have.  But, no, primarily would have been
16   Office of General Counsel doing the review.
17        Q    And you?
18        A    And me.
19        Q    And you're a lawyer?
20        A    Yes, I am a lawyer.
21        Q    All right.  Let's mark the decisional
22   memorandum as Exhibit 30.
```

1          (Plaintiffs' Exhibit 30, Decisional

2     memorandum, was marked.)

3     BY MR. GERSCH:

4          Q    Mr. Comstock, I show you what's been

5     marked as Exhibit 30.  This is Secretary Ross's

6     March 26, 2018 decisional memorandum with his

7     signature affixed to it, correct?

8          A    Yes.

9          Q    I just have a few questions on that.

10              I may have fewer than I thought.

11              Let me just drop back to Exhibits 28 and

12     29.  The Census Bureau analysis for a second --

13          A    Uh-huh.

14          Q    -- and then we'll get to Exhibit 30.

15              With respect to the Census Bureau

16     analysis, you understood that they researched the

17     question about the citizenship question, they

18     researched that by looking at information from the

19     decennial -- past decennial censuses, right?

20          A    Mostly the long form, yes.

21          Q    And past ACS --

22          A    Correct.

1      Q    -- surveys, right?

2      A    Yes.

3      Q    You said mostly the long form, but also

4  the short form, right?  They did a comparison

5  between response rates from the short form and

6  response rates on the long form, right?

7      A    Right.

8      Q    And the long form, we're talking about

9  something that's filled out by on the order of 300

10  million people or something -- withdrawn.

11          It reflects data on 300 million people?

12      A    Well, the long form is --

13      Q    I should have said the short form.

14  You're right.  Let me put it to you again.

15          The short form reflects data on

16  approximately 300 million people?

17      A    That would be about right, yeah.

18      Q    And it's filled out by over 100 million

19  people, right?

20      A    I couldn't answer that question.  I don't

21  know.

22      Q    It's a larger number.

1    A    I think it's 169 million households or

2  something.

3    Q    And the ACS, roughly, how many people

4  fill out the ACS in rough terms?

5    A    My recollection is it's about two to

6  three -- two and half to three percent per year.

7    Q    Two and half to three percent of the

8  total population?

9    A    Total number of households.

10   Q    And the number of households you think

11 are 160 million?

12   A    You'd have to look at the data.

13   Q    But that's --

14   A    In the ballpark, yeah.

15   Q    So the 2 or 3 percent that fill out the

16 ACS, those are millions of people, right?

17   A    Oh, yeah.  Right.

18   Q    Okay.  And you'd call -- withdrawn.

19        When the Census Bureau does analyses

20 based on their findings from the decennial census

21 and the ACS --

22   A    Uh-huh.

Page 329

1      Q   -- those are empirical analyses, right,

2   they count?

3          MR. GARDNER:  Objection.  Form.

4          THE WITNESS:  You'd have to ask the

5   Census Bureau how they do their analysis.

6   BY MR. GERSCH:

7      Q   Right.  But you understand what empirical

8   means, right?

9      A   I understand the use of the term, but I

10  don't know if all of their analyses are based on

11  empirical or some other method.

12     Q   Certainly, some of their analyses are

13  empirical, right?

14     A   Sure.  And some are sampling and some of

15  them are imputation.  They use a variety of

16  statistical methods.

17     Q   Just a few more questions.  Now, turn to

18  Exhibit 30 if you would and turn to Page 7.

19     A   Yeah.

20     Q   Last paragraph, first sentence reads,

21  "The Department of Commerce is not able to

22  determine definitively how inclusion of a

Page 330

1    citizenship question on the decennial census will

2    impact responsiveness."

3         You saw that, right?

4    A    Yep.

5    Q    It says the Department of Commerce is not

6    able to determine definitively.  What does that

7    mean, determine definitively?

8    A    What it says.  In other words, the

9    evidence presented to us was not determinative,

10   and it was not definitive that there would be a

11   drop in response rate.  There was a widely-held

12   belief that there would be a drop in response, but

13   many of those same people that they were not

14   answering the citizenship question, were already

15   not answering the census because of distrust of

16   government, because of whatever the other reasons

17   may be.

18        So they could not identify with any

19   specificity that the addition of a citizenship

20   question would, in fact, cause a decrease in

21   response rate.  They estimated there could be a

22   decrease of a certain number of households, which

1  was less than half a percent.  And based on the

2  size and volume of the exercise we were

3  undertaking, that is not sufficient to say it's an

4  insurmountable obstacle.

5       MR. GERSCH:  I'll move to strike it as

6  nonresponsive.

7  BY MR. GERSCH:

8     Q    My question --

9     A    It was responsive.

10    Q    What do you mean by definitively?

11       MR. GARDNER:  Objection.  Asked and

12  answered.

13       THE WITNESS:  What I mean by definitive

14  is they did not provide evidence that you could

15  draw a straight line and say if you do this, this

16  will happen.  They speculated it, and they drew

17  some conclusions based on other information, but

18  logical people can look at that information and

19  say, yes, but that's not a necessary conclusion

20  that, in fact, as was pointed out, the same

21  hard-to-count populations who were already not

22  responding to the census were likely the very same

Page 332

1    ones that might not answer the census.

2          And just to your point, just to

3    illustrate this, we do know from the ACS that

4    70 percent of the people who are presented with

5    the citizenship question answer it correctly, who

6    are, in fact, noncitizens and 30 percent don't.

7    So it doesn't necessarily mean that you add a

8    citizenship question and people refuse to answer.

9    We have a population that does answer.

10         I know that's not the answer you wanted.

11   BY MR. GERSCH:

12    Q   Mr. Comstock, we're missing each other,

13   so let me try it a little differently.

14         I'm not asking you whether you didn't

15   think the Census Bureau's answer was definitive.

16   I'm asking what is -- what would be -- let's try

17   it this way, what would you consider to be

18   definitive evidence?

19    A   If they had evidence that showed that the

20   addition of a citizenship question would cause a

21   number of people that otherwise would have

22   responded to the census to not respond.

Page 333

1      Q    And what would they need to show you

2    that?

3      A    They would problem have to put the

4    question on the decennial census and compare it to

5    prior decennial censuses and eliminate for the

6    errors.  And, unfortunately, they don't have that

7    data from when they were asking that question, so

8    they couldn't make the comparisons.

9      Q    Well, they could have done it on a test

10   basis for the 2020 census, right?

11     A    They already asked the ACS to 43 million

12   households.  So we'd asked and answered that

13   question already.

14     Q    My question --

15     A    It's been well tested.

16     Q    My question is:  They could do it on the

17   2020 census on a trial basis, right?

18     A    And that's, basically, what the Secretary

19   has determined to do.

20     Q    No.  The Secretary has not decided to do

21   it on a trial basis.  He wants everyone asked,

22   right?

1       A    Well, that would be a trial basis.

2       Q    Let me do it differently.  You could do

3  it on the 2020 census as a test where it's being

4  asked as a sample of the people, right?

5       A    That would not give you -- actually, that

6  would give you no more information than you get

7  from the ACS, so we already have that information.

8       Q    You think asking the question on the

9  decennial census is the same thing as asking on

10  the ACS?

11      A    No, I don't.

12      Q    Okay.  How about a randomized control

13  study of some kind, randomized controlled testing?

14      A    We already have that.

15      Q    You think you already have that?

16      A    Sure, through the ACS.

17      Q    Okay.  Was a proposal to do a randomized

18  controlled test in May of this year from the

19  Census Bureau?

20          MR. GARDNER:  Objection.  Lacks

21  foundation.

22          THE WITNESS:  Not that I'm aware of.

Page 335

1   BY MR. GERSCH:

2        Q    You never heard that Victoria Velkoff

3   proposed conducting a randomized controlled test

4   in May of this year?

5        A    No.

6        Q    This is the first time you're hearing

7   this?

8        A    Yes.

9             MR. GERSCH:   Okay.  We can go off for a

10  second.

11            VIDEOGRAPHER:  We're going off the

12  record.  The time on the video is 4:02 p.m.

13            (Off the record.)

14            VIDEOGRAPHER:  We're back on the record.

15  The time on the video is 4:04 p.m.

16            MR. GERSCH:  Mr. Comstock, thank you very

17  much.  Those are all the questions I have at this

18  time.

19            Our view is there is certain information

20  we haven't received from the government, and to

21  that extent, we are keeping the deposition open,

22  but this concludes my questions for today.

1          MR. GARDNER:  And our position is the

2     deposition is concluded after today.

3          THE WITNESS:  Thank you for your

4     questions.

5               EXAMINATION BY MR. ROSENBERG:

6      Q   And good afternoon, Mr. Comstock.  My

7     name is Ezra Rosenberg.  I think I introduced

8     myself to you.  Although I might have used your

9     wrong name when I first introduced myself.

10     A   That's okay.

11     Q   I represent the City of San Jose and

12    Black Alliance for Just Immigration in the case

13    that's been venued in the North District of

14    California.

15     A   Okay.

16          MR. ROSENBERG:  And can everyone hear me

17    down -- can you hear me?

18          MS. BOUTIN:  Little louder, please.

19    BY MR. ROSENBERG:

20     Q   And I'll try to be short and sweet.  Let

21    me just back up a bit.

22     A   Okay.

1      Q   The initial impetus for putting the

2  citizenship question on the 2020 census was not

3  DOJ's idea; is that correct?

4      A   That's correct.

5      Q   It was Secretary Ross's idea, I think

6  you've testified to that, correct?

7      A   He was the one who asked me to

8  investigate it, yes.

9      Q   He told you sometime shortly after he was

10 confirmed that he wanted the question on the 2020

11 census, correct?

12     A   He asked me to explore putting it on,

13 yes.

14     Q   Well, he actually said he requests the

15 question be put on the census, correct?

16     A   That was the way he phrased it, yes.

17     Q   You said you would make that happen,

18 correct?

19     A   I said I would do my best.

20     Q   And you would get the citizenship

21 question in place, I think was -- were your words?

22     A   I said I would work to get that in place.

1    Q   And he asked you several times during the

2    year what progress you were making on this; is

3    that correct?

4    A   That's correct.

5    Q   And you met with Mary Blanche Hankey at

6    DOJ as a result of that, correct?

7    A   Correct.

8    Q   And you wouldn't have met with her if

9    Secretary Ross hadn't ask you to do what you can

10   to put this citizenship question on the census,

11   correct?

12   A   That's correct.

13   Q   And the only subject that you talked to

14   Ms. Hankey about at that meeting was the

15   citizenship question, correct?

16   A   No.  I'm not sure that's the case.

17   Q   What else did you talk to her about?

18   A   I think we talked generally about what

19   the Department of Commerce and Department of

20   Justice overlap on, what we work on.  So it was

21   just broader conversation, but the primary focus

22   was on the citizenship question.

Page 339

1     Q   And then you memorialized or at least you

2   summarized your discussion with her in the memo

3   that you sent to Secretary Ross on September 8th,

4   correct?

5     A   That's correct.

6     Q   And take a look at what's been marked as

7   C15, please.  That's it.  Yep.

8         The first paragraph you see that there's

9   a sentence -- well, it reads, starting with the

10   third sentence, "We" -- meaning you and

11   Ms. Hankey --

12     A   Uh-huh.

13     Q   -- met in person to discuss the

14   citizenship question."

15     A   Right.

16     Q   "She said she," and then it's blocked

17   out, right?

18     A   Yes.

19     Q   Now, this is something that you wrote

20   that's been blocked out, correct?

21     A   Correct.

22     Q   Do you know why it's been blocked out?

Page 340

1      A   You'd have to ask the Justice Department

2  redactors.

3      Q   Do you -- without saying what is said

4  there, do you know what you wrote there that's

5  been blocked out?

6      A   I don't recall.

7      Q   You did not ask her for legal advice, did

8  you?

9      A   No.

10      Q   Do you have any reason to believe there

11  is some privileged information in what's been

12  blocked out?

13          MR. GARDNER:  Objection.  Calls for a

14  legal conclusion.

15          MR. ROSENBERG:  He's always the client,

16  and the client holds the privilege.

17          THE WITNESS:  I don't know what it says,

18  so I trust the folks who redacted it believe

19  there's a conclusion of some kind that is relevant

20  to the investigation.

21  BY MR. ROSENBERG:

22      Q   Anyone at Commerce who was more involved

Page 341

1   in the citizenship question other than you during

2   the period from the time you came to Commerce

3   until the citizenship question issue was resolved?

4        A    Probably not, no.

5        Q    Let me -- take a look at C5 that's been

6   marked, which is the supplemental memorandum.

7        A    Uh-huh.  I've got it somewhere.  It's a

8   supplemental memorandum.

9        Q    It's dated June 21 --

10            MR. GARDNER:  You want to look at my

11  copy?

12            THE WITNESS:  Okay.  All right.  Go

13  ahead.

14  BY MR. ROSENBERG:

15       Q    When did you first hear that this

16  document was going to be created?

17       A    Sometime shortly before June 21st.

18       Q    Do you recall approximately how many days

19  before June 21st?

20       A    I don't.

21       Q    But before you got a copy of the

22  document; is that correct?

1      A    No.  I think, actually, the first time I

2  knew about it was when I was handed a copy of the

3  document.

4      Q    So all of a sudden, it popped up on your

5  desk one morning, our your computer?

6      A    Right.  Again, as I think I stated

7  before, this was Office of General Counsel with

8  Commerce was handling the litigation in

9  conjunction with Department of Justice who

10  represents us.  So they were having conversations

11  on this matter.  I would have been called in

12  simply to the point of saying, okay, this is being

13  requested, do you have any thoughts or edits on

14  it?

15      Q    So just so it's clear, you did not know

16  that it was being prepared until you saw the first

17  draft?

18      A    That's correct.

19      Q    Were you surprised to see it?

20      A    I didn't think it was necessary, but if

21  that's the advice of counsel, we follow it.

22      Q    You understood that this was a supplement

1  to the March 26th determination by Secretary Ross?

2      A    I understand that it's a supplement to

3  the administration record.

4      Q    And you --

5      A    I don't think it supplements the decision

6  by Secretary Ross.

7      Q    You understood it supplements the

8  administrative record and you understood this was

9  a pretty important document, did you not?

10     A    Not being experienced in this litigation,

11 I couldn't say exactly how important this was or

12 not.

13     Q    Do you have an understanding as to the

14 reason that this document was created?

15     A    My understanding was the reason this

16 document was created was the Department of Justice

17 felt it would be advisable in this litigation.

18     Q    Was there anything in the supplemental

19 memorandum that was not known at the time that the

20 Secretary issued his March 26th determination?

21          MR. GARDNER:  Objection.  Form.

22          THE WITNESS:  No.  I don't think there's

Page 344

1   anything in this memorandum that was not done at

2   the time of the decision.

3   BY MR. GERSCH:

4       Q   After you received the draft of the

5   memorandum, did you discuss it with anyone within

6   Commerce, other than attorneys?

7       A   Just the attorneys.

8       Q   You did not discuss, at all, with

9   Secretary Ross?

10      A   Other than advising him that we -- this

11  has been recommended to sign and that we've

12  reviewed it and made a few edits, no.

13      Q   Did he ask you why it was being

14  recommended?

15      A   I'd already provided that explanation.

16  DOJ was suggesting that we needed it for

17  litigation.  He's not a litigator, so he's not

18  going to question that.

19      Q   Was he surprised when he saw this?  Did

20  he express surprise to you?

21      A   Not particularly.  I mean, he just said,

22  if that's what they recommend, fine.

Page 345

1    Q   Now, I think you testified that you were

2  one of the two persons who were principally

3  involved in the drafting of the March 26th

4  determination; is that correct?

5    A   I was one of the two principal staff.

6  There were a number -- quite a number of other

7  people who reviewed it.

8    Q   Right.  But you were one of the principal

9  draft persons; is that correct?

10    A   I was principal -- James Uthmeier, I

11  think, did the bulk of the drafting, and I did a

12  lot of the editing.

13    Q   During the course of your preparation of

14  the March 26th determination, did you consider

15  including in the March 26th determination any of

16  the information that's in the supplemental

17  memorandum that's identified as C5?

18       MR. GARDNER:  I'm going to object on the

19  grounds that calls for disclosure of information

20  subject to deliberative process by which I

21  instruct the witness not to answer.

22  BY MR. ROSENBERG:

Page 346

1     Q    Are you going to follow counsel's advice?

2     A    I'll follow my counsel's advice, yes.

3     Q    By the way -- by the way, I think you

4  testified that you made some edits to C5, the June

5  21st supplemental memorandum; is that correct?

6     A    I think I may have suggested a wording

7  change or two.

8     Q    Do you know what wording change or two

9  you made?

10    A    I have no recollection of that.

11    Q    Did you maintain the original draft of

12  the June 21st memorandum?

13    A    I imagine I made it -- my edits in

14  electronic form, but that would be, probably,

15  privileged, under the administrative record.

16    Q    Let's turn to C30, which is the

17  March 26th memo.  Now, is it stated anywhere in

18  this memorandum that the Secretary had begun,

19  considering the question of adding the citizenship

20  question to the census almost a year prior or more

21  than a year prior to the March 26th memorandum?

22    A    It wouldn't be relevant to the

1  memorandum.

2      Q   So you don't think that's important

3  information?

4      A   The government has lots of processes

5  where -- and I've been involved in lots of

6  processes throughout the government where things

7  have been under consideration for months, years,

8  decades, even, prior to an administrative record,

9  and that's not usually included in the decision.

10         The question is once you began the formal

11  action of considering this decision and in which

12  you're presented with a situation where you need

13  to make a decision, you document at how you arrive

14  at your conclusion.

15     Q   It's your testimony that the formal

16  action is when?

17     A   When we received the letter from the

18  Department of Justice.  Because prior to that,

19  this was all speculation.

20     Q   Well, but prior to that, you had been

21  directed by the Secretary of the Commerce to put

22  the citizenship question on the census --

1    A    I'd --

2    Q    -- isn't that correct?

3    A    I'd been directed to explore putting a

4    citizenship question on the census.

5    Q    He said he wanted it on the census,

6    correct?

7    A    That was certainly his expressed

8    interest.

9    Q    It was an expressed statement, was it

10   not?

11   A    That's the way he phrased it.  But,

12   again, he can't put something on the census

13   without having the legal authority or process in

14   place to do so.

15   Q    You agree it would have been more

16   accurate if the first sentence of C30 said, as you

17   know, pursuant to my request on December 12, 2017,

18   the Department of Justice requested that the

19   Census Bureau reinstate a citizenship question;

20   isn't that more accurate?

21   A    I wouldn't agree that's more accurate.

22   Q    Isn't that what happened?

1      A    Again, the Department of Justice decision

2   to ask -- send a letter requesting this is a

3   decision they made independently.  We cannot

4   compel them to make that request.

5      Q    By the way, what does Section 2 of the

6   Voting Act provide?

7      A    Well, my understanding of it -- and,

8   again, it's been established that I'm not a Voting

9   Rights Act expert -- is that there are cases in

10  which you might have a population where as they

11  set up a district, you have two minority

12  populations.  If one of those minority

13  populations, for example, Hispanics population,

14  has a large under of undocumented people, they

15  might appear on paper to have a majority.  When,

16  in fact, they can never actually execute that

17  majority because they don't have enough Citizen

18  Voting Age Population people to carry that out.

19          Now, under the census, we already ask

20  about age and we ask about race, so we can

21  determine those two questions.  What you can't

22  determine is how many people of that population

Page 350

1   are, in fact, eligible to vote.

2        Now, using the ACS data, the census

3   provides estimates that the Justice Department

4   uses for that very purpose.  We know, in fact, as

5   a result of this analysis, in the Census Bureau's

6   efforts to promote Alternative C, they, in fact,

7   did an analysis of that ACS data, and lo and

8   behold, it came back that the data that we've been

9   providing to the Justice Department is, in fact,

10  at a fairly significant error.  It's off by a

11  factor of about a third.  And so in light of that

12  information, you'd absolutely want to go forward

13  with this.

14    Q   But the Census Bureau, nevertheless,

15  recommended from a standpoint of accurate and

16  completeness and quality of the census that there

17  should not be a citizenship question added to the

18  census, as opposed to continuing to rely on ACS

19  data supplemented by the administrative records?

20    A   No.  In the process of this memorandum,

21  back and forth, they could not articulate a

22  rationale to support their belief that there would

Page 351

1    be this decline in this response rate.  Their

2    entire analysis relied on the assumption that

3    there would be this decline in response rate of a

4    certain percentage and that that would, therefore,

5    make the data less reliable.

6         What they couldn't refute was the fact

7    that under their proposed approach, they would

8    have had to impute -- again, based on statistical

9    models -- the citizenship of 25 million voting age

10   citizens.  That was not a complete and accurate

11   picture as far as the Secretary was concerned.  So

12   the Secretary said this is why we need to look at

13   combining the two approaches, B and C, to come up

14   with Alternative D.  Because in the absence of

15   that, we don't have good enough data on which to

16   build the formula to impute those people that we

17   would have to because we don't have answers on

18   what their citizenship is.  So that's the

19   rationale that's laid out in this memo, and as far

20   as I know, that's been the rationale that's been

21   the Secretary's all along.

22        Q   But not the rationale that was accepted

1   by the Census Bureau, which nevertheless, rejected

2   as -- from a technical perspective, the

3   Secretary's rationale; isn't that correct?

4       A   I disagree that they rejected it from a

5   technical perspective.  They made some assumptions

6   in making their recommendation -- and that's

7   exactly what it is, it's a recommendation -- that

8   this would be the case.

9       Q   Let me turn your attention to C30,

10  Page 001314, which is Page 2 of the March 26th

11  memo.  And turning your attention to the Option A,

12  the third line in the sentence that says,

13  "Additionally, the block group levels CVAP data

14  currently obtained through the ACS has associated

15  margins of error" --

16      A   Correct.

17      Q   -- "because the ACS is extrapolated based

18  on the sample servers of the population."

19      A   That's correct.

20      Q   Do you know what the margins of errors

21  are that are referred to in this sentence?

22      A   I think you go on and see, you'll see it

Page 353

1    described later in the same memo, which is that

2    they have an error of approximately 30 percent, 28

3    to 34, I believe, is the range.

4              Yeah.  If you look on Page 4,

5    "Census Bureau analysis showed that between 28 and

6    34 percent of citizenship self-responses for

7    persons with administrative records show are

8    noncitizen were inaccurate.  In other words, when

9    noncitizens respond to long form or ACS questions

10   on citizenship, they inaccurately mark citizen

11   about 30 percent of the time.  However, the

12   Census Bureau is still evolving its use of

13   administrative records.  The Bureau does not have"

14   --

15             (Thereupon, the court reporter

16   clarified.)

17             THE WITNESS:  This is in the -- under

18   Option C of Page 4.

19             MR. GARDNER:  You're going to have to

20   slow down for the court reporter.

21             THE WITNESS:  "So they inaccurately mark

22   noncitizen about 30 percent of the time.  However,

1  the Census Bureau is still evolving its use of

2  administrative records, and the Bureau does not

3  yet have a complete administrative record set for

4  the entire population.  Thus, using administrative

5  records alone would provide DOJ data with CVAP

6  data that was not a" -- "that would provide an

7  incomplete picture."

8  BY MR. ROSENBERG:

9      Q   And that's your understanding of what

10 margins of error means as used on Page 01314?

11     A   Well, yes.  They're referring to that --

12 that margin of error they're referring to is the

13 28 to 34 percent they were off.

14     Q   Do you know whether the data that would

15 be provided to DOJ if a citizenship question were

16 added to the 2020 census would also have margins

17 of error associated with that data?

18     A   It would almost certainly have some small

19 margin of error, yes.

20     Q   When you say a small margin of error, can

21 you quantify that?

22     A   Well, yeah.  I think if you look at the

1   decision memo, it spells out that by providing the

2   question on the census, you'll give 100 percent of

3   the population to answer that question.  For

4   90 percent of the people that are citizens, that

5   is not a problem.  For the remaining 10 percent,

6   approximately, again, based on -- again, on the

7   ACS error rate, you can expect that approximately

8   70 percent of those people will also answer that

9   data correctly.  So you're looking at, basically,

10  what is the situation with the remaining

11  30 percent?  And based of the data we get from the

12  actual responses, comparing that with the

13  administrative records, which we're also working

14  to improve, so that that 88.6 from the 2010 census

15  is expected to go up, should be closer to 90 to

16  95, we'll be able to narrow to down to about a 5

17  percent of the population that we'll have to

18  impute.  It's a much smaller number than the

19  number that's being --

20      Q   And that's your understanding of how the

21  phrase margins of error is used in the Secretary's

22  memo?

1      A    Well, I'm not sure -- you're focused on

2    the words margins of error.

3      Q    Right.  All of my questions had to do

4    with the phrase margins of error.

5      A    And you're saying --

6      Q    I'm just trying to get your understanding

7    of the phrase.

8      A    No.  I was focusing on the ACS.  I mean,

9    you're isolating the term margins of error.

10     Q    Yes.

11     A    When you do sampling or other things,

12   there is a margin of error associated with that,

13   and that margin of error can be larger or it can

14   be smaller.  And so they would provide, typically,

15   a confidence interval connected with their data,

16   and, again, depending on how the survey is

17   conducted, it could be large or small.

18     Q    Well, that sounds a little bit different

19   than what you testified to earlier, when I asked

20   you about the phrase margins of error as used in

21   the sentence I read to you from C003134.

22     A    You'll have to remind me what the

1   sentence is again --

2       Q   Sure.  "The Census was additionally" --

3       A   -- because I focused on the ACS.

4       Q   -- "block group level CVAP data currently

5   obtained through the ACS has associated margins of

6   error because the ACS is extrapolated, based on

7   sample surveys of the population."

8       A   And I believe that reference in the

9   context of this memo may be scientifically

10  incorrect, but it's referring to the fact that

11  there's this error in the data of roughly

12  30 percent.  So this was not drafted by, quote,

13  scientists.  So we may have inaccurately used the

14  term margin of error.  But what the Secretary was

15  referring to was the fact that we had now learned

16  that the ACS data was fairly significantly

17  inaccurate.

18      Q   Do you know whether the Census Bureau's

19  use of margins of error, quote, end quote, is the

20  same as you have just described?

21      A   I have no idea.  I mean, I would guess

22  that in other context, that the Census Bureau uses

1  the term margin of error differently.  I'm saying

2  in the context of this memo, I think the reference

3  of margin of error is referring to that margin of

4  inaccurate information in the ACS.  That is what

5  the Secretary was focused on in making his

6  decision.

7      Q   I'd like to turn your attention to

8  001315, Page 3, the second full paragraph that

9  begins "the Census Bureau."

10     A   Uh-huh.

11     Q   And the Census -- I'm sorry -- the

12  sentence that reads, "However, neither the

13  Census Bureau, nor the concerned stakeholders

14  could document that the response rate would, in

15  fact, decline materially."

16         Do you see that?

17     A   I see that.

18     Q   Can you tell me what you understand the

19  word materially to mean?

20     A   Yes.  In that context, it's, basically,

21  saying they could not, as I explained earlier,

22  demonstrate that the decline because of the

Page 359

1  addition of a citizenship question would be any

2  greater than the decline that we already

3  anticipated we would face because of the current

4  political climate and people's concerns about

5  government.

6          And, frankly, the folks bringing this

7  lawsuit are contributing to that.  We already

8  anticipated this was going to be -- this census

9  was going to be more difficult than other

10 censuses, and that was a lot of the reasons behind

11 some of the changes that were made in the

12 lifecycle cost estimate.  So we anticipated there

13 were going to be hard-to-count populations, and

14 many -- many of the same hard-to-count populations

15 would have been disinclined to answer the census

16 with or without a citizenship question.

17    Q   When you say that the -- when you talk

18 about the material decline, are you talking about

19 the decline overall or are you talking about a

20 differential decline depending on what demographic

21 group is being discussed?

22    A   If the data had shown conclusively that

1   the addition of a citizenship question would cause

2   a material -- in other words, significant and

3   major decline in any particular group, I'm sure

4   the Secretary would have considered that quite

5   carefully.

6        Q    When the Secretary used the word material

7   or phrase material decline, was he referring to

8   any decline of any demographic group or was he

9   referring to a decline across the board?

10       A    Again, based on the subject of the

11  discussion here, would there be a significant

12  increase in the number of nonresponse follow-ups

13  that we had to go do because people failed to

14  respond?  The data that was being presented did

15  not isolate the citizenship question as being a

16  material source of potential decline.  There were

17  a lot -- there was a lot of speculation that

18  would, there was a lot of assertions it would.

19  And upon review and analysis, it appears that many

20  of the same populations that were already going to

21  be difficult to count for lots of other reasons

22  would be the same people who might be disinclined

Page 361

1   because of citizenship.  So you cannot say that

2   adding citizen is going to materially increase the

3   nonresponse follow-up rate.

4       Q   Can you quantify what you mean by a

5   material decline?

6       A   Well, I mean, the Census Bureau,

7   basically, under their best analysis, was saying

8   that there might be a decline that would cause an

9   increase of $27 and a half million.  In a

10  $15.6 billion budget, that is -- I mean, that's so

11  far within the margin of error it's not even a

12  fact.

13      Q   Well --

14      A   We could have a bad snow day that would

15  cause bigger damage than that.

16      Q   Was -- do you consider an undercount

17  resulting from the addition of any question to the

18  census of a quarter of a percentage point in a

19  specific population to be material?

20      A   I have no reason to believe the addition

21  of a citizenship question would cause such a

22  thing.

1    Q   Whether it does or not, I'm trying to

2   quantify what you mean by material decline.

3   How --

4    A   And, again, you're postulating a

5   hypothetical.  And my point is that in the absence

6   of the context, would a quarter percent decline in

7   response because we added a question that, for

8   example, asked somebody their ethnicity, again,

9   that's a weighing thing that the decision-maker

10  has to make and say there may be a quarter percent

11  decline, but it's important that we get ethnicity

12  data.

13   Q   But I'm --

14   A   Same thing with gender, same thing with

15  race, same.  You know, lots of questions are added

16  that may, in fact, result in a few people not

17  answering the census.

18   Q   Well, now you're using the word a few

19  people not answering the census.  I'm looking at

20  your language of material decline.

21   A   Uh-huh.

22   Q   Is a quarter percent decline in a

1  response of a demographic group a material decline

2  in your estimation?

3      A   Again, without context, I can't give you

4  an answer.  If that demographic group is composed

5  of 100 people, it may not be --

6      Q   What if the demographic is Hispanics?

7      A   I don't know that -- well, again, no.

8  That's a weighing question that the decision-maker

9  is free to make.

10     Q   Again, you're going back to weighing.

11 I'm talking about the phrase declining material --

12 materially.  I'm not weighing it yet.  You can

13 weigh it later if you want.  I'm just talking

14 about one side of the balance that I think you're

15 suggesting is being applied.

16         Is a quarter decline in response to the

17 census among Hispanics a material decline in your

18 estimation?

19     A   The -- the -- I think the short answer

20 is, the decline identified by -- the potential

21 decline identified by the Census Bureau was not

22 material enough to outweigh the benefits the

Page 364

1    Secretary saw in adding the question.

2         Q    It still doesn't answer my question.

3         A    You're asking me to answer in a

4    hypothetical, which I'm not going to do because I

5    don't have the number of Hispanic voters.  I don't

6    know what 4 percent decline would represent.  I --

7    it's impossible for me to evaluate.  I've never

8    looked at the population numbers of Hispanics

9    versus any other.

10        Q    Well, you know that the number of

11   Hispanics in American is in the tens of millions;

12   is that correct?

13        A    I honestly haven't really given it much

14   thought.

15        Q    Do you know if it's more than a million?

16        A    I think it safe to say it's more than a

17   million.

18        Q    More than five million?

19        A    I think so.

20        Q    More than ten million?

21        A    Let's see.  If the population of the

22   United States is 360 million, and I believe

Page 365

1   Hispanic are somewhere in the 10, 12, 15 percent

2   range, they're, obviously, well above that.

3   They're like -- I don't know, like -- 79 million.

4        Q    Of how many did you say?

5        A    70 -- I can't do the math that quickly,

6   so let's say, whatever, 70 million.  I don't know.

7        Q    Let's use 70 million.  So if there

8   were -- let's make it easier, for my head.  Let's

9   say there was a 1 percent decline in response rate

10  among Hispanics due to the inclusion of a question

11  on the census, would you consider that a material

12  decline?

13       A    I would consider that a factor that you

14  need to take into account.

15       Q    And if it were a 3 percent decline, would

16  you consider that even more of a factor?

17       A    Three percent is greater than 1 percent,

18  so, presumably, it would be greater.  But, again,

19  it depends on, again, what I'm deciding against.

20       Q    Would you consider that material?

21       A    That depends on the context.

22       Q    The context of adding a question to the

Page 366

1   census resulting in a 3 percent decline in

2   responsiveness among Hispanics?

3       A    All of the factors outlined in this memo

4   are material.  It's a question for the

5   decision-maker to decide which are -- which to

6   give greater or lesser weight to.

7       Q    But the phrase here was material

8   decline --

9       A    And, again --

10      Q    -- correct?

11      A    -- in the context of conducting a

12  nationwide census, the half percent change in

13  response rates for NRFU was not something we

14  considered material because there were lots of

15  other factors that would cause an even greater

16  decline.

17      Q    And if the response rate was shown to be

18  greater than a half percent decline, if it was

19  shown to be a 3 percent decline?

20          MR. GARDNER:  Objection.  Calls for

21  hypothetical.

22          THE WITNESS:  I understand you're trying

Page 367

1    to get a certain answer, but I'm just telling you

2    in the context of this, in the context of this

3    memo, the half percent increase in NRFU response

4    rate was not material.

5    BY MR. ROSENBERG:

6        Q   By the way, earlier you said that 30

7    percent of noncitizen citizens answering the ACS

8    citizenship question responded accurately.  Do you

9    recall that?

10       A   That was data provided by the Census

11   Bureau.

12       Q   Okay.  What, if any, evidence is there

13   that noncitizens would respond to a citizenship

14   question on the 2020 census questionnaire at a

15   more accurate rate than they currently do on the

16   ACS?

17       A   That's -- I think we assumed in doing

18   this that they would continue at that potential

19   rate.

20       Q   At a 30 percent inaccurate rate?

21       A   Which is why you have to do both

22   administrative records and put the question on.

Page 368

1    You can't do just one or the other.

2        Q    But the administrative records could be

3    used with ACS; isn't that correct?

4        A    No, they couldn't.

5        Q    They could not be used --

6        A    Because you can't extrapolate from the

7    ACS to the whole population.

8        Q    No.  That wasn't my question.

9            The administrative records could be used

10   in conjunction with the information from ACS?

11       A    Again, you don't get an accurate sampling

12   because you're extrapolating from the ACS to the

13   larger population, so you can't apply your

14   administrative records across in the same way.

15   That's why the census was proposing to just use

16   administrative records and they were prepared,

17   apparently, to have to impute 25 million voting

18   age citizen citizenship records.  Now, on what

19   basis, they would do that, we weren't sure.

20       Q    But both Options C and D require some

21   imputation; isn't that correct?

22       A    Potentially, to get a complete and

1    accurate count, because we don't have 100 percent

2    matching between the administrative records and

3    the respondents.  Yes.  That's correct.

4         Q    Let me draw your attention to the period

5    around January 2018.  Do you recall taking part in

6    the signing of the list of 35 questions to the

7    Census Bureau to answer?

8         A    Yes.  I helped prepare that list.

9         Q    Do you -- who else helped prepare that

10   list?

11        A    The Secretary, Karen Dunn Kelley,

12   James Uthmeier, myself.  There may have been

13   others.

14        Q    Were you the prime drafter?

15        A    Of that particular list, I may have been

16   the prime assembler.  I was not necessarily the

17   prime drafter of all the questions.

18        Q    And what was your purpose -- what was the

19   purpose in proposing those questions?

20        A    Basically, it has -- I think it was

21   pointed out earlier we got an analysis from the

22   Census Bureau that seemed to have a particular

Page 370

1   viewpoint, and it wasn't well supported in some

2   cases.  So those are the questions that arose

3   after reviewing their memo.

4       Q   And when you -- after the questions were

5   formulated, whom did you send them to?

6       A   I believe they were sent to the

7   Census Bureau.

8       Q   And the idea was the Census Bureau would

9   answer the questions; is that correct?

10      A   They would provide that input, yes.

11      Q   And you gave them a deadline, did you

12  not?

13      A   I imagine we did, yeah.

14      Q   Four days; is that correct?

15      A   I don't recall.

16      Q   Was it your understanding that the

17  answers were going to be provided solely by the

18  Census Bureau to those questions?

19      A   I believe all the questions were directed

20  to the Census Bureau, but if they were directed to

21  somebody else, then, obviously, they would provide

22  them.

1      Q   But it was your understanding that the

2   Census Bureau would answer them; is that correct?

3      A   Again, without going back and looking at

4   the documents and the accompanying emails, I can't

5   tell you exactly who it was.  But my understanding

6   was, yes, they were drafted for the Census Bureau.

7      Q   Did there come a time when you reviewed

8   the answers for the questions?

9      A   I imagine there was.

10     Q   Well, was there?

11     A   Again, I know all of you are focused on

12  this case and everything else.  This was one small

13  fraction of the work I was doing at that time.  So

14  I'm quite certain I reviewed the answers.  Exactly

15  when, I can't tell you.  But, clearly, they

16  went -- the responses to those questions were

17  considered in the decision memo.  So I, obviously,

18  reviewed them at some point.

19     Q   Do you recall whether you reviewed those

20  responses all at once or some kind of rolling

21  basis?

22     A   If memory serves, I believe the Census

Page 372

1  responded back to some, and then provided

2  follow-up answers to others that took more time.

3      Q   Do you recall whether in connection with

4  any of the questions the Census Bureau was asked

5  to change their answers to any questions?

6      A   I believe -- well, I believe in one case,

7  they provided a response that indicated that there

8  was a very set format for putting questions on the

9  census.  And we went back to them and said, how

10  can that be?  You haven't -- there hasn't been a

11  question added to the long form?  They went back

12  and reviewed and said, yes, that's correct.  This

13  was the process we used for the ACS.

14      Q   Let me -- let's have this marked as 31.

15          (Plaintiffs' Exhibit 31, Questions on

16  draft Census memo, was marked.)

17  BY MR. ROSENBERG:

18      Q   Showing you what's been marked as --

19          MR. GARDNER:  Ezra, we need a --

20          MR. ROSENBERG:  Can you give me one more

21  copy?

22          I just need one.  Thank you.

1  BY MR. ROSENBERG:

2      Q    Showing you what's been marked as

3  Exhibit 31, have you ever seen this document

4  before?

5      A    Again, I'd have to go back and check

6  emails.  It appears to be an incomplete response

7  to the 35 questions.

8      Q    And when you say it's an incomplete

9  response to the 35 questions, why do you say that?

10     A    Well, Question 4 is not answered.

11 Question 9 is not answered.  Question 11 is not

12 answered.  Question 15 is not answered.

13 Question 20 is not answered.  Question 27 is not

14 answered.  It appears to be -- I'm not sure that's

15 the entire list, but some of that -- some of

16 these -- obviously, it's not a final, because at

17 least five questions are unanswered, so --

18     Q    Let's have this marked as -- one question

19 on that.  Turning our attention to Question 31 --

20     A    Okay.

21     Q    -- is that the question you were

22 referring to before as a question whose answer was

Page 374

1   changed at some point?

2       A    Yeah.  Because this was -- as I said,

3   when we explored the question further, it became

4   evident that this was not, in fact, an accurate

5   representation for the process for the decennial.

6       Q    Do you know when that answer was changed?

7       A    I don't.

8            Is there a date on this?

9       Q    We just give you them as we got them.

10      A    No.  Well, no, unfortunately nobody dated

11  this.  So I don't know -- is there a -- do you

12  have a final --

13      Q    Well --

14      A    -- with all the questions answered?

15      Q    You're going to have to tell me.

16      A    I believe there was one where they

17  managed to answer all the questions.

18      Q    Okay.  Let's have this marked as the next

19  exhibit.

20           (Plaintiffs' Exhibit 32, Memo, was

21  marked.)

22  BY MR. ROSENBERG:

1    Q   Can you identify -- first of all, have

2   you ever seen what's been marked as Exhibit 32?

3    A   I'm flipping through it here.  I believe

4   I've seen -- I can't recall for certain whether

5   this was the document, but I've seen, certainly,

6   something similar to the document, yes.

7    Q   And the last part of this document, I

8   know it's a multi-document document --

9    A   Right.

10    Q   -- does have the 35 questions, all of

11   which are answered; is that correct?

12    A   On a quick review, it looks like you're

13   correct, that they're all answered.

14    Q   And the answer to Question 31 is the same

15   answer as was in Comstock Exhibit 31; is that

16   correct?

17    A   Correct.  But I note this is also marked

18   draft and predecision, so --

19    Q   So -- well, let's deal with that, also.

20   We can represent to you that this is the only

21   version of the March -- of a document dated

22   March 1, 2018 that is -- and it's -- and they're

Page 376

1    all marked draft for decisional -- I can't read

2    the whole watermark.

3         A    Right.

4         Q    Are you aware whether there was a

5    document that does not contain that stamp or

6    watermark?

7         A    I don't recall.

8         Q    And that is dated March 1, 2018; is that

9    correct?

10        A    Correct.

11        Q    Now, let me show you -- let me get this

12   marked as Exhibit 33.

13             (Plaintiffs' Exhibit 33, Questions on

14   draft Census memo, was marked.)

15   BY MR. ROSENBERG:

16        Q    Have you seen that document before?

17        A    Again, possible.  I can't tell from

18   the -- without the accompanying emails to show the

19   traffic back and forth.  I honestly can't tell you

20   when I would have seen which of these documents.

21        Q    Now, do you know whether what's been

22   marked as Document 33 is the final iteration of

Page 377

1    the answers to the questions?

2         A   I don't honestly know that.

3         Q   Now, turning your attention to the answer

4    to 31 --

5         A   Uh-huh.

6         Q   -- does that answer reflect a change in

7    the answer from the previous documents I've shown

8    you?

9         A   Yes.  It reflects a more accurate

10   statement of the response to the question.

11        Q   Who drafted that answer?

12        A   I don't know.

13        Q   Do you know if the Census Bureau drafted

14   that answer?

15        A   It would appear to be since it's a Census

16   document.

17        Q   Who is Christa Jones?

18        A   She's is the chief of staff for the

19   Census Bureau.

20        Q   Who is Sahra Park-Su?

21        A   Sahra Park-Su works in the Office of

22   Policy and Strategic Planning -- or actually did.

Page 378

1    She is now at Bureau of Industry and Security.

2         Q    Did she work for you, report to you, I

3    should say?

4         A    Yes.

5         Q    What was her title?

6         A    She doesn't really have a title.  She's

7    one of the staff that covers an area in the Office

8    of Policy Planning.

9         Q    Was she involved in review of the answers

10   to 35 -- to the 35 questions?

11        A    I don't know.

12        Q    Did you task her with that?

13        A    I did not, no.

14        Q    Do you know if anyone did task her with

15   that?

16        A    I don't know.

17        Q    Let's have this exhibit marked as 34.

18             (Plaintiffs' Exhibit 34, Email, was

19   marked.)

20   BY MR. ROSENBERG:

21        Q    Looking at what's been marked as

22   Exhibit 34, have you ever seen this document

Page 379

1   before?

2        A    No.   I haven't.

3        Q    And does it appear to be an email from

4   Sahra that contains the Question 31, "What was the

5   process that was used in the past to get questions

6   added to the decennial census or do we have

7   something similar where precedent was

8   established"?

9            Do you see that?

10       A    That appears to be Question 31.

11           She pronounces her name Sahra, by the

12   way.

13       Q    I'm sorry?

14       A    She pronounces her name Sahra.

15       Q    Sahra?

16       A    Yes.

17       Q    Okay.   Do you see what has been blocked

18   out below that question?

19       A    I see that there is a block of black

20   below the question, yes.

21       Q    And do you see that that block, if you

22   compare it to the Exhibit C33, the answer, that

Page 380

1   that block seems to be about the same size as the

2   amended answer in C -- in C34?

3       A   You're comparing -- I don't know.  It

4   depends on the font size being used.

5       Q   Do you doubt that Sahra Park-Su may have

6   been the one who wrote the answer to Question 31?

7           MR. GARDNER:  Objection.  Calls for

8   speculation.  Lack of foundation.

9           THE WITNESS:  I was -- as you'll note,

10  I'm not on this email chain, so I don't know who

11  was involved in the drafting change.

12  BY MR. ROSENBERG:

13      Q   Can you deny the possibility that she

14  wrote the answer to 31?

15      A   I -- that's certainly possible.

16          MR. ROSENBERG:  We'll go off the record.

17          VIDEOGRAPHER:  This concludes Media Unit

18  Number 6.  The time on the video is 4:48 p.m.  We

19  are off the record.

20          (Off the record.)

21          VIDEOGRAPHER:  This begins Media Unit

22  Number 7.  The time on the video is 5:05 p.m.  We

Page 381

1    are on the record.

2              EXAMINATION BY MS. SENTENO:

3       Q   Good afternoon, Mr. Comstock.  My name is

4    Andrea Senteno and I'm counsel for the plaintiffs

5    in the LUPE v. Ross.  That's in the Federal

6    District court in Maryland 8:18-CV-01570.  And

7    LUPE stands for La Unión Del Pueblo Entero.

8              So I know we've talked a bit today about

9    your interactions with Mary Blanche Hankey and

10   with James McHenry, so I just have a couple

11   questions on that.

12             Do you understand correctly that it was

13   based on your description of -- of the

14   Department of Commerce's request to add the

15   citizenship question that Ms. Hankey told you that

16   it would be best appropriate to speak to

17   Mr. McHenry?

18             MR. GARDNER:  Objection.  Form.

19             THE WITNESS:  Yes.  I don't know that I

20   went into great detail with her as to the nature

21   of the citizenship question, but as to who in the

22   department would handle Voting Rights Act and

Page 382

1   citizenship questions.

2   BY MS. SENTENO:

3       Q   So you did specifically ask who would

4   best be the appropriate -- who would be the most

5   appropriate person if you wanted to talk about the

6   Voting Rights Act and citizenship data?

7       A   The use of the citizenship data by the

8   Justice Department, yes.

9       Q   And based on that interaction, she

10  referred you to Mr. McHenry?

11      A   Correct.

12      Q   Okay.  And do you understand correctly

13  that it was based upon that conversation or that

14  explanation with respect to the Department of

15  Commerce's request with Mr. McHenry that he then

16  referred you to the Department of Homeland

17  Security?

18      A   I don't know why he referred me to the

19  Department of Homeland Security.  He simply -- I

20  think, as I indicated before, indicated that the

21  Justice Department was a little busy on other

22  issues right now, and so this was not something

1  that high on their priority list.

2      Q   And I know we've talked about this

3  before, but when you spoke with Mr. McHenry, did

4  you relay the same information that you'd relayed

5  to Ms. Hankey about wanting to talk about the

6  voting rights after voting rights enforcement and

7  citizenship -- and the use of citizenship data?

8      A   In both cases, I spoke to them about

9  adding a citizenship question to the decennial

10 census.  I don't recall whether we went into any

11 great detail about the rationale.

12     Q   Did you ever have a conversation with

13 Donald Trump regarding the addition of the

14 citizenship question to the decennial census form?

15     A   No.

16     Q   And that includes during any transition

17 period?

18     A   Correct.

19     Q   I want to introduce Exhibit -- I believe

20 we said 35, Plaintiff's Exhibit 35 for the record.

21         (Plaintiffs' Exhibit 35, Trump campaign

22 email, was marked.)

Page 384

1   BY MS. SENTENO:

2       Q    This is Bates number 2643.  And this is

3   an email that contains a Trump campaign email from

4   March 2008.

5           Have you been shown this email prior to

6   today?

7       A    No.  I'm not on this email.

8       Q    Okay.  Can I refer you to Page 2644?

9   It's the second page of this document.

10      A    Okay.

11      Q    Okay.  And do you see what it has

12  included in the original email chain.  This is an

13  image of a campaign email from the Trump campaign,

14  correct?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.

17          THE WITNESS:  It's rather small print,

18  but it appears to be something from the campaign,

19  yes.

20  BY MS. SENTENO:

21      Q    Okay.  And I'm going to recognize it's

22  small print, but I'm going to draw your attention

Page 385

1    to the first sentence here of the campaign email,

2    quote, the President wants the 2020 United States

3    census to ask people whether or not they are

4    citizens.

5         In continues, in another era this would

6    be common sense.  And common sense is in all

7    capital letters.

8         Do you see that?

9    A    I do see that.

10   Q    And you said you were never made aware of

11   this campaign email; is that correct?

12   A    No.  I said I had not seen this email.

13   Q    You had not seen this particular chain?

14   A    I had not seen this chain or the

15   substance of this -- whatever it is.

16   Q    Prior to today?

17        Okay.  So no one -- so this was looking

18   at 2643 --

19   A    Okay.

20   Q    -- this image, this stamp of the campaign

21   email was sent to Kevin Manning.  Who is

22   Kevin Manning?

Page 386

1     A    Kevin Manning works in our office of --
2    Office of Public Affairs.
3     Q    Okay.  And Kevin Manning has forwarded
4    this email to James Rockas; is that correct?
5     A    Correct.  Well, yes.  Based on the email
6    chain, correct.
7     Q    And I believe we've already established
8    who James Rockas is, but perhaps, again, just
9    remind us.
10     A    Well, as his title at the bottom says,
11    press secretary, deputy director public affairs.
12     Q    Okay.  So were you ever made aware of
13    this email by either Mr. Manning or Mr. Rockas?
14     A    Mr. Rockas mentioned to me there had been
15    a campaign email, yes.
16     Q    Okay.  And did you ever -- did anyone
17    else make you aware of this email?
18     A    I think James Uthmeier or Peter Davidson
19    may have mentioned it.  We were all surprised to
20    see this email.
21     Q    Okay.  When were you made aware of the
22    email?

1    A    Shortly after Mr. Rockas received a copy.

2    Q    Okay.  And why were you made aware of

3    this particular email?

4    A    Well, as you notice, the email is from

5    somebody at Federal Computer Week who apparently

6    got a copy of this and sent it to us to ask for

7    comment, does Commerce have any response to this,

8    and this was, to my knowledge, the first we'd ever

9    seen it.

10    Q    You said you were surprised or everyone

11   was surprised to have seen or made aware of this

12   campaign email.  Can you describe for me why you

13   were surprised?

14    A    Because we've never spoken to the

15   campaign about the Secretary's thinking or

16   decision, so -- I'm not sure what the date of this

17   is, but, 3/19.

18    Q    After you all were made aware of this

19   email, did you discuss the campaign email with

20   anyone else inside the Department of Commerce?

21    A    No.

22    Q    Did you discuss this email with anyone at

Page 388

1    the White House?

2         A    No.

3         Q    Did you discuss this email with anyone at

4    Trump campaign?

5         A    No.

6         Q    Did you discuss this email with anyone at

7    the Department of Justice?

8         A    No.

9         Q    Did you discuss this email with anyone at

10   the Census Bureau?

11        A    No.

12        Q    The flyer also refers to -- and this is

13   on 2644 -- "19 attorney generals who said they

14   will fight Trump if the President dares to ask

15   people if they are citizens."

16             Do you know who those 19 attorney

17   generals are?

18        A    I have no idea.

19        Q    And do you know what, quote, unquote, era

20   this campaign email is referring to when he says

21   in another era?

22        A    I have no knowledge, other than reading

Page 389

1  this email now what the campaign was thinking

2  about.

3       Q   Okay.  Do you agree with the sentiments

4  in this campaign email?

5       A   Do I agree that asking citizenship -- a

6  citizenship question makes sense?  Is that your

7  question?

8       Q   If that's what you understand the

9  sentiment of this email to be?  What do you

10 understand the sentiment of this email to be?

11      A   I said I worked on the Secretary's

12 decision to do this, and I am comfortable with the

13 Secretary's decision.

14      Q   So this was a request for media comment,

15 and you stated earlier that after you all were

16 made aware of this email and you all expressed

17 your surprise that the email existed, you didn't

18 discuss it any further?

19      A   I mean, I'm not sure what our final

20 response to press was, but I think we had no

21 comment.

22      Q   Who would know what the final response to

Page 390

1   the press was?

2          MR. GARDNER:  Objection.  Lack of

3   foundation.

4          THE WITNESS:  Well, I'd say if it's

5   not on -- if it's not published on our website and

6   it's not quoted in media paper anywhere, then it

7   appears we did not respond.

8   BY MS. SENTENO:

9      Q   Would this be something that would be

10   raised to Secretary Ross directly?

11          MR GARDNER:  Objection.  Lack of

12   foundation.  Calls for speculation.

13          THE WITNESS:  Certainly the answer would

14   be that the Secretary would probably be made aware

15   that the press were inquiring on this, yes.

16   BY MS. SENTENO:

17      Q   Would he be made aware of the fact that

18   this email existed?

19      A   Sure.  I mean, he would be made aware of

20   the fact we had received an inquiry from the press

21   with the following email on it.

22      Q   Do you know if Secretary Ross saw this

Page 391

1   campaign email?

2        A    I can't say for certain.

3        Q    Do you know of anyone else at

4   Department of Commerce or the Census Bureau that

5   discussed this campaign email?

6        A    Well, James Rockas, I image, would have

7   presented to it the Secretary and asked him if he

8   had a response or further we'd make no response.

9        Q    So would the best person to ask about the

10  Secretary's knowledge about this particular email

11  be the Secretary?

12       A    That would be the person that could

13  probably best answer your question, yes.

14       Q    Do you know if anyone in Department of

15  Commerce or the Census Bureau discussed this email

16  with the White House?

17       A    Again, I don't know.  You'd have to ask

18  James Rockas.  But absent something else in the

19  administrative record that shows that there was

20  correspondence with the White House, I think we'd

21  probably just ignored this.

22       Q    And so do you know of anyone at the

Page 392

1   Department of Commerce or the Census Bureau who

2   discussed this with the Trump campaign?

3        A    I don't, no.

4        Q    And what was your understanding when you

5   were made aware of this email of the President's

6   rationale for needing a citizenship question on

7   the decennial census?

8            MR. GARDNER:  Objection.  Calls for

9   speculation.  Lack of foundation.

10           THE WITNESS:  I have no knowledge of the

11  President's interest or rationale on this

12  question.

13  BY MS. SENTENO:

14       Q    What was your understanding of President

15  Trump's directive to the Department of Commerce

16  based on this email?

17           MR. GARDNER:  Objection.  Calls for

18  speculation.  Lack of foundation.

19           THE WITNESS:  And to my knowledge,

20  President Trump never gave any directive to the

21  Department of Commerce.

22  BY MS. SENTENO:

Page 393

1     Q   And what was your understanding, sorry,

2  of the President's role in the determination of

3  whether or not to add a citizenship question to

4  the decennial census form?

5     A   My understanding was the President had no

6  role.

7     Q   Did you ever discuss -- did you ever

8  discuss with anyone in the White House other

9  topics outside of the census, such as immigration

10 enforcement?

11    A   I did not, no.

12    Q   Have you ever discussed immigration

13 enforcement with President Trump, the issue of

14 voter fraud?

15    A   No.

16    Q   Have you ever discussed with him the

17 issue of an undercount as a result of the

18 citizenship question?

19    A   No.

20    Q   How about Congress apportionment?

21    A   No.

22    Q   How about redistricting?

Page 394

1       A    No.

2       Q    Section 2 of the VRA?

3       A    No.

4       Q    Okay.  Did you ever have a conversation

5    with Reince Priebus?

6       A    No.

7       Q    Are you aware of anyone in the Department

8    of Commerce or the Census Bureau that had a

9    conversation with Mr. Priebus?

10      A    Regarding?

11      Q    Regarding the census.

12      A    I'm not aware of any specific

13   conversation regarding the census, no.

14      Q    Are you aware of anyone at the

15   Department of Commerce or the Census Bureau that

16   had a conversation with Mr. Priebus about

17   immigration enforcement?

18      A    Not that I'm aware of.

19      Q    About voter fraud?

20      A    Not that I'm aware of.

21      Q    About an undercount as a result of a

22   citizenship question?

Page 395

1      A    Not that I'm aware of.

2      Q    About Congress apportionment?

3      A    Not that I'm aware of.

4      Q    About redistricting?

5      A    Not that I'm aware of.

6      Q    About Section 2 of the VRA?

7      A    Not that I'm aware of.

8      Q    Did you ever have a conversation with

9  White House Chief of Staff John Kelly about the

10 census?

11     A    No.

12     Q    Are you aware of anyone else at the

13 Department of Commerce or the Census Bureau that

14 had a conversation with Chief of Staff John Kelly

15 about the census?

16     A    No.

17     Q    About immigration enforcement?

18     A    No.

19     Q    About voter fraud?

20     A    No.

21     Q    About an undercount as a result of a

22 potential citizenship question?

1       A    No.

2       Q    About Congressional apportionment?

3       A    No.

4       Q    Redistricting?

5       A    No.

6       Q    Or about Section 2 of the VRA?

7       A    No.

8       Q    Did you ever have a conversation with

9    Arthur Gary regarding the addition of the

10   citizenship question to the decennial census form?

11      A    No.

12      Q    Are you aware of anyone else at the

13   Department of Commerce or the Census Bureau that

14   had conversations with Mr. Gary?

15      A    I believe Peter Davidson may have.

16      Q    And are you familiar with who Mr. Gary

17   is?

18      A    I believe he's the person that wrote the

19   letter.

20      Q    When did you learn about your -- about

21   the conversations between Mr. Davidson and

22   Mr. Gary?

Page 397

1      A    I believe I would have heard -- to the

2    extent they occurred, I likely would have heard

3    about it when he was telling -- informing the

4    Secretary he spoke with Mr. Gary.

5      Q    A general time frame?

6      A    I couldn't tell you.

7      Q    Would it have been before the

8    December 2017 letter?

9      A    I don't -- I don't recall.

10     Q    Would it have been after the

11   December 2017 letter?

12     A    Possibly.  Because I know there were

13   discussions about trying to get a meeting between

14   the Census Bureau and the DOJ, and DOJ was not

15   interested in that letter.

16     Q    So you're not aware of anyone other than,

17   potentially, Mr. Davidson that had a conversation

18   with Mr. Gary prior to his letter to the

19   Census Bureau?

20     A    No.

21     Q    Do you know if the conversations between

22   Mr. Davidson and Mr. Gary took place in person or

Page 398

1    by phone?

2        A    Again, I -- there may have been

3    conversations between Mr. Davidson and Mr. Gary.

4    I'm not certain that there were.

5        Q    Who would know that there were?

6        A    Mr. Gary.

7        Q    And what was your understanding of what

8    the conversations between Mr. Davidson and

9    Mr. Gary were about?

10       A    Again, I'm not certain that conversations

11   occurred.  If they occurred, as I said, my

12   recollection would be it came up in the context of

13   trying to get the meeting that Census Bureau was

14   asking.

15       Q    And did those meetings ever occur?

16       A    Not to my knowledge.

17       Q    Do you know why?

18       A    I don't know why.  The Justice Department

19   did not want to do the meetings.

20       Q    When you say the department -- I'm sorry

21   could you repeat?

22       A    I said I do not know why the

1    Justice Department was unavailable for those

2    meetings.

3        Q    Was there ever any follow-up to inquire

4    why Department of Justice was not available for

5    meetings with the Census Bureau?

6        A    As I said, that's why I believe

7    Peter Davidson may have spoken with Mr. Gary.

8        Q    Have ever you discussed with Mr. Gary the

9    issue of immigration enforcement?

10       A    No.

11       Q    Have you ever -- has -- have you or

12   anyone else in the Department of Commerce

13   discussed with Mr. Gary the issue of voter fraud?

14       A    No.

15       Q    The issue of an undercount as a result of

16   the citizenship question?

17       A    Again, not to my knowledge.

18       Q    The issue of Congressional apportionment?

19       A    Again, not to my knowledge.

20       Q    Issue of redistricting?

21       A    Not to my knowledge.

22       Q    Section 2 of the VAR?

1    A    Again, that's the section that they would

2  need the information for, so I think any

3  conversation with the Justice Department -- to the

4  extent it reached the Voting Rights Act, would

5  have been referring to Section 2.

6    Q    Forgive me if you answered this question

7  earlier, but did you -- did you yourself ever have

8  a conversation with the Attorney General -- with

9  Attorney General Jeff Sessions -- sorry --

10  regarding the addition of a citizenship question

11  to the decennial census?

12    A    I personally did not speak to him

13  directly about that matter.

14    Q    Did you speak to him through other

15  individuals?

16    A    No.

17    Q    Have you -- did you say that you -- is it

18  my understanding from your testimony that you

19  didn't speak directly to the Attorney General

20  about the citizenship question?

21    A    I've never spoken directly to the

22  Attorney General about the citizenship question.

1     Q    Okay.  Have you ever spoken with the

2   Attorney General about immigration enforcement?

3     A    No.

4     Q    About voter fraud?

5     A    No.

6     Q    About an undercount as a result of the

7   citizenship question?

8     A    No.

9     Q    About Congressional apportionment?

10    A    No.

11    Q    About redistricting?

12    A    No.

13    Q    About Section 2 of the VRA?

14    A    No.

15    Q    Okay.  Are you aware of anyone in the

16  Department of Commerce who has had direct

17  conversation with the Attorney General,

18  notwithstanding Secretary Ross?

19    A    Other than Secretary Ross, I'm not sure

20  that anybody has spoken directly with the Attorney

21  General.

22    Q    Okay.  Are you aware of the

Page 402

1    Attorney General's views on asking a citizenship
2    question on the decennial census?
3        A    I'm not aware of the Attorney General's
4    view -- Attorney General's views.
5        Q    On?
6        A    On a citizenship question on the census.
7        Q    Are you aware of his views on immigration
8    enforcement?
9        A    Other than what you read in the press,
10   no.
11       Q    Are you aware of his views on the program
12   called Deferred Action For Childhood Arrivals?
13       A    Again, other than what's in the press, I
14   don't know anything about what his views are.
15       Q    So the views that you do know of the
16   Attorney General, you learned through the media?
17       A    Media reports, yes.
18       Q    And approximately when are you learning
19   those?  When did you begin reading media reports
20   about the Attorney General's specific viewpoints?
21       A    I stay abreast in most papers, so the
22   Washington Post, the Wall Street Journal.  I have

Page 403

1    a general knowledge of the issue, but no specific

2    interests.  The Department of Commerce doesn't do

3    immigration enforcement, so --

4        Q   Did you believe at the time of the DOJ

5    letter to the Census Bureau that the

6    Attorney General was committed to the enforcement

7    of the Voting Rights Act but that his hindrance or

8    the hindrance of the DOJ was the availability of

9    data?

10            MR. GARDNER:  I'm sorry.  Can you repeat

11   that question?

12            MS. SENTENO:  Yeah.

13   BY MS. SENTENO:

14       Q   Did you believe at the time of the DOJ

15   letter, that the Attorney General was committed to

16   the enforcement of the Voting Rights Act but that

17   what was holding them up was -- were data issues?

18       A   Their letter communicated that they could

19   use census block-level data, which they currently

20   don't get for that, and if, therefore, we would

21   add a question to the decennial census that would

22   provide that data.

Page 404

1      Q    Have you ever had a conversation with

2  Stephen Miller regarding the addition of the

3  citizenship question to decennial census?

4      A    No.

5      Q    Do you know who Stephen Miller is?

6      A    I do know who Stephen Miller is.

7      Q    Could you tell us who that is?

8      A    He's a policy advisor to the President.

9      Q    And have you ever asked -- have you ever

10  had a discussion with Mr. Miller about immigration

11  enforcement, voter fraud, and undercount as a

12  result of the citizenship question, Congressional

13  apportionment, redistricting or Section 2 of the

14  VRA?

15           MR. GARDNER:  Objection.  Form.

16           THE WITNESS:  No. I have not.

17  BY MS. SENTENO:

18      Q    Are you aware of anyone at the

19  Department of Commerce who has had conversations

20  with Mr. Miller about those topics?

21      A    No.

22      Q    Are you aware of Mr. Miller's views on

Page 405

1    immigration?

2         A    Not specifically, no.

3         Q    The census?

4         A    Not specifically, no.

5         Q    On apportionment?

6         A    Not specifically, no.

7         Q    On Deferred Action for Childhood

8    Arrivals?

9         A    Not specifically, no.

10        Q    Have you ever had a conversation with

11   Alabama Attorney General Steve Marshall regarding

12   the addition of a citizenship question to the

13   decennial census form or about the census

14   generally?

15        A    No.

16        Q    Do you know of anyone at the

17   Department of Commerce or the Census Bureau who

18   has had a conversation with Attorney General

19   Steve Marshall?

20        A    Are they --

21        Q    Alabama.  Sorry.

22        A    Are they the ones bringing the lawsuit

Page 406

1  against us?

2      Q   Yes.

3      A   No.  I don't think so.

4      Q   And you've never -- have you ever had a

5  conversation with Mr. Marshal about voter fraud,

6  undercount as a result of the citizenship

7  question, Congressional apportionment,

8  redistricting or Section 2 of the VRA?

9      A   I've never spoken to Mr. Marshall.

10     Q   Are you aware of anyone at the Department

11  of Commerce who has?

12     A   Not that I know of.

13     Q   Have you ever had a conversation with

14  Alabama Congress member Mo Brooks?

15     A   No.

16         Well, I take that back.  Unless he's been

17  on some panel that's -- that I testified in front

18  of.  It's entirely possible, in that case, I would

19  have had a conversation with him.

20     Q   Okay.  So you've never had a conversation

21  with him outside of a potential panel about

22  anything generally or just about the census or the

1  citizenship question?

2      A   I feel fairly confident I have not spoken

3  with Mr. Brooks about any subject matter.

4      Q   Are you aware of anyone at the

5  Department of Commerce or Census Bureau who has --

6      A   Again, no.

7      Q   -- had a conversation?

8      A   No.

9      Q   Okay.  Outside of the Department of

10  Commerce and the Census Bureau and individuals

11  that I just ran through, have you or anyone else

12  at the Department of Commerce spoken to anyone

13  outside of your agency prior to the DOJ letter

14  about the citizenship question?

15          MR. GARDNER:  Objection.  Lack of

16  foundation.

17          THE WITNESS:  Again, I can only answer

18  for myself.  So I wouldn't know what other people

19  might or might not have spoken to people outside

20  the department on.

21  BY MS. SENTENO:

22      Q   Did you ever speak to anyone from the

1  Heritage Foundation?

2      A    No.

3      Q    You never spoke to anyone at the

4  Heritage Foundation about the census?

5      A    Not that I recall.

6      Q    And you never spoke to anyone at the

7  Heritage Foundation about the potential -- about

8  apportionment?

9      A    Not that I recall, no.

10     Q    How about voter fraud?

11     A    No.

12     Q    Congressional apportionment -- sorry.  I

13  just said that.

14          Section 2 of the VRA?

15     A    No.

16     Q    Okay.  Are you aware of anyone else at

17  the Department of Commerce or the Census Bureau

18  that at any point, either before or after the DOJ

19  letter -- the DOJ letter, who had a conversation

20  with someone we had not already discussed about

21  the purpose of adding a citizenship question for

22  immigration enforcement?

Page 409

1          MR. GARDNER:  Objection.  Form.

2          THE WITNESS:  I'm not aware of any

3   conversations regarding adding a citizenship

4   question for immigration enforcement.

5   BY MS. SENTENO:

6      Q   How about voter fraud?

7      A   No.

8      Q   Congressional apportionment?

9      A   No.

10     Q   Redistricting?

11     A   No.

12         I mean, I will note there was an earlier

13  conversation about that Wall Street Journal

14  article that mentioned -- that referenced

15  apportionment.  So outside of that response with

16  the Secretary, there's never been a discussion of

17  it.

18     Q   Have you spoken to anyone at

19  Department of Justice's voting rights section?

20     A   Not to my knowledge.

21     Q   So you were never referred to anyone or

22  you never inquired from anyone, a contact within

Page 410

1    the voting rights section, to discuss this

2    request --

3            MR. GARDNER:  Objection.  Form.

4    BY MS. SENTENO:

5        Q   -- for a citizenship question?

6            MR. GARDNER:  Sorry.  Objection to form.

7            THE WITNESS:  No.  Again, as I think we

8    established in the earlier testimony, I was

9    referred to Mary Blanche Hankey by someone in the

10   Department of Commerce, by Eric Branstad, who I

11   think got her name from a contract of his at the

12   White House.  She referred me to -- I'm already

13   blanking on his name -- John McHenry.  I did not

14   investigate John McHenry's position in the

15   department.  I just took it on face value he would

16   be the right person to talk to and those are the

17   two people I spoke to at Department of Justice,

18   so -- outside of litigation counsel, obviously.

19   BY MS. SENTENO:

20       Q   You testified earlier in the memo that

21   you drafted for the Secretary that stated that

22   once you had been told by DHS that your request

Page 411

1    would be more appropriately handled by the

2    Department of Justice, you said that the

3    interaction ceased; is that correct?

4         A    Well --

5         Q    From you?

6         A    My efforts at that point to track down

7    somebody ceased because they had run into a dead

8    end.  I mean, our initial conclusion was that

9    Department of Justice was the right place to go.

10   They seemed occupied on other matters, so they

11   referred us to DHS.  DHS referred us back, so now

12   I'm back to where I started.

13        Q    So once you were referred back to DOJ,

14   you didn't ask another follow-up as to who in the

15   voting section would be more appropriate to talk

16   about this particular issue?

17        A    Again, I was working on literally dozens

18   of issues that consumed a lot of time.  And so I

19   had put the time into it that I could afford to

20   put into it and had come up empty.  So I reported

21   that to my boss, and basically, said if absent

22   some instruction from higher up, it appears that

Page 412

1    the DOJ staff is not particularly interested in

2    expending resources on this right now.

3         Q   Did you or Secretary Ross consider having

4    anyone else, any other governmental department or

5    any other jurisdiction make a request to the

6    Census Bureau to add a citizenship question --

7              MR. GARDNER:  Objection.

8    BY MS. SENTENO:

9         Q   -- other than the DOJ and DHS?

10             MR. GARDNER:  Objection.  Form.  And

11   objection.  Foundation.

12             THE WITNESS:  Again, nobody would make a

13   request to the Census Bureau to add it because the

14   statute commits that discretion to the Secretary,

15   not the Census Bureau.  So it's not their decision

16   to make.  It's the Secretary's decision to make.

17   So we would not seek someone else to contact the

18   Census Bureau about the question, no.

19   BY MS. SENTENO:

20        Q   But the DOJ letter was directed to the

21   Census Bureau requesting an addition of the

22   question?

Page 413

1        A    I did not draft that letter, so I -- but

2    their choice of who to send the request to was

3    dictated by the Department of Justice, not by us.

4        Q    Did you or Secretary Ross consider having

5    anyone else make -- anyone else, other than the

6    DOJ to DHS, to make that request to Commerce?

7             MR. GARDNER:  Objection.  Lack of

8    foundation.

9             THE WITNESS:  No.  I think upon further

10   analysis, we determined that the Secretary

11   probably could determine that Commerce had a need

12   for it, but that was not before us at the time,

13   so --

14   BY MS. SENTENO:

15       Q    Can you explain your subsequent research?

16       A    Well, as I mentioned, the United Nations

17   recommends that all countries ask, frankly, rather

18   detailed questions about citizenship,

19   naturalization, et cetera.  So it's considered

20   good practice, good demographic information to

21   have.  It was asked for 150-plus years without any

22   problem.  So -- and every other major democracy

1    inquires of all their citizens on a regular basis

2    of it.  So it's -- I think there's a perception

3    out there -- where it came from, I don't know --

4    that somehow asking a citizenship question is a

5    problem.

6              And I would, again, refer you back to the

7    fact that 70 percent of the noncitizens in the ACS

8    actually answer the question correctly.  So,

9    apparently, those people don't consider it a

10   problem.  So it appears to be a rather small

11   demographic that is concerned about this.  And

12   again, I would point out that when you understand

13   that the data that is being protected by law,

14   cannot be used for any enforcement purpose, cannot

15   be used to identify an individual, there's

16   absolutely no reason I can think of why someone

17   would not answer the census honestly on that,

18   citizen or noncitizen.  It's demographic

19   information.

20   Q    So based on that, was it your

21   understanding that if the DOJ did not make this

22   request to the Department of Commerce or the

Page 415

1    Census Bureau, whoever was the most appropriate

2    point of contact for that request, was it your

3    understanding that the Department of Commerce

4    might move forward with a plan to add the

5    citizenship question based on --

6            MR. GARDNER:  Objection.

7    BY MS. SENTENO:

8        Q   -- that rationale?

9            MR. GARDNER:  Sorry.  Objection.

10   Hypothetical.

11           THE WITNESS:  Right.  It's a hypothetical

12   question that was not before us.

13   BY MS. SENTENO:

14       Q   Okay.  Did Secretary Ross tell you or

15   anyone else whether he would have pursued other

16   justifications for adding the citizenship

17   question?

18           MR. GARDNER:  Objection.

19           THE WITNESS:  We had a request --

20           MR. GARDNER:  Lack of foundation.

21           THE WITNESS:  -- from the

22   Justice Department, so there was no need to

Page 416

1   speculate on that.

2   BY MS. SENTENO:

3       Q    Okay.  Are you aware of any VRA cases

4   that the Department of Justice declined to bring,

5   only because they needed block-level citizenship

6   data?

7       A    I'm not aware of that, but I didn't

8   research that either.

9       Q    So no -- neither yourself or anyone else

10  at the Department of Commerce asked DOJ for this

11  information?

12      A    I did not.  I can't say whether anybody

13  else did.

14      Q    So -- just a couple more questions.

15           The ACS is not a head count, correct?

16      A    That's right.  It's a sample.

17      Q    But the decennial census is a head count,

18  correct?

19      A    That's correct.  Counts all persons.

20      Q    And a decrease in the response rate in

21  the citizen question on the 2016 ACS caused an

22  underestimate of the percent of noncitizens; is

1    that correct?

2        A    No.  That's not correct.

3        Q    Can you explain?

4        A    Well, you're asserting that it's because

5    of the citizenship question, and I'm not sure that

6    the data supports that statement.

7        Q    What are you -- what do you believe the

8    data supports?

9        A    Again, without the data sitting in front

10   of me, it would be hard to make an analysis.  But

11   basically, the Census Bureau has reported that

12   certain number of people may drop off at certain

13   questions.  It's not dissimilar for citizenship

14   versus other questions.  There was not a major

15   statistical variation.  So, yes, a certain percent

16   of people do not complete the 45, 48 or 70

17   questions that are on the ACS or the long form,

18   and they have various break-off rates under the

19   Internet thing to tell where they stopped.

20            But, again, whether citizenship was a

21   determinative factor in any of those cases, it's

22   hard to determine.

Page 418

1      Q    But the data suggests -- the data that

2    the Census Bureau provided suggests that the

3    break-off rate for noncitizens was higher with

4    respect to a citizen question; is that correct?

5      A    Higher than noncitizen?

6      Q    Yes.

7      A    Yes.  That's true.

8      Q    Okay.  So if the same people who did not

9    respond to the citizen question on the ACS also

10   didn't respond to the short form of the decennial

11   census, that would cause a drop in the total head

12   count, correct?

13     A    No.  It would not.

14     Q    Could you explain?

15     A    Secretary Ross placed the question at the

16   end of the census so they would be able to not

17   answer that and still complete the census.  We

18   also have administrative records and

19   Secretary Ross directed we use administrative

20   records, which we're actively doing for a variety

21   of reasons, not just citizenship.

22          So we have every confidence between the

Page 419

1   increased outreach that's planned, the additional

2   money and resources that are to be put into the

3   advertising and other things, that we will more

4   than compensate -- in fact, our objection is to

5   have a complete and accurate count above and

6   beyond the count that was done in 2010.

7       Q   But every individual is required to

8   answer the census fully and completely, including

9   all questions; is that not right?

10      A   That's correct.  Yes.

11          Though I would note, we've never

12  prosecuted anybody for failure to do so.

13          MS. SENTENO:  Okay.  Go off the record.

14          VIDEOGRAPHER:  We're going off the

15  record.  The time on the record is 5:46 p.m.

16          (Off the record.)

17          VIDEOGRAPHER:  We're back on the record.

18  The time on the video is 5:43 p.m.

19          EXAMINATION BY MS. BOUTIN:

20      Q   Sir, I'd like to talk about the time

21  period between the December 12th DOJ letter

22  requesting the citizenship question and before

Page 420

1  Secretary Ross issued the March 26 memo --

2  decision memo.

3      A   I'm sorry.  Could you tell me who you're

4  with?

5      Q   Sure.  My name is Gabrielle Boutin.  I'm

6  with the Attorney General's of the State of

7  California, and I represent plaintiffs, the

8  State of California -- excuse me -- State of

9  California v. Ross in the Northern District of

10 California.

11     A   Okay.  Thank you.

12     Q   So during the time period between the

13 December 12th DOJ letter and the issuance of

14 Secretary Ross's March 26th memorandum, that's

15 what we're talking about.

16     A   I understand.

17     Q   Do you understand?

18     A   So far so good.

19     Q   Good.

20         During that time period, did the

21 Department of Commerce ever inform the

22 Department of Justice that the Census Bureau

Page 421

1   recommended using administrative records alone to

2   meet Justice's December 12th request rather than

3   adding the citizenship question to the census?

4       A    I believe that was part of the purposes

5   of the meeting they were seeking with the -- the

6   Census Bureau was seeking with the

7   Justice Department.

8       Q    Okay.  My question is:  Did the

9   Commerce Department ever inform DOJ that the

10  Census Bureau recommended using administrative

11  records alone to meet their requests, rather than

12  adding a citizenship question to the census?

13      A    Again, I'm not privy to all the

14  conversations with the Justice Department, so --

15      Q    Do you --

16      A    -- I was not --

17      Q    -- know --

18      A    I was not involved in such a discussion,

19  no.

20      Q    Okay.  But you were one of the primary

21  people working on this at Commerce; isn't that

22  right?

Page 422

1    A    Yes.

2    Q    Do you think you would have known if

3  someone from Commerce conveyed that information to

4  the Department of Justice?

5         MR. GARDNER:  Objection.  Calls for

6  speculation.

7  BY MS. BOUTIN:

8    Q    Do you think it's likely you would have

9  known?

10    A    It's possible, yes.

11    Q    Did the Department of Commerce ever

12  transmit to the Department of Justice any of the

13  Census Bureau memos analyzing options for

14  providing block-level -- excuse me -- block-level

15  citizenship data to the Department of Justice?

16         MR. GARDNER:  Objection.  Lack of

17  foundation.

18  BY MS. BOUTIN:

19    Q    That was repetitive.  Let me rephrase.

20    A    All right.

21    Q    Did Commerce ever transmit to

22  Department of Justice any of the Census Bureau's

Page 423

1   memos that analyzed the options for providing to

2   DOJ block-level citizenship data?

3          MR. GARDNER:  Objection.  Lack of

4   foundation.

5          THE WITNESS:  I would just note it's the

6   Secretary of Commerce's decision as to whether

7   this goes forward.  His focus is on a complete and

8   accurate count.

9          And as explained earlier, the Option C

10   alternative, which was to use the administrative

11   records only, would have inquired us to impute --

12   so, in other words, fill in the blanks -- for 25

13   million voting age citizens.  That was not

14   something Secretary Ross was prepared to have the

15   department do.

16   BY MS. BOUTIN:

17      Q   Mr. Comstock, I understand that.  Your

18   counsel is -- wants us to limit the amount or time

19   that we're here today, and the best way to do that

20   is if you would answer my questions directly.  So

21   I'll ask you again.

22          Did the Department of Justice ever --

1      A     Not to my knowledge.

2      Q     Okay.   Thank you.

3            And again, we're talking about between

4    December 12th and the March 26th.

5      A     Right.

6      Q     Did the Department of Commerce ever

7    inform DOJ that the Census Bureau believed that

8    administrative records alone would be more

9    complete -- would create more complete and

10   accurate citizenship data than asking a

11   citizenship question on the census and then

12   combining the data from that question with

13   administrative records?

14           MR. GARDNER:   Objection.   Form.

15   Objection.   Lack of foundation.

16   BY MS. BOUTIN:

17     Q     Do you want me to re-ask that question?

18     A     Sure.

19     Q     Did the Department of Commerce ever

20   inform Justice that the Census Bureau believes

21   that admin -- using administrative records alone

22   would provide more complete and accurate data than

Page 425

1    instead of doing that asking the citizenship

2    question on the census and then combining that

3    with the use of administrative records?

4            MR. GARDNER:  Same objection.

5            THE WITNESS:  Again, I think you

6    mischaracterize the Census Department's -- Census

7    Bureau's analysis.  But, again, it's the

8    Secretary of Commerce's decision as to what to

9    make, and so he would only transmit to the

10   Justice Department what he considered that would

11   provide complete and accurate data.

12   BY MS. BOUTIN:

13      Q   But the Commerce Department did inform

14   the Department of Justice about that belief by the

15   Census Bureau?

16           MR. GARDNER:  Same objections.

17           THE WITNESS:  Again, not to my knowledge.

18   BY MS. BOUTIN:

19      Q   Okay.  But did the Commerce Department

20   ever inform Justice that the Census Bureau

21   believed that 30 percent of responses by

22   noncitizens as to citizen status are incorrect?

Page 426

1        MR. GARDNER:  Objection.  Lacks

2   foundation.

3        THE WITNESS:  Again, I believe we have

4   told the Justice Department that is now the case

5   with the ACS data, yes.

6   BY MS. BOUTIN:

7     Q   And was that conveyed between

8   December 12th and March 26?

9     A   I don't know.

10    Q   Did Commerce ever communicate to Justice

11  any of the substance of the Census Bureau's

12  technical review of the -- of the

13  Justice Department's request for a citizen

14  question?

15        MR. GARDNER:  Same objection.

16        THE WITNESS:  Again, the Justice

17  Department asked us to provide block-level --

18  block-level census data.  How we do that is a

19  decision of Department of Commerce, not the

20  Department of Justice.

21  BY MS. BOUTIN:

22    Q   But is the answer to that question yes or

Page 427

1    no?

2         A    I forget the question.

3         Q    Okay.  I have to, so I'll say it again.

4         Did Commerce ever communicate to DOJ any

5    of the substance of the Census Bureau's technical

6    review to have DOJ's request for a citizenship

7    question?

8         MR. GARDNER:  Same objection.

9         THE WITNESS:  Again, it's -- the

10   technical review was how do we provide data that

11   would respond to this, and that would not be

12   relevant -- why would we communicate that to the

13   Justice Department is not --

14   BY MS. BOUTIN:

15        Q    Well, isn't -- didn't the

16   Justice Department, isn't that ultimately the

17   goal, according to that letter, getting

18   block-level data for Voting Rights Act

19   enforcement?

20        A    Correct.  But they --

21        Q    Hold on.  Hold on.  And isn't -- don't

22   you think they would want the most accurate data

Page 428

1   of which to do that?

2       A   And that's a determination of the

3   Secretary, not the Justice Department, so --

4       Q   But you don't think the

5   Justice Department would want to know the

6   Census Bureau's opinion on what would be best way

7   to do that?

8           MR. GARDNER:  Objection.  Calls for

9   speculation.

10          THE WITNESS:  I don't think it would be

11  relevant if I'm the Justice Department, at all.

12  BY MS. SENTENO:

13      Q   Okay.  I'd like to turn to the March 26th

14  memo.

15          Was that Exhibit 30?

16          MR. GARDNER:  No.  I think --

17          THE WITNESS:  I think it is.  Yes.

18  BY MS. BOUTIN:

19      Q   Okay.  So I'd like to turn to Page 5,

20  which is Bates number 1317.

21      A   Okay.

22      Q   And I'd like to avoid having to read a

1    full paragraph, but I also want you to understand

2    the context, so let's start at the top of the

3    first paragraph.

4         A    Okay.

5         Q    It says, "In my judgment that Option D

6    will product DOJ with the most complete and

7    accurate CVAP" -- excuse me.  Let me start again.

8              "It is my judgment that Option D will

9    provide DOJ with the most complete and accurate

10   CVAP data in response to its request."

11             The paragraph then goes on to give a few

12   reasons why Option D would be the best option in

13   his opinion and then about in the middle of the

14   paragraph, it gives one final reason starting with

15   the word "finally," so I'm going to read that

16   portion.

17        A    Okay.

18        Q    It says, "Finally placing the question on

19   the decennial census and directing the

20   Census Bureau to determine the best means to

21   compare the decennial census responses with

22   administrative records will permit the

Page 430

1  Census Bureau to determine the inaccurate response

2  rate for citizens and noncitizens alike using the

3  entire population.  This will enable the

4  Census Bureau to establish, to the best of its

5  ability, the accurate ratio of citizen to

6  noncitizen responses to impute for that small

7  percentage of cases where it is necessary to do

8  so."

9      A   Yes.

10     Q   So with respect to those two sentences

11 starting with the word finally, who wrote that

12 language?

13     A   I couldn't say for certain, but I likely

14 had a hand in drafting that.

15     Q   Okay.  Can you explain, how does adding a

16 citizenship question to the census and determining

17 the incorrect response rate for citizens and

18 noncitizens help the Census Bureau impute with

19 respect to people who did not respond at all and

20 did not have administrative records?

21     A   I mean, you could ask the Census Bureau

22 for a fuller explanation of imputation, but

1    basically, they do a formula that looks at data

2    that they have.  And so if they know for the

3    people -- let's say 95 percent of the population

4    that they have accurate records for and which they

5    have responses for, if they discover that -- pick

6    a number -- it's now 10 percent of the people who

7    aren't citizens, are, in fact, noncitizens, then

8    they would probably apply that to 5 percent

9    remaining.  So they would take whatever number of

10   people who are citizens, multiply that by that 5

11   percent, and then they would take the noncitizens

12   and say, okay, we now know the accurate count,

13   based on the entire population of what we have,

14   there's a 10 percent error rate, 10 percent of the

15   people that might say they're citizens are

16   noncitizens, so we're going to multiply that

17   number out.  That's going to give you the most

18   accurate count that you can get.

19       Q   So what's your source of that

20   explanation?

21       A   Based on the briefings.

22       Q   So you're saying that the Census Bureau

Page 432

1    supports this statement here?

2        A    This is the Secretary's statement.

3    Whether the --

4        Q    But did the Census Bureau explain,

5    say -- explanation you just offered me -- did

6    they -- did they explain it that way to you?

7        A    More or less, yeah.

8        Q    And do you believe they support this

9    statement in this memo?

10       A    I'm going to make no representations

11   about what the Census Bureau would or would not

12   support.

13       Q    Would it surprise you if you learned that

14   they did not support that statement, that they did

15   not ever represent to you or the Secretary that

16   establishing that ratio would help impute for

17   nonresponders?

18       A    I would not be surprised if that was the

19   opinion of Dr. Abowd, no.

20       Q    Do you believe that Dr. Abowd wrote this

21   memos on his own?

22       A    I believe he had the help of lots of

Page 433

1    staff.  I have no --

2        Q    Do you believe he acted against the

3    opinions of his staff when he wrote the memos?

4        A    I have no idea.

5        Q    So -- but you believe that it was his

6    opinion alone that contributed to -- that was

7    reflected in those memos?

8        A    No.  Dr. Abowd is the head of the

9    division that does that, so at the end of the day,

10   he gets the final call, so --

11          And, again, just to be clear, do I think

12   that there may be other opinions in the

13   Census Bureau?  Absolutely.

14       Q    So do you have any source, other than the

15   Census Bureau, for believing in the scientific

16   empirical accuracy of these last two sentences of

17   this paragraph?

18          MR. GARDNER:  Objection.  Form.

19          THE WITNESS:  Yes.  My experience, my

20   knowledge and other people who also, including the

21   Secretary, who is a very smart man, who also came

22   to a similar conclusion.

Page 434

1    BY MS. BOUTIN:

2         Q    Do you believe you have more expertise in

3    the science of imputation than the experts at the

4    Census Bureau?

5         A    I'm not going to get caught in making

6    such a statement, but I'm perfectly capable of

7    looking at the analysis they provided and deciding

8    whether or not I agreed with that analysis.

9         Q    What's your background in statistical

10   imputation?

11        A    I --

12             (Conference call interruption.)

13   BY MS. BOUTIN:

14        Q    What is your background in statistical

15   imputation?

16        A    I don't have one.

17        Q    Okay.  Switching gears.  Did you ever ask

18   anyone at the Census Bureau whether placing the

19   citizenship question on the census could affect

20   the apportionment of the Congressional

21   representatives to the state?

22        A    I never asked that question.

Page 435

1      Q    Are you aware of whether anyone else at

2   Commerce ever asked that question to the

3   Census Bureau?

4      A    Not to my knowledge.

5      Q    Okay.

6           MS. BOUTIN:  I believe that's all I have.

7           MS. GOLDSTEIN:  Let's go off the record.

8           MS. BOUTIN:  Yeah.  Let's go off the

9   record.

10          VIDEOGRAPHER:  We're going off the

11   record.  The time on the video is 5:56 p.m.

12          (Off the record.)

13          VIDEOGRAPHER:  We're back on the record.

14   The time on the video is 6:02 p.m.

15          MS. BOUTIN:  We have completed our

16   questions for today.  However, based on the fact

17   that there are still outstanding discovery

18   responses and discovery documents, we are keeping

19   the deposition open at this time.

20          MR. GARDNER:  We oppose that, of course.

21   You had the option to put this off, if you wanted

22   to, knowing there were outstanding issues and

Page 436

1   chose to go forward anyway, but we don't have to

2   resolve this here and now.

3           The witness will read and sign.

4           VIDEOGRAPHER:  This concludes today's

5   video deposition.  The time on the video is

6   6:02 p.m.  We are off the record.

7           (Whereupon, at 6:04 p.m., the deposition

8   of EARL COMSTOCK was concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 437

1                        * * * * *

2                CERTIFICATE OF REPORTER

3        I, KAREN LYNN JORGENSON, RPR, CSR, CCR the

4    officer before whom the foregoing deposition was

5    taken, do hereby certify that the witness whose

6    testimony appears in the foregoing deposition was

7    duly sworn by me; that the testimony of said

8    witness was taken by me in stenotype and

9    thereafter reduced to typewriting under my

10   direction; that the said deposition is a true

11   record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in

14   which this deposition was taken; and further, that

15   I am not a relative or employee of any counsel or

16   attorney employed by the parties hereto, nor

17   financially or otherwise interested in the outcome

18   of this action.

19        _____

20             KAREN LYNN JORGENSON, RPR, CCR, CSR

21   Dated this 3rd   day

22   of     September  , 2018.

Page 438

1          ACKNOWLEDGEMENT OF DEPONENT

2        I, EARL COMSTOCK, do hereby acknowledge I

3    have read and examined the foregoing pages of

4    testimony, and the same is a true, correct and

5    complete transcription of the testimony given by

6    me, and any changes or corrections, if any, appear

7    in the attached errata sheet signed by me.

8

9

10

11

12

13    _____      _____

14    Date                  EARL COMSTOCK

15

      Joshua E. Gardner, Esquire

16    U.S. DEPARTMENT OF JUSTICE

      20 Massachusetts Avenue

17    Washington, D.C. 20530

18    IN RE:  New York Immigration Coalition, et al., v.

      United States Department of Commerce, et al.

19

20

21

22

Page 439

1    Dear Mr. Gardner:

2         Enclosed please find your copy of the

3    deposition of EARL COMSTOCK, along with the

4    original signature page.  As agreed, you will be

5    responsible for contacting the witness regarding

6    signature.

7         Within 21 days of receipt of transcript,

8    please forward errata sheet and original signed

9    signature page to counsel for, John Freedman and

10   all counsel  of record.

11        If you have any questions, please do not

12   hesitate to call.  Thank you.

13   Yours,

14   Karen Lynn Jorgenson, RPR, CCR, CSR
     Capital Reporting Company

15   1821 Jefferson Place, Northwest
     3rd Floor

16   Washington, D.C. 20006
     (202) 857-3376

17

     cc:  All counsel of record

18

19

20

21

22

1                 E R R A T A   S H E E T

2   Case Name:  New York Immigration Coalition, et

3   al., v. United States Department of Commerce, et

4   al.,

5   Witness Name:  EARL COMSTOCK

6   Deposition Date:  Thursday, August 30, 2018

7   Page No.   Line No.      Change/Reason for Change

8

9

10

11

12

13

14

15

16

17

18   _____          _____

19   Signature                         Date

20

21

22

| & |
|---|
| **&**   1:15 4:4,11,20 6:15 8:21 47:1 228:2 |

| 0 |
|---|
| **001308**   318:4 |
| **001314**   352:10 |
| **001315**   358:8 |
| **01314**   354:10 |
| **01570**   381:6 |
| **05025**   1:5 |

| 1 |
|---|
| **1**   2:9 8:13 55:22 56:1,2 111:7 147:21 222:11 278:8 318:2 322:1 322:12 323:9 365:9,17 375:22 376:8 |
| **10**   2:13 64:6,8 67:22 68:4 69:8 83:2,16 145:6,7,11 148:11 149:16 192:2 208:1 355:5 365:1 431:6,14,14 |
| **100**   5:3 257:14 327:18 355:2 363:5 369:1 |
| **10005**   6:5 |
| **1004**   4:8 |
| **1016**   5:2 |
| **1050**   5:7 |
| **10:32**   111:7 |
| **10:45**   111:11 |
| **10:51**   203:9 |
| **10th**   65:1 69:3 72:15 81:16,20 82:7,13 83:5,14 89:9 146:13 |

**11**   2:14 147:9,10 158:16 373:11
**114**   2:11
**115**   4:16
**11:00**   209:1
**11:31**   158:10
**11:45**   158:13
**12**   2:14 158:17,18 158:19 159:1 191:22 293:20 348:17 365:1
**120**   2:12
**123**   2:12
**125**   4:8
**1250**   3:18
**12:10**   235:8
**12:32**   212:1
**12th**   419:21 420:13 421:2 424:4 426:8
**13**   2:15 127:8 164:13,14,18
**1300**   5:18
**1317**   428:20
**1321**   93:18
**137**   2:13
**13th**   129:19
**14**   2:15 167:1,2,5,6 206:3
**1401**   5:12 6:16,20
**1410**   56:5
**1411**   219:18
**145**   2:13
**147**   2:14
**14th**   133:15 205:18
**15**   2:16 91:8,10 182:5,6,7,12,13 218:19 232:15 365:1 373:12

**15.6**   361:10
**150**   413:21
**158**   2:14
**15th**   88:1,8,11
**16**   2:16 189:6,7,10 189:11,18
**160**   328:11
**1620**   5:7
**164**   2:15
**167**   2:15
**169**   328:1
**16th**   5:2 189:16
**17**   2:17 194:13,15 235:8,15
**17388**   437:18 439:13
**18**   2:18 27:17 199:20,21 200:2 212:11
**182**   2:16
**1821**   439:15
**189**   2:16
**18th**   28:18 29:6,10 31:20 33:3
**19**   2:18 212:12,13 212:14,17 309:21 388:13,16
**194**   2:17
**199**   2:18
**1992**   12:21,22
**19th**   317:3,11 319:19 320:19 321:2
**1:18**   1:5
**1:19**   212:5
**1:49**   240:19
**1:50**   240:22
**1:58**   250:8

| 2 |
|---|
| **2**   2:9 59:6,11 62:2 62:3,6 64:22 71:3 80:9 111:11 146:2 157:3 161:21 294:3,6,10 328:15 349:5 352:10 394:2 395:6 396:6 399:22 400:5 401:13 404:13 406:8 408:14 |
| **20**   2:19 6:10 91:9 91:11 138:11 171:15 215:18,19 373:13 438:16 |
| **200**   263:9 |
| **2000**   81:1 |
| **20001**   4:5,12 8:22 |
| **20005**   3:19 5:13 |
| **20006**   439:16 |
| **2000s**   67:11 |
| **20036**   5:3,8 |
| **2008**   384:4 |
| **2010**   67:11 78:22 79:4,19 80:4 355:14 419:6 |
| **2016**   15:16 17:16 27:6 124:4 416:21 |
| **2017**   15:17 27:17 33:16,17 34:10 35:5,9,17 36:10 37:7 39:18 40:2 55:2 56:21 58:15 59:6,11 64:6,8 67:22 68:4 77:19 78:1 83:2 88:3,9 88:11 96:12 103:4 104:12,22 105:7 109:1,18 110:8 115:14,15 117:10 117:13,16,18 |

119:1,5,8,12
121:16 122:12
124:5 127:8
129:19 133:15
134:13 138:11
140:16,21 143:22
146:2 147:21
156:15 157:3
161:21 162:2
179:10 183:10
184:8 188:4,15
189:18 195:6
196:17 198:21
201:5 206:3 208:1
209:17,19,22
213:3 215:12
222:12 225:7
235:8,15 237:14
238:6 239:2
241:18,22 242:3
250:17,22 262:15
262:19 263:5,11
264:3,12,17 265:8
286:1 290:17
309:9 348:17
397:8,11
**2018**   1:10 8:5
35:18 39:22 40:1
94:13 111:15
137:11 149:13
198:19 241:16,18
241:20 242:7,9
250:17 287:19
293:7 309:21
318:2 326:6 369:5
375:22 376:8
437:22 440:6
**202**   4:5,13 5:4,8,13
6:11,17,21 439:16
**2020**   21:16 85:21
86:10 88:15 93:4

95:20 130:5 202:9
204:2 244:20
333:10,17 334:3
337:2,10 354:16
367:14 385:2
**20230**   6:17,21
**2034**   224:14
**20530**   6:11 438:17
**20th**   27:20 34:12
35:5,8 143:22
323:15
**21**   2:19 94:12
111:15 121:16
218:4,6,10 341:9
439:7
**210-6053**   5:19
**212**   2:18 4:9 6:5
**215**   2:19
**218**   2:19
**219**   2:20
**21st**   98:10 99:3
101:19 113:10
341:17,19 346:5
346:12
**22**   2:20 56:21
219:18,19,22
**221**   2:20
**224**   2:21
**226**   2:21
**23**   2:20 221:18,19
221:22
**232**   50:14 201:19
**234**   2:22
**2395**   226:16
**2396**   229:20
**24**   2:21 203:9
224:15,16,19
229:13
**241**   2:3
**2424**   221:18

**2458**   189:10
**2462**   167:5
**24th**   201:5
**25**   2:21 224:1
226:17,18,21
351:9 368:17
423:12
**2521**   62:7 78:5
**2522**   80:9
**2561**   114:10
**26**   2:22 137:11
234:19,20 242:9
324:13 326:6
420:1 426:8
**2643**   384:2 385:18
**2644**   384:8 388:13
**2651**   234:19 235:1
**26th**   241:19
323:10 324:2,6
343:1,20 345:3,14
345:15 346:17,21
352:10 420:14
424:4 428:13
**27**   2:22 292:21,22
293:1 361:9
373:13
**28**   3:3 6:4 55:2
309:3,15 314:7
326:11 353:2,5
354:13
**2800**   4:20
**28th**   16:7 37:4,7
63:8 104:19 195:6
**29**   3:3 317:19,20
318:2 321:14
326:12
**293**   2:22
**293-2828**   5:4
**296-2300**   5:8
**29th**   139:18
142:10

**2:14**   250:12
**2nd**   58:15 151:11
151:13 159:11
166:6 183:21
184:3 191:19
239:22

**3**

**3**   2:10 82:14,17,20
92:20,22 158:13
165:17 212:1
224:1 328:15
358:8 365:15
366:1,19
**3/10**   93:13
**3/15**   93:14
**3/19**   387:17
**30**   1:10 3:4 8:5
22:21 27:6 34:10
35:17 36:10 104:9
266:21 307:3
325:22 326:1,5,14
329:18 332:6
353:2,11,22
355:11 357:12
367:6,20 425:21
428:15 440:6
**300**   327:9,11,16
**305-9802**   6:11
**3071**   164:20
**309**   3:3
**30th**   33:20 34:2,13
35:5,9 37:6
**31**   3:5 33:17
372:14,15 373:3
373:19 375:14,15
377:4 379:4,10
380:6,14
**317**   3:3
**31st**   16:2,3 33:14
33:15,20 88:17

**[32 - abowd]**                                                      Page 3

**32** 3:6 374:20 375:2
**326** 3:4
**33** 3:7 376:12,13 376:22
**336** 2:4
**34** 3:8 353:3,6 354:13 378:17,18 378:22
**35** 3:9 23:12 369:6 373:7,9 375:10 378:10,10 383:20 383:20,21
**350** 3:18
**360** 364:22
**366-8500** 4:17
**3685** 82:16
**3686** 87:12
**3694** 137:20
**3699** 158:22
**37** 293:20
**3702** 199:19 202:6
**3703** 200:12
**3705** 194:14,18
**3709** 123:14
**3710** 145:11
**372** 3:5
**374** 3:6
**376** 3:7
**378** 3:8
**381** 2:4
**383** 3:9
**3983** 218:5
**3984** 215:17
**3:11** 308:19
**3:37** 309:1
**3rd** 148:8 165:22 437:21 439:15

**4**

**4** 2:10 87:7,8,13,15 212:5 250:8,11 353:4,18 364:6 373:10
**400** 5:12
**4004** 212:10
**415** 4:21
**416-8441** 6:5
**419** 2:5
**43** 333:11
**45** 417:16
**47,000** 42:2
**48** 417:16
**482-4772** 6:21
**482-5395** 6:17
**4:02** 335:12
**4:04** 335:15
**4:48** 380:18
**4th** 165:22 166:1 169:6

**5**

**5** 2:11 93:16,18,19 93:22 111:16 117:18 244:16,18 244:19 294:4,6,10 308:19 355:16 428:19 431:8,10
**50** 4:20
**500** 4:16
**56** 2:9
**562** 4:17
**5890** 6:16
**5:05** 380:22
**5:43** 419:18
**5:46** 419:15
**5:56** 435:11
**5th** 115:13,15 117:13,16 122:4 183:21

**6**

**6** 2:11 114:6,7,11 114:13 309:1 380:18
**60** 234:8
**601** 1:15 4:4 8:21
**607-3300** 4:9
**62** 2:9
**662-5458** 4:13
**662-8345** 5:13
**6:02** 435:14 436:6
**6:04** 436:7
**6th** 225:19

**7**

**7** 2:12 117:10 120:14,15,20,21 204:21 205:3 208:21 225:6 329:18 380:22
**70** 292:16 294:16 332:4 355:8 365:5 365:6,7 414:7 417:16
**743-6909** 4:21
**763** 120:19
**79** 365:3
**7:00** 115:22
**7:30** 116:1
**7:50** 83:5
**7:51** 83:14
**7th** 227:15 233:2

**8**

**8** 2:12 123:10,11 123:16 127:6 130:2 213:3 215:12
**82** 2:10
**850** 4:12
**857-3376** 439:16

**87** 2:10
**88.6** 355:14
**8:18** 381:6
**8:30** 73:8,15 75:8
**8th** 182:21 183:10 183:19 189:18 213:11 216:5 292:5 339:3

**9**

**9** 2:2,3,13 137:16 137:17,21 373:11
**90** 355:4,15
**90802** 4:17
**916** 5:19
**93** 2:11
**94111** 4:21
**942-5316** 4:5
**94244** 5:19
**944255** 5:18
**95** 355:16 431:3
**9834** 182:12
**9:01** 8:4
**9:08** 1:18
**9:58** 128:14,18

**a**

**a.m.** 1:18 8:4 111:7,11 158:10 158:13 209:1
**aajc.org** 5:9,9
**ability** 15:5,6 261:15 430:5
**able** 15:10 20:4 72:1 84:7 152:15 181:6 284:15 329:21 330:6 355:16 418:16
**abowd** 309:18,22 310:12,18 312:20 314:3,5 315:2 316:6,9,14 318:3

322:18 324:4
325:10 432:19,20
433:8
**abreast** 402:21
**absence** 351:14
362:5
**absent** 391:18
411:21
**absolutely** 46:11
88:12 105:21
113:8 242:5
350:12 414:16
433:13
**accept** 303:10
**accepted** 351:22
**access** 128:5
138:16
**accompanying**
371:4 376:18
**accomplish** 266:3
267:1 282:7
**accomplished**
160:6
**account** 365:14
**accounting** 13:21
**accuracy** 433:16
**accurate** 80:3
103:15 312:8
313:4 315:5
348:16,20,21
350:15 351:10
367:15 368:11
369:1 374:4 377:9
419:5 423:8
424:10,22 425:11
427:22 429:7,9
430:5 431:4,12,18
**accurately** 313:17
367:8
**acknowledge**
438:2

**acknowledgement**
438:1
**acquainted** 320:15
320:21
**acs** 57:20 58:20
88:16 93:6 108:16
126:17 127:13
132:15 153:17,18
171:8 176:6
180:14 181:12
192:9 261:7,21
263:13,16 264:18
265:10 272:15
326:21 328:3,4,16
328:21 332:3
333:11 334:7,10
334:16 350:2,7,18
352:14,17 353:9
355:7 356:8 357:3
357:5,6,16 358:4
367:7,16 368:3,7
368:10,12 372:13
414:7 416:15,21
417:17 418:9
426:5
**act** 126:16 153:19
154:5 155:9
192:17,18,22
194:8 262:9,16,18
263:14 265:11
268:9 277:11
295:1 302:3 349:6
349:9 381:22
382:6 400:4 403:7
403:16 427:18
**acted** 433:2
**acting** 36:17 57:5
93:9 198:3,6
203:12,13 237:15
237:19

**action** 9:7 84:11
106:13 151:9
152:14 168:13
239:8 261:15
347:11,16 402:12
405:7 437:13,18
**actions** 10:3
**active** 13:5,6
310:22
**actively** 418:20
**actual** 355:12
**ad** 39:1
**adam** 283:7
**adams** 160:1
**adc** 4:2
**add** 64:11 87:1
130:21 133:20
151:3 154:13
172:3 176:13
241:14 242:11
245:7 251:9,12
253:7 254:10
257:11 258:2,11
258:16,21 259:8
260:7,16 261:1,22
262:1,1 264:6
272:4 286:11
289:21 291:8
300:6 302:1 332:7
381:14 393:3
403:21 412:6,13
415:4
**added** 39:5 84:13
103:19 106:3,19
107:3,9,10 130:19
131:8,12 153:4,8
154:3 175:21
251:22 253:11,14
253:15 254:1,3
255:3,8 274:20
278:15 279:9

287:16 295:10
298:19 299:6,8,10
350:17 354:16
362:7,15 372:11
379:6
**adding** 54:17 55:6
59:13 68:22 69:17
81:14 82:3 107:19
108:1 109:8,22
131:4 133:4,9
134:5 135:11,18
153:12 171:5
270:2 310:14,19
346:19 361:2
364:1 365:22
383:9 408:21
409:3 415:16
421:3,12 430:15
**addition** 18:20
131:2 251:3
271:22 279:2
291:2 297:11
309:8 330:19
332:20 359:1
360:1 361:17,20
383:13 396:9
400:10 404:2
405:12 412:21
**additional** 70:2,3
419:1
**additionally**
352:13 357:2
**additions** 130:5
**address** 9:19
69:10 261:17
**addresses** 310:12
**adds** 61:12
**admin** 424:21
**administer** 9:5
**administration**
19:3 42:18 44:5

47:2 64:14 84:14
84:15,22 86:12,15
96:2 111:20 112:1
112:7 113:11,13
113:16,20 130:20
143:10 245:1
281:19 315:6
319:11 343:3
**administration's**
37:20 42:7 131:21
**administrative**
311:1 312:4 343:8
346:15 347:8
350:19 353:7,13
354:2,3,4 355:13
367:22 368:2,9,14
368:16 369:2
391:19 418:18,19
421:1,10 423:10
424:8,13,21 425:3
429:22 430:20
**admitted** 13:1,8
13:10
**advance** 20:18
41:1 287:19
**advancing** 5:6
**advancingjustice**
5:9,9
**advertising** 419:3
**advice** 39:4,9
139:15 246:15,18
247:17 248:6,8,16
249:6,9,10 340:7
342:21 346:1,2
**advisable** 343:17
**advise** 16:20 37:18
105:3
**advised** 193:16,22
248:14
**advises** 139:10

**advising** 17:22
124:1 140:11
161:7 181:7 225:8
344:10
**advisor** 74:5,7,17
116:7 167:21
173:12 404:8
**advisors** 50:20
**advisory** 123:20
138:21 139:3,4,9
139:14,19 140:10
141:12 142:20
149:3,7
**advisory's** 140:17
**affairs** 25:17
386:2,11
**affect** 434:19
**affixed** 326:7
**afford** 411:19
**africa** 84:16
**african** 86:19
141:20 143:3
**afternoon** 38:17
121:19 200:15
241:2 336:6 381:3
**ag** 213:17 214:18
215:5 236:19
237:1,4,12 274:22
279:11 283:10
285:11
**ag.ny.gov** 6:6,6,7
6:7
**age** 155:8 272:17
349:18,20 351:9
368:18 423:13
**agencies** 43:20
51:11,18 105:18
276:15
**agency** 126:16
154:4 156:16
171:7 181:3,8,9,20

182:1 185:3
239:11 273:18
274:1,9,14 282:10
407:13
**ago** 9:22 68:20
100:11 125:6
146:22 150:21
206:10 225:10
289:14
**agree** 8:11 112:22
133:13 154:16,19
205:17 223:16
233:1,4 260:12
265:13 267:8
295:22 300:13
302:9 306:15
312:5,22 313:10
316:16,18,18
323:19 348:15,21
389:3,5
**agreed** 63:8 434:8
439:4
**agreement** 52:10
274:16,22
**agriculture** 52:11
**ah** 242:1 312:16
**ahead** 271:4
341:13
**al** 1:3,6 8:16,17
438:18,18 440:3,4
**alabama** 405:11
405:21 406:14
**alaska** 11:21,22
13:10 19:19 20:8
**alerting** 44:21
**alex** 6:3
**alexander** 115:3,5
115:18 138:8
159:10
**alexfinkelstein** 6:7

**aliens** 207:12,18
**aligned** 84:14
**alike** 430:2
**alliance** 336:12
**allocations** 264:10
264:10
**allow** 151:8
272:19
**allowed** 31:8
**alternative** 261:17
310:13,14,19
315:3 318:10,21
319:6,8,10,15,17
319:19 320:16,17
320:19 350:6
351:14 423:10
**alvord** 87:19,21,22
**amended** 380:2
**american** 4:2
364:11
**american's** 81:22
**americans** 5:6
78:19
**amount** 112:19
142:1 163:15
223:20 423:18
**analyses** 328:19
329:1,10,12
**analysis** 106:14
154:21 156:19
213:15,20 260:9
262:2 304:17
309:11 313:20
314:6,6,9,10,16
323:4 324:15,21
325:3 326:12,16
329:5 350:5,7
351:2 353:5
360:19 361:7
369:21 413:10
417:10 425:7

434:7,8
**analyzed** 423:1
**analyzing** 258:15
  422:13
**andrea** 5:1 381:4
**angeles** 4:14,19
**annual** 81:1 130:3
**answer** 10:10,22
  12:12 43:12 55:17
  62:16,18 65:7,10
  65:17 67:5 69:21
  70:1,4,10,11,15,19
  79:6 83:20 98:14
  100:7 106:6 110:6
  118:20 127:17
  128:16,19 135:1
  136:8 142:14
  168:14 176:18
  180:11 186:14
  188:7 193:4 194:4
  195:7 196:1,2
  204:6 206:22
  208:17 218:1
  224:4 226:14,15
  248:11 249:7
  252:5,19 254:15
  259:16 263:8
  273:22 274:20
  275:10 284:7
  289:10 290:6
  297:15 303:9,15
  303:17,18 305:21
  306:4 308:1,14
  311:14 327:20
  332:1,5,8,9,10,15
  345:21 355:3,8
  359:15 363:4,19
  364:2,3 367:1
  369:7 370:9 371:2
  373:22 374:6,17
  375:14,15 377:3,6

377:7,11,14
379:22 380:2,6,14
390:13 391:13
407:17 414:8,17
418:17 419:8
423:20 426:22
**answered** 28:22
  206:20 208:7
  252:4 254:13
  263:12,20 294:18
  297:14 331:12
  333:12 373:10,11
  373:12,12,13,14
  374:14 375:11,13
  400:6
**answering** 28:12
  68:9 108:19
  200:13 263:3
  330:14,15 362:17
  362:19 367:7
**answers** 10:19
  11:1 128:20 275:9
  351:17 370:17
  371:8,14 372:2,5
  377:1 378:9
**anteroom** 199:11
**anti** 4:2
**anticipated** 289:5
  290:6 359:3,8,12
**anybody** 42:15,20
  100:14 213:10
  217:12 286:8
  401:20 416:12
  419:12
**anymore** 75:1
**anyway** 436:1
**apart** 266:5
**apologize** 78:5
  200:13 269:10
**apparently** 72:7
  88:7 131:3 147:17

183:7 368:17
387:5 414:9
**appear** 56:14
  61:19 81:10 216:7
  223:12 230:15
  235:20 266:2
  292:16 294:6,16
  349:15 377:15
  379:3 438:6
**appearances** 9:9
**appeared** 63:20
  82:10 153:10
**appears** 65:7,9,9
  71:7,8 73:10
  79:17 83:6 89:11
  96:11 115:11
  148:6 149:10
  159:15 160:15
  166:16 191:12
  194:22 195:5
  205:9 219:14
  226:1 228:21
  229:15,20 295:5
  309:18 310:16
  360:19 373:6,14
  379:10 384:18
  390:7 411:22
  414:10 437:6
**applied** 222:8
  363:15
**apply** 368:13
  431:8
**appointee** 58:8
  74:13
**appointment**
  95:18 96:9 104:17
  104:19
**apportionment**
  65:6,21 66:15,20
  67:3 81:19 85:20
  207:14,20 208:4,5

208:11,15,18
393:20 395:2
396:2 399:18
401:9 404:13
405:5 406:7 408:8
408:12 409:8,15
434:20
**appreciate** 298:4
**approach** 351:7
**approaches**
  351:13
**appropriate** 107:6
  111:3 381:16
  382:4,5 411:15
  415:1
**appropriately**
  411:1
**appropriation**
  147:2,5 148:2,15
**approximately**
  63:14 271:12
  327:16 341:18
  353:2 355:6,7
  402:18
**april** 35:16,18
  115:15 117:10,13
  117:16,18 122:4
  127:8 129:17,19
  133:15 138:11
  139:18 141:2
  142:10 143:22
**arab** 4:2
**arcane** 18:5
**area** 20:6 44:21
  126:2 255:13
  378:7
**areas** 18:3,6 46:14
**arms** 84:4 86:4
  222:15
**army** 43:15,15

**arnold** 1:15 4:4
  8:21
**arnoldporter.com**
  4:6
**arose** 370:2
**arrange** 156:21
  157:7
**arranging** 93:10
**arrival** 41:9
**arrivals** 402:12
  405:8
**arrive** 347:13
**arriving** 219:2,7
**arthur** 396:9
**article** 79:20
  409:14
**articulate** 350:21
**asenteno** 5:4
**asian** 5:6
**aside** 131:6 307:13
**asked** 10:12 17:4
  22:5 51:15 63:20
  65:2 66:1,9,14,20
  67:2,11,15 68:13
  68:18 73:22 76:13
  79:19 82:8,10
  103:8,8 110:10,13
  110:13,14,15,16
  110:20 112:10
  115:21 119:3
  129:7,10 132:15
  137:2 146:5 157:9
  165:11 166:6,12
  168:6 171:4,22
  175:21 187:12
  191:13 203:1
  204:5 206:19
  207:22 208:6,16
  223:13 226:3,9
  232:20 249:8
  251:7,9 252:3,6

254:12 261:5,6,9
  261:21 263:19
  267:15 269:2
  272:3,11,13,22
  279:12 288:7
  291:10 292:11,15
  294:10 296:14,17
  296:21 297:4,6,11
  297:13,17 298:18
  315:8,12 316:2
  322:6 331:11
  333:11,12,21
  334:4 337:7,12
  338:1 356:19
  362:8 372:4 391:7
  404:9 413:21
  416:10 426:17
  434:22 435:2
**asking** 10:21
  62:20 71:11,13
  85:12 93:1 105:19
  107:22 109:11
  115:20 127:15
  128:22 135:22
  136:1 151:10
  168:8 176:15
  183:13 184:7
  188:4 191:10
  231:15 232:4,18
  233:2 250:16
  251:16 253:1
  266:5 272:4 280:7
  297:21 303:17
  305:9 306:3,4
  307:14 311:22
  313:8 315:21
  319:1,8 322:6,7
  332:14,16 333:7
  334:8,9 364:3
  389:5 398:14
  402:1 414:4

**424:10 425:1**
**asks** 57:8 67:16
  78:19 81:22 213:4
  266:8 294:1 300:3
**asleep** 291:16
**aspect** 123:22
  261:9
**aspects** 82:11
**assembler** 369:16
**asserting** 417:4
**assertions** 321:18
  360:18
**assessment** 302:9
**assigned** 38:1
  46:17
**assignments** 40:13
**assist** 30:19 41:11
  66:21 67:1 76:16
  76:22 95:1 236:20
  252:15 260:5,18
  260:20
**assistant** 6:3,15
  61:12,15,16 73:4
  115:7 283:15
  285:11
**assisted** 28:2
  29:12 95:3
**assisting** 26:11
  253:5
**associate** 203:20
  204:1
**associated** 352:14
  354:17 356:12
  357:5
**assume** 58:2 73:5
  79:13 83:12 167:9
**assumed** 367:17
**assuming** 79:9
  105:1 283:10
  285:12 311:16

**assumption** 351:2
**assumptions** 352:5
**atlantic** 3:18
**atmospheric** 44:4
**attached** 3:11
  438:7
**attempt** 177:14
**attend** 40:9 47:21
  54:11 60:11 201:8
**attended** 23:19
  33:3 126:13
  161:19,22
**attendee** 92:14
**attention** 59:8
  294:3 308:8
  310:10 352:9,11
  358:7 369:4
  373:19 377:3
  384:22
**attorney** 5:17 6:3
  10:2 15:4,6 62:17
  155:18 167:22
  168:1 183:15
  186:16,18 189:21
  189:22 190:3,6
  191:2 195:22
  233:9,18,21 234:2
  235:13,16 236:14
  236:16 237:6
  298:10,15 388:13
  388:16 400:8,9,19
  400:22 401:2,17
  401:20 402:1,3,4
  402:16,20 403:6
  403:15 405:11,18
  420:6 437:16
**attorneys** 214:7,11
  344:6,7
**audio** 8:10,10
**august** 1:10 8:5
  39:22 213:3,11

216:5 440:6
**authority**   150:13
   258:21 261:21
   348:13
**authorized**   9:5
**availability**   403:8
**available**   39:8
   91:22 92:2 102:5
   116:1 137:9
   177:16 265:10
   295:1 296:20
   311:1 312:3 315:6
   399:4
**avenue**   1:15 4:4,16
   5:12 6:10,16,20
   8:21 438:16
**aviation**   18:10
**avoid**   428:22
**aware**   42:22 53:10
   58:4 105:16
   119:11 122:17
   139:8 162:15,16
   169:17 217:2,12
   237:20 286:8
   307:4 334:22
   376:4 385:10
   386:12,17,21
   387:2,11,18
   389:16 390:14,17
   390:19 392:5
   394:7,12,14,18,20
   395:1,3,5,7,12
   396:12 397:16
   401:15,22 402:3,7
   402:11 404:18,22
   406:10 407:4
   408:16 409:2
   416:3,7 435:1
**awkward**   30:14
   31:14

**b**

**b**   127:13 310:13
   310:14,19 315:3
   319:8,19 320:16
   320:19 351:13
**bachelor's**   12:10
**back**   12:7 25:2
   30:21 44:12 46:11
   47:22 50:15 56:10
   64:22 71:3,12
   92:22 102:4 132:2
   148:11 153:4,8
   162:10 185:11
   187:14 191:18
   204:17,21 208:20
   212:8,9 214:3,4,15
   215:15 216:12
   236:6 240:21
   250:15,17,21
   252:8 263:5 266:1
   270:12 271:4
   275:12 278:7
   279:13,18 281:5
   285:22 287:4
   309:6 315:7,8,10
   315:13,14,15,16
   315:18,22 316:3,4
   316:7,15 319:14
   321:12,22 322:5
   323:18 326:11
   335:14 336:21
   350:8,21 363:10
   371:3 372:1,9,11
   373:5 376:19
   406:16 411:11,12
   411:13 414:6
   419:17 435:13
**backed**   313:1
**background**   11:17
   18:17 42:9 46:22
   126:2 127:4 271:2

277:8 283:4 434:9
   434:14
**bad**   361:14
**bailey**   6:9
**balance**   363:14
**ballpark**   49:13
   238:8 292:8
   328:14
**bannon**   115:21
   116:4,6,11,19
   117:2 119:16
   121:22 122:18
   123:1,5,7
**bar**   265:22
**barbara**   11:20
**base**   227:16 302:5
**based**   20:21 65:7
   67:18 81:1 86:14
   110:4 133:13
   141:16 153:9
   154:2,4,21 156:18
   177:19 181:6
   191:12 225:22
   229:6 235:19
   246:15,18 247:17
   248:16 285:10
   298:8 328:20
   329:10 331:1,17
   351:8 352:17
   355:6,11 357:6
   360:10 381:13
   382:9,13 386:5
   392:16 414:20
   415:5 431:13,21
   435:16
**basic**   14:13 32:3
   180:6 193:1
**basically**   16:17
   18:9 21:7 22:3
   74:9 84:21 123:22
   124:14 155:16

224:1 239:9,12
   333:18 355:9
   358:20 361:7
   369:20 411:21
   417:11 431:1
**basis**   38:12 47:16
   47:20 239:10
   249:8 264:10
   266:11 267:14
   274:17 300:10
   302:4 303:16
   333:10,17,21
   334:1 368:19
   371:21 414:1
**bates**   56:5 62:7
   82:15 93:17
   164:20 194:14
   318:3 384:2
   428:20
**beach**   4:17 31:9
**began**   15:20 95:19
   96:9 104:16
   347:10
**beginning**   1:18
   34:6 201:19
   203:16
**begins**   111:10
   158:12 212:4
   250:11 308:22
   358:9 380:21
**begun**   346:18
**behalf**   1:19 4:1,10
   4:14,19 5:1,15 6:1
   6:8
**behold**   350:8
**belief**   106:8,12,19
   330:12 350:22
   425:14
**beliefs**   262:5
**believe**   13:6 16:2
   27:16 45:9 55:20

57:21 95:7 101:6
101:15 102:7
118:1 130:3 140:9
147:4 203:11
204:4 208:12
209:4 217:4
222:20 238:4
242:22 266:19,20
268:12 269:6,8
286:10 288:9
305:4 315:2 318:8
324:3 340:10,18
353:3 357:8
361:20 364:22
370:6,19 371:22
372:6,6 374:16
375:3 383:19
386:7 396:15,18
397:1 399:6 403:4
403:14 417:7
421:4 426:3 432:8
432:20,22 433:2,5
434:2 435:6
**believed** 424:7
425:21
**believes** 424:20
**believing** 433:15
**benefits** 363:22
**best** 37:19 70:18
141:16 164:22
175:4 184:20
185:1 239:19
267:5 282:19
323:6,11 324:10
324:11 337:19
361:7 381:16
382:4 391:9,13
423:19 428:6
429:12,20 430:4
**better** 162:22
163:22 267:21

**beyond** 233:20,20
234:1 419:6
**big** 41:3
**bigger** 361:15
**biggest** 204:12
**billion** 224:1
361:10
**biology** 14:3
**bit** 17:19 31:13
47:13 53:1 75:20
253:2 336:21
356:18 381:8
**black** 147:15
163:15 336:12
379:19
**blacked** 163:13
215:10
**blanche** 167:8,11
167:13 184:11
185:22 188:1
269:13,17,22
338:5 381:9 410:9
**blanked** 205:12,16
222:6 228:22
229:7 231:19
**blanking** 410:13
**blanks** 423:12
**block** 296:19
352:13 357:4
379:19,21 380:1
403:19 416:5
422:14,14 423:2
426:17,18 427:18
**blocked** 222:13
339:16,20,22
340:5,12 379:17
**blog** 67:6,10,19
78:21 79:16 81:8
81:20 146:14
**blummerman**
203:5,7,9,10,20

204:6
**board** 18:16 27:4
27:9 32:4 36:14
37:1 360:9
**body** 153:11
**booked** 90:15
**born** 80:22
**boss** 252:6 266:8
273:16 274:12
278:14 279:11,14
280:3 282:8
284:13 411:21
**bottom** 121:11
127:7 386:10
**boutin** 2:5 5:16
190:18 336:18
419:19 420:5
422:7,18 423:16
424:16 425:12,18
426:6,21 427:14
428:18 434:1,13
435:6,8,15
**box** 5:18
**bpark** 4:18
**brady** 53:2
**branstad** 74:4,15
75:7,17 77:18
97:12 157:9
164:21 166:12
167:15 173:10
197:22 256:3,21
283:5 410:10
**break** 105:4 111:1
111:3,5 158:8
165:10 211:6,15
240:12,15,15
244:9 250:3,16
308:17 417:18
418:3
**breaking** 84:16

**brian** 4:15
**brief** 22:7,8 47:20
92:14 125:22
**briefed** 18:14
19:16 86:9 90:3,4
124:15 125:17
217:19
**briefing** 40:14,17
57:9,12 59:1,19,20
60:2 61:1,2,5 64:3
72:3,6,7,9,15,18
75:18 85:13,21
86:7 88:15 89:5
89:12 90:7 92:5,6
93:3,9,13,13
126:13,19 216:9
216:11
**briefings** 21:22
48:1 91:8 126:5,9
431:21
**briefly** 121:21
**bring** 92:9 161:2
172:11 416:4
**bringing** 32:4
359:6 405:22
**broad** 4:8 288:18
**broader** 338:21
**brooke** 115:3,5
138:8,16 139:16
159:10,16
**brooke's** 138:15
**brooks** 406:14
407:3
**brought** 27:11
76:2 170:3
**budget** 20:20 44:6
52:3,7 86:5
124:19 162:19
164:7 203:14,18
224:2,9 229:10
361:10

**build**   351:16
**building**   89:19
   90:22 91:21
**bulk**   345:11
**bullpen**   197:21
   198:9 199:3,5,14
   255:15
**bullpens**   197:14
**bunch**   262:11
**bureau**   6:4 19:16
   42:16,19,21 44:1
   45:6 46:18 47:10
   47:18 51:7 57:9
   57:12 59:21 72:3
   73:13 75:17 77:18
   81:2 88:15,16
   89:5,18 90:4,19
   91:7 92:7 105:17
   124:12 125:21
   129:15,18 132:13
   132:22 136:18
   139:10,15 153:15
   153:20 154:12,19
   163:19 169:21
   176:12 219:6
   224:6 237:16
   309:10,14,22
   311:3,22 312:14
   312:18 313:9,14
   313:15,20 314:21
   317:16 321:12,17
   321:21 323:17
   324:2,12,17,22
   325:12,13 326:12
   326:15 328:19
   329:5 334:19
   348:19 350:14
   352:1 353:5,12,13
   354:1,2 357:22
   358:9,13 361:6
   363:21 367:11

369:7,22 370:7,8
   370:18,20 371:2,6
   372:4 377:13,19
   378:1 388:10
   391:4,15 392:1
   394:8,15 395:13
   396:13 397:14,19
   398:13 399:5
   403:5 405:17
   407:5,10 408:17
   412:6,13,15,18,21
   415:1 417:11
   418:2 420:22
   421:6,10 422:13
   424:7,20 425:15
   425:20 429:20
   430:1,4,18,21
   431:22 432:4,11
   433:13,15 434:4
   434:18 435:3
**bureau's**   66:13
   106:1 208:10
   323:3 324:21
   325:2 332:15
   350:5 357:18
   422:22 425:7
   426:11 427:5
   428:6
**bureaus**   41:15
   43:20 44:8,22
   45:3,4,16,18 46:10
   46:12 49:6
**burlington**   4:11
**busy**   276:8,13,17
   382:21

**c**

**c**   4:1 5:6 8:1 25:10
   25:11,11,11
   319:10,17 320:17
   350:6 351:13
   353:18 368:20

380:2 423:9
**c003134**   356:21
**c15**   339:7
**c30**   346:16 348:16
   352:9
**c33**   379:22
**c34**   380:2
**c5**   341:5 345:17
   346:4
**cabinet**   51:11,18
**calendar**   60:7,8,10
   60:16,18 61:8,13
   61:20,21 64:5
   72:18,21 73:1,3
   89:15 90:12,17
   91:13,16,19
   117:18 233:16
   288:2
**california**   4:17,20
   4:21 5:15,19
   11:20 336:14
   420:7,8,9,10
**call**   31:9 53:4
   102:19 117:12,15
   118:7,16,21 122:4
   122:9 143:11
   156:6 165:20
   168:7 169:14,16
   178:3,6,6,21
   181:17 183:15
   189:20,22 190:2
   191:4,5,6 208:22
   209:10 210:3,18
   213:4,8,11,17
   214:18 215:5
   231:14 236:11
   237:10 270:8
   273:9 274:21
   281:13 284:3,9,10
   285:5 291:14
   298:14,16 328:18

433:10 434:12
   439:12
**called**   1:13 9:15
   53:5 67:19 72:2
   74:2 84:17 175:15
   241:13 269:21
   270:12 342:11
   402:12
**calling**   279:17
   282:10
**calls**   69:18 83:17
   98:11 116:13
   117:5 118:17
   122:7 130:12
   133:1,21 140:6
   142:11 143:7,16
   144:20 146:18
   148:21 159:20
   161:5,15 163:4
   184:17 186:7,12
   195:21 200:22
   202:19 226:5
   268:14 273:18
   274:1 275:3
   278:12,21 279:10
   285:3 286:7,16
   301:2,17 303:3,4
   304:5,6 305:1,18
   306:12,22 307:20
   308:11,12 340:13
   345:19 366:20
   380:7 390:12
   392:8,17 422:5
   428:8
**campaign**   3:9
   17:15,16 76:2
   383:21 384:3,13
   384:13,18 385:1
   385:11,20 386:15
   387:12,15,19
   388:4,20 389:1,4

391:1,5 392:2
**candidates** 100:9
**cannon** 6:13
**capable** 434:6
**capacity** 124:6
203:12
**capital** 1:17 385:7
439:14
**care** 16:22 304:13
**career** 36:18 37:18
37:19 41:10,10
**carefully** 302:12
360:5
**cares** 18:3
**carry** 239:18
266:8 349:18
**casa** 4:2
**case** 1:5 8:18
16:18 23:16 84:12
149:12 155:6,10
155:15,20 156:5
156:10 160:2
192:18,22 193:3
193:14,20 194:7
194:11 201:18
229:22 230:15
235:20 239:22
240:5 261:19
291:15 298:17
307:12 308:5
311:8 312:6
336:12 338:16
352:8 371:12
372:6 406:18
426:4 440:2
**cases** 155:1,3,4,5
155:16,18 156:4
157:14 172:8,9
192:22 240:1
349:9 370:2 383:8
416:3 417:21

430:7
**catch** 72:1
**catching** 74:1
**caught** 59:7
279:19 434:5
**cause** 330:20
332:20 360:1
361:8,15,21
366:15 418:11
**caused** 103:17
416:21
**cc** 439:17
**ccr** 1:17 437:3,20
439:14
**cea** 50:17,19
**ceased** 185:18
187:12 188:2
411:3,7
**cedcap** 162:18
**cell** 8:8
**cellular** 8:7
**census** 3:5,7 10:5
18:17 19:16,18,20
20:2,2,5,9,17 21:5
21:16 42:16,19,21
46:18 47:10,13,18
51:4,7 54:18 55:7
55:14 57:9,12,19
59:1,14,21 60:14
60:18 63:5,16,19
63:21 64:3,15
66:2,5,6,13 67:11
67:16 69:1 71:4
72:3,8,10 73:13
75:9,17 77:18,21
78:19 79:2,19
80:4 81:11,15
82:4 83:9 84:13
85:6,21 86:4,5,10
88:15,16,16 89:5
89:18 90:4,19

91:7 92:7 93:4
95:20 97:3 103:15
103:21 105:10,17
106:1 107:7
109:21 110:15
115:22 117:13
118:22 119:4,8,11
119:17,20 122:19
123:20 124:1,12
124:15 125:21
126:1,4 127:11,13
128:6 129:15,18
130:5,21 136:18
139:5,10,15,17
140:16 142:2,18
146:22 149:5,8
153:4,13,15,20
154:12,19 156:17
160:19 161:7
162:1,20 163:1,19
164:5,9 165:2
169:21 175:22
176:9,12 180:8,9
204:3 207:7 208:1
208:10,13,18
213:5,11 214:5
220:16,18 221:11
221:15 222:14,16
223:7,19 224:6,8
224:10 229:8
230:12 237:16
241:15 244:21
251:1 252:1
258:16,22 261:20
263:18 264:7,10
265:17 270:3
271:20 272:1,17
272:17 275:8
292:17 294:16
309:10,14,22
310:15,21 311:3

311:22 312:2,14
312:18 313:9,14
313:15,20 314:21
315:4 319:10
320:15 321:12,17
321:21 323:3,17
324:2,12,17,21,22
325:2,12,13
326:12,15 328:19
328:20 329:5
330:1,15 331:22
332:1,15,22 333:4
333:10,17 334:3,9
334:19 337:2,11
337:15 338:10
346:20 347:22
348:4,5,12,19
349:19 350:2,5,14
350:16,18 352:1
353:5,12 354:1,16
355:2,14 357:2,18
357:22 358:9,11
358:13 359:8,15
361:6,18 362:17
362:19 363:17,21
365:11 366:1,12
367:10,14 368:15
369:7,22 370:7,8
370:18,20 371:2,6
371:22 372:4,9,16
376:14 377:13,15
377:19 379:6
383:10,14 385:3
388:10 391:4,15
392:1,7 393:4,9
394:8,11,13,15
395:10,13,15
396:10,13 397:14
397:19 398:13
399:5 400:11
402:2,6 403:5,19

403:21 404:3
405:3,13,13,17
406:22 407:5,10
408:4,17 412:6,13
412:15,18,21
414:17 415:1
416:17 417:11
418:2,11,16,17
419:8 420:22
421:3,6,10,12
422:13,22 424:7
424:11,20 425:2,6
425:6,15,20
426:11,18 427:5
428:6 429:19,20
429:21 430:1,4,16
430:18,21 431:22
432:4,11 433:13
433:15 434:4,18
434:19 435:3
**censuses** 326:19
333:5 359:10
**ceo** 12:5
**certain** 20:21 84:9
106:12 128:17
132:16,18 135:6
141:4 154:8,11
272:17 330:22
335:19 351:4
367:1 371:14
375:4 391:2 398:4
398:10 417:12,12
417:15 430:13
**certainly** 58:6
140:18 144:8
160:11 229:22
251:6,8 268:6
277:9 281:16
285:21 318:14
329:12 348:7
354:18 375:5

380:15 390:13
**certificate** 437:2
**certify** 437:5
**cetera** 44:12 302:3
413:19
**cf** 1:5
**chain** 159:9
160:15 230:8
231:1,21 380:10
384:12 385:13,14
386:6
**chair** 123:20
**chairman** 25:18
53:2
**challenge** 280:3,5
**challenges** 124:16
124:17
**challenging** 10:3
261:3,12
**chance** 147:13
282:20
**change** 18:11 84:8
106:10 181:18
346:7,8 366:12
372:5 377:6
380:11 440:7,7
**changed** 177:19
374:1,6
**changes** 86:14
359:11 438:6
**changing** 106:1
134:2
**characterization**
223:17 265:13
295:22 312:13
**characterize**
112:19 119:6
266:18
**characterized**
68:19 313:17

**characterizing**
107:4
**charge** 36:19
203:14
**chasing** 150:15
**check** 13:7 55:17
162:6 373:5
**checked** 64:5,8
**chemistry** 14:3
**chief** 33:8,10
35:13,14 36:7,9,12
37:10 39:11,13,15
39:17,20,21 102:9
102:18 125:20
160:7 198:8,11
199:17 309:22
377:18 395:9,14
**childhood** 402:12
405:7
**choice** 181:2 413:2
**chooses** 305:16
**chose** 436:1
**christa** 377:17
**christine** 25:8,10
25:12
**ciccone** 25:8,11,12
**circles** 80:2
**circulate** 48:7,9
**circulated** 48:15
**circulating** 48:12
**citizen** 108:18
155:8 272:17
349:17 353:10
361:2 368:18
414:18 416:21
418:4,9 425:22
426:13 430:5
**citizens** 262:10
351:10 355:4
367:7 385:4
388:15 414:1

423:13 430:2,17
431:7,10,15
**citizenship** 10:4
21:12,14,16 24:3,5
24:9,15,17,21
31:17 47:14 51:4
53:8,12,18 54:9,12
54:17 55:6,13
59:13 67:12,16
68:22 69:12,17
75:9 77:21 78:20
79:18 81:14 82:1
82:4 87:2 96:1,14
97:7 103:2,5,7,11
103:18 105:7
106:3,9 107:3,6,13
107:19,19 108:1
109:8 110:1 126:6
126:8,8,12,14
129:20 133:5,9
134:6,12 135:5,12
135:18 136:11
140:4,12 143:15
144:1,15 146:7,11
149:17 150:3
151:5,19,21 153:3
153:8,13,17
154:13 156:17
157:5,18 161:2,20
162:7 163:3,7,9
164:10 166:21
168:4 170:11,22
171:5,17,21 172:1
172:3 175:21
180:8,15 187:7
188:5,11 190:4,7
190:11,13 193:5
195:4,9,16 202:8
202:13,17,22
204:6 207:8 208:2
209:12,21 216:10

216:20 218:14
219:13 220:13
221:9 223:4,8,9
224:11 225:12,16
225:20 230:11,14
230:18 231:17
232:2,6,8,19 233:3
237:18 239:12
240:3 241:15
242:11 244:22
251:1,4,9,13,22
252:16,21 253:7
253:14 254:10
255:3,8 257:12,12
258:2,12,16 259:9
260:7,17 261:1
262:21 264:18
265:10,16 268:1,8
270:2,16 272:1,5,9
272:16 273:2
277:21 278:15
279:2,9 280:2,13
285:22 286:12
287:16 288:8,17
289:6,22 291:2,8
291:19 292:13
296:18 297:12
298:5 300:6 309:9
310:14,19,22
311:22 312:3
315:5 319:8,12,16
320:17 323:4
324:16,21 325:3
326:17 330:1,14
330:19 332:5,8,20
337:2,20 338:10
338:15,22 339:14
341:1,3 346:19
347:22 348:4,19
350:17 351:9,18
353:6,10 354:15

359:1,16 360:1,15
361:1,21 367:8,13
368:18 381:15,21
382:1,6,7 383:7,7
383:9,14 389:5,6
392:6 393:3,18
394:22 395:22
396:10 399:16
400:10,20,22
401:7 402:1,6
404:3,12 405:12
406:6 407:1,14
408:21 409:3
410:5 412:6
413:18 414:4
415:5,16 416:5
417:5,13,20
418:21 419:22
421:3,12 422:15
423:2 424:10,11
425:1 427:6
430:16 434:19
**city** 336:11
**civil** 4:7 5:11
**claim** 155:9
**clarification** 70:22
**clarified** 13:13
  26:14 186:10
  191:15 201:15
  243:13 353:16
**clarity** 20:16
**clause** 303:3
**clear** 10:20 48:7,9
  48:20,21 49:4,9,15
  50:8 84:13 150:13
  154:10 202:22
  229:11 242:3
  261:21 275:17
  293:8 313:12
  342:15 433:11

**cleared** 48:15
  154:7
**clearing** 48:12
  283:1,2
**clearly** 137:1,8
  149:12 159:5
  218:2 261:7 300:9
  307:10 371:15
**client** 186:18
  193:16,22 195:22
  340:15,16
**clients** 266:22
**climate** 18:11
  359:4
**closer** 355:15
**coalition** 1:3 4:2
  8:16 241:4 438:18
  440:2
**coincidence** 85:17
**colangelo** 2:3 6:2
  9:18 10:1 13:14
  26:17 55:22 56:4
  56:6 62:5,22
  69:20 71:2 82:19
  83:19 87:10,13,14
  93:21 98:13 106:5
  108:6 111:4,13
  114:9,12 116:16
  117:8 118:14,19
  120:4,11,13,18
  122:10 123:4,9,13
  131:10 133:7
  134:4,17,22
  137:16,19 140:13
  142:13 143:13,21
  145:1,5,9 146:21
  147:8,12 149:6
  158:7,15,18,21
  160:13 161:8,18
  163:10 164:13,16
  166:2,18 167:1,4

182:3,6,11 186:20
187:4 189:5,9
190:22 191:17,21
192:1,3 194:6,13
194:17 195:17
196:8 199:19
200:1 201:3,22
203:3 204:20
206:7,16,21 210:9
211:5,8,13,20
212:7,10,13,16
215:17,22 218:4,9
219:17,21 221:17
221:21 224:14,18
226:2,12,16,20
228:11 234:18,22
235:21 240:7,10
240:16 243:15
253:20
**cold** 186:11
**colleague** 25:5,13
**colleagues** 99:19
  99:22 101:18
**collect** 263:13,15
  265:18
**collected** 80:4
**collecting** 263:9
**collects** 262:13
**college** 13:15
**colloquial** 16:16
**columbia** 89:22
**combine** 319:7
**combining** 351:13
  424:12 425:2
**come** 25:3 29:9
  37:1 39:7 47:19
  47:22 50:9 76:5
  77:9 90:6 91:3,6
  91:11 109:3 129:4
  154:18 156:15
  157:22 170:7

183:21 192:4,14
213:15 214:16
233:9 262:16
265:20 266:4,14
268:4,7,10 270:18
273:6 289:5 291:6
318:14 351:13
371:7 411:20
**comes** 41:14 43:16
44:1 92:7 275:12
**comfortable**
389:12
**coming** 44:22
74:10 91:1,20
92:14 105:9
162:19 219:5
**command** 43:15
**commenced** 230:8
**comment** 387:7
389:14,21
**commerce** 1:6
6:14 8:17 9:21
15:21 16:1,11,13
16:20 17:6 18:2,6
22:2 26:3,6,8
30:11,12 31:1,22
32:19 33:18 34:14
34:17 35:4 42:2
43:21 48:15 53:11
63:13 73:5 74:22
75:4,22 95:19
99:8 100:15 104:6
104:8 124:9 125:9
150:12 169:19
170:9,20 172:3,17
173:20 176:2,11
177:5 188:20
219:1 227:22
245:21 246:5
247:5 248:4,22
251:3,9 258:11

259:13 260:19,21
273:10,14 274:2
274:14 278:13
279:1 280:1 291:7
291:9 295:20
296:6,8,11,12
299:9 300:5
319:20 320:20
329:21 330:5
338:19 340:22
341:2 342:8 344:6
347:21 387:7,20
391:4,15 392:1,15
392:21 394:8,15
395:13 396:13
399:12 401:16
403:2 404:19
405:17 406:11
407:5,10,12
408:17 410:10
413:6,11 414:22
415:3 416:10
420:21 421:9,21
422:3,11,21 424:6
424:19 425:13,19
426:10,19 427:4
435:2 438:18
440:3
**commerce's**
259:10 381:14
382:15 423:6
425:8
**commitment**
185:9
**commits** 412:14
**committed** 302:1
403:6,15
**committee** 3:1 4:2
5:11 12:1 16:11
16:20 17:1,3,7,22
18:3,10 22:20,22

23:1,7,9,14 25:17
26:3,6 28:13,19
53:3 123:20 130:4
138:21 139:3,4,9
139:14,19 140:10
141:12 149:3,7
291:22 293:2,6,9
293:14
**committees** 18:6
287:22 290:15
**common** 108:2
110:4 201:7,10
281:13 385:6,6
**communicate**
51:14 215:2
426:10 427:4,12
**communicated**
71:6 236:22
403:18
**communications**
196:3
**company** 1:17
439:14
**compare** 333:4
379:22 429:21
**comparing** 355:12
380:3
**comparison** 327:4
**comparisons**
333:8
**compel** 349:4
**compensate** 419:4
**complete** 28:12
103:15 253:6
351:10 354:3
368:22 417:16
418:17 419:5
423:7 424:9,9,22
425:11 429:6,9
438:5

**completed** 435:15
**completely** 10:10
306:9,20 419:8
**completeness**
350:16
**composed** 363:4
**computer** 342:5
387:5
**comstock** 1:12 2:2
2:7 8:14 9:14,20
33:6 56:1,10,12
62:1,6,8 63:2 73:7
80:9 82:14,15,20
87:6,16 93:16,18
93:22 109:7
111:14 120:21
121:12 151:10
159:1 182:13
189:12 194:18
200:2 212:17
216:1 222:1
224:19 226:21
241:2 250:15
293:8 302:11
309:6 316:11,13
318:1 326:4
332:12 335:16
336:6 375:15
381:3 423:17
436:8 438:2,14
439:3 440:5
**concept** 307:18
308:4
**conceptually**
307:14
**concern** 68:7 87:4
131:3 160:5 161:1
215:3
**concerned** 67:22
68:3 86:22 105:14
105:22 108:19

157:22 207:18
214:21,22 351:11
358:13 414:11
**concerning** 41:17
**concerns** 124:18
359:4
**conclude** 67:14
71:14 141:11
**concluded** 311:3
336:2 436:8
**concludes** 111:6
211:22 308:18
335:22 380:17
436:4
**conclusion** 69:6,7
131:21 154:20
185:6 213:16
214:17 230:17
265:20 301:3,20
303:4 304:7 305:2
308:13 312:12,14
320:21 321:12,22
323:19 331:19
340:14,19 347:14
411:8 433:22
**conclusions** 317:1
317:9 321:16
331:17
**conclusive** 317:16
**conclusively**
359:22
**concurred** 30:5
**conducted** 20:21
153:14 356:17
**conducting** 21:5
335:3 366:11
**conference** 80:7
90:7,10,11 165:20
291:14 434:12
**confidence** 224:6
356:15 418:22

**confident** 407:2
**confidential** 115:6
196:3
**confirm** 37:5 55:3
232:8
**confirmation**
16:11,13 20:19
23:22 27:15 28:16
29:2 31:16,19
32:8,11,22 33:4
37:3 54:20 55:8
69:2 76:17,22
124:7
**confirmed** 28:12
29:1 32:8 55:1
63:7 81:16 219:8
234:16 337:10
**confirms** 67:10
**conflating** 106:16
**conflicted** 92:16
**congress** 53:15,18
59:8 84:1,9
127:12 129:9
146:4 148:19
149:11 288:4
393:20 395:2
406:14
**congressional**
52:16,19 53:8,12
57:19 58:20 61:6
66:14,20 86:9
87:2 130:4 142:17
207:14,20 208:4,5
287:18 396:2
399:18 401:9
404:12 406:7
408:12 409:8
434:20
**congresswoman**
294:19

**conjunction** 342:9
368:10
**connected** 223:19
224:8 236:7 283:9
356:15
**connection** 143:20
372:3
**consequently**
181:7
**consider** 105:18
151:7 265:16
289:17,18 332:17
345:14 361:16
365:11,13,16,20
412:3 413:4 414:9
**consideration**
347:7
**considerations**
95:22 244:21
**considered** 16:19
80:2 109:10 158:5
360:4 366:14
371:17 413:19
425:10
**considering** 95:19
96:10 104:13,17
134:2,5 290:5,8
346:19 347:11
**consigned** 301:5
**consistent** 42:6
**constitution** 6:16
6:20
**consult** 311:12
**consulting** 12:6
**consumed** 411:18
**contact** 48:11
164:22 165:11
166:13 174:9
175:14 179:22
187:6 213:16
214:17 215:4,7,13

269:2 275:15
409:22 412:17
415:2
**contacted** 25:5
48:6 157:12 174:6
197:1,10
**contacting** 167:8
167:13 439:5
**contacts** 214:1
232:13,20 270:11
**contain** 376:5
**contained** 217:17
264:18
**contains** 379:4
384:3
**content** 2:1 95:21
130:5 149:8
**contents** 217:15
**contesting** 317:5
**context** 142:7
143:19 149:2,9
191:11 196:21
208:3,14 294:5
306:14 313:13
314:13 317:14
357:9,22 358:2,20
362:6 363:3
365:21,22 366:11
367:2,2 398:12
429:2
**continue** 8:11
150:2 160:16
264:15 266:18
367:18
**continued** 217:22
**continues** 385:5
**continuing** 190:16
190:21 350:18
**contract** 410:11
**contracts** 129:18

**contributed** 244:3
244:6 433:6
**contributing**
359:7
**control** 334:12
**controlled** 334:13
334:18 335:3
**conversation**
51:16 55:7,10
85:4,8,10 101:8,11
101:14 116:22
119:16,20 120:6
120:10 133:15
142:6 178:9,11
179:1,3,5 185:18
187:12 195:15,19
203:15 210:15
221:4,6 233:19
237:6 255:5
280:16 298:9
338:21 382:13
383:12 394:4,9,13
394:16 395:8,14
396:8 397:17
400:3,8 401:17
404:1 405:10,18
406:5,13,19,20
407:7 408:19
409:13
**conversations** 8:7
24:6,10 34:16
35:2,7 123:1
136:14 172:9
188:1 196:19
209:15 233:7
279:5 342:10
396:14,21 397:21
398:3,8,10 404:19
409:3 421:14
**convey** 164:3

**conveyed** 177:9
234:4 422:3 426:7
**conveying** 168:17
237:9
**convinced** 323:18
**copied** 56:15
144:18 209:6
**copy** 56:11 75:7
78:6 138:8 341:11
341:21 342:2
372:21 387:1,6
439:2
**correct** 12:11 14:7
19:11 21:21 22:12
25:14 26:9 29:11
29:14 34:11 35:19
36:3 37:14 39:19
40:5 42:21 45:19
46:16 48:10 56:22
57:3 58:9 61:22
67:13 68:12 73:1
73:6 74:19,21
78:14,22 83:3,6
89:6,20 91:2 93:7
99:21 100:11,12
104:15,18,21
105:1,4 113:1,3
114:3 115:14,16
116:9 119:1
127:14 128:9
131:17,20 138:10
139:12 140:22
141:1,10 143:4
144:17 148:10
151:1,5 152:1,8
159:18 163:12
165:13 166:4,22
167:11 168:2,19
170:13 180:16,17
181:21 183:4,10
183:11 185:19

186:4 198:15
200:9 204:4 205:7
206:3,4,10,14
208:12 209:2,3,7
210:1 214:12
216:18 218:15
220:21 222:9
228:4 229:2,3,4,5
229:21 230:2
231:16,18 232:14
233:11 234:3,10
234:16,17 240:4
241:21 243:7
246:1,14 247:19
248:14 250:1
251:4,5,10,19
255:4,14,19
256:12 257:5,13
262:14 264:22
266:19,20 269:1,4
270:1,4,7,22 273:3
277:2,3 279:7
282:9,16 285:20
288:9 291:20
292:1 294:13
295:2,8,17 297:5
298:12 299:1
309:12 318:11
319:1,12,13 326:7
326:22 337:3,4,6
337:11,15,18
338:3,4,6,7,11,12
338:15 339:4,5,20
339:21 341:22
342:18 345:4,9
346:5 348:2,6
352:3,16,19
364:12 366:10
368:3,21 369:3
370:9,14 371:2
372:12 375:11,13

375:16,17 376:9
376:10 382:11
383:18 384:14
385:11 386:4,5,6
411:3 416:15,18
416:19 417:1,2
418:4,12 419:10
427:20 438:4
**corrections** 438:6
**correctly** 33:19
142:16 255:12
260:3,8 279:20
295:5 332:5 355:9
381:12 382:12
414:8
**correspondence**
41:14 283:2
391:20
**cost** 47:12 222:16
223:21 288:21
319:18 320:18
359:12
**costly** 310:20
312:1 313:2 315:3
**council** 50:2,3
51:1
**counsel** 1:13 6:15
6:20 8:15 9:9 11:7
12:8 39:5,10
50:16,20 56:4
62:20 69:22 70:7
95:5,6,9 97:21
98:3,7 99:4,5,18
100:15 101:19
105:3 127:19,21
128:2,5,18 158:7
188:21,22 189:4
196:11 217:4,7
219:2 227:6,22
231:4 240:8,11
245:20 246:16

247:6,9 248:1,5,8
249:6,19 253:21
258:10 269:2
278:19 311:13
318:16 325:16
342:7,21 381:4
410:18 423:18
437:12,15 439:9
439:10,17
**counsel's**  70:17
128:11 214:8
232:21 346:1,2
**counsels**  98:17
**count**  66:1 69:11
124:17 162:6
208:16 224:10
287:9 310:21
312:2 315:4 329:2
331:21 359:13,14
360:21 369:1
416:15,17 418:12
419:5,6 423:8
431:12,18
**counted**  63:21
65:3,6,21 67:3
81:1 207:13,19
208:6,8,11,15
**counterpart**  165:1
**counting**  67:20
68:1,4
**countries**  108:15
108:22 109:5,10
109:14,16,22
110:7,10 413:17
**counts**  81:19
416:19
**county**  4:19
**couple**  11:21
18:19 23:2 31:7
174:15 178:17
244:8 381:10

416:14
**course**  13:22
14:17 28:7 48:12
125:8 179:9 288:4
288:15 307:10
316:20 345:13
435:20
**courses**  14:3
**court**  1:1 8:18 9:3
9:12 13:12 26:13
154:22 155:3,4,5,6
157:13 186:9
191:14 193:3
201:14 211:14
243:12 353:15,20
381:6
**cov.com**  4:13
**cover**  70:3 126:7
**covered**  18:9
126:8
**covers**  14:17 18:16
378:7
**covington**  4:11
**create**  239:9 424:9
**created**  341:16
343:14,16
**cross**  321:19
**csr**  1:17 437:3,20
439:14
**cubicles**  256:16
**current**  33:7 43:9
224:6 359:3
**currently**  13:1
39:15 41:4 132:15
207:8 261:20
272:15 296:20
352:14 357:4
367:15 403:19
**cursory**  154:21
**cutrona**  235:7,10
235:15,22

**cv**  381:6
**cvap**  181:11
352:13 354:5
357:4 429:7,10

**d**

**d**  8:1 318:10,21
319:6,15 351:14
368:20 429:5,8,12
**d.c.**  1:9,16 3:19
4:5,12 5:3,8,13
6:11,17,21 8:22
13:4 438:17
439:16
**daily**  38:12,13,19
38:22 49:1
**damage**  361:15
**dan**  7:1 9:1
**daniel**  4:11
**danielle**  6:1 235:7
235:10,15
**danielle.fidler**  6:6
**daniels**  4:15
**dares**  388:14
**data**  126:17
153:18 155:9
181:12,16 185:4
222:16 232:22
262:21 263:13,15
274:15 275:8
310:22 315:5
316:19 319:11,16
320:17 327:11,15
328:12 333:7
350:2,7,8,19 351:5
351:15 352:13
354:5,6,14,17
355:9,11 356:15
357:4,11,16
359:22 360:14
362:12 367:10
382:6,7 383:7

403:9,17,19,22
414:13 416:6
417:6,8,9 418:1,1
422:15 423:2
424:10,12,22
425:11 426:5,18
427:10,18,22
429:10 431:1
**date**  55:4,4 59:11
63:10 64:9 73:10
94:10,11 105:1,4
126:11 128:13
133:12 135:15
136:17 140:20
147:6 169:12
182:20 183:20
195:2 230:1,3,6
237:22 238:13
292:10 314:1
374:8 387:16
438:14 440:6,19
**dated**  56:20 78:21
88:1 115:13,15
127:8 138:11
183:10 222:11
230:1 235:7
309:21 323:9,10
341:9 374:10
375:21 376:8
437:21
**dates**  136:4,7,13
213:22
**dave**  85:2
**david**  4:3,19 6:14
46:21,22 56:20
57:1 83:1 85:4
87:18 93:1 98:6
100:2 110:15
201:5 202:6
240:12 241:3

**david.gersch** 4:6
**david.holtzman**
  4:22
**davidson** 95:11
  100:6,8 218:17,22
  220:20 221:3
  225:2 228:7,12,15
  228:19 230:17
  231:7,13,20 232:1
  288:15 386:18
  396:15,21 397:17
  397:22 398:3,8
  399:7
**day** 20:2 31:3
  33:18 34:10,12
  42:3 48:22 58:16
  63:12 73:4,18
  74:1 85:6,13,17
  117:20,21 148:13
  154:9 155:18
  168:7 225:14
  226:4 232:12,12
  232:16 316:12
  361:14 433:9
  437:21
**days** 162:12
  218:17 341:18
  370:14 439:7
**ddewhirst** 6:18
**de** 4:2
**dead** 411:7
**deadline** 84:10
  370:11
**deal** 281:4 375:19
**dealing** 152:14
  224:7 245:17,19
  245:21 257:18
  281:3 282:22
  285:15 306:15
**dealings** 249:21

**dealt** 52:11
**dear** 439:1
**decades** 347:8
**december** 124:4,4
  238:6 239:2
  290:16 309:9
  348:17 397:8,11
  419:21 420:13
  421:2 424:4 426:8
**decennial** 10:5
  54:18 57:19 58:20
  59:5 61:7 67:15
  78:18 79:2 82:4
  127:13 130:21
  153:13 175:22
  176:9 180:9
  192:11 203:21
  204:2 261:20
  265:17 272:19
  292:17 294:16
  319:9 326:19,19
  328:20 330:1
  333:4,5 334:9
  374:5 379:6 383:9
  383:14 392:7
  393:4 396:10
  400:11 402:2
  403:21 404:3
  405:13 416:17
  418:10 429:19,21
**deception** 38:5
**decide** 40:16 84:10
  84:20 132:11
  152:6 296:7 366:5
**decided** 132:3
  154:9 265:7,14
  296:1,4 333:20
**decides** 38:2
**deciding** 365:19
  434:7

**decision** 106:8,21
  110:3 135:20
  136:22 137:3,6
  150:19 151:8
  152:10,16 181:18
  239:9 240:5
  241:14 242:10
  264:20 266:12
  267:18,20 290:5
  296:15 299:4
  300:10,12,17
  301:4,18 302:8
  303:1,5 304:15
  305:15 306:7,10
  306:18,21 307:5
  307:15 308:6
  343:5 344:2 347:9
  347:11,13 349:1,3
  355:1 358:6 362:9
  363:8 366:5
  371:17 387:16
  389:12,13 412:15
  412:16 420:2
  423:6 425:8
  426:19
**decisional** 3:4
  241:13 242:10
  244:11 287:20
  290:18 292:2
  300:9 301:14,16
  302:19 303:22
  304:3 305:17
  306:8,19 311:5
  320:2 323:10
  324:13 325:21
  326:1,6 376:1
**decisions** 36:19
  37:17 86:11 120:3
  135:22 304:14
**decline** 351:1,3
  358:15,22 359:2

359:18,19,20
  360:3,7,8,9,16
  361:5,8 362:2,6,11
  362:20,22 363:1
  363:16,17,20,21
  364:6 365:9,12,15
  366:1,8,16,18,19
**declined** 416:4
**declining** 363:11
**decrease** 330:20
  330:22 416:20
**defendants** 1:7 6:8
**deferred** 402:12
  405:7
**defined** 30:20
**definitive** 330:10
  331:13 332:15,18
**definitively**
  329:22 330:6,7
  331:10
**degree** 12:9,10,14
  13:15 14:6
**del** 381:7
**delay** 236:3,18
**deliberative**
  345:20
**democracy** 103:9
  413:22
**democrat** 307:4
**democratic** 28:9
**demographic**
  132:15,16,18
  134:7 137:7
  359:20 360:8
  363:1,4,6 413:20
  414:11,18
**demography**
  14:12,14,17
**demonstrate**
  358:22

| | | | |
|---|---|---|---|
| **dennis** 87:19,21,22 | 247:6,18 248:1,3,5 | 420:22 421:7,9,14 | 386:11 |
| **deny** 297:9 380:13 | 248:17,21,22 | 422:4,11,12,15,22 | **describe** 28:5 |
| **department** 1:6 | 249:10,13,21 | 423:15,22 424:6 | 141:19 210:17 |
| 5:17 6:10,14 8:17 | 251:2,8 260:19,20 | 424:19 425:10,13 | 237:5 387:12 |
| 9:20 15:21 16:1 | 262:17,21 269:3 | 425:14,19 426:4 | **described** 17:13 |
| 18:2,16 22:2 | 270:6 272:3,15 | 426:17,19,20 | 219:11 353:1 |
| 30:11,12 31:1,22 | 273:1,10,14 274:2 | 427:13,16 428:3,5 | 357:20 |
| 32:19 33:18 34:14 | 274:14 275:6,16 | 428:11 438:16,18 | **description** 38:4,6 |
| 34:17 35:4 36:20 | 275:21 276:3,9,22 | 440:3 | 381:13 |
| 41:13 42:2,14 | 277:10 278:1,13 | **department's** | **desk** 72:2 73:16 |
| 43:21 48:16 51:16 | 279:1 281:6 | 425:6 426:13 | 256:18,19,19,20 |
| 52:8,11 53:11 | 290:16 294:20 | **departments** | 256:21 257:3 |
| 58:5 74:22 75:4 | 295:11,15,18,20 | 42:12 51:14 | 342:5 |
| 75:11,13,22 94:8 | 296:1,6,8,10,11,11 | **depend** 60:15 | **desks** 73:13 |
| 97:4 99:7,10,13,15 | 296:12 297:1,5,10 | 201:11 202:3 | 256:16 |
| 101:1,13,15 104:5 | 297:17 298:3,20 | **depending** 52:20 | **detail** 271:17 |
| 104:8 114:2 124:9 | 299:3,11 300:7 | 143:9 356:16 | 312:22 313:16 |
| 125:9 126:18 | 305:11 309:7 | 359:20 | 381:20 383:11 |
| 150:12 153:7,16 | 319:20 320:20 | **depends** 40:19 | **detailed** 42:11,16 |
| 157:4 165:12 | 329:21 330:5 | 46:3 47:11 50:17 | 42:20 263:22 |
| 166:9,11,14,20 | 338:19,19 340:1 | 52:13 53:5 92:1 | 264:4,17 413:18 |
| 167:20 169:19 | 342:9 343:16 | 280:21 365:19,21 | **detailee** 43:15 |
| 170:8 171:6,10 | 347:18 348:18 | 380:4 | **detailees** 283:22 |
| 172:3,17,22 | 349:1 350:3,9 | **deponent** 438:1 | **details** 43:20 |
| 173:20 174:4 | 381:14,22 382:8 | **deposed** 10:7 | 55:12 84:2 |
| 175:9,20 176:2,2 | 382:14,16,19,21 | **deposition** 1:11 | **determination** |
| 177:1,10 179:6,14 | 387:20 388:7 | 2:7 8:10,14,20 | 199:18 343:1,20 |
| 179:22 180:10,13 | 391:4,14 392:1,15 | 10:5,18 11:6 | 345:4,14,15 393:2 |
| 180:18 183:2 | 392:21 394:7,15 | 56:17 62:14 | 428:2 |
| 184:2,20 185:2,5 | 395:13 396:13 | 287:11 335:21 | **determinative** |
| 185:10,11 186:3 | 398:18,20 399:1,4 | 336:2 435:19 | 330:9 417:21 |
| 187:19 188:9,17 | 399:12 400:3 | 436:5,7 437:4,6,10 | **determine** 109:16 |
| 188:19 190:9 | 401:16 403:2 | 437:14 439:3 | 109:22 329:22 |
| 195:14 196:14,15 | 404:19 405:17 | 440:6 | 330:6,7 349:21,22 |
| 197:2,17,18 | 406:10 407:5,9,12 | **deputy** 6:20 17:9 | 413:11 417:22 |
| 216:16 219:1 | 407:20 408:17 | 20:12 21:20 22:1 | 429:20 430:1 |
| 222:8 227:22 | 409:19 410:10,15 | 22:1,6,14 24:13,20 | **determined** |
| 237:17 238:5 | 410:17 411:2,9 | 26:8 33:8,10 | 264:13 333:19 |
| 239:3,15 245:5,12 | 412:4 413:3 | 35:13,14 36:8,17 | 413:10 |
| 245:18,21 246:3,5 | 414:22 415:3,22 | 57:5 92:13 93:9 | **determining** |
| 246:11,19 247:4,5 | 416:4,10 420:21 | 198:8 203:13 | 262:10 430:16 |

**develop**  45:6,21
  46:6
**developed**  46:7
**developing**  19:2
  19:10 45:2,7,16
  105:16 150:2
**development**  44:9
**developments**
  119:10
**dewhirst**  6:14
**dgrant**  4:13
**dhs**  183:5 184:19
  185:3,7 196:15
  278:2,5 410:22
  411:11,11 412:9
  413:6
**dictated**  413:3
**difference**  22:4
  254:16
**different**  16:21
  19:7 41:14 42:12
  43:20 93:15 113:5
  247:14 254:6
  257:14,15 259:2
  297:22 300:1
  301:11,13 302:20
  305:16 306:9,20
  307:18 313:8
  314:14 356:18
**differential**  359:20
**differently**  19:19
  332:13 334:2
  358:1
**difficult**  261:2,11
  359:9 360:21
**difficulty**  307:15
**dinner**  125:19
  160:18
**direct**  71:21 78:3
  99:14 179:13
  293:20 294:3

310:10 401:16
**directed**  115:11
  122:18 179:5
  183:1 184:12,16
  185:11,16 285:10
  347:21 348:3
  370:19,20 412:20
  418:19
**directing**  175:2
  429:19
**direction**  121:22
  283:11 437:10
**directive**  392:15
  392:20
**directly**  36:6
  47:11 49:20 50:2
  50:3 66:8 69:10
  188:7 245:19
  390:10 400:13,19
  400:21 401:20
  423:20
**director**  18:8 33:9
  33:10,12 35:13,18
  35:20 36:1 37:7
  37:22 43:8 48:2
  52:15 53:15,21
  59:22 60:14,19
  128:7 139:18
  142:19 147:1
  148:1 162:17
  203:13,20 204:1
  237:15,19 281:7
  386:11
**directors**  44:6
**disagree**  305:12
  305:14 306:6
  312:11,13 313:4,7
  317:3,16 352:4
**disagreement**
  258:18

**disclosing**  196:3
**disclosure**  195:21
  345:19
**discourteous**
  279:15,22 280:7
  280:20
**discover**  431:5
**discovery**  435:17
  435:18
**discretion**  70:14
  301:6 302:1
  412:14
**discrimination**  4:2
**discuss**  77:21
  98:19 99:1 100:13
  100:21 101:21
  102:6 113:22
  124:9,12 133:8
  134:11 156:22
  157:8 164:8
  166:11 170:7
  178:8 203:16
  209:9,12 210:8
  221:9,11 228:8,13
  238:20 257:19
  290:11 339:13
  344:5,8 387:19,22
  388:3,6,9 389:18
  393:7,8 410:1
**discussed**  26:7
  89:9 97:11,16
  98:21 99:4,19
  100:2,18 102:7,14
  104:11 118:9,15
  124:14 129:20
  133:17 142:4
  144:1,12 162:8
  163:14,17 164:4
  164:11 188:5
  196:6 208:5
  209:14 225:9

228:16,20 231:8
  283:22 290:22
  359:21 391:5,15
  392:2 393:12,16
  399:8,13 408:20
**discussing**  104:7
  133:4 142:3
  188:10 231:2
  257:20
**discussion**  21:10
  32:6 59:15 124:20
  135:17 172:17
  184:19 195:9
  206:9 225:11,14
  225:18,19 230:10
  236:14 252:1,6,11
  255:1 258:9
  287:15 290:1
  339:2 360:11
  404:10 409:16
  421:18
**discussions**  19:7
  31:21 32:9 59:12
  100:10 157:4
  187:19 232:17
  290:21 316:21
  397:13
**disinclined**  359:15
  360:22
**dissimilar**  417:13
**distressed**  162:17
**district**  1:1,2 4:14
  8:18,19 13:3
  89:22 336:13
  349:11 381:6
  420:9
**distrust**  330:15
**divine**  168:11
**division**  242:20
  289:13 433:9

**doc's** 214:7
**doc.gov** 6:18,18,22
**document** 48:6,8
  48:12,20 49:3,8,14
  50:1,4 56:5,7 62:6
  62:19 63:2 64:12
  78:8 82:15 87:11
  93:17 94:3,6,16,19
  108:11 114:10
  120:19 121:9
  123:14 137:20
  145:10 158:22
  159:8 164:17
  167:5 182:12
  189:10 194:14
  199:19 200:5
  212:10 215:17
  218:5 219:18
  220:5,8 221:18
  222:3 224:14
  226:16 227:1
  234:19 246:7
  247:7,8,10 248:7
  248:20 258:15
  259:7 309:14
  310:5,7,9 311:6,17
  312:7,9 313:2
  318:7,8,9 320:1
  341:16,22 342:3
  343:9,14,16
  347:13 358:14
  373:3 375:5,6,7,8
  375:8,21 376:5,16
  376:22 377:16
  378:22 384:9
**documenting**
  137:6
**documents** 11:8
  11:10,13 48:14,22
  50:8 55:19 62:20
  80:16 174:10

243:10,14 318:13
318:14 320:6,8
371:4 376:20
377:7 435:18
**doing** 19:18 31:13
  40:12 42:5,6 44:4
  45:4,18 47:12,13
  117:17,21 150:16
  186:17 193:1
  266:21 300:21
  307:16,17 325:16
  367:17 371:13
  418:20 425:1
**doj** 154:18 155:1
  156:21 157:8,10
  157:14 158:1
  164:22 165:1
  176:12 192:5,5,7
  192:15,15 213:14
  214:1,2 215:13
  216:21 217:1,3,5
  217:10,13,17
  232:13,17,20
  283:6 290:4 291:8
  291:9,10 299:19
  338:6 344:16
  354:5,15 397:14
  397:14 403:4,8,14
  407:13 408:18,19
  411:13 412:1,9,20
  413:6 414:21
  416:10 419:21
  420:13 421:9
  423:2 424:7 427:4
  429:6,9
**doj's** 155:21 337:3
  427:6
**doj.ca.gov** 5:20,20
**domestic** 50:2
**donald** 383:13

**dorian** 5:11
**double** 13:7 90:15
**doubt** 267:10
  380:5
**doubts** 252:21
  253:1
**dozen** 125:11
  285:14
**dozens** 411:17
**dr** 238:10 312:20
  314:3,3,5,5 315:1
  315:2 316:14,14
  318:3 322:18,18
  324:4 325:10,10
  432:19,20 433:8
**draft** 3:5,7 94:7,21
  94:22 99:2,11
  100:13 113:9
  218:13 219:15
  242:22 243:1,3,18
  243:21 244:2
  246:2,6 247:7
  309:20 310:4,4
  311:4,9 318:12,13
  318:14 319:2,19
  320:2,4,6,9,19
  321:3 342:17
  344:4 345:9
  346:11 372:16
  375:18 376:1,14
  413:1
**drafted** 357:12
  371:6 377:11,13
  410:21
**drafter** 242:15,19
  369:14,17
**drafters** 242:16,17
**drafting** 95:1
  345:3,11 380:11
  430:14

**drafts** 244:5
**draw** 69:5,7
  331:15 369:4
  384:22
**drew** 331:16
**driving** 224:12
  285:4
**drop** 326:11
  330:11,12 417:12
  418:11
**dropped** 292:16
  294:15
**dspence** 5:14
**due** 149:13 236:3
  236:19 365:10
**duly** 9:15 437:7
**dunn** 101:22
  137:12 218:18
  219:3 222:22
  288:15 310:1
  325:7,8 369:11
**dwkesq.com** 4:18

**e**

**e** 4:1,1 8:1,1 25:10
  25:11 160:18
  438:15 440:1,1,1
**eager** 236:19
**earl** 1:12 2:2 8:14
  9:14,20 40:8 57:9
  58:3,4,6,10 139:17
  166:3 227:15
  436:8 438:2,14
  439:3 440:5
**earl's** 57:20,21
**earlier** 83:21 85:6
  104:2 122:1
  161:13 162:8
  166:19 172:6
  195:7 219:11
  221:2 244:10
  283:22 317:2

356:19 358:21
367:6 369:21
389:15 400:7
409:12 410:8,20
423:9
**earliest** 195:8
**early** 27:16 166:1
179:12 184:8
187:22 271:11,11
316:21 317:8
**earn** 12:20
**earned** 12:13
**easier** 365:8
**eastern** 84:16
86:19 141:20
143:2
**easy** 128:5 196:9
**economic** 47:1
50:3,20 51:1
219:5
**economics** 13:21
42:17
**economist** 43:2
**edit** 243:10,14,18
**editing** 345:12
**edits** 95:2,4,11,14
246:3,6 247:9
249:4 342:13
344:12 346:4,13
**eds** 48:17
**education** 13:18
14:8,11,18,21 15:2
**educational** 11:17
**effect** 152:16
237:12
**effective** 199:8,16
**effectively** 204:2
**efforts** 350:6
411:6
**eight** 234:7,10,12

**either** 11:1 23:6
50:9 52:22 124:4
246:8 320:8
386:13 408:18
416:8
**eleanor** 292:12
**election** 15:3,12,13
15:14
**electronic** 60:8
346:14
**elena** 6:2
**elena.goldstein**
6:6
**eleventh** 63:12
**eligible** 350:1
**eliminate** 333:5
**ellen** 36:22 56:20
57:4 87:19 92:12
97:15
**else's** 270:13
**email** 2:9,9,10,10
2:11,12,12,13,13
2:14,14,15,15,18
2:18,19,19,20,20
2:21,21,22 3:8,9
40:14,17 49:17
55:21 56:2,12,16
56:19 57:7,17
59:17 60:3,22
62:3,8,9,13 63:5
63:15 64:22 65:13
67:6,9 69:2,6 71:9
71:10,11,13,21
73:7 75:8 77:22
79:14 82:17 83:1
83:4,11,13,16 87:8
87:18 88:6,10,13
89:9 92:10 93:13
93:14 98:20,21
110:17,19,19
114:7,15,16,22

115:2,10,13,15
116:9,21 118:8
120:15 121:2,5,13
121:18,20 122:11
123:11 127:7,10
128:14 129:14
130:2 132:12
133:13 136:16,20
137:17,21 138:2,5
138:7,17 139:11
143:19 144:19
145:7,13,15,17,19
146:2,17 147:10
147:14,16,20,22
149:4,9,16 152:7
153:2 154:22
156:6,11,12,20
157:13 158:19
159:4,7,9,11,17
160:16 161:9
163:2,6,8 164:14
164:21 165:14
167:2,9 168:12
174:10 184:3
189:14 191:19
199:21 202:5
203:5,8 205:3,5,5
205:18 206:14,14
207:6,11 212:14
212:20 213:2,13
214:16 215:6,19
216:1 218:6,12
219:19 220:7,10
221:1,19 222:4,11
223:18 224:16,22
225:1,5,22 226:18
227:14 229:8,12
230:8,22 231:9,21
232:3 233:2
234:20 235:4,6,19
236:16,21 239:22

378:18 379:3
380:10 383:22
384:3,3,5,7,12,13
385:1,11,12,21
386:4,5,13,15,17
386:20,22 387:3,4
387:12,19,19,22
388:3,6,9,20 389:1
389:4,9,10,16,17
390:18,21 391:1,5
391:10,15 392:5
392:16
**emailed** 81:17,20
83:7 118:5,6
146:13 177:5
206:2 232:1
**emailing** 85:3,18
115:19
**emails** 117:20
156:13 219:11
259:22 371:4
373:6 376:18
**emphasize** 146:3
148:19
**emphasizing**
149:10
**empirical** 329:1,7
329:11,13 433:16
**employed** 437:13
437:16
**employee** 85:20
125:3 437:15
**employees** 30:11
31:1
**employment** 104:5
**empty** 411:20
**en** 90:6 91:3,11
92:8
**enable** 430:3
**enclosed** 439:2

enforce  265:11
294:22
enforced  192:17
enforcement
126:17 262:9
263:14 383:6
393:10,13 394:17
395:17 399:9
401:2 402:8 403:3
403:6,16 404:11
408:22 409:4
414:14 427:19
enforcing  192:13
277:11
entered  61:9
entero  381:7
entire  97:4 314:9
314:10,15 315:19
351:2 354:4
373:15 430:3
431:13
entirely  65:22
85:14 86:6 93:12
95:13 101:12
102:1 133:17
197:16 201:6
203:22 324:8
406:18
environmental  6:4
14:1,6
equally  144:12
era  385:5 388:19
388:21
eric  74:4,5 75:10
97:12 157:9
164:21 165:11,14
166:3,12 167:15
173:8,10,18
197:22 256:3,21
257:4 283:5
410:10

erosenberg  5:14
errata  438:7 439:8
error  285:13
350:10 352:15
353:2 354:10,12
354:17,19,20
355:7,21 356:2,4,9
356:12,13,20
357:6,11,14,19
358:1,3 361:11
431:14
errors  333:6
352:20
esa  43:1
especially  132:17
esquire  4:3,7,11
4:15,19 5:1,5,6,10
5:11,16,16 6:1,2,2
6:3,9,9,13,14,19
438:15
essential  120:9
essentially  18:15
41:9 44:2
establish  149:7
430:4
established  104:20
262:4 349:8 379:8
386:7 410:8
establishing
432:16
estimate  47:12
223:21 288:21
359:12
estimated  330:21
estimates  81:2
350:3
estimation  363:2
363:18
et  1:3,6 8:16,17
44:12 302:3
413:19 438:18,18

440:2,3
ethnic  138:21
139:9 140:10
141:13
ethnicity  362:8,11
evaluate  364:7
evanwell  240:5
evening  83:16
204:7 214:3
227:15,17
events  11:15
everybody  43:10
everybody's  42:5
evidence  330:9
331:14 332:18,19
367:12
evident  374:4
evolving  353:12
354:1
exact  55:9 100:10
133:12 135:15
136:4,7,13 155:4
169:12 178:18
237:3 244:18
314:1
exactly  126:21
187:14,21 188:2
189:19 209:16
217:15 227:13
245:15 253:20
278:10 343:11
352:7 371:5,14
examination  1:13
2:3,3,4,4,5 9:18
241:1 321:19
336:5 381:2
419:19
examined  9:16
438:3
example  19:18
43:14 44:3 50:12

52:7 53:1 349:13
362:8
exchange  55:21
89:11 93:12
133:14 165:14
205:4,5 220:10
233:8 292:14
321:16
exclamation
139:20
exclusively  51:22
52:2
excuse  259:15
284:6 420:8
422:14 429:7
execute  349:16
executive  48:18
281:7
exercise  331:2
exhibit  2:8,9,9,10
2:10,11,11,12,12
2:13,13,14,14,15
2:15,16,16,17,18
2:18,19,19,20,20
2:21,21,22,22 3:3
3:3,4,5,6,7,8,9
55:22 56:1,2 62:1
62:2,3 64:22 71:3
80:9 82:14,17,20
87:7,8,13,15 92:20
92:22 93:18,19,22
111:16 114:6,7,11
114:13 120:14,15
120:20,21 121:12
123:10,11,16
127:6 130:2
137:16,17,21
145:6,7,11 147:8
147:10 148:11
149:16 158:16,19
159:1 164:13,14

164:18 167:1,2,5,6
182:4,7,12,13
189:6,7,10,11
191:20,21 192:1,2
194:13,15 199:20
199:21 200:2,12
204:21 205:3
208:21 212:11,14
212:17 215:18,19
218:6,10 219:18
219:19,22 221:18
221:19,22 224:15
224:16,19 226:17
226:18,21 229:13
232:15 234:19,20
244:16,18,19
293:1 309:3,15
314:7 317:19,20
318:2 321:14
325:22 326:1,5,14
329:18 372:15
373:3 374:19,20
375:2,15 376:12
376:13 378:17,18
378:22 379:22
383:19,20,21
428:15

**exhibits** 2:7 3:11
269:15 326:11

**existed** 41:8
389:17 390:18

**expect** 85:2 268:3
268:6,9 289:20
355:7

**expected** 81:1
355:15

**expediting** 204:13
204:17

**expending** 412:2

**experience** 13:19
14:9,12,19,22 15:3

42:13 185:12
282:13,18 307:2
307:12,13 433:19

**experienced**
343:10

**expert** 349:9

**expertise** 18:4
39:4 42:13 282:3
324:20 434:2

**experts** 324:16
434:3

**explain** 41:22 46:2
150:4 171:16
272:7 278:11
280:12 413:15
417:3 418:14
430:15 432:4,6

**explained** 177:12
272:14 279:3
358:21 423:9

**explaining** 152:11
241:14

**explanation** 181:1
277:22 344:15
382:14 430:22
431:20 432:5

**explore** 150:7
190:16,21 337:12
348:3

**explored** 374:3

**exploring** 135:20
151:2 176:22
177:10,16 178:10
178:22 180:7

**exposed** 301:22

**express** 344:20

**expressed** 82:3
207:21 348:7,9
389:16

**expressing** 160:4

**extensive** 40:21
71:9 316:20

**extent** 18:17 37:16
70:19 131:7 133:3
195:20,22 308:2
335:21 397:2
400:4

**extra** 276:16

**extrapolate** 368:6

**extrapolated**
352:17 357:6

**extrapolating**
368:12

**extremely** 144:6
144:10

**eye** 3:18

**ezra** 5:10 336:7
372:19

---

**f**

**face** 124:16,18
279:16 359:3
410:15

**facilitate** 164:9

**facing** 257:2,2,4

**fact** 20:20 89:21
105:10 106:17
108:15,16,18
162:12 163:19
195:10 207:7
230:13 233:20
283:7 285:3,10
290:14 308:7
330:20 331:20
332:6 349:16
350:1,4,6,9 351:6
357:10,15 358:15
361:12 362:16
374:4 390:17,20
414:7 419:4 431:7
435:16

**factor** 350:11
365:13,16 417:21

**factors** 105:19
366:3,15

**facts** 186:21

**factual** 69:15
295:13,14

**failed** 162:19
360:13

**failure** 419:12

**fair** 43:18 204:9
217:21 226:13
270:14 272:6
288:6 309:17
323:2

**fairly** 47:15 135:6
289:16 290:7
303:18 312:17
350:10 357:16
407:2

**faith** 283:11

**falling** 291:15

**false** 301:20

**familiar** 17:2 84:2
126:2,4 127:22
128:3 138:20
396:16

**faqs** 66:7

**far** 311:8 351:11
351:19 361:11
420:18

**fashion** 275:18

**faster** 204:15

**february** 15:17
37:4,7 55:2 56:21
58:15 59:6,11
63:8 104:19

**federal** 34:9
185:12,15 283:2
307:3 381:5 387:5

feel  185:1 407:2
feeling  211:8
feelings  300:11
feels  120:9
fellow  77:9
felt  184:19 185:3
  190:15,16,20
  199:7 343:17
fewer  326:10
fidler  6:1
field  13:16
fifth  256:9
fight  388:14
figure  32:3 41:18
  42:5 224:2 266:7
  284:4 319:11
file  101:2
filed  8:18 287:5,14
fill  328:4,15
  423:12
filled  37:13 327:9
  327:18
filling  54:5
final  36:19 151:9
  311:6,17 312:14
  316:22 317:9
  319:3 321:10
  373:16 374:12
  376:22 389:19,22
  429:14 433:10
finally  61:16
  429:15,18 430:11
finals  318:13
finance  6:15
financially  9:7
  437:17
find  155:18 162:12
  162:21 163:19
  181:9 208:13
  224:9 266:9 267:5
  267:17 269:14

273:1 279:17
  297:18 439:2
findings  328:20
finds  70:8
fine  211:12 241:7
  274:17 307:13
  344:22
finish  20:16 45:13
  79:5 151:14 224:4
  273:21 284:7
finished  197:19
  263:6
finishes  194:3
finkelstein  6:3
firewalls  31:4
firm  9:1 12:4,6,7
  135:19 228:3
first  9:15 26:22
  30:2 33:17 34:10
  54:16 55:7 68:21
  69:4 71:22 81:14
  82:3,8 84:3 94:5
  99:11 104:3,12
  114:17,21 121:4
  121:12 133:8,17
  150:10 180:4
  181:2 187:5 189:2
  195:15 196:10
  208:21 235:6
  242:22 243:1,18
  290:13 318:3
  329:20 335:6
  336:9 339:8
  341:15 342:1,16
  348:16 375:1
  385:1 387:8 429:3
fisheries  18:4
  201:20
fit  201:13,18
five  158:7 178:12
  197:15 198:13,16

211:2 256:11
  364:18 373:17
fixed  43:22 44:2
flag  41:16,16
flexible  44:3
flipping  375:3
floor  439:15
flyer  388:12
flynn  164:22 165:8
  165:9
focus  254:7 301:1
  301:16 302:22
  304:2 308:9 317:7
  338:21 423:7
focused  130:17
  242:2 356:1 357:3
  358:5 371:11
focusing  356:8
folks  76:4 81:12
  99:7,13 126:3
  279:1 283:8
  289:14 313:19
  324:17 340:18
  359:6
follow  23:3 28:8
  28:10 30:2 40:10
  59:20 60:22 61:2
  61:5 70:17 89:8
  152:13,21 154:17
  154:19 177:17
  181:17 342:21
  346:1,2 360:12
  361:3 372:2 399:3
  411:14
followed  165:15
following  64:3
  115:20 206:8
  242:4 248:6,8,18
  249:6,7 278:3
  285:9 303:19
  390:21

follows  9:16
font  380:4
forefront  64:20
foregoing  437:4,6
  438:3
foreign  80:22
forget  31:9 427:2
forgive  136:9
  400:6
form  103:17 106:4
  106:19 120:1,7
  145:20 160:10
  166:15 187:1
  189:1 195:12
  199:6 204:11
  225:21 252:17
  253:8 255:9 258:6
  259:11 274:5
  276:5 280:15
  284:21 299:12
  310:7,9 326:20
  327:3,4,5,6,8,12
  327:13,15 329:3
  343:21 346:14
  353:9 372:11
  381:18 383:14
  393:4 396:10
  404:15 405:13
  409:1 410:3,6
  412:10 417:17
  418:10 424:14
  433:18
formal  198:7
  239:4,5 296:3
  309:8 347:10,15
formally  123:20
format  320:14
  372:8
formed  106:2
  110:8

**former** 17:1 18:8
25:5,13 123:19
227:21
**forming** 107:2,5
107:22 108:7,13
109:8
**formula** 351:16
431:1
**formulate** 150:5,6
**formulated** 370:5
**formulation** 110:2
**forth** 30:21 46:11
50:15 102:5 271:4
308:6 323:19
350:21 376:19
**forward** 218:3
265:19 266:9
350:12 415:4
423:7 436:1 439:8
**forwarded** 159:16
163:6 165:19
386:3
**forwarding**
159:10 163:11
**forwards** 165:17
**found** 66:2,4 79:21
110:18 261:2,11
297:2
**foundation** 116:14
117:6 118:12,18
122:7,21 134:16
134:21 140:7
142:12 143:8,17
161:5 163:5 201:1
206:6,12 235:18
286:7,16 334:21
380:8 384:16
390:3,12 392:9,18
407:16 408:1,4,7
412:11 413:8
415:20 422:17

423:4 424:15
426:2
**four** 98:7 178:1,20
188:3 256:6 271:7
277:16 370:14
**fourth** 58:16
**fraction** 371:13
**frame** 27:13 40:19
55:9 187:22 188:3
201:11 237:8
289:8 397:5
**francisco** 4:21
**frankly** 261:22
359:6 413:17
**fraud** 393:14
394:19 395:19
399:13 401:4
404:11 406:5
408:10 409:6
**free** 363:9
**freedman** 439:9
**frequency** 144:15
**frequent** 47:15
**frequently** 52:21
53:4 66:9,14,19
119:3,6 160:17
232:10
**friday** 65:1 73:8
75:9 216:11
217:19
**front** 18:10 82:21
87:15 92:20 94:1
111:16 114:13
120:22 123:16
137:21 141:18
152:9 156:13
159:2 167:6
182:14 189:11
194:18 200:3
204:22 212:18
218:10 219:22

221:22 235:1
292:19 313:18
318:5 406:17
417:9
**frustrated** 197:5
223:11,13
**frustration** 160:5
**full** 216:9 269:11
310:11 313:16
358:8 429:1
**fuller** 430:22
**fully** 70:5 254:9
261:16 419:8
**function** 41:11
45:1 53:20 68:9
76:22 208:19
**functions** 26:5,6
41:7 44:17
**fundamental**
95:19 96:10
244:20 258:17
**funded** 124:19
**funding** 95:21
**further** 108:11
149:2 203:14
216:4 262:5 312:7
374:3 389:18
391:8 413:9
437:14
**future** 20:18

## g

**g** 8:1 141:8
**gabrielle** 5:16
420:5
**gabrielle.boutin**
5:20
**gardner** 6:9 62:15
69:18 70:18 83:17
98:11 106:4 108:4
110:22 111:5
116:13 117:5

118:11,17 120:1,7
122:6,20 130:12
133:1,21 134:15
134:20 140:6
142:11 143:7,16
144:20 146:18
148:21 158:17
159:20 160:10
161:4,15 163:4
166:15 182:5
186:7,11,16 187:1
189:1 191:20,22
194:3 195:12,20
196:7 200:22
202:19 204:11
205:20 206:5,11
206:19 210:5
211:5,10,19,21
212:12 224:4
225:21 226:5
228:9 235:17
240:9 246:20
247:1,20 250:5
252:3,17 253:8,17
254:12 255:9
258:6 259:11
263:19 268:14
274:7,10 275:3
276:5 278:16
280:15 284:17,21
286:6,15,22
292:21 297:13
299:12,14,16
301:2,17 303:2
304:5 305:1,18
306:12,22 307:20
308:11,16 311:14
316:9 320:11
329:3 331:11
334:20 336:1
340:13 341:10

343:21 345:18
353:19 366:20
372:19 380:7
381:18 384:15
390:2,11 392:8,17
403:10 404:15
407:15 409:1
410:3,6 412:7,10
413:7 415:6,9,18
415:20 422:5,16
423:3 424:14
425:4,16 426:1,15
427:8 428:8,16
433:18 435:20
438:15 439:1
**gary** 396:9,14,16
396:22 397:4,18
397:22 398:3,6,9
399:7,8,13
**gauge** 57:20
**gears** 232:9
434:17
**geary** 115:3
**gender** 64:19
84:18 86:18
130:22 131:15
141:9 362:14
**gene** 179:16 183:2
183:6 184:16,18
185:9,22 188:2
**general** 5:17 6:3
6:15,20 10:2
16:22 46:6 86:9
95:5,6 99:18
100:14 101:19
127:18,21 128:2,5
128:11,18 167:22
168:1 183:15
188:21,22 189:4
189:21,22 190:3,6
191:2 196:11

214:7 219:1
227:22 231:4
232:21 233:10,18
233:21 234:2
235:13,16 236:14
236:17 237:6
245:20 246:16
247:6,9 249:18
258:10 298:11,15
325:16 342:7
397:5 400:8,9,19
400:22 401:2,17
401:21 402:16
403:1,6,15 405:11
405:18
**general's** 402:1,3
402:4,20 420:6
**generally** 46:7
60:12 65:18 68:15
76:8 307:12
338:18 405:14
406:22
**generals** 388:13
388:17
**generated** 248:4
**genesis** 129:13
**gentleman** 34:19
**george** 13:20
**gersch** 2:3 4:3
186:15,19 240:14
241:1,3 246:21
247:12 248:9
250:3,6,14 252:9
252:18 253:12
254:4,18 255:11
258:8 259:14
264:2 268:18
274:8,18 275:11
276:11 278:18,20
280:18 284:18
285:17 286:9,19

287:3 291:17
292:20,22 293:4
297:20 299:15,21
299:22 301:10
302:10 303:8
305:6 306:2,16
307:6 308:3 309:5
311:19 316:10
317:22 318:18,20
320:13 326:3
329:6 331:5,7
332:11 335:1,9,16
344:3
**getting** 16:10,12
30:20 59:1 69:15
217:22 243:19
281:4 285:7
318:13 319:2
427:17
**give** 50:12 56:11
63:13 136:19
174:16 240:7
275:1 334:5,6
355:2 363:3 366:6
372:20 374:9
429:11 431:17
**given** 30:16 40:13
72:12 140:9 197:3
246:15 303:2
321:10 364:13
437:11 438:5
**gives** 429:14
**go** 13:6 22:22 25:2
31:8 39:8 46:11
64:22 67:5 71:3
84:1 92:22 117:20
142:8,17 150:7,8
152:20 155:18
158:8 169:19,21
181:13 191:18
200:11 204:21

215:15 231:1
240:17 250:17,21
266:8 267:17
286:4 335:9
341:12 350:12
352:22 355:15
360:13 373:5
380:16 411:9
419:13 435:7,8
436:1
**goal** 88:20 427:17
**goes** 88:20 152:16
205:12 423:7
429:11
**going** 8:4,12 16:21
22:17 30:18 32:17
40:16 62:15 64:7
66:6 74:12 77:8
78:7 111:2 128:17
130:17,19 142:17
150:2 158:9 163:1
164:6 168:15
185:7 190:9
192:18 197:17
201:17 208:20
211:7,12 214:15
217:14 233:21
238:14 239:17
240:18 241:6
242:6 260:12
263:22 264:9
266:11 267:9,13
267:18 268:16
271:8 281:11
282:11 283:10
284:12 285:12,16
287:1,10 288:19
288:20 289:10,20
289:21 291:1
299:6 302:13
303:15 305:22

306:4 307:9 308:1
308:14,17 316:7
316:13 335:11
341:16 344:18
345:18 346:1
353:19 359:8,9,13
360:20 361:2
363:10 364:4
370:17 371:3
374:15 384:21,22
419:14 429:15
431:16,17 432:10
434:5 435:10
**goldstein** 6:2
435:7
**good** 8:3 11:2 43:3
44:8 90:13 127:2
150:9 211:6,9
212:9 241:2
249:14 254:9,20
255:2,8 258:15
259:8,9 263:4
265:8 294:9
308:16 336:6
351:15 381:3
413:20,20 420:18
420:19
**google** 109:19
**googled** 109:21
**googling** 110:9
**gotten** 110:11
246:8
**government** 3:2
78:18 81:22 125:3
126:16 152:12,18
153:11 154:4
158:5 185:13,15
204:16 205:14
229:2 239:8
262:12 263:5,10
264:4,16 265:9

266:22 291:22
293:2,7 304:13
307:3 330:16
335:20 347:4,6
359:5
**governmental**
25:16 192:7
258:22 262:2,7
263:17,21 412:4
**grant** 4:11
**granular** 275:7
**granularity**
272:20 273:2
**granule** 176:7
193:4
**great** 11:4,12
26:20 42:4 51:2
271:17 381:20
383:11
**greater** 272:19
313:16 359:2
365:17,18 366:6
366:15,18
**grossman** 4:7
**ground** 70:2,3
**grounds** 62:16
345:19
**group** 76:4,7
77:15 142:20
221:15 352:13
357:4 359:21
360:3,8 363:1,4
**groups** 54:15
132:18
**guess** 37:19
141:15,16 357:21
**guy** 175:4 271:1
271:14 277:6
285:16,19
**guy's** 283:3

**guys** 276:2 280:1
295:19

## h

**h** 25:10 440:1
**half** 12:7 21:7
49:11 111:2 328:6
328:7 331:1 361:9
366:12,18 367:3
**hamilton** 179:16
180:5 183:2,6
184:16,18 185:1
185:22 188:2
196:15 277:4,6,14
277:19 278:17,22
279:5,22
**hand** 56:7 240:11
318:17 430:14
**handed** 82:15
87:11 93:17
114:10 120:19
145:10 342:2
**handful** 144:4
164:6
**handing** 56:4
**handle** 381:22
**handled** 19:19
184:20 185:2
411:1
**handles** 18:2
**handling** 19:8
342:8
**haney** 269:5
**hang** 45:13 107:10
**hankey** 157:11
167:11,14 168:21
168:22 172:4,9
174:2 196:13
269:8,10,19,22
270:15 281:10
283:6 338:5,14
339:11 381:9,15

383:5 410:9
**happen** 84:5
152:14 306:17
307:7,11 331:16
337:17
**happened** 60:5
92:5 348:22
**happening** 86:3
**happens** 232:10
**happy** 62:18 66:22
77:11 78:16
162:20 203:15
302:16 308:2
311:12
**hard** 124:17 244:6
331:21 359:13,14
417:10,22
**harms** 310:20
312:1 315:3
**head** 31:9 204:2
266:6 365:8
416:15,17 418:11
433:8
**hear** 54:16,21
213:10 253:16
316:8,15 336:16
336:17 341:15
**heard** 68:21 174:4
287:4 335:2 397:1
397:2
**hearing** 19:1
20:19 26:19,22
27:15 28:8,16
29:6,10 31:16,20
32:8,12,22 33:4
142:17 147:2,5,6
148:16 288:12,16
335:6
**heavily** 52:11
**held** 8:20 84:21
321:20 330:11

**help** 34:1 41:18
82:2,6 164:9
195:2,7 236:7
260:10,22 261:1
267:5 284:12
311:10 430:18
432:16,22
**helped** 289:15
369:8,9
**helpful** 40:22
150:4 170:9
252:14 253:5
254:8 261:4
**helping** 34:19
**helps** 16:17 74:9
232:15
**herbst** 36:22 56:20
57:4,8 87:19
88:14 97:15
**hereto** 437:16
**heritage** 408:1,4,7
**hernandez** 77:2
97:12 198:1,5,6
209:3,9,13 220:20
256:6
**hesitate** 439:12
**hey** 272:11 273:9
273:16 279:6
280:1,7 283:5
284:2
**hi** 127:10
**high** 11:18,19
383:1
**higher** 411:22
418:3,5
**highlight** 79:8,12
79:15 80:18
**highlighted** 78:3,9
78:17 79:14 80:12
80:16 81:4,8

**highlighting** 79:20
81:21
**highly** 30:17
**hill** 12:3 22:11,16
32:17 88:17 89:6
**hillary** 115:3
**hindrance** 403:7,8
**hire** 21:7 47:4
**hiring** 124:18
**hispanic** 364:5
365:1
**hispanics** 349:13
363:6,17 364:8,11
365:10 366:2
**history** 307:10
**hklaw.com** 4:22
**hoc** 39:1
**hold** 106:12,20
151:14 321:18
427:21,21
**holding** 403:17
**holds** 340:16
**holland** 4:20
**holmes** 292:12
299:18
**holtzman** 4:19
**homeland** 179:6
179:14 180:1,10
180:13,19 181:14
181:15 183:3
275:16,22 276:10
277:2,10 279:22
382:16,19
**honestly** 10:10
179:11 200:14
364:13 376:19
377:2 414:17
**hoping** 168:12
**hour** 111:2 232:3
308:17

**hours** 49:10
**house** 48:4,8,16,19
49:4,9,15,21 50:9
50:11,15,16,16
51:4,7 74:5,7,12
74:17 125:19
147:2,5 148:1,15
167:18 173:12
283:9 288:1
291:21 388:1
391:16,20 393:8
395:9 410:12
**household** 319:9
**households** 328:1
328:9,10 330:22
333:12
**huge** 223:22
**huh** 31:11 67:8
79:1 103:3 123:15
123:17 127:9
128:15 149:19
151:16 159:3
213:7 229:14
231:11 280:9,11
292:4 293:22
326:13 328:22
339:12 341:7
358:10 362:21
377:5
**human** 307:10
**hundreds** 261:6
283:1
**hundredth** 112:21
**hurdles** 154:8
**hurt** 252:22
**hypothetical**
106:18 239:13
274:7,10 275:4
301:19 302:6,17
303:3,13,15 304:6
305:19 306:13

307:1,21,22
308:12 362:5
364:4 366:21
415:10,11

**i**

**idea** 55:6 65:4
72:16 75:19 76:15
81:14 85:7,15
89:14 90:17 97:12
112:6,10,13
116:15 117:11,14
129:22 139:2
144:3 150:9
163:14 165:9
174:12 196:12
206:14 213:12
229:7 231:7 237:7
240:6 245:6,9
249:14 254:9,21
255:2,8 258:15
259:8 263:4 265:8
268:7,21 277:8
289:18 319:6
320:5 337:3,5
357:21 370:8
388:18 433:4
**ideally** 74:11
204:7
**identified** 66:12
99:5 155:20 172:8
239:22 345:17
363:20,21
**identifies** 206:1
**identify** 36:21
39:13 40:6 41:15
98:4 155:10 172:8
186:21 215:7
330:18 375:1
414:15
**identifying** 41:12
215:11

**identity** 64:19
84:18 86:18 131:1
131:15 141:9
**ignore** 300:22
301:15 302:21
**ignored** 391:21
**illegal** 67:20 68:1
68:4 301:21 302:7
302:13,15
**illustrate** 155:1
157:14 332:3
**image** 384:13
385:20 391:6
**imagine** 32:14
60:4 163:22
233:15 238:19
346:13 370:13
371:9
**immigrants** 65:20
67:20 68:1,4
**immigration** 1:3
4:1 8:16 241:4
281:7 336:12
393:9,12 394:17
395:17 399:9
401:2 402:7 403:3
404:10 405:1
408:22 409:4
438:18 440:2
**impact** 105:18
330:2
**impassable** 20:3
**impatience** 217:22
**impetus** 337:1
**implement** 181:21
**implications**
319:18 320:18
**importance** 17:3
**important** 18:6
40:12 91:21
103:13 112:22

113:2,7 134:3,6
155:8 172:2
274:20 278:13,14
278:22 280:13
343:9,11 347:2
362:11
**impossible** 305:21
364:7
**imprecise** 158:3
**imprecisely**
312:20
**improve** 355:14
**imputation** 329:15
368:21 430:22
434:3,10,15
**impute** 351:8,16
355:18 368:17
423:11 430:6,18
432:16
**inaccurate** 353:8
357:17 358:4
367:20 430:1
**inaccurately**
353:10,21 357:13
**inactive** 13:5,11
**inaugural** 27:19
**inauguration** 26:1
27:21 28:1 31:3
34:12
**inclination** 276:19
**inclined** 272:4
276:20,22 277:1
**include** 17:12
91:12 96:21 97:2
107:7 146:7,11
151:5,19 298:5
**included** 26:6
81:18 85:19 95:22
103:21 105:8
106:9,11 130:18
131:15 132:3

155:2 157:15
192:16 202:9,14
202:18 203:1
208:3 244:21
347:9 384:12
**includes** 67:6
96:20 216:21
314:10,16 383:16
**including** 18:16
54:11 71:10 78:18
84:15 95:21
105:19 106:22
157:18 223:8,9
229:10 345:15
419:8 433:20
**inclusion** 10:4
21:15 164:10
237:17 239:11
251:1 329:22
365:10
**incoming** 19:3
**incomplete** 354:7
373:6,8
**incorrect** 357:10
425:22 430:17
**increase** 360:12
361:2,9 367:3
**increased** 419:1
**independent** 54:4
106:14 281:22
282:3 296:15
299:4,10 300:6
**independently**
349:3
**indicate** 69:3
81:10 276:7
**indicated** 69:14
243:3 372:7
382:20,20
**individual** 43:1
414:15 419:7

**individuals** 41:6
46:13 400:15
407:10
**industry** 378:1
**inform** 420:21
421:9 424:7,20
425:13,20
**information** 28:13
30:5,21 40:22
68:17 69:15 79:22
81:17 103:14
108:16 129:14
132:22 136:19
137:1,8,15 151:7
152:5,10 153:12
153:19 154:7
155:22 158:6
163:1,12 177:2,16
177:19 180:9,20
181:10,17 186:8
186:12 190:10
192:6,8,11,20
193:4 195:21
210:20 216:16
217:13,17 223:3,6
223:6 254:17
262:3,13 264:1,1,4
264:17 265:9,15
265:19 276:2,3,4,7
277:20 278:7
286:5 290:9
294:22 296:2,5,8
296:15,18 297:2,7
297:18 299:5
326:18 331:17,18
334:6,7 335:19
340:11 345:16,19
347:3 350:12
358:4 368:10
383:4 400:2
413:20 414:19

416:11 422:3
**informative**
  281:20
**informed** 40:12
  74:11 103:22
  196:18 197:12
**informing** 397:3
**informs** 181:17
**initial** 150:18
  178:3 254:2 337:1
  411:8
**initially** 248:20
**input** 46:8,8,10
  49:6 216:21
  324:19 370:10
**inquire** 261:16
  262:5,20 264:7
  272:21 275:9
  279:17 399:3
**inquired** 55:12,16
  82:10 183:20
  409:22 423:11
**inquires** 414:1
**inquiring** 390:15
**inquiry** 254:2
  390:20
**inside** 387:20
**inspire** 224:5
**institute** 4:3
**institutes** 44:11
**instruct** 62:16
  186:13 196:1
  345:21
**instructed** 70:15
  150:1,21
**instruction** 411:22
**instructions**
  150:22 151:3,6
**instructs** 70:11
**instruments**
  105:17 106:2

**insurmountable**
  265:22 331:4
**interact** 47:9
  52:18 53:14,17,21
**interacted** 47:14
  189:3
**interacting** 48:3
  51:10,18
**interaction** 30:22
  50:15 51:3,6
  52:10,16 53:2,7,11
  55:18 99:15
  196:10 382:9
  411:3
**interactions** 195:3
  381:9
**interest** 57:20,21
  82:3 175:19 177:1
  348:8 392:11
**interested** 9:7
  58:11,19 59:1,5
  64:18 69:14,17
  144:7,9,11,13
  170:10 175:18
  190:4,7 192:11
  202:8 275:13
  298:21 397:15
  412:1 437:17
**interests** 403:2
**interface** 41:18
**interfere** 8:9
**interference** 8:7
  80:6
**internal** 99:8
**internet** 417:19
**interrupt** 11:1
**interruption**
  165:20 291:14
  434:12
**interrupts** 92:2

**interval** 356:15
**introduce** 221:6,7
  383:19
**introduced** 10:17
  336:7,9
**introduction**
  14:13,15
**introductory**
  303:2
**investigate** 252:7
  252:7 254:17
  337:8 410:14
**investigating**
  108:11
**investigation**
  201:19 317:6
  340:20
**invite** 60:16,18
  61:21 91:10,16
**involve** 286:14
**involved** 11:15
  17:21 19:6,10
  21:19 52:7,8,10
  64:16 97:1 99:14
  102:15 221:3
  288:14 340:22
  345:3 347:5 378:9
  380:11 421:18
**involves** 68:9
  98:16 220:19
  280:10 286:20
**involving** 140:15
**irrelevant** 251:15
  265:3 300:12
**isolate** 360:15
**isolating** 356:9
**israel** 77:2 198:6
**issuance** 290:17
  420:13
**issue** 20:9 47:11
  50:18 51:12 52:13

52:20 53:4,6
  64:19 86:19 91:21
  98:16 104:13
  112:16,20,22
  121:21 124:16
  130:17 139:20
  140:2,4 141:17,19
  142:4,10 143:6,12
  143:15,15 144:7
  145:2 166:21
  170:10,11 172:20
  174:5 177:11
  196:11 203:17
  210:4,11 211:1
  222:14 223:22
  233:10 234:6,9
  261:5 264:14
  283:1 341:3
  393:13,17 399:9
  399:13,15,18,20
  403:1 411:16
**issued** 242:9
  244:13 292:3
  343:20 420:1
**issues** 16:22 17:2
  18:10,11,13 20:8
  20:17 41:16 44:21
  54:6 68:10 77:19
  95:20 96:10
  106:22 113:6
  128:6 140:14
  150:10 165:2
  170:8,17,20
  201:20 221:11
  223:19 224:8
  226:10 229:10
  231:5 234:8
  241:13 244:20
  257:18 382:22
  403:17 411:18
  435:22

**items** 257:14
**iteration** 376:22
**iterative** 321:15
**izzy** 97:12 198:1,5
209:1,3,9 256:6,19
257:2

**j**

**j.d.** 12:20
**james** 95:14 97:2
97:15 100:4
155:15 156:3,7
174:20 175:1,5
183:1 184:13
185:22 186:6
187:13,15 188:6,8
189:3 195:14
198:1,2 214:11
217:8 225:2,8,9
242:18 243:4,6
246:8 255:20
256:10,20 257:4
257:16 288:14
345:10 369:12
381:10 386:4,8,18
391:6,18
**jane** 157:11
**january** 16:2
19:22 27:16,17
31:20 33:14,15,17
33:22 34:10 35:5
35:5,8,9,17 36:10
37:6 39:18 124:4
124:5 198:19,21
309:21 317:3,11
319:19 320:19
321:2 369:5
**jarmin** 238:10,10
294:12 314:3,5
315:1 316:14
322:18 325:10

**jeff** 400:9
**jefferson** 439:15
**jim** 57:18
**jmf** 1:5
**job** 17:4 38:4,5,6
42:4 43:17 48:2
58:16 63:12 68:9
70:4 150:8 164:1
252:14 253:5
266:7,20 267:16
268:5
**john** 5:6 59:18
236:1 309:18,22
395:9,14 410:13
410:14 439:9
**join** 16:4 25:4
117:12
**joined** 25:3 31:2
117:15 187:13,15
187:16 188:8,17
**jones** 377:17
**jorgenson** 1:16 9:4
437:3,20 439:14
**jose** 336:11
**josh** 98:6
**joshua** 6:9 438:15
**joshua.gardner**
6:12
**journal** 67:7 80:1
81:21 146:14
402:22 409:13
**jr** 6:19
**judgment** 429:5,8
**july** 121:16 122:12
205:18 206:3
209:22
**june** 94:12 98:10
99:3 101:19
111:15 113:10
179:12 187:16
188:15 195:6

244:13 271:11
341:9,17,19 346:4
346:12
**jurisdiction** 18:7
412:5
**justice** 5:6,17 6:10
94:8 99:7,10,13,15
101:1,13,15 114:2
126:18 153:3,7,16
154:1 157:4
165:12 166:9,11
166:13,20 167:20
170:8,19 171:6,10
172:22 174:4
175:9,20 176:2
177:1,10 181:10
181:13 184:2,20
185:2,5 186:3
187:19 190:3,6,9
196:14,15 197:2
197:17,18 216:16
222:8 233:5
237:17 238:5
239:3,15 245:5,12
245:18 246:3,11
246:19 247:4,5,18
248:1,5,17,21
249:10,13,21
251:2,8 262:17,21
269:3 270:6 272:3
273:1 275:6 278:1
281:5 290:16
294:20 295:11,15
295:18 296:1,10
296:12 297:1,5,10
297:17 298:3,20
309:7 338:20
340:1 342:9
343:16 347:18
348:18 349:1
350:3,9 382:8,21

388:7 398:18
399:1,4 400:3
410:17 411:2,9
413:3 415:22
416:4 420:22
421:7,14 422:4,12
422:15,22 423:22
424:20 425:10,14
425:20 426:4,10
426:13,16,20
427:13,16 428:3,5
428:11 438:16
**justice's** 299:11
300:7 305:11
409:19 421:2
**justifications**
415:16
**justify** 154:6
181:16
**jyang** 5:9

**k**

**kansas** 118:2
206:1
**karen** 1:16 9:3
10:17 101:22
137:11 218:18
219:3 222:22
288:15 310:1
325:7,8 369:11
437:3,20 439:14
**kass** 228:19
**kassinger** 227:17
227:20,21 228:1,8
228:12,16,19
229:1 230:17
231:5,8,9
**kate** 6:9 98:6
**kate.bailey** 6:12
**kdb** 222:15,19
**kdk** 222:19

**keep**  40:11 60:7
  73:1 76:8 136:3
  197:11 211:7,12
  218:2 221:2,5
  304:9 318:13
**keeping**  45:3,17
  45:21 74:11
  196:18 335:21
  435:18
**keeps**  73:2
**kelley**  4:15 101:22
  137:12 218:18
  219:3 220:21
  221:3 222:22
  288:15 310:1
  325:7,9 369:11
**kelly**  395:9,14
**kept**  201:21
**kevin**  385:21,22
  386:1,3
**key**  108:9 220:14
  221:11
**kind**  48:14 84:3
  103:14 175:19
  194:22 203:12
  279:15 286:12
  334:13 340:19
  371:20
**kinds**  50:14
**knew**  86:15 311:2
  342:2
**knight**  4:20
**know**  10:12 16:21
  22:21 23:7,12
  32:4 40:21 41:15
  43:3 52:9 55:17
  60:21 61:11 64:4
  65:2 69:13,16
  72:19 73:21 75:3
  76:5 80:2 81:7
  90:13 93:15 95:10

96:7 97:3,16
  100:1 101:9,10,13
  102:13 103:20
  104:10 109:20
  112:4 114:5 116:4
  116:10,22 117:4,7
  117:15,17,22
  118:15 120:10
  123:2,21 124:22
  125:1 127:2,16
  129:13 132:5
  134:3,7 136:3,6,7
  139:4 142:15
  146:20 150:10
  156:3 160:2,3,7,8
  161:17,22 162:5
  163:6,15 165:8
  167:17,19 169:12
  174:17 175:12
  176:12,22 179:17
  181:16 187:14,16
  187:17 188:2
  190:15,20 191:3,7
  201:2 203:12
  213:9,16 214:17
  215:4 216:22
  217:5,17 228:14
  229:11 231:20
  233:6 235:10,12
  238:13,22 245:15
  246:10 260:6
  267:11 268:11
  269:12 271:2
  276:22 277:16,18
  279:11 282:6,13
  283:7 286:17
  298:9,16 304:18
  304:20 305:20
  306:3 310:3,5
  315:10,16 321:8
  322:19 323:8

324:18 327:21
  329:10 332:3,10
  339:22 340:4,17
  342:15 346:8
  348:17 350:4
  351:20 352:20
  354:14 357:18
  362:15 363:7
  364:6,10,15 365:3
  365:6 371:11
  374:6,11 375:8
  376:21 377:2,12
  377:13 378:11,14
  378:16 380:3,10
  381:8,19 382:18
  383:2 388:16,19
  389:22 390:22
  391:3,14,17,22
  397:12,21 398:5
  398:17,18,22
  402:14,15 404:5,6
  405:16 406:12
  407:18 414:3
  421:17 426:9
  428:5 431:2,12
**knowing**  27:12
  260:15 261:3
  267:22 281:14
  435:22
**knowledge**  122:22
  157:6 164:12
  189:2 228:17
  315:13 387:8
  388:22 391:10
  392:10,19 398:16
  399:17,19,21
  403:1 409:20
  424:1 425:17
  433:20 435:4
**known**  124:2
  287:10 343:19

422:2,9
**knows**  47:2,2,3
  285:21
**kobach**  116:20
  117:9,22 118:3,4,5
  118:6 119:20
  121:13 122:12,15
  122:19 205:4,6
  206:1,18 207:5
  208:22 209:10
  210:3,11,16
**kravitz**  4:10
**kris**  116:20 117:9
  117:22 119:20
  121:13 122:12,15
  122:19 205:4,6
  206:18 207:5
  208:22 210:3,11
  210:16

### l

**l**  5:7 160:18
**la**  381:7
**lack**  116:14 117:6
  118:11,18 122:6
  122:20 134:15,20
  140:7 142:12
  143:8,17 161:4
  163:5 183:14,17
  201:1 206:5,11
  235:17 286:6,15
  380:8 384:15
  390:2,11 392:9,18
  407:15 413:7
  415:20 422:16
  423:3 424:15
**lacks**  334:20 426:1
**laid**  300:9,13,19
  351:19
**langdon**  46:21
  47:4 56:20 57:1,8
  57:17 58:10,19

83:1,15 87:18
88:13 89:4,12
93:1 110:15 200:8
200:12 201:5
202:6,16 203:4,8
204:5
**langdon's** 46:22
59:17
**language** 244:4,7
244:17,18,19
245:3,7,10 362:20
430:12
**large** 20:22 21:3,4
31:4 42:7 163:15
314:3 349:14
356:17
**largely** 20:20
41:10 74:10 102:4
110:3 142:7
203:18
**larger** 327:22
356:13 368:13
**late** 88:4 209:22
316:11
**law** 5:11 8:20 12:4
12:7,13,17 14:19
15:3,8,12,13,14
193:12,20 228:3
300:16,20 301:6
301:15 414:13
**laws** 15:5,7
**lawsuit** 11:15
287:5 359:7
405:22
**lawsuits** 80:17
287:7,14
**lawyer** 127:1
193:8,10 265:1,5
265:12 268:3
325:4,19,20

**lawyers** 5:11
13:21
**lawyerscommitt...**
5:14,14
**lay** 300:16
**lays** 301:5,13
302:19 303:21
**lead** 67:14
**leader** 23:7,8
**leadership** 23:8
44:9 162:21 224:7
**leads** 207:11
**learn** 271:13 281:6
396:20
**learned** 281:9
357:15 402:16
432:13
**learning** 402:18
**leave** 160:18
**leaves** 43:22
**leaving** 32:17,17
131:6
**left** 12:3 43:14
75:3 211:20
**legal** 3:18 9:2,4
52:3 150:13
154:11 155:11,12
172:7 220:14
221:11 239:19
258:21 261:14,21
265:22 266:9
267:3 301:3,18
303:4 304:6,17
305:2 308:12
340:7,14 348:13
**legally** 267:14
**legislative** 18:8
165:2
**legitimate** 155:1
157:14,21 158:1,3
180:19,21 192:15

304:12
**les** 160:19
**lesser** 366:6
**letter** 237:21
238:1,3,4,9,14,17
238:20 239:2
272:4 290:4
347:17 349:2
396:19 397:8,11
397:15,18 403:5
403:15,18 407:13
408:19,19 412:20
413:1 419:21
420:13 427:17
**letters** 385:7
**level** 175:19 176:8
177:1 272:16
275:8 294:21
296:19 357:4
403:19 416:5
422:14,14 423:2
426:17,18 427:18
**levels** 352:13
**leverage** 285:8
**levers** 284:14
**leviathan** 41:19,20
41:22
**lexicon** 273:17
**liberties** 4:7
**liberty** 6:4
**lifecycle** 47:12
203:16 223:20
288:21 359:12
**light** 350:11
**limit** 423:18
**line** 57:12,17,22
63:4,15 71:4,22
78:3,17 79:8,12,15
80:7,12,15,20 81:3
81:4,8,21 90:2
96:16 97:6 111:1

111:21 146:16
148:8 164:22
230:13 293:20
331:15 352:12
440:7
**lines** 294:3,6,10
**link** 66:12 208:9
208:10
**linkage** 86:1
**lisa** 203:5,9,15,17
**list** 22:22 129:1,4
132:14 220:22
369:6,8,10,15
373:15 383:1
**listen** 276:1
284:10 289:19
302:11
**literally** 282:22
411:17
**litigated** 194:7,10
**litigation** 6:15
249:2 342:8
343:10,17 344:17
410:18
**litigator** 344:17
**little** 17:19 31:13
75:20 225:9
247:13 253:2
254:5 259:2
282:21 290:10
301:11 313:7
314:14 332:13
336:18 356:18
382:21
**lo** 350:7
**located** 8:21
199:10,12
**lock** 275:8
**loggerheads** 304:8
**logic** 248:19

[logical - marked]                                   Page 35

**logical** 133:5
  171:8 181:12
  331:18
**logistics** 43:15
**long** 4:17 124:2
  155:18 171:14
  174:8 178:11
  198:16 226:9
  233:12 250:5
  302:2 321:9
  326:20 327:3,6,8
  327:12 353:9
  372:11 417:17
**longer** 74:20 115:8
**look** 57:11 62:8
  80:5,8 92:19
  105:5 127:6 130:1
  147:14 148:7
  171:5,13 174:3,18
  180:12 203:1
  211:17 215:15
  220:2 229:13
  233:22 234:2
  237:2 261:9
  264:14 273:5,15
  276:16 284:14
  288:2 304:4
  315:19 328:12
  331:18 339:6
  341:5,10 351:12
  353:4 354:22
**looked** 110:11
  155:16 156:3
  264:7 364:8
**looking** 117:18
  143:18 155:19
  179:4 180:6 181:3
  181:20 236:15,17
  237:4 326:18
  355:9 362:19
  371:3 378:21

385:17 434:7
**looks** 83:4 93:3
  159:16 165:19,21
  225:2 375:12
  431:1
**los** 4:14,19
**lost** 287:9
**lot** 20:1,7 40:21
  52:10 84:12 88:4
  91:8,17 112:16,17
  113:5 143:2
  147:15 150:15
  204:16 211:13
  222:5 231:5
  232:11 243:14
  285:16 288:12
  345:12 359:10
  360:17,17,18
  411:18
**lots** 230:22 243:10
  347:4,5 360:21
  362:15 366:14
  432:22
**louder** 336:18
**love** 160:19
**lower** 132:17
**lumber** 201:13,18
**lunch** 205:20
  211:6
**lupe** 5:1 381:5,7
**lynn** 1:16 437:3,20
  439:14

---

**m**

**m.s.** 6:14
**mail** 204:8
**maintain** 90:16
  346:11
**major** 54:6 78:18
  81:22 103:9 360:3
  413:22 417:14

**majority** 349:15
  349:17
**maker** 267:20
  305:15 306:7,18
  307:15 308:6
  362:9 363:8 366:5
**makers** 304:15
  307:5
**making** 36:19
  177:2 209:5 290:5
  338:2 352:6 358:5
  434:5
**maldef** 5:2
**maldef.org** 5:4
**man** 433:21
**manage** 41:18,20
**managed** 374:17
**managing** 44:20
**mandate** 140:17
**manning** 385:21
  385:22 386:1,3,13
**march** 64:6,8 65:1
  67:22 68:4 69:3,8
  72:15 77:19 78:1
  81:16,20 82:7,13
  83:2,5,14,16 88:1
  88:9,11,17 89:9
  115:13 137:11
  140:21 146:13
  149:13 199:4
  208:1 241:8,12,16
  241:18,19 242:3,9
  287:19 290:17
  318:2 322:1,12
  323:9,10,15 324:2
  324:13 326:6
  343:1,20 345:3,14
  345:15 346:17,21
  352:10 375:21,22
  376:8 384:4 420:1
  420:14 424:4

426:8 428:13
**margin** 354:12,19
  354:20 356:12,13
  357:14 358:1,3,3
  361:11
**margins** 352:15,20
  354:10,16 355:21
  356:2,4,9,20 357:5
  357:19
**mark** 55:22 62:1
  82:14 93:16 114:6
  120:13 123:18,19
  124:2,3 127:10,15
  127:16 137:16
  145:5 147:8
  155:14,20 156:2
  158:16 160:17
  161:3 163:18
  164:5,8,13 167:1
  172:7 173:22
  182:3 189:5
  194:13 199:19
  212:10 215:17
  218:4 219:17
  224:14 226:16
  234:18 292:22
  317:18 325:21
  353:10,21
**marked** 56:3,11
  62:4 80:9 82:18
  87:6,9,12 93:20
  111:15 114:8,11
  120:16,20 123:9
  123:12 137:18,20
  145:8,11 147:11
  158:20 164:15,18
  167:3 182:8 189:8
  194:16 199:22
  212:15 215:20
  218:7 219:20
  221:18,20 224:17

226:19 234:21
293:3 309:4,15,19
310:4 317:21
318:1,12 320:2,9
326:2,5 339:6
341:6 372:14,16
372:18 373:2,18
374:18,21 375:2
375:17 376:1,12
376:14,22 378:17
378:19,21 383:22
**marking**  62:6
**marshal**  406:5
**marshall**  405:11
405:19 406:9
**mary**  157:11,11
167:8,10,13
184:11 185:22
188:1 269:13,17
269:22 338:5
381:9 410:9
**maryland**  4:2
89:22 90:2 91:11
381:6
**mason**  13:20
**massachusettes**
4:4
**massachusetts**
1:15 6:10 8:21
438:16
**masse**  90:6 91:3
91:11 92:8
**massively**  162:18
**matching**  369:2
**material**  232:7
359:18 360:2,6,7
360:16 361:5,19
362:2,20 363:1,11
363:17,22 365:11
365:20 366:4,7,14
367:4

**materially**  358:15
358:19 361:2
363:12
**materials**  72:12
92:9 105:8
**math**  365:5
**matt**  110:22
**matter**  8:15 16:22
18:1 22:4 37:20
52:13 68:10
168:18 179:4
193:17 194:1
203:2 204:10
220:17 229:8
230:13 231:1,19
233:22 237:4
266:10 290:8
342:11 400:13
407:3
**matters**  19:17
22:2 31:22 32:9
40:6,13 51:20
102:16 119:4,8
124:10,13 411:10
**matthew**  5:16 6:2
10:1 164:21 165:8
165:9
**matthew.colang...**
6:7
**matthew.wise**
5:20
**mcannon**  6:18
**mcconnell**  23:8
**mchenry**  174:20
175:5 177:22
179:8 184:13,14
185:22 196:14
270:20 271:21
272:2,8,11,22
273:4 275:12
276:21 278:4,11

278:17 281:4,5,11
281:14 282:20
284:3,11 285:4,8
381:10,17 382:10
382:15 383:3
410:13
**mchenry's**  175:1
175:13 281:22
410:14
**mean**  14:5,15 15:7
20:11 21:15 29:19
30:14 32:2 39:2
42:1 44:2 49:22
50:12,17 52:1,6
75:21 77:5 91:4
92:1,12 99:12
109:15 111:1
124:14 128:1
130:11 135:19
137:3 139:4
148:20 149:22
152:3,9 155:12,17
159:5 174:14
183:17 185:20
187:8 193:9 197:3
214:20 223:22
241:10 243:11
245:15 261:12
271:6 272:16
278:16 288:16
304:13 330:7
331:10,13 332:7
344:21 356:8
357:21 358:19
361:4,6,10 362:2
389:19 390:19
409:12 411:8
430:21
**meaning**  15:9
21:17 39:11
108:10 339:10

**means**  16:14 53:3
70:14 150:1
185:21 224:12
329:8 354:10
429:20
**meant**  57:21 152:4
222:19 243:16
**media**  8:13 111:6
111:10 158:12
211:22 212:4
250:7,11 308:18
308:22 380:17,21
389:14 390:6
402:16,17,19
**meet**  23:13 38:11
39:8 54:8 90:18
90:19 91:12,21
92:8 98:19 101:16
124:6 125:20
170:15,16 313:19
314:2 421:2,11
**meeting**  2:17 11:9
16:13 23:17 32:12
32:18 33:2 38:14
38:20 39:3,5,6
40:9 60:13,18
64:2 71:17 72:13
91:15 92:15,17
97:22 98:1 121:18
139:18 156:21
157:7 161:10,13
169:11 170:2,21
171:14 172:12,16
173:2,16,20 174:8
194:15,22 195:6
196:5 201:21
202:1,12,15
220:11,12,14
221:9,12 270:9
314:4 322:8 323:1
323:12 324:1,4,12

338:14 397:13
398:13 421:5
**meetings** 17:21
19:1,13 22:8,11,16
23:12,15,20 24:12
25:21 26:11 38:10
38:11,22 47:17,21
54:2,4,11 60:10
61:13,19 90:14
91:17 102:3
161:19,22 162:8
166:11 200:14,21
201:4,8 221:14
322:10,11,22
323:3,7,13 398:15
398:19 399:2,5
**member** 15:17
22:19 23:1,19
123:21 406:14
**members** 16:21
17:3,22 23:5,14
24:13,14,18,22
28:8,9,19 30:7,10
31:7 32:19 53:14
53:17
**memo** 2:11,16,16
3:3,3,6,6,8 40:18
41:2 93:19 94:21
94:22 95:1,2,4,12
95:15,17 96:8,13
97:18 98:9,10,15
98:20 99:2 100:13
101:2,19 104:16
107:12 110:17
111:15,19 113:10
113:19 136:22
137:4,5 174:17,19
179:17,19 182:7,9
182:16,18,20
183:1,9,12 184:10
184:18 185:17

187:8,18 189:7,18
191:9,12 213:22
215:12 216:9,10
216:19,20 217:14
217:16 218:13
219:10,15 223:17
232:13,20 233:4
237:16,19,20
245:3,4,13 269:15
300:9 301:5,14
303:1,12 305:5
306:19 309:3,18
310:16 311:5
312:21 313:16
315:19 317:3,20
318:2 319:14,20
320:20 321:2
322:1,12,12,20
323:9,10 324:2,13
339:2 346:17
351:19 352:11
353:1 355:1,22
357:9 358:2 366:3
367:3 370:3
371:17 372:16
374:20 376:14
410:20 420:1,2
428:14 432:9
**memoranda**
259:20
**memorandum** 3:4
241:13 242:10,13
244:11 245:14
246:14 247:17
248:2,15 249:3,15
249:22 287:20
290:18 292:2
301:16 302:19
303:22 304:3
305:17 306:9
325:22 326:2,6

341:6,8 343:19
344:1,5 345:17
346:5,12,18,21
347:1 350:20
420:14
**memorandums**
41:13 48:17
**memorialized**
339:1
**memory** 77:8
179:2 288:3 295:6
371:22
**memos** 40:15
422:13 423:1
432:21 433:3,7
**mena** 84:17
140:19 141:4,17
141:19 144:11
**mention** 173:4
257:21
**mentioned** 17:5
19:15 21:19 25:12
28:2 35:12 40:3
46:13 83:21 86:2
86:8 97:18 102:21
146:22 172:6
173:2 196:20,21
197:16 210:12
226:7 236:10,13
239:21 257:21
271:9 289:14
386:14,19 409:14
413:16
**mentions** 223:9
**message** 71:22
114:18 138:14,15
139:16 145:3
152:22 180:6
231:12
**met** 9:22 11:7
22:19,22 23:2,9,16

124:3 125:14,15
169:2,3,8,18 171:3
171:15 173:8
174:2 184:11
187:22 322:15
338:5,8 339:13
**method** 329:11
**methodology** 14:9
**methods** 329:16
**michael** 6:13,19
100:1
**microphones** 8:5,9
**mid** 3:18
**middle** 84:16
86:19 141:20
143:2 429:13
**midnight** 28:20
**mike** 95:7 97:2
98:6 246:9
**miller** 404:2,5,6
404:10,20
**miller's** 404:22
**million** 21:8
327:10,11,16,18
328:1,11 333:11
351:9 361:9
364:15,17,18,20
364:22 365:3,6,7
368:17 423:13
**millions** 328:16
364:11
**mind** 141:14
266:16
**mine** 257:4
**minor** 14:2
**minority** 349:11
349:12
**minute** 9:22 48:1
68:20 146:22
150:21 158:7
205:1 289:14

**minutes** 171:15
178:12 218:19
250:6
**mischaracterize**
425:6
**mischaracterizes**
108:5 210:6 247:2
247:21 253:18
316:22
**miscommunicati...**
236:3,19
**misinformed**
285:2
**missed** 12:12
**missing** 332:12
**misunderstanding**
316:6
**mo** 406:14
**models** 351:9
**modified** 177:18
**moment** 58:5
220:2
**monday** 33:20,21
34:1 218:18
**money** 419:2
**monitor** 46:14,17
**monitoring** 45:1
**month** 179:9
271:5,12
**monthly** 47:20,22
**months** 100:11
121:22 125:6
146:6,10 151:4,18
159:13 166:8
177:7 183:22
184:4 198:18
206:9 209:21
211:2 234:7,10,12
234:14 347:7
**morning** 8:3 38:17
166:1 213:4 246:1

246:17 247:16
248:14 324:5
342:5
**motivated** 113:4
**move** 331:5 415:4
**moved** 44:5,12
188:21
**moving** 168:17
218:3 265:19
**multi** 375:8
**multiple** 48:21
290:15 322:21
323:3
**multiply** 431:10
431:16
**mwalsh** 6:22
**myers** 228:2
**mystified** 146:5
151:17 159:12
177:6 318:12

**n**

**n** 4:1 8:1 25:10,11
**name** 9:1,19 77:10
77:16 87:20 125:1
155:15 157:9,10
167:15 174:7,9,16
174:21 175:1,13
179:15,18,19
205:17 219:6
241:2 262:11
269:8,11 270:13
336:7,9 379:11,14
381:3 410:11,13
420:5 440:2,5
**narrow** 355:16
**national** 44:4,11
50:3 51:1 138:20
139:2,8,19 140:10
140:17 141:12
286:14,20

**nations** 413:16
**nationwide** 366:12
**naturalization**
413:19
**nature** 381:20
**near** 94:11 199:9
**nec** 50:16,22
**necessarily** 45:2
45:16 69:5 86:1
119:18,21 154:16
268:4 276:16
281:19 314:9
332:7 369:16
**necessary** 152:5
152:10 177:17
331:19 342:20
430:7
**need** 39:6 40:20
50:6 57:20 64:12
84:11 105:5 106:7
127:11 128:19
129:8,8,14 153:2
153:11,22 154:6
154:10 155:1,7,21
157:14,21 158:4,5
176:8 180:11
192:15,20 193:4
220:2 236:2,18
240:3 254:16
258:22 261:7
262:3,4,7 263:5,10
263:17,17,21
264:1,8,14 266:4
267:11 272:12
273:12,14 274:9
274:15,21 276:2,2
276:3,7 278:6
294:8 296:5 297:8
333:1 347:12
351:12 365:14
372:19,22 400:2

413:11 415:22
**needed** 15:7 37:17
46:9 59:10 86:14
153:6 156:16
166:8 176:5,8
181:8,22 183:15
247:8 248:3 249:2
264:4,16 279:14
294:22 296:8
344:16 416:5
**needing** 392:6
**needs** 84:1 157:17
157:22 158:1
253:10 258:19
**negative** 319:18
**negotiating** 274:16
**negotiations**
201:13,17
**neither** 37:11
67:11 358:12
416:9 437:12
**nelson** 23:16
**neuman** 123:18,19
124:2,3 127:1,3,7
129:10,21 130:11
131:11 132:1
155:14,20 156:2
160:17 161:3,20
163:18 164:8
172:7 173:22
**neuman's** 130:1
**never** 15:12,13,14
112:10,13 118:4,6
122:14 123:7
152:12 164:11
171:22 175:7
185:9 207:21
255:1 258:14
259:7 271:16
272:11,12 279:3,5
279:8 281:9 291:4

291:5,12,13 298:7
307:7,9 315:7,8,9
315:12 316:2
320:7 324:12
335:2 349:16
364:7 385:10
387:14 392:20
400:21 406:4,9,20
408:3,6 409:16,21
409:22 419:11
434:22
**nevertheless**
350:14 352:1
**new** 1:2,3 4:1,3,7,8
4:8 5:12 6:1,5,5
8:16,19 10:2 76:5
178:13 241:3
438:18 440:2
**newman** 124:21
133:10,19 134:12
135:5,10 136:2,6
136:10,19 156:10
162:1 164:5
**newseum** 115:20
**nice** 77:9 121:18
**night** 12:17 28:20
73:8 75:8 83:7
88:4 117:3 128:19
**nine** 198:18 234:7
234:10,12
**nist** 43:14 44:13
**niyati** 5:5
**nom** 27:3
**nominated** 27:3,5
27:9
**nomination** 27:2
28:7
**nominee** 16:17
18:14,21 20:10,11
20:11,13 21:11,20
22:2,6,18 24:13,20

26:8,9 28:11
**nominees** 16:18
17:6
**noncitizen** 65:5
353:8,22 367:7
414:18 418:5
430:6
**noncitizens** 67:2
85:19 208:3,6,11
208:14,17 332:6
353:9 367:13
414:7 416:22
418:3 425:22
430:2,18 431:7,11
431:16
**nongovernmental**
53:22
**nonresponders**
432:17
**nonresponse**
360:12 361:3
**nonresponsive**
331:6
**nonstop** 160:20
**nope** 10:8 77:4
112:12,15 197:20
259:19 270:19
**normal** 290:1
**normally** 71:12
91:14 277:12
318:14
**north** 84:16 86:19
141:20 143:3
336:13
**northern** 420:9
**northwest** 8:22
439:15
**norton** 292:12
293:21 294:10
298:18 299:7,18
300:3

**note** 8:5 128:13
130:21 318:11
375:17 380:9
409:12 419:11
423:5
**noted** 9:9
**notes** 172:14
211:17
**notice** 1:14 92:12
130:14 203:14
321:1 387:4
**noticed** 304:13
**notices** 283:2
**notification** 2:17
57:19 58:20 61:6
64:16 84:1 87:3
88:22 130:3
140:20 194:16
195:1
**notifications** 86:10
88:17 89:5
**notify** 59:8,10
84:8 127:11 129:8
**noting** 132:9
**notion** 54:16 68:21
**notionally** 37:10
**notwithstanding**
70:16 401:18
**november** 15:16
15:19 16:7 27:6
27:10
**nrfu** 366:13 367:3
**nshah** 5:9
**ntia** 44:12
**nullify** 302:8
**number** 2:8 14:2
64:13 81:11 111:7
111:11 147:9
158:13 163:16
178:18 191:20
201:20 209:21

212:5 223:18
229:9 250:8
308:19 309:1
327:22 328:9,10
330:22 332:21
345:6,6 355:18,19
360:12 364:5,10
380:18,22 384:2
417:12 428:20
431:6,9,17
**numbered** 62:7
**numbers** 72:2
364:8
**numerous** 226:10
229:10 244:1
**nw** 1:15 3:18 4:4
4:12 5:2,7,12 6:16
6:20
**nyclu.org** 4:9

**o**

**o** 8:1 25:11 141:8
**o'melveny** 228:2
**oag** 235:12
**oath** 9:6
**object** 62:15
345:18
**objected** 69:22
**objection** 69:18
70:9,16,17 83:17
98:11 106:4 108:4
116:13 117:5
118:11,17 120:1,7
122:6,20 130:12
133:1,21 134:15
134:20 140:6
142:11 143:7,16
144:20 146:18
148:21 159:20
160:10 161:4,15
163:4 166:15
186:7,12 187:1

Case 1:18-cv-02921-JMF   Document 413-1   Filed 10/27/18   Page 480 of 507

[objection - okay]                                                        Page 40

189:1 195:12,20
200:22 202:19
204:11 206:5,11
206:19 210:5
225:21 226:5
228:9 235:17
246:20 247:1,20
252:3,17 253:8,17
254:12 255:9
258:6 259:11
263:19 268:14
274:7,10 275:3
276:5 280:15
284:17,21 286:6
286:15 297:13
299:12,15 301:2
301:17 303:3,4
304:5,6 305:1,18
306:12,22 307:20
308:11,12 329:3
331:11 334:20
340:13 343:21
366:20 380:7
381:18 384:15
390:2,11 392:8,17
404:15 407:15
409:1 410:3,6
412:7,10,11 413:7
415:6,9,18 419:4
422:5,16 423:3
424:14,15 425:4
426:1,15 427:8
428:8 433:18
**objectionable** 70:8
**objections** 70:7
286:22 425:16
**objective** 28:21
106:18 266:3
267:1
**observe** 229:6

**obstacle** 331:4
**obstacles** 261:14
**obtained** 352:14
357:5
**obviously** 23:7,9
36:18 97:14
110:19 181:2,11
183:19 213:1
249:11 325:10
365:2 370:21
371:17 373:16
410:18
**occasion** 52:17
53:16
**occasionally** 198:1
**occupied** 411:10
**occur** 92:17
398:15
**occurred** 280:17
298:10 397:2
398:11,11
**occurs** 308:5
**oceanic** 44:4
**odd** 103:22 104:9
**offered** 432:5
**offers** 301:1
**offhand** 269:12
**office** 1:14 5:17
6:14 8:20 33:18
35:21 37:8 38:1
41:3,8 42:10,15
43:5,8,19 44:16,20
45:6,20 46:4,5,14
47:6 49:18,21
50:10,16 52:15,22
53:21 57:2,13
58:7 75:14 95:5,6
99:17 100:14
101:18 127:18,21
128:2,4,7,8,11,18
169:3,8 173:7,13

173:16 188:20,22
189:4 196:11
198:14,17 199:9
199:11,12 200:8
201:7 214:8
216:12 232:21
235:13,16 245:20
246:16 247:6,9
249:18 255:15
258:10 281:7
283:21 310:6
325:16 342:7
377:21 378:7
386:1,2
**officer** 437:4
**official** 36:18
295:3
**officially** 39:21
**officials** 37:18,19
90:4,19 96:2
111:20 112:2,7
113:11,13,16,21
245:1
**ogc** 99:20 101:10
187:15 219:12
**oh** 148:7 159:6
191:22 309:19
318:18 328:17
**okay** 10:9,14 12:9
12:16,22 13:8
14:8,18 15:6,16,22
16:3 18:18 19:9
19:15 21:6,14
23:11,13,20 24:5
24:12 25:22 27:5
27:14,17 29:3
30:22 31:6 32:5,7
32:11,16 33:6
34:4,8 35:12 36:9
36:12,16 37:6
43:4 45:5 47:4,22

48:11 49:3 55:15
55:18 56:19 57:11
58:6,18 59:3
61:18 63:7,11,22
64:10 65:5,11,13
66:18 67:6,9
69:16 70:6 71:8
71:15,21 72:17,20
73:12 74:4 75:13
76:16,19 77:12
79:13 80:5,19
81:7,13 82:12
83:15 84:4 85:1
85:16 86:17 89:12
89:21 90:3,9
91:10 92:4,7,19,22
93:16 94:9,21
95:3 96:18 97:6
98:9 99:9,12,16
100:18 102:2
105:6 106:7 107:8
109:12 110:5,21
111:19 113:9,18
116:4 120:12
121:7,10 122:4
125:5 128:10
129:10 131:14
132:7 134:11
135:8,14 136:5,15
138:19 139:16
141:19 143:1
144:6,10 145:12
145:15 146:1
147:13,15,22
148:11 150:11
152:2,17 155:16
157:3,13,21
158:16 159:9
161:9 162:7 163:2
164:2 166:19
167:17 168:9

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

171:2 174:13
175:5 176:19
177:21 178:5,13
178:16 179:7
181:14 183:17
184:17 186:5
188:10 189:5,5
191:8,18 195:2
197:11 200:7
202:1,5,12 203:4,8
204:9 205:3,11
209:20 210:2
213:2,10 214:3,15
215:2,11,16 216:4
216:8,19 218:12
218:16 219:17
220:4,5,12 221:17
227:1,12 229:13
230:16 231:22
235:3,14,22
237:14,22 239:1
239:14 241:5
242:15 244:8,8
250:2,18 255:6
256:13 257:9
258:9 259:17
263:16 274:19
276:17,21,21
287:7,13 290:19
292:6 293:12,16
293:19 294:4
298:1 300:19
308:4 309:16
311:11 312:16
313:22 314:22
318:9 321:1,4,10
323:6,16 328:18
334:12,17 335:9
336:10,15,22
341:12 342:12
367:12 373:20

374:18 379:17
382:12 384:8,10
384:11,21 385:17
385:19 386:3,12
386:16,21 387:2
389:3 394:4 401:1
401:15,22 406:20
407:9 408:16
415:14 416:3
418:8 419:13
420:11 421:8,20
424:2 425:19
427:3 428:13,19
428:21 429:4,17
430:15 431:12
434:17 435:5
**old** 146:6,11 151:4
151:19 159:13
166:8 177:7 184:4
**omb** 52:6 154:6
**onboarding** 34:21
35:1
**once** 103:21
150:13 209:14
211:17 247:22
248:19 297:15
322:15 347:10
371:20 410:22
411:13
**ones** 43:9 332:1
405:22
**ongoing** 84:19
**online** 110:11
**op** 48:17
**open** 256:16 257:1
289:16 335:21
435:19
**operated** 197:14
**operates** 204:16
**operation** 124:15
126:1

**opinion** 207:21
428:6 429:13
432:19 433:6
**opinions** 433:3,12
**opportunity** 130:9
130:11 131:9
132:2,8,10 133:20
135:21 285:5
**oppose** 435:20
**opposed** 45:21
318:13 350:18
**opposite** 265:20
**opsp** 283:19
**option** 352:11
353:18 423:9
429:5,8,12,12
435:21
**options** 368:20
422:13 423:1
**oral** 1:13 40:14
71:14,17
**orally** 9:10 71:7,8
**order** 10:19 28:11
90:14 109:22
129:11 152:14
154:19 155:9
181:21 217:13
239:7 282:19
327:9
**orders** 48:18
**ordinarily** 68:16
**organization** 12:5
125:1 192:8
**organizing** 57:8
**orientation** 64:18
84:18 86:18
130:16,22 131:14
141:9
**original** 180:14
185:6 245:3,4
346:11 384:12

439:4,8
**os** 57:12,13
**ought** 105:8
**outcome** 9:8
437:17
**outlined** 107:1
175:18 181:22
239:7 319:19
320:19 366:3
**outlining** 214:1
**outreach** 419:1
**outset** 272:14
**outside** 23:14
53:22 54:8,14,15
77:22 91:20 100:5
100:14 139:5
255:15 325:11
393:9 406:21
407:9,13,19
409:15 410:18
**outstanding**
435:17,22
**outweigh** 304:11
363:22
**overall** 359:19
**overcharacteriza...**
234:13
**overlap** 338:20
**overrun** 162:18
**oversees** 42:18
**oversight** 3:1
291:22 293:2,6
**overstates** 312:6
**overview** 59:19
60:2

**p**

**p** 4:1,1 8:1
**p.m.** 73:8 83:5,14
116:1 128:14,18
203:9 212:1,5
235:8 240:19,22

250:8,12 308:19
309:1 335:12,15
380:18,22 419:15
419:18 435:11,14
436:6,7
**p.o.** 5:18
**page** 2:1,8 66:9,14
78:4 80:8,9,12
88:21 121:7,11,12
127:8 200:11,12
202:6 205:8,10
208:10,13,21
209:6 235:6
293:20 318:4
329:18 352:10,10
353:4,18 354:10
358:8 384:8,9
428:19 439:4,9
440:7
**pages** 438:3
**panel** 406:17,21
**paper** 80:3 172:11
259:18 349:15
390:6
**papers** 402:21
**paperwork** 34:20
154:5 302:3
**paragraph** 57:16
130:8 132:12
182:22 183:8
310:11 321:13
322:1 323:20
329:20 339:8
358:8 429:1,3,11
429:14 433:17
**pardon** 156:8
227:10
**park** 4:15 377:20
377:21 380:5
**part** 13:22 21:8
30:13,15 68:8

76:3 95:21 110:6
116:21 152:11
153:1 159:5,7
215:9 229:17,18
244:21 248:16
249:7,8 273:17
279:19 285:13
296:16 297:21
369:5 375:7 421:4
**participate** 19:12
**particular** 18:3
37:20 42:13 44:22
64:8 92:6 170:20
252:20 261:18
266:10 310:4
314:19 360:3
369:15,22 385:13
387:3 391:10
411:16
**particularity** 33:5
**particularly** 28:9
35:10 84:6 261:8
344:21 412:1
**parties** 1:19 8:11
118:21 437:13,16
**partitions** 256:22
257:7,8
**partner** 12:3
**party** 9:6 125:7
192:12
**pass** 30:2 174:22
**passing** 218:13
**pay** 34:6 308:8
**paying** 164:1
**pending** 84:21
86:16
**people** 16:10,12
20:3 30:18 31:12
41:4,5 42:3,9 43:5
43:19,19 44:20
47:2 63:21 65:3,6

84:17 91:6,9,11,20
102:5,22 107:15
108:18 131:1
150:16 152:12,15
176:5 192:10,19
197:15 202:7
204:14 211:14
224:10 244:1,3
255:17 258:10
266:22 273:9
281:13,20 282:14
284:10 289:12,15
322:8 323:17
325:11 327:10,11
327:16,19 328:3
328:16 330:13
331:18 332:4,8,21
334:4 345:7
349:14,18,22
351:16 355:4,8
360:13,22 362:16
362:19 363:5
385:3 388:15
407:18,19 410:17
414:9 417:12,16
418:8 421:21
430:19 431:3,6,10
431:15 433:20
**people's** 359:4
**percent** 224:1
328:6,7,15 331:1
332:4,6 353:2,6,11
353:22 354:13
355:2,4,5,8,11,17
357:12 362:6,10
362:22 364:6
365:1,9,15,17,17
366:1,12,18,19
367:3,7,20 369:1
414:7 416:22
417:15 425:21

431:3,6,8,11,14,14
**percentage** 108:17
351:4 361:18
430:7
**perception** 143:10
414:2
**perdue** 52:12
**perfect** 11:3
**perfectly** 264:11
302:8 434:6
**period** 30:14
31:19 32:7 34:7
34:17 55:11 96:7
147:1 179:7
197:12,14 262:15
271:8 277:17
283:16 290:4
341:2 369:4
383:17 419:21
420:12,20
**permit** 429:22
**perry** 4:7
**person** 16:17
43:14,17,22 44:1,4
44:10 48:5 76:7
77:5,7 90:5,20
91:12 92:8,13
104:3 125:14,15
153:16 161:7
169:18 171:3
173:9 179:20
183:5 184:11
203:14 213:16
214:18 215:5,7,13
266:21 267:6,17
282:20 283:13
285:9 295:4
339:13 382:5
391:9,12 396:18
397:22 410:16

**person's** 179:15
**personal** 167:10
    205:17 262:5
    266:10 300:11
**personally** 68:2
    297:9 400:12
**personnel** 21:1
    32:3 34:21 35:1
    74:10
**persons** 66:2
    345:2,9 353:7
    416:19
**perspective**
    259:17 266:10
    352:2,5
**persuade** 284:11
    284:15
**persuading** 282:20
**peter** 95:11 100:6
    100:8 218:17,22
    225:1,8 227:16
    231:20 288:15
    386:18 396:15
    399:7
**pgrossman** 4:9
**phone** 74:3 118:16
    121:19,21 122:9
    156:6,11 169:3,4
    169:13 170:6
    175:15,16 178:3
    179:8 184:17
    210:3,17 217:19
    270:8 271:6 398:1
**phones** 8:8
**phrase** 278:10
    355:21 356:4,7,20
    360:7 363:11
    366:7
**phrased** 280:21,22
    337:16 348:11

**physically** 34:13
**pick** 8:6 431:5
**picture** 77:14
    351:11 354:7
**piece** 224:11,12
**pine** 4:16
**pitfalls** 67:19
**place** 8:8,11 60:2
    89:13 122:9 130:6
    132:10 135:16
    149:18 151:22
    152:3,8 171:8
    181:12 204:18
    337:21,22 348:14
    397:22 411:9
    439:15
**placed** 64:15
    163:18 301:8
    418:15
**placing** 265:16
    429:18 434:18
**plaintiff** 8:15
**plaintiff's** 383:20
**plaintiffs** 1:4,14
    2:9,9,10,10,11,11
    2:12,12,13,13,14
    2:14,15,15,16,16
    2:17,18,18,19,19
    2:20,20,21,21,22
    2:22 3:3,3,4,5,6,7
    3:8,9 4:10 5:1
    10:3 56:2 62:3
    80:17 82:17 87:8
    93:19 114:7
    120:15 123:11
    137:17 145:7
    147:10 158:19
    164:14 167:2
    182:7 189:7
    194:15 199:21
    212:14 215:19

218:6 219:19
    221:19 224:16
    226:18 234:20
    241:4 293:1 309:3
    317:20 326:1
    372:15 374:20
    376:13 378:18
    381:4 383:21
    420:7
**plan** 415:4
**planned** 419:1
**planning** 36:2
    37:8 52:8 150:16
    200:9 283:21
    377:22 378:8
**plans** 115:20
**plausible** 86:6
**play** 204:13
**please** 8:5,7 9:12
    9:19 10:12,20
    46:2 79:5 98:5
    100:7 135:1
    213:16 214:17
    296:13 336:18
    339:7 439:2,8,11
**plenty** 130:15
**plus** 263:9 266:21
    413:21
**point** 10:11 12:13
    60:20 64:11 69:13
    75:15 105:7,12
    135:7 137:1,8
    139:20 142:15
    150:4 165:11
    166:13 171:20
    179:22 185:17
    186:1,2,6 187:12
    199:13 216:15
    234:7 237:15
    241:8,12 251:2,13
    268:2 273:4

275:12 292:17
    294:17 315:1
    316:2 332:2
    342:12 361:18
    362:5 371:18
    374:1 408:18
    411:6 414:12
    415:2
**pointed** 193:2
    227:6 278:2
    331:20 369:21
**pointing** 131:7
**points** 124:20
**policy** 19:2,7,10
    19:12 32:9 33:9
    33:11,13 35:13,18
    35:20 36:2 37:8
    37:20 38:1 41:3,8
    41:16 42:7,10,15
    42:21 43:8,19
    44:16,19 45:2,5,6
    45:16,20,21,22
    46:4,5,6,7,14 47:6
    48:2 49:21 50:2
    51:20 52:15 53:15
    53:21 54:6 57:2
    84:7 86:11 102:16
    124:10,12 128:7
    131:19 143:11
    150:5 173:7,13,16
    200:8 201:8
    257:16 267:6,17
    283:21 377:22
    378:8 404:8
**political** 13:17
    58:7 74:13 75:11
    75:12,21 104:10
    359:4
**politicals** 57:12
    76:5

politics  104:11
poorer  319:16
  320:16
popped  342:4
population  108:17
  155:8 272:18
  328:8 332:9
  349:10,13,18,22
  352:18 354:4
  355:3,17 357:7
  361:19 364:8,21
  368:7,13 430:3
  431:3,13
populations
  124:17 138:22
  139:10 140:11
  141:13 331:21
  349:12,13 359:13
  359:14 360:20
porter  1:15 4:4
  8:21
portfolio  281:22
portion  429:16
posed  70:19
position  33:7
  35:20 37:22 38:7
  44:7,13 74:9,13
  84:4 116:8 131:19
  142:18 173:13
  175:8,11 188:19
  188:22 281:14
  313:9,14,15
  317:11,15 336:1
  410:14
positions  19:2
possibility  133:4,9
  135:18 160:12
  164:5 171:5
  176:22 180:7
  190:17,21 380:13

possible  55:21
  65:22 72:19 85:14
  89:17 93:12 95:13
  95:16 101:12
  102:1 133:17,18
  135:13 145:4
  169:7 197:16
  201:6 203:22
  231:2,2 254:9
  282:19 306:7,17
  306:18 318:16
  324:8 376:17
  380:15 406:18
  422:10
possibly  60:20
  61:9 64:3 72:14
  73:19 136:21
  144:5 233:15
  260:5,10 397:12
post  67:7,10,19
  77:14 78:21 79:16
  81:8,20 146:14
  402:22
postal  20:7
postulating  362:4
potential  125:20
  265:18,21 360:16
  363:20 367:18
  395:22 406:21
  408:7
potentially  64:15
  84:12 146:15
  368:22 397:17
practice  13:2
  159:19 413:20
practiced  15:14
  193:11,19
practices  108:22
  109:4,13,21 110:7
pre  213:22 311:5
  320:2

precedent  379:7
precise  230:5,7
precisely  130:18
  142:21
predecision
  375:18
preliminary  153:9
  153:14 154:2,20
  156:18
premise  258:19
  303:10
premised  301:20
premises  258:18
prep  26:19 288:13
preparation  56:17
  62:13 345:13
prepare  20:10,18
  29:21 183:12
  232:21 243:18
  289:15 290:22
  369:8,9
prepared  11:5
  179:17 183:14
  232:5,19 288:10
  324:16 342:16
  368:16 423:14
preparing  18:20
  29:12 216:9
  219:12 288:18
prepped  289:1
prepping  26:10
  290:10
presence  315:11
  315:17 322:3
present  1:18 34:13
  76:12 97:22 126:5
  126:7 151:7 152:4
presentation
  322:20
presented  223:7
  264:5 316:20

330:9 332:4
  347:12 360:14
  391:7
president  116:7
  385:2 388:14
  392:14,20 393:5
  393:13 404:8
president's  29:1
  392:5,11 393:2
presidential  15:18
  16:4 17:16,17
  48:17
press  77:5,7 198:3
  257:17 386:11
  389:20 390:1,15
  390:20 402:9,13
presumably  65:16
  163:16 220:18
  222:5 365:18
presuming  295:4
presumption
  177:14
presupposes
  304:10
pretextual  301:1
pretty  31:4 128:17
  343:9
prevent  84:7
previous  149:4
  159:6 247:2,3,21
  377:7
previously  96:2
  103:8 111:20
  245:2 305:8
priebus  394:5,9,16
primarily  179:10
  224:9 257:16,17
  325:15
primary  41:11
  48:5 124:20 161:6
  171:1 181:11

208:19 242:18
263:14 338:21
421:20
**prime** 369:14,16
369:17
**principal** 242:15
242:16,17 345:5,8
345:10
**principally** 345:2
**print** 384:17,22
**prior** 23:17 41:8
64:12,14 84:11,14
84:22 86:15,17
108:5 130:20
168:11 242:2
253:18 298:8
333:5 346:20,21
347:8,18,20 384:5
385:16 397:18
407:13
**priorities** 160:6
**priority** 168:10
172:21 383:1
**privacy** 167:10
205:17
**private** 8:6 204:14
**privilege** 186:13
186:15,18 195:22
340:16
**privileged** 340:11
346:15
**privy** 421:13
**probably** 59:7
64:2,7 83:14 85:2
88:8 94:7 96:20
104:9 124:3 129:1
129:17 141:17
142:18 146:13
147:21 150:4
179:9 190:11
211:16 215:14

225:6 243:2
261:16 271:6
285:13 323:14
341:4 346:14
390:14 391:13,21
413:11 431:8
**problem** 196:7
207:12,18 333:3
355:5 413:22
414:5,10
**process** 23:22
28:11 30:20 31:13
84:1,19 88:22
97:1 106:10 150:3
152:5,11,20 153:1
154:16 176:5
181:5,22 211:3
239:4,5 296:3
345:20 348:13
350:20 372:13
374:5 379:5
**processes** 106:1
152:13 347:4,6
**processing** 34:19
**proclamation**
50:13
**produced** 78:11
80:16 81:2 137:5
247:10 248:20
309:14 311:9
320:11 321:8
**product** 62:17
429:6
**production** 302:3
**professional** 42:8
**program** 402:11
**programs** 103:14
203:21 204:2
**progress** 172:22
183:14,18,22
197:4 215:1

225:11 230:10
231:15 232:4
233:3 338:2
**promise** 239:19
**promote** 350:6
**prompt** 161:2
**pronounce** 87:20
**pronounced** 203:7
**pronounces**
379:11,14
**properly** 124:19
281:1
**proposal** 334:17
**proposed** 335:3
351:7
**proposing** 368:15
369:19
**proposition**
305:14 306:6
**prosecuted** 419:12
**protected** 62:21
414:17
**protection** 6:4
**provide** 30:4
77:11 95:11,14
103:16 132:14
139:15 162:22
167:16 174:9
177:20 274:13
331:14 349:6
354:5,6 356:14
370:10,21 403:22
424:22 425:11
426:17 427:10
429:9
**provided** 95:2
126:17 132:19
155:14 156:2,5,10
156:12 157:10
174:6 248:6
258:20 275:5,10

301:7,21 303:12
317:5 321:7
344:15 354:15
367:10 370:17
372:1,7 418:2
434:7
**provides** 103:13
312:21 313:16
350:3
**providing** 95:3
350:9 355:1
422:14 423:1
**public** 386:2,11
**published** 390:5
**pueblo** 381:7
**pull** 22:22 284:15
**pulled** 66:19 91:17
**pulling** 66:16
**purpose** 11:14
350:4 369:18,19
408:21 414:14
**purposes** 65:6,21
67:3 85:20 207:14
207:20 208:4,6
249:1 421:4
**pursuant** 1:14
348:17
**pursue** 151:2
152:6 154:10
264:15 265:15
279:12
**pursued** 415:15
**pursuing** 150:19
**put** 61:20 132:2,8
174:17 176:8,19
190:11 243:4
245:9 248:12
267:16,16 295:20
300:1 302:13
306:5,18 307:13
323:19 327:14

**puts** 306:8 308:6
**putting** 91:18
164:5,8 180:7
337:1,12 348:3
372:8
**puzzled** 202:8,13
202:17

**q**

**qfr** 32:1
**qfrs** 29:15,17,22
30:8,12 31:15
**quality** 78:6
310:21 312:1
315:3 319:16,18
320:16,18 350:16
**quantify** 354:21
361:4 362:2
**quarter** 361:18
362:6,10,22
363:16
**quarters** 78:4
**question** 10:4,11
10:21 20:16 21:12
21:15,16 24:3,6,9
24:15,18,21 30:3
31:17 43:3 45:14
47:14 51:4 53:8
53:12,18 54:9,12
54:17 55:6,13
59:13 61:6 63:5
63:16,18 64:1
65:12,14,17,20
67:5 68:6,13,17,22
69:10,11,13,14,17
70:10,15,19 71:4,5
71:17,19 73:17,20

333:3 337:15
338:10 347:21
348:12 367:22
411:19,20 419:2
435:21

76:13 77:22 79:6
79:17,18,22 81:15
82:4,8 83:8,20
84:15,17 85:18
86:19 90:13 96:1
96:15 97:8,17
103:2,5,7,12,18
104:1 105:8,19
106:3,9,18 107:3,6
107:11,13,19
108:1,19 109:9,16
110:1,20 111:21
112:7 126:6 127:2
127:11,15 128:11
128:22 129:11,11
129:16,20 130:22
131:3,4,12,15,20
132:2,8,10 133:5,6
133:9,20 134:6,12
135:5,12,17,18
136:12 140:4,12
140:18,19,21
141:7,14,21,21,22
142:8 143:3 144:1
144:11,15 146:7
146:11 149:17
150:3,11 151:2,3,5
151:15,20,22
152:2,6 153:4,13
153:17 154:10,13
155:2,17 156:9,17
157:5,15,19 161:2
161:21 162:7
163:3,7 164:10
166:10 168:4
170:12,22 171:6,7
171:17,21 172:1,3
173:15 175:21
176:11,13,17
178:10 180:8,8,15
181:19 187:3,7

188:5,11 190:4,7
190:10,12,14
192:16 193:5,6
194:4 195:4,8,10
195:16 196:2
203:1 204:7 208:2
208:7,16 209:13
209:21 214:2,5
216:5,10,20 218:1
218:14 219:13
220:13 221:9
222:14 223:4,8
225:12,16,20
230:11,14,18
231:18 232:2,6,9
232:19 233:3
237:18 239:13,16
240:3 241:14
242:6,11 244:22
247:13 248:11,19
251:1,4,10,13,22
252:16,21 253:2,3
253:4,7,10,11,14
254:3,5,6,10,17
255:3,8 257:12,12
258:2,12,16,18,20
259:2,3,4,6,9,13
259:15,16 260:7
260:14,17 261:1,9
261:15,22 262:3,6
262:8 263:1,1,6,7
263:12 264:6,15
265:3,4,16 266:5
267:16 268:1,8
270:3,6,16 271:20
272:1,5,9 273:21
274:11,17,22
275:9 277:21
278:9,15 279:2,9
279:13 280:2,14
280:19 284:7

285:22 286:12
287:16 288:8,17
289:5,6,22 290:20
291:2,9,19 292:15
294:7,11,14,15,19
295:9 296:4,18
297:12,22 298:6
298:19 299:5,8,10
299:17,18 300:1,4
300:5,6 301:9,11
302:2,5,6,12,15,18
303:9,11,13,14,20
305:9,21 306:5
308:15 309:9
310:14,20 311:15
311:20 312:1
313:7 314:14
315:21 317:10
319:2,9,11 321:21
322:22 323:4,16
324:16,22 325:4
326:17,17 327:20
330:1,14,20 331:8
332:5,8,20 333:4,7
333:13,14,16
334:8 337:2,10,15
337:21 338:10,15
338:22 339:14
341:1,3 344:18
346:19,20 347:10
347:22 348:4,19
350:17 354:15
355:2,3 359:1,16
360:1,15 361:17
361:21 362:7
363:8 364:1,2
365:10,22 366:4
367:8,14,22 368:8
372:11 373:10,11
373:11,12,13,13
373:18,19,21,22

374:3 375:14
377:10 379:4,10
379:18,20 380:6
381:15,21 383:9
383:14 389:6,7
391:13 392:6,12
393:3,18 394:22
395:22 396:10
399:16 400:6,10
400:20,22 401:7
402:2,6 403:11,21
404:3,12 405:12
406:7 407:1,14
408:21 409:4
410:5 412:6,18,22
414:4,8 415:5,12
415:17 416:21
417:5 418:4,9,15
419:22 421:3,8,12
424:11,12,17
425:2 426:14,22
427:2,7 429:18
430:16 434:19,22
435:2
**questioned** 192:8
**questioning** 111:1
240:14
**questionnaire**
130:5 367:14
**questions** 3:5,7
10:9,19 18:19
22:6 23:3 26:12
26:15,21 28:3,5,9
28:10,14,20,22
29:5,9,19 30:16
64:13 66:9,20
68:9 70:4,8 84:19
89:1 127:12 129:8
130:16,18 131:8
132:15,16 134:2,8
134:9 141:22

146:4 149:11,12
149:14 154:3
220:15 226:10
241:6 242:2,6
244:8 250:16
258:21 288:7,18
289:11 292:11,13
303:18 319:5
326:9 329:17
335:17,22 336:4
349:21 353:9
356:3 362:15
369:6,17,19 370:2
370:4,9,18,19
371:8,16 372:4,5,8
372:15 373:7,9,17
374:14,17 375:10
376:13 377:1
378:10 379:5
381:11 382:1
413:18 416:14
417:13,14,17
419:9 423:20
435:16 439:11
**quick** 30:18
109:19 127:10
168:12 264:14
375:12
**quickly** 106:19
128:20 226:14,15
365:5
**quite** 47:13 52:21
53:1 72:14 73:19
106:19 163:16
224:8 345:6 360:4
371:14
**quote** 59:17 67:10
72:1 75:10 83:8
88:14 115:19
146:3 148:4 202:7
225:9 236:1

310:20 357:12,19
357:19 385:2
388:19
**quoted** 390:6

**r**

**r** 4:1 5:16 8:1
25:10 440:1,1
**race** 349:20
362:15
**races** 259:1
**racial** 138:21
139:9 140:10
141:13
**raise** 24:5,8,17,21
144:14 170:17
**raised** 69:1,4
81:14 96:2 104:3
104:14 111:20
112:7 144:8,15
245:2 390:10
**raising** 131:1
**ramp** 20:22 21:3,4
**ran** 12:5 125:7
407:11
**randomized**
334:12,13,17
335:3
**range** 70:8 105:19
288:18 353:3
365:2
**ranges** 49:10
**rarely** 257:3
**rate** 330:11,21
351:1,3 355:7
358:14 361:3
365:9 366:17
367:4,15,19,20
416:20 418:3
430:2,17 431:14
**rates** 105:20
132:14,17 134:7

137:7 327:5,6
366:13 417:18
**ratio** 430:5 432:16
**rationale** 254:1
266:9,14 267:5,8
267:12,22 268:4
268:17,22 271:18
286:11,18 294:21
296:7 300:10,13
300:16,17,19,21
301:7,8,12,13,21
302:13,15,19,20
302:22 303:21
304:1,4,11,12,15
304:20 305:4,8,15
306:8,9,19,20
308:6,7,9,10
350:22 351:19,20
351:22 352:3
383:11 392:6,11
415:8
**reach** 73:13,15
165:1
**reached** 168:3,6
400:4
**read** 15:5,7,7,9
78:10 79:21 80:21
101:4 130:15
145:13 146:17
238:17 294:5,8
312:17,21 314:11
314:16 315:22
321:13 356:21
376:1 402:9
428:22 429:15
436:3 438:3
**reading** 121:8
206:13 220:1
235:2 388:22
402:19

**reads**   80:20 207:6
  207:11 329:20
  339:9 358:12
**ready**   216:10
  281:4
**real**   300:21,22
  301:12,15 302:20
  302:22 303:20,22
  304:20 306:10
  308:7,9
**really**   30:3 41:17
  77:9 103:20
  184:19 211:3
  229:7 276:1 278:2
  322:15 364:13
  378:6
**reason**   64:17
  140:9 143:5 181:9
  192:9 257:19
  258:1,3,19 260:16
  263:8 264:11
  265:18,21 266:4,6
  268:8,12 272:10
  273:13,15 275:1,6
  286:10 291:7
  295:18 296:9
  300:21,22 301:5,9
  301:15 302:7
  303:6,11 305:3
  306:10 307:16,18
  315:14 316:3
  340:10 343:14,15
  361:20 414:16
  429:14 440:7
**reasonable**   67:17
  289:7
**reasonably**   80:3
**reasons**   70:9 86:6
  86:8 106:22
  167:10 205:17
  259:8 262:1,12

263:15 264:8
  291:1 301:1
  304:16 330:16
  359:10 360:21
  418:21 429:12
**recall**   22:17 24:4,7
  24:11,16,19 25:1
  32:14,20 35:10
  38:8 51:8 53:13
  55:11 58:18,22
  59:4,12,15 64:2
  65:12 71:15 73:21
  76:12 77:10,20
  78:2 85:7,9,12
  86:21,22 87:4
  88:10 92:6 94:20
  96:6 100:2,10
  101:20 102:3
  104:7,13 110:12
  114:19 122:16
  124:5,11 125:18
  131:13 133:12,16
  135:15 136:13,21
  137:14 142:16,21
  145:4 146:15
  155:4 156:3
  157:20 162:9
  170:19 172:10,13
  172:18 173:17,21
  174:1 178:7,18
  179:11 188:8,10
  189:19 191:5,11
  195:13,15 202:15
  207:4,6 209:16
  214:14 215:11
  217:11 225:14,17
  233:13 237:3
  242:8 244:15
  246:22 257:22
  260:1 269:7
  292:14 324:14

340:6 341:18
  367:9 369:5
  370:15 371:19
  372:3 375:4 376:7
  383:10 397:9
  408:5,9
**recalling**   33:19
  67:1
**receipt**   439:7
**receive**   26:21 93:3
  237:16,19 246:7
**received**   31:16
  216:15 222:12
  245:4,5 246:2,5
  247:18 290:4
  291:8 294:20
  295:10,15 335:20
  344:4 347:17
  387:1 390:20
**receiving**   71:18
**receptive**   285:13
**recipient**   115:9
  181:11
**recognize**   212:20
  222:3 384:21
**recollection**   11:14
  27:8 29:8 34:4
  61:3 67:4 68:5
  71:20 89:10 93:11
  196:4 203:17
  258:7 323:6,11
  324:7,10,11 328:5
  346:10 398:12
**recommend**   101:3
  132:13 142:19
  344:22
**recommendation**
  246:13 248:22
  352:6,7
**recommendations**
  86:15,17

**recommended**
  173:9 245:13
  247:16 248:5
  283:8 285:11
  344:11,14 350:15
  421:1,10
**recommending**
  113:18 132:21
**recommends**
  101:2 413:17
**record**   8:4,12 10:1
  11:10 20:16 25:9
  26:12,15,22 28:3,6
  28:14,21 29:6,9,19
  36:21 39:14 50:19
  50:21 60:13 98:4
  111:8,9,12 141:8
  158:8,9,11,14
  164:20 211:18
  212:2,3,6 239:9,10
  240:17,18,20,21
  250:9,10,13,15
  301:8 308:20,21
  309:2,6 311:8
  321:8,9 335:12,13
  335:14 343:3,8
  346:15 347:8
  354:3 380:16,19
  380:20 381:1
  383:20 391:19
  419:13,15,15,16
  419:17 435:7,9,11
  435:12,13 436:6
  437:11 439:10,17
**recorded**   8:14
**recording**   8:10
**records**   37:5 60:10
  350:19 353:7,13
  354:2,5 355:13
  367:22 368:2,9,14
  368:16,18 369:2

418:18,20 421:1
421:11 423:11
424:8,13,21 425:3
429:22 430:20
431:4
**red** 53:4
**redacted** 145:20
145:22 167:9
227:8,11,16
229:20 232:7
340:18
**redaction** 78:12
78:14
**redactions** 222:8
**redactors** 340:2
**redistricting** 14:22
193:19,20,22
194:10 393:22
395:4 396:4
399:20 401:11
404:13 406:8
409:10
**reduced** 437:9
**reduction** 154:5
**refer** 79:3 143:11
146:16 148:11
200:18 281:11
292:18 384:8
414:6
**reference** 137:6
141:17 142:21
187:9,10,18 209:4
229:12 230:12
231:10,17 239:21
302:12,14 357:8
358:2
**referenced** 301:22
409:14
**referencing**
219:15

**referred** 60:3
118:7 141:12
143:6,14 198:9
270:20 352:21
382:10,16,18
409:21 410:9,12
411:11,11,13
**referring** 72:6
96:8,18 102:22
107:15 132:6,8
137:10 149:3,4
150:22 155:3
161:14 187:14
200:21 213:8,21
216:19 217:16
222:21,22 229:8
239:5 241:16,18
241:19 244:16,19
354:11,12 357:10
357:15 358:3
360:7,9 373:22
388:20 400:5
**refers** 58:3 60:22
97:6 113:10
157:13 163:2,7,8
230:13 277:2
321:2 388:12
**reflect** 147:22
165:14 312:17
317:11 377:6
**reflected** 55:19
61:7 72:18,20
89:15 110:16
312:9 313:15
321:12 433:7
**reflective** 317:9
**reflects** 217:21
220:9,10 312:19
327:11,15 377:9
**reform** 3:2 291:22
293:2,7

**refresh** 288:3
**refreshing** 11:14
**refuse** 332:8
**refute** 351:6
**regard** 26:7 48:3
51:10 270:2
**regarding** 21:11
22:2 59:13 95:20
117:13 119:11
127:12 165:1
195:3,8 220:16
221:11 225:11,15
225:20 230:10
233:3 241:15
242:10 244:20
262:6 383:13
394:10,11,13
396:9 400:10
404:2 405:11
409:3 439:5
**regardless** 320:14
**region** 3:18
**register** 283:2
**registration** 13:5
**regular** 38:9 44:14
44:16 159:19
414:1
**reidy** 7:1 9:1
**reince** 394:5
**reinstate** 95:22
244:22 348:19
**reinstating** 96:14
97:7 103:1,5
107:13
**rejected** 352:1,4
**relate** 31:17
140:16
**related** 9:6 15:9
20:9,17 110:7
119:4 224:9
437:12

**relates** 318:9
**relating** 130:4,16
**relation** 14:4,5,6
**relative** 112:17
313:3 437:15
**relay** 383:4
**relayed** 184:19
185:3 233:19
237:11 383:4
**relevant** 39:4 50:6
82:11 108:20
109:6 211:3 253:9
253:14 254:2
260:9 299:9,17
300:8 304:17
340:19 346:22
427:12 428:11
**reliable** 351:5
**relied** 108:2 351:2
**rely** 108:7,13
350:18
**relying** 283:7
**remaining** 355:5
355:10 431:9
**remember** 27:1
28:17 32:16,21
33:2 37:4 60:5
61:1 71:18 79:5
82:2,6 92:4 114:4
147:6 179:15
188:12,14 202:12
210:13 221:12,14
237:22 255:12
287:20 292:13
322:17
**remind** 117:19
356:22 386:9
**reminded** 57:18
**reminder** 28:18
**remote** 20:1

**repeat** 259:5
398:21 403:10
**repeatedly** 223:14
**repetitive** 422:19
**rephrase** 10:13
278:18 422:19
**replied** 165:22
**reply** 71:12 130:1
**report** 9:10 36:4
42:3 43:5 102:11
178:14 197:3,8
252:8 272:15
378:2
**reported** 36:13
37:10,15 266:1
411:20 417:11
**reporter** 9:3,12
13:12 26:13 186:9
191:14 201:14
211:14 243:12
293:17 353:15,20
437:2
**reporting** 1:17
202:6 439:14
**reports** 120:8
310:18 402:17,19
**represent** 10:2
66:18 79:11 80:15
205:14 241:3
290:13 311:7
317:15 320:7,11
336:11 364:6
375:20 420:7
432:15
**representation**
312:8 374:5
**representations**
432:10
**representative**
292:12 298:18
299:7 300:3

316:19
**representatives**
297:10,16 299:18
434:21
**represented**
205:15
**represents** 314:20
342:10
**republican** 307:4
**request** 146:6,11
151:4,19 153:3,7
153:22 156:16
159:13 162:15
164:3 165:15
166:8,9 173:1
176:3 177:2,7,18
177:18 181:8
184:5 185:8 186:2
190:9 192:5 197:6
223:3,5 239:10,15
251:3 262:17
264:5 265:16
271:22 279:1
290:16 291:8,10
294:20 295:10,15
295:19 296:3,6,10
296:13,22 297:3,4
297:8,11,19 298:7
299:4,11 300:7
305:11 309:8,11
348:17 349:4
381:14 382:15
389:14 410:2,22
412:5,13 413:2,6
414:22 415:2,19
421:2 426:13
427:6 429:10
**requested** 64:14
153:17 239:3
261:13 299:19
342:13 348:18

**requester** 180:14
180:20
**requesting** 175:20
204:19 237:17
349:2 412:21
419:22
**requests** 28:13
64:21 154:4
250:22 337:14
421:11
**require** 20:22 21:3
21:4 368:20
**required** 13:22
300:15 419:7
**research** 4:2
108:21 109:13
155:5,6,11,12
172:7 181:6 193:2
282:21 283:3
285:6 413:15
416:8
**researched** 109:4
192:21 326:16,18
**researching**
285:16,18
**reside** 207:12,19
**residents** 80:22
81:18
**resolve** 436:2
**resolved** 139:20
141:2,5 142:10
341:3
**resources** 412:2
419:2
**respect** 86:3
248:13 291:18
309:11 324:20
326:15 382:14
418:4 430:10,19
**respectful** 281:1

**respective** 1:19
**respond** 129:11
332:22 353:9
360:14 367:13
390:7 418:9,10
427:11 430:19
**responded** 151:21
217:18 218:17
332:22 367:8
372:1
**respondents** 207:8
369:3
**responding** 76:14
331:22
**response** 30:6,18
65:14 67:18 83:8
105:20 132:14,17
134:7 137:7 146:6
151:4,18 159:13
166:7 177:7
180:12 184:1,4
215:6 216:4
276:15 327:5,6
330:11,12,21
351:1,3 358:14
362:7 363:1,16
365:9 366:13,17
367:3 372:7 373:6
373:9 377:10
387:7 389:20,22
391:8,8 409:15
416:20 429:10
430:1,17
**responses** 29:12
29:21 30:8,12
32:1 353:6 355:12
371:16,20 425:21
429:21 430:6
431:5 435:18
**responsibilities**
16:8 17:11

**responsibility**
242:20 289:13
**responsible** 26:10
44:20 192:12
439:5
**responsive** 65:17
68:14,17 79:22
168:13 300:4
331:9
**responsiveness**
330:2 366:2
**rest** 19:19 130:15
312:21
**restate** 187:2
228:10
**result** 319:15
320:16 338:6
350:5 362:16
393:17 394:21
395:21 399:15
401:6 404:12
406:6
**resulting** 361:17
366:1
**results** 252:8
**resumes** 43:4
**reveal** 291:1,7
305:9
**revealing** 307:17
**review** 11:8,13
41:1,13 97:18
105:9 151:6
153:10,14 154:2
227:7 281:8 290:8
296:4 325:2,16
360:19 375:12
378:9 426:12
427:6,10
**reviewed** 94:7
244:2 247:8 249:4
344:12 345:7

371:7,14,18,19
372:12
**reviewing** 370:3
**revision** 52:9
177:15
**riggins** 17:10
**right** 18:22 19:17
19:18 20:14 26:4
26:10 27:6,7,12,18
27:22 28:17 34:22
37:4,9 46:15 55:2
56:21 57:2,5,6
58:16 62:9 63:9
63:17 66:15 67:7
67:20 68:11 72:11
73:9,14,18 74:16
83:2,5,9 86:12,20
88:1 89:19 90:20
91:1,22 93:2,5,6
94:17,18 97:9,10
97:20,21 98:3
106:21 107:14,17
119:5 121:15,16
122:5 124:21
125:3 130:10
131:2,16 132:4
133:18 134:8
136:18 138:9
140:5 141:3 143:2
143:15 144:11,16
147:3 148:6,9,17
150:5 152:22
153:4,5 157:5
159:14 163:3
165:12,18 166:14
168:4,7 174:21
176:13 177:8
178:15,17 180:21
183:6 185:8 186:3
187:20 193:8
197:7 199:12

203:6 205:4
209:22 214:11
215:8 216:6,17,21
218:21 220:13
221:4 223:11,15
229:19 230:19
232:22 234:5
238:7,8 240:2
241:8,20 243:8,19
244:16 245:22
246:4 250:21
251:20 253:16
254:22 255:12,18
256:11 259:18,20
260:4 264:21
265:2,5 268:13
269:19,21 270:3,9
270:10,21 271:1,5
272:1 274:4,14
275:13 277:4,5,7
278:10 281:1
282:8,11,12,15,17
283:11,13 286:1
286:14 287:5,8
288:1 289:2,6
290:2 291:19
292:7 293:14
294:1,5,9,12 295:7
295:16,21 296:13
296:18 300:14
305:17 307:8,19
309:11,13 310:15
311:3,21 312:18
314:6,11 315:7
316:8,15,16
318:10,22 319:21
320:10,21 321:11
322:9 323:4
325:21 326:19
327:1,4,6,7,14,17
327:19 328:16,17

329:1,7,8,13 330:3
333:10,17,22
334:4 339:15,17
341:12 342:6
345:8 356:3 375:9
376:3 382:22
410:16 411:9
412:2 415:11
416:16 419:9
421:22 422:20
424:5
**rights** 5:11 14:19
126:16 127:3
153:18 155:9
192:13,17,18,21
192:22 193:8,10
193:11,14,17
194:8 262:9,16,18
263:14 264:9
265:1,5,11,12
268:3,9 271:1,14
277:11 295:1
349:9 381:22
382:6 383:6,6
400:4 403:7,16
409:19 410:1
427:18
**rivers** 20:3
**road** 4:3
**rockas** 198:1,2
256:10 386:4,8,13
386:14 387:1
391:6,18
**role** 17:13,20 19:2
25:19 26:1 48:3
51:10,17,20 52:14
53:15 74:20
139:13 152:11
393:2,6
**roles** 37:13 204:13

**rolled** 23:6
**rolling** 371:20
**room** 6:16 90:8,10
90:11 197:15
**rosenberg** 2:4
5:10 336:5,7,16,19
340:15,21 341:14
345:22 354:8
367:5 372:17,20
373:1 374:22
376:15 378:20
380:12,16
**ross** 17:8,9 18:14
20:11,18 21:11
35:8 40:17 63:7
65:1 85:5 115:19
121:20 144:2
200:19 213:17
241:10 244:13
250:22 251:20
279:11 284:13,13
285:21 286:3
287:18 289:10
310:1 318:3 319:7
324:5 338:9 339:3
343:1,6 344:9
381:5 390:10,22
401:18,19 412:3
413:4 415:14
418:15,19 420:1,9
423:14
**ross's** 63:12 94:12
286:11 326:5
337:5 420:14
**rough** 328:4
**roughly** 135:16
271:11 328:3
357:11
**rpr** 1:17 437:3,20
439:14

**rule** 46:6 70:2,3
**run** 30:5 98:18
150:9 224:10
411:7

**s**

**s** 4:1 8:1 25:10
57:18 141:8
160:18 440:1
**sacramento** 5:19
**safe** 364:16
**sahra** 377:20,21
379:4,11,14,15
380:5
**sample** 334:4
352:18 357:7
416:16
**sampling** 329:14
356:11 368:11
**san** 4:21 336:11
**santa** 11:20
**saturday** 189:16
**saw** 62:19 63:1
83:13 88:8 94:5
94:15,19 97:19
98:9 113:9 125:6
138:5 145:17,19
147:19 165:5
201:13,18 221:1
222:5 225:4 227:4
238:4 310:9
319:21 320:1,3
330:3 342:16
344:19 364:1
390:22
**saying** 45:11
149:16 166:3
183:21 203:5
214:4 215:4
217:18 218:17
227:15 230:9
252:13 267:21

279:20,21 293:11
312:11 314:15
317:10,13,16
321:11 340:3
342:12 356:5
358:1,21 361:7
431:22
**says** 40:8,9 57:17
58:10 59:17 66:17
67:10 71:21 78:15
78:17 80:21 81:6
88:14 95:17 96:9
96:13,19 103:1
104:16 107:12,16
108:12 111:19
115:19 121:17,18
127:10 130:2,8
132:13 138:15
139:17 146:2
148:8 150:8 152:7
153:2 154:22
157:16 159:12
160:16 161:9
162:11 177:13
181:13 183:1
184:6,10 185:17
187:11 191:12
200:13 204:8
206:8 213:14
214:16 216:8
221:2 222:12
225:13 229:8
231:14 235:22
236:17,21 244:19
251:20 257:11
258:1 273:19
274:1 275:13
279:6,8,10 293:21
294:14 295:9
299:7 310:16
311:17 319:15

321:2,6 330:5,8
340:17 352:12
386:10 388:20
429:5,18
**scalise** 53:5
**scenario** 155:7
**schedule** 20:22
39:3 86:7 88:15
89:4,13 92:2,16
93:1 202:4
**scheduled** 38:13
39:1 91:14
**scheduling** 85:21
**school** 4:14 11:18
11:19 12:17
**schumer** 23:8
**science** 12:1 13:17
14:2,6 18:11
104:10 434:3
**scientific** 433:15
**scientifically**
357:9
**scientist** 309:22
**scientists** 357:13
**scrap** 259:18
**se** 289:16
**search** 71:10
109:20
**seated** 256:18
**second** 25:2 57:16
80:8 95:17 107:10
116:18 121:7
130:7 151:14
178:21 182:22
191:18 200:11
205:7,10 240:7
284:6 326:12
335:10 358:8
384:9
**secret** 125:2

**secretary** 17:8,9,9
17:20 18:1,14,20
19:16 20:11,12,18
21:11,20 22:1,4,5
22:6,13,14,17 24:8
24:13,20 26:8,9
27:14 30:1 31:16
31:21 32:12 33:3
35:8,21 36:5,6,8
36:14,17 37:1,2,11
38:2,10,19 39:11
40:4,11,17 41:11
41:17 44:17,21
45:8 46:7 47:20
48:13 49:18 50:10
51:13 52:12 54:2
54:5,12,22 55:1,5
57:5,14 58:7,12
63:7,12,13 65:1,2
65:14 67:2,9,15
68:3,10,21 69:1,4
69:16 71:1 72:1,9
73:5,8,17 75:8
76:10,13 79:16
81:9,13 82:3,7
83:8 85:5,5,18
92:13 93:9 94:12
95:18 96:8,13,18
98:17 100:16,19
100:20 101:1,18
104:3,14,16 112:3
112:8 113:2,15
115:21 116:11,20
117:2,9,12,16
118:8 119:3,7,13
119:15 120:3,5
121:20 122:18
123:2 124:15
125:17,22 126:6
128:8 129:7,12
134:11,14 135:3

135:11 136:1,11
137:5,11 138:14
139:17 140:15
141:11 142:5,9
143:5 144:2 146:1
146:10 147:4
148:1,14 149:16
150:8,22 151:17
152:21 154:9,13
159:11 160:4,16
161:20 162:1,10
162:16,20 164:2,4
166:6 168:10
171:4,16,20,22
172:19 173:18
174:18 176:11
177:5,13 179:18
181:7 183:9,13
184:7 190:2,5,13
191:1 196:18
197:1 198:3 199:7
200:19 201:4,8
202:7,13,17,21
204:19 205:7,9,16
205:18 206:2,2,17
207:17,22 209:1
209:10 210:3,10
210:15 213:3,4,14
213:20 214:21
215:12 216:8
217:14,18 218:13
219:5,13 221:15
222:4,12 223:11
224:3 225:10,15
226:3,13 230:9
231:15 232:4,13
232:18 233:4,9,17
234:15 236:13
237:1,5 238:21
239:1,14 241:9,9
241:10,12 242:9

243:2,22 244:13
245:13 246:13
247:7,11,16 248:7
248:15 249:1,5,9
249:14 250:22
251:20 252:15
253:6,7 254:7,20
255:1,7 257:11
258:1,11,20 260:6
261:1,18 264:6
266:1,2,6 267:8
268:2,7 272:8
279:11 284:13
285:21 286:3,11
287:16,18 289:10
289:19 290:12,14
290:21 291:1,6
298:10,14 299:9
299:17,19 300:5
302:18 303:21
304:18 305:8
309:19 310:1
318:3 319:7 324:5
325:5,6,8 326:5
333:18,20 337:5
338:9 339:3 343:1
343:6,20 344:9
346:18 347:21
351:11,12 357:14
358:5 360:4,6
364:1 369:11
386:11 390:10,14
390:22 391:7,11
397:4 401:18,19
409:16 410:21
412:3,14 413:4,10
415:14 418:15,19
420:1,14 423:6,14
425:8 428:3
432:15 433:21

**secretary's** 27:1
63:18 71:5,10
72:21 76:16 90:7
90:11 92:1 102:22
107:12 111:15
115:6,10 138:16
146:17 159:17
161:1 177:18
199:9,10,11
214:15 216:5
217:22 233:16
239:18 255:15
260:16 265:15
266:15 267:22
286:18 301:4,12
310:6 351:21
352:3 355:21
387:15 389:11,13
391:10 412:16
432:2
**section** 50:14
349:5 394:2 395:6
396:6 399:22
400:1,5 401:13
404:13 406:8
408:14 409:19
410:1 411:15
**sector** 204:14
**security** 179:6,14
180:1,10,13,19
181:14,15 183:3
275:16,22 276:10
277:2,10 279:22
286:14,21 378:1
382:17,19
**see** 10:13 38:16
56:14 57:7,17,22
58:1,13 63:4 72:4
78:21 80:13 81:3
81:4 88:18 89:2
96:4,16 111:21

115:2,18 116:2
121:11 122:2,3
127:8 130:7 131:8
131:12 132:16
139:22 140:1
146:1,8,9 148:13
149:15,20 157:1
160:21 161:11,12
162:10,14 163:13
180:22 182:22
184:21,22 191:8
200:16 202:5,10
203:4 204:5
205:22 206:8
207:9,10,15,16
208:20 213:6,13
213:18,19 215:15
216:13 218:16
222:17 227:18
231:9 234:11
235:6 236:4,5,8,9
238:9 258:14
259:7 261:16
267:2 270:5
293:21 310:7
318:1 320:1,6
321:5,6 325:14
339:8 342:19
352:22,22 358:16
358:17 364:21
379:9,17,19,21
384:11 385:8,9
386:20
**seeing** 66:7 88:10
99:17 114:19
137:14 175:19
231:19 232:7
244:5
**seek** 412:17
**seeking** 421:5,6

**seen** 38:6 43:4
44:7 56:12 62:9
83:11 88:6 94:3
114:15,17,21
121:2,4 138:2
145:15 147:16,17
159:4,7 165:3
189:14 200:5
212:22 216:1
220:5 223:14
224:22 227:1
235:4 238:3 310:2
310:3 318:7,8
320:7 373:3 375:2
375:4,5 376:16,20
378:22 385:12,13
385:14 387:9,11
**self** 353:6
**senate** 12:1,18
16:11,13,20 17:6
18:6
**senator** 11:22 18:9
20:6 23:16,17
25:17
**senators** 23:15,21
**send** 28:8,9 30:6
30:16 44:9 49:5
50:7 60:17 68:16
83:15 92:9 110:19
189:17 191:9
272:4 349:2 370:5
413:2
**sending** 79:16
**sends** 160:15
**senior** 38:20 44:13
47:15 52:12 53:3
74:5,7,17 75:10,12
75:21 76:7 96:1
98:17 111:19
112:1,6 113:11,20
113:20 124:22

173:12 245:1
**sense** 19:4,5 59:18
108:2 110:4 385:6
385:6 389:6
**sensitive** 8:6 131:4
**sent** 60:15 61:21
62:10 65:13 71:13
73:7,12 81:8 83:4
83:12 114:4,20
121:20 148:1,14
165:21 189:15
203:5,8 208:9
212:21 215:6
220:7 225:6
232:12,16 233:2,4
237:21 247:4
248:21 311:6
322:21 339:3
370:6 385:21
387:6
**sentence** 95:17
183:1 310:12
313:13 319:15
329:20 339:9,10
348:16 352:12,21
356:21 357:1
358:12 385:1
**sentences** 430:10
433:16
**senteno** 2:4 5:1
381:2,4 382:2
384:1,20 390:8,16
392:13,22 403:12
403:13 404:17
407:21 409:5
410:4,19 412:8,19
413:14 415:7,13
416:2 419:13
428:12
**sentiment** 389:9
389:10

**sentiments** 389:3
**separate** 22:8,9
106:8,11,15,20
107:9 266:5
**separately** 22:14
22:15 26:20
**september** 182:21
183:10,19 187:15
189:16,18,18
215:12 222:11
225:6,19 227:15
234:11 235:8,15
237:14 339:3
437:22
**sequence** 166:17
**series** 223:6
288:22 322:10
**servers** 352:18
**serves** 179:2
371:22
**service** 20:7 307:3
**sessions** 167:22
279:11 283:10
400:9
**set** 85:12 161:10
166:10 199:3
349:11 354:3
372:8
**setting** 17:21 25:6
25:21 189:20
220:11 231:14
**settled** 146:4
148:19 149:11,14
**seven** 12:6 234:14
**sex** 141:9
**sexual** 64:18 84:18
86:18 130:16,22
131:14
**shah** 5:5
**she'd** 174:3

**she'll** 10:18
**sheet** 438:7 439:8
**shelf** 132:19
**sherpa** 16:10,12
  16:14 17:5,13,20
  21:20 25:6,21
  26:2,5 31:13 77:1
  124:7
**shocking** 73:15
  224:2
**short** 55:17 211:15
  240:12 250:3
  327:4,5,13,15
  336:20 363:19
  418:10
**shortly** 25:22 27:9
  27:22 29:1 54:19
  55:7 69:2 81:15
  142:16 177:4,4
  214:4 234:15
  281:18 337:9
  341:17 387:1
**show** 92:15 317:18
  326:4 333:1 353:7
  376:11,18
**showed** 97:21
  101:4,14 332:19
  353:5
**showing** 81:17
  293:5 372:18
  373:2
**shown** 56:16 62:13
  62:21 98:10,15,20
  99:2 101:7,10
  145:20 244:10
  359:22 366:17,19
  377:7 384:5
**shows** 223:18
  391:19
**sic** 27:19 84:17
  157:11 219:14

269:5 278:11
  297:1 316:6
**side** 74:12 150:5
  203:18 363:14
**sign** 101:3 113:18
  245:13 246:14
  247:8,17 248:8,15
  249:5,9,15 344:11
  436:3
**signature** 94:12
  326:7 437:18
  439:4,6,9,13
  440:19
**signed** 100:16,19
  100:22 247:11
  438:7 439:8
**significant** 68:8
  261:14 350:10
  360:2,11
**significantly**
  357:16
**signing** 369:6
**similar** 179:3
  226:9 375:6 379:7
  433:22
**simple** 303:20
**simply** 55:12
  92:14 131:7
  152:16 185:10
  276:8 278:3 285:8
  323:16 342:12
  382:19
**single** 314:13
  317:14
**sir** 253:4 259:5,15
  275:1 303:13
  305:7 315:11
  323:17 419:20
**sit** 287:11
**sitting** 77:15 98:3
  197:21 256:15

257:10 417:9
**situation** 347:12
  355:10
**six** 12:4 41:4,5
  42:9 43:19 188:3
**size** 20:20 272:17
  331:2 380:1,4
**slightly** 297:22
**slow** 353:20
**small** 76:4 224:11
  354:18,20 356:17
  371:12 384:17,22
  414:10 430:6
**smaller** 355:18
  356:14
**smart** 433:21
**snapper** 53:4
**snow** 361:14
**sogi** 140:18,20,22
  141:7,8,13
**solely** 370:17
**solutions** 3:18 9:2
  9:4
**solved** 196:7
**somebody** 42:17
  44:9 46:17 51:15
  60:15,17 61:20
  73:2 76:1 80:1
  90:16 110:14
  118:1 132:10
  149:10 179:6
  185:16 270:13
  279:10 283:5,9
  285:5 289:18
  324:19 362:8
  370:21 387:5
  411:7
**somewhat** 44:3
  285:12
**soon** 59:20 61:1
  95:18 96:9 104:17

**sooner** 200:13
**sorry** 20:15 40:2
  45:13 100:7
  110:22 115:14
  121:8 134:18
  156:9 158:18
  186:11,19 190:18
  197:19 207:2
  228:9 238:11
  241:17 242:5
  255:22 266:1
  271:20 299:18
  316:11 318:18
  358:11 379:13
  393:1 398:20
  400:9 403:10
  405:21 408:12
  410:6 415:9 420:3
**sort** 31:9 36:15
  47:20 84:21
  218:19
**sound** 11:2 27:6
  27:17 238:7 292:7
**sounds** 11:3 27:7
  27:22 174:21
  236:2 238:8 241:7
  356:18
**source** 360:16
  431:19 433:14
**sources** 311:1
  312:4 315:6
**southern** 1:2 8:19
**space** 18:11 257:1
**speak** 117:2,9
  125:5 136:6 145:2
  168:20,22 169:4
  171:10 172:19
  177:21 179:21
  190:18 191:1
  208:14 277:4
  381:16 400:12,14

400:19 407:22
**speaking** 134:18
139:16 142:22
182:10,17,18
183:5 184:14
207:2
**specific** 18:13
46:14 61:3 102:3
153:11 361:19
394:12 402:20
403:1
**specifically** 59:4
66:17 221:13,16
288:16 322:20
382:3 405:2,4,6,9
**specificity** 330:19
**specifics** 225:17
**specifies** 136:16
**specify** 122:8
187:21
**speculate** 68:6
120:2 168:15
251:16 268:16
287:1 416:1
**speculated** 331:16
**speculating** 82:9
251:14
**speculation** 69:19
83:18 98:12
116:14 117:6
118:18 122:7
130:13 132:5
133:2,22 140:7
141:16 142:12
143:8,17 144:21
146:19 148:22
159:21 161:5,16
163:5 201:1
202:20 226:6
268:15 286:7,16
347:19 360:17

380:8 390:12
392:9,18 422:6
428:9
**speed** 40:19 59:10
204:15
**spell** 25:9 305:16
**spelled** 303:6
**spelling** 259:7
304:9
**spells** 304:14
355:1
**spence** 5:11
**spend** 150:15
204:16 218:19
285:16,18
**spent** 20:7 112:16
112:20 142:1
143:1
**spoke** 135:4 136:1
136:4 169:2,13
170:5 174:22
175:16 178:2,16
179:20 180:4
195:10 206:18
207:5 210:11
215:15 227:16
233:10,17 271:6
383:3,8 397:4
408:3,6 410:17
**spoken** 118:3,4
121:21 122:14
123:5,7 125:9
135:11 136:11
156:1 166:20
175:5 183:16
197:18 216:22
217:3 233:5,21
234:1 387:14
399:7 400:21
401:1,20 406:9
407:2,12,19

409:18
**sponsor** 270:6
271:19,22
**sponsored** 171:7
**spots** 147:15
**spring** 55:11 75:5
96:12 103:4 105:7
108:22 109:18
110:8 119:1,5,8,12
126:21 134:12
135:19 140:16
141:6 146:12
184:8 196:17
209:18 250:22
251:21 262:15,19
263:5,10 264:3,12
264:17 265:7
285:22
**square** 278:8
**squares** 295:6
**staff** 17:1 23:13,14
23:17,18,21 25:16
33:8,10 34:17
35:13,15 36:7,9,13
37:11 38:20 39:12
39:13,15,17,20,22
41:10 42:9 45:11
46:5 47:14,15
48:13 49:18 50:10
52:12,16,19 53:2,3
53:5,8,12 73:13
96:14,19,21,22
97:1,3,7 102:9,18
103:1 107:12,16
125:20 156:21
157:8 160:7 198:8
198:12 201:7
268:5 279:16
283:18,19 284:10
284:20 289:17
301:7 321:17

345:5 377:18
378:7 395:9,14
412:1 433:1,3
**staff's** 199:17
**staffed** 41:9
**stakeholders**
53:22 54:1,8,14,15
358:13
**stamp** 73:10 82:15
164:20 318:3
376:5 385:20
**stamped** 56:5 78:5
87:11 93:18
114:10 120:19
123:14 137:20
145:10 158:22
167:5 182:12
189:10 194:14
200:12 234:19
**stand** 57:13 192:9
**standards** 44:11
**standing** 30:19
38:9,11 47:17
256:19,19,20,21
300:18
**standpoint** 350:15
**stands** 141:8
235:12 381:7
**start** 12:8 19:22
34:6 61:15 171:9
181:13 230:22
239:4 275:19
429:2,7
**started** 11:21
43:11 73:5 75:14
195:14 287:14
411:12
**starting** 269:5
339:9 429:14
430:11

starts 296:3
state 5:15 6:1 9:19
　70:7 118:1 206:2
　420:6,8,8 434:21
stated 308:6,9
　312:20 342:6
　346:17 389:15
　410:21
statement 80:1
　130:15 260:13
　295:13,14 305:12
　306:15 312:6
　313:1,18 314:9,11
　314:13,16,20
　315:13,20,22
　316:15,21,22
　317:2,8,14,17
　348:9 377:10
　417:6 432:1,2,9,14
　434:6
statements 313:5
states 1:1,6 8:17
　8:18 13:9 70:9
　207:13,19 364:22
　385:2 438:18
　440:3
stating 80:3
statistical 105:17
　105:18 106:1
　108:21 109:4
　329:16 351:8
　417:15 434:9,14
statistics 13:19,21
　14:3 42:18 47:1
　219:6
status 78:20 82:1
　223:3 310:22
　312:3 315:5
　319:12 425:22
statute 15:9
　412:14

stay 402:21
steel 50:13 53:1
　201:19 288:20
steer 283:10
stenographic 9:10
stenotype 437:8
stephen 404:2,5,6
steve 116:6 405:11
　405:19
steven 115:21
　116:4 119:16
　121:22 122:18
　123:1,5,7
stevens 11:22 18:9
　20:6 25:17
stick 162:11
sticking 141:7
stipulate 205:19
　313:6,10
stood 314:5,8,15
stool 256:20,20,21
stop 150:20 211:9
stopped 199:13
　417:19
straight 260:2
　331:15
straightforward
　290:7
strategic 36:2 37:8
　52:8 200:9 283:21
　377:22
street 3:18 4:8,12
　4:20 5:2,7,18 6:4
　67:7 80:1 81:21
　146:14 402:22
　409:13
strike 44:14 71:15
　76:20 96:6 105:15
　115:14 116:18
　137:15 160:14
　167:18 183:8

198:20 232:11
　331:5
struck 103:22
studied 15:12,13
study 13:16
　334:13
stuff 47:3 203:16
su 377:20,21 380:5
subcommittee
　148:2,15
subject 16:22 18:1
　22:3 57:11 63:4
　63:15 71:4 148:8
　164:22 177:15
　186:13 195:21
　220:17 230:13
　288:11 291:4
　338:13 345:20
　360:10 407:3
subjects 202:8
　231:21
submit 28:20
　249:2
submitted 28:15
subsequent 237:15
　413:15
substance 120:10
　233:7,18 237:10
　275:14 298:4
　385:15 426:11
　427:5
substantially
　310:22 312:2
　313:4 315:4
sudden 342:4
suddenly 292:16
　294:16
sufficient 105:12
　264:11 265:14,18
　265:21 304:11
　331:3

sugar 52:9 201:12
　201:17
suggest 231:14
suggested 123:2
　136:20 248:2
　275:15,21 276:8
　283:12 298:20
　346:6
suggesting 247:7
　344:16 363:15
suggestion 278:3
suggestions
　289:17
suggests 139:7
　418:1,2
suit 287:4
suite 3:18 4:16,20
　5:3,7,12
sum 319:15
summarized 339:2
summary 312:5
　313:18
summer 141:6
　199:2 209:17,18
supersecret
　286:12
supplement
　244:10 342:22
　343:2
supplemental
　101:2 247:17
　248:2,15 249:2
　341:6,8 343:18
　345:16 346:5
supplemented
　350:19
supplements
　343:5,7
support 86:12
　153:12 155:19,21
　193:5 267:9

[support - tell]

350:22 432:8,12
432:14
**supported** 370:1
**supporting** 240:1
**supports** 417:6,8
432:1
**supposed** 266:17
284:3 302:7,21
304:2,3
**supposition** 67:17
**sure** 10:16,20,22
35:11 38:5 42:5
43:12 48:5 49:22
50:7,12 52:1 59:9
78:17 79:7 86:13
90:14 91:22 98:21
104:11 105:3
110:5 128:1 136:8
149:1 154:15
187:5 194:3 198:7
211:19,21 213:9
217:15 219:16
240:9,16 243:10
248:10,18 249:6
251:17 255:17
260:4 279:19
289:1 293:13
296:9 300:2
305:22 308:2
311:5,16 312:10
329:14 334:16
338:16 356:1
357:2 360:3
368:19 373:14
387:16 389:19
390:19 401:19
417:5 420:5
424:18
**surmise** 160:9
**surname** 167:9

**surprise** 344:20
389:17 432:13
**surprised** 342:19
344:19 386:19
387:10,11,13
432:18
**survey** 14:9 78:18
81:22 356:16
**surveys** 105:16
327:1 357:7
**swear** 9:12
**sweet** 336:20
**switch** 43:13
**switched** 231:21
232:9
**switching** 434:17
**sworn** 9:16 437:7
**swr** 200:14,18

**t**

**t** 25:10 440:1,1
**take** 8:11 12:13
14:16 17:7 22:10
22:13 26:20 28:15
30:1 34:3 44:13
54:2,4 56:10
57:11 58:2 60:2
62:8 63:13 66:22
80:5,8 84:11
89:13 92:19 111:5
127:6 130:1,6
139:11 151:9
168:12 172:14
211:15 229:13
239:8 244:9 250:3
261:15 275:17
283:11 287:21
292:10 298:8
302:16 315:8,13
315:14,15,17,22
316:3,4 321:22
322:5 339:6 341:5

365:14 406:16
431:9,11
**taken** 8:14 106:13
304:13 313:13
437:5,8,14
**talk** 52:6 101:17
115:21 116:12,20
117:1 122:18
123:3 135:6
160:17 168:3
170:9 173:6,15,19
173:22 175:4
185:21 190:2
231:4 249:13
275:21 276:9
283:6 284:9
338:17 359:17
382:5 383:5
410:16 411:15
419:20
**talked** 35:11 97:14
100:4 126:14
131:11 155:13,15
157:18 175:7
207:7 219:11
277:14 283:12
338:13,18 381:8
383:2
**talking** 20:12 46:4
46:5 96:11 97:10
111:14 122:5
132:1 133:19
140:15 179:8
190:5 192:5,15
196:13 217:5,6,9
229:11 230:18
242:4 257:20
262:15 298:3
325:11 327:8
359:18,19 363:11
363:13 420:15

424:3
**talks** 160:19
**tariffs** 50:14 53:1
288:20
**task** 42:7 182:1
378:12,14
**tasked** 25:6
257:16,17
**tax** 77:8
**team** 15:18 16:5
17:12 25:3,4,20
26:2 30:8 31:2,10
32:13,19 57:9
76:20,21 161:7
**teams** 19:7 25:6
**technical** 324:20
352:2,5 426:12
427:5,10
**technology** 44:12
**ted** 11:22 227:21
**telecommunicati...**
18:4
**telephone** 71:18
90:5 125:12 206:9
**telephonically**
4:15 5:16
**tell** 11:5,17 13:15
16:14 17:19 18:18
21:22 33:6 42:8
55:5,10 60:6
65:10 66:17 71:5
74:7 75:20 78:15
94:10 100:18
117:20 118:8
122:11 126:11,21
127:5 135:4,9,14
136:10,17 137:2,3
139:6 140:3
144:22 152:21
153:21 154:12
156:14 159:22

169:5 172:19
174:11 175:8
176:1,15 178:22
185:14 195:18
196:5 203:10
205:20 206:17
207:17 210:10
211:17 217:9
219:16 220:8
228:15,18 267:3,4
267:9 284:14
289:19 298:18
314:1 316:16
322:13,16 323:1
358:18 371:5,15
374:15 376:17,19
397:6 404:7
415:14 417:19
420:3
**telling** 58:18,22
78:13 85:9 136:3
151:12 207:4
223:14 367:1
397:3
**temporary** 124:18
**ten** 12:2 250:6
364:20
**tens** 364:11
**tenth** 4:12
**teramoto** 32:21
39:16 75:14 97:3
102:6 121:14
138:9 144:18
159:10 189:17
197:11,22 199:7
202:2 205:6
208:21 218:16
220:19 221:2
231:13 235:7
236:1,6 255:18
256:18 298:13

325:14
**teramoto's** 163:8
**term** 16:15,16
43:22 44:2 158:3
313:3 329:9 356:9
357:14 358:1
**terms** 126:15
328:4
**test** 253:19 260:4
333:9 334:3,18
335:3
**tested** 333:15
**testified** 9:16
22:10 57:1 68:8
68:20 81:16,19
104:2 107:14
108:3 109:7
165:10 166:19
184:10 200:7
208:9 214:10
248:13 255:13
287:22 288:3,4
291:18 305:7
337:6 345:1 346:4
356:19 406:17
410:20
**testify** 132:7
246:17 288:10
290:14 319:4
**testifying** 288:20
288:21
**testimony** 2:22
45:9,15 61:19
108:5 148:2,4,15
177:9 210:2,6,7
231:22 246:1,10
246:22 247:2,3,15
247:21 249:20
252:10 253:13,18
253:22 254:22
276:12 279:4

280:6 287:19
291:21 292:19
293:1,6,18 295:2
298:9 303:19
304:21 312:11
347:15 400:18
410:8 437:6,7,11
438:4,5
**testing** 334:13
**thank** 21:18 28:17
56:9 70:21 120:17
158:18 182:2
186:16 212:13
215:21 218:8
224:13 230:6
243:20 249:12
278:19 294:18
335:16 336:3
372:22 420:11
424:2 439:12
**thanks** 77:17
166:3 236:7
318:19
**thanksgiving**
15:20 26:1
**theirs** 320:21
**theoretically**
281:2
**thereabouts** 324:6
**thing** 79:21 107:7
154:5 251:17
307:5 322:4 334:9
361:22 362:9,14
362:14 417:19
**things** 41:16 74:12
84:3,5,6,12,21
86:3 92:10 106:12
106:15 108:20
109:9 112:17
129:2,3,5 150:16
163:16 168:5

197:8 201:20
204:13,17,17
226:8 229:9
239:20 257:16
266:19 285:14
288:22 289:4
302:3 307:10
309:13 347:6
356:11 419:3
**think** 22:20 25:11
28:19 29:11 37:3
39:21 41:16 55:4
55:12 61:16 63:8
65:19 66:4,8 75:5
75:5 77:14 78:9
85:16 86:1 90:1
94:20 102:4 103:4
103:13 106:7,16
106:17 109:19
115:1 123:19
124:3 125:17
128:10 131:6
141:5 150:6,8
155:13,14,14
156:2 157:11
158:2,17 168:11
169:2 174:6 178:1
179:2 180:2,2,22
187:16 190:15
193:1 198:7 199:3
199:17 203:7
209:14 211:11,11
212:12 219:8
222:19 223:17
233:1 236:13
237:20,20 240:10
244:1 260:3 271:8
272:14 273:14
274:13,13 277:13
278:16 279:14,14
285:2 286:20

289:16 299:8
300:4,8 303:18
312:16,19 314:12
314:18 317:8,13
320:3 321:15,20
323:2 328:1,10
332:15 334:8,15
336:7 337:5,21
338:18 342:1,6,20
343:5,22 345:1,11
346:3,6 347:2
352:22 354:22
358:2 363:14,19
364:16,19 367:17
369:20 382:20
386:18 389:20
391:20 400:2
406:3 410:7,11
413:9 414:2,16
422:2,8 425:5
427:22 428:4,10
428:16,17 433:11
**thinking** 192:2
387:15 389:1
**thinks** 58:11
222:15 254:9
**third** 43:16 310:11
339:10 350:11
352:12
**thirds** 80:11
**thompson** 59:18
59:21 142:19
162:17
**thompson's** 148:1
148:14
**thought** 96:14
97:7 99:9 103:1
107:13 168:16
186:17 254:20
255:2,7 326:10
364:14

**thoughts** 342:13
**three** 78:4 125:18
162:5 178:1,19
180:3 183:22
256:5 270:12
271:7 277:16
310:11 316:1
323:8,12 328:6,6,7
365:17
**threshold** 150:18
**thresholds** 150:14
154:11
**thursday** 1:10 8:4
440:6
**time** 9:11 20:7
21:8 22:7 27:13
28:22 31:1 34:17
38:16 40:19 46:12
49:7 52:6 55:9
57:4 59:22 60:20
62:19 63:1 64:13
64:20 74:6,18
75:11,13,22 83:13
84:9 86:11,13
87:1,1,5 94:5,11
94:15,18 96:7
97:19 99:7,13
104:12 109:3
111:3,7,11 112:16
112:20,21 113:6
114:17,21 115:7
116:1,8 125:8,19
127:20 128:12,13
133:11 134:19
138:4 142:2,3
143:2 145:17
147:1,19 150:15
158:10,13 162:21
164:3 165:5 178:2
179:7 182:1 186:1
186:17 187:14,21

188:3 189:3
197:12,13 198:4
201:10,18 203:11
203:20 204:17
207:3 211:6,9,11
211:20 212:1,5
219:2,7,9 223:19
224:7 225:4 227:4
228:10 229:4
230:3,6 233:9
237:7,7 240:19,22
242:8 250:8,12
251:2 252:2 257:9
258:14 259:6
271:13 281:3,16
281:17 283:3
285:15,16,18
287:13 289:7
290:3 304:14
308:16,19 309:1
319:21 335:6,12
335:15,18 341:2
342:1 343:19
344:2 353:11,22
371:7,13 372:2
380:18,22 397:5
403:4,14 411:18
411:19 413:12
419:15,18,20
420:12,20 423:18
435:11,14,19
436:5
**timeline** 183:16
**times** 125:11,16,18
125:18 143:22
162:4,5,5 168:7
169:1 177:21
178:1,17,19,20
179:21 180:3
256:14 271:7
277:15,16 316:1

338:1
**timing** 30:17
141:4 317:7
**title** 35:12 139:6
198:7 282:1,4
378:5,6 386:10
**titles** 281:19
**today** 10:6 11:6
62:14 97:19 99:22
114:21 138:4
147:19 165:6
197:2 212:22
225:5 227:5
244:10 335:22
336:2 381:8 384:6
385:16 423:19
435:16
**today's** 436:4
**todd** 17:10
**told** 27:5 34:1
81:13 83:22 84:8
112:13 119:15,19
120:5 148:7
153:15,20 162:18
166:8,10 173:8
176:10,21 184:15
193:7 210:4 236:1
239:14 245:16
264:16 337:9
381:15 410:22
426:4
**tomorrow** 209:1
231:14
**top** 130:2 149:15
202:6 209:6 429:2
**topic** 59:19 87:2
131:4,16 142:1
143:1 171:1 187:6
232:10 288:19
**topics** 57:20 58:21
59:6 61:7 85:22

86:10 88:16,22
93:6 140:22 393:9
404:20
**total** 328:8,9
418:11
**touch** 59:18
217:13
**touched** 227:16
**track** 45:3,17,21
51:15 150:9 411:6
**tracks** 22:9
**trade** 12:5 274:16
274:21,22
**traffic** 376:19
**training** 13:18
14:9,11,19,21 15:2
**transcribed** 295:4
**transcribing** 10:18
**transcript** 3:11
10:20 293:5,9,13
293:15 295:4
439:7
**transcription**
438:5
**transition** 15:18
16:5,9 17:12 25:3
25:4,19 26:2 30:8
31:2,8 32:13,19
76:2,19,21 123:21
123:22 124:10,13
126:4 161:7
383:16
**transitioned** 30:15
**transmit** 422:12
422:21 425:9
**transmittal** 219:10
**transmitted** 49:15
49:20 238:10,14
238:15
**transportation**
12:1

**treating** 168:18
**tremendous** 142:1
223:18,20
**trial** 316:6,14
333:17,21 334:1
**tried** 20:2 65:16
193:14,20
**troublesome** 261:8
**true** 418:7 437:10
438:4
**trump** 3:9 383:13
383:21 384:3,13
388:4,14 392:2,20
393:13
**trump's** 392:15
**trust** 340:18
**truth** 295:12
**truthfully** 70:5
**try** 10:22 28:21
30:4,19 41:2,15
68:14 84:4,19
128:20 135:16
162:11 305:13
332:13,16 336:20
**trying** 32:3 42:4
48:7,9 51:13 86:4
89:4,13 128:16
129:2 155:13
162:21 168:13
224:9 254:6
261:18 282:7
314:19 317:15
356:6 362:1
366:22 397:13
398:13
**turn** 8:8 121:7
329:17,18 346:16
352:9 358:7
428:13,19
**turnaround** 49:7

**turned** 283:12
**turning** 352:11
373:19 377:3
**turns** 278:7
**twice** 23:2 209:14
322:15
**two** 12:5 14:1
16:18 18:5 31:5
49:10 80:11 86:2
86:21 100:11
106:11,15,16
125:18 141:22
142:6 150:14
162:5 180:3 214:7
214:10 242:21
243:9 270:11
277:18 287:12
294:11,14 310:11
323:8,12 328:5,6,7
345:2,5 346:7,8
349:11,21 351:13
410:17 430:10
433:16
**typewriting** 437:9
**typical** 28:10 51:9
51:10 52:15 53:20
202:2 243:8
**typically** 22:5 30:1
41:1 49:8,13
51:17 60:13,17
90:4,6,18,21 91:5
91:6,10 92:9
98:18 102:16
279:13 320:5
356:14
**typing** 66:6

**u**

**u.s.** 6:10,14 9:20
152:18 207:7
438:16

**ucsb** 12:9 14:2
**uh** 31:11 67:8 79:1
103:3 123:15,17
127:9 128:15
149:19 151:16
159:3 213:7
229:14 231:11
280:9,11 292:4
293:22 326:13
328:22 339:12
341:7 358:10
362:21 377:5
**ultimately** 267:19
427:16
**umpteenth** 133:11
**unable** 20:4
**unanswered**
373:17
**unavailable** 399:1
**unaware** 278:5
**unclear** 10:12
**uncommon** 185:12
185:14 204:18
276:14 282:17
**undercount**
361:16 393:17
394:21 395:21
399:15 401:6
404:11 406:6
**underestimate**
416:22
**underestimated**
81:11
**undergraduate**
14:16
**underlined** 58:11
139:21
**understand** 10:11
15:10 21:15 29:17
43:12 64:12 70:12
70:20 79:3 110:6

115:9 116:17,19
128:1 138:13
139:13 148:18
172:20 187:18
200:18 202:22
214:20 222:7
223:2 241:10
253:3 254:8,15
259:4 260:7
293:10,11 298:13
299:16 302:4
307:18 308:4
309:10 310:13
311:21 312:10
313:6,8 329:7,9
343:2 358:18
366:22 381:12
382:12 389:8,10
414:12 420:16,17
423:17 429:1
**understanding**
93:8 113:12 154:3
171:19 176:4,6
180:15 181:5
188:18 203:19
221:8,10 230:12
235:14 247:15
248:12 252:15
253:6 260:3
266:13,17 277:9
281:21 300:20
301:14 302:21
304:1 307:15
308:8 314:21
315:1 343:13,15
349:7 354:9
355:20 356:6
370:16 371:1,5
392:4,14 393:1,5
398:7 400:18
414:21 415:3

**understood**
151:11,13 223:5
245:22 246:17
274:19 276:18
317:1 326:16
342:22 343:7,8
**undertaking** 331:3
**underway** 78:19
79:2
**undocumented**
63:21 65:3,20
66:1 81:12,18
262:10 349:14
**unfamiliar** 30:4
**unfortunately**
77:10 276:14
333:6 374:10
**unified** 4:14
**union** 4:7
**unique** 20:8
**unit** 8:13 111:6,10
158:12 212:1,4
250:8,11 308:18
308:22 380:17,21
**united** 1:1,6 8:17
8:18 207:13,19
364:22 385:2
413:16 438:18
440:3
**university** 11:20
13:20
**unión** 381:7
**unquote** 83:9
388:19
**unredacted**
145:21 227:8
229:15
**unusual** 45:5
66:10 119:13
243:17

**upcoming** 57:18
95:20 147:2,5
244:20
**update** 40:17
119:10,13 172:16
214:4 222:13
225:10 226:4
230:9 233:2
236:10,11
**updated** 76:8
222:13 231:6
**updates** 119:4,8
232:19
**updating** 233:5
**upper** 159:7
**uproar** 131:2
**ups** 360:12
**urgency** 204:10
**urgent** 73:20
168:9,16,18
204:19
**usdoj.gov** 6:12,12
**use** 16:15 158:3
177:3 180:11
190:10 262:21
296:2,14,17 297:7
307:9 310:21
312:2 313:3 315:4
319:11 329:9,15
353:12 354:1
357:19 365:7
368:15 382:7
383:7 403:19
418:19 423:10
425:3
**useful** 126:15
176:7 252:22
272:20 273:1
275:7 279:18
297:3,18

**uses** 350:4 357:22
**usual** 45:20
**usually** 49:5 52:21
128:20 150:11
204:16 273:13
347:9
**uthmeier** 95:14
97:2,15 100:4
155:15 156:3
186:6,22 187:6,13
188:6,8,19 195:3,9
195:18 214:11
217:8 220:20
225:2 227:14
228:18 231:13
232:2 242:18
243:16,22 246:9
255:20 288:14
345:10 369:12
386:18
**utilize** 185:4
**utilized** 153:18

**v**

**v** 8:16 381:5 420:9
438:18 440:3
**v10** 320:2
**valid** 267:14 301:5
302:8 303:5,6
**value** 279:16
410:15
**var** 399:22
**variation** 417:15
**variety** 106:21
329:15 418:20
**various** 95:19
96:10 244:5
417:18
**vast** 282:13
**velkoff** 335:2
**venued** 336:13

**veritext** 3:18 9:2,4
**version** 227:7
  229:16 311:17
  319:2 320:3,8
  321:10 375:21
**versions** 245:4
  320:10
**versus** 364:9
  417:14
**vicinity** 22:21
  178:19 323:14
**victoria** 335:2
**victoria's** 125:2
**video** 8:10,13
  111:7,11 158:10
  158:13 212:5
  240:19,22 250:8
  250:12 308:19
  309:1 335:12,15
  380:18,22 419:18
  435:11,14 436:5,5
**videographer** 7:1
  8:3 9:3 111:6,10
  158:9,12 211:15
  211:22 212:4
  240:18,21 250:7
  250:11 308:18,22
  335:11,14 380:17
  380:21 419:14,17
  435:10,13 436:4
**view** 103:17 105:6
  105:9,12 106:2
  107:2,5,18,22
  108:8,14 109:8
  110:8 113:12
  156:15 180:18,22
  192:4,14 284:22
  307:7 311:21
  312:17,19 314:20
  335:19 402:4

**viewpoint** 370:1
**viewpoints** 402:20
**views** 320:15
  402:1,4,7,11,14,15
  404:22
**villages** 20:1
**volume** 331:2
**vote** 350:1
**voter** 393:14
  394:19 395:19
  399:13 401:4
  404:11 406:5
  408:10 409:6
**voters** 364:5
**voting** 14:19
  126:16 127:3
  153:18 155:8,9
  192:13,17,18,21
  192:22 193:8,9,11
  193:14,17 194:8
  262:9,16,18
  263:13 264:9,9
  265:1,5,11,12
  268:3,9 271:1,14
  272:17 275:8
  277:11 295:1
  349:6,8,18 351:9
  368:17 381:22
  382:6 383:6,6
  400:4 403:7,16
  409:19 410:1
  411:15 423:13
  427:18
**vp** 124:22
**vra** 251:10,18
  277:6 394:2 395:6
  396:6 401:13
  404:14 406:8
  408:14 416:3
**vs** 1:5

| w |
|---|

**wait** 10:21 79:5
**wall** 67:7 80:1
  81:21 146:14
  402:22 409:13
**walls** 256:22 257:5
  257:6
**walsh** 6:19 95:7
  97:2 98:6 100:1
  246:9 318:16,19
**want** 18:18 59:9
  91:22 103:11,15
  110:5 116:11
  131:19 161:10
  191:18 240:12
  242:3 250:17,21
  254:1 257:11
  260:2,4 268:8
  270:16 272:12
  273:5,6,11,17,22
  274:6,12 275:2
  277:20,20 279:6,8
  279:19 280:1
  282:15,21 283:6
  284:8,9,12,19
  289:1 293:8 294:2
  302:11,16 310:10
  311:12 312:10
  316:5,7,15 341:10
  350:12 363:13
  383:19 398:19
  424:17 427:22
  428:5 429:1
**wanted** 64:11 86:9
  116:19,22 130:20
  142:18 154:14
  160:7 170:17
  171:16,20 172:1
  176:2,11,11
  190:13 218:2
  226:13 243:3

252:16 258:11
  260:6 261:4 270:5
  272:8 285:22
  287:16 291:2
  299:9 300:6
  332:10 337:10
  348:5 382:5
  435:21
**wanting** 176:22
  260:16 268:1
  286:11 383:5
**wants** 38:2 40:4,7
  44:17 226:15
  251:22 252:2
  253:7,13 258:2
  262:1 266:16
  306:10,20 333:21
  385:2 423:18
**warn** 162:19
**warrant** 265:19
**warranted** 96:15
  97:8 103:2,6
  106:13 107:14,20
  108:1,10 109:9
  110:1,3
**washington** 1:9,16
  3:19 4:5,12 5:3,8
  5:13 6:11,17,21
  8:22 32:18 77:14
  228:5 402:22
  438:17 439:16
**watched** 293:17
**watermark** 376:2
  376:6
**way** 34:7 64:11
  68:19 78:4 80:11
  90:5 92:17 106:10
  107:4 142:8
  152:18 185:10
  243:8 260:6,11,13
  260:15,17,22

261:17 266:13,19
266:20 267:2,4
273:22 280:22
284:8 302:16
305:13 310:13
321:1 332:17
337:16 346:3,3
348:11 349:5
367:6 368:14
379:12 423:19
428:6 432:6
**ways** 45:1 53:3
**we've** 26:7 53:1
87:12 104:20
111:2 145:11
308:17 320:7,11
344:11 350:8
381:8 383:2 386:7
387:14 419:11
**web** 66:14 208:10
208:13
**website** 66:3,5,7
66:19 390:5
**wednesday** 148:5
148:8
**week** 49:11 156:21
178:4 233:14
387:5
**weeks** 174:15
188:3 221:1
277:18 287:12
**weigh** 363:13
**weighing** 362:9
363:8,10,12
**weight** 366:6
**welcome** 212:8
**wendy** 32:21 33:3
39:16 75:14 97:3
102:6,8,9,14,15
121:14,18 122:11
122:14 138:9

144:18 159:10,17
160:15 161:2
164:2,4 173:4,18
189:15 191:8
197:22 205:6
210:12,13 218:16
235:7 236:7
255:18 256:18
257:2 325:14
**went** 11:19 12:6
12:17 170:16
269:21 271:4
283:4 296:12
297:9,16 371:16
372:9,11 381:20
383:10
**when's** 27:19 63:1
83:13 94:5,15,18
145:17 147:19
225:4 227:4
**whispering** 8:6
**white** 48:4,8,16,19
49:4,9,15,21 50:9
50:11,15,16,16
51:4,7 74:5,7,12
74:17 167:18
173:12 283:9
388:1 391:16,20
393:8 395:9
410:12
**widely** 330:11
**wife** 115:10
**wilbur** 200:19
213:17
**willing** 271:22
296:22
**wise** 5:16
**wishes** 239:18
**withdraw** 156:9
294:2

**withdrawn** 138:19
246:12 251:7
252:13 254:21
260:14 271:20
275:18 278:18
282:6 290:12
299:14 304:19
322:7 323:22
327:10 328:18
**witness** 9:13,15,17
26:15 56:8 62:16
70:21 87:11 93:17
114:9 116:15
117:7 118:13
120:2,8,17,19
122:8,22 130:14
133:3 134:1 140:8
143:9,18 144:22
145:10 146:20
149:1 159:22
160:11 161:6,17
163:6 165:21
166:16 182:9
186:13 187:2
189:2 190:20
191:16 194:5
195:13 196:1,4
201:2,16 202:21
204:12 206:13
210:7 211:7,12
215:21 218:8
224:5 225:22
226:7 235:19
243:14 247:3,22
252:5 253:9,19,22
254:14 255:10
258:7 259:12
263:21 268:16
274:11 275:5
276:6 280:16
284:22 286:8,17

287:1 291:15
297:15 299:13
301:4,19 303:5
304:8 305:3,20
306:14 307:2,22
308:14 311:16
329:4 331:13
334:22 336:3
340:17 341:12
343:22 345:21
353:17,21 366:22
380:9 381:19
384:17 390:4,13
392:10,19 404:16
407:17 409:2
410:7 412:12
413:9 415:11,19
415:21 423:5
425:5,17 426:3,16
427:9 428:10,17
433:19 436:3
437:5,8,11 439:5
440:5
**witness's** 108:5
210:6 247:2,21
253:18
**woliver** 4:15
**word** 34:3 66:22
70:13 81:5 108:9
180:21 287:21
292:10 298:17
307:9 358:19
360:6 362:18
429:15 430:11
**wording** 324:1,13
346:6,8
**words** 43:13
176:14,20,21
237:3 251:21
275:13 298:4
330:8 337:21

353:8 356:2 360:2
423:12
**work** 9:19 10:1,15
17:15 30:7,10
38:1,3 40:3,4,7
42:3 43:5 44:10
44:18 62:17 73:18
74:22 89:19
112:18 124:21
150:2,14 153:2,6
199:5 201:19
228:1 229:1
243:21 254:7
256:16,17 260:6
260:11,18,20
266:17 268:5
276:16,20 277:1
280:10 282:11,15
284:12,16,20
285:5 337:22
338:20 371:13
378:2
**worked** 11:21
25:15,16 75:6
76:1 98:16 104:8
152:12 167:20
168:1 235:15
242:13 243:5,9
248:7 255:13
289:9 389:11
**workers** 21:8
124:18
**working** 11:22
12:17 15:20,22
43:10 50:5,13,17
51:13 52:9 54:6
76:9 77:18 97:13
97:15 99:6,13
113:5 118:22
129:2 195:14
198:13,16 199:13

201:11,12,17
209:20 211:1,4
214:8 223:20
226:10 234:6,10
234:12,13 237:12
257:10,15,15
355:13 411:17
421:21
**workload** 285:1,1
**works** 34:7 45:11
57:2 58:4,7 97:4
128:6 152:19
200:8 228:2
377:21 386:1
**world** 103:9
262:12
**worry** 91:18
**worst** 146:3
148:18
**worth** 150:19
**worthy** 108:10
**writes** 162:10
236:6
**written** 146:2
148:2,14 208:21
**wrong** 205:21
246:2 262:14
325:3 336:9
**wrote** 147:18
151:17 159:11
213:1,22 214:3
269:16 339:19
340:4 380:6,14
396:18 430:11
432:20 433:3
**www.census.gov**
66:13

**y**

**yang** 5:6
**yeah** 15:19 16:16
24:1 27:7,19,22

41:21 43:11 44:19
49:19 52:4 54:6
57:10 60:8,20
79:4 83:10 87:21
88:4,19 89:3
92:10 98:8 102:1
109:19 114:19
116:3 135:13
156:1 159:15,15
159:22 196:16
220:3 243:17
247:13 254:5
269:20 271:7,10
271:12 276:19,20
278:9 280:19
287:6 289:3 292:8
292:9 297:21
307:22 310:17
313:6 314:8
327:17 328:14,17
329:19 353:4
354:22 370:13
374:2 403:12
432:7 435:8
**year** 12:7,20 35:16
43:16 44:10 75:6
88:22 89:1 108:17
130:9 131:5,9
132:11 199:4
226:9 241:20,22
242:4 244:14
288:5 292:5 328:6
334:18 335:4
338:2 346:20,21
**years** 11:21 12:2,4
12:5,6 14:1
104:10 261:6
263:9 266:22
292:16 294:16
307:3 347:7
413:21

**yep** 58:17 63:6
67:21 72:5 80:10
80:14 81:4 96:17
125:13 138:12
145:14 148:12
149:21 269:18
330:4 339:7
**yesterday** 11:7
63:3 94:20 97:20
98:1 138:6 145:18
145:19 165:7
225:11 227:6,7
230:10
**york** 1:2,3 4:1,3,7
4:8,8 5:12 6:1,5,5
8:16,19 10:2
241:3 438:18
440:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted
to access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.