## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> *Defendants*. | Civil Action No. 18-2921 (JMF) |
| NEW YORK IMMIGRATION COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> *Defendants*. | Civil Action No. 18-5025 (JMF) |

### NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMICUS BRIEF

PLEASE TAKE NOTICE that the American Statistical Association, American Sociological Association and Population Association of America respectfully seek leave to file the accompanying brief as *amici curiae* in support of Plaintiffs' position at trial.

Because there is no rule directly on point, this Court has "broad discretion" to accept amicus briefs that may provide guidance in resolving thorny legal issues. *See, e.g.*, *City of New York v. United States*, 971 F. Supp. 789, 791 n.3 (S.D.N.Y. 1997), *aff'd*, 179 F.3d 29 (2d Cir. 1999). *Amici* are three leading national organizations of professionals and academics who

regularly rely upon census data in their work; a more complete statement of the interest of *amici* is included at the outset of the attached brief (at pp. 1–2).  The Court should grant *amici* leave to file the attached brief because *amici* have a unique perspective, based on their specialized expertise, on the importance of the integrity and statistical rigor of census data that goes beyond the views of the parties.  Moreover, *amici* can provide much-needed context, from neutral parties whose only interest is the integrity of census data, with respect to the importance of the baseline data-collection practices and procedures ordinarily followed by the Census Bureau and the extent of the departures from those standard practices which Defendants are seeking to pursue by adding a citizenship question to the census.

All parties have consented to the filing of this brief.

Dated:  October 29, 2018

Respectfully submitted,

*/s/ Ira M. Feinberg*
Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3509
Facsimile: (212) 918-3100
ira.feinberg@hoganlovells.com

*Counsel for the American Statistical
Association, American Sociological
Association and Population
Association of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2018, I electronically filed the foregoing with this Court's CM/ECF system, which will send a notice of filing to all registered users.


/s/ *Ira M. Feinberg*
Ira M. Feinberg

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 18-2921 (JMF) |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | |
| *Defendants*. | |
| NEW YORK IMMIGRATION COALITION, *et al.*, | |
| *Plaintiffs*, | Civil Action No. 18-5025 (JMF) |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | |
| *Defendants*. | |

**BRIEF OF THE AMERICAN STATISTICAL ASSOCIATION, AMERICAN SOCIOLOGICAL ASSOCIATION AND POPULATION ASSOCIATION OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' POSITION AT TRIAL**

Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3509
Facsimile: (212) 918-3100
ira.feinberg@hoganlovells.com

*Counsel for the American Statistical Association, American Sociological Association and Population Association of America*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................................... 1

SUMMMARY OF ARGUMENT ............................................................................................. 2

ARGUMENT ........................................................................................................................... 4

I.     The Department's Last-Minute Addition Of A Citizenship Question
Unnecessarily Threatens The Integrity Of Census Data. ......................................... 4

    A.    The Bureau Abandoned Its Longstanding Practice of Following
Proper Statistical Procedures, Which Preclude Adding Questions to
the Census Without Thorough Planning and Field Testing. ....................... 4

    B.    The Citizenship Question Will Reduce Response Rates while
Generating Incomplete and Inaccurate Answers. ...................................... 9

II.    The Accuracy And Reliability Of Census Data Are Of Vital Public
Importance, And Are Seriously Threatened By Inclusion Of The Citizenship
Question. ................................................................................................................ 12

CONCLUSION ....................................................................................................................... 18

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Dep't of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999)................................................................................................2, 12

*Fed'n for Am. Immigration Reform v. Klutznick*,
   486 F. Supp. 564 (D.D.C. 1980)............................................................................10

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)............................................................................................17

*Utah v. Evans*,
   536 U.S. 452 (2002)..............................................................................................3, 4

*Wisconsin v. City of N.Y.*,
   517 U.S. 1 (1996)......................................................................................................4

**Statutes**

13 U.S.C. § 9(a) (1997)...................................................................................................17

13 U.S.C. § 141 (note) .....................................................................................................4

Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 515(b), 114
   Stat. 2763 (codified at 44 U.S.C. § 3516 (note)) ...................................................5

