## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

State of New York,

                    *Plaintiffs*,

                    v.                   Case No. 1:18-cv-2921 (JMF)

U.S. Department of Commerce, *et al.*,

                    *Defendants*,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF UNOPPOSED MOTION AND MOTION FOR LEAVE TO FILE A BRIEF AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' TRIAL POSITION

Five former Directors of the U.S. Census Bureau—Vincent P. Barabba, Martha Farnsworth Riche, Kenneth Prewitt, Steven H. Murdock, and Robert M. Groves—respectfully move for leave to file the accompanying *amicus* brief in support of Plaintiffs' trial position.

*Amici curiae* have collectively served for decades in their roles as Directors of the Census Bureau, under both Democratic and Republican administrations. In that capacity, they took part in planning and preparing critical surveys administered by the Census Bureau, including the decennial census, post-enumeration surveys analyzing census undercounts, and the American Community Survey (ACS, which replaced the decennial census "long form"). Their involvement affords them extensive and unique insight into the testing processes and procedures required to conduct a high quality census, along with the data quality issues risked by the last minute addition of a new question.

 "District courts have broad discretion to permit or deny the appearance of amici curiae in a given case." *United States v. Ahmed*, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992). The "usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not

available from the parties." *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2011 WL 5865296, at *1 (S.D.N.Y. Nov. 22, 2011). The former Directors respectfully submit that their extensive experience with the longstanding practices of the Census Bureau; their knowledge of the testing processes and analysis that is required to ensure a high quality census; and their insight into the far-reaching and negative consequences risked by a compromised population count would be helpful to the Court in its consideration of this case. They also submit that their understanding of the availability of citizenship voting age population data from sources other than an untested citizenship question in the decennial census would be helpful to the Court.

All parties consent to the filing of the amicus brief.

For the foregoing reasons, the motion should be granted.

Dated: October 29, 2018                        Respectfully submitted,

                                               /s/ Matthew D. Ingber
                                               Matthew D. Ingber
                                               MAYER BROWN LLP
                                               1221 Avenue of the Americas
                                               New York, NY 10020
                                               (212) 506 2373
                                               mingber@mayerbrown.com

                                               Andrew J. Pincus*
                                               Michael B. Kimberly*
                                               Colleen M. Campbell*
                                               MAYER BROWN LLP
                                               1999 K Street NW
                                               Washington, DC 20006
                                               (202) 263-3000

                                               *Attorneys for proposed Amici Curiae*
                                               *\* pro hac vice applications forthcoming*

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

State of New York,                            :

                   *Plaintiffs*,          :

                       v.               :    Case No. 1:18-cv-2921 (JMF)

U.S. Department of Commerce, *et al.*,     :

                   *Defendants*.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**[PROPOSED] BRIEF OF *AMICI CURIAE* FORMER CENSUS BUREAU DIRECTORS IN SUPPORT OF PLAINTIFFS' TRIAL POSITION**

October 29, 2018

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

INTEREST OF THE *AMICI CURIAE* .............................................................................. 1

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................... 2

    A.   The Modern Census Format ....................................................................................... 3

    B.   The Addition of a Citizenship Question in 2020 ...................................................... 4

SUMMARY OF THE ARGUMENT ..................................................................................... 6

ARGUMENT .......................................................................................................................... 8

THE ADDITION OF A CITIZENSHIP QUESTION AT THIS LATE DATE WILL
SIGNIFICANTLY REDUCE THE ACCURACY OF THE CENSUS. ................................. 8

    A.   A Citizenship Question Has Never Been Part of the Modern Census "Short
Form" .......................................................................................................................... 8

    B.   A Citizenship Question Will Generate a Less Accurate Population Count ............. 9

        1.   Studies project that rates and quality of responses will drop in light of a
citizenship question ........................................................................................ 10

        2.   An undercount could have a disproportionate impact on specific races
and ethnic groups and geographies ................................................................ 12

        3.   Because addition of a citizenship question has not been adequately
vetted, its impact could be even more far-reaching ...................................... 15

    C.   Compromised Census Data Have Far-Reaching, Negative Consequences ............ 16

    D.   A Citizenship Question in the 2020 Census Is Not Needed To Vigorously
Enforce the VRA ....................................................................................................... 18

CONCLUSION .................................................................................................................... 19

**TABLE OF AUTHORITIES**

**Cases**

*Fed'n for Am. Immigration Reform v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ............................................................................. 9

*Tennant v. Jefferson Cty. Comm'n*,
    567 U.S. 758 (2012) (per curiam) ........................................................................ 18

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ..................................................................................... 8, 18

**Statutes and Constitutional Provisions**

13 U.S.C.

    § 141(a) ................................................................................................... 6

    § 141(b) ................................................................................................... 2

    § 141(c) ................................................................................................... 3

52 U.S.C. § 10503(b) .............................................................................................. 1

U.S. Const. amend. XIV, § 2 ............................................................................... 1, 2

U.S. Const. art. I, § 2, cl. 3 ..................................................................................... 1

