**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | )   Case No. 1:18-cv-02921 (JMF) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF COMMERCE, *et al.*, | ) |
| | ) |
| *Defendants*. | ) |

**NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMICUS BRIEF**

PLEASE TAKE NOTICE that The Leadership Conference on Civil and Human Rights

(the "Leadership Conference") requests leave to file the accompanying amicus brief in support of

plaintiffs.  In support of their motion, amici state as follows:

1.      The Leadership Conference is a coalition of more than 200 national organizations

committed to the protection and advancement of civil and human rights in the United States.

What unites this coalition is an interest in ensuring that all communities—particularly young

children, women, immigrants, low-income communities, and communities of color—continue to

enjoy the recognition, freedom, and economic and political power to which they are entitled

under the U.S. Constitution.

2.      The Leadership Conference's constituents—grassroots, advocacy, and legal-

services organizations committed to the protection of civil and human rights in the United

States—have spent decades advocating and litigating around issues concerning equal

representation, and so have vast knowledge and experience concerning the census and the uses to

which it has been put, including, as relevant here, the enforcement of voting rights.  The

proposed amicus brief addresses issues on which defendants and their amici have staked their defense of the citizenship question and as to which amici are uniquely equipped to provide guidance to this Court.

3. "District courts have broad discretion to permit or deny the appearance of amici curiae in a given case." *United States v. Ahmed*, 788 F. Supp. 196, 198 (S.D.N.Y. 1992). The proposed amicus brief will assist the Court in addressing the issues raised in this case because amici bring expertise and a fresh perspective on certain factual premises and legal arguments advanced by defendants and their amici.

4. All plaintiffs and all defendants have consented to the filing of this brief.

For the foregoing reasons, the Leadership Conference requests that the Court grant leave to file the attached amicus brief.

Dated October 29, 2018

Respectfully submitted,

/s/ Alan E. Schoenfeld
Alan Schoenfeld
Claire M. Guehenno
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Corrine Yu
Michael Zubrensky
THE LEADERSHIP CONFERENCE
    ON CIVIL AND HUMAN RIGHTS
1620 L Street NW, Suite 1100
Washington, DC 20036

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 1:18-cv-02921 (JMF) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

# BRIEF OF
# THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS
# AS AMICUS CURIAE

Corrine Yu
Michael Zubrensky
THE LEADERSHIP CONFERENCE
   ON CIVIL AND HUMAN RIGHTS
1620 L Street NW, Suite 1100
Washington, DC 20036

Alan Schoenfeld
Claire M. Guehenno
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT ..................................1

SUMMARY OF ARGUMENT ..........................................................................................................2

ARGUMENT ...................................................................................................................................3

I.      Existing Data Is Sufficient To Enforce The Voting Rights Act ..........................................3

        A.      VRA Litigation Has Proceeded For Decades With Citizenship Data From
            Sources Other Than The Decennial Census..............................................................3

        B.      The Gary Letter Offers No Valid Reasons For Requesting Citizenship Data
            From the Decennial Census ......................................................................................7

        C.      Defendants' Arguments About The Purportedly Increased "Precision" Of
            Block-Level Citizenship Data Are Specious ..........................................................10

II.     The Inclusion Of A Citizenship Question Will Undermine Enforcement Of The
      Voting Rights Act ..............................................................................................................11

CONCLUSION ..............................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Al-Hakim v. Florida*,
892 F. Supp. 1464 (M.D. Fla. 1995), *aff'd*, 99 F.3d 1154 (11th Cir. 1996) .......................9

*Bartlett v. Strickland*,
556 U.S. 1 (2009).......................................................................................................4, 8

*Benavidez v. Irving Independent School District*,
690 F. Supp. 2d 451 (N.D. Tex. 2010) ......................................................................9-10

*Dillard v. Baldwin Cty. Comm'rs*,
376 F.3d 1260 (11th Cir. 2004) .......................................................................................8

*Fairley v. Hattiesburg*,
584 F.3d 660 (5th Cir. 2009) ...........................................................................................9

