**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-2921 (JMF) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| NEW YORK IMMIGRATION | ) | |
| COALITION, *et. al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-5025 (JMF) (Consolidated Case) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**NOTICE OF MOTION AND MOTION FOR LEAVE**

PLEASE TAKE NOTICE that non-party, the Public Interest Legal Foundation, pursuant to Federal Rule of Civil Procedure 7(b)(1), respectfully requests leave to file the accompanying *amicus* brief in support of Defendants' position at trial. The relief requested is an order granting leave for the *amicus* brief to be filed. All parties consent to the filing of the motion for leave.

The Public Interest Legal Foundation, Inc., (the "Foundation") is a non-partisan, public interest organization incorporated and based in Indianapolis, Indiana. The Foundation's mission is to promote the integrity of elections nationwide through research, education, remedial

programs, and litigation. The Foundation also seeks to ensure that voter qualification laws and

election administration procedures are followed. Specifically, the Foundation seeks to ensure that

the nation's voter rolls are accurate and current, working with election administrators nationwide

and educating the public about the same. The Foundation's President and General Counsel, J.

Christian Adams, served as an attorney in the Voting Section at the Department of Justice.  Mr.

Adams has been involved in multiple enforcement actions under the Voting Rights Act and has

brought numerous election cases relying on Census population data. Additionally, one of the

members of the Foundation's Board of Directors, Hans von Spakovsky, served as counsel to the

assistant attorney general for civil rights at the Department of Justice, where he provided

expertise in enforcing the Voting Rights Act and the Help America Vote Act of 2002, as well as

a commissioner on the Federal Election Commission. The *New York Immigration Coalition*

Plaintiffs specifically reference statements made by Mr. Adams and Mr. von Spakovsky in their

Complaint. (Complaint at ¶¶ 100, 179, *New York Immigration Coalition, et al. v. United States*

*Department of Commerce, et al.*, Case No. 1:18-cv-05025.) The Foundation believes that this

brief—drawing from the expertise of the Foundation's counsel and the Foundation's experience

itself—will aid in the Court's consideration of the purpose of collecting citizenship data in the

Decennial Census.

### **STANDARD**

"'There is no governing standard, rule or statute 'prescrib[ing] the procedure for

obtaining leave to file an *amicus* brief in the district court.'" *C&A Carbone, Inc. v. County. of*

*Rockland*, No. 08-cv-6459-ER, 2014 U.S. Dist. LEXIS 38658, at *12 (S.D.N.Y. Mar. 24, 2014)

(quoting *Onondaga Indian Nation v. State*, No. 97-CV-445, 1997 U.S. Dist. LEXIS 9168, 1997

WL 369389, at *2 (N.D.N.Y. June 25, 1997)). Therefore, "[r]esolution of a motion for leave to

file an amicus brief thus lies in the 'firm discretion' of the district court." *Id.* (references omitted); *see also United States v. Ahmed*, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992) ("District courts have broad discretion to permit or deny the appearance of amici curiae in a given case.") "The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties." *Auto. Club of N.Y., Inc. v. Port Auth.*, 2011 U.S. Dist. LEXIS 135391, at *6 (S.D.N.Y. Nov. 22, 2011) (citations omitted).

As explained by Judge Alito:

A restrictive policy with respect to granting leave to file may . . . create at least the perception of viewpoint discrimination.  Unless a court follows a policy of either granting or denying motions for leave to file in virtually all cases, instances of seemingly disparate treatment are predictable.  A restrictive policy may also convey an unfortunate message about the openness of the court.

*Neonatology Assocs., P.A. v. Commissioner*, 293 F.3d 128, 133 (3d Cir. 2002).

## ARGUMENT

Plaintiffs ask that following the trial, this Court "vacat[e] Defendants' decision and enjoin[] Defendants from adding a citizenship question to the 2020 decennial census." (Plaintiffs' Pretrial Memorandum at 2.) This case and the similar cases across the country that also challenge the reinstatement of the citizenship question have garnered national attention and interest. That the Decennial Census is of utmost public interest is evidenced by the motions for leave to file *amicus* briefs that have already been granted by this Court. *See Andersen v. Leavitt*, No. 03-cv-6115 (DRH) (ARL), 2007 U.S. Dist. LEXIS 59108, at *7 (E.D.N.Y. Aug. 13, 2007) ("'[t]he court is more likely to grant leave to appear as an amicus curiae in cases involving matters of public interest'") (quoting 4 Am. Jur. 2d Amicus Curiae § 3.)

