## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

                 *Plaintiffs*,

        v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

               *Defendants.*

18-CV-2921 (JMF)

## MOTION OF COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY, AND JUSTICE ROBERT ORR (RET.) FOR LEAVE TO FILE *AMICI CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS

*Amici curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.) respectfully move for leave to file the attached brief in support of Plaintiffs' claims and arguments at trial.  All parties have consented to the filing of this motion and the attached brief.  The first section of the brief provides further details on the identities and credentials of the above-named *amici curiae* and their interest in this litigation.

      *Amici* believe that the attached brief will aid in the Court's consideration of Plaintiffs' claims at trial.  The brief marshals highly relevant historical and legal materials to explain that Article I, Section 2 of the Constitution provides all persons in the United States— whether citizens or not—with the right to representation in Congress.  The brief then sets forth why, under existing Supreme Court precedent, this constitutional principle remains relevant to the disposition of plaintiffs' claims under the Fifth Amendment and the Administrative Procedure Act ("APA").  Specifically, the brief explains that because

Secretary Ross's decision undermines a fundamental constitutional principle, it should be subject to more exacting scrutiny under the Fifth Amendment's equal protection guarantees. And the fact that Secretary Ross's decision would undermine a core constitutional commitment without any reasoned explanation for doing so further shows why it violates both the substantive and procedural protections of the APA.  These considerations provide additional reasons for enjoining Secretary Ross's decision to add the unnecessary citizenship question to the 2020 Census, and for a determination in favor of plaintiffs at trial.

For the foregoing reasons, leave to file the attached *amici curiae* brief should be granted.  A proposed order is enclosed with this motion.

Dated: October 29, 2018

*/s/ Gregory L. Diskant*
Gregory L. Diskant
Aron Fischer
Benjamin F. Jackson
Jacob Newman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
gldiskant@pbwt.com
afischer@pbwt.com
bjackson@pbwt.com
jnewman@pbwt.com
Attorneys for *Amici Curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.)

## CERTIFICATE OF SERVICE

I certify that on October 29, 2018, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Benjamin F. Jackson*

Benjamin F. Jackson
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2255
bjackson@pbwt.com

Attorney for *Amici Curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | |
| *Plaintiffs*, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | |
| *Defendants*. | |

## BRIEF OF COMMON CAUSE, TREVOR POTTER, REP. JODY L. MCNALLY, AND JUSTICE ROBERT ORR (RET.) AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

Gregory L. Diskant
Aron Fischer
Benjamin F. Jackson
Jacob Newman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
gldiskant@pbwt.com
afischer@pbwt.com
bjackson@pbwt.com
jnewman@pbwt.com

Attorneys for *Amici Curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.)

# **TABLE OF CONTENTS**

**Page**

INTEREST OF *AMICI CURIAE* ........................................................................1

ARGUMENT ................................................................................................2

I.  Equal representation of persons is the core constitutional value of Article I,
    Section 2 as amended by the Fourteenth Amendment.......................................4

    A.  The Founders agreed that all persons—not just citizens—must be included in
        the representation base for members of Congress. ...................................4

    B.  The Constitution resolves the tension between the broad right to equal
        representation and the then-narrow right to vote by distinguishing between those
        who can vote and those who are counted for census purposes. ........................6

    C.  The Fourteenth Amendment reaffirmed the representation of all persons as a
        foundational principle of our democracy. .............................................8

II.  Census results drive both political representation and funding for large groups
     of people in broad areas. ......................................................................9

III.  Secretary Ross's failure to consider the risk that including a citizenship question
      on the 2020 Census would undermine equality of representation confirms that
      his decision to add the question violates the Fifth Amendment and the
      Administrative Procedure Act. .............................................................13

    A.  The violation of a fundamental constitutional principle warrants stricter scrutiny
        under the Equal Protection Clause. ...................................................13

        1.  Being counted, and being included in the apportionment
            process, is integral to the fundamental right to political
            representation.............................................................14

        2.  The Secretary's decision merits further scrutiny because it
            was intended to undermine a core constitutional value. ..................15

    B.  Secretary Ross's decision to add the citizenship question—and thereby
        undermine a core constitutional commitment—violates both the substantive and
        procedural protections of the APA. ...................................................17

CONCLUSION ............................................................................................19

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belle Terre v. Boraas*,
    416 U.S. 1 (1974)................................................................................16

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980)..........................................................16

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971)..........................................................................18

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016)............................................................ *passim*

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980)..............................................4, 14

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)..........................................................................14

*Harper v. Va. Bd. of Elections*,
    383 U.S. 663 (1966)..................................................................13, 15

*Kadrmas v. Dickinson Pub. Sch.*,
    487 U.S. 450 (1988)..........................................................................15

*Lange-Kessler v. Dep't of Educ.*,
    109 F.3d 137 (2d Cir. 1997)..........................................................16

