**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, | 18-2921 (JMF) |
|        Plaintiffs, | |
|    v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
|       Defendants. | |

-------------------------------------------------------

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | 18-5025 (JMF) (Consolidated Case) |
|        Plaintiffs, | |
|    v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
|       Defendants. | |

**NOTICE OF MOTION FOR LEAVE TO APPEAR AS AMICI CURIAE BY
NORMAN Y. MINETA, THE SAKAMOTO SISTERS, THE COUNCIL ON
AMERICAN-ISLAMIC RELATIONS, NEW YORK, INC., AND
THE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY**

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law in Support of the Motion for Leave to Appear as Amici Curiae by Norman Y. Mineta, the Sakamoto sisters, the Council on American-Islamic Relations, New York, Inc., and the Fred T. Korematsu Center for Law and Equality, dated October 29, 2018, non-party amici shall move this Court, before the Honorable Jesse G. Furman, United States District Judge, at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York, at a date and time to be determined

by the Court, for leave to file the attached Proposed Brief of Amici Curiae Norman Y. Mineta,

the Sakamoto sisters, the Council on American-Islamic Relations, New York, Inc., and the Fred

T. Korematsu Center for Law and Equality in Support of Plaintiffs at Trial.  Both Plaintiffs and

Defendants consent to the filing of the proposed amici brief.


DATED:  October 29, 2018                    Respectfully submitted,

                                             _/s/ Robert H. Pees_____


Robert S. Chang (*pro hac vice*)            Robert H. Pees (SDNY No. RP0393)
Lorraine Bannai (*pro hac vice*)            Alice Hsu (SDNY No. AH9093)
Ronald A. Peterson Law Clinic               Akin Gump Strauss Hauer & Feld LLP
Seattle University School of Law            One Bryant Park
901 12th Ave.                               New York, NY 10036
Seattle, WA 98122                           Telephone: 212-872-1072
Telephone: 206-398-4025                     Facsimile: 212-872-1002
Facsimile: 206-398-4261                     rpees@akingump.com
changro@seattleu.edu                        ahsu@akingump.com
bannail@seattleu.edu

                                            Geoffrey J. Derrick (SDNY No. GD7137)
*Attorneys for Proposed Amici Curiae*       Akin Gump Strauss Hauer & Feld LLP
*Norman Y. Mineta, the Sakamoto sisters, and*  1333 New Hampshire Avenue, N.W.
*the Fred T. Korematsu Center for Law and*   Washington, D.C. 20036-1564
*Equality*                                   Telephone: 202-887-4597
                                            Facsimile: 202-887-4288
Albert Fox Cahn (SDNY No. AC3482)           gderrick@akingump.com
Council on American-Islamic Relations,
    New York, Inc.
46-01 Twentieth Avenue                      *Attorneys for Proposed Amici Curiae*
Queens, New York 11105                      *Norman Y. Mineta, the Sakamoto sisters, the*
Telephone: 646-665-7599                     *Council on American-Islamic Relations, New*
acahn@cair.com                              *York, Inc., and the Fred T. Korematsu Center*
                                            *for Law and Equality*

*Attorney for Proposed Amicus Curiae*
*Council on American-Islamic Relations,*
*New York, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE, et al.,<br><br>      Defendants.<br><br>-------------------------------------------------------<br><br>NEW YORK IMMIGRATION<br>COALITION, et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE, et al.,<br><br>      Defendants. | 18-2921 (JMF)<br><br><br><br><br><br><br><br><br><br>18-5025 (JMF) (Consolidated Case) |

**PROPOSED BRIEF OF AMICI CURIAE NORMAN Y. MINETA, THE SAKAMOTO SISTERS, THE COUNCIL ON AMERICAN-ISLAMIC RELATIONS, NEW YORK, INC., AND THE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY IN SUPPORT OF PLAINTIFFS AT TRIAL**

Robert S. Chang (*pro hac vice*)
Lorraine Bannai (*pro hac vice*)
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Ave.
Seattle, WA 98122
Telephone: 206-398-4025
Facsimile: 206-398-4261
changro@seattleu.edu
bannail@seattleu.edu

*Attorneys for Proposed Amici Curiae
Norman Y. Mineta, the Sakamoto sisters, and
the Fred T. Korematsu Center for Law and
Equality*

Albert Fox Cahn (SDNY No. AC3482)
Council on American-Islamic Relations,
   New York, Inc.
46-01 Twentieth Avenue
Queens, New York 11105
Telephone: 646-665-7599
acahn@cair.com

*Attorney for Proposed Amicus Curiae
Council on American-Islamic Relations,
New York, Inc.*

Robert H. Pees (SDNY No. RP0393)
Alice Hsu (SDNY No. AH9093)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: 212-872-1072
Facsimile: 212-872-1002
rpees@akingump.com
ahsu@akingump.com

Geoffrey J. Derrick (SDNY No. GD7137)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
Telephone: 202-887-4597
Facsimile: 202-887-4288
gderrick@akingump.com

*Attorneys for Proposed Amici Curiae
Norman Y. Mineta, the Sakamoto sisters, the
Council on American-Islamic Relations, New
York, Inc., and the Fred T. Korematsu Center
for Law and Equality*

