UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STATE OF NEW YORK, *et al.*,

               Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

               Defendants.

No. 1:18-cv-02921-JMF
No. 1:18-cv-05025-JMF

---

## NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

PLEASE TAKE NOTICE that Tech:NYC, Univision Communications Inc., Warby Parker, General Assembly, Topia, and the Minneapolis Regional Chamber of Commerce request leave to file the accompanying *amici* brief in support of Plaintiffs.  In support of their motion, *amici* state as follows:

1.     *Amici curiae* are businesses and organizations that represent businesses in the United States.  *Amici* and their members operate in various industries, but they are united in ensuring that they continue to have access to accurate Census data, which play an indispensable role in their operations.

2.     This Court has "broad discretion to permit or deny the appearance of amici curiae in a given case." *United States v. Ahmed*, 788 F. Supp. 196, 198 (S.D.N.Y. 1992).  Courts may grant entities leave to appear as *amici* if their motion for leave is timely, and if *amici* "are of aid to the court and offer insights not available from the parties." *United States v. El-Gabrowny*, 844 F. Supp. 955, 957 n.1 (S.D.N.Y. 1994).  "The primary role of the amicus is to assist the Court in

reaching the right decision in a case affected with the interest of the general public." *Russell v. Bd. of Plumbing Examiners*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999).

3.        The proposed, attached *amici curiae* brief satisfies these standards.  This motion is timely, as *amici* are submitting their proposed brief in accordance with this Court's October 18, 2018 scheduling order (Dkt. No. 384), which requires that "[a]ny amicus briefs for the Court's consideration shall be submitted . . . no later than October 29, 2018."  Furthermore, *amici*'s brief offers the Court distinctive insights into the role that accurate Census data play in businesses' decision-making.  It also addresses the substantial harms that businesses will endure with the addition of the Census Bureau's proposed citizenship question, which threatens to undermine the Census's accuracy and integrity.

4.        Counsel for Plaintiffs and counsel for Defendants have consented to the filing of this brief.

For the foregoing reasons, *amici* request that the Court grant leave to file the attached brief of *amici curiae*.  A proposed order is enclosed with this motion.


Dated:      New York, New York
            October 29, 2018

By: */s/ Alexander H. Southwell*_____
    Alexander H. Southwell
    Lee R. Crain
    GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
    New York, NY 10166-0193
    (212) 351-2454
    ASouthwell@gibsondunn.com
    LCrain@gibsondunn.com

    Stuart F. Delery (*pro hac vice* pending)
    Joshua M. Wesneski
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.

Washington, DC 20036-5306
(202) 887-3650
SDelery@gibsondunn.com
JWesneski@gibsondunn.com

*Attorneys for Proposed Amici Curiae*
Tech:NYC, Univision Communications
Inc., Warby Parker, General Assembly,
Topia, and the Minneapolis Regional
Chamber of Commerce

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 1:18-cv-02921-JMF
No. 1:18-cv-05025-JMF

## BRIEF OF *AMICI CURIAE* TECH:NYC, UNIVISION COMMUNICATIONS INC., WARBY PARKER, GENERAL ASSEMBLY, TOPIA, AND THE MINNEAPOLIS REGIONAL CHAMBER OF COMMERCE IN SUPPORT OF PLAINTIFFS

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Proposed Amici Curiae*
Tech:NYC, Univision Communications
Inc., Warby Parker, General Assembly,
Topia, and the Minneapolis Regional
Chamber of Commerce

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ............................................................................. 1

INTRODUCTION ..................................................................................................... 3

ARGUMENT ............................................................................................................ 5

    A.   The Census Requires An Accurate Count Of The Entire Population, Which The Citizenship Question Threatens ........................................................................ 5

    B.   Inaccurate Census Data Will Harm Businesses That Rely On The Census For Marketing, Product Development, Operations, And Other Purposes ........................... 8

          1.   Inaccurate Census Data Will Harm Businesses That Use That Data In Deciding Where To Open Brick-And-Mortar Locations ...................... 8

          2.   The Citizenship Question And Its Concomitant Reduction In Census Response Rates Will Harm Businesses That Use Census Data In Product Development, Marketing, And Placement ................... 10

          3.   Inaccurate Census Data Will Impair The Ability Of Businesses To Make Informed Judgments About Eligibility For Federal Support .......... 11

          4.   Inaccurate Census Data Will Harm Businesses That Rely On Proportionate Allocations Of Federal Funding ......................................... 12

    C.   Inaccurate Census Data Will Impact Businesses More Substantially As Businesses Become Increasingly Data-Driven ............................................................. 15

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Bode v. Nat'l Democratic Party,*
    452 F.2d 1302 (D.C. Cir. 1971) ........................................................................6

*Colo. Fire Sprinkler, Inc. v. Nat'l Labor Relations Bd.,*
    891 F.3d 1031 (D.C. Cir. 2018) ......................................................................7

*Fed'n for Am. Immigration Reform v. Klutznick,*
    486 F. Supp. 564 (D.D.C. 1980) ......................................................................7

