UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.,* | |
| *Plaintiffs,* | |
| *v.* | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.,* | Civil Action No. 1:18-cv-02921 (JMF) |
| *Defendants* | |
| NEW YORK IMMIGRATION COALITION, *et al.,* | |
| *Plaintiffs,* | Civil Action No. 1:18-cv-5025 (JMF) |
| *v.* | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.,* | |
| *Defendants* | |

**NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE AMICUS BRIEF**

PLEASE TAKE NOTICE THAT the New York State Black, Puerto Rican, Hispanic and Asian Legislative Caucus and other legislative bodies, legislators and organizations, (all listed in the appendix to this motion), request leave to file the accompanying amicus brief in support of plaintiffs. In support of their motion, amici state as follows:

1. Amici are elected state officials who are charged with representing their constituents' interests. Those interests include advocating for basic rights like voting rights and fair representation in the US representative democracy, the protection of the civil rights held by both

citizens and residents alike, and the funding decisions for their geographic districts that will directly affect their constituents' access to vitally important resources.

2.   Amici are united in their interest in ensuring that all of their constituents – particularly, racial and language, minorities, young children, immigrants, and low income residents – continue to enjoy access to the political power granted to them by the United States Constitution and the economic resources distributed based upon the data gathered by the census.

3.   Amici represent constituents whose local, state and congressional districts are drawn based on the Census Bureau's total population data. Their constituents include significant numbers of residents who require access to the hundreds of billions of dollars spent annually in federal, state and local government services and to the civil rights and voting rights protections designed to protect their political power. The proposed amicus brief addresses issues upon which defendants and their amici have staked their defense of the decision to include a question related to citizenship on the census. These are issues about which Amici are particularly qualified and equipped to provide guidance to this Court.

4.   "District courts have broad discretion to permit or deny the appearance of amici curiae in a given case." *United States v. Ahmed*, 788 F. Supp. 196, 198 (S.D.N.Y.1992). The proposed amicus brief will assist the Court in addressing key issues raised in this case because amici offer expertise and a fresh perspective on certain factual premises and legal arguments advanced by defendants and their amici.

5.   Defendants and plaintiffs have consented to the filing of this brief. For the foregoing reasons, amici request that the Court grant leave to file the attached amicus brief.

Dated October 29, 2018
Respectfully submitted,

/s/ Lurie Daniel Favors
Lurie Daniel Favors, Esq.
Esmeralda Simmons, Esq.
CENTER FOR LAW AND SOCIAL JUSTICE AT
MEDGAR EVERS COLLEGE, CUNY
1150 Carroll Street
Brooklyn, NY 11225
718-804-8893
lfavors@mec.cuny.edu

Joan P. Gibbs, Esq.
441-A Classon Ave.
Brooklyn, NY 11238

*Counsel for the New York State Black,*
*Puerto Rican Hispanic Legislative Caucus*

ADDITIONAL AMICI

Colorado State Representative Dominick Moreno

New York State Assembly Assistant Speaker Felix W. Ortiz

The Democratic Caucus of the Pennsylvania House of Representatives

Tennessee State Representative G.A. Hardaway, Sr.

Tennessee State Representative Barbara Cooper

Tennessee State Representative Rick Staples

Utah State Representative Carol Spackman Moss

Utah State Representative Rebecca Chavez-Houck

Utah State Representative Mark A. Wheatley

Utah State Representative Elizabeth Weight

Utah State Representative Patrice Arent

Utah State Representative Karen Kwan

Utah State Senator Jani Iwamoto

Virginia State House of Delegate, Mark Sickles

Washington State Senator Marko Liias

National Association of Jewish Legislators
Jeffrey M. Wice, Esq., Counsel
PO Box 42442
Washington, DC 20015
(202)494-7991

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> *Defendants* | Civil Action No. 1:18-cv-02921 (JMF) |
| NEW YORK IMMIGRATION COALITION, *et al.*, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> *Defendants* | Civil Action No. 1:18-cv-5025 (JMF) |

**BRIEF OF THE NEW YORK STATE BLACK, PUERTO RICAN, HISPANIC AND ASIAN LEGISLATIVE CAUCUS, AS *AMICI CURIAE*, IN SUPPORT OF PLAINTIFFS**

Lurie Daniel Favors, Esq.
Esmeralda Simmons, Esq.
CENTER FOR LAW AND SOCIAL JUSTICE
AT MEDGAR EVERS COLLEGE, CUNY
1150 Carroll Street
Brooklyn, NY 11225
718-804-8893

Joan P. Gibbs, Esq.
441-A Classon Ave.
Brooklyn, NY 11238

ADDITIONAL AMICI

Colorado State Representative Dominick Moreno

New York State Assembly Assistant Speaker Felix W. Ortiz

The Democratic Caucus of the Pennsylvania House of Representatives

Tennessee State Representative G.A. Hardaway, Sr.

Tennessee State Representative Barbara Cooper

Tennessee State Representative Rick Staples

Utah State Representative Carol Spackman Moss

Utah State Representative Rebecca Chavez-Houck

Utah State Representative Mark A. Wheatley

Utah State Representative Elizabeth Weight

Utah State Representative Patrice Arent

Utah State Representative Karen Kwan

Utah State Senator Jani Iwamoto

Virginia State House of Delegate, Mark Sickles

Washington State Senator Marko Liias

National Association of Jewish Legislators
Jeffrey M. Wice, Esq., Counsel
PO Box 42442
Washington, DC 20015
(202)494-7991

# TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE................................................................................1

SUMMARY OF ARGUMENT .................................................................................2

ARGUMENT .............................................................................................................3

I.     THE CONSTITUTIONALLY MANDATED ROLE OF THE DECENNIAL CENSUS IN THE DISTRIBUTION OF POLITICAL AND ECONOMIC POWER, REQUIRES A PROCEDURE GROUNDED IN ACCURACY  ......................................................3

     A. The Historic and Critical Role of Accuracy in Calculating Total Population During the Census Enumeration ..................................................................5

     B. The Census Bureau's Population Data Distribution Process Requires an Accurate Census Count...............................................................................6

     C. The States Rely on an Accurate Census Enumeration in Order to Comply with their Constitutional Mandates ......................................................................8

     D. Including a Citizenship Question on the Census will Undermine its Accuracy and Harm Communities of Color................................................................9

II.    A CENSUS UNDERCOUNT, TRIGGERED BY THE INCLUSION OF A CITIZENSHIP QUESTION WILL NEGATIVELY AND DISPROPORTIONATELY SKEW THE MATHEMATICAL FORMULAE USED FOR POLITICAL REPRESENTATION ACCURACY .........................................................................13

     A. Congressional Districts Must be Drawn with Populations that are as Nearly Equal as Possible.....................................................................................13

     B. State Legislative Districts Must Contain Substantive Equality in Population ..14

     C. A Census Undercount Will Cause Amici's Constituents to Lose Political Representation at the Congressional, State and Local Level ...............................15

III.   THE INCLUSION OF A CITIZENSHIP QUESTION ON THE DECENNIAL CENSUS WILL HOBBLE, NOT BOLSTER THE ENFORCEMENT OF THE VOTIGN RIGHTS ACT  ......................................................................................17

IV.   THE PUBLIC SERVICES DIRECTED TO AMICI'S CONSTITUENTS ARE LIKELY TO BE DIMINISHED IF THE CITIZENSHIP QUESTION IS INCLUDED ..................................................................................................................21

