IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et al., <br><br> Defendants. | 18-CV-2921 (JMF) |
| NEW YORK IMMIGRATION COALITION, et. al., <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et. al., <br><br> Defendants. | 18-CV-5025 (JMF) (Consolidated Case) |

**NOTICE OF FILING OF JOINT STIPULATIONS**

Pursuant to the Court's Joint Pre-Trial Order (Docket No. 461) the parties hereby give notice that they have reached agreement on an initial set of stipulations. The parties will continue to confer and may reach agreement on additional stipulations. The parties' joint stipulations are attached here as Exhibit 1.

Dated: November 4, 2018

Respectfully submitted,

By: /s/ Dale Ho

| | |
|---|---|
| Dale Ho | Andrew Bauer |
| American Civil Liberties Union Foundation | Arnold & Porter Kaye Sholer LLP |
| 125 Broad St. | 250 West 55th Street |
| New York, NY 10004 | New York, NY 10019-9710 |
| (212) 549-2693 | (212) 836-7669 |
| dho@aclu.org | Andrew.Bauer@arnoldporter.com |
| | |
| Sarah Brannon* | John A. Freedman |
| American Civil Liberties Union Foundation | Arnold & Porter Kaye Scholer LLP |
| 915 15th Street, NW | 601 Massachusetts Avenue, N.W. |
| Washington, DC 20005-2313 | Washington, DC 20001-3743 |
| (202) 675-2337 | (202) 942-5000 |
| sbrannon@aclu.org | John.Freedman@arnoldporter.com |
| Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3). | |

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300
pgrossman@nyclu.org

*Attorneys for New York Immigration Coalition Plaintiffs*

Barbara Underwood, Attorney General of the State of New York
*/s/ Elena Goldstein*
Elena Goldstein, Senior Trial Counsel
Matthew Colangelo, Executive Deputy Attorney General
Ajay Saini, Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6021
Elena.Goldstein@ag.ny.gov

*Attorneys for the State of New York Plaintiffs*

Joseph H. Hunt, Assistant Attorney General
Brett A. Shumate, Deputy Assistant Attorney General
John R Griffiths, Director, Federal Programs Branch
Carlotta P. Wells, Assistant Branch Director
*/s/ Kate Bailey*
Kate Bailey, Trial Attorney
Garrett Coyle, Trial Attorney
Stephen Ehrlich, Trial Attorney
United States Department of Justice Civil Division, Federal Programs Branch
1100 L St, N.W., Washington, DC 20005
(202) 514-9239
Kate.Bailey@usdoj.gov

*Attorneys for Defendants*

# Exhibit 1

**Joint Stipulations in *State of New York, et al. v. U.S. Dep't of Commerce, et al*, 18-CV-2921 (JMF)**

**I. Past Census Bureau Practices With Regard to Citizenship Information**

    **a. Decennial Census Overview**

1. The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—with no reference to citizenship status—residing in each state.

2. The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers"; which requires "counting the whole number of persons in each State."

3. The Constitution requires that this count be an "actual Enumeration" conducted every ten years.

4. Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce.

5. The Secretary of Commerce is charged with the responsibility to take a Decennial Census to create an actual enumeration of the United States population.

6. The central constitutional purpose of the Census Bureau in taking the Decennial Census is to conduct an enumeration of the total population.

7. To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States, which is directed to every person living in the United States and all persons living in the United States are legally required to respond.

8. If the Census Bureau does not receive a response to the questionnaire it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data. This process is the Non Response Follow Up ("NRFU") operation.

9. If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household.

10. For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person.

11. If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible."

12. A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there.

13. For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview.

14. After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, to determine the population count in each state.

15. Data from the Decennial Census are reported down to the census block level.

16. The population data collected through the Decennial Census determines the apportionment of seats in the U.S. House of Representatives among the states.

17. The population data collected through the Decennial Census also determines the number of electoral votes each state has in the Electoral College.

