# Exhibit 2

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3    ----------------------------------------

      NEW YORK IMMIGRATION COALITION, ET AL.,

 4

                         Plaintiffs,

 5         vs.        Case No.  1:18-CF-05025-JMF

 6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

 7                     Defendants.

      ----------------------------------------

 8

 9                     Washington, D.C.

10                     Tuesday, August 28, 2018

11    Deposition of:

12                 KAREN DUNN KELLEY

13    called for oral examination by counsel for

14    Plaintiffs, pursuant to notice, at the office of

15    Arnold & Porter, 601 Massachusetts Avenue NW,

16    Washington, D.C., before KAREN LYNN JORGENSON,

17    RPR, CSR, CCR of Capital Reporting Company,

18    beginning at 9:04 a.m., when were present on

19    behalf of the respective parties:

20              Veritext Legal Solutions

                   Mid-Atlantic Region

                1250 Eye Street NW - Suite 350

21              Washington, D.C.  20005

22
```

Page 2

1                          CONTENT

                                                    PAGE
2
      KAREN DUNN KELLEY                              9
3     Examination by Mr. Grossi                     9
      Examination by Ms. Goldstein                  269
4     Examination by Ms. Boutin                     323
      Examination by Ms. Shah                       339
5     Examination by Mr. Adams                      349
6
7        KAREN DUNN KELLEY DEPOSITION EXHIBITS
8     EXHIBIT                                       PAGE
      NUMBER
9     Plaintiffs' Exhibit 1    Statement            33
      Plaintiffs' Exhibit 2    Email chain          47
10    Plaintiffs' Exhibit 3    Email chain          52
      Plaintiffs' Exhibit 4    Supplemental         65
11                             memorandum
      Plaintiffs' Exhibit 5    Defendants'          65
12                             objections
      Plaintiffs' Exhibit 6    Email train          78
13    Plaintiffs' Exhibit 7    Emails               84
      Plaintiffs' Exhibit 8    Email                90
14    Plaintiffs' Exhibit 9    Email                105
      Plaintiffs' Exhibit 10   Email                107
15    Plaintiffs' Exhibit 11   Email                119
      Plaintiffs' Exhibit 12   Declaration          119
16    Plaintiffs' Exhibit 13   Email                135
      Plaintiffs' Exhibit 14   Email                145
17    Plaintiffs' Exhibit 15   Email                156
      Plaintiffs' Exhibit 16   January 3, 2018      159
18                             memorandum
      Plaintiffs' Exhibit 17   Email                183
19    Plaintiffs' Exhibit 18   Email                186
      Plaintiffs' Exhibit 19   Email                194
20    Plaintiffs' Exhibit 20   Email                195
      Plaintiffs' Exhibit 21   January 9, 2018      203
21                             memorandum
      Plaintiffs' Exhibit 22   Email                219
      Plaintiffs' Exhibit 23   Email                235
22    Plaintiffs' Exhibit 24   Email                242

Page 3

1    Plaintiffs' Exhibit 25   Email           243

     Plaintiffs' Exhibit 26   Questions       249

2    Plaintiffs' Exhibit 27   March 1, 2018   252

                              memorandum

3    Plaintiffs' Exhibit 28   Final decision  258

     Plaintiffs' Exhibit 29   September 20,   355

4                             2017 memorandum

5           (Exhibits attached to transcript.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 4

```
 1                 A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
            David Gersch, Esquire
 4          Peter Grossi, Esquire
            John Freedman, Esquire
 5          Caroline Kelly, Esquire
            ARNOLD & PORTER
 6          601 Massachusettes Avenue, NW
            Washington, D.C. 20001
 7          (202) 942-5316
            david.gersch@arnoldporter.com
 8          peter.grossi@arnoldporter.com
            john.freedman@arnoldporter.com
 9          caroline.kelly@arnoldporter.com
10          Perry Grossman, Esquire
            New York Civil Liberties Union
11          125 Broad Street
            New York, New York 1004
12          (202) 607-3300
            pgrossman@nyclu.org
13
    On behalf of Kravitz Plaintiffs:
14          Daniel Grant, Esquire
            COVINGTON & BURLINGTON
15          850 Tenth Street, NW
            Washington, D.C. 20001
16          (202) 662-5458
            dgrant@cov.com
17
    On behalf of Los Angeles Unified School District:
18          Keith Yeomans, Esquire (Telephonically)
            DANIELS WOLIVER KELLEY
19          115 Pine Avenue
            Suite 500
20          Long Beach, California 90802
            (562) 366-8500
21          kyeomans@dwkesq.com
22
```

Page 5

```
 1   On behalf of County of Los Angeles:
          David I. Holtzman, Esquire
 2        HOLLAND & KNIGHT
          50 California Street
 3        Suite 2800
          San Francisco, California 94111
 4        (415) 743-6909
          david.holtzman@hklaw.com
 5
     On behalf of Lupe Plaintiffs:
 6        Andrea Senteno, Esquire (Telephonically)
          MALDEF
 7        1016 16th Street, NW
          Suite 100
 8        Washington, D.C. 20036
          (202) 293-2828
 9        asenteno@maldef.org
10        Niyati Shah, Esquire
          ASIAN AMERICANS ADVANCING JUSTICE
11        1620 L Street, NW
          Suite 1050
12        Washington, D.C. 20036
          (202) 296-2300
13        nshah@advancingjustice-aajc.org
14   On behalf of City of San Jose & Black Alliance for
     Just Immigration:
15        Rory Adams, Esquire
          MANATT, PHELPS & PHILLIPS
16        7 Times Square
          New York, New York 10036
17        (212) 790-4501
          radams@manatt.com
18
          Ezra Rosenberg, Esquire
19        Dorian Spence, Esquire
          LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
20        1401 New York Avenue, NW
          Suite 400
21        Washington, D.C. 20005
          (202) 662-8345
22        erosenberg@lawyerscommittee.org
          dspence@lawyerscommittee.org
```

Page 6

1

On behalf of State of California:
        Gabrielle Boutin, Esquire
2       R. Matthew Wise, Esquire (Telephonically)
        DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
3       GENERAL
        1300 I Street
4       P.O. Box 944255
        Sacramento, California 94244
5       (916) 210-6053
        gabrielle.boutin@doj.ca.gov
6       matthew.wise@doj.ca.gov

7

On behalf of State of New York:
        Elena Goldstein, Esquire
8       Matthew Colangelo, Esquire
        Alex Finkelstein, Esquire
9       ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
        PROTECTION BUREAU
10      28 Liberty Street
        New York, New York 10005
11      (212) 416-8441
        elena.goldstein@ag.ny.gov
12      matthew.colangelo@ag.ny.gov
        alex.finkelstein@ag.ny.gov
13

14  On behalf of Defendants:
        Kate Bailey, Esquire
15      Joshua Gardner, Esquire
        U.S. DEPARTMENT OF JUSTICE
16      20 Massachusetts Avenue
        Washington, D.C. 20530
17      (202) 305-9802
        kate.bailey@usdoj.gov
18      joshua.gardner@usdoj.gov

19

20

21

22

Page 7

```
 1        Michael Cannon, Esquire
          David M.S. Dewhirst,Esquire
 2        U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
          ASSISTANT GENERAL COUNSEL FOR FINANCE &
 3        LITIGATION
          1401 Constitution Avenue, NW
 4        Room 5890
          Washington, D.C. 20230
 5        (202) 482-5395
          mcannon@doc.gov
 6        ddewhirst@doc.gov
 7        Michael Walsh, Jr., Esquire
          DEPUTY GENERAL COUNSEL
 8        1401 Constitution Avenue, NW
          Washington, D.C. 20230
 9        (202) 482-4772
          mwalsh@doc.gov
10
     VIDEOGRAPHER:  Dan Reidy
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 8

1                P R O C E E D I N G S

2      WHEREUPON,

3            VIDEOGRAPHER:  Good morning.  We are

4      going on the record at 9:04 a.m. on Tuesday,

5      August 28, 2018.  Please note that the microphones

6      are sensitive and may pick up whispering, private

7      conversations and cellular interference.  Please

8      turn off all cell phones and place them away from

9      the microphones, as they can interfere with the

10     deposition audio.  Audio and video recording will

11     continue to take place unless all parties agree to

12     go off the record.

13            This is Media Unit 1 of the deposition of

14     Karen Dunn Kelley taken by counsel for the

15     plaintiff in the matter of New York Immigration

16     Coalition, et al., versus U.S. Department of

17     Commerce, et al.  This case is filed in the U.S.

18     District Court for Southern District of New York.

19     This deposition is held at the law offices of

20     Arnold & Porter located at 601 Massachusetts

21     Avenue Northwest, Washington, D.C. 20001.

22            My name is Dan Reidy from the firm

Page 9

1   Veritext Legal Solutions, and I'm the

2   videographer.  The court reporter is

3   Karen Jorgenson from the firm Veritext Legal

4   Solutions.

5           I am not authorized to administer an

6   oath.  I am not related to any party in this

7   action, nor am I financially interested in the

8   outcome.  Also, counsels' appearances will be

9   noted on the stenographic record rather than

10  orally at this time.

11          Will the court reporter please swear in

12  the witness?                        Global
                                        Objection
13                  KAREN DUNN KELLEY,  402/403

14  called as a witness, and having been first duly

15  sworn, was examined and testified as follows:

16          THE WITNESS:  Yes, I do.

17              EXAMINATION BY MR. GROSSI:

18      Q   Good morning, Secretary Kelley.  We met

19  briefly in the hall.  But for the record, my name

20  is Peter Grossi, and I'm an attorney here with

21  Arnold & Porter.  And I'm going to be leading off

22  this morning.  We represent the plaintiffs, the

Page 13

1    just said?

2          You're good.  And I just would like to

3    say good morning.  I think I said good morning to

4    each of you, but I did miss one or two as I

5    came -- as you came in.  So if I missed you, I

6    apologize and good morning.

7    BY MR. GROSSI:

8          Q   That's okay.  Lots a people.

9          A   Yes.  A lot of people.

10         Q   So let's begin a little bit with your

11   background, for the record.

12         A   Yes.

13         Q   So I understand you graduated with a BS

14   degree from the College of Commerce and Finance at

15   Villanova University?

16         A   Yes, I did.

17         Q   And you then pretty much started in the

18   investment business in 1982 with Drexel Burnham?

19         A   Yes, sir.

20         Q   And then you joined a different firm,

21   Federated Investors in 1986; is that right?

22         A   Yes.

Page 14

1    Q    Then in 1989, you joined a firm known as

2    Invesco, correct?

3    A    Not -- no.

4    Q    Okay.  Clarify, please.

5    A    I joined a legacy firm called

6    AIM Management, which, through a series of mergers

7    and acquisitions became Invesco when I left.  But

8    when I started in 1986, it was AIM Management.

9    Q    Okay.  Thank you for the clarification.

10        You then worked at either AIM or Invesco

11   itself until fairly recently, 2017?

12   A    Yes.  I -- from the time I started AIM

13   through its legacy companies until I left last

14   summer.

15   Q    Okay.  You initially started as a money

16   market portfolio manager?

17   A    Yes.  Money market and government

18   portfolio.

19   Q    But by the end, you hold -- held various

20   positions and, ultimately, were in senior

21   management of Invesco; is that correct?

22   A    That is correct.

1   have you ever had training and experience in

2   conducting surveys --

3       A   No.

4       Q   -- of the public?

5           Let me finish.

6           Okay.  Let me ask now a little bit about

7   your early --

8       A   So excuse me.  Could you please then

9   repeat that whole question so I --

10      Q   Sure.

11      A   -- I did not interrupt you.  That was

12  rude.  I apologize.

13      Q   No.  Not at all.

14          Did you ever have any training or

15  experience in conducting surveys of the public?

16      A   No.

17      Q   Okay.  Now, let me ask about your

18  relationship with now Secretary Ross.  Originally,

19  it was Mr. Ross when you met him, right?

20      A   Yes.

21      Q   Okay.  And did you first meet him in

22  about 2006 when his company was folded in or

Page 17

1    became part of Invesco?

2         A    Yes.

3         Q    You didn't know him before then?

4         A    I might have met him or been at a panel

5    with him or an event with him, but I did not know

6    him.

7         Q    Okay.   And his company was an investment

8    company that became part of Invesco?

9         A    Yes.

10        Q    And you worked with him while you were at

11   Invesco, correct?

12        A    Yes.   I would -- I would like you to

13   clarify the word "with."

14        Q    Okay.   Specifically around 2008, 2009 in

15   the financial crisis, did you do a great deal of

16   work with him in various deals?

17        A    Yes.   I did not work within his silo or

18   his company, but we actually did partner on

19   certain aspects in particular during the financial

20   crisis, yes.

21        Q    Okay.   Good.

22             You attended meetings, I guess, when he

Page 25

```
 1       Q   Absolutely.

 2       A   -- once we discussed it.

 3       Q   And do you remember before you were even

 4   nominated, discussing with Secretary Ross the

 5   specific responsibilities or jurisdiction of the

 6   Under Secretary For Economic Affairs?

 7       A   I don't recall.

 8       Q   Okay.   When do you think it was the first

 9   time that you found out that one of the three

10   branches that the Under Secretary supervises is

11   the Census Bureau?

12       A   Early on, early on.

13       Q   Sure.   I mean, one of -- there are just

14   three major branches, right, that the Under

15   Secretary For Economic Affairs supervises?

16       A   Yes.   Yes.

17       Q   All right.

18       A   Well, it's really -- it supervisors ESA,

19   and ESA supervises two branches.

20       Q   Fair enough.

21       A   So I don't want to -- a little bit of

22   semantics, but there is a nuance difference, and
```

Page 26

1    so I don't want to misrepresent.

2        Q   Okay.  I appreciate that.  When do you

3    think it first occurred to you that this would be

4    an important job, in part, because Census Bureau

5    was going to do the 2020 census and fairly soon

6    you'd be involved in that process?

7        A   Oh, absolutely understood.  It was a huge

8    program, and it was a management responsibility.

9        Q   And you understood that even before you

10   were officially nominated?

11           Go ahead.  You have to answer.

12       A   Yes, sir.  But allow me to say, as I have

13   learned more, it has certainly -- the gravity of

14   the position has -- you know, I always recognized

15   the importance.

16       Q   Sure.  Okay.  So it's fair to say that by

17   the spring of 2017, you knew you were going to be

18   nominated for a position which would have, among

19   other things, significant responsibility for the

20   2020 census?

21       A   Yes, sir.

22       Q   Now, when do you think you first talked

Page 37

1    priorities, you were talking about the president,

2    right?

3        A    So if I can back up, I need to clarify my

4    last answer.  Because we -- you said that I went

5    and spoke specifically of the census throughout

6    the rest of the document, and that is not correct.

7    Because I also indicate economical statistical

8    programs, which have -- would have included BEA

9    programs, such as GDP and recreational numbers and

10   things like that.  So I have to clarify my

11   original answer that I said it was only specific

12   to census.  That is not true.

13       Q    Let's go back to that phrase about, "one

14   of his priorities is effective and meaningful

15   management and oversight of the 2020 census."

16           The context there was one of the

17   President's priorities, right?

18       A    Yes.  The --

19       Q    How did you learn the President's

20   priorities with respect to the census?

21       A    When I interviewed with the White House

22   under PPO, during the process -- and we knew what

1   the role was at that point, had been clarified.

2   The census was one of the portfolio

3   responsibilities of that role, and they said that

4   was an important -- that was -- that it was

5   important.  As well as the Secretary reiterated

6   that that was a priority of the Department, and it

7   was priority.

8       Q    And, specifically, it was a priority of

9   the President, it was one of his priorities was

10  managing the 2020 census, right?

11      A    Yes.

12      Q    Okay.  What specifically did you

13  understand the President's priorities to be with

14  respect to the 2020 census?

15      A    Complete and accurate count.

16      Q    As complete and as accurate as it could

17  be?

18      A    Complete and accurate.

19      Q    And you always understood sometime in

20  that spring or summer, that one of the priorities

21  of the White House was adding a citizenship

22  question, correct?

Page 39

1          MR. GARDNER:  Objection.  Lack of      602

2     foundation.

3          THE WITNESS:  I said that I learned it

4     was a priority of the Secretary's.

5     BY MR. GROSSI:

6       Q   Okay.  Did you -- did the Secretary tell

7     you that he was interested in it, in part, because

8     it was also one of the President's priorities or

9     perhaps he used the phrase the White House's

10    priorities?

11      A   No.

12      Q   He never, ever has told you that one of

13    his reasons for wanting the census question added

14    was because the White House staff thought that was

15    a good idea?

16      A   No.

17      Q   Never?

18      A   Not to my recollection, no.

19      Q   Do you think it's possible and you just

20    don't recall at this moment?

21          MR. GARDNER:  Objection.  Form.

22          THE WITNESS:  No, not -- not to my

Page 40

1    recollection.

2    BY MR. GROSSI:

3        Q    You talked to the Secretary quite a bit

4    about the census -- citizenship question over the

5    year, right?

6                MR. GARDNER:   Objection.   Lack of

7    foundation.

8    BY MR. GROSSI:

9        Q    Well, you have talked to the Secretary

10   about adding the citizenship question, correct?

11       A    Yes.   Correct.

12       Q    How often would you say?

13       A    In May -- and I apologize if this is a

14   little long-winded.

15           In May, after the GAO report, and I came

16   in August, the immediate -- my immediate

17   responsibilities were to address the issues in

18   that GAO report, which talked about the budget,

19   the leadership and the operational readiness and

20   those things.   And there -- we were also at that

21   same time preparing for the 2018 end-to-end test,

22   which started this past April 1st.

1        So as I came in, those were the

2   priorities we -- we spent time on and that I

3   operationally spent time on as we went through

4   when I started my work.

5        So I would suggest to you between August

6   and beginning of November, we spent time on the

7   lifecycle cost, the lifecycle budget, the

8   budgetary issues.

9        We also spent a tremendous amount of time

10  in the October, beginning of November -- November

11  time frame, on the management of the census,

12  because we were moving from research and

13  development to actual execution, if you will.  And

14  so we spent time on the leadership and what was

15  happening there.

16        And then, thirdly, we spent time

17  throughout that entire process on operational

18  readiness, systems readiness, responding to the

19  GAO report, making sure we were prepared, making

20  sure we had everything in line to start the test

21  and there were other decisions that needed to be

22  made.  So at -- I did know the citizenship

Page 42

1   question was going to be on there, but that was an

2   issue that I didn't need to deal with until later

3   on, because they -- in a time frame, other issues

4   needed to get addressed immediately --

5        Q   Okay.

6        A   -- from an operational perspective.

7        Q   So your recollection is as early as May,

8   you had heard about the citizenship question, but

9   it was only one feature of an overall review of

10  the census that kept you busy?

11       A   And --

12           MR. GARDNER:   Objection.

13  Mischaracterizes the witness's testimony.

14  BY MR. GROSSI:

15       Q   Correct?

16       A   No.   It was not part of the review I was

17  doing on the census at that time.

18       Q   But you knew that adding a citizenship

19  question was something that Secretary Ross wanted

20  to do, right?

21       A   At -- yes.

22       Q   Okay?

1  various responsibilities, that adding a

2  citizenship question was a topic under discussion,

3  correct?

4      A    I'm sorry.  Please repeat the question.

5      Q    As of July 2017, when you testified to

6  Congress, you knew that the potential of adding a

7  citizenship question to the 2020 decennial census

8  was under consideration by Secretary Ross,

9  correct?

10     A    I do not know exactly when I learned

11 that.  It is very plausible I did know it by that

12 time.

