# Exhibit 2

# Su - PL Designations

**park-Su, Sahra  10-25-2018**



1  IN THE UNITED STATES DISTRICT COURT   FOR THE NORTHERN DISTRICT OF CALIFORNIA

2  SAN FRANCISCO DIVISION

3

4  _____    :

5  CITY OF SAN JOSE, et al.,:    :

6  Plaintiffs,   :    : Case No.

7  vs.    : 3:18-cv-2279-RS    :

8  WILBUR ROSS, JR., et al.,:    :

9  Defendants.   : _____:

10

11                                          **Global Objection**
                                            Rules 401, 403

12  Thursday, October 25, 2018

13

14  Videotape Deposition of SAHRA PARK-SU,

15  taken at the Law Offices of Manatt, Phelps &

16  Phillips, LLP, 1050 Connecticut Avenue NW,

17  Washington, D.C., beginning at 9:40 a.m.,

18  before Ryan K. Black, a Registered Professional

19  Reporter, Certified Livenote Reporter and Notary

20  Public in and for the District of Columbia.

21

22  Veritext Legal Solutions    Mid-Atlantic Region    1250 Eye Street NW - Suite 350

23  Washington, D.C.  20005

24

25

1  A. P P E A R A N C E S:

2

3  MANATT, PHELPS & PHILLIPS LLP

4  BY:  RORY E. ADAMS, ESQUIRE

5  1050 Connecticut Avenue

6  Washington, DC  20036

7  202.585.6614

8  radams@manatt.com

9  Representing - City of San Jose

10

11  ASIAN AMERICANS ADVANCING JUSTICE

12  BY:  NIYATI SHAH, ESQUIRE

13  1620 L Street NW

14  Suite 1050

15  Washington, DC  20036

16  202.296.2300

17  nshah@advancingjustice-aajc.org

18  Representing - Lupe, et al.

19

20

21

22

23

24

25

1   A. P P E A R A N C E S (Cont'd):

2

3   ARNOLD & PORTER LLP

4   BY:  CHASE RAINES, ESQUIRE

5   610 Massachusetts Avenue, NW

6   Washington, DC  20001

7   202.942.5917

8   chase.raines@arnoldporter.com

9   Representing - NYIC Plaintiffs

10

11  COVINGTON & BURLING LLP

12  BY:  DANIEL GRANT, ESQUIRE

13  One CityCenter

14  850 Tenth Street, NW

15  Washington, DC  20001

16  202.662.6000

17  dgrant@cov.com

18  Representing - Kravitz Plaintiffs

19

20

21

22

23

24

25

```
 1   A. P P E A R A N C E S (Cont'd):

 2

 3   UNITED STATES DEPARTMENT OF COMMERCE

 4   OFFICE OF THE GENERAL COUNSEL

 5   BY:  MEGAN HELLER, ESQUIRE

 6   Herbert C. Hoover Building

 7   Room 5890

 8   1401 Constitution Avenue, NW

 9   Washington, DC  20230

10   202.482.4837

11   mheller@doc.gov

12   Representing - Department of Commerce

13

14   UNITED STATES DEPARTMENT OF JUSTICE

15   BY:  KATE BAILEY, ESQUIRE

16   Federal Programs Branch

17   20 Massachusetts Avenue, NW

18   Washington, DC  20530

19   202.514.9239

20   kate.bailey@usdoj.com

21   Representing - Department of Commerce

22

23

24

25
```

```
 1   A. P P E A R A N C E S (Cont'd):

 2

 3   CALIFORNIA OFFICE OF THE ATTORNEY GENERAL

 4   BY:  GABRIELLE D. BOUTIN, ESQUIRE

 5   (Via Teleconference)

 6   P.O. Box 944255

 7   Sacramento, California  94244

 8   916.323.5313

 9   gabrielle.boutin@doj.ca.gov

10   Representing – State of California

11

12   HOLLAND & KNIGHT LLP

13   BY:  DAVID I. HOLTZMAN, ESQUIRE

14   (Via Teleconference)

15   50 California Street

16   Suite 2800

17   San Francisco, California  94111

18   415.743.6900

19   david.holtzman@hklaw.com

20   Representing – County of Los Angeles

21

22

23

24

25
```

1   A. P P E A R A N C E S (Cont'd):

2

3   DANNIS WOLIVER KELLEY

4   BY:  KEITH A. YEOMANS, ESQUIRE

5   (Via Teleconference)

6   115 Pine Avenue

7   Suite 500

8   Long Beach, California  90802

9   562.366.8500

10  kyeomans@dwkesq.com

11  Representing - Los Angeles Unified School     District

12

13

14

15

16

17

18

19

20

21

22

23

24  ALSO PRESENT

25  Gene Aranov - Legal Videographer

1  I N D E X

2  TESTIMONY OF:  SAHRA PARK-SU   PAGE

3  By Mr. Adams............................14, 207

4  By Ms. Bailey...........................32, 199

5  E X H I B I T S

6  EXHIBIT  DESCRIPTION  PAGE

7  Exhibit 1 a printout of Ms. Park-Su's

8  former LinkedIn page............57

9  Exhibit 2 a document Bates Numbered 2630..71

10  Exhibit 3 an e-mail from Secretary Ross

11  to Earl Comstock on August 10th,

12  2017............................80

13  Exhibit 4 an e-mail from Ms. Park-Su to

14  Earl Comstock copying others sent

15  on August 29th, 2017............82

16  Exhibit 5 an e-mail.......................87

17  Exhibit 6 a document Bates Numbered

18  1378............................89

19  Exhibit 7 a document Bates Numbered

20  COM_DIS14166....................92

21  Exhibit 8 a document Bates Numbered

22  2446............................100

23  Exhibit 9 a document Bates Numbered

24  3691............................105

25

1   I N D E X (Cont'd)

2   EXHIBIT   DESCRIPTION   PAGE

3   Exhibit 10    a document Bates Numbered

4   663...........................107

5   Exhibit 11    a June 22nd, 2018, e-mail from

6   David Langdon to Ms. Park-Su...110

7   Exhibit 12    a document Bates Numbered

8   3549...........................118

9   Exhibit 13    a document Bates Numbered

10  1984...........................127

11  Exhibit 14    a document Bates Numbered

12  3503...........................129

13  Exhibit 15    a document Bates Numbered

14  1277...........................134

15  Exhibit 16    a document Bates Numbered

16  3706...........................138

17  Exhibit 17    Defendant's Objections and

18  Responses to Plaintiff's Third Set

19  of Interrogatories in the New York

20  Action, Case No. 18-2025.......139

21  Exhibit 18    a document Bates Numbered

22  1286...........................140

23  Exhibit 19    a document Bates Numbered

24  1616...........................145

25

1  I N D E X (Cont'd)

2  EXHIBIT  DESCRIPTION  PAGE

3  Exhibit 20   a document Bates Numbered

4  1964.............................150

5  Exhibit 21   a document Bates Numbered

6  13023...........................151

7  Exhibit 22   a document Bates Numbered

8  9812............................160

9  Exhibit 23   a document Bates Numbered

10  3403............................160

11  Exhibit 24   a document Bates Numbered

12  2935............................164

13  Exhibit 25   the schedule of Secretary

14  Wilbur Ross for Wednesday

15  March 7th, 2018................174

16  Exhibit 26   a document Bates Numbered

17  0003566.........................177

18  Exhibit 27   an Outlook calendar invite.....179

19  Exhibit 28   a document Bates Numbered

20  001313..........................181

21  Exhibit 29   a certification by Ms.

22  Park-Su.........................185

23  Exhibit 30   a document Bates Numbered

24  001321..........................192

25

1   I N D E X (Cont'd)

2   EXHIBIT   DESCRIPTION   PAGE

3   Exhibit 31   a document Bares Numbered

4   COM_DIS14052...................196

5   Exhibit 32   a letter to Catherine Lhamon

6   from Secretary Ross dated

7   July 5, 2018...................199

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   THE VIDEOGRAPHER:  Good morning.

