## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 1:18-cv-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | **AFFIDAVIT OF JESÚS G. GARCÍA** |

Pursuant to 28 U.S.C. § 1746(2), I, Jesús G. García hereby declare as follows:

1.      My name is Jesús G. García, and I make this Affidavit in connection with *State of New York, et al., v. United States Department of Commerce, et al*.  I am the Cook County Board Commissioner for the 7th District, which is located in Chicago, Illinois.  I am over the age of eighteen and have personal knowledge of all the facts stated herein, except for those facts taken from records maintained by my office in the regular course of business.

2.      I began my tenure on the Cook County Board in 2010. As a Cook County Commissioner, my duties include overseeing the operations and approving the budget of all County departments. The main areas of service under the County's jurisdiction are criminal justice and the court system, public health, and property taxes. I represent the 7th District of Cook County, located in the Southwest Side of Chicago, which is predominantly comprised of immigrant and working-class families. As a legislator, I work with other Commissioners and various stakeholders to develop and present policy proposals for consideration to the Board of Commissioners to further our mission of government accessibility and accountability. My office also provides direct constituent services to facilitate access to information and resources for

constituents. As a Cook County Commissioner I review and approve federal grant awards received by various County departments throughout the year. I have a strong history of going above and beyond my duties by supporting and partnering with diverse community partners and advocates on a range of social justice issues.

3.      The Cook County Board of Commissioners established a Complete Count Committee leading up to the 2000 Census, which was comprised of nine subcommittees targeting various components of society including community based organizations, education, the media, and religion. In 1998, the County Planning and Development staff met with various departments throughout the County that were considered integral partners in working to ensure a complete count. The creation of the Committee was spurred by an undercount in the 1990 Census by at least 81,370 people, which resulted in a loss of over $80 million a year ($800 million over the decade) in federal and state funding. In efforts to keep this from recurring, the County at the time allocated $340,000 and two staff persons towards the Complete Count Committee. The Committee was launched in 1999 and organized many creative events and activities for the following sixteen months, which included distributing a newsletter and partnering with diverse stakeholders. Even at the time, it was considered that Cook County was at risk of an undercount due to its large immigrant population.  A copy of "Cook County Census 2000: Complete Count Committee," a booklet issued by the Complete Count Committee, has been submitted as Trial Exhibit PX-249, a copy of which is in the files maintained by my office in our regular course of business and which I consulted for the facts set forth in this paragraph.

4.      My office monitors constituent concerns regarding matters of the public interest and, in the process, makes and maintains records of those constituent concerns.

5.      My office is administering a survey with constituents in the 7th District and partner

organizations as part of our office practice of identifying ways to understand and address constituent concerns. With this survey, we seek to understand their reactions to the possible inclusion of a citizenship question in the 2020 Census.   We plan to continue gathering responses through constituent walk-ins or community events my office participates in. Through discussions with partner organizations and elected officials who are also advocating for public awareness on the complexities of the 2020 Census (this group is described in more detail in Paragraph 9, below), it became clear that more had to be done to engage the public. Given that I represent a majority Latinx district, my staff and I decided to create this survey to better understand the current level of awareness and reactions to the possible inclusion of a citizenship question. It is my hope that the findings can help my office know how to best respond and disseminate information to constituents as we approach the Census.

6.      During a Property Tax Workshop my staff conducted at our district office in late August 2018, the end of the event was dedicated to having a brief dialogue with attendees about the proposed citizenship question. Attendees remained fairly quiet.  I was concerned that this lack of open reaction meant that my constituents were either afraid to speak publicly on the topic or did not have information on it in order to provide an opinion, and I therefore decided that a survey could be a more confidential strategy to gather information. A survey was created that same week using Google Forms. The survey does not ask for identifying or personal information besides asking for zip codes to understand where in the district responses are coming from and whether the respondent is a service provider, which could impact their view of the proposed questions and its impacts. It is intentionally anonymous in order to gain an objective understanding of reactions to this issue.

7.      My staff has thus far distributed the survey at four community events: a community conversation about the 2020 Census hosted by Telpochcalli Community Education Project on

3

September 11, 2018, a Property Tax Workshop conducted by my staff at Jose Clemente Orozco Community Academy in the Pilsen neighborhood on September 19, 2018, a town hall event on October 11, 2018, and a community event hosted by the group Organized Communities Against Deportations on October 20, 2018. In addition, the survey was also e-mailed to the 7th District Health Task Force, which is a coalition of non-profits and direct service providers in my district. The survey is neutral in that no particular stance is taken for or against the citizenship question. A mixed methods approach focused on obtaining qualitative responses was used and included both open-ended and closed questions, as well as questions with the opportunity to respond using a Likert scale and currently has a sample size of 77.

