# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 1:18-cv-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | **AFFIDAVIT OF JASON HARMON** |

Pursuant to 28 U.S.C. § 1746(2), I, JASON HARMON, hereby declare as follows:

1.      I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2.      I am the Director of the Office of the Every Student Succeeds Act ("ESSA") Funded Programs at the New York State Education Department ("NYSED") and have been employed by NYSED since 2013.  Part of my work includes overseeing the federally-funded programs described below.

3.      My office administers approximately $1.4 billion in federally funded ESSA Programs to Local Education Agencies ("LEAs"), Boards of Cooperative Educational Services ("BOCES"), and Institutions of Higher Learning ("IHL") across the State each year, and is responsible for monitoring the programmatic and fiscal components for each of the federally funded programs identified below:

   o   Title I, Part A – Improving basic programs operated by LEAs;
   o   Title I, Part C – Education of migratory children;
   o   Title I, Part D – Prevention and intervention programs for children and youth who are neglected, delinquent, or at-risk;
   o   Title I – School Improvement Grants ("SIG")
   o   Title II, Part A – Supporting effective instruction;

o   Title IV Part A – Student Support and Academic Enrichment Grants;
o   Title V, Part B – Rural education; and
o   Title IX – McKinney-Vento Homeless Assistance Act.

4.      Many of the ESSA funded programs utilize formulas that directly rely on the population counts for children living in poverty ("children counts") from the federal Census Bureau. Any decline in the number of children in these counts would have a significant impact on not only State resources, but on the ability of school districts and charter schools to serve their administrators, teachers and more importantly, the students of this State.

5.      For example, Title I, Part A funds of the Elementary and Secondary Education Act (ESEA), as amended by ESSA, are used to provide financial assistance to LEAs and schools with high numbers or high percentages of children in poverty to help ensure that all children meet challenging state academic standards. The ESSA statute requires the U.S. Department of Education ("USDOE") to calculate Title I allocations based on four formulas: Basic Grants, Concentration Grants, Targeted Grants, and Education Finance Incentive Grants ("EFIG") to LEAs. Each of these grants directly utilizes the definition of "formula children" to determine each LEA's allocation. The definition of formula children is based on annually-updated poverty estimates by the federal Census Bureau and this count affects the amount of funds an eligible LEA receives under each formula.

6.      For the basic grants formula, an LEA is eligible for funds if the LEA has at least 10 formula children and that number exceeds two percent of the Census Bureau's estimate of the LEA's ages 5 to 17 population. An LEA is eligible for concentration grants, if the LEA meets the basic grant's eligibility formula and if its number of formula children exceeds 6,500 or 15 percent of the Census Bureau's estimate of the LEA's ages 5 to 17 population. An LEA is eligible for Targeted Grants and EFIG if the LEA has at least 10 formula children and that number equals or exceeds five percent of the Census Bureau's estimate of the LEA's ages 5 to 17 population.

7.      New York State's 2017-2018 Title I, Part A allocation was $1,208,000,088 and its 2018-2019 allocation is $1,213,935,615.

2

8.      Title I, Part A funds are used by LEAs for academic support for at-risk students, including, but not limited to: academic intervention services (AIS) and response to intervention (RTI) services provided by certified teachers and teaching assistants; counseling, school-based mental health programs, specialized instructional support services, mentoring services supported by school counselors, social workers, and other support personnel; prekindergarten programs; summer and extended day programs; professional development for teachers, teaching assistants, and other school personnel; and equitable services to students in participating private schools.

9.      These programs and services for at-risk students would be directly and substantially impacted by any decrease in the count of "formula children" and the resulting decrease in Title I, Part A funds. For example, a decrease in the count of "formula children" as small as 0.02 percent could cause an LEA to lose funding under the Targeted Grants and EFIG. Among LEAs that lost funding under those two programs in the 2018-2019 school year, the average decrease was nearly 40 percent of Title I, Part A funding compared to the previous year. For one LEA, a decrease of 1.54 percent in the count of "formula children" resulted in a loss of nearly $300,000 in Title I, Part A funding in a single year. For an LEA with an average teacher salary of $50,000 when budgeting, losing $300,000 translates into a loss of approximately 6 full time academic support teachers, and potentially threatens hundreds of students with a reduction in services.

