UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, et al.,<br><br>        Defendants. | CIVIL ACTION NO. 1:18-cv-2921 (JMF)<br><br>**AFFIDAVIT OF CHRISTINE PIERCE** |

Pursuant to 28 U.S.C. § 1746(2), I, Christine Pierce, hereby declare as follows:

    1.    I am over the age of eighteen and have personal knowledge of all the facts stated herein.

    2.    I am the Senior Vice President of Data Science for The Nielsen Company (US) LLC ("Nielsen"). I am a social scientist by training and worked as a demographer for Nielsen prior to my current role leading a team of scientists who support Nielsen's audience measurement products. I earned a Master of Public Policy from the University of Minnesota and a graduate certificate in Applied Statistics from Pennsylvania State University. I frequently represent Nielsen at research conferences and have authored papers and presentations for the American Association of Public Opinion Research, the Advertising Research Foundation, and the Population Association of America. In the fall of 2018, the New York State Office of the Attorney General requested that I submit a voluntary affidavit in this case describing my communications with the Department of Commerce in lieu of potentially receiving a trial subpoena.

3. I am submitting this affidavit in order to ensure that the record accurately reflects my communications with the Department of Commerce.

4. In the spring of 2018, Nielsen received a request from an assistant to Secretary Ross asking to set up a meeting with someone at Nielsen who is familiar with Nielsen's use of Census data. At the time, I was under the impression that the phone call would be to discuss the importance of the Census generally, the need for Nielsen and its commercial clients to have as complete and accurate a count as possible, and to advocate for full funding for Census operations. Nielsen's SVP Community Engagement (Don Lowery) received this request. When Don Lowery sent the email connecting me to the Secretary's office he included a statement that said "Christine looks forward to speaking to the Secretary regarding the importance of the 2020 Census to Nielsen." *See* PX-532 (a true and accurate copy of email communications with Department of Commerce).

5. Prior to the phone call, Brian Lenihan from Secretary Ross's staff asked me via email for a "copy of my biography (paragraph) along with a description of Data Science/Nielsen and how Census data comes into play." I indicated that "For Nielsen, these public data sources such as the Decennial Census and ACS serve a crucial role in planning samples and consumer panels. Accurate population estimates enhances the sample design and ensures the most accurate coverage of households and persons with various demographic characteristics. Additionally, these public data sources are used to adjust the unweighted input to reflect the entire population." *See id.*

6. I exchanged several emails with the staff regarding the date/time for the call. The staff did not mention the citizenship question in any of these emails. Other than the aforementioned biography and description, Secretary Ross's staff did not ask me to provide any

other documents or data nor did I provide any other data or documents to the Department of Commerce in Spring 2018.

7. On the evening of March 23, 2018, I had a telephone call with Secretary Ross and Michael Walsh, a lawyer from the Commerce Department. This telephone call lasted approximately 10-20 minutes. This was the only time that I spoke with Secretary Ross. I understand that three days after our conversation, Secretary Ross wrote a memo in which he discussed our conversation (the "Ross Memo").

8. Prior to speaking to the Secretary, I was not aware that the citizenship question was going to be a topic of conversation. However, it immediately became apparent that the citizenship question was the only topic of conversation. Secretary Ross and Mr. Walsh told me that they needed to make a recommendation about whether to include a citizenship question on the Decennial Census and were reaching out to experts and stakeholders to gather information.

9. During this conversation, I told Secretary Ross unequivocally that I was concerned that a citizenship question would negatively impact self-response rates. I explained that people are less likely to respond to a survey that contains sensitive questions. I also added that increasing the length of a survey can reduce response rates. I discussed the impact that lower response rates have on survey costs. I emphasized that Census non-response follow up operations are expensive because they require a full count and non-response follow up operations for the Decennial Census include in-person data collection.

10. The Ross Memo states that I "confirmed that, to the best of [my] knowledge, no empirical data existed on the impact of a citizenship question on responses." (Ross Memo at 3). I did not say "to the best of [my] knowledge no empirical data existed on the impact of a citizenship question on responses." I did discuss the importance of testing questions to

understand any impacts to response and I explained that a lack of testing could lead to poor survey results. I confirmed that I was not aware of any such test of a citizenship question by the Census Bureau. I cannot and did not attempt to quantify the extent of the reduction in self response.

11. During our conversation, Secretary Ross and Mr. Walsh asked me if Nielsen asked any sensitive questions. I told them that Nielsen does not ask about citizenship status on its surveys but that we do have surveys that occasionally include sensitive questions.

12. The Ross Memo explains that Nielsen "stated that it had added questions from the ACS on sensitive topics" including "immigration status to certain short survey forms without any appreciable decrease in response rates." (Ross Memo at 3). I did not state that Nielsen had added "questions concerning immigration status to short survey forms without any appreciable decrease in response rates."

13. I did explain to Secretary Ross and Mr. Walsh that Nielsen does ask certain questions from the ACS in our surveys and of our panelists, including place of birth and year of entry to the United States. I stressed the importance of specifically testing changes to questionnaires and that Nielsen had done such testing specifically because we anticipated these sensitive questions could have a negative impact on response rates. I did confirm that these place of birth and year of entry questions had not caused a significant decline in response rates on Nielsen surveys or in our panels. But I did not suggest that Secretary Ross could draw parallels between the surveys conducted by Nielsen and the Decennial Census.

14. Nielsen's survey and panel operations are entirely different from the Decennial Census operations. Nielsen surveys are not conducted by a government agency and are not required by law. Nielsen studies are intended to understand consumer purchases and media

usage. Response rates to the Nielsen surveys and panels in my purview generally range from 5% to 40%. If individuals do not answer a Nielsen survey or decline to participate in a panel, Nielsen will select and recruit different respondents to ensure we have the desired reporting sample size. While we strive for an accurate representation of the population, we are not required to count all people. And unlike the Census, Nielsen provides incentives – usually cash – for filling out our surveys.

15. To my knowledge, the Department of Commerce has not asked for any documents related to Nielsen's survey work or questionnaire testing. To my knowledge, no one else at Nielsen has been asked for, or provided, any additional data, documents, or surveys to the Department of Commerce in response to the discussions around the citizenship question.

16. I have reviewed a copy of the Commerce Department's notes of my March 23, 2018 conversation, marked as page 1276 in the Administrative Record ("AR 1276") for this case.

17. AR 1276 states that "Ms. Pierce stated that including a question on citizenship could make people less likely to respond, but that there is no data to predict how much lower the response rate might be." I do not recall making this statement as worded here. Any statement like this would have been in the context of stressing the importance of conducting specific tests for the purpose of predicting the response rates. Adding a citizenship question to the Decennial Census introduces risk specifically because the impacts have not been tested.

18. AR 1276 states that I "noted that in the only specific situation she was aware of that sensitive questions were tested on a short questionnaire, there was no impact on response rates." I did not state that "in the only specific situation that I was aware of that sensitive questions were tested on a short questionnaire, that there was no impact on response rates." However, I did discuss Nielsen's use of certain ACS questions and how Nielsen has tested those

questions specifically to understand any impact to response. I did not provide any written reports with testing results nor did I provide Nielsen data in an attempt to estimate the impact of adding a citizenship question to the Decennial Census.

Executed on October 25, 2018.

*Christine Pierce*
Christine Pierce