## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | CIVIL ACTION NO. 1:18-cv-2921 (JMF) |
| Defendants. | **AFFIDAVIT OF ARTURO VARGAS** |

Pursuant to 28 U.S.C. § 1746(2), I, Arturo Vargas, hereby declare as follows:

### I.     Introduction:

1.   I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2.   I serve as Chief Executive Officer of the NALEO Educational Fund. The NALEO Educational Fund is a nonprofit, nonpartisan organization that promotes full Latino participation in the American political process, from citizenship to public service.  NALEO Board members and its constituency encompass the nation's more than 6,600 Latino elected and appointed officials, and include Republicans, Democrats and Independents.

3.   NALEO has several decades of experience working closely with its Latino elected official constituency, the Census Bureau, other government officials, and partner organizations, to promote public policies to achieve the most accurate count possible of the nation's population. NALEO Educational Fund has served as a member of the U.S. Census Bureau's national advisory committees since 2000.

4.   I represent NALEO Educational Fund on the U.S. Census Bureau's National Advisory Committee on Racial, Ethnic, and Other Populations ("NAC").  I have served in this capacity, or on predecessor Committees, for the past two decennial censuses, under both Republican and Democrat administrations.  As a member of the NAC, I attend the semi-annual meetings of the Committee and periodic webinars where the Census Bureau staff present updates to all aspects of its work, including preparations and progress for the decennial census, the American Community Survey, and other functions.  The Census Bureau solicits the advice and recommendations from the Committee members on its work.

## II.        **History and Role of Advisory Committees**:

5.   For the 2000 Census, the Commerce Secretary had a Census Advisory Committee. For the 2010 Census, another committee called the National Advisory Committee replaced that Advisory Committee.

6.   In 2012, the Secretary of Commerce re-chartered the National Advisory Committee as the Census Bureau National Advisory Committee on Racial, Ethnic, and Other Populations ("NAC"). NAC is a channel of communication between the Census Bureau and race, ethnic, and other communities, focusing "on the identification of new strategies for improved census operations, survey and data collection methods, including identifying cost-efficient ways to increase census participation and reduce the undercount."[1]

7.   The purpose of the NAC is to provide expert resources to the Census Bureau. Specifically, the charter of the NAC charges NAC with providing the Census Bureau its insight, perspective, and expertise in the following areas: "developing appropriate research and methodologies, operations, communications, and strategies to reduce program/survey costs;

---

[1] https://www.census.gov/about/cac/nac.html

2

improving coverage and operational efficiency; improving the quality of data collected; protecting the public's and business units' privacy; enhancing public participation and awareness of Census Bureau programs and surveys; improving the dissemination of data products; and the use of administrative records and third party data in the decennial census."[2] The Census Bureau selects members of the NAC based on their expertise related to the above-mentioned areas, as well as expertise related to hard to count populations, race and ethnicity, language, aging populations, American Indian and Alaska Native tribal considerations, new immigrant populations, populations affected by natural disasters, highly mobile and migrant populations, complex households, rural populations, population segments with limited access to technology, data privacy, and confidentiality.

8.   The NAC consists of up to 32 members appointed by the Director of the Census Bureau.  Some members serve in their individual capacity as content experts, other members are organizations who represent a key stakeholder community, such as NALEO Educational Fund.

9.   Beginning in 2017, I observed that the Census Bureau staffing support for the NAC reduced from six people to one person.

10. There are currently several vacancies on the NAC, which the current Director has not filled. The seats became vacant after the June 2018 meeting of the NAC because the members – one with expertise on privacy issues, and another with expertise on issues of young children – were termed out. Normal course has been that the Director would fill any vacant seats on the NAC before any upcoming meeting; the next meeting for the NAC is November 1-2, 2018.

11. The Census Bureau and the NAC officially meet twice a year, and at working groups, which are essentially sub-committees of the NAC. A typical meeting of the NAC is held at the

---

[2] https://www2.census.gov/cac/nac/nac-charter.pdf

Suitland headquarters of the Census Bureau and presided by the Designated Federal Officer and the Chair and Co-Chair of the NAC. The agenda is set by the leadership of the Census Bureau in consultation with the Chair and Co-Chair. The meetings typically consist of presentations by Census Bureau staff, prepared reactions by a NAC member, and discussion by the full Committee. The NAC members then develop and agree on recommendations to the Census Bureau on the matters discussed. The Bureau responds to the NAC's recommendations in writing, indicating whether the recommendations are accepted or rejected, and the reasons for doing so. In addition, for the decennial census, there are working groups on issues such as language, the undercount of young children, and partnerships and communications. I sit on the working groups for the undercount of young children and for partnerships and communications.

12. The Census Bureau provides members of the NAC with periodic updates on its progress for the decennial Census, and its work on other surveys including the American Community Survey. On something as fundamental as adding or changing a question, it is normal course for the Census Bureau to consult the NAC before making the decision to add the question. Prior to the citizenship question, the Census Bureau consulted regularly on significant issues relating to the census. To have not been consulted on the addition of the citizenship question to the decennial census was a departure from previous practice.

