UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et al., <br><br> Defendants. | CIVIL ACTION NO. 1:18-cv-2921 (JMF) <br><br> **AFFIDAVIT OF** <br> **TODD A. BREITBART** |

Pursuant to 28 U.S.C. § 1746(2), I, Todd A. Breitbart, hereby declare as follows:

1. I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2. I directed the staff work on redistricting, with the title of Sr. Research Analyst, for successive Minority (Democratic) Leaders of the New York State Senate from 1980 until my retirement in 2005. I was the principal consultant to the Committee on Election Law of the Bar Association of the City of New York in the development of its 2007 report on reform of the New York State redistricting process, and I drafted the text of the report. As a member of the Minority Leader's staff, I marshalled the evidence for plaintiffs challenging the Senate districts enacted in 1992 (*Dixon v. Cuomo*, consolidated on appeal with *Wolpoff v. Cuomo*, 80 N.Y.2d 70 (1992)) and 2002 (*Rodriguez v. Pataki*, 308 F.Supp.2d 346 (2004)). Independently of my former employers, I submitted extensive oral and written testimony to the NYS Legislative Task Force on Reapportionment (LATFOR) during the 2012 redistricting round, including proposed plans of Senate districts. I was the principal witness, as a fact witness, for the plaintiffs challenging the Senate redistricting in subsequent litigation (*Cohen v. Cuomo*, 19 N.Y.3d 196 (2012), in which I was also a plaintiff, and the later stages of *Favors v. Cuomo*, 39 F. Supp. 3d 276 (2014)). I am

the co-author of the chapter on redistricting (Chap. 4) in P. Galie, C. Bopst, and G. Benjamin, eds., *New York's Broken Constitution* (State University of NY Press, 2016).

3. Beginning with the Constitution of 1821, New York State had excluded aliens from the population basis for legislative apportionment. Under the Constitution adopted in 1894, provisions in Article III §4 continued this practice.

4. In 1969, the voters approved an amendment adding §5-a to Article III, requiring that legislative redistricting in New York be based on the whole number of persons, including non-citizens. Although the citizen-population provisions in Article III §4 have not been deleted, they are negated by §5-a. Legislative redistricting in New York has since been based on the whole number of persons as reported in the decennial census. These reports are now known as the PL94-171 redistricting data set (a reference to the statute, enacted in 1975, that makes available to the states what is now known as the Voting District Project). There is no other source for a count of the whole number of persons at the block level. New York State would not have the resources or expertise to substitute its own efforts for those of the Census Bureau.

5. In the PL94-171 redistricting data set from Census 2010, New York has 350,169 census blocks, including: 242,807 with a non-zero population; 52,976 with a population of one to 10 persons; 142,857 with a population of 11 to 100; 26,404 with a population of 101 to 200; and 20,570 with a population exceeding 200.

6. As of 2012, New York State was required to obtain preclearance from the Department of Justice or from a three-judge federal court in the District of Columbia, under §5 of the Voting Rights Act, for any change affecting voting – including redistricting plans – affecting three counties: Bronx, Kings, and New York. The purpose of this requirement was to ensure that any such redistricting plan would not reduce the electoral power of minority groups in those

counties. New York State's 2012 preclearance submission to the Department of Justice, including all data and documents submitted, is available on the LATFOR website, under the heading "DOJ Submission", at the following address: http://latfor.state.ny.us/justice2012/. The submission offers no citizenship data in support of the application for preclearance. Although the Justice Department's procedures for administration of Section 5 of the Voting Rights Act provided that the Department could request additional information if necessary to determine if the preclearance standard had been met, 28 C.F.R. 51.37, there is no indication that the Department of Justice asked for any additional data before granting preclearance.

7. The constitutional amendment approved by New York voters in 2014 provides for an 'Independent Redistricting Commission' that is to hold hearings and recommend congressional and legislative redistricting plans to the Legislature. The principal provisions governing the appointment and function of the 'Independent Redistricting Commission' are to be found in Article III, §§4 and 5-b. The Commission does not yet exist, and its members must be appointed by February 1, 2020. Since that is rather a late date for the Commission to begin assembling a staff and working on databases, it will presumably depend heavily on the work of LATFOR staff. If the Legislature chooses to reject the Commission's recommendation and "draw its own lines" (see *Lieb v. Walsh*, N.Y. Supreme Court, Albany, 2014, slip. op. 24262, at 6), LATFOR will presumably provide the Legislature with the technical resources to craft the districts.

8. By causing an underreporting of the non-citizen population, the proposed citizenship question will impair the constitutionally protected right of ***minority-group voting-age citizens*** to be represented in Congress equally with all other persons in their respective states of residence. In other words, among other likely harms, it will impair the right to representation of

precisely those persons whose right to congressional and legislative representation would supposedly be protected by better enforcement of §2 of the Voting Rights Act.

