# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:18-CF-05025-JMF
------------------------------------x
NEW YORK IMMIGRATION COALITION, ET AL.,

Plaintiffs,

- against -

UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

Defendants.
------------------------------------x

August 24, 2018
9:07 a.m.

Global objection: 401, 403

Videotaped Deposition of WENDY TERAMOTO, taken by Plaintiffs, pursuant to Notice, held at the offices of Arnold & Porter Kaye Scholer LLP, 250 West 55th Street, New York, New York, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION

REDACTED

REDACTED

A P P E A R A N C E S:

ARNOLD & PORTER KAYE SCHOLER LLP

REDACTED

Attorneys for New York Immigration Coalition, CASA De Maryland, American-Arab Anti-Discrimination Committee, ADC Research Institute and Make the Road New York

BY: DAVID GERSCH, ESQ.

REDACTED

DYLAN SCOT YOUNG, ESQ.

REDACTED

CHASE R. RAINES, ESQ. (Via Phone)

REDACTED

AMERICAN CIVIL LIBERTIES UNION

REDACTED

Attorneys for New York Immigration Coalition

BY: DALE HO, ESQ.

REDACTED

COVINGTON & BURLINGTON LLP

REDACTED

Attorneys for Kravitz Plaintiffs

BY: DANIEL T. GRANT, ESQ.

REDACTED

DANIELS WOLIVER KELLEY

REDACTED

Attorneys for Los Angeles Unified School District

BY: KEITH YEOMANS, ESQ. (Via Phone)

REDACTED

REDACTED

A P P E A R A N C E S: (Continued)

MALDEF

REDACTED

Attorneys for LUPE Plaintiffs

BY: DENISE HULETT, ESQ.

REDACTED

JULIA GOMEZ, ESQ.

REDACTED

ANDREA SENTENO, ESQ. (Via Phone)

REDACTED

ASIAN AMERICANS ADVANCING JUSTICE

REDACTED

Attorneys for LUPE Plaintiffs

BY: NIYATI SHAH, ESQ. (Via Phone)

REDACTED

MANATT, PHELPS & PHILLIPS LLP

REDACTED

Attorneys for City of San Jose & Black Alliance for Just Immigration

BY: ANDREW CASE, ESQ.

REDACTED

LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW

REDACTED

Attorneys for City of San Jose & Black Alliance for Just Immigration

BY: EZRA ROSENBERG, ESQ.

REDACTED

REDACTED

A P P E A R A N C E S: (Continued)

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL

REDACTED

Attorneys for State of California

BY: GABRIELLE BOUTIN, ESQ.

REDACTED

MATTHEW WISE, ESQ. (Via Phone)

REDACTED

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

REDACTED

Attorneys for State of New York

BY: ELENA GOLDSTEIN, ESQ.

REDACTED

MATTHEW COLANGELO, ESQ.

REDACTED

ALEX W. FINKELSTEIN, ESQ.

REDACTED

U.S. DEPARTMENT OF JUSTICE

REDACTED

Attorneys for Defendants

BY: CARLOTTA WELLS, ESQ.

REDACTED

KATE BAILEY, ESQ.

REDACTED

REDACTED

A P P E A R A N C E S: (Continued)

U.S. DEPARTMENT OF COMMERCE

REDACTED

Attorneys for Defendants

BY: MICHAEL J. WALSH, JR., ESQ.

REDACTED

DAVID M.S. DEWHIRST, ESQ.

REDACTED

ALSO PRESENT:

CARLOS KING, Videographer

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| TERAMOTO | GERSCH | 9 |
| | GOMEZ | 142 |
| | CASE | 170 |
| | WELLS | 241 |

E X H I B I T S

| TERAMOTO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Bates 001321 | 23 |
| Exhibit 2 | Bates 0003699 | 28 |
| Exhibit 3 | Bates 000763-000764 | 38 |
| Exhibit 4 | Bates 0002461 | 49 |
| Exhibit 5 | Bates 0001411-0001412 | 58 |
| Exhibit 6 | Bates 0002519-0002520 | 63 |
| Exhibit 7 | Bates 0002458 | 67 |
| Exhibit 8 | Bates 0002628-0002629 | 71 |
| Exhibit 9 | Bates 0002651-0002652 | 75 |
| Exhibit 10 | Bates 0002528 | 83 |
| Exhibit 11 | Bates 0002636-0002638 | 87 |
| Exhibit 12 | Bates 001313-001320 | 115 |
| Exhibit 13 | Bates 0003694 | 195 |
| Exhibit 14 | Bates 0003695-0003697 | 199 |
| Exhibit 15 | Prepared Statement of John H. Thompson | 205 |
| Exhibit 16 | Bates 0002167-0002169 | 211 |
| Exhibit 17 | Bates 0002646-0002648 | 216 |
| Exhibit 18 | Bates 0002160-0002162 | 221 |
| Exhibit 19 | Bates 0002199-0002204 | 223 |
| Exhibit 20 | Bates 0002525 | 226 |
| Exhibit 21 | Bates 0003597 | 229 |

REDACTED

DIRECTIONS NOT TO ANSWER

| Page | Line |
| --- | --- |
| 72 | 1 |
| 72 | 13 |
| 81 | 11 |
| 114 | 16 |

REQUESTS

| Page | Line |
| --- | --- |
| (NONE) | |

REDACTED

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:07 a.m. on August 24th, 2018.

Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference. Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number one of the video-recorded deposition of Wendy Teramoto taken by counsel for plaintiffs in the matter of New York Immigration Coalition, et al., versus United States Department of Commerce, et al., filed in the United States District Court, Southern District of New York, case number 1:18-CF-05025-JMF. This deposition is being held at the offices of Arnold & Porter located at 250 West 55th Street, New York, New York.

REDACTED

My name is Carlos King from the firm of Veritext and I am the videographer. The court reporter is Todd DeSimone also from Veritext. I'm not authorized to administer an oath, I'm not related to any party in this action, nor am I financially interested in the outcome.

All appearances will be noted on the steno record. Will the court reporter please swear in the witness.

* * *

W E N D Y T E R A M O T O,

called as a witness, having been first duly sworn, was examined and testified as follows:

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Page 14

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. All right. When did you first

REDACTED

hear about the notion of adding a question about citizenship to the census?

A. I just don't remember.

Q. Is there any way you would be able to date that?

A. No.

Q. Is there any kind of document that you remember as -- well, withdrawn.

How did you first hear about the notion of adding a citizenship question to the census?

A. I don't remember.

Q. Would that be reflected in any documents?

A. Not that I would be aware of.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Do you remember that there was a time when the question of adding a citizenship question to the census came up?

MS. WELLS: I object to form.

A. I don't remember a specific conversation or meeting where it came up.

REDACTED

REDACTED

REDACTED

Q.      Did you undertake any tasks related to trying to get a citizenship question put on the census?

A.      Did I personally?  No.

Q.      None whatsoever?

A.      Did I ever -- I guess I'm a little confused.  You are asking if I did anything for the citizenship question?

Q.      I'm asking if you did anything to try and help get a citizenship question put on the census.

A.      No.

REDACTED

REDACTED

REDACTED

Q. For the record, this is Bates stamped 3699. It is an e-mail thread, the top one of which states that it is from Secretary Ross sent May 2nd, 2017 to Wendy Teramoto, "Re: Census."

Take a moment to read this, I think most of it is blacked out, and let me know when you've had a chance to do that.

(Witness perusing document.)

A. Okay.

Q. Ms. Teramoto, let me direct you to the middle of the document where it says "Begin Forwarded Message: From: Alexander, Brooke, To: Wendy Teramoto."

Do you see that?

A. Uh-huh. Yes, sir.

Q. So this appears that she is forwarding a message, and then the message

REDACTED

that she appears to be forwarding is headed Original Message from Wilbur Ross to Earl Comstock and Ellen Herbst.

You see that, right?

A. Correct. I'm not on the original e-mail.

Q. Correct.

And then Secretary Ross has written "Worst of all, they emphasize they have settled with Congress on the questions to be asked. I am mystified why nothing have been done in response to my months old request that we include the citizenship question. Why not?"

All right, this question appears to have been forwarded to you May 2nd, 2017. Do you remember that?

A. I don't -- I don't remember receiving it.

Q. Do you deny receiving it?

A. No.

Q. And then above the forwarding part, there is a message that says "Wendy Teramoto wrote: I continue to talk frequently with Marc Neumann and we often

REDACTED

have dinner together. He will not leave les, but is in love with the census and talks about it nonstop. Do you want me to set up another meeting? Let me know if you want to have a drink or get together over the weekend."

Then Secretary Ross has written in response to you, "Let's try to stick him in there for a few days to fact-find."

Do you see that?

A. Yes, sir.

Q. So you would have received this at the beginning of May, and the message that is forwarded to you has Secretary Ross complaining that nothing has been done in response to his months-old request that we include a citizenship question.

Does this help you remember that you had some involvement in getting the citizenship question on the census?

A. No.

MS. WELLS: Objection to form.

A. Well, wait a minute. First of all, this is -- this is two sentences out of an e-mail that I have no idea what else

REDACTED

was said. It is titled Census.

So this has -- I mean, just because, you know, for you to imply that because I had suggested he set up a meeting or talk to somebody who worked on the transition team for census has nothing to do with, in my eyes, the citizenship question. It has to do with the census as a whole.

Q. Ms. Teramoto, you started earlier in your answer referencing that there were things in the message that you can't read.

Do you understand that it is the government lawyers who have blocked that information out?

A. Between all the lawyers, I mean, you know, it's not -- I'm not part of the process of what is shown or what's not. I know that they follow the rules and regulations of what they are supposed to do.

Q. My question is, do you understand that it is the government lawyers who have blocked that information

REDACTED

out that you say you can't read on here?

