# Exhibit 2

# PL Designations

---

**Langdon, Sanford  10-26-2018**

---



1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MARYLAND

3   - - - - - - - - - - - - - - - x

4   ROBYN KRAVITZ, et al.,   :      Plaintiffs, :

5   vs.    : Civil Action No. U.S. DEPARTMENT OF COMMERCE,  : 8:18-cv-01041-GJH

6   et al.,    :    Defendants. :

7   - - - - - - - - - - - - - - - x LA UNION DEL PUEBLO ENTERO,  :

8   et al.,    :     Plaintiffs, :

9   vs.     : Civil Action No. WILBUR L. ROSS, sued in his   : 8:18-CV-01570-GJH

10  official capacity as U.S. : Secretary of Commerce, et al.,:

11  Defendants.  : - - - - - - - - - - - - - - - x

12  VIDEOTAPED DEPOSITION OF: DAVID SANFORD LANGDON

13  DATE:   Friday, October 26, 2018     Global Objection--Rules 401, 403

14  TIME:   9:08 a.m.

15  LOCATION:   Covington & Burling

16  850 Tenth Street, D.C.

17  Washington, D.C.

18  REPORTED BY: Denise M. Brunet, RPR,

19  Reporter/Notary

20  Veritext Legal Solutions

21  1250 Eye Street, D.C., Suite 350

22  Washington, D.C.  20005

1  A. P P E A R A N C E S

2

3  On behalf of the Kravitz Plaintiffs:

4  SHANKAR DURAISWAMY, ESQUIRE

5  Covington & Burling, LLP

6  850 Tenth Street, Northwest

7  Washington, D.C.  20001

8  (202) 662-5273

9  sduraiswamy@cov.com

10

11  On behalf of New York Immigration Coalition:

12  DYLAN SCOT YOUNG, ESQUIRE

13  Arnold & Porter Kaye Scholer, LLP

14  601 Massachusetts Avenue, Northwest

15  Washington, D.C.  20001

16  (202) 942-6740

17  dylan.young@arnoldporter.com

18

19

20

21

22  (Appearances continued on the next page.)

1   APPEARANCES (continued):

2

3   On behalf of the Lupe Plaintiffs:

4   NIYATI SHAH, ESQUIRE

5   ERI ANDRIOLA, ESQUIRE

6   Asian Americans Advancing Justice

7   1620 L Street, Northwest

8   Suite 1050

9   Washington, D.C.  20036

10  (202) 296-2300

11  nshah@advancingjustice-aajc.org

12

13  On behalf of the State of California:

14  TODD GRABARSKY, ESQUIRE

15  (via telephone)

16  Deputy Attorney General

17  Office of the Attorney General

18  300 S. Spring Street, Suite 1700

19  Los Angeles, California  90013

20  (213) 269-6044

21  todd.grabarsky@doj.ca.gov

22  (Appearances continued on the next page.)

1  APPEARANCES (continued):

2

3  On behalf of Defendants:

4  CARLOTTA P. WELLS, ESQUIRE

5  U.S. Department of Justice

6  Civil Division

7  1100 L Street, Northwest

8  Washington, D.C.  20530

9  (202) 514-4522

10  carlotta.wells@usdoj.gov

11

12  MICHAEL A. CANNON, ESQUIRE

13  United States Department of Commerce

14  Office of the Assistant General

15  Counsel for Finance and Litigation

16  1401 Constitution Avenue, Northwest

17  Room 5890

18  Washington, D.C.  20230

19  (202) 482-5395

20  mcannon@doc.gov

21

22  (Appearances continued on the next page.)

1   APPEARANCES (continued):

2

3   ALSO PRESENT:  B.J. Altvater

4   Eric Xi

5   Glen Fortner, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1  C O N T E N T S

2  EXAMINATION BY:     PAGE:

3  Counsel for Kravitz Plaintiffs   11

4

5  DEPOSITION EXHIBITS:     PAGE:

6  1 -  E-mail from Herbst to Langdon dated

7  2/2/17        71

8  2 -  E-mail from Langdon to Comstock dated

9  3/10/17        93

10  3 -  E-mail from Langdon to Comstock and

11  Herbst dated 3/15/17    95

12  4 -  E-mail chain starting with e-mail from

13  Comstock to Ross dated 5/2/17   125

14  5 -  E-mail from Comstock to Ross dated

15  3/10/17        137

16  6 -  E-mail chain starting with e-mail from

17  Langdon to Blumerman dated 5/24/17  143

18  7 -  E-mail from Langdon to Comstock and

19  Herbst dated 5/24/17    171

20

21

22  (Exhibits continued on the next page.)

1   DEPOSITION EXHIBITS:    PAGE:

2   8 - E-mail chain starting with e-mail from

3   Langdon to Comstock and Herbst dated

4   5/24/17     190

5   9 - Memo from Ross dated 6/21/18   205

6   10 - E-mail chain starting with e-mail from

7   Langdon to Park-Su dated 6/22/18   211

8   11 - E-mail chain starting with e-mail from

9   Uthmeier to Langdon dated 1/29/18   232

10   12 - Letter and attachment from Gary to

11   Thompson dated 11/4/16    249

12   13 - E-mail from Quinley to Kelley dated

13   1/10/18     253

14   14 - Agenda for steering committee meeting

15   dated 1/11/18    253

16   15 - Questions on the January 19 draft

17   census memo on the DOJ citizenship

18   question reinstatement request   264

19   16 - E-mail chain starting with e-mail from

20   Comstock to Langdon, et al., dated

21   1/30/18     268

22   (Exhibits continued on the next page.)

1  DEPOSITION EXHIBITS:     PAGE:

2  17 - E-mail chain starting with e-mail from

3  Abowd to Reist and Lamas dated 1/31/18  268

4  18 - Memo from Abowd dated 1/19/18   296

5

6  (*Exhibits attached to the transcript.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1  P R O C E E D I N G S

2  THE VIDEOGRAPHER:  Good morning.  We are

3  going on the record at 9:08 a.m. on October 26th,

4  2018.  Please note the microphones are sensitive

5  and may pick up whispering, private conversations

6  and cellular interference.  Please turn off all

7  cell phones or place them away from the

8  microphones as they can interfere with the

9  deposition audio.  Audio and video recording will

10  continue to take place unless all parties agree to

11  go off the record.

12  This is media unit 1 of the

13  video-recorded deposition of David Langdon taken

14  in the matter of Robyn Kravitz, et al., v. U.S.

15  Department of Commerce, et al., and La Union Del

16  Pueblo Entero, et al., v. Wilbur Ross, et al.,

17  filed in the United States District Court for the

18  District of Maryland.

19  This deposition is being held at

20  Covington & Burling, LLP, located at 850 10th

21  Street, Northwest, Washington, D.C.

22  My name is Glen Fortner from the firm

1   Veritext, and I am the videographer.  The court

2   reporter is Denise Brunet from the firm Veritext.

3   I am not related to any party in this action, nor

4   am I financially interested in the outcome.

5   Counsel and all present in the room and

6   everyone attending remotely will now state their

7   appearances and affiliations for the record.  If

8   there are any objections to proceeding, please

9   state them at the time of your appearance,

10  beginning with the noticing attorney.

11  MR. DURAISWAMY:  Shankar Duraiswamy for

12  the Kravitz plaintiffs.

13  MR. ALTVATER:  B.J. Altvater, law clerk,

14  Covington & Burling, for the Kravitz plaintiffs.

15  MS. SHAH:  Niyati Shah for the Lupe

16  plaintiffs and the District of Maryland case

17  number 8:18-01570.

18  MR. YOUNG:  Dylan Young from Arnold &

19  Porter for the NYIC plaintiffs.

20  MR. CANNON:  Michael Cannon, U.S.

21  Department of Commerce agency counsel.

22  MS. WELLS:  And Carlotta Wells from the

1   Department of Justice representing the defendants.

2   THE VIDEOGRAPHER:  The court reporter

3   will please swear in the witness.

4   WHEREUPON,

5   DAVID SANFORD LANGDON,

6   called as a witness, and having been sworn by the

7   notary public, was examined and testified as

8   follows:

9   EXAMINATION BY COUNSEL FOR KRAVITZ PLAINTIFFS

10  BY MR. DURAISWAMY:

11  Q. Good morning, Mr. Langdon.  As you just

12  heard, my name is Shankar Duraiswamy.  I represent

13  the plaintiffs in one of the cases that we're here

14  about today.  Let me start with a simple question.

15  Could you please state and spell your name for the

16  record.

17  A. State and spell?

18  Q. Yes.

19  A. David Sanford Langdon.  D-A-V-I-D,

20  S-A-N-F-O-R-D, L-A-N-G-D-O-N.

21  Q. And could you provide your home and work

22  addresses for the record, please?

1   At a later point in time, you received a

2   master's in applied economics from Johns Hopkins;

3   is that right?

4   A. Yes.

5   Q. That was in 2003?

6   A. Yeah.

7   Q. Is there any other educational background

8   that we've missed?

9   A. In terms of university education, no.

10  Q. What about -- how about non-university

11  education?

12  A. I mean, all federal employees, we take,

13  you know, training courses and, you know,

14  continuing education.

15  Q. Understood.  Why did you decide not to

16  finish the degree in Spain?

17  A. It was a personal lifestyle decision.  So

18  my later wife and I decided that we wanted to look

19  for work in the United States, settle down, and we

20  chose Washington, D.C.

21  Q. And as I understand it, when you settled

22  down in D.C., you took a job with the Bureau of

1  Labor Statistics; is that right?

2  A. Correct.

3  Q. What was your job there?

4  A. I was an economist, a staff economist, at

5  BLS.  I worked on the current employment

6  statistics program, which is part of the Office of

7  Employment and Unemployment Statistics.

8  Q. How did you end up in that job?

9  A. They were hiring a lot.  This was 1998.

10 I interviewed -- I started in July, interviewed in

11 January.  And they had a lot of open positions,

12 and I chose that office to work in.

13 Q. And how long did you have that position?

14 A. Around seven years.

15 Q. What were your job responsibilities?

16 A. So we -- this office was in charge of

17 producing the monthly payroll survey numbers.  So

18 there's two major sets of employment data that go

19 in the monthly jobs report, typically published on

20 the first Friday of the month.  It's a principal

21 federal economic indicator.

22 My office was responsible for the editing

1  of microdata, the preparations of the analysis,

2  and discussion and economic analysis of them with

3  senior BLS management.  We also did --

4  THE REPORTER:  Senior --

5  THE WITNESS:  BLS, Bureau of Labor

6  Statistics.  It's the acronym.

7  Senior BLS management.  And we did

8  research reports as well.

9  BY MR. DURAISWAMY:

10 Q. And that describes your responsibilities

11 during the entire seven years that you had that

12 position?

13 A. Yeah.  I mean, I became a supervisory

14 economist.  So at some point in that time -- I

15 became a team lead and, later, a supervisory

16 economist.  So, you know, staff economists, you

17 know, reported to me.  But we did -- it was the

18 same office, same, you know, general

19 responsibilities.

20 Q. Did you have any responsibility for the

21 design or administration or execution of the

22 payroll survey?

1  A. Yeah.

2  Q. Could you describe what your

3  responsibilities were?

4  A. So we -- I mean, it varied, really.  I

5  mean, we worked with the data collection team.

6  There's a separate collection data team.  So the

7  monthly payroll surveys is a massive business

8  survey.  It goes to around 300,000 U.S. -- between

9  300 and 400,000 U.S. business establishments every

10 month, and it collects information on their

11 payrolls, so employment, female employment, total

12 payroll dollars, total hours worked, and then

13 manufacturing total overtime hours.

14 And we -- during that period, we went

15 through a major transition in how the -- and the

16 industry framework that was used to assign a

17 company to a specific industry within

18 manufacturing, a shift from the standard

19 industrial classification system to the North

20 American industry classification system.  So we

21 were involved with that.

22 We were involved with a potential

1  decision to remove -- to stop collecting data on

2  female employment --

3  THE REPORTER:  Stop collecting data on...

4  THE WITNESS:  Data on the number of women

5  employed by companies.  So, I mean, it was a

6  variety of things.

7  BY MR. DURAISWAMY:

8  Q. Did you have any prior background in

9  survey methodology or design?

10 A. Some.  I mean, I took classes on it when

11 I was in Seville.  So I took classes on survey

12 methodology and survey design.  And I learned a

13 lot on the job.

14 Q. Did you have any involvement with any

15 other surveys or survey data while you were there?

16 A. On BLS?  As an analyst.  I used data from

17 other BLS programs in research reports I did.  So

18 I used data -- we worked closely with the people

19 on the current population survey.  So it's a

20 monthly household survey that actually the Census

21 Bureau administrates -- administers, but BLS is

22 one of the major users.

1 Q. Other than the current population survey,

2 did you have any -- did you do any work related to

3 any other surveys administered by the Census

4 Bureau during that period of time?

5 A. A little bit on the American Time Use

6 Survey, which is also administered by the Census

7 Bureau, mostly as an analyst.  We used the data.

8 Q. So with respect to both of those, you

9 weren't working at the Census Bureau, you weren't

10 involved in the execution of the survey --

11 A. No.

12 Q. -- but you were analyzing the data that

13 came out of the survey?

14 A. Correct.

15 Q. Okay.  Other than the census surveys, any

16 other surveys that you had any experience with

17 while you were at BLS?

18 A. No, not that I recall.

19 Q. As I understand it, you then moved in

20 2006 to the Office of Chief Economist at the

21 Department of Labor; is that right?

22 A. Within the Office of the Assistant

1  Secretary for Policy.  And the chief -- at that

2  time, the chief economist was -- this was in the

3  Bush 43 administration.  The chief economist at

4  that point was housed within that, the policy

5  office.

6  Q. How did you end up in that position?

7  A. I applied for the job.  There was an

8  opening on USAJobs.  It looked interesting and I

9  applied for it and got it.

10 Q. What were your responsibilities there?

11 A. So we -- it varied.  It varied quite a

12 bit.  We did a lot of -- principally, a lot of

13 economic analysis for the Secretary and for her

14 team.  It was Secretary Chao at that point.  So

15 macroeconomic analysis, labor market analysis --

16 THE REPORTER:  I'm sorry.  Could you slow

17 down a little bit?

18 THE WITNESS:  Sure.  I'm sorry.

19 Macroeconomic analysis, labor market

20 analysis, some of it connected to the policy

21 agenda of the department at that point.

22 BY MR. DURAISWAMY:

1  jointly between two statistical agencies, and

2  there's lots of modules to it, and there's an

3  opportunity for all sorts of conversations about

4  what content there might be in specific pieces and

5  for what purposes.  So, I mean, really -- I just

6  can't answer that.

7  Q. Is it fair to say that, generally, the

8  Labor Department determined the priorities for

9  what it needed from survey data -- for what the

10  Labor Department needed?

11  A. The Labor Department sets its policy

12  priorities, but as far as the content goes, I

13  mean, I think it just -- it depends.

14  Q. Any other work related to surveys while

15  you were at the Labor Department in the Office of

16  Chief Economist?

17  A. Not that I recall.

18  Q. Okay.  And your tenure there ended around

19  2011; is that right?

20  A. Yep.

21  Q. And that's when you transitioned to the

22  Department of Commerce, correct?

1   A. Correct

2   Q. What brought about that transition?

3   A. Same answer as previously.  So I learned

4   about a job posting.  It was on USAJobs.  I

5   applied for it, interviewed and was accepted.

6   Q. What was the job?

7   A. It was as a senior economist in the

8   Economics and Statistics Administration and then,

9   within the Economics and Statistics

10  Administration, the Office of the Chief Economist.

11  Q. What -- well, let me do this first.  Is

12  that the position you still hold today?

13  A. No.

14  Q. Can you just walk me through the

15  different positions that you've held in the

16  Commerce --

17  A. Yeah.  It can be a --

18  Q. -- Department since 2011?

19  A. -- bit confusing.  So I --

20  Q. Sorry.  I just want to --

21  MR. DURAISWAMY:  Do you need him to slow

22  down?

1  THE REPORTER:  You're going fast and

2  you're talking over each other.

3  Can you just walk me through the

4  different position that you've held in the

5  Commerce Department in 2011 --

6  MR. DURAISWAMY:  Since 2011.

7  BY MR. DURAISWAMY:

8  Q. So -- sorry, Mr. Langdon.  If you could

9  do you -- you talk fast, as I do naturally.  If

10  you could just try to slow down and wait till I

11  get my question out and then start, that will make

12  it easier --

13  A. Understood.

14  Q. -- for Denise, I think.

15  So, yeah.  Could you just walk me through

16  the different positions you've held at the

17  Commerce Department since 2011?

18  A. Yeah.  I started at Commerce in

19  January 2011.  I was hired as a senior economist

20  in -- the acronym is ESA.  And I continued in that

21  position until about a month or so ago, actually.

22  But in addition to that, in October of 2012, I was

1  asked to also go on detail, essentially a

2  part-time detail, in the office of policy --

3  Office of Policy and Strategic Planning, which is

4  part of the Office of the Secretary of Commerce.

5  So I was basically doing two jobs.  And I was on

6  detail in the policy office and I was an economist

7  in ESA.

8  I actually subsequently became a

9  supervisory economist in ESA.  So I had a staff.

10 So I was managing a staff of economists.  And then

11 I was doing policy work under various Secretaries.

12 And I've continued to do that policy work up until

13 now.

14 Because of a reorganization that was

15 announced in March of 2017, the Office of the

16 Chief Economist was eliminated, and the staff of

17 that office and actually the staff of ESA were

18 reassigned to different positions in the

19 Department of Commerce, some in the Census Bureau,

20 some in the Bureau of Economic Analysis and some

21 in other areas.

22 I was assigned to -- actually, moved

1  full-time as a permanent employee of the Office of

2  Policy and Strategic Planning, and so that's my

3  single job now.

4  And there's a lot of overlap of sort of

5  research and responsibilities and content area

6  between those two jobs.

7  Q. So just to be clear, from about

8  October 2012 until March 2017, you essentially had

9  a dual role as a senior economist in ESA and as a

10 senior policy advisor; is that fair to say?

11 A. That's exactly right.

12 Q. In the Office of Policy and Strategic

13 Planning?

14 A. Yes.

15 Q. Is it possible to estimate roughly how

16 much of your time was devoted to one role versus

17 another during that period of time?

18 A. It varied a lot.  It varied by

19 assignment, by work flow.  I mean, at times -- it

20 was never 50/50.  Actually, somebody joked it was

21 more like 70/70.

22 Q. What were your responsibilities with

1  respect to ESA?

2  A. As a policy advisor?

3  Q. I guess I'm referring to the first role

4  you identified as a senior economist in ESA.

5  A. So think about the -- sort of talk about

6  the structure of ESA.  Okay?  So ESA is an

7  umbrella -- or was an umbrella organization that

8  had three pieces underneath:  The Census Bureau,

9  the Bureau of Economic Analysis, and then the

10  small Office of the Chief Economist.  And so the

11  chief economist's office essentially was -- like

12  an on-call research -- a group of research -- a

13  research agency within the Department of Commerce

14  that would largely support the missions of the two

15  statistical agencies.  So -- and also, you know --

16  they would also conduct research to support

17  whichever administration's policy agenda.

18  So I, or my staff later on, would do a

19  lot of either internal or external research

20  reports on all sorts of topics.  A lot of mine had

21  a labor focus, and there was a strong demand for

22  that.  But the office itself, I mean, did a

1   variety of research.

2   Q. And you said the research was done in

3   part to support the work of the other two

4   statistical agencies that fell within the ESA,

5   correct?

6   A. Yeah.

7   Q. What kinds of work did you do to support

8   the work of the Census Bureau?

9   A. So, I mean, one thing we could do would

10  be research reports that would demonstrate the

11  value or the utility of data that they produced.

12  So for example, we -- I co-authored a few studies

13  on the STEM workforce, you know, so the science,

14  technology, engineering and math workforce.  And

15  for those studies, we used American Community

16  Survey data a lot, and current population survey

17  data.  So -- and we showed, you know, interesting

18  analysis you could do about that workforce and

19  interesting aspects of those data sets.

20  Q. Did any of the work you did have an

21  impact or relate to the content of the surveys

22  administered by the Census Bureau?

1  A. It related to, yes.

2  Q. Let me try to be more specific.  Did it

3  relate to decisions about what the content of

4  those surveys should be?

5  A. I'm not -- I'm not sure.  Maybe

6  indirectly.  So to be specific, like, one of the

7  studies we did looked at -- used a variable on the

8  degree -- the major of -- that bachelor degree

9  holders had.  So, basically, like, the survey form

10  asked people about their educational attainment.

11  If you indicated you had a bachelor's degree, you

12  would receive a subsequent question on what your

13  first major or second major was.  And so our STEM

14  studies looked at that.

15  And during a subsequent content review

16  that I was not involved with for the American

17  Community Survey, that was one of the questions

18  that, you know, was up for potential elimination.

19  And I think -- you know, so there was some overlap

20  and discussion with, you know, probably Census

21  Bureau staff about, you know, things along those

22  lines.

1   I was indirectly involved in some studies

2   that were done in the Obama administration

3   regarding the utility of the American Community

4   Survey that tried to demonstrate use cases.  You

5   know, so how -- you know, the Census Bureau and --

6   all statistical agencies put out data.  And a lot

7   of times you don't really know -- you don't track

8   who is using it and how it's being used.  And

9   knowing -- tracking that information can help you

10  determine what content is useful.

11  There were -- in the Obama administration

12  there were -- and previously, too, there were

13  questions from Congress about the utility of the

14  American Community Survey, the burden associated

15  with the American Community Survey, the questions

16  that were on the survey.  And the research that

17  the chief economist's office did helped inform a

18  lot of their conversations.  So if you look at how

19  the use cases -- or the utility of the survey,

20  that would demonstrate whether or not you should

21  keep asking certain questions or not.

22  Q. What particular questions on the ACS were

1  considered in these -- in these discussions?

2  A. Essentially, the whole -- ultimately, the

3  content review of the ACS, like I said, I was not

4  really directly involved with, looked at

5  everything, every single question.  All the

6  questions on the ACS have to have a federal use.

7  And so part of the study was determining, you

8  know, which federal agencies needed the data and

9  how it was useful to them.

10 Q. I'm not sure I fully understand your

11 answer.  The content review that the bureau does

12 for the ACS obviously considers the full content

13 of the ACS.

14 A. Yeah.

15 Q. The input into that or the participation

16 in that discussion that people in the Office of

17 the Chief Economist were involved in, did that

18 relate to particular questions on the ACS survey

19 or to all of the questions on the ACS survey?

20 A. Ultimately, to all of them.

21 Q. Do yu --

22 A. But that doesn't mean we were involved in

1   Q. Well, maybe I misunderstood, but I

2   thought you told me a minute ago that you were

3   involved in conversations about the potential uses

4   of the -- of the --

5   A. Correct, and --

6   Q. -- questions, correct?

7   A. -- I also indicated that, you know, we

8   looked potentially at the entire survey, but we

9   didn't -- I can't say that we were involved with

10  looking at every single question.

11  Q. Right.  My question now is, do you have

12  any reason to believe that you would have been

13  focused on a citizenship question or place of

14  origin question as part of your efforts to assist

15  in evaluating the uses of ACS survey?

16  A. I don't recall that.

17  Q. I know you don't recall.  I'm saying, do

18  you have any reason to believe that you would have

19  been involved?  Is that the type of thing that

20  potentially the people in the Office of Chief

21  Economist would have been analyzing or opining on?

22  A. Absolutely, but I don't recall it coming

1  up.

2  Q. What possible analysis could you imagine

3  the Office of Chief Economist providing regarding

4  the utility of the citizenship question?

5  MS. WELLS:  Object to the form.

6  BY MR. DURAISWAMY:

7  Q. You can answer.

8  A. Okay.  So a lot of the analysis that was

9  done at that point was basically around use cases,

10  so how -- you know, among researchers, the public

11  states, all the different stakeholders who might

12  use ACS data would say, okay, well, you know, how

13  are they -- just what examples are that -- you

14  know, where the data is being disseminated in some

15  way, input, created as an input into some sort of

16  data tool, things like that.  So use cases.

17  Q. Can you think of any use for the

18  citizenship question on the ACS survey that

19  relates to economic/statistical analysis that the

20  Office of Chief Economist was concerned about?

21  A. I can't say to it specifically, but I

22  mean, throughout -- I mean, when I was at the

1  Labor Department and the Commerce Department, you

2  know, we would look at labor force status, so

3  employment, unemployment, labor force

4  participation.  And we certainly looked at it at

5  times with respect to foreign-born population.  So

6  not as much, maybe, with respect to citizenship

7  that I can recall, but certainly foreign-born and

8  unforeign-born.  That's a regular thing that's

9  looked at.

10  Q. Do you have an understanding as to why

11  the citizenship question was included on the ACS

12  survey?

13  A. Do I have an understanding as to why?  I

14  mean, I've looked at the information at times.  I

15  mean, there's a whole Census Bureau report I've

16  read that outlines all the different federal uses

17  of that data.  So I've certainly looked at that.

18  Q. What's your understanding of why the

19  citizenship question is on the ACS survey?

20  A. I mean, there's a -- well, first of all,

21  there's a historical need for that.  I mean, it

22  dates from the -- I mean, it's been on the census

1   form at different points in time going back

2   decades.  And it's been -- it was a regular part

3   of the long form of the decennial census.  And the

4   long form eventually became the American Community

5   Survey.  So that content carried over.

6   There's some federal uses tied to it.

7   The one that pops to mind right now is the DOJ has

8   used it.  But I believe other ones -- there's

9   other ones as well, other federal uses as well.

10  Q. Any that you can remember, sitting here

11  today?

12  A. I can't recall.  But there's abundant

13  online documentation that goes through that.

14  Q. Do you have an understanding as to why it

15  was on the long form before it was on the ACS?

16  A. You know, general idea, but I can't speak

17  specifically to it.

18  Q. What's your general idea?

19  A. I mean, there's -- you know, when -- it's

20  one of a variety of demographic -- standard

21  demographic questions that help people understand

22  the portrait of the U.S. population, you know,

1   along with sex, age, race, ethnicity, place of

2   birth, educational attainment, and citizenship.

3   It's a natural part of the catalog of data you

4   would need to understand what the U.S. population

5   looks like nationally on a local level [sic].

6   Q. That's your understanding of why it might

7   have been on the long form, but do you have a

8   specific understanding as to why it was, in fact,

9   included in the long form?

10  A. No.

11  Q. This work that you described in the

12  Office of the Chief Economist that related to

13  content reviews for Census Bureau surveys, did any

14  of that relate to decennial census content

15  reviews?

16  A. No.

17  Q. Could you describe your responsibilities

18  in the office with respect to your role in the

19  Office of Policy and Strategic Planning from

20  October 2012 to March 2017?

21  A. So the -- there's a team of policy

22  advisors that supports the director of policy and,

1  ultimately, the Secretary of Commerce.  The policy

2  advisors represent and are assigned a portfolio of

3  bureaus.  In the Department of Commerce, we have

4  13 bureaus.  But assignments can change over time.

5  But as representing those bureaus, you

6  would engage -- review documents for policy

7  content.  And documents can be anything from, you

8  know, research reports to press releases to

9  actually -- you know, actually, serious policy

10 memos.  You would represent the department or

11 sometimes the bureaus in interagency policy

12 discussions, both internally and externally.  You

13 represent the Secretary.

14 My -- my portfolios varied a little bit

15 over time, but one constant piece has been our

16 statistical agencies, so the Census Bureau and the

17 Bureau of Economic Analysis.

18 Q. In that role, have you been involved in

19 content reviews for Census Bureau surveys?

20 A. I mean, involved, yeah, for example --

21 yeah.  Yeah.  More on the tail end, but yeah.

22 Q. Can you describe those instances?

1   A. So -- I mean, it varies, but, I mean,

2   there's been -- I'm trying to think with ACS.  I

3   mean, I've attended meetings that dealt, for

4   example, with the race and ethnicity questions and

5   the -- that review that was contacted over several

6   years.  In the Obama administration, I attended

7   some meetings that dealt with potential inclusion

8   of questions that covered the LGBTQ community.

9   Some on health insurance coverage.

10  I mean, I can't recall everything, but

11  it's -- you know, the thing about the policy job

12  is that it's -- it's quite variable, and the

13  engagement can be deep or light depending on the

14  needs of the Secretary.  So I can't recall

15  everything, but, yeah, it's a natural part of the

16  job.

17  Q. Do I recall attending meetings concerning

18  the addition of a citizenship question to the

19  decennial census?

20  A. So the content of the 2020 census came up

21  in -- I mean, like, organically in this

22  administration.  And we -- it's something -- the

1  content, in general, would come up as a natural

2  part of larger meetings regarding Census Bureau

3  operations and planning.  And that's where I've

4  been in meetings that related to that.

5  In other words, the Secretary would hold

6  regular meetings with Census Bureau staff to

7  review all sorts of issues:  Budget, operations,

8  you know, IT, cyber security.  And content -- I

9  mean, I believe it came up sometimes certainly,

10  so -- yeah.

11  Q. Any other -- let's -- strike that.

12  Any other Census Bureau survey content

13  issues that you recall being involved in as part

14  of your role in the Office of Policy and Strategic

15  Planning?

16  A. I mean, I've been -- dealt with -- I've

17  worked with the Census Bureau on a variety of

18  issues related to their business and their

19  household surveys.  And questions that would come

20  up would, I mean, naturally be, you know, what

21  questions are asked, you know -- you know, a

22  broad -- a recurring issue with all surveys in the

1  United States is just response rates, and

2  something that relates to response rates is the

3  length of the surveys and the burden.

4  And so a natural part of conversations

5  along those lines are, well, what questions do you

6  ask, how you ask them?  And so that -- those types

7  of policy discussions have come up, I mean, in all

8  sorts of contexts in a variety of the household

9  and business surveys for the Census Bureau and the

10  Bureau of Economic Analysis.

11 Q. As a general proposition, the longer the

12 survey, the greater the burden on the respondent,

13 correct?

14 A. Yes.

15 Q. And the greater the burden, the lower the

16 response rate, correct?

17 A. Generally, yeah.  That's a general...

18 Q. Any involvement in evaluating the

19 citizenship question on the ACS survey as part of

20 this role that you had?

21 A. No.  It never -- it never came up

22 specifically.  Like, I do not recall any times

1   where we examined the specific need for the

2   citizenship question.  Or at least I was not part

3   of those conversations.  I mean, I was part of the

4   content review, obviously, but nothing that

5   specifically I was involved with.

6   Q. Even beyond just examining the specific

7   need for the citizenship question, do you recall

8   any other conversations, discussions about the

9   citizenship question on the ACS survey?

10  A. On the ACS?

11  Q. Let's say, prior to 2017.

12  A. I don't recall any.  I mean, I could have

13  had them.  I certainly don't recall any.

14  Q. Okay.  What's your understanding of the

15  history and status of the consideration of the

16  merged race/ethnicity question?

17  A. Can you --

18  MS. WELLS:  Object to the form.

19  BY MR. DURAISWAMY:

20  Q. I'm sorry.  Let me -- that's an objection

21  well taken.

22  **You mentioned, I think, that you were**

1  involved in discussions about the race/ethnicity

2  question on the decennial census; is that right?

3  A. Uh-huh.

4  Q. Did that relate to a possible merge to

5  the race/ethnicity question?

6  A. Yes.

7  Q. And what discussions were you involved

8  in?

9  A. I mean, there was an OMB -- if I recall

10 the process correctly, there was an OMB working

11 group that dated back quite a few years that was

12 involved with research on potential changes to the

13 way that federal surveys asks about race and

14 ethnicity, going from -- basically from two

15 questions to one, and whether or not the quality

16 of the responses was better in one approach or the

17 other.

18 And there's other nuances as well.  But,

19 I mean, that's the broad difference.

20 Q. And what's your recollection of what was

21 done within the department generally to evaluate

22 whether to move from two questions to one

1  question?

2  A. I mean, the typical approach that the

3  Census Bureau uses is to conduct research, so

4  to -- you know, either focus groups or surveys.  I

5  can't speak -- remember specifically this one,

6  but, you know, focus groups or surveys to field

7  and test different questions and see what the

8  results are and understand why there might be

9  differences in the types of responses that people

10 give.

11 Q. Do you recall the period of time over

12 which this research was done?

13 A. For race and ethnicity?  I mean, it was

14 much of the last decade.  I don't recall -- I

15 mean, it came out -- it followed the 2010 census,

16 but I don't recall what year it started.

17 Q. Is it still ongoing, to your knowledge?

18 A. I don't know.  Not to my knowledge, but I

19 don't know.

20 Q. Do you have an understanding as to what

21 decisions were made about whether to consider

22 including a single race/ethnicity question on the

1  A. I'm not a political appointee.  I've

2  worked for political appointees in the Bush

3  administration, the Obama administration, and now

4  the Trump administration.

5  Q. And you've never been a political

6  appointee, correct?

7  A. No.  No.

8  Q. How many people are there in the Office

9  of Policy and Strategic Planning?

10  A. Currently?

11  Q. Sure.  Currently.

12  A. There are a policy director, special

13  assistant and five advisors.  There's a vacancy

14  right now, but it will be filled soon.

15  Q. You're one of the advisors?

16  A. Correct.

17  Q. Who is the policy director?

18  A. Earl Comstock.

19  Q. Who is the special assistant?

20  A. Annie Teague.  T-E-A-G-U-E.

21  Q. You report to Mr. Comstock?

22  A. Yes.

1  Q. Has that been the case since he took that

2  position at the outset of the Trump

3  administration?

4  A. So I reported to whoever was the policy

5  director, and Earl is the current policy director.

6  Q. And he has been since the start of the

7  Trump administration, as far as you recall?

8  A. He was one of the first political

9  appointees to arrive. I can't recall -- I don't

10  know which date, but yeah.

11  Q. Who did you report to before him?

12  A. The last policy director under Secretary

13  Pritzker was John Ratliff.

14  Q. Has the size of the office in terms of

15  personnel changed since 2011?

16  A. It's smaller.

17  Q. Could you just describe the -- how the

18  numbers have changed over time?

19  A. Yeah. We're about, I'd say, less than

20  half as large as we were previously.

21  Q. Previously, about -- maybe about 15 --

22  A. So we maybe had 15 people under Secretary

1  Secretary Pritzker, but there were -- we've

2  suggested ways in which the Office of the

3  Secretary, Penny herself, could engage with

4  businesses to encourage them to respond to the

5  surveys, because there were issues with response

6  rates.

7  And so that -- you know, that was -- we

8  had a lot of conversations with the Census Bureau

9  about how she could support them.  That was sort

10  of the way she operated.

11  Q. Also fair to say that sometimes policy

12  ideas come either from policy director or from the

13  Secretary or others within the Office of the

14  Secretary?

15  A. Yeah.  They can come from many locations.

16  We take all good ideas.

17  Q. And once the Secretary makes a policy

18  decision, part of your job is to implement that

19  decision or execute on it, correct?

20  A. And communicate it.

21  Q. Communicate it.  And advocate for it; is

22  that right?

1  A. Yeah.  I mean, to -- yeah, to -- I would

2  call it communication, really, yeah.

3  Q. Both with external stakeholders and with

4  others within the government, correct?

5  A. Yes.

6  Q. In your position, how often do you

7  interact directly with the Secretary?

8  A. With Secretary Ross?

9  Q. Yes.

10  A. Infrequently.

11  Q. In the last two years, how many meetings

12  have you been in with him?

13  A. With him one-on-one?  Well, I mean, it

14  varies.  I've had very, very, very few, like,

15  one-on-one conversations with him.  I have

16  attended a handful of meetings in his office.  And

17  where I've seen him most frequently are as part of

18  the regular oversight meetings he conducts for --

19  regarding the 2020 census.  Those are large group

20  meetings.

21  Q. How many in the group?

22  A. It can be anywhere from 20 or more.  I

1   census.  Can you recall any meetings other than

2   the monthly oversight meetings that you referenced

3   in which the Census Bureau surveys generally have

4   been discussed, including perhaps the ACS?

5   MS. WELLS:  Object to the form.

6   THE WITNESS:  No, not that I can recall.

7   BY MR. DURAISWAMY:

8   Q. Has your role changed substantively since

9   the transition from one administration to the

10  next?

11  A. It changes depending on who the policy

12  director is and who the Secretary is.  It's not

13  really -- it's not an administration question.

14  It's who the boss is and their needs can vary

15  pretty dramatically.

16  Q. Understood.  How did your role change

17  when Secretary Ross came into office and when

18  Mr. Comstock, you know, came into his position?

19  A. So I -- we're a smaller office, so my

20  policy portfolio is broader.  So I now cover

21  also -- like, I cover the Economic Development

22  Administration and the U.S. Patent and Trademark

1  Office, in addition to the two statistical

2  agencies.

3  Q. And before that, you covered only the two

4  statistical agencies?

5  A. I covered some -- it was more nebulous

6  under Penny.  But, I mean, I covered some EDA

7  issues.  And I interact with other agencies as

8  well.  But, you know, there's -- as far as, like,

9  clearances go and sort of the regular sort of

10 paper movement -- that part of our job, it was

11 basically those two, and some Economic Development

12 Administration.

13 MR. DURAISWAMY:  Why don't we take, like,

14 a five-minute break.

15 THE VIDEOGRAPHER:  Going off the record.

16 The time is 10:04.

17 (Whereupon, a short recess was taken.)

18 THE VIDEOGRAPHER:  Going back on the

19 record.  The time is 10:15.

20 BY MR. DURAISWAMY:

21 Q. Mr. Langdon, do you recall that

22 Mr. Comstock started at the Commerce Department

1  Q. Did you have an understanding as to what

2  his transition team responsibilities were relative

3  to others --

4  A. No.

5  Q. -- that you were meeting with?

6  A. Not really.

7  Q. Did the question of the content of the

8  decennial census come up at any transition team

9  meetings?

10 A. No, not that I recall.  That's a very

11 weighty subject for a transition team meeting.

12 Q. How long were these meetings, typically?

13 A. Half an hour, an hour.  Honestly, that

14 period is kind of a blur to me, really.  You know,

15 there was a lot of new faces, a lot -- you know,

16 just a lot of upheaval when you're, you know,

17 having many people exit and many people enter.

18 (Deposition Exhibit Number 1 was marked

19 for identification.)

20 BY MR. DURAISWAMY:

21 Q. I'll hand you what we've marked as

22 Exhibit 1.  So this is an e-mail from you to Ellen

1   Herbst dated February 2nd, 2017 with the subject

2   line "Census Bureau briefing for OS politicals,"

3   correct?

4   A. I'm sorry, I didn't catch that.

5   Q. Is that what this is?  Just for the

6   record --

7   A. Yeah.

8   Q. -- confirming this is an e-mail from you

9   to Ellen Herbst dated February 2nd, 2017, correct?

10  A. That's what I'm reading, yeah.

11  Q. And the subject of the e-mail is, "Census

12  Bureau briefing for OS politicals," correct?

13  A. Yeah.

14  Q. Did you review this e-mail in preparing

15  for your deposition?

16  A. No.

17  Q. OS is a reference to Office of the

18  Secretary, correct?

19  A. Correct.

20  Q. And what are OS politicals?

21  A. Political appointees working in the

22  Office of the Secretary.

1   be brought up on a temporary detail while there's

2   no political staff in certain positions.  So he

3   was the acting head of that office.

4   Q. And that's another office within the

5   Office of the Secretary?

6   A. Correct.

7   Q. Do you have -- well, strike that.

8   During this period of time, did you have

9   regular communications with him?

10  A. With Jim?

11  Q. Yeah.

12  A. Sure.  Yeah.

13  Q. About what?

14  A. The transition, basically.  Transition

15  issues.

16  Q. When you say -- you say in this sentence,

17  "I ask because Jim S. reminded me about the

18  upcoming congressional notification of decennial

19  and ACS topics and the need to gauge Earl's

20  interest in it."

21  Do you see that?

22  A. Uh-huh.

1  Q. When you say he reminded you about the

2  upcoming congressional notification of decennial

3  and ACS topics, what is that referring to?

4  A. So by calendar -- and I may not get all

5  the details right on this -- but, basically, by --

6  by law and by calendar, the Census Bureau has to

7  notify Congress first of the subjects on the

8  ACS -- on the decennial census, and the ACS would

9  have been by the end of March of 2017.  And then

10 the year after that, it would actually notify

11 Congress of the questions on those surveys.  So, I

12 mean, that was -- you know, March 2017 was

13 right -- you know, shortly after this.

14 Q. And this is your -- personally, your

15 first experience with this process, correct?

16 A. No, it's not my first transition.  I was

17 at the Labor Department at the transition from --

18 working with politicals from the transition from

19 the Bush administration to the Obama

20 administration.

21 Q. I apologize.  I was unclear.  When I said

22 "this process," I mean the congressional

1  notification of decennial and ACS topics.

2  A. Correct.

3  Q. How did this come up in conversation with

4  Jim?

5  A. I would have to be guided by what the

6  e-mail says here.  I don't recall the

7  conversation.  But it indicates that he initiated

8  the conversation or reminded me about it.

9  Q. Do you have any recollection of whether

10 it was just part of a general conversation about

11 transition-related issues or whether he

12 specifically reached out about this issue?

13 A. I have no idea.  I do not recall.

14 Q. You said that Jim reminded you about the

15 need to gauge Earl's interest in it.  Why was

16 there a need to gauge Earl's interest in it?

17 A. So if I understand the e-mail correctly,

18 you know, there's -- we're referring to a briefing

19 that is going to cover a large bureau, actually,

20 one of our largest, and that could cover a lot of

21 different topic.  And so it's important to make

22 sure that that briefing is not overwhelming as a

1 first briefing, but it touches on topics of policy

2 content that are going to be immediately relevant.

3 And that was, you know, a congressional

4 notification about our most -- our flagship survey

5 and the decennial census -- rises to that level.

6 Q. And so, according to the e-mail, you then

7 did reach out to Mr. Comstock to gauge his

8 interest in hearing about that issue at the

9 briefing. Is that fair to say?

10 A. Yeah. I mean, based on what I'm reading

11 here, yeah.

12 Q. But I'm just trying to -- if I understand

13 what you're -- the answer you just gave, you were

14 reaching out to gauge his interest in including

15 that in the briefing that he was going to receive;

16 is that right?

17 A. Yep. Exactly.

18 Q. Then you asked -- and you say, "Earl is

19 very interested and thinks the Secretary will be

20 as well," correct?

21 A. Uh-huh. Yep.

22 Q. Was the conversation in which you asked

1  him about this, was that by phone?  By e-mail?  In

2  person?

3  A. I can only guess.  I don't -- yeah, I

4  don't recall.

5  Q. Well, based on your typical practice and

6  how you interact with him, what's your --

7  A. Earl is hard to track down --

8  Q. -- belief?

9  A. -- is hard to track down, so probably

10  would have been me popping into his office at some

11  point and being lucky to find him and asking him

12  quickly.

13  Q. And what was the substance of the

14  discussion?

15  A. I don't recall.  I mean, obviously,

16  what's reflected here.  I don't know if we had

17  talked about other things.

18  Q. What was your understanding of why he was

19  very interested in this issue?

20  A. So Secretary Ross -- this is across the

21  board -- is -- is very interested in all aspects

22  of, you know, policy decisions across the

1  department.  And this was actually one of the

2  first indications we got that, you know, that --

3  you know, a lot of decisions that -- you know,

4  would begin rising to his level that maybe under

5  other Secretaries might not.

6  Q. My question was a little bit different, I

7  this.

8  A. Okay.

9  Q. What was your understanding as to why

10 Earl was very interested?

11 A. Actually, what I just said.  That's a

12 process question.  I think it's a process response

13 as much as maybe a content response.

14 Q. He was very interested -- your

15 understanding is he was very interested because

16 Secretary Ross was very interested; is that right?

17 A. Yeah.  But like I say, I think it's

18 probably -- keep in mind that, you know, if we're,

19 as a department, notifying Congress about

20 something that's a major policy decision, across

21 the board, he wanted to know.  And so this was a

22 major one.  This was one that touched on me and --

1  you know, so in that vein, that -- that's

2  consistent with how things have operated under

3  Secretary Ross.

4  Q. When you say he wanted to know, you're

5  referring to Secretary Ross?

6  A. Yeah.

7  Q. Okay.  So just so I understand, your

8  understanding as to why Earl was very interested

9  in this is because Secretary Ross was very

10  interested in it?

11  A. I -- I don't know.  I mean, he -- Earl,

12  you know, represents the Secretary's views.  He --

13  you know, obviously, he interacts with him

14  regularly.  And so he can -- somehow, you know,

15  felt that the Secretary, you know -- I'm not sure

16  based on what, but felt that the Secretary would,

17  you know, want to be briefed on this.

18  Q. Did you say why he thought the Secretary

19  would be interested?

20  A. I don't recall.

21  Q. Did he indicate whether he had discussed

22  the issue with the Secretary?

1  A. I don't understand the -- certainly?

2  I -- I don't know.

3  Q. Okay.  Well, let's try to refresh your

4  recollection since --

5  A. Okay.

6  Q. -- it's -- apparently some of these

7  things are challenging for you to recall.

8  (Deposition Exhibit Number 2 was marked

9  for identification.)

10 BY MR. DURAISWAMY:

11 Q. I'm handing you what we've marked as

12 Exhibit 2.

13 A. Okay.

14 Q. So this is an e-mail from you to

15 Mr. Comstock dated March 10, 2017, correct?

16 A. Correct.

17 Q. And it was sent at 7:50 p.m., right?

18 A. Yep.

19 Q. Do you recall this e-mail?

20 A. This specific e-mail?  I don't recall it,

21 but it looks -- looks like an e-mail I would have

22 written.

1  Q. Do you recall e-mails about this topic?

2  A. About this briefing?

3  Q. Yes.

4  A. Not specifically.  I mean, like I say, it

5  was -- we were in a period of transition where we

6  would normally schedule briefings for Earl or for

7  others on specific topics that they cared about.

8  So this is consistent with the way things operate,

9  yeah.

10  Q. For the record, in this e-mail, you ask

11  Mr. Comstock, "What does your schedule look like

12  to receive a one-hour (max) briefing on 2020

13  census and ACS topics later next week?"

14  Correct?

15  A. Correct.

16  Q. And you say, "The goal is help you

17  understand the congressional notification process

18  as well as the actual topics themselves," correct?

19  A. Correct.

20  Q. Do you know if this is the follow-up

21  briefing that you were referring to in your

22  February 2nd e-mail?

1  A. I don't know if it's that specific

2  briefing, but it's -- that's -- it's consistent

3  with what the goal would have been.  The goal

4  would have been to help them understand the

5  subject, so how we notified Congress and the --

6  you know, the actual -- what we ask in these

7  surveys.  You know, they didn't -- yeah.

8  Q. And if you -- let me hand you what we've

9  marked as Exhibit 3.

10  (Deposition Exhibit Number 3 was marked

11  for identification.)

12  BY MR. DURAISWAMY:

13  Q. This is an e-mail from you to

14  Mr. Comstock and Ellen Herbst, copying Dennis

15  Alvord, dated March 15th, 2017.  Do you see that?

16  A. Yes.

17  Q. And in this e-mail you say, "Earl and

18  Ellen:  I would like to schedule a Census Bureau

19  briefing on the 2020 census and ACS topics before

20  the Census Bureau does its Hill notifications on

21  March 31," correct?

22  A. Yep.

1  Q. And you say, "The goal is for all to be

2  on the same page about the notification process

3  for the topics this year and questions next year."

4  A. Uh-huh.

5  Q. Correct?

6  A. Yep.

7  Q. So this is five days after the last

8  e-mail.  You're still trying to schedule this

9  briefing, correct?

10 A. That's par for course, yeah.

11 Q. Okay.  And you're trying to schedule this

12 particular briefing because Mr. Comstock had

13 indicated to you that this was a topic of

14 particular interest to him and the Secretary,

15 correct?

16 MS. WELLS:  Object to the form.

17 THE WITNESS:  So -- yeah.  I mean, so

18 this is -- like I say, this is par for course with

19 Earl and with the Secretary.  They -- you know,

20 when we're notifying, in this case, the Hill on a

21 major policy decision, they want to know how it

22 works and what the content is.

1  BY MR. DURAISWAMY:

2  Q. Why did you understand it to be a major

3  policy decision?

4  A. Well, I mean, you know, it's the nature

5  of the surveys.  It's the 2020 census.  It's, you

6  know, one of our, you know, congressionally -- or

7  constitutionally mandated operation that we do.

8  And on the ACS which is our -- you know, the

9  largest survey that the Census Bureau conducts.

10 And there's -- you know, there's a lot of

11 sensitivity around topics, particularly at that

12 point.  The background I'm coming into this with

13 is probably largely on the ACS as well.  There was

14 a lot of sensitivity about the topics actually on

15 that, so...

16 Q. When you say there was a lot of

17 sensitivity about the topics, what are you

18 referring to?

19 A. Kind of what I mentioned earlier.  I

20 mean, there's a history that that survey in

21 particular has had with the Hill that's perceived

22 as burdensome.  That includes topics that don't

1  really need -- that some members of the Congress

2  or the public feel shouldn't be on there.

3  And so, you know, notifying Congress

4  that, you know, these -- that we're going to ask

5  about any number of things could, you know,

6  trigger concerns.  Yeah.  It's been a sensitive --

7  the ACS part has been sensitive for years and

8  so...

9  Q. Was there any change to the content of

10  the ACS that was being contemplated at the time

11  that would make you think it was a major issue?

12  A. I'm trying to think.  So, I mean, there

13  had been -- let's see.  I mean, there was

14  sensitivity about health -- health insurance and

15  then the -- sexual orientation.  I mean, some --

16  you know, some -- there had been discussions about

17  that as well, so...

18  Q. I assume that all these efforts to

19  schedule this briefing on the notification process

20  regarding decennial and ACS topics was in response

21  to some conversations you had with Mr. Comstock

22  about his interest in these issues, correct?

1   A. Yeah. That would be natural, yeah.

2   Q. Okay. And what do you recall about those

3   conversations by roughly mid-March of 2017?

4   A. Like I say, I don't recall specific

5   conversations, but this is consistent with how --

6   you know, Earl would indicate interest in a topic,

7   and we would work with his tricky schedule to make

8   sure that he would get briefed on it.

9   Q. I'm not asking you to recall specific

10   conversations. I'm asking you, what do you recall

11   about conversations generally with Mr. Comstock

12   regarding this issue by March 15, 2017?

13   A. I dont' really -- help me understand the

14   question.

15   **Q. What do you recall talking to**

16   **Mr. Comstock about with respect to notifying the**

17   **Hill about census and ACS topics?**

18   **A. What this indicates, that it would be --**

19   **that he wanted to understand the process and what**

20   **we were -- what was going to Hill and how -- you**

21   **know, basically.**

22   Q. I understand that's what this indicates.

1  Q. Roughly later?

2  A. And to be clear, I mean, I think I would

3  distinguish between interest in the topics and an

4  interest in -- or the need for adding topics or

5  changing them.

6  You know, a lot of the conversations at

7  this point, you know -- you have to understand

8  that people come in, in this job, with -- you

9  know, unless they have worked with these surveys

10  before or have some sort of background on the

11  Census Bureau, they have a lot to learn.

12  And so -- and the 2020 census is complex.

13  The ACS is complex.  And so there's a lot of just

14  a natural learning process that the principals

15  have to go through.  And this is part of it.

16  MR. DURAISWAMY:  Move to strike as

17  nonresponsive.

18  BY MR. DURAISWAMY:

19 Q. Do you recall that at some point --

20 strike that.

21 At some point, you came to understand

22 that Secretary Ross was interested in adding a

1  question to the decennial that inquired about

2  citizenship or immigration status, correct?

3  A. Correct.

4  Q. When was that, approximately?

5  A. It would have been in the summer of that

6  year.  I can't say if it was early or late summer,

7  but it was --

8  Q. How did you come to that understanding?

9  A. I think it would have been in -- most

10 likely, it would have been in, like, one of these,

11 like, regular meetings that he was holding

12 regarding, you know -- the large group meetings

13 that we had.

14 Q. And what do you recall he communicated at

15 that meeting?

16 A. Specifically?  I -- I don't remember.

17 Q. But you recall that he communicated that

18 he was interested in adding a question about

19 citizenship status to the decennial; is that

20 right?

21 A. Yeah, I'm trying to think about how to

22 characterize that.  Yeah, I mean, that's probably

1  about right.  Yeah.  I mean, there was -- he was

2  interested in -- in the topics, yeah.  I mean,

3  yeah, so...

4  Q. And do you recall -- strike that.

5  What do you recall about why he was

6  interested in adding a citizenship question to the

7  decennial?

8  A. I don't think the why ever came up.

9  Q. Is your recollection that he simply

10  communicated to everyone that he was interested in

11  adding a question about citizenship but didn't say

12  why?

13  A. Uh-huh.  I mean, that's -- yeah.

14  Q. And is it your recollection that nobody

15  asked why?

16  A. I do not recall anybody asking why.

17  Q. And you don't recall any conversations

18  with anyone at the Commerce Department about why

19  Secretary Ross might be interested in adding a

20  citizenship question?

21  A. Well, you know, it would come up

22  subsequently.  And -- yeah.  Obviously, it would

1  come up.  But -- I mean, yeah.

2  Q. When you say subsequently, roughly when

3  are we talking about?

4  A. Again, I mean, from summer onward.

5  Right?  I mean, yeah.

6  Q. And as it came up, what was your

7  understanding as to why he was interested?

8  A. That there was -- you know, so we already

9  collect data on citizenship through the ACS.  And

10 so the question about why it would be added to the

11 2020 census is, you know, that there was a need

12 for more geographically granular data than the ACS

13 could provide.  So, my recollection, it would be

14 along those lines, you know, that there was a data

15 need for it.

16 Q. Is it your recollection that that need --

17 the articulation of that need originated with

18 Secretary Ross himself?

19 A. Yeah.  I mean, we didn't question, you

20 know -- I mean, I guess Secretary Ross versus,

21 like, what?

22 Q. Well, let me ask you.  Who came up with

1 the idea that there was a need for citizenship

2 data at a more granular geographic level?

3 MS. WELLS:  Object to form.

4 THE WITNESS:  I -- so I can't recall.  I

5 mean, if the Secretary asked us to look into it,

6 we look into it.  Now, then -- I mean, the

7 actual -- the need for it?  The way the 2020

8 census and the ACS work, particularly the ACS, is

9 that there is a federal nexus -- right?  There's a

10 federal need for data to be collected.

11 I don't recall when that federal need was

12 articulated, but it was associated with -- you

13 know -- like I say, I guess I'm trying to -- I'm

14 trying to think about how that came up, but -- I'm

15 not quite sure how it was.  But, I mean, at some

16 point, you know, I learned that there was -- you

17 know, that the need was tied to a need from the

18 DOJ for more data.

19 I mean, again, it goes back to the nexus

20 between 2020 census and ACS.  The main customer

21 for the -- the main federal --

22 THE REPORTER:  You need to slow down,

1   please.

2   The main...

3   THE WITNESS:  The main federal customer

4   for the ACS is the Department of Justice.  And so

5   the question was whether DOJ -- you know, so given

6   that as a baseline, the question is, you know,

7   does DOJ need more -- like, more specific data?

8   But how -- you know, how that came up, I don't

9   know.

10  BY MR. DURAISWAMY:

11  Q. Just to be clear, when you say the

12  Secretary asked us to look into it, we look into

13  it, the actual -- the need for it, et cetera,

14  what's the "it" that you're referring to in your

15  answer?

16  A. Which -- where are you referring to?

17  Q. I'm sorry.  I'm reading your answer,

18  which I'm getting --

19  A. Oh.

20  Q. -- a real time transcript.  The answer

21  you just gave, you used the word "it" several

22  times.  For example, you said, the Secretary asked

1  us to look into it, we look into it, the need for

2  it, and so forth.

3  What's the "it" that you're referring to?

4  A. So I think part of it was that there was

5  a need to understand, like, the historical context

6  for asking about citizenship.  So it could well be

7  that, you know, when -- you know, does -- where

8  does the Census Bureau ask about citizenship?

9  When has it asked about citizenship?  You know,

10 why did it ask about citizenship?

11 Q. And you did look into those things,

12 correct?

13 A. Uh-huh.  Yeah.

14 Q. You were specifically asked to, correct?

15 A. I -- yeah.  At least at one point early

16 on.  I mean, I think Ellen and -- yeah, briefly.

17 Q. And you understood that that request was

18 related to the Secretary's interest in that issue,

19 correct?

20 A. I don't recall the context.  You know,

21 like I say, if somebody like Earl or Ellen asks

22 for something, I don't need to ask, like, well,

1  why do you need it?  I mean, they ask for it and,

2  you know, I do it.

3  Q. And they were interested in -- or they

4  asked you to research the history of whether

5  undocumented immigrants were included in the

6  apportionment count, correct?

7  MS. WELLS:  Object to form.

8  THE WITNESS:  I'd have to go back and

9  look into it.  But, I mean, there's one thing

10 that -- I mean, comes up sometimes, and probably

11 came up, was, you know, who is in scope of the

12 decennial census?  Who -- who responds to the

13 survey?  Who's counted?  Yeah.

14 BY MR. DURAISWAMY:

15 Q. And that was something that you didn't

16 raise.  It was something that the politicals in

17 the Office of Secretary raised, correct?

18 A. Ellen is not a political.

19 Q. Well, was it --

20 A. Leadership.  Leadership.

21 Q. Are you telling me that it was Ellen who

22 raised it or that it was Earl or someone else?

1  oh, I didn't know this was -- so, yeah.

2  Q. Right.  And you understand that there was

3  a deadline of March 31st, 2017 to identify the

4  topics that were to be included on the decennial

5  census, correct?

6  A. Yeah.

7  Q. And that, after that date, you would have

8  less leeway to modify the topics to be included on

9  the census, correct?

10  A. Less leeway.

11  Q. And that's why it was important to get on

12  the same page about it, right?

13  A. Uh-huh.  Yeah.  It's a public statement.

14  And -- I mean, so when I say -- it's a

15  congressional notification, but it's also --

16  there's a public aspect to it.  So the Census

17  Bureau is saying to the world and to Congress --

18  you know, and principally to Congress, but to the

19  world, here's what we're asking on these two

20  instruments.

21  Q. And you understood, from your

22  conversations with Mr. Comstock about his interest

1   in this issue, that he did want to consider

2   changing the topics to be included on the census,

3   correct?

4   MS. WELLS:  Object to the form.  And

5   mischaracterizes testimony.  I think that question

6   has been asked.

7   MR. DURAISWAMY:  I just asked it.  It is

8   a question.  And, please, no speaking objections.

9   BY MR. DURAISWAMY:

10  Q. Go ahead.

11  A. So, yeah, I -- the -- my desire to make

12  sure Earl and I and everybody were on the same

13  page wasn't with respect to him necessarily coming

14  in and -- and saying there needed to be a change.

15  And I don't recall him asking for a change at that

16  point.  I think it was just to make sure that he

17  understood -- you know, that, like I say, there

18  were no surprises.

19  Q. Yeah, but you understood that he was

20  considering a change, correct?

21  MS. WELLS:  Object to the form.

22  THE WITNESS:  As of this date?

1  BY MR. DURAISWAMY:

2  Q. Yes.

3  A. No.  Not really, no.

4  Q. When did you first come to understand

5  that he was considering a change to the topics on

6  the decennial census?

7  A. I believe I've said, and I stand by my

8  answer, that it was summer of 2017.

9  Q. Okay.  At this time, your testimony is

10  all you understood is that he was interested in

11  knowing more about the process, correct?

12  A. That's my understanding of it, yeah.

13  Q. But you have no recollection as to why he

14  was concerned about -- why he was interested in

15  knowing more about the process; is that right?

16  A. I can't recall that, yeah.

17  Q. All right.  During these discussions

18  about the process for notifying Congress,

19  presumably, you pointed out to Mr. Comstock that

20  there was this March deadline -- strike that --

21  this March -- let me start over.

22  During these discussions with