1  Mr. Comstock, I assume that you informed him that

2  there was a March 2017 deadline for identifying

3  the topics to be included on the 2020 census,

4  correct?

5  A. For notifying Congress of these topics.

6  Like I say, you asked -- you raised a question

7  about leeway.  I'm not -- even today, I'm not sure

8  what the specific leeway is for changing these

9  topics afterwards, or what the process would be

10 for saying to Congress, actually, we're going to

11 roll out -- we're going to do something different.

12 Q. Okay.  Did you also explain to him that

13 there was a March 2018 deadline for notifying

14 Congress of the questions to be included on the

15 decennial?

16 A. It was in the earlier e-mail you showed

17 me.  At least I thought so.  I thought so.  No,

18 maybe not.  No.  Okay.  It's not.

19 Q. But presumably, you did, correct?

20 A. Yeah, I would have, yeah.  It's a

21 two-stage -- sorry, my misrecollection.  But it's

22 a two-stage process.  First topics -- no, it's

1  actually in this e-mail right here, yeah.  The

2  goal is for -- the March 15th e-mail from

3  8:30 p.m.

4  Q. Right.  I see.  You're referring to the

5  process for the topics this year and questions --

6  A. And questions next year.  Okay.  Yeah.

7  Q. Did you have any discussion about the

8  significance of the two different deadlines?

9  A. I didn't hear you, I'm sorry.

10 Q. Did you have any discussions with

11 Mr. Comstock or any of the other individuals in

12 the Office of the Secretary about the significance

13 of those two deadlines?

14 A. Probably.  I can't remember specific

15 conversations, but I'm sure I did.  Yeah.  When

16 you say significant, it's, like -- I would say the

17 difference, like, what -- you know, what's the

18 difference between talking about topics and what

19 delivering the questions actually means.

20 Q. Did you have any discussion about what

21 leeway you would have to change the questions on

22 the decennial census after submitting the

1  year there was discussion about adding a

2  citizenship question to the census, correct?

3  A. Uh-huh.  Uh-huh.

4  Q. Was there any discussion about whether

5  the citizenship question fell within one of the

6  topics that was identified in the submission to

7  Congress in March 2017?

8  A. I guess I don't understand the question

9  in the sense it's sort of black and white.  Right?

10  I mean, you can look on paper and say, here's what

11  Congress got.  Right?  I mean, there's no -- I

12  mean, there's not much to discuss there, is there,

13  really?  I don't recall.  I mean, is the question,

14  you know, did we say we would include citizenship

15  on the 2020 census, for example?

16  Q. No.  Well, what's your understanding of

17  the difference between the notification deadline

18  for topics and questions?  What's the difference

19  between topics and questions?

20  A. Okay.  So topic is just a list of, like,

21  data fields.  We're going to ask about age.  The

22  question would be, how do you ask about age?  You

1 know, is it multiple choice?  How do you phrase

2 the question?  These are actual questions on the

3 survey form that people would be getting.

4 Q. And agree that citizenship or immigration

5 status was not one of the topics that was

6 identified in the March 2017 submission to

7 Congress?

8 A. Immigration status has never come up.

9 The Census Bureau doesn't ask about that in any of

10 its surveys and it's never come up, as far as I

11 know, in any conversations.  So we can set that

12 aside.

13 Citizenship -- yeah, like I say, I

14 don't -- the actual notification -- I guess, if

15 the question is, you know, did Earl ask about how

16 we would let Congress know or if we decided to

17 change things, I don't recall that.  That's not

18 typically, like, an area where I would work.

19 Yeah.

20 Q. That's -- so that's not the question.

21 A. Okay.

22 Q. My question now is, you agree that in the

1  March 2017 submission of decennial census topics

2  to Congress, citizenship was not included,

3  correct?

4  A. It was included only for the ACS.

5  Q. And it was not included for the decennial

6  census, correct?

7  A. I do not recall -- yeah, I don't think

8  so, no.

9  Q. Okay.  And so to try to go back to my

10  previous question, and keeping in mind why you

11  were struggling with it, agree, then, that when

12  the citizenship question came up for discussion

13  later that year, it was clear that it was not

14  included or among the topics that had been

15  identified for Congress --

16  A. That's demonstrable.  I mean, that's --

17  you can look it up online and -- in the March

18  submission and then -- I'm pretty certain it

19  wasn't on there as something on the 2020 census.

20  Q. Do you have an understanding of the

21  circumstances in which the department can add --

22  include questions in its March 2018 submission to

1  Congress that are not covered by the topics in its

2  March 2017 submission?

3  A. Yeah, I don't know the specific process.

4  And that's a legal question, and I'm not a

5  department lawyer.

6  Q. And to be clear, you don't recall being

7  involved in any discussions or conversations about

8  that?

9  A. Like, how are we going to tell Congress?

10  No.

11  Q. No.  About the circumstances in which you

12  can include a question in the March 2018

13  submission that wasn't in the March 2017 topics.

14  A. That's a process question that I don't

15  recall being a part of.

16  MR. DURAISWAMY:  Why don't we take a

17  five-minute break?

18  THE VIDEOGRAPHER:  Going off the record.

19  The time is 11:08.

20  (Whereupon, a short recess was taken.)

21  THE VIDEOGRAPHER:  Going back on the

22  record.  The time is 11:23.

1  Q. When were those discussions?

2  A. When I was aware of them?  I don't know

3  when the discussions were.  I mean, I became aware

4  of them, like, you know, later in the summer and

5  the fall.  Yeah.

6  Q. What discussions with DOJ did you become

7  aware of?

8  A. You know, just around sort of -- I mean,

9  around the process.  Like I said, I never -- I

10  don't know specifically -- I've never looked into,

11  like, the analytical need for the data.  Right?  I

12  mean, the actual -- you know, how the data was

13  specifically going to be used.

14  Q. Your sentence kind of broke up there, so

15  I'm not sure which part goes with which.

16  A. We can start over.

17  Q. Okay.  Fair enough.  What do you -- what

18  did you become aware of with respect to

19  conversations with DOJ about this in the summer

20  and fall?

21  A. That there were conversations with DOJ

22  about their need for the data.

1  Q. And did you have an understanding of who

2  was involved in those conversations?

3  A. On our side?  James Uthmeier was the --

4  you know --

5  THE REPORTER:  Say it again, please.

6  THE WITNESS:  James Uthmeier.  U-T-H --

7  THE REPORTER:  No.  On our side...

8  THE WITNESS:  Yeah.  On our side, it was

9  James Uthmeier.  U-T-H-M-E-I-E-R.

10  BY MR. DURAISWAMY:

11  Q. Who else do you recall was involved in

12  those discussions?

13  A. I don't know.  I don't know.  I wasn't

14  part of the discussions, so you're asking me sort

15  of secondhand who was part of conversations I

16  wasn't part of.

17  Q. Well, just to your knowledge.  I mean,

18  you know that Mr. Uthmeier was involved in those

19  discussions, right?

20  A. Yeah.

21  Q. Okay.  Do you know if anyone else was

22  involved in those discussions?

1  Q. Handing you what we've marked as

2  Exhibit 6.

3  A. Okay.

4  Q. You see this is a series of e-mails

5  between you and Census Bureau staff from May 24th,

6  2017?

7  A. Correct.

8  Q. And the subject of these e-mails is

9  regarding requested information - legal review all

10 residents.  Do you see that?

11 A. Yeah.

12 Q. Do you want to take a minute to review

13 this e-mail?

14 A. Yeah.  Uh-huh.  Yeah.

15 Q. Okay.  Look at the second e-mail from the

16 bottom from Burton Reist to you dated May 24,

17 2017.  Do you see that?

18 A. Yeah.

19 Q. Who is Burton Reist?

20 A. He is a senior executive in the Census

21 Bureau.  I can't exactly remember his, you know,

22 title.  He's a go-to person for me in the Census

1  Bureau.

2  Q. Is it correct that he is the -- provides

3  oversight for the Census Bureau's redistricting

4  data program?

5  A. Like I say, I can't remember his exact

6  role.  I mean, I work with a lot of different

7  people at the Census Bureau who contribute to the

8  2020 program.  So, I mean, if -- I don't recall if

9  he's a part of that piece or not -- part of that

10 operation or not.

11 Q. He says, "This is the more complete set

12 of documents that I referenced in my earlier

13 e-mail," correct?

14 A. Uh-huh.

15 Q. Do you know what the earlier e-mail is

16 that he's referring to?

17 A. I'd have to see it.  I mean, I can't --

18 you're asking me to recall, like, one of 10,000

19 e-mails.

20 Q. Fair to say that it relates to a subject

21 matter that's similar to this e-mail?

22 A. That would be a reasonable conclusion.

1  Q. Okay.  The subject line, legal review all

2  residents, what does that refer to?

3  A. I don't know.  I didn't write that

4  subject line.  Based on these e-mails, the subject

5  line originally -- originated from Misty Reed.  So

6  I can't speak to why they phrased it that way.

7  Q. Could be that it relates to a legal

8  review pertaining to whether all residents are

9  accounted in the census?

10 MS. WELLS:  Object to form.

11 THE WITNESS:  It could be that, yeah.

12 BY MR. DURAISWAMY:

13 Q. Could be that it relates to a legal

14 review of whether all residents are included in

15 the apportionment counts?

16 MS. WELLS:  Object to form.

17 THE WITNESS:  It could be that as well.

18 Like I say, I don't know.  It's a -- it's a

19 subject line in a e-mail which is, by definition,

20 abbreviated.

21 BY MR. DURAISWAMY:

22 Q. Do you know what the documents are that

1 Mr. Reist is referring to in his e-mail?

2 A. I can't remember. Based on the next

3 e-mail up, it looks like it references to some

4 court cases, but I don't know.

5 Q. Right. What's Louisiana v. Bryson?

6 A. That specific case? I don't know.

7 Q. Could be that it relates to including

8 undocumented residents in apportionment counts?

9 MS. WELLS: Object to form.

10 THE WITNESS: It could be, yeah.

11 BY MR. DURAISWAMY:

12 Q. It could be that the 1989 DOJ letter

13 relates to the same thing?

14 A. Yeah. It's not a subject area I'm, like,

15 fluent in. But, yeah, it could be.

16 Q. Okay. It was a subject matter that you

17 were asked to research, right?

18 MS. WELLS: Object to form.

19 THE WITNESS: It looks like, I'm -- yeah.

20 I'm gathering those documents. So...

21 BY MR. DURAISWAMY:

22 Q. You recall -- sir, you recall being asked

1   to look into this, don't you?

2   MS. WELLS:  Object to the form.

3   THE WITNESS:  From Earl?

4   MR. DURAISWAMY:  What's wrong with the

5   form of the question?

6   MS. WELLS:  It's, like, argumentative and

7   leading.  And you could have -- you haven't laid

8   the foundation for what the context might have

9   been.  Just -- to me, I don't think it's a totally

10  appropriate question.

11  MR. DURAISWAMY:  I can ask leading

12  questions.  It's not argumentative.  All I've

13  asked is -- it is a foundational question, if he

14  recalls being asked to look into this.

15  MS. WELLS:  You didn't ask it that way.

16  But, I mean, that's fine.  He can go ahead and

17  answer.

18  BY MR. DURAISWAMY:

19  Q. You recall being asked to look into this,

20  correct?

21  A. Yeah.

22  Q. Okay.  And what do you recall about that?

1  A. I was asked to look into it.  I gathered

2  information, provided an answer.

3  Q. Okay.  And the "it" is this question of

4  whether certain populations, including certain

5  immigrant populations, are counted in the census

6  and included in the counts for apportionment

7  purposes, right?

8  A. So who's in scope of the 2020 census, who

9  it measures, and then what data tabulations are

10 produced with that information.

11 Q. Right.  And you were --

12 A. Apportionment counts are one of the set

13 of data tabulations.

14 Q. Right.  And you were asked to look into

15 it around this time, in May 2017, correct?

16 A. Yeah.  Based on these e-mails, yeah.

17 Q. And this related to consideration of

18 whether to include a citizenship question on the

19 census, correct?

20 A. I don't believe Earl gave me the context

21 about why he was asking about it.

22 Q. Do you recall that you had subsequent

1   content of the decennial census at this meeting?

2   MS. WELLS:  Object to form.

3   THE WITNESS:  Like I say, I don't recall

4   the specific agenda of that meeting.  But it's all

5   documented.

6   BY MR. DURAISWAMY:

7   Q. Documented where?

8   A. In the PowerPoints that I, you know,

9   mentioned earlier.  The Census Bureau, when it has

10  meetings like this, you know, prepares slide

11  decks.  Makes it easier for everybody to follow

12  what's going on.

13  Q. If you go up to the next e-mail, which is

14  the third one on the first page.

15  A. Okay.

16  Q. There's an e-mail from Mr. Reist back to

17  you.

18  A. Uh-huh.

19  Q. Actually, strike that.

20  **Just to be clear, on the e-mail that you**

21  **sent at 5:24 p.m., you write, "This is a lot to**

22  **digest, but Louisiana v. Bryson seems the most**

1  timely, along with the 1989 DOJ letter," correct?

2  A. Uh-huh.

3  Q. What does "this is a lot to digest" refer

4  to?

5  A. I'm not a lawyer, so, like, to read

6  through, you know, like, court cases and legalese

7  is not something I enjoy or am good at.

8  Q. And your point being that he had

9  apparently sent you several documents related to

10  legal issues, correct?

11  A. Either several or just dense ones.

12  Q. Okay.  And just so I'm clear, sitting

13  here today, you have no recollection of what

14  Louisiana v. Bryson is about?

15  A. No.

16  Q. Or what the 1989 DOJ letter was about?

17  A. No.

18  Q. Okay.  So then Mr. Reist responds at

19  5:42 p.m.  Did you have any follow-up

20  conversations with either him or Melissa Creech or

21  James Dinwiddie or Lisa Blumerman about the

22  contents of the materials that Mr. Reist had sent

1  included him, which would have been Burton.

2  Q. Do you have a sense of what his

3  responsibilities were that related to the subject

4  matter of these e-mails?

5  A. No.  I think I just answered that.  So

6  no.

7  Q. You don't?

8  A. No.

9  Q. Okay.  You respond at 5:53 p.m. and you

10 say, "Actually, the Secretary seemed interested on

11 subjects and puzzled why citizenship is not

12 included in 2020."

13 What subjects was Secretary Ross

14 interested in at that meeting on May 24th?

15 A. So "subjects" references the -- you know,

16 the actual topics of the -- that are on the 2020

17 census, you know, what -- what gets asked, like

18 the topic areas, you know, like, age -- you know,

19 as examples of subjects would be like age, race,

20 ethnicity, number of people in your household.

21 That's what that refers to.

22 And citizenship is not on the list, or at

1  that point wasn't on the list.

2  Q. Why -- why was he puzzled?

3  MS. WELLS:  Object to form.

4  THE WITNESS:  I can't answer why the

5  Secretary was puzzled or not.  I don't know.

6  BY MR. DURAISWAMY:

7  Q. Did he express puzzlement about why

8  citizenship was not included in the 2020 --

9  A. Yeah, he would have.

10 Q. -- topics?

11 A. Based on this e-mail -- I don't recall

12 the meeting, but, yeah, based on this e-mail, he

13 would have inquired -- not understood why

14 citizenship was not part of it.

15 Q. And what was your understanding as to why

16 he was puzzled about that?

17 A. I don't know.  I don't know why he was

18 puzzled about that.

19 Q. Was there a discussion about that at the

20 meeting?

21 A. Like I not, I don't recall the specific

22 aspects of the meeting.  But, you know, this --

1  like I say, there's a learning process that --

2  this is one example of it -- that people go

3  through when they're dealing with these surveys,

4  in trying to figure out what we ask, why we ask

5  it, why things are on there.

6  Q. Right.  But he didn't -- you didn't write

7  that he was puzzled about why some other --

8  A. Yeah.

9  Q. -- topics or questions --

10 A. That's true.

11 Q. -- were not included.

12 A. Yeah.

13 Q. You wrote only that he was puzzled about

14 why citizenship was not included, correct?

15 A. That's right.  Yep.

16 Q. Can you recall any other issues that

17 Secretary Ross was concerned about or took an

18 interest in with respect to the content of the

19 2020 census questionnaire?

20 A. No.

21 Q. You then say, "It might be good to have

22 in our back pocket the criteria used to pick

1  Q. When did you become more fluent on the

2  subject matter?

3  A. I mean, over time, really.  I mean, it

4  was, like -- it was engaging with -- you know,

5  with Melissa -- particularly with Melissa, but

6  also with Lisa on basically trying to gain an

7  understanding of a lot of the questions.  I was

8  particularly interested for one -- one that's

9  unrelated to this, but was on the 2020 census I

10  didn't understand was, for example, the housing

11  tenure question.  There's a question on there, do

12  you own or rent your house?  And it didn't really

13  enter into my mind why --

14  Q. Right.  So --

15  A. -- that question was on the form.

16  Q. Okay.  So in the context of pursuing this

17  idea of adding a citizenship question to the

18  decennial census, you developed a greater

19  understanding of why some -- the criteria for

20  including some topics on the ACS versus the

21  decennial, correct?

22  A. Yeah.  And why -- why every question

1 that's on the decennial is actually on there.  It

2 was something at that point that I was not -- I

3 was generally aware of, but not specifically aware

4 of.

5 Q. Why were you asking for an answer that

6 evening at 10:51 at night?

7 A. Good question.  Yeah, good question.  I

8 don't know.

9 Q. It suggests there was some urgency to

10 this, correct?

11 A. Oh, yeah.  Yeah.  Based on the e-mails,

12 probably just given, like, the fact that the

13 Secretary himself was asking as opposed to, like,

14 me just, you know, interested and trying to do

15 some, you know, research.

16 Q. Right.  So this is -- you're trying to

17 respond promptly to questions that he asked at

18 this meeting on May 24th about why citizenship --

19 the citizenship question is on the ACS but not the

20 Census; is that right?

21 A. Well, not just -- that is one example.  I

22 mean, it's the broader question of what's on each

1   Q. You see that this is an e-mail that you

2   sent to Earl Comstock and Ellen Herbst on the

3   evening of May 24th after the meeting with

4   Secretary Ross?

5   A. Yes.

6   Q. And it's in the midst of the other

7   e-mails that you were exchanging with census

8   staff --

9   A. Yep.

10  Q. -- that are in Exhibit 6, correct?

11  A. Yeah, exactly.

12  Q. Okay.  I assume that you were sending

13  e-mails late at night like this because you felt

14  it important to respond to urgent inquiries raised

15  by the Secretary at the meeting with him, correct?

16  A. That's one possibility.  Other times I

17  might be doing evening work because I had to,

18  like, leave work early to do kids' stuff, and so

19  I'm trying to catch up late at night.  So it could

20  be urgency or because I was making up for lost

21  time.

22  Q. Okay.  Presumably that was not the case

1  on this date, because you had a very long meeting

2  with the Secretary --

3  A. That's probably true, yeah.

4  Q. -- that you just got out of in the late

5  afternoon, right?

6  A. Yeah.  So I'm probably trying to be

7  responsive to Earl on something that was

8  important.

9  Q. Okay.  And the important issue in this

10 e-mail is the counting of illegal immigrants,

11 correct?  That's the subject?

12 A. Let me take a look at it.

13 Q. Sure.

14 A. Uh-huh.  Okay.  Can you ask the question

15 again?

16 Q. Yeah.  So the important issue that you

17 were trying to be responsive to Earl about on the

18 night of May 24th, after the meeting with

19 Secretary Ross, was the counting of illegal

20 immigrants, correct?

21 A. So the -- the two cases I was looking

22 into here, based on these e-mails, dealt

1　specifically with illegal immigrants.

2　Q. Right.

3　A. And so I was answering that question.

4　Q. Right. And that was the important issue

5　that you were trying to be responsive to Earl

6　about, correct?

7　A. Uh-huh. Because that's what the two

8　documents dealt with.

9　Q. Right. And the subject -- the subject --

10　in fact, the subject of the e-mail is counting of

11　illegal immigrants, correct?

12　A. Yeah. That's correct.

13　Q. Okay. And you say, in the first

14　paragraph, "Earl and Ellen: Long story short is

15　that the counting of illegal immigrants (or of the

16　larger group of non-citizens) has a solid and

17　fairly long legal history," correct?

18　A. Correct.

19　Q. And you go on to discuss a case,

20　Louisiana v. Bryson, in which the courts rejected

21　a challenge to including illegal immigrants in the

22　census totals for apportionment purposes, correct?

1  A. Uh-huh.

2  Q. And that's the same case, Louisiana v.

3  Bryson, that you referenced in your e-mail

4  exchange with Mr. Geist [sic] in Exhibit 6,

5  correct?

6  A. Unless there's another Louisiana versus

7  Bryson, it's the same case, yeah.

8  Q. Fair to say it's the same case, given the

9  timing of these e-mails?

10 A. Yeah.

11 Q. Okay.  And that's a case that was passed

12 along to you as part of the research package that

13 Mr. Geist [sic] sent to you, correct?

14 A. Yeah, exactly.

15 Q. And you were sending this to address the

16 question of whether certain immigrants should not

17 be included in the apportionment count, correct?

18 MS. WELLS:  Object to the form.

19 THE WITNESS:  Yeah, I can't say that.  I

20 mean, what I'm answering here is actually just --

21 it goes back to sort of scoping questions --

22 right? -- I mean, who is counted and who is not

1  counted in the surveys.

2  BY MR. DURAISWAMY:

3  Q. But specifically whether illegal

4  immigrants are counted in the census counts for

5  apportionment purposes, correct?

6  A. That's what these cases dealt with.

7  Yeah.  So --

8  Q. Right.  And that's --

9  A. -- Earl asked -- let me finish.

10 Q. Go ahead.

11 A. Earl asked me to basically review these

12 and summarize them from my non-lawyerly point of

13 view.  And that's what I did.

14 Q. Okay.  He wanted you to provide some

15 information about the history of including or

16 excluding illegal immigrants from the census

17 counts for apportionment purposes, correct?

18 MS. WELLS:  Object to the form.

19 THE WITNESS:  He wanted me to answer the

20 question of how -- of what these cases actually

21 looked at, which was whether or not illegal

22 immigrants were part of the -- first of all -- two

1  things here.  There's whether they're counted and

2  then whether they're part of the apportionment

3  counts, and distinguish between them.

4  BY MR. DURAISWAMY:

5  Q. And which was it that you were

6  addressing?

7  A. Both, according to -- I mean, I'm just

8  summarizing the cases.  Right?  So --

9  Q. Right.

10  A. -- I mean, the one case was dealing with

11  apportionment.  And the second one was actually

12  just the broader question, based on this e-mail,

13  of just whether or not illegal immigrants even

14  should be counted.

15  Q. Right.  And you were conveying that

16  there's a long history of both including illegal

17  immigrants in the census count and including them

18  in the counts for apportionment purposes, correct?

19  A. Yeah.

20  Q. Okay.  Because Mr. Comstock wanted you to

21  look into that issue, right?

22  A. Yeah, he asked me to look into the --

1  Let me start over.

2  That evening, as you were exchanging

3  e-mails with census staff about issues raised at

4  the meeting with Secretary Ross, you were also

5  exchanging e-mails with census staff and with

6  Mr. Comstock and Ms. Herbst about the history of

7  counting or not counting illegal immigrants in the

8  census or in the apportionment counts, correct?

9  A. So it's two related lines of -- it's two

10 related questions.  So I was getting information

11 on both.  One question was Earl's, and it was

12 specific to these court cases dealing with illegal

13 immigrants.

14 A. related issue is whether or not -- you

15 know, whether or not or how we count citizens in

16 the decennial census.

17 Q. Right.  And why is it related?

18 A. Well, because illegal immigrants are a

19 subset of non-citizens.

20 Q. In fact, you state that in this e-mail,

21 correct?

22 A. Which e-mail?

1  Q. In this e-mail that we're looking at

2  right now.

3  A. I've got a couple --

4  Q. Exhibit 7.  You say, "Illegal immigrants

5  (or of the larger group of non-citizens)," right?

6  A. Yep.  Actually, yeah.  Making that

7  connection right there.  There you go.

8  Q. Right.  So this question of counting

9  illegal immigrants is fundamentally connected to

10 this issue of whether you are identifying citizens

11 or non-citizens in the census, right?

12 A. They're related, but that -- yeah.  I

13 mean, they're related, because you're talking

14 about different subsets of, you know, the

15 non-citizen population.

16 Q. Right.  And presumably they came up

17 together in the meeting earlier that day, correct?

18 A. I wouldn't --

19 MS. WELLS:  Object to the form.

20 THE WITNESS:  I don't share that

21 presumption.

22 BY MR. DURAISWAMY:

1  Q. You think it's a coincidence that you

2  just happened to be writing an e-mail about

3  counting of illegal immigrants at the same time

4  that you're exchanging e-mails about Secretary

5  Ross' curiosity about the citizenship question?

6  MS. WELLS:  Object to the form.

7  THE WITNESS:  Yeah.  I do not recall the

8  Secretary ever asking specifically about illegal

9  immigrants that are counting [sic]on the decennial

10  census.  Citizenship, certainly, but not illegal

11  immigrants specifically.

12  BY MR. DURAISWAMY:

13  Q. So what prompted this e-mail?

14  MS. WELLS:  Objection.

15  THE WITNESS:  A request from Earl.

16  BY MR. DURAISWAMY:

17  Q. When did you receive that request?

18  A. I don't know.  I'd have to go back and

19  check.  You know, if he sent me an e-mail,

20  whenever I got that e-mail, if he asked me,

21  then -- or Ellen, who is also on this.

22  Q. What did he tell you about why he was

1  asking you to look into this?

2  MS. WELLS:  Object to the form.  You're

3  assuming that he told you [sic].  He said he

4  wasn't sure.

5  BY MR. DURAISWAMY:

6  Q. You can answer.

7  A. I do not recall whether Earl asked me or

8  e-mailed me about it.  And what the context was,

9  you know, I can't give you the context on an ask

10  that I don't remember.

11 Q. Okay.  You attached a memo to this

12 e-mail, correct?

13 A. The DOJ memo, somebody else's memo, yeah.

14 Q. Well, those are my next questions.  But

15 there's an attachment to this e-mail that says --

16 it's titled Crawford letter and DOJ memo.PDF,

17 correct?

18 A. Yeah.

19 Q. What is that?

20 A. I'd have to go back and look at it to see

21 exactly what it was.  I don't know.

22 Q. It presumably relates to the subject of

1  your e-mail, correct?

2  A. I hope so.  Or Earl would not have been

3  happy.

4  Q. Fair to say that it is a memo addressing

5  the counting of illegal immigrants either in the

6  decennial census, period, or for purposes

7  apportionment?

8  A. Yeah.

9  MS. WELLS:  Object to the form.

10 THE WITNESS:  I would presume it relates

11 to, as I reference in the e-mail, a Bush era --

12 Bush 41 era DOJ opinion that proposed legislation

13 excluding illegal immigrants from the decennial

14 census.

15 BY MR. DURAISWAMY:

16 Q. Okay.  Do you know if you were involved

17 in preparing the document?

18 A. The DOJ opinion?

19 Q. The attachment to your e-mail.

20 A. Like, assembling it?

21 Q. Drafting it.

22 A. Well, there's nothing -- if I'm

1   AFTERNOON SESSION

2   (1:16 p.m.)

3   THE VIDEOGRAPHER:  Going back on the

4   record.  The time is 1316.

5   (Deposition Exhibit Number 8 was marked

6   for identification.)

7   Whereupon,

8   DAVID SANFORD LANGDON,

9   was called for continued examination, and having

10  been previously duly sworn was examined and

11  testified further as follows:

12  EXAMINATION BY COUNSEL FOR KRAVITZ PLAINTIFFS

13  BY MR. DURAISWAMY:

14  Q. Good afternoon, Mr. Langdon.  Handing you

15  what we've marked as Exhibit 8.

16  Have you had a chance to review the

17  document, Mr. Langdon?

18  A. This one, yes.

19  Q. Okay.  This is a further e-mail exchange

20  in response to what I believe is Exhibit 7, the

21  e-mail that you sent to Mr. Comstock and

22  Ms. Herbst on May 24th about the counting of

1  illegal immigrants, correct?

2  A. Correct.

3  Q. Okay.  And in his response, Mr. Comstock

4  raises the question of whether the -- strike that.

5  In response to Mr. Comstock asks about

6  why the decennial census does not include the

7  citizenship question, but the ACS does, correct?

8  A. Yeah.

9  Q. Okay.  And then he identifies a case that

10 he believes is relevant to the governmental need

11 for citizenship data, correct?

12 A. Uh-huh.

13 Q. Okay.  And you respond and say that you

14 have asked the Census Bureau team for more clarity

15 on how they decide what topics to include in the

16 decennial versus ACS, correct?

17 A. Yes.

18 Q. And that is consistent with the e-mail

19 that I believe we saw in Exhibit 6 where you were

20 posing that question, I believe, to Lisa

21 Blumerman, correct?

22 A. And Burton Reist and Melissa Creech, yes.

1   Q. Right.  And you say that your hunch is

2   "that the policy change on the citizenship

3   question is tied to the creation of the ACS.  I

4   will share what they say and will review the court

5   case."

6   You recall that they, meaning the Census

7   Bureau staff, came back to you with an explanation

8   as to why the citizenship question was on the ACS,

9   but not the decennial?

10  A. I can't remember the exact answer.  My

11  hunch wasn't entirely correct, actually, so, I

12  mean, the -- it was only a hunch.  The -- I mean,

13  the -- there was confusion here between the --

14  what used to be the short-form --

15  Q. Right.

16  A. -- census, which is now the regular

17  census, the long-form census and then ACS.

18  Q. So what do you recall that the Census

19  Bureau staff told you after looking into this

20  question?

21  A. Regarding the citizenship specifically?

22  Q. Yes.  As to why it was on the ACS but not

1  the decennial.

2  A. Actually, I don't recall exactly why it

3  was not on, like, what would have been, like, the

4  short form or the decennial.  The question -- I

5  think a lot of the conversation was about -- more

6  about what actually is on there and what the

7  justifications are for it, what the legal

8  justifications are.

9  I mean, to be frank, I mean, if nobody

10  asks for something to be on the census, it's not

11  on there.  Right?  So I mean -- so I'm not sure if

12  they could have answered why -- I don't know.  I

13  don't recall the specific answer to the question.

14  Probably well documented.

15  But in any case, I mean, there's always a

16  decision on -- going back to, actually, our much

17  earlier conversation about this survey length and

18  response rates and such -- I mean, there's a

19  decision about what needs to be asked of the

20  entire U.S. and what could be asked of a really

21  large sample.

22  Q. And to your recollection, that was part

1  of the consideration as to why the citizenship

2  question was asked on the ACS but not on the

3  decennial, correct?

4  A. It presumes that somebody actually

5  asked whether there should be -- I mean, the

6  citizenship question hadn't been on what was the

7  short form in, if I recall right, you know, at

8  least a couple of -- a few decades. And so, I

9  mean, that would suggest that there hadn't been a

10 strong case made for it to be on there at that

11 point. There hadn't been a need. But I don't

12 know specifically. I'm just, you know...

13 Q. Right. And you indicate in your previous

14 answer that it's also presumably connected to this

15 concern about survey length and response rates as

16 well, correct?

17 A. Yeah. Exactly.

18 Q. You also say that you're going to look

19 into -- review the court case, correct?

20 A. Yep.

21 Q. Your understanding that this court case

22 regarding the governmental need for citizenship

1   Q. Okay.  Prior to learning about the

2   discussions with DOJ regarding this issue in late

3   summer or early fall of 2017, did you have any

4   discussions with anyone about the need for

5   citizenship data for voting rights purposes other

6   than what's reflected in Exhibit 8?  Let me try

7   that again, because it's kind of a long question.

8   A. Yeah, it was.  Thank you.

9   Q. What I'm trying to understand is, in

10  Exhibit 8, Mr. Comstock e-mails you with this,

11  quote/unquote, relevant court case on the

12  governmental need for citizenship data, correct?

13  A. Uh-huh.

14  Q. And then some months later you become

15  aware of conversations between Commerce Department

16  and Department of Justice regarding the potential

17  need for citizenship data for DOJ purposes,

18  correct?

19  A. Uh-huh.

20  Q. Prior to your becoming aware of those

21  conversations and separate and apart from this

22  communication, do you recall any other discussions

1  with anyone else about whether DOJ had a need for

2  citizenship data?

3  A. So I've looked on the ACS side -- yeah --

4  I mean, conversations isn't the right word.  But

5  in my -- as I gathered background just to

6  become -- to gain a better understanding of why

7  topics are included on the ACS in particular --

8  and I looked at, you know, the publicly available

9  documentation --

10  THE REPORTER:  And I looked at the...

11  THE WITNESS:  Publicly available

12  document, you know, the report the Census Bureau

13  does on federal uses, and I looked at, for

14  example, citizenship, and there it outlined

15  pretty -- you know, all the different uses,

16  including the Voting Rights Act uses.

17  And so that, at some point -- I mean, it

18  probably fell within this window of time.  And at

19  some point, I would have discussed it or shared

20  with it James Uthmeier.

21  BY MR. DURAISWAMY:

22  Q. When?

1  A. I don't know.  I mean, it would have

2  been -- it could have been, like, probably late

3  fall.  There was, like, a point where I, like,

4  gained better understanding, and there was a

5  point, like, later on where, like, I actually

6  discussed it with him.

7  Q. Do you recall if it was before or after

8  the late summer, early fall time period when

9  you --

10  A. After.  It was after.

11  Q. Okay.

12  A. Yeah.  It was -- yeah.

13  Q. Okay.  So prior to the late

14  fall -- strike that.

15  Prior to late summer, early fall time

16  period, and separate and apart from what's in

17  Exhibit 8, do you recall any other discussions

18  with anyone else about whether DOJ had a need for

19  citizenship data from the decennial census?

20  A. I don't think so, no.  I mean, no, I

21  don't think so.

22  Q. You don't remember anything?

1   mentioned this earlier -- that he's been heavily

2   engaged with Census Bureau staff practically since

3   he came on as Secretary on a whole variety of

4   issues -- actually, kind of -- basically what it

5   says here, on a whole variety of issues regarding

6   the census.

7   MR. DURAISWAMY:  Move to strike as

8   nonresponsive everything after "it would be

9   unusual for somebody to do it on their own."

10  (Deposition Exhibit Number 10 was marked

11  for identification.)

12  BY MR. DURAISWAMY:

13  Q. Mr. Langdon, I'm handing you what we've

14  marked as Exhibit 10.

15  A. Uh-huh.

16  Q. This is an e-mail that you sent to Sahra

17  Park-Su --

18  A. Yep.

19  Q. -- a few months ago, June 22nd, 2018.  Do

20  you see that?

21  A. Uh-huh.

22  Q. And you forwarded her a news article

1   titled, "Commerce Secretary suggested citizenship

2   question to Justice Department, according to memo,

3   contradicting his congressional," correct?

4   A. Uh-huh.

5   Q. And that's a reference to the memo that

6   we just looked at in Exhibit 9, correct?

7   A. Uh-huh.

8   Q. Why did you send this to her?

9   A. Sahra and I were colleagues. We worked

10   together both on Census Bureau issues, and so it's

11   par for the course that we would share, you know,

12   relevant press articles about things we're working

13   on.

14   Q. What was your reaction to this article

15   when you read it?

16   A. My reaction to the article?

17   Q. Yeah.

18   A. Surprise, yeah.

19   Q. Why were you surprised?

20   A. Well, I mean, the idea of saying

21   something and then contradict -- you know, saying

22   something else that appears to contradict it is --

1  it surprised me.

2  Q. What he had testified to in Congress

3  appeared to be contradicted by the memo that's

4  Exhibit 9, correct?  That's what the article

5  indicated?

6  A. Yeah.

7  Q. Was that -- that was concerning to you?

8  A. Concerning to me?  No.  I thought it was

9  interesting.

10  Q. Surprising?

11  A. Yeah, surprising.

12  Q. Okay.  Is there a particular reason that

13  you wanted Ms. Park-Su to be aware of this?

14  A. As I stated before, we worked a lot on

15  Census Bureau issues in the policy office

16  together.  We sit also literally right next to

17  each other, from here -- we sat from here to

18  there, so we --

19  Q. No, I understand.  And I'm trying to

20  understand if this was more of, like, here's

21  something related to the census that you might be

22  interested in, or if there was something specific

1   sometime during the summer, give or take a month.

2   When I say late summer, it would be, like, August.

3   Maybe August -- August could have been July; July

4   could have been September.  I don't know exactly,

5   to be frank.

6   Q. But the conversation -- the first

7   conversation with Earl that you recall would have

8   been roughly around the time that you first

9   remember learning that Secretary Ross was

10  interested in adding the question to the census,

11  correct?

12  A. Yeah.  I mean, because that's -- that --

13  the Secretary expressing interest in it would lead

14  to follow-up activity, and that would include

15  conversation with Earl or others.

16  Q. Okay.  That's all I'm trying to

17  understand.  It's not a trick question.  I'm just

18  trying to make sure I understand what you remember

19  and what you don't remember.

20  A. Yeah.

21  Q. Okay.  So apart from reviewing the draft

22  Abowd memo, what other involvement did you have in

1  assessing this issue or pursuing it between the

2  summer of 2017 and March 2018?

3  A. I don't think anything, really.  I mean,

4  the main case was reviewing that memo.

5  THE REPORTER:  I'm sorry.

6  THE WITNESS:  Nothing that I can recall.

7  That was -- that was the meat of it, really, was

8  that analysis.

9  BY MR. DURAISWAMY:

10  Q. Do you recall attending meetings where

11  this issue was discussed?

12  A. No.  I mean, I knew that -- I was aware,

13  certainly, that the Secretary was scheduling quite

14  a few meetings and calls regarding this, you know,

15  different experts and such.  I was aware of that.

16  But I didn't -- I didn't take part of in any of

17  them.

18  Q. Do you believe the issue being discussed

19  at any of the monthly oversight meetings?

20  A. No.  Because it was sort of a -- it was

21  a -- sort of separate line of work.  Right?  I

22  mean, it was something that -- it was something --

1   correct?

2   A. Yeah.  I'd have to go back and see

3   when -- I think the memo came in December, maybe.

4   I don't remember exactly.

5   Q. Did you ever do any work assessing the

6   possible effects of adding a citizenship question

7   to the decennial census?

8   A. Analysis?  No.  No, we relied on what the

9   Census Bureau prepared.

10  Q. My question is whether you ever did any

11  work related to that issue.

12  A. I guess I don't understand the question.

13  Q. Well, let me ask it differently.  Did you

14  ever have any discussions with anyone about the

15  potential effects of adding a citizenship question

16  to the decennial?

17  A. I talked to John a couple of times after

18  we got the memo, just to make sure I understood

19  some of the analysis, had some questions about it.

20  Q. What was the substance of those

21  conversations?

22  A. I'd have to go back and look.  I mean, I

1   making in your previous answer?  How --

2   A. That it's not easy.  It's not easy.  It

3   takes a lot of work.  And you have to -- the

4   reason it takes a lot of work is because the

5   administrative data may not measure what you think

6   it's measuring, how you think it's measuring it.

7   Q. Are you aware of any testing that's been

8   done to evaluate the effects of including a

9   citizenship question on the 2020 decennial on

10  response rates or the accuracy of -- and quality

11  of survey data?

12  A. So the -- no, so there hasn't been.

13  There hasn't been any testing to date.  And the

14  time frame wouldn't -- the Secretary's decision

15  wouldn't -- you know, wouldn't accommodate that

16  kind of testing.

17  That said, the Census Bureau presented a

18  reasonable -- very reasonable alternative to get

19  at those kinds of issues, which was looking at,

20  you know, the impacts -- there was no change.

21  Citizenship has always been part of the American

22  Community Survey, but nonetheless, looking at

1  how -- you know, just how that plays out, you

2  know, what impact -- the John Abowd memo goes into

3  that --

4  THE REPORTER:  I'm sorry.

5  THE WITNESS:  The John -- the memo he

6  prepared goes into how citizenship might

7  potentially -- how information from the American

8  Community Survey and how it's collected may

9  indicate potential impacts on self-response rates

10  in the 2020 census.

11  BY MR. DURAISWAMY:

12  Q. Did you have any conversations with

13  outside stakeholders or parties outside the

14  Commerce Department about the effects of adding a

15  citizenship question to the 2020 census?

16  A. No.  I did not.

17  Q. Do you know who was principally

18  responsible for those conversations?

19  A. For organizing them?  For, like -- or for

20  scheduling them?

21  Q. Both organizing and actually

22  participating in the conversations.

1  number of reasons, because of the quality of the

2  answers, because they're burdensome, or whatever,

3  and whether or not we should consider using

4  administrative data as a substitute for that.  And

5  nowhere in that content review had any problems

6  with the question ever surfaced in terms of either

7  people not wanting to respond to it ever or in

8  terms of quality issues with the responses.

9  Q. In the time that you've worked at the

10 Commerce Department and had a responsibility for

11 issues related to the work of the Census Bureau,

12 do you recall ever hearing about the Department of

13 Justice being interested in census block-level

14 citizenship data for purposes of Voting Rights Act

15 enforcement?

16 A. No.

17 Q. There's a process by which government

18 agencies communicate with the Census Bureau about

19 their data needs, correct?

20 A. Yeah.  I mean, "process" is maybe a

21 generous word for it.  But, yeah, there's a

22 protocol by which -- that the Census Bureau has

1  actually developed with the -- actually, as part

2  of the last content review for the American

3  Community Survey --

4  THE REPORTER:  Part of the last...

5  THE WITNESS:  The content review for the

6  American Community Survey through which, you know,

7  they conducted outreach on to the need for data

8  and examined that need and weighed it.  And it's

9  come up in a few different contexts, most recently

10  with the same SOGI, the sexual orientation and

11  gender identification question.  It came up with a

12  health insurance question in the last couple of

13  years related to the Affordable Care Act.

14  And so there's -- there's not -- I

15  wouldn't say there's a linear process.  There's

16  frequently a dialogue between agencies at

17  different levels and the Census Bureau regarding

18  data needs and the right way to meet those needs.

19  BY MR. DURAISWAMY:

20  Q. Let me hand you what we've marked as

21  Exhibit 12.

22  (Deposition Exhibit Number 12 was marked

1   Q. Right.  But my question is, does the

2   bureau periodically seek input from other

3   agencies, not just as to the ACS, but to other

4   surveys that it administers?

5   A. Yeah.  So keep in mind that the Census

6   Bureau has a lot of reimbursable surveys.  So

7   these are surveys that it conducts for any number

8   of agencies.  An agency has a need, like, say, HUD

9   or DOJ, to have a specific survey on a specific

10   topic, and it will come to the Census Bureau, pay

11   them for it, and develop the survey together.  So

12   that's one venue of dialogue.  This -- so, yeah,

13   absolutely.

14   And this is another venue, which was part

15   of the ACS content review, and reaffirmations from

16   agencies about what data they needed.

17   Q. You don't see any indication in this

18   letter that the Department of Justice is

19   dissatisfied with the nature or quality or --

20   nature or quality of the citizenship data that's

21   provided from the ACS survey, do you?

22   A. They don't make any statement about the

1   make sure that the 2020 census is operationally

2   ready.

3   Q. Have you had any conversations with

4   Mr. Comstock regarding the citizenship question

5   that you can recall since late summer 2017?

6   A. No.

7   Q. Apart from Mr. Uthmeier, do you recall

8   any conversations -- well, strike that.

9   Apart from Mr. Uthmeier and whatever

10  conversations you have had at these meetings

11  related to responding to citizenship inquiries, do

12  you recall any other conversations with folks at

13  the department about the citizenship question?

14  MS. WELLS:  Object to the form.

15  THE WITNESS:  Okay.  Actually, to go back

16  on the question about Earl, I would have -- I

17  mean, to be clear, as far as, like, the clearances

18  go, that's quite -- I'm sure I've, you know,

19  brought, you know, responses to him and discussed

20  with him, you know, edits and such that he's had

21  to the citizenship question.  That's certainly the

22  case.

1  THE REPORTER:  Slow down, please.

2  THE WITNESS:  It's an implementation

3  phase.  The Secretary -- it's on the Census Bureau

4  now to implement his decision to add this question

5  and, you know, get the systems ready.  And

6  that's -- there's really not much more to discuss

7  in a way.  We're not Monday morning -- I'm not the

8  Monday morning quarterback for the Secretary's

9  decision on this.

10  (Deposition Exhibit Number 15 was marked

11  for identification.)

12  BY MR. DURAISWAMY:

13  Q. I'm handing you what we've marked as

14  Exhibit 15.  Have you seen this document before?

15  A. Let me take a look at it.

16  Q. Sure.

17  A. Not this exact one.  I've seen, like,

18  versions of it.

19  Q. What is it?

20  A. As I look at it, it's sort of a Q&A,

21  right, regarding the -- so it's -- basically, it's

22  a Q&A document regarding aspects of the decision

1  to include the citizenship question.

2  Q. Were you involved in preparing this

3  document?

4  A. Not drafting it.

5  Q. Well, what involvement did you have?

6  A. I might have sort of -- like, you know,

7  like in my policy role, I reviewed or cleared

8  parts of it.  I can't remember specifically.  I've

9  seen the document before.

10 And some of it -- the reason I'm waffling

11 on it is because some of the pieces are -- I've

12 seen in different contexts, you know, in, you

13 know, letter responses or other places.  I'm

14 generally familiar with the content.

15 Q. What was the purpose of the document?

16 MS. WELLS:  Object to the form.

17 BY MR. DURAISWAMY:

18 Q. Why was the document prepared?

19 A. I can't say specifically why it was

20  prepared, but its purpose is -- essentially, it's

21  a Q&A document, almost like an FAQ.  That's the

22  way I see it.

1  Q. For whom?

2  A. I don't know.  I mean, I'm not sure.  I

3  can't remember the context under which it was put

4  together.

5  Oh, wait a second.  No, actually, this

6  may have been -- actually, no, this is my mistake.

7  This is -- it looks like it's a response -- it's

8  responses from the Census Bureau regarding

9  questions from -- about John's memo.

10  BY MR. DURAISWAMY:

11  Q. Questions prepared by whom?

12  A. By the department.  I would have had a

13  role in preparing -- you know, in raising issues

14  to include.  I didn't -- I think the questions

15  probably came from Earl, ultimately.  But, you

16  know, there are a variety of people who reviewed

17  John's memo and provided -- you know, had

18  questions about the content of it, analytical

19  questions.  I mean, these are all, like, you

20  know...

21  Q. You had a role in drafting these

22  questions, correct?

1  A. Yeah, I did.

2  Q. At whose direction?

3  A. At -- either Earl or James.

4  Q. What did they -- what did they tell you

5  when they asked you to prepare these questions?

6  A. Well, not -- I mean, when they asked me

7  to review the memo and provide input, it was

8  basically, you know, review it and give me your

9  opinion on it, really.

10  Q. Well, these are -- this is a list of

11  questions.

12  A. Yeah.

13  Q. And you said that --

14  A. And my opinion would be through -- like,

15  what -- in other words, what -- you know, go

16  through it, and sort of like I mentioned earlier,

17  so I go through and I flag things that weren't

18  clear to me or that, you know, the analysis wasn't

19  clear or, like -- you know, it's like a peer

20  review almost.

21  Q. Somebody decided that you should respond

22  to the Abowd memo in the form of a series of

1  MS. WELLS:  Thanks.

2  MR. DURAISWAMY:  Sure.

3  THE WITNESS:  So this was -- yeah.

4  There's John's reference to our conversation.

5  Yeah.  So, I mean, the nature of the

6  questions was, you know, probably just -- it was a

7  very tactical memo.  It wasn't written for, like,

8  a lay audience, I thought.  And so part of our

9  questions were just to help us understand it

10 better just in general.  And part of it was to

11 actually question -- you know, to raise questions,

12 like a peer review, of aspects of the analysis.

13 BY MR. DURAISWAMY:

14 Q. To raise questions to push back on

15 aspects of the analysis, correct?

16 A. Push back is not the word -- phrasing I

17 would use.  But it's just to -- you know, it's

18 like a peer review.  So you're picking apart

19 different aspects of it.  That's -- this is

20 something we do, like, when we do economic

21 reports.  We would send things around and --

22 and -- yeah, you know, you're just, you know,

1  trying to, you know, make sure that the analysis

2  is rock solid and all the implications of it are

3  clear.

4  Q. You understood at the time that senior

5  officials in the Commerce Department wanted to

6  move forward with the citizenship question on the

7  2020 census, correct?

8  A. Uh-huh.

9  Q. And you understood that this memo from

10 John Abowd was taking the position that it would

11 be a bad idea to do that, correct?

12 A. Yep.

13 Q. And --

14 A. Well, let me -- bad idea.  He

15 presented -- what's "it" here?  I guess "it" is,

16 is it adding -- he provided -- the Secretary

17 wanted data on citizenship at a granular level.

18 And the options -- he laid out options for doing

19 that.  It was an options memo.  So one of the

20 options was not get it, not do it.  The second

21 option I remember was relying on the ACS.  The

22 third option was add it to the Census Bureau

1  survey.  And another option was, like,

2  administrative data.

3  So it's, like -- you know, the analytical

4  question is, okay, we want more granular

5  citizenship data; how are we going to get it?

6  Does it make sense to use the 2020 census for

7  those purposes?

8  And so -- I mean, bad idea, I think, is

9  an exaggeration of it, but it's a -- he -- John

10  advocated for administrative data and not for

11  using it on the 2020 census.

12  Q. The -- he characterized the proposal to

13  add a citizenship question to the 2020 census as

14  something that would be very costly, harm the

15  quality of the census count, and use substantially

16  less accurate citizenship status data than are

17  available from administrative sources, correct?

18  A. Uh-huh.

19  Q. This was not a recommendation to proceed

20  with the plan to add a citizenship question to the

21  2020 census, correct?

22  A. So he was -- he was not a fan of it, to

1  say the least, but --

2  Q. It was critical of the idea, correct?

3  A. Yeah, but --

4  Q. Okay.

5  A. -- so -- but then my role was to sort

6  of -- that draft -- that draft. I didn't see the

7  final memo. And then our -- my job was to read

8  through it and say, okay, well, there's a

9  narrative here, and there's data that supports it,

10 and then there's sort of the way the Census Bureau

11 operates. And not all those aspects actually

12 added up.

13 And so, for example, his statement -- and

14 I raised this for Earl -- was, you know, his

15 statement about the quality of the data. So my

16 reaction was, well, if there are data quality --

17 he basically suggested the survey question is not

18 going to get you good data. And so my response

19 was, well, you're trying to have it both ways as

20 the Census Bureau. You're flagging this issue,

21 but at the same point, we've had this question on

22 the ACS for years. We've been giving it to DOJ

1  and other users, through special tabulations, for

2  years.  It's never surfaced until now.  And even

3  now that the Census Bureau is arguing that there

4  are these data quality issues -- and we can set

5  aside whether or not there actually are data

6  quality issues, but let's say there are.  Then I

7  questioned him, why is the Census Bureau not

8  taking action to address the fact that they're

9  still using this question on the American

10 Community Survey?  And there was the dissonance

11 there that didn't make sense.  It still doesn't

12 make sense to me.

13 Q. So you don't know if there are data

14 quality issues with asking people to self-report

15 citizenship or not?

16 A. So you could --

17 Q. Or you don't have an opinion about that?

18 A. He argued in the memo that there were --

19 there were, you know, problems with the

20 non-citizenship estimate.  And so my response is,

21 okay, that's fine.  You're saying this.  I

22 understand your point.  But then if it's such an

1  questions you put on it, but it's the flow of

2  them.  So that's -- you know, it's not a minor

3  issue.  It's not something you take lightly.

4  Q. I agree.

5  A. The other thing I just wanted to flag --

6  the other thing I thought was inconsistent was

7  this question about his recommendation to use

8  administrative records.  And so again, I raised

9  for Earl that the Census Bureau was pretty much on

10  the tail end of having done, you know, a lot of

11  years of research on how to use administrative

12  records to conduct a successful decennial census.

13  A. lot of work.  And so -- and it was good work.

14  And it's inconsistent with that long,

15  thoughtful, methodological, careful approach to

16  say, okay, well, here's this data field that the

17  Secretary would like to add to the decennial

18  census, and we think we should just go ahead and,

19  two years from now, get this data through

20  administrative records.  That's not consistent

21  with the way the Census Bureau tends to approach

22  those kinds of decisions.

1  It's a very short time frame.  And they

2  had a limited -- at least at that point -- I don't

3  know what they have now, but they had a limited

4  set of administrative records to go on.

5  Q. Did you participate in any meetings with

6  Secretary Ross in January, March -- February or

7  March regarding this addition of a citizenship

8  question to the census?

9  A. No.  Like -- like, reviewing the

10  research, do you mean?  Like -- or pondering it

11  or...

12  Q. Any meetings with Secretary Ross

13  regarding the additional of a citizenship question

14  to the 2020 census?

15  A. I don't think so, no.  No.  I mean, the

16  kind of meetings with the agenda you just showed

17  me, like the steering committee?  Those kind of

18  things?

19  Q. Any meetings.  Is there something unclear

20  about my use of the word "meeting"?

21  A. No.  Meeting is very clear.  I appreciate

22  that.

1  the questions in -- I believe it's Exhibit 15?

2  A. Like, specifically?

3  Q. Yeah.

4  A. No, I can --

5  Q. Or generally.

6  A. I mean, generally, it probably would have

7  been John, and then it would have been cleared

8  through -- you know, all the way up through Ron

9  Jarmin.

10  Q. Do you know if anyone at the Commerce

11  Department changed any of the answers that the

12  Census Bureau provided?

13  A. I don't know.  I did not.  I don't have

14  any reason to believe anybody else did.  It's a

15  Census Bureau product.

16  Q. Do you think it would be appropriate if

17  someone at the Commerce Department changed answers

18  that were provided by the Census Bureau?

19  MS. WELLS:  Object to form.

20  THE WITNESS:  I mean -- appropriate?  I

21  mean, look, when we receive materials of any

22  nature -- this could be an example from the Census

1  Bureau -- there can be questions about it and

2  there can be a process by which it gets reviewed

3  and edited or revised.  You know, that would

4  involve a dialogue with the Census Bureau about

5  what did you mean here, you know, what -- what is

6  this, and it could involve Commerce Department

7  staff taking a pen and -- you know, and revising

8  an answer, but not on a sort of one-off, freelance

9  basis.

10 BY MR. DURAISWAMY:

11 Q. Are you aware of any external analyses

12 that were solicited regarding the impact of the

13 citizenship question on the quality or accuracy of

14 the census data?

15 A. Like, written analyses?  Not that I'm

16 involved with, no, I don't know of any.  I mean,

17 the Secretary had a lot of outside meetings, you

18 know, like, for example, with former Census Bureau

19 directors, people like that, but not that I'm

20 aware of.  Certainly nothing I reviewed.

21 Q. I mean, is the answer, no, you're not

22 aware of any external analyses beyond what the

1  Census Bureau did regarding the effects of adding

2  a citizenship question to the census?

3  A. That's a good summary of my answer.

4  Q. Okay.  Do you know if your e-mail files

5  were searched for purposes of producing documents

6  in this lawsuit?

7  A. I do know that and, yes, they were

8  searched.

9  Q. Were your paper files searched?

10  A. Yes, I provided a folder of paper files.

11  Q. You mentioned that you have -- sometimes

12  take notes on the PowerPoint presentations that

13  are essentially -- it sounds like pre-reads for

14  these monthly census team meetings, correct?

15  A. They're more handouts during the meetings

16  as opposed to pre-reads.  But, yeah, I had a

17  file -- I have a file and I provided that.

18  Q. For purposes of responding to discovery

19  in this case?

20  A. Yes.

21  Q. Do you ever send text messages for work

22  purposes?

1  A. Yeah, I don't know.

2  Q. Did you have any involvement in preparing

3  the March 26th memo announcing the decision to add

4  a citizenship question for the 2020 census?

5  A. No.

6  Q. Do you know who was involved in that

7  process?

8  A. Not off the top of my head.  I don't

9  know.

10  Q. So you testified earlier that you were

11  not -- strike that.

12  You testified earlier that you first

13  learned about Secretary Ross' intent to add a

14  citizenship question around late summer of 2017,

15  correct?

16  A. Mid to late summer, I think I said, yeah.

17  Q. Okay.  And I believe you testified that

18  you were not aware of or involved in any

19  discussions regarding the need for a citizenship

20  question for DOJ or voting rights purposes before

21  that time, correct?

22  A. Not that I recall, no.

1  Q. Okay.  And the discussions about adding a

2  citizenship question to the census were not part

3  of the monthly census briefings that you

4  participated in, correct?

5  A. No, not -- no.  Like the -- like the

6  analysis, you mean?  Not that I can recall, no.

7  Q. And, in fact, I believe you testified

8  that there was sort of a separate process at the

9  senior level that was handling that, correct?

10 A. I did testify to that, yep.

11 THE REPORTER:  I'm sorry?

12 THE WITNESS:  I did testify to that.

13 BY MR. DURAISWAMY:

14 Q. You are the senior policy advisor for

15 statistical agencies at the Department of

16 Commerce, correct?

17 A. Uh-huh.

18 Q. And you are the senior-most career

19 staffer for issues of policy and strategy as it

20 relates to the Census Bureau, correct?

21 A. Yeah.  Although at that time I shared a

22 lot of the policy duties regarding -- specific to

1  to 2020 census with Sahra Park-Su.  So we -- we

2  shared a lot of that work for a while.

3  Q. She was a policy advisor as well?

4  A. Yes.

5  Q. Do you know if she was involved in any of

6  those discussions that you were not involved in?

7  A. I don't know.

8  Q. There's no one else in the Office of the

9  Secretary who has more experience dealing with

10 issues of policy and strategy as it pertains to

11 the Census Bureau than you, correct?

12 A. Currently, yeah.  I mean, just by merit

13 of age and experience in the department, that's

14 probably accurate, yeah.

15 Q. And you were basically not involved in

16 the process of deciding to add a citizenship

17 question, right?

18 MS. WELLS:  Object to the form.

19 THE WITNESS:  I was not involved in --

20 yeah.  I mean, I provided input -- I mean, this is

21 the way I operate -- I mean, the way I work.  I

22 mean, I -- I respond to the needs of my boss.

1   And, you know, when he engaged me on specific

2   matters, I responded and provided input.

3   But if he didn't engage me and ask for my

4   input, then I didn't provide it.  I had no

5   shortage of policy matters to deal with.  So...

6   BY MR. DURAISWAMY:

7   Q. And you can't recall being engaged on --

8   for your input on the issue of whether to add a

9   citizenship question until, at the earliest,

10 January 2018; is that correct?

11 MS. WELLS:  Object to the form.

12 THE WITNESS:  I provided input to John's

13 memo, whenever that came in -- I mean, whatever

14 the date is on that.  That came in.  That was a --

15 you know, that was the Census Bureau's analysis

16 regarding, you know, what they -- their views on,

17 you know, how to provide citizenship data to the

18 Secretary at the level that DOJ was asking for.

19 And I provided input into that.

20 BY MR. DURAISWAMY:

21 Q. Take a look at Exhibits 15, 16 and 17.

22 Does that refresh your recollection that that was

1   day.  Right?

2   Q. Did you review any other memos prepared

3   by John Abowd regarding the addition of a

4   citizenship question?

5   A. No.

6   Q. Did you review the memo analyzing

7   alternative D?

8   A. So alternative D, just to be clear, is

9   that the one with the blending of the survey and

10  administrative data?

11  Q. Is that your understanding of

12  alternative D?

13  A. I'm asking.  I mean, like I say, this was

14  an iterative process, so...

15  Q. Well, do you recall reviewing a memo

16  analyzing alternative D?

17  A. I'm aware of alternative D.  I mean, I

18  think I may have seen a version of it, yeah,

19  but it's...

20  Q. Did you ever have any discussions with

21  the Secretary about alternative D?

22  A. No.  I mean, as I stated earlier, the

1  Secretary and I have not had conversations about

2  this -- this matter, really.

3  Q. So when these parallel meetings were

4  going on regarding the addition of a citizenship

5  question that were taking place outside the

6  context of the monthly census briefings, who was

7  participating in those meetings, if not you?

8  MS. WELLS:  Object to form.

9  THE WITNESS:  I believe you asked this

10 earlier, and --

11 BY MR. DURAISWAMY:

12 Q. If you know.

13 A. -- I said I don't know.  Yeah, you've

14 asked this before.  But -- yeah.

15 Q. You have, like, not the slightest idea --

16 like, you don't even have a reasonable basis to

17 believe that Earl Comstock was involved in those

18 meetings?

19 A. And, of course -- I mean, yeah, but, I

20 mean, that's -- you know, it's a question of who

21 is meeting when on what.  And it's not my -- I can

22 hypothesize, of course.  I mean, it would be

1   CERTIFICATE OF NOTARY PUBLIC

2   I, Denise M. Brunet, the officer before

3   whom the foregoing deposition was taken, do hereby

4   certify that the witness whose testimony appears

5   in the foregoing deposition was sworn by me; that

6   the testimony of said witness was taken by me

7   stenographically and thereafter reduced to print

8   by means of computer-assisted transcription by me

9   to the best of my ability; that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this litigation and have no

12  interest, financial or otherwise, in the outcome

13  of this matter.

14  <%14541,Signature%>

15  _____

16  Denise M. Brunet

17  Notary Public in and for

18  The District of Columbia

19

20  My commission expires:

21  December 14, 2022

22