Page 289

1  make up for a decline in self-response or failure

2  to not -- failure to answer a NRFU as a result of

3  this citizenship question?

4          MS. BAILEY:   Objection.   Compound.

5          THE WITNESS:   So I believe in the -- in

6  the -- not this memo -- well, it probably is in

7  this memo, too -- but there was a computation of

8  what the expected increase in nonresponse

9  follow-up costs would be.                      401/403

10 BY MR. TILAK:

11     Q    Do you remember what the calculation was?

12     A    Offhand, I think it was in the, you know,

13 20 to $40 million range, something like that.

14     Q    Was that a conservative estimate?

15     A    A conservative -- yeah.   I think they

16 thought it -- that that was potentially a lower

17 bound.

18     Q    Are you aware of any calculation at the

19 upper bound of what the cost might be?

20     A    Not of an upper bound, no.

21     Q    Earlier today we discussed sensitive

22 questions.   Is it accurate that if a question is

Page 290

1    sensitive to a particular population, that

2    population might fail to respond to that
                                                401/403
3    particular question?

4          MS. BAILEY:   Objection.   Calls for

5    speculation.

6          THE WITNESS:   So to the degree that

7    sensitive questions have lower self-response

8    rates, that could potentially be true, yeah.

9    BY MR. TILAK:

10     Q    And if there's a sensitive question on a

11   questionnaire, does the presence of that question

12   increase the likelihood that a person will not

13   respond to the questionnaire as a whole?

14     A    Again, that -- that could happen, yes.

15     Q    We -- you also talked about cognitive

16   testing at some length this morning.  What does it

17   mean for a question to be cognitively difficult?

18     A    So the person doesn't understand what

19   we're asking.

20     Q    And if a question is cognitively

21   difficult, does that increase the likelihood that

22   the respondent will fail to answer that specific

1   question on the questionnaire?

2       A   Yes.

3       Q   Does it also increase the likelihood that

4   the respondent will fail to respond to the

5   questionnaire as a whole?

6       A   That, I -- I -- I'd have to see studies

7   on that.  As surveys go, census questions are

8   typically not that cognitively difficult.  Health

9   surveys are far more cognitively difficult, just

10  to give you a -- some parameters.

11      Q   Is there -- is there a threshold in your

12  mind for when a question is cognitively difficult?

13      A   Not in my mind.  I would leave that up to

14  the folks that would evaluate that sort of thing.

15      Q   And who would those people be?

16      A   So we have some survey methodologies that

17  look at that type of thing, as do other survey

18  organizations.

19      Q   For the 2020 census, the citizenship

20  question will be placed at the end, correct?

21      A   Correct.

                                    401/403

22      Q   What was the reason for that?

Page 292

1       A    Since it was added late, it was placed at

2   the end.

3       Q    That particular ordering was not tested

4   in any way, correct?                        401/403

5       A    No, it wasn't.

6       Q    But households are still required to

7   answer the citizenship question, correct?

8       A    Yes, they are.

9       Q    Even though it's placed at the end?

10      A    Yes.

11      Q    The Census Bureau has not communicated to

12  the public that the citizenship question is

13  optional, to your knowledge?

14      A    No.

15      Q    Do you know if DOJ has communicated to

16  the public whether the citizenship question is

17  optional?

18          MS. BAILEY:  Objection.  Foundation.

19          THE WITNESS:  Well, the Census Bureau's

20  position is that it is not, so.

21  BY MR. TILAK:

22      Q    In fact, a person faces penalty for

Page 295

1    questionnaires must satisfy some statutory or

2    regulatory need; is that correct?

3        A    Correct.

4        Q    And generally, the Census Bureau only

5    asks questions that are requested by an agency,

6    correct?

7        A    Yes.  That's correct.

8        Q    And the impetus for adding the

9    citizenship question here was the DOJ's Gary

10   letter --

11       A    Yes.

12       Q    -- correct?

13            And this letter asked for block-level

14   citizenship data, correct?

15       A    Correct.

16       Q    And the Census Bureau decided to use the

17   ACS question, correct?

18       A    That's correct.

19       Q    When in the process did the Census Bureau

20   decide that if they were going to ask a

21   citizenship question, it would be the ACS

22   question?

Page 296

1        A    Early in the process.  Given the tight

2    time constraint, we didn't really have time to

3    consider an alternative, and this has the added

4    benefit that it's completely comparable with the

5    ACS data.

6        Q    The ACS question asks for more than just

7    citizenship, though, correct?                401/403

8        A    It has multiple questions.

9        Q    It asks whether someone was born in the

10   United States or U.S. territories?

11       A    Correct.

12       Q    Did DOJ ask for data on where a person

13   was born?

14       A    They did not.

15       Q    To your knowledge, was this information

16   necessary to satisfy DOJ's needs?

17            MS. BAILEY:  Objection.  Foundation.

18            THE WITNESS:  Which information?

19   BY MR. TILAK:

20       Q    The information on whether someone was

21   born, for example, in the U.S. territories?

22       A    I don't think that -- that -- I'm not

1    sure what you're asking here.

2        Q    Well, the DOJ asked for citizenship

3    information?

4        A    Right.

5        Q    Is information on where someone was born

6    responsive to that request apart from the earlier

7    question, are you a citizenship or not?

8        A    No.  So, I mean, that's the way the ACS

9    question is read, so that's what we went with, so.

10       Q    The ACS question also requests whether

11   individuals were born abroad to U.S. citizens?

                                    401/403

12       A    Correct.

13       Q    DOJ did not specifically ask for that

14   information, correct?

15       A    No.  They did not.

16       Q    The ACS question asks if a citizen is

17   naturalized, correct?

18       A    Correct.

19       Q    And, again, that was not specifically

20   requested by DOJ?

21       A    No.

22       Q    It also asks the year someone was

Page 298

1    naturalized, if they were a naturalized citizen?

2        A    Yes.

3        Q    And DOJ doesn't ask for this information

4    either, correct?                        401/403

5        A    No, it does not.

6        Q    At any point, did the Census Bureau ever

7    consider a question that simply asked, are you a

8    citizen; yes or no?

9        A    Again, that would have required a much

10   lengthier period of time.  It would have required

11   testing and what have you.  And so given the time

12   frame and the desire to have comparability to the

13   ACS, a decision was made to go with the ACS.

14       Q    So is it a fair statement that because of

15   the compressed timeline, the Census Bureau went

16   with a question that asks for extraneous

17   information not responsive to the DOJ's request?

18           MS. BAILEY:  Objection.

19           THE WITNESS:  That information is

20   currently used by -- by DOJ right now.  I would

21   assume that, you know, they would still find that

22   useful.

Page 299

1    BY MR. TILAK:

2        Q    Did they specifically request it --

3        A    They did not.

4        Q    Now, we talked a little bit about some of

5    the evidence that Dr. Abowd cites in his memos for

6    why there might be a decline in self-response

7    rates.                    401/403

8            Was there any affirmative evidence you're

9    aware of suggesting that there would not be a

10   decrease in response rates as a result of this

11   citizenship question?

12       A    No.

13       Q    To go back for a second, when the

14   decision was made to use the ACS formulation, who

15   made that decision?

16       A    That was a conversation within the

17   Census Bureau.

18       Q    Was the Commerce Department involved in

19   any way?

20       A    No.

21       Q    Do you know if DOJ was involved in any

22   way?

1      Q    And how are they different?

2      A    Well, they're meant to test procedures

3   and processes and --

4      Q    If the Census Bureau had known about the

5   citizenship question request in February of 2017,

6   would it have been able to do more testing of that

7   question?

8      A    We certainly would have had more time to

9   do testing.  Whether it would have been as

10  definitive as we would have liked, I doubt it.  It

11  still would not have been in the decennial

12  environment of, you know, this spring, summer of

13  2020.

14     Q    Would it have been -- let me rephrase.

15          If the citizenship question had been

16  requested in February of 2017, would the

17  Census Bureau have been able to include it in the

18  2018 end-to-end test?

19          MS. BAILEY:   Objection.   Calls for

20  speculation.

21          THE WITNESS:   So if a decision had been

22  made prior to the development of the materials for

1  the 2018 end-to-end test, we would have included

2  it because it was part of the census.  We ran what

3  we thought was the census.  Again, we weren't

4  testing the questions in the 2018 end-to-end test.

5  We were testing the systems and procedures.

6  BY MR. TILAK:

7       Q    And what systems and procedures,

8  specifically?

9       A    All of the data collection procedures,

10 all of the data processing procedures, the review

11 and publication of the date products.

12      Q    Did that include nonresponse follow-up

13 procedures?

14      A    It did.

15      Q    And did it include proxy response

16 procedures?

17      A    It did.

18      Q    And whole person imputation procedures?

19      A    It will.

20      Q    And based on Dr. Abowd's analysis, is it

21 accurate that the inclusion of a citizenship

22 question will increase the NRFU workload?

Page 307

1    A    That's -- we believe that to be the case,

2  yes.

3    Q    And is it also an accurate statement

4  because people who chose to -- who refuse to

5  respond -- self-respond because of a citizenship

6  question will also not respond to NRFU and the

7  proxy workload will also be increased --

8         MS. BAILEY:   Objection.

9  BY MR. TILAK:

10   Q    -- in the 2020 census?

11   A    So we do believe it will lead to an

12  increase in the proxy rate.  Less confident about

13  that rate, though, because it's a smaller rate.

14   Q    What do you mean by that?

15   A    Well, the number of proxy responses at

16  the end is relatively small compared to the NRFU

17  workload.

18   Q    And of that proportion that's left over

19  for proxy are hard-to-count populations a

20  disproportionate part of the proxy response

21  population as it --

22   A    Yeah.  That's part of what it means to be

1    hard to count, I believe.

2         Q    Turning to 1317 on this memo, the last

3    sentence -- well, let's start with the sentence

4    above that.   "No one provided evidence that there

5    are residents who would respond accurately to a

6    decennial census that did not contain a citizen,

7    but would not respond if it did, although many

8    believe that such residents had to exist."

9          Does the Census Bureau have any evidence

10   responsive to this question here?

11        A    So I think the Census Bureau's analysis

12   suggested that there would be some folks who would

13   have answered the question through

14   self-response -- or responded via self-response

15   that would now have to go to NRFU.   Accuracy of

16   NRFU responses is less than self-response and

17   proxy response is less than NRFU responses.

18        Q    So this is -- it's your testimony that

19   this is not an accurate statement, that the

20   Census Bureau did, in fact, provide evidence?

21        A    So this is the Secretary's assessment of

22   the evidence that was provided to him total, so.

Page 309

1      Q      But your testimony is the Census Bureau

2    did provide evidence; is that correct?

3      A    Yes.

4           MR. TILAK:  We can go off the record for

5    five minutes.

6           MS. BAILEY:  Oh.  Taking a break?

7           MR. TILAK:  Yeah.

8           VIDEOGRAPHER:  The time is 3:44 p.m.

9    This completes Media Unit Number 3.  We are now

10   off the record.

11           (Off the record.)

12           VIDEOGRAPHER:  The time is 3:56 p.m.

13   This begins Media Unit Number 4.  We're now on the

14   record.

15           Please proceed, Counsel.

16             EXAMINATION BY MS. SHAH:

17     Q    Good afternoon.  My name is Niyati Shah,

18   and I represent the plaintiffs in Lupe v. Ross in

19   the District or Maryland, Case Number 8:1801570.

20           Dr. Jarmin -- of course.

21           I'd like to actually just go back to the

22   discussion we had earlier today about the race and

1    ethnicity question.

2         Would you characterize combining the two

3    census questions on race and ethnic origin for the

4    2020 census as modifying the 2020 census

5    questionnaire, as compared to 2020 census, or

6    adding a new question to the 2020 census?

7         MS. BAILEY:  Objection.  Compound.

8         THE WITNESS:  As modifying.

9    BY MR. SHAH:

10    Q   Okay.  Is it your understanding that the

11   Census Bureau fielded a National Content Test or

12   the NCT in 2015 in large part to evaluate the best

13   way to collect race and ethnicity data for the

14   2020 census?

15    A   Yes.

16    Q   And that included the possibility of a

17   combined race and ethnicity question, correct?

18    A   It did.

19    Q   Among other things, did the NCT test for

20   the wording of a combined race and ethnicity, as

21   well as revised wording for a separate race and

22   ethnicity question?

1       A    I --

2            MS. BAILEY:  Objection.  Compound.

3            THE WITNESS:  I believe it did both.

4    BY MS. SHAH:                401/403

5       Q    And did the NCT test for a design and

6    placement of the combined race and ethnicity

7    question?

8       A    I'm not sure if it did placement or not.

9       Q    And did the NCT test for instructions for

10   each iteration of the race and ethnicity question?

11      A    Yes.

12      Q    And as well for the questionnaire, as

13   well?

14      A    I'm not sure for the -- entire

15   question -- I mean, I know for each of the

16   versions of the question, it had different

17   versions of the instructions.

18      Q    And would you characterize the NCT as a

19   randomized controlled test?

20      A    It was.

21      Q    And would the NCT also be considered

22   field testing?

Page 312

1      A    Yes.

2      Q    And from the NCT, would the Census Bureau

3  be able to tell how certain demographic subgroups

4  responded to the race and ethnicity question?

5      A    Yes.                401/403

6      Q    Would they be able to tell how Hispanics

7  responded?

8      A    Yes.

9      Q    How about Asians?

10      A    Yes.

11      Q    What about Native Americans?

12      A    I believe so, yes.

13      Q    And would they also be able to show how

14  populations in certain geographic regions

15  responded?

16      A    I'm not sure about geographic regions, so

17  I'd have to go back and review the -- it was a

18  large test, because it needed to be able to

19  breakdown by these various race and ethnic

20  categories.  But, obviously, some of those get

21  pretty small if you break it into smaller

22  geographies.  So I'm not sure that it had much to

Page 313

1   say geographically, but I'd have to go back and

2   review the parameters of the test to answer that

3   more fully.

4       Q    Okay.  Fair enough.

5            And it's correct that the Census Bureau

6   staff recommended that the 2020 census include a

7   combined race and ethnicity question with a new

8   MENA category and check boxes for collection of

9   racial subgroup data pending a parallel effort at

10  OMB to revise the official standards?

    401/403

11      A    Yes.

12      Q    After the Census Bureau staff made this

13  recommendation to the Census director, they

14  initially planned to include this race and

15  ethnicity question in the 2018 end-to-end test in

16  Rhode Island, correct?

17      A    That is correct.

18      Q    And if that combined race and ethnicity

19  question stayed in the testing -- the end-to-end

20  testing, would that represent a redesign of the

21  questionnaire for 2020 census?

22      A    So --

1      Q   Would it have -- I asked if it would have

2   informed the Census Bureau's development of the

3   data collection instruments for the nonresponse

4   follow-up?

5          MS. BAILEY:  Same objection.

6          THE WITNESS:  So I'm not sure how it

7   would have informed.  The other forms, when you

8   asked if it was going to be on there --

9   BY MS. SHAH:

10     Q   Yeah.

11     A   -- the answer was yes, so.

12     Q   Okay.  And would -- would the results of

13   the end-to-end test, if the race and ethnicity

14   question was -- remained in there as recommended

15   by the staff, would it have informed the

16   development of training modules for enumerators?

17          MS. BAILEY:  Objection.  Calls for

18   speculation.                401/403

19          THE WITNESS:  So part of the end-to-end

20   test is to review procedures.  So regardless of

21   what form of various questions are on there, it's

22   going to inform refinements to training

 1    procedures.

 2    BY MS. SHAH:

 3        Q   Okay.  Just, generally speaking, how

 4    would the Census Bureau go about estimating costs

 5    for a nonresponse follow-up program?

 6        A   So a lot of it is based on past practice.

 7    So we know, approximately, what the workload's

 8    going to be.  We know what we're going to pay our

 9    enumerators, sort of a -- there's a rough formula

10    that they use to estimate these things, based

11    on -- you know, historical practice of NRFU and

12    other things we've learned from the ACS and what

13    have you.

14        Q   Anything else?

15        A   No.

16        Q   Would a scientifically-rigorous

17    calculation of these costs include basing

18    estimates on iterative field testing and other

19    research conducted over the years in the census

20    planning phase?

21            MS. BAILEY:  Objection.  Compound.

22    Objection.  Form.

                              401/403

Page 319

1          THE WITNESS:   So we try to update the

2     cost models as best we can with relevant

3     information.   If some of that was gleaned from

4     mid-decade tests, we would have added that in

5     there.
                        401/403
6     BY MS. SHAH:

7          Q    Okay.   And would the final calculation or

8     estimate also factor in results from the

9     end-to-end test?

10         A    So, yes.   It may.   So, I mean, we have

11    changed procedures that affect the productivity of

12    the enumerators, which is a large cost driver, so

13    that will be incorporated into updated models.

14         Q    But cal- -- so would calculations be

15    based solely on the self-response rate from the

16    previous census or ACS?

17         A    No.   So it's based on the self-response

18    rate.   It's based on the productivity of the

19    enumerators in the field, based on wages and what

20    have you.   So, you know, those are the three main

21    cost drivers.   What's the workload?   What's

22    productivity?   What's the cost per hour of

Page 324

1      A    So this was a team put together that

2  consisted of both Census and Commerce Department

3  officials at the direction of the Secretary.  So

4  shortly after he came on board, there was some --

5  some cost overruns on various things, and this was

6  an attempt to get a broad handle on things.

7      Q    And the -- did this assumption of a

8  3 percent increase factor in the addition of a

9  citizenship question?  401/403

10     A    No.

11     Q    Okay.  I'd like to mark the next document

12 as Exhibit 25, I believe.

13          (Plaintiffs' Exhibit 25, Memorandum, was

14 marked.)

15 BY MS. SHAH:

16     Q    So are you familiar with this memo?

17     A    I am, yes.

18     Q    What is this memo about?

19     A    This was some work that was being done

20 looking at, you know, sort of various response

21 propensity type things for the ACS, I believe.

22     Q    What do you mean by various response

Page 329

1        Q    Where enumerators are --

2        A    Temporary.

3        Q    And are they trained differently, field

4   representatives?

5        A    Well, field representatives are trained

6   to do the surveys that they conduct.  So they go

7   out in the field and do far more complex surveys

8   than the decennial.  So they're trained for each

9   of surveys that they do.  So they do the current

10  population surveys, the SIPP, the ACS, the

11  American Housing -- you know, there's a long list

12  of surveys that they do that are either

13  Census Bureau surveys or surveys we do on a

14  reimbursable basis for government agencies.

15       Q    So is it fair to say field

16  representatives have more training than

17  enumerators?                    401/403

18       A    They would certainly have more experience

19  and training.

20       Q    And then on Page 2, field representatives

21  have asked for additional training to help them

22  overcome these fears regarding confidentiality and

Page 335

 1  So there's a lot of stuff in here that doesn't

 2  refer to the technical characteristics that Census

 3  did not opine on.

 4  BY MS. SHAH:

 5      Q    And from the technical perspective, was

 6  there anything that they opined on?

 7          MS. BAILEY:  Objection.  Vague.

 8          THE WITNESS:  No.  I think we took what

 9  we -- what we perceived from this letter as the

10  technical requirements from DOJ for block-level

11  data and tried to come up with a solution for that

12  problem.

13  BY MS. SHAH:

14      Q    And did you discuss this letter with any

15  knowledge of jurisdictions actually going about

16  drawing districts?

17      A    No, not really.  I mean, we have people

18  in our redistricting office that had some input on

19  this.  But they provide the data.  They're not

20  involved in redrawing districts.

21      Q    Did you discuss this letter with anyone

22  who had knowledge or experience with litigating

1  Section 2, voting rights cases?    401/403

2      A    No.

3      Q    And what was your understanding of why

4  DOJ needs to have this citizenship question asked

5  on the short form?

6      A    So they needed more geographically

7  granular data.  So right now, the no PL94 data at

8  the block level, these data for the five-year ACS

9  are at the block group level, and they have to

10  model them down to the block level.  They just

11  wanted the data at the same level of geographic

12  specificity that would be more accurate data.

13      Q    Okay.  If you look at the bottom of

14  Page 2, the General Counsel sets out a bulleted --

15  bulleted reasons why he believes the ACS does not

16  yield annual data for enforcing the Voting Rights

17  Act.  The first bullet contends jurisdictions

18  conducting redistricting use -- redistricting use

19  total population data from Census to determine

20  compliance with the Constitution's one-person,

21  one-vote requirement.  What is your understanding

22  of that requirement?

Page 350

1    on what we're going to do.  So --

2         Q    And what would be the purposes of talking

3    points in this context?

4         A    So to be able to have a clear message

5    about, you know, how we were responding with the

6    citizenship -- the process that we were following

7    on the citizenship question.

8         Q    And if I can turn your attention back to

9    the draft, which is marked as Exhibit 28, do you

10   recall if that letter and the content in that

11   letter seemed to you to be an appropriate basis

12   for creating talking points to address questions

13   about the citizenship question?            401/403

14        A    Yeah.  And it wasn't about the

15   citizenship question.  It was about what we were

16   doing in response to the question.  So --

17        Q    And -- and to clarify, what you were

18   doing in response to DOJ's inquiry about --

19        A    Right.

20        Q    -- adding a citizenship question?

21        A    Right.

22             So this seems to be a consistent -- so I

Page 351

1    don't remember if this is exactly what we agreed
2    to, but --                    401/403
3         Q    And the middle of this letter, it goes
4    through five steps, correct?
5         A    Uh-huh.
6         Q    And those five steps are summarized in
7    numerous documents that we've looked at today --
8         A    Right.
9         Q    -- for your deposition?
10        A    Yes.
11        Q    Is this a standard process that the
12   Census Bureau uses for adding questions to the ACS
13   and then also to the decennial census?    401/403
14        A    Correct.
15        Q    Okay.  I want to mark this as Exhibit 30?
16             (Plaintiffs' Exhibit 30, Letter, was
17   marked.)
18   BY MS. BRANNON:
19        Q    Are you familiar with this document?
20        A    I'm not sure if I've seen this or not,
21   but I think I've seen other letters like this,
22   though.

Page 353

```
 1      Q   Would you typically approve a letter like
 2   this?
 3      A   I mean, especially if it's a form and we
 4   were discussing it in, you know, sort of the
 5   correspondence group, I probably would have seen
 6   it.
 7      Q   Would your log show whether you approved
 8   this letter or not?
 9      A   I'm not sure that it would show that I
10   approved it or not.
11      Q   Would it show whether you received a
12   letter that was dated January -- January 31, 2018?
13      A   So it -- it would show if I received a
14   letter, yes.
15      Q   Would it show if you received a draft of
16   a letter that was to go out on January 31, 2018
17   from Secretary Ross?
18      A   That, I'm not sure.
19      Q   This letter is markedly different than
20   what we have marked as Exhibit 28, correct?
21      A   Correct.                          401/403
22      Q   And none of the five steps are
```

Page 354

1    removed -- or all of the five steps were removed,

2    none of those are in the January 31, 2018 letter?

3        A    That's correct.                    401/403

4        Q    Do you remember any discussions with

5    anyone at Commerce about the changes of this

6    letter to the draft of the version that Secretary

7    Ross sent out?

8        A    I don't -- not offhand, no.

9        Q    Would you have had any conversations with

10   Karen Dunn Kelley about this letter?

11       A    I don't know.

12       Q    I'm going to turn your attention to what

13   I'm going to mark as Exhibit 31.

14           (Plaintiffs' Exhibit 31, Email, was

15   marked.)

16   BY MS. BRANNON:

17       Q    Are you familiar with this document?

18       A    This sounds like KDK responding to my

19   original email that we discussed earlier.

20       Q    And she says, "Gentlemen, can you please

21   sort through the issues below?"               401/403/802

22           Do you know what she meant by that?

1      A    I think we were trying to track down the

2    changes, yeah.

3      Q    And when you say track down the changes,

4    these were changes that were made by somebody at

5    the Commerce Department?                    401/403

6      A    I think so, yeah.

7      Q    And that would have been at some point

8    before January 24, 2018?

9      A    The changes?

10     Q    Yes.

11     A    Yeah.  I assume so, yeah.

12     Q    And do you have any recollection as to

13   whether you received those changes?

14     A    So I don't recall, per se.

15     Q    Do you remember having any conversations

16   with anyone about -- at Commerce about the content

17   of the letters that Secretary Ross was sending to

18   members of Congress in response to inquiries about

19   the citizenship question?

20     A    No.  I mean, again, this was -- you know,

21   there was lots going on.  This was not a -- you

22   know, a key focus point.  We were trying to

Page 363

1      A   I think this looks familiar.

2      Q   I'm going to direct your attention to the

3   email from Burton Reist on January 24, 2018, which

4   I acknowledge you were not cc'd on, but I just

5   have a question for you, if you know.  In the

6   middle of the email that's at the bottom of

7   Page 8558, it says, "We pulled the residence

8   criteria topics from the PMR."

9          What is the PMR?

10     A   Program management review.  We do one

11  quarterly for the decennial census.

12     Q   Was there a program management review

13  done in January of 2018?

14     A   I have to go back and look, but there

15  probably would have been one in there -- at some

16  point.                          401/403

17     Q   Okay.  And then if you'll turn the page

18  over to 8559 it says, "We also haven't heard

19  anything about the response to the

20  senator" -- "about the response to Senator Harris

21  on the citizenship question.  That response is to

22  inform the talking points we use on this issue for

Page 364

1    the PMR."

2        A    Correct.

3        Q    And that's the performance management

4    review?
                                    401/403

5        A    Program management review.

6        Q    Program management review.

7        A    Right.   And we're only two days out from

8    the PMR, so there you go.

9        Q    Right.   Okay.   So we're only two days

10   out, so there was one coming?

11       A    So there's some urgency that we were

12   going to be expected to say something about this.

13       Q    Right.   Are you involved in the drafting

14   materials for the PMR?

15       A    No, we're not directly.

16       Q    Not directly.

17       A    No.

18       Q    Do you have any awareness of whether the

19   materials drafted for the PMR that was done two

20   days after this email was sent relied on that

21   draft email -- that draft letter from

22   Senator Harris?

Page 366

1       Q    In the middle, the second thing down says

2   testing, correct?

3       A    Uh-huh.

4       Q    Let me go back.   This looks similar to

5   the five points that were outlined in that draft

6   letter to Senator Harris, correct?          401/403

7       A    Correct.

8       Q    So it doesn't appear that there were any

9   changes that were made between the time that email

10  took place on the 24th and when this presentation

11  was done?

12      A    That's correct.

13      Q    So then I'm going to direct your

14  attention to the testing, which is the second

15  point down on Page 23.

16      A    Right.

17      Q    And it says, "Question performance is

18  evaluated in a field test."

19      A    Uh-huh.

20      Q    What do you mean -- what is meant by

21  question performance?

22      A    So, again, there's sort of the cognitive

Page 368

1       A    I don't understand the -- so we've jumped
2    to NRFU here?
3       Q    Yes.
4       A    So are you talking about NRFU generally
5    or are you --
6       Q    Yes.  When you're doing field testing,
7    are you looking for things like the efficacy of
8    nonresponse follow-up?
9       A    So I don't know what you mean by
10   efficacy, per se.  But certainly in the, like,
11   2018 end-to-end field test --
12      Q    Yes.
13      A    -- we tested our systems and procedures
14   for NRFU during that test.
15      Q    And when you say you tested your system
16   and procedures, that was to do an evaluation of
17   how effective the nonresponse follow-up was during
18   the 2018 end-to-end test?          401/403
19      A    Yes.
20      Q    So that is something you would learn from
21   a field test?
22      A    Yes.  And primarily to see that the

Page 369

1    systems and procedures worked as planned.

2        Q    And is that an evaluation as part of the

3    evaluation that is currently going on right now

4    for -- of the results of the end-to-end field

5    test?                    401/403

6        A    Yes.

7        Q    All right.  I'm going to switch gears,

8    and I just have a few more questions, and then I

9    think we have one more person who is going to

10   -- and then we'll be done with you for tonight.

11            I think you testified earlier citizenship

12   is on the CPS, this --

13       A    Current Population Survey.

14       Q    -- Current Population Survey; is that

15   correct?

16       A    That's my understanding, yes.

17       Q    And then I think you said the

18   Census Bureau is tracking item nonresponse rates

19   on the CPS to the citizenship question; is that

20   correct?

21       A    We tracked item nonresponse rates for all

22   of the questions.

Page 376

1      A    I'm not sure.

2           MS. BRENNAN:   That's all I have.   Can we

3   go off the record just for a minute?

4           VIDEOGRAPHER:   Time is 5:07 p.m.   We're

5   going off the record.

6           (Off the record.)

7           VIDEOGRAPHER:   The time is 5:17 p.m.

8   We're back on the record.

9           Please proceed, Counsel.

10              EXAMINATION BY MR. CASE:

11      Q    Dr. Jarmin, my name is Andrew Case.   I'm

12   from Manatt Phelps & Philips.   We represent the

13   City of San Jose and Black Alliance for

14   Just Immigration in the Northern District of

15   California, Case Number 18-CV-2279.

16           Did the Census Department submit a list

17   of topics to be included in the 2020 decennial

18   census to Congress in March of 2017?        401/403

19      A    Yes.

20      Q    Was citizenship one of those topics?

21      A    Not for the census.

22      Q    Not for the short-form decennial census?

Page 377

1      A    Correct.

2      Q    Did you discuss with anyone at Commerce

3    that submission prior to receiving the letter from

4    the DOJ in December?

5      A    So I did not.  So I wasn't involved in

6    the submission of that document prior to that, and

7    that probably would have been when those          401/403

8    conversations would have taken place, so.

9      Q    After you took over, as we'll call it,

10   acting director --

11     A    Much easier.

12     Q    -- did you have conversations about the

13   submission of topics that had previously been

14   made?

15     A    Not that I recall, no.

16          (Plaintiffs' Exhibit 34, Email, was

17   marked.)

18   BY MR. CASE:

19     Q    Give you a document that's been marked as

20   Exhibit 24.  This is Bates number 3470.  I know

21   you're not on the forwarded email, but you're on

22   the email below dated October 11, 2017.  I'd like

Page 378

1    you first to identify the people on this email.

2        A    On which one?

3        Q    The one below, the October 11th one.

4        A    So Joanne Crane is our CFO.

5    Lisa Blummerman was, I think, still at that time

6    the head of decennial, and Enrique as acting

7    deputy director.

8        Q    And in the subject line, there's two

9    questions from Molly McCarthy on citizenship as a

10   topic.  Who is Molly McCarthy?

11       A    She's a Hill staffer, I believe.

12       Q    For whom?

13       A    I don't know.

14       Q    Do you know which party?

15       A    No.

16       Q    Okay.  And the first question, in short,

17   is whether the topics are closed or whether a new

18   question can be added that's not one of the

19   topics.  Is that a fair summary of that?    401/403

20       A    Yes.

21       Q    And what was your answer to that question

22   in October of 2017?

Page 379

1      A    You know, I don't recall what we told

2    Molly at the time.

401/403/802

3      Q    What did you believe the answer to that

4    question was in October of 2017?

5      A    I think -- in October of 2017, I think we

6    thought it was closed.

7      Q    Okay.  And you see that Enrique Lamas

8    sends this to Karen Dunn Kelley?

9      A    Correct.

10     Q    Did he speak to you about sending this to

11   Karen Dunn Kelley?

12     A    I mean, I think it was something that we

13   often -- you know, we like to keep Karen in the

14   loop on things, and so we got an inquiry from the

15   Hill, so we let her know.  I don't recall talking

16   to Enrique directly about it, but, obviously, I

17   would have agreed, obviously, to forward it to

18   her.

19     Q    Did it surprise you that someone from the

20   Hill was asking about adding a citizenship

21   question to the census in October of 2017?

22     A    I don't think -- you know, again, this

Page 398

```
 1      A   Yes.  That's -- that's the one we

 2   discussed this morning.

 3      Q   So at least two?

 4      A   Yeah.

 5      Q   Okay.  During that second

 6   meeting -- you're talking about the February 19th

 7   letter, but I think it was a January 19th letter.

 8   Is that -- is there a February 19th letter, as

 9   well?

10      A   I think -- wasn't it February 19th?

11      Q   Well, there's a lot of letters,

12   but -- during the meeting where Secretary Ross

13   expressed concern about imputation --

14      A   Right.

15      Q   -- whatever day it took place on, did

16   Secretary Ross state that he had scientific data

17   to suggest that asking the citizenship question

18   would provide better information than imputation?

19      A   So the total number of cases that you

20   would have to impute asking the question is lower

21   than if you used administrative data.

22      Q   What did Secretary Ross say regarding his
```

Page 399

1    concerns about imputation?

2         A    I think his concern is the same concern

3    that we all have, that imputed data is lower

4    quality than nonimputed data.     401/403/802

5         Q    Did he say there was any scientific basis

6    he was relying on that had -- that said asking the

7    question would produce better results?

8         A    He did not cite any, no.

9         Q    And did anyone from Census cite data that

10   imputation would provide better results?

11        A    So I think that the comparison on our end

12   was that -- that there would be an increase in the

13   NRFU workload, and that, you know, for some

14   cases, you know, the administrative data appeared

15   to be more accurate than self-response data.

16        Q    Does the Census impute data for any items

17   that are on the ACS and are not on the

18   short-form census?

19        A    We impute data for almost every item,

20   yeah.

21        Q    And did Secretary Ross express any

22   concern about the quality of that data?

 1      A    He did not.

 2      Q    Grandparents as caregivers?

 3      A    We don't -- weren't discussing that,

 4   though.                          401/403

 5      Q    Has he ever -- has anyone from Commerce

 6   ever expressed concern about imputed data for

 7   items on the ACS that weren't on the short form?

 8           MS. BAILEY:  Objection.  Foundation.

 9           THE WITNESS:  No.

10   BY MR. CASE:

11      Q    In either of the meetings that you had

12   where Secretary Ross was present, did he say that

13   he had been interested in the question before the

14   DOJ letter?

15      A    He did not.

16      Q    Did he say that the Census Department had

17   reached out to DOJ to create that letter?

18           MS. BAILEY:  Objection.  Assumes facts

19   not in evidence.

20           THE WITNESS:  That the Census Department

21   had reached out --

22   BY MR. CASE:

Page 405

1      A   Right.

2      Q   -- or when --

3      A   Right.

4      Q   -- the document is talking about

5   Alternative B will result in erroneous
                                              401/403
6   enumerations.

7           Do you agree with that statement?

8      A   Yes.

9      Q   That Alternative B will result in

10  erroneous enumerations?

11     A   Yes.

12     Q   I'd like you to look to your Exhibit 16,

13  which is that March 1 letter I gave you before.

14     A   Which one?  This one?

15     Q   Yeah, 9182.  Look on Page 9816, if you

16  would, near the front, the cover letter.

17          Do you see the statement of how

18  Alternative D will include all the negative -- I

19  don't have it in front of me -- but all the

20  negative impacts --

21     A   Right.

22     Q   -- of Alternative B?

Page 406

1      A    Right.

2      Q    Do you agree with that statement?

3      A    Yes.

4      Q    Do you agree, therefore, that

5  Alternative D will include the erroneous

6  enumerations for Alternative B?

7      A    Yes.

8      Q    Alternative D will result in erroneous

9  enumerations?

10     A    Yes.

11     Q    Just -- yeah.  One quick thing on the

12  actual decisional memo, which is Abowd Exhibit 12.

13  Page 5, which is 1317, on the top of the page,

14  fourth line down, "For the approximately

15  90 percent of the population who are citizens,

16  this question is no additional imposition."

17          What do you understand that sentence to

18  mean?
                                    401/403

19     A    So that's -- that those -- those people

20  will not have any objections to filling out the

21  questionnaire.

22     Q    But it will be an imposition, won't it?

Page 407

1      A    All questions are an imposition, yes.

401/403

2      Q    So -- okay.  So, yes, it would be an

3    imposition.

4           And one quick thing, on the front here,

5    first page, bottom paragraph, "I also met with

6    Census Bureau leadership on multiple occasions."

7      A    Uh-huh.

8      Q    How many times did you meet with

9    Secretary Ross to discuss the DOJ request?

10     A    I don't know the number.  I'd have to go

11   back and look at my calendar.

12     Q    More than once?

13     A    We've already established at least twice.

14     Q    At least twice.

15          More than twice?

16     A    So, you know, I mean, there was -- there

17   was discussions where we didn't have much of a

18   discussion, just that we were looking at it and

19   then there was more meeting discussions that

20   happened later.

21     Q    What were the discussions where you were

22   just looking at it like --

Page 408

1       A    That we were beginning our process and

2    doing a technical review.

3       Q    Were these face-to-face meetings or phone

4    calls?

5       A    Face-to-face.

6       Q    Okay.   You testified this morning with

7    regard to finding people to speak to the

8    Secretary, that you reached out to AEI because

9    they are, quote, I believe this is correct, on the

10    conservative side of D.C. politics; is that

11    correct?                        401/403

12       A    Correct.

13       Q    What about the citizenship question led

14    you to believe that a group on the conservative

15    side of the D.C. politics would be in favor of it?

16       A    Because that's where the support for the

17    question has been generated in the past.

18       Q    And what groups in the past have   401/403/802

19    supported this question?

20           MS. BAILEY:   Objection.   Calls for

21    speculation.

22    BY MR. CASE:

1      Q      The support that you just referenced?

2      A      Republicans in Congress.

3      Q      Which Republican specifically that you

401/403/802

4    recall.

5      A      I believe it was Vitter.

6      Q      And what is Vitter's reason for adding a

7    citizenship question, if you know?

8           MS. BAILEY:   Objection.   Calls for

9    speculation.

10          THE WITNESS:   I don't recall his exact

11    reason.

12   BY MR. CASE:

13      Q      But your association with the citizenship

14    question is with the David Vitter amendment of

15    2009?

16      A      That's -- that -- my association?

17      Q      You understand --

18      A      I recall that that happened, yes.

19      Q      Do you recall any groups that are

20    associated with voting rights having support for

21    the citizenship question on the census?

22      A      No.

Page 417

1          MR. CASE:  Can I ask just one question

2     based on that?

3          FURTHER EXAMINATION BY MR. CASE:

4     Q    You testified that the process is for the

5     short form.  Is there any reason that there should

6     be --

7          MS. BAILEY:  Mischaracterizes testimony.

8          MR. CASE:  I'm sorry.

9     BY MR. CASE:

10    Q    Tell me what you understood the answer to

11    be there about the five-step process.

12    A    So we've not entertained additions to the

13    long form of the census.  The process was for the

14    census generally -- I mean, the short form.  So

15    prior to the ACS, people requested new questions,

16    they were put on the long form, not on the short

17    form.  The short form has gotten shorter over the

18    years, not longer.

19    Q    Is there any reason to engage a less

20    robust process for the short-form census than for

21    the long-form census?          401/403

22    A    No.

Page 419

1                        * * * * *

2                  CERTIFICATE OF REPORTER

3        I, KAREN LYNN JORGENSON, RPR, CSR, CCR the

4    officer before whom the foregoing deposition was

5    taken, do hereby certify that the witness whose

6    testimony appears in the foregoing deposition was

7    duly sworn by me; that the testimony of said

8    witness was taken by me in stenotype and

9    thereafter reduced to typewriting under my

10   direction; that the said deposition is a true

11   record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in

14   which this deposition was taken; and further, that

15   I am not a relative or employee of any counsel or

16   attorney employed by the parties hereto, nor

17   financially or otherwise interested in the outcome

18   of this action

19

20             KAREN LYNN JORGENSON, RPR, CSR, CCR

21   Dated this 23rd day

22   of   August , 2018.