**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et al., <br><br> Defendants. | 18-CV-2921 (JMF) |
| NEW YORK IMMIGRATION COALITION, et. al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et. al., <br><br> Defendants. | 18-CV-5025 (JMF) (Consolidated Case) |

**NOTICE OF FILING OF TRIAL AFFIDAVIT OF DR. JOHN THOMPSON**

Plaintiffs hereby file with the Court the following trial affidavit:

1. Nov. 11, 2018 Amended Declaration of Dr. John Thompson (Ex. 1).

Respectfully submitted,

By: */s/ Dale Ho*

| | |
|---|---|
| Dale Ho | Andrew Bauer |
| American Civil Liberties Union Foundation | Arnold & Porter Kaye Scholer LLP |
| 125 Broad St. | 250 West 55th Street |
| New York, NY 10004 | New York, NY 10019-9710 |
| (212) 549-2693 | (212) 836-7669 |
| dho@aclu.org | Andrew.Bauer@arnoldporter.com |

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*Not admitted in the District of Columbia;
practice limited per D.C. App. R. 49(c)(3).

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Attorneys for the *NYIC* Plaintiffs

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo, *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, *et. al*, | Civil Action No. 18-CV-2921-JMF |
| | Hon. Jesse M. Furman |
| Plaintiff, | |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et. al*, | |
| Defendant. | |

## AMENDED DECLARATION OF JOHN H. THOMPSON

1.        I, John H. Thompson, pursuant to the provisions of 28 U.S.C. § 1746, declare under penalty of perjury as follows:

2.        I submit this declaration in lieu of direct expert testimony in the trial in the above captioned cased.

### I.        Qualifications

3.        I have both a Bachelor's Degree and a Master's Degree in Mathematics from Virginia Polytechnic Institute and State University. Additionally, I completed graduate coursework in statistics at George Washington University.

4.        I served as the Director of the United States Census Bureau from August 2013 to June 2017. The Director of the Census Bureau is appointed by the President and confirmed by the Senate.

5.     My responsibilities as Director of the Census Bureau included overseeing the research and testing program for improving the 2020 Decennial Census questions on Race and Ethnicity.

6.     Prior to becoming Director, I worked at the Census Bureau for 27 years. I started my career as a mathematical statistician in 1975. I spent the majority of my employment at the Census Bureau focused on the Decennial Census. I ultimately served as the Associate Director for the 2000 Decennial Census. In this position I was the senior career executive with management responsibility for all aspects of the 2000 Decennial Census. I was also chairman and director of the Executive Steering Committee for Accuracy and Coverage Evaluation Policy for the 2000 Census.

7.     My work as Associate Director included collaboration with the Office of Management and Budget on the extensive research and testing program that lead to the inclusion of a new race question on the 2000 Census questionnaire.

8.     In addition to my experience at the Census Bureau, I am also a distinguished professional in the area of statistics and survey design. After serving as the Associate Director for the 2000 Decennial Census I was the Executive Vice President and then President at NORC at the University of Chicago ("NORC"). NORC is an objective, non-partisan independent research institution that delivers reliable data and rigorous analysis to guide critical programmatic, business, and policy decisions. NORC's clients include government, corporate, and nonprofit organizations. NORC's services include designing and conducting surveys (telephone, Internet, and in-person) as well as analytical studies. At NORC, my responsibilities encompassed the management of all survey operations including the design and testing of survey questionnaires.

9.     After my term as Director of the Census Bureau ended in June 2017 I served as the Executive Director of the Council of Professional Associations on Federal Statistics ("COPAFS"). COPAFS is a membership organization made up of professional associations and research organizations that depend on and support high quality federal statistics. The Executive Director of COPAFS must have a deep understanding of the Federal Statistical System and the wide range of data products that are produced. Serving as the Executive Director of COPAFS reinforced my appreciation of the importance of high quality Decennial Census data to the entire Federal Statistical System. I retired as Executive Director in August of this year.

10.    In addition to my extensive work experience, I am an elected Fellow of the American Statistical Association, and was selected to serve on the National Academies of Science, Engineering, and Medicine Committee on National Statistics.

11.    A copy of the expert report that I submitted in this case is **PX-311**.

## II.   Summary of Opinions

12.    I was asked by Plaintiffs to review the administrative record upon which the Secretary of Commerce Wilbur Ross based his decision to add a question concerning citizenship on the 2020 Decennial Census, the depositions of Dr. Ron Jarmin and Dr. John Abowd, the Census Bureau research paper *Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census* by Brown et al. and the March 26, 2018 memorandum by Secretary Ross documenting his decision to include a question on citizenship on the 2020 Decennial Census questionnaire.

13.    It is my opinion to that there is no evidence in the administrative record or any of the other documents that I reviewed that the Census Bureau conducted any of the proper testing that should be done in order to determine the effects of including a citizenship question on a

Decennial Census before the decision was made to add such a question to the 2020 Decennial Census.

14.     I have also concluded that the Census Bureau has not conducted any of the proper testing that would allow one to conclude that Census non-response follow up procedures will effectively address the increase in nonresponse rates that will be caused by the addition of the citizenship question.

15.     It is also my opinion that the administrative record indicates that Secretary Ross failed to consider the likelihood that the citizenship question will increase the undercount and ignored the advice of the Census Bureau that citizenship data would best be provided by using other means than including a question on citizenship on the 2020 Decennial Census questionnaire.

## III.     Census Operations

16.     The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—regardless of citizenship status—residing in each state.

17.     Through the Census Act, Congress has assigned the responsibility of making this enumeration to the Secretary of Commerce, and created the Census Bureau within the Department of Commerce to spearhead this effort. 13 U.S.C. §§ 2, 4, 5, 141(a). The central constitutional purpose of the Census Bureau in taking the Decennial Census is to conduct an accurate enumeration of the population.

18.     To enable a person-by-person count, the Census Bureau's goal is to mail a questionnaire, or an invitation to respond to the questionnaire via the internet, to every housing unit in the United States, and to then implement additional procedures to count the population

that does not live in housing units. The questionnaire (or internet invitation) is directed to every resident in the United States and residents are legally required to respond. The Census Bureau then counts responses from every household and those persons not living in a housing unit to determine the population count in each state.

19.     Data from the Decennial Census is reported down to the census block level. The Census Bureau employs disclosure avoidance processes to introduce enough uncertainty into these tabulations to prevent the identification of any individual or that individual's responses.

20.     If the Census Bureau does not receive a response to the questionnaire, it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in-person interview in order to collect the data. This is part of a process is called Non Response Follow Up ("NRFU").

21.     The population of the United States as a whole has been over-counted in the Decennial Census. For example, in 2000 there was a measured net overcount.

22.     Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count." Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census.

23.     The Census Bureau describes the "differential undercount" for a particular racial and ethnic population as the difference between the measured net undercount for that group and the measured net undercount for the White non-Hispanic population. This is an important statistic to consider in addition to the measured net undercounts for these population groups.

24. The population data collected through the Decennial Census determines the apportionment of seats in the U.S. House of Representatives among the states and the number of electoral votes each state has in the Electoral College.

25. States also use Decennial Census data to draw congressional, state, and local legislative districts.

26. Congressional apportionment only takes into account the exact number or count provided by the Decennial Census count. Even very tiny changes in this count can affect apportionment.

27. The federal government also uses Decennial Census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. A total of approximately $900 billion is distributed annually to at least 320 different census-guided federal grant and funding programs. These funds determine the ability of state and local governments to provide for quality education, public housing, transportation, health care and other services, for all their residents, citizens and non-citizens alike.

28. From at least the 1970 Decennial Census through the 2000 Decennial Census, in addition to the questionnaire sent to every household (commonly referred to as the "short form"), the Census Bureau also used a second, "long form" questionnaire, which was sent to approximately one in six households, and which contained additional questions.

29. Data collected from the Decennial Census long form questionnaire were used to generate statistical estimates and were reported down to the census block group level.

30. After the 2000 Decennial Census, the long form Decennial Census questionnaire was discontinued. Its functions were largely replaced by the American Community Survey ("ACS"), which was fully implemented for housing units in 2005, and for group quarters in 2006. The

ACS is a yearly survey of approximately 2% of households across the United States (about 3.5 million).

31.     ACS data is reported down to the census block group level. Margins of error are reported with the ACS estimates that provide a measure of the sampling error associated with each estimate.

32.     The Decennial Census and ACS serve different purposes. While the Decennial Census is intended to provide an official count of the entire U.S. population to Congress, the ACS is intended to provide information on the characteristics of the population, and the social and economic needs of communities.

33.     Unlike the Decennial Census, the ACS estimates are statistical estimates based on a sample which incorporates data from the Decennial Census carried forward throughout the decade as controls. It should be noted that any undercounts or overcounts in the Decennial Census will be carried forward for ten years in these controls.

34.     Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated in multi-year estimates to produce greater levels of statistical precision for estimates concerning smaller geographical units. These are referred to as "1-year", "3-year" or "5-year" estimates," depending on the number of years of data aggregated together (although the 3-year estimate was discontinued after 2013). Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields a sample large enough to support the production of estimates at the census tract and block group levels.

35.     1-year ACS estimates produce data for areas with populations of 65,000+, 3-year ACS estimates produce data for areas with populations of 20,000+, and 5-year ACS estimates produce data for census tracts and block groups.

**IV.     History of a Citizenship Question on the Census**

36.     A question concerning citizenship did not appear on the short-form Decennial Census questionnaire sent to every household in the United States, in 1960, 1970, 1980, 1990, 2000, or 2010.

37.     From 1970 to 2000, one of the questions on the long form questionnaire, which was sent to approximately one in six households, and which contained additional questions, concerned citizenship status. The citizenship status question on the long form was preceded by a question about nativity.

38.     Because the long form was a sample survey, the citizenship data collected from the long form questionnaire were a not a "hard count," but rather were statistical estimates.

39.     The citizenship data collected from the long form in 2000 were made available by the Census Bureau at the census block group level.  Citizenship data broken down by race collected from the 2000 Census long form were not made available by the Census Bureau at the census block level.  The data from the long form were statistical estimates and not a hard count.

40.     A question concerning citizenship status currently appears as among one of more than 70 questions on the detailed 28-page ACS questionnaire. The citizenship status question on the ACS is preceded by a question about nativity.

41.     The citizenship question that appears on the ACS is not a simple binary yes/no question. Rather, for U.S. citizens, it also asks more detailed information about a person's place of birth; and for some U.S. citizens, it also requests information about the citizenship status of their parents, and whether they became a U.S. citizen by naturalization.

42.     The data collected by the ACS allows the Census Bureau to produce estimates of Citizen

Voting Age Population (CVAP). CVAP data based on responses to the ACS are reported by the

Census Bureau down to the census block group level.

### V.     Protocols for Proper Research and Testing of a Question Proposed for Inclusion on the Decennial Census

43.     Inaccuracies or undercounts in Decennial Census data will result in under-representation

of the affected population groups not just in the immediate term, but for ten subsequent years

until the next Decennial Census results are available.

44.     It is a widely accepted principle among statisticians and survey methodologists that even

minor changes in question wording or placement on a questionnaire can have unanticipated

effects on both response rates and the accuracy of the data respondents provide.

45.     Given the importance of the Decennial Census, the Census Bureau has established

extensive testing processes in order to properly assess proposed changes to the content of the

questionnaire and avoid the risk of introducing undercounts or other inaccuracies into the census

data.

46.     It is my opinion that the decision to add a question on citizenship to the 2020 Decennial

Census questionnaire was a deviation from these well-established principles for developing a

Decennial Census questionnaire.

47.     Two examples of the extensive research and testing that is standard practice when the

Census Bureau considers making changes to the Decennial Census questionnaire took place

during my tenure overseeing the 2000 and 2020 Decennial Censuses.  These two extensive

multi-year testing programs are reflective of the great care which the Census Bureau determined

was necessary to ensure that both the 2000 and 2020 Census results would not be influenced by

unanticipated biases or undercounts due to changes in the questionnaires relating to race and ethnicity.

48. Following the 1990 Decennial Census there was a proposal to revise the questionnaire to allow respondents to indicate that they identified with multiple races. In response, the Office of Management and Budget announced in July 1993 that it would undertake a comprehensive review of the current categories for data on race and ethnicity in all Federal Data collections. The review was conducted over four years and included extensive cognitive and field testing conducted by the Census Bureau. This review also included the development and extensive testing of a question to be included on the 2000 Decennial Census questionnaire.

49. Similarly, planning for the 2020 Decennial Census also included an extensive research and testing program to determine how the questions on race and ethnicity could be improved. This research started more than ten years prior to the 2020 Decennial Census when the design of the Alternate Questionnaire Experiment for the 2010 Decennial Census began in 2008. This testing involved three components: 1) a questionnaire sent by mail that respondents received in lieu of the standard 2010 Decennial Census questionnaire; 2) a telephone re-interview of the mail respondents to assess the accuracy and the reliability of both the control and the alternative race and Hispanic origin questions; and 3) a series of focus groups conducted to complement the quantitative analyses. Because the results of the Alternate Questionnaire Experiment were promising but not conclusive additional testing was conducted following the 2010 Decennial Census.

50. Throughout 2014 and 2015, the Census Bureau shared their plans for testing different question designs, and participated in numerous public dialogues in order to obtain community feedback.

51.     In 2015 the proposed changes to the questionnaire were extensively tested through the National Content Test ("NCT"). The NCT examined several key ways to try to improve the data on race and ethnicity. This included question format (e.g. whether to ask separate questions on race and ethnicity or to combine them), response categories (e.g. whether to include a "Middle Eastern or North African" category), instruction wording (e.g. comparing two sets of instructions: "Mark [X] one or more boxes" vs. "Mark all that apply" in paper data collections; and "Select one or more boxes" vs. "Select all that apply" in Internet data collections) and question terminology (e.g. whether to include "race," "origin," "ethnicity," or no terms).

52.     The 2015 NCT was conducted with a nationally representative sample of 1.2 million housing units in the United States, including Puerto Rico. This sample was designed to ensure that the results accurately reflected the nation as a whole, across a variety of demographic characteristics. To ensure a representative sample, the NCT oversampled census tracts that contained relatively high percentages of race and ethnicity groups who were likely to have lower self-response rates.

53.     Following the initial NCT sampling a re-interview was conducted with approximately 75,000 respondents to confirm how effective the initial questionnaire had been. This re-interview asked three questions about how respondents self-identify their race and ethnicity, and collected more detailed information about respondents' racial and ethnic background.

54.     Despite all of this extensive testing and research, in January 2018 Albert Fontenot, the Associate Director for Decennial Census Programs announced that the Census Bureau would continue to use two separate questions for collecting data on race and ethnicity and would not add a separate Middle Eastern or North African category on the 2020 Census. The stated justification was that although extensive testing had been conducted for over a decade, a final

decision had to be made by December 31, 2017 in order to allow the Census Bureau adequate time to deliver the final question wording for the 2020 Decennial Census to Congress by March 31, 2018

55.     Despite the extensive testing conducted in order to test potential new questions for the 2000 and 2020 Census there is no evidence in the administrative record that any similar testing supported the decision to include a citizenship question on the 2020 Census.

56.     Based on my extensive experience at the Census Bureau and at NORC, I will now describe the components of a research and testing program that I believe should be carried out to determine whether or not a proposed new question should be included on a Decennial Census.

57.     First, the Census Bureau should determine whether the proposed question needs to be included on the Decennial Census. This process should begin when a federal agency identifies a need for new information that can only be collected from the Decennial Census and thus makes a formal request to the Census Bureau to consider adding a new question. The request would come in response to a formal solicitation from the Census Bureau or when an agency identifies a new need for data.

58.     Upon receiving the request, the Census Bureau should work with the Office of Management and Budget and with the Department of Commerce Office of General Counsel to determine whether this information should be collected from the Decennial Census questionnaire. The three key components of this review are: (1) confirming the legislative basis for the information need; (2) ensuring that the information is needed from every person in the United States such that it cannot be obtained from some other source such as the American Community Survey; and (3) confirming that there is no other source for the requested information.

12

59.     In my experience, the process that took place to determine the need for a citizenship question to be included on the 2020 Decennial Census is unprecedented. The administrative record makes clear that the Secretary of Commerce solicited the Department of Justice to request that a citizenship question be added to the 2020 Census questionnaire. In my experience, this latter action by Secretary Ross is very unusual. During my tenure at the Census Bureau as both a long-time senior career executive and as a political appointee, I never observed a political official at the Department of Commerce solicit another federal agency to request that a specific question be added to the Decennial Census questionnaire.

60.     Second, if the above process, facilitated by the Census Bureau, determines that the requested information should be collected from the Decennial Census, a rigorous testing program should then begin. The first step of this testing is for experts in both subject matter and cognitive design to develop several reasonable alternatives for the proposed question wording. Input from subject matter experts is essential to the development of a new question. These experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome. The subject matter experts usually consist of staff from both the Census Bureau and the requesting agency.

61.     Based on my review of the administrative record it does not appear that this standard consultation with subject matter experts took place before Secretary Ross decided to add the citizenship question to the 2020 Decennial Census. In fact, the administrative record and the deposition testimony of Dr. Jarmin and Dr. Abowd make it clear that the Department of Justice refused to meet with the Census Bureau to discuss the request that a citizenship question be included on the 2020 Census. Abowd 30(b)(6) Dep. Tr., dated Aug. 29, 2018, at 96:3-99:6.

62.     After alternative question wording is drafted, the next step in a comprehensive testing program is to design the entire questionnaire. Good test design requires considering not just an individual question, but the effect of the question in the context of the entire questionnaire. For example, the testing to assess potential changes to the race and ethnicity questions for the 2000 and 2020 Decennial Census questionnaires that I described above considered this issue extensively. Assessment of the potential questionnaire design should also take into account the order in which the questions will appear.

63.     The fact that a question has previously been used on the ACS does not mean that it has been appropriately tested to be used on the Decennial Census due in part to the importance of testing an entire questionnaire before it is used. The ACS is a much longer questionnaire than the Decennial Census questionnaire and includes over 70 questions. In contrast, the 2020 Decennial Census will contain 11 questions if the citizenship question is included. It is possible that a question concerning citizenship may take on added significance to a respondent in the context of the much shorter Decennial Census questionnaire where it will be one of only 11 questions.

64.     However, the administrative record does not document any testing that was done to consider the impact of on response rates of including the citizenship question that appears on the ACS on the much shorter 2020 Decennial Census questionnaire.

65.     Another important consideration that should be adequately tested is the interactions between questions on a questionnaire. For example, the ACS includes the following question on place of birth that is asked just before the question on citizenship:

**Where was this person born?**

___In the United States – Print name of the state. _____

___Outside the United States—Print name of foreign country, or Puerto Rico, Guam, etc._____

66.     Given that ACS respondents have been influenced by being asked the place of birth question before they are asked the citizenship question it may affect response rates. For example, it is possible that the place of birth question may cause ACS respondents to be more comfortable with the citizenship question than they would otherwise be without it. As such, the absence of the place of birth question before the citizenship question on the 2020 Decennial Census questionnaire may generate respondent concerns that the citizenship question is intrusive. However, my review of the administrative record indicates that such testing was not conducted and thus the actual outcome is unknown.

67.     Whether the wording and length of the question to be added is consistent with the instrument on which it is to be included is another important design consideration. My review of the administrative record did not reveal any evidence that such concerns were considered before the decision was made to include a citizenship question on the 2020 Decennial Census.

68.     The language of the ACS citizenship question that Secretary Ross has indicated will be added to the Decennial Census is as follows:

**Is this person a citizen of the United States?**
___ Yes, born in the United States
___ Yes, born in Puerto Rice, Guam, the U.S. Virgin Islands, or Northern Marianas
___ Yes, born abroad of U.S. parent or parents
___ Yes, by naturalization – print year of naturalization – __ __ __ __
___ No, not a U.S. citizen

69.     There are potential concerns with the five response categories that are included in the ACS question. For example, members of Congress and other stakeholders have raised concerns about the response category "Yes born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas" because respondents in Puerto Rico may be offended by the perception that

their citizenship is different from that of citizens in the mainland United States and thus potentially less likely to respond. However, based on my review of the administrative record no testing has been done to confirm whether this may affect response rates if the citizenship question is asked in this format on the Decennial Census.

70.    Instead, of using the ACS citizenship question, a reasonable alternative question on citizenship could be a very short question such as:

**Is this person a citizen of the United States?**
___ Yes
___ No

71.    However, there is no evidence in the administrative record that such an alternative—or any alternatives at all—were considered or tested before Secretary Ross made the decision to add the ACS citizenship question to the 2020 Decennial Census questionnaire. In my extensive experience overseeing the Decennial Census, this failure to propose and test reasonable alternative questions is contrary to the Census Bureau's standard practices for considering new questions.

72.    Once the reasonable alternative question designs have been developed, the next step in considering a new question is for cognitive survey methodology experts to conduct a number of facilitated focus group studies to examine how potential respondents react to each of the alternative questions.

73.    This focus group testing should test the entire questionnaire and the sequence in which the questions will be asked.

74.    These focus groups are typically conducted in a cognitive laboratory in which a group of 10 to 12 respondents are administered questions by a facilitator. While this administration is being conducted, other cognitive survey methodologists unobtrusively observe how the

respondents react to each question. An important objective of these studies is to determine whether respondents understand the questions and are providing accurate answers. The focus groups will also give an indication if questions are worded or ordered in such a way that they will lead respondents to not respond either to certain questions or to the entire questionnaire which could in turn result in an undercount.

75.     To provide useful data on how the proposed questionnaire will perform in the field, the focus groups must be conducted with a representative sample of the population of the United States. For example, the 2010 Census Alternative Questionnaire Experiment which tested the proposed new questions on race and ethnicity included 67 focus groups with about 800 total respondents.

76.     During the focus group process it is common for the initial alternative question designs to be revised based on the reactions of the focus group respondents and then for the revised designs to be subjected to additional focus group testing. At the end of this iterative process, a set of alternative questions are then ready for field testing.

77.     The administrative record provides no evidence that any cognitive testing of the Decennial Census questionnaire with the ACS citizenship question included was conducted.

78.     One critical objective of focus group testing of the inclusion of the ACS citizenship question would be to determine whether the citizenship question would increase the propensity for certain historically hard-to-count population groups to resist responding to the entire 2020 Decennial Census questionnaire. The Census Bureau has produced research that indicates growing concerns that respondents have with privacy, confidentiality and government surveys, underscoring the importance of such testing. However, the administrative record indicates that there has been no evaluation of the effect of these concerns on how respondents may view the

citizenship question on the 2020 Decennial Census questionnaire. As Dr. Abowd testified, Census Bureau staff concluded that, with respect to "cognitive testing," the 2020 census questionnaire was "not adequately tested with the citizenship question." Abowd 30(b)(6) Dep. Tr., dated Aug. 29, 2018,  at 142:18-143:4.

79.     While cognitive focus group testing of alternative questionnaires is very important, this testing alone is not sufficient to conclude that a question is ready to be included in a data collection activity. For the Decennial Census in particular, field testing of alternative questions and questionnaires is of critical importance to understand how respondents will react in an unsupervised environment.

80.     This field testing must be based on a well-designed national sample of households that simulates to the greatest extent possible a Decennial Census environment. The sample must be representative of the population of the United States and include a sufficient number of observations to assess potential effects on hard-to-count populations.  The sample must also be designed to allow for analysis of the effectiveness of the alternative questions on producing data for both population and geographic subgroups for example, racial and Hispanic populations, urban and rural areas, and American Indian Reservations.

81.     The field testing should be conducted in such a way that the alternative questionnaires are administered to the sample households in a manner that replicates to the greatest extent possible the way in which the Decennial Census will be conducted. For example, since the 2020 Census will allow both internet and paper questionnaire response options, the test design must allow for an analysis of these different response modes.

82.     Once the alternative questionnaires have been field tested, a re-interview of either all or at least a subsample of the respondents who completed the questionnaires should be conducted.

The purpose of the re-interview is to determine whether respondents provided accurate answers. Thus, this re-interview is an extremely critical component of the testing of a new question.

83.    Additionally, if misreporting is detected, the re-interview will identify the factors that are causing the response error. This re-interview would be of critical importance to designing and testing a question on citizenship for the Decennial Census because as Secretary Ross's decision memo indicates, between 28 and 34 percent of non-citizens report themselves as citizens when responding to the citizenship question included on the ACS questionnaire. Before using a citizenship question on the Decennial Census, it would be crucial to understand the factors that are generating such errors in the ACS.

84.    Despite the importance of field testing a new question before inclusion on the Decennial Census—especially for a question that is already known to have a high incorrect response rate on the ACS—the administrative record contains no evidence that any field testing of the citizenship question to be included on the 2020 Decennial Census was conducted.

85.    At the conclusion of a field test the results are then analyzed to determine which of the alternative questions, if any, is producing the desired outcome or if more testing is needed. In the case of the Decennial Census, the analysis of the results would typically be discussed with the Census Bureau advisory committees, the Office of Management and Budget ("OMB"), and outside researchers with expertise in questionnaire design and in the subject matter area related to the new questionnaire.

86.    A good example of such analysis is the work that the Census Bureau carried out as part of the 2015 National Content Test. Census Bureau staff made numerous presentations of each stage of analysis to their federal advisory committees, and other stakeholders including OMB. The Census Bureau published the final research report and then met with numerous stakeholder

groups to discuss the findings and answer questions. A primary objective of this outreach was to ensure that the research adhered to the established principles of openness and objectivity.

87.      Without these discussions, there is a significant risk that the resulting data will not meet the purported intended need.  For example, Dr. Abowd stated that the Census Bureau still doesn't know how the responses from the citizenship question will be combined with administrative records to form the tabulation of block-level citizenship data. In addition, the details of the uncertainties that will be introduced into the citizenship data through the disclosure avoidance processes necessary to prevent the identification of individual respondent's citizenship status is unknown at this time. Also unknown is whether the citizenship data produced after the 2020 Decennial Census will have larger or smaller margins of error than the citizenship data currently relied on by the Department of Justice, whether the error margins associated with the data will allow the Department of Justice to use the data effectively, or even whether the block level data will be included at all in the standard redistricting data file (the "P 94-171 Data File") produced by the Census Bureau. J. Abowd 30(b)(6) Dep. Tr., dated Aug. 29, 2018 at 55:5-62:8. J. Abowd Dep. Tr., dated Aug. 15 2018, at 174:16-178:6.  In other words, the Census Bureau is still not sure how it will use the answers to the citizenship question to give the Department of Justice data to be used for enforcing the Voting Rights Act.  Given the importance of the 2020 Census, the citizenship question should not be asked until these uncertainties are resolved and the implications for the resulting data tabulations are understood.

88.      Based on the analysis, and input of the external review, the Census Bureau would then make a recommendation regarding whether to move forward with proposing that a new questionnaire should be added to the 2020 Census questionnaire. The recommendations would

be discussed with officials at the Department of Commerce with oversight responsibilities including the Secretary of Commerce.

89.     The administrative record documents that the Census Bureau conducted timely and well-thought out research on how to best produce data on citizenship to meet the Department of Justice's request. This research showed that there were more cost effective and more accurate methods to produce these data by using administrative records instead of asking the question directly on the 2020 Census questionnaire

90.     Additionally, speaking for the Census Bureau, Dr. Abowd testified in his deposition that he does not agree with the concluding passage of Secretary Ross's decision memorandum that the addition of the citizenship question "is necessary to provide complete and accurate data in response to the DOJ request." J. Abowd 30(b)(6) Dep. Tr., dated Aug. 29, 2018, at 331:8-17.

91.     The Census Bureau provided these recommendations to Secretary Ross, but they were not adopted and the administrative record does not include a rationale for Ross ignoring them.

92.     In my experience, it is unprecedented for a senior Department of Commerce official to dismiss a Census Bureau technical recommendation based on extensive research without documenting a rationale for such an action.

93.     In his March 26, 2018 decision memorandum Secretary Ross stated that "the citizenship question has been well tested." However, the administrative record does contain any documentation of a research testing program that would be appropriate for supporting the inclusion of the citizenship question on the 2020 Decennial Census questionnaire.  In fact, the administrative record demonstrates that Secretary Ross made his decision to add a new question in the absence of any results from cognitive testing, field testing or other research on the potential effects of including the question on the 2020 Decennial Census questionnaire.

94.     Whatever the Secretary means by "well tested," it does not mean that the Census Bureau did the rigorous kind of testing that would have provided a specific determination of the effect of adding a citizenship question.  As the Secretary stated elsewhere in his decisional memorandum, "there is *no* information available to determine the number of people who would in fact not respond due to a citizenship question being added," and, citing, among others, a former Chief Operating Officer of the Census, "*no* empirical data existed on the impact of a citizenship question on responses."  (I have added the emphasis in the foregoing quotes).  Had there been a through testing and evaluation program, the Secretary would not find himself saying that he had no good information on this subject.

95.     Finally, on this point, while it is clear that the testing was insufficient, it also needs to be noted that the data from the ACS, which the Secretary cites as support for the notion that the citizenship question was "well tested" does not support adding the citizenship question.  That data shows very clearly that the citizenship question is very often answered incorrectly by non-citizens. (See my prior testimony at ¶ 83).  So, to the extent that we have empirical data about how well the citizenship question works, it reinforces the need for proper testing before adding the citizenship question to the 2020 Census questionnaire.

96.     For all these reasons, it is my opinion that the addition of the new question was a significant deviation from standard practice and that Secretary Ross's statement regarding testing is not supported by the administrative record.

**VI.    Inconsistencies between the Administrative Record and Secretary Ross's Decision Memo**

97.     In general, my review of the administrative record revealed that serious inconsistencies exist between the materials in the administrative record and the rationale Secretary Ross provided in support of his decision. I have also found that Secretary Ross has made certain

assumptions that are contrary to his stated goal of prioritizing "complete and accurate data." The two most problematic areas are that Secretary Ross failed to consider the likelihood that the addition of the citizenship question would increase the undercount of traditionally hard to count groups and that he ignored the recommendation of the Census Bureau to collect citizenship data through administrative records rather than adding a new question.

### a. Secretary Ross Failed to Consider the Likelihood that the Citizenship Question will Increase the Undercount

98.     Since the 1990 Decennial Census the Census Bureau has made good progress, and had great success during both the 2000 and 2010 Decennial Censuses, in reducing undercounts. Although, despite these efforts the Decennial Census has never been without undercounts.

99.     A key component of the success in 2000 and 2010 compared to past Census efforts has been the deployment of a combined communication and partnership program (which included national and local advertising) to deliver a message to hard-to-count populations that the census is important to their community, that the data collected through the census is completely confidential and that no individual's information is shared with any other organization or law enforcement entity. The Census Bureau partnered with a number of entities, including local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the self-response to the Census and to encourage participation and improve the accuracy of the count.

100.    I believe that this combined communication and partnership program was responsible for dramatic gains in the accuracy and coverage of the 2000 and 2010 Decennial Census relative to the 1990 Census, which did not include such a program. For example, the undercount of Black or African Americans dropped from 4.6 percent in 1990 to 2.1 percent in 2010. For the Hispanic population the undercount dropped from 5.0 percent in 1990 to 1.5 percent in 2010.

101.    It is my opinion that one of the reasons for the success of these efforts is that it worked to help gain people's trust and that by gaining people's trust, the Census Bureaus was able to obtain better Decennial Census participation.  I do not believe that these programs are going to work as well for the 2020 Census because of this issue of trust.  If you cannot gain people's trust, you cannot get out a message that will compel people to respond to the Census.

102.    It is my opinion that the addition of the citizenship question will make it more difficult to gain people's trust.  This is based not just on my personal belief as a person with significant experience with the Census but also based on information I have learned from others.  For example, I was at a conference of the Population Association of America where demographers, sociologists, professors and academicians told me that they would not encourage members of their communities to respond to the Census because they were very concerned with how the data was going to be used.

103.    Neither Secretary Ross's decision memo nor the administrative record cite any research that would support the conclusion that including the citizenship question on the 2020 Decennial Census questionnaire will not significantly reduce the effectiveness of this messaging, therefore resulting in increased undercounts relative to previous Decennial Censuses.

104.    In his decision memo Ross claimed that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially." However, the reason that neither the Census Bureau nor other stakeholders could provide such documentation is that including a citizenship question on a Decennial Census short form questionnaire has never been tested. Determining the effects of doing so would involve a multi-year testing and research program following the steps I previously described. Instead of engaging

in this extensive testing, Secretary Ross simply assumed that there will be no adverse effects on response rates without any supporting evidence.

105.    In fact, there is evidence to the contrary. The Census Bureau's own internal research, including the research paper Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census by Brown et al. shows that it is very likely that the 2020 Census self-response rates will be lowered by the addition of a citizenship question. *See* **PX-162**. Additionally, in their depositions, Dr. Ron Jarmin and Dr. John Abowd both stated that the inclusion of the citizenship question would result in reducing self-response rates. Jarmin Dep. Tr., dated August 20, 2018, at 278:2-10; Abowd 30(b)(6) Dep. Tr., dated October 5, 2018, at 358:12-17.

106.    In my professional opinion it is more likely than not that this drop in self-response rates will result in increased undercounts. I think it is more likely than not that having a decrease in self-response and increased non-response would result in less accurate data and would also result in higher undercounts.  While I cannot predict precisely what the increase in the undercount will be, I believe to a reasonable degree of scientific certainty that it is more likely than not that the addition of the citizenship question will introduce a significant risk that the undercounts of the hard-to-count populations will be at least as high as was measured in the 1990 Decennial Census before the combined communications and partnership program was implemented. This is because the addition of the citizenship question will limit the effectiveness of the Census Bureau's communication and partnership program aimed at hard to reach populations and its outreach to and through trusted local partners.

107.    The Census Bureau identifies hard-to-count areas as those with a low response score or low self-response rate. Lower self-response rates indicate that an area should receive a higher

rating as hard-to-count than those areas with higher self-response. Decennial Census undercounts would be expected to occur in those areas that are hard-to-count. If the Census Bureau expects that the citizenship question will lower self-response rates, it then follows that the number of hard-to-count areas will increase, and it is therefore likely that undercounts will also increase.

108.     I think it is more likely than not that the number of hard-to-count areas will increase because there are areas that the Census Bureau previously did not expect to be low response areas, but now with the addition of the citizenship question, the response rates in these areas will go down.

109.     However it is the Census Bureau's position, as suggested in Dr. Jarmin and Dr. Abowd's depositions,that NRFU will still be able to obtain information for the populations whose self-response rate is lowered by the citizenship question. That is, despite having a lower self-response rate, the final results for these populations will not show an increased undercount. *See e.g.*, Jarmin Dep. Tr., dated August 20, 2018, at 274:22-275:7; Abowd Dep. Tr., dated August 29, 2018, at 237:17-238:12.

110.     However, there is no research cited in the administrative record—and I know of no research outside of the administrative record—to support their conclusion that despite a lowered self-response rate, NRFU will ensure that there is no undercount.

111.     Instead, the internal Census Bureau analysis by Brown et al. that I previously mentioned raises serious concerns about the accuracy of NRFU procedures for addressing an increase in non-response resulting from the citizenship question. In that report Census Bureau staff acknowledged that "[h]ouseholds deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door in NRFU." In other words, Bureau staff concluded that it is likely that households that refuse to respond to the

Decennial Census questionnaire because of the citizenship question are also likely to respond to enumerators.

112. Similarly, Dr. Abowd also testified at his deposition that there is no empirical evidence that someone who chooses not to respond to the 2020 Decennial Census because of the citizenship question would respond in a face-to-face interaction with the census enumerator. Abowd 30(b)(6) Dep. Tr., dated August 29, 2018, at 251:15-22.

113. Additionally, the CAPI response rate results contain data that suggests that not only is the personal interview rate declining in general, but it is declining significantly more in areas with more non-citizen households. *See* **PX- 155**.

114. These facts all strongly suggest that NRFU efforts may be unsuccessful with respect to households that decline to answer the Decennial Census questionnaire because of the citizenship question, particularly noncitizen households.

115. Moreover, internal Census Bureau research shows that Bureau staff concluded that when such households do not respond to the questionnaire or to NRFU enumerators because of the citizenship question, it will "result in the use of neighbors as proxy respondents on their behalf." That is, when households refuse to respond to an enumerator, the enumerator seeks a proxy response from someone outside the household. In fact, the Census Bureau's research shows that the rate of proxy responses is likely to increase with the addition of the citizenship question.

116. But as noted by Census Bureau staff, proxy enumeration generally produces a lower correct enumeration rate, and poorer quality individual demographic information, than a self-response.

117. Proxy households also have higher rate of imputation. "Whole-person imputation" or "whole household imputation," occurs when the Bureau imputes the characteristics of the

household, including in some circumstances the household member count. However, imputation will not solve the undercount that will likely be caused by the citizenship question. That is because if there are errors in the data collected, those errors are then carried over into the imputation.

118.    The Census Bureau may also attempt to enumerate a household that has not provided a self-response using administrative records. But as Dr. Abowd testified, such records are more likely to exist for citizens than for noncitizen households. Abowd 30(b)(6) Dep. Tr., dated August 2, 2018, at 233:3-11.

119.    The 2020 Decennial Census is too important to risk including an untested citizenship question without an assessment of the potential for increased undercounts that could result. A decision criteria should not be that there is no quantitative evidence that the inclusion of a citizenship question will increase undercounts, as was asserted by Secretary Ross. Instead, the correct decision criteria under professional standards must be that there is strong evidence that the inclusion of a citizenship question will not increase undercounts. In the absence of this latter criterion, the risk of serious undercounts in the 2020 Decennial Census is very high.

### b. Secretary Ross Ignored the Recommendation of the Census Bureau not to include the Citizenship Question

120.    In his decision memorandum Secretary Ross indicated that it was imperative that "another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would provide." As a result, he selected "Option D" in which involved the ACS citizenship question would be asked on the Decennial Census, and "the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data."

121.    However, Secretary Ross's decision directly conflicted with the advice given to him by the Census Bureau which was that using administrative records derived from social security and potentially other databases would yield more accurate citizenship information than could be gained by adding the citizenship question to the 2020 Census.

122.    The Administrative record shows that on January 19, 2018 Dr. Abowd sent Secretary Ross a memorandum titled "Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census".   In the memo, which constitutes the consensus view of the senior Census Bureau staff, Dr. Abowd recommended against asking the citizenship question, which the memorandum referred to as "Alternative B."   According to the memorandum, "Alternative B is very costly, harms the quality of the census count, and would result in substantially less accurate citizenship status data than are available from administrative sources."   By contrast, "Alternative C", using administrative records, primarily derived from social security databases "best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count."

123.    In response, Secretary Ross asked the Census Bureau to consider an "Alternative D" (the Secretary refers to these "Alternatives" in his memorandum as "Options" but they have the same letter designations), which would involve a combination of both using administrative records and asking the citizenship question.

124.    The administrative record shows that Dr. Abowd sent Secretary Ross a second memorandum on March 1, 2018 titled "Preliminary Analysis of Alternative D (Combined Alternatives B and C)."   This memorandum, which also constitutes the consensus view of the senior Census Bureau staff, documented a well-designed analysis of Alternative D and

concluded "In sum, Alternative D would result in poorer quality citizenship data than Alternative C." Thus, according to the Census Bureau, using administrative records alone will produce more accurate citizenship data than using some combination of administrative records and data collected from responses to a citizenship question on the 2020 census.

125.    Dr. Abowd's March 1, 2018 memo also stated that:  Alternative D "would still have all of the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce."

126.    And although Secretary Ross's decisional memorandum states that the "citizenship data provided to DOJ will be more accurate with the question than without it," his memorandum references no evidence of any kind supporting this assertion, which was contrary to the Census Bureau's analysis and recommendation. In short, the record makes clear that Secretary Ross knew that the citizenship data would best be provided by using other means than including a question on citizenship on the 2020 Decennial Census questionnaire and yet he chose to add the question anyway.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _11/02_, 2018

Bend, Oregon

John H. Thompson