**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |
| THE NEW YORK IMMIGRANT COALITION et al., | |
| Plaintiffs, | |
| v. | 18-CV-5025 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

**PLAINTIFFS' JOINT PROPOSED POST-TRIAL FINDINGS OF FACT**

# TABLE OF CONTENTS

I.    Parties and Witnesses ...................................................................................1

    A.    Plaintiffs ...............................................................................................1

        1.    The Governmental Plaintiffs ...................................................1

        2.    The New York Immigration Coalition ....................................1

        3.    Make the Road New York ........................................................3

        4.    American-Arab Anti-Discrimination Committee & ADC Research Institute............3

        5.    CASA de Maryland ("CASA") ................................................5

    B.    Defendants and Key Players .................................................................7

        1.    Census Bureau .........................................................................7

        2.    Commerce Department .............................................................8

        3.    Department of Justice ("DOJ") ...............................................9

        4.    Other Key Players ....................................................................9

    C.    Witnesses ............................................................................................10

        1.    Fact Witnesses .......................................................................10

        2.    Expert Witnesses ...................................................................14

    D.    Administrative Record and Written Discovery ...................................17

        1.    Administrative Record ...........................................................17

        2.    Document Requests ................................................................18

        3.    Interrogatories .......................................................................19

        4.    Requests for Admission .........................................................21

II.   Background on the Census, the Citizenship Question, and Census Bureau Processes .........22

    A.    Decennial Census Overview................................................................22

    B.    The Long Form and the American Community Survey.........................26

    C.    History of a Citizenship Question on the Census ................................28

    D.    The Census Bureau Has Had a Long Standing Objection to the Inclusion of a Citizenship Question on the Decennial Census ...........................29

    E.    Standards for Changing the Content of a Question Prior to Its Addition to the Decennial Census ..........................................................30

        1.    Census Bureau Quality Standards ..........................................30

        2.    Blumerman Memorandum.......................................................33

        3.    Census Bureau's Process .......................................................34

        4.    Guidance Governing Statistical Agency Independence .........36

    F.    Examples of Testing Questions on Other Surveys ..............................37

III.  Process of Adopting Citizenship Question ........................................................41

   A.  Secretary Ross' Spring 2017 Communications with Steve Bannon, Kris Kobach and Others About Adding a Citizenship Question to the Decennial Census (February 2017—April 2017) ........................................................42

   B.  Secretary Ross' Demand for a Citizenship Question and His Staff's Efforts to Enlist Another Agency to Request the Addition of a Citizenship Question .................45

   C.  Secretary Ross' Staff Investigates Whether the Commerce Department Can Add a Citizenship Question On Its Own While Mr. Kobach and Capitol Hill Allies Press for a Citizenship Question ........................................................49

   D.  Secretary Ross and His Staff Discuss Mr. Kobach's Request and Decide to Redouble Their Efforts to Solicit the Department of Justice to Request Addition of a Citizenship Question (September 2017) ........................................................54

   E.  Origins of December 12 Letter from Department of Justice to Census Bureau (September 2017—December 2017) ........................................................58

   F.  Final Revisions to and Delivery of the December 12 Letter (November 2017 - December 2017) ........................................................66

   G.  The Census Bureau Consistently Recommended Against Adding a Citizenship Question (December 2017 - March 2018) ........................................................70

   H.  The Census Bureau Repeatedly Communicated Its Recommendation Against Adding a Citizenship Question to Secretary Ross (December 2017 - March 2018) ......73

      1.  The Attorney General Directs the Department of Justice to Rebuff the Census Bureau's Attempts to Discuss the December 12 Letter ........................................................74

      2.  Census Bureau Analyses Recommended Against the Addition of a Citizenship Question ........................................................78

   I.  Department of Commerce and Department of Justice Discussed the Addition of a Citizenship Question with Outside Stakeholders (January 2018 - February 2018) ......97

IV.  The March 26 Decision Memo ........................................................110

   A.  Political Interference in the Decision to Add a Citizenship Question ........................110

   B.  Deviations from Census Bureau Standard Pre-Testing Processes in the Decision to Add a Citizenship Question ........................................................111

   C.  The March 26 Memo Was Prepared Without Adequate Consultation of Census Bureau Officials ........................................................120

   D.  Secretary Ross' Congressional Testimony Just Prior to the Decisional Memo (March 2018) ........................................................121

   E.  The Conclusions in the Decisional Memorandum ........................................................122

      1.  Statements Concerning the Genesis of a Citizenship Question ........................122

      2.  Statements Concerning the Secretary's Process ........................................................123

      3.  Conclusions Regarding Sufficiency of Testing ........................................................125

      4.  Conclusions Regarding Decline in Response Rate and Expense ........................133

    5.     Conclusions Regarding Respondent Burden ........................................................139

    6.     Conclusions Regarding Data Quality ...................................................................140

    7.     Important Aspects of the Problem Not Discussed in Secretary Ross' March 26 Decision Memo........................................................................................................144

V.    Lawsuit and Post-Lawsuit Disclosures..............................................................................148

VI.   The Addition of a Citizenship Question is Closely Linked With The Trump Administration's Wider Nativist Agenda. ..........................................................................153

  A.    Department of Commerce's Admissions Regarding President Trump, Attorney General Sessions, and Other Senior Administration Officials' Statements of Animus Toward Immigrant Communities of Color and Secretary Ross's Support.....153

  B.    These Expressions of Animus Evidently had an Impact on Immigrant Communities of Color and their Willingness to Participate in Government....................................157

VII. Effect of Citizenship Question on Response Rates ...........................................................161

  A.    Census Bureau Analyses of Decline in Response Due to a Citizenship Question .......162

  B.    Effect of Question on Noncitizen Response Rates ......................................................164

  C.    Effect of Question on Hispanic Response Rates .........................................................167

    1.     Item Non-Response Rates...................................................................................167

    2.     Breakoff Rates....................................................................................................168

  D.    Expert Testimony on Reduced Self-Response Rates Attributable to a Citizenship Question .......................................................................................................................169

    1.     Dr. Jennifer L. Van Hook ..................................................................................169

    2.     Dr. D. Sunshine Hillygus ...................................................................................173

    3.     Dr. Matthew Barreto...........................................................................................176

    4.     Dr. Christopher Warshaw ...................................................................................179

  E.    The Census Bureau's Estimates of the Decline in Self-Response Rates are Conservative.................................................................................................................180

  F.    The Macro-Environment ..............................................................................................183

    1.     CBAMS Results .................................................................................................183

    2.     Center of Survey Measurement Memoranda ......................................................187

    3.     Plaintiffs' Experts Agree that the Current Macro-Environment Heightens Concerns that a Citizenship Question will Substantially Reduce Response Rates ..188

VIII. Effect of A Citizenship Question on Undercount...........................................................189

  A.    Hard-to-Count Populations and Undercount ..............................................................190

  B.    The Parties' Responses to the Expected Undercount ..................................................193

  C.    The Defendants' Planned Integrated Communications and Partnership Campaign.....196

  D.    Household and Household Member Omissions - There is Agreement that Not All Individuals Missed in the Census Will Be Covered by NRFU Processes ...................202

E.     The Defendants' Planned Non-Response Follow-up (NRFU) Operations ..................205

    1.     The Limitations on NRFU to Address Undercount in Prior Decennial Censuses ....206

    2.     The Expected Increase in NRFU Caseload for the 2020 Decennial Census ...........208

    3.     The Relationship Between Reduced Self-Response and Undercount ......................209

    4.     Planned NRFU Operations Will Not Totally Eliminate Impact of Reduced Self-Response Resulting in Higher Undercount ..........................................................211

    5.     The Components of NRFU Will Not Off-Set the Decline in Self-Response. ..........216

    6.     Recap of Key Points on Self-Response and NRFU .................................................240

IX.  Absence of a Legitimate VRA Enforcement Rationale.....................................................245

  A.     Qualifications of Dr. Handley .................................................................................246

  B.     The Department of Justice's Need for Decennial Census CVAP Data .......................248

    1.     VRA Enforcement and the Use of Census Survey Data...........................................248

    2.     The Department of Justice Did Not See a Need for Decennial Census Data Prior to Being Contacted By Secretary Ross' Staff ........................................................251

    3.     There is No Evidence in the Administrative or Evidentiary Record to Support the Claims in the Gary Letter About the Purported Problems with Existing ACS CVAP Data.................................................................................................................253

    4.     There is No Evidence in the Administrative or Evidentiary Record Indicating that CVAP Data Collected through the Decennial Census Will Be an Improvement for VRA Enforcement Purposes over Existing ACS CVAP Data ...............................258

    5.     The Administrative and Evidentiary Record Indicate the Decision to Include a Citizenship Question on the Census Will Produce Less Accurate CVAP Data for VRA Enforcement Purposes than Using Administrative Records .........................262

X.  Injury to Organizations and Governmental Plaintiffs ....................................................270

  A.     Organizational Injuries to NGO Plaintiffs................................................................270

    1.     NYIC .......................................................................................................................271

    2.     Make the Road New York .......................................................................................275

    3.     ADC/ADCRI..........................................................................................................277

    4.     CASA ......................................................................................................................278

  B.     Organizational Injuries to Governmental Plaintiffs ..................................................279

  C.     Injuries Stemming from Undercount ........................................................................282

    1.     Apportionment and Political Power ........................................................................282

    2.     Impact of Undercount on Federal Funding.............................................................294

      a.   Financial Harm to NGO Plaintiffs...........................................................................298

      b.   Financial Harm to Governmental Plaintiffs .............................................................300

  D.     Injuries Independent from Undercount—Data Quality ..............................................307

1.  Adding a Citizenship Question to the Census Will Cause More Respondents to Be Enumerated through NRFU Processes, Resulting in Worse-Quality Census Data ................................................................................... 307

2.  Secretary Ross's Choice of Alternative D, which Will Produce Worse Data Quality, Violates OMB Standards .......................................................... 308

3.  Adding a Citizenship Question to the Census Will Damage the Quality of Census Data Relating to Population Characteristics ................................. 309

4.  The Governmental Plaintiffs Require Accurate Characteristics Data to Make Decisions Regarding the Distribution of Resources ................................. 311

5.  Federal Funding Programs Rely on Accurate Census Data Relating to Characteristics ..................................................................................... 312

6.  Omissions and Data Quality .................................................................. 313

7.  Children are Particularly Vulnerable to Being Omitted from the Census ............... 315

E.  Injury Based on Risk to Privacy ............................................................... 318

## I.      PARTIES AND WITNESSES

### A.      Plaintiffs

#### 1.      The Governmental Plaintiffs

1.      The governmental plaintiffs include 18 states (New York, Colorado, Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and Washington), 15 cities and counties (the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; city and county of San Francisco; counties of Cameron, El Paso, Hidalgo, and Monterey), the District of Columbia, and the United States Conference of Mayors. Docket No. 210.

2.      The governmental plaintiffs are diverse.  They comprise large and small states, urban centers and rural areas, communities from North to South and coast to coast.  Collectively, the state and local governments challenging the Defendants' decision collectively represent more than 39% of the population of the United States.  These jurisdictions are each home to immigrant and Hispanic communities; as detailed more fully below, they will be directly and deleteriously affected by Defendants' demand for citizenship information.  *See*, *e.g.*, Warshaw Aff. (Docket No. 526-1) ¶¶ 39, 54, Tables 5, 7.

#### 2.      The New York Immigration Coalition

3.      Plaintiff New York Immigration Coalition ("NYIC") is an umbrella policy and advocacy organization for nearly 200 groups in New York State, representing the collective interests of New York's diverse immigrant communities and organizations.  Choi Aff. (Docket No. 489-1) ¶ 2; Plum Aff. (Docket No. 498-19) ¶ 2.

4.      As a statewide organization, NYIC and its members serve a community of approximately four million immigrants across New York.  Choi. Aff. ¶ 23.

5.    NYIC's mission is to unite immigrants, members, and allies so that all New Yorkers can thrive; it envisions a New York State that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

6.    NYIC pursues solutions to advance the interests of New York's diverse immigrant communities and advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

7.    NYIC seeks to build the power of immigrants and the organizations that serve them to ensure their sustainability, improve people's lives, and strengthen New York State.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

8.    NYIC's nearly 200 members are dues-paying, nonprofit organizations that are committed to advancing work on immigrant justice, empowerment, and integration and they are located throughout New York State and beyond, all sharing NYIC's mission to serve and empower immigrant communities.  Choi Aff. ¶ 4; Plum Aff. ¶ 4.

9.    NYIC's members include grassroots community groups, social services providers, large-scale labor and academic institutions, and organizations working in economic, social, and racial justice; representatives of NYIC's member organizations serve on the NYIC Board of Directors. Choi Aff. ¶ 4; Plum Aff. ¶ 4.

10.    As an organization, NYIC has an ongoing commitment to promoting engagement in the Decennial Census among individuals served by its member organizations—in large part because of how critical the population count determined by the Census is for NYIC's member organizations' levels of governmental funding and political representation at the federal, state, and local levels.  Plum Aff. ¶ 10.

11.     For example, NYIC partnered with the New York Community Media Alliance to launch an outreach campaign to boost immigrant participation in the 2010 Census.  *Id.*

12.     As part of that effort, NYIC coordinated public service announcements in 24 languages that appeared in 69 newspapers and held press briefings with elected officials, helping to increase New York City's mail-in 2010 Census participation rate by approximately 3%.  *Id.*

### 3.     Make the Road New York

13.     Make the Road New York ("MRNY") is a nonprofit membership organization with offices and service centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains.  Altschuler Aff. (Docket No. 503-1) ¶ 2.

14.     MRNY's mission is to build the power of immigrant and working-class communities, which it advances by engaging in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation.  *Id.* ¶ 3.

15.     MRNY has more than 23,000 members who reside in New York City, Nassau County, Suffolk County, and Westchester County.  *Id.* ¶ 4

16.     These members lead multiple organizing committees across numerous issues and program areas of concern to the organization, take on leadership roles in the campaigns, determine priorities, and elect the representatives who comprise most of the Board of Directors.  *Id.*

### 4.     American-Arab Anti-Discrimination Committee & ADC Research Institute

17.     Plaintiff American-Arab Anti-Discrimination Committee ("ADC"), a civil rights membership organization committed to defending and promoting the rights and liberties of Arab-Americans and other persons of Arab heritage, is the largest American-Arab grassroots civil rights organization in the United States.  Khalaf Aff. (Docket No. 498-16) ¶ 6.

18.    Senator James G. Abourzek founded ADC in 1981 in response to stereotyping, defamation, and discrimination directed at Americans of Arab origin.  *Id.* ¶ 4.

19.    In 1981, Senator Abourzek founded Plaintiff ADC Research Institute ("ADCRI"), a 501(c)(3) corporation.  *Id.* ¶ 5.

20.    ADCRI sponsors a wide range of programs on behalf of Arab Americans and of consequence to the wider American community.  *Id.*

21.    ADC's mission includes focuses on combating stereotypes and discrimination against and affecting the Arab-American community in the United States, serving as its public voice on domestic policy issues, and promoting greater understanding of Arab history and culture.  *Id.* ¶ 7.

22.    ADC advocates, educates, and organizes to defend and promote human rights and civil liberties of Arab-Americans and other persons of Arab heritage, from recent immigrants to citizens born in the United States.  *Id.*

23.    ADC also has a legal department, which focuses on issues that impact the Arab-American community such as immigration, employment discrimination, and educational discrimination.  *Id.* ¶ 9.

24.    ADC serves as a membership organization, with several thousand dues-paying members who reside in all 50 states and the District of Columbia.  *Id.* ¶¶ 8, 31, 33-35.

25.    Many of these members are active in ADC's 28 local chapters, which are in 20 states and the District of Columbia.  *Id.* ¶¶ 8, 32.

26.    This includes active chapters with members leading local efforts, including in Tucson and Phoenix, Arizona, Los Angeles and Orange County, California, Miami and Orlando, Florida, New York, New York, and Austin and Dallas, Texas.  *Id.* ¶¶ 8, 32-33.

27.    ADC's members play a key role in the organization's operations, leading chapter-based activities and electing a majority of the organization's Board of Directors. *Id.* ¶¶ 31, 33.

28.    ADCRI sponsors programs in support of the constitutional rights of Arab-Americans, as well as research studies, publications, seminars, and conferences that document discrimination faced by Arab-Americans in the workplace, schools, media and government agencies. *Id.* ¶ 10.

29.    Since the 1980s, ADC has served in numerous capacities on the Census Bureau advisory committees, and both ADC and ADCRI have actively promoted Arab-American census participation. *Id.* ¶ 13.

30.    For example. in the months leading up to and during the 2010 Decennial Census, ADC and ADCRI conducted outreach work with the Arab-Americans community regarding completing census forms, holding outreach events to counter concerns of sharing of information with government and law enforcement agencies, and engaged in efforts to "get out the count" in that community by hosting townhalls and symposiums in select cities across the country. *Id.* ¶ 14.

31.    Because of the importance of having Arab-Americans accurately counted in the 2020 Decennial Census, ADC and ADCRI have already begun preparations for outreach to the Arab-American community by educating community members about the Decennial Census and its importance and now have increased their spending and efforts due to the addition of a citizenship question. *Id.* ¶¶ 15–16.

### 5.    CASA de Maryland ("CASA")

32.    Plaintiff CASA de Maryland, Inc. ("CASA") is a nonprofit 501(c)(3) membership organization headquartered in Prince George's County, Maryland with offices in Maryland, Virginia and Pennsylvania.  Escobar Aff. (Docket No. 498-3) ¶ 4.

33.     Founded in 1985, CASA is the largest membership-based immigrants' rights organization in the mid-Atlantic region, with more than 90,000 members, including members in Prince George's County and Baltimore, Maryland.  *Id.* ¶ 4.

34.     CASA's mission is to create a more just society by increasing the power of and improving the quality of life of low-income immigrant communities.  *Id.* ¶ 5.

35.     To advance this mission, CASA offers social, health education, job training, employment, and legal services to immigrant communities.  *Id.*

36.     CASA helps nearly 20,000 people a year providing services in its offices, by phone, and through email.  *Id.*

37.     CASA has an ongoing commitment to promoting engagement in the Decennial Census among its members, constituents, and communities.  *Id.* ¶ 7.

38.     CASA supports member participation in the Decennial Census as a means to advance CASA's overall mission by increasing recognition of low-income immigrant populations, which increases both the political power of those communities and the government funding directed to those communities, in turn improving the quality of life for those communities.  *Id.*

39.     With a thirty-year history working with immigrant communities, CASA has cultivated a position of trust with these communities that has made CASA a "go-to" organizational partner for outreach and education surrounding the Decennial Census.  *Id.* ¶ 8.

40.     In 2010, CASA partnered with various local government campaigns related to the census throughout Maryland, receiving dedicated funding to conduct door-to-door outreach, facilitate group educational sessions, and work with local, ethnic media to inform, engage, and encourage participating in the Census among Limited English Proficient immigrant communities in the region.  *Id.* ¶ 9.

6

41.     Beyond the Decennial Census, CASA provides various services to help members navigate public benefits including health, education, and legal services.  *Id.* ¶ 5.

42.     Through its Health and Social Service Program, CASA provides assistance to members navigating Supplemental Nutritional Assistance Program (SNAP) and Special Supplemental Nutrition Program for Women Infants and Children (WIC).  *Id.* ¶ 11.

43.     CASA's Legal Program further provides legal counseling related to employment discrimination, wage theft, and other employment related issues.  *Id.* ¶ 14.

44.     Through other programs, CASA assists members enrolling in Medicaid, Children's Health Insurance Program (CHIP), Title I funded public schools, early education programs, and unemployment insurance.  *Id.* ¶¶ 12–13.

### B.     Defendants and Key Players

#### 1.     Census Bureau

45.     Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency responsible for planning and administering the Decennial Census. Thompson Aff. (Docket No. 516-1) ¶ 17.

46.     Defendant Dr. Ron Jarmin is performing the nonexclusive duties of Director or Acting Director of the Census Bureau. PX-26 (AR).

47.     Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United Stated Census Bureau. Nov. 13 Trial Tr. at 876.

48.     Enrique Lamas is performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau. PX-26 (AR).

49.     Burton Reist is the Chief of the Decennial Communications and Stakeholder Relations at the Census Bureau. PX-4 at AR 3772 (AR).

50.     Victoria Velkoff is Division Chief of the American Community Survey Office at the U.S. Census Bureau. PX-164.

51.     Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question on the 2020 Decennial Census between December 2017 and March 2018. PX-147 (AR); Nov. 13 Trial Tr. at 882–83.

### 2.     Commerce Department

52.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f). The Commerce Department is responsible for planning, designing, and implementing the 2020 Decennial Census. 13 U.S.C. § 4.

53.     Defendant Wilbur Ross is the Secretary of Commerce. *See* PX-26 (AR).

54.     Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross. Comstock Dep. (Docket No. 491-2) at 35.

55.     Karen Dunn Kelley is the Presidentially appointed Under Secretary For Economic Affairs at the U.S. Department of Commerce responsible for the operations of the Census Bureau. Kelley Dep. (Docket No. 493-2) at 25:8-12.

56.     James W. Uthmeier is Senior Counsel to the General Counsel, Regulatory Reform Officer, Department of Commerce. PX-33 (AR).

57.     Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross. Teramoto Dep. (Docket No. 509-2) at 78.

58.     Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock. Park-Su Dep. (Docket No. 494-2) at 26-28.

59.     David Langdon is a Policy Advisor within the Office of Policy and Strategic Planning, reporting to Mr. Comstock. Langdon Dep. (Docket No. 510-2) at 54–55.

60.     Tad Kassinger was the former General Counsel of the Commerce Department who is one of Secretary Ross' personal attorneys. Comstock Dep. at 226–29.

61.     Peter Davison is the General Counsel for the Department of Commerce. Gore Dep. (Docket No. 491-2) at 97-98.

62.     Mike Walsh is the Deputy General Counsel for the Department of Commerce. Park-Su Dep. at 40.

### 3.     Department of Justice ("DOJ")

63.     Jeff Sessions was Attorney General of the United States. Gore Dep. at 77-78.

64.     John Gore is the Acting Assistant Attorney General for Civil Rights at the U.S. DOJ. Gore Dep. at 18:16-22.

65.     Arthur E. Gary is General Counsel for the Justice Management Division in the U.S. DOJ. PX-32 (AR).

### 4.     Other Key Players

66.     Stephen Bannon was the White House Chief Strategist and Senior Counselor to the President.

67.     Kris Kobach was the Kansas Secretary of State, and served as Vice Chair of the Presidential Commission on Election Integrity. PX-19 (AR), PX-614 (AR).

68.     A. Mark Neuman was the point person for the Trump transition team on Census issues. Teramoto Dep. at 126–127.

C.     Witnesses

1.     Fact Witnesses

69.     Evelyn Rodriguez is an employee of the City of Chicago who submitted testimony regarding the effects of a citizenship question on the 2020 Decennial Census on the City of Chicago. Rodriguez Aff. (Docket No. 488-1); Supp. Rodriguez Aff. (Docket No. 488-2).

70.     Monica Sarmiento is the Executive Director of Virginia Coalition for Immigrant Rights (VACIR) who submitted testimony regarding the effects of a citizenship question on the 2020 Decennial Census on immigrant communities and organizations that support those communities. Sarmiento Aff. (Docket No. 488-3); Supp. Sarmiento Aff. (Docket No. 488-4).

71.     Stephen K. Choi is the Executive Director of the New York Immigrant Coalition (NYIC) who submitted testimony regarding the effects of a citizenship question on the 2020 Decennial Census on NYIC and the immigrant communities it serves. Choi Aff. ¶ 1; Supp. Choi Aff. (Docket No. 489-2) at ¶ 1.

72.     Susan Brower is the State Demographer for the State of Minnesota who submitted testimony on Minnesota's Census outreach efforts, Minnesota's redistricting processes, and Minnesota's desire not to have block-level citizenship data provided or published. Brower Aff. (Docket No. 498-1); Supp. Brower Aff. (Docket No. 498-2).

73.     George Escobar is the Chief of Programs and Services at CASA who submitted testimony regarding the effects of a citizenship question on the 2020 Decennial Census on CASA and the immigrant and Hispanic communities it serves. Escobar Aff. ¶ 1; Supp. Escobar Aff. (Docket No. 498-4) at ¶ 1.

74.     Marchelle Franklin is the Human Services Director for the City of Phoenix who submitted testimony regarding the effects of a differential undercount on services provided by the City of Phoenix. Franklin Aff. (Docket No. 498-5); Supp. Franklin Aff. (Docket No. 498-6).

75.     Emily Freedman is the Director of Community Development for the City of Providence who submitted testimony regarding the effect of a differential undercount and inaccurate census count on funding Providence receives under certain federal programs. Freedman Aff. (Docket No. 498-7); Supp. Freedman Aff. (Docket No. 498-8).

76.     Jesús G. García is the Cook County Board Commissioner for the 7th District, located in Chicago, Illinois, who submitted testimony regarding a survey issued to constituents evaluating views on a citizenship question on the 2020 Decennial Census, other evidence of community fears of a citizenship question on the 2020 Decennial Census, outreach efforts for the 2020 Decennial Census, the effect of an undercount on funding and distribution of County services, and the effect of an undercount on redistricting within Cook County. Garcia Aff. (Docket No. 498-9); Supp. Garcia Aff. (Docket No. 498-10).

77.     Katherine Harvell Haney is the Chief Financial Officer at the Massachusetts Office of Health and Human Services who provided testimony regarding the effect of a differential undercount and inaccurate census count on funding received by Massachusetts under several federal programs. Haney Aff. (Docket No. 498-12); Supp. Haney Aff. (Docket No. 498-13).

78.     Jason Harmon is the Director of the Office of Every Student Succeeds Act (ESSA) Funded Programs at the New York State Education Department (NYSED) who provided testimony regarding the effect of a differential undercount on Title I, Title II, and Title IV education funding on the State of New York and on local school districts. Harmon Aff. (Docket No. 498-14); Supp. Harmon Aff. (Docket No. 498-15).

79.     Samer E. Khalaf is the National President of the American-Arab Anti-Discrimination Committee (ADC) and ADC Research Institute (ADCRI) who provided testimony regarding the

11

effects of a citizenship question on the 2020 Decennial Census on ADC and ADCRI and Arab-American communities they serve. Khalaf Aff. ¶ 1; Supp. Khalaf Aff. (Docket No. 498-17).

80.     Christine Pierce is the Senior Vice President of Data Science for the Nielsen Company (US) LLC ("Nielsen") who provided testimony regarding her conversation with Secretary Ross that contradicts the description of the conversation Secretary Ross used to justify his decision to add a citizenship question in his March 26 Memorandum. Pierce Aff. (Docket No. 498-18).

81.     Elizabeth Plum is the Vice President of Policy for the NYIC who provided testimony regarding NYIC's census outreach efforts and the effects of a citizenship question on the 2020 Decennial Census on NYIC and the immigrant communities it serves. Plum Aff. ¶ 1; Supp. Plum Aff. (Docket No. 498-20).

82.     Arturo Vargas is the Chief Executive Officer of the NALEO Educational Fund who provided testimony regarding NALEO's usual role in census operations, its role with respect to the decision to add a citizenship question, and its opposition to adding a citizenship question to the 2020 Decennial Census. Vargas Aff. (Docket No. 498-21); Supp. Vargas Aff (Docket No. 498-22).

83.     Jacqueline Tiema-Massie is the Director of Planning, Research, and Development as well as the Director of Grants Management for the Chicago Department of Family and Support Services ("DFSS") who provided testimony regarding the effects of an inaccurate Census enumeration and a differential undercount on services provided by DFFS to the Chicago community, and federal funding programs overseen by DFFS. Tiema-Massie Aff. (Docket No. 501-1); Supp. Tiema-Masse Aff. (Docket No. 501-2).

84.     Daniel Altschuler is the Director of Civic Engagement and Research for Plaintiff Make the Road New York ("MRNY") who provided testimony regarding the effects of a citizenship

question on the 2020 Decennial Census on MRNY and the immigrant communities it serves. Altschuler Aff.; Supp. Altschuler Aff. (Docket No. 503-2).

85.     Todd A. Breitbart was until his retirement a Senior Research Analyst working on redistricting for successive Minority (Democratic) Leaders of the New York State Senate, who provided testimony regarding the redistricting process in New York and the effects of a differential undercount resulting from a citizenship question on the 2020 Decennial Census on redistricting. Breitbart Aff. (Docket No. 504-1); Supp. Breitbart Aff. (Docket No. 504-2).

86.     Sarah Cullinane is the Director of Make the Road New Jersey who provided testimony regarding the effects of anti-immigrant rhetoric by the Trump Administration on immigrant communities and the likelihood that such rhetoric would impact their decision to respond to a 2020 Decennial Census with a citizenship question. Cullinane Aff. (Docket No. 505-1); Supp. Cullinane Aff. (Docket No. 505-2).

87.     Gregory E. Lucyk is a member of the Board of Directors of One Virginia 2021: Virginians for Fair Redistricting who provided testimony regarding a differential undercount on Virginia redistricting, and the effects of inaccurate districts on Virginia residents. Lucyk Aff. (Docket No. 506-1).

88.     Dr. John Abowd is the Chief Scientist at the United States Census Bureau and Associate Director for Research and Methodology at the United States Census Bureau who testified as a fact witness generally regarding Census Bureau testing and enumeration processes and specifically regarding the processes and analyses presented to the Department of Commerce in response to the DOJ's request to add a citizenship question to the 2020. *See* Census. Nov. 13 Trial Tr. at 876:8-877:4.

##### 2.     Expert Witnesses

89.     Dr. Dione Sunshine Hillygus is a Professor of Political Science and Public Policy and
Director of the Initiative on Survey Methodology at Duke University. Nov. 5 Trial Tr. at 24:18-
26:9. Generally, Dr. Hillygus provided expert testimony in this case evaluating: the likely impact
of a citizenship question on the participation of Hispanics and noncitizen households; the claims
made by Secretary Ross in his memo; the potential effectiveness or not of the census efforts to
mitigate their predicted differential and self-response through the nonresponse follow up
operations and the outreach campaign; and the extent to which this process has, in fact, followed
Census Bureau guidelines. Nov. 5 Trial Tr. at 29:9-17.

90.     Dr. Hermann Habermann is the former Chief Statistician of the United States (1988–
1992), Deputy Director and Chief Operating Officer of the United States Census Bureau (2002–
2007), and Director of the United Nations Statistics Division (1994–2002). Habermann Aff.
(Docket No. 498-11). Dr. Habermann submitted testimony regarding the lack of need for block-
level citizenship data, insufficient coordination between the Census Bureau and DOJ, the
superiority of administrative records for obtaining block-level citizenship data, the need for
pretesting of a citizenship question on the 2020 Decennial Census, the likely damage to the
credibility of the Census and Census Bureau by the inclusion of a citizenship question, and the
lack of support in United Nations recommendation for Secretary Ross's decision. *Id*.

91.     Dr. Jennifer Van Hook is the Roy C. Buck Professor of Sociology and Demography at the
Pennsylvania State University who gave expert testimony regarding unit and item nonresponse
rates of Hispanics and immigrants to citizenship and place of birth questions, including increases
in such nonresponse rates since 2016. Van Hook Aff. (Docket No. 489-3).

92.     Dr. William P. O'Hare a professional demographer and researcher with four decades of
experience utilizing Census Bureau data for a variety of purposes, and who provided expert

14

testimony regarding the likelihood that reduced self-response rates as a result of the addition of a citizenship question to the 2020 Decennial Census would result in an undercount. O'Hare Aff. (Docket No. 507-1).

93.     Dr. Andrew Reamer is a research professor in the George Washington Institute of Public Policy (GWIPP) at George Washington University who provided expert testimony regarding the effect of a Census undercount on distribution of federal funding. Reamer Aff. (Docket No. 508-1).

94.     Dr. Christopher Warshaw is an Assistant Professor of Political Science at George Washington University who provided expert testimony regarding the effects of a Census undercount differentially affecting specific demographic groups on the population of the fifty states and of selected cities and counties, on apportionment of representatives across states for the U.S. House of Representatives, on distribution of voting power within states, and on the distribution of political power within the United States.  Warshaw Aff. ¶¶ 1–2.

95.     John Thompson is the former Director of the United States Census Bureau from August 2013 to June 2017 who provided expert testimony regarding the adequacy of testing of a citizenship question on the 2020 Decennial Census, the effectiveness of NRFU, and the likelihood of a differential net undercount. Thompson Aff. (Docket. No. 516-1).

96.     Dr. Joseph J. Salvo is the Director of the Population Division at the New York City Department of City Planning (essentially, the city's chief demographer). November 6 Trial Tr. at 289:6-19. Dr. Salvo provided expert testimony regarding the the effect of decreased self-response rates on the components of net undercounts, NRFU operations, such as proxies, the use of administrative records and imputation at the local level, and the effect of decreased self-response rates on the provision of services in New York City. Nov. 6 Trial Tr. at 298:23-301:5,

304:5-13.  In addition, Dr. Salvo provided fact testimony on the efforts of New York City to mitigate the expected decrease in self-response resulting from a citizenship question.  Nov. 6 Trial Tr. at 399:9–400:17.

97.     Dr. Matthew A. Barreto is a professor of political science and Chicano studies at the University of California, Los Angeles. Nov. 9 Trial Tr. at 580:14-17. Dr. Barreto surveyed social science literature and conducted a survey experiment designed to ascertain the impacts of a citizenship question on the Decennial Census.  Nov 9 Trial Tr. at 588:18–23.

98.     Dr. Barreto provided expert testimony evaluating the expected effects of a citizenship question on the 2020 Decennial Census, from its effects on initial response rates, through non-response follow up and imputation, and ultimately to the quality of data that would be gathered in 2020; the net differential impact of each of these areas on Hispanic and immigrant communities in particular; and the expected impacts of a citizenship question on the differential net undercount.  Nov. 9 Trial Tr. at 590:2–591:12.

99.     Dr. Lisa Handley is a consultant who specializes in voting rights in redistricting and in electoral district design more generally. Nov. 13 Trial Tr. at 787:5-10. Dr. Handley provided expert testimony regarding the sufficiency of ACS data for purposes of ascertaining whether an electoral system or redistricting plan dilutes minority votes.  Nov. 13 Trial Tr. at 796:22–797:12.

100.    Dr. John Abowd is the Chief Scientist at the United States Census Bureau and Associate Director for Research and Methodology at the United States Census Bureau. Nov. 13 Trial Tr. at 876:8–877:4.

101.    Dr. Abowd provided expert testimony regarding the testing of a citizenship question on the ACS, the effect of a citizenship question on self-response rates on the 2020 Decennial Census, and the effectiveness of NRFU. Nov. 14 Trial Tr. at 1075:14–1078:7.

### D.    Administrative Record and Written Discovery

#### 1.    Administrative Record

102.    Defendants produced an Administrative Record along with a certification and index on June 8, 2018 with only 1,320 pages.  Docket No. 173; PX-1 (AR).  These materials allude to but contain little documentation of internal deliberations before December 2017 or communications between the Departments of Commerce and Justice. PX-1 (AR).

103.    On June 21, 2018, Secretary Ross filed a supplemental memorandum significantly revising the narrative as to the origin and genesis of how a citizenship question came to be placed on the Decennial Census. Docket No. 189; PX-2 (AR).

104.    On July 3, 2018, and memorialized in the July 5, 2018 order, this Court ordered the Defendants to produce a complete Administrative Record by July 23, 2018, and authorized limited extra record discovery.  Docket No. 199.  The Court granted additional time to produce a complete Administrative Record on July 23, 2018. Docket No. 211.

105.    Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (Bates 0003736-0012464). Docket Nos. 212, 216, 217; PX-3 (AR); PX-4 (AR).  The productions of July 23, 2018 and July 27, 2018 contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between Commerce and DOJ. PX-3 (AR); PX-4 (AR).

106.    Defendants released additional Administrative Record documents after review by the Disclosure Review Board ("DRB") on August 28, 2018 and September 4, 2018, without Bates numbers. PX-5 (AR); PX-6 (AR).

107.    Defendants produced additional small supplements to the Administrative Record on September 11, 2018 (Bates 0012464-0012543). PX-7 (AR).

108.    Defendants produced additional sets of documents, including in responses to motions to compel, on various dates (Bates 00012544-0012826). PX-8 (AR); PX-9 (AR); PX-10 (AR); PX-11 (AR); PX-12 (AR).

109.    Defendants produced an additional Administrative Record production on October 1, 2018 (Bates 0012827-0013022), PX-13 (AR), along with further documents (Bates 0013023-0013024) on October 1, 2018, PX-14 (AR).

110.    The parties agreed that all documents bearing prefix-less Bates stamps between 000001 and 0013024 are part of the Administrative Record. Parties' Stipulation No. 63 (Docket No. 523).

111.    Defendants produced focus group materials on October 3, 2018 (Bates 0013025-0013099 and a native file titled "noisy_7"). PX-15; PX-16 (AR, excluding "noisy_7").  The parties disputed whether the focus group materials, including the native file titled "noisy_7," are properly part of the Administrative Record. Parties' Stipulations No. 63; Parties' Stipulations No. 64 (Docket No. 524).

## 2.    Document Requests

112.    Plaintiffs requested documents from Defendants Secretary Ross, Director Jarmin, the Department of Commerce, and the Census Bureau on July 12, 2018.

113.    Defendants responded in ten productions of documents bearing the Bates numbers with the prefix "COM_DIS," along with additional piecemeal documents between August 13, 2018 and October 16, 2018.

114.    A substantial number of the documents produced bearing the Bates prefix "COM_DIS" were stipulated to be a part of the Administrative Record. Parties' Stipulations. No. 63.

115.    Plaintiffs requested documents from DOJ on July 20, 2018.

116.   DOJ responded in eight productions with additional piecemeal documents, particularly

documents for which the deliberative process privilege claim was overturned, between August 3,

2018 and October 23, 2018.

### 3.   Interrogatories

117.   On July 12, 2018, Plaintiffs served its first set of interrogatories on Defendants Ross and

Department of Commerce.

118.   Plaintiff's First Interrogatory read:

"With regard to the document found in the Administrative Record at 1321, please
IDENTIFY:

a. the "senior Administration officials" who "previously raised" reinstating the
citizenship question;

b. the "various discussions with other government officials about reinstating a
citizenship question to the Census";

c. the consultations Secretary and his staff participated in when they "consulted
with Federal governmental components";

d. the date on which the "senior Administration officials" who "previously raised"
reinstating the citizenship question first raised this subject; and

e. all PERSONS with whom the "senior Administration officials had previously
raised" reinstating the citizenship question.

PX-302.

119.   On August 13, 2018, Defendants responded to Plaintiff's first set of interrogatories. PX-

300.

120.   Defendants initially responded to Plaintiffs' first interrogatory by stating, "Defendants

have not to date been able to identify individuals responsive to subpart a," but provided "Mary

Blanche Hankey, James McHenry, Gene Hamilton, John Gore, Danielle Curtrona, Jefferson

Sessions, Kris Kobach, Steve Bannon, and Wilbur Ross," in response to subparts b and c.  PX-

300.

121.   On August 29, 2018, Plaintiffs served a second set of interrogatories asking an additional interrogatory of Defendants regarding the existence of a RCT proposal for the addition of a citizenship question to the 2020 Decennial Census. PX-303.

122.   On August 30, 2018, Defendants Ross and Department of Commerce initially responded to Plaintiffs' first interrogatory by saying they "construed subparts a, b, and c, as coextensive," and identified Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore, and Jefferson Sessions, along with Kris Kobach and Steve Bannon.  PX-511 at 2–3.

123.   With regard to conversations between Secretary Ross and the Attorney General, Defendants in the August 30, 2018 initial response to Plaintiffs' first interrogatory stated that "Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 decennial census with Attorney General Sessions in August 2017. In addition, it is possible that the two had an additional discussion concerning the issue, and although the date of that conversation is unknown, Defendants believe it took place earlier in 2017." PX-511 at 3.

124.   In their August 30, 2018 initial response to Plaintiffs' first interrogatory, Defendants further stated that "Defendants cannot confirm that the Secretary spoke to Steve Bannon regarding the Citizenship Question." PX-511 at 3.

125.   On September 5, 2018 Plaintiffs further supplemented their response to Plaintiffs' first interrogatory, but the response remained substantially the same. PX-301.

126.   On September 11, 2018, Plaintiffs served a third set of interrogatories asking two additional questions of Defendants, one regarding Question 31 of the Census Bureau's response to questions from the Department of Commerce and the other regarding Defendants responses to Requests for Admission.

127.   On September 28, 2018, Defendants responded to Plaintiff's second set of interrogatories. PX-303.

128.   On October 11, 2018, Defendants again supplemented their responses to Plaintiffs' first interrogatory and made substantial changes to the September 5 response. PX-302.

129.   For the first time, on October 11, 2018, Defendants stated definitively in response to Plaintiffs' first interrogatory that "Secretary Ross discussed the possible reinstatement of citizenship question on the 2020 decennial census with Attorney General Sessions in the Spring of 2017 and at subsequent times." PX-302.

130.   On October 11, 2018, Defendants also added for the first time that "Secretary Ross recalls that Steven Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census." PX-302.

131.   On October 23, 2018, Defendants responded to Plaintiffs' third set of interrogatories.

### 4.   Requests for Admission

132.   On September 7, 2018, Plaintiffs served Requests for Admission on Defendant Department of Commerce.

133.   On September 11, 2018, Plaintiffs served Requests for Admission on Defendant Census Bureau.

134.   On October 23, 2018 Defendants Department of Commerce and Census Bureau Provided Reponses to Plaintiffs' Requests for Admission. PX-297; PX-298(R).

## II.   BACKGROUND ON THE CENSUS, THE CITIZENSHIP QUESTION, AND CENSUS BUREAU PROCESSES

### A.   Decennial Census Overview

135.   The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—with no reference to citizenship status—residing in each state. Parties' Stipulations (Docket No. 480-1) ¶ 1.

136.   The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers"; which requires "counting the whole number of persons in each State." *Id.* ¶ 2.

137.   The Constitution requires that this count be an "actual Enumeration" conducted every ten years. *Id.* ¶ 3.

138.   Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce. *Id.* ¶ 4.

139.   The Census Act also created the Census Bureau within the Department of Commerce to spearhead the effort to conduct the enumeration. Thompson Aff. (Docket No. 516-1) ¶ 17.

140.   The Secretary of Commerce is charged with the responsibility to take a Decennial Census to create an actual enumeration of the United States population. Parties' Stipulations ¶ 5.

141.   The central constitutional purpose of the Census Bureau in taking the Decennial Census is to conduct an accurate enumeration of the population. *Id.* ¶ 6.

142.   The Secretary of Commerce must comply with legal requirements established by the Constitution, statutes, and regulations governing the census. For example, the Secretary's decisions must be consistent with the "constitutional goal of equal representation" and that bear a "reasonable relationship to the accomplishment of any actual enumeration of the population." *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996).

143.   To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States, which is directed to every person living in the United States and all persons living in the United States are legally required to respond. Parties' Stipulations ¶ 7.

144.   For the 2020 Decennial Census, households will also be given the option to complete the questionnaire via the internet. Thompson Aff. ¶ 18.

145.   If the Census Bureau does not receive a response to the questionnaire it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data. This process is called Non Response Follow Up ("NRFU"). Parties' Stipulations ¶ 8.

146.   If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. *Id.* ¶ 9.

147.   For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person. *Id.* ¶ 10.

148.   If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." *Id.* ¶ 11.

149.   A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. *Id.* ¶ 12.

150.   For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview. *Id.* ¶ 13.

151.    After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, to determine the population count in each state. *Id.* ¶ 14.

152.    Data from the Decennial Census is reported down to the census block level. *Id.* ¶ 15.

153.    The population data collected through the Decennial Census determines the apportionment of seats in the U.S. House of Representatives among the states. *Id.* ¶ 16.

154.    Apportionment in the U.S. House of Representatives is based on total population, including both citizens and non-citizens. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128-29 (2016).

155.    The population data collected through the Decennial Census also determines the number of electoral votes each state has in the Electoral College. Parties' Stipulations ¶ 17.

156.    States also use Decennial Census data to draw congressional, state, and local legislative districts. Parties' Stipulations ¶ 18.

157.    The federal government also uses Decennial Census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. *Id.* ¶ 19.

158.    At least $900 billion from 320 different census-derived federal grant and funding programs is distributed annually to states and localities for a variety of purposes, including education, public housing, transportation, health care and other services. Thompson Aff. ¶ 27; Reamer Aff. (Docket No. 508-1) ¶ 9.

159.    These funds determine the ability of state and local governments to provide for quality education, public housing, transportation, health care and other services, for all their residents, citizens and non-citizens alike. Thompson Aff. ¶ 27; Reamer Aff. ¶¶ 13, 40, 45, 48, 50 , 53, 55–60, 63, 66–68, 72, 75; Franklin Aff. (Docket No. 498-5) ¶¶ 6-10; Freedman Aff. (Docket No.

498-7) ¶¶ 9, 11, 13; Haney Aff. (Docket No. 498-12) ¶¶ 5, 7, 8; Harmon Aff. (Docket No. 498-14) ¶¶ 5, 9, 13, 15–17; Tiema-Massie Aff. (Docket No. 501-1) ¶¶ 9–12, 15, 17–18, 20.

160.   The population of the United States as a whole has been over-counted in the Decennial Census; for example, in 2000 there was a measured net overcount. Thompson Aff. ¶ 21.

161.   Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count." Parties' Stipulations ¶ 21.

162.   Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census. *Id.* ¶ 22.

163.   Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census. *Id.* ¶ 23.

164.   The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals. *Id.* ¶ 24.

165.   The Census Bureau describes the "differential undercount" for a particular racial and ethnic population as the difference between the measured net undercount for that group and the measured net undercount for the White non-Hispanic population. Thompson Aff. ¶ 23.

166.   The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. Parties' Stipulations ¶ 26.

167.   In the 2000 and 2010 Decennial Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness. *Id.* ¶ 27.

168.   For the 2000 and 2010 Decennial Censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count. *Id.* ¶ 28.

### B.    The Long Form and the American Community Survey

169.   From at least the 1970 Decennial Census through the 2000 Decennial Census, in lieu of the short-form questionnaire the Census Bureau sent a long form questionnaire to approximately one in six households. *Id.* ¶ 31.

170.   For the 1970 Decennial Census, the long form questionnaire, which contained additional questions, was sent to approximately one in five households. *Id.* ¶ 32.

171.   For the 2000 Decennial Census, the long form questionnaire, which contained additional questions, was sent to approximately one in six households. *Id.* ¶ 33.

172.   Data collected from the sample households surveyed with the long form were used to generate statistical estimates. *Id.* ¶ 34.

173.   After the 2000 Decennial Census, the long form questionnaire was replaced by the American Community Survey ("ACS"). *Id.* ¶ 37.

174.   The ACS began operating in 2000 and was at full sample size for housing units in 2005, and for group quarters in 2006. *Id.* ¶ 39.

175.   The ACS is a yearly survey of approximately 2% of households—about 3.5 million— across the United States. *Id.* ¶ 40.

176.   The data collected by the ACS allows the Census Bureau to produce estimates of Citizen Voting Age Population ("CVAP"). *Id.* ¶ 44.

177. CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level. *Id.* ¶ 45.

178. Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate. Parties' Stipulations ¶ 46.

179. The ACS is intended to provide information on characteristics of the population, and the social and economic needs of communities. Parties' Stipulations ¶ 47.

180. Unlike the Decennial Census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates. *Id.* ¶ 48.

181. Because ACS estimates are statistical estimates based on a sample, the tabulations are weighted to reflect sampling probabilities and eligibility for NRFU, as well as well as to control to official population totals as established by the Population Estimates program. *Id.* ¶ 49.

182. Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tract[s]" and "census-block groups." *Id.* ¶ 50.

183. Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3-year" or "5-year" estimates depending on the number of years aggregated together). *Id.* ¶ 51.

184. Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in–every-eight household sample. *Id.* ¶ 52.

185. Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units. *Id.* ¶ 53.

186. 1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1-year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+", 3-year ACS

estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-year estimates, and 5-year ACS estimates produce "[d]ata for all areas." *Id.* ¶ 54.

### C.    History of a Citizenship Question on the Census

187.    The 1950 Decennial Census asked for the individual's place of birth, and whether a foreign-born individual had been naturalized. Parties' Stipulations ¶ 29.

188.    A question concerning citizenship did not appear on the Decennial Census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010. *Id.* ¶ 30.

189.    In the 1970, 1980, 1990, and 2000 Decennial Censuses, the long form Decennial Census questionnaire contained a question about citizenship status. *Id.* ¶ 35.

190.    In the 1990 and 2000 Decennial Censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth. *Id.* ¶ 36.

191.    The citizenship data collected from the long form questionnaire in 2000 were made available by the Census Bureau at the census block group level. Thompson Aff. ¶ 39.

192.    Citizenship data broken down by race collected from the 2000 Census long form were not made available by the Census Bureau at the census block level. *Id.*

193.    The 2000 Decennial Census short form questionnaire did not include a question on citizenship. Parties' Stipulations ¶ 55.

194.    The 2010 Decennial Census questionnaire did not include a question on citizenship. *Id.* ¶ 56.

195.    A question concerning citizenship status currently appears as among one of more than 50 questions on the 28-page ACS questionnaire. Parties' Stipulations ¶ 41.

196.    The citizenship status question on the ACS is preceded by a question asking where the person was born. *Id.* ¶ 42.

197.    The citizenship question that appears on the ACS is not a binary yes/no question. The ACS citizenship question, asks whether the person was born in the United States, a U.S. territory, or abroad. *Id.* ¶ 43.

198.    For U.S. citizens, the ACS citizenship question also asks more detailed information about a person's place of birth; and for some U.S. citizens, it also requests information about the citizenship status of their parents, and whether they became a U.S. citizen by naturalization. Thompson Aff. ¶ 41.

199.    A planned question on the 2020 Decennial Census questionnaire asks, "Is this person a citizen of the United States?," with the answer options:

> "Yes, born in the United States";
>
> "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas";
>
> "Yes, born abroad of U.S. citizen parent or parents";
>
> "Yes, U.S. citizen by naturalization – Print year of naturalization"; and
>
> "No, not a U.S. citizen".

Parties' Stipulations ¶ 57.

> ### D.    The Census Bureau Has Had a Long Standing Objection to the Inclusion of a Citizenship Question on the Decennial Census

200.    In 1980, the Census Bureau opposed adding a citizenship question to the Decennial Census, arguing in federal court that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count. . . . Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment

and refusal to cooperate." *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980).

201.   Prior to the 1990 Decennial Census, the Census Bureau once again opposed the addition of inquiries into immigration status on the Decennial Census. PX-306 at 7–9, 13–17.

202.   In 2016, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that "a [person-by-person] citizenship inquiry would invariably lead to a lower response rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states." PX-309 at 25.

E.     **Standards for Changing the Content of a Question Prior to Its Addition to the Decennial Census**

1.     **Census Bureau Quality Standards**

203.   The Census Bureau's Quality Standards lay out the necessity to conduct pre-testing. PX-260.

204.   Dr. Hillygus testified that the Census Bureau must follow these standards. Nov. 5 Trial Tr. at 135:23–136:5.

205.   Dr. Abowd testified that if the Census Bureau did not comply with these standards, then OMB would evaluate that noncompliance in deciding whether to grant clearance for the inclusion of a citizenship question on the 2020 Decennial Census. Nov. 14 Trial Tr. at 1253:9–1254:3.

206.   Dr. Abowd testified that these quality standards apply to the addition of a citizenship question to the 2020 Decennial Census. Nov. 14 Trial Tr. at 1105:9–1105:11; 1276:19–1277:2.

207.   Sub-Requirement A2-3.3 requires that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (*e.g.*, problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." PX-260 at 8.

208.   Pursuant to A2-3.3-1c and A2-3.3-1d of these same Census Quality Standards, pretesting must be performed when "c. Review by cognitive experts reveals that adding pretested questions to an existing instrument may cause potential context effects" and "d. An existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)." *Id.*

209.   The Census Bureau's Statistical Quality Standards also state that "an existing data collection instrument has substantive modifications" when "existing questions are revised or new questions added." *Id.*

210.   Dr. Abowd testified that, generally speaking, survey questionnaires must be pretested under the Census Bureau Quality Standards. Nov. 14 Trial Tr. at 1278:5-11.

211.   Dr. Abowd testified, therefore, that pretesting of a citizenship question on the Decennial Census was required under the Census Bureau Quality Standards unless one of two exceptions applied. Nov. 14 Trial Testimony at 1279:13-1280:8.

212.   One exception is that "On rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting. In such cases, subject matter and cognitive experts must discuss the need for and feasibility of pretesting. The program manager must document any decisions regarding such pretesting, including the reasons for the decision. If no acceptable options for pretesting can be identified, the program manager must apply for a waiver." PX-260 at 8.

213.   The Census Bureau never applied for a waiver pursuant to this exception before a citizenship question was decided to be added to the 2020 Decennial Census. Nov. 14 Trial Tr. at 1279:6–1279:12.

214.   Another exception is that "Pretesting is not required for questions that performed adequately in another survey."  PX-260 at 8.

215.   In January of 2018, the Census Bureau reported to the Commerce Department that 29.9% of all people identified as noncitizens by administrative records reported themselves as citizens on the 2000 long-form census questionnaire. PX-22 (AR).

216.   In January of 2018, the Census Bureau reported to the Commerce Department that 32.7% of all people identified as noncitizens by administrative records reported themselves as citizens on the 2010 ACS. PX-22 (AR).

217.   In January of 2018, the Census Bureau reported to the Commerce Department that 34.7% of all people identified as noncitizens by administrative records reported themselves as citizens on the 2016 ACS. PX-22 (AR).

218.   In August of 2018, the Census Bureau reported that between 30% and 37% of all people identified as noncitizens by administrative records reported themselves as citizens on the ACS. PX-162.

219.   The Census Bureau views this "disagreement" between administrative records and ACS survey responses as a "problem with the ACS citizenship question." Nov. 14 Trial Tr. at 1282:15-19.

220.   There is no consensus view within the Census Bureau on how to deal with this problem. Nov. 14 Trial Tr. at 1282:20-22.

221.   Given this problem, the Census Bureau plans on conducting a content review process to determine how the citizenship question is performing on the ACS. Nov. 14 Trial Tr. at 1282:23-1283:6; 1284:25-1285:8.

222.   Dr. Abowd testified that in light of the disagreement rate, he does not believe that the citizenship question on the ACS performs adequately.  November 14 Trial Tr. at 1287:20-1288:2.

223.   Dr. Hillygus testified that in light of the disagreement rate, there is a real need to do pretesting prior to adding a citizenship question to the decennial short form. Nov. 5 Trial Tr. at 169:19-23.

224.   Dr. Hillygus testified that, even if applicable on its face, this exception would not make sense to apply to the Decennial Census in these circumstances. Nov. 5 Trial Tr. at 167:2-17.

225.   Application of this exception would mean that the Census Bureau Quality Standards mandate less testing for the Decennial Census than for the ACS, and also that a question could be added to the Decennial Census without pretesting. Nov. 5 Trial Tr. at 167:2-17.

## 2.   Blumerman Memorandum

226.   Lisa Blumerman was Associate Director of Decennial Census Programs on April 29, 2016. PX-271; Nov. 13 Trial Tr. at 995:12-15.

227.   Associate Director Blumerman is the signatory for a memorandum dated April 29, 2016 (the "Blumerman Memorandum"). PX 271.

228.   The Blumerman Memorandum  "officially documents the U.S. Census Bureau's plan to develop and transmit to Congress" questions planned for the 2020 Decennial Census. PX-271.

229.   The Blumerman Memorandum provides a description of how content review was conducted and presented to members of the 2020 Decennial Census executive steering committee. Nov. 13 Trial Tr. at 995:18-996:3.

230.   That description reads: "Federal agencies with known uses of the 2020 Census or ACS content, and select other agencies, will receive a letter with instructions for how federal data users may provide updates to the documentation of data uses. Responses should be received before July 1, 2016. Census Bureau staff may follow up with federal users directly if more clarification is required." PX-271.

231.   The Blumerman Memorandum contains a description of how the Census Bureau determines the content of the 2020 Decennial Census. PX-271.

232.   As part of that description, the Blumerman Memorandum states that "Final proposed questions are based on the results of extensive cognitive testing, field testing, other ongoing research, and input from advisory committees." PX-271.

233.   This sentence describes the process for the 2020 Decennial Census that was presented to the Census Bureau's 2020 executive steering committee. Nov. 13 Trial Tr. at 995:25-996:10.

234.   Consistent with the Blumerman Memorandum, all questions on the 2010 census were the subject of extensive cognitive testing. Nov. 13 Trial Tr. at 997:11-14.

235.   Consistent with the Blumerman Memorandum, all questions on the 2010 Census were field tested. Nov. 13 Trial Tr. at 997:19-23.

### 3.   Census Bureau's Process

236.   The Census Bureau has a well-established process for adding or modifying questions to the Decennial Census.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867-3891 (AR); Docket No. 516-1 at ¶ 45.

237.   The Census Bureau follows this established process when adding or changing content on the Decennial Census to ensure that the data fulfill legal and regulatory requirements established by Congress.  PX-4 at AR 3890 (AR).

238.    One step in the process is for the Department of Commerce to receive requests from the Congress or other agencies in the Executive Branch.  PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR); Thompson Aff. ¶ 57.

239.    After receipt, the Department of Commerce must work with OMB to determine whether the requested data fulfill legal, regulatory, or Constitutional requirements. PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR).

240.    As part of the established process, the Department of Commerce must notify Congress of the subjects to be covered by the census.  For the 2020 Decennial Census, this notification was required by March 28, 2017. PX-4 at AR 3890 (AR).

241.    Another step in the established process is for the Department of Commerce to notify Congress of its intent to add the question. PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR).

242.    For the 2020 Decennial Census, this notification must occur by March 31, 2018. PX-4 AR at 3890 (AR); PX-3 at 2304 (AR); PX-134 (AR).

243.    Another step in the established process is to for the Department of Commerce to notify the public with a Federal Register Notice and invite comments on the proposed question. PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR).

244.    Another step in the established process is for the Census Bureau to field test the wording of the new question.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR); Thompson Aff. ¶ 62.

245.    Testing requires approval from OMB, which requires providing notice to the public and inviting comments through a Federal Register Notice.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 AR 3890, 9867 (AR).

246.   The OMB must respond to comments from the public after 30 days.  Subsequently, the OMB may issue final approval.  PX-4 at AR 3891, 9867 (AR); PX-134 (AR).

247.   Another step in the established process is for the Census Bureau to make operational adjustments, including re-designing paper questionnaires, adjusting the paper data capture system, and redeveloping training modules for enumerators and Census Questionnaire Assistance Agents.  PX-3 at AR 3560 (AR); PX-4 at AR 3891, 9865, 9867 (AR).

248.   The Census Bureau has described this well-established process consistently over time. PX-4 at AR 3890-3891, 9867 (AR); PX-3 at AR 2304, 3560 (AR).

249.   Not all of these steps were followed prior to the addition of a citizenship question to the 2020 Decennial Census. November 14 Trial Tr. at 1264:20-25.

### 4.    Guidance Governing Statistical Agency Independence

250.   The Census Bureau is a federal statistical agency; OMB has designated the Census Bureau as a "principal statistical agency." Nov. 14 Trial Tr. at 1102:2-11: PX-355 at 23; Habermann Aff. (Docket No. 498-11) ¶ 19.

251.   The Census Bureau and the Department of Commerce are subject to OMB Statistical directives. Habermann Aff. ¶ 20; PX-354; PX-359.

252.   These directives recognize the importance of trust and the critical role that agency independence plays in maintaining public trust. Habermann Aff. ¶¶ 70-72; PX-354.

253.   To ensure trust, OMB Statistical Directive Number 1 requires that "a Federal statistical agency must be independent from political and other undue external influence in developing, producing, and disseminating statistics." PX-354 at 4.

254.   The Committee on National Statistics (CNSTAT) is a standing unit of the National Academies of Sciences, Engineering, and Medicine. PX-355 at 10.

255.   CNSTAT publishes a document titled "Principles and Practices for a Federal Statistical Agency: Sixth Edition." PX-355.

256.   The purpose of Principles and Practices is to assist officials in various cabinet departments and independent agencies, as well as the statistical agencies' leadership and staff, to be fully aware of the standards and ideals that are fundamental to the agencies' work. PX-355 at 10.

257.   Principle 4 is titled "Independence from Political and Other Undue External Influence" and reads as follows:

> To be credible, trustworthy, and unhindered in its mission, a statistical agency must maintain a position of independence from undue external influences (even as it proactively seeks input on its program and priorities). It must avoid even the appearance that its collection, analysis, or dissemination processes might be manipulated for political or partisan purposes or that individually identifiable data collected under a pledge of confidentiality might be turned over for administrative, regulatory, or law enforcement uses. Protection from undue outside influences requires that a statistical agency have authority for professional decisions on its programs, including authority over the selection and promotion of staff; the processing, secure storage, and maintenance of data; and the timing and content of data releases, accompanying press releases, and documentation. The credibility that comes from independence is essential for users to maintain confidence in the accuracy and objectivity of a statistical agency's data and for data providers to be willing to cooperate with agency requests.

PX-355 at 24.

## F.   Examples of Testing Questions on Other Surveys

258.   After the 1990 Census, the Census Bureau investigated the possibility of adding a question regarding respondents' social security numbers (SSNs) on the census short form. Nov. 13 Trial Tr. at 998:25-999:4.

259.   The Census Bureau conducted an RCT comparing a version of the short form with and without a question asking for a social security number. Nov. 13 Trial Tr. at 999:5-8.

260.   That RCT assessed the impact on self-response rates of a social security question. Nov. 13 Trial Tr. at 999:9-11.

261.   In the RCT, the self-response rate fell off in the group that had the social security number question by 3.4 percent. Nov. 13 Trial Tr. at 999:12-15.

262.   The conclusion that was drawn from the RCT was that asking for a social security number would be sensitive.  Nov. 13 Trial Tr. at 999:16-18.

263.   For certain subpopulations, the citizenship would be more sensitive than the SSN question. Nov. 13 Trial Tr. at 999:25-1000:8.

264.   This RCT to assess the effect of the SSN question was performed before any decision was made to add a question requiring respondents to provide their social security number to the census. Nov. 13 Trial Tr. at 1000:9-13.

265.   Today, the census does not ask for individuals' social security numbers, in part because of concerns about self-response rates. Nov. 13 Trial Tr. at 999:19- 999:24.

266.   Dr. Thompson provided the example that, following the 1990 Decennial Census, there was a proposal to revise the questionnaire to allow respondents to indicate that they identified with multiple races. Thompson Aff. ¶ 48.

267.   In response, a review was conducted over four years and included extensive cognitive and field testing conducted by the Census Bureau. Thompson Aff. ¶ 48.

268.   This review also included the development and extensive testing of a question to be included on the 2000 Decennial Census questionnaire. Thompson Aff. ¶ 48.

269.   Dr. Thompson described how planning for the 2020 Decennial Census included an extensive research and testing program to determine how the questions on race and ethnicity could be improved. Thompson Aff. ¶ 49.

270.   This research started more than ten years prior to the 2020 Decennial Census in 2008 when the design of the Alternate Questionnaire Experiment for the 2010 Decennial Census began. Thompson Aff. ¶ 49.

271.   This testing involved three components: 1) a questionnaire sent by mail; 2) a telephone re-interview of the mail respondents; and 3) a series of focus groups. Thompson Aff. ¶ 49.

272.   The proposed changes were then subjected to additional testing through the 2015 National Content Test. Thompson Aff. ¶ 51.

273.   The 2015 National Content Test included a nationally representative sample of 1.2 million housing units in the United States, including Puerto Rico and a re-interview with 75,000 respondents. Thompson Aff. ¶ 52, 53.

274.   Despite all of this extensive testing and research, in January 2018, Albert Fontenot, the Associate Director for Decennial Census Programs announced that the Census Bureau would not be making a change to the race and ethnicity questions for the 2020 questionnaire because a final decision had to be made by December 31, 2017 in order to allow the Census Bureau adequate time to deliver the final question wording for the 2020 Decennial Census to Congress by March 31, 2018. Thompson Aff. ¶ 54.

275.   Dr. Abowd gave an example of what he described as another question that had been taken form a different survey and added to the Decennial Census. Nov. 14 Trial Tr. at 1112:20-24.

276.   The example was a change made to the question about Hispanic ethnicity in 1970 that was imported from the Current Population Survey into the 5% sample long form decennial questionnaire. Nov. 14 Trial Tr. at 1112:5-24.

277.   The Census Bureau's statistical quality standards were not in effect in 1970. Nov. 14 Trial Tr. at 1257:20-23.

278.   This change was made to only a sample of census forms sent out in the 1970 census. Nov. 14 Trial Tr. at 1257:24-1258:5.

279.   This change had been tested one or two years prior. Nov. 14 Trial Tr. at 1258:11-17.

280.   Subsequent testing reflected that the 1970 Hispanic ethnicity question included on the 5% sample long form decennial questionnaire engendered substantial cognitive misunderstanding. Nov. 9 Trial Tr. at 738:23-739:22; PX-475.

281.   The citizenship question on the ACS was most recently tested in 2006, 14 years prior to the Secretary's decision in 2018. Nov. 14 Trial Tr. at 1258:18-23.

282.   There is evidence that there is a different political macro-environment between 2006 and 2018, and that 2018 will be a difficult macro-environment for a citizenship question in the census in 2020. Nov 9 Trial Tr. at 617:21-620:13; 630:7-631:12, 737:8-737:16; Nov. 14 Trial Tr. at 1258:25-1259:7.

283.   Dr. Abowd gave another example in his testimony of what was described as an "untested" question that had been added to the Decennial Census. Nov. 14 Trial Tr. at 1111:9-24.

284.   Dr. Abowd's example was the alteration to the race question on the 1990 census with respect to Asian and Pacific Islander (API) race category.  Nov. 14 Trial Tr. at 1111:9-24.

285.   The Census Bureau's current statistical quality standards were not in effect in 1990. Nov. 14 Trial Tr. at 1259:13-15.

286.   As proposed in 1988, the race question would have consisted of seven pre-listed categories and a write in space where a respondent could indicate their race was API. PX-380.

287.   The 1990 Decennial Census was changed to include a pre-listed category for API. PX-380.

288.  The Census Bureau had strongly recommended the change in form to the race question. PX-380; Nov. 14 Trial Tr. at 1260:1-10.

289.  The Census Bureau does not recommend the change to the 2020 Decennial Census to include a citizenship questionnaire. Nov. 14 Trial Tr. at 1260:11-23.

290.  The change to the race question was supported by the API community. PX-380; Nov. 14 Trial Tr. at 1260:24-1261:4.

291.  The change to include a citizenship question is not supported by the Hispanic or immigrant communities. Nov. 14 Trial Tr. at 1261:5-9.

## III.   PROCESS OF ADOPTING CITIZENSHIP QUESTION

292.  As set forth below, the overwhelming evidence shows that Secretary Ross wanted to add a citizenship question to the 2020 Decennial Census prior to, and independent of, DOJ's December 12 request.  The Secretary and his aides pursued this goal vigorously for the better part of a year, with no apparent interest in promoting more vigorous enforcement of the Voting Rights Act ("ACT").  Secretary Ross and his staff had many meetings on the subject, the Secretary demanded repeated status updates, and openly worried that he had run out of time to add the question.  None of the emails in which the Secretary expressed deepening concern that Commerce might not be able to add the question explained *why* he cared so much about adding the question.  Nor have his aides been able to explain the Secretary's interest.  Initially, the Secretary and his aides tried to get other agencies to request addition of a citizenship question. When that failed, they considered having the Commerce Department request the change.  In the end, and notwithstanding its earlier refusal, they persuaded DOJ to make the request.

A. **Secretary Ross' Spring 2017 Communications with Steve Bannon, Kris Kobach and Others About Adding a Citizenship Question to the Decennial Census (February 2017—April 2017)**

293.   Shortly after his appointment to Secretary of Commerce, Secretary Ross "began considering" whether to add to the Decennial Census questionnaire "a citizenship question, which other senior Administration officials had previously raised."  PX-2 (AR).

294.   Secretary Ross' interest in adding a citizenship question began after the issue was raised by "senior Administration officials." *Id.*  According to the Secretary, questions about the census were "in the air," in these early days of the Administration and so it was "natural" for him to discuss a citizenship question with high ranking Administration officials.  PX-688.

295.   It appears that Secretary Ross heard about a citizenship question from other senior Administration officials as well.  According to his own June 21, 2018 memorandum, "senior Administration officials" had raised a citizenship question "previously" to his first considering the question.  PX-2 (AR).  The conversations the Secretary admits that he has had with Attorney General Sessions and Mr. Bannon, as far as Defendants have disclosed, occurred after the Secretary first began considering a citizenship question.  *Compare* PX-30  (AR), PX-55 at 1 (AR), *and* PX-79 (AR) (Secretary's February and March consideration) *with* PX-19 at 1-2 (AR), PX-58 (AR), *and* PX-302 at 1-3 (Subsequent conversations with Sessions and Bannon).

296.   Although the Secretary's own June 21 memo expressly states that the other senior Administration officials had raised a citizenship question "previous[]" to the Secretary's initial consideration of the issue, in discovery the Secretary and the Commerce Department claim that they now do not distinguish between the "other senior Administration officials," who first raised the issue and other federal government officials who the Secretary and staff later consulted.  PX-2 (AR).  As a result, they have not disclosed the identities of the "senior Administration

officials." PX-302 at 2-3.  Defendants' explanation for failing to disclosing these identities is not credible.

297.   The Commerce Department admits that, on or about January 31, 2017, press reported that the Chair of the White House Domestic Policy Council, Andrew Bremberg, released a draft Executive Order proposing census questions to determine immigration and citizenship status. PX-298(R) at RFA 42.

298.   On or before February 2, 2017, David Langdon asked Earl Comstock about his interest in Congressional notification of Decennial Census topics and Comstock indicated that he was "very" interested and the Secretary would be as well. PX-30 (AR); Langdon Dep. at 81.

299.   Following that conversation, Mr. Langdon set up briefings regarding those same topics during and after the transition period. PX-30 (AR); PX-79 (AR); PX-80 (AR); Langdon Dep. at 93-98.

300.   By March 2017, Secretary Ross asked Mr. Comstock whether noncitizens were included in the census.  PX-55 (AR); Comstock Dep. at 62–64.

301.   On March 10, 2017, Mr. Comstock sent Secretary Ross an email responding to Secretary Ross' question.  Mr. Comstock told Secretary Ross that the Census Bureau made clear that "undocumented residents (aliens) in the 50 states" are "included in the apportionment population counts," and pasted in an article entitled "The Pitfalls of Counting Illegal Immigrants."  PX-55 (AR); PX-298(R) at RFA 55; Comstock Dep. at 65–68.

302.   On March 10, 2017, Mr. Langdon offered to set up a briefing for Mr. Comstock to understand the congressional notification process for the Decennial Census. PX-79 (AR).

303.   On March 15, 2017, Secretary Ross and Wendy Teramoto had a telephone discussion with Marc Neuman and Ted Kassinger about the census.  PX-193 at 28.

304.   On or about April 5, 2017 Secretary Ross discussed the addition of a citizenship question on the 2020 Decennial Census with Mr. Bannon.  PX-58 (AR); PX-19 at 1-2 (AR); PX-302 at 3; PX-298(R) at RFA 56.

305.   During their conversation on or about April 5, 2017, Mr. Bannon advised Secretary Ross that he wanted a citizenship question included on the 2020 Decennial Census.  PX-58 (AR); PX-19 at 1 (AR); PX-302 at 3.

306.   The Commerce Department admits that Secretary Ross knew by spring of 2017 that Mr. Bannon wanted him to speak with Kris Kobach about including a citizenship question on the 2020 Decennial Census.  PX-298(R) at RFA 51.

307.   When Secretary Ross spoke with Mr. Bannon, Mr. Bannon asked Secretary Ross to speak with Mr. Kobach about his ideas about adding a citizenship question on the 2020 census.  PX-58 (AR); PX-19 at 1 (AR); PX-302 at 3; PX-298(R) at RFA 56.  Mr. Kobach stated that Mr. Bannon "direct[ed]" him and Secretary Ross to have this conversation.  PX-19 at 1 (AR).

308.   Following the call with Mr. Bannon, Secretary Ross discussed with Mr. Kobach the possibility of adding a citizenship question to the Decennial Census. PX-58 (AR); PX-19 at 1 (AR); Comstock Dep. at 205–208; Teramoto Dep. at 38–47; PX-302 at 2-3.

309.   During the course of their discussion, Secretary Ross and Mr. Kobach discussed the potential effect of adding a citizenship question on how non-citizens are counted for purposes of apportionment. PX-19 at 2 (AR).

310.   The Commerce Department admits that Secretary Ross' conversation with Kris Kobach about adding a citizenship question to the 2020 Decennial Census came before any request from DOJ to add a citizenship question to the Decennial Census.  PX-298(R) at RFA 80.

311.   Shortly after Secretary Ross' call with Steve Bannon, Mr. Comstock contacted Mr. Neuman.  On April 11, 2017, Mr. Neuman emailed Mr. Comstock a link to the Supreme Court's decision in *LULAC v. Perry*, which considered citizen voting age population in assessing claims under section 2 of the VRA.  PX-188 (AR).

312.   On April 13, 2017 Mr. Comstock emailed Mr. Neuman asking when Census would need to notify Congress regarding census questions. PX-87 (AR); PX-186 (AR).

313.   Mr. Neuman responded to Mr. Comstock on April 14, 2017 that the notification deadline for topics had already passed, but there would be another opportunity next year, when the questions are due.  PX-87 (AR).

314.   On April 20, 2017 Secretary Ross' personal assistant Brooke Alexander emailed Mr. Comstock and Ms. Teramoto on Secretary Ross' behalf noting that then-Census Bureau Director John Thompson had an upcoming meeting on April 29 with the Census National Advisory Committee on Racial, Ethnic and Other Populations, and admonishing them that "[w]e <u>must</u> get our issue resolved before this!" PX-81 (AR); Comstock Dep. at 137–41; Cont. Teramoto Dep. (Docket No. 509-3) at 195–97.

315.   In the spring of 2017, Secretary Ross discussed adding a citizenship question to the Decennial Census with Jeff Sessions. PX-302 at 3.

### B.   Secretary Ross' Demand for a Citizenship Question and His Staff's Efforts to Enlist Another Agency to Request the Addition of a Citizenship Question

316.   Secretary Ross decided he wanted to add a citizenship question to the Census soon after he was confirmed, very likely in March or April of 2017. Comstock Dep. at 54, 82, 146; PX-83.

317.   As early as May 2, 2017 Secretary Ross emailed Mr. Comstock stating that he was "mystified why nothing have [sic] been done in response to my months old request that we include a citizenship question [on the 2020 Decennial Census]."  PX-88 (AR); PX-298(R) at

RFA 62; Comstock Dep. at 145–46; Teramoto Dep. at 28–32. By simple arithmetic, "months old" would place the request at the beginning of March or earlier.

318.    That same day, Mr. Comstock responded to Secretary Ross promising "[o]n the citizenship question we will get that in place."  PX-88 (AR); PX-298(R) at RFA 63; Comstock Dep. at 151–52.

319.    As of May 2017, Commerce had not identified any legitimate need for addition of a citizenship question internal to the Commerce Department that would permit adding the question to the census.  Mr. Comstock believed that he needed another agency to request addition of the question because OMB and the Paperwork Reduction Act required Commerce to "justify" why a citizenship question was "need[ed]," and Mr. Comstock understood that simply saying that "the Secretary wanted it" would not "clear [the] legal thresholds."  Comstock Dep. at 153-54.

320.    Mr. Comstock set out in the spring of 2017 to come up with a "legal rationale" to support the Secretary's request to add a citizenship question.  Comstock Dep. at 265-66.  Mr. Comstock testified that it was his job to "help [the Secretary] find the best rationale" for adding the question, because "[t]hat's what a policy person does."  Comstock Dep. at 267. Mr. Comstock testified that he did not "need to know what [the Secretary's] rationale might be, because it may or may not be one that is … legally-valid."  Comstock Dep. at 267.

321.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ."  PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

322.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ."  PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

323.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ."  PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

324.    Prior to May 2017 DOJ had not requested that a citizenship question be added to the 2020 Decennial Census.  PX-298 (R) at RFA 66; Gore Dep. at 168-69 (objection).

325.    Two days after advising Secretary Ross that "we will get [the citizenship question] in place," on May 4, 2017, Mr. Comstock sent an email to Eric Branstad asking him to identify the "best counterpart at DOJ" to speak with "[r]egarding [the] Census." PX-84 (AR); PX-524 (AR); PX-537 (AR).

326.    Eric Branstad was the Senior White House Advisor at the Department of Commerce.  PX-84 (AR).

327.    Mr. Branstad responded with the name "Mary Blanche Hankey," who previously served as legislative counsel to then-Senator Jeff Sessions, and was the White House liaison at the DOJ. PX-84 (AR); PX-524 (AR); PX-537 (AR).

328.    On May 4, 2017, after corresponding with Mr. Branstad, Mr. Comstock sent an email to Ms. Hankey, and asked to set up a meeting.  PX-524 (AR); PX-537 (AR); PX-51 (AR); PX-298 (R) at RFA 68.

329.    When Mr. Comstock contacted DOJ on May 4, 2017 for the purpose of adding a citizenship question to the 2020 Decennial Census, Mr. Comstock was not seeking to promote more effective enforcement of the VRA.  PX-524 (AR); PX-537 (AR); PX-51 (AR); Comstock Dep. at 167–172.

330.    Mr. Comstock and Ms. Hankey spoke in person in May 2017 and later directed Comstock to speak James McHenry in DOJ.  PX-524 (AR); PX-537 (AR).

331.   James McHenry was Director of DOJ's Executive Office for Immigration Review (EOIR). PX-485.

332.   Mr. McHenry had no responsibility for enforcement of the VRA.  PX-485; PX-298 (R) at RFA 71; Comstock Dep. at 270–71; Gore Dep. at 65.

333.   After May 2, 2017, Mr. Comstock spoke on multiple occasions with Mr. McHenry at DOJ for the purpose of adding a citizenship question to the 2020 Decennial Census. PX-524 (AR); PX-537 (AR); PX-51 (AR); PX-298 (R) at RFA 70; Comstock Dep. at 174–179, 270–73.

334.   Mr. McHenry advised Mr. Comstock that "after considering the matter . . . Justice staff did not want to raise the question given the difficulties Justice was encountering in the press at the time (the whole Comey) matter" and Mr. McHenry "directed [Comstock] to Gene Hamilton at the Department of Homeland Security." PX-48 (AR); PX-524 (AR); PX-537 (AR).

335.   Having failed to obtain DOJ's cooperation, Mr. Comstock then contacted Eugene (Gene) Hamilton at Department of Homeland Security for the purpose of adding a citizenship question to the 2020 Decennial Census.  PX-524 (AR); PX-537 (AR).  They spoke several times.  PX-51 (AR); PX-298 (R) at RFA 73; Comstock Dep. at 179–85, 277–83.

336.   The Department of Homeland Security has no responsibility for enforcement of the VRA. PX-298 (R) at RFA 74; Comstock Dep. at 277.

337.   Eugene (Gene) Hamilton had no responsibility for enforcement of the VRA. PX-298 (R) at RFA 77; Comstock Dep. at 277.

338.   When Mr. Comstock contacted Mr. Hamilton at the Department of Homeland Security for the purpose of adding a citizenship question to the 2020 Decennial Census, Mr. Comstock was not seeking to promote more effective enforcement of the VRA. PX-298 (R) at RFA 75; Comstock Dep. at 179–85, 277–83.

339.   Eventually, Mr. Hamilton told Mr. Comstock that the Department of Homeland Security would not request a citizenship question. PX-524 (AR); PX-537 (AR).

340.   Mr. Hamilton told Mr. Comstock that "it was best handled by the Department of Justice." PX-48 (AR); PX-524 (AR); PX-537 (AR).

### C.   Secretary Ross' Staff Investigates Whether the Commerce Department Can Add a Citizenship Question On Its Own While Mr. Kobach and Capitol Hill Allies Press for a Citizenship Question

341.   On May 24, 2017, Secretary Ross met with Mr. Comstock, Mr. Langdon, and others "all afternoon." PX-150 (AR).

342.   On or before May 24, 2017, Mr. Langdon, on behalf of Mr. Comstock, requested information from Census Bureau staff including Burton Reist regarding whether and/or how the census counts non-citizens and illegal immigrants for purposes of apportionment. PX-150 (AR); Cont. Langdon Dep. (Docket No. 510-3) at 174-183, 184.

343.   During that meeting, Secretary Ross asked questions about the content of the Decennial Census and "seemed . . . puzzled why citizenship is not included in the 2020" census. PX-85 (AR); PX-150 (AR); Cont. Langdon Dep. at 160-163.

344.   Following that meeting, Mr. Langdon requested further information from Census Bureau staff including Mr. Reist regarding "the criteria used to pick topics for 2020 versus ACS. Say, citizenship." PX-150 (AR).

345.   Also on May 24, 2017, Mr. Langdon sent an email to Mr. Comstock entitled "Counting of illegal immigrants," which states "the counting of illegal immigrants (or of the larger group of non-citizens) has a solid and fairly long legal history . . . [there is] a Bush 41 era DOJ opinion that proposed legislation to exclude illegal aliens from the decennial census was illegal." PX-565 (AR).

346.    Mr. Comstock responded to Mr. Langdon on May 24, 2017, asking for further information on the selection of questions for the census versus the ACS, and passing along the Supreme Court decision that Mr. Neuman had previously provided for the proposition that the government might have a use for citizenship data.  PX-565 (AR).

347.    Later on May 24, 2017, at nearly 11:00 PM, Mr. Langdon made an apparently urgent request to Acting Associate Director of the 2020 Decennial Census Lisa Blumerman to respond to his inquiry related to a citizenship question, asking for a response, "Ideally this evening." PX-150 (AR); Cont. Langdon Dep. at 172-174.

348.    Mr. Langdon made this request specifically in the context of pursing the addition of a citizenship question.  Cont. Langdon Dep. at 167-169.

349.    Mr. Langdon reported back to Mr. Comstock that he made that request.  PX-543 (AR).

350.    Following his failed discussions with Mr. Hamilton, Mr. Comstock asked James Uthmeier to investigate "how Commerce could add the question to the Census itself."  PX-48 (AR); PX-524 (AR); PX-537 (AR).

351.    On July 14, 2017, Mr. Kobach emailed Secretary Ross. PX-19; PX-298 (R) at RFA 81; Comstock Dep. at 205–06; Teramoto Dep. at 40–46.

352.    In his July 14, 2017 email, Mr. Kobach wrote to Secretary Ross to remind Secretary Ross of their prior telephone discussion "a few months ago."  PX-19 (AR); PX-298 (R) at RFA 82; Comstock Dep. at 205–06.

353.    Mr. Kobach wrote that during their earlier discussion, he and Secretary Ross "talked about the fact that the US census does not currently ask respondents about their citizenship," and further advised Secretary Ross that the absence of such a question "leads to the problem that

aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." PX-19 (AR); PX-298 (R) at RFA 82; Teramoto Dep. at 40–46.

354. Mr. Kobach further wrote that "it was essential that one simple question be added to the upcoming 2020 census" and that a variant of the question that appears on the American Community Survey "needs to be added to the census." PX-19 (AR); Teramoto Dep. at 40–46.

355. On July 21, 2017, Mr. Kobach called Ms. Teramoto. He also emailed her, forwarding his July 14 email to Secretary Ross stating that he had spoken to Secretary Ross about the addition of citizenship question to the 2020 Decennial Census "at the direction of Steve Bannon . . . ." PX-19 (AR); PX-298 (R) at RFA 83; Comstock Dep. at 120–21, 205–06; Teramoto Dep. at 40–46.

356. During her testimony, Ms. Teramoto denied knowledge of her conversation with Mr. Kobach and denied knowing who he was. Teramoto Dep. at 40–41.

357. Following their conversation on July 21, 2017, Ms. Teramoto arranged for a call between Mr. Kobach and Secretary Ross. PX-19 (AR).

358. On or around July 25, 2017, Secretary Ross had a further telephone conversation with Mr. Kobach concerning the addition of a citizenship question to the 2020 Decennial Census, in which Ms. Teramoto and Deputy Chief of Staff Israel Hernandez participated. PX-19 (AR); PX-298 (R) at RFA 84; PX-193 at 8, 40; Comstock Dep. at 208–09.

359. Ms. Teramoto testified she had no recollection of this call and again denied knowing who Mr. Kobach was. Teramoto Dep. at 40–41.

360. Undersecretary Kelley testified that it is "very plausible" that she knew as early as July 2017 that Secretary Ross was considering adding a citizenship question to the 2020 decennial Census. Kelley Dep. at 45:5-12.

361.   On July 25, 2017, the Commerce Department Director of Intergovernmental Affairs, Aaron Willard, requested Census Bureau personnel provide a briefing to Undersecretary Kelley on "how the process works when questions are discussed and approved to be used on the [American Community Survey] and also those on Census questionnaire.  Likewise, we would like to know how issues surrounding things like [the proposal to add a question about Sexual Orientation and Gender Identity] are discussed and reviewed throughout this process as well." PX-28 (AR); PX-29 (AR); Kelley Dep. at 47–54.

362.   On July 25, Census Bureau personnel gave Undersecretary Kelley and Mr. Willard a briefing on, among other things, the process how questions are "approved to be used on the . . . Census questionnaire." PX-28 (AR); PX-29 (AR); Kelley Dep. at 47–54.

363.   During her testimony, Undersecretary Kelley denied this briefing had anything to do with the potential addition of a citizenship question to the Decennial Census.  Kelley Dep. at 49, 51, 54.

364.   Approximately a week after the call with Mr. Kobach, on August 2, Congressman Mark Meadows requested a meeting with Secretary Ross.  PX-567.  Congressman Meadows is a member of the U.S. House of Representatives from North Carolina and is the Chairman of the House Freedom Caucus.

365.   On August 8, 2017, Secretary Ross discussed adding a citizenship question to the Decennial Census with Congressman Mark Meadows. PX-193 at 9.  According to Secretary Ross' calendar, Mr. Comstock, Mr. Hernandez, and Ms. Teramoto attended this call. PX-193 at 41-42.

366.    On August 8, Secretary Ross was advised by an email from Mr. Hernandez that Congressman Steve King introduced a bill to the House of Representatives seeking the addition of a citizenship question to the Decennial Census. PX-18 (AR).

367.    On August 8, 2017, after the call with Congressman Meadows, Secretary Ross emailed Mr. Comstock asking "where is DOJ in their analysis" of whether to request the addition of a citizenship question to the 2020 Decennial Census.  PX-97 (AR); PX-298 (R) at RFA 91; Comstock Dep. at 213.

368.    Secretary Ross' email of August 8, 2017 further advised Mr. Comstock that "[i]f they [the Department of Justice] still have not come to a conclusion please let me know your contact person and I will call the AG." PX-97 (AR); PX-298 (R) at RFA 92; Comstock Dep. at 214.

369.    Mr. Comstock responded to Secretary Ross on August 8, 2017 stating that he would get back to him with the requested information. PX-97 (AR); PX-298 (R) at RFA 93; Comstock Dep. at 213–215.

370.    As of August 8, 2017, DOJ had not agreed to request the addition of a citizenship question to the 2020 Decennial Census.  PX-298 (R) at RFA 94.

371.    On August 9, Mr. Comstock sent a further response to Secretary Ross stating "we are preparing a memo and full briefing for you on a citizenship question.  The memo will be ready by Friday . . . Since this issue will go to the Supreme Court we need to be diligent in preparing the administrative record." PX-95 (AR); PX-523 (AR); Comstock Dep. at 216.

372.    Secretary Ross responded to Mr. Comstock the next day, "I would like to be briefed on Friday by phone . . . we should be very careful about everything, whether or not it is likely to end up in the SC." PX-95 (AR); PX-523 (AR); Comstock Dep. at 217.

373.   On August 11, Mr. Comstock and Mr. Uthmeier exchanged edits on briefing materials on a citizenship question for Secretary Ross.  During this exchange, Mr. Uthmeier wrote that he had "recommendations on execution," stating that he thought "our hook" was "ultimately, we do not make decisions on how the [citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide."  PX-607 (AR).

374.   On August 11, Mr. Comstock emailed Secretary Ross and Ms. Teramoto a memorandum prepared by James Uthmeier concerning the addition of a citizenship question to the Decennial Census. PX-3 at AR 2461 (AR); PX-146 (AR).  The Defendants have withheld this memorandum on grounds of privilege.

375.   On August 16, Ms. Teramoto requested that she and Mr. Comstock meet with Undersecretary Kelley and the new-Commerce General Counsel Peter Davidson on August 21 "to sort this out." PX-50 (AR); PX-94 (AR).

376.   Mr. Comstock agreed to this meeting.  PX-50 (AR).

377.   During their respective depositions, Mr. Comstock, Ms. Teramoto, and Undersecretary Kelley all denied having any recollection of the August 21 meeting. Comstock Dep. at 221; Teramoto Dep. at 54–58; Kelley Dep. at 91–92.

378.   Mr. Gore testified that, at the end of August or beginning of September, Secretary Ross initiated a discussion about the addition of a citizenship question with Attorney General Sessions. Gore Dep. at 83–84; PX-302 at 2-3.

D.   **Secretary Ross and His Staff Discuss Mr. Kobach's Request and Decide to Redouble Their Efforts to Solicit the Department of Justice to Request Addition of a Citizenship Question (September 2017)**

379.   On September 1, Secretary Ross complained to Mr. Comstock and Ms. Teramoto about a number of issues, including that he had "received no update [on] the issue of the census

question" and Mr. Comstock responded, "Understood. Wendy and I are working on it." PX-45 (AR); PX-96 (AR).

380.    On September 6, Secretary Ross and his senior staff (including Messrs. Comstock, Hernandez, Davidson, Uthmeier, and Ms. Teramoto, Undersecretary Kelley, and Ms. Park-Su) had a meeting to discuss the addition of a citizenship question. PX-31 (AR); PX-35 (AR); PX-36 (AR); PX-46 (AR); PX-47 (AR); PX-193 at 11.

381.    Mr. Comstock, Ms. Teramoto, and Undersecretary Kelley have all denied having any recollection of the meeting. Comstock Dep. at 221; Teramoto Dep. at 58–61 (objection); Kelley Dep. at 105–07.

382.    Mr. Uthmeier prepared a briefing book for the September 6 meeting. PX-35 (AR); PX-36 (AR); PX-281 at ¶ 3.

383.    Defendants' counsel represented that none of the participants in the meeting retained the briefing book.

384.    On September 7, Mr. Comstock wrote to Messrs. Uthmeier and Davidson that Secretary Ross "would like an update on progress since the discussion yesterday regarding the citizenship question." PX-37 (AR).

385.    After receiving Mr. Uthmeier's response (which Defendants have withheld on the basis of privilege), Mr. Comstock reiterated "the Secretary is asking for progress on this." PX-44 (AR); PX-49 (AR).

386.    Mr. Uthmeier responded that Mr. Davidson had been in touch with "Kassinger this evening." PX-44 (AR).

387.    In a subsequent exchange, Mr. Davidson wrote to Mr. Comstock, Mr. Uthmeier and Ms. Teramoto that Secretary Ross had discussed Mr. Kobach in the meeting about a citizenship

question the day before, but Mr. Davidson was "concerned about" contacting Mr. Kobach directly, and recommended contacting a trusted advisor, such as Mr. Neuman, "before we do anything externally." PX-614 (AR).

388. The following day (September 8, 2017), Mr. Uthmeier contacted Mr. Neumann to discuss "some Census legal questions for the Secretary." PX-38 (AR).

389. Also on September 8, 2017, Mr. Comstock sent Secretary Ross a memo reporting on his efforts to identify someone who would request the addition of a citizenship question to the 2020 Decennial Census, and advising that, as of that date, he had not been successful. PX-48 (AR); PX-133 (AR); PX-298 (R) at RFA 96.

390. The memo summarized Mr. Comstock's prior discussions with Ms. Hankey, Mr. McHenry, and Mr. Hamilton of the Departments of Justice and Homeland Security. PX-133 (AR); PX-524 (AR); PX-537 (AR).

391. Mr. Comstock later forwarded that memorandum to Ms. Teramoto, PX-58 (AR); PX-133 (AR); PX-524 (AR); PX-537 (AR), presumably to prepare her for an upcoming call she was to have with DOJ regarding a citizenship question. *See* PFOF III.E.

392. Ms. Teramoto denied all recollection of reading that memorandum or discussing it with Mr. Comstock. Teramoto Dep. at 69-70.

393. Early afternoon on September 13, Mr. Uthmeier followed up with Mr. Neuman and they talked later that day regarding a citizenship question. PX-145 (AR); PX-592 (AR).

394. Mr. Comstock testified that the Secretary never told him why he wanted to add a citizenship question to the census. Comstock Dep. at 112, 251-54. Mr. Comstock also testified that he never asked the Secretary why he wanted to add a citizenship question. Comstock Dep. at 171-72. According to Mr. Comstock, the reasons why the Secretary wanted a citizenship

question were irrelevant.  Comstock Dep. at 253-54, 260-62.  Ms. Teramoto similarly testified that she had no knowledge of why the Secretary wanted to add a citizenship question.  Teramoto Dep. at 32.  Undersecretary Kelley similarly testified that she had no knowledge of why the Secretary wanted to add a citizenship question.  Kelley Dep. at 39.

395.    There is no writing of any kind either in the Administrative Record or produced in discovery authored by the Secretary or anyone at the Commerce Department (or anyone else) that describes the reasons why the Secretary wanted to add a citizenship question as early as the first quarter of 2017.  PX-1 to PX-14 (AR).

396.    The record does indicate that, at the same time the Secretary was discussing adding a citizenship question to the census in the spring and summer of 2017, he was asking Mr. Comstock questions about whether congressional apportionment based on the census included non-citizens, he was informed that including non-citizens in congressional apportionment was legally required, but that Mr. Kobach was advising him that it was nonetheless a "problem."  PX-19 (AR), PX-55 (AR), PX-58 (AR), PX-85 (AR), PX-88 (AR), PX-150 (AR), PX-565 (AR), PX-607 (AR), PX-614 (AR).

397.    Mr. Comstock did not believe that the Secretary's unstated reasons to add a citizenship question would "clear [the] legal thresholds" set by OMB and federal law, Comstock Dep. at 153-54, and believed that they might or might not be "legally-valid," Comstock Dep. at 267.

398.    If the Secretary's reasons for wanting a citizenship question were legitimate, it would be ordinary to find in writing some documentation of why the Secretary wanted the question or why the Secretary thought this was a good idea.  The Administrative Record is absent of such documentation.  PX-1 to PX-14 (AR).  It would also be ordinary for the Secretary's aides to know why he wanted the question added and for them to be able to articulate why this was in the

national interest.  But none of Secretary Ross' senior aides could explain why Secretary Ross

wanted the question added.

399.    The record reflects an extraordinary level of concealment and denial.  The evidence is

overwhelming that the Secretary wanted to add a citizenship question and that this was an

important priority for him.  To the extent that Defendants argue that the June 21 Supplemental

Memorandum says that before the DOJ request, the Secretary was merely considering a

citizenship question, the weight of the evidence demonstrates that this position was not credible.

Rather, the weight of the evidence demonstrates that the Secretary made the decision to add a

citizenship question before knowing whether DOJ had any need or even desire for addition of the

question.  *See, e.g.,* PX-44 (AR), PX-49 (AR), PX-72 (AR), PX-88 (AR), PX-95(AR), PX-

97(AR), PX-523(AR).

400.    Similarly, the aides' testimony that they did not know why the Secretary wanted to add a

citizenship question is not credible and is evidence of a cover-up as to the Secretary's true

motivations.  In the alternative, that the Secretary might not have confided in his aides is still

evidence of a cover-up.  Indeed, the evidence that Mr. Comstock did not ask for the Secretary's

reasons, believed that the Secretary's reasons for adding the question might not have been legally

valid, and believed that it was his job to find a legally supportable rationale for addition of the

question demonstrates that the Secretary was attempting to cover up his true rationale for adding

the question.

> ### E.  Origins of December 12 Letter from Department of Justice to Census Bureau (September 2017—December 2017)

401.    In September 2017, Secretary Ross and his staff "inquired whether the Department of

Justice (DOJ) would support, and if so would request, inclusion of a citizenship question."  PX-2

(AR); PX-59 (AR); PX-60 (AR); PX-63 (AR); PX-66 (AR); PX-67 (AR).

402.   Around Labor Day 2017, but before September 8, 2017, John Gore became involved in the deliberations over whether or not to request the inclusion of a citizenship question for the Decennial Census. Gore Dep. at 73–75.

403.   John Gore was the Acting Assistant Attorney General (AAAG) for Civil Rights in the U.S. DOJ.  Gore Dep. at 18.

404.   Mr. Gore was and is a political appointee, not career Civil Rights Division staff.  Gore Dep. at 14, 18–19.

405.   In his role as AAAG, Mr. Gore was the head of DOJ's Civil Rights Division. Gore Dep. at 18-19.

406.   One of the sections within the DOJ Civil Rights Division is the Voting Section.  Among the duties of the Voting Section is to enforce Section 2 of the VRA of 1965. Gore Dep. at 18-19.

407.   Prior to becoming AAAG, Mr. Gore was previously an attorney in private practice.  Gore Dep. at 14.

408.   As an attorney in private practice, Mr. Gore litigated numerous cases under the VRA. Gore Dep. at 14–15.

409.   In all of the cases he litigated under Section 2 of the VRA prior to coming to DOJ, Mr. Gore represented defendants rather than plaintiffs. Gore Dep. at 16.

410.   The issue of the adequacy of CVAP data never came up in any of the VRA cases litigated by Mr. Gore.  Gore Dep. at 16–17.

411.   In his experience representing jurisdictions defending VRA lawsuits, Mr. Gore never took the position that plaintiffs' block-level CVAP data was insufficient because it was based on sample survey data rather than a "hard count" from the decennial Census. Gore Dep. at 16–17.

412.   Mr. Gore has no experience drawing districts for the purposes of complying with the *Gingles* preconditions for VRA liability or using block-level data about the characteristics of populations. Gore Dep. at 17–18.

413.   Mr. Gore became involved in these deliberations through conversation with Ms. Hankey and Attorney General Sessions. Gore Dep. at 73–75.

414.   On or around Labor Day 2017, Mr. Gore had a conversation with Attorney General Sessions regarding a citizenship question.  Gore Dep. at 83.

415.   Mr. Gore learned from that conversation with Attorney General Sessions that Secretary Ross had initiated an earlier discussion between Secretary Ross and Attorney General Sessions regarding a citizenship question.  Gore Dep. at 83–84.

416.   Mr. Gore was also aware that someone from the Department of Commerce had spoken to Ms. Hankey and Mr. McHenry before September 8, 2017.  Gore Dep. at 61–62, 63–64. The Commerce Department initiated all of the prior DOC-DOJ conversations (with Sessions, Hankey and McHenry); these conversations were not initiated by DOJ, either for the purpose of obtaining better data for VRA enforcement or for any other purpose. *Id.* at 67-68.

417.   Beginning roughly in mid-September, the Commerce Department initiated direct conversation with Mr. Gore. Gore Dep. at 91–92, 94–95.

418.   Between September and October 2017, Gore spoke with three individuals from the Commerce Department about a citizenship question: Peter Davidson, James Uthmeier, and Wendy Teramoto.  Gore Dep. at 92-94, 118.  Mr. Gore participated in various conversations with Mr. Davidson, Mr. Uthmeier, and Ms. Teramoto through the autumn of 2017.  Gore Dep. at 92–94.  None of these conversations were initiated by Gore or anyone in DOJ's Civil Rights Division.  Gore Dep. at 94-95.

419.   Mr. Gore recalls first being contacted by Mr. Davidson in mid-September.  Gore Dep. at 92–93, 97–98.

420.   Mr. Davidson called Mr. Gore to discuss the addition of a citizenship question to the census.  Gore Dep. at 97–98.

421.   During their conversation, Mr. Davidson asked Mr. Gore to reach out to Ms. Teramoto.  Gore Dep. at 97, 98.

422.   On September 13, Mr. Gore sent Ms. Teramoto an email "to talk about a DOJ-DOC" issue. PX-59 (AR); PX-60 (AR); Gore Dep. at 95-96.

423.   The "DOJ-DOC" issue referred to the addition of a citizenship question to the 2020 Census.  PX-59 (AR); PX-60 (AR); Gore Dep. at 96-97.

424.   Through Ms. Teramoto's Assistant Macie Leach, Mr. Gore and Ms. Teramoto arranged to speak on the phone on Friday, September 15, 2017. PX-59 (AR); PX-60 (AR).

425.   Ms. Teramoto testified she had no recollection of this conversation.  Teramoto Dep. at 74–77.

426.   Following their conversation on September 15, 2017, Mr. Gore put Ms. Teramoto in touch with Attorney General Sessions' aide Danielle Cutrona on September 16, 2017.  PX-63 (AR); PX-66 (AR); PX-67 (AR); Gore Dep. at 102–103.

427.   Mr. Gore wrote, "Wendy, By this email, I introduce you to Danielle Cutrona from DOJ.  Danielle is the person to connect with about the issue we discussed earlier this afternoon."  PX-63 (AR).

428.   Ms. Teramoto requested Ms. Cutrona to "let me know when the AG is available to speak with Secretary Ross." PX-63 (AR); PX-66 (AR); PX-67 (AR).

429.   Ms. Teramoto testified she had no recollection of this exchange. Teramoto Dep. at 75, 78–79.

430.   Ms. Cutrona responded by providing Attorney General Sessions' cell phone number and stating "From what John [Gore] told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist." PX-66 (AR); PX-67 (AR); Gore Dep. at 105–106.

431.   Ms. Teramoto testified she had no recollection of this exchange.  Teramoto Dep. at 77.

432.   Ms. Cutrona has no experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 104.

433.   On September 18, 2017 Secretary Ross again spoke to Attorney General Sessions specifically regarding the addition of a citizenship question.  PX-61 (AR); Gore Dep. at 112.

434.   On or about September 18, 2017, Ms. Teramoto advised Ms. Cutrona that Secretary Ross and Attorney General Sessions "connected." PX-62 (AR).

435.   On the same day, Ms. Teramoto emailed Mr. Gore, writing, "AG and Sec spoke. Please let me know when you have a minute." PX-61 (AR); Gore Dep. at 111.

436.   Secretary Ross contemporaneously emailed Mr. Davidson that Ms. Teramoto participated on that call. PX-57 (AR).

437.   Ms. Teramoto testified she had no recollection of this call.  Teramoto Dep. at 83–85.

438.   During their September 18, 2017 conversation, Secretary Ross inquired whether Attorney General Sessions would support, and if so, request, inclusion of a citizenship question on the 2020 Decennial Census. PX-62 (AR); PX-61 (AR); Gore Dep. at 112; PX-298 (R) at RFA 98.

439.    On September 19, 2017, Secretary Ross sent an email with the subject "Census" advising Peter Davidson that "Wendy and I spoke with the AG yesterday.  Please follow up so we can resolve this issue today." PX-57 (AR).

440.    Ms. Teramoto testified that she has no recollection of this event. Teramoto Dep. at 84.

441.    On September 22, 2017, Mr. Uthmeier reached out to Mr. Gore. Gore Dep. at 117-18 (objection).

442.    Mr. Gore returned Mr. Uthmeier's call, on or about September 22, 2017, and they discussed the addition of a citizenship question to the 2020 Census. Gore Dep. at 118, 119.

443.    Mr. Uthmeier has no experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 117-118.

444.    After their call, Mr. Gore was also provided Mr. Uthmeier's August 11 memorandum discussing addition of a citizenship question. Gore Dep. at 118.

445.    With the August 11 memorandum, Mr. Gore also received a handwritten note from Mr. Uthmeier.  Gore Dep. at 118–119. This handwritten note from Uthmeier to Gore contained information that DOJ considered in drafting the final letter requesting a citizenship question. *Id.* at 123-24.  Defendants have withheld this note on the basis of privilege.

446.    Mr. Gore responded to that note in a discussion with Mr. Uthmeier and Mr. Davidson, purportedly to provide legal advice in anticipation of litigation.  Gore Dep. at 120-124.

447.    DOJ relied, in part, on Mr. Uthmeier's input in reaching its decision to send the December 12, 2017 letter to the Census Bureau.  Gore Dep. at 123-124

448.    On Sunday October 8, Secretary Ross sent an email to Mr. Davidson with the subject line "Letter from DOJ" and asking "what is its status." PX-52 (AR).

449.   Mr. Davidson responded "I'm on the phone with Mark Neuman right now . . . he is giving me a readout of his meeting last week." PX-52 (AR).

450.   The following day, on October 9 (Columbus Day), Secretary Ross issued a press release applauding Trump Administration programs to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse and chain immigration." PX-479.

451.   Also on October 9, Mr. Willard sent Undersecretary Kelley an email about a citizenship question stating "1) must come from DOJ, 2) court cases you can hang your hat on, 3) every census since 1880, except 2000."  PX-148 (R) (AR).

452.   In October of 2017, AAAG Gore, John Zadrozny of the White House Domestic Policy Council, along with Rachael Tucker, Mr. Hamilton, and others from DOJ participating in a conference call to discuss the addition of a citizenship question to the Census without the participation of any Commerce Department or Census Bureau personnel.  Gore Dep. at 409–12.

453.   During the autumn of 2017, Mr. Gore also discussed a citizenship question with Mr. Neuman with the understanding that he was advising the Department of Commerce and Census Bureau on the issue.  Gore Dep. at 438.

454.   On or about November 1, 2017, Mr. Gore wrote the initial draft of the letter from DOJ to Census Bureau requesting the inclusion of a citizenship question on the 2020 Decennial Census. Gore Dep. at 126–127 (objection).

455.   On Wednesday, November 1, 2017, Mr. Gore emailed Chris Herren, Chief of DOJ's Voting Section, and copied Ben Aguiñaga. Gore Dep. at 126 (objection); PX-211.

456.   The subject of the email was: "Confidential & Close Hold: Draft Letter." Gore Dep. at 126 (objection). Gore testified that he intended that Herren could not share the draft letter without Gore's approval.  Gore Dep. at 130.

457.    Mr. Gore attached a draft letter that he had written requesting a citizenship question be added to the 2020 Census questionnaire.  Mr. Gore asked for input from Mr. Herren on the draft. Gore Dep. at 126-27 (objection).

458.    Also on November 1, 2017, Gore's aide Mr. Aguiñaga forwarded a draft of the December 12 Letter to Bethany Pickett. Gore Dep. at 133.

459.    Ben Aguiñaga and Bethany Pickett were political appointees in the front office of the Civil Rights Division who began working there in 2017, having graduated from law school around 2015. Gore Dep. at 133-34.

460.    Before then, neither had any experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 134–35.

461.    Mr. Gore received substantive input from Mr. Herren, Mr. Aguiñaga and Ms. Pickett. Gore Dep. at 136–137.

462.    Mr. Gore did not solicit or receive substantive input at this stage from anyone besides Mr. Arthur Gary, Ms. Pickett, Mr. Aguiñaga, and Mr. Herren.  Gore Dep. at 136–137.

463.    Mr. Gore does not recall either sharing subsequent drafts of the Gary letter with Herren or Herren giving him comments on any subsequent drafts.  *Id.* at 444-45.

464.    Mr. Gore has no recollection of receiving any input or edits from career DOJ Civil Rights Division staff on the letter requesting a citizenship question other than the first round of edits from Herren.  *Id.* at 152-53.

465.    The only other people in DOJ's Civil Rights Division from whom Gore can recall soliciting or receiving input on the draft letter requesting a citizenship question were Ms. Pickett and Mr. Aguiñaga.  *Id.* at 136-37.

466.    Sometime in mid-November ("a few weeks" before November 27) Mr. Gore discussed adding a citizenship question with Rachael Tucker, then counsel in the front office in the Office of the Attorney General, and Robert Troester, then Associate Deputy Attorney General.  Gore Dep. at 141.

467.    Neither Ms. Tucker nor Mr. Troester had experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 140.

468.    On or about November 26, 2017 (Thanksgiving weekend), Secretary Ross conversed with President Trump.  PX-298(R) at RFA 103.

469.    On the evening November 27, 2017 Secretary Ross sent Mr. Davidson, General Counsel of the Department of Commerce, an email with the subject "Census Question" stating that "Census is about to begin translating the questions into multiple languages and has let the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must get this resolved." PX-143 (AR); PX-298 (R) at RFA 105.

470.    On or around November 27, 2017, Mr. Davidson and Mr. Gore communicated. PX-53 (AR).

### F.    Final Revisions to and Delivery of the December 12 Letter (November 2017 - December 2017)

471.    In late November 2017, Gore solicited and received edits on the draft letter requesting a citizenship question from Rachael Tucker, Counsel in the front office of the Attorney General; and Robert Troester, then-Associate Deputy Attorney General.  PX-205; Gore Dep. at 138-42 (objection).

472.    On November 27, 2017, Mr. Gore sent an email to Rachael Tucker, then Counsel in the front Office of the Attorney General, and Robert Troester, then Associate Deputy Attorney General, and attached a "near-final" draft of the December 12 Letter.  Gore Dep. at 138–139.

473.    Both Ms. Tucker and Mr. Troester provided edits to the letter. Gore Dep. at 142.

474.    Mr. Gore did not receive substantive edits from anyone besides Ms. Tucker and Mr. Troester in the last few days before the December 12 Letter was sent.  Gore Dep. at 146.

475.    In early December 2017 Undersecretary Kelley was officially notified about the DOJ letter.  PX-73 (AR); Kelley Dep. at 145:12-148:7.

476.    On December 8, 2017, Mr. Gore emailed Mr. Gary a draft of the letter "with leadership's final changes," and stated "With these changes, we are authorized to send. Sending on Monday is fine." Gore Dep. at 145, 146–147 (objection).

477.    Mr. Gore did not solicit or receive further edits from within DOJ to the final versions of the December 12 Letter.  Gore Dep. at 146.

478.    Attorney General Sessions decided that DOJ would request that the Census Bureau ask a citizenship question on the Census.  Gore Dep. at 442.

479.    Mr. Gore testified that that final authorization to send the letter came from either Ms. Tucker or Mr. Troester on behalf of Attorney General Sessions, probably on Tuesday, December 12, 2017.  Gore Dep. at 158–160.

480.    On Tuesday, December 12, 2017, Arthur Gary sent the final letter, signed by him and addressed to Ron Jarmin, Acting Director of the Census Bureau. PX-32 (AR); PX-101 (AR); PX-1 at AR 663 (AR); Gore Dep. at 155.

481.    The Gary letter formally requests the addition of a citizenship question to the Census. PX-32 (AR); PX-101 (AR); PX-1 at AR 663 (AR); Gore Dep. at 20–21.

482.    The December 12 Gary letter sent to the Census Bureau requesting a citizenship question does not state that a citizenship question is necessary for the purposes of VRA enforcement to collect CVAP data through the census questionnaire.  PX-32 (AR).

483.    Gore testified he does not personally believe that it is necessary for DOJ's VRA enforcement efforts to collect CVAP data through the census questionnaire.  Gore Dep. at 300.

484.    Gore testified further he does not know whether the data the Census Bureau will obtain through the addition of a citizenship question will have larger or smaller margins of error, or be more precise, than the existing data available to DOJ. Gore Dep. at 215-16, 226-27, 232-33.

485.    The only career staffer in the Civil Rights Division that provided input at any stage of drafting was Mr. Herren in early November. Gore Dep. at 151–153.

486.    After Mr. Herren provided initial edits, Mr. Gore continued to re-draft with input from DOJ political leadership and DOC legal counsel. Gore Dep. at 151–153.

487.    Before the letter was sent to the Census Bureau, Mr. Gore was aware that DOJ "staff did not want to raise the citizenship question" in the fall of 2017.  Gore Dep. at 68–69.

488.    Before the December 12 Letter was sent to the Census Bureau, Mr. Gore was aware that that the "Department of Justice did not reach out to the Department of Commerce to initiate those conversations for the purposes of obtaining better data to enforce the Voting Rights Act." Gore Dep. at 67–68.

489.    Prior to the final December 12 letter requesting the addition of a citizenship question on the Decennial Census, DOJ had never communicated to the Census Bureau that ACS CVAP data was not ideal for DOJ's VRA enforcement purposes.  Nov. 13 Trial Tr. at 996.

490.   Before the letter was sent to the Census Bureau, Mr. Gore was aware that the Commerce Department initiated those conversations and the larger request for DOJ to ask the Census Bureau to add a citizenship question to the Decennial Census.  Gore Dep. at 67, 150.

491.   Mr. Gore is not aware of any communications between DOJ and the Census Bureau about whether or not adding a citizenship question to the census would in fact produce data that has smaller margins of error than the citizenship data currently used by DOJ, due to required disclosure avoidance techniques.  Gore Dep. at 228, 233–234.

492.   The December 12 Letter requests the addition of a citizenship question on the basis of VRA enforcement, and provides no other justification. PX-32 (AR); PX-101 (AR); PX-1 at AR 663 (AR); Gore Dep. at 22, 24–25, 164.

493.   Mr. Gore admitted that he did not know whether citizenship data produced from the census questionnaire would in fact be better for purposes of VRA enforcement than citizenship data that DOJ already had, undermining the sole justification offered in the December 12 letter. Although Mr. Gore authored the letter to the Census Bureau stating that the "decennial census questionnaire is the most appropriate vehicle" for collecting "reliable" data about citizen voting age population for purposes of enforcing the VRA, PX-32, Mr. Gore does not know whether citizen voting age population data produced from the census questionnaire would in fact be "more precise than the CVAP data on which DOJ is currently relying for purposes of VRA enforcement."  Gore Dep. at 233.

494.   The December 12 Letter represents DOJ's and Attorney General Session's final decision and statement of position with respect to the issue of a citizenship question on the Census. Gore Dep. at 162-163 (objection).

### G.    The Census Bureau Consistently Recommended Against Adding a Citizenship Question (December 2017 - March 2018)

495.    As set forth below, the Census Bureau repeatedly advised the Secretary and the Commerce Department against the addition of a citizenship question.  The Census Bureau specifically recommended that DOJ's request for block level citizenship data could be best satisfied by administrative records without asking a question about citizenship.  The Census Bureau advised, based on scientific analysis, that the addition of a citizenship question would be very costly and result in a poorer quality census count.  In addition, the Census Bureau advised that using responses to a citizenship question in conjunction with administrative records, would result in poorer quality citizenship data than from just relying on administrative records.  At no point in the process did the Secretary or the Department of Commerce present any contrary technical or scientific information to the Census Bureau.

496.    Following the December 12 Letter, Undersecretary Kelley directed her assistants to notify the leadership of the Census Bureau, who were then attending a Federal Economic Statistical Committee Meeting, that they needed to convene the appropriate personnel to review that proposal. Kelley Dep. at 145:12-148:7.

497.    Director Jarmin then notified the senior professional staff that it would be necessary for the Census Bureau to evaluate the merits of adding a citizenship question to the 2020 Decennial Census. Jarmin Dep. (Docket No. 511-2) at 60:21-62:10.

498.    In particular, Director Jarmin emailed Dr. John Abowd directing him to assemble a team of census experts to evaluate and formulate a response to DOJ's request. PX-3 at AR 3364 (AR); Nov. 13 Trial Tr. at 879-80.

499.    Prior to being notified in December, Dr. Abowd and other members of the senior staff of the Census Bureau had not been advised that Secretary Ross was considering adding a

citizenship question to the 2020 Decennial Census. Nov. 13 Trial Tr. at 879. Acting Director
Jarmin was aware of the impending request "not much more than a couple of weeks" before the
December 12 Letter.  Jarmin Dep. (Docket No. 511-2) at 24:20-25:2.

500.    Dr. Abowd directed senior professional staff at the Census Bureau (nicknamed the
"SWAT Team"), to formulate a response to the suggestion that a citizenship question be added,
which Dr. Abowd managed and reviewed. PX-74 (AR); PX-4 at AR 9339 (AR); PX-147 (AR);
PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR); Nov. 13 Trial Tr. at 879, 880.

501.    In a series of technical reports, responses to questions posed by Secretary Ross, and other
briefing documents, Census Bureau repeatedly and consistently recommended against the
addition of a question. PX-147 (AR); PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR);
PX-297 at RFA 1; Census Bureau 30(b)(6) Dep. Vol. II. (Docket No. 502-4) at 409:16-410:2,
432:21-433:3.

502.    This recommendation has not changed.  PX-297 at RFA 6, 107; Census Bureau 30(b)(6)
Dep. Vol. II. at 409:16-410:2, 432:21-433:3; Kelley Dep. at 179:3-13, 207:19-213:20; Nov. 13
Trial Tr. at 878-79, 967.

503.    The Census Bureau repeatedly and consistently concluded that adding the question would
reduce self-response rates, harm the overall data and integrity of the Decennial Census, and serve
no useful purpose. PX-147; PX-100; PX-22, PX-132; PX-162; Nov. 13 Trial Tr. at 881, 891-92,
922, 952-53.

504.    The assessment has not changed. Kelley Dep. at 212:7-213:20; PX-297 at RFA 6; Nov. 13
Trial Tr. at 881, 891-92, 922, 952-53.

505.    The Census Bureau repeatedly and consistently concluded that the stated goals of DOJ
with respect to enforcement of the VRA could be accomplished, in a less costly and more

effective manner, by linking Census responses to other administrative data sets available to the federal government. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162 (AR); Kelley Dep. at 258:1-12; Census Bureau 30(b)(6) Dep. Vol. II. at 409:16-410:2; Nov. 13 Trial Tr. at 961-62, 990.

506.    This conclusion has not changed. Kelley Dep. at 174:20-177:7; Nov. 13 Trial Tr. at 990.

507.    The Census Bureau does not believe that inclusion of a citizenship question is necessary to provide complete and accurate data in response to DOJ's request. PX-22 (AR); Census Bureau 30(b)(6) Dep. Vol. I. (Docket No. 502-2) at 331:8-17; Nov. 13 Trial Tr. at 1048.

508.    This position has not changed. Nov. 13 Trial Tr. at 1048.

509.    The Census Bureau repeatedly and consistently concluded that adding a citizenship question would involve substantial additional cost over non-action and the use of administrative records. PX-147 (AR); PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR); Nov. 13 Trial Tr. at 961-62, 990; Nov. 14 Trial Tr. at 1249-1250.

510.    This position has not changed. Kelley Dep. at 167:16-168:5; PX-297 at RFA 6; Nov. 14 Trial Tr. at 1249-1250.

511.    Dr. Abowd and the Census Bureau maintains that the Census Bureau produced "credible, quantitative evidence" that the addition of a citizenship question to the 2020 Census could be expected to lower the self-response rate in households that may contain non-citizens, which is an identifiable and large subpopulation. PX-22 (AR); Nov. 13 Trial Tr. at 881, 918, 921-22, 923.

512.    Moreover, Dr. Abowd and the Census Bureau maintain that the natural experiment reflected in the various memoranda submitted to Secretary Ross represent a sufficiently reliable basis, and the best available evidence, for the Census Bureau to perform a quantitative estimate of the effects of putting a citizenship question on the census. Nov. 13 Trial Tr. at 926.

513. Dr. Abowd and the Census Bureau maintain that the balance of evidence available suggests that adding a citizenship question to the 2020 Decennial Census would lead to a lower self-response rate in households potentially containing noncitizens. Nov. 13 Trial Tr. at 881.

### H. The Census Bureau Repeatedly Communicated Its Recommendation Against Adding a Citizenship Question to Secretary Ross (December 2017 - March 2018)

514. The Census Bureau analyses and recommendations regarding inclusion of a citizenship question in the 2020 Decennial Census are memorialized in memoranda dated December 22, 2017 (PX-102 (AR); PX-147 (AR)), January 3, 2018 (PX-100 (AR)), January 19, 2018 (PX-22 (AR); PX-575 (AR); PX-572 (AR)), March 1, 2018 (PX-25 (AR); PX-132 (AR)), and August 6, 2018 (PX-162)).

515. These memoranda all presented analysis that the addition of a citizenship question was not necessary to meet the DOJ request, and that there were alternatives that were less costly and less burdensome. PX-102 (AR); PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-575 (AR); PX-572 (AR); PX-25 (AR); PX-132 (AR); PX-162.

516. Census Bureau had a single meeting with Secretary Ross on February 12, 2018, to discuss the memorandum of January 19, 2018.  PX-3 at AR 9450 (AR); Nov. 13 Trial Tr. at 883-84.

517. At that meeting, the Census Bureau informed Secretary Ross the Census Bureau observed a difference in self-response rates on the ACS and the census when comparing citizen and non-citizen households and thought that this probably related to the citizenship question on the ACS. Nov. 13 Trial Tr. at 922.

518. The Census Bureau prepared an undated additional memorandum to expound on the data quality issues discussed in the memo of March 1, 2018. PX-24 (AR).

519.   These memoranda and communications use a common nomenclature for four possible alternative responses to the December 12 Letter. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

520.   "Alternative A" refers to the Census Bureau making no changes to data collection and continuing to use ACS data to produce census track-level CVAP data. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

521.   "Alternative B" refers to the addition of a citizenship question to the 2020 Decennial Census to manufacture census block-level CVAP data. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

522.   "Alternative C" refers to the use of existing administrative records available to the Census Bureau to obtain census block-level CVAP data and linking those records to enumeration on the 2020 Decennial Census to populate citizenship data without the use of a citizenship question. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

523.   "Alternative D" refers to the use of administrative records in concert with the addition of a citizenship question to the 2020 Decennial Census to produce census block-level CVAP data. PX-132 (AR); Nov. 13 Trial Tr. at 965.

### 1. The Attorney General Directs the Department of Justice to Rebuff the Census Bureau's Attempts to Discuss the December 12 Letter

524.   Throughout December 2017 and January 2018, the professional staff at the Census Bureau sought to meet with representatives of DOJ to understand their request and to satisfy the goals of DOJ. PX-71 (AR); PX-4 at AR 8651 (AR); Jarmin Dep. (Docket No. 511-2) at 64:17-18.

525.   After a number of attempts, however, the Census Bureau was advised by DOJ that they did not wish to meet to discuss the proposal. Jarmin Dep. (Docket No. 511-2) at 105:11-15; PX-297 at RFA 200.

526.    Director Jarmin provided an initial response to DOJ on December 22, 2018 advising Mr. Gary that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses.  This would result in higher quality data produced at a lower cost." PX-71 (AR); PX-200; PX-197; PX-297 at RFA 184; Census Bureau 30(b)(6) Dep. Vol. I. at 85:1-15; Nov. 13 Trial Tr. at 961-62.

527.    In his December 22, 2017, correspondence, Director Jarmin suggested a "meeting of Census and DOJ technical experts to discuss the details of this proposal." PX-71 (AR); PX-101 (AR); PX-200; PX-297 at RFA 189.

528.    On January 2, 2018, Director Jarmin sent a follow-up email to Mr. Gary requesting for a meeting on the following week. PX-101 (AR); PX-4 at AR 5490 (AR); PX-199.

529.    On January 9, 2018, Director Jarmin emailed Mr. Gary and again requested to meet, stating that they "have a pretty short clock to resolve the request" and that it would be "good to meet with your team as soon as possible."  PX-198.

530.    On January 10, Director Jarmin wrote back, agreeing to meet at Main Justice on Friday, January 19 at 11 AM. PX-197.

531.    Mr. Gore discussed with Mr. Gary in January of 2018 that the Census Bureau had an alternative means of producing block-level CVAP data other than the addition of a citizenship question. Gore Dep. at 263:8-18 (objection (802)).  In that conversation, Mr. Gary told Mr. Gore that the Census Bureau had requested a meeting and Gore told Gary that he would think about it and discuss it further with others.  *Id.* at 264:16-20 (objection (802)).  Gore did not ask Gary to get more information from the Census Bureau about the specifics of their alternative proposal to produce higher-quality CVAP data at lower cost.  *Id.* at 268:12-19.  Mr. Gore also discussed this

with several DOJ officials, including with Attorney General Sessions at an in-person meeting. Gore Dep. at 265:12-22, 268:20-269:3.In January 2018, Attorney General Sessions decided that DOJ would not pursue the Census Bureau's alternative proposal for producing block-level CVAP data. *Id.* at 271:10-272:19.

532.  Around January 29, 2018, Gore informed Gary that DOJ technical staff would not meet with Census Bureau staff to discuss the alternative proposal for producing higher-level CVAP data at lower cost.  Gore Dep. at 273:17-274:4.

533.  On February 16, 2018, almost two months after Director Jarmin had first suggested the technical meeting to DOJ, he reported the Census and Commerce staff that Gary "has spoken to DOJ leadership.  They believe the letter requesting citizenship to be added to the 2020 Census fully describes their request.  They do not want to meet." PX-3 at AR 3460; PX-4 at AR 09074; Census Bureau 30(b)(6) Dep. Vol. I. at 98:9-20.

534.  Attorney General Sessions made the decision by DOJ not to meet with the Census Bureau and to hear the Census Bureau's alternative proposal for producing block-level CVAP data was made by Attorney General Sessions.  Gore Dep. at 271:21-272:13.

535.  No meeting between the Census and DOJ technical experts took place before issuance of the Ross Decision Memo on March 26, 2018. Census Bureau 30(b)(6) Dep. Vol. I. at 96:3-9; PX-297 at RFA 170, 195, 196; Gore Dep. at 259:5-11.

536.  It is normal process for the Census Bureau to hold a technical meeting with the agency requesting additional data to discuss the best way to deliver usable data for a particular use case. Nov. 14 Trial Tr. at 1248.

537.    Mr. Gore testified he is unaware of any other circumstance where DOJ asked the Census Bureau to collect data but then refused to have a technical meeting to discuss that data request. Gore Dep. at 282:4-10.

538.    Dr. Abowd testified that he was unaware of another circumstance in which a Cabinet Secretary personally directed agency staff not to meet with the Census Bureau, and that this refusal was "unusual."  Nov. 13 Trial Tr. at 962-65.

539.    Dr. Abowd also testified that Attorney General Sessions' decision to prevent a meeting between DOJ technical staff and Census Bureau staff constituted "political influence" on the decisionmaking process.  Nov. 14 Trial Tr. at 1267-68.

540.    Former Census Bureau Director John Thompson described input from subject matter experts, usually consisting of "staff from both the Census Bureau and the requesting agency," as "essential to the development of a new question," stating that "[t]hese experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome." Thompson Aff. ¶ 60.

541.    Dr. Hermann Habermann similarly described meetings with a requesting agency, such as the meeting Director Jarmin requested with DOJ on December 22, 2017, as "normal Census Bureau procedure. [Such a meeting] allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers. It also allows for a discussion of alternative ways of meeting a request. In this case, the Census Bureau suggested that modeling of the American Community Survey data would meet the DOJ needs at less cost than adding a question to the Decennial Census. Without such a meeting, it would not be possible to know if the modeling approach would in fact meet the DOJ's needs." Habermann Aff. ¶¶ 28-29.

542.   It is unusual for the Census Bureau to receive a data request and then for the agency to refuse to meet to discuss the technical aspects of that data request. Census Bureau 30(b)(6) Dep. Vol. I. at 98:21-99:6.  The Census Bureau is not aware of any instance, other than the request to add a citizenship question to the Decennial Census questionnaire, in which the DOJ has requested data from the Census Bureau and then declined to meet to discuss that request.  PX-297 at RFA 201.  Defendants have identified no reason, legitimate or otherwise, for the DOJ not to take this meeting.  The only reasonable inference is that the DOJ had no interest in cooperating with the Census Department to find the best solution since that might have resulted in a determination that it was unnecessary to ask a citizenship question on the census.  This much is clear from the facts in the Administrative Record.  The fact that the decision not to hold a technical meeting about how to best satisfy the DOJ's needs was made by the Attorney General confirms that this was a political decision, not driven by a legitimate need for the data..

### 2. Census Bureau Analyses Recommended Against the Addition of a Citizenship Question

543.   On or about December 15, 2017, Dr. Abowd directed senior executives and expert employees of the Census Bureau to evaluate alternative methods of providing estimates of the Citizen Voting Age Population to support redistricting under Public Law 94 -171 (PL94) and Section 2 of the VRA. PX-4 at AR 9339; PX-147 (AR); Nov. 13 Trial Tr. at 879-80.

### a. December 22 Memo (PX-147)

544.   This evaluation is reflected in a memorandum dated December 22, 2017 and provided to the Commerce Department (the "December 22 Memo"). PX-4 at AR 9339 (AR); PX-4 at AR 11634 (AR); PX-147 (AR); Nov. 13 Trial Tr. at 948-49.

545.   The December 22, 2017 Memorandum, reflected the work of six professional Census Bureau employees, Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek,

Lawrence Warren, and Moises Yi, who analyzed two potential sources of citizenship data requested by the DOJ in its December 12, 2017 letter to Director Jarmin. PX-147 (AR).

546.   The December 22 Memo identified eight administrative sources of citizenship information either already in use by the Census Bureau or available for acquisition by the Census Bureau. PX-147 at 3 (AR).

547.   The December 22 Memo concludes that Numident, an administrative source already in use by the Census Bureau was "the most complete and reliable administrative record source of citizenship data currently available." PX-147 at 3 (AR).

548.   The December 22 Memo concluded that using these administrative records to assess CVAP was "potentially a more accurate measure of citizenship" and was also "cost efficient." PX-147 at 11 (AR).

549.   The December 22 Memo concluded that including a citizenship question in the 2020 Decennial Census could affect response rates for the 2020 Decennial Census because "[h]ouseholds with noncitizens could be particularly sensitive to the inclusion of citizenship questions." PX-147 at 6 (AR).

550.   The December 22 Memo concluded that "[t]o collect [citizenship] information through self -report by adding questions to the 2020 decennial would require additional unnecessary costs and burden to the Bureau." PX-147 at 11 (AR).

551.   The December 22 Memo concluded that including a citizenship question in the 2020 Decennial Census could lower the rate of voluntary compliance and would require expanded field operations for the implementation of the 2020 Decennial Census. PX-147 at 12 (AR).

552.   Accordingly, the Census Bureau's December 22 Memo recommends that the best way of "supporting redistricting in the manner requested by the Department of Justice is to make a

citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential data file from which the PL94 tabulations are produced. PX-147 at 11 (AR).

553.    If citizenship were available on that file, the PL94 tabulations could be restructured to include direct estimates of the citizen voting age population by race and ethnicity at the block level. PX-147 at 11 (AR).

554.    "These tabulations would have essentially the same accuracy as current PL94 and Summary File (SF1) data."  PX-147 at 11 (AR).

555.    The December 22 Memo concluded that, if this recommendation were followed, "[t] he 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly." PX-147 at 12 (AR).

556.    After receiving this memo, Director Jarmin sent the initial response to Mr. Gary described above advising Mr. Gary that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses.  This would result in higher quality data produced at a lower cost." PX-71 (AR).

### b.      January 3 Memo (PX-100)

557.    Following the December 22 Memo and Director Jarmin's email to Mr. Gary, the Census Bureau further memorialized its research and analysis of potential sources of citizenship data in a January 3, 2018 memorandum from Dr. Abowd to Director Jarmin (hereinafter the "January 3 Memo"). PX-100 (AR).

558.    The January 3, 2018 Memo analyzed the same three alternative methods of meeting DOJ request for census block level estimates of the citizen voting age population ("CVAP"). PX-100 (AR).

559.   The January 3 Memo concludes that Alternative A—maintaining the status quo and providing improved statistical modeling techniques—would result in only an incremental cost of approximately $200,000.  PX-100 (AR).

560.   The January 3 Memo concludes that Alternative B—adding a citizenship question to the 2020 Decennial Census—would increase the cost of the 2020 Decennial Census by at least $27.5 million. PX-100 (AR).

561.   The January 3 Memo concludes that Alternative B would also increase non-response rates by at least 5.1%. PX-100 (AR).

562.   January 3 Memo did not consider the potential cost of additional communication campaigns required as a result of the addition of a citizenship question to the 2020 Decennial Census under Alternative B. PX-100 (AR).

563.   The January 3 Memo did not recommend Alternative B because adding a citizenship question to the Decennial Census would decrease the coverage quality of the 2020 Decennial Census and could result in at least 154,000 fewer correct enumerations. PX-100 (AR).

564.   The January 3 Memo concludes that Alternative C—using administrative sources to provide CVAP at a census block level—would result in an incremental cost of less than $1 million. PX-100 (AR).

565.   In the January 3 Memo, the Census Bureau recommends using Alternative C because it was far less costly than adding a citizenship question to the 2020 Decennial Census, and would not harm the quality of the census count. PX-100 (AR).

566.   On January 4, 2018, Dr. Abowd wrote to various census officials, including Director Jarmin, that "Ron reports that he has discussed this with the Under Secretary and she agrees with

the recommendation of alternative C, but Alternative A remains a possibility as well." PX-121 (AR).

### c.   January 19 Memo (PX-22)

567.   On January 19, 2018, Dr. Abowd sent a memorandum to Secretary Ross on the "Technical Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census" (hereinafter "January 19 Memo"). PX-22 (AR); PX-297 at RFA 7; Nov. 13 Trial Tr. at 884-85.

568.   The January 19 Memo was prepared by a technical team of census experts under Dr. Abowd's supervision. Nov. 13 Trial Tr. at 882-83.

569.   The January 19 Memo presents the view of Dr. Abowd and his technical team evaluating Alternatives A, B and C. PX-22 (AR); Nov. 13 Trial Tr. at 882-83.

570.   The January 19 Memo was reviewed and approved by Director Jarmin. Nov. 13 Trial Tr. at 883.

571.   In the January 19 Memo, the Census Bureau concluded that adding a citizenship question to the Decennial Census, "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources." PX-22 (AR); Nov. 13 Trial Tr. at 885.

572.   The January 19 Memo further concluded that a citizenship question "would make the 2020 Census modestly more burdensome in the direct sense and potentially much more burdensome in the indirect sense in that it would lead to a larger decline in self-response for noncitizen households" PX-22 (AR); Nov. 13 Trial Tr. at 882-83; Nov. 13 Trial Tr. at 892.

573.   Further, the Census Bureau concluded that Alternative C "is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count." PX-22 (AR); Nov. 13 Trial Tr. at 886.

574.   Instead of adding a citizenship question, the January 19 Memo recommended either Alternative A (making no changes) or Alternative C (using Administrative Records to provide DOJ with block-level CVAP data). PX-22 (AR); Nov. 13 Trial Tr. at 885-86.

575.   In preparing the January 19 memo, the Census Bureau performed three analyses supporting the conclusion that the addition of a citizenship question would have an adverse impact on self-response. PX-22 (AR); PX-297 at RFA 18; Nov. 13 Trial Tr. at 885, 890-91.

576.   In the January 19 Memo, the Census Bureau analyzed unit non-response, item non-response, and break-off rates. PX-22 (AR); Nov. 13 Trial Tr. at 887.

577.   According to Defendants' sole expert, Dr. Abowd, all three analyses (unit self-response, item self-response, and break-off rates) were appropriate to support the Census Bureau's conclusion that using administrative record would be a better option for producing block-level CVAP data for VRA enforcement as compared to the addition of a citizenship question to the census. Nov. 13 Trial Tr. at 890.

578.   All three analyses supported the conclusion that the addition of a citizenship question would have an adverse impact on self-response. PX-22 (AR); Nov. 13 Trial Tr. at 890-91.

579.   For unit self-response, the Census Bureau developed a cautious estimate that 5.1% of households with at least one noncitizen would not self-respond to the 2020 Census questionnaire because of a citizenship question.  PX-22 (AR); PX-297 at RFA 13; Nov. 13 Trial Tr. at 891-92.

580.   The 5.1 % estimate was derived by comparing 2010 ACS data, that was not adjusted or weighted, to 2010 Decennial Census data.  PX-22 (AR); PX-297 at RFA 14; Nov. 13 Trial Tr. at 891-92.

581.   The January 19 Memo find that it  "is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020

census modestly more burdensome in the direct sense and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households." PX-22 (AR); Nov. 13 Trial Tr. at 892.

582.   The 5.1% unit non-response estimate based on 2010 data represented a substantial increase from the 3.3% unit non-response estimate based on 2000 data, which reflects increasing non-response rates overall. PX-22 (AR); Nov. 13 Trial Tr. at 888.

583.   According to the Census Bureau, the 5.1% estimate is "conservative" because "the differences between citizen and noncitizen response rate and data quality will be amplified during the 2020 Census compared to historical levels. Hence the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census." PX-22 (AR).

584.   The Census Bureau has since updated this estimate to 5.8% in the so-called "Brown Memo" of August 6, 2018. PX-162  (AR); PX-297 at RFA 24; PX-22 (AR); Nov. 13 Trial Tr. at 895-96.

585.   The analysis of unit non-response data included in the January 19 Memo applies equally to Alternative B, the subject of the January 19 Memo, and Alternative D, the subject of the March 1 Memo. Nov. 13 Trial Tr. at 953.

586.   In the January 19 Memo, the Census Bureau also analyzed the item non-response rate on the citizenship question on the 2013-2016 ACS, comparing again non-citizen household against citizen households. PX-22 (AR); Nov. 13 Trial Tr. at 905-06, 910-911.

587.   For non-Hispanic whites, item non-response to the mail-in ACS ranged from 6.0% to 6.3% and item non-response to the internet ACS was 6.2%. PX-22 (AR); Nov. 13 Trial Tr. at 906.

588.   Item non-response rate on the citizenship question on for Hispanics ranged from 11.6% to 12.3% on mail-in ACS and 15.5% on the internet ACS. PX-22 (AR); Nov. 13 Trial Tr. at 906-07.

589.   For non-Hispanic whites, there was little change in item non-response rates over time. But, for Hispanics, the item non-response rates increased.  Nov. 13 Trial Tr. at 910.

590.   The January 19 memo also reported break-off rate data showing that the ACS citizenship question was more sensitive for Hispanics than for non-Hispanic whites. Specifically, the breakoff rate on the citizenship question on the 2016 ACS for Hispanics was 8 times that of non-Hispanic whites. PX-22 (AR); Nov. 13 Trial Tr. at 914.

591.   Once 2017 ACS data became available, the Census Bureau further found that citizenship question breakoff rate on the 2017 ACS for Hispanics was more than 12 times what it is for non-Hispanic whites. PX-9 (AR); Nov. 13 Trial Tr. at 916-17.

592.   In light of the unit non-response, item non-response, and break-off rate evidence, the Census Bureau concluded that Hispanics will respond to a citizenship question at lower rates than non-Hispanic whites.  Nov. 13 Trial Tr. at 917-18.

593.   Dr. Abowd testified that insofar as the Hispanic population is correlated to the non-citizen population, the Hispanic population will respond to a citizenship question as lower rates than the non-Hispanic population.  Nov. 13 Trial Tr. at 917-920.

594.   Dr. Abowd testified that the Hispanic population is "highly correlated" to the non-citizen population. Nov. 13 Trial Tr. at 920.

595.   In the January 19 Memo, the Census Bureau also concluded that adding a citizenship question to the 2020 Decennial Census would lead to major potential quality and cost disruptions. PX-22 (AR); PX-297 at RFA 8, 16; Nov. 13 Trial Tr. at 950-52.

596.   In the January 19 Memo, the Census Bureau concluded that the addition of a citizenship question on the 2020 Decennial Census would increase the cost of the 2020 Decennial Census by at least $27.5 million. PX-22 (AR); PX-297 at RFA 15; Nov. 13 Trial Tr. at 951.

597.   The January 19 Memo describes the estimate of $27.5 million as "conservative" and a "lower bound estimate." PX-22 (AR); Nov. 13 Trial Tr. at 951.

598.   The January 19 Memo cost estimates are conservative because "the differences between citizen and noncitizen response rate and data quality will be amplified during the 2020 Census compared to historical levels." Nov. 13 Trial Tr. at 952.

599.   Moreover, the January 19 Memo cost estimates do not account for increased communications costs. Nov. 13 Trial Tr. at 952.

600.   At trial, Dr. Abowd testified that the Census Bureau's current best conservative estimate of increased costs associated with the addition of a citizenship question is now $82.5 million. Nov. 14 Trial Tr. at 1249-50.

601.   In contrast to this figure, the January 19 Memo concluded that using administrative records would only cost between $500,000 and $2,000,000. PX-22 (AR).

602.   In the January 19 Memo, the Census Bureau concluded that addition of a citizenship question to the Decennial Census would increase respondent burden. PX-22 (AR); PX-297 at RFA 9; Nov. 13 Trial Tr. at 892.

603.   In the January 19 Memo, the Census Bureau concluded that addition of a citizenship question to the Decennial Census harm the quality of the census count. PX-22 (AR); PX-297 at RFA 10; Nov. 13 Trial Tr. at 952-53.

604.   The reduction in data quality largely comes from the fact that more response will be acquired through NRFU, which produces a lower quality count.  Nov. 13 Trial Tr. at 953.

605.    In the January 19 memo, the Census Bureau also concluded that addition of a citizenship question would result in substantially less accurate citizenship data than are available from administrative sources. PX-22 (AR); PX-297 at RFA 11; Nov. 13 Trial Tr. at 952-3.

606.    Dr. Abowd and the Census Bureau determined that, for people whom the administrative records indicate are noncitizens, there is disagreement between the administrative records and the survey responses between 30 and 37 percent of the time. PX-22 (AR); Nov. 13 Trial Tr. at 956.  Dr. Abowd and the Census Bureau believe that in the case of such disagreements,  the administrative records are more likely to be correct. PX-22 (AR); Nov. 13 Trial Tr. at 956.

607.    The Census Bureau has no empirical basis to believe that noncitizens who respond to a citizenship question on the Census will respond more accurately than they do to the citizenship question on the ACS. Census Bureau 30(b)(6) (Abowd) Vol. I. (8/29/18) at 93:11-17; Nov. 13 Trial Tr. at 956-57.

608.    And, in fact, the Census Bureau believes that there are "definitely indications" that responses by noncitizens to a citizenship question on the 2020 Census will be less even accurate than they have historically been on the ACS. Census Bureau 30(b)(6) (Abowd) Vol. I. (8/29/18) at 93:18 - 94:7; Nov. 13 Trial Tr. at 957.

609.    If the Census Bureau utilized administrative records as recommended in Alternative C, the issue of responses that conflict with records would not be an issue, and the results would be more accurate. Nov. 13 Trial Tr. at 957-58.

610.    Moreover, the January 19 Memo concluded that many noncitizen households would require six or more NRFU visits. PX-22 (AR); PX-297 at RFA 19.

        **d.**      **35 Questions from Commerce and Commerce's Edits to Question 31**

611.    Following the January 19 Memo, senior aides to Secretary Ross including Mr. Comstock, Mr. Ulthmeier, and Mr. Langdon developed a set of 35 questions for the Census Bureau to answer about the January 19 analysis. PX-545 (AR); Nov. 13 Trial Tr. at 1004: 19-25.

612.    These questions covered overall inquiries as well as questions directed to each of the three Alternatives addressed in the January 19 Memo. PX-545 (AR).

613.    On January 29, 2018, Secretary Ross sent an email to Ms. Teramoto alone with the subject "Census" and asked, "Please arrange a quick update for me tomorrow." PX-56 (AR).

614.    The set of 35 questions was sent to the Census Bureau on January 30, 2018.  PX-545 (AR).

615.    The Census Bureau responded to these questions through Dr. Abowd and Mr. Reist. Nov. 13 Trial Tr. at 1005.

616.    The Census Bureau provided responses to these questions on a running basis. Nov. 13 Trial Tr. at 1005:8-22.

617.    Dr. Abowd testified that he maintained the "control" or "master" copy of the responses to these questions that represent the final and official position of the Census Bureau, as Dr. Abowd understood them. Nov. 13 Trial Tr. at 1010-11.

618.    Mr. Reist provided an initial set of responses to Earl Comstock on February 2, 2018, noting that some following up was being requested for the Question 30. PX-42 (AR); PX-43 (AR).

619.    Commerce requested clarifications and changes to some of these questions in an iterative process. Nov. 13 Trial Tr. at 1013-14; PX-14 (AR).

620.   Dr. Abowd provided a final set of responses with his memorandum of March 1, 2018. PX-132 (AR).

621.   In response to these questions, the Census Bureau indicated, in response to Question 10, that the increased burden on the NRFU process as a result of adding a citizenship question would be a "significant concern" because "it gives rise to incremental NRFU cost of at least $27 million," that that figure was a "lower bound," and that the increased follow-up costs of households affected by a citizenship question would be greater than average "because these households overwhelmingly contained at least one non-citizen and that it is one of our acknowledged hard-to-count subpopulations." PX-23 (AR); PX-43 (AR); PX-132 (AR).

622.   The Census Bureau staff further stated, in response to Question 13, that they were "confident that Alternative C is viable and that we have already ingested enough high-quality citizenship data from SSA and IRS." PX-23 (AR); PX-43 (AR); PX-132 (AR).

623.   Although some of the Census Bureau answers were then revised in various ways, these two conclusions were never revised. PX-23 (AR); PX-43 (AR); PX-132 (AR); Kelley Dep. at 229:18-233:5, 233:11-235:2.

624.   However, in the case of one question (Question 31), senior aides to Secretary Ross replaced the answer provided by Census Bureau experts and approved by Dr. Abowd. Park-Su Dep. at 142:6-21; Nov. 13 Trial Tr. at 1006-14.

625.   Question 31 asked: "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?" PX-23 (AR); PX-43 (AR); PX-132 (AR); PX-140 (AR).

626.   Victoria Velkoff, Chief of the American Community Survey Office at the U.S. Census Bureau, originally drafted an answer to this question on behalf of the Census Bureau, which

stated, "The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation" and went on to describe the "formal process for making content changes" laid out by the Census Bureau and the Office of Management and Budget. PX-43 (AR); PX-132 (AR); PX-140 (AR); PX-4 at AR 7644 (AR).

a. The first step in the formal process is that "federal agencies evaluate their data needs and propose additions or changes to current questions through OMB." PX-140 (AR).

b. The next step is that "[i]n order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations." PX-140 (AR).

c. The next step is that "[f]inal proposed questions result from extensive cognitive and field testing to ensure they result in proper data, with an integrity that meets the Census Bureau's high standards." PX-140 (AR).

d. The next step is that the "process includes several opportunities for public comment." PX-140 (AR).

e. The next step is that "the final decision is made in consultation with OMB." PX-140 (AR).

627. The description of the "well-established" process in the Census Bureau's response to Question 31 is consistent with other Census Bureau documents describing the process to add a

question or change the content of the Decennial Census.  PX-4 at AR 9687, AR 3890, AR 3560 (AR); PX-271.

628.    The Census Bureau's final version of Question 31 was transmitted to the Department of Commerce on March 1, 2018. PX-132 (AR); Nov. 13 Trial Tr. at 1012:13-1014:13.

629.    The Census Bureau's final version of Question 31 contained the steps listed above. PX-132 (AR); Nov. 13 Trial Tr. at 1006:20-1007:6.

630.    Commerce Department personnel revised the language of Question 31. PX-14 (AR); Park-Su Dep. at 142:6-21.

631.    The Commerce Department's revision to Question 31 was drafted by Deputy General Counsel Mike Walsh. PX-14 (AR); Park-Su Dep. at 142:6-21.

632.    On February 23, 2018, Sahra Park-Su, former Senior Policy Advisor at the Department of Commerce, typed up Mr. Walsh's revision. PX-14 (AR); Park-Su Dep. at 142:19-143-1.

633.    The answer to Question 31, as revised by Mr. Walsh and Ms. Park-Su read: "No new questions were added to the 2010 Decennial Census, so there is no recent precedent for considering a request to add questions to a Decennial Census. Consistent with longstanding practice for adding new questions to the ACS survey, the Census Bureau is working with relevant stakeholders to ensure that legal and regulatory requirements are fulfilled and that the question would produce quality, useful information for the nation. As you are aware, that process is ongoing. Upon its conclusion, you will have all of the relevant data at your disposal to make an informed decision about the pending request from the Department of Justice."  PX-14 (AR).

634.    The final version of the response to Question 31 included in the original administrative record was further modified to contains the following language: "Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound

by past precedent when considering the Department of Justices' request. Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation. As you are aware, that process is ongoing at your direction." PX-23 (AR).

635.   Dr. Abowd did not receive, review, or approve either the Park-Su (PX-14 (AR)) or administrative record (PX-23 (AR)) versions of the response to Question 31, and neither set of language was incorporated into Dr. Abowd's "control" copy of the responses. Nov. 13 Trial Tr. at 1010.

### e.      February 12 meeting

636.   Dr. Abowd discussed the January 19 Memo with Secretary Ross and others at a meeting on February 12, 2018. PX-4 at AR 9450 (AR); Nov. 13 Trial Tr. at 883, 922.

637.   In anticipation of the February 12 Meeting with Secretary Ross, Dr. Abowd had a pre-meeting with Undersecretary Kelley early the same day. Nov. 13 Trial Tr. at 883.

638.   During that meeting Dr. Abowd discussed the January 19 Memo with Undersecretary Kelley and others and expressed the views summarized by the January 19 Memo. Nov. 13 Trial Tr. at 883.

639.   Undersecretary  Kelley expressed no disagreement with Dr. Abowd and the Census Bureau's evaluation summarized by the January 19 Memo at their February 12 Meeting. Nov. 13 Trial Tr. at 883.

640.   The meeting on February 12, 2018 was the only meeting between Secretary Ross and the Census Bureau regarding this question. Nov. 13 Trial Tr. at 883-84.

641.   Dr. Abowd expressed the views of the Census Bureau experts, as captured by the January 19 Memo at his meeting with Secretary Ross on February 12, 2018. PX-3 at AR 9450; Nov. 13 Trial Tr. at 883, 922, 959, 1017.

642.    At the February 12, 2018 meeting, Secretary Ross requested a list of stakeholders to meet with, as well as a meeting "with [Young & Rubicam] to discuss how they would handle messaging if citizenship is on the form," as well as a copy of the advertisements used in the 2010 Census.  PX-4 at AR 9450 (AR).

643.    There is no evidence in the Administrative Record that Secretary Ross met with Young & Rubicam to discuss the public campaign.  PX-1 through PX-14 (AR).

644.    Following the February 12 meeting, Census personnel attempted to set up stakeholder meetings with supporters of adding a citizenship question. PX-3 at AR 9450 (AR); PX-70 (AR); PX-286 (AR).

645.    In February of 2017, Under Secretary Kelley worked with Director Jarmin to find individuals that were willing to express their support for adding a citizenship question to the Decennial Census. PX-70 (AR); PX-286 (AR); Kelly Dep. at 236:13-18.

646.    On February 13, 2018, Director Jarmin wrote to an individual at the American Enterprise Institute (AEI) that "We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking for someone thoughtful who can speak to the pros of adding such a question . . . ." PX-70 (AR).

647.    On the same day, Michael Strain of the AEI responded that "None of my colleages at AEI would speak favorably about the proposal." PX-70 (AR).

648.    On the same day, Director Jarmin wrote to Under Secretary Kelley that "Please see the thread below. Appears no one at AEI is willing to speak in favor of putting question on the 2020." PX-70 (AR).

649.    Director Jarmin later reported that Census Bureau personnel were unable to find any supporting organizations other than individuals associated with the Center for Immigration Studies and the Heritage Foundation.  PX-1 at AR 1206, 1261 (AR); PX-3 at AR 4849 (AR); PX-4 at AR 8325 (AR).

650.    At no point at the February 12 meeting or at any other team did the Secretary or the Commerce Department present any technical or scientific evidence contrary to that presented by the Census Bureau.  The evidence is that at no point did the Secretary or the Commerce Department have professional expertise regarding census matters independent from that of the Census Bureau. Comstock Dep. at 324:19–325:1; Park-Su Dep. at 57-58 (objection (vague) at 57:7); Jarmin Dep. (Docket No. 511-2) at 33-37, 59, 108 (objection (602) at 34:10-14).

### f.    March 1 Memo (PX-25, PX-132)

651.    After Dr. Abowd and the Census Bureau communicated the Census Bureau's views during the February 12 meeting, Secretary Ross directed the Census Bureau to consider of a fourth alternative—Alternative D. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 965.

652.    On March 1, 2018, Dr. Abowd sent an additional recommendation memorandum through Mr. Lamas, Director Jarmin, and Undersecretary Kelley to Secretary Ross (hereinafter "March 1 Memo"). PX-25 (AR); PX-132 (AR).

653.    The March 1 Memo analyzed "Alternative D" and the weaknesses in Alternative C on its own, at the request of Secretary Ross. PX-25 (AR); PX-132 (AR).

654.    In the March 1 Memo, the Census Bureau continued to recommend against addition of a citizenship question. PX-25 (AR); PX-132 (AR).

655.    The March 1 Memo also provides a final set of the Census Bureau's responses to the set of 35 questions posed by Secretary Ross and Mr. Comstock with input from Mr. Uthmeier and Mr. Langdon. PX-25 (AR); PX-132 (AR).

656. In the March 1 Memo, the Census Bureau concludes that, "Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce." PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 967.

657. Specifically, the Census Bureau professionals stated that "inclusion of a citizenship question on the 2020 Census Questionnaire is very likely to reduce self-response rate, pushing more households into Nonresponse Follow-up (NRFU). Not only will this likely lead to more incorrect enumerations, but it is expected to increase the number of persons who cannot be linked to the administrative data because NRFU PII is lower quality than self-response data." PX-25 (AR); PX-132 (AR).

658. The memorandum stated that such an alternative "would result in poor quality citizenship data than Alternative C," which uses administrative records but without any additional citizenship question. PX-25 (AR); PX-132 (AR).

659. In part, this is due to the "suspect quality" of any survey data gathered by a citizenship question to the Decennial Census. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 974.

660. In contrast, the Census Bureau considers the administrative data on citizenship that has already been accumulated to be "high quality." Nov. 13 Trial Tr. at 974.

661. In part, this is also due to the fact that a greater number of individuals' responses would need to be modeled and imputed, due to a lower overall response rate. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 974-75.

662. The memorandum of the Census Bureau professionals further stated that Alternative D "would still have all the negative cost and quality implications of Alternative B [adding the

question] outlined in the draft January 19, 2018 memo to the Department of Commerce."  PX-25 (AR); PX-132 (AR).

663.   Under Secretary Kelley was not aware of any memorandum authored by the Census Bureau concerning the issue of adding a citizenship question after March 1, 2018, but before the issuance of Secretary Ross' decision on March 26, 2018. Kelley Dep. at 258:8-12.

g.     **Alternative C v. Alternative D Key Differences Memo (PX-24)**

664.   Census Bureau professionals expounded upon the differences between Alternative C and Alternative D in a further memorandum titled, "Summary of Analysis of the Key Differences Between Alternative C and Alternative D," with a focus on data quality issues. PX-24 (AR); Nov. 13 Trial Tr. at 278.

665.   This memorandum contains analysis that in comparison to Alternative C, Alternative D will lead to a larger number of people for whom the Census cannot match an administrative record and whose answers must be produced by a model. PX-24 (AR). Nov. 13 Trial Tr. at 981.

666.   Further, the memorandum explains: "Under Alternative C, there will be error in the administrative records, but we believe these to be relatively limited dues to the procedure following by SSA, USCIS and State. In both Alternative, the modeled cases will be subject to prediction error. … Alternative D has an additional source or error, response error. This is where 2020 respondent give the incorrect status. Statisticians often hope these error are random and cancel out. However, we know from prior research that citizenship status responses are systematically biased for a subset of noncitizens. Response error is only an issue in alternative D." PX-24 (AR).

667.   The Census Bureau maintains that data quality is better under Alternative C and therefore, a higher number of individuals could be linked to more reliable administrative records. PX-24 (AR); Census Bureau 30(b)(6) (Abowd) Vol. II. (10/5/18) at 418:4-11; Nov. 13 Trial Tr. at 981.

668.    The Census Bureau concluded that, under Alternative D, for the group of 22 million

people for which the Census Bureau has both a response and administrative records, but they do

not match, the citizenship data will be less accurate than under Alternative C, due to response

errors. PX-24 (AR); Census Bureau 30(b)(6) (Abowd) Vol. II. (10/5/18) at 419:12-16; Nov. 13

Trial Tr. at 981.

669.    For 90.4% of the population, Alternative D will provide no improvement to the citizenship

data available under Alternative C. PX-24 (AR); Nov. 13 Trial Tr. at 980.

670.    Further, for 6.7% of the population, Alternative D will produce lower quality data than

Alternative C because the Census Bureau would have to use survey responses that are, generally

speaking, less accurate than the imputation methods the Census Bureau would deploy under

Alternative C. PX-24 (AR); Nov. 13 Trial Tr. at 984.

671.    And finally, for 2.9% of the population, Alternative D creates a problem that does not

exist under Alternative C, where survey and administrative data conflict as to citizenship and the

Census Bureau has no current plans to resolve that conflict. PX-24 (AR); Nov. 13 Trial Tr. at

984.

> **I.     Department of Commerce and Department of Justice Discussed the Addition
> of a Citizenship Question with Outside Stakeholders (January 2018 -
> February 2018)**

672.    On January 4, 2018, Arturo Vargas of NALEO Educational Fund sent a letter to

Undersecretary Kelley and Director Jarmin, to which Director Jarmin responded on the same

day. PX-1 at AR 778-779, AR 1213 (AR).

673.    Mr. Vargas asked to speak with the Under Secretary about NALEO's concerns with

DOJ's request.  PX-1 at AR 778-779, AR 1213 (AR).

674.   Director Jarmin responded that the Census Bureau would review the request and explore options that do not require adding questions to the census, on an expedited basis. PX-1 at AR 778-779, AR 1213 (AR).

675.   On January 5, 2018, Senators Feinstein, Carper, Schatz, Cortez Masto, and Harris wrote to Secretary Ross.  PX-1 at AR 780 (AR).

676.   After reminding Secretary Ross that the GAO report has put the 2020 Decennial Census on its list of high risk projects and the fact that the Census Bureau lacks a permanent director, Senators Feinstein, Carper, Schatz, Cortez Masto, and Harris advised Secretary Ross, "The DOJ's request to include a question on citizenship in the 2020 Census dramatically increase our concerns about the already troubled census. Such a question would likely depress participation in the 2020 Census from immigrants who fear the government could use the information to target them. It could also decrease response rates from U.S. citizens who live in mixed-status households, and who might fear putting immigrant family members at risk through providing information to the government … This chilling effect could lead to broad inaccuracies across the board, from how congressional districts are drawn to how government funds are distributed. Rather than preserve civil rights, as the Justice Department claims, a question on citizenship in the decennial census would very likely hinder a full and accurate accounting of this nation's population" PX-1 at 780-81 (AR).

677.   Also on January 5, 2018, the American Sociological Association wrote to Secretary Ross to strongly urge him to reject DOJ's proposal to add a citizenship question.  PX-1 at AR 787 (AR).

678.   The American Sociological Association's letter advised, "Should such a proposal be favorably received, the integrity of the 2020 Census data will be fundamentally compromised.

Including a citizenship question is likely to keep some people from responding to the questionnaire and others from responding truthfully, thereby undermining the accuracy of the data. In addition, there is no longer time to properly test a new question. As you know, creation of the questionnaire is a complex process that requires years of evaluation. With little time left before the 2020 launch, a new question could not be subject to standard rigorous testing, which would further undermine the quality of the data." PX-1 at AR 787 (AR).

679.    On January 9, 2018, members of the Census Scientific Advisory Committee (CSAC) wrote to Attorney General Sessions, Mr. Gary, Secretary Ross, Director Jarmin, and Mr. Lamas. PX-1 at AR 794-95 (AR).

680.    The CSAC members wrote, "We hold the strong opinion that including citizenship in the 2020 Census would be a serious mistake which would result in a substantial lowering of the response rate." PX-1 at AR 794-95 (AR).

681.    CSAC's letter highlighted the following issue: "The United States Census has not encountered the problems with a high level of Census refusal that have been a problem in many other high income countries, including Germany. One reason is that in 2010 there were about 250,000 community partners who encouraged people in their communities to respond to the Census. It is expected that there will be a similar number of community partners for the 2020 Census. Adding a citizenship question to the main Census questionnaire is almost certain to jeopardize the cooperation of at least some community partners and lead to a lower response rate, hurting the reputation of the Census Bureau." PX-1 at AR 794-95 (AR).

682.    On January 10, 2018, The Leadership Conference on Civil and Human Rights sent a letter to Secretary Ross titled "Protect the Census: Oppose DOJ Request to Add a Citizenship Question to the 2020 Census." PX-1 at AR 798-800 (AR).

683.    The Leadership Conference wrote, "we urge you to reject the Department of Justice's untimely and unnecessary request for a new citizenship question on the 2020 Census, which would threaten a fair and accurate decennial census. Adding a new citizenship question to the 2020 Census would destroy any chance for an accurate count, discard years of careful research, and increase costs significantly." PX-1 at AR 798 (AR).

684.    The Leadership Conference also explained, "Adding a citizenship question to the 2020 Census would disrupt preparations at a pivotal point in the decade, undermining years of research and testing and increasing census costs significantly at a time when Congress has directed a less expensive enumeration. The Justice Department's request would literally would add billions of dollar's to the life-cycle cost of this census, without improving accuracy." PX-1 at AR 798 (AR).

685.    The Leadership Conference further stated, "The question is unnecessarily intrusive and will raise concerns in all households — native- and foreign-born, citizens and non-citizens — about the confidentiality of information provided to the government and how that information might be used. Moreover, there are many mixed status households in the United States, which include members who are both citizens and non-citizens with various legal statuses. Mixed-status and immigrant households will be especially fearful of providing information to the federal government in 2020, given the heightened climate of fear that anti-immigrant rhetoric and policies have created." PX-1 at AR 799 (AR).

686.    The Leadership Conference added, "In short, any effort to determine citizenship through the constitutionally required census would jeopardize the accuracy of the entire count, leaving public, private, and nonprofit decision-makers with bad information for all purposes, for the next 10 years. Further, such an effort is likely to shake public confidence in the narrow (though vital)

statistical objectives of the Census Bureau's work, damaging ongoing data collection efforts well into the future." PX-1 at AR 799 (AR).

687.    The Leadership Conference continued, "Finally, in addition to being untimely, the request is unnecessary. The Justice Department has never needed to add this new question to the decennial census to enforce the VRA before, so there is no reason it would need to do so now. Contrary to the Justice Department's letter, the Census Bureau has not included a citizenship question on the modern census 'short form,' sent to every household." PX-1 at AR 799 (AR).

688.    On January 17, 2018, Secretary Ross received a letter from numerous Members of Congress (hereinafter "January 17 House Letter"). PX-1 at AR 840 (AR).

689.    The January 17 House Letter advised, "The inclusion of citizenship questions in the census will suppress responses from minority communities who will fear reprisal against themselves or loved ones from revealing citizenship details. … In fact, in an amicus curiae brief in Evenwel v. Abbott, four former directors of the U.S. Census Bureau noted that asking about citizenship status 'would likely exacerbate privacy concerns and lead to more inaccurate responses from non-citizens worried about a government record of their immigration status...invariably lead[ing] to a lower response rate to the Census in general…'" PX-1 at AR 840-41 (AR).

690.    The January 17 House Letter continued by explaining that, "The resulting undercount will reverberate across the nation: from ensuring a fair distribution of congressional seats based on the census data to making certain that an accurate allocation of nearly $700 billion taxpayer funds for critical programs is made." PX-1 at AR 840-41 (AR).

691.    The January 17 House Letter also noted, "In addition to the problems described above, the inclusion of such a question so late in the process will not allow for necessary testing to correct wording problems." PX-1 at AR 840-41 (AR).

692.    On January 18, 2018, Secretary Ross received a separate letter from numerous Members of Congress urging Ross to reject the request to add a citizenship question (hereinafter "January 18 House Letter").  PX-1 at AR 908-09 (AR).

693.    The January 18 House Letter highlighted that, "Including a new question this late in the process allows no time for testing or the correction of wording problems, and only serves to increase the risk to a census that has already experienced massive cost increases and heightened levels of public mistrust." PX-1 at AR 908-09 (AR).

694.    The January 18 House Letter also highlighted that the trend of "'unprecedented' level[s] of concern regarding the confidentiality" of census data "suggest that the addition of a citizenship question could exacerbate confidentiality concerns and severely undermine accuracy and initial response levels. This, in turn, would increase the cost of the census by hundreds of millions of dollars in non-response follow-up, the most expensive component of the decennial census operation." PX-1 at AR 909 (AR).

695.    On January 23, 2018, the Population Association of American sent a letter to Secretary Ross opposing the addition of a citizenship question and reminded Secretary Ross that, "As you know, and as noted in the January 10 letter, questionnaire design and testing began nearly eight years ago. With less than two years before Census 2020, there is simply not enough time to responsibly craft and evaluate how a citizenship question would affect census participation. Further, we are concerned that adding a question, particularly one that could influence enhanced nonresponse follow up activity, will significantly increase the costs of the 2020 Census at a time

when Congress is already considering a request from the Administration to spend an estimated

additional $3 billion on the 2020 Census." PX-1 at AR 1053-54 (AR).

696.   On March 19, 2018 Secretary Ross received a letter from the Latino Community

Foundation, which "strongly urge[d Ross] to reject the inclusion of a citizenship question to the

2020 Census." PX-1 at AR 1222 (AR).

697.   The Latino Community Foundation explained, "Including a citizenship question to the

census will add to an extensive list of concerns that can and will suppress Latino participation.

Increased immigration enforcement, anti-immigrant rhetoric in our political discourse, and

privacy concerns have already meshed together to create a climate of fear and aversion of the

federal government. In fact, a recent poll commissioned by LCF showed that over 50% of

California's Latinos believe that their responses to the census might be shared with immigration

authorities." PX-1 at AR 1222 (AR).

698.   On January 26, 2018, Secretary Ross received a letter from six former Directors of the

Census Bureau concerning the possible addition of a citizenship question. PX-116 (AR).

699.   The former Directors stated that they were "troubled to learn that the Department of

Justice has recently asked the Bureau to add a new question on citizenship to the 2020 Census.

We are deeply concerned about the consequence of this possible action and hope that our

objective observations provide a useful perspective before final decision is made on this issue."

PX-116 (AR).

700.   The former Directors were also concerned that the addition of the question had not been

appropriately tested:  "There is a well-proven multi-year process to suggest and test new

questions.  We strongly believe that adding an untested question on citizenship status at this late

point in the decennial planning process would put the accuracy of the enumeration and success of the Census in all communities at grave risk." PX-116 (AR).

701.    The former Directors further explained that, in their opinion, "it is highly risky to ask untested questions in the context of the complete 2020 Census design.  There is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality and truthfulness of response." PX-116 (AR).

702.    The former Directors further stated that in their opinion "the effect of adding a citizenship question to the 2020 Census on data quality and census accuracy, therefore, is completely unknown.  Also of import, overcoming unexpected obstacles that arise as 2020 Census operations unfold would add to the cost, without assurances that such efforts would yield a more accurate outcome." PX-116 (AR).

703.    On February 9, 2018, Secretary Ross received a letter from Senator Jack Reed arguing that a citizenship question "could lead to fewer respondents and less precision" and that "a Census question on citizenship is unnecessary as this information is already gathered through the American Community Survey." PX-1 at AR 1086 (AR).

704.    Secretary Ross also received a February 14, 2018 letter from MinKwon Center on behalf of Asian Pacific Americans Voting & Organizing to Increase Civic Engagement (APA VOICE), PX-1 at AR 1150 (AR).

705.    The MinKwon Center's letter explained that, "[a]dding a citizenship question at this time will negatively impact response rates and the accuracy among millions of United States residents, whether they are lawful permanent residents, asylees, refugees, Temporary Protected Status beneficiaries, visa holders, undocumented, or one of the 16.7 million people who have an

undocumented family member living with them. Census Bureau representatives conducting field tests have already reported unprecedented fear among respondents. Out of fear, distrust, and concern for how the data collected will be used and shared, test respondents have been reported being visibly nervous, providing incomplete or incorrect information about household members. Furthermore, as the 2020 Census topics were already submitted last March, introducing new topics this late in the process would add significant costs to an already constrained budget." PX-1 at AR 1150-51 (AR).

706.    Secretary Ross also received a letter from 10 Jewish Organizations on February 15, 2018. PX-1 at AR 1122 (AR).

707.    These Jewish organizations advised that, "If the Census Bureau were to grant the Department of Justice's request, it raises the likelihood of suppressing response rates from immigrant and other minority communities. From the ban on entry of immigrants from Muslim-majority countries to the termination of DACA, America's immigrant communities feel increasingly vulnerable. A new Census question about citizenship will raise fears about such information now or in the future being used against them or their loved ones. This will potentially lower Census response rates and undermine the Census's accuracy." PX-1 at AR 1122 (AR).

708.    The Jewish organizations' letter also highlighted that, "the federal government continues to conduct the American Community Survey to obtain estimates of the citizen population, the data from which has been deemed suitable for use in Voting Rights Act enforcement cases," while  "all questions that are included on the Census are carefully designed and tested to ensure that the data collected is accurate. Adding a question to the Census at this stage of the planning

process would disrupt preparation and increase costs, in addition to threatening the accuracy of the data." PX-1 at AR 1122 (AR).

709.   On March 20, 2018 Secretary Ross received another letter from three Members of Congress: Grace Meng, José E. Serrano and Carolyn B. Maloney. PX-1 at AR 1223 (AR).

710.   Members Meng, Serrano, and Maloney explained that they represent New York City, which already has a substantial "hard to count" populations and has estimated substantial local undercounts in the past. PX-1 at AR 1223 (AR).

711.   Members Meng, Serrano, and Maloney advised that adding a citizenship question to the Decennial Census "will result in depressed and inaccurate response rates, which could have a real and direct impact on the resources that New York City residents receive from the federal government over the next decade," and urged Secretary Ross to reject the proposed citizenship question. PX-1 at AR 1223 (AR).

712.   On March 21, 2018 the Department of Commerce also received a letter from Gary Bass of the Bauman Foundation, on behalf of nearly 120 non-political organizations opposing the addition of a citizenship question to the 2020 Decennial Census.  PX-1 at AR 1235 (AR).

713.   On March 21, 2018 individuals representing Native American interests wrote to Secretary Ross and explained, "the addition of a citizenship question to the 2020 census form … would jeopardize the responses of hard-to-count communities, including those in Indian Country. We are informed that immigrants and minority groups are currently fearful for the security and safety of their families posed by the possibility of including a question on citizenship, which could have a very negative impact on the accuracy of the 2020 Census count (as highlighted by the Census Bureau at the Fall 2017 meeting of its National Advisory Committee on Racial, Ethnic and Other Population). We believe that a citizenship question would have a similar negative impact in

Indian Country, resulting in an undercount of American Indians and Alaska Natives in 2020 that surpasses their high undercount in 2010. Because of the lengthy and complicated history of discrimination against indigenous peoples in this country, American Indians and Alaska Natives share a strong distrust of non-tribal governments." PX-1 at AR 1239 (AR).

714.   On March 22, 2018, Secretary Ross received a letter from Constitutional Accountability Center, on behalf of several organizations such as Asian Americans Advancing Justice, NAACP Legal Defense and Education Fund.  PX-3 at AR 3605-06 (AR).

715.   The Constitutional Accountability Center's letter advised that, "A new, untested citizenship question would be an end-run around the Constitution's text, history, and values," and "Adding the new citizenship question proposed by the Department of Justice would undermine the Census Bureau's constitutional commitment to count all persons. It would also result in inaccurate data, thereby biasing congressional apportionment, redistricting, and funding decisions, for an entire decade, and producing harmful inequalities which would last even longer. Overwhelming evidence shows that this new question, if it becomes a part of the 2020 Census, will deter participation by immigrants across the country, who do not want an official record of their immigration status and fear that their responses will be used by the government to harm them and their families. The Census Bureau's own data demonstrates "an unprecedented groundswell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants." PX-3 at AR 3605-06 (AR).

716.   The Constitutional Accountability Center's letter further advised, "Adding a citizenship question to the 2020 Census-given the overwhelming evidence that it will chill participation and produce inaccurate responses-would break faith with the Constitution's mandate for a head count of the entire nation." PX-3 at AR 3605-06 (AR).

717.    The Constitutional Accountability Center's letter also advised, "Although the Department of Justice urges the addition of a citizenship question to the 2020 Census, it offers no reason to doubt what the latest Census Bureau data shows: asking all persons to divulge their citizenship status will chill participation by noncitizens and citizens alike and produce inaccurate data. Instead, the DOJ maintains that a new citizenship question will ensure better enforcement of the Voting Rights Act. This is false. Since the passage of the Voting Rights Act in 1965, the Census has never asked all persons to report their citizenship. In other words, a mandatory question on citizenship has never been necessary to ensure robust protection of the right to vote. That is just as true now as it was in 1965 when the Voting Rights Act was passed." PX-3 at AR 3605-06 (AR).

718.    Also on March 22, 2018, Secretary Ross received a letter from Ready Nation, a council of business leaders who wrote "to express our deep concern about the Department of Justice's request that the Census Bureau include an untested question about citizenship in the 2020 Census questionnaire" because "[t]he decennial Census provides critical data that informs decision-making in both the private and public sectors." PX-3 at AR 3608-09 (AR).

719.    The Ready Nation letter advised first that, "Adding a new question this late in the decennial Census process could reduce the accuracy of the 2020 Census. We know from the science of survey design that adding questions to an established questionnaire essentially creates a new questionnaire that needs to be validated. Every question and the order of questions affect how respondents answer the other questions. When a change is made to a standardized questionnaire that has already been tested, the reliability and validity of the questionnaire are potentially affected, requiring the survey to be retested." PX-3 at AR 3608-09 (AR).

720.   The Ready Nation letter also advised that, "Adding a new question would incur additional delays and costs, and waste taxpayer dollars that have already been spent on designing and planning the 2020 Census. The Census Bureau has completed its multi-year, multi-million-dollar research and testing phase for the 2020 Census, and its end-to-end test in Rhode Island is underway. And the schedule is already tight. Instead of spending more money and time on altering the questionnaire, additional taxpayer dollars would be better directed to addressing ongoing challenges around deploying mobile technology that will yield a more accurate Census." PX-3 at 3608-09 (AR).

721.   On March 23, 2018 Secretary Ross received a letter from various members of the scientific community include the Acting President of the Federation of American Scientists, the Director of 2020 Census Counts, and the President of the American Political Science Association.  PX-1 at AR 1269-70 (AR).

722.   The March 23 letter provided the following: "This request is ill-conceived for a number of reasons. We have more accurate methods for measuring and studying non-citizenship, for example through anonymous surveys. Imposing a citizenship question would lead to a lower participation rate and substantial undercount of certain geographic regions and demographic populations, undermining the scientific integrity of the entire project." PX-1 at AR 1269 (AR).

723.   The March 23 letter further reminded Secretary Ross that, "[p]reliminary focus groups and interviews with Census field representatives have already shown that greater fears of deportation, threats of a "Muslim ban," and the termination of the DACA program are exacerbating already high non-response rates among historically undercounted populations. The potential for an increased undercount would have far reaching consequences." PX-1 at AR 1269 (AR).

724.    Secretary Ross also received various letters throughout the process from elected officials and associations at other levels of government, opposing the proposed addition of a citizenship question.  *See e.g.*, PX-1 at AR 1073, AR 1082, AR 1090 (AR).

## IV.    THE MARCH 26 DECISION MEMO

725.    On March 26, 2018, Secretary Ross sent a memorandum to Undersecretary Kelley titled "Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire." Secretary Ross concluded in the memorandum that the Census Bureau should add a citizenship question to the 2020 Decennial Census. PX-26 (AR).  As discussed below, the decisionmaking process departed significantly from normal Census Bureau processes.  And the March 26 memo is rife with misstatements and material omissions.

### A.    Political Interference in the Decision to Add a Citizenship Question

726.    A federal statistical agency such as the Census Bureau should follow the principle that it is independent from political or other undue external influences. PX-355 (AR).

727.    Dr. Abowd testified that "a process where an agency makes a request to the Census Bureau for data to be collected through the census, but then refuses to meet to discuss the technical aspects of that data request" is very problematic with respect to that principle. Nov. 14 Trial Tr. at 1266.

728.    Dr. Abowd testified that the aspect of the process leading up to the decision to include a citizenship question where DOJ was directed by the Attorney General not to meet with the Census Bureau constituted "political influence" on the process. Nov. 14 Trial Tr. at 1267:20-1268:4.

729.    Mr. Thompson testified that in his experience as the former Director of the Census Bureau and a career employee of the Census Bureau for almost three decades, it is unprecedented for a senior Department of Commerce official to dismiss a Census Bureau technical recommendation

based on extensive research without documenting a rationale for such an action. Thompson Aff. (Docket No. 516-1) at ¶ 92.

**B.** **Deviations from Census Bureau Standard Pre-Testing Processes in the Decision to Add a Citizenship Question**

730.   Based on his extensive experience overseeing the Decennial Census and as Director of the Census Bureau, John Thompson testified that it is his opinion that the process for adding a citizenship question to the 2020 Decennial Census constituted a significant deviation from the Census Bureau's standard practices. Thompson Aff. ¶ 92.

731.   Both the Census Bureau and Dr. Abowd have a high opinion of Dr. Thompson and of his qualifications to offer an expert opinion in this case. Nov. 14 Trial Tr. at 1192.

732.   Mr. Thompson described the extensive and well-established testing processes the Census Bureau has developed in order to (a) properly assess proposed changes to the content of a Census Bureau questionnaire and (b) avoid the risk of undercount or introducing inaccuracies into the census data. Thompson Aff. ¶ 56; Nov. 9 Trial Tr. at 566.

733.   The Census Bureau does not have a manual for the precise testing that must be done to prepare for each Decennial Census. Nov. 9 Trial Tr. at 566.

734.   Instead, after each Decennial Census, the Census Bureau begins preparing for the next census by reviewing the previous census and requesting input from stakeholders on improvements that could be made. Following that process, detailed procedures for testing and evaluation for the next upcoming census are then drafted in order to account for issues specific to that census. Nov. 9 Trial Tr. at 578.

735.   In the decade before a Decennial Census, the Census Bureau conducts several large-scale tests, including contacting tens of thousands of addresses, to optimize the data collection procedures.  Nov. 5 Trial Tr. at 149:5-20.

736.   Mr. Thompson also described the procedure that should be followed if a new question is proposed for the Decennial Census. First, the Census Bureau should determine whether the proposed question needs to be included on the Decennial Census. Thompson Aff. ¶ 57.

737.   To do so, the Census Bureau should work with the Office of Management and Budget and with the Department of Commerce Office of General Counsel to determine whether the information from the proposed question should be collected from the Decennial Census questionnaire. Thompson Aff. ¶¶ 57-58.

738.   Before a decision was made to add a citizenship question to the 2020 Decennial Census, the proposed citizenship question should have undergone an evaluation of the need for the data it will produce and a determination of whether that data can only be collected through the Decennial Census. PX-140 at AR 10901; PX- 359 at 10-11; Thompson Aff. ¶¶ 57-58; ; Habermann Aff. (Docket No. 498-11) at ¶ 24, 29, 35, 41; *see also* 13 U.S.C. § 6.

739.   There is no evidence in the Administrative Record that the Census Bureau evaluated the need for the data or concluded such data collection was necessary before deciding to add a citizenship question to the 2020 Decennial Census.  PX-1 through PX-14 (AR).

740.   Nor is there evidence in the Administrative Record that the Census Bureau met with DOJ to evaluate the need for data that would be produced by the addition of a citizenship question. PX-1 through PX-14 (AR).

741.   Indeed, the Administrative Record reflects that DOJ refused to meet with the Census Bureau to discuss the need for a citizenship question to be included on the 2020 Decennial Census. PX-4 at AR 9074 (AR); Thompson Aff. ¶ 61; PX-297 at RFA 170, 171, 201; Habermann Aff. ¶ 41.

742.    Once the need for a new question has been established, a rigorous testing program of the proposed question should begin. Thompson Aff. ¶ 60.

743.    A citizenship question should have been pretested before a decision was made to add it to the 2020 Decennial Census. PX-260; PX-271; PX-364; PX-140 (AR); PX-134 (AR); PX-3 (AR); PX-4 3890, 9867 (AR); Thompson Aff. ¶¶ 43-96; Nov. 5 Trial Tr. at 169:19-23.

744.    There is no evidence in the Administrative Record that there was any pretesting of a citizenship question before a decision was made to add the question to the 2020 Decennial Census. PX-1 through PX-14 (AR); Thompson Aff. ¶ 55.

745.    There has been no pretesting of a citizenship question on the 2020 Decennial Census. Nov. 14 Trial Tr. at 1280:4-8; Thompson Aff. ¶ 77; Census Bureau 30(b)(6) Dep. Vol. I at 142:18-143:4; Habermann Aff. ¶¶ 56-58.

746.    The first step of this testing program is for experts in both subject matter and cognitive design to develop several reasonable alternatives for the proposed question wording. These experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome.  The subject matter experts usually consist of staff from both the Census Bureau and the requesting agency. Thus a citizenship question should have undergone this cognitive testing before the decision was made to add it to the 2020 Decennial Census. Thompson Aff. ¶ 60, 72; Habermann Aff. ¶¶ 56-58; PX-140 (AR); PX-260; PX-271.

747.    The second step of this testing program is to design the entire questionnaire.  Assessment of the potential questionnaire design should take into account the order in which the questions will appear and the length of the questionnaire because any given individual question may take on added significance in a shorter questionnaire. Assessment of the potential questionnaire

should also take into account the interaction between questions on the questionnaire and whether the wording of the question to be added is consistent with the instrument on which it is to be included. Thompson Aff. ¶ 63, 65, 67.

748. If there is not consistency between the wording of a question and the purpose of the instrument in which it is found, respondents may question the instrument's or question's purpose and their response rate can be impacted. Nov. 5 Trial Tr. at 162-163.

749. For example, if the purpose of a citizenship question on the Decennial Census is to determine a person's citizenship status, respondents may question why it is necessary to differentiate, as the proposed citizenship question does, between citizens born in Puerto Rico and those born in other parts of the United States. Nov. 5 Trial Tr. at 152-153; Thompson Aff. ¶ 69.

750. This cognitive testing is also essential in order to ensure that the final question is worded in such a way as to produce the desired data. Thompson Aff. ¶ 60; Habermann Aff. ¶ 57. *See generally* PX-260, PX-364.

751. The next step of this testing is for cognitive survey methodology experts to conduct facilitated focus group studies to examine how potential respondents react to each of the alternative questions. These cognitive testing focus groups are intended to determine whether respondents understand the questions and are providing accurate answers, and whether questions are worded or ordered in such a way that they will lead respondents to not respond either to certain questions or to the entire questionnaire. Thompson Aff. ¶¶ 72, 74; Habermann Aff. ¶¶ 57-58.

752. This focus group testing should test the entire questionnaire and the sequence in which the questions will be asked and be conducted with a representative sample of the population of the United States. Thompson Aff. ¶ 73, 75.

753.   Focus group testing is crucial because it will give an indication if questions are worded or ordered in such a way that they will lead respondents to not respond either to certain questions or to the entire questionnaire, which could in turn result in an undercount. Thompson Aff. ¶ 74.

754.   Focus group testing is particularly important in light of Census Bureau research that indicates growing concerns that respondents have with privacy, confidentiality and government surveys. Thompson Aff. ¶ 78.

755.   There is no evidence in the Administrative Record that there was any cognitive testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census questionnaire. PX-1 through PX-14 (AR); Thompson Aff. ¶ 78.

756.   There was no cognitive testing of a citizenship question prior to the decision to add it to the 2020 Decennial Census. Thompson Aff. ¶¶ 60, 71, 77; Nov. 13 Trial Tr. at 997; Habermann Aff. ¶ 13.

757.   This failure to propose and test reasonable alternative questions is contrary to the Census Bureau's standard practices for considering new questions. Thompson Aff. ¶ 71; Habermann Aff. ¶¶ 42, 59, 63.

758.   After alternative question wording is drafted and tested through focus groups, a comprehensive field testing program should then test the entire proposed Decennial Census questionnaire, including the proposed new question, in order to test the effect of the question in the context of the entire questionnaire. Thompson Aff. ¶ 62.

759.   A citizenship question should have been field tested as a part of the entire Decennial Census questionnaire before the decision was made to add it to the 2020 Decennial Census. PX-271; PX-134 at 9865 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3891, 9867 (AR); Thompson Aff. ¶ 79.

760.   This field testing should have been conducted with a sample that simulates to the greatest possible extent a Decennial Census environment, including a sufficient number of observations to assess potential effects on hard to count populations, and in such a way that the alternative questionnaires were administered to the sample households in a manner that replicates, to the greatest extent possible, the way in which the Decennial Census will be conducted. Thompson Aff. ¶ 80-81; Habermann Aff. ¶ 68.

761.   There is no evidence in the Administrative Record that there was any field testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

762.   The Census Bureau never conducted any field testing analyzing the effect of a citizenship question on the 2020 Decennial Census. Census 30(b)(6) Dep. Vol. I. at 27; Nov. 5 Trial Tr. at 157; Nov. 13 Trial Tr. at 997-98.

763.   After the Census Bureau field tests a new question, it should re-interview either all, or at least a subsample of, the respondents who completed the sample questionnaires to determine whether respondents provided accurate answers. Thompson Aff. ¶ 82.

764.   These re-interviews are of critical importance to designing and testing a citizenship question for the Decennial Census because between 28 and 34 percent of non-citizens report themselves as citizens when responding to the citizenship question included on the ACS questionnaire. Thompson Aff. ¶ 82; PX-22 at AR 1284.

765.   There is no evidence in the Administrative Record that there were any interviews of respondents who participated in field testing of a potential citizenship question before a decision was made to add a citizenship question to the 2020 Decennial Census. PX-1 through PX-14 (AR); Thompson Aff. ¶ 83-84.

766.    A new question added to the 2020 Decennial Census should have been tested in the context of the entire 2020 Decennial Census questionnaire. Thompson Aff. ¶ 62;  Nov. 9 Trial Tr. at 736.

767.    There is no evidence in the Administrative Record that there was any testing of a citizenship question in the context of the full 2020 Decennial Census questionnaire before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

768.    The Census Bureau never conducted any testing of a citizenship question within the context of the entire 2020 Decennial Census questionnaire. Nov. 5 Trial Tr. at 156; Nov. 9 Trial Tr. at 736; Nov. 13 Trial Tr. at 997 -98.

769.    Every cycle of Decennial Census pre-testing culminates with end-to-end census tests (typically there are three); these are a comprehensive field test or "dress rehearsal" of the actual Decennial Census and encompass every stage of the census count. Nov. 5 Trial Tr. at 155.

770.    The peak operations portion of the end-to-end test is intended to include all aspects of the planned Decennial Census, "as a way to make sure that all the operations are in place, all of the —everything is being tested out in the field." Nov. 5 Trial Tr. at 155; Nov. 14 Trial Tr. at 1096.

771.    The 2018 end-to-end test was "planned to test and validate 2020 operations, procedures, systems, and infrastructure together."  PX-406 at 54.

772.    In 2018, there was a single end-to-end test, conducted in Rhode Island. Nov. 5 Trial Tr. at 156.

773.    A new question added to the 2020 Decennial Census questionnaire should have been part of the 2018 end-to-end test in order to be adequately tested prior to the 2020 Decennial Census. Nov. 5 Trial Tr. at 149.

774.   The Census Form for the 2018 end-to-end did not include a citizenship question. Census Bureau 30(b)(6) Dep. Vol. I. Dep. at 225.

775.   A citizenship question was not included in the end-to-end test to prepare for the 2020 Decennial Census. Nov. 13 Trial Tr. at 998; Nov. 5 Trial Tr. at 156; Census Bureau 30(b)(6) Dep. Vol. I. at 225; Nov. 13 Trial Tr. at 998:4-11.

776.   A citizenship question added to the 2020 Decennial Census should have undergone randomized controlled trial (RCT) testing to determine the effect of the addition of a citizenship question to the 2020 Decennial Census. PX-162 at 39; Census Bureau 30(b)(6) Dep. Vol. II. at 430; Nov. 13 Trial Tr. at 923.

777.   There is no evidence in the Administrative Record that there was any RCT testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

778.   A citizenship question on the 2020 Decennial Census was never the subject of RCT testing. 30(b)(6) Dep. Vol. II. at 427; Nov. 13 Trial Tr. at 925.

779.   The analysis of the results of any pre-testing of a new question to be added to a Decennial Census should be discussed with the Census Bureau advisory committees, the Office of Management and Budget ("OMB"), and outside researchers with expertise in questionnaire design and in the subject matter area related to the new questionnaire.  These consultations should happen before a final decision is made to add the question to the Decennial Census questionnaire. PX-140 (AR); PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR); Thompson Aff. ¶ 85; Habermann Aff. ¶ 35, 36, 42-46.

780.    Without these discussions there is a significant risk that the resulting data from the proposed new question will not meet the intended need. Thompson Aff. ¶ 87; Habermann Aff. ¶ 35.

781.    Mr. Thompson testified that, following consultation with outside groups and experts, under standard Census Bureau procedures, the Census Bureau would then make a recommendation to the Department of Commerce on whether or not to proceed with the new question on the Decennial Census. Thompson Aff. ¶ 88.

782.    There is no evidence in the Administrative Record that there was any discussion of a citizenship question with Census Bureau advisory committees, the Office of Management and Budget, or outside researchers before Secretary Ross made the decision to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

783.    A new question added to the 2020 Decennial Census should have been noticed for public comment before the decision was made to add it to the Decennial Census. PX-140 (AR); PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR).

784.    There is no evidence in the Administrative Record that the Census Bureau noticed a citizenship question for public comment before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14.

785.    There was never any opportunity for public comment on the addition of a citizenship question on the 2020 Decennial Census prior to the Secretary's decision to add the question to the 2020 Decennial Census.

786.    If there are any questions about whether a certain process or methodology is consistent with Census Bureau Quality Standards, one option is to consult Census Quality Program staff for guidance on how to proceed. Nov. 14 Trial Tr. at 1283.

787.   There is no evidence in the Administrative Record that Census Quality Program staff were consulted regarding the addition of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

788.   In fact, Quality Program staff were never consulted with respect to the addition of a citizenship question to the 2020 Decennial Census. Nov. 14 Trial Tr. at 1284.

### C.   The March 26 Memo Was Prepared Without Adequate Consultation of Census Bureau Officials

789.   James Uthmeier and Earl Comstock took the lead on drafting the original version of the March 26 Ross Memorandum.  Comstock Dep. at 242-43.

790.   Senior political appointees at DOJ (including Mr. Shumate, Chad Readler, and Hashim Mooppaan) reviewed and commented on multiple drafts of the March 26 memo prior to its issuance.  PX-3 at AR 2036-37, 3669 (AR), PX-4 at AR 11253, 11294-295, 11325 (AR), COM_DIS 17064-065, COM_DIS 17066-67, 17133. All of these documents were withheld as privileged.

791.   Undersecretary Kelley testified she did not substantially participate in the drafting of the March 26, 2018 memorandum.  Kelley Dep. at 68-69.

792.   Census Bureau professionals were only allowed to review the March 26 decisional memorandum to assure that information about the Census Bureau was technically correct; Census Bureau professionals did not make substantive changes. Jarmin Dep. (Docket No. 511-3) at 169, 173.

793.   Neither Undersecretary Kelley nor Census Bureau professionals made any substantive changes to the March 26 decisional memorandum. Kelley Dep. at 69; Jarmin Dep. (Docket No. 511-3) at 169, 173.

### D. Secretary Ross' Congressional Testimony Just Prior to the Decisional Memo (March 2018)

794.   Secretary Ross testified before the House Appropriations Committee on March 20, 2018. PX-491.

795.   Congressman José E. Serrano asked Secretary Ross, ". . . Has the President or anyone else in the White House directed you to add this or a similar question to the 2020 Census?"  Secretary Ross responded that the Department of Commerce was "responding solely to Department of Justice's request." PX-491.

796.   On the same day, Representative Grace Meng asked Secretary Ross if "the President or anyone in the White House discussed with you or anyone on your team about adding the citizenship question?" PX-493.  Secretary Ross replied "I am not aware of any such." PX-493.

797.   Two days later, on March 22, 2018, Secretary Ross testified before the House Ways and Means Committee. PX-480.

798.   Congresswoman Judy Chu asked if Secretary Ross could tell her "whether the Department of Commerce plans to include the citizenship question in the 2020 Census?"  Secretary Ross responded that the "Department of Justice, as you know, initiated the request for the inclusion of the citizenship question" to the Decennial Census. PX-480.

799.   During each of these exchanges, Secretary Ross did not mention that he requested that DOJ send a letter requesting the addition of a citizenship question on the 2020 Census.  PX-2; PX-491; PX-492; PX-493; PX-494; PX-537.

E.       **The Conclusions in the Decisional Memorandum**

1.       **Statements Concerning the Genesis of a Citizenship Question**

800.    Secretary Ross stated in his March 26, 2018 Decisional Memorandum, that "the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census." PX-26 (AR).

801.    In his March 26 memo, Secretary Ross wrote that "following receipt of the DOJ request, I set out to take a hard look at the request and ensure I considered all facts and data relevant so that I could make an informed decision.  To that end, the Department of Commerce immediately initiated a comprehensive review process led by the Census Bureau." PX-26 (AR).

802.    Contrary to the statements in his March 26 memo:

a.       Secretary Ross had personally sought the addition of a citizenship question months prior to the DOJ request and had directly asked that DOJ request the addition of a citizenship question. PX-2 (AR); PX-88 (AR); PX-55 (AR); PX-537 (AR); PX-58 (AR); PX-298(R) at RFA 62; Teramoto Tr. at 28–32; Comstock Tr. at 145–46.

b.       Prior to Secretary Ross's efforts, DOJ had not requested addition of a citizenship question or block-level citizenship voting age population (CVAP) data to enforce the VRA. PX-298(R) at RFA 66, 100.

c.       Secretary Ross's consideration of a citizenship question did not commence "following receipt of the DOJ request," but rather started almost ten months earlier.  PX-2 (AR); PX-55 (AR); PX-58 (AR); PX-19 (AR).

d.       The Department of Commerce did not "initiate a comprehensive review . . . Following receipt of the DOJ request"; the review of this issue by Ross's senior aides started well in advance of the DOJ request.  *See* PFOF III.C.

e.     The review process was not "led by the Census Bureau," nor did Secretary Ross

meet "with Census Bureau leadership on multiple occasions to discuss their

process for reviewing the DOJ request, their data analysis, my questions about

accuracy and response rates, and their recommendation."  Rather, Secretary Ross

made his decision based on minimal contact with Census Bureau leadership and

experts during the review process (limited to one meeting on February 12), and

dismissed the repeated admonition that adding a citizenship question was "very

costly, harms the quality of the census count, and would use substantially less

accurate citizenship status data than are available from administrative sources."

PX-22 (AR); PX-25 (AR); PX-3 at AR 9450 (AR); Nov. 13 Trial Tr. at 883-884.

## 2.     Statements Concerning the Secretary's Process

803.    Secretary Ross did not take a "hard look at the [DOJ] request" nor did he "consider all

facts and data relevant," but as detailed below, ignored key facts and data.

a.     The March 26 Memorandum takes the DOJ request entirely at face value.  There

is not a single "hard" question raised about it.  A true hard look would have raised

any number of obvious questions.

b.     The Secretary does not ask anything about why DOJ needed a question on the

Decennial Census to enforce the Voting Rights Act ("VRA").  The Act was

enacted in 1965 and between now and then, DOJ has never had CVAP data

calculated from a question asked of every household.  Any "hard look," would

have asked how DOJ had been able to enforce the Act for the previous fifty plus

years but apparently not now.  Has something changed?  What exactly is the

problem with the existing data and how in concrete terms is it insufficient?  None

123

of these basic questions were raised in the Secretary's memorandum, or anywhere in the administrative record.

c.    In fact, as detailed in PFOF IX.B.2, the evidence is that DOJ has been able to enforce the VRA in the past and that there is no reason why it required a census question asked of every household.  In any event, the Secretary did not probe DOJ on this point.

d.    A "hard look," would have raised related questions about why a citizenship question needed to be on the 2020 Decennial Census.  What was the rush?  Especially since citizenship was not one of the topics for the census reported to Congress as required under 13 U.S.C. 141(f)(1).  Why could not the matter be tested and analyzed, consistent with the Census's well established procedures, *see* PX-4 at AR 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR) for the 2030 census?  The answer to this might have been apparent had the Secretary asked why the question was needed in the first place.

e.    A "hard look" would have meant inquiring about why the DOJ had refused to have a technical meeting with Census officials to discuss how the Census Bureau might best meet DOJ's needs.  As discussed, *see* PFOF III.I, DOJ's refusal to meet was, at least unusual and inexplicable.

f.    A "hard look" would have raised the question of whether the Census could disclose census block level data consistent with statutory confidentiality provisions.  These provisions, found in Section 6 of Title 13, say the Census cannot disclose identifying information for respondents.  As it stands, it is wholly unclear that consistent with these statutory provisions, the Census Bureau can

124

produce for DOJ any better quality information than it already does now. *See*
PFOF IX.B.4.

g.     A "hard look" at DOJ's request would have examined whether asking a question
about citizenship on the Decennial Census was needed to provide DOJ with the
best data. As discussed at PFOF III.H.2.c, IV.E.1, the Census Bureau
unambiguously advised the Secretary that Alternative B (asking a citizenship
question) "would use substantially less accurate citizenship status data than are
available from administrative resources." PX-22 (AR); Nov. 13 Trial Tr. at 885.

804.   In sum, the Secretary took no "hard look" of any kind at DOJ's request. The only
reasonable inference to be drawn here is that the Secretary deliberately did not ask the many
obvious but "hard" questions to be asked about DOJ's request; the answers to those questions
would lead to rejecting DOJ's request or, at the very least, requiring further study before a
citizenship question could be placed in the Decennial Census. Moreover, it would have been
nonsensical for the Secretary to have asked these sorts of "hard" questions given that it was the
Secretary who had pushed DOJ to ask a citizenship question in the first place. Not only did the
Secretary not take a "hard look," his failure to do so is best explained by his strong interest in
adding a citizenship question to the census, an interest that was prior to, and was independent of,
the DOJ request.

### 3.     Conclusions Regarding Sufficiency of Testing

805.   Secretary Ross stated in his March 26, 2018 Memorandum that "the citizenship question
has been well tested." PX-26 (AR).

806.   Two problems with Secretary Ross' assertion are apparent from the face of the March 26
memo. First, notwithstanding his assertion that the question is "well tested," the Secretary's
analysis makes clear over and over again that answers that would have been available had the

question been well tested are not available.  For example, the Secretary states that "there is no information available to determine the number of people who would in fact not respond to a citizenship question being added." PX-26 at 5 (AR).  Elsewhere he says, citing a former Chief Executive Officer of the Census, "no empirical data existed on the impact of a citizenship question on responses."  PX-26 at 3 (AR).  In fact there is empirical evidence, but as Mr. Thompson testified, had "there been a thorough testing and evaluation program, the Secretary would not find himself saying that he had no good information on this subject."  Thompson Aff. ¶ 94.

807.    Second, while the Secretary states that the question is well-tested (presumably for the ACS), he ignores the testing implications stemming from the evidence that the question did not perform well on the ACS, with noncitizens frequently answering that they were citizens.  (Oddly, the Secretary cites this evidence for the proposition that the question does not perform  well on the ACS without drawing the obvious inference that this suggests the question might also not perform well on the Decennial Census. PX-26 at 6 (AR).  These facts indicate not that the citizenship question was "well tested"  but rather that there was cause for caution.

808.    In any event, the question was not well tested as gauged by governing regulatory requirements and standards.  During trial, Defendants' sole witness, Dr. Abowd, testified that the only testing of a citizenship question of which he was aware was for the ACS.  Nov. 14 Trial Tr. at 1271-73.

809.    The citizenship question on the American Community Survey was last tested in 2006. PX-310.

810.   As discussed above, the Census Bureau did not conduct any cognitive testing or field testing, including randomized control testing (RCT), to analyze the effect of a citizenship question on the 2020 Decennial Census.

811.   This lack of testing conflicted with the Census Bureau's well-established process for making changes to the questionnaire, under which "[t]he Census Bureau must test the wording of the new question." PX-4 at AR 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR); November 14 Trial Tr. at 1264:20-25.

812.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the Census Bureau Statistical Quality Standards.  PX-260. Under Sub-Requirement A2-3.3 of the Statistical Quality Standards, pretesting is not required for questions that performed adequately in another survey, but Dr. Abowd testified that the citizenship question on the ACS is not adequately performing. Nov. 14 Trial Tr. at 1287-88.

813.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the "Planned Development and Submission of Subjects Planned for the 2020 Census Program and Questions Planned for the 2020 Census Program" Memorandum (the "Blumerman Memorandum").  PX-271.

814.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the Census Bureau's response to Question 31 in the questions posed by the Commerce Department about Dr. Abowd's January 19 memorandum. PX-132 (AR); PX-140 (AR).

815.   The testing of the addition of the citizenship question did not comply with the standards set out in "Census Bureau Standard: Pretesting Questionnaires and Related Materials for Surveys and Censuses." PX-364 ("Census Bureau Pretesting Standards").  The Census Bureau Pretesting

Standards explicitly state "if there is insufficient evidence about how well a question performs, the question must be subjected to some form of questionnaire pretest." PX-364.

816.    According to these Census Bureau Pretesting Standards, if the Department of Commerce was not able to determine definitively how a citizenship question would perform on the Decennial Census, it must pretest the question. PX-364.

817.    The testing of the addition of a citizenship question to the 2020 Decennial Census also did not comply with Principle 4 of the Principles and Practices of a Federal Statistical Agency. PX-355.

818.    The Census Bureau's representative, Dr. Abowd, testified that the Decennial Census was not adequately tested. Census Bureau 30(b)(6) Dep. Vol. I. at 142-43.

819.    Dr. Abowd also testified that a citizenship question has not been well-tested in the context of the short-form Decennial Census. Nov. 15 Trial Tr. at 1330.

820.    A citizenship question on the 2020 Decennial Census short form has never been certified by OMB as being properly tested. Nov. 15 Trial Tr. at 1329.

821.    The Decennial Census with a citizenship question was not adequately tested in the view of Former Census Bureau Director Mr. Thompson. Thompson Aff. ¶ 13.

822.    Mr. Thompson testified that the addition of a citizenship question was a significant deviation from standard practice and that Secretary Ross's statement regarding testing is not supported by the Administrative Record. Thompson Aff. ¶ 92.

823.    Dr. Hillygus and Dr. Barreto also testified that the Decennial Census with a citizenship question was not adequately tested. Nov. 5 Trial Tr. at 157:14-16;  Nov. 9 Trial Tr. at 737:3-6.

a.    Dr. Hillygus and Dr. Barreto testified that a citizenship question is a sensitive question both for individuals who live in households with non-citizens and for Hispanics. Nov. 5 Trial Tr. At 51:12-25.

b.    Dr. Hillygus testified that other experts agree that pre-testing of the citizenship question as part of the Decennial Census questionnaire is required. Nov. 5 Trial Tr. at 169:24-170:5; Nov 9 Trial Tr. at 604:10-13.

824.   Six former Census Bureau directors wrote to the Commerce Department to state their view that the citizenship question had not been adequately tested. PX-116 (AR).

825.   The National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics (CNSTAT) Task Force on the 2020 Decennial Census concluded that the citizenship question had not been properly tested for inclusion on the Decennial Census. PX-539.

826.   As Dr. Hillygus and Mr. Thompson testified, the fact that a question has previously been used on the ACS does not mean that it has been appropriately tested to be used on the Decennial Census due in part to the importance of testing an entire questionnaire before it is used. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

827.   There are several differences between the ACS and Decennial Census questionnaires that affect the relevance of ACS testing in the Decennial Census context. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

828.   Changes to the Decennial Census are more dramatic than changes to the ACS. Nov. 14 Trial Tr. at 1263:12-15; 1284:12-15.

829.   The ACS is a different survey instrument and has a different purpose than the Decennial Census questionnaire.  Thompson Aff. ¶ 32.

830.   First, the ACS is a much longer questionnaire than the Decennial Census questionnaire and includes over 70 questions. Thompson Aff. ¶ 63; PX-255; PX-665.

831.   By contrast, the 2020 Decennial Census will contain 11 questions, if a citizenship question is included. Thompson Aff. ¶ 63; Nov. 5 Trial Tr. at 159:3-15.

832.   A question concerning citizenship may take on added significance to a respondent in the context of the much shorter Decennial Census questionnaire. Thompson Aff. ¶ 63; PX-162 at 39; Nov. 5 Trial Tr. at 159:3-15.

833.   Second, the macro-environment is different between when the ACS was last tested and the current environment. Nov 9 Trial Tr. at 737:3-16; Nov. 14 Trial Tr. at 1258-59.

    a.   The ACS was most recently tested in 2006. Nov. 14 Trial Tr. at 1252, 1258.

    b.   The current political macro-environment is different from that of 2006 and it will be a difficult macro-environment for a citizenship question on the Decennial Census in 2020. Nov. 9 Trial Tr. at 616:12-23, 619:11-620:1, 737:3-16; Nov. 14 Trial Tr. at 1258-59.

834.   Third, survey methodologists have shown that the question order and context—not just the question wording—is relevant to evaluating data quality, unit and item nonresponse. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

    a.   The Census Bureau agrees that question sequencing can affect response rates, including in unanticipated ways that could be discovered through testing. Census Bureau 30(b)(6) Dep. Vol. I. at 14-15.

    b.   The citizenship questions on 1950 census and on the Decennial Census long form were preceded by a question on place of birth ("nativity"). Nov. 5 Trial Tr. at 150; Docket No. 516-1 ¶¶ 65, 66; Nov. 14 Trial Tr. at 1274-75.

c.    On the ACS citizenship status is asked as a follow-up to the question: "Where was this person born?" PX-255; Nov. 5 Trial Tr. at 159-60.  Only those who indicate that they were born outside the United States are then asked about citizenship status in the ACS internet self-response. PX-255; Nov. 5 Trial Tr. at 159-60.

d.    In contrast, as indicated by the language submitted to Congress, the 2020 Decennial Census will ask about citizenship without a preceding nativity question regarding place of birth—and it will be asked of all individuals regardless of their method of response.  PX-489; Census Bureau 30(b)(6) Dep. Vol. I. at 22-23; Docket No. 516-1 ¶ 66; Nov. 14 Trial Tr. at 1275.

e.    The nativity question on the ACS may cause respondents to be more comfortable with the citizenship question. Thompson Aff. ¶ 66.

f.    As such, the absence of the nativity question before the citizenship question on the 2020 Decennial Census questionnaire may cause respondents to feel that the citizenship question is intrusive and cause them to be less willing to respond. Thompson Aff. ¶ 66.  This creates a fundamentally different context on the ACS than the context for a citizenship question on the Decennial Census. Nov. 5 Trial Tr. at 160:11-17.

g.    The Census Bureau is not aware of any cognitive testing of citizenship question without a preceding question about nativity. Census Bureau 30(b)(6) Dep. Vol. I. at 24:4-9; Nov. 14 Trial Tr. at 1275:11-18.

h.    The Administrative Record indicates that no testing on the effect of question order was conducted for the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14; Thompson Aff. ¶ 66; Nov. 14 Trial Tr. at 1275.

i.     On the ACS, there are many other questions that make any particular question potentially less salient. PX-255; Nov. 5 Trial Tr. at 160:19-161:6.  This context difference could affect survey responses. Nov. 5 Trial Tr. at 160:19-161:6.

j.     Secretary Ross stated in his March 26, 2018 memorandum that placing the question at the end of the survey will "minimize any impact on decennial response rates." PX-26 (AR).  However, Dr. Hillygus testified that this statement by Secretary Ross reflects a fundamental misunderstanding.  Respondents are directed to answer all of the questions on the Decennial Census questionnaire sequentially for each member of their household.  In other words, respondents will see a citizenship question when they answer the census questionnaire for the first member of the household, and before they answer any questions about other members of the household. Nov. 5 Trial Tr. at 151-52.  Additionally, on a paper form, respondents can view all of the questions before completing any of it. PX-489.

835.   Fourth, the form of the question may affect response rates. Docket No. 516-1 at ¶¶ 68-70.

a.     The ACS citizenship question includes five response categories rather than asking a simple yes/no question. PX-255.

b.     Members of Congress and other stakeholders have raised concerns about the response category "Yes born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas" because respondents in Puerto Rico may be offended by the perception that their citizenship is different from that of citizens in the mainland United States and thus potentially less likely to respond. Thompson Aff. ¶ 69; Nov. 5 Trial Tr. at 162:9-25.

c.      However, there is no evidence in the Administrative Record that any alternative question designs, including a simple yes/no question, were considered or tested before Secretary Ross made the decision to add the ACS citizenship question to the 2020 Decennial Census questionnaire. Thompson Aff. ¶ 71.

836.   The Administrative Record indicates that no testing was conducted to determine how the absence of the nativity question or how the use of the specific wording from the ACS citizenship question will influence response rates to a citizenship question if asked on the Decennial Census. PX-1 to 14 (AR); Thompson Aff. ¶ 71.

### 4.      Conclusions Regarding Decline in Response Rate and Expense

837.   Secretary Ross stated in his March 26, 2018 Decisional Memorandum that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially." PX-26 (AR).

838.   He further stated that "the [Commerce] Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially" and  "the Census Bureau's analysis did not provide definitive, empirical support" for the proposition that the addition of a citizenship question to the 2020 Decennial Census would reduce response rates.  PX-26 (AR).

839.   Prior to issuance of the memo, the Census Bureau provided an analysis to Secretary Ross finding that adding a citizenship question to the 2020 Decennial Census would lead to a 5.1% decrease in self-response rates for households containing noncitizens. PX-22 (AR); PX-297 at RFA 84.

840.   Dr. Abowd testified that he discussed the decline in self-response rates with Secretary Ross during the February 12 meeting.  Nov. 13 Trial Tr.at 921.

841.    Secretary Ross stated in his March 26, 2018 memorandum that while the Census Bureau considered whether non-response follow-up increases resulting from the addition of a citizenship question would lead to increased costs, "this estimate was difficult to assess."  PX-26 (AR).

842.    Prior to issuance of the memo, the Census Bureau provided an analysis to Secretary Ross estimating that the decrease in self-response rates caused by adding a citizenship question to the 2020 Decennial Census would lead to an increase in costs of at least $27.5 million and that this was a "conservative" estimate. PX-22 (AR), PX-297 at RFA 86.

843.    The Census Bureau has subsequently found that adding a citizenship question to the 2020 Decennial Census would lead to a 5.8% decrease in self-response rates and an increase in costs of at least $91.2 million. PX-297 at RFA 87; PX-162.

844.    Secretary Ross stated in his March 26, 2018 Decisional Memorandum that the difference in "nonresponses to the [ACS] citizenship question" for non-Hispanic whites and Hispanics were "comparable" to the difference in "nonresponse rates for other questions," such as marriage, educational attainment, monthly gas costs, weeks worked in the past 12 months, wage/salary income, and yearly property insurance. PX-26 (AR); PX-297 at RFA 88.

845.    The difference in nonresponse rates for Hispanics and non-Hispanic whites for the ACS citizenship question is larger than the difference for nonresponse rates for Hispanics and non-Hispanic whites for the questions about marriage, educational attainment, monthly gas cost, weeks worked in the past 12 months, wage/salary income, and yearly property insurance. PX-297 at RFA 89-95; PX-9 (AR).

846.    In analyzing the impact of the addition of a citizenship question, the Census Bureau found empirical evidence that a citizenship question could reduce response rates and provided that evidence to Secretary Ross. PX-297 at RFA 96-97; PX-22 (AR); PX-162 (AR).

847. In analyzing the impact of the addition of a citizenship question, the Census Bureau did not make or find any analysis which concluded adding a citizenship question would not impact response rates. PX-297 at RFA 98.

848. The Census Bureau's analysis produced credible, quantitative evidence that the addition of a citizenship question could be expected to lower the self-response rate in households that may contain noncitizens. Nov. 13 Trial Tr. at 923.

849. Dr. Barreto and Dr. Hillygus testified that decades of social science research, including Census Bureau reports, establish that the addition of a citizenship question will reduce self-response rates on the 2020 Decennial Census, especially among Latino and immigrant communities. Nov. 9 Trial Tr. at 590:13-18, 591:14-592:2; Nov. 5 Trial Tr. at 30, 50-51; *see also* PFOF VII.D.2-3.

850. Dr. Barreto's survey results also provide credible, quantitative evidence confirming that the addition of a citizenship question to the 2020 Decennial Census will be expected to lower self-response rates both nationally and differentially and will ultimately exacerbate the net differential undercount of Latino and immigrant communities in particular. Nov. 9 Trial Tr. at 590:19-24, 591:9-12, 671:6-671:19, 672:13-672:22, 675:10-675:14; *see also* PFOF VII.D.3.

851. Dr. Barreto provided empirical evidence that between 28 and 35 million people would not respond due to a citizenship question on the 2020 Decennial Census, of which 10-11 million people would be Hispanic. Thus, although the Hispanic population is only 13% of the national total, they would constitute approximately 35% of those affected by a citizenship question. Nov. 9 Trial Tr. at 683-686; PX-675; PX-676.

852.   Secretary Ross's decision memo repeatedly references information provided by The Nielsen Company, particularly as a source of "empirical evidence about the impact of sensitive questions on survey response rates."  PX-26 (AR).

853.   But Christine Pierce, the  Senior Vice President of Data Science for the Nielsen Company who spoke with Secretary Ross about a citizenship question, testified that the Secretary's decision memo does not accurately reflect the telephone conversation she had directly with the Secretary and Michael Walsh, a Commerce Department lawyer, about a citizenship question. Ms. Pierce, the stakeholder referenced in the Secretary's decision memo as a purported source of "empirical evidence about the impact of sensitive questions on survey response rates," testified at trial that Nielsen did not provide any such evidence.  Pierce Aff. (Docket No. 498-18) at ¶¶ 15, 18.

854.   In fact, Pierce testified that Secretary Ross's decision memo materially mischaracterized her input and omitted key facts (including her "unequivocal[]" concern "that a citizenship question would negatively impact self-response rates").  *Id.* at ¶¶ 9, 12-18.

855.   Secretary Ross's decision memorandum states that "to the best of [Nielsen's] knowledge, no empirical data existed on the impact of a citizenship question on responses." PX-26 at AR 1315. But Ms. Pierce testified that she "did not say 'to the best of [my] knowledge no empirical data existed on the impact of a citizenship question on responses.'" Pierce Aff. ¶ 10.

856.   Secretary Ross stated in his March 26, 2018 memorandum that the "Census [Bureau] was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey," and "[t]he Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness."  PX-26 (AR)

857.    Conducting an RCT would have allowed the Census Bureau to isolate the effect of a particular question, such as a citizenship question, on response rates.  Nov. 13 Trial Tr. at 923-26.

858.    Employees at the Census Bureau developed a proposed RCT test for the content of a citizenship question on the 2020 Decennial Census. PX-164; PX-165.

859.    The proposal would have taken six weeks to collect the data, and would have cost between $2 million and $4.1 million, which is money that the Census Bureau has.  PX-165; PX-268; Census Bureau 30(b)(6) (Abowd) Vol. II. (Docket 502-4) at 426-27; Nov. 13 Trial Tr. at 1001-02.

860.    The Census Bureau could have conducted an RCT on the citizenship question prior to printing the questionnaires for the 2020 Decennial Census.  PX-268; Nov. 13 Trial Tr. at 1002.

861.    A group of decision makers including Under Secretary Kelley made the decision not to conduct this proposed RCT.  Census Bureau 30(b)(6) (Abowd) Vol. II. (Docket 502-4) at 427: 8-11; Nov. 13 Trial Tr. at 1002.

862.    The Census Bureau has subsequently updated the analysis in the January 19 Memo in an August 6, 2018 memorandum titled "Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census" (hereinafter "August 6 Memo"; also known as "White Paper" or "Brown Memo"). PX-162; DX-2; PX-297 at RFA 24; Nov. 13 Trial Tr. at 895-96.

863.    The August 6 Memo is the most recent version of the technical report performed under the supervision of Dr. Abowd. Nov. 13 Trial Tr. at 895.

864.    The December 22 Memo constitutes an earlier draft of the August 6 Memo. PX-4 at AR 11634 (AR);  Nov. 13 Trial Tr. at 896.

865.   Dr. Abowd testified that the methodology reflected in this memorandum was appropriate and that the memorandum "constitutes the best analysis that the Census Bureau can do of the consequences of adding the citizenship question to the 2020 census … with the available data." Nov. 13 Trial Tr. at 897.

866.   Dr. Abowd agrees with the conclusions of this memorandum. Nov. 13 Trial Tr. at 897.

867.   The August 6 Memo developed a "cautious" and "conservative" estimate that an additional 5.8% of households with at least one noncitizen would not self-respond to the 2020 Decennial Census because of the addition of a citizenship question. PX-162 (AR); PX-297 at RFA 24; Nov. 13 Trial Tr. at 897-98.

868.   This 5.8% is the "best conservative estimate" of the adverse impact of the addition of a citizenship question on response rates to the 2020 Decennial Census. PX-162 (AR); Nov. 13 Trial Tr. at 897.

869.   The August 6 Memo's 5.8% conservative estimate is based on 2016 ACS data compared against 2010 Census data. Nov. 13 Trial Tr. at 898-98.

870.   The 5.8% estimate is conservative, in part, because it is based on: (a) ACS data that does not reflect the prominence of a citizenship question on the Decennial Census compared to the ACS; (b) 2016 data that does not reflect the changing macro-environment in which a citizenship question would be asked on the 2020 Decennial Census; and (c) the comparison of citizen households against non-citizen households and therefore does not include any possible reduction in self-response among all-citizen households. PX-162 (AR); Nov. 13 Trial Tr. at 901-03.

871.   Dr. Abowd testified that the assumption that a citizenship question will not have any effect on all-citizen households is probably wrong. PX-162 (AR); Nov. 13 Trial Tr. at 903-05.

872.    The August 6 Memo is being submitted for peer reviewed publication by the Census Bureau. Nov. 13 Trial Tr. at 1015-16.

### 5.    Conclusions Regarding Respondent Burden

873.    Secretary Ross stated in his March 26, 2018 Decisional Memorandum that "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition." PX-26 (AR).

874.    The Census Bureau has conducted analyses that conclude the addition of a citizenship question imposes a burden on non-citizens. PX-26 (AR); PX-22 (AR); PX-162; PX-297 at RFA 100.

875.    The Census Bureau has conducted analyses that conclude the addition of a citizenship question imposes a burden on Hispanics, including Hispanic citizens. PX-22 (AR); AR-162; PX-297 at RFA 101.

876.    Dr. Hillygus testified that Secretary Ross' statement that a citizenship question is no additional imposition is contradicted by survey research and Census Bureau opinion.  Nov. 5 Trial Tr. at 50:6-8.

877.    Dr. Habermann testified that a citizenship question would impose higher data collection costs than superior alternatives.  Docket No. 498-11 at ¶¶ 48-54.

878.    Secretary Ross supported his decision in the March 26 Memo with the statement that "the former director of the Census Bureau during the last Decennial Census told me that, while he wished there were data to answer the question, none existed to his knowledge." PX-26 (AR).

879.    On January 26, 2018, Secretary Ross received a letter from six former Census Directors regarding the addition of a citizenship question to the Decennial Census. PX-116(AR).

880.    One of the six former Census Directors was Robert Groves.  PX-116 (AR)

881.    The six former Census Directors warned against adding a citizenship question, and stated that "we believe that adding a citizenship question to the 2020 Census will considerably increase the risks to the 2020 enumeration." PX-116 (AR).

882.    The Secretary stated in the March 26 Memo that "there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added" and that "no empirical data existed on the impact of a citizenship question on responses." PX-26 (AR).

883.    But as detailed above, the Census Bureau provided multiple analyses detailing the impact of a citizenship question on responses.

### 6.    Conclusions Regarding Data Quality

884.    Secretary Ross stated in his March 26, 2018 memorandum that "[i]t is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people."  PX-26 (AR).

885.    Secretary Ross further stated in his March 26 memo that the addition of "a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request."  PX-26 (AR).

886.    Secretary Ross further stated that "citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating the law."  PX-26 (AR).

887.    These assertions are wholly at odds with the administrative record.  The Census Bureau repeatedly advised the Secretary based on empirical analysis, not disclosed in the Secretary's memorandum, that more accurate information could be provided by looking to administrative

records alone rather than by using a citizenship question.  PX-26 (AR); PX-25 (AR); PX-132 (AR); PX-574 (AR); PX-575 (AR).

888.   Dr. Abowd testified that neither he nor the Census Bureau agrees that the addition of a citizenship question to the 2020 Decennial Census is necessary to provide complete and accurate data in response to the DOJ request.  Nov. 13 Trial Tr. at 1048.

889.   In Dr. Abowd's January 19 memo to the Secretary, the Census Bureau unambiguously advised the Secretary that Alternative B (asking a citizenship question) "would use substantially less accurate citizenship status data than are available from administrative resources."  PX-22 (AR); Nov. 13 Trial Tr. at 885.

890.   After the Secretary asked the Census Bureau to consider Alternative D (combining results of asking a citizenship question and using administrative records), the Census Bureau advised him in Dr. Abowd's March 1 memo that "Alternative D would result in poorer quality citizenship data than Alternative C." PX 25 at 5 (AR). The Census Bureau's conclusions were based on a careful analysis of the available data.  *See* PFOF IV.E.4.

891.   By contrast, there is no empirical or other evidence anywhere in the Administrative Record supporting the Secretary's assertion that the "citizenship data provided to DOJ will be more accurate with the question than without it…."  PX-26 at 7 (AR).  Indeed, the Secretary had no professional expertise regarding these matters independent of the Census Bureau.  Comstock Dep. at 324:19-325:1; Park-Su Dep. at 57-58 (objection at 57:7); Jarmin Dep. (Docket No. 511-2) at 33-37, 59, 108 (objection (602) at 34:10-14).  The Secretary's assertion is no more than an assumption which he did not discuss with Dr. Abowd and which was not endorsed by the Census Bureau.  Nov. 13 Trial Tr. at 977.

892.   To the extent that the Secretary's  position is premised on the notion that questioning all households about citizenship would avoid the need for "sophisticated statistical modeling," or for the Census Bureau to "deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data,"  PX 26 (AR), he was operating under a misapprehension.  In analyzing Alternative D, the Census Bureau professionals concluded that "[i]ncluding a citizenship question in the 2020 Census does not solve the problem of incomplete person linkages when producing citizenship statistics after 2020. Both the 2020 decennial record and the record with the person's future location would need to be found in PVS [Person Validation Service] to be used for future statistics."  PX-25 (AR).

893.   Dr. Abowd testified that including a citizenship question on the Decennial Census would not eliminate the need for the Census Bureau to model an answer for millions of people.  Nov. 13 Trial Tr. at 970-72.  Dr. Abowd further testified that because survey responses are not reliable enough to fill the gaps in administrative records regarding citizenship data, the inclusion of citizenship question on the Decennial Census does not eliminate the need to do statistical modeling to determine census block-level citizenship data.  Nov. 13 Trial Tr. at 975.

894.   Elsewhere in his memo, Secretary Ross states that "placing the [citizenship] question on the Decennial Census and directing the Census Bureau to determine the best means to compare the Decennial Census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so." PX-26 (AR).  In contrast the Census Bureau professionals concluded that "survey-collected citizenship data may not be reliable for many of the people falling in the gaps

in administrative data." PX-25 (AR); Nov. 13 Trial Tr. at 973-74.  Indeed, the Census Bureau

professionals found that in the 2016 ACS, individuals whom the administrative records indicate

are noncitizens responded "citizen" 34.7% of the time.  PX-22 (AR).

895.   Secretary Ross relied on technical presumptions in his March 26, 2018 memorandum.

PX-26 (AR); Nov. 13 Trial Tr. at 977.  The technical presumptions that Secretary Ross relied on

in his March 26, 2018 memorandum were not endorsed by the Census Bureau.  Nov. 13 Trial Tr.

at 977.

896.   For reasons discussed in PFOF IX.B.4, the Census Bureau's use of disclosure avoidance

procedures means that the CVAP data produced will necessarily not be "complete and accurate."

897.   There is no evidence in the Administrative Record that supports Secretary Ross' statement

that providing the citizenship data to DOJ "is of greater importance than any adverse effect that

may result from people violating the law."  PX-1 to PX-14 (AR).

    a.    There is evidence in the Administrative Record and the Census Bureau believes

that adding a citizenship question will impose burden on Hispanic and non-citizen

respondents resulting in reduced self-response, greater costs, and a less accurate

census.  PX-22 (AR); PX-162; PX-267.

    b.    By saying that providing the data to DOJ is of "greater importance" than anything

else, he is necessarily saying that provision of the data to DOJ is more important

than achieving a full enumeration—to "count everyone once, only once, and in

the right place." Nov. 14 Trial Tr. at 1087.

    c.    But DOJ was able to enforce the VRA since 1965 without such data.  *See* PFOF

IX.B.2.

    d.      And DOJ witnesses admitted that they do not believe this data is necessary to enforce the VRA.  *See* PFOF III.F, IX.B.5.

    e.      And who is Secretary Ross to say that collection of the data is more important than a community's loss of political representation?  Or a community's loss of funding?  Or the heightened stress that addition of a citizenship question will achieve?

### 7.     Important Aspects of the Problem Not Discussed in Secretary Ross' March 26 Decision Memo

898.   Secretary Ross's March 26 memo does not note or otherwise discuss the Census Bureau's failure to identify citizenship as a topic on the March 31, 2017 notification to Congress pursuant to 13 U.S.C. § 141(f)(1).  PX-26 (AR).

899.   Secretary Ross' March 26 memo does not note or otherwise discuss his obligation to "find new circumstances exist which necessitate" the addition of citizenship as a subject for the Decennial Census after the March 31, 2017 deadline as required by 13 U.S.C. § 13(f)(2).  PX-26 (AR).

900.   There is no evidence in the Administrative Record or discussed in Secretary Ross' memo that DOJ's asserted need for block-level CVAP data constituted a "new circumstance" arising after the March 31, 2017 subject disclosure deadline.  PX-1 to PX-14 (AR), PX-26 (AR).

901.   Secretary Ross's March 26 memo does not note or otherwise discuss his obligation "to the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to "acquire and use information available from any source [from other federal or other governmental entities] inst    ead of conducting direct inquiries as required by 13 U.S.C. § 6(c). PX-26 (AR).

a.  There is evidence in the Administrative Record that Secretary Ross could have acquired and used information available from other federal government agencies (including the Social Security Administration, the Internal Revenue Service, and the Department of State) to obtain the citizenship data needed to satisfy DOJ Request.  PX-22 (AR), PX-25 (AR).

b.  There is evidence in the Administrative Record that the data that Secretary Ross could have acquired from other federal government agencies was of higher quality and could be collected on a more timely basis at far less expense that adding a citizenship question to the Decennial Census.  PX-22 (AR), PX-25 (AR).

902.  Secretary Ross's March 26 memo does not address the Office of Management and Budget Standards and Guidelines for Statistical Surveys, including Standard 1.3 which requires agencies to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs . . ." PX-359; PX-26 (AR).

903.  There is evidence in the Administrative Record that the option chosen by Secretary Ross would not "achieve the highest practical rates of response" and imposed respondent burden and higher data collection costs than alternatives.  PX-22, PX-25.

904.  Secretary Ross's March 26 memo does not discuss the Census Bureau Statistical Quality Standards, including requirement A2-3 which provides that 'data collection instruments . .. must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden."  PX-360; PX-26 (AR).

a.  There is evidence in the Administrative Record that the option chosen by Secretary Ross did not balance "data quality and respondent burden" and imposed

higher respondent burden than options that would have produced more accurate data.  PX-22 (AR); PX-25 (AR).

b.   Dr. Hillygus testified at length about the respondent burden associated with a citizenship question, including how Secretary Ross' statements about burden were contradicted by survey methodology literature, Nov. 5 Trial Tr. at 47-50, the external evidence that the citizenship question was sensitive, *id.* at 52-58, the Census Bureau research on confidentiality concerns, *id.* at 58-68, and Dr. Abowd's analysis on impact on response (PX-22), *id.* at 68-89.

905.   Secretary Ross's March 26 memo does not discuss the Census Bureau's Statistical Quality Standards, including requirement A2-3-3.1 which provides "data collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation based on the pretesting results."  PX-260.

a.   Secretary Ross's memo states that the citizenship question had been "well-tested," but there is no exception in the Census Bureau Statistical Quality Standards for "well-tested questions."  Rather, the exception states that "pretesting is not required for questions that performed adequately in another survey."  PX-260.

b.   There is evidence in the Administrative Record (which Secretary Ross did not address in his decisional memo) that the citizenship question was not performing adequately on the American Community Survey.  PX-22 (AR); PX-25 (AR);  PX-162.  Specifically, the Census Bureau presented analysis to Secretary Ross that in the 2016 ACS, individuals whom administrative records indicate are noncitizens

responded "citizen" 34.7% of the time, and a number of citizens responded that they were non-citizens.  PX-22 (AR).

    c.    Dr. Abowd does not believe the citizenship question on the ACS is performing adequately.  Nov. 14 Trial Tr. at 1287-88.

906.    Secretary Ross's March 26 memo does not discuss that the Census Bureau is prohibited from making "Any publication whereby the data furnished by any particular individual under this title can be identified."  13 U.S.C. § 9(a)(2); PX-26 (AR).

    a.    Because census blocks can contain small numbers of people, the Census Bureau engages in disclosure avoidance procedures in every census block to prevent third parties from potentially unmasking information about Census respondents.  Nov. 13 Tr. at 1031-33.

    b.    Secretary Ross's memo does not address that the Census Bureau, in order to comply with its disclosure mandates, engages in disclosure avoidance procedures that prevent the disclosure of actual demographic characteristics at the census block level.  PX-26 (AR).

    c.    Secretary Ross's memo does not address the implications for disclosure avoidance procedures; Ross does not acknowledge that these procedures will preclude the Census Bureau from providing actual or accurate CVAP counts at the census block level.  PX-26 (AR).

    d.    Neither Secretary Ross's memo nor the Administrative Record provides any support for Secretary Ross's conclusion that asking a citizenship question on the Decennial Census is "necessary to provide complete and accurate data in response to the Department of Justice request."  PX-26 (AR).

## V.    LAWSUIT AND POST-LAWSUIT DISCLOSURES

907.    The States of New York, Connecticut, Delaware, Illinois, Iowa, Maryland, Minnesota,

New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington;

Commonwealths of Massachusetts, Pennsylvania, and Virginia; District of Columbia; cities of

Chicago, New York, Philadelphia, Providence, and Seattle; city and county of San Francisco;

and the United States Conference of Mayors filed a lawsuit to challenge the addition of a

citizenship question on April 3, 2018.  Docket No. 1. The State and City Plaintiffs filed a First

Amended Complaint in April 30, 2018 and a Second Amended Complaint on July 25, 2018

adding Central Falls, Columbus, Pittsburgh, counties of Cameron, El Paso, Hidalgo, Monterey,

and the city of Phoenix as plaintiffs, respectively. Docket No. 85; Docket No. 214.

908.    On June 6, 2018, New York Immigration Coalition, CASA de Maryland, American-Arab

Anti-Discrimination Committee, ADC Research Institute, and Make the Road New York filed a

lawsuit to challenge the addition of a citizenship question. *See* No. 18-cv-05025, Docket No. 1.

909.    On May 9, 2018, this Court ordered the production of the Administrative Record on or

before June 8, 2018. Docket No. 137.

910.    On May 8, 2018, Earl Comstock testified, along with Director Jarmin, before the House

Oversight Committee on the topic of the Census. PX-276.

911.    Congresswoman Eleanor Holmes Norton asked them why a citizenship question, "which

was dropped for 70 years, suddenly appear on the decennial census? What was the point?" PX-

282 at 37.

912.    Mr. Comstock responded that they "received a request from the Justice Department for

this, and their rationale was that the level of the information that they needed to enforce the

Voting Rights Act was not available." PX-282 at 37.

913.    Congresswoman Norton also asked if they had "any evidence that it would not have an impact on the Census, asking such a question, particularly given the testimony of Mr. Levitt that people have increasingly refused to answer this question." PX-282 at 38.

914.    Mr. Comstock responded that Secretary Ross "carefully considered the issue and there was quite extensive discussion of the matter.  And that was exactly the point: we were asked, made a valid request by a government agency to add this to the census; we went through our normal process; and we looked at this carefully." PX-282 at 38-39.

915.    On May 10, 2018, Secretary Ross testified before the Senate Appropriations Committee, and Senator Patrick Leahy asked Secretary Ross, "Now, you have also marketed the citizenship question as necessary to enforce the Voting Rights Act.  The Justice Department hasn't brought any voting rights cases since the President took office, they don't seem to see a problem out there. All the voting rights advocates I've spoken with oppose including the question.  They say it is going to have the opposite effect and will bring about severe under-representation of those who they are trying to protect.  And why the sudden interest in that when the Department that is supposed to enforce violations doesn't see any problems?" PX-494.

916.    Secretary Ross responded that, "Well, the Justice Department is the one who made the request of us." PX-494.

917.    These statements to Congress omitted: (1)  the fact that the Secretary Ross directed his staff and the Census Bureau to consider the addition of a citizenship question long before the December 12, 2017 letter from DOJ, (2) the active lobbying of DOJ by Mr. Comstock on behalf of Secretary Ross, and (3) contacts between Defendants Ross and the White House.  PX-88 (AR); PX-55 (AR); PX-537 (AR); PX-58 (AR); PX-298 (R) at RFA 62; Teramoto Tr. at 28–32; Comstock Tr. at 145–46.

918.    On May 21, 2018, Mr. Gore testified before the House Oversight Committee.  He declined

to answer many questions, citing pending litigation.  Among other things, Gore did not mention

that the Department of Commerce reached out to DOJ to see if DOJ would request a citizenship

question.  PX-509;  Gore Dep. at 63:20–64:10.  Mr. Gore also failed to mention that DOJ was

initially reluctant to request the question, or that Attorney General Sessions had directed DOJ not

to meet with the Census Bureau to discuss a citizenship question.  Gore Dep. at 63:20–64:10,

68:7–14, 69:4–9, 271:21–272:13.  Gore also did not mention that Acting Director Jarmin—the

Acting Director of the Census Bureau—believed that there was a different vehicle that would

yield "more accurate" data for the purposes of VRA enforcement.  PX-509.

919.    Defendants produced an Administrative Record along with a certification and index on

June 8, 2018 with only 1,320 pages.  PX-1 (AR); Docket No. 173.  These materials allude to but

contain little documentation of internal deliberations before December 2017 or communications

between the Departments of Commerce and Justice. Docket No. 173. PX-1 (AR).

920.    On June 21, 2018, Secretary Ross filed a supplemental memorandum significantly

revising the narrative as to the origin and genesis of how a citizenship question came to be

placed on the Decennial Census. Docket No. 189; PX-2 (AR).  The June 21 memorandum

provided the first public acknowledgment of internal consideration of a citizenship question prior

to DOJ's letter on December 12, 2018, but still provided no details of those deliberations or any

communications between the Department of Commerce and DOJ. PX-2 (AR).  The supplemental

memorandum states that Secretary Ross and his staff "inquired whether the Department of

Justice (DOJ) would support, and if so would request, inclusion of a citizenship question . . . ."

PX-2 (AR).  The supplemental memorandum also introduced the fact that Secretary Ross

consulted with "senior administration officials" prior to speaking with DOJ. PX-2 (AR).

921.    Dr. Abowd described himself and everyone he knows at the Census Bureau as surprised when they learned about Secretary Ross's role in soliciting DOJ to request the inclusion of a citizenship question.  Nov. 13 Trial Tr. at 1020-22.

922.    On July 3, 2018, and memorialized in the July 5, 2018 order, this Court ordered the Defendants to produce a complete Administrative Record by July 23, 2018, and authorized limited extra record discovery.  Docket No. 199.  The Court granted additional time to produce a complete Administrative Record on July 26, 2018. Docket No. 211.

923.    Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (0003736-0012464). Docket Nos. 212, 216, 217; PX-3 (AR); PX-4 (AR).  The productions of July 23, 2018 and July 27, 2018 contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between Commerce and DOJ.

924.    On July 12, 2018, Plaintiffs asked several interrogatories of Defendants Ross and Department of Commerce, most particularly Interrogatory No. 1, PX-511:

> "With regard to the document found in the Administrative Record at 1321, please IDENTIFY:
> a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;
> b. the "various discussions with other government officials about reinstating a citizenship question to the Census";
> c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";
> d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject; and
> e. all PERSONS with whom the "senior Administration officials had previously raised" reinstating the citizenship question. PX-280.

925.    On August 13, 2018, Defendants responded to Plaintiffs' first interrogatory by saying, "Defendants have not to date been able to identify individuals responsive to subpart a.

Defendants' investigation is continuing, and Defendants will supplement this response as appropriate," but provided initial responses to the other subparts.  PX-280 at 14-15.

926.    On September 5, 2018, Defendants supplemented their response to Plaintiffs' first interrogatory by saying they "construed subparts a, b, and c, as coextensive," and identified Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore and Jefferson Sessions, along with Kris Kobach and Steve Bannon.  PX-511 at 2-3.  With regard to conversations between Secretary Ross and the Attorney General, Defendants in the September 5 Supplemental response to Plaintiffs' first interrogatory stated that "Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 Decennial Census with Attorney General Sessions in August 2017. In addition, it is possible that the two had an additional discussion concerning the issue, and although the date of that conversation is unknown, Defendants believe it took place earlier in 2017." PX-511 at 3.  In the September 5 Supplemental Response to Plaintiffs' first interrogatory, Defendants further stated that "Defendants cannot confirm that the Secretary spoke to Steve Bannon regarding the Citizenship Question." PX-511 at 3.

927.    On October 11, 2018, Defendants again supplemented their responses to Plaintiffs' first interrogatory and made substantial changes to the September 5 response. PX-302.  For the first time, on October 11, 2018, Defendants stated in response to Plaintiffs' first interrogatory that "Secretary Ross discussed the possible reinstatement of citizenship question on the 2020 Decennial Census with Attorney General Sessions in the Spring of 2017 and at subsequent times." PX-302.  On October 11, 2018, Defendants once again supplemented their response to Plaintiffs' first interrogatory by stating that "Secretary Ross recalls that Steven Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to

then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census." PX-302.

928.   On November 13, 2018, amidst trial, the Department of Commerce issued an official statement reacting to Dr. Abowd's testimony in this case, providing the following: "Under authority granted to the Secretary of Commerce, Ross determined that the addition of the question, combined with administrative records, would provide the best results to fulfill DOJ's request.  While his decision was ultimately different from Dr. Abowd's recommendation, the Secretary reached his decision, in part, due to the Census Bureau's assurances that any drop in self-response rate can and will be remediated by non-response follow operations." PX-684.

929.   On November 13, 2018, Secretary Ross gave an interview to Yahoo! News in which he discussed the matter at issue in this litigation and a citizenship question more broadly.  PX-688. In that interview, Secretary Ross stated, "[W]e ourselves released that there had been a conversation with Steve Bannon, there had been a conversation with Kobach. Those are natural. And there was in the air early in the administration a whole bunch of questions about census, so it was natural that there'd be some limited discussions. But what triggered the investigation, the real study, what triggered the process that lead to the determination to do it was the letter from the Department of Justice." PX-688.

## VI.   THE ADDITION OF A CITIZENSHIP QUESTION IS CLOSELY LINKED WITH THE TRUMP ADMINISTRATION'S WIDER NATIVIST AGENDA.

### A.   Department of Commerce's Admissions Regarding President Trump, Attorney General Sessions, and Other Senior Administration Officials' Statements of Animus Toward Immigrant Communities of Color and Secretary Ross's Support

930.   The Department of Commerce admitted that in December 2016, during an interview with TIME magazine, Donald Trump stated, in reference to an article about a supposed recent crime wave on Long Island: "They come from Central America.  They're tougher than any people

you've ever met.  They're killing and raping everybody out there. They're illegal. And they are

finished."  PX-298 (R) at RFA 15.

931.    The Department of Commerce admitted that on January 27, 2017, Donald Trump signed

an executive order blocking persons from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen

from entering the United States.  PX-298 (R) at RFA 17.

932.    The Department of Commerce admitted that Stephen Bannon called Secretary Ross in the

Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of

State Kris Kobach about Secretary's Kobach's ideas about a possible citizenship question on the

Decennial Census. PX-19(AR); PX-58(AR); PX-298 (R) at RFA 51; Comstock Dep. at 120–123;

Teramoto Dep. at 160. PX-302.

933.    The Department of Commerce admitted that on March 27, 2017, Attorney General

Sessions, referring to Latino immigrants, stated: "the American people are justifiably angry . . .

assaults, burglaries, drug crimes, rapes, crimes against children and murders.  Countless

Americans would be alive today and countless loved ones would not be grieving today . . . The

President has rightly said that this disregard for the law must end. . . ."  PX-298 (R) at RFA 20.

934.    The Department of Commerce admitted that on June 13, 2017, Acting ICE Director

Thomas Homan testified "every immigrant in the country without papers . . . should be

uncomfortable. You should look over your shoulder. And you need to be worried. . . . No

population is off the table. . . ."  PX-298 (R) at RFA 21.

935.    The Department of Commerce admitted that on June 28, 2017, Donald Trump said: "They

are bad people. And we've gotten many of them out already. . . We're actually liberating towns,

if you can believe that we have to do that in the United States of America.  But we're doing it,

and we're doing it fast." PX-298 (R) at RFA 23.

936.    The Department of Commerce admitted that on July 14, 2017, Kris Kobach wrote to Secretary Ross stating: "I'm following up on our telephone discussion from a few months ago. As you may recall, we talked about the fact that the US census does not currently ask respondents their citizenship.  This lack of information impairs the federal government's ability to do a number of things accurately.  It also leads to the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  PX-19(AR); PX-298 (R) at RFA 82.

937.    The Department of Commerce admitted that on September 5, 2017, the Department of Homeland Security announced the rescission of the Deferred Action for Childhood Arrivals program.  PX-298 (R) at RFA 26.

938.    The Department of Commerce admitted that on October 9, 2017, Secretary Ross said: "President Trump's tighter border controls have already reduced greatly the influx of illegal aliens, but he needs legislation to finish the task. I support his request to secure our borders, swiftly return illegal entrants, stop visa fraud and overstays, sanctuary cities, asylum abuse and chain immigration, as well as exploitative employment of illegal aliens.  This will take money for more ICE officers, more federal prosecutors and more physical barriers.  That will be money well spent!"  PX-298 (R) at RFA 29.

939.    The Department of Commerce admitted that on November 6, 2017, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Nicaragua.  PX-298 (R) at RFA 30.

940.    The Department of Commerce admitted that on November 20, 2017, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from Haiti. PX-298 (R) at RFA 31.

941.   The Department of Commerce admitted that on January 8, 2018, the Department of Homeland Security announced that it would not be renewing the Temporary Protected Status designation for immigrants from El Salvador.  PX-298 (R) at RFA 32.

942.   The Census Bureau admitted that in January 2018, the Census Bureau announced that it would not hire census enumerators who are not U.S. citizens for the 2020 Decennial Census. PX-297 at RFA 76.

943.   The Department of Commerce admitted that on April 5, 2018, President Trump, speaking about individuals who enter the country "through chain migration," stated: "This is what the Democrats are doing to you. And they like it because they think they're going to vote Democratic . . . . A lot of them aren't going to be voting. A lot of times it doesn't matter, because in places, like California, the same person votes many times.  You probably heard about that. They always like to say.  'Oh, that's a conspiracy theory.'  Not a conspiracy theory, folks. Millions and millions of people."  PX-298 (R) at RFA 35.

944.   The Department of Commerce admitted that on April 6, 2018, Attorney General Sessions announced a "zero tolerance" policy for immigrants who cross the border unlawfully.  PX-298 (R) at RFA 39.

945.   The Department of Commerce admitted that on April 28, 2018, Donald Trump stated: "If a person puts their foot over the line, we have to take them into our country. We have to register them…. And you know, one of the reasons they do it is because the Democrats actually feel and they are probably right, that all of these people that are pouring across are going to vote for Democrats, they're not going to vote for Republicans, they're going to vote no matter what we do, they're going to vote."  PX-298 (R) at RFA 37.

946.   The Department of Commerce admitted that on April 26, 2018, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Nepal.  PX-298 (R) at RFA 36.

947.   The Department of Commerce admitted that on May 4, 2018, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Honduras.  PX-298 (R) at RFA 38.

948.    The Department of Commerce admitted that on May 16, 2018, Donald Trump stated:

"We have people coming into the country, or trying to come in — and we're stopping a lot of

them — but we're taking people out of the country.  You wouldn't believe how bad these people

are.  These aren't people.  These are animals.  And we're taking them out of the country at a

level and at a rate that's never happened before…"  PX-298 (R) at RFA 40.

### B.    These Expressions of Animus Evidently had an Impact on Immigrant Communities of Color and their Willingness to Participate in Government.

949.   In September 2017, the Census Bureau's Center for Survey Measurement ("CSM")

published a memorandum in which it noted a "recent increase in respondents spontaneously

expressing concerns about confidentiality in some of our pretesting studies conducted in 2017."

PX-158 (AR).

950.   The CSM memorandum stated that "CSM researchers heard respondents express new

concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members

by reporting their demographic characteristics, the dissolution of the 'DACA' . . . repeated

references to Immigration and Customs Enforcement (ICE)," and reported that "respondents'

fears, particularly among immigrant respondents, have increased markedly this year."  PX-158

(AR).

951.    The CSM memorandum also noted that "Spanish-speakers brought up immigration raids, fear of government, and fear of deportation."  PX-158 (AR).

952.    The CSM memorandum further stated that: "A Spanish-speaking respondent answered that he was not a citizen, and then appeared to lie about his country of origin.  When the FR [Field Respondents] started asking about his year of entry into the U.S., he 'shut down' and stopped responding to her questions.  He then walked out and left her alone in the apartment, which had never happened to her during an interview before."  PX-158 (AR).

953.    The CSM memorandum stated that one Field Respondent "added that she had observed Hispanic members of a household move out of a mobile home after she tried to interview them." PX-158 (AR).

954.    The CSM memorandum stated: "Spanish-speaking respondents who participated in paper testing of the CBAMS (Census Barriers, Attitudes, and Motivators Survey) expressed concern about whether their answers might be shared with other government agencies."  PX-158 (AR).

955.    The CSM memorandum stated that, with regard to Respondents, "[d]espite having participated in the past, they seemed visibly nervous and reticent and required extensive explanations regarding how their data would be used and their personal identifying information would be redacted.  This behavior was in contrast to their demeanor during prior CSM pretesting projects."  PX-158 (AR).

956.    The CSM memorandum stated: "Several Chinese-speaking focus group respondents stated that the Chinese community's main fear or concern was immigration status and how the data are used."  PX-158 (AR).

957.   The CSM memorandum stated: "Arabic-speakers reported that they had concerns about their perception of the current environment as unwelcoming to Arabic-speaking immigrants and said that they feared deportation."  PX-158 (AR).

958.   The CSM memorandum stated: "Another FS [Field Supervisor] reported that each time she spoke to a Spanish-speaking respondent, her focus was on convincing the respondent of the confidentiality of their answers 'given the political temperature these days.'"  PX-158 (AR).

959.   The CSM memorandum stated that Field Supervisors "reiterated that the main issue they saw was privacy concerns of Latino respondents, and that FRs [Field Representatives] should do more practice interviews where someone models those concerns and concerns about immigration so that the FRs are more prepared to respond adequately in the field."  PX-158 (AR).

960.   The CSM memorandum stated:  "These findings are particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."  PX-158 (AR).

961.   The CSM memorandum recommended "systematically collecting data on this phenomenon, and development and pretesting of new messages to avoid increases in nonresponse among hard-to-count populations for the 2020 Census."  PX-158 (AR).

962.   The Latino immigrant community is increasingly afraid of being targeted by the government as a result of the Trump administration's anti-immigrant policies and rhetoric, leading to concern about the addition of a citizenship question on the 2020 Decennial Census and fear about the potential use of data gathered based on this question.  PX-662; Supp. Escobar Aff. ¶ 5; Sarmiento Aff. (Docket No. 488-3) ¶¶6-9; Sarmiento Supp. Aff. (Docket No. 488-4) ¶ 2; Cullinane Aff. (Docket No. 505-1) ¶¶ 3, 5-11; Cullinane Supp. Aff. (Docket No. 505-3) ¶ 4; Vargas Supp. Aff. (Docket No. 498-22) ¶ 9. Nov. 9 Trial Tr. at 678:8-25.

963.   Members of CASA are increasingly afraid of interacting with the government due to the Trump Administration's anti-immigrant policies and rhetoric.  Escobar Aff. ¶ 15; Sarmiento Aff. ¶ 7; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

964.   Policies such as family separation at the border, the "zero-tolerance" policy for immigrants entering the United States without documentation, and the elimination of the Deferred Action for Childhood Arrivals and Temporary Protected Status programs have increased fears among immigrant communities of being targeted by agencies such as Immigration and Customs Enforcement (ICE).  Escobar Aff. ¶ 17; Escobar Aff. ¶ 17; Sarmiento Aff. ¶¶ 6-9; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4; Nov. 9 Trial Tr. at 618:1-22.

965.   CASA members have expressed fear of a knock on the door by a stranger, such as a census enumerator, given the high number of arbitrary immigration enforcement actions that have been undertaken by the Trump Administration.  Escobar Aff. ¶ 20.

966.   Many CASA members and other community members have expressed fears that participating in the Census presents too high a risk to their safety and security, due to concerns about information being shared with immigration enforcement agencies, to justify participating in the Census.  Escobar Aff. ¶ 21; Sarmiento Aff. ¶¶ 6-9;Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

967.   Many CASA, VACIR, and Make the Road New Jersey members have expressed fears that responding to a citizenship question on the 2020 Decennial Census could lead to them being targeted by immigration enforcement authorities and deported.  Escobar Aff. ¶ 23; Sarmiento Aff. ¶ 7; Cullinane Aff. ¶¶3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

968.    Particularly if citizenship status is reported at the block-level, this would exacerbate fears among the immigrant community of being targeted by immigration enforcement authorities if they respond to a citizenship question on the 2020 Decennial Census.  Escobar Aff. ¶ 24.

969.    President Trump's anti-immigrant policies, particularly those aimed at the Arab and Muslim communities, have increased fear in the Arab American community.  Supp. Khalaf Aff. ¶ 4.

970.    The Arab-American community is specifically afraid of responding to a citizenship question on the 2020 Decennial Census because of the context in which this question was added, by an administration that implemented a travel ban on several Arab- and Muslim-majority countries. Khalaf Aff. ¶ 22.

971.    The Arab-American community is afraid that census participation could lead to loss of citizenship, revocation of Legal Permanent Resident status, or the broadening of the President's ban on entry for people from several Arab- and Muslim-majority countries.  Khalaf Aff. ¶ 22.

972.    The Trump Administration's hostile and discriminatory actions and attitudes towards immigrants of color have led to fear among immigrants of color of interacting with government workers.  This fear has been increased by the additional of a citizenship question to the Census. Plum Aff. ¶ 13; Sarmiento Aff. ¶¶ 6-9;Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 is struck); Cullinane Supp. Aff. ¶ 4; Rodriguez Aff. (Docket No. 488-1) ¶ 8.

973.    Immigrants have expressed the fear that they will receive a visit from Immigration and Customs Enforcement if they report that there are noncitizens in their household.  Plum Aff. ¶ 16; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶4.

## VII.    EFFECT OF CITIZENSHIP QUESTION ON RESPONSE RATES

974.    The Parties agree that the addition of a citizenship question on the 2020 Census will depress self-response rates, particularly among noncitizen and Hispanic households.

975.    Establishing that there will be a decline in self-response is relevant to certain, but not all, of Plaintiffs' bases for standing. *See* PFOF VIII (Intro).

976.    For purposes of the merits of the Administrative Procedure Act claim, the undercount resulting from the addition of a citizenship question bears on the accuracy of the statements in Secretary Ross' March 26 memo assessing whether adding a citizenship question "would negatively impact the response rate for non-citizens," "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially," and "limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially." PX-26 (AR).

### A.    Census Bureau Analyses of Decline in Response Due to a Citizenship Question

977.    The Census Bureau's primary analysis of the anticipated decline in self-response rates traceable to a citizenship question is found in a series of memoranda drafted by senior technical staff at the Census Bureau and culminating in a detailed white paper.

978.    By memorandum dated January 19, 2018, the Census Bureau prepared a technical review of DOJ request to add a citizenship question to the 2020 Decennial Census ("January 19 Abowd Memo"). PX-22 (AR); Nov. 13 Trial Tr. at 882:23-883:16.

979.    The January 19 Abowd Memo was based on a December 22, 2017 analysis in a draft white paper examining the impact of a citizenship question on response rates. PX-102 (AR); PX-147 (AR); Nov. 13 Trial Tr. at 896:7-12.

980.    The December 22, 2017 draft white paper was compiled by a team of technical experts assembled by Dr. John Abowd, referred to as the Census Bureau SWAT team. Nov. 13 Trial Tr. at 879:23-880:12.

981.    The analysis in this initial draft white paper was later updated and extended, and the most recent version of this analysis is dated August 6, 2018 ("the White Paper").  PX-162 (AR); Nov. 13 Trial Tr. at. 896:7-12; 948:13-949:3.  The initial draft is in the Administrative Record.  *See* PX-4 at AR 5500 (AR), 11634.

982.    The White Paper represents the Census Bureau's most comprehensive and up-to-date analysis of the impact of a citizenship question on self-response rates. Nov. 13 Trial Tr. at 896:7–15; Census Bureau 30(b)(6) Dep. Vol. II at 353:2–354:4; PX-162 at 33-41.

983.    The Census Bureau believes that the analysis in the White Paper is methodologically sound. Nov. 13 Trial Tr. at 897:4-8; Census Bureau 30(b)(6) Dep. Vol. II at 355:13-20.

984.    The Census Bureau believes the White Paper constitutes the best analysis that it can do of the quality of citizenship data available from different sources, including surveys and administrative records, and the Bureau agrees with the analysis set forth in that paper. Nov. 13 Trial Tr. at 897:13-15; Census Bureau 30(b)(6) Dep. Vol. II at 357:6 -11.

985.    The January 19 Abowd Memo concludes that it is "a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households." PX-22 (AR); Nov. 13 Trial Tr. at 892:8-17; PX-297 at RFA 9.

986.    The Administrative Record reflects that, prior to the issuance of the March 26 decisional memo, the Census Bureau's best conservative estimate of the decrease in the self-response rates caused by the addition of a citizenship question was 5.1% for households containing one or more noncitizens relative to all-citizen households, and that there would also be a material decrease in the self-response rates of Hispanics.  PX-22 (AR); PX-25 (AR).

987.   The analysis of declines in self-response contained in the drafts of the White Paper and in the January 19 Abowd Memo apply to any alternative in which a citizenship question is asked on the Census short form, including the option of combining a citizenship question with the use of administrative records, which was eventually selected by Secretary Ross ("Alternative D"). Nov. 13 Trial Tr. at 888:22-889:6; PX-297 at RFA 22.

988.   Dr. Abowd discussed the analysis from the initial White Paper contained in the January 19 Abowd Memo (PX-22 (AR)) with Undersecretary Kelley and Secretary Ross at meetings on February 12, 2018, during which Kelley expressed no disagreement with the analysis, and Secretary Ross indicated he had a thorough understanding of the issues presented by the Census Bureau. Nov. 13 Trial Tr. at 883:17-884:10.

### B.   Effect of Question on Noncitizen Response Rates

989.   As Defendants effectively conceded at trial, and as the overwhelming weight of the evidence establishes, a citizenship question will decrease self-response rates in households with at least one noncitizen.

990.   The Census Bureau agrees that adding a citizenship question to the 2020 Census will lead to a lower self-response rate in households containing noncitizens. PX-22 (AR); PX-25 (AR); PX-100 (AR); PX-147 (AR); PX-162; Nov. 13 Trial Tr. at 881:19-882:3 ("balance of evidence" indicates decline in response rates); Census Bureau 30(b)(6) Dep. Vol. II at 358:12-17; Jarmin Dep. (Docket No. 511-4) at 278:2-10; 279:18-22.

991.   Following the decisional memo, the Census Bureau performed supplemental analyses estimating that the decrease in self-response rates among households with a noncitizen or a person of unknown citizenship status caused by the addition of a citizenship question would range between 5.1 and 11.9 percentage points depending on various estimates and assumptions, and that conservatively the most likely decline would be 5.8 percentage points.  Nov. 13 Trial Tr.

at 897:16-20; Census Bureau 30(b)(6) Dep. Vol. II at 372:2-12; PX-162 at 39; Jarmin Dep.

(Docket No. 511-5) at 290:10-14; PX-297 at RFAs 24, 26.

992.    In arriving at their 5.8 percentage points estimate, the Census Bureau conducted a natural

experiment, comparing response rates on the 2016 ACS, which incorporated a citizenship

question, to response rates on the 2010 Decennial Census, which did not incorporate a

citizenship question, and made a comparison of the resulting change in response rates between

households where all members of the household are citizens (as confirmed by administrative

records and their responses to the ACS citizenship question), and all other households (*i.e.*,

households that contain or may contain one or more noncitizens). Nov. 13 Trial Tr. at 898:2-

899:6; Census Bureau 30(b)(6) Dep. Vol. II at 373:9-15, 374:8-16; PX-162 at 39.  By comparing

the difference in drop-off between all-citizen households and other households between the 2016

ACS (which included a citizenship question) and the 2010 Census (which did not), the Census

Bureau adduced quantitative evidence about the impact of a citizenship question on self-response

rates. Nov. 13 Trial Tr. at 920:17-922:17.

993.    The Census Bureau acknowledges a citizenship question is sensitive to noncitizens. PX-

297 at RFA 70.

994.    The Census Bureau also analyzed response rates to the 2010 Census, which did not

incorporate a citizenship question, and the 2010 ACS, which did, and made a comparison of the

resulting change in response rates between households where all members of the household are

citizens (as confirmed by administrative records), and households in which one or more members

were noncitizens (as reflected in the administrative records).  Nov. 13 Trial Tr. at 891-93.  The

difference in the drop-off was 5.1 percentage points, which formed the basis for the Census

Bureau's best conservative estimate of the effect of a citizenship question on response rates prior

to Secretary Ross's Decision Memo, as reflected in the Administrative Record.  PX-22 (AR);

Nov. 13 Trial Tr. at 891-93.

995.   With respect to the 2000 Census, the Census Bureau compared the decline in self-

response during the 2000 Census on the Census long-form, which had a citizenship question, to

the Census short-form, which did not inquire into citizenship, for households that were all

citizens and households with at least one noncitizen.  PX-22 (AR); PX-162 at 40; Nov. 13 Trial

Tr. at 887:16-20.

996.   In its analysis of 2000 Census response rates, the Census Bureau found that households

with at least one noncitizen in them had a decline in self-response between the long-form and

short form that was 3.3 percentage points more than it was for all-citizen households.  PX-22

(AR); PX-162 at 40; Nov. 13 Trial Tr. at 888:2-6.  The differential response rate from the 2000

Census is credible, quantitative evidence that a citizenship question caused a decline in self-

response rates, and that "noncitizens are more sensitive to the inclusion of citizenship questions."

PX-22 (AR 1280); PX- 162 at 40; Nov. 13 Trial Tr. at 888:7-12.

997.   The Census Bureau also conducted similar analyses of response rates in the 2000 Census,

and the 2014 Survey of Income and Program Participation ("SIPP").  PX-162 at 40.

998.   With respect to the Survey of Income Program Participation ("SIPP") survey, a Census

Bureau survey containing a citizenship question, the evidence reflected that in more recent time

periods, noncitizens shrunk as a share of respondents; the Bureau considered this evidence to be

consistent with other evidence that households with a noncitizen or person of unknown

citizenship status are more sensitive to questions about citizenship status. Census Bureau

30(b)(6) Dep. Vol. I at 113:17 - 116:12. PX-162 at 40.

### C.    Effect of Question on Hispanic Response Rates

999.   A citizenship question will likely decrease response rates of Hispanic respondents at a substantial rate.

1000.  The Census Bureau acknowledges that response rates to the 2020 Decennial Census will decline more among Hispanics than non-Hispanic whites as a result of a citizenship question. Nov. 13 Trial Tr. at 919:12–920:10; Census Bureau 30(b)(6) Dep. Vol. II at 365:18–366:16, 364:21 - 365:6.

### 1.    Item Non-Response Rates

1001.  In the January 19 Abowd Memo and the White Paper, the Census Bureau examined the item nonresponse rates on the ACS for different racial and ethnic groups between 2013 and 2016. PX-22 (AR); PX-162 at 9–10; Nov. 13 Trial Tr. at 905:22-906:11.

1002.  Item nonresponse rates are the rate at which respondents do not answer particular questions on a survey. Nov. 13 Trial Tr. at 905:22–906:11.

1003.  From 2013 through 2016, the item nonresponse rate for the citizenship question on the ACS was more than twice as high for Hispanics as it was for non-Hispanic whites for both the mail-in and internet response versions of the ACS.  PX-22 (AR); PX-162 at 8-10; Nov. 5 Trial Tr. at 70-72; Nov. 13 Trial Tr. at 906:12-907:20; Census Bureau 30(b)(6) Dep. Vol. II at 359:13–361:5; PX-298(R) at RFA 122.

1004.  The item nonresponse rate for the citizenship question for Hispanics increased from 2013 to 2016, in contrast to other questions, such as sex. PX-162 at 9.  As a result, the increase in item nonresponse for the citizenship question could not be attributed to an increase in item nonresponse to all questions. PX-162 at 9; Nov. 5 Trial Tr. at 72; Nov. 13 Trial Tr. at 912:10-19; PX-297 at RFAs 90-92, 94; Kelley Dep. at 297:8-22.

1005.  As the item nonresponse rate for the citizenship question for Hispanics is much higher than for non-Hispanic whites, the Census Bureau concluded that this difference is statistical evidence that a citizenship question on the Census would result in higher nonresponse rates from Hispanics as compared to non-Hispanic whites.  Nov. 13 Trial Tr. at 908:2-6, 910:7-13; Nov. 5 Trial Tr. at 72.  The Census Bureau has documented a higher item non-response rate for Hispanics on the 2000 Census as well. PX-297 at RFA 68.

1006.  As discussed below, once the Census Bureau released the corresponding ACS data for 2017, Dr. Van Hook analyzed that data and found that item nonresponse for Hispanics on citizenship was significantly higher in 2017 compared to prior periods.  Van Hook Aff. (Docket No. 489-3) ¶¶ 69-72, Figures S1, S2, Table S3.

### 2.    Breakoff Rates

1007.  The January 19 Abowd Memo and the White Paper also examined breakoff rates from the 2016 ACS; the breakoff rate is the rate at which people responding to the ACS online stop answering the survey on a particular question.  Nov. 13 Trial Tr. at 913:17-24.

1008.  Breakoff rates for the citizenship question on the 2016 ACS for Hispanics were more than eight times the rate for non-Hispanic whites, a figure that is reflected in the Administrative Record. PX-22 (AR); PX-69 (AR); PX-162 at 10; Nov. 5 Trial Tr. at 72-76; Nov. 13 Trial Tr. at 914:5-8; Census Bureau 30(b)(6) Dep. Vol. II at 361:6–363:4.

1009.  Likewise, the differences in the breakoff rates of Hispanics as compared to non-Hispanic whites were much higher for the year of entry and citizenship questions.  PX-162 at 10; PX-22 (AR); PX-69 (AR); Nov. 5 Trial Tr. at 72-76; Nov. 13 Trial Tr. at 915:9-13.

1010.  The differences in breakoff rates in the 2016 ACS indicate that the citizenship question is more sensitive for Hispanic than non-Hispanic whites, and that the survey-response quality of

Hispanics is differentially affected.  PX-22 (AR); PX 162 at 10; Nov. 5 Trial Tr. at 72; Nov. 13 Trial Tr. at 914:9-12.

1011.  These differential breakoff rates are becoming even higher.  The Hispanic breakoff rate for the citizenship question on the 2017 ACS was twelve times higher than the rate for non-Hispanic whites. PX-151 (AR); Nov. 5 Trial Tr. at 74-75; Nov. 13 Trial Tr. at 916:4-22; Census Bureau 30(b)(6) Dep. Vol. II at 363:5 - 364:8.

1012.  From 2016 to 2017, the breakoff rate for Hispanics for the citizenship question on the ACS increased, while it did not for non-Hispanic whites, resulting in a larger difference between the two. PX-22 (AR); PX-151 (AR); Nov. 5 Trial Tr. at 74-75; Van Hook Aff. ¶¶ 70, 71, Figures S1, S2; Nov. 13 Trial Tr. at 916:18-917:3; Census Bureau 30(b)(6) Dep. Vol. II at 364:9-20.  The breakoff rate for Hispanics to the citizenship question on the 2016 ACS was 8 times that of non-Hispanic whites, but was 12 times the rate in 2017. Nov. 13 Trial Tr. at 916-17.

1013.  Based on its analysis of item non-response rates and breakoff rates, the Census Bureau believes that Hispanics are more sensitive to citizenship survey questions than they were a few years ago, while non-Hispanic whites are not. Nov. 13 Trial Tr. at 917:8-918:2; Census Bureau 30(b)(6) Dep. Vol. II at 366:17–369:19.

### D.  Expert Testimony on Reduced Self-Response Rates Attributable to a Citizenship Question

1014.  In addition, Plaintiffs' expert witnesses concurred that the addition of a citizenship question will decrease self-response on the 2020 Decennial Census among noncitizens and Hispanics.

### 1.  Dr. Jennifer L. Van Hook

1015.  Dr. Jennifer L. Van Hook, an expert sociologist and demographer, likewise confirmed the negative impact of a citizenship question on self-response rates.  Dr. Van Hook conducted an

analysis of data from the "Current Population Survey ("CPS"), which is a monthly survey of approximately 60,000 U.S. households administered by the U.S. Census Bureau, and which contains a question concerning citizenship status, to assess what the nonresponse rates to that survey suggest about the effect of adding a citizenship question to the 2020 Decennial Census. Van Hook Aff. ¶ 17.  Dr. Van Hook testified that "the 2020 Decennial Census will be conducted under the current administration, so current levels of nonresponse on government surveys featuring a citizenship question (i.e., post-2017), including the CPS, are very relevant for anticipating the effect of adding a citizenship question to the 2020 Decennial Census." *Id.* ¶ 20.

1016.  Dr. Van Hook's "analyses of the patterns and trends in nonresponse point to three key findings: 1) Hispanics and immigrants (especially noncitizens or those living in immigrant households) tend to have relatively high unit nonresponse rates and item nonresponse rates for questions on place of birth and citizenship. 2) Both unit and item nonresponse have increased significantly over time among immigrants. Unit nonresponse rates rose in the Trump era among noncitizens while remaining steady or declining among citizens. Item nonresponse also rose among those living in immigrant households, particularly for Hispanics. 3) Hispanic immigrants experienced particularly large increases in nonresponse since the start of 2018." *Id.* ¶ 12.

1017.  Dr. Van Hook further testified that "the overall patterns of unit and item nonresponse are consistent with the understanding that survey response changed for the worse among Hispanic noncitizens [over the period from 2014 through 2018], and the timing of the change suggests that it is linked to changes in the political and/or policy climate, including the proposal to add a citizenship question to the 2020 Decennial Census. The unit nonresponse data is consistent with the understanding that adding a citizenship question to the Census will reduce nonresponse rates

among racial minorities (in particular Hispanics) as compared to non-Hispanic whites, and noncitizens as compared to citizens." *Id.* ¶ 16.

1018.  Dr. Van Hook testified that non-citizens have higher unit non-response rates to the CPS than do citizens. *Id.* ¶¶ 35, 47, Figure 4.  Further, unit nonresponse rates increased among noncitizens in recent years, particularly since 2017, while remaining relatively flat among citizens. *Id.* ¶¶ 41, 48, Figure 8. These diverging trends led the gap in unit nonresponse between noncitizens and citizens to double since the last quarter of 2016, with the unit nonresponse rates for noncitizens that were roughly 30% higher than for citizens by the first quarter of 2018. *Id.*

1019.  Dr. Van Hook testified that unit nonresponse rates are higher for ethnic minorities than non-Hispanic whites: Hispanics are approximately 20% more likely than non-Hispanic whites to drop out of the CPS. *Id.* ¶ 47.  And unit nonresponse among Hispanic noncitizens in particular has increased of recent with unit nonresponse increasing by 43 percent between the last quarter of 2016 and the first quarter of 2018, with a particularly sharp increase in first quarter 2018. *Id.* ¶¶ 43, 48-49, Figure 9.

1020.  Dr. Van Hook concluded that, "[o]verall, the CPS unit nonresponse data is consistent with the understanding that racial and ethnic minorities are less responsive to a survey concerning a citizenship question, and are more likely to not respond to a U.S. Census Bureau survey containing a citizenship question than are non-Hispanic whites. The same is the case for noncitizens as compared to citizens. Finally, the CPS unit nonresponse data is consistent with the understanding that noncitizens, and particularly, Hispanic noncitizens, have become less responsive to a survey containing questions concerning citizenship since the onset of the Trump administration, particularly during the first quarter of 2018." *Id.* ¶ 50.

1021.  Dr. Van Hook's analysis of patterns and trends in item nonresponse on the place of birth and citizenship questions in the CPS shows that item nonresponse is significantly higher among Hispanics and Asians than non-Hispanic whites and blacks, and more than twice as high among those living in immigrant households as for those in U.S.-born households. *Id.* ¶ 62.  Dr. Van Hook further testified that item nonresponse on citizenship has increased in recent years, most dramatically among Hispanics living in immigrant households, reaching its peak in the first quarter of 2018, while there was no corresponding increase in item nonresponse on questions about age. *Id.* ¶ 63.

1022.  Dr. Van Hook testified that the American Community Survey (ACS) is important because it is the most similar to the 2020 Decennial Census with respect to its mode of data collection. *Id.* ¶ 69.  Also, similar to the Decennial Census, response to the ACS is mandatory by law. *Id.*  She testified about the analysis she conducted based on the 2017 ACS data that recently was publicly released. *Id.*  This analysis showed that item nonresponse on citizenship increased significantly among Hispanics each year from 2013 to 2017. *Id.* ¶ 70.  In contrast, item nonresponse did not significantly increase after 2014 among Asians, and it did not significantly increase after 2015 among blacks and among non-Hispanic whites. *Id.*  By 2017, item nonresponse on citizenship was significantly higher among Hispanics than Asians, blacks, and non-Hispanic whites. *Id.* ¶ 70, Figure S1, Table S3.  Among all adults, Hispanics have the highest nonresponse rates to the citizenship question in the ACS. *Id.* ¶ 71.Among those in immigrant households, item nonresponse on citizenship in the ACS increased significantly every year from 2013 to 2017 among Hispanics. *Id.* ¶ 71. In contrast, item nonresponse did not significantly increase after 2014 among Asians; it did not significantly increase after 2015 among blacks; and it did not

significantly increase in any year among non-Hispanic whites in immigrant households. *Id.* ¶ 71, Figure S2.

1023. Dr. Van Hook also examined how item nonresponse on citizenship compares with the other Decennial Census questions that are asked in the ACS: age, sex, race, Hispanic origin, and housing tenure (rent/own). *Id.* ¶ 72. In the 2017 ACS, for all four racial/ethnic groups, item nonresponse rates on citizenship were significantly higher than item nonresponse on any other Decennial Census item. *Id.* ¶ 72, Figure S3, Table S4.

1024. Dr. Van Hook also analyzed trends from 2013 to 2017 in item nonresponse for Hispanics on all Decennial Census questions that are also on the ACS to assess whether item nonresponse on citizenship is part of a broader pattern of increasing nonresponse and concluded that was not the case: a citizenship question is different. *Id.* ¶ 73. The percentage point change in item nonresponse among Hispanics on the ACS citizenship question increased significantly from 2013 to 2017 and more than it did for other questions. *Id.* ¶ 73, Figure S4, Table 5.

1025. Finally, Dr. Van Hook also testified about a difference-in-change analysis of ACS item nonresponse on citizenship. *Id.* ¶ 74, Table S6. Item nonresponse increased more for Hispanics as a whole as well as for Hispanics in immigrant households between 2015 and 2017 than in the earlier 2013 to 2015 time period. *Id.* ¶ 74.

1026. Dr. Van Hook concluded that the nonresponse trends identified in her analysis of the ACS data are consistent with the findings of her analysis of the CPS data and with the understanding that response to Census Bureau surveys has changed for the worse in recent years, particularly among Hispanics and those in immigrant households. *Id.* ¶¶ 75-76.

### 2. Dr. D. Sunshine Hillygus

1027. Dr. D. Sunshine Hillygus is an expert "in public opinion, survey methodology, and the United States Census." Nov. 5 Trial Tr. at 29:19-20. Dr. Hillygus testified there is considerable

evidence "that adding a citizenship question to the decennial census will depress census participation among noncitizens and Hispanics," Nov. 5 Trial Tr. at 30.  She based this conclusion on a review of a "wide range of different types of research," all of which pointed to a "negative impact on the participation of noncitizen and Hispanic households." Nov. 5 Trial Tr. at 50:23-51:4.  The research she reviewed indicated that "noncitizens and Hispanics are differentially concerned about the confidentiality of a citizenship question, so would be less likely to participate, which will contribute to a give [differential] under count." Nov. 5 Trial Tr. at 51:7-11.

1028.  Dr. Hillygus likewise concluded that adding a citizenship question would depress census participation among Hispanics, not limited to noncitizens.  Nov. 5. Trial Tr. at 30:7-13.  She testified that the social science research demonstrated that Hispanics, like noncitizens, were differentially concerned about the confidentiality of a citizenship question, which would make them less likely to participate in the census if it included such a question.  Nov. 5. Trial Tr. at 51.

1029.  In support of this opinion, Dr. Hillygus testified about the following evidence:

    a.  The Census Bureau analysis, including Dr. Abowd's January 19 memo (PX-22(AR)) and the Brown memo (PX-162). Nov. 5 Trial Tr. at 70-89.

    b.  Focus group research conducted in conjunction with the Census Bureau's Barriers, Attitudes, and Motivators Survey (CBAMS) (e.g., PX-152, PX-662, PX-663) found that Spanish-speaking participants "expressed fears of participating in the census, given their or others' immigration status.  Even if they personally are citizens or legal residents, they said that filling out the census form can adversely affect their relatives, people in their community who did not have a secure immigration status . . . [they] were highly suspicious of how the data will be used

once collected . . . while their data might be protected now, there is no guarantee

that it will not be used against them in the future . . . there did not seem to be a

single trusted voice that could mitigate the distrust of the government to uphold

the promise of confidentiality." *Id.* at 64:21-65:1, 65:19-23, 66:4-6; PX-152, PX-

662; PX-663.

c.   Research conducted by the Census Bureau Center for Survey Measurement in

September 2017 (e.g., PX-136(AR), PX-160, PX-448, PX-656(AR)) documenting

"respondent confidentiality concerns" among immigrant respondents "in which

spontaneously the respondents were bringing up these issues of confidentiality"

which shows "Hispanics and immigrants are concerned about the confidentiality

of the Census." Nov. 5 Trial Tr. at 57:23-25, 58:7-9, 61:15-16; PX-136 (AR); PX-

160; PX-448; PX-656 (AR).

d.   Various studies show "the impact of these fears on the engagement with the

government . . . health advocacy organizations have reported that legal

immigrants are less likely to use public health services since Trump's election.

There is empirical research that finds that noncitizen parents are failing to sign

their children up for fear of revealing themselves.  There is also empirical

research showing that those who are not even eligible for deportation are . . .

failing to use food stamps or [Affordable Care Act] because of concerns about

deportation."  Nov. 5 Trial Tr. at 53:21–54:5.

1030.  Dr. Hillygus further testified that there is "empirical evidence . . . that Hispanics will also

be affected, including Hispanic citizens" by a citizenship question and that "we are going to

likely see an impact not only among noncitizens but also the spillover effects on Hispanics."

Nov. 5 Trial Tr. at 51:23-25, 57:6-7, 85:14-19, 86:2-5; Nov. 15. Trial Tr. at 1404:6-17 (noting

that her "opinion on the basis of the available empirical analysis is that the impact is likely to be

on Hispanics, including Hispanic citizens.").

### 3.    Dr. Matthew Barreto

1031.  Dr. Matthew Barreto is "an expert in survey methodology, public opinion polling, and

racial and ethnic politics." Nov. 9. Trial Tr. at 589.  He testified that his review of "the social

science research, as well as the self-published reports by the census, established that the

citizenship question will reduce self-response, and this will ultimately harm the accuracy and the

quality of the data in the census." Nov. 9. Trial Tr. at 590.  Dr. Barreto also conducted a survey

experiment that "confirms that the addition of the citizenship question will reduce self-response

and very clearly establishes that it will exacerbate the net differential undercount in particular of

the Latino and immigrant community." *Id.*

1032.  First, Dr. Barreto reviewed social science literature on the topic of survey methodology, as

well as social science research published by the Census Bureau.  This review of pertinent

literature confirmed that the "addition of a sensitive question such as [the citizenship question]

will erode trust and will lead to lower self-response rates." Nov. 9. Trial Tr. at 591-592.

1033.  Dr. Barreto testified as to the factors affecting survey participation, stating that the main

factors that impact participation in a survey are: trust in the survey administrator, both the person

directly administering the survey and the agency or organization overseeing it; the sensitivity of

the questions; and the macro-environment, or the social and political climate in which the survey

is being administered to the public. Nov. 9. Trial Tr. at 596.

1034.  As Dr. Barreto explained, the social science literature makes clear that absent trust,

respondents will not participate in surveys. Nov. 9. Trial Tr. at 597.  He testified that trust

specifically influences census participation, because "the census is an official government

survey. It is done on behalf of the federal government by the Census Bureau, and the public has

to trust that the federal government is carrying out their job faithfully and using the information

for these purposes." Nov. 9. Trial Tr. at 599-600.  Furthermore, trust is particularly important to

a citizenship question, because "questions related to citizenship are ones that many in the Latino

and immigrant community have trust issues with." Nov. 9. Trial Tr. at 601.

1035.  Although there are legal requirements for confidentiality with the census, Dr. Barreto

explained that such legal requirements may do little to assuage concerns of the public,

particularly given the sensitivity associated with a citizenship question and the current political

environment.  Nov. 9. Trial Tr. at 602-604, 606-610; *see also* PX-462; PX-430.

1036.  Likewise, as Dr. Barreto explained, the macro-environment is directly related to whether

respondents perceive a question as sensitive and therefore to the concomitant response rates.

Where the macro-environment is perceived as threatening, it raises the stakes of participation; if

respondents feel that participation will put them at risk, self-response rates will decline.  Nov. 9.

Trial Tr. at 610.

1037.  Accordingly, Dr. Barreto concluded that given current trust issues arising from the macro-

environment, "the addition of a citizenship question was a particularly sensitive question and that

the addition of this question in today's macro environment would result in reduced participation

in Latino and immigrant communities in 2020." Nov. 9. Trial Tr. at 620-621.

1038.  Dr. Barreto also introduced the results of an original public opinion survey; this survey

confirms that adding a citizenship question will reduce self-response rates. Nov 9 Trial Tr. at

590.  This survey, which examined the willingness of respondents to participate in the 2020

Census included a Randomized Controlled Trial (RCT) experiment.  Put simply, Dr. Barreto's

survey inquired, *inter alia*, into the likelihood of a respondent responding to the census, both with and without a citizenship question.  Nov. 9 Trial Tr. at 644–740.

1039.  Dr. Barreto explained that survey research can "reliably represent populations with millions of members" and present "a truly representative and unbiased picture of it." Nov. 9 Trial Tr. at 644; PX-427 at 2.  Survey research is relied on extensively by the federal government, not just in the census, but in many different agencies and across the social sciences to understand public opinion and participation. Nov. 9 Trial Tr. at 645.  Dr. Barreto testified that his survey met all the applicable criteria for ensuring accuracy and reliability that enabled him to extrapolate his results to the national population. Nov. 9 Trial Tr. at 646-647.

1040.  Dr. Barreto conducted his survey on sample of 6,309 respondents from across the United States, with an additional oversample of Latinos, and geographic oversamples in San Jose, California and Cameron County and Hidalgo County, Texas. Nov. 9 Trial Tr. at 651-653; *see* PX 669.

1041.  The results derived from this survey were set forth in a number of tables.  As Dr. Barreto explained, the drop-off rate—reflecting respondents who would not participate in a census with a citizenship question—was 7.14% for all respondents to the survey, but 14.1% for Latinos. Nov. 9 Trial Tr. at 669-73; *see also* PX 670.

1042.  Even after being assured that the Census Bureau would keep their answers confidential, Dr. Barreto's survey found that Latino households stated that they were unwilling to participate in the census—with or without assurances of confidentiality—at substantially higher rates than the national sample taken as a whole.  Specifically, the national drop-off rate for all respondents was 9.69%, and the drop-off rate for Latinos was 16.58%. Nov. 9 Trial Tr. at 674-675; *see* PX 671 (reflecting the drop-off rate after assurances of confidentiality).

4.      Dr. Christopher Warshaw

1043.  Dr. Christopher Warshaw, an expert in public opinion based on surveys and census data, as well as the study of representation, elections, and polarization in American Politics, testified that "the addition of a citizenship question could… depress response rates among noncitizens and immigrant communities"  Warshaw Aff. (Docket No. 526-1) ¶¶ 1–7, 23.

1044.  Dr. Warshaw analyzed the survey data from Dr. Barreto's RCT (described above), by running a "weighted regression that evaluates the treatment effect of the citizenship question. In other words, it evaluates whether people in the treatment group, that were told the Census would include a citizenship question, are less likely to indicate they would respond to the Census than people in the control group that were told it would not include a citizenship question." Warshaw Aff. ¶¶ 27–31, 33.

1045.  Overall, Dr. Warshaw's results, set forth in the table below, showed that "that the citizenship question makes both Latinos and Foreign-born non-Latinos less likely to respond to the Census. The weighted regression model in column (1) indicates that Latinos are about 5.9% less likely to complete the Census if it includes a citizenship question. The results are similar in the other two models shown in columns (2) and (3). For foreign-born, non-Latinos, the weighted regression in column (4) indicates that they are about 11.3% less likely to complete the Census if it includes a citizenship question. The results are substantively similar, though more statistically significant, in the other two models shown in columns (5) and (6)." Warshaw Aff. ¶ 35.

1046.  Dr. Warshaw testified that he has a 95% confidence in the predictions from the RCT. Warshaw Aff. Table 4.

Table 4: Experiment Results on Effects of Citizenship Question on Census Response among Latinos and Foreign-born

|  | Latinos | | | Foreign-born (not Latino) | | |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) | (6) |
| Citizenship Question | −0.059** | −0.070** | −0.062*** | −0.113 | −0.164** | −0.096** |
|  | (0.029) | (0.028) | (0.016) | (0.072) | (0.066) | (0.039) |
| Survey Weights | X | X |  | X | X |  |
| Controls |  | X | X |  | X | X |
| Observations | 2,362 | 2,362 | 2,362 | 488 | 488 | 488 |
| $R^2$ |  |  | 0.043 |  |  | 0.117 |
| Adjusted $R^2$ |  |  | 0.021 |  |  | 0.022 |
| Log Likelihood | −2,851.497 | −2,763.581 |  | −782.779 | −714.807 |  |

*Note:* $^*p<0.1$; $^{**}p<0.05$; $^{***}p<0.01$

*Id.* ¶ 35.

### E.   The Census Bureau's Estimates of the Decline in Self-Response Rates are Conservative

1047.  The Census Bureau's estimate of the decrease in self-response resulting from a citizenship question is conservative, and underestimates the likely impact of adding the question.

1048.  The Plaintiffs' and Defendants' experts agree that the 5.8 percent decrease in self-response is "conservative." Nov. 5 Trial Tr. at 78:11-12, 80-89; Nov. 13 Trial Tr. at 866:3-4.

1049.  The Census Bureau concurs that the 5.8 percentage point estimate is conservative, noting that "factors suggest the estimated effect on self-response from the exercise in Table 9 [*i.e.,* the 5.8 percent decrease in self-response] is conservative." PX-162 at 39.

1050.  The 5.8 percentage point estimate is conservative because it is based on an analysis on ACS response rates, but a citizenship question on the Decennial Census questionnaire, which is much shorter, would be more prominent. Nov. 5 Trial Tr. at 87-89; Nov. 13 Trial. Tr. at 901:22–902:4.

1051.  The greater prominence of a citizenship question on the Decennial Census questionnaire means that the question could have a larger impact in terms of decreasing self-response as

compared to the less prominent citizenship question on the ACS. Nov. 5 Trial Tr. at 87-89; Nov. 13 Trial Tr. at 902:5-10; Census Bureau 30(b)(6) Dep. Vol. II at 376:13–377:5.

1052.  The "ACS contains 75 questions, so any one question is unlikely to stand out, whereas an added question will be more visible in the 2020 Census questionnaire, which contains just 10 other questions." PX-162 at 39; Nov. 5 Trial Tr. at 88:1-4; PX-255; PX-665.

1053.  The 5.8 percentage point estimate is also conservative because it considers only the impact on households with at least one noncitizen resident and does not account for nonresponse households composed entirely of citizens. PX-162 at 38-39; Nov. 5 Trial Tr. at 85-86; Nov. 13 Trial Tr. at 903:1-8.  As the Census Bureau concedes, this assumption—that a citizenship question will have no impact on the response rates of citizen households—is likely incorrect. Nov. 13 Trial Tr. at 903:15-905:2.

1054.  In addition, the 5.8 percentage point estimate is conservative because it based on 2016 ACS data and does not account for salient developments that might impact response rates that occurred after 2016.  PX-162 at 39; Nov. 5 Trial Tr. at 81-83; Nov. 13 Trial Tr. at 902:11-23.

1055.  The Census Bureau's natural experiments reflect that nonresponse rates to citizenship questions among noncitizens are increasing. Census Bureau 30(b)(6) Dep. Vol. I at 105:17–106:16; Nov. 13 Trial Tr. at 917:8–918:23.  The 5.8 point estimate is based on 2016 ACS data, and would not account for increased sensitivity of the citizenship question after that date, for example, as reflected in 2017 ACS break-off rates.

1056.  For example, the Census Bureau's analysis of item non-response and break-off rates are consistent with the hypothesis that noncitizens and Hispanics have become more sensitive to a citizenship question, and less likely to respond to a census questionnaire including such a

question, over time. PX-22 (AR); PX-151 (AR); Nov. 13 Trial Tr. at 917:8–918:2; Census

Bureau 30(b)(6) Dep. Vol. I at 108:7-16.

1057.  The CBAMS survey and focus group analysis conducted by the Census Bureau also

suggest that noncitizen and Hispanic sensitivity to a citizenship question has been increasing

since 2016. Nov. 13 Trial Tr. at 944:07-14; PX-662.  Increased sensitivity to a citizenship

question as reflected in the 2018 CBAMS research would not be accounted for in the 5.8 point

estimate, which is based on 2016 ACS data. Nov. 13 Trial Tr. at 944-46.

1058.  In addition, Plaintiff's expert, Dr. Hillygus, testified at length about the conservative

nature of the estimate in the August 6, 2018 version of the Census Bureau White Paper. PX-162.

The White Paper reflected that the introduction of a citizenship question on the 2020 Decennial

Census could depress self-response rates among noncitizen households by between 5.1% and

11.9%. Nov. 5 Trial Tr. at 77-80.

1059.  Dr. Hillygus gave numerous reasons for believing that the research set forth in the White

Paper was an underestimate of the effect the introduction of a citizenship question on the 2020

Decennial Census would have on the rates of self-response among noncitizen households, *id.* at

81-88, including:

> a.  Discussing PX-365 and other Census Bureau research, Dr. Hillygus testified the
>
> Census Bureau analysis is based on 2010 data and the issue of citizenship is more
>
> salient and prominent given changes in the macro-environment (in particular
>
> increase in political rhetoric about immigration and increased confidentiality
>
> concerns) and Census Bureau research on difficulty of convincing individuals
>
> with confidentiality concerns to participate.  Nov. 5 Trial Tr. at 81:7-15; PX-365.

    b.   The Census Bureau analyses presented in PX-22 (AR) and PX-162 relied on matching ACS and Census Bureau data, and noncitizens are more likely to be missing from one or both sets of data. Nov. 5 Trial Tr. at 84:5-15; PX-22 (AR); PX-162; Nov. 15 Trial Tr. at 1403:10–1404:3.

    c.   Census Bureau analyses in PX-22 and certain analysis in PX-162 assumed that individuals whose citizenship information was missing from the administrative data were assumed to be citizens. Nov. 5 Trial Tr. at 85:5-6.

    d.   The Census Bureau analyses controlled for a number of factors in their modeling assumptions that are aligned with people who may have confidentiality concerns (such as non-English speakers), such that the Census Bureau's exclusion of them from the model would blunt the impact. Nov. 5 Trial Tr. at 86:18-20, 87:6-11; PX-162 at 37-39; Tables A13, A14.

## F.    The Macro-Environment

1060.  The current macro-environment further confirms the likelihood that a citizenship question will likely decrease self-response rates in the 2020 Decennial Census at a substantial rate.

1061.  The Census Bureau admits that the macro-environment, part of which is the political environment within which a Census is taken, can affect response rates. Nov. 13 Trial Tr. at 926:21-23.

1062.  The current political environment around immigration amplifies the effect of a citizenship question on response rates as compared to response rates in 2016. *Id.* at 927:5-10.

### 1.    CBAMS Results

1063.  Research conducted by the Census Bureau confirms that the current macro-environment has intensified fears relating to a citizenship question.  From February through May 2018 the Census Bureau conducted the "Census Barriers, Attitudes, and Motivators Survey" (CBAMS),

which is designed to provide the Census Bureau with information on the macro- environment. PX-161; PX-152; Nov. 13 Trial Tr. at 927:18-24.

1064.  The CBAMS consists of a survey of 50,000 households and a series of 42 focus groups designed to inform the Census Bureau's integrated partnership and communications program. Nov. 13 Trial Tr. at 927:25–928:11; PX-152; PX-662; Census Bureau 30(b)(6) Dep. Vol. II at 437:6–438:16.

1065.  During the CBAMS, Census Bureau researchers asked about a citizenship question in 30 out of 42 focus groups, including all Spanish-language focus groups. PX-163 at 6; PX-152; Nov. 13 Trial Tr. at 930:16-19.

1066.  The PowerPoint containing this focus group finding was presented to Undersecretary Kelley and Secretary Ross in September 2018. PX-163; Nov. 13 Trial Tr. at 928:20–929:16; Census Bureau 30(b)(6) Dep. Vol. II at 445:5-18, 448:5-17.

1067.  The CBAMS reflect how respondents' fear of deportation influenced their response to a census that included a citizenship question. For example, during the Spanish (U.S. Mainland) focus groups, "[m]ost participants said that though they personally are citizens or legal residents and are not afraid to answer the citizenship question, they know many others who will not fill out the question or the form altogether out of fear.  While all participants expressed the desire to be counted, fear of deportation outweighs any benefit." PX-152 at 22; Nov. 13 Trial Tr. at 933:24–934:7; Census Bureau 30(b)(6) Dep. Vol. II at 449:5–13, 449:21–451:9

1068.  The Census Bureau believes that this focus group result is an indication that a citizenship question is viewed as extremely problematic for the Hispanic population.  Nov. 13 Trial Tr. at 934:8–12.

1069.  The CBAMS reflected similar results for other immigrant and non-white communities. Nov. 13 Trial Tr. at 930:09–24, 938:22–939:17, 940:04–941:14

1070.  Participants from the Middle East and North African focus group stated that they understood that census responses are confidential, but "indicated a fear that this could change," and are therefore less likely to self-respond. PX-152 at 13; Census Bureau 30(b)(6) Dep. Vol. II at 457:12–458:13.

1071.  Participants in the Chinese (Mandarin and Cantonese) focus group expressed a reluctance to report on others outside of their immediate families, thus making the use of neighbors as proxies in these communities difficult. PX-152 at 7; Census Bureau 30(b)(6) Dep. Vol. II at 458:15–459:14.

1072.  Participants in the Native Hawaiian and Pacific Islander focus group expressed reluctance to provide a census response for every member of their household out of concern that their landlords might learn how many people are staying there, thus making the use of landlords as proxies in these communities difficult. PX-152 at 16; Census Bureau 30(b)(6) Dep. Vol. II at 461:2–21.

1073.  The Census Bureau acknowledges that with a citizenship question, people who are afraid of deportation will be an extremely difficult group to count.  Nov. 13 Trial Tr. at 934:13–936:13.

1074.  The focus group results also demonstrate that members of the Hispanic community would be more likely to self-respond if there was not a citizenship question on the 2020 Decennial Census. Nov. 13 Trial Tr. at 936:14–937:4.

1075.  Director Jarmin has acknowledged the new challenges that a citizenship question presents to the Census Bureau. Supp. Vargas Aff. (Docket No. 498-22) ¶ 8.

1076.  In an October 31, 2018 presentation about the CBAMS results, the Census Bureau revealed that 10% of respondents to the CBAMS believe that the 2020 Decennial Census will be used to locate people living in the country without documentation, while 37% are unsure whether the Census will be used in that manner. PX-662 at 20; Nov. 13 Trial Tr. at 938:14-21.

1077.  The Census Bureau found that 41% of both Asian respondents and Limited English Proficient respondents expressed concerns about confidentiality in the CBAMS, and 34% of Hispanics expressed these concerns. PX-662 at 30, 58; Nov. 13 Trial Tr. at 940:4-9.

1078.  The Census Bureau found that 37% of Limited English Proficient respondents, and 36% of those responding in Spanish expressed concerns about data sharing of Census responses with other government agencies.  In addition, 32% of foreign-born respondents, and 32% of Hispanic respondents expressed similar concerns. PX-662 at 32.

1079.  The Census Bureau found that 41% of Asian respondents fear that their Census responses will be used against them, as did 39% of foreign-born respondents, 34% of those responding in Spanish, and 33% of Hispanics. PX-662 at 36, 58; Nov. 13 Trial Tr. at 941:2-14.

1080.  The Census Bureau further noted that "the citizenship question may be a major barrier", and that participants in focus group testing expressed concerns that the purpose of the question is "to find undocumented immigrants" and that the "political discourse is targeting their ethnic group." PX-662 at 43; Nov. 13 Trial Tr. at 941:15–942:3; Supp. Vargas Aff. ¶ 9.

1081.  For Hispanic participants in focus groups, the Census Bureau noted that they "expressed intense fear that information will be shared with other government agencies to help them find undocumented immigrants.  Participants worried that their participation in the census could harm them personally or others in their communities/households they care about." PX-662 at 58; Nov. 13 Trial Tr. at 943:14-21.

1082.  The CBAMS research suggests that a citizenship question is particularly sensitive in the current macro-environment.  Nov. 13 Trial Tr. at 944:7-14.

1083.  The sensitivity to a citizenship question that is reflected in the CBAMS research is not captured in the Census Bureau's estimate of a 5.8% decrease in self-response, which is based on 2016 data. Nov. 13 Trial Tr. at 944:25-945:5.

### 2. Center of Survey Measurement Memoranda

1084.  In addition to the CBAMS, the former Center for Survey Measurement at the Census Bureau also found concerns about confidentiality during focus group testing in 2017 that suggest issues in the macro-environment. PX-136 (AR); PX-448.

1085.  Researchers at the Center for Survey Measurement summarized several issues relating to "Respondent Confidentiality Concerns," in a memorandum for the Associate Directorate for Research and Methodology at the Census Bureau, dated September 20, 2017, and a subsequent presentation, dated November 2, 2017. PX-136 (AR), PX-448.

1086.  The researchers noted that during Census Bureau pretesting in 2017, they found "fears, particularly among immigrant respondents, have increased markedly this year." PX-136 (AR).

1087.  In addition, the researchers noted a "[r]ecent increase in respondents spontaneously expressing concerns to researchers and field staff about confidentiality and data access relating to immigration." PX-448 at 2.

1088.  During focus group testing, the researchers found that respondents expressed "fear of deportation, concern about how the data are used, and which agencies can see it (DHS? ICE?)." PX-448 at 9.

1089.  The researchers also noted that the behavioral changes were recent, quoting one Census Bureau interviewer who reported that "[t]hree years ago was so much easier to get respondents

compared to now because of the government changes . . . and trust factors . . . Three years ago I didn't have problems with the immigration questions." PX-448 at 13.

1090.  The findings from the CBAMS and Center for Survey Measurement research suggest that the sensitivity of a citizenship question is increasing in the current political environment.

### 3. Plaintiffs' Experts Agree that the Current Macro-Environment Heightens Concerns that a Citizenship Question will Substantially Reduce Response Rates

1091.  As set forth above, Dr. Barreto testified that the existence of a hostile macro-environment on issues relating to immigration enforcement could be expected to drive down self-response rates on the 2020 Decennial Census among Latinos and immigrants. Nov. 9 Trial Tr. at 612-617.

1092.  Dr. Hillygus also testified to the existence of a climate of fear of deportation among Hispanics and noncitizens, noting that a recent Pew Research Center public opinion poll showed that 47% of Hispanics polled say, "regardless of their own immigration or citizenship status, they worry a lot or some that they, a family, or close member could be deported," while 52% of foreign-born citizens and 66% of noncitizens expressed the same belief.  Nov. 5. Trial Tr. at 52:11-21.  Dr. Hillygus also testified about a recent UCLA survey of both Latinos and whites showed that 56% of Latinos surveyed were concerned about deportation, while only 19% of whites were.  Nov. 5 Trial Tr. at 53:17-20.

1093.  In addition to the survey evidence of a hostile macro-environment on immigration issues, Dr. Hillygus also relied on impact evidence, examining behaviors of Latinos and noncitizens relating to their willingness to interact with government programs as evidence of their levels of concern. Nov. 5 Trial Tr. at 54.  For example, she testified:

- that research conducted by health advocacy organizations that "legal immigrants are less likely to use public health services since Trump's election," and that

noncitizen parents are failing to sign their children up for those services for fear of revealing themselves.  Nov. 5 Trial Tr. at 53-54.

- that fear of deportation had a chilling effect on willingness to use WIC in families with mixed citizenship status, and is therefore "preventing U.S. children from receiving aid."  Nov. 5 Trial Tr. at 55:7-25.

- that a National Bureau of Economic Research study shows that, due to fear related to deportations, even Hispanic citizens who are not themselves at risk of deportation are nonetheless less likely to use SNAP or enroll with the ACA. Nov. 5 Trial Tr. at 56:7-25.

1094.  The combination of survey evidence and impact evidence about the climate of fear among Latinos and noncitizens makes it likely that inclusion of a citizenship question on the 2020 Decennial Census would have "an impact not only among noncitizens but also the spillover effects on Hispanics." Nov. 5 Trial Tr. at 57:6-7.

## VIII.   EFFECT OF A CITIZENSHIP QUESTION ON UNDERCOUNT

1095.  Establishing that there will be an undercount is relevant to certain, but not all, of Plaintiffs' claims of standing.

1096.  In particular, establishing that there will be a statewide net differential undercount is relevant to Plaintiffs' injuries about diminishment of federal political power (relative to apportionment of federal representatives and Electoral College electors).  *See* PFOF X.C.1.  And establishing that there will be a statewide net differential undercount is relevant to the State Governmental Plaintiffs' claims about claims about loss of federal funding, and NGO Plaintiffs' claims of loss of federal funding. *See* PFOF X.C.2.a & b.

1097.  Establishing that there will be a net differential undercount within states or local geographies is relevant to Plaintiffs' claims about diminishment of political power at the state or local level. *See* PFOF X.C.1.

1098.  Establishing that there will be a net differential undercount is not necessary to establish Plaintiffs' injuries that flow from the impact of a citizenship question on data quality or data privacy issues.  As discussed in PFOF X.D, the quality of Census data has a direct impact on funding and resource allocation issues.  And as discussed in PFOF.X.E, respondent data privacy is implicated by both the use of the Census to collect citizenship data and the plans to publish PL-94-171 data at the granular block level.

1099.  Establishing that there will be a net differential undercount is not necessary to establish Plaintiffs' injuries related to a citizenship question stemming from the diversion of their resources (in terms of expenditures, staff time, and resources) in their capacity as "trusted voices" to promote participation in the Census. *See infra* PFOF X.A.

1100.  Establishing that there will be a net differential undercount for non-citizens, racial or ethnic minorities is relevant to the NYIC's Plaintiffs' Fifth Amendment claim.

### A. Hard-to-Count Populations and Undercount

1101.  The Census always fails to count some people. Census Bureau 30(b)(6) Dep. Tr. Vol. I  at 253:20-254:4; Nov. 15 Trial Tr. at 1362 (Abowd).

1102.  Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count." Docket No. 480-1 at ¶ 21.

1103.   Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census. Docket No. 480-1 at ¶ 22.

1104.   Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census. Docket No. 480-1 at ¶ 23.

1105.   The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals. Docket No. 480-1 at ¶ 24.

1106.   The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. Docket No. 480-1 at ¶ 25.

1107.   Dr. Abowd acknowledged that either a 5.1 or a 5.8 percent decline in non-citizen self-response would result in millions of additional individuals going into non-response follow up operations. Nov. 13 Trial Tr. at 894:1-895:2.

1108.   Dr. Barreto testified that "due to the citizenship question, there will be heightened concerns and trust issues related to confidentiality and that these concerns will make the NRFU process less successful in 2020." Nov. 9 Trial Tr. at 621:15-615:20.

1109.   Dr. Barreto explained that trust and sensitivity concerns around a citizenship question would have differential impacts: "for some groups, the NRFU process this year might be as successful in previous years. They may feel no change. . . But for other groups who feel that the question is sensitive and is putting them at risk, it is expected to be far less successful. So not only do I think overall NRFU will be more challenging and less successful, but there will be a

differential success rate, and in particular, Latino and immigrant communities are expected to have less NRFU success." Nov. 9 Trial Tr. at 621:21-622:8.

1110.  Dr. Barreto based his opinion, in part, on a review of relevant social science research. Nov. 9 Trial Tr. at 593:6-595:16.

1111.  The social science research relied on by Dr. Barreto in forming his opinion involved more than fifty sources, *see* PX 389, PX-420 to PX-450 and PX-452 to PX-478, and included:

    a.    Census Bureau research work by Manuel de la Puente examining the 1990 and 2000 census undercounts of the Hispanic and immigrant communities. De la Puente recognized that "trust and concerns over immigration status remained barriers to participation in Latino and immigrant communities, and he continued to note an undercount and difficulties in the NRFU process in successfully implementing the census in these communities." Nov. 9 Trial Tr. at 608:2-609:22; PX-430; PX 431.

    b.    A 2018 Census Bureau study by Brown, et al. which "concluded that there would not only be a lower self-response rate due to the citizenship question, but that this would affect NRFU as well. This . . . perceived negative environment would follow through all the way through the NRFU process, leading people to be less likely to participate and interact with field staff." Nov. 9 Trial Tr. at 635:8-637:5; PX-162.

    c.    A 2017 study by Terry, et al. which found a direct link between increased immigration enforcement and lower enumeration and less effective NRFU in the presence of that increased immigration enforcement. "The main take-away is that if people are choosing to not participate in the census, if they are pulling

themselves out due to a threatening context . . . NRFU cannot fix that because that
. . . threat is still there. So whatever problems we have in lowering the self-report
will stay for those same communities and we will have problems with NRFU."
Nov 9 Trial Tr. at 635:8-637:5; PX-385.

1112.  Dr. Hillygus testified that adding "a citizenship question is going to make conducting the
census a heck of a lot more difficult because of concerns about confidentiality among noncitizens
and Hispanics." Nov. 5 Trial Tr. at 67:10-12.

1113.  Dr. Hillygus cites social science research supporting her conclusion, noting that Census
Bureau's ethnographic research has found that fear of deportation, cultural resistance to
government compliance, language barriers, and complex households all contribute to the
differential undercounts of racial and ethnic groups. PX-390 at 68-70.

### B.  The Parties' Responses to the Expected Undercount

1114.  The Census Bureau has developed a range of strategies to address the net differential
undercount of "hard-to-count" populations—including targeted marketing and outreach efforts,
partnerships with community organizations, deployment of field staff to follow up with
individuals who do not respond, and retention of staff with foreign language skills. Docket No.
480-1 at ¶ 26.

1115.  All parties expect to expend significant resources to mitigate the expected net differential
undercount.

1116.  The NGO Plaintiffs' efforts, which will divert resources from other organizational
priorities, are described at PFOF X.A.

1117.  The NGO Plaintiffs do not expect their efforts will prevent the material net differential
undercount resulting from the addition of a citizenship question. PFOF X.A.

1118.  The Governmental Plaintiffs' efforts, which will divert resources from other funding needs, are described at PFOF X.B.

1119.  The Governmental Plaintiffs do not expect their efforts will prevent a material net differential undercount resulting from the addition of a citizenship question. PFOF X.B.

1120.  Through their expert testimony, Defendants' position is that they expect to be able to mitigate the decline in self-response through the integrated communications campaign and their non-response follow up operations ("NRFU"). Nov. 14 Trial Tr. at 1113:18-111-8.

1121.  Plaintiffs' and Defendants' experts agree that neither the integrated communications campaign nor the Census Bureau's NRFU operations will fully mitigate the decline in non-citizen and Hispanic self-response, nor will they eliminate the net differential undercount. Nov. 15 Trial Tr. at 1357:4-14 (Abowd).  Among other reasons, Dr. Hillygus testified:

   a.   The Census Bureau CBAMS focus groups found that Spanish language and immigrant respondents were concerned about confidentiality and that "there does not seem to be a single trusted voice that could mitigate the distrust of the government to uphold the promise of confidentiality." Nov. 5 Trial Tr. at 66:4-6; PX-152, PX-662 & PX-663.

   b.   "[C]ommunication scholars recognize that reaching the public is incredibly difficult and more difficult today than it was in 2010. We have a fragmented media environment, so simply even getting the message out is more complicated today than it was in previous censuses." Nov. 5 Trial Tr. at 91:20-24.

   c.   The Census Bureau "planned to do considerable research to be able to have a more effective communication campaign [for the 2020 Decennial Census], and that was eliminated, including being eliminated from the 2018 end-to-end test,

and so [the Census Bureau] are going in without . . . a robust set of evidence backing up their communications campaign." Nov. 5 Trial Tr. at 91:25-92:6.

      d.     Census Bureau research (including PX-365) suggests that confidentiality concerns (such as those implicated by a citizenship question) "can be especially difficult to move in terms of any outreach . . . you couldn't kind of message your way out of those concerns." Nov. 5 Trial Tr. at 81:16-18, 81:22-23; PX-365.

1122.  Dr. Barreto testified that a "citizenship question, coupled with the political environment that immigrants perceive, will make it very difficult for census enumerators to convince people to participate, and that this will remain a very low participation rate, not only of the self-response, but throughout the entire NRFU process. That will result in an undercount of many in the Latino and immigrant community." Nov. 9 Trial Tr. at 644:1-7.

1123.  These concerns are becoming more acute. As Dr. Barreto discussed, a 2017 presentation by the Center for Survey Measurement (CSM) reflected increasing concern regarding confidentiality, particularly around immigration issues, posing serious barriers for NRFU operations. Nov. 9 Trial Tr. at 625:24-626:24, 630:6-630:24; PX-448.

1124.  Dr. Abowd conceded that if there were a citizenship question on the census, the trusted partners that the Census Bureau relies on to carry forth the message that it is important to participate in the census would have additional challenges communicating that message. Nov. 13 Trial Tr. at 937:16-23.

1125.  And Dr. Abowd testified that "it would either be very or extremely difficult to mitigate the citizenship question consequences in 2020 . . . because of the macro-environment." Nov. 14 Trial Tr. at 1159:4-8.

### C. The Defendants' Planned Integrated Communications and Partnership Campaign

1126. Although Defendants' expert noted the importance of the integrated communications and partnership campaign, Secretary Ross' decisional memo does not cite or otherwise discuss the impact of the integrated communications and partnership campaign. PX-26 (AR).

1127. In particular, Secretary Ross' decisional memo does not claim that the integrated communications campaign will either mitigate the impact of a citizenship question in reducing self-response or in promoting the efficacy of Defendants' non-response follow up efforts. PX-26 (AR).

1128. There is no evidence in the Administrative Record about Defendants' planned integrated communications (planned advertising campaign) or partnership campaign for the 2020 Decennial Census. PX-1 to PX-14 (AR).

1129. There is no evidence in the Administrative Record that Defendants' planned integrated communications and partnership campaign will mitigate the expected reduction in self-response due to the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14 (AR).

1130. There is no evidence in the Administrative Record that Defendants' planned integrated communications campaign will foster cooperation with the Census, the Census' non-response follow up operations, or that such efforts will mitigate or eliminate the undercount due to the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14 (AR).

1131. In the 2000 and 2010 Decennial Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness. Docket No. 480-1 at 27.

1132.  Former Census Bureau Director John Thompson testified about the importance of the integrated communications and partnership campaign in the 2000 and 2010 Censuses, noting that it was a "key component" to reducing undercounts relative to the 1990 Census because it helped "deliver a message to hard-to-count populations that the census is important to their community, that the data collected through the census is completely confidential and that no individual's information is shared with any other organization or law enforcement entity." Thompson Aff. (Docket No. 516-1) ¶ 99.

1133.  For the 2000 and 2010 Decennial Censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count. Docket No. 480-1 at ¶ 28.

1134.  Mr. Thompson further testified that the communications and partnership campaign "was responsible for dramatic gains in the accuracy and coverage of the 2000 and 2010 Decennial Census relative to the 1990 Census, which did not include such a program" and his opinion was that "one of the reasons for the success of these efforts is that it worked to help gain people's trust and that by gaining people's trust, the Census Bureau was able to obtain better Decennial Census participation."  Thompson Aff. ¶¶ 100-101.

1135.  Dr. Abowd testified that a key component of the Census Bureau's strategy for enumerating households that are reluctant to interact with enumerators is the integrated partnership and communications program. Nov. 14 Trial Tr. at 1187:25-1188:10.

1136.  There is no information in the Administrative Record that the planned advertising campaign for the 2020 Decennial Census is materially different from the advertising campaigns

in the 2000 or 2010 Censuses that failed to eliminate the differential undercounts in those Censuses between Hispanics and non-Hispanic whites. PX-1 to PX-14 (AR).

1137. There is no information in the Administrative Record that the planned partnership campaign for the 2020 Decennial Census is materially different from the partnership campaigns in the 2000 or 2010 Censuses that failed to eliminate the differential undercounts in those Censuses between Hispanics and non-Hispanic whites. PX-1 to PX-14 (AR).

1138. With regard to the partnership campaign, Dr. Abowd testified about the "trusted voices" campaign, where community voices with whom the census partners carry forward a message that census participation is safe and important, and confirmed that the trusted voices campaign is a key part of the Census Bureau's efforts to mitigate the decline in self-response. Nov. 14 Trial Tr. at 1304:5-13; Nov. 15 Trial Tr. at 1382:17-23. In his testimony, Dr. Abowd testified about several "trusted voices"—including the National Association of Latino Elected Officials (NALEO), the National Conference of American Indians (NCAI), and the Leadership Conference on Civil and Human Rights. Nov. 14 Trial Tr. at 1304:14-1305:9.

1139. The Administrative Record includes materials reflecting the opposition of NALEO, NCAI, the Leadership Conference, and many other census partners to the addition of a citizenship question. PX-1 at AR 773-775, 778-779, 1239-1240 (AR).

1140. For example, on January 4, the Leadership Conference on Civil and Human Rights wrote to Secretary Ross that adding a citizenship question would be "unnecessarily intrusive and will raise questions in all households—native and foreign born, citizen and noncitizens—about the confidentiality of information provided to the government and how government authorities might use that information. Asking every household and every person in the country about their

citizenship status in the current political environment . . . will no doubt give many people pause about participating in the census altogether." PX-1 at AR 774 (AR).

1141.  In a follow up letter on January 10 sent on behalf of 167 organizations, the Leadership Conference warned "there are many mixed status households in the United States, which include members who are both citizens and non-citizens with various legal statuses. Mixed-status and immigrant households will be especially fearful of providing information to the federal government in 2020, given the heightened climate of fear that anti-immigrant rhetoric and policies have created." PX-1 at AR 799 (AR).

1142.  In addition to the letter in the Administrative Record, NALEO's Chief Executive Officer Arturo Vargas testified that he advised Secretary Ross on March 13 that (i) the Center for Survey Measurement had recently documented challenges the Census Bureau staff had documented challenges the Census Bureau staff had in securing the participation and trust of immigrants, and (ii) that several NALEO members had expressed that they would not encourage their constituents to complete their census forms if a citizenship question is added for fear that the Trump Administration would use the information against them. Vargas Aff. (Docket No 498-21) at ¶ 21.

1143.  The Administrative Record documentation of Secretary Ross' March 13 communication with Mr. Vargas fails to document their discussion of the Center for Survey Management findings. PX-1 at AR 1213 (AR).

1144.  Mr. Vargas also testified that although NALEO is a "trusted messenger" and will cooperate with the Census Bureau, that NALEO's messaging strategy research "has shown that individuals are scared to answer the citizenship question for fear of disclosure of that information to other government entities." Vargas Aff. ¶ 25. Mr. Vargas further testified that "it is not clear

how we should advise our members in terms of messaging and processes related to non-response

follow up, as we have received no direction on this from the Census Bureau." *Id.*

1145.  Other organizations (including the non-governmental plaintiff organizations) that have

served in the past and plan to serve as "trusted voices" in the Census have uniformly expressed

that the addition of a citizenship question will negatively impact their ability to persuade

Hispanics and immigrant communities to participate in the Census. *See* PFOF III.I; PFOF X.A.

1146.  Organizations who are not formally "trusted voices," but who are conducting critical

outreach on the Decennial Census have also expressed challenges in overcoming the reluctance

in immigrant communities to fill out the citizenship question, as well as an overall confusion on

messaging due to a lack of direction from the Census Bureau. Cullinane Aff. (Docket No. 505-2)

¶¶ 3-11, Sarmiento Aff. (Docket Nos. 488-3 & 488-4) ¶¶ 6-10, Rodriguez Aff. (Docket Nos.

488-1 & 488-2) ¶¶ 8-12.

1147.  Former Census Bureau Director Thompson testified that his opinion was that the

integrated communications and partnership campaign would "not work as well for the 2020

Census because of this issue of trust. If you cannot gain people's trust, you cannot get out a

message that will compel people to respond to the Census." Thompson Aff. ¶ 101.

1148.  Dr. Hillygus testified that it will "be incredibly difficult for this outreach campaign to be

effective at overcoming their predicted differential self-response." Nov. 5 Trial Tr. at 91:14-16.

1149.  Dr. Hillygus further testified that the reason that these campaigns would have limited

effect is that the barriers to participating in the census caused by the addition of a citizenship

question are not like other participatory barriers, but are driven by concerns about

confidentiality, making them particularly hard to overcome. Nov. 5 Trial Tr. at 81-82.

1150.  Dr. Barreto also testified that he did not believe Defendants' communication plan will be effective in 2020 "as a direct result of the citizenship question being added to the census." Nov. 9 Trial Tr. at 696:24-697:4. He explained that "many of the important trusted partners that the census has identified are actually quite concerned and skeptical right now of the citizenship question," and that they will "not be as effective in getting the word out in the community." Nov. 9 Trial Tr. at 697:12-697:22; 698:10-699:2.

1151.  In sum, as Dr. Barreto explained, "the communications plan and the work with the trusted partners is very tenuous at this point. The partners are very concerned themselves about this, and it is not at all clear to me that these trusted partners will be effective—even if they do work with the census, they will be able to convince people to participate." Nov. 9 Trial Tr. at 699:3-699:10.

1152.  The Census Bureau's Barriers Attitudes and Motivators Survey (CBAMS) research confirms that the integrated communications and partnership campaign will not be effective in overcoming the decision to not participate in the census due to a citizenship question. PX-15, PX-662.

1153.  For example, Census Bureau research has noted that one messaging strategy that has been critical to prior integrated communications and partnership campaigns aimed at Hispanics is that the Census does not inquire about immigration status, i.e., "None of the questions in this survey will ask about immigration status."  PX-160 at 16.  This message would not be accurate or effective if a citizenship question is asked on the Decennial Census.

1154.  Similarly, CBAMS focus groups of Spanish language participants found there was not a single trusted voice that could mitigate their distrust of the government to uphold the promise of confidentially. PX-15 at 22.

1155.  Dr. Abowd agreed that the CBAMS research "suggests a particularly difficult macro environment for a census questionnaire with a citizenship question on it." Nov. 14 Trial Tr. at 1259:3-7.

1156.  The Census Bureau admitted that if there is "a citizenship question on the decennial census, trusted partners will have additional challenges in convincing this [immigrant] community to participate." Census Bureau 30(b)(6) Dep. Vol. II at 451-453, 462 (objection).

### D.  Household and Household Member Omissions - There is Agreement that Not All Individuals Missed in the Census Will Be Covered by NRFU Processes

1157.  Households are included in NRFU only if they are included within the Master Address File ("MAF"). Nov. 6 Trial Tr. at 290:19-21.

1158.  As Dr. Salvo explained, "the address list is the foundation for the decennial census. If you do not have an address that is on the Census Bureau's master address file (MAF), you cannot be enumerated." *Id.*

1159.  Similarly, NRFU efforts do not capture households whose addresses were not in the Census Bureau's Master Address File (MAF), which Dr. Hillygus testified is "likely to miss" hard-to-count populations. Nov. 5 Trial Tr. at 103:21-104:6.

1160.  Likewise, Dr. Salvo testified that "hidden units"—often in small, multi-unit buildings— are not always captured by the MAF.  Nov. 6 Trial Tr. at 296:25-297:09, 338:17-339:08.

1161.  Census Bureau research has concluded that one reason for an undercount of noncitizen and Hispanic households is that they live in unusual or concealed housing units that are not in the MAF and that the MAF is more likely to miss non-citizens and ethnic and racial minorities who are more likely to live in complex housing situations. PX-389; PX-390 at 70.

1162.  Dr. Hillygus testified that the role of the MAF in determining which individuals are included in NRFU was one of the features of NRFU that may exacerbate the differential

undercount because there is "potential for individuals to respond who are not in the master address file . . . to go onto the Internet and/or make a phone call and make sure that you're counted. That requires self-motivation . . . and it seems unlikely that that option will be used by noncitizens or those concerned about the confidentiality . . . it could potentially . . . exacerbate [the undercount]." Nov. 5 Trial Tr.131:9-24.

1163.  Dr. Salvo similarly testified that the MAF is not foolproof; to the contrary, the Census Bureau has historically struggled with the erroneous designation of occupied units as vacant. For example, during the 2010 Census, there were a large number of discrepancies between the determination of occupancy status in NRFU and in the Vacant   Delete Check operation (intended to verify the occupancy status of units classified in NRFU as deletes) in Northwestern Queens and Southern Brooklyn, demonstrating that NRFU operations had significantly overstated the number of vacant addresses in these areas. Nov. 6 Trial Tr. at 308:21-309:15, 350:24-353:12, 451:06-21.

1164.  There is additional evidence of some populations being undercounted because they are left out of both the self-response and the NRFU processes. Census Bureau research has acknowledged a significant problem with the counts of young children. PX-346; PX-378; PX-381; PX-410; Nov. 6 Trial Tr. at 383:07-22. For example, the undercount of children under the age of 5 in the 2010 census was 4.6% even though there was an overcount of adults in the 2010 Census. PX-346 at 4. Among other issues, the Census Bureau found that one reason for this undercount is "Fear of government, political factors, or respondent fatigue may cause a household respondent to intentionally leave a child off the roster." *Id.* at 6.

1165.  Additionally, Dr. Hillygus testified that experimental and ethnographic research has found deliberate concealment of household members based on "concerns about confidentiality,

deportation, and their general trust in government." Nov. 5 Trial Tr. at 125-126; PX-385 at 11;

PX-390 at 70.

1166. In a specific discussion of NRFU field operations among Hispanic respondents, for

instance, researchers explained that "some proxy respondents resisted the interview by providing

data that seemed inaccurate or incomplete just to comply with the interview." PX-385 at 11.

1167. This research suggests that noncitizens and Hispanics might systematically underreport

household size to enumerators, and increased confidentiality concerns associated with the

addition of a citizenship question could exacerbate such underreporting. Nov. 5 Trial Tr. at 124-

125.

1168. The Census has historically undercounted Hispanics in part because of the failure of

Hispanic households to provide a response for every member of their households. Census Bureau

30(b)(6) Dep. Vol. II at 394:7-20; Nov. 14 Trial Tr. at 1306 (Abowd).

1169. The Census Bureau's internal research is consistent with the notion that a citizenship

question will "cause an incremental increase in the number of households that respond to the

census but don't provide a response for every member of the household." Census Bureau

30(b)(6) Dep. Vol. II at 396:2-11; Nov. 14 Trial Tr. at 1308-09 (Abowd).

1170. If a household omits one or members in its census response, the Census Bureau will not

conduct NRFU efforts to enumerate those individuals. Census Bureau 30(b)(6) Dep. Vol. II. at

397:19-399:2; Nov. 14 Trial Tr. at 1309-10 (Abowd).

1171. There is nothing in current Census protocols to address situations where a household

provides a response but does not include every member of the household. Census Bureau

30(b)(6) Oct. 5 Dep. Tr. at 459:21 - 460:15; Nov. 14 Trial Tr. at 1310 (Abowd).

### E.     The Defendants' Planned Non-Response Follow-up (NRFU) Operations

1172.  Nonresponse Follow-up (NRFU) is the process by which the Census Bureau attempts to collect information from households that do not self-respond to the census questionnaire. The parties have stipulated on the basic planned components of NRFU for the 2020 Decennial Census. Docket No. 480-1 at ¶¶ 8-13; PX-655.

1173.  If the Census Bureau does not receive a response to the questionnaire, it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data. Docket No. 480-1 at ¶ 8.

1174.  If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. Docket No. 480-1 at ¶ 9.

1175.  For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person. Docket No. 480-1 at ¶ 10.

1176.  If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." Docket No. 480-1 at ¶ 11.

1177.  A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. Docket No. 480-1 at ¶ 12.

1178.  For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview. Docket No. 480-1 at ¶ 13.

1179.  If the Census Bureau is unable to find a proxy, it will impute the "count" or number of members of the household, as well as the demographic characteristics of the individual residents. PX-655.

### 1.       The Limitations on NRFU to Address Undercount in Prior Decennial Censuses

1180.  Of the NRFU processes, the use of in-person enumeration, proxies, and imputation was used in prior censuses, including the 1990, 2000, and 2010 Censuses. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 400:19-401:21; Nov. 5 Trial Tr. at 94:23-95:3 (Hillygus);  Nov. 6 Trial Tr. at 295:23-296:11, 312:22-313:06, 388:19-23 (Salvo).

1181.   The Census Bureau conducted a post-enumeration study after the 2010 Census to estimate how well the 2010 Census covered the total population of the United States. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 399:3 - 400:18; Nov. 14 Trial Tr. at 1362-63 (Abowd).

1182.  The post-enumeration study examined the percentage of racial and ethnic groups omitted and undercounted in the 2010 census and noted that neither omissions nor the undercount is distributed evenly across racial and ethnic groups. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 401:22 - 402:6, 403:21 - 404:21; Nov. 6 Trial Tr. at 393:12-16, 407:10-13, 416:9-23 (Salvo); Nov. 15 Trial Tr. at 1363 (Abowd).

1183.  Blacks and Hispanics had a higher omission rate than non-Hispanic whites in the 2010 Census, and also had a higher undercount rate. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II. at 404:22 - 406:19; Nov. 15 Trial Tr. at 1364-65 (Abowd).

1184.  In the 2010 Census, there were undercounts among particular racial and ethnic groups and also in certain states and localities. PX-267; PX-338; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 406:20 - 407:8; Nov. 6 Trial Tr. at 412:25- 413:2.

1185.  The post-enumeration survey conducted for the 2010 Census determined that, following NRFU and imputation, Hispanics were undercounted by 1.54 percent and non-Hispanic whites

were overcounted by .84 percent, resulting in a net undercount of Hispanics of 2.38 percent. PX-267 at Table 7; Nov. 5 Trial Tr.42:6-13 (Hillygus).

1186.  The post-enumeration survey conducted for the 2000 Census determined that, following NRFU and imputation, Hispanics were undercounted by .71 percent and non-Hispanic whites were overcounted by 1.13 percent, resulting in a net undercount of Hispanics of 1.84 percent. PX-267 at Table 7; Nov. 5 Trial Tr.42:6-17 (Hillygus).

1187.  The post-enumeration survey conducted for the 1990 Census determined that, following NRFU and imputation, Hispanics were undercounted by 4.99 percent and non-Hispanic whites were undercounted by .68 percent, resulting in a net undercount of Hispanics of 4.31 percent. PX-267 at Table 7; Nov. 5 Trial Tr. at 42:6-17 (Hillygus). That survey also found that New York City was undercounted by over three percent. Nov. 6 Trial Tr. at 394:07-11 (Salvo).

1188.  Furthermore, as Dr. Salvo testified, these differential undercounts can manifest at the neighborhood level. Nov. 6 Trial Tr. at 407:10-13, 412:10-413:13, 414:11-20, 416:09-23 452:19-453:07. For example, in the 2010 census, approximately 65,000 individuals were omitted or undercounted in minority neighborhoods of Brooklyn and Queens, both boroughs of New York City. Nov. 6 Trial Tr. at 452:19-453:07. In particular, Dr. Salvo testified that there was an erroneous enumeration of 8.4 percent in non-Hispanic white areas and an omission of over 10 percent in "the black communities of Brooklyn followed by areas with large clusters of Hispanic population." Nov. 6 Trial Tr. at 412:10-413:13, 414:11-20, 452:19-453:07.

1189.  These local inaccuracies at the granular level can be masked at higher levels of geography. For example, in the 2010 census, the net undercount in Brooklyn was effectively zero, but the Census reported that over 10% of the population was omitted and 8.4% was erroneously enumerated. Nov. 6 Trial Tr. at 412:8-15; 414:2-7. The omissions and erroneous enumerations in

Brooklyn likely occurred in different neighborhoods within Brooklyn. Based on the racial and ethnic differential undercount in 2010, it is likely that the 10.4% of omissions in Brooklyn were concentrated "heavily in the black communities of Brooklyn followed by areas with large clusters of Hispanic population." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:11-16. Similarly, the 8.4% of erroneous enumerations were "likely in the non-Hispanic white areas . . . .that tend to show net overcounts." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:17-20.

1190.  Problems resulting from undercounts in particular neighborhoods are not always reflected in borough or city-level net undercount rates. Nov. 6 Trial Tr. at 452:25-453:7. For instances, approximately 65,000 individuals were missed by the Census in 2010 in Brooklyn and Queens as a result of problems with the Census Bureau's vacant-delete check process. Nov. 6 Trial Tr. at 351:22-352:9, 353:18-354:13. This undercount had serious implications on City services dependent on accurate data, including the calculation of vital rates by the New York City Department of Health. Nov. 6 Trial Tr. at 355:14-357:2. However, this undercount was not reflected in the net undercount rates for Brooklyn or Queens in 2010.  PX-338 at 39.

## 2.    The Expected Increase in NRFU Caseload for the 2020 Decennial Census

1191.  In 2010, approximately 219,207,000 out of 300,703,000 persons enumerated, or approximately 73 percent of respondents self-responded to the Census. The remaining cases were sent to NRFU. PX-267 at 32, table 19.

1192.  Any household that does not self-respond is assigned to NRFU. Nov. 5 Trial Tr.; 33:6-9 (Hillygus); Nov. 13 Trial Tr. at 950; Nov. 14 Trial Tr. at 1131:19-24.

1193.  Prior to the addition of a citizenship question, the Census Bureau estimated that self-response rate will decrease to 60.5 percent. PX-1 at 172 (AR); PX-3 at 2401 (AR).

1194. The expected decrease in self-response will result in a direct increase in NRFU cases. Nov. 5 Trial Tr. at 94:13-15; 134:18-24 (Hillygus).

1195. At the time of Secretary Ross' determination, the Census Bureau conservatively estimated that the decline in self-response of 5.1 percent of households containing a non-citizens because of a citizenship question would result in an increased NRFU workload of 630,000 households or 1.6 million persons. PX-22 at 6 (AR).

1196. The Census Bureau conservatively estimates that the addition of a citizenship question this will result in an increase in NRFU workload of 2.09 million households and 6.5 million persons. PX-162 at 42; Nov. 5 Trial Tr. at 94:19-22 (Hillygus).

1197. Dr. Barreto estimated that between 28 and 35 million people would not respond due to a citizenship question on the 2020 Decennial Census and would go into non-response follow up operations, of which a disproportionately high number (10-11 million people) would be Hispanic.  Nov. 9 Trial Tr. at 683-686; PX-675; PX-676.

### 3.   The Relationship Between Reduced Self-Response and Undercount

1198. The Census Bureau has acknowledged that "response rates and net undercount rates may be causally linked." PX-343 at 1.

1199. The Census Bureau Task Force on the Undercount of Young Children similarly concluded that "research suggests that areas with the lowest levels of cooperation have higher levels of coverage and nonresponse error." PX-346 at 5.

1200. Dr. Hillygus testified that there was "an empirical pattern that we have seen in the past . . . [where] we had a differential self-response in the past and we had a differential undercount . . . There's nothing to suggest that, we wouldn't see that same pattern this time." Nov. 5 Trial Tr. at 97:13-17.

1201.  Dr. Hillygus testified that areas with lower self-response rates have more census omissions, and that there is post enumeration survey evidence to support this fact. Nov. 5 Trial Tr. at 123:9-24; PX 414 at 2.

1202.  Dr. William O'Hare testified that prior censuses demonstrated that there is a "close connection between lower self-response rates and higher net undercount rates" such that "the Census Bureau's expected decrease of at least 5.1 percentage points in the self-response rate for households with at least one noncitizen because of the citizenship question will increase the net undercount and omission rates for people living in those households." O'Hare Aff. (Docket No. 507-1) ¶ 9.

1203.  Dr. O'Hare found a moderate to high correlation between self-response rates and net undercounts for all demographic groups in each of the last three censuses. O'Hare Aff. ¶¶ 47-48.

1204.  Dr. O'Hare testified social scientists typically look for four elements to show causation: (i) that the causal agent occurs prior in time to the thing that it is causing; (ii) that there is an association or correlation between the causal agent and the thing being caused; (iii) that intervening mechanisms between the independent variable and the dependent variable can be specified; and (iv) that other potential explanations have been controlled. O'Hare Aff. ¶ 49.

1205.  Dr. O'Hare testified that three elements of causation are satisfied here: self-response occurs prior in time to net undercounting, it is moderately to highly correlated with net undercounting, and the intervening mechanism is the lower response rate. O'Hare Aff. (Docket No. 507-1) at ¶ 50.

1206.  Dr. Abowd testified that while he does not know the marginal coefficients that he believes are necessary to evaluate the relationship between omissions and undercounts, he acknowledged that it is factually true that in the past increased gross omissions for Hispanics have been offset in

the net undercount calculation by an increase in the erroneous enumerations of whites that get double counted. Nov. 14 Trial Tr. at 1219:13-1220:4.

1207.  It is, therefore, likely that an increase in gross omissions for Hispanics would contribute to an increase in the differential net undercount of Hispanics, consistent with Dr. O'Hare's testimony that there is a correlation between increases in omissions and ultimate differential net undercounts.

1208.  Dr. O'Hare testified that while his analysis does not control for other potential explanations, this could be controlled for through a randomized control trial ("RCT"), which the Census Bureau could have, but has not, performed. O'Hare Aff. ¶ 50.

1209.  Discussing PX-378 and research conducted by Dr. O'Hare, Dr. Hillygus testified that demographic analysis demonstrated that the "census count had systematically underestimated the number of Hispanic young children . . . this is one of those direct links to the differential undercount" and "offers very clear documentation about the undercount of Hispanics and provides links to the undercount as associated with the NRFU operations.  Nov. 5 Trial Tr. at 127:13-128:5.

1210.  Dr. Hillygus further testified that "Again, the Census Bureau agrees that there is going to be a differential self-response of non-citizen households, and this is part of the evidence that leads to my conclusion that they are not going to be able to fully address that differential self-response through NRFU operations." Nov. 5 Trial Tr. at 127:18-24; 129:8-15.

### 4.    Planned NRFU Operations Will Not Totally Eliminate Impact of Reduced Self-Response Resulting in Higher Undercount

1211.  The Census Bureau has not conducted any testing of the efficacy of NRFU operations with a citizenship question, nor has it included evidence of such testing in the Administrative Record. PX-1 to PX-14 (AR); Nov. 14 Trial Tr. at 1303:18-21.

1212.  The Census Bureau has not placed any evidence of the efficacy of NRFU operations in the Administrative Record. PX-1 to PX-14 (AR).

1213.  The Census Bureau has not placed any evidence in the Administrative Record that NRFU operations will be sufficient to address the decline in self-response, the increase in NRFU operations, or the resulting net differential undercount. PX-1 to PX-14 (AR).

1214.  The Census Bureau testified that enumeration errors resulting from a decline in self-response may be unavoidable regardless of how much money the Census Bureau spends on fieldwork. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 380:16 - 381:13; Nov. 15 Trial Tr. at 1337 (Abowd).

1215.  The Census Bureau testified that the macro-environment, including the political context, can affect NRFU efficacy; and it is possible that a citizenship question will exacerbate those effects. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 314:4 - 315:1.

1216.  The Census Bureau's analysis of a citizenship question acknowledged that NRFU may not eliminate undercount, even with unlimited resources, stating that "errors may not be avoidable simply by spending more money on fieldwork. Once a household decided not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on the door." PX-162 at 43 n. 60.

1217.  Former Census Bureau Director Thompson testified that "there is no research cited in the administrative record—and I know of no research outside of the administrative record—to support [Dr. Abowd's] conclusion that despite a lowered self-response rate, NRFU will ensure that there is no undercount . . . [and] the internal Census Bureau analysis [PX-162]. . . raises serious concerns about the accuracy of NRFU procedures for addressing an increase in non-response resulting from the citizenship question." Thompson Aff. ¶ 110-111.

1218.  Dr. Hillygus testified "there are lots of reasons to think that the NRFU operations will fail to correct what is predicted to be a differential self-response rate among noncitizen households, and there are parts of the operation that potentially could even exacerbate things." Nov. 5 Trial Tr. at 96:4-8.

1219.  Dr. Hillygus testified that among other reasons that NRFU will be less effective in 2020 than it was in 2010 is that a citizenship question will be "in a different macro and political environment" and will "be occurring during a presidential election" and "the potential for this to be politicized and for the salience of this to be even more means that the NRFU challenge is even greater in . . . 2020 than even today with respect to a citizenship question." Nov. 5 Trial Tr. at 100:4-12.

1220.  Dr. Barreto testified that "the citizenship question, coupled with the political environment that immigrants perceive, will make it very difficult for census enumerators to convince people to participate, and that this will remain a very low participation rate, not only of the self-response, but throughout the entire NRFU process. That will result in an undercount of many in the Latino and immigrant community." Nov. 9 Trial Tr. at 643:22-644:7.

1221.  Indeed, he testified that differential responsiveness to NRFU might well widen the differential between non-Hispanic white and Latino and immigrant communities: "the enumeration process during NRFU is unlikely to be effective, and instead, it is likely to widen the gap or exacerbate the differential between white and . . . nonimmigrant communities, which may not be threatened and may participate regularly with NRFU, and Latino and immigrant communities who will feel more threatened and will participate at lower rates. So whatever gap or differential we have just at the beginning in self-response, the NRFU process will seek to widen that because where it will be successful will be in those communities that already had a

higher self-response rate, and Latino immigrant communities are likely to further have problems responding." Nov. 9 Trial Tr. at 637:7-637:19.

1222. Dr. Barreto's opinions regarding NRFU were based in part upon his survey, which was designed to "understand why people would or would not participate in the census, and also to evaluate whether or not the NRFU in the imputation process might be successful or not." Nov. 9 Trial Tr. at 650:23-651:1.

1223. Dr. Barreto's survey looked at two components that directly touch on nonresponse follow-up.

1224. First, Dr. Barreto's survey examined the trust and confidence of various communities in the federal government's ability to keep census responses confidential, which is critical to an accurate nonresponse follow-up. Nov. 9 Trial Tr. at 686:12-687:16; PX-677.

1225. Second, Dr. Barreto's survey explored respondents' willingness to participate in a census that included a citizenship question with simulated NRFU procedures; respondents received assurances of confidentiality and were asked again if they would participate in order to observe expected NRFU success. Nov. 9 Trial Tr. at 686:12-687:3.

1226. As detailed in PX-677, assurances of confidentiality were far less effective for Latino and immigrant respondents, suggesting that those households will be more likely refuse to participate during NRFU operations. Nov. 9 Trial Tr. at 688:18-688:25. Dr. Barreto's survey asked respondents in question 2 whether they would respond to a census that included a citizenship question, and then, later in the survey, assured respondents that their census responses would be kept confidential and again asked them whether they would respond to the census.  Nov. 9 Trial Tr. at 686:12-687:20.

a.   For the sample as a whole, 45.2 percent of respondents who had initially refused to respond to a census with a citizenship question agreed to respond to a census with a citizenship question after assurances of confidentiality. PX 677.

b.   For white respondents, 49.5 percent of initial non-responders agreed to respond to a census with a citizenship question after assurances. *Id.*

c.   For Latino respondents, 38.9 percent of non-responders agreed to respond to a census with a citizenship question after assurances. *Id.*

Assurances of confidentiality were therefore significantly less likely to convert Latino respondents from non-responders into responders than they were for white respondents or for the sample as a whole. *Id.*

1227.  However, 89.3% of whites and 80.1% of Latinos were willing to participate in the census after receiving assurances of confidentiality when they were advised that the census would not include a citizenship question.  Nov. 9 Trial Tr. at 687:4-688:15; PX-677.

1228.  Moreover, respondents receiving assurances of confidentiality were much more likely to indicate willingness participate in the census when they were advised that the census would not include a citizenship question, though even then white respondents were significantly more likely to participate than Latinos.  In contrast, when advised that the census did include a citizenship question, even assurances of confidentiality did little to assuage concerns of Latino and immigrant households or elicit their participation.  Nov. 9 Trial Tr. at 687:4-688:15; PX-677.

1229.  Dr. Barreto testified that PX-677 "is very clear evidence that in the presence of a citizenship question, significantly less people are going to participate in the NRFU. Nov. 9 Trial Tr. at 689:3-689:11.

1230.  Other analyses performed by Dr. Barreto suggest that "the longer the census is in the field, the longer people are talking about it, the longer there's more information," more people will convert to become non-responders; as Dr. Barreto explained, this finding is "consistent with the social science literature…reviewed, which found that some people may grow suspicious of these follow-up visits and of this additional information." Nov. 9 Trial Tr. at 693:21-695:20; PX-678; PX-679.

1231.  Moreover, these findings corroborate social science research about the expected inadequacies of NRFU, including the Brown memo (PX-162).  Nov. 9 Trial Tr. at 692:1-692:7.

### 5.      The Components of NRFU Will Not Off-Set the Decline in Self-Response.

1232.  Each of the major components of NRFU—in-person enumeration, use of administrative records, proxies, and imputation—have shortcomings that will prevent the components from off-setting the impact of decline in self-response.

### a.      In-person Enumerators

1233.  The Census Bureau noted in the Administrative Record that "those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well. . . ." PX-25 at 4.

1234.  The Census Bureau's subsequent analysis of the "effects of citizenship question on Nonresponse Follow-up" similarly acknowledged that "Households deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door." PX-162 at 41 (COM_DIS 9873); Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 425:3-21; Nov. 15 Trial Tr. at 1336-37 (Abowd).  The Census Bureau's analysis of the "effects of citizenship question on Nonresponse Follow-up" also acknowledged that "If a household declines to self-respond due to the citizenship question, we suspect it would also refuse to

cooperate with an enumerator coming to their door, resulting in a need to use a proxy." PX-162 at 42 n. 59.  Dr. Abowd also testified that the same considerations at play in causing households not to respond to the Census because of a citizenship question will also be at play with respect to enumerator visits.  Nov. 14 Trial Tr. at 1312 (Abowd).

1235.  There is no evidence in the Administrative Record reflecting credible quantitative evidence that someone who chooses not to respond to the 2020 Decennial Census because of a citizenship question will respond at all in a face-to-face encounter with an in-person enumerator. Nov. 15 Trial Tr. at 1336 (Abowd); *see also* PX-1 to PX-14 (AR).

1236.  The Census Bureau testified that it has "no empirical evidence that someone who chooses not to self-respond to the citizenship question would respond in a face-to-face interaction with a census enumerator." Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 251:15-21.

1237.  In contrast, the Administrative Record does contain an analysis of "computer-assisted personal interview" (CAPI) which is the in-person non-response follow up used for the ACS, that was conducted in conjunction with preparing the January 19 memorandum.  PX-155 (AR). This analysis shows that for the census tracts with the highest percentages of non-citizen households (i) participation in the ACS has been decreasing, and (ii) non-response follow-up is less successful.  Census Bureau Aug. 29 30(b)(6) Dep. Tr. at 124-135; PX-155 (AR).  The Census Bureau's analysis of CAPI response rates is consistent with the notion that citizenship questions have become more sensitive on surveys since 2010. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 131:4-11. Given the Census tracts with higher percentages of noncitizen household have lower response rates to the ACS and lower ACS NRFU success, the Census Bureau believes that people who live in census tracts will be less likely to give proxy responses than people who live in other areas. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:2-15.

1238.  The Census Bureau's cost analysis in the Administrative Record similarly assumed that an average of three enumerator visits to enumerate households that do not self-respond to the Census because of a citizenship question, with the authors stating that they "expect that many more of these noncitizen households would receive six NRFU visits." PX-22 at 6 (AR 1282).

1239.  Dr. Abowd testified that he is not aware of any credible quantitative evidence that three visits will, in fact, be sufficient on average to enumerate households that do not respond to Census because of a citizenship question.  Nov. 15 Trial Tr. at 1336 (Abowd).

1240.  In testifying about PX-162, Dr. Hillygus testified that the Census Bureau's analysis confirms that confidentiality issues "are going to matter for the NRFU operations as well" and "the Census Bureau agrees that the concerns raised will affect NRFU" and "the concerns about confidentiality are going to reduce cooperation not only through self-response but also cooperation with NRFU operations." Nov. 5 Trial Tr.98:1-2; 99:4-6; 99:18-21.

1241.  Dr. Hillygus testified that the same issues that result in decreased self-response will impact respondent's willingness to respond to in-person enumerators. Nov. 5 Trial Tr. at 97-98.

1242.  Likewise, Dr. Barreto testified that in-person enumeration could be counterproductive. He explained that "there is a very good chance that the literature that is left behind will create more anxiety and fear in many immigrant communities because it will resemble government monitoring or surveillance, leaving information that somebody from the government was at your doorstep, they're coming to try to find out your household count, your personal information about your household, and that is a strong finding in the literature." Nov. 9, Trial Tr. at 625:4-625:16; *see also* Nov. 9, Trial Tr. at 629:17-630:4; PX-448 at 12 (describing how one household moved after a field staff member dropped off information concerning the enumeration).

1243.  Dr. Hillygus further testified that "there's an extensive research and survey methodology that emphasizes that there's an interaction between . . . how [somebody] respond[s] and willingness to respond depends on the interviewer . . . so with NRFU, you're no longer having somebody self-respond about their household, they're now going to be talking to an enumerator. And the survey methodology research indicates people are less likely to reveal sensitive information when they have to reveal it to a person as opposed to write it on a form." Nov. 5 Trial Tr.100:15-24.

1244.  The Census Bureau similarly testified that none of the testing that has been used to plan NRFU staffing levels has included a citizenship question. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 198:2-10.

1245.  The Census Bureau testified that none of the testing that has been used to project the number of field offices, adequacy of enumerator training, NRFU protocols, or census questionnaire assistance has accounted for a citizenship question. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 200:9 - 201:10; Nov. 14 Trial Tr. at 1303-04 (Abowd).

1246.  Former Census Bureau Director Thompson testified that the Census Bureau's conclusion "that it is likely that households that refuse to respond to the Decennial Census questionnaire because of the citizenship question are also likely to respond to enumerators" is one fact that "strongly suggests that NRFU efforts may be unsuccessful with respect to households that decline to answer the Decennial Census questionnaire because of the citizenship question." Thompson Aff. ¶¶ 111, 114.

1247.  When Dr. Hillygus was asked about whether "respondent sensitivity impacts cooperation with NRFU" she responded the "confidentiality concerns associated with the citizenship question

that the Census Bureau acknowledges and has shown to have an impact on the self-response, all matter for cooperation with a census enumerator." Nov. 5 Trial Tr.97:18-24.

1248.  Discussing PX-385 (Terry), Dr. Hillygus testified that "fears of deportation are related to people being omitted from the roster" and that "experimental and ethnographic research have found deliberate concealment of household members based on concerns about confidentiality, deportation, and their general trust in government . . . field staff report that they are not able to get a full count of a household, and that will happen whether individual members are being excluded because of fears of disclosure." Nov. 5 Trial Tr. at 126:5-8; 125:14-17; 125:19-23.

1249.  Additionally, the Census Bureau will have challenges with mitigated non-response of individuals who fail to self-respond through in-person enumerators because the decennial enumerators tend to have less experience than the ACS interviews. Nov. 5 Trial Tr. at 101; PX-162 at 30 n. 44. And it is clear that the Census Bureau is going have trouble hiring the number of enumerators that are needed. A GAO report notes that "[i]n early hiring for 2020, Bureau officials reported smaller than expected applicant pools, declined offers, and turnover." PX-367 at 2.

1250.  The Census Bureau testified that the macro-environment is making it difficult to hire enumerators. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 316:11-17.

1251.  As Dr. Hillygus testified the Census Bureau is likely to have trouble hiring enumerators for hard to count neighborhoods that match the language and background of the enumerator to more effectively canvas the neighborhood. Nov. 5 Trial Tr. at 182.

1252.  Dr. Hillygus testified about further challenges the Census Bureau will have in conducting in-person enumeration, including the potential that the Census Bureau will not hire non-citizen enumerators which will make it difficult to hire enumerators from certain neighborhoods, and

concerns raised by the General Accountability Office about the Census Bureau's ability to hire a strong pool of enumerators. Nov. 5 Trial Tr. at 100:25-101:16; 182:18-23; PX-367 at 2; Nov. 14 Trial Tr. at 1176:15-1177:11 (Census is still trying to get permission to hire non-citizen enumerators).

1253.  Additionally, as Dr. Hillygus also testified that a research presentation at the American Association of Public Opinion Research, Census researchers Mikelyn Meyers and Patricia Goerman explained that respondents were "spontaneously expressing concerns" about confidentiality during multilingual pretesting projects conducted in 2017. PX-448 at 2; Nov. 5 Trial Tr. at 57-58.

1254.  Respondents referenced legal residency status, immigration, and certain current events like changes to the DACA program and in fact provided an example of an individual getting up and leaving their own home rather than continue an interview with a census enumerator. PX-448 at 12, Nov. 5 Trial Tr. at 57-21-58:12.

1255.  Dr. Hillygus testified about the results from focus group testing during the Census Barriers, Attitudes, and Motivators Survey (CBAMS), which showed that a citizenship question "may be a major barrier" as respondents interpret its purpose as "find[ing] undocumented immigrants," and "targeting their ethnic group."  Nov. 5 Trial Tr. at 67-68; PX-662.

1256. Dr. Hillygus further testified  about the results from the CBAMS: "[W]hat's so significant about this is that post the addition of the citizenship question, this offers one of the only kind of attempts by the Census Bureau to evaluate the impact of that citizenship question, and so these focus groups . . . offer some especially direct evidence about what can be expected." Nov. 5 Trial Tr. at 64:20-65:8; *see* PX-152 at 22.

   **b.**  **Use of Administrative Records in the NRFU process**

1257.  For the first time in 2020, the Census Bureau plans to use administrative records to enumerate individuals who do not self-respond. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 387; Nov. 15 Trial Tr. at 1340: 3-7 (Abowd).

1258.  The Census intends to use administrative data from the Social Security Administration, the Internal Revenue Service, Medicare, and the U.S. Postal Service to enumerate individuals who do not self-respond. PX-25 at AR 1309; DX-27 Appendix D.

1259.  These administrative records will be used for two purposes: first, to determine whether an address should be deleted from the MAF, and second, to enumerate some households who did not initially self-respond.  Both of uses of administrative records will exacerbate the differential undercount.

(a)      **Use of administrative records in the vacant/delete check**

1260.  Dr. Abowd testified that administrative records will be used by an enumerator after one NRFU visit to an address to determine whether the address is vacant or should be deleted.  Nov. 14 Trial Tr. at 1116:13-24; 1202:25-1203:14.

1261.  If, on the basis of an administrative record, the Census Bureau determines an address is vacant or should be deleted, the Census Bureau will remove the address from the NRFU workload, and will mail a final postcard to the address encouraging self-response.  PX-655 at 7. Nov. 14 Trial Tr. at 1200:5-13.

1262.  Dr. Salvo testified that when an address is declared vacant or deleted, the address is determined as containing no people, and as a result, there is no subsequent imputation that occurs for the address.  Nov. 6 Trial Tr. at 368:8-21.

1263.  But as Dr. Salvo testified, this vacant/delete process is problematic.  This process has been because it has been error prone in the past, resulting in misidentification of occupied housing as

vacant, and there is strong evidence that the Census Bureau's plans for 2020 will exacerbate the problem.  Nov. 6 Trial Tr. at 308:19-309:15; 313:19-314:10.

1264.  The Census Bureau conducted tests on their planned use of administrative records to identify vacant housing in 2016 in Los Angeles and Harris Counties.  Nov. 6 Trial Tr. at 365:17-21.

1265.  The tests in Los Angeles and Harris County compared the determination of housing status for addresses using administrative records, with determinations made by NRFU fieldwork, i.e. in-person follow-up.  Nov. 6 Trial Tr. at 366:25-367:5.

1266.  The tests revealed that over 20% of addresses determined as vacant by administrative records were found to be occupied by NRFU fieldwork, and another 15% could not be resolved or determined by NRFU fieldwork. PX-564 at 18, Table 5.  Nearly 30% of addresses that administrative records determined should be deleted were found to be occupied by NRFU fieldwork, while another 10% could not be resolved or determined by NRFU fieldwork.

1267.  Dr. Salvo testified that the high rate of misidentification revealed by the 2016 Census Tests suggested that administrative records do not accurately portray vacancy status for addresses, and "calls into question the efficacy" of what the Census Bureau is planning to do with administrative records.  Nov. 6 Trial Tr. at 330:14-20; 357:22-358:2.

1268.  Dr. Abowd acknowledged this high rate of error in the use of administrative records in his testimony, however, he suggested that the Census Bureau planned to address the issue by adding a direct visit by a field enumerator before any address will be designated as vacant or delete. Nov. 14 Trial 1199:19-25; 1200:5-13.

1269.  Dr. Abowd acknowledged, however, that the Census Bureau had performed no analyses or testing to ascertain how effective these modified vacant/delete procedures will be.  Nov. 15 Trial Tr. at 1379:3-9.

1270.  Moreover, the use of field enumerators to confirm the vacancy status of an address is similar to the vacant delete process in place in 2010, where an enumerator was sent to an address identified as vacant to make an independent determination of housing status.  Nov. 6 Trial Tr. at 352:14-24.

1271.  Dr. Salvo testified that the process in 2010 was also error prone, and often led to the misidentification of vacancies, including over 60,000 households misidentified as vacant and undercounted in Northwest Queens and South Brooklyn.  Nov. 6 Trial Tr. at 351:24-352:9; 353:18-354:13; PX-666.

1272.  As a result, the planned vacant delete process for the 2020 Decennial Census, will likely result in the misidentification of some addresses as vacant or should be deleted, when they are, in fact, occupied.

1273.  The inclusion of a citizenship question on the 2020 Decennial Census will exacerbate misidentifications in the vacant delete process, by increasing the NRFU workload, and the number of cases that will be subject to the vacant delete process.  Nov. 6 Trial Tr. at 330:21-331:11.

1274.  Ultimately, Dr. Salvo testified that, the vacant delete process introduces error into the Decennial Census, as does every NRFU operation, and that the way to prevent these errors is through self-response. Nov. 6 Trial Tr. at 302:13-19; 353:9-17.

(b)      **Use of administrative records in the enumeration**

1275.  If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. Stipulation No. 9.

1276.  The Census Bureau's proposal to use administrative records has not yet been approved by OMB. PX-655, at 7. Dr. Abowd testified that the Census Bureau "hasn't made a decision yet about how it will process responses to the citizenship question alongside the administrative records." Nov. 13, Trial Tr. at 1030:3-6.

1277.  Because the Census Bureau has not used administrative records for enumeration on a wide scale in a prior Census, it does not have evidence from a deployment in a prior Census as to how well enumeration by administrative records will work in practice.  Nov. 15 Trial Tr. at 1340 (Abowd).

1278.  The Census Bureau has noted in the Administrative Record that the "inclusion of a citizenship question on the 2020 Census is very likely . . . to increase the number of persons who cannot be linked to the administrative data because the NRFU PII is lower quality than the self-response data. In the 2010 Decennial Census, the percentage of NRFU persons who could be linked to administrative data rate was 81.6 percent, compared to 96.7 percent for mail responses." PX-25 at AR 1311.

1279.  The Census Bureau analysis of the citizenship question acknowledged that "missing data are higher for administrative records (AR) than the ACS, and both sources' rates are higher for minorities and nonrelatives." PX-162.

1280.  Director Jarmin testified that administrative records could be used to enumerate non-citizens, Hispanics and hard-to-count population households "less of the time." Jarmin Dep. (Docket No. 511-4) at 285-286.

1281.  The Census Bureau testified that it cannot link Hispanics to administrative records at a higher rate than non-Hispanic whites. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 389:12 - 390:5; Nov. 15 Trial Tr. at 1340-41 (Abowd).

1282.  The Census Bureau testified that undocumented immigrants are less likely to be found in administrative records, and this will be harder to enumerate using such records. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 391:4-19; Nov. 15 Trial Tr. at 1341:3-6 (Abowd).

1283.  The Census Bureau testified that it is a reasonable hypothesis that administrative records are more likely to exist for citizens than for noncitizens. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 252:16 - 253:6.

1284.  The Census Bureau testified that it expects that enumeration using administrative records will be less successful for noncitizens than for citizens. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 391:21-392:4; Nov. 15 Trial Tr. at 1341:16-19 (Abowd).

1285.  Dr. Hillygus and Dr. Barreto also testified that the quality of administrative records varies for different groups and "noncitizen households and Hispanics who are less likely to have administrative records or quality administrative records." Nov. 5 Trial Tr. at 104:19-24; Nov. 9 Trial Tr. at 639:22-640:15; PX-399.

1286.  Social science research also confirms this testimony. PX-383 at 8 (noting that "characteristics observed with lower validation rates may be associated with language barriers, trust in government, or privacy preferences. These include groups such as Hispanic, some other race, non-U.S. citizen, poor spoken English, and other language than English spoken at home.")

1287.  Dr. Hillygus and Dr. Barreto specifically cited differential coverage in administrative records as a factor that could exacerbate the differential undercount of Hispanics relative to

whites because "those records are more available for some portions of the population than others." Nov. 5 Trial Tr.131:4-8; Nov. 9 Trial Tr. at 638:16-639:22.

### c. Proxy Responses

1288.  If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." Stipulation No. 11; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:9-17; PX-162 at 41 n. 15.

1289.  A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. Stipulation No. 12; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:9-17.

1290.  Proxy responses generally are more likely to result in errors and omissions of a member of a household. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:18-383:9.

1291.  There is no evidence in the Administrative Record reflecting credible quantitative evidence that households that fail to respond to the Census because of a citizenship question will be enumerated through the use of proxies as successfully as other non-responding households. Nov. 15 Trial Tr. at 1342 (Abowd); *see also* PX-1 to PX-14.

1292.  The Census Bureau did not conduct any testing of the impact of a citizenship question on the willingness of proxies to cooperate with enumerators. Nov. 15 Trial Tr. at 1344 (Abowd).

1293.  There is no evidence in the Administrative Record that proxies will be as cooperative with NRFU operations in the 2020 Decennial Census as they have been in prior Censuses. PX-1 to PX-14 (AR).

1294.  The Census Bureau testified that census tracts with higher percentages of households with a non-citizen would be less likely to give proxy responses to the Census than people who live in other areas. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:2-15.

1295.  The Census Bureau analysis on a citizenship question similarly concluded that because "reference persons are much less likely to answer the citizenship question for nonrelatives in the household than for themselves . . . they may be even less likely to answer it for neighbors." PX-162 at 43; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:16 - 387:10.

1296.  The Census Bureau has also raised significant questions about the accuracy of proxy responses. PX-22 (AR); PX-267 at 33, Table 21; PX-162.

1297.  The Census Bureau's analysis in the Administrative Record noted that one of the reasons errors are "so much greater during NRFU is that the data are much more likely to be collected from a proxy rather than a household member . . . [and] that person has less accurate information than self-responders." PX-22 at AR 1282.

1298.  The Census Bureau's analysis in the Administrative Record cited the 2010 post-enumeration study found that proxy responses resulted in a correct enumeration only 70.2 % of the time, as compared to the 97.3 % of the self-responses. PX-22 at AR 1282 (citing PX-267 at 33, Table 21).

1299.  Summarizing the Census Bureau's analyses on proxy accuracy, the Census Bureau analysis on a citizenship question similarly stated that "proxies supply poor quality individual demographic and socioeconomic information about the person on behalf of whom they are responding. PX-162 at 41-42 & Table 12.

1300.  Director Jarmin testified that "accuracy of NRFU response is less than self-response and proxy response is less than NRFU response." Jarmin Dep. (Docket No. 511-5) at 308: 15-17.

1301.  Moreover, the use of proxy respondents, such as landlords, may further exacerbate the problem. As Dr. Salvo testified, proxy respondents may have incentives to minimize the number of occupants in a unit; occupancy regulations, for example, may lead landlords to understate the

number of household members in a unit, since disclosure of high occupancy levels may be seen as inviting scrutiny by the government. *See* Nov. 6 Trial Tr. at 336:09-337:06, 337:15-338:05. Dr. Salvo explained that reliance on such proxies risks introducing error in the enumeration and omissions with respect to household size. *See id.*; 380:04-09.

1302. Dr. Abowd acknowledged that he believes that proxy responses are more likely to result in the omission of a household member than self-responses.  Nov. 15 Trial Tr. at 1343 (Abowd).

1303. Census Bureau research on the undercount of young children has demonstrated that "proxy responses are potentially problematic, as proxies may not provide complete and accurate information for the census enumeration." PX-378 at 23.

1304. Dr. Abowd testified that, based on a census tract-level analysis showing that ACS responses rates (PX-162 at 12) and ACS NRFU success (PX-137, 3rd Table) are lower in census tracts with higher percentages of households with a noncitizen, that the Census Bureau will be less likely to be able to obtain proxy responses in areas with more noncitizens.  Nov. 15 Trial Tr. at 1344-49.

1305. Dr. Hillygus testified (discussing PX-162) that the "Census Bureau recognizes that the use of proxy respondents will result in less accurate census data. That's not a question at all . . . The evidence . . . indicates . . . that the expected increase in proxy respondents in the NRFU operations will contribute to a systemic underestimation of the size of non-citizen and Hispanic households." Nov. 5 Trial Tr.112:14-20. In support of this conclusion, Dr. Hillygus noted the following:

    a.    Discussing PX-386, Dr. Hillygus testified that "for noncitizen households and Hispanics . . . proxy respondents are likely underestimating household size . . . for households that are larger and more complex, proxy respondents do not have

accurate information, and we know from other research that noncitizen households in particular are likely to have more—they might have more people living in the household than known by a landlord." Nov. 5 Trial Tr. at 107:18-108:18 & PX-386.

b.  Discussing PX-387, Dr. Hillygus further testified that empirical research "shows that the households that are more complex . . . are more likely to have proxy respondents omitting members of the household. Again, this is that key link between proxy respondents not just giving less accurate information, but they are underestimating the size of noncitizen and Hispanic households at a higher rate than they would do for other households." Nov. 5 Trial Tr. at 110:15-22 & PX-387.

c.  Dr. Hillygus further testified, discussing recent public opinion research and the CBAMS results (PX-152, PX-662 & PX-663) that "the evidence points to the likelihood that the neighbors are also going to be reluctant to share information, particularly about citizenship status, of their neighbors, [a]nd . . . the potential consequence [is] . . . you'll either have more difficulty finding a proxy respondent or you're going to find proxy respondents who have less information about the household . . . . What I think the evidence is suggest—is that it's systematically going to underestimate household size because of the use of proxy respondents." Nov. 5 Trial Tr.111:2-14.

1306. In a specific discussion of NRFU field operations among Hispanic respondents, for instance, as Dr. Hillygus noted in her testimony, researchers explained that "some proxy respondents resisted the interview by providing data that seemed inaccurate or incomplete just to

230

comply with the interview." PX-385 at 11, Nov. 15 Trial Tr. at 1399:21-23. This research

suggests that noncitizens and Hispanics might systematically underreport household size to

enumerators, and increased confidentiality concerns associated with the addition of a citizenship

question could exacerbate such underreporting.

1307.  Dr. Hillygus also testified that analysis suggests "unknowledgeable or unwilling proxy

respondents may be a key factor in the undercount of young children" Nov. 15 Trial Tr. at

1399:2-5, citing PX-339.  Dr. Hillygus testified that PX-385 and PX-339 provide support for her

opinion that "there is sufficient evidence to suggest that an increase in proxy respondents

associated with the citizenship questions will also reduce accuracy because of the direction of

some of those inaccuracies, in other words, there will be bias."  Nov. 15, Trial Tr. at 1400:19-23.

1308.  Additionally, research has shown "that tenuously attached people are likely to be omitted

from the typical survey roster." PX-392 at 2. Proxy respondents are a "source[] of residential

ambiguity" and that "[p]eople whose residence status is ambiguous or uncertain are at risk of

being omitted from or incorrectly included in demographic surveys and the census."  PX-392 at

3, 9. PX-378, PX-386, PX-387.

1309.  Similarly, Dr. Barreto testified that proxies would not mitigate the harm of a citizenship

question. He explained that proxy responses will decline for the same reasons that self-response

will decline, and that the proxy response information will be less accurate either because proxies

do not know the underlying information, or because they will be unwilling to provide

information to the census if they believe that there are people who would be at risk of

immigration enforcement. Nov. 9 Trial Tr. at 640:23-641:9

1310.  Dr. Barreto emphasized that proxies tend to result in understatement of total household size and, accordingly, lead to omissions, resulting in ultimate undercount. Nov. 9 Trial Tr. at 641:10-643:21; PX-162.

1311.  Dr. Abowd testified that the "the fewer imputations you have to make the more accurate you're going to be . . . ."  Nov. 14 Trial Tr. at 1239:7-15; Nov. 14 Trial Tr. at 1235:6-12.

### d.    Imputations

1312.  If the Census Bureau is unable to otherwise enumerate a household through NRFU procedures, it will "impute" the number of persons living in the household and their characteristics. PX-655.

1313.  Count imputation is the process by which the Census Bureau imputes the household size of an address determined to be occupied but where no information could be collected about the occupants, even household size, from proxies or other means. Nov. 14 Trial Tr. at 1193:23—1194:1 (Abowd). Whole-person census imputation, which includes count imputations, is the process by which "all the characteristics were imputed for these census person records." PX 267 at 100-11.

1314.  Imputation involves modeling information for non-responding households based on information from households that have already been enumerated.  Nov. 15 Trial Tr. at 1351 (Abowd).

1315.  The Census Bureau uses an ignorable missing data model for imputation, which "assum[es] that the people that you have observed provide sufficient information to fill in the people that you . . . have [not] observed" Nov. 5 Trial Tr. at 115:18 - 116:5 (Hillygus).

1316.  Non-ignorable missing data means there is a "relationship between those who have not responded and the information that should be in there."  Nov. 5 Trial Tr. at 116:3-5 (Hillygus).

Dr. Abowd explained if there is nonignorable missing data from the whole data set used for imputation this will result in incorrect imputations. Nov. 14 Trial Tr. at 1236:19-24.

1317.  Dr. Abowd testified that using an ignorable missing data model when the missing data are not ignorable can bias the imputation data model.  Nov. 15 Trial Tr. at 1351:20-1352:3.

1318.  Self-response to the census is correlated with citizenship status, meaning that imputation will be based on households that are disproportionately all-citizen households.  Nov. 15 Trial Tr. at 1351-52 (Abowd); PX-162 at 44.

1319.  Dr. Abowd testified that whole person imputations are not very accurate. Nov. 15 Trial Tr. at 1351:11-14 (Abowd); Nov. 14 Trial Tr. at 1222:20-23; Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 253:7-15.

1320.  The Census Bureau has noted that "[t]he accuracy of this imputation system is unknown at this time."  PX-162 at 44.  The Census Bureau has not publicly disclosed its imputation procedures, and has not set its imputation algorithms for the 2020 Decennial Census.  Nov. 15 Trial Tr. at 1351 (Abowd).

1321.  Dr. Abowd testified that qualitative evidence confirms that "count imputation disadvantages hard-to-count subpopulations" Nov. 15 Trial Tr. at 1384-85 (Abowd).

1322.  In the 2010 Census, there were 5.99 million people imputed, of whom 1.16 million were count imputations and 4.61 million where imputation was required for the whole household. PX-267 at 14 & Table 6; PX-478.

1323.  The Census Bureau analysis of the addition of a citizenship question acknowledges that there are going to be significantly more whole person imputations (1.477 million) in the 2020 Census because of the addition of a citizenship question and its impact of decreasing self-response. PX-162 at 42.

1324.  Dr. Hillygus testified that it is "critical . . . that it is expected that there is going to be more [imputation] in 2020." Nov. 5 Trial Tr.115:10-11.

1325.  There is no evidence in the Administrative Record that whole person imputation will be more accurate in 2020 than it was in 2010. PX-1 to PX-14 (AR).

1326.  Dr. Abowd testified that "an expert panel within the Census Bureau" can "modify the imputation algorithm, if they can figure out a way to do so successfully, but I will say that no such modification has been proposed to date." Nov. 15 Trial Tr. at 1353:7-13.

1327.  The Census Bureau post-enumeration survey for 2010 concluded that the Hispanic population had larger percentage of omissions (7.7 percent) than the Non-Hispanic white population (3.8 percent) and "part of the omissions . . . may be accounted for by the whole-person census imputations" because Hispanic populations have larger percentage of imputations (2.4 percent) than the white population (1.6 percent). PX-267 at 16 & Table 9.

1328.  Accordingly, Defendants' claims about the relative accuracy of the imputation procedure for 2020 are entitled to little weight.

1329.  While the processes have varied, the Census Bureau's past imputation processes have all involved an algorithm that in part is dependent using data from households that have respond to the census to impute the size of the households that did not respond. PX-478 at 5-7.

1330.  Federal government research has concluded that Hispanic and immigrant households are more likely to live in crowded, complex households than citizen or white households. PX-388 at Figures 13 & 14.

1331.  Census Bureau research similarly has linked crowded, complex household types to census omissions in previous censuses. PX-389, PX-430, PX-469, PX-390 at 70.

1332.  Dr. Hillygus testified that "imputation is essentially just using a guess to fill in the numbers," and "the imputation is going to contribute to the under count because the imputation procedure is likely to under estimate household size in non-citizen and Hispanic households." Nov. 5 Trial Tr. at 113:5-6; 114:25-115:1-3.

1333.  Dr. Hillygus further testified that although the Census Bureau has not finalized or released the planned imputation procedures for 2020, based on the 2010 process "there is still reason to believe that is going to underestimate the size of non-citizen households." Nov. 5 Trial Tr. at 118:2-8. In support of this conclusion, Dr. Hillygus testified:

    a.   The imputation models the Census Bureau has used treat household size of imputed individuals as "ignorable" meaning that it assumes that there is no relationship between the size of households who self-respond to the Census and those who do not self-respond to the Census and the household size of imputed individuals is "random." Because "households that are not responding to the census, are larger" use of "information about those household that did respond is going to systematically underestimate the size of the imputed households." Nov. 5 Trial Tr.115:23-116:18.

    b.   "There is compelling evidence that because household size is related to census participation, because Hispanics and non-citizens are documented to have larger household sizes on average, that it is not reasonable to assume that the household size of those individuals who failed to respond will be the same as those who do." Nov. 5 Trial Tr. at 119:4-9.

    c.   Discussing PX-400 and PX-397, Dr. Hillygus testified that "there is evidence that household size is related to census participation. That is the key for saying that the

missing data is non-ignorable because the missingness related to the quantum that we're trying to impute" and "Hispanic origin is not ignorable." Nov. 5 Trial Tr. at 120:6-9; 121:12.

d.  Discussing PX-267 and PX-400, Census Bureau and other Bureau research, including post-enumeration surveys and demographic analysis, "consistently find that noncitizens and Hispanics are more likely to be omitted from the census." Nov. 5 Trial Tr.123:2-4.

e.  Discussing PX-388 and PX-394, Dr. Hillygus testified that external research shows "Hispanics and immigrants have larger households, more complex households" and are "harder to enumerate [and] are more likely to be omitted from the census. . . .these are the same individuals who the Census Bureau documents and predicts are going to be less likely to respond to citizenship question and so it follows that we are also going to see it with the differential undercount." Nov. 5 Trial Tr. at 124:11-20.

f.  Discussing PX-414 and PX-389, Dr. Hillygus testified "we most directly see this link between self-response and differential undercount . . . [in the] decades of ethnographic research conducted about different censuses where they go in and they talk to households and have found out that Hispanic and noncitizens are being missed by the census count" and "[o]ther research has also found empirically that the larger the household size, the more likely those households— that households members are going to be omitted . . . so what that results is a systemic underestimation of Hispanic and non-citizens because they have larger household size on average." Nov. 5 Trial Tr.125:2-13.

236

1334.  Dr. Hillygus testified that "the missing-ness on citizenship will not be ignorable . . . so if you apply an ignorable assumption in the imputation methods, then you will end up with bias." Nov. 15 Trial Tr. at 1401:9-19.

1335.  Dr. Barreto confirms that whole-person imputation is the end of the census process "because it's sort of the last resort, and it's known to be the least accurate." Nov. 9 Trial Tr. at 701:5-701:17.

1336.  Dr. Barreto's survey experiment provides quantitative evidence that the Hispanic and immigrant households that do not respond to the census are larger than those households that do respond; accordingly, imputation (which relies on responding households to impute household size for nonresponding households) will systematically undercount nonresponding households.

    a.    Dr. Barreto's data reflects that "for multiple different demographic indicators, responding units are not statistically the same as non-responding units. They are, in fact, statistically different on many important metrics," which "will create considerable problems for imputation." Nov. 9 Trial Tr. at 711:4-711:8.

    b.    Specifically, Dr. Barreto's experiment shows that households that will respond to a census that includes a citizenship question have smaller household sizes than those that will choose not to respond. PX-680. Accordingly, responders who would serve as the donor group for imputation have smaller household sizes than the non-responders whose household size would need imputing, resulting in omissions and ultimate differential undercount. Nov. 9 Trial Tr. at 711:18-712:16.

    c.    As Dr. Barreto explained: "[w]hat we found when we analyzed this imputation model was that the decision to not respond appears to be correlated with household size, that is, people who are the most anxious and nervous and not

willing to respond have larger household sizes that cannot be accounted for by other demographic differences. This is consistent with the literature that suggested that people would be more fearful if they had other relatives who were noncitizens and others living in the house. So when the imputation model is applied at the very end of the process, there will be more Latino and immigrant households in need of imputation, first of all, because of the lower self-response and because of the lesser success of NRFU. So when we get to the imputation component, this model suggests that there will be a larger miss, disproportionately larger miss of Latino household sizes leading to a net undercount." Nov. 9 Trial Tr. at 733:7-733:24

d.  Moreover, Dr. Barreto's survey shows that non-respondents will be geographically clustered, concentrated in zip codes that have high Latino and immigrant populations, further challenging the ability of an imputation model to adequately or accurately address non-response. Nov. 9 Trial. Tr. at 713:1-714:5; PX-681.

e.  Dr. Barreto's "analysis indicates that, on whole, [imputation] will exacerbate the net differential undercount for Latino and immigrant communities, in that the imputation estimates will be less accurate and they will be too small in Latino and immigrant communities. So while they will come up with a number, it will continue to underestimate[] the true count." Nov. 9. Trial Tr. at 707:21-709:11.d

1337.  Dr. Barreto created an imputation model designed to mimic the model historically used by the Census Bureau and set forth in PX-478, the "DSSD 2010 Decennial Census Memorandum Series #J-12" ("J-12 Memo"). Nov. 9 Trial Tr. at 725:18-726:7.

1338.  This model uses "nearest neighbors" to impute household count for non-responding households; it controls for similar housing type, characteristics, and geographic proximity: "When they get 20 of these so-called nearest neighbors, they then create a distribution of the household sizes from there, and then they assign a household size to the missing unit." Nov. 9 Trial Tr. at 718:20-719:9; Nov. 9 Trial Tr. at 719:12-721:21; Nov. 14 Trial Tr. at 1232:13-1232:14; PX-661 (screenshot of Dr. Barreto's model applied to the dataset, reflecting the difference between the model's imputation or guess as to a particular respondent's household size and the household's actual size).

1339.  Dr. Barreto's imputation analysis reflects that, on a national level, since responding households tend to be larger than those that do not respond, imputation would undercount households by an average of .3179 persons (or approximately 1/3 of a person) per household. As a result, a citizenship question would be responsible for a national net undercount of 2.8 million households. Nov. 9 Trial Tr. at 727:3 - 729:12; PX-682.

1340.  However, the effects of imputation will be amplified in the Latino population. For Latino households, imputation misses approximately .75 of a person per household on average; higher non-response rates will result in higher NRFU rates, higher imputation rates, and ultimately, a higher net differential undercount. Ultimately, Dr. Barreto estimated that the addition of a citizenship question would result in a 1.78 million net undercount of Latinos: "That is 65 percent of the people missed will be in Latino households. So while they only represented 13 percent of all households, and every step along the way they are over represented in being undercounted, the final estimates suggests that they'll be 65 percent of all of the undercount." Nov. 9 Trial Tr. at 729:13-730:25; PX-682.

1341.  Even when accounting for mitigated non-response in light of assurances of confidentiality, Dr. Barreto's data reflects that Latino's will be disproportionately undercounted by 1.45 million people. Nov 9 Trial Tr. at 732:1-732:23; PX-683.

1342.  In sum, based on the expected impacts of imputation, Dr. Barreto estimated that the net differential undercount anticipated to flow from a citizenship question to be in the range of about 1.45 and 1.8 million in the Latino and immigrant community. Nov. 9 Trial Tr. at 734:19-734:25.

1343.  Dr. Barreto's findings are confirmed by social science research concerning imputation in Latino and immigrant communities. Nov. 9 Trial Tr. at 717:5-718:1; PX-389

### 6.        Recap of Key Points on Self-Response and NRFU

1344.  Overall, the Census Bureau's various enumeration procedures, including NRFU efforts, are more likely to miss Hispanics, as compared to non-Hispanic whites. PX-267 Table 7; Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 259:1-15; Nov. 6 Trial Tr. at 393:09-16, 393:25-394:03; Nov. 15 Trial Tr. at 1353-54 (Abowd).

1345.  Overall, the Census Bureau's various enumeration procedures, including NRFU efforts, are more likely to miss people living in bilingual areas compared to the U.S. population as a whole. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. Vol. I. at 261:11-16; PX-267 at 27.

1346.  The evidence reflects that historically the Census process omits significant numbers of certain populations, such as young children, when they are left off the household roster in self-responses submitted from their household or when their residence is not part of the Master Address File. The evidence described here establishes that more likely than not the addition of a citizenship question will exacerbate this problem, contributing to an increase in the net differential undercount of Hispanics and persons who live in non-citizen households. In particular, the addition of a citizenship question to the Decennial Census will cause many

households, even if they do self-respond, to leave off their responses members of their household who are not US citizens or do not have legal status.

1347.  While the Census Bureau concedes that there will be a decline in self-response of 5.8% among non-citizen households, the evidence presented establishes that it is more likely than not that the decrease in self-response of individuals who live in non-citizen households caused by the addition of a citizenship question will be significantly more than 5.8%.  Moreover, the evidence presented about the impact of the addition of a citizenship question on the response rates of Hispanics establishes that there will also be a meaningful decline in the self-response rates of Hispanics.

1348.  Relying upon all the evidence presented, the decrease in self-response rates before the implementation of NRFU will be significantly more than 5.8% of non-citizen households and Hispanics.

1349.  In addition, there is no evidence that the NRFU operations will adequately address the decline in self-response rates caused by the addition of a citizenship question among Hispanics and individuals who live in non-citizen households.

1350.  The Census Bureau has provided no evidence that demonstrates that the decline in self-response rates will not result in a differential net undercount.

1351.  While Dr. Abowd suggested that it might be possible to conduct an analysis as to determine the exact relationship between such declines in self-response and net differential undercount, Dr. Abowd testified that such a hypothetical analysis would require identifying a statistical way of predicting the relationships between different components such as omissions and erroneous enumerations; even the Census Bureau has not ascertained how to conduct such an analysis. Nov. 14 Trial. Tr. at 1219:6-9. And Dr. Abowd testified that some of the coverage

measurement experts at the Census Bureau do not think this is possible even for the Census Bureau. Nov. 14 Trial. Tr. at 1216:12-18.

1352.  The Census Bureau has not yet determined exactly what method is going to be used for imputation in the 2020 Decennial Census, but the process will be similar to that used in 2010. The evidence described here establishes that historically the Census imputation process has resulted in a downward bias of certain subpopulations that on average have larger families and more complicated living arrangements, such as Hispanics and non-citizen households. The historical imputation process has under-estimated the populations of these households.  *See* PFOF ¶¶ 1315, 1320, 1326.

1353.  The evidence described here establishes that the addition of a citizenship question to the Decennial Census will significantly increase the number of Hispanic persons and non-citizen households that end-up in the imputation process.  Once in imputation, the evidence reflects that the addition of a citizenship question will exacerbate this bias in the imputation process, contributing to an increase in the net differential undercount of Hispanics and persons who live in non-citizen households. *See* PFOF ¶¶1312-1343, 1333, 1336.

1354.  All the available evidence strongly suggests that the addition of a citizenship question will significantly increase the net differential undercount among these identified subpopulations. Likewise, the addition of a citizenship question will exacerbate the net differential undercount. In particular, the testimony, scientific literature, and census documents all support the finding that the NRFU operations will not prevent the differential net undercount of individuals of non-citizen households and Hispanics caused by the decrease in the self-response resulting from the inclusion of a citizenship question.

1355.   While NRFU operations and imputation will have some success in mitigating the decrease in self-response, given the likely significant decrease in self-response among persons who reside in non-citizens households, it is a reasonable inference that more likely than not there will an undercount of individuals in household with at least one non-citizen of at least 5.8% caused by the addition of a citizenship question even after NRFU and imputation.

1356.   While NRFU operations and imputation will have some success in mitigating the decrease in self-response, given the likely significant decrease in self-response among Hispanics, there will an undercount of Hispanics of at least 5.8% caused by the addition of a citizenship question even after NRFU and imputation.

1357.   The conclusion that there will more likely than not be an undercount of Hispanics and non-citizen households is consistent with Dr. Barreto's survey results.  These results reflect that the national decline in self-response due to a citizenship question is between 7.14% and 9.69% and that for Latinos, that estimate is between 14.1% and 16.58%. Nov. 9 Trial Tr. at 671:6-671:19, 672:13-672:22, 675:10-675:14. It is a reasonable inference that the ultimate undercount for non-citizen households and Hispanics will be at least 5.8% if self-response declines by between 7.14% and 16.58%.

1358.   Even if one were to accept the Census Bureau's more conservative prediction that the only impact on self-response caused by a citizenship question will be among individuals who live in non-citizen households, and that this impact will be only a 5.8% decrease in self-response; and even assuming that the NRFU efforts will result in the accurate enumeration of at least some of these households that do not self-respond, there is no evidence to suggest NRFU efforts could possibly achieve accurate enumeration of every such household that does not self-respond.  The overwhelming weight of the evidence reflects that the addition of a citizenship question will

increase the net differential undercount of individuals who live in non-citizen households. Additionally, there is no doubt that the addition of a citizenship question will increase the net differential undercount of Hispanics.

1359.  Given all the evidence presented of the limitations of the ability of NRFU operations to achieve accurate enumerations of households that do not self-respond, even if NRFU efforts have some limited success, there will still be an increase in the undercount of at least 2% among individuals who live in households with non-citizens.

1360.  This conclusion—that even after NRFU, there will still be an undercount of individuals living in non-citizen households of at least 2%—is consistent with the other evidence presented in this case, and if anything, is conservative. Dr. Warshaw testified that the 2 percent net differential undercount scenario could be viewed as the ultimate result, after NRFU, of a 5.8 decline in self-response rate.  Nov. 13 Trial Tr. at 863:5-9; 863:18-22; 869:4-13.

1361.  This conclusion is also consistent with the results of Dr. Barreto's survey, which suggests that NFRU efforts will have only a 45.2% success rate for the entire population. Nov. 9 Trial Tr. at 686:12-687:20.

1362.  This conclusion is also consistent with the opinion of Dr. Thompson, that the addition of a citizenship question will limit the effectiveness of the Census Bureau's communication marketing campaign aimed at hard to reach populations and outreach through trusted community partners, efforts which have helped the lower the undercount since 1990. Dr. Thompson testified that he believes that the addition of a citizenship question will cause the undercount of Hispanics to be at least as high as it was in the 1990 census before these programs were implemented. Thompson Decl. (Docket No. 516-1) ¶106. The net undercount for Hispanics in 1990 was 4.99 %. PX-267, p. 15. Parties Stipulation ¶ 23.

1363.  Considering the evidence as a whole, it is that more likely than not that there will be an undercount of individuals in households with at least one non-citizen—at a bare minimum, 2%—caused by the addition of a citizenship question; in all likelihood, the resulting undercount will be far higher.

## IX.    ABSENCE OF A LEGITIMATE VRA ENFORCEMENT RATIONALE

1364.  The evidence shows that the only justification that Secretary Ross offered for his decision to add a citizenship question to the Decennial Census—that a citizenship question was necessary for the DOJ  enforcement of the VRA ("VRA")—is a myth.  The VRA enforcement justification that Secretary Ross relied upon in his decisional memo is not supported by DOJ's prior practice of enforcing the VRA over the past five decades.  Indeed, during that time, DOJ has *never* had access to the kind of "hard count" citizenship data that it claimed to need and that Secretary Ross cited in his decisional memo.  On top of that, the citizenship data that the Decennial Census will produce will not enhance DOJ's ability to enforce the VRA relative to its existing capabilities.

1365.  On December 12, 2017, DOJ sent a letter signed by Mr. Gary to Director Jarmin "to formally request" that the Census Bureau include a citizenship question on the 2020 decennial Census questionnaire directed to every household in the United States.  PX-32 (AR).

1366.  Although the letter was signed by Mr. Gary, it was initially drafted by Acting Assistant Attorney General ("AAAG") John Gore.  Gore Dep. at 127.

1367.  The Gary letter asserts that "the decennial census questionnaire is the most appropriate vehicle for collecting" citizen voting-age population ("CVAP") data for purposes of enforcing Section 2 of the VRA.  *Id.*

1368.  Other than the Gary letter, there is no evidence in the Administrative Record to support the assertion that existing CVAP data are in any way deficient for purposes of enforcing the

VRA, or that adding a citizenship question to the Decennial Census questionnaire is the most appropriate vehicle for collecting CVAP data.  PX-1 through PX-14 (AR).

1369.  DOJ has always relied on statistical estimates of CVAP rather than hard count data for purposes of VRA enforcement.  No DOJ case has ever been hampered or unsuccessful because of that fact.  Prior to December 2017, DOJ had never requested the inclusion of a citizenship question on the Decennial Census questionnaire.

1370.  There is nothing in the Administrative Record indicating that CVAP data collected through the Decennial Census will be more accurate or more precise than existing CVAP data used by DOJ.  PX-1 through PX-14.

1371.  On December 22, Director Jarmin advised Mr. Gary that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses.  This would result in higher quality data produced at a lower cost."  PX-71 (AR); PX-200; PX-197; PX-297 at RFA 184; Census Bureau 30(b)(6) Dep. Vol. I. at 85:1-15; Nov. 13 Trial Tr. at 961-62.

1372.  The Administrative Record reflects that the Census Bureau repeatedly requested a meeting with DOJ to discuss its request, but was rebuffed. PX-71 (AR); PX-75(R) (AR); PX-197; PX-198; PX-199; PX-200; PX-4 at AR 8651 (AR); PX-4 at AR 9074 (AR); Jarmin Dep. (Docket 511-2) at 64:17-18, 105:11-15; Census Bureau 30(b)(6) Dep. Vol. I. at 98:9-20; PX-297 at RFA 184, 189, 200.

## A.       Qualifications of Dr. Handley

1373.  Plaintiffs have offered the testimony of Dr. Lisa Handley to address the need for a census citizenship question to enforce Section 2 of the VRA.

1374.  Dr. Handley is a consultant in redistricting and in electoral district design.  She has over thirty years of experience as an expert in redistricting, minority voting rights, and the use of

census data for voting rights enforcement purposes, advising many jurisdictions and other clients on minority voting rights and redistricting-related issues and serving as an expert in dozens of voting rights cases.  Nov. 13 Trial Tr. at 787, 790-92.

1375.  Dr. Handley's clients have included state and local jurisdictions, the DOJ, national civil rights organizations, and such international organizations as the United Nations.  *Id.* at 790-92.

1376.  Dr. Handley holds a Ph.D. in political science from The George Washington University and she is currently a visiting research academic at Oxford Brookes University in the UK.  *Id.* at 788.

1377.  In the last dozen years, Dr. Handley has served as an expert in four cases that involved drawing redistricting plans featuring districts in which minorities constitute a majority of the citizen voting age population, two as an expert on behalf of DOJ.  *Id.* at 793-795.

1378.  Overall, Dr. Handley has served as a voting rights expert in more than 25 voting rights cases, including in six cases on behalf of DOJ; of the ten Section 2 redistricting cases DOJ has filed since 2006, it has retained Dr. Handley in five of them.  *Id.* at 794-96.

1379.  Dr. Handley has also co-authored a book, *Minority Representation and the Quest for Voting Equality*, as well as three other books, and her research on these topics has also appeared in a number of peer-reviewed journals and law reviews including her North Carolina Law Review Article entitled "Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence."  *Id.* at 789-90.

1380.  Based on her education, experience, and knowledge, Dr. Handley is well-qualified to offer opinions on Section 2 of the VRA, and the use of census data in Section 2 litigation and enforcement proceedings, and Dr. Handley's opinions in this case are reliable and credible.

## B.    The Department of Justice's Need for Decennial Census CVAP Data

### 1.    VRA Enforcement and the Use of Census Survey Data

1381.  In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court determined that minority plaintiffs had to satisfy three threshold factors to establish a violation of Section 2 of the VRA: 1) the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district; 2) the minority group must be politically cohesive; and 3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate.  Nov. 13 Trial Tr. at 797-99.

1382.  Dr. Handley testified that in most Section 2 cases, plaintiffs use data collected and reported by the Census Bureau to determine if there are a sufficient number of geographically concentrated minorities to satisfy the first *Gingles* precondition.  *Id.* at 798-99.

1383.  Dr. Handley testified that she occasionally uses Census Bureau data to conduct an analysis of voting patterns by race/ethnicity if registration or turnout data by race/ethnicity is not available.  *Id.* at 800.

1384.  Dr. Handley also testified that if a court finds that a jurisdiction is violating Section 2, Census Bureau data may be used in part to draw effective remedial districts, though the electoral behavior of those within the district—participation rates and cohesiveness by race—plays a far more important role.  *Id.* at 800-01.  When crafting remedial districts, Dr. Handley explained that she uses a district-specific, functional approach in which an analysis of voting patterns by race and ethnicity plays the essential role in the evaluation and citizenship rates are taken into account only indirectly.  This is the same approach DOJ has adopted.  Nov. 13 Trial Tr. at 823-24; PX-332.

1385.  In its redistricting-related work, DOJ has always relied on total population data collected through the Decennial Census.  The Census Bureau produces what is referred to as the PL 94-171 data file, which provides data to be used in redistricting at various levels of census geography, including census blocks.  Census Bureau Aug. 29 30(b)(6) Dep. at 38-39; Nov. 13 Trial Tr. at 1024 (Abowd).  The PL 94-171 data file has never had citizenship data in it.  *Id.* at 40; Nov. 13 Trial Tr. at 1025 (Abowd).  P.L. 94-171 data has margins of error associated with it. *Id.* at 48-49; Nov. 13 Trial Tr. at 1027 (Abowd).

1386.  Since the passage of the Voting Rights Act of 1965, the Decennial Census questionnaire directed to every household in the United States has not included a question about citizenship. Parties' Stipulations (Docket No. 480-1) ¶ 30; Nov. 13 Trial Tr. at 802-03 (Handley).  DOJ has never had CVAP data based on hard count total population enumeration data from the Decennial Census. Nov. 13 Trial Tr. at 802 (Handley); Gore Dep. at 203:5-10.

1387.  When it has needed citizenship data, DOJ has always relied on CVAP data based on statistical estimates for purposes of VRA enforcement.  Nov. 13 Trial Tr. at 802 (Handley); Gore Dep. at 173-76 (Objection); 203:5-10.

1388.  From the 1970 through 2000 Censuses, the Census Bureau included a citizenship question on the "long form" questionnaire; in 2000, the long form was sent to about one in every six households during each Decennial Census.  Parties' Stipulations ¶¶ 31, 33, 35.  Because the long form questionnaire was not sent to every household in the U.S., citizenship data based on responses to the long form were statistical estimates that had a margin of error.  Nov. 13 Trial Tr. at 802-03 (Handley), 1026 (Abowd).

1389.  Between the 2000 and 2010 decennial Censuses, the long form was discontinued and its functions were taken over by the ACS, which also includes a citizenship question and is sent to about 2% of households in the U.S. every year.  Parties' Stipulations ¶¶ 39-41.

1390.  The Census Bureau produces different CVAP data, including 1-year statistical estimates based on a single year of ACS survey responses for CVAP ("1-year ACS estimates") and 5-year statistical estimates aggregated from a consecutive 5-year period for CVAP ("5-year ACS estimates").  Parties' Stipulations ¶ 51; Nov. 13 Trial Tr. at 1028 (Abowd).

1391.  The 1-year ACS estimates are intended for areas with a population larger than 65,000, while the 5-year ACS estimates have a larger sample size and a smaller margin of error than 1-year ACS estimates, and are considered by the Census Bureau to be usable for all geographic areas.  Parties' Stipulations ¶¶ 53-54; PX-504; Nov. 13 Trial Tr. at 806-07 (Handley); 1028-29 (Abowd).

1392.  The 5-year ACS estimates represent a sample of about 1-in-8 households, roughly comparable to the long form's sample of about 1-in-6 households.  Parties' Stipulations ¶ 52; Nov. 13 Trial Tr. at 807 (Handley).

1393.  The Census Bureau's tabulation of CVAP data is publicly available.  Census Bureau Aug. 29 30(b)(6) Dep. at 41-42.

1394.  Dr. Handley described how she uses 5-year ACS CVAP estimates for purposes of analyzing the first *Gingles* precondition in VRA cases.  Dr. Handley testified credibly that such data are perfectly adequate for the purposes of VRA enforcement, and that her opinion to a reasonable degree of scientific certainty is that block-level CVAP data derived from the ACS are reliable and accurate.  Nov. 13 Trial Tr. at 808-19.

1395.  Dr. Handley further explained that the district-specific functional analysis that she

employs in VRA analysis, and used by DOJ, does not depend on precise measurement of CVAP

at the individual block level, but rather on an analysis of turnout rates and voting patterns within

a district.  Nov. 13 Trial Tr. at 819-24; PX-332.

### 2.  The Department of Justice Did Not See a Need for Decennial Census Data Prior to Being Contacted By Secretary Ross' Staff

1396.  Prior to this letter, in the 53-year history of the VRA, DOJ had never requested the

inclusion of a citizenship question on the decennial Census questionnaire directed to every

household in the United States.  Gore Dep. at 168-69 (Objection).

1397.  DOJ had also never communicated to the Census Bureau that ACS CVAP data was not

ideal for DOJ's VRA enforcement purposes.  Nov. 13 Trial Tr. at 996.

1398.  DOJ filed five Section 2 cases during the Obama Administration.  PX-515; Gore Dep. at

251.  The Obama Administration also had obligations under Section 5 of the VRA to review

voting changes in all or part of 16 states for more than four years before the decision in *Shelby

County v. Holder*, 570 U.S. 529 (2013); the Trump Administration has not had Section 5

obligations to the same extent.  Gore Dep. at 250-51.

1399.  DOJ has not filed any Section 2 VRA cases during the Trump Administration.  PX-515;

Gore Dep. at 249-50.

1400.  On July 1, 2016, Arthur Gary wrote a letter to then-Census Bureau Director John

Thompson in which he indicated that DOJ had no need to amend the current content or to request

new content in the ACS for the 2020 Census.  PX-1 at AR 311 (AR).

1401.  On November 4, 2016, Mr. Gary wrote another letter to Mr. Thompson to "supplement[]"

his July letter.  *Id.*  In the November 4, 2016 letter, Mr. Gary formally requested that the Census

Bureau include a topic on the ACS relating to LGBT populations.  *Id.* The November 4, 2016

letter does not request additional information on either the ACS or the 2020 Decennial Census questionnaire beyond this request about LGBT populations. *Id.* The November 4, 2016 letter does not make any request for the inclusion of a citizenship question on the Decennial Census questionnaire, nor does it make any mention of a need for better citizenship data. *Id.*

1402.  Mr. Gore testified that he was unaware of any changes in law since November 4, 2016 with respect to the data that plaintiffs may rely on to establish the first *Gingles* precondition for Section 2 VRA liability. Gore Dep. at 54-55.

1403.  Mr. Gore testified he is also unaware of any changes to the forms of citizenship data available to plaintiffs bringing VRA claims in order to satisfy the first *Gingles* precondition. *Id.* at 56.

1404.  Mr. Gore testified he knows of no changes in the social scientific community since November 4, 2016 regarding the assessment of the accuracy of citizenship estimates based on ACS data. *Id.* at 57 (Objection).

1405.  Mr. Gore first became involved in deliberations about whether or not to request a citizenship question on the Decennial Census around September 4, 2017. *Id.* at 73, 75.

1406.  At that time—a little more than three months before DOJ officially requested a citizenship question—Gore did not hold an opinion about whether hard-count CVAP data would be better for DOJ's VRA enforcement needs than would ACS statistical estimates. *Id.* at 77-78.

1407.  Mr. Gore testified that he was unaware of whether, by September 8, 2017, he held the opinion that the Decennial Census would be the best vehicle for collecting CVAP data for DOJ's VRA enforcement purposes. *Id.* at 79.

1408.  Mr. Gore testified that as of September 8, 2017 (the date Mr. Comstock wrote his memo stating that "Justice staff did not want to raise the [citizenship] question"), DOJ staff did not

want to raise a citizenship question.  Gore Dep. at 69; PX-133 (AR); PX-524 (AR); PX-537

(AR).

> **3.      There is No Evidence in the Administrative or Evidentiary Record to Support the Claims in the Gary Letter About the Purported Problems with Existing ACS CVAP Data**

1409.  Prior to the December 12, 2017 Gary Letter, the Census Bureau had never heard from

DOJ that the Census Bureau's tabulation of CVAP data was insufficient for purposes of VRA

enforcement.  Nov. 13 Trial Tr. at 996.

1410.  DOJ has not identified any cases it failed to bring, or any VRA cases it brought that were

unsuccessful, due to concerns about the accuracy of CVAP data.

1411.  The Gary letter states that ACS data "does not yield the ideal data for the purpose of"

Section 2 enforcement, and lists four bullet points in support:

> a.      DOJ uses Decennial Census "total population data . . . to determine compliance
>
> with the Constitution's one-person, one-vote requirement," but must then use
>
> "ACS citizenship estimates," for purposes of "conducting redistricting" or
>
> "enforcing Section 2"
>
> b.      ACS citizenship data "do not align in time with the Decennial Census data"
>
> c.      ACS citizenship "estimates are reported at a ninety percent confidence level, and
>
> the margin of error increases as the sample size—and, thus, the geographic area—
>
> decreases"
>
> d.      ACS citizenship data are not published at the smallest unit of census geography,
>
> the census block, requiring CVAP estimates for redistricting that "interject[s]
>
> further uncertainty."  PX-32 (AR).

1412.  With regard to the first assertion in the Gary Letter regarding the purported difficulty of using a "different data set[]," namely, "ACS citizenship estimates," for purposes "conducting redistricting" or "enforcing Section 2," PX-32 (AR), there is no evidence in the Administrative Record that supports this assertion.  PX-1 to PX-14 (AR).

1413.  DOJ has always relied on a separate data set for citizenship rates for purposes of VRA enforcement, even prior to the ACS.  *See supra*.

1414.  Dr. Handley testified that it is not difficult to combine the two data sets, that her work as an expert has never been impeded by the need to do so, and that she is unaware of a single case that failed because of the need to combine total population and CVAP data from separate data sets.  Nov. 13 Trial Tr. at 827-29.

1415.  Mr. Gore testified he is not aware of any time where DOJ, in enforcing the VRA, has had a single dataset that contained both total population and citizenship data.  Gore Dep. at 188-89. He similarly testified he is unaware of any filed VRA cases where DOJ or any plaintiff was unsuccessful because citizenship data and total population data were in two different data sets. *Id.* at 190-91.

1416.  Dr. Abowd testified is not sure yet whether the Census Bureau will in fact be able to produce a single dataset with block-level CVAP data from the 2020 Decennial Census.  Nov. 13 Trial Tr. at 1029.  The Census Bureau has not yet determined how it will assemble the CVAP tabulation, or whether it will be included in the P.L. 94-171 data file.  Census Bureau 30(b)(6) Vol. I Dep. at 56.

1417.  With regard to the second claim in the Gary letter, that ACS citizenship data "do not align in time with the decennial census data," PX-32 (AR), there is no evidence in the Administrative Record that supports this assertion.  PX-1 to PX-14 (AR).

1418. Dr. Handley testified ACS citizenship data are available that align in time with Decennial Census data by using the 5-year ACS dataset with a midpoint that aligns with the Decennial Census year.  Nov. 13 Trial Tr. at 829-30.  She testified that her work has never been impeded because ACS 5-year estimates are collected over a longer period of time than Decennial Census data, and the she is unaware of any case in which a claim failed because of the purported misalignment in time between Decennial Census total population data and 5-year ACS CVAP estimates.  *Id.*

1419. Mr. Gore testified he is unaware of any case filed by DOJ under the VRA or filed by any plaintiff that was unsuccessful because ACS citizenship data does not align in time with Decennial Census data.  Gore Dep. at 194-95.

1420. With regard to the Gary Letter's third assertion, that ACS citizenship "estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases," PX-32 (AR), there is no evidence in the Administrative Record that supports the suggestion that this has impeded VRA enforcement. PX-1 to PX-14 (AR).

1421. As an initial matter, it is not the case that, in contrast to ACS CVAP estimates, the total population data from the Decennial Census lacks margins of error.  The P.L. 94-171 data has also has margins of error associated with it.  Nov. 13 Trial Tr. at 1027 (Abowd).

1422. DOJ has always relied on CVAP data that are sample-based estimates featuring a margin of error.  Even before the ACS, when the Census Bureau included a citizenship question on the "long form" questionnaire, the data produced based on responses to the long form were statistical estimates that had a margin of error.  Nov. 13 Trial Tr. at 802-03 (Handley), 1026 (Abowd).  Dr. Handley testified that her work as a VRA expert has never been hampered by this fact, and that

she is unaware of any cases in which a claim failed due to reliance on statistical estimates of CVAP.  Nov. 13 Trial Tr. at 830-32.

1423.  Mr. Gore testified that as long as DOJ has been enforcing the VRA, it has always relied upon statistical estimates for citizenship data, and that he is unaware of any cases filed by DOJ where DOJ was unsuccessful because the CVAP data it relied upon had a margin of error that increases as the geographic area decreases; and that he was unaware of any cases where a claim failed because the plaintiffs relied on 5-year ACS estimates.  Gore Dep. at 173-76 (Objection), 203-04.

1424.  With regard to the fourth claim of the Gary letter—that "redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan," PX-32 (AR)—there is no evidence in the Administrative Record that this inhibits VRA enforcement in any way.  PX-1 to PX-14 (AR).

1425.  Dr. Handley testified that in VRA cases involving states and larger jurisdictions, there is often no need to split census blocks either to satisfy the first prong of the *Gingles* test or to draw remedial districts.  Nov. 13 Trial Tr. at 810.

1426.  Dr. Handley further testified that for instances in which splitting census blocks are necessary (such as those involving smaller geographies), VRA plaintiffs have relied on available CVAP at the tract or block group level to estimate CVAP at the census block level using one of several reliable methods to conduct this analysis and generate estimates of the CVAP of particular racial groups at the block level, and that these estimation procedures are sufficiently reliable to a reasonable degree to scientific certainty.  Nov. 13 Trial Tr. at 810-19, 856.

1427.  Dr. Handley testified that, to the extent that block-level CVAP data is necessary in a case, it has always been obtained through the use of an estimation procedure, but that this has never hampered her work as a VRA expert and that she is unaware of any case that failed before of the use of such an estimation procedure.  Nov. 13 Trial Tr. at 831-32 (Handley).

1428.  Mr. Gore testified that he is unaware of any time in which DOJ had access to block-level CVAP that was produced without using an estimation procedure to develop that data from a different level of geographic specificity, and that he is unaware of any case failing because of the need to employ such an estimation procedure.  Gore Dep. at 235-37.

1429.  Overall, none of the cases cited in the Gary Letter involved a claim that failed because of reliance on statistical estimates of CVAP data based on data collected separate and apart from the "full count" Decennial Census; plaintiffs in all of the cases cited in the letter relied on sample-based CVAP estimates without any problems.  Nov. 13 Trial Tr. at 824-25 (Handley).

1430.  AAAG Gore testified that he is aware of only one case in which plaintiffs bringing a VRA were unsuccessful in part because of their reliance on ACS data, *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010); Gore Dep. at 244.

1431.  DOJ did not bring the *Benavidez* case, which expressed no opinion as to the general reliability of ACS number for VRA purposes and explained that the plaintiffs relied on 1-year ACS estimates for CVAP data.  Gore Dep. at 242-46.  The Plaintiffs in *Benadidez* did not rely on 5-year ACS estimates.  As noted, *supra*, 1-year ACS estimates are not considered reliable for areas with a population less than 65,000; while 5-year ACS are considered reliable by the Census Bureau for any geographic area. PX-504;  Nov. 13 Trial Tr. at 806-07 (Handley), 1029 (Abowd).

1432.  For both statewide and local districting purposes, the current data available is perfectly adequate for meeting the *Gingles* requirements and drawing adequate remedial districts to a

reasonable degree of scientific certainty, as Dr. Handley credibly explained and as Defendants

have not rebutted.  *See* Nov. 13 Trial Tr. at 840-42.

> **4.      There is No Evidence in the Administrative or Evidentiary Record
> Indicating that CVAP Data Collected through the Decennial Census
> Will Be an Improvement for VRA Enforcement Purposes over
> Existing ACS CVAP Data**

1433.  There is no evidence in the Administrative Record that if a citizenship question is

included on the decennial form that the data would be more accurate or more precise for VRA

purposes than existing survey data used. PX-1 to PX-14 (AR).

1434.  Rather, the evidentiary record in this case suggests data gathered through the Decennial

Census may, in fact, be less accurate and less precise for such purposes.  Nov. 13 Trial Tr. at

834, 840 (Handley), 956-57 (Abowd).

1435.  With respect to *accuracy*, the trial record indicates that CVAP data collected through the

Decennial Census will not be more accurate than existing ACS CVAP Data.  Dr. Handley

testified that the Decennial Census itself has several types of errors: (1) coverage errors, which

arise when persons are incorrectly excluded, included, or duplicated in the count; (2) geographic

errors, which happen when an address was placed in the wrong census geographic location or a

misunderstanding of the census residence rules; and (3) demographic errors, which occur when a

person's demographic characteristics have been incorrectly reported, recorded, or imputed.  Nov.

13 Trial Tr. at 832-34; *see also* Census Bureau Aug. 29 30(b)(6) Dep. at 49.

1436.  In its post-2010 enumeration survey, the Bureau estimated that "among the 300.7 million

people who live in housing units, about 94.7 percent were counted correctly, 3.3 percent were

counted erroneously, 1.6 percent provided only a census count and had their demographic

characteristics imputed, and .4 percent needed more extensive imputation after all census follow-

up efforts were attempted."  PX-333 at 1.  The Bureau also estimated there were 16.0 million

omissions in the 2010 census (although it indicates that 6 million of these people were likely to have been counted in the census but could not be verified in the post-enumeration survey).  *Id.* These omissions disproportionately affect certain segments of the population, including blacks and Hispanics, who are more likely not to be counted than others.  *Id.*

1437.  As noted, *supra*, documents in the Administrative Record including Dr. Abowd's memos dated January 19, 2018, and March 1, 2018, indicate that the addition of a citizenship question will exacerbate these errors and harm the overall quality of Census data.  In particular, Dr. Abowd's January 19 Memo in the Administrative Record noted "[m]ajor potential quality and cost disruptions" from the addition of a citizenship question.  PX-22 (AR) at 2.  *See also* Nov. 13 Trial Tr. at 832-34 (Handley).  Dr. Abowd testified that there is considerable evidence indicating that a citizenship question will depress census participation among noncitizens and Hispanics. Nov. 14 Trial Tr. at 1249.  Data collected through the NRFU process will not be as accurate as data collected from self-response; as Dr. Abowd testified, NRFU creates more erroneous enumeration, whole person census imputations, and gross omissions, all of which raise error rates.  PX-25 (AR); Nov. 13 Trial Tr. at 966-70.

1438.  With respect to *precision*, disclosure avoidance techniques employed by the Census Bureau to mask responses to the Census questionnaire will render block-level CVAP data imprecise, which undermines any justification for adding a citizenship question to the 2020 Decennial Census based on any purported need for "hard count" CVAP data.

1439.  Because of confidentiality concerns, citizenship data reported in the Decennial Census will have to go through a disclosure avoidance process to prevent the personal identification of individuals or families in relation to their reported answers.  Census Bureau Aug. 29 30(b)(6) Dep. at 50-51; Nov. 13 Trial Tr. at 1032-33, 1039-46 (Abowd).

1440.   For example, some census blocks only have one person on them.  Nov. 13 Trial Tr. at 837-38 (Handley); 1031-32 (Abowd).  In census blocks where there is only one person, the Census Bureau produces block-level CVAP data in which it will not publish that person's actual citizenship status as reported in their response to a citizenship question.  Census Bureau Aug. 29 30(b)(6) Dep. at 65-68; Nov. 13 Trial Tr. at 1032-33, 1036 (Abowd)

1441.   The Census Bureau has not yet set the parameters for the 2020 disclosure avoidance system, but they have used two primary techniques in the past: household-level swapping and synthetic noise infusion.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-41 (Abowd).

1442.   In previous censuses, the Census Bureau has employed household-level swapping, meaning that the certain variables on the household record are matched to variables on a household record in a different geographic area and across census blocks.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-40.  For households selected for swapping, all the values are swapped except the address ID so it looks as if the data from a different address lived at the address of the original.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-40 (Abowd).

1443.   In this Census, the Census Bureau will employ synthetic noise infusion, which involves identifying sensitive responses and then using a statistical model to replace the sensitive value with a value that is sampled from the model and its error distribution.  Census Bureau Aug. 29 30(b)(6) Dep. at 53-54; Nov. 13 Trial Tr. at 1039-42 (Abowd).

1444.   By nature, the disclosure avoidance process introduces further errors into CVAP data produced at the block level.  Census Bureau Aug. 29 30(b)(6) Dep. at 53-56, 69-71, 100-01.

1445.  The Census Bureau will undertake disclosure avoidance for every census block, meaning that—except for randomly—there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 Decennial Census questionnaire.  Census Bureau Aug. 29 30(b)(6) Dep. at 67-68; Nov. 13 Trial Tr. at 1033 (Abowd).  The block-level CVAP produced by the Census Bureau will not reflect the actual citizenship status of each individual in each census block as reported from a citizenship question on the census questionnaire.  Census Bureau Aug. 29 30(b)(6) Dep. at 67-68, 70-71.

1446.  Block-level CVAP data based on responses to a citizenship question will be estimates rather than a precise tabulation.  Nov. 13 Trial Tr. at 1043-44 (Abowd).  Thus, even with the inclusion of a citizenship question on the Census, the block-level CVAP data produced by the Census Bureau will still have margins of error associated with it. Census Bureau Aug. 29 30(b)(6) Dep. at 71; Nov. 13 Trial Tr. at 1044 (Abowd).  As with ACS CVAP data currently used by DOJ, the CVAP data based on responses to a citizenship question will be estimates that will be more precise for areas with larger populations, but will be less precise, more uncertain, and will have larger margins of error for geographic units with smaller populations.  Nov. 13 Trial Tr. at 1041-42 (Abowd).

1447.  The Census Bureau has not determined if, after disclosure avoidance, the error margins for the block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census Bureau Aug. 29 30(b)(6) Dep. at 100-101.  The Census Bureau does not know if the CVAP produced based on responses to a citizenship question will have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies. *Id.*; Nov. 13 Trial Tr. at 1044-46.

A citizenship question therefore cannot be justified based on a purported need for more precise CVAP data.

1448.  There are no documents in the Administrative Record indicating that DOJ considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.  *See* PX-1 to PX-14 (AR).  There were no conversations between the Census Bureau and DOJ regarding this issue.  Nov. 13 Trial Tr. at 1046 (Abowd).

1449.  There are no documents in the Administrative Record indicating that Secretary Ross considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.  *See* PX-1 to PX-14 (AR); Nov. 13 Trial Tr. at 1047-48 (Abowd).

1450.  Dr. Abowd testified that he informed Secretary Ross of disclosure avoidance issues, but Secretary Ross nevertheless made the decision to order the inclusion of a citizenship question. Nov. 13 Trial Tr. at 1046-48 (Abowd).

### 5.     The Administrative and Evidentiary Record Indicate the Decision to Include a Citizenship Question on the Census Will Produce Less Accurate CVAP Data for VRA Enforcement Purposes than Using Administrative Records

1451.  The Administrative Record indicates that, to the extent DOJ could use better-quality CVAP data than it currently has, a better option would be to use administrative records than a citizenship question on the Census (Alternative C).  In Dr. Abowd's January 19 memo, the Census Bureau concluded that adding a citizenship question to the 2020 Decennial Census "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  PX-22 at 1 (AR); Nov. 13 Trial Tr. at 885 (Abowd testimony).  The Census Bureau determined that using administrative

records under Alternative C "best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count." PX-22 at 1; Nov. 13 Trial Tr. at 886 (Abowd testimony).

1452.  Using administrative records will produce more accurate block-level CVAP data than adding a citizenship question—either alone or in combination with administrative records—for three reasons.  The first reason is that administrative records tend to be more accurate than survey self-responses as to citizenship status, particularly for noncitizens.  Nov. 13 Trial Tr. at 955 (Abowd).

1453.  There is sometimes disagreement between a person's citizenship status as reflected in administrative records and what is reported for that person in response to the ACS citizenship question.  PX-22 at 7-8; Nov. 13 Trial Tr. at 953-54 (Abowd).

1454.  The Census Bureau describes citizenship status as reflected in the administrative records as "verified," because the administrative records are a legal document indicating a person's citizenship status. PX-22 at 7 (AR); Nov. 13 Trial Tr. at 954 (Abowd testimony).

1455.  By contrast, the Census Bureau describes citizenship status as reported in response to the ACS citizenship question as "unverified" or a "survey response," because it does not constitute a legal document. PX-22 at 7 (AR); Nov. 13 Trial Tr. at 954-55.

1456.  Dr. Abowd believes that administrative records tend to report more accurate citizenship status data than do survey records.  PX-22 at 7 (AR); PX-162 at 46 ("the survey responses are more often inaccurate when they disagree"); PX-4 at 7913 et seq (AR); Nov. 13 Trial Tr. at 955. The Census Bureau has determined that citizenship data gathered based on survey responses to a citizenship question are of "suspect quality," while administrative record citizenship data are "high quality." PX-25 (AR); Nov. 13 Trial Tr. at 974.

1457.  In the 2016 ACS, individuals whom the administrative records indicate are noncitizens responded that they were citizens 34.7 percent of the time. PX-22 at 8 (AR).  That number rose even higher on the 2017 ACS.  Census Bureau Aug. 29 30(b)(6) Dep. at 91-92; Nov. 13 Trial Tr. at 915-16 (Abowd testimony).  Dr. Abowd estimates that more than 30 percent of noncitizens provide an inaccurate response to the ACS citizenship question. PX-22 at 8 (AR); Nov. 13 Trial Tr. at 956.

1458.  The Census Bureau has no empirical basis to believe that noncitizens would give more accurate responses to the citizenship question on the Census than they do on the ACS.  Census Bureau Aug. 29 30(b)(6) Dep. at 93; Nov. 13 Trial Tr. at 956-57.  To the contrary, the Census Bureau believes that there are "definitely indications" that responses by noncitizens to a citizenship question on the 2020 Decennial Census will be even less accurate than they have historically been on the ACS. Nov. 13 Trial Tr. at 957.

1459.  The Census Bureau estimates that there would be 9.5 million people for whom the survey self-response and the administrative record would disagree on citizenship status. PX-24 at 4 (AR); Nov. 13 Trial Tr. at 982.  For this group, the traditional Census Bureau practice would be to rely on the survey response rather than the administrative record—a practice that Dr. Abowd states would be less accurate.  PX-25 at 4 (AR); Census Bureau Oct. 5 30(b)(6) Dep. at 416-17; Nov. 13 Trial Tr. at 982-83 (Abowd).  If instead the Census Bureau were to use administrative records to produce CVAP data and did not include a citizenship question, the Bureau would not have situations in which there were disagreements between survey responses and administrative records, and would, on balance, produce higher quality and more accurate CVAP data. Nov. 13 Trial Tr. at 958.

1460.  The Census Bureau has made no determination about how it will address disagreement between survey responses on a citizenship question on the 2020 Decennial Census and the administrative records regarding citizenship status when producing block-level CVAP data for DOJ. Nov. 13 Trial Tr. at 957.  There have been no conversations with DOJ about how the CVAP tabulation will be assembled from the various forms of citizenship data available to the Census Bureau.  Census Bureau Aug. 29 30(b)(6) Dep. at 62; ; Gore Dep. at 273-74; Nov. 13 Trial Tr. at 962-63 (Abowd).

1461.  A second reason that Alternative C (relying on administrative records) will produce more accurate CVAP data than adding a citizenship question to the 2020 Decennial Census (either alone or in combination with using administrative records) is that adding a citizenship question will result in lower-quality Census data and fewer people who can be linked to administrative records. Nov. 13 Trial Tr. at 969.

1462.  Because a citizenship question would produce lower-quality personal data because fewer people will self-respond to the Census, there would also be a reduction in the number of people whom the Census Bureau can link to administrative records under Alternative D. PX-25 (AR); Nov. 13 Trial Tr. at 969.  The Census Bureau was able to link 93 percent of self-responses to administrative records in the 2010 Census; by contrast, the Census Bureau was only able to link 33.8 percent of proxy responses obtained through the NRFU responses to administrative records in the 2010 Census. *Id.*

1463.  The Census Bureau estimates that, under Alternative D, there would be about 36 million people who cannot be linked to administrative records on citizenship—greater than the number of people who the Census Bureau estimates would not be able to be linked to administrative records under Alternative C.  PX-24 at 4 (AR); Nov. 13 Trial Tr. at 981.  The Census Bureau

believes that there would be a greater number of people who could not be linked to administrative records under Alternative D than under Alternative C because a citizenship question would reduce self-response rates and drive more people into NRFU efforts, which hurts data quality.  PX-24 at 3-4 (AR); Nov. 13 Trial Tr. at 981.  This means that, in comparison to Alternative C, Alternative D would result in more people whose citizenship status cannot be determined by linking them to administrative records.

1464.  ACS item non-response rates and break-off rates indicate that Hispanics as compared to non-Hispanic whites, are more likely not to respond to a citizenship question on the Census.  Nov. 13 Trial Tr. at 919-20 (Abowd); Nov. 9 Trial Tr. at 737-38 (Barreto).  Under Alternative D, for individuals who do not respond to a citizenship question and cannot be linked to administrative records, modeling of citizenship status will still be necessary.  Nov. 5 Trial Tr. at 35 (Hillygus); Nov. 13 Trial Tr. at 976 (Abowd).  The Census Bureau estimates that there will be 13.8 million people who do not provide a response to the citizenship question, and who cannot be linked to administrative records.  PX-24 at 4 (AR).

1465.  A third reason that Alternative C (relying on administrative records) will produce more accurate CVAP data than adding a citizenship question to the 2020 Decennial Census (either alone or in combination with using administrative records) is that, for people who cannot be linked to administrative records, modeling citizenship status produces more accurate data in comparison to self-reported survey responses.  Nov. 13 Trial Tr. at 976 (Abowd).

1466.  Secretary Ross' memo claims that a downside to Alternative C—using administrative records without a citizenship question—is that the Census Bureau would have to impute, or model, the citizenship status for respondents who cannot be linked to administrative records. PX-26 at 4 (AR); Nov. 13 Trial Tr. at 970 (Abowd).  Secretary Ross' memo claims that using both a

citizenship question and administrative records might eliminate the need for modeling citizenship status for respondents who cannot be matched to administrative records, because the Census Bureau would be able to rely on survey responses. PX-26 at 5 (AR); Nov. 13 Trial Tr. at 971-3 (Abowd).

1467.  The Census Bureau estimated that under Alternative C, the Census Bureau would be able to link 295 million out of the 330 million people expected to be enumerated in the 2020 Decennial Census to administrative records—meaning that 89.4 percent of the population would be linked to administrative records and 10.6 percent of the population would fall into an administrative record gap. PX-24 at 3 (AR); Nov. 13 Trial Tr. at 978-79 (Abowd testimony). Under Alternative C, then, the Census Bureau has estimated that it would model citizenship status for about 10.6 percent of the population. PX-24 at 3 (AR); Nov. 13 Trial Tr. at 979.

1468.  A major difference between Alternatives C and D, then, is that for respondents who cannot be linked to administrative records, the Census Bureau under Alternative C would model respondents' citizenship status, and under Alternative D would use survey self-responses. Nov. 13 Trial Tr. at 973.

1469.  The Census Bureau estimates that under Alternative D there would be 22.2 million people who couldn't be linked to administrative records but who would provide a survey response to the citizenship question—comprising about 6.7 percent of the population. PX-24 at 4 (AR); Nov. 13 Trial Tr. at 981, 984.

1470.  The Census Bureau states that one problem with relying on survey responses to fill gaps in administrative records is that noncitizens have a strong incentive to provide an incorrect answer to the citizenship question or not answer at all. PX-25 at 4 (AR); PX-162 at 19; Nov. 13 Trial Tr. at 973 (Abowd testimony).  Even a large number of legal permanent residents provide incorrect

answers to the ACS citizenship question. PX-25 at 4 (AR); Nov. 13 Trial Tr. at 973 (Abowd

testimony).  The Census Bureau has concluded that survey-collected citizenship data may not be

reliable for many respondents for whom there are no administrative records. PX-25; Nov. 13

Trial Tr. at 973-74.

1471.  Dr. Abowd and the Census Bureau believe that, for individuals who cannot be linked to

administrative records on citizenship, the modeling conducted under Alternative C would be

more accurate than survey responses under Alternative D for respondents who cannot be

matched to administrative records. Nov. 13 Trial Tr. at 975.  As such, the Census Bureau would

prefer modeling to survey responses in determining citizenship status for respondents who

cannot be linked to administrative records. Nov. 13 Trial Tr. at 975-76; PX-162 at 46.

1472.  There are an estimated 22.2 million people under Alternative D for whom there would be

a survey response to the citizenship question but not an administrative record; for this group, the

Census Bureau believes that relying on the survey response would be less accurate than

modeling their citizenship status.  Nov. 13 Trial Tr. at 985.

1473.  The Census Bureau estimates that under Alternative D there would be 13.8 million people

who have no administrative record on citizenship and would also provide no survey response to a

citizenship question.  PX-24 at 4 (AR); Nov. 13 Trial Tr. at 981.  Under Alternative D, modeling

of citizenship status for this group would still be necessary.

1474.  The Brown, et al memo contains analyses of various scenarios with respect to Alternatives

C and D, which led to the same conclusion: that it will produce worse quality Census data overall

and worse quality citizenship data specifically.  PX-162 at 49-53; Nov. 13 Trial Tr. at 986

(Abowd testimony).

1475.  Secretary Ross' decision memo stated that including a citizenship question on the 2020 Decennial Census would enable the Census Bureau to model citizenship status more accurately. PX-26; Nov. 13 Trial Tr. at 977. (Abowd testimony).

1476.  No one at the Commerce Department ever discussed Secretary Ross' contention that a citizenship question would enable the Census Bureau to model citizenship status more accurately with Dr. Abowd. Nov. 13 Trial Tr. at 977.  Secretary Ross' conclusion that including a citizenship question on the 2020 Decennial Census would enable the Census Bureau to model citizenship status more accurately is based on technical presumptions that the Census Bureau does not currently endorse. *Id.*  At the time of Secretary Ross' decision memo, the Census Bureau had not completed any analysis as to whether or not the inclusion of a citizenship question would enable the Census Bureau to more accurately model citizenship status for people who are not listed in administrative records. *Id.* at 978.

1477.  Both Dr. Abowd and the Census Bureau disagree with Secretary Ross' claim that Alternative D is justified over Alternative C because Alternative C requires modeling for people who cannot be linked to administrative records.  PX-25 at 5 (AR); Nov. 13 Trial Tr. at 985-86. When Secretary Ross wrote in his decision memo that Alternative D may eliminate the need for the Census Bureau to model the citizenship status for millions of people, the Census Bureau had already communicated its conclusion to Secretary Ross that Alternative D would not eliminate that modeling need.  PX-25 at 5 (AR); Nov. 13 Trial Tr. at 988.

1478.  In sum, Dr. Abowd and the Census Bureau concluded that, contrary to the assertions in Secretary Ross's decision memo, adding a citizenship question is not necessary to provide a complete and accurate response to DOJ's request.  Nov. 13 Trial Tr. at 1048 (Abowd testimony). Compare PX-22 at 1 (AR) (Abowd Memo) with PX-26 at 8 (AR) (Ross Decision Memo).

1479.  Acting AAG Gore also acknowledged that a citizenship question on the Decennial Census questionnaire is not necessary for DOJ's VRA enforcement efforts.  Gore Dep. at 300.

## X.    INJURY TO ORGANIZATIONS AND GOVERNMENTAL PLAINTIFFS

1480.  The evidence establishes that adding a citizenship question to the Decennial Census will cause several types of harms to the NGO and Governmental Plaintiffs. Both sets of Plaintiffs will be forced to devote more resources to a Decennial Census that includes a citizenship question than they would have done otherwise. Adding a citizenship question will also harm the NGO and Governmental Plaintiffs in other ways, including by causing a decline in self-reporting leading to a differential undercount that will cause them to lose political power from malapportioned legislative districts. Because adding a citizenship question will cause both a differential undercount and undermine the accuracy of the count, it will also harm the NGO and Governmental Plaintiffs by reducing federal funding to their communities and distorting allocation of resources. And adding a citizenship question to the  Decennial Census injures the NGO Plaintiffs' members by invading their right to privacy.

### A.  Organizational Injuries to NGO Plaintiffs

1481.  Each NGO Plaintiff has suffered harm as a result of being required to divert resources from other organizational priorities and spend more money to address the effects of the fear created by a citizenship question among community members who are less likely to respond to the Decennial Census questionnaire. *See* Plum Aff. (Docket No. 498-19) ¶¶ 12-23; Choi Aff. (Docket No. 489-1) ¶¶ 14-22; Altschuler Aff. (Docket No. 503-1) ¶¶ 7-11; Khalaf Aff. (Docket No. 498-16) ¶¶ 15-29; Escobar Aff. (Docket No. 498-3) ¶¶ 15-29.

1482.  The NGO Plaintiffs have also proved harm to their organizational missions—all of which include promoting engagement in and representation of immigrant communities of color—as a

result of a citizenship question. *See* Plum Aff. ¶¶ 10-13; Choi Aff. ¶¶ 3-9, 14-15; Altschuler Aff. ¶¶ 11-22; Khalaf Aff. ¶¶ 13-16; Escobar Aff. ¶¶ 15, 20-25.

1483.  Moreover, as Dr. Abowd testified, a critical component of the Census Bureau's outreach to hard-to-count communities is through its "trusted partners" program, which involves non-profit organizations such as the NGO Plaintiffs. Census Bureau 30(b)(6) Vol I. Dep. at 453, 462; Nov. 11 Trial Tr. at 1119.

1484.  Dr. Abowd admitted that, as demonstrated by the Census Barriers, Attitudes and Motivators Survey (CBAMS), the macro-environment has created "significant barriers associated with self-response that may plausibly and credibly be related to a citizenship question" which has made outreach more difficult for trusted partners such as the NGO Plaintiffs. Nov. 11 Trial Tr. at 1123; PX-158 (AR); PX-162; PX-448; PX-662.

1485.  As Dr. Abowd testified, many of the trusted partners (including the NGO plaintiffs) will need to spend their own money and resources to address the negative effects of a citizenship question. Census Bureau 30(b)(6) Vol I. Dep. at 453, 462; Nov. 11 Trial Tr. at 1121-22.

### 1.  NYIC

1486.  Plaintiff NYIC, its member organizations, and the communities NYIC serves all have a fundamental interest in ensuring as complete and accurate a Decennial Census as possible, principally because an undercount would diminish crucial governmental funding and political representation to which immigrant communities are entitled. Choi Aff. ¶¶ 6-7.

1487.  NYIC has worked to encourage Decennial Census response rates among noncitizens in prior Decennial Censuses; in the 2010 Decennial Census cycle, NYIC launched an outreach campaign to boost immigrant participation in the Decennial Census, held press briefings with elected officials, and coordinated public service announcements in 24 languages that appeared in 69 newspapers. *Id.* ¶ 9; Plum Aff. ¶ 10.

1488.  NYIC had planned to engage in similar work in the 2020 Decennial Census in mid-2017 before the announcement of a citizenship question. Choi Supp. Aff. (Docket No. 489-2) ¶ 10.

1489.  A citizenship question has substantially increased the amount of resources NYIC felt necessary to devote to the Decennial Census and has already caused NYIC to divert resources from other program areas to accelerate its Census education and outreach work for the 2020 Decennial Census. Choi Aff. ¶¶ 16-21; Plum Aff. ¶ 14.

1490.  NYIC has also shown that fear in its community due to the addition of a citizenship question will make their efforts to encourage participation of noncitizens in the 2020 Decennial Census more difficult. Choi Aff. ¶¶ 12-15; Plum Aff. ¶ 13.

1491.  NYIC and several of its member organizations have also reported community members who have expressed reluctance or unwillingness to respond to the 2020 Decennial Census because of a citizenship question. Plum Aff. ¶¶ 15-21.

1492.  Further, NYIC demonstrated that because of the heightened fear and suspicion created by a citizenship question, it has expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the noncitizen community. Choi Aff. ¶¶ 17-21; Plum Aff. ¶ 14.

1493.  Prior to the decision to add a citizenship question, NYIC did not anticipate having to commence significant Census education and outreach work until the Summer of 2019. Choi Aff. ¶ 18.

1494.  Instead, as a result of the announcement of Secretary Ross's decision, NYIC had to accelerate the start of significant Census work to March 2018. Choi Aff. ¶¶ 10, 18; Plum Aff. ¶ 11.

1495.  The decision to add a citizenship question to the 2020 Decennial Census has required NYIC both to make substantial and additional investments just to achieve Census participation rates comparable to what NYIC would have achieved absent a citizenship question, Choi Aff. ¶ 16; Plum Aff. ¶ 14, and to hire more staff than previously planned, Choi Aff. ¶ 19.

1496.  To alleviate fear and confusion caused by a citizenship question among the immigrant communities that NYIC and its members serve, NYIC has had to begin its Census education and outreach efforts substantially earlier and engage many more staff, members, and partners than planned—i.e., in March 2018, instead of in 2019. Choi Aff. ¶ 18.

1497.  Prior to the addition of a citizenship question, NYIC had planned to spend approximately $625,000 on Census education and outreach over a three-year period ahead of the 2020 Decennial Census. Choi Aff. ¶ 16.

1498.   Instead, over the next three years and due to a citizenship question's addition, NYIC is planning to spend approximately $1 million on community education and outreach efforts to work towards a complete and accurate count within the communities that NYIC and its member organizations serve—representing an increase of approximately 60% over what the organization would have spent in the absence of a citizenship question. Choi Aff. ¶ 16; Plum Aff. ¶ 14.

1499.  So far in 2018, as a result of the decision to add a citizenship question, NYIC has spent at least $93,000 on Census-related activities that it would have not spent otherwise. Choi Aff. ¶ 17; Plum Aff. ¶ 14.

1500.  NYIC anticipates spending an additional amount in excess of $282,000 between now and May 2020 as a result of a citizenship question. Choi Aff. ¶ 17.

1501.  The fear and confusion brought on by the decision to add a citizenship question prompted NYIC to hire a dedicated, full-time senior Census fellow at a cost of approximately $36,000 in

the year to date; absent a citizenship question, NYIC would not have hired such a fellow until 2019. *Id.* ¶ 19.

1502.  NYIC also hired multiple paid Census Interns to engage with NYIC's ongoing communications, training, and education needs as they related to a citizenship question, at a cost of nearly $10,000 in the year to date. *Id.* ¶ 19.

1503.  Without a citizenship question, NYIC would not have hired any Census-focused interns, but now anticipates spending $50,000 on interns through May 2020. *Id.*

1504.  NYIC also expended resources to broaden the reach of the New York Counts 2020 conference to address concerns among NYIC's members and their communities arising out of the decision to add a citizenship question, which cost over $19,000—excluding the cost of the time for organizational staff or the senior Census fellow. *Id.*

1505.  NYIC is also in the process of hiring a full-time manager of democracy policy, an estimated 40% of whose time through May 2020 will be spent on work generated by a citizenship question, costing approximately $41,000. *Id.*

1506.  NYIC has also made or anticipates making considerable and additional expenditures for communications, training, and travel expenses to educate members of the immigrant communities it serves about the Decennial Census and a citizenship question in particular—it anticipates these expenditures will total approximately $100,000. *Id.* ¶ 20.

1507.  Because of these increased expenditures and time commitments, NYIC has shown it will need to divert resources from other mission critical areas including health care, language access, and employment issues. Plum Aff. ¶ 23.

1508.  NYIC diverted and anticipates continuing to have to divert 10% of the staff time from the organization's managers of member engagement for the Long Island, Western New York,

Hudson Valley, and Central New York regions to address concerns related to a citizenship question, costing approximately $19,000. Choi Aff. ¶ 19.

1509.  Since March 2018, NYIC has had to divert approximately 20% of staff time from the organization's director of immigration policy to staff work, at a cost of approximately $14,000 to the organization. *Id.*

### 2.      Make the Road New York

1510.  Plaintiff MRNY has demonstrated an ongoing commitment to promoting engagement in the Decennial Census among its members and constituents. Altschuler Aff. ¶ 7.

1511.  MRNY has worked to encourage Census response rates among noncitizens in prior Decennial Censuses, worked on census advisory committees, and planned to engage in similar work in the 2020 Decennial Census before the announcement of a citizenship question. *Id.*

1512.  A citizenship question has increased the amount of resources MRNY felt necessary to devote to this area and has already caused MRNY to divert resources from other program areas to accelerate its Census education and outreach work for the 2020 Decennial Census. *Id.* ¶ 19.

1513.  MRNY has also shown that the fear in its community due to the addition of a citizenship question will make their efforts to encourage participation of noncitizens in the 2020 Decennial Census more difficult. *Id.* ¶¶ 13, 19.

1514.  MRNY has reported at least six members who have expressed reluctance or unwillingness to respond to the 2020 Decennial Census because of a citizenship question. *Id.* ¶¶ 14-17.

1515.  Further, MRNY demonstrated that because of the heightened fear and suspicion created by a citizenship question, they have expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the noncitizen community. *Id.* ¶¶ 13, 19.

1516.  Because of the heightened fear and suspicion created by a citizenship question, MRNY has begun its 2020 Decennial Census outreach earlier than initially anticipated and will be forced to expend more resources than initially anticipated to try to reduce the negative effect of this question on the response rate in the immigrant communities of color it serves. *Id.* ¶ 19.

1517.  MRNY anticipates expending at least double the amount on 2020 Decennial Census education and outreach that the organization spent on its efforts to encourage participation in the 2010 Decennial Census. *Id.*

1518.  To date, far more than a year out from the 2020 Decennial Census, MRNY has already created a two-page informational sheet for educational purposes, and its communications team has spent several hours creating and sharing social media content to educate the public and encourage them to submit public comments on a citizenship question. *Id.* ¶ 20.

1519.  MRNY's research team has spent approximately 30 hours researching the impact of an undercount towards the purpose of informing its communications and outreach efforts to its members about the 2020 Decennial Census. *Id.*

1520.  Additionally, MRNY has organized nearly 30 organizations statewide—and subsequently nearly twenty organizations on Long Island—to sign onto letters rejecting the proposed citizenship question and to release a joint media statement once the question was formally recommended. *Id.*

1521.  Because of the need to increase the time and money spent on Census outreach due to the addition of a citizenship question, MRNY has diverted and will continue to divert resources from other areas critical to its mission including civic engagement and providing legal services. *Id.* ¶ 21.

1522.  MRNY's Director for Civic Engagement and Research has spent at least 50 hours on Census-related work that he would have otherwise spent on other civic engagement areas of work, such as voter registration and voter education. *Id.* ¶ 22.

1523.  MRNY has also already diverted resources with regard to its participation in this lawsuit; the legal director spent approximately ten hours drafting declarations, communicating with the litigation team, drafting educational materials, fielding questions from the organization, and communicating with individual MRNY members about the litigation. *Id.*

### 3.    ADC/ADCRI

1524.  Plaintiffs ADC and ADCRI have both shown the importance to their missions of having Arab-Americans accurately counted in the Decennial Census; both worked to improve Arab-American response rates in prior Decennial Censuses and ADC served on Census advisory committees, and both planned to engage in similar work for the 2020 Decennial Census even before the announcement of a citizenship question. Khalaf Aff. ¶¶ 13-15.

1525.  The announcement of a citizenship question changed the amount of resources both organizations felt necessary to devote to Census outreach. *Id.* ¶¶ 15-16.

1526.  ADC and ADCRI have also shown that the fear in their community due to the addition of a citizenship question will make their efforts to encourage participation of Arab-Americans more difficult—fear documented through forums held in different parts of the country and conversations with active members and manifested in an increased reluctance to respond to the 2020 Decennial Census. *Id.* ¶¶ 17-22, 28.

1527.  This increased level of fear and likelihood that more Arab Americans will not respond to the Decennial Census harms the organizational missions of ADC and ADCRI of promoting a stronger voice for Arab Americans. *Id.* ¶¶ 6-12.

1528.  Further, ADC and ADCRI demonstrated that because of the heightened fear and suspicion created by a citizenship question, they have expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the Arab-American community. *Id.* ¶¶ 23-28.

1529.  Specifically, they are holding public forums, panels and community symposiums, working in coalition with partner organizations, conducting training for Census enumerators, running advertisements encouraging participation, holding a strategy symposium, and held a panel addressing the Census and citizenship question at the 2018 annual national convention. *Id.* ¶¶ 25-27.

1530.  In total between them, ADC and ADCRI anticipate spending at least $150,000 more on 2020 Decennial Census education and outreach than the organizations spent on its efforts to encourage participation in the 2010 Decennial Census as a result largely as a result of the presence of a citizenship question. *Id.* ¶ 28.

1531.  Because of these increased expenditures and time commitments, ADC and ADCRI have shown they will need to divert resources from other mission critical areas including organizing, issue advocacy efforts and educational initiatives. *Id.* ¶ 29.

1532.  Additionally, ADC will need to divert resources from its legal work to Census related matters, resulting in less money to use towards assisting victims of hate crimes and providing pro bono legal services. *Id.*

## 4.      CASA

1533.  CASA has a long-held commitment to promoting engagement of its members, constituents, and the communities it serves in the Decennial Census as a core part of its mission to increase the political power of low-income immigrant communities; a commitment it has

shown through 30 years of outreach including door-to-door efforts, group education sessions, and media campaigns. Escobar Aff. ¶¶ 7-9.

1534.  The announcement of the addition of a citizenship question to the 2020 Decennial Census has caused CASA to divert its limited resources to try to address the likely negative impact of the question in the communities it serves. *Id.* ¶ 15.

1535.  The likelihood of lower response rates in its community due to a citizenship question also directly harms CASA's organizational mission of increasing the political voice of immigrant communities. *Id.* ¶¶ 7, 15, 25.

1536.  CASA has conducted additional outreach because of the tremendous level of fear and greater unwillingness of its constituents to respond to the Decennial Census due to a citizenship question in the context of other policies from the Trump Administration targeting them. *Id.* ¶¶ 16-24.

1537.  CASA's substantial effort to address the negative effects of a citizenship question and increase community participation in the Decennial Census includes conducting neighborhood meetings, rolling Census education into "Get Out The Vote" activities, and reorganizing its communications team and staff to address the barriers posed by the addition of the question. *Id.* ¶¶ 25-28

1538.  These increased efforts have caused CASA to divert both personnel and monetary resources from other organizational priorities to address the addition of a citizenship question. *Id.* ¶¶ 26, 29.

### B.  Organizational Injuries to Governmental Plaintiffs

1539.  Similarly, as Dr. Abowd testified, local and state governments are a critical component of the Census Bureau's outreach to hard-to-count communities through its "trusted partners"

program. Dr. Abowd specifically cited the City of New York's work at the local level as a "trusted voice to indicate that it's safe to answer the question." Nov. 14 Trial Tr. at 1121:1-7.

1540.  The governmental plaintiffs have demonstrated that they have or will expend additional resources to mitigate the adverse effects of a citizenship question on response rates. For example, the governmental plaintiffs introduced evidence—uncontroverted by Defendants—about the recent mitigation efforts of New York City and Chicago that indicate that governmental plaintiffs generally have or intend to devote substantial resources and personnel to respond to the impacts of a citizenship question. For example, in stark contrast to past Decennial Censuses, New York City has dramatically expanded its efforts to encourage its residents to participate in the 2020 Census. Nov. 6 Trial Tr. at 317-321.

1541.  Dr. Salvo—who serves as the Director of the Population Division at the New York City Department of City Planning—testified that because of reluctance in some communities to complete the Decennial Census questionnaire because of a citizenship question, the City has taken concrete steps to encourage participation. Nov. 6. Trial Tr. at 319, 430. These efforts include the City creating a specially-designated census office for the first time, staffed with at least 15 employees, who will help to encourage participation in the census.  *Id.*

1542.  In addition, the Plaintiffs offered undisputed evidence that New York City is budgeting $5.5 million for the 2020 Decennial Census, whereas it did not have any specialized budget for outreach in 2010 or 2000. *Id.* at 429-431.  The City budgeted $4.3 million of this total after DOJ made its request to add a citizenship question to the 2020 Decennial Census in December 2017; after Defendants announced their plans to add a citizenship question to the 2020 Decennial Census, and in response to that decision, New York City increased its budget for census outreach efforts by approximately $1.2 million dollars. *Id*. at 427-29.

1543.  These unprecedented outreach efforts, and concomitant expenditures of time and

resources resulted, in significant part, from New York City's concern about the impact that a

citizenship question will have on the quality of the data collected during the 2020 Decennial

Census. *Id.* at 359-61, 427-31.

1544.  Likewise, because of the citizenship question, the City of Chicago anticipates the need to

allocate additional resources and staff to encourage Chicagoans to participate in the 2020

Decennial Census. Rodriguez Aff. (Docket No. 488-1) ¶¶ 7, 10, 12, 13. A recently-introduced

City Council resolution specifically designates funds for specialized outreach to immigrant

communities in light of the citizenship question. *See id.* ¶ 12; Garcia Aff. (Docket No. 498-9)

¶¶ 14-15 (discussing efforts to allocate additional resources to countermand the impact of the

citizenship question on immigrant communities); PX-243 (Cook County resolution to

"Establishing an Emergency Fund to Address the Citizenship Question in the 2020 Census");

PX-246 (Chicago City Council resolution to establish a $500,000 "emergency fund to address a

citizenship question in the 2020 census" in order to "conduct specialized outreach to immigrant

communities in the City of Chicago").

1545.  In light of the Census Bureau's own recognition that the addition of a citizenship question

will depress self-response rates among Hispanic and immigrant communities, *see infra*, both

state and local governmental plaintiffs will be called upon to mitigate the anticipated harm

stemming from those depressed response rates, and many, as the examples of New York City

and Chicago demonstrate, are already devoting considerable resources to that effort.  Such

expenditures directly constitute injury to the governmental plaintiffs.

### C. Injuries Stemming from Undercount

1546.  The evidence shows that the addition of a citizenship question to the Decennial Census will cause a differential undercount of certain persons that will lead to several distinct types of injuries for plaintiffs. First, the citizenship question will cause the malapportionment of federal and state legislative districts, diminishing the political power of the Governmental Plaintiffs and the members of the NGO Plaintiffs that reside in impacted federal, state, and local districts. Second, the citizenship question will cause a loss of federal funds that will harm the NGO and Governmental Plaintiffs alike.

### 1.    Apportionment and Political Power

1547.  Dr. Christopher Warshaw has a Ph.D. in Political Science from Stanford University, where his graduate training included courses in political science and statistics. Dr. Warsaw also has a J.D. from Stanford Law School. His academic research focuses on public opinion based on surveys and census data, as well as the study of representation, elections, and polarization in American Politics. He has also taught courses on statistical analysis. Dr. Warshaw has published or forthcoming articles in peer-reviewed journals such as: the American Political Science Review, the American Journal of Political Science, the Journal of Politics, Political Analysis, Political Science Research and Methods, the British Journal of Political Science, Political Behavior, the Election Law Journal, Nature Energy, Public Choice, and edited volumes from Cambridge University Press and Oxford University Press. He is also on the Editorial Board of the Journal of Politics. Warshaw Aff. (Docket No. 526) ¶¶ 2-5.

1548.  Dr. Christopher Warshaw is qualified to be an expert witness in this case to provide expert opinions on population projections, apportionment, redistricting, the impact of redistricting on awards for government funding, and generally statistics and political science. It further finds his methodology reliable and his opinions helpful to the Court's fact-finding role.

1549.  Dr. Warshaw calculated the likely population for each state and for a number of local

jurisdictions in 2020 when the Decennial Census is conducted.

    a.  The jurisdictions are**:** Phoenix, AZ; Los Angeles County, CA; Monterey County,

        CA; San Francisco, CA; Miami, FL; Chicago, IL; Prince Georges County, MD;

        New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls,

        RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County,

        TX; and Seattle, WA. Warshaw Aff. Table 2, p.8, Table 3, p.9.

    b.  Defendants provided no evidence disputing those population projections.

1550.  Dr .Warshaw's testimony about population projections for the 2020 population supports  a

conclusion that the population projections reflected in Tables 2 and 3 of his Affidavit are

reasonable and reliable. Warshaw Aff. ¶¶ 18-22. Nov. 13 Trial Tr. at 872:5-25, 873:1-4.

1551.  Apportionment of the 435 Congressional House of Representatives seats is done through

the Method of Equal Proportions, which was adopted by Congress in 1941. Warshaw Aff. ¶ 43.

1552.  Based on Dr. Warshaw's testimony, it is well established in the political science research

that jurisdictions in the area of a state that were underrepresented in state legislatures or

Congress due to malapportionment received substantially lower shares of distributive funding.

Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1553.  Using the apportionment method and his population projections, Dr. Warshaw analyzed

the likely population and the Census counts for each state in 2020 if there is an 5.8% undercount

of individuals in households with at least one non-citizen and determined that the impact on the

Census population counts caused by this undercount would cause the State of California to lose a

congressional seat that it will not lose otherwise. Warshaw Aff. Table 6, pg. 23, ¶¶ 42-46.  Dr.

Warshaw determined that under this scenario, the State of California would suffer a 1.7%

decrease in its projected census population count, creating a very high probability that the California would lose a congressional seat that it would not lose otherwise.  Warshaw Aff. Table 6, pg. 23, ¶¶ 42-45, 46, 62(a).

1554.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 5.8% of individuals in households with at least one non-citizen. *See* PFOF ¶¶ 1344-1363, 1347, 1349, 1352, 1353, 1355, 1356.  Therefore, on the basis of the calculations reflected in Table 6 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question will cause California to lose a congressional seat that it would not have otherwise lost.  Warshaw Aff. ¶¶ 46, 47, 48, 62(a).

1555.  Plaintiff ADC has active chapters with members residing in California. Khalaf Aff. ¶ 8. Specifically, ADC has 1,296 dues paying members in California. *Id.* ¶ 35.

1556.  All of the members of ADC who reside in California will lose political power as a result of this loss of a Congressional seat.  Additionally, Governmental Plaintiffs City and County of San Francisco, and County of Monterey will also lose political power if California loses a Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research that the loss of political power causes injury, this loss of political power due to a loss of a seat in Congress will injure the Governmental Plaintiffs in California and the ADC members who reside in California. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1557.  Using the apportionment method and his population projections, Dr. Warshaw analyzed the likely population and Decennial Census counts for each state in 2020 if there is a 5.8% undercount of individuals living in noncitizen households and Hispanic individuals, and determined that the impact on the Census population counts caused by this undercount of both

these subpopulations would more likely than not cause the State of Texas, in addition to California, to lose a congressional seat that it will not lose otherwise. Warshaw Aff. Table 6 p. 20, ¶¶ 42-45, 46, 47, 48, 62(a).

1558.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 5.8% of individuals in households with at least one non-citizen and Hispanic individuals. *See* PFOF ¶¶ 1344-1363, 1347, 1349, 1352, 1353, 1355, 1356. Therefore, on the basis of the calculations reflected in Table 6 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will cause Texas to lose a congressional seat that it would not have otherwise lost. Warshaw Aff. Table 6 p. 20, ¶¶ 46, 47, 48, 62(a).

1559.  Plaintiff ADC has active chapters with members residing in Texas. Khalaf Aff. ¶ 8. Specifically, ADC has 408 dues paying members who reside in Texas.  All of the members of ADC who reside in Texas will lose political power as a result of the loss of this Congressional seat. Additionally, Governmental Plaintiffs Cameron County, El Paso County, and Hidalgo County, Texas will also lose political power if Texas loses a Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research, this loss of political power due to the loss of a seat in Congress will injure the Governmental Plaintiffs in Texas and the ADC members who reside in Texas. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1560.  Using the apportionment method and his population projections, Dr. Warshaw analyzed the likely population Decennial Census counts for each state in 2020 if there is an undercount of foreign-born and Hispanic individuals equivalent to the non-response observed in Dr. Barreto's survey results, *see, e.g.*, PFOF ¶ 1357, and determined that the impact on the Decennial Census population counts caused by this undercount of these subpopulations would cause the State of

Florida, in addition to California and Texas, to lose a congressional seat that it will not lose otherwise. Warshaw Aff. Table 6 p. 20, ¶¶ 42-45, 46, 47, 48, 62(a).

1561.  Plaintiff ADC has active chapters with members residing in Florida. Khalaf Aff. ¶ 8. Specifically, ADC has 551 dues paying members who reside in Florida. Khalaf Aff. ¶ 35. Under this scenario, all of the members of ADC who reside in Florida will lose political power as a result of the loss of this Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research, this loss of political power due to the loss of a seat in Congress would injure the ADC members who reside in Florida. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1562.  In addition to these interstate impacts, Dr. Warshaw also examined the impact of a citizenship question on intrastate redistricting.  Dr. Warshaw's analysis shows that even a 2% undercount of only individuals who live in non-citizen households would lower the population enumeration of Phoenix, AZ; Los Angeles, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince George's County, MD; New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, thereby lowering each areas' share of its state population.  Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 53, 54, 55, 57, 58, 59.

1563.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 2% of individuals in households with at least one non-citizen. *See* PFOF ¶¶ 1359-1362. Therefore, based on the calculations reflected in Table 8 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will lower the population counts for Phoenix, AZ; Los Angeles, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince Georges

County, MD; New York, NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, and this in turn will lower each jurisdiction's share of its state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 50, 53, 54, 55, 57, 58, 59.

1564. Dr. Warshaw's analysis also shows that a 2% undercount of individuals who live in non-citizen households and Hispanics would lower the population enumeration of Phoenix, AZ; Los Angeles, CA; San Francisco, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince George's County, MD; New York, NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, thereby lowering most of these areas' share of their state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 53, 54, 55, 57, 58, 59.

1565. As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 2% of individuals in households with at least one non-citizen and Hispanics. *See* PFOF ¶¶ 1359-1362. Therefore, based on the calculations reflected in Table 8 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will lower the population counts for Phoenix, AZ; Los Angeles, CA; San Francisco, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince Georges County, MD; New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, and this in turn will lower most of these jurisdictions' share of their state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 50, 53, 54, 55, 57, 58, 59.

1566.  Dr. Warshaw notes the reductions in share of their state's population caused by these undercounts are particularly pronounced for Plaintiffs Central Falls and Providence, Rhode Island; Cameron, Hidalgo, and El Paso County, Texas, and Phoenix, Arizona and New York City. Warshaw Aff. ¶¶ 54, 55.

1567.  Based on Dr. Warshaw's testimony that it is a well-established fact of political science research, these lower population enumerations caused by the addition of a citizenship question will lead to the dilution of the voting power of these jurisdictions and the individuals who reside in them because it will result in decreased representation in state legislatures, which is a loss of intrastate voting power. Warshaw Aff. ¶¶ 51, 54, 57 (citing PX 326), Nov. 13 Trial Tr. at 870:1-14.

1568.  When state legislatures use population enumerations reflecting fewer people than a place actually has, this means that the area has lost representation. Warshaw Aff. ¶ 57.

1569.  This loss of political power is highly likely because the reasonable assumption is that state governments will not consciously try to remedy any undercounts when they redistrict absent some specific assertion that they would. Warshaw Aff. ¶ 52.

1570.  This loss of political power will result in less distributive government spending to these locations and the individuals who reside in them, and this will cause injury to these locations. Warshaw Aff. ¶ 57 (citing PX-326).

1571.  It is, therefore, more probable than not that the Plaintiff cities of Phoenix, Chicago, New York, Columbus, Philadelphia, Pittsburgh, Central Fall, Providence and Seattle, and the Plaintiff Counties of Monterey County, CA; Cameron County, El Paso County, and Hidalgo County will be injured by this population undercount of individuals who live in non-citizen households caused by the addition of a citizenship question. Additionally, it is more probable than not that

the Plaintiff City of San Francisco will be injured by this population undercount of individuals who live in non-citizen households and Hispanics caused by the addition of a citizenship question.

1572.  Plaintiff ADC has active chapters with members residing in Phoenix, Arizona, Los Angeles, California, Miami, Florida, and New York, New York. Khalaf Aff. ¶ 8. Also Plaintiff ADC has dues paying members who live in Los Angeles County, California; New York, New York; Miami, Florida; Prince George's County, Maryland; Phoenix, Arizona; and Chicago, Illinois. Khalaf Aff. ¶ 5.

1573.  Plaintiff MRNY has 23,000 members who reside in New York City, Nassau County, Suffolk County and Westchester County. Altschuler Aff. ¶ 4. Some of these members live in New York City, New York. *Id.* at ¶¶ 25, 26, 27, 28, 29, 30 (describing MRNY members who live in New York City in Queen County, King County, the Bronx and Brooklyn); Altshuler Supp. Aff. (Docket No. 503-3) ¶¶ 15, 16, 17-18, 19, 20 (describing the same).

1574.  CASA has 32,000 members who reside in Prince George's County. George Escobar Aff. ¶ 14.

1575.  It is more probable than not that Plaintiffs ADC, MRNY and CASA's members who reside in Los Angeles County, California; New York, New York; Miami, Florida; Prince George's County, Maryland; Phoenix, Arizona; and Chicago, Illinois will be injured by the dilution of the voting power caused by these lower population enumerations resulting from the addition of a citizenship question. Warshaw Aff. ¶¶ 51, 54, 57 (citing PX-326).

1576.  Nearly all the Local Governmental Plaintiffs will experience vote dilution as a result of even small levels of undercounting caused by the addition of a citizenship question.

1577.  For example, Plaintiff the City of New York is substantially likely to be injured by the undercount in the Decennial Census caused by the addition of a citizenship question. New York State has been required since 1969 by its Constitution to base legislative redistricting on the whole number of persons as reported in the Decennial Census. There is no other source for a count of the whole number of persons at the block level. New York State would not have the resources or expertise to substitute its own efforts for those of the Census Bureau. Breitbart Aff. ¶ 4.

1578.  In New York State, there is a strong tendency for minority-group voting-age citizens to be concentrated in the same congressional districts as non-citizens. The five congressional districts in New York State in which non-citizens constitute the highest percentages of the total population are, in descending order: CD 14 (population 25.11% non-citizen), where 68.40% of the citizens of voting-age are members of minority groups; CD 6 (population 21.20% non-citizen), where 55.73% of the citizens of voting-age are members of minority groups; CD 15 (population 21.08% non-citizen), where 96.58% of the citizens of voting-age are members of minority groups; CD 7 (population 20.04% non-citizen), where 64.80% of the citizens of voting-age are members of minority groups; and CD 13 (population 19.23% non-citizen), where 82.74% of the citizens of voting age are members of minority groups. Breitbart Aff. ¶ 10.  All five of these congressional districts are located entirely in New York City.  An undercount differentially affecting non-citizens would dilute the voting power of those districts, and would be very likely to lead to less distributive spending to those districts. Warshaw Aff. ¶ 57 (citing PX-326).

1579.  In contrast, the five congressional districts in which noncitizens constitute the lowest percentages of the total population are, in ascending order: CD 27 (population 1.34% non-citizen), where 6.49% of the citizens of voting-age are members of minority groups; CD 21

(population 1.59% non-citizen), where 8.23% of the citizens of voting age are members of minority groups; CD 23 (population 2.22% non-citizen), where 8.51% of the citizens of voting-age are members of minority groups; CD 22 (population 2.33% non-citizen), where 8.82% of the citizens of voting-age are members of minority groups; and CD 24 (population 2.70% non-citizen), where 13.28% of the citizens of voting age are members of minority groups.  No part of these congressional districts is located in New York City.

1580.  In the total population estimates created by the Census Bureau with the 2012-16 five-year ACS estimates, New York State has a total population of 19,697,457, and New York City has a total population of 8,461,961—42.96% of the state total. New York State is estimated to have a non-citizen population of 2,020,397, and New York City is estimated to have a non-citizen population of 1,438,215. Thus, non-citizens are estimated to constitute 10.26% of the state population, 17.00% of the New York City population, and 5.18% of the total population of the 57 counties outside of New York City. New York City, with 42.96% of the total state population, has 71.18% of the non-citizen population, while the other 57 Counties, with 57.04% of the total state population, have 28.82% of the non-citizen population. Breitbart Aff. ¶ 12. An undercount differentially affecting non-citizens would dilute the voting power of New York City, and would be very likely to lead to less distributive spending to New York City. Warshaw Aff. ¶ 57 (citing PX-326), Nov. 13 Trial Tr. at 871:9-14.

1581.  As explained, there is a substantial risk that a citizenship question will cause an undercount of non-citizens.  Given that non-citizens in New York State are heavily concentrated in New York City, it is likely that the voting power of the City will be adversely impacted by the addition of a citizenship question.

1582.  Within New York City, moreover, Dr. Salvo testified that there are neighborhoods with large concentrations of immigrants and Hispanics that are vulnerable to the impact of citizenship question on the 2020 Decennial Census. Nov. 6 Trial Tr. at 376:3-11.  These neighborhoods are at risk of undercounting, while other neighborhoods, with predominantly white populations, are likely to be overcounted.  Nov. 6 Trial Tr. at 407:14-408:8. These differential undercounts at the neighborhood level can lead to vote dilution for particular communities compared to others. Nov. 6 Trial Tr. at 417:21-418:20.

1583.  As noted above, Dr. Warshaw found that even under a 2% undercount of non-citizens and Hispanics, several Plaintiff jurisdictions, including the El Paso, Cameron and Hidalgo Counties, are at risk of losing over 1% of their share of their state's population. Warshaw Aff. Table 8, p. 28.  Central Falls and Providence, Rhode Island will experience significant decreases in the share of Rhode Island's population with an undercount of non-citizens, alone. *Id.*

1584.  In addition to the injury caused by the loss of political power that nearly all the Local Governmental Plaintiffs will experience as a result of undercounting caused by the addition of a citizenship question, nearly every State Governmental Plaintiff will struggle to distribute voting power equitably during the next redistricting cycle because of the poor quality of the data collected through the 2020 Decennial Census.  Dr. Warshaw found that a citizenship question would have the most substantial impact in large metropolitan counties with major cities. Warshaw Aff. ¶ 61.  Specifically, he found that the undercount in these areas would result in a reduction of their share of the overall population, while increasing the share of rural areas.  *Id.* This "would reduce the representation of urban counties, and increase the voting power of rural counties." *Id.* As a result, nearly every State Governmental Plaintiff will struggle to distribute

voting power equitably during the next redistricting cycle, as required by the one person one vote rule.

1585.  For example, Plaintiff the Commonwealth of Virginia relies exclusively on tabulations of the population produced by the Census Bureau from the Decennial Census to establish legislative districts, and is required by the Constitution of Virginia to do so. Lucyk Aff. (Docket No. 506-1) ¶ 5.

1586.  As of 2016, the total foreign-born population in Virginia was 1.031 million people, or over 12% of the population. Of this number, only about 45% of the population statewide were naturalized citizens. Thus, the majority of Virginia's foreign-born residents are non-citizens. Lucyk Aff. ¶ 8.

1587.  Foreign-born residents are not evenly distributed throughout Virginia. For instance, based on 2010 Decennial Census data, the Northern Virginia region planning district,  has 561,718 foreign-born persons, or roughly 64% of the entire immigrant population in Virginia. The Richmond region planning district has 77,951 foreign-born residents, or 9% of the state total, while the Tidewater region planning district has 71,130, or 8% of the state total. By contrast, the very rural Southside and Southwest region planning districts have  between one tenth and one half of one percent of the total immigrant population, while the also rural Upper Shenandoah Valley and Roanoke Valley region planning districts are home to 0.7 % to 1.5% of the foreign-born population.  Lucyk Aff. ¶ 9.

1588.  A differential undercount of non-citizens and foreign-born residents of Virginia in the 2020 Decennial Census would—due to the significantly higher numbers of noncitizens residing in the Northern Virginia region, as well as the Richmond and Tidewater regions—mean that these regions will likely lose representation in the Virginia General Assembly, while other, more

rural parts of the Commonwealth with fewer noncitizen residents would have greater representation in the General Assembly.  Lucyk Aff. ¶ 10.

### 2.      Impact of Undercount on Federal Funding

1589.  Dr. Andrew Reamer is an expert in how census data influence federal financial assistance programs.  Reamer Aff. (Docket No. 508-1) ¶ 8.

1590.  A research professor in the George Washington Institute of Public Policy (GWIPP) at George Washington University, Dr. Reamer previously spent six years at the Brookings Institution's Metropolitan Policy Program and 20 years as a consultant in U.S. regional economic development and public policy, helping ensure the commencement and continued existence of the American Community Survey (ACS).  *Id.* ¶¶ 2-3.

1591.  Throughout his career, Dr. Reamer prepared strategic analyses and plans that relied heavily on federal demographic and economic statistics including his current research project "Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds."  *Id.* ¶ 4.

1592.  Prior to the 2010 Decennial Census, Dr. Reamer published a Counting for Dollars study that identified Census-guided federal financial assistance programs and calculated FY2008 funding flows by program to states, metro areas, and counties. *Id.* ¶ 5.

1593.  Dr. Reamer received a Ph.D. in Economic Development and Public Policy and a Master of City Planning from the Massachusetts Institute of Technology and a Bachelor of Science in Economics from the Wharton School, University of Pennsylvania. *Id.* ¶ 6.

1594.  Dr. Reamer is a member of several federal advisory committees—the Bureau of Economic Analysis (BEA) Advisory Committee, which is part of  the Commerce Department, as well as the U.S. Bureau of Labor Statistics (BLS) Data Users Advisory Committee (former chair) and

the Workforce Information Advisory Council, both of which are part of the Department of Labor. *Id.* ¶ 7.

1595.  Based on his education, experience, and knowledge, Dr. Reamer possesses the qualifications to offer expert opinions in the area of how census survey results influence federal financial assistance program funds distribution.

1596.  Dr. Reamer's opinions are reliable and helpful to the Court in rendering its decision as it concerns Plaintiffs' standing based on loss of federal funding.

1597.  Plaintiffs have demonstrated the likely undercount of noncitizen households and Hispanics, *see* PFOF VIII, this disparate undercount will harm a number of states and their residents due to that undercount's effect on a number of federal domestic financial assistance programs with census-tied geographic allocation formulas. Reamer Aff. ¶¶ 15-17, 83.

1598.  Because Census data influence a large number of federal financial assistance programs, an undercount in the Decennial Census among non‑citizens, the foreign‑born, and Hispanics will lead to measurable fiscal losses for states with population percentages of these subgroups that are above the nationwide average. *Id.* ¶ 18.

1599.  A significant portion of federal domestic financial assistance is distributed on the basis of statistics derived from the Decennial Census, including at least 320 federal domestic assistance programs that use census‑derived data and distributed about $900 billion in FY2016. *Id.* ¶ 9.

1600.  Specifically, Dr. Reamer identified and analyzed almost two-dozen federal financial assistance programs with funding formulas that allocate federal funds geographically in a manner dependent in part or whole on Decennial Census results. *Id.* ¶ 10; PX-329.

1601.  Eighteen of these programs are "state-share" programs, in that they rely in whole or part on state share of a U.S. population total. Reamer Aff. ¶¶ 16-17.  The relevant state-share

programs are as follows: Federal Transit Formula Grants, Community Block Development Grants/Entitlement Grants, Crime Victim Assistance, Title I Grants to Local Educational Authorities (LEAs), Special Education Grants, Head Start, Supplemental Nutrition Program for Women, Infants, and Children (WIC), Child Care and Development Block Grant, Supporting Effective Instruction State Grants, WIOA Youth Activities, Rehabilitation Services: Vocational Rehabilitation Grants to the States, Unemployment Insurance administrative costs, Block Grants for Prevention and Treatment of Substance Abuse, Social Services Block Grants, Career and Technical Education—Basic Grants to States, WIOA Disclosed Worker Formula Grants, Special Programs for the Aging, Title III, Part C, Nutrition Services. PX-329.

1602. The remaining six programs Dr. Reamer identified use the Federal Medical Assistance Percentage (FMAP) reimbursement formula. Reamer Aff. ¶¶ 16-17.  The relevant FMAP programs are: Medical Assistance Program (traditional Medicaid), State Children's Health Insurance Program (CHIP), Foster and Child Care, Adoption Assistance, and Medicare Part D Clawback.  PX-329.

1603. Because the Decennial Census is carried out once a decade and collects data on a small number of demographic characteristics, Congress authorized a series of more current and descriptive census   derived datasets for use in funding formulas. Reamer Aff. ¶ 23.

1604. Of particular note, the Census Bureau constructs annual Population Estimates and Housing Estimates by augmenting decennial population and housing numbers with more recent data, primarily from vital statistics and tax records. *Id.* ¶ 26.

1605. While a number of these programs use the Population Estimates datasets directly, many also use other datasets derived from Population Estimates, including Per Capita Income (PCI). *Id.* ¶ 27.

1606.  Additionally, the Census Bureau relies on the Decennial Census in several different ways to design and implement the American Community Survey (ACS), the Current Population Survey, and the Consumer Expenditure Survey.  *Id.* ¶ 28.

1607.  Therefore, programs that use funding formulas reliant on these surveys are also sensitive to undercounts in the Decennial Census.  *Id.* ¶¶ 30-31.

1608.  There is a strong, direct relationship between the accuracy of the Decennial Census and the reliability all of these datasets and surveys such that Decennial Census data is an essential ingredient to their accuracy and reliability.  *Id.* ¶ 11; Nov. 7 Trial Tr. at 514-17.

1609.  Using five of these programs as examples, Dr. Reamer performed calculations using a series of seven potential undercount figures due to the addition of a citizenship question of individuals living in noncitizen households, these individuals and Hispanics, and Hispanics and foreign-born individuals, which he applied to 2020 population projections by state.  Reamer Aff. ¶¶ 13-15, 32-33.

1610.  Dr. Reamer's analysis shows that the magnitude of the impact varies greatly across states depending on the nature of the undercount, but that numerous states and programs will be negatively impacted if the addition of a citizenship question causes any measurable undercount of individuals living in non-citizen households relative to the population as a whole.  *Id.* ¶¶ 15-19.

1611.  Specifically, for the eighteen state-share programs identified—as Dr. Reamer demonstrated with the WIC, Social Services Block Grants, and Title I Grants to LEAs programs—New York, California, Texas, Florida, New Jersey, Nevada, and Hawaii will lose population share and thus funding under these programs if there is an undercount caused by the

addition of a citizenship question of individuals living in non-citizen households of least 2 percent. *Id.* ¶¶ 46-47, 51-52, 61-62.

1612.  In fact, these states would lose funding for these programs based on any measurable undercount of non-citizens, as well as of non-citizens plus Hispanics. *Id.* ¶¶ 19, 83; Nov. 7 Trial Tr. at 518-19.

1613.  Additionally, for the six FMAP programs, Texas, Florida, Nevada, Hawaii, and Arizona would see relatively large decreases in their FMAP due to the population share that each state would lose as a result of any measurable undercount of individuals living in non-citizen households.  Reamer Aff. ¶¶ 70, 71, 81; Nov. 7 Trial Tr. at 518-19.

1614.  This would make calculated reimbursement levels fall for these states due to the lower FMAP, causing these states to lose funding for these programs.  Reamer Aff. ¶ 17.

1615.  Therefore, these states—New York, California, Texas, Florida, New Jersey, Nevada, and Hawaii for state-share programs, and Texas, Florida, Nevada, Arizona, and Hawaii for FMAP programs—and their residents will suffer a loss of federal funding and will be harmed if a citizenship question is added. *Id.* ¶¶ 70-71, 81-82.

1616.  It is possible that New Mexico, Washington, Maryland, Massachusetts, Connecticut, Oregon, Illinois, and Georgia may also lose funding under some or all of these programs as a result of the undercount of non-citizens households, Hispanics and foreign-born residents caused by a citizenship question. *Id.*

### a.  Financial Harm to NGO Plaintiffs

1617.  Plaintiff ADC has demonstrated that it has individual members who live in all fifty states, including the states described above that will be negatively impacted regarding funding, and has identified individual members by name living in California, New York, Florida, Texas, and New Jersey.  Khalaf Aff. ¶¶ 30-31.

1618.   Although their residence in these states is enough to cause them to be harmed due to federal funding losses to their states, ADC has also shown that its some of its members directly rely upon affected programs such as Title I educational funds that a citizenship question will negatively affect in the states where they live.  *Id.* ¶ 36.

1619.   As for Plaintiff MRNY, it has 23,000 members residing in New York City, Nassau County, Suffolk County, and Westchester County, New York, including several specific members living in New York who will be harmed by the loss of funding to the state due to an undercount caused by a citizenship question.  Altschuler Aff. ¶¶ 4, 23-30.

1620.   Several individual MRNY members have also demonstrated reliance on Title I educational funds and Head Start funding due to their children attending schools and programs that receive such funding, and thus will be directly harmed when New York loses funding for this program due to an undercount.  *Id.* ¶¶ 25-28.

1621.   Plaintiff CASA has more than 90,000 members in the Mid-Atlantic including in Maryland (including Prince George's County and the City of Baltimore), Virginia, and Pennsylvania. Escobar Aff. ¶ 4.

1622.   CASA assists many of its members who use census-related funding programs including Supplemental Nutritional Assistance Program (SNAP), which provides food assistance to low-income residents and the Special Supplemental Nutrition Program for Women Infants and Children (WIC); these members in Maryland will be harmed under several of the undercount scenarios discussed by Professor Reamer. *Id.* ¶¶ 10-11.

1623.   Both plaintiff NYIC itself as well as a number of its member organizations directly receive census-influenced funding through programs that will be negatively affected if New

York state residents are undercounted due to a citizenship question, as this will reduce the pool of funding available to them through the State. Plum Aff. ¶¶ 5-9; Choi Aff. ¶ 6.

1624.  Specifically, NYIC receives census-guided funding through the Corporation for National & Community Service for 21 positions filled by AmeriCorps VISTA, NYIC member Chhaya Community Development Corporation receives funding through the Community Development Block Grant program, and NYIC member Chinese-American Planning Council receives funding through the Workforce Innovation and Opportunity Act.  Plum Aff. ¶¶ 6, 9.

### b.  Financial Harm to Governmental Plaintiffs

1625.  The governmental plaintiffs have also shown that they will suffer harm due to losses in funding from census-related federal programs due to a disproportionate undercount of their states and localities because of a citizenship question.

1626.  Dr. Reamer found that State Governmental Plaintiffs New York State and New Jersey will consistently lose state-share program funds under each of the undercount scenarios he evaluated. Reamer Aff. ¶ 16.  New York and New Jersey are home to large non-citizen, Hispanic, and foreign-born populations.  As a result, even minimal undercounting resulting from a citizenship question is likely to impact these states relative to others.  *Id.* ¶ 13.

1627.  Dr. Reamer specifically demonstrated potential losses for New York and New Jersey under the WIC, Social Service Block Grant and Title I LEA Grant Program. *Id.* Table "Change in Allocation of WIC Supplemental Food Grants due to Census Undercount, by State, FY2016," p. 16, Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, ¶¶ 46-47, 51-52, 61-62.

1628.  Dr. Reamer also demonstrated that other State Governmental Plaintiffs will likely lose funding under particular undercount scenarios, depending on the specific groups impacted by undercounting in those scenarios.

1629.  For instance, even a 2% undercounting concentrated in households with at least one non-citizen is likely to result in funding losses under the Title I LEA Grant program and the Social Service Block Grant Program for Illinois, the District of Columbia, Massachusetts, Washington, and Maryland.  *Id.*  Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, ¶¶ 51-52, 61-62.

1630.  Under the non-citizen only undercount scenario, Illinois will also lose Medicaid funds, while Oregon and New Mexico will lose Children's Health Insurance Program ("CHIP") funds, and Washington will lose both Medicaid funds and CHIP funds.  *Id.* Table "Change in Federal Reimbursements for Traditional Medicaid FY 2015," p. 23, Table "Change in Federal Reimbursements for CHIP FY 2015," p.27 ¶¶ 70-71, 81-82.

1631.  Dr. Reamer found that New Mexico will be at risk of losing federal funding at minimal levels of undercounting of non-citizens and Hispanics.  Under a 2% undercount of individuals in households with at least one non-citizen, and Hispanic individuals generally, New Mexico lost funding under the WIC, Social Service Block Grants, and Title I LEA Grant programs, as well as the CHIP program.  *Id.*  Table "Change in Allocation of WIC Supplemental Food Grants due to Census Undercount, by State, FY2016," p. 16, Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, Table "Change in Federal Reimbursements for CHIP FY 2015," p.27 ¶¶ 46-47, 51-52, 61-62, 81-82.

1632.  Apart from the state-share programs identified by Dr. Reamer, many other federal programs distribute funds to states on the basis of census-derived information, and are likely to be impacted by undercounting resulting from the addition of a citizenship question on the 2020 Decennial Census.  For instance, the Community-Based Child Abuse Prevention (CBCAP) Grants and Older Americans Act (OAA) Grants for State and Community Programs on Aging, Title II Part A and Title IV Part A funding under the Every Student Succeeds Act, Temporary Assistance for Needy Families ("TANF") funding, Low-Income Home Energy Assistance Program ("LIHEAP") funding, and Community Services Block Grant ("CSBG") funding are allocated to states, at least in part, on Decennial Census data.  Haney Aff. (Docket No. 498-12) ¶¶ 5-8; PX-329; Harmon Aff. (Docket No. 498-14) ¶¶ 10-13, 17; Franklin Aff. (Docket No. 498-5) ¶¶ 6-10; Tiema-Massie Aff. (Docket No. 501-1) ¶ 11.

1633.  An undercount resulting from the addition of a citizenship question on the 2020 Decennial Census that reduces a state's relative share of the relevant population covered by these federal funding programs would likely result in losses of funding under these programs.  Haney Aff. ¶¶ 7, 8; Harmon Aff. ¶¶ 9, 13, 17; Franklin Aff. ¶¶ 7-8.

1634.  Differential undercounting concentrated among non-citizens and Hispanics will also injure State Governmental Plaintiffs by preventing the equitable distribution of federal funds to localities.

1635.  Many federal funding programs require states to distribute funds to localities on the basis of Census-derived information, including, under the Every Student Succeeds Act, Title I LEA Grants (improving basic programs), Title II Part A funds (supporting effective instruction), and Title IV Part A funds (student support and academic enrichment grants).  Harmon Aff. (Docket No. 498-14) ¶¶ 3, 5, 6, 10-13, 17; Harmon Supp. Aff. (Docket No. 498-15) ¶ 5.

1636.  Under each of these education-related programs, the State Education Agency is required to distribute funds to LEAs on the basis, at least in part, of the number of children aged 5-17 living in poverty within each LEA's jurisdiction. Harmon Aff. ¶¶ 5-6, 12-13, 16, 17; Harmon Supp. Aff. ¶ 5.

1637.  Undercounts, therefore, not only impact the allocation of education funding to the state, but also have a "negative direct impact" on individual school districts most in need of funding. Harmon Aff. ¶¶ 13, 17; Harmon Supp. Aff. ¶ 5.

1638.  For example, New York State estimates that a decrease of 1.54% in the count of children in poverty aged 5-17 would result in a loss of nearly $300,999 in Title I LEA funding in a single year.  Harmon Aff. ¶ 9.  This loss would not only impact the allocation of funding to New York State, but also the direct amount received by the locality. Harmon Supp. Aff. ¶ 5.  A loss of over $300,000 for a LEA in New York is the equivalent of losing 6 full-time academic support teachers paid at the state's average teachers' salary.  Harmon Aff. ¶ 9.

1639.  Moreover, even a decrease as low as 0.02% in the count of children in poverty aged 5-17 residing in an LEA's jurisdiction can lead to changes in eligibility for federal education grants that could amount to cuts as large as 40% of an LEA's Title I Grant.  Harmon Aff. ¶ 9.

1640.  As explained above, Dr. Warshaw found that undercounting resulting from a citizenship question is likely to reduce population shares of large metropolitan counties relative to other areas, and specifically noted reductions for nearly all Plaintiff Cities and Counties relative to their states, under every undercount scenario.  Warshaw Aff. Table 8, p. 28, ¶¶ 59, 60-61.

1641.  As a result, the addition of a citizenship question on the 2020 Decennial Census will likely require State Governmental Plaintiffs to inequitably distribute education funds to localities, specifically depriving non-citizen and Hispanic students in poverty residing in large metropolitan

areas, including those located in most of the Plaintiff Cities and Counties, of much needed education funding.

1642.  Similarly, several additional programs require states to use census-derived information to distribute funds directly to the City and County Plaintiffs.  Examples include funding under the Victims of Crime Act program, Temporary Assistance for Needy Families ("TANF") program, Low Income Home Energy Assistance ("LIHEAP") Program, the Workforce Innovation and Opportunity Act ("WIOA") program, and the Community Services Block Grant ("CSBG"). Franklin Aff. ¶¶ 6-10; Tiema-Massie Aff. ¶ 11.

1643.  Localities, including Plaintiff Cities and Counties, receive funds under these programs based on their relative share of the relevant population within a state.  For instance, states are required to distribute TANF, LIHEAP, WIOA, and CSBG funds to localities based, at least in part, on the proportion of low-income individuals residing in the jurisdiction.  Franklin Aff. ¶¶ 7-8, 10; Tiema-Massie Aff. ¶ 11.

1644.  As a result, the addition of a citizenship question on the 2020 Decennial Census will likely require State Governmental Plaintiffs to inequitably distribute funding under these and similar program, disadvantaging residents in need of important services.  Franklin Supp. Aff. (Docket No. 498-6) ¶ 5.  Undercounting resulting from the inclusion of a citizenship question on the 2020 Decennial Census thus will also cause Plaintiff Cities and Counties to lose crucial federal funding under these programs as well.

1645.  For example, the City of Phoenix explained that an undercount that results in a 1% cut in funding under these programs would result in significant losses for the City, including $60,209 under the LIHEAP program, meaning utility assistance payments will not be processed for 109

households, and $107,518 in WIOA funds available for employment and support services to adult, youth and displaced workers.  Franklin Aff. ¶¶ 8, 10; Franklin Supp. Aff. ¶ 5.

1646.  Similarly, the City of Chicago receives significant funding under the CSBG program that is used to provide services to 26,000 vulnerable families.  Tiema-Massie Aff. ¶ 11.  Reductions in these funds would disrupt provision of these services.  *Id.* ¶ 15.

1647.  Plaintiff Cities and Counties have also proven that they will lose funding from federal programs due to a citizenship-question-induced undercount of their cities.

1648.  Many federal funding programs provide direct funding to localities based on census-derived information.  These include the Community Development Block Grant ("CDBG") program, the Emergency Solutions Grant ("ESG") program, and the HOME Investment Partnerships Program.  Freedman Aff. (Docket No. 498-7) ¶¶ 7, 10, 12.

1649.  Each of these programs provides funding to cities and counties on the basis, at least in part, of their share of the overall population count relative to other metropolitan areas, and their share of the population in poverty. *Id.*

1650.  As a result, an undercount resulting from the addition of a citizenship question that reduces the share of the overall population, or the population in poverty of Plaintiff Cities or Counties, will impact the Plaintiffs' funding allocations, and impact critical services.

1651.  For example, Plaintiff City of Providence, Rhode Island offered testimony that a 1% decrease in CDBG funds would result in losses of over $50,000 in critical services, and would likely force the city to cut free daycare, and after-school programs for low-income families. Freedman Aff. ¶ 9.

1652.  A similar decrease in ESG funding would result in losses of $4,000 and cuts to the hours of case workers devoted to finding housing for the homeless residents of Providence.  *Id.* ¶ 11.

1653.  A 1% reduction in HOME Investment funding would result in losses of $170,000, denying approximately 22 low-income families down-payment and closing cost assistance.  *Id.* ¶ 13.

1654.  As explained above, Dr. Warshaw found that several City and County Plaintiffs were at particular risk of undercounting based on the impact of a citizenship question on non-citizens. Warshaw Aff. ¶ 56.  Specifically, Dr. Warshaw showed that Cameron, Hidalgo, and El Paso Counties in Texas, Monterey County in California, and Providence and Central Falls in Rhode Island, experienced some of the largest decreases in population counts under the scenario of estimating 2% undercounting of household with at least one non-citizen.  Warshaw Aff. Table 7, p. 26.  As a result, it is likely that these Plaintiff Cities and Counties are at high risk of losing population relative to other metropolitan areas.

1655.  Moreover, cities that are home to large populations of non-citizens and Hispanics, including Chicago, New York City, Phoenix and San Francisco, also experience significant losses in population count under Dr. Warshaw's analysis relative to cities with smaller proportions of non-citizen and Hispanic residents.  Warshaw Aff. Table 7, pg. 26.  These Plaintiff Cities are also at substantial risk of losing population share relative to other less diverse metropolitan areas.

1656.  An undercount of 2% of individuals in non-citizen households and Hispanic individuals resulting from the inclusion of a citizenship question on the 2020 Decennial Census would result in losses of funding for several Plaintiff Cities and Counties, by reducing the share of the overall population, and the population in poverty, relative to cities and counties with fewer non-citizens and Hispanics.

1657.  The Plaintiff States, Cities and Counties are likely to experience losses of federal funding, or, for many states, inequitable intrastate distribution of federal funding, as a result of the addition of a citizenship question on the 2020 Decennial Census.

### D.  Injuries Independent from Undercount—Data Quality

#### 1.  Adding a Citizenship Question to the Census Will Cause More Respondents to Be Enumerated through NRFU Processes, Resulting in Worse-Quality Census Data

1658.  In Dr. Abowd's January 19 memo, the Census Bureau concluded that adding a citizenship question to the 2020 Decennial Census "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources." PX-22 at 1 (AR); Nov. 13 Trial Tr. at 885 (Abowd testimony).

1659.  Dr. Abowd's March 1 memo confirms that the Census Bureau's conclusion that adding a citizenship question will harm Census data quality also applies to the option of adding a citizenship question in conjunction with using administrative records to develop block-level CVAP data for DOJ ("Alternative D"). PX-25 at 5 (AR); Nov. 13 Trial Tr. at 953, 968.

1660.  Dr. Abowd testified that Alternative D will result in worse data quality and will be worse for the Census Bureau's goal of conducting an accurate 2020 Decennial Census, as compared to Alternative C (relying exclusively on administrative records to produce block-level CVAP data). Nov. 15 Trial Tr. at 1374-75 (Abowd testimony). He testified that, if one's goal is to have an accurate Census, Alternative C is superior to Alternative D. Nov. 13 Trial Tr. at 968-69.

1661.  Dr. Abowd's memos in the Administrative Record indicate that the Census Bureau concluded that, because a citizenship question will lead to a decline in self-response rates to the 2020 Decennial Census questionnaire, it will result in the enumeration of more people through

nonresponse follow-up (NRFU) efforts, such as proxy responses. PX-22; PX-25 at 4 (AR). Dr. Abowd confirmed this point in his trial testimony. Nov. 13 Trial Tr. at 950-52, 968.

1662.  The Census Bureau has specifically acknowledged that "nonresponse is highly correlated with citizenship." PX-162 at 44. In other words, noncitizens, to the extent that they are enumerated at all, will disproportionately be enumerated through NRFU efforts.

1663.  NRFU efforts produce Census questionnaire responses that are not as reliable as answers from self-responses. Nov. 13 Trial Tr. at 953. The NFRU process involves the use of proxies, and the Census Bureau acknowledges "that proxies supply poor quality . . . socioeconomic characteristic information about the person on behalf of whom they are responding." PX-162 at 41.

1664.  The Census Bureau thus believes that the increased number of enumerations through the NRFU process in the event of a citizenship question would produce lower-quality personal data than would a Census without a citizenship question. Nov. 13 Trial Tr. at 968 (Abowd).

1665.  The result will be more incorrect enumerations through the NRFU process than there would be if there were no citizenship question. PX-25 (AR); Nov. 13 Trial Tr. at 968 (Abowd).

1666.  Using administrative records to provide DOJ with block-level CVAP data under Alternative C would not harm the quality of the census data. PX-22 (AR); Nov. 13 Trial Tr. at 958 (Abowd).

> **2.    Secretary Ross's Choice of Alternative D, which Will Produce Worse Data Quality, Violates OMB Standards**

1667.  The Census Bureau believes that harming the quality of census data is a bad thing that should be avoided. Nov. 13 Trial Tr. at 953 (Abowd).

1668.  Before Secretary Ross issued his March 26, 2018 decision memo, he was aware of the Census Bureau's findings that Alternative C—obtaining citizenship data from administrative

records—would be less costly and produce more accurate CVAP data than adding a citizenship question to the census questionnaire. Nov. 13 Trial Tr. at 959 (Abowd).

1669.  The Census Bureau is bound by the Office of Management and Budget's Standards and Guidelines. Nov. 13 Trial Tr. at 989 (Abowd).

1670.  OMB Standard 2.3 states that "[a]gencies must design and administer their data collection instruments and methods in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost." PX-359.

1671.  Dr. Abowd has concluded that—within the meaning of OMB Standard 2.3—Alternative D would result in lower data quality, higher cost, and higher respondent burden than the Census Bureau's recommended Alternative C. Nov. 13 Trial Tr. at 989-90.

1672.  OMB Guideline 2.3.1 states: "Design the data collection instrument in a manner that minimizes respondent burden, while maximizing data quality." PX-359.

1673.  Dr. Abowd stated that Alternative C would comport with OMB Guideline 2.3.1. Nov. 13 Trial Tr. at 990-91.

### 3. Adding a Citizenship Question to the Census Will Damage the Quality of Census Data Relating to Population Characteristics

1674.  Dr. Salvo testified that while the Census Bureau collects the count of residents in a particular neighborhood, it also collects information relating to the attributes or characteristics of those residents, such as race and age. Nov. 6 Trial Tr. at 303:21-304:4.

1675.  The Administrative Record indicates that the Census Bureau determined that a citizenship question will damage the quality of population characteristic data collected through the 2020 Decennial Census. In the January 19 Abowd Memo, the Census Bureau concluded that lower self-response and increased NRFU workload resulting from the inclusion of a citizenship

question, will "degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates." PX-1 at AR 1281 (AR). The Census Bureau similarly concluded that a citizenship question will reduce data quality in the March 1 Memo evaluating Alternative D that was ultimately adopted by Secretary Ross. PX-1 at AR 1311 (AR). And outside of the Administrative Record, the Bureau's August 6, 2018 White Paper reached the same conclusion. PX-162 at 54.

1676.  Dr. Salvo testified that apart from a citizenship question's impact on the net differential undercount, a citizenship question will reduce the data quality of characteristic data and impair local-level information. Nov. 6 Trial Tr. at 302:8-20.

1677.  When the quality of the data relating to characteristics is compromised, sub-groups are no longer accurately defined. Nov. 6 Trial Tr. at 304:5-7. As a result, even when the total population of the jurisdiction is accurate, data about subgroups within the jurisdiction may be inaccurate. Nov. 6 Trial Tr. at 304:5-13.

1678.  Such data quality issues can give rise to substantial local-level differential inaccuracies between neighborhoods in the same jurisdiction. Nov. 6 Trial Tr. at 415:9-17. These inaccuracies impact the delivery of services and funding. Nov. 6 Trial Tr. at 304:5-13.

1679.  Dr. Abowd acknowledges that a citizenship question, by decreasing self-response rates and thus increasing reliance on NRFU efforts, will reduce the quality of characteristic data produced during the 2020 Decennial Census. Nov. 13 Trial Tr. at 882:2-5, 952:23-953:14; Nov. 14 Trial Tr. at 1251:9-13. Dr. Abowd conceded that a citizenship question will reduce the accuracy of the characteristic data collected regardless of whether there is ultimately a net undercount, or differential net undercount. Nov. 14 Trial Tr. at 1221: 22-1222:1.

1680.  Moreover, Dr. Salvo explained that high rates of proxy response and high imputation rates in particular neighborhoods diminish the accuracy of census information about demographic subgroups in those neighborhoods. Nov. 6 Trial Tr. at 395:8-396:14.

### 4.      The Governmental Plaintiffs Require Accurate Characteristics Data to Make Decisions Regarding the Distribution of Resources

1681.  Dr. Abowd testified that the data quality with respect to characteristics information is important for state and local decisions relating to services and funding. Nov. 14 Trial Tr. at 1223:2-1224:23.

1682.  For example, when New York City seeks to design services and infrastructure that takes into account future locations of aging populations in the City; such efforts depend on accurate census data relating to where those populations reside within the City. Nov. 6 Trial Tr. at 356:15-21.

1683.  Likewise, localities depend on accurate characteristic data—including race and age information—in order for health departments to allocate resources or decide where to put health centers. Nov. 6 Trial Tr. at 395:16-396:14, 416:24-417:20.

1684.  For example, since particular ethnic populations are particularly at risk for particular illnesses, the New York City Department of Health requires accurate characteristic data relating to age and race. Nov. 6 Trial Tr. at 307:6-16. Without accurate characteristics data, "the health department can't make good decisions on where to deploy resources." Nov. 6 Trial Tr. at 308:3-18.

1685.  Accurate census information about the number of children in a jurisdiction is also critically important. For instance, Dr. Salvo testified that the New York City Department of Education relies on demographic data from the census to draw school zone boundaries, and that

inaccurate information about groups such as children under the age six or children of school age compromises that process. Nov. 6 Trial Tr. at 305:11-21.

1686.  Similarly, the Department of Education relies on information about neighborhood composition by race to understand and react to changes in neighborhood composition; inaccurate information can compromise that process as well. Nov. 6 Trial Tr. at 305:21-306:10.

1687.  Similarly, New York City depends on accurate characteristic data on a neighborhood-by-neighborhood basis in order to determine where to properly allocate language access services. No. 6 Trial Tr. at 306:23-308:25.

## 5. Federal Funding Programs Rely on Accurate Census Data Relating to Characteristics

1688.  Dr. Hillygus explained that "there are federal funding decisions made on the basis of the characteristics of the population, not just the count of the population." Nov. 15 Trial Tr. at 1401:24-1402:22.

1689.  Dr. Reamer identified several federal funding programs that depend on accurate counts of children. *See* Reamer Aff. ¶¶ 36, 38, 40, 44, 45, 55, 56, 59. An inaccurate count of children will impact funding streams under these programs.

1690.  For example, under the Head Start program, municipalities and non-profits are required to use Census data about the number of children aged 0-5 to identify families eligible for enrollment in the program, and the location of services and slots within a municipality. Franklin Aff. ¶ 9.

1691.  If a city such as Phoenix, New York City, Chicago or Philadelphia experiences a differential undercount of the population of children aged 0-5 relative to other municipalities, as New York City and Chicago did in 2010, that undercount would lead to erroneous information

that would impact the identification of eligible families within the City and could reduce funding available for necessary services. Franklin Aff. ¶ 9; Harmon Aff. ¶¶ 4-6; PX-346 at 18.

1692.  Similarly, the Supplemental Nutrition Program for Women, Infants, and Children (WIC) funds are apportioned by each state's share of the nationwide number of infants and children ages 1-4 at or below 185 percent of poverty. Reamer Aff. ¶ 44. Where a state, like New York, New Jersey or Illinois experiences a differential undercount of children ages 1-4, as compared to other states, as New York and Illinois did in 2010, it would lose funding under the WIC program, regardless of whether the state experienced a net undercount in total population. PX-346 at 17.

1693.  Under the Community-Based Child Abuse Prevention (CBCAP) Program, funds are distributed to states based on the number of children under the age of 18, a figure drawn from the Decennial Census. Harvell-Haney Aff. (Docket No. 498-12) at ¶ 7. If the population of children under the age of 18 in a particular state, such as Massachusetts, New York or New Jersey, were to appear to decrease relative to other states because of an undercount, that state would receive less in CBCAP funds. *Id.*

1694.  As a result, even if there is little to no net undercounting in the total population nationally or within the state, if the population of children under 18 within a state like New York or New Jersey is disproportionately undercounted as compared to other states, that state's share of CBCAP funding would decrease. *Id.*

### 6.    Omissions and Data Quality

1695.  Reductions in data quality introduced by the decline in self-response rates can have other far-reaching implications even when they do not result in a net undercount.

1696.  Dr. Salvo noted that respondents are often missed by the Census Bureau, but are offset by the double counting of dissimilar individuals in other neighborhoods, thereby ensuring a net undercount close to zero that hides underlying inaccuracies. Nov. 6 Trial Tr. at 411:2-15. The

number of omissions in the Census, i.e. those households that should have been counted in the Census but were missed, is an important indicator of local Census accuracy. Nov. 6 Trial Tr. at 403:25-404:2. As Dr. O'Hare explained, omissions can be completely offset by erroneous double counting of other respondents, known as erroneous enumerations, and whole person imputations, which would result in no net undercounting. O'Hare Aff. (Docket No. 507-1) at ¶ 15.

1697.  However, as Dr. Salvo testified, the households that are omitted are often different demographically and different in location than the households that are double counted. Nov. 6 Trial Tr. at 412:10-13; 414:11-23.

1698.  For instance, Dr. Salvo testified that misidentification of significant amounts of housing units as vacant in 2010 resulted in vacancy rates suggestive of urban abandonment in several dynamic neighborhoods in Northwest Queens and South Brooklyn. Nov. 6 Trial Tr. at 309:8-18. This error resulted in the undercounting of approximately 65,000 people in Northwest Queens and South Brooklyn. Nov. 6 Trial Tr. at 351:22-352:9; 354:4-13. While these undercounts were not reflected in the overall net undercounts for Queens and Brooklyn in 2010, both of which were effectively zero, they nevertheless impacted New York City agencies and services. PX-338 at 39; Nov. 6 Trial Tr. at 355:14-357:2.

1699.  In the 2010 Decennial Census, the net undercount in Brooklyn was effectively zero, but the Census reported that over 10% of the population was omitted while 8.4% was erroneously enumerated. Nov. 6 Trial Tr. at 412:8-15; 414:2-7; PX-338 at 39.

1700.  Dr. Salvo testified that the omissions and erroneous enumerations in Brooklyn likely occurred in different neighborhoods within Brooklyn. Nov. 6 Trial Tr. at 414:11-23. Specifically, Dr. Salvo testified that it is likely that the 10.4% of omissions in Brooklyn were concentrated "heavily in the black communities of Brooklyn followed by areas with large clusters of Hispanic

population". PX-267 at Table 7; Nov. 6 Trial Tr. at 414:11-16. Similarly, the 8.4% of erroneous enumerations were "likely in the non-Hispanic white areas . . . .that tend to show net overcounts." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:17-20, 415:3-9.

1701.  The differential impacts of omissions—even when balanced out in the final calculus—can have significant impacts on planning decisions by local agencies. Nov. 6 Trial Tr. at 416:24-417:11. The Department seeks data from the Census about children in need of services, to determine where to locate health centers. Nov. 6 Trial Tr. at 417:2-6. Where the data the Department is relying on has significant omissions, as where Black children are disproportionately missing from the data, the Department of Health is more likely to shortchange the undercounted community, meaning "they may not pay attention to a particular neighborhood that they need to pay attention to." Nov. 6 Trial Tr. at 417:6-11.

1702.  Dr. Abowd has conceded that a citizenship question is likely to increase gross omissions in the 2020 Decennial Census. Nov. 14 Trial Tr. at 1221:18-19. The differential impact of increased omissions resulting from a citizenship question is likely to negatively impact the planning of local services and the distribution of funding.

### 7.      Children are Particularly Vulnerable to Being Omitted from the Census

1703.  The Census historically has struggled to obtain accurate information about children. During the 2010 Decennial Census, the Census Bureau failed to collect accurate information about children, especially those aged 0-4, even when collecting overall accurate counts for the population. PX-381 at 6; PX-267 at 18, Table 7; PX-337 at 35.

1704.  While the net overcount in 2010 for the total population was near zero, 4.6% of children between the ages of 0-4 were undercounted, and 10.3% of that demographic was omitted, or missed. O'Hare Aff. ¶ 18, Table 1.1.

315

1705. Moreover, the Census Bureau found that these undercounts were clustered geographically. Specifically, the undercounts of children in several states, including Arizona, California, Texas, New York, Illinois, and New Mexico were higher than the national average. PX-346 at 17, 30, Appendix A. Moreover, counties with a total population of more than a half million total population in 2010, including Kings, Queens, New York and Bronx boroughs in New York, Cook County in Illinois, and Philadelphia County, Pennsylvania, accounted for more than 90% of the national net undercount of the population age 0-4. PX-346 at 18.

1706. The Census Bureau, evaluating the 2010 Decennial Census, found that "the likelihood of the census missing a young child is higher than the likelihood of missing a person in any other age or age/sex group" and that "a higher omission rate is a driver for the undercount of young children." PX-410 at 15.

1707. Moreover, the Census Bureau found that "census duplication, other enumeration errors, and whole-person imputations do not offset the high levels of omissions for young children." PX-410 at 15.

1708. Within the total population of children aged 0-4, some subgroups were more likely to be missed than young White children, including Black, American Indian and Alaska Natives, and Hispanic children. PX-339 at 18, 20; PX-337 at 35. This was especially problematic in 2010, as Hispanics made up a disproportionate share of children overall, and children aged 0-4. PX-381 at 14, Table 4. In addition, "children who were grandchildren, other relatives (such as a niece, nephew, or cousin), and nonrelatives of the householder," were also more likely to be undercounted in 2010. PX-339 at 18.

1709.  Dr. O'Hare testified that nearly a third of children missed in the 2010 Census were left off of household self-responses, and nearly two thirds were missed in the NRFU operation. PX-339 at 19, Table 9; Nov. 7 Trial Tr. at 548:5-17.

1710.  Significantly, the Census Bureau found that, "NRFU proxy respondents and misclassification of vacant units may contribute to the undercount of young children." PX 339 at 18.

1711.  Specifically, the Census Bureau found that its evidence suggested that "proxies may not provide complete and accurate information for the census enumeration," and that "unknowledgeable or unwilling proxy respondents may be a key factor in the undercount of young children." PX-339 at 19.

1712.  A citizenship question will likely contribute to the undercount of children. Dr. Abowd testified that a citizenship question will likely decrease self-response among noncitizen and Hispanic households, and increase reliance on flawed NRFU operations, such as proxies, to capture the characteristics of these households. Nov. 13 Trial Tr. at 881:19-882:5, 919:12-920:10, 952:23-953:10. As a result, by increasing reliance on proxies, the key factor in the undercount of young children, a citizenship question will likely contribute to the problem. PX-339 at 19.

1713.  Dr. Abowd also testified that a citizenship question will lead to more gross omissions during the 2020 Decennial Census. Nov. 14 Trial Tr. at 1221:18-19.

1714.  The Census Bureau found that young children are more likely to be missed than any other age group, and that higher omissions is a driver of the undercount of young children. PX-410 at 15. Moreover, the Census Bureau found that erroneous enumerations and whole person imputations "do not offset the high level of omissions for young children." PX-410 at 15. As a

result, by causing higher omissions, a citizenship question is likely to contribute to the undercount of children.

1715.  As detailed above, the Plaintiff jurisdictions depend on accurate census data relating to children to ensure appropriate allocations of federal resources that are distributed, in part, based on the number of children within a particular jurisdiction.

### E.  Injury Based on Risk to Privacy

1716.  In his March 26, 2018 decisional memo, Secretary Ross called for the institution of a citizenship question on the 2020 Decennial Census as a means to provide citizenship voting-age population (CVAP) data at the census block level. PX-26 (AR).

1717.  Dr. Abowd testified that census blocks vary significantly in terms of their populations. Nov. 13 Trial Tr. at 1031.

1718.  Both Dr. Abowd and Dr. Handley similarly testified that some census blocks are very small; some census blocks have just one person in them. *Id.*; Nov. 13 Trial Tr. at 837; *see also* Brower Aff. (Docket No. 498-1) ¶ 6.

1719.  For example, according to the 2010 Census Redistricting Data (Public Law 94-171) File, 26,213 blocks in Minnesota contained only one household, while 95,220 blocks in Minnesota contained between one and nine households. Brower Aff. ¶ 6.  In 2010, 63% of the populated census blocks (i.e., those census blocks with a non-zero population) in Minnesota contained fewer than ten households.  *Id.*

1720.  For another example, according to the 2010 Census PL 94-171 data set, 52,976 census blocks in New York State—comprising nearly 22% of all populated census blocks in New York State—had a population of only one to ten persons. Breitbart Aff. ¶ 5.

1721.  The State Demographer for the State of Minnesota testified that if citizenship data is published at the block level, it will be harder to give people assurances that their responses on the census questionnaire will be kept safe and confidential. Brower Aff. ¶ 9.

1722.  Federal law prohibits the Commerce Secretary—or any other Department of Commerce employee, bureau, agency, or local government census liaison—from "mak[ing] any publication whereby the data furnished by any particular establishment or individual . . . can be identified." 13 U.S.C. § 9(a)(2).

1723.  The publication of granular, deeply personal citizenship information could also constitute a violation of a legally protected interest in confidentiality of Census responses.

1724.  As Dr. Hillygus explained, the addition of a citizenship question creates a real increased risk of disclosure.  She testified that "you have policies that can change and you can have mistakes happen where data are accidentally released . . . there is no doubt you have increased harm associated with accidental or deliberate disclosure with a citizenship question." Nov. 5 Trial Tr. at 136:9-24.

1725.  The risk created by the potential of disclosure is substantially more than it was without citizenship information—if, in 2010, somebody accidentally got your individual census level data they would not have known your citizenship status, but now they would have access to "what the Census Bureau designates as sensitive information, and the risk of harm is substantially increased." *Id.* at 136:25–137:5.

1726.  Moreover, there is an actual increase in the probability of disclosure because now the Census data will have more information about individual households. Nov. 5 Trial Tr. at 137:9-14.  This makes the potential of disclosure stronger.  Nov. 5 Trial Tr. at 138:5-11.

1727.  This potential threat is understood by the general public.  For example, George Escobar, Chief of Programs and Services at CASA, is concerned that by identifying the citizenship status of individuals living within a very small geographic area, a citizenship question could lead to immigration enforcement targeting these particular areas and communities and harm the privacy of CASA members. Escobar Aff. ¶ 24.

1728.  A large number of people living in immigrant communities of color—citizens and noncitizens alike—have expressed significant apprehension about answering the citizenship for fear that their citizenship status or the citizenship status of their neighbors and loved ones will be made public and potentially used for law enforcement profiling against people on blocks with high levels of noncitizens. Escobar Aff. ¶¶ 20-24; Althschuler Aff. ¶¶ 13-18; Vargas Supp Aff. (Docket No. 498-22) ¶9; PX-662. One U.S. citizen with undocumented parents stated that she feared that filling out a citizenship question would prompt the Census Bureau and potentially other governmental entities to check the status of any non-citizens living in her home, and that the government could use the citizenship question to create a list to separate families and deport undocumented Virginians. Sarmiento Aff. (Docket 488-3) ¶ 6.

1729.  On November 1 and 2, at the National Advisory Committee ("NAC") Meeting, the Census Bureau presented its finding from the Census Barriers, Attitudes, and Motivators Surveys ("CBAMS").  Vargas Supp. Aff. (Docket No. 498-22) ¶ 7.  The Census Bureau reported its finding that focus group participants in the CBAMS expressed concern that the purpose of a citizenship question was to target certain ethnic groups for purposes of fear and immigration enforcement.  *Id.* ¶ 8; PX-662 at 20-21, 29-38, 43-46, 56-59, 61.

1730.  On June 20, 2018 in Falls Church, Virginia, an undocumented mother with U.S. citizen children expressed concern to the Executive Director of the Virginia Coalition for Immigrant

Rights that the Trump Administration could use citizenship data to create a deportation list and separate families, or potentially round up undocumented individuals and put them in internment camps. Sarmiento Aff. ¶ 7. She stated that she was not planning to fill out the census form, solely because of the citizenship question. *Id.*

1731.  On July 12, 2018, a visibly upset undocumented Latino activist stated that he feared disclosing citizenship information to the government and would therefore likely not fill out the census form. *Id.* ¶ 8.

1732.  Immigrant communities of color in Virginia have expressed concern that—in light of the Trump Administration separating families at the border—the Administration would use citizenship information derived from the census to separate mixed status families. *Id.* ¶ 9.

1733.  Many CASA members have expressed fears that answering a particular census question could lead to their family being harmed or separated, and have stated that participating in the Census presents too high a risk to the safety and security of themselves and their families to justify participating. Escobar Aff. ¶ 21.

1734.  One CASA member told a CASA Health Promoter about a family member that he believed was placed in deportation proceedings shortly after applying for a Driver's License—a story this member said made answering a question about immigration status on a federal government form not worth the risk. *Id.* ¶ 23.

1735.  Since the beginning of the Trump Administration, members of immigrant communities of color in New Jersey have been increasingly hesitant to share their information with governmental agencies to help their U.S. citizen family members apply for critical governmental benefits or services. Cullinane Aff. (Docket 505-1) ¶ 6.

1736.  Enrollment in Supplemental Nutrition Assistance Program has declined across the state of New Jersey among families where only children apply for the program—typically a marker of an immigrant household. *Id.*

1737.  A school in Elizabeth, New Jersey that provides Head Start services and is attended mainly by immigrant children and children of immigrants has experienced an extreme decline in enrollment. *Id.*

1738.  At Passaic County College, a public community college with a significant number of immigrant students, enrollment also decreased in 2017. *Id.*

1739.  Make the Road New Jersey found that immigrant clients were increasingly afraid to access the justice system, out of fear of ICE enforcement around courthouses, including clients that failed to pursue orders of protection, and clients who had failed to attend court dates altogether.  Cullinane Aff. ¶ 5

1740.  Multiple members of immigrant communities of color in New Jersey have asked whether the government will misuse the information they divulge when filling out the census questionnaire, while others have asked whether they will be deported if they report that they are non-citizens. *Id.* ¶ 8.

1741.  The Chinese-American Planning Council (CPC), a member organization of Plaintiff NYIC, has reported that some of their members have expressed concern that they will receive a visit from Immigration and Customs Enforcement (ICE) if they indicate that there are noncitizens in their household. Plum Aff. ¶ 16.

1742.  Some CPC members have also expressed concern about answering a citizenship question because they are aware that Census data was used to identify Japanese-Americans for internment during World War II. *Id.*

1743.  Somia Elrowmeim, Adult Education Program Manager of NYIC member organization Arab-American Association of New York (AAANY), has reported that many of her students are fearful or apprehensive about having their names disclosed because of their legal status. *Id.* ¶ 17.

1744.  Members of Chhaya Community Development Corporation ("Chhaya"), another NYIC member organization, have expressed that answering a citizenship question is deeply concerning to them because they do not trust the federal government with such information. *Id.*  ¶ 18.

1745.  A man who emigrated to the United States from Guyana reported to NYIC member organization Desis Rising Up and Moving that he would not answer a citizenship question because he feared that the information could be used to target his family members who are non-citizens for deportation based on his understanding that Census data was used to target Japanese-American citizens for internment. *Id.*  ¶ 19.

1746.  A 30-year-old DACA recipient who lives in a mixed status household reported to NYIC member organization Little Sisters of the Assumption Family Health Service that he is afraid to answer a citizenship question because he is concerned that the Trump Administration may use that data to hurt his family and community. *Id.*  ¶ 20.

1747.  A central concern of NYIC's member organizations and NYIC itself regarding a citizenship question is the loss of privacy that members in the immigrant communities they serve would suffer by publishing citizenship data at the block level. *Id.*  ¶ 21.

1748.  Members of immigrant communities of color in New York City and New York State are deeply concerned that citizenship information may be viewed and potentially used for law enforcement profiling against people on blocks with high levels of noncitizens by ICE or other parts of the Trump Administration that have been used to intimidate and marginalize immigrants. Choi Aff. ¶ 22; Altschuler Aff. ¶¶ 13, 18.

1749.  One member of Make the Road New York (MRNY) who is a DACA recipient and lives in a mixed status household has reported that he is afraid to answer the Census out of fear of subjecting his household or other households on his block to profiling by immigration authorities. Altschuler Aff. ¶ 15.

1750.  Another MRNY member—a naturalized U.S. citizen and Long Island resident—reported that she is less likely to respond to the Census if it contains a citizenship question because she is fearful of the consequences of answering the question for non-citizens in her neighborhood. *Id.* ¶ 16.

1751.  At least three other individuals have expressed fear to MRNY about answering the Census survey if a citizenship question is on it: a 48-year-old non-citizen MRNY member of Honduran origin who lives in Brooklyn; a 30-year-old woman of Ecuadorian origin with DACA status who resides in Suffolk County and comes from a mixed status family; and a 54-year-old woman of Salvadoran origin who is a United States citizen and resides in Suffolk County with her mixed status family. *Id.* ¶ 17.

*          *          *

Respectfully submitted,

BARBARA D. UNDERWOOD
Attorney General of the State of New York

By: */s/ Matthew Colangelo*

Steven C. Wu
  *Deputy Solicitor General*
Judith N. Vale
  *Senior Assistant Solicitor General*

Matthew Colangelo
  *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Danielle Fidler, *Assistant Attorney General*
Sania Khan, *Assistant Attorney General*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Laura Wood, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*

Dale Ho
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Sarah Brannon*
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*\* Not admitted in the District of
Columbia; practice limited pursuant to*

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

*D.C. App. R.*
*49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the NYIC Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | |
| v. | 18-CV-5025 (JMF) (Consolidated Case) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

## PLAINTIFFS' JOINT PROPOSED POST-TRIAL CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iv

I.      The obligation to conduct a decennial census ................................................... 1

II.     Plaintiffs have standing to challenge Defendants' decision to demand citizenship
        information through the 2020 decennial census. ............................................... 2

        A.     This Court may consider all of the evidence at trial, including extra-record
               evidence, to evaluate Plaintiffs' standing. ............................................. 3

        B.     The evidence shows that Plaintiffs have suffered and will suffer concrete
               injuries-in-fact. ........................................................................................ 3

               1.    Injuries from the diversion of resources. .................................... 5

                     a.     Organizational injuries to NGO Plaintiffs. ....................... 5

                     b.     The Governmental Plaintiffs are injured through the expenditure of
                            resources necessary to mitigate the substantial risk of harm. ........ 8

               2.    Loss of privacy ........................................................................... 11

               3.    Injuries from degradation of data quality .................................. 14

               4.    Injuries from diminished political representation. ..................... 17

                     a.     The addition of a citizenship question will result in a differential
                            undercount ...................................................................... 19

                     b.     Plaintiffs will lose political power as a result of the differential
                            undercount ...................................................................... 21

               5.    Reductions in federal funding. ................................................... 23

                     a.     The citizenship question will cause Plaintiffs to directly lose federal
                            funding. ........................................................................... 24

                     b.     The Governmental Plaintiffs will suffer financial harms arising from the
                            addition of a citizenship question. ................................. 25

                     c.     The NGO Plaintiffs will suffer financial harms arising from the addition
                            of a citizenship question ................................................ 27

        C.     Traceability and redressability ................................................................ 29

III.    Defendants' decision to demand citizenship information through the decennial
        census violates the Administrative Procedure Act .......................................... 31

        A.     The scope of judicial review in this case. .............................................. 32

               1.    Review on the whole Administrative Record is to be probing and thorough. ...... 32

2. The "whole record" before the agency includes not only the designated Administrative Record, but also evidence that reflects information the Secretary directly or indirectly considered. ........................................................ 33

3. The Court may consider extra-record evidence that serves as background to explain or clarify scientific or technical subjects requiring specialized knowledge. ................................................................................................................... 39

4. The Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors. ......................................................... 41

5. The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext or prejudgment. .................... 44

B. Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA. ................................................................ 46

1. The decision to add a citizenship question was counter to the evidence before the agency. ................................................................................................ 47

   a. Adding a citizenship question will materially lower response rates. ........... 47

   b. Adding a citizenship question will not provide more accurate, usable, or complete citizenship data. ...................................................................... 51

   c. The Secretary's decision to choose Option D over Option C is contrary to the evidence before the agency. ............................................................. 53

   d. Adding a citizenship question to the census is not necessary to enforce the Voting Rights Act, and would instead undermine the goal of fair representation for all communities. ............................................................. 56

   e. Secretary Ross's decision memo is replete with assertions unsupported by and often contrary to the evidence. ......................................................... 60

2. Defendants' decision entirely failed to consider important aspects of the problem ..................................................................................................... 63

   a. The March 26 decision memo failed to address key legal obligations. ....... 63

   b. The Secretary failed to consider the relevant standard of proof for adding new questions to the census. ............................................................. 65

   c. The Secretary failed to consider the impact of disclosure avoidance protocols on his decision. ........................................................................... 66

   d. Defendants bypassed the procedures designed to identify the best means of satisfying DOJ's request. ............................................................. 68

   e. Defendants failed adequately to consider the need for testing both the citizenship question and the full census questionnaire. ............................. 70

**Page**

  f. Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates .................. 74

 3. Defendants' stated rationale was pretextual. ...................................... 75

  a. The Administrative Record alone confirms that the stated rationale is pretext. ................................................................... 76

  b. Extra-record evidence confirms that the Secretary's given rationale is pretext. ................................................................. 82

 4. The Secretary improperly prejudged the decision to add a citizenship question. .......................................................................... 84

C. Defendants' decision to demand citizenship information is not in accordance with law ........................................................................ 89

 1. Section 141(f) of the Census Act. ................................................. 90

  a. The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act. ...................................... 92

  b. Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3). ...................................... 95

 2. Section 6 of the Census Act. ........................................................ 95

  a. The Administrative Record is clear that Defendants did not comply with Section 6(c) of the Census Act. ......................................... 96

  b. Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c). .................... 98

 3. OMB standards and Census Bureau guidelines regarding pretesting and burden reduction. ........................................................................ 99

  a. The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards. ................................. 101

  b. Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards. ...................... 102

 4. Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief. ................................. 102

D. Remedies for Defendants' APA violation. ....................................... 102

 1. This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census. ........................... 102

 2. This Court should should decline to remand to the agency and reject any request to remand without vacatur. .................................................... 103

 3. This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census ......................... 107

**Page**

4.   Whether this Court vacates the Secretary's decision or issues an injunction, any relief will properly apply nationwide. ........................................................... 109

5.   This Court should enter the requested declaratory relief. ................................... 111

IV.   Defendants' decision to add a citizenship question was motivated by discriminatory animus. ....................................................................................................................... 111

A.   Plaintiffs have proven that the citizenship-question decision was motivated by discriminatory intent through substantial evidence on each of the *Arlington Heights* factors. ........................................................................................................ 111

1.   The addition of a citizenship question will disparately impact Latinos and immigrants of color. .......................................................................................... 112

2.   Historical background of the decision. ............................................................. 114

3.   Irregular procedural sequence. .......................................................................... 115

4.   Substantive departures from past practice. ....................................................... 119

5.   Contemporary statements by decisionmakers and those influencing them. ....... 120

B.   The pretextual nature of the decision also supports a finding of discriminatory intent. ................................................................................................................... 122

C.   Plaintiffs proved intentional discrimination based on race and national origin, but even if Defendants discriminated against immigrants generally, such discrimination would violate the Fifth Amendment. .......................................... 127

1.   Defendants' citizenship question decision seeks to diminish political power and harms groups based on race, rthnicity, and national origin. .............................. 128

2.   Defendants' arbitrary targeting of a politically unpopular group cannot pass constitutional muster under any level of scrutiny ............................................. 131

Conclusion ........................................................................................................................135

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*ACEMLA v. Copyright Royalty Tribunal,*
   763 F.2d 101 (2d Cir. 1985)...................................................................................94

*Action on Smoking & Health v. Civil Aeronautics Bd.,*
   699 F.2d 1209 (D.C. Cir. 1983)..............................................................................55

*Air India v. Brien,*
   No. 00-cv-1707, 2002 WL 34923740 (E.D.N.Y. Feb. 14, 2002) .........................103

*Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.,*
   663 F.3d 476 (D.C. Cir. 2011).........................................................................84, 85

*All. for the Wild Rockies v. U.S. Forest Serv.,*
   2018 WL 5316129 (9th Cir. Oct. 25, 2018).................................................103, 105

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993)........................................................................105, 106

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001)......................................................................103, 106

*Am. Littoral Soc'y v. U.S. Envtl. Prot. Region,*
   199 F. Supp. 2d 217 (D. N.J. 2002) ...........................................................................3

*Am. Petroleum Inst. v. EPA,*
   787 F.2d 965 (5th Cir. 1986) ................................................................................101

*Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017).................................................................................66

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008).................................................................................41

*Animal Defense Council v. Hodel,*
   840 F.2d 1432 (9th Cir. 1988) ................................................................................39

*Asarco, Inc. v. United States E.P.A.,*
   616 F.2d 1153 (9th Cir. 1980) .....................................................................39, 42, 43

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,*
   412 U.S. 800 (1973).................................................................................................41

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.,*
   818 F.3d 493 (9th Cir. 2016) ................................................................................122

**Cases**                                                                                              **Page(s)**

*Bank of Am. Corp. v. City of Miami, Fla.*,
   137 S. Ct. 1296 (2017) ................................................................................................5

*Bar MK Ranches v. Yuetter*,
   994 F.2d 735 (10th Cir. 1993) ...............................................................................33

*Barnett v. City of Chicago*,
   141 F.3d 699 (7th Cir. 1998) ................................................................................58

*Batalla Vidal v. Duke*,
   295 F. Supp. 3d 127 (E.D.N.Y. 2017) ..................................................................31

*Batalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) ..............................................19, 120, 122

*Bauer v. DeVos*,
   325 F. Supp. 3d 74 (D.D.C. 2018) ..........................................................................2

*Bellevue Hosp. Ctr. v. Leavitt*,
   443 F.3d 163 (2d Cir. 2006)..................................................................................55

*Benavidez v. Irving Indep. Sch. Dist.*,
   690 F. Supp. 2d 451 (N.D. Tex. 2010) ...............................................................125

*Benavidez v. Irving Indep. Sch. Dist.*,
   No. 3:13–CV–0087–D, 2014 WL 4055366 (N.D. Tex. 2014) .............................125

*Bennett v. Spear*,
   520 U.S. 154 ..................................................................................................3, 29

*Beta Analytics Int'l, Inc. v. United States*,
   61 Fed. Cl. 223 (2004) ..........................................................................................44

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006)....................................................................................2

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
   290 F.R.D. 409 (S.D.N.Y. 2012) .......................................................................5, 17

*Buffalo Cent. Terminal v. United States*,
   886 F. Supp. 1031 (W.D.N.Y.1995)......................................................................39

*Bunyard v. Hodel*,
   702 F. Supp. 820 (D. Nev. 1988) ........................................................................101

*Camp v. Pitts*,
   411 U.S. 138 (1973)............................................................................................103

| Cases | Page(s) |
|---|---|

*Carey v. Klutznick,*
  508 F. Supp. 420 (S.D.N.Y. 1980)...................................................................................40

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980)................................................................................... passim

*Carey v. Klutznick,*
  653 F.2d 732 (2d Cir. 1981)..............................................................................................12

*Casa de Maryland v. U.S. Dep't of Homeland Sec.,*
  284 F. Supp. 3d 758 (D. Md. 2018) ..................................................................................19

*Central United Life, Inc. v. Burwell,*
  128 F. Supp. 3d 321 (D.D.C. 2015) ...............................................................................107

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017).................................................................................2, 5, 30

*Centro Presente v. U.S. Dept. of Homeland Sec.,*
  No. CV 18-10340, 2018 WL 3543535 (D. Mass. July 23, 2018)...........................120

*Chemical Mfrs. Ass'n v. EPA,*
  28 F.3d 1259 (D.C. Cir. 1994) .......................................................................................104

*Chevron Corp. v. Donziger,*
  833 F.3d 74 (2d Cir. 2016)...............................................................................................29

*Choice Care Health Plan, Inc. v. Azar,*
  315 F. Supp. 3d 440 (D.D.C. 2018) .................................................................................61

*Citizens to Pres. Overton Park v. Volpe,*
  401 U.S. 402 (1971)..........................................................................................32, 41, 45

*City & County of San Francisco v. Sessions,*
  No. 17-cv-04642-WHO, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018) ..................50

*City of Chicago v. Sessions,*
  888 F.3d 272 (7th Cir. 2018) .........................................................................................111

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985)........................................................................................................133

*City of Detroit v. Franklin,*
  4 F.3d 1367 (6th Cir. 1993) .............................................................................................23

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.,*
  923 F.2d 188 (D.C. Cir. 1991)..........................................................................................48

**Cases**                                                                 **Page(s)**

*City of Los Angeles v. Sessions,*
   293 F. Supp. 3d 1087 (C.D. Cal. 2018) ...............................................49

*City of New York v. U.S. Dep't of Commerce,*
   713 F. Supp. 48 (E.D.N.Y. 1989) ....................................................18

*City of New York v. U.S. Dep't of Commerce,*
   822 F. Supp. 906 (E.D.N.Y. 1993) ..................................................40

*City of Phila. v. Sessions,*
   280 F. Supp. 3d 579 (E.D. Pa. 2018) ...............................................50

*City of Philadelphia v. Klutznick,*
   503 F. Supp. 663 (E.D. Pa. 1980) ...................................................23

*City of Willacoochee, Ga. v. Baldrige,*
   556 F. Supp. 551 (S.D. Ga. 1983) ...................................................23

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................4, 8, 11

*Clean Air Council v. Pruitt,*
   862 F.3d 1 (D.C. Cir. 2017) ........................................................103

*Connecticut v. Daley,*
   53 F. Supp. 2d 147 (D. Conn. 1999) ...............................................35

*Crawford v. Bd. of Educ.,*
   458 U.S. 527 (1982) ...............................................................112

*Crown Cork & Seal Co. v. NLRB,*
   36 F.3d 1130 (D.C Cir. 1994) ......................................................104

*Ctr. for Biological Diversity v. Zinke,*
   900 F.3d 1053 (9th Cir. 2018) .......................................................66

*Ctr. for Food Safety v. Price,*
   No. 17-cv-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ...........14, 17

*Cuomo v. Baldrige,*
   674 F. Supp. 1089 (S.D.N.Y. 1987) ................................................40

*Davis v. Mineta,*
   302 F.3d 1104 (10th Cir. 2002) ..................................................86, 88

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA,*
   785 F.3d 1 (D.C. Cir. 2015) .....................................................55, 57

**Cases**                                                                                          **Page(s)**

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ................................................................................. 11

*Dep't of Agriculture v. Moreno,*
   413 U.S. 528 (1973) ................................................................... 127, 128, 133

*Dopico v. Goldschmidt,*
   687 F.2d 644 (2d Cir. 1982) ....................................................................... 33, 35, 37

*EEOC v. Ethan Allen,*
   44 F.3d 116 (2d Cir. 1994) ....................................................................................... 81

*Engine Mfrs. Ass'n v. EPA,*
   20 F.3d 1177 (D.C. Cir. 1994) ............................................................................... 106

*Evenwel v. Abbott,*
   136 S. Ct. 1120 (2016) ................................................................................................ 1

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................................................. 32

*FEC v. Akins,*
   524 U.S. 11 (1998) ............................................................................................ 14, 17

*Fed'n for Am. Immigration Reform v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980) ................................................................ 1, 114, 119

*Fertilizer Inst. v. EPA,*
   935 F.2d 1303 (D.C. Cir. 1991) ............................................................................. 106

*Florida v. United States,*
   885 F. Supp. 2d 299 (D.D.C. 2012) ...................................................................... 123

*Friedman v. U.S. Postal Serv.,*
   No. 08-cv-00913, 2011 WL 3267713 (D. Conn. July 28, 2011) ...................... 11, 14

*Glavin v. Clinton,*
   19 F. Supp. 2d 543 (E.D. Va. 1998) ................................................................ 18, 23

*Gorzynski v. JetBlue Airways Corp.,*
   596 F.3d 93 (2d Cir. 2010) .................................................................................... 129

*Guglielmi v. Northwestern Mut. Life Ins. Co.,*
   No. 06-cv-3431, 2007 WL 1975480 (S.D.N.Y. July 6, 2007) ................................. 35

*Hampton v. Mow Sun Wong,*
   426 U.S. 88 (1976) ................................................................... 127, 128, 131

ix

**Cases**                                                                      **Page(s)**

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) ................................................................................110

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ...................................................................................2, 5, 15, 17

*Hooper v. Nat'l Transp. Safety Bd.,*
    841 F.2d 1150 (D.C. Cir. 1988) ................................................................................68

*Humane Soc'y of United States v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) ..................................................................................66

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .....................................................................................................2

*Inforeliance Corp. v. United States,*
    118 Fed. Cl. 744 (2014) .............................................................................................86

*Innovative Health Sys., Inc. v. City of White Plains,*
    117 F.3d 37 (2d Cir. 1997) ......................................................................................117

*INS v. Yueh-Shaio Yang,*
    519 U.S. 26 (1996) .....................................................................................................40

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ..................................................................................54

*Int'l Resource Recovery, Inc. v. United States,*
    61 Fed. Cl. 38 (2004) .................................................................................................44

*Int'l Snowmobile Mfrs. Ass'n v. Norton,*
    340 F. Supp. 2d 1249 (D. Wyo. 2004) .....................................................................84

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,*
    920 F.2d 960 (D.C. Cir. 1990) ................................................................................101

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    626 F.3d 84 (D.C. Cir. 2010) ....................................................................................51

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.,*
    482 F.3d 79 (2d Cir. 2006) ...............................................................................47, 53

*Karcher v. Daggett,*
    462 U.S. 725 (1983) ...................................................................................................17

*Katzenbach v. Morgan,*
    384 U.S. 641 (1966) ...................................................................................................58

**Cases**                                                                                        **Page(s)**

*Kern v. U.S. Bureau of Land Mgmt.,*
   284 F.3d 1062 (9th Cir. 2002) ............................................................................53

*Kuang v. U.S. Dep't of Defense,*
   No. 18-cv-3698-JST, 2018 WL 6025611 (N.D. Cal. Nov. 16, 2018)....................56

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
   91 Fed. Cl. 347 (2010) ......................................................................................44

*L-3 Commc'ns Integrated Sys., L.P. v. United States,*
   98 Fed. Cl. 45 (2011) ...................................................................................43, 44

*LaFleur v. Whitman,*
   300 F.3d 256 (2d Cir. 2002)................................................................................3

*Lam v. Univ. of Hawaii,*
   40 F.3d 1551 (9th Cir. 1994) ...........................................................................126

*Lands Council v. Powell,*
   395 F.3d 1019 (9th Cir. 2005) ...........................................................................38

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy,*
   19 F.3d 1342 (11th Cir. 1994) .....................................................................74, 85

*League of United Latin Am. Citizens v. Wheeler,*
   899 F.3d 814 (9th Cir. 2018) .............................................................................99

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)........................................................................94, 105

*Leibovitz v. N.Y. City Transit Auth.,*
   252 F.3d 179 (2d Cir. 2001)..............................................................................12

*Los Angeles v. Lyons,*
   461 U.S. 95 (1983)............................................................................................12

*Luciano v. Olsten Corp.,*
   110 F.3d 210 (2d Cir. 1997)............................................................................119

*LULAC v. Perry,*
   548 U.S. 399 (2006)..........................................................................................56

*Mathews v. Diaz,*
   426 U.S. 67 (1976)..........................................................................................124

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force,*
   375 F.3d 1182 (D.C. Cir. 2004)........................................................................51

**Cases**                                                                    **Page(s)**

*McNabola v. Chicago Transit Auth.*,
    10 F.3d 501 (7th Cir. 1993) ................................................................120

*Mhany Management, Inc. v. Cty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016)...................................................109, 119

*Monga v. Nat'l Endowment for the Arts*,
    323 F. Supp. 3d 75 (D. Me. 2018) ..........................................128, 129

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)................................................................104

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................... passim

*N. Mariana Islands v. United States*,
    686 F.2d 7 (D.D.C. 2009) ......................................................72

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
    684 F.3d 286 (2d Cir. 2011)....................................................30

*N.Y. Pub. Interest Research Grp. v. Whitman*,
    321 F.3d 316 (2d Cir. 2003)......................................................3

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015)....................................................21

*NAACP v. Trump*,
    315 F. Supp. 3d 457 (D.D.C. 2018) ........................................107

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
    55 F. Supp. 3d 316 (E.D.N.Y. 2014) .......................................48

*Nat'l Audubon Soc'y v. Hoffman*,
    132 F.3d 7 (2d Cir. 1997) .....................................39, 41, 42, 44

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006)................................................60

*Nat'l Mining Ass'n v. Jackson*,
    856 F. Supp. 2d 150 (D.D.C. 2012) ........................................39

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................104

*Nat. Res. Def. Council v. EPA*,
    658 F.3d 200 (2d Cir. 2011)...................................................32

**Cases**                                                                **Page(s)**

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
    894 F.3d 95 (2d Cir. 2018) ................................................................ passim

*Negron v. City of Miami Beach,*
    113 F.3d 1563 (11th Cir. 1997) ................................................................. 58

*New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n,*
    727 F.2d 1127 (D.C. Cir. 1984) ................................................................. 57

*New York State Bar Ass'n v. Fed. Trade Comm'n,*
    276 F. Supp. 2d 110 (D.D.C. 2003) ........................................................ 73

*New York v. Salazar,*
    701 F. Supp. 2d 224 (N.D.N.Y. 2010) ....................................... 79, 80, 85

*New York v. U.S. Dep't of Commerce,*
    315 F. Supp. 3d 766 (S.D.N.Y. 2018) .............................................. 91, 101

*New York v. U.S. Dep't of Commerce,*
    No. 18-cv-2921, 2018 WL 4539659 (S.D.N.Y. Sept. 21, 2018) ............... 75, 76, 109

*Nnebe v. Daus,*
    644 F.3d 147 (2d Cir. 2011) ....................................................................... 5

*North Carolina v. EPA,*
    550 F.3d 1176 (D.C. Cir. 2008) ............................................................. 105

*NRDC v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) ...................................................... 103, 105

*NRDC v. Train,*
    519 F.2d 287 (D.C. Cir. 1975) ................................................................. 36

*Oceana, Inc. v. Pritzker,*
    126 F. Supp. 3d 110 (D.D.C. 2015) ........................................................ 42

*Orange Lake Assocs., Inc. v. Kirkpatrick,*
    21 F.3d 1214 (2d Cir. 1994) ................................................................... 129

*Padula v. Webster,*
    822 F.2d 97 (D.C. Cir. 1987) ................................................................. 101

*Patino v. City of Pasadena,*
    230 F. Supp. 3d 667 (S.D. Tex. 2017) .................................................. 125

*Pearl River Union Free Sch. Dist. v. King,*
    214 F. Supp. 3d 241 (S.D.N.Y. 2016) ................................................... 101

**Cases**                                                                          **Page(s)**

*Personnel Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ....................................................................................130

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.,*
    No. 18-cv-5680 (NRB), 2018 WL 4168977 (S.D.N.Y. Aug. 30, 2018) .......................107, 109

*Pleune v. Pierce,*
    765 F. Supp. 43 (E.D.N.Y. 1991) ...................................................................101

*PLMRS Narrowband Corp. v. F.C.C.,*
    182 F.3d 995 (D.C. Cir. 1999) ........................................................................85

*Plyler v. Doe,*
    457 U.S. 202 (1982) ....................................................................................127

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) .................................................................104, 106

*Porrazzo v. Bumble Bee Foods, LLC,*
    822 F. Supp. 2d 406 (S.D.N.Y. 2011) ...............................................................98

*Portland Audubon Soc'y v. Endangered Species Committee,*
    984 F.2d 1534 (9th Cir. 1993) .........................................................................33

*Prometheus Radio Project v. FCC,*
    373 F.3d 372 (3d Cir. 2004) ...........................................................................68

*Pub. Citizen, Inc. v. Mineta,*
    340 F.3d 39 (2d Cir. 2003) .............................................................................54

*Pub. Citizen v. Heckler,*
    653 F. Supp. 1229 (D.D.C. 1986) ....................................................................80

*Pub. Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989) ................................................................................14, 17

*Ragin v. Harry Macklowe Real Est. Co.,*
    6 F.3d 898 (2d Cir. 1993) .............................................................................4, 5

*Ramos v. Nielsen,*
    No. 18-cv-1554, 2018 WL 4778285 (N.D. Cal. Oct. 3, 2018) .................49, 120, 122, 130

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ....................................................................................81

*Remijas v. Neiman Marcus Group, LLC,*
    794 F.3d 688 (7th Cir. 2015) .......................................................................9, 11

**Cases**                                                                    **Page(s)**

*Reyes v. City of Farmers Branch*,
    586 F.3d 1019 (5th Cir. 2009) ................................................................57

*Rioux v. City of Atlanta, Ga.*,
    520 F.3d 1269 (11th Cir. 2008) ...........................................................120

*Rodriguez v. Harris Cty.*,
    964 F. Supp. 2d 686 (S.D. Tex. 2013) ..................................................12

*Rodriguez-Silva v. I.N.S.*,
    242 F.3d 243 (5th Cir. 2001) ..............................................128, 129, 130

*Romer v. Evans*,
    517 U.S. 620 (1996)............................................................125, 130, 131

*Romero v. City of Pomona*,
    665 F. Supp. 853 (C.D. Cal. 1987) .......................................................57

*Rosen v. Thornburgh*,
    928 F.2d 528 (2d Cir. 1991)................................................................109

*Ross v. AXA Equitable Life Ins. Co.*,
    115 F. Supp. 3d 424 (S.D.N.Y. 2015)...................................................12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)....................................................................30

*Sackin v. TransPerfect Glob., Inc.*,
    278 F. Supp. 3d 739 (S.D.N.Y. 2017)...............................................9, 11

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016)....................................................................98

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ................................................................39

*Secretary of Labor v. Cranesville Aggregate Cos.*,
    878 F.3d 25 (2d Cir. 2017)....................................................................99

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*,
    769 F.3d 1184 (D.C. Cir. 2014).............................................................70

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ..............................................................37

*Sierra Club v. Leavitt*,
    355 F. Supp. 2d 544 (D.D.C. 2005) ......................................................98

**Cases**                                                                                        **Page(s)**

*Soberal-Perez v. Heckler*,
    717 F.2d 36 (2d Cir. 1983)......................................................................125

*Sokaogon Chippewa Cmty. v. Babbitt*,
    961 F. Supp. 1276 (W.D. Wis. 1997) .............................................43, 87

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..............................................................................2

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*,
    85 F. Supp. 3d 197 (D.D.C. 2015) ........................................................68

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993).............................................................................119

*State of Connecticut v. U.S. Dep't of Commerce*,
    No. 3:04-cv-1271, 2007 WL 2349894 (D. Conn. Aug. 15, 2007)..........66

*State of Tex. v. Mosbacher*,
    783 F. Supp. 308 (S.D. Tex. 1992) .................................................18, 24

*Stewart v. Azar*,
    313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................70

*Stratton v. Dep't for the Aging for City of New York*,
    132 F.3d 869 (2d Cir. 1997).................................................................79

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)................................................................................2

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014)............................................................................3

*Sztorc v. Prudential Ins. Co. of America*,
    No. 05-cv-0222, 2007 WL 521278 (W.D.N.Y. Feb. 12, 2007)..............34

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ..............................................................107

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)................................................................................55

*Tovar v. U.S. Postal Serv.*,
    3 F.3d 1271 (9th Cir. 1993) ................................................................130

*Tummino v. Torti*,
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ........................................ passim

**Cases**                                                                                          **Page(s)**

*Tummino v. von Eschenbach,*
   427 F. Supp. 2d 212 (E.D.N.Y. 2006) .......................................................................... passim

*U.S. Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999)......................................................................................................18, 19, 40

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.,*
   517 U.S. 544 (1996)....................................................................................................................2

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991)..................................................................................................41

*United States v. Duggan,*
   743 F.2d 59 (2d Cir. 1984)....................................................................................................129

*United States v. Lue,*
   134 F.3d 79 (2d Cir. 1998)....................................................................................................128

*United States v. Windsor,*
   570 U.S. 744 (2013)...............................................................................................................130

*United States v. Yonkers Bd. of Educ.,*
   837 F.2d 1181 (2d Cir. 1987).................................................................................................109

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall,*
   647 F.2d 1189 (D.C. Cir. 1980) ..............................................................................................35

*Utah v. Evans,*
   536 U.S. 452 (2002)................................................................................................................15

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ................................................................................................113

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
   429 U.S. 252 (1977)........................................................................................................109, 111

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
   749 F.2d 788 (D.C. Cir. 1984)................................................................................................37

*Water Quality Ins. Syndicate v. United States,*
   225 F. Supp. 3d 41 (D.D.C. 2016) ........................................................................................47

*Wesberry v. Sanders,*
   376 U.S. 1 (1964)....................................................................................................................17

*Wisconsin v. City of New York,*
   517 U.S. 1 (1996).......................................................................................................1, 15, 89

xvii

| Cases | Page(s) |
|---|---|

*Wong Yang Sung v. McGrath*,
339 U.S. 33 (1950)................................................................................33

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
18 F.3d 854 (10th Cir. 1994) ...............................................................74

*XP Vehicles, Inc. v. Dep't of Energy*,
118 F. Supp. 3d 38 (D.D.C. 2015).......................................................74

**Constitutional Provisions**

U.S. Const. Amend. XIV § 2 .......................................................1, 73, 125

U.S. Const. art. I, § 2, cl. 3.........................................................1, 73, 125

**Federal Statutes and Congressional Authorities**

Pub. L. No. 94-521, 90 Stat. 2459 (1976)..........................................88, 93

Pub. L. No. 105-119, 111 Stat. 2440 (1997)..............................................1

5 U.S.C.
§ 553.....................................................................................................42
§ 554.....................................................................................................42
§ 706........................................................................................... passim

13 U.S.C.
§ 4............................................................................................................1
§ 6....................................................................................................93, 94
§ 9.........................................................................................12, 13, 63
§ 141..........................................................................................16, 87, 88

42 U.S.C. § 7607 ...........................................................................102

44 U.S.C.
§ 3501...................................................................................................96
§ 3504...................................................................................................96

H. Rep. No. 94-944 (1976) ...............................................................88, 93

S. Rep. No. 94-1256 (1976) .............................................................88, 93

**Rules**

Fed. R. Evid. 201 ..................................................................................14

**Miscellaneous Authorities**                                                                    **Page(s)**

Administrative Conference of the United States Recommendation 2013-4: The
 Administrative Record in Informal Rulemaking, 78 Fed. Reg. 41,352 ..................................34

*Administrative Records Offset Declining Census Survey Responses: Survey
 Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at
 https://census.gov/library/stories/2018/11/administrative-records-offset-
 declining-census-survey-response.html ...............................................................................95

*ICE Out of Courts*, Immigrant Defense Project..........................................................................14

John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious
 Operation*, NPR (Sept. 20, 2017)...............................................................................................14

*Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the
 Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil
 Serv.*, 94th Cong. 25 (1976) ......................................................................................................88

National Commission on the Voting Rights Act, Protecting Minority Voters: The
 Voting Rights Act at Work, 1982-2005, https://lawyerscommittee.org/wp-
 content/uploads/2015/07/0023.pdf (2006) ................................................................................57

Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—
 Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006).........................................97

Ray Sanchez, *ICE arrests undocumented father taking daughter to California
 school*, CNN (Mar. 3, 2017) .....................................................................................................14

Richard McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings,
 Discovery, and Additional Factfinding During Judicial Review of Informal
 Agency Action*, 1982, Duke L. J. 333, 348-50 (1982).......................................................34, 39

**PROPOSED CONCLUSIONS OF LAW**

**I.      The obligation to conduct a decennial census.**

1.      The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State."  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.

2.      All residents must be counted, regardless of citizenship status.  *See Fed'n for Am. Immigration Reform v. Klutznick* ("*FAIR*"), 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

3.      The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs."  Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

4.      The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts.  *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).

5.      Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau.  13 U.S.C. § 4.

6.      Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law.  Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

**II.     Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the 2020 decennial census.**

7.      To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

8.      The standing inquiry is satisfied so long as a single plaintiff establishes standing, including in a consolidated case. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 90-91 (D.D.C. 2018) (consolidated case).

9.      Organizations can establish standing in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), or "associational standing" on behalf of their members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

10.     An organization has associational standing to sue if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006). The third prong is a prudential requirement only. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996).

11.     Where, as here, a plaintiff "seeks civil penalties and injunctive relief only, not money damages, its claims do not require 'individualized proof.'" *Bldg. & Constr. Trades Council*, 448 F.3d at 150. Moreover, even the participation "of a limited number of individual

2

members" will not negate standing if the claims and relief do not "make the individual

participation of each injured party indispensable to proper resolution of the cause." *N.Y. State*

*Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 130–31 (2d Cir. 2015) (citation and

internal quotation marks omitted).

12.     The NGO Plaintiffs and the Governmental Plaintiffs both have standing in this

case because they have suffered several different types of injuries-in-fact that are fairly traceable

to Defendants' decision to add a citizenship question to the census, and these injuries will

redressed if Defendants' decision is vacated or enjoined.

**A.     This Court may consider all of the evidence at trial, including extra-record evidence, to evaluate Plaintiffs' standing.**

13.     Defendants concede that the Court can consider evidence outside the

Administrative Record to evaluate standing in this case.  Trial Tr. 1421–22.

14.     Courts adjudicating APA challenges can and do consider extra-record evidence

for standing purposes.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167-68 (because "each element

of Article III standing 'must be supported . . . with the manner and degree of evidence required at

the successive stages of the litigation,'" a plaintiff "must ultimately support any contested facts

with evidence adduced at trial") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992));

*see also Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*, 199 F. Supp. 2d 217, 228 & n.3

(D. N.J. 2002) (considering plaintiffs' extra-record evidence in support of standing in an APA

case because "they go to the issue of the Court's jurisdiction").

**B.     The evidence shows that Plaintiffs have suffered and will suffer concrete injuries-in-fact.**

15.     Allegations of a "future injury" qualify "if the threatened injury is 'certainly

impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v.*

*Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

16.     The injury-in-fact required to establish standing "need not be large, an identifiable trifle will suffice." *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (quoting *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996)); *see also N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (holding that *Havens* required only a "perceptible impairment" of an organization's mission to create standing).

17.     The possibility that Defendants may take undefined future steps (some of which are hypothetical, not planned) to try to mitigate harms caused by the addition of a citizenship question, *see* Trial Tr. 1424-25, does not undermine the showing of injury-in-fact described in Parts II.B.1 to II.B.5 below.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (concluding that plaintiffs established injury-in-fact based on expected effects of the use of sampling in the 2000 census because "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issue presented here, because such a pause would result in extreme – possibly irremediable – hardship"); *see also* Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481 ("Congress finds that . . . the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.").

18.     The evidence establishes that Plaintiffs will be injured in numerous different and independent ways from the addition of a citizenship question to the census, including through:

(1) diversion of resources; (2) loss of privacy; (3) harms to data accuracy and quality; (4) diminished political representation; and (5) reductions in federal funding.

### 1. Injuries from the diversion of resources.

#### a. Organizational injuries to NGO Plaintiffs.

19.     The Supreme Court and the Second Circuit have both recently affirmed that "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Comunidad Hispana*, 868 F.3d at 111 (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017), and *Havens*, 455 U.S. at 379).

20.     To demonstrate such an injury, a plaintiff need only show a "'perceptible impairment' of an organization's activities." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin*, 6 F.3d at 905).  In *Nnebe*, the Second Circuit held that a taxi driver advocacy group had a sufficient injury for organizational standing "[e]ven if only a few suspended drivers are counseled by [the group] in a year" as a result of the challenged policy, because there was "some perceptible opportunity cost expended." *Id*. at 156–57.

21.     A "nonprofit organization establishes an injury-in-fact if . . . it establishes that it 'spent money to combat' activity that harms its organization's core activities." *City of Miami*, 137 S. Ct. at 1303 (citing *Havens*, 455 U.S. at 379).

22.     The NGO Plaintiffs have standing because they have diverted "resources that could be spent on other activities," and the addition of a citizenship question harms their organizational missions.  *Nnebe*, 644 F.3d at 157; *see also Comunidad Hispana*, 868 F.3d at 111 (organizational standing is established when resources are diverted); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012) (Second Circuit requires only "'scant' evidence of 'only a perceptible impairment of an organization's activities'").

23.     Plaintiffs presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, NGO Plaintiffs will expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.  This evidence is uncontroverted by Defendants.

24.     Each NGO Plaintiff – the New York Immigration Coalition ("NYIC"), Make the Road New York ("MRNY"), the American-Arab Anti-Discrimination Committee ("ADC") and the ADC Research Institute ("ADCRI"), and CASA de Maryland ("CASA") – has suffered harm as a result of being required to divert resources from other organizational priorities and spend more money to address the effects of the fear created by a citizenship question among community members who are less likely to respond to the census.  *See* Plum Aff. (Docket No. 498-19) ¶¶ 12-23; Choi Aff. (Docket No. 489-1) ¶¶ 14-22; Altschuler Aff. (Docket No. 503-1) ¶¶ 7-11, 21; Khalaf Aff. (Docket No. 498-16) ¶¶ 15-29; Escobar Aff. (Docket No. 498-3) ¶¶ 15-29.

25.     The NGO Plaintiffs have also established that their organizational missions – all of which include promoting engagement in and representation of immigrant communities of color – will be impaired as a result of a citizenship question.  *See* Plum Aff. ¶¶ 10-13,23; Choi Aff. ¶¶ 3-9, 14-15; Altschuler Aff. ¶¶ 3,11-22; Khalaf Aff. ¶¶ 13-16; Escobar Aff. ¶¶ 15, 20-25.

26.     The trial record establishes that Plaintiff NYIC has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.1.  For example, NYIC demonstrated that because of the heightened fear and suspicion created by the addition of a citizenship question, they have expanded plans for census-related services, programming, and support to try

to reduce the negative effect of this question on the response rate among noncitizens.  Choi Aff.
¶¶ 17-22; Plum Aff. ¶ 14.  Because of these increased expenditures and time commitments,
NYIC has shown it will need to divert resources from other mission-critical areas, including
health care, language access, and employment issues.  Plum Aff. ¶ 23.

27.     The trial record establishes that Plaintiff MRNY has suffered harm and will
continue to suffer harm as a result of being required to divert resources to address the effects of
adding a citizenship question to the census.  PFOF § X.A.2.  For example,

    a.     MRNY demonstrated that because of the heightened fear and suspicion created
by the citizenship question, they have expanded plans for census-related services,
programming, and support to try to reduce the negative effect of this question on
the response rate among noncitizens.  Altschuler Aff. ¶¶ 13, 19.

    b.     At least six MRNY members expressed unwillingness or reluctance to respond to
the 2020 census because of the citizenship question.  *Id.* ¶¶ 14-17.

    c.     Because of the need to increase the time and money spent on Census outreach due
to the addition of a citizenship question, MRNY has diverted and will continue to
divert resources from other areas critical to its mission including civic
engagement and providing legal services.  *Id.* ¶ 21.

28.     The trial record establishes that Plaintiffs ADC and ADCRI have suffered harm
and will continue to suffer harm as a result of being required to divert resources to address the
effects of adding a citizenship question to the census.  PFOF § X.A.3.  For example,

    a.     ADC and ADCRI demonstrated that because of the heightened fear and suspicion
created by the citizenship question, they have expanded plans for census-related
services, programming, and support to try to reduce the negative effect of this

question on the response rate in the Arab-American community.  Khalaf Aff. ¶¶ 23-28.

    b.  Because of these increased expenditures and time commitments, ADC and ADCRI have shown they will need to divert resources from other mission-critical priorities including organizing, issue advocacy efforts, and educational initiatives. *Id.* ¶ 29.

29.    The trial record establishes that Plaintiff CASA has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.4.  For example, CASA has conducted additional outreach because of the tremendous level of fear and greater unwillingness of its constituents to respond to the census due to the citizenship question in the context of other policies from the Trump Administration targeting them.  Escobar Aff. ¶¶ 16-27.

    **b.**    **The Governmental Plaintiffs are injured through the expenditure of resources necessary to mitigate the substantial risk of harm.**

30.    The Governmental Plaintiffs similarly presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, they have expended and will continue to expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.

31.    These expenditures constitute a direct injury to the budgets and resources of the Governmental Plaintiffs that is sufficient to establish injury-in-fact for standing purposes.  *See, e.g.*, *Clapper*, 568 U.S. at 414 n.5 (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 746-47 (S.D.N.Y. 2017) (where harm is sufficiently imminent, "a plaintiff's expenses in

taking reasonable measures to prevent the harm's fruition also may be viewed as an injury-in-fact"); *see also Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015).

32.    The Governmental Plaintiffs have demonstrated that they have expended or will expend additional resources to mitigate the adverse effects of the citizenship question on response rates.  This evidence – all of which is uncontroverted by Defendants – establishes that several of the Governmental Plaintiffs have or intend to devote substantial resources and personnel to respond to the impacts of the citizenship question. PFOF § X.B.

33.    For example, in stark contrast to past decennial censuses, New York City has dramatically expanded its efforts to encourage its residents to participate in the 2020 census. Trial Tr. 317-21.  Dr. Salvo – who serves as the Director of the Population Division at the New York City Department of City Planning – testified that because of reluctance in some communities to fill out the census because of the citizenship question, the City has taken concrete steps to encourage participation.  Trial Tr. 319, 430.  These efforts include the creation of a specially-designated census office, including at least fifteen staff members, who will help to encourage participation in the census.  *Id.*  These outreach efforts, and concomitant expenditures of time and resources, substantially exceed those of past censuses.  *Id.*; *see also id.* at 359-61, 430-31.

34.    Plaintiffs offered undisputed evidence that after Defendants announced their plans to add a citizenship question to the 2020 census, and in response to that decision, New York City increased its budget for census outreach efforts by approximately $1.2 million dollars.  Trial Tr. 427, 429.

35.    Likewise, because of the citizenship question, the City of Chicago anticipates the need to allocate additional resources and staff to encourage Chicagoans to participate in the 2020

census.  Rodriguez Aff. (Docket No. 488-1) ¶¶ 7, 10, 12, 13.  A recently-introduced City Council resolution specifically designates funds for specialized outreach to immigrant communities in light of the citizenship question.  *See id.* ¶ 12; Garcia Aff. (Docket No. 498-9) ¶¶ 14-15 (discussing efforts to allocate additional resources to countermand the impact of the citizenship question on immigrant communities); PX-243 (Cook County resolution to "Establish an Emergency Fund to Address the Citizenship Question in the 2020 Census"); PX-246 (Chicago City Council resolution to establish a $500,000 "emergency fund to address citizenship question in 2020 census" in order to "conduct specialized outreach to immigrant communities in the City of Chicago").

36.     In light of the Census Bureau's own recognition that the addition of a citizenship question will depress self-response rates among Hispanic and immigrant communities, the Governmental Plaintiffs reasonably seek to mitigate the anticipated harm stemming from those depressed response rates.  Such expenditures constitute direct, significant, and concrete injury to the Governmental Plaintiffs.

37.     There is no dispute that, as Dr. Abowd testified, the current macro environment has created "significant barriers associated with self-response that may plausibly and credibly be related to the citizenship question."  Trial Tr. 1123; *see also* PX-158 (AR); PX-160; PX-161; PX-162; PX-448; PX-662.  These barriers make outreach more difficult for both the NGO Plaintiffs and the Governmental Plaintiffs, requiring Plaintiffs to spend their own money and resources to address the negative effects of the citizenship question.  Census Bureau 30(b)(6) Dep. (Docket No. 502-2) at 453, 462; Trial Tr. 1122.

38.     Because Plaintiffs have diverted resources from other priorities and spent their own money to counteract the expected decline in self-response caused by addition of a

citizenship question, they have demonstrated sufficient injury-in-fact to establish standing.  *E.g.*,

*Remijas*, 794 F.3d at 694; *Sackin*, 278 F. Supp. 3d at 746-47.

### 2.     Loss of privacy.

39.     Defendants' sole justification for adding a citizenship question – to provide DOJ

with census block data about citizenship of residents – also injures NGO Plaintiffs' members by

invading their right to privacy.

40.     "[A]esthetic, emotional or psychological harms . . . suffice for standing purposes."

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006); *see also Leibovitz v. N.Y. City*

*Transit Auth.*, 252 F.3d 179, 184-85 (2d Cir. 2001).

41.     To satisfy the injury-in-fact requirement for standing purposes, Plaintiffs must

establish that the emotional or psychological harm is significant enough to constitute injury, and

is more than mere "personal sense of embarrassment."  *Friedman v. U.S. Postal Serv.*, No. 08-

cv-00913, 2011 WL 3267713, at *5 (D. Conn. July 28, 2011).

42.     The threatened harm must be "sufficiently real and immediate to show an existing

controversy," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), though Plaintiffs need not

"demonstrate that it is literally certain that the harms they identify will come about," *Ross v. AXA*

*Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting Clapper, 568 U.S. at

414 n.5).

43.     Both the likelihood of and widespread concern regarding privacy violations from

disclosure of immigration status caused by including a citizenship question on the census are

sufficient to show injury-in-fact.

44.     Federal law provides that Defendants must maintain the confidentiality of

responses to the Census questionnaire.  *See* 13 U.S.C. § 9(a)(2) ("Neither the [Commerce]

Secretary, nor any other officer or employee of the Department of Commerce or bureau or

agency thereof," may "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified.").

45.     "Both the history of the Census Act and the broad language of the confidentiality provisions of § 9 make abundantly clear that Congress intended both a rigid immunity from publication or discovery and a liberal construction of that immunity that would assure confidentiality." *Carey v. Klutznick*, 653 F.2d 732, 739 (2d Cir. 1981) (quoting *McNichols v. Klutznick*, 644 F.2d 844, 845 (10th Cir. 1981)).

46.     But the federal government's intention to publish CVAP data on a block-level basis will result in the disclosure of at least some individuals' responses to the citizenship question, and presents a high risk of disclosure for many others.

47.     Census blocks often consist of only a few households, and some contain only a single individual.  Publication of granular CVAP data will necessarily disclose the citizenship status of some individuals, violating the confidentiality of their census responses.  13 U.S.C. § 9(a)(2).

48.     The Census Bureau admits that it has not yet developed any methodology or plan for how such granular data can be published without disclosure, and as such its assertion that it does not intend to publish actual individual responses does not mitigate the risk of violating the confidentiality requirement. *See Carey*, 653 F.2d at 738-39 (holding that it was error to compel discovery of address registers, even though individual names would be redacted, because the § 9(a)(2) requirement is that no identifying information be made public).

49.     Moreover, there is a genuine increased threat of disclosure, which the general public is aware of.  PFOF § X.E ¶¶ 1724-1727.  As Dr. Hillygus explained, the addition of a citizenship question creates a real increased risk of disclosure.  Trial Tr. 136 ("You have policies

that can change and you can have mistakes happen where data are accidentally released. . . .
[T]here is no doubt that you have increased . . . the harm associated with accidental or deliberate
disclosure with a citizenship question.").  There is an actual increase in the probability of
disclosure because census data will now have more information about individual households.  *Id.*
at 137-38.

50.     For members of the NGO Plaintiffs, being compelled to answer questions as to
the citizenship status of every member of their household – deeply personal information – is
extremely invasive when combined with Defendants' goal of providing this information to DOJ
at the census block level.

51.     In addition, the door-to-door collection of citizenship information will result in
increased fear and emotional stress among members of immigrant communities, and raises the
specter that the release of such granular data could be used for immigration enforcement.

52.     For members of NGO Plaintiffs who are undocumented immigrants and
noncitizens with legal status, the publication of CVAP data presents a grave threat that such
publicly-available information could be used for immigration enforcement against known
noncitizens or targeting areas with high levels of noncitizens.

53.     The Census Bureau's own qualitative research records this widespread concern.
*E.g.*, PX-662 at 17, 21, 29, 31, 34-36, 43.

54.     These fears are warranted because this Administration has used other publicly
available information to target noncitizens.  For example, using public data, U.S. Immigration
and Customs Enforcement (ICE) has targeted noncitizen communities for enforcement action,
which has resulted in both a 1,200% increase in ICE arrests and attempted arrests in New York
State generally and at courthouses in New York between 2016 and 2017, as well as swaths of

13

enforcement actions at sensitive public locations such as schools, hospitals, and churches. *See, e.g.*, *ICE Out of Courts*, Immigrant Defense Project; *see also* Ray Sanchez, *ICE arrests undocumented father taking daughter to California school*, CNN (Mar. 3, 2017); John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious Operation*, NPR (Sept. 20, 2017).[1]

55.     The fear that immigration enforcement will use all available information to target noncitizens is real, as documented in the Census Bureau's own research, *see* PX-662; and demonstrates sufficient injury-in-fact for NGO Plaintiffs to establish standing. *See, e.g.*, *Friedman*, 2011 WL 3267713, at *5.

### 3.     Injuries from degradation of data quality.

56.     Plaintiffs have also proved injury-in-fact because adding a citizenship question will admittedly harm the quality of the count.   *See* PFOF § X.D.

57.     Where a defendant has a duty to provide accurate information, failure to so provide creates an injury-in-fact sufficient to confer standing. *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal Advisory Committee Act for failure to make publicly available reports and minutes of American Bar Association meetings relating to prospective judicial nominees); *see also FEC v. Akins*, 524 U.S. 11, 20-21 (1998) (plaintiff voters had standing to sue the Federal Election Commission on the ground that the statute in question gave plaintiffs a right to the information being withheld by the FEC); *see also Ctr. for Food Safety v. Price*, No. 17-cv-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (informational injury satisfies the injury-in-fact requirement of standing where a statutory provision has explicitly created a right to information).

---

[1] The Court may take judicial notice of facts "generally known within the trial court's territorial jurisdiction," including recent increases in ICE immigration enforcement activities at sensitive locations in New York.  Fed. R. Evid. 201(b)(1).

58.     An injury sufficient to create standing is created not only by a total deprivation of

information to which plaintiffs have a statutory right, but also by the deprivation of accurate or

truthful information. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982)

(holding that because the Fair Housing Act created a statutory right to truthful information

concerning the availability of housing, "testers" who were misinformed had standing to sue

without demonstrating any further injury).

59.     Here, Defendants are constitutionally required to provide accurate information,

and Plaintiffs have a statutory right to the provision of those results. *See Utah v. Evans*, 536 U.S.

452, 478 (2002) (explaining Framers' "strong constitutional interest in accuracy"); *Wisconsin v.

City of N.Y.*, 517 U.S. 1, 20 (1996) (the conduct of the census must bear a "reasonable

relationship to the accomplishment of an actual enumeration of the population, keeping in mind

the constitutional purpose of the census," namely, obtaining an accurate count of the population

in each state); 13 U.S.C. § 141(c); *see also* Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481

("Congress finds that . . . [i]t is essential that the decennial enumeration of the population be as

accurate as possible, consistent with the Constitution and laws of the United States." ).

60.     As Dr. Salvo testified, increased reliance on methods of enumeration other than

self-response compromises the quality and accuracy of census data in terms of its ability to

describe demographic subgroups by, for example, age or ethnicity; and this loss of accuracy

constitutes an injury to Plaintiffs who make use of that data.  Trial Tr. 289, 302-04 (Salvo).

61.     The decision to add a citizenship question, and its concomitant harm to data

quality, injures Plaintiffs in concrete ways.  PFOF § X.D.  For example, Dr. Salvo testified that

New York City will be injured if the 2020 census is of lessened accuracy overall, regardless of

whether the City is subject to a net undercount.   Trial Tr. 289, 302-04.

62.     As Dr. Salvo explained, the New York City Department of Education relies on demographic data from the census to draw school zone boundaries, and inaccurate information about groups such as children under six or children of school age compromises that process. *Id.* at 305.  Similarly, the Department of Education relies on information about neighborhood composition by race, and inaccurate information can cause problems there as well. *Id.* at 305-06.

63.     Similarly, the New York City Department of Health recognizes that certain populations are particularly at risk for some diseases; accordingly, the Department of Health requires accurate information about the population of particular demographic groups to calculate vital rates such as disease prevalence within particular groups. *Id.* at 307-08.  This information is used to make decisions about where to deploy Health Department resources, and inaccurate census information – for example, as a result of inaccuracies in the 2010 census – has caused serious problems for the Health Department in the past. *Id.* at 308.

64.     Where high imputation rates are concentrated in a particular neighborhood, those differential imputation rates diminish the accuracy of census information about demographic subgroups in that neighborhood, and render the count less useful to city agencies such as the Health Department. *Id.* at 394-95.  Likewise, the combination of overcounts in some neighborhoods and net undercounts in others can lead to errors in measuring neighborhood populations, which leads to misallocation of resources. *Id.* at 416-17.

65.     The Governmental Plaintiffs have a strong interest in ensuring that they allocate resources properly throughout their jurisdictions.  The degradation of data quality caused by the citizenship question will impinge on those vital interests.

66.     In addition, Plaintiffs have a strong interest in accurate data for drawing election districts.  The Governmental Plaintiffs are required to rely on decennial census counts as the

population base for periodically redrawing their state and local districts to be "as nearly of equal population as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 782 n.14 (1983); *see also Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

67. For example, trial testimony confirms that Virginia requires accurate data from the decennial census for drawing congressional and state legislative election districts. Lucyk Aff. (Docket No. 506-1), at ¶¶ 5-6. The trial record includes evidence that New York relies on census data for the same purposes. Breitbart Aff. (Docket No. 504-1), at ¶ 4.

68. The addition of a citizenship question will force these states to redistrict using population counts that will be fundamentally inaccurate, harming their sovereign interests in ensuring that their representative governments fairly and accurately reflect the number of people who live in each district.

69. Defendants' decision to add a citizenship question, and the resulting impairment of data quality, harms Plaintiffs' interests in accurate information and is sufficient to establish injury-in-fact. *Havens Realty*, 455 U.S. at 373-74; *see also FEC*, 524 U.S. at 20-21; *Pub. Citizen*, 491 U.S. at 449-51; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

### 4. Injuries from diminished political representation.

70. Plaintiffs will likely lose political power as a result of their communities being undercounted, or inaccurately counted, in the 2020 census. These harms will directly injure the Governmental Plaintiffs and the NGO Plaintiffs' members who reside in those jurisdictions, on whose behalf the NGO Plaintiffs may assert associational standing. *See Bloomberg*, 290 F.R.D. at 415 (an organization can establish "standing solely as a representative of its members.").

71. The likely loss of political power as a result of a plaintiff's community being undercounted in the decennial census constitutes a "concrete," "actual or imminent" injury that is

"not 'conjectural' or 'hypothetical.'"  *Dep't of Commerce*, 525 U.S. at 332 (quoting *Whitmore v.*

*Arkansas*, 495 U.S. 149, 155 (1990)).

72.     This is true for both effects on interstate apportionment (the allocation of

Congressional seats among the states) and intrastate districting (the drawing of lines for election

districts for state and local legislative bodies).  *See id.*; *see also Carey v. Klutznick*, 637 F.2d 834,

838 (2d Cir. 1980); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 549 (E.D. Va. 1998) (three-judge

court), *aff'd sub nom. Dep't of Commerce*, 525 U.S. 316 (1999); *State of Tex. v. Mosbacher*, 783

F. Supp. 308, 313 (S.D. Tex. 1992); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp.

48, 50 (E.D.N.Y. 1989).

73.     It is well-established that where changes to the decennial census will likely result

in a loss of congressional representation, plaintiffs have standing.  In *Department of Commerce*,

the Supreme Court evaluated whether individual plaintiffs would be injured if the Census Bureau

adopted sampling rather than person-by-person enumeration for the decennial census; the Court

concluded, based on expert testimony, that Indiana would likely lose a seat, and the Indiana

resident plaintiff was injured because with "one fewer Representative, Indiana residents' votes

will be diluted."  *Dep't of Commerce*, 525 U.S. at 330-32; *see also Carey*, 637 F.2d at 838

(holding that individual New York residents "made a showing . . . that Census Bureau actions in

New York State have caused a disproportionate undercount which will result in loss of

representation in Congress").

74.     Changes to the census that will result in intrastate harms, such as dilution of

voting power *within* a state, also confer standing.  The *Department of Commerce* Court held that

because particular localities used decennial census population numbers for their state legislative

redistricting, residents of those localities could "suffer vote dilution in state and local elections as

18

a result" of the Census Bureau's proposed sampling plan. *Dep't of Commerce*, 525 U.S. at 332-33. Accordingly, those residents had grounds to challenge the plan based in intra-state redistricting harms. *Id*.

75. Moreover, the NGO plaintiffs have associational standing on behalf of their members to seek redress for these injuries-in-fact for multiple reasons. First, the NGO plaintiffs have members living in affected areas. Second, each of the NGO Plaintiffs works to facilitate civic engagement and enhance the political representation of the very communities whose representation will be diluted by an undercount resulting from the inclusion of the citizenship question. Third, the NGO Plaintiffs easily can pursue this action without much individual participation of members. *See Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018) (finding Plaintiff CASA a "prototypical example[] of possessing associational standing"); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 282 n.12 (E.D.N.Y. 2018) (holding Plaintiff MRNY had associational standing).

## a. The addition of a citizenship question will result in a differential undercount.

76. The record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount. PFOF §§ VII, VIII. As detailed below, this undercount will cause several states to lose congressional representation and will cause many of the local government plaintiffs to suffer intrastate vote dilution harms.

77. Plaintiffs' injuries are actual and imminent, not conjectural and speculative. As the Supreme Court held in *Department of Commerce*, because Defendants have set the policy that will harm Plaintiffs, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme – possibly irremediable – hardship." 525 U.S. at 332.

78.     Although Defendants contend that the Census Bureau's non-response follow up (NRFU) efforts may mitigate the undercount, NRFU has never prevented an undercount of hard-to-count populations in the past.  PFOF § VIII.E ¶¶ 1101-06.  And the trial record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount in the 2020 census.  PFOF § VII-VIII.

79.     Moreover, the near-unanimous evidence establishes that NRFU will be even less effective in 2020 due to a citizenship question and the current political environment.  PFOF §§ VII.F; VIII.A – VIII.E.

80.     The evidence reflects that the addition of a citizenship question will significantly reduce the self-response rate and increase the NRFU workload for certain subpopulations, and will increase the net differential undercount among those populations.  PFOF §§ VII-VIII.

81.     The overwhelming weight of the evidence, including testimony, scientific literature, and Census Bureau analyses, supports the finding that the NRFU operations will not prevent the differential net undercount of individuals of non-citizen households and Hispanics caused by the decrease in the self-response resulting from the inclusion of a citizenship question. PFOF § VIII.A-E.

82.     To the contrary, the evidence reflects that the citizenship question will cause an undercount of individuals in households with at least one non-citizen of at least 5.8%, even after NRFU and imputation.  PFOF § VIII.E.6.

83.     As a result, many of the Governmental Plaintiffs and, as in *Dep't of Commerce*, various states and localities in which the NGO Plaintiffs' members reside, will lose political power as a result of the inclusion of a citizenship question on the census.  PFOF § X.C.1.

> **b.** **Plaintiffs will lose political power as a result of the differential undercount.**

84.     As detailed below, because of the differential undercount stemming from the addition of a citizenship question, Plaintiffs will suffer both inter- and intra-state losses of political power.

> **(1)** **Interstate apportionment harms.**

85.     Defendants' decision to add a citizenship question on the census will cause several Plaintiffs to lose congressional representation.

86.     *California.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause California to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

87.     Plaintiff ADC has members residing in California, and all of the members of ADC who reside in California will lose political power as a result of this loss of a Congressional seat.  *Id.*

88.     Additionally, Governmental Plaintiffs City and County of San Francisco and County of Monterey and all the residents of these jurisdictions will also lose political power if California loses a Congressional seat.  *Id.*

89.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in California and the ADC members who reside in California.  *Id.*

90.     *Texas.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Texas to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

91.     Plaintiff ADC has members residing in Texas, and all of the members of ADC who reside in Texas will lose political power as a result of this loss of a Congressional seat.  *Id.*

21

92.     Additionally, Governmental Plaintiffs Cameron County, Texas; El Paso County, Texas; and Hidalgo County, Texas, and all the residents of these jurisdictions will also lose political power if Texas loses a Congressional seat.  *Id.*

93.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Texas and the ADC members who reside in Texas.  *Id.*

94.     *Florida.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Florida to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

95.     Plaintiff ADC has members residing in Florida, and all of the members of ADC who reside in Florida will lose political power as a result of this loss of a Congressional seat.  PFOF § IV.A.

96.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Florida and the ADC members who reside in Florida.  *Id.*

**(2)     Intra-state dilution of political power.**

97.     Based on the evidence, including expert testimony, the addition of a citizenship question will lower both the population counts and the relative population share within their states for each of the county and city Plaintiffs: the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; and counties of Cameron, El Paso, Hidalgo, and Monterey.  PFOF § X.C.1.

98.     Additionally, based on the evidence, including expert testimony, the addition of a citizenship question to the census will lower the population counts and relative population of Los Angeles, Miami, and Prince George's County, Maryland.  *Id.*

99.     Plaintiff ADC has members residing in Phoenix, Arizona; Miami, Florida; New York City; Prince George's County, Maryland; and Chicago, Illinois.  PFOF § X.C.2.a.  Plaintiff

22

MRNY has members residing in New York City.  *Id.*  Plaintiff CASA has members who reside in Prince George's County.  *Id.*

100.    The addition of a citizenship question will therefore lead to the dilution of the voting power of these jurisdictions and the individuals who reside in them, and this loss of political power will cause injury to these locations and the individuals who reside in them. PFOF § X.C.1.  *See, e.g.*, *Carey*, 637 F.2d at 838.

### 5.    Reductions in federal funding.

101.    Plaintiffs have also established injury-in-fact based on the harmful effect the citizenship question will have on federal funds that they (or the jurisdictions in which their members reside) receive.

102.    In *Carey*, the Second Circuit held that New York State and New York City had standing to challenge the conduct of the 1980 census because they "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in . . . decreased federal funds flowing to their city and state."  *Carey*, 637 F.2d at 838.

103.    Other courts have followed *Carey*.  *See, e.g.*, *Glavin*, 19 F. Supp. 2d at 550; *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (injury-in-fact existed for standing purposes even if "none of the named plaintiffs personally receives a dollar of state or federal aid, [because] all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money"); *Mosbacher*, 783 F. Supp. at 313-14 (even though the "Census Bureau and the Department of Commerce are not in charge of distribution of federal funds," their "actions significantly affect the distribution of funds"); *see also City of Detroit v. Franklin*, 4 F.3d 1367, 1375 (6th Cir. 1993) (finding standing where plaintiffs claimed that "the census undercount will result in a loss of federal funds" to their city); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 554 (S.D. Ga. 1983) (same).

104.    Both the NGO Plaintiffs and Governmental Plaintiffs will suffer financial harm from the addition of a citizenship question.  Even a small citizenship-question-induced disparate undercount of noncitizen households or Hispanics will cause jurisdictions with a greater-than-average share of noncitizen or Hispanic residents to lose funding under several dozen federal financial assistance programs that rely on geographic distribution criteria.  PFOF § X.C.2; Reamer Aff. (Docket No. 508-1) ¶¶ 16-19.  In addition, this differential undercount will injure the Governmental Plaintiffs by preventing the equitable distribution of federal funds to localities.

### a.    The citizenship question will cause Plaintiffs to directly lose federal funding.

105.    Because Census data influence a large number of federal financial assistance programs, a differential census undercount involving noncitizens, the foreign-born, or Hispanics will lead to measurable fiscal losses for states with population percentages of these subgroups that are above the nationwide average, harming both the Governmental Plaintiffs and members of NGO Plaintiffs in those states.  *Id.*

106.    A significant portion of federal domestic financial assistance is distributed on the basis of statistics derived from the decennial census, including at least 320 federal domestic assistance programs that use census-derived data and distributed about $900 billion in Fiscal Year 2016.  PFOF § X.C.2.

107.    There is a strong, direct relationship between the accuracy of the decennial census and the reliability of these datasets and surveys; decennial census data is an essential ingredient of accurate and reliable funding allocations.  PFOF § X.C.2 ¶ 1608.

108.    Dr. Reamer identified nearly two dozen financial assistance programs, including state-share programs and Federal Medical Assistance Percentage (FMAP) programs, with funding formulas that allocate federal funds geographically in a manner dependent in part or in

whole on decennial census results.  *Id.*  As described in the PFOF, *see* § X.C.2, even a small differential undercount stemming from the citizenship question will cause Plaintiffs (or the jurisdictions in which NGO Plaintiffs' members reside) to lose federal funding.

109.   Using five of these programs as examples, Dr. Reamer performed calculations using a series of seven undercount scenarios that he applied to 2020 population projections.  PFOF § X.C.2 ¶ 1609.

110.   Dr. Reamer's analysis reflects that while the magnitude of the impact varies across states depending on the nature of the undercount, numerous states and localities will be negatively impacted if a citizenship question causes even a minimal undercount of non-citizen households relative to the population as a whole.[2]  PFOF § X.C.2 ¶ 1610.

> **b.    The Governmental Plaintiffs will suffer financial harms arising from the addition of a citizenship question.**

111.   Dr. Reamer's analysis establishes that a differential undercount will cause many of the Governmental Plaintiffs to suffer harm due to the direct loss of funding from census-related federal programs.  PFOF § X.C.2.b.

112.   For example, Plaintiffs New York and New Jersey are home to large non-citizen, Hispanic, and foreign-born populations.  As a result, even minimal undercounting resulting from a citizenship question is likely to impact these states relative to others; as Dr. Reamer's analysis

---

[2] That not every Plaintiff will see a reduction in funding under every federal funding program as a result of the citizenship question does not defeat Plaintiffs' showing of injury-in-fact.  It is well-settled that in the context of multi-plaintiff challenges to government action, injury on the part of a single plaintiff is sufficient to confer standing.  *See, e.g.*, *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim."); *Melrose Credit Union v. City of N.Y.*, 247 F. Supp. 3d 356, 365 (S.D.N.Y. 2017).  Nor does the possibility that some individual Governmental Plaintiffs' share of specific funding programs increase under some of the undercount scenarios defeat standing, because "standing is not defeated by other benefits that outweigh the injury that establishes standing, even if the other benefits may defeat damages."  Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. & Supp. 2018); *see also, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.").

reflects, New York State and New Jersey will consistently lose state-share program funds under each of the undercount scenarios. *Id.* Likewise, many of the other State Governmental Plaintiffs will be lose federal funding under many of the scenarios examined by Dr. Reamer. *Id.*

113.    In addition to the programs described in Dr. Reamer's analysis, various representatives from the Governmental Plaintiffs' broad coalition of states and localities submitted detailed descriptions of how a differential undercount will impair additional funding streams. *See id.* For example, in New York, even a .02% undercount in the number of children in poverty aged 5 to 17 residing in a Local Education Agency's (LEA) jurisdiction can lead to changes in eligibility for federal education grants that could amount to cuts as large as 40% of an LEA's Title I Grant. *See id.*; Harmon Aff. (Docket No. 498-14) ¶ 9.

114.    Other Governmental Plaintiffs described a broad swath of federal programs designed to ensure funding for, *inter alia*, public schools, families living in poverty, energy assistance for the needy, and the elderly, all of which depend on census or census-derived data. PFOF § X.C.2.

115.    These harms – the diminution of funds attributed to a citizenship question – also directly impact the City and County Governmental Plaintiffs.   As detailed in the PFOF, some federal programs require states to use census-derived information to distribute federal funds directly to the City and County Plaintiffs.  Localities receive funds under these programs based on their relative share of the relevant population within the state. Given the concentration of immigrants and Hispanics within the City and County Governmental Plaintiffs as compared to their states, PFOF § X.C.1, nearly all of the City and County Plaintiffs will likewise experience direct funding harms.

116.     For the same reason – that differential undercounting will be concentrated among non-citizens and Hispanics that are likely to live in metropolitan areas – State Governmental Plaintiffs will be required to inequitably distribute funds to localities within their jurisdiction.  As detailed at PFOF § X.C.2.b, states are required to distribute many federal funds to localities based on census or census-derived data.  This is also plainly injury.  For example, the addition of a citizenship question will require State Governmental Plaintiffs to misallocate funds within their states, specifically depriving noncitizen and Hispanic students in poverty residing in large metropolitan areas, including those located in most of the Plaintiff Cities and Counties, of much-needed social services and educational funding.  *See id.*

>    c.     **The NGO Plaintiffs will suffer financial harms arising from the addition of a citizenship question.**

117.     Plaintiff ADC has individual members who live in all fifty states, including the states above that will be negatively impacted regarding funding, and has identified individual members living in California, New York, Florida, Texas, and New Jersey.  PFOF § X.C.2.a ¶ 1617; *see also* PFOF § I.A.4; Khalaf Aff. ¶¶ 30-31.  Each of these states was identified by Dr. Reamer as losing population share and thus funding under the state-share programs he identified if there is even a 2% undercount of individuals living in non-citizen households.

118.     As for Plaintiff MRNY, it has 23,000 members residing in New York City, Nassau County, Suffolk County, and Westchester County, New York, including several specific members living in New York who will be harmed by the loss of funding to the state due to an undercount caused by the citizenship question.  PFOF § X.C.2.a ¶ 1619; *see also* PFOF § I.A.3; Altschuler Aff. ¶¶ 4, 23-30.

119.     Finally, although the Second Circuit has held that it is unnecessary for standing purposes, the NGO Plaintiffs also introduced evidence that a number of their members do

27

directly use, rely on, or interact with some of the programs that would lose money. *See Carey*, 637 F.2d at 838 (holding that individuals could establish harm by showing "decreased federal funds flowing to their city and state," without showing that they themselves relied on the particular programs at issue).

120.    Although their residence in these states is enough to be harmed due to federal funding losses to their states, ADC has also shown that its some of its members directly rely upon programs such as Title I education funds that the citizenship question will negatively affect in the states where they live.  PFOF § X.C.2.a ¶ 1618.

121.    Several individual MRNY members have also demonstrated reliance on Title I educational funds and Head Start funding due to their children attending schools and programs that receive such funding, and thus even more direct harm when New York loses funding for this program due to an undercount.  PFOF § X.C.2.a ¶ 1620.

122.    CASA assists many of its members who use census-related funding programs including Supplemental Nutritional Assistance Program (SNAP), which provides food assistance to low-income and the Special Supplemental Nutrition Program for Women Infants and Children (WIC); these members in Maryland will be harmed under several of the undercount scenarios discussed by Professor Reamer.  PFOF § X.C.2.a ¶ 1622.

123.    Plaintiff NYIC and a number of its member organizations directly receive census-influenced funding through programs that will be negatively affected if New York state residents are undercounted due to the citizenship question, as this will reduce the pool of funding available to them through the State.  Plum Aff. (Docket No. 498-19) ¶¶ 5-9; Choi Aff. (Docket No. 489-1) ¶ 6.

124.    Specifically, NYIC receives census-guided funding through the Corporation for

National & Community Service for 21 positions filled by AmeriCorps VISTA; NYIC member

Chhaya Community Development Corporation receives funding through the Community

Development Block Grant program; and NYIC member Chinese-American Planning Council

receives funding through the Workforce Innovation and Opportunity Act.  Plum Aff. ¶¶ 6, 9.

125.    The evidence is overwhelming that Plaintiffs have demonstrated sufficient injury-

in-fact caused by losses to their fair share of federal funds.  *E.g., Carey*, 637 F.2d at 838.

### C.    Traceability and redressability.

126.    To establish causation, a plaintiff must show that the injury-in-fact is "fairly

traceable to the challenged action of the defendant."  *N.Y. Civil Liberties Union v. N.Y. City

Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011) (quoting *Summers*, 555 U.S. at 493).

127.    This requirement is met if Plaintiffs "demonstrate a causal nexus between the

defendant's conduct and the injury."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir.

2016)

128.    Such a nexus is established if Defendants' conduct "has a determinative or

coercive effect on the action of someone else."  *Bennett*, 520 U.S. at 169.

129.    This standard, however, is "lower than that of proximate cause," and "indirectness

is 'not necessarily fatal.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Simon

v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976)).

130.    Defendants' actions need not be "the very last step in the chain of causation," and

independent action by a third party "does not exclude injury produced by determinative or

coercive effect upon the action of someone else."  *Bennett*, 520 U.S. at 168-69 (1997); *see also

Chevron Corp.*, 833 F.3d at 121 ("A defendant's conduct that injures a plaintiff but does so only

after intervening conduct by another person, may suffice for Article III standing").

29

131.    Thus, Plaintiffs will be injured by the question's "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 168-69; *see also Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104-05 (2d Cir. 2018) ("*NRDC*") (holding that delaying penalty increase for automakers that violate fuel standards would lead automakers to violate those standards more frequently, and thus cause more pollution that would injure the plaintiff organizations' members).

132.    Here, the evidence shows that addition of a citizenship question will cause a significant decline in self-response.  PFOF § VII.  That decline is unlikely to be fully remedied by any of Defendants' NRFU operations.  PFOF §§ VIII.A – VIII.D.  And even if the likelihood of a net differential undercount could somehow be avoided, Defendants concede that adding a citizenship question will distort the quality and accuracy of the resultant census data.  PFOF § X.D.1.  Whether from a net undercount, a net differential undercount, or simply a decline in data quality, adding a citizenship question will directly cause the harms identified in Parts II.B.1 to II.B.4 above.  This showing meets Plaintiffs' traceability burden.  *NRDC*, 894 F.3d at 104-05.

133.    To meet the redressability requirement, Plaintiffs must show only "that a favorable decision would redress [their] injuries."  *Comunidad Hispana*, 868 F.3d at 109.

134.    A favorable decision vacating or enjoining the citizenship question on the census would redress Plaintiffs' injuries from increased mitigation expenses and diversion of resources, by ensuring that not all of these additional resources need be expended or diverted.

135.    A favorable decision would redress NGO Plaintiffs' loss-of-privacy injuries, by reducing the risk that publication of citizenship data regarding NGO Plaintiffs' members at the granular block level would expose them to statutory privacy violations and heightened risk of targeted immigration enforcement.  *See Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 156

(E.D.N.Y. 2017) (plaintiffs had standing to challenge changes to DHS's information-use policy for DACA recipients because "[i]t is not difficult to infer that this information would facilitate DHS's ability to remove these individuals from the country," which is "sufficiently concrete, imminent, and traceable to Defendants' alleged conduct to establish standing").

136.    A favorable decision would also redress harms caused by the expected distortions to data accuracy that a citizenship question would cause, as well as Plaintiffs' electoral and funding injuries arising from a differential undercount.  *Carey*, 637 F.2d at 838.

137.    Because Plaintiffs have alleged extensive injuries-in-fact that are fairly traceable to Defendants' decision to add a citizenship question and would be redressed by an order vacating or enjoining that decision, the Court should find that Plaintiffs have satisfied their burden to demonstrate standing.

## III.    Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act.

138.    The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A); or that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

139.    Judicial review of agency action under the APA is based on the rationale the agency provided in making its decision; a court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A.     **The scope of judicial review in this case.**

　　　　1.     **Review on the whole Administrative Record is to be probing and thorough.**

140.    The APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706.

141.    The Supreme Court has made clear that this Court's review is to be "thorough, probing, [and] in-depth." *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching and careful" review).

142.    Rigorous judicial review under the APA was intended to maintain the balance of power between the branches of government: "[I]t would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the [APA] warrant, to give effect to its remedial purposes." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in the judgment) (in enacting the APA, "Congress confined agencies' discretion and subjected their decisions to judicial review").

143.    The parties agree that the Court may consider the designated Administrative Record.  Docket No. 523; Docket No. 524; Docket No. 529; Trial Tr. 1415-16.

144.    The parties agree that the Court may consider extra-record evidence, including expert evidence, that addresses Plaintiffs' standing.  Trial Tr. 1421-22.

2. **The "whole record" before the agency includes not only the designated Administrative Record, but also evidence that reflects information the Secretary directly or indirectly considered.**

145.    The full administrative record contains not only the designated Administrative Record, but also other evidence reflecting important information that Secretary Ross directly or indirectly considered in deciding to add a citizenship question, including oral conversations with Secretary Ross that are not reflected in the designated Administrative Record.

146.    APA review requires a court to consider the "whole record" before the agency.  5 U.S.C. § 706; *see Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982).

147.    As Defendants have recognized in this proceeding, that record must include *all* information "'directly or indirectly'" considered by the agency, including "'evidence contrary to the agency's position.'"  Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018) (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)); *see Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).

148.    In this case, the full Administrative Record includes testimony or affidavits recounting meetings or other oral conversations that provided important information to Secretary Ross or his direct subordinates regarding the addition of a citizenship question.

149.    Agency decision-makers and their direct subordinates often receive important data, perspectives, or other information through oral communications with their staff, officials in other agencies, or outside third parties.  When such communications convey critical information that a decision-maker directly or indirectly considered in reaching the challenged decision, evidence about these communications is not "extra-record" material at all, but rather a necessary component of the entire "informational base" before the agency when it made its decision. *Dopico*, 687 F.2d at 654; *see Portland Audubon Soc'y*, 984 F.2d at 1548 (whole record includes "everything that was before the agency pertaining to the merits"); *Sztorc v. Prudential Ins. Co. of*

*America,* No. 05-cv-0222, 2007 WL 521278, at *3 n.4 (W.D.N.Y. Feb. 12, 2007) (administrative

record incomplete where it lacked information about telephone calls); *see also* Richard

McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and*

*Additional Factfinding During Judicial Review of Informal Agency Action,* 1982 Duke L. J. 333,

348-50 (1982).

150.   Indeed, federal guidance about the proper compilation of an administrative record

in informal proceedings confirms that the record should include, *inter alia,* "transcripts or

recordings, if any, of oral presentations made in the course of a rulemaking."  Administrative

Conference of the United States Recommendation 2013-4: The Administrative Record in

Informal Rulemaking, 78 Fed. Reg. 41,352, 41,360 (adopted June 14, 2013).

151.   To be part of the "whole record," such oral communications must be sufficiently

relevant and important that they had (or should have had) "a significant impact on the agency's

decisionmaking process." McMillan & Peterson at 348; *cf. United Steelworkers of Am., AFL-*

*CIO-CLC v. Marshall*, 647 F.2d 1189, 1215 (D.C. Cir. 1980) (noting concern "whenever the

record fails to disclose important communications that may have influenced the agency decision

maker").

152.   In the ordinary case, an agency can be presumed in the regular course of agency

decisionmaking to follow record-keeping processes that will provide the court with a complete

record, including important information discussed in meetings or oral communications.   For this

reason, the ordinary APA case will not require a court to decide whether it is necessary to

consider discovery, testimony, or affidavits of oral conversations not reflected in the designated

administrative record to allow review of the whole record.

153.    For example, a typical administrative record will often include written briefings or summaries of meetings and calls, which, together with memoranda, emails, and other written materials, adequately provide the court with all information directly or indirectly considered by the decision-maker.  *See, e.g.*, *Guglielmi v. Northwestern Mut. Life Ins. Co.*, No. 06-cv-3431, 2007 WL 1975480, at *8 (S.D.N.Y. July 6, 2007) (summary of telephone call that involved information on which decision-maker relied); *Connecticut v. Daley*, 53 F. Supp. 2d 147, 158-160 (D. Conn. 1999) (transcripts and summaries of meetings).

154.    Here, by contrast, the initial record produced by Defendants was patently incomplete – including the absence of materials reflecting the agency's consideration of the issue prior to the December 2017 letter from the Department of Justice (notwithstanding the June 21 supplement to the Administrative Record indicating that Secretary Ross began considering whether to add the question soon after his confirmation); the absence of materials or analyses expressly referenced in the Secretary's decision memo; and the failure to include materials considered by key subordinates including Dr. Abowd, July 3 Hearing Tr. 79-82 (Docket No. 205) – leading this Court to issue its July 3 order requiring Defendants to complete the Administrative Record.  *Id.* at 76-90; *see also* Docket No. 199.  Defendants have affirmatively declined to contest that mandate.  *See* Defs.' Reply Br. 17, No. 18-2652, *In re U.S. Dep't of Commerce* (2d Cir. Sept. 21, 2018), Docket No. 56.

155.    Although Defendants have since supplemented the record with thousands of pages of additional documents, this Court is not required to accept Defendants' supplemented record as complete if other evidence produced through discovery "identifie[s] specific materials that appear to be missing from the record."  Order at 2, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *see also Dopico*, 687 F.2d at 654 (declining to accept federal

"defendants' assurances that they have submitted the full record"); *NRDC v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (declining to treat even supplemented administrative record as complete).

156.    Here, that additional material includes testimony and affidavits about oral communications that conveyed critical information that the Secretary considered in deciding to add the citizenship question.

157.    Excluding "oral communications of central relevance" to the Secretary's decision from this Court's review would improperly force this Court to ignore "information central to the [Secretary's] justification" simply because it was "communicat[ed] . . . by voice rather than by pen."  *Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C. Cir. 1981).

158.    If agencies were permitted to shield oral communications from judicial review – even when, as here, there is clear evidence that their documentary record is incomplete – it would be too easy for them to hide adverse evidence through the simple expedient of providing it to the decision-maker through unrecorded meetings or telephone calls.  But bedrock principles of administrative law provide that an agency may not "withhold evidence unfavorable to its case" and thereby impede the court's ability "to review [the] agency's action fairly."  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

159.    The evidence that this Court may consider under this category includes the following:

160.    Dr. Abowd testified that he attended a meeting with the Secretary and others on February 12, 2018, to discuss the citizenship question and the Census Bureau's findings about the adverse effects of adding such a question to the decennial enumeration. This meeting was the

only one that the Secretary had with the Census Bureau's Chief Scientist before deciding to add the citizenship question.  Trial Tr. 883-84.

161.     Although it is difficult to imagine that such an important meeting played no role whatsoever in the Secretary's decision-making process, *cf.* Order at 3, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *Dopico*, 687 F.2d at 654, the designated Administrative Record contains only a single email written by a Census Bureau employee summarizing follow up points from this meeting.  PX-127 (AR 9450).

162.     Dr. Abowd also testified that he had separate conversations with Secretary Ross and Acting Deputy Secretary Kelley about, *inter alia*, the Census Bureau's intention to use disclosure avoidance procedures at the block level.  Trial Tr. 1046-47.  These conversations are also not reflected in the designated Administrative Record.

163.     Christine Pierce, Senior Vice President of Data Science for the Nielsen Company, testified that the designated Administrative Record does not accurately reflect a telephone conversation she had directly with the Secretary and Michael Walsh, then the Commerce Department's Deputy General Counsel (and now Chief of Staff), about the citizenship question. This conversation is expressly cited as support in the Secretary's decision memo.  Ms. Pierce's testimony provides context and details about this telephone conversation that are not reflected in the designated Administrative Record.  *Compare* Pierce Aff. (Docket No. 498-18) ¶¶ 10-13, 17-18, *with* PX-1 at AR 1276, PX-26 at AR 1318.

164.     In addition, in his June 21, 2018 Supplemental Memorandum regarding the Administrative Record, Secretary Ross admitted that he began considering whether to add a citizenship question to the 2020 census soon after his confirmation in February 2017.  PX-2 (AR).  This consideration included "discussions with other governmental officials," all of which

occurred prior to the December 12, 2017, date on which the Department of Justice sent its letter requesting a citizenship question on the 2020 census. *Id*.

165.    Secretary Ross, and his team at his direction, were later revealed to have had conversations about the citizenship question with a long list of officials outside the Commerce Department prior to December 2017, including with DOJ officials (Mary Blanche Hankey, James McHenry, John Gore, and Attorney General Jefferson Sessions); the Department of Homeland Security (Eugene Hamilton); senior White House advisers; and Members of Congress including Representative Mark Meadows.  PX-193; PX-302; PX-524 (AR); PX-567.

166.    The Secretary and his team made very little record of these conversations.  Key discussions that Secretary Ross had prior to December 12, 2017 are not memorialized in the designated Administrative Record, including discussions with Attorney General Sessions in the spring of 2017 and around Labor Day 2017, with Steve Bannon on April 5, 2017, with Kris Kobach in the spring and summer of 2017, and with Representative Meadows on August 8, 2017.  PX-193; PX-302.  Similarly, key meetings with senior staff, including meetings on August 21, 2017, and September 6, 2017, are not memorialized in the designated Administrative Record.  The only way to know about the content of these discussions and meetings, which were part of the Secretary's decision-making process, is from the testimony of senior aides that attended these meetings, such as Earl Comstock, Wendy Teramoto, Karen Dunn Kelley, David Langdon, and Sahra Park-Su.

3.     **The Court may consider extra-record evidence that serves as background to explain or clarify scientific or technical subjects requiring specialized knowledge.**

167.     As is standard in Administrative Procedure Act cases, this Court may consider extra-record evidence as background to explain or clarify scientific or technical subjects requiring specialized knowledge.[3]

168.     This Court may consider evidence outside of the administrative record where such evidence "is necessary to explain technical terms or complex subject matter involved" in the agency decision at issue. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988); *see, e.g., Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1045-46 (W.D.N.Y.1995) ("[T]he court is permitted to go outside of the administrative record to consider background evidence to clarify the information before the agency at the time of its decision.").

169.     This type of extra-record evidence is routinely permitted to ensure that the court can fully understand highly technical or scientific information referenced in the administrative record.  Such evidence may also be necessary to ensure that the court can properly understand the agency's reasoning and decision-making when that reasoning and decision-making involved, for example, scientific tests, complex calculations, or other specialized processes.  *See, e.g.*, *Asarco, Inc. v. United States E.P.A.*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) (testimony of copper plant manager to explain operation of smelter); *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (extra-record evidence permissible in

---

[3] Defendants' pending application in the Supreme Court does not challenge this aspect of the Court's July 3 Order permitting extra-record discovery.  Defendants challenge only discovery "to probe the mental processes of the agency decisionmaker." *See* Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018).  That application for relief has no bearing on the Court's independent authorization for expert discovery, which is "commonplace in cases of this sort."  July 3 Hearing Tr. at 87 (Docket No. 205).

APA case to explain "technical terms or complex subject matter"); *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 157 (D.D.C. 2012) (extra record evidence will be considered "if it is needed to assist a court's review").  *See generally* Richard McMillan, Jr. and Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and Additional Factfinding During Judical Review of Informal Agency Action*, 1982 Duke L. J. 333, 359 (1982) ("As administrative decisionmaking becomes increasingly complex, courts may not be able to understand, much less evaluate, the complexities of the record.").

170.    Absent such explanatory evidence, a court would not be able to "evaluate the challenged action on the basis of the record before it."  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

171.    Such explanatory expert evidence is commonplace in census-related disputes, which often involve technical issues, such as statistical techniques and calculations; survey methodology and design; demography; and the Census Bureau's established testing and other procedures.  *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999); *City of New York v. U.S. Dep't of Commerce*, 822 F. Supp. 906, 917 (E.D.N.Y. 1993); *Cuomo v. Baldrige*, 674 F. Supp. 1089, 1093-1103 (S.D.N.Y. 1987); *Carey v. Klutznick*, 508 F. Supp. 420, 422 (S.D.N.Y. 1980).

172.    Here, for example, Plaintiffs and Defendants proffered expert testimony to help the Court understand the Census Bureau's testing procedures and the role of survey methodology in those procedures.  Both parties also proffered expert testimony on the Census Bureau's efforts to enumerate hard-to-count populations, NRFU operations, and imputation procedures, including the general methodology and factors that may bias or skew the imputation model.

173.     Both parties also proffered expert testimony relevant to issues of standing, including the impact of the citizenship question on data accuracy, privacy, political representation, eligibility for federal funding resources, and other matters.

### 4.     The Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors.

174.     This Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices.

175.     An agency's decision is arbitrary and capricious under the APA if, among other things, the agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 31, 43-44; or made "an irrational departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

176.     To apply these standards, a court must as a threshold matter understand what is "relevant," "important," or "settled" in the field where the challenged agency decision was made.

177.     In many cases, the administrative record will provide the relevant benchmarks. But evidence outside the "bare record" may be required to determine "the applicable standard" to apply in evaluating the completeness of the agency's reasoning and in determining whether the agency ignored critical factors or information.  *Overton Park*, 401 U.S. at 420 (emphasis added); *see also Hoffman*, 132 F.3d at 15; *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

178.     Such extra-record evidence is essential in cases involving technical, complex, or specialized subjects, where the reviewing court would otherwise lack the expertise to know the factors that a reasonable decision-maker in the field would typically consider or the "settled course of behavior," *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S.

41

800, 807 (1973) (plurality op.), that such a decision-maker would typically follow.  *See Hoffman*, 132 F.3d at 15; *cf. United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (expert "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice").

179.    As courts have explained, "[i]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."  *Asarco*, 616 F.2d at 1160; *see also Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 114 (D.D.C. 2015) (permitting expert testimony to "point out gaps in the agency's explanation and analysis").

180.    Indeed, without extra-record evidence to determine the relevant benchmarks, a court would be unable to even identify, let alone redress, the most egregious instances where an agency disregards important or relevant factors, since it will be in the most flagrant violations of reasonable agency decision-making that the administrative record will be most bare.  *See Hoffman*, 132 F.3d at 15 ("omission of technical scientific information is often not obvious from the record itself").

181.    The potential need for such extra-record record evidence is particularly acute where, as here, the agency engages in *informal* rather than *formal* decision-making.  Formal notice-and-comment rulemaking and adjudicatory proceedings provide numerous procedural safeguards that ensure that interested parties can present all relevant factors and information to the agency – and thereby to the court.

182.    For example, notice-and-comment procedures provide all interested parties, including experts, the opportunity to submit "written data, views, or arguments" that will be added to the administrative record.  5 U.S.C. § 553.

183.    Adjudicatory proceedings likewise provide the parties to such proceedings an opportunity to submit "facts [and] argument" that the agency should consider.  *Id.* § 554.

184.    Informal decision-making, by contrast, lacks such mechanisms to guard against the creation of an inadequate administrative record.  Accordingly, where informal decision-making is at issue, the reviewing court may not be able to "adequately discharge its duty to engage in a 'substantial inquiry'" into the agency's decision if the court "is required to take the agency's word that it considered all relevant matters" and followed all relevant procedures.  *Asarco*, 616 F.2d at 1160.

185.    Here, for example, and as described in Parts III.B.1 and III.B.2 below, the decision-making process lacked adequate consideration of several relevant factors.  The process did not include an evaluation of the utility or fitness of citizenship data collected from the census for the stated purpose in the request from the Department of Justice, *i.e.* enforcement of Section 2 of the Voting Rights Act.  For instance, Secretary Ross did not consider any information in making his decision about the granularity of data required by the Department of Justice to enforce the Voting Rights Act.  PX-26 (AR).  Similarly, Secretary Ross did not consider any information about the impact of disclosure avoidance requirements on the quality of citizenship data that would be produced by including a citizenship question on the 2020 census, or how those requirements could impact the utility of the data for Voting Rights Act enforcement.  *Id.*  Ignoring these and other considerations relevant to the fitness of the data for its purported use, was a significant omission.

### 5. The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext or prejudgment.

186.    This Court may also consider extra-record evidence that is relevant to Plaintiffs' claims that the Secretary's decision to add a citizenship question was based on pretext, prejudgment, undue political influence, or other types of bad faith.

187.    On July 3, this Court authorized extra-record discovery based on its finding that "plaintiffs have made a strong preliminary or prima facie showing that they will find material beyond the Administrative Record indicative of bad faith." July 3 Hearing Tr. at 85 (Docket No. 205). Now that discovery and trial are complete, this Court may consider extra-record evidence that is relevant to adjudicating the merits of Plaintiffs' claims of pretext, prejudgment, undue political influence, or other types of bad faith.

188.    The Court's consideration of such evidence is "necessary to meaningful judicial review" of Plaintiffs' claims. *Tummino v. Torti*, 603 F. Supp. 2d 519, 543 (E.D.N.Y. 2009); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 49 (2011) (considering extra-evidence of bias and bad faith that was "clearly necessary for the Court to conduct effective judicial review").

189.    Evidence of bad faith rarely appears in a formal administrative record precisely because an agency is unlikely to record and make public its own improper conduct – hence the need for extra-record discovery in the first place. *See, e.g.*, *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) (placing "evidence of bad faith . . . in an administrative record" would be "both sinister and stupid"); *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997) (agency is not likely "to keep a written record of improper political contacts").

190.    Where, as here, such evidence is uncovered, the agency's actual decision-making "cannot be fully understood" without considering that extra-record evidence.  *Tummino*, 603 F. Supp. 2d at 544.

191.    Here, for example, extra-record evidence of bad faith includes, but is not limited to, the testimony of Acting Assistant Attorney General John Gore that the DOJ components with responsibility for enforcing the Voting Rights Act did not request a citizenship question on the census; that he drafted the letter requesting a citizenship question because of Secretary Ross's request; that he does not believe a citizenship question on the census is in fact necessary to enforce the VRA; and that he does not know if data based on responses to a citizenship question will be any more precise than existing data.  *See infra* Part III.B.3.b.

192.    This Court asked the parties to brief whether some additional, intermediate finding of bad faith is required before the Court may consider this evidence.  Trial Tr. 1426. Courts that have allowed initial extra-record discovery on the basis of a preliminary showing of bad faith have at times conducted an intermediate inquiry, at the close of discovery, into whether to formally supplement the administrative record with specific extra-record evidence before proceeding to summary judgment or trial.  *See, e.g.*, *L-3 Commc'ns*, 98 Fed. Cl. at 49-53; *Int'l Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41-42 (2004).

193.    In such cases, the intermediate inquiry warrants formally supplementing the record where the evidence produced through discovery confirms either a "strong showing of bad faith or improper behavior" or the continued inadequacy of the designated administrative record to provide a "full picture" of the agency's decision-making.  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010) (quoting *Overton Park*, 401 U.S. at 420); *see Hoffman*, 132 F.3d at 16 (affirming district court's decision not to supplement record with

affidavit where "plaintiffs failed to make the required 'strong showing' of bad faith"); *Int'l Resource Recovery*, 61 Fed. Cl. at 42 (supplementing record where allegations of bad faith were "sufficiently well grounded").

194.    In this case, because the Court has already completed the trial, there is no need to conduct the intermediate inquiry that other courts have applied at an earlier stage of proceedings. Rather, this Court should decide the scope of its review of extra-record evidence (just as it is determining the admissibility of evidence) in connection with its final ruling on the merits of Plaintiffs' claims of pretext, prejudgment, and undue political influence.

195.    More specifically, this Court should identify the grounds on which a finding of bad faith would invalidate the Secretary's decision, and consider only the extra-record evidence that is relevant to the grounds it has accepted.  If the Court rejects a particular ground for finding bad faith, or finds that the evidence (including extra-record evidence) fails to support bad faith, then it should decline to consider the extra-record evidence that is associated with such rejected or failed theories of bad faith. Through this analysis, the Court can ensure that the scope of its review is limited to extra-record evidence that is directly relevant to bad-faith findings that would invalidate the Secretary's decision to add a citizenship question.

**B.    Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA.**

196.    Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

197.    Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

198.    Agency action is also arbitrary and capricious if not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id.* at 42-43.

199.    Defendants' decision is arbitrary and capricious when measured against each and every one of these considerations.

### 1.    The decision to add a citizenship question was counter to the evidence before the agency.

#### a.    Adding a citizenship question will materially lower response rates.

200.    Defendants' decision is counter to the evidence because adding a citizenship question to the census will materially lower self-response rates.

201.    Secretary Ross justified his decision on the grounds that "no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates."  PX-26 at AR 1317.  This assertion is counter to the uncontroverted evidence in the Administrative Record (*e.g.*, PX-22 at AR 1277; PX-102 at AR 5500; PX-147 AR 11634), and is further disproven if extra-record evidence is considered.

202.    The Administrative Record contains substantial quantitative evidence detailing how the addition of a citizenship question to the decennial census would reduce response rates among immigrant and Hispanic households.  As detailed in PFOF § III.H.2, the Census Bureau conducted several natural experiments designed to assess the effect a citizenship question would have on response rates.  The Census Bureau examined differential declines in self-response rates, and differential sensitivity to citizenship inquiries as shown in item non-response rates and breakoff rates.  The Census Bureau's initial analyses, as detailed in the Administrative Record,

reflect that adding a citizenship question to the 2020 census would lead to a 5.1% decrease in self-response rates.  PX-22; PX 147 at AR 11634 (draft white paper).

203.    The scientific analyses done by the Census Bureau are the *only* quantitative evidence in the Administrative Record on this point.  The Administrative Record contains no evidence whatsoever that the citizenship question will *not* harm the response rate.  Although the decision memo references studies that purport to show the contrary, such as survey evidence purportedly provided by the Nielsen Company, *see* PX-26 at AR 1315, 1318; no such evidence appears anywhere in the record.

204.    The qualitative evidence in the Administrative Record likewise confirms that adding a citizenship question will cause a material decline in self-response rates, particularly among immigrant and Hispanic households.  PFOF § III.H.2.

205.    Nothing in the Administrative Record supports Secretary Ross's effort to dismiss this quantitative and qualitative evidence of a decline in self-response from the addition of a citizenship question.  Courts "ha[ve] not hesitated" to reverse agency decisions "when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action."  *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (reversing agency decision that "ignore[d] critical context" and "cherry-pick[ed] evidence"); *see also, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking and cannot survive review under the arbitrary and capricious standard.").

206.    Courts will not defer to agency action where the record evidence "directly contradicts the unsupported reasons of the agency and the agency fails to support its

pronouncements with data or evidence." *See Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006); *see also City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1099-1100 (C.D. Cal. 2018) (agency decision is arbitrary and capricious where "there is no evidence of record . . . that Defendants based [their] conclusion on any findings or data").

207.    This is not a case where the Administrative Record shows that "specialists express conflicting views," *see Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 351 (E.D.N.Y. 2014) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); to the contrary, the evidence in the Administrative Record uniformly confirms that adding a citizenship question will reduce self-response rates.

208.    The Secretary's description otherwise is simply an unsupported pronouncement that cannot substitute for record evidence. *See Ramos v. Nielsen*, No. 18-cv-1554, 2018 WL 4778285, at *9-15 (N.D. Cal. Oct. 3, 2018) (finding likelihood of success on merits of APA arbitrary-and-capricious claim regarding termination of Temporary Protected Status for certain countries where DHS Secretary's unsupported pronouncement of changed country conditions is contradicted by extensive record evidence to the contrary).

209.    In addition, evidence that is outside of the designated A.R., but that the court may consider as evidence that essentially completes the Administrative Record, further shows that adding a citizenship question will decrease self-response rates in immigrant and Hispanic households.

210.    Christine Pierce, the Nielsen Company's Vice President of Data Science – the stakeholder referenced in the Secretary's decision memo as a purported source of "empirical

evidence about the impact of sensitive questions on survey response rates" – testified that

Nielsen did not provide any such evidence.  Pierce Aff. (Docket No. 498-18) at ¶¶ 15, 18.

211.    In fact, Pierce testified that Secretary Ross's decision memo materially

mischaracterized her input and omitted key facts (including her "unequivocal[]" concern "that a

citizenship question would negatively impact self-response rates").  *Id.* at ¶¶ 8, 12-18.

212.    This Court specifically noted the omission of any empirical evidence from

Nielsen as one basis for its order directing Defendants to complete the Administrative Record.

*See* July 3 Hearing Tr. at 81 (Docket No. 205) ("[T]he current record expressly references

documents that Secretary Ross claims to have considered but which are not themselves a part of

the Administrative Record.  For example, Secretary Ross claims that 'additional empirical

evidence about the impact of sensitive questions on the survey response rates came from the

Senior Vice-President of Data Science at Nielsen.'  That's page 1318 of the record.  But the

record contains no empirical evidence from Nielsen.").

213.    The reason this empirical evidence nowhere appears in the Administrative Record

is that the Secretary's decision memo falsely claimed it existed, when it does not.  Resting a

decision on claims that are "factually untrue" itself renders agency action arbitrary and

capricious.  *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 623-24 (E.D. Pa. 2018) (vacating the

Justice Department's imposition of immigration-related grant conditions on local law

enforcement funding where the stated basis for the Department's decision rested on claims that

were factually untrue); *see also City & County of San Francisco v. Sessions*, No. 17-cv-04642-

WHO, 2018 WL 4859528, at *25-28 (N.D. Cal. Oct. 5, 2018) (same).

214.    Moreover, extra-record evidence developed and presented at trial – including the

testimony of Plaintiffs' experts and of Defendants' only witness – confirms beyond any doubt

that adding a citizenship question will have devastating effects on the self-response rates of

immigrant and Hispanic households. *See, e.g.*, PX-162 (revising "conservative" estimate of

decline in self-response to 5.8% percent);  PX-297 at RFA 98, RFA 84 (5.1% decrease in self

response), RFA 96-97 (the Census Bureau found empirical evidence that a citizenship question

could reduce response rates); PX-662 (updated CBAMS presentation); Trial Tr. 881-82, 897,

919-20 (Abowd); Trial Tr. 30, 50-51, 78-80 (Hillygus); Trial Tr. 881-82, 919-20 (Barreto); PX-

670; PX-671; *see generally* PFOF § VII.

> **b.**     **Adding a citizenship question will not provide more accurate, usable, or complete citizenship data.**

215.    Defendants' decision is counter to the evidence because adding a citizenship

question to the census will not provide more accurate citizenship data than are currently

available.

216.    Defendants' decision is predicated on the notion that a citizenship question will

result in the "most complete and accurate" citizenship data for DOJ.  PX 26 at AR 1317; *see also*

*id.* at AR 1313 ("prioritiz[ing] the goal of obtaining *complete and accurate data*") (emphasis in

original); *id.* at AR 1316 ("it was imperative" to choose an option to "provide a greater level of

accuracy").  But when viewed in light of this stated goal, Defendants' decision to add a

citizenship question to the 2020 census plainly runs counter to the evidence.

217.    The evidence in the Administrative Record establishes that the addition of the

citizenship question will result in *less* accurate and *less* complete citizenship data.

218.    Defendants do not dispute, and the Administrative Record establishes, that survey

data regarding citizenship is inaccurate; non-citizens respond to inquiries into their citizenship

status by responding that they are citizens approximately 30% of the time.  PX-22 at AR 1283;

PX-25 at AR 1311.

219.    Every scientific analysis in the record confirms that the addition of the citizenship question will result in lower quality citizenship data.  *See, e.g.*, PX-25 (AR 1312) ("Alternative D would result in poorer quality citizenship data than Alternative C."); PX-22 (AR 1277-78) (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources").

220.    Moreover, as detailed above, the addition of the citizenship question will reduce self-response rates, which will further reduce data quality by driving more households into NRFU procedures that compromise that accuracy of the ultimate data produced.  *See* PFOF § III.H.2.

221.    The uncontroverted empirical evidence belies Secretary Ross's contention that collection of citizenship data through the census will enhance the accuracy of the data collected. Courts will "not defer to the agency's conclusory or unsupported suppositions."  *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *see also Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 626 F.3d 84, 94 (D.C. Cir. 2010) (explaining that an agency has an "obligation to explain its reasoning for rejecting" expert evidence contrary to its decision).

222.    Secretary Ross's statement is unsupported by *any* evidence in the record; asserting that the citizenship question will improve the accuracy of the data collected does not make it so.  Rather, as the Administrative Record makes clear, the use of the census to collect citizenship data compromises the accuracy of the data collected by the census.

223.    In addition, Secretary Ross contends that Option D "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," PX- 26 at

AR 1316, so as to allow for "more complete" citizenship data.  But this assertion is likewise contrary to the evidence in the Administrative Record.

224.    The Administrative Record reflects that because adding a citizenship question would drive down the self-response rate and put more households into NRFU operations, Option D actually reduces the Census Bureau's ability to match survey responses with administrative records.  PX-25 at AR 1311 (explaining that since "NRFU PII is lower quality than the self-response data," the citizenship question will increase "the number of persons who cannot be linked to the administrative data").  There is no evidence in the record to the contrary.

225.    Consideration of extra-record evidence – including trial testimony from Defendants' sole expert witness, the consistent testimony of Plaintiffs' experts, and subsequent analyses performed by the experts at the Census Bureau – explained the use of survey-based inquiries and the statistical methods used to understand whether adding a citizenship question will yield lower quality citizenship data. This testimony further explained the factors and benchmarks that a reasonable decision-maker would have looked at to determine whether adding a citizenship question will yield lower quality citizenship data.  *See* PFOF § IX.B.5.

226.    The Secretary's stated desire for accuracy cannot be squared with a decision that moves the census in precisely the opposite direction.  *See State Farm*, 463 U.S. at 43 (decision is arbitrary when it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

> **c.    The Secretary's decision to choose Option D over Option C is contrary to the evidence before the agency.**

227.    Defendants' decision is counter to the evidence because the Secretary unreasonably rejected the Census Bureau's alternative proposal of Option C, which would have

better met DOJ's stated needs at lower cost, lower respondent burden, and higher quality.  PX-22 (AR 1277).

228.    Evidence in the Administrative Record makes clear that Option C "best meets DoJ's stated uses, is comparatively far less costly [than adding a citizenship question], does not increase response burden, and does not harm the quality of the census count."  *Id.*

229.    This uncontroverted evidence establishes that Option C – the use of administrative records alone – is better by every metric that the Secretary purports to value.  *See Islander,* 482 F.3d at 99 (reversing where agency offered "no explanation for dismissing record evidence that runs counter to its findings").

230.    In contrast, adding a citizenship question "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  PX-22 (AR 1277); *see also*, *e.g.*, PX-24; PX-25; PX-132.

231.    Adopting a "plainly inferior" course of action is arbitrary and capricious.  *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003).

232.    The Administrative Record standing alone also makes clear that selecting Option D is arbitrary for the independent reason that it depends on achieving undefined future improvements in Census Bureau methods.  PX-26 at AR 1316 ("Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data.").

233.    A decision based on the vague expectation of future improvements "to provide more complete and accurate data" is almost the definition of arbitrary; this kind of build-the-plane-as-you're-flying-it approach is no substitute for reasoned decisionmaking, especially

regarding a decision as consequential as the conduct of the census.  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("An agency may not avoid an obligation to analyze in an [environmental impact statement] environmental consequences that foreseeably arise from [a resource management plan] merely by saying that the consequences are unclear or will be analyzed later . . . ."); *cf. Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 179 (2d Cir. 2006) (agency decision was arbitrary where instead of complying with statutory requirement, "agency simply stated its intent to do better the next time")

234.    Extra-record evidence – including Dr. Abowd's testimony, the testimony of Plaintiffs' experts witnesses, testimony of Census Bureau executives, and subsequent Census Bureau analyses provided background on the complex concepts and calculations that were used to evaluate Options C and D, which are reflected but not entirely explained in the Administrative Record. This extra-record evidence further highlighted the professionally accepted and objective benchmarks and standards that a rational decision-maker would have relied on to evaluate whether Option D is by any standard worse than Option C.  PFOF § IX.B.5.

235.    Secretary Ross's failure to articulate a satisfactory explanation  for rejecting a less expensive, less burdensome, and higher quality alternative renders his decision arbitrary and capricious.  *See, e.g.*, *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015), *as amended* (July 21, 2015) (reversing where, *inter alia*, agency did not fully consider alternatives); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 825-26 (D.C. Cir. 1983) (rescission of ban on work within another's home was arbitrary where the agency failed to consider alternatives to complete elimination of the restriction); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision failed to give sufficient consideration to narrower alternatives).

d.     **Adding a citizenship question to the census is not necessary to enforce the Voting Rights Act, and would instead undermine the goal of fair representation for all communities.**

236.    Defendants' decision is counter to the evidence because adding a citizenship question to the census is not necessary to enable DOJ to enforce Section 2 of the Voting Rights Act.

237.    The Secretary's decision memo determines that adding a citizenship question is "necessary" to provide the data DOJ requires to enforce Section 2 of the VRA.  PX-26 at AR 1313, 1320.

238.    The Administrative Record contains no evidence that census-derived block-level CVAP data are necessary to enforce Section 2 of the VRA.

239.    The December 2017 DOJ letter does not state that such data is "necessary" to enforce the VRA; rather it studiously avoids using the word "necessary" to describe the request for the data.  PX-32 (AR).

240.    The DOJ letter does not identify any VRA cases that it failed to bring because of inadequate block-level CVAP data.  *Id.*

241.    The DOJ letter does not identify any VRA cases that it did bring that failed because of inadequate block-level CVAP data.  *Id.*

242.    The Administrative Record contains extensive evidence that the Secretary ignored from voting rights experts and others demonstrating that census-derived block-level CVAP data are not necessary to enforce the VRA.  PFOF § III.I.

243.    The Administrative Record also establishes that citizenship data produced in response to a citizenship question on the census will have serious issues with accuracy and completeness, particularly as to the data for immigrant and Hispanic populations.  PFOF § III.H.2.

56

244.     Congress could not possibly have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data have never been available at any point since Section 2 has existed: not in 1965 when the Voting Rights Act was first enacted; not in 1982 when the Act was amended to clarify the vote-dilution standard; and not in 1986 when the Supreme Court articulated the vote-dilution test in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

245.     Agency action should be set aside as arbitrary when "the reason which the [agency] gave for its action . . . makes no sense." *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984).

246.     In addition, the Secretary's decision memo gives no explanation at all for how the DOJ letter justified the ultimate decision, except to state that DOJ requested a citizenship question.  Failure to conduct any analysis at all of how the DOJ letter supports the Secretary's decision also renders that decision invalid under the APA.  *Kuang v. U.S. Dep't of Defense*, No. 18-cv-3698-JST, 2018 WL 6025611, at *31 (N.D. Cal. Nov. 16, 2018) ("DoD has simply provided no explanation for how the 2017 Study's findings support its policy choice, and 'where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).

247.     Nor were Defendants entitled simply to rely uncritically on the DOJ letter to support their decision, without any independent assessment of its merits.  Defendants may not simply hide behind the Department of Justice's stated rationale.  *See Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 16 ("EPA seeks to excuse its inadequate responses by passing the entire issue off onto a different agency.  Administrative law does not permit such a dodge.").  This is especially so where the Administrative Record establishes that Defendants themselves not

only solicited the request from DOJ, but also and provided DOJ with the rationale in the December 2017 letter.  PFOF § III.B – III.E.

248.    In addition, the cases cited in the DOJ letter – which provide the only support in the Administrative Record for the VRA justification – do not themselves support the contention that existing citizenship data were inadequate or caused plaintiffs to lose their Section 2 actions. PX-32 (AR 1525) (citing cases).  *See LULAC v. Perry*, 548 U.S. 399, 423-42 (2006) (plaintiffs *prevailed* on their vote-dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (plaintiffs' expert testimony for estimating HCVAP failed to satisfy the first *Gingles* precondition, but that analysis was *not* based on ACS data, and court of appeals left open whether plaintiffs could have satisfied *Gingles* One had their expert properly used his alternative method); *Barnett v. City of Chicago*, 141 F.3d 699, 702-04 (7th Cir. 1998) (Posner, J.) ("The census counts the total population for the same reason that it counts rather than samples: in order to minimize controversy.  To verify the age and citizenship of the population would enormously complicate the decennial census and open the census-takers to charges of manipulation." (citations omitted)); *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) (plaintiffs did not even attempt to demonstrate that illustrative districts had a majority Latino CVAP population); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (the plaintiffs acknowledged that none of their illustrative districts had majority Hispanic or black population).

249.    The extra-record evidence introduced at trial provided background about and explained the ways that data are used for VRA enforcement.  This evidence further explained the standards and benchmarks that are used to determine whether census-derived block-level data would be necessary for VRA enforcement.

250.     Dr. Lisa Handley explained that existing data products are more than adequate to enforce the VRA.  PFOF § IX.B.3 – IX.B.4.

251.     The substantial number of successful Section 2 cases filed since 1982 belies Defendants' assertion that census-derived CVAP information is somehow necessary to enforce the Voting Rights Act.  *See* National Commission on the Voting Rights Act, Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005, at 88, https://lawyerscommittee.org/wp-content/uploads/2015/07/0023.pdf (2006) (listing 117 "reported Section 2 cases leading to favorable results for minority voters" in the "23-year period following the 1982 reauthorization" of the Act).

252.     And the extra-record evidence confirms that data produced pursuant to the Secretary's Option D will retain margins of error; and that Defendants do not know whether the error margins for block-level CVAP data produced from a citizenship question on the census will be larger or smaller than currently available block-level CVAP data.  PFOF § IX.B.4.

253.     The extra-record evidence further explained that disclosure avoidance concerns will also impact the utility (if any) of adding a citizenship question—an important aspect of the problem that the Secretary entirely ignored.  The Census Bureau's disclosure avoidance protocols will introduce further errors into CVAP data produced at the block level, and will effectively mean that in general, there will not be a single census block where the CVAP data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  PFOF § IX.B.4.

254.     Extra-record evidence further establishes another important factor that the Secretary failed to consider, namely, that not only is a citizenship question unnecessary to

enforce the VRA, but that adding this question to the census will in fact *undermine* the goals the Voting Rights Act was enacted to protect.

255.    The purpose of the Voting Rights Act is to accomplish "nondiscriminatory treatment by government – both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement."  *Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

256.    Because adding a citizenship question will predictably undercount some communities, those communities will not achieve nondiscriminatory treatment in the application either of voting qualifications or of the administration of governmental services.  Warshaw Aff. (Doc. 526-1) at ¶¶ 50-61.

> **e.      Secretary Ross's decision memo is replete with assertions unsupported by and often contrary to the evidence.**

257.    Defendants' decision is counter to the evidence because the Secretary's decision memo contains numerous flawed assertions that are either based on no supporting evidence at all or are directly contradicted by the record evidence.

258.    For example, the Secretary contends that "no one has identified any mechanism" for identifying respondents who would self-respond to the census but for the addition of a citizenship question.  PX-26 at AR 1313, 1317.  This claim ignores the Census Bureau's multiple empirical analyses in the Administrative Record that go to precisely this issue.  *E.g.*, PX-22 at AR 1277; PX-25 at AR 1308; PX-4 at AR 8614; PX-147 at AR 11634.

259.    The Secretary also asserts that placing the citizenship question last on the census will somehow "minimize any impact on decennial census response rates."  PX-26 at AR 1320. The Administrative Record includes no evidence supporting this hypothesis.

260.     The Secretary's decision memo states that it was "difficult to assess" whether "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs."  PX-26 at AR 1319.  But the Administrative Record reflects that prior to the Secretary's decision, the Census Bureau prepared an analysis estimating that the expected self-response decline from adding a citizenship question would increase costs by at least $27.5 million.  PX-22 at AR 1282.

261.     The Secretary concluded that nonresponse rates to the ACS citizenship question for Hispanics and non-Hispanic whites were "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve.  PX-26 at AR 1315.  The nonresponse rates listed in the decision memo are, on their face, not comparable.  (*E.g.*, nonresponse rates to the ACS citizenship question for Hispanics are *twice as high* as nonresponse rates for non-Hispanic whites.  *Id.*)

262.     The Secretary stated with no support that "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition."  PX-26 at AR 1317.  The Administrative Record contains the Census Bureau's clear and evidence-based determination that adding a citizenship question to the census would impose an additional burden on all respondents.  PX-22 at AR 1277, 1281.

263.     It is the definition of arbitrary to base an agency decision on assertions with no foundation in fact.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (agency rule was arbitrary and capricious where agency lacked any evidence to support key factual conclusion); *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive review under the APA, "the facts on which the agency purports to

have relied" must "have some basis in the record") (quoting *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014)).

264.    If considered, the extra-record evidence presented at trial further confirms that many of the Secretary's assertions ignored important factors that a rational decision-making process would have considered.

265.    The assertion that there are no mechanisms to identify respondents who would self-respond but for the inclusion of a citizenship question ignores the possibility of conducting a randomized control test, which extra-record evidence confirms would have been possible if the Secretary had actually wanted additional empirical evidence.  *See* PX-162 (White Paper) at 39 n. 53 (noting the possibility of conducting "a randomized control trial (RCT) comparing self-response rates where some households are randomly chosen to have an 11-question Census questionnaire with a citizenship question (the treated group), and a randomly chosen set of control households receive a 10-question Census questionnaire without citizenship"); PX-165 (proposed RCT); *see also* PFOF § IV.B; Trial Tr. 164-65 (Hillygus); Trial Tr. 925-26 (Abowd).

266.    Extra-record evidence also confirms that all questions on the decennial census impose an incremental burden on respondents.  *See, e.g.*, Habermann Aff. (Docket No. 498-11) ¶¶ 22-25; Pierce Aff. (Docket No. 498-18) ¶ 9; Trial Tr. 43 (Hillygus).

267.    The Census Bureau has produced further analyses estimating the significantly increased costs from asking the question.  PX-162.

268.    In response to requests for admissions, the Census Bureau admitted that the non-response rates to the ACS citizenship question for Hispanics and non-Hispanic whites were not "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve.  PX-297 at RFAs 89-95.

269.    Unrebutted extra-record testimony from the former Director of the UN Statistics
Division proves that the Secretary relied on UN recommendations for conducting population
censuses without considering that the UN recommendations include a number of steps that were
totally ignored here, including that Defendants "ensure that the topics are appropriate for meeting
the demonstrated requirements of users," include "suitable consultation with existing and
potential users at all stages," and conduct "adequate testing of new topics."  Habermann Aff.
(Docket No. 498-11) at ¶¶ 78-84.

270.    The same unrebutted testimony identifies further factors that the Secretary
ignored in relying on international comparisons, including that Australia and Canada (cited by
the Secretary as benchmarks for adding a citizenship question, *see* PX-26 at AR 1319) do not in
fact have comparable practices.  Habermann Aff. at ¶ 85.

## 2.    Defendants' decision entirely failed to consider important aspects of the problem.

271.    The APA requires this Court to set aside Defendants' decision as arbitrary if
Defendants "entirely failed to consider an important aspect of the problem."  *State Farm*, 463
U.S. at 43.

### a.    The March 26 decision memo failed to address key legal obligations.

272.    As set out in more detail in Part III.C.1 below, Secretary Ross's decision memo
does not note or otherwise discuss Defendants' failure, in its March 2017 notification to
Congress pursuant to 13 U.S.C. § 141(f)(1), to identify citizenship as a subject that would be
included on the decennial census.  PX-26 (AR); *see also* PX-357.

273.    Secretary Ross' decision memo does not note or otherwise discuss his mandatory
statutory obligation to "find[] new circumstances exist which necessitate" the addition of any

new subjects to the decennial census after the March 31, 2017 deadline, as required by 13 U.S.C. § 141(f)(3).  PX-26 (AR).

274.    As set out in more detail in Part III.C.2 below, Secretary Ross's decision memo does not note or otherwise discuss his obligation "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to "acquire and use information available from any source [from other federal or other governmental entities] instead of conducting direct inquiries," as required by 13 U.S.C. § 6(c).  PX-26 (AR).

275.    As set out in more detail in Part III.C.3 below, Secretary Ross's decision memo does not address the binding Office of Management and Budget standards, including Statistical Policy Directive No. 2, which requires agencies to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs."  PX-359 (Standard 1.3); PX-26 (AR).

276.    Secretary Ross's decision memo does not discuss the Census Bureau's binding Statistical Quality Standards, which requires that "data collection instruments . . . must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden."  PX-260 (req. A2-3); PX-26 (AR).

277.    Secretary Ross's decision memo does not discuss the requirement in the Census Bureau's Statistical Quality Standards, including requirement A2-3.3 which provides "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." PX-260 (req. A2-3.3).

278.    Secretary Ross's decision memo does not discuss that the Census Bureau is prohibited from making "[a]ny publication whereby the data furnished by any particular . . . individual under this title can be identified."  13 U.S.C. § 9(a)(2); PX-26 (AR).

279.    Defendants' complete failure to address these binding statutory mandates and internal standards renders the decision arbitrary and capricious.  *League of Women Voters v. Newby*, 838 F.3d 1, 10-12 (D.C. Cir. 2016) (disregard for statutory criterion renders agency decision arbitrary under the APA)

> **b.**    **The Secretary failed to consider the relevant standard of proof for adding new questions to the census.**

280.    Defendants' decision failed to consider important aspects of the problem because the Secretary applied an incorrect (and insurmountable) standard for determining when new questions would unreasonably harm the census count or data quality.

281.    The Secretary's decision inverts the standard of proof for adding new questions to the census.  Defendants bear the burden to demonstrate the need for the question, and to confirm that the change will not cause harm.  Habermann Aff. (Docket No. 498-11), at ¶ 18.

282.    Dr. Habermann testified that "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public."  Habermann Aff. (Docket No. 498-11), at ¶ 18; *see also* PFOF § IV.B.

283.    But the Secretary's decision makes clear that Defendants made no affirmative finding whatsoever that the citizenship demand would *not* harm the decennial census; instead,

the Secretary based his decision on the purported *absence* of evidence of harm.  *See* PX-26

(AR 1313, 1316-17).

284.    As detailed above, the Administrative Record is replete with evidence

demonstrating that, *inter alia*, adding the question would "increase response burden" and "harm

the quality of the census count."  PX-22 (AR 1277).

285.    But even setting aside such evidence, the Secretary's reliance on the purported

absence of evidence inverts the relevant burden of proof and introduces unacceptable – and

unlawful – risk to the census.  *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1075

(9th Cir. 2018) (agency action was arbitrary and capricious where the agency failed to consider

scientific evidence "solely because of 'uncertainty'").

286.    In light of the irreparable impact of adding a citizenship question – dilution of

political power, reductions in funding streams for the next decade, impaired demographic data

and statistics – Secretary Ross's failure to consider and apply the appropriate standard is

arbitrary and capricious.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C.

Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

> c.    **The Secretary failed to consider the impact of disclosure**
> **avoidance protocols on his decision.**

287.    Defendants' decision failed to consider important aspects of the problem because

the Secretary did not address the effect of the Census Bureau's confidentiality obligations and

disclosure avoidance practices on the fitness of citizenship data for DOJ's stated purposes.

288.    The words "disclosure avoidance" appear nowhere in the Secretary's decision

memo.  *See* PX-26 (AR).  Yet the Census Bureau's disclosure avoidance protocols, which

require the Census Bureau to ensure that data released by the Bureau do not compromise

respondent confidentiality, indisputably impact how the Census Bureau will be able to process and release block-level CVAP data.

289.     Pursuant to their disclosure avoidance protocols, the Census Bureau will undertake disclosure avoidance for every census block, meaning that even after the addition of a citizenship question – except for randomly – there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  Trial Tr. 1033 (Abowd); Census 30(b)(6) Dep. (Docket No. 502-2) at 54-56, 65-86, 70-71, 100-01; PFOF § IX.B.4.

290.     The Bureau has not determined if, after disclosure avoidance, the error margins for block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census 30(b)(6) Dep. at 101.  PFOF §§ IX.B.4, IX.B.5.

291.     As documents in the Administrative Record make clear, Defendants were well-aware that disclosure avoidance protocols would impact the ultimate CVAP data produced for the DOJ.  *See, e.g.*, PX-1 at AR 1292 (explaining that only data that has been "processed through the Bureau's disclosure avoidance procedures can be released for public use"); PX-3 at AR 2952 (Census Bureau acknowledgment that the Bureau will need to ascertain "how disclosure avoidance will be handled"); PX-3 at AR 6415 (discussing application of disclosure avoidance system to Census Bureau proposal to obtain CVAP information).

292.     Because the Administrative Record includes no details as to how this process will impact the DOJ's stated data need for granular citizenship data, and does not even contain any suggestion that the Secretary in any way considered the implications of disclosure avoidance for his ultimate decision, Defendants' failure even to consider this important aspect of the issue is

arbitrary. *See, e.g.*, *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) ("Despite immense losses in the gray wolves' historical range . . . the Service nowhere analyzed the impact of that loss on the survival of the gray wolves as a whole . . . .  Such a failure to address 'an important aspect of the problem,' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking.") (quoting *State Farm*, 463 U.S. at 43); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 420-21 (3d Cir. 2004) (vacating agency repeal rule where agency failed to consider or even acknowledge "the effect of its decision on minority television station ownership"); *State of Connecticut v. U.S. Dep't of Commerce*, No. 3:04-cv-1271, 2007 WL 2349894, at *12-13 (D. Conn. Aug. 15, 2007) (vacating agency decision as arbitrary because, *inter alia*, "the Secretary failed to address an important aspect of the problem because he effectively ignored the adverse effects on oysters," where "the destruction of oysters . . . is significant in balancing the adverse effects of the project against the national interest").

### d. Defendants bypassed the procedures designed to identify the best means of satisfying DOJ's request.

293.    Defendants' decision failed to consider important aspects of the problem because Defendants never complied with their standard practice of conferring with the requesting agency to determine how best to meet its data needs.

294.    The absence of any communication between the Census Bureau and the DOJ subject matter experts to discuss the parameters or details of DOJ's stated data need bolsters the conclusion that the Secretary's decision was arbitrary and capricious.

295.    As detailed in the Administrative Record, when an agency requests data, it is standard operating procedure for the Census Bureau to meet with that agency to discuss the data

request, drill down into the details of the data use, and consider how best to meet the need presented. PX-1 at AR 1168-72; *see also* PX-71 (AR); PX-101 (AR); PX-4 at AR 5490, 8651.

296.    In this case, the Census Bureau advised DOJ that they had a less burdensome proposal for meeting DOJ's purported data need and reached out repeatedly to DOJ to set up a meeting between their respective experts. PX-71 (AR); PX-4 at AR 8651. But the Administrative Record makes clear that DOJ refused to meet with the Census Bureau to explain their request for block level CVAP data or discuss how best to satisfy DOJ's stated needs. PX-75(R) (AR); PX-4 at AR 5489, AR 9074.

297.    This deviation from usual practice supports a finding that the Secretary's decision to add a citizenship question is arbitrary and capricious. *See Tummino v. Torti*, 603 F. Supp. 2d 519, 523 (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-cv-366, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013) (holding that where the FDA "departed from its normal procedures," agency conduct was arbitrary and capricious); *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 207 (D.D.C. 2015) (agency's unsupported departure from prior practice was arbitrary and capricious); *see also Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1150 (D.C. Cir. 1988) (failure to enforce a procedural rule uniformly is arbitrary and capricious).

298.    The purpose of these inter-agency meetings is to allow the Census Bureau to understand the granular use case for the requested data and ensure that the method proposed for satisfying that data need is suited to the use required.

299.    In the absence of such coordination, Defendants cannot demonstrate that the Secretary's decision fits DOJ's data needs. For example, the Administrative Record confirms that DOJ was not even apprised of the high inaccuracy rate of citizenship survey responses. *See*

PX 23 (AR 1294-95).  Nor is there any evidence in the Administrative Record that the Census Bureau discussed their disclosure avoidance protocols, and concomitant implications for block level CVAP data, with DOJ.  The record is bereft of any indication as to whether these issues – widespread errors in survey responses and impacts of disclosure avoidance protocols – will make the resulting data product unfit for DOJ's stated use.

300.    Consideration of extra-record evidence confirms that Defendants deviated from long-established processes that were designed and are followed precisely to ensure that federal statistical agencies can perform their jobs effectively.

301.    Plaintiffs' experts confirm that it is standard operating procedure, and best practice, for the Census Bureau to meet with a requesting agency to discuss that agency's data needs.  PFOF § IV.B.

302.    The extra-record evidence further confirms that the refusal to meet was politically motivated and highly unusual.  PFOF § III.H.1, IV.A-B.  Acting AAG John Gore testified that this refusal was personally directed by Attorney General Sessions himself.  Gore Dep. (Docket No. 491-2) at 274.  Dr. Abowd testified that this kind of political interference contravenes foundational principles designed to uphold the effectiveness and trusworthiness of federal statistical agencies.  Trial Tr. 1265-68; *see also* PX-355 at 3.

303.    Under these circumstances, Defendants cannot show that there is a fit between the purported data need presented by the Department of Justice – block-level CVAP data – and the method identified to satisfy that need – the addition of a citizenship question.

> e.    **Defendants failed adequately to consider the need for testing both the citizenship question and the full census questionnaire.**

304.    Defendants' decision failed to consider important aspects of the problem because Defendants unreasonably overlooked the insufficiency of prior testing of the citizenship

question, and disregarded the need to test the census questionnaire as a whole after having been changed.

305.     The Secretary's decision memo dismisses the need for testing the citizenship question exclusively on the grounds that because the citizenship question had been included on the ACS since 2005, it had already been sufficiently tested.  PX-26 (AR 1314, 1319).

306.     Based on evidence in the Administrative Record alone, this determination failed to properly consider the Census Bureau's established processes and specific considerations that require pretesting of new survey questions.

307.     The Census Bureau's well-established policies and practices reflect that when changing the decennial census, "[t]he Census Bureau must test the wording of the new question." PFOF § II.E.1; PX-4 at AR 3890, 9867; PX-3 at AR 2304; PX-134 (AR).

308.     The Administrative Record likewise reflects that stakeholders, including six former census directors, emphasized to the Secretary the importance of testing the citizenship question.  PFOF § III.I; PX-116; PX-539.

309.     Defendants contend that they were not obligated to test the citizenship question because it had "performed adequately" on the ACS, but the Administrative Record proves that, in fact, the citizenship question had not performed adequately; instead, roughly 30% of all people identified as noncitizens by administrative records self-report as citizens.  PFOF § IV.E.3; PX-22 (AR).

310.     Secretary Ross says in his decision memo that the high disagreement rate is a sign that ACS citizenship data are unreliable.  PX-26 at AR 1316.  The Secretary seems not to have understood that this assertion undermines his reliance on the ACS for his conclusion that the citizenship question as "well tested."  PFOF § IV.E.3; PX-26 at AR 1314.  There is no evidence

of any kind in the Administrative Record that Secretary Ross evaluated whether the ACS

citizenship question was performing adequately in concluding it did not need to be tested again.

311.    There is no evidence in the Administrative Record that Secretary Ross considered

whether testing was required in light of the changing macro environment.

312.    There is no evidence in the Administrative Record that Secretary Ross considered

whether the citizenship question required testing in light of differences between the ACS and the

decennial census, including the absence of a preceding nativity question on the ACS or the

prominence of the citizenship question in a much shorter survey.

313.    The Secretary's failure to address any of these reasons why prior testing of a

citizenship question on the ACS was insufficient is a paradigmatic example of arbitrary

decisionmaking.  *See, e.g.*, *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184,

1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential

harms of its changes to an airport advertising program); *Stewart v. Azar*, 313 F. Supp. 3d 237,

263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded

Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated 95,000 people

who would lose coverage, which gives the Court little reason to think that he seriously grappled

with the bottom-line impact on healthcare.").

314.    The Administrative Record also demonstrates that Defendants failed entirely to

consider the need to test the full census questionnaire, as modified to include a new citizenship

question.  The Secretary's decision memo does not address the need for full testing of the

complete questionnaire, as distinct from testing of the question itself, at all.

315.    OMB statistical directives and the Census Bureau's own Statistical Quality

Standards dictate that the full census instrument be pre-tested when changes are made, as even

minor variations in the design of a questionnaire can lead to unanticipated differences in response patterns. *See, e.g.*, PX-260 at § A2-3.3.

316. The Secretary's decision memo makes no reference to the scientific consensus concerning the need for full-questionnaire testing or the Census Bureau's own Statistical Quality Standards that require testing of the entire census questionnaire. PX-26 (AR 1313, 1314, 1319) (referencing only testing of the question for the ACS).

317. Defendants' failure even to consider the need for testing of the entire proposed questionnaire is arbitrary and capricious. *See, e.g.*, *New York State Bar Ass'n v. Fed. Trade Comm'n*, 276 F. Supp. 2d 110, 145 (D.D.C. 2003) (agency's failure to consider whether statutory scheme warranted a *de minimis* exception was arbitrary and capricious).

318. If considered, the extra-record evidence further proves that testing of the citizenship question on the ACS does not justify its use on the decennial census.

319. Expert testimony from Plaintiffs' witnesses confirms that the citizenship question was not properly tested for inclusion on the census, because the question was not performing adequately on the ACS; because changes in the macro environment required up-to-date testing; and because of the many differences between the ACS sample survey and the decennial census. PFOF § IV.E.3.

320. Extra-record evidence also demonstrates that the Census Bureau typically spends *years* testing survey instruments prior to deciding whether or not to change the decennial census; for this census cycle alone, the Census Bureau conducted many tests of the instrument. PFOF § IV.E.4; Thompson Aff. (Docket No. 516-1) ¶¶ 48-54; Habermann Aff. (Docket No. 498-11) ¶¶ 44-46; Trial Tr. 167.

321. The Committee on National Statistics (CNSTAT) of the National Academy of Sciencies also concluded that the citizenship question had not been properly tested. PX-529.

322. Dr. Abowd himself testified at trial that the ACS citizenship question is *not* in fact performing well. Trial Tr. 1282.

323. In addition, both Dr. Abowd and David Langdon testified that one reason to conclude that prior testing was sufficient here was that there was not enough time following receipt of the DOJ request to conduct new testing. Trial Tr. 1291; Langdon Dep. (Docket No. 510-2) at 243 ("There hasn't been any testing to date. And the time frame wouldn't – the Secretary's decision wouldn't – you know, wouldn't accommodate that kind of testing."). But that is an exigency of Defendants' own making; failure to give themselves enough time to conduct proper pretesting does not excuse noncompliance with testing standards. *See N. Mariana Islands v. United States*, 686 F.2d 7, 21 (D.D.C. 2009) ("DHS should not now expect to excuse its violation of the APA by pointing to the problems created by its own delay.").

> **f. Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates.**

324. The Secretary's decision memo states that "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond." PX-26 at AR 1319. The Secretary's assertion that providing information to DOJ "is of greater importance," than "any adverse effect" is both incorrect and fails to consider the broad range of harms that stem from depressing responses to the census.

325. The sole constitutional purpose of the decennial census – the reason it exists, first and foremost – is the apportionment of Representatives in Congress among the states. U.S.

Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  This interest is paramount and certainly more important than assisting DOJ.

326.    The Secretary's decision memo nowhere considers the wide variety of harms that can result from getting this enumeration wrong.  PX-26; *see* PFOF § X.  Nor does he make any effort to weigh those harms against the value of assisting DOJ.  PX-26 (AR).

327.    Finally, the Secretary's assertion that assisting DOJ is more important than adverse effects "that may result from people violating their legal duty to respond," again failed adequately to consider the nature and quality of injuries that may result from an inaccurate census.  The fact that some people might refuse to respond because the Secretary has chosen to include a question uniformly understood to discourage people from responding is not a good reason why other residents of that state or community should be denied their just representation, or funding for medical services, educational services, and the like.  In any case, nowhere is there any evidence that the Secretary weighed these issues.  PX-26.

328.    Extra-record evidence confirms that the Secretary's failure to consider the profound detrimental impact of adding a citizenship question on the census is arbitrary.  As Dr. Abowd testified, the decennial census "is the statistical foundation of the Census Bureau's work on households and compromising its quality to produce a citizenship tabulation that could be produced from other sources more accurately is not a risk that I would be willing to take."  Trial Tr. 1332.

### 3.    Defendants' stated rationale was pretextual.

329.    Agency action is invalid under the APA where the agency has "relied on factors which Congress has not intended it to consider."  *State Farm*, 463 U.S. at 43.

330.    Agency action will be arbitrary and capricious if it is based on a pretext – that is, if "the stated rationale for Secretary Ross's decision was not his actual rationale."  *New York v.*

*U.S. Dep't of Commerce*, No. 18-cv-2921, 2018 WL 4539659, at *2 (S.D.N.Y. Sept. 21, 2018);

*see also Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994); *XP*

*Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 79 (D.D.C. 2015) (plaintiff stated pretext

claim based on allegations that, *inter alia*, agency proffered pretextual reason for its decision).

331.    Manufacturing a post hoc explanation—DOJ's purported need for citizenship data

for VRA-enforcement purposes—for a decision that Secretary Ross had already made based on

some other rationale is evidence of pretext.  *See Tummino v. von Eschenbach*, 427 F. Supp. 2d

212, 231-33 (E.D.N.Y. 2006) (officials "needed to find acceptable rationales"); *see also Woods*

*Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994) (setting aside

agency action because "sole reason" for that action was "to provide a pretext" for the agency's

"ulterior motive"), *adhered to on reh'g en banc*, 47 F.3d 1032 (10th Cir. 1995).

> a.    **The Administrative Record alone confirms that the stated**
> **rationale is pretext.**

332.    The Administrative Record demonstrates that the Secretary's reliance on DOJ's

purported need for citizenship data for VRA enforcement was a pretext manufactured by

Commerce to cover the Secretary's actual rationale for adding a citizenship question to the

decennial census questionnaire.

333.    The Secretary's own statements, along with the emails and documents contained

in the Administrative Record, establish that the Secretary was pursuing a citizenship question

long before he reached out to DOJ to obtain DOJ's December 2017 letter, and long before he had

any awareness of any purported VRA-enforcement rationale.  PX-55 (AR); PX-19 (AR); PX-150

(AR); PX-607 (AR).

334.    As the Secretary has admitted, he began considering the citizenship question "[s]oon after [his] appointment as Secretary" in February 2017 – almost a year before DOJ's letter.  PX-2 at AR 1321.

335.    The Secretary's ensuing months-long pursuit of the citizenship question had nothing to do with any purported VRA-enforcement rationale.  For example, early in the Secretary's tenure, at the direction of then-White House Chief Strategist Stephen Bannon, the Secretary spoke with Kris Kobach, the Kansas Secretary of State, who urged the Secretary to add a citizenship question as an "essential" tool to resolve "the problem" of noncitizens' being counted for purposes of congressional apportionment.  PX-19 (AR 763-64).  Kobach's email made no mention of the VRA.  *Id.*

336.    The Secretary then pressed his staff to add a citizenship question to the decennial census when they failed to move quickly.  In March 2017, Comstock responded to the Secretary's "question on the census" by discussing whether the census's total-population count must include noncitizens.  PX-55 (AR).  This email also did not discuss the VRA.  *Id.*

337.    In May 2017, the Secretary asked Comstock by email why "nothing [has] been done in response to my *months old* request that we include the citizenship question."  PX-88 (AR) (emphasis added).  The Secretary's email did not mention the VRA.

338.    Comstock replied that Commerce would "get that in place" and "work with Justice to get them to request that citizenship be added," again without mentioning the VRA. PX-88 (AR).

339.    The Secretary's demand for progress also set off further activity among the Secretary's staff, including discussions about the legal basis for counting "illegal immigrants" in the census.  PX-150; PX-565.

340.    In August and early September 2017, the Secretary sent multiple emails to his staff demanding updates, briefings, and meetings about adding the citizenship question. Although one of these emails references DOJ and offers to call the Attorney General, PX-97 (AR), none of them mentions the VRA.  PX-45 (AR), PX-95 (AR).

341.    The VRA rationale continued to be absent during Commerce's subsequent, extensive efforts "to find acceptable rationales" for adding the citizenship question.  *See Tummino*, 427 F. Supp. 2d at 231-33.

342.    As the Administrative Record demonstrates, Commerce staff began shopping the question around to different federal agencies.  Staff solicited officials in other agencies to request addition of the question, including officials who work on immigration matters in the Departments of Justice and Homeland Security, but these officials declined Commerce's overtures.  When those efforts failed, the Secretary's staff worked on "how Commerce could add the question to the Census *itself*" – i.e., without any rationale from another agency.  PX-48 (AR). Commerce's efforts to find some other justification for adding the citizenship question, rather than the VRA rationale that the Secretary later relied on, further demonstrate that the VRA justification is pretext.

343.    In December 2017, DOJ eventually requested that Commerce add a citizenship question to the 2020 census questionnaire.  But the origins of that request and the Secretary's shifting characterization of it further underscore the pretextual nature of the VRA rationale.

344.    The Secretary's initial memorandum in March 2018 stated that he began his decision-making process about a citizenship question *after* receiving the Department of Justice's December 2017 request letter.  PX-26 at AR 1313.  The Secretary repeated this account in subsequent Congressional testimony, in which the Secretary claimed that Commerce's

investigation into adding a citizenship question was *solely* in response to DOJ's December 2017 request.  PFOF § IV.D.  What these statements did (and were intended to) convey was that the Secretary was merely deferring to DOJ's independent judgment about the need for citizenship data in an area of DOJ expertise.

345.    But the Administrative Record demonstrates that both aspects of the Secretary's narrative were false: it was the Secretary, not DOJ, who initiated the decision-making process to add a citizenship question, nearly a year before DOJ's December 2017 request; and it was the Secretary who first reached out to DOJ about the citizenship question rather than the other way around.

346.    Indeed, DOJ's request had not arisen organically from that agency's independent judgment; instead, Commerce had repeatedly solicited DOJ and then worked with DOJ to produce the December 2017 letter so that it would appear – falsely – as though DOJ had independently initiated the request for citizenship data.  PX-537 at AR 12756.

347.    Among other efforts, the Secretary personally and repeatedly lobbied the Attorney General to submit the request that the Secretary later claimed was the sole reason he began considering a citizenship question.  PFOF §§ III.D, III.E; PX-97 at AR 4004; PX-48 at AR 2458; PX-67 at AR 2653; PX-61 at AR 2636; PX-52 at AR 12755.  Such post-hoc rationalizations do not constitute rationale or good faith decision-making.  *See, e.g., Tummino v. Torti*, 603 F. Supp. 2d 519, 547-49 (E.D.N.Y. 2009); *Tummino*, 427 F. Supp. 2d at 231-33; *New York v. Salazar*, 701 F. Supp. 2d 224, 242 (N.D.N.Y. 2010), *aff'd*, 2011 WL 1938232 (N.D.N.Y. 2011).

348.    The Administrative Record also belies the genuineness of DOJ's assertion in its December 2017 letter that adding the citizenship question would assist VRA enforcement.

349.   First, as explained, that rationale originated with the Secretary and not with DOJ staff or leadership independently.

350.   Second, DOJ officials refused to meet with the Bureau's experts to discuss their concerns that adding a citizenship question would not produce accurate citizenship data and that there were better, alternative means to obtain higher quality and more accurate CVAP data that better suits DOJ's needs.  *See* PFOF §§ III.H, IX.B.5.

351.   Both facts suggest that DOJ officials with relevant expertise did not in fact believe that, or care whether, the question would provide accurate citizenship data for VRA enforcement.  The questionable nature of DOJ's request further demonstrates that the Secretary adopted the VRA-enforcement rationale as a pretext, particularly given the Secretary's direct role in inducing that letter.

352.   Commerce's efforts to cover up the Secretary's actual decision-making process and rationales also support a finding of pretext.  *See Salazar*, 701 F. Supp. 2d at 242 (agency took steps to conceal that official "prejudged and controlled" decision); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing . . . and do another" is "the essence of arbitrary action.").

353.   As explained, the Secretary's initial explanations of his decision-making were false, as was the Secretary's testimony regarding the lack of White House involvement in his decisionmaking process.  AR 763, AR 2561.  Defendants then also submitted a patently deficient administrative record that lacked nearly any documents from before December 2017, even those these documents disclosed the Secretary's extensive pursuit of the citizenship question before the DOJ letter and before any purported VRA-rationale was in the picture.

354.     Moreover, Secretary Ross and his senior staff agreed in August 2017 to whitewash the administrative record.  AR 12476.  These efforts to conceal the pre-December 2017 events strongly suggest that the Secretary's reliance on DOJ's December 2017 letter is pretext.

355.     By analogy to employment discrimination caselaw, evidence of Defendants' false or shifting justifications is a strong demonstration of pretext. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 881 (2d Cir. 1997) (evidence of employer's false explanation for employment action supported jury's finding of unlawful pretext); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994) (evidence of shifting explanations was sufficient for a jury to conclude that employer's explanations were pretextual).

356.     Finally, the Administrative Record establishes that the stated reason for the decision – to better enforce Section 2 of the Voting Rights Act ("VRA") – is also implausible and thus a pretext.  *See Torti*, 603 F.Supp.2d at 523 ("implausible justifications for decision-making" showed "lack of good faith and reasoned agency decision-making").  Block-level citizenship data from the decennial census have never been available since the 1965 enactment of the VRA, yet DOJ has been able to enforce the VRA since its passage without such information. PFOF § IX.B.

357.     And even if more accurate data could in theory be helpful to DOJ, here, the Administrative Record shows that CVAP data collected through a citizenship question on the

census will be less accurate, because the addition of a citizenship question will damage the overall quality of census data.  *See* PFOF IX.B.4.

> **b.**     **Extra-record evidence confirms that the Secretary's given rationale is pretext.**

358.    Extra-record evidence strengthens the conclusion that the VRA-enforcement rationale is a pretext and that the Secretary's decision to add the citizenship question based on that rationale should therefore be set aside as arbitrary and capricious.

359.    Specifically, Acting AAG Gore's testimony further undermined the genuineness of DOJ's claim to need more accurate citizenship data to enforce the VRA, and confirmed that DOJ did not independently request such data from Commerce.

360.    In his testimony, Gore acknowledged that none of the DOJ components with principal responsibility for enforcing the VRA requested the addition of a citizenship question; instead, he drafted the DOJ letter solely in response to the Secretary's request.  Gore Dep. (Docket No. 491-2) at 64-67, 94-95.  He also testified that he drafted the DOJ letter despite not even knowing if citizenship data based on responses to a citizenship question on the census will have smaller or larger margins of error, or will be any more precise, than the existing citizenship data on which DOJ currently relies.  PFOF § III.F.

361.    The extra-record evidence confirms that the VRA-enforcement rationale was not the Secretary's actual reason for adding the citizenship question because the extra-record evidence demonstrates that better block-level citizenship data are not in fact needed to enforce Section 2 of the VRA.  PFOF § IX.B.1.

362.    And the extra-record evidence adduced at trial establishes that any citizenship data collected through the 2020 census would not be usable at the block level in any event, because of the Census Bureau's statutorily-mandated disclosure avoidance protocols and

confidentiality protections.  In order to make such data usable, the Census Bureau will be forced to introduce errors into the data, transforming any block-level CVAP data into estimates with a margin of error rather than a hard count; and the Bureau does not know whether such CVAP estimates will be any more precise than the existing CVAP data on which DOJ relies.  *See* PFOF § IX.B.4.

363.    The extra-record evidence also confirms that Commerce failed even to inform the Census Bureau that the Secretary had long been pursuing a citizenship question or his purported reason for doing so.  As the extra-record evidence shows, the entire senior executive staff of the Census Bureau – indeed, "everyone" Dr. Abowd knows at the Census Bureau – was surprised by the contents of the Administrative Record that predated the December 2017 letter from DOJ. Trial Tr. 1020 (Abowd).

364.    During all of the work that Dr. Abowd and his senior team did to evaluate the DOJ request, nobody from the Commerce Department ever told him of the Secretary's many repeated demands to add a citizenship question, the lengthy efforts to recruit another federal agency to sponsor the question, or any purported VRA-enforcement rationale for adding the citizenship question.  PFOF § III.G.

365.    Nor did Commerce officials – during their months-long efforts to solicit an agency to request a citizenship question – ever consult the Census Bureau to understand the methodological or programmatic implications of their actions.

366.    Commerce officials' persistent failure to consult with the Census Bureau strongly suggests pretext by demonstrating that officials were not genuinely interested in obtaining high-quality and accurate citizenship data for VRA enforcement.

367.     No one at Commerce or DOJ asked the Census Bureau's expert staff whether adding a citizenship question would, in fact, provide citizenship data more accurate than the data that DOJ already uses for VRA enforcement.  Nor did anyone at Commerce or DOJ find out whether there were other, better ways to obtain more accurate citizenship data without adding a citizenship question.

368.     Indeed, the extra-record evidence confirms that when the Census Bureau sought to discuss the best way to obtain accurate citizenship data with DOJ, Attorney General Sessions personally directed DOJ officials not to meet with the Bureau's staff.  *See* PFOF §§ III.H.1; V. Trial testimony conclusively demonstrated that the Census Bureau determined that using administrative records would produce more accurate data for DOJ's needs.  *See* PFOF § IX.B.5. Asserting that a citizenship question will provide more accurate citizenship data without knowing whether that assertion is true and without asking the professional staff whether that assertion is even supportable is strong evidence of pretext.

369.     Finally, extra-record evidence strengthens the conclusion that the Secretary's initial presentation of the genesis of his decision was false and misleading.  On November 13, 2018 – in the middle of the trial of this action – the Secretary gave a press interview regarding his decision to add a citizenship question, and stated that he was aware that discussions of adding a citizenship question were "in the air" from the "early days" of the Trump Administration.  PX-688.  But as Dr. Abowd testified, after viewing the video of Secretary Ross's November 13 press interview, a citizenship question was "not [in] the air I was breathing."  Trial Tr. 1373.

### 4.     The Secretary improperly prejudged the decision to add a citizenship question.

370.     Agency action is arbitrary and capricious under the APA where the decision-maker prejudged important matters underlying the challenged decision.  *See, e..g, Air Transport*

84

*Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 486-88 (D.C. Cir. 2011); *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1002 (D.C. Cir. 1999); *Salazar*, 701 F. Supp. 2d at 242.

371.    An agency decision-maker prejudges important matters when he acts with a closed mind rather than engaging in "fair and honest consideration" of the matters at hand. *Torti*, 603 F. Supp. 2d at 542; *see Air Transport*, 663 F.3d at 486-88.

372.    The Administrative Record demonstrates that the Secretary prejudged his decision to add the citizenship question.  As the Administrative Record establishes, the Secretary decided to add the citizenship question to the 2020 census well before DOJ's December 2017 letter and well before his March 2018 initial decision memorandum.  Moreover, the Secretary single-mindedly pursued that goal despite multiple obstacles and objections, without giving fair consideration to important underlying issues.

373.    The Administrative Record shows that the Secretary decided to add the citizenship question many months before he even received DOJ's December 2017 letter.  For example, the Secretary demanded to know in May 2017, "why nothing [has] been done in response to my *months old* request that we include the citizenship question," to which Comstock answered that Commerce would "get that in place."

374.    In the months that followed, the Secretary repeatedly demanded to know why his goal of adding the citizenship question had not been completed, and repeatedly stated that he would personally reach out to the Attorney General if progress was not made on getting DOJ to sponsor the addition of a citizenship question.

375.    And in November 2017, before DOJ had sent its request, the Secretary warned that Commerce was "out of time" to add the citizenship question and that he would thus personally call "whoever is the responsible person at [DOJ]."  PFOF § III.E.

376.    An open-minded decision-maker would not speak about the decision to add a citizenship question as a matter decided "months ago" or as an action that must be completed now because the agency is "out of time."  *See Davis v. Mineta*, 302 F.3d 1104, 1112-13 (10th Cir. 2002), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) (agency comments reflected prejudgment); *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1260-61 (D. Wyo. 2004) (decision-maker's comments reflected prejudgment).

377.    The Administrative Record also belies the Secretary's contention that he fairly considered the addition of a citizenship question after receiving DOJ's December 2017 request. The fact that the Secretary and his staff solicited DOJ's request and worked with DOJ to draft the December 2017 letter strongly suggests that the Secretary had already made up his mind before the request arrived, and that DOJ's request letter merely provided cover for a decision already made.  *Tummino*, 427 F. Supp. 2d at 231-33.

378.    The Administrative Record also establishes that throughout his entire decision-making process, the Secretary continued to push to add the citizenship question no matter the hurdles he faced or the strong objections raised by the Census Bureau, legislators, or other third parties.  For example, the Secretary repeatedly demanded that his staff take action to add the citizenship question when they were not making sufficient progress. He urged his staff to add the citizenship question even after he found out that both DOJ and Homeland Security had refused to sponsor such a question.  He personally and repeatedly lobbied the Attorney General to request the question even after DOJ had declined to do so.  PFOF § III.B.

379.     The Secretary also disregarded the repeated warnings of the Census Bureau.  As the Administrative Record demonstrates, the Secretary added the question even though the Census Bureau informed him that adding the question would reduce rather than enhance the accuracy of citizenship data, and that using administrative records would provide more accurate citizenship data than adding a citizenship question.  He also ignored the Census Bureau's warning that adding the citizenship question would undermine the Bureau's ability to use administrative records to produce accurate citizenship data.  PFOF §§ III.E.6, III.H.  In fact, no evidence before the Secretary suggested that adding a citizenship question would improve, rather than detract from, the accuracy of citizenship data.

380.     The Administrative Record also demonstrates that the Secretary ignored many other warnings from the Census Bureau, including that adding the citizenship question would harm the accuracy of the census count, result in enormous extra costs, and place significant burdens on the residents responding to the census and NRFU operations. PFOF §§ III.H, III.E.4-6. And the Secretary also ignored the significant concerns about adding the citizenship question that were raised by a numerous and broad group of stakeholders, including Ms. Pierce, whose opinion the Secretary invoked in his decision memorandum. PFOF § III.E.4.

381.     Indeed, the Administrative Record demonstrates that Commerce struggled to find *anyone* who would publicly support adding the citizenship question. PFOF § III.H.2.e.

382.     A decision-maker who was fairly and honestly considering the evidence before him would not have proceeded in the face of one-sided evidence that adding a citizenship question would not only lead to an inaccurate enumeration, but also prevent the collection of accurate citizenship data for the VRA-enforcement purpose that was his ostensible rationale. The Secretary's insistence on adding the question notwithstanding this evidence demonstrates

that the Secretary had prejudged the issue. *See Latecoere*, 19 F.3d at 1365; *Tummino*, 427 F. Supp. 2d at 231-33.

383.    The Administrative Record also belies the Secretary's contention that he or his staff at Commerce genuinely set out to take a "hard look" at the citizenship question or engage in a "comprehensive review process" after receiving DOJ's December 2017 letter.

384.    The true timeline of the extraordinary efforts that the Secretary and his staff had already undertaken well before DOJ's letter to add the citizenship question demonstrate that the process that occurred after December 2017 could not plausibly have altered the Secretary's decision and was simply a vehicle to make it falsely appear as if the Commerce staff and the Secretary had initiated the decision-making solely in response to DOJ's request. *Davis*, 302 F.3d at 1112-13 (agency prejudged decision where it conducted "an evidently *pro forma* public opportunity to comment").

385.    The Administrative Record further shows prejudgment based on the Secretary's dramatic departures from the typical decision-making process for making even minor alterations to the decennial census questionnaire. The Census Bureau typically takes years to test the census design and validate new questions, but here Defendants decided to add the citizenship demand in less than four months, with no testing or validation, and with no consultation with DOJ to determine how its data needs could be met. AR 3460.

386.    Bypassing the very procedures that are designed to provide the Secretary with the information he needs to make an informed and open-minded judgment about whether to add the citizenship question demonstrates that he had already made the determination and would not alter his mind. *See Tummino*, 427 F. Supp. 2d at 233-34 ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing

88

of bad faith . . . has been made."); *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747-48 (2014).

387.     Finally, the evidence in the Administrative Record of political pressure on the Commerce Department from White House staff and Presidential advisers, including Stephen Bannon and Kris Kobach, to add the citizenship question, independently supports setting aside Defendants' decision on arbitrary and capricious grounds.  AR 763-764, AR 2561.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 544-45 (E.D.N.Y. 2009) (citing *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49 (D.C. Cir. 1971)); *see also Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997).

## C.     Defendants' decision to demand citizenship information is not in accordance with law.

388.     The Administrative Procedure Act provides that the Court "shall" "hold unlawful and set aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

389.     The Secretary's decision to add a citizenship question is not in accordance with law and should be set aside under the APA because (1) it does not comply with the Congressional reporting requirements of Section 141(f) of the Census Act; (2) it does not comply with the requirements of Section 6 of the Census Act to prioritize use of administrative records over direct inquiries to the maximum extent possible; and (3) it does not comply with the pretesting and burden-reduction requirements contained in the OMB Statistical Policy Directives and in the Census Bureau's Statistical Quality Standards.

### 1. Section 141(f) of the Census Act.

390.   Section 141(f) of the Census Act sets a strict timeline for changing the content of the decennial census and cabins the Secretary's discretion to add new questions to the instrument.

391.   The Act provides that the Secretary "shall submit" a report to Congress "not later than 3 years before the appropriate census date," identifying the "subjects proposed to be included, and the types of information to be compiled, in such a census."  13 U.S.C. § 141(f)(1).

392.   The Census Act allows the Secretary to amend the subjects on the census after the report is submitted only where "*new* circumstances exist which *necessitate* that the subjects, types of information, or questions contained in reports so submitted be modified."  13 U.S.C. §  141(f)(3) (emphasis added).

393.   The Act additionally requires the Secretary to submit a report to Congress documenting any such "new circumstances."  *Id.*

394.   Congress added the requirements at Section 141(f) of the Census Act through the 1976 amendments to that Act.  Pub. L. No. 94-521, § 7(a), 90 Stat. 2459, 2461-62 (1976).

395.   The legislative history of those amendments establishes that the purpose of these provisions was to enable Congress to exercise greater scrutiny and oversight of decennial census subjects and questions.  The Senate Report on the 1976 amendments notes that the purpose of the provisions codified at Section 141 was to "*require*[] that the Secretary of Commerce submit at various intervals the subjects and questions to be used in the decennial and mid-decade censuses of population to the appropriate committees of Congress for their review and recommendations." S. Rep. No. 94-1256, at 5 (1976) (emphasis added).

396.   Similarly, the House Report on the 1976 amendments notes that "[i]n view of the increasing attention focused on the content of census questionnaires," the requirements at

90

Section 141 were intended to "establish[] a time table for proposed subjects and questions . . . to be submitted to the Congress for its review and recommendations," in order to allow Congress to "assure that the statistical needs will be met and that the citizens will not be unfairly subject to questions invading their privacy."  H. Rep. No. 94-944, at 5-6 (1976).

397.    The Commerce Department advised Congress in 1976, during consideration of these amendments, that "[w]e have no objection to this provision which is to ensure that Congress is kept informed on census planning."  *Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil Serv.*, 94th Cong. 25 (1976) (statement of agency views, General Counsel, U.S. Dep't of Commerce).

398.    The reporting requirements in 13 U.S.C. § 141(f) are therefore not merely ministerial, but are necessary for Congress to assure adequate oversight of the Commerce Secretary's exercise of his discretion regarding the decennial census.  This is particularly so because the Constitution "vests *Congress* with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15 (emphasis added); and Defendants are authorized to act only by subsequent delegation of that authority by Congress to the Secretary of Commerce, *id.* at 19 (citing 13 U.S.C. § 141(a)).

399.    The requirements at Section 141(f) are therefore substantive components of – and restrictions on – the Secretary's exercise of the discretion delegated to him by Congress.  *Cf. New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 795-96 (S.D.N.Y. 2018) (rejecting Defendants' argument that the Secretary's decision is judicially unreviewable as "committed to agency discretion by law," because among other reasons "the Census Act imposes any number of mandatory duties upon the Secretary").

a. **The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act.**

400. In March 2017, the Secretary submitted the report required under Section 141(f)(1) in March 2017, and did not identify citizenship as a subject to be included on the decennial census.  PX-1 at AR 194 (the "Subjects Planned" report).

401. The Administrative Record makes clear that commenters on the DOJ request pointed out to the Secretary the importance of complying with the Section 141(f)(1) requirement. Six former Directors of the Census Bureau wrote the Secretary in January 2018 to stress, among other considerations, the three-year report requirement.  PX-1 at AR 1057 ("There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.").

402. Plaintiff the U.S. Conference of Mayors wrote the Secretary in January 2018 and stressed "the Justice Department has not set forth new legal or programmatic reasons for the Census Bureau to collect this information from every household in the country since its initial cataloguing of data requirements for the census . . . prior to the Census Bureau's submission of 2020 Census and ACS topics to Congress last spring."  PX-1 at AR 1066, AR 1075.

403. The Administrative Record is clear that the Census Bureau was well aware of these deadlines and requirements, and organized their original content review process around these mandatory statutory deadlines.  PX-1 at AR 1168 ("This memorandum officially documents the U.S. Census Bureau's plan to develop and transmit to Congress the *Subjects Planned for the 2020 Census Program*," and noting that "Title 13, U.S. Code requires the Census Bureau to send Congress the subjects proposed to be included in the census not later than three years before the Census date.").

404.     The Census Bureau's own description of the process for adding content to the decennial census questionnaire notes that "[b]y law, the Census Bureau notified the Congress of the topics to be covered by the 2020 Census on March 31, 2017. . . .  This is an intentional[] process designed to give Congress the ability to review the topics and questions on the questionnaire before they are finalized.  If an additional topic is required, it is imperative that Congress be notified as soon as possible."  PX-134 at AR 9865; *see also* PX-4 at AR 3890-91.

405.     Defendants have never transmitted any report to Congress that identifies new circumstances "necessitating" a change in the topics to be covered by the decennial census, as required by Section 141(f)(3).  The report required by Section 141(f)(2), which was submitted to Congress in March 2018, simply notes that a question on citizenship will be included in the census.  PX-489 at 11.  It does not identify "new circumstances . . . which necessitate" a need for a citizenship question.  *Id.*

406.     Nor does anything else in the Administrative Record identify any new circumstances arising after the March 2017 report suggesting that existing data for VRA enforcement were suddenly problematic or ineffective.

407.     To the contrary, the evidence in the Administrative Record confirms that as far as effective enforcement of the Voting Rights Act is concerned, no "new circumstances" arose between March 2017 and March 2018 "which necessitate[d]" the inclusion of a citizenship question.  *See, e.g.*, PX-1 at AR 773 (letter from Vanita Gupta, President and CEO of the Leadership Conference on Civil & Human Rights) ("I know from my prior experience as the chief government enforcer of the Voting Rights Act [that] the Justice Department has never needed to add this new question to the decennial census to enforce the Voting Rights Act before, so there is no reason it would need to do so now."); *id.* at AR 798 (citizenship data from the

decennial census are "unnecessary" to enforce the Voting Rights Act); *id.* at AR 1083 (same from the National League of Cities); *id.* at AR 1096-98 (same from coalition of state Attorneys General); *id.* at AR 1207 (same as recorded in Gupta stakeholder call).

408.    The Court may take judicial notice that Congress did not enact legislation amending the Voting Rights Act between March 2017 and March 2018.

409.    The DOJ request letter does not identify any changed circumstances between March 2017 and March 2018, and does not contend that data from a citizenship question on the decennial census are "necessary" for VRA enforcement.

410.    Accordingly, Defendants' failure to include citizenship on the list of decennial subjects in the March 2017 report to Congress, and the concomitant absence of changed circumstances that necessitate the addition, is plainly contrary to law.  *See NRDC*, 894 F.3d at 108-13 (vacating the agency's decision for failure to comply with unambiguous statutory deadlines); *ACEMLA v. Copyright Royalty Tribunal*, 763 F.2d 101, 109 (2d Cir. 1985) (vacating the agency's order as not in accordance with law for failure to comply with statutory obligation to "state in detail the criteria . . . , the various facts that it found . . . , and the specific reasons for its determination"); *East Bay Sanctuary Covenant v. Trump*, 18-cv-6810-JST, 2018 WL 6053140, at *11-14 (N.D. Cal. Nov. 19, 2018) (finding likelihood of success on the merits sufficient to enter nationwide temporary restraining order to enjoin rule that would bar asylum for immigrants entering between ports of entry, on the ground that "the [r]ule flouts the explicit language of the statute").

b.    **Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3).**

411.    Dr. Jarmin testified that he agrees the Section 141(f) requirements are intentionally designed "to give Congress the ability to review the topics and questions on the questionnaire before they're finalized."  Jarmin Dep. (Docket No. 511-2) at 50.

412.    Even if Defendants were to attempt today to cure this violation of their statutory obligations, extra-record evidence establishes that the statutory standard to identify new evidence necessitating a change cannot be met.

413.    The Department of Justice itself agrees that adding a citizenship demand to the census is not "necessary" to enforce the VRA.  Gore Dep. (Docket No. 491-2) at 300 ("Q. You agree, right, Mr. Gore, that CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts?  A. I do agree with that.  Yes.").

414.    Dr. Abowd similarly testified that he does not believe adding a citizenship question is "necessary" to provide the Department of Justice with the data they requested.  PFOF § IV.E.6 ¶ 888.

415.    The unrebutted expert testimony of Plaintiffs' voting rights expert Dr. Lisa Handley also confirms that a citizenship question on the census is not "necessary" to enforce the Voting Rights Act.  PFOF § IX.B.2; *see also* Br. of the Leadership Conference on Civil & Human Rights as *Amicus Curiae* at 2 (Docket No. 443) (explaining that there is "no evidence" that census-derived CVAP data "would have assisted the litigation" of VRA cases in the past, nor evidence that such data "would assist this litigation either today or in the future").

2.    **Section 6 of the Census Act.**

416.    Section 6(c) of the Census Act requires that "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary

95

*shall* acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries." 13 U.S.C. § 6(c). Subsections (a) and (b) in turn refer to the administrative records of other federal agencies as well as state and municipal governments and private parties. *Id.* § 6(a), (b).

417.   Congress added the requirement at Section 6(c) of the Census Act through the 1976 amendments to that Act. Pub. L. No. 94-521, § 5, 90 Stat. at 2460.

418.   The legislative history of Section 6(c) of the Census Act is clear that Congress intended to make *mandatory* the use of statistical data from other sources in lieu of direct inquiry whenever possible, in order to reduce burden and cost.

419.   The Senate Report on the 1976 amendments explains that "Section 5 adds a new subsection (c) to section 6 of title 13, U.S.C., which directs the Secretary of Commerce to acquire and use to the greatest extent possible statistical data available from other sources, in lieu of direct inquiries. While current law authorizes the Secretary to purchase or otherwise acquire such information, this amendment serves to emphasize Congress['s] desire that the authority be used whenever possible in the interest of economy and reducing respondent burden." S. Rep. No. 94-1256, at 3 (1976).

420.   The House Report on the 1976 amendments likewise notes that the requirement codified at Section 6(c) "direct[s] the Secretary to the maximum extent possible to acquire and use information already available, instead of conducting direct inquiries." H. Rep. No. 94-944, at 5 (1976).

### a.   The Administrative Record is clear that Defendants did not comply with Section 6(c) of the Census Act.

421.   The Administrative Record makes clear that the Secretary's decision to select "Alternative D" over "Alternative C" was not in accordance with his mandatory obligation to use

96

administrative records "[t]o the maximum extent possible," 13 U.S.C. § 6(c), instead of conducting direct inquiries.

422. The Census Bureau analyses in the Administrative Record demonstrate that using administrative records was a superior alternative to the direct inquiry Secretary Ross ultimate chose. The Census Bureau's January 2018 memo concluded that Alternative C (obtaining citizenship status from administrative records) "best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count." PX-22 at AR 1277; *see also* PX-25 at AR 1312 ("In sum, Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B . . . ."); PX-23 at AR 1293 (Question 21: "Is using sample data and administrative records sufficient for DOJ's request? A. The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request.").

423. Secretary Ross discarded those conclusions based on a flawed assessment of Alternative C that Dr. Abowd debunked at trial. PFOF § IV.E.6.

424. Because Defendants failed to comply with the mandatory obligation in Section 6(c) to use administrative records instead of direct inquiries "[t]o the maximum extent possible," the decision should be set aside under § 706(2)(C) of the APA. *See NRDC*, 894 F.3d at 112-13 ("because the text, purpose, and history of the [statutory provision] are all unambiguous regarding the mandatory nature of the" agency's obligation, the agency's decision was "issued 'in excess of statutory . . . authority'") (quoting 5 U.S.C. § 706(2)(C)); *cf. League of Women Voters*, 838 F.3d 9-10 ("Because [the agency's executive director] expressly found that the criterion set by Congress . . . was 'irrelevent' to his analysis, it is difficult to imagine a more clear violation of the APA[].").

### b.   Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c).

425.   Extra-record evidence further confirms that the unjustified decision not to use administrative records to respond to the DOJ request was inconsistent with the Secretary's mandatory obligations under Section 6(c) of the Census Act.

426.   Dr. Jarmin testified that on receiving the Justice Department's letter, the Census Bureau decided to "explore the use of administrative records to fulfill the request" because "it's an area that we always explore," because "it's often easier, potentially more accurate to [use] administrative records, but it's also the intention of Congress in Title 13, the census code, that when possible, we use administrative records in lieu of direct collection.  So this is something that we typically – typically do."  Jarmin Dep. (Docket No. 511-2) at 59-60.

427.   Dr. Abowd testified that using administrative records is consistent with the Census Bureau's obligation to control costs and burden on respondents under, among other sources of authority, Section 6 of Title 13.  Trial Tr. 1338 (Abowd).

428.   Just yesterday, the Census Bureau published an article describing its statutory obligation under Section 6 to use administrative records in place of direct inquiries "to the maximum extent possible," and noting the benefits in terms of cost savings, quality improvement, and burden reduction.  U.S. Census Bureau, *Administrative Records Offset Declining Census Survey Responses: Survey Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at https://census.gov/library/stories/2018/11/administrative-records-offset-declining-census-survey-response.html.[4]

---

[4] Under Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice at any stage of the proceedings of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," such as statements of federal government policy published on a government website.  *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (taking notice of agency guidance documents, consumer advisory, backgrounder, and letters because they were available on FDA website).

3. **OMB standards and Census Bureau guidelines regarding pretesting and burden reduction.**

429.    The Census Bureau's conduct of the census is constrained by a number of federal standards that require burden-reduction and pretesting of statistical data collection instruments administered by the federal government, like the decennial census.

430.    By statute, the Office of Management and Budget (OMB) has responsibility for coordinating the federal statistical system, including to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes."  44 U.S.C. § 3504(e)(1); *see also id.* §§ 3501(9), 3504(a)(1)(B)(iii), 3504(e).

431.    OMB is also required to establish government-wide guidelines and policies regarding statistical collection methods.  *Id.* § 3504(e)(3).

432.    The purpose of these government-wide guidelines is to ensure that federal statistical agencies minimize the burden of their data collection activities and maximize the utility of the information collected.  *Id.* § 3501(1), (2).

433.    Consistent with these statutory obligations, OMB has published a number of Statistical Policy Directives that govern the data collection efforts of federal statistical agencies, including the Census Bureau.  PX-354 (Statistical Policy Directive No. 1); PX-359 (Statistical Policy Directive No. 2); PX-360 (addendum to SPD No. 2).

434.    Statistical Policy Directive No. 1, *Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, requires among other obligations that statistical agencies like the Census Bureau "[c]onduct objective statistical activities" by "produc[ing] data that are impartial, clear, and complete and are readily perceived as such by the public."  PX-354 at 7.

435.    Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys*, was issued because OMB determined it was "essential that, to the extent permitted by law, there be sufficient government-wide uniformity in statistical methods and practices to ensure the maximum usefulness of the statistics produced."  Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006).

436.    Directive No. 2 requires, among other obligations, that agencies "must" design all statistical surveys "to achieve the highest practical rates of response" and "minimize[] respondent burden, while maximizing data quality."  PX-359 at 13, 16 (§§ 1.3, 2.3).

437.    These guidelines also require that agencies conduct a pretest of all components of a survey, including by conducting a field test and full dress rehearsal "for highly influential surveys."  PX-359 at 14 (§ 1.4).

438.    The Census Bureau has further clarified the statistical standards it must utilize to address the agency's unique methodological and operational challenges.  PX-260 (Census Bureau Statistical Quality Standards).

439.    The Statistical Quality Standards provide that "[a]ll Census Bureau employees . . . *must comply* with these standards." *Id.* at 5.

440.    These standards require that all data collection instruments be tested "in a manner that balances data quality and respondent burden," and specifically require pretesting to ensure questions are not "unduly sensitive" and "do not cause undue burden."  *Id.* at 7-8 reqs. A2-3 & A2-3.3.

441.    The Census Bureau Statistical Quality Standards and the OMB Statistical Policy Directives provide "meaningful standards [to] constrain[]" agency discretion.  *Salazar v. King*,

822 F.3d 61, 77-80 (2d Cir. 2016); *see also Pearl River Union Free Sch. Dist. v. King*, 214 F.

Supp. 3d 241, 257 (S.D.N.Y. 2016); *New York*, 315 F. Supp. 3d at 798 n.19; *Sierra Club v.*

*Leavitt*, 355 F. Supp. 2d 544, 550-53 (D.D.C. 2005) (regulation implementing the Clean Air Act

"clearly and unambiguously" establishes a nondiscretionary duty).

### a.     The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards.

442.    The Administrative Record standing alone establishes that in deciding to add a

citizenship question to the census, Defendants did not comply with the pretesting and burden-

reduction requirements contained in OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

443.    Because Defendants did not comply with these obligations, the Secretary's

decision should be set aside as not in accordance with law under the APA.  *See Padula v.*

*Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that

enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its

discretion.") (citation omitted); *Am. Petroleum Inst. v. EPA*, 787 F.2d 965, 975 (5th Cir. 1986)

("It is elementary administrative law that an agency must operate within the confines of its own

regulations."); *Pleune v. Pierce*, 765 F. Supp. 43, 45 (E.D.N.Y. 1991) ("Actions taken in

violation of agency regulations are . . . 'not in accordance with law'" under the APA); *Bunyard*

*v. Hodel*, 702 F. Supp. 820, 822 (D. Nev. 1988) ("Numerous Courts of Appeals have held that an

agency's failure to interpret properly and to comply with applicable CFR regulations constitutes

arbitrary and capricious conduct that is not in accordance with law.") (citing cases); *cf. Secretary*

*of Labor v. Cranesville Aggregate Cos.*, 878 F.3d 25, 36 (2d Cir. 2017) (holding that decision of

the Occupational Safety and Health Review Commission was "not in accordance with the law"

under § 706(2)(A) where the Commission's decision did not comply with the Labor Secretary's

interpretation of sub-statutory standards).

**b.**   **Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards.**

444.   The extra-record evidence developed at trial further confirms that Defendants have failed to comply with binding OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

**4.**   **Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief.**

445.   Plaintiffs pled a distinct claim for relief that the Secretary's decision should be set aside under the APA because it is "not in accordance with law" or "in excess of statutory . . . authority."  Docket No. 214 (Second Am. Compl.); No. 18-cv-5025, Docket No. 1 (Compl.).

446.   Plaintiffs briefed this claim for relief in both their pretrial memorandum of law and pretrial reply.  Docket No. 410, at 28-29; Docket No. 455, at 7-8.

447.   Defendants raised no argument regarding this claim for relief in either their pretrial memorandum of law or their pretrial reply.  Docket No. 413; Docket No. 456.

448.   Defendants' failure to raise any defense to Plaintiffs' argument that the Secretary's decision is contrary to law should constitute a waiver.  *See, e.g.*, *League of United Latin Am. Citizens v. Wheeler*, 899 F.3d 814, 829 (9th Cir. 2018) (Rakoff, D.J., sitting by designation) ("The EPA presents no arguments in defense of its decision.  Accordingly, the EPA has forfeited any merits-based argument.")

**D.**   **Remedies for Defendants' APA violation.**

**1.**   **This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census.**

449.   The APA mandates that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

450.    "[O]rdinarily, when a regulation is not promulgated in accordance with the APA,

the regulation is invalid" and must be vacated.  *All. for the Wild Rockies v. U.S. Forest Serv.*,

2018 WL 5316129 (9th Cir. Oct. 25, 2018) (quotation marks omitted); *see also Am. Bioscience,*

*Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled

to relief under that statute, which normally will be a vacatur of the agency's [decision]").

451.    Vacatur properly reflects the sound principle that an agency action that violates

the APA "'cannot be afforded the force and effect of law,' and therefore is void."  *Air India v.*

*Brien*, No. 00-cv-1707, 2002 WL 34923740, at *14 (E.D.N.Y. Feb. 14, 2002) (quoting *Chrysler*

*Corp. v. Brown*, 441 U.S. 281, 313 (1979)).

452.    Vacatur is an appropriate remedy under the APA both when an agency acts

contrary to law, *e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule that

"conflicts with the plain meaning" of statute), and when an agency action is arbitrary and

capricious, *e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's] finding is not

sustainable on the administrative record made, then the [agency's] decision must be vacated

. . . .").

### 2.    This Court should should decline to remand to the agency and reject any request to remand without vacatur.

453.    Although courts will often remand to the agency after invalidating an improper

determination, courts have also not hesitated to vacate agency actions without remand when they

are taken in violation of statutory or procedural requirements.  *See, e.g.*, *NRDC*, 894 F.3d at 115-

16; *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017).

454.    That disposition reflects the fact that statutory or procedural violations can be so

fundamental as to render the agency's basic choice – and not merely its particular articulation of

that choice – "substantively fatal."  *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety*

& *Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand").

455.    Here, as discussed in Part III.C above, Plaintiffs have proven statutory and procedural violations that warrant vacatur without remand.  In particular, because Defendants violated their notification deadlines to Congress under 13 U.S.C. § 141(f), failing to give Congress the time it determined it would need to review Defendants' decisions; and because the circumstances for addressing that statutory violation cannot be met, *see infra* Part III.C.1; Defendants cannot at this point add a citizenship question to the 2020 census and remand of the issue for further administrative proceedings would be pointless.

456.    Remand is also unnecessary if this Court concludes that the Secretary's stated rationale for the citizenship question is arbitrary and capricious, because the Secretary has never suggested an alternative basis for his decision.  *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43 (D.C Cir. 1994) (remand unnecessary when NLRB "suggested no alternative bases for upholding" its determination); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) ("No remand for further administrative proceedings is warranted because the EPA did not suggest in the rulemaking under review that there is any alternative basis in the record" for its decision.).

457.    Defendants have in fact disclaimed reliance on any other basis.  July 3 Hearing Tr. 47 (Docket No. 205); Defs.' Mem. Opp. Motions in Limine 2-3 (Docket No. 453).

458.    Even if this Court were to order a remand, it should reject any suggestion by Defendants that remand *without* vacatur would be appropriate.  It is questionable whether such a disposition is even available in this case, when no statute expressly confers such remedial

discretion. *Compare* 5 U.S.C. § 706(2)(A) (providing that court "*shall . . .* hold unlawful and set aside" improper agency action (emphasis added)), *with, e.g.*, 42 U.S.C. § 7607(d)(9) (judicial review provision under Clean Air Act providing that court "*may* reverse" improper action (emphasis added)); *see NRDC v. EPA*, 489 F.3d at 1262 (Randolph, J., concurring) ("In cases governed by the Administrative Procedure Act, I have long believed that the law *requires* us to vacate the unlawful agency rule," in contrast to cases governed by the Clean Air Act, which provides "remedial discretion." (emphasis added)).

459.     In any event, the standards for ordering remand without vacatur have not been met here.  An agency overcomes "the presumption of vacatur" of an improper agency determination, *All. for the Wild Rockies*, 2018 WL 5316129, at *12, only if it can demonstrate that vacatur would be "quite disruptive," and further show a "serious possibility that the [agency] will be able to substantiate its decision on remand."  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

460.     Neither factor is satisfied here. Vacatur would not be disruptive because it would merely preserve the status quo, under which the decennial census has omitted a citizenship question for more than sixty years.  This case is thus not one where vacatur of an improper determination would itself trigger the very harms that the challenge to that determination was intended to prevent.  *Compare North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding insufficiently protective environmental rule without vacatur when vacating that rule "would at least temporarily defeat . . . the enhanced protection of the environmental values" sought by petitioner) (quotation marks omitted).

461.     To the contrary, leaving the citizenship question in place, notwithstanding the invalidity of the Secretary's determination, would be the more disruptive choice here, for reasons

described in Plaintiffs' showing of injury-in-fact at Part II.B above. *See Pollinator Stewardship Council*, 806 F.3d at 532 (declining remand without vacatur when leaving improper environmental rule in place "risks more potential environmental harm than vacating it").

462.    This case is also not one where the agency's violations may easily be resolved on remand in the limited time that remains before the June 2019 deadline for printing the decennial census questionnaires.  The errors here are not just "of form," *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1184 (D.C. Cir. 1994) – such as providing an unclear or incomplete statement of the agency's decision, *see id.*; *Am. Bioscience*, 269 F.3d at 1086 (remand without vacatur appropriate "where we perceive that a ground poorly articulated might be sufficient to sustain agency action"), or failing to comply with a simple procedural step, *compare Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[A]n unlawfully promulgated regulation can be left in place while the agency provides the proper *procedural* remedy." (emphasis added)).

463.    Rather, Plaintiffs' claims here identify far more serious defects, including that the Secretary's decision is unsupported by the evidence, rests on glaring factual errors and made-up evidence, relies in some cases on propositions with no support whatsoever, failed to consider important aspects of the problem, is based on a false and pretextual explanation for the Secretary's action, and was reached in violation of Defendants' statutory and regulatory obligations.  *See infra* Parts III.B, III.C.

464.    Because there is no "serious possibility" that defendants can expeditiously resolve these many pervasive defects on remand, *Allied-Signal*, 988 F.2d at 151, remand without vacatur would be wholly inappropriate.

### 3. This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census.

465.     A plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

466.     The decision to grant injunctive relief under the APA is "controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted); *see, e.g.*, *Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 18-cv-5680 (NRB), 2018 WL 4168977, at *24 (S.D.N.Y. Aug. 30, 2018) (applying equitable factors for permanent injunction in APA challenge to agency decision).  All of these factors counsel in favor of an injunction here.

467.     An injunction prohibiting an agency from taking an action is appropriate where the court has found that action to be contrary to law under the APA.  *See Planned Parenthood*, 2018 WL 4168977, at *24.

468.     Under such circumstances, an injunction properly prohibits "the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and ensures that the agency complies with the law going forward, *see Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

469.    As demonstrated in Part III.C above, Plaintiffs have proven that the Secretary's decision is contrary to law in multiple ways, and that any attempt to institute a citizenship question on the 2020 Census now would also be unlawful.

470.    An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts.

471.    An injunction is particularly advisable here because, as Defendants themselves have repeatedly represented, there is little time remaining to conduct further testing or analysis before Defendants must print the 2020 census questionnaire in June 2019.  *See* Trial Tr. 1023 (Abowd); Docket No. 540 (stating that Census Bureau needs to begin printing the 2020 census questionnaire in June 2019); Docket No. 103, at 4-5 (noting Acting Director Ron Jarmin's Congressional testimony that "the Census Bureau would like to 'have everything settled for the questionnaire this fall'" and "wants to resolve this issue 'very quickly'"); Langdon Dep. (Docket No. 510-2) at 243.

472.    At the same time, any efforts by Defendants to continue pursuing the citizenship question would risk inflicting further irreparable harm on Plaintiffs.  The evidence at trial – including the results of the CBAMS surveys and focus groups, PFOF § VII.F.1; the reactions of the Census Bureau's "Trusted Voices," PFOF § VIII.C ¶¶ 1138-46; the unrebutted and uncontested fact testimony of Plaintiffs' witnesses, PFOF § X.A.1 – X.A.4;  and the testimony of Defendants' own witness, PFOF § X.A ¶¶ 1483-85 – demonstrates beyond doubt that the Secretary's decision to add the citizenship question has inflamed fears among populations who are particularly sensitive to such a question, particularly in the current political climate.

108

473.     If this Court were to invalidate the Secretary's decision, allowing Defendants to *continue* perpetuating these harms in a futile pursuit to remedy the defects identified by this Court will severely injure Plaintiffs and their residents and members.

474.     And these harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief.  *See Planned Parenthood*, 2018 WL 4168977, at *24.

475.     The balance of the hardships and the public interest also weigh heavily in favor of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years.  By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

476.     As this Court has explained, the "fair and orderly administration of the census . . . is arguably the Secretary of Commerce's most important duty, and it is critically important that the public have 'confidence in the integrity of the process' underlying 'this mainstay of our democracy.'"  *New York v. U.S. Dep't of Commerce*, __ F. Supp. 3d __, 2018 WL 4539659, at *5 (S.D.N.Y. Sept. 21, 2018) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring in part and concurring in the judgment)).

477.     An injunction prohibiting the addition of a citizenship question on the 2020 census will provide the public with the certainty and confidence that is necessary to protect the integrity of the 2020 census.

> **4.      Whether this Court vacates the Secretary's decision or issues an injunction, any relief will properly apply nationwide.**

478.     As an initial matter, nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is

proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C. § 706(2)(A).

479.    An order vacating the Secretary's decision under the APA thus inherently has nationwide application, without implicating concerns about the power of courts to issue nationwide injunctive relief. *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018) (order setting aside agency decision under APA did not implicate any concerns about nationwide injunctions).

480.    In any event, even an injunction preventing defendants from instituting a citizenship question would not implicate the concerns raised by other nationwide injunctions. There is only a single form of the census questionnaire that is sent to every household nationwide. Defendants have never suggested – let alone presented any evidence to support – that a citizenship question could somehow be included in only some but not other questionnaires.

481.    Nor would a geographically limited injunction make sense in this context because, as Defendants' own expert has made clear, the census questionnaire must be uniform across the country in order to count accurately *all* residents across the nation.

482.    Defendants' uniform, nationwide treatment of the census questionnaire necessarily means that any injunctive relief here must also apply nationwide. *Cf. Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform immigration rules).

483.    The broad geographic scope of the plaintiffs in this case also minimizes any concern about this Court's power to order nationwide relief. The Governmental Plaintiffs in 18-CV-2921 are state and municipal governments located in eleven of the twelve federal judicial circuits (all but the 11th Circuit). Second Am. Compl., Docket No. 210, ¶¶ 12-24. The NGO

plaintiffs include the American-Arab Anti-Discrimination Committee, which has members in every state and regional chapters in Miami and Orlando, Florida (in the 11th Circuit).  Khalaf Aff. (Docket No. 498-16), at ¶ 8.

484.    This case is thus not one where a single plaintiff seeks to leverage an essentially localized dispute into national relief.  *Compare City of Chicago v. Sessions*, 888 F.3d 272, 296 (7th Cir. 2018) (Manion, J., concurring in part and dissenting in part), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

### 5.    This Court should enter the requested declaratory relief.

485.    The Court should also enter declaratory judgment that Defendants' decision to add a citizenship question to the census is not in accordance with law, beyond statutory authority, and is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706.

486.    The Court should further enter declaratory judgment Defendants have not met and cannot meet their requirements under § 141 and § 6 of the Census Act, and that the decision to add a citizenship question violates the APA for this reason as well.  5 U.S.C. § 706.

## IV.    Defendants' decision to add a citizenship question was motivated by discriminatory animus.

### A.    Plaintiffs have proven that the citizenship-question decision was motivated by discriminatory intent through substantial evidence on each of the *Arlington Heights* factors.

487.    Secretary Ross's decision to add a citizenship question to the Decennial Census was motivated at least in part by a desire to harm Latinos and immigrants of color by diminishing their political power, and thus violates the Fifth Amendment's prohibitions on intentional discrimination on the basis of race and national origin.

488.    To succeed on an intentional discrimination claim, Plaintiffs need not show that intentional discrimination was the sole reason for Secretary's Ross's decision, but only that it

was one of several motivating factors.  *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216–17 (2d Cir. 1987).

489.    Because "discriminatory intent is rarely susceptible to direct proof," *Mhany Management, Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016), the Court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("A victim of discrimination is . . . seldom able to prove his or her claim by direct evidence. . . .").

490.    Under the Supreme Court's decision in *Arlington Heights*, 429 U.S. at 266–68, the relevant factors for this "sensitive inquiry" include: (1) disparate impact; (2) the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures" from past practice; and (5) "contemporary statements" by those deciding the issue.

### 1.    The addition of a citizenship question will disparately impact Latinos and immigrants of color.

491.    The "racially disproportionate effect of official action provides an important starting point" in the intentional discrimination inquiry.  *Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982) (internal quotation marks & citation omitted).

492.    The evidence presented at trial shows that a citizenship question will have a disparate effect on Decennial Census response rates among the overlapping categories of non-citizens, immigrants, and Hispanics and that these reduced response rates will ultimately lead to an undercount of these groups and a drop in overall data quality.  *See generally* PFOF §§ VII, VIII, X.D.

112

493.    The Census Bureau estimates that adding a citizenship question will decrease self-response rates by 5.8 percent among households with a noncitizen or person of unknown citizenship status relative to all-citizen households—itself a conservative estimate.  PFOF § VII.B; PX-22 (AR); Trial Tr. 894-95.

494.    Testimony from Plaintiffs' experts demonstrates that a citizenship question would likely increase the non-response rate for non-citizen households by more than 5.8 percent, and possibly by as much as 11.9 percent.  *See, e.g.*, PFOF § VII.B; Trial Tr. 80.

495.    Additionally, the Census Bureau expects that a citizenship question will cause Hispanic response rates to the Decennial Census to decline more than those of non-Hispanic whites.  PFOF § VII.C; Trial Tr. 918.

496.    In addition to the statistical evidence from the Census Bureau and Plaintiffs' experts, qualitative evidence at trial demonstrated that the inclusion of a citizenship question would bear more heavily on those who are foreign-born, and Hispanics in particular.  PFOF § VII.D, F.

497.    That qualitative testimony included focus groups research conducted by the Census Bureau as part of the Census Barriers, Attitudes, and Motivators Survey (CBAMS)—evidence that showed that Hispanic citizens and foreign-born individuals are extremely concerned about answering a citizenship question for fear of negative repercussions for themselves and their neighbors and loved ones.  PFOF § VII.F; PX-152; PX-163; PX-662.

498.    Plaintiffs have also introduced considerable testimony regarding fear among immigrant and Hispanic communities about responding to the Census due to the addition of a citizenship question, which has raised concerns about targeting for immigration-enforcement actions and harassment. *See, e.g.*, Cullinane Aff. (Docket 505-1) ¶¶ 5-9; Escobar Aff. (Docket

113

498-3) ¶¶ 20-24; Sarmiento Aff. (Docket 488-3) ¶¶ 6-9; Plum Aff. (Docket 498-19) ¶¶ 16-23; Altschuler Aff. (Docket 503-1) ¶¶ 11, 13-18.

499.    Notwithstanding the Census Bureau's non-response follow-up (NRFU) efforts, the decline in response rates will translate into an undercount, with a concomitant loss of resources and political representation for communities with larger percentages of immigrants and Hispanics—i.e., a disparate impact on those groups.  *See, e.g.*, PFOF § VIII; Trial Tr. 30.

### 2.    Historical background of the decision.

500.    Plaintiffs presented evidence regarding the historical background of a citizenship question "reveals a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 266, that creates an inference of discriminatory intent.

501.    First, other individuals who recently have tried to add a citizenship question to the Decennial Census have done so for anti-immigrant purposes rather than a VRA-related motive. *See, e.g.*, *FAIR*, 486 F. Supp. at 568; PX-296.

502.    By contrast, Defendants presented no evidence that DOJ or any other party has ever tried to add a citizenship question for purposes of VRA enforcement; instead, Defendants admitted that as of early September 2017, DOJ staff did not want to request a citizenship question and had previously made no complaints about data usability or quality for VRA purposes.  PFOF § IX.B.2.

503.    Indeed, the Census Bureau has a longstanding objection to adding a citizenship question to the Decennial Census, manifested as recently as 2015, when four former Census Bureau Directors submitted a brief arguing that adding a citizenship question to the Decennial Census would "likely exacerbate privacy concerns and lead to inaccurate responses from non-citizens worried about a government record of their immigration status."  PFOF § II.D; PX-1 at AR 840-41.

504.    Second, the evidence showed that the decision to add a citizenship question stemmed from discriminatory, rather than VRA-related, motives.

505.    Immediately after assuming office, Secretary Ross began considering adding a citizenship question, and his request to do so was already "months old" by May 2017.  PFOF § III.A-B; PX-88 (AR).

506.    During this same period of early 2017 and months before the VRA rationale first emerged in the Administrative Record in the December 12 DOJ letter, Secretary Ross had conversations with several individuals who sought to target immigrants of color.  PFOF § III.A.

507.    As the evidence reveals, the individuals who first encouraged Secretary Ross to add a citizenship question—unnamed senior administration officials (including Steve Bannon) and Kris Kobach—were motivated by a desire to stem the political power of immigrant communities of color.  PFOF § III.A, C; PX-1 at AR 763-64 (AR).

508.    Despite his public testimony that his decision-making process was spurred by a request from DOJ in December 2017, Secretary Ross had made his decision independently, and then had lobbied several agencies to request the question and concocted a reason to do so.  PFOF §§ III.A-E.

509.    Given the origin of attempts to add a citizenship question for the 2020 Decennial Census, the historical-background evidence points strongly to discriminatory intent.

### 3.    Irregular procedural sequence.

510.    The trial record also revealed several aspects of the citizenship-question decision that evidence major departures from the usual and recommended sequence of adding or changing a question on a Census survey.

511.    As described above, the evidence shows that Secretary Ross made a series of misleading and contradictory assertions about the genesis of the request, and that he solicited other agencies to provide a post hoc reason for his decision.  PFOF §§ III.B-D, IV.D, V.

512.    The evidence also demonstrates that Defendants did not follow their own standard procedures and methodology in adding the question, instead attempting to rush the question onto the form.  PFOF §§ II.E, III.G-I, IV.A-C.

513.    First, the Administrative Record demonstrates that Secretary Ross offered shifting rationales for when and why he decided to add a citizenship question.  *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 240–41 (5th Cir. 2016) (noting that shifting rationales for a voter identification law were probative of discriminatory intent).

514.    Secretary Ross testified in congressional hearings that his process of considering whether to add a citizenship question was "initiated" by DOJ's request to include a citizenship question on the 2020 Decennial Census, and that he undertook his consideration "solely" in response to the DOJ letter, which stated that the question was needed to obtain better citizenship data for VRA enforcement.  PFOF §§ IV.D, V; *see also* PX-491; PX-492; PX-493.

515.    However, only after this litigation was filed and the Administrative Record was lodged, DOJ drafted and urged Secretary Ross to sign and file a supplemental memorandum as part of the Administrative Record, stating that, in fact, he "'began considering' whether to add the citizenship question '[s]oon after' his appointment as Secretary in February 2017 — almost ten months before the 'request'" from DOJ — and that, '[a]s part of that deliberative process,' he and his staff asked the Department of Justice if it 'would support, and if so would request, inclusion of a citizenship question.'"  PX-2 (AR).

116

516.     At Secretary Ross's direction, Department of Commerce officials then pushed DOJ and then the Department of Homeland Security (DHS) to request a citizenship question, contacting individuals responsible for immigration and not voting rights issues.  PFOF § III.B, D.

517.     The evidence showed that DOJ initially rebuffed these overtures, and instead referred Commerce officials to DHS, which also declined to request the question.  PFOF § III.B.

518.     Only after both DHS and DOJ declined, Secretary Ross exerted political pressure to get DOJ to make the request, ultimately securing the request in part by speaking to Attorney General Sessions personally, and having his staff coordinate with Acting Assistant Attorney General John Gore, to ensure that DOJ did so.  PFOF §§ III.D-E.

519.     Secretary Ross and top Commerce officials did not consult with Census Bureau officials during this period, and kept them in the dark about the fact that it was not DOJ, but rather Secretary Ross, who had originated the attempt to add a citizenship question after his conversations with Messrs. Bannon and Kobach.  PFOF §§ IV.C, V; *see also* Trial Tr. 1015-22.

520.     The evidence at trial also showed that the process for adding a citizenship question departed from normal procedures.  PFOF §§ II.E, IV.A-C.

521.     Plaintiffs' expert witnesses, including the former Director of the Census Bureau, explained the extensive testing processes the Census Bureau has developed in order to properly assess proposed changes to a census questionnaire, none of which were followed here.  PFOF § II.E, F.

522.     This is in stark contrast to the extensive process that was used previously for considering changes to questions concerning race and ethnicity on the Decennial Census.  PFOF § II.F.

523.     The evidence at trial showed that, here, the Census Bureau conducted no pretesting of the 2020 Decennial Census questionnaire with the inclusion of a citizenship question, including no testing of the survey design or any cognitive of field testing.  PFOF § IV.B.

524.     Defendants asserted that no pre-testing was required because a citizenship question has been adequately tested through its inclusion on the Census Bureau's American Community Survey ("ACS").  PFOF § IV.E.3.

525.     But the evidence shows that there are significant differences between the citizenship question on the 2020 Decennial Census and the citizenship question currently used on the ACS; differences that significantly limit the relevance and validity of prior testing of the citizenship question on the ACS.  PFOF § IV.E.3.

526.     Although Defendants contend that the ACS citizenship question was "adequately tested," their own expert Dr. Abowd admitted that the ACS citizenship question was tested in a different political environment. PFOF §§ IV.E.3, F.

527.     Dr. Abowd also admitted that the reliance on the testing of the ACS citizenship question which was done about fifteen years ago was only adequate in the sense that it was the best they could do under the rushed timeline of several months that was of Secretary Ross's own making.  PFOF § IV.E.3; Trial Tr. 1270-74.

528.     Most notably, Dr. Abowd also stated that the Census Bureau's own internal analysis indicates that the ACS citizenship question is not performing "adequately" and therefore cannot be deemed to have been adequately tested in accordance with accepted survey standards. PFOF § IV.E.3; Trial Tr. 1287-88.

529.    The evidence further establishes that impartial experts—including six former Census Directors, the National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics Task Force on the 2020 Census, and the Census Bureau's own Scientific Advisory Committee—have uniformly expressed the view that the rushed process to add a citizenship question was inconsistent with accepted standards for survey methodology, and thereby threatens the accuracy of the count.  PFOF § IV.E.3.

### 4.    Substantive departures from past practice.

530.    The evidence also shows that the decision to add a citizenship question departs from past practice, as the Census Bureau has repeatedly rejected prior attempts to add a citizenship question to the Decennial Census.  PFOF § II.D.

531.    Prior to both the 1980 and 1990 Decennial Censuses, the Census Bureau opposed adding a citizenship question, stating in the former case that "any effort to ascertain citizenship will inevitably jeopardize" the accuracy of the count because such questions "are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate." *FAIR*, 486 F. Supp. at 568; *see also* PX-306, PX-307.

532.    In 1988, Census Bureau Director John Keane testified before Congress that the Census Bureau believed that the addition of a citizenship question would cause immigrants and legal residents to "misunderstand or mistrust the census and fail or refuse to respond." PX-307.

533.    Similarly, in 2015, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that a person-by-person citizenship inquiry would reduce the Decennial Census response rate.  PX-309.

534.    And of course, the Census Bureau continues to this day to oppose adding a citizenship question, citing reduced response rates for non-citizen households and Latinos and reduced data quality—views ignored by Secretary Ross.  PFOF §§ III.G, H.2.

### 5. Contemporary statements by decision-makers and those influencing them.

535.    Plaintiffs also introduced contemporary statements by Secretary Ross and those who influenced him to add a citizenship question that further support a discriminatory motive.

536.    As the Second Circuit has explained, when multiple officials influence a final decision, the relevant inquiry is whether the decision was "tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997).

537.    In fact, several courts have recently applied these very principles to situations in which President Trump or his advisors influenced other government officials in making decisions such as revoking protections from Deferred Action for Childhood Arrivals (DACA) recipients and temporary protected status from residents of certain Central American, Caribbean, and African nations.  *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (holding in DACA-rescission case that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos v. Nielsen*, No. 18-CV-01554-EMC, -- F. Supp. 3d --, 2018 WL 4778285, at *16 (N.D. Cal. Oct. 3, 2018) (granting preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process.") (citation omitted); *see also Centro Presente v. U.S. Dept. of Homeland Sec.*, No. CV 18-10340, 2018 WL 3543535, at *14 n.3 (D. Mass. July 23, 2018) (explaining that although the "cat's paw" principle originates in the employment discrimination context, "nothing in the reasoning of those opinions makes them inapplicable in a constitutional context").

538.     Here, Plaintiffs presented evidence that Secretary Ross and those who influenced him were motivated at least in part by a desire to dilute the political power of immigrant communities of color.  *See generally* PFOF §§ III.A, VI.

539.     In October 9, 2017, Secretary Ross made clear his support for a wide array of President Trump's  immigration policies, including the President's efforts to restrict what he called "chain migration," or the process of one family member with legal status sponsoring other family members for immigration—a program that primarily benefits immigrants of color.  PX-479.

540.     And in connection with the consideration of a citizenship question, in March 2017, Secretary Ross asked another Commerce official whether noncitizens were included in the census, and received in response an article entitled "The Pitfalls of Counting Illegal Immigrants."  PX-55 (AR).

541.     Additionally, the evidence shows that the individuals who played a major role in convincing Secretary Ross to add a citizenship question did so with discriminatory motives.  PFOF §§ III.A, VI.

542.     Secretary Ross has admitted that in early 2017, he discussed adding a citizenship question with Kris Kobach, Steve Bannon, and Attorney General Sessions.  PX-2 (AR).

543.     The White House, through senior aide Steve Bannon, requested the Secretary speak with Mr. Kobach about adding a citizenship question.  Secretary Ross knew Mr. Kobach was advocating for a citizenship question in part to make it easier for states to exclude immigrants from apportionment considerations.  PFOF § III.C; *see also* PX-19 (AR); PX-298 (R) at RFA 82.  In fact, other than the discredited VRA justification, the only other reason for adding a citizenship question to the Decennial Census that is identified anywhere in the

administrative record is Kris Kobach's explanation to Secretary Ross that Commerce should add

the citizenship question to respond to the "problem" of non-citizen immigrants being counted for

apportionment purposes.  *Id.*

544.    Moreover, the trial record is rife with statements by President Trump—whose

campaign claims he ordered Secretary Ross to add a citizenship question—demeaning immigrant

communities of color.  PFOF § VI.

545.    Attorney General Sessions expressed some of these sentiments as well.  PFOF

§ VI.

546.    The Court need not "bury its head in the sand when faced with overt expressions

of prejudice." *Batalla Vidal*, 291 F. Supp. 3d at 278.

547.    Nor need it ignore statements that employ "code words" rather than overt

statements of bias against a group.  *See Mhany Mgmt.*, 819 F.3d at 609 (affirming a finding of

racial discrimination in a housing case and holding that given the context, certain comments

"were code words for racial animus" and proper evidence of discrimination); *Ave. 6E Invs., LLC

v. City of Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir.), *cert. denied*, 137 S. Ct. 295 (2016) (holding

that "the use of 'code words' may demonstrate discriminatory intent").

548.    The evidence that President Trump and others from his Administration that

pushed Secretary Ross to add a citizenship question "harbor[ ] an animus against non-white, non-

European aliens which influenced" the decision provides strong evidence of discriminatory

intent. *Ramos*, 2018 WL 4778285, at *17.

**B.      The pretextual nature of the decision also supports a finding of
discriminatory intent.**

549.    As the Supreme Court has held in the Title VII context, "rejection of the

defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional

discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis removed); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 216 (2d Cir. 1997) (holding that a "showing of pretext was probative of intentional discrimination").

550.    Other courts have extended this proposition to constitutional intentional discrimination claims, explaining that even though pretext "was not a factor expressly mentioned in *Arlington Heights*," in "some circumstances it is reasonable to infer discriminatory intent based on evidence of pretext." *Florida v. United States*, 885 F. Supp. 2d 299, 355 (D.D.C. 2012); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282–83 (11th Cir. 2008) (holding that if "the trier of fact believed [the plaintiff's] showing of pretext, and disbelieved [defendant's] proffered legitimate reason, then a violation of the Equal Protection Clause would be shown" where additional evidence permitted the inference); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513–14 (7th Cir. 1993) (adopting principle of inference from pretext for equal protection claim).

551.    The evidence at trial showed that the decision to add a citizenship question was motivated by discriminatory purposes rather than for VRA enforcement; and furthermore, that even taking the DOJ letter at face value, there is no actual need for citizenship data from the Decennial Census to properly enforce Section 2 of the VRA.

552.    First, the idea for a citizenship question originated in early 2017 with Secretary Ross, as influenced by still unidentified senior Administration officials (including Steve Bannon) and Kris Kobach, not from DOJ, the agency responsible for enforcing the VRA.  PFOF § III.A.

553.    When Commerce officials did reach out to DOJ in May 2017, they spoke with James McHenry, the then-acting head of DOJ's immigration arm and an individual with no VRA-related responsibilities.  PFOF § III.B.

554.    After he rebuffed Commerce's appeal to request a citizenship question, Commerce then turned to DHS, an agency with no voting rights responsibility, which also rejected the request. PFOF § III.B.

555.    When DOJ finally did agree to make the request in late 2017, it was not due to any unmet VRA-related needs or a request from DOJ's VRA enforcement attorneys, but rather from political pressure applied by Secretary Ross and a direct appeal to Attorney General Sessions.  PFOF § III.E, F.

556.    The request for a citizenship question was ultimately drafted by a political appointee, John Gore, and edited by other political appointees with no voting rights experience, with only minimal input from career Civil Rights Division staff—on only one occasion to the first draft of the letter.  PFOF § III.E; *see also* Gore Dep. at 126-27.

557.    None of this process was made public through either the December 2017 DOJ letter or subsequent DOJ statements until the origin of the question was revealed through this litigation. *See, generally*, PFOF § V.

558.    Second, the evidence at trial has shown that DOJ does not and has never needed citizenship data collected through the "full count" Decennial Census questionnaire to properly enforce Section 2 of the VRA.  PFOF § IX.B.2, 3.

559.    DOJ has never had "hard count" citizenship data during the lifespan of the VRA, but that this has not hampered enforcement efforts.  PFOF § IX.B.2, 3; Trial Tr. 802; Gore Dep. at 203:5-10.

560.    For decades, survey sample data collected through the Decennial Census "long form" questionnaire was used to produce citizenship estimates used for VRA enforcement, and

more recently, similar estimates are based on survey sample data collected through the ACS. PFOF § IX.B.2, 3.

561.    In fact, Defendants have been unable to identify any DOJ Section 2 case that has ever failed because of a lack of citizenship data collected through the Decennial Census.  PFOF § IX.B.2, 3.

562.    The one case Defendants identified in which a court rejected reliance on ACS data, *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010), was a district court case brought by private plaintiffs and not the DOJ where plaintiffs relied on estimates based on only a single year of ACS responses ("one-year ACS estimates"), which had too small of a sample size to generate statistically reliable estimates for the geographic area in question.  PFOF § IX.B.3.

563.    This contrasts with the estimates based on a pool of five years of ACS responses ("five-year ACS estimates") that courts have repeatedly found sufficient.  *See, e.g.*, *Rodriguez v. Harris Cty.*, 964 F. Supp. 2d 686, 727–28 (S.D. Tex. 2013); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 687-89 (S.D. Tex. 2017); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13–CV–0087–D, 2014 WL 4055366, at *17 (N.D. Tex. 2014).

564.    At trial, Plaintiffs presented evidence from Dr. Lisa Handley, a frequent expert witness for DOJ in VRA cases, who credibly testified that she has never been hampered by a lack of Decennial Census citizenship data in proving a Section 2 violation, and that the current data is perfectly adequate for this process.  PFOF § IX.A, B.1, 2.

565.    For example, as to the lack of block-level citizenship data from the ACS, Dr. Handley demonstrated that in some VRA cases involving states and larger jurisdictions, there is often little or no need to split census blocks.  PFOF § IX.B.3; Trial Tr. 810.

566.     And for instances in which splitting census blocks are necessary, DOJ has always relied on citizenship data not published at the block level and performed further calculations to estimate CVAP at the census block level using one of several reliable methods.  PFOF § IX.B.3; Trial Tr. 810-19.

567.     The evidence at trial also showed that citizenship data based on responses to a question on the Decennial Census questionnaire will likely be no better and perhaps even worse than currently available citizenship data.  PFOF § IX.B.4.

568.     The data from the Decennial Census already contains several types of errors; errors that will be found in citizenship data collected through the Decennial Census, and could even be magnified by the inclusion of a citizenship question on the Decennial Census questionnaire.  There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more accurate than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.4.

569.     Additionally, the evidence shows that the Census Bureau uses disclosure-avoidance techniques to protect the confidentiality of responses to the Decennial Census questionnaire, which will entail purposefully introducing errors into any block-level CVAP data made available to DOJ and the public.  The Census Bureau does not even know whether the error margins for block-level CVAP data based on responses to a citizenship question will be smaller or more precise than those associated with the ACS estimates on which DOJ currently relies. There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more precise than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.5.

570.     The Census Bureau approached DOJ after receiving the December 12 letter to discuss the technical dimensions of DOJ's request, and to instead propose using administrative data to generate CVAP data at the block level, which the Census Bureau determined would better meet their VRA-related needs than adding a citizenship question.  PFOF § III.H.1.

571.     But DOJ refused to meet with the Census Bureau to discuss these issues, belying the notion that DOJ was interested in obtaining the best possible data for VRA enforcement purposes.  PFOF § III.H.1.

572.     Indeed, the evidence at trial showed a complete lack of interest by the Trump Administration in enforcing the VRA; the Administration, for example, has not filed any such cases during its almost two years in power.  PFOF § IX.B.2; *see also* PX-515; Gore Dep. (Docket 491-2) at 249-50.

573.     In sum, the evidence at trial rebuts Defendants' asserted motive for adding a citizenship question and provide affirmative evidence on all *Arlington Heights* factors, allowing the Court to infer intentional discrimination based on national origin and race.

574.     This evidence clearly shows that the decision was motivated by a "bare [ ] desire to harm a politically unpopular group," and thus violates the Fifth Amendment.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

### C.     Plaintiffs proved intentional discrimination based on race and national origin, but even if Defendants discriminated against immigrants generally, such discrimination would violate the Fifth Amendment.

575.     The Fifth Amendment prohibits invidious discrimination—even against people "whose presence in this country is unlawful."  *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

576.     Regardless of whether Defendants' decision to add a citizenship question was intended to target individuals because of race and/or national origin or because they are

immigrants generally, the Fifth Amendment applies—this distinction only raises the issue of what level of scrutiny applies.

577.    Plaintiffs have provided substantial evidence that Defendants intended to target Latinos and immigrant communities of color, meriting strict scrutiny.

578.    Even under a lower level of scrutiny, however, the Fifth Amendment does not permit  arbitrary exclusions of non-citizens in a way that does not promote a legitimate federal interest, *see Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 (1976).  And "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *Romer v. Evans*, 517 U.S. 620, 634 (1996) (citing *Moreno*, 413 U.S. at 534) (emphasis removed).

579.    The need for meaningful review of the government's proffered justifications and actual intent applies here where—rather than using its plenary power regarding immigration and naturalization issues—Defendants attempt to weaken immigrants' political power through the Decennial Census despite the Constitution requiring counting of and apportionment based on *all* individuals residing in the United States.  *See* U.S. Const. art. I, § 2, cl. 3; U.S. Const. Amend. XIV, § 2.

### 1.    Defendants' citizenship question decision seeks to diminish political power and harms groups based on race, ethnicity, and national origin.

580.    As discussed in more depth *supra*, Defendants' decision to add a citizenship question targets not only immigrants generally, but also all Latinos and immigrants of color specifically: individuals whose presence the Trump Administration has repeatedly targeted.

581.    Because "Hispanics as an ethnic group do constitute a suspect class for the purpose of equal protection analysis," *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983),

128

Defendants' targeting of individuals in this group merits strict scrutiny.  *See also Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994) (noting broadly that actions that intentionally discriminate based on race and national origin merit strict scrutiny).

582.    For immigrants of color, that Defendants discriminate in part because of those individuals' non-citizen status does not lower the level of scrutiny required because Defendants also seek to target these individuals due to their race and national origin.

583.    Strict scrutiny still applies because attempting to "bisect a person's identity at the intersection of race and [another characteristic] often distorts or ignores the particular nature of their experiences." *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994), *as amended* (Nov. 21, 1994 & Dec. 14, 1994).

584.    A "plaintiff's discrimination claims may not be defeated . . . based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010).

585.    The evidence provides two primary bases for finding that Defendants discriminated against Latinos and immigrants of color and not just immigrants as an entire class.

586.    First, Secretary Ross was aware that adding a citizenship question would discourage participation among Latinos.

587.    Dr. Abowd and his team informed Secretary Ross personally and through written analysis on several occasions that adding a citizenship question would disproportionately negatively impact not only non-citizen households, but also Hispanic individuals.  PFOF § III.H.

588.    Dr. Abowd's team also explained that there would be no countervailing benefit to adding a citizenship question, that DOJ's request was better served by using administrative

records to determine citizenship, and that a citizenship question on the Decennial Census would merely add cost and harm data quality.  PFOF § III.H.

589.    Yet Secretary Ross forged ahead with his decision to add a citizenship question despite all the evidence showing that it was unnecessary and would only create negative outcomes and while knowing that those negative outcomes would primarily affect non-citizens and Latinos.

590.    As a result, there can be little doubt that he chose this path "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

591.    Second, as explained above, the Administrative Record shows that the White House and other Trump administration officials pushed Secretary Ross to add a citizenship question, and these individuals were motivated by animus toward immigrants of color and Latinos in particular and not just all immigrants.

592.    As another court recently recognized in granting a preliminary injunction against President Trump's attempt to revoke temporary protected status from individuals from Haiti, Sudan, El Salvador, and Nicaragua, the plaintiffs were likely to succeed on their equal protection claim because the White House influenced this decision and "there is evidence that President Trump harbors an animus against non-white, non-European aliens which influenced" the decision. *Ramos*, 2018 WL 4778285, at *17.

593.    Likewise, the record from trial shows that Secretary Ross and those who influenced him sought to target immigrants of color specifically and not merely immigrants as a whole.  PFOF § VI.A.

## 2.    Defendants' arbitrary targeting of a politically unpopular group cannot pass constitutional muster under any level of scrutiny.

594.    Even if the Court determines that Defendants' animus targets immigrants generally (rather than subgroups based on race, ethnicity, and/or national origin) and thus that less-than-strict scrutiny should apply, the Court's review must still have teeth—particularly when there is no legitimate federal interest relating to immigration and naturalization for the action in question and where the evidence reflects a desire to harm immigrants. *See United States v. Lue*, 134 F.3d 79, 86 (2d Cir. 1998) (explaining that "deference to the federal government" in its treatment of non-citizens is "tied to Congress's express Constitutional authority to regulate the conduct of noncitizens within our borders").

595.    First, the Supreme Court has recognized that "federal power over" non-citizens is not "so plenary that any agent of the National Government may arbitrarily" treat non-citizens differently than citizens.  *Hampton*, 426 U.S. at 101.

596.    As one Court recently explained in citing *Hampton*, "a more searching judicial analysis than mere rational basis and a less searching judicial analysis thank strict scrutiny" may be appropriate the "further the challenged law, regulation,  or policy from the core federal interests in immigration and foreign affairs."  *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 91–92 (D. Me. 2018); *see also Rodriguez-Silva v. I.N.S.*, 242 F.3d 243, 247 (5th Cir. 2001) ("the broad power to control immigration does not imbue Congress with plenary power over aliens themselves.").

597.    Therefore, when "the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest."  *Hampton*, 426 U.S. at 103.

598.     In *Hampton*, the Supreme Court struck down a regulation from the Civil Service

Commission prohibiting the employment of non-citizens in most positions of federal

employment, holding that even if "national interests" could support such a decision, those

interests did not rationally explain the determination by the Civil Service Commission.  *Id.* at

116.

599.     *Hampton* thus established the principle that federal decisions or regulations that

target non-citizens or treat them differently still require a rational link to a legitimate interest of

the decision-maker.

600.     Here, the evidence shows that the VRA enforcement rationale advanced by

Defendants represents a pretext.

601.     Moreover, the fact that the Constitution requires that the Census count all persons

and that Congress use such figures for apportionment, the attempt to enact a policy that would

hinder that ability has no nexus to "core federal interests in immigration and foreign affairs."

*Monga*, 323 F. Supp. 3d at 91–92; *see also Rodriguez-Silva*, 242 F.3d at 247.

602.     And although the Second Circuit "has adopted a stance of minimal scrutiny

respecting federal regulations that contain alienage-based classifications," *United States v.*

*Duggan*, 743 F.2d 59, 76 (2d Cir. 1984), this standard does not prohibit judicial review and

regardless, should not apply here where the issues presents not an actual classification but

instead reflects invidious intent.

603.     Applying less-than-strict scrutiny but conducting an actual review of Defendants'

justifications, even assuming that there was a legitimate need for better citizenship data to

enforce Section 2 of the VRA, Secretary Ross's decision bears no rational relationship to that

interest.

604.    Because the Census Bureau explained that it could better achieve that interest by using administrative records and that adding such a question would harm response rates of non-citizen households as well as the quality of the data itself (and Defendants have presented no arguments to the contrary), the citizenship-question decision lacks a rational basis.

605.    Second, the Supreme Court has paved a now-well-trodden path for striking down governmental action even without heightened scrutiny when that action is "inexplicable by anything but animus." *Romer*, 517 U.S. at 632; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (striking down decision under rational basis review that "rest[s] on an irrational prejudice"); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (citing *Moreno* regarding the Constitution's "guarantee of equality").

606.    Because the decision to add a citizenship question was motivated by a "bare [ ] desire to harm a politically unpopular group," *Moreno*, 413 U.S. at 534, it violates the Fifth Amendment regardless of the level of scrutiny applied.  This line of cases has not depended on the targeting of a group based on a recognized characteristic like race or national origin that requires strict scrutiny—instead, the Supreme Court has struck down laws that target individuals without a legitimate basis based on sexual orientation (*Romer* and *Windsor*), disability (*Cleburne*), and even groups of non-married individuals living together in the same household (*Moreno*).

607.    Indeed, the federal government "cannot subject all aliens or any group of aliens to invidious discrimination." *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1288 (9th Cir. 1993); *Rodriguez-Silva*, 242 F.3d at 247 ("aliens are 'persons' entitled to protection against invidious State action under the Fourteenth Amendment.").

608. Sweeping away the only rationale offered by Defendants as pretext, the record makes it clear that Secretary Ross knew that his decision would negatively affect the ability of the Decennial Census to accurately count noncitizen households. PFOF § III.H.

609. In addition to his knowledge that adding a citizenship question would harm noncitizens, Secretary Ross has previously expressed animus toward immigrants, using the derogatory term "chain migration" to praise Trump Administration immigrant policies and oppose the process of granting status to family members of current immigrants with legal status. PFOF § VI.A; PX-479.

610. Defendants also admit that Secretary Ross discussed adding a citizenship question with the Trump White House and Steve Bannon in particular, and the record makes clear that this helped motivate him to request the question. PFOF § III.A.

611. Yet Secretary Ross was well-aware that President Trump and Steve Bannon had long made statements and enacted policies designed to ostracize immigrants, reduce their numbers, and single them out for disfavored treatment, and that Mr. Kobach shared these same goals. PFOF §§ III.C, VI.A.

612. Taken together, the proffered explanation for adding a citizenship question—VRA enforcement—lacks any credibility, and thus adding it had no rational purpose at all other than the one communicated or implied by the individuals influencing Secretary Ross: a desire to harm a politically unpopular group in violation of the Fifth Amendment. *See Romer*, 517 U.S. at 632 (holding that the decision at issue was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects" and thus "lacks a rational relationship to legitimate state interests").

613.    This intentional discrimination violates the equal protection guarantee embedded in the Due Process Clause of the Fifth Amendment.

## CONCLUSION

614.    The evidence demonstrates that Defendants' decision to add a citizenship question to the census substituted impermissible considerations for reasoned, scientific processes; disregarded mandatory statutory obligations and federal agency requirements; and was motivated by discriminatory animus in violation of the Fifth Amendment.

615.    Plaintiffs respectfully request that this Court vacate and set aside Defendants' decision, enjoin Defendants from adding a citizenship question to the 2020 census, and declare that the decision is arbitrary, capricious, not in accordance with law, and unconstitutional under the Fifth Amendment.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Matthew Colangelo
  *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Danielle Fidler, *Assistant Attorney General*
Sania Khan, *Assistant Attorney General*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Laura Wood, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Steven C. Wu
  *Deputy Solicitor General*
Judith N. Vale
  *Senior Assistant Solicitor General*

Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*


Dale Ho
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*Not admitted in the District of Columbia;
practice limited pursuant to D.C. App. R.
49(c)(3).*

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

136

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs