# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, et al., | | |
| Plaintiffs, | | |
| v. | | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | | |
| Defendants. | | |

| | | |
|---|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | | |
| Plaintiffs, | | |
| v. | | 18-CV-5025 (JMF) (Consolidated Case) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | | |
| Defendants. | | |

## PLAINTIFFS' JOINT PROPOSED POST-TRIAL CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... iv

I. The obligation to conduct a decennial census ..................................................... 1

II. Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the 2020 decennial census. ................................................. 2

    A. This Court may consider all of the evidence at trial, including extra-record evidence, to evaluate Plaintiffs' standing. ............................................... 3

    B. The evidence shows that Plaintiffs have suffered and will suffer concrete injuries-in-fact. ..................................................................................... 3

        1. Injuries from the diversion of resources. .................................... 5

            a. Organizational injuries to NGO Plaintiffs. ................. 5

            b. The Governmental Plaintiffs are injured through the expenditure of resources necessary to mitigate the substantial risk of harm. ........ 8

        2. Loss of privacy ............................................................................. 11

        3. Injuries from degradation of data quality .................................. 14

        4. Injuries from diminished political representation. .................... 17

            a. The addition of a citizenship question will result in a differential undercount ................................................................. 19

            b. Plaintiffs will lose political power as a result of the differential undercount ................................................................. 21

        5. Reductions in federal funding. .................................................. 23

            a. The citizenship question will cause Plaintiffs to directly lose federal funding. ................................................................... 24

            b. The Governmental Plaintiffs will suffer financial harms arising from the addition of a citizenship question. ................................ 25

            c. The NGO Plaintiffs will suffer financial harms arising from the addition of a citizenship question ................................ 27

    C. Traceability and redressability .......................................................... 29

III. Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act ......................................... 31

    A. The scope of judicial review in this case. ......................................... 32

        1. Review on the whole Administrative Record is to be probing and thorough. ...... 32

i

2.  The "whole record" before the agency includes not only the designated Administrative Record, but also evidence that reflects information the Secretary directly or indirectly considered. ........................................................... 33

3.  The Court may consider extra-record evidence that serves as background to explain or clarify scientific or technical subjects requiring specialized knowledge. ................................................................................................................... 39

4.  The Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors. ........................................................ 41

5.  The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext or prejudgment. .................... 44

B.  Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA. ................................................................. 46

1.  The decision to add a citizenship question was counter to the evidence before the agency. .................................................................................................. 47

    a.  Adding a citizenship question will materially lower response rates. ........... 47

    b.  Adding a citizenship question will not provide more accurate, usable, or complete citizenship data. ........................................................................ 51

    c.  The Secretary's decision to choose Option D over Option C is contrary to the evidence before the agency. ................................................................ 53

    d.  Adding a citizenship question to the census is not necessary to enforce the Voting Rights Act, and would instead undermine the goal of fair representation for all communities. ................................................................. 56

    e.  Secretary Ross's decision memo is replete with assertions unsupported by and often contrary to the evidence. ......................................................... 60

2.  Defendants' decision entirely failed to consider important aspects of the problem ........................................................................................................ 63

    a.  The March 26 decision memo failed to address key legal obligations. ....... 63

    b.  The Secretary failed to consider the relevant standard of proof for adding new questions to the census. ............................................................. 65

    c.  The Secretary failed to consider the impact of disclosure avoidance protocols on his decision. ............................................................................ 66

    d.  Defendants bypassed the procedures designed to identify the best means of satisfying DOJ's request. ............................................................ 68

    e.  Defendants failed adequately to consider the need for testing both the citizenship question and the full census questionnaire. ............................... 70

Page

    f.    Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates................... 74

    3.    Defendants' stated rationale was pretextual. ........................................ 75

        a.    The Administrative Record alone confirms that the stated rationale is pretext.................................................................... 76

        b.    Extra-record evidence confirms that the Secretary's given rationale is pretext.................................................................... 82

    4.    The Secretary improperly prejudged the decision to add a citizenship question................................................................................ 84

C.    Defendants' decision to demand citizenship information is not in accordance with law......................................................................... 89

    1.    Section 141(f) of the Census Act. ...................................................... 90

        a.    The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act. ........................ 92

        b.    Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3)............................ 95

    2.    Section 6 of the Census Act. .............................................................. 95

        a.    The Administrative Record is clear that Defendants did not comply with Section 6(c) of the Census Act. .......................... 96

        b.    Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c)................... 98

    3.    OMB standards and Census Bureau guidelines regarding pretesting and burden reduction. ........................................................................... 99

        a.    The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards. ................................. 101

        b.    Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards. ...................... 102

    4.    Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief................................. 102

D.    Remedies for Defendants' APA violation. ....................................... 102

    1.    This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census. ........................... 102

    2.    This Court should should decline to remand to the agency and reject any request to remand without vacatur................................................... 103

    3.    This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census....................... 107

                                                                                          **Page**

4.    Whether this Court vacates the Secretary's decision or issues an injunction,
      any relief will properly apply nationwide. ........................................................... 109

5.    This Court should enter the requested declaratory relief. .................................... 111

IV.   Defendants' decision to add a citizenship question was motivated by discriminatory
      animus. ............................................................................................................................ 111

A.    Plaintiffs have proven that the citizenship-question decision was motivated by
      discriminatory intent through substantial evidence on each of the *Arlington
      Heights* factors. ......................................................................................................... 111

1.    The addition of a citizenship question will disparately impact Latinos and
      immigrants of color. .............................................................................................. 112

2.    Historical background of the decision. ............................................................... 114

3.    Irregular procedural sequence. ........................................................................... 115

4.    Substantive departures from past practice. ....................................................... 119

5.    Contemporary statements by decisionmakers and those influencing them. ....... 120

B.    The pretextual nature of the decision also supports a finding of discriminatory
      intent. ........................................................................................................................... 122

C.    Plaintiffs proved intentional discrimination based on race and national origin,
      but even if Defendants discriminated against immigrants generally, such
      discrimination would violate the Fifth Amendment. .......................................... 127

1.    Defendants' citizenship question decision seeks to diminish political power and
      harms groups based on race, rthnicity, and national origin. ............................... 128

2.    Defendants' arbitrary targeting of a politically unpopular group cannot pass
      constitutional muster under any level of scrutiny ............................................... 131

Conclusion .................................................................................................................................135

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*ACEMLA v. Copyright Royalty Tribunal*,
  763 F.2d 101 (2d Cir. 1985)............................................................................94

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
  699 F.2d 1209 (D.C. Cir. 1983).......................................................................55

*Air India v. Brien*,
  No. 00-cv-1707, 2002 WL 34923740 (E.D.N.Y. Feb. 14, 2002) .........................................103

*Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011)....................................................................84, 85

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  2018 WL 5316129 (9th Cir. Oct. 25, 2018)........................................................103, 105

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993).....................................................................105, 106

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)....................................................................103, 106

*Am. Littoral Soc'y v. U.S. Envtl. Prot. Region*,
  199 F. Supp. 2d 217 (D. N.J. 2002) ....................................................................3

*Am. Petroleum Inst. v. EPA*,
  787 F.2d 965 (5th Cir. 1986) .........................................................................101

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017).........................................................................66

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008).........................................................................41

*Animal Defense Council v. Hodel*,
  840 F.2d 1432 (9th Cir. 1988) .........................................................................39

*Asarco, Inc. v. United States E.P.A.*,
  616 F.2d 1153 (9th Cir. 1980) ...............................................................39, 42, 43

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
  412 U.S. 800 (1973)....................................................................................41

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.*,
  818 F.3d 493 (9th Cir. 2016) .........................................................................122

**Cases**  **Page(s)**

*Bank of Am. Corp. v. City of Miami, Fla.*,
137 S. Ct. 1296 (2017) .................................................................................5

*Bar MK Ranches v. Yuetter*,
994 F.2d 735 (10th Cir. 1993) ....................................................................33

*Barnett v. City of Chicago*,
141 F.3d 699 (7th Cir. 1998) ......................................................................58

*Batalla Vidal v. Duke*,
295 F. Supp. 3d 127 (E.D.N.Y. 2017) ........................................................31

*Batalla Vidal v. Nielsen*,
291 F. Supp. 3d 260 (E.D.N.Y. 2018) ..............................................19, 120, 122

*Bauer v. DeVos*,
325 F. Supp. 3d 74 (D.D.C. 2018) ...............................................................2

*Bellevue Hosp. Ctr. v. Leavitt*,
443 F.3d 163 (2d Cir. 2006)........................................................................55

*Benavidez v. Irving Indep. Sch. Dist.*,
690 F. Supp. 2d 451 (N.D. Tex. 2010) ......................................................125

*Benavidez v. Irving Indep. Sch. Dist.*,
No. 3:13–CV–0087–D, 2014 WL 4055366 (N.D. Tex. 2014) .............................125

*Bennett v. Spear*,
520 U.S. 154 ..........................................................................................3, 29

*Beta Analytics Int'l, Inc. v. United States*,
61 Fed. Cl. 223 (2004) ...............................................................................44

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)..........................................................................2

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
290 F.R.D. 409 (S.D.N.Y. 2012) .............................................................5, 17

*Buffalo Cent. Terminal v. United States*,
886 F. Supp. 1031 (W.D.N.Y.1995)............................................................39

*Bunyard v. Hodel*,
702 F. Supp. 820 (D. Nev. 1988) ...............................................................101

*Camp v. Pitts*,
411 U.S. 138 (1973)...................................................................................103

**Cases**                                                                                 **Page(s)**

*Carey v. Klutznick,*
    508 F. Supp. 420 (S.D.N.Y. 1980) ................................................................. 40

*Carey v. Klutznick,*
    637 F.2d 834 (2d Cir. 1980) ................................................................. passim

*Carey v. Klutznick,*
    653 F.2d 732 (2d Cir. 1981) ................................................................. 12

*Casa de Maryland v. U.S. Dep't of Homeland Sec.,*
    284 F. Supp. 3d 758 (D. Md. 2018) ......................................................... 19

*Central United Life, Inc. v. Burwell,*
    128 F. Supp. 3d 321 (D.D.C. 2015) ......................................................... 107

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ......................................................... 2, 5, 30

*Centro Presente v. U.S. Dept. of Homeland Sec.,*
    No. CV 18-10340, 2018 WL 3543535 (D. Mass. July 23, 2018) ..................... 120

*Chemical Mfrs. Ass'n v. EPA,*
    28 F.3d 1259 (D.C. Cir. 1994) ......................................................... 104

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016) ......................................................... 29

*Choice Care Health Plan, Inc. v. Azar,*
    315 F. Supp. 3d 440 (D.D.C. 2018) ......................................................... 61

*Citizens to Pres. Overton Park v. Volpe,*
    401 U.S. 402 (1971) ......................................................... 32, 41, 45

*City & County of San Francisco v. Sessions,*
    No. 17-cv-04642-WHO, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018) ............... 50

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ......................................................... 111

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) ......................................................... 133

*City of Detroit v. Franklin,*
    4 F.3d 1367 (6th Cir. 1993) ......................................................... 23

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.,*
    923 F.2d 188 (D.C. Cir. 1991) ......................................................... 48

**Cases**                                                                 **Page(s)**

*City of Los Angeles v. Sessions,*
   293 F. Supp. 3d 1087 (C.D. Cal. 2018) ..................................................49

*City of New York v. U.S. Dep't of Commerce,*
   713 F. Supp. 48 (E.D.N.Y. 1989) ......................................................18

*City of New York v. U.S. Dep't of Commerce,*
   822 F. Supp. 906 (E.D.N.Y. 1993) ....................................................40

*City of Phila. v. Sessions,*
   280 F. Supp. 3d 579 (E.D. Pa. 2018) ................................................50

*City of Philadelphia v. Klutznick,*
   503 F. Supp. 663 (E.D. Pa. 1980) ....................................................23

*City of Willacoochee, Ga. v. Baldrige,*
   556 F. Supp. 551 (S.D. Ga. 1983) ....................................................23

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..............................................................4, 8, 11

*Clean Air Council v. Pruitt,*
   862 F.3d 1 (D.C. Cir. 2017) ..........................................................103

*Connecticut v. Daley,*
   53 F. Supp. 2d 147 (D. Conn. 1999) ................................................35

*Crawford v. Bd. of Educ.,*
   458 U.S. 527 (1982) ....................................................................112

*Crown Cork & Seal Co. v. NLRB,*
   36 F.3d 1130 (D.C Cir. 1994) ........................................................104

*Ctr. for Biological Diversity v. Zinke,*
   900 F.3d 1053 (9th Cir. 2018) ........................................................66

*Ctr. for Food Safety v. Price,*
   No. 17-cv-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ..........................14, 17

*Cuomo v. Baldrige,*
   674 F. Supp. 1089 (S.D.N.Y. 1987) ..................................................40

*Davis v. Mineta,*
   302 F.3d 1104 (10th Cir. 2002) ....................................................86, 88

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA,*
   785 F.3d 1 (D.C. Cir. 2015) ........................................................55, 57

**Cases**          **Page(s)**

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ................................................................. 11

*Dep't of Agriculture v. Moreno,*
   413 U.S. 528 (1973) ..................................................... 127, 128, 133

*Dopico v. Goldschmidt,*
   687 F.2d 644 (2d Cir. 1982) ............................................ 33, 35, 37

*EEOC v. Ethan Allen,*
   44 F.3d 116 (2d Cir. 1994) ................................................................. 81

*Engine Mfrs. Ass'n v. EPA,*
   20 F.3d 1177 (D.C. Cir. 1994) ......................................................... 106

*Evenwel v. Abbott,*
   136 S. Ct. 1120 (2016) ......................................................................... 1

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................ 32

*FEC v. Akins,*
   524 U.S. 11 (1998) ....................................................................... 14, 17

*Fed'n for Am. Immigration Reform v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980) ........................................ 1, 114, 119

*Fertilizer Inst. v. EPA,*
   935 F.2d 1303 (D.C. Cir. 1991) ....................................................... 106

*Florida v. United States,*
   885 F. Supp. 2d 299 (D.D.C. 2012) ................................................ 123

*Friedman v. U.S. Postal Serv.,*
   No. 08-cv-00913, 2011 WL 3267713 (D. Conn. July 28, 2011) .......... 11, 14

*Glavin v. Clinton,*
   19 F. Supp. 2d 543 (E.D. Va. 1998) ........................................... 18, 23

*Gorzynski v. JetBlue Airways Corp.,*
   596 F.3d 93 (2d Cir. 2010) .............................................................. 129

*Guglielmi v. Northwestern Mut. Life Ins. Co.,*
   No. 06-cv-3431, 2007 WL 1975480 (S.D.N.Y. July 6, 2007) .............. 35

*Hampton v. Mow Sun Wong,*
   426 U.S. 88 (1976) ..................................................... 127, 128, 131

**Cases**                                                                    **Page(s)**

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) ...................................................................... 110

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .............................................................................. 2, 5, 15, 17

*Hooper v. Nat'l Transp. Safety Bd.,*
    841 F.2d 1150 (D.C. Cir. 1988) ...................................................................... 68

*Humane Soc'y of United States v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) ........................................................................ 66

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ......................................................................................... 2

*Inforeliance Corp. v. United States,*
    118 Fed. Cl. 744 (2014) ................................................................................. 86

*Innovative Health Sys., Inc. v. City of White Plains,*
    117 F.3d 37 (2d Cir. 1997) ............................................................................ 117

*INS v. Yueh-Shaio Yang,*
    519 U.S. 26 (1996) ......................................................................................... 40

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ........................................................................ 54

*Int'l Resource Recovery, Inc. v. United States,*
    61 Fed. Cl. 38 (2004) ...................................................................................... 44

*Int'l Snowmobile Mfrs. Ass'n v. Norton,*
    340 F. Supp. 2d 1249 (D. Wyo. 2004) ............................................................ 84

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,*
    920 F.2d 960 (D.C. Cir. 1990) ....................................................................... 101

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    626 F.3d 84 (D.C. Cir. 2010) .......................................................................... 51

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.,*
    482 F.3d 79 (2d Cir. 2006) ........................................................................ 47, 53

*Karcher v. Daggett,*
    462 U.S. 725 (1983) ....................................................................................... 17

*Katzenbach v. Morgan,*
    384 U.S. 641 (1966) ....................................................................................... 58

**Cases**                                                                                    **Page(s)**

*Kern v. U.S. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002) ..........................................................................53

*Kuang v. U.S. Dep't of Defense*,
    No. 18-cv-3698-JST, 2018 WL 6025611 (N.D. Cal. Nov. 16, 2018).....................56

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
    91 Fed. Cl. 347 (2010) ......................................................................................44

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
    98 Fed. Cl. 45 (2011) ...................................................................................43, 44

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002)................................................................................3

*Lam v. Univ. of Hawaii*,
    40 F.3d 1551 (9th Cir. 1994) ...........................................................................126

*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ...........................................................................38

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*,
    19 F.3d 1342 (11th Cir. 1994) ......................................................................74, 85

*League of United Latin Am. Citizens v. Wheeler*,
    899 F.3d 814 (9th Cir. 2018) .............................................................................99

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).........................................................................94, 105

*Leibovitz v. N.Y. City Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001)...............................................................................12

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983)............................................................................................12

*Luciano v. Olsten Corp.*,
    110 F.3d 210 (2d Cir. 1997)..............................................................................119

*LULAC v. Perry*,
    548 U.S. 399 (2006)..........................................................................................56

*Mathews v. Diaz*,
    426 U.S. 67 (1976)...........................................................................................124

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
    375 F.3d 1182 (D.C. Cir. 2004)..........................................................................51

**Cases**                                                                      **Page(s)**

*McNabola v. Chicago Transit Auth.,*
    10 F.3d 501 (7th Cir. 1993) ...................................................................120

*Mhany Management, Inc. v. Cty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016).........................................................109, 119

*Monga v. Nat'l Endowment for the Arts,*
    323 F. Supp. 3d 75 (D. Me. 2018) ..............................................128, 129

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)...................................................................................104

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).......................................................................... passim

*N. Mariana Islands v. United States,*
    686 F.2d 7 (D.D.C. 2009) .........................................................................72

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.,*
    684 F.3d 286 (2d Cir. 2011).......................................................................30

*N.Y. Pub. Interest Research Grp. v. Whitman,*
    321 F.3d 316 (2d Cir. 2003).........................................................................3

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.,*
    798 F.3d 125 (2d Cir. 2015).......................................................................21

*NAACP v. Trump,*
    315 F. Supp. 3d 457 (D.D.C. 2018) .......................................................107

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.,*
    55 F. Supp. 3d 316 (E.D.N.Y. 2014) .......................................................48

*Nat'l Audubon Soc'y v. Hoffman,*
    132 F.3d 7 (2d Cir. 1997) ..................................................39, 41, 42, 44

*Nat'l Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006).................................................................60

*Nat'l Mining Ass'n v. Jackson,*
    856 F. Supp. 2d 150 (D.D.C. 2012) .......................................................39

*Nat'l Wildlife Fed'n v. Espy,*
    45 F.3d 1337 (9th Cir. 1995) .................................................................104

*Nat. Res. Def. Council v. EPA,*
    658 F.3d 200 (2d Cir. 2011).....................................................................32

**Cases**     **Page(s)**

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.,*
   894 F.3d 95 (2d Cir. 2018)..................................................................... passim

*Negron v. City of Miami Beach,*
   113 F.3d 1563 (11th Cir. 1997) .............................................................58

*New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n,*
   727 F.2d 1127 (D.C. Cir. 1984) ............................................................57

*New York State Bar Ass'n v. Fed. Trade Comm'n,*
   276 F. Supp. 2d 110 (D.D.C. 2003) ......................................................73

*New York v. Salazar,*
   701 F. Supp. 2d 224 (N.D.N.Y. 2010) .....................................79, 80, 85

*New York v. U.S. Dep't of Commerce,*
   315 F. Supp. 3d 766 (S.D.N.Y. 2018)..............................................91, 101

*New York v. U.S. Dep't of Commerce,*
   No. 18-cv-2921, 2018 WL 4539659 (S.D.N.Y. Sept. 21, 2018) ..............75, 76, 109

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011)...................................................................5

*North Carolina v. EPA,*
   550 F.3d 1176 (D.C. Cir. 2008) ..........................................................105

*NRDC v. EPA,*
   489 F.3d 1250 (D.C. Cir. 2007) ...................................................103, 105

*NRDC v. Train,*
   519 F.2d 287 (D.C. Cir. 1975) .............................................................36

*Oceana, Inc. v. Pritzker,*
   126 F. Supp. 3d 110 (D.D.C. 2015) ......................................................42

*Orange Lake Assocs., Inc. v. Kirkpatrick,*
   21 F.3d 1214 (2d Cir. 1994).................................................................129

*Padula v. Webster,*
   822 F.2d 97 (D.C. Cir. 1987) ..............................................................101

*Patino v. City of Pasadena,*
   230 F. Supp. 3d 667 (S.D. Tex. 2017) .................................................125

*Pearl River Union Free Sch. Dist. v. King,*
   214 F. Supp. 3d 241 (S.D.N.Y. 2016)...................................................101

**Cases**                                                                  **Page(s)**

*Personnel Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979).................................................................................130

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.,*
   No. 18-cv-5680 (NRB), 2018 WL 4168977 (S.D.N.Y. Aug. 30, 2018).......................107, 109

*Pleune v. Pierce,*
   765 F. Supp. 43 (E.D.N.Y. 1991) ...........................................................101

*PLMRS Narrowband Corp. v. F.C.C.,*
   182 F.3d 995 (D.C. Cir. 1999)...............................................................85

*Plyler v. Doe,*
   457 U.S. 202 (1982)...........................................................................127

*Pollinator Stewardship Council v. EPA,*
   806 F.3d 520 (9th Cir. 2015) .........................................................104, 106

*Porrazzo v. Bumble Bee Foods, LLC,*
   822 F. Supp. 2d 406 (S.D.N.Y. 2011)......................................................98

*Portland Audubon Soc'y v. Endangered Species Committee,*
   984 F.2d 1534 (9th Cir. 1993) .............................................................33

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004).................................................................68

*Pub. Citizen, Inc. v. Mineta,*
   340 F.3d 39 (2d Cir. 2003)....................................................................54

*Pub. Citizen v. Heckler,*
   653 F. Supp. 1229 (D.D.C. 1986) .........................................................80

*Pub. Citizen v. U.S. Dep't of Justice,*
   491 U.S. 440 (1989).......................................................................14, 17

*Ragin v. Harry Macklowe Real Est. Co.,*
   6 F.3d 898 (2d Cir. 1993) ..................................................................4, 5

*Ramos v. Nielsen,*
   No. 18-cv-1554, 2018 WL 4778285 (N.D. Cal. Oct. 3, 2018) ..............49, 120, 122, 130

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000)...........................................................................81

*Remijas v. Neiman Marcus Group, LLC,*
   794 F.3d 688 (7th Cir. 2015) .............................................................9, 11

**Cases** **Page(s)**

*Reyes v. City of Farmers Branch*,
    586 F.3d 1019 (5th Cir. 2009) ................................................................57

*Rioux v. City of Atlanta, Ga.*,
    520 F.3d 1269 (11th Cir. 2008) ...........................................................120

*Rodriguez v. Harris Cty.*,
    964 F. Supp. 2d 686 (S.D. Tex. 2013) .................................................12

*Rodriguez-Silva v. I.N.S.*,
    242 F.3d 243 (5th Cir. 2001) ...........................................128, 129, 130

*Romer v. Evans*,
    517 U.S. 620 (1996)........................................................125, 130, 131

*Romero v. City of Pomona*,
    665 F. Supp. 853 (C.D. Cal. 1987) ......................................................57

*Rosen v. Thornburgh*,
    928 F.2d 528 (2d Cir. 1991)..............................................................109

*Ross v. AXA Equitable Life Ins. Co.*,
    115 F. Supp. 3d 424 (S.D.N.Y. 2015).................................................12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..................................................................30

*Sackin v. TransPerfect Glob., Inc.*,
    278 F. Supp. 3d 739 (S.D.N.Y. 2017)............................................9, 11

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016)..................................................................98

*San Luis & Delta-Mendota Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) ..............................................................39

*Secretary of Labor v. Cranesville Aggregate Cos.*,
    878 F.3d 25 (2d Cir. 2017)..................................................................99

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*,
    769 F.3d 1184 (D.C. Cir. 2014)..........................................................70

*Sierra Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) ...........................................................37

*Sierra Club v. Leavitt*,
    355 F. Supp. 2d 544 (D.D.C. 2005) ...................................................98

**Cases**                                                                    **Page(s)**

*Soberal-Perez v. Heckler,*
717 F.2d 36 (2d Cir. 1983) ................................................................... 125

*Sokaogon Chippewa Cmty. v. Babbitt,*
961 F. Supp. 1276 (W.D. Wis. 1997) ............................................... 43, 87

*Spokeo, Inc. v. Robins,*
136 S. Ct. 1540 (2016) ............................................................................ 2

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard,*
85 F. Supp. 3d 197 (D.D.C. 2015) ......................................................... 68

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) ............................................................................ 119

*State of Connecticut v. U.S. Dep't of Commerce,*
No. 3:04-cv-1271, 2007 WL 2349894 (D. Conn. Aug. 15, 2007) ........... 66

*State of Tex. v. Mosbacher,*
783 F. Supp. 308 (S.D. Tex. 1992) .................................................. 18, 24

*Stewart v. Azar,*
313 F. Supp. 3d 237 (D.D.C. 2018) ....................................................... 70

*Stratton v. Dep't for the Aging for City of New York,*
132 F.3d 869 (2d Cir. 1997) .................................................................. 79

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ................................................................................ 2

*Susan B. Anthony List v. Driehaus,*
134 S. Ct. 2334 (2014) ............................................................................ 3

*Sztorc v. Prudential Ins. Co. of America,*
No. 05-cv-0222, 2007 WL 521278 (W.D.N.Y. Feb. 12, 2007) ............... 34

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015) ............................................................... 107

*Thornburg v. Gingles,*
478 U.S. 30 (1986) ................................................................................ 55

*Tovar v. U.S. Postal Serv.,*
3 F.3d 1271 (9th Cir. 1993) ................................................................. 130

*Tummino v. Torti,*
603 F. Supp. 2d 519 (E.D.N.Y. 2009) ........................................... passim

**Cases**                                                                    **Page(s)**

*Tummino v. von Eschenbach*,
    427 F. Supp. 2d 212 (E.D.N.Y. 2006) ........................................................... passim

*U.S. Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) .................................................................................18, 19, 40

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ....................................................................................................2

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ...................................................................................41

*United States v. Duggan*,
    743 F.2d 59 (2d Cir. 1984) ....................................................................................129

*United States v. Lue*,
    134 F.3d 79 (2d Cir. 1998) ....................................................................................128

*United States v. Windsor*,
    570 U.S. 744 (2013) ...............................................................................................130

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d Cir. 1987) .................................................................................109

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) ...............................................................................35

*Utah v. Evans*,
    536 U.S. 452 (2002) .................................................................................................15

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .................................................................................113

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................................109, 111

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984) .................................................................................37

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) ...........................................................................47

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .....................................................................................................17

*Wisconsin v. City of New York*,
    517 U.S. 1 (1996) ...........................................................................................1, 15, 89

xvii

**Cases**                                                                 **Page(s)**

*Wong Yang Sung v. McGrath*,
   339 U.S. 33 (1950)...................................................................................33

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
   18 F.3d 854 (10th Cir. 1994) ..............................................................74

*XP Vehicles, Inc. v. Dep't of Energy*,
   118 F. Supp. 3d 38 (D.D.C. 2015) .....................................................74

**Constitutional Provisions**

U.S. Const. Amend. XIV § 2 ................................................................1, 73, 125

U.S. Const. art. I, § 2, cl. 3..................................................................1, 73, 125

**Federal Statutes and Congressional Authorities**

Pub. L. No. 94-521, 90 Stat. 2459 (1976)..................................................88, 93

Pub. L. No. 105-119, 111 Stat. 2440 (1997)....................................................1

5 U.S.C.
   § 553.......................................................................................................42
   § 554.......................................................................................................42
   § 706............................................................................................... passim

13 U.S.C.
   § 4...........................................................................................................1
   § 6....................................................................................................93, 94
   § 9..........................................................................................12, 13, 63
   § 141.....................................................................................16, 87, 88

42 U.S.C. § 7607 ............................................................................................102

44 U.S.C.
   § 3501.....................................................................................................96
   § 3504.....................................................................................................96

H. Rep. No. 94-944 (1976) .......................................................................88, 93

S. Rep. No. 94-1256 (1976) .....................................................................88, 93

**Rules**

Fed. R. Evid. 201 ...........................................................................................14

**Miscellaneous Authorities**                                                    **Page(s)**

Administrative Conference of the United States Recommendation 2013-4: The
   Administrative Record in Informal Rulemaking, 78 Fed. Reg. 41,352 ...................................34

*Administrative Records Offset Declining Census Survey Responses: Survey
   Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at
   https://census.gov/library/stories/2018/11/administrative-records-offset-
   declining-census-survey-response.html ..............................................................................95

*ICE Out of Courts*, Immigrant Defense Project.............................................................14

John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious
   Operation*, NPR (Sept. 20, 2017)..................................................................................14

*Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the
   Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil
   Serv.*, 94th Cong. 25 (1976).........................................................................................88

National Commission on the Voting Rights Act, Protecting Minority Voters: The
   Voting Rights Act at Work, 1982-2005, https://lawyerscommittee.org/wp-
   content/uploads/2015/07/0023.pdf (2006)....................................................................57

Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—
   Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006).............................97

Ray Sanchez, *ICE arrests undocumented father taking daughter to California
   school*, CNN (Mar. 3, 2017) ........................................................................................14

Richard McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings,
   Discovery, and Additional Factfinding During Judicial Review of Informal
   Agency Action*, 1982, Duke L. J. 333, 348-50 (1982).........................................34, 39

## PROPOSED CONCLUSIONS OF LAW

**I.      The obligation to conduct a decennial census.**

1.      The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State."  U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.

2.      All residents must be counted, regardless of citizenship status.  *See Fed'n for Am. Immigration Reform v. Klutznick* ("*FAIR*"), 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

3.      The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs."  Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

4.      The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts.  *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).

5.      Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau.  13 U.S.C. § 4.

6.      Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law.  Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

II.     **Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the 2020 decennial census.**

7.      To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

8.      The standing inquiry is satisfied so long as a single plaintiff establishes standing, including in a consolidated case. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 90-91 (D.D.C. 2018) (consolidated case).

9.      Organizations can establish standing in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), or "associational standing" on behalf of their members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

10.     An organization has associational standing to sue if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006). The third prong is a prudential requirement only. *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996).

11.     Where, as here, a plaintiff "seeks civil penalties and injunctive relief only, not money damages, its claims do not require 'individualized proof.'" *Bldg. & Constr. Trades Council*, 448 F.3d at 150. Moreover, even the participation "of a limited number of individual

2

members" will not negate standing if the claims and relief do not "make the individual

participation of each injured party indispensable to proper resolution of the cause."  *N.Y. State*

*Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 130–31 (2d Cir. 2015) (citation and

internal quotation marks omitted).

12.     The NGO Plaintiffs and the Governmental Plaintiffs both have standing in this

case because they have suffered several different types of injuries-in-fact that are fairly traceable

to Defendants' decision to add a citizenship question to the census, and these injuries will

redressed if Defendants' decision is vacated or enjoined.

**A.     This Court may consider all of the evidence at trial, including extra-record
         evidence, to evaluate Plaintiffs' standing.**

13.     Defendants concede that the Court can consider evidence outside the

Administrative Record to evaluate standing in this case.  Trial Tr. 1421–22.

14.     Courts adjudicating APA challenges can and do consider extra-record evidence

for standing purposes.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167-68 (because "each element

of Article III standing 'must be supported . . . with the manner and degree of evidence required at

the successive stages of the litigation,'" a plaintiff "must ultimately support any contested facts

with evidence adduced at trial") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992));

*see also Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*, 199 F. Supp. 2d 217, 228 & n.3

(D. N.J. 2002) (considering plaintiffs' extra-record evidence in support of standing in an APA

case because "they go to the issue of the Court's jurisdiction").

**B.     The evidence shows that Plaintiffs have suffered and will suffer concrete
         injuries-in-fact.**

15.     Allegations of a "future injury" qualify "if the threatened injury is 'certainly

impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v.*

3

*Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

16.     The injury-in-fact required to establish standing "need not be large, an identifiable trifle will suffice." *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (quoting *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996)); *see also N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (holding that *Havens* required only a "perceptible impairment" of an organization's mission to create standing).

17.     The possibility that Defendants may take undefined future steps (some of which are hypothetical, not planned) to try to mitigate harms caused by the addition of a citizenship question, *see* Trial Tr. 1424-25, does not undermine the showing of injury-in-fact described in Parts II.B.1 to II.B.5 below.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (concluding that plaintiffs established injury-in-fact based on expected effects of the use of sampling in the 2000 census because "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issue presented here, because such a pause would result in extreme – possibly irremediable – hardship"); *see also* Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481 ("Congress finds that . . . the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.").

18.     The evidence establishes that Plaintiffs will be injured in numerous different and independent ways from the addition of a citizenship question to the census, including through:

(1) diversion of resources; (2) loss of privacy; (3) harms to data accuracy and quality; (4) diminished political representation; and (5) reductions in federal funding.

### 1. Injuries from the diversion of resources.

#### a. Organizational injuries to NGO Plaintiffs.

19.   The Supreme Court and the Second Circuit have both recently affirmed that "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Comunidad Hispana*, 868 F.3d at 111 (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017), and *Havens*, 455 U.S. at 379).

20.   To demonstrate such an injury, a plaintiff need only show a "'perceptible impairment' of an organization's activities." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin*, 6 F.3d at 905).   In *Nnebe*, the Second Circuit held that a taxi driver advocacy group had a sufficient injury for organizational standing "[e]ven if only a few suspended drivers are counseled by [the group] in a year" as a result of the challenged policy, because there was "some perceptible opportunity cost expended." *Id.* at 156–57.

21.   A "nonprofit organization establishes an injury-in-fact if . . . it establishes that it 'spent money to combat' activity that harms its organization's core activities." *City of Miami*, 137 S. Ct. at 1303 (citing *Havens*, 455 U.S. at 379).

22.   The NGO Plaintiffs have standing because they have diverted "resources that could be spent on other activities," and the addition of a citizenship question harms their organizational missions.   *Nnebe*, 644 F.3d at 157; *see also Comunidad Hispana*, 868 F.3d at 111 (organizational standing is established when resources are diverted); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012) (Second Circuit requires only "'scant' evidence of 'only a perceptible impairment of an organization's activities'").

23.     Plaintiffs presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, NGO Plaintiffs will expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.  This evidence is uncontroverted by Defendants.

24.     Each NGO Plaintiff – the New York Immigration Coalition ("NYIC"), Make the Road New York ("MRNY"), the American-Arab Anti-Discrimination Committee ("ADC") and the ADC Research Institute ("ADCRI"), and CASA de Maryland ("CASA") – has suffered harm as a result of being required to divert resources from other organizational priorities and spend more money to address the effects of the fear created by a citizenship question among community members who are less likely to respond to the census.  *See* Plum Aff. (Docket No. 498-19) ¶¶ 12-23; Choi Aff. (Docket No. 489-1) ¶¶ 14-22; Altschuler Aff. (Docket No. 503-1) ¶¶ 7-11, 21; Khalaf Aff. (Docket No. 498-16) ¶¶ 15-29; Escobar Aff. (Docket No. 498-3) ¶¶ 15-29.

25.     The NGO Plaintiffs have also established that their organizational missions – all of which include promoting engagement in and representation of immigrant communities of color – will be impaired as a result of a citizenship question.  *See* Plum Aff. ¶¶ 10-13,23; Choi Aff. ¶¶ 3-9, 14-15; Altschuler Aff. ¶¶ 3,11-22; Khalaf Aff. ¶¶ 13-16; Escobar Aff. ¶¶ 15, 20-25.

26.     The trial record establishes that Plaintiff NYIC has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.1.  For example, NYIC demonstrated that because of the heightened fear and suspicion created by the addition of a citizenship question, they have expanded plans for census-related services, programming, and support to try

6

to reduce the negative effect of this question on the response rate among noncitizens.  Choi Aff. ¶¶ 17-22; Plum Aff. ¶ 14.  Because of these increased expenditures and time commitments, NYIC has shown it will need to divert resources from other mission-critical areas, including health care, language access, and employment issues.  Plum Aff. ¶ 23.

27.     The trial record establishes that Plaintiff MRNY has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.2.  For example,

     a.     MRNY demonstrated that because of the heightened fear and suspicion created by the citizenship question, they have expanded plans for census-related services, programming, and support to try to reduce the negative effect of this question on the response rate among noncitizens.  Altschuler Aff. ¶¶ 13, 19.

     b.     At least six MRNY members expressed unwillingness or reluctance to respond to the 2020 census because of the citizenship question.  *Id.* ¶¶ 14-17.

     c.     Because of the need to increase the time and money spent on Census outreach due to the addition of a citizenship question, MRNY has diverted and will continue to divert resources from other areas critical to its mission including civic engagement and providing legal services.  *Id.* ¶ 21.

28.     The trial record establishes that Plaintiffs ADC and ADCRI have suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.3.  For example,

     a.     ADC and ADCRI demonstrated that because of the heightened fear and suspicion created by the citizenship question, they have expanded plans for census-related services, programming, and support to try to reduce the negative effect of this

question on the response rate in the Arab-American community.  Khalaf Aff. ¶¶ 23-28.

  b.  Because of these increased expenditures and time commitments, ADC and ADCRI have shown they will need to divert resources from other mission-critical priorities including organizing, issue advocacy efforts, and educational initiatives. *Id.* ¶ 29.

29.  The trial record establishes that Plaintiff CASA has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.4.  For example, CASA has conducted additional outreach because of the tremendous level of fear and greater unwillingness of its constituents to respond to the census due to the citizenship question in the context of other policies from the Trump Administration targeting them.  Escobar Aff. ¶¶ 16-27.

  **b.  The Governmental Plaintiffs are injured through the expenditure of resources necessary to mitigate the substantial risk of harm.**

30.  The Governmental Plaintiffs similarly presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, they have expended and will continue to expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.

31.  These expenditures constitute a direct injury to the budgets and resources of the Governmental Plaintiffs that is sufficient to establish injury-in-fact for standing purposes.  *See, e.g.*, *Clapper*, 568 U.S. at 414 n.5 (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 746-47 (S.D.N.Y. 2017) (where harm is sufficiently imminent, "a plaintiff's expenses in

taking reasonable measures to prevent the harm's fruition also may be viewed as an injury-in-fact"); *see also Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015).

32.     The Governmental Plaintiffs have demonstrated that they have expended or will expend additional resources to mitigate the adverse effects of the citizenship question on response rates.  This evidence – all of which is uncontroverted by Defendants – establishes that several of the Governmental Plaintiffs have or intend to devote substantial resources and personnel to respond to the impacts of the citizenship question. PFOF § X.B.

33.     For example, in stark contrast to past decennial censuses, New York City has dramatically expanded its efforts to encourage its residents to participate in the 2020 census. Trial Tr. 317-21.  Dr. Salvo – who serves as the Director of the Population Division at the New York City Department of City Planning – testified that because of reluctance in some communities to fill out the census because of the citizenship question, the City has taken concrete steps to encourage participation.  Trial Tr. 319, 430.  These efforts include the creation of a specially-designated census office, including at least fifteen staff members, who will help to encourage participation in the census.  *Id.*  These outreach efforts, and concomitant expenditures of time and resources, substantially exceed those of past censuses.  *Id.*; *see also id.* at 359-61, 430-31.

34.     Plaintiffs offered undisputed evidence that after Defendants announced their plans to add a citizenship question to the 2020 census, and in response to that decision, New York City increased its budget for census outreach efforts by approximately $1.2 million dollars.  Trial Tr. 427, 429.

35.     Likewise, because of the citizenship question, the City of Chicago anticipates the need to allocate additional resources and staff to encourage Chicagoans to participate in the 2020

census.  Rodriguez Aff. (Docket No. 488-1) ¶¶ 7, 10, 12, 13.  A recently-introduced City Council resolution specifically designates funds for specialized outreach to immigrant communities in light of the citizenship question.  *See id*. ¶ 12; Garcia Aff. (Docket No. 498-9) ¶¶ 14-15 (discussing efforts to allocate additional resources to countermand the impact of the citizenship question on immigrant communities); PX-243 (Cook County resolution to "Establish an Emergency Fund to Address the Citizenship Question in the 2020 Census"); PX-246 (Chicago City Council resolution to establish a $500,000 "emergency fund to address citizenship question in 2020 census" in order to "conduct specialized outreach to immigrant communities in the City of Chicago").

36.     In light of the Census Bureau's own recognition that the addition of a citizenship question will depress self-response rates among Hispanic and immigrant communities, the Governmental Plaintiffs reasonably seek to mitigate the anticipated harm stemming from those depressed response rates.  Such expenditures constitute direct, significant, and concrete injury to the Governmental Plaintiffs.

37.     There is no dispute that, as Dr. Abowd testified, the current macro environment has created "significant barriers associated with self-response that may plausibly and credibly be related to the citizenship question."  Trial Tr. 1123; *see also* PX-158 (AR); PX-160; PX-161; PX-162; PX-448; PX-662.  These barriers make outreach more difficult for both the NGO Plaintiffs and the Governmental Plaintiffs, requiring Plaintiffs to spend their own money and resources to address the negative effects of the citizenship question.  Census Bureau 30(b)(6) Dep. (Docket No. 502-2) at 453, 462; Trial Tr. 1122.

38.     Because Plaintiffs have diverted resources from other priorities and spent their own money to counteract the expected decline in self-response caused by addition of a

citizenship question, they have demonstrated sufficient injury-in-fact to establish standing.  *E.g.*,

*Remijas*, 794 F.3d at 694; *Sackin*, 278 F. Supp. 3d at 746-47.

> **2.    Loss of privacy.**

39.    Defendants' sole justification for adding a citizenship question – to provide DOJ

with census block data about citizenship of residents – also injures NGO Plaintiffs' members by

invading their right to privacy.

40.    "[A]esthetic, emotional or psychological harms . . . suffice for standing purposes."

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006); *see also Leibovitz v. N.Y. City*

*Transit Auth.*, 252 F.3d 179, 184-85 (2d Cir. 2001).

41.    To satisfy the injury-in-fact requirement for standing purposes, Plaintiffs must

establish that the emotional or psychological harm is significant enough to constitute injury, and

is more than mere "personal sense of embarrassment."  *Friedman v. U.S. Postal Serv.*, No. 08-

cv-00913, 2011 WL 3267713, at *5 (D. Conn. July 28, 2011).

42.    The threatened harm must be "sufficiently real and immediate to show an existing

controversy," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), though Plaintiffs need not

"demonstrate that it is literally certain that the harms they identify will come about," *Ross v. AXA*

*Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting Clapper, 568 U.S. at

414 n.5).

43.    Both the likelihood of and widespread concern regarding privacy violations from

disclosure of immigration status caused by including a citizenship question on the census are

sufficient to show injury-in-fact.

44.    Federal law provides that Defendants must maintain the confidentiality of

responses to the Census questionnaire.  *See* 13 U.S.C. § 9(a)(2) ("Neither the [Commerce]

Secretary, nor any other officer or employee of the Department of Commerce or bureau or

agency thereof," may "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified.").

45.     "Both the history of the Census Act and the broad language of the confidentiality provisions of § 9 make abundantly clear that Congress intended both a rigid immunity from publication or discovery and a liberal construction of that immunity that would assure confidentiality." *Carey v. Klutznick*, 653 F.2d 732, 739 (2d Cir. 1981) (quoting *McNichols v. Klutznick*, 644 F.2d 844, 845 (10th Cir. 1981)).

46.     But the federal government's intention to publish CVAP data on a block-level basis will result in the disclosure of at least some individuals' responses to the citizenship question, and presents a high risk of disclosure for many others.

47.     Census blocks often consist of only a few households, and some contain only a single individual.  Publication of granular CVAP data will necessarily disclose the citizenship status of some individuals, violating the confidentiality of their census responses.  13 U.S.C. § 9(a)(2).

48.     The Census Bureau admits that it has not yet developed any methodology or plan for how such granular data can be published without disclosure, and as such its assertion that it does not intend to publish actual individual responses does not mitigate the risk of violating the confidentiality requirement. *See Carey*, 653 F.2d at 738-39 (holding that it was error to compel discovery of address registers, even though individual names would be redacted, because the § 9(a)(2) requirement is that no identifying information be made public).

49.     Moreover, there is a genuine increased threat of disclosure, which the general public is aware of.  PFOF § X.E ¶¶ 1724-1727.  As Dr. Hillygus explained, the addition of a citizenship question creates a real increased risk of disclosure.  Trial Tr. 136 ("You have policies

that can change and you can have mistakes happen where data are accidentally released. . . . [T]here is no doubt that you have increased . . . the harm associated with accidental or deliberate disclosure with a citizenship question."). There is an actual increase in the probability of disclosure because census data will now have more information about individual households. *Id.* at 137-38.

50.    For members of the NGO Plaintiffs, being compelled to answer questions as to the citizenship status of every member of their household – deeply personal information – is extremely invasive when combined with Defendants' goal of providing this information to DOJ at the census block level.

51.    In addition, the door-to-door collection of citizenship information will result in increased fear and emotional stress among members of immigrant communities, and raises the specter that the release of such granular data could be used for immigration enforcement.

52.    For members of NGO Plaintiffs who are undocumented immigrants and noncitizens with legal status, the publication of CVAP data presents a grave threat that such publicly-available information could be used for immigration enforcement against known noncitizens or targeting areas with high levels of noncitizens.

53.    The Census Bureau's own qualitative research records this widespread concern. *E.g.*, PX-662 at 17, 21, 29, 31, 34-36, 43.

54.    These fears are warranted because this Administration has used other publicly available information to target noncitizens. For example, using public data, U.S. Immigration and Customs Enforcement (ICE) has targeted noncitizen communities for enforcement action, which has resulted in both a 1,200% increase in ICE arrests and attempted arrests in New York State generally and at courthouses in New York between 2016 and 2017, as well as swaths of

enforcement actions at sensitive public locations such as schools, hospitals, and churches.  *See, e.g.*, *ICE Out of Courts*, Immigrant Defense Project; *see also* Ray Sanchez, *ICE arrests undocumented father taking daughter to California school*, CNN (Mar. 3, 2017); John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious Operation*, NPR (Sept. 20, 2017).[1]

55.     The fear that immigration enforcement will use all available information to target noncitizens is real, as documented in the Census Bureau's own research, *see* PX-662; and demonstrates sufficient injury-in-fact for NGO Plaintiffs to establish standing.  *See, e.g.*, *Friedman*, 2011 WL 3267713, at *5.

### 3.     Injuries from degradation of data quality.

56.     Plaintiffs have also proved injury-in-fact because adding a citizenship question will admittedly harm the quality of the count.   *See* PFOF § X.D.

57.     Where a defendant has a duty to provide accurate information, failure to so provide creates an injury-in-fact sufficient to confer standing.  *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal Advisory Committee Act for failure to make publicly available reports and minutes of American Bar Association meetings relating to prospective judicial nominees); *see also FEC v. Akins*, 524 U.S. 11, 20-21 (1998) (plaintiff voters had standing to sue the Federal Election Commission on the ground that the statute in question gave plaintiffs a right to the information being withheld by the FEC); *see also Ctr. for Food Safety v. Price*, No. 17-cv-3833 (VSB), 2018 WL 4356730, at *5 (S.D.N.Y. Sept. 12, 2018) (informational injury satisfies the injury-in-fact requirement of standing where a statutory provision has explicitly created a right to information).

---

[1] The Court may take judicial notice of facts "generally known within the trial court's territorial jurisdiction," including recent increases in ICE immigration enforcement activities at sensitive locations in New York.  Fed. R. Evid. 201(b)(1).

58.     An injury sufficient to create standing is created not only by a total deprivation of
information to which plaintiffs have a statutory right, but also by the deprivation of accurate or
truthful information. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982)
(holding that because the Fair Housing Act created a statutory right to truthful information
concerning the availability of housing, "testers" who were misinformed had standing to sue
without demonstrating any further injury).

59.     Here, Defendants are constitutionally required to provide accurate information,
and Plaintiffs have a statutory right to the provision of those results. *See Utah v. Evans*, 536 U.S.
452, 478 (2002) (explaining Framers' "strong constitutional interest in accuracy"); *Wisconsin v.
City of N.Y.*, 517 U.S. 1, 20 (1996) (the conduct of the census must bear a "reasonable
relationship to the accomplishment of an actual enumeration of the population, keeping in mind
the constitutional purpose of the census," namely, obtaining an accurate count of the population
in each state); 13 U.S.C. § 141(c); *see also* Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481
("Congress finds that . . . [i]t is essential that the decennial enumeration of the population be as
accurate as possible, consistent with the Constitution and laws of the United States." ).

60.     As Dr. Salvo testified, increased reliance on methods of enumeration other than
self-response compromises the quality and accuracy of census data in terms of its ability to
describe demographic subgroups by, for example, age or ethnicity; and this loss of accuracy
constitutes an injury to Plaintiffs who make use of that data.  Trial Tr. 289, 302-04 (Salvo).

61.     The decision to add a citizenship question, and its concomitant harm to data
quality, injures Plaintiffs in concrete ways.  PFOF § X.D.  For example, Dr. Salvo testified that
New York City will be injured if the 2020 census is of lessened accuracy overall, regardless of
whether the City is subject to a net undercount.   Trial Tr. 289, 302-04.

62.     As Dr. Salvo explained, the New York City Department of Education relies on demographic data from the census to draw school zone boundaries, and inaccurate information about groups such as children under six or children of school age compromises that process. *Id.* at 305. Similarly, the Department of Education relies on information about neighborhood composition by race, and inaccurate information can cause problems there as well. *Id.* at 305-06.

63.     Similarly, the New York City Department of Health recognizes that certain populations are particularly at risk for some diseases; accordingly, the Department of Health requires accurate information about the population of particular demographic groups to calculate vital rates such as disease prevalence within particular groups. *Id.* at 307-08. This information is used to make decisions about where to deploy Health Department resources, and inaccurate census information – for example, as a result of inaccuracies in the 2010 census – has caused serious problems for the Health Department in the past. *Id.* at 308.

64.     Where high imputation rates are concentrated in a particular neighborhood, those differential imputation rates diminish the accuracy of census information about demographic subgroups in that neighborhood, and render the count less useful to city agencies such as the Health Department. *Id.* at 394-95. Likewise, the combination of overcounts in some neighborhoods and net undercounts in others can lead to errors in measuring neighborhood populations, which leads to misallocation of resources. *Id.* at 416-17.

65.     The Governmental Plaintiffs have a strong interest in ensuring that they allocate resources properly throughout their jurisdictions. The degradation of data quality caused by the citizenship question will impinge on those vital interests.

66.     In addition, Plaintiffs have a strong interest in accurate data for drawing election districts. The Governmental Plaintiffs are required to rely on decennial census counts as the

16

population base for periodically redrawing their state and local districts to be "as nearly of equal population as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 782 n.14 (1983); *see also Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

67.     For example, trial testimony confirms that Virginia requires accurate data from the decennial census for drawing congressional and state legislative election districts.  Lucyk Aff. (Docket No. 506-1), at ¶¶ 5-6.  The trial record includes evidence that New York relies on census data for the same purposes.  Breitbart Aff. (Docket No. 504-1), at ¶ 4.

68.     The addition of a citizenship question will force these states to redistrict using population counts that will be fundamentally inaccurate, harming their sovereign interests in ensuring that their representative governments fairly and accurately reflect the number of people who live in each district.

69.     Defendants' decision to add a citizenship question, and the resulting impairment of data quality, harms Plaintiffs' interests in accurate information and is sufficient to establish injury-in-fact.  *Havens Realty*, 455 U.S. at 373-74; *see also FEC*, 524 U.S. at 20-21; *Pub. Citizen*, 491 U.S. at 449-51; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

### 4.     Injuries from diminished political representation.

70.     Plaintiffs will likely lose political power as a result of their communities being undercounted, or inaccurately counted, in the 2020 census.  These harms will directly injure the Governmental Plaintiffs and the NGO Plaintiffs' members who reside in those jurisdictions, on whose behalf the NGO Plaintiffs may assert associational standing.  *See Bloomberg*, 290 F.R.D. at 415 (an organization can establish "standing solely as a representative of its members.").

71.     The likely loss of political power as a result of a plaintiff's community being undercounted in the decennial census constitutes a "concrete," "actual or imminent" injury that is

"not 'conjectural' or 'hypothetical.'"  *Dep't of Commerce*, 525 U.S. at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

72.     This is true for both effects on interstate apportionment (the allocation of Congressional seats among the states) and intrastate districting (the drawing of lines for election districts for state and local legislative bodies).  *See id.*; *see also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 549 (E.D. Va. 1998) (three-judge court), *aff'd sub nom. Dep't of Commerce*, 525 U.S. 316 (1999); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313 (S.D. Tex. 1992); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989).

73.     It is well-established that where changes to the decennial census will likely result in a loss of congressional representation, plaintiffs have standing.  In *Department of Commerce*, the Supreme Court evaluated whether individual plaintiffs would be injured if the Census Bureau adopted sampling rather than person-by-person enumeration for the decennial census; the Court concluded, based on expert testimony, that Indiana would likely lose a seat, and the Indiana resident plaintiff was injured because with "one fewer Representative, Indiana residents' votes will be diluted."  *Dep't of Commerce*, 525 U.S. at 330-32; *see also Carey*, 637 F.2d at 838 (holding that individual New York residents "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in loss of representation in Congress").

74.     Changes to the census that will result in intrastate harms, such as dilution of voting power *within* a state, also confer standing.  The *Department of Commerce* Court held that because particular localities used decennial census population numbers for their state legislative redistricting, residents of those localities could "suffer vote dilution in state and local elections as

a result" of the Census Bureau's proposed sampling plan. *Dep't of Commerce*, 525 U.S. at 332-33.   Accordingly, those residents had grounds to challenge the plan based in intra-state redistricting harms. *Id*.

75.     Moreover, the NGO plaintiffs have associational standing on behalf of their members to seek redress for these injuries-in-fact for multiple reasons.   First, the NGO plaintiffs have members living in affected areas.   Second, each of the NGO Plaintiffs works to facilitate civic engagement and enhance the political representation of the very communities whose representation will be diluted by an undercount resulting from the inclusion of the citizenship question.   Third, the NGO Plaintiffs easily can pursue this action without much individual participation of members. *See Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018) (finding Plaintiff CASA a "prototypical example[] of possessing associational standing"); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 282 n.12 (E.D.N.Y. 2018) (holding Plaintiff MRNY had associational standing).

### a.     The addition of a citizenship question will result in a differential undercount.

76.     The record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount.   PFOF §§ VII, VIII.   As detailed below, this undercount will cause several states to lose congressional representation and will cause many of the local government plaintiffs to suffer intrastate vote dilution harms.

77.     Plaintiffs' injuries are actual and imminent, not conjectural and speculative. As the Supreme Court held in *Department of Commerce*, because Defendants have set the policy that will harm Plaintiffs, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme – possibly irremediable – hardship."   525 U.S. at 332.

78.     Although Defendants contend that the Census Bureau's non-response follow up (NRFU) efforts may mitigate the undercount, NRFU has never prevented an undercount of hard-to-count populations in the past.  PFOF § VIII.E ¶¶ 1101-06.  And the trial record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount in the 2020 census.  PFOF § VII-VIII.

79.     Moreover, the near-unanimous evidence establishes that NRFU will be even less effective in 2020 due to a citizenship question and the current political environment.  PFOF §§ VII.F; VIII.A – VIII.E.

80.     The evidence reflects that the addition of a citizenship question will significantly reduce the self-response rate and increase the NRFU workload for certain subpopulations, and will increase the net differential undercount among those populations.  PFOF §§ VII-VIII.

81.     The overwhelming weight of the evidence, including testimony, scientific literature, and Census Bureau analyses, supports the finding that the NRFU operations will not prevent the differential net undercount of individuals of non-citizen households and Hispanics caused by the decrease in the self-response resulting from the inclusion of a citizenship question. PFOF § VIII.A-E.

82.     To the contrary, the evidence reflects that the citizenship question will cause an undercount of individuals in households with at least one non-citizen of at least 5.8%, even after NRFU and imputation.  PFOF § VIII.E.6.

83.     As a result, many of the Governmental Plaintiffs and, as in *Dep't of Commerce*, various states and localities in which the NGO Plaintiffs' members reside, will lose political power as a result of the inclusion of a citizenship question on the census.  PFOF § X.C.1.

       **b.**     **Plaintiffs will lose political power as a result of the differential undercount.**

84.     As detailed below, because of the differential undercount stemming from the addition of a citizenship question, Plaintiffs will suffer both inter- and intra-state losses of political power.

        **(1)**     **Interstate apportionment harms.**

85.     Defendants' decision to add a citizenship question on the census will cause several Plaintiffs to lose congressional representation.

86.     *California.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause California to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

87.     Plaintiff ADC has members residing in California, and all of the members of ADC who reside in California will lose political power as a result of this loss of a Congressional seat.  *Id.*

88.     Additionally, Governmental Plaintiffs City and County of San Francisco and County of Monterey and all the residents of these jurisdictions will also lose political power if California loses a Congressional seat.  *Id.*

89.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in California and the ADC members who reside in California.  *Id.*

90.     *Texas.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Texas to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

91.     Plaintiff ADC has members residing in Texas, and all of the members of ADC who reside in Texas will lose political power as a result of this loss of a Congressional seat.  *Id.*

92.     Additionally, Governmental Plaintiffs Cameron County, Texas; El Paso County, Texas; and Hidalgo County, Texas, and all the residents of these jurisdictions will also lose political power if Texas loses a Congressional seat.  *Id.*

93.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Texas and the ADC members who reside in Texas.  *Id.*

94.     *Florida.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Florida to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

95.     Plaintiff ADC has members residing in Florida, and all of the members of ADC who reside in Florida will lose political power as a result of this loss of a Congressional seat. PFOF § IV.A.

96.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Florida and the ADC members who reside in Florida.  *Id.*

**(2)     Intra-state dilution of political power.**

97.     Based on the evidence, including expert testimony, the addition of a citizenship question will lower both the population counts and the relative population share within their states for each of the county and city Plaintiffs: the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; and counties of Cameron, El Paso, Hidalgo, and Monterey.  PFOF § X.C.1.

98.     Additionally, based on the evidence, including expert testimony, the addition of a citizenship question to the census will lower the population counts and relative population of Los Angeles, Miami, and Prince George's County, Maryland.  *Id.*

99.     Plaintiff ADC has members residing in Phoenix, Arizona; Miami, Florida; New York City; Prince George's County, Maryland; and Chicago, Illinois.  PFOF § X.C.2.a.  Plaintiff

MRNY has members residing in New York City.  *Id.*  Plaintiff CASA has members who reside in Prince George's County.  *Id.*

100.     The addition of a citizenship question will therefore lead to the dilution of the voting power of these jurisdictions and the individuals who reside in them, and this loss of political power will cause injury to these locations and the individuals who reside in them. PFOF § X.C.1.  *See, e.g.*, *Carey*, 637 F.2d at 838.

### 5.     Reductions in federal funding.

101.     Plaintiffs have also established injury-in-fact based on the harmful effect the citizenship question will have on federal funds that they (or the jurisdictions in which their members reside) receive.

102.     In *Carey*, the Second Circuit held that New York State and New York City had standing to challenge the conduct of the 1980 census because they "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in . . . decreased federal funds flowing to their city and state."  *Carey*, 637 F.2d at 838.

103.     Other courts have followed *Carey*.  *See, e.g.*, *Glavin*, 19 F. Supp. 2d at 550; *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (injury-in-fact existed for standing purposes even if "none of the named plaintiffs personally receives a dollar of state or federal aid, [because] all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money"); *Mosbacher*, 783 F. Supp. at 313-14 (even though the "Census Bureau and the Department of Commerce are not in charge of distribution of federal funds," their "actions significantly affect the distribution of funds"); *see also City of Detroit v. Franklin*, 4 F.3d 1367, 1375 (6th Cir. 1993) (finding standing where plaintiffs claimed that "the census undercount will result in a loss of federal funds" to their city); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 554 (S.D. Ga. 1983) (same).

104.     Both the NGO Plaintiffs and Governmental Plaintiffs will suffer financial harm from the addition of a citizenship question.  Even a small citizenship-question-induced disparate undercount of noncitizen households or Hispanics will cause jurisdictions with a greater-than-average share of noncitizen or Hispanic residents to lose funding under several dozen federal financial assistance programs that rely on geographic distribution criteria.  PFOF § X.C.2; Reamer Aff. (Docket No. 508-1) ¶¶ 16-19.  In addition, this differential undercount will injure the Governmental Plaintiffs by preventing the equitable distribution of federal funds to localities.

### a.     The citizenship question will cause Plaintiffs to directly lose federal funding.

105.     Because Census data influence a large number of federal financial assistance programs, a differential census undercount involving noncitizens, the foreign-born, or Hispanics will lead to measurable fiscal losses for states with population percentages of these subgroups that are above the nationwide average, harming both the Governmental Plaintiffs and members of NGO Plaintiffs in those states.  *Id.*

106.     A significant portion of federal domestic financial assistance is distributed on the basis of statistics derived from the decennial census, including at least 320 federal domestic assistance programs that use census-derived data and distributed about $900 billion in Fiscal Year 2016.  PFOF § X.C.2.

107.     There is a strong, direct relationship between the accuracy of the decennial census and the reliability of these datasets and surveys; decennial census data is an essential ingredient of accurate and reliable funding allocations.  PFOF § X.C.2 ¶ 1608.

108.     Dr. Reamer identified nearly two dozen financial assistance programs, including state-share programs and Federal Medical Assistance Percentage (FMAP) programs, with funding formulas that allocate federal funds geographically in a manner dependent in part or in

whole on decennial census results.  *Id.*  As described in the PFOF, *see* § X.C.2, even a small differential undercount stemming from the citizenship question will cause Plaintiffs (or the jurisdictions in which NGO Plaintiffs' members reside) to lose federal funding.

109.    Using five of these programs as examples, Dr. Reamer performed calculations using a series of seven undercount scenarios that he applied to 2020 population projections. PFOF § X.C.2 ¶ 1609.

110.    Dr. Reamer's analysis reflects that while the magnitude of the impact varies across states depending on the nature of the undercount, numerous states and localities will be negatively impacted if a citizenship question causes even a minimal undercount of non-citizen households relative to the population as a whole.[2]  PFOF § X.C.2 ¶ 1610.

### b.    The Governmental Plaintiffs will suffer financial harms arising from the addition of a citizenship question.

111.    Dr. Reamer's analysis establishes that a differential undercount will cause many of the Governmental Plaintiffs to suffer harm due to the direct loss of funding from census-related federal programs.  PFOF § X.C.2.b.

112.    For example, Plaintiffs New York and New Jersey are home to large non-citizen, Hispanic, and foreign-born populations.  As a result, even minimal undercounting resulting from a citizenship question is likely to impact these states relative to others; as Dr. Reamer's analysis

---

[2] That not every Plaintiff will see a reduction in funding under every federal funding program as a result of the citizenship question does not defeat Plaintiffs' showing of injury-in-fact.  It is well-settled that in the context of multi-plaintiff challenges to government action, injury on the part of a single plaintiff is sufficient to confer standing.  *See, e.g.*, *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim."); *Melrose Credit Union v. City of N.Y.*, 247 F. Supp. 3d 356, 365 (S.D.N.Y. 2017).  Nor does the possibility that some individual Governmental Plaintiffs' share of specific funding programs increase under some of the undercount scenarios defeat standing, because "standing is not defeated by other benefits that outweigh the injury that establishes standing, even if the other benefits may defeat damages."  Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. & Supp. 2018); *see also, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.").

reflects, New York State and New Jersey will consistently lose state-share program funds under each of the undercount scenarios. *Id.* Likewise, many of the other State Governmental Plaintiffs will be lose federal funding under many of the scenarios examined by Dr. Reamer. *Id.*

113.    In addition to the programs described in Dr. Reamer's analysis, various representatives from the Governmental Plaintiffs' broad coalition of states and localities submitted detailed descriptions of how a differential undercount will impair additional funding streams. *See id.* For example, in New York, even a .02% undercount in the number of children in poverty aged 5 to 17 residing in a Local Education Agency's (LEA) jurisdiction can lead to changes in eligibility for federal education grants that could amount to cuts as large as 40% of an LEA's Title I Grant. *See id.*; Harmon Aff. (Docket No. 498-14) ¶ 9.

114.    Other Governmental Plaintiffs described a broad swath of federal programs designed to ensure funding for, *inter alia*, public schools, families living in poverty, energy assistance for the needy, and the elderly, all of which depend on census or census-derived data. PFOF § X.C.2.

115.    These harms – the diminution of funds attributed to a citizenship question – also directly impact the City and County Governmental Plaintiffs.   As detailed in the PFOF, some federal programs require states to use census-derived information to distribute federal funds directly to the City and County Plaintiffs.  Localities receive funds under these programs based on their relative share of the relevant population within the state. Given the concentration of immigrants and Hispanics within the City and County Governmental Plaintiffs as compared to their states, PFOF § X.C.1, nearly all of the City and County Plaintiffs will likewise experience direct funding harms.

116.    For the same reason – that differential undercounting will be concentrated among non-citizens and Hispanics that are likely to live in metropolitan areas – State Governmental Plaintiffs will be required to inequitably distribute funds to localities within their jurisdiction.  As detailed at PFOF § X.C.2.b, states are required to distribute many federal funds to localities based on census or census-derived data.  This is also plainly injury.  For example, the addition of a citizenship question will require State Governmental Plaintiffs to misallocate funds within their states, specifically depriving noncitizen and Hispanic students in poverty residing in large metropolitan areas, including those located in most of the Plaintiff Cities and Counties, of much-needed social services and educational funding.  *See id.*

### c.    The NGO Plaintiffs will suffer financial harms arising from the addition of a citizenship question.

117.    Plaintiff ADC has individual members who live in all fifty states, including the states above that will be negatively impacted regarding funding, and has identified individual members living in California, New York, Florida, Texas, and New Jersey.  PFOF § X.C.2.a ¶ 1617; *see also* PFOF § I.A.4; Khalaf Aff. ¶¶ 30-31.  Each of these states was identified by Dr. Reamer as losing population share and thus funding under the state-share programs he identified if there is even a 2% undercount of individuals living in non-citizen households.

118.    As for Plaintiff MRNY, it has 23,000 members residing in New York City, Nassau County, Suffolk County, and Westchester County, New York, including several specific members living in New York who will be harmed by the loss of funding to the state due to an undercount caused by the citizenship question.  PFOF § X.C.2.a ¶ 1619; *see also* PFOF § I.A.3; Altschuler Aff. ¶¶ 4, 23-30.

119.    Finally, although the Second Circuit has held that it is unnecessary for standing purposes, the NGO Plaintiffs also introduced evidence that a number of their members do

directly use, rely on, or interact with some of the programs that would lose money.  *See Carey*, 637 F.2d at 838 (holding that individuals could establish harm by showing "decreased federal funds flowing to their city and state," without showing that they themselves relied on the particular programs at issue).

120.    Although their residence in these states is enough to be harmed due to federal funding losses to their states, ADC has also shown that its some of its members directly rely upon programs such as Title I education funds that the citizenship question will negatively affect in the states where they live.  PFOF § X.C.2.a ¶ 1618.

121.    Several individual MRNY members have also demonstrated reliance on Title I educational funds and Head Start funding due to their children attending schools and programs that receive such funding, and thus even more direct harm when New York loses funding for this program due to an undercount.  PFOF § X.C.2.a ¶ 1620.

122.    CASA assists many of its members who use census-related funding programs including Supplemental Nutritional Assistance Program (SNAP), which provides food assistance to low-income and the Special Supplemental Nutrition Program for Women Infants and Children (WIC); these members in Maryland will be harmed under several of the undercount scenarios discussed by Professor Reamer.  PFOF § X.C.2.a ¶ 1622.

123.    Plaintiff NYIC and a number of its member organizations directly receive census-influenced funding through programs that will be negatively affected if New York state residents are undercounted due to the citizenship question, as this will reduce the pool of funding available to them through the State.  Plum Aff. (Docket No. 498-19) ¶¶ 5-9; Choi Aff. (Docket No. 489-1) ¶ 6.

124.    Specifically, NYIC receives census-guided funding through the Corporation for

National & Community Service for 21 positions filled by AmeriCorps VISTA; NYIC member

Chhaya Community Development Corporation receives funding through the Community

Development Block Grant program; and NYIC member Chinese-American Planning Council

receives funding through the Workforce Innovation and Opportunity Act.  Plum Aff. ¶¶ 6, 9.

125.    The evidence is overwhelming that Plaintiffs have demonstrated sufficient injury-

in-fact caused by losses to their fair share of federal funds.  *E.g., Carey*, 637 F.2d at 838.

### C.    Traceability and redressability.

126.    To establish causation, a plaintiff must show that the injury-in-fact is "fairly

traceable to the challenged action of the defendant."  *N.Y. Civil Liberties Union v. N.Y. City

Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011) (quoting *Summers*, 555 U.S. at 493).

127.    This requirement is met if Plaintiffs "demonstrate a causal nexus between the

defendant's conduct and the injury."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir.

2016)

128.    Such a nexus is established if Defendants' conduct "has a determinative or

coercive effect on the action of someone else."  *Bennett*, 520 U.S. at 169.

129.    This standard, however, is "lower than that of proximate cause," and "indirectness

is 'not necessarily fatal.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Simon

v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976)).

130.    Defendants' actions need not be "the very last step in the chain of causation," and

independent action by a third party "does not exclude injury produced by determinative or

coercive effect upon the action of someone else."  *Bennett*, 520 U.S. at 168-69 (1997); *see also

Chevron Corp.*, 833 F.3d at 121 ("A defendant's conduct that injures a plaintiff but does so only

after intervening conduct by another person, may suffice for Article III standing").

131.    Thus, Plaintiffs will be injured by the question's "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 168-69; *see also Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104-05 (2d Cir. 2018) ("*NRDC*") (holding that delaying penalty increase for automakers that violate fuel standards would lead automakers to violate those standards more frequently, and thus cause more pollution that would injure the plaintiff organizations' members).

132.    Here, the evidence shows that addition of a citizenship question will cause a significant decline in self-response.  PFOF § VII.  That decline is unlikely to be fully remedied by any of Defendants' NRFU operations.  PFOF §§ VIII.A – VIII.D.  And even if the likelihood of a net differential undercount could somehow be avoided, Defendants concede that adding a citizenship question will distort the quality and accuracy of the resultant census data.  PFOF § X.D.1.  Whether from a net undercount, a net differential undercount, or simply a decline in data quality, adding a citizenship question will directly cause the harms identified in Parts II.B.1 to II.B.4 above.  This showing meets Plaintiffs' traceability burden.  *NRDC*, 894 F.3d at 104-05.

133.    To meet the redressability requirement, Plaintiffs must show only "that a favorable decision would redress [their] injuries."  *Comunidad Hispana*, 868 F.3d at 109.

134.    A favorable decision vacating or enjoining the citizenship question on the census would redress Plaintiffs' injuries from increased mitigation expenses and diversion of resources, by ensuring that not all of these additional resources need be expended or diverted.

135.    A favorable decision would redress NGO Plaintiffs' loss-of-privacy injuries, by reducing the risk that publication of citizenship data regarding NGO Plaintiffs' members at the granular block level would expose them to statutory provacy violations and heightened risk of targeted immigration enforcement.  *See Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 156

(E.D.N.Y. 2017) (plaintiffs had standing to challenge changes to DHS's information-use policy for DACA recipients because "[i]t is not difficult to infer that this information would facilitate DHS's ability to remove these individuals from the country," which is "sufficiently concrete, imminent, and traceable to Defendants' alleged conduct to establish standing").

136.    A favorable decision would also redress harms caused by the expected distortions to data accuracy that a citizenship question would cause, as well as Plaintiffs' electoral and funding injuries arising from a differential undercount.  *Carey*, 637 F.2d at 838.

137.    Because Plaintiffs have alleged extensive injuries-in-fact that are fairly traceable to Defendants' decision to add a citizenship question and would be redressed by an order vacating or enjoining that decision, the Court should find that Plaintiffs have satisfied their burden to demonstrate standing.

### III.    Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act.

138.    The Administrative Procedure Act provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A); or that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

139.    Judicial review of agency action under the APA is based on the rationale the agency provided in making its decision; a court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A.     **The scope of judicial review in this case.**

1.     **Review on the whole Administrative Record is to be probing and thorough.**

140.    The APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706.

141.    The Supreme Court has made clear that this Court's review is to be "thorough, probing, [and] in-depth." *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching and careful" review).

142.    Rigorous judicial review under the APA was intended to maintain the balance of power between the branches of government: "[I]t would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the [APA] warrant, to give effect to its remedial purposes." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in the judgment) (in enacting the APA, "Congress confined agencies' discretion and subjected their decisions to judicial review").

143.    The parties agree that the Court may consider the designated Administrative Record.  Docket No. 523; Docket No. 524; Docket No. 529; Trial Tr. 1415-16.

144.    The parties agree that the Court may consider extra-record evidence, including expert evidence, that addresses Plaintiffs' standing.  Trial Tr. 1421-22.

2.      The "whole record" before the agency includes not only the
designated Administrative Record, but also evidence that reflects
information the Secretary directly or indirectly considered.

145.    The full administrative record contains not only the designated Administrative

Record, but also other evidence reflecting important information that Secretary Ross directly or

indirectly considered in deciding to add a citizenship question, including oral conversations with

Secretary Ross that are not reflected in the designated Administrative Record.

146.    APA review requires a court to consider the "whole record" before the agency.  5

U.S.C. § 706; *see Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982).

147.    As Defendants have recognized in this proceeding, that record must include *all*

information "'directly or indirectly'" considered by the agency, including "'evidence contrary to

the agency's position.'"  Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018)

(quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)); *see Bar MK

Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).

148.    In this case, the full Administrative Record includes testimony or affidavits

recounting meetings or other oral conversations that provided important information to Secretary

Ross or his direct subordinates regarding the addition of a citizenship question.

149.    Agency decision-makers and their direct subordinates often receive important

data, perspectives, or other information through oral communications with their staff, officials in

other agencies, or outside third parties.  When such communications convey critical information

that a decision-maker directly or indirectly considered in reaching the challenged decision,

evidence about these communications is not "extra-record" material at all, but rather a necessary

component of the entire "informational base" before the agency when it made its decision.

*Dopico*, 687 F.2d at 654; *see Portland Audubon Soc'y*, 984 F.2d at 1548 (whole record includes

"everything that was before the agency pertaining to the merits"); *Sztorc v. Prudential Ins. Co. of

33

*America,* No. 05-cv-0222, 2007 WL 521278, at *3 n.4 (W.D.N.Y. Feb. 12, 2007) (administrative

record incomplete where it lacked information about telephone calls); *see also* Richard

McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and*

*Additional Factfinding During Judicial Review of Informal Agency Action*, 1982 Duke L. J. 333,

348-50 (1982).

150.    Indeed, federal guidance about the proper compilation of an administrative record

in informal proceedings confirms that the record should include, *inter alia,* "transcripts or

recordings, if any, of oral presentations made in the course of a rulemaking."  Administrative

Conference of the United States Recommendation 2013-4: The Administrative Record in

Informal Rulemaking, 78 Fed. Reg. 41,352, 41,360 (adopted June 14, 2013).

151.    To be part of the "whole record," such oral communications must be sufficiently

relevant and important that they had (or should have had) "a significant impact on the agency's

decisionmaking process." McMillan & Peterson at 348; *cf. United Steelworkers of Am., AFL-*

*CIO-CLC v. Marshall*, 647 F.2d 1189, 1215 (D.C. Cir. 1980) (noting concern "whenever the

record fails to disclose important communications that may have influenced the agency decision

maker").

152.    In the ordinary case, an agency can be presumed in the regular course of agency

decisionmaking to follow record-keeping processes that will provide the court with a complete

record, including important information discussed in meetings or oral communications.   For this

reason, the ordinary APA case will not require a court to decide whether it is necessary to

consider discovery, testimony, or affidavits of oral conversations not reflected in the designated

administrative record to allow review of the whole record.

153.    For example, a typical administrative record will often include written briefings or summaries of meetings and calls, which, together with memoranda, emails, and other written materials, adequately provide the court with all information directly or indirectly considered by the decision-maker.  *See, e.g.*, *Guglielmi v. Northwestern Mut. Life Ins. Co.*, No. 06-cv-3431, 2007 WL 1975480, at *8 (S.D.N.Y. July 6, 2007) (summary of telephone call that involved information on which decision-maker relied); *Connecticut v. Daley*, 53 F. Supp. 2d 147, 158-160 (D. Conn. 1999) (transcripts and summaries of meetings).

154.    Here, by contrast, the initial record produced by Defendants was patently incomplete – including the absence of materials reflecting the agency's consideration of the issue prior to the December 2017 letter from the Department of Justice (notwithstanding the June 21 supplement to the Administrative Record indicating that Secretary Ross began considering whether to add the question soon after his confirmation); the absence of materials or analyses expressly referenced in the Secretary's decision memo; and the failure to include materials considered by key subordinates including Dr. Abowd, July 3 Hearing Tr. 79-82 (Docket No. 205) – leading this Court to issue its July 3 order requiring Defendants to complete the Administrative Record.  *Id.* at 76-90; *see also* Docket No. 199.  Defendants have affirmatively declined to contest that mandate.  *See* Defs.' Reply Br. 17, No. 18-2652, *In re U.S. Dep't of Commerce* (2d Cir. Sept. 21, 2018), Docket No. 56.

155.    Although Defendants have since supplemented the record with thousands of pages of additional documents, this Court is not required to accept Defendants' supplemented record as complete if other evidence produced through discovery "identifie[s] specific materials that appear to be missing from the record."  Order at 2, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *see also Dopico*, 687 F.2d at 654 (declining to accept federal

35

"defendants' assurances that they have submitted the full record"); *NRDC v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (declining to treat even supplemented administrative record as complete).

156.    Here, that additional material includes testimony and affidavits about oral communications that conveyed critical information that the Secretary considered in deciding to add the citizenship question.

157.    Excluding "oral communications of central relevance" to the Secretary's decision from this Court's review would improperly force this Court to ignore "information central to the [Secretary's] justification" simply because it was "communicat[ed] . . . by voice rather than by pen."  *Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C. Cir. 1981).

158.    If agencies were permitted to shield oral communications from judicial review – even when, as here, there is clear evidence that their documentary record is incomplete – it would be too easy for them to hide adverse evidence through the simple expedient of providing it to the decision-maker through unrecorded meetings or telephone calls.  But bedrock principles of administrative law provide that an agency may not "withhold evidence unfavorable to its case" and thereby impede the court's ability "to review [the] agency's action fairly."  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

159.    The evidence that this Court may consider under this category includes the following:

160.    Dr. Abowd testified that he attended a meeting with the Secretary and others on February 12, 2018, to discuss the citizenship question and the Census Bureau's findings about the adverse effects of adding such a question to the decennial enumeration. This meeting was the

only one that the Secretary had with the Census Bureau's Chief Scientist before deciding to add the citizenship question.  Trial Tr. 883-84.

161.    Although it is difficult to imagine that such an important meeting played no role whatsoever in the Secretary's decision-making process, *cf.* Order at 3, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *Dopico*, 687 F.2d at 654, the designated Administrative Record contains only a single email written by a Census Bureau employee summarizing follow up points from this meeting.  PX-127 (AR 9450).

162.    Dr. Abowd also testified that he had separate conversations with Secretary Ross and Acting Deputy Secretary Kelley about, *inter alia*, the Census Bureau's intention to use disclosure avoidance procedures at the block level.  Trial Tr. 1046-47.  These conversations are also not reflected in the designated Administrative Record.

163.    Christine Pierce, Senior Vice President of Data Science for the Nielsen Company, testified that the designated Administrative Record does not accurately reflect a telephone conversation she had directly with the Secretary and Michael Walsh, then the Commerce Department's Deputy General Counsel (and now Chief of Staff), about the citizenship question. This conversation is expressly cited as support in the Secretary's decision memo.  Ms. Pierce's testimony provides context and details about this telephone conversation that are not reflected in the designated Administrative Record.  *Compare* Pierce Aff. (Docket No. 498-18) ¶¶ 10-13, 17-18, *with* PX-1 at AR 1276, PX-26 at AR 1318.

164.    In addition, in his June 21, 2018 Supplemental Memorandum regarding the Administrative Record, Secretary Ross admitted that he began considering whether to add a citizenship question to the 2020 census soon after his confirmation in February 2017.  PX-2 (AR).  This consideration included "discussions with other governmental officials," all of which

occurred prior to the December 12, 2017, date on which the Department of Justice sent its letter requesting a citizenship question on the 2020 census. *Id.*

165.    Secretary Ross, and his team at his direction, were later revealed to have had conversations about the citizenship question with a long list of officials outside the Commerce Department prior to December 2017, including with DOJ officials (Mary Blanche Hankey, James McHenry, John Gore, and Attorney General Jefferson Sessions); the Department of Homeland Security (Eugene Hamilton); senior White House advisers; and Members of Congress including Representative Mark Meadows.  PX-193; PX-302; PX-524 (AR); PX-567.

166.    The Secretary and his team made very little record of these conversations.  Key discussions that Secretary Ross had prior to December 12, 2017 are not memorialized in the designated Administrative Record, including discussions with Attorney General Sessions in the spring of 2017 and around Labor Day 2017, with Steve Bannon on April 5, 2017, with Kris Kobach in the spring and summer of 2017, and with Representative Meadows on August 8, 2017.  PX-193; PX-302.  Similarly, key meetings with senior staff, including meetings on August 21, 2017, and September 6, 2017, are not memorialized in the designated Administrative Record.  The only way to know about the content of these discussions and meetings, which were part of the Secretary's decision-making process, is from the testimony of senior aides that attended these meetings, such as Earl Comstock, Wendy Teramoto, Karen Dunn Kelley, David Langdon, and Sahra Park-Su.

**3.    The Court may consider extra-record evidence that serves as background to explain or clarify scientific or technical subjects requiring specialized knowledge.**

167.    As is standard in Administrative Procedure Act cases, this Court may consider extra-record evidence as background to explain or clarify scientific or technical subjects requiring specialized knowledge.[3]

168.    This Court may consider evidence outside of the administrative record where such evidence "is necessary to explain technical terms or complex subject matter involved" in the agency decision at issue. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988); *see, e.g., Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1045-46 (W.D.N.Y.1995) ("[T]he court is permitted to go outside of the administrative record to consider background evidence to clarify the information before the agency at the time of its decision.").

169.    This type of extra-record evidence is routinely permitted to ensure that the court can fully understand highly technical or scientific information referenced in the administrative record.  Such evidence may also be necessary to ensure that the court can properly understand the agency's reasoning and decision-making when that reasoning and decision-making involved, for example, scientific tests, complex calculations, or other specialized processes.  *See, e.g.*, *Asarco, Inc. v. United States E.P.A.*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) (testimony of copper plant manager to explain operation of smelter); *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (extra-record evidence permissible in

---

[3] Defendants' pending application in the Supreme Court does not challenge this aspect of the Court's July 3 Order permitting extra-record discovery.  Defendants challenge only discovery "to probe the mental processes of the agency decisionmaker." *See* Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018).  That application for relief has no bearing on the Court's independent authorization for expert discovery, which is "commonplace in cases of this sort."  July 3 Hearing Tr. at 87 (Docket No. 205).

APA case to explain "technical terms or complex subject matter"); *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 157 (D.D.C. 2012) (extra record evidence will be considered "if it is needed to assist a court's review").  *See generally* Richard McMillan, Jr. and Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and Additional Factfinding During Judical Review of Informal Agency Action*, 1982 Duke L. J. 333, 359 (1982) ("As administrative decisionmaking becomes increasingly complex, courts may not be able to understand, much less evaluate, the complexities of the record.").

170.    Absent such explanatory evidence, a court would not be able to "evaluate the challenged action on the basis of the record before it."  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

171.    Such explanatory expert evidence is commonplace in census-related disputes, which often involve technical issues, such as statistical techniques and calculations; survey methodology and design; demography; and the Census Bureau's established testing and other procedures.  *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999); *City of New York v. U.S. Dep't of Commerce*, 822 F. Supp. 906, 917 (E.D.N.Y. 1993); *Cuomo v. Baldrige*, 674 F. Supp. 1089, 1093-1103 (S.D.N.Y. 1987); *Carey v. Klutznick*, 508 F. Supp. 420, 422 (S.D.N.Y. 1980).

172.    Here, for example, Plaintiffs and Defendants proffered expert testimony to help the Court understand the Census Bureau's testing procedures and the role of survey methodology in those procedures.  Both parties also proffered expert testimony on the Census Bureau's efforts to enumerate hard-to-count populations, NRFU operations, and imputation procedures, including the general methodology and factors that may bias or skew the imputation model.

40

173.     Both parties also proffered expert testimony relevant to issues of standing, including the impact of the citizenship question on data accuracy, privacy, political representation, eligibility for federal funding resources, and other matters.

> **4.     The Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors.**

174.     This Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices.

175.     An agency's decision is arbitrary and capricious under the APA if, among other things, the agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 31, 43-44; or made "an irrational departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

176.     To apply these standards, a court must as a threshold matter understand what is "relevant," "important," or "settled" in the field where the challenged agency decision was made.

177.     In many cases, the administrative record will provide the relevant benchmarks. But evidence outside the "bare record" may be required to determine "the applicable standard" to apply in evaluating the completeness of the agency's reasoning and in determining whether the agency ignored critical factors or information.  *Overton Park*, 401 U.S. at 420 (emphasis added); *see also Hoffman*, 132 F.3d at 15; *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

178.     Such extra-record evidence is essential in cases involving technical, complex, or specialized subjects, where the reviewing court would otherwise lack the expertise to know the factors that a reasonable decision-maker in the field would typically consider or the "settled course of behavior," *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S.

800, 807 (1973) (plurality op.), that such a decision-maker would typically follow. *See Hoffman*, 132 F.3d at 15; *cf. United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (expert "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice").

179.    As courts have explained, "[i]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco*, 616 F.2d at 1160; *see also Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 114 (D.D.C. 2015) (permitting expert testimony to "point out gaps in the agency's explanation and analysis").

180.    Indeed, without extra-record evidence to determine the relevant benchmarks, a court would be unable to even identify, let alone redress, the most egregious instances where an agency disregards important or relevant factors, since it will be in the most flagrant violations of reasonable agency decision-making that the administrative record will be most bare. *See Hoffman*, 132 F.3d at 15 ("omission of technical scientific information is often not obvious from the record itself").

181.    The potential need for such extra-record record evidence is particularly acute where, as here, the agency engages in *informal* rather than *formal* decision-making.  Formal notice-and-comment rulemaking and adjudicatory proceedings provide numerous procedural safeguards that ensure that interested parties can present all relevant factors and information to the agency – and thereby to the court.

42

182.    For example, notice-and-comment procedures provide all interested parties, including experts, the opportunity to submit "written data, views, or arguments" that will be added to the administrative record.  5 U.S.C. § 553.

183.    Adjudicatory proceedings likewise provide the parties to such proceedings an opportunity to submit "facts [and] argument" that the agency should consider.  *Id.* § 554.

184.    Informal decision-making, by contrast, lacks such mechanisms to guard against the creation of an inadequate administrative record.  Accordingly, where informal decision-making is at issue, the reviewing court may not be able to "adequately discharge its duty to engage in a 'substantial inquiry'" into the agency's decision if the court "is required to take the agency's word that it considered all relevant matters" and followed all relevant procedures. *Asarco*, 616 F.2d at 1160.

185.    Here, for example, and as described in Parts III.B.1 and III.B.2 below, the decision-making process lacked adequate consideration of several relevant factors.  The process did not include an evaluation of the utility or fitness of citizenship data collected from the census for the stated purpose in the request from the Department of Justice, *i.e.* enforcement of Section 2 of the Voting Rights Act.  For instance, Secretary Ross did not consider any information in making his decision about the granularity of data required by the Department of Justice to enforce the Voting Rights Act.  PX-26 (AR).  Similarly, Secretary Ross did not consider any information about the impact of disclosure avoidance requirements on the quality of citizenship data that would be produced by including a citizenship question on the 2020 census, or how those requirements could impact the utility of the data for Voting Rights Act enforcement. *Id.*  Ignoring these and other considerations relevant to the fitness of the data for its purported use, was a significant omission.

5. **The Court may consider extra-record evidence relevant to Plaintiffs' claims that the Secretary's decision was based on pretext or prejudgment.**

186.    This Court may also consider extra-record evidence that is relevant to Plaintiffs' claims that the Secretary's decision to add a citizenship question was based on pretext, prejudgment, undue political influence, or other types of bad faith.

187.    On July 3, this Court authorized extra-record discovery based on its finding that "plaintiffs have made a strong preliminary or prima facie showing that they will find material beyond the Administrative Record indicative of bad faith." July 3 Hearing Tr. at 85 (Docket No. 205). Now that discovery and trial are complete, this Court may consider extra-record evidence that is relevant to adjudicating the merits of Plaintiffs' claims of pretext, prejudgment, undue political influence, or other types of bad faith.

188.    The Court's consideration of such evidence is "necessary to meaningful judicial review" of Plaintiffs' claims. *Tummino v. Torti*, 603 F. Supp. 2d 519, 543 (E.D.N.Y. 2009); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 49 (2011) (considering extra-evidence of bias and bad faith that was "clearly necessary for the Court to conduct effective judicial review").

189.    Evidence of bad faith rarely appears in a formal administrative record precisely because an agency is unlikely to record and make public its own improper conduct – hence the need for extra-record discovery in the first place. *See, e.g.*, *Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) (placing "evidence of bad faith . . . in an administrative record" would be "both sinister and stupid"); *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997) (agency is not likely "to keep a written record of improper political contacts").

190.    Where, as here, such evidence is uncovered, the agency's actual decision-making "cannot be fully understood" without considering that extra-record evidence. *Tummino*, 603 F. Supp. 2d at 544.

191.    Here, for example, extra-record evidence of bad faith includes, but is not limited to, the testimony of Acting Assistant Attorney General John Gore that the DOJ components with responsibility for enforcing the Voting Rights Act did not request a citizenship question on the census; that he drafted the letter requesting a citizenship question because of Secretary Ross's request; that he does not believe a citizenship question on the census is in fact necessary to enforce the VRA; and that he does not know if data based on responses to a citizenship question will be any more precise than existing data. *See infra* Part III.B.3.b.

192.    This Court asked the parties to brief whether some additional, intermediate finding of bad faith is required before the Court may consider this evidence. Trial Tr. 1426. Courts that have allowed initial extra-record discovery on the basis of a preliminary showing of bad faith have at times conducted an intermediate inquiry, at the close of discovery, into whether to formally supplement the administrative record with specific extra-record evidence before proceeding to summary judgment or trial. *See, e.g.*, *L-3 Commc'ns*, 98 Fed. Cl. at 49-53; *Int'l Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41-42 (2004).

193.    In such cases, the intermediate inquiry warrants formally supplementing the record where the evidence produced through discovery confirms either a "strong showing of bad faith or improper behavior" or the continued inadequacy of the designated administrative record to provide a "full picture" of the agency's decision-making. *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010) (quoting *Overton Park*, 401 U.S. at 420); *see Hoffman*, 132 F.3d at 16 (affirming district court's decision not to supplement record with

45

affidavit where "plaintiffs failed to make the required 'strong showing' of bad faith"); *Int'l Resource Recovery*, 61 Fed. Cl. at 42 (supplementing record where allegations of bad faith were "sufficiently well grounded").

194.    In this case, because the Court has already completed the trial, there is no need to conduct the intermediate inquiry that other courts have applied at an earlier stage of proceedings. Rather, this Court should decide the scope of its review of extra-record evidence (just as it is determining the admissibility of evidence) in connection with its final ruling on the merits of Plaintiffs' claims of pretext, prejudgment, and undue political influence.

195.    More specifically, this Court should identify the grounds on which a finding of bad faith would invalidate the Secretary's decision, and consider only the extra-record evidence that is relevant to the grounds it has accepted.  If the Court rejects a particular ground for finding bad faith, or finds that the evidence (including extra-record evidence) fails to support bad faith, then it should decline to consider the extra-record evidence that is associated with such rejected or failed theories of bad faith. Through this analysis, the Court can ensure that the scope of its review is limited to extra-record evidence that is directly relevant to bad-faith findings that would invalidate the Secretary's decision to add a citizenship question.

**B.    Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA.**

196.    Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

197.    Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

46

198.    Agency action is also arbitrary and capricious if not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 42-43.

199.    Defendants' decision is arbitrary and capricious when measured against each and every one of these considerations.

### 1.    The decision to add a citizenship question was counter to the evidence before the agency.

#### a.    Adding a citizenship question will materially lower response rates.

200.    Defendants' decision is counter to the evidence because adding a citizenship question to the census will materially lower self-response rates.

201.    Secretary Ross justified his decision on the grounds that "no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates." PX-26 at AR 1317.  This assertion is counter to the uncontroverted evidence in the Administrative Record (*e.g.*, PX-22 at AR 1277; PX-102 at AR 5500; PX-147 AR 11634), and is further disproven if extra-record evidence is considered.

202.    The Administrative Record contains substantial quantitative evidence detailing how the addition of a citizenship question to the decennial census would reduce response rates among immigrant and Hispanic households.  As detailed in PFOF § III.H.2, the Census Bureau conducted several natural experiments designed to assess the effect a citizenship question would have on response rates.  The Census Bureau examined differential declines in self-response rates, and differential sensitivity to citizenship inquiries as shown in item non-response rates and breakoff rates.  The Census Bureau's initial analyses, as detailed in the Administrative Record,

reflect that adding a citizenship question to the 2020 census would lead to a 5.1% decrease in

self-response rates.  PX-22; PX 147 at AR 11634 (draft white paper).

203.    The scientific analyses done by the Census Bureau are the *only* quantitative

evidence in the Administrative Record on this point.  The Administrative Record contains no

evidence whatsoever that the citizenship question will *not* harm the response rate.  Although the

decision memo references studies that purport to show the contrary, such as survey evidence

purportedly provided by the Nielsen Company, *see* PX-26 at AR 1315, 1318; no such evidence

appears anywhere in the record.

204.    The qualitative evidence in the Administrative Record likewise confirms that

adding a citizenship question will cause a material decline in self-response rates, particularly

among immigrant and Hispanic households.  PFOF § III.H.2.

205.    Nothing in the Administrative Record supports Secretary Ross's effort to dismiss

this quantitative and qualitative evidence of a decline in self-response from the addition of a

citizenship question.  Courts "ha[ve] not hesitated" to reverse agency decisions "when an agency

ignores factual matters or fails to respond adequately to meritorious arguments raised in

opposition to the agency's action."  *Water Quality Ins. Syndicate v. United States*, 225 F. Supp.

3d 41, 68 (D.D.C. 2016) (reversing agency decision that "ignore[d] critical context" and "cherry-

pick[ed] evidence"); *see also, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,

923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly

contradicted by the agency's own record does not constitute reasoned administrative

decisionmaking and cannot survive review under the arbitrary and capricious standard.").

206.    Courts will not defer to agency action where the record evidence "directly

contradicts the unsupported reasons of the agency and the agency fails to support its

pronouncements with data or evidence." *See Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006); *see also City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1099-1100 (C.D. Cal. 2018) (agency decision is arbitrary and capricious where "there is no evidence of record . . . that Defendants based [their] conclusion on any findings or data").

207.    This is not a case where the Administrative Record shows that "specialists express conflicting views," *see Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 351 (E.D.N.Y. 2014) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); to the contrary, the evidence in the Administrative Record uniformly confirms that adding a citizenship question will reduce self-response rates.

208.    The Secretary's description otherwise is simply an unsupported pronouncement that cannot substitute for record evidence.  *See Ramos v. Nielsen*, No. 18-cv-1554, 2018 WL 4778285, at *9-15 (N.D. Cal. Oct. 3, 2018) (finding likelihood of success on merits of APA arbitrary-and-capricious claim regarding termination of Temporary Protected Status for certain countries where DHS Secretary's unsupported pronouncement of changed country conditions is contradicted by extensive record evidence to the contrary).

209.    In addition, evidence that is outside of the designated A.R., but that the court may consider as evidence that essentially completes the Administrative Record, further shows that adding a citizenship question will decrease self-response rates in immigrant and Hispanic households.

210.    Christine Pierce, the Nielsen Company's Vice President of Data Science – the stakeholder referenced in the Secretary's decision memo as a purported source of "empirical

evidence about the impact of sensitive questions on survey response rates" – testified that

Nielsen did not provide any such evidence.  Pierce Aff. (Docket No. 498-18) at ¶¶ 15, 18.

211.    In fact, Pierce testified that Secretary Ross's decision memo materially

mischaracterized her input and omitted key facts (including her "unequivocal[]" concern "that a

citizenship question would negatively impact self-response rates").  *Id.* at ¶¶ 8, 12-18.

212.    This Court specifically noted the omission of any empirical evidence from

Nielsen as one basis for its order directing Defendants to complete the Administrative Record.

*See* July 3 Hearing Tr. at 81 (Docket No. 205) ("[T]he current record expressly references

documents that Secretary Ross claims to have considered but which are not themselves a part of

the Administrative Record.  For example, Secretary Ross claims that 'additional empirical

evidence about the impact of sensitive questions on the survey response rates came from the

Senior Vice-President of Data Science at Nielsen.'  That's page 1318 of the record.  But the

record contains no empirical evidence from Nielsen.").

213.    The reason this empirical evidence nowhere appears in the Administrative Record

is that the Secretary's decision memo falsely claimed it existed, when it does not.  Resting a

decision on claims that are "factually untrue" itself renders agency action arbitrary and

capricious.  *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 623-24 (E.D. Pa. 2018) (vacating the

Justice Department's imposition of immigration-related grant conditions on local law

enforcement funding where the stated basis for the Department's decision rested on claims that

were factually untrue); *see also City & County of San Francisco v. Sessions*, No. 17-cv-04642-

WHO, 2018 WL 4859528, at *25-28 (N.D. Cal. Oct. 5, 2018) (same).

214.    Moreover, extra-record evidence developed and presented at trial – including the

testimony of Plaintiffs' experts and of Defendants' only witness – confirms beyond any doubt

that adding a citizenship question will have devastating effects on the self-response rates of immigrant and Hispanic households. *See, e.g.*, PX-162 (revising "conservative" estimate of decline in self-response to 5.8% percent);  PX-297 at RFA 98, RFA 84 (5.1% decrease in self response), RFA 96-97 (the Census Bureau found empirical evidence that a citizenship question could reduce response rates); PX-662 (updated CBAMS presentation); Trial Tr. 881-82, 897, 919-20 (Abowd); Trial Tr. 30, 50-51, 78-80 (Hillygus); Trial Tr. 881-82, 919-20 (Barreto); PX-670; PX-671; *see generally* PFOF § VII.

> **b.      Adding a citizenship question will not provide more accurate, usable, or complete citizenship data.**

215.     Defendants' decision is counter to the evidence because adding a citizenship question to the census will not provide more accurate citizenship data than are currently available.

216.     Defendants' decision is predicated on the notion that a citizenship question will result in the "most complete and accurate" citizenship data for DOJ.  PX 26 at AR 1317; *see also id.* at AR 1313 ("prioritiz[ing] the goal of obtaining *complete and accurate data*") (emphasis in original); *id.* at AR 1316 ("it was imperative" to choose an option to "provide a greater level of accuracy").  But when viewed in light of this stated goal, Defendants' decision to add a citizenship question to the 2020 census plainly runs counter to the evidence.

217.     The evidence in the Administrative Record establishes that the addition of the citizenship question will result in *less* accurate and *less* complete citizenship data.

218.     Defendants do not dispute, and the Administrative Record establishes, that survey data regarding citizenship is inaccurate; non-citizens respond to inquiries into their citizenship status by responding that they are citizens approximately 30% of the time.  PX-22 at AR 1283; PX-25 at AR 1311.

219.    Every scientific analysis in the record confirms that the addition of the citizenship question will result in lower quality citizenship data.  *See, e.g.*, PX-25 (AR 1312) ("Alternative D would result in poorer quality citizenship data than Alternative C."); PX-22 (AR 1277-78) (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources").

220.    Moreover, as detailed above, the addition of the citizenship question will reduce self-response rates, which will further reduce data quality by driving more households into NRFU procedures that compromise that accuracy of the ultimate data produced.  *See* PFOF § III.H.2.

221.    The uncontroverted empirical evidence belies Secretary Ross's contention that collection of citizenship data through the census will enhance the accuracy of the data collected. Courts will "not defer to the agency's conclusory or unsupported suppositions."  *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *see also Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 626 F.3d 84, 94 (D.C. Cir. 2010) (explaining that an agency has an "obligation to explain its reasoning for rejecting" expert evidence contrary to its decision).

222.    Secretary Ross's statement is unsupported by *any* evidence in the record; asserting that the citizenship question will improve the accuracy of the data collected does not make it so.  Rather, as the Administrative Record makes clear, the use of the census to collect citizenship data compromises the accuracy of the data collected by the census.

223.    In addition, Secretary Ross contends that Option D "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," PX- 26 at

AR 1316, so as to allow for "more complete" citizenship data.  But this assertion is likewise

contrary to the evidence in the Administrative Record.

224.    The Administrative Record reflects that because adding a citizenship question

would drive down the self-response rate and put more households into NRFU operations, Option

D actually reduces the Census Bureau's ability to match survey responses with administrative

records.  PX-25 at AR 1311 (explaining that since "NRFU PII is lower quality than the self-

response data," the citizenship question will increase "the number of persons who cannot be

linked to the administrative data").  There is no evidence in the record to the contrary.

225.    Consideration of extra-record evidence – including trial testimony from

Defendants' sole expert witness, the consistent testimony of Plaintiffs' experts, and subsequent

analyses performed by the experts at the Census Bureau – explained the use of survey-based

inquiries and the statistical methods used to understand whether adding a citizenship question

will yield lower quality citizenship data. This testimony further explained the factors and

benchmarks that a reasonable decision-maker would have looked at to determine whether adding

a citizenship question will yield lower quality citizenship data.  *See* PFOF § IX.B.5.

226.    The Secretary's stated desire for accuracy cannot be squared with a decision that

moves the census in precisely the opposite direction.  *See State Farm*, 463 U.S. at 43 (decision is

arbitrary when it is "so implausible that it could not be ascribed to a difference in view or the

product of agency expertise").

          **c.**       **The Secretary's decision to choose Option D over Option C is contrary to the evidence before the agency.**

227.    Defendants' decision is counter to the evidence because the Secretary

unreasonably rejected the Census Bureau's alternative proposal of Option C, which would have

better met DOJ's stated needs at lower cost, lower respondent burden, and higher quality.  PX-22 (AR 1277).

228.   Evidence in the Administrative Record makes clear that Option C "best meets DoJ's stated uses, is comparatively far less costly [than adding a citizenship question], does not increase response burden, and does not harm the quality of the census count." *Id.*

229.   This uncontroverted evidence establishes that Option C – the use of administrative records alone – is better by every metric that the Secretary purports to value. *See Islander,* 482 F.3d at 99 (reversing where agency offered "no explanation for dismissing record evidence that runs counter to its findings").

230.   In contrast, adding a citizenship question "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  PX-22 (AR 1277); *see also*, *e.g.*, PX-24; PX-25; PX-132.

231.   Adopting a "plainly inferior" course of action is arbitrary and capricious. *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003).

232.   The Administrative Record standing alone also makes clear that selecting Option D is arbitrary for the independent reason that it depends on achieving undefined future improvements in Census Bureau methods.  PX-26 at AR 1316 ("Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data.").

233.   A decision based on the vague expectation of future improvements "to provide more complete and accurate data" is almost the definition of arbitrary; this kind of build-the-plane-as-you're-flying-it approach is no substitute for reasoned decisionmaking, especially

54

regarding a decision as consequential as the conduct of the census.  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("An agency may not avoid an obligation to analyze in an [environmental impact statement] environmental consequences that foreseeably arise from [a resource management plan] merely by saying that the consequences are unclear or will be analyzed later . . . ."); *cf. Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 179 (2d Cir. 2006) (agency decision was arbitrary where instead of complying with statutory requirement, "agency simply stated its intent to do better the next time")

234.    Extra-record evidence – including Dr. Abowd's testimony, the testimony of Plaintiffs' experts witnesses, testimony of Census Bureau executives, and subsequent Census Bureau analyses provided background on the complex concepts and calculations that were used to evaluate Options C and D, which are reflected but not entirely explained in the Administrative Record. This extra-record evidence further highlighted the professionally accepted and objective benchmarks and standards that a rational decision-maker would have relied on to evaluate whether Option D is by any standard worse than Option C.  PFOF § IX.B.5.

235.    Secretary Ross's failure to articulate a satisfactory explanation  for rejecting a less expensive, less burdensome, and higher quality alternative renders his decision arbitrary and capricious.  *See, e.g.*, *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015), *as amended* (July 21, 2015) (reversing where, *inter alia*, agency did not fully consider alternatives); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 825-26 (D.C. Cir. 1983) (rescission of ban on work within another's home was arbitrary where the agency failed to consider alternatives to complete elimination of the restriction); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision failed to give sufficient consideration to narrower alternatives).

d.   **Adding a citizenship question to the census is not necessary to enforce the Voting Rights Act, and would instead undermine the goal of fair representation for all communities.**

236.   Defendants' decision is counter to the evidence because adding a citizenship question to the census is not necessary to enable DOJ to enforce Section 2 of the Voting Rights Act.

237.   The Secretary's decision memo determines that adding a citizenship question is "necessary" to provide the data DOJ requires to enforce Section 2 of the VRA.  PX-26 at AR 1313, 1320.

238.   The Administrative Record contains no evidence that census-derived block-level CVAP data are necessary to enforce Section 2 of the VRA.

239.   The December 2017 DOJ letter does not state that such data is "necessary" to enforce the VRA; rather it studiously avoids using the word "necessary" to describe the request for the data.  PX-32 (AR).

240.   The DOJ letter does not identify any VRA cases that it failed to bring because of inadequate block-level CVAP data.  *Id.*

241.   The DOJ letter does not identify any VRA cases that it did bring that failed because of inadequate block-level CVAP data.  *Id.*

242.   The Administrative Record contains extensive evidence that the Secretary ignored from voting rights experts and others demonstrating that census-derived block-level CVAP data are not necessary to enforce the VRA.  PFOF § III.I.

243.   The Administrative Record also establishes that citizenship data produced in response to a citizenship question on the census will have serious issues with accuracy and completeness, particularly as to the data for immigrant and Hispanic populations.  PFOF § III.H.2.

56

244.    Congress could not possibly have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data have never been available at any point since Section 2 has existed: not in 1965 when the Voting Rights Act was first enacted; not in 1982 when the Act was amended to clarify the vote-dilution standard; and not in 1986 when the Supreme Court articulated the vote-dilution test in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

245.    Agency action should be set aside as arbitrary when "the reason which the [agency] gave for its action . . . makes no sense." *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984).

246.    In addition, the Secretary's decision memo gives no explanation at all for how the DOJ letter justified the ultimate decision, except to state that DOJ requested a citizenship question.  Failure to conduct any analysis at all of how the DOJ letter supports the Secretary's decision also renders that decision invalid under the APA.  *Kuang v. U.S. Dep't of Defense*, No. 18-cv-3698-JST, 2018 WL 6025611, at *31 (N.D. Cal. Nov. 16, 2018) ("DoD has simply provided no explanation for how the 2017 Study's findings support its policy choice, and 'where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).

247.    Nor were Defendants entitled simply to rely uncritically on the DOJ letter to support their decision, without any independent assessment of its merits.  Defendants may not simply hide behind the Department of Justice's stated rationale.  *See Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 16 ("EPA seeks to excuse its inadequate responses by passing the entire issue off onto a different agency.  Administrative law does not permit such a dodge.").  This is especially so where the Administrative Record establishes that Defendants themselves not

only solicited the request from DOJ, but also and provided DOJ with the rationale in the December 2017 letter.  PFOF § III.B – III.E.

248.    In addition, the cases cited in the DOJ letter – which provide the only support in the Administrative Record for the VRA justification – do not themselves support the contention that existing citizenship data were inadequate or caused plaintiffs to lose their Section 2 actions. PX-32 (AR 1525) (citing cases).  *See LULAC v. Perry*, 548 U.S. 399, 423-42 (2006) (plaintiffs *prevailed* on their vote-dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (plaintiffs' expert testimony for estimating HCVAP failed to satisfy the first *Gingles* precondition, but that analysis was *not* based on ACS data, and court of appeals left open whether plaintiffs could have satisfied *Gingles* One had their expert properly used his alternative method); *Barnett v. City of Chicago*, 141 F.3d 699, 702-04 (7th Cir. 1998) (Posner, J.) ("The census counts the total population for the same reason that it counts rather than samples: in order to minimize controversy.  To verify the age and citizenship of the population would enormously complicate the decennial census and open the census-takers to charges of manipulation." (citations omitted)); *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) (plaintiffs did not even attempt to demonstrate that illustrative districts had a majority Latino CVAP population); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (the plaintiffs acknowledged that none of their illustrative districts had majority Hispanic or black population).

249.    The extra-record evidence introduced at trial provided background about and explained the ways that data are used for VRA enforcement.  This evidence further explained the standards and benchmarks that are used to determine whether census-derived block-level data would be necessary for VRA enforcement.

250.     Dr. Lisa Handley explained that existing data products are more than adequate to enforce the VRA.  PFOF § IX.B.3 – IX.B.4.

251.     The substantial number of successful Section 2 cases filed since 1982 belies Defendants' assertion that census-derived CVAP information is somehow necessary to enforce the Voting Rights Act.  *See* National Commission on the Voting Rights Act, Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005, at 88, https://lawyerscommittee.org/wp-content/uploads/2015/07/0023.pdf (2006) (listing 117 "reported Section 2 cases leading to favorable results for minority voters" in the "23-year period following the 1982 reauthorization" of the Act).

252.     And the extra-record evidence confirms that data produced pursuant to the Secretary's Option D will retain margins of error; and that Defendants do not know whether the error margins for block-level CVAP data produced from a citizenship question on the census will be larger or smaller than currently available block-level CVAP data.  PFOF § IX.B.4.

253.     The extra-record evidence further explained that disclosure avoidance concerns will also impact the utility (if any) of adding a citizenship question—an important aspect of the problem that the Secretary entirely ignored.  The Census Bureau's disclosure avoidance protocols will introduce further errors into CVAP data produced at the block level, and will effectively mean that in general, there will not be a single census block where the CVAP data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  PFOF § IX.B.4.

254.     Extra-record evidence further establishes another important factor that the Secretary failed to consider, namely, that not only is a citizenship question unnecessary to

enforce the VRA, but that adding this question to the census will in fact *undermine* the goals the Voting Rights Act was enacted to protect.

255.    The purpose of the Voting Rights Act is to accomplish "nondiscriminatory treatment by government – both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement."  *Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

256.    Because adding a citizenship question will predictably undercount some communities, those communities will not achieve nondiscriminatory treatment in the application either of voting qualifications or of the administration of governmental services.  Warshaw Aff. (Doc. 526-1) at ¶¶ 50-61.

> **e.    Secretary Ross's decision memo is replete with assertions unsupported by and often contrary to the evidence.**

257.    Defendants' decision is counter to the evidence because the Secretary's decision memo contains numerous flawed assertions that are either based on no supporting evidence at all or are directly contradicted by the record evidence.

258.    For example, the Secretary contends that "no one has identified any mechanism" for identifying respondents who would self-respond to the census but for the addition of a citizenship question.  PX-26 at AR 1313, 1317.  This claim ignores the Census Bureau's multiple empirical analyses in the Administrative Record that go to precisely this issue.  *E.g.*, PX-22 at AR 1277; PX-25 at AR 1308; PX-4 at AR 8614; PX-147 at AR 11634.

259.    The Secretary also asserts that placing the citizenship question last on the census will somehow "minimize any impact on decennial census response rates."  PX-26 at AR 1320. The Administrative Record includes no evidence supporting this hypothesis.

260.     The Secretary's decision memo states that it was "difficult to assess" whether "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs."  PX-26 at AR 1319.  But the Administrative Record reflects that prior to the Secretary's decision, the Census Bureau prepared an analysis estimating that the expected self-response decline from adding a citizenship question would increase costs by at least $27.5 million.  PX-22 at AR 1282.

261.     The Secretary concluded that nonresponse rates to the ACS citizenship question for Hispanics and non-Hispanic whites were "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve.  PX-26 at AR 1315.  The nonresponse rates listed in the decision memo are, on their face, not comparable.  (*E.g.*, nonresponse rates to the ACS citizenship question for Hispanics are *twice as high* as nonresponse rates for non-Hispanic whites.  *Id.*)

262.     The Secretary stated with no support that "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition."  PX-26 at AR 1317.  The Administrative Record contains the Census Bureau's clear and evidence-based determination that adding a citizenship question to the census would impose an additional burden on all respondents.  PX-22 at AR 1277, 1281.

263.     It is the definition of arbitrary to base an agency decision on assertions with no foundation in fact.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (agency rule was arbitrary and capricious where agency lacked any evidence to support key factual conclusion); *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive review under the APA, "the facts on which the agency purports to

have relied" must "have some basis in the record") (quoting *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014)).

264.   If considered, the extra-record evidence presented at trial further confirms that many of the Secretary's assertions ignored important factors that a rational decision-making process would have considered.

265.   The assertion that there are no mechanisms to identify respondents who would self-respond but for the inclusion of a citizenship question ignores the possibility of conducting a randomized control test, which extra-record evidence confirms would have been possible if the Secretary had actually wanted additional empirical evidence.  *See* PX-162 (White Paper) at 39 n. 53 (noting the possibility of conducting "a randomized control trial (RCT) comparing self-response rates where some households are randomly chosen to have an 11-question Census questionnaire with a citizenship question (the treated group), and a randomly chosen set of control households receive a 10-question Census questionnaire without citizenship"); PX-165 (proposed RCT); *see also* PFOF § IV.B; Trial Tr. 164-65 (Hillygus); Trial Tr. 925-26 (Abowd).

266.   Extra-record evidence also confirms that all questions on the decennial census impose an incremental burden on respondents.  *See, e.g.*, Habermann Aff. (Docket No. 498-11) ¶¶ 22-25; Pierce Aff. (Docket No. 498-18) ¶ 9; Trial Tr. 43 (Hillygus).

267.   The Census Bureau has produced further analyses estimating the significantly increased costs from asking the question.  PX-162.

268.   In response to requests for admissions, the Census Bureau admitted that the non-response rates to the ACS citizenship question for Hispanics and non-Hispanic whites were not "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve.  PX-297 at RFAs 89-95.

269.     Unrebutted extra-record testimony from the former Director of the UN Statistics Division proves that the Secretary relied on UN recommendations for conducting population censuses without considering that the UN recommendations include a number of steps that were totally ignored here, including that Defendants "ensure that the topics are appropriate for meeting the demonstrated requirements of users," include "suitable consultation with existing and potential users at all stages," and conduct "adequate testing of new topics."  Habermann Aff. (Docket No. 498-11) at ¶¶ 78-84.

270.     The same unrebutted testimony identifies further factors that the Secretary ignored in relying on international comparisons, including that Australia and Canada (cited by the Secretary as benchmarks for adding a citizenship question, *see* PX-26 at AR 1319) do not in fact have comparable practices.  Habermann Aff. at ¶ 85.

## 2.     Defendants' decision entirely failed to consider important aspects of the problem.

271.     The APA requires this Court to set aside Defendants' decision as arbitrary if Defendants "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

### a.     The March 26 decision memo failed to address key legal obligations.

272.     As set out in more detail in Part III.C.1 below, Secretary Ross's decision memo does not note or otherwise discuss Defendants' failure, in its March 2017 notification to Congress pursuant to 13 U.S.C. § 141(f)(1), to identify citizenship as a subject that would be included on the decennial census.  PX-26 (AR); *see also* PX-357.

273.     Secretary Ross' decision memo does not note or otherwise discuss his mandatory statutory obligation to "find[] new circumstances exist which necessitate" the addition of any

new subjects to the decennial census after the March 31, 2017 deadline, as required by 13 U.S.C. § 141(f)(3).  PX-26 (AR).

274.    As set out in more detail in Part III.C.2 below, Secretary Ross's decision memo does not note or otherwise discuss his obligation "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to "acquire and use information available from any source [from other federal or other governmental entities] instead of conducting direct inquiries," as required by 13 U.S.C. § 6(c).  PX-26 (AR).

275.    As set out in more detail in Part III.C.3 below, Secretary Ross's decision memo does not address the binding Office of Management and Budget standards, including Statistical Policy Directive No. 2, which requires agencies to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs."  PX-359 (Standard 1.3); PX-26 (AR).

276.    Secretary Ross's decision memo does not discuss the Census Bureau's binding Statistical Quality Standards, which requires that "data collection instruments . . . must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden."  PX-260 (req. A2-3); PX-26 (AR).

277.    Secretary Ross's decision memo does not discuss the requirement in the Census Bureau's Statistical Quality Standards, including requirement A2-3.3 which provides "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." PX-260 (req. A2-3.3).

278.     Secretary Ross's decision memo does not discuss that the Census Bureau is prohibited from making "[a]ny publication whereby the data furnished by any particular . . . individual under this title can be identified."  13 U.S.C. § 9(a)(2); PX-26 (AR).

279.     Defendants' complete failure to address these binding statutory mandates and internal standards renders the decision arbitrary and capricious.  *League of Women Voters v. Newby*, 838 F.3d 1, 10-12 (D.C. Cir. 2016) (disregard for statutory criterion renders agency decision arbitrary under the APA)

> **b.     The Secretary failed to consider the relevant standard of proof for adding new questions to the census.**

280.     Defendants' decision failed to consider important aspects of the problem because the Secretary applied an incorrect (and insurmountable) standard for determining when new questions would unreasonably harm the census count or data quality.

281.     The Secretary's decision inverts the standard of proof for adding new questions to the census.  Defendants bear the burden to demonstrate the need for the question, and to confirm that the change will not cause harm.  Habermann Aff. (Docket No. 498-11), at ¶ 18.

282.     Dr. Habermann testified that "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public."  Habermann Aff. (Docket No. 498-11), at ¶ 18; *see also* PFOF § IV.B.

283.     But the Secretary's decision makes clear that Defendants made no affirmative finding whatsoever that the citizenship demand would *not* harm the decennial census; instead,

the Secretary based his decision on the purported *absence* of evidence of harm.  *See* PX-26
(AR 1313, 1316-17).

284.    As detailed above, the Administrative Record is replete with evidence
demonstrating that, *inter alia*, adding the question would "increase response burden" and "harm
the quality of the census count."  PX-22 (AR 1277).

285.    But even setting aside such evidence, the Secretary's reliance on the purported
absence of evidence inverts the relevant burden of proof and introduces unacceptable – and
unlawful – risk to the census.  *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1075
(9th Cir. 2018) (agency action was arbitrary and capricious where the agency failed to consider
scientific evidence "solely because of 'uncertainty'").

286.    In light of the irreparable impact of adding a citizenship question – dilution of
political power, reductions in funding streams for the next decade, impaired demographic data
and statistics – Secretary Ross's failure to consider and apply the appropriate standard is
arbitrary and capricious.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C.
Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

**c.    The Secretary failed to consider the impact of disclosure
avoidance protocols on his decision.**

287.    Defendants' decision failed to consider important aspects of the problem because
the Secretary did not address the effect of the Census Bureau's confidentiality obligations and
disclosure avoidance practices on the fitness of citizenship data for DOJ's stated purposes.

288.    The words "disclosure avoidance" appear nowhere in the Secretary's decision
memo.  *See* PX-26 (AR).  Yet the Census Bureau's disclosure avoidance protocols, which
require the Census Bureau to ensure that data released by the Bureau do not compromise

respondent confidentiality, indisputably impact how the Census Bureau will be able to process and release block-level CVAP data.

289.     Pursuant to their disclosure avoidance protocols, the Census Bureau will undertake disclosure avoidance for every census block, meaning that even after the addition of a citizenship question – except for randomly – there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  Trial Tr. 1033 (Abowd); Census 30(b)(6) Dep. (Docket No. 502-2) at 54-56, 65-86, 70-71, 100-01; PFOF § IX.B.4.

290.     The Bureau has not determined if, after disclosure avoidance, the error margins for block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census 30(b)(6) Dep. at 101.  PFOF §§ IX.B.4, IX.B.5.

291.     As documents in the Administrative Record make clear, Defendants were well-aware that disclosure avoidance protocols would impact the ultimate CVAP data produced for the DOJ.  *See, e.g.*, PX-1 at AR 1292 (explaining that only data that has been "processed through the Bureau's disclosure avoidance procedures can be released for public use"); PX-3 at AR 2952 (Census Bureau acknowledgment that the Bureau will need to ascertain "how disclosure avoidance will be handled"); PX-3 at AR 6415 (discussing application of disclosure avoidance system to Census Bureau proposal to obtain CVAP information).

292.     Because the Administrative Record includes no details as to how this process will impact the DOJ's stated data need for granular citizenship data, and does not even contain any suggestion that the Secretary in any way considered the implications of disclosure avoidance for his ultimate decision, Defendants' failure even to consider this important aspect of the issue is

arbitrary.  *See, e.g.*, *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) ("Despite immense losses in the gray wolves' historical range . . . the Service nowhere analyzed the impact of that loss on the survival of the gray wolves as a whole . . . .  Such a failure to address 'an important aspect of the problem,' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking.") (quoting *State Farm*, 463 U.S. at 43); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 420-21 (3d Cir. 2004) (vacating agency repeal rule where agency failed to consider or even acknowledge "the effect of its decision on minority television station ownership"); *State of Connecticut v. U.S. Dep't of Commerce*, No. 3:04-cv-1271, 2007 WL 2349894, at *12-13 (D. Conn. Aug. 15, 2007) (vacating agency decision as arbitrary because, *inter alia*, "the Secretary failed to address an important aspect of the problem because he effectively ignored the adverse effects on oysters," where "the destruction of oysters . . . is significant in balancing the adverse effects of the project against the national interest").

> **d.     Defendants bypassed the procedures designed to identify the best means of satisfying DOJ's request.**

293.     Defendants' decision failed to consider important aspects of the problem because Defendants never complied with their standard practice of conferring with the requesting agency to determine how best to meet its data needs.

294.     The absence of any communication between the Census Bureau and the DOJ subject matter experts to discuss the parameters or details of DOJ's stated data need bolsters the conclusion that the Secretary's decision was arbitrary and capricious.

295.     As detailed in the Administrative Record, when an agency requests data, it is standard operating procedure for the Census Bureau to meet with that agency to discuss the data

request, drill down into the details of the data use, and consider how best to meet the need presented.  PX-1 at AR 1168-72; *see also* PX-71 (AR); PX-101 (AR); PX-4 at AR 5490, 8651.

296.    In this case, the Census Bureau advised DOJ that they had a less burdensome proposal for meeting DOJ's purported data need and reached out repeatedly to DOJ to set up a meeting between their respective experts.  PX-71 (AR); PX-4 at AR 8651.  But the Administrative Record makes clear that DOJ refused to meet with the Census Bureau to explain their request for block level CVAP data or discuss how best to satisfy DOJ's stated needs.  PX-75(R) (AR); PX-4 at AR 5489, AR 9074.

297.    This deviation from usual practice supports a finding that the Secretary's decision to add a citizenship question is arbitrary and capricious.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 523 (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-cv-366, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013) (holding that where the FDA "departed from its normal procedures," agency conduct was arbitrary and capricious); *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 207 (D.D.C. 2015) (agency's unsupported departure from prior practice was arbitrary and capricious); *see also Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1150 (D.C. Cir. 1988) (failure to enforce a procedural rule uniformly is arbitrary and capricious).

298.    The purpose of these inter-agency meetings is to allow the Census Bureau to understand the granular use case for the requested data and ensure that the method proposed for satisfying that data need is suited to the use required.

299.    In the absence of such coordination, Defendants cannot demonstrate that the Secretary's decision fits DOJ's data needs.  For example, the Administrative Record confirms that DOJ was not even apprised of the high inaccuracy rate of citizenship survey responses.  *See*

PX 23 (AR 1294-95).  Nor is there any evidence in the Administrative Record that the Census Bureau discussed their disclosure avoidance protocols, and concomitant implications for block level CVAP data, with DOJ.  The record is bereft of any indication as to whether these issues – widespread errors in survey responses and impacts of disclosure avoidance protocols – will make the resulting data product unfit for DOJ's stated use.

300.    Consideration of extra-record evidence confirms that Defendants deviated from long-established processes that were designed and are followed precisely to ensure that federal statistical agencies can perform their jobs effectively.

301.    Plaintiffs' experts confirm that it is standard operating procedure, and best practice, for the Census Bureau to meet with a requesting agency to discuss that agency's data needs.  PFOF § IV.B.

302.    The extra-record evidence further confirms that the refusal to meet was politically motivated and highly unusual.  PFOF § III.H.1, IV.A-B.  Acting AAG John Gore testified that this refusal was personally directed by Attorney General Sessions himself.  Gore Dep. (Docket No. 491-2) at 274.  Dr. Abowd testified that this kind of political interference contravenes foundational principles designed to uphold the effectiveness and truthworthiness of federal statistical agencies.  Trial Tr. 1265-68; *see also* PX-355 at 3.

303.    Under these circumstances, Defendants cannot show that there is a fit between the purported data need presented by the Department of Justice – block-level CVAP data – and the method identified to satisfy that need – the addition of a citizenship question.

      e.    **Defendants failed adequately to consider the need for testing both the citizenship question and the full census questionnaire.**

304.    Defendants' decision failed to consider important aspects of the problem because Defendants unreasonably overlooked the insufficiency of prior testing of the citizenship

question, and disregarded the need to test the census questionnaire as a whole after having been changed.

305.    The Secretary's decision memo dismisses the need for testing the citizenship question exclusively on the grounds that because the citizenship question had been included on the ACS since 2005, it had already been sufficiently tested.  PX-26 (AR 1314, 1319).

306.    Based on evidence in the Administrative Record alone, this determination failed to properly consider the Census Bureau's established processes and specific considerations that require pretesting of new survey questions.

307.    The Census Bureau's well-established policies and practices reflect that when changing the decennial census, "[t]he Census Bureau must test the wording of the new question." PFOF § II.E.1; PX-4 at AR 3890, 9867; PX-3 at AR 2304; PX-134 (AR).

308.    The Administrative Record likewise reflects that stakeholders, including six former census directors, emphasized to the Secretary the importance of testing the citizenship question.  PFOF § III.I; PX-116; PX-539.

309.    Defendants contend that they were not obligated to test the citizenship question because it had "performed adequately" on the ACS, but the Administrative Record proves that, in fact, the citizenship question had not performed adequately; instead, roughly 30% of all people identified as noncitizens by administrative records self-report as citizens.  PFOF § IV.E.3; PX-22 (AR).

310.    Secretary Ross says in his decision memo that the high disagreement rate is a sign that ACS citizenship data are unreliable.  PX-26 at AR 1316.  The Secretary seems not to have understood that this assertion undermines his reliance on the ACS for his conclusion that the citizenship question as "well tested."  PFOF § IV.E.3; PX-26 at AR 1314.  There is no evidence

of any kind in the Administrative Record that Secretary Ross evaluated whether the ACS citizenship question was performing adequately in concluding it did not need to be tested again.

311.    There is no evidence in the Administrative Record that Secretary Ross considered whether testing was required in light of the changing macro environment.

312.    There is no evidence in the Administrative Record that Secretary Ross considered whether the citizenship question required testing in light of differences between the ACS and the decennial census, including the absence of a preceding nativity question on the ACS or the prominence of the citizenship question in a much shorter survey.

313.    The Secretary's failure to address any of these reasons why prior testing of a citizenship question on the ACS was insufficient is a paradigmatic example of arbitrary decisionmaking.  *See, e.g.*, *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential harms of its changes to an airport advertising program); *Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare.").

314.    The Administrative Record also demonstrates that Defendants failed entirely to consider the need to test the full census questionnaire, as modified to include a new citizenship question.  The Secretary's decision memo does not address the need for full testing of the complete questionnaire, as distinct from testing of the question itself, at all.

315.    OMB statistical directives and the Census Bureau's own Statistical Quality Standards dictate that the full census instrument be pre-tested when changes are made, as even

minor variations in the design of a questionnaire can lead to unanticipated differences in response patterns.  *See, e.g.*, PX-260 at § A2-3.3.

316.    The Secretary's decision memo makes no reference to the scientific consensus concerning the need for full-questionnaire testing or the Census Bureau's own Statistical Quality Standards that require testing of the entire census questionnaire.  PX-26 (AR 1313, 1314, 1319) (referencing only testing of the question for the ACS).

317.    Defendants' failure even to consider the need for testing of the entire proposed questionnaire is arbitrary and capricious.  *See, e.g.*, *New York State Bar Ass'n v. Fed. Trade Comm'n*, 276 F. Supp. 2d 110, 145 (D.D.C. 2003) (agency's failure to consider whether statutory scheme warranted a *de minimis* exception was arbitrary and capricious).

318.    If considered, the extra-record evidence further proves that testing of the citizenship question on the ACS does not justify its use on the decennial census.

319.    Expert testimony from Plaintiffs' witnesses confirms that the citizenship question was not properly tested for inclusion on the census, because the question was not performing adequately on the ACS; because changes in the macro environment required up-to-date testing; and because of the many differences between the ACS sample survey and the decennial census. PFOF § IV.E.3.

320.    Extra-record evidence also demonstrates that the Census Bureau typically spends *years* testing survey instruments prior to deciding whether or not to change the decennial census; for this census cycle alone, the Census Bureau conducted many tests of the instrument.  PFOF § IV.E.4; Thompson Aff. (Docket No. 516-1) ¶¶ 48-54; Habermann Aff. (Docket No. 498-11) ¶¶ 44-46; Trial Tr. 167.

321.     The Committee on National Statistics (CNSTAT) of the National Academy of Sciencies also concluded that the citizenship question had not been properly tested.  PX-529.

322.     Dr. Abowd himself testified at trial that the ACS citizenship question is *not* in fact performing well.  Trial Tr. 1282.

323.     In addition, both Dr. Abowd and David Langdon testified that one reason to conclude that prior testing was sufficient here was that there was not enough time following receipt of the DOJ request to conduct new testing.  Trial Tr. 1291; Langdon Dep. (Docket No. 510-2) at 243 ("There hasn't been any testing to date.  And the time frame wouldn't – the Secretary's decision wouldn't – you know, wouldn't accommodate that kind of testing.").  But that is an exigency of Defendants' own making; failure to give themselves enough time to conduct proper pretesting does not excuse noncompliance with testing standards.  *See N. Mariana Islands v. United States*, 686 F.2d 7, 21 (D.D.C. 2009) ("DHS should not now expect to excuse its violation of the APA by pointing to the problems created by its own delay.").

> **f.     Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates.**

324.     The Secretary's decision memo states that "[t]he citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond."  PX-26 at AR 1319.  The Secretary's assertion that providing information to DOJ "is of greater importance," than "any adverse effect" is both incorrect and fails to consider the broad range of harms that stem from depressing responses to the census.

325.     The sole constitutional purpose of the decennial census – the reason it exists, first and foremost – is the apportionment of Representatives in Congress among the states.  U.S.

Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  This interest is paramount and certainly more important than assisting DOJ.

326.    The Secretary's decision memo nowhere considers the wide variety of harms that can result from getting this enumeration wrong.  PX-26; *see* PFOF § X.  Nor does he make any effort to weigh those harms against the value of assisting DOJ.  PX-26 (AR).

327.    Finally, the Secretary's assertion that assisting DOJ is more important than adverse effects "that may result from people violating their legal duty to respond," again failed adequately to consider the nature and quality of injuries that may result from an inaccurate census.  The fact that some people might refuse to respond because the Secretary has chosen to include a question uniformly understood to discourage people from responding is not a good reason why other residents of that state or community should be denied their just representation, or funding for medical services, educational services, and the like.  In any case, nowhere is there any evidence that the Secretary weighed these issues.  PX-26.

328.    Extra-record evidence confirms that the Secretary's failure to consider the profound detrimental impact of adding a citizenship question on the census is arbitrary.  As Dr. Abowd testified, the decennial census "is the statistical foundation of the Census Bureau's work on households and compromising its quality to produce a citizenship tabulation that could be produced from other sources more accurately is not a risk that I would be willing to take."  Trial Tr. 1332.

### 3.    Defendants' stated rationale was pretextual.

329.    Agency action is invalid under the APA where the agency has "relied on factors which Congress has not intended it to consider."  *State Farm*, 463 U.S. at 43.

330.    Agency action will be arbitrary and capricious if it is based on a pretext – that is, if "the stated rationale for Secretary Ross's decision was not his actual rationale."  *New York v.*

*U.S. Dep't of Commerce*, No. 18-cv-2921, 2018 WL 4539659, at *2 (S.D.N.Y. Sept. 21, 2018);
*see also Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994); *XP*
*Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 79 (D.D.C. 2015) (plaintiff stated pretext
claim based on allegations that, *inter alia*, agency proffered pretextual reason for its decision).

331.    Manufacturing a post hoc explanation—DOJ's purported need for citizenship data
for VRA-enforcement purposes—for a decision that Secretary Ross had already made based on
some other rationale is evidence of pretext.  *See Tummino v. von Eschenbach*, 427 F. Supp. 2d
212, 231-33 (E.D.N.Y. 2006) (officials "needed to find acceptable rationales"); *see also Woods*
*Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994) (setting aside
agency action because "sole reason" for that action was "to provide a pretext" for the agency's
"ulterior motive"), *adhered to on reh'g en banc*, 47 F.3d 1032 (10th Cir. 1995).

### a.    The Administrative Record alone confirms that the stated rationale is pretext.

332.    The Administrative Record demonstrates that the Secretary's reliance on DOJ's
purported need for citizenship data for VRA enforcement was a pretext manufactured by
Commerce to cover the Secretary's actual rationale for adding a citizenship question to the
decennial census questionnaire.

333.    The Secretary's own statements, along with the emails and documents contained
in the Administrative Record, establish that the Secretary was pursuing a citizenship question
long before he reached out to DOJ to obtain DOJ's December 2017 letter, and long before he had
any awareness of any purported VRA-enforcement rationale.  PX-55 (AR); PX-19 (AR); PX-150
(AR); PX-607 (AR).

334.    As the Secretary has admitted, he began considering the citizenship question "[s]oon after [his] appointment as Secretary" in February 2017 – almost a year before DOJ's letter.  PX-2 at AR 1321.

335.    The Secretary's ensuing months-long pursuit of the citizenship question had nothing to do with any purported VRA-enforcement rationale.  For example, early in the Secretary's tenure, at the direction of then-White House Chief Strategist Stephen Bannon, the Secretary spoke with Kris Kobach, the Kansas Secretary of State, who urged the Secretary to add a citizenship question as an "essential" tool to resolve "the problem" of noncitizens' being counted for purposes of congressional apportionment.  PX-19 (AR 763-64).  Kobach's email made no mention of the VRA.  *Id.*

336.    The Secretary then pressed his staff to add a citizenship question to the decennial census when they failed to move quickly.  In March 2017, Comstock responded to the Secretary's "question on the census" by discussing whether the census's total-population count must include noncitizens.  PX-55 (AR).  This email also did not discuss the VRA.  *Id.*

337.    In May 2017, the Secretary asked Comstock by email why "nothing [has] been done in response to my *months old* request that we include the citizenship question."  PX-88 (AR) (emphasis added).  The Secretary's email did not mention the VRA.

338.    Comstock replied that Commerce would "get that in place" and "work with Justice to get them to request that citizenship be added," again without mentioning the VRA. PX-88 (AR).

339.    The Secretary's demand for progress also set off further activity among the Secretary's staff, including discussions about the legal basis for counting "illegal immigrants" in the census.  PX-150; PX-565.

340.     In August and early September 2017, the Secretary sent multiple emails to his staff demanding updates, briefings, and meetings about adding the citizenship question. Although one of these emails references DOJ and offers to call the Attorney General, PX-97 (AR), none of them mentions the VRA.  PX-45 (AR), PX-95 (AR).

341.     The VRA rationale continued to be absent during Commerce's subsequent, extensive efforts "to find acceptable rationales" for adding the citizenship question.  *See Tummino*, 427 F. Supp. 2d at 231-33.

342.     As the Administrative Record demonstrates, Commerce staff began shopping the question around to different federal agencies.  Staff solicited officials in other agencies to request addition of the question, including officials who work on immigration matters in the Departments of Justice and Homeland Security, but these officials declined Commerce's overtures.  When those efforts failed, the Secretary's staff worked on "how Commerce could add the question to the Census *itself*" – i.e., without any rationale from another agency.  PX-48 (AR). Commerce's efforts to find some other justification for adding the citizenship question, rather than the VRA rationale that the Secretary later relied on, further demonstrate that the VRA justification is pretext.

343.     In December 2017, DOJ eventually requested that Commerce add a citizenship question to the 2020 census questionnaire.  But the origins of that request and the Secretary's shifting characterization of it further underscore the pretextual nature of the VRA rationale.

344.     The Secretary's initial memorandum in March 2018 stated that he began his decision-making process about a citizenship question *after* receiving the Department of Justice's December 2017 request letter.  PX-26 at AR 1313.  The Secretary repeated this account in subsequent Congressional testimony, in which the Secretary claimed that Commerce's

investigation into adding a citizenship question was *solely* in response to DOJ's December 2017 request.  PFOF § IV.D.  What these statements did (and were intended to) convey was that the Secretary was merely deferring to DOJ's independent judgment about the need for citizenship data in an area of DOJ expertise.

345.    But the Administrative Record demonstrates that both aspects of the Secretary's narrative were false: it was the Secretary, not DOJ, who initiated the decision-making process to add a citizenship question, nearly a year before DOJ's December 2017 request; and it was the Secretary who first reached out to DOJ about the citizenship question rather than the other way around.

346.    Indeed, DOJ's request had not arisen organically from that agency's independent judgment; instead, Commerce had repeatedly solicited DOJ and then worked with DOJ to produce the December 2017 letter so that it would appear – falsely – as though DOJ had independently initiated the request for citizenship data.  PX-537 at AR 12756.

347.    Among other efforts, the Secretary personally and repeatedly lobbied the Attorney General to submit the request that the Secretary later claimed was the sole reason he began considering a citizenship question.  PFOF §§ III.D, III.E; PX-97 at AR 4004; PX-48 at AR 2458; PX-67 at AR 2653; PX-61 at AR 2636; PX-52 at AR 12755.  Such post-hoc rationalizations do not constitute rationale or good faith decision-making.  *See, e.g., Tummino v. Torti*, 603 F. Supp. 2d 519, 547-49 (E.D.N.Y. 2009); *Tummino*, 427 F. Supp. 2d at 231-33; *New York v. Salazar*, 701 F. Supp. 2d 224, 242 (N.D.N.Y. 2010), *aff'd*, 2011 WL 1938232 (N.D.N.Y. 2011).

348.    The Administrative Record also belies the genuineness of DOJ's assertion in its December 2017 letter that adding the citizenship question would assist VRA enforcement.

349.    First, as explained, that rationale originated with the Secretary and not with DOJ staff or leadership independently.

350.    Second, DOJ officials refused to meet with the Bureau's experts to discuss their concerns that adding a citizenship question would not produce accurate citizenship data and that there were better, alternative means to obtain higher quality and more accurate CVAP data that better suits DOJ's needs.  *See* PFOF §§ III.H, IX.B.5.

351.    Both facts suggest that DOJ officials with relevant expertise did not in fact believe that, or care whether, the question would provide accurate citizenship data for VRA enforcement.  The questionable nature of DOJ's request further demonstrates that the Secretary adopted the VRA-enforcement rationale as a pretext, particularly given the Secretary's direct role in inducing that letter.

352.    Commerce's efforts to cover up the Secretary's actual decision-making process and rationales also support a finding of pretext.  *See Salazar*, 701 F. Supp. 2d at 242 (agency took steps to conceal that official "prejudged and controlled" decision); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing . . . and do another" is "the essence of arbitrary action.").

353.    As explained, the Secretary's initial explanations of his decision-making were false, as was the Secretary's testimony regarding the lack of White House involvement in his decisionmaking process.  AR 763, AR 2561.  Defendants then also submitted a patently deficient administrative record that lacked nearly any documents from before December 2017, even those these documents disclosed the Secretary's extensive pursuit of the citizenship question before the DOJ letter and before any purported VRA-rationale was in the picture.

354.     Moreover, Secretary Ross and his senior staff agreed in August 2017 to whitewash the administrative record.  AR 12476.  These efforts to conceal the pre-December 2017 events strongly suggest that the Secretary's reliance on DOJ's December 2017 letter is pretext.

355.     By analogy to employment discrimination caselaw, evidence of Defendants' false or shifting justifications is a strong demonstration of pretext. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 881 (2d Cir. 1997) (evidence of employer's false explanation for employment action supported jury's finding of unlawful pretext); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994) (evidence of shifting explanations was sufficient for a jury to conclude that employer's explanations were pretextual).

356.     Finally, the Administrative Record establishes that the stated reason for the decision – to better enforce Section 2 of the Voting Rights Act ("VRA") – is also implausible and thus a pretext.  *See Torti*, 603 F.Supp.2d at 523 ("implausible justifications for decision-making" showed "lack of good faith and reasoned agency decision-making").  Block-level citizenship data from the decennial census have never been available since the 1965 enactment of the VRA, yet DOJ has been able to enforce the VRA since its passage without such information. PFOF § IX.B.

357.     And even if more accurate data could in theory be helpful to DOJ, here, the Administrative Record shows that CVAP data collected through a citizenship question on the

census will be less accurate, because the addition of a citizenship question will damage the overall quality of census data.  *See* PFOF IX.B.4.

> **b.      Extra-record evidence confirms that the Secretary's given rationale is pretext.**

358.    Extra-record evidence strengthens the conclusion that the VRA-enforcement rationale is a pretext and that the Secretary's decision to add the citizenship question based on that rationale should therefore be set aside as arbitrary and capricious.

359.    Specifically, Acting AAG Gore's testimony further undermined the genuineness of DOJ's claim to need more accurate citizenship data to enforce the VRA, and confirmed that DOJ did not independently request such data from Commerce.

360.    In his testimony, Gore acknowledged that none of the DOJ components with principal responsibility for enforcing the VRA requested the addition of a citizenship question; instead, he drafted the DOJ letter solely in response to the Secretary's request.  Gore Dep. (Docket No. 491-2) at 64-67, 94-95.  He also testified that he drafted the DOJ letter despite not even knowing if citizenship data based on responses to a citizenship question on the census will have smaller or larger margins of error, or will be any more precise, than the existing citizenship data on which DOJ currently relies.  PFOF § III.F.

361.    The extra-record evidence confirms that the VRA-enforcement rationale was not the Secretary's actual reason for adding the citizenship question because the extra-record evidence demonstrates that better block-level citizenship data are not in fact needed to enforce Section 2 of the VRA.  PFOF § IX.B.1.

362.    And the extra-record evidence adduced at trial establishes that any citizenship data collected through the 2020 census would not be usable at the block level in any event, because of the Census Bureau's statutorily-mandated disclosure avoidance protocols and

confidentiality protections.  In order to make such data usable, the Census Bureau will be forced to introduce errors into the data, transforming any block-level CVAP data into estimates with a margin of error rather than a hard count; and the Bureau does not know whether such CVAP estimates will be any more precise than the existing CVAP data on which DOJ relies.  *See* PFOF § IX.B.4.

363.    The extra-record evidence also confirms that Commerce failed even to inform the Census Bureau that the Secretary had long been pursuing a citizenship question or his purported reason for doing so.  As the extra-record evidence shows, the entire senior executive staff of the Census Bureau – indeed, "everyone" Dr. Abowd knows at the Census Bureau – was surprised by the contents of the Administrative Record that predated the December 2017 letter from DOJ. Trial Tr. 1020 (Abowd).

364.    During all of the work that Dr. Abowd and his senior team did to evaluate the DOJ request, nobody from the Commerce Department ever told him of the Secretary's many repeated demands to add a citizenship question, the lengthy efforts to recruit another federal agency to sponsor the question, or any purported VRA-enforcement rationale for adding the citizenship question.  PFOF § III.G.

365.    Nor did Commerce officials – during their months-long efforts to solicit an agency to request a citizenship question – ever consult the Census Bureau to understand the methodological or programmatic implications of their actions.

366.    Commerce officials' persistent failure to consult with the Census Bureau strongly suggests pretext by demonstrating that officials were not genuinely interested in obtaining high-quality and accurate citizenship data for VRA enforcement.

367.    No one at Commerce or DOJ asked the Census Bureau's expert staff whether adding a citizenship question would, in fact, provide citizenship data more accurate than the data that DOJ already uses for VRA enforcement.  Nor did anyone at Commerce or DOJ find out whether there were other, better ways to obtain more accurate citizenship data without adding a citizenship question.

368.    Indeed, the extra-record evidence confirms that when the Census Bureau sought to discuss the best way to obtain accurate citizenship data with DOJ, Attorney General Sessions personally directed DOJ officials not to meet with the Bureau's staff.  *See* PFOF §§ III.H.1; V. Trial testimony conclusively demonstrated that the Census Bureau determined that using administrative records would produce more accurate data for DOJ's needs.  *See* PFOF § IX.B.5. Asserting that a citizenship question will provide more accurate citizenship data without knowing whether that assertion is true and without asking the professional staff whether that assertion is even supportable is strong evidence of pretext.

369.    Finally, extra-record evidence strengthens the conclusion that the Secretary's initial presentation of the genesis of his decision was false and misleading.  On November 13, 2018 – in the middle of the trial of this action – the Secretary gave a press interview regarding his decision to add a citizenship question, and stated that he was aware that discussions of adding a citizenship question were "in the air" from the "early days" of the Trump Administration.  PX-688.  But as Dr. Abowd testified, after viewing the video of Secretary Ross's November 13 press interview, a citizenship question was "not [in] the air I was breathing."  Trial Tr. 1373.

      **4.**  **The Secretary improperly prejudged the decision to add a citizenship question.**

370.    Agency action is arbitrary and capricious under the APA where the decision-maker prejudged important matters underlying the challenged decision.  *See, e..g, Air Transport*

*Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 486-88 (D.C. Cir. 2011); *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1002 (D.C. Cir. 1999); *Salazar*, 701 F. Supp. 2d at 242.

371.    An agency decision-maker prejudges important matters when he acts with a closed mind rather than engaging in "fair and honest consideration" of the matters at hand. *Torti*, 603 F. Supp. 2d at 542; *see Air Transport*, 663 F.3d at 486-88.

372.    The Administrative Record demonstrates that the Secretary prejudged his decision to add the citizenship question.  As the Administrative Record establishes, the Secretary decided to add the citizenship question to the 2020 census well before DOJ's December 2017 letter and well before his March 2018 initial decision memorandum.  Moreover, the Secretary single-mindedly pursued that goal despite multiple obstacles and objections, without giving fair consideration to important underlying issues.

373.    The Administrative Record shows that the Secretary decided to add the citizenship question many months before he even received DOJ's December 2017 letter.  For example, the Secretary demanded to know in May 2017, "why nothing [has] been done in response to my *months old* request that we include the citizenship question," to which Comstock answered that Commerce would "get that in place."

374.    In the months that followed, the Secretary repeatedly demanded to know why his goal of adding the citizenship question had not been completed, and repeatedly stated that he would personally reach out to the Attorney General if progress was not made on getting DOJ to sponsor the addition of a citizenship question.

375.     And in November 2017, before DOJ had sent its request, the Secretary warned that Commerce was "out of time" to add the citizenship question and that he would thus personally call "whoever is the responsible person at [DOJ]."  PFOF § III.E.

376.     An open-minded decision-maker would not speak about the decision to add a citizenship question as a matter decided "months ago" or as an action that must be completed now because the agency is "out of time."  *See Davis v. Mineta*, 302 F.3d 1104, 1112-13 (10th Cir. 2002), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) (agency comments reflected prejudgment); *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1260-61 (D. Wyo. 2004) (decision-maker's comments reflected prejudgment).

377.     The Administrative Record also belies the Secretary's contention that he fairly considered the addition of a citizenship question after receiving DOJ's December 2017 request. The fact that the Secretary and his staff solicited DOJ's request and worked with DOJ to draft the December 2017 letter strongly suggests that the Secretary had already made up his mind before the request arrived, and that DOJ's request letter merely provided cover for a decision already made.  *Tummino*, 427 F. Supp. 2d at 231-33.

378.     The Administrative Record also establishes that throughout his entire decision-making process, the Secretary continued to push to add the citizenship question no matter the hurdles he faced or the strong objections raised by the Census Bureau, legislators, or other third parties.  For example, the Secretary repeatedly demanded that his staff take action to add the citizenship question when they were not making sufficient progress. He urged his staff to add the citizenship question even after he found out that both DOJ and Homeland Security had refused to sponsor such a question.  He personally and repeatedly lobbied the Attorney General to request the question even after DOJ had declined to do so.  PFOF § III.B.

379.    The Secretary also disregarded the repeated warnings of the Census Bureau.  As the Administrative Record demonstrates, the Secretary added the question even though the Census Bureau informed him that adding the question would reduce rather than enhance the accuracy of citizenship data, and that using administrative records would provide more accurate citizenship data than adding a citizenship question.  He also ignored the Census Bureau's warning that adding the citizenship question would undermine the Bureau's ability to use administrative records to produce accurate citizenship data.  PFOF §§ III.E.6, III.H.  In fact, no evidence before the Secretary suggested that adding a citizenship question would improve, rather than detract from, the accuracy of citizenship data.

380.    The Administrative Record also demonstrates that the Secretary ignored many other warnings from the Census Bureau, including that adding the citizenship question would harm the accuracy of the census count, result in enormous extra costs, and place significant burdens on the residents responding to the census and NRFU operations. PFOF §§ III.H, III.E.4-6. And the Secretary also ignored the significant concerns about adding the citizenship question that were raised by a numerous and broad group of stakeholders, including Ms. Pierce, whose opinion the Secretary invoked in his decision memorandum. PFOF § III.E.4.

381.    Indeed, the Administrative Record demonstrates that Commerce struggled to find *anyone* who would publicly support adding the citizenship question. PFOF § III.H.2.e.

382.    A decision-maker who was fairly and honestly considering the evidence before him would not have proceeded in the face of one-sided evidence that adding a citizenship question would not only lead to an inaccurate enumeration, but also prevent the collection of accurate citizenship data for the VRA-enforcement purpose that was his ostensible rationale. The Secretary's insistence on adding the question notwithstanding this evidence demonstrates

that the Secretary had prejudged the issue.  *See Latecoere*, 19 F.3d at 1365; *Tummino*, 427 F. Supp. 2d at 231-33.

383.    The Administrative Record also belies the Secretary's contention that he or his staff at Commerce genuinely set out to take a "hard look" at the citizenship question or engage in a "comprehensive review process"  after receiving DOJ's December 2017 letter.

384.    The true timeline of the extraordinary efforts that the Secretary and his staff had already undertaken well before DOJ's letter to add the citizenship question demonstrate that the process that occurred after December 2017 could not plausibly have altered the Secretary's decision and was simply a vehicle to make it falsely appear as if the Commerce staff and the Secretary had initiated the decision-making solely in response to DOJ's request.  *Davis*, 302 F.3d at 1112-13 (agency prejudged decision where it conducted "an evidently *pro forma* public opportunity to comment").

385.    The Administrative Record further shows prejudgment based on the Secretary's dramatic departures from the typical decision-making process for making even minor alterations to the decennial census questionnaire.  The Census Bureau typically takes years to test the census design and validate new questions, but here Defendants decided to add the citizenship demand in less than four months, with no testing or validation, and with no consultation with DOJ to determine how its data needs could be met.  AR 3460.

386.    Bypassing the very procedures that are designed to provide the Secretary with the information he needs to make an informed and open-minded judgment about whether to add the citizenship question demonstrates that he had already made the determination and would not alter his mind. *See Tummino*, 427 F. Supp. 2d at 233-34 ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing

of bad faith . . . has been made."); *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747-48 (2014).

387.    Finally, the evidence in the Administrative Record of political pressure on the Commerce Department from White House staff and Presidential advisers, including Stephen Bannon and Kris Kobach, to add the citizenship question, independently supports setting aside Defendants' decision on arbitrary and capricious grounds.  AR 763-764, AR 2561.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 544-45 (E.D.N.Y. 2009) (citing *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49 (D.C. Cir. 1971)); *see also Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997).

**C.    Defendants' decision to demand citizenship information is not in accordance with law.**

388.    The Administrative Procedure Act provides that the Court "shall" "hold unlawful and set aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

389.    The Secretary's decision to add a citizenship question is not in accordance with law and should be set aside under the APA because (1) it does not comply with the Congressional reporting requirements of Section 141(f) of the Census Act; (2) it does not comply with the requirements of Section 6 of the Census Act to prioritize use of administrative records over direct inquiries to the maximum extent possible; and (3) it does not comply with the pretesting and burden-reduction requirements contained in the OMB Statistical Policy Directives and in the Census Bureau's Statistical Quality Standards.

1.      **Section 141(f) of the Census Act.**

390.    Section 141(f) of the Census Act sets a strict timeline for changing the content of the decennial census and cabins the Secretary's discretion to add new questions to the instrument.

391.    The Act provides that the Secretary "shall submit" a report to Congress "not later than 3 years before the appropriate census date," identifying the "subjects proposed to be included, and the types of information to be compiled, in such a census."  13 U.S.C. § 141(f)(1).

392.    The Census Act allows the Secretary to amend the subjects on the census after the report is submitted only where "*new* circumstances exist which *necessitate* that the subjects, types of information, or questions contained in reports so submitted be modified."  13 U.S.C. §  141(f)(3) (emphasis added).

393.    The Act additionally requires the Secretary to submit a report to Congress documenting any such "new circumstances."  *Id.*

394.    Congress added the requirements at Section 141(f) of the Census Act through the 1976 amendments to that Act.  Pub. L. No. 94-521, § 7(a), 90 Stat. 2459, 2461-62 (1976).

395.    The legislative history of those amendments establishes that the purpose of these provisions was to enable Congress to exercise greater scrutiny and oversight of decennial census subjects and questions.  The Senate Report on the 1976 amendments notes that the purpose of the provisions codified at Section 141 was to "*require*[] that the Secretary of Commerce submit at various intervals the subjects and questions to be used in the decennial and mid-decade censuses of population to the appropriate committees of Congress for their review and recommendations." S. Rep. No. 94-1256, at 5 (1976) (emphasis added).

396.    Similarly, the House Report on the 1976 amendments notes that "[i]n view of the increasing attention focused on the content of census questionnaires," the requirements at

Section 141 were intended to "establish[] a time table for proposed subjects and questions . . . to be submitted to the Congress for its review and recommendations," in order to allow Congress to "assure that the statistical needs will be met and that the citizens will not be unfairly subject to questions invading their privacy."  H. Rep. No. 94-944, at 5-6 (1976).

397.    The Commerce Department advised Congress in 1976, during consideration of these amendments, that "[w]e have no objection to this provision which is to ensure that Congress is kept informed on census planning."  *Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil Serv.*, 94th Cong. 25 (1976) (statement of agency views, General Counsel, U.S. Dep't of Commerce).

398.    The reporting requirements in 13 U.S.C. § 141(f) are therefore not merely ministerial, but are necessary for Congress to assure adequate oversight of the Commerce Secretary's exercise of his discretion regarding the decennial census.  This is particularly so because the Constitution "vests *Congress* with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15 (emphasis added); and Defendants are authorized to act only by subsequent delegation of that authority by Congress to the Secretary of Commerce, *id.* at 19 (citing 13 U.S.C. § 141(a)).

399.    The requirements at Section 141(f) are therefore substantive components of – and restrictions on – the Secretary's exercise of the discretion delegated to him by Congress.  *Cf. New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 795-96 (S.D.N.Y. 2018) (rejecting Defendants' argument that the Secretary's decision is judicially unreviewable as "committed to agency discretion by law," because among other reasons "the Census Act imposes any number of mandatory duties upon the Secretary").

91

### a. The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act.

400.    In March 2017, the Secretary submitted the report required under Section 141(f)(1) in March 2017, and did not identify citizenship as a subject to be included on the decennial census.  PX-1 at AR 194 (the "Subjects Planned" report).

401.    The Administrative Record makes clear that commenters on the DOJ request pointed out to the Secretary the importance of complying with the Section 141(f)(1) requirement. Six former Directors of the Census Bureau wrote the Secretary in January 2018 to stress, among other considerations, the three-year report requirement.  PX-1 at AR 1057 ("There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.").

402.    Plaintiff the U.S. Conference of Mayors wrote the Secretary in January 2018 and stressed "the Justice Department has not set forth new legal or programmatic reasons for the Census Bureau to collect this information from every household in the country since its initial cataloguing of data requirements for the census . . . prior to the Census Bureau's submission of 2020 Census and ACS topics to Congress last spring."  PX-1 at AR 1066, AR 1075.

403.    The Administrative Record is clear that the Census Bureau was well aware of these deadlines and requirements, and organized their original content review process around these mandatory statutory deadlines.  PX-1 at AR 1168 ("This memorandum officially documents the U.S. Census Bureau's plan to develop and transmit to Congress the *Subjects Planned for the 2020 Census Program*," and noting that "Title 13, U.S. Code requires the Census Bureau to send Congress the subjects proposed to be included in the census not later than three years before the Census date.").

404.     The Census Bureau's own description of the process for adding content to the

decennial census questionnaire notes that "[b]y law, the Census Bureau notified the Congress of

the topics to be covered by the 2020 Census on March 31, 2017. . . .  This is an intentional[]

process designed to give Congress the ability to review the topics and questions on the

questionnaire before they are finalized.  If an additional topic is required, it is imperative that

Congress be notified as soon as possible."  PX-134 at AR 9865; *see also* PX-4 at AR 3890-91.

405.     Defendants have never transmitted any report to Congress that identifies new

circumstances "necessitating" a change in the topics to be covered by the decennial census, as

required by Section 141(f)(3).  The report required by Section 141(f)(2), which was submitted to

Congress in March 2018, simply notes that a question on citizenship will be included in the

census.  PX-489 at 11.  It does not identify "new circumstances . . . which necessitate" a need for

a citizenship question.  *Id.*

406.     Nor does anything else in the Administrative Record identify any new

circumstances arising after the March 2017 report suggesting that existing data for VRA

enforcement were suddenly problematic or ineffective.

407.     To the contrary, the evidence in the Administrative Record confirms that as far as

effective enforcement of the Voting Rights Act is concerned, no "new circumstances" arose

between March 2017 and March 2018 "which necessitate[d]" the inclusion of a citizenship

question.  *See, e.g.*, PX-1 at AR 773 (letter from Vanita Gupta, President and CEO of the

Leadership Conference on Civil & Human Rights) ("I know from my prior experience as the

chief government enforcer of the Voting Rights Act [that] the Justice Department has never

needed to add this new question to the decennial census to enforce the Voting Rights Act before,

so there is no reason it would need to do so now."); *id.* at AR 798 (citizenship data from the

decennial census are "unnecessary" to enforce the Voting Rights Act); *id.* at AR 1083 (same from the National League of Cities); *id.* at AR 1096-98 (same from coalition of state Attorneys General); *id.* at AR 1207 (same as recorded in Gupta stakeholder call).

408.    The Court may take judicial notice that Congress did not enact legislation amending the Voting Rights Act between March 2017 and March 2018.

409.    The DOJ request letter does not identify any changed circumstances between March 2017 and March 2018, and does not contend that data from a citizenship question on the decennial census are "necessary" for VRA enforcement.

410.    Accordingly, Defendants' failure to include citizenship on the list of decennial subjects in the March 2017 report to Congress, and the concomitant absence of changed circumstances that necessitate the addition, is plainly contrary to law.  *See NRDC*, 894 F.3d at 108-13 (vacating the agency's decision for failure to comply with unambiguous statutory deadlines); *ACEMLA v. Copyright Royalty Tribunal*, 763 F.2d 101, 109 (2d Cir. 1985) (vacating the agency's order as not in accordance with law for failure to comply with statutory obligation to "state in detail the criteria . . . , the various facts that it found . . . , and the specific reasons for its determination"); *East Bay Sanctuary Covenant v. Trump*, 18-cv-6810-JST, 2018 WL 6053140, at *11-14 (N.D. Cal. Nov. 19, 2018) (finding likelihood of success on the merits sufficient to enter nationwide temporary restraining order to enjoin rule that would bar asylum for immigrants entering between ports of entry, on the ground that "the [r]ule flouts the explicit language of the statute").

> **b.      Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3).**

411.    Dr. Jarmin testified that he agrees the Section 141(f) requirements are intentionally designed "to give Congress the ability to review the topics and questions on the questionnaire before they're finalized."  Jarmin Dep. (Docket No. 511-2) at 50.

412.    Even if Defendants were to attempt today to cure this violation of their statutory obligations, extra-record evidence establishes that the statutory standard to identify new evidence necessitating a change cannot be met.

413.    The Department of Justice itself agrees that adding a citizenship demand to the census is not "necessary" to enforce the VRA.  Gore Dep. (Docket No. 491-2) at 300 ("Q. You agree, right, Mr. Gore, that CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts?  A. I do agree with that.  Yes.").

414.    Dr. Abowd similarly testified that he does not believe adding a citizenship question is "necessary" to provide the Department of Justice with the data they requested.  PFOF § IV.E.6 ¶ 888.

415.    The unrebutted expert testimony of Plaintiffs' voting rights expert Dr. Lisa Handley also confirms that a citizenship question on the census is not "necessary" to enforce the Voting Rights Act.  PFOF § IX.B.2; *see also* Br. of the Leadership Conference on Civil & Human Rights as *Amicus Curiae* at 2 (Docket No. 443) (explaining that there is "no evidence" that census-derived CVAP data "would have assisted the litigation" of VRA cases in the past, nor evidence that such data "would assist this litigation either today or in the future").

### 2.      Section 6 of the Census Act.

416.    Section 6(c) of the Census Act requires that "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary

*shall* acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries." 13 U.S.C. § 6(c). Subsections (a) and (b) in turn refer to the administrative records of other federal agencies as well as state and municipal governments and private parties. *Id.* § 6(a), (b).

417.    Congress added the requirement at Section 6(c) of the Census Act through the 1976 amendments to that Act. Pub. L. No. 94-521, § 5, 90 Stat. at 2460.

418.    The legislative history of Section 6(c) of the Census Act is clear that Congress intended to make *mandatory* the use of statistical data from other sources in lieu of direct inquiry whenever possible, in order to reduce burden and cost.

419.    The Senate Report on the 1976 amendments explains that "Section 5 adds a new subsection (c) to section 6 of title 13, U.S.C., which directs the Secretary of Commerce to acquire and use to the greatest extent possible statistical data available from other sources, in lieu of direct inquiries. While current law authorizes the Secretary to purchase or otherwise acquire such information, this amendment serves to emphasize Congress['s] desire that the authority be used whenever possible in the interest of economy and reducing respondent burden." S. Rep. No. 94-1256, at 3 (1976).

420.    The House Report on the 1976 amendments likewise notes that the requirement codified at Section 6(c) "direct[s] the Secretary to the maximum extent possible to acquire and use information already available, instead of conducting direct inquiries." H. Rep. No. 94-944, at 5 (1976).

>           **a.      The Administrative Record is clear that Defendants did not
>                    comply with Section 6(c) of the Census Act.**

421.    The Administrative Record makes clear that the Secretary's decision to select "Alternative D" over "Alternative C" was not in accordance with his mandatory obligation to use

administrative records "[t]o the maximum extent possible," 13 U.S.C. § 6(c), instead of conducting direct inquiries.

422.    The Census Bureau analyses in the Administrative Record demonstrate that using administrative records was a superior alternative to the direct inquiry Secretary Ross ultimate chose.  The Census Bureau's January 2018 memo concluded that Alternative C (obtaining citizenship status from administrative records) "best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count."  PX-22 at AR 1277; *see also* PX-25 at AR 1312 ("In sum, Alternative D would result in poorer quality citizenship data than Alternative C.  It would still have all the negative cost and quality implications of Alternative B . . . ."); PX-23 at AR 1293 (Question 21: "Is using sample data and administrative records sufficient for DOJ's request?  A. The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request.").

423.    Secretary Ross discarded those conclusions based on a flawed assessment of Alternative C that Dr. Abowd debunked at trial.  PFOF § IV.E.6.

424.    Because Defendants failed to comply with the mandatory obligation in Section 6(c) to use administrative records instead of direct inquiries "[t]o the maximum extent possible," the decision should be set aside under § 706(2)(C) of the APA.  *See NRDC*, 894 F.3d at 112-13 ("because the text, purpose, and history of the [statutory provision] are all unambiguous regarding the mandatory nature of the" agency's obligation, the agency's decision was "issued 'in excess of statutory . . . authority'") (quoting 5 U.S.C. § 706(2)(C)); *cf. League of Women Voters*, 838 F.3d 9-10 ("Because [the agency's executive director] expressly found that the criterion set by Congress . . . was 'irrelevent' to his analysis, it is difficult to imagine a more clear violation of the APA[].").

### b.   Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c).

425.    Extra-record evidence further confirms that the unjustified decision not to use administrative records to respond to the DOJ request was inconsistent with the Secretary's mandatory obligations under Section 6(c) of the Census Act.

426.    Dr. Jarmin testified that on receiving the Justice Department's letter, the Census Bureau decided to "explore the use of administrative records to fulfill the request" because "it's an area that we always explore," because "it's often easier, potentially more accurate to [use] administrative records, but it's also the intention of Congress in Title 13, the census code, that when possible, we use administrative records in lieu of direct collection.  So this is something that we typically – typically do."  Jarmin Dep. (Docket No. 511-2) at 59-60.

427.    Dr. Abowd testified that using administrative records is consistent with the Census Bureau's obligation to control costs and burden on respondents under, among other sources of authority, Section 6 of Title 13.  Trial Tr. 1338 (Abowd).

428.    Just yesterday, the Census Bureau published an article describing its statutory obligation under Section 6 to use administrative records in place of direct inquiries "to the maximum extent possible," and noting the benefits in terms of cost savings, quality improvement, and burden reduction.  U.S. Census Bureau, *Administrative Records Offset Declining Census Survey Responses: Survey Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at https://census.gov/library/stories/2018/11/administrative-records-offset-declining-census-survey-response.html.[4]

---

[4] Under Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice at any stage of the proceedings of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," such as statements of federal government policy published on a government website.  *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (taking notice of agency guidance documents, consumer advisory, backgrounder, and letters because they were available on FDA website).

### 3. OMB standards and Census Bureau guidelines regarding pretesting and burden reduction.

429. The Census Bureau's conduct of the census is constrained by a number of federal standards that require burden-reduction and pretesting of statistical data collection instruments administered by the federal government, like the decennial census.

430. By statute, the Office of Management and Budget (OMB) has responsibility for coordinating the federal statistical system, including to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes." 44 U.S.C. § 3504(e)(1); *see also id.* §§ 3501(9), 3504(a)(1)(B)(iii), 3504(e).

431. OMB is also required to establish government-wide guidelines and policies regarding statistical collection methods. *Id.* § 3504(e)(3).

432. The purpose of these government-wide guidelines is to ensure that federal statistical agencies minimize the burden of their data collection activities and maximize the utility of the information collected. *Id.* § 3501(1), (2).

433. Consistent with these statutory obligations, OMB has published a number of Statistical Policy Directives that govern the data collection efforts of federal statistical agencies, including the Census Bureau. PX-354 (Statistical Policy Directive No. 1); PX-359 (Statistical Policy Directive No. 2); PX-360 (addendum to SPD No. 2).

434. Statistical Policy Directive No. 1, *Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, requires among other obligations that statistical agencies like the Census Bureau "[c]onduct objective statistical activities" by "produc[ing] data that are impartial, clear, and complete and are readily perceived as such by the public." PX-354 at 7.

435.    Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys*, was issued because OMB determined it was "essential that, to the extent permitted by law, there be sufficient government-wide uniformity in statistical methods and practices to ensure the maximum usefulness of the statistics produced."  Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006).

436.    Directive No. 2 requires, among other obligations, that agencies "must" design all statistical surveys "to achieve the highest practical rates of response" and "minimize[] respondent burden, while maximizing data quality."  PX-359 at 13, 16 (§§ 1.3, 2.3).

437.    These guidelines also require that agencies conduct a pretest of all components of a survey, including by conducting a field test and full dress rehearsal "for highly influential surveys."  PX-359 at 14 (§ 1.4).

438.    The Census Bureau has further clarified the statistical standards it must utilize to address the agency's unique methodological and operational challenges.  PX-260 (Census Bureau Statistical Quality Standards).

439.    The Statistical Quality Standards provide that "[a]ll Census Bureau employees . . . *must comply* with these standards." *Id.* at 5.

440.    These standards require that all data collection instruments be tested "in a manner that balances data quality and respondent burden," and specifically require pretesting to ensure questions are not "unduly sensitive" and "do not cause undue burden."  *Id.* at 7-8 reqs. A2-3 & A2-3.3.

441.    The Census Bureau Statistical Quality Standards and the OMB Statistical Policy Directives provide "meaningful standards [to] constrain[]" agency discretion.  *Salazar v. King*,

822 F.3d 61, 77-80 (2d Cir. 2016); *see also Pearl River Union Free Sch. Dist. v. King*, 214 F.

Supp. 3d 241, 257 (S.D.N.Y. 2016); *New York*, 315 F. Supp. 3d at 798 n.19; *Sierra Club v.*

*Leavitt*, 355 F. Supp. 2d 544, 550-53 (D.D.C. 2005) (regulation implementing the Clean Air Act

"clearly and unambiguously" establishes a nondiscretionary duty).

### a.    The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards.

442.    The Administrative Record standing alone establishes that in deciding to add a

citizenship question to the census, Defendants did not comply with the pretesting and burden-

reduction requirements contained in OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

443.    Because Defendants did not comply with these obligations, the Secretary's

decision should be set aside as not in accordance with law under the APA.  *See Padula v.*

*Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that

enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its

discretion.") (citation omitted); *Am. Petroleum Inst. v. EPA*, 787 F.2d 965, 975 (5th Cir. 1986)

("It is elementary administrative law that an agency must operate within the confines of its own

regulations."); *Pleune v. Pierce*, 765 F. Supp. 43, 45 (E.D.N.Y. 1991) ("Actions taken in

violation of agency regulations are . . . 'not in accordance with law'" under the APA); *Bunyard*

*v. Hodel*, 702 F. Supp. 820, 822 (D. Nev. 1988) ("Numerous Courts of Appeals have held that an

agency's failure to interpret properly and to comply with applicable CFR regulations constitutes

arbitrary and capricious conduct that is not in accordance with law.") (citing cases); *cf. Secretary*

*of Labor v. Cranesville Aggregate Cos.*, 878 F.3d 25, 36 (2d Cir. 2017) (holding that decision of

the Occupational Safety and Health Review Commission was "not in accordance with the law"

under § 706(2)(A) where the Commission's decision did not comply with the Labor Secretary's

interpretation of sub-statutory standards).

> **b.     Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards.**

444.    The extra-record evidence developed at trial further confirms that Defendants have failed to comply with binding OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

> **4.     Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief.**

445.    Plaintiffs pled a distinct claim for relief that the Secretary's decision should be set aside under the APA because it is "not in accordance with law" or "in excess of statutory . . . authority."  Docket No. 214 (Second Am. Compl.); No. 18-cv-5025, Docket No. 1 (Compl.).

446.    Plaintiffs briefed this claim for relief in both their pretrial memorandum of law and pretrial reply.  Docket No. 410, at 28-29; Docket No. 455, at 7-8.

447.    Defendants raised no argument regarding this claim for relief in either their pretrial memorandum of law or their pretrial reply.  Docket No. 413; Docket No. 456.

448.    Defendants' failure to raise any defense to Plaintiffs' argument that the Secretary's decision is contrary to law should constitute a waiver.  *See, e.g.*, *League of United Latin Am. Citizens v. Wheeler*, 899 F.3d 814, 829 (9th Cir. 2018) (Rakoff, D.J., sitting by designation) ("The EPA presents no arguments in defense of its decision.  Accordingly, the EPA has forfeited any merits-based argument.")

> **D.     Remedies for Defendants' APA violation.**

> **1.     This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census.**

449.    The APA mandates that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

450.    "[O]rdinarily, when a regulation is not promulgated in accordance with the APA,

the regulation is invalid" and must be vacated.  *All. for the Wild Rockies v. U.S. Forest Serv.*,

2018 WL 5316129 (9th Cir. Oct. 25, 2018) (quotation marks omitted); *see also Am. Bioscience,*

*Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled

to relief under that statute, which normally will be a vacatur of the agency's [decision]").

451.    Vacatur properly reflects the sound principle that an agency action that violates

the APA "'cannot be afforded the force and effect of law,' and therefore is void."  *Air India v.*

*Brien*, No. 00-cv-1707, 2002 WL 34923740, at *14 (E.D.N.Y. Feb. 14, 2002) (quoting *Chrysler*

*Corp. v. Brown*, 441 U.S. 281, 313 (1979)).

452.    Vacatur is an appropriate remedy under the APA both when an agency acts

contrary to law, *e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule that

"conflicts with the plain meaning" of statute), and when an agency action is arbitrary and

capricious, *e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's] finding is not

sustainable on the administrative record made, then the [agency's] decision must be vacated

. . . .").

### 2.    This Court should should decline to remand to the agency and reject any request to remand without vacatur.

453.    Although courts will often remand to the agency after invalidating an improper

determination, courts have also not hesitated to vacate agency actions without remand when they

are taken in violation of statutory or procedural requirements.  *See, e.g.*, *NRDC*, 894 F.3d at 115-

16; *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017).

454.    That disposition reflects the fact that statutory or procedural violations can be so

fundamental as to render the agency's basic choice – and not merely its particular articulation of

that choice – "substantively fatal."  *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety*

& *Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand").

455.    Here, as discussed in Part III.C above, Plaintiffs have proven statutory and procedural violations that warrant vacatur without remand.  In particular, because Defendants violated their notification deadlines to Congress under 13 U.S.C. § 141(f), failing to give Congress the time it determined it would need to review Defendants' decisions; and because the circumstances for addressing that statutory violation cannot be met, *see infra* Part III.C.1; Defendants cannot at this point add a citizenship question to the 2020 census and remand of the issue for further administrative proceedings would be pointless.

456.    Remand is also unnecessary if this Court concludes that the Secretary's stated rationale for the citizenship question is arbitrary and capricious, because the Secretary has never suggested an alternative basis for his decision.  *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43 (D.C Cir. 1994) (remand unnecessary when NLRB "suggested no alternative bases for upholding" its determination); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) ("No remand for further administrative proceedings is warranted because the EPA did not suggest in the rulemaking under review that there is any alternative basis in the record" for its decision.).

457.    Defendants have in fact disclaimed reliance on any other basis.  July 3 Hearing Tr. 47 (Docket No. 205); Defs.' Mem. Opp. Motions in Limine 2-3 (Docket No. 453).

458.    Even if this Court were to order a remand, it should reject any suggestion by Defendants that remand *without* vacatur would be appropriate.  It is questionable whether such a disposition is even available in this case, when no statute expressly confers such remedial

discretion. *Compare* 5 U.S.C. § 706(2)(A) (providing that court "*shall* . . . hold unlawful and set aside" improper agency action (emphasis added)), *with, e.g.*, 42 U.S.C. § 7607(d)(9) (judicial review provision under Clean Air Act providing that court "*may* reverse" improper action (emphasis added)); *see NRDC v. EPA*, 489 F.3d at 1262 (Randolph, J., concurring) ("In cases governed by the Administrative Procedure Act, I have long believed that the law *requires* us to vacate the unlawful agency rule," in contrast to cases governed by the Clean Air Act, which provides "remedial discretion." (emphasis added)).

459.     In any event, the standards for ordering remand without vacatur have not been met here.  An agency overcomes "the presumption of vacatur" of an improper agency determination, *All. for the Wild Rockies*, 2018 WL 5316129, at *12, only if it can demonstrate that vacatur would be "quite disruptive," and further show a "serious possibility that the [agency] will be able to substantiate its decision on remand."  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

460.     Neither factor is satisfied here. Vacatur would not be disruptive because it would merely preserve the status quo, under which the decennial census has omitted a citizenship question for more than sixty years.  This case is thus not one where vacatur of an improper determination would itself trigger the very harms that the challenge to that determination was intended to prevent.  *Compare North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding insufficiently protective environmental rule without vacatur when vacating that rule "would at least temporarily defeat . . . the enhanced protection of the environmental values" sought by petitioner) (quotation marks omitted).

461.     To the contrary, leaving the citizenship question in place, notwithstanding the invalidity of the Secretary's determination, would be the more disruptive choice here, for reasons

described in Plaintiffs' showing of injury-in-fact at Part II.B above.  *See Pollinator Stewardship Council*, 806 F.3d at 532 (declining remand without vacatur when leaving improper environmental rule in place "risks more potential environmental harm than vacating it").

462.    This case is also not one where the agency's violations may easily be resolved on remand in the limited time that remains before the June 2019 deadline for printing the decennial census questionnaires.  The errors here are not just "of form," *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1184 (D.C. Cir. 1994) – such as providing an unclear or incomplete statement of the agency's decision, *see id.*; *Am. Bioscience*, 269 F.3d at 1086 (remand without vacatur appropriate "where we perceive that a ground poorly articulated might be sufficient to sustain agency action"), or failing to comply with a simple procedural step, *compare Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[A]n unlawfully promulgated regulation can be left in place while the agency provides the proper *procedural* remedy." (emphasis added)).

463.    Rather, Plaintiffs' claims here identify far more serious defects, including that the Secretary's decision is unsupported by the evidence, rests on glaring factual errors and made-up evidence, relies in some cases on propositions with no support whatsoever, failed to consider important aspects of the problem, is based on a false and pretextual explanation for the Secretary's action, and was reached in violation of Defendants' statutory and regulatory obligations.  *See infra* Parts III.B, III.C.

464.    Because there is no "serious possibility" that defendants can expeditiously resolve these many pervasive defects on remand, *Allied-Signal*, 988 F.2d at 151, remand without vacatur would be wholly inappropriate.

**3.** **This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census.**

465.   A plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

466.   The decision to grant injunctive relief under the APA is "controlled by principles of equity."  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted); *see, e.g.*, *Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 18-cv-5680 (NRB), 2018 WL 4168977, at *24 (S.D.N.Y. Aug. 30, 2018) (applying equitable factors for permanent injunction in APA challenge to agency decision).  All of these factors counsel in favor of an injunction here.

467.   An injunction prohibiting an agency from taking an action is appropriate where the court has found that action to be contrary to law under the APA.  *See Planned Parenthood*, 2018 WL 4168977, at *24.

468.   Under such circumstances, an injunction properly prohibits "the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and ensures that the agency complies with the law going forward, *see Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

469.     As demonstrated in Part III.C above, Plaintiffs have proven that the Secretary's decision is contrary to law in multiple ways, and that any attempt to institute a citizenship question on the 2020 Census now would also be unlawful.

470.     An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts.

471.     An injunction is particularly advisable here because, as Defendants themselves have repeatedly represented, there is little time remaining to conduct further testing or analysis before Defendants must print the 2020 census questionnaire in June 2019.  *See* Trial Tr. 1023 (Abowd); Docket No. 540 (stating that Census Bureau needs to begin printing the 2020 census questionnaire in June 2019); Docket No. 103, at 4-5 (noting Acting Director Ron Jarmin's Congressional testimony that "the Census Bureau would like to 'have everything settled for the questionnaire this fall'" and "wants to resolve this issue 'very quickly'"); Langdon Dep. (Docket No. 510-2) at 243.

472.     At the same time, any efforts by Defendants to continue pursuing the citizenship question would risk inflicting further irreparable harm on Plaintiffs.  The evidence at trial – including the results of the CBAMS surveys and focus groups, PFOF § VII.F.1; the reactions of the Census Bureau's "Trusted Voices," PFOF § VIII.C ¶¶ 1138-46; the unrebutted and uncontested fact testimony of Plaintiffs' witnesses, PFOF § X.A.1 – X.A.4;  and the testimony of Defendants' own witness, PFOF § X.A ¶¶ 1483-85 – demonstrates beyond doubt that the Secretary's decision to add the citizenship question has inflamed fears among populations who are particularly sensitive to such a question, particularly in the current political climate.

473.    If this Court were to invalidate the Secretary's decision, allowing Defendants to *continue* perpetuating these harms in a futile pursuit to remedy the defects identified by this Court will severely injure Plaintiffs and their residents and members.

474.    And these harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief.  *See Planned Parenthood*, 2018 WL 4168977, at *24.

475.    The balance of the hardships and the public interest also weigh heavily in favor of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years.  By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

476.    As this Court has explained, the "fair and orderly administration of the census . . . is arguably the Secretary of Commerce's most important duty, and it is critically important that the public have 'confidence in the integrity of the process' underlying 'this mainstay of our democracy.'"  *New York v. U.S. Dep't of Commerce*, __ F. Supp. 3d __, 2018 WL 4539659, at *5 (S.D.N.Y. Sept. 21, 2018) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring in part and concurring in the judgment)).

477.    An injunction prohibiting the addition of a citizenship question on the 2020 census will provide the public with the certainty and confidence that is necessary to protect the integrity of the 2020 census.

**4.    Whether this Court vacates the Secretary's decision or issues an injunction, any relief will properly apply nationwide.**

478.    As an initial matter, nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is

proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C.
§ 706(2)(A).

479.    An order vacating the Secretary's decision under the APA thus inherently has
nationwide application, without implicating concerns about the power of courts to issue
nationwide injunctive relief.  *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018)
(order setting aside agency decision under APA did not implicate any concerns about nationwide
injunctions).

480.    In any event, even an injunction preventing defendants from instituting a
citizenship question would not implicate the concerns raised by other nationwide injunctions.
There is only a single form of the census questionnaire that is sent to every household
nationwide.  Defendants have never suggested – let alone presented any evidence to support –
that a citizenship question could somehow be included in only some but not other questionnaires.

481.    Nor would a geographically limited injunction make sense in this context because,
as Defendants' own expert has made clear, the census questionnaire must be uniform across the
country in order to count accurately *all* residents across the nation.

482.    Defendants' uniform, nationwide treatment of the census questionnaire
necessarily means that any injunctive relief here must also apply nationwide.  *Cf. Texas v. United
States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform
immigration rules).

483.    The broad geographic scope of the plaintiffs in this case also minimizes any
concern about this Court's power to order nationwide relief.  The Governmental Plaintiffs in 18-
CV-2921 are state and municipal governments located in eleven of the twelve federal judicial
circuits (all but the 11th Circuit).  Second Am. Compl., Docket No. 210, ¶¶ 12-24.  The NGO

110

plaintiffs include the American-Arab Anti-Discrimination Committee, which has members in every state and regional chapters in Miami and Orlando, Florida (in the 11th Circuit).  Khalaf Aff. (Docket No. 498-16), at ¶ 8.

484.    This case is thus not one where a single plaintiff seeks to leverage an essentially localized dispute into national relief.  *Compare City of Chicago v. Sessions*, 888 F.3d 272, 296 (7th Cir. 2018) (Manion, J., concurring in part and dissenting in part), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018).

### 5.    This Court should enter the requested declaratory relief.

485.    The Court should also enter declaratory judgment that Defendants' decision to add a citizenship question to the census is not in accordance with law, beyond statutory authority, and is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706.

486.    The Court should further enter declaratory judgment Defendants have not met and cannot meet their requirements under § 141 and § 6 of the Census Act, and that the decision to add a citizenship question violates the APA for this reason as well.  5 U.S.C. § 706.

## IV.    Defendants' decision to add a citizenship question was motivated by discriminatory animus.

### A.    Plaintiffs have proven that the citizenship-question decision was motivated by discriminatory intent through substantial evidence on each of the *Arlington Heights* factors.

487.    Secretary Ross's decision to add a citizenship question to the Decennial Census was motivated at least in part by a desire to harm Latinos and immigrants of color by diminishing their political power, and thus violates the Fifth Amendment's prohibitions on intentional discrimination on the basis of race and national origin.

488.    To succeed on an intentional discrimination claim, Plaintiffs need not show that intentional discrimination was the sole reason for Secretary's Ross's decision, but only that it

was one of several motivating factors. *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216–17 (2d Cir. 1987).

489.    Because "discriminatory intent is rarely susceptible to direct proof," *Mhany Management, Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016), the Court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("A victim of discrimination is . . . seldom able to prove his or her claim by direct evidence. . . .").

490.    Under the Supreme Court's decision in *Arlington Heights*, 429 U.S. at 266–68, the relevant factors for this "sensitive inquiry" include: (1) disparate impact; (2) the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive departures" from past practice; and (5) "contemporary statements" by those deciding the issue.

### 1.    The addition of a citizenship question will disparately impact Latinos and immigrants of color.

491.    The "racially disproportionate effect of official action provides an important starting point" in the intentional discrimination inquiry. *Crawford v. Bd. of Educ.*, 458 U.S. 527, 544 (1982) (internal quotation marks & citation omitted).

492.    The evidence presented at trial shows that a citizenship question will have a disparate effect on Decennial Census response rates among the overlapping categories of non-citizens, immigrants, and Hispanics and that these reduced response rates will ultimately lead to an undercount of these groups and a drop in overall data quality. *See generally* PFOF §§ VII, VIII, X.D.

493.     The Census Bureau estimates that adding a citizenship question will decrease self-response rates by 5.8 percent among households with a noncitizen or person of unknown citizenship status relative to all-citizen households—itself a conservative estimate.  PFOF § VII.B; PX-22 (AR); Trial Tr. 894-95.

494.     Testimony from Plaintiffs' experts demonstrates that a citizenship question would likely increase the non-response rate for non-citizen households by more than 5.8 percent, and possibly by as much as 11.9 percent.  *See, e.g.*, PFOF § VII.B; Trial Tr. 80.

495.     Additionally, the Census Bureau expects that a citizenship question will cause Hispanic response rates to the Decennial Census to decline more than those of non-Hispanic whites.  PFOF § VII.C; Trial Tr. 918.

496.     In addition to the statistical evidence from the Census Bureau and Plaintiffs' experts, qualitative evidence at trial demonstrated that the inclusion of a citizenship question would bear more heavily on those who are foreign-born, and Hispanics in particular.  PFOF § VII.D, F.

497.     That qualitative testimony included focus groups research conducted by the Census Bureau as part of the Census Barriers, Attitudes, and Motivators Survey (CBAMS)—evidence that showed that Hispanic citizens and foreign-born individuals are extremely concerned about answering a citizenship question for fear of negative repercussions for themselves and their neighbors and loved ones.  PFOF § VII.F; PX-152; PX-163; PX-662.

498.     Plaintiffs have also introduced considerable testimony regarding fear among immigrant and Hispanic communities about responding to the Census due to the addition of a citizenship question, which has raised concerns about targeting for immigration-enforcement actions and harassment. *See, e.g.*, Cullinane Aff. (Docket 505-1) ¶¶ 5-9; Escobar Aff. (Docket

498-3) ¶¶ 20-24; Sarmiento Aff. (Docket 488-3) ¶¶ 6-9; Plum Aff. (Docket 498-19) ¶¶ 16-23;
Altschuler Aff. (Docket 503-1) ¶¶ 11, 13-18.

499.    Notwithstanding the Census Bureau's non-response follow-up (NRFU) efforts,
the decline in response rates will translate into an undercount, with a concomitant loss of
resources and political representation for communities with larger percentages of immigrants and
Hispanics—i.e., a disparate impact on those groups.  *See, e.g.*, PFOF § VIII; Trial Tr. 30.

## 2.    Historical background of the decision.

500.    Plaintiffs presented evidence regarding the historical background of a citizenship
question "reveals a series of official actions taken for invidious purposes," *Arlington Heights*,
429 U.S. at 266, that creates an inference of discriminatory intent.

501.    First, other individuals who recently have tried to add a citizenship question to the
Decennial Census have done so for anti-immigrant purposes rather than a VRA-related motive.
*See, e.g.*, *FAIR*, 486 F. Supp. at 568; PX-296.

502.    By contrast, Defendants presented no evidence that DOJ or any other party has
ever tried to add a citizenship question for purposes of VRA enforcement; instead, Defendants
admitted that as of early September 2017, DOJ staff did not want to request a citizenship
question and had previously made no complaints about data usability or quality for VRA
purposes.  PFOF § IX.B.2.

503.    Indeed, the Census Bureau has a longstanding objection to adding a citizenship
question to the Decennial Census, manifested as recently as 2015, when four former Census
Bureau Directors submitted a brief arguing that adding a citizenship question to the Decennial
Census would "likely exacerbate privacy concerns and lead to inaccurate responses from non-
citizens worried about a government record of their immigration status."  PFOF § II.D; PX-1 at
AR 840-41.

504.     Second, the evidence showed that the decision to add a citizenship question stemmed from discriminatory, rather than VRA-related, motives.

505.     Immediately after assuming office, Secretary Ross began considering adding a citizenship question, and his request to do so was already "months old" by May 2017.  PFOF § III.A-B; PX-88 (AR).

506.     During this same period of early 2017 and months before the VRA rationale first emerged in the Administrative Record in the December 12 DOJ letter, Secretary Ross had conversations with several individuals who sought to target immigrants of color.  PFOF § III.A.

507.     As the evidence reveals, the individuals who first encouraged Secretary Ross to add a citizenship question—unnamed senior administration officials (including Steve Bannon) and Kris Kobach—were motivated by a desire to stem the political power of immigrant communities of color.  PFOF § III.A, C; PX-1 at AR 763-64 (AR).

508.     Despite his public testimony that his decision-making process was spurred by a request from DOJ in December 2017, Secretary Ross had made his decision independently, and then had lobbied several agencies to request the question and concocted a reason to do so.  PFOF §§ III.A-E.

509.     Given the origin of attempts to add a citizenship question for the 2020 Decennial Census, the historical-background evidence points strongly to discriminatory intent.

### 3.     Irregular procedural sequence.

510.     The trial record also revealed several aspects of the citizenship-question decision that evidence major departures from the usual and recommended sequence of adding or changing a question on a Census survey.

511.    As described above, the evidence shows that Secretary Ross made a series of misleading and contradictory assertions about the genesis of the request, and that he solicited other agencies to provide a post hoc reason for his decision.  PFOF §§ III.B-D, IV.D, V.

512.    The evidence also demonstrates that Defendants did not follow their own standard procedures and methodology in adding the question, instead attempting to rush the question onto the form.  PFOF §§ II.E, III.G-I, IV.A-C.

513.    First, the Administrative Record demonstrates that Secretary Ross offered shifting rationales for when and why he decided to add a citizenship question.  *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 240–41 (5th Cir. 2016) (noting that shifting rationales for a voter identification law were probative of discriminatory intent).

514.    Secretary Ross testified in congressional hearings that his process of considering whether to add a citizenship question was "initiated" by DOJ's request to include a citizenship question on the 2020 Decennial Census, and that he undertook his consideration "solely" in response to the DOJ letter, which stated that the question was needed to obtain better citizenship data for VRA enforcement.  PFOF §§ IV.D, V; *see also* PX-491; PX-492; PX-493.

515.    However, only after this litigation was filed and the Administrative Record was lodged, DOJ drafted and urged Secretary Ross to sign and file a supplemental memorandum as part of the Administrative Record, stating that, in fact, he "'began considering' whether to add the citizenship question '[s]oon after' his appointment as Secretary in February 2017 — almost ten months before the 'request'" from DOJ — and that, '[a]s part of that deliberative process,' he and his staff asked the Department of Justice if it 'would support, and if so would request, inclusion of a citizenship question.'"  PX-2 (AR).

116

516.    At Secretary Ross's direction, Department of Commerce officials then pushed DOJ and then the Department of Homeland Security (DHS) to request a citizenship question, contacting individuals responsible for immigration and not voting rights issues.  PFOF § III.B, D.

517.    The evidence showed that DOJ initially rebuffed these overtures, and instead referred Commerce officials to DHS, which also declined to request the question.  PFOF § III.B.

518.    Only after both DHS and DOJ declined, Secretary Ross exerted political pressure to get DOJ to make the request, ultimately securing the request in part by speaking to Attorney General Sessions personally, and having his staff coordinate with Acting Assistant Attorney General John Gore, to ensure that DOJ did so.  PFOF §§ III.D-E.

519.    Secretary Ross and top Commerce officials did not consult with Census Bureau officials during this period, and kept them in the dark about the fact that it was not DOJ, but rather Secretary Ross, who had originated the attempt to add a citizenship question after his conversations with Messrs. Bannon and Kobach.  PFOF §§ IV.C, V; *see also* Trial Tr. 1015-22.

520.    The evidence at trial also showed that the process for adding a citizenship question departed from normal procedures.  PFOF §§ II.E, IV.A-C.

521.    Plaintiffs' expert witnesses, including the former Director of the Census Bureau, explained the extensive testing processes the Census Bureau has developed in order to properly assess proposed changes to a census questionnaire, none of which were followed here.  PFOF § II.E, F.

522.    This is in stark contrast to the extensive process that was used previously for considering changes to questions concerning race and ethnicity on the Decennial Census.  PFOF § II.F.

523.     The evidence at trial showed that, here, the Census Bureau conducted no pretesting of the 2020 Decennial Census questionnaire with the inclusion of a citizenship question, including no testing of the survey design or any cognitive of field testing.  PFOF § IV.B.

524.     Defendants asserted that no pre-testing was required because a citizenship question has been adequately tested through its inclusion on the Census Bureau's American Community Survey ("ACS").  PFOF § IV.E.3.

525.     But the evidence shows that there are significant differences between the citizenship question on the 2020 Decennial Census and the citizenship question currently used on the ACS; differences that significantly limit the relevance and validity of prior testing of the citizenship question on the ACS.  PFOF § IV.E.3.

526.     Although Defendants contend that the ACS citizenship question was "adequately tested," their own expert Dr. Abowd admitted that the ACS citizenship question was tested in a different political environment. PFOF §§ IV.E.3, F.

527.     Dr. Abowd also admitted that the reliance on the testing of the ACS citizenship question which was done about fifteen years ago was only adequate in the sense that it was the best they could do under the rushed timeline of several months that was of Secretary Ross's own making.  PFOF § IV.E.3; Trial Tr. 1270-74.

528.     Most notably, Dr. Abowd also stated that the Census Bureau's own internal analysis indicates that the ACS citizenship question is not performing "adequately" and therefore cannot be deemed to have been adequately tested in accordance with accepted survey standards. PFOF § IV.E.3; Trial Tr. 1287-88.

529.     The evidence further establishes that impartial experts—including six former Census Directors, the National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics Task Force on the 2020 Census, and the Census Bureau's own Scientific Advisory Committee—have uniformly expressed the view that the rushed process to add a citizenship question was inconsistent with accepted standards for survey methodology, and thereby threatens the accuracy of the count.  PFOF § IV.E.3.

### 4.     Substantive departures from past practice.

530.     The evidence also shows that the decision to add a citizenship question departs from past practice, as the Census Bureau has repeatedly rejected prior attempts to add a citizenship question to the Decennial Census.  PFOF § II.D.

531.     Prior to both the 1980 and 1990 Decennial Censuses, the Census Bureau opposed adding a citizenship question, stating in the former case that "any effort to ascertain citizenship will inevitably jeopardize" the accuracy of the count because such questions "are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate." *FAIR*, 486 F. Supp. at 568; *see also* PX-306, PX-307.

532.     In 1988, Census Bureau Director John Keane testified before Congress that the Census Bureau believed that the addition of a citizenship question would cause immigrants and legal residents to "misunderstand or mistrust the census and fail or refuse to respond." PX-307.

533.     Similarly, in 2015, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that a person-by-person citizenship inquiry would reduce the Decennial Census response rate.  PX-309.

534.     And of course, the Census Bureau continues to this day to oppose adding a citizenship question, citing reduced response rates for non-citizen households and Latinos and reduced data quality—views ignored by Secretary Ross.  PFOF §§ III.G, H.2.

119

## 5. Contemporary statements by decision-makers and those influencing them.

535.     Plaintiffs also introduced contemporary statements by Secretary Ross and those who influenced him to add a citizenship question that further support a discriminatory motive.

536.     As the Second Circuit has explained, when multiple officials influence a final decision, the relevant inquiry is whether the decision was "tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997).

537.     In fact, several courts have recently applied these very principles to situations in which President Trump or his advisors influenced other government officials in making decisions such as revoking protections from Deferred Action for Childhood Arrivals (DACA) recipients and temporary protected status from residents of certain Central American, Caribbean, and African nations.  *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (holding in DACA-rescission case that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos v. Nielsen*, No. 18-CV-01554-EMC, -- F. Supp. 3d --, 2018 WL 4778285, at *16 (N.D. Cal. Oct. 3, 2018) (granting preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process.") (citation omitted); *see also Centro Presente v. U.S. Dept. of Homeland Sec.*, No. CV 18-10340, 2018 WL 3543535, at *14 n.3 (D. Mass. July 23, 2018) (explaining that although the "cat's paw" principle originates in the employment discrimination context, "nothing in the reasoning of those opinions makes them inapplicable in a constitutional context").

538.    Here, Plaintiffs presented evidence that Secretary Ross and those who influenced him were motivated at least in part by a desire to dilute the political power of immigrant communities of color.  *See generally* PFOF §§ III.A, VI.

539.    In October 9, 2017, Secretary Ross made clear his support for a wide array of President Trump's  immigration policies, including the President's efforts to restrict what he called "chain migration," or the process of one family member with legal status sponsoring other family members for immigration—a program that primarily benefits immigrants of color.  PX-479.

540.    And in connection with the consideration of a citizenship question, in March 2017, Secretary Ross asked another Commerce official whether noncitizens were included in the census, and received in response an article entitled "The Pitfalls of Counting Illegal Immigrants."  PX-55 (AR).

541.    Additionally, the evidence shows that the individuals who played a major role in convincing Secretary Ross to add a citizenship question did so with discriminatory motives.  PFOF §§ III.A, VI.

542.    Secretary Ross has admitted that in early 2017, he discussed adding a citizenship question with Kris Kobach, Steve Bannon, and Attorney General Sessions.  PX-2 (AR).

543.    The White House, through senior aide Steve Bannon, requested the Secretary speak with Mr. Kobach about adding a citizenship question.  Secretary Ross knew Mr. Kobach was advocating for a citizenship question in part to make it easier for states to exclude immigrants from apportionment considerations.  PFOF § III.C; *see also* PX-19 (AR); PX-298 (R) at RFA 82.  In fact, other than the discredited VRA justification, the only other reason for adding a citizenship question to the Decennial Census that is identified anywhere in the

administrative record is Kris Kobach's explanation to Secretary Ross that Commerce should add

the citizenship question to respond to the "problem" of non-citizen immigrants being counted for

apportionment purposes.  *Id.*

544.    Moreover, the trial record is rife with statements by President Trump—whose

campaign claims he ordered Secretary Ross to add a citizenship question—demeaning immigrant

communities of color.  PFOF § VI.

545.    Attorney General Sessions expressed some of these sentiments as well.  PFOF

§ VI.

546.    The Court need not "bury its head in the sand when faced with overt expressions

of prejudice." *Batalla Vidal*, 291 F. Supp. 3d at 278.

547.    Nor need it ignore statements that employ "code words" rather than overt

statements of bias against a group.  *See Mhany Mgmt.*, 819 F.3d at 609 (affirming a finding of

racial discrimination in a housing case and holding that given the context, certain comments

"were code words for racial animus" and proper evidence of discrimination); *Ave. 6E Invs., LLC*

*v. City of Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir.), *cert. denied*, 137 S. Ct. 295 (2016) (holding

that "the use of 'code words' may demonstrate discriminatory intent").

548.    The evidence that President Trump and others from his Administration that

pushed Secretary Ross to add a citizenship question "harbor[ ] an animus against non-white, non-

European aliens which influenced" the decision provides strong evidence of discriminatory

intent.  *Ramos*, 2018 WL 4778285, at *17.

**B.      The pretextual nature of the decision also supports a finding of
         discriminatory intent.**

549.    As the Supreme Court has held in the Title VII context, "rejection of the

defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional

discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis removed); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 216 (2d Cir. 1997) (holding that a "showing of pretext was probative of intentional discrimination").

550.    Other courts have extended this proposition to constitutional intentional discrimination claims, explaining that even though pretext "was not a factor expressly mentioned in *Arlington Heights*," in "some circumstances it is reasonable to infer discriminatory intent based on evidence of pretext." *Florida v. United States*, 885 F. Supp. 2d 299, 355 (D.D.C. 2012); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282–83 (11th Cir. 2008) (holding that if "the trier of fact believed [the plaintiff's] showing of pretext, and disbelieved [defendant's] proffered legitimate reason, then a violation of the Equal Protection Clause would be shown" where additional evidence permitted the inference); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513–14 (7th Cir. 1993) (adopting principle of inference from pretext for equal protection claim).

551.    The evidence at trial showed that the decision to add a citizenship question was motivated by discriminatory purposes rather than for VRA enforcement; and furthermore, that even taking the DOJ letter at face value, there is no actual need for citizenship data from the Decennial Census to properly enforce Section 2 of the VRA.

552.    First, the idea for a citizenship question originated in early 2017 with Secretary Ross, as influenced by still unidentified senior Administration officials (including Steve Bannon) and Kris Kobach, not from DOJ, the agency responsible for enforcing the VRA.  PFOF § III.A.

553.    When Commerce officials did reach out to DOJ in May 2017, they spoke with James McHenry, the then-acting head of DOJ's immigration arm and an individual with no VRA-related responsibilities.  PFOF § III.B.

554.    After he rebuffed Commerce's appeal to request a citizenship question, Commerce then turned to DHS, an agency with no voting rights responsibility, which also rejected the request. PFOF § III.B.

555.    When DOJ finally did agree to make the request in late 2017, it was not due to any unmet VRA-related needs or a request from DOJ's VRA enforcement attorneys, but rather from political pressure applied by Secretary Ross and a direct appeal to Attorney General Sessions.  PFOF § III.E, F.

556.    The request for a citizenship question was ultimately drafted by a political appointee, John Gore, and edited by other political appointees with no voting rights experience, with only minimal input from career Civil Rights Division staff—on only one occasion to the first draft of the letter.  PFOF § III.E; *see also* Gore Dep. at 126-27.

557.    None of this process was made public through either the December 2017 DOJ letter or subsequent DOJ statements until the origin of the question was revealed through this litigation. *See, generally*, PFOF § V.

558.    Second, the evidence at trial has shown that DOJ does not and has never needed citizenship data collected through the "full count" Decennial Census questionnaire to properly enforce Section 2 of the VRA.  PFOF § IX.B.2, 3.

559.    DOJ has never had "hard count" citizenship data during the lifespan of the VRA, but that this has not hampered enforcement efforts.  PFOF § IX.B.2, 3; Trial Tr. 802; Gore Dep. at 203:5-10.

560.    For decades, survey sample data collected through the Decennial Census "long form" questionnaire was used to produce citizenship estimates used for VRA enforcement, and

more recently, similar estimates are based on survey sample data collected through the ACS. PFOF § IX.B.2, 3.

561.    In fact, Defendants have been unable to identify any DOJ Section 2 case that has ever failed because of a lack of citizenship data collected through the Decennial Census.  PFOF § IX.B.2, 3.

562.    The one case Defendants identified in which a court rejected reliance on ACS data, *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010), was a district court case brought by private plaintiffs and not the DOJ where plaintiffs relied on estimates based on only a single year of ACS responses ("one-year ACS estimates"), which had too small of a sample size to generate statistically reliable estimates for the geographic area in question.  PFOF § IX.B.3.

563.    This contrasts with the estimates based on a pool of five years of ACS responses ("five-year ACS estimates") that courts have repeatedly found sufficient.  *See, e.g.*, *Rodriguez v. Harris Cty.*, 964 F. Supp. 2d 686, 727–28 (S.D. Tex. 2013); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 687-89 (S.D. Tex. 2017); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13–CV–0087–D, 2014 WL 4055366, at *17 (N.D. Tex. 2014).

564.    At trial, Plaintiffs presented evidence from Dr. Lisa Handley, a frequent expert witness for DOJ in VRA cases, who credibly testified that she has never been hampered by a lack of Decennial Census citizenship data in proving a Section 2 violation, and that the current data is perfectly adequate for this process.  PFOF § IX.A, B.1, 2.

565.    For example, as to the lack of block-level citizenship data from the ACS, Dr. Handley demonstrated that in some VRA cases involving states and larger jurisdictions, there is often little or no need to split census blocks.  PFOF § IX.B.3; Trial Tr. 810.

566.    And for instances in which splitting census blocks are necessary, DOJ has always relied on citizenship data not published at the block level and performed further calculations to estimate CVAP at the census block level using one of several reliable methods.  PFOF § IX.B.3; Trial Tr. 810-19.

567.    The evidence at trial also showed that citizenship data based on responses to a question on the Decennial Census questionnaire will likely be no better and perhaps even worse than currently available citizenship data.  PFOF § IX.B.4.

568.    The data from the Decennial Census already contains several types of errors; errors that will be found in citizenship data collected through the Decennial Census, and could even be magnified by the inclusion of a citizenship question on the Decennial Census questionnaire.  There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more accurate than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.4.

569.    Additionally, the evidence shows that the Census Bureau uses disclosure-avoidance techniques to protect the confidentiality of responses to the Decennial Census questionnaire, which will entail purposefully introducing errors into any block-level CVAP data made available to DOJ and the public.  The Census Bureau does not even know whether the error margins for block-level CVAP data based on responses to a citizenship question will be smaller or more precise than those associated with the ACS estimates on which DOJ currently relies. There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more precise than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.5.

570.    The Census Bureau approached DOJ after receiving the December 12 letter to discuss the technical dimensions of DOJ's request, and to instead propose using administrative data to generate CVAP data at the block level, which the Census Bureau determined would better meet their VRA-related needs than adding a citizenship question.  PFOF § III.H.1.

571.    But DOJ refused to meet with the Census Bureau to discuss these issues, belying the notion that DOJ was interested in obtaining the best possible data for VRA enforcement purposes.  PFOF § III.H.1.

572.    Indeed, the evidence at trial showed a complete lack of interest by the Trump Administration in enforcing the VRA; the Administration, for example, has not filed any such cases during its almost two years in power.  PFOF § IX.B.2; *see also* PX-515; Gore Dep. (Docket 491-2) at 249-50.

573.    In sum, the evidence at trial rebuts Defendants' asserted motive for adding a citizenship question and provide affirmative evidence on all *Arlington Heights* factors, allowing the Court to infer intentional discrimination based on national origin and race.

574.    This evidence clearly shows that the decision was motivated by a "bare [ ] desire to harm a politically unpopular group," and thus violates the Fifth Amendment.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

    **C.**    **Plaintiffs proved intentional discrimination based on race and national origin, but even if Defendants discriminated against immigrants generally, such discrimination would violate the Fifth Amendment.**

575.    The Fifth Amendment prohibits invidious discrimination—even against people "whose presence in this country is unlawful."  *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

576.    Regardless of whether Defendants' decision to add a citizenship question was intended to target individuals because of race and/or national origin or because they are

immigrants generally, the Fifth Amendment applies—this distinction only raises the issue of what level of scrutiny applies.

577.    Plaintiffs have provided substantial evidence that Defendants intended to target Latinos and immigrant communities of color, meriting strict scrutiny.

578.    Even under a lower level of scrutiny, however, the Fifth Amendment does not permit  arbitrary exclusions of non-citizens in a way that does not promote a legitimate federal interest, *see Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 (1976).  And "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *Romer v. Evans*, 517 U.S. 620, 634 (1996) (citing *Moreno*, 413 U.S. at 534) (emphasis removed).

579.    The need for meaningful review of the government's proffered justifications and actual intent applies here where—rather than using its plenary power regarding immigration and naturalization issues—Defendants attempt to weaken immigrants' political power through the Decennial Census despite the Constitution requiring counting of and apportionment based on *all* individuals residing in the United States.  *See* U.S. Const. art. I, § 2, cl. 3; U.S. Const. Amend. XIV, § 2.

### 1.    Defendants' citizenship question decision seeks to diminish political power and harms groups based on race, ethnicity, and national origin.

580.    As discussed in more depth *supra*, Defendants' decision to add a citizenship question targets not only immigrants generally, but also all Latinos and immigrants of color specifically: individuals whose presence the Trump Administration has repeatedly targeted.

581.    Because "Hispanics as an ethnic group do constitute a suspect class for the purpose of equal protection analysis," *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983),

Defendants' targeting of individuals in this group merits strict scrutiny. *See also Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994) (noting broadly that actions that intentionally discriminate based on race and national origin merit strict scrutiny).

582.   For immigrants of color, that Defendants discriminate in part because of those individuals' non-citizen status does not lower the level of scrutiny required because Defendants also seek to target these individuals due to their race and national origin.

583.   Strict scrutiny still applies because attempting to "bisect a person's identity at the intersection of race and [another characteristic] often distorts or ignores the particular nature of their experiences." *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994), *as amended* (Nov. 21, 1994 & Dec. 14, 1994).

584.   A "plaintiff's discrimination claims may not be defeated . . . based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010).

585.   The evidence provides two primary bases for finding that Defendants discriminated against Latinos and immigrants of color and not just immigrants as an entire class.

586.   First, Secretary Ross was aware that adding a citizenship question would discourage participation among Latinos.

587.   Dr. Abowd and his team informed Secretary Ross personally and through written analysis on several occasions that adding a citizenship question would disproportionately negatively impact not only non-citizen households, but also Hispanic individuals.  PFOF § III.H.

588.   Dr. Abowd's team also explained that there would be no countervailing benefit to adding a citizenship question, that DOJ's request was better served by using administrative

records to determine citizenship, and that a citizenship question on the Decennial Census would merely add cost and harm data quality.  PFOF § III.H.

589.    Yet Secretary Ross forged ahead with his decision to add a citizenship question despite all the evidence showing that it was unnecessary and would only create negative outcomes and while knowing that those negative outcomes would primarily affect non-citizens and Latinos.

590.    As a result, there can be little doubt that he chose this path "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

591.    Second, as explained above, the Administrative Record shows that the White House and other Trump administration officials pushed Secretary Ross to add a citizenship question, and these individuals were motivated by animus toward immigrants of color and Latinos in particular and not just all immigrants.

592.    As another court recently recognized in granting a preliminary injunction against President Trump's attempt to revoke temporary protected status from individuals from Haiti, Sudan, El Salvador, and Nicaragua, the plaintiffs were likely to succeed on their equal protection claim because the White House influenced this decision and "there is evidence that President Trump harbors an animus against non-white, non-European aliens which influenced" the decision. *Ramos*, 2018 WL 4778285, at *17.

593.    Likewise, the record from trial shows that Secretary Ross and those who influenced him sought to target immigrants of color specifically and not merely immigrants as a whole.  PFOF § VI.A.

## 2.      Defendants' arbitrary targeting of a politically unpopular group cannot pass constitutional muster under any level of scrutiny.

594.      Even if the Court determines that Defendants' animus targets immigrants generally (rather than subgroups based on race, ethnicity, and/or national origin) and thus that less-than-strict scrutiny should apply, the Court's review must still have teeth—particularly when there is no legitimate federal interest relating to immigration and naturalization for the action in question and where the evidence reflects a desire to harm immigrants. *See United States v. Lue*, 134 F.3d 79, 86 (2d Cir. 1998) (explaining that "deference to the federal government" in its treatment of non-citizens is "tied to Congress's express Constitutional authority to regulate the conduct of noncitizens within our borders").

595.      First, the Supreme Court has recognized that "federal power over" non-citizens is not "so plenary that any agent of the National Government may arbitrarily" treat non-citizens differently than citizens.  *Hampton*, 426 U.S. at 101.

596.      As one Court recently explained in citing *Hampton*, "a more searching judicial analysis than mere rational basis and a less searching judicial analysis thank strict scrutiny" may be appropriate the "further the challenged law, regulation,  or policy from the core federal interests in immigration and foreign affairs."  *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 91–92 (D. Me. 2018); *see also Rodriguez-Silva v. I.N.S.*, 242 F.3d 243, 247 (5th Cir. 2001) ("the broad power to control immigration does not imbue Congress with plenary power over aliens themselves.").

597.      Therefore, when "the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest."  *Hampton*, 426 U.S. at 103.

598.    In *Hampton*, the Supreme Court struck down a regulation from the Civil Service

Commission prohibiting the employment of non-citizens in most positions of federal

employment, holding that even if "national interests" could support such a decision, those

interests did not rationally explain the determination by the Civil Service Commission.  *Id.* at

116.

599.    *Hampton* thus established the principle that federal decisions or regulations that

target non-citizens or treat them differently still require a rational link to a legitimate interest of

the decision-maker.

600.    Here, the evidence shows that the VRA enforcement rationale advanced by

Defendants represents a pretext.

601.    Moreover, the fact that the Constitution requires that the Census count all persons

and that Congress use such figures for apportionment, the attempt to enact a policy that would

hinder that ability has no nexus to "core federal interests in immigration and foreign affairs."

*Monga*, 323 F. Supp. 3d at 91–92; *see also Rodriguez-Silva*, 242 F.3d at 247.

602.    And although the Second Circuit "has adopted a stance of minimal scrutiny

respecting federal regulations that contain alienage-based classifications," *United States v.

Duggan*, 743 F.2d 59, 76 (2d Cir. 1984), this standard does not prohibit judicial review and

regardless, should not apply here where the issues presents not an actual classification but

instead reflects invidious intent.

603.    Applying less-than-strict scrutiny but conducting an actual review of Defendants'

justifications, even assuming that there was a legitimate need for better citizenship data to

enforce Section 2 of the VRA, Secretary Ross's decision bears no rational relationship to that

interest.

604.    Because the Census Bureau explained that it could better achieve that interest by using administrative records and that adding such a question would harm response rates of non-citizen households as well as the quality of the data itself (and Defendants have presented no arguments to the contrary), the citizenship-question decision lacks a rational basis.

605.    Second, the Supreme Court has paved a now-well-trodden path for striking down governmental action even without heightened scrutiny when that action is "inexplicable by anything but animus."  *Romer*, 517 U.S. at 632; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (striking down decision under rational basis review that "rest[s] on an irrational prejudice"); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (citing *Moreno* regarding the Constitution's "guarantee of equality").

606.    Because the decision to add a citizenship question was motivated by a "bare [ ] desire to harm a politically unpopular group," *Moreno*, 413 U.S. at 534, it violates the Fifth Amendment regardless of the level of scrutiny applied.  This line of cases has not depended on the targeting of a group based on a recognized characteristic like race or national origin that requires strict scrutiny—instead, the Supreme Court has struck down laws that target individuals without a legitimate basis based on sexual orientation (*Romer* and *Windsor*), disability (*Cleburne*), and even groups of non-married individuals living together in the same household (*Moreno*).

607.    Indeed, the federal government "cannot subject all aliens or any group of aliens to invidious discrimination."  *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1288 (9th Cir. 1993); *Rodriguez-Silva*, 242 F.3d at 247 ("aliens are 'persons' entitled to protection against invidious State action under the Fourteenth Amendment.").

608.    Sweeping away the only rationale offered by Defendants as pretext, the record makes it clear that Secretary Ross knew that his decision would negatively affect the ability of the Decennial Census to accurately count noncitizen households.  PFOF § III.H.

609.    In addition to his knowledge that adding a citizenship question would harm noncitizens, Secretary Ross has previously expressed animus toward immigrants, using the derogatory term "chain migration" to praise Trump Administration immigrant policies and oppose the process of granting status to family members of current immigrants with legal status. PFOF § VI.A; PX-479.

610.    Defendants also admit that Secretary Ross discussed adding a citizenship question with the Trump White House and Steve Bannon in particular, and the record makes clear that this helped motivate him to request the question.  PFOF § III.A.

611.    Yet Secretary Ross was well-aware that President Trump and Steve Bannon had long made statements and enacted policies designed to ostracize immigrants, reduce their numbers, and single them out for disfavored treatment, and that Mr. Kobach shared these same goals.  PFOF §§ III.C, VI.A.

612.    Taken together, the proffered explanation for adding a citizenship question— VRA enforcement—lacks any credibility, and thus adding it had no rational purpose at all other than the one communicated or implied by the individuals influencing Secretary Ross: a desire to harm a politically unpopular group in violation of the Fifth Amendment.  *See Romer*, 517 U.S. at 632 (holding that the decision at issue was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects" and thus "lacks a rational relationship to legitimate state interests").

613.    This intentional discrimination violates the equal protection guarantee embedded in the Due Process Clause of the Fifth Amendment.

## CONCLUSION

614.    The evidence demonstrates that Defendants' decision to add a citizenship question to the census substituted impermissible considerations for reasoned, scientific processes; disregarded mandatory statutory obligations and federal agency requirements; and was motivated by discriminatory animus in violation of the Fifth Amendment.

615.    Plaintiffs respectfully request that this Court vacate and set aside Defendants' decision, enjoin Defendants from adding a citizenship question to the 2020 census, and declare that the decision is arbitrary, capricious, not in accordance with law, and unconstitutional under the Fifth Amendment.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Steven C. Wu                                  Matthew Colangelo
  *Deputy Solicitor General*             *Executive Deputy Attorney General*
Judith N. Vale                                Elena Goldstein, *Senior Trial Counsel*
  *Senior Assistant Solicitor General*    Danielle Fidler, *Assistant Attorney General*
                                              Sania Khan, *Assistant Attorney General*
                                              Elizabeth Morgan, *Assistant Attorney General*
                                              Ajay Saini, *Assistant Attorney General*
                                              Laura Wood, *Assistant Attorney General*
                                              Office of the New York State Attorney General
                                              28 Liberty Street
                                              New York, NY 10005
                                              Phone: (212) 416-6057
                                              matthew.colangelo@ag.ny.gov

                                              Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*


Dale Ho                                          Andrew Bauer
American Civil Liberties Union Foundation        Arnold & Porter Kaye Scholer LLP
125 Broad St.                                    250 West 55th Street
New York, NY 10004                               New York, NY 10019-9710
(212) 549-2693                                   (212) 836-7669
dho@aclu.org                                     Andrew.Bauer@arnoldporter.com

Sarah Brannon*                                   John A. Freedman
American Civil Liberties Union Foundation        Arnold & Porter Kaye Scholer LLP
915 15th Street, NW                              601 Massachusetts Avenue, N.W.
Washington, DC 20005-2313                        Washington, DC 20001-3743
202-675-2337                                     (202) 942-5000
sbrannon@aclu.org                                John.Freedman@arnoldporter.com
*\* Not admitted in the District of Columbia;*
*practice limited pursuant to D.C. App. R.*
*49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs