IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE, *et al.*,<br><br>                    Defendants. | No. 1:18-cv-2921 (JMF) |

**DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW REGARDING PLAINTIFFS' CLAIMS**

# **TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ...................................................................................... 1

I.      History and Purpose of the Decennial Census ............................................. 1

II.     Census Operations .......................................................................................... 4

III.    The 2020 Decennial Census .......................................................................... 5

IV.     The ACS .......................................................................................................... 6

V.      The Evidence in the Record Does Not Establish Plaintiffs' Standing.......................... 8

    A.      The Inclusion of a Citizenship Question Will Not Cause An Injury in Fact.................. 8

        1.      Address Canvassing........................................................................... 8

        2.      Plaintiffs Have Not Proven that the Magnitude of Any Decrease in the Self-Response Rate Can be Specifically Attributable to the Inclusion of a Citizenship Question. ........................................................................ 8

        3.      NRFU Efforts Will Be Sufficient to Mitigate Any Potential Decline in Self-Response as a Result of a Citizenship Question ........................ 16

        4.      Partnership and Communication/Outreach ........................................ 20

        5.      In-Person Enumerators....................................................................... 21

        6.      Administrative Records ...................................................................... 23

        7.      Proxy Responses ................................................................................ 24

        8.      Imputation .......................................................................................... 26

        9.      No Differential Undercount................................................................ 29

        10.     Failure to Show Loss of Apportionment ............................................ 31

        11.     Failure to Show Loss of Federal Funding.......................................... 33

        12.     Failure to Show Other Financial Harm Caused by Citizenship Question............... 39

        13.     Data Quality....................................................................................... 40

        14.     Plaintiffs Cannot Show a Loss of Confidentiality Due to the Inclusion of a Citizenship Question........................................................................ 40

B. Plaintiffs' Alleged Harm Due to the General Macro-Environment Cannot Be Fairly Traced to the Secretary's Decision to Include a Citizenship Question on the Census . 41

VI. Administrative Record Facts ........................................................................ 44

 A. Secretary Ross Examines Census Issues After His Appointment as Secretary............ 44

 B. DOJ Asks the Census Bureau to Reinstate a Citizenship Question on the 2020 Decennial Census to Facilitate Enforcement of the Voting Rights Act...................... 45

 C. The Department Of Commerce Analyzes DOJ's Request and the Costs and Benefits of Reinstating a Citizenship Question .......................................... 46

 D. The Secretary Issues His Decision................................................ 50

VII. Proposed Findings of Fact from Trial ........................................................ 52

 A. The ACS .................................................................................. 52

 B. Secretary Ross Examines Census Issues After His Appointment as Secretary............ 53

 C. DOJ's Request for Citizenship Data from the Decennial Census for VRA Enforcement Purposes.............................................................. 54

 D. Dr. Handley's Views About the Sufficiency of the Data in the ACS Are Irrelevant .... 56

 E. The Department Of Commerce Analyzes DOJ's Request and the Costs and Benefits of Reinstating a Citizenship Question .......................................... 57

 F. The Secretary's March 26, 2018 Memorandum.......................................... 60

 G. The Citizenship Question Was Adequately Tested .................................... 60

 H. Alternative to Citizenship Question.................................................. 63

 I. The August 6, 2018 Working Paper.................................................... 63

 J. The May 2018 Proposed RCT ........................................................ 63

VIII. Plaintiffs Have Not Proven An Equal Protection Violation ........................... 64

IX. Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext"............. 65

PROPOSED CONCLUSIONS OF LAW................................................................ 66

I. Plaintiffs Have Failed to Prove Standing. ...................................................... 66

 A. General Legal Standards for Article III Standing ...................................... 66

B.     Plaintiffs Have Failed to Prove a Concrete, Non-Speculative Injury That Is Certainly Impending.................................................................................... 67

    1.    Plaintiffs Failed to Prove that They Face Any Imminent Risk of Concrete Actionable Injury in the Form of Lost Representation or Federal Funding. ............................ 67

    2.    Plaintiffs Failed to Prove That Their Expenditures of Resources Establish Article III Injury-in-Fact. ...................................................................................... 69

    3.    Plaintiffs Failed to Prove That Any Lower Quality Demographic Data Will Perceptively Impair Any Concrete and Tangible Cognizable Interest.................... 70

C.     Plaintiffs Failed to Prove Injury Traceable to the Inclusion of the Citizenship Question on the Census. ................................................................................ 70

D.     The Nongovernmental Organization Plaintiffs Do Not Have Standing Because They Cannot Show that Any of Their Members Have Standing. ................................ 71

II.    Plaintiffs Failed to Prove that the Secretary's Decision to Reinstate a Citizenship Question was Arbitrary and Capricious........................................................................... 72

  A.     Any Judgment in this Case Would Inherently Rest on Speculation And Would Thus Be Premature ............................................................................................... 72

  B.     Legal Standards for Review Under Administrative Procedure Act ............................ 73

  C.     The Effect of the Court's Prior Preliminary Finding of Bad Faith and Pretext............ 75

  D.     Expert Testimony That Merely Second Guesses the Secretary's Decision Is Improper.................................................................................................... 76

III.    The Secretary's Decision to Reinstate a Citizenship Question Was in Accordance With Law. ................................................................................................................ 77

  A.     The Secretary's Decision Fully Complies With 13 U.S.C. § 6(c). ............................... 77

  B.     The Secretary's Decision Was in Accordance with 13 U.S.C. § 141(f). ...................... 78

    1.    The Court Lacks Jurisdiction to Review Plaintiffs' Claim that Secretary Ross Violated the Reporting Requirement of § 141(f)(3). ............................................... 78

    2.    Even if 13 U.S.C. § 141(f) imposes a substantive constraint on the Secretary of Commerce, it is not judicially reviewable. ............................................................ 79

    3.    Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper.................... 80

    4.    Defendants Have Not Waived Their Arguments Regarding 13 U.S.C. § 141(f)....... 81

IV.    Plaintiffs Failed to Prove am Equal Protection Violation. ................................ 81

X.    Any Relief Provided in This Case Must Be Consistent With the APA and Article III ..... 83

    A.    Remand to the Agency Is the Only Potentially Appropriate Remedy......................... 83

    B.    Any Relief in This Case Should Not Extend Beyond the Plaintiffs That Have Demonstrated an Injury-In-Fact Traceable to Defendants ........................................ 85

XI.    Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext".............. 87

Pursuant to Paragraph 6 of the Court's September 17, 2018 Scheduling Order (Docket No. 323) and the Court's oral order on the record of November 13, 2018, the Defendants United States Department of Commerce, Wilbur L. Ross, Jr., in his official capacity as Secretary of Commerce, Bureau of the Census, and Ron S. Jarmin, in his capacity as performing the non-exclusive functions and duties of the Director of the U.S. Census Bureau, hereby submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

**I.      History and Purpose of the Decennial Census[1]**

1.      The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—with no reference to citizenship status—residing in each state.  Joint Stipulations ("Joint Stips."), Docket No. 480-1, ¶ 1.

2.      The Constitution provides that Representatives "shall be apportioned among the several States … according to their respective Numbers," which requires "counting the whole number of persons in each State."  Joint Stips. ¶ 2.

3.      The Constitution requires that this count be an "actual Enumeration" conducted every ten years.  Joint Stips. ¶ 3.

4.      From 1820 to 1950, with the exception of 1840, every decennial census asked a question concerning citizenship or birthplace in some form.  Measuring America: The Decennial Censuses from 1790 to 2000, https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf ("Measuring America");[2] AR649-653; PX-297 at 3 (response to Census RFA No. 4).  In addition, the American Community Survey has asked a citizenship question since 2005 and is a survey within the Decennial Census Program in the Census Bureau; PX-297 at 3 (response to Census RFA No. 4).

5.      For the 1820 decennial census, Congress added a question about citizenship, directing enumerators to tally the number of "Foreigners not naturalized."  Act of March 14, 1820, 3 Stat. 548, 550 (1820).

6.      The 1830 decennial census tallied all "white persons" who were "ALIENS – Foreigners not naturalized."  Act of March 23, 1830, 4 Stat. 383, 389 (1830).

7.      The 1850 decennial census asked all "free inhabitants" to provide their place of birth ("State, Territory, or country").  Act of May 15, 1850, 9 Stat. 428, 433 (1850).

8.      The questions in 1860 were largely the same as that in 1850.  Measuring America, at 11.

---

[1] The findings of fact in this section are largely not included in the Administrative Record ("AR").

[2] The Court relied on this publication for historical information about the census in its July 26, 2018, opinion. ECF No. 215, at 7.

9.      The 1870 decennial census included a question about the respondent's place of birth and also asked whether the person's father or mother was "of foreign birth" and whether the respondent was a "[m]ale [c]itizen[] of 21 years of age and upwards."  Measuring America, at 13, 15.

10.     The 1880 decennial census asked for the birthplaces of the respondent and each of the respondent's parents ("naming the State or Territory of the United States, or the Country, if of foreign birth").  Measuring America, at 17.

11.     The 1890 decennial census asked for the respondent's place of birth and the place of birth of both of the respondent's parents, and, for adult males of foreign birth 21 years or older, the number of years the individual had resided in the United States, whether he had naturalized, or if not, whether naturalization papers had been taken out.  Measuring America, at 22.

12.     The 1900, 1910, 1920, and 1930 decennial census all asked about birthplace and parental birthplace, as well as specifically asking male immigrant residents 21 years or older their year of immigration and whether they were naturalized.  Measuring America, at 34, 45-46, 58, 59.

13.     The 1940 decennial census asked for residents' birthplace and for "[c]itizenship of the foreign born," as well as a supplemental question about parental birthplace on a questionnaire that only went to a fraction of the population.  Measuring America, at 62, 63.

14.     The 1950 decennial census asked for the individual's place of birth, and whether a foreign-born individual had been naturalized.  Joint Stips. ¶ 29.

15.     In 1960, the Census Bureau asked 25% of the population for the respondent's birthplace and that of his or her parents.  Measuring America, at 72-73.  It also asked all residents of New York and Puerto Rico about citizenship — the former "at the expense of the State, to meet State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration." U.S. Census Bureau, 1960 Censuses of Population and Housing: Procedural History 10, 130 (1966), available at http://www2.census.gov/prod2/decennial/documents/1960/proceduralHistory/1960proceduralhistory.zip.  In a review of the census, the Census Bureau explained the decision not to ask all respondents about citizenship as follows: "It was felt that general census information on citizenship had become of less importance compared with other possible questions to be included in the census, particularly in view of the recent statutory requirement for annual alien registration which could provide the Immigration and Naturalization Service, the principal user of such data, with the information it needed."  Id. at 194.

16.     A question concerning citizenship did not appear on the decennial census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010.  Joint Stips. ¶ 30; AR 42-53.

17.     From at least the 1970 decennial census through the 2000 decennial census, in lieu of the short-form questionnaire the Census Bureau sent a long form questionnaire to approximately one in six households.  Joint Stips. ¶ 31.

18.     For the 1970 decennial census, the long form questionnaire, which contained additional questions, was sent to approximately one in five households.  Joint Stips. ¶ 32.

2

19.     For the 2000 decennial census, the long form questionnaire, which contained additional questions, was sent to approximately one in six households.  Joint Stips. ¶ 33; AR 2-41, 557.

20.     Data collected from the sample households surveyed with the long form were used to generate statistical estimates.  Joint Stips. ¶ 34.

21.     In the 1970, 1980, 1990, and 2000 decennial censuses, the long form decennial census questionnaire contained a question about citizenship status.  Joint Stips. ¶ 35; AR 5.

22.     In the 1990 and 2000 decennial censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth.  Joint Stips. ¶ 36; AR 5.

23.     Through the Census Act, Congress assigned the responsibility of conducting the decennial census to the Secretary of Commerce.  Joint Stips. ¶ 4.

24.     Data from the decennial census are reported down to the census block level.  Joint Stips. ¶ 15.

25.     The population data collected through the decennial census determines the apportionment of seats in the U.S. House of Representatives among the states.  Joint Stips. ¶ 16.

26.     After the census is taken, congressional seats are distributed pursuant to "the method of equal proportions," a complex process that ranks states in order of priority based on their populations (multiplied by a multiplier).  *See* 2 U.S.C. § 2a(a).

27.     Each State's number of representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College.  *See* U.S. Const. art. II, § 1, cl. 2; Joint Stips. ¶ 17.

28.     The population data collected through the decennial census also determines the number of electoral votes each state has in the Electoral College.

29.     States also use decennial census data to draw congressional, state, and local legislative districts.  Joint Stips. ¶ 18.

30.     The federal government also uses decennial census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments.  Joint Stips. ¶ 19.

31.     Approximately 132 programs used Census Bureau data to distribute hundreds of billions of dollars in funds during fiscal year 2015.  Joint Stips. ¶ 20.

32.     Some demographic groups have proven more difficult to count in the decennial census than others. The Census Bureau refers to these groups as "hard-to-count."  Joint Stips. ¶ 21.

33.     Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the decennial census.  Joint Stips. ¶ 22.

34.     Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 decennial census.  Joint Stips. ¶ 23; AR 613.

35.     The 2010 decennial census undercounted on net more than 1.5 million Hispanic and African American individuals.  Joint Stips. ¶ 24.

36.     In the 2000 and 2010 decennial censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness.  Joint Stips. ¶ 27.

37.     For the 2000 and 2010 decennial censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count.  Joint Stips. ¶ 28.

## II.     Census Operations[3]

38.     Any person over the age of eighteen living in the United States who refuses or willfully neglects to answer any part of the census questionnaire sent to him or her is subject to a fine.  13 U.S.C. § 221(a).

39.     To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States, which is directed to every person living in the United States and all persons living in the United States are legally required to respond.  Joint Stips. ¶ 7.

40.     If the Census Bureau does not receive a response to the questionnaire it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in-person interview in order to collect the data. This process is the non-response follow-up ("NRFU") operation.  Joint Stips. ¶ 8.

41.     If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household.  Joint Stips. ¶ 9.

42.     For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person.  Joint Stips. ¶ 10.

43.     Every case in the NRFU workload will be eligible for six unique contact days and twelve proxy attempts.  U.S. Census Bureau (June 8, 2018), Proposed Information Collection, 2020 Census. Federal Register Notice. Vol. 83 (111), p. 26649.

---

[3] The findings of fact in this section are largely not included in the Administrative Record.

44.     If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible."  Joint Stips. ¶ 11.

45.     A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there.  Joint Stips. ¶ 12.

46.     For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview.  Joint Stips. ¶ 13.

47.     For the 2010 decennial census, after three proxy attempts a household became eligible for what is known as "whole person imputation" or "whole household imputation," in which the Bureau imputed the characteristics of the household, including in some circumstances the household member count.  AR 11399.

48.     After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, to determine the population count in each state.  Joint Stips. ¶ 14.

49.     The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population.  Joint Stips. ¶ 25.

50.     The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills.  Joint Stips. ¶ 26.

## III.    The 2020 Decennial Census[4]

51.     For the 2020 decennial census, households will also be given the option to complete the questionnaire via the Internet, in addition to other enumeration options such as printed questionnaires and telephone responses.  AR 165.

52.     The 2020 Decennial Census will also be a "short form only" census.  AR 198.

53.     On March 28, 2017, the Department of Commerce notified Congress of the subjects planned for the 2020 decennial census and the American Community Survey, in accordance with 13 U.S.C. 141(f)(1).  The subjects planned for the 2020 decennial census did not include a citizenship question.  AR 202-213.

54.     As in past years, the 2020 Decennial Census will pose a number of questions, including questions regarding sex, Hispanic origin, race, and relationship status.  Joint Stips. ¶ 58.

---

[4] The findings of fact in this section cite largely to both the Administrative Record and the Joint Stipulations.

55.     A planned question on the 2020 Decennial Census questionnaire asks, "Is this person a citizen of the United States?," with the answer options "Yes, born in the United States"; "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas"; "Yes, born abroad of U.S. citizen parent or parents"; "Yes, U.S. citizen by naturalization – Print year of naturalization"; and "No, not a U.S. citizen."  Joint Stips. ¶ 57.

56.     A planned question on the 2020 Decennial Census questionnaire asks "Is this person of Hispanic, Latino, or Spanish origin?"  Joint Stips. ¶ 59.

57.     A planned question on the 2020 Decennial Census questionnaire asks "What is this person's race?"  Joint Stips. ¶ 60.

58.     A planned question on the 2020 Decennial Census questionnaire asks how each person in the household is related to the person filling out the questionnaire.  Joint Stips. ¶ 61.

59.     A planned question on the 2020 Decennial Census questionnaire asks, "What is this person's sex?"  Joint Stips. ¶ 62.

60.     The 2020 Census Life Cycle Cost Estimate ("LCCE") includes an estimated fiscal year 2020 cost for NRFU of approximately $1.6 billion.  AR 183, 191.

## IV.     The ACS[5]

61.     After the 2000 Decennial Census, the long form questionnaire was replaced by the American Community Survey.  Joint Stips. ¶ 37.

62.     After the 2000 Decennial Census, the functions performed by the long form have been replaced by the American Community Survey ("ACS").  Joint Stips. ¶ 38.

63.     The ACS began operating in 2000 and was at full sample size for housing units in 2005, and for group quarters in 2006.  Joint Stips. ¶ 39.

64.     The ACS is a yearly survey of approximately 2% of households—about 3.5 million—across the United States.  Joint Stips. ¶ 40.

65.     A question concerning citizenship status currently appears as among one of more than 50 questions on the 28-page ACS questionnaire.  Joint Stips. ¶ 41; AR495-523; Trial Transcript ("Tr.") 889:24-25.

66.     The citizenship question that appears on the ACS is not a binary yes/no question. The ACS citizenship question asks whether the person was born in the United States, a U.S. territory, or abroad.  Joint Stips. ¶ 43.

67.     The data collected by the ACS allows the Census Bureau to produce estimates of Citizen Voting Age Population ("CVAP").  Joint Stips. ¶ 44.

---

[5] The findings of fact in this section are largely not included in the Administrative Record.

68.     CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level.  Joint Stips. ¶ 45.

69.     Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate.  Joint Stips. ¶ 46.

70.     The ACS is intended to provide information on characteristics of the population, and the social and economic needs of communities.  Joint Stips. ¶ 47.

71.     Unlike the Decennial Census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates.  Joint Stips. ¶ 48.

72.     Because ACS estimates are statistical estimates based on a sample, the tabulations are weighted to reflect sampling probabilities and eligibility for NRFU, as well as to control to official population totals as established by the Population Estimates program.  Joint Stips. ¶ 49.

73.     Both the ACS and its predecessor, the census long form were statistical estimates based on survey samples and they therefore have margins of error called sampling error.  Tr. 1026:10-22.

74.     Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tract[s]" and "census-block groups."  Joint Stips. ¶ 50.

75.     Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1- year", "3-year" or "5-year" estimates depending on the number of years aggregated together).  Joint Stips. ¶ 51.

76.     Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in–every-eight- household sample.  Joint Stips. ¶ 52.

77.     Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units.  Joint Stips. ¶ 53.

78.     1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1- year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+", 3-year ACS estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-years estimates, and 5-year ACS estimates produce "[d]ata for all areas."  Joint Stips. ¶ 54.

79.     If there are any coverage errors in the census, those are carried through to population estimates throughout the decade, which are used to weight the ACS.  Tr. 1084:18 – 1085:15.

80.     The Census Bureau plans to continue to distribute the ACS each year, and plans to continue to include a citizenship question.  PX-357-51.

## V.     The Evidence in the Record Does Not Establish Plaintiffs' Standing[6]

### A.  *The Inclusion of a Citizenship Question Will Not Cause An Injury in Fact.*

#### 1.   Address Canvassing

81.      The Census Bureau uses a master address file ("MAF") to determine the addresses to count in the census.  Tr. 1115:16 – 1116:12.  The MAF is continuously improved and updated over the course of the decade by using in-office address canvassing and administrative records to identify all addresses where people could live.  *Id.*; *id.* 1116:13 – 1118:16.  The Census Bureau also utilizes extensive in-person address canvassing (starting in Summer 2019), *id.*, and the Local Update Census Addresses ("LUCA") operation, which is a "statutorily mandated cooperative program between the Census Bureau and states, counties, and cities who enter into partnership with the Census Bureau" and undertake "an organized comparison of alternative address lists," *id.* 1089:12 – 1090:1.

82.      Since 1994, the Census Bureau has given local jurisdictions access to the MAF before each decennial census.  Tr. 290:18 – 291:1, 291:9-23.  For each decennial census starting with 2000, local jurisdictions like New York City review the MAF and ask the Census Bureau to correct and add addresses in the file.  *Id.* 291:2-23.  As part of that address review process, local jurisdictions like New York City present LUCA submissions to the Census Bureau to request changes to the MAF. *Id.* 296:25 – 297:2.  New York City's LUCA submissions in 2000 and 2010 were successful, resulting in a more accurate MAF for the 2000 and 2010 decennial censuses.  *Id.* 440:20-25.

83.      The MAF is completely independent from the characteristics of people residing at those addresses.  Tr. 1118:17 – 1119:8.  As it relates to a citizenship question on the 2020 Census, then, "the citizenship status of the physical unit is related to who lives there, not to its purpose as a living quarter," and therefore the presence of a citizenship question says nothing about whether a particular address is included or excluded from the MAF.  *Id.*

84.      Although administrative records will be used to update the master address file, the "failed" 2016 administrative record tests referenced by Dr. Salvo informed the Census Bureau's use of these records.  Tr. 1116:13 – 1117:19.  Accordingly, the Census Bureau will not delete an address from the MAF without at least one in-person verification.  *Id.* 1116:13 – 1118:16.  None of Plaintiffs' evidence links a citizenship question on the 2020 Census to the omission of certain people at the address-canvassing stage.

#### 2.   Plaintiffs Have Not Proven that the Magnitude of Any Decrease in the Self-Response Rate Can be Specifically Attributable to the Inclusion of a Citizenship Question.

85.      Households may respond to the 2020 Census in three ways: online, by telephone, or by mail.  Tr. 1126:2 – 1127:18.  About 80% of households will first receive an invitation to fill out the census online or by phone, while the other 20% of households will receive the same invitation with a paper questionnaire on the first mailing.  *Id.*  If a household does not respond, it may receive up to five mailings, including a paper questionnaire on the fourth mailing.  *Id.* 1127:17 – 1128:24.

_____

[6] The findings of fact in this section cite to both the Administrative Record and the trial record.

86.     For a household filling out the census questionnaire online, they would first enter the address or address ID, then roster the number of people in the home. Tr. 1129:10 – 1130:1. After that, a household would be prompted for the names of each person in the home, and would only then fill out characteristic information for each person in the household. *Id.* A household filling out the census questionnaire online would not reach the citizenship question until the end of the characteristic information for Person 1—the respondent himself or herself. *Id.* 1130:2-8.

87.     For a household filling out the census questionnaire by phone, the questions would be asked in the same manner as those filling it out online. Tr. 1130:16 – 1131:3. Again, a household filling out the census questionnaire by phone would not reach the citizenship question until the end of the characteristic information for Person 1—the respondent himself or herself. *Id.* 1130:2-8.

88.     For a household filling out a multi-page paper questionnaire, the first page asks for information regarding how many people live in the household, and then begins asking characteristic questions about Person 1. Tr. 1130:9-15. In the current draft of the paper questionnaire, the citizenship question appears at the bottom of the first page. *Id.*

89.     Regardless of the how a household responds to the 2020 Census, if they simply skip the citizenship question, that household will nonetheless be enumerated in full. Tr. 1134:4-7.

90.     And if a household reaches the citizenship question and refuses to respond beyond that point, that household will nonetheless be enumerated in full. Tr. 1134:12-15. It is only if a household does not self-respond to the questionnaire at all that the household is included in the Nonresponse Followup (NRFU) workload. Tr. 1131:19-23.

91.     Self-response rates have been steadily declining for decades, and the Census Bureau currently projects a 60.5% self-response rate for the 2020 Census. Tr. 1131:24 – 1132:17.

92.     The Census Bureau projects an overall self-response rate in the range of 55.5% to 65.5%, and while it uses the midpoint (60.5%) for certain purposes, it uses the low point (55.5%) for budgeting and other planning purposes. Tr. 1131:24 – 1132:5, 1167:24 – 1168:8. These projections are consistent with the decades-long decline in self-response rates. *Id.* 1132:6-17.

93.     While the balance of available evidence suggests that including a citizenship question on the 2020 Census could lead to a lower self-response rate in households that potentially contain a noncitizen, Tr. 881:19-23, the magnitude of any such decline is unknown.

94.     Although inclusion of a citizenship question will "very likely" lead to a decline in self-response for noncitizen households, Jarmin Dep. 278:2-7, 279:2-8, a decline in self-response for a subpopulation is "not necessarily" associated with an increase in the net undercount of that population. *Id.* 273:21 – 274:6, 274:22 – 275:7. A decline in self-response means that the NRFU workload may be increased, but the Bureau "may capture all of" the additional nonresponding households during NRFU. *Id.* 274:22 – 275:7.

95.     The Brown paper is the best analysis of the citizenship question's impact on the potential decline in self-response rates. Tr. 897:9-12; PX-162. Using available data from the 2010 Census, the 2010 ACS, and administrative records, the paper estimated a 5.8 percentage point decline in households that potentially contain a noncitizen. PX-162. It reached this number using

four steps.  First, it subtracted the response rates to the 2010 Census short-form questionnaire (without a citizenship question) from the response rates for the lengthy 2010 ACS questionnaire (with a citizenship question) for two groups—an all-citizen-household group and an every-other-household group.  Tr. 1139:25 – 1143:5; PX-162, tbl. 7.  Second, it subtracted the all-citizen-household difference in response rate (–8.9) from the every-other-household difference in response rate (–0.7), which results in a raw "difference-in-differences" of –11.9.  *Id.*  Third, because there are many questions that may cause a household to forego answering the ACS, the paper performed a "decomposition" to control for certain other questions on the ACS.  Tr. 1146:3 – 1149:5; PX-162, tbl. 8.  The decline in response rates attributable to the controlled-for ACS questions is considered "explained" (–5.8) and the decline in response rates attributable to other questions—including the ACS citizenship question—is considered "unexplained."  *Id.*  Lastly, the paper updated this analysis using 2016 ACS data to model the "unexplained" portion of the foregoing analysis, resulting in a 5.8% response-rate decline for households potentially containing noncitizens.  *Id.* 1154:10 – 1155:11; PX-162, tbl. 9.

96.     While 5.8% is the best available estimate of the decline in self-response rate, Tr. 901:1-18, it is far from certain.  For one, the Brown paper's analysis is merely a natural experiment—which cannot assign causation to the citizenship question—in contrast to a randomized control trial.  Tr. 923:21 – 925:12.  And even when attempting to control for certain variables in the natural experiment, the Brown paper did not, and to a certain extent could not, do so.  For example, the "decomposition" used by the Brown paper to rule out certain ACS questions as possible causes of the decline in self-response rate, *id.* 1149:6-12, did not rule out *all* other questions on the ACS, *id.* 1152:2-13.  It also did not rule out the cumulative effect of asking the full battery of ACS questions—many of which may be sensitive to potential noncitizen households—rather than any one question.  *Id.* 1152:14 – 1153:5.  Additionally, as discussed more fully below, the Brown paper could not account for the changing macro environment.  *Id.* 1153:6-15 ("These kinds of analyses can't make any sophisticated controls for the macro environment.  It is what it is when they are calculated, and some portion of it could be picked up and explained and some portion of it picked up and unexplained.").  All parties agree that the analysis does not capture any changes in the macro environment after 2016.  *Id.* 902:19-24, 944:25 – 945:4.

97.     Plaintiffs unpersuasively point to the Brown paper's analysis of item-nonresponse rates and breakoff rates for Hispanics in the 2016 and 2010 ACS, Tr. 910:7 – 917:11, as a reason that Hispanic households (as opposed to potential noncitizen households) are unlikely to respond to the 2020 census due to the citizenship question.  As Dr. Abowd convincingly explained, however, this analysis of the item-nonresponse rates and breakoff rates for Hispanics, demonstrates only that Hispanics may be more likely to skip or break off at the citizenship question on the 2020 census than non-Hispanic whites, Tr. 919:3 – 920:7, and provides no evidence related to whether they are less likely to respond at all.  In the case of either skipping the citizenship question or breaking off the survey at the citizenship question, the household would still be counted.  Tr. 1134:4-15.

98.     Plaintiffs' expert, Dr. D. Sunshine Hillygus, testified that she believes that the 5.8 percent decline in self-response generated by the Brown paper, PX-162, is likely "conservative" in the sense that she believes the impact the inclusion of a citizenship question on the 2020 decennial census has on the self-response rate of Hispanics and non-citizens is likely to be larger than that figure.  Tr. 79:18 – 80:17.  Dr. Hillygus provided a number of reasons for her belief that the net differential undercount will probably be greater than 5.8 percent, and those reasons were

summarized on PDX-11.  However, after considering all of the testimony, the Court finds that several of the stated bases for Dr. Hillygus's opinion are flawed.

99.     Plaintiffs' evidence that the 5.8% decline is self-response rate is "conservative" concerns the *cost* implications, not the percentage decline in self-response rates.  Tr. 901:1-18.

100.     Dr. Hillygus testified that the "matched data sets" of administrative records used by the Census Bureau were more likely to omit noncitizens.  Tr. 84:1-21.  However, as Dr. Abowd testified, the matched data sets used come from the Master Address File used for the ACS, which includes a number of measures to avoid missing noncitizens.  *Id.* 1160:7-15.

101.     Dr. Hillygus also testified that the 5.8 percent figure was based in part upon an assumption in the use of administrative records that respondents whose citizenship status is unknown are United States citizens.  Tr. 84:22 – 85:6.  However, Dr. Abowd testified that he was not aware of any of the analyses he recalled in the Brown study that made that assumption, and further testified that the Brown paper's analysis included only those who responded on the ACS and for whom all members of the household were presently and successfully linked to administrative records would be counted in the "all citizen household group."  *Id.* 1160:16-25.

102.     Dr. Hillygus also testified that one of the reasons for her opinion that the 5.8 percent estimate was likely to be conservative is that the differential response rate was calculated for certain subgroups relative to all citizens, instead of to non-Hispanic whites.  Tr. 85:7-25.  However, as Dr. Abowd testified, "differential undercount" simply means a comparison between two groups, and "[t]here is a variety of ways to calculate differential net undercounts."  *Id.* 1161:1-16.  The Census Bureau's standard method of calculating differential undercounts is to compare a particular subgroup "relative to the general population," *id.* 1161:12, so Dr. Hillygus's particular narrow methodology of calculating a differential undercount is not the standard, let alone the only, accepted way of doing so.

103.     Given these flaws in the reasons provided by Dr. Hillygus, the Court finds Dr. Abowd's testimony that the Brown et al. estimate is inherently speculative because it failed to rule out all other ACS questions, did not rule out the cumulative effect of asking all ACS questions, and most importantly, that it did not account for the impact of a changing macro political environment, Tr. 1152:2 – 1153:15, as credible.  While the Brown paper's estimate is likely the best available estimate provided at trial, these inherent uncertainties reveal that Dr. Hillygus's opinion that the Brown estimate is conservative is ultimately speculative and entitled to little probative value.

104.     Plaintiffs' expert, Dr. Jennifer Van Hook, purported to find evidence "that adding a citizenship question to the Census will reduce nonresponse rates among racial minorities (in particular Hispanics) as compared to non-Hispanic whites, and noncitizens as compared to citizens," Van Hook Decl. 5, by analyzing data derived from the Current Population Survey ("CPS"), Tr. 206:25 – 207:5.  But the CPS is fundamentally different from the decennial enumeration:  the CPS is conducted jointly with the Bureau of Labor Statistics and used to gather labor force statistics, *id.* 207:15-23; *see also* AR 641; it is sent to only a sample of the population, Tr. 208:5-7; participation involves *eight* separate interviews, *id.* 208:8-10; the CPS questionnaire is far longer than the decennial short form, *id.* 209:4-6; and participation is voluntary, which *decreases* the expected response rate, *id.* 208:24 – 209:3.

11

105.     Dr. Van Hook's ultimate conclusion "that CPS unit nonresponse data is consistent with the understanding that noncitizens, and particularly Hispanic noncitizens, have become less responsive to a survey *containing questions concerning citizenship*," Tr. 245:17-25, is nonsensical and unsupported because, as Dr. Van Hook acknowledged, all respondents in her sample set already "answered it in the first interview," *id.* 247:25, and that question is not repeated in any of the later interviews unless a new person joins the household, *id.* 269:9 – 270:12.

106.     Dr. Van Hook admitted that, because her definition of unit non-response included only individuals who initially participated in the first CPS interview that contained a citizenship question, each of the households she classifies as unit non-response "have not failed to respond to a survey that contained a citizenship question," but, on the contrary, "have responded to a survey that contained a citizenship question and then skipped a follow up that did not contain a citizenship question." Tr. 216:21 – 217:6.

107.     CPS respondents are asked about citizenship or nativity only once, during the initial interview, Tr. 215:19 – 216:1, and, in Dr. Van Hook's words, "[t]he questions that are repeated are labor force questions." *Id.* 218:8-10. Therefore her assertion that "[i]f nonresponse to the CPS … increased when the 2020 citizenship question was being proposed and debated,… this would be consistent with the understanding that the administration's proposal to add the citizenship question to the 2020 decennial census is already having an effect on respondents' willingness to respond to a Census Bureau survey containing a question on citizenship," *id.* 216:5-14, is unsupported and illogical.

108.     Dr. Van Hook's assertion that "[e]ven though the citizenship question is not asked during follow-up interviews, the respondents would not necessarily know that when contacted for a follow-up interview," Van Hook Decl. 14, is speculative and unsupported. Given that all households in her sample set participated in the first interview—the only interview to actually contain a citizenship question, Tr. 247:25, it is unlikely that any failure to respond to one of the seven follow-up interviews is attributable to apprehension about answering the citizenship question *again.*

109.     Attempting to determine the decline in self-response rate due to the citizenship question based on the CPS is inapposite. As Dr. Abowd persuasively explained, an ACS-based analysis is more appropriate because the CPS "has very different field operation instructions and controls and data processing from a decennial census." Tr. 1145:2-21. By contrast, the ACS is "a mandatory survey, sampled from a dense sample from the master address file, … [and it] provided a large amount of relevant data on a questionnaire that contained a" citizenship question. *Id.*

110.     Dr. Van Hook based her opinions on changes in unit non-response to the CPS for various racial/ethnic groups, Van Hook Decl. 5. But she included as "unit non-response" any household who skipped *even one* out of eight separate interviews, Tr. 212:6-15, although the CPS is conducted during one specific week each month, and Dr. Van Hook admitted that "if a family were, for instance, on vacation or otherwise unavailable during the week that the CPS were conducted in any given month, they may be skipped for that particular month," *id.* 208:16-23. Furthermore, because Dr. Van Hook's sample set included only households who participated in the first CPS interview—the only month to include a citizenship question—each household in her sample set already had, as she put it, "answer[ed] the [citizenship] question to begin with." *Id.* 216:21 – 217:1.

These fundamental distinctions render any comparison to likely response rates to the decennial census unpersuasive.

111.    Moreover, Dr. Van Hook's expert report was replete with errors, she compounded those errors by relying on that report during her deposition, and she made no attempt to correct her errors until signing her errata two business days before trial. For example, even though, "in performing [her] analysis, [she] was interested in particular in the behavior of Hispanics and Asians … *because a large share are immigrants*," Tr. 219:21 – 220:4 (emphasis added), Dr. Van Hook's expert report and deposition testimony falsely conflated the share of Hispanic and Asian adults who are noncitizens and naturalized citizens. *Id.* 220:5 – 223:20 (acknowledging that both the text and graph showing immigrant makeup of various racial/ethnic groups was incorrect; that these errors were not corrected in supplemental report or at deposition; and that Dr. Van Hook had initially "represented that a substantially greater share of the Asian population are noncitizens than is actually the case"). And as Dr. Van Hook admitted, she "made additional substantive changes to [her] deposition testimony through [her] errata that corrected errors contained in the initial report," *id.* 225:2-5. These substantive changes included a figure contained within the body of her initial expert report but shunted to the appendix of her trial testimony, *id.* 225:25 – 226:6, after she discovered that both the graph itself and the text analyzing it had reversed the data representing African-Americans and Asians. *Id.* 226:7-17. The result of this error is that Dr. Van Hook's expert report falsely stated that Asians (the group with the highest rates of immigrants) evidenced a sharp increase in nonresponse coinciding with discussion of a citizenship question in the media when, in fact, it was African-Americans (a group with very low rates of immigrants) who evidenced an increase in nonresponse. *Id.* 226:7 – 227:22. Contrary to the statements made in her initial report and at deposition, Asians actually exhibited a *decreased* rate of nonresponse during the Trump administration. *Id.* 227:23 – 228:2, 229:12. Dr. Van Hook also admitted to having wrongly testified to the existence of a "suppression effect" (that did not, in fact, exist) in an attempt to explain the discrepancy between one of her incorrect graphs and the very different representation in another graph. *Id.* 231:9 – 232:21. Finally, Dr. Van Hook was forced to remove a conclusion from her trial testimony that had been set forth in her expert report but was based on incorrect data: That changes in "the unadjusted increase [in unit nonresponse] for Asians … can be attributed to compositional change in the Asian population." *Id.* 237:8-23. In fact, when presented at trial with her previous inconsistent statement, Dr. Van Hook stated "I agree with you on that … Yes, I should have made that correction." *Id.* 237:22-23, 238:3. The volume and magnitude of Dr. Van Hook's errors render her trial testimony entirely unreliable and, thus, her opinions should be given no weight.

112.    Dr. Van Hook cherry-picked data that supported her conclusions, while ignoring that which does not. For instance, she testified that "[c]omparing Hispanics to non-Hispanic whites, the difference [in CPS unit non-response] is 7.0 percentage points." Van Hook Decl. 14. But on cross-examination she admitted that "the unit nonresponse rate for blacks in your sample set is nearly 10 percent higher compared to the nonresponse rate for Hispanic households," Tr. 213:20-23, even though African-Americans as a group contain only 4.8% noncitizens, Van Hook Decl. 7. She also admitted that the "nonresponse rate for Asian households is lower still" *id.* 213:24 – 214:1, even though Asians as a group contain the greatest share of immigrants. Later she testified that "nonresponse rates [among] Hispanics significantly increased" during the Trump administration, while ignoring completely that nonresponse for Asians, the group with the highest rates of immigrants, was commensurate with the rate for whites and *fell* during the current administration. *Id.* 235:3 – 236:14. Dr. Van Hook's attempt to tie any changes in nonresponse among Hispanics to the current administration's policies are undermined by the fact that nonresponse is highest among

African-Americans, a group containing very low immigrants, and is relatively low among Asians, the group with the *highest* proportion of immigrants. *Id.* 239:2-20. Finally, Dr. Van Hook's testimony called "especially noteworthy" an increase in nonresponse among Hispanics in early 2018 because that increase coincided with media discussion of the citizenship question—yet her testimony ignored declining nonresponse rates among Asian noncitizens for that same time period. *Id.* 245:3-15. These examples evidence that Dr. Van Hook's analysis of CPS nonresponse rates selectively focused on only the data supportive of her hypothesis while disregarding evidence that cut against her conclusions. This provides an additional reason her opinions should not be credited.

113.     Nor does the analysis of plaintiffs' expert, Dr. Matthew Barreto, provide reliable evidence of an undercount. Dr. Barreto conducted a public opinion survey "designed primarily to look at response rates to the 2020 census in the face of a citizenship question," Tr. 650:19-22, but the fundamental flaws in the design of that survey render its results unreliable. For instance, Dr. Barreto's survey had a response rate of only 28 percent, *id.* 742:1-6, and he acknowledged that this response rate is "substantially lower than the response rate that the Census Bureau obtains on its own surveys," *id.* 742:8-10. And although Dr. Barreto "fielded a pilot test of [his] survey to test the efficacy" of questions, *id.* 741:15-17, he did not test either the wording or ordering of his first two questions, designed to measure nonresponse rates—meaning "no respondents were asked whether they would answer a census with a citizenship question without having just been asked about a census that did not include that question," *id.* 743:17-21. Dr. Barreto also failed to test any alternate wording of question two, which asked respondents whether they would respond to a census conducted by *the federal government*, rather than the *Census Bureau*, *id.* 192:18-24, and that choice of wording—associating the request for information with the government writ large, rather than the nonpartisan, statistical Census Bureau—likely influenced respondents' choices. In fact, Dr. Barreto stated that, in his opinion, most census respondents would view the Bureau as part of the "political administration," *id.* 748:18 – 750:17, although he provided no support for this assumption, which clearly influenced Dr. Barreto's survey design.

114.     Although Dr. Barreto attempted to determine the decline in self-response rates due to a citizenship question by conducting his own opinion poll, the conclusions drawn therefrom are fatally flawed and not credible. As Dr. Abowd convincingly explained, "asking someone about their intention to do something and actually measuring what they do in a field experiment is very different." Tr. 1162:13 – 1163:3. That is to say, "[j]ust because something is randomized doesn't make it a salient, randomized controlled trial." *Id.* 1163:4-9. Setting aside the low 29% response rate, Dr. Barreto also failed to control the weighting of his household-size estimates by using objective population totals. *Id.* 1163:20 – 1164:7. While that may be "perfectly fine for opinion polls," it is not fine if you are "then going to subsequently make an inference about the difference in the households sizes from two different sub populations, and particularly if you're not going to make an inference about one of those sub populations based on a very small sub sample of your survey data in the first place." *Id.*

115.     Put differently, the appropriate use of Dr. Barreto's opinion poll is the same as the Census Bureau's CBAMS research: "to inform marketing and partnership decisions, not to make an inference about what would happen on the 2020 census, [and] certainly not to make an inference about which sizes of households might be more or less inclined to go to proxy." Tr. 1163:10-19, 1379:12-22, 1381:3-9. To get such actionable information, it would be most appropriate to construct a small-scale "RCT in which the components of the RCT came as close to census practice as possible." *Id.* 1164:24 – 1165:5.

14

116.     Dr. Barreto classifies as "nonresponse" individuals who indicated they would participate in the census during question one of his survey, but then change their answer to "no" in question two, which asked about a census containing a citizenship question.  Tr. 669:2-22.  But his definition of nonresponse included individuals whom, upon first being told about a census containing a citizenship question, did not immediately know or declined to provide an answer to the question whether they would respond.  *Id.* 744:18 – 745:1.  Accordingly, Dr. Barreto's survey misclassifies many responses as "nonresponsive" when they are only neutral regarding a citizenship question, skewing the results to his desired conclusion.

117.     Dr. Barreto opined that the citizenship question is sensitive for Latino communities and immigrant-adjacent communities, Tr. 750:22-25, but his survey did not allow him to distinguish between the proportion of citizens versus noncitizens in his survey that indicated they would not participate in a census containing a citizenship question, *id.* 751:4-15. This incongruity undermines any connection between Dr. Barreto's results and his ultimate opinions, and it is borne out by the fact that Dr. Barreto's survey found that 63.9% of African-Americans "think the Trump administration will share their information," when "the share of African Americans nationally who are immigrant or immigrant-adjacent isn't anywhere near 63 percent.  *Id.* 755:24 – 756:6.

118.     There is no evidence that all-citizen households would be impacted by a citizenship question, Tr. 903:9-21, 905:3-9, including all-citizen Hispanic households, *id.* 918:10 – 919:2.  To the contrary, Plaintiffs themselves point out that non-Hispanic whites (many of whom are all-citizen households) are not more sensitive to survey questions about citizenship than they were a few years ago.  *Id.* 917:18 – 918:2.

119.     Dr. Barreto's survey found that the drop-off, or nonresponse rate, *increased* from the beginning of his survey (question two, the first time respondents were asked about a census containing a citizenship question) to the end (question eight, when respondents were asked again about participation in a census containing that question).  Tr. 674:19 – 675:14. Dr. Barreto used the responses to question 8 to "assess the potential success of nonresponse follow-up." *Id.* 686:7-9, 686:20 – 687:3.  But this is illogical, since, as Dr. Barreto admitted, he "would expect the nonresponse follow-up efforts to result in at least some increased response rate," *id.* 760:5-9.

120.     Dr. Barreto acknowledged "[i]t's possible that [non-response follow-up] could close the gap" between response rates for "Latino and immigrant communities" relative to the rest of the population.  Tr. 622:9-11.

121.     Dr. Barreto testified that, with respect to survey research, there is a "peer review process where when you're sending that research to an academic journal for consideration, people are reviewing your survey methodology, they are reviewing the standards that you implemented, the questions you asked, and those external reviewers are asking questions to make sure that it is accurate." Tr. 649:14-23.  Despite the existence of this process, Dr. Barreto did not submit the survey underlying his testimony in this case for peer review before it was implemented. *Id.* 741:18-25.

122.     Dr. Barreto's ultimate conclusion, that "the differential undercount … flowing from the citizenship question" will be "between the range of about 1.5 million and 1.8 million," Tr. 734:19-23, should not be credited because he based that prediction on results of his survey—the

design of which was fundamentally flawed—and his equally unreliable attempt to approximate imputation, based on those same survey results.

123.    The testimony of Dr. William P. O'Hare also does not establish that there will be an increased undercount in 2020 because of the addition of a citizenship question, let alone provide any estimate as to the size of that undercount.  Dr. O'Hare testified for Plaintiffs that he determined that, in the 1990, 2000, and 2010 censuses, there was a strong correlation between a decrease in self-response rates and increased undercount and omissions rates.  Corrected O'Hare Aff. ¶¶ 1, 48, 50, ECF 507-1.  But, as he admitted, correlation alone does not establish causation.  Corrected O'Hare Aff. ¶¶ 49-50; Tr. 537:7-11.  He further admitted that there "probably are other factors involved" in producing an undercount, in addition to the self-response rate.  Tr. 545:15-22.  Dr. O'Hare also did not quantify the size of the increase in undercount or omissions that correlated with any particular decrease in the self-response rate in the 1990, 2000, and 2010 censuses, or predict the exact increase in net undercounts or omissions for the 2020 census.  Corrected O'Hare Aff. ¶ 51; Tr. 541:4 – 542:1.

124.    Dr. O'Hare's findings as to correlation in the 1990, 2000, and 2010 censuses therefore do not establish that a decrease in self-response in the 2020 census will ultimately result in an increased undercount or increased omissions.  The paper he cites to support the possibility of a causal link, *see* Corrected O'Hare Aff. ¶ 53 (citing PX-343), merely hypothesizes that "response rates and net undercount rates may be causally linked," PX 343, at 1, without citing any support whatsoever for that proposition.  That study itself only looked at the geographic variation in mail response rates for tracts and block groups.  *Id.*

125.    Dr. O'Hare's assertions that the additional people who fail to self-respond in the 2020 census will not be fully or correctly enumerated because NRFU "has not mitigated low response rates in the past," and "[d]ata collected in the NRFU portion of the Census is less accurate than that collected in the self-response portion" are also not worthy of credence.  Corrected O'Hare Aff. ¶ 58.  Finally, there is no evidence as to the success rate that NRFU will have among the population of individuals (if any) who fail respond because of a citizenship question, that is, whether it will be more or less successful than the usual NRFU success rate.

126.    Finally, Dr. O'Hare's example of the failure to fully enumerate certain groups, that is, the example of children, is a longstanding issue not specific to the 2020 census or related to the addition of a citizenship question and which, moreover, the Census Bureau is continuously working to address more successfully in the future.  Corrected O'Hare Aff. ¶ 57 (citing undercount of children in the 2010 census); *see* PX 346, at 4 (stating that the undercount of children "is not a new problem and has been present in decennial censuses for many decades" and proposing "suggestions to move [the Census Bureau] in the right direction in addressing this problem in the future").  The historic difficulties with enumerating children are of no relevance to this case.

3.    NRFU Efforts Will Be Sufficient to Mitigate Any Potential Decline in Self-Response as a Result of a Citizenship Question

127.    Any decline in the self-response rate due to the citizenship question is within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  PX-297 at 23 (response to Census RFA No. 74).

16

128.     At the end of the self-response period, six weeks into the 2020 Census, households without a self-response become part of the NRFU workload.  Tr. 1166:11-23.  Households that skip the citizenship question or break off at the citizenship question will be counted through their self-response and will not proceed to NRFU.  *Id.* 1166:24 – 1167:10.

129.     The 2018 End-to-End Test did not include a citizenship question because it began after the Secretary made his decision.  Tr. 1097:6-10.  In any event, the End-to-End test was simply meant to test integration of the operations and systems for 2020, including the NRFU operations, and it passed that test.  *Id.* 1097:11 – 1098:3.  The current assessment of the 2018 End-to-End Test is that it was successful overall.  *Id.* 1300:14-22.

130.     The Census Bureau will have the resources available to counteract any conceivable decline in self-response rate due to the citizenship question.  Indeed, if Congress appropriates funds in accordance with the Life Cycle Cost Estimate, the Census Bureau will have $1.5 billion to conduct NRFU operations, along with another $1.7 billion in contingency funding.  Tr. 1167:11-23.  For every one percent increase or decrease in the overall self-response rate, the Census Bureau assumes $55 million will be spent or saved in NRFU operations, which is based on various parameters such as a constant number of census offices and supervisors, along with an increasing or decreasing amount of enumerators deployed and an average of three enumerator visits per household.  *Id.* 1171:13 – 1172:7.

131.     Even if the Brown paper accurately predicted the 5.8% decline in self-response rate for potential noncitizen households—*i.e.*, approximately 28.6% of the population—this leads to only a 1.5% decline in the overall self-response rate, resulting in an extra $82 million in NRFU expenditures.  Tr. 1169:8-18.  A higher, hypothetical 10% decline in self-response rate among potential noncitizen households results in a 2.5% decline in overall response rate with an estimated $137.5 million in NRFU costs.  *Id.* 1169:18 – 1170:4.  And even using the decline in self-response rate discovered during a 1992 RCT of a question asking for the respondent's social security number—3.4% decline in overall self-response rate—NRFU costs increase by $187 million.  *Id.* 1170:5-21.  All foregoing estimates are far below the projected $1.7 billion in contingency funding, and this remains true even if one assumes six enumerator visits per household and concomitantly doubles all estimated NRFU costs.  *Id.* 1173:2-12.

132.     Plaintiffs' expert Dr. Hillygus testified that she believes that the Census Bureau's NRFU efforts will be insufficient to overcome any net differential impact the citizenship question has on the initial self-response rate.  Tr. 90:7-14, 129:21 – 130:11.  Dr. Hillygus cited to a number of sources as the basis for this opinion, which appear on PDX-14.  A number of these sources were either official memos or publications of the Census Bureau or publications drafted by Census Bureau employees.  *See, e.g.*, PX-162; PX-378; PX-385; PX-386.  However, these sources are of very limited relevance and value to the issue before the Court in this case because, as Dr. Hillygus concedes, none of the studies or publications upon which she bases her opinion about NRFU analyze the question of how NRFU might deal with a citizenship question.  Tr. 184:7-13.  Dr. Hillygus did not herself perform any independent analysis on the question of how effective NRFU efforts would be at addressing any issues specifically caused by the citizenship question, *id.* 184:15-18, and did not cite to anyone else who had done so.

133.     Dr. Hillygus's testimony also was based at least in part upon her opinion that the inclusion of the citizenship question on the 2020 Decennial Census was likely to lead to less accurate

data gained in NRFU, or respondents refusing to answer the citizenship question altogether. However, as Dr. Hillygus concedes, respondents answering the question inaccurately, or skipping the citizenship question – "item nonresponse," as distinct from "unit nonresponse," which is not answering the questionnaire at all – is still counted for enumeration purposes. Tr. 183:23 – 184:6.

134.     Dr. Barreto's testimony that the difference in responses to questions seven and eight—his "follow-up" asking whether respondents would participate in a census without and with a citizenship question, respectively—provides "very clear evidence that NRFU will not work as well in 2020 as in previous years," Tr. 689:3-11, is unsupported and not credible. What Dr. Barreto described as "a simulation" that "approximates the same spirit" of NRFU, *id.* 689:19-22, 690:9, is anything but the "recontact effort" Dr. Barreto portrays, *id.* 758:1-6. First, his "follow-up took place later during the same phone call," meaning Dr. Barreto "didn't actually recontact anyone at a later day or at a later time." *Id.* 758:7-12. And his supposed simulated recontact came on the heels of "the intervening discussion about trust in the Trump administration." *Id.* 758:13-23. It therefore is unsurprising that *every racial or ethnic group*, including those with low rates of immigrants, evidenced an increase in nonparticipation from the beginning to the end of the survey. *Id.* 758:24 – 759:2.

135.     Dr. Barreto acknowledged that he would "expect that most people would have some opinion of the federal government" before encountering his survey. *Id.* 746:6-8. But in the section of his survey purporting to measure trust, Dr. Barreto's survey pivoted from a description of Title XIII's assurances of confidentiality to ask "*Do you trust the Trump administration to protect your personal information, including citizenship, or do you think they will share this information,*" *id.* 753:7-11 (emphasis added). This jarring and unexpected reference to trust in the Trump administration—rather than the Census Bureau—almost certainly colored respondents' responses, rendering his measure of "trust" unreliable. This is particularly true given that, as Dr. Barreto testified, the President's approval ratings during the survey fell in the low 40s and was "at least 10 points lower" among Latino communities, *id.* 753:21 – 754:6, and that neither Dr. Barreto's survey *nor* the pretesting he conducted in advance "included an alternate wording asking respondents whether they trust the Census Bureau rather than the Trump administration to protect their data," *id.* 754:7-11. The fact that the questions related to trust preceded Dr. Barreto's "simulated follow-up," i.e., his repetition of a question regarding intended participation in the census with a citizenship question, likely caused the otherwise inexplicable increase in reported nonresponse evidenced between questions two and eight. And Dr. Barreto neglected to "include any follow-up qualitative component to determine why respondents reported a lack of trust in the administration," *id.* 756:19-22, making any conclusion drawn from respondents' indication of lack of trust inherently speculative.

136.     Likewise, Dr. Barreto's reliance on his own opinion poll to simulate NRFU is fatally flawed. Indeed, his NRFU "methodology" was thoroughly debunked by Dr. Abowd, who explained that a follow-up question after several minutes in the same successful telephone interview does not remotely simulate NRFU. Tr. 1190:22 – 1192:9 ("So, my opinion is that it doesn't simulate NRFU. A simulation of NRFU has to be a simulation of an actual second contact."); 1381:20 –1382:2.

137.     Plaintiffs' demography expert Dr. Joseph J. Salvo testified that data gathered through the Census Bureau's NRFU procedures is more prone to error than data gathered through self-responses. Tr. 292:15-21, 299:14-17, 299:25 – 300:3, 302:13-20, 320:19 – 321:14, 330:14-20, 335:2-12, 343:23 – 344:1, 344:8-18, 379:6 – 380:9, 380:24 – 381:4, 396:15 – 397:5. Dr. Salvo's testimony, however, was conclusory and lacked specifics. To the extent he was referring to demographic data about a household, like age and race, any errors in that data would not cause a net undercount

because such errors would not affect the actual enumeration—meaning the count.  To the extent he was referring to the number of people in the household, he failed to provide details showing that any errors in that data would systematically overstate or understate the true number of people in the household, resulting in a predictable net overcount or net undercount.  *Id.* 434:19 – 435:12.

138.  Dr. Salvo testified that the Census Bureau's NRFU procedures in 2010 likely resulted in a net undercount of certain New York City neighborhoods, like Bedford-Stuyvesant, Canarsie, and East New York.  Tr. 392:23 – 395:4, 408:23 – 416:23; PX-338-39 (Table A1); PDX-20.  However, no data shows reliable net undercount estimates at the sub-county level.  Tr. 432:6-14.  Also, Dr. Salvo's testimony about the estimated net undercounts for the New York City boroughs in 2010 did not include imputations, which are included in the census count.  *Id.* 432:4-5, 432:15 – 433:18; PDX-20.  Instead, the basis for Dr. Salvo's conclusion was that those neighborhoods have a higher percentage of subgroups that tend to be undercounted at the national level.  Tr. 393:23 – 394:3, 397:3-10, 405:20 – 408:22, 412:23 – 413:2, 414:11 – 415:9, 433:22 – 434:1, 439:10-18; PX-267-18 (Table 7).  But Dr. Salvo's own testimony revealed that that logic does not necessarily hold true: Brooklyn has a higher percentage black population than the nation as a whole, and the black population tends to be undercounted at the national level, yet Brooklyn had no net undercount in 2010.  Tr. 434:2-11.  Dr. Salvo's testimony thus did not show that households enumerated through the Census Bureau's NRFU procedures are more likely to be undercounted than self-responding households.

139.  Dr. Salvo testified that the 2010 components of census coverage by mail return date support his opinion that households counted via the Census Bureau's NRFU procedures are more likely to be undercounted than self-responding households.  Tr. 321:18 –325:8; PX-267-30 (Table 18).  Specifically, Dr. Salvo testified that the 2010 components of census coverage by mail return date show that the percentage of correct enumerations was lower for responses gathered through NRFU procedures than for self-responses.  Tr. 323:11 – 324:3; PX-267-30 (Table 18).  However, the percentage of whole-person census imputations was correspondingly higher for responses gathered through NRFU procedures than for self-responses.  Tr. 324:4-25, 435:13 – 436:16; PX-267-30 (Table 18).  Also, no quantitative evidence shows that whole-person census imputations tend to systematically overcount or undercount the number of people in a household.  Tr. 436:17 – 438:4.  Dr. Salvo testified that survey literature generally shows that households that self-respond are different from households that do not self-respond.  *Id.* 326:10-25.  Notably, however, he did not testify that the survey literature shows that households that self-respond tend to have fewer people than households that do not self-respond, such that whole-person census imputation would tend to undercount the number of people in a household.  *Id.*  The 2010 components of census coverage by mail return date thus do not indicate that households enumerated via NRFU procedures are more likely to be undercounted than self-responding households.

140.  Dr. Salvo testified that the Census Bureau erroneously classified large swaths of housing units as vacant in northwest Queens and southern Brooklyn before the 2010 decennial census, causing a net undercount of about 65,000 people.  Tr. 308:19 – 309:15, 344:19 – 359:8, 441:5-23; PX-666; PDX-21.  However, there was no increase in the reported net undercount in Queens or Brooklyn from the 2000 census to the 2010 census.  Tr. 441:24 – 443:24; PX-404-26.  The supposed error discussed by Dr. Salvo thus had no effect on the net undercount and did not support his opinion that the Census Bureau's NRFU procedures tend to result in a higher net undercount than self-responses.

141.    Dr. Abowd's testimony, including as to the likelihood that the Census Bureau's NRFU procedures will mitigate any decrease in self-response rates attributable to the citizenship question and eliminate any differential net undercount attributable to the question, was credible and convincing. Dr. Hillygus's, Dr. Salvo's, Dr. Barreto's, and Dr. O'Hare's testimony about the likelihood that NRFU procedures would not eliminate any differential net undercount attributable to the citizenship question and that a decrease in self-response will lead to an increased undercount was not persuasive to the extent that it differed from Dr. Abowd's testimony.

4.    Partnership and Communication/Outreach

142.    Plaintiffs' expert Dr. Hillygus testified that outreach and communications efforts by the Census Bureau prior to the rollout of the decennial census can have the effect not only of increasing the overall self-response rate, but also of reducing the net differential self-response rate. Tr. 192:9-15.  In fact, Dr. Hillygus's own research causes her to believe that in the 2000 Decennial Census, which also took place during a presidential election year, the Census Bureau's outreach and communications efforts increased the self-response rate and reduced the net differential undercount. *Id.* 193:6-14.  Dr. Hillygus does not know exactly what the Census Bureau's outreach and communications efforts for the 2020 Decennial Census are. *Id.* 193:21-24.

143.    For the 2020 Census, the Census Bureau will utilize an integrated communications and partnership campaign to recruit national, regional, and local partners and develop effective messages stressing the confidentiality of census data, the statistical purposes for census data, and the statutory prohibition against sharing those data with any agency.  Tr. 1119:9-23.  The integrated communications and partnership campaign is run by the Census Bureau in conjunction with Young & Rubicam and other professional marketing firms that specialize in reaching hard-to-count populations. *Id.* 1119:24 – 1120:6, 1388:8 – 1389:9.

144.    The Census Bureau itself has already begun recruiting both national and local partners, which provide "trusted voice[s]" informing the public that it is safe to answer the census. Tr. 1119:7 – 1122:6.  Partners will include both state and local governments and private organizations. *Id.* 1121:8-12.  The Census Bureau recruits local partners to help organize and promote local cooperation, as they have specific knowledge regarding their communities and the best ways in which to deliver this message. *Id.* 1187:25 – 1188:10, 1325:6-21.  While partners—like the City of New York—are welcomed to spend their own money to aid the Census Bureau's mission, the federal government compensates partners for any expenditures specifically requested by the Census Bureau. *Id.* 1121:13 – 1122:5.

145.    The partnership component works in conjunction with a multi-tiered advertising campaign engineered by Young & Rubicam and other professional marketing firms.  Tr. 1119:24 – 1120:18.  Advertisements are not only used at the national level, but also are targeted down to small areas of geography known as census tracts. *Id.*  Tract-level advertising is used throughout the census to encourage self-responses and cooperation with enumerators. *Id.*

146.    The Census Bureau—in conjunction with its professional marketing firms—utilizes the Census Barriers Attitudes and Motivators Study ("CBAMS") to inform the integrated partnership and communication program for the 2020 census.  Tr. 928:3-11, 1122:8 – 1123:4. CBAMS has two components: a multi-stage survey sent to households from the master address file, and focus groups specifically drawn from hard-to-count populations. *Id.* 1124:2-14.

147.    Information from CBAMS is used to not only develop content for the national marketing campaign, but also to develop targeted advertising.  Tr. 1122:8 – 1123:4.  Indeed, while recent CBAMS presentations identified certain self-response barriers, *see* PX-662, "[t]hose barriers and attitudes are being incorporated into content study for the communication campaign and work with [the Census Bureau's] potential and actual partners to attempt to overcome those barriers."  Tr. 1123:11 – 1124:1.  Other CBAMS research indicates that Hispanics, for example, care about the census and would like to participate.  *Id.* 936:14-24; PX-152.

148.    Dr. Abowd acknowledges that the ability of trusted partners to convey that the census is "safe and important" has been made more difficult by the inclusion of a citizenship question.  Tr. 1304:9-13.  However, the Census Bureau and the marketing firms working with the Census Bureau on outreach and communications effort are taking into account and addressing the trusted partners' concerns, and to date Dr. Abowd is not aware of any trusted partners that will not participate in the program due to the citizenship question.  *Id.* 1395:4-24.

149.    While the Integrated Partnership and Communications Program will not eliminate the effect of adding a citizenship question by itself, it can be successful in mitigating the impact of a citizenship question.  Tr. 1357:4-10.

### 5.  In-Person Enumerators

150.    The entire enumerator process, from recruitment through deployment, is designed to maximize NRFU effectiveness.  First and foremost, enumerator recruiting targets are based on an overall self-response rate of 55.5%, so the Census Bureau will have plenty of enumerators ready to deploy in the event self-response rates decline.  Tr. 1173:13 – 1175:6.  These enumerators are drawn from the communities in which they will be deployed, helping households feel comfortable in responding.  *Id.* 1175:11-22.  And while the current 2018 Appropriations Act prevents the Census Bureau from hiring noncitizen enumerators, the Census Bureau is seeking to reclassify certain enumerators as translators—an exception to this hiring restriction—and is actively lobbying Congress to lift any prohibition on hiring noncitizen enumerators for 2020.  *Id.* 1176:11 – 1177:22.  The Census Bureau will hire non-U.S. citizens as permitted by federal law.  PX-297 at 23-24 (response to Census RFA No. 76).

151.    Enumerators are also deployed in an efficient manner to best obtain census enumerations.  Using a state-of-the-art optimizer, census enumerators are assigned households to visit, provided the most efficient route to reach each household, and then given the optimal times to visit each household based on statistical models of the local area.  Tr. 1180:11 – 1181:13.  More specifically, the optimizer can adjust the timing of visits to a particular address in order to reach other members of the household who may be less reluctant to respond; the Census Bureau accepts enumeration answers from anyone over age 15.  *Id.* 1187:25 – 1188:20.  The optimizer also allows field staff to identify the most effective enumerators and adjust NRFU workloads accordingly.  *Id.* 1179:6-10.  There is no limit placed on the number of times an enumerator may visit a particular household, as the only constraint is the time available for NRFU.  *Id.* 1179:11 – 1180:10.

152.    Plaintiffs' proffered evidence attempting to show that in-person visits will be ineffective for households choosing not to self-respond due to a citizenship question.  But this evidence is neither persuasive nor credible.  For example, Plaintiffs place much emphasis on a Census Bureau presentation that predates DOJ's letter requesting reinstatement of a citizenship

question.  PX-448.  Using this presentation, Plaintiffs claim that households may falsify data, skip certain questions, break off the survey, or purposely leave household members off the household roster.  *See, e.g.*, PX-448 at 3, 7.  But data falsification in response to the citizenship question, skipping the citizenship question, or breaking off at the citizenship question would not prevent in a complete count of the household.  Tr. 1182:2-11.  And obtaining accurate household rosters has been a continuing issue for the Census Bureau whether or not a citizenship question appears on the census; there is no quantitative evidence linking the incompleteness of household rosters specifically to a citizenship question.  *Id.* 1183:9-17.  Perhaps most importantly, however, Plaintiffs overlook the fact that such presentations, including CBAMS research, is specifically used to inform the communications and partnership program.  *Id.* 1183:20 – 1184:23.

153.    Dr. Barreto in particular cited other research he claimed to indicate that in-person enumeration is unlikely to succeed for those sensitive to a citizenship question.  But his reliance on studies from 1992 and 2010 merely raise challenges common to the census-taking process in general, with or without a citizenship question.  Tr. 1186:18 – 1187:1, 1189:5-14.  He relies, for example, on a 1992 study about undocumented immigrants avoiding contact with census field workers.  But as Dr. Abowd testified, undocumented immigrants have been a continuing problem for census enumeration, and therefore they will present a challenge for the 2020 Census with or without a citizenship question.  *Id.* 1186:18 – 1187:1.  Dr. Barreto also relies on a census study regarding immigration enforcement laws in Arizona and Texas passed shortly before the 2010 census and how they had an important role in enumeration.  Again, Dr. Abowd acknowledged that immigration activities make NRFU operations more difficult, but he testified that this "was also going to be a problem whether or not there was a citizenship question on the census," and that he was not aware of "any quantitative evidence that specifically assigns [this difficulty] to the citizenship question."  *Id.* 1189:5-14.

154.    Dr. Hillygus testified that she believes that the inclusion of a citizenship question will exacerbate the net differential undercount for certain subgroups and harm the quality of census data because the Census Bureau may not be able to hire enough effective enumerators with the cultural and language backgrounds to enumerate certain subgroups.  Tr. 100:25 – 101:16.  However, Dr. Hillygus was not able to point to any quantitative or detailed analysis of this specific problem for the 2020 Decennial Census, and conceded that she had no documentation or quantitative evidence for these predicted problems.  *Id.* 182:2 – 183:12.

155.    Dr. Hillygus also testified that she believes respondents will be less likely to respond to an in-person interview due to the presence of the sensitive citizenship question.  Tr. 97:18 – 98:17.  However, Dr. Hillygus conceded that this conclusion was based on research that was done in other contexts, and that she was not aware of any research on whether respondents were any less likely to respond to an in-person enumerator about the citizenship question specifically.  *Id.* 183:19-22.

156.    Dr. Salvo testified that the Census Bureau's NRFU efforts in 2020 are likely to be less effective than in 2010 because the Census Bureau is planning to have fewer local census offices and fewer enumerators.  Tr. 316:24 – 318:10, 444:1-5.  But there are other differences between the 2020 census and the 2010 census, such as the Census Bureau's planned use of administrative records to reduce the NRFU workload.  *Id.* 444:6-11.  A simple comparison of the number of local census offices or enumerators is thus not an apples-to-apples comparison.  *Id.* 444:12-18.  In any event, the Census Bureau has a 2020 contingency budget of over $1.6 billion to hire more enumerators if the

NRFU workload is higher than expected. *Id.* 444:19-24. The Census Bureau's enumerator recruitment and hiring plans for the 2020 census thus do not indicate that its NRFU procedures are likely to be less effective than in 2010.

157.    Dr. Salvo testified that the Census Bureau's use of in-person enumerators during NRFU is likely to result in a net undercount because the Census Bureau cannot hire non-citizens as enumerators in 2020, resulting in fewer enumerators with key foreign language skills. Tr. 310:19 – 311:21. However, as in past decennial censuses, the Census Bureau has asked Congress for permission to hire non-citizens as enumerators for the 2020 census, and that request is still pending. It is thus premature to conclude whether the Census Bureau will be able to hire non-citizens as enumerators for the 2020 census and how that fact might affect any net undercount.

158.    Mr. Thompson testified that response rate data from the CAPI (the Census Bureau's NRFU process for the American Community Survey) suggests that the Census Bureau's use of in-person enumerators during the NRFU process will not fully mitigate any decline in self-response rates due to the citizenship question and will likely lead to a net undercount. Am. Thompson Decl. ¶ 113, ECF No. 516-1; PX-155; Tr. 569:15-23. However, the CAPI process for the ACS differs significantly from the decennial census NRFU procedures. Unlike the decennial census NRFU process, the CAPI process does not send in-person enumerators to every household that fails to self-respond to the ACS. Tr. 569:24 – 570:7. Unlike the decennial census, the ACS has no marketing campaign to encourage cooperation and participation. Tr. 570:8-10. Unlike the decennial census NRFU procedures, the CAPI process does not use proxy respondents to collect information from occupied units. Tr. 570:11-18. Unlike the decennial census NRFU process, the CAPI process does not use whole-person census imputation to fill in data for households that fail to self-respond. Tr. 570:19–571:2. In light of these significant differences, the CAPI response rate data does not suggest that in-person enumerators during the 2020 NRFU process will not fully mitigate any decline in self-response rates from the citizenship question or lead to a net undercount.

159.    In sum, Plaintiffs have presented no credible evidence that in-person enumerator visits will be ineffective in enumerating households that do not initially self-respond to the census because of the reinstatement of a citizenship question on the decennial census.

6.    Administrative Records

160.    The Census Bureau will also use administrative records in NRFU to make vacant/delete determinations and to enumerate occupied housing units. Tr. 1196:21 – 1197:4. Administrative records are electronic records compiled by another unit of the federal government, including the Internal Revenue Service, Health and Human Services, the Bureau of Indian Affairs, the Postal Service, and the Social Security Administrations. *Id.* 1197:5 – 1198:24. Although administrative records were not used the same way in the 2010 Census, the Census Bureau has accumulated a large amount of evidence about the efficacy and accuracy of using administrative records from a number of experiments and the 2018 End-to-End Test. *Id.* 1339:18 – 1340:7. The Census Bureau has also utilized administrative records for decades and has developed advanced statistical models that aggregate all information available to the Census Bureau about a particular address in order to gauge the reliability of administrative records for that particular household. *Id.* 1197:25 – 1200:15, 1200:22 – 1201:4.

161.    If an address in the NRFU workload receives one unsuccessful in-person visit, it becomes eligible for enumeration by administrative records. Tr. 1201:25 – 1202:14. If no high-quality administrative records exist for that household, the address "stays in the NRFU workload and gets the full NRFU consideration." *Id.*

162.    Plaintiffs could not establish that the use of administrative records will exacerbate the differential net undercount. As Dr. Abowd testified, administrative records simply supply a method of low-cost enumeration when high-quality administrative records are available; if no such records exist, then the full NRFU protocol will be used. Tr. 1205:9 – 1206:12.

163.    Dr. Salvo testified that the 2020 decennial census is the first time that the Census Bureau will use administrative records to determine whether a housing unit is occupied, vacant, or non-existent. Tr. 311:24 – 312:18, 312:22 – 313:18. He testified that this use of administrative records is likely to result in a net undercount because in Census Bureau tests (in Los Angeles County, California; Harris County, Texas; and Maricopa County, Arizona), about 20% of units that administrative records listed as vacant were not actually vacant. Tr. 312:19-21, 313:19 – 314:20, 364:10 – 368:23. However, the Census Bureau will not conclude that a unit is vacant unless at least three separate sources of administrative records indicate that the unit is vacant. Tr. 445:23–446:14. The Census Bureau's reliance on multiple sources of administrative records minimizes any chance that using administrative records to determine the occupancy status of housing units would result in higher net undercounts.

164.    Dr. Salvo and Mr. Thompson testified that households enumerated using administrative records are more likely to be undercounted than self-responding households because hard-to-count subgroups of the population are less likely to be represented in administrative records. Tr. 368:25 – 376:12, 448:4-11; Am. Thompson Decl. ¶ 118, ECF No. 516-1. However, if administrative records do not exist for a household, that household will not go uncounted; instead, it will go back into the NRFU workload and ultimately may be enumerated using whole-person census imputation. Tr. 448:12-20, 571:9-19. The fact that hard-to-count groups are relatively underrepresented in administrative records thus does not show that those groups are more likely to be undercounted when enumerated using administrative records.

165.    Dr. Salvo testified that the Census Bureau's planned use of administrative records in 2020 to reduce the NRFU workload is unlikely to be effective because tests in 2014, 2015, and 2016 showed that using administrative records was correlated with higher rates of unresolved housing units. Tr. 327:7–331:11; PX-562-10 (Figure 1). However, those unresolved housing units do not go uncounted; instead, they are enumerated using whole-person census imputation. Tr. 330:6-13. The 2014, 2015, and 2016 tests thus do not show that using administrative records to reduce the NRFU workload is unlikely to be effective.

7.   Proxy Responses

166.    If a household does not self-respond, the Census Bureau is unable to get a response through in-person visits, and a household cannot be enumerated using administrative records, enumerators may interview a proxy. Tr. 1296:17 – 1297:1. A proxy could be a landlord, a neighbor, a postal carrier, or another person with knowledge of the household. Tr. 1193:5-17. The proxy process is specifically designed to obtain a head count for the number of people residing at an

address, and training techniques developed by Plaintiffs' own expert, Dr. Salvo, have been implemented to ensure that enumerators seek out a reliable proxy for that "critical" purpose. *Id.*

167.    The Census Bureau is unaware of any credible empirical evidence suggesting that proxies in the census provide a greater net undercount or differential net undercount in comparison to self-response or in-person interviews.  PX-297 at 25 (response to Census RFA No. 81).

168.    Dr. Hillygus testified that households enumerated via proxy responses are more likely to be undercounted than self-responding households because proxy respondents are likely to underreport the number of people living in certain units.  Tr. 106:8-15.  Although the research on which Dr. Hillygus relies, summarized in PDX-15, PX-162, PX-386, seems to indicate that proxy responses are generally less accurate, it does not necessarily support her opinion that proxy responses tend to systemically underreport the number of residents after the Census Bureau uses administrative records and imputation to derive a final enumeration.

169.    Despite no credible quantitative evidence that the use of proxies will affect the net undercount or differential net undercount, Tr. 1187:13 – 1187:24, 1193:18-20, Plaintiffs attempt to marshal unpersuasive qualitative evidence to the contrary.  For example, Dr. Hillygus cites a paper from Martin in 1999, noting proxy respondents are less likely to have knowledge about a person's living arrangements.  But as Dr. Abowd correctly observed, this paper represents only a small-scale study of different ways to elicit a household roster.  Tr. 1194:11 – 1195:16.  That paper is also "relatively dated at this point, and many of the innovations that have been produced by this research and research like it have been incorporated into the self-administered instruments that [the Census Bureau] use['s] now in order to get better household rosters."  *Id.*  Dr. Hillygus also relied on a Fay paper from 1989 to support her conclusion that proxies were likely to undercount household members.  But, again, Dr. Hillygus overstated the paper's conclusions:  the 1989 Fay paper was a coverage measurement evaluation of the CPS, *not* the census.  Tr. 1195:17 – 1196:4.  Dr. Hillygus's reliance on a Lopez and Rohal 2017 study is also misplaced.  As Dr. Abowd pointed out, this study "found that public opinion about deportation had increased between 2017 and 2016, but it also found that it was higher in 2013 than in either 2016 or 2017, and that it was comparable in 2017 to where it was in 2010."  Tr. 1196:5-18.

170.    Dr. Salvo testified that households enumerated via proxy responses are more likely to be undercounted than self-responding households because proxy respondents like landlords are likely to understate the number of people living in illegal and overcrowded units to avoid government scrutiny.  Tr. 336:6 – 342:9.  However, no quantitative evidence supports that opinion. Tr. 340:21-23, 342:1–3.

171.    Dr. Salvo testified that the 2010 components of census coverage by NRFU field operation respondent type support his opinion that households counted via proxy responses are more likely to be undercounted than self-responding households.  Tr. 331:12 – 336:2; PX-267-33 (Table 21).  Specifically, Dr. Salvo testified that the 2010 components of census coverage by NRFU field operation respondent type show that the percentage of correct enumerations was lower for proxy responses than for self-responses.  Tr. 332:6 – 334:25; PX-267-33 (Table 21).  However, the percentage of whole-person census imputations was correspondingly higher for proxy responses than for self-responses.  Tr. 332:18 – 333:4, 439:19 – 440:12; PX-267-33 (Table 21).  The 2010 components of census coverage by NRFU field operation respondent type thus do not indicate that

households counted via proxy responses are more likely to be undercounted than self-responding households.

172.    Mr. Thompson testified that the Census Bureau's use of proxy respondents to enumerate households that fail to self-respond will not be fully effective because proxy responses are correlated with a lower correct enumeration rate than self-responses.  Am. Thompson Decl. ¶¶ 115-116.  However, proxy responses are also correlated with a correspondingly higher rate of whole-person census imputations.  Am. Thompson Decl. ¶ 117; Tr. 332:18 – 333:4, 439:19 – 440:12; PX-267-33 (Table 21).  The fact that proxy responses are correlated with a lower correct enumeration rate than self-responses thus does not indicate that households counted via proxy responses are more likely to be undercounted than self-responding households.

173.    Mr. Thompson testified that proxy responses tend to produce poorer quality individual demographic information than self-responses.  Am. Thompson Decl. ¶ 116.  However, inaccurate demographic data does not affect the actual enumeration.  The fact that proxy responses tend to generate less accurate demographic data thus does not indicate that proxy responses tend to result in higher net undercounts.

174.    In sum, Plaintiffs have adduced no credible evidence that the use of proxies will be ineffective in enumerating households that do not initially self-respond to the census as a result of the inclusion of a citizenship question on the 2020 decennial census.

8.    Imputation

175.    The Census Bureau uses imputation to enumerate housing units that remain unresolved after the NRFU procedures (in-person interviews, administrative records, and proxy responses) are exhausted.  Tr. 1231:10-21.  The Census Bureau's imputation process has multiple steps.  *Id.*

176.    The first step of the imputation process involves determining whether a unit is vacant, occupied, or nonexistent.  Tr. 1231:21-23.  If that information was gathered during another NRFU procedure (like a proxy response), that information is used and imputation is not used to determine whether the unit is vacant, occupied, or nonexistent.  Tr. 1231:21 – 1232:2.  If, however, the other NRFU procedures yielded no information about whether the unit is vacant, occupied, or nonexistent, the Census Bureau uses imputation to fill in whether that unit is vacant, occupied, or should be deleted.  Tr. 1232:3-7.

177.    The second step of the imputation process involves determining the number of people in occupied units—both units actually shown to be occupied in another NRFU procedure and units whose occupancy status was imputed in the first step of the imputation process.  Tr. 1232:7-12.  The Census Bureau uses statistical criteria to aggregate nearby housing units that have characteristics matching the characteristics of the missing unit in the Master Address File, taking into account the distribution of household sizes.  *Id.* 1232:13-21. The Census Bureau then randomly selects one of those nearby units and uses the number of people in that unit to fill in the number of people in the missing unit.  *Id.*

178.    Like all imputation methods, the Census Bureau's imputation method increases the variance of the resulting data.  Tr. 1232:22 – 1234:1, 1235:6 – 1236:12, 1238:23 – 1239:15.  Variance

measures how closely data points are distributed around their estimated average value.  Tr. 1233:10-14.  As a general matter, the more heavily imputation is used, the greater the variance of the imputed data.  Tr. 1235:6-10.

179.    The Census Bureau's imputation method does not, however, affect the bias of the resulting data.  Tr. 1232:22 – 1234:1, 1235:6 – 1236:12, 1238:23 – 1239:15.  Bias measures whether an estimated average value is measurably bigger or smaller than the true average value.  Tr. 1233:11-12.  Showing that an imputation method tends to affect the bias of the resulting data necessarily requires additional information not already used as part of the imputation method, such that the accuracy of the imputation method can be independently evaluated.  Tr. 1235:13 –1236:12.  The Census Bureau's imputation method, however, uses all available information about a unit, including the information in the Master Address File.  Tr. 1235:21 – 1236:12, 1237:15-17, 1237:18 – 1238:5.  Imputation can thus mitigate the impact of the citizenship question and the accompanying potential reduction in self-response rates.  Tr. 1350:11-15.

180.    Tracing out three different scenarios, Dr. Abowd testified to the exact way in which people could be enumerated even if they do not self-respond to the 2020 Census.  Using assumptions built into the Life Cycle Cost Estimate, along with the rate of imputation from the 2010 Census, Dr. Abowd explained that, without a citizenship question, he projected that 0.38% of all households would be imputed.  Tr. 1206:13 – 1209:25.  Using these same assumptions, Dr. Abowd then applied Brown et al.'s 5.8% estimate for the decline in self-response rate for potential noncitizen households, which resulted in a projected imputation of 0.40% of all households, assuming the average rate of resolution in NRFU.  Tr. 1210:1 – 1211:9.  Lastly, Dr. Abowd tweaked the previous scenario to assume that all households not self-responding due to a citizenship question would go through the full NRFU process, which resulted in a projected imputation of 0.60% of all households.  Tr. 1211:10 – 1212:11.  Importantly, in none of these scenarios would a household go uncounted simply because it did not self-respond due to a citizenship question.  Even in the worst-case scenario illustrated by Dr. Abowd, the result was simply more imputations.

181.    The Census Bureau has not yet determined the imputation algorithms it will use in the 2020 census.  Tr. 1233:22-24.  Indeed, there remains a possibility that advanced statistical modeling imputation would be used, similar to the modeling that would be used to impute citizenship status under Plaintiffs' preferred alternative of relying only on administrative records for citizenship data.  Tr.  974:22 – 975:16, 976:5-17, 985:25 – 985:8.  Dr. Barreto's testimony was based on the imputation algorithms used in the 2010 census.  Tr. 1233:22–23.  Dr. Abowd is scheduled to review the imputation algorithms proposed for use in 2020, but they have not yet been presented to him.  Tr. 1233:23 – 1234:1.

182.    Dr. Barreto opined that imputation will fail to correct any impact on self-response because, in part, "the donor group of self-responders [to the census] is statistically different on multiple demographic characteristics, while the donor group is supposed to be statistically the same so that the information it can provide is similar."  Tr. 708:2-6.  But Dr. Barreto cannot possibly know what "donor group" the Census Bureau will rely on for imputation, or how imputation will work in practice, because the Bureau has not yet determined its algorithm for imputation in 2020.  In other words, it is not yet knowable whether the Census Bureau's imputation methodology will impute household size and other characteristics from similar or dissimilar households.

27

183. Dr. Barreto used a simplified example with shapes to show why he believes imputation is inaccurate. Tr. 1234:2-7; PX-287-22 (Figure 1). However, Dr. Barreto's example did not accurately represent the Census Bureau's imputation procedures. Tr. 1234:8-23. The Census Bureau's imputation procedures, like most statistical imputation procedures, do not simply eyeball existing data to divine some underlying pattern. Tr. 1234:16-20. Instead, the Census Bureau's imputation procedures use objective facts about known data (for example, the fact that Panel A shows five squares and four stars) to impute missing data at the same ratio (for example, four-fifths stars to squares). Tr. 1234:20 – 1235:5. Dr. Barreto's simplified example shows that using imputation more heavily increases the variance of the imputed data, but it does not show that using imputation more heavily increases the bias of the imputed data. Tr. 1238:23 – 1239:15.

184. Dr. Barreto admitted that he lacked the data necessary to mimic the Census Bureau's imputation formula. Tr. 719:10-13. Dr. Barreto's attempt to analyze likely imputation efficacy relied on comparisons of data to other randomly selected respondents to his survey, *id.* 719:18 – 720:16, did not rely on comparisons to *actual* neighbors, as will the Census Bureau, is not based on an imputation algorithm, and therefore produces no reliable data on the likely results of imputation in 2020.

185. Dr. Hillygus testified that she believes that imputation will contribute to the net differential undercount because the assumptions used in the imputation process are inaccurate. Tr. 114:22-115:3. However, the sources cited by Dr. Hillygus in support of this opinion, PX-397 and PX-400, both only discussed problems with the imputation process generally, and did not discuss any link between the imputation process and the citizenship question. Dr. Hillygus could cite to no source or authority as to whether, or how much, imputation may increase as a result of the inclusion of a citizenship question. Dr. Hillygus also conceded that only a small number of imputations were done for the 2010 Decennial Census, Tr. 115:4-7, and admitted that she does not actually know the exact imputation procedures the Census Bureau will use for the 2020 Decennial Census enumeration. Tr. 118:2-4.

186. Dr. Salvo testified that his field experience in prior censuses supports his opinion that whole-person census imputation tends to systematically undercount the number of people in the imputed household. Tr. 436:17 – 437:14. However, Dr. Salvo had no quantitative data to support that experience. Tr. 436:17 – 438:4. Moreover, as Dr. Abowd explained, using assumptions about missing information in an imputation method with no directly collected data to support those assumptions (as Dr. Salvo suggested) is not a defensible imputation method. Tr. 1238:7-17.

187. No quantitative evidence shows that whole-person census imputations tend to systematically overcount or undercount the number of people in a household. Tr. 436:17 – 438:4. The survey literature cited by Dr. Salvo does not indicate that imputation tends to cause undercounts; he did not testify that the survey literature shows that households that self-respond tend to have fewer people than households that do not self-respond. Tr. 326:10–25.

188. Dr. Salvo testified that data about whole-person imputations by type in the 2010 census supports his opinion that households enumerated using whole-person census imputation are more likely to be undercounted than self-responding households. Tr. 383:7 – 386:6; PX-410-12 (Table 4). However, that data shows only how often whole-person census imputation is used—not that whole-person census imputation tends to result in a net undercount. Tr. 438:5 – 15; PX-410-12 (Table 4). Data about whole-person imputations by type in the 2010 census thus does not show that

households enumerated using whole-person census imputation are more likely to be undercounted than self-responding households.

189.    Dr. Salvo testified that 2010 data about the percentage of the population substituted (i.e., enumerated by whole-person census imputation) by census tract supports his opinion that households enumerated using whole-person census imputation are more likely to be undercounted than self-responding households.  Tr. 388:1 – 393:21, 394:12 – 395:4, 381:17 –382:1; PX-667.  However, that data shows only how often whole-person census imputation is used—not that whole-person census imputation results in a net undercount.  Tr. 439:3-18; PX-667.  Data from 2010 about the percentage of the population substituted by census tract thus does not show that households enumerated using whole-person census imputation are more likely to be undercounted than self-responding households.

190.    Mr. Thompson testified that the Census Bureau's use of whole-person census imputation to enumerate households that fail to self-respond likely will not be fully effective because any errors in data collected through self-responses are repeated in the imputation process.  Am. Thompson Decl. ¶ 117; Tr. 571:20-25.  However, the fact that imputation uses data from self-responding households to supply data for households that fail to self-respond indicates that imputation is no less accurate than self-responses.  Indeed, Mr. Thompson acknowledged that the Census Bureau's imputation method is an accepted and reliable statistical method for supplying missing data and has been used for decades.  Tr. 572:1-15.  The fact that imputation uses self-responses to supply data for households that fail to self-respond thus does not indicate that households enumerated through imputation are more likely to be undercounted than self-responding households.

191.    Dr. Salvo testified that demographic data generated through imputation is less accurate than demographic data from self-responses.  Tr. 386:9 – 387:25, 392:23 – 393:21, 395:9 – 396:14.  However, inaccurate demographic data does not affect the actual enumeration.  The fact that imputation tends to generate less accurate demographic data thus does not indicate that imputation tends to result in higher net undercounts.

9.  No Differential Undercount

192.    Plaintiffs contend that, because of the citizenship question, Hispanics will be missed in the 2020 Census—i.e., gross omissions will increase—and, accordingly, Plaintiffs will be injured.  Even assuming there will be a decline in initial self-response rate due to the citizenship question, however, the result is more households in NRFU, which impacts all three components of differential net undercount: correct enumerations, erroneous enumerations, and whole-person census imputations.  Tr. 1212:12 – 1214:5.  Plaintiffs have adduced no evidence regarding how the citizenship question will impact directly each of these components, Tr. 1220:4 – 1220:11, and therefore they have adduced no evidence of a differential net undercount.

193.    As Dr. Abowd explained, "when gross omissions of Hispanics go up, erroneous enumerations of Hispanics go up, and that's an offset, as do whole-person census imputations, and that's an offset."  Tr. 1219:18 – 1220:4.  Even using this simplistic example, Plaintiffs have not offered any explanation, let alone proof, that a decrease in correct enumerations will not be offset by erroneous enumerations, by whole-person census imputations, or by some combination of both.  Tr. 1220:4-11.  Indeed, Dr. Abowd described at length how an outside expert may undertake such a

quantitative analysis using publicly-available data sources. Tr. 1218:8 – 1220:11. And he also described at length how Plaintiffs have not done so. Tr. 1220:12 – 1221:19. With this testimony by the Census Bureau's Chief Scientist, and a lack of any testimony from Plaintiffs examining the projected impact on differential net undercount, Plaintiffs have failed to meet their burden of proving standing.

194.    Plaintiffs' expert Dr. Hillygus testified that there has always been some level of net differential undercount in the decennial census, noting that even George Washington noticed and commented upon this phenomenon. Tr. 10-19. Dr. Hillygus testified that net differential undercounts had been observed going back to at least the 1940 decennial census. Tr. 186:1-11. Many decennial censuses during that time period did not include a citizenship question on the "short form" of the census questionnaire sent to every American, and therefore the net differential undercounts in those censuses could not have been caused by the presence of a citizenship question. Tr. 186:16-21. In fact, Dr. Hillygus cited to PX-267, a 2012 memorandum prepared by Thomas Mule of the Census Bureau's Decennial Statistical Studies Division, which showed a net differential undercount in the 1990, 2000, and 2010 decennial censuses, none of which contained a citizenship question on the "short form" questionnaire sent to all Americans. PDX-2.

195.    Dr. Hillygus opined that a citizenship question is of a high degree of sensitivity for certain subgroups of persons in America. Tr. 43:25 – 44:7; Tr. 45:2-6; Tr. 46:3-8; Tr. 51:12-15; Tr. 70:8-14. However, that the citizenship question may be "sensitive" for certain persons, or groups of persons, does not, without more, establish that the citizenship question is likely to exacerbate the net differential undercount for the 2020 Decennial Census.

196.    Dr. Hillygus's opinion is also substantially based upon her conclusion that the inclusion of the citizenship question on the 2020 Decennial Census represents a significant burden to certain subgroups of persons. Tr. 44:8 – 46:2; Tr. 49:3 – 50:8. Dr. Hillygus testified that the context of the citizenship question on the 2020 Decennial Census questionnaire, combined with the sensitive nature of the question, means that the question constitutes a significant burden for some subgroups. Tr. 43:16-24; PDX-3. However, a substantial portion of the sources cited by Dr. Hillygus in support of her opinion on burden concerns "breakoffs," which occurs when respondents start but do not complete a survey. Tr. 45:7-13. Dr. Hillygus cites to ACS breakoff rates and notes that the breakoff rate for Hispanics for the citizenship question was much higher than it was for non-Hispanic whites. Tr. 75:24 – 76:3; PX-69; PX-151. However, Dr. Hillygus also acknowledges that breakoff rates were higher for Hispanics than for non-Hispanic whites overall on most questions. Tr. 195:22 – 196:7.

197.    Dr. Hillygus also acknowledged that she has not performed any calculations or quantitative analysis, and is aware of no calculations or quantitative analysis performed by anyone else, as to what the burden of a citizenship question on the decennial census will be for any subgroup or subgroups. Tr. 190:10-15.

198.    Overall, Dr. Hillygus's opinion that the inclusion of a citizenship question on the 2020 Decennial Census is likely to exacerbate a differential net undercount of Hispanics and/or non-citizens is critically undermined by a lack of original analysis or quantitative evidence that directly supports her opinion. Dr. Hillygus did not rely on any evidence that actually purported to analyze the impact of a citizenship question on the decennial census. Dr. Hillygus also conceded in testimony that she is not aware of any quantitative evidence about whether a citizenship question

will result in a differential net undercount of Hispanics.  Tr. 194:3-23.  She further conceded that she has not herself done any quantitative analysis of this question.  Tr. 195:7-10.  She has not done any calculations or quantitative analysis as to how any subgroup is to respond to the census as a result of the citizenship question.  Tr. 195:11-15.  She has not done any calculations or quantitative analysis as to how likely any subgroup is to skip the citizenship question.  She has not done any calculations or quantitative analysis as to how much less likely any subgroup is to give an accurate response to the citizenship question.  Tr. 196:10-13.  She has not done any data analysis at all in support of any of the opinions she is providing in this case, Tr. 196:14-20, instead relying upon sources and studies that mostly involve very different issues from the citizenship question and many of which are not even in the context of responding to a census questionnaire.  For these reasons, the relevance and probative value of Dr. Hillygus's testimony is very limited as to the matters before the Court.

199.    Plaintiffs base their harm on the contingency of a differential undercount. However, such contingencies do not establish causation or traceability to the reinstatement of the citizenship question. Accordingly, the stated "harm" is too speculative to establish standing.  *See e.g.*, Altschuler Affidavit ¶ 23 ("[MRNY] members also face significant negative consequences *in the event of an undercount*." (emphasis added)); Breitbart Affidavit ¶ 10 (assumes a differential undercount based on the unsupported leap of assumption that non-citizens are in the same households as citizens simply because non-citizens tend "to be concentrated in the same congressional districts as non-citizens").

10.  Failure to Show Loss of Apportionment

200.    On behalf of Plaintiffs, Dr. Christopher Warshaw, an Assistant Professor of Economics at George Washington University, presented population projections and the resultant estimated effects on apportionment, assuming various possible undercount percent increases among certain subpopulations purportedly attributable to the reinstatement of the citizenship question. Warshaw Decl., ECF No. 526-1.

201.    Dr. Warshaw did not perform any calculations himself as to the expected increase in undercount from a citizenship question but relied on the decline in self-response rate determined in the internal Census Bureau study and on numbers derived from Dr. Barreto's survey.  Warshaw Decl. ¶¶ 23, 24.a, 25-35; Tr. 862:3-9, 862:19-23.  He also used two arbitrary percentages (2% and 10%) to represent what he and counsel felt to be a range of possible results.  Warshaw Decl. ¶ 24.b, .c; Tr. 862:10-18.

202.    Dr. Warshaw did not expressly take into account the effect of non-response follow-up on undercount rates in any of his scenarios but rather assumed that respondents who did not self-respond would not be enumerated.  Warshaw Decl. ¶ 24.a, .c; Tr. 863:5-13.  He also did not take into account the effects of imputation.  Tr. 863:18-22.  The undercount rates he used are therefore generally much higher than can be expected to be the actual rates in 2020.  At best, the 2% rate he used for one set of calculations comes closest to approximating the net result after NRFU and imputation.  Warshaw Decl. ¶ 24.c; Tr. 863:23 – 864:1.

203.    Dr. Warshaw did not calculate the effects on apportionment for the 2% undercount scenario.  Warshaw Decl. at 23, Table 6; Tr. 864:9-16, 866:25 – 867:1.  Plaintiffs have therefore provided no evidence of any adverse effect on their federal representational interests in any reasonable scenario that can be anticipated to occur as a result of the 2020 census.

31

204.     The possible changes in the 2020 population estimate for New York that Dr. Warshaw calculated in the 2% undercount scenario are within the margin of error for that population projection.  Warshaw Decl. p. 33, Table A1; Tr. 867:8-25.

205.     In the scenarios for which Dr. Warshaw did calculate apportionment, the only states that are more likely than not to lose a representative in any of the scenarios are Arizona, California, Florida, or Texas.  Tr. 865:18 – 866:8.  Plaintiffs have therefore provided no evidence that is more likely than not that their federal representational interests will be affected by the 2020 census.

206.     Dr. Warshaw also opined that states that lose seats in the House of Representatives would receive lower shares of federal distributive funds.  Warshaw Decl. ¶ 49.  He bases this conclusion on what he describes as a "well-established finding in political science and political economy that a loss of political power as result of loss of representation leads to the loss of funding."  *Id.*  But the sources he cites for this conclusion are not persuasive in this context.  First, the study by Ansolabehere, Gerber, and Snyder that he cites (PX 326)  compared the distribution of *state* (not federal) funds to *counties* (not states) that occurred after *state redistricting* (not federal apportionment changes) pursuant to *Baker v. Carr*, 369 U.S. 186 (1962).  Specifically, they examined the change in distribution of funds within states between the 1957-1962 period (averaged) and the 1977-1982 period (averaged).  In 1957-1962, before *Baker v. Carr*, "unequal representation was the norm in U.S. legislatures, and in some states districts had extremely unequal populations."  PX 326, at 1.  The resulting redistricting accordingly effected an "immense change in representation," and, by 1972, "populations of state legislative districts were nearly equal in every state."  *Id.* at 2.  This study of data from 30-60 years ago, in a completely different context involving wholesale changes to state legislative districts, has no applicability to the question of the distribution of federal funding following reapportionment in the modern context.  *See* PX 325 (noting that the Ansolabehere study "is specific to the United States in the 1960s and therefore . . . does not generalize to other eras in the U.S. or to comparative contexts").

207.     The other study cited by Dr. Warshaw, by Elis, Malhotra, and Meredith (PX 325), is more on point as it examines the effect on a state's federal funding receipts from changes in its representation in the U.S. House of Representatives.  However, this study notably found that, "in large states, the effect of representation is nearly 0."  PX 325, at 15.  The authors defined "large" states as those having "at least 15 representatives in every Congress since the 1970 apportionment."  This includes three of the four states that Warshaw calculates as being more likely than not to lose a representative in his scenarios (California, Florida, and Texas) and also includes New York.  *Id.* at 15 n.14.  Arizona currently has nine representatives.

208.     Dr. Warshaw also provided an opinion on the possible effects of an undercount caused by the citizenship question on the distribution of the enumerated population between urban and rural areas, and resultant effect on the distribution of federal and state funding.  Warshaw Decl. ¶¶ 1, 50-51.  In support of this opinion, he again cites the study by Ansolabehere, Gerber, and Snyder, PX 326, as an example of the "well-established finding in political science" that "[a]reas with greater population enumerations, and thus more voting power, are likely to receive more funding."  *Id.* ¶ 51; *see also* Tr. 870:1-18.  This study of funding changes between the 1957-1962 and 1977-1982 periods, described *supra*, at paragraph 207,  is not probative in the current context, more than 30 years later, as it examined funding changes in a completely different context involving wholesale changes to state legislative districts.  There is no evidence that marginal changes in district sizes would have the same effects in today's context, where districts are more equal in population.

209.     The declarations submitted by Plaintiffs similarly fail to establish that the citizenship question will cause a decrease in representation.  *See generally* Breitbart Affidavit; Garcia Affidavit; Lucyk Affidavit.

210.     Dr. Warshaw's opinion that New York may lose a seat is insufficient to form a concrete, particularized harm likely to be suffered by Plaintiff the State of New York, particularly in light of Dr. Warshaw's acknowledgement that New York will likely not lose a Congressional seat as the result of any of his differential undercount scenarios.

### 11.   Failure to Show Loss of Federal Funding

211.     The Plaintiffs' expert on government funding programs, Dr. Reamer, acknowledged that his calculations rely entirely upon the undercount scenarios performed by Dr. Warshaw.  Tr. 488:22-25.  Dr. Reamer acknowledged that he is unsure as to how those scenarios were calculated, Tr. 489:1-7, or whether the scenarios took into account the Census Bureau's NRFU efforts, Tr. 491:1-4, and offered no opinion as to the validity of such projections, Tr. 489:24 – 490:1.

212.     Dr. Reamer's calculations are based upon the most recent funding amounts and allocation formulas, which Congress could choose to change at any time.  Tr. 507:7-20.

213.     Dr. Reamer's calculations do not offer a prediction about what will occur should a net differential undercount happen.  Tr. 508:6-13.  Instead. Dr. Reamer's calculations are based upon taking Dr. Warshaw's various differential undercount scenarios for the 2020 census, applying those scenarios to the actual count of the 2010 census, and then calculating the impact such an undercount would have had on Fiscal Year 2015 or Fiscal Year 2016 funding amounts to states under five particular government programs.  Tr. 508:14 – 509:21.

214.     Only one dataset used in federal funding formulas, the Census Bureau's Urban-Rural Classification, uses solely decennial census data, Tr. 503:13-19, reflecting Congress' judgment that census numbers alone are not an adequate basis to equitably distribute federal funds.  Declaration of Dr. Andrew Reamer, ECF No. 508-1 ("Reamer Decl.") ¶ 23; Tr. 503:20-25.

215.     Out of the approximately 2,249 government funding programs, Tr. 504:13-16, only approximately 320 use census-derived data to allocate funds.  Tr. 504:4-8.

216.     A differential net undercount would not have an impact on federal funding under the vast majority of federal funding programs.  Tr. 507:3-6.

217.     Out of the approximately 320 federal government funding programs that use census-derived data to allocate funds, Dr. Reamer has provided funding formulas for only twenty-four such programs, PX-229, and has performed calculations for only five such programs.  Tr. 509.

218.     All of the census-derived data sets that are used to determine funding amounts under certain federal funding programs use the final census data, not initial self-response rates.  Tr. 490:2-14.

219.     All twenty-four of the programs for which Dr. Reamer provided formulas, and all five of the programs for which Dr. Reamer has actually performed calculations, are geographic

allocation formulas, Reamer Decl. ¶ 10, Tr. 510:3-5, which are particularly sensitive to fluctuations in census data.  Tr. 510:6-9.

220.    Dr. Reamer offered no calculations or estimates as to the overall impact on the federal funding any state government would receive as a result of a differential net undercount in the 2020 Decennial Census.  Tr. 510:23 – 511:1.

221.    Under Dr. Reamer's calculations, Plaintiff the State of Delaware would have received more federal funding under the WIC program, Reamer Decl. p. 16 (Table); Tr. 494:6-14, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program. Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

222.    Because Dr. Reamer calculated that Plaintiff the State of Delaware would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Delaware has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Delaware is dismissed from this action because of a lack of standing.

223.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the State of Iowa would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19-503:11.

224.    Because Dr. Reamer calculated that Plaintiff the State of Iowa would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Iowa has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Iowa is dismissed from this action because of a lack of standing.

225.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the State of Minnesota would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

226.    Because Dr. Reamer calculated that Plaintiff the State of Minnesota would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Minnesota has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Minnesota is dismissed from this action because of a lack of standing.

227.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the State of North Carolina would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

228.    Because Dr. Reamer calculated that Plaintiff the State of North Carolina would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of North Carolina has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of North Carolina is dismissed from this action because of a lack of standing.

229.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the Commonwealth of Pennsylvania would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

230.    Because Dr. Reamer calculated that Plaintiff the Commonwealth of Pennsylvania would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the Commonwealth of Pennsylvania has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants. Accordingly, Plaintiff the Commonwealth of Pennsylvania is dismissed from this action because of a lack of standing.

231.    Under Dr. Reamer's calculations, Plaintiff the State of Rhode Island would have received more federal funding under the WIC program, Tr. 494:15-24, more federal funding under the SSBG program, Tr. 498:15 – 499:1, more federal funding under Title I LEA grants, Tr. 500:22 – 501:7, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25-502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

232.    Because Dr. Reamer calculated that Plaintiff the State of Rhode Island would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Rhode Island has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Rhode Island is dismissed from this action because of a lack of standing.

233.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the Commonwealth of Virginia would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants

program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

234.    Because Dr. Reamer calculated that Plaintiff the Commonwealth of Virginia would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the Commonwealth of Virginia has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the Commonwealth of Virginia is dismissed from this action because of a lack of standing.

235.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the State of Vermont would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

236.    Because Dr. Reamer calculated that Plaintiff the State of Vermont would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Vermont has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Vermont is dismissed from this action because of a lack of standing.

237.    Under Dr. Reamer's calculations, under any differential undercount scenario, Plaintiff the State of Colorado would have received more federal funding under the WIC program, Reamer Decl. p. 16 (table); Tr. 495:20-24, more federal funding under the SSBG program, Reamer Decl. p. 17 (table); Tr. 498:8-14, more federal funding under the Title I LEA grants program, Reamer Decl. p. 20 (table); Tr. 500:10-21, the same or a greater amount of federal funding under the Medicaid program, Reamer Decl. p. 23 (table); Tr. 501:25 – 502:4, and the same or a greater amount of federal funding under the CHIP program.  Reamer Decl. p. 27 (table); Tr. 502:19 – 503:11.

238.    Because Dr. Reamer calculated that Plaintiff the State of Colorado would actually receive more federal funding in the event of a differential undercount resulting from the inclusion of a citizenship question, Plaintiff the State of Colorado has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the State of Colorado is dismissed from this action because of a lack of standing.

239.    Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding any city or municipal government would receive under any federal program.  Tr. 510:10-13.

240.    Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Chicago would receive, and therefore Plaintiff the City of Chicago has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Chicago is dismissed from this action because of a lack of standing.

241.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Philadelphia would receive, and therefore Plaintiff the City of Philadelphia has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Philadelphia is dismissed from this action because of a lack of standing.

242.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Providence would receive, and therefore Plaintiff the City of Providence has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Providence is dismissed from this action because of a lack of standing.

243.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City and County of San Francisco would receive, and therefore Plaintiff the City and County of San Francisco has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City and County of San Francisco is dismissed from this action because of a lack of standing.

244.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Seattle would receive, and therefore Plaintiff the City of Seattle has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Seattle is dismissed from this action because of a lack of standing.

245.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Pittsburgh would receive, and therefore Plaintiff the City of Pittsburgh has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Pittsburgh is dismissed from this action because of a lack of standing.

246.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the County of Cameron would receive, and therefore Plaintiff the County of Cameron has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the County of Cameron is dismissed from this action because of a lack of standing.

247.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Central Falls would receive, and therefore Plaintiff the City of Central Falls has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Central Falls is dismissed from this action because of a lack of standing.

248.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the City of Columbus would receive, and therefore Plaintiff the City of Columbus has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the City of Columbus is dismissed from this action because of a lack of standing.

249.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding any county government would receive under any federal program.  Tr. 510:14-17.

250.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the County of El Paso would receive, and therefore Plaintiff the County of El Paso has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the County of El Paso is dismissed from this action because of a lack of standing.

251.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the County of Monterey would receive, and therefore Plaintiff the County of Monterey has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the County of Monterey is dismissed from this action because of a lack of standing.

252.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding that Plaintiff the County of Hidalgo would receive, and therefore Plaintiff the County of Hidalgo has failed to show that it is at imminent risk of a concrete injury as a result of any action taken by Defendants.  Accordingly, Plaintiff the County of Hidalgo is dismissed from this action because of a lack of standing.

253.     Plaintiffs have not provided any evidence of how a differential undercount would impact the amount of federal funding any nonprofit organization would receive under any federal program.  Tr. 510:18-22.

254.     In addition, the declarations submitted by Plaintiffs in support of their assertions that they will lose funding due to an undercount is not sufficient to establish standing because Plaintiffs fail to demonstrate that the loss in funding is due to a differential undercount caused by the citizenship question.  *See generally* Franklin Affidavit (listing public services provided by the City of Phoenix with no discussion of funding as related to the citizenship question); Freedman Affidavit (generally asserting that an undercount will reduce funding for the City of Providence, Rhode Island, but no specific explanation of projected decrease in funding due to the citizenship question); Garcia Affidavit (noting that "the annual award [of federal funding] would decrease as a result of an undercount," but no analysis that the undercount is due to the citizenship question); Haney Affidavit (generally asserting that an undercount will reduce funding for programs in Massachusetts, but no specific explanation of projected decrease in funding due to the citizenship question); Harmon Affidavit (generally asserting that an undercount will reduce funding for programs in New York State, but no specific explanation of projected decrease in funding due to the citizenship question); Thiema-Massie Affidavit (generally asserting that an undercount will reduce funding for programs in the City of Chicago, but no specific explanation of projected decrease in funding due to the citizenship question).

255.     Dr. Reamer's calculations are of very limited evidentiary value because they are based entirely upon the undercount scenarios generated by Dr. Warshaw, which completely fail to take into account the effect of NRFU on response rates, which makes Dr. Reamer's undercount scenario estimates inaccurate and unreliable.

256.     Dr. Reamer's calculations are also of very limited evidentiary value because they do not even purport to predict what will happen in 2020. Instead, his calculations, are backwards-looking to what would have happened in fiscal years 2015 and 2016 had there been an additional undercount due to the presence of a citizenship question on the 2010 Decennial Census.

257.     The evidentiary value of Dr. Reamer's calculations is further diminished because his calculations rest upon the assumption that allocation formulas for the five programs in question will not change in the coming years and that funding amounts will remain substantially unchanged. However, Congress very well could alter the funding amounts and allocation formulas, including the manner and extent to which they rely upon census-derived data, between now and several years after 2020, which is the earliest possible year the 2020 census numbers would impact federal funding.

12.   Failure to Show Other Financial Harm Caused by Citizenship Question

258.     Dr. Salvo testified that New York City increased its 2020 census operations budget allocation from $4.3 million to $5.5 million after Secretary Ross announced his decision to reinstate a citizenship question. Tr. 319:7-24, 362:10 – 363:14, 426:20 – 429:24. However, Dr. Salvo had no basis for that knowledge besides inadmissible hearsay. Tr. 429:15-24. The other examples that Dr. Salvo gave to show that New York City has changed its plans because of the added citizenship question were conclusory and lacked key specifics. Tr. 359:9 – 361:5, 377:19 – 379:3, 399:9 – 400:15. In any event, any decision by New York City to spend more resources specifically because of the citizenship question was not based on a reasonable fear that the citizenship question would cause a net undercount in New York City because no evidence indicated that New York City accounted for the Census Bureau's non-response follow-up procedures in mitigating any such net undercount.

259.     Similarly, none of the non-governmental organizational ("NGO") Plaintiffs have established an imminent, concrete harm to them or their members. Though NGO Plaintiffs allege that they will expend more resources due to the reinstatement of the citizenship question, they have not shown any analysis to account for the incremental increase due to the citizenship question. *See e.g.,* Rodriguez Affidavit.

260.     Although Plaintiff MRNY alleges that it anticipates expending at least double the amount on 2020 Census education and outreach than what it spent for the 2010 Census, it provides no analysis of the incremental increase due to the citizenship question. Altschuler Affidavit ¶ 19. Indeed, MRNY acknowledges that there is a general "increased fear . . . due to the Trump Administration[,]" Altschuler Affidavit ¶ 23, and that MRNY's increased investment is only "driven in part by concerns about the citizenship question." Altschuler Affidavit ¶ 19. *See also* Khalaf Affidavit ¶ 13 (admitting that the American-Arab Anti-Discrimination Committee and ADC Research Institute would promote engagement in the Decennial Census regardless of the citizenship question but failing to analyze any incremental increase in expenditures due to the citizenship question).

261.     Plaintiff New York Immigration Coalition ("NYIC") similarly alleges generally that it will expend more resources due to the citizenship question, but it does not establish that the increased expenditures are due to the citizenship question rather than the general "fear and distrust of government among immigrants and communities of color … exacerbated by the Trump Administration['s] … numerous acts and statements." Choi Affidavit ¶ 13; *see also* Plum Affidavit ¶

39

13 (citing a general "more difficult Census-response environment … due to the Trump Administration[]").

262.    The concern about unnecessary and speculative expenditures is present with full force here, as none of the Plaintiffs testified that their expenditure of resources took into account the extent to which the Census Bureau's non-response follow-up procedures would mitigate any differential net undercount attributable to the citizenship question.

263.    Here, the NGO Plaintiffs have not met their burden of proving by a preponderance of the evidence a direct conflict between their missions and the reinstatement of a citizenship question on the census.

### 13. <u>Data Quality</u>

264.    Dr. Salvo testified that even if the count of a local population is accurate, inaccurate demographic data about that population can be harmful because it can affect city services delivered to that population.  Tr. 303:8 – 304:13.  Dr. Salvo's testimony, however, was conclusory and lacked key specifics, including what city services might be affected, how those city services depend on demographic data about local populations, and the degree of inaccuracy necessary to affect those city services.  For Dr. Salvo's example about school zone boundaries, he failed to provide any details about how the New York City Department of Education uses race and ethnicity data to draw school zone boundaries, or how inaccurate race and ethnicity data might change how those boundaries would be drawn.  Tr. 304:22 – 306:10.  For Dr. Salvo's example about language services, he failed to provide any details about how the Mayor's Office of Immigrant Affairs uses demographic data to allocate English language services or how inaccurate demographic data might change that allocation.  Tr. 306:13 – 307:3, 307:17-25.  For Dr. Salvo's example about public health services, he failed to provide any details about how the New York City Department of Health and Mental Hygiene uses age, race, and ethnicity data to allocate public health services or how inaccurate age, race, or ethnicity data might change that allocation.  Tr. 307:3-16, 308:3-18, 395:9 – 396:14, 416:24 – 417:20.

### 14. <u>Plaintiffs Cannot Show a Loss of Confidentiality Due to the Inclusion of a Citizenship Question</u>

265.    The Census Bureau is barred from disclosing individual responses to a citizenship question on the decennial census questionnaire, and cannot disclose any information whereby the data furnished by any particular establishment or individual can be identified.  PX-297 at 43 (response to Census RFA No. 139).

266.    The Census Bureau does not disclose citizenship information that has not gone through an approved disclosure avoidance process.  PX-297 at 43-44 (response to Census RFA No. 140).

267.    The Census Bureau has not yet finalized the disclosure avoidance methodology that it will use for the data collected from the citizenship question on the 2020 decennial census.  PX-297 at 34 (response to Census RFA No. 103).  The Census Bureau is in the process of developing those methodologies.  *Id.*

268.    The Census Bureau's use of disclosure avoidance procedures in reporting block-level citizenship data from the 2020 census will not impair the Department of Justice's intended use of that data to assemble voting districts for Voting Rights Act purposes. Tr. 1245:14–17. The disclosure avoidance procedures, which have been used since the 2000 census, necessarily affect the variability of the data.  Tr. 1241:17–1242:24.  It is therefore true that data for a particular census block may be obscured for confidentiality purposes, Tr. 1031:16 – 1036:17.  However, for the 2020 census, the Census Bureau is using Department of Justice input—specifically, examples of cases in which the Department of Justice has used demographic data in Voting Rights Act cases—to adjust the accuracy of the Census Bureau's disclosure avoidance procedures so that when census blocks are *combined* to build voting districts, the resulting data will be fit for the Department of Justice's intended use. Tr. 1037:22 – 1039:4; 1041:14 – 1042:1; 1044:16 – 1044:25; 1242:25–1245:13.

269.    Plaintiffs' alleged confidentiality concerns fail to establish a cognizable harm. Though Susan Brower, state demographer for the State of Minnesota, alleges that confidentiality concerns are real for the State because 63% of the blocks in Minnesota that contained any households contained fewer than ten households and releasing block level data will allow the identities of non-citizens to be discovered, Brower Affidavit ¶ 6, Dr. John Abowd explained that noise is infused in these census blocks in order to comply with the Census Bureau's legal duty to protect the confidentiality of sparsely populated blocks.

270.    Furthermore, while Dr. Hillygus testifies that there could be an "increased risk" of disclosure of sensitive information due to the inclusion of a citizenship question on the 2020 Decennial Census, Tr. 138:5-24, she provides no evidence to support this opinion and also concedes that the Census Bureau is "required by law" not to disclose any such confidential data by Title 13, Tr. 138:22-23, and that the Census Bureau has disclosure avoidance procedures of adding "noise" to citizenship data prior to disclosure specifically to avoid disclosing confidential data about an individual such as citizenship.  Tr. 139:9-23.

271.    Dr. Hillygus's opinion is that certain subgroups will be less likely to respond to the 2020 Decennial Census questionnaire due to confidentiality concerns.  Tr. 46:18 – 47:19; Tr. 51:5-11.  In support of this opinion, Dr. Hillygus cited to, and this Court admitted into evidence, a number of different sources generated by Census Bureau researchers that documented increased concerns about the confidentiality of data respondents provide to the Census Bureau.  PX-136; PX-160; PX-365; PX-448, PX-656.  While all of these sources are credible indicators that certain subgroups are more concerned about the confidentiality of the data submitted to the Census Bureau than they have been in the past, all of the sources cited by Dr. Hillygus predate the Secretary's decision to include a citizenship question on the 2020 Decennial Census, and therefore show at most that there may be a link between the macro political environment and confidentiality concerns, but do not document any relationship between the citizenship question itself and these increased confidentiality concerns.  Tr. 187:21 – 188:11.

### B.  *Plaintiffs' Alleged Harm Due to the General Macro-Environment Cannot Be Fairly Traced to the Secretary's Decision to Include a Citizenship Question on the Census*

272.    Plaintiffs generally attribute their harm to the macro-environment, which is not sufficient to show that their alleged harm is caused by the citizenship question.  *See, e.g.*, Choi Affidavit ¶ 12 (NYIC asserts that confidentiality concerns are due to "distrust of government

officials", not specifically due to the citizenship question); Cullinane Affidavit ¶ 5 (noting "an increase in the immigrant community's fear and apprehension about engaging with government authorities . . . . since President Trump took office in January 2017"); Escobar Affidavit ¶ 15 (detailing an "increased fear among immigrants, caused by the Trump Administration's anti-immigrant policies and rhetoric").

273.    The macro environment, including the political environment, can affect response rates.  Tr. 926:21 – 927:10.

274.    Recent CBAMS research indicates that respondents are concerned about the census, and the confidentiality of its collected data, with or without a citizenship question.  Tr. 938:10 – 943:23; 942:5 – 942:12 ("A lot of people are afraid.  It doesn't matter if they ask you whether or not you're a citizen.  The first question they ask you, are you Hispanic or Latino?  And that's enough. That's all they need and people are scared.");  PX-662.

275.    Even the recent announcement to potentially end birthright citizenship—unrelated to a census citizenship question—may impact the macro environment.  Tr. 945:5 – 946:3.

276.    Census Bureau research conducted before Secretary Ross's decision confirms that these concerns exist whether or not a citizenship question appears on the 2020 Census.  PX-448.

277.    Plaintiffs place much emphasis on household members being left off the household roster.  *See, e.g.*, PX-448 at 7.  But getting accurate household rosters has been a continuing issue for the Census Bureau whether or not a citizenship question appears on the census, and there is no quantitative evidence linking the incompleteness of household rosters with a citizenship question on the census.  Tr. 1183:9 – 1183:17; 1393:18-21.

278.    The Census Bureau believes that households might be unlikely to provide a full enumeration whether or not there is a citizenship question on the census and does not have evidence of an incremental effect from the citizenship question.  Tr. 394:21-395:16 (Rule 30(b)(6)).

279.    "[I]f the political climate increases or decreases" the distrust in government generally, "it could have an impact on response rates."  Jarmin Dep. 197:14-22.

280.    Dr. Hillygus testified that it is her opinion that the inclusion of a citizenship question on the 2020 Decennial Census is likely to exacerbate a net differential undercount.  Tr. 30:7-13.  Her conclusion is based on her opinion that (1) a citizenship question has a high degree of sensitivity for persons in certain subgroups; (2) a citizenship question poses a substantial burden for persons in certain subgroups; (3) the current macro political environment makes certain persons unlikely to respond to the census overall and the citizenship question in particular; and (4) certain persons have confidentiality concerns about the data they submit to the Government.

281.    Dr. Hillygus's opinion is substantially based upon her opinion that the current political "macro climate" will make certain subgroups less likely to respond to the census questionnaire.  Tr. 48:19 – 49:2.  In particular, Dr. Hillygus testified at length that there is significant evidence that fear of adverse immigration action such as deportation is currently at a historically very high rate among certain subgroups of the population.  Tr. 52:7 – 57:7.  In support of this, Dr. Hillygus cited to a number of sources – a Pew Research Center survey summarized on PDX-5;

several surveys summarized on PDX-10 that show Hispanics have recently been less likely to enroll in public benefits programs; a study published in the National Bureau of Economic Research showing a decline in certain government benefits programs among Hispanics, PDX-6; and an article published in Social Science Quarterly, showing a decline in enrollment in the WIC program among Hispanics, PDX-7.

282.    However, the relevance of this testimony is significantly undermined by the fact that none of the sources cited by Dr. Hillygus establish a link between the general fears of deportation or reluctance to participate in certain government programs with a refusal to answer a census questionnaire.  Dr. Hillygus conceded that not only did none of the sources she relied upon for this opinion involve the citizenship question specifically, none of them involved responding to the Census.  Tr. 191:4-9; Tr. 191:13-18; Tr. 191:23 – 192:3.  Dr. Hillygus even testifies that the studies relied upon "are really about the impact of these fears on the engagement with government and other realms *beyond the census.*"  Tr. 53:21-23 (emphasis added).

283.    Overall, there is no indication (and Dr. Hillygus does not seem to claim) from any of the sources relied upon by Dr. Hillygus that the macro political environment was caused by the Secretary's decision to include a citizenship question on the 2020 Decennial Census – indeed, the sources relied upon by Dr. Hillygus predate the decision so could not have been caused by the Secretary's decision.  The evidence relied upon by Dr. Hillygus therefore indicates, if anything, that the macro political environment may make persons from some subgroups reluctant to respond to the census questionnaire regardless of whether it contains a citizenship question or not.

284.    The only source Dr. Hillygus has cited that is from after the Secretary made his decision that addresses the citizenship question is from the recent Census Barriers Attitudes and Measures Survey (CBAMS) focus groups.  PX-152; PDX-9.  While some focus group participants expressed skepticism towards the inclusion of a citizenship question, others seemed to indicate that the macro political climate was the real issue that might impact response rates, *see, e.g.*, PDX-9 ("For this census, a lot of people are afraid. It doesn't matter if they ask you whether or not you're a citizen."), and one of the emerging themes arising out of the focus groups was "Citizenship question response is mixed," noting that "many recognize the practical benefits of completing information related to demographic background."  PX-152 at 27.  Not one of the focus group participants indicated that he or she would skip the citizenship question or refuse to respond to the questionnaire altogether, although some speculated that others in their community might.  PX-152.

285.    Dr. Hillygus also cites to the 2010 Census Barriers, Attitudes and Measures Survey (CBAMS) survey, Tr. 63:20 – 64:6.  However, neither the 2010 CBAMS survey nor the 2020 CBAMS survey asked specifically about a citizenship question.  Tr. 187:2-15.  One of the sources relied upon by Dr. Hillygus and introduced as an exhibit by Plaintiffs, the CBAMS focus group results, also contradicts Dr. Hillygus's opinion, as participants in the focus group noted that they were "willing to give benefit of the doubt to government on information security."  PX-152 at 27.

286.    Many of the sources relied upon by Dr. Hillygus concern rates of responding to surveys or applying for certain benefits which are optional under the law.  Tr. 188:19 – 190:4.  If anything, this shows that certain subgroups of people may be unwilling to participate in government programs due to the macro political environment, not the presence of a citizenship question.  Furthermore, the relevance of such sources to the matter before the Court is significantly limited

because unlike those circumstances, responding to a census questionnaire is required by law.  Tr. 188:13-18.

287.    Dr. Hillygus's opinion that the inclusion of a citizenship question on the 2020 Decennial Census is likely to exacerbate a differential net undercount of Hispanics and/or non-citizens is further undermined by statements she made against the decision immediately after it was announced.  Dr. Hillygus, in her capacity as a member of the Census Scientific Advisory Committee (CSAC), gave a presentation at the March 29, 2018 CSAC meeting, Tr. 173:24 – 174:1, in which she stated that the Secretary's decision was "an absolutely awful decision."  Tr. 175:23 – 176:1.  While Dr. Hillygus's opinions in this case about what she believes to be likely harmful effects of the citizenship question are based in large upon, *inter alia*, the wording of the question and its placement on the questionnaire, her belief that the question has not been adequately tested, and the Census Bureau's proposed outreach efforts, Dr. Hillygus was not aware of any of those things at the time she made a very public statement that the Secretary's decision was "absolutely awful."  Tr. 174:2-175:8.  The fact that Dr. Hillygus had made up her mind about the merits of the decision before knowing about many of the factors she now cites as being the basis for her opinion about the predicted negative impact of the citizenship question does call into question the extent to which those factors truly influence her conclusion, and accordingly further reduce the relevance and probative value of her testimony as to the present matter before the Court.

## VI.    Administrative Record Facts

### A.  Secretary Ross Examines Census Issues After His Appointment as Secretary

288.    Soon after Wilbur L. Ross was appointed and confirmed as Secretary of Commerce, he "began considering various fundamental issues" regarding the 2020 Census, "including funding and content," as well as schedule, contracting issues, systems readiness, and the upcoming 2018 End-to-End Test.  AR 1321; *see also* AR 317-322, 1416-1470.  The Secretary's ultimate goal in reviewing these issues is "make every effort to provide a complete and accurate decennial census."  AR 1313.

289.    One of the issues examined by Secretary Ross early in his tenure "included whether to reinstate a citizenship question," which he and his staff "thought . . . could be warranted."  AR 1321.  Secretary Ross questioned why a citizenship question was not on the census questionnaire and sought other general background "factual information."  AR 2521-2522, 12465, 12541-12543; *see also* AR 3699 (referring in a May 2017 email to his "months['] old request that we include the citizenship question").

290.    Secretary Ross and his staff "had various discussions with other governmental officials about reinstating a citizenship question to the Census" and, "[a]s part of that deliberative process, [they] consulted with Federal governmental components."  AR 1321; *see* AR 2561.  In particular, they inquired "whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act."  *Id.*

291.    DOJ has requested that the American Community Survey ("ACS") include a citizenship question for the purposes of carrying out its enforcement responsibilities under the Voting Rights Act.  AR 278-283, 9203-9216.

292.    Department of Commerce Deputy Chief of Staff and Chief of Policy Earl Comstock initially reached out to the Justice Department in May 2017.  AR 2462, 12755.

293.    In August and September 2017, Secretary Ross requested an update on the status of the inquiries regarding the reinstatement of a citizenship question.  AR 2034, 2424, 2459-2460, 4004, 12476.

294.    Secretary Ross spoke with the Attorney General on September 18, 2017, about whether DOJ would find citizenship data from the decennial census useful.  AR 2528, 2636.

### B.  DOJ Asks the Census Bureau to Reinstate a Citizenship Question on the 2020 Decennial Census to Facilitate Enforcement of the Voting Rights Act

295.    On December 12, 2017, Arthur E. Gary, General Counsel of the Department of Justice's Justice Management Division, sent a letter to Dr. Ron Jarmin, performing the non-exclusive functions and duties of the Director of the Census Bureau.  AR 663-65.

296.    In that letter, Mr. Gary stated that "[t]he Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans.  In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called 'long form' census.  This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting.  To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected.  As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2."  AR 663.

297.    Mr. Gary went on to note the importance of obtaining citizen voting-age population for determining whether a racial group could constitute a majority in a single-member district, and its utility for avoiding the "wrong result" of drawing a single-member district in which a minority group constituted a majority of the voting-age population but not the majority of the citizen voting-age population.  AR 663-64.

298.    Mr. Gary stated that "in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected."  AR 664.

299.    Mr. Gary stated that the Census Bureau had included a citizenship question on the "long form" questionnaire from 1970 to 2000, and that DOJ had formerly used that data to assess compliance with Section 2 and in Section 2 enforcement litigation.  AR 664.

300.    Mr. Gary noted that DOJ had begun using citizenship data from the ACS after the Census Bureau discontinued the use of the "long form" questionnaire, but he explained that the ACS does not yield the ideal data for such purposes for four reasons.  AR 664-65.

301.     First, Mr. Gary explained that "[j]urisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, *see Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly." AR664.

302.     Second, because the ACS estimates are rolling and aggregated into one-year, three-year, and five- year estimates, Mr. Gary stated that "they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting." AR 665.

303.     Third, Mr. Gary explained that "the ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. *See* U.S. Census Bureau, Glossary: Confidence interval (American Community Survey), available at https://www.census.gov/glossary/#term_Confidenceinterval AmericanCommunitySurvey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population." AR 665.

304.     Fourth, Mr. Gary noted that "[c]ensus data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. *See* American Community Survey Data 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan." AR 665. Mr. Gary explained that "[h]aving all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process." *Id.*

305.     For all these reasons, DOJ stated that it "believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates." Accordingly, "the Department formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship" and "that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census." AR 677.

306.     Mr. Gary concluded by stating that "the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates," and reiterated DOJ's formal request that the Census Bureau reinstate a citizenship question on the 2020 decennial census. AR 665.

## C. The Department Of Commerce Analyzes DOJ's Request and the Costs and Benefits of Reinstating a Citizenship Question

307.     Following receipt of DOJ's request, the Secretary of Commerce "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond." AR 1313. To that end, the Department of Commerce "immediately initiated a comprehensive review process led by the Census

Bureau." *Id.* "The Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations." *Id.* As part of this process, the Secretary "met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, [his] questions about accuracy and response rates, and their recommendations." *Id.*

308.    The Secretary "agreed to open discussions with DoJ on meeting their data needs," although he did not immediately authorize the technical team to approach DOJ. AR 7263; *see also* AR 8684. The Census Bureau and DOJ have a long history of communication regarding DOJ's needs as regards to data for enforcement of the Voting Rights Act. *See* AR 9203-9216. Nevertheless, DOJ leadership subsequently declined to meet with the Census Bureau to discuss their request, indicating the letter's intent was clear on its face. AR 3460, 5489-5491, 9193.

309.    The Census Bureau assembled a team to perform the technical analysis, led by Dr. John M. Abowd, Chief Scientist and Associate Director for Research and Methodology. AR 3354, 5539-5542, 9339; *see also, e.g.,* 8990, 9005, 9244. That team conducted preliminary analyses throughout the rest of December 2017, preparing one initial set of memoranda by December 22, 2017. *See* AR 5495-5511; *see also* AR 5539-5542, 5553-5564, 5658-5677, 5656-5717, 7763-8261.

310.    On January 4, 2018, the Census Bureau presented its first preliminary memoranda to the Commerce Department summarizing its technical review to date of the Department of Justice's request. AR 3713-3720. The Census Bureau analyzed three alternatives, Alternative A (maintain the status quo), Alternative B (add a citizenship question to the 2020 census questionnaire), and Alternative C (use administrative records to produce block-level CVAP tables), and analyzed the cost and quality implications of each alternative. AR 3713. After a brief summary of the three alternatives, the Census Bureau ultimately recommended Alternative C because it "better meets DoJ's stated uses, is comparatively less costly than Alternative B, and does not harm the quality of the census count." AR 3720. However, the memo noted that the cost estimate for Alternative C had not yet been fully vetted and that the Census Bureau has not acquired all of the administrative data necessary to implement this alternative. AR3719. The team continued its work. *See, e.g.*, AR 5338, 6489-6495, 6533-6542.

311.    On January 19, 2018, Dr. Abowd and his team submitted a more detailed memorandum (hereinafter referred to as "January 2018 Abowd Memo") to the Department of Commerce. AR 1277-85. This memorandum analyzed three alternatives to provide DOJ with the data it had requested – Option A (make no change), Option B (add the question on the 2020 census questionnaire), and Option C (use administrative data to provide citizenship information). AR 1277.

312.    The January 2018 Abowd Memo described certain advantages of Option B, adding a citizenship question to the 2020 Decennial Census, including that it would improve block-level data and would provide a direct measure of self-reported citizenship for the whole population. AR 1278.

313.    The January 2018 Abowd Memo also reported that because the citizenship question was already asked on the ACS, the Census Bureau "would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question. This means that the cost of preparing the new question would be minimal." AR 1279; *see also* AR 415 (Census Bureau presentation on adding questions to the census, stating that "[i]f the question is not currently used in an ongoing survey, the Census Bureau must test the wording of the question").

314.     The January 2018 Abowd Memo also addressed the potential shortcomings of including a citizenship question on the census, including that there would likely be a decrease in the self-response rate, which would lead to higher nonresponse follow-up costs and fewer correct enumerations.  AR 1280-82.  The Memo estimated a potential 5.1% decrease in self-response among noncitizen households.  AR 1280; *see also* AR 456.  The Memo also concluded that the anticipated decrease in self-response would lead to lower quality citizenship data.  AR 1280.

315.     As reflected in the January 2018 Memo, the Census Bureau conservatively estimated that an additional 5.1% of households with at least one noncitizen may not self-respond to the 2020 census questionnaire if a citizenship question were included.  AR 1280; PX-297 at 5-6 (response to Census RFA No. 13).  In the absence of a randomized controlled trial, this estimate was based on a natural experiment that could not definitively assign causation to the citizenship question itself.  AR 1280; PX-297 at 5-6 (response to Census RFA No. 13).

316.     The January 2018 Abowd Memo concluded that Option C, using administrative records, would result in more accuracy since administrative citizenship records are more accurate than self reports and would be less costly.  AR 1283-1285; *see also* AR284-310.  *But see* AR 534-544.  However, high-quality administrative records on citizenship do not cover the entire population.  AR 1283-1285; *see also* AR 66-67, 108-09, 116, 660-62.

317.     The January 2018 Abowd memo ultimately recommended that the Secretary either make no change to the Census Bureau's data collection on citizenship or obtain citizenship status from administrative records for the whole 2020 Census population.  AR 1277.

318.     Following submission of the Census Bureau's January 19, 2018, memo to Department of Commerce leadership, the Department of Commerce prepared a list of 35 questions to the Census Bureau to test and obtain more details about their analysis.  AR 1286-1303, 8987.  The questions were submitted by various members of the Secretary's staff and, thus, represented a variety of views and concerns about the Census Bureau's analysis and recommendations.  *See* AR 1335, 1976-1978, 1980, 2043-44, 2046, 2472-2475, 2504-2505, 8678-8680.  The final list of questions was delivered to the Census Bureau on January 30, 2018.  AR 1974, 12902-12904.

319.     The Census Bureau provided answers to the questions in an iterative process with the Commerce Department (*i.e.*, Commerce received many drafts and partial responses before receiving the final response).  *See, e.g.*, AR 1340-1352, 1599-1626, 1903-1963, 2316-2376, 5212-5215, 5583-5589, 7638-7645.  The final draft of these responses was provided to Commerce on February 2, 2018.  AR 2292-2315.  However, further revisions were made to this version and an updated version was provided on February 6, 2018.  AR 2954-2981, 3441-3459; *see, e.g.*, AR 2702-2711, 3142-3181, 6222-6232.  A final version was provided subsequently, which included a revised answer to question 31, regarding the process that was used in the past to get questions added to the decennial census.  AR 1286-1303, 13023.  The revised answer, as approved by the Census Bureau, specified that, because no new questions had been added to the decennial census in recent years, the Census Bureau did not feel bound by past precedent when considering DOJ's request.  AR 1296; *see* AR 13023.

320.     Secretary Ross and his immediate staff reviewed Census's analyses.  AR 12479.

321.    On February 12, 2018, Commerce and Census Bureau groups, including Secretary Ross himself, met to discuss the Census Bureau's analysis to date.  AR 9334-9335.[7]  At this meeting, the Secretary requested that the Census Bureau analyze a fourth alternative, Option D, which would combine Options B and C.  AR 1309; AR 9433-9434.

322.    The Census Bureau provided two memoranda analyzing Option D on February 23, 2018, and March 1, 2018.  AR 1304-1312, 2935-2940, 4713-4721; *see*, *e.g.,* AR 2180-2198, 4454-4462, 5613-22, 5945-5948, 5967-6155, 6159-6173.  In addition, the Census Bureau continued to answer questions posed by the Commerce Department until late March, 2018.  *See, e.g.,* AR 2670-2680, 2894-2901, 5577-5581, 5608-5610, 5798-5803, 9370, 9680-9721.

323.    The Secretary reviewed over 50 incoming letters and emails from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census.  AR 1313; *see* AR 775-792, 794-1165, 1176-1193, 1195-1197, 1210-1212, 1217-1220, 1222-1255, 1262-1273; *see also* AR 1768-1771, 3563-3565, 3915-3917.  He also monitored views of the public more generally, as represented in media accounts.  AR 1313; *see* AR 666-733.  In addition, he personally had conversations on the citizenship question with over 24 diverse, well-informed and interested parties, diligently selected by his staff to represent a broad range of views.  AR 1313*; see* AR 1194, 1198-1209, 1213-1216, 1221, 1256-1261, 1274-1276; *see also* AR 1638, 1798, 1807-08, 1815-1816, 2599-2600, 2604, 3491, 8392-8467.

---

[7] AR 9334-9335 is a list of action items drafted by a Census Bureau employee on February 13, 2018, "from yesterday's meeting with the Secretary."  AR 9433-9434 (cited in the next sentence of the paragraph in the text) is an email chain which begins on February 14, 2018, with a discussion of "combined options B and C" and contains a reference by Dr. Abowd to "the elaborations that the Secretary requested."  The February 12 meeting is also briefly alluded to in AR 4929, although it is described only as "the meeting on Monday on citizenship."  No further notes or minutes of this meeting exist.

Defendants believe that the foregoing documents in the Administrative Record are sufficient to establish the fact and content of the February 12 meeting for the purposes of this Court's review.  Although the references to the February 12 meeting do not mention discussion of the application of disclosure avoidance techniques to block level data, as this Court inquired, this information was analyzed by the Census Bureau prior to February 2018 in developing its recommendations and the analysis is in the administrative record.  *See* AR7704.  It therefore must be presumed that the Secretary constructively considered this information.  *See Styrene Info. & Research Center, Inc. v. Sebelius*, 851 F. Supp. 2d 57, 64 (D.D.C. 2012) ("The mere fact that the subgroup drafts were not ultimately passed on to the final decisionmaker does not lead to the conclusion that they were not before the agency."); *Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1260 (D. Colo. 2010) (holding that decisionmakers "constructively considered" deliberations that "so directly served as the basis for the recommendation ultimately passed on to the Assistant Secretary and other relevant decision makers").

As Defendants have maintained throughout this litigation, this Court's review is properly limited to the administrative record, not "some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  It would therefore be improper for Defendants to create and then submit a document summarizing the meeting, or for the Court to consider extra-record testimony as to the meeting.  *See Community for Creative Nonviolence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (rejecting government's affidavit in record review case because it "added nothing–it either duplicated the record and was thus unnecessary or it added to the record and was thus beyond the record").  However, should the Court determine that it is permitted to consider extra-record material in this case, the trial testimony concerning this meeting is summarized in paragraphs 404-408 below.
.

### D.  The Secretary Issues His Decision

324.    On March 26, 2018, Secretary of Commerce Wilbur Ross issued a decision memo announcing his decision to reinstate a citizenship question on the 2020 Decennial Census.  AR 1313-20.

325.    In the decision memo, the Secretary stated that the decision was being made in response to the December 12, 2017 DOJ letter, and that after he had received the DOJ request, "I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond.  To that end, the Department of Commerce ('Department') immediately initiated a comprehensive review process led by the Census Bureau."  AR 1313.

326.    The Secretary stated that this review included legal, program, and policy considerations, and that he had met with Census Bureau leadership on multiple occasions to discuss their review of the DOJ request and their recommendations.  He also noted that he had received and reviewed over fifty letters from stakeholders regarding the issue of reinstatement of a citizenship question on the 2020 Census.  AR 1313.

327.    The Secretary first observed that the citizenship question had been a feature of almost every decennial census for over a century, and had been included in some form on the "long form" or ACS for decades, and was thus a well-tested question.  AR 1314.

328.    The Secretary stated that many stakeholders as well as the Census Bureau itself had raised concerns that the reinstatement of a citizenship question would have a negative impact on the response rate for non-citizens, but also noted that no one had produced evidence that the response rate would decline "materially" as a result of the inclusion of a citizenship question.  The Secretary also cited a discussion with the survey agency Nielsen, in which some evidence was produced that other sensitive questions on the ACS had not led to any "appreciable decrease in response rates."  AR 1315.

329.    The Secretary observed that while there was recent evidence that self-response rates on the ACS were lower than on the 2010 decennial census, there were a number of potential causes for this separate and apart from the citizenship question, including the outreach efforts and increased public awareness for the decennial census and the increased burden of responding to the much longer ACS.  AR 1315.

330.    Weighing the information that had been provided to him, the Secretary concluded that "while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief."  AR 1316.

331.    The Secretary considered the alternative option of using administrative records to provide the citizenship data requested by DOJ, but noted that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population."  AR 1316.  The Secretary noted that this meant that a significant portion of the American voting age population could not be matched to administrative records and would have to have their citizenship information imputed.  AR 1316.

332.    The Secretary finally determined that a combination of using administrative records, which the Census Bureau could prioritize the development of before the 2020 census, and reinstating a citizenship question on the 2020 decennial census questionnaire, was the best option to provide DOJ the data it requested.  AR 1317.

333.    In making this determination, the Secretary explained that including the question on the 2020 decennial census will give each person an option to provide an accurate answer, and would only impose a minimal imposition of a single extra question which by law could only be used anonymously and for statistical purposes.  AR 1317.

334.    The Secretary also noted that the use of administrative records in conjunction with a question on the 2020 Decennial Census questionnaire would provide a method for gaining citizenship data for people who do not respond, as well as providing a check for accuracy for those who respond with an inaccurate answer.  AR 1317.

335.    The Secretary noted that "I have carefully considered the argument that the reinstatement of a citizenship question on the decennial census would depress response rate."  AR 1317.  However, the Secretary determined that the "need for accurate citizenship data" outweighed such concerns, particularly in light of the lack of empirical evidence that the self-response rate would be materially impacted by the reinstatement of a citizenship question.  AR 1317.

336.    The Secretary also considered the concern that reinstatement of a citizenship question would increase non-self-response rates by imposing an additional burden on those responding to the questionnaire.  However, the Secretary noted that there was very limited empirical evidence that the inclusion of one additional question would have any material impact on self-response rate.  AR 1318.

337.    In addition, the Secretary considered whether the sensitivity of a question about citizenship could lead to a decrease in self-response rates.  However, the Secretary noted that there was evidence from Nielsen studies, as well as past census initiatives, that the inclusion of such a sensitive question would not materially change the response rate.  AR 1318.

338.    The Secretary further considered the potential that the reinstatement of a citizenship question on the 2020 Decennial Census would lead to increased costs.  Ultimately, the Secretary determined that a possible increase in costs for NRFU efforts if the citizenship question led to lower initial self-response rates was difficult to assess, but evidence demonstrated that the impact on cost of NRFU would ultimately likely be very small as the percent decrease in overall self-response estimated to be potentially caused by the citizenship question (1/2%) was within the percent decrease (3%) accounted for in the Department's recent Lifecycle Cost Estimate for the 2020 census.  AR 1319; *see* AR 173.

339.    The Secretary further noted that some form of citizenship question had been a part of Census questionnaires for centuries, and that censuses in many other major democratic nations, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, all include a question asking about citizenship on their respective censuses.  AR 1319.

340.     The Secretary ultimately concluded that while it could not definitively be determined what the impact of a citizenship question would be on response rates, the value of having more complete and accurate citizenship data outweighed those concerns.  AR 1319.

341.     The Secretary announced that "after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request. To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form."  AR 1320.

## VII.  Proposed Findings of Fact from Trial[8]

### A.  The ACS

342.     The ACS contains margins of error.  Tr. 841:18-19.

343.     The ACS is not a count of an enumeration of the population; rather it is a sample. Tr. 846:6-8; Tr. 847:6-8.

344.     Because the ACS is based on a sample of the population, it is subject to sampling errors.  Tr. 847:19-23.

345.     The coverage errors contained in the decennial census are also contained in the ACS. Tr. 848:15-22.

346.     The ACS data are not publicly available at the block level.  Tr. 847:24-848:1.

347.     Rather, the ACS reports data at the block-group level.  Tr. 848:2-3.

348.     Because of the limitations on the data contained in the ACS, Plaintiffs' expert on Voting Rights Act enforcement, Dr. Lisa Handley, uses estimation techniques on occasion to estimate block-level data.  Tr. 848:4-7.

349.     Dr. Handley is aware that studies show that people do not answer the citizenship question accurately on the ACS, and that could affect her analysis under the first *Gingles* precondition.  Tr. 841:20-842:2-9.

350.     The decennial census is not a sample, and is designed to provide an actual count of the people.  Tr. 847:3-5.

351.     Dr. Handley does not know the primary purpose of the ACS.  Tr. 847:1-2.

---

[8] The government maintains that the merits of Plaintiffs' APA claim should be decided solely on the administrative record. The proposed findings of fact from trial are offered only for the issue of standing and are offered for the merits of the APA claim only if the Court determines that it is appropriate to consider extra-record evidence.

**B.  Secretary Ross Examines Census Issues After His Appointment as Secretary**

352.  The number-one priority of the President, the Secretary, and the Department as a whole with regard to the census was, and remains, to conduct a "complete and accurate census." Dunn Kelley Dep. 38:12-15, ECF 493; *id.* at 308:2-4.  The issues the Secretary and his staff began looking at soon after he was sworn in as a Secretary included the budget, leadership, operational readiness, and preparation for the 2018 End-to-End Test, among which the budget was the largest and most immediate issue.  Dunn Kelley Dep. 40:15-42:17; *id.* 270:5-275:22 (discussing budget); Comstock Dep. 223:13-224:12 (discussing budget).  Notably, Secretary Ross tended to take a fairly active role in policy decisions; as one senior policy adviser at Commerce explained, "a lot of decisions . . . would begin rising to his level that maybe under other Secretaries might not." Langdon Dep. 83:3-5, ECF No. 510; *see also id.* at 96:20-22 (noting that "when [the Department is] notifying, in this case, the Hill on a major policy decision, [Secretary Ross and Deputy Chief of Staff and Chief of Policy Earl Comstock] want to know how it works and what the content is").

353.  Secretary Ross's questions during this time period about the absence of a citizenship question on the census, and whether it made sense to reinstate such a question, were not unusual – Acting Census Bureau Director Ron Jarmin testified that "[t]here was interest in the citizenship question in 2010, as well."  Jarmin Dep. 20:5-14, ECF No. 511.  Senior Policy Adviser David Langdon explained that, in general, "there's a learning process that . . . people go through when they're dealing with these surveys, in trying to figure out what we ask, why we ask it, why things are on there."  Langdon Dep. 162:1-8.

354.  Secretary Ross was not aware of any desire by the Trump Administration to add a citizenship question to the 2020 decennial census in the February 2017 timeframe, or at any other point in time.  PX-298 at 28 (response to Commerce RFA No. 48); at 42-43 (response to Commerce RFA No. 90.  In particular, he had no knowledge as to what views, if any, President Trump may have had regarding the inclusion of a citizenship question on the 2020 decennial census.  PX-298 at 29 (response to Commerce RFA No. 50).  He did not discuss the issue with President Trump.  PX-298 at 41 (response to Commerce RFA No. 87) at 48 (response to Commerce RFA No. 104).  Nor was Secretary Ross aware of any views that Stephen Miller had, if any, concerning the inclusion of a citizenship question on the 2020 decennial census.  PX-298 at 29 (response to Commerce RFA No. 52).

355.  Initially, Secretary Ross wanted to know why the question was not on the census questionnaire and other general background "factual information" such as whether undocumented aliens are enumerated for apportionment purposes.  Comstock Dep. 55:12-17, 63:18-21, 65:19-66:3, 67:9-18, 69:13-15, 82:9-13; Langdon Dep. 149:3-16, 175:19-176:1.  Before the end of April 2017, Secretary Ross asked others in the Commerce Department to look into the possibility of reinstating a citizenship question on the 2020 decennial census.  PX-298 at 33 (response to Commerce RFA No. 61); Comstock Dep. 135:17-21.

356.  On April 5, 2017, Steven Bannon called Secretary Ross to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census.  PX-302 at 3; PX-298 at 31 (response to Commerce RFA No. 57).  Mr. Bannon did not advise Secretary Ross that he wanted a citizenship question included on the 2020 decennial census during this call.  PX-298 at 31 (response to Commerce RFA No. 57).

357.    By May, Mr. Comstock received "instructions to review and consider and present to [the Secretary] information that would allow him to make a decision on whether or not to take final action."  Comstock Dep. 151:3-9; *see also* Langdon Dep. 116:4-8.

358.    As part of their early deliberations, the Secretary and his staff contacted the Justice Department because DOJ was the agency that "had requested the citizenship question on the ACS and … they utilized the ACS data for Voting Rights Act information."  Comstock Dep. 153:14-19. On May 4, 2017, Mr. Comstock reached out to DOJ to "see[] what kind of level of interest the Justice Department would have in requesting the citizenship question be asked -- added to the decennial census" and whether "it might be useful for them to have citizenship data at a more granul[ar] level."  Comstock Dep. 175:13-176:9; *see also id.* at 170:5-171:13, 272:11-273:3; Dunn Kelley Dep. 126:18-127:12; PX-298 at 35 (response to Commerce RFA No. 68).   Mr. Comstock explained that "what we asked them was if they could use this information, and if so, then they would need to request it."  Comstock Dep. 297:4-8.

359.    Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 decennial census with former Attorney General Sessions in the spring of 2017 and at subsequent times.  PX-302 at 3; Comstock Dep. 233:17-22.

360.    Given the other issues regarding the census that the Department was focusing on at the time, the question of reinstating a citizenship question "was not a front-burner issue" during this period.  Dunn Kelley Dep. 131:4-132:9; *see also* Comstock Dep. 113:2-6 (agreeing that the issue of whether to reinstate a citizenship question "was important to the Secretary" but stating that the Secretary "was working on a lot of different issues at the time"); *id.* at 112:19-20 (Mr. Comstock stating that this issue involved about 1% of his (Mr. Comstock's) time).  The Secretary was also working on other issues concerning the content of the census at the time, in particular, whether there should be question asking about Middle Eastern or North African heritage ("MENA") or sexual orientation and gender identity ("SOGI").  Dunn Kelley Dep.; Comstock Dep. 140:14-142:3.

361.    At some point during the spring of 2017, Secretary Ross came to believe that the inclusion of a citizenship question on the 2020 decennial census could be warranted, but did not reach a final conclusion on the issue until March 2018.  PX-298 at 31-32 (response to Commerce RFA No. 58).

### C.  DOJ's Request for Citizenship Data from the Decennial Census for VRA Enforcement Purposes

362.    After being contacted by the Secretary of Commerce, the Attorney General decided that the Department of Justice would request that the Census Bureau reinstate a citizenship question on the census questionnaire.  Gore Dep. 442:13-19.

363.    John Gore, Acting Assistant Attorney General for the Civil Rights Division, drafted the letter requesting the reinstatement of the citizenship question.  Gore Dep. 127:12-17.

364.    "[C]itizenship data at the block level is necessary to bring Section 2 cases."  Gore Dep. 33:2-8.

365.    "The Department of Justice is always trying to find the best possible data, whether it's from one source or multiple sources, to analyze jurisdictions for potential Section 2 violations and to bring appropriate Section 2 enforcement actions."  Gore Dep. 25:1-14.

366.    The Department of Justice investigates hundreds of Section 2 matters, and not all investigations result in the filing of a complaint in district court.  Tr. 853:9-15.

367.    "[H]aving the most complete and accurate data regarding citizenship rates that the Census Bureau could provide would allow [DOJ] to fulfill its commitment to robustly enforcing the Voting Rights Act."  Gore Dep. 26:8-13.

368.    It is the position of the Department of Justice that the decennial census questionnaire is the most appropriate vehicle for collecting CVAP data for purposes of VRA enforcement.  Gore Dep. 169:22-170:5

369.    Mr. Gore stated that CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts.  Gore Dep. 300:5-11.  However, Mr. Gore is not himself a statistician and has no experience drawing districts or using census block-group-level data to estimate block-level data.  Gore Dep. 17:21-18:14, 167:14-19.  The Census Bureau is therefore better situated than he is to determine the accuracy of various forms of CVAP data.  Gore Dep. 39:16-40:3.

370.    Because of the way that the three prongs of *Gingles* have been interpreted by some appellate courts, it is necessary to have CVAP data for Hispanics.  Tr. 844:1-3.

371.    Some appellate courts have determined that CVAP data at the block level is necessary to determine if Hispanics meet the first prong of *Gingles*.  Tr. 844:4-12; Tr. 844:22-845:1.

372.    The P.L. 94-171 data does not have the kind of standard errors associated with an estimate based on a statistical sample.  Tr. 49:16-50:1 (Rule 30(b)(6)).  The P.L. 94-171 data file does not have sampling margins of error.  PX-297 at 41 (response to Census RFA No. 130).

373.    In contrast, the tabulation of CVAP data does contain sampling errors.  Tr. 50:3-5 (Rule 30(b)(6)).

374.    The Census Bureau has not made a decision on the way in which it will aggregate the data to the block level for the CVAP table as a public use product, which would be available to the Department of Justice.  Tr. 55:5-20 (Rule 30(b)(6)).  Nor has the Census Bureau decided whether the block-level CVAP data will be included in the P.L. 94-171 data file.  Tr. 56:15-18 (Rule 30(b)(6)).

375.    Although the Census Bureau believes that administrative data would be the best way to provide block-level CVAP data, it has yet to acquire a linked file of administrative data.   PX-297 at 36-37 (response to Census RFA No. 113).

376.    The Census Bureau's request for a meeting with DOJ was discussed internally within DOJ.  Gore Dep. 265:12-22; 268:20-269:3. The Attorney General ultimately determined not to pursue the meeting with the Census Bureau.  Gore Dep. 271:21-272:6, 274:5-9.

### D.  Dr. Handley's Views About the Sufficiency of the Data in the ACS Are Irrelevant

377.    Dr. Handley uses CVAP data at the block level to determine if Hispanics meet the first prong of *Gingles*.  Tr. 844:4-10.

378.    Dr. Handley has calculated the block-level citizenship data in her work, including in *Village of Port Chester* and *Lopez v. Abbott*.  Tr. 845:4-16.

379.    Dr. Handley agrees that some courts require a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected when citizenship is at issue.  Tr. 845:16-21.  Indeed, Dr. Handley has performed calculations of the citizen voting-age population at the block level on behalf of the Department of Justice.  Tr. 845:22-846:4.

380.    The functional analysis that Dr. Handley has employed does not relate to the first of the *Gingles* preconditions.  Tr. 850:22-25.

381.    The first *Gingles* precondition does not require a functional analysis; rather, it simply requires a bare majority of voting-age citizens.  Tr. 851:1-9.

382.    The Gary letter focuses on the first *Gingles* precondition.  Tr. 851:10-12.

383.    The federal register notice that Dr. Handley relies upon, PDX-322, concerning her functional analysis addresses guidance concerning the review of redistricting plans submitted to the attorney general for review pursuant to Section 5 of the Voting Rights Act.  Tr. 849:11-16.

384.    After the Supreme Court's decision in *Shelby County*, there are no longer any jurisdictions covered by Section 5 preclearance.  Tr. 849:21-850:2.

385.    After *Shelby County*, jurisdictions are no longer required to submit any changes to the Department of Justice under Section 5.  Tr. 850:3-7.

386.    The Gary letter focuses on enforcement under Section 2 of the VRA.  Tr. 849:17-20.

387.    Dr. Handley was not involved in drafting the Gary letter, and was not involved in the Department of Justice's decision-making process concerning the letter.  Tr. 851:13-19.

388.    Dr. Handley is not offering an opinion in this case about the decision-making process the Department of Justice uses in deciding whether to bring a Section 2 case.  Tr. 852:24-853:8.

389.    Dr. Handley is not an attorney and is not an employee of the Justice Department's Civil Rights Division.  Tr. 853:16-20.

390.    Dr. Handley is not a decision-maker for the Department of Justice.  Tr. 853:21-25.

391.    Plaintiffs' expert Dr. Hermann Habermann testified that the Department of Justice letter did not sufficiently justify a need for block-level citizenship data to warrant a citizenship question on the 2020 decennial census.  Hermann Habermann Aff. ¶¶ 5, 22–33, ECF No. 498-11.

However, the Department of Justice letter explained that using statistical methods to estimate block-level citizenship data from block-group-level citizenship data results in uncertainty in the estimates—a principle that Dr. Habermann acknowledged.  AR 665; Tr. 463:11-17.  The Department of Justice letter also explained that, unlike ACS citizenship data, citizenship data from the decennial census would align in time with the total and voting-age population data from the census already used in redistricting.  AR 665.  Finally, the Department of Justice letter explained that census citizenship data would allow the same data set to be used for redistricting, enforcing the Voting Rights Act, and determining compliance with the Constitution's one-person, one-vote requirement.  AR 664.

### E.  The Department Of Commerce Analyzes DOJ's Request and the Costs and Benefits of Reinstating a Citizenship Question

392.    After receiving DOJ's formal request, the Secretary initiated a three-component process that included legal, technical, and policy reviews.  Dunn Kelley Dep. 99:16-100:16, 139:3-7.  As part of the technical review, the Census Bureau assembled a team of experts to analyze the request.  Dunn Kelley Dep. 136:8-15, 172:6-14.

393.    Under Secretary Dunn Kelley said that during this entire process she wanted to ensure Secretary Ross "got a full breadth of information and opinions," Dunn Kelley Dep. 155:19-21, and the Census Bureau was given "free rei[n] to do what they wanted" to inform the Department of their opinion.  Dunn Kelley Dep. 283:21-284:2.  Dr. Jarmin agreed that they "were trying to take as broad a view as possible" and were not given any particular directions from anyone at Commerce.  Jarmin Dep. 59:9-18, 60:9-20.

394.    There is an established process for adding or altering existing content on the ACS, and for altering existing content on the decennial census.  PX-297 at 9 (response to Census RFA No. 28).  There is no established process for adding content on the decennial census short-form questionnaire.  *Id.*; *see also* Dunn Kelley Dep. 248:21-249:1 ("[T]here was no hard fast guideline in terms of this is a statutory requirement or this is a requirement that has been passed down."); Park-Su Dep. 142:14-143:1 ("Census … indicated … that the Decennial Census did not necessarily have a similar process, to their knowledge, that they could point to.  And, therefore, it would not be an accurate characterization to say that it was the same."); *see also id.* 147:12-18 ("there was an effort that was made by Census to see if they could find the last time a question was added to the Decennial and, when it was added, what process . . . .  And Census, to my recollection, did not have anything to provide.").

395.    In answering one of the questions (question 31 of "Questions on the Jan. 19 Draft Census Memo on the DOJ Citizenship Reinstatement Request") that the Department submitted to the Census Bureau in late January 2017 regarding the process to be followed in adding a question to the decennial census, the Census Bureau summarized the process for adding content *to the ACS* and provided a possible option for adapting that process to the decennial short-form census.  PX-297 at 12 (response to Census RFA No. 33); *see* AR 2303-04.  This answer to question 31, reflected in AR 2303-04, does not set forth the established process for altering existing content on the decennial census short-form questionnaire.  *Id.*  Instead, AR 9867; AR 3890-91; and AR 3560 summarize the process for adding content to the ACS and provided a possible option to adapt that process to the decennial short-form census.  PX-297 at 11 (response to Census RFA No. 30); at 11 (response to Census RFA No. 31); at 12 (response to Census RFA No. 32).

396.    Subsequently, Ron Jarmin, Enrique Lamas, Burton Reist, Christa Jones, Michael Walsh, and Sahra Park-Su worked on revising the response to Question 31. PX-299 at 3. Once Census and the Department of Commerce started to confer on the question and realized that there was no process for adding such a question to the 2020 decennial census because it had not been done in recent memory, the individuals identified above collectively approved the final language. *Id.*

397.    The revised, corrected version of Question 31 may be found at AR 1296. PX-297 at 13 (response to Census RFA No. 37).

398.    The citizenship question did not require cognitive testing because the wording of new questions does not need to be tested when a specific question was previously used on another survey. PX-297 at 16-17 (response to Census RFA No. 49). Thus, the question had been "fully tested" because it had been tested for and used in the ACS. Jarmin Dep. 55:12-18, 140:19-141:1, 215:16-19 ("[T]he technical team, every – you know, management, everybody agreed that this question has been thoroughly tested on the ACS.").

399.    More specific field testing in a decennial census context would be impossible because the census is a unique environment that cannot be duplicated in the context of a test. Jarmin Dep. 222-223. The Census Bureau does not believe it would have learned anything more if the question had been included in the 2018 End-to-End test because the number of respondents in that test was so low and the test was designed to test systems, not question content. *Id.*

400.    After receiving requests like DOJ's, Census's "methodologists and technical people" "typically meet with folks who have a data request . . . to have them describe what they need from a technical perspective so that [Census] can best understand how [Census] would go about seeing if [it] could fulfill it." Jarmin Dep. 33:6-18. In this case, Acting Director Jarmin stated that he would have wanted to ask DOJ "[q]uestions that would have helped us strategize how we would perform disclosure avoidance on these files," Jarmin Dep. 107:13-17, and "what characteristics were the most important for their purposes." Jarmin Dep. 108:6-9. However, it was not unprecedented for agencies requesting data not to meet with the Census Bureau. Dunn Kelley Dep. 193:16-22. Moreover, the Census Bureau has "been doing this [providing data to the Justice Department for enforcement of the Voting Rights Act] for a long time" and therefore has "fully researched and … fully understand[s]" DOJ's needs. Dunn Kelley Dep. 285:19-286:2. Dr. Jarmin "know[s] there had been conversations [in the past] between Census and Justice regarding" the data provided from the ACS, Jarmin Dep. 35:12-2, and stated that "[t]o that extent that [the DOJ request] requires block level data, it is a pretty well-formulated request." Jarmin Dep. 106:22-107:4.

401.    As reflected in its January 19, 2018 memorandum, the Census Bureau developed a cautious estimate that an additional 5.1% of households with at least one noncitizen may not self-respond to the 2020 census questionnaire if a citizenship question were included. PX-297 at 5-6 (response to Census RFA No. 13). In the absence of a randomized controlled trial, this estimate was based on a natural experiment that could not definitively assign causation to the citizenship question itself. *Id.*

402.    After the Commerce Department leadership reviewed the January 19, 2018, memorandum prepared by Dr. Abowd, they "came back with questions. And so there was an effort to compile those questions because different people had different questions." Park-Su Dep. 136:25-137:9. This process of developing the questions and providing the answers "was iterative. It was

collaborative." Dunn Kelley Dep. 220:8-18. "[A]ny answers that were written were viewed and looked at across the groups," Dunn Kelley Dep. 250:19-20, and "there were other meetings. … So there were lots of dialoging and conversation going on." Dunn Kelley Dep. 225:17-226:5; Comstock Dep. 323:2-4 (multiple meetings). Secretary Ross was at many of these meetings. Dunn Kelley Dep. 226:6-7.

403. On February 12, 2018, there was a meeting between the Department of Commerce and the Census Bureau, including Secretary Ross, to discuss the Census Bureau's analysis and recommendations. Dunn Kelley Dep. 227:18-21; Trial Tr. 883:17-884:14, 1098:25-1100:9; PX-298 at 59 (response to Commerce RFA No. 132). This meeting was attended by "a compliment of the entire group of the three groups" that were looking at the issue – legal, technical and policy. Dunn Kelley Dep. 221:9-222:10.

404. Dr. Abowd testified that, at this meeting, the Secretary did not appear to have made up his mind yet. Trial Tr. 1098:25-1099:17. The Secretary asked questions for about an hour on topics such as sampling, weights, missing data, and quality of administrative record data "that indicated to [Dr. Abowd] that he [the Secretary] had a thorough understanding of the issues in [the Census Bureau's] memo." Trial Tr. 884:6-10, 1098:25-1100:9. Dr. Abowd also stated that the Census Bureau reminded the Secretary and the Under-Secretary that the Bureau "would be using disclosure-avoidance procedures at the block level." Trial Tr. 1047:3-16. Dr. Abowd testified that this meeting was a "very open discussion with both the Under Secretary and the Secretary." Trial Tr. 991:2-20.

405. The Secretary "quickly ho[m]ed in on that none of the three options were perfect. …. [E]ach one has respective strengths and weaknesses." Jarmin Dep. 121:15-122. According to Mr. Comstock, "the conclusions of the Census Bureau to staff and some of their assertions did not hold up under cross-examination." Comstock Dep. 321:15-19.

406. In addition, what the Census Bureau "couldn't refute was the fact that under their proposed approach, they would have had to impute—again, based on statistical models—the citizenship of 25 million voting age citizens. That was not a complete and accurate picture as far as the Secretary was concerned." Comstock Dep. 350:20-351:21; *see also* Langdon Dep. 278:14-279:4 (noting that the Census Bureau "had a limited set of administrative records to go on"). The Secretary's "focus is on a complete and accurate count. And as explained earlier, the Option C alternative, which was to use the administrative records only, would have inquired us to impute—so, in other words, fill in the blanks—for 25 million voting age citizens. That was not something Secretary Ross was prepared to have the department do." Comstock Dep. 423:7-15; *see also* Jarmin Dep. 399:22-399:4 ("I think his concern is the same concern that we all have, that imputed data is lower quality than nonimputed data.").

407. Accordingly, "the Secretary asked for the hybrid model," which would combine two of the options the Bureau had presented. Jarmin Dep. 121:15-122; *see also* Comstock Dep. 350:20-351:21 ("So the Secretary said this is why we need to look at combining the two approaches, B and C, to come up with Alternative D. Because in the absence of that, we don't have good enough data on which to build the formula to impute those people that we would have to because we don't have answers on what their citizenship is."); Tr. 965:15-966:5.

59

408.     Also as part of the review process, Departmental and Census Bureau staff set up calls between Secretary Ross and as broad and comprehensive a spectrum of stakeholders as possible.  Dunn Kelley Dep. 333:22-334:3.  It was "very much with a view [the Department] wanted the Secretary to have not only geographic, demographically, but across multiple – multiple groups." Dunn Kelley Dep. 241:6-9; Jarmin Dep. 149:17-150:2 (the Secretary "wanted to get a broad set of interpretations, both pro and con").

### F.  The Secretary's March 26, 2018 Memorandum

409.     The Census Bureau agrees with the statement in Secretary Ross's March 26, 2018 memorandum that "neither the Census Bureau nor the concerned stakeholders could document that the response rates would materially decline."  PX-297 at 25-26 (response to Census RFA No. 83). The term "materially" in that memorandum references the potential decline in self-response rates, estimates of the magnitude of that decline, and the cost and quality implications of such estimates. *Id.*  All Census Bureau estimates regarding a potential decline in the self-response rate are within the budget, planning and operational design of NRFU and other statistical methods used to mitigate any decrease in the self-response rate.  *Id.*

410.     The Census Bureau agrees with the statement in Secretary Ross's March 26, 2018 memorandum that it was difficult to estimate increased costs resulting from NRFU increases due to "the Census Bureau and the Department's inability to determine what impact there will be on decennial survey responses."  PX-297 at 26-27 (response to Census RFA No. 85).  Like other aspects of the decennial cost estimation, there is a wide range of values associated with the Census Bureau's cost estimates regarding a citizenship question.  *Id.*  However, all Census Bureau estimates regarding a potential decline in self-response rate are within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  *Id.*

411.     The Census Bureau agrees with the statement in Secretary Ross's March 26, 2018 memorandum that "the Census Bureau's analysis did not provide definitive, empirical support" that "adding a citizenship question could reduce response rates."  PX-297 at 31 (response to Census RFA No. 95).  The Census Bureau set forth empirical evidence, derived from a natural experiment, that the self-response rate could potentially decline for identifiable subpopulations.  *Id.*  Such evidence is probative of whether "adding a citizenship question could reduce response rates," but it is not "definitive, empirical support" for that proposition.  *Id.*

### G.  The Citizenship Question Was Adequately Tested

412.     There are four OMB Statistical Policy Directives ("SPD"), Tr. 1102:1 – 1104:8, each of which applies to the Census Bureau, Tr. 1104:3 – 1104:11.  These SPDs do not set forth specific rules, but rather provide guidelines for agencies to implement standards and internal practices that are in conformance with them.  Tr. 1104:12 – 1104:21.  As part of the OMB regulatory process, the Chief Statistician of OMB reviews whether statistical products are in compliance with the SPDs.  *Id.*

413.     The Census Bureau set up its own quality standards that are meant to generate statistical products in conformance with all of the SPDs such that the operations of the Census Bureau following these quality standards would be expected to obtain OMB clearance without difficulty.  Tr. 1104:22 – 1105:8; PX-260.

414.     Most pertinent here is Standard 2.3 of SPD 2, which sets forth guidelines for the life cycle of a survey instrument, from conceptualization through design execution, publication, and curation.  Tr. 1103:1 – 1103:14; PX-359.  Census Bureau sub-requirement A2-3.3 governs the development of questionnaire design components in compliance with SPD 2.  Tr. 1105:21 – 1106:7; PX-260.  This sub-requirement, and its attendant notes, specifically acknowledges that the Census Bureau operates under both budget and time constraints, which must be incorporated into decisionmaking.  Tr. 1107:2 – 1108:9.

415.     The note under sub-requirement A2-3.3 explains: "pretesting is not required for questions that performed adequately in another survey."  PX-260 at 18.  This is a cost-saving measure allowed by OMB when senior methodologists at the Census Bureau agree that a question was properly tested, and that the context in which it was tested was sufficiently similar that it could be brought into a new survey without pretesting.  Tr. 1107:11 – 1108:9.

416.     The note under sub-requirement A2-3.3 also explains that "[o]n rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting."  PX-260 at 18.  The note goes on to provide that in such situations, "[i]f no acceptable options for pretesting can be identified, the program manager must apply for a waiver."  PX-260 at 18.  Such a waiver request would be made through the Census Bureau's Methods and Standards Council, which is chaired by Dr. Abowd.  Trial Tr. 1390:21-1391:6.  If the Census Bureau determines that the ACS citizenship question required a waiver before being used on the 2020 Census, it could seek such a waiver prior to seeking OMB approval.  Trial Tr. 1391:7-11.  In that event, if OMB disagreed with the Census Bureau's waiver determination, OMB could order additional testing before approving the 2020 Decennial Census questionnaire.  Trial Tr. 1391:24-1392:4.

417.     Before being included on the ACS, the citizenship question that will appear on the 2020 Census underwent extensive testing, including cognitive testing and field testing.  Tr. 1100:10 – 1101:22.  This testing, in conjunction with 41 million households receiving the ACS questionnaire, satisfy sub-requirement A2-3.3's exception for pretesting.  Tr. 1108:10 – 1108:16.  The question was thoroughly tested for the ACS, and the senior executive staff at the Census Bureau determined that that testing was adequate testing for the question's inclusion on the 2020 Decennial Census given logistical constraints.  Trial Tr. 1252:5-10.

418.     The ACS citizenship question was therefore the best available choice for the 2020 Census given the constraints of quality, cost, time, and risk.  Tr. 1110:22 – 1111:8.  And while there has been no thorough testing of a citizenship question in the current macro political environment, Trial Tr. 1259:8-10, it is not Census Bureau practice to retest previously used questions due to changes in the macro political environment, Trial Tr. 1389:15-19.

419.     This situation is not unprecedented.  The 1970 long-form questionnaire used the Hispanic-origin question from the CPS without further pretesting.  Tr. 1112:5 – 1112:24.  And the 1990 short-form questionnaire used a completely untested question regarding race.  Tr. 1111:9 – 1111:24.  Neither of these questions negatively impacted their respective censuses.  Tr. 1111:25 – 1112:4; 1112:25 – 1113:14.

420.     And while Dr. Abowd's January 2018 analysis revealed that over 30% of responses to the ACS citizenship question were in disagreement with administrative records, this was the first evidence that the Census Bureau had encountered suggesting any issue with the citizenship question.

Tr. 1108:17 – 1109:9.  Thus, although the citizenship question does not appear to be performing adequately on the ACS, Tr. 1287:20-1288:2, much more analysis is needed to determine how best to handle the ACS citizenship question.  Tr. 1282:15-1283:6.

421.    In any event, the Census Bureau's obligation is not to determine how OMB will interpret its guidelines.  Tr. 990:12 – 990:15.  Given all available information, OMB must decide whether to clear the 2020 Census questionnaire with a citizenship question.  Tr. 1109:24 – 1110:11. If OMB thinks that the questionnaire should undergo further testing, it can work with the Census Bureau to do so before issuing a clearance number.  Tr. 1110:12 – 1110:21.  And although Plaintiffs elicited extensive testimony regarding a purportedly "well established" process that was supposedly not followed, Tr. 10004:19 – 1014:23; PX-140, the Census Bureau has indeed followed or is currently following each step of this process, including consultation with OMB.  Tr. 1392:5-1393:11; PX-134 at 7.

422.    Plaintiffs' experts John H. Thompson and Dr. Habermann testified that the Census Bureau did not properly test the citizenship question before including it on the 2020 census.  John H. Thompson Am. Decl. ¶¶ 13, 43-96, ECF No. 516-1; Hermann Habermann Aff. ¶¶ 8, 55-68, ECF No. 498-11.  However, the Census Bureau has no general written policy establishing testing procedures for questions being added to a decennial census.  Tr. 566:2–20.  The testing procedures that Mr. Thompson testified should have applied to the citizenship question were derived from two examples in which the Census Bureau considered changing the wording or form of questions already on the decennial census questionnaire.  Tr. 566:21–567:14.  By contrast, the citizenship question being added to the 2020 decennial census already appears on the ACS with the same wording.  Tr. 567:15–21.  The citizenship question was completely and thoroughly tested before it was included on the ACS.  Trial Tr. 567:22–568:13.  If the OMB were to determine that the citizenship question did not meet OMB testing requirements, it could order further testing of the 2020 census questionnaire before approving it for use in the 2020 decennial census.  Trial Tr. 466:19–21.  The importation of the citizenship question from the ACS to the 2020 decennial census thus did not violate any Census Bureau testing procedures.

423.    Plaintiffs' expert Dr. Hillygus testified that she believes that the Census Bureau did not adequately test the citizenship question before reinstating it on the 2020 Decennial Census. Trial Tr. 144-73.  Dr. Hillygus's opinion in large part relied upon the Census Bureau's Standard on Pretesting Questionnaires and Related Materials for Surveys and Censuses, PX-364, which she asserts emphasizes the necessity of conducting pre-testing in situations such as the one before the Court.  Trial Tr. 154:21-155:10.

424.    However, Dr. Hillygus's opinion is significantly undermined by the U.S. Census Bureau's Statistical Quality Standards, which expressly state that "[p]retesting is *not* required for questions that perform adequately in another survey."  PX-260 at 18 (emphasis added).  Here, Dr. Hillygus acknowledged during testimony that the text of the citizenship question to be included in the 2020 Decennial Census is identical to the text of the citizenship question which has appeared on the ACS in recent years, Trial Tr. 181:14-21.  Dr. Hillygus also did not deny that the question has been adequately tested for inclusion on the ACS.  Trial Tr. 180:22-181:13.

425.    Dr. Hillygus's opinion that the citizenship question has not been adequately tested for inclusion on the 2020 Decennial Census also relies upon her opinion that respondents would have a different perception of the question on the 2020 Decennial Census than they would of the

exact same question on the ACS.  Trial Tr. 159:3-160:17.  However, Dr. Hillygus acknowledges that respondents are frequently unaware of the purpose behind the questions being asked on census questionnaires, Trial Tr. 180:13-20, and acknowledges that she has not done, and is not aware of, any studies done specifically on whether perception of the purpose of the citizenship question changes at all based on different placement or prominence on a questionnaire, Trial Tr. 180:8-12.

### H. *Alternative to Citizenship Question*

426.    Dr. Habermann testified that using administrative records to generate block-level citizenship data was a less costly and better-quality alternative to reinstating a citizenship question on the 2020 census. Habermann Aff. ¶¶ 7, 47–54, ECF No. 498-11. However, Dr. Habermann acknowledged that using statistical methods to estimate block-level citizenship data from block-group-level citizenship data results in uncertainty in the estimates. Trial Tr. 463:11–17.

427.    Dr. Habermann testified that creating a database on citizenship status will likely damage the Census Bureau's credibility. Habermann Aff. ¶¶ 9, 69–77, ECF No. 498-11. However, Plaintiffs failed to show that any evidence about the citizenship question's likely effect on the Census Bureau's reputation was before Secretary Ross when he decided to reinstate a citizenship question.

428.    Dr. Habermann testified that the United Nations recommendations on population censuses do not support Secretary Ross's decision to reinstate a citizenship question on the 2020 census.  Habermann Aff. ¶¶ 10, 78–85, ECF No. 498-11. However, Dr. Habermann acknowledged that citizenship is one of the core recommendations in the United Nations Principles and Recommendations for Population and Housing Censuses. Habermann Aff. ¶ 82, ECF No. 498-11. Dr. Habermann acknowledged that the fact that citizenship is a core recommendation means that a global consensus supports considering the topic for inclusion on a country's census. Habermann Aff. ¶ 84, ECF No. 498-1.

### I. *The August 6, 2018 Working Paper*

429.    As reflected in an August 6, 2018 working paper "Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census," the Census Bureau developed a cautious estimate that an additional 5.8% of households with at least one noncitizen or one person of unknown citizenship status may not self-respond to the 2020 census questionnaire if a citizenship question were included.  PX-297 at 9 (response to Census RFA No. 24).  In the absence of a randomized controlled trial, this estimate was based on a natural experiment that could not definitively assign causation to the citizenship question itself.  *Id.*

430.    The August 6, 2018 working paper utilizes potential declines in self-response rates of households with at least one non-citizens or one person of unknown citizenship status of 5.1 and 5.8 percentage points to develop its cost and quality estimates.  PX-297 at 9 (response to Census RFA No. 27).

### J. *The May 2018 Proposed RCT*

431.    In or around May 2018, Census Bureau personnel drafted a proposal for an RCT to analyze the potential effects of a citizenship question to the decennial census.  PX-297 at 17 (response to Census RFA No. 52).  Karen Dunn Kelly was consulted and affirmed the Census

Bureau leadership's decision not to conduct the proposed RCT.  PX-297 at 18-19 (response to Census RFA No. 57).

## VIII.   Plaintiffs Have Not Proven An Equal Protection Violation

432.   Plaintiffs have been unable to identify any information, either in the administrative record or based on evidence or testimony introduced at trial, that shows that the Secretary's decision was motivated by any unlawful discriminatory animus towards person of any race or national origin. The letter sent by the Department of Justice formally requesting the inclusion of a citizenship question specifically noted that the Department was requesting up-to-date citizenship data at the census-block level so as to avoid the "wrong result" of drawing a single-member district in which a minority group constituted a majority of the voting-age population but not the majority of the citizen voting-age population.  AR 663-64.  The Department of Justice's request for the inclusion of the citizenship question was therefore designed to protect minority groups.

433.   In announcing his decision to reinstate a citizenship question on the 2020 decennial census, the Secretary cited the Department of Justice's request for citizenship data to assist with Voting Rights Act enforcement as the reason as the motivating factor behind his decision.  AR 1313-20.  There was no indication of any discriminatory animus expressed in the Secretary's memo.

434.   Plaintiffs are unable to point to any evidence whatsoever in the administrative record that the Secretary ever expressed any discriminatory animus towards any particular group that in any way motivated his decision to reinstate a citizenship question on the 2020 decennial census.

435.   Plaintiffs likewise did not produce any evidence or testimony at trial that the Secretary expressed any discriminatory animus towards any particular group that motivated his decision to reinstate a citizenship question on the 2020 decennial census.

436.   If Plaintiffs argue that the Secretary's limited communications with Steven Bannon early in 2017 are somehow probative of discriminatory animus on the part of the Secretary, that argument is unfounded.  The record shows that Bannon called the Secretary in Spring 2017 to ask the Secretary if he would be willing to speak to then Kansas Secretary of State Kris Kobach about the possibility of including a citizenship question on the decennial census.  *See* Defs.' Second Supp. Resp. to Pls.' First Inter., at 3.  And the record shows that the Secretary did communicate with then-Secretary Kobach, and that Kobach urged the Secretary to add an entirely new question asking respondents about their legal status.  AR 763-64.  However, as this Court recognized in its order denying Plaintiffs' motion for leave to depose former Secretary Kobach, "the timing and nature of the communications between Mr. Kobach and Secretary Ross" and "the fact that Mr. Kobach is one of many people outside the Commerce Department who communicated with Secretary Ross about the citizenship question" indicate that any communications between the Secretary and Mr. Kobach were not instrumental in the Secretary's decision.  ECF No. 286.  The fact that the Secretary explicitly did not choose to adopt Mr. Kobach's suggested question about legal status further shows that any influence Mr. Bannon or Mr. Kobach had over the Secretary was very limited.  Finally, and most importantly, even if Plaintiffs had somehow shown that Mr. Bannon or Mr. Kobach was somehow instrumental to the Secretary's decision, they have not shown that Mr. Kobach or Mr. Bannon were motivated by discriminatory animus.

437.     If Plaintiffs argue that departures from ordinary procedure somehow evidence discriminatory animus, that argument is equally founded.  The procedures employed by the Secretary in reaching his ultimate decision neither shed light on his motives nor provide any evidence of discriminatory purpose.

438.     Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.

## IX.    Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext"

439.     Plaintiffs failed to demonstrate that the Secretary did not believe the rationale set forth in his decision memorandum or that the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious.

440.     Plaintiffs have failed to produce evidence sufficient to rebut the presumption of regularity.

441.     There are myriad legitimate reasons more-precise citizenship data could prove useful to both the federal and state governments, including policy formation and resource allocation.  Accordingly, Plaintiffs' reliance upon Mr. Comstock's statement that "[his] job is to figure out how to carry out what [his] boss asks [him] to do . . . and . . . find a legal rationale," Comstock Dep. Tr. at 266:7-8, is taken out of context.  It is unremarkable for an agency head to enter office with predispositions toward certain policy choices and, as Mr. Comstock explained, "what a policy person does" is to "help them find the best rationale to do it," or, "if it's not legal, you tell them that." *Id.* That the Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, and asked his staff to explore such an action, is neither unexpected nor evidence of improper decisionmaking.

442.     To the extent Plaintiffs rely on statements by officials other than the Secretary himself, such reliance is misplaced.  That other officials might have supported the reinstatement of a citizenship question for different reasons does not indicate that the reasons given by the actual decisionmaker—the Secretary—were pretextual.  And most of the statements on which Plaintiffs rely, including general expressions about immigration, do not even concern the census or the citizenship question whatsoever.

443.     Even if relevant, no statements of other officials plausibly give rise to a cognizable inference of pretext here.  Plaintiffs insist, for example, that the Secretary's reliance on VRA enforcement was pretextual because, early in his tenure at the Department of Commerce, the Secretary spoke with Kris Kobach about the potential inclusion of a census question on both citizenship and lawful status.  But Plaintiffs have failed to introduce any evidence at trial that the Secretary shared or was influenced by Kobach's outreach—indeed, the Secretary rejected the latter's proposed question.  Plaintiffs' reliance on this isolated, unsolicited communication as evidence of pretext is misplaced.

444.     Plaintiffs' attempt to demonstrate pretext through the Secretary's congressional testimony is both inappropriate and unpersuasive.  For example, the Secretary in his March 2018 memorandum did not say he "'set out to take a hard look" at adding the citizenship question following receipt of the Gary Letter; the Secretary actually said he "set out to take a hard look *at the*

*request*" to "ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond. AR 1313 (emphasis added). That statement does not necessarily imply that he had not previously considered whether to reinstate a citizenship question, or that he had not had discussions with other agencies or government officials before he received DOJ's formal request. Nor would it have made sense for the Secretary to take a "hard look" at DOJ's request before receiving it.

445.     The Secretary's March 20 statement to Congress that he was "'responding solely to the Department of Justice's request,'" Hr'g on FY 2019 Dep't of Commerce Budget: Hearing Before the Subcomm. On Commerce, Justice, Sci. & Related Agencies of the H. Comm. on Appropriations, 115th Cong. 9 (2018), at 2018 WLNR 8815056, PX-491, was actually in response to a question asking whether he was also responding to requests from third parties, *see id.*

446.     The Secretary's March 22 statement that DOJ "'initiated the request for inclusion of the citizenship question,'" Hr'g on Recent Trade Actions, Including Section 232 Determinations on Steel & Aluminum, Hr'g Before the H. Ways & Means Comm., 115th Cong. 24 (2018), at 2018 WLNR 8951469, PX-480, was in response to a question about whether Commerce planned to include a citizenship question on the 2020 census, not a question about the Secretary's decision-making process. The statement was immediately followed by an acknowledgment that he had been communicating with "quite a lot of parties on both sides of [the] question" and that he "ha[d] not made a final decision, as yet" on this "very important and very complicated question," *id.*

## PROPOSED CONCLUSIONS OF LAW

### I.  Plaintiffs Have Failed to Prove Standing.

#### A.  General Legal Standards for Article III Standing

1.     The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citation omitted).

2.     At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

3.     The standing requirement of "injury in fact" requires an allegation that the plaintiff "'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).

4.     The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) ("[A] plaintiff cannot rely solely on conclusory

allegations of injury or ask the court to draw unwarranted inferences in order to find standing.");
*Treiber v. Aspen Dental Mgmt., Inc.*, 635 F. App'x 1, 3 (2d Cir. 2016) ("[B]ecause the allegation [of injury] is wholly conclusory and unsupported by any facts, it is insufficient to support standing.").

5.      Thus, an alleged future injury must be "*certainly impending*"; "'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

6.      The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

7.      In the census context, merely a showing of differential net undercount is not enough, as there has never been a perfect census count.  *See Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981).  Plaintiffs instead must prove by a preponderance of the evidence that any differential net undercount (1) is specifically attributable to the citizenship question and (2) has a specific injurious effect on Plaintiffs.

8.      As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing these elements of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Defs. of Wildlife*, 504 U.S. at 561.  "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'"  *Id.* (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31 (1979)).

9.      If Plaintiffs cannot prove standing by a preponderance of the evidence, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000), the Court must refrain from addressing the merits of Plaintiffs' Administrative Procedure Act (APA) and equal protection claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

10.      The record demonstrates that none of the Plaintiffs have established Article III standing.  Plaintiffs have not established that they have a concrete and particularized injury-in-fact, that there is a fairly traceable causal connection between the injury and the reinstatement of the citizenship question, and a likelihood that the injury will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

### B.  Plaintiffs Have Failed to Prove a Concrete, Non-Speculative Injury That Is Certainly Impending.

#### 1.  Plaintiffs Failed to Prove that They Face Any Imminent Risk of Concrete Actionable Injury in the Form of Lost Representation or Federal Funding.

11.      Plaintiffs' claims concerning the anticipated effect of an undercount as a result of the reinstatement of a citizenship question leading to a loss of funding or representation are too speculative to satisfy Article III's requirements.  *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding lack of standing where court could not determine "what

effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some of the communities' shares, it likely would have reduced the shares of other communities"); *id.* at 186 ("interstate vote dilution injury is difficult to establish"); *Strunk v. U.S. Dep't of Commerce*, Civ. A. No. 09-1295, 2010 WL 960428, at *3 (D.D.C. Mar. 15, 2010) (rejecting vote dilution claim for lack of standing where plaintiff was "but one citizen of New York and one voter in New York's 11th Congressional District"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which states would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding that "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, *inter alia*, on "the interplay of all other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have to show, at least approximately, the apportionment his interpretation . . . would yield, not only for New York *but for every other State as well*") (emphasis added).

12.     Plaintiffs' asserted injury that the decision to include a citizenship question in the 2020 Decennial Census will result in a dilution of Plaintiffs' representation in the House of Representatives and in the Electoral College is inherently speculative.  Plaintiffs have not, and cannot, establish that the citizenship question will affect the number of Representatives in Congress.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992) (because the plaintiffs had not "shown . . . that Massachusetts would have an additional Representative if the allocation had been done using some other source of 'more accurate' data," they "d[id] not have standing to challenge the accuracy of the data."  *Id.* at 802 (plurality opinion)).

13.     The evidence adduced at trial does not show that the inclusion of the citizenship question "will *likely* result" in a loss of representation for Plaintiffs.  Thus, Plaintiffs have fallen far short of demonstrating an "injury in fact" that is "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural or 'hypothetical' or otherwise speculative."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alleged future injury must be '*certainly impending*"; "'[a]llegations of *possible* future injury' are not sufficient") (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

14.     Moreover, the process of apportionment itself makes any pre-census allegations as to the distribution of representatives (and, therefore, electors) speculative.  Because the apportionment process is based on the population of every state, Plaintiffs cannot establish an imminent injury here because the 2020 census has not yet taken place and projections of state populations will continue to change between now and 2020.  It is therefore impossible to "accurately measure" the population before the actual measurement.  *See Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570, 572 (holding "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" when plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" depending on "the interplay of all the other population factors which affect apportionment").

68

2.   Plaintiffs Failed to Prove That Their Expenditures of Resources Establish Article III
     Injury-in-Fact.

15.     Although an organization's expenditure of resources to avoid a harm can in certain
circumstances constitute an Article III injury-in-fact, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363,
378–79 (1982), the organization cannot "simply choos[e] to spend money fixing a problem that
otherwise would not affect the organization at all." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285
(3d Cir. 2014); *accord Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268,
1277 (D.C. Cir. 1994) (organization's reallocation of resources not sufficient for standing when
organization "and its programs would have been totally unaffected [by defendant's conduct] if it had
simply refrained from making the re-allocation"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416
(2013) (plaintiff "cannot manufacture standing merely by inflicting harm on [itself] based on [its]
fears of hypothetical future harm that is not certainly impending"). Instead, the organization must
show that "it would have suffered some other injury if it had not diverted resources to counteracting
the problem." *Blunt*, 767 F.3d at 285 (emphasis deleted) (citing *La Asociacion de Trabajadores de Lake
Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)); *accord Nat'l Treasury Emps. Union v.
United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) (organization must show that its expenditure
of resources was "a necessary link in achieving the organization's ultimate purpose" and not just a
product of "unnecessary alarmism constituting a self-inflicted injury"); *Ragin v. Harry Macklowe Real
Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (finding standing because organization showed that it "was
forced to 'devote significant resources to identify and counteract'" defendants' unlawful practices).
Whether Plaintiffs' expenditure of resources is sufficient to establish Article III injury thus ultimately
turns on whether, absent that expenditure of resources, the reinstatement of a citizenship question
on the 2020 census would likely cause a differential net undercount in the specific localities
represented by Government Plaintiffs that would lead to a concrete injury to Plaintiffs.

16.     An expenditure of resources is also insufficient to establish Article III standing
unless it is "beyond those normally expended" in the absence of the challenged action. *Nat'l
Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *accord Nat'l Law Ctr. on
Homelessness & Poverty v. Kantor*, 91 F.3d 178, 182–83 (D.C. Cir. 1996) (organization's expenditure of
resources not sufficient to create standing because it was "part of its ordinary program
expenditures").

17.     Defendants are not aware of any case allowing a state, city, or municipal government
to establish Article III standing on a *Havens Realty* "diversion of resources" theory. Even if such a
theory were available to the Government Plaintiffs, the Government Plaintiffs would have to show
that they "would have suffered some other injury if [they] had not diverted resources to
counteracting the problem." *Blunt*, 767 F.3d at 285 (emphasis deleted) (citing *La Asociacion de
Trabajadores*, 624 F.3d at 1088). Thus, whether the Government Plaintiffs' expenditure of resources
is sufficient to establish Article III injury ultimately turns on whether, absent that expenditure of
resources, the reinstatement of a citizenship question on the 2020 census would likely cause a
differential net undercount that would harm the Government Plaintiffs.

18.     In addition, "an organization seeking to establish *Havens* standing must show a 'direct
conflict between the defendant's conduct and the organization's *mission*.'" *Am. Soc'y for Prevention of
Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Nat'l Treasury
Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original); *accord Nat'l
Treasury Emps. Union,* 101 F.3d at 1429-30 ("[I]n those cases where an organization alleges that a

defendant's conduct has made the organization's activities more difficult, the presence of a direct conflict between the defendant's conduct and the organization's mission is necessary—though not alone sufficient—to establish standing."). The rationale for this requirement is that "[i]f the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, [it is] 'entirely speculative' whether the challenged practice will actually impair the organization's activities." *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 25. Notably, when an organization's mission is to vindicate the rights of a particular group, there is no such "direct conflict" between that mission and an undercount of that group in the census because the undercount does not prevent the organization from continuing to pursue its mission of helping that group. *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 181–82 (D.C. Cir. 1996).

19.    The record demonstrates that Plaintiffs failed to establish any tangible, cognizable harm associated with the alleged expenditure of resources associated with the reinstatement of a citizenship question on the 2020 decennial census. *See* Proposed Findings of Fact ("PFOFs") ¶¶ 259-264.

### 3.   Plaintiffs Failed to Prove That Any Lower Quality Demographic Data Will Perceptively Impair Any Concrete and Tangible Cognizable Interest.

20.    Lower quality data in the abstract is insufficiently "concrete" and "tangible" to constitute an Article III injury in fact. *See Warth*, 422 U.S. at 508. Instead, Plaintiffs must show that that lower quality data will perceptibly impair some concrete and tangible cognizable interest. *See Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality op.) (no standing for claim challenging use of inaccurate data in reapportionment because plaintiffs "have neither alleged nor shown … that Massachusetts would have had an additional Representative if the allocation had been done using some other source of 'more accurate' data"); *id.* at 823–29 (Scalia, J., concurring in judgment) (no standing for any claims); *Whitmore v. Arkansas*, 495 U.S. 149, 156–57 (1990) (death-row inmate lacked standing to challenge state's incomplete and skewed database of other capital crimes against which his case could be compared because he failed to show that corrected database would lead state court to set aside his death sentence).

21.    The record demonstrates that Plaintiffs failed to establish any tangible, cognizable harm based on alleged lower quality data resulting from the reinstatement of a citizenship question on the 2020 decennial census. *See* PFOFs ¶ 265.

### C.   Plaintiffs Failed to Prove Injury Traceable to the Inclusion of the Citizenship Question on the Census.

22.    To ensure that a plaintiff's allegations of harm are fairly attributable to the challenged action, it is necessary to allege "a causal nexus between the defendant[s'] conduct and the injury," such that the alleged injury is "fairly traceable to the government conduct claimed as illegal." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). The Supreme Court repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decision of independent actors." *Clapper*, 568 U.S. at 414; *see also Defs. of Wildlife*, 504 U.S. at 561-62. "[A] federal court [must] act only to redress injury that fairly can be traced to the challenged conduct of the defendant, and not injury from independent action *of some third party not before the court*." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (emphasis added); *see also Warth*, 422 U.S. at 504 (finding standing lacking where alleged injury resulted from outside forces, "rather than . . .

respondents' assertedly illegal acts"). In addition, mere encouragement by the defendant is insufficient to establish traceability. *See Simon*, 426 U.S. at 42.

23.     The record demonstrates that Plaintiffs cannot meet their burden of establishing an injury-in-fact that is traceable to the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census. *See* PFOFs ¶¶ 275-286.

##### D. The Nongovernmental Organization Plaintiffs Do Not Have Standing Because They Cannot Show that Any of Their Members Have Standing.

24.     For an organization to establish standing to sue on its own behalf, it must demonstrate "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997); *see also N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. … At the very least, the identity of the party suffering an injury in fact must be firmly established.").

25.     In satisfying the first prong of this inquiry, an organizational plaintiff must identify a particular affected member, rather than merely rely on a "statistical probability that some of [its] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Thus, a vague reference to unidentified members does not confer associational standing on an organization. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State*, 454 U.S. 464, 487 n.23 (1982).

26.     The record demonstrates that the nongovernmental-organization Plaintiffs failed to identify any member who has standing to sue in his or her own right. *See* PFOFs ¶ 260. Accordingly, the organizational Plaintiffs lack standing.

27.     To establish that the Plaintiff organizations have standing to sue on their own behalf (rather than on behalf of their members), they must demonstrate that the organizations have suffered a "concrete and demonstrable injury to [their] activities—with a consequent drain on [their] resources—constitut[ing] . . . *more than simply a setback* to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 378-79 (emphasis added). The Second Circuit has held that, to meet this burden, an organization must demonstrate at least "a 'perceptible impairment' of an organization's activities" constituting a "real" economic effect. *Nnebe v. Daus*, 644 F.3d 147, 156-57 (2d Cir. 2011) (citation omitted).

28.     In addition, a plaintiff generally "must assert his or her own legal rights and interests, and cannot rest a claim for relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (citation omitted). The principle of prudential standing recognizes that "third parties themselves usually will be the best proponents of their rights" and thus protects third parties who "may not, in fact, wish to assert the claim in question." *Miller v. Albright*, 523 U.S. 420, 466 (1998) (O'Connor, J., concurring in judgment) (citation omitted). Here, the nongovernmental-organization Plaintiffs have failed to offer any explanation as to why their individual members would be unable to assert their own rights.

29.     The third-party standing exception to the general rule against asserting the rights of others requires a plaintiff to show both (1) "a close relation to the third party" whose rights the plaintiff is asserting, and (2) "some hindrance to the third party's ability to protect his or her own interests." *Powers*, 499 U.S. at 411 (citation omitted). The "close relation" must be "such that the [plaintiff] is fully, or very nearly, as effective a proponent of the right as" the third party. *Fenstenmaker v. Obama*, 354 F. App'x 452, 455 (2d Cir. 2009). The types of relationships that have been held to be sufficiently close are trustee-trust, guardian ad litem-ward, receiver-receivership, bankruptcy assignee-estate, executor-testator estate, attorney-client, and foster parent-foster child. *See W.R. Huff Asset Mgmt. Co v. Deloitte & Touche LLP*, 549 F.3d 100, 109-10 (2d Cir. 2008) (citing cases). The "hindrance" element requires a "genuine obstacle" preventing the third party from asserting his or her own right. *Nat'l Union of Hosp. & Health Care Emps. v. Carey*, 557 F.2d 278, 281 (2d Cir. 1977).

30.     The record demonstrates that the organizational Plaintiffs failed to demonstrate concrete and demonstrable injuries to their activities that could be directly attributed to the reinstatement of a citizenship question on the 2020 decennial census, *see* PFOFs ¶¶ 261-264, and accordingly, the organizational Plaintiffs lack standing.

31.     The record further demonstrates that the organizational Plaintiffs failed to establish third-party standing to sue on behalf of others. *See* PFOFs ¶¶ 259-264.

## II.     Plaintiffs Failed to Prove that the Secretary's Decision to Reinstate a Citizenship Question was Arbitrary and Capricious.

### A.     Any Judgment in this Case Would Inherently Rest on Speculation And Would Thus Be Premature

32.     The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects *felt in a concrete way* by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967) (abrogated on other grounds) (emphasis added). As this Court recognized at the close of trial, "there is a clearance package that was submitted to OMB [the Office of Management and Budget], but OMB hasn't yet actually cleared it," and could reject "the questionnaire with the citizenship question on it." Trial Tr. 1424:20-1425:1. This adds *another* layer of speculation to Plaintiffs' inherently speculative claims—because the citizenship question has not even received clearance under the Paperwork Reduction Act and may be rejected by OMB, rendering Plaintiffs' claims unripe for judicial resolution. *See Ohio Forestry Ass'n., Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998) (challenge to agency action unripe where review may prove "to have been unnecessary" because action had not been finalized and was subject to modification).

33.     It is similarly impossible to determine at this stage whether Plaintiffs have standing because, as this Court recognized, "the Census Bureau has not yet determined what the algorithms would be for the imputation process, and [] there is an expert panel … that has been tasked with coming up with that and trying to incorporate and address any effects that the citizenship question may have on the count." Trial Tr. 1425:3-8. This uncertainty means that, *even if* the citizenship question impacts self-response to a degree that NRFU fails to mitigate, it is not possible to determine at this stage the extent to which imputation will rectify any impact on the count. A panel

of highly qualified experts is working to determine the best way to ensure a full count in 2020 even if some subpopulations experience a decline in participation. Until the Census Bureau determines the manner and methodology it will use for imputation, it is not possible to determine whether any differential undercount will remain.

### B. *Legal Standards for Review Under Administrative Procedure Act*

34.     The APA provides only for limited judicial review of agency actions.  *Guertin v. United States*, 743 F.3d 382, 385 (2d Cir. 2014).

35.     A court is authorized to set aside an agency action if it is arbitrary and capricious. In deciding an arbitrary-and-capricious claim, the question for the Court ultimately is whether the agency's decision "was the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 52 (1983).   Consequently, "[u]nder the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow."  *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008).

36.     "A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency."  *Id.*   The Court asks only whether the decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

37.     A court does not determine whether the decision "is the best one possible or even whether it is better than the alternatives."  *Fed. Energy Regulation Comm'n v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).   Indeed, "[w]hether [the Court] would have done what the agency did is immaterial," so long as the agency engages in an appropriate decisionmaking process.  *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 718 (D.C. Cir. 2016).

38.     "An agency decision will thus only be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 446 (2d Cir. 2013) (citation omitted).

39.     The Court's role is limited to determining "whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 498 (2d Cir. 2005) (quoting *State Farm*, 463 U.S. at 43).   And "[t]hat requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).

40.     The Court's review in this case must be particularly deferential because Plaintiffs challenge the Secretary's broad discretion over the census.   "The text of the Constitution vests Congress with *virtually unlimited discretion* in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides."  *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting art. 1, § 2, cl. 3) (emphasis added).

41.     Congress, in turn, "has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)).  Thus, as this Court has recognized, "'[t]he wide discretion bestowed by the Constitution upon Congress, and by Congress upon the Secretary' demands a high degree of 'judicial deference' to the Secretary's decisions concerning the conduct of the census." *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 799 (S.D.N.Y. 2018) (quoting *Wisconsin*, 517 U.S. at 22-23).

42.     Plaintiffs' arbitrary-and-capricious claim should be resolved as a matter of law based on an evaluation of the record before the agency decisionmaker.  "Where, as here, 'a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'" *Koopmann v. U.S. Dep't of Transp.*, ---F. Supp. 3d ---, 2018 WL 3946450, at *3 (S.D.N.Y. Aug. 16, 2018) (quoting *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

43.     "Indeed, 'district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues'" as a matter of course.  *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996)).  That is because "the question whether an agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record." *Greene v. Carson*, 256 F. Supp. 3d 411, 423 (S.D.N.Y. 2017) (quoting *Glara Fashion, Inc. v. Holder*, No. 11-cv-889, 2012 WL 352309, at *5 (S.D.N.Y. Feb. 3, 2012)) (alterations omitted).

44.     The testimony introduced by Plaintiffs at trial is not properly the subject of APA review because it was not before the Secretary and irrelevant to his decision.  Considering expert testimony after the fact is inconsistent with the APA standard of review and the required deference to the agency's factfinding.  *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat. Resources Def. Council, Inc.*, 435 U.S. 519, 549 (1978); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

45.     Similarly, materials produced in discovery are not properly considered in a review of agency action under the APA because those materials are not considered part of the "whole record" before the agency.  5 U.S.C. § 706; *see e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*); *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1051-52 (2d Cir. 1985).

46.     The Secretary's decision to reinstate a citizenship question on the 2020 decennial census was entirely reasonable.  Following receipt of DOJ's request, the Secretary of Commerce "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond."  AR 1313.  To that end, the Department of Commerce "immediately initiated a comprehensive review process led by the Census Bureau."  *Id.*  "The Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations."  *Id.*  As part of this process, the Secretary "met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, [his] questions about accuracy and response rates, and their recommendations."  *Id.*  The Secretary reviewed the legal, policy, and technical aspects of the decision.  This included a consideration of the costs and benefits of asking the question, as well as a consideration of the analyses and recommendations from the Census Bureau and consideration of the views of outside parties who both favored and opposed the reinstatement of the question.  The Secretary explicitly recognized that both stakeholders and the Census Bureau had raised concerns that the reinstatement of a citizenship question on the census

could have a negative impact on self-response rates for non-citizens, but correctly noted that no one had produced evidence that the response rate would decline materially as a result of the reinstatement of a question that had previously been on the census for decades. AR 1315. The Secretary also considered alternative options, such as the use of administrative records, but reasonably concluded that the Census Bureau "is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population." AR 1316. After carefully considering the possibility of depressed self-response rates, the Secretary made the entirely reasonable judgment that "the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate." AR 1317. The Secretary acknowledged the macro-environment and that there may be a distrust of government, and recognized that this distrust would exist regardless of a citizenship question. *Id.* The Secretary correctly noted that no one could provide an analysis showing a material decline in self-response rates among those who generally distrusted the government. *Id.* Ultimately, the Secretary reasonably weighed the evidence, including the possible cost and quality implications of reinstating a citizenship question, and concluded that a combination of using administrative records, which the Census Bureau could prioritize the development of before the 2020 Census, and reinstating a citizenship question on the 2020 Decennial Census, was the best option to provide DOJ the data it requested. AR 1317.

47.     The administrative record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census was reasonable and fully consistent with the APA. *See* PFOFs ¶¶ 308-342.

### C.  The Effect of the Court's Prior Preliminary Finding of Bad Faith and Pretext.

48.     In determining the merits of an APA claim, the Court reviews "the whole record." 5 U.S.C. § 706. The whole record includes all information "that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). It "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *In re United States*, 138 S. Ct. 371, 372 (2017) (Breyer, J., dissenting) (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)).

49.     Even though the Court authorized discovery based on a *preliminary* finding of bad faith, *see* ECF No. [X], July 3, 2018 Order, that prefatory showing does not mean extra-record evidence may properly be considered by the Court for APA merits review. On the contrary, as the Supreme Court repeatedly has explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp*, 411 U.S. at 143. Because the court should be applying "the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 743-44 (1985) (internal citation omitted), Plaintiffs should not be able to rely on material outside the properly designated administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). At *most*, the Court may consider extra-record evidence for the limited purpose of determining whether Plaintiffs have adduced evidence sufficient to prove the bad faith they alleged. Here, Plaintiffs have failed to prove that the Secretary did not actually believe the rationale set forth in his decision memorandum or that he acted with an unalterably closed mind. Nor can they show that the Secretary's initial policy

preferences, whatever they may have been, render his ultimate decision arbitrary and capricious. Even if the Secretary had *additional* reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged. *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion"). As set forth in Defendants' pretrial memorandum, *see* ECF No. 412, at 30-31, the uncharitable gloss Plaintiffs ask this Court to read into benign statements of the Secretary in exploring the decision are utterly unavailing.  Because Plaintiffs have failed to prove bad faith, their request to consider extra-record evidence on the merits must be rejected.

### D. Expert Testimony That Merely Second Guesses the Secretary's Decision Is Improper.

50.     "Under the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow." *Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150–51 (2d Cir. 2008) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) and *Environmental Def. v. EPA,* 369 F.3d 193, 201 (2d Cir.2004)).  A reviewing court should not itself weigh the evidence or substitute its own judgment for that of the agency.  *Id.*  The APA's arbitrary-and-capricious standard is "particularly deferential" to the decisionmaker.  *Envtl. Def.*, 369 F.3d at 201.

51.     Under the applicable standard of review for an APA action, this Court is not to substitute its own judgment for that of the agency, or decide what the Court would have done had it been in the decisionmaker's position.  Accordingly, the testimony of experts from either side, including Dr. Abowd, that they disagree with the Secretary's decision to include a citizenship question on the 2020 Decennial Census, or would have made a different decision, is irrelevant to this Court's consideration of whether the Secretary's decision was arbitrary and capricious, and is accordingly given no consideration.

52.     Furthermore, an expert witness cannot merely recite a factual narrative based on record evidence or read, selectively quote from, or regurgitate record evidence, as that usurps the role of the court.  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009). Portions of Plaintiffs' experts' testimony merely recited record evidence—including (1) Mr. Thompson's testimony that Secretary Ross ignored the Census Bureau's recommendation against the citizenship question, Am. Thompson Decl. ¶¶ 120–26, ECF No. 516-1; (2) portions of Mr. Thompson's testimony about purported inconsistencies between the administrative record and Secretary Ross's decision memo, Am. Thompson Decl. ¶¶ 105, 111, 112, 116, 118; (3) portions of Dr. Habermann's testimony about the sufficiency of the Department of Justice's justification for block-level citizenship data, Habermann Aff. ¶¶ 26–28, 30–32, ECF No. 498-11; (4) portions of Dr. Habermann's testimony that the Census Bureau failed to adequately coordinate with the Department of Justice to determine its data needs, Habermann Aff. ¶¶ 37–41, ECF No. 498-11; (5) portions of Dr. Habermann's testimony that the administrative records option was a less costly and better-quality alternative to the citizenship question option, Habermann Aff. ¶¶ 51–53, ECF No. 498-11; (6) portions of Dr. Habermann's testimony about whether the citizenship question was properly tested, Habermann Aff. ¶¶ 59–67, ECF No. 498-11; and (7) Dr. Habermann's testimony that the United Nations recommendations on population censuses do not support Secretary Ross's decision, Habermann Aff. ¶¶ 78–85, ECF No. 498-11.  This expert testimony is given no more weight than

the record evidence it recites.

53.     The evidence outside the administrative record similarly demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census was reasonable.  *See* PFOFs ¶¶ 343-377.

## III.   The Secretary's Decision to Reinstate a Citizenship Question Was in Accordance With Law.

### A.   *The Secretary's Decision Fully Complies With 13 U.S.C. § 6(c).*

54.     There is a statutory requirement that, "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries."  13 U.S.C. § 6(c).

55.     As an initial matter, the Court notes that Plaintiffs have not raised any argument that 13 U.S.C. § 6(c) restricts the Secretary from taking any action other than using administrative records to provide citizenship data in their respective complaints.  *See* ECF No. 284; Civil Action No. 1:18-cv-05025, ECF No. 1.  Because this Court cannot consider claims for relief not raised in a plaintiff's complaint, Plaintiffs are not entitled to relief under 13 U.S.C. § 6(c) for that reason alone.

56.     Furthermore, here, the Department of Justice specifically requested that a citizenship question be included on the 2020 Decennial Census to gather census-block level data to assist the Department of Justice in its enforcement efforts under Section 2 of the Voting Rights Act.  AR663-64.  The Secretary, in making his decision, specifically noted that the Census Bureau's use of administrative records was "evolving" and that the Census Bureau did not yet have administrative records for the entire population, meaning that using administrative records alone would result in a large segment of the population for whom imputation would have to be used.  AR1316.

57.     Finally, the Court notes that there is no apparent distinction between the citizenship question and a number of other questions on the decennial census for purposes of 13 U.S.C. § 6(c).  The decennial census asks questions about sex, race, and ethnicity.  Administrative records could likely be used in the enumeration for some or all of the characteristics, yet no one would suggest that the statute prohibits the Census Bureau from including those questions on the decennial census questionnaire.

58.     Accordingly, because the Secretary made an explicit determination that using administrative records alone would be inadequate for a significant portion of the population, the information that could be gained from administrative records alone was not of "the kind, timeliness, quality and scope of the statistics required" for the Department of Justice's Voting Rights Act enforcement efforts.  Therefore, 13 U.S.C. § 6(c) does not prohibit the Secretary from including a citizenship question on the 2020 Decennial Census in addition to the use of administrative records.

### B. *The Secretary's Decision Was in Accordance with 13 U.S.C. § 141(f).*

1. The Court Lacks Jurisdiction to Review Plaintiffs' Claim that Secretary Ross Violated the Reporting Requirement of § 141(f)(3).

59.     Section 141(f) of the Census Act reads:

With respect to each decennial and mid-decade census . . . the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census—

(1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;

(2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and

(3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C. § 141(f).

60.     Plaintiffs contend that the Secretary violated this section because he did not identify "citizenship" as a subject for the 2020 Census in his March 2017 report to Congress, and "there are no 'new circumstances . . . which necessitate' the inclusion of the citizenship question on the census." Pls.' Pretrial Mem. at 28–29.

61.     As an initial matter, congressional reporting requirements—like § 141(f)—are beyond the courts' jurisdiction to review. That is for two reasons. First, the courts cannot redress any injury resulting from an inadequate report because it is Congress's sole decision how to respond to a report, adequate or inadequate. Second, submitting an informational report to Congress is not the type of "final agency action" covered by APA review because it does not determine rights or obligations or trigger legal consequences.

62.     The Ninth Circuit exhaustively considered a similar reporting requirement in *Guerrero v. Clinton*, where the plaintiff sought to challenge an executive branch official's failure for six consecutive years to provide statutorily required annual reports to Congress. 157 F.3d 1190, 1191-92 (9th Cir. 1998). Notwithstanding these clear violations of the statutory text, the Ninth Circuit concluded that plaintiffs lacked a redressable injury, because "only Congress" could address the problems plaintiff identified based on the report "and nothing that we could order with respect to the reports or their adequacy can make Congress do anything," *id.* at 1194; and that the adequacy of the reports was not judicially reviewable under the APA because the submission of an informational

report to Congress was not a final agency action because "no legal consequences flow from the report.  No matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act upon," *id.* at 1194.

63.     Here, likewise, Plaintiffs lack a redressable injury because the § 141(f) reports do not determine Plaintiffs' rights or obligations; they simply convey information to Congress, and the submission (or lack thereof) of the reports does not constitute a reviewable final agency action because no legal consequences flow from the report.  Therefore, this Court lacks jurisdiction to review the Secretary's submission of § 141(f) reports.  *See, e.g., Guerrero*, 156 F.3d at 1196 ("[T]his issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." (quoting *Nat. Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)); *see also, e.g., Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006) (declining to review agency's required submission of recommendations to the President, because "[t]here is no good reason to believe that such an order will redress [plaintiffs'] injuries. No legal consequences flow from the recommendations"); *Taylor Bay Protective Ass'n v. Adm'r*, EPA, 884 F.2d 1073, 1080-81 (8th Cir. 1989) (declining to review agency compliance with a congressional reporting provision because "nothing in the scheme indicat[es] that judicial review . . . is necessary or advisable. . . . Additionally, the nature of the agency action here is distinct from the type of agency action normally reviewable"); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (declining to review an agency's compliance with a congressional requirement because "[t]his court will not scrutinize the merits or timeliness of reports intended solely for the benefit of Congress"); *Natural Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) (declining to review an agency's allegedly insufficient report under a congressional reporting provision because managing the reports should be left to Congress, and the Court "despair[ed] at formulating judicially manageable standards" to evaluate the reports on Congress's behalf); *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (holding that plaintiffs could not bring an APA claim to challenge an agency's misstatements to Congress under a reporting statute because "[w]here a report is not explicitly or implicitly intended as anything more than a vehicle to inform Congress, it is for Congress alone to determine if the Report satisfies the statutory requirements it enacted" (internal quotation marks and citation omitted)).

> 2.     Even if 13 U.S.C. § 141(f) imposes a substantive constraint on the Secretary of Commerce, it is not judicially reviewable.

64.     Furthermore, even if § 141(f) represented a substantive requirement rather than a reporting requirement, it would not be reviewable under the APA.  Under 5 U.S.C. § 701(a), APA review is precluded where "Congress expressed an intent to prohibit judicial review."  *Webster v. Doe*, 486 U.S. 592, 599 (1988).  Congress has expressed its intent to prohibit judicial review of the Secretary's compliance with § 141(f) in two ways.  First, § 141(f)(3) explicitly leaves the decision of when to modify questions or topics to the Secretary.  *See* § 141(f)(3) (calling for a report "if *the Secretary finds* new circumstances exist" (emphasis added)).  Second, § 141(f)(3) requires only that the Secretary inform Congress of modifications to subjects or questions, not the "new circumstances" leading thereto.  *See* § 141(f)(3) (requiring the Secretary to submit "a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified").  Congress, let alone the courts, would therefore have little basis to review the Secretary's exclusive determination of "new circumstances."

3.   Secretary Ross's Submission of § 141(f) Reports Was Entirely Proper

65.     Section 141(f) has been fully satisfied.  Pursuant to 13 U.S.C. § 141(f)(2), the intended questions for the 2020 decennial census have been submitted to Congress.  PX-501; Questions Planned for the 2020 Census and American Community Survey (Mar. 29, 2018), https://www2.census.gov/library/publications/decennial/2020/operations/planned-questions-2020-acs.pdf.  Through that report, Secretary Ross informed Congress of the questions for the 2020 decennial census, including the citizenship question, *id.* at 7, thus satisfying the requirements of § 141(f)(3), if a 141(f)(3) report were required.  As noted above, there is no requirement that the Secretary inform Congress of the new circumstances triggering modifications to subjects submitted under (f)(1).  13 U.S.C. § 141(f)(3).

66.     Consequently, Congress is fully informed, and the Secretary's duties to inform Congress have been fully discharged.  Indeed, the House Committee on Oversight and Government Reform has already held several hearings addressing the reinstatement of the citizenship question.

67.     In any event, Secretary Ross could remedy any error by simply submitting a §141(f)(3) report at any time between now and the 2020 census.  *See* 13 U.S.C. § 141(f)(3) (permitting submission of such a report at any time after the submission of a § 141(f)(1) or (2) report and "before the appropriate census date").  DOJ's request to the Census Bureau—and Secretary Ross's recent understanding of block-level CVAP data to enforce the Voting Rights Act—constitutes new circumstances justifying inclusion of an additional topic.  Secretary Ross had not previously been aware of DOJ's desire for citizenship data from the decennial census prior to receipt of the Gary letter, at which time the Secretary's initial § 141(f)(1) report had been submitted.  *Cf.* Tr. 996:19-23 (prior to receipt of the Gary Letter, DOJ had not communicated its concerns about ACS data).  Because the Census Bureau relies on other agencies to present needs for census data, "newness" is appropriately measured by information available to the Secretary, and, as the Gary Letter explained, DOJ itself was still in the process of understanding the challenges of working with data from the 2010 decennial census (the first recent census not to include a long-form questionnaire with a citizenship question).  AR 664.  Accordingly, if a §141(f)(3) report is required, the Secretary has fully satisfied the Census Act, or could do so any time before April 1, 2020.[9]

---

[9]   Amicus Electronic Privacy Information Center ("EPIC") suggests that Defendants may have violated the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, by failing to conduct an adequate "privacy impact assessment" ("PIA") before proposing to collect citizenship information.  EPIC Amicus Br., ECF 428-1, at 11.  EPIC alleges that the Census Bureau issued a cursory PIA for the division that maintains and processes census response data that failed to address security risks posed by collecting citizenship information or the possibility that such data could be transferred to other agencies and used for purposes unrelated to the Census.  *Id.*  The parties, however, have never raised a claim under the E-Government Act and amicus cannot insert such a new claim.  *See Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007) ("Amicus participation goes beyond its proper role if the submission is used to present wholly new issues not raised by the parties."); *Russell v. Bd. of Plumbing Examiners*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) ("The amicus cannot raise or implicate new issues that have not been presented by the parties.").

In any event, EPIC's assertions are without merit, as the Census Bureau filed a sufficient PIA on September 27, 2018, covering collection of data pursuant to the decennial census, in which it listed "citizenship" as an example of general personal data to be collected on the 2020 decennial census.  *See* Privacy Impact Assessment for the CEN08 Decennial Information Technology Division, Section 2.1, pg. 5, http://www.osec.doc.gov/opog/privacy/Census%20PIAs/CEN08_PIA_SAOP_Approved.pdf.  Moreover, EPIC's concerns regarding the sharing of data with other agencies for purposes unrelated to the census are misplaced.  Section 9

4.   Defendants Have Not Waived Their Arguments Regarding 13 U.S.C. § 141(f).

68.   Defendants have not waived any arguments with respect to § 141(f).  Indeed, Defendants briefly addressed § 141(f) in their reply to Plaintiffs' pretrial memorandum.  Defs.' Pretrial Mem. Reply at 6.  And in any event, Plaintiffs were on notice that Defendants contested this issue: they proffered evidence at trial in an attempt to show that the Secretary violated § 141(f).  *See, e.g.*, Habermann Trial Aff. ¶ 25 ("At the three-year deadline to identify subjects for the 2020 census, the Census Bureau notified Congress of a citizenship subject on the ACS, but not on the short form."); Trial Tr. 470:2 – 471:7.

69.   Even if Defendants had not previously raised this argument, trial courts enjoy inherent discretion to determine whether an argument has been waived, *Brown v. City of New York*, 862 F.3d 182, 187 (2d Cir. 2017), and an argument is not automatically waived even if raised in post-trial briefing following a bench trial, *Fortress Bible Church v. Feiner*, 694 F.3d 208, 216 n.3 (2d Cir. 2012).  And, as set forth above, Defendants' jurisdictional arguments regarding § 141(f) are not waived because a "litigant generally may raise a court's lack of subject-matter jurisdiction at any time."  *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).  Accordingly, Defendants have not waived any argument with respect to § 141(f).

## IV.   Plaintiffs Failed to Prove am Equal Protection Violation.

70.   To establish a violation of the equal protection component of the Due Process Clause, Plaintiffs bear the burden of demonstrating that the Secretary's decision "was motivated by discriminatory animus and its application results in a discriminatory effect."  *Hayden v. Cty. of Nassau ("Hayden I")*, 180 F.3d 42, 48 (2d Cir. 1999); *Jana –Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006).  While Plaintiffs need not establish that discriminatory animus was the sole or even primary motivating factor behind the decision, *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996), they must put forth evidence that an "invidious discriminatory purpose was a motivating factor" behind the Secretary's decision.  *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp. ("Arlington Heights")*, 429 U.S. 252, 266 (1977).

71.   Discriminatory intent "implies more than intent as volition or intent as awareness of consequences."  *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (citing *Feeney*, 442 U.S. at 279).  It implies that the decisionmaker[s] . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (quoting *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

---

of Title 13 precludes the Secretary of Commerce, his employees, or any person who has sworn to protect census information from making "*any* publication whereby the data furnished . . . can be identified."  13 U.S.C. § 9 (emphasis added).  Therefore, before any product or document involving census data may be released, the product, document, and/or data to be produced or released must be and is reviewed by the Census Bureau to ensure that no identifiable Title 13 confidential data are or may be disclosed.

Finally, to the extent EPIC argues that "[t]he decision to add a citizenship question to the 2020 census should be suspended" because a cyberattack could result in exposing census data, EPIC Amicus Br. 2, 18-20, EPIC cites no authority for the proposition that a speculative data breach is a basis to enjoin an agency from collecting any information.  Indeed, the proposition appears to be without foundation in law or reason, and provides no principled distinction for enjoining the collection of citizenship data or any census data whatsoever.

72.     A facially neutral policy such as the reinstatement of a citizenship question on the 2020 decennial census violates equal protection "only if [a disparate] impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 274.  Accordingly, where a plaintiff challenging a facially neutral law "fail[s] to demonstrate that the law in any way reflects *a purpose to discriminate*," there is no equal protection violation.  *Id.* at 279 (emphasis added).  *See also Trump v. Hawaii*, 138 U.S. 2392, 2420 (2018) (reaffirming that facially neutral policies are subject to only limited, deferential review and may not lightly be held unconstitutional).

73.     "A racially disproportionate impact" alone is virtually never sufficient to establish discriminatory intent.  *Arlington Heights*, 429 U.S. at 264-64.  This is particularly true where, as here, the decision is facially neutral in its applicability and any disproportionate harm is dependent upon persons in those sub groups defying their legal duty to complete the questionnaires.

74.     If Plaintiffs argue that Defendants' actions constitute an equal protection violation because they improperly discriminate between citizens and non-citizens, that argument is rejected. Plaintiffs failed to point to any evidence in the administrative record or at trial that rebuts the fundamental fact that the 2020 decennial census questionnaire, including the citizenship question, will be sent to every person residing in the United States, and a response from every person residing in the United States (a) will be vigorously sought by the Census Bureau's NRFU process in the absence of a self-response; and (b) will be recorded and tallied for the purposes of the decennial enumeration; and (c) is required by law.  Including a question asking about citizenship status on a questionnaire that goes out to everyone does not constitute "discrimination" on the basis of citizenship status any more than questions about sex or race constitute discrimination based upon those characteristics.

75.     Even if Plaintiffs had established that the inclusion of a citizenship question on the 2020 Decennial Census constitutes some sort of action that "discriminates" between citizens and non-citizens, the Federal Government makes many distinctions between citizens and non-citizens, both for privileges such as voting, jury service, and eligibility for certain types of benefits, *see, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (holding that limitation on eligibility for a federal medical insurance program was limited to citizens and long-term permanent residents did not violate Equal Protection Clause); *Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (holding Welfare Reform Act's denial of prenatal care coverage to unqualified non-citizens against Equal Protection challenge); *Moving Phones Partnership L.P. v. F.C.C.*, 998 F.2d 1051, 1055-56 (D.C. Cir. 1993) (rejecting Equal Protection challenge to Communications Act's prohibition on business entity with non-citizens among its general partners from obtaining a radio license), as well as making non-citizens subject to certain governmental actions, most obviously exclusion and deportation, to which citizens are not subject, *see, e.g.*, *United States v. Duggan*, 743 F.2d 59, 75-76 (2d Cir. 1984) (rejecting equal protection claim to Foreign Intelligence Surveillance Act's provision of certain protections and evidentiary burdens only to citizens and legal residents).  As the Supreme Court has explained, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. . . .  The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Mathews*, 426 U.S. at 79-80.  Therefore to set forth a valid equal protection claim here, Plaintiffs were required to prove that the Secretary was motivated by a discriminatory animus towards persons of a certain race or national origin.

76.     If Plaintiffs attempt to frame their allegations of discriminatory animus under the guise of "national origin," against anyone of *any* national origin outside of the United States, as counsel suggested at the close of trial, that argument is rejected.  Plaintiffs are unable to distinguish how this re-casting of their claim is different from an argument that this was motivated by animus towards non-citizens, or foreign nationals.  *See Rajah v. Mukasey*, 544 F.3d 427, 438-39 (2d Cir. 2008) (rejecting Equal Protection challenge to government program that monitored foreign nationals from certain nations).  The proposed question asks only about citizenship status, and makes no inquiry as to the legal or residency status of any non-citizen.  *See* Joint Stips. ¶ 57.  Plaintiffs have not identified any evidence, either in the administrative record or at trial, that demonstrates that there was any animus towards non-citizens of any particular national origin, or that this will have a disparate impact on non-citizens of any particular national origin.  An argument that the Secretary was motivated by discriminatory animus towards people of every national origin is circular, illogical, and contrary to the entire concept of discrimination.  As the Supreme Court has said, a plaintiff must show that "the decisionmaker . . . selected and reaffirmed a particular course of action at least in part because, not merely in spite of, its adverse effects *on a particular group*."  *Feeney*, 442 U.S. at 279 (emphasis added).  Because Plaintiffs have failed to prove that the Secretary was motivated by discriminatory animus towards "a particular group," Plaintiffs' equal protection claim cannot be based upon a discriminatory animus towards people of all "national origins" other than the United States.

77.     If Plaintiffs argue that statements by other people, either within or outside of the current administration evidence some discriminatory motive, such statements – particularly those statements that have nothing to do with the decision to include a citizenship question – are of no probative value in evaluating whether the Secretary was motivated by unlawful discriminatory animus.  This Court is bound to examine "the *decisionmaker's* purposes," *Arlington Heights*, 429 U.S. at 267 (emphasis added), and statements by other people are not relevant to the decisionmaker's purposes here.  Plaintiffs cannot satisfy their burden for an equal protection claim by relying upon irrelevant statements that were entirely extrinsic to the decision to include a citizenship question on the 2020 Decennial Census.

78.     The administrative record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census does not violate the equal protection component of the Due Process Clause.  *See* PFOFs ¶¶ 353-377, 393-426.

79.     Even looking beyond the administrative record, the record demonstrates that the Secretary of Commerce's decision to reinstate a citizenship question on the 2020 decennial census does not violate the equal protection component of the Due Process Clause.  *See* PFOFs ¶¶ 353-377, 393-426.

## X.     Any Relief Provided in This Case Must Be Consistent With the APA and Article III

### A.  Remand to the Agency Is the Only Potentially Appropriate Remedy

80.     Although 5 U.S.C. § 706(2) authorizes courts to "hold unlawful and set aside agency actions," courts have long recognized that it does not require vacatur and permits remand without vacatur instead.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*. 988 F.2d 146, 151 (D.C. Cir. 1993) (holding that remand without vacatur was appropriate when "the consequences of vacating may be quite disruptive" and "the possibility that the [agency] may be able to justify" the decision on

remand); *Nat. Res. Def. Council v. U.S. Envt'l Prot. Agency*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) ("Where an agency action is remanded for further proceedings, the determination of whether or not also to vacate the agency action is left to the court's discretion.") (citing *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002)).

81.     "To determine if vacatur is appropriate, a court weighs the 'seriousness of the agency action's deficiency (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *NRDC v. EPA*, 676 F. Supp. 2d at 312 (quoting *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009)); *Allied-Signal*, 988 F.2d at 151. Courts examine these two factors separately, "bearing in mind that '[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (citation omitted). "[I]n circumstances where the first prong on *Allied-Signal* supports remand without vacatur, the second prong 'is only barely relevant.' In those instances, 'though the disruptive consequences of vacatur might not be great, the probability that the [agency] will be able to justify retaining [its prior decision] is sufficiently high that vacatur . . . is not appropriate.' *Id.* at 108 (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002), *opinion modified on reh'g.* 293 F.3d 537 (D.C. Cir. 2002)).

82.     In this case, both factors tip sharply in favor of remand to the agency without vacatur because the agency could correct any procedural deficiencies on remand, and vacatur would be extremely disruptive to the agency. With respect to the first factors, courts have recognized that this is not a demanding standard, and the court must determine whether it is "conceivable" or there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. Indeed, courts have repeatedly emphasized that the remand without vacatur is appropriate even if there is only "'a non-trivial likelihood' that the [agency] will be able to state a valid legal basis for its rules,' *In re Core Comm'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008) (quotation omitted), or a "significant possibility" that the agency may be able to explain itself on remand. *Williston Basin Interstate Pipeline Co v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

83.     Here, there is, at a minimum, a "serious possibility" that the Commerce Department would be able to correct any deficiencies in its justification for the reinstatement of a citizenship question on the decennial census – a question that previously had been on the census for decades. *Allied-Signal*, 988 F.2d at 151. Plaintiffs contend, among other things, that the agency failed to "consider several important considerations," and "refused to consider alternatives" in deciding to reinstate a citizenship question. *See* ECF 410 at 16-23. Although Defendants disagree, such considerations could be addressed by the Commerce Department on remand in continued support of the reinstatement of a citizenship question on the decennial census. In short, there "is a non-trivial likelihood that the [agency] will be able to state a valid legal basis for its [decision]." *In re Core Comm'ns*, 531 at 861 (internal quotation marks omitted).

84.     In addition, the disruptive consequences of vacating the rule are substantial. Here, the undisputed evidence at trial indicates that the Census Bureau is diligently at work preparing for the 2020 census, including working with its communication contractors and trusted partners concerning the reinstatement of a citizenship question. Vacating that decision, with the possibility that it could be reinstated on appeal, will greatly complicate that messaging strategy and inject

confusion into the process.[10]

85.     Accordingly, if the Court concludes that the Secretary's decision is not supported by the administrative record or otherwise unlawful, the appropriate remedy would be to set aside that decision and remand to the agency for further consideration.

### B. Any Relief in This Case Should Not Extend Beyond the Plaintiffs That Have Demonstrated an Injury-In-Fact Traceable to Defendants

86.     If Plaintiffs seek broader relief in the form of an injunction that would extend beyond the Plaintiffs to this litigation, such a request should be rejected for the reasons discussed below.

87.     To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quotation marks omitted).  "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion.").  *See also Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

88.     The Supreme Court recently reaffirmed these principles in *Gill*, 138 S. Ct. at 1916, concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts.  The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map.  *Id.* at 1924-25.  But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides."  *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).  Accordingly, the Court held that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts."  *Id.* at 1930-31.  And the Court "caution[ed]" that, on remand, "'standing is not dispensed in gross':  A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353); *accord id.* at 1933 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").  That holding makes absolutely clear that it is the scope of the Plaintiffs' injury, and not the scope of the Defendants' challenged decision, that governs the permissible scope of an injunction under Article III.

---

[10] Although the Census Bureau must finalize the 2020 decennial questionnaire by summer 2019, the agency is best placed to consider the limited time available before the 2020 decennial in deciding how to proceed.  And, as the voluminous record in this case demonstrates, the agency has already produced significant materials analyzing the reinstatement of a citizenship question, and remand should therefore proceed efficiently.

89.     Accordingly, under black letter Article III requirements, the Court rejects providing any relief to Plaintiffs that extends beyond the injuries they have proven they have sustained and that are directly attributable to the Defendants' conduct.

90.     But even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity. Several equitable principles cut decisively against such broad injunctions.

91.     *First*, paralleling the rule under Article III, the Supreme Court and Second Circuit have made clear that a court's injunctive power is limited to relief "no broader than necessary to cure the effects of the harm caused by the violation," and that courts must "mould each decree to the necessities of the particular case." *Forschner Grp. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (quoting *Perfect Fit. Indus. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981)). "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of military-wide injunction except as to individual plaintiff).

92.     *Second*, nationwide injunctions, "emerging for the first time in the 1960s and dramatically increasing in popularity only very recently,"[11] *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring) "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* at 2425. In "'foreclosing adjudication by a number of different courts and judges,'" nationwide injunctions "deprive[] the Supreme Court of the benefit it receives from permitting multiple courts of appeals to explore a difficult question before it grants certiorari." *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Yamasaki*, 442 U.S. at 702); *see also Virginia Soc'y for Human Life*, 263 F.3d at 393 (permitting a court to issue a nationwide injunction "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue'" (quoting *United States v. Mendoza*, 464 U.S. 154, 160 (1984)). That is particularly true where, as here, lawsuits challenging the Secretary's decision also have been filed in the District of Maryland and the Northern District of California.

93.     *Third*, issuing injunctions that provide relief to non-parties subverts the class-action mechanism provided under the Federal Rules of Civil Procedure. *See McKenzie*, 118 F.3d at 555; *Zepeda*, 753 F.2d at 727-28. The availability of nationwide injunctions without class certification creates a fundamentally inequitable asymmetry, whereby non-parties can claim the benefit of a single favorable ruling, but are not bound by a loss and can thus go to another district court to obtain

---

[11] The absence of nationwide injunctions was certainly not for lack of opportunities to seek such relief against federal enactments or policies that were facially invalid. To give a particularly stark counter-example, in the 1930s, courts issued roughly 1600 injunctions against enforcement of a single federal statutory provision. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 434 (2017). While in some cases before traditional courts of equity, small groups of plaintiffs could join together to bring a "bill of peace" on behalf of an affiliated group, this "kind of proto-class action" was not extended to equitable relief against federal action on behalf of entirely absent, unrepresented parties. *See id.* at 426-27.

another bite at the apple.  In other words, if Plaintiffs prevail, the court issues the relief that might have been appropriate had it certified a class of all similarly situated entities; but if the federal government prevails, it gains none of the benefits of prevailing in a class action.

94.     *Finally*, and relatedly, an injunction that extends beyond a plaintiff's injury to cover potential plaintiffs nationwide undermines *Mendoza*'s holding "that nonmutual offensive collateral estoppel simply does not apply against the government."  464 U.S. at 162.  That bar on non-parties' invocation of issue preclusion against the federal government is largely meaningless if the first party to obtain a favorable ruling against the government can obtain an injunction that extends to all non-parties who would otherwise be forced to relitigate the issue under *Mendoza*.

95.     The fact that Plaintiffs are bringing an APA challenge does not change this result, as the APA's text does not permit, let alone, require, universal vacatur.  *Cf. Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue nationwide injunctions."); *see also Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011) (vacating district court's grant of nationwide injunction in APA case because "[t]he Supreme Court has also suggested that nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals.") (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) and *United States v. Mendoza*, 464 U.S. 154, 160 (1984)); *Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*, 263 F.3d 379, 383 (4th Cir. 2001) (vacating district court's grant of nationwide injunction in APA case because it would "'thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.'") (quoting *Mendoza*, 464 U.S. at 160). Even where the final agency action challenged is the facial validity of a rule, the text of 5 U.S.C. 706(2) does not specify whether the decision, if found invalid, should be "set aside" *on its face* or *as applied to the plaintiffs*.  In the absence of a clear and unequivocal statement in the APA that it displaces traditional rule of equity, the Court should construe the "set aside" language in section 706(2) as applying only to the Plaintiffs to this lawsuit.  Indeed, the APA provides that in the absence of a special statutory review provision, the proper "form of proceeding" under the APA is a traditional suit for declaratory or injunctive relief.  *See* 5 U.S.C. § 703. Declaratory and injunctive remedies are equitable in nature and, as discussed *supra*, equitable relief traditionally has been limited to determining the rights of the parties before the court.  Moreover, the historical backdrop to the APA's enactment bolsters this reading.  The absence of nationwide injunctions before Congress's enactment of the APA in 1946 (and for over fifteen years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief.

96.     For these reasons, the Court rejects any request for relief that extends beyond the Plaintiffs in this lawsuit.

97.     For these reasons, the Court declines to grant any request for relief that extends beyond the Plaintiffs in this lawsuit.

## XI.   Plaintiffs Have Failed To Show That the Secretary's Decision Was a "Pretext"

447.     "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *J. Andrew*

*Lange, Inc. v. FAA*, 208 F.3d 389, 394 n.7 (2d Cir. 2000) ("Absent a showing to the contrary, it is presumed the agency considered all evidence in the record when making its determination.")

448.    As the Supreme Court repeatedly has explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp*, 411 U.S. at 143.  Because the court should be applying "the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 743-44 (1985) (internal citation omitted), Plaintiffs may not rely on material outside the properly designated administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

449.    Even if the Secretary had *additional* reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged.  *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").

450.    As Justice Gorsuch has explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."  *In re Dep't of Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring in part and dissenting in part).

98.    Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

Dated: November 21, 2018                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General

                                            BRETT A. SHUMATE
                                            Deputy Assistant Attorney General

                                            JOHN R. GRIFFITHS
                                            Director, Federal Programs Branch

                                            JOSHUA E. GARDNER
                                            Special Counsel, Federal Programs Branch
                                            CARLOTTA P. WELLS
                                            Assistant Director, Federal Programs Branch

                                            */s/ Carol Federighi*
                                            KATE BAILEY
                                            GARRETT COYLE
                                            STEPHEN EHRLICH
                                            CAROL FEDERIGHI
                                            MARTIN TOMLINSON
                                            Trial Attorneys
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883
                                            Washington, DC  20044
                                            Tel.:  (202) 514-1903
                                            Email:  carol.federighi@usdoj.gov

                                            *Counsel for Defendants*