**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

                Plaintiffs,

      v.                           18-CV-2921 (JMF)

UNITED STATES DEPARTMENT
OF COMMERCE, et al.,

                Defendants.

**PLAINTIFFS' POST-TRIAL REPLY**

As permitted by the Court (Trial Tr. 1581-83), Plaintiffs submit the following reply in support of their arguments that (1) Plaintiffs have standing because their injuries are fairly traceable to Defendants' decision to add a citizenship question; (2) Plaintiffs' claims are ripe for judicial review; and (3) Defendants' failure to comply with 13 U.S.C. § 141(f) is judicially reviewable under the Administrative Procedure Act.

**I.**      **In determining that Plaintiffs' injuries are fairly traceable to Defendants' decision to add a citizenship question, the Court should consider the factual evidence at trial.**

The Court invited the parties to brief "whether the traceability argument that defendants put forth in their motion to dismiss is a purely legal question as opposed to an issue of fact that turns, in part, on evidence at trial." Trial Tr. 1581; *see also id.* at 1583. Defendants' argument in support of dismissal was that Plaintiffs' injuries are not fairly traceable to the Secretary's decision to add a citizenship question because those injuries "rely upon the intervening acts of third parties violating a clear legal duty to participate in the decennial census." Defs.' Mem. Supp. Mot. to Dismiss (Docket No. 155), at 19-21. The Court should conclude both that this is not a purely legal argument, and that the factual record developed at trial establishes that Plaintiffs' injuries are fairly traceable to Defendants' decision.

*1.*  Defendants have identified no caselaw suggesting that the traceability requirement of the standing inquiry can be treated as a pure question of law.  To the contrary, the cases cited by Defendants confirm that whether an injury is "fairly traceable" to a defendant's action turns on particular facts to be proved at trial.  *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992) (where the defendant argues that the plaintiff's injuries are caused by the decisions of independent actors, the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury"); *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) ("indirectness of injury does not necessarily deprive the person harmed of standing to vindicate his rights" where the plaintiff can "establish that, *in fact*, the asserted injury was the consequence of the defendants' actions" (emphasis added)).[1]

Nor have Defendants identified any cases holding that the specific traceability argument they put forth in their motion to dismiss – that the statutory obligation to respond to the census, *see* 13 U.S.C. § 221, breaks the chain of causation between Defendants' decision and Plaintiffs' injuries – is itself a purely legal argument.  To the contrary, the Second Circuit has in other cases assessed as both a legal and a factual matter whether the decision of independent actors to violate a legal duty breaks the chain of causation between the defendant's action and the plaintiff's injury.  For example, in *NRDC v. National Highway Traffic Safety Administration*, 894 F.3d 95 (2d Cir. 2018), the Second Circuit cited both the administrative record and the agency's own factual conclusions in determining that the plaintiffs met their traceability burden based on the likelihood that vehicle manufacturers' noncompliance with fuel-efficiency standards – an unlawful act – would increase because of lower penalties for each violation.  *Id.* at 104-05.

---

[1] *See also Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) ("each element of Article III standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation,'" and plaintiffs "must ultimately support any contested facts with evidence adduced at trial" (quoting *Defs. of Wildlife*, 504 U.S. at 561)).

Indeed, if the fine authorized by 13 U.S.C. § 221 for not responding accurately to the census were sufficient as a legal matter to defeat a showing of causation for standing purposes, it is likely that no party would ever have standing to challenge any government action regarding the conduct of the census, because *every* census undercount is arguably caused by "third parties violating a clear legal duty to participate in the decennial census."  Defs.' Mem. Supp. Mot. to Dismiss (Docket No. 155), at 20.  The caselaw does not support this conclusion.  *See, e.g.*, *Carey v. Klutznick*, 637 F.2d 834, 836 (2d Cir. 1980) (holding, in a challenge that "the census was conducted in a manner that will inevitably result in an undercount," that "New York City and New York State have asserted a direct injury . . . traceable to the Bureau's actions").

*2.*  In addition, Defendants have themselves treated the question whether Plaintiffs' injuries are fairly traceable to the Secretary's decision as a question of fact.  Defendants argue in their post-trial briefing that Plaintiffs' injuries are due to the general macro environment, "including the political environment," not solely the addition of a citizenship question.  Defs.' Post-Trial Proposed Findings of Fact (Docket No. 546), at 41-44 ¶¶ 272-87.  Although Defendants characterized this position at closing argument as a distinct traceability argument from the one they put forth in their motion to dismiss, *see* Trial Tr. 1497, this argument in fact overlaps with the standing defense Defendants raised at the motion-to-dismiss stage.  *See* Defs.' Mem. Supp. Mot. to Dismiss (Docket No. 155), at 20-21 (arguing that Plaintiffs could not meet the traceability requirement without identifying and excluding from an undercount "individuals who would refuse to respond regardless of the citizenship question because of any number of other factors, such as a general reluctance to provide information to the government or the current political climate").  Having briefed this argument at length as a factual dispute,

Defendants should not be heard to contend it is a purely legal matter divorced from the factual record at trial.

    *3.* Bearing the factual record in mind, the Court should conclude that Plaintiffs' injuries are fairly traceable to the decision to add a citizenship question. Defendants' own expert witness testified that the best conservative estimate is that a citizenship question will reduce self-response rates among households containing at least one noncitizen by at least 5.8%, *see, e.g.*, Trial Tr. 894-97; and will inevitably compromise data quality, *see, e.g.*, Trial Tr. 884-85, 890-91, 952-53, 967-69, 978-81, 986-90, 1221-24, 1251, 1288-89, 1331-34, 1374-75. Defendants offered no evidence to suggest that all individuals who will be deterred by a citizenship question would have refused to respond to the census in any event because of the macro environment alone. To the contrary, the evidence showed that adding a citizenship question in the current macro environment will have the effect of *exacerbating* the decline in self-response rates. *See, e.g.*, Trial Tr. 48-52 (Hillygus); PX-677 (Barreto survey documenting that 80.1% of Latino respondents who said they would not participate in a census that included a citizenship question changed their position and said they *would* participate if a citizenship question was *not* included); *see* Pls.' Proposed Post-Trial Findings of Fact (Docket No. 545), at § VII.F.[2]

---

[2] Among other factors, the trial record shows that the addition of a citizenship question will exacerbate the differential undercount because it will make the Census Bureau's Integrated Partnership and Communications Program less effective. The evidence shows that a citizenship question will compound confidentiality fears that are difficult to mitigate with some populations, and that trusted partners do not know how they will persuade people to participate in light of these concerns. *See, e.g.*, Pls.' PFOF ¶ 1059 & § VIII.C; PX-152 at 22 (CBAMS focus group findings that "there does not seem to be a single trusted voice that could mitigate" confidentiality concerns); Trial Tr. 1123 (Abowd testimony that CBAMS studies show "significant barriers associated with self-response that may plausibly and credibly be related to the citizenship question"); Thompson Aff. (Docket No. 516-1), at ¶¶ 99-103. The addition of a citizenship question eliminates a key message – that the census is unrelated to immigration status – that field researchers have found effective in reassuring reluctant respondents in the past. *See, e.g.*, PX-160 at 16 (Center for Survey Measurement research showed that indicating "[n]one of the questions in this survey will ask about immigration status" was reassuring to Spanish-speaking respondents); PX-158 at 7 (field researchers recommended addressing respondent confidentiality concerns by explaining to respondents that the decennial census "does not collect information on immigration status"). Defendants have identified no specific plans to address these confidentiality concerns, much less data or evidence suggesting that such plans would assuage the anticipated surge in fear and concomitant decline in self-response rates.

Moreover, Defendants' contention that Plaintiffs' injuries are traceable only to the macro environment overlooks those injuries that do not depend on proving the likelihood of an undercount at all.  Plaintiffs have already spent and will in the future spend money to mitigate harms from the citizenship question, *see* Trial Tr. 427-29 (Salvo); Rodriguez Aff. (Docket No. 488-1); PX-246, and are in fact encouraged to do so by the Census Bureau, *see* Trial Tr. 1325 (Abowd).  This injury is directly traceable to Defendants' decision and in no way depends on the conduct of third parties.  *See Air All. Houston v. Envtl. Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) ("The Delay Rule affects State Petitioners' proprietary interests due to the expenditures states have previously made and may incur again when responding to accidental [chemical] releases during the delay period.").

As Defendants' own research findings and expert witness acknowledge, the addition of a citizenship question will cause a foreseeable decline in self-response rates and predictable resource expenditures by Plaintiffs.  The factual record therefore establishes that Plaintiffs have shown that their injuries are fairly traceable to Defendants' decision.

## II.    Plaintiffs' challenges to the citizenship question are ripe for judicial review.

The Court should also conclude that Plaintiffs' claims are ripe for judicial review notwithstanding the OMB review provisions in the Paperwork Reduction Act, 44 U.S.C. § 3507.

The cases Defendants cite in their post-trial proposed conclusions of law (Docket No. 546, at 72 ¶ 32) establish that in determining whether a challenge to agency action is ripe for judicial review, courts consider (1) whether delaying review would cause hardship to the plaintiffs; (2) whether, taking a "pragmatic" and "flexible" view, agency action is sufficiently final that judicial intervention will not interfere with orderly agency decisionmaking; and (3) whether further factual development is necessary to avoid judicial entanglement in abstract

disagreements.[3] *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-53 (1967); *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998).

Here, as the Court has already determined, delaying review of this case would cause immense harm to Plaintiffs and the public interest. *See, e.g.*, *New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 5307097, at *6 (S.D.N.Y. Oct. 26, 2018), *as amended*, 2018 WL 5791968, at *6-7 (Nov. 5, 2018); *see also* Trial Tr. 1484-85 (Defendants' counsel: "[T]he Court has to look at the hardships of the parties, and that is a concern, that there wouldn't be time for judicial review if OMB doesn't clear it until after the printing date. . . . [T]he hardship to the parties waiting for judicial review is a significant factor here, and it is a difficult factor for us to argue"); *cf. Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) ("[I]t is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme – possibly irremediable – hardship"). In addition, final agency action is not speculative, as Defendants concede. Trial Tr. 1482 (Defendants' counsel: "We agree there is final agency action in the sense that the Department of Commerce concluded its decision-making process."). Nor can it be argued following the extensive record developed in this case – and where ripeness was not raised for the first time until post-trial briefing – that there is anything abstract about the parties' disagreement.

At closing argument, Defendants cited *CTIA—The Wireless Association v. FCC*, 530 F.3d 984 (D.C. Cir. 2008), as additional support for their ripeness argument. In that case, the court held in abeyance petitions for review of an FCC rule pending OMB decision, where final

---

[3] These factors apply to this Court's determination of whether this challenge to agency action is ripe for judicial review, regardless whether the Court concludes that Defendants' ripeness argument here raises jurisdictional or only prudential concerns. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003).

agency action was "entirely speculative" and where there was "little hardship to the parties in not

deciding the case now." *Id.* at 987-88. As mentioned, final agency action is *conceded* here, not

speculative; and the hardship in delaying review would be significant, if not irremediable. In

addition, the D.C. Circuit based its holding in *CTIA* in part on express provisions in the FCC rule

tying that rule's effective date to "the date of Federal Register notice announcing OMB

approval," *id.* at 986-87 (quoting 22 F.C.C. Reconsideration Order 18,013, 18,025-26, 18,032

(2007)); which the D.C. Circuit concluded rendered the FCC rule "contingent upon future action

by another administrative agency." *Id.* at 988. Here, by contrast, there is no similar constraint

included in the Secretary's decision memo or otherwise, and the Census Bureau's ability to use

the census questionnaire is not tied to affirmative publication of a "Federal Register notice

announcing OMB approval," *id.* at 987. Instead, the Paperwork Reduction Act itself explicitly

provides that an agency's collection of information is presumptively approved if the OMB

Director takes no action on the agency's submission. *See* 44 U.S.C. § 3507(c)(3) ("If the [OMB]

Director does not notify the agency of a denial or approval within the 60-day period . . . the

approval may be inferred."); *see also id.* § 3507(a)(2). Because affirmative approval by OMB is

not required by the Paperwork Reduction Act, the Secretary's decision to add a citizenship

question to the census questionnaire is *not* contingent upon any future action by OMB.[4]

---

[4] The D.C. Circuit also noted in *CTIA* that the court was "not concerned that the [agency] will use this holding to delay unnecessarily judicial review of its rules going forward," because the agency had "no interest in putting off review in these circumstances." *CTIA*, 530 F.3d at 989. Here, by contrast, Defendants have filed more than a dozen requests in multiple courts in an effort to stay these proceedings. *See New York v. U.S. Dep't of Commerce*, 18-CV-2921 (JMF), 2018 WL 6060304, at *3 (S.D.N.Y. Nov. 20, 2018) (order denying stay) ("Defendants' motion makes so little sense, even on its own terms, that it is hard to understand as anything but an attempt to avoid a timely decision on the merits altogether.").

In fact, Defendants have already delayed submitting the census questionnaire to OMB by more than three months beyond their announced plans with no explanation. *Compare* PX-1 at AR 1170 (September 2018 submission to OMB), *with* Trial Tr. 1484 (projecting December 2018 submission to OMB). This submission is already months later than in prior decades: the 2010 census clearance request was submitted on September 3, 2008, *see* 73 Fed. Reg. 52,264, 52,264 (Sept. 9, 2008); and the 2000 census clearance request was submitted on August 10, 1998, *see* 63 Fed. Reg. 43,369, 43,370 (Aug. 13, 1998).

**III.    Defendants' failure to comply with 13 U.S.C. § 141(f) is judicially reviewable.**

Defendants argue that the Court lacks jurisdiction to review Defendants' noncompliance with Section 141(f) of the Census Act because (1) Section 141(f) imposes only a "congressional reporting requirement" and "it is Congress's sole decision how to respond to a report, adequate or inadequate"; and (2) the Section 141(f) requirements are not judicially reviewable because "Congress expressed an intent to prohibit judicial review."  Docket No. 546, at 78-79, ¶¶ 61, 64 (quoting 5 U.S.C. § 701(a)).  The Court should reject both arguments and conclude that Defendants' decision is not in accordance with law under the APA, 5 U.S.C. § 706(2), for failure to comply with the requirements of the Census Act.

*1.*  The Court should reject Defendants' argument that Section 141(f) reports "simply convey information to Congress" and "do not determine Plaintiffs' rights or obligations," Docket No. 546, at 79 ¶ 63.  Defendants cite *Guerrero v. Clinton*, 157 F.3d 1190 (9th Cir. 1998), but that case involved a reporting requirement quite different from the statute at issue here.  In *Guerrero*, the Ninth Circuit observed that the reporting requirement there was "purely informational," and that "no legal consequences flow[ed] from a . . . report" under the statute at issue.  *Id.* at 1195 (citing *NRDC v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988)).  The Ninth Circuit further found that the plaintiffs there were seeking to challenge the report itself, and seeking to compel the agency to prepare "a better report."  *Id.*

Neither of these factors is present here.  As Plaintiffs have argued, Section 141(f) *does* have legal consequences because the statute's requirements are substantive components of, and restrictions on, the Secretary's exercise of the discretion delegated to him by Congress.  Pls.' Proposed Post-Trial Conclusions of Law (Docket No. 545-1), at 91, ¶ 399.  Specifically, Section 141(f) does not just serve the "purely informational" purpose of giving Congress three years' notice of the subjects planned for inclusion on the census, 13 U.S.C. § 141(f)(1); in addition,

once that notice is submitted, the statute in essence obligates the Secretary to adhere to those subjects until and unless he identifies "new circumstances . . . which necessitate that the subjects" be modified, *id.* § 141(f)(3).  And what Plaintiffs seek here is not to require the Secretary to issue "a better report" than those submitted in March 2017 and March 2018, *Guerrero*, 157 F.3d at 1195, but rather to set aside the Secretary's decision under the APA for failure to adhere to Section 141(f)'s further mandate that he not deviate from what he earlier told Congress the census questionnaire would contain, unless certain statutory prerequisites are met.

Put another way, Section 141(f) – and specifically subsection (f)(3) – provides substantive standards that constrained the Secretary's actions when he decided in March 2018 to depart from what he had previously told Congress and add a question to the decennial census. Courts have not hesitated to find similarly enforceable standards in statutory reporting requirements that involve more than purely informational reporting and instead represent "the completion of [a] decision-making process" that has "direct legal consequences" on plaintiffs. *South Carolina v. United States*, 329 F. Supp. 3d 214, 225-26 (D.S.C. 2018) (distinguishing *Guerrero* and *Hodel*); *see also Ctr. for Biological Diversity v. Brennan*, 571 F. Supp. 2d 1105, 1118 (N.D. Cal. 2007) (same).

Here, the requirements in Section 141(f) codify meaningful restrictions – not simply a ministerial reporting requirement – on the Secretary's authority.  *See* Pls.' Proposed Post-Trial Conclusions of Law (Docket No. 545-1), at 90-91, ¶¶ 390-98.  Specifically, the statute requires the Secretary to provide to Congress not just information but also his substantive "determination" as to the content of the census and whether any new circumstances necessitate altering that content.  That substantive determination has direct legal consequences to all of the plaintiffs here, as this litigation has made clear.  *See South Carolina*, 329 F. Supp. 3d at 225-26

(holding that South Carolina had standing to challenge a facility termination decision by the Department of Energy contained in a termination report to Congress, where the commitments set forth in the termination letter "have direct legal consequences" and "practical effect").  The Secretary's reports under Section 141(f) thus do not merely convey information to Congress, like the reports at issue in *Guerrero* and *Hodel*.  Rather, they represent the culmination of an administrative process that Congress understandably sought to guide and constrain by setting both concrete timelines and substantive standards to justify late-arising changes.

Defendants' interpretation of Section 141(f) as imposing no constraint on the Secretary's decision-making process makes little sense.  For example, Section 141(f)(3) by its terms obligates the Secretary to report a late-arising change to the census if he finds that "new circumstances" necessitate such a change.  Under Defendants' interpretation, however, because the Secretary is free to alter the census *without* identifying any new circumstances, he paradoxically would have *fewer* reporting obligations if a change in the census questionnaire were wholly unjustified than if it were justified by "new circumstances . . . which necessitate" such a change.  There would be no reason for Congress to keep itself most in the dark precisely when the Secretary's actions would ordinarily call for more, rather than less, oversight.

Defendants' interpretation also presupposes that only Congress would have an interest in the Secretary's compliance with Section 141(f).  But Congress itself has recognized that the reporting requirements in Section 141(f) benefit not only Congress, but also "the citizens" by ensuring that they "will not be unfairly subject to questions invading their privacy."  H. Rep. No. 94-944, at 5-6 (1976).[5]

---

[5] Because Congress intended that Section 141(f)'s reporting requirements would benefit the public, and because (as discussed in the text) those requirements protect Plaintiffs' interests in the procedure and contents of the census questionnaire, Plaintiffs are also within the zone of interest of Section 141(f).  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) (noting that the zone of interest test "is not meant to be especially demanding").

*2.*  Defendants' argument that the Section 141(f) requirements are not judicially reviewable under the APA should be rejected as well.  The "generous review provisions" of the APA, *Abbott Labs.*, 387 U.S. at 140-41, create a strong "presumption favoring judicial review," *Salazar v. King*, 822 F.3d 61, 75-76 (2d Cir. 2016).  This presumption is subject only to narrow exceptions where "statutes preclude judicial review," 5 U.S.C. § 701(a)(1), or where "agency action is committed to agency discretion by law," *id.* § 701(a)(2).

Defendants previously argued in their motion to dismiss that the congressional review provisions in Section 141(f) indicate "Congress has reserved to itself the responsibility for oversight of the Secretary's performance" and agency action is therefore "committed to agency discretion by law."  Docket No. 155, at 29-30.  This Court rejected that argument with a thorough analysis identifying "four independent reasons" why the argument falls short, including that the Second Circuit has already rejected it, and that there are in fact judicially manageable standards for courts to apply in reviewing the Secretary's decisions.  *New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 794-99 (S.D.N.Y. 2018) (citing *Carey*, 637 F.2d at 838-39). The Court should reject Defendants' argument again for the same reasons.

To be sure, Defendants' argument at the motion-to-dismiss stage was addressed largely to the statutory obligation at 13 U.S.C. § 141(a) that the Secretary "shall . . . take a decennial census . . . in such form and content as he may determine"; but there is no reason the Court's analysis should differ where the statutory obligation under the Census Act is to identify "new circumstances . . . which necessitate" that the subjects identified for inclusion on the census be modified, *id.* § 141(f)(3).  If anything, the obligation to identify "new circumstances" which "necessitate" a change to the census subjects is an even clearer and more judicially manageable standard for the Court to consider.  Section 141(f) is thus quite different from the reporting

requirements in *Guerrero* and *Hodel*, which provided essentially no "judicially manageable standards by which to gauge the fidelity of the Secretary's response" to Congress.  *Hodel*, 865 F.2d at 319; *see also Guerrero*, 157 F.3d at 1196.

The Court should therefore conclude that the question of Defendants' compliance with § 141(f) does not fall within the narrow exceptions precluding judicial review, and that the Court may assess Defendants' disregard for these provisions of the Census Act in concluding that the Secretary's decision to add a citizenship question was "not in accordance with law" as required by the APA.  5 U.S.C. § 706(2)(A).

*3.*  Finally, even if the requirements of Section 141(f) were not independently enforceable – either on their own or through the APA – this Court may still consider Defendants' non-compliance with the statute to evaluate Plaintiffs' arbitrary-and-capricious and discrimination claims.  If deviations from an agency's uncodified but well-established practices support a finding that agency action is arbitrary and capricious, *e.g.*, Pls.' Proposed Post-Trial Conclusions of Law (Docket No. 545-1), at 69, ¶ 297 (citing cases), then violations of statutorily compelled procedures provide even more compelling evidence of the same.  Similarly, the *Arlington Heights* test that governs Plaintiffs' discrimination claim looks in part to decision-makers' substantive departures from past practices, *see id.* at 119, ¶¶ 530-34.  Thus, this Court need not consider Section 141(f) as a distinct statutory basis of liability to take into consideration the Secretary's disregard of congressionally mandated reporting requirements.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo, *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs


AMERICAN CIVIL LIBERTIES UNION
ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Dale Ho*

Dale Ho
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*\* Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).*

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs