

**U.S. Department of Justice**

Civil Division

Federal Programs Branch

1100 L Street, N.W.

Washington, DC 20005

_____

**By ECF**

The Honorable Jesse M. Furman

United States District Judge

Southern District of New York

  Re:  *State of New York* v. *United States Department of Commerce*, No. 18-cv-2921

Dear Judge Furman:

  The Court should deny Plaintiffs' motion (ECF No. 595) to issue an order to show cause why sanctions should not be imposed.  The motion borders on frivolous, and appears to be an attempt to reopen the evidence in this already-closed case and to drag this Court into Plaintiffs' eleventh-hour campaign to improperly derail the Supreme Court's resolution of the government's appeal.  The Court should not countenance Plaintiffs' tactics.

  1. a. At the heart of Plaintiffs' motion is their claim that then-Acting Assistant Attorney General John Gore relied on a private, unpublished 2015 study by Dr. Thomas Hofeller in drafting the Department of Justice's formal December 2017 request (Gary Letter) to reinstate a citizenship question on the 2020 decennial census.  That claim is false.  Plaintiffs provide no evidence that Gore ever read, received, or was even aware of the existence of that unpublished study before the filing of Plaintiffs' motion and the near-simultaneous publication of an accompanying article in the *New York Times* last Thursday morning, *see* Gov't Ex. L, much less that he had any such awareness when drafting the Gary Letter.  Nor can they, because such evidence does not exist.  Neither Hofeller nor his unpublished study played any role whatsoever in the drafting of the Gary Letter.  There is no smoking gun here; only smoke and mirrors.

  In lieu of actual, admissible evidence, Plaintiffs rely on pure speculation to conjure an imagined link between the Hofeller study and the Gary Letter based on supposed "striking similarities" between the two documents.  Plaintiffs' insinuation is false.  The purported "striking similarities" between the study and the Gary Letter concern their respective descriptions of the widely and publicly-known problems of using citizenship data from the American Community Survey (ACS) for estimating the citizen voting-age population (CVAP).  But even a cursory comparison of the two documents shows that they are not "strikingly" similar.  For example, Plaintiffs contend that the Gary Letter's observation that "the [ACS's] margin of error increases as the sample size—and, thus, the geographic area—decreases" is "strikingly similar" to the study's assertion that "the [ACS's] accuracy for small units of geography is extremely poor."  *See* Pls.' Ex. I.  How those statements are "strikingly similar" is, to put it mildly, not self-evident.  Plaintiffs' remaining examples (*see id.*) are of a piece, and their pattern-matching exercise reads more like the product of a conspiracy theorist than a careful legal analysis.

  Indeed, the Gary Letter is far more similar to briefs filed in *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), than to the Hofeller study.  The Gary Letter expressly cites *Evenwel* in its discussion of the ACS, and Gore testified that he was familiar with the case and had read the briefs in it.  *See* Gov't

Ex. G, Gore Dep. 339:13-340:4. Unsurprisingly, the Gary Letter contains many similarities—some even "striking"—to, for instance, the amicus brief filed by former Directors of the U.S. Census Bureau. *See* Gov't Ex. D. That brief identifies the same problems with using ACS citizenship data that the Gary Letter identifies, often using identical language, as the attached chart (Gov't Ex. C) demonstrates. Other amicus briefs in *Evenwel* also address the same problems, using similar language. *See, e.g.*, Br. for United States at 22–23; Br. of Democratic Nat'l Comm. at 15–19; Br. of Nathaniel Persily et al. at 11–24. (Those and other *Evenwel* briefs are available at www.scotusblog.com/case-files/cases/evenwel-v-abbott.) The Persily brief even describes the problems with the ACS "in the exact same order," Pls.' Mot. at 3, as the Hofeller study and the Gary Letter, exposing the speciousness of Plaintiffs' argument on that score too. *See* Br. of Nathaniel Persily et al. at 16-24.

Moreover, it is hardly surprising that the Gary Letter, *Evenwel* briefs, and Hofeller study all describe similar problems with ACS citizenship data. Those issues are widely known, and have been discussed in case law and academic literature for years. *See, e.g., Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016); *Fabela v. City of Farmers Branch, Tex.*, 2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012); *Benavidez* v. *Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 457-458 (N.D. Tex. 2010); Justin Levitt, *Democracy on the High Wire*, 46 U.C. Davis L. Rev. 1041, 1109 n.116 (2013); Nathaniel Persily, *The Law of the Census*, 32 Cardozo L. Rev. 755, 776-777 (2011). The Census Bureau itself has long acknowledged these limitations of the ACS. *See, e.g.*, U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data: What General Data Users Need to Know*, at 4, 8-11 (Oct. 2008), *available at* https://www.census.gov/content/dam/Census/library/publications/2008/acs/ACSGeneralHandbook.pdf. The assertion that Gore relied on a private, unpublished study to compile information that is widely known and publicly available is absurd.

b.   Without any actual evidence that the Gary Letter relied on or was even influenced by the unpublished Hofeller study, Plaintiffs attempt to build a link by a circuitous path. According to Plaintiffs, a paragraph in a letter that Mark Neuman gave to Gore (Neuman Letter) matches a paragraph found in a document on one of Hofeller's hard drives. From this, Plaintiffs leap to the conclusion that a completely separate document on one of Hofeller's hard drives (*i.e.*, the unpublished study) also must have made its way to Gore—through mysterious and unidentified channels. Plaintiffs' illogical speculation is baseless.

Even assuming Hofeller gave Neuman a paragraph from one document on his hard drive, it would not even arguably show that he also gave an entirely separate document (the study) to Neuman, much less that Hofeller (or anyone else) gave it to Gore. Indeed, although Plaintiffs state that Neuman produced the Neuman Letter in discovery, they do not say that Neuman produced a copy of the 2015 study, because he did not. That, in turn, strongly suggests that he did not have it in his possession, custody, or control. The Department of Justice, too, produced the Neuman Letter but not the 2015 study. That is because the study was not in the possession, custody, or control of any of the relevant custodians at DOJ. Those facts alone rebut Plaintiffs' baseless assertions that DOJ or Gore had the Hofeller study and based the Gary Letter on its contents.

Nor is there any logical basis to draw a link between the Neuman Letter and the Gary Letter. Plaintiffs' assertion that the "December 2017 DOJ letter was adapted from the Neuman DOJ Letter, including, in particular, Dr. Hofeller's VRA rationale" is risible. The Gary Letter bears no resemblance to anything in the Neuman Letter, including the nonsensical paragraph allegedly written by Hofeller. *Compare* Pls.' Exs. G & H *with* Gov't Ex. F. Neither the text nor the substance of the Neuman Letter appears anywhere in the Gary Letter, and Neuman himself testified that he "wasn't part of the drafting process of the [Gary] [L]etter" and that the Neuman Letter is "very different" from the Gary Letter.

Gov't Ex. H, Neuman Dep. 114:19-20, 280:23-24. Tellingly, Plaintiffs have had the Neuman Letter for *months*, yet never previously suggested that it bore any resemblance to the Gary Letter. Plaintiffs' repeated insistence on conflating the two documents, as if the Neuman Letter were an early draft of the Gary Letter, is disingenuous, misleading, and contradicted by the evidence in the record.

2.   In addition to incorrectly claiming that the Gary Letter was based on the unpublished Hofeller study, Plaintiffs allege that Gore and Neuman testified falsely about Hofeller's involvement in drafting the Gary Letter. As explained above, neither Hofeller nor his unpublished study played any role whatsoever in the drafting of the Gary Letter, so Plaintiffs' allegations fail at the outset. But they fail even on their own terms.

a.   Plaintiffs assert that "Gore repeatedly testified that he prepared the initial draft of the DOJ letter, failing to disclose that Neuman gave a draft of the DOJ letter in October 2017." Pls.' Mot. at 1. The first half of that sentence is unequivocally true: Gore *did* prepare the first draft of the *Gary Letter*, and Plaintiffs have not identified any evidence to the contrary. *See* Ex. G, Gore Dep. 152:4-155:8. (Again, Plaintiffs' insistence on calling both the Neuman Letter and the Gary Letter "the DOJ letter" is misleading because it willfully conflates two entirely different documents.)

As for the second half: Gore, it is true, did not testify that Neuman gave him a draft of the Neuman Letter. But that is because *Plaintiffs did not ask him about it.* Gore disclosed that he talked to Neuman while drafting the Gary Letter. *See* Ex. G, Gore Dep. 437:20-438:13. When Plaintiffs asked for the substance of that conversation, the government appropriately asserted deliberative-process privilege—an assertion that Plaintiffs chose not to challenge. *Id.* at 437:14-20. And instead of following up to ask whether Neuman gave him any materials, Plaintiffs simply moved on to other topics. *Id.* at 437:22-438:13. The lack of testimony from Gore about the Neuman Letter is thus the result of Plaintiffs' own deposition techniques and strategic litigation choices. Gore's testimony was entirely truthful.

Perhaps more important, *Plaintiffs have long known that Gore had the Neuman Letter.* The government produced the Neuman Letter in full in discovery. *See* Gov't Ex. E, at 4–5. In the cover email to Plaintiffs' counsel, the government expressly said: "These materials were collected from John Gore" "in hard copy." *Id.* at 3. Accordingly, Plaintiffs have known since at least October 23, 2018, that Gore had the Neuman Letter—which belies their repeated claims that they learned that fact only recently. It is thus unclear how Plaintiffs could have been misled by Gore's failure to tell them something they (1) did not ask him and (2) have known since last October. Plaintiffs' obliviousness is not a valid basis to sanction the government.

Plaintiffs' other accusations of false or misleading testimony on the part of Gore are even more perplexing. For example, they assert that "Gore, meanwhile, testified that he 'drafted the initial draft of the [Gary Letter] sometime around the end of October or early November of 2017,' and he did not name Neuman or Dr. Hofeller as people who provided 'input' on the initial draft." Pls.' Mot. at 2. Of course the reason Gore did not identify Neuman or Hofeller as people who provided input on the Gary Letter is that neither Neuman nor Hofeller provided any input on the Gary Letter. Plaintiffs have identified no evidence to the contrary. Similarly baseless is Plaintiffs' denunciation of Gore for not "disclos[ing] that Dr. Hofeller ghostwrote a substantial part of the Neuman DOJ Letter setting forth the VRA rationale," and for "conceal[ing] Dr. Hofeller's role in crafting the October 2017 draft letter and the VRA enforcement rationale it advanced." Pls.' Mot. at 1, 3. Again, Plaintiffs have provided no evidence whatsoever that Gore was aware of Hofeller's involvement in anything, much less his alleged contribution of a cryptic paragraph in the Neuman Letter. Besides, as noted above, Plaintiffs neglected to ask Gore about any materials he might have received from Neuman, so Gore

never opined on what he thought of that letter or who he thought might have contributed to it.

b.    Plaintiffs attack Neuman's testimony on similar grounds.  Neuman is not a governmental employee and was represented by private counsel in this litigation.  His acts or omissions are thus not attributable to the government and provide no basis for sanctions against the government.  Nevertheless, Plaintiffs' accusations against Neuman fail for largely the same reasons as with Gore.

Plaintiffs assert that "Neuman testified that his October 2017 meeting with Gore was *not* about a 'letter from DOJ regarding the citizenship question,' and that he gave Gore only a different document."  Pls.' Mot. at 3.  That is false.  Neuman never said he gave Gore "only" a different document.  Plaintiffs asked him what he gave to Gore, and Neuman answered:  "Mainly the—mainly a copy of the—of the letter from the Obama Administration, Justice Department, to the Census Bureau on the issue of adding a question on the ACS."  Gov't Ex. H, Neuman Dep. 123:25-124:3.  After asking some follow-up questions about that document, *id.* at 124:4-126:16, counsel moved on to another topic, *see id.* at 126:19-20 ("Did [Gore] provide you any information at that meeting?").  Counsel never asked *what else*, if anything, Neuman gave Gore beyond the Obama-era document.  Neuman's failure to inform Plaintiffs that he also gave Gore a copy of the Neuman Letter is thus traceable to Plaintiffs' inadequate deposition questioning, not Neuman.  (Besides, as noted above, Plaintiffs already knew that Gore had received a copy of the Neuman Letter.)

Also the product of Plaintiffs' own deposition decisions is Neuman's alleged failure to inform Plaintiffs of Hofeller's purported role in drafting the Neuman Letter.  Neuman was discussing the letter's authorship when the questioner cut him off:  "I don't—I don't want—I'm not asking you to tell me about who the original author was or anything."  Gov't Ex. H, Neuman Dep. 281:23-25.  It is quite rich for Plaintiffs to now complain about Neuman's failing to tell them something he was instructed not to tell them.  And Plaintiffs did not lack for opportunity; Neuman testified at length about Hofeller and the discussions they had about redistricting and the census.  *See id.* at 33:2-10, 36:19-45:14, 51:7-53:3, 55:9-59:6, 64:18-67:14, 89:11-90:13, 100:18-101:7, 136:17-139:3, 143:13-144:6.

c.    In a chart attached to their motion, Pls.' Ex. A, Plaintiffs repeat the allegations of misrepresentations above and add additional allegations, including about statements in the government's court filings.  All of the allegations are meritless.  The government has prepared an expanded version of Plaintiffs' chart, Gov't Ex. A, explaining that there are no misrepresentations in Gore's testimony, Neuman's testimony, or the government's filings.

3.    Plaintiffs' assertions are not only false, but legally irrelevant as both a procedural and substantive matter.

Procedurally, it is too late to reopen the evidence in this already-closed case (setting aside that this Court has no jurisdiction over that aspect of the case while the Supreme Court considers the government's appeal).  Moreover, the supposedly "new" evidence from Hofeller's files likely would be inadmissible, in particular because none of it has been authenticated and all of it is hearsay.  *See* Gov't Ex. B (describing some of the evidentiary problems with Plaintiffs' submissions).  It would be improper to impose sanctions on the basis of inadmissible evidence.  To the extent Plaintiffs claim the "new" evidence is their learning that Gore had the Neuman Letter, as discussed above, they knew that in October and decided not to pursue it further.  Plaintiffs also made the strategic litigation choice not to challenge the government's assertion of deliberative-process privilege over Gore's discussions with Neuman, and similarly decided not to "close out" their questioning of Neuman on that point.  Plaintiffs are not entitled to a do-over.

Substantively, the "new" evidence is irrelevant because the critical issue in this APA case is

whether the Secretary provided an objectively rational basis for his decision to reinstate the citizenship question.  Nothing in the private files of a deceased political operative can affect the resolution of that issue.  To the extent Plaintiffs believe the "new" evidence affects their equal-protection claim, the question there is whether *Secretary Ross* harbored discriminatory animus.  Not even Plaintiffs allege that Secretary Ross was aware of Hofeller's unpublished 2015 study or its ideas.  And this Court has already determined that the private motivations of various non-governmental actors cannot be attributed to the Secretary.  *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 570–71 (S.D.N.Y. 2019).  The secret motivations of Hofeller, allegedly memorialized in a private, unpublished study recovered from his hard drive long after his death, likewise are not attributable to the Secretary.

Finally, Plaintiffs have misrepresented the nature of Hofeller's study.  Contrary to their representation, the study did *not* conclude "that adding a citizenship question to the 2020 Census 'would clearly be a disadvantage to Democrats' and 'advantageous to Republicans and Non-Hispanic Whites' in redistricting."  Pls.' Mot. at 1.  Rather, the study concluded that "[a] *switch to the use of citizen voting age population* as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," Pls.' Ex. D at 9, and that "[*u*]*se of CVAP* would clearly be a disadvantage for the Democrats," *id.* at 7.  Those statements demonstrate no discriminatory animus against anyone; they are empirical observations about the likely impact of using CVAP for redistricting.  They are also inapposite to Plaintiffs' claims.  Plaintiffs' theory is *not* that the citizenship question will harm them *because it will enable the use of CVAP* in redistricting.  Rather, their theory is that the citizenship question harms them by causing an undercount in certain noncitizen populations *regardless* of whether future redistricting is done by CVAP or total population.  Hofeller's study does not address that issue at all.

* * * * *

The Department of Justice takes accusations of false testimony very seriously.  For the reasons set forth above and in the attached charts, Plaintiffs' accusations are meritless.  Plaintiffs had an obligation to conduct a pre-filing investigation before leveling such inflammatory accusations, especially against a high-ranking DOJ official.  And they have had ample time to conduct that investigation; according to the *New York Times*, Plaintiffs' counsel have had the Hofeller materials since at least February.  *See* Gov't Ex. L, at 3.  Yet they appear to have spent more time coordinating with the media—the detailed *Times* article was posted online less than an hour after the ECF filing notice— than performing the requisite investigation.  Plaintiffs apparently hope that by filing their eleventh-hour motion they might (improperly) derail the Supreme Court's resolution of this case.  There is no other plausible explanation for why they spilled so much ink describing "new" evidence that they have known since October and conjuring a conspiracy theory involving a deceased political operative that essentially hinges on wordplay.  The Court should deny their baseless motion.

Dated:  June 3, 2019                          Respectfully submitted,

                                              JOSEPH H. HUNT
                                              Assistant Attorney General

                                              JAMES M. BURNHAM
                                              Deputy Assistant Attorney General

                                              JOHN R. GRIFFITHS
                                              Director, Federal Programs Branch

                                              */s/ Joshua E. Gardner*
                                              JOSHUA E. GARDNER
                                              Special Counsel
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street, N.W.
                                              Washington, DC  20005
                                              Tel.:  (202) 305-7583
                                              Email: joshua.e.gardner@usdoj.gov

                                              CARLOTTA P. WELLS
                                              Assistant Director, Federal Programs Branch

                                              KATE BAILEY
                                              GARRETT COYLE
                                              STEPHEN EHRLICH
                                              CAROL FEDERIGHI
                                              DANIEL HALAINEN
                                              MARTIN TOMLINSON
                                              Trial Attorneys, Federal Programs Branch

                                              *Counsel for Defendants*

CC:      All Counsel of Record (by ECF)

Exhibit A

**Plaintiffs' Exhibit A[1] Expanded to Discuss Actual Evidence**

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| Neuman denied at deposition that his October 2017 meeting with Gore was about a "letter from DOJ regarding the citizenship question." Ex. B. at 273:10-21. He testified that the meeting was instead about "how Census interacts with the Justice Department" generally. *Id.* When asked what information he gave Gore at the meeting, Neuman described a different document, but not the Neuman DOJ letter. *Id.* at 123:20-124:7. | Gore recently told congressional investigators that Neuman gave him the Neuman DOJ Letter, which was framed as a request from DOJ to Commerce requesting the addition of the citizenship question, at their October 2017 meeting which was arranged by Commerce's General Counsel. Ex. F. at 2-4. | In response to Plaintiffs' questions, Gore agreed that it was "fair to say" that he "wrote the first draft of the letter," Gov't Ex. G, Gore Dep. 127:12-17, and that he "drafted the initial draft of the letter," *id.* 150:9-13. That was entirely truthful—Gore wrote the first draft of the Gary Letter, and Plaintiffs identify nothing to the contrary. Instead, they cite evidence that Neuman gave Gore the *Neuman Letter*, which was not only distinct in substance, language, and form, but which Neuman testified was "very different" from the Gary Letter. Gov't Ex. H, Neuman Dep. 280:23-24. And Neuman conceded that he "wasn't a part of the drafting process" of the Gary Letter. *Id.* at 114:19-20.

Plaintiffs' suggestion that Gore concealed his receipt of the Neuman Letter is incorrect. Gore specifically testified that he met with Neuman, Gov't Ex. G, Gore Dep. 437:20-439:6, yet Plaintiffs never asked Gore if he received any materials from Neuman. Also, the government produced the Neuman Letter in discovery and expressly told Plaintiffs it had been "collected from John Gore." Gov't Ex. E, Oct. 23, 2018 Email from K. Bailey at 3–5.

Plaintiffs also purport to have newly discovered evidence that Neuman met with Gore at the request of the General Counsel of the Commerce Department. But Neuman testified at his deposition that his meeting with Gore was at the request of James Uthmeier, then an attorney in the General Counsel's office at the |

---

[1] Aside from column headings, the first two columns are taken verbatim from Plaintiffs' Exhibit A.

[2] Although the government addresses Plaintiffs' fatuous assertions about Neuman's testimony, Neuman was not a government employee and the government did not represent him in this litigation. Indeed, Neuman retained private counsel and routinely disregarded the government's instructions not to answer certain deposition questions. *See, e.g.*, Gov't Ex. H, Neuman Dep. 124:15-126:23, 273:18-274:5. The government does not purport to have any information regarding Neuman that is not expressed in his deposition testimony or documents in the record.

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| Gore testified that he "drafted the initial draft of the letter to request the citizenship question sometime around the end of October or early November of 2017." Ex. E at 150:9-13; *see also id.* at 127:12-17. | | Commerce Department, and Neuman further testified that he did not know "who originally had the idea" but that he thought it was "someone at the Commerce Department." Gov't Ex. H, Neuman Dep. 112:5-25, 113:1-22.  Plaintiffs also never asked Gore who arranged the meeting between him and Neuman.<br><br>Plaintiffs selectively quote Neuman's response to one question concerning what the meeting was "about." *See* Pls.' Ex. B at 273:10-21.  In fact, Neuman testified at several points during his deposition that he discussed a citizenship question (and a Justice Department letter to the Census Bureau) with Gore.  *See, e.g.,* Gov't Ex. H, Neuman Dep. 110:5-8, 114:15-23, 123:20-124:3.<br><br>Finally, there is nothing inconsistent about Neuman's testimony.  In his deposition, Plaintiffs asked Neuman: "So at the meeting you provided some information to Gore for purposes of the letter that DOJ subsequently drafted regarding the citizenship question?"  Gov't Ex. H, Neuman Dep. 123:21-24.  Neuman stated that he "mainly" provided a copy of a letter from the previous administration, *id.* at 123:25-124:3. But Plaintiffs never asked Neuman whether he provided the draft to Gore or discussed it with him, despite designating the Neuman Letter as an exhibit and asking several other questions about it.  *Id.* at 278:23-280:24. |
| Neuman testified that he "wasn't part of the drafting process of the [DOJ] letter." Ex. B. at 114:15-21. | Neuman gave Gore the Neuman DOJ Letter in October 2017.  Ex. F at 2-4. | Plaintiffs cite no evidence that Neuman played any role in drafting the *Gary Letter*.  The mere fact that Neuman provided a copy of the *Neuman Letter* to Gore says nothing about whether Gore relied on the Neuman Letter—a document distinct in substance, language, and form—in drafting the Gary Letter.  To the contrary, the testimony of Neuman and Gore is fully consistent: Neuman testified that he played no role in the drafting of the Gary Letter, Gov't Ex. H, Neuman Dep. 114:10-23, and Gore testified that he initially drafted the Gary Letter, Pls.' Ex. D at 127:17, 150:13.<br><br>Plaintiffs' reliance upon their Exhibit F is also misplaced because this inadmissible document misrepresents Gore's transcribed interview, as reflected in the |

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| | | government's Exhibit K, which is a letter from DOJ to the Honorable Elijah E. Cummings correcting the record. |
| When asked about the "substance" of his conversations with Dr. Hofeller "about the citizenship question" after January 2017, Neuman testified that Dr. Hofeller said, "Mark, you need to make sure that we take a good census, that the administration doesn't skimp on the budget." Ex. B at 138:3-15. | Dr. Hofeller helped ghostwrite the Neuman DOJ Letter for Neuman in August 2017.  Exs. G, H. | Plaintiffs offer no evidence to suggest that Neuman's testimony is inaccurate or misleading.  Far from concealing their relationship, Hofeller was the first person Neuman identified in response to a general question about discussions concerning a potential citizenship question on the 2020 Census.  Gov't Ex. H, Neuman Dep. 33:2-10.  Neuman then discussed Hofeller throughout the deposition.  *See, e.g., id.* at 33:2-10, 36:19-45:14, 51:7-53:3, 55:9-59:6, 64:18-67:14, 89:11-90:13, 100:18-101:7, 136:17-139:3, 143:13-144:6.<br><br>Plaintiffs did not ask Neuman whether Hofeller was involved in composing the draft letter, despite Neumann's repeated references to Hofeller and extended discussion of the draft.  *See id.* at 278:23-280:24.  Indeed, Plaintiffs' counsel expressly told Neuman during his deposition that they were "not asking you to tell me about who the original author was or anything."  *Id.*  at 281:5-21.  Once again, Plaintiffs failed to ask the question that they now claim is material to their claims.<br><br>Finally, Plaintiffs have failed to establish the admissibility of their Exhibit H.  This document lacks authentication, and Plaintiffs have failed to provide any reliable basis on which to establish the province of this undated document.  *See* Gov't Ex. B, Evid. Objs. to Pls.' Exs.  Indeed, it is just as possible that Exhibit H was excerpted from the Neuman Letter as Plaintiffs' unsupported contrary speculation. |
| Neuman denied at deposition that "Dr. Hofeller was one of the people [Neuman] relied on for expertise on the Voting Rights Act."  Ex. B at 143:25-144:6. | The paragraph of the Neuman DOJ Letter that Dr. Hofeller ghostwrote specifically concerns VRA enforcement.  Exs. G, H. | There is nothing inconsistent in Neuman's testimony.  Even if Neuman purportedly excerpted from Hofeller's (unauthenticated) document—a proposition that Plaintiffs have failed to support with any admissible evidence—one nonsensical paragraph does not make Hofeller an "expert."  Plaintiffs utterly fail to show that Hofeller had any VRA "expertise," let alone that Neuman relied on it. |
| Neuman testified that Dr. Hofeller "did not appear to me to be an | Dr. Hofeller helped ghostwrite the Neuman DOJ Letter for Neuman | Plaintiffs cite no evidence that Hofeller met with or advised any government official.  And Plaintiffs cite no evidence that Neuman misrepresented his impressions of Hofeller's role. |

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| adviser to the … administration at all." Ex. B. at 136:9-10. | in August 2017, which Neuman gave to Gore at a meeting arranged by the Commerce General Counsel.  Exs. G, H, F. | Plaintiffs' reliance on their Exhibit F is misplaced because this inadmissible document misrepresents Gore's transcribed interview, as reflected in the government's Exhibit K, which is a letter from DOJ to the Honorable Elijah E. Cummings correcting the record.<br><br>Finally, Plaintiffs have failed to establish the admissibility of Exhibit H.  This document lacks authentication, and Plaintiffs have failed to provide any reliable basis on which to establish the province of this undated document.  *See* Gov't Ex. B.  Indeed, it is just as possible that Exhibit H was excerpted from the Neuman Letter as Plaintiffs' unsupported contrary speculation. |
| Neuman testified that Dr. Hofeller told him that adding the citizenship question would "maximize[]" representation for the "Latino community." Ex. B at 142:3-18. | Dr. Hofeller concluded in his 2015 study that adding a citizenship question to facilitate the use of CVAP in redistricting would benefit "Non-Hispanic Whites" while significantly harming Latino voters.  Ex. D at 6-9. | Plaintiffs present no evidence that Neuman's testimony is false or misleading.  As an initial matter, Plaintiffs have failed to establish the authenticity of their Exhibit D.  This undated, unsigned document lacks any indicia to support what Plaintiffs claim this to be, and it also contains inadmissible hearsay.  *See* Gov't Ex. B.  But even if Plaintiffs' Exhibit D were what Plaintiffs claim it to be, the views Hofeller expressed in a 2015 study are not evidence of what he told Neuman years later.<br><br>Further, Neuman specifically explained that "maximizing" representation for the "Latino community" was his goal, not anything he gleaned from Hofeller.  *See* Gov't Ex. H, Neuman Dep. 142:3-23 ("My point about maximization is my word. I want Latino representation to be maximized.").<br><br>Plaintiffs also present no evidence that Hofeller provided his 2015 study to Neuman.  To the contrary, Plaintiffs purport to present evidence that Hofeller intended the 2015 study to be used solely for the purposes of his client "regarding a funding decision for the Evenwel Plaintiffs" and on the understanding that it "would not be attributed either directly or indirectly."  *See* Pls.' Ex. C at 1–3. Plaintiffs' Exhibit C also lacks authentication and reflects inadmissible hearsay.  *See* Gov't Ex. B. |

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| Defendants represented to this Court that "[t]he record does not indicate that Neuman provided any particularly significant consultations on the citizenship question … during his conversations with Commerce officials in 2017." ECF 346 at 2. | Neuman was the key conduit between Commerce and DOJ in the fall of 2017, including transmitting the Neuman DOJ Letter to Gore at the request of Commerce's General Counsel. Ex. F at 2-4. | Plaintiffs purport to offer "new" evidence about Neuman's role but instead seek to relitigate issues already addressed by this Court.  The government's letter opposing Plaintiffs' motion—which sought leave to depose Neuman—characterized the record evidence at that time in support of the government's argument.  *See* Gov't Ex. J, ECF No. 346 at 1–2.  Plaintiffs subsequently questioned the government's characterizations, and the Court addressed this issue in ruling on the government's assertions of privilege over communications between Neuman and the government.  *See* ECF No. 531 at 8.<br><br>In any event, Plaintiffs' description of "new" information regarding Neuman's role is startlingly disingenuous.  Indeed, there would have been no need to litigate whether Neuman should be deposed—resulting in the government's filing referenced here—if Plaintiffs were unaware of Neuman's involvement.  And in that filing, the government provided a full account of Neuman's role, including his March 22, 2018 meeting with the Secretary, the PowerPoint presentation Neuman gave to the Secretary, and Neuman's communications with Commerce Department attorney James Uthmeier.  *See* Gov't Ex. J, at 2–3.  If that were not enough, the government previously produced documentation of each.  *See* AR 8371 (Meeting memo); AR 10237 (presentation); AR 11329 (email to Uthmeier).  For Plaintiffs to now insinuate that DOJ attorneys misrepresented Neuman's role in the referenced filing is remarkable.<br><br>Worse yet, Plaintiffs' description of Neuman as "the key conduit between Commerce and DOJ" is preposterous.  As the Court itself chronicled, the Departments of Justice and Commerce communicated directly on this issue.  *See generally New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 550–57 (S.D.N.Y. 2019).  Indeed, Gore testified at his deposition about several discussions directly with Commerce employees concerning the citizenship question, including Commerce General Counsel Peter Davidson, Senior Counsel to the General Counsel James Uthmeier, and Chief of Staff Wendy Teramoto.  Gov't Ex. G, Gore Dep. 91:2-94:3.  And neither Gore nor Neuman even suggested they had |

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| | | more than a single meeting. *See* Gov't Ex. G, Gore Dep. 437:20-439:6; Gov't Ex. H, Neuman Dep. 110:5-13, 114:15-23, 123:20-124:3.<br><br>Plaintiffs also cite a document stating that Neuman met with Gore and provided him with the Neuman Letter. *See* Pls.' Ex. F at 2–3. As an initial matter, Plaintiffs' reliance upon their Exhibit F is misplaced because this inadmissible document misrepresents Gore's transcribed interview, as reflected in the government's Exhibit K, which is a letter from DOJ to the Honorable Elijah E. Cummings correcting the record. But more fundamentally, Gore and Neuman previously attested to their meeting. *See, e.g.*, Gov't Ex. G, Gore Dep. 437:20-439:6; Gov't Ex. H, Neuman Dep. 101:23-102:4. The government also produced the Neuman Letter in response to Plaintiffs' Rule 45 subpoena to the Department of Justice, *see* Gov't Ex. E, at 4–5, and in the cover email explained that this document was "collected from John Gore" "in hard copy." *Id.* at 3.<br><br>Moreover, Neuman testified that his meeting with Gore was at the request of an attorney in the Department of Commerce's Office of General Counsel. *See* Gov't Ex. H, Neuman Dep. 112:5-25, 113:1-22. |
| Neuman testified that he did not know who authored the Neuman DOJ letter or who wrote the "first template." Ex. B at 280:8-15. | Dr. Hofeller helped ghostwrite the Neuman DOJ Letter, which Neuman gave to Gore in October 2017. Exs. F, G, H. | Plaintiffs claim that the Neuman Letter contains one paragraph purportedly also found among Hofeller's files (offering no competent evidence establishing those facts), *see* Pls.' Exs. F, G, H, but Plaintiffs cite no evidence that Hofeller wrote the "first template" of the Neuman Letter or that Neuman knew who did.<br><br>Again, Plaintiffs' less-than-thorough deposition questioning is to blame. Plaintiffs never asked Neuman to identify the author (or authors) of the draft letter and, to the contrary, instructed Neuman not to elaborate further on that issue when he tried to explain. In response to a question about who "provided" Neuman with the letter, Neuman testified: "I'm not sure which version this is. Again, I'm familiar with the letter. I'm not sure who the original author is. I'm sure that I looked at it. I might have commented on it, but I'm not sure who writes a first—a first template, as it were." Gov't Ex. H, Neuman Dep. 280:11-15. Neuman began to explain further, *id.* at 281:15-19, but the questioner interjected to state: "I |

| Testimony or Representations | Plaintiffs' "New" Evidence | Actual Evidence[2] |
|---|---|---|
| | | don't—I don't want—I don't—I'm not asking you to tell me about who the original author was or anything." *Id.* at 281:23-25.  Counsel then proceeded to inquire about issues other than authorship. |
| Defendants represented to this Court that there was a "low likelihood of AAG Gore's testimony resulting in any relevant evidence concerning Secretary Ross's decision or intent." ECF 90 at 1. | Defendants knew, but failed to disclose, that Gore met with Neuman in October 2017 at the request of Commerce's General Counsel, during which Neuman gave Gore the Neuman DOJ Letter.  Ex. F at 2-4. | The government's letter opposing Plaintiffs' motion to compel the deposition of Gore correctly argued that a deposition was unlikely to produce information relevant to *Secretary Ross*'s decision or intent, consistent with the Court's earlier statement "that the limited discovery may encompass 'materials from the Department of Justice' to the extent that they 'shed light on the motivations for Secretary Ross's decision.'"  Gov't Ex. I, ECF No. 90 at 2 (quoting July 3, 2018 Tr. 86:11-13).  Gore discussed Secretary Ross at several points in his deposition.  *See, e.g.,* Gov't Ex. G, Gore Dep. 35:13-22, 63:20-22, 64:1-4.  But Gore's testimony about Secretary Ross's "decision or intent" was limited to the Secretary's memorandum.  *See, e.g., id.* at 36:8-22, 37:1-22, 38:1-8, 41:8-16, 42:13-22, 43:1-3, 284:17-22, 285:1-15, 317:4-22, 318:1-8.  When asked if he "ever discussed the issue of the citizenship question with Secretary Ross," Gore responded: "No."  *Id.* at 89:22, 90:1-2.  When asked if he was "consulted by Secretary Ross regarding whether the Department of Justice would support or request the inclusion of a citizenship question on the decennial census," Gore responded: "No."  *Id.* at 90:10-15.  In fact, it is difficult to discern how Gore's testimony provided "any relevant evidence concerning *Secretary Ross's* decision or intent."  Gov't Ex. I, at 1.  And contrary to Plaintiffs' suggestion that the government misrepresented Gore's relationship with Neuman, Gore testified that he had a conversation with Neuman about the citizenship question and "understood that he was advising the Department of Commerce and the Census Bureau with respect to this issue."  Gov't Ex. G, Gore Dep. 437:20-22, 438:1-13.  Further, the government produced the Neuman Letter in response to Plaintiffs' Rule 45 subpoena to the Department of Justice, *see* Gov't Ex. E, at 4–5, and explained in a cover email that this document was "collected from John Gore" "in hard copy."  *Id.* at 3. |

# Exhibit B

## Evidentiary Objections to Plaintiffs' Exhibits

| Plaintiffs' Exhibit | The Government's Evidentiary Objections |
|---|---|
| Exhibit C | FRE 901; FRE 802.  This exhibit purports to be an email chain between two non-parties to this litigation.  This exhibit is not self-authenticating and Plaintiffs have failed to properly authenticate it.  In addition, the statements by Stephanie Edelman are hearsay and are not subject to any hearsay exception. |
| Exhibit D | FRE 901; FRE 802.  Plaintiffs contend that this exhibit is a 2015 report from Dr. Thomas Hofeller.  This exhibit is not self-authenticating and Plaintiffs have failed to properly authenticate it.  Among other things, there is no date or author name on this document or any indication of where this document came from.  Relatedly, because this exhibit has not properly been authenticated and there is no indication of the author, this exhibit contains hearsay and is not subject to any hearsay exception. |
| Exhibit F | FRE 901; FRE 802.  This exhibit purports to be a summary prepared by the Majority Staff of the U.S. House of Representatives Committee on Oversight and Reform of a transcribed interview of DOJ employee John Gore.  This exhibit is not self-authenticating, and Plaintiffs have failed to properly authenticate it.  More fundamentally, there is substantial reason to question the accuracy and reliability of this document, as reflected in the government Exhibit K, which identifies numerous misstatements in Plaintiffs' Exhibit F.  In addition, both the statements from the Majority Staff and the statements attributed to Gore are hearsay and are not subject to any hearsay exception. |
| Exhibit H | FRE 901; FRE 802.  Plaintiffs contend that this exhibit comes from the files of Hofeller.  This exhibit is not self-authenticating, and Plaintiffs have failed to properly authenticate it.  This document lacks a date, an author, or any indicia of its origins.  In addition, this exhibit constitutes hearsay and is not subject to any exception. |

Exhibit C

**Plaintiffs' Exhibit I Expanded to Include Excerpts from the *Amicus* Brief of Former Directors of the U.S. Census Bureau in *Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016)**

| Purported Hofeller 2015 Study | Gary Letter | Former Census Bureau Directors' *Evenwel* Brief |
|---|---|---|
| In decennial censuses prior to 2010, a citizenship question was included in the long form questionnaire which was distributed to approximately one in seven households…<br><br>For several reasons, the Bureau of the Census decided to discontinue the use of the long form questionnaire for the 2010 Decennial Census and to depend exclusively on the short form Questionnaire, which did not include a question on citizenship…<br><br>As a replacement to the long form questionnaire, the Census Bureau instituted the American Community Survey. To quote the Census Bureau: "The American Community Survey (ACS) is an ongoing survey that provides vital information on a yearly basis about our nation and its people. Information from the survey generates data that help determine how more than $400 billion in federal and state funds are distributed each year." Each year, about 3.5+ million households receive very detailed questionnaires of which about 2.2 million are successfully returned. This represents a 62% return rate. | From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census….<br><br>In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, American Community Survey Information Guide at 6, available at https://www.census.gov/content/dam/Census/pro gramssurveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22,2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population. | From 1970 to 2000, the Census Bureau also sent a "long form" to approximately one in every six households.  This "long form" was used to collect answers to a wider array of questions, including demographic, economic, social, and housing questions, as well as inquiring about citizenship status.  Following the 2000 Census, the decennial "long form" was discontinued and was replaced by a continual sampling program called the American Community Survey ("ACS").  ACS collects the same type of information that was included on the long form, but does so on a continuous basis throughout the decade.[8]  Each month, about 295,000 addresses are mailed the ACS questionnaire, for a total of 3.5 million households a year, or roughly one in thirty-eight households.<br>[FN8]: *See* U.S. Census Bureau, *American Community Survey Information Guide* ….<br><br>The actual number of voting age citizens in each state is unknown.  The only information in existence is ACS's statistical sample-based estimates. |

| Purported Hofeller 2015 Study | Gary Letter | Former Census Bureau Directors' *Evenwel* Brief |
|---|---|---|
| In addition, the use of a 5-year rolling sample was much less reflective of the actual characteristics of the population at the time of the actual 2010 Decennial Enumeration. which would have been a one-time snapshot taken in mid-2010 (April to August). | Because the ACS estimates are rolling and aggregated into one-year, three-year, and five- year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting. | As an initial matter, the ACS estimates do not align with the timing of congressional apportionment or traditional legislative apportionment. States traditionally redistrict their state legislative districts at the same time as their congressional districts, using the same decennial Census count …. To begin, only the five-year information could be used because the one- and three-year reports are not statistically reliable at the small geographic units used to draw district boundaries. … First, with respect to the ACS five-year survey, eighty percent of the data is already between two and five years old at the time of redistricting. |
| Another issue with use of the ACS in redistricting is that the accuracy for small units of geography is extremely poor. This is particularly true for Census Tracts and Census Block Groups. In some cases the confidence interval for a Block Group exceeds the actual range of the data, creating negative numbers for the low point of the confidence interval. | The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. | The ACS reports margins of error at the ninety percent confidence level. … The margin of error grows as the sample size decreases, so the smaller the area, the higher the possibility of error. |

| **Purported Hofeller 2015 Study** | **Gary Letter** | **Former Census Bureau Directors'** *Evenwel* **Brief** |
|---|---|---|
| Another problem with the ACS data is that the units of geography by which the ACS is compiled is different from the geographic units used in redistricting. Almost all states are using Census Voting Districts (VTDs) are preferred as the basic geographic building blocks for creating new districts. VTD boundaries generally follow precinct boundaries. ACS data are simply not available for VTDs, and any estimates of CVAP populations for VTDs would be even more inaccurate than the ACS estimates for Census Tracts and Block Groups. For those states in which CVAP estimates for legislative districts have been compiled, determinations have been required to compute the percentage of each Census Block Group's population which is in each legislative or congressional district. The CVAP statistics have been summed for all the block groups which have either 50% or 75% of their population in an individual district and these estimates have been imputed to the total adult populations of the districts. | Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group.  See American Community Survey Data 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process. | An additional problem is that ACS estimates are not available at the smallest geographical level that is actually used for purposes of redistricting—the Census block.  The smallest geographic level at which ACS estimates can accurately be utilized is the block group level.  [citation] This would pose significant problem for states seeking to evenly populate districts. …  States need data at granular levels in order to make a good-faith effort to equalize population to the extent possible among districts.  [citations]  Without the granular Census block data typically used to balance population between and among districts, states relying on ACS voting age citizen estimates likely will be unable to satisfy the standard this Court requires for legislative redistricting. |

# Exhibit D

No. 14-940

IN THE

# Supreme Court of the United States

————

SUE EVENWEL, *ET AL.*,
*Appellants*,

v.

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF TEXAS, *ET AL.*,
*Appellees.*

————

On Appeal from the United States District Court for
the Western District of Texas

————

## BRIEF OF FORMER DIRECTORS OF THE U.S. CENSUS BUREAU AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

————

J. Gerald Hebert
Trevor Potter
CAMPAIGN LEGAL CENTER
1411 K St. NW, Suite 1400
Washington, DC 20005
(202) 736-2200

Anita S. Earls
SOUTHERN COALITION FOR
  SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, NC 27707
(919) 794-4198

Paul M. Smith
Jessica Ring Amunson
  *Counsel of Record*
Mark P. Gaber
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC  20001
(202) 639-6000
jamunson@jenner.com

September 25, 2015                 Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................i

TABLE OF AUTHORITIES .......................................... iii

INTERESTS OF *AMICI CURIAE* ...............................1

SUMMARY OF ARGUMENT.........................................4

ARGUMENT....................................................................6

I.  States Redistrict Based Upon Decennial Census Data that Counts the "Whole Number of Persons" in Each State and There Is No Count of "Citizens" by the Decennial Census. ...........................................7

   A.  Legal Framework and History of the Census..7

   B.  States Rely on Census Data to Redistrict. .....11

II. Serious Practical Concerns Counsel Against Constitutionally Requiring States to Draw Districts with Equal Numbers of Voting Age Citizens. ...................................................................13

   A.  ACS Citizenship Estimates Cannot Provide the Basis For a Constitutional Equal Protection Rule. ....................................................................13

      1.  The ACS Estimates Do Not Align with the Timing of Redistricting. ...................................14

      2.  ACS Estimates Are Not Available at the Smallest Geographic Levels, and Some Data is Suppressed to Protect Privacy..................17

      3.  As a Statistical Sample, ACS Estimates Are Subject to Error That Makes their Use for Line-Drawing Difficult. ...................................19

ii

B.  Asking Citizenship Status of Every Household Would Lead to Reduced Response Rates and Inaccurate Responses, While Multiplying Privacy and Government Intrusion Fears. ......23

III. Voter Registration Data Would Be an Inappropriate Measure Upon Which to Require Districts To Be Drawn. .............................................26

CONCLUSION .................................................................28

iii

## TABLE OF AUTHORITIES

### CASES

*Board of Estimate of City of New York v. Morris*, 489 U.S. 688 (1989) .................................... 11

*Brown v. Thomson*, 462 U.S. 835 (1983) .................... 17

*Burns v. Richardson*, 384 U.S. 73 (1966) ................. 27

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316 (1999) ................................................................ 8, 9, 13

*Georgia v. Ashcroft*, 539 U.S. 461 (2003), *superseded by statute on other grounds as stated in Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ..14, 15

*Karcher v. Daggett*, 462 U.S. 725 (1983) ........ 12, 17, 22

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ..................................... 15

*Reynolds v. Sims*, 377 U.S. 533 (1964) ....................... 11

*Valdespino v. Alamo Heights Indpendent School District*, 168 F.3d 848 (5th Cir. 1999) ....................................................................... 22

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ..................... 11

### CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. II, § 1 .................................................. 25

U.S. Const. art. I, § 2 .................................................... 7

U.S. Const. amend. XIV, § 2 .............................. 7, 8, 25

13 U.S.C. § 9(a)(1) ....................................................... 18

iv

13 U.S.C. § 9(a)(2) ...................................................18

13 U.S.C. § 141(a) .....................................................8

13 U.S.C. § 141(b) .....................................................8

13 U.S.C. § 141(c) ...................................................12

13 U.S.C. § 195 .........................................................8

Act of Aug. 31, 1964, Pub. L. No. 88-530, 78
    Stat. 737 ...........................................................8

Act of Mar. 1, 1790, § 1, 1 Stat. 101 ............................8

Act of Mar. 26, 1810, § 1, 2 Stat. 565-66 ......................8

Ga. Const. art. 3, § 2 ...............................................12

Ill. Const., art. 4, § 3(b) ..........................................12

N.J. Const. art. IV, § 2, ¶ 1.......................................11

Pa. Const. art. 2, § 17(a) ..........................................11

Fla. Stat. § 11.031(1) ...............................................12

Ill. Comp. Stat., Chapter 55, § 2-3001c ......................12

LEGISLATIVE MATERIALS

*Counting the Vote: Should Only U.S. Citizens
    be Included in Apportioning Our Elected
    Representatives?:    Hearing    Before
    Subcomm. on Federalism and the Census
    of the H. Comm. on Gov't Reform*, 109th
    Cong. (2005) (Statement of Kenneth
    Prewitt). ........................................................24, 25

v

OTHER AUTHORITIES

Sandra L. Colby & Jennifer M. Ortman, U.S. Census Bureau, *Projections of the Size and Composition of the U.S. Population: 2014 to 2016* (Mar. 2015), https://www.census.gov/content/dam/Census/library/publications/2015/demo/p25-1143.pdf ................................................................16

Andy Greenberg, *Census Paranoia Fueled Distrust in Government Privacy More than NSA Wiretapping*, Forbes, June 30, 2010, http://www.forbes.com/sites/firewall/2010/06/30/census-paranoia-fueled-distrust-in-government-privacy-more-than-nsa-wiretapping/ ................................................23

Letter from Postmaster General Timothy Pickering to Secretary of State Thomas Jefferson, Dec. 26, 1793, http://founders.archives.gov/documents/Jefferson/01-27-02-0557 .............................................7

Catherine McCully, U.S. Census Bureau, *Designing P.L. 94-171 Redistricting Data for the Year 2020 Census* (Dec. 2014), http://www.census.gov/content/dam/Census/library/publications/2014/rdo/pl94-171.pdf ................................................................17

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardozo L. Rev. 755 (2011)..............................16, 17

vi

Pew Charitable Trust, *Inaccurate, Costly, and Inefficient: Evidence that America's Voter Registration System Needs an Upgrade* (Feb. 2012), http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/PewUpgradingVoterRegistrationpdf.pdf ...................................................... 27

Kenneth Prewitt, *What if We Give a Census and No One Comes?*, 304 Sci. Mag. 1452 (June 4, 2004) ................................................ 23

Prerana Swami, *Rep. Bachmann Refuses to Fill out 2010 Census*, CBS News (June 18, 2009), http://www.cbsnews.com/news/rep-bachmann-refuses-to-fill-out-2010-census/ ......... 24

U.S. Census Bureau, *2010 Geographic Terms and Concepts*, https://www.census.gov/geo/reference/terms.html (last visited Sept. 23, 2015) ................................................ 11

U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data* (Oct. 2008), https://www.census.gov/content/dam/Census/library/publications/2008/acs/ACSGeneralHandbook.pdf ................................................ 10, 11

U.S. Census Bureau, *American Community Survey: Data Suppression* (Nov. 15, 2013), http://www2.census.gov/programssurveys/acs/tech_docs/data_suppression/ACSO_Data_Suppression.pdf ................................................ 18

vii

U.S. Census Bureau, *American Community Survey Design and Methodology (January 2014)*—Chapter 15: Improving Data Quality by Reducing Non-Sampling Error (Jan. 30, 2014), http://www2.census.gov/ programssurveys/acs/methodology/design _and_methodology/acs_design_methodolo gy_ch15_2014.pdf....................................................19

U.S. Census Bureau, *American Community Survey Information Guide*, http://www.census.gov/acs/www/about_th e_survey/acs_information_guide/flipbook/ ........10

U.S. Census Bureau, Census Instructions, https://www.census.gov/history/www/thro ugh_the_decades/census_instructions/ (last visited Sept. 23, 2015).....................................7

U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey*, https://www.census.gov/glossary/#term_C onfidenceintervalAmericanCommunitySur vey (last visited Sept. 23, 2015) ............................19

U.S. Census Bureau, Index of Questions, https://www.census.gov/history/www/thro ugh_the_decades/index_of_questions/ (last visited Sept. 23, 2015)................................................9

viii

U.S. Census Bureau, Redistricting Data, *Voting Age Population by Citizen and Race (CVAP), 2009-2013 American Community Survey 5 Year Estimates*, https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html (last visited Sept. 23, 2015) ..................22

U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing—* Chapter 8: Accuracy of the Data 8-3 (July 2007), https://www.census.gov/prod/cen2000/doc/sf3.pdf..................................................9

1

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are former directors of the U.S. Census Bureau. As former directors responsible for administering the U.S. Census, *amici* have a unique and valuable perspective on the practical implications of the rule proposed by Appellants and the limitations of the data on which such a rule would necessarily rely. In *amici*'s view, serious practical concerns counsel against adopting Appellants' proposals to require states to draw districts with equal numbers of either voting age citizens or registered voters.

*Amicus curiae* Dr. Kenneth Prewitt was the Director of the U.S. Census Bureau from 1998 to 2001. In that capacity, he oversaw the execution of the 2000 decennial Census and development of the American Community Survey. Currently, Dr. Prewitt serves as the Carnegie Professor of Public Affairs and Special Advisor to the President at Columbia University, where he teaches and writes on issues related to the intersection of the Census, politics, and statistics. Prior to serving as Director of the Census, Dr. Prewitt served as Director of the National Opinion Research Center, President of the Social Science Research Council, and Senior Vice President of the Rockefeller Foundation. Dr. Prewitt has considerable knowledge and experience with the use and limitations of Census data and their effect on the political system.

---

[1] Pursuant to Rule 37.6, *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* and their counsel made a monetary contribution to its preparation or submission. The parties' letters of consent to the filing of *amicus* briefs are on file with the Clerk's office.

2

*Amicus curiae* Dr. Robert Groves was the Director of the U.S. Census Bureau from 2009 to 2012. During his tenure, he oversaw the 2010 decennial Census and implementation of the American Community Survey. Currently, Dr. Groves is the Executive Vice President and Provost of Georgetown University, where he also serves as a professor in the Math and Statistics Department as well as the Sociology Department. Prior to serving as Director of the Census Bureau, Dr. Groves was a professor at the University of Michigan and Director of its Survey Research Center, and before that a research professor at the University of Maryland's Joint Program in Survey Methodology. Dr. Groves has written extensively on the mode of data collection and its effect on responses, the social and political influences on survey participation, and the effect of privacy concerns on Census data collection. He has significant knowledge and experience related to the use and limitations of Census data and their effect on the political system.

*Amicus curiae* Dr. Martha Farnsworth Riche was the Director of the U.S. Census Bureau from 1994 to 1998. In that capacity, she oversaw the design of the 2000 decennial Census, as well as the new American Community Survey. Currently, Dr. Riche is affiliated with the Cornell Population Center at Cornell University, and participates in research projects with various Washington-based organizations, most recently on issues of demographic concern to the U.S. military. Prior to serving as Director of the Census Bureau, Dr. Riche directed policy studies for the Population Reference Bureau, and was a founding editor of American Demographics magazine. Dr. Riche has

3

considerable knowledge and experience with the use and limitations of Census data across the public, private, for profit, and not-for-profit sectors.

*Amicus curiae* Vincent P. Barabba was the Director of the U.S. Census Bureau from 1973 to 1976 and from 1979 to 1980—the only director to be appointed by presidents of both political parties. After serving as Director of the Census Bureau, Dr. Barabba was appointed by Presidents Reagan and George H.W. Bush to be the U.S. Representative to the Population Commission of the United Nations. He has also served on the board of directors for the Marketing Science Institute, the American Institutes for Research, and the National Opinion Research Center of the University of Chicago. In recognition of his performance in the private and public sectors he has received: An Honorary Doctorate of Laws degree from the Trustees of the California State University, been Inducted into the Market Research Council Hall of Fame, and was awarded The Certificate of Distinguished Service for Contribution to the Federal Statistical System from the Office of Management and Budget. Currently, Dr. Barabba is a member of the California Citizens Redistricting Commission. He has a demonstrated interest in both accurate population statistics and redistricting.

4

## SUMMARY OF ARGUMENT

In order to comply with the equal protection principle of one-person, one-vote, nearly all states and jurisdictions redistrict using total population data based on counts from the most recent decennial U.S. Census. Appellants urge the Court to overthrow this long-settled practice and replace it with one of the two voter-based measures of population they propose— citizen voting age population or registered voters. Beyond the legal and policy flaws with Appellants' argument, serious practical concerns counsel against adopting either of their proposed metrics as a constitutionally mandated means of complying with the one-person, one-vote principle.

As an initial matter, there is no actual count of the number of voting age citizens. In keeping with the manner the Constitution provides for apportioning seats in the U.S. House of Representatives among the states, the Census Bureau counts the number of persons in each state. The Census Bureau does not count the number of citizens. The only voting age citizen data that exists are estimates based on a continual sampling conducted as part of the American Community Survey ("ACS") by the Census Bureau. But ACS was not designed with redistricting in mind. The timing of ACS estimates does not align with the timing of redistricting and ACS estimates are not reported at the small geographic levels redistricters normally use to build districts. Moreover, the geographic areas at which such estimates are available carry large error margins because of the small sample sizes. These factors make the ACS an inappropriate

5

source of data to support a constitutional rule requiring states to create districts with equal numbers of voting age citizens.

Nor is it possible to accurately obtain a count of voting age citizens by inquiring about citizenship status as part of the Census count.   Recent experience demonstrates lowered participation in the Census and increased suspicion of government collection of information in general.   Particular anxiety exists among non-citizens.  There would be little incentive for non-citizens to offer to the government their actual status; the result would be a reduced rate of response overall and an increase in inaccurate responses.  Both would frustrate the actual express obligation the Constitution imposes on the U.S. Census Bureau to obtain a count of the whole number of persons in order to apportion House of Representatives seats among the states.

Finally,   Appellants'   suggestion   that   voter registration data be used to draw districts is even more flawed.   Studies show that the country's voter registration data is often inaccurate and outdated.  And its inaccuracy aside, voter registration is, as this Court has already recognized, a fluctuating and political measure, making it generally a poor candidate for protecting a right to equal representation guaranteed by the Constitution.

Adequate data to support Appellants' positions simply do not exist.   The district court's judgment should be affirmed.

6

## ARGUMENT

A theory of how to determine equal protection for purposes of the one-person, one-vote principle is only as good as the data upon which it is built. Appellants urge the Court to adopt a constitutional rule that would require states to draw districts that have equal numbers of eligible voters rather than equal numbers of people. But the available data to implement such a requirement simply cannot bear the weight the Constitution requires. Indeed, such a requirement would in practice lead to serious equal protection violations because of the inherent uncertainty and fluctuation currently present in the various measures proposed by Appellants to tally eligible voters.[2] Moreover, there is strong reason to doubt sufficiently precise data could be obtained to ensure Appellants' theory of equal protection would ever be equal in practice.

An overview of the history and legal framework regarding population data aids in understanding the practical difficulties posed by Appellants' position.

---

[2] Indeed, as Appellants' own brief demonstrates, there is considerable fluctuation and uncertainty even among the multiple measures Appellant proposes as potential constitutional requirements. *See* Br. of Appellants at 9, 11-12.

7

## I. States Redistrict Based Upon Decennial Census Data that Counts the "Whole Number of Persons" in Each State and There Is No Count of "Citizens" by the Decennial Census.

### A. Legal Framework and History of the Census.

The Constitution contains only one explicit requirement regarding the enumeration of population: to properly apportion the number of seats in the House of Representatives among the states, "the whole number of persons in each State," U.S. Const. amend XIV, § 2, must be enumerated "every . . . ten years, in such Manner as [Congress] shall by Law direct," *id.* art. I, § 2.[3]

Since the original decennial Census in 1790, Congress has passed a number of laws regarding the Census.[4] The discretion afforded the Census Bureau to determine the content and methodology of the Census has grown over time. Originally, U.S. Marshals conducting the Census took an oath to obtain "a just

---

[3] As historical documents show, this was from the start understood to be a "Census of Inhabitants," without regard to citizenship. *See, e.g.*, Letter from Postmaster General Timothy Pickering to Secretary of State Thomas Jefferson, Dec. 26, 1793, http://founders.archives.gov/documents/Jefferson/01-27-02-0557 (last visited Sept. 23, 2015) (referring to the "Census of Inhabitants").

[4] *See generally* U.S. Census Bureau, Census Instructions, https://www.census.gov/history/www/through_the_decades/census _instructions/ (last visited Sept. 23, 2015) (providing description of congressional authorizations and instructions provided to U.S. Marshals, enumerators, and inhabitants from 1790 to 2010).

8

and perfect enumeration," *see* Act of Mar. 1, 1790, § 1, 1 Stat. 101.  Congress amended this provision in 1810 to require "an actual inquiry at every dwelling-house." Act of Mar. 26, 1810, § 1, 2 Stat. 565-66.  The current Census Act, enacted in 1954, also required data be collected by personal visit until it was modified first to permit some non-apportionment data to be obtained through statistical sampling, *see* 13 U.S.C. § 195, and then to repeal the requirement that Census data be obtained through personal visits, and thus permit the Census Bureau to obtain responses through the mail, *see* Act of Aug. 31, 1964, Pub. L. No. 88-530, 78 Stat. 737.

Currently, the only statutorily required data point the Census Bureau must obtain is a "tabulation of total population by States," 13 U.S.C. § 141(b), which is necessary to fulfill the constitutional mandate to apportion based on the "whole numbers of persons," U.S. Const. amend. XIV, § 2; *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 341 (1999) (holding that Census Act requires actual enumeration data, not sample-based counts, to be used for apportionment purposes).  Beyond that, the Secretary of Commerce, acting through the Census Bureau and its directors, is granted wide latitude to conduct the Census "in such form and content as he [or she] may determine, including the use of sampling procedures and special surveys.  In connection with any such census, the Secretary is authorized to obtain such other census information as necessary." 13 U.S.C. § 141(a).

Exercising the discretion afforded by Congress (and, in turn, conferred upon Congress by the

9

Constitution), the Census Bureau has, in every Census since 1970, asked only a limited number of questions (known as the "short form") as part of the actual enumeration of every person. These "short form" questions are generally limited to information such as name, age, sex, and race.[5] From 1970 to 2000, the Census Bureau also sent a "long form" to approximately one in every six households.[6] This "long form" was used to collect answers to a wider array of questions, including demographic, economic, social, and housing questions, as well as inquiring about citizenship status.[7] The data gathered through the "long form" sampling was used by local, state, and federal agencies to administer a wide range of government programs. *See Dep't of Commerce*, 525 U.S. at 341 (characterizing the Census as the "linchpin of the federal statistical system" (quotation marks omitted)).

---

[5] *See* U.S. Census Bureau, Index of Questions, https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Sept. 23, 2015).

[6] *See, e.g.*, U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Chapter 8: Accuracy of the Data 8-3 (July 2007), https://www.census.gov/prod/cen2000/doc/sf3.pdf. Although the total sample size was one in six households, it was not evenly distributed: a greater percentage of households in rural areas were sampled to increase the reliability of the data estimates in such areas. *Id.*

[7] *See* U.S. Census Bureau, Index of Questions, https://www.census.gov/history/www/through_the_decades/index_of_questions/ (listing long form questions for 1970 to 2000) (last visited Sept. 23, 2015).

10

Following the 2000 Census, the decennial "long form" was discontinued and was replaced by a continual sampling program called the American Community Survey ("ACS").   ACS collects the same type of information that was included on the long form, but does so on a continuous basis throughout the decade.[8] Each month, about 295,000 addresses are mailed the ACS questionnaire, for a total of 3.5 million households a year, or roughly one in thirty-eight households.[9]  The ACS data is then used to generate three sets of estimates, according to the size of the jurisdictions covered: a yearly report for cities and states with over 65,000 people, a three-year report for jurisdictions with over 20,000 people, and a five-year report for all jurisdictions.[10]  This practice reflects the small size of the ACS sample compared to the prior decennial long form, and the resultant larger sampling errors.  A new version of each report is published every year, with the most recent year's data replacing the oldest year's data in the three- and five-year versions.[11]  The smallest geographic unit for which ACS estimates are available

---

[8]  *See* U.S. Census Bureau, *American Community Survey Information Guide*, http://www.census.gov/acs/www/ about_the_survey/acs_information_guide/flipbook/.

[9] *Id.* at 6, 8.

[10]  *See* U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data* at 9 (Oct. 2008), https://www.census.gov/content/dam/Census/library/publications/2 008/acs/ACSGeneralHandbook.pdf; *see id.* Appendix 1 at A-1-A-2.

[11] *See id.* at 13.  For example, if one five-year report aggregates information from 2008 to 2013; the next report will cover 2009 to 2014.

11

is the Census block group level in the five-year report. Unlike short form counts, ACS estimates are never available at the individual Census block level.[12]

## B. States Rely on Census Data to Redistrict.

Understandably, states and municipalities do not generally fulfill their requirement to redistrict congressional, state legislative, and other local districts by conducting their own, separate population counts. Rather, they largely rely on Census data to perform their redistricting obligations. *See Bd. of Estimate of City of New York v. Morris*, 489 U.S. 688 (1989); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964). Indeed, the constitutions and laws of a number of states expressly require that decennial Census data be used to redistrict. *See, e.g.*, N.J. Const. art. IV, § 2, ¶ 1 (requiring state senate seats to be apportioned "as nearly as may be according to the *number of their inhabitants* as reported in the last preceding decennial census of the United States" (emphasis added)); Pa. Const. art. 2, § 17(a) (requiring redistricting to occur "each year following the Federal

---

[12] *Id.*, Appendix 1 at A-2. The Census Bureau has developed different levels of "statistical geography" to report information. The largest is the Census tract; typically each county will contain several tracts, with each tract having an ideal population of 4,000 (ranging from 1,200 to 8,000). *See* U.S. Census Bureau, *2010 Geographic Terms and Concepts*, https://www.census.gov/geo/reference/terms.html (last visited Sept. 23, 2015). Block groups are clusters of blocks within a tract, and contain between 600 and 3,000 people. *Id.* The lowest level of geography is the individual Census block, which follows physical features (such as the streets bounding a city block) or non-physical features (such as property lines). *Id.*

12

decennial census"); Ga. Const. art. 3, § 2 (same); Ill. Const. art. 4, § 3(b) (same); Fla. Stat. § 11.031(1) ("All acts of the Florida Legislature based upon population and all constitutional apportionments shall be based upon the last federal decennial statewide census"); Ill. Comp. Stat., ch. 55, § 2-3001c (defining "[p]opulation" for county board redistricting as "the number of inhabitants as determined by the last preceding federal decennial census"); *see also Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (approving the use of decennial Census counts for congressional redistricting, noting that because "the census count represents the best population data available, it is the only basis for good-faith attempts to achieve population equality" (internal quotation marks and citation omitted)).

States and municipalities do, however, generally use their own geographic units—called voter precincts—for purposes of conducting elections in their respective jurisdictions. Each voter precinct is comprised of a number of Census blocks. Congress has facilitated states' reliance on Census data for redistricting by providing that states may submit to the Census Bureau, three years prior to the decennial Census, the geographic boundaries for which they would like Census data to aid them in making redistricting decisions. *See* 13 U.S.C. § 141(c). Thus, states generally provide the Census with voter precinct information, and the Census in turn provides the states with data files that are organized by voter precincts.[13]

---

[13] If the Court holds that the Constitution requires states and local governments to use voting age citizens as the measure for the one-person, one-vote principle, nothing in the Constitution or in the

13

## II. Serious Practical Concerns Counsel Against Constitutionally Requiring States to Draw Districts with Equal Numbers of Voting Age Citizens.

A constitutional requirement mandating that states draw legislative districts with equal numbers of voting age citizens would be impossible to accurately implement with currently available data. Moreover, for several reasons, it would be difficult to obtain an accurate actual count, even were one attempted.

### A. ACS Citizenship Estimates Cannot Provide the Basis For a Constitutional Equal Protection Rule.

The actual number of voting age citizens in each state is unknown. The only information in existence is ACS's statistical sample-based estimates. In some circumstances, statistical sampling can be preferable to an actual count. *See Dep't of Commerce*, 525 U.S. at 322-23 ("Some identifiable groups—including certain minorities, children, and renters—have historically had substantially higher undercount rates than the population as a whole."); *id.* at 354 ("[U]nadjusted headcounts are also subject to error or bias—the very fact that creates the need for a statistical supplement") (Breyer, J., concurring in part, dissenting in part). But

---

current Census Act would require the Census Bureau to provide this information to states and local governments. Rather, the Court would be requiring states and local governments to obtain this information on their own, in the process abrogating the many state constitutional and statutory provisions linking the state process to the federal Census data.

14

the ACS was not designed to provide data to support a constitutional right to districts with equal numbers of voting age citizens.

### 1. The ACS Estimates Do Not Align with the Timing of Redistricting.

As an initial matter, the ACS estimates do not align with the timing of congressional apportionment or traditional legislative apportionment. States traditionally redistrict their state legislative districts at the same time as their congressional districts, using the same decennial Census count that triggered the congressional reapportionment. States thus use the Census count to create population equality among and within the states measured by a single, consistent snapshot in time that persists for the decade. As this Court explained in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), *superseded by statute on other grounds as stated in Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015):

> When the decennial census numbers are released, States must account for any changes or shifts in population. But before the new census, States operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned. After the new enumeration, no districting plan is likely to be legally enforceable if challenged, given the shifts and changes in a population over 10 years. And if the State has not redistricted in response to the new census figures, a federal court will ensure that the districts comply with the one-person, one-vote mandate before the next election.

15

*Id.* at 488 n.2.  This "legal fiction" is "necessary to avoid constant redistricting, with accompanying costs and instability."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 421 (2006) (opinion of Kennedy, J., joined by Souter, J., and Ginsburg, J.).

Using the ACS voting age citizen estimates would unsettle this system.  To begin, only the five-year information could be used because the one- and three-year reports are not statistically reliable at the small geographic units used to draw district boundaries.  *See supra* Part I.   This poses several problems that seriously undermine the ACS's utility for redistricting.

First, with respect to the ACS five-year survey, eighty percent of the data is already between two and five years old at the time of redistricting.  In contrast, redistricting occurs as soon as the population counts currently used by states is released by the Census Bureau.   To illustrate, if ACS estimates were used instead of the total population count, a state redistricting in 2021 would be using aggregated estimates spanning from 2015 to 2020.  Because the map drawn in 2021 would govern elections through the decade, by 2030, forty percent of the underlying aggregated estimates will be from questionnaires answered fourteen or fifteen years prior.  The ACS estimates are therefore a more stale source of information than the total population count currently relied upon by the states.

Second, because the ACS estimates contain five years of sampling, and the age information is not adjusted each year to reflect the passage of a year, many respondents who were between the ages of

16

thirteen and seventeen when their responses were recorded will continue to be excluded from the *voting age* citizen count at the time the estimates are used to draw district lines, despite the fact that they are in fact eighteen or older at that time. *See* Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardozo L. Rev. 755, 777 (2011). This problem is exacerbated, as discussed above, by the fact that district lines remain in place for a decade, meaning that at the end of the redistricting cycle, a thirty-two-year-old person is not "counted" as a voting age person in their district if she was seventeen when first surveyed.

Third, the share of minorities among people under the age of eighteen greatly exceeds their share of the total population.[14] As a result, areas with larger minority populations will be disproportionately affected by the use of ACS estimates that are not annually updated to reflect the actual age of respondents at the time the report is released, thus undercounting "eligible voters" among minority communities and therefore overpopulating minority legislative districts.

Together, these issues would result in outdated information governing district lines and entrenched undercounting of young voters, disproportionately affecting minority populations. For these reasons, the

---

[14] *See* Sandra L. Colby & Jennifer M. Ortman, U.S. Census Bureau, *Projections of the Size and Composition of the U.S. Population: 2014 to 2016* 10-11 (Mar. 2015), https://www.census.gov/content/dam/Census/library/publications/2015/demo/p25-1143.pdf.

17

use of five-year-old ACS estimates cannot support the constitutional one-person, one-vote requirement.

## 2. ACS Estimates Are Not Available at the Smallest Geographic Levels, and Some Data is Suppressed to Protect Privacy.

An additional problem is that ACS estimates are not available at the smallest geographical level that is actually used for purposes of redistricting—the Census block. The smallest geographic level at which ACS estimates can accurately be utilized is the block group level. *See Persily*, 32 Cardozo L. Rev. at 777. This would pose significant problem for states seeking to evenly populate districts. "In order to achieve the lowest possible levels of deviation within state legislative and congressional plans, state technicians have repeatedly advised the Census Bureau that they need decennial counts by small-area geography such as voting districts and census blocks."[15] States need data at granular levels in order to make a good-faith effort to equalize population to the extent possible among districts. *See Karcher*, 462 U.S. at 730 (requiring that, for congressional redistricting, states "make a good-faith effort to achieve precise mathematical equality" (quotation marks omitted)); *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (noting that the Court has permitted "minor deviations from mathematical equality among state legislative districts" (quotation marks omitted)). Without the granular Census block

---

[15] Catherine McCully, U.S. Census Bureau, *Designing P.L. 94-171 Redistricting Data for the Year 2020 Census* 7-8 (Dec. 2014), http://www.census.gov/content/dam/Census/library/publications/2014/rdo/pl94-171.pdf.

18

data typically used to balance population between and among districts, states relying upon ACS voting age citizen estimates likely will be unable to satisfy the standard this Court requires for legislative redistricting.

Moreover, even at the block group level, there are a number of geographical areas where there are too few people to permit the Census Bureau to even release estimates without jeopardizing privacy. Congress has mandated that Census data may only be used for "the statistical purpose for which it is supplied," 13 U.S.C. § 9(a)(1), and that the Census Bureau may not "make any publication whereby the data furnished by any particular . . . individual . . . can be identified," *id.* § 9(a)(2). As a result, the Census Bureau suppresses certain estimates that could be linked to identifiable persons in light of the small geographic size of the reporting area.[16]

States depend upon population counts being reported at small geographic units to permit districts to be built that meet the constitutional requirement for equal distribution of population. In addition, having decennial Census counts available at small geographic units makes it easier to follow voter precinct lines or other political subdivision lines, such as city boundaries, particularly where those lines have recently changed by annexations or precinct splits. The ACS voting age citizen estimates are not reported—and in some cases

---

[16] *See* U.S. Census Bureau, *American Community Survey: Data Suppression* 2, 7 (Nov. 15, 2013), http://www2.census.gov/ programs-surveys/acs/tech_docs/data_suppression/ ACSO_Data_Suppression.pdf.

19

are statutorily prohibited from being reported—at the Census block level.  The ACS estimates thus cannot meet the needs of states for redistricting purposes.

### 3. As a Statistical Sample, ACS Estimates Are Subject to Error That Makes their Use for Line-Drawing Difficult.

As with any survey, the ACS estimates are subject to non-sampling errors (*e.g.*, errors in data coding) and sampling errors (*e.g.*, the chosen sample is non-representative of the actual community).[17]  The ACS reports margins of error at the ninety percent confidence level.[18]  For example, if the ACS estimates reported that a county had 10,000 citizens over the age of eighteen, with a five percent relative error, nine times out of ten (ninety percent of the time) one could be confident that the actual citizen voting age population of the county was between 9,500 and 10,500.

The margin of error grows as the sample size decreases, so the smaller the area, the higher the possibility of error.  This could become a significant issue because redistricting decisions are often made on the margins, using very small geographic units to

---

[17] *See* U.S. Census Bureau, *American Community Survey Design and Methodology (January 2014)*—Chapter 15: Improving Data Quality by Reducing Non-Sampling Error, at 1 (Jan. 30, 2014), http://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_ch15_2014.pdf.

[18] U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey*, https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunitySurvey (last visited Sept. 23, 2015).

20

surgically move populations in and out of districts to satisfy the one-person, one-vote requirement. And, as discussed above, the smallest unit—the Census block—is not available with ACS estimates because of sample size limitations.

Take for example Titus County, Texas, where Appellant Sue Evenwel resides. *See* Br. of Appellants at 10. Titus County has eight Census tracts, each with between two and four Census block groups, for a total of twenty-two block groups—the smallest level of geography reported by the ACS. The relative error for the ACS's estimates of voting age citizens for the Titus County block groups range from a low of 14.1 percent to a high of 36.6 percent. Figure 1 below shows the estimates by block group for Titus County.

**Figure 1: Titus County, Texas CVAP Estimates with Absolute and Relative Error by Block Group (2009-2013)**

| Block Group | Est. CVAP with Absolute and Relative Error | Block Group | Est. CVAP with Absolute and Relative Error |
|---|---|---|---|
| 9501: #1 | 1,045 ±213 (20.4%) | 9505: #1 | 640 ±153 (23.9%) |
| 9501: #2 | 485 ±148 (30.5%) | 9505: #2 | 560 ±149 (26.6%) |
| 9502: #1 | 895 ±162 (18.1%) | 9506: #1 | 750 ±197 (26.3%) |
| 9502: #2 | 680 ±116 (17.1%) | 9506: #2 | 825 ±192 (23.3%) |
| 9503: #1 | 1,445 ±236 (16.3%) | 9506: #3 | 615 ±154 (25.0%) |
| 9503: #2 | 905 ±204 (22.5%) | 9507: #1 | 325 ±90 (27.7%) |
| 9503: #3 | 1,870 ±263 (14.1%) | 9507: #2 | 315 ±114 (36.2%) |
| 9503: #4 | 540 ±177 (32.8%) | 9508: #1 | 655 ±240 (36.6%) |
| 9504: #1 | 1,360 ±264 (19.4%) | 9508: #2 | 575 ±178 (31.0%) |
| 9504: #2 | 2,020 ±301 (14.9%) | 9508: #3 | 815 ±193 (23.7%) |
| 9504: #3 | 850 ±210 (24.7%) | 9508: #4 | 330 ±111 (33.6%) |

As Figure 1 shows, even if redistricters could conceivably rely upon block groups to move areas

21

among districts to properly draw boundaries, they would contend with relatively large error margins. For example, if an adjoining district needed to be increased by 330 voting age citizens, Block Group 4 of Census Tract 9508 would be considered. But the most that can be said is that nine times out of ten, one could be confident that there were between 219 and 441 voting age citizens in that area—a 33.6 percent relative error.

The error margins are still relatively high at the next largest geographic unit, the Census tract, as illustrated by Figure 2 below.

**Figure 2: Titus County, Texas CVAP Estimates and Error Margins by Census Tract**

| Census Tract | Est. CVAP | Absolute Error | 90% Confidence Range | Relative Error |
|---|---|---|---|---|
| 9501 | 1,530 | ± 210 | 1,320 – 1,740 | 13.7% |
| 9502 | 1,570 | ± 180 | 1,390 – 1,750 | 11.5% |
| 9503 | 4,755 | ± 297 | 4,458 – 5,052 | 6.2% |
| 9504 | 4,230 | ± 297 | 3,933 – 4,527 | 7.0% |
| 9505 | 1,200 | ± 182 | 1,018 – 1,382 | 15.2% |
| 9506 | 2,190 | ± 217 | 1,973 – 2,407 | 9.9% |
| 9507 | 635 | ± 123 | 512 – 758 | 19.4% |
| 9508 | 2,375 | ± 237 | 2,138 – 2,612 | 10.0% |

The relative error ranges from 6.2 to 19.4 percent for the Titus County Census tracts. So, if redistricters needed to move 635 people to a neighboring district, tract 9507 would be an obvious candidate, but using ACS estimates, the most they could know is that nine

22

times out of ten, it would contain between 512 and 758 citizens of voting age.[19]

All of these issues together—the timing issues, the unavailability of estimates at the block level typically used by redistricters, the unavailability of certain estimates because of privacy concerns, and the error margins combine to make the ACS voting age citizen estimates an inappropriate source to support the constitutional one-person, one-vote right.

This is not to say the ACS estimates are inappropriate for other uses. Because it is the only citizenship information that exists, where courts require citizenship information to support legal claims, as some have for cases under Section 2 of the Voting Rights Act, *see, e.g.*, *Valdespino v. Alamo Heights Independent School District*, 168 F.3d 848, 853 (5th Cir. 1999), it is the "best population data available," *Karcher*, 462 U.S. at 738 (quotation marks omitted). It is one thing to use less than perfect data when it is the only data available to meet a statutory evidentiary burden; it is quite another to create and impose a new constitutional rule that must necessarily be built upon that data.

---

[19] Data for both Figures 1 and 2 is taken from U.S. Census Bureau, Redistricting Data, *Voting Age Population by Citizen and Race (CVAP), 2009-2013 American Community Survey 5 Year Estimates*, https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html (last visited Sept. 23, 2015).

23

### B. Asking Citizenship Status of Every Household Would Lead to Reduced Response Rates and Inaccurate Responses, While Multiplying Privacy and Government Intrusion Fears.

Directly inquiring about citizenship status as part of the short form Census is not a solution to the data problem posed by Appellants' legal theory. Doing so would likely exacerbate privacy concerns and lead to inaccurate responses from non-citizens worried about a government record of their immigration status.

During the past two decades, the Census Bureau has had to contend with significantly increased distrust, based on concerns about government intrusion and privacy. When the 2000 Census was taken, controversy erupted over the Census questions, with congressional leaders and others calling on people to disregard questions they found intrusive.[20]  In one survey, 71 percent of respondents said that intrusive questions should go unanswered.[21]  This problem continued with the 2010 Census—between 2009 and 2010, one survey showed the Census Bureau dropped in its "trust" rating from 75 percent to 39 percent.[22]  One

---

[20] Kenneth Prewitt, *What if We Give a Census and No One Comes?*, 304 Sci. Mag. 1452 (June 4, 2004).

[21] *Id.*

[22] Andy Greenberg, *Census Paranoia Fueled Distrust in Government Privacy More than NSA Wiretapping*, Forbes, June 30, 2010, http://www.forbes.com/sites/firewall/2010/06/30/census-paranoia-fueled-distrust-in-government-privacy-more-than-nsa-wiretapping/.

24

Congresswoman publicly proclaimed that her family "will only be indicating the number of people in the household, because 'the Constitution doesn't require any information beyond that.'"[23]

A mandatory inquiry into citizenship status is all the more likely to engender privacy concerns, particularly among non-citizens. "The nuanced reasons for the question . . . will of course be lost to millions upon millions of Americans. The question will be viewed with suspicion."[24] "[I]t is foolish to expect that census-taking is immune from anxieties that surround such issues as undocumented aliens, immigration enforcement, terrorism prevention, national identity cards, total information awareness, and sharp increases in surveillance generally."[25]

In addition to both citizens and non-citizens simply not responding, "[n]on-citizens, mistrustful of the government's promise that their answers to a census question can never be used against them, will misrepresent themselves on the census form."[26]

---

[23] Prerana Swami, *Rep. Bachmann Refuses to Fill out 2010 Census*, CBS News (June 18, 2009), http://www.cbsnews.com/news/rep-bachmann-refuses-to-fill-out-2010-census/.

[24] *Counting the Vote: Should Only U.S. Citizens be Included in Apportioning Our Elected Representatives?: Hearing Before Subcomm. on Federalism and the Census of the H. Comm. on Gov't Reform*, 109th Cong. 77 (2005) (Statement of Kenneth Prewitt).

[25] *Id.* at 78.

[26] *Id.*

25

The sum effect would be bad Census data.  And any effort to correct for the data would be futile.

> The Census Bureau cannot become a quasi-investigatory agency and still perform its basic responsibilities as a statistical agency. Responses to a citizenship question cannot be validated on a case-by-case basis.  Although the bureau may devise ways to estimate the magnitude of misrepresentation in responses to a citizenship question at the national level, such an estimate would not likely be robust enough to be used in state-level counts—let alone at the smaller levels of geography relevant to congressional districting, state legislatures, and local government.[27]

Finally, because a one-by-one citizenship inquiry would invariably lead to a lower response rate to the Census in general, such an inquiry would seriously frustrate the the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states. *See* U.S. Const. art. II, § 1; *id.* amend XIV, § 2.[28]

Neither existing data estimates nor a potential actual count can reliably permit states to draw districts

---

[27] *Id.*

[28] Appellants offer no explanation for how it could be that the Fourteenth Amendment *forbids* Texas from apportioning seats within the state in the same manner the Fourteenth Amendment *requires* seats to be apportioned among the states.

26

with equal numbers of voting age citizens.  As a result, voting age citizen data cannot plausibly serve as a constitutionally-mandated metric for defining the one-person, one-vote principle.

### III. Voter Registration Data Would Be an Inappropriate Measure Upon Which to Require Districts To Be Drawn.

Appellants' alternative measure—voter registration data—is also an inappropriate measure by which to require states to draw districts.  The data is often inaccurate and unreliable, it is prone to dramatic changes, and it is generally available only at the voting precinct level, not at the smaller Census block level at which states generally draw districts.

Although this Court has before *permitted* a state to draw districts based on voter registration data, it did so only for an interim districting plan with assurances that the data in the particular case did not vary from other population measures.  In so doing, the Court expressed considerable doubts about the use of this data, stating:

> Use of a registered voter or actual voter basis . . . depends . . . upon the extent of political activity of those eligible to register and vote.  Each is thus susceptible to improper influences by which those in political power might be able to perpetuate underrepresentation of groups constitutionally entitled to participate in the electoral process, or perpetuate a ghost of prior malapportionment.  Moreover, fluctuations in the number of registered voters in a given election may be sudden and substantial, caused by such fortuitous factors as a peculiarly

27

controversial election issue, a particularly popular candidate, or even weather conditions.

*Burns v. Richardson*, 384 U.S. 73, 92-93 (1966) (internal quotation marks omitted) (footnotes omitted).  These problems have not changed since 1966 when *Burns* was decided.

A 2012 study by the Pew Charitable Trust found that approximately 24 million voter registration records in the United States—1 in 8—are invalid or inaccurate, including 12 million with incorrect addresses, suggesting voters had moved or the addresses were otherwise incorrect.[29]  The study also found 1.8 million deceased still registered, and 2.75 million voters registered in more than one state.[30]

Beyond the inaccuracy of voter registration data, state registration data simply is not available at the Census block level.  Rather, the smallest geographic unit at which voter registration data is available is the voter precinct level.  Thus, redistricters would not be able to move particular Census blocks from district to district and would instead be limited to moving precincts.  These geographic areas are generally too large to accurately draw districts with substantially equal populations.

---

[29] Pew Charitable Trust, *Inaccurate, Costly, and Inefficient: Evidence that America's Voter Registration System Needs an Upgrade* 3-4 (Feb. 2012), http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/PewUpgradingVoterRegistrationpdf.pdf.

[30] *Id.* at 4.

28

In light of the serious flaws in voter registration data, it would in most instances be a violation of equal protection for this metric to be used, contrary to Appellants' argument that the Constitution actually should require it.[31]

## CONCLUSION

For the foregoing reasons, the Court should affirm the decision of the district court.

Respectfully submitted,

J. Gerald Hebert
Trevor Potter
CAMPAIGN LEGAL
  CENTER
1411 K St. NW, Suite 1400
Washington, DC 20005
(202) 736-2200

Anita S. Earls
SOUTHERN COALITION
  FOR SOCIAL JUSTICE
1415 West Highway 54
Suite 101
Durham, NC 27707
(919) 794-4198

September 25, 2015

Paul M. Smith
Jessica Ring Amunson
  *Counsel of Record*
Mark P. Gaber
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

---

[31] The "Non-Suspense Voter Registration" metric offered by Appellants is equally flawed—it adds additional potential error related to mailing of notices. *See* Br. of Appellants at 9.

# Exhibit E

| From: | Bailey, Kate (CIV) |
|---|---|
| To: | Freedman, John A.; Federighi, Carol (CIV); Ehrlich, Stephen (CIV); Coyle, Garrett (CIV); Wells, Carlotta (CIV) |
| Cc: | DHo@aclu.org; Cc: Khan, Sania; asenteno@MALDEF.org; Todd Grabarsky; Raines, Chase; Thomas, Tina; Goldstein, Elena; Colangelo, Matthew; Gabrielle.Boutin@doj.ca.gov; Duraiswamy, Shankar; Matthew Wise; Rosenberg, Ezra; "Case, Andrew" |
| Subject: | RE: Remaining discovery productions |
| Date: | Tuesday, October 23, 2018 5:43:53 PM |
| Attachments: | DOJ00039722.pdf |
| | DOJ00039725.pdf |
| | DOJ00039728.pdf |
| | DOJ00039730.pdf |
| | DOJ00039733.pdf |
| | DOJ00039735.pdf |
| | DOJ00039736.pdf |
| | DOJ00039740.pdf |
| | DOJ00039743.pdf |
| | DOJ00039745.pdf |
| | DOJ00039747.pdf |
| | DOJ00039748.pdf |
| | DOJ00039749.pdf |
| | DOJ00039753.pdf |
| | DOJ00039756.pdf |
| | DOJ00039758.pdf |
| | DOJ00039759.pdf |
| | DOJ00039760.pdf |
| | DOJ00039764.pdf |
| | DOJ00129991.pdf |
| | Def."s R&Os to Census RFAs FINAL.pdf |
| | DOJ00129977.pdf |

Counsel,

Attached please find:

- Corrected versions of the documents we produced to you on October 9th in response to Judge Furman's order (these now contain both old and new bates numbers, for your reference)
- DOJ 15199 and DOJ 15200, which, as referenced in my email below, we have determined we can produce in full (the attachments show both old and new bates numbers, for your reference)
- Defendants' responses to NYIC Plaintiffs' requests for admission to Census

Regarding the full transcripts from the CBAMS focus groups, as promised, here is Dr. Abowd's explanation as to why the transcripts themselves cannot be subject to disclosure:

The transcripts from the 42 focus groups conducted as a part of the 2018 Census Barriers, Attitudes and Motivators Study were collected under the authority of Title 13 of the U.S. Code and are protected under Sections 9(a)(3) and 214 in exactly the same manner as the individual response data from a survey or census. As such, their release is subject to the approval of the Disclosure Review Board under the supervision of the Data Stewardship Executive Policy Committee, chaired by the Chief Operating Officer at the Census Bureau.

The OMB-approved Consent Form for these focus groups said:

**Are my answers confidential?**

Yes. The U.S. Census Bureau is required by law to protect your information (13 U.S.C. § 9 and § 214). The Census Bureau is not permitted to publicly release your responses in a way that could identify you or your household.

https://www.reginfo.gov/public/do/DownloadDocument?objectID=79530702

The DRB has an approved protocol for reviewing and releasing redacted transcript summaries, after-action reports, and scientific articles based on the analysis of focus group transcripts. It does not have any approved protocol for releasing full transcripts. Because current research shows that there is no reliable collection of algorithms for providing acceptable disclosure avoidance in the full transcripts, there is no plan to approve a protocol that would allow the DRB to release full transcripts.

Thank you,
**Kate Bailey**
Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7214
Washington, D.C. 20530
202.514.9239 | kate.bailey@usdoj.gov

**From:** Bailey, Kate (CIV)
**Sent:** Tuesday, October 23, 2018 3:23 PM
**To:** Freedman, John A. <John.Freedman@arnoldporter.com>; Federighi, Carol (CIV) <CFederig@CIV.USDOJ.GOV>; Ehrlich, Stephen (CIV) <sehrlich@CIV.USDOJ.GOV>; Coyle, Garrett (CIV) <gcoyle@CIV.USDOJ.GOV>; Wells, Carlotta (CIV) <CWells@CIV.USDOJ.GOV>
**Cc:** DHo@aclu.org; Cc: Khan, Sania <Sania.Khan@ag.ny.gov>; asenteno@MALDEF.org; Todd Grabarsky <Todd.Grabarsky@doj.ca.gov>; Raines, Chase <Chase.Raines@arnoldporter.com>; Thomas, Tina <TThomas@cov.com>; Goldstein, Elena <Elena.Goldstein@ag.ny.gov>; Colangelo, Matthew <Matthew.Colangelo@ag.ny.gov>; Gabrielle.Boutin@doj.ca.gov; Duraiswamy, Shankar <sduraiswamy@cov.com>; Matthew Wise <Matthew.Wise@doj.ca.gov>; Rosenberg, Ezra <erosenberg@lawyerscommittee.org>; 'Case, Andrew' <ACase@manatt.com>
**Subject:** Remaining discovery productions

Counsel,

In accordance with Judge Furman's order at last week's status conference, I write to provide most of the outstanding written discovery productions.

- Today we overnighted materials to the NYAG's offices and sent the same materials by courier to Arnold and Porter's DC offices.
  - Production letters for DOJ Productions 6, 7, and 8 are attached, as well as the accompanying privilege logs.
  - Production 7 is on an encrypted flash drive because it was too large to fit on CDs. The password for the drive is 333774206277, and instructions for use are included in the box. Kindly return the flash drives to us after you've copied the files, please. The remaining productions are on CDs, and the password is F3dprg20M!!!

○ Production 7 includes several "dead," or missing bates numbers, due to an inadvertent error on our end. The production was too large for us to re-run once we discovered those errors, so please understand that any missing bates numbers you observe in Prod007 are intentional.

○ In response to Dale Ho's email of 10/7, we previously produced 115 documents without bates numbers. Today we have also transmitted bates numbered versions of these documents. We did not previously address DOJ 15200, but we have determined that that document can be released in full. It will be provided by separate email later today.

○ In response to the DOJ doc issues raised in John Freedman's email of October 5th at 8:32 am, you requested that we produce email chains represented at DOJ 14907, 14922, 14996, 15002, 15006, 30720, 30723 and 30725. We have determined that we can release this chain in full, and these documents are attached to this email.

○ You requested more information about DOJ 15197, 15198, 15199, and 15200. These documents were in hard copy, and therefore no metadata exists for author, recipient, date, or time. These materials were collected from John Gore. As noted above, we have determined that DOJ 15200 can be released in full. In addition, we have determined that DOJ 15199 can be released in full, and will be coming later this afternoon. As noted in the privilege log entry for DOJ 15198, it is a copy of the Uthmeier memo provided to Gore, and DOJ 15198 is a note that accompanied DOJ 15197. These documents will not be released.

○ Also attached are the production letter and privilege log for Commerce Production 6.

○ On Thursday, 10/8, Elena wrote to us requesting the basis for our request to claw back two documents. The replacement documents also are attached. Information has been redacted as privileged in these two documents for the reasons set forth in the privilege log for the same redactions in COM_DIS00014369, Row 114.

• Also attached to this email are Defendants' responses to NYIC Plaintiffs' RFAs to the Department of Commerce and responses to the Third Interrogatories to all Defendants. Responses to NYIC Plaintiffs' RFAs to Census will be coming later today.

• By separate email momentarily, I will be providing you re-produced versions of the documents we produced on October 9th in response to Judge Furman's order—the new versions have both the original and new bates numbers.

• Sahra Park-Su is available for deposition this Thursday. David Langdon is available this Friday and, per my earlier email, John Gore's earliest date of availability also is Friday.

**Kate Bailey**
Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7214
Washington, D.C. 20530
202.514.9239 | kate.bailey@usdoj.gov

John H. Thompson
Director,
Bureau of the Census
US Department of Commerce
Washington, DC 20233


Dear Mr Thompson:

We are writing to formally request the reinstatement of a question on the 2020
Census questionnaire relating to citizenship.   The Department seeks to reinstate
the question because of recent Court decisions _____ where courts
required enumerated  (block level) data related to voting age population.  This data
can only be provided based on enumerated (Census), rather than sample (ACS)
data.

We are aware that the 2010 Census was the first decennial census since the 1880
Census without a question about citizenship.  We also note that the American
Community Survey, which replaced the "long form" version of the questionnaire in
the decennial 2000 Census, asks a question about citizenship.  We are not aware
that of any serious concerns relating to the presence of a citizenship question on
the ACS.

We understand that the Bureau personnel may believe that ACS data on
citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be
aware that two recent Court cases have underscored that ACS data is not viable
and/or sufficient for purposes of redistricting.  Two important citations from these
cases are as follows:

_____

We note that in these two cases, one in 2006 and one in 2009, courts reviewing
compliance with requirements of the Voting Rights Act and its application in
legislative redistricting, have required Latino voting districts to contain 50% + 1 of
"Citizen Voting Age Population (or CVAP).  It is clear that full compliance with
these Federal Court decisions will require block level data than can only be
secured by a mandatory question in the 2020 enumeration.  Our understanding is
that data on citizenship is specifically required to ensure that the Latino
community achieves full representation in redistricting.

We accordingly request that the Bureau prepare, without delay, the appropriate
question on citizenship for the 2020 Census, and submit this addition for 2020

Census for OMB Review and other appropriate notifications.

Please let me know if you have any questions about his letter or wish to discuss this subject.  I can be reached at (202) ------- or _____@doj.gov.

Sincerely yours,


Attachment.


Cc:

Exhibit F

**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

### DEC 1 2 2017

### VIA CERTIFIED RETURN RECEIPT
*7014 2120 0000 8064 4964*

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans. In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called "long form" census. This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting. To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected. As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority. See *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district. See, e.g., *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023–24 (5th Cir. 2009); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Negrn v. City of Miami Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); see also *LULAC v. Perry*, 548 U.S. 399, 423–442 (2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

000663

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation … in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos*, 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide* at 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22, 2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

•        Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

2

000664

- Because the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

- The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunity Survey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

- Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia*, to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

3

# Exhibit G

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK

2
   - - - - - - - - - - - - - -x
3     NEW YORK IMMIGRATION         :
      COALITION, et al.,           :
4                                  :
         Plaintiffs,               :
5                                  :   Case No.
         v.                        :
6                                  :   1:18-CF-05025-JMF
      UNITED STATES DEPARTMENT     :
7     OF COMMERCE, et al.,         :
                                   :
8        Defendants.               :
   - - - - - - - - - - - - - -x
9                                  Friday, October 16, 2018
                                        Washington, D.C.
10

11

12   Videotaped Deposition of:
13                      JOHN GORE,
14   called for oral examination by counsel for the
15   Plaintiffs, pursuant to notice, at the law offices of
16   Covington & Burling, LLP, One City Center, 850 Tenth
17   Street, Northwest, Washington, D.C. 20001-4956,
18   before Christina S. Hotsko, RPR, CRR, of Veritext
19   Legal Solutions, a Notary Public in and for the
20   District of Columbia, beginning at 9:05 a.m., when
21   were present on behalf of the respective parties:
22

Page 35

1    the judgment of the Census Bureau from publicly

2    available information.  Secretary Ross issued a

3    memo of decision with respect to the letter that

4    the Department of Justice submitted in which he

5    decided, among other things, to order

6    reinstatement of the citizenship question on the

7    census questionnaire.

8           I also had watched at least portions of

9    the May 8th hearing before the committee that you

10   referenced earlier, and understood from testimony

11   at that hearing that that was the position of the

12   Census Bureau.

13      Q.  So when you say the judgment of the

14   Census Bureau, whose judgment, if you could

15   identify individuals, are you referring to?

16      A.  Secretary Ross would be one.  And the

17   other would be -- I can't remember who it was who

18   testified at the hearing, but it was whoever

19   testified at the hearing about the accuracy of a

20   hard count versus an estimate.  It may have been

21   Ron Jarmin or somebody else.  I just can't

22   remember.

Page 36

1    Q.   May 8th -- the May 8th hearing?

2    A.   The May 8th hearing, yeah.

3    Q.   And when you say Ron Jarmin, you're

4  referring to the acting director of the Census

5  Bureau?

6    A.   That's who I understand he is.  I've

7  never met him.

8    Q.   When you testified that it was the

9  judgment of the Census Bureau that CVAP data

10  collected through the decennial enumeration would

11  be more accurate, what did you mean by more

12  accurate?

13    A.   As I understand the judgment of the

14  Census Bureau, it's that the hard count would be

15  more accurate than an ACS estimate because an ACS

16  estimate has a margin of error associated with it

17  and also requires an extrapolation because, as

18  you're no doubt aware, the ACS estimates are only

19  released at the block group level, and so further

20  extrapolation is required to estimate CVAP levels

21  at the block level.

22         And it was my understanding, from

Page 37

1    Secretary Ross' memo and the testimony that I

2    believe I heard on May 8th, that the Census Bureau

3    believed that a hard count would be more accurate

4    than estimates of an extrapolation with an

5    associated margin of error.

6         Q.  And just so we're clear on your

7    understanding, your understanding is that, in the

8    judgment of the Census Bureau, it would be more

9    accurate to have CVAP data collected through the

10   decennial enumeration than the existing ACS data

11   for two reasons:  One, the decennial enumeration

12   data is a hard count and not an estimate; and,

13   two, the decennial enumeration data is available

14   at the census block level, and so you wouldn't

15   have to perform an estimation procedure the same

16   way that you do with the ACS; is that right?

17              MR. GARDNER:  Objection.  Compound.

18              THE WITNESS:  As I understand your

19   question, I believe that was Secretary Ross'

20   judgment on behalf of the Department of Commerce,

21   of which the Census Bureau is part.  I don't have

22   his memo right in front of me, so I can't -- I'm

Page 38

1   going off of my memory rather than a document

2   that's in front of me.  But my recollection of

3   that is that he analyzed a number of different

4   options and concluded that reinstating the

5   question on the census questionnaire, in addition

6   to other data, would provide the most accurate and

7   complete picture of data for the Department of

8   Justice's purposes.

9   BY MR. HO:

10      Q.  Now, all things being equal, the

11  Department of Justice would want to use the CVAP

12  data that was, in the Census Bureau's view, the

13  more accurate data available, correct?

14      A.  I think that's probably correct.  I guess

15  I could imagine a scenario, which I don't know is

16  present here or not, where we would make a

17  different judgment as to what was more accurate

18  than the Census Bureau might.  But that's correct.

19      Q.  When you say we would make a different

20  judgment as to what is more accurate than the

21  Census Bureau might, who's we?

22      A.  The Department of Justice.

Page 39

1      Q.  Who's we at the Department of Justice who

2   is in a position to make an assessment as to

3   whether or not CVAP data is more accurate than the

4   Census Bureau?

5      A.  I don't know.  I can't point to any

6   individual person.  But, of course, we're

7   constantly reviewing the data, the various data

8   sources, the academic literature.  We send people

9   to conferences so that we can understand the

10  latest about data in this area and other

11  demographic areas.

12         But I don't believe there's any dispute

13  at this point about what would be more accurate.

14  And the Census Bureau is charged to make that

15  judgment, as I understand it, as a matter of law.

16     Q.  Do you think you're better situated than

17  career Census Bureau professionals to make an

18  assessment as to the accuracy of various forms of

19  CVAP data?

20     A.  Me personally?

21         MR. GARDNER:  Objection to form.

22         THE WITNESS:  Me personally?

Page 40

```
 1   BY MR. HO:

 2        Q.   Yes.

 3        A.   No, I don't.

 4        Q.   Let's look at page 2 of your testimony.

 5   Oh, I'm sorry --

 6        A.   It appears to be a list of the committee

 7   members' names.

 8        Q.   Yeah.

 9        A.   I'm happy to review that.

10        Q.   We'll come back to that.

11             Let's look at page 37 of your testimony.

12   So the second-to-last question here is from

13   Representative Krishnamoorthi.  And he asks you,

14   "Let me shift to another issue, which is, is the

15   DOJ aware of any study, analysis, or projection of

16   how the inclusion of the citizenship question will

17   affect the response rate for the census?"

18             Your response was, "That's a great

19   question, Congressman.  I don't know the

20   Department of Justice is aware of that.  That's

21   really a question for the Department of Commerce

22   and the Census Bureau, since it is the Secretary
```

Page 41

1   of Commerce's province to decide which questions

2   get included or are not within the bounds set by

3   law."

4           When Representative Krishnamoorthi used

5   the term --

6       A.  Can you read the rest of my answer for

7   completeness?

8       Q.  "My understanding is that, from Secretary

9   Ross' memo, that he took a hard look at that issue

10  and didn't find empirical evidence to suggest that

11  the question would lead to a reduction in response

12  rates.  That's based on the memo of decision that

13  he issued.  I obviously can't speak on his

14  behalf."

15          Did I read that right?

16      A.  Thank you.  Yes.

17      Q.  When the representative uses the term

18  "response rates," what did you understand him to

19  mean?

20      A.  I understood him to be suggesting that

21  adding a question and, in particular, reinstating

22  a citizenship question might cause people not --

Page 42

1   some incremental number of people not to answer

2   the -- that question or fill out the census form.

3        Q.  And your testimony was, on May 21st, that

4   DOJ was not aware of any analysis indicating that

5   the inclusion of the citizenship question will

6   affect response rates to the census?

7             MR. GARDNER:  Objection.

8   Mischaracterizes the document.

9             THE WITNESS:  I think what I've testified

10  to is -- is what is here in the record, and that

11  answer speaks for itself.

12  BY MR. HO:

13       Q.  Well, what did you mean by that?  Were

14  you aware of any analysis as to whether or not

15  including the citizenship question on the census

16  could affect the rate at which the people respond

17  to the census?

18       A.  As I said then, and as I sit here today,

19  no, I'm not aware of any -- any data on that

20  issue.  And as I further explained, Secretary Ross

21  in his memo explains that he took a hard look at

22  that issue and found no empirical evidence to

Page 43

1    support the conclusion that there be a reduction

2    in response rates from reinstatement of the

3    citizenship question on the census questionnaire.

4         Q.  One more question about your testimony

5    for now.  On page 27, the last question on the

6    page from Representative Gowdy:  "So if

7    Secretary Ross wanted to include a question,

8    what's your favorite movie, how would a court

9    determine whether or not that was an appropriate

10   question?  I mean, I guess what I'm getting at is,

11   what is the standard by which you judge the

12   legitimacy of the inclusion or exclusion of a

13   question on the census form?"

14        Your response:  "I think that is a very

15   good question.  It's probably better directed to

16   the commerce department.  I'm not involved in the

17   litigation.  That's being handled out" -- and then

18   you got cut off.

19        What do you mean when you testified on

20   May 21st that you're not involved in the

21   litigation over the citizenship question?

22        A.  I am not a counsel of record in that

Page 63

1    your letter from Justice to the Census Bureau went

2    out requesting a citizenship question, what were

3    you aware of with respect to the nature of those

4    pre-September 8th conversations?

5           MR. GARDNER:  Same objection.  Same

6    instruction.

7           THE WITNESS:  I can tell you that I was

8    aware of the fact that conversations had occurred.

9    And beyond that, I don't believe I can give an

10   answer in light of the instruction I've just

11   received.

12   BY MR. HO:

13      Q.  When you say that you were aware of the

14   fact that conversations occurred, what do you mean

15   by conversations?

16      A.  I mean -- a conversation is a

17   communication between two or more people, and I

18   was aware that two or more people had talked to

19   each other.

20      Q.  When you say that you were aware that two

21   or more people had talked to each other, which

22   people were you aware had talked to each other?

Page 64

1        A.   It was my understanding that somebody

2   from Commerce had spoken to Mary Blanche Hankey,

3   that someone had spoken to James McHenry, and that

4   Secretary Ross had spoken to the attorney general.

5        Q.   And that all of those conversations were

6   about the inclusion of a citizenship question on

7   the census?

8        A.   I wasn't a party to those conversations,

9   but my understanding is that they would have

10  touched on that issue.

11       Q.   James McHenry is the director of the

12  Executive Office for Immigration Review within

13  DOJ, correct?

14       A.   He is now, although at that time he

15  wasn't.  At that time, he was on detail to the

16  Office of the Associate Attorney General.  And he

17  had come from somewhere else.  I can't remember.

18  I think it was OCAHO, which is -- since we're in

19  D.C. and talking about government things, it's an

20  acronym that -- I don't know what it stands for.

21  But Mr. McHenry has been involved -- has been an

22  employee of the department for some time, but in

Page 89

1    conversation I had with Mr. Gary about this took

2    place around Halloween.

3    BY MR. HO:

4         Q.   My question wasn't about --

5         A.   2017.

6         Q.   My question wasn't about your next

7    interaction with Mr. Gary.

8         A.   Oh, I'm sorry.

9         Q.   It was just your next interaction about

10   the citizenship question on the decennial census.

11        A.   I see.

12        Q.   After this e-mail exchange with Mr. Gary,

13   when was the next interaction that you had about

14   the issue of a citizenship question on the

15   decennial census?

16        A.   That's a fair question.  Around the -- I

17   don't know -- I guess I don't know which was the

18   next communication I had or who it was with.

19        Q.   Okay.

20        A.   I was communicating with various

21   individuals at that time about the issue.

22        Q.   Have you ever discussed the issue of the

Page 90

1  citizenship question with Secretary Ross?

2      A.  No.

3      Q.  Prior to May 2017 -- so I'm changing the

4  time period here a little bit --

5      A.  Sure.

6      Q.  -- had you ever raised the issue of a

7  citizenship question on the decennial census

8  questionnaire?

9      A.  No.

10      Q.  Were you consulted by Secretary Ross

11  regarding whether the Department of Justice would

12  support or request the inclusion of a citizenship

13  question on the decennial census?

14          MR. GARDNER:  Objection.  Vague.

15          THE WITNESS:  No.

16  BY MR. HO:

17      Q.  Were you consulted by Secretary Ross'

18  staff regarding whether the Department of Justice

19  would support or request inclusion of a

20  citizenship question on the census?

21          MR. GARDNER:  Same objection.

22          THE WITNESS:  Who do you mean by staff?

Page 91

1   BY MR. HO:

2       Q.   Anyone who works in the front office of

3   the Department of Commerce.  Were you ever

4   consulted by front office Department of Commerce

5   employees -- that's what I mean by Secretary Ross'

6   staff --

7       A.   Okay.

8       Q.   -- regarding whether the Department of

9   Justice would support or request the inclusion of

10  a citizenship question on the census?

11          MR. GARDNER:  Same objection.

12          THE WITNESS:  I guess I'm still not clear

13  on what you mean by the front office of the

14  Department of Commerce.  I can recall speaking to,

15  I believe, three individuals at the Department of

16  Commerce about this issue.

17  BY MR. HO:

18      Q.   Who are the three individuals at the

19  Department of Commerce --

20      A.   Sure.

21      Q.   -- that you spoke to about the

22  citizenship question on the census?

Page 92

1       A.   I didn't mean to cut you off, and I

2   apologize, again, to the court reporter for being

3   a fast talker.

4           I recall speaking to Peter Davidson,

5   James Uthmeier, U-T-H-M-E-I-E-R -- and Wendy

6   Teramoto.

7       Q.   When was the first occasion on which you

8   consulted with one of those three individuals

9   about the inclusion of a citizenship question on

10  the census?

11      A.   I'm not sure I would describe it as a

12  consultation as much as I would describe it as a

13  conversation about various issues related to the

14  reinstatement of a citizenship question on the

15  census questionnaire.  I can recall having

16  conversations starting sometime around this

17  September 2017 time frame.

18      Q.   Who was the first of those three

19  individuals that you had a conversation with about

20  the inclusion of a citizenship question on the

21  2020 census?

22      A.   Peter Davidson.

Page 93

1      Q.   And roughly when was your first
2   conversation with Peter Davidson about including a
3   citizenship question on the 2020 census?
4      A.   I don't recall exactly, but I would say
5   it was probably around mid-September of 2017 or
6   somewhere in that time frame.
7      Q.   After you spoke to Mr. Davidson in
8   mid-September, what was the next conversation that
9   you had among those three individuals from
10  Commerce about the citizenship question?
11     A.   I don't recall exactly when it was.  I
12  had several conversations with Peter Davidson
13  beginning in September and continuing through
14  December.  I had a couple of conversations as well
15  with Mr. Uthmeier, including at least one between
16  just Mr. Uthmeier and me and one, and maybe two,
17  where Mr. Uthmeier and Peter Davidson were both
18  involved.  Then I had a conversation at one point
19  with Wendy Teramoto about a scheduling issue that
20  I think took place in October of 2017, but I don't
21  recall exactly.  Somewhere in that time frame.
22     Q.   Roughly when was your first conversation

Page 94

1   with Mr. Uthmeier about the citizenship question?

2       A.  I think it would have been either late

3   September or sometime in October of 2017.

4           MR. HO:  We've been going for a little

5   over an hour, about an hour-ten.  Would now be an

6   okay time for a first break?

7           MR. GARDNER:  That's fine with me, yeah.

8           MR. HO:  Great.

9           VIDEO TECHNICIAN:  This concludes media

10  unit number 1.  The time on the video is

11  10:19 a.m.  And we are off the record.

12          (A recess was taken.)

13          VIDEO TECHNICIAN:  This begins media unit

14  number 2.  The time on the video is 10:37 a.m.  We

15  are on the record.

16  BY MR. HO:

17      Q.  Mr. Gore, I just want to follow up

18  on something from before the break.  The

19  communications between the Department of Justice

20  and the Department of Commerce about the

21  citizenship question, those communications were

22  not initiated by the voting section, correct?

Page 127

1   the 2020 census questionnaire, correct?

2        A.   Correct.

3        Q.   Is it fair to say that you wrote the

4   first draft of the letter from the Department of

5   Justice to the Census Bureau requesting a

6   citizenship question on the 2020 census

7   questionnaire?

8        A.   Is that a question?  I'm sorry.  That

9   sounded like a statement.

10        Q.   No.  It was a question.

11        A.   Okay.

12        Q.   Is it fair to say that you wrote the

13   first draft of the letter from the Department of

14   Justice to the Census Bureau requesting a

15   citizenship question on the 2020 census

16   questionnaire?

17        A.   Yes.

18        Q.   You write in this e-mail that you

19   discussed the draft letter with Mr. Herren

20   yesterday.

21             Would that have been your first

22   conversation with Mr. Herren about the citizenship

Page 150

1    was conveying there is that Mr. Gary didn't need

2    to work late on a Friday night during the holiday

3    season to send the letter out.

4         Q.  So just so I understand the process here,

5    you had -- you first had communications about the

6    issue of a citizenship question sometime around

7    Labor Day of 2017, correct?

8         A.  Give or take, yes, that's correct.

9         Q.  You drafted the initial draft of the

10   letter to request the citizenship question

11   sometime around the end of October or early

12   November of 2017, correct?

13        A.  Correct.

14        Q.  The conversations to add the citizenship

15   question with the Department of Commerce were not

16   initiated by the civil rights division, correct?

17        A.  Correct.

18        Q.  And they were not initiated by the

19   Department of Justice, correct?

20        A.  That's my working understanding.

21        Q.  Around the time that you wrote the first

22   draft of this letter, you received input from

Page 151

1    three individuals:  Mr. Herren, Ms. Pickett, and

2    Mr. Gary, correct?

3         A.  Yes.  And I may have received input from

4    others as well.

5         Q.  Around the time of the first draft of the

6    letter in early November of 2017, who else did you

7    receive input from other than Mr. Herren,

8    Ms. Pickett, and Mr. Gary?

9         A.  Mr. Aguinaga would have provided -- may

10   have provided some input.  I would have had

11   discussions on -- regarding the letter generally

12   with Patrick Hovakimian, who at the time was

13   detailed to the Office of Associate Attorney

14   General, and with Jesse Panuccio in the Office of

15   the Associate Attorney General.

16          And I had various conversations with

17   others at various times throughout this process.

18   But I don't recall who else I would have spoken to

19   at that particular moment in time, around

20   November 1st of 2017.

21        Q.  Okay.  Around November 1st of 2017, the

22   only career staff in the civil rights division

                                                    Page 152

1    from whom you received input on the letter was

2    from Mr. Herren, correct?

3         A.   That's correct.

4         Q.   After that period of early November

5    of 2017 when you had drafted the initial draft of

6    that letter, Mr. Herren gave you some edits,

7    correct?

8         A.   That's correct.

9         Q.   After that time, did you receive any

10   further edits from Mr. Herren to the draft letter?

11        A.   I don't recall one way or the other.

12        Q.   So you have no recollection of receiving

13   input from career civil rights division staff on

14   the letter requesting a citizenship question other

15   than that one occasion in early November around

16   the time of the first draft from Mr. Herren,

17   correct?

18        A.   I believe that's correct.  Yeah.

19        Q.   You continued to revise the letter after

20   early November of 2017 with input from different

21   people.  But after that first round of edits from

22   Mr. Herren, you received no subsequent edits from

Page 153

```
 1  people who were career staff in the civil rights

 2  division, correct?

 3            MR. GARDNER:  Objection.  Compound.

 4            THE WITNESS:  To the extent I understand

 5  your question, I believe that's correct.

 6  BY MR. HO:

 7       Q.  During this period when you were revising

 8  the letter to request a citizenship question, you

 9  had multiple conversations with legal staff at the

10  Department of Commerce, correct?

11       A.  Yes.

12       Q.  And the edits that you were receiving to

13  the letter from other DOJ personnel included

14  political appointees in the front office of the

15  Department of Justice and in the front office of

16  the civil rights division, correct?

17       A.  I -- certainly that's correct with

18  respect to the leadership offices at the

19  Department of Justice.  I can't remember if I was

20  receiving edits from the front office of the civil

21  rights division at that time after receiving the

22  edits from Ms. Pickett.
```

Page 154

1      Q.   Who made the final decision to send the

2   letter requesting the citizenship question be

3   added to the 2020 census questionnaire?

4      A.   I'm not sure I know.   And I can't recall

5   who communicated the final decision to me.

6      Q.   The letter was ultimately sent on

7   December 12th, 2017 --

8      A.   Correct.

9      Q.   -- correct?

10      A.   Correct.

11      Q.   Who gave the final signoff to put that

12   letter in the mail?

13          MR. GARDNER:   Objection.   Asked and

14   answered.

15          THE WITNESS:   I don't recall who gave the

16   final signoff.

17   BY MR. HO:

18      Q.   Was it you?

19      A.   No, I don't believe I would have given

20   the final signoff.   But maybe.   I guess it depends

21   on what you're asking.   Like, who told Art Gary he

22   could press "send" on the e-mail?   I don't

Page 155

 1    understand your question.

 2         Q.  Yes, that's my question.

 3         A.  I don't know.

 4         Q.  You don't know whether or not you did?

 5         A.  I don't recall whether it was me or

 6    somebody else.

 7         Q.  All right.

 8         A.  It's possible it could have been me.

 9              (Gore Deposition Exhibit 17 marked for

10              identification and attached to the

11              transcript.)

12    BY MR. HO:

13         Q.  I'm going to show you what's been marked

14    as Exhibit 17.  This is a document in the

15    administrative record, the first page of which has

16    the number 000663.  This is a letter stamped

17    December 12th, 2017, from Arthur Gary at the

18    Department of Justice addressed to Ron Jarmin at

19    the Census Bureau, correct?

20         A.  Yes.  It appears to be.

21         Q.  And this is the letter we've been talking

22    about in which the Department of Justice

Page 284

1    with Arthur Gary about the decision over whether

2    or not to meet with Census Bureau personnel to

3    discuss their proposal to produce block-level CVAP

4    data without a citizenship question?

5         A.   I have no awareness on that one way or

6    the other.

7         Q.   Dr. Jarmin is correct that DOJ leadership

8    did not want to meet to discuss the technical

9    aspects of the citizenship question request,

10   correct?

11        A.   I'm sorry, can you repeat that question?

12        Q.   Dr. Jarmin was correct that DOJ

13   leadership did not want to have a technical

14   meeting to discuss DOJ's request for block-level

15   CVAP data, correct?

16        A.   I believe that's correct.

17        Q.   The reason you didn't want to have that

18   meeting is because it was more important to the

19   Department of Justice to get a citizenship

20   question on the 2020 census questionnaire than to

21   get accurate block-level CVAP data, correct?

22             MR. GARDNER:  Objection.  Calls for

Page 285

 1   information subject to deliberative process

 2   privilege.

 3           To the extent you can answer that

 4   question without divulging privileged information,

 5   you may do so.  Otherwise, I instruct you not to

 6   answer.

 7           THE WITNESS:  Consistent with that

 8   instruction, the answer I can give is that

 9   Secretary Ross determined in his memo of decision

10   that the best possible way to proceed is the way

11   that he approved.  And he specifically considered

12   and rejected an alternative that called for

13   comparing administrative records and other

14   information, survey data, already available to the

15   Census Bureau.

16           MR. HO:  Well, I know we haven't been

17   going for all that long, I just drank a little too

18   much coffee.  I apologize, but I think I need to

19   take a --

20           MR. GARDNER:  You don't need to talk

21   about that on the record.  It's okay.

22           MR. HO:  I can talk about it more on the

Page 317

1   substantial lowering of the response rate."

2           Do you see that?

3       A.   Yes.

4       Q.   Now, Mr. Gore, when you testified in

5   Congress that you were not aware of any analysis

6   that the citizenship question would reduce

7   response rates to the census, you didn't mention

8   the fact that you had received multiple e-mails

9   from -- one from Chris Herren and at least one

10  from Arthur Gary that referenced analyses

11  indicating that the inclusion of a citizenship

12  question would reduce response rates, correct?

13          MR. GARDNER:   Objection.

14  Mischaracterizes the documents.

15          THE WITNESS:   That, again, is a gross

16  mischaracterization of this document.   This

17  document doesn't contain any analysis on that

18  question.   It simply conveys that the authors of

19  the document purport to hold the opinion that

20  there would be a certain result.

21          Moreover, the New York Times article

22  doesn't contain any analysis.   It contains quotes

Page 318

1   from people who hold a particular view or opinion,

2   but there's no analysis or data on that question.

3            Secretary Ross, when he took a hard look

4   at this, from what I understand based on the

5   publicly available memo of decision, didn't find

6   any empirical evidence to support that view,

7   claim, or opinion.

8            So this is not an analysis of that issue.

9   BY MR. HO:

10       Q.   Okay.  So as of the date of your

11  testimony in Congress, you were aware that people

12  had the opinion that the citizenship question

13  would reduce response rates, right?

14       A.   Yes.

15       Q.   Okay.  But you're saying the reason you

16  didn't mention that is because you believe that

17  was an opinion but not analysis, correct?

18            MR. GARDNER:  Objection.

19  Mischaracterizes the witness' testimony.

20            THE WITNESS:  I believe the -- and again,

21  I don't have the testimony in front of me.  I'm

22  happy to look back at the transcript.  I believe I

Page 339

1    redistricting should be conducted using total

2    population or some other measure?

3         A.   I imagine I have.  Yes.

4         Q.   And do you recall any of those

5    conversations that are not covered by deliberative

6    privilege?

7         A.   No.

8         Q.   So every conversation that you've ever

9    had is covered by deliberative privilege with

10   regard to this citizenship question issue?

11             MR. GARDNER:  Objection.

12   Mischaracterizes the witness' previous testimony.

13             THE WITNESS:  I would say conversations

14   that I can recall that have taken place while I've

15   been employed by the Department of Justice would

16   all fall within that category, that's correct.

17   It's possible that I had conversations regarding

18   that topic while I was in private practice, but

19   those obviously were before my time serving in the

20   government and wouldn't relate to this particular

21   letter.

22             There was a case that went to the Supreme

Page 340

1    Court a couple of terms ago, the Evenwel versus

2    Abbott case, which raised this issue, and I may

3    have discussed that case or read the briefs in

4    that case while I was still in private practice.

5    BY MS. HULETT:

6         Q.   Did you have an opinion as to whether or

7    not Evenwel was decided correctly by the U.S.

8    Supreme Court?

9         A.   At what point in time?

10        Q.   After the opinion came out.

11        A.   Yeah, the opinion came out while I was in

12   private practice, and I believe I had an opinion

13   on that.

14        Q.   And what was your opinion on that at that

15   time?

16        A.   That it was correctly decided.

17        Q.   Have you had any conversations with any

18   state officials -- let me start again.

19             Have there been any state officials that

20   communicated to the Department of Justice about

21   the possibility of using data other than total

22   population for redistricting purposes?

Page 341

1      A.   I don't know -- I can't speak for other

2   individuals in the Department of Justice.  I can

3   tell you that no state official has communicated

4   with me about that.  Whether some state official

5   has communicated with some other person associated

6   with the Department of Justice, I don't know.

7      Q.   I'm going to ask you a few questions

8   about Section 203.  Are you familiar with

9   Section 203 of the Voting Rights Act?

10      A.   Yes.

11      Q.   And do you agree that Section 203

12   requires the director of the census to determine

13   which jurisdictions meet the requirements for

14   coverage under Section 203?

15      A.   Yes, I do.

16      Q.   And in order to make that determination,

17   do you agree that it's necessary to estimate the

18   total population of voting age persons who are

19   citizens?

20      A.   Yes.  I believe that's correct.

21      Q.   And that the permitted data source for

22   those estimates are the most current available ACS

Page 342

1   data; isn't that correct?

2        A.   That is correct.   Those determinations

3   have to be made by the Census Bureau every five

4   years.   And I believe that the ACS data is

5   specifically mentioned in the statute that

6   Congress enacted directing the Census Bureau to

7   make those determinations.

8             I believe that the Gary letter also

9   mentions that issue in the last or second-to-last

10  paragraph.

11       Q.   So you would agree, then, that whether or

12  not the short form contains the citizenship

13  question, the data for Section 203 coverage will

14  continue to come from the ACS or will have to

15  continue to come from the ACS?

16       A.   I -- some data related to 203 will

17  continue to come from the ACS because those

18  determinations are made every five years.

19            I can't remember the wording of the

20  statute precisely as to whether the Census Bureau

21  is required to consider that data or can use other

22  data.   It may be permitted to use other data as

Page 343

1   well.  But I'm familiar that its current practice

2   is to use the ACS data.

3        And the decennial census data obviously

4   is only available every ten years, not every five

5   years.

6        Q.  I'd like to draw your attention back to

7   this Exhibit 17, which is the December 12th,

8   2017 -- I think we've been referring to it as the

9   Gary letter.

10       A.  Yes.  Bear with me one moment.  My

11   exhibits are not in order.

12       Q.  Okay.

13       A.  Let me see if I can find it.  Got it.

14   Thank you.

15       Q.  When you were -- do you see that you've

16   cited several cases in this letter?

17       A.  I see that the department has cited

18   several cases in the letter.  Yes.

19       Q.  You drafted -- did the initial draft of

20   this letter, correct?

21       A.  That is correct.

22       Q.  And when you were drafting the letter,

Page 344

1   did you, personally, do the research that resulted

2   in the citation to these particular cases or did

3   someone else do it for you and send them to you?

4           MR. GARDNER:  Objection.  Calls for

5   information subject to deliberative process

6   privilege.  I instruct the witness not to answer.

7           THE WITNESS:  Consistent with that

8   instruction, I can't answer.

9   BY MS. HULETT:

10      Q.  So you can't tell me whether you chose

11  these cases or whether someone else chose these

12  cases for inclusion in the letter because that's

13  deliberative process?  I just want to make sure I

14  understand what you're refusing to answer.

15      A.  Yes.  That's on the instruction of

16  counsel.

17      Q.  Okay.  Did you read the opinions that are

18  cited in the letter?

19      A.  Yes, I did.

20      Q.  How recently have you read the opinions?

21      A.  Well, let me look at which opinions we're

22  talking about.

Page 437

1  not have authority or standing to assert such

2  constitutional claims.  The Department of Justice

3  has, in the past, gotten involved in racial

4  gerrymandering claims, either as an intervener or

5  as an amicus because frequently those claims

6  implicate districts that were drawn or preserved

7  to comply with Section 2 or Section 5 of the

8  Voting Rights Act, which the Department of Justice

9  does enforce.

10      Q.  So a citizenship question would not help

11  DOJ bring racial or partisan gerrymandering claims

12  because DOJ doesn't have jurisdiction to bring

13  them in the first place, correct?

14      A.  That's correct, although it would

15  facilitate DOJ's participation in such cases if it

16  chose to participate for -- because, again,

17  particularly, racial gerrymandering cases can

18  implicate Section 2 and Section 5 districts where

19  CVAP data is not necessary.

20      Q.  Prior to December 12th, 2017, did you

21  have any communication with anybody who was not a

22  federal employee at the time about having a

Page 438

1   citizenship question on the census?

2        A.   Yes.

3        Q.   Who?

4        A.   I had a conversation with a gentleman

5   named Mark Neuman, who I believe was not a federal

6   employee at the time.

7        Q.   Who is Mark Neuman?

8        A.   I understand Mark Neuman to be a former

9   employee of the Census Bureau or the Department of

10  Commerce -- I'm not sure which one.  And I

11  understood that he was advising the Department of

12  Commerce and the Census Bureau with respect to

13  this issue.

14       Q.   And what was the substance of your

15  conversation with Mr. Neuman?

16            MR. GARDNER:  Objection.  Calls for

17  information subject to deliberative process

18  privilege.  I instruct the witness not to answer.

19            THE WITNESS:  Consistent with that

20  instruction, I can't answer.

21

22  BY MR. GREENBAUM:

Page 439

1      Q.   Other than Mr. Neuman, did you have a

2  conversation with anybody else -- or a

3  communication with anybody else who was not an

4  employee of the federal government about having a

5  citizenship question on the census?

6      A.   No.

7      Q.   Did you communicate with anybody employed

8  by the Census Bureau about the issue of putting a

9  citizenship question on the census prior to

10  December 12th, 2017?

11     A.   No, I don't believe so.

12     Q.   Do you know anybody at DOJ who did?

13     A.   I don't know one way or the other.

14     Q.   Did DOJ consider privacy issues related

15  to revealing a person's citizenship data or --

16  strike that.

17          Prior to the issuance of the

18  December 12th letter, did you, John Gore, consider

19  privacy issues related to revealing a person's

20  citizenship status if citizenship data was taken

21  from -- was at the individual level or at the

22  block level on the census?

# Exhibit H

Page 1

1                       UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MARYLAND
2

3    ROBYN KRAVITZ, et al.,   ) Civil Action No.
                              ) 8:18-cv-01041-GJH
4             Plaintiffs,     )
                              ) Hon. George J. Hazel
5    vs.                      )
                              )
6    U.S DEPARTMENT OF        )
     COMMERCE, et al.,        )
7                             )
              Defendants.     )
8    _____ )
                              )
9    LA UNION DEL PUEBLO      ) Civil Action No.
     ENTERO; et al.,          ) 8:18-cv-01570-GJH
10                            )
              Plaintiffs,     ) Hon. George J. Hazel
11                            )
     vs.                      )
12                            )
     WILBUR L. ROSS, sued in  )
13   his official capacity as )
     U.S. Secretary of        )
14   Commerce, et al.,        )
                              )
15            Defendants.     )
16
17           VIDEOTAPED DEPOSITION OF A. MARK NEUMAN
18                 Taken on behalf of Plaintiffs
19                      October 28, 2018
20       (Starting time of the deposition:  12:22 p.m.)
21
22                   Veritext Legal Solutions
                       Mid-Atlantic Region
                     1250 Eye Street NW - Suite 350
23               Washington, D.C.  20005
24
25

Page 33

1    knew.

2         Q.    (By Mr. Duraiswamy) That's fair.  So you

3    mentioned a few minutes ago that the citizenship

4    question was something that came up during the

5    transition.  Who did you talk to about a potential

6    citizenship or immigration question on the 2020 census

7    during the transition?

8         A.    I'm sure I would have talked to people in

9    the Commerce team, and I'm sure -- and I'm sure Tom

10   Hoffler would have talked to me.

11        Q.    When you say "people on the Commerce team,"

12   can you be more specific?

13        A.    The people that I mentioned before.

14        Q.    Okay.  So you --

15        A.    Willie Gaynor.

16        Q.    You would have talked to Mr. Gaynor and

17   Mr. -- is it Rokeath?

18        A.    Rokeach.

19        Q.    Rokeach, and Mr. Washburn about --

20        A.    I'm not sure about Washburn.  Washburn

21   wasn't there on a daily basis.  Willie Gaynor was

22   there on a daily basis.

23        Q.    Who else, other than Mr. Gaynor and Mr.

24   Rokeach, would you have talked to about that issue?

25        A.    I'm not -- those -- those are people I'm

1  sure I would have talked to about it.  Those are

2  people that I would have talked to about it for sure.

3  I don't recall -- you know, remember we're sitting at

4  a desk, a desk about this size, and it's open air.  So

5  people are coming, dropping by, saying things to us,

6  you know.  There were people that I didn't know who

7  were, you know, commenting on things related to

8  Commerce issues.  So I -- I definitely remember that I

9  would have discussed it with Willie and with Rokeach.

10      Q.   Are there other people who you think you --

11  you may have talked to about this issue during the

12  transition, but you can't be certain?

13      A.   You know, I -- I talk to people all the time

14  in my job.  Remember, this is all volunteer activity.

15  The -- you know, I have a day job.  So I wasn't -- and

16  I would run into people at the transition all the

17  time, in the lobby, people that I had known for --

18  from previous campaigns, people that I had known from

19  agencies and so forth.  So, again, the -- for me to

20  try to remember everyone I talked to about this, it --

21  it would be pretty hard for me.

22      Q.   And I understand that.  My question is a

23  little bit different.  You said that --

24      A.   Do you have people in mind?

25      Q.   Well, I -- I -- I can ask you about some

Page 35

1   specific people, but I don't know everybody who was

2   either.  You -- you said that the people who you know

3   that you talked to for sure about it were Mr. Gaynor

4   and Mr. Rokeach, and I'm wondering if there are some

5   people who fall into the category of maybe I talked to

6   them about this, or I'm not -- but I'm not sure.  I'm

7   sure there are people who fall into the category of,

8   no, I would not have talked to this person about it.

9        A.    Yeah, that's --

10       Q.    Who -- who is in the middle category?

11       A.    Well, I would know better who are people I

12  didn't talk to.

13       Q.    Okay.

14       A.    If you have some people you want to ask

15  about.

16       Q.    I do, but first -- first I want to know if

17  there's -- if there are folks that you have in mind as

18  people that you may have talked to about this, but you

19  can't be sure?

20       A.    If they were -- if they were on the Commerce

21  transition team, I probably talked to them about it.

22       Q.    Okay.  Is there a list of individuals who

23  are on the Commerce transition team somewhere?

24            MR. ROSENBERG:  Objection, vague.

25            MR. FELDMAN:  You can go ahead and answer if

Page 36

1  you know.

2       A.    I don't have -- I -- I never really sort of

3  knew the total number of people who were on the

4  Commerce transition.  Because, again, there were

5  people who showed up at meetings, and I didn't see

6  very much, and there were other people that -- the

7  core group of people, when we were writing a Commerce

8  agency action plan, sitting around the table, David

9  Bohigian, Willie Gaynor, David Rokeach.

10      Q.    (By Mr. Duraiswamy) Anyone else that you

11 remember on the Commerce team, other than those three?

12      A.    Loretta Green was sort of the -- you know,

13 like coordinating -- coordinating appointments for

14 Ray, you know, arranging when Ray would show up.

15 Again, that -- that was really the core group of

16 people on the agency action plan.  And I wasn't always

17 there.  So like, you know, there -- there was a lot of

18 time that I wasn't even in town.

19      Q.    Who is Tom Hoffler?

20      A.    Tom Hoffler was a person who was known in

21 the redistricting community.  He passed away in -- in

22 August.

23      Q.    Was he a member of the transition?

24      A.    No, he was not.

25      Q.    What was the context in which you talked to

Page 37

1   him about the citizenship question during the

2   transition?

3        A.   He would have told me what views of members

4   of Congress would have been on this issue.

5        Q.   Did he reach out to you to have that

6   conversation, or did you reach out to him?

7        A.   I can't remember which it was, but, you

8   know, I've known him for 25 years.

9        Q.   How do you know him?

10        A.   I knew him when he was working at the NRCC,

11   and I knew him when he was working at the Department

12   of Agriculture.

13        Q.   Could you spell his last name for me?

14        A.   It's H-O-F-F-L-E-R, I think.  Thomas

15   Hoffler.

16        Q.   How many times did you talk to him about the

17   citizenship question during the transition?

18        A.   I don't know how many times.

19        Q.   More than five?  Less than five?

20        A.   It certainly would be less than ten.  It

21   would -- probably less than five during the

22   transition.

23        Q.   Why were you talking to him about the views

24   of members of Congress regarding the citizenship

25   question?

Page 38

```
 1        A.   The goal of the transition is not to sort of
 2   say, "This is what you should do.  This is what you
 3   shouldn't do."  The goal of the -- one of the most
 4   important things that Willie Gaynor and others wanted
 5   us to do is reach out to people who would be pushing
 6   different things related to Commerce and make sure
 7   that we had an understanding if someone was going to
 8   introduce legislation on NOAA, that we would have a
 9   forecast of likely proposals, likely interests, likely
10   budgetary issues, likely priorities.  So the incoming
11   team would have a good sense of what Congress is
12   likely to do.
13        Q.   So if I understand you correctly, one of the
14   things you were trying to accomplish on a transition
15   is understand the views of members of Congress with
16   regard to certain policy issues that were relevant to
17   the Commerce Department and what the --
18        A.   Correct.
19        Q.   -- incoming team would have to deal with at
20   the Commerce Department, correct?
21        A.   So on NOAA, we would be interested.  Well,
22   people from Alaska are very interested in fisheries.
23   The Magnuson Act.  People from other states with
24   installations are interested in the NOAA satellites,
25   that this delegation is interested in the technology
```

Page 39

1   issues or the intellectual property issues related to

2   PTO, that there are budgetary issues that the

3   Oversight Committee or the Appropriations Committee

4   thinks that the Census Bureau is costing too much, or

5   spending too much money.  You'd want to have all of

6   that, that forecast in there, and not prejudge what --

7   whether Congress was right or wrong about the issue.

8           But Congress is likely to introduce

9   legislation affecting international -- affecting NAFTA

10  and dispute resolutions.  So you would want to have a

11  forecast so you could give them a sense of what --

12  what issues they're going to face coming into the

13  door.

14      Q.   So you were speaking with Mr. Hoffler to

15  understand the views of Congress with respect to a

16  potential citizenship question on the decennial,

17  because that was an issue that you anticipated the

18  incoming Commerce team was going to be dealing with?

19      A.   They needed to understand that this was one

20  of the issues that people would raise with him.

21      Q.   Who is the "they"?  When you say, "they

22  needed to understand that this was one of the

23  issues" --

24      A.   The incoming Commerce team needed to

25  understand all the potential issues that would be

Page 40

1  raised by members of Congress, especially those in
2  oversight roles or committee chairmen.  And so this
3  was one of many, many issues that were identified.
4       Q.   So you were speaking with Mr. Hoffler to --
5  to understand and identify issues related to the
6  Commerce Department that members of Congress would
7  likely be interested in; is that correct?
8       A.   I was trying to make sure that if the new
9  Commerce team were going on the Hill and meeting with
10  people on the census, that they would understand
11  issues that would be raised to them.
12      Q.   And specifically the conversations with
13  Mr. Hoffler were to understand what members of
14  Congress might say or think about possibly adding a
15  citizenship question to the 2020 decennial?
16      A.   No, that would have been one --
17           MR. ROSENBERG:  Objection, form.
18      Q.   (By Mr. Duraiswamy) I'm sorry, go ahead.
19      A.   That would have been one of the issues.
20  Remember, Tom Hoffler is also pretty important,
21  because in the past Tom Hoffler was able to get
22  members of Congress to support funding for the Bureau.
23  Because he would say, we need to take a good census.
24  Because, remember, people generally don't want to
25  spend money on the census until we get on top of 2020.

Page 41

```
 1        Q.   And you said Mr. Hoffler was a redistricting
 2   expert; is that right?
 3        A.   He was a point person on redistricting,
 4   yeah.
 5        Q.   A point person in what context?
 6        A.   He would talk to members of Congress about
 7   redistricting.
 8        Q.   From his perch at the NRCC?
 9        A.   He wasn't -- I'm not sure he was at the NRCC
10   at the time.  I'm not sure he was a -- he was
11   certainly a person that was connected to that issue.
12        Q.   Do you know when he was at the NRCC?
13        A.   I would imagine that he was a consultant or
14   something.  Again, I don't know his status, but I know
15   that he was connected to that.
16        Q.   What other issues did you talk to
17   Mr. Hoffler about during the transition, other than
18   the citizenship question, redistricting issues and
19   funding issues?
20        A.   About the -- about the challenges that the
21   census would face in 2020.  Because again, we were
22   going to the Internet to the online response.  We were
23   going to -- we're adopting new technology.  And, you
24   know, when I talk to people, stakeholders, I'm talking
25   always about the challenges that we'll face in the
```

Page 42

```
 1   next census that we didn't face in the last one.
 2            And those really have to do with the work
 3   force.  They have to do with the technology that
 4   sometimes is successful, sometimes is unsuccessful.
 5   And what -- it's really important for the census to
 6   have a broad -- a broad range of stakeholders that all
 7   have skin in the game, that all feel like they're
 8   united around the idea of, you know, we may have
 9   political differences, but we all want to take a good
10   census.
11       Q.  What do you recall learning from Mr. Hoffler
12   about the views of members of Congress regarding a
13   potential citizenship question on the 2020 decennial?
14       A.  Pretty much what I just explained to you.
15       Q.  Maybe I didn't understand.  I'm trying to
16   understand what were the views that members of
17   Congress held that he conveyed to you?
18            MR. ROSENBERG:  Objection.  It call -- form.
19   It calls for speculation.
20       Q.  (By Mr. Duraiswamy) You -- you can answer.
21   They will object from time to time.  Unless they tell
22   you not to answer, you can answer.
23            MR. FELDMAN:  The only comment I would have,
24   if you know in the conversations that he specifically
25   represented something from his knowledge of Congress'
```

Page 43

```
 1    view.
 2         A.    I -- I -- I don't recall specifics, but I
 3    know, in general, Tom always believed, and I share his
 4    view on this, block level data, accurate block level
 5    data is very important.
 6         Q.    (By Mr. Duraiswamy) For redistricting
 7    purposes?
 8         A.    For everything.  For everything.
 9         Q.    Including redistricting purposes?
10         A.    Including redistricting purposes.
11         Q.    Block level data for what?
12         A.    For everything.  For all census data, and
13    that basically if you -- the hardest thing about the
14    census is not counting everyone living in America.
15    It's counting everyone living in America at the right
16    address one time.
17         Q.    And he conveyed that view to you in your
18    conversations with him during the transition?
19              MR. ROSENBERG:  Objection, vague, form.
20         A.    Yeah, again --
21         Q.    (By Mr. Duraiswamy) Let me try to --
22         A.    I gave you a broad thing of -- of something
23    that Tom was always concerned with in every
24    conversation that I would have with him.
25         Q.    I'm just trying to understand.  You said you
```

Page 44

1    talked to him about the views of members of Congress
2    related to the citizenship question.
3         A.   I -- so I would start --
4         Q.   That's my understanding.
5         A.   I would start out the conversation by saying
6    what are members of Congress likely to raise on the
7    census issue that we can incorporate into the
8    transition planning so the new Commerce team is not
9    blindsided.
10        Q.   And then he raised the issue of a
11   citizenship question or an immigration --
12        A.   That was one of -- that was one of the
13   questions.
14        Q.   Okay.  Did he --
15        A.   And I'm sure that we talked about census
16   residency rules as well.
17        Q.   Can you -- just for people who may not
18   understand what census residency rules means, can you
19   explain what that means?
20        A.   It basically means where were you on
21   April 1st.  So people move around, they're snowbirds,
22   they're living at colleges, they're incarcerated or
23   otherwise detained.  They're in group houses.  There's
24   overseas military.  Census residency rules say -- are
25   designed to ensure that people are -- are counted at

Page 45

1   the right address.

2        Q.   I assume you talked about census residency

3   rules for undocumented immigrants?

4        A.   No, not that I recall.

5        Q.   It's possible, but you just don't recall one

6   way or the other?

7        A.   I don't recall that.  It's generally not

8   something associated -- residency rules generally

9   don't get associated with that issue, unless you're

10  dealing with migrant farm workers who tend to be

11  documented.

12       Q.   Well, you know there's litigation going on

13  about that right now, right?

14       A.   Not -- I don't.

15            MR. ROSENBERG:  Objection.

16       A.   I don't.

17       Q.   (By Mr. Duraiswamy) Okay.  That's fair.  I'm

18  sorry.

19            (The court reporter motioned to the

20  attorney.)

21            MR. DURAISWAMY:  I will do my best, but I

22  will caution you that may not be the last time you

23  have to remind me.

24            COURT REPORTER:  Thanks.

25       Q.   (By Mr. Duraiswamy) And the census residency

1    Then there was October.  Not a lot happened.  Then

2    November, a lot of activity.  Then December, a lot of

3    activity.  Now a lot of activity.

4          So it's -- and, again, this is a part-time

5    volunteer job, so it's very difficult for me to kind

6    of try to recall exactly who said what when.

7          Q.    Well -- well, do you recall discussing with

8    other individuals on the Commerce team whether there

9    were particular people or constituencies who are

10   interested in adding a citizenship question to the

11   census?

12         MR. ROSENBERG:  Objection, vague.

13         MR. FELDMAN:  If you -- if you can answer

14   it, answer it.

15         A.    Tom Hoffler was, I think, the first person

16   that said something to me about that issue.

17         Q.    (By Mr. Duraiswamy) Meaning he -- he --

18         A.    He flagged it, you know.  He said --

19         Q.    He flagged it as something that might be of

20   interest to some people --

21         A.    Right.

22         Q.    -- in constituencies?

23         A.    Right.

24         Q.    And you said he was a point person for

25   redistricting in certain circles.  He's -- he's a

Page 52

1    Republican -- he was a Republican?

2         A.    Yeah, he is.

3         Q.    Okay.

4         A.    Yeah.

5         Q.    And so his work on redistricting over the

6    years has been in connection with the Republican party

7    or different state Republican parties, if you know?

8         A.    Well, he was --

9              MR. ROSENBERG:  Objection, vague, lack of

10   foundation.

11             MR. FELDMAN:  Go ahead.

12        A.    He was the person I recall in the 2000

13   census who was advising Bill Thomas, who was the

14   Chairman of the House Administration Committee, and

15   Bill Thomas was an expert, you know, as -- he was an

16   expert on a lot of things, but he was an expert on

17   redistricting.  So I knew that Tom Hoffler had the ear

18   of committee chairmen who would interact with a

19   Secretary of Commerce.

20        Q.    (By Mr. Duraiswamy) Did he -- do you recall

21   him referring to specific members of Congress who

22   might be interested in that issue?

23        A.    I don't recall --

24             MR. ROSENBERG:  Objection, vague --

25        A.    -- the specific ones.

Page 53

1           MR. ROSENBERG:  -- as to who the him was.

2           MR. DURAISWAMY:  Okay.

3           MR. FELDMAN:  He answered it.

4           MR. DURAISWAMY:  That's fine.  I'd ask,

5    though, that you just object to the form.

6           MR. ROSENBERG:  (Nodding head.)

7       Q.   (By Mr. Duraiswamy) What was the substance

8    of the conversations that you had with the other

9    members of the Commerce team regarding a citizenship

10   question during the transition?

11      A.   Again, one of many issues.

12      Q.   I understand it's one of many issues.  I'm

13   just trying to understand what was discussed about it.

14          MR. FELDMAN:  When?

15          MR. DURAISWAMY:  During the transition.

16          MR. FELDMAN:  That's from a period of when

17   to when?  Why don't we put --

18      A.   From September through -- through January.

19      Q.   (By Mr. Duraiswamy) When did you join the

20   transition?

21      A.   Probably September was the first time I went

22   there.

23      Q.   Okay.  And I assume we can agree that the

24   transition ended at the time that President Trump, now

25   President Trump, took office as --

Page 54

```
 1        A.    Right.
 2        Q.    -- the president, correct?
 3        A.    Right.
 4        Q.    Okay.
 5        A.    So, again, the November, December, January
 6   is a whirlwind of activity.  I'm volunteering.  This
 7   is my spare time that I'm doing it, and it's not like
 8   I'm there 8:00 to 5:00 five days a week.  I'm there
 9   when I can be there.  And so, again, very difficult
10   for me to try to recall who said what to whom.
11        Q.    Okay.  Let me try to be more specific.  Did
12   you all talk about the potential uses of a citizenship
13   question on the census?
14        A.    Uses?
15        Q.    Of how the citizenship -- of how -- strike
16   that.
17              By uses, I mean how the data gathered from
18   asking the citizenship question could be used?
19        A.    Well, my understanding would be that the use
20   would be having block level citizen voting age
21   population data.
22        Q.    And that was the understanding that you had
23   at the time?
24        A.    That was what I was told was the principal
25   objective.
```

Page 55

1      Q.   By who?

2      A.   By Tom Hoffler.

3      Q.   For what purpose?

4      A.   Taxes.

5      Q.   What would be the value of having block

6   level --

7      A.   Citizen age voting -- to ensure one person,

8   one vote.

9      Q.   Can you explain, how -- how does having

10  block level citizenship voting age population data

11  ensure one person, one vote?

12     A.   This is going to be a long explanation.

13     Q.   That's fine.

14     A.   Have you -- have you read through my

15  presentation on this?

16     Q.   Yes.

17     A.   You know which one it is?

18     Q.   I think so.

19     A.   You said to a federal judge that I -- that

20  there was no record of what I talked about with the

21  Secretary.  And yet you're saying that you read my

22  presentation to the Secretary, but you told a federal

23  judge that I didn't --

24          MR. FELDMAN:  Just answer the question.

25     Q.   (By Mr. Duraiswamy) I think he produced it

Page 56

```
 1    in response to the subpoena we served after the

 2    federal judge ordered the deposition.

 3         A.    No, actually it was in -- it was in the

 4    documents before.

 5              MR. FELDMAN:  Mark, answer -- answer his

 6    question.

 7         Q.    (By Mr. Duraiswamy) In any event, can you

 8    explain what Mr. Hoffler said to you about why --

 9         A.    No.  Wait.  No.  You wanted me to explain

10    why I think that block level data is important to

11    citizen voting age population, or do you want it

12    explained why Tom Hoffler does?

13         Q.    I'm trying to understand the conversations

14    you had during the transition.  So you said --

15         A.    He said that after the long-form data went

16    away in 2000, that the quality of block level citizen

17    voting age population had now diminished.  So the --

18    so the ability to draw a district which would elect a

19    Latino in a population where there were non-citizens

20    was very, very difficult.

21         Q.    He said that to you during the transition?

22         A.    He -- we would have talked about it.  I'm

23    not sure whether it was in the transition or after the

24    transition, but we would have talked about that issue.

25         Q.    I'm trying to focus on in the transition
```

Page 57

```
 1    right now.  So you're not sure if you had that
 2    conversation with him about that potential use of
 3    citizenship data during the transition; is that right?
 4         A.   I'm not sure that I did.
 5         Q.   Okay.  So I'm trying to understand, you
 6    discussed potential uses of citizenship data gathered
 7    from the decennial with others on the Commerce team or
 8    Mr. Hoffler during the transition?
 9         A.   I would think so.
10         Q.   Okay.  And --
11         A.   I -- I don't recall, but I would think so.
12         Q.   Do you recall discussing the possibility
13    that it could be used for immigration enforcement
14    purposes?
15         A.   Oh, I -- I would never -- first of all, I
16    would -- that would be illegal, number one.  Number
17    two, anyone that would suggest that or broach that to
18    me, I would immediately be totally opposed to that.
19         Q.   I understand your view about that.  Did
20    someone, in fact, suggest or broach that to you during
21    the transition?
22         A.   No, no.
23         Q.   Okay.  I'm just -- I'm not asking for your
24    views, and I'm not even asking if you advocated for
25    it.  I'm just trying to understand, did you have any
```

Page 58

1    conversations with anyone where the possibility, good

2    or bad, of using --

3         A.    Definitely -- definitely not.

4         Q.    Let me just finish the question --

5              MR. FELDMAN:  Let him finish the question.

6         Q.    (By Mr. Duraiswamy) -- so the record's

7    clear -- of using citizenship data from the decennial

8    for immigration enforcement purposes came up?

9         A.    No.

10        Q.    Okay.  Did you discuss, during the

11   transition, potential use of citizenship data from the

12   decennial for reapportionment purposes?

13        A.    Citizenship, no.

14        Q.    Did you discuss, during the transition, with

15   anyone, whether undocumented immigrants or

16   non-citizens should be included in the state

17   population counts for reapportionment purposes?  That

18   issue, generally.  I'm not asking you about a position

19   you took, but did that issue come up in your

20   conversations?

21        A.    Not -- not to my --

22             MR. ROSENBERG:  Objection, form.

23        A.    Not to my recollection, no.

24        Q.    (By Mr. Duraiswamy) Did the issue of how

25   states might use citizenship data from the decennial

Page 59

```
 1   census in deciding how to draw legislative districts
 2   come up in your conversations with Mr. Hoffler?
 3        A.   I don't believe so.  Again, you know, when
 4   you -- these are conversations long ago, but it --
 5   it -- I don't think so.  Because it -- again, it's not
 6   the kind of thing that he would talk about.
 7        Q.   Did it come up in your discussions with
 8   anyone else during --
 9        A.   No.
10        Q.   -- the transition?  Are you aware of anyone
11   else involved with the transition or the Trump
12   campaign or the incoming Trump administration
13   discussing that issue during the transition?
14        A.   I -- not personally, but I've heard that
15   from reporters and other people.
16        Q.   Okay.  What have you heard from reporters
17   and other people?
18        A.   That those people -- that there were people
19   discussing it.  And I said, "Well, if they were, they
20   weren't discussing it with me."
21        Q.   Who have you heard was discussing that issue
22   during the transition?
23        MR. ROSENBERG:  Objection, vague.
24        A.   Again, I don't have personal knowledge of --
25   because I didn't -- no one discussed it with me.
```

Page 64

 1   name.  So that was the one I was focused on.

 2        Q.    I think I understand what you're saying.

 3   You're saying the -- Steve Bannon's name, in

 4   connection with this, came up recently for you in the

 5   context of reviewing our subpoena.  You're not sure if

 6   it came up in the context of the other rumors --

 7        A.    Right.

 8        Q.    -- that you heard about this issue?

 9        A.    Right.

10             MR. ROSENBERG:  Objection, vague and form.

11        Q.    (By Mr. Duraiswamy) And sitting here today,

12   you can't remember any other individual names or

13   organizational names that came up in these rumors that

14   you heard recently?

15             MR. ROSENBERG:  The same objection.

16        Q.    (By Mr. Duraiswamy) Is that right?

17        A.    That's -- yeah, that's correct.

18        Q.    Okay.  In your discussions with Mr. Hoffler

19   and folks on the Commerce team during the transition,

20   did you discuss how -- the potential process for

21   adding a citizenship question to the decennial census?

22        A.    I'm not sure whether I would have -- that

23   probably would have come -- yeah, that probably would

24   have been something that we discussed.

25        Q.    What kinds of discussions about that did you

Page 65

1   have?

2        A.    How -- I'm trying to remember here.  I'm

3   trying to remember whether the issue of adding a

4   question about sexual orientation on the ACS was

5   something that came up before or after the issue of

6   citizenship.  That's what I can't remember in my head.

7   Because that would have been sort of --

8        Q.    I'm --

9        A.    -- the last -- that was another issue that

10  was -- came up in the transition, was that advocacy

11  groups for the LGBTQ community wanted to add a

12  question about sexual orientation on the ACS.  And

13  that was something that we all -- also would have, I

14  think, discussed during the transition, was that

15  there -- you know, there --

16          The issue was are you going to add or change

17  questions to the decennial census questionnaire in

18  addition to the citizenship issue.  How are you going

19  to, you know, change the relationship questions when

20  you say how was this person related, opposite sex

21  couple; again, I -- this is stuff that I haven't

22  looked at for a long time.  So I don't remember

23  whether I was looking at -- at those, at that process

24  issue before or after the citizenship discussions.

25        Q.    But that process issue, you're saying, would

Page 66

1    have been relevant to the addition of a citizenship

2    question and potentially other questions; is that --

3    is that what you're --

4         A.   Yeah.  Yeah.

5         Q.   Okay.

6         A.   Because obviously there was a -- there was

7    a -- a request in to -- from DOJ to Census about the

8    sexual orientation question addition.  So you know,

9    again, it's -- it's hard for me to remember which

10   comes first, whether I was looking at that in the

11   context of the citizenship, or looking at that in the

12   context of how we're going to -- how the transition is

13   going to approach the sexual orientation issue.

14        Q.   Okay.  Other than what we've talked about,

15   did you come to learn during the transition that there

16   was anyone else who was interested in potentially

17   adding a citizenship question to the census?

18        A.   I don't -- I don't -- I don't remember

19   specifically about which other -- I remember Tom

20   Hoffler for certain.  It might have come up when I was

21   on Capitol Hill during the transition and meeting

22   people in early January.

23        Q.   With whom do you think it may have come up?

24        A.   I went to see the -- the counting of the

25   electoral count in the -- in the house chamber, so I

Page 67

1   would have run into a lot of people there.

2        Q.   And --

3        A.   And some of them would have known Tom.  So

4   they would have known that I was working on the

5   Commerce transition.  So there would have been members

6   of Congress there.  Again, it's one of those things

7   where you go to a ceremony like that and you see a lot

8   of people, and they say, oh, yeah, I hear you're

9   working on the transition.

10            And I think Willie Gaynor went with me to

11  that, and Willie knows a lot of people, so he would

12  have said, "Oh, yeah, Mark's working on census

13  issues."  So, again, that would have been a time that

14  people could have talked to me about it.

15       Q.   And do you recall who might have talked to

16  you about it during that time?

17       A.   No.  Because, again, there were lots of

18  people and I -- it blurs in to other things.

19       Q.   Sitting here today, do you have an

20  understanding of whether there are particular members

21  of Congress who are interested in a citizenship

22  question being added to the census in 2020?

23       A.   I haven't followed that.  I didn't go to any

24  of the hearings with Secretary Ross when he testified

25  on the census.  I didn't go to his confirmation

Page 89

 1    question for 2020, correct?

 2         A.   I'm saying they -- the department will need

 3    to -- wait.  The question -- the Department of Justice

 4    may request.  So it's -- it's letting people, the

 5    agency team, know they may request something that

 6    affects your department.

 7         Q.   And you're saying this is a possibility that

 8    could happen in the future, correct?

 9         A.   Right.  You don't know that it will.  It's a

10    possibility.

11         Q.   And -- and certainly no one during the

12    transition told you that the Department of Justice was

13    going to do that, correct?

14         A.   I'm not interacting with the DOJ team.

15         Q.   Okay.

16         A.   So unlike -- with Commerce and USTR, we're

17    interacting because we share authorities.  DOJ and

18    Commerce aren't sort of sitting down and saying,

19    "Okay.  What are you going to do to affect us, and

20    what are we doing to affect you?"

21         Q.   So the possibility that the DOJ would

22    request the addition of the question for 2020, was

23    that something that you learned about from your

24    conversations with Mr. Hoffler?

25              MR. ROSENBERG:  Objection, misleading.

Page 90

1          MR. FELDMAN:  If you could answer.

2      A.   It would have been something that he

3   discussed, but I could have learned it from other

4   people too.

5      Q.   (By Mr. Duraiswamy) Do you remember learning

6   it from anyone else?

7      A.   I don't recall.  Again, understand that

8   we're sitting in an open floor plan, and people are

9   coming to us, you know, a lot of people I didn't know

10  saying, "Oh, well, you know, what about this on export

11  controls?  What about this on trade?"  And impromptu

12  meetings back and forth, a lot of -- lot of cooks in

13  the kitchen.

14     Q.   So you don't recall specifically anyone else

15  raising this issue, but this is an issue that likely

16  would have been raised in the discussions with

17  Mr. Hoffler, correct?

18         MR. ROSENBERG:  Objection.  It calls for

19  speculation.

20     A.   Again, I -- there could have been people

21  that talked about it, but I don't recall those

22  conversations.

23         MR. DURAISWAMY:  Brad, can I ask you to just

24  limit your objections to the form, please?

25         MR. ROSENBERG:  I think that is a form

Page 100

1              MR. FELDMAN:  And by "this," he's

2      referencing Exhibit 2.

3         A.   Exhibit 2, yeah.  May I point out something

4      about --

5              MR. FELDMAN:  No.

6              THE WITNESS:  Okay.

7         Q.   (By Mr. Duraiswamy) Is there something that

8      you would like to point out about the memo?

9              MR. FELDMAN:  Now you can point it out.

10        A.   On Page 7 you say -- it says, "The director

11     of the U.S. Census Bureau shall include questions to

12     determine U.S. citizenship and immigration status on

13     the long-form questionnaire in the decennial census."

14     This is clearly written by someone who isn't talking

15     to anyone who knows something about the census,

16     because there is no long form.  It was eliminated in

17     2000.

18        Q.   (By Mr. Duraiswamy) You testified earlier

19     that Mr. Hoffler had indicated to you that after the

20     ACS census CEDCaP data was no longer available at the

21     block level; is that right?

22        A.   Correct.

23        Q.   Did he suggest to you that prior to the ACS,

24     while the long-form questionnaire was in effect, that

25     citizenship data was available at the block level?

Page 101

1          A.     That was the whole point of a one in six

2     household sample, is one in six gives you block level

3     data confidence that one in forty-three does not give

4     you.

5          Q.     Are you confident of that, that during the

6     period in which --

7          A.     That's my understanding.

8          Q.     Okay.

9               MR. ROSENBERG:   Objection, form.

10         Q.     (By Mr. Duraiswamy) Just to clean that up.

11    It's your understanding that while the long-form

12    questionnaire was in place, citizenship data was

13    available at the census block level and not just at

14    the census block group level?

15         A.     That's my understanding.

16         Q.     And is that based -- that understanding

17    based on your conversations with Mr. Hoffler or

18    anything else?

19         A.     No, it's based on my experience with the

20    census as chairman of the monitoring board, as member

21    of the executive staff and as a chairman of the 2010

22    Advisory Committee.

23         Q.     Okay.  So we've talked about the transition.

24    I want to now talk about the post-transition period.

25    Can you identify everyone at the Department of Justice

Page 102

```
 1   with whom you have communicated about the possible
 2   addition of a citizenship or immigration question to
 3   the 2020 census?
 4        A.   That would be one person, John Gore.
 5        Q.   Have you spoken to anyone at the Department
 6   of Justice about the inclusion of noncitizens or
 7   undocumented immigrants in the population count for
 8   reapportionment?
 9        A.   No.
10        Q.   Have you spoken to anyone at the Department
11   of Justice about the inclusion of non-citizens or
12   undocumented immigrants in the population count for
13   state level redistricting?
14        A.   No.  See, we're talking about people --
15             MR. FELDMAN:  Just answer his questions.
16        A.   I'm -- I'm assuming you're asking me about
17   people other than John Gore when you say "talked to
18   people at the Department of Justice."  Because John
19   Gore in the only person at the Justice Department I've
20   ever talked to.
21        Q.   (By Mr. Duraiswamy) No, I appreciate that
22   clarification, and I encourage you to let him clarify
23   his testimony, because I --
24             MR. FELDMAN:  That's -- well, I -- why don't
25   you ask -- you had said, and I think he recognized --
```

Page 110

```
 1   count everyone, and you can't subtract anyone from the
 2   count.
 3        Q.   Do you have an understanding of whether
 4   there are -- well, strike that.
 5             When was your conversation with John Gore
 6   about a citizenship question?
 7        A.   It would have been after the summer, but
 8   well before the winter.
 9             MR. FELDMAN:  The summer of what year?  '17?
10        A.   2017.
11        Q.   (By Mr. Duraiswamy) How many conversations
12   about that issue did you have with him?
13        A.   We -- we met one time.
14        Q.   Where did you meet?
15        A.   At a -- not at the -- not at a government
16   building.  We met for coffee near -- near -- probably
17   we met like in the cafe around the -- around his
18   office.
19        Q.   Could it have been in October of 2017?
20        A.   Yeah, it could have been.
21        Q.   Was anyone else present?
22        A.   No one else was present.
23        Q.   How did that meeting come about?
24             MR. ROSENBERG:  I'm going to object.  I just
25   want to caution the witness that there's potential
```

Page 111

1   that that question calls for information that's

2   protected by the deliberative process privilege.  And

3   the Government would instruct the witness not to

4   answer any questions that would reveal the substance

5   of a conversation between the witness and Mr. Gore.  I

6   think that the witness can answer that question in

7   general terms, so long as he does not reveal

8   substantive information that was deliberative and that

9   was shared with Mr. Gore.

10          MR. FELDMAN:  I'm trying to get this down.

11   I believe the question was how did the meeting come

12   about?  Have I said that correctly?

13          MR. DURAISWAMY:  Yes.

14          MR. ROSENBERG:  But just to be clear, the

15   basis for the objection, I mean, there could be a

16   basis by which the meeting came about that would not

17   reveal deliberative information, but there could also

18   be, you know, somebody asking a question that would

19   reveal substantive information.  So, you know, it's

20   possible that the witness might be able to answer the

21   question, but I would instruct him not to provide

22   deliberative information that would reveal the

23   substance of the conversation.

24          MR. DURAISWAMY:  Well, let me withdraw the

25   question for a second and ask it a little different.

Page 112

1        Q.    (By Mr. Duraiswamy) Were you ever asked to

2    serve as a formal or informal adviser to the

3    Department of Justice?

4        A.    No.

5        Q.    How did the meeting with John Gore in the

6    fall of 2017 come about?

7               MR. ROSENBERG:  The same objection.

8               MR. FELDMAN:  Go ahead, answer.

9        A.    James Undermeier [sic] asked me to -- to

10   meet with him.  I think that's his name.  I -- I may

11   be getting the -- Commerce official.

12       Q.    (By Mr. Duraiswamy) Is -- does James

13   Uthmeier --

14       A.    Yeah.

15       Q.    -- or Uthmeier sound correct?

16       A.    Something --

17       Q.    And apologies to James for mispronouncing

18   his name.  When did he ask you to have that meeting?

19   Was it shortly before the meeting took place?

20       A.    Within a few weeks before the meeting took

21   place.

22       Q.    Did you have an understanding as to who --

23   whose idea it was to have that meeting, whether it

24   was --

25       A.    I wouldn't have known who John Gore was.

Page 113

```
 1        Q.   Let me --
 2             MR. FELDMAN:  You -- you -- you answered the
 3   question before counsel -- counsel finished his
 4   question.  Let him finish it.
 5             MR. DURAISWAMY:  In fairness, it wasn't a
 6   great question, so let me try to ask it in a better
 7   way.
 8        Q.   (By Mr. Duraiswamy) Was it your
 9   understanding that it was someone at the Commerce
10   Department who had the idea for you and Mr. Gore to
11   meet?
12        A.   I think so.
13        Q.   Okay.  Not someone at the Department of
14   Justice?
15        A.   Not someone at the Department of Justice.
16        Q.   Do you know who -- who originally had the
17   idea for you and Mr. Gore to meet?
18        A.   No.  And originally is the -- you know,
19   again --
20        Q.   Obviously, Mr. Uthmeier reached out to
21   you --
22        A.   Yeah.
23        Q.   -- and that's what I'm asking, if you know
24   who originally had the idea.  How long was your
25   meeting with Mr. Gore?
```

Page 114

1          A.    I don't know.

2          Q.    I'm just looking for an approximation.   More

3   than an hour?

4          A.    I doubt it was more than an hour.

5          Q.    More than 30 minutes?

6          A.    Probably.

7          Q.    Okay.   So roughly somewhere between 30 and

8   60 minutes?

9          A.    I think so.

10         Q.    You're aware that there was a letter sent by

11  the Department of Justice to the Commerce Department

12  in December 2017 regarding the addition of a

13  citizenship question to the census?

14         A.    Yes.

15         Q.    Did you have any involvement in the drafting

16  of that letter?

17              MR. ROSENBERG:   Objection, form.

18              MR. FELDMAN:   If you know.

19         A.    Well, it -- again, I wasn't part of the

20  drafting process of the letter, but I'm sure that in

21  our -- I -- when I met with John Gore, I wanted to

22  show him what the Census Bureau said about why they

23  ask the ACS question.   Because, again --

24              MR. ROSENBERG:   And I'm -- again, I'm going

25  to object and instruct the witness not to answer the

Page 123

1              MS. BRANNON:   Okay.

2              MR. ROSENBERG:   -- of course, in the

3     Government be as -- as nimble as possible in meeting

4     and conferring and responding, and I imagine that we

5     could do so tomorrow.

6              MS. BRANNON:   Okay.  No, that makes sense.

7     So we will agree to that.  There has -- and just to be

8     clear, the reason, there has been some meet and

9     confer -- meet and confer on related topics to this,

10    and a motion was filed today in the NYIC case.  And so

11    I am just not familiar enough, and would want to

12    confer with my colleagues as to whether or not the

13    nature of the discussions that have come up at the

14    deposition today fall within that issue or whether it

15    is a new and separate issue.  We will certainly try to

16    meet and confer about that part with you as quickly as

17    possible before we would move forward without

18    revealing anything publicly.

19             MR. ROSENBERG:   Thank you.

20        Q.   (By Mr. Duraiswamy) Okay.  Sorry for the

21    interlude.  So at that meeting you provided some

22    information to Mr. Gore for purposes of the letter

23    that DOJ subsequently drafted regarding the

24    citizenship question?

25        A.   Mainly the -- mainly a copy of the -- of the

Page 124

1   letter from the Obama Administration, Justice

2   Department, to the Census Bureau on the issue of

3   adding a question on the ACS.  Right.

4       Q.   There -- there were -- in the documents that

5   you produced, there were two such letters, I believe,

6   one from 2014 and one from 2016.  Does that sound

7   correct to you?

8       A.   Yeah.

9       Q.   And you provided both of those?

10      A.   Just -- I think probably just the 2016 one.

11      Q.   Okay.  And the purpose of that was to

12  show --

13      A.   Modalities.

14      Q.   Well, strike --

15           MR. ROSENBERG:  And I'm going to interpose

16  an objection and again instruction to not answer again

17  on deliberative process privilege grounds.

18      Q.   (By Mr. Duraiswamy) Well -- well, let me

19  strike that and ask a -- a different question.

20           That document, if I'm recalling correctly,

21  has a chart of different demographic questions that

22  are asked on the ACS and an explanation of the

23  governmental uses of those questions; is that correct?

24      A.   Yes.

25      Q.   Okay.  And you were providing that to

Page 125

1   Mr. Gore in order to explain the potential use of a

2   citizenship question on the decennial census as well?

3           MR. ROSENBERG:  The same -- the same

4   objection and instruction not to answer on

5   deliberative process privilege grounds.

6           MR. FELDMAN:  Go ahead.

7       A.  I wanted the -- John Gore, who was a

8   non-career person, to understand the modalities and

9   accepted process of the interaction between DOJ and

10  Census on census issues.

11      Q.  (By Mr. Duraiswamy) What was it about that

12  that you wanted him to understand?

13          MR. ROSENBERG:  The same objection and

14  instruction not to answer on deliberative process

15  privilege grounds.

16          MR. FELDMAN:  Go ahead.

17      A.  I wanted him to understand what had -- the

18  previous interactions on additions of questions.

19      Q.  (By Mr. Duraiswamy) What about those

20  interactions did you want him to understand?

21          MR. ROSENBERG:  The same objection and

22  instruction not to answer on deliberative process

23  privilege grounds.

24          MR. FELDMAN:  Go ahead.

25      A.  How that -- the normal procedures.  Who at

Page 126

1    DOJ, when you're talking about census issues, talks to

2    Census and who they talk to.

3          Q.   (By Mr. Duraiswamy) And the fact that in

4    adding questions to the ACS or the decennial census

5    questionnaire, the requests come from outside of the

6    Commerce Department to the Commerce Department where

7    there is a need for some other agency; is that

8    correct?

9          MR. ROSENBERG:  Objection.  The same

10    objection and instruction not to answer on

11    deliberative process privilege grounds and also an

12    objection to form.

13          MR. FELDMAN:  Go ahead and answer if you

14    understand the question.

15        A.   I communicated that requests for data to the

16    Census from the administration come from agencies.

17        Q.   (By Mr. Duraiswamy) You agree that the

18    census doesn't typically -- well, strike that.

19          Did he provide you any information at that

20    meeting?

21          MR. ROSENBERG:  Same objection and

22    instruction not to answer on deliberative process --

23        A.   I don't know.

24          MR. ROSENBERG: -- privilege grounds, unless

25    the witness can answer that with a yes or no.

Page 136

1      A.   No.

2      Q.   James Sherk?

3      A.   No.

4      Q.   Have you spoken with Mr. Hoffler about this
5  issue since the transition?

6      A.   Tom was very sick, very sick.  And, in fact,
7  I didn't know that he passed away.  So Tom was really
8  kind of out of the picture.  And I also want to say,
9  Tom was not an -- did not appear to me to be an
10  adviser to the -- to the administration at all.

11      Q.   A separate question.

12      A.   Yeah.

13      Q.   And I'm not -- I didn't necessarily mean to
14  connect it.

15      A.   So I don't kind of see him as an
16  intermediary for the administration.

17      Q.   No, I'm asking about Mr. Hoffler separately.
18  Did you -- I'm not sure that I got a clear answer to
19  the question.  Did you have any communications with
20  him about a potential citizenship question since the
21  transition?

22      A.   Tom Hoffler?

23      Q.   Yes.

24      A.   Oh, yes.  Yes.

25      Q.   How many times, roughly?

1       A.   It would be more than a couple, but it

2  wouldn't be more than a dozen.  And remember, we're

3  talking about from January through -- through whenever

4  I last talked to him, which would have been maybe --

5  I'm not even sure I talked to him in 2017.

6            MR. FELDMAN:  2017 or 2000 --

7       A.   Or 2000 -- I'm not sure I talked to him

8  since even May of this year.

9       Q.   (By Mr. Duraiswamy) And he -- what were

10  the -- what was the substance of those conversations?

11      A.    Well, Tom and I are good friends, so I don't

12  know -- you know, I've known him for 30 years.  We

13  talked a lot about his cancer treatment.  We talked a

14  lot about what he was going through.  We talked a lot

15  about prayer.  So, you know, there would be

16  conversations about what was going on in politics that

17  would bleed into our personal conversations.

18      Q.    And some of that was about the potential

19  citizenship question on the 2020 census?

20      A.    It seemed like -- like it wasn't a topic in

21  the last -- in the last -- certainly the last six

22  months.  Again, hard for me to remember about --

23  again, with someone like Tom that I'm a -- a good

24  friend of a long time, and with someone that I check

25  in with about their health, and there are not a lot of

Page 138

1   people like that, so I don't -- I don't recall how

2   many times.

3       Q.   Well, my question is -- well, I think you

4   mentioned before that you did have those conversations

5   since January 2017, but my question is just what was

6   the substance of your conversation about this issue,

7   about the citizenship question?

8       A.   Well, he talked about how block level data

9   was -- and, again, block level data is an obsession

10  with him, because block level data means that you can

11  draw the most accurate districts.  And so, again, his

12  focus was always on block level data, and always on,

13  "Mark, you need to make sure that we take a good

14  census, that the administration doesn't skimp on the

15  budget," because a good census is good for what he

16  does.

17      Q.   And he was the person that you principally

18  relied on for your understanding regarding the need

19  for block level citizenship data; is that right?

20      A.   He was the one of the people that I --

21  actually, Tom -- in talking to Tom, I knew that it was

22  going to be an issue that the department would

23  confront, because I knew Tom had the ability to get

24  members of Congress, who were important to the

25  administration, to pay attention to the issue.  You

Page 139

```
 1   know, that's what -- again, in the transition, your
 2   job is to forecast what's going to come across the
 3   transom for the new administration.
 4        Q.   Did you speak with anyone else in Congress
 5   or affiliated with a member of Congress about the
 6   citizenship question since January of 2017?
 7        A.   I talked to -- you know, I talk to my own
 8   member of Congress, Rodney Davis, all the time.  You
 9   know, I see him at things.  I talk to people in the
10   Illinois delegation that I see at the University of
11   Illinois.  I -- again, to say did I talk to someone in
12   Congress, I talk to people in Congress who I've known
13   for a long time.  I went to school with Peter Roskam.
14   I -- I talk about lots of things with them.
15        Q.   Sure.
16        A.   Did I go and do a presentation in anyone's
17   office about this, no.
18        Q.   I was wondering if you talked to any of them
19   about this issue?
20        A.   I'm sure that I talked to members of
21   Congress, including Democratic members of Congress
22   about this issue.
23        Q.   And what do you recall them communicating to
24   you about it?
25        A.   I recall Congressman Lacy Clay being upset
```

Page 140

1   that this question was going to be answered.  But at
2   the same time, he was very concerned about getting the
3   administration to focus on getting a good count, and
4   he asked for my help in that.
5        Q.   What else do you recall about --
6        A.   I recall that we --
7        Q.   -- those conversations?
8        A.   I talked to a Congresswoman from New York,
9   Carolyn Maloney --
10       Q.   Uh-huh.
11       A.   -- who has, you know, long time involvement
12  with census issues.  And she was telling me how
13  important it is to get Secretary Ross to focus on how
14  important the census would be and that to request full
15  funding and so forth.  So, again, you have these
16  conversations that are taking place.  People see me
17  and they say, "There's the census guy."  You know,
18  "Let's talk to him about it."  So I don't want to
19  leave anything out, but I talk to members of Congress
20  all the time.
21       Q.   I understand that.  But I -- we sort of
22  drifted into issues unrelated to the citizenship
23  question.  So I'm trying to help you by narrowing it
24  to that -- to that issue.
25       A.   Again, I -- there's interaction all the time

Page 141

1    and I don't want to leave anything out.

2         Q.   And I'm just asking you to please tell us

3    what you remember about the conversations that you had

4    with members of Congress, or people affiliated with

5    members of Congress, regarding a citizenship question

6    since January 2017 --

7         A.   Again, I --

8         Q.   -- other than the discussion with

9    Congressman Clay that you just mentioned.

10        A.   I -- I don't have a log.  I don't -- I -- I

11   talk to people all the time.  I run into them in

12   airports.  I run into them at events.  We talk about

13   things.  And for me to say -- to recall among those

14   hundreds, thousands of conversations that I have, I

15   know what I generally want to talk about with members

16   of Congress about the census, which is we need to take

17   a good census.  We need to focus on the differential

18   undercount.  We need to focus on all these issues that

19   I've been involved with for the last 30 years.  But

20   again, it's -- this is not my job, so I don't, you

21   know, keep logs of all the -- who I talk to when and

22   so forth.

23             MR. DURAISWAMY:  Okay.  Move to strike as

24   non-responsive.

25        Q.   (By Mr. Duraiswamy) Has anyone ever

Page 142

1    suggested to you that block level citizenship data --
2    strike that.
3           Has anyone ever suggested to you that having
4    access to block level citizenship data would be
5    helpful to Republican efforts in redistricting?
6       A.   I'm sure someone has said that.
7       Q.   Tom, presumably?
8       A.   What he said is that it will help draw maps,
9    which will be acceptable as the maps that best provide
10   minority representation, and so therefore are not
11   challenged.  So the frustration is you keep drawing a
12   district, and because you don't have block level data,
13   someone says, well, you didn't draw a map that
14   maximized -- I use the word "maximized," Latino
15   representation based on their numbers.  And when you
16   don't have that block level citizenship data, what
17   you're doing is you're cheating the Latino community
18   out of representation at all levels of government.
19      Q.   That was the -- that was something that he
20   suggested to you?
21      A.   No, it was -- it was a conversation that we
22   had.  My point about maximization is my word.  I want
23   Latino representation to be maximized.
24      Q.   Have you done any research on the Voting
25   Rights Act?

Page 143

1          A.    I'm not an expert on the Voting Rights Act.

2          Q.    Have you done any research on the Voting

3    Rights Act?

4          A.    I'm not an expert on it.  I -- I read about

5    the Voting Rights Act, yeah.

6          Q.    Do you have any expertise on the legal

7    standard for Section 2 of the Voting Rights Act?

8          A.    I'm not an expert on it.

9          Q.    Have you relied on others for expertise on

10   the Voting Rights Act in Section 2 in particular?

11         A.    Yes.  So I -- you know, when I -- when I

12   study things, I look to people who are experts.

13         Q.    Okay.  And who -- who have you looked to for

14   expertise on those issues?

15         A.    Off the top of my head, I'd have to go back.

16   I'd have to go back and look at it.  But I did -- I --

17   one of the things that I was most interested in is

18   there was an amicus brief that was filed by five

19   census directors.  And those -- in a nutshell, what

20   those census directors said is block level data is the

21   most important thing in end product in terms of

22   ensure -- ensuring accurate representation, and you

23   can only get block level data from the census.  I

24   didn't look at that until -- you know, until 2018.

25         Q.    Was Mr. Hoffler one of the people you relied

Page 144

1   on for expertise about the Voting Rights Act --

2          A.   I -- you --

3          Q.   I'm asking you.  Sorry.

4          A.   Oh, okay.

5          Q.   Was he one of the people?

6          A.   No.

7          Q.   Who -- who were the people?  You said off

8   the -- you'd have to go back and check, but --

9          A.   I'd have to -- I'd have to -- I don't

10  recall.

11         Q.   You -- you can't remember anyone that you've

12  relied on --

13         A.   I can recall looking at the cases --

14         Q.   -- for expertise on that issue?

15         A.   -- and looking at what Justices of the

16  Supreme Court said about it and looking at that.

17         Q.   Okay.  Let's go back to if you recall

18  communicating with anyone else direct -- in the Trump

19  administration directly or indirectly about the

20  citizenship question, other than the people we've

21  already identified.

22              MR. FELDMAN:  I'm not sure I understand.

23  Are you talking about was there anybody else other

24  than the people that have been discussed?

25              MR. DURAISWAMY:  Yes.

Page 272

1       A.    I don't remember the person's name.  I seem

2   to remember he had a Bush connection, like law school

3   or something like that.

4       Q.    Any other candidates that you can recall?

5       A.    Brunell was the main one that I recall.

6       Q.    Anyone else from the redistricting world

7   that you recall being considered?

8       A.    Not that I recall, no.

9             [Marked Exhibit No. 17.]

10      Q.    Handing you what we've marked as Exhibit 17.

11  Did we mark it as Exhibit 17?  Yes.  Sorry.  Do you

12  see this is an e-mail exchange between Secretary Ross

13  and Peter Davidson from October 8th, 2017?

14      A.    Uh-huh.

15      Q.    Was the --

16      A.    Yes.

17      Q.    For the record, can you identify the subject

18  of the e-mail exchange?

19      A.    Subject is, "Letter from DOJ."

20      Q.    Okay.  And the first e-mail is from

21  Secretary Ross to Mr. Davidson --

22      A.    Uh-huh.

23      Q.    -- asking what is its status.  Do you see

24  that?

25      A.    Yes.

Page 273

1      Q.    And Mr. Davidson responds that he is on the

2    phone with you, and you're giving him a readout of a

3    meeting last week, correct?

4      A.    I see that.

5      Q.    Was that your meeting with John Gore?

6            MR. ROSENBERG:  Objection, assumes facts not

7    in evidence.  It calls for speculation.

8      A.    I don't know whether it's -- it would make

9    sense, but I don't know.

10     Q.    (By Mr. Duraiswamy) Did you have a meeting

11   with anyone else about a letter from DOJ?

12     A.    That -- that's why I said the -- the timing

13   seems like it's -- dovetails with what you and I were

14   discussing earlier.

15     Q.    Right.  Because the meeting with John Gore

16   was about the letter from DOJ regarding the

17   citizenship question, correct?

18     A.    No, the letter -- the meeting with John Gore

19   was about the -- how Census interacts with the Justice

20   Department.  Again, this is a communication from two

21   other people, not from me.

22            MR. ROSENBERG:  And just -- just for the

23   record, again, we're going back to the substance of

24   the communications with Mr. Gore, which the Government

25   believes is covered by the deliberative process

Page 274

```
 1   privilege, and so I would instruct the witness not to,
 2   you know, provide any additional information regarding
 3   that meeting.
 4           MR. FELDMAN:  And subject to that, he's
 5   answered the question, I believe.
 6       Q.   (By Mr. Duraiswamy) Well -- well, you had a
 7   phone call with Mr. Neuman -- strike that.
 8           You had a phone call with Mr. Davidson
 9   around -- on or around October 8th, correct?
10       A.   It -- it says that.  I don't know that I
11   did.
12       Q.   Okay.
13       A.   I don't recall that I did.
14       Q.   No reason to believe it didn't happen,
15   correct?
16       A.   I don't recall that it happened.
17       Q.   Okay.  No reason to believe that when
18   Mr. Davidson wrote on October 8th in an e-mail, "I'm
19   on the phone with Mark Neuman right now" that he was
20   lying?
21       A.   I don't know the answer to that question.
22       Q.   Okay.  You don't know whether he was lying
23   or not when he wrote Secretary Ross on October 8th?
24       A.   I don't know what he did --
25           MR. ROSENBERG:  Objection.
```

Page 275

```
 1      A.   -- and what he didn't do.  I only know when

 2   you ask me things about me.

 3      Q.   (By Mr. Duraiswamy) Well, I am asking you

 4   things about you.  I'm asking you -- I understand you

 5   may not specifically remember.  I'm just asking you,

 6   do you --

 7      A.   I said I do not recall.

 8      Q.   -- have any reason to believe it didn't

 9   happen?

10           MR. ROSENBERG:  Objection, form.

11           MR. FELDMAN:  If you know what -- if -- if

12   you don't have a reason that it didn't happen, say --

13   tell him.

14      A.   I don't have a reason to know whether it

15   happened or it didn't happen.

16      Q.   (By Mr. Duraiswamy) Just -- just so we're

17   clear on what the e-mail says, Secretary Ross asks

18   Mr. Davidson what is the status of the letter from

19   DOJ, right?

20      A.   That's what this says.

21      Q.   Okay.  And Mr. Davidson responds and says

22   that he's on the phone with you and you're giving him

23   a readout of a meeting that you had the previous week,

24   correct?

25      A.   That's what this says.
```

Page 276

1          Q.   Okay.  And separate from the e-mail, your

2      meeting with John Gore was around this time frame,

3      correct?

4          A.   Yes.

5          Q.   Okay.  But you have no recollection of

6      this -- of a phone call with Mr. Davidson around this

7      date?

8          A.   I don't recall that.

9          Q.   Do you recall ever having a phone call with

10     Mr. Davidson where he told you that Secretary Ross

11     wanted an update on the status of a letter from DOJ?

12         A.   I don't recall.

13         Q.   The e-mail seems to indicate that

14     Mr. Davidson wrapped up the call at 10:54 p.m. after

15     emailing Secretary Ross that he was on the phone with

16     you at 6:47 p.m.  First of all, do -- do you see what

17     I'm referring to in the e-mail?

18         A.   Yes.

19         Q.   Okay.  Have you ever been on the phone with

20     Mr. Davidson for four hours?

21              MR. ROSENBERG:  Objection, misleading.

22              MR. DURAISWAMY:  What is misleading about

23     the --

24         A.   I --

25              MR. DURAISWAMY:  Wait, wait.  What's --

Page 277

```
 1            MR. ROSENBERG:  It may not --
 2            MR. DURAISWAMY:  No, no.  That -- that's an
 3      improper objection.
 4            MR. ROSENBERG:  No.
 5            MR. DURAISWAMY:  What's misleading about the
 6      question?
 7            MR. ROSENBERG:  It's -- so we don't know
 8      necessarily from these date -- time stamps whether
 9      there might be different time zones involved in this
10      e-mail.
11            MR. DURAISWAMY:  Do you -- what was my
12      question?
13            MR. ROSENBERG:  I made my objection.
14        Q.   (By Mr. Duraiswamy) Have you ever been on
15      the phone with Mr. Davidson for four hours?
16        A.   I don't recall.
17        Q.   How long were -- were your typical phone
18      calls with him about census issues?
19        A.   I don't recall how long they would go.
20        Q.   You don't recall anything about how long
21      your phone calls were with him?
22        A.   No.
23        Q.   Do you recall if they were -- it's possible
24      that they were 14 hours in length?
25        A.   I'm sure that I never talked him for 14
```

Page 278

1   hours.

2        Q.   Okay.  Do you remember that when we started

3   this deposition, we talked about the fact that if you

4   say that you don't recall something, when, in fact,

5   you do recall it, that that's false testimony?  Do you

6   remember that we talked about that --

7        A.   Yes.

8        Q.   -- at the outset?  Okay.  What do you recall

9   about the length of the phone calls or conversations

10  that you had with Mr. Davidson about the census over

11  the last couple of years?

12       A.   I recall that I had some.

13       Q.   And you have no recollection about how long

14  those calls were or those interactions were?

15       A.   Well, you said -- you asked me if I was --

16  talked to him for four hours.  I don't recall talking

17  to anyone for hour hours in one phone call.

18       Q.   No.  I'm asking you now approximately how

19  long were the interactions that you had with him

20  regarding the census.  Can you give me a range?

21       A.   I -- I don't know.  I don't recall how long

22  they were.

23            [Marked Exhibit No. 18.]

24       Q.   Handing you what we've marked as Exhibit 18.

25  We've got one copy for you guys.  Take a minute to

```
 1   review this document and let me know if you've seen it
 2   before.
 3         A.    I have seen it before.
 4         Q.    When did you see it?
 5         A.    I've seen versions of this before.
 6         Q.    When you say versions of this, what do you
 7   mean?
 8         A.    Well, something that starts out with John
 9   Thompson and then says reinstatement of the
10   questionnaire.  I -- I've -- this is -- I recall
11   seeing something like this in different versions --
12         Q.    This is --
13         A.    -- at different times.
14         Q.    Okay.  And just so the record is clear, this
15   is a -- a draft of a letter from the Department of
16   Justice to the Commerce Department requesting the
17   reinstatement of a question on the 2020 census
18   questionnaire related to citizenship, correct?
19         A.    Do we know that it's from DOJ?  Oh, because
20   it says --
21         Q.    Do you see the last line?
22         A.    -- for doj.gov.
23         Q.    Yes.
24         A.    So what was the question again?
25         Q.    So this is a draft of a letter from DOJ to
```

Page 280

1    the Commerce Department requesting a reinstatement of

2    a citizenship question on the 2020 --

3         A.    Right.

4         Q.    -- census, right?

5              MR. ROSENBERG:  Objection, form, assumes

6    facts not in evidence.

7         A.    I -- I -- I -- it seems to be that.

8         Q.    (By Mr. Duraiswamy) Okay.  And when did

9    you -- or who -- who provided you with versions of

10   this draft letter?

11        A.    I'm not sure which version this is.  Again,

12   I'm familiar with the letter.  I'm not sure who the

13   original author is.  I'm sure that I looked at it.  I

14   might have commented on it, but I'm not sure who

15   writes a first -- a first template, as it were.

16   What's interesting is when I look at this, it seems

17   like --

18              MR. FELDMAN:  And this being?

19        A.    This being the version that you're looking

20   at right now.

21              MR. FELDMAN:  Exhibit 18.

22        A.    And I look at the letter that I first saw in

23   ProPublica.  This letter is very different than the

24   letter that ultimately went from DOJ.

25        Q.    (By Mr. Duraiswamy) Okay.  In order to help

Page 281

```
 1   us all get out of here on time, I'm going to ask you
 2   try to --
 3        A.   Oh, we're all going to get here on -- out of
 4   here on time.
 5        Q.   Well, I want you -- in order to avoid the
 6   risk of our having to come back and do more
 7   questioning, I want to you to try to focus on just
 8   answering the question --
 9        A.   Right.
10        Q.   -- that I've asked.  So my question, you
11   stated that you had previously seen a version of this
12   draft, correct?
13        A.   Correct.
14        Q.   Okay.  And I believe you said --
15        A.   And, again, there are people within the
16   Secretary's office who could have had a version, could
17   have had -- marked up their own version, could have --
18   again, trying to figure out who an original author is
19   when this looks a little --
20             MR. FELDMAN:  The question --
21        Q.   (By Mr. Duraiswamy) Yeah.
22             MR. FELDMAN:  Just --
23        Q.   (By Mr. Duraiswamy) I don't -- I don't
24   want -- I don't -- I'm not asking you to tell me about
25   who the original author was or anything.  I want to
```

Page 282

1    try to ask about your experience with this --

2        A.   Right.

3        Q.   -- with versions of this draft letter.

4    Okay?  Do you recall who provided you with a -- a

5    version of this draft letter?

6        A.   No.

7        Q.   Presumably, you -- well, strike that.

8            You said you might have commented on it.  Do

9    you recall what comments you may have made on the

10   draft letter?

11       A.   I don't recall.

12       Q.   Do you recall why you were reviewing it?

13       A.   I was comparing this to that ACS letter.  So

14   again, how does DOJ interact with Census on data

15   needs.

16       Q.   Why were you comparing it to the ACS letter?

17       A.   Process.  I'm a process person.

18       Q.   But I'm -- I'm --

19       A.   If you want --

20       Q.   -- trying to understand why specifically you

21   were asked to or took the initiative to compare a

22   draft version of this letter to the ACS letter that we

23   talked about before.

24       A.   Again, I want to make sure that if the

25   department has an interest in evaluating a change in

Page 283

1      the questionnaire, that they're following procedures.

2      This clearly doesn't look like the -- the letter that

3      actually went out, but it looks like almost a

4      placeholder, a template.

5           Q.   When you say you want to make sure that if

6      the department has an interest in evaluating a change

7      in the questionnaire, you're referring to the -- the

8      Department of Commerce --

9           A.   Correct.

10          Q.   -- correct?

11          A.   Correct.

12          Q.   Okay.  And you recall that others at the

13     Department of Commerce were reviewing and offering

14     thoughts on draft versions of this letter?

15          A.   I seem to recall that, yes.

16          Q.   Who do you recall was involved in that

17     effort?

18          A.   It might have been the general counsel's

19     office, and it might have been the policy office.  And

20     again, blurring a lot of those people, interactions

21     together, new people coming on board, Peter Davidson

22     coming on board, Earl being involved in policy

23     matters, people that work for Earl.  There are a lot

24     of cooks in the kitchen.

25          Q.   Other than Mr. Davidson and Mr. Comstock,

Page 284

1    who you just mentioned, are there other specific

2    people that you recall being involved in that process?

3          A.    Maybe --

4                MR. ROSENBERG:  Objection, mischaracterizes

5    testimony.

6                MR. FELDMAN:  Go ahead.

7          A.    Maybe Izzy Hernandez, maybe Sahra Park-Su.

8    You know, when I think of the policy people, they're

9    all sort of blended together, the general counsel's

10   people and so forth.

11         Q.    (By Mr. Duraiswamy) Do you recall any

12   specific comments or edits that you suggested to the

13   draft version of this letter?

14         A.    I don't recall, but I'm sure that I made

15   comments.

16         Q.    You just don't remember specifically what

17   the comments were?

18         A.    Right, right.

19         Q.    Do you remember who you made the comments to

20   or who you provided the comments to?

21         A.    They would have been within that group of

22   people, and I would -- I would -- you know, when I say

23   general counsel, I -- I include James in that too.

24         Q.    Okay.

25         A.    And in this --

# Exhibit I



**U.S. Department of Justice**
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

---

<u>**By ECF**</u>                                                                                      August 15, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

     Re:  *State of New York, et al., v. U.S. Department of Commerce, et al.*, 18-cv-2921 (JMF)
          *N.Y. Immigration Coalition v. U.S. Dep't of Commerce,* 18-cv-5025 (JMF)

Dear Judge Furman:

     Pursuant to Local Rule 37.2 and Individual Practice 2.C, the Department of Justice (DOJ) opposes Plaintiffs' letter requesting a conference or an order compelling DOJ to produce for deposition Acting Assistant Attorney General (AAG) for Civil Rights John Gore. DOJ further requests that the Court issue a protective order precluding such a deposition.

     DOJ is not a party to this lawsuit, and Plaintiffs must therefore "take reasonable steps to avoid imposing undue burden or expense" in serving Rule 45 subpoenas on DOJ. *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting Fed. R. Civ. P. 45(d)(a)). Plaintiffs nonetheless seek to depose AAG Gore, apparently in large part to probe *DOJ's* intent in sending the December 12, 2017 letter to Ron Jarmin (the "Gary Letter"). Plaintiffs make this request despite the low likelihood of AAG Gore's testimony resulting in any relevant evidence concerning *Secretary Ross's* decision or intent, and despite the burden such a deposition would place on DOJ. A court evaluating a Rule 45 subpoena must "balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." *Hermitage Glob. Partners LP v. Prevezon Holdings Ltd.*, No. 13-CV-6326, 2015 WL 728463, at *3 (S.D.N.Y. Feb. 19, 2015). Here, few interests would be served by compliance because AAG Gore's testimony would be irrelevant and privileged; moreover, compliance would unduly burden DOJ by requiring the preparation and deposition of a high-level official in a case in which DOJ is not even a party and did not issue the decision being challenged.

I.    <u>A Deposition of AAG Gore Is Unlikely to Produce Information Relevant to Secretary Ross's Decision.</u>

     Plaintiffs' claims center on Secretary Ross's decision to reinstate a citizenship question on the 2020 Census, which they claim was arbitrary and capricious (or motivated by discriminatory animus). As this Court has held, although discovery normally is precluded in an APA case, limited discovery may be permitted under certain circumstances. *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). But as the Court recognized, a plaintiff in this scenario is not entitled to "all the liberal discovery available under the federal rules. Rather, the Court must permit only that discovery necessary to effectuate the Court's judicial review; i.e., review the decision of the agency

under Section 706." Transcript at 85:11-14, Hearing of July 3, 2018 [hereinafter, "Tr."] (citation and internal quotation marks omitted). The Court has explained that the limited discovery may encompass "materials from the Department of Justice" to the extent that they "shed light on the motivations for Secretary Ross's decision." Tr. at 86:11-13. Consistent with that directive, DOJ has already begun producing non-privileged, non-burdensome, responsive documents in accordance with Plaintiffs' Rule 45 subpoena. But Plaintiffs have not demonstrated a need to take the much more significant, indeed extraordinary, step of taking deposition discovery of DOJ, which is not the agency that issued the decision being challenged here.

This Court has given no indication that Plaintiffs are permitted, under the limited scope of discovery, to take DOJ depositions at all, much less without meeting the standards of reasonableness and undue burden that govern Rule 45 subpoenas. Plaintiffs have already overreached the bounds of this Court's limited authorization by seeking extensive discovery from DOJ as if DOJ were a party to an ordinary civil case, including requesting that DOJ prepare a Rule 30(b)(6) deponent on numerous burdensome topics and serving extremely broad document discovery into irrelevant and privileged topics (including all documents relating to DOJ's enforcement of the Voting Rights Act). The Court should not permit Plaintiffs to expand discovery even further by taking the extraordinary step of deposing the Acting Assistant Attorney General.

Plaintiffs suggest that AAG Gore's testimony could be relevant to "pretext," ECF No. 236 at 2, but they are wrong. The relevant question here (in light of the Court's ruling at the July 3 hearing) is whether *Commerce's* stated reasons for reinstating the citizenship question were pre-textual, not whether DOJ's reasons for sending the Gary Letter were pre-textual. Commerce was the decision-maker, not DOJ. Under the Court's July 3 Order, therefore, Commerce's intent is at issue not DOJ's.[1] And in any event, the Gary Letter states DOJ's request and rationale, so there is no basis to probe DOJ's "intent" behind that letter.[2]

## II.   In Addition to Its Irrelevance, Nearly All Testimony by AAG Gore Would Be Privileged.

Plaintiffs further have not shown that they could elicit any non-privileged information in a deposition of AAG Gore. The deliberative process privilege would apply to AAG Gore's involvement in the DOJ process resulting in the Gary Letter, *see Tigue v. U.S. Dep't of Justice,*

---

[1] Although not necessary to demonstrate that a deposition of AAG Gore is uncalled for, Defendants reiterate the Government's position that this case should be decided based on the administrative record compiled by the Department of Commerce. Furthermore, although the Court's July 3 ruling necessarily raises the issue of *Commerce's* intent, under a pretext theory, the relevant question is not whether Commerce had additional motives for adopting the policy in question beyond the reasons set forth in its final decision. The sole inquiry should be whether Commerce actually believed the articulated basis for adopting the policy.

[2] In any event, Plaintiffs provided no basis to believe that the reasons stated in the Gary Letter were not DOJ's actual reasons (under the counterfactual assumption that DOJ's intent is relevant). DOJ uses citizenship data in a variety of ways, including in its own redistricting cases and in its role as amicus in Voting Rights Act cases before the Supreme Court. *Cf. Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) (rejecting a plaintiff's attempt to support his Section 2 Voting Rights Act claim with only ACS statistics for citizen voting age population).

312 F.3d 70, 80 (2d Cir. 2002), whether or not he was "the primary point of contact for communications with senior Commerce Department political appointees," ECF No. 236 at 1. The deliberative process privilege also likely encompasses any information that AAG Gore could offer about his oral communications with Commerce (as part of Commerce's deliberative process) and DOJ's enforcement of the Voting Rights Act (an area where several other privileges may also apply), contrary to Plaintiffs' suggestion that a privilege log *from Commerce* is somehow salient to the privileges applicable to AAG Gore's deposition testimony, ECF No. 236 at 2. Plaintiffs further argue that Defendants have not "cited . . . authority," ECF No. 236 at 2, for a court's power to quash a deposition based on privilege, but it is well established that evaluating a Rule 45 subpoena requires balancing the interests favoring compliance with the burden, *Hermitage Glob. Partners*, No. 13-CV-6326, at *3 (quoting Wright & Miller, Fed. Practice & Proc. § 2463.1 (3d ed. 2008)), and here the interests served by compliance are accordingly lessened because Plaintiffs are unlikely to elicit much, if any, non-privileged material. It would be a waste of time and resources for AAG Gore to prepare for a deposition in which he could not provide any non-privileged information relevant to Plaintiffs' claims.

III.    A Deposition of AAG Gore Would Unduly Burden DOJ.

Finally, a deposition of AAG Gore would unduly burden DOJ, a non-party to this litigation. AAG Gore leads the Civil Rights Division of DOJ, a law enforcement agency comprised of 590 employees that enforces critical civil rights guarantees. A deposition would hinder AAG Gore from performing his numerous important duties as a high-ranking DOJ official, and further sap DOJ resources in preparation. *See Anwar v. Fairfield Greenwich Ltd.*, 297 F.R.D. 223, 228 (S.D.N.Y. 2013) (denying a motion to compel Rule 45 testimony of SEC officials based in part on the undue burden from preparation). Indeed, "courts analyzing . . . a third party subpoena . . . may take into account not only the direct burdens caused by the testimony, but also 'the government's serious and legitimate concern that its employee resources not be commandeered into service by private litigants to the detriment of the smooth functioning of government operations.'" *Id.* (quoting *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)). Plaintiffs cite no precedent authorizing the deposition of a high-ranking DOJ official in a case where DOJ merely provided input to another agency, which then issued the decision being challenged. Permitting such a deposition would impose unnecessary burdens on DOJ, threaten privileges—including the attorney-client privilege—and chill DOJ's (and other agencies') willingness to assist other agencies in their policy deliberations by consulting and providing information.

In sum, the Court should deny Plaintiffs' request to compel deposition testimony from AAG Gore because the burden imposed on DOJ by such a deposition outweighs the minimal value of AAG Gore's testimony, which would be irrelevant to the case and largely privileged. It should also clarify that discovery of DOJ is limited to non-privileged, non-burdensome document discovery. Alternatively, the Court could revisit AAG Gore's proposed deposition after Plaintiffs review DOJ's document productions, complete their discovery on Commerce, and make a persuasive showing of need. *See Solomon v. Nassau Cty.*, 274 F.R.D. 455, 461 (E.D.N.Y. 2011) ("In weighing the undue burden against the necessity of the testimony, the Court may also consider under Rule 26(b)(2)(C)(i) if the discovery can be 'obtained from some other source that is more convenient' or 'less burdensome.'").

Dated: August 15, 2018       Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Kate Bailey*
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
DANIEL HALAINEN
MARTIN TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC 20530
Tel.: (202) 514-9239
Fax: (202) 616-8470
Email: kate.bailey@usdoj.gov

*Counsel for Defendants*

CC:

All Counsel of Record (by ECF)

4

# Exhibit J



**U.S. Department of Justice**

Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530

September 21, 2018

**By ECF**
The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall Courthouse
40 Foley Square
New York, New York 10007

      Re: *State of New York, et al., v. U.S. Department of Commerce, et al.*, 18-cv-2921 (JMF)

Dear Judge Furman:

      Pursuant to Local Rule 37.2 and this Court's Rules of Individual Practice 2.C, Defendants write to oppose Plaintiffs' letter seeking leave to depose a third-party, Mark Neuman.

      Plaintiffs' motion seeking leave to depose Mr. Neuman should be denied because Plaintiffs have failed to demonstrate that it is "necessary or appropriate" to depose Mr. Neuman. At this Court's July 3, 2018 hearing in which the Court authorized discovery outside of the administrative record, the Court held that, while Plaintiffs are entitled to some extra-record discovery, the Court will limit the scope of discovery consistent with the APA. Tr.[1] at 85. The Court explicitly stated that it is "mindful that discovery in an APA action, when permitted, 'should not transform the litigation into one involving all the liberal discovery available under the federal rules. Rather, the Court must permit only that discovery necessary to effectuate the Court's judicial review; i.e., *review the decision of the agency* under Section 706.'" *Id.* (quoting *Ali v. Pompeo*, 2018 WL 2058152 at *4 (E.D.N.Y. May 2, 2018)) (emphasis added). The Court went on to explicitly limit any extra-record discovery by Plaintiffs "absent agreement of the defendants or leave of Court" to the Department of Justice and the Department of Commerce, noting that "I am not persuaded that discovery from other third parties would be necessary or appropriate; to the extent that third parties may have influenced Secretary Ross's decision, one would assume that the influence would be evidenced in Commerce Department materials and witnesses themselves." *Id.* at 86.

      Plaintiffs' basis for seeking leave to depose Mr. Neuman arises primarily from references to conversations between Commerce officials and Mr. Neuman in the record. The record, including the deposition testimony of Earl Comstock and Wendy Teramoto, indicates that Mr. Neuman, who was formerly chair of the Census Bureau's National Advisory Committee and later in late 2016 and early 2017 served as a member of the administration's transition team for the Department of Commerce, ECF No. 338-5 at 11329, had a handful of conversations with Secretary Wilbur Ross and other Commerce officials about Census matters. The record indicates that such conversations were about Census matters generally and not limited to the possibility of reinstating a citizenship question to the decennial census; indeed, budgetary, operational, and personnel issues

---

[1] Excerpts from the July 3, 2018 hearing are attached to this response as Exhibit A.

predominated. *See* Earl Comstock depo., ECF No. 338-1, p. 124, ll. 14-20 (describing the "primary discussion points" of meetings with Mr. Neuman as census-related matters other than citizenship question); *id.* at p. 125 ll. 17-21; p. 126 ll. 8-9 (noting that Mr. Neuman briefed Ross on a number of census matters but only once on the citizenship question); Teramoto depo., ECF No. 338-8, p. 31, ll. 3-8 (noting that her suggestion that Secretary Ross meet with Mr. Neuman had "nothing to do with . . . the citizenship question"); *id.* at p. 34, ll. 3-6 ("[A] lot of the census focus was on the budget and how are you going to properly ramp up half a million employees in such a short amount of time."). This is entirely consistent with the reasons the Secretary consulted with Mr. Neuman during the first year of the Administration: Mr. Neuman's expertise on Census operations and administration. *See* Exhibit B (Secretary Ross, Post-Hearing Questions for the Record (Oct. 31, 2017)) at 7. Mr. Neuman has worked with multiple incoming administrations to assist leaders who are acclimating to Census Bureau management. His involvement here was no different. The record does not indicate that Mr. Neuman provided any particularly significant consultations on the citizenship question issue during his conversations with Commerce officials in 2017; indeed, the record indicates that Mr. Neuman was one of two dozen interested persons, and one of six former high-ranking Census Bureau officials, who offered to discuss census-related matters with Secretary Ross. Insofar as these 2017 conversations are the basis for Plaintiffs' motion for leave to depose Mr. Neuman, Plaintiffs fail to meaningfully distinguish how Mr. Neuman is differently situated from Kris Kobach, who was also involved in the administration's transition and who also had a few conversations with Secretary Ross about the decennial census nearly a year before the Secretary made his decision. This Court recently denied Plaintiffs' motion for leave to depose Mr. Kobach, on the basis that it was not "necessary or appropriate" to depose a third-party given the "timing and nature of the communications" and that Mr. Kobach was "one of many people" with whom Commerce had correspondence about the decennial census during the time period in question. ECF No. 303. These factors apply with equal force to Mr. Neuman's communications with Secretary Ross and other high-ranking Commerce officials in 2017.

To the extent that Plaintiffs are seeking leave to depose Mr. Neuman based upon Mr. Neuman's conversations with Secretary Ross in March 2018 in the lead-up to Secretary Ross's final decision reinstating a citizenship question on the 2020 Census, that argument is also unavailing. As an initial matter, Defendants note that the exhibits Plaintiffs attach to their letter motion show that there were a large number of persons from outside Commerce with whom Secretary Ross held discussions about the census. For example, on March 15, 2018, Mr. Neuman was listed as the final of eight separate persons with whom Secretary Ross was scheduled to speak with by telephone – a list that also includes one of Plaintiffs' experts – with all calls being allocated for either five or ten minute blocks. ECF No. 338-7 at 3491. On March 22, 2018, Mr. Neuman was scheduled to be the final of three separate calls or meetings about the decennial census; his meeting was scheduled for forty-five minutes. ECF No. 338-7 at 1815. Mr. Neuman's inclusion as one of just several calls or meetings between elected officials, business leaders, and others with Secretary Ross to discuss the decennial census indicates that he was not acting as a high-level advisor to Secretary Ross, but rather was one of a large number of people who communicated information or opinions about the census to Secretary Ross before Secretary Ross's decision to reinstate a citizenship question.[2] This was confirmed by the declaration of Michael A. Cannon, who stated that the information and opinions provided by Mr. Neuman at the March 22, 2018

---

[2] To the extent Mr. Neuman did participate in any high-level deliberations, the substance of such deliberations could be protected by the deliberative process privilege.

meeting were "not considered by the Secretary in his decision to reinstate the citizenship question." ECF No. 254 at 3 ¶ 16.

Finally, this Court should deny Plaintiffs' motion for leave to depose Mr. Neuman because, like Mr. Kobach, his views are adequately represented by materials provided to Plaintiffs. Although Mr. Neuman provided officials his views on a range of Census matters, his views on reinstating a citizenship question in particular are already memorialized in the record. Mr. Neuman met with Secretary Ross to discuss a citizenship question on March 22, 2018. ECF No. 338-7 at 1815. At the meeting, Mr. Neuman gave Secretary Ross a PowerPoint presentation explaining how he believed that using the decennial census to gather block-level citizen voting age population data would be helpful in ensuring that Latino voters were not underrepresented by their elected officials. This PowerPoint presentation has been provided to Plaintiffs, as Plaintiffs concede in their letter motion, ECF No. 338 at 3, and is attached to this response as Exhibit C. Plaintiffs also have a September 13, 2017 communication from Mr. Neuman to Commerce attorney James Uthmeier, in which Mr. Neuman broadly outlines his concerns with differential undercounts and the need to "count every person living in America." ECF No. 338-5 at 11329. These documents reflect the substance of Mr. Neuman's views and concerns about reinstating a citizenship question on the decennial census. Plaintiffs note that Mr. Neuman also spoke with officials by phone or in person but offer no explanation as to why the documentary evidence of Mr. Neuman's views in the record is inadequate to understand the views he presented. ECF No. 338 at 3. Furthermore, this Court has ruled that Plaintiffs may depose Secretary Ross as part of this litigation. ECF No. 345. While Defendants anticipate seeking mandamus review of this decision, if Secretary Ross were to be deposed, Plaintiffs would have the opportunity to ask him about conversations with Mr. Neuman, and if and to what extent those conversations impacted his decision to reinstate a citizenship question, rendering any deposition of Mr. Neuman unnecessary. Therefore, just as this Court denied Plaintiffs' motion for leave to depose Mr. Kobach in part because of "the fact that the substance of Mr. Kobach's views is already reflected in the record," ECF No. 303, it should deny Plaintiffs' motion for leave to depose Mr. Neuman because such a deposition is not "necessary or appropriate."

Conclusion

For the foregoing reasons, Defendants request that this Court deny Plaintiffs' letter motion requesting leave to depose Mark Neuman.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Martin M. Tomlinson*
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
DANIEL HALAINEN
MARTIN M. TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 353-4556
Fax:  (202) 616-8470
Email: martin.m.tomlinson@usdoj.gov

*Counsel for Defendants*

CC:

All Counsel of Record (by ECF)

4

# Exhibit K



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General

*Washington, D.C. 20530*

MAR 2 5 2019

The Honorable Elijah E. Cummings
Chairman
Committee on Oversight and Reform
U. S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

The Department of Justice (Department) writes to correct the record regarding the transcribed interview of Department official John Gore and to provide context for the circumstances that gave rise to the interview.  As set forth below, the March 14, 2019 Memorandum from the Committee's Majority Staff, entitled "Supplemental Memo on Transcribed Interview with John Gore Regarding Addition of Citizenship Question to Census" (Supplemental Memorandum), mischaracterizes Mr. Gore's testimony and the record in this matter.

The Constitution establishes the executive and legislative branches as co-equal.  "The constitutional role of Congress is to adopt general legislation that will be implemented—'executed'—by the executive branch."[1]  As part of its legislative function, Congress has "[b]road . . . power" to conduct oversight, but that power is not "without limitations" and does not extend to inquiring "into matters which are within the exclusive province of one of the other branches of Government."[2]  Moreover, in the course of carrying out its duty to faithfully execute the law, including its duty to represent the United States in court, the executive branch may have "a legitimate, constitutionally recognized need to keep certain information confidential."[3]

As co-equal branches of government, Congress and the executive branch have "the obligation . . . to accommodate the legitimate needs of the other," where "Congress has a legitimate need for information that will help it legislate, and the executive branch has a legitimate, constitutionally recognized need to keep certain information confidential."[4]  The executive branch

---

[1]  Congressional Requests for Confidential Executive Branch Information, 13 Op. O.L.C. 153, 153 (1989) (Congressional Requests).

[2]  *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959).

[3]  Congressional Requests, 13 Op. O.L.C. at 157.

[4]  *Id.* at 157-58.

The Honorable Elijah E. Cummings
Page Two

and the Department have long maintained a "general practice [of] attempt[ing] to accommodate whatever legitimate interests Congress may have in obtaining information, while, at the same time, preserving executive branch interests in maintaining essential confidentiality."[5]  The executive branch and Congress have facilitated this interbranch cooperation through an "accommodation process" that calls upon each branch to "explain to the other why it believes its needs to be legitimate" and "to assess the needs of one branch and relate them to those of the other."[6]

Consistent with this accommodation responsibility, the Department agreed to make Mr. Gore voluntarily available to the Committee for a transcribed interview.  The Department conditioned this agreement on several mutual understandings.  Chief among those was the Committee's agreement that the Department would have a full and fair opportunity to review the transcript of Mr. Gore's testimony before it was made part of the Committee record, and that the transcript would not be made public or become part of the record prior to that review.  In addition, and importantly, the Department maintained throughout this phase of the accommodation process that Mr. Gore would not be able to answer questions bearing on the Department's internal deliberations.  The Committee was well aware of the Department's position on the scope of the transcribed interview and elected to move forward with the interview under those limitations.

This mutual understanding was vital to the Department's willingness to make Mr. Gore available for a voluntary interview.  As the Department repeatedly explained to the Committee, the Department has an essential need to maintain the confidentiality of its internal deliberations.  Maintaining confidentiality in executive branch deliberations facilitates robust and open discussion.  Fully-informed decision-making would be chilled if executive branch officials and staff believed that those discussions could become public.  Moreover, the Department continues to represent the United States in ongoing litigation, including in the United States Supreme Court, regarding the Commerce Department's decision to reinstate the citizenship question on the 2020 Census.  The United States' litigation position regarding privileges, which was not challenged in litigation, could be compromised if those very same confidential deliberations were made public through a concurrent oversight process.

Premised upon our mutual understanding, Mr. Gore appeared voluntarily and was questioned by majority and minority Committee staff for several hours on March 7, 2019.  Mr. Gore answered hundreds of questions from Committee staff.  When Mr. Gore did not answer a question during the interview, he did so only on the instruction of the Department's counsel and based on the Department's legitimate confidentiality and litigation interests.  Both majority and minority staff stated on the record that they had asked all of their questions of Mr. Gore and had no further questions at that time.[7]  This process represents a good faith effort by the Department

---

[5]  *Id.* at 153.

[6]  *Id.* at 159.

[7]  Transcribed Interview of John Gore (March 7, 2019) at 99 (minority), 179 (majority) (Gore Transcript).

The Honorable Elijah E. Cummings
Page Three

to accommodate the Committee and to establish a record of which questions implicate vital executive branch confidentiality interests and remain open for further discussion in the accommodation process.

The Committee also had access to a transcript of Mr. Gore's seven-hour deposition in the civil litigation before interviewing Mr. Gore. The Department offered that transcript to the Committee, and it is our understanding that the Committee obtained that transcript from another source.

In light of these good faith efforts by the Executive Branch, the Department is disappointed that the Committee has acted in a manner inconsistent with the spirit of mutual accommodation.

On March 14, just one week after Mr. Gore's interview, the Committee publicly released the Supplemental Memorandum, which includes and mischaracterizes Mr. Gore's testimony and provides selective, misleading excerpts from the transcript. On the same day, the Committee issued a press release that linked to the Supplemental Memorandum on both its website and its Twitter feed.[8] The Committee provided the Supplemental Memorandum to its members and referenced the Supplemental Memorandum repeatedly in its questioning of Secretary Ross at a public hearing that same day. The Department did not have a full and fair opportunity to review the transcript prior to the Committee's public disclosure of portions of it, nor did the Department receive an advance copy of the Supplemental Memorandum for review.[9] This has limited the Department's ability to timely respond to mischaracterizations in the record.

The Supplemental Memorandum mischaracterizes Mr. Gore's testimony to the Committee in at least four ways. First, the Supplemental Memorandum alleges that Mr. Gore exhibited a "refusal to answer" the Committee's requests.[10] This is an unfair characterization. Mr. Gore answered over five hundred questions posed by Committee staff, and when he did not answer, he did so only on the instruction of Department counsel. As the Committee knew, the Department's accommodation was to make Mr. Gore available for a voluntary interview to answer only those

---

[8] Oversight Committee (OversightDems). "News Alert: Chairman @RepCummings releases memo on interview with #DOJ Official on citizenship question for #2020Census https://oversight.house.gov/news/press-releases/cummings-releases-memo-on-interview-with-doj-official-on-citizenship-question-0." Mar. 14, 2019, 10:30 a.m. Tweet. https://twitter.com/OversightDems/status/1106216034812547073.

[9] Majority staff emailed the Department after 6 p.m. on Tuesday, March 12, inviting the Department to review the transcript the next day in Committee offices. The Department was unable to review the transcript in Committee offices on Wednesday, March 13. The Department was offered a subsequent opportunity to review the transcript of Mr. Gore's interview in Committee offices on March 15, after issuance of the Supplemental Memorandum, and the appropriate attorneys did so on March 19.

[10] Supplemental Memorandum at 1.

The Honorable Elijah E. Cummings
Page Four

questions that could be answered without compromising the ongoing litigation or other executive branch confidentiality interests. This was an appropriate effort to satisfy the Committee's request at this phase in the accommodation process.[11]  The Supplemental Memorandum's suggestion that the Department's instructions were somehow improper or unexpected contravenes both our shared understanding that the Department would make those instructions and the Committee's fundamental accommodation obligation.[12]

Second, the Supplemental Memorandum misleadingly describes as "new information" received from Mr. Gore's interview the existence of a "secret" memorandum and note authored by a Department of Commerce official.[13]  But Mr. Gore previously testified regarding the memorandum and the note during his deposition in the civil litigation and the Committee had access to a transcript of that deposition prior to interviewing Mr. Gore.[14]  The Department also provided a description of the memorandum and note on a privilege log produced in the *New York v. Department of Commerce* litigation.  The parties in that case extensively litigated the government's assertion of privilege over those documents.  After an in camera review, the district court upheld the government's assertion of privilege and held that the government could not be compelled to produce those documents to the plaintiffs.[15]  Producing those documents to the Committee could be viewed in these circumstances as a waiver of the privilege that the federal court already has upheld.

Third, the Supplemental Memorandum incorrectly implies that Mr. Gore identified Mark Neuman as "a former member of the Trump Transition Team."[16]  Mr. Gore, however, offered no such testimony.  The transcript excerpts in the Supplemental Memorandum omit the portion of Mr. Gore's testimony where he stated that he believes Mr. Neuman to be a former employee of the Department of Commerce or the Census Bureau who in the fall of 2017 was serving as an "advisor" to the Commerce Department on Census-related issues.[17]  Mr. Gore had no knowledge of, and has never testified about, whether Mr. Neuman was affiliated with the Trump Transition Team.

---

[11]  *See* Congressional Requests, 13 Op. O.L.C. at 157-62.

[12]  *See id.*

[13]  Supplemental Memorandum at 1-2.

[14]  Gore Deposition, 118:18-125:22 (Oct. 16, 2018) (discussing the note and the memorandum).

[15]  *See New York v. Department of Commerce*, No. 18-CIV-2921, Minute Order, ECF No. 361 (S.D.N.Y. Sept. 30, 2018).

[16]  Supplemental Memorandum at 2.

[17]  *See* Gore Transcript at 22.

The Honorable Elijah E. Cummings
Page Five

        Finally, the Department is concerned with the Committee's mischaracterization of the draft letter that Mr. Neuman provided to Mr. Gore.  The Department produced that draft letter in litigation and has since produced it to the Committee.  The Chairman's opening statement described that draft as an "an initial draft of a letter from the Department of Justice asking for the citizenship question to be added."[18]  To the extent that the Chairman suggested that the draft Mr. Neuman provided served as an "initial draft" of the Department's December 12, 2017 letter, that suggestion is incorrect.  Any such suggestion also is unsupported by the draft itself and the transcript of Mr. Gore's testimony.  The transcript confirms that at no time did Mr. Gore agree that the draft he received from Mr. Neuman served as a basis for, let alone "an initial draft of," the Department's December 12, 2017 letter.  Unfortunately, this mischaracterization has implied, perhaps unintentionally, that Mr. Gore's statements during his deposition and his transcribed interview, in which he stated that he wrote the first draft of the December, 12, 2017 letter, were untrue.  Mr. Gore's testimony in his deposition and his testimony to the Committee were truthful.  The Department rejects any implication to the contrary as it is inconsistent with the evidence.

        The Department respectfully requests that, in the interests of accuracy and transparency, the Committee make this letter part of the legislative record and disseminate it to all Committee members and staff.  The Department also requests that the Committee withdraw or correct the Supplemental Memorandum based upon the information provided in this letter.

                                        Sincerely,

                                        Stephen E. Boyd
                                        Assistant Attorney General

cc:  The Honorable Jim Jordan
     Ranking Member

---

[18]  Opening Statement Chairman Elijah E. Cummings Hearing with Commerce Secretary Wilbur Ross March 14, 2019, at 2. https://oversight.house.gov/legislation/hearings/commerce-secretary-wilbur-l-ross-jr.

Exhibit L

# The New York Times

# Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question

**By Michael Wines**

May 30, 2019

WASHINGTON — Thomas B. Hofeller achieved near-mythic status in the Republican Party as the Michelangelo of gerrymandering, the architect of partisan political maps that cemented the party's dominance across the country.

But after he died last summer, his estranged daughter discovered hard drives in her father's home that revealed something else: Mr. Hofeller had played a crucial role in the Trump administration's decision to add a citizenship question to the 2020 census.

Files on those drives showed that he wrote a study in 2015 concluding that adding a citizenship question to the census would allow Republicans to draft even more extreme gerrymandered maps to stymie Democrats. And months after urging President Trump's transition team to tack the question onto the census, he wrote the key portion of a draft Justice Department letter claiming the question was needed to enforce the 1965 Voting Rights Act — the rationale the administration later used to justify its decision.

Those documents, cited in a federal court filing Thursday by opponents seeking to block the citizenship question, have emerged only weeks before the Supreme Court is expected to rule on the legality of the citizenship question. Critics say adding the question would deter many immigrants from being counted and shift political power to Republican areas.

The disclosures represent the most explicit evidence to date that the Trump administration added the question to the 2020 census to advance Republican Party interests.

[*Inside the Trump administration's fight to add a citizenship question to the census*]

In Supreme Court arguments in April over the legality of the decision, the Trump administration argued that the benefits of obtaining more accurate citizenship data offset any damage stemming from the likely depressed response to the census by

minority groups and noncitizens. And it dismissed charges that the Commerce Department had simply invented a justification for adding the question to the census as unsupported by the evidence.

Opponents said that the Justice Department's rationale for seeking to add a citizenship question to the census was baldly contrived, a conclusion shared by federal judges in all three lawsuits opposing the administration's action.

But a majority of the Supreme Court justices seemed inclined to accept the department's explanation the question was needed to enforce the Voting Rights Act, and appeared ready to uphold the administration's authority to alter census questions as it sees fit. The justices are expected to issue a final ruling before the court's term ends in late June.

In nearly 230 years, the census has never asked all respondents whether they are American citizens. But while adding such a question might appear uncontroversial on its face, opponents have argued that it is actually central to a Republican strategy to skew political boundaries to their advantage when redistricting begins in 2021.

[*How the Supreme Court's decision on the census could alter American politics.*]

Until now, Mr. Hofeller seemed a bystander in the citizenship-question debate, mentioned but once in thousands of pages of lawsuit depositions and evidence. Proof of his deeper involvement surfaced only recently, and only after a remarkable string of events beginning after his death in August at age 75.

Mr. Hofeller was survived by a daughter, Stephanie Hofeller, from whom he had been estranged since 2014. In an interview, Ms. Hofeller said she learned of her father's death by accident after searching for his name on the internet, and returned to her parents' retirement home in Raleigh, N.C., to see her mother, Kathleen Hofeller.

Sorting through Mr. Hofeller's personal effects, looking for items she had asked her father to save for her, Stephanie Hofeller came across a clear plastic bag holding four external hard drives and 18 thumb drives, backups of data on Mr. Hofeller's Toshiba laptop. Her mother gave Ms. Hofeller the backups, which turned out to hold some 75,000 files — family photographs and other personal data, but also a huge trove of documents related to Mr. Hofeller's work as a Republican consultant.

Late last year, Ms. Hofeller said, she contacted the Raleigh office of the advocacy group Common Cause, seeking its help in finding a lawyer unconnected to her father to help settle his estate. Only after several conversations with a staff member there did she mention the hard drives in passing, she said, remarking almost jokingly that an expert on gerrymanders might find a lot in them that was of interest.

"My understanding was that anything that would be on these hard drives was duplicative of things that had already been hashed out" in court challenges to Mr. Hofeller's maps, she said.

In fact, Common Cause had recently filed a new lawsuit in state court, challenging gerrymandered maps of North Carolina's legislative districts drawn by Mr. Hofeller himself. When the staff member told her of the lawsuit, Ms. Hofeller said, she thought, "Wow — this might be of use."

Lawyers for Arnold & Porter, the law firm representing Common Cause in the North Carolina suit, subpoenaed the drives in February. By happenstance, the same firm was representing private plaintiffs pro bono in the principal lawsuit opposing the citizenship question, in Federal District Court in Manhattan.



Activists rallied outside the Supreme Court in April. The justices are expected to issue a final ruling on the census citizenship question before the court's term ends in late June.
J. Scott Applewhite/Associated Press

The documents cited in the Thursday court filing include an unpublished August 2015 analysis by Mr. Hofeller, who was hired by The Washington Free Beacon, a conservative news outlet financially backed by Paul Singer, a billionaire New York hedge fund manager and major Republican donor. Mr. Hofeller's charge was to assess the impact of drawing political maps that were not based on a state's total population — the current practice virtually everywhere in the nation — but on a slice of that population: American citizens of voting age.

At the time, the study's sponsor was considering whether to finance a lawsuit by conservative legal advocates that argued that counting voting-age citizens was not merely acceptable, but required by the Constitution.

Mr. Hofeller's exhaustive analysis of Texas state legislative districts concluded that such maps "would be advantageous to Republicans and non-Hispanic whites," and would dilute the political power of the state's Hispanics.

The reason, he wrote, was that the maps would exclude traditionally Democratic Hispanics and their children from the population count. That would force Democratic districts to expand to meet the Constitution's one person, one vote requirement. In turn, that would translate into fewer districts in traditionally Democratic areas, and a new opportunity for Republican mapmakers to create even stronger gerrymanders.

The strategy carried a fatal flaw, however: The detailed citizenship data that was needed to draw the maps did not exist. The only existing tally of voting-age citizens, Mr. Hofeller's study stated, came from a statistical sample of the population largely used by the Justice Department to verify that the 1965 Voting Rights Act was ensuring the voting rights of minority groups.

"Without a question on citizenship being included on the 2020 Decennial Census questionnaire," Mr. Hofeller wrote, "the use of citizen voting age population is functionally unworkable."

Roughly 16 months later, as President-elect Trump prepared to take office, Mr. Hofeller urged Mr. Trump's transition team to consider adding a citizenship question to the census, the transition official responsible for census issues, Mark Neuman, said last year in a deposition in the Manhattan census lawsuit.

Mr. Neuman testified that Mr. Hofeller told him that using citizenship data from the census to enforce the Voting Rights Act would increase Latino political representation — the opposite of what Mr. Hofeller's study had concluded months earlier.

Court records show that Mr. Neuman, a decades-long friend of Mr. Hofeller's, later became an informal adviser on census issues to Commerce Secretary Wilbur L. Ross Jr. By that summer, a top aide to Mr. Ross was pressing the Justice Department to say that it required detailed data from a census citizenship question to better enforce the Voting Rights Act.

The court filing on Thursday describes two instances in which Mr. Hofeller's digital fingerprints are clearly visible on Justice Department actions.

The first involves a document from the Hofeller hard drives created on Aug. 30, 2017, as Mr. Ross's wooing of the Justice Department was nearing a crescendo. The document's single paragraph cited two court decisions supporting the premise that more detailed citizenship data would assist enforcement of the Voting Rights Act.

That paragraph later appeared word for word in a draft letter from the Justice Department to the Census Bureau that sought a citizenship question on the 2020 census. In closed congressional testimony in March, John M. Gore, the assistant attorney general for civil rights and the Justice Department's chief overseer of voting rights issues, said Mr. Neuman gave him the draft in an October 2017 meeting.

The second instance involves the official version of the Justice Department's request for a citizenship question, a longer and more detailed letter sent to the Census Bureau in December 2017. That letter presents nuanced and technical arguments that current citizenship data falls short of Voting Rights Act requirements — arguments that the plaintiffs say are presented in exactly the same order, and sometimes with identical descriptions like "building blocks" — as in Mr. Hofeller's 2015 study.

In their court filing on Thursday, lawyers for the plaintiffs said that "many striking similarities" between Mr. Hofeller's study and the department's request for a citizenship question indicated that the study was an important source document for the Justice Department's request.

The filing also says flatly that Mr. Gore and Mr. Neuman "falsely testified" under oath about the Justice Department's actions on the citizenship question.

Ms. Hofeller said her decision to open her father's files to his opponents was a bid for transparency, devoid of personal or political animus. Although she believed he was undermining American democracy, she said, their estrangement stemmed not from partisan differences, but a family dispute that ended up in court. Ms. Hofeller described herself as a political progressive who despises Republican partisanship, but also has scant respect for Democrats.

Her father, she said, was a brilliant cartographer who was deeply committed to traditional conservative principles like free will and limited government. As a child, she said, she was schooled in those same principles, but every successive gerrymandered map he created only solidified her conviction that he had abandoned them in a quest to entrench his party in permanent control.

"He had me with the idea that we are made to be free," she said. "And then he lost me."

Alain Delaqueriere contributed research in New York.

READ 23 COMMENTS