THE WHITE HOUSE
Office of the Press Secretary

FOR IMMEDIATE RELEASE
July 11, 2019

EXECUTIVE ORDER

- - - - - - -

COLLECTING INFORMATION ABOUT CITIZENSHIP
STATUS IN CONNECTION WITH THE DECENNIAL CENSUS

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

Section 1. Purpose. In *Department of Commerce v. New York*, No. 18-966 (June 27, 2019), the Supreme Court held that the Department of Commerce (Department) may, as a general matter, lawfully include a question inquiring about citizenship status on the decennial census and, more specifically, declined to hold that the Secretary of Commerce's decision to include such a question on the 2020 decennial census was "substantively invalid."  That ruling was not surprising, given that every decennial census from 1820 to 2000 (with the single exception of 1840) asked at least some respondents about their citizenship status or place of birth.  In addition, the Census Bureau has inquired since 2005 about citizenship on the American Community Survey -- a separate questionnaire sent annually to about 2.5 percent of households.

The Court determined, however, that the explanation the Department had provided for including such a question on the census was, in the circumstances of that case, insufficient to support the Department's decision.  I disagree with the Court's ruling, because I believe that the Department's decision was fully supported by the rationale presented on the record before the Supreme Court.

The Court's ruling, however, has now made it impossible, as a practical matter, to include a citizenship question on the 2020 decennial census questionnaire.  After examining every possible alternative, the Attorney General and the Secretary of Commerce have informed me that the logistics and timing for carrying out the census, combined with delays from continuing litigation, leave no practical mechanism for including the question on the 2020 decennial census.

Nevertheless, we shall ensure that accurate citizenship data is compiled in connection with the census by other means.  To achieve that goal, I have determined that it is imperative that all executive departments and agencies (agencies) provide the Department the maximum assistance permissible, consistent with law, in determining the number of citizens and non-citizens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing that objective.  When the Secretary of Commerce decided to include the citizenship question on the census, he determined that such a question, in combination with administrative records, would provide the most accurate and complete data.  At that time, the Census Bureau had determined based on experience that administrative records to which it had access would enable it to determine citizenship status for

approximately 90 percent of the population.  At that point, the benefits of using administrative records were limited because the Department had not yet been able to access several additional important sets of records with critical information on citizenship.  Under the Secretary of Commerce's decision memorandum directing the Census Bureau "to further enhance its administrative record data sets" and "to obtain as many additional Federal and state administrative records as possible," the Department has sought access to several such sets of records maintained by other agencies, but it remains in negotiations to secure access.  The executive action I am taking today will ensure that the Department will have access to all available records in time for use in conjunction with the census.

        Therefore, to eliminate delays and uncertainty, and to resolve any doubt about the duty of agencies to share data promptly with the Department, I am hereby ordering all agencies to share information requested by the Department to the maximum extent permissible under law.

        Access to the additional data identified in section 3 of this order will ensure that administrative records provide more accurate and complete citizenship data than was previously available.

        I am also ordering the establishment of an interagency working group to improve access to administrative records, with a goal of making available to the Department administrative records showing citizenship data for 100 percent of the population.  And I am ordering the Secretary of Commerce to consider mechanisms for ensuring that the Department's existing data-gathering efforts expand the collection of citizenship data in the future.

        Finally, I am directing the Department to strengthen its efforts, consistent with law, to obtain State administrative records concerning citizenship.

        Ensuring that the Department has available the best data on citizenship that administrative records can provide, consistent with law, is important for multiple reasons, including the following.

        First, data on the number of citizens and aliens in the country is needed to help us understand the effects of immigration on our country and to inform policymakers considering basic decisions about immigration policy.  The Census Bureau has long maintained that citizenship data is one of the statistics that is "essential for agencies and policy makers setting and evaluating immigration policies and laws."

        Today, an accurate understanding of the number of citizens and the number of aliens in the country is central to any effort to reevaluate immigration policy.  The United States has not fundamentally restructured its immigration system since 1965.  I have explained many times that our outdated immigration laws no longer meet contemporary needs.  My Administration is committed to modernizing immigration laws and policies, but the effort to undertake any fundamental reevaluation of immigration policy is hampered when we do not have the most complete data about the number of citizens and non-citizens in the country.

If we are to undertake a genuine overhaul of our immigration laws and evaluate policies for encouraging the assimilation of immigrants, one of the basic informational building blocks we should know is how many non-citizens there are in the country.

Second, the lack of complete data on numbers of citizens and aliens hinders the Federal Government's ability to implement specific programs and to evaluate policy proposals for changes in those programs.  For example, the lack of such data limits our ability to evaluate policies concerning certain public benefits programs.  It remains the immigration policy of the United States, as embodied in statutes passed by the Congress, that "aliens within the Nation's borders [should] not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations" and that "the availability of public benefits [should] not constitute an incentive for immigration to the United States" (8 U.S.C. 1601(2)).  The Congress has identified compelling Government interests in restricting public benefits "in order to assure that aliens be self-reliant in accordance with national immigration policy" and "to remove the incentive for illegal immigration provided by the availability of public benefits" (8 U.S.C. 1601(5), (6)).

Accordingly, aliens are restricted from eligibility for many public benefits.  With limited exceptions, aliens are ineligible to receive supplemental security income or food stamps (8 U.S.C. 1612(a)).  Aliens who are "qualified aliens" -- that is, lawful permanent residents, persons granted asylum, and certain other legal immigrants -- are, with limited exceptions, ineligible to receive benefits through Temporary Assistance for Needy Families, Medicaid, and State Children's Health Insurance Program for 5 years after entry into the United States (8 U.S.C. 1613(a)).  Aliens who are not "qualified aliens," such as those unlawfully present, are generally ineligible for Federal benefits and for State and local benefits (8 U.S.C. 1611(a), 1621(a)).

The lack of accurate information about the total citizen population makes it difficult to plan for annual expenditures on certain benefits programs.  And the lack of accurate and complete data concerning the alien population makes it extremely difficult to evaluate the potential effects of proposals to alter the eligibility rules for public benefits.

Third, data identifying citizens will help the Federal Government generate a more reliable count of the unauthorized alien population in the country.  Data tabulating both the overall population and the citizen population could be combined with records of aliens lawfully present in the country to generate an estimate of the aggregate number of aliens unlawfully present in each State.  Currently, the Department of Homeland Security generates an annual estimate of the number of illegal aliens residing in the United States, but its usefulness is limited by the deficiencies of the citizenship data collected through the American Community Survey alone, which includes substantial margins of error because it is distributed to such a small percentage of the population.

Academic researchers have also been unable to develop useful and reliable numbers of our illegal alien population using currently available data.  A 2018 study by researchers

at Yale University estimated that the illegal alien population totaled between 16.2 million and 29.5 million.  Its modeling put the likely number at about double the conventional estimate.  The fact is that we simply do not know how many citizens, non-citizens, and illegal aliens are living in the United States.

Accurate and complete data on the illegal alien population would be useful for the Federal Government in evaluating many policy proposals.  When Members of Congress propose various forms of protected status for classes of unauthorized immigrants, for example, the full implications of such proposals can be properly evaluated only with accurate information about the overall number of unauthorized aliens potentially at issue.  Similarly, such information is needed to inform debate about legislative proposals to enhance enforcement of immigration laws and effectuate duly issued removal orders.

The Federal Government's need for a more accurate count of illegal aliens in the country is only made more acute by the recent massive influx of illegal immigrants at our southern border.  In Proclamation 9822 of November 9, 2018 (Addressing Mass Migration Through the Southern Border of the United States), I explained that our immigration and asylum system remains in crisis as a consequence of the mass migration of aliens across our southern border.  As a result of our broken asylum laws, hundreds of thousands of aliens who entered the country illegally have been released into the interior of the United States pending the outcome of their removal proceedings.  But because of the massive backlog of cases, hearing dates are sometimes set years in the future and the adjudication process often takes years to complete.  Aliens not in custody routinely fail to appear in court and, even if they do appear, fail to comply with removal orders.  There are more than 1 million illegal aliens who have been issued final removal orders from immigration judges and yet remain at-large in the United States.

Efforts to find solutions that address the immense number of unauthorized aliens living in our country should start with accurate information that allows us to understand the true scope of the problem.

Fourth, it may be open to States to design State and local legislative districts based on the population of voter-eligible citizens.  In *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), the Supreme Court left open the question whether "States may draw districts to equalize voter-eligible population rather than total population."  Some States, such as Texas, have argued that "jurisdictions may, consistent with the Equal Protection Clause, design districts using any population baseline -- including total population and voter-eligible population -- so long as the choice is rational and not invidiously discriminatory".  Some courts, based on Supreme Court precedent, have agreed that State districting plans may exclude individuals who are ineligible to vote.  Whether that approach is permissible will be resolved when a State actually proposes a districting plan based on the voter-eligible population.  But because eligibility to vote depends in part on citizenship, States could more effectively exercise this option with a more accurate and complete count of the citizen population.

The Department has said that if the officers or public bodies having initial responsibility for the legislative

districting in each State indicate a need for tabulations of citizenship data, the Census Bureau will make a design change to make such information available.  I understand that some State officials are interested in such data for districting purposes.  This order will assist the Department in securing the most accurate and complete citizenship data so that it can respond to such requests from the States.

To be clear, generating accurate data concerning the total number of citizens, non-citizens, and illegal aliens in the country has nothing to do with enforcing immigration laws against particular individuals.  It is important, instead, for making broad policy determinations.  Information obtained by the Department in connection with the census through requests for administrative records under 13 U.S.C. 6 shall be used solely to produce statistics and is subject to confidentiality protections under Title 13 of the United States Code.  Information subject to confidentiality protections under Title 13 may not, and shall not, be used to bring immigration enforcement actions against particular individuals.  Under my Administration, the data confidentiality protections in Title 13 shall be fully respected.

Sec. 2.  *Policy*.  It is the policy of the United States to develop complete and accurate data on the number of citizens, non-citizens, and illegal aliens in the country.  Such data is necessary to understand the effects of immigration on the country, and to inform policymakers in setting and evaluating immigration policies and laws, including evaluating proposals to address the current crisis in illegal immigration.

Sec. 3.  *Assistance to the Department of Commerce and Maximizing Citizenship Data*.  (a)  All agencies shall promptly provide the Department the maximum assistance permissible, consistent with law, in determining the number of citizens, non-citizens, and illegal aliens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing that objective.  In particular, the following agencies shall examine relevant legal authorities and, to the maximum extent consistent with law, provide access to the following records:

> (i)   Department of Homeland Security, United States Citizenship and Immigration Services - National-level file of Lawful Permanent Residents, Naturalizations;
>
> (ii)  Department of Homeland Security, Immigration and Customs Enforcement - F1 & M1 Nonimmigrant Visas;
>
> (iii) Department of Homeland Security - National-level file of Customs and Border Arrival/Departure transaction data;
>
> (iv)  Department of Homeland Security and Department of State, Worldwide Refugee and Asylum Processing System - Refugee and Asylum visas;
>
> (v)   Department of State - National-level passport application data;
>
> (vi)  Social Security Administration - Master Beneficiary Records; and

6

    (vii) Department of Health and Human Services – CMS Medicaid and CHIP Information System.

 (b) The Secretary of Commerce shall instruct the Director of the Census Bureau to establish an interagency working group to coordinate efforts, consistent with law, to maximize the availability of administrative records in connection with the census, with the goal of obtaining administrative records that can help establish citizenship status for 100 percent of the population.  The Director of the Census Bureau shall chair the working group, and the head of each agency shall designate a representative to the working group upon request from the working group chair.

 (c) To ensure that the Federal Government continues to collect the most accurate information available concerning citizenship going forward, the Secretary of Commerce shall consider initiating any administrative process necessary to include a citizenship question on the 2030 decennial census and to consider any regulatory changes necessary to ensure that citizenship data is collected in any other surveys and data-gathering efforts conducted by the Census Bureau, including the American Community Survey.  The Secretary of Commerce shall also consider expanding the distribution of the American Community Survey, which currently reaches approximately 2.5 percent of households, to secure better citizenship data.

 (d) The Department shall strengthen its efforts, consistent with law, to gain access to relevant State administrative records.

 <u>Sec</u>. <u>4</u>. <u>General Provisions</u>.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

    (i) the authority granted by law to an executive department or agency, or the head thereof; or

    (ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

 (b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

 (c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

           DONALD J. TRUMP

THE WHITE HOUSE,
 July 11, 2019.

           # # #