**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | |
| v. | 18-CV-5025 (JMF) (Consolidated) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

**NYIC PLAINTIFFS' MOTION FOR SANCTIONS**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION** ...................................................................................................1

**I.   FACTS RELEVANT TO DEFENDANTS' MISCONDUCT** ...........................4

   **A.   Plaintiffs Discover New Evidence About the Citizenship Question's Origins**.............4

   **B.   Defendants, Their Witnesses, and Their Representatives Concealed Evidence About the Decision to Add a Citizenship Question to the 2020 Census**...........................................6

      **1.   Neuman provided false testimony and withheld critical evidence.** ...........................7

      **2.   Gore provided false testimony and concealed he received the draft letter from Neuman** ..........................................................................................................9

      **3.   Senior Commerce officials caused Defendants to misrepresent the completeness of the Administrative Record.** .........................................................................11

      **4.   Defendants failed to conduct a reasonable inquiry as to the "senior Administration officials" and "other governmental officials" involved in requesting the Citizenship Question and Comstock falsely certified the completeness of the interrogatory response.** ...........................................................................................16

**LEGAL ARGUMENT** ...........................................................................................18

**I.   THE COURT SHOULD IMPOSE APPROPRIATE SANCTIONS FOR DEFENDANTS' LITIGATION MISCONDUCT**.................................................18

   **A.   This Court Has Multiple Sources of Authority to Impose Sanctions** .........................19

   **B.   Defendants and Their Agents Misled Plaintiffs and the Court**...................................21

   **C.   Sanctions Are an Appropriate Remedy Under These Circumstances**.......................23

**II.   THE COURT SHOULD AUTHORIZE TARGETED DISCOVERY TO DETERMINE THE EXTENT AND INDIVIDUALS RESPONSIBLE FOR DEFENDANTS' MISCONDUCT** ..................................................................24

**III.   THE COURT SHOULD IMPOSE SANCTIONS FOLLOWING PLAINTIFFS' COMPLETION OF LIMITED ADDITIONAL DISCOVERY** ..........................................32

**CONCLUSION** ...................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Serio*,
No. 97-cv-0670, 2000 WL 554221 (S.D.N.Y. May 30, 2002) ............................................29

*Almeciga v. Ctr. for Investigative Reporting, Inc.*,
185 F. Supp. 3d 401 (S.D.N.Y. 2016) ..................................................................................23

*Am. Exp. Warehousing, Ltd. v. Transamerica Ins. Co.*,
380 F.2d 277 (2d Cir. 1967) ...............................................................................................29

*Azar v. Garza*,
138 S. Ct. 1790 (2018) ........................................................................................................34

*Browning Debenture Holders' Comm. v. DASA Corp.*,
560 F.2d 1078 (2d Cir. 1977).............................................................................................23

*Burbar v. Inc. Vill. of Garden City*,
303 F.R.D. 9 (E.D.N.Y. 2014)............................................................................................29

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ........................................................................................................19, 25

*Chilcutt v. U.S.*,
4 F.3d 1313 (5th Cir. 1993) ................................................................................................32

*Common Cause v. Lewis*,
No. 18-CVS-14001 (N.C. Super.)..........................................................................................3

*Cooksey v. Hilton Int'l Co.*,
863 F. Supp. 150 (S.D.N.Y. 1994)......................................................................................30

*In re Delphi Corp.*,
276 F.R.D. 81 (S.D.N.Y. 2011) ..........................................................................................29

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ..................................................................................................*passim*

*E. Fin. Corp. v. JSC Alchevsk Iron & Steel Works*,
258 F.R.D. 76 (S.D.N.Y. 2008) ..........................................................................................20

*E.E.O.C. v. Waterfront Comm'n of N.Y. Harbor*,
665 F. Supp. 197 (S.D.N.Y. 1987)...................................................................................3, 32

*F.D.I.C. v. Maxxam, Inc.*,
    523 F.3d 566 (5th Cir. 2008) ..................................................32

*In re Fannie Mae Sec. Litig.*,
    552 F.3d 814 (D.C. Cir. 2009)................................................32

*Feld v. Feld*,
    No. 08-cv-1557, 2011 WL 13193354 (D.D.C. Mar. 9, 2011) ................................30

*In re General Motors LLC Ignition Switch Litigation*,
    80 F.Supp.3d 521 (S.D.N.Y. 2015)................................................29

*In re Good Hope Indus., Inc.*,
    886 F.2d 480 (1st Cir. 1989).................................................33

*Goodyear Tire & Rubber Co. v. Haeger*,
    137 S. Ct. 1178 (2017) ..................................................19

*In re Grand Jury Subpoena Duces Tecum*,
    731 F.2d 1032 (2d Cir. 1984)................................................30

*Hargan v. Garza*,
    No. 17-654 ..................................................34

*Jung v. Nechis*,
    2009 WL 262835 (S.D.N.Y. March 23, 2009) ..................................................25

*Margo v. Weiss*,
    No. 96 CIV. 3842 (MBM), 1998 WL 765185 (S.D.N.Y. Nov. 3, 1998), *aff'd*,
    213 F.3d 55 (2d Cir. 2000) ..................................................22

*Mattingly v. U.S.*,
    939 F.2d 816 (9th Cir. 1991) (U.S. is subject to Rule 11 sanctions, including
    but not limited to attorneys' fees) ..................................................32

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002)................................................33

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
    51 F. Supp. 2d 457 (S.D.N.Y. 1999)................................................22

*Passlogix, Inc. v. 2FA Tech., LLC*,
    708 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................19, 23

*Penthouse Int'l, Ltd. v. Playboy Enters.*,
    663 F.2d 371 (2d Cir. 1981) ..................................................19, 20

*Reilly v. Natwest Mkts. Grp. Inc.*,
  181 F.3d 253 (2d Cir. 1999) ...........................................................................23

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
  306 F.3d 99 (2d Cir. 2002) ............................................................................20

*In re Richard Roe, Inc. (Roe II)*,
  168 F.3d 69 (2d Cir.1999) .............................................................................31

*S.E.C. v. Smith*,
  710 F.3d 87 (2d Cir. 2013) ............................................................................22

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ....................................................................3, 29

*Shah v. Eclipsys Corp.*,
  No. 08-cv-2528, 2010 WL 2710618 (E.D.N.Y. 2010) ...................................20

*Shim-Larkin v New York*,
  2019 US Dist LEXIS 19245 (S.D.N.Y. Feb. 5, 2019) ....................................20

*Sussman v. Bank of Israel*,
  56 F.3d 450 (2d Cir. 1995) ............................................................................19

*United States v. Gavilan Joint Cmty. Coll. Dist.*,
  849 F.2d 1246 (9th Cir. 1988) .......................................................................33

*United States v. Philip Morris Inc.*,
  347 F.3d 951 (D.C. Cir. 2003) .......................................................................33

## INTRODUCTION

This remains a case of significant public importance.  The Supreme Court concluded that Defendants' purported rationale to add the citizenship question was "contrived" and "a distraction."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019).  But it is worse than that.  This Court has before it irrefutable evidence that Defendants—led by senior officials and agents of the Commerce Department, including Mark Neuman, Earl Comstock, Peter Davidson, James Uthmeier, and Christa Jones—knowingly, and repeatedly, engaged in litigation conduct that is nothing less than a fraud on the Court.  Acting Assistant Attorney General John Gore assisted these individuals; beyond Mr. Gore, there are serious questions about the role other senior Department of Justice (DOJ) officials played in abetting misconduct.

Defendants and their senior officials concealed facts about the case's central issues through a concerted campaign of delay and obfuscation.  Through the use of false or misleading testimony, they obscured evidence suggesting that the true purpose of Secretary Ross's decision to add a citizenship question to the 2020 Census—suppressing the political power of minority immigrant communities.  For example:

- In their original version of events, the Commerce Department "initiated" a review of the citizenship question after Arthur Gary, General Counsel of DOJ's Judicial Management Division, drafted and sent a letter requesting that Commerce add a citizenship question to help DOJ enforce the Voting Rights Act (VRA).  Exs. 1 & 2.  Defendants then took great pains to curate an incomplete Administrative Record that would be consistent with that cover story.  During litigation, however, the Administrative Record was revealed to be woefully incomplete, and every aspect of Secretary Ross's narrative was proven to be untrue.

- Defendants steadfastly denied that Secretary Ross's decision to add a citizenship question to the census harbored discriminatory motives, or that the decision had anything to do with curbing the political power of minority immigrant communities through redistricting.  But we now know that the citizenship question's architect—Dr. Thomas Hofeller, the late Republican redistricting specialist who was the first person to suggest adding a citizenship question to the Trump transition team—did so to enable states to

redistrict using citizenship voting age population (CVAP), because this change would benefit "Republicans and non-Hispanic Whites" at the expense of Latinos.  Ex. 6.

- Gore testified he prepared the initial draft of the DOJ request letter and that the VRA rationale was legitimate.  But we now know that Gore received the first draft from Mark Neuman, Secretary Ross's key advisor on census issues.  Ex. 13 at 26.  And we now know that Dr. Hofeller and Neuman were long-time associates, and that it was Hofeller who proposed the VRA rationale, which was incorporated verbatim in the draft DOJ request letter Neuman provided to Gore.  Exs. 9 & 10.  And we know that Defendants interfered with Plaintiffs' discovery that Neuman delivered the draft letter to Gore, initially failing to turn it over, then producing it on the eve of Gore's deposition while denying that they had any information as to its provenance.  Exs. 18 (line 15199), 19 & 20.

- Defendants argued to this Court that Neuman "played no meaningful role in discussions about adding a citizenship question."  But Neuman testified he worked on the draft DOJ request letter (subsequently provided to Gore) with senior Commerce officials, including Policy Director Earl Comstock, General Counsel Peter Davidson, and Secretary Ross's Counsel James Uthmeier.  Ex. 12 at 278-84.  And we also know that Uthmeier and Davidson played a role in connecting Neuman with Gore.  Ex. 12 at 112; Ex. 13 at 22.  We now know that Uthmeier and Davidson continued to work with Gore, and that they discussed apportionment.  Ex. 13 at 21, 139.  And we know that Defendants interceded in Neuman's document production, after which he failed to produce his communications with Hofeller, Davidson, Uthmeier, or other Commerce personnel.  Exs. 21 & 22.

- Defendants represented to this Court that they had taken "all proper and reasonable steps to ensure that the administrative record and supplemental materials are complete."  But we know that virtually none of the foregoing communications—concerning Comstock, Uthmeier, or Davidson's work on the draft DOJ request letter, Uthmeier or Davidson's role in connecting Gore to Neuman, or Uthmeier or Davidson's "dozen" communications with Gore—are reflected in the Administrative Record, suggesting that Comstock, Davidson, and Uthmeier all caused this representation to be incorrect.  And there appear to be other missing materials as well.

- Defendants represented that Commerce personnel did not use personal email to conduct government business.  But we now know that Hofeller discussed the citizenship question and redistricting strategy with a *second* long-time associate, Christa Jones, through her Hotmail account.  Ex. 26.  And we know that Jones was placed in a high-level position at the Census Bureau, where she played a direct role in drafting the Secretary's March 26 decision memo. Ex. 27.

- Defendants represented that "no additional information is available" to identify the "senior Administration officials" or "other government officials" identified in Secretary Ross's June 21 memorandum, and that they answered Plaintiffs' interrogatory "in the most complete manner possible."  ECF 319.  And Defendants sought to minimize the role the White House had in the process.  Ex. 35.  Defendants' misleading response was

certified by Comstock.  Ex. 35.  In fact, we now know that White House personnel interacted directly with Gore and Uthmeier (who told congressional investigators he had contacts with multiple White House employees but was instructed not to identify them), none of which is reflected in the Administrative Record.  Exs. 13 at 57-8; 14 at 90, 142.

There are two additional points that bear emphasis.  First, this conduct all transpired against Defendants' repeated representations that the deadline to finalize the census questionnaire was June 30, 2019.  It is in large part because Defendants insisted on expedited proceedings that they were able to get away with such pervasive misconduct.

Second, it is apparent from privilege logs produced in litigation that senior DOJ officials beyond Mr. Gore may have abetted Commerce to promulgate a false rationale, both by helping Gore with the December 12 request letter and by consulting with Secretary Ross's senior staff concerning the March 26 and June 21 memos—all of which implemented the "distraction." *Dep't of Commerce*, 139 S. Ct. at 2576.  While much of this conduct has been shielded from public view by assertions of privilege, the ability to shield such communications "disappears altogether when there is any reason to believe government misconduct occurred." *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).  The role of senior DOJ officials in enabling this conduct is one of the areas where Plaintiffs believe additional discovery is appropriate.

It is important that the Court take action—for this case and for future cases.  "The same ethical considerations should delimit the bounds of activity for both private and public lawyers." *E.E.O.C. v. Waterfront Comm'n of N.Y. Harbor*, 665 F. Supp. 197, 200 (S.D.N.Y. 1987). Indeed, those ethical considerations are heightened in this case, where the misconduct appears to have been perpetrated by senior Commerce and DOJ officials—not the career DOJ line attorneys who litigated this case on behalf of Defendants.  It is of the utmost importance that such senior government officials be held to the highest ethical standards.

The Background section details the facts relevant to Defendants' misconduct as presently known.  The Argument Section outlines the legal framework, including (I) the Court's authority to impose sanctions and why sanctions are appropriate here; (II) the authority to permit limited discovery and the discovery sought to ascertain the full extent of the misconduct and the persons responsible; and (III) the Court's authority to impose the specific relief sought here.  Plaintiffs respectfully request to submit supplemental briefing following discovery so as to better and more narrowly tailor the relief sought.

## I.      FACTS RELEVANT TO DEFENDANTS' MISCONDUCT

### A.      Plaintiffs Discover New Evidence About the Citizenship Question's Origins

Months after this Court entered judgment and after oral argument in the Supreme Court, counsel for the NYIC Plaintiffs received new evidence in discovery in a separate state court lawsuit—*Common Cause v. Lewis*, No. 18-CVS-14001 (N.C. Super.).  *See* Exs. 3-11.  Those documents revealed that Dr. Thomas Hofeller played a critical yet undisclosed role in orchestrating the citizenship question's addition to the 2020 Decennial Census and in devising the VRA rationale that Secretary Ross ultimately cited in his decisional memo.

In late August 2015, Dr. Hofeller was commissioned to study the "practicality" and "political and demographic effects" of using citizen voting age population ("CVAP") instead of total population ("TPOP") to achieve equal population in redistricting.  Exs. 5, 6.  In the resulting study, Hofeller wrote that use of CVAP as the population base for redistricting was "functionally unworkable" "[w]ithout a question on citizenship being included on the 2020 Decennial Census questionnaire."  Ex. 6 at 8.

Hofeller was clear about the impact of adding a citizenship question to the 2020 Census and use of CVAP in redistricting:  the results "would be advantageous to Republicans and Non-Hispanic Whites," "would clearly be a disadvantage for the Democrats," and would "provoke a

high degree of resistance from Democrats and the major minority groups in the nation." *Id.* at 7, 9. Using the example of the Texas State House of Representatives, Hofeller detailed that the strategy would enable Republican mapmakers to pack more Democratic and Latino voters into each district and could be thus employed to particularly great effect in heavily Latino areas. *Id.* at 6.

Plaintiffs also obtained a document Hofeller wrote in August 2017, which asserted that adding a citizenship question to the census could be justified as necessary to enforce the VRA. Ex. 10. This language was incorporated verbatim into the draft letter that Secretary Ross's trusted advisor Mr. Neuman provided to John Gore (Ex. 9) during a meeting set up at the request of Commerce General Counsel Peter Davidson and Secretary Ross's counsel James Uthmeier. Ex. 12 at 112; Ex. 13 at 21-22. Neuman worked on "versions" of that draft letter, and testified that he recalled senior Commerce officials reviewed and offered thoughts on draft versions, identifying Davidson, Uthmeier and Earl Comstock by name. Ex. 12 at 278-79, 281, 283-84. DOJ's December 12, 2017, letter requesting inclusion of a citizenship question includes the same VRA rationale, and tracks the reasoning and analysis of Dr. Hofeller's 2015 study. Exs. 9, 11.

Since the filing of the May 30 letter, additional evidence has confirmed Dr. Hofeller's participation in the decision to reinstate the citizenship question. Specifically, while Dr. Hofeller's materials are from a back-up drive taken in fall 2017 and contain only his emails prior to 2017,[1] they detail the length and strength of Dr. Hofeller's association with Mark Neuman, and reveal that Dr. Hofeller had a long association with a second key official—Christa Jones—a senior official at the Census Bureau, who played a central role preparing the March 26, 2018 decisional memo. Ex. 27. Jones was one of six individuals (the others of whom are senior

---

[1] At the time of his death, Dr. Hofeller's computer was taken by his business partner, Dale Oldham. Additional materials relevant to Dr. Hofeller's role in the citizenship question are likely in Mr. Oldham's possession.

Republican operatives and lawyers) whom Dr. Hofeller regularly briefed on redistricting

strategy.  Ex. 26.  And Hofeller's emails reflect that he and Jones discussed adding a citizenship

question to the Census before she assumed her senior position at the Census Bureau.  *Id.*

Congressional interviews have also revealed information previously undisclosed in the

Administrative Record reflecting that:

- Mr. Davidson had extensive communications with Mr. Gore (at least "a dozen") as Gore drafted DOJ's request letter, and Davidson put Mr. Neuman in touch with Gore. Ex. 13 at 21-22.  Mr. Neuman's testimony previously established Mr. Uthmeier also asked Mr. Neuman to contact Mr. Gore. Ex. 12 at 112.

- Mr. Davidson and Mr. Uthmeier both discussed legislative apportionment with Mr. Gore. Ex. 13 at 138-40.

- Mr. Gore (and other DOJ officials) consulted directly with the White House and Department of Homeland Security while he was drafting the DOJ's request letter.  Ex. 13 at 21-22, 57-58, 126-29.

- Mr. Uthmeier had contacts with a number of undisclosed White House personnel as he worked to get the citizenship question added to the census. Ex. 14 at 90, 142.

- Mr. Uthmeier had contacts with another external advisor (Professor John Baker)—a long-time proponent of adding a citizenship question to the census—about adding the citizenship question to the census and the impact such a question would have on apportionment.  Ex. 14 at 145.

### B.  Defendants, Their Witnesses, and Their Representatives Concealed Evidence About the Decision to Add a Citizenship Question to the 2020 Census

The foregoing facts should have been disclosed in the course of litigation before this

Court.  They detail multiple instances in which Defendants, their witnesses, and representatives

provided materially false or misleading testimony to Plaintiffs or statements to the Court.  They

also lay bare other instances where Defendants attempted to obstruct or delay Plaintiffs'

discovery on the genesis and purpose of the citizenship question.  Defendants successfully

obscured the role that Hofeller (and others) played in advancing the decision to include a

citizenship question on the 2020 Census, including development of the VRA rationale.

### 1.    Neuman provided false testimony and withheld critical evidence.

Mr. Neuman testified falsely about (i) his interaction with Gore and the DOJ letter, (ii) his consultations with Hofeller about the citizenship question, Hofeller's role in the decision and motivations for advocating addition of the citizenship question to the 2020 census, (iii) Neuman's interactions with Gore, and (iv) Neuman and Hofeller's role with regard to the draft DOJ letter provided to Gore. It is beyond dispute that Neuman played a critical role in this decision making process to add a citizenship question. He was, in the Defendants' words, a "trusted advisor to Commerce," ECF 451, at 3, who "act[ed] analogously to an agency employee" such that he and Commerce "were engaged in a common enterprise" regarding the 2020 Census. *Id.*; *see also* Ex. 15 at 8 (finding that "the evidence supports the conclusion" that Neuman was a "trusted advisor" to Ross and Commerce). Indeed, Secretary Ross and others at Commerce repeatedly turned to Neuman to advance the citizenship question.[2]

- Neuman testified that his meeting with Gore was about "how Census interacts with the Justice Department" and denied meeting with Gore about a "letter from DOJ regarding the citizenship question." Ex. 12 at 273. When asked what information he gave Gore at the meeting, Neuman described a different document, but not the Neuman draft of the DOJ Letter. *Id.* at 123-24. Gore told congressional investigators, however, that he discussed the citizenship question with Neuman, that he understood Neuman "was an advisor to the Department of Commerce on . . . the issue of whether to reinstate a citizenship question on the 2020 questionnaire," and that Neuman provided him with the draft letter requesting "reinstatement of the citizenship question on the census questionnaire." Ex. 13 at 22, 24. 26-28.

- Neuman testified that he "wasn't part of the drafting process of the [DOJ] letter." Ex. 12 at 114. Gore, however, testified that Neuman gave him the draft DOJ letter. Ex. 13 at 26.

---

[2]  For example, in May 2017, when Secretary Ross berated his deputies that nothing had been done about his "months-old request to add a citizenship question," he recommended that they should try to "stick Neuman in there to fact find." Ex. 16. Similarly, on September 7, 2017—soon after Secretary Ross and Attorney General Sessions agreed that DOJ would provide Commerce with a letter requesting the citizenship question—Davidson recommended the team "set up a meeting with" someone "trusted" like Neuman before doing "anything externally." Ex. 17 at 3.

- Neuman testified that he did not know who authored the draft DOJ letter or who wrote the "first template." Ex. 12 at 280. It is now apparent that Dr. Hofeller helped ghostwrite the draft DOJ letter because language on his hard drive appears verbatim in the draft Neuman provided to Gore. Exs. 8, 9, 10.

- When asked about the "substance" of his conversations with Dr. Hofeller "about the citizenship question" after January 2017, Neuman testified that Dr. Hofeller said, "Mark, you need to make sure that we take a good census, that the administration doesn't skimp on the budget." Ex. 12 at 138. Neuman denied at deposition that "Mr. Hofeller was one of the people [Neuman] relied on for expertise on the Voting Rights Act." *Id.* at 143-44. And Neuman testified that Hofeller "did not appear to me to be an adviser to the . . . administration at all." *Id.* at 136. But, in fact, Hofeller drafted the excerpt concerning the VRA rationale in August 2017 that was subsequently incorporated into the draft letter Neuman provided Gore. Exs. 9, 10.

- Although Neuman admitted that Hofeller was the "first person" to suggest adding a citizenship question to the 2020 Census to the transition, Ex. 12 at 51, Neuman testified that Dr. Hofeller told him that adding the citizenship question would "maximize[]" representation for the "Latino community." *Id.* at 142. But Dr. Hofeller had concluded the opposite in his 2015 study: *i.e.*, that adding a citizenship question to facilitate the use of CVAP in redistricting would benefit "Non-Hispanic Whites" while significantly harming Latino voters. Ex. 6 at 6-9.

Neuman's false testimony about Hofeller's role and his interactions with Gore went to the very heart of Plaintiffs' claims. It obscured evidence of racially discriminatory intent.

Prior to his deposition, Mr. Neuman also withheld critical evidence—he failed to produce any documents reflecting his communications with Dr. Hofeller, Mr. Gore, or any Commerce Department employees. Importantly, Mr. Neuman testified that he worked with Messrs. Davidson, Comstock, Uthmeier and others at the Commerce Department on versions of the draft DOJ letter, Ex. 12 at 278-84, yet Mr. Neuman failed to produce any such materials in discovery. And this failure to produce such materials happened only after Defendants interceded in Mr. Neuman's document production.[3]

---

[3] Mr. Neuman's counsel initially represented that Mr. Neuman planned to make production on October 9. ECF 604-1, Ex. 2-B. He did not, and the following day, Mr. Neuman unilaterally rescheduled his deposition, which had been scheduled for the last day of fact discovery—October 12. ECF 199. On October 24, Mr. Neuman's counsel advised that he had been "working with" Defendants on the production. Ex. 21. Shortly thereafter, Mr. Neuman's counsel interposed untimely objections to the subpoena, indicating that he would only produce communications with the

Two other points bear emphasis.  First, in opposing the subpoena to Mr. Neuman, Defendants denied that "Mr. Neuman provided any particularly significant consultations on the citizenship question."  ECF 346 at 2.  That representation was demonstrably false.  Indeed, Defendants ultimately represented that Neuman "functioned as a trusted adviser and consultant to the agency," "acted analogously to an agency employee," and that "he and commerce were engaged in a common enterprise."  ECF 451 at 3.  And the Court relied on those representations. *See, e.g.*, ECF 459 (denying motion to compel); Ex. 15 at 8 (crediting Defendants' representations regarding Neuman).

Second, although Defendants have disputed allegations that Neuman falsely testified, they carefully avoided denying that he knew about the 2015 study or Hofeller's findings.  ECF 601.

Third, although Defendants have taken the position that it was clear at the time of Neuman's deposition in October 2018 that Neuman had given the draft DOJ letter to Gore, ECF 601 at 3, Defendants' counsel present at Neuman's deposition—including Mr. Uthmeier—failed to correct the record when Neuman testified falsely.[4]

### 2.   Gore provided false testimony and concealed he received the draft letter from Neuman

Gore provided false testimony about drafting the DOJ letter to Commerce.  Gore repeatedly testified that he "drafted the initial draft of the letter to request the citizenship question."  Ex. 7 at 127, 150-51, 343.  At no point did he name Neuman or Dr. Hofeller in the

---

individual defendants. Ex. 22.  The following day, Defendants advised Plaintiffs that they were engaged in a pre-production review of Neuman's materials and instructed Neuman to withhold documents on the basis of deliberative privilege.  ECF 604-1 Ex. 2-E.

[4]  Mr. Uthmeier attended the Neuman deposition as counsel for the Commerce Department.  While Mr. Neuman testified that Uthmeier helped arrange the Gore/Neuman meeting, Ex. 12 at 112, and Neuman testified he provided his edits on the draft DOJ letter to Uthmeier *Id.* at. 283-84 ("I include James in that too"), it remains unknown whether Uthmeier knew that Neuman had provided the draft letter to Gore.  As discussed below, this is one of the potential issue for discovery.

long list of people who provided "input" on the draft letter. *Id.* at 150-51. This testimony is misleading, at best—at worst, false.

Gore contradicted himself in congressional interviews held *after* the final judgment in this case. There, Gore disclosed that, in October 2017, Neuman gave Gore a "draft letter that would request reinstatement of the citizenship question on the census questionnaire." Ex. 13 at 26. Gore said that Neuman gave him this draft letter (which framed as a request from DOJ to Commerce) after Davidson mentioned Neuman and Neuman called Gore to meet. *Id.* at 22.

Gore also caused Defendants to mislead Plaintiffs regarding the provenance of the letter. Defendants initially withheld Gore's copy of the Neuman letter. When the document was logged, Defendants failed to include any identifying information required under Rule 26(b)(5) or Local Rule 26.2(a)(2)(A). Ex. 18 (line 15199). Plaintiffs promptly challenged this entry, Ex. 19, but Defendants delayed release of DOJ's copy of the document until three days before Gore's deposition. It was then relabeled with a different Bates number (DOJ 129991) and produced as part of nearly 92,000 pages of additional DOJ production. Ex. 20. Even then, Defendants did not identify Neuman as the document's source, instead representing that they were unable to provide information regarding "author, recipient, date, or time." *Id.* Gore allowed Defendants to make this representation,[5] even though he was well aware of the document's provenance.

In addition to failing to identify Mr. Neuman or Dr. Hofeller as having provided input to his letter, Gore also failed to identify Messrs. Davidson or Uthmeier in the long list of people he identified as having provided input in the letter. Ex. 7 at 151. During his congressional interview, however, Gore disclosed for the first time that he received feedback from both Messrs. Davidson and Uthmeier on his memo, that he discussed the citizenship question with Davidson a

---

[5] Defendants *never* acknowledged that the document in Gore's possession originated with Neuman until their response to Plaintiffs' letter motion for sanctions. *See* ECF 601 at 3.

"dozen times," that he discussed apportionment with Davidson and Uthmeier.  Ex. 13 at 21, 139-40, 166-169.  Gore also told Congress that that he discussed the citizenship question directly with the White House and DHS in October 2017. Ex. 13 at 21, 57-8, 126-29.

Gore's insistence that he initially drafted the DOJ letter is striking given the letter's facially obvious similarities to Hofeller's 2015 study.  *See* Ex. 11.  Defendants' response that the similarities are just happenstance and that they may share a common origin in briefing from the *Evenwel* litigation is hardly adequate.  ECF 601.[6]

Gore thus helped hide from Plaintiffs and the Court critical evidence demonstrating a direct through-line from Dr. Hofeller's conclusion that adding a citizenship question would advantage Republican and non-Hispanic whites to DOJ's ultimate letter.  The new evidence thus not only contradicts testimony in this case, but it shows that those who constructed the VRA rationale knew that adding a citizenship question would not benefit Latino voters, but rather would facilitate diluting their political power.

### 3.   Senior Commerce officials caused Defendants to misrepresent the completeness of the Administrative Record.

From the case's outset, Plaintiffs have raised questions about the completeness of the Administrative Record, particularly materials predating the December 12, 2017 DOJ request letter.  This Court ordered Defendants to complete production of the Administrative Record by June 9 and then by July 23, 2018.  ECF 137 & 199.  Following post-judgment congressional interviews, it is now obvious Defendants omitted information that should have properly formed part of the Administrative Record and misrepresented their efforts in two critical respects.

---

[6] Tellingly, Defendants have not disputed that Neuman, who actually supplied the initial draft of the DOJ letter, saw Hofeller's 2015 study.  And, as Plaintiffs have previously explained, the *Evenwel* brief reaches exactly the opposite conclusion regarding use of CVAP for districting as Hofeller.  *See* ECF 604 at 3.

a. *Defendants' and Uthmeier's Misrepresentations Regarding the Completeness of the Administrative Record*.   During a July 31, 2018 conference, Plaintiffs specifically raised questions about the lack of materials from Mr. Uthmeier, including the failure to log drafts of his August 11 memorandum, and the general dearth of his (and other custodians' materials) predating December 12.  Ex. 23.  On August 6, Plaintiffs reiterated these concerns noting that it was "apparent that certain of [Mr. Uthmeier's] materials have not been produced and are not otherwise reflected on any log," including Uthmeier or Peter Davidson's interactions with Mark Neuman.  Ex. 24.

After meeting and conferring on these issues on August 8, Plaintiffs followed up in an email (Ex. 25) and raised this issue in a motion to compel.  ECF 237.  Plaintiffs specifically raised concerns about "conspicuous omissions from the Administrative Record," specifically noting several examples regarding Mr. Uthmeier, *id.* at 3, and that "Defendants are still in the process of confirming to Plaintiffs that all likely custodians were adequately identified, their records adequately searched and reviewed, and no custodians used non-governmental accounts," *id.*  On August 14, the Court issued an order noting Plaintiffs' "troubling" allegations about material missing from the administrative record but agreed to "withhold judgment" until Defendants could respond, ordering them to do so by the next day.  ECF 241.

On August 15, 2018, Defendants responded to Plaintiffs' motion to compel, insisting that Plaintiffs' concerns about material missing from the Administrative Record were "meritless," "baseless," and representing Defendants had taken "all proper and reasonable steps to ensure that the administrative record and supplemental materials are complete."  ECF 250 at 3.  Defendants supported their filing with a declaration from Mr. Uthmeier.  Uthmeier detailed the steps he had taken to search for information to be included in the Administrative Record and explained that he

inadvertently omitted five documents, all of which were publicly available, and that would have been included on the privilege log because they contained his legal advice.  ECF 253 ¶¶ 88 5-8. With that exception, Uthmeier affirmed, he had "thoroughly searched and re-searched my office for any responsive physical documents" and "have no other responsive documents."  ECF 253 ¶ 10.

On August 17, 2018, this Court denied Plaintiffs' motion to compel.  ECF 261.  The Court stated that it would "accept Defendants' representations . . . that they have 'now taken all proper and reasonable steps to ensure that the administrative record and supplemental materials are complete.'"  *Id.*

It is now evident Plaintiffs were right to question the completeness of the Administrative Record because multiple senior Commerce officials (including Uthmeier, Jones, Comstock, and Davidson) appear to have withheld documents relating to contacts with the White House, contacts with Hofeller, and work on the draft DOJ request letter which Neuman provided to Gore.

<u>Uthmeier</u>: Either Uthmeier misled this Court, or he misled congressional interviewers. No other conclusion is possible:

- Mr. Uthmeier told congressional interviewers that he communicated about the citizenship question with "*individuals* from the White House."  Ex. 14 at 90, 142 (emphasis added). The Administrative Record reflects Mr. Uthmeier was in contact with a single White House official, John Zadrozny.  The Administrative Record does not indicate additional contacts, and Commerce Department counsel instructed Mr. Uthmeier not to identify any such individuals beyond Mr. Zadrozny.  Ex. 14 at 91-92, 135-41.

- Mr. Uthmeier told congressional investigators that Secretary Ross asked him to look into adding the citizenship question in "spring of 2017, likely March or April."  Ex. 14 at 22.  The Administrative Record does not reflect Uthmeier working on the question before late June 2017.

- Mr. Uthmeier also told congressional investigators that he communicated with Professor John Baker about the citizenship question and apportionment. Ex. 14 at 145. No such communications are reflected in the Administrative Record.

- Uthmeier acknowledged he "likely" used his Gmail account related to his census work. Ex. 14 at 14.

Jones: In addition, the Hofeller materials reflect that Jones failed to turn over relevant

materials:

- Dr. Hofeller regularly corresponded with Christa Jones through her Hotmail account. In at least one email, they discussed the issue of a citizenship question on the decennial census. Ex. 26. Many emails discussed redistricting.[7]

- Jones went on to play an important role in advancing the plan to include a citizenship question on the 2020 Census. She is identified on Defendants' privilege logs as having participated in the drafting of Secretary Ross's memo, and Dr. Abowd testified that all of the Census Bureau's comments on Ross's memo were filtered through Jones. Ex. 27 at 172-73. Had Defendants turned over emails between Jones and Hofeller, they may have reflected a direct connection between Hofeller and Secretary Ross's ultimate decision.

Comstock, Davidson, Uthmeier, and Others: Similarly, Mr. Neuman's testimony about

the draft DOJ letter suggests significant omissions from the Administrative Record by Davidson,

Comstock, Uthmeier, and others. Neuman testified:

- He had seen multiple "versions" of the draft DOJ letter and that "there are people within the Secretary's office" whom he believed had a version. Ex. 12 at 281.

- He recalled "others at the Department of Commerce were reviewing and offering thoughts on draft versions of" the letter. He specifically identified Mr. Davidson and Comstock "and people that work for Earl" as being involved in that process. *Id.* at 283-84.

- He believed he provided his comments on the letter to Mr. Uthmeier. *Id.* at 284.

Neither Defendants' productions nor privilege logs reflect that anyone at the Department

of Commerce had a copy of the draft DOJ letter, worked on the draft DOJ letter, or

---

[7] Ms. Jones was also on emails discussing redistricting with Hofeller and various other operatives—including David Avella of GOPAC, a Republican training organization, David Winston, a "strategic advisor to Senate and House Republican leadership for the past 10 years," Charles R. Black, Jr., a longtime Republican strategist, and Michael Smith, a member of the "Majority America" political organization. *See id.* Ex. 26.

communicated about the draft DOJ letter.  The failure to produce all relevant materials demonstrates Defendants' representations were inaccurate and may have played a role in concealing the genesis and purpose of the citizenship question.

      b.  *Misrepresentations Regarding Use of Personal Email Accounts*: Shortly after production of the supplemental Administrative Record, Plaintiffs pressed Defendants on the need to include in the Administrative Record relevant communications from personal email accounts. Between July 31 and August 9, 2018, Plaintiffs raised this issue on a telephonic meet and confer and in multiple email communications, asking Defendants to confirm that they had searched all relevant custodians' personal email accounts for communications that should be in the administrative record.  Exs. 24 & 25.

      On August 10, 2018, Defendants responded by email stating its "preliminary understanding is that no custodians have responsive documents that were not also present in their government email addresses" and promising "a conclusive position on Monday."  Ex. 28.  On August 15, Defendants represented that they had received "verbal affirmation" from custodians that they had "adhered to the Department of Commerce Policy regarding personal email use," and that they "confirmed that they are aware of and adhere to the Department's policy that government business be conducted over government email."  Ex. 29.  The email added that Commerce employees were "instructed to copy or forward to government email addresses any government communications sent or received from personal email addresses."  On the same day, Defendants filed a declaration from the Commerce Department's Chief of Litigation to provide detail about "the agency's process in gathering documents for production . . . and confirming the completeness of those efforts. . . ."  ECF 254.  The Declaration explained that Commerce "collected materials from indirect advisors to the Secretary, meaning individuals who provided

material or advice relied upon by the Secretary's direct advisors in providing their advice to the Secretary" and that "all custodians were directed to search their offices, desks, and file cabinets for hard copies of any documents that were related to the issues in this litigation. Each custodian provided a certification that this search was performed and any responsive documents that were found were produced either on Commerce's online FOIA reading room, accessible to Plaintiffs, or identified on a privilege log."

On August 17, Plaintiffs' counsel followed up again, noting that the declaration (ECF 254) did not specifically address questions about "senior Commerce officials use of personal or non-governmental accounts to communicate about the potential addition of a citizenship question" and noted that Plaintiffs had been "raising this issue for at least three weeks." Ex. 30. Defendants responded: "Regarding your continued questions about use of personal email accounts, [we have] provided affirmation on that matter in [our] email of August 15, 2018, sent at 2:56 pm." Ex. 31.

Defendants' representations were inaccurate, misleading, or false. The August 15 declaration specifically identifies both Ms. Jones and Mr. Uthmeier as custodians whose materials were searched. Yet neither produced materials central to this matter.

    **4.** **Defendants failed to conduct a reasonable inquiry as to the "senior Administration officials" and "other governmental officials" involved in requesting the Citizenship Question and Comstock falsely certified the completeness of the interrogatory response.**

On June 21, 2018, Secretary Ross "filed a supplemental memo that added new, pertinent information to the administrative record." *Dep't of Commerce*, 139 S. Ct. at 2574. That memorandum stated that "other senior Administration officials had previously raised" adding a citizenship question and Ross and his staff had "discussions with other governmental officials" about the topic. Ex. 32. On July 12, Plaintiffs propounded an interrogatory requesting

identification of these two groups of individuals.  Ex. 33.  After Defendants thrice promised to provide a response identifying individuals, Defendants served a supplemental response pointing to documents in the Administrative Record.  Plaintiffs then filed a motion to compel.  ECF 293. On September 5, Defendants advised that they would provide this information.  The Court denied the motion without prejudice.  ECF Nos. 301, 302.  Later on September 5, Defendants served supplemental responses that again failed to identify individuals beyond those named in the Administrative Record.  Ex. 35.  These responses were certified by Mr. Comstock and submitted by senior lawyers in DOJ's Civil Division, including Mr. Shumate.

On September 10, Plaintiffs re-filed their motion to compel, specifically challenging the completeness of the response and Mr. Comstock's capacity to certify the completeness of the response.  Exs. 34, 35, 36.  Defendants opposed, responding that they answered "in the most complete manner possible" and "no additional information is available."  ECF 319.  At oral argument, Defendants represented that they had "provided all of the information that is available within the agency."  Ex. 37 at 15.  This Court again denied Plaintiffs' motion, observing that "one cannot draw blood from a stone."  *Id.* at 16.

For two reasons, it is now apparent that Defendants failed to provide all information available about other involved government officials, and that Defendants failed to conduct a thorough, reasonable inquiry.  First, Mr. Uthmeier told congressional investigators that that he started working on the citizenship question "likely March or April" 2017 (several months earlier than is reflected in the Administrative Record) and communicated about the status of the citizenship question with "*individuals* from the White House," including individuals who are not identified in the Administrative Record and still remain unknown.  Ex. 14 at 22, 90, 142 (emphasis added)].  In light of this, it is apparent that either Defendants and Mr. Comstock failed

to adequately interview Mr. Uthmeier about his contacts, or that Mr. Uthmeier failed to be sufficiently forthcoming with counsel; in any event, the identity of these contacts were wrongfully withheld from discovery.[8]

Second, DOJ logs produced subsequent to the Court's order on Plaintiffs' motion to compel show that in the week leading up to the filing of Secretary Ross's June 21 supplemental memorandum, numerous DOJ officials (including Mr. Shumate) were heavily involved in drafting the June 21 supplemental memorandum.[9]  Mr. Shumate's name (along with other senior DOJ officials) appears on the interrogatory response.  Ex. 35.  It strains credulity that Defendants could have conducted a reasonable search for information "within the agency," and yet failed to collect information known to senior DOJ Justice lawyers from their work on the June 21 supplemental memo.[10]  Given Dr. Hofeller's extensive relationships with senior Republican operatives and lawyers (some of whom work in the Administration), Defendants' failure to completely respond to this interrogatory may have obscured his role.

## LEGAL ARGUMENT

## I.    THE COURT SHOULD IMPOSE APPROPRIATE SANCTIONS FOR DEFENDANTS' LITIGATION MISCONDUCT

"The essence of fraud on the court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.'"

---

[8] Defendants also failed to identify Professor Baker (who should have also been identified by Mr. Uthemeier), Mr. Neuman (who should have been identified by numerous individuals), or Dr. Hofeller (who should have been identified by Ms. Jones).  Defendants did represent "for the sake of completeness" they were identifying a fourth non-governmental employee, Mr. Kobach, whose involvement was disclosed in the Administrative Record.

[9] In addition to Mr. Shumate, other DOJ political appointees reflected on the log in the week before Secretary Ross released the June 21 memo include Alex Haas, Eric McArthur, Michael Murray, Hashim Mooppan, Jesse Panuccio, Chad Readler, Rachael Tucker, and the Office of Solicitor General.  These documents were all withheld in full or heavily redacted.  Ex. 38.

[10] Defendants' failure to check with DOJ sources is evident from the significant error in the September 5 interrogatory response reporting that "Secretary Ross discussed the possible reinstatement of a citizenship question on the decennial census with Attorney General Sessions in August 2017."  Ex. 35.  On October 11, Defendants served a supplemental interrogatory response indicating the discussion took place in "the Spring of 2017."  Ex. 39.

*Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (internal quotation marks omitted). That is exactly what has happened here. Defendants and their agents, witnesses, and counsel made repeated false and misleading statements to Plaintiffs and the Court that concealed the true origin and purpose of the proposal to add the citizenship question to the 2020 census. Defendants' misconduct amounts to a fraud on the Court and requires meaningful sanctions.

### A.     This Court Has Multiple Sources of Authority to Impose Sanctions

Parties, witnesses, and counsel must be truthful and not misrepresent facts to opposing parties or the Court. When they are not, federal courts "possess[] broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices." *Penthouse Int'l, Ltd. v. Playboy Enters.*, 663 F.2d 371, 386 (2d Cir. 1981).

The misconduct outlined above is sanctionable and the Court may issue sanctions pursuant to several sources of authority. First, this Court retains inherent authority "to fashion . . . appropriate sanction[s] for conduct which abuses the judicial process"—particularly when "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46 (1991) (citations and internal quotation marks omitted); *see also Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) ("Federal courts possess certain 'inherent powers,' not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.") (internal citations and quotation marks omitted); *Sussman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995) (noting court's "inherent power" to "sanction counsel or a litigant for bad-faith conduct").

The Court's inherent authority to impose sanctions may be used where "false testimony, material misrepresentations [by counsel] and foot-dragging were used in an effort to prevent [the plaintiff] from getting at [] records that were relevant to the central issue of the case." *Penthouse*

*Int'l, Ltd.*, 663 F.2d at 392.  That authority extends to where there has been fraud on the court.

*See Shah v. Eclipsys Corp.*, No. 08-cv-2528, 2010 WL 2710618, at \*14 (E.D.N.Y. 2010).  A

fraud on the court may occur "[w]hen an attorney misrepresents or omits material facts to the

court, or acts on a client's perjury or distortion of evidence."  *E. Fin. Corp. v. JSC Alchevsk Iron*

*& Steel Works*, 258 F.R.D. 76, 85 (S.D.N.Y. 2008).  "To find that a party has committed fraud on

the court, it must be established by clear and convincing evidence that the party has repeatedly

and intentionally lied about issues that are central to the truth-finding process."  *Shah*, 2010 WL

2710618, at \*14.  Courts may also use their inherent authority to "impose sanctions on a party

for misconduct in discovery."  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99,

106-07 (2d Cir. 2002).

Second, Rule 26(g)(3) authorizes sanctions for certain misconduct in discovery filings.

Under Rule 26(g)(1), attorneys must certify, among other things, that every discovery response

or objection is consistent with the rules and not interposed for an improper purpose.  Fed. R. Civ.

P. 26(g)(1)(i)-(iii).  The court must impose sanctions if a certification violates the Rule.  Fed. R.

Civ. P. 26(g)(3).  *See Shim-Larkin v New York*, 2019 US Dist LEXIS 19245, at \*34 (S.D.N.Y.

Feb. 5, 2019).  Rule 26(g)(3) applies to Defendants' representations regarding the completeness

of the Administrative Record (ECF 250), Defendants' interrogatory responses (Exs. 34 & 35)

and Defendants' representations regarding the completeness of the interrogatory responses (ECF

319), Defendants' representations denying that Mr. Neuman had significant consultations on the

citizenship question (ECF 346), the withholding and failure to log properly Mr. Gore's copy of

the Neuman letter (Ex. 18 (line 15199), and Defendants' subsequent denial that they could

identify the provenance of Gore's copy of the Neuman letter.  Ex. 20.

Third, Rule 37(b)(2) authorizes sanctions against a party that fails to comply with a discovery order and applies to Defendants' (i) failure to produce the complete Administrative Record (including the materials from Jones and Uthmeier) by the deadline set in ECF 199 & 211, and (ii) the Defendants delay of the DOJ's production resulting in production of over 90,000 pages of responsive materials on October 23—well after the Court's directive that "all fact discovery be completed by October 12." ECF 137.  Rule 37(b)(2)(A) authorizes a wide range of sanctions including but not limited to directing that the matters embraced in the discovery order be taken as established, prohibiting the disobedient party from supporting or opposing designated claims or defenses, striking pleadings, rendering a default judgment, or treating as contempt of court the failure to obey the order.  Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).

### B.     Defendants and Their Agents Misled Plaintiffs and the Court

The record establishes multiple instances of misconduct by Defendants and their agents, including the following instances of false or misleading testimony, statements, and conduct by Defendants and those acting on their behalf, all of which are sanctionable under the inherent powers of the Court, and some of which are sanctionable under Rules 26 and 37.  While discovery and further inquiry will be necessary to ascertain the extent of individuals' knowledge,[11] there is ample evidence of sanctionable misconduct:

- Neuman lied during his deposition on multiple occasions.  Defendants (as well as Commerce counsel Mr. Uthmeier) never corrected this false testimony, even though they knew or should have known the testimony was false.

- Gore provided false and misleading testimony about the authorship of the initial draft of the DOJ letter.  Defendants failed to correct the record after Gore testified before Congress, disclosing to the public his false testimony in this case.

- Defendants misrepresented Neuman's role in helping Secretary Ross install a citizenship question on the census when they opposed Plaintiffs' attempt to depose him.  Among

---

[11] For example, at present, Plaintiffs are unable to ascertain the extent to which Defendants' counsel were misled or were complicit in the misrepresentations described here.

other things, Defendants insisted in court filings that Neuman's views were "adequately represented by materials provided to Plaintiffs" and that he did not provide "any particularly significant consultations on the citizenship question issue during his conversations with Commerce officials in 2017."  ECF 346.

- Defendants misrepresented to the Court (and, it seems, to their own counsel) that the Administrative Record was complete and that relevant custodians did not use personal email accounts to communicate about the census.  These misrepresentations caused the Court to deny Plaintiffs' motion to compel and resulted in Defendants' failure to produce important communications involving Jones, Uthmeier, Davidson, Comstock, and others.

- Gore failed to stop Defendants from improperly withholding Gore's copy of the Neuman letter, and from subsequently representing that no details about its provenance were available.  Exs. 18 (line 15199) & 20.

- Defendants failed to respond completely to Plaintiffs' interrogatory about individuals who were involved in requesting the citizenship question.  Defendants, in a response certified by Comstock, nonetheless represented to the Court and in discovery filings that their response was comprehensive, leading the Court to deny a motion to compel.  Exs. 34 & 35.

These individual acts of misconduct are all sanctionable under the Court's inherent authority. *S.E.C. v. Smith*, 710 F.3d 87, 97 (2d Cir. 2013) (noting that "sanctions are appropriate when an individual has made a false statement to the court and has done so in bad faith"); *Margo v. Weiss*, No. 96 CIV. 3842 (MBM), 1998 WL 765185, at *3 (S.D.N.Y. Nov. 3, 1998), *aff'd*, 213 F.3d 55 (2d Cir. 2000) (sanctions warranted when "parties and lawyers make false statements to their adversaries").  In addition, Defendants' false and misleading statements in discovery are sanctionable under Rule 26(g)(3), and their violation of this Court's orders are sanctionable under Rule 37.

Defendants are responsible for Neuman's and Gore's conduct because they acted as agents of Commerce.  *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp. 2d 457, 471 (S.D.N.Y. 1999) (noting that a "principal becomes responsible for the agent's acts within the scope of the bestowed authority").  As previously noted, Defendants represented that Neuman "act[ed] analogously to an agency employee" such that he and Commerce "were

engaged in a common enterprise" regarding the 2020 Census, ECF 451 at 3, and the Court credited and relied upon those representations.  ECF 459, Ex. 15 at 8.  Similarly, Defendants have claimed that Gore was their agent and they "sought Gore's legal advice" in asserting attorney-client over their communications with him.  *Id.*  Defendants cannot now disclaim responsibility for Neuman or Gore's false and misleading testimony in this case.

Moreover, as set forth in further detail below, discovery is necessary to ascertain which Defendants and counsel were aware of Gore and Neuman's false and misleading testimony.  If discovery reflects that Defendants were aware of the material misstatements, they may be held liable for such conduct.  Courts impute bad faith to another party that is "personally were aware of or otherwise responsible" for the bad faith acts.  *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977).

### C.     Sanctions Are an Appropriate Remedy Under These Circumstances

Defendants' misconduct, which resulted in the Court relying upon false and misleading statements, warrant meaningful sanctions.  The Court has "wide discretion" to determine appropriate sanctions.  *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (discussing sanctions for "discovery abuses").  When fashioning a remedy, courts often consider the following factors:  "(i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the injured party; (iii) whether there is a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future."  *Passlogix, Inc. v. 2FA Tech., LLC,* 708 F.Supp.2d 378, 394 (S.D.N.Y.2010); *see also Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 435 (S.D.N.Y. 2016) (same).  These factors all favor meaningful sanctions.

First, the misconduct was intentional.  This is clear from the pattern of Defendants using false and misleading statements and testimony to obstruct Plaintiffs' from discovering evidence of their true, discriminatory motive—including evidence regarding Dr. Hofeller's role in the decision to add a citizenship question to the census and his creation of the VRA rationale. Defendants similarly used false and misleading statements to conceal the true roles that Neuman, Jones, Uthmeier, Davidson, and White House personnel played in fashioning the decision to add a citizenship question to the census.

Second, Defendants' misconduct was highly prejudicial because it concealed critical evidence from Plaintiffs, including by causing the Court to deny Plaintiffs' motions to compel that could have led to the discovery of additional evidence about Defendants' actual intent. Indeed, the Court ultimately rejected Plaintiffs' equal protection claim due to the absence of evidence that Defendants' actual reason was discriminatory and the lack of "nexus" between the White House and the Defendants—it is now clear that Defendants actively interfered with Plaintiffs' ability to uncover that very evidence.

The third and fourth factors also weigh heavily in favor of significant sanctions. Defendants' misconduct was not isolated.  It started at the very outset of the case, includes multiple acts of false and misleading statements delivered in testimony, court filings, and communications to Plaintiffs.  Indeed, Defendants' misconduct continues through the present day as Defendants have never attempted to correct the record and continue to deny the existence of any misstatement of fact.

## II.    THE COURT SHOULD AUTHORIZE TARGETED DISCOVERY TO DETERMINE THE EXTENT AND INDIVIDUALS RESPONSIBLE FOR DEFENDANTS' MISCONDUCT

But for the fortuitous discovery of the Hofeller documents and disclosure of additional information through congressional testimony, Defendants' effort to obfuscate the truth would

have succeeded. However, while Defendants' misconduct is now apparent, additional discovery
is warranted and necessary to determine the scope of potentially sanctionable conduct and the
identities of the culpable parties.

It is well-established that courts have "the power to conduct an independent investigation
in order to determine whether it has been the victim of fraud." *Chambers*, 501 U.S. at 44; *see
also Passilogix*, 708 F.Supp.2d at 394 ("The Court's inherent powers serve to do whatever is
reasonably necessary to deter abuse of the judicial process and assure a level playing field for all
litigants.") (internal citations and quotation marks omitted)); *id*. at 392 (noting five-day
evidentiary hearing on motions for fraud on the court and spoliation sanctions); *Jung v. Nechis*,
2009 WL 262835, at *9 (S.D.N.Y. March 23, 2009) (noting holding two-day evidentiary hearing
on the issue of fraud on the court).

Here, the Supreme Court has found that Defendants' explanation for the addition of the
question was "contrived." *Dep't of Commerce*, 139 S. Ct. at 2576.  This Court should authorize
targeted discovery under its inherent authority to ensure that the full scope of misconduct is
exposed and to ensure answers to key questions about Defendants' actions and whether and to
what extent particular employees or agents of Defendants intentionally withheld information
from counsel.  Key questions include:

- Did anyone at Commerce (including Neuman or Jones) have Dr. Hofeller's 2015 study?

- Did anyone at Commerce (including Neuman or Jones) know that Dr. Hofeller—before
  suggesting a citizenship question—concluded that adding a citizenship question would
  enable redistricting advantageous to "Republicans and Non-Hispanic Whites"?

- Even if they did not have a copy of Dr. Hofeller's 2015 study, did anyone at Commerce
  (including Neuman or Jones) appreciate that adding a citizenship question would enable
  redistricting advantageous to "Republicans and Non-Hispanic Whites"?

- What did Uthmeier mean when he wrote to Earl Comstock in forwarding his August 11
  memo that "our hook" was "[u]ltimately, we do not make decisions on how the

[citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide"?  Ex. 40.

- What information did Jones receive from Hofeller relevant to redistricting or the citizenship question and what did she share with individuals at Commerce?  Did any of the information she had (including that received prior to the start of the Administration) play any role in her contributions to Secretary Ross's March 26 decisional memo?

- Did anyone at DOJ appreciate that adding a citizenship question would enable redistricting advantageous to "Republicans and Non-Hispanic Whites"?  What was the substance of Gore's discussion of "apportionment" with Davidson and Uthmeier?  What did Gore discuss with the White House?  Did others at DOJ discuss these matters with the White House, with Neuman, or with Dr. Hofeller?

- Who asked Dr. Hofeller to ghostwrite the VRA rationale that appears in the draft DOJ letter that Neuman gave Gore?  Someone must have asked Dr. Hofeller to draft it.

- How did Dr. Hofeller's ghostwritten VRA rationale reach Neuman?  Did Commerce officials in their editing of the draft DOJ letter relay it?  Did Hofeller give it to Neuman directly?

- Why didn't Gore identify Neuman, Davidson, or Uthmeier at deposition when he provided a list of other people who provided input in drafting the DOJ letter?

- Where are the other "versions" of the draft DOJ letter that Neuman testified he worked on with Davidson, Uthmeier, and Comstock?  Why weren't these included in the Administrative Record or identified on a privilege log?

- Why didn't DOJ disclose on its privilege log that the draft DOJ letter came from Neuman?

- Why didn't Defendants correct Neuman's materially false testimony that his October 2017 meeting with Gore was *not* about a draft DOJ letter requesting a citizenship question on the 2020 Census, that Neuman gave Gore only a *different* document at that meeting, and that Neuman was not involved in the drafting process for the DOJ letter at all?

- Was Uthmeier aware that Neuman gave Gore the draft DOJ letter, and if so, why didn't he correct Neuman's testimony?

- Who were the White House officials that Uthmeier testified he consulted with about the citizenship question?

- Why didn't Defendants disclose the role of these White House officials, Neuman, Hofeller, or John Baker in their interrogatory responses?  Was the identity of these individuals known to Mr. Comstock when he certified the interrogatory response?  Were they known to any of the DOJ officials who consulted on Secretary Ross's June 21 memo.

- Do Defendants now assert that Gore's motivation and guide for requesting a citizenship question was the *Evenwel* case about potential use of citizenship data in redistricting, as opposed to VRA enforcement?  Do they assert that Gore relied on *Evenwel amicus* briefs

26

which concluded that ACS data was sufficient for VRA enforcement and that adding a citizenship question to the Census would depress turnout and reduce accuracy?

Plaintiffs seek four categories of materials.

1. *Materials Not Produced in Response to Prior Discovery*.  Defendants were obligated to produce certain materials in discovery, but failed to do so based on reasons we now know are invalid.  It is clear that Mr. Neuman failed to produce, *inter alia*, his communications with Hofeller, Hofeller's associate Dale Oldham, Davidson, Uthmeier, Jones, Gore, or other Administration personnel.  Such documents should now be produced, and Plaintiffs are entitled to discovery to ascertain whether and to what extent Defendants' involvement with Mr. Neuman's subpoena response played a role in these improper withholdings.  Similarly, Defendants failed to produce (or log) any communications between Gore and Commerce or White House officials, even though he testified he had a "dozen" communications with Davidson and at least one with the White House.  In addition, Defendants were obligated to but failed to search and produce materials from government employees' personal emails to the extent they contained relevant communications; it is clear that at least two witnesses (Uthemeier and Jones) may have had such communications.  Defendants should be required to conduct supplemental searches and produce relevant materials.

2. *New Third Party Discovery*: Plaintiffs understand that Mr. Oldham and one other person may have access to additional Hofeller communications that post-date the back-up drive that Plaintiffs have access to.  These materials include emails after October 2016 when Mr. Neuman indicated he was in communication with Hofeller about the citizenship question. Plaintiffs request authorization to issue Rule 45 subpoenas for these materials.

3. *Supplemental or Additional Depositions*: In light of the record, Plaintiffs seek leave to conduct supplemental depositions of Neuman and Gore, and to depose Uthmeier, Davidson, and

Jones.  Each of the new witnesses was a potential conduit of Hofeller's views to Gore's request

or Ross's memo; as described above, there are serious reasons to inquire into the adequacy of

these witnesses' efforts to locate and produce documents, as well as their candor with counsel

and counsel's efforts to obtain responsive documents.

   4.  *Production of Certain Documents Previously Withheld on Grounds of Privilege*:

Plaintiffs request four sets of documents withheld on the grounds of privilege:

- Documents demonstrating how Defendants "contrived" the VRA "distraction."  Between the period in late June when Mr. Uthmeier started working on his August 11 memo, through Secretary Ross's September 6 meeting and leading up to the contact with Mr. Gore on September 13, Defendants developed their plot to have the Justice Department articulate a false rationale to justify addition of the citizenship question to the decennial census.  Notably, it is apparent during these communications that Defendants were very sensitive to how their actions would be reviewed and took steps to conceal involvement of the third-party advocates of adding the citizenship question.  Exs. 17 & 41.  These materials are identified on Exhibits 42 (list) & 43 (log).

- Documents related to Gore's drafting of the December 12 letter.  Because Defendants have denied that Hofeller had any role and have minimized significance of Neuman's contributions, they have put the drafting of the December 12 letter at issue.  The Court should order production of all such documents, including all 18 drafts and the records of all participants beyond Gore (including the individuals in the Attorney General and Deputy Attorney General's offices) who participated in drafting the letter, including all communications from Commerce (including Mr. Uthmeier's memo and cover note).  These materials are identified on Exhibits 44 (list) & 45 (log).

- Documents related to Jones' role in drafting the March 26 memo.  Given her long association with Hofeller and her role in helping write Secretary Ross's decisional memorandum, materials related to Ms. Jones involvement should be produced.  These materials are identified on Exhibits 46 (list) & 47 (log).

- Documents related to the DOJ's consultations related to Secretary Ross's June 21 memoranda.  During the process of "contriv[ing]" the VRA "distraction," Commerce officials consulted with senior personnel at Justice, including Mr. Shumate and other leaders of the Civil Division.  When it was apparent that the March 26 memorandum contained material errors as to the genesis of the citizenship question, a broader set of senior Justice officials (including an individual in the Attorney General's office) consulted on the June 21 memorandum, furthering the "distraction."  All such materials should be produced.  These materials are identified on Exhibits 48 (list) & 49 (log).

While Defendants may claim that these documents should remain privileged, Plaintiffs have overcome any such assertions of privilege as to these categories of documents.  First, Defendants' assertions of deliberative process privilege cannot stand.  By falsely contending that the "sole stated reason" for adding the citizenship question was to promote VRA enforcement and denying the role that Hofeller and Neuman played in the process, Defendants have put their deliberative process directly at issue and have thus waived the privilege.  *See e.g.*, *Allstate Ins. Co. v. Serio*, No. 97-cv-0670, 2000 WL 554221, at *11 (S.D.N.Y. May 30, 2002) (deliberative process "cannot be used as both a shield and a sword").

Moreover, deliberative-process privilege "disappears altogether when there is any reason to believe government misconduct occurred."  *In re Sealed Case*, 121 F.3d at 746.  Defendants cannot reasonably contend that the deliberative process privilege protects the processes of "contriv[ing]" a false rationale or developing a "distraction." [12]

To the extent that the Defendants have asserted work product over any of these documents (*see* Exs.42-49), such "protection is not so absolute that disclosure can never be justified."  *Am. Exp. Warehousing, Ltd. v. Transamerica Ins. Co.*, 380 F.2d 277, 281 (2d Cir. 1967) (citing *Hickman v. Taylor*, 329 U.S. 495, 511–415 (1947)).  As this Court has held, "the protections afforded by the attorney work product doctrine are not absolute. Instead, a party may obtain 'fact' work product if it 'shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'"  *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F.Supp.3d 521, 533 (S.D.N.Y. 2015) (quoting

---

[12] Even if Defendants' conduct has not waived the deliberative process privilege, disclosure is warranted under the relevant balancing test, which considers:  (1) the relevance of the evidence; (2) the availability of other evidence; (3) the seriousness of the litigation; (4) the agency's role in the litigation; and (5) the possibility that disclosure will inhibit candid debate within the agency.  *See Winfield*, 2018 WL 716013, at *6; *see also In re Delphi Corp.*, 276 F.R.D. 81, 85 (S.D.N.Y. 2011).  All factors weigh in favor of disclosure here.  *See, e.g., Burbar v. Inc. Vill. of Garden City*, 303 F.R.D. 9, 14 (E.D.N.Y. 2014) (recognizing concern that disclosure will inhibit debate reduced where materials "may shed light on alleged government malfeasance").

Fed. R. Civ. P. 26(b)(3)(ii)).  "By contrast, 'opinion' work product is subject to heightened

protection; it is not subject to disclosure absent, 'at a minimum ... a highly persuasive showing of

need.'"  *Id*. at 533 n. 6 (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 192 (2d Cir.

2000)).  Here, there is substantial need for the work product documents, which may demonstrate

the extent to which senior officials at the Commerce and Justice Departments orchestrated or

abetted the Commerce Department's perpetuation of a false rationale and covered up the true

genesis and purpose of the citizenship question.

    In addition, any claims of work product or attorney-client privilege as to these documents

(*see* Exs. 42-49) are void under the fraud exception.  These documents were all in furtherance of

a fraud—the "contriv[ing]" of the "distraction" of the false VRA rationale, *Dep't of Commerce*,

139 S. Ct. at 2576—and "[i]t is well-established that communications that otherwise would be

protected" may be abrogated for documents that relate to "fraudulent conduct."  *In re Grand Jury

Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984).  When Mr. Uthmeier presented his

August 11 memo and Defendants hatched their plot to have DOJ request the information to

promote VRA enforcement, they did so knowing that they perpetuated a falsehood and a fraud

on the Court.  As Secretary Ross wrote to Mr. Comstock, "we should be very careful, about

everything, whether or not it is likely to end up in the S[upreme ]C[ourt]."  Ex. 41.  Put simply,

"privilege does not protect communications used to perpetrate an ongoing or future contemplated

crime or fraud on the court."  *Feld v. Feld*, No. 08-cv-1557, 2011 WL 13193354, at *3 (D.D.C.

Mar. 9, 2011).  As now-Justice Sotomayor has explained, such privilege-waiving fraud "does not

require the commission of an actual crime or fraud."  *Cooksey v. Hilton Int'l Co.*, 863 F. Supp.

150, 151 (S.D.N.Y. 1994).  "[T]here need only be presented a reasonable basis for believing that

the objective was fraudulent."  *Id.*  This crime-fraud exception applies  in circumstances where

there is: "(i) a determination that the client communication or attorney work product in question was itself in furtherance of the crime or fraud and (ii) probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity." *In re Richard Roe, Inc. (Roe II)*, 168 F.3d 69, 71 (2d Cir.1999) (internal quotation marks omitted).

Here, the communications at issue (particularly those around "contriv[ing]" the VRA "distraction" were in furtherance of a fraud: that the sole reason for the citizenship question was to promote VRA enforcement and to conceal that the real purpose was to impact apportionment and redistricting to disadvantage minority immigrant communities. To further this fraud, Defendants concealed the involvement of Dr. Hofeller and White House officials, sought to minimize the importance of Neuman, and made extensive misrepresentations about the true discriminatory purpose behind the initiative. Documents that demonstrate or furthered this scheme should be compelled.

*Timing*: There is some overlap between the discovery that Plaintiffs seek with the discovery that Judge Hazel has authorized related to the Maryland Plaintiffs Rule 60(b)(2) Motion for relief on their Equal Protection and statutory claim. In the event such discovery proceeds, for the sake of efficiency and judicial economy (*i.e.*, avoiding multiple depositions of witnesses, testimony may moot relief sought by this motion), Plaintiffs request leave to participate in such discovery while the Court considers the sanctions motion. In the event Maryland discovery does not proceed, Plaintiffs propose conducting the discovery over a period of 60 days.

### III.     THE COURT SHOULD IMPOSE SANCTIONS FOLLOWING PLAINTIFFS' COMPLETION OF LIMITED ADDITIONAL DISCOVERY

As described above, Plaintiffs seek limited additional discovery in order to ascertain the scope of the misconduct by Defendants and identify the particular individuals culpable for any such fraud upon the court.  Plaintiffs respectfully request leave to submit supplemental briefing at the close of such discovery that will more specifically identify the sanctions sought. However, Plaintiffs highlight below the three categories of likely appropriate sanctions.[13]

*Findings*.  An essential component of any sanction for fraud on the court is a full accounting of what happened.  This is particularly true in cases of litigation misconduct that involve the government, especially when the misconduct occurs in a case of public significance. Defendants' misconduct here compels a full and complete statement of the true facts by the Court.  Among other things, it is important to clarify the roles of specific senior government personnel—including Secretary Ross, Attorney General Sessions, Gore, Uthmeier, Davidson, and Jones—as well as key external advisors (including Neuman and Hofeller) in advancing the pretextual VRA rationale as well as what these individuals knew about and whether they adopted Hofeller's improper and discriminatory reasons for adding a citizenship question to the census.

*Waiver of privilege*.  Courts have held that an appropriate sanction against the government can include requiring production of materials withheld on deliberative process privilege.  *See, e.g.*, *In re Fannie Mae Sec. Litig.*, 552 F.3d 814 (D.C. Cir. 2009) (affirming sanction requiring Government to produce documents withheld on deliberative process grounds

---

[13] In framing appropriate sanctions for litigation misconduct, the Government is treated like any other litigant and is not shield by sovereign immunity.  *See, e.g.*, *Waterfront Comm'n of N.Y. Harbor*, 665 F. Supp. at  201 (applying Rule 11 sanctions to government and noting that "government attorneys . . . will be held to the highest standards of the Bar"); *see also F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 595 (5th Cir. 2008) (government subject to sanctions based on court's inherent authority); *Chilcutt v. U.S.*, 4 F.3d 1313, 1326 (5th Cir. 1993) ("Congress could not have been clearer in revealing its intent to subject the Government and its attorneys to Rule 37(b)(2)(E)."); *Mattingly v. U.S.*, 939 F.2d 816, 818 (9th Cir. 1991) (U.S. is subject to Rule 11 sanctions, including but not limited to attorneys' fees).

not timely disclosed on privilege logs); *see generally United States v. Philip Morris Inc.*, 347 F.3d 951, 954 (D.C. Cir. 2003) ("waiver of [attorney-client] privilege is a serious sanction most suitable for cases of unjustified delay, inexcusable conduct, and bad faith").

Defendants' litigation misconduct warrants such a sanction.  In two key areas, the Defendants invoked privileges to withhold evidence of their machinations and their plot to obstruct inquiry into the real purpose of adding the citizenship question by propounding a false rationale: (1) the plotting by senior Commerce Department officials to approach DOJ to request the question with the VRA rationale (starting with the August 11 Uthmeier memo, continuing through the all-hands meeting on September 6, and continuing until John Gore was contacted on September 13, and (2) John Gore's drafting of the December 12 request letter (with input from Messrs. Neuman, Davidson, Uthmeier, and the White House) though all 18 drafts and the records of all participants in drafting the letter.  Defendants should not be permitted to use privilege to hide this misconduct and fraud.  The relevant documents which should be disclosed are set forth on Exhibits 42 through 45.

<u>*Monetary sanction, attorneys fees and costs*</u>.  Courts regularly impose monetary sanctions and awards of attorney's fees and costs as remedies for litigation misconduct that amounts to fraud on the court.  *See*, *e.g.*, *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 461 (S.D.N.Y. 2002) (imposing monetary sanction for fraud on the court based on inherent authority).  *See also In re Good Hope Indus., Inc.*, 886 F.2d 480, 482 (1st Cir. 1989) (awarding attorneys' fees as sanction on government); *United States v. Gavilan Joint Cmty. Coll. Dist.*, 849 F.2d 1246, 1251 (9th Cir. 1988) (awarding attorneys' fees for government's violation of Rule 11).  The Court here should consider whether an award of attorney's fees is appropriate to

compensate Plaintiffs for time spent on various discovery matters as a result of Defendants' misconduct.

## CONCLUSION

As the Solicitor General has recognized "counsel have a duty to zealously advocate on behalf of their client, but they also have duties to this Court and to the Bar." *Hargan v. Garza,* No. 17-654 *Cert. Pet.* at 28. And as the Supreme Court wrote, "[e]specially in fast-paced, emergency proceedings like those at issue here, it is critical that lawyers and courts alike be able to rely on one another's representations." *Azar v. Garza*, 138 S. Ct. 1790, 1793 (2018).

For these reasons, the Court should authorize discovery and should impose appropriate sanctions on Defendants for their misconduct.

Dated: July 16, 2019

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION
NEW YORK CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*

Dale Ho
Adriel I. Cepeda Derieux
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

Sarah Brannon+*
Davin Rosborough
Ceridwen Cherry
American Civil Liberties Union Foundation

John A. Freedman
R. Stanton Jones+
David P. Gersch
Elisabeth S. Theodore+

915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*Not admitted in the District of Columbia;
practice limited pursuant to D.C. App. R.
49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

+ admitted pro hac vice

Daniel F. Jacobson+
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Attorneys for the *NYIC* Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of July, 2018, the foregoing NYIC PLAINTIFFS'

MOTION FOR SANCTIONS was served on all counsel of record via ECF and on Mark Neuman

through his counsel in this matter via email and overnight mail at the following address:

> Howard W. Feldman, Esq.
> FeldmanWasser
> Post Office Box 2418
> 1307 South 7th Street
> Springfield, Illinois 62705
> *Counsel for A. Mark Neuman*

*/s/ John A. Freedman*
John A. Freedman
