**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

                  *Plaintiffs,*              :

v.

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :

                  *Defendants.*       18-CV-2921 (JMF)

                                  :

NEW YORK IMMIGRATION COALITION, et al.,

                  *Plaintiffs,*              :

v.

UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :

                  *Defendants.*       18-CV-5025 (JMF)

                               :    (Consolidated)

---

**PLAINTIFF-INTERVENOR ROBERT A. HEGHMANN'S MOTION TO INTERVENE**

Robert A. Heghmann respectfully moves pursuant to Federal Rule of Civil Procedure 24 to intervene as a Plaintiff in this action. Intervention is warranted as of right because Plaintiff-Intervenor's interest in the Fundamental Right of Voters in Suburban and Rural Voting Districts in Elections for the U.S. House of Representatives is and will be in serious jeopardy if the 2020 Census does not, as the 2000 Census did, determine with 90% confidence the Citizen/Non-Citizen composition of every Congressional Voting District in the United States.

Plaintiff-Intervenor is a registered voter and resides in the Second Congressional District in Virginia Beach, Virginia. The Second Congressional District is suburban on one end where



1

Virginia Beach borders the City of Norfolk and rural farm land on the other end where it borders the Outer Banks of North Carolina.

The inclusion of the question, Are you a Citizen?, is absolutely essential for the Intervenor-Plaintiff to protect his Fundamental Right to an undiluted and undebased Vote in Congressional Elections. Only if the Census determines the Citizen/Non-Citizen ratio of every Congressional District will Suburban and Rural voters such as the Plaintiff have the data necessary to guard against dilution of their votes. And only by guarding against the creation of Urban Congressional Voting Districts with a ratio of Citizen Population versus the Ratio of Non-Citizen Population that is less than the ratio of Citizen Population in Suburban and Rural Congressional Voting Districts can the Intervenor Plaintiff prevent the creation of such Urban Congressional Districts that would dilute and debase the Plaintiff's Vote in violation of the One man, One Vote Requirement.

*Background*

During the 1996 and 1998 Election cycles the Intervenor-Plaintiff was an attorney practicing law in Avon Connecticut and participating in Republican Elections. In those cycles he served as Finance Chairman for Wade Horsey who ran for the Connecticut State House from the Avon District. Wade, a Republican African-American, ran a spirited election and won over 8,000 votes in each election. He lost both elections. While Wade lost with 8,000 votes, Democratic Candidates running in Urban Election Districts won election with fewer than 2,000 votes. One obvious cause of this disparity in the number of votes necessary for election was the fact that the Ratio of Eligible Voters as a percentage of the population of election districts in Urban Voting Districts was lower than the Ratio of Eligible Voters as a percentage of the population in Suburban and Rural voting districts. This disparity was caused by the increasing number of non-citizen immigrants in the population of the Urban Voting Districts. This raised the question in the mind

2

of Wade and I as to whether this disparity Diluted and Debased the Votes of Suburban and Rural Voters.

*Wade Horsey v. Bysiewicz, Secretary of State, 3:99-cv-2250 (D. Conn. 1999)*

I filed an action on behalf of Wade Horsey in federal court to challenge the creation of voting districts based solely upon population without regard to the ratio of citizens in the population of both state and Congressional Districts. The case was assigned to District Judge Stefan Underhill. Since it was an Apportionment Case I requested a Three-Judge Panel and my request was granted. Circuit Court Judge Winter and District Court Judge Hall joined the Three-Judge panel.

It must be remembered that 1999 was before the explosion of conservative talk radio. Drudge and Breitbart were not even a gleam in the minds of their eventual creators. Rush Limbaugh was still at best a regional voice crying in the Wilderness. The public's access to information was limited to the main-street media which in the case of Connecticut meant the New York Times and the Boston Globe externally and the Hartford Courant and New Haven Register internally. All of these "news" papers were true blue, died in the wool Democrat. Despite the significance of the litigation and its potential impact voting rights throughout the United States, none of these "news" papers covered the litigation. *Horsey* became exclusively inside baseball.

*The Critical Legal Findings of Horsey and their Impact Upon this Litigation*

The Three-Judge Panel issued two opinion, *Horsey I* and *Horsey II.* Both were significant and both directly impact this case. In *Horsey I*, the Court denied the State's Rule 12 Motion to Dismiss based upon lack of Subject Matter jurisdiction and ruled that the issue of whether or not apportionment based solely upon population without regard to the Ratio of Citizens to Non-

Citizens was justiciable. The Court then decided that Wade Horsey had standing to raise the issue. These decisions have never been appealed.

The Court then considered the evidence presented by the Plaintiff and found that the evidence was too speculative upon which to rule on such a critical issue. The Court did leave open the possibility that the Plaintiff could return with evidence that more clearly and definitively supported his claim. Until then, the case was dismissed.

When the case was initiated, I was working exclusively with Data from the 1990 Census. That Data was too raw to definitely establish the Ratio of Citizens to Non-Citizens in each Connecticut Congressional District. At about the time *Horsey I* was decided, the 2000 Census results were issued. Perhaps in response to my case, the Census determined that it could determine with a 90%confidence factor the Ratio of Citizens to Non-Citizens in every Congressional District in the U.S. including Connecticut. Armed with this Data, I returned to the Three-Judge Panel. This return resulted in *Horsey II* a copy of which is attached as Exhibit 1.

In *Horsey II*, the Court armed with the new Census Data ruled as follows:

> The data reveal that the percentage of non-citizens in Connecticut's congressional districts varies from between 2.2 percent and 9.7 percent. However, this is within a generally accepted range of deviation from equality. See Chen v. City of Houston, 206 16 F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is constitutionally tolerated for state elections); Garza v. County of Los Angeles, 918 F.2d 763, 785-86 (9th Cir. 1990) (Kozinski, J., concurring in part and dissenting in part) (same). Horsey II at 12.

As Wade Horsey's attorney, I wanted to appeal this ruling. The rationale in *Chen* has never been applied to Congressional Districts as opposed to state election districts. The Supreme Court which has allowed some latitude to state's in apportionment decisions has demanded strict equality in Congressional District Apportionment. I believed application of *Chen* in this case was error. Unfortunately, the Clerk for the Second Circuit so mis-handled the Notice of Appeal that

4

the opportunity for Appeal was lost. A copy of Judge Underhill's description of how that occurred is attached as Exhibit 2.

*Citizenship and Politics*

The Washington Democratic Establishment which was monitoring the litigation closely knew it had dodged a political bullet. Although the range of non-citizens in Connecticut was less than 10%,

> Horsey's second set of data shows that whereas Connecticut's Sixth Congressional District has 2.9 percent non-citizens, nine congressional districts spread across California and New York have non-citizen populations of between 17.8 percent and 40.7 percent. See id. at ¶ 12. *Horsey II* at 8.

Had Wade Horsey brought his case in New York or California, he might well have gotten a much different decision. Therefore, to make sure another *Horsey*-type challenge was not brought to apportionment based upon population without regard to citizenship, Barack Obama upon becoming President seized control of the Census for one purpose, make sure the question Are you a Citizen? was removed so that Census Data could not be used to mount a similar challenge in the future. Thus, it is not the Republicans who are playing politics with the Census, it is the Democrats.

*Horsey's Impact upon this litigation.*

*Horsey* II is the law of this Circuit. This Court is bound by it. Further, This Court has vowed to Defend and Protect the Constitution of the United States which by Supreme Court decisions includes One Man, One Vote. This Court must take whatever steps are required to protect the Fundamental Right to Vote of the Citizens of the United States. In this case that means permitting the Censes to include the question, Are you a Citizen?

By enjoining the Census from asking this question this Court has become complicit in the Democrat Party scheme implemented by Barack Obama to deny Suburban and Rural Voters access to Census Data absolutely necessary to determine if their votes are being unconstitutionally diluted

and debased, and if so, to challenge it in federal courts throughout the United States including New York.

This Court consistent with its vow to Defend and Protect the Constitution has no choice. It must vacate its injunction and Order the Census to include the Question Are you a Citizen? in the 2020 Census.

Dated: July 12, 2019

The Plaintiff,

Robert A. Heghmann
933 Wyden Drive
Virginia Beach, VA 23462
(603) 866 – 3024
Bob_Heghmann@Reagan.com

**Certification**

I hereby certify that I served copies of this pleading via e-mail to Sania.Khan@ag.ny.gov for the Plaintiffs and Carlotta.Wells@usdoj.gov for the Defendants. The Intervenor-Plaintiff anticipates Pacer will serve all other Parties.

```
 1              UNITED STATES DISTRICT COURT

 2                        FOR THE            Exhibit 1

 3                  DISTRICT OF CONNECTICUT

 4            Docket No. 3:99 CV 2250 (SRU)

 5   - - - - - - - - - - - - - - - - - - - - - - - - - -
 6   - -
 7
 8   WADE H. HORSEY, II, Individually and on behalf of all other
 9   Suburban and Rural Citizen Voters Similarly Situated,
10
11            Plaintiff,
12
13                   - v. -
14
15   SUSAN BYSIEWICZ, Secretary of the State of Connecticut, JEFF
16   TRANDAHL, Clerk of the United States House of Representatives,
17   JOHN G. ROWLAND, Governor of the State of Connecticut, DENISE
18   L. NAPPIER, Treasurer of the State of Connecticut, NANCY
19   WYMAN, Comptroller of the State of Connecticut, and the 2001
20   REAPPORTIONMENT COMMITTEE OF THE STATE OF CONNECTICUT,
21
22            Defendants.
23
24   - - - - - - - - - - - - - - - - - - - - - - - - - -
25   - -
26
27   B e f o r e:   WINTER, Circuit Judge, HALL, and UNDERHILL,
28                  District Judges.
29
30                           ROBERT A. HEGHMANN, Law Office of
31                           Piazza and Pickel, Stamford,
32                           Connecticut, for Plaintiff.
33
34                           SUSAN QUINN COBB, Assistant
35                           Attorney General of Connecticut,
36                           Hartford, Connecticut and KERRY
37                           W. KIRCHER, Deputy General
38                           Counsel for the United States
39                           House of Representatives,
40                           Washington, D.C. (Richard
41                           Blumenthal, Attorney General of
42                           Connecticut, Gregory T. D'Auria,
43                           Associate Attorney General of
44                           Connecticut, and Jane R.
```

1
2
3
4

                    Rosenberg, Assistant Attorney
                    General of Connecticut, of
                    counsel), _for Defendants_.

1                     MEMORANDUM AND ORDER

2   WINTER, Circuit Judge:

3        Wade H. Horsey moves for reconsideration of our grant of

4   summary judgment to the defendants.  See Horsey v. Bysiewicz,

5   No. 3:99CV2250 SRU, at 3 (D. Conn. Sept. 18, 2002) (memorandum

6   and order) ("Horsey I").  He also asks us to order the

7   defendants to show cause why they should not be ordered to

8   request that the Department of Commerce, Bureau of Census

9   provide the parties and the court with Census 2000

10  Supplementary Survey Profiles of fourteen Connecticut State

11  House of Representatives voting districts established in 1991.

12       In our prior decision, id., familiarity with which is

13  assumed, we granted summary judgment against Horsey on his

14  claim that apportioning voting districts solely on total

15  population denies him equal protection of the laws because, as

16  a suburban voter, his vote is diluted relative to that of an

17  urban voter for purposes of elections to the United States

18  House of Representatives and to the Connecticut House of

19  Representatives.  Underlying this claim is Horsey's factual

20  assertion that urban districts have disproportionate (to

21  suburban districts) numbers of persons who are not eligible

22  voters because they are aliens, minors, or we might add,

23  felons.  We concluded that Horsey had submitted only

                              3

1  "speculative evidence based on various, often non-comparable

2  demographic data," that was insufficient as a matter of law to

3  support these factual claims, Horsey I, at 3, or to allow a

4  redrawing of the districts, id. at 14.  We did, however, hold

5  out the possibility that Horsey might cure the evidentiary

6  deficiencies on a motion for reconsideration.  See id. at 16-

7  17 n.3.

8      On October 17, 2002, Horsey moved for reconsideration and

9  submitted further evidentiary data in a supporting affidavit.

10 The defendants argue that Horsey's motion is untimely under

11 Rule 9(e)(1) of the Local Rules of the District of Connecticut

12 and that it has been submitted without the accompanying

13 memorandum of law as required under Rule 9(e).  Defendants

14 also request that this court deny Horsey's application for an

15 order to show cause because he has provided no legal basis for

16 requiring defendants to gather evidentiary support on his

17 behalf.  We grant Horsey's motion for reconsideration,

18 reaffirm our grant of summary judgment and deny Horsey's

19 request for an Order to Show Cause.

20                          DISCUSSION

21 A.  Untimely Filing under Local Rule 9(e)(1)

22      Local Rule 9(e)(1) requires that motions for

23 reconsideration be "filed and served within ten (10) days of

4

1   the filing of the decision or order from which such relief is

2   sought, and [that such motions] shall be accompanied by a

3   memorandum setting forth concisely the matters or controlling

4   decisions which counsel believes the Court overlooked in the

5   initial decision or order."  D. Conn. L. Civ. R. 9(e)(1)

6   (reserved and recodified at D. Conn. L. Civ. R. 7(c)(1)

7   (2003)).  Defendants are correct that Horsey's motion is

8   untimely by almost three weeks and lacks a supporting

9   memorandum of law.

10       Motions for reconsideration under Local Rule 9(e) are

11   essentially motions for amendment of judgment under Fed. R.

12   Civ. P. 59(e).  See City of Hartford v. Chase, 942 F.2d 130,

13   133 (2d Cir. 1991).  When such motions are untimely, they are

14   construed as motions for relief from judgment under Fed. R.

15   Civ. P. 60(b).  See Wright, Miller & Kane, Federal Practice

16   and Procedure § 2817 & n.16, at 184 (1995).  Although a

17   district court retains the "inherent power to decide when a

18   departure from its Local Rules should be excused or

19   overlooked," see Somlyo v. J. Lu-Rob Enters., 932 F.2d 1043,

20   1048 (2d Cir. 1991), specific provisions of the Federal Rules

21   of Civil Procedure may shed light on whether a district court

22   has abused its discretion in departing from its local rules.

23   See Ass'n for Retarded Citizens of Conn., Inc. v. Thorne, 68

5

1    F.3d 547, 553-54 (2d Cir. 1995) (finding no abuse of

2    discretion where district court's consideration of untimely

3    motion was "[b]ased on rationales for granting Rule 60(b)

4    relief").

5         While reluctant to disregard rules and deadlines, and

6    mindful of Horsey's failure in other regards to observe

7    procedural niceties, see Horsey I, at 5-6, we will entertain

8    his motion.  First, Horsey's motion is somewhat unusual in

9    that we invited him to submit this data, see id., at 16-17

10   n.3, rendering his motion equally analogous to a supplement of

11   the summary judgment record as to a motion for

12   reconsideration.  Second, some of Horsey's claims raise

13   serious constitutional issues, in particular whether a

14   disproportionate number of non-voting-eligible persons in one

15   district violates the rights of voters in other districts.  We

16   are reluctant in such circumstances not to give him every

17   opportunity to pursue his claim.

18        Courts have the latitude to deal with extenuating

19   circumstances under Fed. R. Civ. P. 60(b)(6), which provides

20   that courts may relieve a party from a final judgment for "any

21   other reason justifying relief from the operation of the

22   judgment."  For these reasons, we grant Horsey's motion for

23   reconsideration and consider the impact of his new data on our

1   prior summary judgment order.

2   B.   The Nature of Horsey's Claims

3        In his pleadings and other submissions, Horsey challenges

4   the apportionment of: (i) Connecticut State House of

5   Representatives districts; (ii) United States congressional

6   districts within Connecticut; and (iii) Congressional

7   districts nationally, in particular, Connecticut, New York and

8   California.  Horsey also challenges the manner in which the

9   federal government allocates the number of seats to the United

10  States House of Representatives.

11       In our prior opinion, we viewed Horsey's claim of

12  unconstitutional dilution as mainly based on the

13  disproportionate combination of residents who were either non-

14  citizens or were citizens ineligible to vote (hereafter

15  "ineligible citizens").  See id. at 2.  However, we do note

16  that, at times, Horsey has characterized his apportionment

17  challenges as based solely on disparities in the numbers of

18  citizens and non-citizens among legislative districts,[1] and

19  that, at other times, he has described his claims as based

20  solely on disparities in the numbers of ineligible citizens.[2]

21  See Second Amended Compl. at ¶¶ 12, 13, 16, 17, 22, 25, 27,

22  28, 30, 33, 51.  See also Horsey I, at 2 (characterizing

23  Horsey's claim as focused on apportionment practices that have

7

"given no regard to whether the number of citizens eligible to register to vote ('eligible voters') in the resultant districts is also equal").   Our analysis of Horsey's new evidence varies depending on whether his claims are characterized as based on disparities resulting from the number of aliens, ineligible citizens, or a combination thereof.

C.   Horsey's New Evidentiary Submission

Horsey's affidavit offers three sets of data based on Census 2000 Supplemental Survey Profiles.   Two sets compare Connecticut's Sixth Congressional District[3] to a total of eight or nine congressional districts in California and New York.   Horsey's first set of data shows that the total number of votes cast in the Sixth Congressional District exceeded by more than 100,000 the total number of votes cast in the New York and California  districts.   See Heghmann Aff. at ¶ 8. Horsey's second set of data shows that whereas Connecticut's Sixth Congressional District has 2.9 percent non-citizens, nine congressional districts spread across California and New York have non-citizen populations of between 17.8 percent and 40.7 percent.   See id. at ¶ 12.   A third set of data shows that Connecticut has a total non-citizen population of 4.9 percent whereas California's non-citizen population is 15.7

8

percent and New York's is 10.9 percent.  See id. at ¶ 14.[4]

We find this submission insufficient to justify overturning our prior decision for the reasons that follow.

1.  <u>Claims Regarding Ineligible Citizens or a Combination of Ineligible Citizens and Aliens</u>

Horsey's new submission provides no support for his claims regarding disparities resulting from the number of ineligible citizens or a combination of ineligible citizens and aliens among Connecticut state legislative and federal congressional districts.  The submission includes data showing only the distribution of citizens and aliens within districts, whereas his factual claims as to the inclusion of ineligible citizens or a combination of ineligible citizens and aliens require a different and more refined showing.

Although there is an overlap between citizenship and voter eligibility, the need for naked speculation to support his claim regarding the distribution of ineligible citizens in the various voting districts at issue is not eliminated by the new data.  To uphold his factual claim we would need to know the distribution of those under 18 who are citizens in each district and the distribution of those who are over 18 but ineligible to vote as felons in each district.  It might also be necessary for Horsey to provide evidence showing how many

1   residents of particular areas live in "institutions, college

2   dormitories, and other group quarters," their eligibility to

3   vote, and where they are registered to vote. See id., at A-6

4   note.   None of this information is included in the census data

5   presented. See id.   Finally, for remedial purposes, far more

6   localized information would be necessary to redraw the

7   boundaries of the districts involved.

8       While we construe the record in the light most favorable

9   to the non-movant on a summary judgment motion, and draw all

10  permissible inferences in his favor, see Anderson v. Liberty

11  Lobby, Inc., 477 U.S. 242, 255 (1986), a non-movant cannot

12  "escape summary judgment merely by vaguely asserting the

13  existence of some unspecified disputed material facts,"

14  Borthwick v. First Georgetown Sec., Inc., 892 F.2d 178, 181

15  (2d Cir. 1989), "or defeat the motion through mere speculation

16  or conjecture," W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d

17  118, 121 (2d Cir. 1990) (internal quotation marks and

18  citations omitted).

19      As explained above, Horsey's new submission does not

20  eliminate the need for wholly speculative inferences, and we

21  therefore adhere to our prior grant of summary judgment to the

22  defendants on these claims.

23          2.   Claims Regarding Citizens and Aliens

10

1    Because Horsey offers information regarding the

2    percentages of citizens and non-citizens in different states

3    and certain congressional districts, see Heghmann Aff. at ¶¶

4    12, 14, there may be some evidentiary support for his claim

5    that including non-citizens for apportionment purposes

6    substantially dilutes his vote.

7                            (i)

8    Apportionment of State House of Representatives Districts

9

10   The citizen/non-citizen evidence submitted by Horsey

11   relates only to the composition of districts for the United

12   States House of Representatives.  This evidence, therefore,

13   has no bearing on his claims regarding the composition of

14   Connecticut's House of Representatives' districts, and we

15   adhere to our prior ruling on this claim.

16                           (ii)

17   Apportionment of Congressional Districts within Connecticut

18

19   In our prior decision, we noted that Horsey had expressly

20   waived mandatory relief relating to the apportionment of

21   congressional districts within Connecticut, see Horsey I, at

22   6, but that he continued to seek a declaratory judgment that

23   these apportionments are unconstitutional, see id.[5]

24   In his affidavit accompanying his new submission, Horsey

25   provides instructions on how to compile comparative

11

1   citizen/non-citizen data for Connecticut's six congressional

2   districts as they existed in the year 2000.  <u>See</u> Heghmann Aff.

3   at ¶ 5.  While Horsey states that, if we follow these

4   instructions we will have "all the statistical evidence [we]

5   need[] to rule [on] the issues raised by [Horsey] regarding

6   the dilution of his vote in congressional elections," <u>id.</u>, he

7   neither compiles the statistical information nor elaborates on

8   its relevance to, or effect on, his equal protection claim.

9        While we are reluctant to interpret data that is not

10  properly submitted or explained, we consider it, such as it

11  is, but find it unpersuasive.  The data reveal that the

12  percentage of non-citizens in Connecticut's congressional

13  districts varies from between 2.2 percent and 9.7 percent.

14  However, this is within a generally accepted range of

15  deviation from equality.  <u>See</u> <u>Chen v. City of Houston</u>, 206

16  F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is

17  constitutionally tolerated for state elections); <u>Garza v.</u>

18  <u>County of Los Angeles</u>, 918 F.2d 763, 785-86 (9th Cir. 1990)

19  (Kozinski, J., concurring in part and dissenting in part)

20  (same).

21       Moreover, it is not at all clear, and Horsey's papers are

22  unhelpful in this regard, that the data offered is

23  sufficiently refined to allow the redrawing of congressional

12

1   districts to achieve the equality in citizen population that

2   he wants.   A similar lack of refined data was in part the

3   basis for our earlier decision.   See Horsey I, at 14.

4                              (iii)

5   Apportionment of Congressional Districts Nationally
6
7       As noted in our prior decision, Horsey filed a waiver of

8   relief of all claims relating to the apportionment of

9   congressional seats among the states, although he continues to

10  seek a declaratory judgment that these apportionments are

11  unconstitutional.   See id., at 6.   Horsey's new evidence --

12  which indicates that some states may receive a

13  disproportionate share of congressional seats due to higher

14  numbers of non-citizens -- provides factual support for his

15  claim.   Nevertheless, his claim is foreclosed by the text of

16  the Constitution.

17      The Fourteenth Amendment states that "Representatives

18  shall be apportioned among the several States according to

19  their respective numbers, counting the whole number of persons

20  in each state, excluding Indians not taxed."   U.S. Const.

21  amend. XIV, § 2 (emphasis added).   For Horsey's claim to have

22  merit, i.e., for us to conclude that the federal government

23  has unconstitutionally included non-citizens in its

24  apportionment determination, the meaning of "persons" would

have to be restricted to "citizens."  The text of the

Fourteenth Amendment clearly indicates that this

interpretation is incorrect.  Section 1 of the Fourteenth

Amendment uses both terms in a manner suggesting that

"persons" comprises a broader category of people that includes

both citizens and non-citizens.  See U.S. Const. amend. XIV, §

1 ("No State shall make or enforce any law which shall abridge

the privileges or immunities of citizens of the United States;

nor shall any State deprive any person of life, liberty, or

property, without due process of law; nor deny to any person

within its jurisdiction the equal protection of the laws.")

(emphasis added).

     Nor does the pre-Civil War text of the Constitution lend

support to Horsey's argument that the apportionment of

representatives is restricted to citizens.  As originally

enacted, the Constitution deliberately "diluted" the voting

power of citizens living in free states by counting three-

fifths of all slaves in the apportionment determination.  See

U.S. Const. art. I, § 2, cl. 3 ("Representatives . . . shall

be apportioned among the several States . . . according to

their respective Numbers, which shall be determined by adding

to the whole Number of free Persons, including those bound to

Service for a Term of Years, and excluding Indians not taxed,

three fifths of all other Persons."). While Horsey's new evidence may support his argument that there is a disparity between citizenship and the allocation of congressional representatives among the fifty states, this disparity is sanctioned by the Constitution.

Horsey's remaining claim is therefore limited to disparities among congressional districts in California and among congressional districts in New York with regard to the numbers of resident citizens and non-citizens. However, Horsey lacks standing to bring such a claim. As a non-resident of either state, Horsey has suffered no cognizable injury from the alleged malapportionment of California's or New York's congressional districts. Nor may Horsey bring an equal protection claim on behalf of California and New York residents who have had their votes diluted by their respective states' redistricting. See United States v. Hays, 515 U.S. 737, 739 (1995) (holding that plaintiff lacks standing to assert an equal protection voting rights claim in a state where he or she is not a resident of the challenged district); see also Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1279 (11th Cir. 2000) (interpreting Hays to mean that "if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific

1  evidence of harm other than the fact that the composition of
2  her district might have been different were it not for the
3  gerrymandering of the other district."); cf. Allen v. Wright,
4  468 U.S. 737, 755 (1984) (plaintiff only has standing to bring
5  equal protection challenge where he is "personally denied
6  equal treatment"); Valley Forge Christian Coll. v. Americans
7  United for Separation of Church and State, 454 U.S. 464, 489-
8  90 n.26 (1982) (disapproving the proposition that every
9  citizen has "standing to challenge every affirmative-action
10  program on the basis of a personal right to a government that
11  does not deny equal protection of the laws").

12  c)  Request for an Order to Show Cause

13      Horsey requests that we order the defendants to show
14  cause why they should not be ordered to request that the
15  Bureau of Census provide the parties and the court with Census
16  2000 Supplemental Survey Profiles of fourteen Connecticut
17  State House of Representatives voting districts established in
18  1991.  We deny this request.  Not only could Horsey have
19  purchased a Special Tabulation showing the percentages of non-
20  citizens in various Connecticut State House of Representatives
21  districts from the Bureau of Census,[6] but it remains unclear
22  whether such a tabulation would contain sufficient data to
23  permit findings on the number of eligible voters in the state

1  districts.

2                                CONCLUSION

3       For the reasons indicated, we grant Horsey's motion for

4  reconsideration, reaffirm our earlier grant of summary

5  judgment for the defendants, and deny Horsey's request for an

6  Order to Show Cause.  We again emphasize that we intimate no

7  view on whether Horsey's claims, if factually supported, would

8  be valid.

9

10

11                           /s/ Ralph K. Winter
12                           Ralph K. Winter, U.S.C.J.

FOOTNOTES


1. <u>See, e.g.</u>, Second Amended Compl. at 22 (demanding preliminary and permanent injunction preventing Clerk of the U.S. House of Representatives from including representatives from any state "in which election districts are not apportioned to reflect as nearly as possible equal percentages of the citizen population"); Plaintiff's Reply to Defendants' Objections to the Plaintiff's Motion for Reconsideration and Application for an Order to Show Cause at 2-3:

> Because the Census Bureau has now published detailed reports congressional district by congressional district stating with 90% accuracy the number of non-citizens in each district, the plaintiff if permitted to do so can now factually demonstrate the constitutional violation. <u>The constitutional issue simply stated is does the disparity in the vote total between voting districts reflect the disparity in the distribution of the citizen population</u>. . . . Now the plaintiff can use the Census Bureau Community Surveys <u>to link the disparity in the distribution of the citizen population with the disparity in the vote totals</u>.

(emphasis added)


2. An equal protection claim that apportionment must be based solely on the number of citizens resident in a district differs crucially from a claim that apportionment must be

18

based solely on the number of eligible voters.  Whereas upholding the former would exclude aliens, upholding the latter would exclude citizens as well, principally minors and felons.  There is of course a tension between equality of representation and equality of voting power.  However, a claim of dilution seems intuitively weaker when based solely on disparities in ineligible citizens resident in a district. For example, dilution of voting power in one district based on a disproportionate number of minor citizens in another does not discriminate between groups with differential claims to representation in the political process.  Minors are denied the right to vote on grounds of judgment and independence rather than a weak claim to representation.  Aliens, however, are denied the right to vote based on potential loyalty to another nation, their presumed smaller stake in the outcomes of American elections, etc.


3. Ironically, Connecticut's Sixth Congressional District no longer exists following reapportionment after the 2000 census although the apportionment of state House of Representatives districts is unaffected by these changes.  Horsey's claims as to federal House districts are nonetheless not moot because they might escape review and recur.  See Southern Pacific

Terminal Co. v. ICC, 219 U.S. 498, 515 (1911) (providing an exception to the mootness doctrine for situations "capable of repetition, yet evading review.").

4. Horsey has also instructed this court on how to compile a fourth data set providing information on the numbers of citizens and non-citizens in Connecticut's congressional districts.  See Heghmann Aff. at ¶ 5.

5. In view of our disposition, we need not reach the propriety of both waiving relief and seeking a declaratory judgment in these circumstances.

6. In order to obtain these numbers, Horsey would have had to determine which census tracts corresponded to the state house districts.  Once he had this information, the census could have performed a statistical breakdown similar to one Horsey provided for congressional districts in the affidavit accompanying his motion for reconsideration.

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Exhibit 2

WADE H. HORSEY, II,      :
    Plaintiff,             :
                           :            CIVIL ACTION NO.
        v.                 :            3:99cv2250 (SRU)
                           :
SUSAN BYSIEWICZ, ET AL.,  :
    Defendants.            :
                           :

## RULING ON MOTION FOR RELIEF FROM JUDGMENT

Wade H. Horsey, II challenged the constitutionality of Connecticut's method of drawing voting districts for elections to the United States and Connecticut Houses of Representatives. As required by 28 U.S.C. § 2284, this three-judge district court was convened to hear Horsey's case. On September 18, 2002, we granted summary judgment in favor of the defendants. Horsey moved for reconsideration. On March 24, 2004, we affirmed our grant of summary judgment. Thirty days later, Horsey filed a timely notice of appeal, correctly indicating that his appeal was to the Supreme Court.

The docketing clerk who received the notice of appeal, unfamiliar with the obscure procedure applicable to cases heard by three-judge district courts, forwarded the notice to the Second Circuit Court of Appeals, not the Supreme Court. Shortly thereafter the docketing clerk received a call from a clerk at the Second Circuit who pointed out that the notice of appeal did not designate the Second Circuit and should be amended. The docketing clerk then called Horsey's attorney and  instructed him to amend Horsey's notice of appeal to designate an appeal to the Second Circuit, rather than the Supreme Court. Uncertain of the appropriate procedure, Horsey's attorney followed the clerk's instructions and, on June 7,  filed an "Amended Notice of Appeal," designating an appeal to the Second Circuit. On July 20, a Second Circuit staff attorney

contacted Horsey's attorney and expressed concern that Horsey's appeal was with the wrong court. Several discussions between Horsey's attorney and the staff of both courts eventually revealed the mis-communication and cleared up the confusion, but too late. The sixty-day time limit for filing a jurisdictional statement with the Supreme Court had passed. *See* Supreme Court Rule 18(3).

Horsey asks us to vacate our order, pursuant to Rule 60(b), and then to reissue it, thereby resetting his appeal deadlines. Though we are inclined to grant Horsey's motion, we cannot, because we do not currently have jurisdiction.

On April 24, 2004, Horsey filed a proper notice of appeal, correctly designating the Supreme Court as the court that would hear his appeal. That filing vested jurisdiction in the Supreme Court. Nothing since then has taken jurisdiction away from the Supreme Court – the Court has not dismissed Horsey's appeal and Horsey has not requested leave from the Court to withdraw his notice of appeal.[1] Filing a proper notice of appeal divests a district court of jurisdiction except to the extent explicitly reserved by statute. *Ryan v. United States Lines Co.*, 303 F.2d 430, 434 (2d Cir. 1962). Nevertheless, this Circuit has adopted the practical rule of allowing district courts to entertain and *deny* Rule 60(b) motions after a notice of appeal is filed, even though they may not *grant* Rule 60(b) motions without consent of the appellate court. *King v. First American Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir. 2002). When faced with a post-

---

[1] There is no reason to think Horsey's filing of an "Amended Notice of Appeal" with the Second Circuit could have ousted the Supreme Court's jurisdiction. The filing of dual notices with separate courts is not without precedent, the notices serving to "protect" the jurisdiction of the appropriate court. *See, e.g., Swift & Co. v. Wickham*, 382 U.S. 111, 114 (1965) (dismissing appeal to Supreme Court and noting that appeal would now go directly to Court of Appeals because a separate notice of appeal was already filed with that court). There is no indication that in such a case the later-filed notice has the ability to undo the effect of the earlier one.

-2-

appeal Rule 60(b) motion, the proper procedure is for a district court to reach the merits of the motion. If the court believes the motion should be denied, it may do so, but if it is inclined to grant the motion, it cannot do so until the case has been remanded by the higher court. *Ryan*, 303 F.2d at 434. Accordingly, though lacking complete jurisdiction, we address the merits of Horsey's motion.

As we have already had occasion to note in this case, Rule 60(b)(6) gives a district court latitude to grant relief from judgment for "any other reason justifying relief from the operation of the judgment." *See Horsey v. Bysiewicz*, 2004 WL 725363, *2 (D. Conn. March 24, 2004). On occasion, courts have used this authority in the manner urged by Horsey, namely, to reset appeals deadlines. *See, e.g., Lewis v. Alexander*, 987 F.2d 392 (6th Cir. 1993). The Second Circuit does not favor such action because it is rare that time limitations are not adequately addressed by the relevant appeal statutes. "It is evident that a somewhat more stringent test must govern petitions for relief under Rule 60(b) [of the Federal Rules of Civil Procedure]; were this not so, the binding time constraints imposed by Rule 4(a)(5) [of the Federal Rules of Appellate Procedure] would be completely eroded by the open-ended relief offered by Rule 60(b)." *Mennen Co. v. Gillette Co.*, 719 F.2d 568, 570 n.5 (2d Cir. 1983). Under 60(b), a party "must show an affirmative if ultimately unfruitful effort to track the progress of its litigation, not merely an acceptable excuse for failure to do so." *Id.* In our view, the circumstances of this case, including the diligent efforts of Horsey's attorney, satisfy the more stringent test.

What Professors Wright, Miller, and Cooper call the "labyrinthian and even bizarre body of jurisdiction rules" governing appeals from a three-judge district court is enough to bewilder all but the most erudite practitioner. *See* 17 Wright, Miller, and Cooper, Federal Practice and

-3-

Procedure § 4040 (1988).  In fact, although Horsey's situation appears unique, the reverse

situation – lodging an appeal from a three-judge district court with the Supreme Court, when the

circuit court is the appropriate court – is so common that in those situations the Supreme Court

routinely vacates the district court's judgment and directs that a new judgment be issued from

which a fresh appeal may be taken.[2]  *Norton v. Mathews*, 427 U.S. 524, 531 (1976).  Horsey's

situation is even more sympathetic.  Horsey's attorney actually got it right and appealed to the

proper court, but did not pursue his appeal to that court because of a statement made by a clerk of

this court.  Under these circumstances, we deem it appropriate under Rule 60(b)(6) to vacate our

former judgment and reissue it so that Horsey may have his case heard by the Supreme Court.

Because we conclude that Horsey's motion should be granted, we are now powerless to

do anything.  The Supreme Court has jurisdiction; we do not.  Accordingly, one of two things

will happen.  It is possible that the Supreme Court will agree to hear Horsey's case despite his

tardy jurisdictional statement.  If that happens, all is well, and Horsey needs no relief.  If,

however, the Supreme Court dismisses Horsey's appeal as out of time, we will again have

jurisdiction over the case and will grant a renewed motion under Rule 60(b)(6).

---

[2] The occurrence is less frequent now that the repeal of 28 U.S.C. §§ 2281 and 2282 has reduced the need to convene three-judge district courts, but the Supreme Court still endorses the practice of "refreshing" judgments when appropriate. *See Clinton v. Jeffers*, 503 U.S. 930 (1992) (vacating and remanding Voting Rights Act case to allow appeal to Eighth Circuit of order on attorneys' fees).

Horsey's motion under Rule 60(b) (doc. # 90) is DENIED, but may be re-filed in the event the Supreme Court dismisses his appeal as untimely.

It is so ordered.

Dated at Bridgeport, Connecticut, this 23rd day of November 2004.

FOR THE THREE JUDGE COURT:

   /s/ Stefan R. Underhill
                    Stefan R. Underhill
                    United States District Judge