# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

               Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

               Defendants.

No. 1:18-cv-2921 (JMF)

**DEFENDANTS' OPPOSITION TO NYIC PLAINTIFFS' MOTION FOR SANCTIONS**

Dated:  August 3, 2019

JOSEPH H. HUNT
Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel

Civil Division, Federal Programs Branch
United States Department of Justice
P.O. Box 883
Washington, D.C.  20044

Telephone:  (202) 514-3358
Fax:        (202) 616-8470
E-mail:     james.gilligan@usdoj.gov

*Counsel for Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARDS ........................................................................................................ 2

ARGUMENT ........................................................................................................................ 5

I.  PLAINTIFFS' ALLEGATIONS ARE UNFOUNDED. ............................................ 5

    A.  Gore Testified Truthfully at His Deposition and Withheld No Information
        Concerning the Preparation of the Gary Letter or the "Provenance" of the
        Neuman Letter. ............................................................................................... 5

    B.  The Administrative Record Is Complete ........................................................ 10

        1.  No pertinent records of Uthmeier's work on the citizenship question
            have been withheld from the Administrative Record ....................... 11

        2.  No evidence supports the claim that relevant communications of
            Christa Jones are absent from the administrative record. ............... 14

        3.  Defendants did not misrepresent their efforts to obtain pertinent
            communications from custodians' personal email accounts. .......... 16

        4.  Defendants have not withheld drafts of the Neuman Letter. .......... 17

    C.  Defendants' Supplemental Response to Plaintiffs' Interrogatory No. 1 Is
        Complete and Accurate. ................................................................................. 18

    D.  Plaintiffs Identify No Evidence that Neuman Provided False Testimony or
        Withheld Evidence. ........................................................................................ 21

        1.  Plaintiffs' claims of false testimony are unsupported. .................... 21

        2.  Plaintiffs' claims that Neuman withheld evidence are unsupported. .............. 25

        3.  Defendants neither made, nor acquiesced in, misrepresentations
            concerning Neuman's involvement with the Gary Letter. .............. 27

II.  PLAINTIFFS' REQUEST FOR DISCOVERY SHOULD BE DENIED. ................. 29

    A.  The Discovery Plaintiffs Seek Is Neither Directed Toward Nor Justified by
        Their Allegations of Misconduct. ................................................................. 29

    B.  Plaintiffs' Claims of Wrongdoing Do Not Overcome Defendants' Privileges. .......... 32

III.  THE SANCTIONS PLAINTIFFS PROPOSE ARE UNWARRANTED ................. 33

CONCLUSION .................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alexander v. FBI,*
   541 F. Supp. 2d 274 (D.D.C. 2008) ..................................................................................35

*Allstate Ins. Co. v. Serio,*
   2000 WL 554221 (S.D.N.Y. May 5, 2000) ......................................................................32

*Benavidez* v. *Irving Indep. Sch. Dist., Tex.,*
   690 F. Supp. 2d 451 (N.D. Tex. 2010) ..............................................................................7

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ..............................................................................................................2

*Comprehensive Cmty. Dev. Corp. v. Sebelius,*
   890 F. Supp. 2d 305 (S.D.N.Y. 2012) ...............................................................................3

*Conservation Force v. Jewell,*
   66 F. Supp. 3d 46 (D.D.C. 2014), *aff'd*, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015) .......33

*Crown Awards, Inc. v. Trophy Depot, Inc.,*
   2017 WL 564885 (S.D.N.Y. Feb. 13, 2017) ......................................................................2

*Daval Steel Prods. v. M/V Fakredine,*
   951 F.2d 1357 (2d Cir. 1991) .......................................................................................3, 4

*Enmon v. Prospect Capital Corp.,*
   675 F.3d 138 (2d Cir. 2012) ...............................................................................................2

*Evenwel* v. *Abbott,*
   136 S. Ct. 1120 (2016) ........................................................................................................7

*Fabela v. City of Farmers Branch,*
   2012 WL 3135545 (N.D. Tex. Aug. 2, 2012), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ..............7

*In re Fannie Mae Sec. Litig.,*
   552 F.3d 814 (D.C. Cir. 2009)..........................................................................................34

*In re Motors Liquidation Co.,*
   829 F.3d 135 (2d Cir. 2016), *cert denied, Gen. Motors LLC v. Elliott*, 137 S. Ct. 1813 (2017)............34

*In re Gen. Motors LLC Ignition Switch Litig.,*
   80 F. Supp. 3d 521 (S.D.N.Y. 2015) ...............................................................................33

*In re Richard Roe, Inc.,*
   168 F.3d 69 (2d Cir. 1999)...............................................................................................33

*In re Sealed Case,*
   121 F.3d 729 (D.C. Cir. 1997)..........................................................................................32

*In re Subpoena Issued to Dennis Freidman*,
    350 F.3d 65 (2d Cir. 2003) ...................................................................................................30

*Martal Cosmetics, Ltd. v. Int'l Beauty Exch.*,
    2007 WL 2126091 (E.D.N.Y. July 24, 2007) ....................................................................23

*Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ...........................................................................................................22

*Mo. St. Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
    201 F. Supp. 3d 1006 (E.D. Mo. 2016) ...............................................................................7

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y.), *aff'd in part, rev'd in part*, 139 S. Ct. 2551 (2019) ...............4

*Omega S.A. v. 375 Canal LLC*,
    324 F.R.D. 47 (S.D.N.Y. 2018) ...........................................................................................3

*Revson v. Cinque & Cinque, P.C.*,
    221 F.3d 71 (2d Cir. 2000) ...................................................................................................2

*S. Forest Watch, Inc. v. Jewell*,
    817 F.3d 965 (6th Cir. 2016) .............................................................................................14

*Salahuddin v. Harris*,
    782 F.2d 1127 (2d Cir. 1986) ........................................................................................ 3, 4

*Schlaifer Nance & Co., Inc. v. Estate of Warhol*,
    194 F.3d 323 (2d Cir. 1999) .................................................................................................2

*U.S. Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .......................................................................................................32

*United States v. Callanan*,
    582 F. Supp. 2d 1125 (N.D. Iowa 2008) ...........................................................................35

*United States v. Droganes*,
    728 F.3d 580 (6th Cir. 2013) .............................................................................................35

*United States v. Gavilan Joint Community Coll. Dist.*,
    849 F.2d 1246 (9th Cir. 1988) ...........................................................................................35

*United States v. Horn*,
    29 F.3d 754 (1st Cir. 1994) ................................................................................................35

*United States v. Phillip Morris Inc.*,
    347 F.3d 951 (D.C. Cir. 2003) .................................................................................... 34, 35

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) ..........................35

*United States v. Yonkers Bd. of Educ.*,
   946 F.2d 180 (2d Cir. 1991)..........................................................................................................30

*Wilson v. Citigroup NA*,
   702 F.3d 720 (2d Cir. 2012)............................................................................................................2

**RULES**

Fed. R. Civ. P. 26 ............................................................................................................... 2, 3, 4

Fed. R. Civ. P. 37 ............................................................................................................... 2, 3, 4

**OTHER AUTHORITIES**

Justin Levitt, *Democracy on the High Wire: Citizen Commission Implementation of the Voting Rights Act*,
   46 U.C. Davis L. Rev. 1041 (2013)..............................................................................................7

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*,
   32 Cardozo L. Rev. 755 (2011) .....................................................................................................7

## INTRODUCTION

As the Court well knows, the parties litigated this case extensively and Plaintiffs ultimately prevailed in a 5-4 decision by the Supreme Court of the United States.  Not satisfied with that victory, some of the Plaintiffs now seek sanctions against the Government based on a web of speculation that is no more plausible, credible, or grounded in actual evidence than the theories they offered in their original sanctions motion several months ago.  Far from advancing a clear case of Government misconduct, Plaintiffs' motion traffics in speculation and innuendo, accompanied by a series of mischaracterizations of what the record actually shows.  The evidence before the Court at the time of Plaintiffs' filing made clear its lack of merit, while new testimony and evidence presented in this filing dispel any doubt.  Plaintiffs' assertion of a broad inter-agency conspiracy—involving countless public officials in multiple components of different federal agencies—to withhold evidence, frustrate discovery, and mislead the Court in these proceedings, is baseless.  Defendants vigorously contested Plaintiffs' claims during the course of the litigation, but they did so ethically and appropriately. Plaintiffs are wrong to suggest otherwise and their motion should be denied.

This Court should likewise deny Plaintiffs' request for discovery.  Particularly given the new evidence filed today, the record gives no reason to expect that discovery would reveal any more genuine proof of misconduct than what Plaintiffs have sought to muster thus far.  And examination of the particular subjects and methods of inquiry that Plaintiffs wish to pursue reveals less interest in ascertaining the scope of any supposed misconduct than in continuing to pursue evidence to support the theory of discriminatory motive that underlies Plaintiffs' Equal Protection claim.  But Plaintiffs already have prevailed on their separate pretext claim, and obtained all the relief they sought when they brought this case—a permanent injunction barring addition of a citizenship question to the 2020 census questionnaire.  There is no reason to continue litigating their other, moot claims.

## LEGAL STANDARDS

Plaintiffs base their motion for sanctions on three sources of authority:  (1) a court's "inherent power" to impose "appropriate sanction[s] for conduct which abuses the judicial process," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); (2) Federal Rule of Civil Procedure 26(g)(3)'s authorization to "impose an appropriate sanction" for improper certification of a discovery response; and (3) Rule 37(b)(2)'s authorization to "issue further just orders" when a party "fails to comply with a discovery order."   NYIC Pls.' Mot. for Sanctions, at 20-21, ECF No. 635 ("Pls.' Mot.").   Settled principles govern the exercise of the Court's power under each source of authority.

A.      "Because of their very potency," as well as the fact that the court "may act as accuser, fact finder, and sentencing judge," a court's inherent powers "must be exercised with restraint and discretion."  *Chambers*, 501 U.S. at 44; *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999).   Chief among these restraints is the requirement that before exercising its inherent power to impose sanctions a court must find "that the challenged actions are *entirely without color*, and are taken for reasons of harassment or delay or for other improper purposes."  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000).   Such "bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012).   In addition, the requisite findings of bad faith must be based on "clear evidence" and possess "a high degree of specificity."  *Wilson v. Citigroup NA*, 702 F.3d 720, 724 (2d Cir. 2012); *Crown Awards, Inc. v. Trophy Depot, Inc.*, 2017 WL 564885 at *10 (S.D.N.Y. Feb. 13, 2017) ("clear and convincing evidence" required to impose inherent-power sanctions for a "fraud on the court").

B.      Rule 26(g)(1) provides that "every discovery … response or objection must be signed by at least one attorney of record," constituting a certification "to the best of the [attorney's] knowledge, information, and belief formed after reasonable inquiry" that the discovery response or objection is consistent with the Federal Rules of Civil Procedure, justified under existing law, and "not

interposed for any improper purpose." Fed. R. Civ. P. 26(g)(1)(B).  If a certification violates these requirements "without substantial justification," Rule 26(g)(3) requires that a court "impose an appropriate sanction." *Omega S.A. v. 375 Canal LLC*, 324 F.R.D. 47, 56 (S.D.N.Y. 2018).

As discussed herein, Defendants' discovery responses were appropriate and consistent with their obligations under the Federal Rules.  Moreover, Plaintiffs take issue with a number of Defendants' "representations," *see* Pls.' Mot. at 20, that do not constitute discovery responses or objections governed by Rule 26(g).  *See, e.g., Omega SA*, 324 F.R.D. at 56 (Rule 26(g) not applicable to allegedly false declarations).  These include, for example, Defendants' representations concerning the completeness of the Administrative Record, the production of which is not a "discovery response," *see Comprehensive Cmty. Dev. Corp. v. Sebelius,* 890 F. Supp. 2d 305, 312 (S.D.N.Y. 2012) (in APA review of agency action, "the standard discovery tools of civil litigation … do not apply"), and Defendants' September 21, 2018, letter-brief opposing Plaintiffs' request for leave to depose third-party A. Mark Neuman, ECF No. 346.

**C.**      Plaintiffs also invoke Rule 37(b)(2), which provides that if a party "fails to obey an order to provide or permit discovery," the court "may issue further just orders," including but not limited to those listed in Rule 37(b)(2)(A)(i)-(vii), but this invocation fails at the outset.  Under Rule 37(b)(2), the court "must order" the payment of reasonable expenses and attorney's fees "caused by the failure," "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  As a pre-condition to imposing sanctions under Rule 37(b), there must be "a clearly articulated order of the court requiring specified discovery," *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991), but Plaintiffs have identified no such order with which Defendants failed to comply. *See also Salahuddin v. Harris*, 782 F.2d 1127, 1131 (2d Cir. 1986) (sanctions under Rule 37(b) could not be based on an order "that did not specify what matters could or could not be inquired into at [plaintiff's] deposition").

Plaintiffs first point to the Court's Orders of July 5 and 23, 2018, ECF Nos. 99, 211, *see* Pls.' Mot. at 21, which directed Defendants to "produce the complete [administrative] record" by July 23, 2018, and then extended that deadline to July 26, 2018.  But these were not "order[s] to provide or permit discovery" within the meaning of Rule 37(b)(2).  As the Court recognized earlier in this litigation, "[p]roperly understood … an order directing completion of an administrative record is not the same thing as ordering 'discovery'…." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 633 (S.D.N.Y.), *aff'd in part, rev'd in part* 139 S. Ct. 2551 (2019)  Moreover, neither of the Court's orders "specified" particular documents or information that Defendants were required to include in the administrative record.  *Daval*, 951 F.2d at 1363; *Salahuddin*, 782 F.2d at 1131.  Absent the specificity that Rule 37(b)(2) requires, mere failure to satisfy Plaintiffs' notions of what a "complete" administrative record should include cannot form the basis for sanctions.

Plaintiffs also note that Defendants did not complete their production of documents under Rule 34 until October 23, 2018, eleven days after the Court's October 12, 2018, deadline.  Pls.' Mot. at 21.  But the Supreme Court had temporarily stayed all discovery under the Court's July 3, 2018, Order pending consideration of Defendants' petition for a writ of mandamus prohibiting Secretary Ross's deposition.  *See* ECF No. 374.  As a result of that temporary stay, the Court's Order requiring the production of documents on October 12, 2018, was not "in force," *Daval*, 951 F.2d at 1364, when that deadline arrived.  And the day after the Supreme Court's stay was lifted, Defendants completed their production.  Defs.' Ex. 1, Email from K. Bailey to J. Friedman (Oct. 23, 2018).  Hence, there was no delay for which Rule 37 sanctions could be justified.

*     *     *     *     *

In short, and as detailed further below, Plaintiffs come nowhere close to showing that any form of further relief—sanctions or otherwise—is warranted under the legal principles that govern the exercise of the Court's authority under its inherent power, Rule 26(g)(3), or Rule 37(b)(2).

## ARGUMENT

## I.    PLAINTIFFS' ALLEGATIONS ARE UNFOUNDED.

### A.    Gore Testified Truthfully at His Deposition and Withheld No Information Concerning the Preparation of the Gary Letter or the "Provenance" of the Neuman Letter.

Plaintiffs accuse then-Acting Assistant Attorney for the Department of Justice ("DOJ") Civil Rights Division, John Gore, of "help[ing] [to] hide from Plaintiffs and the Court critical evidence demonstrating a direct through-line" from Dr. Thomas Hofeller's unpublished 2015 study to the December 12, 2017, letter from the General Counsel of DOJ's Justice Management Division, Arthur Gary, to the Census Bureau (the "Gary Letter"), requesting the reinstatement of a citizenship question ("Gary Letter").  Pls.' Mot. at 11.  The various allegations on which this charge is based, *see id.* at 9-11, rest on speculation and misrepresentations of the record—rather than actual evidence—and are now directly rebutted by the facts.

1.    Plaintiffs assert that Gore provided "false testimony" when he stated during his deposition that he wrote the first draft of the Gary Letter.  *Id.* at 9.  According to Plaintiffs, that testimony conflicts with Gore's transcribed interview with staff of the House of Representatives Committee on Oversight and Reform ("House Oversight Committee"), during which he acknowledged that at an October 2017 meeting Neuman provided him with a purported draft letter from DOJ to the Census Bureau requesting a citizenship question (the "Neuman Letter").  *Id.* at 10.

It is Plaintiffs' assertion that is false, not Gore's testimony.  Plaintiffs' assertion relies entirely on their characterization of the Neuman Letter as a "first draft" of the Gary Letter.  That characterization is belied by the documents on their face, as even a cursory comparison of the two reveals.  *Compare* Defs.' Ex. 2 (Neuman Letter) *with* Defs.' Ex. 3 (Gary Letter).  No reasonable reader could conclude that the Neuman Letter is a "first draft" of the Gary Letter, which is entirely different in substance, terminology, and form.  The only thing the two have in common is that both purport to be letters from DOJ to the Census Bureau.  Despite reciting their characterization of the Neuman

Letter as a first draft of the Gary Letter multiple times in multiple filings in this Court and the Supreme Court, Plaintiffs have yet to identify any basis for their characterization beyond their own *ipse dixit*. Plaintiffs have thus failed to provide any evidence—much less clear and convincing evidence—that Gore's testimony that he wrote the first draft of the Gary Letter was anything but truthful.

Indeed, Plaintiffs have had the Neuman Letter since last October, yet never asserted that it bore any similarity to the Gary Letter. Neuman himself testified that he "wasn't part of the drafting process of the [Gary] [L]etter," Defs.' Ex. 4, Neuman Dep. 114:19-20, and that the Neuman Letter was "very different" from the Gary Letter. *Id.* 280:23-24. If Plaintiffs seriously thought the two documents were related, they easily could have probed the (non-existent) connection between them at Gore's deposition. As soon as the Supreme Court lifted its stay of discovery, *see supra* at 4, Defendants produced the Neuman Letter to Plaintiffs. That production occurred on October 23, 2018, three days before Gore's deposition, and Defendants specifically identified the document as having been collected from Mr. Gore's files. *See* Defs.' Ex. 1.[1] Thus, Plaintiffs had timely notice that Gore possessed a copy of the Neuman Letter, and every opportunity to question Gore during his deposition about the document, including who gave it to him and whether he relied on it while drafting the Gary Letter. A deponent is not required to answer questions that are not asked, much less face sanctions for not doing so. Any information Plaintiffs feel they did not have about the Neuman Letter is attributable to their own deposition choices, not to any sanctionable misconduct by Gore.

---

[1] Plaintiffs misleadingly insist that Defendants "delayed release" of Gore's copy of the Neuman Letter, and buried it in a production of 92,000 pages of documents. Pls.' Mot. at 10. The Supreme Court issued its temporary administrative stay of discovery in this case on October 9, 2018. ECF No. 374. The day after the stay lifted on October 22, Defendants produced all outstanding documents, including the hard copy of the Neuman Letter from Gore's files. Defs.' Ex. 1. As Plaintiffs themselves note, this was "three days before [Mr.] Gore's deposition." Pls.' Mot. at 10. In addition, whereas the bulk of Defendants' production that day was sent by overnight delivery or courier on disk drives, Gore's copy of the Neuman Letter was one of 21 discrete documents that were separately produced as attachments to a transmittal e-mail, which specifically identified them as previously withheld materials "collected from John Gore," and for the sake of clarity referenced the Neuman Letter *both* by its new Bates number assigned for purposes of production, and the number used earlier to identify it on Defendants' privilege log. Defs.' Ex. 1 at 1-2. Thus, far from burying the document, Defendants called it to Plaintiffs' attention prior to Gore's deposition.

**2.**     Plaintiffs next fault Gore because during his deposition he did not name Neuman or Hofeller as persons who provided him "input" on the Gary Letter.  Pls.' Mot. at 9-10.  That argument incorrectly assumes that Gore actually did receive input on the Gary Letter from Neuman and Hofeller.  Plaintiffs provide no factual support for that assumption.

Besides the Neuman Letter, discussed above, Plaintiffs offer no reason to conclude that Gore received "input" on the Gary Letter from Neuman.  And they offer no evidence at all that Gore ever read, received, or even knew about Hofeller's unpublished 2015 study.  Instead, they offer only speculation that Gore must have seen the unpublished study because both the study and the Gary Letter discuss various shortcomings of citizenship data from the American Community Survey (ACS).  *See* Pls.' Mot. at 11.  But as the government already has explained, see ECF No. 601 at 2, those shortcomings were widely known and published, so any supposed similarities are hardly surprising.[2]  There is thus no basis for Plaintiffs' speculation that Gore more likely relied on Hofeller's unpublished study rather than, for example, publicly available and well known briefs filed in *Evenwel* v. *Abbott*, 136 S. Ct. 1120 (2016)—a case the Gary Letter expressly cites— or speculation that Gore, Neuman, and Hofeller were engaged in a secret conspiracy to share this broadly available information.

**3.**     Next, Plaintiffs accuse Gore of "caus[ing] Defendants to mislead" them because "even though he was well aware of the [Neuman Letter's] provenance," Gore "allowed" Defendants to represent, on their privilege log, and in subsequent exchanges between counsel, that they did not know the Neuman Letter's "author, recipient, date, or time."  Pls.' Mot. at 10 (citing Pls.' Ex. 20).  In the first place, Plaintiffs do not explain how a witness such as Mr. Gore can be held responsible for what

---

[2]  The shortcomings of ACS citizenship data have been discussed in judicial decisions and academic literature.   *See, e.g., Mo. St. Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016); *Fabela v. City of Farmers Branch,*  2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Benavidez* v. *Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 457-58 (N.D. Tex. 2010); Justin Levitt, *Democracy on the High Wire: Citizen Commission Implementation of the Voting Rights Act*, 46 U.C. Davis L. Rev. 1041, 1045 n.116 (2013); Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 Cardozo L. Rev. 755, 776-777 (2011).

is or is not stated in DOJ's privilege log.   Moreover, they have mischaracterized Defendants' representations by misleadingly truncating the exchange they quote.  In fact, Defendants told Plaintiffs the Neuman Letter was collected "in hard copy, and therefore *no metadata exists for* author, recipient, date, or time."  Pls.' Ex. 20, at 1 (emphasis added).  That was and is true.  In any event, if Plaintiffs were interested in where Gore acquired the Neuman Letter, they simply could have asked him about it in his deposition.  They did not.  Again, a deponent cannot be sanctioned for failing to answer an unasked question, and Defendants were not obligated to conduct Plaintiffs' deposition for them.

    4.    Plaintiffs next claim that during his deposition, Gore failed to identify the Commerce Department's General Counsel, Peter Davidson, and Commerce Department Attorney James Uthmeier, as individuals who provided input to the Gary Letter, information he provided during his interview by House Oversight Committee staff.  Pls.' Mot. at 10.  They also treat as "new" information that "he discussed the citizenship question directly with the White House and [the Department of Homeland Security ("DHS")] in October 2017," a fact he also shared with the Committee staff.  *Id.* But Plaintiffs neither explain what connection those discussions might have to their theory of a fraud on the court nor acknowledge relevant facts that belie their accusations.

    Gore testified at his deposition that, in addition to various individuals in DOJ's Civil Rights Division, he "may have received input" from and "had various conversations with others at various times throughout [the] process" of drafting the Gary Letter, Defs.' Ex. 5, Deposition of John Gore ("Gore Dep.") 150:21-151:4, 151:16-20, including multiple conversations with legal staff at the Department of Commerce, *id.* 153:7-11.  And Gore *did* testify in his deposition that at some point after November 2017 he had conversations with Davidson about the citizenship question, *id.* 137:13-21, as well as that he spoke about the citizenship question with a member of the White House Staff, John Zadrozny, in October 2017, *id.* 409:19-410:9.  Unlike the House Oversight Committee, however, Plaintiffs never asked Gore with whom in the Commerce Department's General Counsel's Office he had discussions, or about the nature of those conversations.  Gore did not hide that information from

Plaintiffs; they simply did not ask.   At the risk of belaboring the point, it is not sanctionable conduct

for Gore not to have volunteered information that Plaintiffs did not solicit.  Indeed, Plaintiffs cannot

even explain what relevance that information would have had to their claims in this case.

*     *     *     *     *

Plaintiffs' failure to offer any evidence, much less clear and convincing evidence, to support

their allegations that Gore provided untruthful testimony is sufficient to defeat their request for

sanctions.   Nevertheless, in an abundance of caution, Gore has provided a sworn declaration in

response to Plaintiffs' motion.  Gore's declaration makes clear that the Neuman Letter was not a first

draft of the Gary Letter, that Gore did not rely on the Neuman Letter in drafting the Gary Letter, that

neither Neuman nor Hofeller had any input into the Gary Letter, and that Gore did not rely on

anything he heard from Davidson, Uthmeier, Zadrozny, or anyone else at the Commerce Department,

the White House, or DHS, in drafting the Gary Letter.  *See generally* Defs.' Ex. 6. [3]

As Gore explains, "[t]he Neuman Letter was not a draft of the Gary Letter."  Defs.' Ex. 6 ¶ 7.

After receiving the Neuman Letter on the one occasion when the two men met (after which Gore had

no further communication with Neuman), Gore reviewed the letter once, placed it in a file folder, and

"did not consult, refer to, or rely upon the Neuman Letter, or any other information provided to [him]

by Mr. Neuman, in drafting the Gary Letter."  *Id.* ¶¶ 8-9; *see also id.* ¶ 6 (stating that he "had no further

oral or written communications with Mr. Neuman after receiving the Neuman Letter from him").

Gore was thus entirely truthful when he stated that he prepared the first draft of the Gary Letter

before it was sent to the Commerce Department.  *See id.* ¶¶ 2, 12; Defs.' Ex. 5, Gore Dep. 150:9-

155:8.[4]  Gore also never met or communicated with the late Hofeller, much less relied on the

---

[3] Gore's discussions with Davidson and Uthmeier concerning a citizenship question were oral
and are not reflected in written communications.  *See* Defs.' Ex. 6, Declaration of John Gore, at ¶ 14.
Accordingly, Plaintiffs' suggestion that these conversations should have been included in the
Administrative Record, Pls.' Mot. at 2, 6, are without merit.

[4] As Mr. Gore attests in his declaration, he has no knowledge regarding the Neuman Letter's
author, recipients (other than himself), or when it was drafted.  Defs.' Ex. 6 ¶ 10.  Mr. Gore cannot

9

unpublished 2015 study that Gore did not even know existed until he reviewed Plaintiffs' May 30, 2019, motion for an order to show cause. Defs.' Ex. 6, Gore Decl. ¶ 5. Finally, as Gore explains, he did not rely upon anything communicated to him by Davidson, Uthmeier, Zadrozny, or anyone else at the Commerce Department, the White House, or DHS, in drafting the Gary Letter. *Id.* ¶¶ 11-16.

In short, "[a]t no time, including during [his] deposition, did [Gore] withhold, direct anyone to withhold, or become aware that anyone had withheld [non-privileged] documents or information required to be produced" in this case. Gore Decl. ¶ 17. Nothing Gore did, or failed to do, during the litigation of this case provides any justification for imposing sanctions.

## B.   The Administrative Record Is Complete

Plaintiffs next claim that Defendants omitted information that should have been part of the Administrative Record, and misrepresented the completeness of the record, to "conceal[ ] the genesis and purpose of the citizenship question." Pls.' Mot. at 11, 15. In particular, Plaintiffs contend that "senior Commerce officials (including Uthmeier, Jones, Comstock, and Davidson) appear to have withheld documents relating to contacts with the White House, contacts with Hofeller, and work on the draft DOJ request letter which Neuman provided to Gore." *Id.* at 13. They also contend that emails from the personal accounts of Uthmeier and Census Bureau Chief of Staff Christa Jones, *see id.* at 16, and certain communications with Gore, *id.* at 6, were improperly withheld. Plaintiffs, however, do not identify any actual documents that were omitted. They simply speculate about the existence of the supposedly withheld documents, and based on that speculation assert that the Administrative Record is incomplete and that Defendants have misled the Court. Plaintiffs' speculative arguments are again contradicted by the facts.

---

be faulted, as Plaintiffs attempt, Pls.' Mot. at 8, for failing to provide Defendants with information that he himself lacks. Nor can Defendants be faulted for failing to describe this document on the Justice Department's privilege log in the absence of this information. Plaintiffs point to the fact that Mr. Gore now recalls that he received the Neuman Letter from Mr. Neuman, *see* Pls.' Mot. at 10 (citing Pls.' Ex. 13 at 22 (transcript of House Oversight Committee interview)), but who authored the Neuman Letter, and who gave it to Mr. Gore, are entirely different pieces of information.

       1.      **No pertinent records of Uthmeier's work on the citizenship question have been withheld from the Administrative Record.**

Citing Uthmeier's interview by House Oversight Committee staff, Plaintiffs claim that he is responsible for misleading the Court about the existence of four categories of documents that should have been included in the Administrative Record, thereby rendering it incomplete.  Pls.' Mot. at 13-14.  None of Plaintiffs' contentions withstands scrutiny.

First, Plaintiffs assert that although Uthmeier told the Committee staff that he spoke to multiple individuals from the White House about the citizenship question, the Administrative Record reflects his contact with only a single White House official, John Zadrozny.  *Id.* at 13.  That is incorrect. The Administrative Record reflects that Uthmeier likely had communications with other members of the White House staff, including James Sherk and Theo Wold.  *See, e.g.,* Defs.' Ex. 7, Email from J. Zadrozny to B. Lenihan (Feb. 21, 2018); Defs.' Ex. 8, Email from J. Uthmeier to J. Zadrozny (Jan. 31, 2018).  In addition, a document produced in discovery that post-dated the Secretary's decisional memo reflects that Uthmeier communicated by e-mail with staffperson George Doty.  *See* Defs.' Ex. 9, Email from J. Uthmeier to G. Dory (Mar. 28, 2018).

Second, Plaintiffs contend that although Uthmeier told Committee staff that Secretary Ross asked him to look into adding the citizenship question in "the spring of 2017, likely March or April," the record does not contain documents reflecting work by him on the citizenship question before June 2017.  Pls.' Mot. at 13.  That, too, is incorrect.  Documentation of Uthmeier's work on the citizenship question as early as April 2017 was produced in discovery (documentation Plaintiffs never sought to add to the Administrative Record).  *See* Defs.' Ex. 10, Email from B. Robinson to J. Uthmeier (Apr. 20, 2017).  And Plaintiffs provide no basis to question Defendants' wide-ranging document searches during discovery confirming the absence of additional relevant pre-June 2017 documents in the Commerce Departments custody.  *See generally* Defs.' Ex. 12, Cannon Decl.

Third, Plaintiffs complain that Uthmeier's conversations about the citizenship question with Professor John Baker, as documented in his interview with House Oversight Committee staff, are not reflected in the Administrative Record. Pls.' Mot. at 14. But those conversations would appear in the Administrative Record only if they were in writing or otherwise memorialized in writing. Plaintiffs provide no basis for their speculation that those conversations were anything but purely oral.

Finally, again citing Uthmeier's interview with the Committee staff, Plaintiffs argue that the Administrative Record should include emails from his personal Gmail account that he sent and received in the course of performing official Government business related to the census. Pls.' Mot. at 14. According to Plaintiffs, Uthmeier "acknowledged that he 'likely' used his Gmail account for work related to [the] census," *see id.* But Plaintiffs have misconstrued Uthmeier's testimony. Uthmeier did not state that he used a private e-mail account to conduct official business while an employee of the Commerce Department. Rather, he told the Committee staff that he "likely" used his Gmail account to conduct business as a member of the President's transition team, before the President's inauguration. Pls.' Ex. 14 at 14. He did not state that he used his Gmail account after the transition for purposes of work-related issues; and, he explained that he did not work on the census or the citizenship question during the transition. *Id.* at 7-8. Plaintiffs thus have no basis for their assertion that the Administrative Record should contain Uthmeier's personal emails.

*     *     *     *     *

As with the baseless allegations against Gore, Plaintiffs' allegations related to Uthmeier are unsupported by any evidence, much less clear and convincing evidence; that is sufficient on its own to deny their motion. Nevertheless, in an abundance of caution, Uthmeier has provided a sworn declaration in response to Plaintiffs' motion. That declaration makes clear that Uthmeier did not withhold communications with White House personnel; did not withhold any pre-June 2017 documents related to his work on the citizenship question, followed all Commerce Department policies regarding use of personal email for government business once he joined the Department

shortly after the inauguration, and did not have any written notes memorializing his conversations with Professor Baker.  *See* Defs.' Ex. 11, Declaration of James Uthmeier, at ¶¶ 3-5.  As Uthmeier states, when he first started working on the citizenship question in the spring of 2017, he spent the first several months participating in a number of in-person briefings and discussions concerning this issue and several other topics related to the Department, and that beyond the documents that comprise the Administrative Record, there are no additional notes or materials that were taken or received that were not produced.  Defs.' Ex. 11 ¶ 4.  He does not recall speaking to White House personnel about a citizenship question during this time.  *Id.* 12.

Defendants' wide-ranging document searches—both those performed initially and those Defendants recently conducted for purposes of responding to Plaintiffs' motion, confirm the absence of such documents.  These searches were calculated to identify, among other things, any documents or communications reflecting work that Uthmeier would have performed on a citizenship question before late June 2017—but they found none that were not otherwise already reflected in the Administrative Record.  *See generally* Defs.' Ex. 12, Declaration of Michael Cannon; Defs.' Ex. 13, Supplemental Declaration of Michael Cannon; Defs.' Ex. 14, Declaration of Jean McKenzie; Defs.' Ex. 15, Declaration of Terri Ware.[5]

As Uthmeier also explains, his conversations with Baker were conducted over the phone and in person, and he did not take notes during these conversations.  Defs.' Ex. 11 ¶ 5.  Moreover, Defendants have conducted additional searches of Uthmeier's files for documents constituting or

---

[5]  As discussed in the supplemental Cannon declaration, three of the recent searches performed by Defendants returned documents within the specified parameters.  Defs.' Ex. 14, Cannon Supp. Decl. ¶¶ 2-4.  The first was a search for communications about or including Hofeller, which identified a single email that made no mention of a citizenship question, redistricting, or apportionment, and was not related to the Secretary's decisionmaking process.  *Id.* ¶ 2.  The second was a search for communications about or including Neuman, which revealed no communications except those already identified by earlier searches in this litigation and already produced or logged.  *Id.* ¶ 3.  The last search that returned documents within the parameters specified was a search for relevant communications with or about Baker, but none of the communications identified were communications to, from, or about Professor John S. Baker.  *Id.* ¶ 4.  Therefore, the supplemental searches performed by Defendants yielded no new relevant documents.

reflecting communications with Baker, and found none.  Defs.' Ex. 13 ¶ 4.   Hence, there is no basis for Plaintiffs to claim that Defendants overlooked, much less deliberately withheld, documents concerning communications between Uthmeier and Baker.[6]

Finally, Uthmeier has confirmed that once he officially joined the Department of Commerce in mid-February 2017, he exclusively used his Commerce Department email account to conduct official Government business.  Defs.' Ex. 11 ¶ 3.  Thus, the record contains no support for an allegation that official emails Uthmeier sent or received using his personal account are missing from the Administrative Record.  And to the extent that Plaintiffs contend the record should include transition-team e-mails *predating* Uthmeier's—and, for that matter, Secretary Ross's—tenure at the Department of Commerce, Plaintiffs provide no legal or factual basis to support such a claim.

### 2. No evidence supports the claim that relevant communications of Christa Jones are absent from the administrative record.

Relying on materials in Hofeller's files, Plaintiffs next contend that Christa Jones, a career Census Bureau employee, "failed to turn over relevant materials" that should have been included in the Administrative Record.  Pls.' Mot. at 14.  They speculate that "emails between Jones and Hofeller … may have reflected a direct connection between Hofeller and Secretary Ross's ultimate decision." *Id.*  That claim, too, is both unsupported and belied by the record.

Although Plaintiffs allege that Hofeller "regularly" corresponded with Jones through private email, and that "many" of her emails discussed redistricting, *id.*, Plaintiffs identify only five emails exchanged between Hofeller and Jones—three from 2010, two from 2015—some of them including multiple recipients.  *See* Pls.' Ex. 26.   Those five emails hardly support a conclusion that Jones "regularly" corresponded with Hofeller at all, let alone on redistricting.  The first and third, for example, have nothing to do with a citizenship question or redistricting, *id.* (Pls.' Ex. 26 at A-18; A-

---

[6]  Defendants had no obligation to undertake the precarious task of attempting, long after the fact, to memorialize these oral conversations.  *See S. Forest Watch, Inc. v. Jewell*, 817 F.3d 965, 977 (6th Cir. 2016) (administrative record properly excluded oral communications absent documentation).

20), and the fifth concerns dinner plans, *id.* (A-22).  The second, *id.* (A-19), appears to be a January 2010 email chain circulated among a large number of individuals, under the subject line "Redistricting Article," that includes no content.  And aside from that, Plaintiffs do not explain how an email sent during the last administration in any way suggests the absence of relevant information regarding the Secretary's March 16, 2018, decision—over eight years later—regarding the citizenship question.[7] Finally, the fourth email, from January 2015, simply contains a suggestion from Jones to Hofeller that a recent Federal Register notice inviting public comment about the Census Bureau's 2015 Content Test—which tests the wording and placement of census questions—might present "an opportunity to mention citizenship."  Pls.' Ex. 26 at A-21.  Plaintiffs do not even attempt to explain how that single personal communication more than three years before Secretary Ross's decision (indeed, nearly two years before President Trump's election), suggests that Jones—a career employee of the Census Bureau who advised against reinstatement of a citizenship question, *see* ECF No. 545 at ¶ 495— conducted official business using her personal email account, or that any of her emails involved would have reflected a "direct connection" between Hofeller and the Secretary's decision.

*   *   *   *   *

Because Plaintiffs' claims for sanctions based on Jones are unsupported by any evidence, let along clear and convincing evidence, their motion should be denied.  Nevertheless, in an abundance of caution, Jones has provided a sworn declaration in response to Plaintiffs' motion.  That declaration makes clear that Jones had several telephone conversations with Hofeller since January 2017 concerning personal matters, but that they did not discuss the reinstatement of a citizenship question during their conversations, and that she did not exchange any written communications with him during that time.  Defs.' Ex. 16, Declaration of Christa Jones ¶ 2.  Jones also explains that she

---

[7] Citing this email, Plaintiffs also claim that Jones was "one of six individuals (the others of whom are senior Republican operatives and lawyers) whom Dr. Hofeller regularly briefed on redistricting strategy."  Pls.' Mot. at 5-6.  The email obviously supports no such claim.

15

had never seen or heard about Hofeller's unpublished 2015 study prior to press reports earlier this year, and that she never discussed the contents of that study with Hofeller or anyone else in connection with Secretary Ross's decision to include a citizenship question on the 2020 census. *Id.* ¶ 3. Similarly, prior to this litigation, Jones had never seen a copy of the Neuman Letter or the one-paragraph document allegedly created in 2017 that was retrieved from Hofeller's computer, and whose text appears in that letter. *Id.* ¶ 4. And contrary to Plaintiffs' suggestion, Pls' Mot. at 14, Jones was neither a primary drafter nor contributor of comments to the Secretary's March 2018 decision memorandum, and did not play a central role in preparing that memorandum. *Id.* ¶ 5.

### 3. Defendants did not misrepresent their efforts to obtain pertinent communications from custodians' personal email accounts.

Plaintiffs contend that Defendants' representations about their efforts to determine whether Commerce Department employees conducted official business using their personal email accounts were "inaccurate, misleading or false." Pls.' Mot. at 15-16. That baseless contention simply reprises the same unfounded allegations that Uthmeier and Jones withheld emails sent and received on their personal accounts to conduct official business regarding a citizenship question. See *id.* at 16. As explained above, those allegations are false. Moreover, the Commerce Department already "conducted searches for all pertinent documents to create the Administrative Record for this case," searches "designed to identify and produce documentary evidence that was considered during the [Secretary's] decision-making process." ECF No. 254, at ¶ 3. In the course of conducting those searches, Defendants individually verified with all relevant custodians "that they 'confirmed that they are aware of and adhere to the Department's policy that government business be conducted over government email.'" *See* Pls.' Mot. at 15 (quoting Pls.' Ex. 29, email from K. Bailey). Plaintiffs provide no basis for their accusation that those representations and document searches "were inaccurate, misleading, or false."

### 4.   Defendants have not withheld drafts of the Neuman Letter.

Finally, Plaintiffs claim that the Administrative Record wrongfully omitted drafts of the Neuman Letter.  Pls.' Mot. at 14-15.  According to Plaintiffs, Neuman testified during his deposition that he had seen multiple draft versions of the Neuman Letter; that he believed individuals in the Commerce Department also had versions of this document and had reviewed and commented on it; and that he believed he provided comments on the letter to Uthmeier.  *Id.* at 14.  As an initial matter, Plaintiffs easily could have raised this argument before the close of discovery or trial, as it is based on deposition testimony that Neuman gave when they deposed him on October 28, 2018.  If Plaintiffs believed the Administrative Record was incomplete because it did not contain drafts of the Neuman Letter,  it was incumbent on them to raise the issue at that time.  They did not.

In any event, Plaintiffs overstate Neuman's testimony.  He did not testify that Commerce Department employees in fact had copies, or were reviewing drafts, of the Neuman Letter.  Rather, he could only speculate that "there [were] people within the Secretary's office who *could* have had a version" of the letter, Defs.' Ex. 4, Neuman Dep. 281:10-19 (emphasis added); and "seem[ed] to recall" that others at the Commerce Department were reviewing and offering thoughts on draft versions of the letter, *id.* 283:12-24.  Based on that equivocal testimony, Plaintiffs leap to the conclusion that there must be "significant omissions" of documents from the Administrative Record because it does not include (nor do Defendants' privilege logs identify) copies of the draft Neuman Letter that Neuman "seem[ed] to recall."  Pls.' Mot. at 14-15.  But Defendants have twice conducted comprehensive searches for pertinent electronic and hard-copy documents in this case—first when originally assembling the Administrative Record, and most recently for purposes of addressing Plaintiffs' motion.  *See generally* Defs.' Exs. 12-15.  Those searches, which included relevant custodians such as Davidson, Uthmeier, and former Commerce Department Director of Policy Earl Comstock, were designed to locate any documents pertaining to the census, a citizenship question, or the Justice Department, all matters addressed in the Neuman Letter.  *See generally* Defs.' Ex. 5.  No such

documents were found, either in the first instance or now. *Id.*; *see generally* Defs.' Ex. 13; Defs.' Ex. 14 ¶ 4; Defs.' Ex. 15 ¶¶ 5, 7. Neuman's speculation and equivocal recollection of a draft Neuman Letter circulating within the Commerce Department has now been twice tested against the documentary record, and both times found wanting.

Neuman's uncertain recollection is also questionable given the testimony of Uthmeier, who confirmed to House Oversight Committee staff that Neuman never provided him with the Neuman Letter, or any other draft letter concerning a citizenship question, and that Neuman never provided him with draft language that could be included in such a letter. Defs.' Ex. 17, Interview of J. Uthmeier, Comm. on Oversight & Reform, U.S. House of Reps. (June 11, 2019) ("Uthmeier House Tr.") 99-100; 121. Uthmeier further informed the Committee staff that he had never seen any documents from Neuman, including language contained in the 2017 paragraph allegedly retrieved from Hofeller's files, and which appears in the Neuman Letter. *Id.* at 120-21. Uthmeier's declaration confirms these statements, as do the declarations of Davison and Comstock. *See* Defs.' Ex. 11 ¶ 6; Defs.' Ex. 26, Declaration of Peter Davidson, ¶¶ 5-6; Defs.' Ex. 27, Declaration of Earl Comstock, ¶ 3. And Uthmeier is likewise unaware of anyone at the Department of Commerce who possessed, worked on, or received from Neuman any draft letter (or language for inclusion in a letter) requesting reinstatement of a citizenship question. Defs.' Ex. 11 ¶ 8.

### C. Defendants' Supplemental Response to Plaintiffs' Interrogatory No. 1 Is Complete and Accurate.

Plaintiffs contend that Defendants failed to conduct a reasonable inquiry in response to Plaintiffs' much-litigated Interrogatory No. 1, which sought identification of the "senior Administration officials" and "other government officials" referred to in Secretary Ross's June 21, 2018 supplemental memorandum. Pls.' Mot. at 16-17. As the Court is aware, on June 21, 2018, Secretary Ross issued a supplemental memorandum that was "intended to provide further background and context regarding [his] March 26, 2018, memorandum concerning the reinstatement of a

citizenship question to the decennial census." Defs.' Ex. 18, AR 1321. As relevant here, that supplemental memorandum explained that, at or about the time of his appointment, "other senior Administration officials" had already raised the issue of reinstating a citizenship question on the census, and, thinking that reinstatement of a citizenship question could be warranted, Secretary Ross and his staff "had various discussions with other government officials" about the matter. *Id.*.

After the Secretary issued his supplemental memorandum, Plaintiffs served their Interrogatory No. 1, seeking the identities of "the 'senior Administration officials" who had raised, and the "other government officials" with whom the Secretary and his staff "had discussed the possible reinstatement of a citizenship question."' Defs.' Ex. 19 (Rog. Resq.) at 9. On October 11, 2018, Defendants provided a supplemental response to Plaintiffs' interrogatory, identifying "the individuals within the executive branch but outside the Department of Commerce who, before the December 12, 2017 Department of Justice letter … either (a) discussed the citizenship question with Secretary Ross, (b) had raised or discussed whether to reinstate a citizenship question, or (c) were consulted by Secretary Ross or his staff regarding whether the Department of Justice … would request, inclusion of a citizenship question …." Defs.' Ex. 20 (2d Supp Rog Resp.) at 2. Plaintiffs now contend that Defendants "failed to provide all information available about the other government officials" involved for two reasons. Pls.' Mot. at 17. Neither has merit.

**1.**     Plaintiffs first contend that because Uthmeier told the House Oversight Committee staff he began working on the citizenship question "likely in March or April" of 2017, Defendants improperly failed to identify individuals from the White House with whom Uthmeier communicated about it. *Id.* Evidently Plaintiffs' contention is based on the unfounded assumption that because Uthmeier began working on the citizenship question in March or April 2017, he must have communicated with White House officials at that time as well. Uthmeier's transcribed interview does not support that assumption. Instead, Uthmeier indicated that his conversations with the White House occurred after September 2017, and in fact likely after the DOJ sent its December 2017 Gary

Letter to the Census Bureau.  *See* Defs.' Ex. 17, Uthmeier House Tr. at 90 (testifying that he "would have provided updates to individuals at the White House" at some point after September 2017). Uthmeier explained that "[w]hen the DOJ letter was leaked" in December 2017, he and other Commerce Department personnel answered questions and provided briefings to the White House. *Id.* at 137.  And he further testified that he spoke to someone from the White House around February 2018.  *Id.* at 141-42.[8]  Accordingly, nothing in Uthmeier's transcribed interview suggests that Defendants' interrogatory response was inaccurate or incomplete.

Defendants explained in their responses that they construed Plaintiffs' interrogatory to inquire about conversations concerning the citizenship question that predated the Department of Justice's December 12, 2017, letter.  Defs.' Ex. 20 at 2.  Plaintiffs did not challenge that construction of the interrogatory's date scope.  Uthmeier's interview undermines Plaintiffs' speculation that he had discussions with the White House before that date.[9]  And Uthmeier has now confirmed in his declaration that he does not recall any conversations with the White House concerning the citizenship question until after DOJ sent its letter in December 2017.  Defs.' Ex. 11 ¶ 13.

**2.**     Plaintiffs also attempt to resurrect an argument that this Court already rejected at an October 24, 2018 hearing—namely, that Defendants failed to engage in a reasonable inquiry within DOJ itself for information about the identities of the officials with whom the Commerce Department consulted in 2017.  Pls.' Mot at 18.  That argument relies entirely on the assumption that Defendants "failed to collect information known to senior DOJ Justice [sic] lawyers from their work on the June 212 supplemental memo," *id.*, an assumption for which they offer no supporting evidence.  As

---

[8] Uthmeier also explained that the White House did not play a role in the decision to add a citizenship question, Defs.' Ex. 17, Uthmeier House Tr. at 92-93, a statement that Plaintiffs overlook in their motion.

[9] In a footnote, Plaintiffs also contend, without any elaboration or factual support, that Defendants should have identified Baker, Neuman, and Hofeller in their response to Plaintiffs' Interrogatory No. 1.  Pls.' Mot. at 18, n.8.  These individuals are neither "senior Administration officials" nor "other government officials," so any disclosure of consultations with them about the citizenship question was not called for by the plain language of Plaintiffs' interrogatory.

Defendants explained at the time, "[w]e have provided all facts known at the Department of Justice on this matter, period," Defs.' Ex. 21, Oct. 24, 2018 Hr'g Tr. 38:20-21; accordingly, the Court concluded that, "on the basis of those representations, I don't think there's anything further that I can or should order," *id.* at 38:22-24.  Plaintiffs provide no basis to reopen that ruling other than to assert that "Hofeller's extensive relationships with senior Republican operatives and lawyers (some of whom work in the Administration)" somehow implies that Defendants "obscured [Hofeller's] role" in the Secretary's decision.  Pls.' Mot. 18.  That accusation of guilt-by-association—Hofeller knew many Republican lawyers, therefore DOJ lawyers in this case acted to obscure his role—is irresponsible and not a valid ground for the Court to revisit its earlier ruling.

### D.     Plaintiffs Identify No Evidence that Neuman Provided False Testimony or Withheld Evidence.

Plaintiffs further contend that Neuman gave "false testimony" going to "the very heart of Plaintiffs' claims" that "obscured evidence of racially discriminatory intent."  Pls.' Mot. at 8.  Neuman, of course, was not and is not a Government employee, and the Government does not represent him in this litigation.  Neuman retained private counsel and in his deposition he routinely disregarded the Government's instructions not to answer certain questions on the basis of executive privilege.  *See* Defs.' Ex. 4, Neuman Dep. 124:15–126:23, 273:18–274:5.  In any event, Plaintiffs identify no evidence showing that Defendants knew, or had any reason to believe, that Neuman's testimony was anything but truthful, and cite no authority for the proposition that Defendants could be held responsible for testimony given by this third party.

#### 1.     Plaintiffs' claims of false testimony are unsupported.

Plaintiffs cite five supposed falsehoods in Neuman's testimony, in essence contending that he testified falsely about his interactions with Gore and Hofeller's role in Secretary Ross's decisionmaking.  Pls.' Mot. at 7–9.  But Plaintiffs' theory is viable only if one *assumes* their unsupported

assertions about Hofeller and Gore.  When those unfounded assumptions are set aside, Neuman's

sworn testimony is fully consistent with the record and does not even suggest misinformation.[10]

      **a.**      First, Plaintiffs take issue with Neuman's description of his meeting with Gore.

According to Plaintiffs, "Neuman testified that his meeting with Gore was about 'how Census

interacts with the Justice Department' and denied meeting with Gore about a 'letter from DOJ

regarding the citizenship question.'"  Pls.' Mot. 7.  But Plaintiffs selectively quote Neuman's response

to one question concerning what his meeting with Gore was "about."  *See* Defs.' Ex. 4, Neuman Dep.

273:10-21.  In fact, Neuman discussed his meeting with Gore at several points during his deposition,

making clear that he discussed a citizenship question (and a Justice Department letter to the Census

Bureau) with Gore.  *See, e.g., id.* at 110:5-8, 114:15-23, 123:20-124:3.  This was no secret; Gore himself

testified that he met with Neuman "about having a citizenship question on the census," Defs.' Ex. 5,

Gore Dep. 437:20–438:13, and Plaintiffs cited this testimony in their post-trial brief, Pls.' Post-Trial

Br. ¶ 453, ECF No. 545 ("Mr. Gore also discussed a citizenship question with Mr. Neuman with the

understanding that he was advising the Department of Commerce and Census Bureau on the issue.").

      **b.**      Second, Plaintiffs fault Neuman for not volunteering that he provided the Neuman

Letter to Gore.  Pls.' Mot. at 7.  When asked what he gave to Gore, Neuman testified: "Mainly the—

mainly a copy of the—of the letter from the Obama Administration, Justice Department, to the

Census Bureau on the issue of adding a question on the ACS."  Defs.' Ex. 4, Neuman Dep. 123:25–

124:3.  After asking some follow-up questions about that document, *id.* at 124:4–126:16, counsel

---

[10] Plaintiffs also wrongly contend that Neuman's testimony "obscured evidence of racially discriminatory intent."  Pls.' Mot. at 8.  As Plaintiffs admit, the 2015 unpublished Hofeller study simply recognized that "a switch to the use of citizen voting age population [CVAP] as the … population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," and that "[u]se of CVAP would clearly be a disadvantage for the Democrats."  Pls.' Mot. at 4–5 (quoting Pls.' Ex. 6).  Those statements are merely empirical observations about the likely political impact of using CVAP for redistricting.  The fact that CVAP redistricting could have a disparate effect on persons of Latino origin does not mean that any Federal official taking action that could be used to facilitate CVAP redistricting did so "'because of,' not merely in 'spite of,'" that possibility.  *See Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

moved on to another topic, *see id.* at 126:19–20.  Plaintiffs never asked *what else*, if anything, Neuman gave Gore beyond the Obama-era document.  That is particularly striking because by that time Plaintiffs (a) knew the Neuman Letter was "collected from John Gore" "in hard copy," Defs.' Ex. 1, at 3, and (b) in fact used the Neuman Letter as an exhibit *in Neuman's deposition* and asked other questions about it, Defs.' Ex. 4, Neuman Dep. 278:23-280:24.  Neuman's failure to inform Plaintiffs that he gave Gore a copy of the Neuman Letter is thus traceable directly to questions they declined to ask, not false testimony.  *See Martal Cosmetics, Ltd. v. Int'l Beauty Exch.*, 2007 WL 2126091, at *6–7 (E.D.N.Y. July 24, 2007) (party that fails to ask certain questions "cannot . . . be heard to complain about the consequences of their indolence").

c.      Third, Plaintiffs highlight Neuman's testimony that he "wasn't part of the drafting process of the [Gary] letter," even though he gave Gore a copy of the Neuman letter.  Pls.' Mot. at 7.  As discussed above, that statement is completely accurate.  After their first and only meeting, Gore had no further written or oral communications with Neuman, and did not rely on the Neuman Letter, or any other information he received from Neuman, in drafting the Gary letter.  Defs.' Ex. 6 ¶¶ 6-9.  Nor did he share any draft of the Gary Letter with anyone at the Department of Commerce, *id.* ¶ 12, Defs.' Ex. 11 ¶¶ 7-8; Defs.' Ex. 26 ¶ 8; Defs.' Ex. 27 ¶ 4, thus foreclosing any possibility that Neuman may have indirectly participated in the drafting process in his role as a Commerce Department advisor.

The sole supposedly contrary evidence to which Plaintiffs point is Gore's testimony that Neuman gave him the Neuman Letter, which Plaintiffs refer to in their motion as "the draft DOJ letter," Pls.' Mot. at 7—thus once more blurring the critical distinction between the separate Neuman and Gary Letters.  But the record is clear that neither the Neuman Letter nor Neuman himself in any way played a role in Gore's drafting of the Gary Letter, just as Neuman testified.

d.      Fourth, Plaintiffs quibble with Neuman's testimony about the "substance" of his conversations with Hofeller, his disclaimed reliance on Hofeller's "expertise," and his testimony that he does not know who authored the "first template" of the Neuman Letter, all because Hofeller

23

supposedly "drafted the excerpt concerning the VRA rationale … that was subsequently incorporated into the draft letter Neuman provided Mr. Gore." Pls.' Mot. at 8. Plaintiffs do not explain how any of that testimony is relevant here; whether or not Hofeller "helped ghostwrite" the Neuman Letter, *see id.*, Gore placed no reliance whatsoever on the Neuman Letter as source material for the Gary Letter. Defs. Ex. 6 ¶¶ 6-9. And as explained above, the Neuman letter bears no resemblance to the Gary Letter.

Moreover, if Plaintiffs did not receive the information they now claim was withheld, it was not for lack of opportunity. Neuman testified at length about Hofeller and their discussions regarding redistricting and the census. *See*, *e.g.*, Defs.' Ex. 4, Neuman Dep. at 33:2–10, 36:19–45:14, 51:7–53:3, 55:9–59:6, 64:18–67:14, 89:11–90:13, 100:18–101:7, 136:17–139:3, 143:13–144:6. Yet Plaintiffs never asked him whether Hofeller was involved in composing the Neuman Letter, despite Neuman's repeated references to Hofeller and an extended discussion of the draft. *See id.* (Hofeller discussions); *id.* at 278:23-280:24 (discussing the Neuman Letter). Indeed, Neuman was discussing the Neuman Letter's authorship when Plaintiffs' counsel cut him off: "I don't—I don't want—I don't—I'm not asking you to tell me about who the original author was or anything." *Id.* at 281:23–25. It is remarkable for Plaintiffs now to complain that Neuman did not reveal something that during the deposition they instructed him not to tell them, much less blame him for failing to answer questions they did not ask.

**e.** Fifth, Plaintiffs try to make something suspicious out of alleged testimony by Neuman that "Hofeller told him that adding the citizenship question would 'maximize[ ]' representation for the 'Latino community,'" even though "Hofeller had concluded the opposite in his 2015 study." Pls.' Mot. at 8 (quoting Pls.' Ex. 6). That, too, is a makeweight argument based on purported testimony having no discernible bearing on this case. Again, Gore neither relied on Hofeller's unpublished 2015 study nor was even aware of it when drafting the Gary Letter. Defs.' Ex. 6, Gore Decl. ¶¶ 4-5. Moreover, Plaintiffs have mischaracterized the testimony. Neuman did not testify that Hofeller had told him that reinstating a citizenship question would maximize Latino representation. Rather,

24

Neuman made clear that "maximizing" representation for the "Latino community" was *his* goal, not anything he gleaned from Hofeller.  *See* Defs.' Ex. 4, Neuman Dep. at 142:3–23 ("My point about maximization is my word.  I want Latino representation to be maximized.").

### 2.    Plaintiffs' claims that Neuman withheld evidence are unsupported.

Plaintiffs also accuse Neuman of "with[o]ld[ing] critical evidence" prior to his deposition, specifically, "documents reflecting his communications with Dr. Hofeller, Gore, [and] Commerce Department employees."  Pls.' Mot. at 8.  Defendants have no firsthand knowledge with which to assess the completeness of Neuman's response to Plaintiffs' subpoena, particularly insofar as his communications with Hofeller, if any, are concerned.  Neuman's private counsel collected Neuman's documents, reviewed them for responsiveness, and determined the scope of production.  *See* Pls.' Ex. 22 (correspondence from Neuman's attorney asserting objections to Plaintiffs' document requests).  Accordingly, even if there were evidence that Neuman's production was incomplete, that would not provide a basis for sanctions against Defendants.

That said, two things are clear from the record.  *First*, Plaintiffs do not and cannot point to evidence that Neuman withheld communications he had with Gore, because following their one-time meeting in October 2017, they had none.  Defs.' Ex. 6 ¶ 6.  *Second*, although Neuman "recall[ed] that others at the Department of Commerce were reviewing and offering thoughts on draft versions of" the Neuman Letter, *see* Defs.' Ex. 4, Neuman Dep. 283:12-284:10,[11] Plaintiffs never asked him if he ever received, or still had possession of, those drafts.  And Defendants previously conducted hard-copy and electronic searches broadly formulated to capture records concerning the citizenship question.  *See generally* Defs.' Ex. 12.  They located none.

---

[11] Neuman did not testify, however, that "he *worked with* Messrs. Davidson, Comstock, Uthmeier and others at the Commerce Department on versions of the draft DOJ letter."  Pls.' Mot at 8 (emphasis added).

In an abundance of caution, for purposes of responding to Plaintiffs' motion, Defendants now have conducted additional searches targeted at discovering communications of this nature. Defs.' Exs. 13-15. The searches turned up nothing. *Id.* Consistent with those search results, Uthmeier, the Commerce Department attorney who was tasked with evaluating the possible reinstatement of a citizenship question on the census, never received a draft letter from Neuman requesting reinstatement of a citizenship question, nor language for inclusion in such a letter. Defs.' Ex. 11 ¶ 6. Nor to the best of his knowledge did anyone else with whom he worked on matters involving the census and the citizenship question, including Davidson and Comstock. *Id.* ¶ 8; Defs.' Ex. 26 ¶¶ 5-6; Defs.' Ex. 27 ¶ 3. There is simply no evidence in the record of communications, much less critical communications, that Neuman improperly withheld.

Not satisfied with their baseless accusations that Neuman suppressed evidence, Plaintiffs insinuate that Defendants themselves did so, remarking that Neuman's "failure to produce" documents reflecting communications with Hofeller, Gore, or Commerce Department employees "happened only after Defendants interceded in Mr. Neuman's document production." Pls.' Mot. at 8. But as Defendants have previously explained, they simply reviewed Neuman's intended document production, after his counsel had assembled it, to determine whether any governmental privileges were implicated. *See* ECF No. 604-1, Ex. 2-E (identifying seven privileged documents, six of which appeared on prior privilege logs). They did not remove, nor ask Neuman's counsel to remove, any documents from this production except the seven privileged documents that were appropriately identified and logged. Plaintiffs provide no evidence to support their insinuations to the contrary.

### 3. Defendants neither made, nor acquiesced in, misrepresentations concerning Neuman's involvement with the Gary Letter.

Plaintiffs further accuse Defendants of misrepresenting matters when they "denied that 'Mr. Neuman provided any particularly significant consultations on the citizenship question.'" Pls.' Mot. at 9 (quoting Defendants' letter brief opposing leave to depose Neuman, ECF No. 346, at 2); *see also*

*id.* at 21-22.  Plaintiffs, however, quote only a portion of the statement with which they take issue.  In support of the position that Neuman should not be deposed in this action, Defendants' letter-brief stated, in full, that Neuman did not provide "any particularly significant consultations on the citizenship question issue *during his conversations with Commerce officials in 2017.*"  ECF No. 346 at 2 (emphasis added).  And Defendants provided a full account of Neuman's role, including his March 22, 2018, meeting with the Secretary, the PowerPoint presentation Neuman gave to the Secretary, and Neuman's communications with Commerce Department attorney Uthmeier.  *See id.* at 2–3.  Moreover, Defendants previously had produced documentation of each event.  *See* Defs.' Ex. 22, AR 8371 (meeting memo); Defs.' Ex. 23, AR 10237 (presentation); Defs.' Ex. 24, AR 11329 (email to Uthmeier).  Defendants' letter-brief therefore accurately characterized the record evidence in support of their argument.  *See* ECF No. 346 at 1–2.

If Plaintiffs mean instead to suggest that Defendants misrepresented "significant consultations on the citizenship question" that Neuman allegedly had *with Gore* their claim is doubly wrong.  First, Gore is not a "Commerce official," and so Defendants' representation is accurate.  Second, as discussed above, the record is clear that Gore's one meeting with Neuman had no significant impact (indeed, any impact) on the drafting of the Gary Letter.  At all events, Defendants *lost* the dispute at issue in that letter brief, so Plaintiffs could not have suffered any prejudice from representations made in that brief; Neuman was deposed, and Plaintiffs had a full opportunity to ask him about all of those (and any other) communications or "consultations" he might have had with the Commerce Department.

Plaintiffs' related suggestion that Uthmeier, failed to correct allegedly false testimony given by Neuman at his deposition, *see* Pls.' Mot at 9 & n.4, fares no better.  This claim rests on the premise that Neuman testified falsely by failing to identify the Neuman Letter as a document that he had provided to Gore.  *Id.*  As discussed, Neuman did not inform Plaintiffs that he had provided the Neuman Letter to Gore because they did not ask him that question.  Defendants' counsel had no

27

obligation to make their opposing counsel aware of the gaps in their questioning of Neuman. Furthermore, at least prior to this litigation, Uthmeier never received or reviewed any documents purportedly drafted or handled by Neuman, Defs.' Ex. 11, Uthmeier Decl. ¶ 6, and so there is no reason to expect that he would know whether or not Neuman had given the Neuman Letter to Gore.

*   *   *   *   *

Finally, Plaintiffs insinuate that Defendants proffered an artificially tight timetable for printing census forms and "insisted on expedited proceedings" in this litigation solely "to get away with … pervasive misconduct," Pls.' Mot. at 3, but that is manifestly not the case. Defendants' consistent position throughout this litigation has been that "the government must finalize the decennial census questionnaire for printing by the end of June 2019," Pet. for Writ of Cert. Before J. (Cert. Pet.) at 13-14, *Dep't of Commerce v. New York* (No. 18-966), because "changes to the paper questionnaire after June of 2019 would impair the Census Bureau's ability to timely administer the 2020 census." Petr's Opp. to NYIC Resp'ts' Mot. for Remand (Remand Opp.) at 19, *Dep't of Commerce v. New York* (No. 18-966)) (brackets, citations, and ellipses omitted). As the attached Census Bureau declaration explains, "due to the printer's resource and timing constraints and the terms of the contract, the latest possible date to finalize the printed decennial questionnaire without … jeopardizing the operational feasibility of the census, was the end of June. That was true then, and remains true now." Defs.' Ex. 25, Declaration of Albert E. Fontenot, Jr. ¶ 12.

## II.   PLAINTIFFS' REQUEST FOR DISCOVERY SHOULD BE DENIED.

Although maintaining that Defendants' misconduct is already "apparent," Plaintiffs seek to take extraordinary post-judgment discovery for the stated purpose of "determin[ing] the scope of potentially sanctionable conduct and the identities of the culpable parties." Pls.' Mot. at 25. Plaintiffs have not provided any genuine reason to question Defendants' conduct or good faith. And even if they had, any such question is dispelled by the additional evidence that Defendants have now provided to the Court. Discovery is therefore unwarranted, particularly because the contemplated discovery is

28

not actually calibrated to determine the scope of sanctionable conduct or the identities of responsible parties. Rather, its evident purpose is to allow Plaintiffs to continue litigating their claim that the decision to place a citizenship question on the 2020 census was motivated by racial animus. But the Supreme Court has already ruled in their favor on their pretext claim, Plaintiffs have already been awarded a permanent injunction barring the inclusion of a citizenship question on the 2020 decennial census, and Defendants already have begun to print the decennial census forms without that question. Plaintiffs can obtain no further relief by continuing to litigate allegations underlying their Equal Protection claim. There is thus no basis for continued discovery in support of that claim.

### A.    The Discovery Plaintiffs Seek Is Neither Directed Toward Nor Justified by Their Allegations of Misconduct.

The 16 bulleted subjects of inquiry that Plaintiffs refer to as "[k]ey questions" for further discovery, *see* Pls.' Mot. at 25-27, reveal the true nature of the inquiry they seek. Nearly half (bullets 1-3, 5-8) concern whether anyone at the Departments of Commerce or Justice had copies of Hofeller's 2015 study, received other information from him, or were aware of its conclusion concerning the potential impact of a citizenship question on redistricting. None of that has anything to do with the truthfulness of the witnesses who testified in this proceeding or the completeness of the Administrative Record, but everything to do with Plaintiffs' continued pursuit of an Equal Protection claim mooted by their victory on their pretext theory.

Otherwise, Plaintiffs seek to restart the engines of discovery to pursue lines of inquiry that would serve no purpose. For example, another five of their "[k]ey questions" (bullets 9-13), *see* Pls.' Mot. at 25-27, pursue inquiries about the Neuman Letter to which we already have the answers. For instance, "Why weren't [other versions of the Neuman Letter] included in the Administrative Record or identified on a privilege log?" *Id.* at 26. Because, as discussed above, repeated searches for such documents have revealed that there are none. "Why didn't DOJ disclose on its privilege log that the draft DOJ letter came from Neuman?" Pls.' Mot. at 26. Because, as also discussed, the Neuman

Letter was neither a draft of the Gary Letter nor used in any way to prepare the Gary Letter.  And why didn't Defendants identify Neuman, Hofeller, or Baker in their responses to Plaintiffs' Interrogatory No. 1?  *See* Pls.' Mot. at 26 (bullet 15).  Because, as addressed earlier, these individuals were not "senior Administration officials" or "other government officials" that Plaintiffs asked Defendants to identify.

The specific categories of discovery that Plaintiffs seek also make stark the reality that additional discovery would largely be pointless except to continue litigation over their moot Equal Protection claim.  Plaintiffs seek, for example, to re-depose Neuman and Gore, and to depose Davidson and Uthmeier, to ascertain whether they were "conduit[s] of Hofeller's views to Gore's request or [Secretary] Ross's memo."  Pls.' Mot. at 27-28.[12]  They seek to conduct further third-party discovery against Dale Oldham (whom they describe as Hofeller's "associate") and another, unidentified person, to fish for "additional Hofeller communications" that they believe Hofeller may have exchanged with Neuman after October 2016.  *Id.* at 27.  Such requests are aimed solely at unearthing hoped-for evidence concerning Hofeller's "role," to support the theory of racial animus underlying their (mooted) Equal Protection claim.

Plaintiffs also seek documents "not produced in response to their earlier requests, in particular (i) Neuman's communications with "Davidson, Uthmeier, Jones, Gore, or other Administration personnel," (ii) "communications between [Mr.] Gore and Commerce or White House officials," and (iii) pertinent e-mails sent or received using personal accounts.  Pls.' Mot. at. 27.  But the testimonial

---

[12] Plaintiffs' request to depose Davidson and Uthmeier is particularly problematic, as both acted as counsel for Defendants in connection with the decision to reinstate the citizenship question as well as the litigation of this case.  "[D]epositions of opposing counsel are disfavored," *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 185 (2d Cir. 1991), and Plaintiffs have not made the requisite showing of need to depose either of these individuals, who, as the evidence shows, have no connection with Hofeller and his 2015 study, *see In re Subpoena Issued to Dennis Freidman*, 350 F.3d 65, 72 (2d Cir. 2003) (enumerating considerations as to whether an attorney should be deposed).

evidence and search results that Defendants have presented to the Court already reveal that there are no such additional communications to be produced.  *See supra* at 11-18.

In addition, Plaintiffs seek to compel the production of a slew of documents and information that Defendants have withheld on grounds of privilege, which they sort into four major categories. Pls.' Mot. at 28.  The first and fourth categories are expressly targeted at the process, in Plaintiffs' words, of "contriving" and "furthering" the "VRA 'distraction.'"  *Id.*  The third category similarly seeks numerous privileged communications to which Jones was a party, a request that Plaintiffs consider justified by her "long association" with Hofeller.  *Id.* at 28 & Pls.' Ex. 47.  The evident point of these requests, like others, is to cast about for evidence of a "role" that Plaintiffs surmise Hofeller must have played in the Secretary's decision-making process, which Plaintiffs consider evidence of discriminatory motive.  But Plaintiffs' curiosity about that process is not a basis for further discovery, as they have already prevailed on their claim that the VRA-enforcement rationale for reinstating the citizenship question was a pretext.  Finally, the second category of privileged materials seeks drafts of the Gary Letter, *id.*, but this Court already has reviewed certain of those drafts *in camera*, and upheld Defendants' assertion of privilege over these documents.  *See* ECF No. 364.  Plaintiffs offer no justification for revisiting that decision now.  Although they claim that the drafts of the Gary Letter should be produced because Defendants have denied that Hofeller or Neuman contributed to the letter, Pls.' Mot. at 28, Gore has confirmed they did not so contribute, *see supra* at 9-10.  Plaintiffs' unsubstantiated (and now disproven) suspicions to the contrary are not a basis for overturning Defendants' legitimate claim of privilege.

## B.    Plaintiffs' Claims of Wrongdoing Do Not Overcome Defendants' Privileges.

Plaintiffs maintain that they have "overcome" Defendants' assertions of privilege over the foregoing categories of documents, Pls.' Mot. at 29-31, but their arguments are meritless.

First, Plaintiffs argue that Defendants have put their deliberative process "directly at issue" by "falsely contending" that the "sole stated reason" for adding the citizenship question was to promote

VRA enforcement and by denying that Hofeller and Neuman played any role in the process.  Pls.'

Mot. at 29.  But the relevant question is not whether the VRA-enforcement rationale was a pretext—

that issue has been decided; and it cannot be said that Defendants engaged in "misconduct" simply

because they defended a decision that a closely divided Supreme Court held was "pretextual."  *U.S.

Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574-76 (2019).   Rather, the question is whether

Defendants have improperly concealed evidence of a "role" played by Hofeller or his 2015 study in

the decision to reinstate a citizenship question.  Plaintiffs have made no showing, nor could they, that

Defendants have attempted to use the deliberative process privilege "as both a shield and a sword"

on that issue.  *Id.* (quoting *Allstate Ins. Co. v. Serio*, 2000 WL 554221, at *11 (S.D.N.Y. May 5, 2000)).

The same flaw underlies Plaintiffs' second argument, that the deliberative process privilege is

inapplicable when "government misconduct has occurred."  Pls.' Mot. at 29 (quoting *In re Sealed Case*,

121 F.3d 729, 746 (D.C. Cir. 1997) (dicta)).   The alleged misconduct Plaintiffs are supposedly seeking

to prove now concerns Defendants' "process" of defending this case rather than the process by which

the Commerce Department decided to reinstate a citizenship question.  None of the documents over

which Defendants have asserted the deliberative process privilege concerns the process by which

Defendants reached litigation decisions in this case.  Nor have Plaintiffs given "any reason to believe

government misconduct [has] occurred" in that process.   *In re Sealed Case*, 121 F.3d at 746.

Third, Plaintiffs assert that they need Defendants' fact work product because it "may

demonstrate the extent to which senior officials at the Commerce and Justice Departments

orchestrated or abetted the Commerce Department's perpetuation of a false rationale" for the

citizenship question.  Pls.' Mot. at 30.  Such speculation does not constitute the "highly persuasive

showing of need," *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 532, n.6 (S.D.N.Y.

2015), required to overcome the work product protection, particularly where Plaintiffs no longer have

any need of evidence to support their claim of pretext, and have made no showing (nor could they)

that Defendants' work product contains evidence of sanctionable misconduct.

Finally, Plaintiffs mistakenly claim that Defendants' attorney-client privilege and work product assertions are overcome by the fraud exception.  Pls.' Mot. at 30-31.  To establish that materials are subject to the crime-fraud exception, Plaintiffs must establish on a document-by-document basis that: (1) "the client communication or attorney work product in question was *itself* in furtherance of the crime or fraud;" and (2) there is "probable cause to believe that the particular communication with counsel or attorney work product was *intended* in some way to facilitate or to conceal the criminal activity."  *In re Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) (emphasis in original).  Plaintiffs make no serious effort to carry this burden, however, beyond their blunderbuss argument that the relevant documents "were all in furtherance of a fraud—the 'contriv[ing] of the 'distraction' of the false VRA rationale."  Pls.' Mot. at 30.  That is insufficient.  *See Conservation Force v. Jewell*, 66 F. Supp. 3d 46, 64 (D.D.C. 2014) (agency's refusal to disclose the alleged true reasons for its decision do not constitute a fraud that vitiates the privilege), *aff'd*, 2015 WL 9309920 (D.C. Cir. Dec. 4, 2015).

## III.    THE SANCTIONS PLAINTIFFS PROPOSE ARE UNWARRANTED

Like their discovery requests, Plaintiffs' desired "sanctions" betray their true interest in continuing to litigate their Equal Protection claim, rather than remedying alleged litigation misconduct.

**A.**    First, Plaintiffs ask this Court to make "findings" to provide "a full accounting of what happened," Pls.' Mot. at 32, but never explain what remedial purpose this would serve.  Regardless of any new "findings" by this Court, the Supreme Court has already held that Plaintiffs have established pretext, and they have obtained all the relief they were seeking in the form of a permanent injunction prohibiting inclusion of a citizenship question on the 2020 decennial census questionnaire.  If Plaintiffs envision that this "full accounting" will result in findings by this Court that Government officials involved in the decision to reinstate a citizenship question were motivated by discriminatory animus (as their intended discovery plan suggests), those findings likewise would not change the fact that Plaintiffs have prevailed in this litigation and received all of the relief they sought.  They would amount to no more than an advisory opinion.  *In re Motors Liquidation Co.*, 829 F.3d 135, 167-68 (2d Cir. 2016)

("'The oldest and most consistent thread in the federal law of justiciability is that federal courts will not give advisory opinions.'")(citation omitted).  Indeed, Plaintiffs have not identified a single case in which a federal court issued findings as a "sanction" in and of themselves rather than as the predicate to taking some other remedial or punitive action against an offending party.

**B.**      Next, Plaintiffs indicate that they intend to seek "waiver of privilege" as a sanction, Pls.' Mot. at 32-33—a proposal even more novel than their request for "findings."  Even setting aside that this argument lacks factual support, Plaintiffs are not seeking to overrule Defendants' claims of privilege as a means of achieving some other remedial objective.  Rather, Plaintiffs seek the disclosure of these documents—and the exposure of Defendants' confidential attorney-client and internal deliberative communications—as an end in itself, to reveal additional evidence they believe will support a pretext claim on which  they have already prevailed.  In this respect, Plaintiffs' request for "waiver of privilege" is little different than their request for "findings," and no more justifiable.[13]

Finally, Plaintiffs indicate that they seek "monetary sanctions and awards of attorney's fees and costs."  Pls.' Mot. at 33-34.  There are at least three problems with this request.  First, sovereign immunity bars awards of attorney's fees against the Government, unless authorized by an express Congressional waiver of sovereign immunity.  *See, e.g.*, *United States v. Stein*, 435 F. Supp. 2d 330, 374-75 (S.D.N.Y. 2006) (absent an express legislative waiver, sovereign immunity barred exercise of court's supervisory powers to order Government to pay defendant's attorney's fees and costs as a sanction

---

[13] Plaintiffs cite to only two cases as purported support for a "waiver" sanction: *In re Fannie Mae Sec. Litig.*, 552 F.3d 814 (D.C. Cir. 2009), and *United States v. Phillip Morris Inc.*, 347 F.3d 951 (D.C. Cir. 2003).  Neither of these cases support Plaintiffs' argument.  In *In re Fannie Mae*, the D.C. Circuit affirmed the district court's sanction requiring a litigant that had not submitted a timely privilege log to produce certain documents withheld on the basis of privilege to opposing counsel, as a means of "mov[ing] the [d]iscovery process forward," while allowing for recovery of any documents found to be privileged.  552 F.3d at 823.  *Phillip Morris* is even less apt.  There, the issue was whether the defendant had waived the attorney-client privilege over a document it had failed to identify on a privilege log.  347 F.3d at 954.  The D.C. Circuit remanded to allow the district court to determine whether any of defendant's scope objections covered the document; whether waiver was an appropriate sanction if not; and whether, if an objection did apply, it should be overruled and defendant should be given the opportunity to identify the document on a privilege log.  *Id.* at 955.

for prosecutorial misconduct), *aff'd*, 541 F.3d 130 (2d Cir. 2008); *see also United States v. Droganes*, 728 F.3d 580, 590 (6th Cir. 2013); *United States v. Horn*, 29 F.3d 754, 764-67 (1st Cir. 1994); *United States v. Callanan*, 582 F. Supp. 2d 1125, 1139 (N.D. Iowa 2008); *Alexander v. FBI*, 541 F. Supp. 2d 274, 300-02 (D.D.C. 2008).  Second, the NYIC Plaintiffs and Defendants have reached a settlement resolving "[Plaintiffs'] claims for any fees, cost, and expenses relating to this action," *see* ECF No. 647, thus bringing to a close the final remaining issue related to the merits of this case.  Plaintiffs should not be awarded, as a sanction, a double recovery of fees and costs for the same work that is the subject of the parties' fees settlement.  *See United States v. Gavilan Joint Community Coll. Dist.*, 849 F.2d 1246 (9th Cir. 1988) (holding, under Rule 11, that no attorney's fees should be awarded as a sanction because EAJA provided a mechanism through which the injured party could seek attorney's fees). Finally, for all the reasons explained herein, Plaintiffs have come nowhere close to making the clear showing of misconduct required to authorize an award of attorney's fees and costs.

## CONCLUSION

Plaintiffs' motion for sanctions should be denied.

Dated:  August 3, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

*/s/ James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel
Civil Division, Federal Programs Branch
United States Department of Justice
P.O. Box 883
Washington, D.C.  20044
Telephone:  (202) 514-3358
Fax:          (202) 616-8470
E-mail:      james.gilligan@usdoj.gov

*Counsel for Defendants*

35

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

                Plaintiffs,

      v.                          No. 18-cv-02921

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

                Defendants.

**<u>EXHIBIT INDEX</u>**

1. Email from K. Bailey to J. Friedman (Oct. 23, 2018)

2. Neuman Letter

3. Gary Letter

4. Deposition of Mark Neuman Excerpts

5. Deposition of John Gore Excerpts

6. Declaration of John Gore

7. Email from J. Zadrozny to B. Lenihan (Feb. 21, 2018)

8. Email from J. Uthmeier to J. Zadrozny (Jan. 31, 2018)

9. Email from J. Uthmeier to G. Dory (Mar. 28, 2018)

10. Email from B. Robinson to J. Uthmeier (Apr. 20, 2017)

11. Declaration of James Uthmeier

12. Declaration of Michael A. Cannon

13. Supplemental Declaration of Michael A. Cannon

14. Declaration of Jean McKenzie

15. Declaration of Terri Ware

16. Declaration of Christa Jones

17. Interview of J. Uthmeier, Comm. on Oversight & Reform, U.S. House of Reps. (June 11, 2019) Excerpts

18. AR 1321

19. Plaintiffs' First Set of Requests for Expedited Production of Documents and First Set of Interrogatory to Defendants United States Department of Commerce and Wilbur Ross

20. Defendants' Supplemental Responses to Plaintiffs' First Set of Interrogatories to Defendants United States Department of Commerce and Wilbur Ross

21. Oct. 24, 2018 Hr'g Tr. Excerpts

22. AR 8371

23. AR 10237

24. AR 11329

25. Declaration of Albert E. Fontenot

26. Declaration of Peter Davidson

27. Declaration of Earl W. Comstock

# Exhibit 1

| | |
|---|---|
| **From:** | Bailey, Kate (CIV) |
| **To:** | Freedman, John A.; Federighi, Carol (CIV); Ehrlich, Stephen (CIV); Coyle, Garrett (CIV); Wells, Carlotta (CIV) |
| **Cc:** | DHo@aclu.org; Cc: Khan, Sania; asenteno@MALDEF.org; Todd Grabarsky; Raines, Chase; Thomas, Tina; Goldstein, Elena; Colangelo, Matthew; Gabrielle.Boutin@doj.ca.gov; Duraiswamy, Shankar; Matthew Wise; Rosenberg, Ezra; "Case, Andrew" |
| **Subject:** | RE: Remaining discovery productions |
| **Date:** | Tuesday, October 23, 2018 5:42:00 PM |
| **Attachments:** | DOJ00039722.pdf |
| | DOJ00039725.pdf |
| | DOJ00039728.pdf |
| | DOJ00039730.pdf |
| | DOJ00039733.pdf |
| | DOJ00039735.pdf |
| | DOJ00039736.pdf |
| | DOJ00039740.pdf |
| | DOJ00039743.pdf |
| | DOJ00039745.pdf |
| | DOJ00039747.pdf |
| | DOJ00039748.pdf |
| | DOJ00039749.pdf |
| | DOJ00039753.pdf |
| | DOJ00039756.pdf |
| | DOJ00039758.pdf |
| | DOJ00039759.pdf |
| | DOJ00039760.pdf |
| | DOJ00039764.pdf |
| | DOJ00129991.pdf |
| | Def."s R&Os to Census RFAs FINAL.pdf |
| | DOJ00129977.pdf |

Counsel,

Attached please find:

- Corrected versions of the documents we produced to you on October 9th in response to Judge Furman's order (these now contain both old and new bates numbers, for your reference)
- DOJ 15199 and DOJ 15200, which, as referenced in my email below, we have determined we can produce in full (the attachments show both old and new bates numbers, for your reference)
- Defendants' responses to NYIC Plaintiffs' requests for admission to Census

Regarding the full transcripts from the CBAMS focus groups, as promised, here is Dr. Abowd's explanation as to why the transcripts themselves cannot be subject to disclosure:

> The transcripts from the 42 focus groups conducted as a part of the 2018 Census Barriers, Attitudes and
> Motivators Study were collected under the authority of Title 13 of the U.S. Code and are protected under Sections
> 9(a)(3) and 214 in exactly the same manner as the individual response data from a survey or
> census. As such, their release is subject to the approval of the Disclosure Review Board under the
> supervision of the Data Stewardship Executive Policy Committee, chaired by the Chief Operating Officer

at the Census Bureau.

The OMB-approved Consent Form for these focus groups said:

**Are my answers confidential?**
Yes. The U.S. Census Bureau is required by law to protect your information (13 U.S.C. § 9 and
§ 214). The Census Bureau is not permitted to publicly release your responses in a way that could
identify you or your household.
https://www.reginfo.gov/public/do/DownloadDocument?objectID=79530702

The DRB has an approved protocol for reviewing and releasing redacted transcript summaries, after-action
reports, and scientific articles based on the analysis of focus group transcripts. It does not have
any approved protocol for releasing full transcripts. Because current research shows that there is no
reliable collection of algorithms for providing acceptable disclosure avoidance in the full transcripts,
there is no plan to approve a protocol that would allow the DRB to release full transcripts.

Thank you,

**Kate Bailey**
Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7214
Washington, D.C. 20530
202.514.9239 | kate.bailey@usdoj.gov

---

**From:** Bailey, Kate (CIV)
**Sent:** Tuesday, October 23, 2018 3:23 PM
**To:** Freedman, John A. <John.Freedman@arnoldporter.com>; Federighi, Carol (CIV) <CFederig@CIV.USDOJ.GOV>; Ehrlich, Stephen (CIV) <sehrlich@CIV.USDOJ.GOV>; Coyle, Garrett (CIV) <gcoyle@CIV.USDOJ.GOV>; Wells, Carlotta (CIV) <CWells@CIV.USDOJ.GOV>
**Cc:** DHo@aclu.org; Cc: Khan, Sania <Sania.Khan@ag.ny.gov>; asenteno@MALDEF.org; Todd Grabarsky <Todd.Grabarsky@doj.ca.gov>; Raines, Chase <Chase.Raines@arnoldporter.com>; Thomas, Tina <TThomas@cov.com>; Goldstein, Elena <Elena.Goldstein@ag.ny.gov>; Colangelo, Matthew <Matthew.Colangelo@ag.ny.gov>; Gabrielle.Boutin@doj.ca.gov; Duraiswamy, Shankar <sduraiswamy@cov.com>; Matthew Wise <Matthew.Wise@doj.ca.gov>; Rosenberg, Ezra

<erosenberg@lawyerscommittee.org>; 'Case, Andrew' <ACase@manatt.com>
**Subject:** Remaining discovery productions

Counsel,

In accordance with Judge Furman's order at last week's status conference, I write to provide most of the outstanding written discovery productions.

- Today we overnighted materials to the NYAG's offices and sent the same materials by courier to Arnold and Porter's DC offices.
  - o Production letters for DOJ Productions 6, 7, and 8 are attached, as well as the accompanying privilege logs.
  - o Production 7 is on an encrypted flash drive because it was too large to fit on CDs. The password for the drive is ▮▮▮▮▮▮▮▮▮▮, and instructions for use are included in the box. Kindly return the flash drives to us after you've copied the files, please. The remaining productions are on CDs, and the password is ▮▮▮▮▮▮▮
  - o Production 7 includes several "dead," or missing bates numbers, due to an inadvertent error on our end. The production was too large for us to re-run once we discovered those errors, so please understand that any missing bates numbers you observe in Prod007 are intentional.
  - o In response to Dale Ho's email of 10/7, we previously produced 115 documents without bates numbers. Today we have also transmitted bates numbered versions of these documents. We did not previously address DOJ 15200, but we have determined that that document can be released in full. It will be provided by separate email later today.
  - o In response to the DOJ doc issues raised in John Freedman's email of October 5th at 8:32 am, you requested that we produce email chains represented at DOJ 14907, 14922, 14996, 15002, 15006, 30720, 30723 and 30725. We have determined that we can release this chain in full, and these documents are attached to this email.
  - o You requested more information about DOJ 15197, 15198, 15199, and 15200. These documents were in hard copy, and therefore no metadata exists for author, recipient, date, or time. These materials were collected from John Gore. As noted above, we have determined that DOJ 15200 can be released in full. In addition, we have determined that DOJ 15199 can be released in full, and will be coming later this afternoon. As noted in the privilege log entry for DOJ 15198, it is a copy of the Uthmeier memo provided to Gore, and DOJ 15198 is a note that accompanied DOJ 15197. These documents will not be released.
  - o Also attached are the production letter and privilege log for Commerce Production 6.
  - o On Thursday, 10/8, Elena wrote to us requesting the basis for our request to claw back two documents. The replacement documents also are attached. Information has been redacted as privileged in these two documents for the reasons set forth in the privilege log for the same redactions in COM_DIS00014369, Row 114.
- Also attached to this email are Defendants' responses to NYIC Plaintiffs' RFAs to the Department of Commerce and responses to the Third Interrogatories to all Defendants. Responses to NYIC Plaintiffs' RFAs to Census will be coming later today.

- By separate email momentarily, I will be providing you re-produced versions of the documents we produced on October 9th in response to Judge Furman's order—the new versions have both the original and new bates numbers.
- Sahra Park-Su is available for deposition this Thursday. David Langdon is available this Friday and, per my earlier email, John Gore's earliest date of availability also is Friday.

**Kate Bailey**
Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7214
Washington, D.C. 20530
202.514.9239 | kate.bailey@usdoj.gov

Exhibit 2

John H. Thompson
Director,
Bureau of the Census
US Department of Commerce
Washington, DC 20233


Dear Mr Thompson:

We are writing to formally request the reinstatement of a question on the 2020
Census  questionnaire relating to citizenship.   The Department seeks to reinstate
the question because of recent Court decisions _____ where courts
required enumerated  (block level) data related to voting age population.  This data
can only be provided based on enumerated (Census), rather than sample (ACS)
data.

We are aware that the 2010 Census was the first decennial census since the 1880
Census without a question about citizenship.  We also note that the American
Community Survey, which replaced the "long form" version of the questionnaire in
the decennial 2000 Census, asks a question about citizenship.  We are not aware
that of any serious concerns relating to the presence of a citizenship question on
the ACS.

We understand that the Bureau personnel may believe that ACS data on
citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be
aware that two recent Court cases have underscored that ACS data is not viable
and/or sufficient for purposes of redistricting.  Two important citations from these
cases are as follows:

_____

We note that in these two cases, one in 2006 and one in 2009, courts reviewing
compliance with requirements of the Voting Rights Act and its application in
legislative redistricting, have required Latino voting districts to contain 50% + 1 of
"Citizen Voting Age Population (or CVAP).  It is clear that full compliance with
these Federal Court decisions will require block level data than can only be
secured by a mandatory question in the 2020 enumeration.  Our understanding is
that data on citizenship is specifically required to ensure that the Latino
community achieves full representation in redistricting.

We accordingly request that the Bureau prepare, without delay, the appropriate
question on citizenship for the 2020 Census, and submit this addition for 2020



EXHIBIT

18

10-28-18          BSc

Census for OMB Review and other appropriate notifications.

Please let me know if you have any questions about his letter or wish to discuss this subject.  I can be reached at (202) ------- or _____@doj.gov.

Sincerely yours,


Attachment.


Cc:

Exhibit 3



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

**DEC 1 2 2017**

<u>**VIA CERTIFIED RETURN RECEIPT**</u>
*7014 2120 0000 8064 4964*

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's civil rights laws and to free and fair elections for all Americans. In furtherance of that commitment, I write on behalf of the Department to formally request that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in the so-called "long form" census. This data is critical to the Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting. To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected. As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for collecting that data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by state and local jurisdictions engaged in redistricting, which can occur when a racial group is improperly deprived of a single-member district in which it could form a majority. See *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that, where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the proper metric for determining whether a racial group could constitute a majority in a single-member district. See, e.g., *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023–24 (5th Cir. 2009); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Negrn v. City of Miami Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); see also *LULAC v. Perry*, 548 U.S. 399, 423–442 (2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation ... in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos*, 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide* at 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22, 2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

• Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

2

DEC-14-2017  17:52                                                                                    P.04/04

- Because the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

- The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunity Survey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

- Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia,* to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

3

Exhibit 4

Page 1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
2

3    ROBYN KRAVITZ, et al.,   ) Civil Action No.
                              ) 8:18-cv-01041-GJH
4             Plaintiffs,     )
                              ) Hon. George J. Hazel
5    vs.                      )
                              )
6    U.S DEPARTMENT OF        )
     COMMERCE, et al.,        )
7                             )
              Defendants.     )
8    _____)
                              )
9    LA UNION DEL PUEBLO      ) Civil Action No.
     ENTERO; et al.,          ) 8:18-cv-01570-GJH
10                            )
              Plaintiffs,     ) Hon. George J. Hazel
11                            )
     vs.                      )
12                            )
     WILBUR L. ROSS, sued in  )
13   his official capacity as )
     U.S. Secretary of        )
14   Commerce, et al.,        )
                              )
15            Defendants.     )
16

17         VIDEOTAPED DEPOSITION OF A. MARK NEUMAN
18               Taken on behalf of Plaintiffs
19                    October 28, 2018
20     (Starting time of the deposition:  12:22 p.m.)
21

22              Veritext Legal Solutions
                 Mid-Atlantic Region
                1250 Eye Street NW - Suite 350
23             Washington, D.C.  20005
24

25

Page 2

```
 1              I N D E X   O F   E X A M I N A T I O N
 2
 3                                                          Page
 4    Questions by Mr. Duraiswamy ....................    8
 5
 6    INDEX  OF  EXHIBITS
 7    EXHIBIT      DESCRIPTION                          PAGE
 8    For the Defendant:
 9    Exhibit 1   Washington Post Article                86
      Exhibit 2   Excerpts of Draft of Executive Order   86
10    Exhibit 3   Document Excerpt                        86
      Exhibit 4   Ross Calendar Excerpts                 174
11    Exhibit 5   E-Mail                                 186
      Exhibit 6   LULAC Link                             197
12    Exhibit 7   E-Mail                                 107
      Exhibit 8   E-Mail Exchange                        200
13    Exhibit 9   Summary of Supreme Court Cases         208
      Exhibit 10  E-Mail Exchange                        211
14    Exhibit 11  E-Mail Exchange                        221
      Exhibit 12  E-Mail Exchange                        231
15    Exhibit 13  E-Mail                                 237
      Exhibit 14  E-Mail                                 241
16    Exhibit 15  Compilation of Documents               260
      Exhibit 16  E-Mail Exchange                        267
17    Exhibit 17  E-Mail Exchange                        272
      Exhibit 18  Draft of Letter                        278
18    Exhibit 19  Document Subpoena                       285
      Exhibit 20  E-Mail Exchange                        309
19    Exhibit 21  Call Agenda                            309
      Exhibit 22  E-Mail                                 309
20    Exhibit 23  July 28, 2017 Presentation             337
      Exhibit 24  Memo                                   338
21
              (The original exhibits were retained by the
22    court reporter, to be attached to Mr. Duraiswamy's
      transcript.)
23
24
25
```

Page 3

1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
2
3    ROBYN KRAVITZ, et al.,  ) Civil Action No.
                             ) 8:18-cv-01041-GJH
4            Plaintiffs,     )
                             ) Hon. George J. Hazel
5    vs.                     )
                             )
6    U.S DEPARTMENT OF       )
     COMMERCE, et al.,       )
7                            )
             Defendants.     )
8    _____)
                             )
9    LA UNION DEL PUEBLO     ) Civil Action No.
     ENTERO; et al.,         ) 8:18-cv-01570-GJH
10                           )
             Plaintiffs,     ) Hon. George J. Hazel
11                           )
     vs.                     )
12                           )
     WILBUR L. ROSS, sued in )
13   his official capacity as)
     U.S. Secretary of       )
14   Commerce, et al.,       )
                             )
15           Defendants.     )
16
17           DEPOSITION OF WITNESS, A. MARK NEUMAN,
18   produced, sworn, and examined on the 28th day of
19   October, 2018, between the hours of nine o'clock in
20   the forenoon and six o'clock in the evening of that
21   day, at the offices of Feldman, Wasser, Draper & Cox,
22   1307 South Seventh Street, Springfield, Illinois
23   62705, before BRENDA ORSBORN, a Certified Shorthand
24   Reporter within and for the State of Illinois, in a
25   certain cause now pending before United States

Page 4

1    District Court for the District of Maryland, wherein

2    Robyn Kravitz, et al. are the Plaintiffs and U. S.

3    Department of Commerce, et al. are the Defendants, and

4    La Union Del Pueblo Entero, et al. are the Plaintiffs

5    and Wilbur L. Ross, in his official capacity as U.S.

6    Secretary of Commerce, et al. are the Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    A P P E A R A N C E S
 2            For the Plaintiffs:
 3            Mr. Shankar Duraiswamy
              Covington & Burling LLP
 4            850 Tenth Street, NW
              Washington, D.C
 5            (202) 622-5273
              sduraiswamy@cov.com
 6
 7
 8            For Los Angeles Unified School District:
 9            Mr. Keith A. Yeomans (via phone)
              Dannis Woliver Kelley
10            115 Pine Street, Suite 500
              Long Beach, California 90802
11            (562) 366-8500
              kyeomans@DWKesq.com
12
13            For the County of Los Angeles:
14            Mr. David I. Holtzman (via phone)
              Holland & Knight LLP
15            50 California Street, Suite 2800
              San Francisco, California 94111
16            (415) 743-6909
              david.holtzman@hklaw.com
17
18
              For La Union del Pueblo Entero:
19
              Ms. Julia A. Gomez (via phone)
20            MALDEF
              634 South Spring Street, 11th Floor
21            Los Angeles, CA 90014
              (213) 629-2512, Ext. 109
22            jgomez@maldef.org
23
24
25
```

Page 6

```
 1              APPEARANCES CONTINUED:
 2              For the State of California:
 3              Ms. Gabrielle D. Boutin
                Office of the Attorney General
 4              of the State of California
                1300 I Street, Suite 125
 5              Sacramento, California 94244
                gabrielle.boutin@doj.ca.gov
 6
 7              For the State of New York:
 8              Mr. Alex Finkelstein
                Volunteer Assistant Attorney General
 9              Civil Rights Bureau
                Office of the NYS Attorney General
10              28 Liberty Street, 20th Floor
                New York, New York 10005
11              (212) 416-6129
                alex.finkelstein@ag.ny.gov
12
13              For the New York Immigration Coalition:
14              Ms. Sarah E. Brannon
                ACLU Foundation 915
15              15th Street NW
                Washington, D.C. 20005
16              (212) 549-2500
                sbrannon@aclu.org
17
18              For the Defendant United States:
19              Mr. Brad P. Rosenberg
                U.S. Department of Justice
20              Civil Division, Federal Program Branch
                1100 L Street, N.W.
21              Washington, D.C. 20005
                (202) 514-3374
22              brad.rosenberg@usdoj.gov
23
24
25
```

Page 7

```
 1            APPEARANCES CONTINUED:
 2
              For the Defendant Department of Commerce:
 3
 4            Mr. Howard W. Feldman
 5            Mr. David M.S. Dewhirst
              Mr. James W. Uthmeier
 6            United States Department of Commerce
              Office of the General Counsel
 7            1401 Constitution Avenue, NW
              Washington, D.C. 20230
 8            (202) 258-5887
              ddewhirst@doc.gov
 9            juthmeier@doc.gov
10
11            For the Witness:
12            Mr. Howard W. Feldman
              Mr. Stanley N. Wasser
13            Feldman, Wasser, Draper & Cox
              1307 South Seventh Street
14            Springfield, Illinois 62705
              (217) 514-3403
15            hfeldman@feldman-wasser.com
              swasser@feldman-wasser.com
16
17            Also Present:  Mr. Thomas R. Lamont
18
19            The Court Reporter
20            Brenda Orsborn, RPR/CSR/CCR
              Missouri CCR No. 914
21            Illinois CSR No. 084-003460
              Veritext Legal Solutions
22            515 Olive Street, Suite 300
              St. Louis, Missouri 63101
23            (888) 391-3376
24            The Videographer:
25            Mr. Tim Perry
```

Page 33

1   knew.

2        Q.   (By Mr. Duraiswamy) That's fair.  So you

3   mentioned a few minutes ago that the citizenship

4   question was something that came up during the

5   transition.  Who did you talk to about a potential

6   citizenship or immigration question on the 2020 census

7   during the transition?

8        A.   I'm sure I would have talked to people in

9   the Commerce team, and I'm sure -- and I'm sure Tom

10  Hoffler would have talked to me.

11       Q.   When you say "people on the Commerce team,"

12  can you be more specific?

13       A.   The people that I mentioned before.

14       Q.   Okay.  So you --

15       A.   Willie Gaynor.

16       Q.   You would have talked to Mr. Gaynor and

17  Mr. -- is it Rokeath?

18       A.   Rokeach.

19       Q.   Rokeach, and Mr. Washburn about --

20       A.   I'm not sure about Washburn.  Washburn

21  wasn't there on a daily basis.  Willie Gaynor was

22  there on a daily basis.

23       Q.   Who else, other than Mr. Gaynor and Mr.

24  Rokeach, would you have talked to about that issue?

25       A.   I'm not -- those -- those are people I'm

Page 36

1   you know.

2        A.   I don't have -- I -- I never really sort of

3   knew the total number of people who were on the

4   Commerce transition.  Because, again, there were

5   people who showed up at meetings, and I didn't see

6   very much, and there were other people that -- the

7   core group of people, when we were writing a Commerce

8   agency action plan, sitting around the table, David

9   Bohigian, Willie Gaynor, David Rokeach.

10       Q.   (By Mr. Duraiswamy) Anyone else that you

11  remember on the Commerce team, other than those three?

12       A.   Loretta Green was sort of the -- you know,

13  like coordinating -- coordinating appointments for

14  Ray, you know, arranging when Ray would show up.

15  Again, that -- that was really the core group of

16  people on the agency action plan.  And I wasn't always

17  there.  So like, you know, there -- there was a lot of

18  time that I wasn't even in town.

19       Q.   Who is Tom Hoffler?

20       A.   Tom Hoffler was a person who was known in

21  the redistricting community.  He passed away in -- in

22  August.

23       Q.   Was he a member of the transition?

24       A.   No, he was not.

25       Q.   What was the context in which you talked to

Page 37

1    him about the citizenship question during the

2    transition?

3        A.   He would have told me what views of members

4    of Congress would have been on this issue.

5        Q.   Did he reach out to you to have that

6    conversation, or did you reach out to him?

7        A.   I can't remember which it was, but, you

8    know, I've known him for 25 years.

9        Q.   How do you know him?

10       A.   I knew him when he was working at the NRCC,

11   and I knew him when he was working at the Department

12   of Agriculture.

13       Q.   Could you spell his last name for me?

14       A.   It's H-O-F-F-L-E-R, I think.  Thomas

15   Hoffler.

16       Q.   How many times did you talk to him about the

17   citizenship question during the transition?

18       A.   I don't know how many times.

19       Q.   More than five?  Less than five?

20       A.   It certainly would be less than ten.  It

21   would -- probably less than five during the

22   transition.

23       Q.   Why were you talking to him about the views

24   of members of Congress regarding the citizenship

25   question?

1       A.   The goal of the transition is not to sort of

2    say, "This is what you should do.  This is what you

3    shouldn't do."  The goal of the -- one of the most

4    important things that Willie Gaynor and others wanted

5    us to do is reach out to people who would be pushing

6    different things related to Commerce and make sure

7    that we had an understanding if someone was going to

8    introduce legislation on NOAA, that we would have a

9    forecast of likely proposals, likely interests, likely

10   budgetary issues, likely priorities.  So the incoming

11   team would have a good sense of what Congress is

12   likely to do.

13       Q.   So if I understand you correctly, one of the

14   things you were trying to accomplish on a transition

15   is understand the views of members of Congress with

16   regard to certain policy issues that were relevant to

17   the Commerce Department and what the --

18       A.   Correct.

19       Q.   -- incoming team would have to deal with at

20   the Commerce Department, correct?

21       A.   So on NOAA, we would be interested.  Well,

22   people from Alaska are very interested in fisheries.

23   The Magnuson Act.  People from other states with

24   installations are interested in the NOAA satellites,

25   that this delegation is interested in the technology

Page 39

```
 1    issues or the intellectual property issues related to
 2    PTO, that there are budgetary issues that the
 3    Oversight Committee or the Appropriations Committee
 4    thinks that the Census Bureau is costing too much, or
 5    spending too much money.  You'd want to have all of
 6    that, that forecast in there, and not prejudge what --
 7    whether Congress was right or wrong about the issue.
 8              But Congress is likely to introduce
 9    legislation affecting international -- affecting NAFTA
10    and dispute resolutions.  So you would want to have a
11    forecast so you could give them a sense of what --
12    what issues they're going to face coming into the
13    door.
14        Q.   So you were speaking with Mr. Hoffler to
15    understand the views of Congress with respect to a
16    potential citizenship question on the decennial,
17    because that was an issue that you anticipated the
18    incoming Commerce team was going to be dealing with?
19        A.   They needed to understand that this was one
20    of the issues that people would raise with him.
21        Q.   Who is the "they"?  When you say, "they
22    needed to understand that this was one of the
23    issues" --
24        A.   The incoming Commerce team needed to
25    understand all the potential issues that would be
```

Page 40

```
 1   raised by members of Congress, especially those in
 2   oversight roles or committee chairmen.  And so this
 3   was one of many, many issues that were identified.
 4        Q.   So you were speaking with Mr. Hoffler to --
 5   to understand and identify issues related to the
 6   Commerce Department that members of Congress would
 7   likely be interested in; is that correct?
 8        A.   I was trying to make sure that if the new
 9   Commerce team were going on the Hill and meeting with
10   people on the census, that they would understand
11   issues that would be raised to them.
12        Q.   And specifically the conversations with
13   Mr. Hoffler were to understand what members of
14   Congress might say or think about possibly adding a
15   citizenship question to the 2020 decennial?
16        A.   No, that would have been one --
17             MR. ROSENBERG:  Objection, form.
18        Q.   (By Mr. Duraiswamy) I'm sorry, go ahead.
19        A.   That would have been one of the issues.
20   Remember, Tom Hoffler is also pretty important,
21   because in the past Tom Hoffler was able to get
22   members of Congress to support funding for the Bureau.
23   Because he would say, we need to take a good census.
24   Because, remember, people generally don't want to
25   spend money on the census until we get on top of 2020.
```

Page 41

```
 1        Q.    And you said Mr. Hoffler was a redistricting
 2   expert; is that right?
 3        A.    He was a point person on redistricting,
 4   yeah.
 5        Q.    A point person in what context?
 6        A.    He would talk to members of Congress about
 7   redistricting.
 8        Q.    From his perch at the NRCC?
 9        A.    He wasn't -- I'm not sure he was at the NRCC
10   at the time.  I'm not sure he was a -- he was
11   certainly a person that was connected to that issue.
12        Q.    Do you know when he was at the NRCC?
13        A.    I would imagine that he was a consultant or
14   something.  Again, I don't know his status, but I know
15   that he was connected to that.
16        Q.    What other issues did you talk to
17   Mr. Hoffler about during the transition, other than
18   the citizenship question, redistricting issues and
19   funding issues?
20        A.    About the -- about the challenges that the
21   census would face in 2020.  Because again, we were
22   going to the Internet to the online response.  We were
23   going to -- we're adopting new technology.  And, you
24   know, when I talk to people, stakeholders, I'm talking
25   always about the challenges that we'll face in the
```

1   next census that we didn't face in the last one.

2           And those really have to do with the work

3   force.  They have to do with the technology that

4   sometimes is successful, sometimes is unsuccessful.

5   And what -- it's really important for the census to

6   have a broad -- a broad range of stakeholders that all

7   have skin in the game, that all feel like they're

8   united around the idea of, you know, we may have

9   political differences, but we all want to take a good

10  census.

11      Q.  What do you recall learning from Mr. Hoffler

12  about the views of members of Congress regarding a

13  potential citizenship question on the 2020 decennial?

14      A.   Pretty much what I just explained to you.

15      Q.   Maybe I didn't understand.  I'm trying to

16  understand what were the views that members of

17  Congress held that he conveyed to you?

18           MR. ROSENBERG:  Objection.  It call -- form.

19  It calls for speculation.

20      Q.   (By Mr. Duraiswamy) You -- you can answer.

21  They will object from time to time.  Unless they tell

22  you not to answer, you can answer.

23           MR. FELDMAN:  The only comment I would have,

24  if you know in the conversations that he specifically

25  represented something from his knowledge of Congress'

Page 43

```
 1    view.
 2         A.   I -- I -- I don't recall specifics, but I
 3    know, in general, Tom always believed, and I share his
 4    view on this, block level data, accurate block level
 5    data is very important.
 6         Q.   (By Mr. Duraiswamy) For redistricting
 7    purposes?
 8         A.   For everything.  For everything.
 9         Q.   Including redistricting purposes?
10         A.   Including redistricting purposes.
11         Q.   Block level data for what?
12         A.   For everything.  For all census data, and
13    that basically if you -- the hardest thing about the
14    census is not counting everyone living in America.
15    It's counting everyone living in America at the right
16    address one time.
17         Q.   And he conveyed that view to you in your
18    conversations with him during the transition?
19              MR. ROSENBERG:  Objection, vague, form.
20         A.   Yeah, again --
21         Q.   (By Mr. Duraiswamy) Let me try to --
22         A.   I gave you a broad thing of -- of something
23    that Tom was always concerned with in every
24    conversation that I would have with him.
25         Q.   I'm just trying to understand.  You said you
```

Page 44

1    talked to him about the views of members of Congress

2    related to the citizenship question.

3         A.   I -- so I would start --

4         Q.   That's my understanding.

5         A.   I would start out the conversation by saying

6    what are members of Congress likely to raise on the

7    census issue that we can incorporate into the

8    transition planning so the new Commerce team is not

9    blindsided.

10        Q.   And then he raised the issue of a

11   citizenship question or an immigration --

12        A.   That was one of -- that was one of the

13   questions.

14        Q.   Okay.  Did he --

15        A.   And I'm sure that we talked about census

16   residency rules as well.

17        Q.   Can you -- just for people who may not

18   understand what census residency rules means, can you

19   explain what that means?

20        A.   It basically means where were you on

21   April 1st.  So people move around, they're snowbirds,

22   they're living at colleges, they're incarcerated or

23   otherwise detained.  They're in group houses.  There's

24   overseas military.  Census residency rules say -- are

25   designed to ensure that people are -- are counted at

Page 45

1  the right address.

2      Q.   I assume you talked about census residency

3  rules for undocumented immigrants?

4      A.   No, not that I recall.

5      Q.   It's possible, but you just don't recall one

6  way or the other?

7      A.   I don't recall that.  It's generally not

8  something associated -- residency rules generally

9  don't get associated with that issue, unless you're

10  dealing with migrant farm workers who tend to be

11  documented.

12      Q.   Well, you know there's litigation going on

13  about that right now, right?

14      A.   Not -- I don't.

15           MR. ROSENBERG:  Objection.

16      A.   I don't.

17      Q.   (By Mr. Duraiswamy) Okay.  That's fair.  I'm

18  sorry.

19           (The court reporter motioned to the

20  attorney.)

21           MR. DURAISWAMY:  I will do my best, but I

22  will caution you that may not be the last time you

23  have to remind me.

24           COURT REPORTER:  Thanks.

25      Q.   (By Mr. Duraiswamy) And the census residency

 1   Then there was October.  Not a lot happened.  Then
 2   November, a lot of activity.  Then December, a lot of
 3   activity.  Now a lot of activity.
 4           So it's -- and, again, this is a part-time
 5   volunteer job, so it's very difficult for me to kind
 6   of try to recall exactly who said what when.
 7       Q.   Well -- well, do you recall discussing with
 8   other individuals on the Commerce team whether there
 9   were particular people or constituencies who are
10   interested in adding a citizenship question to the
11   census?
12           MR. ROSENBERG:  Objection, vague.
13           MR. FELDMAN:  If you -- if you can answer
14   it, answer it.
15       A.   Tom Hoffler was, I think, the first person
16   that said something to me about that issue.
17       Q.   (By Mr. Duraiswamy) Meaning he -- he --
18       A.   He flagged it, you know.  He said --
19       Q.   He flagged it as something that might be of
20   interest to some people --
21       A.   Right.
22       Q.   -- in constituencies?
23       A.   Right.
24       Q.   And you said he was a point person for
25   redistricting in certain circles.  He's -- he's a

Page 52

1    Republican -- he was a Republican?

2         A.   Yeah, he is.

3         Q.   Okay.

4         A.   Yeah.

5         Q.   And so his work on redistricting over the

6    years has been in connection with the Republican party

7    or different state Republican parties, if you know?

8         A.   Well, he was --

9              MR. ROSENBERG:  Objection, vague, lack of

10   foundation.

11             MR. FELDMAN:  Go ahead.

12        A.   He was the person I recall in the 2000

13   census who was advising Bill Thomas, who was the

14   Chairman of the House Administration Committee, and

15   Bill Thomas was an expert, you know, as -- he was an

16   expert on a lot of things, but he was an expert on

17   redistricting.  So I knew that Tom Hoffler had the ear

18   of committee chairmen who would interact with a

19   Secretary of Commerce.

20        Q.   (By Mr. Duraiswamy) Did he -- do you recall

21   him referring to specific members of Congress who

22   might be interested in that issue?

23        A.   I don't recall --

24             MR. ROSENBERG:  Objection, vague --

25        A.   -- the specific ones.

Page 53

```
 1              MR. ROSENBERG:  -- as to who the him was.
 2              MR. DURAISWAMY:  Okay.
 3              MR. FELDMAN:  He answered it.
 4              MR. DURAISWAMY:  That's fine.  I'd ask,
 5    though, that you just object to the form.
 6              MR. ROSENBERG:  (Nodding head.)
 7        Q.   (By Mr. Duraiswamy) What was the substance
 8    of the conversations that you had with the other
 9    members of the Commerce team regarding a citizenship
10    question during the transition?
11        A.   Again, one of many issues.
12        Q.   I understand it's one of many issues.  I'm
13    just trying to understand what was discussed about it.
14              MR. FELDMAN:  When?
15              MR. DURAISWAMY:  During the transition.
16              MR. FELDMAN:  That's from a period of when
17    to when?  Why don't we put --
18        A.   From September through -- through January.
19        Q.   (By Mr. Duraiswamy) When did you join the
20    transition?
21        A.   Probably September was the first time I went
22    there.
23        Q.   Okay.  And I assume we can agree that the
24    transition ended at the time that President Trump, now
25    President Trump, took office as --
```

Page 55

1      Q.   By who?

2      A.   By Tom Hoffler.

3      Q.   For what purpose?

4      A.   Taxes.

5      Q.   What would be the value of having block

6   level --

7      A.   Citizen age voting -- to ensure one person,

8   one vote.

9      Q.   Can you explain, how -- how does having

10   block level citizenship voting age population data

11   ensure one person, one vote?

12      A.   This is going to be a long explanation.

13      Q.   That's fine.

14      A.   Have you -- have you read through my

15   presentation on this?

16      Q.   Yes.

17      A.   You know which one it is?

18      Q.   I think so.

19      A.   You said to a federal judge that I -- that

20   there was no record of what I talked about with the

21   Secretary.  And yet you're saying that you read my

22   presentation to the Secretary, but you told a federal

23   judge that I didn't --

24           MR. FELDMAN:  Just answer the question.

25      Q.   (By Mr. Duraiswamy) I think he produced it

Page 56

1    in response to the subpoena we served after the

2    federal judge ordered the deposition.

3          A.   No, actually it was in -- it was in the

4    documents before.

5               MR. FELDMAN:  Mark, answer -- answer his

6    question.

7          Q.   (By Mr. Duraiswamy) In any event, can you

8    explain what Mr. Hoffler said to you about why --

9          A.   No.  Wait.  No.  You wanted me to explain

10   why I think that block level data is important to

11   citizen voting age population, or do you want it

12   explained why Tom Hoffler does?

13         Q.   I'm trying to understand the conversations

14   you had during the transition.  So you said --

15         A.   He said that after the long-form data went

16   away in 2000, that the quality of block level citizen

17   voting age population had now diminished.  So the --

18   so the ability to draw a district which would elect a

19   Latino in a population where there were non-citizens

20   was very, very difficult.

21         Q.   He said that to you during the transition?

22         A.   He -- we would have talked about it.  I'm

23   not sure whether it was in the transition or after the

24   transition, but we would have talked about that issue.

25         Q.   I'm trying to focus on in the transition

Page 57

```
 1   right now.  So you're not sure if you had that
 2   conversation with him about that potential use of
 3   citizenship data during the transition; is that right?
 4        A.   I'm not sure that I did.
 5        Q.   Okay.  So I'm trying to understand, you
 6   discussed potential uses of citizenship data gathered
 7   from the decennial with others on the Commerce team or
 8   Mr. Hoffler during the transition?
 9        A.   I would think so.
10        Q.   Okay.  And --
11        A.   I -- I don't recall, but I would think so.
12        Q.   Do you recall discussing the possibility
13   that it could be used for immigration enforcement
14   purposes?
15        A.   Oh, I -- I would never -- first of all, I
16   would -- that would be illegal, number one.  Number
17   two, anyone that would suggest that or broach that to
18   me, I would immediately be totally opposed to that.
19        Q.   I understand your view about that.  Did
20   someone, in fact, suggest or broach that to you during
21   the transition?
22        A.   No, no.
23        Q.   Okay.  I'm just -- I'm not asking for your
24   views, and I'm not even asking if you advocated for
25   it.  I'm just trying to understand, did you have any
```

Page 58

1   conversations with anyone where the possibility, good

2   or bad, of using --

3        A.   Definitely -- definitely not.

4        Q.   Let me just finish the question --

5             MR. FELDMAN:  Let him finish the question.

6        Q.   (By Mr. Duraiswamy) -- so the record's

7   clear -- of using citizenship data from the decennial

8   for immigration enforcement purposes came up?

9        A.   No.

10        Q.   Okay.  Did you discuss, during the

11   transition, potential use of citizenship data from the

12   decennial for reapportionment purposes?

13        A.   Citizenship, no.

14        Q.   Did you discuss, during the transition, with

15   anyone, whether undocumented immigrants or

16   non-citizens should be included in the state

17   population counts for reapportionment purposes?  That

18   issue, generally.  I'm not asking you about a position

19   you took, but did that issue come up in your

20   conversations?

21        A.   Not -- not to my --

22             MR. ROSENBERG:  Objection, form.

23        A.   Not to my recollection, no.

24        Q.   (By Mr. Duraiswamy) Did the issue of how

25   states might use citizenship data from the decennial

Page 59

```
1    census in deciding how to draw legislative districts
2    come up in your conversations with Mr. Hoffler?
3         A.   I don't believe so.  Again, you know, when
4    you -- these are conversations long ago, but it --
5    it -- I don't think so.  Because it -- again, it's not
6    the kind of thing that he would talk about.
7         Q.   Did it come up in your discussions with
8    anyone else during --
9         A.   No.
10        Q.   -- the transition?  Are you aware of anyone
11   else involved with the transition or the Trump
12   campaign or the incoming Trump administration
13   discussing that issue during the transition?
14        A.   I -- not personally, but I've heard that
15   from reporters and other people.
16        Q.   Okay.  What have you heard from reporters
17   and other people?
18        A.   That those people -- that there were people
19   discussing it.  And I said, "Well, if they were, they
20   weren't discussing it with me."
21        Q.   Who have you heard was discussing that issue
22   during the transition?
23             MR. ROSENBERG:  Objection, vague.
24        A.   Again, I don't have personal knowledge of --
25   because I didn't -- no one discussed it with me.
```

Page 64

1   name.  So that was the one I was focused on.

2       Q.    I think I understand what you're saying.

3   You're saying the -- Steve Bannon's name, in

4   connection with this, came up recently for you in the

5   context of reviewing our subpoena.  You're not sure if

6   it came up in the context of the other rumors --

7       A.    Right.

8       Q.    -- that you heard about this issue?

9       A.    Right.

10           MR. ROSENBERG:  Objection, vague and form.

11      Q.    (By Mr. Duraiswamy) And sitting here today,

12  you can't remember any other individual names or

13  organizational names that came up in these rumors that

14  you heard recently?

15           MR. ROSENBERG:  The same objection.

16      Q.    (By Mr. Duraiswamy) Is that right?

17      A.    That's -- yeah, that's correct.

18      Q.    Okay.  In your discussions with Mr. Hoffler

19  and folks on the Commerce team during the transition,

20  did you discuss how -- the potential process for

21  adding a citizenship question to the decennial census?

22      A.    I'm not sure whether I would have -- that

23  probably would have come -- yeah, that probably would

24  have been something that we discussed.

25      Q.    What kinds of discussions about that did you

Page 65

1    have?

2        A.   How -- I'm trying to remember here.  I'm

3    trying to remember whether the issue of adding a

4    question about sexual orientation on the ACS was

5    something that came up before or after the issue of

6    citizenship.  That's what I can't remember in my head.

7    Because that would have been sort of --

8        Q.   I'm --

9        A.    -- the last -- that was another issue that

10   was -- came up in the transition, was that advocacy

11   groups for the LGBTQ community wanted to add a

12   question about sexual orientation on the ACS.  And

13   that was something that we all -- also would have, I

14   think, discussed during the transition, was that

15   there -- you know, there --

16          The issue was are you going to add or change

17   questions to the decennial census questionnaire in

18   addition to the citizenship issue.  How are you going

19   to, you know, change the relationship questions when

20   you say how was this person related, opposite sex

21   couple; again, I -- this is stuff that I haven't

22   looked at for a long time.  So I don't remember

23   whether I was looking at -- at those, at that process

24   issue before or after the citizenship discussions.

25          Q.   But that process issue, you're saying, would

1   have been relevant to the addition of a citizenship

2   question and potentially other questions; is that --

3   is that what you're --

4        A.    Yeah.   Yeah.

5        Q.    Okay.

6        A.    Because obviously there was a -- there was

7   a -- a request in to -- from DOJ to Census about the

8   sexual orientation question addition.   So you know,

9   again, it's -- it's hard for me to remember which

10  comes first, whether I was looking at that in the

11  context of the citizenship, or looking at that in the

12  context of how we're going to -- how the transition is

13  going to approach the sexual orientation issue.

14       Q.    Okay.   Other than what we've talked about,

15  did you come to learn during the transition that there

16  was anyone else who was interested in potentially

17  adding a citizenship question to the census?

18       A.    I don't -- I don't -- I don't remember

19  specifically about which other -- I remember Tom

20  Hoffler for certain.   It might have come up when I was

21  on Capitol Hill during the transition and meeting

22  people in early January.

23       Q.    With whom do you think it may have come up?

24       A.    I went to see the -- the counting of the

25  electoral count in the -- in the house chamber, so I

Page 67

1   would have run into a lot of people there.

2       Q.   And --

3       A.   And some of them would have known Tom.  So

4   they would have known that I was working on the

5   Commerce transition.  So there would have been members

6   of Congress there.  Again, it's one of those things

7   where you go to a ceremony like that and you see a lot

8   of people, and they say, oh, yeah, I hear you're

9   working on the transition.

10          And I think Willie Gaynor went with me to

11  that, and Willie knows a lot of people, so he would

12  have said, "Oh, yeah, Mark's working on census

13  issues."  So, again, that would have been a time that

14  people could have talked to me about it.

15      Q.   And do you recall who might have talked to

16  you about it during that time?

17      A.   No.  Because, again, there were lots of

18  people and I -- it blurs in to other things.

19      Q.   Sitting here today, do you have an

20  understanding of whether there are particular members

21  of Congress who are interested in a citizenship

22  question being added to the census in 2020?

23      A.   I haven't followed that.  I didn't go to any

24  of the hearings with Secretary Ross when he testified

25  on the census.  I didn't go to his confirmation

Page 89

1    question for 2020, correct?

2         A.   I'm saying they -- the department will need

3    to -- wait.  The question -- the Department of Justice

4    may request.  So it's -- it's letting people, the

5    agency team, know they may request something that

6    affects your department.

7         Q.   And you're saying this is a possibility that

8    could happen in the future, correct?

9         A.   Right.  You don't know that it will.  It's a

10   possibility.

11        Q.   And -- and certainly no one during the

12   transition told you that the Department of Justice was

13   going to do that, correct?

14        A.   I'm not interacting with the DOJ team.

15        Q.   Okay.

16        A.   So unlike -- with Commerce and USTR, we're

17   interacting because we share authorities.  DOJ and

18   Commerce aren't sort of sitting down and saying,

19   "Okay.  What are you going to do to affect us, and

20   what are we doing to affect you?"

21        Q.   So the possibility that the DOJ would

22   request the addition of the question for 2020, was

23   that something that you learned about from your

24   conversations with Mr. Hoffler?

25             MR. ROSENBERG:  Objection, misleading.

Page 90

1           MR. FELDMAN:  If you could answer.

2       A.   It would have been something that he

3   discussed, but I could have learned it from other

4   people too.

5       Q.   (By Mr. Duraiswamy) Do you remember learning

6   it from anyone else?

7       A.   I don't recall.  Again, understand that

8   we're sitting in an open floor plan, and people are

9   coming to us, you know, a lot of people I didn't know

10  saying, "Oh, well, you know, what about this on export

11  controls?  What about this on trade?"  And impromptu

12  meetings back and forth, a lot of -- lot of cooks in

13  the kitchen.

14      Q.   So you don't recall specifically anyone else

15  raising this issue, but this is an issue that likely

16  would have been raised in the discussions with

17  Mr. Hoffler, correct?

18          MR. ROSENBERG:  Objection.  It calls for

19  speculation.

20      A.   Again, I -- there could have been people

21  that talked about it, but I don't recall those

22  conversations.

23          MR. DURAISWAMY:  Brad, can I ask you to just

24  limit your objections to the form, please?

25          MR. ROSENBERG:  I think that is a form

Page 100

1          MR. FELDMAN:  And by "this," he's

2     referencing Exhibit 2.

3          A.   Exhibit 2, yeah.  May I point out something

4     about --

5          MR. FELDMAN:  No.

6          THE WITNESS:  Okay.

7          Q.   (By Mr. Duraiswamy) Is there something that

8     you would like to point out about the memo?

9          MR. FELDMAN:  Now you can point it out.

10         A.   On Page 7 you say -- it says, "The director

11    of the U.S. Census Bureau shall include questions to

12    determine U.S. citizenship and immigration status on

13    the long-form questionnaire in the decennial census."

14    This is clearly written by someone who isn't talking

15    to anyone who knows something about the census,

16    because there is no long form.  It was eliminated in

17    2000.

18         Q.   (By Mr. Duraiswamy) You testified earlier

19    that Mr. Hoffler had indicated to you that after the

20    ACS census CEDCaP data was no longer available at the

21    block level; is that right?

22         A.   Correct.

23         Q.   Did he suggest to you that prior to the ACS,

24    while the long-form questionnaire was in effect, that

25    citizenship data was available at the block level?

Page 101

1      A.    That was the whole point of a one in six

2  household sample, is one in six gives you block level

3  data confidence that one in forty-three does not give

4  you.

5      Q.    Are you confident of that, that during the

6  period in which --

7      A.    That's my understanding.

8      Q.    Okay.

9            MR. ROSENBERG:   Objection, form.

10      Q.    (By Mr. Duraiswamy) Just to clean that up.

11  It's your understanding that while the long-form

12  questionnaire was in place, citizenship data was

13  available at the census block level and not just at

14  the census block group level?

15      A.    That's my understanding.

16      Q.    And is that based -- that understanding

17  based on your conversations with Mr. Hoffler or

18  anything else?

19      A.    No, it's based on my experience with the

20  census as chairman of the monitoring board, as member

21  of the executive staff and as a chairman of the 2010

22  Advisory Committee.

23      Q.    Okay.  So we've talked about the transition.

24  I want to now talk about the post-transition period.

25  Can you identify everyone at the Department of Justice

Page 110

1   count everyone, and you can't subtract anyone from the

2   count.

3        Q.   Do you have an understanding of whether

4   there are -- well, strike that.

5             When was your conversation with John Gore

6   about a citizenship question?

7        A.   It would have been after the summer, but

8   well before the winter.

9             MR. FELDMAN:  The summer of what year?  '17?

10       A.   2017.

11       Q.   (By Mr. Duraiswamy) How many conversations

12  about that issue did you have with him?

13       A.   We -- we met one time.

14       Q.   Where did you meet?

15       A.   At a -- not at the -- not at a government

16  building.  We met for coffee near -- near -- probably

17  we met like in the cafe around the -- around his

18  office.

19       Q.   Could it have been in October of 2017?

20       A.   Yeah, it could have been.

21       Q.   Was anyone else present?

22       A.   No one else was present.

23       Q.   How did that meeting come about?

24            MR. ROSENBERG:  I'm going to object.  I just

25  want to caution the witness that there's potential

Page 114

1        A.    I don't know.

2        Q.    I'm just looking for an approximation.   More

3   than an hour?

4        A.    I doubt it was more than an hour.

5        Q.    More than 30 minutes?

6        A.    Probably.

7        Q.    Okay.   So roughly somewhere between 30 and

8   60 minutes?

9        A.    I think so.

10       Q.    You're aware that there was a letter sent by

11   the Department of Justice to the Commerce Department

12   in December 2017 regarding the addition of a

13   citizenship question to the census?

14       A.    Yes.

15       Q.    Did you have any involvement in the drafting

16   of that letter?

17             MR. ROSENBERG:   Objection, form.

18             MR. FELDMAN:   If you know.

19       A.    Well, it -- again, I wasn't part of the

20   drafting process of the letter, but I'm sure that in

21   our -- I -- when I met with John Gore, I wanted to

22   show him what the Census Bureau said about why they

23   ask the ACS question.   Because, again --

24             MR. ROSENBERG:   And I'm -- again, I'm going

25   to object and instruct the witness not to answer the

Page 123

1              MS. BRANNON:   Okay.

2              MR. ROSENBERG:   -- of course, in the

3     Government be as -- as nimble as possible in meeting

4     and conferring and responding, and I imagine that we

5     could do so tomorrow.

6              MS. BRANNON:   Okay.   No, that makes sense.

7     So we will agree to that.   There has -- and just to be

8     clear, the reason, there has been some meet and

9     confer -- meet and confer on related topics to this,

10    and a motion was filed today in the NYIC case.   And so

11    I am just not familiar enough, and would want to

12    confer with my colleagues as to whether or not the

13    nature of the discussions that have come up at the

14    deposition today fall within that issue or whether it

15    is a new and separate issue.   We will certainly try to

16    meet and confer about that part with you as quickly as

17    possible before we would move forward without

18    revealing anything publicly.

19             MR. ROSENBERG:   Thank you.

20        Q.    (By Mr. Duraiswamy) Okay.   Sorry for the

21    interlude.   So at that meeting you provided some

22    information to Mr. Gore for purposes of the letter

23    that DOJ subsequently drafted regarding the

24    citizenship question?

25        A.    Mainly the -- mainly a copy of the -- of the

1    letter from the Obama Administration, Justice

2    Department, to the Census Bureau on the issue of

3    adding a question on the ACS.  Right.

4         Q.   There -- there were -- in the documents that

5    you produced, there were two such letters, I believe,

6    one from 2014 and one from 2016.  Does that sound

7    correct to you?

8         A.   Yeah.

9         Q.   And you provided both of those?

10        A.   Just -- I think probably just the 2016 one.

11        Q.   Okay.  And the purpose of that was to

12   show --

13        A.   Modalities.

14        Q.   Well, strike --

15             MR. ROSENBERG:  And I'm going to interpose

16   an objection and again instruction to not answer again

17   on deliberative process privilege grounds.

18        Q.   (By Mr. Duraiswamy) Well -- well, let me

19   strike that and ask a -- a different question.

20             That document, if I'm recalling correctly,

21   has a chart of different demographic questions that

22   are asked on the ACS and an explanation of the

23   governmental uses of those questions; is that correct?

24        A.   Yes.

25        Q.   Okay.  And you were providing that to

Page 125

1    Mr. Gore in order to explain the potential use of a

2    citizenship question on the decennial census as well?

3              MR. ROSENBERG:  The same -- the same

4    objection and instruction not to answer on

5    deliberative process privilege grounds.

6              MR. FELDMAN:  Go ahead.

7         A.   I wanted the -- John Gore, who was a

8    non-career person, to understand the modalities and

9    accepted process of the interaction between DOJ and

10   Census on census issues.

11        Q.   (By Mr. Duraiswamy) What was it about that

12   that you wanted him to understand?

13             MR. ROSENBERG:  The same objection and

14   instruction not to answer on deliberative process

15   privilege grounds.

16             MR. FELDMAN:  Go ahead.

17        A.   I wanted him to understand what had -- the

18   previous interactions on additions of questions.

19        Q.   (By Mr. Duraiswamy) What about those

20   interactions did you want him to understand?

21             MR. ROSENBERG:  The same objection and

22   instruction not to answer on deliberative process

23   privilege grounds.

24             MR. FELDMAN:  Go ahead.

25        A.   How that -- the normal procedures.  Who at

Page 126

1   DOJ, when you're talking about census issues, talks to

2   Census and who they talk to.

3        Q.   (By Mr. Duraiswamy) And the fact that in

4   adding questions to the ACS or the decennial census

5   questionnaire, the requests come from outside of the

6   Commerce Department to the Commerce Department where

7   there is a need for some other agency; is that

8   correct?

9             MR. ROSENBERG:  Objection.  The same

10  objection and instruction not to answer on

11  deliberative process privilege grounds and also an

12  objection to form.

13            MR. FELDMAN:  Go ahead and answer if you

14  understand the question.

15       A.   I communicated that requests for data to the

16  Census from the administration come from agencies.

17       Q.   (By Mr. Duraiswamy) You agree that the

18  census doesn't typically -- well, strike that.

19            Did he provide you any information at that

20  meeting?

21            MR. ROSENBERG:  Same objection and

22  instruction not to answer on deliberative process --

23       A.   I don't know.

24            MR. ROSENBERG: -- privilege grounds, unless

25  the witness can answer that with a yes or no.

Page 136

1      A.    No.

2      Q.    James Sherk?

3      A.    No.

4      Q.    Have you spoken with Mr. Hoffler about this

5    issue since the transition?

6      A.    Tom was very sick, very sick.  And, in fact,

7    I didn't know that he passed away.  So Tom was really

8    kind of out of the picture.  And I also want to say,

9    Tom was not an -- did not appear to me to be an

10   adviser to the -- to the administration at all.

11     Q.    A separate question.

12     A.    Yeah.

13     Q.    And I'm not -- I didn't necessarily mean to

14   connect it.

15     A.    So I don't kind of see him as an

16   intermediary for the administration.

17     Q.    No, I'm asking about Mr. Hoffler separately.

18   Did you -- I'm not sure that I got a clear answer to

19   the question.  Did you have any communications with

20   him about a potential citizenship question since the

21   transition?

22     A.    Tom Hoffler?

23     Q.    Yes.

24     A.    Oh, yes.  Yes.

25     Q.    How many times, roughly?

1      A.   It would be more than a couple, but it
2  wouldn't be more than a dozen.  And remember, we're
3  talking about from January through -- through whenever
4  I last talked to him, which would have been maybe --
5  I'm not even sure I talked to him in 2017.
6           MR. FELDMAN:  2017 or 2000 --
7      A.   Or 2000 -- I'm not sure I talked to him
8  since even May of this year.
9      Q.   (By Mr. Duraiswamy) And he -- what were
10  the -- what was the substance of those conversations?
11      A.   Well, Tom and I are good friends, so I don't
12  know -- you know, I've known him for 30 years.  We
13  talked a lot about his cancer treatment.  We talked a
14  lot about what he was going through.  We talked a lot
15  about prayer.  So, you know, there would be
16  conversations about what was going on in politics that
17  would bleed into our personal conversations.
18      Q.   And some of that was about the potential
19  citizenship question on the 2020 census?
20      A.   It seemed like -- like it wasn't a topic in
21  the last -- in the last -- certainly the last six
22  months.  Again, hard for me to remember about --
23  again, with someone like Tom that I'm a -- a good
24  friend of a long time, and with someone that I check
25  in with about their health, and there are not a lot of

Page 138

1    people like that, so I don't -- I don't recall how

2    many times.

3         Q.   Well, my question is -- well, I think you

4    mentioned before that you did have those conversations

5    since January 2017, but my question is just what was

6    the substance of your conversation about this issue,

7    about the citizenship question?

8         A.   Well, he talked about how block level data

9    was -- and, again, block level data is an obsession

10   with him, because block level data means that you can

11   draw the most accurate districts.  And so, again, his

12   focus was always on block level data, and always on,

13   "Mark, you need to make sure that we take a good

14   census, that the administration doesn't skimp on the

15   budget," because a good census is good for what he

16   does.

17        Q.   And he was the person that you principally

18   relied on for your understanding regarding the need

19   for block level citizenship data; is that right?

20        A.   He was the one of the people that I --

21   actually, Tom -- in talking to Tom, I knew that it was

22   going to be an issue that the department would

23   confront, because I knew Tom had the ability to get

24   members of Congress, who were important to the

25   administration, to pay attention to the issue.  You

1    know, that's what -- again, in the transition, your

2    job is to forecast what's going to come across the

3    transom for the new administration.

4        Q.   Did you speak with anyone else in Congress

5    or affiliated with a member of Congress about the

6    citizenship question since January of 2017?

7        A.   I talked to -- you know, I talk to my own

8    member of Congress, Rodney Davis, all the time.  You

9    know, I see him at things.  I talk to people in the

10   Illinois delegation that I see at the University of

11   Illinois.  I -- again, to say did I talk to someone in

12   Congress, I talk to people in Congress who I've known

13   for a long time.  I went to school with Peter Roskam.

14   I -- I talk about lots of things with them.

15       Q.   Sure.

16       A.   Did I go and do a presentation in anyone's

17   office about this, no.

18       Q.   I was wondering if you talked to any of them

19   about this issue?

20       A.   I'm sure that I talked to members of

21   Congress, including Democratic members of Congress

22   about this issue.

23       Q.   And what do you recall them communicating to

24   you about it?

25       A.   I recall Congressman Lacy Clay being upset

                                                    Page 142

1    suggested to you that block level citizenship data --
2    strike that.
3               Has anyone ever suggested to you that having
4    access to block level citizenship data would be
5    helpful to Republican efforts in redistricting?
6          A.    I'm sure someone has said that.
7          Q.    Tom, presumably?
8          A.    What he said is that it will help draw maps,
9    which will be acceptable as the maps that best provide
10   minority representation, and so therefore are not
11   challenged.  So the frustration is you keep drawing a
12   district, and because you don't have block level data,
13   someone says, well, you didn't draw a map that
14   maximized -- I use the word "maximized," Latino
15   representation based on their numbers.  And when you
16   don't have that block level citizenship data, what
17   you're doing is you're cheating the Latino community
18   out of representation at all levels of government.
19         Q.    That was the -- that was something that he
20   suggested to you?
21         A.    No, it was -- it was a conversation that we
22   had.  My point about maximization is my word.  I want
23   Latino representation to be maximized.
24         Q.    Have you done any research on the Voting
25   Rights Act?

Page 143

1        A.    I'm not an expert on the Voting Rights Act.

2        Q.    Have you done any research on the Voting

3   Rights Act?

4        A.    I'm not an expert on it.  I -- I read about

5   the Voting Rights Act, yeah.

6        Q.    Do you have any expertise on the legal

7   standard for Section 2 of the Voting Rights Act?

8        A.    I'm not an expert on it.

9        Q.    Have you relied on others for expertise on

10  the Voting Rights Act in Section 2 in particular?

11       A.    Yes.  So I -- you know, when I -- when I

12  study things, I look to people who are experts.

13       Q.    Okay.  And who -- who have you looked to for

14  expertise on those issues?

15       A.    Off the top of my head, I'd have to go back.

16  I'd have to go back and look at it.  But I did -- I --

17  one of the things that I was most interested in is

18  there was an amicus brief that was filed by five

19  census directors.  And those -- in a nutshell, what

20  those census directors said is block level data is the

21  most important thing in end product in terms of

22  ensure -- ensuring accurate representation, and you

23  can only get block level data from the census.  I

24  didn't look at that until -- you know, until 2018.

25       Q.    Was Mr. Hoffler one of the people you relied

Page 144

1    on for expertise about the Voting Rights Act --

2         A.   I -- you --

3         Q.   I'm asking you.  Sorry.

4         A.   Oh, okay.

5         Q.   Was he one of the people?

6         A.   No.

7         Q.   Who -- who were the people?  You said off

8    the -- you'd have to go back and check, but --

9         A.   I'd have to -- I'd have to -- I don't

10   recall.

11        Q.   You -- you can't remember anyone that you've

12   relied on --

13        A.   I can recall looking at the cases --

14        Q.   -- for expertise on that issue?

15        A.   -- and looking at what Justices of the

16   Supreme Court said about it and looking at that.

17        Q.   Okay.  Let's go back to if you recall

18   communicating with anyone else direct -- in the Trump

19   administration directly or indirectly about the

20   citizenship question, other than the people we've

21   already identified.

22             MR. FELDMAN:  I'm not sure I understand.

23   Are you talking about was there anybody else other

24   than the people that have been discussed?

25             MR. DURAISWAMY:  Yes.

Page 273

1      Q.   And Mr. Davidson responds that he is on the

2   phone with you, and you're giving him a readout of a

3   meeting last week, correct?

4      A.   I see that.

5      Q.   Was that your meeting with John Gore?

6           MR. ROSENBERG:  Objection, assumes facts not

7   in evidence.  It calls for speculation.

8      A.   I don't know whether it's -- it would make

9   sense, but I don't know.

10     Q.   (By Mr. Duraiswamy) Did you have a meeting

11  with anyone else about a letter from DOJ?

12     A.   That -- that's why I said the -- the timing

13  seems like it's -- dovetails with what you and I were

14  discussing earlier.

15     Q.   Right.  Because the meeting with John Gore

16  was about the letter from DOJ regarding the

17  citizenship question, correct?

18     A.   No, the letter -- the meeting with John Gore

19  was about the -- how Census interacts with the Justice

20  Department.  Again, this is a communication from two

21  other people, not from me.

22          MR. ROSENBERG:  And just -- just for the

23  record, again, we're going back to the substance of

24  the communications with Mr. Gore, which the Government

25  believes is covered by the deliberative process

Page 274

```
 1   privilege, and so I would instruct the witness not to,
 2   you know, provide any additional information regarding
 3   that meeting.
 4         MR. FELDMAN:  And subject to that, he's
 5   answered the question, I believe.
 6      Q.   (By Mr. Duraiswamy) Well -- well, you had a
 7   phone call with Mr. Neuman -- strike that.
 8         You had a phone call with Mr. Davidson
 9   around -- on or around October 8th, correct?
10      A.   It -- it says that.  I don't know that I
11   did.
12      Q.   Okay.
13      A.   I don't recall that I did.
14      Q.   No reason to believe it didn't happen,
15   correct?
16      A.   I don't recall that it happened.
17      Q.   Okay.  No reason to believe that when
18   Mr. Davidson wrote on October 8th in an e-mail, "I'm
19   on the phone with Mark Neuman right now" that he was
20   lying?
21      A.   I don't know the answer to that question.
22      Q.   Okay.  You don't know whether he was lying
23   or not when he wrote Secretary Ross on October 8th?
24      A.   I don't know what he did --
25         MR. ROSENBERG:  Objection.
```

Page 278

1      hours.

2           Q.    Okay.  Do you remember that when we started

3      this deposition, we talked about the fact that if you

4      say that you don't recall something, when, in fact,

5      you do recall it, that that's false testimony?  Do you

6      remember that we talked about that --

7           A.    Yes.

8           Q.    -- at the outset?  Okay.  What do you recall

9      about the length of the phone calls or conversations

10     that you had with Mr. Davidson about the census over

11     the last couple of years?

12          A.    I recall that I had some.

13          Q.    And you have no recollection about how long

14     those calls were or those interactions were?

15          A.    Well, you said -- you asked me if I was --

16     talked to him for four hours.  I don't recall talking

17     to anyone for hour hours in one phone call.

18          Q.    No.  I'm asking you now approximately how

19     long were the interactions that you had with him

20     regarding the census.  Can you give me a range?

21          A.    I -- I don't know.  I don't recall how long

22     they were.

23               [Marked Exhibit No. 18.]

24          Q.    Handing you what we've marked as Exhibit 18.

25     We've got one copy for you guys.  Take a minute to

Page 279

1    review this document and let me know if you've seen it

2    before.

3            A.    I have seen it before.

4            Q.    When did you see it?

5            A.    I've seen versions of this before.

6            Q.    When you say versions of this, what do you

7    mean?

8            A.    Well, something that starts out with John

9    Thompson and then says reinstatement of the

10   questionnaire.  I -- I've -- this is -- I recall

11   seeing something like this in different versions --

12           Q.    This is --

13           A.    -- at different times.

14           Q.    Okay.  And just so the record is clear, this

15   is a -- a draft of a letter from the Department of

16   Justice to the Commerce Department requesting the

17   reinstatement of a question on the 2020 census

18   questionnaire related to citizenship, correct?

19           A.    Do we know that it's from DOJ?  Oh, because

20   it says --

21           Q.    Do you see the last line?

22           A.    -- for doj.gov.

23           Q.    Yes.

24           A.    So what was the question again?

25           Q.    So this is a draft of a letter from DOJ to

Page 280

1    the Commerce Department requesting a reinstatement of

2    a citizenship question on the 2020 --

3         A.    Right.

4         Q.    -- census, right?

5              MR. ROSENBERG:  Objection, form, assumes

6    facts not in evidence.

7         A.    I -- I -- I -- it seems to be that.

8         Q.    (By Mr. Duraiswamy) Okay.  And when did

9    you -- or who -- who provided you with versions of

10   this draft letter?

11        A.    I'm not sure which version this is.  Again,

12   I'm familiar with the letter.  I'm not sure who the

13   original author is.  I'm sure that I looked at it.  I

14   might have commented on it, but I'm not sure who

15   writes a first -- a first template, as it were.

16   What's interesting is when I look at this, it seems

17   like --

18              MR. FELDMAN:  And this being?

19        A.    This being the version that you're looking

20   at right now.

21              MR. FELDMAN:  Exhibit 18.

22        A.    And I look at the letter that I first saw in

23   ProPublica.  This letter is very different than the

24   letter that ultimately went from DOJ.

25        Q.    (By Mr. Duraiswamy) Okay.  In order to help

Page 281

1    us all get out of here on time, I'm going to ask you
2    try to --
3         A.   Oh, we're all going to get here on -- out of
4    here on time.
5         Q.   Well, I want you -- in order to avoid the
6    risk of our having to come back and do more
7    questioning, I want to you to try to focus on just
8    answering the question --
9         A.   Right.
10        Q.   -- that I've asked.  So my question, you
11   stated that you had previously seen a version of this
12   draft, correct?
13        A.   Correct.
14        Q.   Okay.  And I believe you said --
15        A.   And, again, there are people within the
16   Secretary's office who could have had a version, could
17   have had -- marked up their own version, could have --
18   again, trying to figure out who an original author is
19   when this looks a little --
20             MR. FELDMAN:  The question --
21        Q.   (By Mr. Duraiswamy) Yeah.
22             MR. FELDMAN:  Just --
23        Q.   (By Mr. Duraiswamy) I don't -- I don't
24   want -- I don't -- I'm not asking you to tell me about
25   who the original author was or anything.  I want to

Page 283

1    the questionnaire, that they're following procedures.
2    This clearly doesn't look like the -- the letter that
3    actually went out, but it looks like almost a
4    placeholder, a template.
5         Q.    When you say you want to make sure that if
6    the department has an interest in evaluating a change
7    in the questionnaire, you're referring to the -- the
8    Department of Commerce --
9         A.    Correct.
10        Q.    -- correct?
11        A.    Correct.
12        Q.    Okay.  And you recall that others at the
13   Department of Commerce were reviewing and offering
14   thoughts on draft versions of this letter?
15        A.    I seem to recall that, yes.
16        Q.    Who do you recall was involved in that
17   effort?
18        A.    It might have been the general counsel's
19   office, and it might have been the policy office.  And
20   again, blurring a lot of those people, interactions
21   together, new people coming on board, Peter Davidson
22   coming on board, Earl being involved in policy
23   matters, people that work for Earl.  There are a lot
24   of cooks in the kitchen.
25        Q.    Other than Mr. Davidson and Mr. Comstock,

Page 284

1  who you just mentioned, are there other specific

2  people that you recall being involved in that process?

3      A.   Maybe --

4          MR. ROSENBERG:  Objection, mischaracterizes

5  testimony.

6          MR. FELDMAN:  Go ahead.

7      A.   Maybe Izzy Hernandez, maybe Sahra Park-Su.

8  You know, when I think of the policy people, they're

9  all sort of blended together, the general counsel's

10 people and so forth.

11     Q.   (By Mr. Duraiswamy) Do you recall any

12 specific comments or edits that you suggested to the

13 draft version of this letter?

14     A.   I don't recall, but I'm sure that I made

15 comments.

16     Q.   You just don't remember specifically what

17 the comments were?

18     A.   Right, right.

19     Q.   Do you remember who you made the comments to

20 or who you provided the comments to?

21     A.   They would have been within that group of

22 people, and I would -- I would -- you know, when I say

23 general counsel, I -- I include James in that too.

24     Q.   Okay.

25     A.   And in this --

Exhibit 5

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - -x
3      NEW YORK IMMIGRATION              :
       COALITION, et al.,                :
4                                        :
           Plaintiffs,                   :
5                                        :  Case No.
          v.                             :
6                                        :  1:18-CF-05025-JMF
       UNITED STATES DEPARTMENT          :
7      OF COMMERCE, et al.,              :
                                         :
8          Defendants.                   :
    - - - - - - - - - - - - - - -x
9                               Friday, October 16, 2018
                                    Washington, D.C.
10

11

12  Videotaped Deposition of:
13                      JOHN GORE,
14  called for oral examination by counsel for the
15  Plaintiffs, pursuant to notice, at the law offices of
16  Covington & Burling, LLP, One City Center, 850 Tenth
17  Street, Northwest, Washington, D.C. 20001-4956,
18  before Christina S. Hotsko, RPR, CRR, of Veritext
19  Legal Solutions, a Notary Public in and for the
20  District of Columbia, beginning at 9:05 a.m., when
21  were present on behalf of the respective parties:
22

Page 2

```
 1              A P P E A R A N C E S
 2   On behalf of New York Immigration Coalition:
         DALE HO, ESQUIRE
 3       JONATHAN TOPAZ, ESQUIRE
         American Civil Liberties Union Foundation
 4       915 15th Street, Northwest
         Washington, D.C. 20005
 5       (202) 675-2337
         dale.ho@aclu.org
 6
 7   On behalf of Lupe Plaintiffs:
         DENISE HULETT, ESQUIRE
 8       MALDEF
         1512 14th Street
 9       Sacramento, California 95814
         (916) 642-6352
10       dhulett@maldef.org
11       ERI ANDRIOLA, ESQUIRE
         Asian Americans Advancing Justice
12       1620 L Street, Northwest, Suite 1050
         Washington, D.C. 20036
13       (202) 296-2300
14
     On behalf of City of San Jose and Black Alliance for
15   Just Immigration:
         JON M. GREENBAUM, ESQUIRE
16       DORIAN L. SPENCE, ESQUIRE
         Lawyers Committee for Civil Rights Under Law
17       1401 New York Avenue, Northwest, Suite 400
         Washington, D.C. 20005
18       (202) 662-8324
         jgreenbaum@lawyerscommittee.org
19       dspence@lawyerscommittee.org
20
21
22
```

Page  3

 1          A P P E A R A N C E S   C O N T I N U E D
 2

    On  behalf  of  Kravitz  Plaintiffs:
 3       TINA  M.  THOMAS,  ESQUIRE
         Covington  &  Burling,  LLP
 4       One  City  Center
         850  Tenth  Street,  Northwest
 5       Washington,  D.C.  20001-4956
         (202)  662-5083
 6       tthomas@cov.com
 7

    On  behalf  of  the  State  of  California:
 8       GABRIELLE  D.  BOUTIN,  ESQUIRE  (Via  Telephone)
         California  Department  of  Justice
 9       Office  of  the  Attorney  General
         1300  I  Street
10       P.O.  Box  944255
         Sacramento  California  94244-2550
11       (916)  210-6053
         gabrielle.boutin@doj.ca.gov
12

13    On  behalf  of  Defendants:
         JOSH  GARDNER,  ESQUIRE
14       REBECCA  KOPPLIN,  ESQUIRE
         ALICE  LACOUR,  ESQUIRE
15       BRETT  SHUMATE,  ESQUIRE
         U.S.  Department  of  Justice,  Civil  Division
16       20  Massachusetts  Avenue,  Northwest
         Washington,  D.C.  20530
17       (202)  514-4522
18       VALERIE  M.  NANNERY,  ESQUIRE
         ANDREW  SAINDOM,  ESQUIRE
19       Office  of  the  Attorney  General  for  D.C.
         One  Judiciary  Square
20       441  Fourth  Street,  Northwest,  Suite  600  South
         Washington,  D.C.  20001
21       (202)  442-9596
         valerie.nannery@dc.gov
22

Page 4

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2   On behalf of Defendants:
         DAVID DOREY, ESQUIRE
 3       DAVID DEWHIRST, ESQUIRE
         U.S. Department of Commerce
 4       1401 Constitution Avenue Northwest
         Washington, D.C. 20230
 5       (202) 482-2000
 6
     Also Present:
 7       Dan Reidy, Video Technician
 8
 9
10
11
12
13
14
15
16
17
18                   Veritext Legal Solutions
                       Mid-Atlantic Region
                  1250 Eye Street NW - Suite 350
19                Washington, D.C.  20005
20
21
22
```

Page 5

1                    C O N T E N T S

2    EXAMINATION BY:                                 PAGE

3       Counsel for Plaintiffs

           Mr. Ho                                    11

4          Ms. Hulett                                335

           Mr. Greenbaum                             414

5

6

     GORE DEPOSITION EXHIBITS:   *                   PAGE

7

     Exhibit 1    E-mail Chain                       22

8

     Exhibit 2    Bloomberg Transcript of Gore       26

9                 Testimony - 21 May 2018

10   Exhibit 3    Letter - 4 Nov 2016                47

11   Exhibit 4    Memo - 8 Sept 2017                 58

12   Exhibit 5    E-mail Chain                       79

13   Exhibit 6    E-mail Chain                       95

14   Exhibit 7    E-mail Chain                       101

15   Exhibit 8    E-mail Chain                       105

16   Exhibit 9    E-mail Chain                       110

17   Exhibit 10   E-mail Chain                       115

18   Exhibit 11   E-mail Chain                       125

19   Exhibit 12   E-mail Chain                       132

20   Exhibit 13   E-mail Chain                       135

21   Exhibit 14   E-mail Chain                       138

22   Exhibit 15   E-mail Chain                       142

Page 6

1  GORE DEPOSITION EXHIBITS:   *                          PAGE
2    Exhibit 16    E-mail Chain                            145
3
     Exhibit 17    Letter - 12 Dec 2017                    155
4
     Exhibit 18    Screenshot from Census Bureau           178
5                  Website
6    Exhibit 19    Map derived from Census Data on          204
                   Census Bureau Website
7
     Exhibit 20    Printout from DOJ Website               240
8
     Exhibit 21    E-mail Chain                            254
9
     Exhibit 22    E-mail Chain                            282
10
     Exhibit 23    Fourth Privilege Log from DOJ in        292
11                 Response to Plaintiffs' Document
                   Subpoenas
12
     Exhibit 24    E-mail Chain                            296
13
     Exhibit 25    Exhibit 24 Attached Draft Letter        297
14
     Exhibit 26    E-mail Chain                            300
15
     Exhibit 27    2020 Census Hearing Gore QFRs CRT       300
16                 Draft
17   Exhibit 28    DOJ Office of Legal Counsel             303
                   Opinion - 4 Jan 2010
18
     Exhibit 29    E-mail Chain                            311
19
     Exhibit 30    Article                                 312
20
     Exhibit 31    E-mail Chain                            315
21
     Exhibit 32    Memo - 19 Jan 2018                      319
22
     Exhibit 33    E-mail Chain                            330

Page 7

GORE DEPOSITION EXHIBITS:   *                      PAGE

1

2    Exhibit 34    Census Citizenship Question      330

3    Exhibit 35    District Court Opinion in Reyes  349
                   versus City of Farmers Branch

4
     Exhibit 36    Fabela versus City of Farmers    350

5                  Branch

6    Exhibit 37    Negron versus City of Miami Beach 358

7    Exhibit 38    Campos versus City of Houston    362

8    Exhibit 39    E-mail Chain                     365

9    Exhibit 40    E-mail Chain                     369

10   Exhibit 41    E-mail Chain                     371

11   Exhibit 42    E-mail Chain                     398

12   Exhibit 43    E-mail Chain                     403

13   Exhibit 44    Karlan Report                    416

14   Exhibit 45    E-mail Chain                     443

15   Exhibit 46    E-mail Chain                     445

16   Exhibit 47    Gore Written Testimony           446
                   18 May 2018

17

18

19

20

21          *   (Exhibits attached to transcript.)

22

Page 137

1   letter from anyone else within the civil rights
2   division?
3           A.   Not that I can recall.
4           Q.   Other than Ms. Pickett, Mr. Aguinaga, and
5   Mr. Herren, did you receive input on the draft
6   letter from anyone else within the civil rights
7   division?
8           A.   Not that I can recall.
9           Q.   Sometime after you wrote the first draft
10  of this e-mail, you had a conversation with Peter
11  Davidson at the Department of Commerce, correct?
12          A.   Yes.  That would be correct.
13          Q.   So sometime in November of 2017, you had
14  conversation -- you had a conversation with
15  Mr. Davidson about the citizenship question,
16  correct?
17          A.   Yes.  At some point I would have.
18          Q.   How many conversations did you have with
19  Mr. Davidson in November of 2017 about the
20  citizenship question?
21          A.   I don't recall exactly how many.
22          Q.   What, if anything, did you communicate to

Page 150

1    was conveying there is that Mr. Gary didn't need

2    to work late on a Friday night during the holiday

3    season to send the letter out.

4         Q.  So just so I understand the process here,

5    you had -- you first had communications about the

6    issue of a citizenship question sometime around

7    Labor Day of 2017, correct?

8         A.  Give or take, yes, that's correct.

9         Q.  You drafted the initial draft of the

10   letter to request the citizenship question

11   sometime around the end of October or early

12   November of 2017, correct?

13        A.  Correct.

14        Q.  The conversations to add the citizenship

15   question with the Department of Commerce were not

16   initiated by the civil rights division, correct?

17        A.  Correct.

18        Q.  And they were not initiated by the

19   Department of Justice, correct?

20        A.  That's my working understanding.

21        Q.  Around the time that you wrote the first

22   draft of this letter, you received input from

Page 151

1    three individuals:  Mr. Herren, Ms. Pickett, and

2    Mr. Gary, correct?

3        A.  Yes.  And I may have received input from

4    others as well.

5        Q.  Around the time of the first draft of the

6    letter in early November of 2017, who else did you

7    receive input from other than Mr. Herren,

8    Ms. Pickett, and Mr. Gary?

9        A.  Mr. Aguinaga would have provided -- may

10   have provided some input.  I would have had

11   discussions on -- regarding the letter generally

12   with Patrick Hovakimian, who at the time was

13   detailed to the Office of Associate Attorney

14   General, and with Jesse Panuccio in the Office of

15   the Associate Attorney General.

16          And I had various conversations with

17   others at various times throughout this process.

18   But I don't recall who else I would have spoken to

19   at that particular moment in time, around

20   November 1st of 2017.

21       Q.  Okay.  Around November 1st of 2017, the

22   only career staff in the civil rights division

Page 152

1   from whom you received input on the letter was

2   from Mr. Herren, correct?

3       A.  That's correct.

4       Q.  After that period of early November

5   of 2017 when you had drafted the initial draft of

6   that letter, Mr. Herren gave you some edits,

7   correct?

8       A.  That's correct.

9       Q.  After that time, did you receive any

10  further edits from Mr. Herren to the draft letter?

11      A.  I don't recall one way or the other.

12      Q.  So you have no recollection of receiving

13  input from career civil rights division staff on

14  the letter requesting a citizenship question other

15  than that one occasion in early November around

16  the time of the first draft from Mr. Herren,

17  correct?

18      A.  I believe that's correct.  Yeah.

19      Q.  You continued to revise the letter after

20  early November of 2017 with input from different

21  people.  But after that first round of edits from

22  Mr. Herren, you received no subsequent edits from

Page 153

1   people who were career staff in the civil rights

2   division, correct?

3             MR. GARDNER:  Objection.  Compound.

4             THE WITNESS:  To the extent I understand

5   your question, I believe that's correct.

6   BY MR. HO:

7        Q.  During this period when you were revising

8   the letter to request a citizenship question, you

9   had multiple conversations with legal staff at the

10  Department of Commerce, correct?

11       A.  Yes.

12       Q.  And the edits that you were receiving to

13  the letter from other DOJ personnel included

14  political appointees in the front office of the

15  Department of Justice and in the front office of

16  the civil rights division, correct?

17       A.  I -- certainly that's correct with

18  respect to the leadership offices at the

19  Department of Justice.  I can't remember if I was

20  receiving edits from the front office of the civil

21  rights division at that time after receiving the

22  edits from Ms. Pickett.

Page 154

1    Q.  Who made the final decision to send the

2  letter requesting the citizenship question be

3  added to the 2020 census questionnaire?

4    A.  I'm not sure I know.  And I can't recall

5  who communicated the final decision to me.

6    Q.  The letter was ultimately sent on

7  December 12th, 2017 --

8    A.  Correct.

9    Q.  -- correct?

10    A.  Correct.

11    Q.  Who gave the final signoff to put that

12  letter in the mail?

13        MR. GARDNER:  Objection.  Asked and

14  answered.

15        THE WITNESS:  I don't recall who gave the

16  final signoff.

17  BY MR. HO:

18    Q.  Was it you?

19    A.  No, I don't believe I would have given

20  the final signoff.  But maybe.  I guess it depends

21  on what you're asking.  Like, who told Art Gary he

22  could press "send" on the e-mail?  I don't

Page 155

1  understand your question.

2       Q.  Yes, that's my question.

3       A.  I don't know.

4       Q.  You don't know whether or not you did?

5       A.  I don't recall whether it was me or

6  somebody else.

7       Q.  All right.

8       A.  It's possible it could have been me.

9            (Gore Deposition Exhibit 17 marked for

10           identification and attached to the

11           transcript.)

12  BY MR. HO:

13       Q.  I'm going to show you what's been marked

14  as Exhibit 17.  This is a document in the

15  administrative record, the first page of which has

16  the number 000663.  This is a letter stamped

17  December 12th, 2017, from Arthur Gary at the

18  Department of Justice addressed to Ron Jarmin at

19  the Census Bureau, correct?

20       A.  Yes.  It appears to be.

21       Q.  And this is the letter we've been talking

22  about in which the Department of Justice

Page 409

1   prosecutions on that basis, at least at all

2   recently.  And I think I might have read something

3   once that suggested there might have been one

4   decades ago, but I don't know that for sure.

5        Q.  And just a few final questions.  Have you

6   ever communicated in any way -- by phone, in

7   person, by e-mail, text -- have you ever

8   communicated about the citizenship question with

9   Kris Kobach?

10       A.  No.

11       Q.  Have you ever communicated in any of

12  those ways about the citizenship question with

13  Steve Bannon?

14       A.  No.

15       Q.  Have you ever communicated in any of

16  those ways about the citizenship question with

17  Stephen Miller?

18       A.  No.

19       Q.  Have you ever communicated with anyone at

20  the White House about the citizenship question?

21       A.  Yes.

22       Q.  Who?

Page 410

1      A.   I communicated with John Zadrozny.

2      Q.   And who is he?

3      A.   Z-a-d-r-o-z-n-y, I believe, is how he

4  spells his last name.  And at the time, he was

5  working, I believe, for the Domestic Policy

6  Council.

7      Q.   And when did you communicate with him?

8      A.   I believe it was sometime in October of

9  2017.

10     Q.   Who initiated the contact?

11     A.   I don't recall.  What I recall about it

12 is that I participated in a conference call on the

13 issue on which Mr. Zadrozny -- in which

14 Mr. Zadrozny also participated.

15     Q.   Conference call on the issue of adding

16 the citizenship question?

17     A.   That's correct.

18     Q.   In October of 2017?

19     A.   I believe it was October of 2017.

20     Q.   Who else was on that conference call?

21     A.   I can recall that other people from the

22 Department of Justice were on the call.  Rachael

Page 437

1    not have authority or standing to assert such

2    constitutional claims.  The Department of Justice

3    has, in the past, gotten involved in racial

4    gerrymandering claims, either as an intervener or

5    as an amicus because frequently those claims

6    implicate districts that were drawn or preserved

7    to comply with Section 2 or Section 5 of the

8    Voting Rights Act, which the Department of Justice

9    does enforce.

10        Q.  So a citizenship question would not help

11   DOJ bring racial or partisan gerrymandering claims

12   because DOJ doesn't have jurisdiction to bring

13   them in the first place, correct?

14        A.  That's correct, although it would

15   facilitate DOJ's participation in such cases if it

16   chose to participate for -- because, again,

17   particularly, racial gerrymandering cases can

18   implicate Section 2 and Section 5 districts where

19   CVAP data is not necessary.

20        Q.  Prior to December 12th, 2017, did you

21   have any communication with anybody who was not a

22   federal employee at the time about having a

Page 438

1   citizenship question on the census?

2        A.   Yes.

3        Q.   Who?

4        A.   I had a conversation with a gentleman

5   named Mark Neuman, who I believe was not a federal

6   employee at the time.

7        Q.   Who is Mark Neuman?

8        A.   I understand Mark Neuman to be a former

9   employee of the Census Bureau or the Department of

10  Commerce -- I'm not sure which one.  And I

11  understood that he was advising the Department of

12  Commerce and the Census Bureau with respect to

13  this issue.

14       Q.   And what was the substance of your

15  conversation with Mr. Neuman?

16            MR. GARDNER:  Objection.  Calls for

17  information subject to deliberative process

18  privilege.  I instruct the witness not to answer.

19            THE WITNESS:  Consistent with that

20  instruction, I can't answer.

21

22  BY MR. GREENBAUM:

Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

Defendants.

18-CV-2921 (JMF)

## DECLARATION OF JOHN GORE

I, John Gore, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.  I am the Principal Deputy Assistant Attorney General in the Civil Rights Division at the U.S. Department of Justice, a position I have held since July 28, 2017.  I served as the Acting Assistant Attorney General for the Civil Rights Division from July 28, 2017 to November 5, 2018. As the Acting Assistant Attorney General, I was the senior management official of the Civil Rights Division.  As a part of my official duties, I was responsible for the overall supervision of the Division's enforcement of the federal statutes and regulations that fall within the Division's purview, including the Voting Rights Act of 1965.  The following statements are based upon my personal knowledge.  These statements are provided in support of the Defendants' opposition to the motion for sanctions filed by the New York Immigration Coalition ("NYIC") in the above-captioned case.

2.  As I have previously testified, I prepared the December 12, 2017, letter to the Census Bureau from Arthur E. Gary, General Counsel of the Department of Justice's Justice Management

Division, requesting that a citizenship question be reinstated on the 2020 decennial census questionnaire ("the Gary Letter").

3.   I have never met, communicated with, or spoken to Dr. Thomas Hofeller.

4.   Prior to NYIC's May 30, 2019, motion for an order to show cause, I never saw, received, or reviewed the document that NYIC claims is a 2015 unpublished study by Dr. Hofeller.

5.   I first saw and became aware of the purported 2015 Hofeller study on May 30, 2019, when I reviewed NYIC's motion for an order to show cause and accompanying press reports. I did not consult, refer to, or rely upon the purported 2015 Hofeller study in drafting the Gary Letter.  Indeed, I was not even aware of the existence of the purported 2015 Hofeller study at the time I drafted the Gary Letter.

6.   I received from Mark Neuman a draft letter concerning a citizenship question on the census questionnaire ("the Neuman Letter"), when I met with Mr. Neuman around October 2017. I had no further oral or written communications with Mr. Neuman after receiving the Neuman Letter from him, including during the time that I was drafting the Gary Letter.

7.   The Neuman Letter was not a draft of the Gary Letter.

8.   Prior to discovery in this case, I reviewed the Neuman Letter only once, shortly after receiving it from Mr. Neuman, and then placed it in a file folder in my office along with other documents about the census.

9.   I did not consult, refer to, or rely upon the Neuman Letter, or any other information provided to me by Mr. Neuman, in drafting the Gary Letter.

2

10. I have no personal knowledge regarding who authored, reviewed, commented on, or contributed to the Neuman Letter.

11. During the time that I was drafting the Gary Letter, I had discussions with Peter Davidson and James Uthmeier in the Department of Commerce's Office of General Counsel about the citizenship question. I discussed with Mr. Davidson and Mr. Uthmeier the drafting and the timing of a letter from the Department of Justice to request reinstatement of a citizenship question on the census questionnaire. I also discussed with Mr. Davidson and Mr. Uthmeier the possible content of such a letter in general terms. I did not rely upon anything communicated by Mr. Davidson, Mr. Uthmeier, or anyone else at the Department of Commerce in drafting the Gary Letter.

12. I never provided any draft of the Gary Letter to Mr. Davidson, Mr. Uthmeier, or anyone else at the Department of Commerce.

13. I never received comments, feedback, or edits on any draft of the Gary Letter from Mr. Davidson, Mr. Uthmeier, or anyone else at the Department of Commerce.

14. My conversations with Mr. Davidson and Mr. Uthmeier all occurred over the phone, and I did not take any notes of those conversations. I did not exchange any written communications about the Gary Letter or its contents with Mr. Davidson, Mr. Uthmeier, or anyone else at the Department of Commerce prior to the letter's transmission to the Census Bureau on December 12, 2017.

15. During the time I was drafting the Gary Letter, I participated in a single conference call with Department of Justice officials and one member of the White House Staff, John Zadrozny,

concerning a citizenship question on the census. I had no oral or written communications with any

other members of the White House Staff concerning a citizenship question or the census before

the Gary Letter was sent to the Census Bureau on December 12, 2017. I did not share any

documents concerning a citizenship question or the census with Mr. Zadrozny or anyone else at

the White House, and did not rely upon anything communicated by Mr. Zadrozny or anyone else

at the White House in drafting the Gary Letter.

16. Similarly, during the time I was drafting the Gary Letter, I participated in a single

conference call with Department of Justice officials and several individuals from the Department

of Homeland Security concerning a citizenship question on the census. I do not recall their names

or titles. I had no oral or written communications with anyone else at the Department of Homeland

Security concerning a citizenship question or the census. I did not share any documents concerning

a citizenship question or the census with these individuals or anyone else at the Department of

Homeland Security, and did not rely upon anything communicated by these individuals or anyone

else at the Department of Homeland Security in drafting the Gary Letter.

17. During discovery in this case, I was asked to produce, among other things, hard copy

documents in my possession that were responsive to Plaintiffs' Rule 45 subpoena directed to the

Department of Justice. I provided a number of documents to counsel for the Defendants, including

the Neuman Letter. At the time I produced these documents to counsel for the Defendants, I did

not recall exactly where I had received the Neuman Letter. This is because I kept all of my hard-

copy documents concerning the census in a file folder in my office, and that folder contained

documents from a number of sources, including materials I found on my own, the legal

4

memorandum from Mr. Uthmeier, and the documents I received from Mr. Neuman.  It is my understanding that all of the documents in this folder either have been produced in discovery in this case or were withheld as privileged.  After Mr. Neuman produced the Neuman Letter in response to a separate Rule 45 subpoena, I realized that the document in my possession must have come from Mr. Neuman.

18. As a member of the Bar and an official of the Department of Justice, I took with utmost seriousness my duties and obligations to comply with all requests for discovery in this matter to the full extent required by law, and as a witness in these proceedings to provide complete and accurate testimony.  At no time, including during my deposition, did I withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required to be produced in discovery, except for documents and information withheld on grounds of privilege that were accounted for in Defendants' privilege logs or Defendants' counsel's objections and instructions not to answer during deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Washington, DC
August 2, 2019

John Gore
Principal Deputy Assistant Attorney General
United States Department of Justice

5

Exhibit 7

| | |
|---|---|
| **From**: | Zadrozny, John A. EOP/WHO [ PII ] |
| **Sent**: | 2/21/2018 11:02:38 PM |
| **To**: | Lenihan, Brian (Federal) [ PII ] |
| **CC**: | Uthmeier, James (Federal) [ PII ]; Hamilton, Gene (OAG) [ PII ]; Sherk, James B. EOP/WHO [ PII ] |
| **Subject**: | RE: Conversation Next Week |

Thanks, Brian.


JZ

w: [ PII ]

c: [ PII ]



**From:** Lenihan, Brian (Federal) [mailto: PII ]
**Sent:** Wednesday, February 21, 2018 5:52 PM
**To:** Zadrozny, John A. EOP/WHO < PII >
**Cc:** Uthmeier, James (Federal) < PII >; Hamilton, Gene (OAG) < PII >; Sherk, James B. EOP/WHO < PII >
**Subject:** Re: Conversation Next Week


Monday afternoon is good on my end


BJL

[ PII ]
via iPad


On Feb 21, 2018, at 5:49 PM, Zadrozny, John A. EOP/WHO < PII > wrote:

James:


If Brian is okay with it, I have no problem on waiting until you get back. I know this conversation is somewhat time-sensitive, though.


I should be able to do Monday 2/26, working around some PCCs and a couple of other meetings.


Does 4:00-5:00 p.m. work for the group on Monday? If so, I can set logistics and send out a calendar appointment.


(Also, I am adding James Sherk.)

JZ
w: **PII**
c:

**From:** Uthmeier, James (Federal) [mailto: **PII** ]
**Sent:** Wednesday, February 21, 2018 5:00 PM
**To:** Zadrozny, John A. EOP/WHO < **PII** >; Lenihan, Brian (Federal) < **PII** >
**Cc:** Hamilton, Gene (OAG) < **PII** >
**Subject:** Re: Conversation Next Week

Hey John,

I can make a call work tomorrow but would prefer Monday if at all possible.  Let me know - we might have some better updates at that time.

Thanks,

James

---

On: 21 February 2018 20:36,
"Zadrozny, John A. EOP/WHO" < **PII** > wrote:

Brian:

Let me know. I can track down a call-in number.

JZ
w: **PII**
c:

**From:** Lenihan, Brian (Federal) **PII**
**Sent:** Wednesday, February 21, 2018 1:24 PM
**To:** Zadrozny, John A. EOP/WHO < **PII** >
**Cc:** Uthmeier, James (Federal) < **PII** >; Hamilton, Gene (OAG) < **PII** >
**Subject:** Re: Conversation Next Week

I am checking to see if James can call in from abroad (7+ hrs)


BJL

PII

via iPad


On Feb 16, 2018, at 12:58 PM, Zadrozny, John A. EOP/WHO <  PII  > wrote:

Brian, James, and Gene:


I wanted to connect with the three of you about having that conversation we discussed at some point next week.


Please let me know who else from your respective agencies needs to be in attendance. We will host. We have significant scheduling flexibility after next Tuesday 2/20, but as a starter suggestion, how about **Thursday 2/22 from 11:00 a.m.-noon**? Once we pin down time, I will send out a WAVES link and make other necessary arrangements.


Please do not hesitate to call me if questions.


John A. Zadrozny

Special Assistant to the President

Justice and Homeland Security

Domestic Policy Council

Executive Office of the President

w:

c:  

Exhibit 8

**To:**      Uthmeier, James (Federal) [⸤⸺⸺PII⸺⸺⸻⸻⸻⸺⸻]
**From:**    Zadrozny, John A. EOP/WHO
**Sent:**    Wed 1/31/2018 12:48:02 PM
**Importance:**        Normal
**Subject:**   RE: Hill/DOJ pushing for citizenship question on census forms: report
**Received:**            Wed 1/31/2018 12:48:27 PM

James:

Apologies for missing your e-mail. I am literally just seeing this.

I can talk today (Wednesday 1/31) or Friday 2/2, if you can. Tomorrow is a mess. Best window today (for the moment) is 11:00 a.m.-2:00 p.m.

Also, if you don't mind, I'd like to rope my new DPC colleague, Theo Wold, into our call (and our mutual subjects). Theo is handling most of Zina's old portfolio. He literally just started last week.

JZ

w:


c:

---

**From:** Uthmeier, James (Federal) [mailto:⸤⸺⸺PII⸺⸺⸻⸻⸺⸻]
**Sent:** Friday, January 26, 2018 8:53 AM
**To:** Zadrozny, John A. EOP/WHO [⸤⸺⸺⸺PII⸺⸺⸺⸻⸻⸺⸻]
**Subject:** Re: Hill/DOJ pushing for citizenship question on census forms: report

COM_DIS00015698
PX-581

John,

Monday I'm open 1230-2 and after 4.  Any chance you're also open for a brief call today?  Let me know.

Thanks,

James

Sent from my iPhone

On Jan 26, 2018, at 7:07 AM, Zadrozny, John A. EOP/WHO [ **PII** ] wrote:

James:

I hope all is well.

Any chance we can chat census on Monday (1/29)? Let me know when works for you.

JZ

w: **PII**
c:

COM_DIS00015699

**From:** Uthmeier, James (Federal) [mailto PII ]
**Sent:** Sunday, December 31, 2017 5:30 PM
**To:** Zadrozny, John A. EOP/WHO PII
**Subject:** Re: Hill/DOJ pushing for citizenship question on census forms: report

The DOJ letter was not released by any political at DOC, so I assume it was leaked.

Yes, we have connected with DOJ and plan to discuss with them as soon as possible.

Happy New Year,

James

On Dec 31, 2017, at 1:46 PM, Zadrozny, John A. EOP/WHO PII wrote:

Works for me.

Also, have you connected with DOJ yet on this? I talked to them on Wednesday 12/20 about this, and they sounded like they are anticipating this being a point of discussion in the New Year.

Question: Was the DOJ letter released by politicals, or was it leaked?

JZ

w: PII

COM_DIS00015700

c: PII

**From:** Uthmeier, James (Federal) [mailto: PII ]
**Sent:** Sunday, December 31, 2017 11:36 AM
**To:** Zadrozny, John A. EOP/WHO PII
**Subject:** Re: Hill/DOJ pushing for citizenship question on census forms: report

Yep - propublica broke the story late Friday.  They incorrectly cited that the question had not been asked since the 1800s, which we had them correct.  This will likely get attention and follow-up questions early next week, so let's plan to get together for a discussion on Tuesday.

**From:** Zadrozny, John A. EOP/WHO PII
**Sent:** Sunday, December 31, 2017 10:23:43 AM
**To:** Uthmeier, James (Federal)
**Subject:** FW: Hill/DOJ pushing for citizenship question on census forms: report

FYI.

John A. Zadrozny

Special Assistant to the President

Justice and Homeland Security

Domestic Policy Council

Executive Office of the President

COM_DIS00015701



w:

c:

---

**From:** Watts, Brad (Judiciary-Rep) [                    PII                    ]
**Sent:** Sunday, December 31, 2017 10:21 AM
**To:** Watts, Brad (Judiciary-Rep) [            PII            ]
**Subject:** Hill/DOJ pushing for citizenship question on census forms: report

DOJ pushing for citizenship question on census forms: report

BY JULIA MANCHESTER - 12/29/17 09:24 PM EST  794

2,243

The Department of Justice (DOJ) is asking the Census Bureau if a question on citizenship status could be added to 2020 census forms, according to a letter first reported by ProPublica on Friday.

The DOJ letter, dated Dec. 12, said including a question on citizenship would allow the the department to better enforce the Voting Rights Act.

"To fully enforce those requirements, the Department needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected," the letter said.

COM_DIS00015702

However, critics say including a question on immigration could prevent immigrants from participating in the census due to fears the government could use the information against them.

The letter was drafted by Arthur Gary, a lawyer at the DOJ, to Census Bureau official Dr. Ron Jarmin.

A spokesperson for the Census Bureau confirmed the letter to ProPublica, saying the "request will go through the well-established process that any potential question would go through."

The Hill has reached out to the Justice Department for comment.

The letter comes after reports in recent months that the Trump administration plans to include an immigration-related question in the census.

>>>http://thehill.com/homenews/administration/366849-doj-pushing-for-citizenship-question-on-census-forms-report<<<;;

COM_DIS00015703

# Exhibit 9

**To:** **George Doty's email address**
**From:** Uthmeier, James (Federal)
**Sent:** Wed 3/28/2018 3:27:07 AM
**Importance:** Normal
**Subject:** Fwd: Internal Census Talking Points
**Received:** Wed 3/28/2018 3:27:08 AM

2018-03-26 (2).pdf
ATT00001.htm

Jed- please see the attached talking points.

Sent from my iPhone

Begin forwarded message:

> **From:** "Uthmeier, James (Federal)" < [PII]
> **To:** "Zadrozny, John A. EOP/ Who" [PII]
> **Subject: Internal Census Talking Points**

John-

Here are the high level talking points.  I'll have some more detailed Q&As to you soon.

Thanks,
James

**From:** Rockas < [PII]
**Date:** Monday, March 26, 2018 at 8:57 PM
**To:** **Mercedes Schlapp's email address** Natalie Strom
[PII] Bradley Rateike [PII]
**Matthew Flynn's email address**
**Subject:** Going at 9

## U.S. DEPARTMENT OF COMMERCE ANNOUNCES REINSTATEMENT OF CITIZENSHIP QUESTION TO THE 2020 DECENNIAL CENSUS

WASHINGTON – Today, the U.S. Department of Commerce announced that a question on citizenship status will be reinstated to the 2020 decennial census questionnaire to help enforce the Voting Rights Act (VRA). Secretary Ross's decision follows a request by the Department of Justice (DOJ) to add a question on citizenship status to the 2020 decennial census.

Please click HERE to view the memorandum directing the Census Bureau to reinstate a question on citizenship to the 2020 decennial census.

The citizenship question will be the same as the one that is asked on the yearly American Community Survey (ACS).  Citizenship questions have also been included on prior decennial censuses.  Between 1820 and 1950, almost every decennial census asked a question on citizenship in some form.  Today, surveys of sample populations, such as the Current Population Survey and the ACS, continue to ask a question on citizenship.

On December 12, 2017, DOJ requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population (CVAP) data that is not currently available from government surveys. DOJ and the courts use CVAP data for the enforcement of Section 2 of the VRA, which protects minority voting rights.

Having citizenship data at the census block level will permit more effective enforcement of the VRA, and Secretary Ross determined that obtaining complete and accurate information to meet this legitimate government purpose outweighed the limited potential adverse impacts.

Congress delegated to the Secretary of Commerce the authority to determine questions to be asked on the decennial census. The Census Act requires the list of decennial census questions be submitted to Congress no later than March 31, 2018.

Following receipt of the DOJ request, the Department of Commerce immediately initiated a comprehensive review process led by the Census Bureau, prioritizing the goal of obtaining *complete and accurate data*.

After a thorough review of the legal, program, and policy considerations, as well as numerous discussions with Census Bureau leadership, Members of Congress, and interested stakeholders, Secretary Ross has determined that reinstatement of a citizenship question on the 2020 decennial census questionnaire is necessary to provide complete and accurate census block level data.

### 

**CENSUS BUREAU HOLDING STATEMENT:**

Today, the U.S. Department of Commerce announced that a question on citizenship status will be added to the 2020 decennial census questionnaire to help enforce the Voting Rights Act. The Department of Commerce is focused on delivering the 2020 decennial questions to Congress by March 31 as is required by statute. The Census Bureau is looking forward to working with the Secretary and the Department of Commerce to conduct a complete and accurate 2020 census. Any questions regarding Secretary Ross's decision may be sent to publicaffairs@doc.gov.

### 

**TOP - LINE TALKING POINTS:**

# Deliberative

# Deliberative

###

----------

James Rockas

Press Secretary & Deputy Director of Public Affairs

U.S. Department of Commerce



COM_DIS00017523

Exhibit 10

**To:** DiGiacomo, Brian (Federal) [PII] Uthmeier, James (Federal) [PII]
**Cc:** Creech, Melissa L (CENSUS/PCO CTR); Ortmeyer, Beverly (Federal)
**From:** Robinson, Barry (Federal)
**Sent:** Thur 4/20/2017 6:27:42 PM
**Importance:** Normal
**Subject:** FW: Strunk summary
**Received:** Thur 4/20/2017 6:27:43 PM

Strunk v California_2016_2017_summary.docx

Good afternoon:

 The attached file identifies the one open case brought against the Census Bureau challenging the constitutionality of its enumerative authorities and functions.

# ACP/Deliberative

 Thanks,

Barry

---

**From:** Melissa L Creech (CENSUS/PCO CTR) [mailto:Melissa.L.Creech@census.gov]
**Sent:** Thursday, April 20, 2017 9:53 AM
**To:** Robinson, Barry (Federal) [PII]
**Subject:** Strunk summary

Melissa L. Creech

Deputy Chief Counsel

Office of the Chief Counsel for Economic Affairs

U.S. Department of Commerce

Telephone (301) 763-9844

Facsimile (301) 763-6238

 Confidentiality Notice:  This e-mail message is intended only for the named recipients.  The information contained in this e-mail and any attachments may be confidential, privileged, attorney-work product, or otherwise exempt from disclosure.  If you have received this message in error, are not the named recipient, or are not an employee or agent responsible for delivering this message to the named recipient, then be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message, its contents, or attachments is strictly prohibited.  If you have received this e-mail in error, then please notify the sender and permanently delete the e-mail and any attachments immediately.  Thank you.

Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

Defendants.

18-CV-2921 (JMF)

## DECLARATION OF JAMES UTHMEIER

I, James Uthmeier, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. This declaration is provided in support of the Defendants' opposition to the motion for sanctions filed by the New York Immigration Coalition ("NYIC") Plaintiffs in the above-captioned case. The statements made herein are based on my personal knowledge.

2. From February 2017 to May 2019 I served in multiple capacities as a Senior Advisor and Counsel to the Secretary at the Department of Commerce. At all relevant time periods I provided legal counsel.

3. When I joined the Commerce Department in mid-February 2017, I used a Commerce Department email account to conduct official business. As a Commerce Department official I followed all policies and regulations regarding use of email to conduct official business. As I explained during my transcribed interview with the House Oversight Committee staff, I likely used my Gmail account while serving in a volunteer capacity on the Presidential Transition Team. At

no time during the 2016 presidential campaign or during the transition team work, or otherwise prior to my starting as an employee at the Department of Commerce, did I work on or discuss, in writing or otherwise, a census citizenship question.

4.   In the spring of 2017, after I had begun working at the Department of Commerce, the Commerce Secretary and other Commerce senior officials asked me to look into the issue of a citizenship question.  Subsequently, for several months thereafter I participated in a number of in-person briefings and discussions on this and several other topics related to the Department. Transcribed Interview at 22.  The purpose of some of these briefings and discussions was to learn more about the census generally and the process for determining census questions specifically. During these briefings and discussions, I received hundreds of pages of materials—including legal opinions, agency correspondence, and many publicly available census documents—that made up the basis for the Administrative Record developed and produced in this case.  No additional notes or materials were taken or received that were not produced.

5.   As one of the preliminary steps I took in 2017 to learn about the census generally, including its scope and legal authorities and requirements, I spoke in person and by telephone to a friend, Professor John Baker.  Professor Baker is a Constitutional law scholar who has taught over a dozen different subjects, mostly in the area of public law.  I did not take notes on these conversations.

6.   As I explained in my transcribed interview with the House Oversight Committee staff, I never received, reviewed, or provided any comments or feedback on any draft, advance copy, or other document purportedly to be sent from the Department of Justice to the Census Bureau

2

requesting reinstatement of a citizenship question on the decennial census.  Transcribed Interview

at 99-100.  This includes any documents purportedly drafted or handled by Mr. Mark Neuman, as

well as any document(s) prepared or handled by Department of Justice officials.

7.  I am aware that the Department of Justice sent a letter, dated December 12, 2017, to

the Census Bureau requesting the reinstatement of a citizenship question on the 2020 decennial

census.  As I stated in my transcribed interview, I never received any advance copies, drafts, or

other documents resembling that letter and I did not provide any comments or feedback on any

such documents.  Transcribed Interview at 146-147.

8.  I am unaware of others in the Commerce Department receiving, reviewing, or

otherwise commenting on drafts of the December 12, 2017 DOJ letter, as well as any other draft

letter prepared or handled by Mr. Neuman.  I never saw or had any conversations with others in

the Commerce Department about drafts or purported drafts of any letters until after litigation began

in this case.

9.  I am aware that Mr. Neuman made statements in his deposition in this case concerning

his uncertain recollection about versions of a letter, and that I may have provided comments on a

draft of a letter.  Paragraphs 6-8 above represent a true and accurate account of events concerning

the letter to the best of my knowledge, information, and belief.

10. Prior to the NYIC Plaintiffs' motion for a show cause order, I was unaware of the late

Dr. Thomas Hofeller, or what purports to be a 2015 study prepared by him concerning the use of

citizen-voting-age population ("CVAP") for purposes of congressional redistricting.  I was also

unaware of a one-paragraph document purportedly recovered from his files after his death that

3

discusses compliance with the Voting Rights Act as a justification for including a citizenship question on the census.

11. I have never met, spoken to, or otherwise communicated with Dr. Hofeller.

12. In 2017 I spoke to then-Acting Assistant Attorney General John Gore on several occasions about reinstatement of the citizenship question on the 2020 census. Those communications were conducted over the telephone, in person, or are otherwise reflected in the Administrative Record, discovery, and the privilege logs produced this case. I did not take any additional notes of those conversations.

13. I have no recollection of speaking to anyone at the White House concerning the citizenship question until after the Department of Justice's December 12, 2017 letter was leaked to the public, which occurred shortly after December 12. After December 12, I had oral communications with individuals in the White House and written communications as reflected in the Administrative Record, discovery, and the privilege logs in this case.

14. As a member of the Bar and as legal counsel to the Department of Commerce, I took with utmost seriousness my duties and obligations to respond to all requests for discovery in this matter, and to furnish documents and information required for inclusion in the administrative record, as required by law. I took equally seriously my obligation to ensure that my client responded as required to all discovery requests, and included the information required in the administrative record. At no time did I withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required in discovery, or for purposes of the

4

administrative record, except for documents and information withheld on grounds of privilege that were accounted for in Defendant's privilege logs.

I declare under penalty of perjury that the foregoing is true and correct.

Tallahassee, FL
August 2, 2019

James Uthmeier

5

Exhibit 12

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | ) No. 1:18-CV-2921 (JMF) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF COMMERCE, et al, | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## DECLARATION

I, Michael A. Cannon make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

*Department of Commerce Document Search Process*

1. I am the Chief of the General Litigation Division, Office of the General Counsel, U.S. Department of Commerce, and my staff assisted in managing the document collection process for this litigation. As such, I oversaw the search, collection, review, and production of these documents. In the course of my duties, and through personal observation, and upon advice and representations from my staff, I obtained information to confirm the following facts set forth below.

2. My office sent out timely litigation holds to relevant parties in the Department of Commerce and the Census Bureau who had custody of documents that were deemed to be relevant or possibly relevant to this litigation.

3. The Department of Commerce ("Department") conducted searches for all pertinent documents to create the Administrative Record for this case using the manner normally employed by the Department in litigation involving administrative records. This search was designed to identify and produce documentary evidence that was considered during the decision-making process in this case.

4. More specifically, this search included the identification and collection of documents reviewed by the Secretary in the course of making his decision to reinstate the citizenship question on the Decennial Census. These documents included internal Census advisory memos on the decision, documentation of the input given directly to the Secretary through stakeholder letters and phone calls, the contents of a media tracker set up to encompass

1

all news articles regarding the decision, Census publications, relevant case law, and relevant statutes.

5.      Pursuant to the Court's July 3, 2018 order, the Department expanded its search and production in accordance with the parameters set forth by the Court. The Department conducted a search of emails, electronic documents, and hard-copy documents reviewed and created by direct advisors to the Secretary.

6.      The emails were obtained by giving search terms to the Office of the Chief Information Officer (OCIO) that were specifically designed to identify responsive documents. Those OCIO employees were directed to run those search terms through the email inboxes of identified "direct advisor" custodians. "Direct advisor" custodians were defined as individuals who demonstrably provided work product or advice directly to the Secretary.[1] My office then requested certifications from the custodians that they understood their emails had been searched.

7.      Similar search terms and processes were applied to the direct advisor custodians' desktop computers in order to identify and produce responsive documents. Custodians' physical documents were also searched for relevant hard-copies of information created or received regarding the reinstatement of the citizenship question. Each custodian provided a certification that this search was performed, and responsive documents that were found were produced either directly to the Plaintiffs or identified on a privilege log.

8.      The Department also collected materials from indirect advisors to the Secretary, meaning individuals who provided material or advice relied upon by the Secretary's direct advisors in providing their advice or recommendations to the Secretary.[2] Any documents provided to direct advisors by their subordinates either in hard copy or via email were included in the search of the documents held by the "direct advisor" custodian's offices or emails. Specifically, in the case of the Census Bureau's "direct advisors," Dr. Abowd, Dr. Jarmin, and Dr. Lamas, the Department collected and produced both documents from their key advisors and documents generated by Dr. Abowd's subordinates. Those latter documents were housed in a secured shared drive, which included the documents and edits produced by Dr. Abowd's subordinates in the drafting of the Census memos sent to Secretary Ross. The Department also had Dr. Abowd's subordinates, who had access to and stored most materials on the secured shared drive, search their personal files for any digital or hard copy materials that were not on the secured shared drive but that were provided to Dr. Abowd in some form.

9.      All custodians were directed to search their offices, desks, and file cabinets for hard copies of any documents that were related to the issues in this litigation. Each custodian provided a certification that this search was performed and any responsive documents that were found were produced either on Commerce's online FOIA reading room, accessible to Plaintiffs, or identified on a privilege log.

---

[1] **Exhibit A** lists all custodians whose emails were searched and all search terms used.

[2] **Exhibit B** lists all custodians whose documents were searched and all search terms used.

2

*Responses to Specific Allegations*

10.     Plaintiffs attempt to raise "notable omissions" in the Administrative Record and July 3, 2018 productions. None of the documents identified by Plaintiffs indicate "gaps" in the productions. From the information obtained by me in the course of my duties, the Department found no other documents that could constitute a "gap" as alleged by Plaintiffs.

### Conversations with Mark Neumann

11.     For example, Plaintiffs claim that the Administrative Record shows no notes or other memorialization of certain conversations between Mr. Neumann and Department personnel. In its search the Department found no notes from the conversations Plaintiffs highlight and have no cause to believe such notes exist.

12.     In AR 2497, the produced email confirms that Mr. Peter Davidson, the Department's General Counsel, spoke to Mr. Neumann over the phone and could provide Secretary Ross a verbal "read out" of the conversations. My staff confirmed and can attest that neither Secretary Ross nor Mr. Davidson took notes during these phone calls.

13.     In AR 3699, Wendy Teramoto writes that she and Mr. Neumann "talk frequently and have dinner." This email describes how often Ms. Teramoto and Mr. Neumann communicate but does not indicate it is for purposes of departmental policy. Furthermore, my staff confirmed and can attest that Ms. Teramoto did not take notes during these calls or meetings

14.     AR 3709 is a chain of two emails in which Mr. Neumann responds to a request for information from Mr. Earl Comstock. Mr. Neumann's response is recorded and included in the Administrative Record at the top of AR 3709. These emails do not establish any gap in documentation.

15.     Plaintiffs' footnote 3 references emails mistakenly marked as attorney-client privileged in Defendants' earlier production. Those documents are no longer designated as privileged and have been produced to Plaintiffs.

16.     Plaintiffs question the absence of a post-call memo reflecting stakeholder input provided by Mr. Neumann to Secretary Ross in March 2018 in a meeting reflected in AR 1815, 3421, and 3491. Mr. Neumann was on the transition team for the Department of Commerce and the Record reflects Department employees consulted him on various Census matters. Mr. Neumann was not seen as an external stakeholder. As such, in this meeting with the Secretary he did not represent a particular constituency and the conversation was not memorialized in the same manner as outside stakeholder calls. Unlike other calls, Mr. Neumann did not provide information on the impact of the reinstatement of a citizenship question on response rates or the quality of the citizenship data. Instead, Mr. Neumann looked past the impacts of reinstating the question and provided information regarding his views on the potential impact the resulting data would have on the political landscape. The presentation Mr. Neumann provided is included in the Record at AR 10237 and the presentation obviated the need for a post call memo. In any event, this information was not considered by the Secretary in his decision to reinstate the citizenship question but was produced per the Court's July 3, 2018 order.

3

**Conversations with other individuals**

17.     Plaintiffs also claim that "substantive" input from Mr. Kobach, Mr. Bannon, and other key individuals at federal agencies was excluded from the record. However, the Department provided to Plaintiffs the relevant documents produced by the searches conducted. Despite thorough searches, no additional documents have been identified.

18.     In AR 763, Mr. Kobach himself memorializes his call with the Secretary. My staff confirmed and can attest that neither the Secretary nor Ms. Teramoto took notes on these phone calls.

19.     In AR 2458, Mr. Comstock memorializes his prior conversation with various Federal Agency individuals to inform the Secretary of his activity. Mr. Comstock is the Policy Director of the Department of Commerce and due to the large number of areas he oversees, my staff confirmed and can attest that he did not take notes on these calls or meetings. This memo was in direct response to a request from the Secretary to report on his work related to this topic.

20.     In AR 2488, 2491, and 2496, the Administrative Record shows that Mr. Davidson missed calls from Mr. Gore. This indicates that calls did not happen at that time, not that they took place, that notes from those calls were taken, and subsequently were omitted from the record. If those calls eventually took place, the Department has no reason to believe that notes from those calls were taken.

21.     In AR 2561, Secretary Ross's assistant indicates that she would like to set up a call at the suggestion of Mr. Bannon while Secretary Ross is en route to an event. If this call did occur, our search did not produce any notes and there is no cause to believe such notes exist.

22.     AR 2634 indicates that Ms. Teramoto spoke with Mr. Gore. My staff confirmed and can attest that Ms. Teramoto did not take notes on this phone call.

23.     AR 11160 indicates that Mr. Zadrozny, Mr. Hamilton, Mr. Sherk, and Mr. Lenihan set up a call to speak with Mr. Uthmeier regarding the leak of the Department of Justice's request to the Department of Commerce. Mr. Uthmeier provided updates on the status of the Department of Commerce's review and analysis of the Department of Justice Request. He did not take notes on that conversation because he was not receiving information.

24.     In AR 11193, Secretary Ross asks Mr. Davidson to set up a call with the "responsible person at Justice." Mr. Davidson responds that there is "no need for you to call." This indicates that the call likely did not happen, not that call notes were omitted. Our search did not produce any notes, and there is no cause to believe such notes exist.

4

_Michl A. Cannon_    8/15/18

Michael A. Cannon
Chief, General Litigation Division
Office of General Counsel
U.S. Department of Commerce

5

Exhibit 13

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) No. 1:18-CV-2921 (JMF) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF COMMERCE, et al, | ) |
| | ) |
| *Defendants.* | ) |

## DECLARATION

I, Michael A. Cannon, make the following declaration pursuant to 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

1.     I am the Chief of the General Litigation Division for the U.S. Department of Commerce, and my staff assisted in managing the document collection process for this litigation. As such, my staff and I oversaw the search, collection, review, and production of documents in this litigation. In the course of my duties, and through personal observation, and upon advice and representations from my staff as well as the Office of the Chief Information Officer (OCIO) at the Department of Commerce and the Office of Information Security (OIS) for the Census Bureau within the Department of Commerce, I confirm the following facts set forth below.

2.     As set forth in the declarations of Jean McKenzie (McKenzie Declaration), ¶ 4, and Terri Ware (Ware Declaration), ¶ 5, I understand that in July 2019, OCIO and OIS conducted new searches of the governmental e-mail accounts for the Census and Commerce custodians identified in those declarations for any communications about or including Hofeller by using the search terms and parameters described in those declarations. Those searches identified a single email, which made no mention of a citizenship question, redistricting, or apportionment, and is not related to the decision-making process. Accordingly, no responsive documents were found based on this search.

3.     As set forth in the Ware declaration, ¶ 5, I understand that in July 2019, OCIO conducted new searches of the governmental e-mail accounts for the Commerce custodians identified in that declaration for any communications about or including A. Mark Neuman by using the search terms and parameters described in that declaration. The results of those searches were turned over to agency counsel, and after being reviewed by my staff, it was determined that all of those communications had been identified by previous searches in this litigation, and were either produced or withheld on the basis of privilege. Accordingly, this search did not result in the identification of any new documents.

1

4.      As set forth in the Ware Declaration, ¶ 6, I understand that in July 2019, OCIO conducted new search of the governmental e-mail account for James Uthmeier for any communications with or about Professor John S. Baker concerning topics relevant to this litigation by using the search terms and parameters described in that declaration.  The results of those searches were turned over to agency counsel, and after being reviewed by my staff, it was determined that none of those communications identified by the search were sent by, sent to, or concerned Professor John S. Baker.

*Michael A. Cannon*      8/2/2019

Michael A. Cannon
Chief, General Litigation Division

Exhibit 14

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, et al,

       *Plaintiffs,*

       v.

UNITED STATES DEPARTMENT
OF COMMERCE, et al,

       *Defendants.*

No. 1:18-CV-2921 (JMF)

## DECLARATION

    I, Jean McKenzie, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

    1.    I am an IT Specialist and Special Assistant to the Division Chief in the Office of Information Security ("OIS") for the Census Bureau within the United States Department of Commerce ("Commerce"), and my staff assisted in managing the document collection process for this litigation.  Agency counsel provided OIS with the names of custodians and lists of relevant search terms for each of the e-mail searches conducted within Commerce over the course of this litigation. OIS completed those searches and provided the results to agency counsel. In the course of my duties, and through personal observation, and upon advice and representations from my staff, I obtained information to confirm the following facts set forth below.

    2.    OIS conducted searches for all pertinent documents through the process normally employed by the Census Bureau in searching Census Bureau e-mails.

    3.    In August 2018, OIS received a request from Commerce agency counsel to conduct a search of the governmental e-mail account belonging to Christa Jones.  The search was conducted for the period of January 1, 2017 through March 26, 2018, for the following terms: ["citizenship" & "question or topic"] as both required in the email, ["DOJ or Justice" & "census or decennial"] as both required in the email, and ["Citizenship" & "Census"] as both required in the email.  The results of this search were provided to Commerce agency counsel.

    4.    In July 2019, OIS received a request from Commerce agency counsel to conduct a search of the governmental e-mail account belonging to Christa Jones.  The search was conducted for the period of January 1, 2017 through March 28, 2018, for the following words and phrases:  Hofeller, Hoefeller, Hofler, Hoffler, "A proposal to use CVAP can be expected to provoke a high degree of resistance from Democrats", and "Our understanding is that data on

1

citizenship is specifically required to ensure that the Latino community achieves full representation in redistricting". These searches yielded no results.

Date: *august 2 2019*

*Jean McKenzie*

Jean McKenzie, Esq., CISM, CIPP-G
Office of Information Security
U.S. Census Bureau
U.S. Department of Commerce

# Exhibit 15

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, et al, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 1:18-CV-2921 (JMF) |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, et al, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## **DECLARATION**

I, Terri Ware, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under the penalty of perjury the following is true and correct to the best of my knowledge and belief:

1.      I am the Deputy Chief Information Officer within the Office of the Chief Information Officer (OCIO) at the Department of Commerce ("Department"), and my staff assisted in supporting the document collection process for this litigation.  Agency counsel provided OCIO with the names of custodians and lists of relevant search terms for each of the e-mail searches conducted within Commerce over the course of this litigation.  OCIO completed those searches and provided the results to agency counsel.  In the course of my duties and upon advice and representations from my staff, I obtained information to confirm the following facts set forth below.

2.      OCIO conducted searches for all pertinent documents through the process normally employed by the Department in searching Department e-mails.  A list of custodians, search terms used, and date ranges applied in the e-mail searches discussed below is attached as Exhibit A.

3.      In August 2018, OCIO received requests from agency counsel to conduct searches of governmental e-mail accounts for the following custodians:  Israel Hernandez, Brian Lenihan, and Kevin Manning.  The results of these searches were provided to agency counsel.

4.      In September 2018, OCIO received requests from agency counsel to conduct additional searches of governmental e-mail accounts for the following custodians:  Secretary Wilbur Ross, Wendy Teramoto, Karen Dunn Kelley, Earl Comstock, Peter Davidson, Michael Walsh, Israel Hernandez, James Uthmeier, Brook Alexander, Sally (Macie) Leach, Eric Branstad, Aaron Willard, Brian Lenihan, Sahra Park-Su, and David Langdon.  The results of these searches were provided to agency counsel.

5.      In July 2019, OCIO received a request from agency counsel to search the governmental e-mail accounts for the following custodians:  Secretary Wilbur Ross, Earl

1

Comstock, Peter Davidson, Michael Walsh, James Uthmeier, Israel Hernandez, Eric Branstad, Sally (Macie) Leach, Wendy Teramoto, Karen Dunn Kelley, Sahra Park-Su, David Langdon, Ellen Herbst, Aaron Willard, Austin Schnell, Brian Lenihan, and Kevin Manning.  The searches were conducted for the period of January 1, 2017 through March 26, 2018, for the following terms:  Hofeller, Hoefeller, Hofler, Hoffler, "Neuman" & "redistricting", "Newman" & "redistricting", "Neumann" & "redistricting", "Neumann" & "redistricting", "Neuman" & "apportionment", "Newman" & "apportionment", "Neumann" & "apportionment", and "Neumann" & "apportionment".  The results of these searches were provided to agency counsel.

6.      In July 2019, OCIO received a request from agency counsel to search the governmental e-mail account for custodian James Uthmeier for the period of January 1, 2017 through March 26, 2018 for the following terms:  ["baker" or "professor"] & "citizenship", ["baker" or "professor"] & "redistricting", ["baker" or "professor"] & "apportionment", and ["baker" or "professor"] & "census".  The results of these searches were provided to agency counsel.

7.      In July 2019, OCIO received a request from agency counsel to search the governmental e-mail accounts for the following custodians:  Secretary Wilbur Ross, Earl Comstock, Peter Davidson, Michael Walsh, James Uthmeier, Israel Hernandez, Eric Branstad, Sally (Macie) Leach, Wendy Teramoto, Karen Dunn Kelley, Sahra Park-Su, David Langdon, Ellen Herbst, Aaron Willard, Austin Schnell, Brian Lenihan, and Kevin Manning.  The searches were conducted for the period of January 1, 2017 through March 26, 2018, for the following phrases:  "A proposal to use CVAP can be expected to provoke a high degree of resistance from Democrats" and "Our understanding is that data on citizenship is specifically required to ensure that the Latino community achieves full representation in redistricting".  These searches yielded no results.

Date:  8-2-2019

_____
Terri Ware
Deputy Chief Information Officer

Office of the Chief Information Officer
U.S. Department of Commerce

2

Exhibit 16

15.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

    Defendants.

18-CV-2921 (JMF)

## DECLARATION OF CHRISTA JONES

I, Christa D. Jones, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I have served as a career employee of the U.S. Bureau of the Census for more than fifteen (15) years. At the start of the Trump Administration, I served as Senior Advisor to the Assistant Director for Research and Methodology, until my departure from the Bureau on May 27, 2017. I returned to the Bureau on February 20, 2018, where I assumed the position of Senior Advisor to the Census Bureau's Deputy Director and Chief Operating Officer, Dr. Ron Jarmin, who was then performing the nonexclusive functions and duties of the Acting Director of the Census Bureau. These statements are provided in support of the Defendants' opposition to the New York Immigration Coalition's ("NYIC") motion for sanctions in the above-captioned case.

2. Until his passing in August 2018, I was personally acquainted with Dr. Thomas Hofeller, whom I have known for many years. Since January 2017, I have had several telephone

conversations with Dr. Hofeller concerning personal matters. To my knowledge, I did not exchange any written correspondence with Dr. Hofeller during this time. Also during this time, I do not recall having any discussion with Dr. Hofeller concerning the reinstatement of a citizenship question to the decennial census.

3.   Prior to press reports earlier this year concerning the discovery of Dr. Hofeller's unpublished 2015 study, I had never seen nor heard about that study. I had never discussed the contents of that study with Dr. Hofeller or with anyone else in connection with Secretary Ross's decision to include a citizenship question on the 2020 decennial census.

4.   Similarly, prior to this litigation, I had never seen a copy of a purported draft letter from the Department of Justice to the Census Bureau requesting a citizenship question ("the Neuman Letter"), or the one-paragraph document, allegedly created in 2017, that allegedly was retrieved from Dr. Hofeller's computer and whose text appears in the Neuman Letter.

5.   During the time Secretary Ross and his staff were drafting his March 2018 decision memorandum, I was responsible for collecting comments on those drafts from employees of the Census Bureau, such as Dr. Ron Jarmin, Dr. John Abowd, and Enrique Lamas, and transmitting them to the Commerce Department. I was neither a primary drafter nor contributor of comments to the Secretary's March 2018 decision memorandum and did not play a central role in preparing that memorandum.

2

6. At all times during my tenure with the Census Bureau, including following the Secretary's issuance his decision memorandum in March 2018, I have concurred with the view of the Census Bureau that it was not advisable to include a citizenship question on the 2020 decennial census.

Washington, DC
August 2, 2019

Christa D. Jones
Senior Advisor
United States Census Bureau

3

Exhibit 17

COMMITTEE ON OVERSIGHT AND REFORM,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:    JAMES UTHMEIER

Tuesday, June 11, 2019

Washington, D.C.

The interview in the above matter was held in Room 6200, O'Neill House Office

Building, commencing at 9:35 a.m.

<u>Appearances:</u>

For the COMMITTEE ON OVERSIGHT AND REFORM:

TORI ANDERSON, COUNSEL

RUSSELL ANELLO, CHIEF OVERSIGHT COUNSEL

SUSANNE SACHSMAN GROOMS, DEPUTY STAFF DIRECTOR AND CHIEF COUNSEL

KATHLEEN TELEKY, PROFESSIONAL STAFF MEMBER

CAROLINE NABITY, MINORITY COUNSEL

STEVE CASTOR, MINORITY GENERAL COUNSEL

TYLER SANDERSON, MINORITY COUNSEL

ELLEN JOHNSON, MINORITY SENIOR PROFESSIONAL STAFF MEMBER

For DEPARTMENT OF COMMERCE:

DAVID DEWHIRST, ESQ. [VIA TELEPHONE]

CORDELL HULL, ESQ. [VIA TELEPHONE]

Were you instructed or did you do anything else regarding the citizenship question after you provided the memo, and after you received this email asking for progress and provided a progress update email?

A      Did I do anything about --

Q      The citizenship question?

A      With regard to the citizenship question?

Q      Yes.

A      Can you repeat that question?    I'm sorry.

Q      Sure.

You said earlier that you provided a legal memo to Earl Comstock and the Secretary.    And then after that we talked about the emails that were sent in early September.    And you said you remember providing an update email to the Secretary or a response to him asking for progress.

Did you do anything after that time period with regard to the citizenship question?

A      Yes.

Q      What did you do?

A      I continued to collect information and receive counsel from Census officials as well as attorneys that worked on Census issues.    And I would have had other conversations within the administration on the topic.

Q      Who did you have conversations with within the administration?

A      I consulted John Gore at the Department of Justice.    Again, as I said earlier, I was referred to him as the Department's, you know, Voting Rights Act expert.    I believe at the time he was heading up the Office of Civil Rights at Justice.    And I would have provided updates to individuals at the White House.

Q      Who at the White House would you provide updates to?

the basis is?

So you are just sort of refusing to tell us who you talked to at the White House, is that what we have, but without a reason?

Mr. <u>Dewhirst.</u>    Yeah, I don't know how much clearer I can be on this, Ross.    But he's --yeah, he's instructed not to answer.

Mr. <u>Anello.</u>    Without a basis, it is it just a clean instruction not to answer?

Mr. <u>Dewhirst.</u>    No, it is on the same basis.

Mr. <u>Anello.</u>    What is the basis for the instruction?

Mr. <u>Dewhirst.</u>    Executive branch confidentiality concerns.

Mr. <u>Anello.</u>    So the identity of the White House officials with whom Mr. Uthmeier spoke is something that you cannot tell Congress?

Mr. Uthmeier, did you speak with Steve Bannon about this issue?

Mr. <u>Dewhirst.</u>    Same instruction to the witness.

Mr. <u>Anello.</u>    Did you speak with the chief of staff at the White House this time?

Mr. <u>Dewhirst.</u>    Same instruction.

Mr. <u>Anello.</u>    Did you speak to anybody at Domestic Policy Council?

Mr. <u>Dewhirst.</u>    Same instruction.

Mr. <u>Anello.</u>    Did you to Stephen Miller about it?

Mr. <u>Dewhirst.</u>    Same instruction.

Mr. <u>Anello.</u>    Did anybody at the White House tell you to pursue this issue?

I haven't heard an answer or an instruction to that question.    Did anybody at the White House tell you to pursue the issue of citizenship question?

Mr. <u>Uthmeier.</u>    No.

BY MR. ANELLO:

Q    Okay.    Did anybody at the White House express interest in the citizenship

question?

      A     No different than interest in other ongoings at the Department.

Communications made to the White House on this topic were in briefing nature, in

update nature, coordination in keeping the White House apprised as I would do on any

other topic.

      Q     Did anybody at the White House express interest in the citizenship question

issue question?

      Mr. <u>Dewhirst.</u>    Beyond what Mr. Uthmeier has just answered, I am going to

instruct him not to answer this question, same basis as before.

         BY MR. ANELLO:

      Q     Well he already told us they did not tell him to do anything, but now, what is

the difference between that question is something he can't answer, but expressing

interest is something that he cannot answer?    I am not sure I understand the basis

there.

      A     I did not receive any directives or direction from the White House on the

topic of the Census citizenship question.    Communications I made to the White House

were of the nature that they were briefings and updates.

      Q     Great.    So it sounds like there should not be confidentiality issues then.

So who did you brief?

      Mr. <u>Dewhirst.</u>    Same instruction as before.

         BY MR. ANELLO:

      Q     Was the White House involved in the decision to add a citizenship question?

Did they play a role in that decision?

      A     No, they did not.

      Q     Okay.    If they didn't play a role in the decision, then there is provided your

populations for the Census I think we probably spoke about the rate base undercount in every meeting or discussion we ever had.    I talked to him about advertising and ways to develop new community groups through partnerships, and agreements to better get the word out about Census.    And then I also asked him for background information on citizenship and other topics that are asked about on the Census.

Q      Did you have a particular reason for asking him -- is there a particular a reason that you went to him for information on citizenship?

Mr. <u>Dewhirst.</u>    Instruct the witness not to answer on the same basis articulated before.

Mr. <u>Anello.</u>    The question is did you have a reason to think he -- is there a reason you picked him as your source?

I am not asking why you were motivated to ask about the citizenship question generally, I am asking why did you pick Mr. Neuman as somebody to ask?

Mr. <u>Dewhirst.</u>    Well, I can tell you this, I am going to assert -- I am going to provide the same instruction.    I mean, even though you are trying to parse the question a certain way Ross, I think it still implicates the same interest.    And so I am going to instruct the witness not to answer.

BY MS. ANDERSON:

Q      You talked earlier before we took our break that -- and you said Mr. Neuman provided you documentation, some documents.    Was one of those a draft letter from the Department of Justice to the Census Bureau requesting a citizen question?

A      No.

Q      Did he ever provide you with any draft language that would go into a letter from the Department of Justice to the Census Bureau asking for addition of citizenship question?

A       No, not to my recollection, he never provided me anything like that.

Q       Did he ever provide you with legal research about adding a citizenship question to the 2020 Census?

A       No.    He may have provided me some cases, case names or information on prior legal issues that face the Census Bureau during previous administrations, knowing that I was a new political counsel and would be working on Census issues.

Other than cases and a brief overview of some of those litigation matters, no, no legal research.

Q       Did he ever provide you with any information about citizen voting age population data?

A       Yes.

Q       What did he provide you?

A       I do not recall specifically, but it would have been Census data, most likely public information.

Q       Did he ever provide any analysis or comments on that citizen voting age population data?

Mr. Dewhirst.    I am going to jump in and instruct the witness not to answer, that implicates the executive branch confidentiality and litigation interests.

Ms. Anderson.    Just to be clear, I was asking whether he provided that, not specifically what his analysis was at this point.

Mr. Dewhirst.    Okay.    On that basis I will withdraw the instruction.    Can you please ask the question one more time?

BY MS. ANDERSON:

Q       Sure.    Did Mark Neuman provide any comments, thoughts, opinions or analysis of citizen voting age population data?

sense about the amount of time you have left?

Ms. <u>Anderson.</u>   I think it is hard for us to put an exact number on it.    It could be that we need another two rounds.    It could be that we end in the next round.    Sorry, it is a very lawyerly answer.

Mr. <u>Dewhirst.</u>   I would say that answer myself.    Okay. Thank you very much. We will call back in 5 minutes.

Ms. <u>Johnson.</u>   Okay.

Ms. <u>Anderson.</u>   Thank you.

[Recess.]

Ms. <u>Anderson.</u>   Okay.    We can go back on the record, it is 3:54 p.m.

[Uthmeier Exhibit No. 25

Was marked for identification.]

BY MS. ANDERSON:

Q    Before we took our break on the majority side, Mr. Uthmeier, we were talking about your interactions with Mark Neuman, I would like you to look at exhibit No. 25.    We will mark it as such here.    It is a copy of a Word document that came off of Thomas Hofeller's drive.    It says in quotes:    "We note that in these two cases, one in 2006 and one in 2009, courts reviewing compliance with requirement of the Voting Rights Act and its application in legislative redistricting, have required Latino voting districts to contain 50 percent plus one of 'Citizen Voting Age Population,' or CVAP.    It is clear that full compliance with these Federal Court decisions will require block level data that can only be secured by a mandatory question in the 2020 enumeration.    Our understanding is that data on citizenship is specifically required to ensure that the Latino community achieves full representation in redistricting."

Did you ever receive any documentation from Mark Neuman that contained this

wording or this information?

Q        I do not recall ever receiving this document at all.    You know, this seems to

be the first time I am looking at it, so information contained herein I would have even

gleaned from my own -- from my own research.

Q        And I would like you to also look at exhibit 24.    And not to be confused, it is

marked as exhibit 18, but we will mark it for our purposes as exhibit 24.

[Uthmeier Exhibit No. 24

Was marked for identification.]

Mr. Uthmeier.    Okay.    I have opened it up.    I am looking at it now.

BY MS. ANDERSON:

Q        Did Mr. Neuman ever provide you with this document or any part of this

document?

A        No.

Q        Did you ever discuss with Mark Neuman why the Department of Commerce

wanted -- or did you ever talk to Mark Neuman about whether he knew why Secretary

Ross was interested in a citizenship question?

A        No.

Q        Did you ever discuss legislative apportionment or redistricting with Mark

Neuman?

A        Not to my recollection.    To the extent it doesn't just deal with ensuring

majority, minority populations obtained fair representation.

Q        Did you ever discuss with Mark Neuman about how adding a citizenship

question could affect participation of immigrants or noncitizens in the Census?

A        Can you repeat that question?

Q        Sure.    Did you ever discuss with Mark Neuman about how adding a

citizenship question?

Mr. Hull.    Again, this is Cordell.    And reiterating the bases on which we have

had the discussion about this.    But I will allow him to answer to the extent that he can

answer within the parameters we have set out.

Mr. Uthmeier.    Yeah.    As I have stated, I spoke with White House personnel.    I

am aware of at least, you know, a couple of other individuals that would have also spoken

with the White House on this topic, always in a briefing capacity, providing updates,

insuring that, you know, the executive branch is coordinated and that there are no

surprises.

When the DOJ letter was leaked, immediately there were press stories, there

were -- there were allegations, things were misconstrued.    And myself and other

Commerce personnel provided -- you know, answered questions and provided briefings

to other administration officials to explain, you know, what we were working on and just

provide updates generally.

Mr. Anello.    Okay.    Who at the White House did you brief about the citizenship

question?

Mr. Hull.    And again, this is Cordell.    Again, we have laid out the parameters on

this, so I would instruct the witness not to answer.

Mr. Anello.    But I guess I don't understand.    He is allowed to say who he didn't

talk to, but he can't say who he did talk to?    Is that what you're saying?

Should we, like, read a list of everybody at the White House, and he can say no

and then just not answer the people he did talk to?

Mr. Hull.    Mr. Anello, we are trying to provide accomodation to the committee.

You asked about a certain number of people --

Mr. Anello.    The minority staff had unlimited number of people.    I would like to

decision-making process.    But it is also possible that he may have limited information about the role that they played.    And the communications that he did have with the White House might be extremely material in helping us understand who at the White House was involved in these issues.

So I don't think there is any question -- I am sorry -- I am going to finish now.

I don't think there is any question that we have a legislative purpose.    I am kind of surprise to hear you suggest otherwise.    And I understand the instruction that you have made to the witness, which is not to answer the question.    And I am happy for us to move on at this point.

Mr. <u>Dewhirst.</u>    I think we can move on.    I think that is fine.

[Uthmeier Exhibit No. 14

Was marked for identification.]

BY MS. ANDERSON:

Q    If you could look at Exhibit 14.

A    14?

Q    Yes.    14.

A    I am sorry.    Give me just a minute.

Q    Okay.    And it should be in the first email.

Have you had a chance to review?

A    Yes, I have.

Q    Okay.    It is an email from John Zadrozny on February 16, 2018, to you, Gene Hamilton, and -- it is blacked out, but Brian.

And it says, quote, I want to connect with the three of you about having that conversation we discussed at some point this week.

Why was he connecting the three of you?

A     I do not recall.

Q     Was the conversation that he was referring to about the citizenship

question?

A     I am not sure.    I do not recall ever meeting with Gene Hamilton.    You

know, if I may have had interaction with him and forgotten, I apologize.    But I am not

even sure if this meeting took place.

Q     Do you remember speaking with John Zadrozny around this time?

A     I remember speaking with John on multiple occasions around this time, yes.

I don't know if it was specific to this day.

Q     Okay.    And you spoke with him about the citizenship question; is that

correct?

Mr. Dewhirst.    I am going to interpose an instruction of the witness not to

answer.    That implicates the executive branch and litigation concerns, confidentiality

and litigation concerns.

Ms. Anderson.    Was John Zadrozny --

Mr. Dewhirst.    Dewhirst.

Ms. Anderson.    I am sorry.    That was Mr. Dewhirst.

Mr. Dewhirst.    I am sorry, too.    That is an awkward thing, but anyway.

BY MS. ANDERSON:

Q     Was John Zadrozny one of the people at the White House that you did brief

about the citizenship question issue?

A     Yes, among several other individuals.

Q     How many times did you brief him about the citizenship question?

A     I provided updates on a couple of occasions.    I know I provided updates

following this leak of the DOJ letter and several press stories that broke thereafter.    But

# Exhibit 18



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

### Supplemental Memorandum by Secretary of Commerce Wilbur Ross
### Regarding the Administrative Record in Census Litigation

This memorandum is intended to provide further background and context regarding my March 26, 2018, memorandum concerning the reinstatement of a citizenship question to the decennial census. Soon after my appointment as Secretary of Commerce, I began considering various fundamental issues regarding the upcoming 2020 Census, including funding and content. Part of these considerations included whether to reinstate a citizenship question, which other senior Administration officials had previously raised. My staff and I thought reinstating a citizenship question could be warranted, and we had various discussions with other governmental officials about reinstating a citizenship question to the Census. As part of that deliberative process, my staff and I consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act.

Ultimately, on December 12, 2017, DOJ sent a letter formally requesting that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship. My March 26, 2018, memorandum described the thorough assessment process that the Department of Commerce conducted following receipt of the DOJ letter, the evidence and arguments I considered, and the factors I weighed in making my decision to include the citizenship question on the 2020 Census.

Wilbur Ross
June 21, 2018

# Exhibit 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, *et. al*,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et. al*,<br><br>    Defendant. | Civil Action No. 1:18-cv-05025-JMF<br><br>Hon. Jesse M. Furman<br><br>**PLAINTIFFS' FIRST SET OF REQUESTS FOR EXPEDITED PRODUCTION OF DOCUMENTS AND FIRST SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DEPARTMENT OF COMMERCE AND WILBUR ROSS** |

   Pursuant to Federal Rules of Civil Procedure 33 and 34, by and through their attorneys of record, Plaintiffs request that Defendants, or those authorized to act on behalf of Defendants, respond to the following Interrogatories and Requests for Production of Documents and produce for inspection, copying and use all responsive documents requested herein.  Documents should be produced by July 31, 2018 to the offices of Arnold & Porter Kaye Scholer LLP, 601 Massachusetts Avenue, N.W., Washington, D.C. 20001.

   Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.  As used in these Requests, the following terms are to be interpreted in accordance with the following definitions.

**DEFINITIONS**

   1.  CENSUS BUREAU means the United States Census Bureau, including all regional offices and subdivisions of the Census Bureau, including any PERSON or PERSONS.

2.      CITIZENSHIP QUESTION means a question posed by the CENSUS BUREAU inquiring as to a PERSON's citizenship status.

3.      COMMUNICATION or COMMUNICATIONS means any contact between two or more PERSONS (including any individual, corporation, proprietorship, partnership, association, government agency or any other entity) by which any information, knowledge or opinion is transmitted or conveyed, or attempted to be transmitted or conveyed, and shall include, without limitation, written contact by means such as letters, memoranda, e-mails, text messages, instant messages, tweets, social networking sites, or any other DOCUMENT, and oral contact, such as face-to-face meetings, video conferences, or telephonic conversations.

4.      COMMERCE means the United States Department of Commerce and all of its component agencies, including the Census Bureau.

5.      DECENNIAL CENSUS means the constitutionally mandated census that is administered every ten years by the Census Bureau to count the number of people residing in the United States.

6.      DOJ means the United States Department of Justice, including any PERSON OR PERSONS currently or formerly employed by such agency since January 20, 2017.

7.      DOCUMENT means any "document or electronically stored information— including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form." Fed. R. Civ. P. 34(a)(1)(A).

8.      IDENTIFY means:

   a.   When referring to a person, you shall set forth the following information: (i) Full Name; (ii) Present or last known residential address; (iii) Present or last known

       telephone number; (iv) Present occupation, job title, employer and employer's address; and  (v) Occupation, job title, employer, and employer's address at the time of the event or period referred to in each particular interrogatory.

   b.  When referring to a document, you shall set forth the following information: (i) the nature (*e.g.*, e-mail, letter, handwritten note) of the document; (ii) the subject line, title, or heading that appears on the document; (iii) the date of the document and the date of each addendum, supplement or other addition or change; (iv) identification of the author and of the signer thereof, and of the person on whose behalf or at whose request or direction the document was prepared or delivered; (v) identification of the addressee or recipient thereof, if any; and (vi) the present locations of the document, and the name, address, position or title, and telephone number of the person or persons having custody.

   c.  When referring to an event, occurrence, act, transaction or conversation, you shall set forth the following information: (i) the date and place of such event; (ii) the persons involved; and (iii) a description of the event.

   9.    NEILSEN means Nielsen Media Research, and any PERSON OR PERSON employed by Nielsen Media Research, including Christine Pierce.

   10.   PERSON OR PERSONS means any natural person, firm, partnership, association, joint venture, public or private corporation, individual, proprietorship, governmental entity, organization, other enterprise, group of natural persons or other entity that has a separate legal existence.

   11.   OTHER GOVERNMENT AGENCIES means the DOJ, the United States Department of Homeland Security, the United States  Department of State, and any other agencies of the United States Government, including any PERSON OR PERSONS currently or formerly employed by such agencies since January 20, 2017.

   12.   SECRETARY ROSS means Wilbur J. Ross, Secretary of COMMERCE.

   13.   TRUMP CAMPAIGN means any PERSON or PERSONS, organizations, or agents seeking the election or reelection of Donald J. Trump, including but not limited to employees of the presidential campaign committee, Donald J. Trump for President, Inc.

14.     TRUMP ADMINISTRATION means President Donald J. Trump, Vice President Michael R. Pence, and any PERSON or PERSONS currently or formerly employed at, for, or within the Executive Office of the President and all of its components at any time since January 20, 2017.

15.     The use of the singular form of any word shall include the plural and vice versa.

16.     The connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses which might otherwise be construed outside the scope.

## INSTRUCTIONS

1.  The word "any" includes all and the word "all" includes any.

2.  These Requests require the production of all responsive DOCUMENTS within the sole or joint possession, custody, or control of Defendants including, but not limited to, any such DOCUMENT or thing that is within the possession, custody, or control of any agents, agencies, departments, attorneys, employees, consultants, investigators, representatives, or other PERSONS or entities acting for, or otherwise subject to the control of, Defendants.

3.  Defendants shall answer each Request and each part or subpart of a Request separately. Defendants shall leave no part of a Request unanswered merely because an objection is interposed to another part of the Request.  If Defendants are unable to answer fully any of these Requests, after exercising due diligence to secure the information to do so, Defendants should so state, answer to the extent possible, specify Defendants' inability to answer the remainder and provide or state whatever information is in Defendants' possession, custody, control, or knowledge concerning any unanswered portion.

4.  If Defendants object to or otherwise decline to answer any portion of a Request, Defendants shall identify the portion of the Request to which they object or otherwise decline to

answer, state with particularity the reason for such objection or declination, and identify each PERSON or organization having knowledge of the factual basis, if any, upon which the objection, privilege, or other ground is asserted.

5.   For any responsive DOCUMENT or portion thereof that is either reacted or withheld, in whole or in part, on the basis of any assertion of privilege or other asserted exemptions from discovery, identify each DOCUMENT so redacted or withheld.  With regard to all DOCUMENTS or portions of documents redacted or withhold on this basis, identify:

   a. the type of DOCUMENT;

   b. the subject matter of the DOCUMENT;

   c. the date of the DOCUMENT; and

   d. such other information as is sufficient to identify the DOCUMENT, including, where appropriate, the author, addressee, custodian, and any other recipient of the DOCUMENT, and, where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

6.   If Defendants refuse to provide any information requested herein on the ground that said information is protected from discovery by a privilege (including executive or deliberative privilege) or other protection (including work product doctrine), then Defendants shall:

   a. specify with particularity the nature of the privilege or other protection (including the work product doctrine) being claimed;

   b. provide a specific statement of the ground and authority on which Defendants rely in withholding information;

    c.  provide a statement setting forth each PERSON having knowledge of the factual

basis, if any, on which the claim or privilege or immunity or other ground is

based; and

    d.  in the case of a DOCUMENT or COMMUNICATION, a privilege log, served at

the time of production identifying the DATE, description, author (s), addressee(s),

recipient(s), and subject matter and state the factual basis for the claim of

privilege.

7.  If any DOCUMENT has been lost, discarded, or destroyed, identify such DOCUMENT.

State the type of DOCUMENT, its date, the approximate date it was lost, discarded, or

destroyed, the reason it was lost, discarded, or destroyed, a summary of its substance, and the

identity of each PERSON having knowledge of the contents thereof.

8.  If any information contained in the requested documents is confidential, requiring

secured transfer and management, Plaintiffs have the capacity through consultants to receive

information through a Federal Statistical Research Data Centers.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

### REQUEST FOR PRODUCTION NO. 1.

All COMMUNICATIONS, including drafts and DOCUMENTS reflecting

COMMUNICATIONS, regarding or relating to the inclusion of a CITIZENSHIP QUESTION on

the DECENNIAL CENSUS, including but not limited to COMMUNICATIONS with or about

the CENSUS BUREAU, OTHER GOVERNMENT AGENCIES, the TRUMP

ADMINISTRATION, the TRUMP CAMPAIGN, NIELSEN, Kris Kobach, Steve Bannon,

Stephen Miller, Andrew Bremberg, Steve King, Steven Camarota, Hermann Habermann, and

Robert Groves.

REQUEST FOR PRODUCTION NO. 2.

All DOCUMENTS, including drafts, regarding, relating, or concerning the inclusion of a CITIZENSHIP QUESTION on the DECENNIAL CENSUS, including but not limited to: (a) DOCUMENTS, analysis or data considered by (or reflecting information considered by) COMMERCE in proposing, evaluating, or analyzing the citizenship question, (b) DOCUMENTS analysis or data considered by (or reflecting information considered by) by ROSS in proposing, evaluating, or analyzing the citizenship question, or (c) DOCUMENTS, analysis or data generated by or relied upon by COMMERCE, the CENSUS BUREAU, or the TRUMP ADMINISTRATION in preparing ROSS' March 26, 2018 memorandum.

REQUEST FOR PRODUCTION NO. 3.

All DOCUMENTS, including drafts, regarding, relating, or concerning the inclusion of a CITIZENSHIP QUESTION on the DECENNIAL CENSUS, including but not limited to: DOCUMENTS, data or analysis generated by or relied upon by the CENSUS BUREAU, COMMERCE, or the TRUMP ADMINISTRATION in preparing for Congressional testimony by ROSS, any COMMERCE, CENSUS BUREAU, or OTHER GOVERNMENT AGENCY employee related to the inclusion of a citizenship question on the DECENNIAL CENSUS.

REQUEST FOR PRODUCTION NO. 4.

All DOCUMENTS, including drafts, regarding, relating, or concerning the sufficiency of available data for federal enforcement of the Voting Rights Act, 52 U.S.C. 10101.

REQUEST FOR PRODUCTION NO. 5.

All  DOCUMENTS, including drafts, discussing, regarding or relating to the sufficiency of administrative data necessary for the CENSUS BUREAU to create the citizenship data that DOJ requested in its December 2017 memo.

REQUEST FOR PRODUCTION NO. 6.

All DOCUMENTS regarding or relating to changes or edits made by COMMERCE, the

TRUMP ADMINISTRATION or OTHER GOVERNMENT AGENCIES to CENSUS BUREAU

Quarterly Program Management Reviews since January 2017 regarding or relating to the

inclusion of CITIZENSHIP QUESTION on the DECENNIAL CENSUS.

REQUEST FOR PRODUCTION NO. 7.

All COMMUNICATIONS and DOCUMENTS, including drafts, generated by, prepared

by, relied upon by, referenced, or otherwise produced by COMMERCE, the CENSUS

BUREAU, or the TRUMP ADMINISTRATION in conjunction with the documents found in the

Administrative Record at 1277-1285, 1286-1297, 1298-1303, 1304-1307, 1308-1312, and 1313-

1320.

REQUEST FOR PRODUCTION NO. 8.

All DOCUMENTS AND COMMUNICATIONS concerning the decision whether to

include a Citizenship Question on the 2020 DECENNIAL CENSUS before December 12, 2017,

including but not limited to, those related to whether to include citizenship as a subject in the

March 2017 Report to Congress.

REQUEST FOR PRODUCTION NO. 9.

All DOCUMENTS and COMMUNICATIONS that Defendants plan to introduce into

evidence at trial.

**INTERROGATORIES**

INTERROGATORY NO. 1.

With regard to the document found in the Administrative Record at 1321, please

IDENTIFY:

a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;

b. the "various discussions with other government officials about reinstating a citizenship question to the Census";

c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";

d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject; and

e. all PERSONS with whom the "senior Administration officials had previously raised" reinstating the citizenship question.

## INTERROGATORY NO. 2.

Please IDENTIFY all persons involved in drafting, commenting on, or approving ROSS' March 26, 2018 memorandum.

## INTERROGATORY NO. 3.

With respect to any Congressional testimony by ROSS or any COMMERCE, CENSUS BUREAU, or OTHER GOVERNMENT AGENCY concerning the inclusion of a question concerning citizenship on the DECENNIAL CENSUS, please IDENTIFY all persons involved in the preparation for such testimony.

Dated:      July 12, 2018


By: /s/ John A. Freedman

Dale Ho
David Hausman+
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org
dhausman@aclu.org

Sarah Brannon+ **
Davin Rosborough**
Ceridwen Cherry*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
drosborough@aclu.org
ccherry@aclu.org

Arthur N. Eisenberg
Christopher T. Dunn
Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
aeisenberg@nyclu.org
cdunn@nyclu.org
pgrossman@nyclu.org

Samer E. Khalaf*
American-Arab Anti-Discrimination Committee
1705 DeSales Street, N.W., Suite 500
Washington, DC 20036
202-244-2990
skhalaf@adc.org

Nicholas Katz*
CASA de Maryland
8151 15th Avenue

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
David P. Gersch*
Peter T. Grossi, Jr*
R. Stanton Jones*
Eric A. Rubel*
David J. Weiner*
Robert N. Weiner*
Barbara H. Wootton*
Elisabeth S. Theodore*
Daniel F. Jacobson*
Caroline D. Kelly+
Christine G. Lao-Scott*
Jay Z. Leff+
Chase R. Raines+
Dylan S. Young+
Arnold & Porter Kaye Scholer LLP
Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Hyattsville, MD 20783
(240) 491-5743
nkatz@wearecasa.org

+ admitted pro hac vice.
* designates pro hac vice application forthcoming.
** Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R.
49(c)(3).

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 12, 2018, the foregoing was served on counsel for Defendants United States Department of Commerce and Wilbur L. Ross and on the United States Attorney for the Southern District of New York by email and first class mail.

By: /s/ John A. Freedman

Exhibit 20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NEW YORK IMMIGRATION
COALITION, *et al.*,

        Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

        Defendants.

No. 1:18-cv-5025 (JMF)

## DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DEPARTMENT OF COMMERCE AND WILBUR ROSS

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Defendants United States Department of Commerce and Wilbur Ross submit these supplemental objections and responses to Plaintiffs' First Set of Interrogatories to Defendants United States Department of Commerce and Wilbur Ross, as modified by Plaintiffs' counsel by email dated August 27, 2018.

### OBJECTIONS AND RESPONSES TO INTERROGATORIES

**Interrogatory No. 1.** With regard to the document found in the Administrative Record at 1321, please IDENTIFY:
    a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;
    b. the "various discussions with other government officials about reinstating a citizenship question to the Census";
    c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";
    d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject with SECRETARY ROSS or with COMMERCE; and
    e. all PERSONS with whom, to the knowledge of COMMERCE and SECRETARY ROSS, the "senior Administration officials had previously raised" reinstating the citizenship question.

<u>Objections</u>:

Defendants object to this interrogatory to the extent that it seeks (a) communications or information protected by the attorney-client privilege or (b) communications or information protected by the deliberative-process privilege.

Defendants further object to this interrogatory as vague and overbroad to the extent it seeks information about meetings or conversations with government officials and other persons whose identities are immaterial to the claims in this litigation, and because the burden of responding is disproportionate to the needs of this case.

<u>Response</u>:

After conducting a diligent search, Defendants do not distinguish among the terms used synonymously in the Secretary's Supplemental Memorandum: "senior Administration officials," "other government officials," and officials at other "Federal governmental components". In order to respond as fully as possible to this interrogatory, Defendants therefore will construe subparts a, b, and c, as coextensive and will identify, as a single group, the individuals within the executive branch but outside the Department of Commerce who, before the December 12, 2017 Department of Justice letter, and as referenced in the Secretary's Supplemental Memorandum, either (a) discussed the citizenship question with Secretary Ross, (b) had raised or discussed whether to reinstate a citizenship question, or (c) were consulted by Secretary Ross or his staff regarding whether the Department of Justice would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act. In accordance with that interpretation, and subject to and without waiving the above objections, Defendants identify the following individuals:

Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore and Jefferson Sessions. Although Kris Kobach is not a "government official" within the meaning of the Supplemental Memorandum, the Defendants identify him nonetheless for

the sake of completeness.  Lastly, the Defendants cannot confirm that the Secretary spoke to Steve Bannon regarding the Citizenship Question. However, since the current Administrative Record indicates that Mr. Bannon was attempting to put Mr. Kobach in touch with the Secretary, the Defendants are also listing Mr. Bannon for the sake of completeness.

With respect to Interrogatory 1, subparagraphs a, d, and e, as reflected in the Administrative Record, Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 decennial census with Attorney General Sessions in August 2017.  In addition, it is possible that the two had an additional discussion concerning this issue, and although the date of that conversation is unknown, Defendants believe it took place earlier in 2017.

As to Interrogatories, see Verification page *infra*.

As to objections:

Dated: August 30, 2018

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Director, Federal Programs Branch

*/s/    Kate Bailey*
KATE BAILEY
GARRETT COYLE
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 514-9239
Email:  kate.bailey@usdoj.gov

*Counsel for Defendants*

## CERTIFICATION OF EARL COMSTOCK

I certify under penalty of perjury that the foregoing supplemental response to Plaintiffs' Interrogatory No. 1 is true and correct to the best of my knowledge, information, belief, understanding, or recollection, with the understanding that the Department of Commerce is continuing to research its responses to Plaintiffs' interrogatories and reserves the right to further supplement its responses.

Dated: September 5, 2018

_____
Earl Comstock

Exhibit 21

IAOTSTAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STATE OF NEW YORK, et al.,

                  Plaintiffs,

            v.                          18 Civ. 2921 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,
                                        Conference

                  Defendants.


------------------------------x

NEW YORK IMMIGRATION
COALITION,et al.,

                  Plaintiffs,

            v.                          18 Civ. 5025 (JMF)

UNITED STATES DEPARTMENT OF
COMMERCE, et al.,


                  Defendants.


------------------------------x

                                        New York, N.Y.
                                        October 24, 2018
                                        2:35 p.m.
Before:

                  HON. JESSE M. FURMAN,

                                        District Judge

IAOTSTAC

APPEARANCES

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
        Attorneys for Plaintiffs
BY:  MATTHEW COLANGELO
        ELENA S. GOLDSTEIN
        – and –
ARNOLD & PORTER KAYE SCHOLER
BY:  DAVID P. GERSCH
        – and –
AMERICAN CIVIL LIBERTIES UNION FOUNDATION(DC)
BY:  DALE E. HO

UNITED STATES DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
        Attorneys for Defendants
BY:  KATE BAILEY
        CARLOTTA A. WELLS
        ALICE LACOUR

IAOTSTAC

1        MR. GERSCH:  Yes, your Honor.  I don't believe the

2   identity of the lawyers is attorney-client privilege, and I

3   don't believe that you can make facts disappear under the

4   attorney-client privilege by telling them to a lawyer.  I think

5   it's fairly evident someone drafted this.  The idea that senior

6   administration officials raised this before the secretary

7   considered it is not some trivial detail.  The notion that that

8   might have been accidently dropped into the memorandum -- which

9   no one claims, by the way -- I think would not be credible at

10  all.

11       Someone drafted this, they drafted it because they

12  were told by someone that senior administration officials

13  raised this, and all we want, your Honor, since there's no

14  other way to find out, is to have the persons who are

15  responsible for that language identified and to have them

16  identify or disclose the basis for saying that.  It's clear

17  they were told that by someone.

18       MS. BAILEY:  Your Honor, it is correct that you can't

19  obscure facts by telling them to an attorney, but that's not

20  what we are seeking to do.  We have provided all facts known at

21  the Department of Justice on this matter, period.

22       THE COURT:  I think on the basis of those

23  representations, I don't think there's anything further that I

24  can or should order.  I agree that the identity of the person

25  who drafted it is not necessarily privileged information, but

Exhibit 22

March 21, 2018

**BRIEFING MEMORANDUM FOR SECRETARY ROSS**

| | |
|---|---|
| **FROM:** | Census Bureau |
| **EVENT:** | Decennial Census Stakeholder Call – A. Mark Neuman |
| | Former, Chair National Advisory Committee [ **PII** ] |
| **DATE:** | March 22, 2018 |
| **TIME:** | Within 12:00 – 12:45 P.M.[1] |
| **PLACE:** | Secretary's Suite |

**BIOGRAPHY**

A. Mark Neuman is an expert on international trade and Retail industry issues. Secretary of Agriculture Dan Glickman appointed Neuman as a member of the National Cotton Board . He also serves on the Policy Council of the National Retail Federation and the Board of Directors of the United States Association of Importers of Textiles and Apparel (USAITA).  Neuman, a native of Champaign, IL. was appointed by Senate Majority Leader Trent Lott to the Census Monitoring Board. Neuman is the only member, out of 8 members of the Monitoring Board to have worked as a Census Bureau employee during a Decennial Census. From 1989 to 1991, Neuman served on the executive staff of the U.S. Census Bureau, where he was the agency's highest ranking Hispanic official. Neuman served under Director Barbara Everitt Bryant as Director of Congressional Affairs. From 1991-1992, Neuman served as Director of Legislative Affairs and Intergovernmental Affairs for the Bureau of Export Administration at the U.S Department of Commerce.  Neuman served in the White House during the second Reagan Administration as the Associate Director of Political Affairs and also worked on Capitol Hill as an aide for Representative Crane of Illinois.

**CONTEXT AND PURPOSE**

On December 18, 2017, the U.S. Department of Justice faxed a copy of its letter to the U.S. Census Bureau requesting to reinstate the citizenship question on the 2020 Census questionnaire. The Commerce Department is required by law to submit the proposed final list of questions to Congress by March 31, 2018.  This is an opportunity to hear first-hand stakeholder views on this matter as the Census Bureau and the Department of Commerce continues to conduct its review of the request.

**SUGGESTED TALKING POINTS**

# Deliberative

---

[1] *In-person*

**Deliberative**

**ATTACHMENT 1 – U.S. Department of Justice Letter Re. Request to Reinstate Citizenship Question on 2020 Census Questionnaire**

COM_DIS00019628

Exhibit 23

0010237

# BLOCK-LEVEL DATA on

# Citizen Voting Age Population Data (CVAP)

# is needed to ensure ONE PERSON ONE VOTE

March 22, 2018

# The only way to ACCURATELY collect block-level CVAP data is to RESTORE a question about citizenship to the 2020 Decennial Census.

*Without block-level CVAP data, the way that Congressional Districts are drawn will CONTINUE to effectively UNDERREPRESENT the Latino community in the United States.*

After the 2020 Census, U.S. legislative districts will be redrawn as part of the next redistricting cycle.

Without CVAP data:

- Legislative districts will be drawn to encompass large numbers of Latino residents, BUT many of those residents will likely be *ineligible to vote*, mostly due to their non-citizen status.

- Because of the high number of residents who are ineligible to vote, these districts will be UNLIKELY to elect a Latino representative, thereby DILUTING the Latino community's voice in public office.

With CVAP data:

- By restoring a citizenship question to the 2020 Decennial Census, block-level CVAP data can be used to help draw up legislative districts that *accurately* reflect the Latino voting population.

- Thus achieving the vital goal of *ONE PERSON ONE VOTE.*



**8  Is this person a citizen of the United States?**

☐ Yes, born in the United States → *SKIP to question 10a*

☐ Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas

☐ Yes, born abroad of U.S. citizen parent or parents

☐ Yes, U.S. citizen by naturalization – *Print year of naturalization*

☐ No, not a U.S. citizen

The snapshot above was taken from the 2016 American Community Survey.

Currently, the 2020 Decennial Census does *not* include a question regarding citizenship or naturalization.

Source: https://www.census.gov/2010census/text/download/interactive/

0010238

# There are 37 U.S. Congressional Districts with a LATINO MAJORITY, BUT 10 of those 37 Districts are represented by NON-LATINOS.

## Districts with Latino Majority

| State | District | Latino Share of Total Population | Latino Share of Voting Population | Representative |
|---|---|---|---|---|
| Texas | 15 | 89% | 73% | Vincente Gonzalez (D) |
| California | 40 | 89% | 78% | Lucille Roybal-Allard (D) |
| Texas | 34 | 86% | 77% | Filemon Vela (D) |
| Texas | 16 | 84% | 74% | Beto O'Rourke (D) |
| Florida | 27 | 83% | 72% | Ileana Ros-Lehtinen (R) |
| Texas | 29 | 83% | 62% | Gene Green (D) |
| Texas | 28 | 80% | 68% | Henry Cuellar (D) |
| Florida | 25 | 76% | 63% | Mario Diaz-Balart (R) |
| California | 21 | 76% | 59% | David Valadao (R) |
| Texas | 20 | 75% | 64% | Joaquin Castro (D) |
| California | 35 | 74% | 61% | Norma Torres (D) |
| Florida | 26 | 74% | 64% | Carlos Curbelo (R) |
| Illinois | 4 | 74% | 56% | Luis Gutierrez (D) |
| California | 44 | 73% | 58% | Nanette Barragan (D) |
| California | 51 | 73% | 60% | Juan Vargas (D) |
| Texas | 23 | 72% | 50% | Will Hurd (R) |
| California | 29 | 71% | 56% | Tony Cardenas (D) |
| New York | 15 | 70% | 61% | José Serrano (D) |
| Arizona | 7 | 70% | 48% | Ruben Gallego (D) |
| California | 46 | 70% | 48% | Lou Correa (D) |
| Texas | 33 | 67% | 43% | Marc Veasey (D) |
| Texas | 35 | 67% | 51% | Lloyd Doggett (D) |
| California | 34 | 67% | 51% | Jimmy Gomez (D) |
| Arizona | 3 | 57% | 51% | Raúl Grijalva (D) |
| California | 32 | 65% | 54% | Grace Napolitano (D) |
| California | 38 | 65% | 56% | Linda Sanchez (D) |
| California | 43 | 63% | 47% | Mark Takano (D) |
| New York | 13 | 61% | 47% | Adriano Espaillat (D) |
| California | 16 | 61% | 46% | Jim Costa (D) |
| New Jersey | 8 | 60% | 47% | Albio Sires (D) |
| California | 20 | 55% | 34% | Jimmy Panetta (D) |
| California | 31 | 54% | 42% | Pete Aguilar (D) |
| Texas | 27 | 54% | 45% | Blake Farenthold (R) |
| New Mexico | 2 | 54% | 45% | Steve Pearce (R) |
| California | 36 | 53% | 35% | Raul Ruiz (D) |
| Florida | 9 | 52% | 42% | Darren Soto (D) |
| New York | 14 | 52% | 39% | Joe Crowley (D) |

## Districts with Black Majority

| State | District | Black Share of Total Population | Black Share of Voting Population | Representative |
|---|---|---|---|---|
| Tennessee | 9 | 66% | 66% | Steve Cohen |
| Mississippi | 2 | 66% | 64% | Bennie Thompson |
| Alabama | 7 | 63% | 62% | Terri Sewell |
| Louisiana | 2 | 62% | 63% | Cedric Richmond |
| Georgia | 4 | 59% | 67% | Hank Johnson |
| Georgia | 5 | 59% | 61% | John Lewis |
| Pennsylvania | 2 | 58% | 58% | Dwight Evans |
| Georgia | 13 | 58% | 64% | David Scott |
| South Carolina | 6 | 57% | 58% | Jim Clyburn |
| Michigan | 13 | 57% | 59% | Brenda Lawrence |
| Illinois | 2 | 56% | 59% | Robin Kelly |
| Michigan | 13 | 56% | 55% | Vacant (formerly John Conyers) |
| New York | 8 | 55% | 63% | Hakeem Jeffries |
| Maryland | 7 | 54% | 55% | Elijah Cummings |
| Ohio | 11 | 54% | 52% | Marcia Fudge |
| Florida | 20 | 53% | 66% | Alcee Hastings |
| Maryland | 4 | 53% | 63% | Anthony Brown |
| New Jersey | 10 | 53% | 61% | Donald Payne Jr. |
| Georgia | 2 | 52% | 51% | Sanford Bishop |
| Illinois | 1 | 51% | 52% | Bobby Rush |
| Florida | 24 | 51% | 62% | Frederica Wilson |

*ONE-THIRD (10 out of 37) of LATINO-majority districts are represented by NON-LATINOS

ONLY ONE representative in BLACK-majority districts is NON-BLACK

The **LACK** of block-level Citizen Voting Age Population data for LATINO-majority Congressional Districts suggests that the result has been a **diminution** of Latino representation in Congress.

*Latino / Black share of voting population = Latino/Black population that is eligible to vote; **Jim Costa is not Latino, according to Mark Neuman (origins are not Spanish-speaking, origins in Latin America)
Sources: ...

0010239

# Latinos comprise 11% of the DC population. WHY then is there NOT ONE Latino on the 13-member City Council?



*There are ZERO Latino representatives on DC's 13-Member City Council*

**Latinos comprise 11% of the DC population**

- But the ward lines have been drawn to DILUTE Latino voting power.
- There are NO WARDS with a Latino majority*

**Latino Residents**

- < 5%
- 5-15%
- 15-25%
- 25-50%
- > 50%
- No Residents

\* Information as of the 2013 Census
Sources:

0010240

# The Latino population of ILLINOIS is now LARGER (by a quarter million) than the Black population (2.1 vs. 1.9 million). Why are Latinos so UNDERREPRESENTED in Congress, the State House, State Senate, and Chicago City Council?

*ANSWER: The lack of CVAP Census Data for the Latino population.*

Having block-level CVAP data would facilitate drawing legislative districts where Latino candidates could have a fair shot at being elected to office.

## Latino Representation

**1** out of Illinois' 20 Members of Congress is LATINO

Rep. Luis Gutiérrez (RETIRING)

**5** out of Illinois' 59-Member State Senate is LATINO

**5** out of Illinois' 118-Member State House of Representatives is LATINO

## Black Representation

**3** out of Illinois' 20 Members of Congress is BLACK

Rep. Bobby Rush   Rep. Robin Kelly   Rep. Danny Davis




**10** out of Illinois' 59-Member State Senate is BLACK

**22** out of Illinois' 118-Member State House of Representatives is BLACK

Source: https://www.census.gov/acs/www/about/why-we-ask-each-question/voting/ http://www.ilga.gov/default.asp

0010241

# In Chicago, 11 wards have a LATINO majority. WHY then are 4 of these wards represented by NON-LATINOS?

Chicago has 11 Latino-majority wards BUT 4 of those wards are represented by NON-LATINOS.

*OVER ONE-THIRD of the Councilmembers representing Latino-majority wards are NON-LATINO.*









**Ward 14:**
88% Latino
Ed Burke

**Ward 13:**
72% Latino
Marty Quinn

**Ward 10:**
63% Latino
Susan Sadlowski Garza

**Ward 33:**
54% Latino
Deb Mell

Latinos are the LARGEST minority group in Chicago (~30%), yet they are UNDER-REPRESENTED in the City Council.

- Chicago's City Council has 50 seats.
- LATINO Councilmembers comprise LESS THAN A QUARTER (12/50).

**The lack of CVAP data DIMINISHES the VOTING POWER of Latinos in Chicago, DESPITE being the dominant minority group.**





Non-Latino Rep.

Non-Latino Rep.

Non-Latino Rep.

Non-Latino Rep.

Legend

Exhibit 24

**From**: ████████████████████████████
**Sent**: 9/13/2017 8:33:27 PM
**To**: A M Neuman ████████████████
**Subject**: Re: Questions re Census

Mark,

Thanks again for the discussion and helpful information.

Regards,
James

On Sep 13, 2017, at 1:21 PM, A M Neuman ████████████████ wrote:
Note to James Uthmeier

From:    A Mark Neuman

Subject:  Census 2020

_____

James -- I appreciate our discussions about the 2020 Census preparations.



On Sep 13, 2017, at 12:19 PM, Uthmeier, James (Federal) ████████████████ wrote:

Hey Mark—just following up on this, sorry for not getting back to you sooner.  Any chance you are free to chat soon today?  Would be much appreciated.  My cell is ███████████

**From:** Uthmeier, James (Federal)
**Sent:** Friday, September 08, 2017 8:46 AM
**To:** ██████████████████████████████
**Subject:** Questions re Census

Hi Mark,

I am working on ██████████████████████████████████████████████████ and they asked me to reach out to you about some research that I have been doing.  Any chance you might have a few minutes this morning to discuss?  I'm available all morning at the number below, or happy to give you a call whenever convenient.

Thank you,
James

James W. Uthmeier
Senior Counsel to the General Counsel
Regulatory Reform Officer
Department of Commerce
████████████████████████

Exhibit 25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,

        Defendants.

No. 1:18-cv-2921 (JMF)

NEW YORK IMMIGRATION COALITION, *et al.*,

        Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,

        Defendants.

No. 1:18-cv-5025 (JMF)

## DECLARATION OF ALBERT E. FONTENOT, JR.

I, Albert E. Fontenot, Jr., make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1.      I am the Associate Director for Decennial Census Programs at the Census Bureau.  I have served in this capacity since October 2017. Before that, I served as the Assistant Director, Decennial Census Programs.

2.      In connection with my job responsibilities I am thoroughly familiar with this litigation brought by the plaintiffs.  The following statements are based upon my personal knowledge or on information supplied to me in the course of my professional responsibilities.

3.      The purpose of these statements is to provide the court with a current status of the Census Bureau's efforts to print questionnaires to be used in the 2020 Decennial Census.

4.      On July 2, 2019, the Census Bureau directed its primary printing contractor RR Donnelly, Inc., ("printer") to begin the physical production of the 2020 Census questionnaires. Due to the Supreme Court's decision in *Department of Commerce v. New York*, the Bureau directed the printer to produce questionnaires without a citizenship question.

5.      As of 12:00 pm Eastern Time, July 12, 2019, the printer had completed 11,572,746 questionnaires without the citizenship question included in the questionnaire.  The printer is continuing to print at their planned production rate without the citizenship question.

6.      I have not received instructions from anyone to pause, cease, or otherwise suspend the printing of the decennial census questionnaires that RR Donnelly is currently printing.

2

7.      The printing requirements for the decennial census are massive, and under the contract the printer is required to print, stitch and compile, finish, and mail more than a billion individual products.  The most serious operational risks of the census print contract are time, printer capacity, and print material availability.

8.      Based on discussions between employees of the Bureau and the printer, the Bureau and the printer concluded that due to the printer's resource and timing constraints and the terms of the contract, which was awarded December 2018, the latest possible date to finalize the printed decennial questionnaire without substantially modifying the decennial schedule, budget, and operations, and therefore jeopardizing the operational feasibility of the census, was the end of June.

9.      I understand that the President directed the Departments of Justice and Commerce to examine whether, after and in consideration of the Supreme Court's decision in *Department of Commerce*, there was a viable avenue to ask a citizenship question as part of the 2020 Census.  In view of that directive, the Department of Commerce and Census Bureau evaluated the contractual, operational, and mission effects of conducting a decennial census that asks a citizenship question.

10.     In order to ensure that all options were properly considered, the Census Bureau evaluated whether there were extraordinary measures available to direct the printer to re-start physical production of questionnaires which would include a citizenship question at some later date.  The Bureau has concluded that option is not viable to keep the Census on track.  Any delay in printing the census questionnaire would significantly increase operational risk and could result in harm to the decennial operational design, leading to downstream risks that could negatively impact the Bureau's ability to administer a complete and accurate decennial census.

11.   For these reasons, the Census Bureau will continue printing questionnaires without the citizenship question. The Census Bureau is unaware of any continuing efforts to include a citizenship question on the 2020 Census.

12.   To reiterate, prior discussions between employees of the Bureau and the Bureau's primary printer resulted in the conclusion that due to the printer's resource and timing constraints and the terms of the contract, the latest possible date to finalize the printed decennial questionnaire without substantially modifying the decennial schedule, budget, and operations, and therefore jeopardizing the operational feasibility of the census, was the end of June. That was true then, and remains true now.

Albert E. Fontenot, Jr.
Associate Director, Decennial Census Programs
Bureau of the Census

4

Exhibit 26

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

Defendants.

18-CV-2921 (JMF)

## DECLARATION OF PETER DAVIDSON

I, Peter Davidson, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the General Counsel of the United States Department of Commerce, a position I have held since August 2017. As General Counsel, I am the legal advisor to the Secretary of Commerce and the Department's Chief Legal Officer. The following statements are based upon my personal knowledge and best recollection. These statements are provided in support of the Defendants' opposition to the motion for sanctions filed by the New York Immigration Coalition ("NYIC") in the above-captioned case.

2. I have never met, communicated with, or spoken to Dr. Thomas Hofeller.

3. Prior to NYIC's May 30, 2019, motion for an order to show cause, I never saw, received, or reviewed the document that NYIC claims is a 2015 unpublished study by Dr. Hofeller.

4. I first saw and became aware of the purported 2015 Hofeller study after May 30, 2019, when I reviewed NYIC's motion for an order to show cause and accompanying press reports. I

was similarly unaware of other documents that purportedly were retrieved from the computer of Dr. Hofeller, such as the 2017 draft paragraph that discusses the Voting Rights Act.

5.   I was unaware that A. Mark Neuman, who served as an informal adviser to the Commerce Department, had in his possession a draft letter concerning a citizenship question on the census questionnaire ("the Neuman Letter"), until sometime after the litigation in this case began and the document was produced during discovery.  I never discussed a draft letter with Mr. Neuman.

6.   I did not draft, provide comments on, or discuss the Neuman Letter with anyone, including Mr. Neuman.  I have no personal knowledge regarding who authored, reviewed, commented on, or contributed to the Neuman Letter.  Nor have I ever seen any drafts of the Neuman Letter or documents resembling the Neuman Letter until sometime after the litigation in this case began and the document was produced during discovery.

7.   In the fall of 2017 I had discussions with John Gore, the Acting Assistant Attorney General of the Civil Rights Division at the Department of Justice about the citizenship question. We discussed the drafting and the timing of a letter from the Department of Justice to request reinstatement of a citizenship question on the census questionnaire.  We also discussed the possible content of such a letter in general terms.

8.   I never received any drafts of the Department of Justice's December 12, 2017 letter to the Census Bureau requesting the reinstatement of a citizenship question ("Gary Letter"), from Mr. Gore or anyone else.

9.   I never provided comments, feedback, or edits on any draft of the Gary Letter.

2

10. My conversations with Mr. Gore all occurred over the phone, and I did not take any notes of those conversations.  I did not exchange any written communications about the Gary Letter or its contents with Mr. Gore prior to the letter's transmission to the Census Bureau on December 12, 2017.

11. As a member of the Bar and an official of the Department of Commerce, I took with utmost seriousness my duties and obligations to comply with all requests for discovery in this matter to the full extent required by law.  At no time did I withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required to be produced in discovery, except for documents and information withheld on grounds of privilege that were accounted for in Defendants' privilege logs.

I declare under penalty of perjury that the foregoing is true and correct.

Washington, DC
August 1, 2019

Peter Davidson
General Counsel
United States Department of Commerce

3

# Exhibit 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

    Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

    Defendants.

18-CV-2921 (JMF)

## DECLARATION OF EARL W. COMSTOCK

I, Earl W. Comstock, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am the Deputy Chief of Staff for Policy and the Director of the Office of Policy and Strategic Planning at the U.S. Department of Commerce ("DOC"). I am responsible for reviewing submissions to the Secretary from various bureaus for alignment with departmental policy and for overseeing general policy development and implementation. The following statements are based upon my personal knowledge. These statements are provided in support of the Defendants' opposition to the New York Immigration Coalition's ("NYIC") motion for sanctions in the above-captioned case.

2. Prior to press reports earlier this year concerning the discovery of Dr. Thomas Hofeller's unpublished 2015 study, I had never heard of Dr. Hofeller and had not seen or heard of that unpublished study. I was similarly unaware of other documents that purportedly were

retrieved from the computer of Dr. Thomas Hofeller, such as the 2017 draft paragraph that discusses the Voting Rights Act. Nor have I met, communicated with, or spoken to Dr. Thomas Hofeller.

3.   Similarly, prior to this litigation, I had never seen a copy of a purported draft letter from the Department of Justice to the Census Bureau requesting a citizenship question ("the Neuman Letter"), nor did I ever comment on any drafts of the Neuman letter. To the best of my knowledge, none of my staff worked on or provided comments on the Neuman letter.

4.   Lastly, I never saw any drafts of the Department of Justice's December 12, 2017 letter to the Census Bureau requesting the reinstatement of a citizenship question ("Gary Letter") nor did I have any discussions with anyone at DOJ about the Gary Letter.

Washington, DC
August 2, 2019

Earl W. Comstock
Deputy Chief of Staff and Director of the
Office of Policy and Strategic Planning
United States Department of Commerce

2