UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF COMMERCE, et al.,<br><br>                Defendants. | 18-CV-2921 (JMF) |
| NEW YORK IMMIGRATION<br>COALITION, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF COMMERCE, et al.,<br><br>                Defendants. | 18-CV-5025 (JMF)<br>(Consolidated) |

**NYIC PLAINTIFFS' REPLY BRIEF IN
SUPPORT OF MOTION FOR SANCTIONS**

Cutting through the hedges, caveats, and non-denial denials, Defendants' response confirms Defendants engaged in extensive misconduct to hide the pretextual nature of the VRA rationale and the true reasons they sought to add the citizenship question. The declarations and brief are a studied exercise in admission by omission, crafted to avoid addressing critical points. Ex. 1. Indeed, of the 26 questions posed at pages 25-27 of the opening brief, Defendants address only 9, and those are only partial responses. Ex. 2. Defendants instead leave a patchwork of unrebutted facts and open questions. They do not deny that Hofeller came up with the pretextual VRA rationale or that he did so at the request of *someone* at (or working at direction of) Commerce. But Defendants are silent about who engaged Hofeller, or how Hofeller's VRA language came into Neuman and then Gore's possession. Nor do Defendants say whether they understood (or intended) that the citizenship question would enable redistricting advantageous to "Republicans and Non-Hispanic Whites." Defendants' excuses for their obfuscation, including concealing Neuman's and Hofeller's involvement, are unsatisfactory.

The Court has at its disposal mechanisms to uncover the extent of Defendants' wrongdoing—including authorizing Plaintiffs to obtain materials from third parties (such as Neuman), and compelling both testimony and production of withheld materials that would permit actual verification of Defendants' denials. The Court should sanction Defendants and permit targeted discovery to confirm the extent of misconduct and the persons responsible.

**I.      DEFENDANTS FAIL TO REFUTE EVIDENCE OF THEIR MISCONDUCT**

1.      <u>Defendants Fail to Answer Why or How Gore Obtained Hofeller's Language</u>

Defendants do not and cannot dispute that at their depositions, neither Neuman nor Gore admitted that Neuman provided the Neuman draft to Gore. Nor do they dispute that Neuman testified Hofeller was the "first person" to suggest adding a citizenship question, or that when he

1

was questioned about the Neuman draft, Neuman testified he worked on draft "versions" and that Commerce officials reviewed draft "versions." ECF 635-2, Ex. 12 at 51, 278-84. Defendants characterize his testimony as "uncertain," Opp. 18, but also argue there is "no evidence that Neuman provided false testimony," Opp. 21. Defendants' summary of Neuman's testimony elides key passages, including that "others at the Department of Commerce were reviewing and offering thoughts on draft versions of this letter," that when asked to identify participants he said "there are a lot of cooks in the kitchen" and that although he was "blurring" some people he specifically named Davidson, Comstock, and Uthmeier. ECF 635-2, Ex. 12 at 283-84.

Defendants' declarations fail to address this and other significant issues. Exs. 1&2. For example, while Davidson, Comstock, and Uthmeier all deny having "received" or "seen" the Neuman letter "prior to the litigation" (Davidson ¶6, Uthmeier ¶6, Comstock ¶3), only Davidson avers that he was contemporaneously unaware of the Neuman letter. Davidson ¶5. Similarly, while all three deny having "met, communicated with, or spoken to" Hofeller (Comstock ¶2, Davidson ¶2, Uthmeier ¶11), none address whether they knew that someone else was requesting that Hofeller help develop the VRA rationale. Davidson and Uthmeier do not deny that they arranged the meeting between Neuman and Gore, at which Neuman provided Gore with the Hofeller-concocted VRA rationale. Nor do Davidson, Uthmeier, or Comstock contest that they understood adding a citizenship question would enable redistricting advantageous to "Republicans and Non-Hispanic Whites." And Uthmeier does not explain what he meant when he wrote "our hook" is "[u]ltimately, we do not make decisions on how the [citizenship] data should be used for apportionment . . ." PX-607.

Tellingly, Defendants have not provided a declaration from Neuman—their "trusted advisor," "analogous[] to an agency employee" (ECF No. 451 at 3)—who presumably could

2

address these issues.  While Uthmeier's declaration says that Neuman testified incorrectly that Comstock, Davidson, or Uthmeier reviewed "versions" of the letter (Uthmeier ¶9) neither Defendants nor Uthmeier explain why Uthmeier (who attended the deposition as counsel for Commerce) failed to correct the record contemporaneously.  And Uthmeier's declaration is silent on why he failed to correct other demonstrably false testimony, including that Neuman's meeting with Gore was *not* about a draft DOJ letter requesting a citizenship question on the 2020 Census, that Neuman gave Gore only a *different* document (not the Neuman letter) at that meeting, that Neuman was not involved in the drafting process for the DOJ letter at all, etc.

Several other related points bear emphasis.  First, all of this occurred against the backdrop of Defendants adamantly opposing the Rule 45 testimony and document subpoena to Neuman, denying that "Neuman provided any particularly significant consultations on the citizenship question."  ECF 346 at 2.  Defendants contend that statement is taken out of context and that they "provided a full account of Neuman's role" and "accurately characterized the record evidence."  Opp. 27.  But the September 21, 2018 letter they cite (ECF 346) failed to note (i) Neuman met with Gore at Davidson and Uthmeier's behest, (ii) Neuman provided the Neuman letter to Gore, (iii) Neuman worked on draft versions of the letter with senior Commerce personnel, including Davidson, Uthmeier, and Comstock, and (iv) the Neuman letter contained the VRA rationale for adding a citizenship question (drafted by Hofeller).

Second, Defendants dispute the Neuman letter is a "draft" of the DOJ Request Letter, contending "no reasonable reader could conclude that the Neuman letter is a 'first draft' of the Gary Letter." Opp. 5.  But when Neuman was presented with the letter at his deposition, he confirmed it appeared to be a "draft" of the DOJ request letter.  ECF 635-2, Ex. 12 at 279-80.  And when Gore was questioned by congressional investigators, he admitted that the letter he

3

received from Neuman was a "draft letter that would request reinstatement of the citizenship question . . . . ." ECF 635-2, Ex. 13, Tr. 26.  Moreover, Defendants give no explanation for the overlap between the substantive content of the two letters related to sophisticated and nuanced issues, most notably the purported need for block-level citizenship data to enforce the VRA.  In addition to having similar discussion of Census history and the VRA rationale, both the Neuman draft and the DOJ Request letter contain virtually identical closing language.[1]

Third, Defendants state they are not in a position "to assess the completeness of Neuman's response to Plaintiffs' subpoena" (Opp. 25), but they do not dispute Neuman failed to produce his correspondence with Hofeller or Commerce personnel.  And their attempt to deflect blame to Neuman and his private counsel falls short considering their admission that they interceded in his document production.  Opp. 26.  Defendants do not address why they cannot produce their complete correspondence with Neuman or his counsel; there is no privilege that would shield such communications.  Defendants also provide no reason why the Court should not order Neuman to comply fully and completely with the subpoena issued to him.

Fourth, Defendants failed to timely produce the Neuman letter from Gore's files.  Defendants' response—that there was a temporary stay that extended the fact discovery cutoff, Opp. 4, 6—does not explain why (i) when served with a subpoena on July 20, they delayed identifying the Neuman letter on a log until October 3, (ii) they withheld the document at all, or (iii) they did not immediately produce the document when Plaintiffs challenged the designation on October 5.  As for their belated production, Defendants do not explain why they relabeled the document, and they falsely represent that "for the sake of clarity" (Opp. 6) the document

---

[1] *Compare* ECF 635-1 Ex. 1 ("Please let me know if you have any questions about this letter or wish to discuss this request . . . Sincerely yours") with Ex. 9 ("Please let me know if you have any questions about his letter or wish to discuss this subject . . . Sincerely yours").

4

continued to bear the Bates number 15199 when there is nothing in the cover email or file title reflecting that Bates number.

As for their justification of the representation that "no metadata exists for author, recipient, date, or time" (Opp. 8) this is a classic illustration that a statement "may be completely misleading although every sentence separately considered is literally true." *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 675 (2d Cir. 1963) (citation omitted). More troubling, Defendants provide an unsatisfactory explanation for why Gore failed to prevent the misrepresentation. They cite no authority for their assertion that Gore cannot "be held responsible for what is or is not stated on DOJ's privilege log." Opp. 7-8. Beyond being a witness, he is (or was) a senior official at the DOJ. And Gore's explanation—that he did not "realize[] that the document in my possession must have come from Mr. Neuman" until "after Mr. Neuman produced the Neuman Letter" (Gore ¶17)—is contrary to Defendants' previous assertion that anyone who did not know that "Gore had the Neuman letter" suffered from "obliviousness." ECF 601 at 3. Nor does it explain why Gore failed to correct the misrepresentation when he purportedly remembered the provenance of the Neuman letter.

Finally, neither Davidson nor Uthmeier contest Gore's statement to congressional investigators that he had a "dozen" interactions with them about the DOJ request letter, at least one of which concerned apportionment. ECF 635-2, Ex. 13 at 21. Yet, during his deposition, Gore did not identify Uthmeier (or Neuman or Hofeller) as having provided "input" into his letter, and as Defendants emphasize (Opp. 8), he testified that he had a conversation with Davidson (ECF 648-1, Ex. 5 at 137), not the "dozen" he told congressional investigators. As noted in Plaintiffs' opening brief, almost none of these communications are reflected in the Administrative Record. According to both Davidson and Uthmeier, there are no "notes" or

"written communications" reflecting these discussions. Davidson ¶10, Uthmeier ¶12. The effort to avoid a paper trail is troubling, as they closely followed Secretary Ross's directive—when advised by Comstock to be mindful of the Administrative Record in light of judicial review—that "we should be very careful, about everything. . . ." AR 12476. All of this suggests a purposeful effort to frustrate judicial review. *Cf. D.C. Federation of Civic Ass'n v. Volpe*, 459 F.2d 1231, 1237 (D.C. Cir. 1972) (the "non-existence of any contemporaneous administrative record is [] serious."). Davidson, Uthmeier, and Comstock should all give a full accounting of their misconduct.

2. <u>Defendants Fail to Confirm Completeness of the Administrative Record</u>

Plaintiffs' opening brief cited evidence that Comstock, Uthmeier, Davidson, and Jones failed to provide all of their materials in the Administrative Record or in response to discovery requests. ECF 635 at 11-16. While Uthmeier has averred that he "followed all policies and regulations regarding use of email to conduct official business" and did not "withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required in discovery, or for purposes of the administrative record" (Uthmeier ¶¶3, 14), the other three do not provide such assurances. Davidson limits his representation to "documents or information required to be produced in discovery" but fails to aver to the Administrative Record. Davidson ¶11. And there is no assurance in Comstock or Jones' declarations at all. *See* Ex. 3.

The lack of assurance is troubling. As discussed above, Comstock initiated a discussion about the importance of curating the Administrative Record, and Davidson appears to have purposefully avoided creating a paper trail. Jones's declaration confirms that she continued to communicate with Hofeller after January 2017 (Jones ¶2), and she does not dispute that her practice was to use her Hotmail account for such communications. While she states "to my

knowledge, I did not exchange any written correspondence with Dr. Hofeller" since 2017, Defendants do not represent that Jones or anyone else actually checked her email to confirm this was accurate or for materials responsive to discovery requests. Moreover, while Jones asserts that she does not recall communicating with Hofeller about the citizenship question "[s]ince January 2017," she says nothing about communications with Hofeller during the Presidential transition, when Hofeller was speaking with transition officials about this very issue.

There are equally troubling inconsistencies between Uthmeier's declaration and the record. For example, he states that he has "no recollection of speaking to anyone at the White House concerning the citizenship question until . . . after December 12." Uthmeier ¶13. That is not what he told congressional investigators.[2] Like Davidson, Uthmeier appears to have engaged in a concerted effort to avoid a paper trail, failing to document his communications with John Baker, Gore, or Neuman. Uthmeier ¶¶5, 7-8, 12. Uthmeier does not deny using his personal email account to conduct official business; Defendants now acknowledge they misstated this in their brief. ECF 651. While Uthmeier attests as to his compliance with Commerce Department policies regarding use of personal emails, (i) there are no documents in the Administrative Record reflecting this compliance (i.e., no evidence he forwarded his personal emails to his official government email address), and (ii) neither Defendants nor Uthmeier have represented that anyone actually searched his personal email for responsive documents.

Finally, there is a disconnect between Uthmeier's statement that he started working on the question in "spring of 2017" and that "for several months thereafter" he "received hundreds of pages of materials," all of which have purportedly been included in the Administrative Record

---

[2] In response to a question what he did after providing his memo to Comstock and his early September emails, Uthmeier stated "I consulted John Gore at the Department of Justice. . . And I would have provided updates to individuals at the White House." ECF 635-2 Ex. 14 at 90. There is no suggestion in this testimony that he was referring to events that occurred after the DOJ Request.

7

(Uthmeier ¶4), and the actual Administrative Record, which contains virtually *nothing* from this period.  Defendants' support their argument that the Administrative Record must have been complete by citing a sole email from Uthmeier from April 20, 2017.  Opp. 11.  This solitary email is hardly consistent with Uthmeier's assertion that he received hundreds of pages of materials.  Moreover, a log of materials (Ex. 3) involving the "several months" Uthmeier references (i.e., the four month period prior to Uthmeier sending his memo to Comstock on August 11) reflect he was involved in eighteen documents in the Administrative Record and four produced in discovery—hardly the "hundreds of pages of materials" referenced in his declaration.  *See* Ex. 3.  Uthmeier nowhere explains what happened to these materials.

3. <u>Defendants Fail to Provide Sufficient Assurance Regarding their Interrogatory Response</u>

Defendants have provided no reasonable assurance that their response to Interrogatory No. 1 is complete and accurate.  Neither the declarations of Comstock (who verified the original answers) nor Uthmeier confirm the completeness of the answer.  Regarding the omissions Plaintiffs identified, Uthmeier's assertion that his White House contacts were exclusively after the Request letter is not what he told congressional investigators.  And he has not specified with whom (beyond John Zadrozny) he discussed the citizenship question that would allow verification of the interrogatory response's accuracy.

As to knowledge within DOJ, Plaintiffs previously raised completeness in the context of Comstock's testimony that the June 21 supplemental memo was drafted by DOJ; Defendants did represent to the Court on October 24 that the interrogatory response encompasses "all facts known" to DOJ.  What Defendants neglect to mention is that the day before making this representation, DOJ dumped over 90,000 pages and three additional privilege logs on Plaintiffs.  It was only after these materials could be reviewed that it was apparent that almost a dozen

individuals at the highest levels of DOJ provided input on the supplemental memo. *See* ECF 635-5, Exs. 48 & 49. DOJ made no representation on October 24 that they had interviewed any of these people, and their brief still provides no such assurance.

Finally, Defendants acknowledge their failure to disclose Baker, Neuman, and Hofeller, but claim they were under no obligation to make such disclosure because they were not government officials. Opp. 20 n.9. But that ignores the fact that, in their interrogatory, Defendants made a specific representation that for the "sake of completeness," they were identifying a non-government official, Kris Kobach. ECF 635-4, Ex. 39 at 2-3. A party who voluntarily discloses information "assumes a duty to speak fully and truthfully on those subjects." *See*, *e.g.*, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001).

## II. DEFENDANTS ARE INCORRECT ON KEY LEGAL ISSUES

Defendants' response is a case study in using deliberative process privilege as both a shield and a sword. Inisting they were not engaged in a fraud and denying Hofeller's role and minimizing Neuman's, Defendants bookend their response with five declarations that purport to detail the drafting process and Neuman's and Hofeller's lack of involvement, all while shielding the actual drafting documents under deliberative process and work product privilege. Defendants cannot have it both ways—they cannot use self-selected, self-serving evidence about their process to escape sanctions while they deny Plaintiffs access to the record about that same process. For this reason and under the balancing test (which Defendants do not address), the Court should find that the deliberative and work product privileges are waived as to the documents identified in ECF 635-5, Exs. 42-49.

Defendants' response on the fraud exception misstates the case law: there is no requirement to prove the exception on a document-by-document basis. Rather, *In re Richard*

*Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) merely recognized that the party invoking the exception must demonstrate that "there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." Plaintiffs meet that standard because Defendants attempted to perpetrate a fraud on the public and the Court through their use of the false VRA rationale and subsequent cover up of the true rationale in litigation.[3] Defendants do not dispute that the small number of documents at issue were in furtherance of fraudulent conduct and fraud on the Court. Plaintiffs are not required to show anything more for the fraud exception to apply.

Finally, Defendants are wrong on the relief sought. First, Plaintiffs' request for findings as to the persons responsible and the extent of misconduct does not amount to an "advisory" opinion. There is nothing at all "advisory" about a conclusion backed up with factual findings that a party perpetrated a fraud on the Court. Second, waiver of privilege as to a limited set of documents is appropriate where, as here, Defendants' misconduct was not limited to creating and promulgating a false explanation for adding a citizenship question but also litigation misconduct (including misrepresentations to the Court) to conceal that truth. Defendants' efforts to distinguish authority finding privilege waiver as a sanction are unavailing. Finally, since the motion was filed, the parties have settled Plaintiffs' claim for attorneys' fees, and any further work the Court authorizes will be done *pro bono*. That said, Defendants are wrong that they cannot be assessed attorneys' fees as a sanction. *See*, *e.g.*, *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 595-97 (5th Cir. 2008); *Adamson v. Bowen*, 855 F.2d 668, 671 (10th Cir. 1988).

---

[3] Contrary to Defendants' argument, nothing in *Conservation Force v. Jewell*, 66 F. Supp. 3d 46 (D.D.C. 2014) suggests that an agency can maintain a privilege with respect to documents used to proffer a false, pretextual justification for a decision that the agency then perpetrates a fraud on the court in its defense of the decision.

10

Dated: August 9, 2019

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION
NEW YORK CIVIL LIBERTIES UNION


By: */s/ John A. Freedman*

Dale Ho
Adriel Cepeda Derieux
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

Sarah Brannon+*
Davin Rosborough
Ceridwen Cherry
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
* *Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).*

John A. Freedman
R. Stanton Jones+
David P. Gersch
Elisabeth S. Theodore+
Daniel F. Jacobson+
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

+ admitted pro hac vice

Attorneys for the *NYIC* Plaintiffs

11

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of August, 2018, the foregoing NYIC PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR SANCTIONS was served on all counsel of record via ECF and on Mark Neuman through his counsel in this matter via email and overnight mail at the following address:

Howard W. Feldman, Esq.
FeldmanWasser
Post Office Box 2418
1307 South 7th Street
Springfield, Illinois 62705
*Counsel for A. Mark Neuman*

*/s/ John A. Freedman*
John A. Freedman