**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | |
| v. | 18-CV-5025 (JMF) (Consolidated) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | |
| Defendants. | |

**NYIC PLAINTIFFS' [PROPOSED] SUR-REPLY IN**
**SUPPORT OF MOTION FOR SANCTIONS**

New information—which the House Committee on Oversight and Reform made public on November 12—makes clear that sanctions are not only justified, they are imperative.

In a short memorandum dated titled, *Update on Investigation of Census Citizenship Question Since House Held Attorney General Barr and Commerce Secretary Ross in Contempt of Congress* ("House Oversight Committee Update"), the House Oversight Committee released documents and testimony excerpts demonstrating further instances in which Defendants and their agents—in particular Mark Neuman, John Gore, and Peter Davidson—withheld crucial documents from Plaintiffs and misled the Plaintiffs and the Court.  *See* ECF 635 at 26-28.

I.     **Newly-Discovered Emails and Texts from Mark Neuman Confirm that Defendants and Neuman Misrepresented Hofeller's Role in the Genesis of the Citizenship Question.**

At the heart of Defendants' sanctionable conduct is their effort to conceal Dr. Thomas Hofeller's central role in the attempt to add a citizenship question to the 2020 census.  The basic facts are simple:  Neuman incorporated verbatim the VRA enforcement rationale from a 2017 document Hofeller authored into an initial draft of DOJ's letter requesting the citizenship question.  *See* ECF 635 at 10.  Defendants sought to brush off evidence of Hofeller's role in adding a citizenship question to the census as a "conspiracy theory," ECF 601 at 5, but the newly-released documents confirm that Hofeller played an even bigger part in Defendants' scheme than previously was understood.  And these new documents provide further proof that Defendants improperly withheld pertinent information from Plaintiffs and the Court.

Documents quoted in the House Oversight Committee Update establish that Neuman expressly sought and received an explicit affirmation from Hofeller and his business partner (Dale Oldham) for the language used in the draft DOJ request letter.  In an email dated August 30, 2017, Commerce Secretary Ross's "trusted advisor" Mark Neuman, ECF 451 at 3, directly asked Hofeller to review language for the DOJ request letter, urging Hofeller to "[p]lease make

1

certain that this language is correct."  Ex. A.  Referring to Oldham, Hofeller's business partner, Hofeller responded: "Dale Just read it, and says it is fine as written."  Ex. B.  This exchange confirms Hofeller's essential role devising Defendants' "contrived" VRA enforcement rationale. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

The House Oversight Committee Update also makes clear why Hofeller favored adding a citizenship question to the census: not to enforce the VRA and protect minority voting rights, but rather, as Christa Jones (the Census Bureau Chief of Staff) explained in sworn testimony, for "the Republican redistricting effort."  Ex. E at 12.  Jones also confirmed that, in 2015, she contacted Hofeller on the "opportunity to mention citizenship" in response to a Census Bureau comment request because of his interest in the issue as a major figure in the "Republican redistricting community."  *Id.*  And she testified that she knew Hofeller's partner, Oldham, for a long time, and that Oldham pushed for a citizenship question for redistricting and apportionment "more times than I can remember."  *Id.*

In sum, contrary to Defendants' assertion that Hofeller's involvement was a "conspiracy theory," ECF 601 at 5, these documents confirm Hofeller's central involvement in the chain of events leading to DOJ's request and Defendants' effort to concoct a rationale for the question. Defendants repeatedly, and without justification, tried to withhold all of this from the public, Plaintiffs, and the Court.

## II.    A Newly-Discovered Text Message from Neuman Confirms that Defendants and Gore Concealed a Relevant Draft of the DOJ Request Letter, and Misrepresented the Initial Drafting Process of the Letter.

The House Oversight Committee Update also released an October 6, 2017 text message from Neuman to Gore with a second, previously-undisclosed draft DOJ request letter including the language that Hofeller and Oldham approved.  Ex. C.  This texted draft is different from the hard copy draft of the Neuman Letter that Defendants first improperly withheld, and then

belatedly disclosed in this case (without identifying information in the 90,000 page document dump on the eve of Gore's deposition).  *Compare* Ex. C (text version addressed to Ron Jarmin, with citations to two VRA cases and a quote from one of them) *with* ECF 635-1, Ex. 9 (previously-produced version, addressed to John Thompson, which does not include VRA case citations or the accompanying quote).  This version of the DOJ request letter, which Neuman sent to Gore, was not produced, logged, or otherwise disclosed.

The text message definitively shows how the VRA pretext was relayed from Hofeller through Neuman to Gore.  And it also shows that Gore made numerous statements in his sworn testimony and declaration that are misleading, if not outright misrepresentations:

- Gore did not, as he testified in this case, write the initial draft of the DOJ request letter as he claimed in his deposition.  *See* ECF 635-1, Ex. 7 at 127, 150, 343.  Rather, he received at least *two separate drafts* from Neuman, both of which included Hofeller's VRA enforcement rationale.

- In his declaration, Gore averred that "shortly after receiving it from Mr. Neuman, [Gore] placed [the Neuman Letter] in a file folder in [his] office," ECF 648-1, Ex. 6 at ¶ 8strongly implying that he had only a hard copy of the letter.  The text exchange shows that was *not* the case—that he in fact received *a separate electronic version* of the DOJ Request Letter.  Defendants never disclosed or logged this electronic version.

- In his declaration, Gore averred that he "had no further oral or written communications with Mr. Neuman after receiving the Neuman Letter from him." ECF 648-1, Ex. 6, at ¶ 6.  In fact, the text exchange between Gore and Neuman suggests Gore met with Neuman in person *after* receiving the texted version of the DOJ request letter.  *See* Ex. C (Text between Gore and Neuman on October 6, reading, "On my way").

- During his testimony, Gore initially testified that he "may have" used "personal e-mail, text messaging, or private messaging apps to communicate about DOJ work," but then reversed course and affirmatively denied that he had done so, stating "I don't think I have used [personal text messages] for DOJ work." Ex. F.  The fact that Neuman texted him a copy of the draft DOJ letter raises, at a minimum, serious doubts about the accuracy of that denial.

- In his declaration, Gore averred that as "a member of the Bar and an official of the Department of Justice, I took with utmost seriousness my duties and obligations to

comply with all requests for discovery in this matter . . . At no time, including during my deposition, did I withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required to be produced in discovery, except for documents and information withheld on grounds of privilege that were accounted for in Defendants' privilege logs . . . ." ECF 648-1, Ex. 6 at ¶ 18.  Yet Gore failed to produce the texted version of the draft DOJ letter that Neuman provided him on October 6.

### III.    A Newly-Discovered Text Message from Neuman Confirms that Defendants and Davidson Concealed a Relevant Communications About Secretary Ross' Awareness of the Drafting of the DOJ Request Letter.

The House Oversight Committee Update also released a series of text messages between Neuman and Commerce Department General Counsel Peter Davidson, including exchanges on October 7 and October 8, 2017 and January 3, 2018.  These texts show that following his meeting with Gore, Neuman gave a readout to Davidson, who discussed it with Secretary Ross. On October 8, 2017, Davidson sent a text message to Neuman, stating that "[Secretary Ross] appreciated the update and your help."  Ex. D.  Defendants failed to produce or log this text message.

Defendants' withholding of their correspondence with Neuman was the subject of several motions to compel in the underlying litigation, ECF 117, 237, 338, 414, yet they failed to produce this exchange.  This failure not only sheds further doubt on the completeness of Defendants' production, it also contradicts Davidson's August 2, 2019 declaration in which he averred that as "a member of the Bar and an official with the Department of Commerce, I took with the utmost seriousness my duties and obligations to comply with all requests for discovery in this matter . . . [a]t no time did I withhold, direct anyone to withhold, or become aware that anyone had withheld documents or information required to be produced in discovery, except for documents and information withheld on grounds of privilege that were accounted for in Defendants' privilege logs."  *See* ECF 648-1, Ex. 26 at ¶ 11.  And, given the timing of the withheld text—which confirms Neuman gave Davidson a readout on his meeting with Gore—the

failure to produce the exchange with Neuman also raises substantial questions about Davidson's averment that he "was unaware" that Neuman "had in his possession a draft letter concerning a citizenship question." *Id.* at ¶ 5.

### IV. Defendants and Their Agents Concealed These Documents from Plaintiffs and the Court, Casting Further Doubts about the Completeness of Their Productions.

Another thing is now obvious: Neuman produced documents and communications to congressional investigators that were highly relevant to this case but somehow went undisclosed in litigation. *See* Ex. E at 10, 12. At all points in discovery, through many twists and turns, Neuman and Defendants withheld these documents from Plaintiffs and the Court. They only became known to Plaintiffs because the House Oversight Committee made them public on November 12. As Plaintiffs previously explained, Defendants' failure to log or produce this material during the litigation reflects numerous violations of court orders and Federal Rules.

### CONCLUSION

Defendants are no longer entitled to the benefit of doubt. There is now a well-developed body of evidence showing that Defendants repeatedly prevented the Court from being able to review a complete record in this litigation. It was Neuman—not Defendants, their counsel, or Gore—who produced the emails, text messages, and documents discussed above to congressional investigators. Litigating this case, Defendants did not log or produce *any* of the communications to or from Gore or Davidson mentioned *supra*—including the different version of the Neuman Letter that Neuman sent to Gore in a text message on October 6, 2017—and despite Gore's and Davidson's sworn statements that their productions were complete.

The recent revelation of these documents raises serious doubts about the candor of Messrs, Gore, Davidson, and Neuman and the conduct of Defendants. It also raises other troubling questions. In addition to concealing one version of the DOJ letter, why wasn't the

second version of the draft DOJ letter produced?  What other text messages did Messrs, Gore,

Davidson, and Neuman have relevant to the matter that were not produced?  Did Gore and

Davidson fail to preserve their copies of these text messages, and if so, how do they square that

with the fact that Defendants contend that they were anticipating litigation over these issues?

Did other witnesses have relevant text messages that weren't produced?  Why didn't the

Defendants produce any text messages at all?

Defendants have had countless opportunities to be straight with Plaintiffs and this Court.

Instead, they have repeatedly misled and have never provided a complete record.  The need for

sanctions, including the targeted discovery that Plaintiffs outlined in their motion, is now starker

than ever.  *See* ECF 635 at 24-32.  As the Court said almost exactly a year ago, "enough is

enough."  ECF 544 at 7.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION
ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Dale E. Ho*

Dale E. Ho
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Sarah Brannon*
American Civil Liberties Union Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
*Not admitted in the District of Columbia;*
*practice limited pursuant to D.C. App. R.*

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

*49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs

EXHIBIT A

From: A Mark Neuman

To: Tom Hofeller

Hide 

**Census**

August 30, 2017 at 9:44 AM

◁ Found in Sent Mailbox

Please make certain that this language is correct.  Dale doesn't return my calls



FullSizeRender.jpg
246 KB

We understand that the
Bureau personnel may
believe that ACS data on
citizenship was sufficient
for redistricting
purposes.  We wanted the
Bureau to be aware that two
recent Court cases have
underscored that ACS data
is not viable and/or

believe that ACS data on citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be aware that two recent Court cases have underscored that ACS data is not viable and/or sufficient for purposes of redistricting.  Two important citations from these cases are as follows:
__Bartlet v Simpson; lullac v perry
"Relevant numbers must account for citizenship in order to determine the group's opportunity to elect candidates in order to determine the groups opportunity to elect candidates... pg 4 lulac v

EXHIBIT B

From: **Tom Hofeller**

To: A Mark  Neuman                                                          Hide           

## RE: Census

August 30, 2017 at 2:52 PM

📁 Found in Inbox

Mark:  Dale Just read it, and says it is fine as written.  Tom

-----Original Message-----

From: A Mark Neuman [mailto:amarkneu@aol.com]

Sent: Wednesday, August 30, 2017 9:44 AM

To: Tom Hofeller

Subject: Census

Please make certain that this language is correct.  Dale doesn't return my calls

EXHIBIT C



John ›

.sl

iMessage
Oct 6, 2017, 11:51 AM

On my way.

Ron Jarmin
Acting Director,
Bureau of the Census
US Department of Commerce
Washington, DC 20233
Dear Mr Jarmin:
We are writing to formally request the reinstatement of a
question on the 2020 Census questionnaire relating to
citizenship. The Department seeks to reinstate the
question because of recent Court decisions
_____ where courts required enumerated
(block level) data related to voting age population. This
data can only be provided based on enumerated
(Census), rather than sample (ACS) data.
We are aware that the 2010 Census was the first
decennial census since the 1880 Census without a
question about citizenship. We also note that the
American Community Survey, which replaced the "long
form" version of the questionnaire in the decennial 2000
Census, asks a question about citizenship. We are not
aware that of any serious concerns relating to the
presence of a citizenship question on the ACS.
We understand that the Bureau personnel may believe
that ACS data on citizenship was sufficient for
redistricting purposes. We wanted the Bureau to be
aware that two recent Court cases have underscored
that ACS data is not viable and/or sufficient for purposes
of redistricting. Two important citations from these cases
are as follows:
_ Bartlet v Simpson  lullac v perry
"Relevant numbers must account for citizenship in order
to determine the group's opportunity to elect candidates
in order to determine the groups opportunity to elect
candidates. . pg 4 lulac v perry
We note that in these two cases, one in 2006 and one in
2009, courts reviewing compliance with requirements of
the Voting Rights Act and its application in legislative
redistricting, have required Latino voting districts to
contain 50% + 1 of "Citizen Voting Age Population (or
CVAP). It is clear that full compliance with these Federal
Court decisions, will require block level data than can only
be secured by a mandatory question in the 2020
enumeration. Our understanding is that data on
citizenship is specifically required to ensure that the
Latino community achieves full representation in
redistricting

 iMessage

John >

We note that in these two cases, one in 2006 and one in 2009, courts reviewing compliance with requirements of the Voting Rights Act and its application in legislative redistricting, have required Latino voting districts to contain 50% + 1 of "Citizen Voting Age Population (or CVAP). It is clear that full compliance with these Federal Court decisions will require block level data than can only be secured by a mandatory question in the 2020 enumeration. Our understanding is that data on citizenship is specifically required to ensure that the Latino community achieves full representation in redistricting.

We accordingly request that the Bureau prepare, without delay, the appropriate question on citizenship for the 2020 Census, and submit this addition for 2020 Census for OMB Review and other appropriate notifications. Please let me know if you have any questions about his letter or wish to discuss this subject. I can be reached at (202) ------- or _____@doj.gov.

Sincerely yours,

Attachment.





EXHIBIT D



Peter >

Oct 7, 2017, 8:43 PM

Hey, Mark...sorry I missed your call...I will try you tomorrow

Oct 8, 2017, 7:09 PM

**Bruce D. Meyer | Harris Public Policy**
harris.uchicago.edu

Thx

He appreciated the update and your help

Jan 3, 2018, 6:21 PM

**Text of Dec. 2017 DOJ letter to Census**
documentcloud.org

I found this publicly available link on HUFFPOST

Ok. Thanks.

Exhibit E

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225-5051
MINORITY (202) 225-5074
http://oversight.house.gov

## MEMORANDUM

**November 12, 2019**

**To:**  **Members of the Committee on Oversight and Reform**

**Fr:**  **Acting Chairwoman Carolyn B. Maloney**

**Re:**  **Update on Investigation of Census Citizenship Question Since House Held
Attorney General Barr and Commerce Secretary Ross in Contempt of Congress**

Before he passed away, Chairman Elijah E. Cummings directed Committee staff to
continue investigating the Trump Administration's false rationale for adding a citizenship
question to the 2020 Census. He strongly believed that the Constitution requires the Census to
be conducted in a professional, nonpartisan manner, and he was extremely troubled by the
Trump Administration's efforts to politicize the Census and impair its accuracy. He was
particularly disturbed by the repeated false statements that Administration officials made to
Congress, the courts, and the country. In the face of the Administration's unprecedented
obstruction and baseless legal arguments, Chairman Cummings believed that Congress must
press forward to protect the integrity of the Census and to inform Congress' legislative options
going forward. He believed that these are among Congress' most fundamental responsibilities
under the Constitution.[1]

This memorandum provides Committee Members with an update on the Committee's
investigation since the House of Representatives voted to hold Attorney General William Barr
and Commerce Secretary Wilbur Ross in contempt for refusing to produce documents in
response to bipartisan subpoenas issued by the Committee.

Rep. Cummings began investigating the Administration's effort to add a citizenship
question soon after Commerce Secretary Wilbur Ross first publicly announced it on March 26,
2018. Secretary Ross claimed repeatedly—in sworn testimony to Congress, in public statements,
and in court filings—that he was adding the citizenship question "solely" at the request of the
Department of Justice (DOJ) to help enforce the Voting Rights Act (VRA). This explanation
made little sense because DOJ had never needed such data before to enforce the VRA. As the
Supreme Court later concluded, and as the contemporaneous record demonstrates, that

---

[1] The Constitution expressly grants Congress the authority to determine the manner in which the Census is
conducted, and House Rules place oversight and legislative responsibility for the Census with this Committee. The
Committee also has broad authority to investigate "any matter" at "any time."

explanation was false—a "contrived" and "pretextual" diversion from the true rationale for the decision.

The Constitution requires the Census to count every person—not just citizens. Congressional districts are based on total population, and many federal programs allocate funding based on total population.  At the time Secretary Ross announced his decision, experts warned that adding a citizenship question would harm the accuracy of the Census, thereby undermining the explicit goal of the Constitution to obtain a national count of all persons. Secretary Ross and others denied repeatedly that their effort was related in any way to legislative redistricting or apportionment.

In the exercise of its authority to oversee the administration of the Census, the Committee requested key documents and testimony from the Department of Commerce and DOJ.  Both Departments refused to comply, claiming that they could not do so while there was litigation pending regarding the citizenship question.  Because the Supreme Court had previously rejected this rationale for refusing to comply as baseless, the Committee voted on a bipartisan basis to issue subpoenas to both Departments for certain key documents.  Even in the face of these subpoenas, however, Secretary Ross and Attorney General Barr continued to insist that the Committee had to wait to receive these documents until the Supreme Court ruled on the citizenship question case.

On June 27, 2019, the Supreme Court ruled that the Administration could not go forward with its plan to add a citizenship question because it violated the law and because the VRA rationale offered by the Administration was not the true reason for the attempted addition.

Even after the Supreme Court ruled, however, Secretary Ross and Attorney General Barr continued to defy the Committee's bipartisan subpoenas and refused to produce key documents. As a result of the Administration's obstruction, the House of Representatives voted on July 17, 2019, to hold both Attorney General Barr and Secretary Ross in contempt of Congress.

Since the contempt vote, neither the Commerce Department nor DOJ has produced any documents responsive to the subpoenas, and neither has attempted to resolve outstanding questions regarding the Administration's broad "protective" assertion of privilege over all remaining responsive documents.

Despite the refusal of the Commerce Department and DOJ to cooperate, the Committee has continued its investigation over the past several months, obtaining documents and information from other sources.  The Committee's investigation seeks to determine why the Administration fought so hard to add a citizenship question that experts warned would impair the accuracy of the Census, why the Administration provided a false narrative to Congress, the courts, and the public, and who else was involved in these actions.

Because the Committee's requests for documents have gone unfulfilled, however, the Committee is unable to complete its investigation.  The documents that the Committee has subpoenaed go to the heart of the Committee's investigative interests:  they reflect the reasons and process for developing the citizenship question, the coordination between the Commerce

Department and DOJ to create the "pretextual" rationale, and the involvement of internal and outside parties in implementing the question.

The Committee's investigation is urgent because it may lead to legislative reforms to safeguard the 2020 Census and to prevent similar maladministration in the future.  Although the citizenship question will not be added to the 2020 Census, its attempted adoption has raised a number of live concerns relating to potential political influences on the nonpartisan Census process, the Commerce Department's willingness to compromise an accurate enumeration, and both the Commerce Department's and DOJ's willingness to misrepresent their actions in connection with the Census.

Depending on the Committee's findings regarding the processes that led to the addition of the citizenship question, Congress may need to direct the Commerce Department's use of resources relating to the Census, require enhanced disclosures or oversight, cabin the authority and powers granted under the Census Act, or take other responsive actions.  However, the Committee cannot effectively remediate issues affecting the 2020 Census without first understanding how and why Census procedures and disclosures were compromised with respect to the citizenship question.

The investigation has also raised serious questions about whether agency officials had an unconstitutional motive for their actions and whether they might now be taking further surreptitious action to achieve that same result.  Evidence obtained by the Committee indicates that the Administration may have been trying to stop immigrants from being counted in the Census or in legislative districts, which one Republican operative concluded would be "advantageous to Republicans and Non-Hispanic Whites."

Many Trump Administration officials who pushed for the citizenship question are still in place today and may be overseeing components of the upcoming 2020 Census.  It is this Committee's responsibility to exercise its oversight authority to ensure that the Trump Administration acts to further the Census's constitutional goals—not to hinder them.  As Chairman Cummings explained in connection with the contempt vote, the Committee is responsible for ensuring that the Census is "run by nonpartisan experts based on their professional experience—not manipulated by political appointees as part of a political influence and interference operation."[2]

---

[2] Committee on Oversight and Reform, *Committee Votes on Bipartisan Basis to Hold Barr and Ross in Contempt* (June 12, 2019) (online at https://oversight.house.gov/news/press-releases/committee-votes-on-bipartisan-basis-to-hold-barr-and-ross-in-contempt).

# I.    BACKGROUND

On March 26, 2018, Secretary Ross announced that he was adding a citizenship question to the 2020 Census in response to a request from DOJ on December 12, 2017.[3]  DOJ's request claimed that the citizenship question was needed to help enforce the VRA.[4]  Secretary Ross testified that he was adding the question "solely" at the request of DOJ to enforce the VRA.[5]

On March 27, 2018—the day after Secretary Ross' announcement—then-Ranking Member Cummings called for the Committee to investigate this decision.[6]  In April and May 2018, he sent letters to the Department of Commerce and DOJ seeking documents.[7]  In June and August 2018, Committee Democrats wrote to Secretary Ross, requesting responses to questions regarding the Secretary's misleading testimony.  Neither Department produced any of the documents responsive to these requests.

When Democrats took control of the House in 2019, the Committee requested documents from the Department of Commerce on January 8, 2019, and from DOJ on February 14, 2019.[8]  Both Departments obstructed and delayed the Committee for months despite repeated attempts to accommodate their interests.  On April 2, 2019, following a bipartisan vote, the Committee

---

[3] Letter from Secretary Wilbur Ross, Jr., Department of Commerce, to Karen Dunn Kelley, Under Secretary for Economic Affairs, Department of Commerce (Mar. 26, 2018) (online at www.documentcloud.org/documents/4426785-commerce2018-03-26-2.html).

[4] Letter from Arthur E. Gary, General Counsel, Justice Management Division, Department of Justice, to Ron Jarmin, Director, Census Bureau (Dec. 12, 2017) (online at www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html).

[5] House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *FY19 Budget Hearing:  Department of Commerce,* 115th Cong. (Mar. 20, 2018).

[6] Committee on Oversight and Government Reform Democrats, *Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census* (Mar. 27, 2018) (online at https://oversight.house.gov/news/press-releases/cummings-issues-statement-calling-for-hearings-on-trumpadministration-plan-to).

[7] Letter from Ranking Member Elijah E. Cummings et al., Committee on Oversight and Government Reform, to Secretary Wilbur L. Ross, Jr., Department of Commerce, and Dr. Ron Jarmin, Ph.D., Acting Director, Census Bureau (Apr. 4, 2018) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2018-04-04.%20EEC%20Maloney%20Norton%20Clay%20Connolly%20&%20Gomez%20to%20Commerce%20re.Cens_...  .pdf ); Letter from Ranking Member Elijah E. Cummings et al., Committee on Oversight and Government Reform, to John Gore, Acting Assistant Attorney General, Department of Justice (May 1, 2018) (online at https://maloney.house.gov/sites/maloney.house.gov/files/2018-05-01.%20Dem.Members%20to%20DOJ-Gore%20re.Citizenship%20Question-2020%20Decennial%20Census.pdf).

[8] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Secretary Wilbur L. Ross, Jr., Department of Commerce (Jan. 8, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-01-08.EEC%20to%20Ross-DOC%20re%20Citizenship%20Question.pdf); Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore, Principal Deputy Assistant Attorney General, Department of Justice (Feb. 14, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-02-14.EEC%20to%20Gore-DOJ%20re%20Transcribed%20Interview%20Request_1.pdf).

issued subpoenas to compel Attorney General Barr and Secretary Ross to produce key documents.[9]

The Committee also issued a subpoena to a DOJ official, John Gore, ordering his deposition.  Mr. Gore refused to appear, with DOJ stating that "the Attorney General has determined that Mr. Gore will not appear" unless DOJ counsel were permitted to participate—in direct violation of the Committee's longstanding, bipartisan rules governing depositions.[10]  DOJ also claimed that the deposition of Mr. Gore "could compromise the integrity of ongoing litigation in the Supreme Court."[11]

On June 12, 2019, the Committee voted on a bipartisan basis to hold Secretary Ross and Attorney General Barr in contempt for withholding the subpoenaed documents.[12]

The same day, the White House asserted executive privilege over each of the priority documents identified in the Committee's subpoenas.[13]  In addition, the White House made a "protective assertion of executive privilege" over **all other documents** responsive to the

---

[9] Committee on Oversight and Reform, *Business Meeting* (Apr. 2, 2019) (online at https://oversight.house.gov/news/press-releases/committee-approves-subpoenas-in-security-clearance-and-census-investigations).

[10] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf); *see also* Rule 15(e) of the Committee on Oversight and Reform, 116th Cong. ("Witnesses may be accompanied at a deposition by counsel to advise them of their rights. No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's counsel. Observers or counsel for other persons, or for agencies under investigation, may not attend.").

[11] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf).  As described later in this memorandum, the Committee followed up with Mr. Gore on September 20, 2019, to clarify his position following the Supreme Court's decision in the census matter.  In response, Mr. Gore's attorney reiterated that Mr. Gore was bound by the Attorney General's decision. Letter from John D. Adams to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Sept. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/9-27-2019%20Ltr.pdf).

[12] Committee on Oversight and Reform, *Business Meeting* (June 12, 2019) (online at https://oversight.house.gov/legislation/markups/a-resolution-recommending-that-the-house-of-representatives-find-the-attorney); Committee on Oversight and Reform, *Resolution Recommending That The House Of Representatives Find William P. Barr, Attorney General Of The United States, And Wilbur L. Ross, Jr., Secretary Of Commerce, In Contempt Of Congress For Refusal To Comply With Subpoenas Duly Issued By The Committee On Oversight And Reform*, 116th Cong. (2019) (H. Rept. 116-125).

[13] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 12, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-12%20Census%20Documents%20Notification%20of%20Assertion%20-%20Cummings_AS%20DISTRIBUTED_1.pdf).

Committee's subpoenas, including "tens of thousands of additional pages of documents" that the Administration had "identified as responsive to the subpoena" and "had been planning to produce." The Administration claimed that this "protective" assertion was necessary to protect "ongoing litigation," even though the Supreme Court had ruled repeatedly that ongoing litigation is not a legitimate reason to withhold information from Congress.[14] The Administration also claimed this blanket assertion of privilege was needed to give the President "the ability to make a final decision whether to assert privilege following a full review of these materials"—despite the fact that the Administration had already been withholding these documents for several months.[15]

On June 27, 2019, the Supreme Court ruled that Secretary Ross could not add the citizenship question based on his "contrived" rationale. The Court found that "the decision to reinstate a citizenship question cannot be adequately explained in terms of DOJ's request for improved citizenship data to better enforce the VRA." The Court further found that "the evidence tells a story that does not match the explanation the Secretary gave for his decision" and that "the VRA enforcement rationale—the sole stated reason—seems to have been contrived."[16]

Even after the Supreme Court ruled, however, Secretary Ross and Attorney General Barr refused to produce the key documents subpoenaed by the Committee. As a result, Chairman Cummings issued a statement warning: "I urge Attorney General Barr and Secretary Ross to change course and produce the documents we have subpoenaed on a bipartisan basis, so the House is not forced to hold them in contempt of Congress."[17]

On the evening of July 17, 2019, just prior to the House of Representatives' contempt vote, Attorney General Barr and Secretary Ross sent a letter to Speaker Nancy Pelosi opposing the vote, but offering no documents.[18] That same day, the House of Representatives voted to

---

[14] *See Hutcheson v. United States*, 369 U.S. 599 (1962) ("But surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, Sinclair v. United States, supra, at 295, or when crime or wrongdoing is disclosed, McGrain v. Daugherty, 273 U.S. 135, 179-180."); *Sinclair v. United States*, 279 U.S. 263 (1929) ("It may be conceded that Congress is without authority to compel disclosure for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.").

[15] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 12, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-12%20Census%20Documents%20Notification%20of%20Assertion%20-%20Cummings_AS%20DISTRIBUTED_1.pdf).

[16] *Department of Commerce v. New York,* 139 S. Ct. 2551 (2019).

[17] *Cummings Issues Statement on Executive Order on the Census,* Committee on Oversight and Reform (July 12, 2019) (online at https://oversight.house.gov/news/press-releases/cummings-issues-statement-on-executive-order-on-the-census).

[18] Letter from Secretary Wilbur L. Ross, Jr., Department of Commerce, and Attorney General William P. Barr, Department of Justice, to Speaker Nancy Pelosi, House of Representatives (July 17, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-

hold Attorney General Barr and Secretary Ross in criminal contempt of Congress.[19]

Over the past three months, the White House has refused to narrow its baseless, blanket "protective" assertion of executive privilege, which it claimed was necessary to give the President time to "make a final decision whether to assert privilege following a full review of these materials." Secretary Ross and Attorney General Barr have also refused to produce any additional documents in response to the Committee's subpoenas.

The Administration has had ample opportunity to finalize any good faith privilege claims. The Administration's failure to do so confirms that it has abused privilege doctrines to undermine Congressional authority.

## II.     THE COMMITTEE'S ONGOING INVESTIGATION

Despite the Administration's obstruction, the Committee has continued to seek to determine why the Administration labored for two years to add the citizenship question, how internal procedures at the Departments of Commerce and Justice failed to prevent the addition of the question, why and how the Administration hid the true purpose of this effort behind a false rationale, who else within and outside of the Administration was involved with these efforts, and whether these concerns pose ongoing risks to an accurate and nonpartisan Census.

The Committee must complete its investigation in order to protect the integrity of the 2020 Census, to prevent the improper use of citizenship data being gathered pursuant to an Executive Order issued by President Trump on July 11, 2019, and to ensure that the Executive Branch does not seek to politicize the Census further. Because the Census Bureau has already begun major field operations for the 2020 Census,[20] and the Census is scheduled to occur by April 1, 2020,[21] any legislative reforms to safeguard this Census must be considered immediately. This effort is also urgent because many of the same Administration officials who pushed for the illegal citizenship question are still in place today and may be involved with executing various components of the 2020 Census.

### A.     Protecting the Integrity of the 2020 Census

The Administration has withheld information that the Committee needs to conduct effective oversight and to assess the need for legislative reforms with respect to the 2020 Census. The 2020 Census begins in Alaska on January 21, 2020, and in the rest of the country on April 1, 2020.[22] The Census is vitally important to communities across the United States because it will

---

17%20Barr%20and%20Ross%20to%20Pelosi.pdf).

[19] H. Res. 497.

[20] Census Bureau, *U.S. Census Bureau Announces the Start of First Major Field Operation for 2020 Census* (Aug. 12, 2019) (online at www.census.gov/newsroom/press-releases/2019/ad-can-launch.html).

[21] Census Bureau, *Census Day, One Year and Counting: April 1, 2019* (Apr. 1, 2019) (online at www.census.gov/newsroom/stories/2019/census-day.html).

[22] *Why the U.S. Census Starts in Alaska's Most Remote, Rural Villages,* National Public Radio (Jan. 21,

determine the allocation of hundreds of billions of dollars in federal funds and the apportionment of every seat in the House of Representatives.[23]

As part of this effort, key tasks will be overseen by the Department of Commerce.  For example, the Census Bureau is preparing for the first phase of its communications campaign, which is essential to increasing participation among minority and hard-to-count populations that are traditionally less likely to respond.[24]  This effort is particularly important because the Administration's previous efforts to add the citizenship question may have already discouraged some communities from participating.[25]

The Census Bureau is also building technology systems that are supposed to protect personal information.  Dr. Steven Dillingham, the Director of the Census Bureau, testified on July 24, 2019, that Census participants "must trust that we will protect the data they provide."[26]

The Census Bureau also plans to hire more than 500,000 temporary employees by April 1, 2020, to help people navigate online census forms and conduct follow-up to ensure that individuals, including hard-to-count populations, are fully counted.[27]

On July 24, 2019, the Subcommittee on Civil Rights and Civil Liberties held a hearing with the Director of the Census Bureau entitled, "Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count 'We the People' in 2020."  In his opening statement, Subcommittee Chairman Jamie Raskin stated:

> Although the move to impose the citizenship question has been rejected by the courts as arbitrary and capricious, I fear that it may still be endangering the 2020 count.  The Bureau must take aggressive steps to repair the damage caused by the Administration's

---

2019) (online at www.npr.org/2019/01/21/686963414/why-the-u-s-census-starts-in-alaskas-most-remote-rural-villages).

[23] Census Bureau, *Uses of Census Bureau Data in Federal Funds Distribution* (Sept. 2017) (online at www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf).

[24] Census Bureau, *Census Barriers, Attitudes, and Motivators Study Survey and Focus Groups Report Findings Presentation* (Feb. 1, 2019) (online at www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/02-01-2019/pmr-cbams-comm-2019-02-01.pdf?#).

[25] *Local Groups:  'Damage Has Already Been Done' By Census Citizenship Question,* National Public Radio (July 4, 2019) (online at www.npr.org/local/309/2019/07/04/738660741/local-groups-damage-has-already-been-done-by-census-citizenship-question).

[26] Committee on Oversight and Reform, Subcommittee on Civil Rights and Civil Liberties, *Hearing on Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count "We the People" in 2020* (July 24, 2019) (online at https://oversight.house.gov/legislation/hearings/beyond-the-citizenship-question-repairing-the-damage-and-preparing-to-count-we).

[27] *The Census Bureau Needs to Hire Half a Million Workers for the 2020 Count,* National Public Radio (Jan. 28, 2019) (online at www.npr.org/2019/01/28/689237309/census-bureau-conducts-massive-recruiting-effort-for-2020-head-count).

ill-considered campaign.[28]

Congress has a constitutional responsibility to oversee the Executive Branch and to pass laws that will promote an accurate enumeration.[29]  In this case, there is clear and substantial evidence of procedural defects relating to the Census and serious misconduct by senior government officials, but the Committee is being blocked from determining the scope and nature of those issues.

The Committee is concerned that the accuracy of the Census could be impaired if, for example, responsible government entities continue to disclose inaccurate information, the Census is vulnerable to ongoing politicization, or individuals who engaged in deliberate misconduct are involved in executing key functions relating to the Census.  The subpoenaed documents are crucial to determining how these issues facilitated the prior maladministration and whether they pose continuing risks.  Among other evidence, the Administration has withheld Secretary Ross' unredacted emails with his staff regarding his campaign to add the citizenship question—which may shed light on the Department of Commerce's internal procedures—as well as communications involving DOJ, the Commerce Department, and the White House related to the development of the false rationale of VRA enforcement.

## B.    Investigating the False Rationale for the Citizenship Question

Contrary to Secretary Ross' claim that he added the citizenship question "solely" at the request of DOJ to help enforce the VRA, evidence obtained by the Committee suggests that the Administration's purpose may have been an unconstitutional effort to exclude immigrants for purposes of legislative redistricting and apportionment.

The evidence shows that the Administration engaged in a concerted effort to add a citizenship question months before DOJ sent its letter in December 2017.  President Trump and top White House advisors discussed adding a citizenship question just days after taking office, and Secretary Ross began a secret campaign to add a citizenship question soon after he joined the Administration in February 2017.  Secretary Ross enlisted other Department of Commerce officials in his efforts, including his Chief of Staff, his General Counsel, and the Director of Policy, and these officials communicated with other agencies.  Secretary Ross personally asked Attorney General Jeff Sessions to request the citizenship question.  Secretary Ross and other officials then actively concealed their efforts.

---

[28] Committee on Oversight and Reform, Subcommittee on Civil Rights and Civil Liberties, *Hearing on Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count "We the People" in 2020* (July 24, 2019) (online at https://oversight.house.gov/legislation/hearings/beyond-the-citizenship-question-repairing-the-damage-and-preparing-to-count-we).

[29] *See* U.S. Const., art. I, § 2; *United States v. Rumely*, 345 U.S. 41 (1953) (Congress has the authority to inform the public about the conduct of federal officials as they administer government); *Watkins v. United States*, 354 U.S. 178 (1957) ("The public is, of course, entitled to be informed concerning the workings of its government."); *id* (the informing function allows "Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government").

This evidence also indicates that Administration and Transition Team officials had been in contact with a Republican gerrymandering expert, Thomas Hofeller, who wrote a secret study in 2015 concluding that adding a citizenship question would be "advantageous to Republicans and Non-Hispanic Whites." Rather than helping to enforce to the VRA, Mr. Hofeller argued that adding a citizenship question to the 2020 Census was a necessary step to excluding immigrants from legislative redistricting.[30]

Similarly, in April 2017, Secretary Ross spoke with Kris Kobach at the direction of Steve Bannon. Mr. Kobach later wrote to Secretary Ross urging him to add a citizenship question, writing that it was "essential" to address "the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."[31]

Over the last several months, the Committee has continued to investigate these issues, and the Committee's efforts have uncovered new information. However, the Administration's obstruction has hindered the Committee's ability to conduct a full and thorough investigation.

On June 18, 2019, the Committee requested documents from Mark Neuman, a member of President Trump's Transition Team who had direct contact with Mr. Hofeller regarding the citizenship question.[32] In 2017, Mr. Neuman advised Secretary Ross on the citizenship question and had extensive contact with senior Commerce Department officials, including Peter Davidson, the Commerce Department's General Counsel; James Uthmeier, an advisor to the Secretary and the General Counsel; and Earl Comstock, the Director of the Office of Policy and Strategic Planning.[33]

The Committee's June 18, 2019, letter requested Mr. Neuman's communications about the citizenship question with Mr. Hofeller, Mr. Gore, the Transition Team, the Trump Administration, and others.[34]

On July 2, 2019, Mr. Neuman produced previously undisclosed documents to the Committee. These documents confirmed that he had direct communications about the citizenship question with Mr. Hofeller, as well as with Dale Oldham, a Republican gerrymandering attorney who was Mr. Hofeller's business partner.

---

[30] Thomas Hofeller, *The Use of Citizen Voting Age Population in Redistricting* (2015) (online at https://assets.documentcloud.org/documents/6111284/May-31-2019-Unredacted-Exhibits.pdf).

[31] Email from Kris Kobach, Kansas Secretary of State, to Secretary Wilbur L. Ross, Jr., Department of Commerce (July 14, 2017) (online at https://apps.npr.org/documents/document.html?id=4500011-1-18-Cv-02921-Administrative-Record#document/p776/a428457).

[32] Deposition of A. Mark Neuman, Civ. No. 8:18-cv-01041-GJH (D. Md. Oct. 28, 2018).

[33] *See, e.g.,* Email from Mark Neuman to Earl Comstock, Director, Office of Policy and Strategic Planning, Department of Commerce (Apr. 14, 2017).

[34] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Mark Neuman (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-06-18.EEC%20to%20Neuman%20re%20Census%20REDACTED.pdf).

For example, on August 30, 2017, Mr. Neuman sent a text message asking Mr. Hofeller to review language for a letter Mr. Neuman was drafting to request the addition of a citizenship question.  The letter was addressed from DOJ to the Director of the Census Bureau and argued that data from a citizenship question was needed to ensure "compliance with requirements of the Voting Rights Act and its application in legislative redistricting."[35]  The language that Mr. Neuman sent to Mr. Hofeller comprised part of that draft letter.  It stated:

> We understand that the Bureau personnel may believe that ACS [American Community Survey] data on citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be aware that two recent Court cases have underscored that ACS data is not viable and/or sufficient for purposes of redistricting.[36]

Mr. Neuman wrote:  "Please make certain that this language is correct.  Dale doesn't return my calls."[37]  The same day, Mr. Hofeller replied:  "Dale Just read it, and says it is fine as written."[38]

On October 6, 2017, Mr. Neuman sent his draft letter—including the language approved by Mr. Hofeller and Mr. Oldham—to Mr. Gore at DOJ via text message.[39]

Around the same date, Mr. Neuman met with Mr. Gore.  Documents previously obtained by the Committee show that Mr. Neuman provided a "readout of his meeting" to Mr. Davidson, who then briefed Secretary Ross.[40]  Mr. Davidson then sent a text message to Mr. Neuman referring to Secretary Ross, stating, "He appreciated the update and your help."[41]

---

[35] Draft Letter from Department of Justice to John H. Thompson, Director, Census Bureau (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/HOGR-Census-02122019-001371.pdf).

[36] Email from Mark Neuman to Thomas Hofeller (Aug. 30, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.08.30%20Email%20from%20Mark%20 Neuman%20to%20Thomas%20Hofeller%20%281%29.pdf).

[37] *Id.*

[38] Email from Thomas Hofeller to Mark Neuman (Aug. 30, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.08.30%20Email%20from%20Thomas%2 0Hofeller%20to%20Mark%20Neuman.pdf).

[39] Text Message from Mark Neuman to John Gore (Oct. 6, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Text%20from%20Mark%20Ne uman%20to%20John%20Gore.pdf).

[40] Email from General Counsel Peter Davidson, Department of Commerce, to Secretary Wilbur Ross, Department of Commerce (Oct. 8, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Email%20from%20Peter%20D avidson%20to%20Wilbur%20Ross%20about%20DOJ%20Letter%20status%20-%20AR%202482%20%281%29.pdf).

[41] Text Message from General Counsel Peter Davidson, Department of Commerce, to Mark Neuman (Oct. 8, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Text%20from%20Mark%20Ne uman%20to%20Peter%20Davidson.pdf).

Mr. Neuman's text messages with Mr. Gore and Mr. Davidson were not produced to the Committee by DOJ or the Department of Commerce.

In addition, on June 18, 2019, the Committee requested documents from Christa Jones, the Chief of Staff at the Census Bureau, after news reports indicated that she had direct communications with Mr. Hofeller as far back as 2015.[42]  According to an email obtained by a news organization, Ms. Jones emailed Mr. Hofeller from her personal email address in 2015 regarding the Census Bureau's effort to "evaluate and compare different census content … prior to making final decisions about the content in the 2020 Census."  She wrote to Mr. Hofeller: "This can also be an opportunity to mention citizenship as well."[43]

In response to the Committee's request for certain documents and communications from January 2014 through June 2019, Ms. Jones and the Department of Commerce produced to the Committee a limited set of redacted emails from Ms. Jones' official and personal accounts. These productions were incomplete.  Neither the Department nor Ms. Jones produced emails from earlier than 2018, even though Ms. Jones worked at the Census Bureau for many years and communicated with Mr. Hofeller in 2015 and earlier.

Ms. Jones appeared for a transcribed interview on July 31, 2019.  In that interview, she stated that she had known Mr. Hofeller for many years and that he had raised the topic of adding a citizenship question during a conversation in 2014.  Ms. Jones recalled that Mr. Hofeller expressed interest in using the citizenship question for "the Republican redistricting effort."  She recalled telling Mr. Hofeller that a citizenship question "would have a negative impact on the response rate to the census, and that the Census Bureau would be concerned about the impacts to the nonresponse follow-up and the differential undercount."[44]

Ms. Jones explained that in 2015, she contacted Mr. Hofeller about the "opportunity to mention citizenship" in response to a request for comments from the Census Bureau because she was aware of his interest in the issue as a leader in the "Republican redistricting community."[45]

Ms. Jones told Committee staff that she also knew Mr. Hofeller's partner, Dale Oldham, for many years, and that he had advocated for a citizenship question for purposes of redistricting and apportionment "[p]robably more times than I can remember."[46]

---

[42] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Christa Jones, Chief of Staff, Office of the Director, Census Bureau (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-18.EEC%20to%20Jones-Census%20Bureau%20re%20Census.pdf).

[43] Email from Christa Jones to Thomas Hofeller (Jan. 7, 2015) (online at https://apps.npr.org/documents/document.html?id=6154258-January-2015-Emails-From-Christa-Jones-To-Thomas#document/p2/a507303).

[44] Committee on Oversight and Reform, Transcribed Interview of Christa Jones (July 31, 2019).

[45] *Id.*

[46] *Id.*

Ms. Jones stated that she was not involved in efforts at the Department of Commerce to add a citizenship question to the 2020 Census and that when she learned of these efforts from news reports in December 2017, she felt "concern for the census and the Census Bureau" because the citizenship question was a "late design change" that could hurt response rates and lead to a differential undercount.[47]

## C.    Evaluating the President's Executive Order

On July 11, 2019, President Trump announced that the Administration would follow the Supreme Court's decision and refrain from adding the citizenship question to the 2020 Census. However, he also issued a new Executive Order requiring the Census Bureau to collect citizenship data through other means.

According to the Executive Order, the purpose of collecting this information is, in part, to allow "States to design State and local legislative districts based on the population of voter-eligible citizens."[48]  When announcing the Executive Order, the President explained that the citizenship information was "relevant to administering our elections."  He also noted, "Some states may want to draw state and local legislative districts based upon the voter-eligible population."[49]

The President's Executive Order and his announcement appear to contradict multiple, repeated statements from Secretary Ross and other Administration officials claiming that they never had any plans to seek citizenship information for the purpose of legislative apportionment.

For example, during the Committee's hearing on March 14, 2019, Chairman Cummings had the following exchange with Secretary Ross:

Chairman:           And it is your testimony today, sir, that your interest in the citizenship question had nothing to do with counting undocumented immigrants for apportionment purposes?

Secretary Ross:     No, sir, it did not.[50]

On September 6, 2019, the Census Bureau stated that an interagency working group had already been formed and that it would announce a plan for the release of additional

---

[47] *Id.*

[48] The White House, *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Census* (July 11, 2019) (online at www.whitehouse.gov/presidential-actions/executive-order-collecting-information-citizenship-status-connection-decennial-census/).

[49] The White House, *Remarks by President Trump on Citizenship and the Census* (July 11, 2019) (online at www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/).

[50] Committee on Oversight and Reform, *Hearing with Commerce Secretary Wilbur L. Ross, Jr.* (Mar. 14, 2019) (online at https://oversight.house.gov/legislation/hearings/commerce-secretary-wilbur-l-ross-jr).

administrative citizenship data on March 31, 2020—the day before Census Day.[51]

If the Administration is now attempting to do what it claimed repeatedly it had no intention of doing, these actions raise serious questions about the true purposes behind the Executive Order and the implementation of the 2020 Census itself.

### D.    **Impact of Obstruction on Potential Legislative Efforts**

The Committee may consider a wide range of legislative reforms based on information it is seeking as part of its investigation.  In order to protect the 2020 Census, such reforms must be considered, voted on, and implemented well in advance of Census Day on April 1, 2020.  The Committee's efforts, however, are being hampered by the Trump Administration's refusal to produce the documents under subpoena, thereby limiting the information Congress may consider as part of its work.

For example, depending on what the documents reveal concerning the process for soliciting and evaluating input with respect to the citizenship question, Congress could enhance current requirements for reporting new Census questions and topics to Congress; add requirements for testing new Census questions or prohibit certain types of questions; require disclosure when Census questions or other actions relating to the Census are proposed by third parties; require disclosures of the identities of outside individuals, entities, or government agencies and officials that the Commerce Department consults in connection with the Census; or make disclosure requirements judicially enforceable.[52]

Depending on what the documents reveal concerning the source and extent of political influences on the development of the citizenship question, Congress could prohibit the Commerce Department from taking steps based solely on outside entities' requests, prohibit the Census Bureau from collecting or releasing data from the Department of Homeland Security, increase penalties for unlawful use of Census data, or prohibit the collection or release of citizenship data for legislative apportionment purposes.[53]  If the evidence demonstrates severe malfeasance and deception, Congress could revisit the Census Act's broad delegation of authority to the Secretary of Commerce.

Depending on what the documents reveal regarding the Commerce Department's efforts to further the accuracy of the enumeration, Congress could consider legislation to ensure the Census Bureau hires the workers needed for an accurate count, including requiring certain language thresholds.  Congress also could mandate the hiring of additional personnel, require

---

[51] Census Bureau, *Census Bureau Citizenship Data Research and Product Development* (Sept. 6, 2019) (online at www.documentcloud.org/documents/6386176-Census-Bureau-Citizenship-Data-Research-and.html#document/p7/a523902).

[52] *See, e.g.,* H.R. 732 (prohibiting the Department of Commerce from making changes to the decennial census without adequate testing and notice to Congress); H.R. 1734 (prohibiting questions regarding "citizenship, nationality, or immigration status" on "any decennial census," excluding the American Community Survey).

[53] *See, e.g.,* H.Amdt. 401 to H.R. 3055 (providing that "no Census Bureau funds may be used in violation of the Bureau's confidentiality policies"); S. 2068 (prohibiting the Census Bureau from "including citizenship data in the legislative redistricting data prepared by the Bureau").

more interagency resource-sharing, or require consultation with career Census Bureau officials at various stages of proposed procedural changes.

Based on the extent of damage caused by the Administration's actions, Congress may determine that additional funding or legislative direction is necessary to carry out a robust and effective communications plan to encourage participation in the 2020 Census. Legislation could increase funding for communications, require that the Census Bureau launch a media campaign in languages other than English, or require the Bureau to use additional media platforms to reach hard-to-count populations.

To be effective, many of these steps must be implemented quickly. The Committee therefore seeks to review and assess evidence that will help the Committee understand what steps are necessary.

## III.     ADDITIONAL OBSTRUCTION BY THE TRUMP ADMINISTRATION

In addition to withholding key documents that have been subpoenaed by the Committee, the Trump Administration is also blocking the production of documents from the Transition Team and continuing to refuse to allow DOJ official John Gore to be deposed.

### A.     White House Blocking Transition Team Documents

On June 18, 2019, the Committee sent a request for documents to the Transition Team with a due date of July 2, 2019.[54] The letter followed admissions from several former Transition Team members that they discussed adding a citizenship question during the Trump campaign and transition.

For example, Mark Neuman testified in separate proceedings that he had discussions on this topic during the transition, including with Thomas Hofeller.[55]

In addition, former Kansas Secretary of State Kris Kobach, who advised both the campaign and the Transition Team on immigration policy, told Committee staff in an interview, "I certainly discussed the issue with people during the campaign." He also said it was "possible" he had such discussions during the transition.[56]

Gene Hamilton, another former member of the Transition Team and now a senior immigration advisor in the Trump Administration, told Committee staff that Mr. Kobach contacted him in "early November of 2016" to discuss proposals regarding the citizenship

---

[54] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Ken Nahigian, Trustee and Executive Director, Trump for America, Inc. (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-18.EEC%20to%20Nahigian-Transition%20Team%20re%20Census.pdf).

[55] Deposition of A. Mark Neuman, Civ. No. 8:18-cv-01041-GJH (D. Md. Oct. 28, 2018).

[56] Committee on Oversight and Reform, Transcribed Interview of Kris Kobach (June 3, 2019).

question.[57]

The Committee's June 18, 2019, letter sought all Transition Team documents and communications relating to the citizenship question, including those involving Mr. Hofeller, Mr. Kobach, Mr. Hamilton, Mr. Neuman, and others.

The Transition Team identified responsive documents prior to the July 2, 2019, deadline. These documents were due more than four months ago, but the Transition Team has not produced a single one to the Committee.  When Committee staff followed up, the Transition Team stated that the documents had been sent to the White House Counsel's Office for review for "potential Executive Branch equities or confidentiality interests."[58]

The White House has had these documents since July, but has refused to clear any of them for production—even though the Committee's request is for documents from the period **before** President Trump took office.  Neither the Transition Team nor the White House has cited any valid legal authority to withhold transition documents from the Committee.  To the contrary, a federal court that recently examined the applicability of executive privilege over Trump Transition Team materials confirmed that "no court has ever recognized that this privilege applies before a president takes office."[59]

### B.      DOJ Blocking Deposition with John Gore

After the Supreme Court issued its ruling in *Department of Commerce v. New York*, the Committee continued to seek a deposition with John Gore pursuant to the Committee's April 2, 2019, subpoena, but Mr. Gore has continued to refuse to appear at the instruction of Attorney General Barr.

Chairman Cummings first wrote to DOJ to request a voluntary transcribed interview of Mr. Gore on February 14, 2019.[60]  During the interview on March 7, 2019, DOJ counsel directed Mr. Gore not to answer more than 150 questions about the addition of the citizenship question. Department counsel cited "ongoing litigation" and "other executive branch confidentiality interests."[61]

---

[57] Committee on Oversight and Reform, Transcribed Interview of Gene Hamilton (May 30, 2019).

[58] Email from Thomas Basile, Counsel for Statecraft PLLC, to Committee Staff, Committee on Oversight and Reform (Aug. 14, 2019).

[59] *Fish v. Kobach*, No. 16-2105-JAR-JPO, 2017 U.S. Dist. LEXIS 72051 (D. Kan. May 10, 2017).

[60] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore, Principal Deputy Assistant Attorney General, Department of Justice (Feb. 14, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-02-14.EEC%20to%20Gore-DOJ%20re%20Transcribed%20Interview%20Request_1.pdf).

[61] Committee on Oversight and Reform, Transcribed Interview of John Gore (Mar. 7, 2019).

Over the next month, the Committee sought to have Mr. Gore return voluntarily to answer the questions he refused to answer during his interview with the Committee.[62]  However, DOJ declined to make Mr. Gore available.[63]

On April 2, 2019, the Committee voted on a bipartisan basis to authorize a subpoena compelling Mr. Gore to testify.[64]  However, prior to the deposition, DOJ wrote to the Committee that Attorney General Barr personally directed Mr. Gore not to comply with the subpoena and not to appear for the deposition, citing opposition to the Committee's longstanding rule prohibiting agency counsel from attending depositions.[65]

In response, on April 10, 2019, the Committee wrote to Attorney General Barr that he appeared to be "instructing Mr. Gore to defy a duly authorized congressional subpoena approved by the Committee on a bipartisan basis," as well as the Committee's rules.  However, the Committee offered to accommodate DOJ's interests in protecting any valid privilege by making a separate room available at the Committee's offices for DOJ counsel during the deposition and permitting Mr. Gore or his counsel to request a break to consult with DOJ counsel.[66]  The Committee also agreed to postpone the deposition at the request of Mr. Gore's personal counsel.

On April 24, 2019, DOJ wrote a letter reiterating the Attorney General's instruction to Mr. Gore to defy the Committee's subpoena.[67]  On April 25, 2019, Mr. Gore failed to appear for his deposition.

---

[62] Email from Staff, Committee on Oversight and Reform, to Staff, Department of Justice (Mar. 7, 2019).

[63] Email from Staff, Department of Justice, to Staff, Committee on Oversight and Reform (Mar. 22, 2019).

[64] *Committee Approves Subpoenas in Security Clearance and Census Investigations*, Committee on Oversight and Reform (Apr. 2, 2019) (online at https://oversight.house.gov/news/press-releases/committee-approves-subpoenas-in-security-clearance-and-census-investigations).

[65] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf); *see also* Rule 15(e) of the Committee on Oversight and Reform, 116th Cong. ("Witnesses may be accompanied at a deposition by counsel to advise them of their rights. No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's counsel. Observers or counsel for other persons, or for agencies under investigation, may not attend.").

[66] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Attorney General William P. Barr, Department of Justice (Apr. 10, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-04-10%20EEC%20to%20Barr-DOJ%20re%20Gore%20Deposition.pdf).

[67] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 24, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-24%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573_0.pdf).

On June 6, 2019, DOJ once again refused to allow Mr. Gore to sit for a deposition consistent with Committee rules.[68]

After the Supreme Court decision, on September 20, 2019, the Committee sent another letter to Mr. Gore seeking compliance with the bipartisan subpoena issued on April 2, 2019, for a deposition.  The letter noted the Supreme Court's ruling and explained that the Committee's investigation is "urgent in light of the ongoing preparations for the 2020 Census."[69]

On September 27, 2019, Mr. Gore's attorney responded that Mr. Gore "remains unable to be deposed."  The letter explained that the "Justice Department has confirmed to Mr. Gore that Attorney General Barr maintains his prior instruction" prohibiting Mr. Gore from complying with the Committee's subpoena due to the Attorney General's disagreement with longstanding Committee rules prohibiting agency counsel at depositions.[70]

***

As Chairman Cummings recognized, ensuring an accurate, nonpartisan enumeration is among Congress' most fundamental responsibilities under the Constitution.  Despite ongoing obstruction by Attorney General Barr, Secretary Ross, and other Administration officials, the Committee's urgent investigation into the manipulation of the 2020 Census continues.  Committee Members will continue to receive updates on the progress of this investigation to inform Congress' legislative work.

---

[68] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 6, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-06%20Letter%20from%20DOJ%20to%20COR%2006-06-19%20%281%29.pdf ).

[69] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore (Sept. 20, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-09-20.EEC%20to%20Gore-DOJ%20re%20Deposition%20Compliance.pdf).

[70] Letter from John D. Adams to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Sept. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/9-27-2019%20Ltr.pdf).

EXHIBIT F

1                UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF NEW YORK

2

- - - - - - - - - - - - - -x

3      NEW YORK IMMIGRATION          :

       COALITION, et al.,            :

4                                    :

          Plaintiffs,                :

5                                    :   Case No.

          v.                         :

6                                    :   1:18-CF-05025-JMF

       UNITED STATES DEPARTMENT      :

7      OF COMMERCE, et al.,          :

                                     :

8          Defendants.               :

- - - - - - - - - - - - - -x

9                              Friday, October 26, 2018

                                    Washington, D.C.

10

11

12   Videotaped Deposition of:

13                       JOHN GORE,

14   called for oral examination by counsel for the

15   Plaintiffs, pursuant to notice, at the law offices of

16   Covington & Burling, LLP, One City Center, 850 Tenth

17   Street, Northwest, Washington, D.C. 20001-4956,

18   before Christina S. Hotsko, RPR, CRR, of Veritext

19   Legal Solutions, a Notary Public in and for the

20   District of Columbia, beginning at 9:05 a.m., when

21   were present on behalf of the respective parties:

22

Page 45

1   the Department of Justice itself is a party in

2   this case, correct?

3         A.   That's my understanding.  I believe the

4   case was brought against the Department of

5   Commerce, but I've not studied the pleadings

6   closely enough to know whether or not the

7   Department of Justice is a party, but I believe

8   it's not.

9         Q.   And you wouldn't describe yourself as a

10  consultant giving legal advice to counsel of

11  record in this case, would you?

12        A.   No.

13        Q.   Mr. Gore, you sometimes use personal

14  e-mail, text messages or private messaging apps to

15  communicate about DOJ work, correct?

16        A.   I believe I may have done that.  Yeah.

17        Q.   Which of those things have you used for

18  DOJ work before?

19        A.   Well, actually, I don't think I have used

20  it for DOJ work, now that I think about it.

21        Q.   You've sometimes sent e-mails between

22  your personal gmail account and your DOJ account,