UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
                                                            :
STATE OF NEW YORK, et al.,                                  :
                                                            :
                              Plaintiffs,                   :
                                                            :          18-CV-2921 (JMF)
                -v-                                         :
                                                            :          OPINION AND ORDER
UNITED STATES DEPARTMENT OF COMMERCE, et al.,  :
                                                            :
                              Defendants.                   :
                                                            :
------------------------------------------------------------------------ X

JESSE M. FURMAN, United States District Judge:

        In these consolidated cases, two groups of Plaintiffs — the first, a coalition of states and

other government entities (the "Governmental Plaintiffs"); and the second, a coalition of non-

governmental organizations (the "NGO Plaintiffs") — challenged Secretary of Commerce

Wilbur L. Ross, Jr.'s decision to add a question about citizenship status to the 2020 decennial

census questionnaire.  After more than a year of hard-fought litigation, which included an eight-

day bench trial, Plaintiffs ultimately prevailed: This Court granted an injunction barring the

question's inclusion, *see New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y.

2019), and the Supreme Court affirmed on the ground that Secretary Ross's stated rationale —

that adding the citizenship question was necessary to help enforce the Voting Rights Act of 1965

— was "pretextual" and "contrived," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573,

2575 (2019).  Defendants then consented to entry of a permanent injunction barring any

inclusion of a citizenship question on the 2020 census questionnaire.

        Normally, that would be the end of the matter.  But while the case was pending before the

Supreme Court, Plaintiffs obtained new evidence that, they claim, suggests Secretary Ross's true

motive in adding a citizenship question to the census questionnaire was to facilitate redistricting strategies to benefit Republicans and non-Hispanic whites.  Shortly after the Supreme Court affirmed this Court's judgment, the NGO Plaintiffs filed a motion for sanctions and other relief based on that newly discovered evidence.  Before the Court could issue a ruling on that motion, even more evidence emerged.  First, Plaintiffs obtained documents that were produced to Congress in connection with its investigation of the citizenship question.  Second, in November 2019, Defendants revealed that, in the course of responding to congressional inquiries, they had discovered "a number of documents . . . that were inadvertently not produced in discovery in this matter."  ECF No. 669-1, at 1.  A more thorough investigation eventually revealed that the "number" of documents erroneously withheld from production exceeded 2,000.  *See* ECF No. 676, at 2.  Defendants have since remedied these failings, and the NGO Plaintiffs' motion for sanctions, updated to reflect all of these developments, is finally ripe for the Court's resolution.

For the reasons stated below, the Court concludes that the NGO Plaintiffs' motion should be granted in part and denied in part.  First, the Court concludes that sanctions and further inquiry are not warranted with respect to the NGO Plaintiffs' most serious allegations — that Defendants concealed evidence and that two witnesses provided false testimony.  To be clear, that conclusion is not based on a finding that Plaintiffs' troubling allegations are wrong; the Court intimates no view on that question.  Instead, the conclusion is based primarily on the fact that, even if Plaintiffs' allegations are accurate, that would not have changed the outcome of this litigation.  As Defendants themselves acknowledge, Plaintiffs prevailed at trial and in the Supreme Court on precisely the theory that the NGO Plaintiffs seek to reinforce here: that Secretary Ross's stated reasons for adding the citizenship question were contrived and pretextual.  By contrast, the Court concludes that sanctions *are* justified with respect to

Defendants' admitted failure to review and produce hundreds of documents that should have been disclosed prior to trial — a failure that may well have been inadvertent, but is nevertheless unacceptable for any litigant, and particularly for the Department of Justice ("DOJ"). Specifically, the Court orders Defendants to reimburse the NGO Plaintiffs for the costs and fees that they incurred as a result of Defendants' violations of their obligations.

## BACKGROUND

The Court presumes familiarity with the background and procedural history of these cases, which are set forth — at some length — in the Court's prior Opinions.  In short, Plaintiffs sought review of Secretary Ross's decision principally under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*  At an early stage of the case, the Court found that the Administrative Record submitted by Defendants was incomplete.  *See New York*, 351 F. Supp. 3d at 529.  Thereafter, the Court ordered Defendants to complete the Administrative Record and authorized "extra-record" discovery on the ground that Plaintiffs had made a "strong preliminary showing . . . that they [would] find material beyond the Administrative Record indicative of bad faith or pretext."  *Id.* (internal quotation marks omitted).  The Court then held an eight-day bench trial on Plaintiffs' claims.  On January 15, 2019, the Court issued findings of fact and conclusions of law, holding that the Secretary's decision was arbitrary and capricious, contrary to law, and pretextual — a "veritable smorgasbord of classic, clear-cut APA violations."  *Id.* at 516; *see id.* at 635-64.  For all these reasons, the Court vacated Secretary Ross's decision, enjoined its implementation, and remanded the matter to the Secretary.  *Id.* at 671-80.  Because questions about the proper scope of the record had been the subject of significant controversy throughout the litigation — generating an unprecedented, largely unsuccessful effort by Defendants to halt the proceedings and obtain extraordinary relief from higher courts — the

Court carefully bifurcated its findings and reasoning to make clear which conclusions were supported solely by what the parties agreed was the Administrative Record and which conclusions were further supported by extra-record evidence.  *See id.* at 530.  Defendants — Secretary Ross, the United States Department of Commerce, the Director of the Census, and the Bureau of the Census — filed a notice of appeal and a petition for certiorari before judgment in the Supreme Court.  The Supreme Court granted their petition and, as noted, affirmed on the ground that Secretary Ross's stated rationale was pretextual on the basis of the entire record — including the evidence beyond the Administrative Record adduced at trial.  *See Dep't of Commerce*, 139 S. Ct. at 2573.

In the days after the Supreme Court's decision, Defendants vacillated over whether to persist in their efforts to include a citizenship question on the 2020 census questionnaire — presumably on the basis of a new (or at least newly disclosed) rationale.  *See* ECF Nos. 613, 627. The uncertainty came to an end on July 11, 2019, when the President announced in a Rose Garden address that, in lieu of a question on the census questionnaire, he was directing the Department of Commerce to use administrative records (such as databases maintained by the Department of Homeland Security and the Social Security Administration) to collect citizenship data on those living in the United States.  *See* https://www.whitehouse.gov/briefings-statements/ remarks-president-trump-citizenship-census/ ("POTUS Tr."); *see also* ECF No. 627-1 ("EO 13880").  Notably, that decision seemed to recognize what Plaintiffs had been arguing all along, over Defendants' strenuous objections: that collecting citizenship data in that manner would be "far more accurate" than adding a citizenship question to the census questionnaire and would yield "an even more complete count of citizens than through asking the single question alone." POTUS Tr. 3; *cf.* ECF No. 545-1 ("Pls.' Proposed Conclusions of Law"), ¶ 229 (arguing that

"the use of administrative records alone" to collect citizenship data "is better by every metric that the Secretary purports to value"); *New York*, 351 F. Supp. 3d at 533-39 (discussing evidence in the Administrative Record indicating that using administrative records would yield the most accurate citizenship data).  Days later, Defendants consented to entry of a permanent injunction barring them from adding a citizenship question to the 2020 census questionnaire.  *See* ECF No. 634.  Thereafter, the NGO Plaintiffs and Defendants reached a settlement with respect to the NGO Plaintiffs' attorney's fees and costs.  *See* ECF No. 647.  Thus, as Defendants rightly concede, Plaintiffs "prevailed" and "obtained all the relief they sought when they brought this case."  ECF No. 648 ("Defs.' Opp'n"), at 1.

In the meantime, while the case was pending before the Supreme Court, the NGO Plaintiffs acquired new evidence that, in their view, shed more light on the genesis of Secretary Ross's decision and cast doubt on certain representations made, and testimony given, in this case.  Most significantly, they obtained documents through an unrelated lawsuit suggesting that a redistricting specialist named Dr. Thomas Hofeller may have provided a paragraph to Mark Neuman, an outside advisor to Secretary Ross, for use in a draft letter that Neuman then provided to John Gore, then the Assistant Attorney General for Civil Rights.  Gore, in turn, drafted the letter (known as the "Gary Letter" after its signatory) that DOJ sent to the Department of Commerce purporting to request the addition of a citizenship question on the decennial census questionnaire.  ECF No. 635 ("NGO Pls.' Mem."), at 4-5; *see New York*, 351 F. Supp. 3d at 530-32.  The paragraph in question, like the final version of the Gary Letter that DOJ sent to the Department of Commerce, argued that adding a citizenship question to the decennial census questionnaire would help DOJ enforce the Voting Rights Act.  Other evidence obtained by the NGO Plaintiffs, however, suggested that Dr. Hofeller's true motive in promoting a census

citizenship question was to facilitate redistricting strategies that would, in his words, be "advantageous to Republicans and non-Hispanic Whites." NGO Pls.' Mem. 4. The NGO Plaintiffs argued that this and other evidence revealed that two of Defendants' witnesses, Neuman and Gore, "provided false testimony" in their depositions and concealed evidence in discovery. *Id*. at 7-11.

After the NGO Plaintiffs brought their concerns to the Court's attention via letter motion, *see* ECF No. 595, the Court held a conference on June 5, 2019 and set a schedule for more formal motion practice, *see* ECF No. 605. Consistent with that schedule, the NGO Plaintiffs filed a motion in July 2019 — after the Supreme Court had resolved the merits of this case in their favor — seeking sanctions and other relief against Defendants, including additional discovery. Before the Court addressed that motion, however, the plot thickened twice, causing the Court to defer judgment: First, on November 14, 2019, the NGO Plaintiffs sought and obtained leave to file a sur-reply in support of their sanctions motion, in order to bring to the Court's attention several documents included in a report issued by the U.S. House of Representatives' Committee on Oversight and Reform. ECF Nos. 663, 664; ECF No. 665 ("NGO Pls.' Sur-Reply"). In their sur-reply, the NGO Plaintiffs argued that the newly discovered documents reinforced their contentions that Neuman had concealed his relationship with Dr. Hofeller and that Defendants had improperly withheld documents that should have been disclosed in discovery. NGO Pls.' Sur-Reply 2-6. In response, Defendants acknowledged that their "discovery searches in this case may not have been perfect," ECF No. 667 ("Defs.' Sur-Sur-Reply"), at 7, but argued that the NGO Plaintiffs were "leap[ing] to unsubstantiated conclusions to promote a false narrative of litigation misconduct" by Defendants, *id.* at 2.

Second, several days after filing that response, Defendants notified Plaintiffs and the

Court that they had discovered a batch of documents that, in fact, should have been but were not

produced to Plaintiffs in the course of discovery.  *See* ECF No. 669.  Defendants represented that

these documents "were collected in the course of responding to discovery in this litigation, [and

were] loaded into [a] document review platform for that purpose."  ECF No. 669-1, at 1.

Nevertheless, Defendants claimed that they had "inadvertently" failed to produce them to

Plaintiffs.  *Id.*  Defendants further represented that they were "still investigating the cause of the

error" and "whether any other documents were similarly inadvertently omitted from production."

*Id.* at 2.  In the exchange of letters that followed, the NGO Plaintiffs asked that the Court order a

"full . . . accounting of Defendants' search protocols," including "production of all litigation hold

notices and document collection certifications."  ECF No. 673, at 3-4.  Defendants maintained

that such relief was not warranted, and represented that although they had "attempted to ascertain

why, having been collected," the omitted documents "were not thereupon produced," Defendants

were "[r]egrettably[] . . . unable to discover the cause."  ECF No. 674 ("Defs.' Dec. 12, 2019

Letter"), at 4.  The Court stopped short of granting Plaintiffs' full request, but ordered

Defendants to provide a more complete update regarding their investigation into whether other

documents might have been omitted from their earlier productions, *see* ECF No. 675, and on

December 19, 2019, Defendants filed a letter advising that their investigation had revealed "480

potentially responsive emails . . . , which including attachments total[ed] 2,062 documents" that

had not been produced to Plaintiffs in discovery.  ECF No. 676, at 2.  After another exchange of

letters, the Court ordered Defendants to review and produce any non-privileged materials from

among these documents by February 21, 2020 — noting that if that deadline imposed a burden

on Defendants, they had "no one but themselves to blame since the documents at issue should have been produced a year and a half" earlier.  ECF No. 682, at 4.

Defendants have now completed their review and produced the non-privileged materials that were improperly withheld, ultimately totaling at least 900 previously unproduced documents.  *See* ECF No. 693 ("Defs.' Suppl. Reply"), at 2 n.1.  Since then, the parties — including the Government Plaintiffs — have filed letters detailing their respective positions on what, if any, effect the newly produced materials should have on the NGO Plaintiffs' underlying motion for sanctions.  *See* ECF No. 690 ("NGO Pls.' Suppl. Letter"); ECF No. 691; ECF No. 692 ("Defs.' Suppl. Letter"); Defs.' Suppl. Reply.  The motion is, thus, finally ripe for decision.

## DISCUSSION

The NGO Plaintiffs contend that sanctions are, or may be, warranted pursuant to two Federal Rules of Civil Procedure — Rule 26(g)(3) and Rule 37(b)(2) — and the Court's "inherent authority."  NGO Pls.' Mem. 19-21.  Significantly, however, although they frame their motion as a motion for sanctions, it is really a motion for discovery first, and sanctions only second.  That is, the NGO Plaintiffs first seek additional discovery in aid of their sanctions motion, after which they would "more specifically identify the sanctions sought" from among "three categories of likely appropriate sanctions," including additional findings of fact, waivers of Defendants' deliberative-process privilege against disclosure of certain materials, and monetary sanctions (including attorney's fees and costs).  *Id*. at 32-33.  Arguably implicit in this ordering is a concession that, on its own, the newly discovered evidence does not support the

imposition of sanctions on any particular individual or party.  Be that as it may, the Court will address each of the NGO Plaintiffs' arguments in turn.

## A.  Rule 26(g)(3)

Rule 26(g)(1) of the Federal Rules of Civil Procedure provides that "[e]very" discovery "disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record" and that, by signing, the attorney "certifies," among other things, that the disclosure "is complete and correct as of the time it is made."  Rule 26(g)(3) provides, in turn, that, "[i]f a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."  Significantly, although the Rule is phrased in mandatory terms, and states that a court "must" impose sanctions for any violation "without substantial justification," courts have interpreted the Rule to include a prejudice requirement.  *See, e.g.*, *Wisser v. Vox Media, Inc.*, No. 19-CV-1445 (LGS), 2020 WL 1547381, at *3 (S.D.N.Y. Apr. 1, 2020); *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, No. 99-CV-0275 (RWS), 2004 WL 1811427, at *23 (S.D.N.Y. Aug. 12, 2004); *Clark v. Westchester Cty.*, No. 96-CV-8381 (DLC), 1998 WL 709834, at *9 (S.D.N.Y. Oct. 9, 1998) (collecting cases).  Put another way, "sanctions under Rule 26(g) are not appropriate when a party has not been harmed" by the violation.  *Kara Holding Corp.*, 2004 WL 1811427, at *23.

For that reason, the Court concludes that sanctions under Rule 26(g) are unwarranted and, by extension, that there is no basis under the Rule to authorize discovery.  *See id.*  For one thing, the NGO Plaintiffs are clear that their primary allegations of wrongdoing are directed at "senior Commerce and DOJ officials — not the career DOJ line attorneys who litigated this case on behalf of Defendants."  NGO Pls.' Mem. 3.  But Rule 26(g)(3) does not provide a basis to

impose sanctions for those officials' conduct; the Rule authorizes sanctions for "certifications" that violate Rule 26(g)(1), and it is the line attorneys who provided the relevant certifications here.  *See, e.g.*, *Omega SA v. 375 Canal, LLC*, 324 F.R.D. 47, 56 (S.D.N.Y. 2018) (holding that Rule 26(g)(3) applies to discovery responses and objections, not to "false declarations" more generally).  But more fundamentally, to the extent Defendants committed any misconduct that would fall within the scope of the Rule, it plainly did not cause the NGO Plaintiffs any substantive harm.  As noted, the NGO Plaintiffs prevailed on the merits and obtained all of the relief that they sought in their pleadings, and they negotiated a settlement with Defendants for the fees and costs that they incurred during the primary stage of this litigation.  In these circumstances, and regardless of whatever facts further discovery might uncover, the Court concludes that Rule 26(g)((3) sanctions are inappropriate.

**B.  Inherent Authority**

Whether to impose sanctions pursuant to the Court's inherent powers is a closer call.  The NGO Plaintiffs' seek such sanctions for what they describe as a "fraud on the court," and identify six instances of alleged "false or misleading testimony, statements, and conduct by Defendants and those acting on their behalf," NGO Pls.' Mem. 21 — most notably, Neuman and Gore — as a basis for sanctions under the Court's inherent powers, *id*. at 19-22.  It is well established that, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002).  But "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).  In the first place, "a finding of bad faith" is a prerequisite "for the imposition of sanctions" pursuant to a court's inherent

powers. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998). Because of

that "bad faith" requirement, a court exercising its inherent powers will often have to overlook

statements that are merely false, even suspiciously so. Instead, a court will impose sanctions

pursuant to its inherent powers only where a person "has made a false statement to the court *and*

has done so in bad faith." *SEC v. Smith*, 710 F.3d 87, 97 (2d Cir. 2013) (emphasis added).

Notably, the Court's inherent sanctioning authority is even more limited with respect to

the alleged misconduct of a non-party witness. In particular, mere "[u]ntruthful testimony,"

"perjury," and "nondisclosure" by a non-party witness is insufficient to warrant sanctions under

the Court's inherent powers unless it is part of a larger scheme amounting to a fraud on the

Court. *Rybner v. Cannon Design, Inc.*, No. 95-CV-0279 (SS), 1996 WL 470668, at *3

(S.D.N.Y. Aug. 20, 1996) (Sotomayor, J.) (internal quotation marks omitted). "In short, neither

perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a

single litigant." *Gleason v. Jandrucko*, 860 F.2d 556, 560 (2d Cir. 1988). Thus, "[u]ntruthful

testimony by a witness, which has not been suborned by his lawyer, does not, standing alone,

constitute fraud upon the court," particularly where "the testimony is given during a pretrial

deposition." *In re Grievance Comm. of U.S. Dist. Court, Dist. of Conn.*, 847 F.2d 57, 64 (2d Cir.

1988) (Van Graafeiland, J., concurring). "Only when a fraud seriously affects the integrity of the

normal process of adjudication, does the conduct amount to a fraud upon the court," as "where it

can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some

unconscionable scheme calculated to interfere with the judicial system's ability impartially to

adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of

the opposing party's claim or defense." *Rybner*, 1996 WL 470668, at *3 (citations and internal

quotation marks omitted).

In light of these standards, the Court concludes that Neuman's testimony, however troubling, could merit sanctions pursuant to the Court's inherent powers only if it were part of a broader scheme orchestrated by Defendants or their attorneys to intentionally mislead the Court. But the record as it stands does not contain "clear and convincing" evidence of such a scheme. *Rybner*, 1996 WL 470668, at *4.  Gore's situation is more complicated because he was both a witness and (until August 2019) a high-level attorney at DOJ, which represented Defendants in this litigation.  Thus, although Gore did not appear on behalf of Defendants, he occupied a gray area — he was a participant in the decision-making process, a witness to the underlying events, and an official at the government agency tasked with representing Defendants in court.  In theory, therefore, evidence that Gore knowingly misled the Court could support a finding that Defendants and their counsel engaged in a scheme to defraud the Court.  But the evidence as it stands does not support such a conclusion.  According to the NGO Plaintiffs, Gore "provided false testimony about drafting the DOJ letter to Commerce" — that is, the Gary Letter on which Secretary Ross allegedly relied.  NGO Pls.' Mem. 9.  In his deposition, Gore testified that he "drafted the initial draft of the letter to request the citizenship question."  *New York*, 351 F. Supp. 3d at 555; *see* ECF No. 635-1, Ex. 7, at 127.  The NGO Plaintiffs now say that this was false; instead, before Gore drafted his letter, *Neuman* "gave Gore a draft letter that would request reinstatement of the citizenship question on the census questionnaire."  NGO Pls.' Mem. 10 (internal quotation marks omitted).  Thus, according to the NGO Plaintiffs, it was Neuman, not Gore, who wrote the "initial" draft of what became the Gary Letter.

At the heart of this dispute is a semantic, if not philosophical, question.  Neuman drafted a letter requesting the inclusion of a citizenship question on the decennial census and then gave that draft to Gore.  Gore, in turn, drafted a letter making the same request, a letter that was then

edited by others.  The final version — the Gary Letter — was then transmitted to the Department

of Commerce.  On these facts, who authored the "initial" draft of the Gary Letter?  To be sure,

Neuman's letter preceded Gore's in time.  But how similar would Neuman's effort have to have

been to Gore's, or to the final document, for Neuman's draft to be considered the "initial"

version of the Gary letter?  For present purposes, it suffices to say that there is no evidence in the

record that Gore relied on Neuman's draft at all in preparing his own draft of what became the

Gary Letter.  Nor are the Neuman drafts and any of Gore's early drafts of the Gary Letter in the

record so similar as to compel an inference that he did.[1]  Notably, the similarity upon which the

NGO Plaintiffs' hang their hat — and, admittedly, it is a striking one — is between *Neuman*'s

draft and a paragraph discovered on Dr. Hofeller's computer.  *Compare* ECF No. 635-1, at 133-

34, *with id.* at 136.  That similarity suggests a degree of coordination between Neuman and Dr.

Hofeller that might undermine any claim that *Neuman* was the initial "author" of his own draft.

But it does not suggest that *Gore* intentionally misled the Court when he testified that it was he

who authored the "initial draft" of what became the Gary Letter.  And it certainly does not

amount to "clear and convincing" evidence of bad faith.  Accordingly, the Court declines to

exercise its inherent authority to sanction Gore.

　　　The remaining instances of allegedly misleading statements or conduct concern the

behavior of Defendants and their counsel throughout the discovery process.  NGO Pls.' Mem.

21-22.  The NGO Plaintiffs acknowledge, however, that "discovery and further inquiry [would]

be necessary to ascertain the extent of individuals' knowledge" of each alleged falsehood.  *Id.* at

21.  But the broad scope of discovery in this litigation was already unusual for an APA action,

---

[1]　　Before trial, the Court reviewed *in camera* four early drafts of the Gary Letter (bearing
Bates Numbers 2722, 2736, 2739, and 2786), which remain under seal.  *See* ECF No. 369, at 5-6.

*see New York v. U.S. Dep't of Commerce*, 345 F. Supp. 3d 444, 451-53 (S.D.N.Y. 2018), and discovery must ultimately be "proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1). Here, assessment of whether additional discovery would be "proportional" must take stock of the unusual posture of this litigation and the appropriate role of a court in these circumstances.  Put simply, the needs of the case have changed.  Discovery serves the goals of litigation, not the other way around.  And a federal court is not an investigative body charged with government oversight.  The degree of discovery in this litigation was amply justified by the substance of Plaintiffs' claims and the Court's responsibility to resolve them.  *See New York v. U.S. Dep't of Commerce*, 339 F. Supp. 3d 144, 149-51 (S.D.N.Y. 2018).  But the same considerations are no longer present in this case, precisely because Plaintiffs prevailed on their claims and obtained all the substantive relief they sought.  Moreover, there are actual oversight bodies better suited to the task of investigating and evaluating the process that led to Secretary Ross's decision — most notably, Congress — as some of the events that gave rise to this motion illustrate.

The Court accordingly declines to order further discovery in aid of the NGO Plaintiffs' contention that sanctions are appropriate under the Court's inherent authority, even though that means stopping short of a full accounting of the conduct of Neuman, Gore, and others in the evidence-gathering stages of this litigation (and even though stopping short also denies these people the possibility of exoneration that might have come from further discovery).  Instead, the Court concludes that "restraint and discretion" counsel against the further expense of judicial resources in pursuit of these matters, at least in this case.  *Chambers*, 501 U.S. at 44.

## C.  Rule 37

That leaves the NGO Plaintiffs' requests for sanctions pursuant to Rule 37(b)(2), which provides in relevant part that "[i]f a party . . . fails to obey an order to provide or permit

discovery . . . , the court where the action is pending may issue further just orders."  Such orders,

the Rule continues, "may include the following":

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii) striking pleadings in whole or in part;

> (iv) staying further proceedings until the order is obeyed;

> (v) dismissing the action or proceeding in whole or in part;

> (vi) rendering a default judgment against the disobedient party; or

> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  A district court has "wide discretion in imposing sanctions under

Rule 37," and may consider a wide variety of factors in deciding whether and how to do so —

the Rule's bottom-line requirement, as its text indicates, is "only that the district court's orders

be just."  *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010)

(internal quotation marks omitted).  Moreover, a party's willfulness in disobeying a discovery

order is not a prerequisite to Rule 37 sanctions; instead, it is merely one of several factors to be

considered in selecting a sanction.  *See Cine Forty-Second St. Theatre Corp. v. Allied Artists*

*Pictures Corp.*, 602 F.2d 1062, 1067-68 (2d Cir. 1979).  Indeed, the Second Circuit has

recognized that "gross professional incompetence no less than deliberate tactical intransigence"

may cause discovery violations and is worthy of deterrence through sanctions.  *Id.* at 1067.

The NGO Plaintiffs' Rule 37 motion centers on what they describe as Defendants' failure

to provide a complete Administrative Record and their "delay" in producing documents in the

course of the initial round of litigation (that is, before the present motion was filed).  However meritorious these claims may be, the sanctions enumerated in Rule 37(b)(2)(A) would be largely pointless at this stage of litigation, where the party seeking sanctions has already won a final judgment and successfully defended it on appeal.  To the extent any of those sanctions could even be brought to bear, moreover, the Court concludes that they would be unwarranted in the unique circumstances of this case.  That is not the end of the matter, however, because Rule 37(b) also provides that, "*[i]nstead of or in addition to the orders above*, the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C) (emphases added).  An order pursuant to Rule 37(b)(2)(C) "to reimburse the opposing party for expenses caused by the failure to cooperate" is the "mildest" Rule 37 sanction available to a court faced with a party's failure to comply with a discovery order.  *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066.

Plaintiffs' efforts to obtain discovery in advance of trial — both in this Court and in opposing Defendants' various "emergency" interlocutory appeals to higher authorities — were certainly burdensome.  *See New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (JMF), 2018 WL 6060304, at *1 (S.D.N.Y. Nov. 20, 2018) (discussing Defendants' multiple attempts "to halt the orderly progress of this litigation" with meritless stay requests and interlocutory appeals).  But the NGO Plaintiffs were already compensated for those efforts — they settled their claims for fees and costs arising from the main phase of this case, *see* ECF No. 647 — and that moots most of the relief the Court might otherwise have granted pursuant to Rule 37(b)(2)(C).  But not all.  As it turned out, developments outside this litigation — in other litigation and in Congress

16

— revealed that Defendants may not have been entirely forthcoming in their productions in this case.  The NGO Plaintiffs accordingly had compelling reasons to file this motion, reasons that became only more compelling when Defendants confirmed that there were still more documents that should have been, but were not, produced in the course of discovery.  All told, it turned out that Defendants had failed to produce at least 900 documents excluding duplicates, totaling 3,700 pages — "roughly 11 percent . . . of the approximately 32,500 pages of documents that [Defendants] produced in the administrative record and discovery."  Defs.' Suppl. Reply 2 n.1.[2] Notably, Defendants do not attempt to argue that their failure to produce these documents was "substantially justified."  Fed. R. Civ. P. 37(b)(2)(C).  To the contrary, Defendants have explained that their non-production was due to a "technical error": Although the documents had been collected and loaded onto Defendants' document-review platform, a coding error in the "custodian" field led to searches that returned incomplete results for production.  ECF No. 676, at 2.  In other words, Defendants' failure to produce the documents was caused by a lapse that would make a first-year litigation associate wince.

Instead, Defendants oppose the NGO Plaintiffs' request for Rule 37 sanctions on a purely technical ground.  In their view, although Rule 37 permits sanctions for a party's "fail[ure] to obey an order to provide or permit discovery," there was "no such order with which Defendants failed to comply" here.  Defs.' Opp'n 3 (internal quotation marks omitted).  That is because, they continue, the order at issue was the Court's July 5, 2018 Order directing Defendants to complete

---

[2]     The parties dispute the scale of Defendants' non-production in proportion to the overall record, but that disagreement ultimately comes down to whether the missing documents amount to eleven percent or twenty percent of that record.  *Compare* NGO Pls.' Suppl. Letter 1-2, *with* Defs.' Suppl. Reply 2 n.1.  The Court is uninterested in whether Defendants managed eighty or eighty-nine percent compliance with their obligations; either way, the NGO Plaintiffs are obviously correct that "[t]hese major omissions are more than a few documents 'falling through the cracks.'"  NGO Pls.' Suppl. Letter 1-2 (quoting Defs.' Dec. 12, 2019 Letter 4).

the Administrative Record and, "[a]s the Court recognized earlier in this litigation, [p]roperly understood . . . an order directing completion of an administrative record is not the same thing as ordering 'discovery.'"  *Id.* at 4 (quoting *New York*, 351 F. Supp. 3d at 633).  To be sure, the lines dividing orders to "complete" an administrative record from orders to "supplement" an administrative record and orders for discovery "beyond" an administrative record can be blurry. *See New York*, 351 F. Supp. 3d at 631-35.  That is particularly true here because the parties eventually stipulated that a large number of materials produced in extra-record discovery were actually part of the Administrative Record.  *See id.* at 518 n.4, 630; ECF No. 523.  As a result, it is hard (if not impossible) to tell in retrospect, simply on the basis of terminology, whether any given order should be classified as an order to "complete" the Administrative Record or to provide discovery "beyond" it.  *Compare* ECF No. 676, at 2 (explaining that the production errors at issue occurred in the course of resolving Plaintiffs' fifth motion to compel), *with* ECF No. 293, at 2 (Plaintiffs' fifth motion to compel, seeking, among other relief, an order compelling Defendants "to undertake reasonable searches of all material custodians to complete the Administrative Record").  Presumably for the same reasons, Defendants' own terminology is not always consistent with their arguments.  *See* Defs.' Suppl. Letter 1 (explaining that "the newly produced documents include e-mails and attachments thereto that inadvertently were not produced during the *discovery* stage of this case" (emphasis added)).

In any event, the Court is unpersuaded by Defendants' contention that an order to complete an administrative record — although "not the same thing as ordering discovery *beyond* the record," *New York*, 351 F. Supp. 3d at 633 — is different from an "order to provide or permit discovery" within the meaning of Rule 37.  By its terms, Rule 37(b)(2)(A)'s list of orders whose violation may trigger sanctions is non-exclusive.  *See Daval Steel Prods., a Div. of Francosteel*

*Corp. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991); Fed. R. Civ. P. 37(b)(2)(A)

(authorizing a court to impose sanctions for a party's "fail[ure] to obey an order to provide or

permit discovery, *including* an order under Rule 26(f), 35, or 37(a)" (emphasis added)); Fed. R.

Civ. P. 37 advisory committee's note to 1970 amendments (explaining that Rule 37(b)(2) had

been "broadened by extending it to include any order 'to provide or permit discovery'").

Moreover, the fact that it is clarifying for some purposes to distinguish orders to complete an

administrative record from orders authorizing traditional "discovery" does not mean that the

Court's power to enter either type of order derives from different sources.  As the Court had

occasion to confront earlier in this case, the APA and the Federal Rules do not always speak with

a unified voice about the procedures governing APA challenges.  In this type of APA case, the

"form of proceeding for judicial review" pursuant to 5 U.S.C. § 702 is "any applicable form of

legal action . . . in a court of competent jurisdiction."  5 U.S.C. § 703.  And, with exceptions that

do not apply here, the Federal Rules of Civil Procedure "govern the procedure in all civil actions

and proceedings in the United States district courts."  Fed. R. Civ. P. 1.  Thus, while the Court's

obligation to review the "whole record" in an APA case is derived from the APA itself, 5 U.S.C.

§ 706, its power to order production or completion of that record is derived from the Federal

Rules of Civil Procedure.

At this level, then, the distinction between orders that carry the label "discovery" and

those that order completion of the administrative record disappears.  Sure enough, at least one

Court of Appeals has held that a prior court order to produce or complete an administrative

record can be the basis for Rule 37 sanctions — even, as in that case, where the obligation to

produce the record arises in the first instance from a governing statute.  *See Diaz-Fonseca v.

Puerto Rico*, 451 F.3d 13, 26 (1st Cir. 2006).  Indeed, absent a specialized statutory framework

for production of an administrative record, *see id.* (discussing such a framework in the context of the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2)(C)(i)), the administrative record is normally produced, as it was in this case, pursuant to a scheduling order issued by the reviewing court, *see* ECF No. 199; *see generally New York*, 351 F. Supp. 3d at 631-33.  Given that context, the Court sees little reason to depart from the usual rule even where an administrative record is at issue: "Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order."  *Daval Steel Prods.*, 951 F.2d at 1363.  Here, there was such an order — the Court's Order of July 5, 2018 directing Defendants to "produce the complete [Administrative] [R]ecord."  ECF No. 199.  And as Defendants themselves concede, the documents at issue here were improperly withheld in the course of resolving a dispute over whether Defendants had fully complied with that order in the first place.  *See* ECF No. 676, at 2; ECF No. 293, at 2.  It follows that sanctions are appropriate.

Accordingly, the Court will — and arguably "must," Fed. R. Civ. P. 37(b)(2)(C) — order Defendants to pay the reasonable costs and attorney's fees caused by their lapse.  The Court will therefore order Defendants to reimburse the NGO Plaintiffs for the expenses, including attorney's fees and costs, they reasonably incurred in addressing Defendants' production failures. *See, e.g.*, *Shanchun Yu v. Diguojiaoyu, Inc.*, No. 18-CV-7303 (JMF), 2019 WL 6174204, at *6 (S.D.N.Y. Nov. 20, 2019).  More specifically, the Court awards any costs and fees reasonably incurred by the NGO Plaintiffs since Defendants' letter to the Court of November 25, 2019, in which they revealed the fact of (but not the explanation for) the discovery lapses described above.  *See* ECF No. 669.  As discussed in more detail below, the Court will direct the parties to confer in an effort to reach agreement on the relevant figure.

## CONCLUSION

At the end of the day, the NGO Plaintiffs' allegations of misconduct merely reinforce their overall theory of this case: that Secretary Ross's decision to add a citizenship question to the 2020 decennial census questionnaire was not made for the reasons he gave.  With newly discovered evidence in hand, the NGO Plaintiffs now argue that Secretary Ross's decision was even more pretextual than they had been able to show in the first instance.  But even if these allegations are true, and even if Defendants' misconduct would otherwise have been sanctionable, this is a case in which, for the most part, "the proper remedy is exactly what happened at trial."  *Ideal Steel Supply Corp. v. Anza*, No. 02-CV-4788 (RMB), 2013 WL 6912681, at *4 (S.D.N.Y. Dec. 23, 2013) (citation and internal quotation marks omitted).  Plaintiffs tested the credibility of Defendants' explanations, including the testimony of Defendants' witnesses; persuaded the Court that Defendants' official story concealed their true reasons for acting; and — on that basis — ultimately prevailed.  *See, e.g.*, *New York*, 351 F. Supp. 3d at 565 (finding the testimony of one witness "materially misleading"); *id.* at 556 (noting Gore's admission that he did not believe adding the citizenship question was necessary to improve Voting Rights Act enforcement efforts, the stated rationale for doing so).  Indeed, evidence that apportionment effects might have been a reason for Secretary Ross's decision supported the Court's conclusion that improving Voting Rights Act enforcement was *not* his actual reason.  *See id.* at 568, ¶ 170.  Thus, not only did the NGO Plaintiffs ultimately "obtain[] all the relief they sought when they brought this case," but they did so in part for the same reasons they now seek further sanctions against Defendants.  In the final analysis, although the NGO Plaintiffs' allegations are troubling, so too were the facts that won them a victory at trial

and in the Supreme Court.  Plaintiffs' theory of the case could hardly need more judicial vindication than that.

To be sure, this was not DOJ's finest hour.  At best, DOJ failed to produce more than ten percent of the documents that Defendants were required to produce as part of this litigation.  But the Court cannot conclude from the record before it that further investigation into possible sanctionable conduct is warranted in the circumstances of this case.  Accordingly, and as an exercise of the Court's "wide discretion," *S. New England Tel. Co.*, 624 F.3d at 144 (internal quotation marks omitted), the Court will not impose sanctions on Defendants beyond the litigation defeat they have already suffered, or the fee award in which they have acquiesced — except to order that Defendants pay the costs and fees associated with a portion of this motion and its embedded disputes.  Nor will the Court invite further discovery in order to determine exactly who did what and when with respect to the decision to add a citizenship question to the decennial census.  NGO Pls.' Mem. 32-33.  Litigation, despite its truth-seeking function, sometimes produces an incomplete or unsatisfying version of the facts.  In this case, however, the facts that Plaintiffs were able to prove at trial won them complete relief in this Court and in the Supreme Court of the United States.  If there is more to the story, principles of judicial restraint counsel in favor of letting it be uncovered and told somewhere else.

For the reasons given and to the extent set forth above, the NGO Plaintiffs' motion for discovery and sanctions is GRANTED in part and DENIED in part.  In particular, pursuant to its authority under Rule 37(b)(2)(C), the Court orders Defendants to reimburse the NGO Plaintiffs for the fees and costs they incurred in addressing Defendants' admittedly incomplete productions.  Within **three weeks** of this Opinion and Order, Defendants and the NGO Plaintiffs shall meet and confer in an effort to resolve any disputes over the amount of attorney's fees

22

reasonably incurred by the NGO Plaintiffs' in the course of litigating their motion for sanctions and, if successful, shall promptly file a joint stipulation in accordance with the Court's Individual Rules and Practices.  Within **thirty days** of this Opinion and Order, the NGO Plaintiffs shall file a supplemental application for any fees remaining in dispute, in the form of a letter-motion not to exceed three pages, supported by contemporaneous time records or other appropriate documentation.  *See M.D. v. N.Y.C. Dep't of Educ.*, No. 17-CV-2417 (JMF), 2018 WL 4386086, at *6 (S.D.N.Y. Sept. 14, 2018).  Defendants shall file any opposition within **two weeks** of the NGO Plaintiffs' submission. No reply may be filed absent leave of Court.

The Clerk of Court is directed to terminate ECF No. 635.

SO ORDERED.

Dated: May 21, 2020
New York, New York

JESSE M. FURMAN
United States District Judge