**Other Authorities**

15 C.F.R. § 90.2 ..............................................................................................................5

71 Fed. Reg. 55522-01 (Sept. 22, 2006) ........................................................................5

A. Michael Froomkin, *The Metaphor Is the Key: Cryptography, the Clipper Chip,
   and the Constitution*, 143 U. Pa. L. Rev. 709 (1995) .............................................16

Nathaniel Persily, Book Review, *The Right to Be Counted Counting on the
   Census?*, 53 Stan. L. Rev. 1077 (2001) ................................................................13

Robert P. Swierenga, *Historians and the Census: The Historiography of Census
   Research*, 50 The Annals of Iowa 650 (1990) .......................................................15

Kent Walker, *Where Everybody Knows Your Name: A Pragmatic Look at the
   Costs of Privacy and the Benefits of Information Exchange*, 2000 Stan. Tech.
   L. Rev. 2 (2000)....................................................................................................16

U.S. Const. amend XIV § 2 ........................................................................................4, 10

U.S. Const. art. I, § 2, cl. 3........................................................................................4, 10

## STATEMENT OF INTEREST

*Amici curiae* are three leading national associations of professional and academic statisticians, sociologists and demographers who have a strong interest in, and regularly rely on, the integrity of the data produced by the United States Census Bureau, including the results of the decennial census that the Constitution mandates.  *Amici* have a strong interest in ensuring that their members and the public at large are able to continue to benefit from the accurate and trustworthy data that the Census Bureau has historically generated through the census.[1]

The American Statistical Association is the world's largest community of statisticians and one of the oldest continuously operating professional science societies in the United States. Its members generally hold advanced degrees and serve in industry, government and academia in more than 90 countries, advancing research and promoting sound statistical practice to inform public policy.  With over 18,000 members, who are primarily but not exclusively located in the United States, the American Statistical Association is the "Big Tent for Statistics" worldwide. Since its founding in 1839, the American Statistical Association has supported excellence in the development, application and dissemination of statistical science through meetings, publications, membership services, education, accreditation and advocacy.

The American Sociological Association is the national professional and scholarly association of sociologists in the United States.  Founded in 1905, the organization has almost 12,000 members and publishes twelve leading peer-reviewed journals.   The American Sociological Association is a nonprofit membership association dedicated to advancing sociology as a scientific discipline and profession that serves the public good.

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

The Population Association of America is a nonprofit, scientific organization of professionals from multiple disciplines engaged in the scientific study of population. Its common purpose is to advance knowledge and understanding of the causes and consequences of population composition, processes and change. Founded in 1931, the Population Association of America now has over 3,000 members, who include demographers, sociologists, economists, public-health professionals and other individuals interested in research and education in the population field.

*Amici curiae* have a unique interest in ensuring the integrity of the data generated by the 2020 census. *Amici* are deeply concerned that an uncertain and untested change to that census will imperil the accuracy, reliability and utility of a core tool for their research and decision-making. And because *amici* so heavily rely on census data, they are further concerned that the addition of the citizenship question will cause lasting damage to the credibility and professional standing of the Census Bureau, one of the world's leading statistical agencies.

## SUMMMARY OF ARGUMENT

The decennial census is "a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 341 (1999). Charged with safeguarding the integrity of this critical data, the United States Census Bureau (the "Bureau") has historically set the world standard for a statistical agency, employing scientifically rigorous methods to generate trustworthy information. Like so many others, *amici* place their faith in this data source every day. Accurate and reliable census information features in an astonishing array of decisions, from where voters cast their ballots, to where small businesses choose to invest, to how the federal government allocates money, and to how emergency responders prepare for

natural disasters, among many others.  And the Supreme Court has emphasized that our Nation has a "strong constitutional interest" in census-data accuracy.  *Utah v. Evans*, 536 U.S. 452, 478 (2002).

But the U.S. Department of Commerce (the "Department") has made an arbitrary-and-capricious, last-minute decision to add a citizenship question to the 2020 census that will significantly jeopardize the integrity of the data that the census produces.  The Bureau has well-established procedures designed to generate accurate data when the census includes a new question, and these procedures are consistent with standard statistical practices.  For example, the Bureau ordinarily conducts extensive field testing—often for many years—before adding a question to the decennial census.  During this field-testing process, the Bureau ordinarily gives careful consideration to how an additional question might affect response rates and data accuracy.  And the Bureau ordinarily proceeds with particular caution when considering a question that threatens to cause fear and lack of participation among vulnerable populations.

However, the Commerce Department has forced the Bureau to abandon these basic principles in this case.  Notwithstanding the cogent analysis of the Bureau's Chief Scientist, John Abowd, the Department now rushes to insert a citizenship question into the census, for the first time in seven decades, without any type of meaningful field testing.  The Department mandated the addition of the citizenship question in March 2018—months after the Bureau's internal deadline for proposing new census questions had passed and years after the Bureau had begun preparing for the 2020 census without having ever included such a question.

According to Commerce Secretary Wilbur Ross, the Department allegedly believes that adding a citizenship question will "prioritize[ ] the goal of obtaining complete and accurate data."  It will not.  Instead, contravening one established statistical principle after another in this

fashion will throw into doubt that data's integrity and utility.  The overwhelmingly sensitive nature of the citizenship question will substantially reduce census participation rates while generating a higher percentage of incomplete or inaccurate responses.  The Secretary asserts that there is no evidence that the citizenship question will cause lower participation rates, but that assertion improperly stands the appropriate statistical standard on its head, is inconsistent with the Bureau's longstanding practice of deliberative caution in adding questions to the census, and is deeply at odds with basic professional statistical norms.

The citizenship question imperils the Bureau's enduring role as a leading statistical agency, and it threatens the integrity of census data, which influences everything from the operation of our economy to the fairness of our democracy.  The last-minute addition of the citizenship question ignores well-established statistical methods.  And it will have significant negative consequences for professional and academic researchers, like *amici*'s members, who count on accurate census data to help us better understand our world.

## ARGUMENT

I.  **The Department's Last-Minute Addition Of A Citizenship Question Unnecessarily Threatens The Integrity Of Census Data.**

A.  **The Bureau Abandoned Its Longstanding Practice of Following Proper Statistical Procedures, Which Preclude Adding Questions to the Census Without Thorough Planning and Field Testing.**

The Bureau has a constitutional duty to conduct an accurate census.  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV § 2; *Evans*, 536 U.S. at 478 ("strong constitutional interest in accuracy" of the census); *Wisconsin v. City of N.Y.*, 517 U.S. 1, 19–20 (1996) (the Secretary may violate the Constitution if he unreasonably compromises "the distributive accuracy" of the census).  The Bureau also has a statutory duty to conduct an accurate census.  *See* 13 U.S.C. § 141 (note) ("[I]t is essential that the decennial enumeration of the population be as accurate as

possible, consistent with the Constitution and laws of the United States.").   And the Census Bureau's own binding regulations likewise create a federal regulatory duty to conduct an accurate census.   15 C.F.R. § 90.2 ("It is the policy of the Census Bureau to provide the most accurate population estimates possible.").   In addition, the Information Quality Act requires that federal agencies—including the Census Bureau—issue guidelines for "maximizing the quality, objectivity, utility, and integrity of information (including statistical information)."   Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 515(b), 114 Stat. 2763 (codified at 44 U.S.C. § 3516 (note)).   The agencies must, for example, "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs, to ensure that survey results are representative of the target population so that they can be used with confidence to inform decisions."   *See* Office of Mgmt. and Budget, *Standards and Guidelines for Statistical Survey*s 1 (Sept. 2006)[2]; 71 Fed. Reg. 55522-01 (Sept. 22, 2006).

The Bureau has developed and issued statistical quality standards in line with the Information Quality Act and in keeping with its constitutional, statutory and regulatory duties to ensure census-data accuracy.   These quality standards "apply to all information products released by the Bureau and the activities that generate those products," including the decennial census. U.S. Census Bureau, *Statistical Quality Standards* ii (July 2013).[3]   Under the Bureau's quality standards, "pretesting *must* be performed" to avoid questionnaire content that could cause "confusion," "misinterpretation" and "a loss of information."   *Id.* at 12 (emphasis added).   This pretesting is required, for example, when "review by cognitive experts reveals that adding

---

[2] *Available at* https://bit.ly/2Jhql99.
[3] *Available at* https://bit.ly/2D7L2zB.

pretested questions to an existing instrument may cause potential context effects," or where "an existing data collection instrument has substantive modifications (*e.g.*, existing questions are revised or new questions added)." *Id.* at 8. The pretesting process must verify that questions "are not unduly sensitive and do not cause undue burden." *Id.*

These guidelines are consistent with proper statistical practices. A leading treatise emphasizes the importance of careful analysis and pretesting before changing data-collection techniques. For example, there are several well-accepted methodologies for evaluating such changes:

> Research on methods to improve data quality may cover such areas as alternative methods for imputing values for missing data, alternative question wordings to reduce respondent reporting errors (based on cognitive methods), and alternative sources of data and ways for combining them to enhance quality. Methods for such research may include the use of "methods panels" (small samples for which experiments are conducted by using alternative procedures and questionnaires), matching with administrative records, and simulations of sensitivity to alternative procedures.

Nat'l Academies of Science, Eng'g & Medicine, *Principles & Practices for a Federal Statistical Agency* 114 (6th ed. 2017) ("*Principles & Practices*"). "In ongoing programs for which it is disruptive to implement improvements on a continuing basis, a common practice is to undertake major research and development activities at intervals of *5, 10, or more years*." *Id.* (emphasis added). Indeed, "[h]igh-quality surveys *always* provide adequate budget and time for pre-testing questionnaire(s) and field procedures," because "[a] pre-test of the questionnaire and field procedures is the only way of finding out if everything 'works' especially if a survey employs new techniques or a new set of questions." Am. Assoc. for Pub. Op. Research, "Best Practices for Survey Research" (emphasis added).[4]

---

[4] *Available at* https://bit.ly/2QbKzTW.

As the Bureau has explained, since 1970 it has "conducted content tests to research and improve the design and function of different questions." U.S. Census Bureau, *Content Research* (Jan. 11, 2017).[5] These tests seek "to ensure [that] census questionnaires are easily understood and reflect the population accurately." *Id*. Consider, for example, that the Bureau has been pretesting changes to questions about Hispanic origin and race for inclusion in the 2020 census *since 2010*. *Id*. And the Bureau has conducted annual "research and testing" phases *since 2013* to evaluate "fundamental changes to the design, implementation, and management of the decennial Census." U.S. Census Bureau, *2020 Census: Census Testing By Year*.[6] The Bureau has explained that it has engaged in this careful, methodical process to "maintain[ ] a disciplined and transparent acquisition decision process" and to "obtain evidence-based decisions." *Id*.

By March 2018, the Bureau had already launched its *last* field test for the 2020 census, in Providence, Rhode Island, again without including a citizenship question. *Id*. Yet the Department announced its intent to add a citizenship question to the 2020 census—for the first time in seven decades—on *March 26, 2018*, long after any changes to its testing could be made. The Department's eleventh-hour mandate to add the citizenship question, overriding the objections of the professionals at the Census Bureau, has left the Bureau with no choice but to forgo its standard procedures and to operate completely outside the bounds of standard practice and appropriate methodology. It is simply too late to conduct adequate pretesting of such a major reconfiguration of the census, as the Bureau's internal guidelines and statistical principles require. *Amici* are unaware of any previous example of such a potentially enormous and uncertain change to the census being made with such haste and lack of preparation.

---

[5] *Available at* https://bit.ly/2DBFYJn.
[6] *Available at* https://bit.ly/2QZlEnI.

Unsurprisingly, the Department's insistence on moving forward with the citizenship question notwithstanding this violation of the Bureau's ordinary procedures drew a sharp response from its Chief Scientist, who concluded that adding a citizenship question "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from other administrative sources."  Mem. from J. Abowd to W. Ross (Jan. 19, 2018) ("Abowd Mem."), at 1.[7]

The Secretary nonetheless argues that there is no evidence that implementing a last-minute change to the 2020 census will result in unreliable data.  As discussed in more detail below, this is not true; evidence shows that adding a citizenship question will significantly affect both data accuracy and response rates.  But even crediting the Secretary's dubious claim, the Secretary's position flips the statistical "burden of proof" on its head, and is inconsistent with sound statistical practice.  *See* Nat'l Academies of Sciences, Eng'g & Medicine, *Letter Report on the 2020 Census* 6 (Aug. 7, 2018).[8]  Field testing potential survey questions is the *norm* for proper statistical inquiries, as the Bureau's own guidelines and professional statistical standards show; it is not some nicety that can be dispatched when inconvenient.  *See* U.S. Census Bureau, *Statistical Quality Standards* at 8, 12; Am. Assoc. for Pub. Op. Research, "Best Practices for Survey Research," *supra*.  The statistically valid approach requires great caution before adding a question, so that the Bureau—and all those who rely on the Bureau's historically excellent work—can proceed with confidence that the additional question will not skew or otherwise affect the validity of the data.

---

[7] *Available at* https://bit.ly/2tzRYUi.
[8] *Available at* https://bit.ly/2AQivTr.

In short, the Bureau has not conducted the type of careful pretesting that its own standards and professionally recognized statistical practices require.  While it has spent nearly a decade testing other potential census questions, the Bureau has not spent one moment testing the citizenship question.  And there is a significant risk that the addition of this untested question will strike fear into members of discrete populations, reducing census response rates in asymmetric fashion, and thus generating incomplete and inaccurate data.

**B.      The Citizenship Question Will Reduce Response Rates while Generating Incomplete and Inaccurate Answers.**

The Bureau's addition of a citizenship question will undermine, rather than promote, the accuracy of census data.  Statisticians recognize that even seemingly innocuous additional survey questions can increase "respondent burden," that is, "[t]he degree to which a survey respondent perceives participation in a survey research project as difficult, time consuming, or emotionally stressful."  Encyclopedia of Survey Research Methods.[9]  "The researcher must consider the effects of respondent burden prior to administering a survey instrument, as too great an average burden will yield lower-quality data and is thereby counterproductive."  *Id.*; *accord* Scott Fricker, U.S. Dept. of Labor Statistics, *Defining, Measuring, and Mitigating Respondent Burden* (Mar. 8, 2016).  Adding any question to a survey increases respondent burdens and therefore risks reducing participation rates.  Dillman *et al.*, *Effects of Questionnaire Length, Respondent-Friendly Design, and a Difficult Question on Response Rates for Occupant-Addressed Census Mail Surveys*, 57 Public Opinion Quarterly 289 (1993) ("An experimental study of alternatives to the current US decennial census questionnaire demonstrated that shortening the questionnaire

---

[9] *Available at* https://bit.ly/2Imzih1.

and respondent-friendly questionnaire design improve response, whereas asking a potentially difficult and/or objectionable question (i.e., social security number) lowers response.").

But adding a question on citizenship—one so fraught with emotional, psychological and legal ramifications—will almost certainly increase respondent burdens by orders of magnitude, cause significant declines in the response rate and lead to a substantial undercount of immigrant populations, despite the Bureau's constitutional obligation to count *all* persons in the United States, citizen or otherwise.  U.S. Const. art. I, § 2, cl. 3; *id.* amend XIV § 2.  As the Bureau's Chief Scientist and Associate Director for Research and Methodology, John Abowd, has noted, "item nonresponse rates for the citizenship question [asked as part of the American Community Survey] are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity."  Abowd Mem. at 4.  The reason is obvious:  questions about citizenship status are overwhelmingly sensitive.   In this light, the Secretary's unsupported assertion that "limited empirical evidence exists of whether a citizenship question would decrease response rates materially," Mem. from W. Ross to K. Kelley (Mar. 26, 2018) at 5,[10] is directly contradicted by the data and conclusion cited by the Bureau's Chief Scientist. Moreover, anecdotal evidence contradicting the Secretary's assertion is legion.  *See, e.g.*, Hansi Lo Wang & Marisa Penaloza, *Many Noncitizens Plan To Avoid the 2020 Census, Test Run Indicates*, NPR (May 11, 2018), *available at* https://n.pr/2wSkLHF.

Indeed, the Census Bureau itself has explained the reality best, in terms that directly contradict the Secretary's position.   As the Bureau argued in *Federation for American Immigration Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980):  "Obtaining the cooperation of a suspicious and fearful population would be impossible if the group being counted perceived

---

[10] *Available at* https://bit.ly/2yHcMuK.

any possibility of the information being used against them.  Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Id.* at 568 (recounting the Bureau's litigation position in that case). The suspicions and fears that the Bureau referred to in 1980 are no doubt even more acute today, at a time when anti-immigrant sentiments run high and immigration-enforcement raids create an enormous fear of deportation among immigrant communities.  *See* Associated Press, "Hunger, Fear, Desperation: What Came of an Ordinary ICE Raid," (July 9, 2018).[11]  And because questions surrounding citizenship status are "known or anticipated to have tangible physical, financial, or psychological effects," ethical guidelines caution that statisticians use extra care when engaging in those analyses.  Am. Statistical Ass'n, *Ethical Guidelines for Statistical Practice* H-3.  Here, the Secretary's complete lack of care in choosing to add a citizenship question to the census will inevitably lower response rates.

Lower response rates, in turn, will jeopardize data accuracy.  After examining "several Census Bureau surveys with and without citizenship questions," the Bureau has concluded that "households that may contain noncitizens are more sensitive to the inclusion of citizenship in the questionnaire than all-citizen households," and that "adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in more nonresponse follow-up . . . fieldwork, more proxy responses, and a lower-quality population count."  J. David Brown et al., *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census* 54 (Aug. 2018).[12]

---

[11] *Available at* https://cbsn.ws/2zUs8Oo.
[12] *Available at* https://bit.ly/2xIlDfR.

And to top it all off, including the citizenship question in the decennial census is entirely unnecessary.  The American Community Survey *already* measures the citizenship voting-age population and provides both the Justice Department and researchers like *amici* with sufficiently detailed data to study noncitizen populations, particularly when paired with other data sources, for example, records from federal administrative agencies such as the Social Security Administration.  The justification for the last-minute addition of a citizenship question is therefore especially dubious because, in addition to causing a number of serious negative effects, the added question will not have any offsetting benefits, as it will largely duplicate data that is already available for the same purpose.

Instead of engaging in the careful testing and evaluation required by the Bureau's guidelines, the Secretary insists on injecting a controversial, untested question shortly before the 2020 census.  There is no principled basis in professional statistical practice for this approach.

## II.    The Accuracy And Reliability Of Census Data Are Of Vital Public Importance, And Are Seriously Threatened By Inclusion Of The Citizenship Question.

The departure mandated by the Commerce Secretary from the Census Bureau's historical and professionally responsible practices will have enormous and adverse practical consequences.  As the Supreme Court recognized in *U.S. House of Representatives*, although the decennial census was "originally established for the sole purpose of apportioning Representatives," it has "grown considerably over the past 200 years."  525 U.S. at 341.  The data produced by the decennial census now is absolutely vital to our Nation's growth and development, and provides the basic foundation for countless decisions made on a daily basis by the federal government, local governments, and private business.  *Amici* are deeply troubled by any action taken to alter the census without proper testing and calibration that threatens the accuracy and reliability of this vital data resource.  Whether intended or not, the consequences are potentially enormous.  *See*

Haley Sweetland Edwards, *Why the Census Matters Now More than Ever*, Time (May 18, 2017).[13]

    The census's direct effects on American life are obvious.  The census establishes the baseline for how seats in the House of Representatives are apportioned among the States and how electors to the Electoral College are allocated.  *See generally* Nathaniel Persily, Book Review, *The Right to Be Counted Counting on the Census?*, 53 Stan. L. Rev. 1077, 1087–90 (2001).  But the census's significance goes far beyond the political.  The census determines where almost $700 billion in federal funding is directed, through numerous national, state, and local programs each year.  *See Decennial Census of Population and Housing:  Why We Conduct the Decennial Census*, United States Census Bureau (Oct. 19, 2017).[14]  These programs include, among many others, the Highway Trust Fund and Urbanized Area Formula Funding programs, the Head Start program, Medicare, the Supplemental Nutrition Assistance Program, and Title I funding for low-income schoolchildren.  *See* Jim Tankersley & Emily Baumgaertner, *Here's Why an Accurate Census Count Is So Important*, N.Y. Times, Mar. 28, 2018, at A16.[15]  Long-term programs dependent on population changes over time, including Social Security, likewise rely heavily on census data.  *See generally* Office of the Chief Actuary, Social Security Administration, The Long-range Demographic Assumptions for the 2018 Trustees Report (June 5, 2018).[16]  It is not hard to understand, given these consequences, why the manner in which the census is conducted is so important.

---

[13] *Available at* https://ti.me/2qzlt7n.

[14] *Available at* https://bit.ly/2hvVrwz.

[15] *Available at* https://nyti.ms/2GlOtFk.

[16] *Available at* https://bit.ly/2xUUeXk.

The census's indirect effects are of similarly great importance to the national interest. Private businesses, nonprofit organizations and government actors have all come to depend on the unique reliability and utility of census data when making all manner of economic, business, and strategic planning decisions.  It is widely acknowledged that "federal statistical agencies" like the Census Bureau "have refined a set of practices that ensure the quality and impartiality" of their data that make the data a uniquely valuable public resource.  *See Principles & Practices*, *supra*, at 1; *see also* Nicholas Eberstadt, Ryan Nunn, Diane Whitmore Schanzenbach & Michael R. Strain, The Hamilton Project, "In Order That They Might Rest Their Arguments on Facts": The Vital Role of Government-Collected Data 1–4 (Mar. 2017) ("Because the reports are of such value to the private sector and the public at large, financial markets carefully scrutinize them, reacting quickly to many of the releases.").[17]  The Census Bureau itself recognizes as much.  On its own website, the agency rightly touts the Census Bureau Economic Programs, explaining how the detailed statistical information that the Bureau makes publically available have wide-ranging practical benefits.  For example, the agency highlights how a new small business was able to use census data to identify a potentially viable location to manufacture and sell mountain-bike components in Portland, Oregon; how census data successfully enabled an Albuquerque, New Mexico entrepreneur to expand his restaurant business and secure a small-business loan; and how emergency-management officials in South Florida use census data to better prepare for the aftermath of severe weather.  *Economic Census:  Uses of Data*, United States Census Bureau (Apr. 3, 2018).[18]

---

[17] *Available at* https://bit.ly/2xSCDzv.
[18] *Available at* https://bit.ly/2R3aj5Y.

Public access to that data is particularly crucial to the States and local governments that receive over $400 billion a year in federal funds dependent on demographic, socioeconomic, and geographic factors.  The State and local governments often partner on key support programs with institutions that rely on census data because they lack the means to generate such data independently.  *See generally* Kate Cheyne, *Why The US Census is Important to Food Banks— and Why We Need To Protect It*, Alameda County Community Food Bank (Jan. 31, 2018) ("For non-profits, policy makers, and advocates working to end food insecurity and hunger, [Census Bureau data is] our most comprehensive source of information on poverty rates, household incomes, cost of living, health insurance, nutrition assistance participation, and more.").[19]

Academic researchers also rely heavily on census data to better understand and evaluate numerous aspects of the world around us.   Statisticians, demographers, economists, epidemiologists and political scientists, among countless other social-science professionals, have long used census data as a key tool for generating knowledge.  Robert P. Swierenga, *Historians and the Census: The Historiography of Census Research*, 50 The Annals of Iowa 650 (1990). Use of census data has generated a wide range of statistical innovations.  Recent advances in statistical analysis, computing and data analytics have only bolstered that crucial utility.  Leading research institutions around the world recognize the vital uses of census data.  The University of Minnesota,[20] Amherst College,[21] the Dartmouth College Library[22] and New York University,[23] for example, all make available special training materials and aggregate various sources of census data to use in research across a wide range of disciplines.  So does the Census Bureau

---

[19] *Available at* https://bit.ly/2xFphHi.
[20] *Available at* https://bit.ly/2QZf7IQ.
[21] *Available at* https://bit.ly/2IlLkas.
[22] *Available at* https://bit.ly/2Dz6Tpc.
[23] *Available at* https://bit.ly/2xGMaKG.

itself.  Recognizing the range of uses to which census data may be put, the Bureau has recently offered a series of informational videos and provides a channel of communication with agency experts for teachers, students, researchers and the public generally.  *See Census Academy:  Free courses on how to use Census data*, United States Census Bureau (last visited Oct. 29, 2018).[24] The knowledge and exploration enabled by census data informs untold aspects of policymaking, both directly and indirectly, and carries crucial real-world consequences as a result.  Though these downstream effects may be difficult to quantify, they too are worthy of significant consideration.

Each of these critical uses of census data would be severely undermined if the data's integrity were to falter.  The potential consequences are enormous.  In addition to political malapportionment and potentially billions of dollars in misdirected government funding, the private sector and the academy—and all of us who rely on these institutions—would be forced to make decisions in the face of uncertain or known-to-be-incorrect baseline assumptions.

To underscore the power of census data, one need only turn to history.  As with any sufficiently powerful tool, census data has been at various moments of great strain put to infamous ends.  William Tecumseh Sherman, for example, turned to census data in planning his March to the Sea, in the military operation during the Civil War that would "make Georgia howl."  *See, e.g.*, Kent Walker, *Where Everybody Knows Your Name: A Pragmatic Look at the Costs of Privacy and the Benefits of Information Exchange*, 2000 Stan. Tech. L. Rev. 2, 106 (2000).  In one of the darkest moments in United States history, the Roosevelt Administration used census data during World War II to identify and round up Americans of Japanese ancestry, who were then held forcibly in internment camps.  *See, e.g.*, A. Michael Froomkin, *The*

---

[24] *Available at* https://bit.ly/2N3PUKY.

*Metaphor Is the Key: Cryptography, the Clipper Chip, and the Constitution*, 143 U. Pa. L. Rev. 709, 732–733 (1995); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("The forcible relocation of U.S. citizens to concentration camps, solely and explicitly on the basis of race, is objectively unlawful and outside the scope of Presidential authority."). And, in the wake of the September 11, 2001 terrorist attacks, the then-recently formed Department of Homeland Security secured from the Census Bureau specially tabulated statistics concerning the concentration of Arab-Americans in the United States. *See* Lynette Clemetson, Homeland Security Given Data on Arab-Americans, N.Y. Times, July 30, 2004, at A14.[25] Although legal protections and modern practice seek to curb the potential for abuse, *see, e.g.*, 13 U.S.C. § 9(a) (1997) (limiting use of census data to "the statistical purposes for which it is supplied"), the reality of the power of census data—and the potential for misuse—remains.

Finally, informed decision-making requires accurate information. But more information (produced by adding an additional question) is *not* the same thing as better information. On the contrary, if the method used to generate that additional information taints the validity of the collection process, the value of future census data will be worsened overall. There is no evidence-based reason to believe that the Department of Commerce can add a citizenship question to the 2020 census without compromising the accuracy and reliability of the overall data. At the very least, the inherent uncertainty of moving forward with that question would undermine the widespread trust that has long been the hallmark of Census Bureau data. Any marginal benefit from the answers to the citizenship question would be far outweighed by the asymmetric effects on political representation, funding decisions and academic and policy research.

---

[25] *Available at* https://nyti.ms/2xI3Rt8.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' challenge to the Census Bureau's inclusion of a question on citizenship in the 2020 census should be sustained.

Dated:  October 29, 2018                                        Respectfully submitted,

/s/ *Ira M. Feinberg*
Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY  10022
Telephone: (212) 918-3509
Facsimile: (212) 918-3100
ira.feinberg@hoganlovells.com

*Counsel for the American Statistical Association, American Sociological Association and Population Association of America*