**Other Authorities**

Am. Statistical Ass'n, *The American Statistical Association Strongly Cautions
    Against Addition of a Citizenship Question on the 2020 Census* (Aug. 2018) ...................... 15

Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in
    the Geographic Distribution of Federal Funds, Estimating Fiscal Costs of a
    Census Undercount to States*, G.W. Inst. of Pub. Policy (Mar. 19, 2018) ...................... 16, 17

*Census Finds 'Sore Spot' As Aliens Dislike Admitting Lack of Citizenship*,
    Hartford Courant (Apr. 5, 1940) ........................................................................... 8

Consortium of Soc. Sci. Ass'ns, *COSSA Statement on the Impact of a Citizenship
    Question in the 2020 Decennial Census* (Mar. 2018) ...................................... 16, 17

*Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before
    the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S.
    Comm. on Governmental Affairs*, 99th Cong. (1985) ......................................... 9

Lawrence D. Brown et al., *Experimentation and Evaluation Plans for the 2010
    Census: Interim Report*, Nat'l Res. Council of the Nat'l Acads. (2008) ...................... 15

J. David Brown et al., *Understanding the Quality of Alternative Citizenship Data
    Sources for the 2020 Census* (Aug. 2018) ................................................... *passim*

Joseph Fishkin, *The Administration is Lying About the Census*, Balkanization
(Mar. 27, 2018) ...................................................................................................18

Memorandum from Arthur E. Gary, Department of Justice, to Dr. Ron Jarmin,
U.S. Census Bureau, *Re: Request to Reinstate Citizenship Question on 2020
Census Questionnaire* (Dec. 12, 2017) ...................................................4, 5, 18

Memorandum from the Center for Survey Measurement to the Associate
Directorate for Research and Methodology, *Re: Respondent Confidentiality
Concerns* (Sept. 20, 2017) ..................................................................................12

Memorandum from John M. Abowd to Wilbur L. Ross, Jr., *Re: Preliminary
Analysis of Alternative D (Combined Alternatives B and C)* (Mar. 1, 2018) ...........................5

Memorandum from John M. Abowd to Wilbur L. Ross, Jr., *Re: Technical Review
of the Department of Justice Request to Add Citizenship Question to the 2020
Census* (Jan. 19, 2018) ................................................................................ *passim*

Memorandum from the Secretary of Commerce to Karen Dunn Kelley, Under
Secretary for Economic Affairs, *Re: Reinstatement of a Citizenship Question
on the 2020 Decennial Census Questionnaire* (Mar. 2018) ...................................6

Nat'l Acads. Of Scis., Eng'r & Med., *Letter Report on the 2020 Census* (Aug. 7,
2018) ................................................................................................... *passim*

*Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight
& Gov't Reform*, 115th Cong. (2018) ............................................... *passim*

U.S. Census Bureau, *A Basic Explanation of Confidence Intervals* ................................4

U.S. Census Bureau, *American Community Survey: Response Rates* ..........................11

U.S. Census Bureau, *American Community Survey Sample Size* ...................................4

U.S. Census Bureau, *Census Bureau Releases Estimates of Undercount and
Overcount in the 2010 Census* ..........................................................................14

U.S. Census Bureau, *Decennial Census of Population and Housing* ..........................3, 4

U.S. Census Bureau, *DS-16: Policy on Respondent Identification and Sensitive
Topics in Dependent Interviewing* ........................................................................9

U.S. Census Bureau, *History* ...............................................................................3

U.S. Census Bureau, *Notice of Required Information for the 1960 Census of
Population and Housing* ........................................................................................3

U.S. Census Bureau, *Pretests and Dress Rehearsals of the 1970 Census of
Population and Housing* (1972).............................................................................15

William P. O'Hare, *Citizenship Question Nonresponse*, Georgetown Law Ctr. on
Poverty & Inequality (Sept. 2018) .............................................................10, 13, 14

iii

## INTEREST OF THE *AMICI CURIAE*

*Amici curiae* are five former Directors of the U.S. Census Bureau: Vincent P. Barabba, Martha Farnsworth Riche, Kenneth Prewitt, Steven H. Murdock, and Robert M. Groves.[1]

*Amici* served as Directors under both Democratic and Republican administrations. Their collective experience in that position spans decades. In their roles as Directors of the Census Bureau, the former Directors took part in planning and conducting the decennial census, post-enumeration surveys analyzing census undercounts, and the American Community Survey (ACS, which replaced the decennial census "long form" and is legally part of the decennial census), as well as other surveys regularly administered by the Census Bureau. Since the advent of the ACS after the 2000 Census (and prior to 2000 from the census long form that preceded the ACS), they carried out their statutory duty to determine when state or political subdivisions are required under Section 203 of the Voting Rights Act to provide language assistance for minority voting groups. *See* 52 U.S.C. § 10503(b). Accordingly, the former Directors have unique expertise in the practices of the Census Bureau and the testing processes and procedures required to conduct an accurate, high quality census. From that experience, the former Directors also gained unique insight on the likely impact on data quality and census coverage of a last-minute addition of an untested question, such as a citizenship question on the 2020 Census.

## INTRODUCTION

Defendants' insertion of a citizenship question into the 2020 Census seriously jeopardizes the accuracy of the only count expressly required by the Constitution: the total number of persons in each State. *See* U.S. Const. art. I, § 2, cl. 3; *id.* U.S. Const. amend. XIV, § 2.

The last minute addition of a citizenship question contravenes the Census Bureau's longstanding practice of rigorous testing and fulsome analysis of all questions over the course of many years prior to their inclusion in the census. It also reverses the Census Bureau's decades-

---

[1]  Former Director John Thompson was unable to join this brief due to his involvement as an expert witness in this litigation.

long position that a citizenship question may undermine the accuracy of the Bureau's constitutionally mandated population count.

We do not repeat the arguments advanced by Plaintiffs. Instead, this brief addresses the data quality issues and adverse policy consequences that will result from the late insertion of a citizenship question.

The Census Bureau's own experts have concluded that the addition of a citizenship question is likely to compromise data quality and census accuracy by depressing response rates and introducing a differential impact on specific populations and the geographies where those populations are most concentrated. An undercount that varies by population will compromise congressional and state apportionment, legislative redistricting, and the distribution of federal funds to the States. It will also have ripple effects throughout the economy in light of the many private businesses that depend on census data for their operations. Defendants' purported basis for this shift in practice—that citizenship voting age population (CVAP) data at the census block level are needed for the Department of Justice to pursue Section 2 claims under the Voting Rights Act (VRA)—is not credible. Data generated from the census long form and ACS have adequately supported VRA litigation since the enactment of this milestone law in 1965.

## BACKGROUND

The Census Bureau assists the Secretary of Commerce by conducting the census, a "tabulation of total population by States." 13 U.S.C. § 141(b). The decennial count of "the whole number of persons in each state" is constitutionally mandated for purposes of apportioning congressional representatives among the several States. U.S. Const. amend. XIV, § 2. The population count generated is also critical to periodic updates to congressional and state legislative district lines, allocating federal funds among the States, and supporting research by statisticians, demographers, economists, sociologists, and other scientific disciplines.

A.     **The Modern Census Format**

The census form sent to every household has excluded a citizenship question since 1950.[2] Since 1960, the modern decennial census has encompassed both a short form and a long form. The census short form is intended to reach every American households and focuses on an accurate population count, along with basic demographic and limited housing data. It is "designed to be short, simple, and minimally intrusive, to maximize response rates" and thus conduct an "actual Enumeration," not an extrapolated one. *Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. 5 (2018) (testimony of Professor Justin Levitt), perma.cc/7FV6-GXEF (Levitt Testimony).

When the Bureau adopted the bifurcated format after the 1960 census, it continued to exclude the citizenship question from the census short form. That is because the goal of the census short form is to collect "only the data necessary for a concise and condensed full population count" (J. David Brown et al., *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census* 4 (Aug. 2018), perma.cc/M253-V5GR (Brown Study)), along with data mandated by Public Law 94-171, which allows States "not later than 3 years before the decennial census date" to identify geographic areas "for which specific tabulations of population are desired" for districting purposes. 13 U.S.C. § 141(c).

The census long form, by contrast, was sent to approximately one in six households. U.S. Census Bureau, *Decennial Census of Population and Housing*, perma.cc/M6LQ-RWHM. It collected voluminous, detailed population and housing data, including data on citizenship status, educational attainment, disability status, and housing costs. *See* U.S. Census Bureau, *Notice of Required Information for the 1960 Census of Population and Housing*, perma.cc/DQ7P-UR9P.

---

[2]   The Census Bureau lists an index of questions included in each decennial census. *See* U.S. Census Bureau, *History*, perma.cc/696U-WKFL. The question related to citizenship varied from decade to decade and was not included in every decennial enumeration.

"After years of testing, outreach to stakeholders, and interaction with key data users," the Census Bureau in 2005 replaced the census long form with the ongoing American Community Survey, which remains a legal part of the decennial census. U.S. Census Bureau, *Decennial Census of Population and Housing*, perma.cc/M6LQ-RWHM. The ACS collects responses from a representative sample of households; it currently records final interviews from over two million households annually. U.S. Census Bureau, *American Community Survey Sample Size*, perma.cc/2YM9-CZTK; *see also* Brown Study at 4 (calculating that the ACS reaches 1.6 percent of households annually). It also generates citizenship data that permit highly accurate estimates of citizen voting age population at the block group level at a 90-percent level of confidence.[3] U.S. Census Bureau, *Citizen Voting Age Population (CVAP) Special Tabulation*, perma.cc/PZF3-TPGR. The Census Bureau website describes this new system as an "innovation" that allows it to "focus decennial census efforts on the constitutional requirements to produce a count of the resident population." U.S. Census Bureau, *Decennial Census of Population and Housing*, perma.cc/M6LQ-RWHM.

## B.     The Addition of a Citizenship Question in 2020

In December 2017, the Department of Justice (DOJ) requested that the Secretary of Commerce add a citizenship question to the 2020 Census short form, dubiously citing the need for "a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected" in order to enforce Section 2 of the Voting Rights Act. Memorandum from Arthur E. Gary, Department of Justice, to Dr. Ron Jarmin, U.S. Census Bureau, *Re: Request to Reinstate Citizenship Question on 2020 Census Questionnaire* (Dec. 12, 2017) (DOJ Memo). The request acknowledged that the ACS provides estimates of CVAP data, but pointed to margins of error in ACS estimates and noted that ACS data are provided at the

---

[3]     A confidence interval is a range of values that describes the uncertainty surrounding an estimate. U.S. Census Bureau, *A Basic Explanation of Confidence Intervals*, perma.cc/QVL2-UNF9.

larger geographic units, while the decennial census reports data at a smaller census block level unit. *Id.* at 3. It did not acknowledge or address that census short form data are also error-prone.

In January 2018, Chief Scientist and Associate Director for Research and Methodology of the Census Bureau, John M. Abowd, produced a draft memorandum analyzing the impact of adding a citizenship question dubbed "Alternative B"—that memorandum concluded that adding the proposed question "harms the quality of the census count." Memorandum from John M. Abowd to Wilbur L. Ross, Jr., *Re: Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census* at 1277-1307 (Jan. 19, 2018), goo.gl/RB4Emn (Abowd Memo).

Another option called Alternative A, "developing model-based statistical methods to better facilitate [DOJ's] uses of [ACS] data in performing its Voting Rights Act duties," risked no impact to the 2020 Census. *Id.* at 1279. This method would build on modeling already implemented to improve small area estimates for purposes of the Census Director's determinations under Section 203 Voting Rights Act. "[A] small team of Census Bureau experts similar in size and capabilities to the teams used to provide Voting Rights Act Section 203 language determinations would be deployed [to DOJ]." *Id.*

A later-explored alternative, referred to as "Alternative D," would add a citizenship question to the 2020 Census and then cross-reference census responses against administrative records to calculate the rate of inaccurate responses. Dr. Abowd concluded that Alternative D "would still have all the negative cost and quality implications of Alternative B." Memorandum from John M. Abowd to Wilbur L. Ross, Jr., *Re: Preliminary Analysis of Alternative D (Combined Alternatives B and C)* (Mar. 1, 2018).

The Secretary of Commerce nonetheless selected Alternative D, deciding to add a citizenship question to the 2020 Census form. He stated, without explanation, that under Alternative C, statistical imputation of ACS data to smaller units might not reach "a sufficient

degree of accuracy." Memorandum from the Secretary of Commerce to Karen Dunn Kelley, Under Secretary for Economic Affairs, *Re: Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* (Mar. 2018).

A later study completed by experts at the Census Bureau in August 2018 "to forecast the effect of adding a citizenship question to the 2020 Census" found "the evidence in this paper . . . suggests that adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in higher fieldwork costs and a lower-quality population count." Brown Study at 2, 33.

Importantly, the citizenship question was not included on the 2018 "dress-rehearsal" questionnaire (the 2018 End-to-End Census Test), which was the final testing opportunity for the 2020 Census and was conducted in Providence County, Rhode Island. Letter from Former Directors of the U.S. Census Bureau to Secretary of Commerce Wilbur L. Ross (Jan. 2018), perma.cc/3RE2-58ZZ (Former Directors Letter).

## SUMMARY OF THE ARGUMENT

The census short form and the ACS, though related by law (13 U.S.C. § 141(a)), serve separate and distinct purposes. The purpose of the census short form is to generate an accurate, actual population count for the purposes of apportionment and redistricting in accordance with constitutional standards and a minimal amount of other essential data to support important statutory goals. The ACS, in contrast, collects a much broader range of demographic, social, and economic data needed to implement federal programs and policies from a sample of households. Because the Census Bureau has recognized for decades that citizenship status is a sensitive topic that discourages full and accurate participation in the census by lawful residents who are not citizens, and by anyone with undocumented household members, the citizenship question has appeared only in the ACS (and its predecessor, the census long form) and not on the census short form sent to all households. Forcing a citizenship question onto the census short form

compromises its key goal: to generate an accurate population count by maximizing response rates from *all* households.

***First***, studies anticipate that addition of the question will materially depress response quality on the 2020 Census.

***Second***, a citizenship question is projected to have a differential impact across population subgroups and geographies, leading to a higher survey nonresponse rate among Hispanic, immigrant, and foreign-born populations and the areas where they are concentrated. Because these subpopulations are more sensitive to a citizenship question, its addition could drive a higher non-participation rate among these groups and in turn skew the population count data that are collected.

***Third***, addition of the question without rigorous testing in keeping with longstanding Census Bureau practice risks additional, unknown effects. Unreliable population count data will compromise the key calculations that rely on the data: apportionment of the U.S. House of Representatives, state districting efforts, and the distribution of federal program funds among States and local governments. Specifically, an undercount that differentially impacts particular population subgroups and geographies could shift seats in the House of Representatives and federal funds among States, leading to a disparate impact on those subgroups and geographies.

Defendants' excuse for this last-minute break with practice is unpersuasive. There is no need to generate CVAP data at the block level to vigorously enforce a Section 2 claim under the VRA. While the decennial census produces more granular data than the ACS, experts can and do use statistical modeling and imputation from data generated by the ACS to fill any need for more localized citizenship data. Indeed, the Census Bureau itself similarly determines what political units are subject to the requirements of Section 203 through use of statistical models based on small area estimation. *See* U.S. Census Bureau, *VRA Section 203 Determinations: Statistical Methodology Summary* (Nov. 30, 2016), perma.cc/RFE5-SSTD. In any event, VRA claims do

not require absolute statistical precision, but have been prosecuted effectively for decades using citizenship data from either the census long form or, more recently, the ACS, supplemented with a rich array of sources to ensure that minority voters have equal opportunity to "participate in the political process and to elect representatives of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 34 (1986).

**ARGUMENT**

**THE ADDITION OF A CITIZENSHIP QUESTION AT THIS LATE DATE WILL SIGNIFICANTLY REDUCE THE ACCURACY OF THE CENSUS.**

> **A.      A Citizenship Question Has Never Been Part of the Modern Census "Short Form"**

To safeguard the accuracy of the constitutionally-mandated population count by State, the Census Bureau has for decades administered a shorter census form sent to every household that prioritizes an accurate population count, distinct from the census long form (and now the ACS) that includes a wide range of socio-economic questions. And the Bureau has recognized that the sensitive nature of a citizenship question will interfere with the population count.

The citizenship question was removed in 1960 and later reintroduced only on the census long form when the Bureau first began implementing a long form and a short form in 1970. Since that time, the Census Bureau has consistently voiced its objections to mixing a citizenship status inquiry with the census short form. As early as 1940, a newspaper reported that "the Census Bureau has found a 'sore spot' among the census questions . . . It's the question of whether or not a person is a citizen, and local enumerators are finding that Hartford aliens are more reluctant to admit their lack of citizenship than to disclose any other fact concerning themselves." *Census Finds 'Sore Spot' As Aliens Dislike Admitting Lack of Citizenship*, Hartford Courant (Apr. 5, 1940).

In litigation in 1980, the Census Bureau argued that that it could not "count illegal aliens" because "obtaining even a reasonably accurate count of the total population would be impossible

8

if a simultaneous effort were made to count illegal aliens separately." *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980). "The two goals are incompatible, according to the Bureau; any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count." *Id.*

Again in 1990, Director John Keane stated in Congressional testimony that census questions about citizenship status would lead to the Census Bureau being "perceived [] as an enforcement agency," and that such a perception would have "a major effect on census coverage" among both undocumented individuals and the "population at large." *Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before the Subcomm. on Energy, Nuclear Proliferation, & Gov't Processes of the S. Comm. on Governmental Affairs*, 99th Cong. 16, 23, 32 (1985).

The Census Bureau continues to recognize that citizenship is a "sensitive" topic and that its inclusion on the form that every household is required to complete compromises the accuracy of the overall population count. *See* U.S. Census Bureau, *DS-16: Policy on Respondent Identification and Sensitive Topics in Dependent Interviewing*, perma.cc/EL9N-MSBE. Including a citizenship question breaks from the Bureau's long-established practice of excluding this question from the population count in the decennial census.

**B.      A Citizenship Question Will Generate a Less Accurate Population Count**

*Amici* explained to Secretary Ross, prior to his decision, that "[a]dding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk." Former Directors Letter at 1.

It will do so for three reasons: (1) the Census Bureau's own experts conclude that data quality and accuracy would be reduced by inclusion of a citizenship question on the 2020 Census; (2) these same studies along with expert opinion projects a disproportionate impact by race and geography that will undermine data quality; and (3) because the question has not been

appropriately vetted, the full extent of its impact on the quality of the 2020 Census data is unknown.

### 1.    *Studies project that rates and quality of responses will drop in light of a citizenship question*

**a.**  Citizenship questions generate far higher nonresponse rates than other questions that will be included on the 2020 Census form. A study analyzing item nonresponse rates for the citizenship question on the 2016 ACS concluded that "[r]espondents treat the question about citizenship differently than the other questions." William P. O'Hare, *Citizenship Question Nonresponse*, Georgetown Law Ctr. on Poverty and Inequality, 20, perma.cc/LX85-9B5A (Sept. 2018) (O'Hare Study). The question's nonresponse rate is much higher than that of any other question that will be on the 2020 Census. *Id.* at 5. This difference is significant. "In 2016, the nonresponse rate for citizenship is 6.0 percent and no other question had a nonresponse rate higher than 1.8 percent." *Id.* at 10.

But the adverse effect of including a citizenship question on the decennial census is much greater than a fall-off in item response rates. A memorandum from the Chief Scientist and Associate Director for Research and Methodology of the Census Bureau analyzed the impact of adding the citizenship question to the 2020 Census and concluded that adding the question "harms the quality of the census count" and would cause "[m]ajor potential quality and cost disruptions" and an increase in "whole-person census imputations." Abowd Memo at 1277-78.

The memorandum explains that while all households respond at a lower rate to the ACS than the census, "the decline in self-response was 5.1 percentage points greater for noncitizen households than for citizen households." Abowd Memo at 1280. Because only the ACS contains a citizenship question, the study determined it is a "reasonable inference" that addition of a citizenship question on the 2020 census "would lead to a larger decline in self-response for noncitizen households," depressing the overall self-response rate. *Id*. at 1281.

Using a "cautious estimate" and assuming no impact on households with only citizens,

the memorandum calculated that addition of the citizenship question would increase the non-response rate by 630,000 households as a "lower bound" estimate. Abowd Memo at 001282. An additional study conducted by individuals at the Census Bureau (without the initial time constraints imposed on Dr. Abowd's Memo) similarly analyzed "the data quality and cost consequences of adding the citizenship question to the enumeration form." Brown Study at 42. Using "revised assumptions," it estimated that 2,090,000 households and 6.5 million persons would fail to self-respond. *Id.* at 42-43. Although the Census Bureau follows up in-person with households that do not return a census form, these measures result in lower quality data because of the increased likelihood of a response from a "proxy" rather than a household member, the frequent need for multiple re-visits, and the passage of time from Census Day.[4] *See* Abowd Memo. at 1281-82.

An analysis that compared Census Bureau surveys with and without citizenship questions confirmed: "households that may contain noncitizens are more sensitive to the inclusion of citizenship in the questionnaire than all-citizen households. The clear implication is that adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in more nonresponse follow-up (NRFU) fieldwork, more proxy responses, and a lower-quality population count." Brown Study at 54. These studies directly project an undercount of noncitizens.

**b.** Even before Secretary Ross decided to add a citizenship question to the 2020 Census, the Census Bureau reported increased nonresponse rates on the ACS. *See* U.S. Census Bureau, *American Community Survey: Response Rates*, perma.cc/Q6LZ-3QE6. Indeed, "in 29 different states, the rate at which individuals refused to respond to the ACS was higher in 2016 than ever before; in 44 different states, the rate at which individuals refused to respond to the

---

[4]   This is to say nothing of the monetary costs incurred. The Abowd Memo, using a "conservative" estimate, predicted $27.5 million in increased costs incurred from the projected follow-up required into non-citizen households. The later August study calculated an increased cost of " at least" $91.2 million. Brown Study at 43.

ACS was higher in either 2015 or 2016 than ever before." Levitt Testimony at 6 n. 22 (citing *id.*). Experience of Census Bureau officials conducting other surveys indicates that these high non-response rates derive from immigration-related concerns. While these increased nonresponse rates do not speak directly to the marginal impact of adding a citizenship question on the 2020 census, they suggest that adding the question may stoke already prevalent concerns that lead to non-participation. And, because the question has not been fully vetted, these surveys suggest that the impact of adding a citizenship question is particularly unpredictable in the present environment.

For example, a memorandum from the Center for Survey Measurement (CSM), a division of the Census Bureau, reported an increase "in respondents spontaneously expressing concerns about confidentiality" that could raise "barriers to respondent participation in the 2020 Census." Memorandum from the Center for Survey Measurement to the Associate Directorate for Research and Methodology, *Re: Respondent Confidentiality Concerns*, 1, 7 (Sept. 20, 2017), perma.cc/8JZ6-KJLS (CSM Memo). Moreover, respondents in a Census Barriers, Attitudes, and Motivators Survey were "visibly nervous and reticent and required extensive explanations regarding how their data would be used." *Id.* at 3. "Spanish-speakers brought up immigration raids, fear of government, and fear of deportation." *Id.* Adding a citizenship question on an official government survey is certain to stoke these concerns. These experiences suggest that any undercount of noncitizens will be even larger than predicted. And if noncitizen householders decide not to respond to the 2020 Census due to similar fears about how their data will be used, citizens who also live in those households—notably citizen children of noncitizens—also would not be counted in the census, contributing even further to the overall undercount.

2. ***An undercount could have a disproportionate impact on specific races and ethnic groups and geographies***

The harm inflicted by the last minute addition of a citizenship question to the census has implications for data quality, as well. The anticipated undercount could impact specific popula-

tions and geographies disproportionately.

As we have discussed, the citizenship question is likely to increase an undercount of noncitizens. This anticipated undercount, in turn, is extended to households containing both citizens and noncitizens—citizens with a noncitizen parent, child, or sibling will avoid the census altogether for fear of running afoul of the authorities. *See* Levitt Testimony at 11 (citizen children and housemates of undocumented individuals who determine not to reply to the 2020 Census are at risk of omission). Based on what we know about these households, such an undercount is likely to produce a differential impact on particular racial and ethnic groups. Because these populations are not uniformly distributed, any undercount would then skew population count data towards States and geographies where fewer such individuals are located.

Expert analyses support this projection. Dr. O'Hare analyzed nonresponse rates to the citizenship question on the 2016 ACS and found significant variation in response rates by race and place of birth. *See* O'Hare Study at 19-20. Perhaps unsurprisingly, Dr. O'Hare determined that racial and ethnic minorities as well as foreign-born individuals are less likely to reply to a citizenship question. *See id*. The Abowd memorandum analyzed break-off rates—that is, the point at which a respondent decides to discontinue rather than complete a survey—disaggregated by race. *See* Abowd Memo at 1281. The results were disturbing for data quality and demonstrate that response rates will vary by race: "Hispanics and non-Hispanic non-whites breakoff much more often than non-Hispanic whites, especially on the citizenship-related questions[.] [T]heir survey response quality is differentially affected." *Id.*

Any disparate impact would affect non-citizens and citizens alike, as the census form is a household questionnaire, and many households are made up of both citizens and noncitizens. A non-response may follow out of concern for one non-citizen in the household and thus compromise the data for the entire household. That would be on top of an already present undercount of marginalized populations. Studies demonstrate that the census has undercounted communities

of color, including the Black population and the Hispanic population, because they disproportionately live in "hard to count" circumstances. *See* U.S. Census Bureau, *Census Bureau Releases Estimates of Undercount and Overcount in the 2010 Census*, perma.cc/X2SM-PYRY.

A disproportionate impact on foreign-born individuals and households with noncitizens would in turn drive geographic variability because such individuals are not uniformly dispersed throughout the country. Dr. O'Hare's study shows marked variation in item nonresponse rates on the 2016 ACS to a citizenship question between urban and rural areas: Nonresponse rates to the citizenship question were the highest in central metropolitan areas and well below the national average in rural areas. *See* O'Hare Study at 15. Urban communities are therefore likely to be disproportionately disadvantaged by the anticipated undercount.



Figure 1: Non-response rates by geographic location on the 2016 ACS. *See* O'Hare Study at 15.

The geographic variability extends to States. Arizona's non-response rate to a citizenship question on the 2016 ACS was "four times that of Vermont." O'Hare Study at 7. These studies show that a citizenship question will have a disparate impact on various population subgroups,

which in turn will impact response rates by geography, depending on how those subgroups are clustered throughout the Nation. Additional studies establish that a citizenship question deters participation and does so at a higher rate for noncitizen households. It is only a small step to conclude that a citizenship question on the 2020 Census will drive similar geographic variability in the enumeration and skew the population count in favor of States with lower noncitizen populations.

Experts uniformly agree that the question will jeopardize data quality. For example, the Population Association of America released a statement concluding that "[b]ased on the experience of other surveys, population scientists have observed that responses to citizenship questions tend to be of low quality." *PAA Statement on Citizenship Question Added to 2020 Census*, perma.cc/N579-KHHV. And the American Statistical Association has expressed concern regarding "a very strong potential the quality of the census will be undermined" and could lead to undercount concerns for immigrant populations. Am. Statistical Ass'n, *The American Statistical Association Strongly Cautions Against Addition of a Citizenship Question on the 2020 Census*, 1 (Aug. 2018), perma.cc/V3GL-5T2B.

### 3. Because addition of a citizenship question has not been adequately vetted, its impact could be even more far-reaching

Changes to the census are traditionally subject to "years of repeated testing and evaluation." Nat'l Acads. Of Scis., Eng'r & Med., *Letter Report on the 2020 Census*, 4 (Aug. 7, 2018) (Task Force Letter). *E.g.*, U.S. Census Bureau, *Pretests and Dress Rehearsals of the 1970 Census of Population and Housing*, 20 (1972) (reflecting years of pre-tests). Indeed, testing for the 2020 Census began over a decade in advance—of course, without a citizenship question. Levitt Testimony at 9-10 (citing Lawrence D. Brown et al., NAT'L RESEARCH COUNCIL, *Experimentation and Evaluation Plans for the 2010 Census: Interim Report*, Nat'l Res. Council of the Nat'l Acads., 8 (2008). With good reason: "even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, qual-

ity, and truthfulness of response." Former Directors Letter at 2; *see also* Task Force Letter at 4.

Late inclusion of a citizenship question "circumvents the Census Bureau's routine research and testing processes to ensure potential questions do not affect the quality of responses." Consortium of Soc. Sci. Ass'ns, *COSSA Statement on the Impact of a Citizenship Question in the 2020 Decennial Census* (Mar. 2018) (COSSA Objection). Even more, "[a]dding a citizenship question without a testing opportunity in a contemporary, census-like environment will invalidate the results" of testing that has already been completed without a citizenship question. Former Directors Letter at 2. The accuracy of the constitutionally-mandated population count should not be put at risk by an untested question.

## C.     Compromised Census Data Have Far-Reaching, Negative Consequences

Compromised population counts carry very substantial adverse consequences. A count of the population in each State skewed by citizenship status will redirect apportionment of seats in the House of Representatives among the States based on the concentration of noncitizen households, or other populations differentially impacted by the citizenship question. As one expert explains:

> [I]f the Census count is accurate, most projections suggest that Texas will . . . gain an extra three congressional seats . . . Based on the local climate, if those minorities are substantially less likely to complete the decennial enumeration than are residents of other states, those funds and those seats vanish … to be picked up by states where the population is less afraid.

Levitt Testimony at 12.

The impact also extends to federal funding. Census data are used to allocate annually "more than $800 billion in taxpayer dollars to programs across the country." COSSA Objection at 1. The census thus guides the distribution of federal funds among no fewer than 300 programs over the course of the entire decade, until the next census. *See* Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds, Estimating Fiscal Costs of a Census Undercount to States*, G.W. Inst. of Pub. Policy, 2

(Mar. 19, 2018) (Reamer Report). To be sure, the measure of how funds are distributed under many of these important programs is more sophisticated than a direct measure of population and can depend on the level of funding allocated to other States or the presence of communities eligible for select programs within each State. But that does not undermine the very basic observation that a skewed undercount will redirect funds to States with lower populations of noncitizen households.

As just one example, a measure called the Federal Medical Assistance Percentage (FMAP) is used to determine payments to States under five U.S. Department of Health and Human Services programs. *See* Reamer Report at 2. The programs collectively are unmatched in size: They accounted for 48% of all federal grants allocated to the States in 2015. *See id*. The FMAP measure uses census data to calculate a State's per capita income, which then determines the FMAP, or the federal-state split in spending under each program. *See id.* at 6. The higher the per capita income, the lower the FMAP. *See id.* The minimum FMAP is 50, meaning a 50-50 federal-state split in spending under each program. *See id*. Eliminating States that received an FMAP of 50 (as to which an undercount would have no impact on the federal dollars received), the remaining 37 States were deprived of an average $1,091 in federal funding *per person* missed in the 2010 Census in fiscal year 2015 alone. *Id.* at 2-3. The stakes here are therefore enormous—and the allocation of such important and significant resources should not be influenced by how frightened some residents of this Nation are of participating in the census.

Compromised data also carry negative implications for social science research. "[I]nformation from the decennial census undergirds numerous other surveys and data sets at the Census Bureau and beyond, so a problem at the source would have far-reaching implications across the statistical system." COSSA Objection at 1. Actors ranging from the business community, to nongovernmental organizations, the media, and the general public rely on census data for a myriad of important decisions. Task Force Letter at 1.

### D.     A Citizenship Question in the 2020 Census Is Not Needed To Vigorously Enforce the VRA

The government suggests that enforcement of Section 2 of the Voting Rights Act (VRA) requires "a reliable calculation of the citizen voting-age population [CVAP] in localities where voting rights violations are alleged or suspected." *See* DOJ Memo at 1. But the addition of a citizenship question is simply not necessary to provide such data: other sources have provided CVAP data to successfully prosecute VRA violations for the past 50 years.

The 2000 Census long form provided CVAP estimates at the block group level for the first time. *See* Brown Study at 5. These estimates are now provided at the block group level from the most recent so-called five-year ACS data. *See id.* While ACS citizenship data do contain a margin of error and are reported at the larger block group rather than smaller census block level, VRA claims do not demand the same precision as those tied to the "'one-person, one-vote' principle . . . embodied in Article I, § 2." *Tennant v. Jefferson Cty. Comm'n*, 567 U.S. 758, 759 (2012) (per curiam). (And, even one person-one vote claims do not demand absolute mathematical rigor. *See id.* at 760). Section 2 of the VRA addresses claims of racial vote dilution. It ensures that minority voters have the opportunity "to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 34. The claims are driven by predictions of whether a given district affords a minority group an appropriate chance to win in an election, "a much richer and messier concept than equalizing district populations." Joseph Fishkin, *The Administration is Lying About the Census*, Balkanization, (Mar. 27, 2018), perma.cc/R2QQ-XWSY (cited in Levitt Testimony at 17 n.74).

It is highly unlikely that more localized, precise data would be required to prosecute a Section 2 case. *See* Levitt Testimony at 17. But, even assuming such a need might arise, experts can reliably translate ACS data to the block level via statistical imputation. Indeed, the Abowd memorandum noted the potential improvement of ACS CVAP data with "small area modeling methods" and use of "statistical modeling methods to produce the block-level eligible voter

data." Abowd Memo at 1278-79, *see also* Task Force Letter at 7. To make determinations under Section 203 of the Voting Rights Act (which requires calculations of citizens in small political units), the Census Bureau uses statistical models based on small area estimation. *See* U.S. Census Bureau, *VRA Section 203 Determinations: Statistical Methodology Summary* (Nov. 30, 2016), perma.cc/RFE5-SSTD.

Finally, citizenship data generated by a last-minute, untested question on a sensitive topic predicted to undercount particular populations are of limited value. Any purported added precision would be undermined by the data's unreliability. And data compromised by an undercount that disproportionately impacts certain racial and ethnic minority groups could undermine the efficacy of VRA claims brought on behalf of the very populations that they are intended to protect. *See* Levitt Testimony at 20.

## CONCLUSION

The Court should enter judgment for Plaintiffs.

Dated: October 29, 2018

Respectfully submitted,

*/s/ Matthew D. Ingber*
Matthew D. Ingber
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506 2373
mingber@mayerbrown.com

Andrew J. Pincus*
Michael B. Kimberly*
Colleen M. Campbell*
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000

*Attorneys for proposed Amici Curiae*

* *pro hac vice applications forthcoming*