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*,
486 F. Supp. 564 (D.D.C. 1980)......................................................................................12

*Gause v. Brunswick Cty.*,
92 F.3d 1178, 1996 WL 453466 (4th Cir. Aug. 13, 1996) (unpublished
table decision) ...............................................................................................................9

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ...........................................................................................8

*In re 2012 Legislative Districting*,
80 A.3d 1073 (Md. 2013) .................................................................................................9

*McNeil v. Springfield Park Dist.*,
851 F.2d 937 (7th Cir. 1988) ...........................................................................................8

*Montes v. City of Yakima*,
40 F. Supp. 3d 1377 (E.D. Wash. 2014).........................................................................4

*Negron v. City of Miami Beach*,
113 F.3d 1563 (11th Cir. 1997) .......................................................................................8

*Rios-Andino v. Orange Cty.*,
51 F. Supp. 3d 1215 (M.D. Fla. 2014)...........................................................................8

*Romero v. City of Pomona*,
665 F. Supp. 853 (C.D. Cal. 1987), *aff'd*, 883 F.2d 1418 (9th Cir. 1989).........................8

*Sensley v. Albritton*,
    385 F.3d 591 (5th Cir. 2004) ..................................................................9

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)...................................................................4, 8, 9, 13

*Wright v. Sumter Cty. Bd. of Elections & Registration*,
    No. 1:14-cv-42, 2014 WL 1347427 (M.D. Ga. Apr. 3, 2014)............................9

## STATUTES

52 U.S.C. § 10301....................................................................................3, 4

Voting Rights Act .................................................................................. *passim*

## LEGISTLATIVE MATERIALS

Enumeration of Undocumented Aliens in the Decennial Census: Hr'g Before the
    Subcomm., on Energy, Nuclear Proliferation, and Gov't Processes of the
    S. Comm. on Governmental Affairs, 99th Cong. (1985) (statement of John
    Keane, Dir., Bureau of the Census),
    http://www.loc.gov/law/find/hearings/pdf/00172011883.pdf ..........................12

*Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight
    & Gov't Reform*, 115th Cong. (2018) (testimony of Justin Levitt,
    Professor, Loyola Law School), https://oversight.house.gov/wp-
    content/uploads/2018/05/Levitt-Testimony-2020-Census-Hearing-
    05082018.pdf ..................................................................5, 6, 10, 11

*Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight
    & Gov't Reform,* 115th Cong. (2018) (statement of John M. Gore, Acting
    Assistant Att'y Gen., U.S. Dep't of Justice),
    https://oversight.house.gov/wp-content/uploads/2018/05/Gore-
    DOJ_Testimony-2020-Census-Hearing-05182018.pdf..................................11

## OTHER AUTHORITIES

Fishkin, Joseph, *The Administration is Lying About the Census*, Balkinization
    (Mar. 27, 2018), https://balkin.blogspot.com/2018/03/the-administration-
    is-lying-about-census.html.................................................................10

Memorandum from Center for Survey Measurement (CSM), U.S. Census Bureau,
    to Associate Directorate for Research and Methodology (ARDM):
    *Respondent Confidentiality Concerns* (Sept. 20, 2017),
    https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-
    Respondent-Confidentiality-Concerns.pdf .........................................12, 13

Memorandum from Ron S. Jarmin, Director, U.S. Census Bureau, to Barbara
    Anderson, Chair, Census Scientific Advisory Comm.: *U.S. Census Bureau
    Responses to Census Scientific Advisory Committee Fall 2017
    Recommendations* (Jan. 26, 2018),
    https://www2.census.gov/cac/sac/meetings/2017-09/2018-01-26-census-
    response.pdf ........................................................................................................13

Memorandum from Wilbur Ross, Sec'y of Commerce, U.S. Dep't of Commerce,
    to Karen Dunn Kelley, Under Sec'y for Econ. Affairs, U.S. Dep't of
    Commerce (Mar. 26, 2018),
    https://www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf ........................12

National Commission on the Voting Rights Act, *Protecting Minority Voters: The
    Voting Rights Act at Work, 1982-2005* (2006),
    https://lawyerscommittee.org/wp-content/uploads/2015/07/0023.pdf ...............................6

Robbins, Liz & Katie Benner, *Documents Show Political Lobbying in Census
    Question About Citizenship*, N.Y. Times (June 9, 2018),
    https://www.nytimes.com/2018/06/09/nyregion/kobach-bannon-lobbying-
    census-question-on-citizenship-documents.html ..................................................................3

U.S. Census Bureau, *Decennial Census and the American Community Survey
    (ACS)*, https://www.census.gov/programs-surveys/decennial-
    census/about/census-acs.html ..............................................................................................5

## INTEREST OF AMICUS CURIAE AND SUMMARY OF ARGUMENT

The Leadership Conference on Civil and Human Rights ("The Leadership Conference") is the nation's oldest, largest, and most diverse coalition of more than 200 national organizations committed to the protection of civil and human rights in the United States. The Leadership Conference was founded in 1950 by leaders of the civil rights and labor rights movements, grounded in the belief that civil rights would be won not by one group alone but through coalition. The Leadership Conference works to build an America that is inclusive and as good as its ideals by promoting laws and policies that promote the civil and human rights for all individuals in the United States.

The Leadership Conference's constituents—grassroots, advocacy, and legal-services organizations committed to the protection of civil and human rights in the United States—have spent decades advocating and litigating around issues concerning equal representation, and so have vast knowledge and experience concerning the census and the uses to which it has been put, including, as relevant here, the enforcement of voting rights. What unites this coalition is an interest in ensuring that all communities—particularly young children, women, immigrants, low-income communities, and communities of color—continue to enjoy the recognition, freedom, and economic and political power to which they are entitled under the U.S. Constitution. The government's addition of a citizenship question to the 2020 census gravely threatens to undermine that goal.

Defendants contend that inclusion of the citizenship question is necessary to ensure proper enforcement of the Voting Rights Act. That cynical claim should be rejected; the Act has been enforced throughout its history notwithstanding the absence of a citizenship question on the census, and including the question now for the first time would do nothing to improve

1

enforcement—indeed, the negative effects of including the question would far outweigh any benefit to communities of color that defendants claim from enforcement of the Act.

## SUMMARY OF ARGUMENT

In this case and in other challenges to the Department of Commerce's decision to include a citizenship question on the 2020 census, the United States has sought to defend that effort principally on the ground that the data on citizenship derived directly from the decennial census is necessary to enforce the Voting Rights Act.  *See, e.g.*, U.S. Pretrial Mem. 2 (citing "the Secretary's reasoned policy decision that obtaining more precise citizenship data via the decennial census will be useful to the Department of Justice in enforcing the Voting Rights Act"), ECF No. 412; *see also* AR663 (letter from Arthur Gary to Ron Jarmin, justifying citizenship question as "critical to the [Justice] Department's enforcement of Section 2 of the Voting Rights Act [("VRA")] and its important protections against racial discrimination in voting"); AR1314 (memorandum from Wilbur Ross to Karen Dunn Kelley citing "DOJ's request for improved CVAP data to enforce the VRA").  Defendants' invocation of the Voting Rights Act is not just pretextual.  It is also meritless, for at least two reasons.

First, the Justice Department and private plaintiffs—including The Leadership Conference and its constituent organizations—have successfully litigated claims under the Voting Rights Act using currently available citizenship data ever since the VRA's passage in 1965.  During that more than half century, citizenship data obtained from the decennial census has not been available—and so parties have not proffered, and courts have not required, such data in Voting Rights Act cases.  There is no evidence that it would have assisted the litigation of these cases in the past.  Nor is there evidence that it would assist this litigation either today or in the future.

Second, not only would citizenship data derived directly from the decennial census not aid in the prosecution of Voting Rights Act claims, but soliciting citizenship data through the decennial census would in fact undermine enforcement of the Voting Rights Act by causing the census to undercount the very communities who are today among the primary intended but underserved beneficiaries of the Voting Rights Act, and who rely upon the Voting Rights Act to vindicate their rights to full and equal participation in federal, state, and local democratic processes.[1]

In short, including a citizenship question on the 2020 census will inflict grievous harm on poor people and communities of color, with no countervailing benefit—and certainly not the supposed benefit on which the United States stakes its defense.

## ARGUMENT

**I. Existing Data Is Sufficient To Enforce The Voting Rights Act**

### A. VRA Litigation Has Proceeded For Decades With Citizenship Data From Sources Other Than The Decennial Census

Section 2 of the VRA prohibits States and their political subdivisions from implementing voting standards, practices, or procedures that result in "a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  52 U.S.C. § 10301(a). Section 2 is violated when, based upon the totality of the circumstances, the challenged voting

---

[1] The administrative record makes clear that eliminating non-citizens from the census count was in fact the primary objective behind adding the citizenship question.  The record reveals that Kansas Secretary of State Kris Kobach, a sponsor of numerous forms of anti-immigration legislation, lobbied to add the citizenship question to the 2020 census at the suggestion of Stephen Bannon, former White House Chief Strategist, for the very purpose of ensuring that "aliens" are not "counted for congressional apportionment purposes."  *See* Robbins & Benner, *Documents Show Political Lobbying in Census Question About Citizenship*, N.Y. Times (June 9, 2018), https://www.nytimes.com/2018/06/09/nyregion/kobach-bannon-lobbying-census-question-on-citizenship-documents.html.

process is "not equally open to participation by members of a [racial minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).  Because Section 2 violations involve suppressing minority voting power—frequently through discriminatory redistricting—they are often referred to as "vote dilution" claims.  *See Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1387 (E.D. Wash. 2014).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court identified three "necessary preconditions" plaintiffs must show before proceeding with a vote-dilution claim under the VRA.  *Id.* at 50.  First, plaintiffs must establish that their minority group is "sufficiently large and geographically compact to constitute a majority in a single-member [voting] district" if the districts were drawn differently.  *Id.*  Second, they must show that the minority group is "politically cohesive."  *Id.* at 51.  Third, they must "demonstrate that the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate."  *Id.*  In *Bartlett v. Strickland*, 556 U.S. 1 (2009), the Supreme Court held that to satisfy the first *Gingles* precondition, plaintiffs must show that it is possible to draw a district with a "numerical majority of minority voters" in the "voting-age population," *id.* at 14, 20.

Plaintiffs bear the burden of establishing the three *Gingles* preconditions, and they routinely leverage data about citizenship status for a variety of purposes in vote-dilution cases.  First, this data is useful for establishing liability.  For example, data about the "citizen voting-age population" ("CVAP") can be used to generate a picture of the local electorate to help show that the minority group could elect candidates of its choice if the district were drawn differently, that the group is unified by race or language, and that a white majority can mobilize against the minority group in most elections.  *See Gingles*, 478 U.S. at 51.  And, in cases where plaintiffs are

successful in proving discriminatory vote dilution, courts may also make use of CVAP data to fashion an effective remedy.[2]  In such cases, citizenship data may be used as part of a basis to redraw district lines to provide minority voters with an equitable opportunity to elect their candidates of choice.

Critically for present purposes, existing citizenship data—from sources other than the decennial census—has been largely sufficient for plaintiffs to effectively litigate Section 2 cases. While CVAP data has frequently been used in vote-dilution cases, in the 53 years that the Department of Justice and private plaintiffs have enforced Section 2 of the VRA, they have never tried to obtain CVAP data from the decennial census.  That is because such data can be reliably obtained from other sources—without the negative effects of including a citizenship question in the census, described in more detail below.  *See infra* Section II.  For much of the history of the Voting Rights Act, from 1970 to 2005, CVAP data had been obtained through the long-form census, a questionnaire provided to a small portion of census respondents—approximately one in six households.  The long-form census included a citizenship question mixed in with a battery of other personal questions, ranging from questions about the mode of entry into the house to the extent of its kitchen facilities.[3]  More recently, from 2005 to the present, CVAP data has been obtainable from the annual American Community Survey ("ACS"), a monthly data-gathering exercise to collect continuous, consistent nationwide demographic data.[4]  That data has amply

---

[2] *Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. 16 (2018) (testimony of Justin Levitt, Professor, Loyola Law School), https://oversight.house.gov/wp-content/uploads/2018/05/Levitt-Testimony-2020-Census-Hearing-05082018.pdf ("Levitt Testimony").

[3] *Id.* at 3, 4.

[4] *See* U.S. Census Bureau, *Decennial Census and the American Community Survey (ACS)*, https://www.census.gov/programs-surveys/decennial-census/about/census-acs.html..

suffced to facilitate Voting Rights Act litigation without running the risk of suppressing census response rates from under-represented communities.  In fact, where DOJ has sought to collect additional data in the past, it has requested that such data be collected on the ACS, not the decennial census.[5]

Recent Section 2 cases demonstrate that litigants have succeeded in bringing vote-dilution claims cases using existing CVAP data.  According to one comprehensive study of litigation to enforce the Voting Rights Act, there have been 117 "reported Section 2 cases leading to favorable results for minority voters" since the Act was reauthorized in 1982.[6]  That number likely dramatically undercounts the incidence of successful vote-dilution challenges:  It includes only reported litigation with favorable outcomes, but the number of successful Section 2 cases is even higher if one includes unreported decisions and settlements.  For example, one study in nine States with a history of voting-related discrimination found that there are "approximately ten times the number of" unreported cases to reported ones and that at least 825 counties in those nine states had successful Section 2 lawsuits.[7]  These numerous successful Voting Rights Act challenges demonstrate that existing data derived from the ACS—providing citizenship estimates rather than actual enumeration—has sufficed for Section 2 cases and has enabled litigants to successfully litigate vote-dilution claims.

---

[5] *See* Levitt Testimony 13-14.

[6] National Commission on the Voting Rights Act, *Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005*, at 88 (2006), https://lawyerscommittee.org/wp-content/uploads/2015/07/0023.pdf.

[7] *Id.*

### B.     The Gary Letter Offers No Valid Reasons For Requesting Citizenship Data From the Decennial Census

As noted above, the Census Bureau's decision to include a citizenship question in the decennial census nominally follows from a request made by the Justice Department, which cited the Voting Rights Act as its basis.  AR663.[8]  In his letter making the request, Arthur Gary, the General Counsel for the Justice Management Division of the U.S. Department of Justice, explained that "reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2."  AR663.  Specifically, the Gary letter observed that "[m]ultiple federal courts of appeals have held that … citizenship voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district," citing five cases.  *Id.*  Those cases, the letter contends, "make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected."  AR664.

The cases the Gary letter cites do not support the anomalous and damaging request to include a citizenship question on the decennial census.  While these cases confirm that citizenship is a relevant consideration in Section 2 cases, they offer no indication that existing data is insufficient to make that determination.  Indeed, to the extent Section 2 litigants have

---

[8] A recently released memorandum from Commerce Secretary Wilbur Ross indicates that the stated rationale of enforcing the Voting Rights Act is pretextual.  *See* Supplemental Memorandum by Secretary of Commerce Wilbur Ross Regarding the Administrative Record in Census Litigation (June 21, 2018), ECF No. 189.  The memorandum demonstrates that the Commerce Department was already considering the addition of a citizenship question before receiving a request from the Department of Justice and the Commerce Department, in fact, asked the Justice Department to consider requesting such a question.

been unable to satisfy the first *Gingles* precondition, there is no evidence that these failures have been the result of insufficient citizenship data.

Quite the opposite.  In cases in which plaintiffs have not met the first *Gingles* precondition, including those cited in the Gary letter, the plaintiffs have failed for reasons wholly unrelated to the adequacy of existing citizenship data.  For example, in several cases, plaintiffs have proposed districts that did not meet the numerosity requirement and did not include a majority of minority voters.  In *Negron v. City of Miami Beach, Florida*, for instance, the Eleventh Circuit affirmed the district court's conclusion that plaintiffs failed to satisfy the first *Gingles* conclusion, not because of a *lack* of citizenship data, but because "when citizenship is taken into account, there is no Hispanic majority in any of the districts."  113 F.3d 1563, 1568 (11th Cir. 1997).  The court relied for that conclusion on its analysis of existing citizenship data, and identified no flaw or deficiency in that information.  Similarly, in *Romero v. City of Pomona*, the district court did not dismiss the accuracy or sufficiency of existing data; rather, it concluded that such data "conclusively establishes that neither hispanics nor blacks can constitute a majority of the voters of any single member district."  665 F. Supp. 853, 858 (C.D. Cal. 1987), *aff'd*, 883 F.2d 1418 (9th Cir. 1989).[9]

---

[9] *See also Bartlett v. Strickland*, 556 U.S. 1, 14 (2009) (African–Americans represented 39.36 percent of voting-age population); *Dillard v. Baldwin Cty. Comm'rs*, 376 F.3d 1260, 1269 (11th Cir. 2004) ("As of the last census, the African–American population of Baldwin County had declined to less than 10% of the county's total voting-age population."); *Hall v. Virginia*, 385 F.3d 421, 430 (4th Cir. 2004)  ("The plaintiffs concede that black voters cannot form a majority in the Fourth District, and thereby elect a candidate, without the support of voters from other racial or ethnic groups."); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 944 (7th Cir. 1988); *Rios-Andino v. Orange Cty.*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014) (trial expert "stated that he was uncertain as to whether Latino citizens of voting age were actually a majority" in the district).

Plaintiffs have failed to meet the first *Gingles* precondition for a number of other reasons, none of which includes the lack of sufficient citizenship data.  In some cases, plaintiffs have been unable to show the existence of any illustrative district.[10]  In other words, plaintiffs have not demonstrated that redrawing district lines differently could create a district with a majority of minority voters.  In other cases, plaintiffs have proposed an illustrative district that was not "geographically compact."[11]  It is not sufficient for plaintiffs to merely show that a district *could* be drawn to capture a majority of minority voters; that district must also have a sufficiently geographically compact shape.  In none of these cases did the courts express any concerns about existing citizenship data or the lack of sufficient information.  Indeed, it does not appear that the inclusion of a citizenship question on the decennial census would remedy plaintiffs' ability to satisfy the first *Gingles* precondition in such cases.

The inclusion of a citizenship question would also not assist plaintiffs attempting to show any shift in the population of minority voters over the course of a decade following the census.  For example, in *Benavidez v. Irving Independent School District*, the court rejected plaintiffs' argument that the share of Latino CVAP had risen since the last census to now capture a majority of votes.  The court's ruling was not based, however, on any flaw in the decennial census.  The

---

[10] *See Wright v. Sumter Cty. Bd. of Elections & Registration*, No. 1:14-cv-42, 2014 WL 1347427, at *2 (M.D. Ga. Apr. 3, 2014) (plaintiff "did not propose or identify any scheme or district division—a benchmark—that would provide black voters better access to the political process"); *In re 2012 Legislative Districting*, 80 A.3d 1073, 1115-16 (Md. 2013); *Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009) (plaintiffs have burden of showing illustrative plans and did not meet burden).

[11] *See Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004) (plaintiffs were able to show that proposed district would have majority African-American voting-age population but did not satisfy "geographic compactness" component of *Gingles* analysis); *Gause v. Brunswick Cty.*, 92 F.3d 1178, 1996 WL 453466, at *2 (4th Cir. Aug. 13, 1996) (unpublished table decision) ("The plaintiffs' vote dilution claim fails because the African-American population 'is spread evenly throughout' the County."); *Al-Hakim v. Florida*, 892 F. Supp. 1464, 1474 (M.D. Fla. 1995), *aff'd,* 99 F.3d 1154 (11th Cir. 1996).

court cited plaintiffs' reliance on a single year's worth of ACS data, instead of the more accurate five-year ACS data.  690 F. Supp. 2d 451, 458-59 (N.D. Tex. 2010).  The collection of additional data in a census that takes place every ten years would not remedy this problem with mid-decade redistricting challenges.

### C. Defendants' Arguments About The Purportedly Increased "Precision" Of Block-Level Citizenship Data Are Specious

Defendants and their amici have further argued that collecting citizenship data in the decennial census would benefit Voting Rights Act plaintiffs because it would provide for more precision and generate CVAP data at a more granular level than the ACS—at the "block level" rather than the "block group level."  *See* MTD 6-7.  As an initial matter, this claim ignores the fact that, because the ACS is administered in a survey format, experts can still translate that data to the block level using statistical imputation where necessary.[12]  Moreover, Section 2 analysis can tolerate a degree of imprecision because it necessarily relies on a series of statistical estimates to determine whether the relevant racial or language minority communities could constitute more than half of the electorate in a district-sized population.  That end determination is necessarily an approximation that depends on a variety of data in addition to CVAP, including rates of voter eligibility, registration, and turnout—all of which have corresponding margins of error.[13]  Even the definition of a "district-sized population" is a range, given that the "Supreme Court has repeatedly held that district sizes may vary—for state and local districts, up to a presumptively valid 10% population disparity, and in some instances beyond."[14]  It is therefore

---

[12] *See* Levitt Testimony 16.

[13] *See* Fishkin, *The Administration is Lying About the Census*, Balkinization (Mar. 27, 2018), https://balkin.blogspot.com/2018/03/the-administration-is-lying-about-census.html.

[14] Levitt Testimony 17.

irrelevant to VRA plaintiffs if the decennial census could generate CVAP data at the smaller block level .

The pointlessness of defendants' argument is underscored by the fact that in all of the Section 2 cases brought by the Justice Department over the past 18 years—across both Republican and Democratic administrations—"there is not one of these cases in which a decennial enumeration would have enabled enforcement that the existing survey data on citizenship did not permit.  Indeed, not one of these cases has realistically been close to the line."[15]  Acting Assistant Attorney General John Gore confirmed this assessment during his testimony before Congress, in which he was unable to identify a single Justice Department enforcement action that was hampered by currently available citizenship data.[16]  There is simply no evidence that the litigation of Section 2 cases has been hampered by any inadequacy in existing citizenship data.

## II.    The Inclusion Of A Citizenship Question Will Undermine Enforcement Of The Voting Rights Act

Far from assisting Section 2 litigation, citizenship data derived directly from the decennial census will undermine VRA enforcement.  Indeed, as amici are acutely aware, including a citizenship question on the 2020 census will result in a differential undercount of certain segments of the population—in particular, historically under-represented minorities— which in turn, will hamper rather than assist the litigation of Section 2 cases.  The Census Bureau has long opposed adding a citizenship question to the census because of the real likelihood that it

---

[15] Levitt Testimony 18 & n.77 (gathering cases).

[16] *See Progress Report on the 2020 Census: Hearing Before the H. Comm. on Oversight & Gov't Reform,* 115th Cong. (2018) (statement of John M. Gore, Acting Assistant Att'y Gen., U.S. Dep't of Justice), https://oversight.house.gov/wp-content/uploads/2018/05/Gore-DOJ_Testimony-2020-Census-Hearing-05182018.pdf.

would lead to a systemic undercount of people in immigrant communities.  For example, in 1980, the Bureau opined that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count. …   Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980) (describing Bureau's litigation position).  The Director of the Census Bureau confirmed that intuition in congressional testimony in 1990, explaining that census questions about citizenship status would lead to the Census Bureau being "perceived as an enforcement agency," and that such a perception would have "a major effect on census coverage."[17]  Indeed, in requesting the inclusion of a citizenship question, Secretary Ross recognized that the career staff of "the Census Bureau and many stakeholders expressed concern [that the decision] would negatively impact the response rate" in the census.[18]

The Bureau's longstanding resistance to including a citizenship question is well-founded.  Indeed, the Census Bureau's own data from the Center for Survey Measurement ("CSM") demonstrate that if a citizenship question is added to the census, formerly willing respondents will go to extraordinary lengths to avoid participating in it.[19]  The Bureau's Center for Survey

---

[17] Enumeration of Undocumented Aliens in the Decennial Census: Hr'g Before the Subcomm., on Energy, Nuclear Proliferation, and Gov't Processes of the S. Comm. on Governmental Affairs, 99th Cong. 16, 23, 32 (1985) (statement of John Keane, Dir., Bureau of the Census), http://www.loc.gov/law/find/hearings/pdf/00172011883.pdf.

[18] Memorandum from Wilbur Ross, Sec'y of Commerce, U.S. Dep't of Commerce, to Karen Dunn Kelley, Under Sec'y for Econ. Affairs, U.S. Dep't of Commerce 3 (Mar. 26, 2018), https://www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf.

[19] Memorandum from Center for Survey Measurement (CSM), U.S. Census Bureau, to Associate Directorate for Research and Methodology (ARDM): *Respondent Confidentiality Concerns* (Sept. 20, 2017) ("*CSM Memo*"), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf.

Measurement conducted pretesting after the Census Scientific Advisory Committee expressed concerns "about the possibility that 2020 could be politicized" through illegal uses of census information.[20]  Through multiple methods including internet self-response, cognitive inquiry via the Census Barriers, Attitudes, and Motivators Survey, doorstep messages, and field representatives and supervisors interacting with focus groups, the CSM concluded that an unprecedented number of respondents raised issues concerning confidentiality and immigration status while participating.[21]  Respondents also largely refused to share their own information with Bureau employees after expressing these privacy and safety concerns, and the CSM saw extremely high levels of "deliberate falsification" of information on the internet self-response instruments due specifically to the respondent's expressed concerns regarding revealing immigration status to the Census Bureau.  *Id.*  The CSM declared that its findings are "particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."  *Id.*  As the Census Bureau has recognized for decades, and as recent, concrete evidence confirms, the inclusion of a citizenship question will have the inevitable—indeed, intended—effect of diminishing the response rates not only of undocumented persons, but also U.S. citizens and lawful permanent residents who fear the implications of responding for their families and communities.

An undercount of minority groups will necessarily hamper the success of Section 2 cases. Without an accurate estimate of minority populations, it will be more challenging for plaintiffs to meet the first *Gingles* precondition and show the existence of a majority minority voting district.

---

[20] Memorandum from Ron S. Jarmin, Director, U.S. Census Bureau, to Barbara Anderson, Chair, Census Scientific Advisory Comm.: *U.S. Census Bureau Responses to Census Scientific Advisory Committee Fall 2017 Recommendations* (Jan. 26, 2018), https://www2.census.gov/cac/sac/meetings/2017-09/2018-01-26-census-response.pdf.

[21] *CSM Memo.*

Because any citizenship data collected from the decennial census would likely underestimate minority populations, adding a citizenship question to the census would only harm efforts to enforce the VRA.

In sum, the inclusion of a citizenship question will not assist the enforcement of the Voting Rights Act because, while it may create the illusion of more precise data, it is far more likely to lead to inaccurate census data.  There is a high risk that the most vulnerable minority communities—those that the VRA seeks to protect—will be systematically undercounted in the decennial census.   Contrary to Defendants' assertions that a citizenship question will aid in the enforcement of the VRA, the resulting undercount will harm plaintiffs'—and the Department of Justice's—ability to prosecute Section 2 claims.

## CONCLUSION

Defendants' claim that a citizenship question will advance the interests of the Voting Rights Act should be rejected.  Existing citizenship data has proven more than adequate for enforcement of Section 2 of the VRA.  And, given the risk of a systematic undercount, it is unlikely that the inclusion of a citizenship question on the decennial census will result in useful data for the litigation of Section 2 cases.

Dated October 29, 2018

Corrine Yu
Michael Zubrensky
THE LEADERSHIP CONFERENCE
   ON CIVIL AND HUMAN RIGHTS
1620 L Street NW, Suite 1100
Washington, DC 20036

Respectfully submitted,

/s/ Alan E. Schoenfeld
Alan Schoenfeld
Claire M. Guehenno
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

14