The Foundation, with its unique interests and expertise, is able to aid the Court in the resolution of Plaintiffs' request by offering specific insights that the parties are unable or

unwilling to provide. *Auto. Club of N.Y., Inc.*, 2011 U.S. Dist. LEXIS 135391 at *6. The Foundation's brief will not be a duplication of the briefs submitted by the parties. Specifically, in its proposed *amicus* brief, the Foundation covers the following relevant issues:

1) Citizenship data from the 1950 Census was critical to a recent finding of a violation of the right to vote;

2) How citizenship data is used in the enforcement of the Voting Rights Act;

3) Concerns regarding Plaintiffs' assertions of discriminatory intent;

4) How citizenship data will assist in the private enforcement of federal law.

Finally, the Foundation's motion is timely. *See* ECF No. 384 ("*amicus* briefs for the Court's consideration at trial shall be submitted, accompanied by a motion for leave to file (indicating, among other things, whether the parties have consented to the filing), no later than October 29, 2018.").

## **CONCLUSION**

The Foundation believes its brief will be helpful to the Court. Accordingly, the Foundation respectfully requests leave to file the attached brief.

Respectfully submitted on October 29, 2018,


/s/ Edward Paltzik
Edward Paltzik
Joshpe Mooney Paltzik LLP
360 Lexington Ave.
Suite 1502
New York, NY 10017
Tel: (212) 421-8100
Cell: (516) 526-0341
Fax: (212) 313-9478
epaltzik@jmpllp.com

J. Christian Adams*
Public Interest Legal Foundation
1555 King Street
Suite 200
Alexandria, VA  22314
Tel: (317) 203-5599
Fax: (888) 815-5641
a@electionlawcenter.com

Kaylan L. Phillips*
Public Interest Legal Foundation
32 E. Washington Street,
Ste. 1675
Indianapolis, IN 46204
Tel: (317) 203-5599
Fax: (888) 815-5641
kphillips@publicinterestlegal.org

*Not admitted in this jurisdiction


*Counsel for Public Interest Legal Foundation*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,                    )
                                                )
        *Plaintiffs*,                 )
                                                )
     v.                                    )     18-cv-2921 (JMF)
                                                )
UNITED STATES DEPARTMENT                        )
OF COMMERCE, *et. al*,                          )
                                                )
        *Defendants*.                 )
_____ )


NEW YORK IMMIGRATION                            )
COALITION, *et. al*,                            )
                                                )
        *Plaintiffs*,                 )
                                                )
     v.                                    )     18-cv-5025 (JMF) (Consolidated Case)
                                                )
UNITED STATES DEPARTMENT                        )
OF COMMERCE, *et. al*,                          )
                                                )
        *Defendants*.                 )
_____ )


**BRIEF *AMICUS CURIAE* OF THE PUBLIC INTEREST LEGAL FOUNDATION IN
SUPPORT OF DEFENDANTS' POSITION AT TRIAL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF *AMICUS CURIAE* ...............................................................1

SUMMARY OF ARGUMENT ........................................................................2

ARGUMENT ...................................................................................................4

    A.    The Citizenship Data from the 1950 Census Helped Court Find Violation of the Right to Vote ..............................................................4

           *Davis v. Guam* ..............................................................................4

    B.    Enforcement of Section 2 of the Voting Rights Act Requires Citizenship Data .................................................................................6

           *Euclid City (OH)* .........................................................................8

           *Osceola County (FL) (2008)* .......................................................8

           *Georgetown County (SC)* ............................................................8

           *City of Boston* ..............................................................................9

           *Osceola County (FL) (2005)* .......................................................9

           *Alamosa County (CO)* .................................................................9

           *Charleston County (SC)* ............................................................10

    C.    Disagreement Between Previous and Current Political Appointees Cannot Support a Finding of Discriminatory Intent ...............................................................10

    D.    Citizenship Data Will Assist in the Private Enforcement of Federal Law .......................................................................................11

CONCLUSION ..............................................................................................12

# TABLE OF AUTHORITIES

**Cases**

*Am. Civil Rights Union v. Martinez-Rivera*,
  166 F. Supp. 3d 779 (W.D. Tex. 2015)..............................................................11-12

*Bellitto v. Snipes*,
  302 F. Supp. 3d 1335 (S.D. Fla. 2017) ................................................................. 12

*Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617
  (S.D. Fla. Mar. 30, 2018) ...................................................................................... 12

*Davis v. Guam*,
  No. 11-00035, 2017 U.S. Dist. LEXIS 34240 (D. Guam Mar. 8, 2017) .................2-5

*Thornburgh v. Gingles*,
  478 U.S. 30 (1986).................................................................................................. 6

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)........................................................................................3, 10-11

*Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*,
  301 F. Supp. 3d 612 (E.D.N.C. 2017) ................................................................... 12

**Statutes and Constitution**

52 U.S.C. § 20507(a)(4)............................................................................................ 11

52 U.S.C. § 20507(i)................................................................................................. 11

52 U.S.C. § 20510..................................................................................................... 11

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellee and Urging
Affirmance, No. 17-15719 at 4, 12-13, 18 (9th Cir., filed Nov. 28, 2017)............................. 5

"Cases Raising Claims Under Section 2 of the Voting Rights Act,"
https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0.... 6 n. 2

Citizen Voting Age Population (CVAP) Special Tabulation from the 2012-2016 5-Year
American Community Survey (ACS)....................................................................................... 6

Complaint, Public Interest Legal Foundation v. Bennett,
  No. 4:18-cv-00981 (S.D. Tex.) ............................................................................. 11

Complaint, United States v. Alamosa County,
  No. 01-B-2275 (D. Colo. 2001) .............................................................................. 9

Complaint, United States v. Charleston County,
  No. 2-01-0155 (D.S.C. 2001)................................................................................ 10

Complaint, United States v. City of Boston, MA,
No. 05-11598 (D. Mass. 2005) ...................................................................... 9

Complaint, United States v. Euclid City School District Board of Education, OH,
No. 1:08-cv-02832 (N.D. Ohio 2008)............................................................. 8

Complaint, United States v. Georgetown County School District
No. 2:08-cv-00889 (D.S.C. 2008)............................................................... 8-9

Complaint, United States v. Osceola County,
No. 6:05-cv-1053 (M.D. Fla 2005) ................................................................ 9

Complaint, United States v. The School Board of Osceola County,
No. 6:08-cv-00582 (M.D. Fla. 2008) ............................................................. 8

Complaint, United States v. Town of Lake Park, FL,
No. 09-80507 (S.D. Fla. 2009) ...................................................................... 7

Public Interest Legal Foundation, Press Release, 248 Counties Have More Registered
Voters Than Live Adults (Sept. 25, 2017) .................................................... 11

## INTEREST OF *AMICUS CURIAE*

The Public Interest Legal Foundation, Inc., (the "Foundation") is a non-partisan, public interest organization incorporated and based in Indianapolis, Indiana. The Foundation's mission is to promote the integrity of elections nationwide through research, education, remedial programs, and litigation. The Foundation also seeks to ensure that voter qualification laws and election administration procedures are followed. Specifically, the Foundation seeks to ensure that the nation's voter rolls are accurate and current, working with election administrators nationwide and educating the public about the same. The Foundation's President and General Counsel, J. Christian Adams, served as an attorney in the Voting Section at the Department of Justice.  Mr. Adams has been involved in multiple enforcement actions under the Voting Rights Act and has brought numerous election cases relying on Census population data. Additionally, one of the members of the Foundation's Board of Directors, Hans von Spakovsky, served as counsel to the assistant attorney general for civil rights at the Department of Justice, where he provided expertise in enforcing the Voting Rights Act and the Help America Vote Act of 2002, as well as a commissioner on the Federal Election Commission. The *New York Immigration Coalition* Plaintiffs specifically reference statements made by Mr. Adams and Mr. von Spakovsky in their Complaint. (Complaint at ¶¶ 100, 179, *New York Immigration Coalition, et al. v. United States Department of Commerce, et al.*, Case No. 1:18-cv-05025.) The Foundation believes that this brief—drawing from the expertise of the Foundation's counsel and the Foundation's experience itself—will aid in the Court's consideration of the purpose of collecting citizenship data in the Decennial Census.

1

## SUMMARY OF ARGUMENT

Collecting robust citizenship data on the Decennial Census will help enforce the Voting Rights Act. The U.S. Department of Justice ("DOJ") determined that gathering citizenship "data is critical to the Department [of Justice]'s enforcement of Section 2 of the Voting Rights Act." (Administrative Record at 000663, *see also* Defendants' Pretrial Memorandum at 24-25.) The DOJ, as a statutorily designated enforcer of the Voting Rights Act, understands the importance of "a reliable calculation of the citizen voting age population in localities where voting rights violations are alleged or suspected." *Id*. Nevertheless, the Plaintiffs assert that the stated justification is "pretextual." (Plaintiffs' Pretrial Memorandum at 34.) They ask that following the trial, this Court "vacat[e] Defendants' decision and enjoin[] Defendants from adding a citizenship question to the 2020 decennial census." (Plaintiffs' Pretrial Memorandum at 2.) Plaintiffs are not entitled to such relief for four reasons the Defendants have not presented but which relate to Voting Rights Act enforcement.

First, courts have relied on Census citizenship data to enter summary judgment against a jurisdiction in a voting rights case. Specifically, citizenship data from the 1950 Decennial Census—the last Census in which such data was requested of all participants—was central to the finding of a violation of the right to vote in a recent case concerning the U.S. territory of Guam. In *Davis v. Guam*, the district court relied heavily on data showing which inhabitants of the territory were U.S. citizens and which ones were non-U.S. citizens, data that was collected by the 1950 Census. *Davis v. Guam*, No. 11-00035, 2017 U.S. Dist. LEXIS 34240, at *15 (D. Guam Mar. 8, 2017). Because citizenship data was available for analysis, the court was able to ascertain that a Guam law restricting the right to vote in a particular election to only "Native Inhabitants of

Guam" was a race-based restriction in violation of the Fifteenth Amendment to the Constitution. *Id*. at *37.

Second, the Civil Rights Division of the Department of Justice relies on citizenship data in cases it has brought to enforce the Voting Rights Act. Plaintiffs twist this past reliance into support for their position that data from the Decennial Census cannot be necessary. (Plaintiffs' Pretrial Memorandum at 21, 35.) These cases demonstrate that the DOJ is familiar with the data presently available. The DOJ has determined that obtaining more robust citizenship data will allow those officials charged with enforcing the Voting Rights Act to enjoy more precise citizen population data, particularly in small jurisdictions, and thus enhance enforcement of civil rights laws. Such a decision is not "pretext"; it is progress.

Third, contrary to Plaintiffs' position, (Plaintiffs' Pretrial Memorandum at 32-33), current executive branch officials disagreeing with previous executive branch officials cannot possibly constitute a "substantive departure" under *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429 U.S. 252 (1977). Plaintiffs cite no legal authority for their proposition that a disagreement between previous and current political appointees supports a finding of discriminatory intent under *Arlington Heights.*

Finally, the reinstatement of the citizenship question on the 2020 Census enriches the ability of private citizens to enforce federal law. As part of its mission, the Foundation strives to ensure that voter rolls are being lawfully maintained nationwide. The Foundation relies upon citizenship data in its analysis of the nation's rolls. Robust citizenship data—including data from smaller jurisdictions—from the Decennial Census will aid the Foundation and others in this important task.

## ARGUMENT

### A. The Citizenship Data from the 1950 Census Helped Court Find Violation of the Right to Vote.

Robust citizenship data aids enforcement of the Voting Rights Act and federal protections regarding voting rights. Plaintiffs argue DOJ's stated purpose for adding citizenship data to the Decennial Census—namely that it will help the enforcement of the Voting Rights Act—is "pretext" for its alleged discriminatory intent. (Plaintiffs' Pretrial Memorandum at 27.) In order to do so, they frame citizenship data from the Decennial Census as unnecessary and even unhelpful for the enforcement of voting rights laws. Plaintiffs are flat wrong. A cursory review of actual voting rights enforcement reveals that citizenship data derived from the Census is central to recent judicial decisions upholding the right to vote as well as actions by the United States to enforce Section 2 of the Voting Rights Act.[1]

#### *Davis v. Guam*

Census citizenship data derived from the 1950 Census was essential to the decision of the United States District Court for the District of Guam in *Davis v. Guam* (hereinafter, "*Davis*"). In *Davis*, the court confronted a Guam law establishing a "Political Status Plebiscite" that would allow those on the island to vote in a referendum regarding the territory's future status with the United States. *Davis*, 2017 U.S. Dist. LEXIS 34240, at *3. The plaintiff was denied the right to register to vote in the plebiscite due to the fact that he did not meet the definition of "Native Inhabitant of Guam." *Id*. Eligibility to vote was anchored to 1950. An eligible "Native Inhabitant of Guam" means "'those persons who became U.S. Citizens by virtue of the authority and enactment of the 1950 Guam Organic Act and descendants of those persons.'" *Id*. (quoting 3

---

[1] The Foundation does not know why the Defendants have not brought these cases to the attention of the Court.  Nevertheless, that the cases occurred is not subject to debate and is therefore appropriate to consider despite the United States being a party in several of them.

Guam Code Ann. § 21001(e)). Those who were on Guam in 1950 *and* became citizens by virtue of the 1950 Organic Act, and their blood descendants, were eligible to vote in the status plebiscite. Thus, the composition of citizens as compared to non-citizens on Guam in 1950 became highly relevant. Thankfully, the 1950 Census included a citizenship question.

Using Census citizenship data from the 1950 Census, the district court found that law violated the Fifteenth Amendment to the U.S. Constitution, because "Native Inhabitants of Guam" was a race-based classification. *Id*. at *12-28. Of the 26,142 non-U.S. citizens in Guam in 1950, the vast majority, or 25,788, were of Chamorro descent. *Id.* at *15.  As a result of the court's analysis of the 1950 Census citizenship data, it determined that "the use of 'Native Inhabitants of Guam' as a requirement to register and vote in the Plebiscite is race-based and that the Guam Legislature has used ancestry as a racial definition and for a racial purpose." *Id*. at *18-19. Put simply, almost everyone who became a citizen by virtue of the 1950 Organic Act was of the Chamorro race, and therefore a law which anchors voting eligibility to that event violated the Constitution.

An appeal of the summary judgment finding in the plaintiff's favor is pending in the Ninth Circuit. No. 17-15719. On appeal, the United States filed an *amicus curiae* brief supporting the plaintiff-appellee and requesting that the district court decision be affirmed. The United States relies on the citizenship data collected in the 1950 Census to support its position. Brief for the United States as *Amicus Curiae* Supporting Plaintiff-Appellee and Urging Affirmance, No. 17-15719 at 4, 12-13, 18 (9th Cir., filed Nov. 28, 2017), *available at* https://www.cir-usa.org/legal_docs/davis_v_guam_doj_amicus.pdf.

The citizenship data collected during the 1950 Census was essential to the determination that Guam's plebiscite law unconstitutionally imposed a race-based restriction in violation of the

Fifteenth Amendment. This case supports the DOJ's determination that the collection of citizenship data is critical to the enforcement of federal law.

### B.  Enforcement of Section 2 of the Voting Rights Act Requires Citizenship Data.

When the United States brings a case pursuant to Section 2 of the Voting Rights Act,[2] there are three so-called "preconditions" that it must show are present. *See Thornburgh v. Gingles*, 478 U.S. 30 (1986). The first *Gingles* precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single member district." *Id*. at 50-51. To establish this precondition, the United States has historically used citizen voting age populations, or "CVAP."

CVAP, while reliable, is an estimation based on ongoing surveying conducted every year by the Census Bureau's American Community Survey (ACS). *See* Citizen Voting Age Population (CVAP) Special Tabulation from the 2012-2016 5-Year American Community Survey (ACS), *available at* https://www2.census.gov/programs-surveys/decennial/rdo/technical-documentation/special-tabulation/CVAP_2012-2016_ACS_documentation.pdf. Additionally, CVAP data is not available for all jurisdictions. The DOJ correctly noted that more robust citizenship data will allow it to better enforce federal law. (Administrative Record at 000663.) This is hardly a pretext for discrimination.  A cursory review of the record of Justice Department Voting Rights Act enforcement reveals that citizen voting age population—a value that can be determined with greater precision if the question is asked in the 2020 Census—is central to a Voting Rights Act complaint.

---

[2] All cases brought under Section 2 of the Voting Rights Act, with the complaints and other documents linked, are listed at the DOJ website under "Cases Raising Claims Under Section 2 of the Voting Rights Act," https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0.

Currently, the Census does not capture citizenship data for smaller jurisdictions in the same way it does for larger jurisdictions. This limits the Justice Department's ability to bring cases that enjoy greater clarity and confidence. A rare Voting Rights Act case brought against a smaller jurisdiction was against Lake Park, a small town in Palm Beach County, Florida. Complaint, *United States v. Town of Lake Park, FL*, No. 09-80507 (S.D. Fla. 2009). In the 2000 Census, 48 percent of Lake Park residents were black, but in 2009 not a single black candidate for town council had ever won a seat in the at-large voting plan. A large non-citizen Haitian population, however, made it less than clear what the precise black citizenship population was in Lake Park. The United States could not turn to the Decennial Census for precise citizenship data because precise citizenship data were not collected in the 2000 Census. While it is true that the United States alleged in the Lake Park complaint a sufficiently large black citizenship population to justify bringing the case, the extraordinarily large black population (more than 40%) made that an easier assertion to make. *See* Complaint at ¶ 8, *United States v. Town of Lake Park, FL*, No. 09-80507 (S.D. Fla. 2009) ("The black population of the Town is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Defendant Commission can be drawn in which black persons would constitute a majority of the total population, voting age population, and citizen voting age population in at least one district.").

For larger jurisdictions, the importance of CVAP in a Voting Rights Act case is obvious. Remember, the following cases rely on ACS estimates rather than the sort of enumeration which will be part of the 2020 Census. These cases illustrate that citizenship data are relevant to a cause of action under Section 2. While in the past the United States used ACS estimates, seeking more precise and unimpeachable data would aid enforcement of the law. The important point for this

Court is that the justification for including the citizenship question is hardly a pretext for an impermissible intent. Rather, it is an enforcement agency seeking to better enforce the law. Previous examples of the United States relying on citizenship data to enforce the Voting Rights Act include:

***Euclid City (OH)***

 The Complaint alleged, "The at-large method of electing the Euclid Board of Education dilutes the voting strength of African-American *citizens*, in violation of Section 2 of the Voting Rights Act…." Complaint at ¶ 6, *United States v. Euclid City School District Board of Education*, OH, No. 1:08-cv-02832 (N.D. Ohio 2008) (emphasis added).

***Osceola County (FL) (2008)***

 In that Complaint, the DOJ alleged, "The Hispanic population of the county is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the School Board can be drawn in which Hispanic persons would constitute a majority of the *citizen* voting-age population in one out of five districts." Complaint at ¶ 12, *United States v. The School Board of Osceola County*, No. 6:08-cv-00582 (M.D. Fla. 2008) (emphasis added).

***Georgetown County (SC)***

 The DOJ's Complaint alleged, "The African-American population of the county is sufficiently numerous and geographically compact that a properly apportioned single-member district plan for electing the Defendant Board can be drawn in which black *citizens* would constitute a majority of the total population, and voting age population in three districts." Complaint at ¶ 12, *United States v. Georgetown County School District, et. al*., No. 2:08-cv-00889 (D.S.C. 2008) (emphasis added).

***City of Boston***

The DOJ's Complaint in this matter was based explicitly on "citizen voting age population." The Second Cause of Action alleges, "Defendants' conduct has had the effect of denying limited English proficient Hispanic and Asian American voters an equal opportunity to participate in the political process and to elect candidates of their choice on an equal basis with other *citizens* in violation of Section 2 of the Voting Rights Act." Complaint at ¶ 21, *United States v. City of Boston, MA*, No. 05-11598 (D. Mass. 2005) (emphasis added).

***Osceola County (FL) (2005)***

The DOJ alleged, "The effects of discrimination on Hispanic *citizens* in Osceola County, including their markedly lower socioeconomic conditions relative to white *citizens*, continue to hinder the ability of Hispanic *citizens* to participate effectively in the political process in county elections." Complaint at ¶ 17, *United States v. Osceola County*, No. 6:05-cv-1053 (M.D. Fla 2005) (emphasis added).

***Alamosa County (CO)***

The DOJ's Complaint alleged, "The current at-large method of electing the members of the Alamosa County Board of Commissioners violates Section 2 of the Voting Rights Act, because it results in Hispanic *citizens* of the county having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice…." Complaint at ¶ 16, *United States v. Alamosa County*, No. 01-B-2275 (D. Colo. 2001) (emphasis added).

***Charleston County (SC)***

The Complaint by the United States alleged a violation of Section 2 because "the at-large election system for electing the Charleston County Council has the effect of diluting black voting strength, resulting in black *citizens* being denied an opportunity equal to that afforded to other members of the electorate to participate in the political process and elect representatives of their choice." Complaint ¶ 15, *United States v. Charleston County*, No. 2-01-0155 (D.S.C. 2001) (emphasis added).

The Justice Department relies on citizenship data to enforce the Voting Rights Act. It is familiar with the citizenship data available and has stated that more robust data will allow it to better enforce the law.

### C. Disagreement Between Previous and Current Political Appointees Cannot Support a Finding of Discriminatory Intent.

Plaintiffs assert that the reinstatement of the citizenship question was motivated by discriminatory animus. (Plaintiffs' Pretrial Memorandum at 29-35.) As legal support, Plaintiffs rely upon the Supreme Court's analysis of relevant topics of inquiry when determining if discriminatory intent exists. (Plaintiffs' Pretrial Memorandum at 29-30, referencing *Arlington Heights*, 429 U.S. at 266-68). Under *Arlington Heights*, the court may consider "[d]epartures from the normal procedural sequence" and "legislative or administrative history," among other factors, to evaluate whether discriminatory intent is present. 429 U.S. at 267-68.

Here, Plaintiffs would have the Court disregard the results of an election and the ensuing powers of the executive to alter policies priorities of the executive branch.  Plaintiffs reference the statements of *former* Census Bureau executives expressing concern about the impact of the citizenship question as evidence that Secretary Ross's decision was a "[s]ubstantive departure[] from past practice." (Plaintiffs' Pretrial Memorandum at 32-33.) Whether or not prior political

appointees who served under a different executive agree with Secretary Ross's decision cannot

be material whatsoever to an analysis under *Arlington Heights*.

Plaintiffs repeatedly attempt to tarnish the legitimate need for reinstating the citizenship

question with political rhetoric. (*See* Plaintiffs' Pretrial Memorandum at 31, 33-34.)  Plaintiffs

have simply not alleged sufficient facts to even engage in an analysis under *Arlington Heights*,

much less support a finding of discriminatory intent. Elections must mean something, and an

executive may depart from the policies of prior executive without implicating *Arlington Heights*.

### D.  Citizenship Data Will Assist in the Private Enforcement of Federal Law.

Robust citizenship data from the 2020 Census will aid in the private enforcement of

federal law. For example, the National Voter Registration Act ("NVRA"), in part, requires that

election officials conduct reasonable list maintenance and make available for public inspection

records relating to their list maintenance. 52 U.S.C. § 20507(a)(4) and (i). The NVRA also

authorizes private parties to enforce its provisions. 52 U.S.C. § 20510. The Foundation has

utilized this private right of action in order to advance its mission of ensuring that voter rolls are

current and accurate. In so doing, the Foundation relies on available Census data to determine

which jurisdictions may be failing to comply with federal law. *See*, *e.g.*, Press Release, *248

Counties Have More Registered Voters Than Live Adults* (Sept. 25, 2017), *available at*

https://publicinterestlegal.org/blog/248-counties-registered-voters-live-adults/. The Foundation

then works with election officials to correct the violations of law or, if needed, files a complaint

in federal court to enforce the law. *See*, *e.g.*, *Public Interest Legal Foundation v. Bennett*, No.

4:18-cv-00981 (S.D. Tex.). Courts have found the ratio of registrants on the voter rolls to eligible

citizens living in a jurisdiction to be probative of whether election officials are complying with

federal law. *See Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 793 (W.D.

Tex. 2015), *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017), *Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1358 (S.D. Fla. 2017). Courts have also found that the current set of citizenship data obtained by the Census may contain limitations that could impair some interpretations of the data. *See Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at *30 (S.D. Fla. Mar. 30, 2018).

## CONCLUSION

Robust citizenship data from Decennial Censuses has aided in the enforcement of federal law in the past and will do so again. The determination to gather such data during the 2020 Census is logical and appropriate. For these reasons, Plaintiffs' request that this Court "vacat[e] Defendants' decision and enjoin[] Defendants from adding a citizenship question to the 2020 decennial census" (Plaintiffs' Pretrial Memorandum at 2) should be denied.


Respectfully submitted on October 29, 2018,


/s/ Edward Paltzik
Edward Paltzik
Joshpe Mooney Paltzik LLP
360 Lexington Ave.
Suite 1502
New York, NY 10017
Tel: (212) 421-8100
Cell: (516) 526-0341
Fax: (212) 313-9478
epaltzik@jmpllp.com

J. Christian Adams*
Public Interest Legal Foundation
1555 King Street
Suite 200
Alexandria, VA  22314
Tel: (317) 203-5599
Fax: (888) 815-5641
a@electionlawcenter.com

Kaylan L. Phillips*
Public Interest Legal Foundation
32 E. Washington Street,
Ste. 1675
Indianapolis, IN 46204
Tel: (317) 203-5599
Fax: (888) 815-5641
kphillips@publicinterestlegal.org

*Not admitted in this jurisdiction

*Counsel for Public Interest Legal Foundation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-2921 (JMF) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |


| | | |
|---|---|---|
| NEW YORK IMMIGRATION | ) | |
| COALITION, *et. al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-5025 (JMF) (Consolidated Case) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER ACCEPTING AMICUS CURIAE BRIEF**

The Court, having considered the Public Interest Legal Foundation's Motion for Leave to

file an *amicus* brief dated October 29, 2018, hereby GRANTS the motion. The BRIEF AMICUS

CURIAE OF THE PUBLIC INTEREST LEGAL FOUNDATION IN SUPPORT OF THE

DEFENDANTS' POSITION AT TRIAL is accepted for filing.

SO ORDERED

Dated: _____

New York, New York

_____

HON. JESSE M. FURMAN

United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-2921 (JMF) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

| | | |
|---|---|---|
| NEW YORK IMMIGRATION | ) | |
| COALITION, *et. al*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | 18-cv-5025 (JMF) (Consolidated Case) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et. al*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

### CERTIFICATE OF SERVICE

I, Edward A. Paltzik, declare under penalty of perjury that on October 29, 2018, I

caused the following documents to be electronically filed with the Court's CM/ECF

Filing System, which will send a Notice of Electronic Filing to all parties of record who

are registered with CM/ECF: (1) Public Interest Legal Foundation's Notice of Motion for Leave

to File Amicus Brief; (2) Brief of the Public Interest Legal Foundation's In Support of

Defendants' Position at Trial; (3) Proposed Order Accepting Amicus Brief.

DATED: October 29, 2018

_____

Edward A. Paltzik
JOSHPE MOONEY PALTZIK LLP
360 Lexington Avenue, Suite 1502
New York, NY 10017
Tel: (212) 421-8100
Cell: (516) 526-0341
Fax: (212) 313-9478
epaltzik@jmpllp.com
*Counsel for Public Interest Legal Foundation*