*Lindsey v. Normet*,
    405 U.S. 56 (1972)............................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co. (State Farm)*,
    463 U.S. 29 (1983)............................................................................17

*Shapiro v. Thompson*,
    394 U.S. 618 (1969)..................................................................13, 15

*Shaw v. Reno*,
    509 U.S. 630 (1993)............................................................................8

*Skinner v. Oklahoma*,
316 U.S. 535 (1942) ........................................................................................ 13, 15

*Utah v. Evans*,
536 U.S. 452 (2002) ........................................................................................ 16, 18

*Wesberry v. Sanders*,
376 U.S. 1 (1964) ............................................................................................. 5, 16

*Wisconsin v. City of New York*,
517 U.S. 1 (1996) ................................................................................................. 14

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ............................................................................................... 8

## Other Authorities

Richard Briffault, *Legal History: The Contested Right to Vote*, 100 MICH. L.
REV. 1506, 1510 (2002) .......................................................................................... 6

CONSTITUTIONAL RIGHTS FOUND., *Who Voted in Early America?*, BILL OF
RIGHTS IN ACTION (Fall/Winter 1991) .................................................................... 6

THE FEDERALIST ...................................................................................................... 7

FOUNDING FAMILIES: DIGITAL EDITIONS OF THE PAPERS OF THE WINTHROPS
AND THE ADAMSES (C. James Taylor ed., 2015) .................................................. 5

Thomas Jefferson, Letter to William King (1819), Jefferson Papers, Library of
Congress, Vol. 216 .................................................................................................. 5

Michael Kitch, *State's Population Growth All Depends on Migration*, N.H.
BUS. REV. (Sept. 13, 2018), https://www.nhbr.com/September-14-
2018/States-population-growth-all-depends-on-migration/ ................................ 12

MICHAEL J. KLARMAN, THE FRAMERS' COUP (2016) ............................................. 4

Jens Manuel Krogstad et al., *5 Facts About Illegal Immigration in the U.S.*,
PEW RES. CTR. (Apr. 27, 2017), http://www.pewresearch.org/fact-
tank/2017/04/27/5-facts-about-illegal-immigration-in-the-u-s/ ......................... 7

Justin Levitt, *Citizenship and the Census*, 19 COLUM. L. REV. (forthcoming
2018) ................................................................................................................. 9, 11

*National Demographic Characteristics*, U.S. DEP'T OF LABOR,
https://www.doleta.gov/naws/pages/research/docs/Table1.NAWS_
National_Demographics.xlsx (last visited Oct. 15, 2018) .................................................10

Press Release, Election Data Services, Some Change in Apportionment
Allocations with New 2017 Census Estimates; But Greater Change Likely
by 2020 (Dec. 26, 2017), *available at*
https://www.electiondataservices.com/wp-content/uploads/2017/12/
NR_Appor17c3wTablesMapsC2.pd ...................................................................................11

ANDREW REAMER, COUNTING FOR DOLLARS 2020: THE ROLE OF THE
DECENNIAL CENSUS IN THE GEOGRAPHIC DISTRIBUTION OF FEDERAL
FUNDS (2017) ...........................................................................................................11, 12

*Rural Health for New Hampshire*, RURAL HEALTH INFO. HUB (June 5, 2017),
https://www.ruralhealthinfo.org/states/new-hampshire ......................................................12

Ed Stoddard, *Agriculture Dependent on Migrant Workers*, REUTERS (July 22,
2007, 8:09 p.m.), https://www.reuters.com/article/us-usa-immigration-
farms/agriculture-dependent-on-migrant-workers-
idUSN1526113420070723?feedType=RSS ......................................................................11

U.S. CENSUS, USES OF CENSUS BUREAU DATA IN FEDERAL FUNDS
DISTRIBUTION (2017), *available at* https://www2.census.gov/programs-
surveys/decennial/2020/program-management/working-papers/Uses-of-
Census-Bureau-Data-in-Federal-Funds-Distribution.pdf ...............................................9, 11

GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787
(2d ed. 1998) ........................................................................................................................4

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Common Cause was founded by John Gardner in 1970 as a nonpartisan "citizens lobby" whose primary mission is to protect and defend the democratic process and make government accountable and responsive to the interests of ordinary people, and not merely to those of special interests. Common Cause is one of the nation's leading democracy organizations and currently has over 1.2 million members and supporters nationwide and local chapters in 25 states, including states that will be disproportionately impacted by the inclusion of a citizenship question on the 2020 Census, including California, Colorado, Illinois, New York, Pennsylvania, Rhode Island, and Texas. Common Cause has been a leading advocate for policies that ensure a responsive and representative government.

Common Cause filed an *amicus* brief in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016). Common Cause is also a leading organization challenging the practice of partisan gerrymandering. Common Cause is the lead plaintiff in the challenge to the congressional gerrymander in North Carolina pending on remand from the United States Supreme Court in *Common Cause et al. v. Rucho et al.*, 1:16-CV-1026 (M.D.N.C.).

*Amicus curiae* Trevor Potter is a former Republican Chairman of the Federal Election Commission. He is one of the country's most prominent and experienced campaign and election lawyers, and served as general counsel to John McCain's 2000 and 2008 presidential campaigns. Mr. Potter is currently the President of the Campaign Legal Center, a nonprofit nonpartisan organization that fights the current threats to our democracy in the areas of campaign finance, voting rights, redistricting, and ethics. Mr. Potter has long been engaged with good government issues and has served as *amicus curiae* in a number of cases.

*Amicus curiae* Representative Jody L. McNally is a Republican representative in the Strafford 10 district in the New Hampshire House of Representatives. As an elected representative, she has a vested interest in ensuring a full and accurate count in the 2020 Census.

*Amicus curiae* Justice Robert Orr is a retired Associate Justice of the North Carolina Supreme Court. Justice Orr was elected as a Republican to the Supreme Court and is a former Republican candidate for governor of North Carolina. After retiring from the Supreme Court, Justice Orr headed the North Carolina Institute for Constitutional Law. Justice Orr has also served on the United States National Park System Advisory Board, as an adjunct faculty member at North Carolina Central University ("NCCU"), and as a member of the Board of Visitors for NCCU's Law School. A former justice and a constitutional scholar, Justice Orr is dedicated to the rule of law and the preservation of our system of representative government.

## ARGUMENT

In our constitutional democracy, *all* persons who reside within the United States— including non-citizens—are granted the equal right to be represented by a member of Congress. This core constitutional principle is as old as our democracy itself. The Founders introduced it in Article I, Section 2 of the Constitution, and the country reaffirmed and perfected it in the Fourteenth Amendment. Although the right to vote in federal elections has expanded over time, it has always been the case that the right to representation in Congress belongs to persons, not to voters or citizens.

The primary constitutional purpose of the census is to ensure that our constitutional commitment to equal representation of all persons is fully realized.  Nevertheless, Secretary Ross has decided to include a citizenship question on the 2020 Census, despite—or, Plaintiffs allege, precisely because of—the fact that doing so will cause undercounts in areas with large non-citizen populations.  This, in turn, will mean that representation in Congress will not be equally apportioned by population, and that areas with large non-citizen populations will not receive their fair share of federal attention and resources.

This Court has ruled that demographic questions beyond the simple counting of persons are permitted in the census and that as a result Plaintiffs did not state a claim for a violation of the Enumeration Clause.  This determination should not be understood to mean, however, that the constitutional purpose of Article I, Section 2 is irrelevant to the disposition of this case.  Rather, Secretary Ross's failure to account for the risk that including a citizenship question on the 2020 Census would undermine the fundamental constitutional principle of equality of representation is an important reason that his decision to add the question violates the Fifth Amendment and the Administrative Procedure Act ("APA").  Because Secretary Ross's decision undermines a fundamental constitutional principle, it should be subject to more exacting scrutiny under the Fifth Amendment's equal protection guarantees.  And the fact that Secretary Ross's decision would undermine a core constitutional commitment without any reasoned explanation for doing so further shows why it violates both the substantive and procedural protections of the APA.  The core constitutional value embodied in Article I, Section 2, the right to equal representation—"the

right to be counted and represented"[1]—should inform the district court's analysis of the remaining claims in this litigation.

## I. EQUAL REPRESENTATION OF PERSONS IS THE CORE CONSTITUTIONAL VALUE OF ARTICLE I, SECTION 2 AS AMENDED BY THE FOURTEENTH AMENDMENT.

### A. The Founders agreed that all persons—not just citizens—must be included in the representation base for members of Congress.

Equal representation of all persons in the United States is, and has always been, a foundational principle of our republican system of government. The Founders firmly believed that all persons living in the United States must be included in the representation base for Congress. They enshrined this belief in Article I, Section 2 of the Constitution, which apportions congressional representatives based on an "actual Enumeration" of the residents of each state.

The Founders disagreed on a great many things. The process of debating and ratifying the Constitution was tumultuous, discordant, and heavily politicized. *See generally* MICHAEL J. KLARMAN, THE FRAMERS' COUP (2016). But the Founders were in accord on one very important thing: that members of Congress should represent *all* of the persons within their districts—not just citizens, and not just voters. *See Evenwel*, 136 S. Ct. at 1132 ("As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote."); *see also* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787, at 170 (2d ed.

---

[1] *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge district court) (quoting 86 Cong. Rec. 4372 (1940)).

1998) (Of all "the electoral safeguards for the representational system," none "was as important to Americans as equality of representation.").

John Adams, a Federalist, and Thomas Jefferson, a Democratic Republican, agreed that equality of representation was a core principle of the new American political order. *See* John Adams, Letter to Joseph Hawley (Aug. 25, 1776), quoted in FOUNDING FAMILIES: DIGITAL EDITIONS OF THE PAPERS OF THE WINTHROPS AND THE ADAMSES (C. James Taylor ed., 2015) ("Equality of Representation in the Legislature, is a first Principle of Liberty, and the Moment, the least departure from such Equality takes Place, that Moment an Inroad is made upon Liberty." ); Thomas Jefferson, Letter to William King (1819), Jefferson Papers, Library of Congress, Vol. 216, p. 38616 ("Equal representation [was] so fundamental a principle in a true republic that no prejudice [could] justify its violation . . . ."). Alexander Hamilton likewise said, "[t]here can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government." *Evenwel*, 136 S. Ct. at 1127.

This foundational principle of representational equality ultimately found its way into Article I, Section 2 of the Constitution, which provides that "Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons . . . three fifths of all other Persons." U.S. CONST. art. I, § 2, cl. 3; *see also Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (stating that "equal representation for equal numbers of people" is "the fundamental goal for the House of Representatives"). Obviously and infamously, the Constitution as originally drafted, in distinguishing between "free Persons"

and "all other Persons" and thereby ratifying slavery, fell woefully short of giving full effect

to the principle.  But even as written, Article I, Section 2 of the Constitution bases political

representation on an individual's status as a "Person"—not as a citizen or a voter.

**B.     The Constitution resolves the tension between the broad right to equal
         representation and the then-narrow right to vote by distinguishing
         between those who can vote and those who are counted for census
         purposes.**

Although the original Constitution provided for a broad right to representation for

free persons, it did not give every free person the right to vote.  Rather, the Constitution

envisioned a system where a limited subset of all persons would vote for the representatives

who would represent all (free) persons.  *See Evenwel*, 136 S. Ct. at 1127 ("[T]he basis

of *representation* in the House was to include all inhabitants—although slaves were counted

as only three-fifths of a person—even though States remained free to deny many of those

inhabitants the right to participate in the selection of their representatives."); *id.* at 1129 ("[I]t

remains beyond doubt that the principle of representational equality figured prominently in

the decision to count people, whether or not they qualify as voters.").

The Founders frankly did not believe in the principle of universal enfranchisement.

They limited the franchise to adult white males who satisfied various state-imposed religious

tests and property requirements—amounting to only about 10%–20% of the total national

population at the time.  Richard Briffault, *Legal History: The Contested Right to Vote*, 100

MICH. L. REV. 1506, 1510 (2002); CONSTITUTIONAL RIGHTS FOUND., *Who Voted in Early

America?*, BILL OF RIGHTS IN ACTION (Fall/Winter 1991).  Even today, many persons who

reside in the United States cannot vote.  For instance, many states permanently

disenfranchise people with prior felony convictions.  Minors cannot vote.  Non-citizen

immigrants who are authorized to be in the United States for work or education cannot vote in federal elections.  Nor can the 11 million undocumented immigrants who live here.  Jens Manuel Krogstad et al., *5 Facts About Illegal Immigration in the U.S.*, PEW RES. CTR. (Apr. 27, 2017), http://www.pewresearch.org/fact-tank/2017/04/27/5-facts-about-illegal-immigration-in-the-u-s/.

Despite having unjustly limited views of the right to vote, the Founders believed that all persons, voters or non-voters, deserved representation in Congress.  As James Madison wrote in *The Federalist*,

> It is a fundamental principle of the proposed Constitution, that as the aggregate number of representatives allotted to the several States is to be determined by a federal rule, founded on the aggregate number of inhabitants, so the right of choosing this allotted number in each State is to be exercised by such part of the inhabitants as the State itself may designate.

THE FEDERALIST No. 54 (James Madison); *see also Evenwel*, 136 S. Ct. at 1127.  Thus, representatives would be apportioned based on the state's "aggregate number of inhabitants," while the state itself would decide which particular "part of the inhabitants" would be permitted to vote for those representatives.

The Founders included this concept in Article I by providing that those who cast their ballots as "Electors" do so on behalf of the broader "People":

> The House of Representatives shall be composed of Members chosen every second Year by **the People** of the several States, and **the Electors** in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

U.S. CONST., art. 1, § 2, cl. 1 (emphasis added).  *Cf. Evenwel*, 136 S. Ct. at 1132 ("By ensuring that each representative is subject to requests and suggestions from the same

number of constituents, total-population apportionment promotes equitable and effective

representation."); *Shaw v. Reno*, 509 U.S. 630, 648 (1993) (congressional representatives are

"obligat[ed]" to "represent . . . their constituency as a whole").  By permitting states to

determine who shall qualify as an "Elector," while also apportioning representation

uniformly based on the number of "People," the Constitution therefore provides for a hybrid

system of representation.

**C.     The Fourteenth Amendment reaffirmed the representation of all persons
         as a foundational principle of our democracy.**

The Fourteenth Amendment, which amended Article I, Section 2, reaffirmed and

perfected the principle of representational equality.  *See id.* at 1128–29.  The first sentence of

the Fourteenth Amendment defines "citizen."  U.S. CONST. amend. XIV, § 1.  The next

sentence contains the Equal Protection Clause, which protects "any person within [the]

jurisdiction [of the states]."  *Id.*  This juxtaposition makes clear that the Equal Protection

Clause protects "all *persons* within [a state's] territorial jurisdiction," and "is not confined to

the protection of citizens."  *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (emphasis added).

The Fourteenth Amendment went on to replace Article I, Section 2's reference to "the whole

Number of free Persons" in the state with "the whole number of persons" in the state.  In

reaffirming and expanding the principle of representation for "persons" in the same breath

that it provided a new definition of "citizens," the Fourteenth Amendment unmistakably

provides that the right to political representation flows to persons, not citizens.

This reaffirmation was intentional.  During the debates over the Fourteenth

Amendment, many in Congress sought a drastic change in our constitutional principles of

equal representation, arguing that only citizens or voters should be counted in determining

representation.  *See Evenwel*, 136 S. Ct. at 1128.  But, in the end, the Amendment retained—

with its framers' and ratifiers' full awareness of the available alternatives—the commitment

to apportionment based on total population.  *See id.* ("The product of these debates was § 2

of the Fourteenth Amendment, which retained total population as the congressional

apportionment base.").  The Framers of the Fourteenth Amendment decisively rejected

apportionment based on a privileged subset of the whole population, choosing to cement the

Constitution's commitment to apportionment based on total population, without regard to

citizenship or enfranchisement.  *See id.* (quoting Senator Jacob Howard introducing the final

version of the Amendment: "[The] basis of representation is numbers . . . this is the theory of

the Constitution.").

## II.     CENSUS RESULTS DRIVE BOTH POLITICAL REPRESENTATION AND FUNDING FOR LARGE GROUPS OF PEOPLE IN BROAD AREAS.

Because the enumeration of all persons is so fundamental to our system of

representational equality, census results inevitably drive political representation and

government policymaking.  *See* Justin Levitt, *Citizenship and the Census*, 19 COLUM. L. REV.

(forthcoming 2018) at 20 ("The enumeration drives the apportionment of congressional

districts; redistricting for federal, state, and local districts of all kinds; and the distribution of

billions of dollars in government grants tied by formula to population. Communities that are

undercounted lose political voice and substantial government aid.").  Each year, census

results are used to allocate more than $600 billion in funding to over a hundred federal

programs, including programs for healthcare, nutrition assistance, highway planning and

construction, student financial aid, housing assistance, and childcare.  U.S. CENSUS, USES OF

CENSUS BUREAU DATA IN FEDERAL FUNDS DISTRIBUTION 3-8 (2017), *available at*

https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

When fear and distrust depress the census response in some areas more than others, those areas in which the response has been reduced lose political clout as well as funding for local programs, hurting long-time residents, citizens and newly arrived immigrants. Differential undercounts do not merely impact undocumented individuals, or lawful permanent residents, or minority citizens; everyone in an area with depressed census participation also loses clout and cash.  Adding a citizenship question to the 2020 Census will cause an undercount in any community that thrives because of non-citizens—whether that area is an urban minority community or a rural area dependent on immigrant farm laborers by depressing response rates.

Of course, the vast majority of non-citizens reside in cities and large urban areas, which are magnets for immigrants drawn to build new lives in this country.  The concentration of foreign-born residents in cities and urban areas is almost always greater—sometimes vastly greater—than the concentration in the rest of the states in which they are situated.  Cities need representation commensurate with their population in order to ensure they receive their fair share of federal resources so that they can provide the services their many residents require.

But many rural communities are also home to a disproportionate number of non-citizens, millions of whom work as agricultural laborers.  In fact, the vast majority—approximately 73%—of America's agricultural laborers are foreign-born. *National Demographic Characteristics*, U.S. DEP'T OF LABOR, https://www.doleta.gov/naws/pages/

research/docs/Table1.NAWS_National_Demographics.xlsx (last visited Oct. 15, 2018). Adding a citizenship question to the 2020 Census would undoubtedly harm the rural communities in which these agricultural laborers live.  Levitt, *supra*, at 21.

The state of Texas, which contains both of these kinds of areas, provides an illuminating example.  Its major cities such as Houston are among the fastest-growing areas in America, and contain huge immigrant non-citizen populations.  Its rural areas are heavily dependent on immigrant or migrant farmworkers, predominantly from Mexico and other Central American countries.[2]  Indeed, "Texas's population boom has been fueled by growth in historically vulnerable minority communities.  Approximately 55% of Texans were racial and ethnic minorities in 2010, and projections from past growth patterns indicate that 61% of Texans are likely to be racial and ethnic minorities in 2020."  *Id.* at 22.  If the 2020 Census count is accurate, most projections suggest that Texas will gain billions of dollars in federal aid[3] and additional congressional seats[4] due to its increase in population.  But if Texas's "minorities are substantially less likely to complete the decennial enumeration than are residents of other states, those funds and those seats vanish. And they vanish for all Texans, to be picked up by states where the population is less afraid."  *Id.*

---

[2] *See, e.g.*, Ed Stoddard, *Agriculture Dependent on Migrant Workers*, REUTERS (July 22, 2007, 8:09 p.m.), https://www.reuters.com/article/us-usa-immigration-farms/agriculture-dependent-on-migrant-workers-idUSN1526113420070723?feedType=RSS.

[3] *See, e.g.*, ANDREW REAMER, COUNTING FOR DOLLARS 2020: THE ROLE OF THE DECENNIAL CENSUS IN THE GEOGRAPHIC DISTRIBUTION OF FEDERAL FUNDS no. 1 at 5 (2017), *available at* https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/ Counting%20for%20Dollars%202020%2008-22-17_0.pdf.

[4] *See, e.g.*, Press Release, Election Data Services, Some Change in Apportionment Allocations with New 2017 Census Estimates; But Greater Change Likely by 2020 (Dec. 26, 2017), *available at* https://www.electiondataservices.com/wp-content/uploads/2017/12/ NR_Appor17c3wTablesMapsC2.pdf.

New Hampshire is another illustrative example.  Approximately 37% of New Hampshire residents live in rural communities.[5]  Additionally, for smaller states, such as New Hampshire, domestic migration patterns can have an outsized effect.  Among the states east of the Mississippi River, New Hampshire has the second largest percentage of residents that were not born in the state in the United States.[6]  An accurate census count is essential to track population changes and ensure that New Hampshire is receiving the federal funding it needs to serve its residents.  New Hampshire counts on over $2 billion dollars per year that is based on census data, amounting to $1,590 per capita.[7]  Even in smaller states, an undercount would have an outsized impact.

Adding a citizenship question to the 2020 Census will result in a differential undercount in areas with large non-citizen populations—whether those areas are cosmopolitan metropolises with vibrant immigrant communities, or rural areas dependent on foreign-born agricultural labor.  This will cause these areas to lose ground in the competition for federal resources, depriving their residents of vital services and programs, and hurting everyone who lives there in the process.

---

[5] *See, e.g., Rural Health for New Hampshire*, RURAL HEALTH INFO. HUB (June 5, 2017), https://www.ruralhealthinfo.org/states/new-hampshire.

[6] *See, e.g.,* Michael Kitch, *State's Population Growth All Depends on Migration*, N.H. BUS. REV. (Sept. 13, 2018), https://www.nhbr.com/September-14-2018/States-population-growth-all-depends-on-migration/.

[7] *See, e.g.*, REAMER, *supra* note 3 (data for New Hampshire), *available at* https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/New%20Hampshire%20CFD%2008-18-17.pdf.

**III.  SECRETARY ROSS'S FAILURE TO CONSIDER THE RISK THAT INCLUDING A CITIZENSHIP QUESTION ON THE 2020 CENSUS WOULD UNDERMINE EQUALITY OF REPRESENTATION CONFIRMS THAT HIS DECISION TO ADD THE QUESTION VIOLATES THE FIFTH AMENDMENT AND THE ADMINISTRATIVE PROCEDURE ACT.**

Otherwise constitutionally permissible action merits stricter scrutiny when its intended effect is to undermine a core constitutional commitment.  Secretary Ross's decision to add a citizenship question to the 2020 Census deserves such scrutiny because it is intended to undermine our core commitment to representational equality: the right of every person living in the United States to be represented in our republican form of government; the right to be counted.  Further, Secretary Ross's failure to consider the constitutional values that conflict with his decision shows that the decision also violates the requirements for upholding the action under the APA.

**A.     The violation of a fundamental constitutional principle warrants stricter scrutiny under the Equal Protection Clause.**

In the equal protection context, it is well established that, in addition to invidious discrimination on the basis of a suspect classification (here, race and alienage), violations of core foundational constitutional protections or principles subject government action to a higher degree of judicial scrutiny.  *See Shapiro v. Thompson*, 394 U.S. 618, 629–30 (1969) (right to travel); *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668–69 (1966) (right to vote); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (right to procreate).  In this case, although strict scrutiny is already the applicable standard given Plaintiffs' allegations of discrimination on the basis of race and national origin, the Court's analysis of Plaintiffs' equal protection claims should be informed and guided by the fact that the Department's action intentionally seeks to undermine a fundamental constitutional value, "the right to be counted and

represented," *see FAIR*, 486 F. Supp. at 576 (agreeing with the 1940 statement of

Representative Celler of New York  that the Constitution's clear reference to "persons"

requires that "aliens who are in this country in violation of law" be included in the Census);

*cf. Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996) (describing "the constitutional

goal of equal representation" (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804

(1992))).

1.      **Being counted, and being included in the apportionment process, is integral to the fundamental right to political representation.**

As discussed above, the history of Article I and the Fourteenth Amendment

demonstrates that the concern animating both the enactment and the subsequent modification

of the Enumeration Clause is that all persons living in the United States be counted for the

purposes of apportionment.  This core constitutional commitment is embodied in Article I,

Section 2 and the Fourteenth Amendment, which provide that representatives and direct taxes

be apportioned based on "the whole number of persons."  U.S. CONST. amend. XIV, § 2

(modifying U.S. CONST. art. I, § 2, cl. 3).  Because this value is embodied directly in the text

of the Constitution,[8] both as ratified at the Founding and as improved by the Fourteenth

Amendment, it should be treated as a foundational right worthy of protection.

The right to be counted, and thereby to be represented in our constitutional system, is

no less important than the other "fundamental rights" that the court has sought to protect.

For instance, in *Harper v. Virginia Board of Elections*, the Supreme Court concluded that a

---

[8] *Cf. Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("[T]he Constitution does not provide judicial remedies for every social and economic ill. We are *unable to perceive in that document* any constitutional guarantee of access to dwellings of a particular quality." (emphasis added)).

denial of the right to vote on the basis of indigency (an unprotected class in other contexts[9])

was an equal protection violation because it implicated a "fundamental right" explicitly

protected by the Constitution. 383 U.S. at 667. As discussed above, the right to be counted,

and thereby represented, is as essential for non-citizens as the right to vote is for citizens. It

works to further their interests and guarantee that their voices are heard. In *Shapiro*, the

Supreme Court concluded that strict scrutiny was warranted not based on the nature of the

classification being made, but rather based on the foundational nature of the right in question:

the right to interstate travel. *See* 394 U.S. at 629-30. In *Skinner*, the Court concluded that

strict scrutiny was warranted because the legislation at issue touched on "[m]arriage and

procreation," which are "one of the basic civil rights of man" and "fundamental to the very

existence and survival of the race." 316 U.S. at 541.

 The right to be counted is the essential right for representation in American

government, and it has clear roots in the text of the Constitution. It is, therefore, a

fundamental constitutional right.

 **2.** **The Secretary's decision merits further scrutiny because it was
intended to undermine a core constitutional value.**

 As Plaintiffs allege and the evidence to date confirms, the Secretary's true goal in

adding a citizenship question to the 2020 Census was not merely to accomplish the ancillary

or secondary objective of additional data collection, nor was it to improve enforcement of the

Voting Rights Act. Rather to undermine the census' essential purpose: to accurately account

for the total number of people present in each tract, district, and state to ensure that

---

[9] *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988) ("We have previously rejected the
suggestion that statutes having different effects on the wealthy and the poor should on that account
alone be subjected to strict equal protection scrutiny.").

congressional representation and federal funding are fairly and equitably apportioned.  *See Utah v. Evans*, 536 U.S. 452, 478 (2002) (describing the "strong constitutional interest in accuracy" of the census).

The Supreme Court has time and again made clear that when such a basic constitutional principle is implicated, courts must more searchingly scrutinize the risk that the right is being denied on the basis of an arbitrary or impermissible classification.  *See Belle Terre v. Boraas*, 416 U.S. 1, 7–8 (1974) (collecting cases); *see also Lange-Kessler v. Dep't of Educ.*, 109 F.3d 137, 141 (2d Cir. 1997).  Here, the Secretary's decision to include a citizenship question on the decennial census implicates the core constitutional value of equality of representation for non-citizens as well as citizens who live in communities with a disproportionately high population of non-citizens.  *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) ("[O]ur Constitution's plain objective (is to make) equal representation for equal numbers of people the fundamental goal." (quoting *Wesberry*, 376 U.S. at 18)).  To be sure, the Court's decision here need not rest upon the denial of this fundamental right, because the groups whose representational rights Secretary Ross's decision works to diminish—non-citizen aliens and members of the minority communities in which they disproportionately reside—are suspect classes and this provides an independent basis to apply strict scrutiny to the Secretary's actions.  Nonetheless, the Court should carefully scrutinize Secretary Ross's decision not only because it discriminates on the basis of a protected classification, but also because it is in conflict with a core constitutional objective: an accurate count of all persons living in the United States.

16

**B.** **Secretary Ross's decision to add the citizenship question—and thereby undermine a core constitutional commitment—violates both the substantive and procedural protections of the APA.**

The Court's analysis of Plaintiffs' APA claims should also be informed by the Secretary's failure to adequately consider the way that his decision undermines the core constitutional commitment to representational equality. By willfully turning a blind eye to the constitutional issues with his decision to add the citizenship question to the 2020 Census, Secretary Ross violated both the procedural and substantive requirements of the APA.

As Plaintiffs articulate, the Secretary's politically motivated decision did not consider the "relevant data" or "articulate a satisfactory explanation." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983). His explanation for the decision—that it would aid in enforcement of the Voting Rights Act ("VRA")—was irrational, because to the contrary it would undermine representation of those whom the VRA is intended to protect. *See id.* (an agency may not make a "decision that runs counter to the evidence"). It was also pre-textual, as demonstrated by the Secretary's now-admitted conversations with anti-immigrant advisors to the President, Steve Bannon and Kris Kobach. A decision that lacks a coherent rationale violates the APA . *See, e.g.*, *id.* at 43–44. So too does a decision that fails to account for why it undermines a core constitutional objective. *See id.* at 43 (explaining that it violates the APA to "entirely fail[] to consider an important aspect of the problem").

Based on the pre-trial record, it is evident that the Secretary's stated rationale of enforcing the VRA is a mere pretext to obscure his actual purpose: artificially depressing the response rate of both documented and undocumented immigrants and diminishing the

representation and provision of government services to the communities in which they live. *Cf. Utah v. Evans*, 536 U.S. at 500-01 (Thomas, J., concurring in part and dissenting in part) ("The Framers knew that the calculation of populations could be and often were skewed for political or financial purposes.  Debate about apportionment and the census consequently focused for the most part on creating a standard that would limit political chicanery.").  To achieve this political objective, Secretary Ross sought to undermine the core constitutional principle embodied in the Enumeration Clause.

In analyzing Plaintiffs' APA claims, the Court should weigh the Secretary's intentions to directly undermine this core constitutional value.  Here, the intended attack on a core constitutional principle that guided the Secretary's decision to add the citizenship question gives additional weight to the already persuasive evidence supporting a finding that the decision violated the APA because the decisionmaking process was marred by bad faith.  *Cf. Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (explaining that, while "inquiry into the mental processes of administrative decisionmakers is usually to be avoided," "[t]he court may require the administrative officials who participated in the decision to give testimony explaining their action," where there is either "a strong showing of bad faith" or there have been no "formal findings" such that "the only way there can be effective judicial review is by examining the decisionmakers themselves"), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).   Had the Secretary engaged in that undertaking in good faith—looking at the core constitutional objective furthered by the census and the past practices and legislative enactments that have sought to effective it— there would have been no possible conclusion that he could have drawn except that the

addition of this question to the census would likely undermine the primary purpose of the census, a core constitutional objective, the accurate accounting of the entire population of people living within the United States.

## CONCLUSION

The Court should enjoin Secretary Ross's decision to add the unnecessary citizenship question to the 2020 Census because it violates both the Fifth Amendment's guarantees of equal protection as well as the procedural and substantive requirements of the APA.  As described here, Secretary Ross's decision is also inconsistent with the values enshrined in the Constitution by the Founders and reaffirmed by the Congress that enacted the Fourteenth Amendment.  The addition of this question will depress representation of communities—both urban and rural—with significant immigrant populations that deserve to be adequately represented.  Further, it undermines the core constitutional value that the Enumeration Clause of Article I, Section 2 seeks to protect.  The Court's analysis should be informed by the unavoidable reality that Secretary Ross's decision will undermine the very purpose for which the Census exists, namely the "actual Enumeration" of "the whole number of persons in each state."  U.S. CONST. art. 1, § 2, cl. 3; *id.* amend. XIV, § 2.  Notwithstanding this Court's determination that Plaintiffs failed to state a claim under the Enumeration Clause, the principles embodied in Article I, Section 2 should inform the Court's decision in favor of the Plaintiffs.


Dated: October 29, 2018

*/s/ Gregory L. Diskant*
Gregory L. Diskant
Aron Fischer

Benjamin F. Jackson
Jacob Newman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
gldiskant@pbwt.com
afischer@pbwt.com
bjackson@pbwt.com
jnewman@pbwt.com
Attorneys for *Amici Curiae* Common Cause,
Trevor Potter, Rep. Jody L. McNally, and
Justice Robert Orr (Ret.)

# CERTIFICATE OF SERVICE

I certify that on October 29, 2018, I caused the foregoing document to be filed with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Benjamin F. Jackson*

Benjamin F. Jackson
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2255
bjackson@pbwt.com

Attorney for *Amici Curiae* Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.)

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et al.*,

               *Plaintiffs*,

        v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

               *Defendants*.

18-CV-2921 (JMF)

**[PROPOSED] ORDER ACCEPTING
*AMICI CURIAE* BRIEF**

      The Court, having considered the unopposed Motion of Common Cause, Trevor

Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.) for Leave to File *Amici Curiae*

Brief in Support of Plaintiffs, hereby GRANTS the motion.  The *Amici Curiae* brief of

Common Cause, Trevor Potter, Rep. Jody L. McNally, and Justice Robert Orr (Ret.) is

accepted for filing.

      **SO ORDERED.**

Dated: _____

        New York, New York

                                        _____

                                        HON JESSE M. FURMAN
                                        United States District Judge