## <u>TABLE OF CONTENTS</u>

Page

INTERESTS OF AMICI CURIAE ......................................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ......................................................3

ARGUMENT ..................................................................................................4

      I.     PUBLIC TRUST IN THE CENSUS DERIVES FROM THE FEDERAL
           GOVERNMENT'S ASSURANCE THAT IT WILL NOT USE THE
           INFORMATION PERSONS PROVIDE IN A WAY THAT HARMS
           THEM OR THEIR COMMUNITIES. .....................................................4

      II.    THE UNITED STATES USED THE DECENNIAL CENSUS AS A TOOL
           IN FURTHERANCE OF WORLD WAR II JAPANESE AMERICAN
           INCARCERATION. ...........................................................7

      III.   THE JAPANESE AMERICAN INCARCERATION CASES ARE
           POWERFUL REMINDERS OF WHY THIS COURT MUST BE
           ESPECIALLY VIGILANT IN POLICING WHETHER GOVERNMENT
           OFFICIALS' STATED JUSTIFICATIONS FOR THE CITIZENSHIP
           QUESTION ARE PRETEXT FOR INTENTIONAL DISCRIMINATION. .........10

CONCLUSION ................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

Page

## CASES

*City of Boerne v. Flores*, 521 U.S. 507 (1997)............................................................ 10

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)......................................... 10

*Hirabayashi v. United States*, 320 U.S. 81 (1943).................................................11, 12

*Hirabayashi v. United States*, 828 F.2d 591 (9th Cir. 1987).............................11, 12, 13

*Korematsu v. United States*, 323 U.S. 214 (1944) .................................................11, 12

*Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984) ....................11, 12, 13

*Marbury v. Madison*, 1 Cranch 137 (1803)................................................................. 10

*Ozawa v. United States*, 260 U.S. 178 (1922)................................................................ 1

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) .................................... 10

*Yasui v. United States*, 320 U.S. 115 (1943) ...............................................................11

*Yasui v. United States*, 772 F.2d 1496 (9th Cir. 1985)................................................11

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018) (en banc)....................... 10

## STATUTES

13 U.S.C. §§ 8-9 (1940)................................................................................................ 7

Second War Powers Act of 1942, Pub. L. No. 77–507, 56 Stat 176 (Mar. 27, 1942).................... 6

## OTHER AUTHORITIES

*1910 Census Proclamation*, U.S. Census Bureau,
   https://tinyurl.com/y88tzaph (last visited July 10, 2018)........................................ 5

1940 Supplement to the Code of Federal Regulations (1941),
   *available at* https://tinyurl.com/ya9jywnl............................................................ 10

Brief for Plaintiffs-Respondents, *In re Dept. of Commerce, et al.*,
   No. 18A375 (U.S. Oct. 11, 2018), *available at* https://tinyurl.com/y79x5axs ........ 14

Brief of the United States, *Korematsu v. United States*, No. 22 (U.S. Oct. 5, 1944).................. 13

FY19 Budget Hearing – Dept. of Commerce Before the H. Comm. on
  Appropriations Subcomm. on Commerce, Justice, Science, and
  Related Agencies, 115th Cong. (Mar. 20, 2018)
  (statement of Wilbur L. Ross, Jr., Sec'y, Dept. of Commerce),
  *available at* https://tinyurl.com/ycaxh8sg................................................................... 14

J.L. DeWitt, *Final Report: Japanese Evacuation
  from the West Coast, 1942* (June 5, 1943),
  *available at* https://tinyurl.com/ybxwqwc2 .................................................................. 8

Jason G. Gauthier, *Measuring America:  The Decennial Census
  From 1790 to 2000* (2002), *available at*
  https://www.census.gov/prod/2002pubs/pol02-ma.pdf ............................................. 4

Jerry N. Hess, *Oral History Interview with Tom C. Clark*,
  Harry S. Truman Library (Oct. 17, 1972, and Feb. 8, 1973), *available at*
  http://www.trumanlibrary.org/oralhist/clarktc.htm ..................................................... 9

Lt. Comm. Kenneth D. Ringle to Chief of Naval Operations,
  *Report on Japanese Question* (Jan. 26, 1942), in
  File ASW 014.311, RG 107, U.S. National Archives, Washington, D.C................................. 13

Margo Anderson, *Public Management of Big Data:
  Historical Lessons from the 1940s*, Federal History (2015),
  *available at* https://tinyurl.com/ycnml58o.................................................................. 8

*Proclamation 2385:  Sixteenth Decennial Census* (Feb. 9, 1940) ................................................ 10

Report of the Commission of Wartime Relocation and
  Internment of Civilians (CWRIC), *Personal Justice Denied* (1982),
  *available at* https://tinyurl.com/ycnhbckk ................................................................. 8

*The Census and Politics*, N.Y. Times (Aug. 18, 1909),
  https://tinyurl.com/ydhcpl7k.................................................................................. 5

U.S. Census Bureau Policy Office, A *Monograph of Confidentiality and
  Privacy in the U.S. Census* (July 2001),
  *available at* https://tinyurl.com/yda5rur3 ................................................................. 7

U.S. Dept. of Commerce, *Report on Statistical Disclosure and
  Disclosure-Avoidance Techniques* (1978),
  *available at* https://tinyurl.com/y85zu8sz................................................................. 5

U.S. Dept. of Justice Office of Pub. Affairs, *Confession of Error:*
    *The Solicitor General's Mistakes During the Japanese American*
    *Internment Cases* (May 20, 2011), *available at* https://tinyurl.com/y7bacp2o ....................... 13

Vincent P. Barabba & D.L. Kaplan, U.S. Census Bureau,
    *Statistical Techniques to Prevent Disclosure--*
    *The Right of Privacy vs. the Need to Know* (1975).................................................................... 5

William Seltzer & Margo Anderson, *After Pearl Harbor:*
    *The Proper Role of Population Data Systems in Time of War* (Mar. 28, 2000)
    (unpublished draft), *available at* http://perma.cc/NJH3-RADN........................................ 7, 8, 9

William Seltzer & Margo Anderson, *Census Confidentiality Under*
    *the Second War Powers Act (1942-1947)* (Mar. 12, 2007)
    (unpublished draft), *available at* https://tinyurl.com/ydxat2sy.................................................. 9

William Seltzer & Margo Anderson, *Challenges to the Confidentiality*
    *of U.S. Federal Statistics, 1910-1965*, 23 Journal of Official Statistics (2007),
    *available at* https://tinyurl.com/ycdx7jkc ......................................................................... 4, 5, 6

iv

## INTERESTS OF AMICI CURIAE

Norman Y. Mineta served as Secretary of Transportation under President George W. Bush, as Secretary of Commerce under President Clinton, as a member of the U.S. House of Representatives from 1975 to 1995, and as mayor of San Jose, California, from 1971 to 1975.  He was 10 years old when the federal government removed him and his family from their home and incarcerated them with thousands of other Japanese Americans first at the Santa Anita racetrack in Southern California and then at the Heart Mountain camp in Wyoming.  Norm's parents had to respond as non-citizens to the 1920, 1930, and 1940 Decennial Censuses because the United States Supreme Court made clear in *Ozawa v. United States*, 260 U.S. 178 (1922), that his parents — who emigrated from Japan — were not eligible for naturalized citizenship due to their Japanese ethnicity.  Norm's parents were, however, able to respond to the 1940 Decennial Census that Norm — born in San Jose, California in 1931 — was a U.S. citizen.  Citizenship, though, did not protect Norm and tens of thousands of other Japanese Americans from incarceration during World War II.  Even though he was a young boy at the time, Norm clearly recalls being surprised that the federal government was able to so quickly round up many Japanese Americans from his community on the day of the bombing of Pearl Harbor and in the weeks that followed.  Years later, he learned that the Census Bureau had provided critical information that facilitated the surveillance of Japanese American communities, as well as their eventual exclusion and incarceration.

Sharon Sakamoto, Eileen Yoshiko Sakamoto Okada, and Joy Sakamoto Barker are three sisters who spent World War II incarcerated at the Minidoka concentration camp in Idaho.  Their parents, Roy and Josephine Sakamoto, were American citizens born and raised in Washington State.  Eileen was five years old and Joy was six months old when the federal government removed them, their parents, and two brothers from their Seattle home and sent them all to live in a

converted horse stall at the Puyallup Fairgrounds south of Seattle. The federal government then moved them to Minidoka, where Sharon was born. Like Norm and his family, the Sakamoto family was unaware that the Census Bureau cooperated with military authorities in identifying where Japanese Americans lived. Sharon, Eileen, and Joy join as amici because they are deeply concerned that the proposed citizenship question on the 2020 Decennial Census will cause immigrants and other persons of color to avoid responding for fear that the information will be used to harm them, just as the federal government harmed Japanese Americans during World War II.

The Council on American-Islamic Relations, New York, Inc., (CAIR-NY) is the New York State affiliate of the nation's largest Muslim American civil rights and advocacy organization. Following the tragic attacks of 9/11, CAIR-NY aided Muslim New Yorkers impacted by the perceived misuse of census data. Shortly after 9/11, at the request of what is now U.S. Customs and Border Protection, the Census Bureau provided a list of U.S. cities that had more than 1,000 Arab American residents. Over a year later, it provided a zip-code-level breakdown of Arab American populations by country of origin. Government officials subsequently insisted that the Census Bureau disclosed this data to help notify travelers about currency reporting requirements and to improve airport signage. Muslim Americans, however, viewed these post-9/11 disclosures as pretextual and infected with animus, which reduced their trust and participation in the 2010 Decennial Census. CAIR-NY joins as amicus out of concern that the inclusion of a citizenship question in the 2020 Decennial Census will further erode Muslim Americans' trust and participation.

The Fred T. Korematsu Center for Law and Equality is a non-profit organization based at the Seattle University School of Law.  It works to advance justice through research, advocacy, and education.  Inspired by the legacy of Fred Korematsu — who defied military orders during World War II that resulted in the unlawful incarceration of 120,000 Japanese Americans — the Korematsu Center works to advance social justice for all.  It has a special interest in addressing government action that harms classes of persons based on race or nationality.[1]

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The decennial census depends on self-reporting and can only achieve its goal of enumeration when the public trusts that the Census Bureau will not misuse information.  In recognition of this need for public trust, every U.S. President since 1910 has issued a decennial census proclamation that seeks to reassure individuals and their communities that the Census Bureau will not harm them through the use or misuse of collected information.

Despite these assurances, there have been several notable breaches of trust during World War I and World War II, which provide important context for why individuals and communities are suspicious of the government's inclusion of a citizenship question on the 2020 Decennial Census.  The most notable breach was the Census Bureau's 1942 disclosure of data on the whereabouts of Japanese Americans in order to effectuate their mass removal and incarceration. The historical record is clear — and, indeed, the Census Bureau now admits — that it provided the data that powered the machinery of mass removal and incarceration of Japanese Americans.

The federal judiciary plays a vital role in ensuring that improper reasons such as racial animus do not infect government decision-making, and that the public has trust and confidence in

---

[1] The Korematsu Center does not represent the official views of Seattle University.

the integrity of the decennial census.  Federal courts help maintain that public trust and confidence

when they police animus and enforce the boundaries of the Due Process Clause of the Fifth

Amendment.  Amici offer these historical examples of how the Census Bureau breached the public

trust to inform the Court's decision at trial about whether Commerce Secretary Wilbur J. Ross Jr.'s

stated justification for the citizenship question — to better enforce the Voting Rights Act ("VRA")

— was pretext for a desire to harm Latinos and immigrants of color.  The *coram nobis* cases in

particular offer the Court a historical guide for how to scrutinize the motivations of executive

branch decision makers.  The Court should consider this history when evaluating Plaintiffs' claims

at trial.

## ARGUMENT

### I.    PUBLIC TRUST IN THE CENSUS DERIVES FROM THE FEDERAL GOVERNMENT'S ASSURANCE THAT IT WILL NOT USE THE INFORMATION PERSONS PROVIDE IN A WAY THAT HARMS THEM OR THEIR COMMUNITIES.

The promise of data confidentiality is the primary mechanism by which the modern Census

Bureau seeks to achieve a complete enumeration.  It was not always so.  As a means of achieving

an accurate enumeration in the 1790 Decennial Census, the federal government posted draft census

data in public places to shame noncompliant persons and levy community pressure on them.  *See*

Jason G. Gauthier, *Measuring America:  The Decennial Census From 1790 to 2000*, at 102 (2002),

*available at* https://www.census.gov/prod/2002pubs/pol02-ma.pdf.

By the twentieth century, however, the Census Bureau (created in 1902) had adopted a

conciliatory approach to incentivize public compliance with the decennial census through data

confidentiality.  *See* William Seltzer & Margo Anderson, *Challenges to the Confidentiality of U.S.

Federal Statistics, 1910-1965*, 23 Journal of Official Statistics 1, 5 (2007), *available at*

https://tinyurl.com/ycdx7jkc.  In addition, President William Howard Taft sought to remove

politics from the execution of the census by ordering the Secretary of Commerce and Labor to promulgate regulations to ensure that "the census shall not be made to serve the political purposes of any one." *The Census and Politics*, N.Y. Times, at 8 (Aug. 18, 1909), https://tinyurl.com/ydhcpl7k (quoting President Taft's letter). President Taft also issued a proclamation to assure the public that participation in the census would not lead to harm:

> The sole purpose of the census is to secure general statistical information . . . , and replies are required from individuals only to enable the compilation of such general statistics. The census has nothing to do with . . . army . . . service . . . , with the regulation of immigration, or with the enforcement of any national, State, or local law, or ordinance, nor can any person be harmed in any way by furnishing the information required. There need not be any fear that any disclosure will be made regarding any individual person or his affairs.

*1910 Census Proclamation*, U.S. Census Bureau, https://tinyurl.com/y88tzaph (last visited July 10, 2018). The sitting U.S. President has delivered an almost identical proclamation for every decennial census since President Taft. Seltzer & Anderson, *Challenges* at 5.

The purpose of these declarations has been to assure the American public that they could place their trust in the decennial census. Indeed, trust in the census was an avatar for trust in American civic institutions writ large. *See* Seltzer & Anderson, *Challenges* at 29. The presidential census proclamations align with the Census Bureau's position that an accurate enumeration of the American populations demands public trust: there will not be an accurate count if the persons to be counted distrust the counter. *See*, *e.g.*, Vincent P. Barabba & D.L. Kaplan, U.S. Census Bureau, *Statistical Techniques to Prevent Disclosure--The Right of Privacy vs. the Need to Know* (1975) ("Should the public's confidence in the Bureau's pledge of confidentiality for their census returns erode, goodwill and cooperation will erode."), *quoted in* U.S. Dept. of Commerce, *Report on Statistical Disclosure and Disclosure-Avoidance Techniques*, at 32 (1978), *available at* https://tinyurl.com/y85zu8sz.

Yet the Census Bureau almost immediately found it difficult to maintain the confidentiality it promised.  In 1917, it disclosed "to courts, draft boards, and the Justice Department" the names of thousands of draft-age men who failed to register for the Selective Service during World War I.  Seltzer & Anderson, *Challenges* at 7.  In doing so, the Census Bureau's Director concluded that "statistical confidentiality should be conditioned and compromised by more apparently pressing government needs."  *Id*.  This disclosure opened the floodgates:  "[O]nce census officials supported the initial release of information to draft boards in 1917, officials in other agencies, for example in the Justice Department, asked for further releases."  *Id*. at 9.  "[I]n early 1920, while the enumerators were in the field, the Justice Department, on behalf of the Department of Labor, asked if the local enumerators in Toledo, Ohio, could provide information about individuals' citizenship from the 1920 Census of Population . . . for use in deportation cases."  *Id*. at 8.

After World War I, Census Bureau Directors William Mott Steuart (1921-1933) and William Lane Austin (1933-1941) viewed regaining public trust through data confidentiality as a paramount duty.  *See* Seltzer & Anderson, *Challenges* at 9-10, 16.  Yet by 1941, as the United States faced the prospect of World War II, President Franklin Roosevelt "sought a mechanism to permit the administrative and intelligence agencies access to individual level information collected by the U.S. Census Bureau."  *Id*. at 16.  President Roosevelt "involuntarily retired" Director Austin and nominated a more compliant Director, J.C. Capt.  *Id*. at 17.  Director Capt immediately "authorized the Commerce Secretary to provide officials in other government agencies access to confidential census data for the national defense program."  *Id*.  Within a year, Congress passed the Second War Powers Act of 1942, Pub. L. No. 77–507, 56 Stat 176 (Mar. 27, 1942), which stated "[t]hat notwithstanding any other provision of law, . . . data . . . in the possession of the Department of Commerce or any bureau or division thereof, may be made available . . . to any

branch or agency of the Government . . . for use in connection with the conduct of the war."  *Id.* § 1402.  This statute temporarily obviated the existing statutory confidentiality protection for census data, 13 U.S.C. §§ 8-9 (1940).

## II.     THE UNITED STATES USED THE DECENNIAL CENSUS AS A TOOL IN FURTHERANCE OF WORLD WAR II JAPANESE AMERICAN INCARCERATION.

One of the most glaring and heinous examples of how the Census Bureau violated public trust is the primary role it played in the mass removal and incarceration over 120,000 Japanese Americans during the spring of 1942.

"The historical record is clear that senior Census Bureau staff proactively cooperated with the internment, and that census tabulations were directly implicated[.]"  U.S. Census Bureau Policy Office, *A Monograph of Confidentiality and Privacy in the U.S. Census*, at 16 (July 2001), *available at* https://tinyurl.com/yda5rur3.  The Census Bureau now admits to "providing 1940 census data on Japanese Americans" to the War Department, specifically the Western Defense Command, "for small geographic areas down to the census tract and block level."  *Id.* at 15. Scholars refer to this tract and block level information as "mesodata, that is, the use of census results for very small geographic units."  William Seltzer & Margo Anderson, *After Pearl Harbor: The Proper Role of Population Data Systems in Time of War*, at 5 (Mar. 28, 2000) (unpublished draft), *available at* http://perma.cc/NJH3-RADN.

The Census Bureau's 2001 admission that it provided such data confirmed the Western Defense Command's contemporaneous report during the incarceration.  U.S. General John L. DeWitt, Commander of the Western Defense, authored what the government offered as the military's official account of the wartime removal and incarceration in 1943.  J.L. DeWitt, *Final Report: Japanese Evacuation from the West Coast, 1942* (June 5, 1943), *available at*

https://tinyurl.com/ybxwqwc2.  The report detailed how the Census Bureau performed a "special tabulation" of the 1940 Decennial Census data for the Western Defense Command, which "plotted on maps . . . the total number of Japanese individuals and families . . . for each census tract."  *Id*. at 86.  Specifically, the census provided "tables" showing "various city blocks where the Japanese lived and . . . how many were living in each block."   Report of the Commission of Wartime Relocation and Internment of Civilians (CWRIC), *Personal Justice Denied*, at 105 n.* (1982), *available at* https://tinyurl.com/ycnhbckk.   This information allowed the Western Defense Command to round-up of Japanese Americans — what General DeWitt referred to as the "logistics of evacuation" — with swift and surgical precision.  DeWitt, *Final Report* at 356.  Indeed, General DeWitt concluded that the "[t]he most important single source of information prior to the evacuation was the 1940 Census of Population," which "became the basis for the general evacuation and relocation plan."  DeWitt, *Final Report* at 352; *see also id*. at 79 (census data was "[o]f prime importance in shaping the evacuation procedure").

Other available history confirms that the Census Bureau's assistance was central to the mass removal and incarceration of Japanese Americans.  In February 1942, the Census Bureau deployed the head of its statistical research division, Calvert Dedrick, "to the Western Defense Command to assist in the implementation of the evacuations."   Margo Anderson, *Public Management of Big Data:  Historical Lessons from the 1940s*, Federal History, at 22 (2015), *available at* https://tinyurl.com/ycnml58o.  Dedrick later testified the Western Defense Command asked him for "a detailed cross-tabulation for even the most minute areas" such as "cities by block."  Seltzer & Anderson, *After Pearl Harbor* at 7.  Dedrick agreed and provided the Western Defense Command unpublished data from the 1940 Decennial Census "'to find where the citizens of Japanese descent lived'" and to identify for the Western Defense Command "'exactly the city

blocks where the people of Japanese descent lived.'"  *Id*. at 29-30 (quoting Jerry N. Hess, *Oral History Interview with Tom C. Clark*, Harry S. Truman Library, at 58-59 (Oct. 17, 1972, and Feb. 8, 1973), *available at* https://tinyurl.com/y8j7bkrn).   One member of the Western Defense Command who worked with Dedrick recalls that the 1940 census data was "amazing" and accurate "within 1/2 of 1 percent of the actual figures."  *Id*. at 30.

The Census Bureau also disclosed information about individual Japanese Americans to other federal agencies during the incarceration.  William Seltzer & Margo Anderson, *Census Confidentiality Under the Second War Powers Act (1942-1947)*, at 5 (Mar. 12, 2007) (unpublished draft), *available at* https://tinyurl.com/ydxat2sy.  In 1943 — pursuant to the Second War Powers Act — the U.S. Treasury Department requested from the Commerce Department "a list of the Japanese residing in the Metropolitan Area of Washington, D.C., as reported in the 1940 Census, including information as to addresses[.]"  *Id*. at 16 & Fig. 1.  The Commerce Department complied within seven days by creating a spreadsheet that listed the "name, address, sex, age, marital status, citizenship status, status in employment, and occupation and industry" of 79 Japanese Americans in Washington, D.C.  *Id*. at 21-22 & Figures 5a-b.  The rapidity of the disclosure demonstrates that "the Bureau not only provided identifiable micro-data on Japanese Americans to other federal agencies but also had well-developed procedures to do so expeditiously."  *Id*. at 24.  At the very least, the 1943 Washington, D.C. disclosure is strong evidence that "lists of Japanese Americans from the 1940 Census were provided to assist in the mopping up stages of the round-up of Japanese Americans on the West Coast."  *Id*. at 40.

This history lays bare how the United States used the 1940 Decennial Census for the purpose of rounding-up and incarcerating Japanese Americans.  This occurred despite President Roosevelt's 1940 proclamation promising that "[t]here need be no fear that any disclosure will be

made regarding any individual person or his affairs," and that "[n]o person can be harmed in any way by furnishing the information required." *Proclamation 2385: Sixteenth Decennial Census* (Feb. 9, 1940), *in* 1940 Supplement to the Code of Federal Regulations 26-27 (1941), *available at* https://tinyurl.com/ya9jywnl.  The example of Japanese Americans provides important historical context for Plaintiffs' concern that the Census Bureau will use citizenship data for improper political purposes or in ways that will harm them or their communities.

III.   **THE JAPANESE AMERICAN INCARCERATION CASES ARE POWERFUL REMINDERS OF WHY THIS COURT MUST BE ESPECIALLY VIGILANT IN POLICING WHETHER GOVERNMENT OFFICIALS' STATED JUSTIFICATIONS FOR THE CITIZENSHIP QUESTION ARE PRETEXT FOR INTENTIONAL DISCRIMINATION.**

Since the founding, Article III federal courts have served as a counter-majoritarian bulwark against encroachment on constitutional rights by the coordinate, elected branches of the federal government.  *See Marbury v. Madison*, 1 Cranch 137, 176 (1803) ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.").  "[O]ne aspect of the judiciary's role under the Equal Protection Clause is to protect 'discrete and insular minorities' from majoritarian prejudice or indifference[.]"  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495 (1989) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153, n.4 (1938)).  "[I]t has long been generally accepted that the courts have a special role to play in defending the liberties enshrined in the Constitution against encroachment even by the people's elected representatives."  *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 164 (2d Cir. 2018) (en banc) (Lohier, J., concurring) (citing *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997)).  To force disfavored minorities out of the courthouse and into the political headwinds in Congress would abdicate this Court's essential role in the constitutional structure that entrusts the Judiciary with the protection of fundamental rights.

Here, the Court's critical role is to determine if Commerce Secretary Ross's stated justification for the citizenship question — to better enforce the VRA — was pretext for a desire to harm Latinos and immigrants of color. Amici ask this Court to remember the lessons of the Japanese American incarceration cases when performing that role, and to ensure that the government is not allowed to again assert pretextual justifications for actions that violate the Due Process Clause of the Fifth Amendment. *See Hirabayashi v. United States*, 320 U.S. 81 (1943), *conviction vacated* 828 F.2d 591 (9th Cir. 1987); *Yasui v. United States*, 320 U.S. 115 (1943), *conviction vacated* 772 F.2d 1496, 1498 (9th Cir. 1985); *Korematsu v. United States*, 323 U.S. 214 (1944), *conviction vacated* 584 F. Supp. 1406, 1413 (N.D. Cal. 1984). The government argued in those cases that the wartime incarceration of 120,000 persons of Japanese ancestry — two-thirds of whom were American citizens — was justified by military necessity because they posed a threat of espionage and sabotage. The Supreme Court deferred to that judgment by "those branches of the Government on which the Constitution has placed the responsibility of warmaking," holding that "it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs." *Hirabayashi v. United States*, 320 U.S. at 93; *see also Korematsu v. United States*, 323 U.S. at 218 (same).

Forty years later, *coram nobis* petitions revealed that the government presented the Supreme Court a false and pretextual record to support its justification for the mass exclusion of Japanese Americans. First, the *coram nobis* cases revealed that General DeWitt's Final Report was altered to support the government's argument before the Supreme Court and to hide the racial animus that formed the basis for the mass removal. *See Hirabayashi v. United States*, 828 F.2d at 598. In the Japanese American incarceration cases, the government had consistently argued that its mass round-up of Japanese Americans was required because there was insufficient time to

11

separate the loyal from the disloyal.  *See Hirabayashi v. United States*, 828 F.2d at 596 (citing

government's brief); *Hirabayashi v. United States*, 320 U.S. at 100-01.  However, the *coram nobis*

cases revealed that General DeWitt's Final Report had actually stated that urgency was not the

basis for his exclusion orders.  *Hirabayashi v. United States*, 828 F.2d at 598.  Instead, he stated

that one could never separate the "sheep from the goats," that is, one could never tell a loyal

Japanese American from a disloyal Japanese American, no matter how much time one had.  *Id*.

When it was discovered that General DeWitt's Final Report contradicted the government's

argument before the Supreme Court, the government ordered it revised to align with the argument

it advanced and destroyed the original versions of the report.  *Id*. at 598-99.  The Supreme Court

only saw the altered version of General DeWitt's Final Report and, in *Korematsu v. United States*,

uncritically accepted the "judgment of the military authorities" that they could not "precisely and

quickly ascertain[]" which Japanese Americans "were disloyal."  323 U.S. at 218.

Second, the government failed to disclose to the Supreme Court intelligence reports from

the Federal Bureau of Investigation ("FBI"), the Federal Communications Commission ("FCC"),

and the Office of Naval Intelligence ("ONI") that refuted the government's claim of military

necessity.  Assistant Attorney General John L. Burling attempted to insert a footnote into the

government's brief in *Korematsu v. United States*, stating that General DeWitt's "recitals" with

respect to "the use of illegal radio transmitters and shore-to-ship signaling by persons of Japanese

ancestry" was "in conflict with information in the possession of the Department of Justice."

*Korematsu v. United States*, 584 F. Supp. at 1417 (emphasis and internal citation omitted).  His

memorandum to his colleague Herbert Wechsler stated, "General DeWitt's report makes flat

statements concerning radio transmitters and ship-to-shore signaling which are categorically

denied by the FBI and by the [FCC].  There is no doubt that these statements were intentional

12

falsehoods." *Id*. at 1424.  The footnote as filed, however, did the opposite of what Burling recommended, "ask[ing] the Court to take judicial notice" of "the justification for the evacuation." Brief of the United States at 11 n.2, *Korematsu v. United States*, No. 22 (U.S. Oct. 5, 1944).  By providing the Supreme Court with an altered version of General DeWitt's report, the government engaged in "the suppression of evidence which established . . . the real reason for the exclusion order":  a desire to harm Japanese Americans on the basis of race and national origin.  *Hirabayashi v. United States*, 828 F.2d at 604.

Moreover, the ONI's Kenneth Ringle wrote a report that there was no basis for mass incarceration.  *See generally* Lt. Comm. Kenneth D. Ringle to Chief of Naval Operations, *Report on Japanese Question* (Jan. 26, 1942), in File ASW 014.311, RG 107, U.S. National Archives, Washington, D.C. ("Ringle report").  Justice Department lawyer Edward Ennis urged the Solicitor General to disclose the Ringle report to the Court, but "[n]otwithstanding [his] plea, the . . . brief in *Hirabayashi* made no mention of Ringle's analysis."  *Hirabayashi v. United States*, 828 F.2d at 602 n.11.  The Solicitor General finally confessed error for its conduct in 2011.  U.S. Dept. of Justice Office of Pub. Affairs, *Confession of Error:  The Solicitor General's Mistakes During the Japanese American Internment Cases* (May 20, 2011), *available at* https://tinyurl.com/y7bacp2o.

The Japanese American incarceration cases remind this Court of its duty to ensure that the government's stated reasons for its actions do not serve as a mask for invidious discrimination. Secretary Ross's shifting explanations for the citizenship question suggest that his stated reason — to better enforce the VRA — may similarly be pretext.  His decisional memo stated that his directive to the Census Bureau to add a citizenship question to the census was solely in response to a request from the Department of Justice for more granular citizenship data so that it could better enforce the VRA.  *See* AR 1320.  He testified to Congress that he was "responding solely to the

Department of Justice's Request" and had not spoken with "anyone in the White House" about the citizenship question.  *See* FY19 Budget Hearing – Dept. of Commerce Before the H. Comm. on Appropriations Subcomm. on Commerce, Justice, Science, and Related Agencies, 115th Cong. (Mar. 20, 2018) (statement of Wilbur L. Ross, Jr., Sec'y, Dept. of Commerce), *available at* https://tinyurl.com/ycaxh8sg.  The government's initial interrogatory responses in this case — which it represented in open court were based on conversations with Secretary Ross himself, *see* Tr. 2018-09-16 at 16 [Dkt. 366] — likewise averred that it "cannot confirm that [Secretary Ross] spoke to Steve Bannon regarding the Citizenship Question."  Brief for Plaintiffs-Respondents at Supp. App. 22A, *In re Dept. of Commerce, et al.*, No. 18A375 (U.S. Oct. 11, 2018), *available at* https://tinyurl.com/y79x5axs.  Yet now the government contends, in "second supplemental" interrogatory responses filed on the eve of trial, that "Secretary Ross recalls that Steve Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross" to discuss the citizenship question with Kris Kobach.  *Id.* at Supp. App. 27A.

This striking about-face compels the Court to probe the government's VRA justification for adding the citizenship question.  The Court should remember the history of the government's conduct in the Japanese American incarceration cases when it evaluates whether Secretary Ross's decision to add a citizenship question to the census was motivated by a desire to harm Latinos and immigrants of color in violation of the Due Process Clause of the Fifth Amendment.

## <u>CONCLUSION</u>

The public's trust that data provided for the 2020 Decennial Census will remain confidential is vital to its integrity.  The historical misuse of confidential data during World War I and World War II provides important context for why communities of color are suspicious of the inclusion of a citizenship question on the 2020 Decennial Census.  That history, revealed over time and in the *coram nobis* cases, highlights the necessity of this Court's scrutiny to determine whether Secretary Ross's stated reasons for his decision to add a citizenship question to the 2020 Decennial Census are pretext.  The Court should consider this history when evaluating Plaintiffs' claims at trial.

[SIGNATURE BLOCK ON NEXT PAGE]

DATED:  October 29, 2018                    Respectfully submitted,

                                             /s/ Robert H. Pees

Robert S. Chang (*pro hac vice*)            Robert H. Pees (SDNY No. RP0393)
Lorraine Bannai (*pro hac vice*)            Alice Hsu (SDNY No. AH9093)
Ronald A. Peterson Law Clinic               Akin Gump Strauss Hauer & Feld LLP
Seattle University School of Law            One Bryant Park
901 12th Ave.                               New York, NY 10036
Seattle, WA 98122                           Telephone: 212-872-1072
Telephone: 206-398-4025                     Facsimile: 212-872-1002
Facsimile: 206-398-4261                     rpees@akingump.com
changro@seattleu.edu                        ahsu@akingump.com
bannail@seattleu.edu

                                            Geoffrey J. Derrick (SDNY No. GD7137)
*Attorneys for Proposed Amici Curiae*       Akin Gump Strauss Hauer & Feld LLP
*Norman Y. Mineta, the Sakamoto sisters, and* 1333 New Hampshire Avenue, N.W.
*the Fred T. Korematsu Center for Law and*  Washington, D.C. 20036-1564
*Equality*                                  Telephone: 202-887-4597
                                            Facsimile: 202-887-4288
                                            gderrick@akingump.com
Albert Fox Cahn (SDNY No. AC3482)
Council on American-Islamic Relations,
    New York, Inc.                          *Attorneys for Proposed Amici Curiae*
46-01 Twentieth Avenue                      *Norman Y. Mineta, the Sakamoto sisters, the*
Queens, New York 11105                      *Council on American-Islamic Relations, New*
Telephone: 646-665-7599                     *York, Inc., and the Fred T. Korematsu Center*
acahn@cair.com                              *for Law and Equality*

*Attorney for Proposed Amicus Curiae*
*Council on American-Islamic Relations,*
*New York, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Robert H. Pees, declare under penalty of perjury that on October 29, 2018, I caused the

foregoing documents to be electronically filed with the Court's CM/ECF Filing System, which

will send a Notice of Electronic Filing to all parties of record who are registered with CM/ECF.

Respectfully submitted,

 */s/ Robert H. Pees*

Robert S. Chang (*pro hac vice*)
Lorraine Bannai (*pro hac vice*)
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Ave.
Seattle, WA 98122
Telephone: 206-398-4025
Facsimile: 206-398-4261
changro@seattleu.edu
bannail@seattleu.edu

*Attorneys for Proposed Amici Curiae*
*Norman Y. Mineta, the Sakamoto sisters, and*
*the Fred T. Korematsu Center for Law and*
*Equality*

Albert Fox Cahn (SDNY No. AC3482)
Council on American-Islamic Relations,
   New York, Inc.
46-01 Twentieth Avenue
Queens, New York 11105
Telephone: 646-665-7599
acahn@cair.com

*Attorney for Proposed Amicus Curiae*
*Council on American-Islamic Relations,*
*New York, Inc.*

Robert H. Pees (SDNY No. RP0393)
Alice Hsu (SDNY No. AH9093)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: 212-872-1072
Facsimile: 212-872-1002
rpees@akingump.com
ahsu@akingump.com

Geoffrey J. Derrick (SDNY No. GD7137)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036-1564
Telephone: 202-887-4597
Facsimile: 202-887-4288
gderrick@akingump.com

*Attorneys for Proposed Amici Curiae*
*Norman Y. Mineta, the Sakamoto sisters, the*
*Council on American-Islamic Relations, New*
*York, Inc., and the Fred T. Korematsu Center*
*for Law and Equality*