*Genuine Parts Co. v. Envt'l Prot. Agency,*
    890 F.3d 304 (D.C. Cir. 2018) ........................................................................7

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.,*
    482 F.3d 79 (2d Cir. 2006) ..............................................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................................5, 7

*State of New York v. United States Dep't of Commerce,*
    315 F. Supp. 3d 766 (S.D.N.Y. 2018) ...............................................4, 7, 12, 15

*Utah v. Evans,*
    536 U.S. 452 (2002) ..........................................................................................5

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ..............................................................................................6

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) .........................................................................................5, 12

**Statutes**

13 U.S.C. § 9 ...................................................................................................3

13 U.S.C. § 141 ...............................................................................................6

26 U.S.C. § 45D .............................................................................................12

29 U.S.C. § 3162 ............................................................................................13

29 U.S.C. § 3172 ............................................................................................13

29 U.S.C. § 3242 ............................................................................................13

Permanent Census Act, Pub. L. 27 (1902) ....................................................................6

**Other Authorities**

154 Cong. Rec. H4890 (June 4, 2008) ..........................................................................6

*Act Now to Save the 2020 Census*, Bloomberg Opinion (Aug. 11, 2017),
    https://www.bloomberg.com/view/articles/2017-08-11/act-now-to-save-the-
    2020-census..........................................................................................................10

AJ Agrawal, *Why Data Is Important for Companies and Why Innovation Is On the
    Way*, Inc.com (Mar. 24, 2016), https://www.inc.com/aj-agrawal/why-data-is-
    important-for-companies-and-why-innovation-is-on-the-way.html ......................15

*CDBG: Community Development Block Grant Programs*, HUD Exchange,
    https://www.hudexchange.info/programs/cdbg/ ....................................................15

*Census and ACS*, Esri Demographics, https://doc.arcgis.com/en/esri-
    demographics/data/census-acs.htm.........................................................................9

Census Business Builder, https://www.census.gov/data/data-tools/cbb.html ................8

*Census Data Trends*, Zillow Blogs (Sept. 13, 2006),
    https://www.zillow.com/blog/census-data-trends-3888/ .......................................16

*Census May Be Wildly Inaccurate—And It Matters More Than You Think*,
    Brookings Inst. (Aug. 31, 2017),
    https://www.brookings.edu/blog/fixgov/2017/08/31/the-2020-census-may-be-
    wildly-inaccurate-and-it-matters-more-than-you-think/ .......................................11

*Data-Driven Location Choices Drive Latest Starbucks Surge*, SiteTech Systems,
    http://www.sitetechsystems.com/data-driven-location-choices-drive-latest-
    starbucks-surge/ .....................................................................................................9

Paul Farhi, *For Business, Census Is a Marketing Data Motherlode*, Wash. Post,
    Mar. 17, 1990..........................................................................................................4

*Falling Behind*, Harvard Business School: Open Knowledge by Digital Initiative
    (Nov. 18, 2016), https://rctom.hbs.org/submission/zillow-ahead-of-its-time-or-
    falling-behind/;.......................................................................................................16

*Federal Funds* 10, Brookings Inst. (Mar. 9, 2010),
    https://www.brookings.edu/wp-
    content/uploads/2016/06/0309_census_report.pdf ........................................11, 13

Tom Foster, *Warby Parker Grew to $250 Million in Sales Through Disciplined Growth. Now It's Time to Get Aggressive*, Inc. (June 2017), https://www.inc.com/magazine/201706/tom-foster/warby-parker-eyewear.html ..................................................................................................................9

*Grant Program*, U.S. Envtl. Prot. Agency, https://www.epa.gov/water-pollution-control-section-106-grants/learn-about-water-pollution-control-section-106-grant ....................................................................................................................14

Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds Distribution: A New Design for the 21st Century* 3 (Sept. 2017)..........................12, 13

*Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*, U.S. Dep't of Educ., https://www2.ed.gov/programs/titleiparta/index.html?exp=0 ................................14

Douglas A. Kysar, *Kids & Cul-de-Sacs: Census 2000 and the Reproduction of Consumer Culture*, 87 Cornell L. Rev. 853, 854–56 (2002) ...............................8, 11

Scott McDonald, *A 2020 Census Flop Would Pose a Danger to U.S. Businesses* ......................16

Amy Merrick, *New Data Will Let Starbucks Plan Store Openings, Help Blockbuster Stock Its Videos*, Wall St. J., Feb. 14, 2001 ..........................................9

Mikelyn Meyers & Patricia Goerman, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census* 24–25 (U.S. Census Bureau May 2018) ...........................7

National Research Council, *Modernizing the U.S. Census* 297 (1995) ..............................9, 11, 12

*New Markets Tax Credit Program*, Community Development Financial Institutions, https://www.cdfifund.gov/programs-training/Programs/new-markets-tax-credit/Pages/default.aspx ..................................................................11

William P. O'Hare, *Citizenship Question Nonresponse: A Demographic Profile of People Who Do Not Answer the American Community Survey Citizenship Question* 6–7 (Georgetown Center on Poverty and Inequality Sept. 2018) ............................8

*Overview*, U.S. Fish & Wildlife Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/swg/swg.htm....................................14

*Overview*, U.S. Fish & Wildlife Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/wr/wr.htm .........................................14

Kenneth Prewitt, *The American People Census 2000: Politics and Science in Census Taking* 6 (Russell Sage Foundation 2003), http://www.washingtonpost.com/wp-srv/politics/documents/Pol_Sci.pdf?noredirect=on ..................................................................6

Report, Council of Economic Advisers, *The Use of Census Data: An Analytical Review* (Apr. 1, 2000), https://clintonwhitehouse3.archives.gov/WH/EOP/CEA/html/censusreview.html ......................................................................................................................................3

*Small Business Development Center*, U.S. Small Business Administration, https://www.sba.gov/tools/local-assistance/sbdc ......................................................................................................................14

Statement on the Impact of a Citizenship Question in the 2020 Decennial Census (Mar. 27, 2018), http://www.cossa.org/wp-content/uploads/2018/03/Census-Citizenship-Question-3-27-18.pdf ......................................................................................3

Greg Sterling, *Chipotle Customers Are Smarter Than McDonald's And Other Insights From Smartphone Data* (June 24, 2014), https://marketingland.com/chipotle-customers-smarter-mcdonalds-insights-smartphone-data-88637......................................................................................................16

United States Census Bureau, Directors 1790 – 1810 (Aug. 2, 2017), https://www.census.gov/history/www/census_then_now/director_biographies/ ......................6

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 3..................................................................................................3

## INTERESTS OF *AMICI CURIAE*

*Amici* submit this brief to provide necessary context regarding how *amici* and businesses like them rely on Census data, how the proposed citizenship question will make the Census less reliable, and how inaccurate Census data harms businesses and ultimately consumers.

Tech:NYC is a nonprofit organization working to bring principled New Yorkers together to support a successful technology ecosystem.  Tech:NYC has approximately 650 member companies, including some of the most prominent and successful tech companies in the nation. Many of its members receive federal funding based on Census data or use Census data to plan their operations.  Tech:NYC and its members would be harmed by inaccurate Census data.

Univision Communications Inc. is the leading media company serving Hispanic America.  It uses and relies on Census data in conveying accurate news and information to its viewers and in conducting its business operations, in addition to doing business regularly with advertisers that also rely on such data in their decision making. Univision and its viewers would be harmed by inaccurate Census data.

Warby Parker (JAND, Inc.) is an eyewear brand that sells prescription glasses and sunglasses.  It uses and relies on Census data in its operations, including in planning locations for its physical store locations.  Warby Parker's business would be negatively affected by inaccurate Census data.

General Assembly is a global educational institution with 22 locations around the world, offering online courses, onsite trainings for Fortune 500 companies and governmental organizations, and a global community of professionals. General Assembly and many of its students rely on federal funding that is impacted by Census data.  General Assembly and its students would be harmed by inaccurate Census data.

Topia provides a talent mobility software suite that companies use to move their employees between locations and roles.  Topia values being a global citizen and equality of opportunity for everyone.

The Minneapolis Regional Chamber of Commerce advocates on behalf of the business community in the Minneapolis Saint Paul region and provides various services for its members. Many of the Chamber's members and the communities in which they operate depend on accurate Census data to plan their operations or receive federal funding impacted by Census data.  The Regional Chamber and its members would be harmed by inaccurate Census data.

## INTRODUCTION

Accurate Census data is important to businesses.  They use that data to plan new locations and future projects, and rely on that data for the allocation of important federal funding.  But the Census Bureau's proposed citizenship question threatens to reduce response rates, particularly by naturalized citizens and immigrants, and thereby to impair the accuracy of the Census.  *Amici* submit this brief to explain their perspective on the serious harm that will result if the citizenship question is adopted—harm that the Secretary should have considered before deciding to ask it.

The United States Constitution requires an "actual Enumeration" of the people to allow the "Representatives" to "be apportioned among the several states which may be included within this union, according to their respective numbers."  U.S. Const. art. I, § 2, cl. 3.  But the importance of accurate Census data extends well beyond its constitutional purpose of apportioning congressional representation.  Census data is made public, *see* 13 U.S.C. § 9(a), and social scientists have called Census responses "an irreplaceable source of data for researchers," Consortium of Social Science Ass'ns, COSSA Statement on the Impact of a Citizenship Question in the 2020 Decennial Census (Mar. 27, 2018), http://www.cossa.org/wp-content/uploads/2018/03/Census-Citizenship-Question-3-27-18.pdf.  "Today, policy makers at all levels of government, as well as private businesses, households, researchers, and nonprofit organizations, rely on an accurate census in myriad ways that range far beyond the single fact of how many people live in each state."  Report, Council of Economic Advisers, *The Use of Census Data: An Analytical Review* (Apr. 1, 2000), https://clintonwhitehouse3.archives.gov/WH/EOP/CEA/html/censusreview.html.

*Amici* are businesses and organizations that represent businesses in numerous industries that routinely use Census data to make business decisions and that will be impacted by an inaccurate Census.  *Amici* include Warby Parker, an American retailer of prescription glasses and sunglasses that uses Census data in planning locations for its physical store locations; Univision

Communications Inc., which uses Census data in conveying accurate news and information to its viewers and in conducting its business operations, in addition to doing business regularly with advertisers that also rely on such data in their decision making; and General Assembly, an educational institution whose students rely on federal funding impacted by Census data. *Amici* also include Tech:NYC and the Minneapolis Regional Chamber of Commerce, which represent hundreds of businesses that rely on Census data in making business decisions or receive federal funding tied to Census data. While businesses have a number of resources at their disposal to help them understand the traits, preferences, and distribution of their customers, the Census is a particularly important tool. *See* Paul Farhi, *For Business, Census Is a Marketing Data Motherlode*, Wash. Post, Mar. 17, 1990. In the words of a large group of current and former business leaders— "[t]he decennial Census provides critical data that informs decision-making in both the private and public sectors," and which is regularly used "to determine where to locate stores and facilities, find qualified workers, and market products and services," to name just a few of its many crucial applications. A.R.1252–54, Public Comment – Ready Nation (Mar. 22, 2018).

But as the Census Bureau's own officials have concluded (backed by research the Bureau itself recently conducted), asking about a respondent's citizenship as a part of the United States Census will result in reduced response rates, particularly by naturalized citizens and immigrants, and will thus yield inaccurate census data. *See State of New York v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 782 (S.D.N.Y. 2018). The inaccuracy resulting from the citizenship question will harm businesses. Put simply, Census data can play a role in many decisions by large and small businesses alike; as demonstrated below, introduction of the citizenship question and a resulting reduction in response rate and accuracy would negatively affect businesses in a variety of ways.

Plaintiffs challenge the Secretary of Commerce's decision to add a question to the Census asking respondents about their citizenship. They contend that using the question violates the Equal Protection Clause and that the Secretary failed to follow the requirements of the Administrative Procedure Act ("APA"). Whether the Secretary adequately considered the threat to Census accuracy the citizenship question poses—and the attendant harms—is at the core of Plaintiffs' APA challenge. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). *See* Second Am. Compl. ¶¶ 189–97 (Dkt. 18-CV-2921, ECF 214); Compl. ¶¶ 193–200, 208–12 (Dkt. 18-CV-5025, ECF 1). This brief provides important context for the APA claim.

## ARGUMENT

### A.  The Census Requires An Accurate Count Of The Entire Population, Which The Citizenship Question Threatens

An accurate Census is the cornerstone of our democracy. Knowing that the "calculation of populations could be and often were skewed for political or financial purposes," the Framers "chose to make an 'actual Enumeration' part of our constitutional structure" in order "to preclude the availability of methods that permit political manipulation." *Utah v. Evans*, 536 U.S. 452, 500, 507, 510 (2002) (Thomas, J., concurring in part and dissenting in part); *Wisconsin v. City of New York*, 517 U.S. 1, 6 (1996) ("[E]ach [decennial Census] was designed with the goal of accomplishing an 'actual Enumeration' of the population."). The Census was an integral part of the design of the new government at the Founding—an attempt to ensure that the House of Representatives would be based on proportional representation, itself essential to the "Great

5

Compromise" that yielded our bicameral legislature.  *See Wesberry v. Sanders*, 376 U.S. 1, 12–14

(1964); *Bode v. Nat'l Democratic Party*, 452 F.2d 1302, 1307 (D.C. Cir. 1971).

Indeed, our nation's earliest leaders recognized the importance of Census accuracy.  For

instance, when Thomas Jefferson supervised the nation's first Census as Secretary of State in 1790,

he expected a population count of at least 4 million people.  Yet the Census ultimately revealed a

nation of just 3.9 million people, much to his and President George Washington's concern.

Jefferson thought that the Census had significantly undercounted the population, perhaps by

several hundred thousand residents.  United States Census Bureau, Directors 1790 – 1810, (Aug.

2, 2017), https://www.census.gov/history/www/census_then_now/director_biographies/

directors_1790_-_1810.html.  And Washington, who had expected a population count about 5

percent higher, was similarly chagrined, blaming the "'inaccuracy' on avoidance by some residents

as well as on negligence by those responsible for taking the census."  Kenneth Prewitt, *The

American People Census 2000: Politics and Science in Census Taking* 6 (Russell Sage Foundation

2003), http://www.washingtonpost.com/wp-srv/politics/documents/Pol_Sci.pdf?noredirect=on.

By making these concerns about the Census public, then-Secretary Jefferson "helped alert the

Nation to the importance of accuracy in the numbers used to describe the society."  154 Cong. Rec.

H4890 (June 4, 2008) (statement of Rep. Johnson).

At the turn of the twentieth century, as the Census grew more complex, Congress created

the Census Bureau, which opened its doors in 1902.  *See, e.g.*, Permanent Census Act, Pub. L. 27

(1902).  Congress authorized the Secretary of Commerce to "obtain . . . census information as

necessary."  13 U.S.C. § 141(a).  And as this Court has recognized, the Secretary does not have

unreviewable discretion in carrying out that task.  Instead, his decisions regarding the Census are

judicially reviewable, and so a decision of the Secretary to add or remove a Census question must

comply with all relevant laws, including the APA and the Equal Protection Clause.  *See Dep't of Commerce*, 315 F. Supp. 3d at 793, 806.

In assessing the impact of various questions, the Secretary, the Commerce Department, and the Census Bureau must take into account the impact of the question on the conduct of the Census and on various communities.  *Cf. State Farm*, 463 U.S. at 43.  A failure to consider an "important aspect of the problem," such as "evidence that runs counter to the agency's decision," will render agency action arbitrary and capricious.  *Genuine Parts Co. v. Envt'l Prot. Agency*, 890 F.3d 304, 307 (D.C. Cir. 2018) (internal quotation marks omitted).  Courts have not hesitated to vacate agency action where the agency failed to meet this mandate.  *See, e.g.*, *Colo. Fire Sprinkler, Inc. v. Nat'l Labor Relations Bd.*, 891 F.3d 1031, 1041 (D.C. Cir. 2018); *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Prot.*, 482 F.3d 79, 101 (2d Cir. 2006).

Available evidence indicates that the citizenship question threatens to impair the accuracy of the Census.  For decades, the Census Bureau has recognized the negative impact a citizenship question would have, telling a court in 1980 that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count" because "[q]uestions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate."  *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980); *see also Dep't of Commerce*, 315 F. Supp. 3d at 782.  And even *recent* research by the Census Bureau confirms that multilingual Census respondents fear their answers will not be kept confidential, and may be reluctant to answer certain questions for that reason.  *See* Mikelyn Meyers & Patricia Goerman, *Respondent Confidentiality Concerns in Multilingual Pretesting Studies and Possible Effects on Response Rates and Data Quality for the 2020 Census* 24–25 (U.S. Census Bureau May 2018).  Indeed, research shows that respondents are becoming more hesitant

to answer a comparable question about citizenship included in the American Community Survey. *See* William P. O'Hare, *Citizenship Question Nonresponse: A Demographic Profile of People Who Do Not Answer the American Community Survey Citizenship Question* 6–7 (Georgetown Center on Poverty and Inequality Sept. 2018).

**B.     Inaccurate Census Data Will Harm Businesses That Rely On The Census For Marketing, Product Development, Operations, And Other Purposes**

Businesses have long used Census data in a variety of strategic ways to plan their operations, enhance their understanding of their customer base, and develop products that meet consumer needs.  *See* Douglas A. Kysar, *Kids & Cul-de-Sacs: Census 2000 and the Reproduction of Consumer Culture*, 87 Cornell L. Rev. 853, 854–56 (2002).   The Census Bureau itself recognizes the value businesses derive from the types of data the Census provides.  The Bureau even provides businesses with a "Census Business Builder," "a suite of services that provide selected demographic and economic data from the Census Bureau tailored to specific types of users in a simple to access and use format."  *See* Census Business Builder, https://www.census.gov/data/data-tools/cbb.html.  The Bureau notes that this data can "help you start or grow a business or understand the business landscape for a region."  *Id*. If the citizenship question is adopted—rendering Census data less accurate—each business that uses Census data for these purposes will be harmed.

**1.     Inaccurate Census Data Will Harm Businesses That Use That Data In Deciding Where To Open Brick-And-Mortar Locations**

Businesses rely on Census data when they plan the placement and construction of new locations.  That data lets businesses maximize the effectiveness of a location and capitalize on a particular region's needs or preferences.  Building a new location is a significant undertaking, requiring major capital investments.  Mistakes about where to place a store, warehouse, or other facility can harm not only a business's overall outlook, but also the communities that need (or

8

don't need) such a facility.  If a business misjudges where to place a new retail location, an operations hub, or other facility—and if a business incorrectly estimates demand for its products due to inaccurate data—both the business and its community will be harmed.

Many retail merchants use Census data to strategically place their stores and other facilities. *See* Amy Merrick, *New Data Will Let Starbucks Plan Store Openings, Help Blockbuster Stock Its Videos*, Wall St. J., Feb. 14, 2001; Malcolm Wheatley, *Data-Driven Location Choices Drive Latest Starbucks Surge*, SiteTech Systems, http://www.sitetechsystems.com/data-driven-location-choices-drive-latest-starbucks-surge/ (highlighting value of "the demography, the data, the science" in site selection and new store openings).  *Amicus curiae* Warby Parker, for instance, relies on Census data to place its brick-and-mortar locations in areas where customers are most likely to visit a store in person (as opposed to shop online).  *See* Tom Foster, *Warby Parker Grew to $250 Million in Sales Through Disciplined Growth.  Now It's Time to Get Aggressive*, Inc. (June 2017),  https://www.inc.com/magazine/201706/tom-foster/warby-parker-eyewear.html.    Indeed, some companies offer business analytics solutions based, in part, on Census data, to assist with these location decisions.  *Census and ACS*, Esri Demographics, https://doc.arcgis.com/en/esri-demographics/data/census-acs.htm.  Without accurate Census data on which to base location decisions, businesses would lose a tool that has become crucial to their survival and growth.

The effects of inaccurate Census data on a business's decision as to where to place a new location would not only harm that business, but also its surrounding community.  For example, healthcare providers use Census data to understand community needs.  *See* National Research Council, *Modernizing the U.S. Census* 297 (1995).  A hospital can use Census data for residents in the area of a new location to determine how many and what kind of doctors will likely be needed at that location.  *See id.*  This same analysis can be performed to determine the need for certain

health services, like obstetrical or family practice services, in a given area. *See id.* at 298. Inaccurate census data thus may lead to some communities having inadequate healthcare in light of business decisions driven by this data, just as other communities may face an inefficient influx of healthcare resources beyond what is actually needed. These important healthcare decisions affect members of the community, and depend on accurate Census data.

With a Census whose accuracy is impaired by the citizenship question, businesses will have less ability to design and build stores and service locations that meet the needs of local communities. Businesses, their customers, and the communities they serve will all suffer.

### 2.     The Citizenship Question And Its Concomitant Reduction In Census Response Rates Will Harm Businesses That Use Census Data In Product Development, Marketing, And Placement

Inaccurate Census data will also affect the development and marketing of numerous products around the country. Businesses use Census data to inform decisions about product development and placement. A retail business may, for instance, rely on demographic data to determine which products are going to sell best in which regions, and calibrate each store's stock accordingly. *See* Diane W. Schanzenbach & Michael R. Strain, *Act Now to Save the 2020 Census*, Bloomberg Opinion (Aug. 11, 2017), https://www.bloomberg.com/view/articles/2017-08-11/act-now-to-save-the-2020-census ("If you walk into a Target store in suburban Florida, the items on the shelves are different from what is in a Target store in downtown Washington D.C. Target makes these decisions in large part using government data."). Entire product lines may even be developed based on data culled from the Census. *See, e.g.*, *The Use of Census Data: An Analytical Review*, *supra* (noting that accurate Census data helps "[m]anufacturers of baby products such as baby food, clothes, diapers, and toys, and manufacturers of maternity clothes and greeting cards . . . develop . . . their product lines").).

Flawed Census data can also impact customer outreach.  Because utility companies often offer lower rates for poorer, elderly, or disabled customers, utility customers use Census data to determine which areas are most likely to need those special rates and reach out to customers in those areas to evaluate eligibility.  *See Modernizing the U.S. Census*, *supra*, at 297.  Cable television companies may use Census data to target advertising for pay-per-view events to those areas whose residents are most likely to purchase the event.  *See id.* at 296.  And when a car manufacturer learned through customer research that its vehicles were popular with people in the nursing profession, it used data from the Census to tailor its regional advertising to that demographic.  *See* Kysar, *supra*, at 885.  Inaccurate Census data would weaken the ability of businesses to adapt their marketing and outreach strategies to a changing population, resulting in wasted dollars for businesses and unwanted advertising for customers.

Product design, placement, and marketing are essential aspects of any business, and each phase can rely on—and many businesses do rely on—accurate Census data.

### 3. Inaccurate Census Data Will Impair The Ability Of Businesses To Make Informed Judgments About Eligibility For Federal Support

Inaccurate Census data threatens to harm businesses that use such data to evaluate their eligibility for certain federal support.  For example, under the New Market Tax Credit ("NMTC")—a federal program designed to stimulate investment in distressed communities—an investment may qualify for special tax treatment if it occurs in an area with certain concentrations of low- or moderate-income households.  *See New Markets Tax Credit Program*, Community Development Financial Institutions, https://www.cdfifund.gov/programs-training/Programs/new-markets-tax-credit/Pages/default.aspx; Robert Shapiro, *The 2020 Census May Be Wildly Inaccurate—And It Matters More Than You Think*, Brookings Inst. (Aug. 31, 2017), https://www.brookings.edu/blog/fixgov/2017/08/31/the-2020-census-may-be-wildly-inaccurate-

and-it-matters-more-than-you-think/.[1]  Or a nonprofit organization, such as a rural health clinic, may use Census data for a special federal designation based on location and population served. *See Modernizing the U.S. Census*, *supra*, at 298.  But miscalculating whether a community has a certain economic demographic means that a business may well miscalculate its investment's tax treatment, and may miscalculate its estimated bottom line.  If margins are tight, inaccurate Census data and its effect on tax treatment could be the difference between a new business that survives and one that falters.

### 4.   Inaccurate Census Data Will Harm Businesses That Rely On Proportionate Allocations Of Federal Funding

Finally, the federal government relies on Census data to allocate and distribute federal funding—to the tune of about $700 billion—and where inaccurate Census data threatens the proper allocation of federal funds, it also affects businesses that rely directly or indirectly on those funds. *See* A.R.8375, Public Comment – Coalition of Philanthropic Organizations (Mar. 21, 2018) ("[R]ecent decennial censuses have resulted in net undercounts of many communities, with consequences for . . . disbursing roughly $700 billion in federal funds.").  In 2015 alone, the federal government used Census data to distribute over $675 billion in federal funding to a variety of programs.  *See* Marisa Hotchkiss & Jessica Phelan, *Uses of Census Bureau Data in Federal Funds Distribution: A New Design for the 21st Century* 3 (Sept. 2017) (on file with the U.S. Census Bureau); *see also Wisconsin v. City of New York*, 517 U.S. 1, 5–6 (1996) ("Today, census data also have important consequences not delineated in the Constitution: The Federal Government considers census data in dispensing funds through federal programs to the States . . . ."); *see also Dep't of Commerce*, 315 F. Supp. 3d at 782–83.  Those billions of dollars were funneled through

---

[1]  An NMTC-eligible investment must be located in a designated "low-income community," defined by U.S. Census data as a Census tract with a poverty rate of at least 20 percent or with a median family income that does not exceed 80 percent of the statewide median family income.  26 U.S.C. § 45D(e).

132 different programs, ranging from subsidies for school lunches to historic preservation.  *See* Hotchkiss & Phelan, *supra*, at 16–17.

The bulk of Census-guided federal assistance goes to state governments through a handful of grant programs that aid low-income households and support highway infrastructure.  *See* Andrew D. Reamer, *Counting for Dollars: The Role of the Decennial Census in the Geographic Distribution of Federal Funds* 10, Brookings Inst. (Mar. 9, 2010), https://www.brookings.edu/wp-content/uploads/2016/06/0309_census_report.pdf.   In  2008,  using  Census  data,  the  federal government distributed over $36 billion in federal funds via the Federal-Aid Highway Program, and distributed an additional $10 billion to fund other transportation needs.  *See id.* at 11–12. Businesses have an interest in ensuring that the basic infrastructure of their communities— including the availability of accessible and well-kept highways—is supported by federal funding. And an inaccurate Census threatens the proper allocation of that funding.

Businesses have an interest in the federal funding allocated to various programs.  For example,  through  the  Workforce  Innovation  and  Opportunity  Act  ("WIOA"),  the  federal government subsidizes the education and workforce training of youth and adults from disadvantaged backgrounds and area.  *See* 29 U.S.C. §§ 3162, 3172.  The allocation of those subsidies is determined using the "most recent satisfactory data from the Bureau of the Census." 29 U.S.C. § 3242(a).  Some organizations, like *amicus curiae* General Assembly, enroll students that rely entirely on that federal funding, or operate in cities that are fully funded by WIOA.  And the Department of Labor allocated over $7 billion in 2008 on the basis of Census data, *see* Reamer, *supra*, at 13, some of which went to educational institutions like General Assembly providing free training programs to underserved and overlooked talent.

Companies may have more specific interests depending on their size or line-of-business. For example, many new businesses have an interest in the federal funding that goes to Small Business Development Centers, which receive federal funding to provide small businesses and entrepreneurs with free consulting and training services. *See Small Business Development Center*, U.S. Small Business Administration, https://www.sba.gov/tools/local-assistance/sbdc. A local outdoors-equipment retail store, whose business depends in part on the availability and quality of nearby outdoor activities, will likely have an interest in ensuring that the surrounding community is receiving adequate support from federal programs such as the Wildlife Restoration Program[2] and the Water Pollution Control Grant Program,[3] both of which rely on the Census to determine allocation of funding.

Businesses with deep roots in particular communities may also have a more general interest in ensuring that the communities they serve—and that make up their customer and employee bases—are receiving the needed federal assistance to which they are entitled. The U.S. Department of Education, for instance, relies on Census data to allocate funds to educational agencies and schools with high numbers or percentages of children from low-income families.[4] The Department of Education allocated over $10 billion in special education grants to states in 2008, based in large part on Census data. *See* Reamer, *supra*, at 11. It distributed over $7 billion

---

[2] *See Wildlife Restoration Program – Overview*, U.S. Fish & Wildlife Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/wr/wr.htm (providing funding to restore, conserve, manage, and enhance wild birds and mammals and their habitat); *see also State Wildlife Grant Program – Overview*, U.S. Fish & Wildlife Serv., https://wsfrprograms.fws.gov/subpages/grantprograms/swg/swg.htm (providing funding to develop and implement programs that benefit wildlife and their habitats).

[3] *See Learn About the Water Pollution Control (Section 106) Grant Program*, U.S. Envtl. Prot. Agency, https://www.epa.gov/water-pollution-control-section-106-grants/learn-about-water-pollution-control-section-106-grant (providing funding to states and agencies to build and sustain effective water quality programs).

[4] *See Improving Basic Programs Operated by Local Educational Agencies (Title I, Part A)*, U.S. Dep't of Educ., https://www2.ed.gov/programs/titleiparta/index.html?exp=0.

in Title I grants to local educational agencies during the same time period.  *Id.*  Businesses in such

a community, like all members of a community, benefit from strong educational programs.  Federal

funds are also allocated through Community Development Block Grant Programs—again on the

basis of Census data—to help develop urban communities and improve living and economic

conditions.[5]  Again, businesses benefit when their communities receive the infrastructure support

they need to thrive.  But an inaccurate Census risks misallocating funds to each of these programs,

harming businesses and their communities.

* * *

These varied and documented uses of Census data are possible only because businesses

can depend on the Census to provide accurate demographic information about customers.  The

citizenship question, however, threatens to undermine that reliability of Census data and therefore

substantially reduce its value to businesses.  If businesses cannot rely on the Census to provide

usable, accurate data, they will be hamstrung in their ability to track and adapt to customers'

changing needs and preferences.  Competitive businesses must always be evolving to respond to

changes in the market, and the citizenship question will impede their ability to do so.

## C.     Inaccurate Census Data Will Impact Businesses More Substantially As Businesses Become Increasingly Data-Driven

Inaccurate Census data would be more disruptive to businesses now than ever before.

Businesses are relying more and more on data-driven analytics to plan their operations and reach

customers in the most efficient ways possible.  Census data has been integral to this change and

will continue to be, rendering an accurate Census imperative to business growth and innovation in

this country.  *See* AJ Agrawal, *Why Data Is Important for Companies and Why Innovation Is On*

---

[5]  *See CDBG: Community Development Block Grant Programs*, HUD Exchange,
https://www.hudexchange.info/programs/cdbg/; *see also Dep't of Commerce*, 315 F. Supp. 3d at 782–83.

15

*the Way*, Inc.com (Mar. 24, 2016), https://www.inc.com/aj-agrawal/why-data-is-important-for-companies-and-why-innovation-is-on-the-way.html (asserting that in an era in which "[p]eople are generating more [data] than ever before," this data is becoming "essential for companies and it's going to spell an era of innovation").

And not only have businesses begun focusing data to drive their operations, but also entire businesses have sprung up around processing, analyzing, and advising consumers based on available data—including that provided in the Census.  For instance, numerous businesses have developed commercial databases that contain information gathered about their customers and target audience.  But in order to make use of these commercial databases—whether, for instance, in an effort to understand and cater to the preferences of a local market segment, or to understand the national population at large—businesses need what are called "truth sets."  These are sets of data that serve as benchmarks to evaluate the quality of the data contained in the commercial database, and to provide a basis for statistical adjustments.  The information that the Census generates "usually provide[s] a definitive benchmark."  Scott McDonald, *A 2020 Census Flop Would Pose a Danger to U.S. Businesses*, Forbes (Dec. 6, 2017).

Some companies, like location intelligence providers, repurpose Census data to provide insights to customers and to help them draw better, data-driven inferences about how to run their organizations.  *See* Greg Sterling, *Chipotle Customers Are Smarter Than McDonald's And Other Insights From Smartphone Data*,  (June 24, 2014), https://marketingland.com/chipotle-customers-smarter-mcdonalds-insights-smartphone-data-88637.  Real estate aggregators can use Census data to compile its listings and real estate estimates.  *Zillow: Ahead of Its Time or Falling Behind*, Harvard Business School: Open Knowledge by Digital Initiative (Nov. 18, 2016), https://rctom.hbs.org/submission/zillow-ahead-of-its-time-or-falling-behind/; *see also Census*

*Data Trends*, Zillow Blogs (Sept. 13, 2006), https://www.zillow.com/blog/census-data-trends-3888/.  Businesses like these might not exist without the internet and advanced data processing. And among the information these businesses process is Census data, the accuracy of which is and will continue to be essential to the existence of these businesses.  Indeed, the fact that these businesses exist in the first place is a testament to just how important Census data and information like it has become to the business world.

    Although it is impossible to determine how innovators and entrepreneurs will use Census data in the future, one thing is clear: businesses will keep using it so long as it is accurate.  They will seek to leverage key data and determine new, profitable uses to draw from it.  Ensuring the accuracy of this data is essential, and any attempt by the federal government to diminish the Census data threatens businesses and economic growth nationwide.

## CONCLUSION

For the reasons stated above, *amici* support judgment in favor of Plaintiffs.

Respectfully submitted this 29th day of October, 2018.

/s/ Alexander H. Southwell
Alexander H. Southwell
Lee R. Crain
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-2454
ASouthwell@gibsondunn.com
LCrain@gibsondunn.com

Stuart F. Delery (*pro hac vice* pending)
Joshua M. Wesneski
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 887-3650
SDelery@gibsondunn.com

*Attorneys for Proposed Amici Curiae*
Tech:NYC, Univision Communications Inc., Warby
Parker, General Assembly, Topia, and the
Minneapolis Regional Chamber of Commerce

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STATE OF NEW YORK, *et al.*,

                    Plaintiffs,

        v.                                         No. 1:18-cv-02921-JMF
                                                   No. 1:18-cv-05025-JMF
UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

                    Defendants.

---

**[PROPOSED] ORDER**


Upon consideration of the motion of Tech:NYC, Univision Communications Inc., Warby

Parker, General Assembly, Topia, and the Minneapolis Regional Chamber of Commerce for

leave to file their proposed *amici curiae* brief in support of Plaintiffs, it is hereby

ORDERED that the motion is GRANTED.


Dated: _____
        New York, New York                 _____
                                           Hon. Jesse M. Furman
                                           United States District Judge