     A. Census Undercount Triggered by the Inclusion of a Citizenship Question Will Negatively Impact Education Programs in the Districts that Amici Represent.....21

     B. A Census Undercount Triggered by the Inclusion of a Citizenship Question will Harm Health Care, Housing and Transportation Programs in the Districts that Amici Represent..................................................................................24

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Barlett v. Strickland*, 556 U.S. 1, 18 (2009) ............................................................... 24

*Brown v. Thompson*, 462 U.S. 835, 842-843 (1983) .................................................... 21

*Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980)..................... 16

Karcher v. Dagett 462 U.S. 725, 734 (1983) ................................................ 14, 19, 20

*Kirkpatrick v. Pressler* 394 U.S. 526 (1969) ............................................................... 19

*Klahr v. Goddard*, 250 F. Supp. 537, 547 (D. Ariz. 1966)........................................... 13

*Kostick v. Nago*, 960 F. Supp. 2d 1074, 1083-84 (D. Haw. 2013), *aff'd*, 134 S. Ct. 1001 (2014)13

*Montes v. City of Yakima*, 40 F. Sipp d 1377, 1393 (E.D. Wash. 2014)....................................... 26

*Reynolds v. Sims*, 377 U.S. 533 (1964)............................................................. 10, 13, 20

*Thornbug v. Gingle*s, 478 U.S. 30, 50 -51 (1986) ........................................................ 24

*Travis v. King*, 552 F. Supp. 554, 564-66 (D. Haw. 1982) ........................................... 13

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ................................................................. 21

*Wesberry v. Sanders*, 376 U.S. 1 (1964)........................................................... 10, 19

## STATUTES

13 U.S.C. § 141(c) ............................................................................................. 14

13 U.S.C. §141(a) (2006).................................................................................. 12

2 U.S.C. §2a and §2b (2006)............................................................................ 12

Ill. Const. of 1870, art. IV, §§ 6-8...................................................................... 13

Mich. Const. of 1909, art. 5, § 4 ....................................................................... 13

Mo. Const. of 1875, art. IV, § 7 ............................................................................... 13

Pub. L. No. 94-171, 89 Stat.1023 (1975) (codified at 13 U.S.C. §141 (c) ................................. 14

U.S. CONST. amend. XIV, Section 2 .......................................................................... 26

**LEGISLATIVE MATERIALS**

Attorney General Nomination: Hearing Before the Senate Committee on the Judiciary, 5th Cong.
(Jan 10, 2017) (statement of Senator Jeff Sessions) ................................................. 27

*Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before the Subcomm,
on Energy, Nuclear Proliferation and Gov't Processes of the S. Comm on Governmental
Affairs*, 99th Cong. 23 (1985) (statement of John Keane, Dir. Bureau of the Census) .............. 16

Memorandum from John H. Thompson, Director, U.S. Census Bureau, to Ditas Katague, Chair,
National Advisory Committee on Racial, Ethnic and Other Populations: Census Responses to
the NAC Recommendations from the Administrative Records, Internet, and Hard to Count
Working Group, at 2 (Oct. 26, 2016) ................................................................... 6

Presidential Executive Order on the Establishment of Presidential Advisory Commission on
Election Integrity, May 11, 2017 (https://www.whitehouse.gov/presidential
actions/presidential-executive-order-establishment -presidential-advisory-commission-
election-integrity/ ..................................................................................... 28

Progress Report on the 2020 Census: Hearing Before the House Committee on Oversight and
Government Reform, 115th Cong., 15-14 (2018) ...................................................... 24, 25, 26

Tabulation Of Population For Purposes Of Apportionment Of State Legislative Bodies: Hearings
Before The Subcomm. On Census & Statistics Of The Comm. On Post Office & Civil Service,
94th Cong. (1975) ....................................................................................... 14

**OTHER AUTHORITIES**

Rucker and Weigel, Trump Advocates Depriving Undocumented Immigrants of Due-Process
Rights. Washington Post (June 25, 2018) ............................................................. 26

Andrew Reamer, GW Institute of Public Policy, Counting for Dollars 2020: New York .... 29, 30,
31, 32

Andrew Reamer, GW Institute of Public Policy, Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds Report #2: *Estimating Fiscal Costs of a Census Undercount to States,* at 2, 5 (2018) (https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Reamer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FMAP-based%20Programs%2003-19-18.pdf) .................................................................................................................... 8

Assemb. N. Nick Perry, The People's Budget: Budget Equity XXVI Preliminary Analysis of the Governor's Executive Budget 2018, Message from the Caucus Chairman (Feb. 2018), https://nyassembly.gov/comm/BlackPR/20030130/ ................................................................. 6

Bess Levin, *Trump Suggests Kneeling Football Players Should Be Deported*, Vanity Fair, May 24, 2018, (https://www.vanityfair.com/news/2018/05/trump-suggests-kneeling-nfl-players-should-be-deported) ........................................................................................ 17, 18

Bill Mahoney, *New York on Pace to Lose 1 Congressional Seat in 2022*, Politico, Dec. 21, 2017 (https://www.politico.com/states/new-york/albany/story/2017/12/21/new-york-on-pace-to-lose-one-congressional-seat-in-2022-158612) ...................................................................... 23

CUNY Mapping Serv. at the Ctr. for Urban Research, CUNY Graduate Ctr., HTC 2020: Mapping Hard to Count (HTC) Communities for a Fair and Accurate 2020 Census, https://www.censushardtocountmaps2020.us/ .......................................................................... 6

Emily Bazelon, The Voter Fraud Case Jeff Sessions Lost and Can's Escape, New York Times Jan. 9, 2017 (https://www. nytimes,com/2017/01/09/magazine/the-voter-fraud case-jeff-sessions-lost-and can't-escape.htmi .......................................................................... 27

Joseph P. Williams, Trump Panel Finds No Voter Fraud (https:www.usnews.com/national-news/articles/2018-01-10/trump-commission-on-election-integrity-found-no-evidence-ofvoter-fraud ................................................................................................................................ 28

Josh Dawsey, Trump derides protections for immigrants from 'shithole' countries, Washington Post, Jan 12, 2018 (https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?noredirect=on&utm_term=.e1b43d296475) .................... 17, 18

Michael Tackett and Michael Wines, Trump Disbands Commission on Voter Fraud, New York Times, Jan 3, 2018 (https://www. nytimes,com/2018/01/03/us/politics/trump-voter-fraud-commission. htmi .................................................................................................................. 28

Michael Waldman, Trump's Commission on 'election integrity' could instead restrict voting,. Washington Post, May 12, 2017 (https://www.washingtonpost.com/opinions/trumps-

commission -on-election-integrity-could-instead-restrict-voting/2017/05/12/b9d4fdde-3698-11e7-b373 ............................................................................................................ 28

N.Y. State Black, Puerto Rican, Hispanic and Asian Legis. Caucus, Mission Statement, https://nyassembly.gov/comm/BlackPR/20030130/ .................................................. 6

Nat'l Conference of State Legislatures, *Redistricting Law 2010 ("NCSL Redistricting")*, at 7 (2009) ............................................................................................................... 10, 12, 14

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardoza L. Rev. 755, 759 -761 (2011) .......................................... 26

Philip Rucker, *Trump Says He is Considering a New Family Separation Policy at U.S.-Mexico Border*, Washington Post, Oct 13, 2018, (https://www.washingtonpost.com/politics/trump-says-he-is-considering-a-new-family-separation-policy-at-us-mexico-border/2018/10/13/ea2f256e-cf25-11e8-920f-dd52e1ae4570_story.html?utm_term=.b783b8bfd72d) ..................................................... 17, 18

Press Release, Leadership Conference on Civil and Human Rights, Secretary Ross Approves Ill-Advised Census Citizenship Question. Mar. 26, 2018,  https://civilrights.org./secretary-ross-approves-ill-advised-census-citizenship-question/.................................................................. 28

Silva Mathema, Keeping Families Together: Why All Americans Should Care About What Happens to Unauthorized Immigrants, Center for American Progress (March 16, 2017)........ 26

U.S. Census Bureau, *U.S. Census Bureau Statistical Quality Standards*, (Jul. 2013) (https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf) 11, 13

US Department of Education, *Special Education: Grants to States* (2018), ............................... 30

## INTERESTS OF AMICI CURIAE[1]

The lead named Amicus is the New York State Black, Puerto Rican, Hispanic and Asian Legislative Caucus (hereinafter "the Caucus"), an association of state elected officials from the State of New York.[2] The Caucus is "a body whose members are united by a common interest in the purpose and function of the legislative process, and the manner in which that process affects the lives and well-being of the people, in general, and in particular, those persons with ties in the Black and Hispanic communities."[3] Caucus members represent districts throughout the State of New York that include citizen and non-citizen residents. As elected officials, Caucus member districts include residents who live in so-called "hard to count" communities (hereinafter "HTC communities") – areas where the initial census "self-response rate has been relatively low."[4] HTC communities typically include (but are not limited to): racial and ethnic minorities; residents who do not speak or read fluent English; low income communities; communities with high numbers of homeless residents; undocumented immigrants; young children; members of the LGBTQIA community, and residents who are distrustful or fearful of government.[5]

---

[1] No person or entity other than amici and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

[2] N.Y. State Black, Puerto Rican, Hispanic and Asian Legis. Caucus, Mission Statement, https://nyassembly.gov/comm/BlackPR/20030130/ (last visited Oct. 20, 2018)

[3] *Id.*; *See also*, Assemb. N. Nick Perry, The People's Budget: Budget Equity XXVI Preliminary Analysis of the Governor's Executive Budget 2018, Message from the Caucus Chairman (Feb. 2018), https://nyassembly.gov/comm/BlackPR/20030130/ (last visited Oct 20, 2018) ("In 2018, statewide elected officials shoulder the unenviable task of serving during the presidential tenure of a man who has expressed little interest in aiding the communities we represent. Therefore, we must endeavor to work even harder to make significant and positive impact at the state level for our residents…").

[4] CUNY Mapping Serv. at the Ctr. for Urban Research, CUNY Graduate Ctr., HTC 2020: Mapping Hard to Count (HTC) Communities for a Fair and Accurate 2020 Census, https://www.censushardtocountmaps2020.us/, (last visited Oct 21, 2018).

[5] Memorandum from John H. Thompson, Director, U.S. Census Bureau, to Ditas Katague, Chair, National Advisory Committee on Racial, Ethnic and Other Populations: *Census Responses to the NAC Recommendations from the Administrative Records, Internet, and Hard to Count Working Group,* at 2 (Oct. 26, 2016) (https://www2.census.gov/cac/nac/reports/2016-10-responses-admin_internet-wg.pdf).

The lead Amicus is joined by similarly situated legislators and organizations from throughout the United States. Amici are united in their interest in ensuring that all of their constituents – particularly, racial and language minorities, young children, immigrants, and low income residents – continue to enjoy access to the political power granted to them by the United States Constitution and the economic resources distributed based upon the data gathered by the census. The government's decision to insert an untested and highly controversial question on citizenship on the 2020 census, in contravention of decades-long Census Bureau policies and methodological procedures, directly threatens Amici's ability to protect these united interests.

## SUMMARY OF ARGUMENT

The allocation of political power, voting rights protections and the annual distribution of an estimated $800 billion dollars[6] in government resources, are tied to the vitally important numeric and geographic data that is generated by the decennial census. The census creates a data set that is used in federal and state formulae as part of a highly complex series of mathematical and geographic calculations.[7] These calculations determine the appropriate level of political representation and the amount and type of resources that will be provided by each level of government to every community in the United States.

The defendants' decision to include a citizenship question on the 2020 census will trigger an undercount in census self-response rates, particularly in HTC communities, further exacerbating pre-existing challenges in counting the residents who live there. This undercount threatens to gravely disenfranchise Amici's constituents politically and economically for the next

---

[6] Andrew Reamer, GW Institute of Public Policy, Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds Report #2: *Estimating Fiscal Costs of a Census Undercount to States,* at 2, 5 (2018)
(https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Reamer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FMAP-based%20Programs%2003-19-18.pdf) ("*Reamer Report*")
[7] *Id.*

decade as it will erroneously skew the entire data set upon which each of the regulatory formulae that determine political power, civil rights, and resource allocation, rely. The negative impacts of a flawed census data set are myriad. Amici are principally concerned with the following:

1. Including a citizenship question will produce inaccurate census data and disproportionately negatively impact state level redistricting against Amici's constituents;

2. An undercount triggered by the inclusion of a citizenship question on the 2020 census puts Amici's constituents at risk of losing electoral power in congressional, state and local government and during the redistricting process;

3. A faulty census data set will negatively impact voting rights; and

4. A faulty census data set will produce a diminution of federal, state, and local resources.

## ARGUMENT

### I. THE CONSTITUTIONALLY MANDATED ROLE OF THE DECENNIAL CENSUS IN THE DISTRIBUTION OF POLITICAL AND ECONOMIC POWER, REQUIRES A PROCEDURE GROUNDED IN ACCURACY

The constitutionally mandated decennial census produces statistical information which determines the political power, civil rights protections, and economic sustainability of programs to which each community is entitled. U.S. CONST. Art. 1 Section 2.[8] Census data creates a snapshot of the nation's demographics by human population and local geography. That data provides the integers that populate the regulatory mathematic and geographic formulae used to determine the apportionment of political power at the federal, state, and local level. This apportionment will be in place for the following decade. Additionally, the snapshot will

---

[8] "The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct." U.S. CONST. Art. 1 Section 2.

determine whether communities, within our representative form of government, will have access to equitable political power as determined through the redistricting processes. In addition to guiding the allocation of power and resources, census data also drives policy decisions made by state and local government agencies, nonprofit and community-based organizations, and the broader business community.[9] The ability to determine whether each community has its fair and accurate share of apportioned political representation and political and economic power requires a census that can produce an *accurate* data snapshot.

Amici, as elected public officials and organizations, are charged with representing their constituents' interests. Those interests include advocating for basic rights like voting rights and fair representation in the US representative democracy, the protection of the civil rights which are held by both citizens and residents alike, and the funding decisions for their geographic districts that will directly affect their constituents' access to crucial resources. These funding allocations are tied to vitally necessary programs, including but not limited to programs related to affordable housing, education, health care, transportation and more.[10]

Despite political protestations to the contrary, accurate data, like accurate facts, are vitally important in order to arrive at the proper outcome. In the case of the constitutionally mandated census, the proper outcome is the correct and proportionate distribution of electoral power and fiscal resources, regardless of zip code, community or race. The inclusion of a citizenship question on the 2020 census gravely threatens Amici's constituents' ability to reach that goal. Including a citizenship question will devastate the Census Bureau's ability to

---

[9] Census Bureau; *Economic Census*: *Uses of Data*, https://www.census.gov/programs-surveys/economic-census/guidance/data-uses.html (April 3, 2018).
[10] Reamer Report.

accurately count the nation's residents. The resulting inaccuracy will unnecessarily lock some of our country's most vulnerable communities into a political and economic underclass.

### A. The Historic and Critical Role of Accuracy in Calculating Total Population During the Census Enumeration

The boundaries for the districts that Amici represent are drawn based on the total population data gathered by the decennial census.[11] That data determines the size of each of Amici's districts and the number of residents they represent.[12] When drawing congressional and legislative districts, districting bodies must design districts that are equally populated. *Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders,* 376 U.S. 1 (1964). Indeed, mathematical precision lies at the heart of the equal population requirements for congressional, legislative and local districts.[13] Congressional districts are required to be as "nearly equal in population as practical."[14] *Wesberry v. Sanders*, 376 U.S. 1 (1964). This mandate is found within Article 1 Section 2 of the U.S. Constitution, "Representatives... shall be apportioned among the several states … according to their respective Numbers which shall be determined by addition to the whole Number of Free Persons … [and] three-fifths [sic] of all other Persons."

The framers were so concerned with numerical accuracy in the distribution of electoral power and access to government resources, that they compromised on which residents would be counted, and who would be counted as whole or fractions of persons. They used racial classifications distinguishing between free White residents and White indentured servants who were counted as whole persons, and enslaved African residents who received a three-fifths count.

---

[11] Nat'l Conference of State Legislatures, *Redistricting Law 2010 ("NCSL Redistricting")*, at 7 (2009).
[12] *Id.* at 25-26.
[13] *Id*. at 2.
[14] *Id.* at 26.

Only after slavery was legally abolished did Congress adjust the mathematical formula for distributing political representation and government resources. Once Congress formally recognized African descendants as full human beings, the formula for apportionment was revised to accommodate the new calculation. The Fourteenth Amendment modified the first sentence of Article I, Section 2, to provide: Representatives shall be apportioned among the several States *according to their respective numbers, counting the whole number of persons in each State*, excluding Indians not taxed." U.S. CONST. amend, XIV, Section 2.

Accuracy of population data is one of the principal underpinnings of the Equal Protection Clause mandate that there be substantive equality in population among the various congressional, state and local legislative districts. As with any mathematical equation, the accuracy of the data determines the accuracy of the answer. The Constitution's demand for population equity in apportioning electoral power is central to how and why the Census Bureau vigorously eschews data gathering policies that could skew census data or produce statistically questionable results.[15]

### B. The Census Bureau's Population Data Distribution Process Requires an Accurate Census Count

One of the most significant reasons for the census enumeration is to produce a set of nationwide total population data.[16] Once gathered, this data set is converted into a report of population, broken down by state, and is delivered to the president by December 31st of the

---

[15] "As the largest statistical agency of the federal government, the Census Bureau strives to serve as the leading source of quality data about the nation's people and economy. The Census Bureau has developed these standards to promote quality in its information products and the processes that generate them. These standards provide a means to ensure consistency in the processes of all the Census Bureau's program areas, from planning through dissemination. By following these standards, the Census Bureau's employees and contractors will ensure the utility, *objectivity, and integrity* of the statistical information provided by the Census Bureau to Congress, to federal policy makers, to sponsors, and to the public." (emphasis added) U.S. Census Bureau, *U.S. Census Bureau Statistical Quality Standards*, (Jul. 2013) (https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf).
[16] NCSL Redistricting, at 8.

year that the census is taken.[17] That report provides the data necessary to reapportion congressional representatives to each state. This reapportionment is processed according to a mathematical formula known as the "method of equal proportions" (hereinafter "MEP"). 2 U.S.C. §2a and §2b (2006). According to the MEP, each state receives an initial allocation of one congressional representative, leaving a balance of 385 seats. The states are then assigned a priority value based on the MEP that divides each state's population by the "geometric mean of that state's current number of seats and the next seat."[18]

By April 1st of the year following the census enumeration, the census report is provided to each of the state officials, who are tasked with state level redistricting, and the governors of each state. 13 U.S.C. §141(a) (2006). The information contained in these reports form the baseline data set that is used for state and local redistricting and the re-drawing of congressional district boundary lines within each state.[19]

To maintain its commitment to numerical accuracy and independence from state and local politics, the Census Bureau has long employed objective, scientific methodologies to ensure accuracy. The Census Bureau's Statistical Quality Standards, with which all Census Bureau employees must comply, defines "information quality" as an "encompassing term comprising utility, objectivity and integrity."[20] The agency strives to ensure that its information is "accurate, reliable, and unbiased," and that it is "…presented in an accurate, clear, complete, and unbiased manner. Objectivity involves both the *content of the information* and the presentation of the information…"[21]

---

[17] *Id.*
[18] NCSL Redistricting, at 10, n42.
[19] NCSL Redistricting, at 10.
[20] U.S. Census Bureau, *Statistical Quality Standards*, I (July 2013) https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/QualityStandards.pdf.
[21] *Id.* at ii.

**C. The States Rely on an Accurate Census Enumeration in Order to Comply with their Constitutional Mandates**

Many states have relied on the Census Bureau's total population data to draw legislative districts for more than a century.[22] (*e.g.* Ill. Const. of 1870, art. IV, §§ 6-8; Mo. Const. of 1875, art. IV, § 7; Mich. Const. of 1909, art. 5, § 4). By the 1970s, the remaining states had also turned to Census Bureau data, in part because of the agency's commitment to accuracy and questions regarding the constitutionality of other metrics.[23] *See Travis v. King*, 552 F. Supp. 554, 564-66 (D. Haw. 1982); *see also Kostick v. Nago*, 960 F. Supp. 2d 1074, 1083-84 (D. Haw. 2013), *aff'd*, 134 S. Ct. 1001 (2014); *Klahr v. Goddard*, 250 F. Supp. 537, 547 (D. Ariz. 1966).

The significance of the Census Bureau's total population data was formally recognized during congressional hearings held in 1975.[24] Prior to that time, the Census Bureau could provide data on "political units as counties, townships, cities, towns and even city wards-but [could not] readily provide statistics on one of the most essential political units – the precinct."[25] As a result, the states confronted numerous difficulties in translating the population data, because the geographic boundaries used by the Census Bureau during that time were not "coterminous with state political subdivisions."[26] Public Law 94-171 was enacted to resolve this issue by creating a process for producing accurate total population information in a format that the states could readily adopt for redistricting purposes. *See* Pub. L. No. 94-171, 89 Stat.1023 (1975) (codified at 13 U.S.C. §141 (c)) (hereinafter "Public Law 94-171"). Public Law 94-171 requires the Census

---

[22]Before the Supreme Court's decision *Reynolds v. Sims*, 377 U.S. 533 (1964), some states also engaged in redistricting based on geographic subdivisions.

[24] *Tabulation of Population for Purposes of Apportionment of State Legislative Bodies*: *Hearings Before the Subcomm. on Census & Statistics of the Comm. on Post Office & Civil Service*, 94th Cong. (1975) ("*Tabulation Hearing*).

[25] Tabulation Hearing, at 1, Opening Statement of Chairwoman Pat Schroeder.

[26] *Id*. at 2-3, statement of Rep. Richard White.

Bureau to provide total population counts in a census block format (including block and census tract) and in the political subdivisions requested by the state. *See* 13 U.S.C. § 141(c).

Upon receipt of the total population data, states are able to group and/or separate out the necessary geographic units and census blocks required to draw district maps in line with constitutional and redistricting principles.[27] These maps must satisfy several requirements, namely: equalize the population between each district; prevent discrimination against racial minority voters, and fulfill state priorities (e.g., compact districts, respecting natural and municipal boundaries, etc.). *Karcher v. Daggett*, 462 U.S. 725, 740-741 (1983).

Since Public Law 94-171 was enacted, states have refined their processes for equalizing residents across political subdivisions by relying on the Census Bureau's data as their baseline. This is not merely a matter of convenience; rather it is a matter of accuracy. Each state is required to comply with the Constitution's mandate of equal protection under the law. The Census Bureau's longstanding commitment to producing *accurate* and useful data plays the quintessential role in empowering the states and local governments to meet these mandates.

### D. Including a Citizenship Question on the Census will Undermine its Accuracy and Harm Communities of Color

Including a citizenship question on the census will impede Amici's ability to draw district lines that comply with their constitutional obligations and will harm the very communities that Amici were elected to represent, particularly communities of color and immigrant communities. The citizenship question will undermine one of the primary purposes of the census enumeration — the distribution of equal representative power. As noted *supra,* the citizenship question is predicted to trigger a reduced census self-response rate and generate a severe undercount in total

---

[27] NCSL Redistricting, at 10.

population data. This undercount will produce a flawed set of data that will skew the results of

the regulatory formulae that employ census data to determine the appropriate distribution of

resources. This will impact nearly 300 congressional financial assistance programs that rely on

census data to guide the fair distribution of hundreds of billions of dollars in state and local

funding.[28]

As noted *infra,* those programs include everything from education and health programs,

funding for seniors and the differently abled, highway and road construction, and public

transportation, community development, infrastructure and more.[29] For decades, the Census

Bureau explicitly and unambiguously opposed questions related to citizenship being included on

the decennial census. That is precisely due to the Census Bureau's acknowledgement that a

citizenship question on the census would produce faulty census data. *Fed'n for Am. Immigration*

*Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980). According to the Bureau in 1980,

> "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the
> population count. Obtaining the cooperation of a suspicious and fearful population would
> be impossible if the group being counted perceived any possibility of the information
> being used against them. Questions as to citizenship are particularly sensitive in minority
> communities and would inevitably trigger hostility, resentment and refusal to cooperate."
> (*FAIR v Klutznick,* at 568).

The decision to include the citizenship question on the census was made in contravention of that

position. In 1985, when discussing the possible impact of questions related to citizenship being

included on the census, the Census Bureau Director testified that such a line of questioning

would:

> "...run the risk of [the Census Bureau] being perceived as an enforcement agency...
> among those residents who could suffer injury as a result of being identified as
> undocumented aliens. This, in turn, could have a major effect on the cooperation we
> receive, not only from segments of this population, *but from the population at large*. In a
> free society, we are *entirely dependent upon respondent cooperation. The Census Bureau*

---

[28] Reamer Report at 2.
[29] *Id.*

*goes to great lengths to avoid misperceptions that could adversely affect that cooperation.*"[30]

Notably, the agency's concerns about the negative impact of a citizenship question on the census existed prior to the creation of the current anti-immigrant, anti-Black and anti-Latinx statements and policies emanating from the Trump Administration.[31] Now that the political atmosphere has been poisoned with bigoted, xenophobic rhetoric and policies aimed squarely and antagonistically at these communities, the Census Bureau's long held reservations about the impact of including a citizenship question on the census are being realized.

Census Bureau personnel have been sounding the alarm about the negative impact a citizenship question on the 2020 census will have on the response rate. The Census Bureau's Center for Survey Management (CSM) indicates that when the citizenship question is added, even residents who were once willing to participate in their questions, are no longer willing to do so.[32] After extensive testing, which incorporated multiple response methods and field representative outreach efforts, the CSM recorded an unprecedented number of respondents who reported concerns about immigration status and confidentiality.[33] Census Bureau Field Representatives ("Field Representatives") noted that they were "facing a 'new phenomenon' in

---

[30] *Enumeration of Undocumented Aliens in the Decennial Census: Hearing Before the Subcomm, on Energy, Nuclear Proliferation and Gov't Processes of the S. Comm on Governmental Affairs*, 99th Cong. 23 (1985) (statement of John Keane, Dir. Bureau of the Census) (emphasis added).

[31] *See*, Josh Dawsey, Trump derides protections for immigrants from 'shithole' countries, Washington Post, Jan 12, 2018 (https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?noredirect=on&utm_term=.e1b43d296475); Bess Levin, *Trump Suggests Kneeling Football Players Should Be Deported*, Vanity Fair, May 24, 2018, (https://www.vanityfair.com/news/2018/05/trump-suggests-kneeling-nfl-players-should-be-deported); Philip Rucker, *Trump Says He is Considering a New Family Separation Policy at U.S.-Mexico Border*, Washington Post, Oct 13, 2018, (https://www.washingtonpost.com/politics/trump-says-he-is-considering-a-new-family-separation-policy-at-us-mexico-border/2018/10/13/ea2f256e-cf25-11e8-920f-dd52e1ae4570_story.html?utm_term=.b783b8bfd72d).

[32] Memorandum Center for Survey Management, U.S. Census Bureau, to Associate Directorate for Research and Methodology ("ARDM"): *Respondent Confidentiality Concerns* (Sept. 20, 2017) (https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf) ("CSM Memo").

[33] CSM Memo at 1-2.

the field and that respondents' fears, particularly among immigrant respondents, have increased markedly."[34] The CSM Memo noted that residents in immigrant and HTC communities were increasingly fearful of responding, "...given the political temperature these days."[35]

One Field Representative reported that a respondent stated "...that he was not a citizen, and then appeared to lie about his country of origin. When the [Field Representative] started asking about his year of entry into the U.S., he 'shut down' and stopped responding to her questions. He then walked out and left her alone in the apartment, which had never happened to her during an interview before."[36] The CSM Memo noted that these negative outcomes are "particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."[37]

These are just some of the fears that Field Representatives reported. They are grounded in a reality where the Trump Administration engages in forced family separations; where President Trump referred to various Black and Latinx countries in the most vulgar of terms and advocated for deporting American citizens without affording them due process.[38] This harmful rhetoric and the accompanying policies have ramped up fear in communities of color and immigrant communities within Amici's districts. The fear of government will further contribute to a massive census undercount which will make accurately enumerating historically HTC communities even more challenging. As a result, the communities that Amici represent, which are some of the most vulnerable communities in our nation, will lose out on their fair share of political representation and the vitally necessary resources, upon which they depend.

---

[34] *Id.* at 1.
[35] *Id.* at 6.
[36] *Id.* at 5.
[37] *Id.* at 7 (emphasis added).
[38] Dawsey, *supra* note 34; Levin, *supra* note 34; Rucker, *supra* note 34.

**ARGUMENT**

**II. A CENSUS UNDERCOUNT, TRIGGERED BY THE INCLUSION OF A CITIZENSHIP QUESTION WILL NEGATIVELY AND DISPROPORTIONATELY SKEW THE MATHEMATICAL FORMULAE USED FOR POLITICAL REPRESENTATION**

    **A. Congressional Districts Must be Drawn with Populations that are As Nearly Equal as Possible**

Announced in *Wesberry v Sanders*, under the "one person-one vote" principle, the Supreme Court held that congressional districts must be drawn such that they contain populations that are as nearly as equal as possible. 376 U.S. 1 (1964). Later in *Kirkpatrick v. Pressler*, the Court clarified that with respect to congressional district lines, there is no point at which population differences among the districts becomes *de minimus*. 394 U.S. 526 (1969). To the extent there are population differences among the districts, the state must demonstrate that the variances are unavoidable or otherwise provide specific justification.[39]

This position was reaffirmed a decade later in *Karcher v. Daggett*, where the Court held that, when it comes to congressional districts, there is "no level of population inequality...that is too small to worry about, *as long as those challenging the plan can show that the inequality could have been avoided*. 462 U.S. 725, 734 (1983), (emphasis added). Justice Brennan, stated: "We thus reaffirm that there are no de minimis population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, Sec. 2, without justification." *Id.* at 734. The Court has consistently held that "absolute population equality [is] the paramount objective "when adhering to the "one person-one vote" mandate in congressional districting.[40]

A census undercount triggered by the inclusion of a citizenship question will harm Amici's constituency by relegating them to districts that are not reflective of the "one person one

---

[39] NCSL Redistricting, at 26.
[40] NCSL Redistricting at 29.

vote" principle in congressional representation. By embracing a policy that is in contravention of the Census Bureau's own standards for accuracy, defendants are eviscerating Amici's constituents' congressional representation power.

### B. State Legislative Districts Must Contain Substantive Equality in Population

Equal distribution of political power is also the driving principle behind local and state level redistricting for both houses of a bicameral state house.[41] While the same mathematical precision in population equality in congressional district lines is not required for state level redistricting, the Supreme Court has repeatedly held that "the overriding objective [in state level redistricting] must be substantial equality of population among the various districts." *Reynolds v. Sims*, 377 U.S. 533, 579 (1964). Indeed, the Equal Protection Clause of the 14th Amendment "requires states to construct legislative districts that are substantially equal in population."[42]

Early on in its state legislative jurisprudence, the Supreme Court outlined the distinction between the congressional districting demand for mathematical precision in population and the slightly less restrictive – yet still mathematically derived – formulation used at the state level. The Court settled on a 10% variation standard and stated that population deviations among the districts beyond a 10% range require justification by substantial state considerations.[43] The Court has since held that legislative apportionment plans with a maximum deviation of under 10% do not make out a prima facie case of invidious discrimination.[44] The Court noted that:

> "[a] plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State ... . The ultimate inquiry, therefore, is whether the legislature's plan 'may reasonably be said to advance [a] rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.'" *Brown v. Thompson*, 462 U.S. 835, 842-843 (1983).

---

[41] *Id.* 138.
[42] *Id.* at 26.
[43] *Id.* at 30-31.
[44] *Id.* at 34.

The Court clarified that "consideration must be given to the character as well as the degree of deviations." *Brown v. Thompson* at 846-846. Should a state legislative plan contain population deviations that exceed the 10% bar, however, "that plan creates a prima facie case of discrimination and must be justified by the state." *Voinovich v. Quilter*, 507 U.S. 146 (1993) (quoting *Brown* at 842-843). The state must then show that its range in excess of the 10% bar is "required in order to advance a 'rational state policy' and that it 'does not dilute or take away the voting strength of any particular group of citizens." *Voinovich* at 161. Upon the establishment of a prima facie case of discrimination, the court must evaluate whether the plan is in the furtherance of a rational state policy and whether the deviation proposed by the plan is in line with constitutional limitations.[45]

The fulfillment of each element of the "equal protection under the law" and the "one person one vote" constitutional mandates, including the equitable distribution of political representation and the determination for how and where to draw congressional, legislative and local district boundary lines, are all determined by census data. These calculations require accuracy for each community to access to the representation afforded to them.

### C. A Census Undercount Will Cause Amici's Constituents to Lose Political Representation at the Congressional, State and Local Level

The inclusion of a citizenship question will create faulty data that will be used to calculate political representation at the congressional, state, and local levels. When that calculation is populated by faulty data, Amici's constituents will also bear the brunt of diminished political power within their state and local districts. This travesty of justice is an avoidable affront to the democratic principles that form the basis of this society.

---

[45] *Id.* at 36.

When the citizenship question triggers the predicted undercount, communities in Amici's districts will be among those communities that will experience the lowest census self-response rates. When congressional, legislative and local redistricting begins following the 2020 census, the requisite mathematical formulae for political representation will erroneously produce fewer representatives when applied to Amici's districts. This decrease in representation will undermine the political strength of Amici's constituents, deny them the political representation to which they are constitutionally entitled, contribute to their disenfranchisement, and lead to the diminution of their political power.

As noted *supra*, the distribution of political representatives is based on the Method of Equal Proportions. New York State is already predicted to lose "...one of its 27 congressional seats in the 2020 reapportionment…"[46] due to its smaller growth in population. It is one thing, if a congressional seat is lost due to a true reduction in population. Yet, it is an entirely different matter if that congressional seat loss stems from faulty data; particularly when the faulty data is produced by irrationally abandoning decades of Census Bureau practices explicitly designed to prevent this outcome. An undercount triggered by the inclusion of a citizenship question, is *precisely* the outcome that the Census Bureau typically tries to avoid.

The same concerns exist on the state and local level. As noted *supra*, Amici's districts are drawn according to formulae designed to comply with the Constitution's "substantive equality" mandate. By intentionally embracing policies that the Census Bureau acknowledges will undermine the accuracy of census data, the decision to insert a citizenship question poses a direct threat to the political power of Amici's constituents on the state level, as well.

---

[46] Bill Mahoney, *New York on Pace to Lose 1 Congressional Seat in 2022*, Politico, Dec. 21, 2017 (https://www.politico.com/states/new-york/albany/story/2017/12/21/new-york-on-pace-to-lose-one-congressional-seat-in-2022-158612).

16

**ARGUMENT**

**III.     THE INCLUSION OF A CITIZENSHIP QUESTION ON THE DECENNIAL CENSUS WILL HOBBLE, NOT BOLSTER THE ENFORCEMENT OF THE VOTING RIGHTS ACT**

Contrary to Defendants' claim, the inclusion of a citizenship question on the 2020 census will not aid in the enforcement of the Voting Rights Act. Rather, the inclusion of a citizenship question, especially in the current political climate will chill the participation of both citizens and noncitizens in the census, produce a disproportionate undercount of racial and language minority communities, the primary beneficiaries of the VRA, and make it harder for these communities to claim the VRA's protections.

Citizenship status information is primarily used in the litigation of cases under Section 2 of the Voting Rights Act. To proceed on a claim under Section 2, plaintiffs first bear the burden of demonstrating that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member [voting] district" if the district were redrawn, that the minority group is "politically compact"; and that "the white majority votes sufficiently as a bloc to enable it. . .usually to defeat the minority's preferred candidate." *Thornbug v. Gingle*s, 478 U.S. 30, 50 -51 (1986).

In meeting their threshold burden under Section 2, plaintiffs may rely on data about citizenship status for several reasons. Namely, citizenship status data may be employed to generate "citizenship voting age population" ("CVAP") data. The CVAP data then may be used to show that members of the minority group vote together as a bloc, that they are regularly defeated under the challenged electoral configuration, or that they would be numerous enough to

elect candidates of their choice if the district were redrawn. And, if the plaintiffs are ultimately successful, CVAP data may also be used to fashion a remedial redistricting plan.[47]

However, the Supreme Court has never held that CVAP data was required to establish a vote dilution claim under Section 2. In fact, the Court has suggested that mere "voting- age population" data may be sufficient. See *Barlett v. Strickland*, 556 U.S. 1, 18 (2009). Furthermore, as noted *supra*, the decennial census has not included a citizenship question since the passage of the VRA in 1965. Indeed, during the 53 years since the VRA became law, neither the U.S. Department of Justice, nor state and local governmental entities that defend their electoral practices have ever claimed that citizenship status should be asked on the census to ensure proper enforcement of the VRA until now.[48] It is only the current Administration that has suggested that the enforcement of the VRA was hampered by the Census Bureau's failure to do so. Tellingly too, during the 53 years since the passage of the VRA, none of the major civil rights groups who litigate VRA cases on behalf of the racial and language minority communities have ever requested that a citizenship question be included on the decennial census to aid their enforcement of the VRA, and strenuously oppose the inclusion of a such a question now.[49]

---

[47] See e.g., Progress Report on the 2020 Census: Hearing Before the House Committee on Oversight and Government Reform, 115th Cong., 15-14 (2018) (testimony of Professor Justin Levitt, former Deputy Assistant Attorney General, Civil Rights Division) (Despite a deep commitment to enforcing the Voting Rights Act … we never requested that the decennial enumeration include a question relating to citizenship. Nor had any the Civil Rights Division of any Justice Department, under any Administration, for the previous 53 years.") [hereinafter "Levitt Testimony']

[48] Levitt Testimony at 14.

[49] See Levitt Testimony at 14. (…[C]onsider the position of civil rights groups engaged in extensive private enforcement of the Voting Rights Act, and fiercely advocating for vigorous public enforcement of the Act. Groups like the NAACP Legal Defense Fund, MALDEF, Asian Americans Advancing Justice, LatinoJustice PRLDEF, the Lawyers Committee for Civil Rights Under the Law, the ACLU, and many other members of the Leadership Conference for Civil and Human Rights coalition have a long and proud history of deploying the Voting Rights Act to combat discriminatory laws and procedures and to ensure equitable electoral opportunity. Each and every one has opposed vigorous opposition to the Commerce Secretary's decision to include a question related to citizenship on the decennial enumeration in this political climate. If the information were really necessary to enforce the Voting Rights Act, this unified opposition by the private organizations most frequently litigating cases enforcing the Voting Rights would be exceedingly odd.") (footnote omitted).

The reason why governmental and private VRA litigants have not sought to include citizenship questions in the decennial census is patently obvious. This data has been readily available and reliably obtainable from other sources. In particular, citizenship status data is available from the census 'long form', a survey sent to a portion of the population at the same time as the Census Bureau uses a "short form" survey in an attempt to count every person in compliance with the Constitution's mandate. U.S. CONST. amend. XIV, Section 2. Since 2005, citizenship status data has come from the American Community Survey (hereinafter "ACS"), a rolling monthly survey capturing over two million responses per year that provides information for the US, state and local governmental entities down to aggregated block groups covering either one-year or five-year periods. As one court has noted, the ACS is "routinely relied upon in Section 2 cases." *Montes v. City of Yakima*, 40 F. Sipp d 1377, 1393 (E.D. Wash. 2014).

While the ACS data is admittedly far from perfect, the data that will result from the inclusion of a citizenship question on the decennial census will certainly be far worse. This is so because the ACS is a survey and experts can use sampling and other techniques to compensate for nonresponse rates.[50] By contrast, federal law and Supreme Court precedent significantly limit the techniques that can be used to compensate for undercounting on the decennial census.[51] In short, even assuming *arguendo* that the inclusion of a citizenship question on the decennial census will produce more precise citizenship status data, it will also produce both less accurate total population and citizenship numbers because of the decrease in responses rates by justifiably fearful citizens and noncitizens in immigrant communities.[52]

---

[50] *See* Levtitt Testimony 6-7

[51] *See* e.g., Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardoza L. Rev. 755, 759 -761 (2011).

[52] Since January 2017, the current Administration has advocated for, and several instances adopted anti-immigrant policies in various domains, including making it harder for noncitizens to enlist in the military, seek protection from persecution, apply for and receive visas. In addition, as noted *supra*, President Trump has openly called for the deportation of undocumented persons without due process of law. The current Administration's anti-immigrant

Furthermore, Defendants' claim that the addition of a citizenship question is necessary because the Department of Justice purportedly needs this data to better enforce the VRA is simply not credible. Defendants' professed interest in the more effective enforcement of the VRA is belied by the fact that strengthening enforcement of the VRA is clearly not one of its priorities. To the contrary, the current Administration has taken several steps that demonstrate a desire to weaken, not strengthen, enforcement of the VRA.

In particular, in one of his first acts as President-Elect, Donald Trump nominated then Alabama Senator Jeff Sessions, notorious for his unsuccessful prosecution of three Black voting rights activist on charges of voter fraud during his tenure as U.S. Attorney in Alabama in the 1980s, for the position as Attorney General.[53] Former Massachusetts Governor Deval Patrick who assisted of one of the three defendants in the case, Spencer Hogue called Sessions efforts in the case "a cautionary tale."[54]  Indeed, during the nomination hearings for his current position, then Senator, now Attorney General Sessions opined that the Voting Rights Act was "intrusive."[55] Under Sessions' leadership, the Department of Justice, upon information and belief, has not initiated a single enforcement action under the Voting Rights Act.

Six months into his tenure, President Trump, following up on his false claims that he had not won the popular vote because millions of "illegal aliens" had purportedly voted in the 2016 presidential election, issued an executive order establishing the Presidential Advisory

---

stance will directly affect the response rates of both citizens and noncitizens to the Census as millions of U.S. citizens reside in homes with at least one undocumented person and may fear not without justification that filling out the Census form will lead to detention or deportation of their undocumented family members. See e.g. Rucker and Weigel, Trump Advocates Depriving Undocumented Immigrants of Due-Process Rights. Washington Post (June 25, 2018); Silva Mathema, Keeping Families Together: Why All Americans Should Care About What Happens to Unauthorized Immigrants, Center for American Progress (March 16, 2017).

[53] See e.g. Emily Bazelon, The Voter Fraud Case Jeff Sessions Lost and Can't Escape, New York Times Jan. 9, 2017 (https://www. nytimes,com/2017/01/09/magazine/the-voter-fraud case-jeff-sessions-lost-and can't-escape.htmi.
[54] Id.
[55] Attorney General Nomination: Hearing Before the Senate Committee on the Judiciary, 5th Cong. (Jan 10, 2017) (statement of Senator Jeff Sessions).

Commission on Election Integrity (hereinafter "Commission").[56] The Commission was tasked with, *inter alia*, "study[ing] the registration and voting processes used in Federal elections."[57] The creation of the Commission was widely criticized by voting rights advocates, scholars and experts, and newspaper editorial boards as a pretext for, and prelude to, voter suppression.[58] Less than a year later, following the refusal of over half of the fifty states to comply with the commission's request for personal voter information from every state, and array of lawsuits, the commission was abandoned without having uncovered any evidence of fraudulent voting during its 11 months of operation.[59]

In short, Defendants' invocation of the VRA to justify the inclusion of a citizenship question in the upcoming census is a pretext, yet another a political strategy in the current Administration's ongoing campaign to reduce the voting strength and opportunities of racial and language minority communities, in contravention of the objective and goals of the VRA and should be squarely rejected by this Court.

## ARGUMENT

### IV. THE PUBLIC SERVICES DIRECTED TO AMICI'S CONSTITUENTS ARE LIKELY TO BE DIMINISHED IF THE CITIZENSHIP QUESTION IS INCLUDED

#### A. Census Undercount Triggered by the Inclusion of a Citizenship Question will Negatively Impact Education Programs in the Districts that Amici Represent

---

[56] See Presidential Executive Order on the Establishment of Presidential Advisory Commission on Election Integrity, May 11, 2017 (https://www.whitehouse.gov/presidential actions/presidential-executive-order-establishment -presidential-advisory-commission-election-integrity/
[57] Id.
[58] See e.g. Press Release, Leadership Conference on Civil and Human Rights, Secretary Ross Approves Ill-Advised Census Citizenship Question. Mar. 26, 2018, https://civilrights.org./secretary-ross-approves-ill-advised-census-citizenship-question/; Michael Waldman, Trump's Commission on 'election integrity' could instead restrict voting,. Washington Post, May 12, 2017 (https://www.washingtonpost.com/opinions/trumps-commission -on-election-integrity-could-instead-restrict-voting/2017/05/12/b9d4fdde-3698-11e7-b373;
[59] See e.g., Michael Tackett and Michael Wines, Trump Disbands Commission on Voter Fraud, New York Times, Jan 3, 2018 (https://www. nytimes,com/2018/01/03/us/politics/trump-voter-fraud-commission. htmi; Joseph P. Williams, Trump Panel Finds No Voter Fraud (https:www.usnews.com/national-news/articles/2018-01-10/trump-commission-on-election-integrity-found-no-evidence-ofvoter-fraud .   ,

The funds the states receive from the federal government come in the form of direct payments, and block, categorical, project, and formula grants, which are guided by the decennial census count. The decennial census is then used to produce data sets in a manner instructed and authorized by Congress.[60] The majority of funds that a state receives are used to distribute funds for low-income individuals with a focus on children. Medicaid, for example, accounts for 58% of the federal funding received by New York State. This is separate from the State Children Health Insurance Program (S-CHIP), foster care, Special Education, Title I, Head Start, Women Infant and Children (WIC), Section 8, LIHEAP, the Health Center Program, and SNAP – all of which also rely on census data.[61]

The New York State Education Department, Department of Health, Office of Children and Families, Department of Homes and Community Renewal are the primary state agencies that utilize the decennial census for grant-funding within the state. These agencies principally rely on an accurate count of the state's population and subsequently, an accurate count of children living in low-income households that qualify for entitlement programs. Hence, an undercount in the decennial census will also produce a reduction of funds for these vitally important programs.

Departments of Education in states like New York receive census-guided funding for Title I Grants to Local Education Agencies (LEAs), Special Education Grants, (IDEA), and the National School Lunch Program. In New York, these three programs combine for a total of $2,518,943,089 which is approximately 5% of NYS's total allocation.[62] Title I programs provide

---

[60] Reamer Report, at 4-5.
[61] *Id.* at 7.
[62] Andrew Reamer, GW Institute of Public Policy, Counting for Dollars 2020: New York. Washington, D.C.: The George Washington University, 1-2 (2017), (https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/New%20York%20CFD%2008-18-17.pdf) ("Counting for Dollars: New York")

funding to states to close the achievement gap. They are geared towards low income at-risk students and are provided directly to a LEA.[63] In New York and similarly situated states, federal funding is provided to the state education department based on poverty data generated from the decennial census. This funding is then distributed to a LEA based on federal allocation formulae which then makes allocations to schools based on a per pupil formula for low-income students.[64] In fiscal year 2015, New York received $1,093,856,656 for Title I funding, which accounted for approximately 2% of its total funding and 43% of New York's census-guided education funding.[65] Special Education grant funding is also awarded to education departments based upon census data. New York received $750,705,898 which accounted for approximately 1% of NYS's funding from the federal government and 30% of the census-guided education funding.[66] Thus, the distribution of these dollars is directly impacted by the total count of children in the decennial census.

The Child Care Development Fund (CCDF) is a block grant that allocates funding to states to improve the quality of child care and provide access to low-income families. In fiscal year 2015, New York's allocation was $198,303,000.[67] New York also received $404,848,000 from census-guided funding for foster care and $591,919,016 for both Head Start and Early Head Start.[68] The Head Start and Early Head Start programs fund 50,748 children and the funding allocations are determined by the total count of children calculated by age group in the decennial census. The children in Amici's districts rely on these and other programs for educational

---

[63] US Department of Education, *Special Education: Grants to States* (2018), (https://www2.ed.gov/programs/osepgts/index.html).
[64] *Id.*
[65] Counting for Dollars: New York, at 1.
[66] *Id.*
[67] *Id.*
[68] *Id.*

advancement and to ensure receipt of adequate care. They will be among those who will bear the brunt of a census undercount triggered by the inclusion of a citizenship question.

### B. A Census Undercount Triggered by the Inclusion of a Citizenship Question will Harm Health Care, Housing and Transportation Programs in the Districts that Amici Represent

The Department of Health is one of the agencies that stands to lose the most from an allocation of funds based on an inaccurate population count of the decennial census. Medicaid accounts for 60% of the census-guided funding in New York. In fiscal year 2015, New York received $32,147,147, 368 out of a total of $53,194,672,345 and $476,760,910 for its Women Infants and Children program ("WIC").[69] The WIC program was designed to serve women who are pregnant, postpartum (up to six months after birth of infants), infants, and children (up to age 5). NYS receives the third largest amount in grant funding next to California and Texas, and receives approximately 8% of the program's national funding. This accounts for approximately 1% of the census-guided federal funding allocated to New York.[70]

In addition to health programs, housing programs will also suffer if the citizenship question remains on the census. The Department of Homes and Community Renewal administers the Section 8 program for the State of New York. Section 8 vouchers are administered directly to the owners of the housing units of the individual that resides in the unit. Owners in New York received a total of $2,444,859,000 which is approximately 5% for private units and $1,265,756,712 which accounts for approximately 2% for public housing units.[71] New York receives approximately 30% of national Section 8 funding given that it operates the largest public housing agency in the country.[72] Nationally, approximately 2 million families receive

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

Section 8 funding which amounts to 25% of individuals/families who are eligible for a Section 8 housing voucher.[73] The calculation and distribution of Section 8 and other housing programs are all driven by the data supplied by the Census Bureaus.[74] Should the baseline data which populates each of the mathematical formulae for distribution of these and other vitally necessary programs be faulty, then the result will be a devastating loss of resources for the communities that most need them. This outcome is all the more tragic because it is *completely unnecessary*.

Each of the afore mentioned programs represent just a small sample of the federal and state funding allocations that will be decimated if a citizenship question on the census triggers a massive undercount. Though these examples are specific to New York State, the pattern is the same in each of the districts that Amici represent across the country.

## CONCLUSION

The usefulness of census data relies on *accuracy*. That data is the key to allocating political power and access to resources – the very arrangement that the nation's founders envisioned. That is why the Census Bureau embraces methodologies that minimize the inclusion of flawed data – and rejects those that do not. It is only defendants who seek to abandon decades of the Census Bureau's own quality control practices by inserting a question regarding citizenship on the census, in contravention of the Census Bureau's own policy. For the foregoing reasons, defendants must not be permitted to toy with one of our nation's most sacred tasks: the enumeration of *all persons* in order to accurately and equitably distribute political power and pathways to economic sustainability. The plaintiffs' challenge should be sustained.

---

[73] *Id.*
[74] *Id.*

AO 458 (Rev. 06/09)  Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Case No. |
| _____ | ) | |
| *Defendant* | ) | |

## APPEARANCE OF COUNSEL

To:     The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

_____ .

Date: _____

_____
*Attorney's signature*

_____
*Printed name and bar number*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

_____
*FAX number*