18. States also use Decennial Census data to draw congressional, state, and local legislative districts.

19. The federal government also uses Decennial Census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments.

20. Approximately 132 programs used Census Bureau data to distribute hundreds of billions of dollars in funds during fiscal year 2015.

21. Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count."

22. Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census.

23. Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census.

24. The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals.

25. The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population.

26. The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills.

27. In the 2000 and 2010 Decennial Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness.

28. For the 2000 and 2010 Decennial Censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count.

### b. The Long Form and the American Community Survey

29. The 1950 Decennial Census asked for the individual's place of birth, and whether a foreign-born individual had been naturalized.

30. A question concerning citizenship did not appear on the Decennial Census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010.

31. From at least the 1970 Decennial Census through the 2000 Decennial Census, in lieu of the short-form questionnaire the Census Bureau sent a long form questionnaire to approximately one in six households.

32. For the 1970 Decennial Census, the long form questionnaire, which contained additional questions, was sent to approximately one in five households.

33. For the 2000 Decennial Census, the long form questionnaire, which contained additional questions, was sent to approximately one in six households.

34. Data collected from the sample households surveyed with the long form were used to generate statistical estimates.

35. In the 1970, 1980, 1990, and 2000 Decennial Censuses, the long form Decennial Census questionnaire contained a question about citizenship status.

36. In the 1990 and 2000 Decennial Censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth.

37. After the 2000 Decennial Census, the long form questionnaire was replaced by the American Community Survey.

38. After the 2000 Decennial Census, the functions performed by the long form have been replaced by the American Community Survey ("ACS").

39. The ACS began operating in 2000 and was at full sample size for housing units in 2005, and for group quarters in 2006.

40. The ACS is a yearly survey of approximately 2% of households—about 3.5 million—across the United States.

41. A question concerning citizenship status currently appears as among one of more than 50 questions on the 28-page ACS questionnaire.

42. The citizenship status question on the ACS is preceded by a question asking where the person was born.

43. The citizenship question that appears on the ACS is not a binary yes/no question. The ACS citizenship question, asks whether the person was born in the United States, a U.S. territory, or abroad.

44. The data collected by the ACS allows the Census Bureau to produce estimates of Citizen Voting Age Population ("CVAP").

45. CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level.

46. Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate.

47. The ACS is intended to provide information on characteristics of the population, and the social and economic needs of communities.

48. Unlike the Decennial Census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates.

49. Because ACS estimates are statistical estimates based on a sample, the tabulations are weighted to reflect sampling probabilities and eligibility for NRFU, as well as well as to control to official population totals as established by the Population Estimates program.

50. Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tract[s]" and "census-block groups."

51. Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3-year" or "5-year" estimates depending on the number of years aggregated together).

52. Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in–every-eight-household sample.

53. Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units.

54. 1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1-year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+", 3-year ACS estimates produced "[d]ata for areas with populations of

20,000+" until they were discontinued after the 2011-2013 3-year estimates, and 5-year ACS estimates produce "[d]ata for all areas."

55. The 2000 Decennial Census short form questionnaire did not include a question on citizenship.

56. The 2010 Decennial Census questionnaire did not include a question on citizenship.

**II. The 2020 Decennial Census**

57. A planned question on the 2020 Decennial Census questionnaire asks, "Is this person a citizen of the United States?," with the answer options "Yes, born in the United States"; "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas"; "Yes, born abroad of U.S. citizen parent or parents"; "Yes, U.S. citizen by naturalization – Print year of naturalization"; and "No, not a U.S. citizen".

58. The 2020 Decennial Census questionnaire will pose questions including questions regarding sex, Hispanic origin, race, and relationship status.

59. A planned question on the 2020 Decennial Census questionnaire asks "Is this person of Hispanic, Latino, or Spanish origin?"

60. A planned question on the 2020 Decennial Census questionnaire asks "What is this person's race?"

61. A planned question on the 2020 Decennial Census questionnaire asks how each person in the household is related to the person filling out the questionnaire.

62. A planned question on the 2020 Decennial Census questionnaire asks, "What is this person's sex?"