13     Q    Okay.  Who was responsible for helping

14 you prepare for this testimony in your nomination

15 process at Commerce?

16     A    The Legislative Affairs department is

17 responsible for helping the process.  And so in

18 that process, I was assigned three individuals to

19 help me go through the process.  And those three

20 individuals I worked -- I worked -- let's say four

21 individuals, one was the senior, but assigned the

22 three, four, and then that was who I was assigned.

1     A   They were all public documents.   They

2   have a quarterly review, a PMR they call it, for

3   the census.   On a quarterly basis, they would --

4   provided me all those public documents so I could

5   review them, ask questions, and then they provided

6   me the websites for the 2020 census.   Census has a

7   very large website, and so they provided me all

8   the website information, and so we looked at that.

9   I was only provided public information.

10     Q   Okay.   Let me have this exhibit marked as

11   Exhibit 2.

12         (Plaintiffs' Exhibit 2, Email chain, was

13   marked.)

14   BY MR. GROSSI:

15     Q   Okay.   Secretary Kelley, this is an email

16   chain, Exhibit 2, begins with the Bates 1404 and

17   runs to 1406, and like all of those email chains I

18   think we'll be doing today, it goes in reverse

19   order.   As you know, they keep piling on top.

20         So I'm going to go to the end first, and

21   ask you if it refreshes your recollection that on

22   or about July 24, 2017 you had communicated in

1   some fashion with Mr. Willard, asking for a review

2   of the process of how questions are created and

3   chosen for the ACS.  Do you remember making that

4   type of inquiry through Mr. Willard?

5        A   Yes.

6        Q   Okay.  And then he enlisted the help of a

7   Victoria Velkoff.  You know her?  Or at least you

8   know her now?

9        A   I know her now, Tori.

10        Q   Right.

11        A   She goes by Tori, yes.

12        Q   Tori.  And she works at Census?

13        A   And, in fact, I'm sort of amazed -- I'm

14   saying, oh, there's -- that -- I didn't know that

15   was Tori.

16            THE WITNESS:  Does everybody have this

17   paper in the room?

18   BY MR. GROSSI:

19        Q   Anybody who has it, needs it.

20            And then Mr. Willard refined his request

21   above and said, "What we would primarily like to

22   discuss with you today, is the" -- "is how the

1   process works to when questions are discussed and

2   are approved to be used on the ACS and also those

3   on the census questionnaire."

4         Does that refresh your recollection, that

5   one of the things that you discussed with

6   Ms. Velkoff, perhaps, and Mr. Willard, in

7   July 2017, was specifically how questions are

8   added to a decennial census questionnaire?

9       A   Yes.

10      Q   Okay.   So we're clear, that as of late

11  July 2017, you had a specific interest in how a

12  question would be added to the decennial census,

13  correct?

14      A   As it applied to a particular topic that

15  was being discussed.

16      Q   And what topic was that?

17      A   The SOGI topic.

18      Q   Just the SOGI topic?

19      A   Yes.

20      Q   You didn't know that they were also

21  dealing at that same time with a citizenship

22  question?

Page 50

1        A     I --

2               MR. GARDNER:   Objection to form.

3               THE WITNESS:   I was --

4    BY MR. GROSSI:

5        Q     Is that your testimony?

6        A     I was dealing -- this has to do with the

7    SOGI question.

8               And would you like me to explain?

9        Q     I don't need to know about that.   I just

10   need to make it clear that your conversation was

11   also at a time when you knew they were thinking

12   about adding a citizenship question, as well.

13              MR. GARDNER:   Objection.

14   Mischaracterizes the witness's prior testimony.

15   BY MR. GROSSI:

16       Q     I mean, it can be both, Sec- --

17   Ms. Madam Secretary?

18              MR. GARDNER:   Objection.   Form.

19              THE WITNESS:   Sir, you're going to have

20   to go back.   Because you're starting to tie things

21   together with ends and -- you know, ands and buts

22   that I'm not following.

Page 51

1        This topic, let me be very clear, had to

2    do with the SOGI issue.  I was going to be -- I

3    was going to be asked a SOGI question on the -- at

4    the testimony.  There was a -- the topics -- and

5    I'm sorry if I'm boring you and you all know

6    this -- the topics for inclusion in the census

7    need to be given the March prior, so not March of

8    '18 but March of --

9        Q    '19?

10        A    -- '17.

11   BY MR. GROSSI:

12        Q    '17, right.

13        A    And there was an issue whether there

14   would be a SOGI question or not.  And when I was

15   told I was going to be asked about that, I said I

16   would like to know the process.  Topics go on.  I

17   did not know the details to know how the topics

18   get put on it, and then it's a year later, the

19   questions get put on it, and how does that work?

20   And I asked for that information in regard to the

21   SOGI question.

22        Q    Were you also advised that at that point

Page 52

1   in time, Mr. Ross -- Secretary Ross was being

2   approached by various people to put a citizenship

3   question on --

4        A    No.

5        Q    -- the 2020 census?

6             You're very confident that he never told

7   you that?

8        A    I don't know.  And I've repeated that.  I

9   don't know when I learned that information.  And

10  I'm very sorry I don't, but I don't.

11       Q    Okay.  Let's see if we can maybe do a

12  little refreshing.

13            I'm marking as Exhibit 3,

14  Bates Number 0763-64, which is an email chain,

15  again, that runs from July 14, 2017 to

16  July 24, 2017.

17            (Plaintiffs' Exhibit 3, Email chain, was

18  marked.)

19  BY MR. GROSSI:

20       Q    Before we begin this, just one quick

21  follow-up question on the last bit of testimony.

22  Was that --

Page 53

1       A     May I finish reading this?

2       Q     Oh.  I'm sorry.  Go ahead.

3       A     Yes, sir.

4       Q     Before we turn to the exhibit, I just

5   want to follow up on one thing.

6             The SOGI topic that you mentioned a

7   moment ago, was that topic being considered and

8   included in the ACS or also in the decennial

9   census?

10            MR. GARDNER:  Objection.  Form.

11            THE WITNESS:  I was not there at the

12  time, but there was a discussion at the time that

13  the information was going on the topics as to

14  whether or not that would be a topic back in

15  March of '17 that would be put forth when the

16  topics are put forth.

17  BY MR. GROSSI:

18      Q     For the -- for the ACS study?

19      A     I don't know which -- which, but that was

20  pulled as a topic being discussed.

21      Q     Okay.

22      A     And, therefore, there was a discussion

1   about the SOGI issue and how it would -- why it

2   was pulled, why it was not pulled, why it was on

3   there.  There was a whole myriad of discussion

4   around it.  Of course, I knew nothing about that

5   topic.  So I, just for an educational purpose,

6   said if I'm going to ask, I wanted to learn how

7   this works.  Going from a topic to inclusion on

8   any or either, it didn't matter to me.  How does

9   this happen?

10      Q   But you're not testifying that you were

11  ever told that the SOGI topic would be included on

12  the decennial census, correct?

13      A   I am not testifying to that.

14      Q   And so when Mr. Willard said you were

15  interested in how citizenship -- how questions

16  were added to the decennial census, that was

17  somewhat broader than the SOGI topic, correct?

18      A   No.  It was written in regards to the

19  SOGI topic.

20      Q   Okay.  Let's take a look at what's been

21  written in regard to Exhibit 3.

22      A   Yes.

1   BY MR. GROSSI:

2      Q   Okay.  Let me actually turn to that.

3            MR. GARDNER:  Tell you what, Counsel,

4   before we go to the next document, take a break?

5            MR. GROSSI:  Sure.

6            MR. GARDNER:  We've been going about an

7   hour.

8            VIDEOGRAPHER:  This concludes Media Unit

9   Number 1.  The time on the record is 10:06 a.m.

10  We are off the record.

11            (Off the record.)

12            VIDEOGRAPHER:  This begins Media Unit

13  Number 2.  The time on the video is 10:18 a.m.  We

14  are on the record.

15            (Plaintiffs' Exhibit 4, Supplemental

16  memorandum, was marked.  Plaintiffs' Exhibit 5,

17  Defendants' objections, was marked.)

18  BY MR. GROSSI:

19      Q   Secretary Kelley, I'd like to hand you

20  two exhibits.   The first is Exhibit 4, which is

21  supplemental memorandum by Secretary of Commerce

22  Wilbur Ross, has Bates number 1321.   And I will

Pl. Objection: No testimony of the witness has been designated.

Page 66

1   also give you a copy as Exhibit 5 of the

2   defendants' objections and responses to

3   plaintiffs' first set of requests of

4   interrogatories.  And I've tabbed Page 14, and

5   I'll let you know that that's the only page I'll

6   be asking you about.

7         MR. GARDNER:  Peter, you said 14?

8   BY MR. GROSSI:

9      Q   Okay.

10     A   No.  Where on --

11     Q   Just on the bottom --

12     A   Where on Page 14 do you want me to --

13     Q   The list of names at the bottom, and I'll

14  direct your attention to it and give you plenty of

15  time.

16     A   The list of names at the bottom?

17     Q   Yeah.

18     A   Okay.  And then -- yes, sir.

19     Q   Okay.  Do you see in Exhibit 4, this is a

20  supplemental memorandum?  Have you seen this

21  document before?

22     A   One other time.

1      Q     When was that?

2      A     Yesterday.

3      Q     Okay.   Not before it was issued?

4      A     No.   I was not part of the issuing of

5   this.

6           THE WITNESS:   I'm sorry.   Did you not

7   hear me?   I -- did you hear me?   I apologize.

8   Speak up?

9           MS. BOUTIN:   Just a little bit.

10          THE WITNESS:   I'm sorry.   And usually I'm

11   very loud, so I apologize.   I -- I --

12   BY MR. GROSSI:

13     Q     Do you know why this supplemental

14   memorandum was added to the record so late as June

15   of this year?

16          MR. GARDNER:   Objection.   Lack of

17   foundation.

18          THE WITNESS:   To supplement the

19   information is my assumption.

20   BY MR. GROSSI:

21     Q     The information that Congress was

22   concerned about after they learned that people,

1    other Census and Commerce Department officials,

2    had talked about the citizenship question,

3    correct?

4              MR. GARDNER:  Objection.  Lack of

5    foundation.

6              THE WITNESS:  To supplement the

7    memorandum of the Secretary regarding the

8    administrative record.

9    BY MR. GROSSI:

10       Q    You were involved in that original

11   memorandum, correct, March 26th?

12       A    Which memorandum are you speaking, sir?

13       Q    The March 26, 2018 memorandum of

14   decision.

15       A    The decision memorandum to me.

16       Q    Okay.  Right.  But you were also

17   involved -- you were actually involved in its

18   preparation, correct?

19       A    I was involved in the proofing, not the

20   preparation.

21       Q    Okay.  You didn't actually draft any

22   portions of it?

 1      A    No.

 2      Q    You weren't asked for your input before

 3 it was essentially put in the final form?

 4      A    I -- I looked at it over the few days

 5 before it was released, in proofing it.

 6      Q    What changes did you make?

 7      A    I don't remember.  Minor changes.  I

 8 don't remember anything substantive.

 9      Q    How about any other people in the

10 Census Bureau, did they make any changes?

11      A    The Census Bureau?

12      Q    Yes.

13      A    The Census Bureau made a few -- a few

14 changes, but, again, nothing substantial.

15      Q    They had not been involved in drafting

16 it, correct?

17      A    Could --

18          MR. GARDNER:  Objection to form.

19          THE WITNESS:  Could you define the word

20 drafting?  To me, anything up to a final form is

21 still in draft.  So you're -- I don't want to get

22 balled up with your nomenclature.  To me, anything

1      A    In preparation for my -- my hearing.

2      Q    Okay.  And you -- did you communicate

3  with any of those people by email?

4      A    No.  They were communicated by -- with

5  the people at -- the four people that worked with

6  me.  I didn't have an email at Commerce at that

7  time.

8      Q    I understand.  You had an email at

9  Invesco or your personal email account?

10     A    Right.  And we did not -- we did not

11  email.

12     Q    But we haven't checked that out yet,

13  right?

14     A    Right.

15     Q    Okay.  Well, let me just ask about

16  Exhibit 7, in the hopes it might refresh your

17  recollection about other things.

18          Do you recall hearing, perhaps when you

19  came in in late August, that Secretary Ross was

20  attempting to get the Department of Justice to

21  request that the citizenship question be added?

22  And maybe it's August, maybe it's September of

1   2017, when you first came on board.

2       A   No.  I was not aware of that.

3       Q   You didn't know that he was attempting to

4   get people at the Department of Justice to say

5   they wanted a citizenship question?

6       A   I knew he was in conversation with

7   people, but you said that he was trying to get

8   them to do something.  I have no -- what the

9   Secretary tried to get people to do or try to do.

10      Q   Is that another question that we could

11  ask Secretary Ross --

12          MR. GARDNER:   Objection.   Form.

13  BY MR. GROSSI:

14      Q   -- best?

15          MR. GARDNER:   Calls for speculation.

16  BY MR. GROSSI:

17      Q   Would Secretary Ross be the best person

18  to ask about what Secretary Ross was doing with

19  the Department of Justice on this issue?

20      A   I would always say that -- best to ask

21  the person that you're speaking about questioning.

22  I don't exactly know how to answer that.  I mean,

1    just as we asked Karen what I said, which was on

2    the record.

3        Q    Let me have marked the next exhibit.

4            (Plaintiffs' Exhibit 8, Email, was

5    marked.)

6    BY MR. GROSSI:

7        Q    We're marking as Exhibit 8 a

8    memorandum -- I'm sorry -- an email.   The top one

9    of which is dated August 16, 2017.

10           Now, this email indicates that

11   Mr. Earl Comstock wrote to Secretary Ross on

12   August 11th and he stated, quote, per your

13   request, here is a draft memo on the citizenship

14   question that James Uthmeier in the Office of

15   General Counsel prepared and I reviewed.   Once you

16   have had a chance to review, we should discuss so

17   we can refine the memo to better address any

18   issues.

19           And it appears that Ms. Teramoto then

20   followed up on that by saying that Peter Davidson

21   and Karen Dunn Kelley will both be here Monday.

22   Let's spend 15 minutes together and sort this out.

Page 91

1          And then Mr. Comstock responded to

2    Ms. Teramoto and to Secretary Ross by copy saying,

3    "Thanks, Wendy, that works for me."

4          Now, Wednesday was August 16th, and I'll

5    represent that the Monday was August 20th.  Is

6    that consistent with your recollection that you

7    came in on August 20th and had a discussion about

8    various things?

9          MR. GARDNER:  I think your math is wrong.

10         THE WITNESS:  Sir, I think it was the

11   21st.

12         MR. GARDNER:  The 21st.

13         THE WITNESS:  August 21st.  Or I said the

14   wrong date before, as well, so we have to correct

15   Monday -- Monday was the 21st.

16   BY MR. GROSSI:

17      Q   You're right.  Absolutely right.

18         So Monday was the 21st, and that's the

19   day you came in and assumed your position, okay.

20         And so you discussed with them on

21   August the 21st, among other things, I'm sure, the

22   draft memo on the citizenship question that had

1    been prepared for Secretary Ross, correct?

2         A    I do not recall any conversations like

3    that.

4         Q    Do you think that might have been the

5    first time you really got into the details of

6    adding it?

7         A    I don't recall a conversation about it.

8         Q    Okay.   But you wouldn't deny that as of

9    August 21st, you had been briefed on the

10   citizenship issue?

11            MR. GARDNER:   Objection.   Mischaracterize

12   the witness's testimony.

13            THE WITNESS:   As I said, I do not,

14   unfortunately, remember when I first learned about

15   it.   It is possible.   I'm not denying it.   I'm not

16   confirming it.   I just don't know.   I wish I

17   could -- I wish I could tell you.   I just don't

18   know.

19   BY MR. GROSSI:

20        Q    Did you receive memoranda about the

21   citizenship question, and that's a shorthand of,

22   obviously, adding a citizenship question to the

1    BY MR. GROSSI:

2        Q   Were you relying on the experts in the

3    Census Bureau?

4        A   I was not relying on anything, but I rely

5    heavily on the experts at the Census Department

6    for many things.  But in terms of your question,

7    was I relying on it for the citizenship question?

8    That preassumes that I'm answering the

9    question -- I'm making the decision, and I was not

10   making the decision.

11       Q   Other than Secretary Ross, as the

12   Secretary, and the people in the Census Bureau, as

13   the experts, who else decided who else made

14   recommendations concerning whether or not there

15   should be a citizenship question?

16       A   In October -- in December, when this

17   came, that the question needed to be evaluated and

18   a discussion about whether the question would be

19   on the 2020 -- 2020 form of questions going to

20   Congress in March of '18, I spoke to the senior

21   people at the Census, the senior team.  And I

22   said, we have this letter.  We need to now give

1   the Secretary all the information.  He needs to

2   make this decision.  And there are pieces of it,

3   and what is your recommendation?  And when we

4   spoke to them, we said at the top of the house,

5   there needed to be a legal review.  There needed

6   to be a technical/operational review and a policy

7   position.  Those were the three major things that

8   needed to take place.

9           Obviously, the legal review being done by

10  the legal department.  The Census handling the

11  technical and operational -- technical or

12  operational, whatever term you prefer, review, and

13  the combination of those plus auxiliary

14  information that would be provided would create

15  the ability for the Secretary to make a policy

16  position on that.

17      Q   And that was something you did in

18  December of 2017, after you received a letter from

19  the Department of Justice; is that right?

20      A   All of those things?

21      Q   Yes.

22      A   What we did in December and at -- what we

Page 101

1   did in December is came up with a strategy on how

2   to -- how to work through this process, working

3   very much with Census, because I went to them and

4   said, have we done this before -- you know, you

5   always go back, have we done this before, how do

6   you do it, what do we think about it?  And, of

7   course, the answer is no, this really -- there was

8   not precedence on it.

9          And that's where we said, okay, at the

10  top of the house has to have a legal review, a

11  technical/operational review and then that leads

12  to a policy decision or policy review.

13         And so we then said okay, if, in fact,

14  the question needs to be to Congress, by law, on

15  March 31st, which -- and not that I want you to

16  think I'm a walking calendar, because I've already

17  made mistakes -- but March 31st was the date that

18  it has to legally be there, that happened to be

19  Good Friday.  So for courtesy, you would bring it

20  to them on the Thursday.  So we sort of walked

21  back and said, what are we going to do over the

22  next months?

1      Q   Or did you?

2      A   I don't recall.

3      Q   Do you think you might have discussed

4  with it Mr. Jarmin?

5      A   We certainly laid out what events had to

6  take place through next March, and we sort of

7  looked at that big timeline of what had to happen.

8  And when the conversations of the questions needed

9  to get to Congress by the 31st, I can't recall if

10  there was a discussion on that.

11      Q   Let me be very clear.  You testified a

12  moment ago, I thought, that it was the

13  Department of Justice letter in December that

14  prompted you to call in Mr. Jarmin and others in

15  the Census Bureau and ask for their input on the

16  citizenship question, correct?

17      A   It was that letter that -- that we then

18  sat with the people from the Census Bureau to say,

19  it's coming up in March now.  We've got this

20  letter.  We need to address how do we do this,

21  what is the process that would take place and the

22  strategy around how to make this happen.

Page 105

1   exhibit.

2        (Plaintiffs' Exhibit 9, Email, was

3   marked.)

4   BY MR. GROSSI:

5        Q    Exhibit 9.

6             Exhibit 9 is an email chain that begins

7   on August 29th where Mr. Davidson wrote to

8   Mr. Hernandez, Comstock, Uthmeier and other names

9   that have been blocked out, as well as a copy to

10  Ms. Teramoto.

11       A    Excuse me.   Are they other names or are

12  they just simply the email addresses?

13       Q    I'm not sure.   I really don't know.

14            It says, "The Secretary asked to set up

15  briefing" -- "a briefing on some key legal issues

16  he is concerned about."   And the overall subject

17  line is census.   "Can we get something on the

18  books for next week when Izzy returns.   I can't

19  find Karen in the directory, but she should be

20  included, as well."   And then there is additional

21  information about scheduling leading to an email

22  from a Chelsey Neuhart -- haus to various people

1   indicating that she wanted to confirm that the

2   attendees at the next census briefing regarding

3   legal questions should be Ms. Teramoto,

4   Mr. Hernandez, Mr. Comstock, Mr. Uthmeier,

5   Mr. Davidson and you, Ms. -- Secretary Kelley.

6           Now, we have not been provided with any

7   information about what the subject matter was,

8   other than it has been produced in the case.  And

9   what I want to ask you is:  Do you recall in late

10  August 2017, attending a meeting where legal

11  issues involving the census were discussed?

12      A   No.  I do not recall that.

13      Q   Do you think it's possible --

14      A   I do not remember is what I said.  I

15  apologize.

16      Q   Is it possible that one of those legal

17  issues was this question you mentioned about the

18  legal implications of adding a citizenship

19  question to the census?

20          MR. GARDNER:  Objection.  Form.

21          THE WITNESS:  Sir, I don't remember the

22  meeting.  I don't know that the meeting got

Page 107

1    cancelled, took place, whether I could be there or

2    not be there.  So for me to speculate, at all, as

3    to what was discussed or not discussed would be an

4    erroneous things.  I just have no recollection of

5    this whatsoever.  And even if there was a meeting,

6    did I get called to something -- I just don't

7    know.  I would be speculating if I said anything

8    to this.

9  BY MR. GROSSI:

10       Q    And you don't recall specifically on the

11   last page, what legal issues -- key legal issues

12   Secretary Ross was interested in pertaining to the

13   census at about this time?  Doesn't refresh your

14   recollection?

15       A    No, it does not, sir.  It does not.  I'm

16   sorry.  It does not.

17       Q    Let's take the next one.

18            (Plaintiffs' Exhibit 10, Email, was

19   marked.)

20  BY MR. GROSSI:

21       Q    I marked as Exhibit 10, 9799 and 9800.

22   It's an email sent to Karen Kelley on

1   December 5, 2017 from Mr. Willard.   The subject is

2   items to cover with Izzy.   I'm just going to refer

3   you to one portion of it.   It says, "Karen, please

4   find below and attached a list of items to cover

5   with Izzy today."

6          And I'm going to direct your attention to

7   the 11th numbered item on the second page, which I

8   will read that says, Higgins amendment:   House

9   Rules committee considering today, at 4:00 p.m.,

10  an amendment that would block all fiscal 2018

11  funding for the 2020 decennial census unless the

12  survey includes questions about residence,

13  citizenship and immigration status.   The amendment

14  comes amid concerns that the 2020 census is

15  already in danger of being underfunded, unquote.

16          Do you recall attending a meeting and

17  discussing with Mr. Hernandez and others the issue

18  of adding a census question to the 2020 census,

19  either in context of the Higgins amendment or

20  anything else in September 2017?

21      A   Allow me to take a look at this email,

22  please.

Page 109

BY MR. GROSSI:

Q    Sure.   My question, again, is:   Whether this refreshes your recollection that on or about September 5th, you were meeting with various people at the Commerce Department to talk about, among other things, an amendment that would block fiscal funding unless a citizenship question was added to the 2020 census?

A    I do not recall this document, at all, but at the beginning, we were meeting with several people.   And, in fact, you can see in here it says, "Izzy also confirmed that there is a 3:30 p.m. with the Secretary to discuss the budget," which I said has -- a big topic and one I was spending a lot of time on.

I -- I will tell you that there were a lot of topics on this discussion -- on this agenda, and I cannot confirm or deny that they took place.   The meeting was scheduled once and then rescheduled, so I couldn't even tell you that this meeting actually took place, to my recollection.   But I'm not saying to you these

Page 110

1    would not have been topics we would have

2    discussed.

3        Q    You might have been discussing adding a

4    citizenship question as of September of 2017?

5        A    Well, if we went through this agenda and

6    actually got through it all, we would certainly

7    have been discussing the Higgins amendment, which

8    would have made sense, because you would have been

9    discussing topical news on the -- on the census.

10       Q    And that would have a big impact on the

11   census, right, in terms of its funding?   That's

12   what the message says.

13            MR. GARDNER:   Objection.   Lack of

14   foundation.

15            THE WITNESS:   Sir, I -- the last thing I

16   want to do is be, at all, argumentative with you.

17   But it says, "The amendment comes amid concerns

18   that the 2020 census is already in danger of being

19   underfunded."

20            So it sort of dissects those and says

21   there is already a concern here and now this has

22   come up.

Page 111

1    BY MR. GROSSI:

2        Q    Because the amendment would have not

3    funded the census, at all, if it didn't have this

4    question?

5        A    It certainly would be a problem, wouldn't

6    it?

7        Q    Right.   And do you remember discussing

8    that issue?

9        A    No.   I do not.   Do not.

10       Q    Is there anybody on this email that you

11   can identify as a member of the Census Bureau?

12   Just a minute.

13       A    Repeat your question, sir.

14       Q    It's simply, are there any of the names

15   on this as people who were aware of this meeting

16   or attended this meeting who were members of the

17   Census Bureau?

18            MR. GARDNER:   Objection.   Lack of

19   foundation.

20            THE WITNESS:   The memo came to two

21   people, myself and Aaron Willard.

22   BY MR. GROSSI:

Page 114

1   saying I wasn't there.  I'm not denying it.  I'm

2   not confirming it.  I'm saying I wasn't there, so

3   I, therefore, cannot answer who was at the

4   meeting.

5   BY MR. GROSSI:

6       Q    Do you recall, at all, telling people

7   such as Mr. Hernandez or Mr. Willard that if they

8   were considering matters of great importance to

9   the census, they should consult with Mr. Jarmin

10  and other people at the Census Bureau?

11      A    That question is out of context of this

12  memo, but from August 21st when I showed up, we

13  consulted and had communication and conversation

14  all the time with the senior officials at the

15  Census, Dr. Jarmin included.  We were -- I said

16  and we lived by we were going to live under

17  the -- we were going to be very communicative and

18  talk with them.

19           So your question was:  Did I tell people

20  of anything of importance with the census -- to

21  talk with them?  The answer is:  We would have had

22  that conversation.

1      Q    I'm sure.   That's all I was trying to

2   establish.   That, as a general rule, a general

3   policy, when issues of importance to the Census

4   were developed by people of Commerce -- I'm

5   distinguishing the superiors at Commerce -- your

6   role was to tell those people to discuss it with

7   the people at the Census Bureau, correct?

8      A    That would have been my policy.

9      Q    Yes.  Right.  But your best recollection,

10   and from all that we can tell and from what

11   Mr. Jarmin told us, you did not discuss adding a

12   citizenship question with Mr. Jarmin and other

13   people at the Census Bureau prior to

14   December 2017; is that also your best

15   recollection?

16          MR. GARDNER:  Objection.  Form.

17          THE WITNESS:  My best recollection, which

18   I've told you, is that I don't remember when I

19   discussed that for the first time with the people

20   at Census.  You then indicated that Dr. Jarmin

21   said -- you asked if I would say he was lying, I

22   said absolutely not.  I would not say that.  But

Page 126

1    though, is, simply, he's saying he's going to drop

2    off some review materials, conveying that they

3    were physical.  Do you remember him doing that?

4         A    No.  I do not.

5         Q    Can't help us, at all, about whether you

6    ever saw a legal memorandum from him?

7         A    I cannot help you, at all.

8         Q    Now, before the break, we were talking

9    about some documents that showed that Mr. Comstock

10   was working with Mr. Ross to determine if the

11   Department of Justice had any interest in adding a

12   citizenship question.  And what I'd like to

13   determine is whether, in fact, you knew anything

14   about that effort prior to the time that the

15   letter came over from Justice in December of 2017.

16            MR. GARDNER:  Objection.  Form.

17   BY MR. GROSSI:

18       Q    So my question is:  Did you know anything

19   about an effort to get the Department of Justice

20   to send such a letter?

21       A    I knew there were conversations between

22   Commerce and Justice.

1      Q    And did you know the substance of those

2  conversations, even in summary form?

3      A    That it was about the citizenship

4  question, yes.

5      Q    Okay.  And that Secretary Ross was hoping

6  to get the Department of Justice to support a

7  request for such information, correct?

8      A    And that's where you're taking it to I --

9  those are details that I do not know.

10      Q    You just know he was discussing it with

11  the Department of Justice?

12      A    Yes.

13      Q    And you didn't have anything to do with

14  any of those discussions; is that right?

15         MR. GARDNER:  Objection.  Form.

16         THE WITNESS:  No.

17         Are you asking me if I participated in

18  any of those discussions?  The answer is:

19  Absolutely not.

20  BY MR. GROSSI:

21      Q    And he didn't brief you of any of those

22  discussions in the fall of 2017?

Page 130

1   been a cursory conversation with the

2   Census Bureau.  I do not recall.  I know when it

3   was -- when we were clear there was going to be a

4   letter, that I spoke with Dr. Jarmin and others at

5   the Census.

6       Q    What about at the Department of

7   Homeland Security, do you recall being told that

8   Secretary Ross and Mr. Comstock and others were

9   attempting to elicit their support for a

10  question -- citizenship question?

11      A    No.  I do not know anything about that.

12      Q    Did anybody --

13      A    I'm not aware of that.

14      Q    Nobody ever told you of an interest in

15  the Department of Homeland Security about having

16  Census include a citizenship question; is that

17  right?

18      A    Not to my recollection, no.

19      Q    Okay.  And you don't recall hearing,

20  around Thanksgiving, around the end of November,

21  that Secretary Ross had finally lost patience with

22  the Department of Justice and needed to get

Page 131

1   something from them to justify a citizenship

2   question?  Does that ring a bell with you?

3        A    No.

4        Q    You never talked with Secretary Ross in

5   November about his frustrations with the

6   Department of Justice; is that right?  Or is it

7   possible?

8             MR. GARDNER:  Objection.  Form.

9             THE WITNESS:  Sir, you are -- I could

10  have been briefed.  I could have been told that

11  there was frustration.  We don't know if we're

12  getting a letter, but it was not -- it was not at

13  the top -- if I can use the -- you know, the old

14  -- front -- front burner, it was not a

15  front-burner issue.  We had front-burner issues to

16  get ready for the '18 end-to-end test.  We, at

17  that point, had a -- were in a situation where

18  AT&T protested the group that was using the

19  handhelds.  So if we didn't get through the

20  protest, we wouldn't have handhelds for the '18

21  end-to-end test.  So I apologize, but those were

22  top-of-the-house issues to me.  That -- we were

Page 132

1   dealing with those.  We had so many fires to be

2   putting out on those kinds of issues that were

3   happening and the time frame prep -- getting ready

4   for the end-to-end test in April, those were the

5   topics we were -- I was spending my time on.  So

6   if somebody over here said we're working on the

7   citizenship question and the Secretary is

8   frustrated, I would not know it.  It would not be

9   top of my mind.

10  BY MR. GROSSI:

11      Q   Were you surprised, though, they wanted

12  to add a question with all the rest of what was

13  going on and the need to test that question ahead

14  of time?

15      A   Sir, you already asked me earlier.  This

16  question was not for the end-to-end test.

17      Q   Okay.

18      A   We were prepping up for the end-to-end

19  test, which would then be, obviously, into the

20  2020 census.

21      Q   But you said earlier you were concerned

22  or it was a difficult thing, because when you

Page 136

1    Q    What I've marked as Exhibit 13 is an

2    email from Mr. Jarmin to various people identified

3    by email addresses at the Census saying, as of

4    Friday, December 15, 2017 that he needed to huddle

5    with that staff and propose a time of 8:30 the

6    following morning -- the following Monday, which

7    would have been December 18th.

8         Do you recall Mr. Jarmin -- Dr. Jarmin

9    telling you that he would want to involve a number

10   of technical experts in evaluating the request to

11   add a citizenship question to the 2020 census?

12   A    Yes.

13   Q    What did he tell you?

14   A    He told me he was going to get the team

15   together and come up with it.

16   Q    Did he express surprise at that point

17   because he had not heard previously that this was

18   a possibility?  What do you remember about that

19   meeting or phone call?

20   A    Prior to -- so if you go down to this

21   December 15th bottom email, if you --

22         THE WITNESS:  Does everybody have this

Pl. Objection:
Fed R. Evid. 403

1    paper?

2         Okay.  If you go down to that

3    December 15th, what had happened was the

4    Department of Justice said they were sending a

5    letter, a letter was forthcoming.  And I -- I

6    called -- I told the Census that a letter was

7    forthcoming, but they did not get it because they

8    sent it to the Department -- excuse me -- the

9    Census Bureau, not the Department -- they sent it

10   to the Census Bureau with a stamp, in the mail, in

11   the postal.  Somebody, as a courtesy, legal to

12   legal, or whatever, as a courtesy, sent a copy to

13   the Department.  So I asked that it got sent to

14   Dr. Jarmin and Enrique Lamas, who is also a

15   doctor.  I don't want to be rude there.

16         So I asked that that be sent to them.  So

17   they -- before -- you said were they surprised, so

18   before that, they knew something was coming.  This

19   was what was sent with the -- with the note.

20         I -- I -- I'm -- I'm just reading it.

21   I'm like a little confused because it says, "I

22   understand the Department of Justice sent the

Page 138

1   attached letter."  But there's no attachment, and

2   this is a blank page, so maybe there's a --

3       Q   Well, I can give you the letter --

4       A   No.  No.  No.  But I -- it was

5   attached --

6       Q   Right.

7       A   It was attached to this.

8       Q   Right.

9       A   And it's just not on here --

10      Q   So the situation was --

11      A   So I then sent them -- I had asked

12  Mr. Uthmeier to send them the letter, so they then

13  had the first chance to read it.  But they knew it

14  was coming, so there was no shock in law [sic] in

15  that conversation.

16          He said -- we talked.  He said, fine.

17  Let me get a group together.  Let us think about

18  it.  And we said at that point -- we had a

19  conversation between Ron Jarmin, Enrique Lamas and

20  myself -- and I don't want to tie it to any time

21  or date on this letter -- but at the time, I said

22  what -- I said, tell me historically what happens,

1   what do we do here?  You're the technical experts.

2   Well, really, a question hadn't been added, but

3   they said the fundamental things that need to take

4   place is there needs to be a legal review, a

5   technical operational review and a policy decision

6   review from that.  And that's the guiding

7   principles in how we had to work on it.

8         And so I said, fine, let's get thinking

9   about this, and we need -- you need to do your

10  thing as the experts at the Census.  And from my

11  position, as a convener, if you will, having that

12  we need to put a -- a strategy, as I said earlier,

13  in place, so that we can back up to the date of

14  the 31st of March, which was very much what we did

15  on many things.

16        There were other decisions that the

17  Census had to make by certain dates, such as race

18  and ethnicity, and other decisions that needed to

19  be done, such as where to count certain -- certain

20  groups, and all of those things would have a date

21  they need to be done by here, how do you back up

22  so we can get all the information?  So this took

1    on the similar process.

2         Q    And who --

3         A    Does that help answer your question?

4         Q    Yes.   Thank you.

5              And who was it that said there should be

6    a legal review?

7         A    I asked the Census, and it was a

8    conversation I had with the Census.  So I don't

9    remember exactly who at the table said this is

10   what needs to happen, and that's when I said,

11   okay, so that's the guiding principles that we

12   should work from.

13        Q    And I want to flesh that out.  What sort

14   of legal review do you recall them discussing?

15   What needed to be reviewed?  What aspects of

16   legalities?

17        A    The rule of thumb on -- at the

18   census -- and, again, I'm not giving

19   you -- I'm -- I'm not a Census employee for

20   30 years, and I'm not a technical expert on these

21   things, and I am not a lawyer, okay.

22             So in a very layman's terms, the rule of

1   thumb when we looked at legal reviews was two

2   things.   Number 1, is there a statutory reason or

3   a program-added reason that this question that

4   this -- that this should happen?   And that was

5   some of the things we talked about.

6   Whether -- and I am not a lawyer, so handing it to

7   legal guys -- if there was further review they

8   wanted to do, but that was two things that was --

9   that were always important.

10      Q    And who made that legal review at Census

11   or for Census?

12      A    That was done by the legal team, and I

13   know there were a number of lawyers on it.   I

14   can't speak to all of them.

15      Q    Who?  Give us the name of the people you

16   recall.

17      A    I just said there was a number of people

18   involved, and I can't speak to all of them.

19      Q    But do you know any of them?

20      A    Sure.   Some of them would have included

21   Barry Robinson, who was with Census.

22   Melissa Creech -- Creech, I think is how you

1      A    They were absolutely involved.  To my

2    knowledge sound -- absolutely sounds --

3      Q    And you saw copies of those memorandum?

4      A    No.  I did not.  Well, I did -- I saw

5    some documents.  So I -- but I -- I was not an

6    expert on those documents.

7      Q    Okay.  Now, we're going to go right now,

8    in a few minutes, into the technical aspects that

9    were mentioned, and I think you're going to

10   hear -- see a number of memoranda in January and

11   February of 2018.

12          With that as background, do you remember

13   when you saw or knew about the legal reviews?  Was

14   it before, in the same time frame or after you

15   knew about the technical reviews?

16     A    I would -- I would want to leave the

17   group with the understanding that there were

18   paths -- two simultaneous paths going on.  There

19   was a legal review happening.  There was a

20   technical review happening.  And that was

21   informing the policy review.

22     Q    And you had understood determining

1   whether it was statutorily mandated or appropriate

2   was something that was normally done when a new

3   census -- citizenship question was asked -- I'm

4   sorry -- when a new census question was asked?

5       A    That was my understanding from the

6   technical experts at the Census.

7           The -- it was also my understanding that

8   the Census lawyers and the Department lawyers

9   worked together.

10      Q    I'm going to mark as Exhibit 14 another

11  email from the same day, the same time.

12          (Plaintiffs' Exhibit 14, Email, was

13  marked.)

14  BY MR. GROSSI:

15      Q    And this is from Enrique Lamas.  He is

16  the assistant director of the Census, correct?

17      A    He is the acting assistant director, sir,

18  to be technical.

19      Q    And it's to, again, Mr. Willard, that

20  we've talked about, but also cc's to Mr. Jarmin,

21  and he's responding to an earlier email from 12:01

22  from Mr. Willard saying, "Hey, guys.  Karen got a

1   call from the Secretary and has an update for all

2   of you.   If you can step away from the FESAC" --

3   F-E-S-A-C -- "it is regarding a letter from the

4   Department of Justice," unquote.

5           Do you recall getting a call from

6   Secretary Ross presumably either on or shortly

7   before December 15th?

8       A    I don't recall what this is about.   I

9   don't recall what this is about, but --

10      Q    Well, it says it is regarding a letter

11  from DOJ.

12          Do you see that?

13      A    And if you see the page before, which

14  your handed me, and the bottom, which I

15  articulated to you that I asked James Uthmeier

16  that -- and I told you -- it doesn't say it

17  here -- but that James sent them the letter that

18  afternoon, the -- the problem with making

19  assumptions or speculating is that I could be

20  totally wrong.   So I am -- I -- I don't

21  necessarily want to do that.

22          But if I were to be making an educated

 1    guess, would you tolerate an educated guess --

 2         Q    Yes, please.

 3         A    -- that could be wrong?

 4              I learned we had the letter.  I said

 5    let's get those guys, but they're in the FESAC

 6    meeting, which is federal economic statistical

 7    committee, so it's an important committee, so I

 8    didn't want to -- if they could come out, and that

 9    we would -- we got the letter, we will send it to

10    them.

11              That would be me taking a -- seeing these

12    things and saying -- but do I specifically

13    remember this?  No, I can't tell you I do.

14         Q    Okay.  That was helpful.  So what you're

15    saying is you do -- do you remember calling them

16    out of a meeting that was important?

17         A    No.  That's -- that -- that says if you

18    can step away the FESAC.  That means if there's a

19    break or whatever.  I am extremely respectful of

20    these guys, and I think you've met Dr. Jarmin and

21    you've met Dr. Abowd.  These guys are brilliant.

22    They are hard working.  They are incredible.  I

Page 148

1   don't call them out of anything.  I say when you

2   can speak to me, I appreciate.  No.  No.  No.  I

3   would never call anybody out of anything, sir.

4       Q   So this was a relatively unusual thing,

5   for you to be pressing on their time in this way,

6   right?

7       A   Yes.

8       Q   What was it that Secretary Ross told you

9   was so important?

10      A   As I said, sir, I don't remember -- and,

11  also, I didn't write this.  So people love to use

12  the Secretary's name in the vernacular of, the

13  Secretary called.  It could have been the

14  Secretary's office.  It could have been somebody

15  in connection.  So people love to use that,

16  Number 1.  Whether the Secretary called or not, I

17  can't speak to that, okay.

18          And all I'm trying to do is say from this

19  document, because I generically remember what

20  happened, that we got the letter.  They did not

21  get the letter until later, because it came with a

22  post stamp on it, and I felt very strongly as soon

Page 154

1          A    I do not recall.

2          Q    Okay.  But what you did was you turned to

3     your experts in the Census Bureau, correct?

4          A    That is correct.  Because what I felt

5     was -- you are characterizing this as the

6     Secretary put pressure on me to make this a

7     priority at the Census.  Once I told the Census

8     this letter was somewhere in the works and they

9     hadn't got it yet, it was priority for them to get

10    it, and it was priority to service the

11    Census Bureau and --

12         Q    And that's --

13         A    -- the executives.

14         Q    And that's what, then, you did?

15         A    That's what I did.

16         Q    And in January, February, March, you

17    worked with the Census Bureau people to prepare

18    drafts and respond to various questions of

19    Secretary Ross concerning the addition of the

20    citizenship question, correct?

21         A    Correct.

22         Q    Now, I want to --

1          A    I want to be sort of -- yes.   But as in

2     my role, what I did is I sort of was the convener,

3     and I got a group together to say, Census said

4     these are the three aspects we need to deal with.

5     So we know we've got legal people.    We know we've

6     got Census people, and we know we've got policy

7     people so that we can go down this path.    It

8     becomes very iterative and evolutionary at that

9     point.   So we put a team together that could look

10    at these things.

11         Q    And as the Under Secretary responsible

12    for the Census Bureau, and someone who had told

13    Congress that you wanted to make a complete and

14    accurate 2020 census a high priority, are you

15    saying that you did not feel it was your place to

16    make a recommendation or conclusion about whether

17    the citizenship question should be added?

18         A    That decision was a decision that the

19    Secretary makes.   It was absolutely my job to make

20    sure he got a full breadth of information and

21    opinions.   There were certain decisions that the

22    director made.   And so we'd have meetings, and I

1  would not give Ron Jarmin -- excuse me --

2  Dr. Jarmin my opinion on what he should do.   It

3  was his decision to make.   It was my position

4  to help and facilitate.

5      Q    Right.

6      A    So there was all kinds of decisions that

7  needed to be made by all kinds of people, and I

8  can promise you I didn't tell you -- the

9  technology people how to do their jobs either.

10     Q    Okay.   Let me go through some documents

11 that I think I saw you were involved in.   I just

12 want to get your recollection of how that process

13 proceeded.

14     A    Great.

15     Q    We're marking as Exhibit 15 a one-page

16 email Bates number 9679.

17          (Plaintiffs' Exhibit 15, Email, was

18 marked.)

19          THE WITNESS:   I'm sorry.

20 BY MR. GROSSI:

21     Q    Now, this is an email chain, on the

22 bottom, Mr. Jarmin wrote to Karen, "Happy New

1  Year.  I'd like to discuss the following with you

2  as soon you have a chance."  And the third item

3  mentioned is strategy to the Department -- to the

4  DOJ letter on citizenship.  And then that is

5  followed by an email from the name is blacked out,

6  however, the initials KDK are at the bottom of

7  that email, saying, "Perfect.  Let's discuss

8  tomorrow."  Which I guess would have been the 3rd

9  of 2018 -- 3rd of January 2018.

10         Despite the fact that someone has blacked

11  out the name, can you confirm that is your email?

12     A   Again, can I confirm that I wrote this

13  email on January 2nd of 2018, that many months

14  ago?  The answer is no, I can't confirm that.

15  Somebody could have written this.  But would I

16  suspect and would I -- would I say yes, most

17  likely, that is mine, that --

18     Q   Right.

19     A   And I do sign things by KDK, which are my

20  initials.  So I have no problem going forward.

21  But I cannot promise you absolutely, categorically

22  that I wrote this email.

Page 167

1    That's what the memo says right here.

2    BY MR. GROSSI:

3        Q   But you remember this information being

4    conveyed to you, correct?

5        A   Sir, are what you asking me, do I

6    remember me getting a memo where these

7    alternatives were in here and these numbers were

8    herein?

9        Q   That's one question, yes.  Do you

10   remember that?

11       A   Yes.  I remember that.

12       Q   And do you remember discussing it with

13   them?

14       A   We discussed it on multiple -- multiple

15   occasions.

16       Q   Okay.  Let me ask this:  In all the

17   time -- and now I'm taking it all the way through

18   the March 26th final decision -- did the Census

19   experts ever conclude that there would not be

20   additional costs to adding -- as a result of

21   adding the question on citizenship?

22       A   The discussions we had went not only with

Page 168

1    a complete, accurate and the cost, and yes, we did

2    say that there would be an additional cost.

3         Q    And they always maintained that view, to

4    this day, as far as you?

5         A    As far as I know.

6         Q    Okay.   That's what I'm looking for.   I'm

7    looking for them ever coming to you and saying,

8    you know, Under Secretary, we were wrong?

9         A    But they didn't know it.   They didn't

10   know it.   It was what they thought.   They did not

11   know what would happen.   We won't know the answer

12   to that until 2020.

13        Q    And you knew that the Census people were

14   providing you with their best estimate, correct?

15        A    They were certainly doing -- coming up

16   with their conclusion.

17        Q    We don't know how bad it might be; is

18   that right?

19        A    We -- we cannot -- you and I cannot

20   speculate on the future.

21        Q    But the Census experts can give you and

22   Secretary Ross their best estimates?

Page 171

1      A    I'm sorry?

2      Q    You have to -- you have to say yes for

3   the record.

4           MR. GARDNER:  She's asking you to repeat

5   the question.

6           THE WITNESS:  Sorry.  Could you repeat

7   the question?  I'm sorry.

8   BY MR. GROSSI:

9      Q    Oh.  I'm sorry.

10          Dr. Jarmin asked these various people to

11   be involved, to prepare a memorandum for him on

12   this issue?

13      A    That is my assumption.

14      Q    And Dr. Jarmin understood that he should

15   enlist the best people at the Census Bureau?

16          MR. GARDNER:  Objection.  Calls for

17   speculation.

18          THE WITNESS:  I can't --

19          MR. GARDNER:  No foundation.

20          THE WITNESS:  I can't tell you what

21   Dr. Jarmin was thinking.

22   BY MR. GROSSI:

1      Q    Did you ever say to Dr. Jarmin, why

2    didn't you include, Mr. X, Ms. X?

3           MR. GARDNER:   Objection.   Form.

4           THE WITNESS:   Dr. Jarmin is an -- is the

5    direct- -- is the acting director of the Census.

6    I did not question him.   I asked him if he would

7    put together the team he wanted to put together.

8    BY MR. GROSSI:

9      Q    Okay.   Let me ask you this:   Are you

10   satisfied that he did a good job selecting the

11   right people and coming up with a competent

12   assessment, or not?

13     A    The Census did the very best job they

14   could on this.

15     Q    Now, it goes on on the next page, 5474,

16   again, to say with respect to Alternative B,

17   quote, it would lower -- I'm sorry -- it would

18   result in lower quality enumeration date, unquote.

19          Do you remember that being the view of

20   the Census experts as of early January 2018?

21     A    At this point in the decision, that was

22   their assessment.

1      Q    Did they ever change that assessment,

2   which is specifically that adding the citizenship

3   question would result in lower quality enumeration

4   data?

5      A    I do not believe so.

6      Q    And then it goes on to say, that they

7   also estimate that asking the citizenship

8   question, quote, would result in 154,000

9   fewer -- and they emphasize that

10  word -- enumerations.   This is also a lower bound

11  estimate on the loss of accuracy, unquote.

12          Let's take them in pieces.   Did -- have

13  the Census Bureau experts ever changed their

14  opinion that asking the citizenship question would

15  result in 154,000 fewer correct enumerations?

16          MR. GARDNER:   Objection.   Lack of

17  foundation.

18          THE WITNESS:   Conceptually, I -- they

19  have not, but this has evolved, and the numbers

20  have evolved.   And I don't want to get caught

21  saying absolutely that number did not change over

22  three months and a whole lot of work, so please

Page 174

1   don't put me in that box.

2   BY MR. GROSSI:

3        Q    Okay.   We'll look at this.   I don't mean

4   to do that.   We'll look at the subsequent ones.

5             Do you also remember that when they made

6   these estimates, they were emphasizing that this

7   was the lower bound, which is to say it could have

8   been worse?

9        A    It says it right there.   This is the

10  lower bound estimate.

11       Q    And they've never changed their view

12  about that, have they?

13            MR. GARDNER:   Objection.   Lack of

14  foundation.

15  BY MR. GROSSI:

16       Q    To your knowledge, as the person who

17  supervised their work, they never changed that to

18  you, correct?

19       A    Not to my knowledge.

20       Q    Okay.   Now, let's go to the last page,

21  two points here.   At the very beginning, it says,

22  "Alternative C delivers higher quality data for

Page 175

1    Alternative B for DOJ's stated uses," unquote.

2         Now, let's just change the nomenclature.

3    Alternative C was a program of using

4    administrative data and not asking the citizenship

5    question, correct?

6        A    Correct.

7        Q    Alternative B --

8         THE WITNESS:   Correct.   I said correct,

9    everybody.

10   BY MR. GROSSI:

11       Q    Alternative B was asking the citizenship

12   question, correct?

13       A    Correct.

14       Q    So it was the view of the Census experts

15   that as between the two, using this administrative

16   data without a citizenship question or asking the

17   citizenship question, it would be preferable in

18   terms of getting quality data for DOJ's stated

19   uses to go with the administrative data, correct?

20         MR. GARDNER:   Objection.

21   Mischaracterizes the document.

22   BY MR. GROSSI:

1    Q    That's how you understood it, right?

2    A    Please repeat your question, sir.

3    Q    Yeah.

4    A    You -- you -- you --

5    Q    Fair enough.

6    A    You're jumbling it.  And I will accept

7   this document as it is written here.

8    Q    Okay.  I just want to be clear, because

9   we're getting Alternative C and B here.

10        What they were telling you --

11    A    And A.

12    Q    And A, too.

13        But what they were telling you here was

14   that as between --

15    A    At this junction in time --

16    Q    Right.

17    A    -- when they wrote this memo --

18    Q    They thought it would be better to use

19   administrative data and not ask the citizenship

20   question from the standpoint of the

21   Department of Justice quality data, correct?

22    A    It says right here, "Alternative C even

Page 177

1    better meets DOJ's stated use."

2        Q    Than Alternative B, right?

3             And they've never changed their view on

4    that either, have they?

5             MR. GARDNER:  Objection.  Lack of

6    foundation.

7             THE WITNESS:  Not to my knowledge.

8    BY MR. GROSSI:

9        Q    Okay.  And then it comes down to the

10   recommendation, and they say Alternative A isn't

11   costly and doesn't harm the count, but then

12   referring specifically to the idea of adding or

13   not, it says, "Alternative B better addresses the

14   DOJ's stated uses.  However, it is very costly and

15   does harm the quality of the census count by

16   increasing erroneous enumerations," and then as

17   you just said a moment ago, they also said,

18   "Alternative C even better meets DOJ's stated

19   uses."

20             Let me take each little piece, all right.

21   As the Census -- have the Census experts ever

22   changed their view that Alternative B is very

Page 178

1    costly?

2              MR. GARDNER:   Objection.   Lack of

3    foundation.

4              THE WITNESS:   Not to my knowledge.

5    BY MR. GROSSI:

6        Q    Have they ever changed their view that

7    Alternative B, adding the question, harms the

8    quality of the census count by increasing

9    erroneous enumerations?

10             MR. GARDNER:   Same objection.

11             THE WITNESS:   Not to my knowledge.

12   BY MR. GROSSI:

13       Q    Have they ever changed their view that

14   Alternative C, using administrative data without a

15   question, even better meets DOJ's stated uses?

16             MR. GARDNER:   Same objection.

17             THE WITNESS:   Not to my knowledge.

18   BY MR. GROSSI:

19       Q    Have they ever changed their view that

20   Alternative C, administrative data, is

21   comparatively far less costly than Alternative B?

22             MR. GARDNER:   Same objection.

1          THE WITNESS:   Not to my knowledge.

2     BY MR. GROSSI:

3        Q    And then they say, "For these reasons, we

4     recommend Alternative C, using administrative

5     records without the citizenship question for

6     meeting the Department of Justice's data request."

7          Have they ever changed their final

8     recommendation to use administrative data without

9     a citizenship question additional rather than

10    adding such a question?   Have they ever changed

11    their recommendation in that respect?

12          MR. GARDNER:   No objection.

13          THE WITNESS:   Not to my knowledge.

14    BY MR. GROSSI:

15        Q    Okay.

16          MR. GARDNER:   Tell you what, we've been

17    going a long time.   Why don't we go off the record

18    and grab lunch?

19          MR. GROSSI:   I think this is a good time.

20    I agree.

21          VIDEOGRAPHER:   This concludes Media Unit

22    Number 3.   Time on the video is 12:34 p.m.   We are

1   not give an opinion on C or A or B.  I did not do

2   that.  It is a misrepresentation of what I said.

3   It could be a confusion or it's a game of

4   telephone tag, because it went from me to somebody

5   else.  I can't speak to it.

6        Q    Okay.  Is that because you never took any

7   position on how the citizenship issue should be

8   handled?

9        A    I never took a position on how the

10  citizenship issue should be handled.

11       Q    So if Dr. Jarmin testified, as he did,

12  that you never disagreed with the recommendations

13  of the experts at the Census Bureau to use

14  administrative records rather than a citizenship

15  question, you're not contradicting that testimony

16  in any way?

17       A    I didn't take a stance.  So I didn't

18  agree or disagree.

19       Q    Okay.  Fair enough.

20            Now I'd like to talk about a little bit

21  of a different topic.  Let's mark -- I'm marking

22  as Exhibit 18 some emails where the Bates number

1   begins 5489 and runs to 5491.   The top email being

2   an email from Dr. Jarmin 1/3/2018 at 6:55 p.m.

3         (Plaintiffs' Exhibit 18, Email, was

4   marked.)

5   BY MR. GROSSI:

6        Q   Okay.  Now, Secretary Kelley, I think you

7   testified in words or substance before the break

8   that you viewed your job primarily as facilitating

9   and making sure that the best possible people at

10  Census focus on this particular issue of adding

11  the citizenship question; is that right?

12       A   I -- I said that I felt it was my job to

13  convene and organize and work with Census to put a

14  strategy in place for the overall timeline, as

15  well as provide the Secretary with the best

16  information for him to make a decision.

17       Q   Okay.  And this was specifically in the

18  context of a request that was received in December

19  from the Department of Justice about their needs

20  for certain data, correct?

21       A   Correct.

22       Q   Okay.  Did you also feel that as part of

Page 187

1   your job, it was important to make sure that your

2   folks in the Census Department were talking

3   productively with the appropriate people in the

4   Department of Justice about what they needed and

5   how they could best -- how Census could best serve

6   their needs?

7       A   Quite frankly, the suggestion of a

8   meeting between Census and DOJ came from Census.

9   In one of our conversations, as we were going

10  through strategies and timelines, we talked about

11  what would you normally do when this comes up, how

12  would you normally handle it?  And they said they

13  would try to set up a meeting with the agency or

14  department or whatever it may be that wanted the

15  information and see -- you know, fine tune and

16  discuss and those kinds of things, and I said

17  super.

18      Q   Good.  I mean, and someone is asking

19  you --

20      A   I don't know if I actually said super.  I

21  want to be really clear.

22      Q   That's okay.

Page 189

1  happening.  I'm talking to the Census.  We're

2  saying what do we do, what's the strategy?  They

3  say we're going to call -- and I support that

4  decision, if that's what they want to do and have

5  that meeting.

6  BY MR. GROSSI:

7       Q   Okay.

8       A   But I'm not hoping and -- you know --

9       Q   Poor choice of words.  I'm sorry.

10          Let's go over the particulars here.

11  Let's go to the last page -- actually, take a look

12  at the bottom of 5490.

13          A   Got it.

14          Q   And it indicates that Director Jarmin, on

15  Friday the 22nd of December, is sending an email

16  to Arthur Gary, who is later identified as someone

17  at the Department of Justice, and the subject is

18  the request to reinstate the citizenship question

19  on the 2020 census.  Dr. Jarmin writes -- first,

20  he thanks him for the letter of December 12th

21  about the request by the Department of Justice,

22  and then says the Bureau is fully supportive of

Page 190

1    working with Justice.

2         And then says, quote, to that end, I

3    directed staff to review all possible ways to

4    address the needs expressed in the letter.  They

5    have now briefed me, and their findings suggest

6    that the best way to provide P.L. 94 block-level

7    data, with Citizen Voting Population By Race and

8    Ethnicity would be through utilization of a linked

9    file of administrative and survey data the

10   Census Bureau already possessed.  This would

11   result in higher quality data produced at lower

12   costs.

13        Do you see that?

14    A    I see.

15    Q    And that's what we had referred to in the

16   Abowd memo that refers to as Alternative C,

17   correct?

18        MR. GARDNER:  Objection.  Lack of

19   foundation.

20        THE WITNESS:  It would appear that way.

21   BY MR. GROSSI:

22    Q    Okay.  And then to follow the train,

Page 191

1  working backwards, very quickly, on the afternoon

2  of December 22nd, Mr. Gary, who's identified as

3  the general counsel of the justice management

4  division of the Department of Justice, writes back

5  to Dr. Jarmin saying, "Thank you.  We look forward

6  to meeting you and your team in early January,"

7  since now we're pretty much into the Christmas

8  season.

9          And then there is that break, and on

10 January 2nd, Dr. Jarmin writes back to Mr. Gary

11 and asks him if late the following week would work

12 for a meeting.  And then Mr. Gary quickly responds

13 back and says, "It should work fine.  Let me get

14 back to you."

15          And then on the very top, on January 3rd,

16 Dr. Jarmin writes to Mr. Gary and says, quote, I'm

17 bringing technical, program and legal folks.  It

18 would be good if some technical folks on the DOJ

19 side were there so we can ensure we understand and

20 can meet your requirements, unquote.  And then he

21 suggests a couple different days.

22          Were you aware at about this time that

1   Dr. Jarmin was trying to set up a meeting with the

2   Department of Justice including their technical

3   and program people?

4       A   As I indicated before, I knew he was

5   setting up a meeting.  The full compliment of

6   staff he was bringing, I would not have

7   questioned, and I'm not sure I knew or did not

8   know, but --

9       Q   Now, in fact, the meeting never took

10  place, right?

11      A   No.  The meeting did not take place.

12      Q   Why?

13          MR. GARDNER:  Objection.  Calls for

14  speculation.  Lack of foundation.

15  BY MR. GROSSI:

16      Q   Well, you would know why, wouldn't you?

17  You were involved in hoping that -- or planning

18  that Dr. Jarmin would set it up, right?

19          MR. GARDNER:  Objection.  Form.

20  Objection.  Mischaracterizes witness's prior

21  testimony.

22          THE WITNESS:  Again, Dr. Jarmin told me

Page 193

1    he was going to set up the meeting.  I did not get

2    involved in helping him plan to do that.  I

3    just -- he said he was going to set up the

4    meeting, I said good.  I support that.  That makes

5    sense.  Great.  So that is that issue.

6            Do I know that the meeting did not take

7    place?  Yes, I do know the meeting did not take

8    place.

9    BY MR. GROSSI:

10       Q    And do you know why?        802

11       A    It was under -- my understanding that the

12   Justice came back and said we really don't need to

13   meet.  We do not need to meet.  Our request is

14   what we've got in the letter, is the written

15   request.

16       Q    Basically, they didn't even want to

17   discuss the use of administrative data?

18       A    That's exactly right.  And we had seen

19   that before in a couple other examples.  Where we

20   wanted to meet with OMB on a topic, and they said,

21   no, what we've given you is what we've got, so we

22   don't need to meet.  I've seen that happen before.

Page 203

1    that I would -- I can't personally say I remember

2    this agenda on January 11th.  I don't really even

3    know if I remember January 11th, but this would be

4    a typical agenda of the topics that now are

5    topical that we need to discuss.

6        Q   I take it you don't remember anybody

7    saying that the citizenship question should be

8    added at this meeting?

9        A   I do not remember that, but I do not

10   remember.

11       Q   Okay.  Let's go on, now, to the next one.

12           (Plaintiffs' Exhibit 21, January 9, 2018

13   memorandum, was marked.)

14   BY MR. GROSSI:

15       Q   All right.  I'm marking as Exhibit 21 a

16   memorandum and the Bates number is 1277 to 1285,

17   and it indicates it's dated January 9, 2018.  It

18   states to be a memorandum for Secretary Ross that

19   has been transmitted from Dr. Abowd through

20   Enrique Lamas, the acting deputy director, and

21   then Dr. Jarmin, the acting director -- or the

22   director, and then you, now performing the duties

1    of deputy secretary.

2            Before we start, let me just ask you:

3    You assumed acting deputy secretary role in

4    November of 2017?

5        A    Yes.  I just want to clarify one thing,

6    and for those that do know this or don't know

7    this, there is in government -- and I'm new to

8    government -- a distinct difference between the

9    acting and the person who is performing the

10   nonexclusive functions and duties.  I just want to

11   be very clear that in any colloquialism, if

12   somebody calls me the acting, I am not the acting

13   deputy secretary.  I am performing the

14   nonexclusive functions and duties of the deputy

15   secretary.

16       Q    And so for a single salary, you're doing

17   two jobs.  You are performing the nonexclusive

18   duties of secretary and you're also the

19   Under Secretary; is that right?

20       A    Yes, I am.

21       Q    Well, I think that you should get a

22   raise.

1      A   I am not an expert and technical genius

2   on this -- what is the actual technical, but this

3   goes through our exec seg process and all the

4   people that should know and this is the process.

5      Q   As a practical matter?

6      A   As a practical matter, yes.

7      Q   Fair enough.

8      A   Yes.

9      Q   And you sent this to Secretary Ross?

10      A   Yes.

11      Q   Now, I want to discuss this document in

12   some detail, and you can read the whole thing or

13   I'm going to direct your attention to specific

14   questions, and I think they'll be in fair context.

15      A   Okay.  May I just say that this memo was

16   from Dr. Abowd and it came through myself,

17   Dr. Jarmin and Dr. Lamas.  So you said you sent

18   this.  This actually was sent through the three of

19   us, okay.

20      Q   And all of you concurred it ought to go

21   up to Secretary Ross?

22      A   Indeed.

1    Q    Just to get the nomenclature correct

2  again, on the first page, the memo states, as

3  we've previously discussed, that the Census

4  experts had discussed three alternatives --

5    A    Excuse me, sir.  If you would not mind,

6  we've said prior to this that there have been many

7  iterations, many versions, many everything.  If

8  you wouldn't mind, I would like to take a minute

9  to look at this, as we are going to go through

10  this document.

11    Q    Sure.

12    A    Thank you.

13    Q    Ready to go.  Okay.  Secretary Kelley, in

14  this memo that we've marked as Exhibit 19 --

15    A    21.

16         MR. GARDNER:    21.

17  BY MR. GROSSI:

18    Q    Oh, I'm sorry.  21.  Thank you.

19         The first page is sort of a summary of

20  the recommendations, and I want to ask you about a

21  couple of them.  The Census experts begin by

22  saying that the Department of Justice has

1    requested block-level citizen voting age

2    population estimates.

3           Do you see that?

4    A    Yes.

5    Q    That's what we've been referring to as

6    the DOJ request, correct?

7    A    Correct.

8    Q    And then they say, as they did in the

9    earlier versions, the prior memos, that they

10   considered three alternatives, A, no change in

11   data collection.  That is no additional

12   citizenship question, correct?

13   A    Correct.

14   Q    And B would be adding the question to the

15   2020 census, correct?

16   A    Correct.

17   Q    And C would be obtaining the citizenship

18   data and status from administrative records for

19   all of the census --

20   A    Right.

21   Q    -- population?

22          And then the Census experts in the memo

1    that you forwarded to Secretary Ross states,

2    quote, we recommend either Alternative A or

3    Alternative C, correct?

4         A    Says right there in the memo.

5         Q    So they were not recommending adding a

6    question?

7         A    They were recommending A or C.

8         Q    Correct.  Neither of which added the

9    citizenship question, correct?

10        A    Correct.

11        Q    And they then go on to explain that in

12   their view, quote, Alternative C best meets DOJ's

13   stated uses, is comparatively far less costly than

14   Alternative B, does not increase response burden,

15   and does not harm the quality of the census count.

16             Do you see that?

17        A    Yes, I do.

18        Q    At no time have the experts in the Census

19   recanted or changed their view on any of those

20   four propositions with respect to Alternative C,

21   correct?

22             MR. GARDNER:  Objection.  Lack of

1   foundation.  Calls for speculation.

2          THE WITNESS:  I can't speak to what all

3   the people of the Census who participated in

4   putting this memo together, I can't speak to that.

5   I can agree with what you're saying on the page.

6   BY MR. GROSSI:

7      Q   What I'm asking you is:  You're not aware

8   of anybody -- anybody at the Census Bureau coming

9   to you or writing you and saying I disagree with

10  any of those four facts, correct?

11     A   Correct.  And your four facts are --

12     Q   We can take them one at a time.  C best

13  meets the DOJ's stated uses:  That was their

14  position then and it's their position now,

15  correct?

16          MR. GARDNER:  Objection.  Calls for

17  speculation.  Lack of foundation.

18  BY MR. GROSSI:

19     Q   I mean, in terms of lack of foundation,

20  these people do work under your supervision,

21  correct?

22     A   That is what they wrote in the letter.  I

1  don't know every single person at the Census -- I

2  don't want to get caught up in that situation.

3       Q    But they --

4       A    But they have written that here in this

5  memo, and I agree that that's what they wrote

6  here.

7       Q    And you also agree that from your own

8  knowledge of dealing with these people on this

9  issue and otherwise, you've never heard anybody

10  from Census saying that it was wrong that

11  Alternative C best meets DOJ's stated uses?

12       A    Not to my knowledge.

13       Q    And the same with no one ever said to you

14  that it was wrong that Alternative C is

15  comparatively far less costly than Alternative B?

16       A    Not to my knowledge.

17       Q    And Alternative C does increase the

18  response burden:  They never changed their mind

19  about that as far as you know, correct?

20       A    Not to my knowledge.

21       Q    And Alternative C does not harm the

22  quality of the census count:  You have no reason

Page 212

1   to think that's not their view today, correct?

2           MR. GARDNER:   Objection.   Calls for

3   speculation.   Lack of foundation.

4           THE WITNESS:   Not to my -- not to my

5   knowledge.

6   BY MR. GROSSI:

7       Q   Now, let's talk about Alternative B,

8   which is adding the question.   And the Census

9   experts said that, in their view, Alternative B is

10  very costly.

11          Are you aware of anybody at the

12  Census Bureau who has said that that is not true

13  in their view?

14      A   It is costly if they are -- their

15  conclusions are correct.

16      Q   Okay.

17      A   It is more costly if their conclusions

18  are correct.

19      Q   And they've never suggested, as best they

20  understand it and believe, that their conclusions

21  in this memo are incorrect, they've never said

22  that?

Page 213

1      A    Not to my knowledge.

2      Q    They've also said that adding the

3  question would harm the quality of the census

4  count, correct --

5      A    That is what they said.

6      Q    -- they said that?

7           And you're not aware of any place where

8  they've changed their minds since this memo was

9  written?

10     A    Not to my knowledge.

11     Q    And then they finish off Alternative B by

12 saying that it would use substantially less

13 accurate citizenship status data that are

14 available from the administrative sources.

15          Do you see that?

16     A    I do.

17     Q    And you understood that was their view.

18          And as far as you know, that's still

19 their view today?

20     A    Not to my knowledge.  It did not change.

21     Q    Now, I'm going to go into the specifics

22 on the next page a little bit more, but let me

Page 219

1    are off the record.

2              (Off the record.)

3              VIDEOGRAPHER:   This begins Media Unit

4    Number 5.   The time on the video is 2:35 p.m.   We

5    are on the record.

6              (Plaintiffs' Exhibit 22, Email, was

7    marked.)

8    BY MR. GROSSI:

9         Q    Secretary Kelley, I'm going to give you a

10   document -- and I'm going to tell you right now,

11   I'm going to ask you about the front page and not

12   the attachment.  I'm going to show you a later

13   version of the questions, and we'll get into it

14   then.  If you want to just look at the first page,

15   I just want to get context of when you began to be

16   aware, again, of these questions that were being

17   floated.  And I'll just read in for the record,

18   and tell you why I'm interested, the top page,

19   2292, on Exhibit 22 is an email to Mr. Comstock

20   from Burt Reist, and it talks about the

21   citizenship questions complete set as of that

22   date, February 2nd, and then there is a set of the

1  questions and answers.

2      A    We're not looking at those?

3      Q    Right.  And all I'm asking you is:  Was

4  it about the first week in February when you

5  returned that you learned that these questions and

6  answers were being circulated and being addressed

7  by the Census experts?

8      A    To back up, the day that we had the

9  meeting, there were questions being thrown out by

10  a lot of people.  Again, I want you to understand.

11  This process was iterative.  It was collaborative.

12  We were sitting around, people were asking

13  questions.  I was jotting down questions.  Other

14  people were jotting down questions.  We were sort

15  of compiling questions.  Then people had the

16  ability to come back later on and say, I just

17  thought of this.  There's another question.  So we

18  were sort of keeping a pile of the questions.

19          I was the keeper of the questions.  They

20  weren't all my questions, but they would refer to

21  them as Karen's questions or Karen's list or

22  Karen's whatever, just because I had them.  When I

Page 221

1    did leave, I handed that document, that list of

2    questions to somebody else so that they would have

3    it so the work could continue, they knew where it

4    was.  And so when I returned, I knew the questions

5    were in process -- or some had been answered, some

6    had been processing, and I just needed to get

7    caught up on where they stood.

8        Q    Good.  Thank you.

9             Let me ask you a little bit more about

10   this meeting.  Whenever the date actually was, who

11   was present, the best you can remember?

12       A    There were -- certainly, Enrique Lamas,

13   Dr. Abowd, Dr. Jarmin -- I should say Dr. Lamas.

14   We had people from legal -- legal there.  We had

15   people from policy there.  Earl was there.

16   Comstock was there.  I believe both James and

17   Peter were there, but I -- I don't know exactly.

18       Q    Peter Davidson?

19       A    Yeah.  But, again, I'm not exactly

20   100 percent sure.  But it was a compliment of the

21   entire group of the three groups that I talked

22   about being involved.

Page 222

1      Q    It was all Commerce and/or Census people,

2   correct?

3      A    Oh, yes.   As opposed to who?

4      Q    As opposed to the Department of Justice?

5      A    Oh.  No.  No.  No.  It was just Commerce

6   people, yes.

7      Q    And Secretary Ross was not there?

8      A    No.   He was there.

9      Q    Oh.   He was there?

10      A    He was there.   Absolutely.

11      Q    And he had, by this time, received and

12   digested the memo --

13      A    The memo, not the -- the question --

14      Q    -- we talked about earlier, the January

15   19th memo?

16      A    Yes.

17      Q    Did he express his view that he thought

18   the citizenship question should be added?

19      A    No.   He asked questions.   It was really a

20   very open dialog with a lot of questions going

21   back and forth and clarification and can we find

22   this out, which led to many of the questions.

1      Q    Did Secretary Ross know at that time that

2    Justice had declined to meet about this --

3          MR. GARDNER:   Objection.   Calls for

4    speculation.

5    BY MR. GROSSI:

6      Q    -- something had happened a couple weeks

7    earlier?

8          MR. GARDNER:   Objection.   Calls for

9    speculation.   Lack of foundation.

10         THE WITNESS:   I don't know the answer to

11   that.

12   BY MR. GROSSI:

13     Q    Did Secretary Ross express to you that it

14   would be important for the Justice people to meet

15   with the Census people so that they could

16   understand the technical aspects of why Census was

17   saying that administrative records would be better

18   than adding a citizenship question?

19     A    I -- I don't recall the dialog around

20   that.

21     Q    You don't recall anybody expressing the

22   view that they should meet with Justice to explain

1   to them why the Census solution was better than

2   adding a question?  You don't remember that coming

3   up?

4        A    No.   In regard to my conversation with

5   Ron and the notes that you told me that I knew the

6   meeting wasn't happening, I mean, I knew all that.

7   You were speaking specifically in reference to the

8   Secretary, and I don't recall the conversations

9   around that with the Secretary.

10       Q    All right.   Okay.   I want to switch

11  topics slightly, and we're going to come back to

12  the questions in chronological order.

13       A    And are these the questions we're using,

14  or are you giving me --

15       Q    I'll give you a later version.

16       A    Because, like the letter, there were lots

17  of versions of the questions.

18       Q    Right.   As you look at that, as best you

19  can, do you think that it refreshes your

20  recollection that by about February 2nd you were

21  back focusing in on this issue?

22       A    That would have been the Friday after

1  I -- if I were back that day -- and I believe I

2  was -- I was just sort of cleaning up and prepping

3  up.

4       Q    That was the transitional time.   Okay.

5  Fair enough.

6       A    And, in fact, I'm not even on this email

7  that went to Earl.

8       Q    Right.   I noted that.   I just wanted to

9  see if, perhaps, they gave you a copy as soon as

10  you got back.

11           Do you remember a meeting with the

12  Secretary -- a further meeting with the Secretary

13  around February 12th?

14       A    Again, I don't remember the dates, but

15  there was a second -- secondary meeting that --

16       Q    Who was present at that meeting?

17       A    So I want to be very clear that at the

18  time that this was going on, this became an

19  iterative process.   It was evolutionary.   People

20  were working collaboratively together.   It wasn't

21  a work, stop, hand all the documents.   It was

22  answering questions.   It was dialog.   And so there

1    were other questions -- there were other meetings.

2    If there was an oversight meeting or steering

3    committee meeting, a group may have joined at the

4    end of it to discuss this.  So there were lots of

5    dialog and conversation going on.

6        Q    And Secretary Ross attended that meeting?

7        A    Not all, but many of them.

8        Q    He attended that meeting -- if it might

9    be the first week or second week in February.

10       A    I believe that sounds reasonable.

11       Q    And it was, otherwise, all Commerce and

12   Census people, correct?

13       A    Yes.

14       Q    No Justice people?

15       A    No Justice people.

16       Q    And is it essentially the same group you

17   think you had before, Mr. Comstock?

18       A    We had, clearly, representation from

19   legal, policy, Census.

20       Q    Okay.

21       A    Because you wouldn't want to have the

22   meeting unless you had representation from all

Page 227

1   three of these groups we were using as guiding

2   principle as we looked at this.

3       Q    Now, Secretary Ross by this point had

4   heard from the Census experts that they

5   recommended against adding this -- the citizenship

6   question, correct?

7       A    Right.   He asked many questions of them,

8   and he said they are valid questions, and we will

9   get back to you.   So it was a dialog going on.

10      Q    And they had, in fact, prepared a set of

11  those questions to provide to him?

12          MR. GARDNER:   Objection.   Form.

13  BY MR. GROSSI:

14      Q    That was -- part of the process on

15  February 12th was to receive, either in written

16  form or in oral form, the answers to his

17  questions?

18      A    I don't want to get hung up on the date

19  of the meeting, but, yes, there was a later

20  meeting for him to get the answers to the

21  questions.

22      Q    Actually, I think now that we know that

1   this may be a more important document, let's go

2   through it.  I just want to point out the answers

3   to three questions, okay?

4       A    In this document that we weren't going to

5   use?

6       Q    Right.  The one we have the attachment

7   on.

8       A    Which we don't know if this was a draft

9   or final copy, do we?

10       Q    It is not the final copy, but it is the

11   copy closest to the mid-February meeting.  That's

12   why I'm going to ask you about it.

13       A    I said I don't know if there was meet- --

14   when the date was of that mid-February meeting

15   was.

16       Q    Okay.

17       A    So I don't want to --

18       Q    Well, we have had testimony that there

19   was a big meeting with Secretary Ross on

20   February 12th.

21           Does that refresh your recollection?

22       A    I know there was a meeting around that

1    time, so I'm not disputing that.  If my colleagues

2    said it was on February 12th, I wouldn't disagree

3    with them.  I'm just saying I don't specifically

4    remember.

5        Q    Okay.  Just take a look --

6             MR. GARDNER:  Exhibit 23.

7    BY MR. GROSSI:

8        Q    So 22.

9        A    I have one big packet of stuff here and

10   it --

11       Q    Right.  And it should have the questions

12   attached.

13            MR. GARDNER:  No.

14            MS. KELLY:  It's --

15            MR. GARDNER:  You intended it to be a

16   single exhibit?

17   BY MR. GROSSI:

18       Q    Okay.  So we're -- and to be very

19   precise, in Exhibit 22 on Page 2294, it begins the

20   questions and answers to the questions that were

21   asked about the January 19th draft.

22            Do you see that?

1       A    Yes.

2       Q    Okay.    I want to just ask you about

3    three, all right.

4            The first one is Question Number 10.

5    Someone was interested and asked the question,

6    "The NRFU numbers are comparatively small.

7    Approximately one additional house for NFRU [sic]

8    percent enumerator.    Is this really a significant

9    source of concern?"

10           Let me just ask:    Do you recall who posed

11   that question initially?

12      A    No, I don't.

13      Q    Okay.    The answer of Census experts is,

14   quote, yes, this is a significant concern.    First,

15   it gives rise to incremental NRFU costs of at

16   least 27.5 million.    This is a lower bound because

17   it assumes the households do not self-respond

18   because we added a question on citizenship, have

19   the same follow-up costs as an average U.S.

20   household.    They won't, because they -- these

21   households overwhelmingly contain at least one

22   noncitizen, and that is one of our acknowledged

Page 231

1    hard-to-count subpopulations.

2            Do you remember that the Census Bureau

3    responded to the question by saying that it really

4    was a significant concern in their minds that

5    adding the citizenship question would increase the

6    nonresponse rate?

7        A    So my vernacular here will be NRFU,

8    that's what they call it, N-R-F-U is called NRFU.

9    And there was a discussion about this, and there

10   was a discussion about the fact that one

11   percentage point out there is -- there's

12   $15.6 billion lifecycle cost estimate to get this,

13   and -- to do this census and, quite frankly, as

14   we're going through this and there were many

15   new -- new ways the census was being taken by

16   Internet self-response and telephone and there

17   were other things, there was -- at least the 27.5

18   million, which is in this.

19           This -- because of the conversation

20   around the fact that it would be a noncitizen who

21   would not answer this, in their opinion, this is

22   their conclusion of the data, they looked at it.

1   It would be those households, you know, at least

2   one noncitizen are the hard-to-count population,

3   and that is absolutely right.  We consider that

4   the hard-to-count population, and we spend a

5   tremendous amount of time on how to count the

6   hard-to-count population.

7        The Census Bureau, if you ever have been

8   with the Census, you can do all the technology you

9   want in the background and we can provide

10  everything.  It's the people -- feet on the

11  ground, those people that are out there

12  enumerating, doing the job, which the Secretary

13  did when he was himself in college.  So he is very

14  familiar with that exercise -- they do this and

15  they did -- they did state this concern.

16        We also talked about mitigation to this

17  concern, and we talked about the fact that we

18  were, in this census, increasing the number of

19  partnership programs that we were having.  We were

20  rethinking the way things were being done, so we

21  were already talking about if -- not on this

22  date -- but what our mitigation strategies were if

Page 233

1    this were to be the case.

2         Q    But Census never changed its view and

3    never changed their answer to this question,

4    correct?

5         A    No, they did not, as far as I know.

6         Q    Let me ask you about another one

7    that's --

8              (Conference call interrupted.)

9    BY MR. GROSSI:

10        Q    Okay.  Let me state it again.

11             Directing your attention to Page 2299,

12   the Question 13 and answer -- excuse me -- the

13   question is, quote, if Census is confident that

14   administrative data will be available to be used

15   to determine citizenship for all persons, e.g.,

16   not all citizens have Social Security numbers,

17   unquote.

18             I think you alluded to this a moment ago

19   when you talked about having MOUs in place to have

20   the right administrative data.  Do you remember

21   that?

22        A    Yes, I did.

Page 234

1      Q    But the answer of the Census experts was,

2    quote, we are confident that Alternative C is

3    viable, and that we already have invested enough

4    high quality citizen administrative data from SSA

5    and IRS, unquote, and then it goes on to elaborate

6    a little bit.

7           I'll represent to you that this answer

8    was never changed in any subsequent draft of these

9    Q&As.   Is that also your recollection, that the

10   Census experts believed they had the data in place

11   to make administrative data use viable?

12      A    They answered the Question Number 13, to

13   say yes.   But also in the original document, which

14   has the three alternatives, they do say that they

15   would want to put a memorandum of understanding in

16   place so they would have higher quality data in

17   order to do that.   But it is not my understanding

18   that they have changed that answer to that

19   question.

20      Q    So they thought it was viable six months

21   ago and they think it's viable now, right,

22   Alternative C?

1        A    They've not -- to my knowledge, they have

2    not changed that.

3        Q    All right.   Let's leave that, and I just

4    want to ask about a couple more things.

5        A    Are we leaving this?

6        Q    Yes.   We may be returning to it, but for

7    right now, we're leaving it.

8             I'm marking as Exhibit 23 an email that

9    begins on Bates number 4853.

10            (Plaintiffs' Exhibit 23, Email, was

11    marked.)

12    BY MR. GROSSI:

13        Q    Now, this is an email chain on

14    February 13th, which if Dr. Jarmin's recollection

15    is correct, was the day after the meeting with

16    Secretary Ross.   And if you go to the first item,

17    which is the last on the chain, we find Mr. Jarmin

18    writing to a Michael Strain, and he says, "We are

19    trying to set up some meetings for Secretary Ross

20    to discuss the proposed citizenship question on

21    the 2020 census with interested stakeholders.

22    Most stakeholders will speak against the proposal.

1   We're looking to find someone thoughtful who can

2   speak to the pros of adding such a question or

3   perhaps addressing the fundamental need, some

4   other" -- I'm sorry -- "the fundamental data need

5   some other way (e.g., admin records.)  Do you know

6   of anyone at AIE or elsewhere that could do this

7   sometime over the next couple weeks?"

8           And Michael responds by saying, "None of

9   my colleagues at AIE would speak favorably about

10  the proposal.  It is -- is it important that the

11  person actually be in favor of how -- the

12  proposal?"

13          You were involved in efforts to discuss

14  the possibility of adding a citizenship question

15  with what has been referred to as stakeholders?

16      A   Uh-huh.

17      Q   Correct?

18      A   Yes.  I'm sorry.

19          THE WITNESS:  Yes, Karen.

20  BY MR. GROSSI:

21      Q   You attended some meetings with some of

22  those people?

1       A    I attended some meetings.  Did not attend

2    all the meetings.

3       Q    Did you also, on one occasion, listen in

4    by telephone, because maybe you were in a

5    different location?

6       A    Yes.  Yes.

7       Q    AIE is the American Enterprise Institute

8    in this context, correct?

9            MR. GARDNER:  Objection.  Lack of

10   foundation.  Calls for speculation.

11           THE WITNESS:  I honestly am not 100

12   percent sure, but I believe so.  I do not know

13   Michael Strain, at all.  So I have no basis --

14   BY MR. GROSSI:

15      Q    Dr. Jarmin was tasked with trying to find

16   someone who would speak in favor of adding the

17   citizenship question, correct?

18      A    I'm going to say that is incorrect.  What

19   we sat in the meeting and discussed with the

20   people from the Census, the entire group that were

21   there, we said that the Secretary wanted to get

22   opinions of stakeholders.  We then wrote those

1  stakeholders, and it was a group effort and group

2  discussion to say we want pros, we want cons, we

3  want him to hear from federal, local businesses,

4  businesses, special interest groups, so on and so

5  forth, former directors, so that he could get an

6  academic, intellectual -- he could get a full look

7  at the -- at people who wanted to comment on it.

8  And we wanted to get -- a combination of views,

9  because we wanted it to be very objective.

10       Q   And what Mr. Jarmin -- Dr. Jarmin

11  responded to Mr. Strain, as indicated on the first

12  page, 4853, is, "We are trying to find someone who

13  can give us a professional expression of support

14  for the proposal in contrast to the many folks we

15  can find to give professional statements against

16  the proposal," unquote.

17           So bottom line was you had plenty of

18  people who were against adding the question, so

19  Dr. Jarmin was trying to balance that out with

20  someone who would speak in favor of the proposal;

21  isn't that right?

22           MR. GARDNER:   Objection.   Lack of

Page 239

1    foundation.  Calls for speculation.

2            THE WITNESS:  Yeah.  I wouldn't say that

3    as much as I would say that what we did is we

4    had -- we were trying to make the list, we were

5    trying to make it very fair, very balanced, and we

6    were looking at it.  And I don't know where it was

7    in the process of discussing this.  But, for

8    example, I don't know a lot of people in this

9    town.  I wouldn't -- I wasn't involved in making

10   many calls, but one person I did know, a gentleman

11   named Arturo Vargas, who I had met with before,

12   who I knew was against this.  I said, let's make

13   sure he's on the question -- on the list, because

14   he had been vocal, and he came to meet with me on

15   other topics well before the question.  I said,

16   let's make sure we get his opinions on this.  So

17   we were getting opinions.  We were filling out the

18   list.  So I can't tell you at this point how they

19   were filling out the list.

20   BY MR. GROSSI:

21        Q   Okay.  In any event, he told you at the

22   top in an email to you that, "It appears that no

Page 240

1   one at AIE willing to speak in favor of putting

2   question on the 2020," unquote, correct?

3        A    Yeah.  That's exactly what it says.  He

4   wrote to me.

5        Q    And did Dr. Jarmin keep looking for

6   people who would speak in favor of putting the

7   question on the proposal?

8        A    I believe as we sat in that meeting, we

9   had a list of groups and/or people that would make

10  sense to talk to.  And so -- I don't know where he

11  was on the list.  If he was at the beginning, the

12  end, where he was exhausted on the list, but there

13  would be other people on the list that he could

14  call and not call.  And we actually felt very

15  important, that we had the Census input on who

16  they wanted us to speak to.

17       Q    You figured the Census people would be

18  the best judges of who would be an effective

19  person, one way or the other?

20       A    Well, they would certainly know experts

21  in the field.

22       Q    Right.

1       A    They would certainly know -- and we had

2    the business liaison talk to us about which

3    business people we should put on, and, you know,

4    that kind of thing.

5       Q    Sure.

6       A    But very much with a view we wanted the

7    Secretary to have not only geographic,

8    demographically, but across multiple -- multiple

9    groups.

10      Q    One group that you were particularly

11   interested in were the prior Census directors,

12   correct?

13      A    Yes, we did.  We put that as one of our

14   categories.

15      Q    And did Mr. Jarmin

16   provide -- Dr. Jarmin -- I'm sorry -- provide you

17   with the input of Census directors?

18      A    No.  The Secretary had calls with them.

19      Q    The Secretary directly called up prior

20   Census directors?

21      A    So let me be very clear on this.  We put

22   together -- from the lists that we produced from

Page 242

1   these meetings and the work people did, we

2   produced a list and then worked with his

3   scheduling to have meetings so he could hear what

4   these people said.  I would say to you that the

5   Secretary has schedulers and other people that

6   probably made the phone calls for him.  Very

7   specific to your question, did he make phone

8   calls, but he did have -- he participated in phone

9   calls.

10       Q    And did you participate in any of those

11  calls by listening in?

12       A    I participated in some, not all.

13       Q    Let me mark two related documents as

14  Exhibit 24, 8554, an email from John Thompson to

15  Ron Jarmin dated January 29, 2018, and

16  sequentially, 8555, which is Exhibit 25, which is

17  a letter to Secretary Ross.

18            MR. DEWHIRST:  Is this two exhibits or

19  one?

20            MR. GARDNER:  Two exhibits.

21            MR. GROSSI:  Two.

22            (Plaintiffs' Exhibit 24, Email, was

1    marked.   Plaintiffs' Exhibit 25, Email, was

2    marked.)

3    BY MR. GROSSI:

4        Q    Okay.   Have you seen copies of this

5    document before?

6        A    Yes.

7        Q    Did you see it at about the time that, I

8    guess, Dr. Thompson sent it to Dr. Jarmin in

9    either late January or more likely, in your case,

10   early February 2018?

11       A    I would -- I would have probably seen it,

12   yes.   I would probably have seen it in February.

13       Q    And, for the record, what Exhibit 25 is,

14   is a letter that was addressed to Secretary Ross

15   on January 26th by six different former

16   Census directors, correct?

17       A    Yes.

18       Q    And it's fair to sum this up by saying

19   that they were against adding the citizenship

20   question, correct?

21       A    They suggest to not put the question on

22   the census because of the testing.

Page 244

1    Q    Uh-huh.

2    A    They don't bring up, to my knowledge, or

3  to my quick review here, they don't bring up other

4  reasons for not putting it on, but that it has not

5  been well tested.

6        The question had been on the ACS

7  since -- for many years and had been many -- had

8  been tested over and over with that wording.  So

9  there was a discussion about whether or not the

10  testing was tested.

11    Q    You think maybe those former Census

12  directors didn't know about the question on the

13  ACS?

14        MR. GARDNER:  Objection.  Calls for

15  speculation.

16        THE WITNESS:  I --

17  BY MR. GROSSI:

18    Q    Because that is what was suggested?

19        MR. GARDNER:  Objection.  Argumentative.

20        THE WITNESS:  I'm not commenting on that.

21  I'm just saying this was a letter that talked

22  about the testing.  We then had a full discussion

1   with the Census Bureau on the testing of the

2   question on the ACS, and if they thought that that

3   was acceptable amount of testing and that the

4   testing was sufficient, and that that is what I am

5   suggesting.   I am not suggesting and would not

6   suggest making any comments about what these

7   individuals were thinking.

8   BY MR. GROSSI:

9        Q    So when they state on the first page,

10  quote, we strongly believe adding an untested

11  question on the citizenship status at this late

12  date in the decennial planning progress would put

13  the accuracy of the enumeration and success of the

14  census in all communities at grave risk.   That is

15  what they told Secretary Ross, correct?

16       A    That is what is written here.

17       Q    And was there anyone among your Census

18  experts who said, you know, these guys are wrong

19  about that, I disagree with them?

20       A    Our Census experts talked to us about the

21  testing that had taken place under the ACS and the

22  fact that that was adequate testing.

1      Q    Did they say they disagreed with the

2  conclusions of the former Census directors?

3      A    I do not believe we ever asked the

4  question in relation to.   But when we read this

5  letter, said we need to discuss with Census

6  whether they think the testing is correct.   But we

7  did not -- you're making it did we put this letter

8  down, and, therefore, they answered these

9  questions.   Once this letter was read, we said

10 we've got to discuss testing with the

11 Census Bureau, who said that they believed

12 adequate testing had been done --

13     Q    Okay.

14     A    -- over the years of the ACS.

15     Q    Now I'd like you to go back to those

16 questions and answers from the prior draft, and I

17 want you to turn in Exhibit 22 to Page 2303 and,

18 specifically, Question 31 in the answer.

19     A    I'm on the wrong page.   Excuse me.

20     Q    You see that?   And it has to do with this

21 issue of process.   And it says, what was the

22 process that was used in the past to get questions

Page 247

1    added to decennial census, or do we have something

2    similar where a precedent was established?

3           And then in a very long answer, it says

4    that the Census Bureau follows a well-established

5    process that involves extensive testing, review

6    and evaluation.  And then specifically on the next

7    page, outlines six steps that are taken.

8           Do you remember that?

9      A    I see this, yes.

10     Q    Okay.  In this case, had the federal

11   agencies evaluated their needs and proposed

12   additions through the OMB?

13     A    So let me be really clear on this.  When

14   we started down the process of putting this

15   question on, we said to Census, how do we go

16   about -- what is it that we need to come up

17   with -- what do we need to do in order to put this

18   question on?  And the answer was, at the top of

19   the house, the guiding principles were we needed

20   to have a legal review, an operational/technical

21   review, and we needed to have a policy decision

22   made.

*Pl. Objection: Testimony is misleading without designation of the question at 246:15-247:12.*

1          We then said, have you had any other

2    likewise times where this has happened?  And they

3    said, well, it's kind of complicated, because

4    before, for 2000 -- in 2000, we had the long form,

5    we had the short form, so we really didn't -- we

6    really didn't change much there.  And then we went

7    to the ACS, and we think about how we put the

8    question on the ACS, and sort of talked about all

9    of these things down -- down the path, and I have

10   seen this written -- this same language -- this

11   same dialog written in about four, five, six

12   different ways.  And so what I would always go

13   back to with Ron, Enrique and others was, what is

14   it that we need?  We need a legal review.  We need

15   a technical policy review -- excuse

16   me -- technical/operational view, scientific

17   review, and we need a -- a policy decision made.

18          So I will tell you the way this question

19   Number 31 is written here, there had been other

20   iterations of this same thing written by different

21   people, but there was no hard fast guideline in

22   terms of this is a statutory requirement or this

Page 249

1    is a requirement that has been passed down.

2        Q    This question was assigned to

3    Victoria Velkoff to answer initially?

4        A    I don't know the answer --

5            MR. GARDNER:  Objection.  Foundation.

6            THE WITNESS:  I don't know the answer to

7    that.

8    BY MR. GROSSI:

9        Q    The answer that appears on 2302, 3 and 4

10   that we just referred to, that's the answer of the

11   Census Bureau; isn't it?

12       A    Yes.  I believe so.

13       Q    Okay.

14       A    But the Census Bureau has answered that

15   same question several different ways in other

16   discussions.

17       Q    Okay.  That's what I want to try to

18   understand.  I'm going to mark as Exhibit 26 a

19   later version.

20           (Plaintiffs' Exhibit 26, Questions, was

21   marked.)

22   BY MR. GROSSI:

1     Q   Now, on Page 1296 of Exhibit 26, there's

2   the same question about what process has been

3   used, but a very different answer, a much shorter

4   answer that doesn't mention all the steps that

5   have typically been taken.  All I want to know is:

6   Who wrote that?

7            MR. GARDNER:  Objection.  Lack of

8   foundation.  Calls for speculation.

9            THE WITNESS:  I don't know who wrote

10   that.

11   BY MR. GROSSI:

12     Q   Do you think it was anybody in the Census

13   or do you think it was someone else not in the

14   Census Bureau?

15            MR. GARDNER:  Objection.  Form.

16   Objection.  Lack of foundation.  Calls for

17   speculation.

18            THE WITNESS:  Oh, no.  I will tell you I

19   truly believe that any answers that were written

20   were viewed and looked at across the groups.

21   BY MR. GROSSI:

22     Q   That wasn't my question, ma'am.  My

Page 251

1    question was:  Do you know who wrote the

2    answer --

3         A    And I told you I don't know.  I don't

4    know.  And then you ask me a subsequent

5    question --

6         Q    And you're not prepared to say that you

7    swear that it was written by somebody in the

8    Census Bureau, correct?  You don't know?

9         A    I don't.  I -- I would assume so, but I

10   can't assume --

11        Q    I would not want you to assume here.

12        A    But everybody proofed the questions.

13   Everybody had a look at the questions.  So

14   everybody looked at these questions.

15        Q    All right.  I have just a couple more

16   exhibits.  Okay.  I'm marking as Exhibit 27 a

17   document that begins with Bates number 9812.  It's

18   dated March 1, 2008 [sic].  It does have a list of

19   those questions, but I'm not going to ask you

20   anything about them.  My questions are going to be

21   entirely about the first three pages of the

22   document.

1             (Plaintiffs' Exhibit 27, March 1, 2018

2    memorandum, was marked.)

3    BY MR. GROSSI:

4        Q    I'm sorry.   Five pages before the

5    questions begin, up through 9816.

6             Okay.   Okay.   On this exhibit, is it the

7    same type of format at the beginning that shows

8    that the views of Dr. Abowd and then Director

9    Jarmin, Assistant Director Lamas, and then you,

10   you were sending this up to Secretary Ross,

11   correct?

12            MR. GARDNER:   Objection.

13   Mischaracterizes the document.

14   BY MR. GROSSI:

15       Q    Let me ask, you sent this document to

16   Secretary Ross, correct?

17       A    It went from -- through Dr. Abowd,

18   Dr. Lamas, Dr. Jarmin to the Secretary.

19       Q    And according to Dr. Jarmin, you had

20   reviewed this memorandum before it was sent to

21   Secretary Ross.   Is that your recollection, also?

22       A    Yes.

1      Q    And what's going on here on March 1, 2018

2  is that by now, someone has come up with the idea

3  of an Alternative D, which would, in a sense,

4  combine the old Alternatives B and C, in that a

5  census -- the census would contain a citizenship

6  question, but in addition, they would use the

7  administrative data to link up to answer needs of

8  Department of Justice and other people, correct?

9      A    Correct.

10     Q    Who came up with that Alternative D

11 first?

12     A    I honestly do not remember.  I'll tell

13 you we were in a meeting.  We were talking about

14 all the different facts.  And, again, it was an

15 iterative, evolving process, as I said.  The

16 questions were being reviewed.  We were

17 talk- -- and -- and somebody said, why don't we

18 look at the combination of B and C and see what

19 that would do.

20          Because one of the things that we

21 determined as we looked at it, that there was no

22 baseline.  So you really didn't have a baseline.

1   So if you did this, you would create that baseline

2   and then the administrative records,

3   which -- which we are going to be using much more

4   in the census than in other censuses prior, we

5   could then have a baseline in to which use -- use

6   that going forward.

7        Q    D wasn't proposed by anybody at the

8   Census Bureau, correct?   It was someone else,

9   right?

10            MR. GARDNER:   Objection to form.

11            THE WITNESS:   I -- yeah.   You're asking

12   me who proposed the question.   I don't remember

13   who was sitting around -- we were sitting around a

14   table, in a group.   I remember discussing the

15   baseline, and the Census Bureau clearly agreed

16   that there was a lack of issue -- there was a lack

17   of a baseline, and that this would -- that that

18   was, as well as others, a -- a flaw, if you will,

19   in Option C.   And I don't know who said it.

20            It was one of those things where -- and,

21   again, I don't want to sound simpleton, but, you

22   know, when a whole group of people are sitting in

1   a room and trying to work through a problem the

2   best they can, and these people are throwing out

3   suggestions, what about this, what about this,

4   what about this question and then it came up.

5   BY MR. GROSSI:

6        Q    Then it was decided that the experts in

7   the Census Bureau would analyze that in detail,

8   correct?

9        A    Absolutely.  Yes.

10       Q    And that's the product --

11       A    The product that --

12       Q    -- that's here?

13       A    That product --

14       Q    And what they concluded on Page 9816 --

15   and I'm not going to go through all the reasons

16   they set forth -- is they say in their last

17   paragraph, "In sum, Alternative D would result in

18   poor quality citizenship data than does

19   Alternative C" -- the old Alternative C.  They

20   concluded that, correct?

21       A    Yes.  It says that right on Page 9816.

22       Q    And they've never taken that back,

1    correct?

2            MR. GARDNER:   Objection.   No foundation.

3    Calls for speculation.

4            THE WITNESS:   I -- not that I -- not that

5    I know of.

6    BY MR. GROSSI:

7        Q    They further say that, "Alternative D

8    would have all the negative cost and quality

9    implications of Alternative B outlined in the

10   draft January 19th memo to the Department of

11   Commerce."

12           Correct?

13       A    Correct.

14       Q    So Alternative D was not going to solve

15   any of those problems in adding the census --

16   citizenship question, correct, according to the

17   experts at the Census?

18       A    Certainly from Dr. Abowd's comments here.

19   But it -- it did not still -- and we discussed it

20   at length, addressed the baseline situation.

21       Q    There were no subsequent memoranda like

22   this from the Census Bureau up the chain to

1   Secretary Ross concerning this issue of whether or

2   not to add a citizenship question, correct?

3            MR. GARDNER:  Objection.  Form.

4            THE WITNESS:  Okay.  And I want to be

5   very clear on this, and I want people to

6   understand what I'm saying.

7            When we discussed this memo -- and I

8   think many people, not all, would say this is

9   reasonably complicated -- we tried to look at what

10  was a schematic that we could make this easier to

11  understand, and, therefore, later, a schematic was

12  produced that was -- I don't want to say added to

13  this -- but complimented this.  So I don't want to

14  say nothing -- you're saying to me, was anything

15  created from this document?  I don't want to

16  play -- I don't want to get in a nomenclature

17  issue with you.  I want to be very honest with

18  this group that, yes, there was a schematic that

19  was produced to help understand what this looked

20  like.

21  BY MR. GROSSI:

22        Q   And I appreciate the answer.

1          The schematic addition or iteration did

2     not change the conclusion that we just talked

3     about of the Census Bureau, that Alternative D was

4     not preferable to C, and, in fact, had all of the

5     problems of B adding to the question, correct?

6          A    In Dr. Abowd's memo, yes.   That is

7     correct.

8          Q    And there is no subsequent

9     Census-authored memorandum?

10         A    Not that I am aware of.

11         Q    On this issue?

12         A    Not that I'm aware of.

13         Q    And I'm going to ask in a moment, but I

14    want to clarify one thing.

15              (Plaintiffs' Exhibit 28, Final decision,

16    was marked.)

17    BY MR. GROSSI:

18         Q    Exhibit 28 is what I believe you've

19    referred to as the final decision of

20    Secretary Ross.  Can you confirm that that's what

21    you had in mind when we talked about it?

22         A    Yes.  Yes.

1          Now, I know that you testified earlier

2    that funding was one of your big priorities when

3    you first became Under Secretary; is that fair?

4        A    Yes.

5        Q    So is the census still in danger of being

6    underfunded?

7        A    No.

8        Q    Can you explain?

9        A    Yes.   I'd be happy to.   And I don't have

10   all the numbers in front of me, so we will -- if

11   we will directionally correct.

12          When the GAO put our their report in May

13   and the Secretary articulated about that report,

14   he said he would look at the lifecycle cost

15   estimate and the budget for the census.   And so

16   for those who would obviously assume -- that,

17   again, remember the Census has the economic,

18   demographic, so they have a baseline budget that

19   keeps going.   But once the decennial gets into

20   play, the decennial budget goes up expeditiously,

21   expeditiously and then it comes back down, and so

22   you get the big hump.

1           So what our job was to do was really look

2   at what should the lifecycle cost be in terms of

3   the -- in terms of this -- there were already

4   projects and programs -- and, again, I was not

5   there at the time -- that were going over budget.

6   So you really needed to look at this and say, what

7   is the reality of doing the budget?  So what we

8   did is we went through the entire budget.  We got

9   certified independent cost estimators to come in

10  and work with us.  So there was a co-project

11  between the Department of Commerce and

12  Census Bureau that would look at these two

13  budgets.  And then when I got -- by the time I got

14  there, again, August -- not July -- August 21st,

15  the first meeting, big meeting with all the groups

16  to review this budget was taking place within two

17  days.  So that is one of the first things we did.

18           Once we identified that budget and made

19  adjustments to that budget and everybody agreed to

20  the budget -- because we didn't want -- very

21  important part of -- if you will, not to deviate,

22  part of the governance I talked about before, that

1   steering committee, we didn't want the Census

2   running a budget and the Department of Commerce

3   running a budget, and then all of a sudden, a year

4   later, oh, my goodness gracious.  We wanted them

5   on a periodic basis to get together, meet, make

6   sure we were all agreeing on the numbers.  So that

7   was part of that steering committee's reason for

8   kind of putting those kind of governance

9   structures in place.

10          So what we did is we worked on

11  those -- we also invited -- and when I say "we," I

12  want it to be colloquial we.  I was not there when

13  all this work was done.  They also invited people

14  from OMB to participate in the project with the

15  independent cost estimators, because OMB has been

16  looking at the census for so long.

17          So at the end of this analysis, we

18  determined -- we being -- the large we being

19  inclusive of Census and the Department of

20  Commerce -- that there needed to be a new

21  lifecycle cost estimate.  That we needed to go

22  back to Congress, which the Secretary had said he

1    would do.  We were then prepped up, prepared, went

2    to some briefing meetings, so on and so forth, and

3    went to Congress at the end of October, beginning

4    of November, if my time frame is correct, and we

5    talked about the funding, the change of the

6    funding, the estimate, so on and so forth.

7              And, actually, the Congress has been

8    extremely, extremely responsive to our needs, and

9    we have the funding we want.  And they actually --

10   if I may compliment them -- did something that we

11   very rarely see before, and they said that we

12   could actually -- because at the time, if you

13   remember, one of the other things in the GAO

14   report was how are the systems going, scalability,

15   all these kinds of issues.  And they actually said

16   that even though this was earmarked -- this is an

17   example, '19 money, if you are ready to use it in

18   '18 and you document why and you bring it to OMB

19   and it is approved, we will let you use '19 money

20   in '18.  So, actually, that has been a very, very,

21   very successful collaborative process.

22              I've answered enough of your questions.

Page 274

1      Q    You have.  Let me just make sure I

2   understand a couple smaller pieces of it.

3           Around October or November, you folks at

4   Commerce finalized a lifecycle estimate; is that

5   right?

6      A    Yes.

7      Q    And you brought that to Congress?

8      A    Yes.

9      Q    And Congress approved the budget that you

10  were requesting?

11     A    For '18 -- '19, now we're working on the

12  '20 budget right now.  But we have no reason to

13  believe that they would not.

14     Q    Has the funding request that you've made

15  changed since the citizenship question

16  determination in March of 2018?

17     A    No.  It has not.

18     Q    Now, let's turn back to Exhibit 28, which

19  is that decision memo.

20          Do you know who primarily wrote this

21  document?

22     A    No, I don't know who primarily wrote the

1   make sure the process was working.  We wanted to

2   see what was the U.N. recommendations, what did

3   other developed countries do, those kind of

4   things.  But I was not -- those assignments were

5   given to the most appropriate people to do.

6       Q    Okay.  So let's start from the second

7   paragraph and Secretary Ross writes -- or let's

8   say that he writes, because this is his memo, he

9   signed it.  "I had set out to take a hard look at

10  the request and ensure that I considered all the

11  facts and data relevant to the question so I could

12  make an informed decision on how to respond."

13          Now, it's my understanding that you

14  testified that Secretary Ross saw those memos that

15  Census prepared, correct?

16      A    Correct.

17      Q    And you testified that he spoke to a

18  number of stakeholders about this?

19      A    Correct.

20      Q    Are you aware of any other information or

21  facts or data relevant to this question that

22  Secretary Ross reviewed, other than those sources?

Page 278

1     A    Well, as I said, there were legal

2  documentation produced, right.

3     Q    Okay.

4     A    There was information about what do other

5  developed countries do.   There was information on

6  what the UN sources do.

7     Q    Uh-huh.   Anything else that you can think

8  of?

9     A    Not off the top of my head.

10    Q    Anything you can think of that would

11  refresh your recollection?

12    A    No.

13    Q    Now, you reported directly to

14  Secretary Ross, correct?

15    A    Yes, ma'am.

16    Q    And Census was within your purview?

17    A    Yes.

18    Q    So did you have access to all of the

19  information that Secretary Ross looked at in

20  considering whether or not to add the question?

21         MR. GARDNER:  Objection.  Form.

22         THE WITNESS:  I do not have access to all

Page 279

1    of the Secretary's files, information, and over a

2    time span, I just would not have it.  So I would

3    have to answer that question as I do not believe I

4    do -- I do not.

5    BY MS. GOLDSTEIN:

6        Q    So Secretary Ross had some meetings with

7    stakeholders that you did not attend, correct?

8        A    Correct.

9        Q    And he may have reviewed documents

10   germane to this question that you are unaware of,

11   correct?

12       A    Over the course of time or in reading

13   public documents or in whatever, I can't speak to

14   what the Secretary did in full.

15       Q    Okay.  So let's go down this document.

16   If you go to the last paragraph on this page,

17   three lines down, it says that, "I also met with

18   Census Bureau leadership on multiple occasions."

19           Now, you've testified already about a

20   couple of those meetings that Secretary Ross had

21   with Census Bureau leadership.  Are there any

22   other meetings that Secretary Ross held with

Pl. Objection: Fed R.
Evid. 403

1  testified to earlier and the meeting on the

2  timeline and the meeting on the forms, do you

3  recall any other meetings that you attended with

4  Secretary Ross and Census Bureau leadership?

5      A   I cannot recall, but he had access to

6  anybody he wanted to along this process.

7      Q   Do you know if he spoke to the Census

8  Bureau leadership without you present?

9      A   I don't know the answer to that.

10     Q   So let's turn the page.  And if you go to

11 the second full paragraph, the last --

12     A   Can I -- he says here that he has been

13 monitoring press coverage.  So when you talk about

14 things he was looking at, I'm sure that -- he says

15 right there that was also there.  I failed to

16 remember to say that.

17     Q   Terrific.  And if you remember other

18 things as we go on, just go ahead and tell me.

19     A   I read that.

20     Q   So the last sentence of that second full

21 paragraph, it says that "Following the 2020" --

22 "the 2000 census, decennial census -- "the long

Page 283

1   form sample was replaced by the American Community

2   Survey, ACS, which has included a citizenship

3   question since 2005.  Therefore, the citizenship

4   question has been well tested."

5          Now, are you aware of whether the

6   Census Bureau performed any research on how the

7   citizenship question will perform specifically in

8   the decennial census environment?

9      A   The Census Bureau told us that they felt

10   that it was well tested to be on the form.

11      Q   Are you aware of any research that has

12   been done with respect to how the citizenship

13   question will perform on the decennial census

14   environment?

15      A   Not that I'm aware of.  I am not aware.

16      Q   And did you or anyone at Commerce ask the

17   Census Bureau to research that question?

18      A   We asked them if they felt that the

19   question had been tested sufficiently enough to be

20   on the -- on the form.  We did not dictate

21   research or tell them not to do research.  We

22   asked them for their opinion and gave them free

Pl. Objection:
Testimony is
misleading
without
designation of
the question at
282:20-283:8

1    reign to do what they wanted to give us that

2    opinion.

3        Q    Within the time constraints that you were

4    working, correct?

5        A    Correct.

6        Q    Do you know when the citizenship question

7    was last tested in the context of the ACS or long

8    form?

9        A    No, I'm not -- I do not.

10       Q    Was Census asked that question?

11           MR. GARDNER:  Objection.  Lack of

12   foundation.  Calls for speculation.

13   BY MS. GOLDSTEIN:

14       Q    To your knowledge.

15       A    To my knowledge, I'm not sure.

16       Q    Did you or, to your knowledge, anyone

17   else at Commerce see the results of the testing

18   that had been performed on the citizenship

19   question in the context of the ACS?

20       A    No, not to my knowledge.

21       Q    So let's go down to the next paragraph,

22   and I'm just going to start in the middle of the

1   sentence, because it's a long one.  "DOJ states

2   that the current data collected under the ACS are

3   insufficient in scope, detail and certainty to

4   meet its purpose under the VRA."

5           Do you see that?

6       A   And DOJ states current data collected

7   under -- yes.

8       Q   What, if anything, did Commerce do to

9   validate that rationale, to your knowledge?

10      A   I'm not aware.  I'm not aware of

11  anything.

12      Q   And, to your knowledge, what, if

13  anything, did the Census Bureau do to validate

14  that rationale?

15      A   You have to ask Census that question.

16      Q   You're not aware of anything, correct?

17      A   Correct.

18      Q   To your knowledge, did the --

19      A   I know that they have fully researched

20  and they fully understand -- they've been doing

21  this for a long time, but you need to get into

22  details with them on that.

1    Q    And who is they?

2    A    The Census Bureau.

3    Q    And the Census Bureau, to be clear, asked

4    to meet the Department of Justice's technical

5    experts, correct?

6    A    I believe the note said that they sent it

7    to Art Gary, and they said they were bringing

8    their technical so they knew who to bring.

9    Q    You understand that the Census Bureau

10   asked to meet with the technical experts at DOJ,

11   correct?

12        I don't want you to look at the

13   documents, Secretary Kelley.

14        You understand that, right?

15   A    There's a nomenclature issue here.  They

16   sent the letter to Art Gary, they said we're going

17   to bring our technical people.  Right.  So the

18   answer is, they did not -- I don't know if they

19   reached out to the technical guys.  I know they

20   reached out to Art Gary from this, but I know they

21   wanted to meet with him.

22   Q    So Census asked Art Gary to set up a

1    meeting, yes?

2         A    Yes.   Absolutely.   Yes.

3         Q    And ultimately -- and that meeting was

4    going to involve experts, correct?

5         A    Yes.

6         Q    And that meeting didn't happen, correct?

7         A    Correct.   Yes.

8         Q    Okay.

9         A    Well, what I don't know is who the DOJ

10   was going to bring to the meeting.   I do know who

11   Census was going to bring to the meeting.

12        Q    Who was Census going to bring to the

13   meeting?

14        A    Well, they said they were going to bring

15   some technical people --

16        Q    Oh, the categories?

17        A    Yes.

18        Q    To your knowledge, did the Department of

19   Justice ever identify a number of cases that they

20   would have brought, but for the absence of

21   block-level citizenship data?

22        A    And I'm not aware of that.

1          You can look at me.

2      A    Describe what you mean by that.

3      Q    What do you think I mean?  What does

4  empirical data mean to you?

5      A    Is this data that Census Bureau produced?

6  Absolutely.  They produced this on a factual

7  basis.  Is that where you're going?

8      Q    I just want to make sure -- so if you

9  look at the last line of that paragraph that we

10  were just looking at in the decision memo?

11     A    Okay.

12     Q    "No empirical data existed on the impact

13  of a citizenship question on responses."

14          You see that?

15     A    So --

16     Q    Did I read it right?

17     A    No.  You read it -- that's Nielsen,

18  senior vice-president, from the Nielsen Group who

19  said that.

20     Q    Okay.  So -- I see your point.

21     A    That's the opinion of the --

22     Q    Okay.  So let's go back to the sentence

Page 293

1    we were reading a moment ago, that neither the

2    Census Bureau or the concerned stakeholders could

3    document that the response rate would, in fact,

4    decline materially.

5            Is that whether testing a question is

6    for -- or one thing that testing can be for, to

7    determine if response rates will decline

8    materially?

9        A    Yes.

10       Q    And, for example, an end-to-end test

11   that -- could test whether or not a question

12   causes response rates to decline, correct?

13       A    Yes.  But an end-to-end test does a whole

14   lot more than that.

15       Q    Of course.  But that's one thing it could

16   do, right?

17       A    It's one thing it could do.

18       Q    And another thing that an end-to-end test

19   can do is test whether or not NRFU -- or how

20   effective NRFU is in the context of a citizenship

21   question, correct?

22       A    Correct.

1    Q    And that was not done with the

2    citizenship question, correct?

3    A    Correct.   It was done with the ACS over

4    the year's time frame that was shown at the

5    percent numbers and the amount of people.

6    Q    And it's my understanding that you have

7    not seen that data with respect to the ACS

8    testing, correct?

9    A    You said the testing.   I've seen the

10   results on the ACS, how many -- how many ACSs are

11   out there, how many times the question's been

12   asked, which is what this paragraph refers to.

13   Q    So then the paragraph goes on to talk

14   about Secretary Ross's discussion with Nielsen.

15   Were you part of that conversation?

16   A    I don't remember, but I -- I don't

17   remember if I was on that call or not.

18   Q    Is there anything that would help you

19   remember if you were on that call?

20   A    I could reconstruct the day, I guess.   I

21   mean --

22   Q    Okay.   Have you -- so you see that

Page 295

1    Nielsen is referencing that it had added questions

2    on the ACS on sensitive topics to certain short

3    survey forms without any appreciable decrease in

4    response rates.

5            Did you ever see those surveys from

6    Nielsen -- that are referenced from Nielsen in

7    that sentence?

8        A    No.

9        Q    Do you know if anyone at Commerce did?

10       A    I don't know.

11       Q    I would have to ask other people at

12   Commerce to find out, correct?

13       A    Correct.

14       Q    Including Secretary Ross, to find out if

15   Secretary Ross saw those, correct?

16       A    Correct.

17       Q    So let's go -- let's go to the last

18   paragraph here, and this states that, "The

19   Census Bureau determined that for 2013 to 2016,

20   ACS surveys nonresponses to the citizenship

21   question for non-Hispanic whites ranged from 6.0

22   to 6.3, for non-Hispanic blacks ranged from 12.0

1    to 12.6 percent, and for Hispanics ranged from

2    11.6 to 12.3 percent.  However, these rates were

3    comparable to nonresponse rates for other

4    questions on the 2013 and 2016 census."

5            And one of the examples that is

6    giving --

7            MR. GARDNER:  You misread.  It's 2016

8    ACS.

9            MS. GOLDSTEIN:  2016, I apologize.

10   BY MS. GOLDSTEIN:

11       Q    And one of the examples that they give,

12   "The Census Bureau estimates" -- "Census Bureau

13   estimates showed similar nonresponse rate ranges

14   occurred for questions on the ACS asking the

15   number of times the respondent was married, 4.7 to

16   6.9 percent."

17           Now, do you agree that the 4.7 to 6.9

18   percent nonresponse rate for the question, the

19   number of times the respondent was married, is

20   similar to the nonresponse rates to the

21   citizenship question for non-Hispanic blacks and

22   Hispanics that ranged from 11.6 to 12.6 percent?

Page 297

1          MR. GARDNER:  Objection.  Lack of

2     foundation.   Objection.

3          (Thereupon, the court reporter

4     clarified.)

5          MR. GARDNER:  Objection.  Form.

6          THE WITNESS:  The way this reads --

7     BY MS. GOLDSTEIN:

8      Q    I just want to know if you agree that 4.7

9     to 6.9 percent for the marriage rates, if you

10    agree that is similar to the 11.6 to 12.6 rates

11    for the citizenship question for non-Hispanic

12    blacks and Hispanics?

13          MR. GARDNER:  Same objections.

14          THE WITNESS:  You are taking it out of

15    context of how this was written, but you're asking

16    me where it is comparing three sets of numbers

17    with a group of numbers which I count down below.

18    You're asking me to isolate two or three of those

19    numbers and make a comparison, which is taking

20    this paragraph out of context.  So if you're

21    asking me simply to say is that comparable, the

22    answer would be, they are dissimilar.

1   rates for the citizenship question are much

2   greater than comparable rates for other

3   demographic variables like sex, birth date/age and

4   race/ethnicity, data not shown."

5        Do you see that?

6   A   I wasn't with you.  Whether the response

7   is by mail-in questionnaire or --

8   Q   No.  The very last line of the last

9   paragraph in B1.

10  A   Right.  But there's a full sentence that

11  starts with "whether."

12  Q   Sure.

13  A   "The response is by mail-in questionnaire

14  or ISR instrument and item response -- nonresponse

15  rates for citizenship question are much greater

16  than the comparable rates for other demographic

17  variables like sex, birth/age, race/ethnicity

18  not" -- "data not shown."

19  Q   Have you seen any empirical data that

20  contradicts this analysis on Page 1280?

21  A   No.

22  Q   And, to your knowledge, has anyone in

1  Commerce seen any empirical data or studies that

2  contradict the Census Bureau's analysis on

3  Page 1280?

4       A    Not that I'm aware of.

5       Q    And that includes Section B2 on

6  self-response rates, correct?

7       A    Right.   And it's interesting, because

8  this talks about -- well, not being asked that

9  question.

10      Q    And that includes Section B2 on

11 self-response rates?

12      A    Well, we only looked at that one little

13 part of -- if you want --

14      Q    That one little part of that?

15      A    -- me to take the --

16      Q    That one little part of the sentence.

17      A    What's the question?   You'd rather me --

18      Q    Sure.   Let me rephrase it.   Let me re-ask

19 it then.

20           Have you seen any -- apart from the

21 Census Bureau memos, have you seen any empirical

22 data or studies that contradict the

1    Census Bureau's analysis of self-response rates

2    with respect to the citizenship question?

3        A    Not that I'm aware of.

4        Q    And, to your knowledge, has anyone in

5    Commerce seen any empirical data or studies that

6    contradict the self-response rate analysis that

7    the Census Bureau put forth in Section B2 on

8    Page 1280?

9            Just asking what you know.

10       A    I don't know.

11       Q    And if you go to Page 1281, let me ask

12   this more generally so we don't have to bother

13   with the documents.

14           Have you seen -- other than the materials

15   that the Census Bureau prepared for you, the Abowd

16   memos that we've been talking about a lot today,

17   have you seen any scientific studies or data that

18   contradict those analyses?

19           Have you --

20       A    These specific analyses, not that I'm

21   aware of.

22       Q    And, to your knowledge, has anyone in

 1    Commerce?

 2         A    I don't know.   I can't speak to anybody

 3    in Commerce -- everybody in Commerce.

 4         Q    I'd have to speak to the other people in

 5    Commerce who were involved, correct?

 6         A    Correct.

 7         Q    To see if they saw other science that you

 8    haven't seen?

 9              MR. GARDNER:   Objection to form.

10              THE WITNESS:   Yes.

11    BY MS. GOLDSTEIN:

12         Q    Okay.  So let's go back to the decision

13    memo, and let's go to -- you see where it says

14    "Option C"?

15         A    Yes, ma'am.

16         Q    So in the middle of that paragraph,

17    Secretary Ross writes, "That Census Bureau

18    analysis showed that between 28 and 34 percent of

19    citizenship for self-responses for persons that

20    administrative records show are noncitizens are

21    inaccurate."

22              Did I read that correctly?

Page 307

1      Q    Sure.

2      A    -- and tie it back.

3      Q    So let's step away from the document for

4  a second.  It sounds like you just testified -- I

5  just want to make sure I understand -- that the

6  Census wanted an accurate and complete count,

7  correct?

8      A    The Census wants?

9      Q    Or I'm sorry.  Commerce wants an accurate

10  and complete count?

11      A    A complete and accurate census, yes.

12      Q    And that the Secretary's goal in choosing

13  between these options, he wanted to pick an option

14  that would provide a great amount of accuracy,

15  correct?

16      A    I can't speak for the -- now you're

17  asking me to speak for the Secretary.

18      Q    To your knowledge, you talked to the

19  Secretary?

20      A    Yes.

21      Q    You know what the Secretary prioritized,

22  correct?

1       A    Correct.

2       Q    Accuracy was important to the Secretary?

3       A    Complete and accurate were important to

4   the Secretary.

5       Q    And the Census Bureau concluded that

6   Option D was not the most accurate option,

7   correct?

8            If you're not sure, you can tell me.

9   We'll go back to the document.

10           You want to read my question one more

11  time?   Thanks.

12           (Thereupon, the reporter read the record

13  as requested.)

14           THE WITNESS:   But this -- okay.

15  BY MS. GOLDSTEIN:

16      Q    Correct?

17      A    In the opinion of the Census Bureau, this

18  is opinion, it's not conclusive fact --

19      Q    I'm not asking for conclusive fact.   The

20  Census Bureau --

21      A    Their opinion was --

22      Q    -- concluded that the most accurate

Page 313

1     Q   I'd have to ask him?

2     A   Please.

3     Q   And then it says, the next full sentence,

4  "But no one provided evidence that reinstating a

5  citizenship question on the decennial census would

6  materially decrease response rates among those who

7  generally distrusted government and government

8  information collection efforts, dislike the

9  current administration or fear of law

10  enforcement."

11       Do you see that?

12     A   Yes.

13     Q   You didn't ask the Census Bureau to test

14  that question, correct?

15     A   The Census Bureau indicated that they

16  felt the question had been tested.

17     Q   Now, this says that no one provided

18  evidence that reinstating the question -- I'm just

19  going to paraphrase -- that reinstating the

20  question in this climate with these people who

21  generally distrusted government would decrease

22  response rates, correct?

Page 314

1      A    That's what it says, which is

2   paraphrased.

3      Q    Yeah.

4      A    You read it verbatim before.

5      Q    But fair enough, right?

6           No one in Commerce asked the

7   Census Bureau to provide that evidence through

8   additional testing, correct?

9           MR. GARDNER:   Objection.   Calls for

10  speculation.   Lack of foundation.

11  BY MS. GOLDSTEIN:

12     Q    To your knowledge?

13     A    The Census Bureau -- excuse

14  me -- Commerce asked the Census Bureau whether

15  they felt the question was adequately tested.

16     Q    And Secretary Ross felt that there was no

17  evidence, at least with respect to this

18  implication of the citizenship question, correct?

19     A    I can't tell you what he felt or anything

20  else.

21     Q    That's just what he wrote --

22     A    We know what he wrote.

1      Q    Okay.   And you never asked the

2   Census Bureau to run tests on the impact of

3   reinstating the citizenship question on this

4   population described in that sentence we've just

5   been reading, correct?

6      A    We asked them if they felt that this

7   question had been tested appropriately enough to

8   be put on the 2020 decennial.

9      Q    I'm just going to try my question one

10   more time.

11           You didn't ask the Census Bureau to

12   provide evidence that reinstating the citizenship

13   question would impact or -- the response rates on

14   the population that is referenced in that sentence

15   we've just been reading, correct?

16      A    So if --

17      Q    I just want to know whether you asked for

18   testing on that subject.

19      A    If you are asking me if I asked the

20   Census to provide testing on response rates of

21   people who -- among those who generally distrust

22   government and government information collected

1   efforts, dislike the current political climate, or

2   fear law enforcement, I did not do that.

3        Q    And, to your knowledge, did anyone at

4   Commerce ask the Census Bureau to provide evidence

5   of that?

6        A    I do not know.

7        Q    Okay.   So let's go to the last sentence

8   of that paragraph.   "While it is possible that

9   this belief is true, there is no information

10  available to determine the number of people who

11  would, in fact, not respond due to a citizenship

12  question being added and no one has identified any

13  mechanism for making such a determination."

14       Do you see that?

15       A    I do.

16       Q    Did you ask the Census Bureau if they

17  could design a test to make this determination?

18       A    No.   I did not ask them to make -- to

19  create a test.

20       Q    And, to your knowledge --

21       A    I --

22       Q    I just have to ask it for the record.

Page 317

1          -- did anyone at Commerce ask the

2     Census Bureau to design a test to make this

3     determination?

4          A    Not that I know of.

5               But I repeat, we asked the Census Bureau

6     if they felt that this question had been

7     thoroughly tested on a number of occasions.

8          Q    Okay.  Let's go to the next page.

9               And I want to go to the middle of that

10    first paragraph.  The same former director

11    noted -- do you see where I'm starting?  "In the

12    years preceding" --

13         A    Yes.

14         Q    -- "certain interest groups consistently

15    attacked the census and discouraged

16    participation."

17              Do you know what Secretary Ross is

18    referring to here?

19              Just with respect to those interest

20    groups, do you know what he's referring to?

21              MR. GARDNER:  Objection.  Calls for

22    speculation.

1    "While the reinstatement of a citizenship question

2    may be a data point on which these interest groups

3    seize in 2019, past experience demonstrates that

4    it is likely efforts to undermine the decennial

5    census will occur -- will occur again, regardless

6    of whether the decennial census includes a

7    citizenship question."

8            Now, I only want to know, have you seen

9    any empirical data that relates to that point?

10       A    No.

11       Q    And do you know if Secretary Ross has

12   seen any empirical data --

13           MR. GARDNER:  Objection.

14   BY MS. GOLDSTEIN:

15       Q    -- relating to that point?

16           MR. GARDNER:  Calls for speculation.

17           THE WITNESS:  I'm not going to speak for

18   Secretary Ross.

19   BY MS. GOLDSTEIN:

20       Q    I need to speak to him --

21           MR. GARDNER:  Objection

22   BY MS. GOLDSTEIN:

1          What time frame are we talking about?

2     I'm not sure which communications you're referring

3     to.

4          A    I have no idea what you're -- you're

5     asking me the questions, and you're asking me what

6     time frame we're talking about.  This has gotten

7     off the rails a little.

8          Q    It's late in the day.

9          A    And I really want to be as helpful as

10    possible, so, please.

11         Q    Understood.  Understood.

12              So let's say March 2018, so after the

13    March 1st memo, before the March 26th decision,

14    and from understanding of the documents, that's

15    the time period when he was doing a lot of the

16    discussions with stakeholders.  So during that

17    time period, did he have communications with DOJ

18    about the citizenship question?

19         A    I don't know the answer to that.

20         Q    You don't know?

21         A    I do not know the answer to that.

22         Q    Okay.  Do you know whether he had any

1  stakeholder conversations with any Voting Rights

2  Act -- I should say organizations interested in

3  Voting Rights Act enforcement, such as, for

4  example, the ACLU, MALDEF, any other such groups

5  that occasionally bring Section 2 enforcement

6  actions?

7          MR. GARDNER:  Objection.  Form.

8          THE WITNESS:  I would have to refer to

9  the list of everybody and want you to ask the

10 question.

11 BY MS. BOUTIN:

12    Q    Okay.  But do you recall any, offhand, as

13 you sit here?

14    A    No, I don't.

15    Q    Did you ever suggest to Secretary Ross or

16 Earl Comstock that they hold stakeholder

17 conversations about the citizenship

18 questions -- question -- excuse me -- with DOJ or

19 any groups interested in Voting Rights Act

20 enforcement?

21         MR. GARDNER:  Objection.  Form.

22         THE WITNESS:  We certainly talked and

1  took great, earnest interest in making sure we had

2  a broad -- a broad and comprehensive group for the

3  Secretary to talk to.

4  BY MS. BOUTIN:

5      Q    But you don't remember any suggestion, as

6  far as stakeholders go, whose specific interests

7  were Voting Rights Act enforcement?

8      A    I can't speak to -- I don't know that

9  somebody wasn't spoken to that are --

10     Q    But you don't know of anyone?

11     A    Not to my knowledge.

12     Q    Earlier, you stated that there are other

13 instances in which an agency has refused to meet,

14 and you referred to as an example -- you referred

15 to OMB as an example.  What was that in reference

16 to.

17     A    The race and ethnicity question, which is

18 a question that its form is dictated by a group

19 called oh OIRA, which is part of OMB.  And because

20 the question needed to be -- the questions needed

21 to be done by a certain point when we're talking

22 about theses timelines, OIRA would have had to

1  change how it -- it mandated race and ethnicity to

2  be viewed and how it would be broken out.  And so

3  we were getting towards -- closer to them, and we

4  would call and say, do you have an update, do you

5  want us to come meet?  And they'd say no, we don't

6  have an update.  At that point, we're not --

7      Q   Had there been previous meetings prior to

8  their refusal to meet?

9      A   They did not meet.  I don't want to go

10  all the way to they refused -- they refused to

11  meet, but they did not meet.  Do I know if there

12  were any meetings before that?

13      Q   About the race and ethnicity question?

14      A   Not prior to my arrival, but prior to

15  that, I don't -- not after my arrival.  Prior to

16  that, I don't know.  I do know that over the

17  years, there was communication and correspondence,

18  that they worked closely together.

19      Q   Okay.

20      A   So I believe they did meet prior.

21      Q   Okay.  So did they -- and I'm sorry.  You

22  say OIRA is the name of --

Page 336

1         Okay.  Did -- what -- was the final

2    result in that process such that OIRA got what

3    they wanted?  Did the race and -- let me rephrase.

4         Did the race and ethnicity question end

5    up in the form that they had advocated?

6         A    OIRA, yes.

7         Q    Okay.  This question was asked earlier,

8    but I don't think -- I think things got

9    sidetracked.

10        Were you surprised by Secretary Ross's

11   decision to add the citizenship question against

12   the recommendation of the Census Bureau?

13        A    It wasn't my place to be surprised or

14   not.  It was my place to do --

15        Q    But were you surprised?

16        A    -- what the Secretary asked.

17        Q    But were you surprised?

18        A    I was not surprised or not surprised.  I

19   said, okay, that's the decision, now we need to

20   say, how do we implement it?  How do we go

21   forward?

22        Q    So I think without looking at them, I

Page 355

1    Measurement?

2        A    Not intimately.

3        Q    Okay.  I will represent to you that it is

4    an office within Census, and I'd like to show

5    you --

6        A    Please show me.

7        Q    -- a September 20, 2017 memorandum for

8    Associate Director Research and Methodology, and I

9    think it will be Exhibit 29.

10           (Plaintiffs' Exhibit 29, September 20,

11   2017 memorandum, was marked.)

12           THE WITNESS:  I was afraid you were going

13   to give me that without a number and I couldn't

14   take it.

15           May I clarify, Rory, my last statement?

16   BY MR. ADAMS:

17       Q    Yes.

18       A    When you said the Center for Survey

19   Measurement, I thought you were talking about an

20   outside concern.  As a group inside of the

21   research and methodology, they have all kinds of

22   teams.

Page 356

BY MR. ADAMS:

Q    Okay.

A    So I -- I recognize they do all these
things, but I -- I did not understand the context
in which you were talking.

Q    Okay.

A    So I would not say to you I've never seen
any work by CSM before, but there's lots of
acronyms, as you can well imagine.

Q    I can.

     Are you familiar with this document?

A    No.  I am not familiar with this
document.

Q    I'd like to read a number of statements
in the document and ask if you are familiar
with -- in general, with the concerns that are
expressed in the document.  So beginning at the
bottom of the first page, "FRs, field" --
sorry -- "field representatives, and FS is field
supervisors, emphasized facing a, 'new phenomenon'
in the field, and reported that respondent's
fears, particularly among immigrant respondents,

1  have increased markedly this year.  Respondents

2  reported being told by community leaders not to

3  open the door without a warrant signed by a judge,

4  and CSM researchers observed respondents

5  falsifying names, dates of birth and other

6  information on household rosters."

7         Were you aware that these observations

8  had been made in the field in the context of CSM's

9  various research projects?

10     A   I understood the concerns were made, but

11  not under this particular research paper or other

12  things, and I think we've seen today where -- but

13  this is from the field itself.  I have not seen

14  this document, but we have talked about concerns.

15     Q   Turning to the third page, which is Bates

16  number 2448, the very top, "It should be noted

17  that this level of deliberate falsification of the

18  household roster and spontaneous mention of

19  concerns regarding negative attitudes towards

20  immigrants is largely unprecedented in the

21  usability interviews that CSM has been conducting

22  since 2014 in preparation for the 2020 census."

Page 363

```
 1                      * * * * *

 2               CERTIFICATE OF REPORTER

 3        I, KAREN LYNN JORGENSON, RPR, CSR, CCR the

 4   officer before whom the foregoing deposition was

 5   taken, do hereby certify that the witness whose

 6   testimony appears in the foregoing deposition was

 7   duly sworn by me; that the testimony of said

 8   witness was taken by me in stenotype and

 9   thereafter reduced to typewriting under my

10   direction; that the said deposition is a true

11   record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in

14   which this deposition was taken; and further, that

15   I am not a relative or employee of any counsel or

16   attorney employed by the parties hereto, nor

17   financially or otherwise interested in the outcome

18   of this action.


19        _____

20            KAREN LYNN JORGENSON, RPR, CCR, CSR

21   Dated this  31st   day

22   of  August , 2018.
```