2   We are going on the record at 9:40

3   a.m. on October 25th, 2018.  Please note that

4   the microphones are sensitive and may pick up

5   whispering, private conversations and cellular

6   interference.  Please turn off all cell phones,

7   or place them away from the microphones, as they

8   can interfere with the deposition audio.  Audio

9   and video recording will continue to take place

10   unless all parties agree to go off the record.

11   This is Media Unit 1 of the

12   video-recorded deposition of Sahra Park-Su taken

13   by counsel for plaintiff in the matter of the

14   City of San Jose, et al., versus Wilbur M.

15   Ross, Jr., et al., filed in the United States

16   District Court for the Northern District of

17   California, San Francisco Division, Case Number

18   3:18-cv-2279-RS.

19   This deposition is being held at

20   Manatt Phelps & Phillips, located at 1050

21   Connecticut Avenue Northwest, Suite 600,

22   Washington, D.C.

23   My name is Gene Aranov, from the

24   firm Veritext Legal Solutions, and I'm the

25   videographer.  The court reporter is Ryan Black,

1   from the firm of Veritext Legal Solutions.

2   I'm not authorized to administer

3   an oath, I'm not related to any party in this

4   action, nor am I financially interested in the

5   outcome.

6   Counsel and all present in the room,

7   and everyone attending remotely, will now state

8   their appearances and affiliations for the

9   record.  If there are any objections to

10  proceeding, please state them at the time of

11  your appearance, beginning with the noticing

12  attorney.

13  MR. ADAMS:  Good morning.  This is

14  Rory Adams.  I represent Plaintiffs City of

15  San Jose and the Black Alliance for Just

16  Immigration.

17  MS. SHAH:  Hi.  My name is Niyati

18  Shah.  I represent the plaintiffs in Lupe,

19  et al., versus Ross, et al., Case Number

20  8:18-01570, in the District of Maryland.

21  MR. RAINES:  Hi.  My name is Chase

22  Raines.  I represent the NYIC plaintiffs in

23  2:18-cv-5025, which is now consolidated with

24  2921 in the Southern District of New York.

25  MR. GRANT:  My name is Dan Grant,

```
 1   from Covington & Burling.  I represent the

 2   plaintiffs in Kravitz v. Department of

 3   Commerce, et al., in the District of Maryland.

 4   MS. HELLER:  My name is Megan Heller.

 5   I'm agency counsel for the Department of

 6   Commerce.

 7   MS. BAILEY:  My name is Kate Bailey.

 8   I'm with the Department of Justice, representing

 9   defendants in this matter.

10   THE VIDEOGRAPHER:  Anybody on the

11   phone?

12   MS. BOUTIN:  Yes.  This is Gabrielle

13   Boutin --

14   MR. HOLTZMAN:  David Holtzman --

15   MS. BOUTIN:  -- rep --

16   MR. HOLTZMAN:  Go ahead, please.

17   MS. BOUTIN:  Thank you.

18   This is Gabrielle Boutin, representing

19   the State of California in the State of

20   California v. Roth.

21   MR. HOLTZMAN:  This is David Holtzman

22   of Holland & Knight, representing the County of

23   Los Angeles.

24   MR. YEOMANS:  Keith Yeomans,

25   representing Los Angeles Unified School District
```

1   in California v. Ross.

2   THE VIDEOGRAPHER:  Is that everyone?

3   MR. ADAMS:  Is anyone else on the

4   line?

5   THE VIDEOGRAPHER:  Will the court

6   reporter please swear in the witness?

7   *   *   *

8   Whereupon --

9   SAHRA PARK-SU,

10  called to testify, having been first duly sworn

11  or affirmed, was examined and testified as

12  follows:

13  EXAMINATION

14  BY MR. ADAMS:

15  Q. Good morning.  We met briefly in

16  the hall.  I'm Rory Adams, and I represent the

17  City of San Jose and the Black Alliance for Just

18  Immigration.

19  Ms. Park-Su, have you ever been

20  deposed before?

21  A. No.

22  Q. Have you ever provided testimony in

23  court before?

24  A. No.

25  Q. I'd like to go over in some basic

1   A. My understanding at the time was

2   that if there are any issues that I was familiar

3   with, that I had expertise in, that I would have

4   an opportunity to review it and provide any

5   comment, input or suggestions.

6   Q. Has your understanding of that role

7   changed?

8   A. Yes.

9   Q. In what ways?

10  A. I was assisting with Census, and I

11  don't think that title necessarily applied to my

12  role regards to Census.  It did, however, with

13  regards to the International Trade

14  Administration.

15  Q. When did you start working at the

16  Department of Commerce?

17  A. I believe it was the end of June,

18  early July of 2017.

19  **Q. And when you started working at the**

20  **Department of Commerce, did you have the title**

21  **senior policy adviser?**

22  **A. Yes.**

23  **Q. Have you had any other titles while at**

24  **the Department of Commerce?**

25  **A. Currently, I have a different title.**

1  Q. What is that?

2  A. Senior counselor.

3  Q. Have you had any other titles, other

4  than senior policy adviser and senior counselor

5  at the Department of Commerce?

6  A. No.

7  Q. Who did you report to at the

8  Department of Commerce when you first joined?

9  A. When I first joined, I was working

10  most closely with Israel Hernandez.

11  MS. BAILEY:  Counsel, can we specify

12  that -- are these directed to this current

13  tenure at the Department of Commerce versus the

14  previous tenure?

15  MR. ADAMS:  Yes.  This is directed

16  to the current tenure at the Department of

17  Commerce.

18  THE WITNESS:  Okay.  Yes.  Thank you.

19  Israel Hernandez.

20  BY MR. ADAMS:

21  Q. What were your -- what were your job

22  responsibilities while you were reporting to

23  Mr. Hernandez?

24  A. Sure.  It was assisting Izzy with both

25  any International Trade Administration matters,

1  as well as helping to pull together materials

2  that Census was sending over to the Department

3  of Commerce.

4  Q. How long was -- how long did you

5  report to Mr. Hernandez?

6  A. Until his departure.

7  Q. When was that?

8  A. December of 2017.

9  Q. Who do you report to -- who did you

10 report to after December of 2017?

11 A. It was sort of split.  I was assisting

12 Karen Dunn Kelly, the Undersecretary for ESA,

13 and I still, technically, was reporting

14 to Earl Comstock since they had placed me in

15 his organization.

16 Q. What was his organization?

17 A. The Office of Policy and Strategic

18 Planning.

19 Q. When did you become a senior

20 counselor?

21 A. Probably almost three months ago.

22 Q. So when you started reporting to

23 Secretary Kelly and Mr. Comstock, you were still

24 a senior policy adviser?

25 A. Correct.

1  Q. Would you do anything else?

2  A. If I had questions, I'd ask them to

3  clarify.

4  Q. Anything else?

5  A. No.

6  Q. So you would not, for example, edit

7  draft responses?

8  A. If there are grammatical suggestions,

9  I'd make those, but, substance-wise, we would

10  keep it consistent with what Census had told us.

11 **Q. Do you recall ever making substantive**

12 **revisions to responses to QFRs?**

13 **A. There was one.**

14 **Q. What was that?**

15 **A. I believe that was asking what the**

16 **process was.**

17 **Q. The process for what?**

18 **A. For adding a question to the Decennial**

19 **Census.**

20  Q. Do you recall when that question came

21  in -- when did you first see that question?

22  A. I can't remember when I first saw

23  that question.  The Office was handling three

24  Questions For The Record that were sent to us

25  simultaneously.

1  did not have a process, per se, but they were

2  not aware of a well-established process, as they

3  were with regards to the American Community

4  Survey.

5  BY MR. ADAMS:

6  Q. Following the meeting, did anyone

7  within the Department of Commerce substantively

8  revise the response to the QFR addressing this

9  issue?

10  A. Could you clarify just a little bit

11  more?

12  Q. Sure.

13  We've been talking about a QFR with

14  respect to the process for adding a question to

15  the Decennial Census, --

16  A. Mm-hmm.

17  Q. -- and you testified that Secretary

18  Kelly asked for clarification of the process

19  from Census and Census provided clarification.

20  After that point, --

21  A. Mm-hmm.

22  Q. -- was a written response to that QFR

23  revised?

24  A. After that meeting, it was my

25  understanding that Census was asked to help

1   them properly revise that answer that they had

2   provided to the QFR.

3   Mind you, things were very busy

4   at this time, and it still is.  Days, if not

5   maybe a week or so had gone by, and it had

6   occurred to me that Census had not provided

7   an updated response, probably because they were

8   just crashing.  And so, at the time, I remember

9   we had just finished a call with Census, I think

10  it was one of our weekly meetings with Census,

11  but for some reason we didn't have it at

12  Commerce.  So what we sometimes will do is

13  we'll do a call-in in lieu of an actual physical

14  meeting.

15  **After the call-in meeting, I believe**

16  **I had a paper copy of that particular question**

17  **that I was going to ask Census to help revise,**

18  **to ask them where it was.  Unfortunately, I had**

19  **forgotten to ask them on that call, and, when it**

20  **ended, I was in Mike Walsh's office, our Deputy**

21  **General Counsel.  Our Deputy General Counsel was**

22  **also at -- present at that meeting where we had**

23  **asked Census to specify what the process was.**

24  **And I had asked the Deputy General Counsel,**

25  **could you put the together a draft response from**

1  your understanding of what Census had told us so

2  I can send this to Census and see whether they

3  accept, reject, edit or accept so I can get the

4  ball rolling, because we need to finalize the

5  QFRs.

6  Q. Did Mr. Walsh provide you with a draft

7  response to that question?

8  A. He did.

9  Q. What did you do with his draft

10  response?

11  A. I typed it and sent it to Census for

12  their comments and approval or any suggestions.

13  Q. Did Census provide comments, approval

14  or suggestions?

15  A. Census did respond.

16  Q. What was their response?

17  A. They were okay with the Deputy General

18  Counsel's draft response.

19  Q. How was that communicated to you?

20  A. By e-mail.

21  Q. And what did you do after receiving

22  that communication with respect to the response

23  to the question?

24  A. I then took that response and put it

25  into the QFR.

1   administrative related to Secretary Kelly's

2   calendar?

3   A. Right.

4   **Q. Did you do any other work that was**

5   **not administrative and not related to Secretary**

6   **Kelly's calendar?**

7   **MS. BAILEY:  Objection; vague.**

8   **THE WITNESS:  Could you give me an**

9   **example?**

10  **BY MR. ADAMS:**

11  **Q. No.**

12  **A. Okay.  Well, we did more than just**

13  **scheduling.  We would, oftentimes, look at**

14  **a document and if there are any additional**

15  **information that need -- was needed we would**

16  **ask bureaus for more information.  But, again,**

17  **neither Aaron or I, to my knowledge, were Census**

18  **experts, so we would rely on Census to give us**

19  **as much information as possible.**

20  **Q. Why do you say that you're not a**

21  **Census expert?**

22  **A. Because I'm not.**

23  Q. Have you tried to -- strike that.

24  When you provide information to others

25  within the Department of Commerce related to the

1  Census, do you create independent work product

2  without the input of experts from Census?

3  MS. BAILEY:  Objection; vague.

4  THE WITNESS:  I do not create my own

5  work product without Census's input.

6  BY MR. ADAMS:

7  Q. If you're providing information

8  to others related to the Census, would the

9  information that you provide come from experts

10  at Census?

11  A. They would come from people at Census.

12  Q. Any other sources?

13  A. Public sources, like the internet.

14  Q. That you would look up?

15  A. Mm-hmm.

16  Q. Any other sources?

17  A. Those sources were, actually, all

18  directed towards Census's website.

19  Q. So aside from direct input from

20  experts at Census and publicly available

21  information on the internet, did you use any

22  other sources to gather and provide information

23  to others at Commerce about the Census?

24  MS. BAILEY:  Objection; form.

25  THE WITNESS:  Could you rephrase that

1   assembling administrative records?

2   MS. BAILEY:  Objection; vague.

3   THE WITNESS:  Training?

4   BY MR. ADAMS:

5   Q. Training.

6   A. There's training?

7   Q. I'm asking did you receive any?

8   A. Not that I know of.

9   MS. BAILEY:  Same objection.

10   THE WITNESS:  Not that I'm aware of.

11   If there's official training, I did not receive

12   official training.

13   BY MR. ADAMS:

14   Q. Did you receive unofficial training?

15   A. What do you mean unofficial training,

16   on the job?

17   Q. Yes.

18   A. The work that I described in Import

19   Administration is probably the closest to

20   compiling information.

21   **Q. Did anyone ever explain to you what**

22   **types of information should or should not be**

23   **included within an administrative record?**

24   **A. No.**

25   **Q. Have you ever assembled an**

1  administrative record at the Department

2  of Commerce?

3  A. I had assembled -- helped assemble

4  the Secretary's deliberation in considering the

5  citizenship question.

6  MR. ADAMS:  I'd like to show you

7  Exhibit Number 13.

8  (Deposition Exhibit No. 13, a document

9  Bates Numbered 1984, was marked.)

10 BY MR. ADAMS:

11 Q. This is Bates Number 1984.

12 The second e-mail in this chain is

13 dated January 28th, 2018, from James Uthmeier.

14 A. Mm-hmm.

15 Q. And he says, additionally, I know that

16 KDK, --

17 That's Secretary Kelly?

18 A. Karen Dunn Kelly, yes.

19 Q. -- wanted to do a follow-up meeting

20 to tomorrow's Steering Committee -- steering

21 meeting, --

22 A. Mm-hmm.

23 Q. -- at which we could visit directly

24 with Ron and Enrique about the admin record.

25 And you responded, also, I spoke with

1   about this document?

2   Q. In -- in the latter half of January

3   2018.

4   A. Possibly.  I don't know.

5   Q. Did you attend any meeting where this

6   document was discussed?

7   A. Not that I can recollect.

8   Q. Did you attend any meeting where

9   Options A, B and C were discussed?

10   THE WITNESS:  I'm sorry.  Just to

11   clarify, discussed this with Karen Dunn Kelly or

12   with Census?

13   BY MR. ADAMS:

14   Q. With anyone within the Department of

15   Commerce or the Census Bureau.

16   A. Around this time in late January, I

17   don't -- I don't recall.

18   **Q. Do you recall the Department of**

19   **Commerce coming up with a set of 35 questions**

20   **for the Census Bureau?**

21   **A. I don't know if there are 35**

22   **questions.  I know that Commerce did come up**

23   **with a list of questions based off of this**

24   **options paper that was provided by Census.**

25   **Q. How did Commerce come up with those**

1  questions?

2  A. So Commerce was given a copy of this

3  document, the options paper, and it was shared

4  with some of us at Commerce.  And I believe

5  after reviewing it there's some folks that came

6  back with questions.  And so there was an effort

7  to compile those questions because different

8  people had different questions.

9  Q. Do you recall who had questions?

10 A. I believe David Langdon, I think James

11 Uthmeier may have, and I think Earl may have, as

12 well.  I don't know if there would be more or --

13 or less.

14 Q. Karen Dunn Kelly, --

15 A. Mm-hmm.

16 Q. -- did -- did she have questions, that

17 you recall?

18 A. I don't know.  I can't remember.

19 Somebody was collecting everybody's questions,

20 so she may or may not have.  But I wasn't

21 compiling everybody's questions, so I don't

22 know.

23 MR. ADAMS:  I'm showing you what's

24 been marked as Exhibit 16.  This is Bates Number

25 3706.

1  (Deposition Exhibit No. 16, a document

2  Bates Numbered 3706, was marked.)

3  THE WITNESS:  Mm-hmm.  Okay.

4  BY MR. ADAMS:

5  Q. Does this refresh your recollection

6  as to whether Secretary Kelly may have had

7  questions?

8  A. I do not know.

9  Just to clarify, I don't know if

10 they're Karen's questions or if they're a

11 compilation of questions, but it sounds like

12 I had a copy of some questions -- her copy at my

13 desk.

14 Q. At some point were the que -- were the

15 questions transmitted to the Census Bureau?

16 A. I don't know.  I'd imagine they were,

17 because Census provided responses.

18 Q. But you did not transmit them?

19 A. I did not transmit those questions.

20 Q. Did you receive responses to the

21 questions --

22 A. I think --

23 Q. -- from Census?

24 A. -- I may have seen a copy of them.

25 I don't know if I was on an e-mail.  I can't

1  recall.

2  Q. The administrative record reflects

3  multiple versions of these questions.  What do

4  you recall about the process of preparing a

5  final set of responses?

6  MS. BAILEY:  Objection; foundation.

7  THE WITNESS:  All I know was a final

8  copy was given to me to keep for record's sake,

9  and that's all I know.

10 MR. ADAMS:  I'd like to show you

11 what's been marked as Exhibit 17.

12 (Deposition Exhibit No. 17,

13 Defendant's Objections and Responses to

14 Plaintiff's Third Set of Interrogatories in the

15 New York Action, Case No. 18-2025, was marked.)

16 BY MR. ADAMS:

17 Q. Exhibit 17 is Defendant's Objections

18 and Responses to Plaintiff's Third Set of

19 Interrogatories in the New York -- in the

20 related New York action, Case Number 18-5025.

21 I'd like to direct your attention to Page 2 of

22 the document.

23 A. Mm-hmm.

24 Q. And at the bottom of the page

25 is Interrogatory Number 5.  With regard to

1  draft and final response to Question 31 in the

2  questions on the January 19th draft census memo

3  on the DOJ Citizenship Reinstatement Request,

4  found at Administrative Record 2303 to 2304 and

5  Administrative Record 196, please identify, A,

6  all persons who worked on any draft of the

7  response.

8  A. Mm-hmm.

9  Q. And in response the Department of

10 Commerce responded with a list of names, among

11 others, yours, correct?

12 A. Mm-hmm.  Yes.

13 Q. In what ways did you work on a

14 draft of the response to Question 31, and I

15 can -- would it help to show you Question 31?

16 A. Sure.  That would be helpful.  I think

17 it's in reference to what we spoke about

18 earlier, --

19 Q. It is.

20 A. -- but I'd love to see a copy.

21 MR. ADAMS:  Sure.  So what I'm marking

22 as Exhibit Number 18 is Bates Number 1286 from

23 the administrative record.

24 (Deposition Exhibit No. 18, a document

25 Bates Numbered 1286, was marked.)

1  BY MR. ADAMS:

2  Q. And Question 31 appears on Page 11.

3  A. Mm-hmm.

4  Q. What is the process that was used

5  in the past to get questions added to the

6  Decennial Census, or do we have something

7  similar where a precedent was established?

8  A. Mm-hmm.

9  Q. And as we saw in Exhibit 17, the

10 Department of Commerce responded with your name

11 when asked for all people who worked on any

12 draft of the response.

13 A. Yep.

14 Q. And what work did you do on a draft of

15 re -- of the response to this question?

16 A. Yes.  It goes back to what I mentioned

17 earlier.  Census, based off of our understanding

18 of our meetings with them, had indicated that

19 there was a distinction between the process

20 that's used at questions to the American

21 Community Survey, which they had shared with

22 us, and that the Decennial Census did not

23 necessarily have a similar process, to their

24 knowledge, that they could point to.

25 And, therefore, it would not be an accurate

1  characterization to say that it was the same.

2  And so based off of that, Census was

3  to go about -- my understanding from the meeting

4  was that Census was going to go back and work on

5  the draft response to Question 31.

6  Now, as I mentioned, these were

7  extremely busy times.  And I think a few days,

8  if not a week or so had gone by, and this was

9  not updated.  And I was in a meeting with Mike

10  Walsh, we had a call with Census in lieu of an

11  in-person meeting that we typically have, and

12  had a hard copy of this and had asked Mike

13  Walsh, our Deputy General Counsel, based off

14  of his recollection of our meeting with Census,

15  could he draft together a draft response so that

16  I can send it to Census for clearance, comments

17  or edits so I could get the ball rolling so we

18  can finalize these answers.

19  Mike Walsh then handwrote the draft

20  response for me on my paper, which then I then

21  went back and typed it up and sent it to Census.

22  I sent it to -- by e-mail to Ron Jarmin, I

23  believe Enrique Lamas, Christa, which those are,

24  typically, the people that I'll e-mail asking

25  for their comments, suggestions or clearance on

1  this.

2  And that was my involvement regarding

3  this question and answer.

4  Q. When was -- so Census sent a draft

5  response to Question 31 to Commerce?

6  A. Mm-hmm.

7  Q. And you asked at some point for a

8  revision to that response?

9  A. I don't recall myself asking.  I

10  remember at the meeting the understanding was

11  Census was going to go back, because I don't

12  believe this was the only one where they were

13  going to revisit.  This was one of some that

14  Census was supposed to come back with their

15  revision.

16  Q. Do you recall when Census was first

17  asked to revisit their initial response to

18  Question 31?

19  A. I don't.  I would imagine it

20  probably wasn't too long after they provided

21  this response, and it was probably during the

22  course of one of our subsequent meetings with

23  them, either weekly or biweekly, or even a phone

24  conversation -- no, it was an in-person meeting.

25  Excuse me.

1   to prepare the questions to send up to Congress.

2   Q. Did Mike Walsh draft revised responses

3   to any questions, other than Question 31?

4   A. Not that I'm aware of.

5   Q. In terms of timing, would you agree

6   that Census provided initial responses to most

7   of the 35 questions by the beginning of February

8   2018?

9   A. Likely.  Census tries to turn around

10  information as quickly as they can.

11  But as you can see from Question 30,

12  there's a lot of back and forth where Census

13  would come back and ask, we're not sure what

14  you're asking for, please clarify the question.

15  MR. ADAMS:  I'd like to show you

16  what's been marked as Exhibit Number 19.

17  (Deposition Exhibit No. 19, a document

18  Bates Numbered 1616, was marked.)

19  BY MR. ADAMS:

20  **Q. This is Bates Number 1616, and I'd**

21  **like to turn to Question Number 31.**

22  **A. Mm-hmm.**

23  **Q. And if you could review the response**

24  **to Question 31 and let me know when you've had a**

25  **chance to look at it.**

1  A. Mm-hmm.

2  Okay.

3  Q. Does this -- does this look to you

4  like the initial response that Commerce received

5  from the Department of Census to Question 31?

6  MS. BAILEY:  Objection; vague.

7  THE WITNESS:  Question to 31?  Could

8  you --

9  MR. ADAMS:  Could you repeat the

10  question?

11  THE REPORTER:  The last question, or

12  the one prior?

13  MR. ADAMS:  The last question.

14  (Referred-to testimony read back.)

15  MS. BAILEY:  Same objection.

16  THE WITNESS:  It looks similar, but

17  I cannot tell you if this is exactly what it

18  looked like word for word.

19  BY MR. ADAMS:

20  Q. This is not the response that

21  Mr. Walsh drafted?

22  A. That's correct.

23  Q. The re -- the response says

24  that adding a question or making a change to

25  the Decennial Census toward the ACS involves

1   extensive testing, review and evaluation.

2   Did you have any reason to believe

3   that that statement was inaccurate in this

4   response?

5   A. Yes.  My understanding from the

6   meetings that we had from Census was that

7   this statement was very true for the American

8   Community Survey, and I believe when we

9   had asked about the Decennial Census, my

10  understanding was that Census said it had been a

11  very long time since they have added a question,

12  to which I believe there was an effort that was

13  made by Census to see if they could find the

14  last time a question was added to the Decennial

15  and, when it was added, what process, any

16  historical record that Census could show us

17  to support that statement.  And Census, to my

18  recollection, did not have anything to provide.

19  Q. What prompted the Department of

20  Commerce to dig deeper into this initial

21  response to Question 31?

22  MS. BAILEY:  Objection; foundation.

23  Mischaracterizes previous testimony.

24  THE WITNESS:  Could you repeat

25  that question or miss -- rephrase it for me.

1   in connection with considering the process

2   for adding a question to the 2020 Census?

3   A. Not to my recollection.  This looks

4   like this was in preparation for the PMR, the

5   quarterly Performance Management Review that

6   Census hosts to provide the public an update on

7   the progress that they've made in preparation

8   for the Decennial.  And I think this may be

9   one of those public presentations that Census

10  provided.

11  It says here that they were including

12  a slide to send to Ellen Johnson, who is a

13  staffer in the House Oversight and Government

14  Reform Committee, who I guess she might have

15  inquired about that.

16  Q. That's HOGR?

17  A. Mm-hmm.

18  **MR. ADAMS:  I'd like to show you what**

19  **I've marked as Exhibit 21.  It's Bates Number**

20  **13023.**

21  **(Deposition Exhibit No. 21, a document**

22  **Bates Numbered 13023, was marked.)**

23  **THE WITNESS:  Mm-hmm.**

24  **BY MR. ADAMS:**

25  **Q. And this is an e-mail from you on**

1  February 23rd, 2018, to Ron, Enrique and

2  Christa at the Census Bureau, correct?

3  A. Correct.

4  Q. And you would agree that the bolded

5  question that appears beneath your name is

6  Question 31?

7  A. Mm-hmm.  Yes.

8  Q. Are you familiar with this draft

9  response to Question 31?

10 A. I believe this is Mike Walsh's draft

11 response that I typed and sent to Census asking

12 for their thoughts.

13 Q. When you say the -- Mike Walsh wrote

14 an answer, --

15 A. Mm-hmm.

16 Q. -- I believe you said that he wrote

17 it on a hard copy document that you had of the

18 questions?

19 A. He wrote it for me because I had a

20 hard copy and I asked him on the spot after we

21 had concluded a call with Census.

22 Q. Did you -- strike that.

23 Who came up with the language that he

24 wrote down?

25 A. I believe it was based off of

1  his understanding from the meeting that he

2  participated in with Census when they went over,

3  among many things, what the process was for the

4  Decennial Census where Census clarified to us.

5  Q. Did you make suggestions for the

6  language to be used in the revised version of

7  the response to Question 31?

8  A. Could you rephrase that?

9  Q. The -- the version of -- the revision

10 of the response to Question 31 that Mr. Walsh

11 wrote on your hard copy, --

12 A. Mm-hmm.

13 Q. -- did you provide suggestions as to

14 what wording should be used for that response?

15 A. No.  I typed it verbatim.

16 Q. And Mr. Walsh came up with the

17 language independently?

18 A. No.  It was based off of his

19 understanding from the meeting he had

20 participated in with Census, that we had all

21 participated in.

22 Q. Let me rephrase -- ask a different

23 question.

24 A. Okay.

25 Q. He came up with the -- is it correct

1  to say that he came up with the language

2  independent of substantive input from you?

3  MS. BAILEY:  Objection; form.

4  Objection.  Mischaracterizes previous testimony.

5  THE WITNESS:  I did not provide any

6  input with regards to the response to Question

7  Number 31.

8  BY MR. ADAMS:

9  Q. Part of this response in your e-mail

10  says, consistent with longstanding practice

11  for adding new questions to the ACS survey,

12  the Census Bureau is working with relevant

13  stakeholders to ensure that legal and regulatory

14  requirements are fulfilled and that the

15  questions would produce quality, useful

16  information for the nation.

17  A. Mm-hmm.

18  Q. Who provided the information used

19  to come up with that language to Mr. Walsh?

20  MS. BAILEY:  Objection; form.

21  THE WITNESS:  I believe this language

22  was based off of Census's explanation to us

23  about the process for the American Community

24  Survey.

25  BY MR. ADAMS:

1  aware, that process is ongoing.  I think "as

2  upon its conclusion" probably should have been

3  a separate paragraph and it should have been

4  clarified that "upon its conclusion of looking

5  at the Department of Justice request with

6  regards to Decennial Census", that it's still

7  ongoing and that the information would be

8  provided to the Secretary for consideration.

9  But, again, I wrote this based upon what was

10  given to me --

11  Q. Typing --

12  A. -- without any corrections.  Right.

13  Q. Typing up verbatim what you received

14  from Mr. Walsh?

15  A. Correct.

16  **Q. Christa Jones responded to you and**

17  **said, Sahra, I'm fine with this.  This is not**

18  **to say that there weren't some improvements and**

19  **presentation changes for the topics between**

20  **1990, 2000, 2010 and planned for 2020.  I just**

21  **want us all to be clear that the questionnaires**

22  **were not -- was not identical from 1990 to now.**

23  **A. Mm-hmm.**

24  **Q. Aside from this response from**

25  **Ms. Jones, did you receive any other responses**

1  or feedback from Mr. Jarmin, Mr. Lamas or

2  Ms. Jones about this proposed response?

3  A. No.  And the reason why Christa is

4  always copied on any e-mail to Ron and Enrique

5  is so that she can also ping them and check with

6  them in the event that they missed an e-mail

7  from us.

8  And so Christa was my liaison

9  over there to ensure that we could get a timely

10  response from Census, and, if she responded,

11  then that was good as -- as what census was

12  going forward with, so that was my

13  understanding.

14  Q. So your understanding -- was it

15  your understanding that Census had reviewed and

16  approved of the language that Mr. Walsh wrote on

17  your hard copy and you retyped here?

18  A. That's what I took it as.

19  Q. Following -- following this exchange,

20  did Commerce send to you any other revisions to

21  a response to Question 31?

22  A. No, not that I can recall.

23  Q. Can you recall -- do you know whether

24  they -- whether Census sent anyone within the

25  Department of Commerce a further revision of the

1  response to Question 31?

2  A. I do not know.  As far as I was

3  concerned, this was done and over and we can

4  move on.

5  Q. From your perspective, you said it's

6  done and over and we can move on, so you view

7  this language as having been approved final

8  language for the response to Question 31?

9  A. With regards to Census's review, that

10 was my understanding.

11 Q. Was there further review of the

12 response within the Department of Commerce?

13 A. I do not know.  At this point there

14 are a lot of e-mails going back and forth,

15 so ...

16 MR. ADAMS:  I'd like to show you

17 what's been marked as Exhibit Number 22, and

18 this is Bates Number 9812.

19 (Deposition Exhibit No. 22, a document

20 Bates Numbered 9812, was marked.)

21 MR. ADAMS:  Before we go to this

22 exhibit, I want to go back to what we were just

23 discussing and show you Exhibit 23.

24 (Deposition Exhibit No. 23, a document

25 Bates Numbered 3403, was marked.)

1   know if they came in together or if they came in

2   separately, the attachment.

3   Q. Taking a look at Exhibit 22, --

4   A. Mm-hmm.

5   Q. -- if we could turn to page -- it's

6   the second-to-last page, --

7   A. Mm-hmm.

8   Q. -- Question 31.  So the version of

9   the response to Question 31 that's in this

10  document --

11  A. Mm-hmm.

12  Q. -- is not the version that was

13  prepared by Mike Walsh.

14  A. Correct.

15  Q. Do you know why, as late as March 1st,

16  2018, Dr. Abowd would be using this version of

17  the response to Question 31?

18  MS. BAILEY:  Objection.  Calls for

19  speculation.  Foundation.

20  THE WITNESS:  I do not know why,

21  but this is not the version he should have been

22  using.

23  BY MR. ADAMS:

24  Q. He should have been using the version

25  as drafted by Mr. Walsh?

1  A. The one that was cleared by Census.

2  MR. ADAMS:  Could we go off the record

3  for two minutes?

4  THE VIDEOGRAPHER:  We're going off the

5  record.  The time is 1:53 p.m.

6  (Brief recess.)

7  THE VIDEOGRAPHER:  We're back on the

8  record.  The time is 1:55 p.m.

9  BY MR. ADAMS:

10  Q. I'd like to compare the different

11  versions of the response to Question 31 that we

12  have.

13  A. Okay.

14  Q. So there is the version in Exhibit 22,

15  which is the March 1st, 2018, memo from

16  Dr. Abowd.

17  A. Okay.

18  Q. There's the version in Exhibit 19.

19  I think this might be it.

20  A. No, that's 18.  You said 19, right?

21  So Exhibit 19, --

22  Q. Exhibit 19.

23  A. -- and then what was the one before

24  that that you asked?  Oh, and then this one, --

25  Q. And Exhibit --

1   A. -- Exhibit 22?

2   Q. So 18, 19, --

3   A. Nineteen.

4   Q. -- 21 and 22.  So we have four -- four

5   documents.

6   A. Okay.  Okay.

7   Q. Starting with 19 and 22, --

8   A. 19 and 22.  Okay.

9   Q. Okay.

10  -- would you agree that these versions

11  of the response to Question 31 are the same?

12  A. I'm sorry.  That the response to --

13  Q. Question 31.

14  A. -- 31 for Exhibit 18 --

15  Q. 19 and 22.

16  A. -- 19 -- I'm sorry.

17  Q. I'm sorry.

18  A. I'm sorry.  One more time.  For 19 and

19  22, are they the same?

20  Q. Yes.

21  A. Okay.  Yes, they read the same.

22  Q. Turning to the version in Exhibit 21,

23  this is the e-mail version with the typed-up

24  version of Mr. Walsh's response?

25  A. Mm-hmm.  Twenty-one.  Okay.  Sorry.

1  There's -- okay.

2  Q. This had been communicated to Census

3  prior to March 1st, 2018, correct?

4  A. Correct.

5  Q. Are you aware of any reason why

6  Dr. Abowd would not be using this version of the

7  response to Question 31?

8  MS. BAILEY:  Objection.  Objection.

9  Calls for speculation.  Objection; foundation.

10 THE WITNESS:  I don't know.

11 BY MR. ADAMS:

12 Q. Did -- did Dr. Abowd, to your

13 knowledge, express to anyone at the Department

14 of Commerce disagreement with the version of the

15 response in Exhibit 21?

16 A. You mean the one that the Commerce

17 Department provided --

18 Q. Yes.

19 A. -- to 21?

20 I don't know.  I believe Dr. Abowd

21 is not in that e-mail that I had sent to Census.

22 I only had sent it, it seems, to Ron Jarmin,

23 Enrique Lamas, Christa Jones, Karen Dunn Kelly,

24 Mike Walsh and Brian Lenihan.

25 Q. Before we compare the version of the

1  response in Exhibit 21 to the version that's in

2  Exhibit 18, --

3  A. Okay.

4  Q. -- I just want to go back to 21

5  and make sure I understand what, if anything,

6  happened to this version of the response after

7  February 23rd, 2018.  Did you make any further

8  revisions to the response to Question 31?

9  A. No.

10  Q. To your knowledge, did Mr. Walsh

11  make any further revisions to the response?

12  A. No.

13  Q. To your knowledge, did Secretary Kelly

14  make any revisions to this version?

15  A. No.

16  Q. Are you aware of anyone who made

17  revisions to this version of Question 31 after

18  February 23rd?

19  MS. BAILEY:  Objection.  Asked and

20  answered.

21  THE WITNESS:  No.

22  BY MR. ADAMS:

23  **Q. If we could compare Exhibit 21 with**

24  **Exhibit 18, --**

25  **A. Okay.**

1  Q. Okay.

2  -- you would agree that these are not

3  identical, correct?

4  A. Correct.

5  Q. And the sentence, consistent with

6  longstanding practice for adding new questions

7  to the ACS survey, the Census Bureau is working

8  with relevant stakeholders.

9  MS. BAILEY:  Sorry.  Can we clarify

10  which exhibit?  I'm sorry.

11  MR. ADAMS:  Yes.  Exhibit 21.

12  BY MR. ADAMS:

13  Q. There is a sentence in 21, consistent

14  with longstanding practice for adding new

15  question -- for adding new questions to the

16  ACS survey, the Census Bureau is working with

17  relevant stakeholders to ensure that legal and

18  regulatory requirements are fulfilled and that

19  the question would produce quality and useful

20  information for the nation.

21  A. Mm-hmm.

22  Q. That initial phrase, consistent with

23  longstanding practice for adding a new question

24  to the ACS survey, does not appear in the

25  version of the answer in Exhibit 18, --

1  A. Mm-hmm.

2  Q. -- correct?

3  A. Correct.

4  Q. Do you know why?

5  A. I do not know why.  It seems like

6  it's a truncated version of Exhibit 21.  It's

7  the same answer, just shortened.

8  Q. You testified, and correct me if I'm

9  wrong, that you're not aware of anyone having

10  made further revisions to Question 31 as

11  reflected in Exhibit 21.

12  A. Correct.

13  Q. In terms of control of the -- the

14  document that had the responses to all of these

15  questions, I'd imagine it changed hands a number

16  of times; is that correct?

17  A. Yes.  I would imagine.

18  Q. And after February 23rd, people in

19  addition to you made revisions; is that correct?

20  MS. BAILEY:  Objection.  Calls for

21  speculation.

22  THE WITNESS:  I don't know.  I don't

23  know.

24  BY MR. ADAMS:

25  Q. How many -- strike that.

1   responses to these questions after February

2   23rd?

3   MS. BAILEY: Objection.

4   THE WITNESS: The Secretary?

5   MS. BAILEY: Objection. Asked and

6   answered several times.

7   THE WITNESS: No.

8   BY MR. ADAMS:

9   Q. I've been asking about revisions by

10   people at the Department of Commerce. Are you

11   aware of whether anyone within the Census Bureau

12   revised answers -- the answer to Question 31

13   after February 23rd, 2018?

14   MS. BAILEY: Objection; foundation.

15   THE WITNESS: No. I don't know.

16   BY MR. ADAMS:

17   **Q. Who changed the response to Question**

18   **31 from the version reflected in Exhibit 21 to**

19   **the version reflected in Exhibit 18?**

20   **MS. BAILEY: Objection. Calls for**

21   **speculation, foundation, asked and answered.**

22   **THE WITNESS: I don't know.**

23   BY MR. ADAMS:

24   Q. Okay. With respect to -- with respect

25   to the process of considering DOJ's request,

1  A. That's what it looks like from the

2  scheduler.

3  Q. And it lists calls with members of

4  Congress and others, such as Kay Coles James

5  with the Heritage Foundation, Christine Pierce,

6  a demographer at Nielsen.  Did these calls take

7  place?

8  A. Some did and some didn't.  It was

9  tricky.  Like, the scheduling team tried to

10  squeeze in as many calls during certain hours,

11  but then they were shifting and changing, and

12  sometimes the members or people were not

13  available.  So the final list of summaries based

14  off these stakeholder calls were all the people,

15  to my recollection, that we -- that the

16  Secretary was able to get ahold of and have a

17  listening session.

18  Q. For each of the calls you participated

19  in, did you take contemporaneous notes?

20  A. Yes.  I tried.

21  I think I may have missed a couple

22  with the members at the tail end, but Kasey was

23  in those meetings so she would have read the

24  summaries.

25  **Q. Do you recall whether you were on the**

1   **phone call with Christine Pierce from Nielsen?**

2   **A. If my notes show it, maybe.**

3   **Q. You don't recall either way, though?**

4   **A. I don't. There were so many. I mean,**

5   **that's why we were taking notes.**

6   MR. ADAMS: I'd like to show you

7   what's been marked as Exhibit Number 28.

8   (Deposition Exhibit No. 28, a document

9   Bates Numbered 001313, was marked.)

10   BY MR. ADAMS:

11   Q. Are you familiar with this document?

12   A. I believe it was the Secretary's

13   decision.

14   Q. Who drafted the Secretary's decision?

15   A. Boy, I don't know, but it wasn't me.

16   Q. Did you work on preparing any inputs

17   into this decision?

18   MS. BAILEY: Objection; vague.

19   THE WITNESS: Inputs? No.

20   BY MR. ADAMS:

21   Q. Did you provide any information

22   -- strike that.

23   Did you have any role in the creation

24   of this document, in particular?

25   A. No. I think I saw the final finished

1  product.

2  Q. As this was being drafted, did

3  anyone ask you any questions about formulations

4  -- strike that.

5  As this was being drafted, did

6  anyone ask you questions about preparing the

7  Secretary's final decision?

8  MS. BAILEY:  Objection; vague.

9  THE WITNESS:  Preparing his final

10  decision for ...

11  BY MR. ADAMS:

12  Q. Preparing this document.

13  A. No.

14  Q. If you could turn to Page 6 -- oh,

15  that has my underline in it.

16  A. Is this your copy?

17  Q. That's all right.

18  A. Okay.

19  Q. So what I have underlined is the

20  sentence, first, several stakeholders who

21  opposed reinstatement of the citizenship

22  question did not appreciate that the question

23  had been asked in some form or another for

24  nearly 200 years.

25  A. Mm-hmm.

1   Q. Do you recall -- do you recall

2   stakeholder phone calls where stakeholders

3   expressed opposition to the reinstatement of

4   the citizenship question?

5   A. The stakeholders, I think they were --

6   they were folks who were not fans of the

7   request.

8   Q. And do you recall, based on those

9   phone calls, whether stakeholders who were

10   opposed appreciated that the question had been

11   asked in some form or another for nearly 200

12   years?

13   MS. BAILEY:  Objection; vague.

14   THE WITNESS:  I don't know.  I'd have

15   to go back and look at those notes.

16   BY MR. ADAMS:

17   Q. Without looking at those notes, would

18   you be able to say what the source of this

19   statement is?

20   A. I do not.

21   MR. ADAMS:  If we could take a

22   10-minute break, I think we're approaching the

23   end.  So why don't we take a 10-minute break and

24   come back?

25   THE VIDEOGRAPHER:  We're going off the

1　answer on your hard copy?

2　A. I don't remember when, but I'd imagine

3　once he provided edits, typically, I would try

4　to send it back as soon as possible, but I don't

5　know when.

6　Q. Do you know the date of the meeting

7　-- do you know the date of the meeting where

8　Mr. Walsh received what information he needed

9　to receive to draft that response?

10　A. I don't recall the date of the

11　meeting, but I remember it was the same briefing

12　that I had participated in, and it was the

13　bigger group meeting with Census, but I don't

14　remember which one.  We had a lot of them.

15　(Deposition Exhibit No. 29, a

16　certification by Ms. Park-Su, was marked.)

17　BY MR. ADAMS:

18　Q. Okay.  Earlier we spoke about

19　-- generally, about administrative records,

20　and I'm going to show you what's been marked as

21　Exhibit Number 29.

22　A. Mm-hmm.

23　Q. Do you recognize -- do you recognize

24　this document?

25　A. I do.

1  Q. And is this your signature in the

2  middle of the document?

3  A. That is my signature.

4  Q. What is this document?

5  A. What do you mean?

6  Q. What do you understand this document

7  to be?

8  A. I mean it to be what it says on

9  the paper where it says, I here certify that

10  the annexed is a true copy of the complete

11  administrative record upon which the Secretary

12  of Commerce based his decision to reinstate a

13  question concerning citizenship on the 2020

14  Decennial Census.  I base this certificate on my

15  personal involvement with the compilation review

16  of the documents comprising the administrative

17  record.

18  Q. How were you personally involved with

19  the compilation of the documents comprising the

20  administrative record?

21  A. Yeah.  As I told you, I was usually

22  given final versions, to my understanding, of

23  documents that were going back and forth, and

24  it was my responsibility to hold on to those

25  documents because there was so many paper

 1  movements.

 2  Q. Was that the extent of your personal

 3  involvement on the compilation of documents?

 4  A. I believe I had also looked up

 5  online a history that Census had in one of their

 6  reviews about questions regarding citizenship

 7  that was added.  So a lot of the public

 8  historical documents that Census had, I had

 9  gone back to find them online or verify that

10  they were, in fact, there.

11  Q. When compiling documents comprising

12  the administrative record, did you affirmatively

13  reach out to others and ask for documents that

14  should be included in the record?

15  A. Ask for other documents?

16  Q. Yes.

17  A. Besides what we had from Census?

18  Q. Yes.

19  A. Not that I recall.

20  Q. Did anyone provide you guidance on

21  how to compile documents for the administrative

22  record?

23  A. No.  My only under -- understanding

24  was that I was going to keep the record of all

25  documents that were handed to me.

1  Q. So just to clarify, aside from

2  documents that were handed to you, you did

3  not affirmatively reach out to others within

4  Commerce --

5  A. No.

6  Q. -- to send you documents for the

7  record?

8  A. No.  I had asked Commerce, though, if

9  there are any documents that Census had sent to

10 them that I was not copied on, please send them

11 to me.

12 Q. So that referred to documents from

13 Census?

14 A. Right.  Just as a precautionary

15 measure, but I don't believe that -- that they

16 had.

17 Q. From whom were you receiving documents

18 that you compiled for the administrative record?

19 A. I think it varied.  Oftentimes,

20 they were given to me when we had our meeting

21 with Karen Dunn Kelly or with Census.  So,

22 oftentimes, people would hand what I believe

23 to be a final version of a document.  So, for

24 instance, the Department of Justice letter in

25 early January was one that a hard copy was given

1  to me to keep, so it varied.

2  Q. Were all documents that you compiled

3  for the administrative record hard copy

4  documents?

5  A. Most of them, but not all of them.

6  Q. The documents that were not hard copy

7  documents, --

8  A. Mm-hmm.

9  Q. -- did you have them saved on your

10  computer?

11  A. Mm-hmm.  I believe so.

12  Q. And from whom did you receive

13  electronic copies of documents for the

14  administrative record?

15  MS. BAILEY:  Objection; vague.

16  THE WITNESS:  I don't know.

17  BY MR. ADAMS:

18  Q. When people provided you with various

19  documents, did anyone indicate, this is a

20  document that should be part of the

21  administrative record?

22  A. No.

23  Q. You decided which documents should

24  be part of the administrative record?

25  MS. BAILEY:  Objection.

1  Mischaracterizes witness's previous testimony.

2  THE WITNESS:  No, I would just hold on

3  to documents that people would give me when it

4  came to Department of Justice's inquiry.

5  BY MR. ADAMS:

6  Q. Did you consider all documents that

7  you received related to the Department of

8  Justice's inquiry to be part of the

9  administrative record?

10 A. I don't know.

11 MS. BAILEY:  Objection; vague.

12 THE WITNESS:  Sorry.

13 BY MR. ADAMS:

14 Q. Part of the certification says that

15 it was based on your personal review of the

16 documents comprising the administrative record.

17 A. Personal involvement --

18 Q. I base this --

19 A. -- and the compilation and review of

20 the documents?

21 Q. Yes.

22 A. Mm-hmm.

23 Q. So how did you review the documents

24 comprising the administrative record?

25 A. Sure.

1   Counsel's office had asked if I would

2   sign this document that contained information

3   about the Secretary's decision to consider the

4   citizenship question, and so it was a massive

5   electronic file of documents. And I went

6   through each and every one of them and I

7   looked at them, and that's what I reviewed.

8   Q. The compilation of documents that you

9   reviewed, did you create that compilation of

10   documents?

11   A. I didn't create it. I had -- it was

12   -- most of them were documents that were given

13   to me that I had in hard copy.

14   Q. Mm-hmm.

15   A. And it looked like most -- it

16   looked like counsel's office had scanned them

17   individually and had saved them, and that was

18   part of the administrative record.

19   Q. From whom did you receive the

20   compilation of documents that you reviewed?

21   A. I can't remember. It was from one

22   of the attorneys in General Counsel's office.

23   Q. Did you select the documents that were

24   part of that compilation?

25   A. I did not select the documents. I

1 held on to the documents that were given to me.

2 Q. Do you know who selected the documents

3 that were part of that compilation?

4 A. I do not know.

5 Q. Did anyone ask you which documents

6 ought to be part of the compilation?

7 A. No.

8 Q. Did you have any say whatsoever in

9 determining the content of that compilation?

10 A. No.

11 MS. BAILEY:  Objection; vague.

12 Confusing.

13 MR. ADAMS:  I'd like to show you

14 what's been marked as Exhibit Number 30.

15 (Deposition Exhibit No. 30, a document

16 Bates Numbered 001321, was marked.)

17 THE WITNESS:  Okay.

18 BY MR. ADAMS:

19 Q. Are you familiar with this document?

20 A. This is the first time I'm seeing this

21 document.

22 Q. You've never seen this document

23 before?

24 A. I have not seen this document.

25 Q. To your knowledge, have you seen any

1  Q. And did you familiarize yourself with

2  the documents selected before certifying the

3  record?

4  A. I looked at the documents at the

5  General Counsel's Office provided prior to

6  signing.

7  MS. BAILEY:  Thank you.  That's all I

8  have.

9  FURTHER EXAMINATION

10  BY MR. ADAMS:

11  Q. Did you make an independent

12  determination that the compilation you received

13  was complete?

14  A. No.

15  MR. ADAMS:  I have no further

16  questions.

17  MS. BAILEY:  And, I'm sorry.  I forgot

18  one.  I'm sorry.

19  FURTHER EXAMINATION

20  BY MS. BAILEY:

21  Q. Do you have an understanding

22  as to whether individuals who worked on the

23  citizenship question inquiry for Secretary Ross

24  were consulted as far as providing potential

25  documents for the record before that

1  Sahra Park-Su

2

3  C E R T I F I C A T E

4

5  I do hereby certify that the aforesaid

6  testimony was taken before me, pursuant to

7  notice, at the time and place indicated; that

8  said deponent was by me duly sworn to tell the

9  truth, the whole truth, and nothing but the

10  truth; that the testimony of said deponent was

11  correctly recorded in machine shorthand by me

12  and thereafter transcribed under my supervision

13  with computer-aided transcription; that the

14  deposition is a true and correct record of the

15  testimony given by the witness; and that I am

16  neither of counsel nor kin to any party in said

17  action, nor interested in the outcome thereof.

18

19  WITNESS my hand and official seal this

20  29th day of October 2018.

21

22  <%11516,Signature%>      _____

23  Ryan K. Black

24

25

1   Sahra Park-Su

2

3

4   INSTRUCTIONS TO THE WITNESS

5   Please read your deposition over

6   carefully and make any necessary corrections.

7   You should state the reason in the appropriate

8   space on the errata sheet for any corrections

9   that are made.

10  After doing so, please sign the errata

11  sheet and date it.

12  You are signing same subject to the

13  changes you have noted on the errata sheet,

14  which will be attached to you deposition.

15  It is imperative that you return the

16  original errata sheet to the deposing attorney

17  within thirty (30) days of receipt of the

18  deposition transcript by you.  If you fail to do

19  so, the deposition transcript may be deemed to

20  be accurate and may be used in court.

21

22

23

24

25

 1  Sahra Park-Su

 2  E R R A T A

 3  - - - - -

 4  PAGE   LINE   CHANGE

 5  ___ ___ _____

 6  Reason:_____

 7  ___ ___ _____

 8  Reason:_____

 9  ___ ___ _____

10  Reason:_____

11  ___ ___ _____

12  Reason:_____

13  ___ ___ _____

14  Reason:_____

15  ___ ___ _____

16  Reason:_____

17  ___ ___ _____

18  Reason:_____

19  ___ ___ _____

20  Reason:_____

21  ___ ___ _____

22  Reason:_____

23  ___ ___ _____

24  Reason:_____

25  Job No. PA3072227

1   Sahra Park-Su

2

3   ACKNOWLEDGMENT OF DEPONENT

4   I, _____, do

5   hereby certify that I have read the foregoing

6   pages and that the same is a correct

7   transcription of the answers given by

8   me to the questions therein propounded,

9   except for the corrections or changes in form

10  or substance, if any, noted in the attached

11  Errata Sheet.

12

13  _____  _____

14  DATE   SIGNATURE

15

16  Subscribed and sworn to before me this

17  _____  day of _____, 20__.

18

19  My commission expires: _____

20  _____

21  Notary Public

22

23  Job No. PA3072227

24

25