        8.      Respondents are adults aged 18 and over and 81.8% identify as Latinx/Hispanic. All Respondents indicated negative initial reactions to learning about the potential citizenship question and described it as profiling and biased. One Respondent stated "This is an attempt to exploit the fear among people who are currently under attack by federal immigrant agents, in order to reduce the accuracy of the census. It is a racist, anti-immigrant, and anti-democratic effort by the federal administration." The majority of respondents indicate that they do plan on participating in the Census.  Using a Likert Scale with points 1 through 5, 37.7% of Respondents selected Option 5, indicating they are very likely to participate in the Census if asked about their citizenship. However, 61.1% selected Options 1 or 2 ("Extremely or very unlikely to participate") when asked how likely they believe their neighbors or community are to participate if asked about their citizenship on the Census. Nearly all the Respondents believe the question is unnecessary, with one individual describing it as a "racist and xenophobic tactic" and another stating "the census survey is a way to ascertain support for a local community, and citizenship has no place in determining that support." Another respondent stated the following: "The question is unnecessary given the current political

climate with respect to immigration practices and prejudices…. This type of questioning will either deter participation in the survey, fuel further distrust, and/or decrease data reliability." I plan to continue distributing the survey to build a better picture of how the community I represent feels about this issue and determine the best strategies to work with constituents and partners on outreach for the 2020 Census. As of October 22, 2018, total costs for my office associated with this effort, which include printing costs, transportation to events, and staff time, are approximated to be $442.61 and a total of 17.5 staff hours.

9.     Other indications of community fear due to the proposed citizenship question are also strong. In June 2018, I hosted the first Count Me In 2020 Census Community Briefing in Illinois in collaboration with various civic organizations and other elected officials.  Leaders from non-profit organizations throughout Chicago were in attendance. Many of them provide direct services to immigrant communities and their questions to panelists and Census Bureau staff clearly reflected the uncertainty and concern over how to safely direct community members to fill out the Census if a citizenship question is included. In surveys distributed to attendees, concern that the proposed citizenship question would reduce census participation was among the most common reasons participants gave for their continued interest in remaining engaged in census outreach. My office has directly received communications from organizations that want to learn about government appropriations to assist them with conducting outreach. Furthermore, at a community event held at my office in August 2018, attendees expressed concern over the question and remarked that its inclusion in the Census can be problematic for their neighbors and community, and for the federal funding the district receives.

10.     Since early 2018, I have informally convened a representative group of local organizations and elected officials serving various hard-to-count communities on a monthly basis to

discuss strategy for the 2020 Census at various levels of government, and these leaders have also expressed increasing concern at the slow pace of building a campaign to engage the public. They are not sure how to confront the dilemma of communicating the importance of the Census to all communities and the impact of an accurate count in securing needed programs while confidently engaging noncitizens despite the uncertainty surrounding the rollout of the citizenship question. I can attest to the fact that the concerns leading up to the 2020 Census are unprecedented. I do not recall this level of alarm from government, philanthropy, and civic and community based organizations in past decades.

11.     Much of the concern specific to the citizenship question coincides with heightened immigration enforcement and drastic changes within immigration law and policy on behalf of the federal government which are pushing longstanding advocates, including myself, to be cautious in how Census outreach will continue to be conducted.

12.     Residents of the 7th District have directly experienced the impacts of this heightened federal immigration enforcement, as evidenced by the August 2018 arrest of Samuel Armando Peralta, a Honduran immigrant without a criminal history, in the Back of the Yards Neighborhood. Such incidents lead to heightened fear and mistrust throughout the immigrant community.

13.     In order to combat the anticipated negative effects of the citizenship question, the Cook County Board approved a resolution (Item #18-2098) in February 2018 that calls on Congress and the Secretary of Commerce to ensure Census funding, fairness, and accuracy. It cites the constitutional requirement to count all persons living in the United States, regardless of citizenship or legal status as well as research that documents the growing reluctance of immigrants to participate in surveys or census tests.  The resolution calls for Congress and the Department of Commerce to reject the Department of Justice's request to include the question. Cook County faces

6

stark demographic challenges as the largest county in the nation to witness a continuous population decline. The County is also home to over one million immigrants from all over the world, and it is vital that the diversity of our constituents be counted to ensure needed service provision and representation.

14.     On October 17, 2018, the Cook County Board of Commissioners approved a resolution (Item #18-6056) titled "Establishing the Cook County Complete Count Committee to Develop and Implement an Outreach Strategy for the 2020 Census." I was one of the co-sponsors of this resolution and successfully proposed amendments to include language that indicates the risk of a disparate impact on immigrant communities with the proposed citizenship question.  A copy of this resolution was submitted as Trial Exhibits PX-244 and PX-245.  Furthermore, the Resolution requires that adequate funding and staff be allocated to the Complete Count Committee for it to be able to carry out its functions. County officials have stated the possibility that $750,000.00 will be allocated for this purpose, although the amount has yet to be approved by the Cook County Board.

15.     In addition to this resolution, I also filed a Proposed Resolution (Item #18-6420) to "Establish an Emergency Fund to Address the Citizenship Question in the 2020 Census" for the October 17, 2018 Cook County Board of Commissioners Meeting. A copy of this Proposed Resolution was submitted as Trial Exhibit PX-243.  This fund would draw a minimum of $200,000 from the surplus in the County's operating funds and would focus on specialized outreach to immigrant communities for the 2020 Census. I plan to file a budget amendment on this matter in November. I have worked with Alderman Gilbert Villegas of the Chicago City Council to ensure a similar resolution was filed at that level of government on October 17, 2018 (Resolution #R2018-1074) which would call for an emergency fund in the amount of $500,000. A copy of this Resolution was submitted as Trial Exhibit PX-246. This Proposed Resolution, however, will not be on the agenda

until the next City Council meeting on October 31, 2018. These funds alone would cost the City of Chicago at least $700,000.00.

16.     As a member of the Cook County Board of Commissioners, I am one of the seventeen Commissioners that make up the legislative body of this unit of government. My colleagues and I are tasked with determining and voting on a balanced budget for the entire county for every fiscal year. This includes analyses of budgets proposed by all departments throughout the County and proposing new revenue sources as applicable. Furthermore, as a Commissioner, I vote to approve receipt of federal awards either to the appropriate County departments or of funds that pass through the County to smaller jurisdictions. Much of this funding is reliant on Census data.

17.     In June 2018, the Board of Commissioners, including my office, received an annual report on federal awards granted to Cook County during Fiscal Year 2017. My staff cross-checked this report with the award information made public by the Census Bureau itself. Specifically, my office used the report titled "Uses of Census Bureau Data in Federal Funds Distribution: A New Design for the 21st Century" which was issued in September 2017 by the U.S. Census Bureau to identify the federal awards granted to Cook County that are reliant on U.S. Census population data. Cook County and jurisdictions within the County currently receive over $90 million in federal funding. Fourteen of the grants from the federal government use data from the Census to determine amount of funding to award. In Fiscal Year 2017, the County and jurisdictions within the county received fourteen grants totaling more than $43 million that are affected by the Census. About half of the federal funding that the County and its jurisdictions have received is affected by the Census; these federal funds include Highway Planning and

Construction funds, Community Development Block Grants, Crime Victim Assistance, and the National School Lunch Program.

18.     The data obtained from the decennial Census and intermittent surveys assist in tracking demographic changes that determine how to prioritize the allocation of federal funding.

19.     Just over half of the federal funds that Cook County received and managed for Fiscal Year 2017 came from programs that allocate funding on the basis of Census Bureau data. In order to arrive at this conclusion, my staff made an analysis of federal grants Cook County received for Fiscal Year 2017, using an annual audit report and a listing of federal funds that use Census Bureau data. Various Cook County programs are funded by agencies and programs that rely on Census population data, with the greatest amount of funding allocated on the basis of Census data coming from the following agencies: the U.S. Department of Housing and Urban Development ($27.54 million), the U.S. Department of Agriculture ($8.4 million), and the U.S. Department of Justice ($5.9 million).

20.      An undercount would not accurately capture the population of Cook County and would result in a misinterpretation of where and how much federal funding is needed.

21.     With the reliance of these programs on federal funding, the annual award would decrease as a result of an undercount and result as an impediment to delivering needed services. For example, the WIC Special Supplemental Nutrition Program for Women, Infants, and Children provides $7.8 million to Cook County residents, which include residents of the City of Chicago, and losing any portion of that due to an undercount would negatively impact women and children during a critical time in their lives. Additionally, Community Development Block Grants awarded through the U.S. Department of Housing and Human Development have $9.5 million at stake, which could compromise needed investment in infrastructure and affordable

housing to parts of the County with limited options. The loss of such funding would starve Cook County residents of resources that should instead be expanded.

22.     The Cook County Board of Commissioners is responsible for establishing the boundaries of 17 commissioner districts. In 2011, as a member of the redistricting committee and as of the Cook County Board of Commissioners, I considered testimony and comprehensive data analyses to decide the configuration of the districts. The County Board is required by the U.S. Constitution, the Illinois Constitution, and by federal law, including the Voting Rights Act to comply with the general principle of one-person one vote as well as to take care to not diminish the voting strength of two protected minority groups.

23.     Federal and Illinois state courts have determined that Decennial Census is the only source of population and demographic data that we may use in determining the final configuration of Cook County Board districts. To that end, we require use of Decennial Census data to have a complete and accurate population count, a complete and accurate count of voting age population, and complete and accurate counts by race and ethnicity, all at the level of individual blocks in order to establish commissioner districts that are essentially equal in population and that afford African Americans/Black and Hispanics/Latinos opportunities to elect candidates of their choice pursuant to the requirements of the Voting Rights Act. Decennial Census data is modeled down to the block level using data through Public Law 94-171. The citizenship status of Cook County residents does not factor directly into the design of these election districts.

24.     I have experienced the outcomes of discriminatory redistricting in the past. The outcomes of the *Ketchum v. Byrne* litigation, which functioned as a response to the discriminatory 1981 redistricting plan for the City of Chicago that unjustly denied fair

representation for Black and Latino residents, ultimately led to my election as Alderman of the 22nd Ward in 1986. Furthermore, I am concerned that an undercount in the next Census could deprive communities in suburban areas and the collar counties of the Chicago region from creating districts where Latinos can become a supermajority, given that there has been significant growth of the Latino population in suburban areas. I have direct knowledge of concern on this matter from partners at the Mexican American Legal Defense and Education Fund and the Latino Policy Forum. Similarly, the NAACP and the Chicago Urban League have expressed concern to me that an undercount would impact the ability to draw districts in historically African American communities in the Chicago area, which have experienced dramatic population decline.

25.     Based on 2016 U.S. Census American Community Survey data, out of the seventeen Cook County districts, the 7th District which I represent has the largest foreign-born population, with 110,152 residents born outside the United States. The foreign-born population in the 7th District is among the densest per square mile, and comprises 51% to over 75% of the population within the district's boundaries. The demographic data is sourced from 2012-2016 American Community Survey 5-Year Estimates, Table #B99051 Allocation of Citizenship Status, Geography: US Census Block Group. The information on district boundaries is provided by the Cook County Bureau of Technology GIS Department, using the boundaries determined by the County Board. My staff and I have reviewed both of these sources.  The data indicates that the 7th District has the highest risk of an undercount when compared to the rest of Cook County. When compared to the rest of the State of Illinois, Cook County and its neighboring counties have the largest accumulation of hard-to-count communities. The immigrant/foreign-born population in Cook County is at largest risk of an undercount when compared to the rest of the

state as well; while, according to City University of New York data, the foreign-born population comprises approximately 15% of the state's population, the foreign-born population comprises approximately 21% of the population in Cook County alone. The data suggests that based on the higher concentration of foreign-born residents in Cook County and the 7th District in particular, the proposed citizenship question could have a disproportionate impact on people living here and more education and support is needed to tailor outreach to these residents.

26.     In 2012, at the time when the district boundaries for the Cook County Board were last established, the County Board determined that the districts must be contiguous and compact, that they must adhere to the principle of one-person one-vote, that they must conform to the requirements established by the United State and Illinois State Constitutions, and that they must conform to the Voting Rights Act as interpreted by the courts. Data with respect to voting age population and population counts of African Americans/Blacks and of Hispanics/Latinos, including those who indicate that they are one race or of several races, are used to determine whether districts do not overly pack or dilute the capacity of these minority groups from electing candidates of their choice. Other factors, such as known community boundaries, boundaries of other units of governments, known boundaries of other election districts and visible or physical barriers are secondary considerations. Knowledge of these issues is generally gathered through public testimony. The final map is decided by a vote of the Cook County Board of Commissioners following extensive public comment. Members of the County Board are also able to present amendments or substitute maps during the course of redistricting process. All amendments and substitute maps are required to rely on Census data in the same manner as the maps generated by the Cook County Board in order for them to receive consideration by the Board.

27.     An undercount affecting an identifiable population will have the effect of diluting the ability of that population to elect a candidate of its choice. This is because the process of redistricting works within a fixed jurisdiction and, in the case of Cook County, divides that population equally among seventeen election districts. Consequently, the district boundaries of an undercounted area must be unnecessarily expanded to include areas that would not otherwise be included but for the fact that the population count was flawed. Similarly, systematic undercounts of African American/Black and Hispanic/Latino populations result in districts that take in non-Latino and non-African American populations thereby diminishing the voting strength of those minority districts as well as possibly denying either of these groups an additional district in which they may elect a candidate of their choice.

28.     Such an impact on representational interests is harmful because it would limit the ability of residents in undercounted areas to have a voice within their own government. It would be less likely for policies to advance the interests of these communities to be developed and would serve to extend inequity in our society.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 2 4 day of October, 2018

Jesús G. García,
Cook County Board Commissioner, 7th District