10.     Title II, Part A funds from ESEA, as amended by ESSA, are also directly reliant on poverty counts from the federal Census Bureau data.   There is a two-step allocation process for Title II, Part A funds. First, the USDOE calculates an SEA apportionment, using the most recent federal Census Bureau data. For Fiscal Year (FY) 2017, the amount of funds allocated to each state was based on the following:

- 35 percent according to each State's population of children ages 5 through 17 relative to the number of these children in all States; and

- 65 percent according to each State's relative numbers of individuals ages 5 through 17 from families with incomes below the poverty line relative to the number of these children in all States.

11.     Beginning in fiscal year 2018, new percentages have been phased in. The share of excess funds allocated on the basis of a State's relative number of children ages 5 through 17 from families with incomes below the poverty line increases and the share allocated on the basis of a State's relative number of children ages 5 through 17 decreases, as follows:

| Fiscal Year | Percentage based on population ages 5 - 17 | Percentage based on population ages 5 - 17 in poverty |
|---|---|---|
| FY 2017 | 35 | 65 |
| FY 2018 | 30 | 70 |
| FY 2019 | 25 | 75 |
| FY 2020 and subsequent years | 20 | 80 |

12.     After required reserves for subgrants to eligible LEAs and allowable reserves for administration and state-level activities, the SEA, then distributes funds to LEAs based solely on the following formula:

- 20 percent of the funds must be distributed to LEAs based on the relative numbers of individuals ages 5 through 17 who reside in the area the LEA serves (based on the most recent Census data, as determined by the Secretary); and

- 80 percent of the funds must be distributed to LEAs based on the relative numbers of individuals ages 5 through 17 who reside in the area the LEA serves and who are from families with incomes below the poverty line (based on the most recent Census data, as determined by the Secretary) (ESEA section 2102(a)).

13.     Both funding formulas directly rely on population counts from the federal Census Bureau. If the population counts for children under the Census Bureau were to decline, this would have a negative direct impact on not only statewide activities supported by the New York State Education Department, but on the nearly 1,000 school districts and charter schools across New York State.

4

14.     New York State's 2017-2018 Title II, Part A allocation was $166,390,917 and its 2018-2019 allocation is $157,360,601.

15.     Specifically, a decrease in Title I, Part A and Title II, Part A funds would immediately reduce the amount of available administrative funds used to support State-level program activities. Such a reduction would immediately and substantially diminish NYSED's capacity to: assist schools, districts, charter schools, and private schools with basic program implementation; develop tools and resources such as technical assistance aids, guidance materials, and other supports; and conduct effective compliance monitoring based on established risk protocols. A decrease in Title II, Part A funds would also drastically reduce the State's capacity to provide guidance and resources on the Next Generation Learning Standards; to train teachers in low performing schools on how to develop curriculum materials aligned to such standards; and to ensure that teachers properly prepared on these new standards and appropriately qualified to teach low income students. These supports and training are necessary to ensure that low income students will have consistent or equitable access to effective educators and properly trained and skilled teachers as compared to their peers from lower-needs communities across the state.

16.     Beyond the negative impacts described above, decreases in Title I, Part A funding as the result of a decline in population counts used in the federal Census Bureau data would also have a disproportionately negative impact on the lowest performing schools and districts in the state. Under Section 1003 of ESSA, 7 percent of Title I funds must be set-aside annually for the purposes of School Improvement. School Improvement Grants are funds that are set aside specifically for the lowest achieving schools, that have the greatest need for funding and who demonstrate the strongest commitment to ensuring funds are used to improve the academic achievement of the lowest performing students in these schools. Low performing LEAs use School Improvement funds help implement critical supports, services, and evidence-based interventions detailed in school and district-level improvement plans that are informed by a state-required review process. Funds to support improvement plans are primarily targeted at addressing (1) the specific

5

academic, social-emotional, and safety needs of students, (2) the professional development needs of teachers and (3) effectively engaging parents and families.

17.     An LEA's funding allocation for Title IV, Part A of ESSA is also contingent upon the LEA's funding allocation provided under Title I, Part A, which as described in paragraph 5 above, is directly reliant on the population counts of the federal Census Bureau.  As a result, if an LEA's Title I allocation decreases as a result of a decline in child poverty counts, its Title IV, Part A allocation will also decrease. Title IV, Part A funding is used to support well-rounded educational programs such as college and career counseling, STEM education, arts, civics and advanced programs such as International Baccalaureate/Advanced Placement; safe and healthy school programs including school climate surveys, comprehensive school mental health, drug and violence prevention, training on trauma-informed practices, and health and physical education; and to support the effective use of technology.  These services may be at risk with any decrease in funding.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 23rd day of October, 2018

JASON HARMON