**III.     Typical Involvement of NAC in Census Questionnaire:**

13. When contemplating the addition of a race/ethnicity question to the census, the Census Bureau engaged with the NAC and several stakeholder organizations over a period of approximately 10 years as part of the research and testing of a revised question on race and ethnicity. Beginning in 2009, the Census Bureau began considering a change to the race and ethnicity question on the decennial census. The Bureau first identified research areas to explore before engaging in testing to

add the question, and embedded alternative questions on how to ask race/ethnicity in the 2010 census. At the conclusion of the 2010 Census, the Bureau then prepared an analysis on how individuals answered different versions of the questions. The Bureau then engaged in more research using the results of the analysis, this included focus groups, consultations, and more tests.

14. The NAC played a major consulting role in this process. The Bureau provided NAC with detailed briefings on the results of the Alternative Question Experiment that was embedded in the 2010 Census and subsequent focus groups, which were the largest and most detailed research ever undertaken by the Census Bureau to develop a new question for the decennial census. The Census Bureau also participated in two briefings organized by NALEO Educational Fund, which I led, to explain the Bureau's research and findings to key stakeholders in the Latino community and solicit their feedback. None of this occurred with the citizenship question.

## IV.   Advisory Committees Excluded From Consultation On Citizenship Question:

15. The NAC was never advised by the Census Bureau that it was considering adding a question on citizenship.

16. The NAC was not consulted before the decision to add the citizenship question and the addition of the question was not included as an agenda matter when the NAC met in June 2018, the first meeting after Secretary Ross issued his decision memorandum. The decision to add the citizenship question was undoubtedly rushed and made outside of the window between NAC meetings. This timeline prevented any meaningful input from NAC; a fact that was and still is alarming.

17. On December 20, 2017 – approximately one week after the Department of Justice requested the addition of the citizenship question – I met with Undersecretary Karen Dunn Kelley at the Department of Commerce. At no point during this meeting did she or anyone else present at

the meeting bring up the addition of the citizenship question to the decennial census. Also present at the meeting were Dr. Ron Jarmin, Enrique Lamas, and a representative of the Department of Commerce. The purpose of the meeting was for me to meet the Undersecretary and to share with her NALEO's primary concerns about the progress toward the Decennial Census, and the issues I believed she should direct her attention.

18. No one from the Department of Commerce or Census Bureau raised the subject of a citizenship question with the NAC. Most NAC members learned of the issue through media reports that first emerged in late December 2017.

19. On December 29, 2017, I learned about the Department of Justice's request to add a citizenship question after a reporter called me asking for my reaction. I then reached out via email to Undersecretary Kelley to express my concerns about the addition of the question. I received an email reply from Dr. Jarmin who indicated that the Census Bureau was looking at developing options other than adding a question to meet the needs of the Department of Justice.

20. On March 12, 2018, I received an email from Dr. Ron Jarmin requesting that I schedule a telephone conversation with Secretary Ross so that he could hear my concerns about adding a citizenship question on the decennial Census.

21. On March 13, 2018, I spoke via telephone with Secretary Ross and the Deputy General Counsel. Secretary Ross said that he was gathering information to respond to the request from the Department of Justice to add a citizenship question and that he was in a "listening only mode." I expressed my concerns about adding the question, reminding the Secretary that in November the Census Bureau's Center for Survey Measurement had issued a memorandum, which documented the recent challenges Census Bureau staff had in securing the participation and trust of immigrants in surveys. I also told him that several NALEO members who are elected officials

expressed that they would not encourage their constituents to complete their census forms if a citizenship question is added for fear that the Trump Administration would use the information against them.

22. On March 26, 2018, just three months after receiving the DOJ letter, Secretary Ross announced that he was putting the citizenship question on the decennial census. As mentioned above, this unusual and rushed timeline meant that the NAC was not consulted on the topic of the citizenship question, a significant deviation from prior practice on a topic of such importance.

23. In June 2018, the NAC strongly recommended that the Census Bureau not include a question on citizenship because of the impact it would have on response rates. The NAC also recommended that if the question is included on the 2020 questionnaire, that the Census Bureau not conduct Non Response Follow Up for returned questionnaires that leave the citizenship question unanswered to limit fear in hard to count communities. The Census Bureau rejected both recommendations.

24. The process by which the Census Bureau decided to add the citizenship question was unique, as it did not include consultation with the NAC before the decision was made – a deviation from past practice. For a decision as significant as this, the decision has never been this rushed, left this many unanswered questions about its implementation, or gone without meaningful consultation from key committees.

25. Both NALEO and I are "trusted messengers," for the Census Bureau, i.e., organizations or community leaders that the Bureau relies on to relay assurances to the public on issues such as the confidentiality of census information, and the overall safety in filling out the census. Both NALEO and I will cooperate with the Census Bureau in this context; however, currently it is not clear how we should advise our members in terms of messaging and processes

related to non-response follow up, as we have received no direction on this from the Census Bureau. And any research NALEO has done to anticipate messaging strategies has shown that individuals are scared to answer the citizenship question for fear of disclosure of that information to other government entities.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on the 23rd day of October, 2018.

ARTURO VARGAS
Executive Director, NALEO Educational Fund