9. In states to which more than one congressional seat is apportioned, the districts must be as nearly equal in population as possible. There is no *de minimis* population deviation, even the smallest population deviation must be justified, and any avoidable population deviation impairs the right to representation of all persons in the overpopulated districts (*see Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964); *Karcher v. Daggett*, 462 U.S. 725, 734 (1983); *Evenwel v. Abbott*, 136 S. Ct., 1120, 1124 (2016): "States must draw congressional districts with populations as close to perfect equality as possible."). Although the current New York congressional districts, which have a maximum population deviation of one person, were imposed by a district court (*see Favors v. Cuomo*, 2012 US Dist LEXIS 36910, at *6 (E.D.N.Y. Mar. 19, 2012)), not enacted by the Legislature, the Legislature previously adhered to the same strict standard when it fulfilled its obligation to enact congressional districts in 1992 and 2002 (the two previous post-*Karcher* redistrictings). New York is not exceptional. After the 2010 census, according to the National Conference of State Legislatures in a study available at http://www.ncsl.org/research/redistricting/2010-ncsl-redistricting-deviation-table.aspx, 30 of the 43 states with more than one representative adopted congressional redistricting plans with maximum population deviations of no more than one person.

10. Data from the American Community Survey 2012-16 five-year estimates shows that there is a strong tendency for minority-group voting-age citizens to be concentrated in the same congressional districts as non-citizens. In New York State, the five congressional districts in which non-citizens constitute the highest percentages of the total population are, in descending order: CD 14 (population 25.11% non-citizen), where 68.40% of the citizens of voting-age are

members of minority groups; CD 6 (population 21.20% non-citizen), where 55.73% of the citizens of voting-age are members of minority groups; CD 15 (population 21.08% non-citizen), where 96.58% of the citizens of voting-age are members of minority groups; CD 7 (population 20.04% non-citizen), where 64.80% of the citizens of voting-age are members of minority groups; and CD 13 (population 19.23% non-citizen), where 82.74% of the citizens of voting age are members of minority groups. In contrast, the five congressional districts in which non-citizens constitute the lowest percentages of the total population are, in ascending order: CD 27 (population 1.34% non-citizen), where 6.49% of the citizens of voting-age are members of minority groups; CD 21 (population 1.59% non-citizen), where 8.23% of the citizens of voting-age are members of minority groups; CD 23 (population 2.22% non-citizen), where 8.51% of the citizens of voting-age are members of minority groups; CD 22 (population 2.33% non-citizen), where 8.82% of the citizens of voting-age are members of minority groups; and CD 24 (population 2.70% non-citizen), where 13.28% of the citizens of voting age are members of minority groups. A differential undercount of non-citizens, and of citizens who share a household – and a census return – with non-citizens, will therefore cause congressional districts with a high percentage of minority-group citizens of voting age to have a larger population than the PL94-171 data would seem to indicate. If congressional districts are created with equal *reported* populations, the districts with a high percentage of minority-group citizens of voting age will have a larger *actual* total population than districts with a relatively small non-citizen population and a relatively small percentage of minority-group citizens of voting age.

11.     Although I have focused the preceding discussion on minority-group citizens of voting-age – the citizens whose rights to representation would presumably be protected by better enforcement of VRA §2 – all persons residing in the *actually* overpopulated districts would

suffer an impairment of their constitutional right to congressional representation equal to that enjoyed by other residents of the same states. It should also be noted that if congressional districts have equal populations as *reported* in the decennial census, this impairment would not depend on varying partisan or procedural factors. It would occur if congressional redistricting were dominated by Democrats, Republicans, or neither party, and if the congressional districts were devised by a legislature, a commission of whatever sort, or a special master appointed by a District Court.

12. A differential undercount of non-citizens and of citizens who share a household with non-citizens will also harm those regions within a state, such as New York City, where a disproportionate share of the state's non-citizen population resides. In the total population estimates associated by the Census Bureau with the 2012-16 five-year ACS estimates, New York State has a total population of 19,697,457, and New York City has a total population of 8,461,961 – 42.96% of the state total. New York State is estimated to have a non-citizen population of 2,020,397, and New York City is estimated to have a non-citizen population of 1,438,215. Thus, non-citizens are estimated to constitute 10.26% of the state population, 17.00% of the New York City population, and 5.18% of the total population of the 57 counties outside of New York City. Put another way, New York City, with 42.96% of the total state population, has 71.18% of the non-citizen population, while the other 57 Counties, with 57.04% of the total state population, have 28.82% of the non-citizen population. Consequently, if inclusion of a citizenship question in the decennial census discourages participation by non-citizens and those with whom they share a household, the people of New York City as a whole will be disadvantaged in relation to other residents of the state in the apportionment of congressional and legislative districts, and in any distribution of funds that depends on the count of total population.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 26TH day of October, 2018

Todd A. Breitbart