A. If that's what you are telling me, I have no reason to believe that it's not true.

Q. All right. When Secretary Ross says "I'm mystified why nothing have been done in response to my months old request," why did Secretary Ross request as of several months apparently before May 2nd, 2017, why did he request that a citizenship question be included on the census?

A. I have no idea. I mean, as you have correctly pointed out, this was in May. I didn't write the e-mail and I wasn't even -- he didn't even send it to me.

Q. I take it your testimony is that Secretary Ross never told you the reason that he made such a request?

A. I have never asked.

Q. That's not my question. Did he ever tell you?

A. No.

Q. Did you ever learn to whom he made that request?

REDACTED

A. Of what?

Q. The request to add a citizenship question.

MS. WELLS: I object to form.

A. I guess I'm confused. Can you please repeat the question?

Q. Certainly.

He says he "made a months old request that we include a citizenship question." Did you ever learn to whom he made the request?

A. I have no idea.

REDACTED

Who is Marc Neumann?

A. So Marc Neumann was somebody that I met on the transition team who had worked at Census before.

Q. And did you discuss the citizenship question with Marc Neumann?

A. Did I?

Q. Yes.

REDACTED

A. Not that I remember.

Q. And --

A. Again, a lot of the census focus was on the budget and how are you going to properly ramp up half a million employees in such a short amount of time.

Pl. objection: 611(a) - nonresponsive

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. Did you ever speak with Marc Neumann about the citizenship question?

A. Not that I remember.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. All right. So there is an e-mail from Kris Kobach to you, July 21, in which he says -- he references meeting you on the phone this afternoon.

Do you recall speaking with Kris Kobach?

REDACTED

A. Not at all.

Q. You don't deny speaking with him?

A. I think you asked me if I remember. I don't remember talking to him.

Q. This is a different question. You don't deny speaking with him?

A. Given this e-mail, I would assume that I spoke to him, but I don't remember ever speaking to him.

Q. All right. And he asks -- withdrawn.

He says that he had sent an e-mail to Secretary Ross and he attaches it here. You see that, correct?

A. Well, I see his e-mail to me says "Below is the e-mail that I sent to Secretary Ross."

Q. Okay.

A. So I assume however this is produced, it would have been this e-mail.

Q. All right. And one of the things that the e-mail that Kris Kobach forwards to you, one of the things in it is

REDACTED

the statement "It is essential that one simple question be added to the upcoming 2020 census," that's the first sentence of the second paragraph of this forwarded e-mail; do you see that?

A. The second -- the first sentence of the second paragraph that Kris Kobach sent to, I believe it is Secretary Ross, but I can't say his -- there is no e-mail address -- says "It is essential that one simple question be added to the upcoming 2020 census."

Q. All right. When you spoke with Kris Kobach, didn't he talk to you about adding a citizenship question to the census?

A. Again, I have no recollection ever speaking to him.

Q. Who did you understand Kris Kobach to be at the time?

A. I had no idea.

Q. Do you typically set up meetings with the Secretary or calls with the Secretary to people -- with people you have no idea who they are?

REDACTED

A. You asked me, sir, if at the time if I knew who Kris Kobach was, and I said I didn't.

Q. Correct. I have asked you a different question now.

A. Okay. Could you please repeat it?

Q. My question is, would you typically set up a call for the Secretary with somebody who you didn't know anything about who they were?

A. Well, no.

Q. Why did you do so on this occasion?

A. Here it looks as though he forwarded to me and told me who he was.

Q. Okay. And why did you set up a call with him with the Secretary?

A. At this point in time, I don't remember.

Q. It had to do with the citizenship question, didn't it?

A. He had sent an e-mail requesting a call, and I don't remember, well, it looks like I set it up, so, you

REDACTED

know --

Q. Ms. Teramoto, my question is simply, the call that you set up, that was for the purpose of discussing the citizenship question, correct?

A. It was -- I would have set up the call because somebody had asked for a call with the Secretary.

Q. Didn't you set it up for the Secretary in part because it was about the citizenship question?

A. I would have set up the call because somebody had asked for the call with the Secretary. It wouldn't be specifically because of a certain question.

Q. You wouldn't set up a call for anyone who asks for a call with the Secretary, would you?

A. If there is somebody who wants to speak to the Secretary and it seems like it is something that he would want to talk about, then I would set it up.

Q. So I take it he would, in your mind, he would have wanted to talk about the citizenship question?

REDACTED

A. I would have set up the call if somebody like this would have asked for a call with the Secretary, so if another Secretary of State had asked for some call with the Secretary, I would have tried to facilitate that.

Q. Wouldn't you have told the Secretary what the topic of the call was?

MS. WELLS: I object to the form.

A. It depends.

Q. Wouldn't you have told him what the topic of this call was?

MS. WELLS: I object to the form.

A. Somebody would have told him what the topic was.

Q. In this time period, July 2017, and earlier, hadn't you heard talk like this before that it is essential that the citizenship question be added to the census?

A. I don't remember anything specific.

Again, sir, I was not involved

REDACTED

in the day-to-day workings of the census. I think that's also demonstrated by the fact that I wasn't -- I don't remember ever being on this call, and it doesn't look like when I set it up, I had any intention of being on that call.

Q. In his e-mail to you, Kris Kobach also said that when he spoke to the Secretary, he did so at the direction of Steve Bannon.

Steve Bannon worked in the White House, correct?

A. Yes.

Q. Did you ever talk to Steve Bannon about the census?

A. Never.

Q. Did you ever set up a call for the Secretary and Steve Bannon about the census?

A. No.

Q. Would there be notes of the Secretary's conversation with Kris Kobach?

A. I have no idea, sir, because I wasn't part of that call.

Q. Were there -- but as his chief

REDACTED

Page 47

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Page 51

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. All right. You have read it. You see, I take it, that Mr. Comstock has written the Secretary that he is enclosing a draft memo on the citizenship question, and then that e-mail has found its way to you because you are on this chain, correct?

A. I believe so. Again, I know, sir, it's not your fault, but I find it just tricky to follow the e-mail chains, because, again, here we have an e-mail from Earl Comstock, and it's, you know, addressed to the Secretary, so I assume he e-mailed it to the Secretary. I just can't see it.

Q. All right. In any event, you respond to Mr. Comstock, CC to the Secretary, that "Peter Davidson and Karen Dunn Kelley will both be here Monday. Let's spend 15 minutes together and sort this out. W."

A. Sure.

Q. And this is on the memo on the citizenship question?

A. Sure.

REDACTED

Q. So it appears that you had some involvement with the citizenship question, correct?

A. If setting up a meeting -- it looks like I set up a meeting for them. I don't ever remember being at that meeting.

Q. All right, thank you for that.

But it does suggest -- am I reading it right when it suggests that you are going to participate in this meeting? "Let's spend 15 minutes together and sort this out."

MS. WELLS: Objection to form.

A. No.

Q. You don't read that as saying you would participate in the meeting?

MS. WELLS: I object to the form.

A. When I say "let's," it doesn't mean I always join the meetings. Let's have the group get together.

Q. All right. I'm sorry, finish your answer.

A. I don't remember -- I don't remember ever participating in this

REDACTED

meeting.

Q. If there was such a meeting, would you have typically put it on your calendar if you were participating?

A. If there was such a meeting? No, I mean, again, again, I did not participate in very many census meetings at all.

Q. Is it your testimony that you did not participate in this meeting?

A. My testimony is that I don't remember being in a meeting with Peter Davidson and Karen Dunn Kelley specifically talking about the census memo.

Q. Do you have an understanding as to why this is coming to you if you have no involvement with the citizenship question?

A. Sure. People CC me on things.

Q. Why are you the one setting up the meeting?

A. Probably because I said people should get together and discuss it.

Q. Why do they need you to do that? Why can't they do that without you?

A. I'm sure they can.

REDACTED

Q. You agree that someone would have had to forward Earl Comstock's original e-mail to the Secretary about this to you for you to be setting up the meeting?

A. Somebody would have had to forward -- I'm sorry, can you say that again?

Q. Yeah. For you to be setting up this meeting and for you to have a copy of Earl Comstock's e-mail to the Secretary about the citizenship question memo, someone would have had to forward you that e-mail?

A. Sir, that's the exact thing I was telling to you earlier, is that the way these are laid out, I know it is not your fault, it is just confusing. I don't know if it was forwarded or if I was CC'd on it.

And I can't tell, you know, who -- I mean, it says that it is what Earl Comstock wrote, but I don't see who he sent it to, so I share your frustration.

Q. You don't deny getting a copy of Earl Comstock's e-mail to Secretary

REDACTED

Ross, do you?

A. Again, from what I can see here, it looks as though I was either forwarded or CC'd it. I don't know. I'm guessing like you are, sir.

Q. My question was a little more specific.

You don't deny receiving a copy of Earl Comstock's e-mail at the bottom of that page --

MS. WELLS: I object to the form.

Q. -- saying that he has got a memo for the Secretary about the citizenship question?

MS. WELLS: Objection to form.

A. My best guess, sir, is that it was sent to my e-mail.

Q. Thank you.

Let's mark this as Teramoto Exhibit No. 5. It is a two-page document Bates stamped 1411 and 1412.

(Teramoto Exhibit 5 marked for identification.)

Q. All right. You have in front

REDACTED

of you what has been marked as Exhibit 5.

My first question is going to go to what is on the second page, that is the first e-mail in the thread, which says it is sent from Peter Davidson August 29, 2017, to Israel Hernandez, Earl Comstock, James Uthmeier, CC'd to you, and it says "The Secretary asked to set up a briefing on some of the legal questions he is concerned with." The subject is the Census. And it goes on.

Do you know why this was CC'd to you?

A. Sir, can I read the e-mail, please?

Q. Sure.

A. Thanks.

(Witness perusing document.)

A. Okay. Could you please repeat your question, sir?

Q. Do you know why this was CC'd to you?

A. Probably for situational awareness or seeing if when he had time on his calendar.

REDACTED

Q. All right. And then --

A. Because this is, again, I was only CC'd, this isn't even to me.

Q. Understood.

A. Okay.

Q. Then the scheduler, who at the time, who is Chelsey Neuhaus, she sends around an e-mail August 29, 2017, this is on the first page, that says "Would one of you be able to confirm that these are the only attendees that should be included in next Wednesday's census briefing."

Do you see that?

A. Yes, sir.

Q. The first name of the people to be included is you, right?

A. Yes, sir.

Q. You participated in this briefing; is that right?

A. Not that I'm aware of.

Q. Do you deny that you participated in this meeting?

A. I don't remember attending this meeting. And just so you understand, sir, they usually include me as an attendee for

Pl. Objection - 611(a) - non responsive

REDACTED

every single meeting of the Secretary. Many of them I don't attend.

Q. Okay. I understand you saying that you don't recall.

My question is, as you sit here today, do you deny attending this meeting?

A. As I sit here today, I don't remember going to this and I highly doubt that I went to it. Again, I was not involved in the day-to-day interactions on the census.

REDACTED

REDACTED

Page 62

REDACTED

REDACTED

Q. Sure. Did you provide any information to Secretary Ross to assist him in arriving at his decision to add the citizenship question?

MS. WELLS: I will say asked and answered again.

A. Okay, thank you.

I certainly did not create any information to give to the Secretary relating to the citizenship question.

Q. Let's have this marked as Teramoto Exhibit 6.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. Did you learn that, through the course of 2017, either directly from the Secretary or from other people who worked at Commerce, that the Secretary was very interested in adding a census question --

REDACTED

I'm sorry, a citizenship question to the census?

MS. WELLS: I object to form.

A. Did I learn throughout 2017?

Q. During 2017.

A. It is hard for me to say very interested. It clearly was a topic that had come up.

Q. Did you learn that it was a matter of importance for him?

A. I don't know how to engage matter of importance. There is a lot of things that are important to him.

The budget on census, I remember that being extremely important to him. I remember --

Q. Wasn't the -- I'm sorry, go ahead.

A. -- spending time trying to figure out how we are going to ramp up the employment for census. I remember those.

Q. Wasn't the citizenship question important to Secretary Ross?

MS. WELLS: I object to the form.

REDACTED

A. Again, I can't answer, sir, what is or is not important to the Secretary.

Q. Who could?

A. The Secretary.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. Did you discuss -- did you have discussions with Mr. Comstock about the citizenship question in connection with this e-mail or for any reason on or about September 16th, 2017?

A. I don't believe so.

Q. And when I say on or about, I mean the day before, the day after. You don't believe you had any discussions with him?

A. I don't believe I actually read the memo.

Q. Why do you think that?

A. Because I wasn't involved with the census.

Q. You had no involvement as far as you could tell?

REDACTED

A. Very limited involvement.

Q. Didn't you have involvement on the citizenship question on or about September 16, 2017, and isn't that why he is sending you this e-mail?

MS. WELLS: I object to the form.

A. No. Again, as I've said, I'm copied or sent things for my situational awareness. I don't know if receiving an e-mail constitutes being involved.

Q. And you did nothing with respect to the citizenship question in this time frame?

MS. WELLS: Objection, form, asked and answered.

A. I don't remember receiving this e-mail. I don't remember reading this e-mail. And I certainly don't recall ever having a discussion specifically on this e-mail train with Earl Comstock around September.

Q. You didn't ask Mr. Comstock what's the latest on the citizenship question, what's DOJ doing on the

REDACTED

citizenship question, anything like that?

MS. WELLS: I object to form.

A. Not that I remember.

Again, I'm CC'd on a lot of things. Just because I received the e-mail does not mean that, A, I read it, and B, I then get involved in it. There is too much stuff going on at Commerce.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

You did have a call with Mr. Gore, didn't you?

MS. WELLS: I object to the form.

REDACTED

A. I believe so, but I don't remember.

Q. And the call was about the citizenship question, wasn't it?

MS. WELLS: I object to form.

A. I don't remember.

Q. Let's have this marked as Exhibit 9.

(Teramoto Exhibit 9 marked for identification.)

Q. For the record, Exhibit 9 is a two-page exhibit Bates stamped 2651 and 52, the top of which is headed with an e-mail from Danielle Cutrona to Wendy Teramoto, "Re: Call."

A. Would you like me to read it, sir?

Q. Let me ask you a question and then you can read whatever you need to to answer it.

Ms. Teramoto, you will see at the beginning of this e-mail, at the bottom of 2652, is Mr. Gore's e-mail introducing you, and then at the very bottom -- and there is an e-mail thread.

REDACTED

At the very bottom of 2651, he says to you "By this e-mail, I introduce you to Danielle Cutrona from DOJ. Danielle is the person to connect with about the issue we discussed earlier this afternoon."

Take a look at the e-mail. The question I have for you is, I take it you spoke with Acting Assistant Attorney General Gore?

MS. WELLS: I'm going to object to the form.

(Witness perusing document.)

A. Okay. I'm sorry, sir, what was your question?

Q. My question was, I take it you spoke to Assistant Attorney General Gore?

MS. WELLS: Objection to form.

A. I don't remember speaking to him.

The e-mail that he sent to me said Danielle is the person to connect with about the issue we discussed earlier this afternoon. So I have no reason to believe that I did not talk to him, but I don't remember speaking to him.

REDACTED

Q. Understood. And the issue that you spoke with Assistant Attorney General Gore about, that was about the citizenship issue; is that correct?

MS. WELLS: I object to the form.

A. Again, I don't remember -- I don't remember speaking to John Gore.

Q. Higher up on the page, September 17, 2017 at 12:10, Ms. Cutrona e-mails you that "the Attorney General is available on his cell," and then she goes on to say "the AG is eager to assist."

Wasn't that in connection with the citizenship question?

MS. WELLS: I object to the form, lack of foundation.

A. I mean, I didn't -- I didn't write the e-mail. You would have to ask Danielle Cutrona.

Q. You were the recipient of the e-mail; is that correct?

A. Well, it says to me. Again, I can't see how these e-mails are sent to, but I have no reason to believe I didn't

602

REDACTED

receive this e-mail.

Q. It says "Wendy," comma, at the beginning of the e-mail, right? You are the recipient?

A. Again, I agree with you, I'm a Wendy. It is just frustrating that you can't see who is actually -- these are addressed to. I have no reason to believe I didn't receive this.

Q. All right. And in this period of time, September 18th, 2017, you would have been chief of staff for the Secretary of Commerce, right?

A. Yes.

Q. And you knew that the AG was eager to assist with respect to the citizenship question, didn't you?

602

MS. WELLS: I object to form, mischaracterizes her testimony.

A. You would have to ask Danielle Cutrona, because she is the one who wrote this e-mail.

Q. Didn't you learn that the Secretary -- I'm sorry, didn't you learn that the Attorney General of the United

REDACTED

States wanted to assist with respect to the citizenship question?

MS. WELLS: I object to the form, asked and answered.

A. Again, I didn't write the e-mail. I'm reading the exact same e-mail that you are.

Q. My question has nothing to do with the e-mail now.

Didn't you learn that the Attorney General of the United States wanted to assist Secretary Ross with respect to adding a citizenship question?

MS. WELLS: I object to form.

A. Sir, I'm reading the same e-mail that you are. I don't see in here that it says the citizenship question. It says "the AG is eager to assist." I have no idea what else the Secretary and the AG may or may not have been working on.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. Sure. Whether or not you recall speaking to the Attorney General, you knew that the Attorney General of the United States and Secretary Ross were working together to add a citizenship question to the census, didn't you?

MS. WELLS: I object to form.

A. I was not part of discussions between the Attorney General and Secretary Ross.

Q. Do you have that understanding from any source?

MS. WELLS: I object to the form.

Q. You've got to answer that.

A. Do I have -- could you repeat it, please?

Q. Yeah. I have been asking you didn't you know that Secretary Ross and the

REDACTED

Attorney General were working together to add a citizenship question to the census, and I understood you to say that you don't remember being in discussions with them.

A. Right.

Q. And so my question is, did you learn this from any source, whether you were in discussions with them or not?

A. I don't remember any specific discussions from others.

REDACTED

Q. And that e-mail is September 18th, 2017. Let's mark this as Teramoto Exhibit 10.

(Teramoto Exhibit 10 marked for identification.)

Q. For the record, this is an

REDACTED

exhibit Bates stamped 2528. It is a single page and it is an e-mail from Wilbur Ross to Peter Davidson, "Subject: Census."

It contains a single line of text which reads as follows: "Wendy and I spoke with the AG yesterday. Please follow up so we can resolve this issue today. WLR."

Didn't you and Secretary Ross speak to the Attorney General on September 18th, 2017?

MS. WELLS: I object to form.

A. I don't remember being a part of that call at all.

Q. Do you deny being part of the call?

A. I said I don't remember being a part of that call. I remember calls with different cabinet members. I don't ever remember being on a call with the AG.

Q. Can you think of any reason why Mr. Ross would get this wrong just a day after the call?

MS. WELLS: I object to form.

A. You would have to ask him, but

REDACTED

I don't remember being on the call with the AG.

Q. Do you have any reason to believe Mr. Ross would make up the fact that you were on the call with him and the Attorney General on or about September 18th, 2017?

MS. WELLS: I object to form.

A. You would have to ask him. Again, I don't remember being on the call with the AG.

Q. "Him" being Secretary Ross?

MS. WELLS: I object to the form.

A. I don't remember being on a call with the AG.

REDACTED

REDACTED

Page 86

REDACTED

REDACTED

REDACTED

Q. Well, I'm asking about a conversation that you had with Mr. Gore. Presumably she is referencing that conversation.

Didn't you have a discussion with Mr. Gore about what you at Commerce needed them at DOJ to do?

MS. WELLS: I object to form.

Q. Wasn't that the purpose of the call with Mr. Gore?

MS. WELLS: I object to the form.

A. I think what I testified earlier is I don't remember talking to John Gore, and I still don't remember talking to John Gore.

Q. Let's have this marked Teramoto Exhibit 11.

(Teramoto Exhibit 11 marked for identification.)

Q. All right. For the record, this is a three-page exhibit. It is 2636

REDACTED

through 2638. It includes much of the e-mail chain between Mr. Gore, Ms. Teramoto, and Ms. Cutrona that we have seen before.

My question is going to have to do with the e-mail at the very top of this chain in which someone who the government tells me is you e-mails Mr. Gore and says "Hi. AG and Sec spoke. Please let me know when you have a minute."

You understand that you are the sender of this e-mail, correct?

A. I mean, I can't see the address either.

Q. The government has represented that you are the sender.

A. Okay. Then okay.

Q. Do you accept their representation?

A. Sure.

Q. So when you write "Hi. AG and Sec" -- first of all, Sec means Secretary Ross, right?

A. Sure.

Q. So "the Attorney General and

REDACTED

Secretary spoke. Please let me know when you have a minute."

So certainly you know that the Attorney General Sessions and Secretary Ross had a conversation because you are reporting that, correct?

MS. WELLS: I object to the form. But go ahead.

A. My e-mail said the AG and Secretary spoke, so I must have known that they spoke.

Q. And then you say "Please let me know when you have a minute."

Did you call -- didn't you call Assistant Attorney General John Gore?

A. Again, to this day, again, I don't ever remember speaking to him on the phone.

Q. All right. But certainly as the author of this e-mail, you would read this that way, that, in other words, you would read this e-mail as saying you want a call with Assistant Attorney General Gore?

MS. WELLS: Objection to form.

A. Again, this is, you know, an

REDACTED

e-mail from a year ago that I'm reading to you that I must have written saying "Hi. AG and Sec spoke. Please let me know when you have a minute."

Q. Right. My question to you is, don't you understand that to be a request for Mr. Gore to speak with you further or request by you saying you would like to speak with him further?

MS. WELLS: I object to form.

A. When I read this, it would be, you know, let me know when you have a minute.

Q. So that you can speak with him, right?

MS. WELLS: I object to form.

A. Sure.

Q. And what did you speak with him about?

A. Again, I don't ever remember speaking to John Gore.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Q. I hear you on that, which is why I'm asking, so if you're not the best person to be involved, why is it that the documents make it seem like you were involved in speaking to the Assistant Attorney General of the United States about this, the Acting Assistant Attorney General, and the Attorney General of the United States?

MS. WELLS: I object to form.

A. You are asking me. I think you have to ask John Gore why he reached out to me. I can't answer why John Gore reached out to Wendy Teramoto.

REDACTED

REDACTED

Page 95

REDACTED

REDACTED

REDACTED

REDACTED

Page 97

REDACTED

REDACTED

REDACTED

Congress having received this June 21, 2018 memorandum from Secretary Ross, you remember that they accused Secretary Ross of having given them misleading testimony; is that right?

MS. WELLS: I object to the form.

A. Again, I've heard that, but I haven't actually read if there has been correspondence. I have not read any direct correspondence.

Q. I'm curious, you are the chief of staff. If members of Congress, and this is multiple members of Congress, accuse the Secretary of not being candid with them in sworn testimony, that's not something you want to read?

REDACTED

MS. WELLS: I object to the form.

Q. You don't say to somebody, get me that letter from Congress?

MS. WELLS: I object to the form. Go ahead.

A. There are many important letters and correspondence throughout all of the different departments in Commerce. I'm not physically able to read every single one, I'm just not, sir.

Q. I believe that. But when you hear that members of Congress have written a letter accusing the Secretary of not being candid with them, you don't say to somebody I would like to see a copy of that letter?

A. No.

Q. Have I got that right? No?

MS. WELLS: I object to the form. Asked and answered.

A. That's correct.

Q. It doesn't appear to be showing up on the transcript. I heard you to say no. Did I hear that right?

REDACTED

MS. WELLS: I object to the form, and it also mischaracterizes the testimony, I believe.

Q. I'm characterizing the transcript, which I'm looking at.

A. I have not specifically asked for this letter that you're talking about.

REDACTED

Sort of almost halfway down the first paragraph of Teramoto Exhibit 1, Secretary Ross says that with respect to the fundamental issues regarding the census, he says "Part of these

REDACTED

considerations included whether to reinstate a citizenship question which other senior Administration officials had previously raised."

Do you know who the other senior Administration officials are?

A. I have no idea.

Q. Who would know?

A. You would have to ask Secretary Ross.

REDACTED

REDACTED

REDACTED

Q. Can you think of any reason why the identity of the senior Administration officials who had raised the citizenship question to whom Mr. Ross refers, can you think of any reason why this is secret or why we can't know the answer to who those

REDACTED

people are?

MS. WELLS: I object to form.

A. I have no idea.

Q. I take it you have not heard any discussion of that issue?

A. Of the issue of the senior Administration officials?

Q. Yeah.

A. Right, I have not.

REDACTED

REDACTED

REDACTED

So I'm asking, have you seen any documents, any memoranda, any e-mail, scraps of paper, what have you, about the Secretary's consideration of whether to reinstate a citizenship question? Have you seen any such documents?

A. Outside of what you provided me here?

Q. Correct.

A. No.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Page 109

REDACTED

REDACTED

Page 110

REDACTED

REDACTED

REDACTED

REDACTED

Page 112

REDACTED

REDACTED

Page 113

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

-

Q. You haven't heard about that from any source?

A. Heard about what?

Q. That Secretary Ross went to the Department of Justice and asked the

REDACTED

Department of Justice to please request the addition of a citizenship question.

A. I have no recollection of the Secretary ever going to the Department of Justice.

REDACTED

You understand that Attorney General Jeff Sessions spoke to Secretary Ross about asking a citizenship question on the census?

MS. WELLS: I object to the question, the form of the question.

A. From the e-mails, I can see that the Secretary and the AG spoke. What they spoke about, I don't know, because, as I said, I have no recollection of ever

REDACTED

being on a call between the two of them.

REDACTED

REDACTED

Q. So the first part was, did you learn from any source; you are with me on that, right?

A. Yes.

Q. And the second part was that the Commerce Department didn't want the Congress or the public to know that it was Secretary Ross who went to the Department of Justice and asked the Department of Justice to request the citizenship

REDACTED

question.

A. I have not heard from any source that the Commerce Department did not want Congress or the public to know.

REDACTED

Q. I take it Secretary Ross never said to you, in words or in substance, I'm not going to tell Congress that I was the one who went to the Department of Justice and asked for the citizenship question?

A. Secretary Ross has never said that to me.

Q. Do you remember any discussion with Secretary Ross about the citizenship question?

A. I don't remember having any direct conversations with him on it.

Q. Is it your best recollection that you had no such conversations, or are you saying there were, but you don't

REDACTED

recall?

A. I'm saying I don't remember having any direct conversations with the Secretary on the question.

Q. Do you believe that you had some?

A. Again, I don't remember having any direct conversations with him on the citizenship question.

Q. My question is a little different. I'm not asking for your memory now.

I'm asking for whether you think you had some, for example, I can think of lots of conversations that I have had with my spouse, with my children, on certain subjects, but I can't remember the conversations, I just know I had them.

So I'm asking in that context, do you believe you had conversations with --

A. I don't think we did.

Q. Let me just finish the question.

A. I'm sorry.

REDACTED

Q. I have your answer. Let me just finish the question.

Do you believe you had?

A. I don't believe I have.

Again, again, I'm not the census person, so if there is issues related to census, I'm not the first person or even the second or third, fourth, fifth person that I believe the Secretary would call.

REDACTED

REDACTED

REDACTED

Is there anyone the Secretary uses as a close advisor on questions of importance and sensitivity?

MS. WELLS: I object to the form.

A. Sure, yes.

Q. Who are those people?

A. Karen Dunn Kelley, Earl Comstock.

Q. Anyone else?

A. I mean, I would say those are the immediate ones. There is other people. I mean, if it is something related to patents, he would speak to Andre Iancu. There is the Under Secretary Gil Kaplan, Matt Borman.

REDACTED

REDACTED

Q. How about on census, are there people outside of the Commerce Department that the Secretary turns to for advice on either the citizenship question or on the census generally?

A. If he goes outside of Commerce, you know, other than, you know, he has spoken to Marc Neumann, but anybody else, I wouldn't know, unless there are other people at the transition that talked to him

REDACTED

about it, but I wasn't part of the transition team, so I wouldn't know.

Q. If someone -- why Marc Neumann? Let me come back to him.

A. Sure. I think as I stated before, Marc Neumann was part of the transition team who used to work at -- I think he worked at Census, so he was the one who would brief the Secretary just on census during the transition.

Q. In that summer of 2017 and going to September when we saw those e-mails between you and Assistant Attorney General Gore and the other e-mails on those chains, if someone had come to you then and said Ms. Teramoto, I need -- I have got an important issue that I want to talk to you about regarding adding a citizenship question, who would you have put them in touch with?

MS. WELLS: I object to the form.

A. Well, I mean, I think I did put them in touch with Izzy Hernandez.

Q. And what was his position?

REDACTED

A. He was the deputy chief of staff.

Q. Did he have any special, you know, was the census question, citizenship question on the census, was that something that he had particular responsibility for?

A. I mean, I don't know. He worked on the census.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Page 139

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED